John G. Michael    #106107
**BAKER MANOCK & JENSEN, PC**
5260 North Palm Avenue, Fourth Floor
Fresno, California 93704
Telephone:  559.432.5400
Facsimile:  559.432.5620

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BP WEST COAST PRODUCTS LLC, a Delaware Limited Liability Company; and ATLANTIC RICHFIELD COMPANY, a Delaware Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> STTN ENTERPRISES, INC., a California Corporation; NAZIM FAQUIRYAN, an individual; SAYED FAQUIRYAN, an individual; MAGHUL FAQUIRYAN, an individual; and AVA GLOBAL ENTERPRISES, LLC, a California limited liability company, <br><br> Defendants. | Case No.: 5:07-cv-04808 JF <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' IN *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION.** <br><br> ACTION FILED:  Sepember 18, 2007 <br> TRIAL DATE:  None <br> HEARING DATE:  To Be Determined <br> TIME: <br> DEPARTMENT: <br> JUDGE:  Hon. Jeremy Fogel |

///
///
///
///
///
///
///
///

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................. 2

II.    STATEMENT OF FACTS ................................................................................. 3

III.    PLAINTIFFS HAVE FAILED TO MEET THE STANDARD REQUIRED FOR INJUNCTIVE RELIEF AND THEIR APPLICATION SHOULD BE DENIED ............. 6

    A.    Plaintiffs Cannot Establish Likelihood of Success on the Merits .......................... 7

        a.    The Grounds as a Basis For Termination Were False ......................... 8

        b.    The Termination Failed to Comply With PMPA Notice Requirements .......................................................................... 9

      2.    Plaintiffs Breach of the Loan Agreements Prevented Defendants' Performance ...................................................................... 10

      3.    Defendants Have Not Infringed on Plaintiffs' Protected Marks ............... 12

    B.    Plaintiffs Cannot Establish Likelihood of Irreparable Injury ................................ 15

    C.    Balance of Hardships Do Not Tip Sharply in Favor of Plaintiffs ......................... 16

IV.    CONCLUSION .................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Archdale v. American Industrial Lines Ins. Co.</u>, 154 Cal. App. 4th 449, 463 (2007) .................. 11

<u>Chevron USA, Inc. v. Lutz</u>, 271 F.Supp.2d 1196, 1200 (N.D.Cal. 2003) ..................................... 8

<u>Dep't of Parks & Recreation for the State of Ca. v. Bazaar Del Mundo, Inc.</u>,
    448 F.3d 1118, 1124 (9th Cir. 2006) ......................................................................... 12

<u>Dr. Seuss Enters. V. Penguin Books USA, Inc.</u>, 109 F.3d 1394, 1397 n.1 (9th Cir. 1997)............ 6

<u>Fiipino Yellow Pages, Inc., v. Asian Journal Publications, Inc.</u>, 198 F.3d 1143, 1147 n. 3
    (9th Cir. 1999)...................................................................................................... 12

<u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) ................................................................ 7

<u>Mobil Oil Corp. v. Karbowski</u>, 879 F.2d 1052, 1055 (2d Cir. 1989) ......................................... 2

<u>Patel v. Liebermensch</u>, 154 Cal.App.4th 373, 384 (2007) .................................................... 11

<u>Rudolph Int'l, Inc., v. Realys, Inc.</u>, 482 F.3d 1195, 1197 (9th Cir. 2007)................................. 12

<u>Thompson v. Kerr-McGee Refining Corp.</u>, 660 F.2d 1380, 1391 (10th Cir. 1981)...................... 8

<u>Wisser</u>, 730 F.2d at 60 ............................................................................................... 10

<u>Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove, Inc.</u>, 419 F.3d 925, 928
    (9th Cir. 2007)...................................................................................................... 12

<u>Zipper</u>, 947 F.Supp. at 69............................................................................................ 10

**Statutes**

15 U.S.C. § 2801 ....................................................................................................... 2

15 U.S.C. § 2801(13). .................................................................................................. 8

15 U.S.C. § 2802(b)(2)(A). ............................................................................................ 8

15 U.S.C. § 2802(b)(2)(C) ............................................................................................. 8

15 U.S.C. § 2804........................................................................................................ 9, 10

1   Defendants submit this memorandum of points and authorities in opposition to Plaintiff's

2   *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re Issuance of

3   Preliminary Injunction.

4   **I.**

5   **INTRODUCTION**

6   Plaintiffs BP WEST COAST PRODUCTS LLC ("BP") and the ATLANTIC

7   RICHFIELD COMPANY ("ARCO") are refiners and distributors of branded motor fuel in the

8   State of California.  STTN ENTERPRISES, INC. ("STTN"), operates a motor fuel retail station

9   in Hollister, California.  NAZIM FAQUIRYAN and SAYED FAQUIRYAN are shareholders of

10  STTN and AVA GLOBAL ENTERPRISES, LLC ("AVA").  AVA owns the land on which

11  STTN's station operates.  In addition, NAZIM, SAYED, and MAGHUL FAQUIRYAN (Sayed's

12  wife) signed as guarantors on some of the agreements between STTN and Plaintiffs.

13  BP and STTN entered into two franchise agreements on July 11, 2006.  The purpose of

14  these agreements is for STTN to operate an ARCO-branded motor fuel station and AM/PM mini-

15  market at 631 San Felipe Road, in Hollister, California (the "Station").  STTN paid $70,000.00

16  as a franchise fee and agreed to make periodic royalty payments for the right to operate the

17  franchises.

18  After little more than one year, and after Defendants had spent over $1,000,000 to

19  remodel the Station to BP's specifications, on September 6, 2007, BP sent notice that it was

20  terminating the franchise agreements.  BP further stated that the termination was effective

21  immediately.  The termination of franchise agreements for the sale of branded motor fuels is

22  governed by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* ("PMPA").[1]  As a

23  result of rampant abuse by refiners and distributors like BP and ARCO, Congress enacted the

24  PMPA. The PMPA is designed to provide some degree of protection for franchisees against the

25  arbitrary and ruthless actions by refiners and distributors of branded motor fuel.  *See* Mobil Oil

26  Corp. v. Karbowski, 879 F.2d 1052, 1055 (2d Cir. 1989).  As such, Congress requires all refiners

27

28  [1] All statutory citations refer to Title 15 of the United States Code, unless otherwise noted.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   and distributors to satisfy certain substantive and procedural requirements before a franchise

2   agreement can be legally terminated under the PMPA. Plaintiffs' compliance with these

3   requirements is plainly lacking this case. The remaining causes of action alleged by Plaintiffs all

4   flow from this illegal termination.

**II.**

**STATEMENT OF FACTS**

7           Prior to July 2006, STTN, operated a Chevron-branded motor fuel station at 631 San

8   Felipe Road, in Hollister, California (the "Station"). STTN profitably operated the station and

9   enjoyed a good business relationship with Chevron. At some point before May 2006, STTN was

10  approached by employees of BP, and/or ARCO (collectively "Plaintiffs"). Plaintiffs asked to

11  purchase the Station from STTN or for STTN to brand the Station as an ARCO. STTN rejected

12  the purchase offer and agreed to re-brand the Station into an ARCO-branded station. To

13  effectuate the transition to an ARCO-branded motor fuel station, BP offered STTN a self-

14  amortized loan package in the amount of $475,000. [*See* Declaration of Sayed Faquiryan

15  ("Faquiryan Dec.") ¶ 2; Faquiryan Dec. Exhibit A] In essence, so long as STTN sold a specified

16  amount of product annually, a portion of the debt would deemed repaid each year by BP. On

17  May 25, 2006, BP provided a Commitment Letter to STTN in the sum of $475,000.

18          On July 11, 2006, BP and STTN entered into two franchise agreements. The purpose of

19  these agreements was for STTN to sell ARCO-branded motor fuel as well as to operate an

20  AM/PM convenience store at the Station. The agreements required STTN to be operating as an

21  ARCO-branded motor fuel station by April 11, 2007. The parties orally agreed that the Station

22  would be operated as a "gas only" station starting October 10, 2006, until the Mini Market was

23  completed. (Faquiryan Dec. ¶ 3)

24          In order to comply with the construction schedule promulgated by BP, STTN was forced

25  to begin reconstruction on the Station immediately. BP worked closely with STTN throughout

26  the construction phase by approving site plans, contractors, architects, and informing STTN of

27  deficiencies. BP also knew that the Station was a re-brand, not a new, ground-up facility. STTN

28  worked diligently to satisfy all of BP's requirements. Indeed, STTN spent of $790,000 of its

3

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   own funds to remodel the Station. (Faquiryan Dec. ¶ 9) BP did not finalize its loan agreements

2   until February 12, 2007. The loan was to be disbursed according to the various schedules

3   accompanying the loan documents, including the proposed budget and the disbursement

4   schedule. (Faquiryan Dec. Exhibit C) Despite its close involvement with the process, and

5   despite having made a commitment to assist STTN in the construction of the Station, BP

6   consistently refused to provide any loan funds to STTN. (Faquiryan Dec. ¶ 9, 10)

7          As a result of BP's breach of its obligations under the loan agreements, while at the same

8   time requiring STTN to continue construction and purchase motor fuel, STTN was unable to pay

9   some of its contractors on time. Mechanics liens were then filed by certain contractors.

10  However, as of July 7, 2007, STTN completely paid off all liens on the Station. Still, BP refused

11  to comply with the loan agreements. During this same time period, because of STTN's working

12  capital was tied up in construction costs awaiting reimbursement from BP, STTN fell behind in

13  its payments for gasoline delivery and was put on a cash-on-delivery basis.

14         BP eventually paid $150,000.00 of the loan in July 2007. (Faquiryan Dec. ¶ 9)

15  However, the remaining $250,000.00 of the loan funds then due were not disbursed by BP.

16  STTN demanded disbursement of said funds to pay off the creditors of the project and replenish

17  its working capital, but BP refused, claiming that it lacked all of the required documents. STTN

18  asked for clarification as to which documents were missing, and BP simply refused to inform

19  STTN of the missing documents. (Faquiryan Dec. ¶ 9) At the same time, BP demanded that

20  STTN continue to purchase gasoline. Being forced to use its operating capital to satisfy the

21  construction debts due to BP's refusal to disburse the loan, STTN asked that BP enter into an

22  escrow agreement whereby STTN would place the remaining money due for fuel into escrow

23  and BP would similarly place the loan funds in escrow. BP initially agreed to this request, but

24  later failed to place the loan funds in escrow without explanation. (Faquiryan Dec. ¶ 10) Indeed,

25  even as of August 31, 2007, BP offered STTN reassurances that all the information needed to

26  fund the loans was in BP's possession and the funds would be disbursed soon. (Faquiryan Dec. ¶

27  11)

28         On August 31, 2007, BP sent seven notices of default to STTN, each alleging that STTN

1  failed to offer any grade of motor fuel for sale to the public on a specified date.  However, STTN

2  sold 91 octane and diesel gasoline during the relevant dates cited by BP.  (Faquiryan Dec. ¶ 12)

3  Moreover, STTN could not sell 87 and 89 octane gasoline for part of the relevant period because

4  BP refused to deliver any motor fuel to the Station, despite STTN obtaining and offering a

5  cashier's check to tender upon delivery.  (Faquiryan Dec. ¶ 11)

6      On September 6, 2007, BP terminated the franchise agreement.  In so doing, it cited (1)

7  STTN's failure to offer <u>any</u> grade of motor fuel to the motoring public for a period of seven

8  consecutive days and (2) STTN's failure to pay all sums when due.  Rather than give the 90 days

9  notice that is typically required under the PMPA, and without any factual basis thereof, BP cited

10  risk of confusion to the public and safety risks as justifying an immediate termination of the

11  franchise agreement.  As such, the franchise relationship was allegedly terminated on September

12  6, 2007.

13      On September 17 and 18, 2007, BP sent multiple agents to "de-brand" the Station.  As

14  part of the de-branding process, BP removed, destroyed, re-painted, or otherwise obliterated any

15  registered trademark or proprietary information belonging to BP.  STTN, while maintaining that

16  the franchise agreement was terminated illegally, cooperated with BP during the de-branding

17  process.

18      Curiously, while the de-branding was carried out over the two-day period from

19  September 17 to 18, BP's complaint is that "[a]s of <u>September 11, 2007</u>, the Station was still

20  improperly displaying these Protected Marks…" some six days before the Station was de-

21  branded. (emphasis added)  Since the de-brand, Defendants have continued to operate the

22  Station, but as an independent station.  Indeed, with the exception of the Pay Island Cashier

23  ("PIC") machines, Defendants are not currently using or otherwise infringing any protectable

24  marks.

25      Defendants have contacted the manufacturer of the PIC machines, FMi, and requested the

26  removal of the BP and ARCO protected marks from the display screens.  However, according to

27  FMi, the graphics cannot be removed.  (Faquiryan Dec. ¶ 17)  To avoid any confusion,

28  Defendants have posted a sign informing customers that the Station is not an ARCO-branded

1  motor fuel facility.  [Declaration of John Michael ("Michael Dec."), Exhibit E-13]  Moreover, to

2  the extent that any protected marks are displayed by the PIC machines, it is only after a customer

3  has purchased gasoline.

4   Apparently dissatisfied with their own de-branding efforts, Plaintiffs filed this *Ex Parte*

5  Application on October 18, 2007.  They now ask the Court to use its inherent equitable authority

6  to remove items that BP's own personnel left behind.

7  **III.**

8  **PLAINTIFFS HAVE FAILED TO MEET THE STANDARD REQUIRED FOR**

9  **INJUNCTIVE RELIEF AND THEIR APPLICATION SHOULD BE DENIED**

10   The Ninth Circuit has long held that the standard for a preliminary injunction requires the

11  moving party to show *either* (1) a combination of probable success on the merits *and* the

12  possibility of irreparable injury, or (2) that serious questions are raised and the balance of the

13  hardships tips *sharply* in favor of the moving party.  <u>Dr. Seuss Enters. V. Penguin Books USA,</u>

14  <u>Inc.</u>, 109 F.3d 1394, 1397 n.1 (9th Cir. 1997) (emphasis added).

15   Using this standard, it is clear that Plaintiffs are not entitled to preliminary injunctive

16  relief.  First, Plaintiffs cannot establish their probable success on the merits on any of the

17  underlying claims, nor have then even attempted such a showing beyond broad, conclusory, self-

18  serving statements.  Indeed, BP's termination of the franchise relationship was unlawful because

19  it is grounded on false allegations and the notice fails to comply with the PMPA.  To the extent

20  that the termination is deemed lawful, any alleged breach of the various agreements by

21  Defendants was the direct and proximate result of BP's prior breach of the loan agreements and

22  the implied covenant of good faith and fair dealing.  As to Plaintiff's Lanham Act claims,

23  Defendants are not using any protectable marks beyond those programmed into the PIC machine,

24  and even then Defendants taken steps to affirmatively inform customers that it is not an ARCO-

25  branded motor fuel station to avoid any confusion.  Additionally, BP's employees removed all of

26  the protected marks in September.  Anything remaining after the two days was clearly not an

27  interest that BP deemed important enough to protect.  In any event, since there is no likelihood of

28  confusion, Plaintiffs Lanham Act claims are without merit as well.

1    Second, Plaintiffs fail to demonstrate the possibility of irreparable injury.  Plaintiffs had

2  ample opportunity to remove any trade marks they deemed to violate their own protected marks.

3  Plaintiffs then waited an entire month to bring an action and now claim that if the items are not

4  removed immediately, they will suffer irreparable harm.  However, in light of Plaintiffs' own

5  delay in filing this application and considering that there is no likelihood of confusion, there is

6  clearly no risk of irreparable injury.

7    Finally, Plaintiffs fail to establish that the balance of the hardships weigh *sharply* in their

8  favor.  As noted above, the only items that display any protected mark of Plaintiffs are the 6 inch

9  display screens on the two PIC machines.  Despite Plaintiffs sweeping allegations, the cost of

10  replacing these machines alone is substantial and would effectively shut down the gas station.

11  Not only would STTN be required to expend over $46,000.00 to replace the machines, it would

12  also be unable to operate and generate revenue during this period.  This would likely force STTN

13  out of business and into foreclosure.  On the other hand, there is no hardship inflicted onto BP

14  because there is no likelihood of confusion.

15    It is clear that Plaintiffs have not met their burden under either prong of the analysis, nor

16  have they even attempted to undertake the proper analysis.  Indeed, Plaintiffs merely make

17  sweeping declarations and point to outdated information to support their *Ex Parte* Application.

18    **A.    Plaintiffs Cannot Establish Likelihood of Success on the Merits**

19    In order to prevail on a motion for preliminary injunctive relief, the moving party must

20  demonstrate a strong likelihood of success on the merits of the underlying case.  As noted by the

21  United States Supreme Court, "a preliminary injunction is an extraordinary and drastic remedy,

22  one that should not be granted unless the movant, by a clear showing, carries the burden of

23  persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  This heavy burden has simply

24  not been met by the Plaintiffs, and therefore, the entry of a preliminary injunction is not justified.

25    In this case, Plaintiffs' First Amended Complaint presents thirteen causes of action

26  against the various defendants.  These causes of action are all premised on the Defendants'

27  alleged violation of the franchise agreement, breach of the various loan agreements, and

28  infringement of Plaintiffs' Protected Marks.  However, as is more fully set forth below, these

1    causes of action are without merit.  Accordingly, Plaintiffs cannot demonstrate any likelihood of

2    success on the merits, let alone a strong likelihood.  Regardless, Plaintiffs have not even

3    attempted to make such a showing.  Therefore, Plaintiffs are not entitled to preliminary

4    injunctive relief, as a matter of law.

5                    **1.    BP's Termination of the Franchise Relationship Was Unlawful**

6                        **a.    The Grounds as a Basis For Termination Were False**

7            Under the PMPA, a refiner/distributor such as BP can terminate a franchise relationship

8    only for the grounds specified in the PMPA.  Chevron USA, Inc. v. Lutz, 271 F.Supp.2d 1196,

9    1200 (N.D.Cal. 2003).  Moreover, even where sufficient grounds exist to justify termination, the

10   refiner/distributor must also provide notice in the form specifically prescribed by the PMPA.

11   Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1391 (10th Cir. 1981), cert. denied

12   455 U.S. 1019.  If a termination is deficient as to either of these requirements, the termination is

13   deemed unlawful and the franchisee is entitled to a variety of remedies, including injunctive

14   relief, damages, attorneys' fees, and punitive damages.  § 2802(b)(1).  Under the PMPA, the

15   burden is on the franchisor to establish that the termination of the franchise relationship complied

16   with the provisions of the PMPA. Thompson, 660 F.2d at 1390.

17           For franchise agreements executed after June 19, 1978, there are four grounds permitting

18   the franchisor to terminate the relationship, and two such grounds are implicated here.  First, if

19   the franchisee fails to comply with any provision of the franchise agreement, the franchisor may

20   terminate the agreement so long as the violated provision is both "reasonable" and "of material

21   significance to the franchise relationship."§ 2802(b)(2)(A).  Significantly, under the PMPA, the

22   term "failure" does not include any failure that is only technical or unimportant to the franchise

23   relationship, any failure for a cause that is beyond the control of the franchisee, or any failure

24   based on a provision that is illegal or unenforceable.  § 2801(13).  Second, the franchisor may

25   terminate the relationship upon the occurrence of some event which is relevant to the franchise

26   relationship, and as a result of the occurrence, termination is reasonable.  § 2802(b)(2)(C).

27           Here, Plaintiffs cite two grounds for termination.  First, Plaintiffs claim that Defendants

28   failed to have any fuel available for purchase to the motoring public for a period of seven

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   consecutive days.  However, as is clearly set forth in the declaration of Sayed Faquiryan, there

2   was fuel available during the period in question.  (Faquiryan Dec. ¶ 12)  Moreover, to the extent

3   that Defendants failed to have a certain grade of gasoline available, this failure was due solely to

4   Plaintiffs' own failure to comply with the various agreements, including the loan and gasoline

5   agreements.  (Faquiryan Dec. ¶ 11)  As such, Defendants did not fail to have any gasoline for

6   sale for seven consecutive days as envisioned by the PMPA.

7       The second ground for termination cited by Plaintiffs was the Defendants alleged failure

8   to timely pay all sums due.  However, with the exception of a disputed invoice, Defendants were

9   current on all payment arrangements (C.O.D. with extra payments to amortize the balance owed)

10  at the time of termination.  Moreover, Defendants had a cashiers' check ready to tender to

11  Plaintiffs upon their delivery of fuel, but Plaintiffs simply refused to deliver anything.

12  (Faquiryan Dec. ¶ 11)  Finally, STTN had offered to pay the balance through an escrow which

13  would provide for simultaneous loan funding, but BP failed to perform.  (Faquiryan Dec. ¶ 10)

14  Additionally, and to the extent that Defendants failed to make any payments as scheduled, that

15  failure was due solely to Plaintiffs' own breach of the various loan agreements.  As such,

16  Defendants did not fail to timely pay all sums due as defined by the PMPA.

17      Since the failures cited by Plaintiffs are not failures as defined by the PMPA, they are not

18  proper grounds for termination.  And since the grounds for termination do no satisfy the PMPA,

19  the termination is clearly unlawful.

20          **b.      The Termination Failed to Comply With PMPA Notice**

21                   **Requirements**

22      A valid termination under the PMPA must also comply with the notice requirements in §

23  2804.  Typically, a franchisor must provide notice of at least 90 days and the notice must be: (1)

24  in writing; (2) sent via certified mail or personally delivered to the franchisee; and (3) contain a

25  statement of intent to terminate the relationship and the reasons for the termination, the effective

26  date of the termination, and a summary statement of the rights and responsibilities of any party

27  under the PMPA.  § 2804.  Franchisors may give less than 90 days notice in circumstances in

28  which it would "not be reasonable."  Significantly, if the notice of termination does not satisfy

1    the requirements of the PMPA, the termination is unlawful.  Thompson, 660 F.2d 1391; §

2    2802(b)(1).

3         Under the PMPA, BP was required to give at least 90 days notice of its intent to terminate

4    unless it would not be reasonable for BP to furnish 90 days notice.  The 90 day notice provision

5    "should not be lightly excused."  Wisser Co., Inc. v. Mobil Oil Corp., 730 F.2d 54, 60 (2nd Cir.

6    1984).  The 90 day notice requirement is not an "all or nothing" requirement that permits no

7    notice at all when 90 days would be unreasonable.  Zipper v. Sun Co., Inc., 947 F.Supp. 62, 69

8    (E.D.N.Y. 1996).  Indeed, the legislative history and Congressional hearings conducted in

9    drafting the PMPA "indicate that § 2804(b)(1)(A) was added to dispense with the lengthy notice

10   requirement where, for example, a franchisee committed serious defaults of the franchise

11   agreement, such as misbranding."  Wisser, 730 F.2d at 60.  (emphasis added)

12        As noted above, BP terminated the franchise with no notice whatsoever.  In its notice of

13   termination, BP states that "it would not be reasonable for BPWCP to furnish notification of 90

14   days prior to the date of termination because of the risk of confusion to the public as well as

15   possible safety risks."  While confusion to the public and safety risks could justify an accelerated

16   notice schedule in limited circumstances, there is no evidence in this case that there was any risk

17   of confusion to the public, nor is there any evidence to suggest that the station was a safety

18   hazard.  Indeed, BP terminated the agreement, in part, because there was allegedly no gas being

19   sold at the station.  If Defendants were not selling gas, there would be little risk of confusion to

20   the public.  Nor do any cases addressing this issue recognize an immediate termination notice as

21   reasonable where the franchisee merely owed money.  Zipper, 947 F.Supp. at 69.  As such, BP's

22   immediate termination of the franchise relationship clearly violates the PMPA.  Therefore, it is

23   the Defendants, and not Plaintiffs, who are likely entitled to all the relief set forth in the PMPA,

24   including injunctive relief, damages, costs, and attorney fees.  Accordingly, Plaintiffs cannot

25   demonstrate their likely success on the merits of their PMPA claim.

26         **2.    Plaintiffs Breach of the Loan Agreements Prevented Defendants'**

27              **Performance.**

28    In their First Amended Complaint, Plaintiffs present claims based on Defendants alleged

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1    breach of various contracts.  However, to the extent that the Defendants failed to comply with

2    any material provision of the contract in question, that failed was the direct and proximate result

3    of Plaintiffs' own breach of the agreements.

4         Under California law, there is in every contract an implied covenant that neither party

5    will do anything to destroy or injure the right of the other party to receive the benefits of the

6    contract.  Archdale v. American Industrial Lines Ins. Co., 154 Cal. App. 4th 449, 463 (2007).

7    This is known as the implied covenant of good faith and fair dealing.  Under this covenant, each

8    party has a duty to do everything that the contract presupposes he or she will do to accomplish

9    the purpose of the contract and the duty not to prevent or hinder the performance by the other

10   party.  It follows that performance is excused when prevented or rendered impossible by the acts

11   of the opposite party and similarly operates as a defense to an action for breach of contract.

12        In this case, the Gasoline and Mini-Market Agreements are silent as to the Loan

13   Agreement.  However, it is well-settled that all agreements should be considered together where

14   the nature and character of the agreements show that they were part of the same transaction, as is

15   the case here.  Patel v. Liebermensch, 154 Cal.App.4th 373, 384 (2007).  Additionally, pursuant

16   to the implied covenant of good faith and fair dealing, BP was under a duty to not prevent STTN

17   from performing under the Agreements.

18        In spite of this covenant, Plaintiffs breached their agreement to help finance the re-

19   construction of the Station.  Plaintiffs did so knowing that Defendants had to undertake

20   immediate construction and knowing that the contractors would demand payment.  Indeed,

21   Plaintiffs encouraged Defendants to continue construction despite Plaintiffs' refusal to fund the

22   loan.  (Faquiryan Dec. ¶ 7)  Moreover, Plaintiffs were to fund the gas loan according to the

23   schedule attached to the loan.  (Faquiryan Dec. Exhibit C)  To date, Plaintiffs have failed to

24   make all required  payments, despite the Station's completion and despite the agreed upon

25   disbursement schedule.  Thus, to the extent that Defendants failed to comply with any of the

26   contracts as issue – specifically the failure to pay money and to purchase gasoline – that failure

27   was solely the result of Plaintiffs' own breach of the loan agreements.

28        Accordingly, Plaintiffs cannot demonstrate their likelihood of success of the merits of the

11

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   breach of contract claims.  Therefore, their application for preliminary injunctive relief must be

2   denied.

3              **3.       Defendants Have Not Infringed on Plaintiffs' Protected Marks**

4              Plaintiffs also assert claims for trademark infringement against the defendants.  A

5   plaintiff asserting trademark infringement must establish both "(1) that it has a protectable

6   ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause

7   consumer confusion, thereby infringing upon the [plaintiffs] rights to the mark." <u>Dep't of Parks</u>

8   <u>& Recreation for the State of Ca. v. Bazaar Del Mundo, Inc.</u>, 448 F.3d 1118, 1124 (9th Cir.

9   2006).  When a plaintiff has an unregistered trademark, the presumption of validity is

10  inapplicable, and the plaintiff must establish its protectable interest. <u>Yellow Cab Co. of</u>

11  <u>Sacramento v. Yellow Cab Co. of Elk Grove, Inc.</u>, 419 F.3d 925, 928 (9th Cir. 2007).

12  Trademarks fall into five categories: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary;

13  and (5) fanciful." <u>Yellow Cab</u>, 419 F.3d at 927. The latter three are automatically entitled to

14  protection, as they require a "mental leap" between the mark and the object referenced. <u>Filipino</u>

15  <u>Yellow Pages, Inc., v. Asian Journal Publications, Inc.</u>, 198 F.3d 1143, 1147 n. 3 (9th Cir. 1999).

16  By contrast, generic and descriptive terms "refer[ ] to the type or species of the product at issue."

17  <u>Rudolph Int'l, Inc., v. Realys, Inc.</u>, 482 F.3d 1195, 1197 (9th Cir. 2007). Trademark protection

18  does not extend to generic marks, and only extends to descriptive marks that have acquired

19  "secondary meaning" in the minds of consumers. <u>Id.</u> at 1197-98.

20             Despite Plaintiffs' claims to the contrary, the simple fact is that Defendants are not

21  currently using any protected marks, aside from the display on the 6 inch computer screen on the

22  PIC machines.  Attached to this motion are photographs of the Station taken on October 19,

23  2007.  Some of Plaintiffs' allegations as to the infringement of registered marks are simply

24  incorrect:

25        •   Plaintiffs state that Defendants are using the AM/PM logo on fountain beverage cups.

26             However, Michael Dec. Exhibit E-1 clearly demonstrates that the cups do not bear

27             any AM/PM logo.  In fact, the cups bear a Pepsi logo.

28        •   Plaintiffs state that Defendants are using the AM/PM logo on the wrapping that

1    accompanies nachos.  However, Michael Dec. Exhibits E-2 and E-3 clearly show that

2    the wrappers do not bear the AM/PM logo.

3    • Plaintiffs state that fountain beverage cups contain the words "Thirst Oasis."

4    However, Michael Dec. Exhibit E-1 clearly shows that the fountain beverage cups in

5    the Station do not bear the words "Thirst Oasis," but rather bear the Pepsi logo.

6    Moreover,  the receipts produced by the Station do not bear the words "Thirst Oasis."

7    (Faquiryan Dec. Exhibit D)

8    Additionally, Plaintiffs claim proprietary rights to the following items, although the

9    marks are unregistered.  As noted above, because the marks are unregistered, Plaintiffs must

10    demonstrate that they have a protectable interest in the marks in order to succeed in their claims.

11    Plaintiffs have simply failed to make even basic showing that the marks are protectable.

12    Nevertheless, a quick look over the evidence demonstrates that the marks are simply generic

13    marks that have not attained secondary meaning.

14    • The "Fill Smart" words on the PIC machine pay screen actually is a protected mark,

15    but it is not registered to Plaintiffs.  Instead, it is registered to Hallum, Inc., a

16    corporation in Flagstaff, Arizona (Michael Dec. Exhibit H).  Moreover, Plaintiffs

17    have not demonstrated that the phrase has acquired secondary meaning that relates to

18    Plaintiffs' goods or services.  Thus, Plaintiffs have no protectable interest in the

19    words "Fill Smart."  In fact, Plaintiffs' use of this mark may be infringement.

20    • The "Crunch Cube" graphics are also generic and Plaintiff has failed to make any

21    attempt to show that the graphics have acquired the secondary meaning entitling it to

22    protection.  Moreover, when BP de-branded the Station, it painted over portions of

23    the Crunch Cube graphics, but chose to leave the rest of the graphics in place.

24    (Michael Dec. Exhibit E-14)  Clearly, BP's decision not to remove the rest of the

25    graphics is an admission that they graphics are not a protectable interest.

26    • The "AM/PM Coffee Graphics" is simply a coffee cup with beans, as can be seen in

27    Michael Dec. Exhibits E-4.  Indeed, employees from BP painted over portions of the

28    coffee graphics when they conducted the de-brand, but elected to leave the rest of the

coffee graphics intact.  Clearly, if the coffee graphics constituted a protectable interest
of BP, the individuals trained specifically to destroy BP's marks would have also
painted over the rest of the cup.  Their decision not to destroy the graphics is an
admission that the graphics are not a protectable interest.

- The "hamburger graphics" is nothing more than a hamburger painting, as reflected in
  Michael Dec. Exhibit E-2.  To qualify for protected status, Plaintiff must show that
  the hamburger is more than a generic hamburger.  This analysis that is noticeably
  absent from Plaintiff's *Ex Parte* Application.  In any event, the BP de-branding squad
  elected to leave the hamburger in place.  Presumably, if it was a protectable interest,
  they would have painted it over it, as they did with other marks.  Additionally, a brief
  internet search reveals that plenty of other organizations use a hamburger similar to
  the one at issue here.  (Michael Dec. Exhibit G)  This is further evidence that the
  hamburger has not attained the secondary meaning necessary to establish status as a
  protectable interest.

- Plaintiffs also claim a protectable interest in the blue light stripe on the fuel canopy.
  As can be seen in Michael Dec. Exhibits E-9 and E-10, this is nothing more than a
  generic blue neon light.  It is similar to those used by other gasoline companies, such
  as Chevron, Marathon, and countless other independent stations.  Like the coffee and
  hamburger marks, this was left behind after the BP employees de-branded the Station.
  And, as with the other marks, Plaintiffs have failed to make even a rudimentary
  showing that the mark is entitled to protection.

- Plaintiffs also claim protection over the orange neon light stripe on the convenience
  store.  As show in Exhibits Michael Dec. E-7, 8, and 12, this light stripe is nothing
  more than a generic orange neon light, similar to that used by other gasoline stations,
  including 76 and untold other independent stations.  This light was also left behind by
  the BP employees, and like the blue light, Plaintiffs have failed to make even a
  rudimentary showing that the mark is entitled to protection.

The only other marks claimed by Plaintiffs are those that appear on the six-inch screen on

1  the PIC machines after a customer has purchased gasoline. These marks are built into the

2  machine by the manufacturer and, according to the manufacturer, cannot be deprogrammed.

3  Defendants have done everything in their power to attempt to remove the marks, but have been

4  unsuccessful in doing so. To avoid confusion, Defendants have installed signs that inform

5  customers that the station is not an ARCO-branded motor fuel station. (Michael Dec. Exhibits

6  E-13) Indeed, the only way to effectively remove the marks is to remove the PIC machines

7  completely. However, Defendants paid $46,000.00 for the machines and would incur an

8  additional $46,000.00 to install new ones. In light of the serious questions that surround the

9  legality of Plaintiffs' termination of the franchise relationship, and considering the steps that

10  Defendants have taken to inform the purchasing public that the station is not affiliated with

11  Plaintiffs, it is inequitable to force Defendants to incur these substantial costs at this stage in the

12  litigation. Therefore, Plaintiffs have not established that Defendants are violating a protectable

13  interest in the continued operation of the Station. As such, their *Ex Parte* Application for

14  preliminary injunctive relief must be denied.

15       **B.    Plaintiffs Cannot Establish Likelihood of Irreparable Injury**

16       In addition to demonstrating their probable success on the merits, Plaintiffs must also

17  establish the likelihood of irreparable injury. Plaintiffs contend that they will suffer immediate

18  and irreparable injury if preliminary injunctive relief is not granted. To support this assertion,

19  Plaintiffs state that "[c]onsumers may be confused into purchasing motor fuel or convenience

20  store goods or products from Defendants' Station under the misguided belief that they are doing

21  so from an ARCO-branded gasoline station and am/pm mini market." However, as noted above,

22  there is no likelihood that any consumer will confuse the Station with an AM/PM mini market or

23  ARCO-branded motor fuel station, especially in light of Defendants' placement of signs

24  informing all consumers that the station is not affiliated with BP or ARCO. In addition, even a

25  cursory comparison of the photographs of the Station (Michael Dec. Exhibits E-1 to E-14)

26  against the photographs published by ARCO (Michael Dec. Exhibit F) reveals that no reasonable

27  person could possibly confuse the Station with an AM/PM and/or ARCO-branded motor fuel

28  station.

1    Moreover, BP employees visited the Station over a month ago to remove all BP or ARCO

2    marks.  Those marks left behind are presumably marks that BP is not interested in protecting.

3    Regardless, BP was aware of the existence of the remaining marks for over a month, and now

4    claims that it will suffer immediate injury, such that an *ex parte* application is necessary.

5    However, as noted above, the claims presented by Plaintiffs are without merit and there is no

6    likelihood of irreparable injury.  As such, Plaintiffs are not entitled to preliminary injunctive

7    relief.

8    **C.    Balance of Hardships Do Not Tip Sharply in Favor of Plaintiffs**

9    An integral part of the analysis in determining the propriety of preliminary injunctive

10   relief is an analysis that balances of the hardships that will result if the injunction is granted

11   against those that will result if the injunction is not granted.  Plaintiffs present no evidence of the

12   hardships that will be inflicted on either side, beyond broad, self-serving, conclusory statements.

13   However, as noted above, the cost of removing and replacing the PIC machines will be

14   substantial and may effectively drive Defendants out of business.  At the same time, there is little

15   likelihood that Plaintiffs will suffer any injury whatsoever, since every customer is informed that

16   the Station is not affiliated with BP or ARCO <u>before</u> they purchase anything.  Moreover, the only

17   protectable mark that is even arguably infringed appears <u>after</u> the purchase has been made.

18   Plaintiffs cannot show that operation of the Station in its current form will harm Plaintiffs at all.

19   On the other hand, if the *Ex Parte* Application is granted, Defendants will be damaged to the

20   tune of $92,000.00 and possibly may be forced out of business.

21   As such, Plaintiffs clearly have not demonstrated that the balance of the hardships tips

22   <u>sharply</u> in their favor.  Indeed, a balancing of the hardships shows that much greater hardships

23   will be inflicted on Defendants if the Application is granted, than will be inflicted on Plaintiffs if

24   it is not granted.  Accordingly, Plaintiffs have failed to satisfy this element as well, making the

25   entry of preliminary injunctive relief inappropriate.

26   **IV.**

27   **CONCLUSION**

28   For the above reasons, Plaintiffs are not entitled to an entry of preliminary injunctive

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

relief.  Primarily, Plaintiffs have not shown their probable success on the merits.  Indeed, an analysis of the facts demonstrates that the underlying claims are without merit.  Similarly, Plaintiffs have not established the likelihood of irreparable injury if the *Ex Parte* Application is denied.  Finally, Plaintiffs have not established that the balance of the hardships tips sharply in their favor.  Accordingly, Plaintiffs' *Ex Parte* Application must be denied in its entirety.

DATED: October 26, 2007.

BAKER MANOCK & JENSEN, PC


By  s/ John G. Michael
John G. Michael
Attorneys for Defendants

DMS: 572599_1
15678.0003

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1  **DECLARATION OF SAYED FAQUIRYAN IN OPPOSITION TO EX PARTE**

2  **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW**

3  **CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

4

5  I, Sayed Faquiryan, declare:

6  1.  I am a defendant herein and am the Vice-President, Secretary and Treasurer of

7  Defendant STTN ENTERPRISES, INC. ("STTN"). I am also the Managing Member of

8  Defendant AVA GLOBAL ENTERPRISE, LLC. The facts contained in this declaration are

9  within my personal knowledge and, if called as a witness, I could competently testify thereto.

10  2.  In 2006, Ken Wirkerham, an employee of BP West Coast Products, LLC ("BP")

11  approached me and inquired about BP purchasing or re-branding STTN's gas station and mini

12  mart located at 631 San Felipe, Hollister, California (the "Station"). At the time the Station was

13  operating as a Chevron station, with a mini mart. When I rejected the purchase inquiry, Mr.

14  Wirkerham offered me a self amortizing loan of $475,000 to re-brand the Station to an Arco

15  station, with an am/pm mini mart. I agreed and on or about May 25, 2006, BP provided STTN

16  with a commitment letter for the $475,000 loan (the "Commitment Letter"). A true and correct

17  copy of the Commitment Letter is attached hereto as Exhibit "A."

18  3.  In July, 2006, in reliance on the Commitment Letter, STTN executed a Mini Mart

19  Agreement and a Contract Dealer Gasoline Agreement, the purpose of which (together with the

20  commitment letter) was to re-brand the station to an Arco station and operate it as an Arco

21  station and am/pm mini mart. True and correct copies of the Mini Mart Agreement and the

22  Contract Dealer Gasoline Agreement are attached hereto as Exhibits "B." The Commitment

23  Letter contained many conditions to funding, all of which have been satisfied by STTN, as

24  shown by the fact that BP eventually funded a portion of the loan, including the payment by

25  STTN of a $70,000 franchise fee. The Contract Dealer Gasoline Agreement required at

26  paragraph 1.2 that the station be ready to receive and sell gasoline within nine months of the

27  date of the agreement. According to that agreement, STTN needed to have the Station ready by

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   April 11, 2007. Pursuant to discussions between BP personnel and me, I was to have the gas

2   station portion of the Station up and running by October 10, 2006.

3       4.      Pursuant to the request of BP personnel, the oral agreement to have the gas station

4   portion open in early October, and so I could meet the time line in the Contract Dealer Gasoline

5   Agreement, I immediately began preparations for construction. I obtained bids, plans and

6   permits. At first, BP would not agree to my chosen contractor because they had not worked

7   with him before, but after I indicated that I would not go forward with the project without him,

8   they relented. I continued with construction preparation during the fall of 2006, before any

9   loans funded, using my own funds from various sources, including my account and the account

10  of AVA Global Enterprise, Inc., another company in which I have an interest, at Omni Financial

11  Services, Inc. (an unrelated financial services institution). These were funds that I owned and

12  were not borrowed.

13      5.      I provided to BP the bids, plans and permits. I also provided bank statements for

14  myself, my son Nazim, STTN and some of my other relatives, as requested by BP. I provided

15  to BP information about the first priority lien on the real property upon which the Station is

16  situated. In October, 2006, I requested reimbursement from BP for payments I had made for the

17  remodeling of the Station in the approximate amount of $128,000. I submitted a pay voucher,

18  invoices and a copy of the checks used for payment, as required by BP. No reimbursement was

19  forthcoming. However, the gas station was ready and began receiving gasoline deliveries from

20  BP in October, 2006.

21      6.      At the request of BP personnel, I commenced construction on the mini mart and

22  gas station remodel in January, 2007, before any of the loan had funded. At this point, the only

23  agreements between BP and STTN were the Loan Commitment Letter, a Mini Mart Agreement

24  and a Contract Dealer Gasoline Agreement. Because of the continuing construction costs and

25  BP's failure to fund the loan as promised, STTN could not keep up with the payments for

26  gasoline delivered and complete construction. STTN missed some gasoline payments and BP

27  put STTN on a COD basis. From that point forward, STTN was forced to pay for gasoline with

28  a cashier's check for each load delivered. It was also agreed that STTN would pay down the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   balance owing by paying an extra $3,000 per load, which would be applied to STTN's

2   outstanding balance.

3       7.      Construction continued and, in February, 2007, BP for the first time presented me

4   with loan agreements to sign. A true and correct copy of the Gasoline Loan is attached hereto as

5   Exhibit "C." These loan agreements broke the loan down into two loans, one for the mini mart

6   and one for the gasoline station. Even though all parties understood, based on prior

7   conversations, that my station was not a new construction, the loans were structured as if it were

8   a new construction. During prior discussions, it was understood by all parties that there was not

9   much construction needed to re-brand the gasoline station portion of the project. STTN was

10  already operating as a gasoline station. It had tanks, isles, pumps and a canopy already. The

11  major portion of the construction was to be on the mini mart remodel. The loan agreements,

12  however, allocated only $150,000 to the mini mart remodel and $250,000 to the gasoline station

13  construction. I was informed by Ken Wirkerham and Rima that this was the only way that BP

14  could do it and that they would work with me on the allocation of the funds. In addition, many

15  of the categories of construction were vague, so I was told by Ken Wirkerham that it was

16  possible to move funds from one category to another. By this time, I had already expended

17  approximately $387,500 of my own funds on the construction and re-branding and had no

18  choice but to rely upon the representations of Ken Wirkerham that they would work with me on

19  the allocation of funds. I signed the agreements.

20      8.      On March 9, 2007, BP required me to sign a revised commitment letter because

21  the first one, dated in May, 2006, contained some errors. The budget provided at the same time

22  was for a new "ground up" facility, even though all parties understood that this was a re-brand,

23  not new construction. Around this time I had conversations with Cecile McDonald and Jean

24  Smith at BP in which it was agreed that the loans would be switched to $150,000 for the

25  gasoline side and $250,000 for the mini mart side. This, however, was not done.

26      9.      Construction continued and I continually requested reimbursement, but none was

27  forthcoming. I had my lawyer work with BP personnel to try to get the loan funded. After

28  many delays, in July 2007, BP finally reimbursed the $138,000 that I had requested in October,

1   2006 and distributed the remainder of the $150,000 loan, less the $10,000 loan fee and some

2   escrow costs.  By this time I had spent over $790,000 of my own funds and had run out of

3   money.  I continually requested that the $250,000 loan be funded, but was told that BP did not

4   have all of the necessary documentation.  I tried to get information about what they were

5   missing, but that information was not provided to me.  Eventually BP stopped returning my

6   phone calls and they would not respond to my emails.

7          10.     In late August, 2007, in an effort to get BP personnel to pay attention to me, I

8   stopped purchasing gasoline.  That got their attention and they demanded that I pay the balance

9   owing on STTN's account and start to purchase gasoline again, but the $250,000 loan was still

10  not funded.  This was a problem because STTN needed to be reimbursed for the construction

11  costs in order to be able to pay the gasoline bill, but BP would not fund the loan until STTN

12  paid the gasoline bill.  By this time, I no longer trusted them.  I suggested that we open an

13  escrow account, BP would deposit the $250,000 and I would borrow the money to pay the

14  gasoline bill, which loan I would pay back immediately upon the loan funding. This procedure

15  was agreed to by BP, but they never deposited the funds into escrow, so I did not obtain the

16  loan.  I could not afford to obtain the loan funds, deposit them into escrow and then wait an

17  indefinite period of time for BP to deposit the $250,000.

18         11.     Around this same time, Mike Hager of BP told me that BP had all of the

19  documents needed to fund the loan.  BP did not tell me that they needed any further

20  documentation.  Mr. Hager told me that the loan would fund in a few days.  On the Friday

21  before Labor Day Weekend (August 31, 2007), Tom Reeder of BP  told me that I needed to buy

22  gasoline.  I told him I would try to arrange for a cashier's check but that with the weekend and

23  banking holiday coming up, it may not be until Tuesday.  On Tuesday, September, 4, 2007, I

24  informed BP that I had a cashier's check ready for them.  I was told that a load would be

25  delivered later that day.  Then, I received a phone call from Brad Christensen informing me that

26  they were terminating my contracts immediately and that I could no longer buy gasoline from

27  BP.

28  ///

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1   12.   On September 6, 2007, I received the termination notices. These notices state that

2   STTN did not have any gasoline to sell for seven consecutive days. This statement is false.

3   While STTN was out of regular unleaded, it still had and was selling premium gasoline and

4   diesel fuel. The termination notices are, therefore, false and ineffective.

5   13.   STTN's failure to purchase and pay for gasoline was directly caused by BP's

6   breach of the commitment letter and loan agreements by its delay in funding the $150,000 loan

7   and its total failure to fund the $250,000 loan. If BP had timely performed its obligations,

8   STTN would be successfully operating the Station today.

9   14.   On September 18, 2007, BP came and "de-branded" the Station. They removed

10   all of the "Arco" and "am/pm" signs and logos. At that time, they left the "Crunch Cube" sign

11   intact, except for oblioterating the "am/pm" logo that was on the sign. They left the coffee

12   menu and graphics intact, except for obliterating the "am/pm" logo that was on the graphics..

13   They left the hamburger graphic intact, even though they painted over other graphics in the store

14   (such as the "Arctic Avenue" graphic over the drink coolers). Had they thought that these

15   graphics were proprietary, they would have painted them over at the time that they "de-branded"

16   the store. Their claims of trademark or trade dress rights appear to be an after thought.

17   15.   The pictures attached to the declaration of John G. Michael, filed herewith,

18   accurately depict to Station and store as they appeared on October 19, 2007. As can be seen

19   from those pictures, there are no "Arco" or "am/pm" logos being used anywhere in the store.

20   The nacho wrappers do not have any "am/pm" marks on them, nor do any of the other food

21   items. The hamburger graphic is just a cartoon depiction of a hamburger. Many similar ones

22   can be found for free on the internet. This is hardly something that BP can claim exclusive

23   rights to use. The analysis for the coffee graphic is the same. All it consists of is a picture of

24   coffee beans. There is nothing proprietary about it. The coffee menu is just a list of coffee

25   drinks and prices. There is nothing proprietary about that. Similar ones can be found in any

26   coffee shop. The only fountain cups that STTN is using are "Pepsi" cups. There are no

27   "am/pm" or "thirst oasis" logos or marks on the cups. The "Crunch Cube" sign is just as Mr.

28   Christensen left it after "de-branding" it by obliterating the "am/pm" logo in the middle of the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1  sign. If BP truly thought this was proprietary, Mr. Christensen would have obliterated the rest

2  of the sign or removed it. The cash register receipts say "Circle A Food Store #200." They do

3  not state "Thirst Oasis." A true and correct copy of a sample receipt is attached hereto as

4  Exhibit "D."

5    16.    As for the exterior of the Station, the alleged "Arco blue illuminated light band" is

6  now nothing more than a blue neon light. The thick blue banding and the Arco logo were

7  removed during the de-branding process. Arco cannot claim exclusive rights to use a blue light.

8  The same analysis applies to the "orange illuminated light band" on the exterior of the mini

9  mart. The thick banding was removed. All that is left is an orange light, to which Arco cannot

10  claim exclusive rights.

11    17.    With regard to the Pay Island Cashier Machines, the do still state Arco and

12  "Thank you for choosing Arco." I have contacted the manufacturer and they have informed me

13  that this cannot be changed. If BP knows of a way to make the change, I am willing to do so, as

14  I no longer wish to do business with BP or Arco. These machines cost $23,000 each. If BP

15  wants to buy them, I am willing to sell them to it. I am not willing, however, to just throw the

16  machines away and purchase new ones. As for the alleged "Fill Smart" claim, that trademark is

17  already registered to another company as Reg. No. 3277063 and BP has no claim to its use.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on October 26, 2007 at Hollister, California.

Sayed Faquiryan

@PFDesktop\::ODMA/MHODMA/DMS;DMS;572534;1
14366.0001

DECLARATION OF SAYED FAQUIRYAN IN OPPOSITION TO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

1    **DECLARATION OF JOHN G. MICHAEL IN OPPOSITION TO EX PARTE**

2    **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW**

3    **CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

4    I, John G. Michael, declare:

5         1.    I am an attorney duly admitted to practice before all courts of the State of

6    California and am admitted to practice before this Court.  I am a shareholder in the law firm of

7    Baker Manock & Jensen, PC, attorneys for defendants herein.  The facts contained in this

8    declaration are within my personal knowledge and, if called as a witness, I could competently

9    testify thereto.

10         2.    On October 19, 2007, I traveled to the gas station in issue in this litigation, located

11    at 631 San Felipe, Hollister (the "Station").  At approximately 11:30 a.m. I took the pictures,

12    true and correct copies of which are attached hereto as Exhibits "E-1" through "E-14".  These

13    pictures were taken with a Sony digital camera and have not been altered in any way.  The

14    pictures accurately represent the condition of the Station at the time that the photo's were taken

15    on October 19, 2007.

16         3.    Attached hereto as Exhibit "F" is a color printout of web pages from the

17    am/pm.com web site.  These pages were printed out on October 22, 2007.  These pages show

18    what a properly branded Arco station and am/pm mini mart look like.

19         4.    By comparing the photo's of Defendants' "de-branded" Station with the pictures

20    from the am/pm web site, it can easily be seen that there is no likelihood that any consumer

21    would be confused into thinking that Defendants' "de-branded" Sataion was an Arco station or

22    an am/pm mini mart.  With regard to the exterior of the mini mart, Defendants' mini mart does

23    not have the am/pm signage or the combined orange and blue stripe.  It merely has an orange

24    neon bulb in a broken line along the front of the mini mart.  It also displays a sign that indicates

25    to any consumer that the station and mini mart are not Arco and am/pm.

26         5.    As for the interior of the mini mart, there are no "Arco" or "am/pm" logos being

27    used anywhere in the store.  The nacho wrappers do not have any "am/pm" marks on them, nor

28    do any of the other food items.  The hamburger graphic is just a cartoon depiction of a

25

1   hamburger.  Many similar ones can be found for free on the internet.  Attached hereto as Exhibit

2   "G" is a true and correct copy of the cartoon hamburgers that can be found and acquired without

3   charge.  The pages were printed on October 22, 2007.  This is hardly something that BP can

4   claim exclusive rights to use.  The analysis for the coffee graphic is the same.  All it consists of

5   is a picture of coffee beans and a coffee cup.  There is nothing proprietary about it.  The coffee

6   menu is just a list of coffee drinks and prices.  There is nothing proprietary about that.  The only

7   fountain cups that STTN is using are "Pepsi" cups.  There are no "am/pm" or "thirst oasis"

8   logos or marks on the cups.  The "Crunch Cube" sign has no am/pm logo.   There is no "Arctic

9   Avenue" graphic over the refrigerated drinks.

10          6.       As for the exterior of the Station, the thick"Arco blue illuminated light band" and

11   red logos are now nothing more than a blue neon light bulb.  Arco cannot claim exclusive rights

12   to use a blue light.  The same analysis applies to the "orange illuminated light band" on the

13   exterior of the mini mart.  The thick banding was removed.  The blue band was removed.  All

14   that is left is an orange light, to which Arco cannot claim exclusive rights.

15          7.       Attached hereto as Exhibit "H" is a true and correct copy of a printout from the

16   United States Patent and Trademark Office web site, which shows that the mark "Fill Smart" is

17   a registered trademark of Hallum, Inc. In fact, as shown on Exhibit "H" hereto, Arco applied for

18   this trademark, but abandoned that application in April of 2006.  Despite the fact that the mark

19   is registered to someone else and Arco abandoned its attempt to obtain a registration for that

20   mark, Arco is now alleging that it has some trademarks rights in "Fill Smart" and is complaining

21   that Defendants are infringing on those rights.  It appears, however, that Arco's use of the mark

22   is the infringing use.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct and that this declaration was executed on October ___, 2007 at

3    Fresno, California.

4

5

6                                        s/John G. Michael
                                         John G. Michael
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION