**EXHIBIT "B"**

**Part 2 of 3**

(j)  The term "Retailer's Account" shall mean the account maintained by Franchisee at a financial institution that is a member of the Cal-Western Automated Clearing House Association or the National Automated Clearing House Association and named by Franchisee on Exhibit C, attached hereto, incorporated herein and made a part hereof, as the account into which deposits resulting from Cardholder Transactions at Franchisee's location are made.

(k)  The term "POS Terminal," "POS System," or "POS Equipment" shall mean the point-of-sale device(s) or system used by Franchisee, which must meet the communications protocol and criteria of the PayPoint Network.

(l)  The term "Settlement Day" shall mean any day excluding weekends and the following holidays: New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day as well as any other days on which the Settlement Bank(s) are closed.

(m)  The term "participating Financial Institution," "Financial Institution," or "Network" shall mean the financial institutions, networks or Members or Affiliates of participating networks which execute agreements with Franchisor to participate in or provide services through the PayPoint Network.

3.    PayPoint Network Description
The PayPoint Network shall enable Cardholders to receive cash or to pay for purchases of products and services by means other than cash, money order or check. Each Cardholder shall use an access card to initiate a Transaction. Franchisee shall promptly honor all valid access cards when presented by Cardholders and shall treat Cardholders from all participating Financial Institutions equally. Franchisee shall use a POS Terminal and may also use one or more Island Card Reader devices ("ICR Device") that are in communication with the PayPoint Network computer facility(ies).

When the Cardholder's access card is inserted in the POS Terminal or ICR Device, information encoded on the magnetic stripe on the reverse of the access card shall be read by a magnetic stripe reader. The Cardholder shall enter his or her Personal Identification Number ("PIN") on a key pad. The encoded information, the encrypted PIN, the purchase amount or preauthorization request, and such other data regarding the Transaction as Franchisor may reasonably require, shall be transmitted from the POS Equipment to the Pay Point Network computer facility(ies) and from the PayPoint Network computer facility(ies) to a participating Financial Institution. Financial Institution shall respond with either an approval or denial for the requested Transaction.

With certain types of POS equipment, certain purchases, e.g. gasoline, may be preauthorized by the participating Financial Institution before any product or service is purchased or performed; the actual purchase amount shall be transmitted to the

Financial Institution after the Cardholder has obtained such product or service. It is understood and agreed that the actual purchase amount shall be no more than the amount preauthorized.

The final purchase amount shall subsequently be debited form the Cardholder's deposit account and credited to the Retailer's Account via the PayPoint Account(s). Franchisee shall not permit anyone to complete a Transaction unless Franchisee has received approval through the PayPoint Network.

4.    Rent
Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor, or the Commencement Date, as defined below, if this is the initial PayPoint Agreement between Franchisee and Franchisor or, where applicable, the first day of the thirteenth month following the Commencement Date, Franchisee shall pay to Franchisor, for participation in the PayPoint Network, transaction fees in the amount set forth on Exhibit A, which is incorporated herein, made a part hereof and attached hereto. Such fees shall be due and payable to Franchisor on or before the tenth day of the month following the month in which such fees were incurred during the term of this Addendum. Provided, however, that if Franchisee installs and ICR device at the Facility prior to the Commencement Date and operates it thereafter, Franchisee shall pay no fees for participation in the PayPoint Network for the first twelve months following the Commencement Date and 50% of the applicable fees for the balance of the term of this Agreement. The term "Commencement Date" shall mean the date on which the first "live" Transaction, that is, a Transaction involving a Cardholder at the Facility, is provided to Franchisee through the PayPoint Network.

Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor or, if this is the initial PayPoint Agreement between Franchisee and Franchisor, on the Commencement Date, and thereafter on or before the first day of each month during the term of this Addendum, Franchisee shall also pay Franchisor telephone line charges set forth on Exhibit A. It is understood that if Franchisee's product agreement(s) with Franchisor expires within the first twelve months following the Commencement Date and Franchisee and Franchisor execute a new Addendum to Contract Dealer Gasoline Agreement (PayPoint Network Non-Lessee BPWCP Retailer) and Franchisee has installed and is operating an ICR Device and is therefore eligible for the waiver of transaction fees as set forth above, Franchisee shall pay no transaction fees for participation in the PayPoint Network for the number of months remaining of the original twelve month waiver period following the original Commencement Date referred to in this Addendum.

If Franchisor terminates this Addendum at any time during the term of this Addendum for cause or because Franchisee has been designated a Special Retailer as described in Paragraph 14, or if Franchisee elects to terminate this Addendum at the end of the thirteenth month following the Commencement Date, as provided below for Franchisees on their initial PayPoint agreement, Franchisee shall pay Franchisor as set forth on Exhibit D, attached hereto, incorporated herein and made a part hereof, for disconnection and removal of telephone lines. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all fees, and sales, use, rental, gross receipts, inventory, excise, income and any other taxes (including interest, penalties, and additions to tax) imposed by any federal, state or local governmental authority upon Franchisee or Franchisor (except those taxes based upon or measured by the net income of Franchisor) in connection with any payments made pursuant to this Addendum. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges or the use of any loaned property. Franchisee shall furnish to Franchisor, promptly upon request, any documentation, which in Franchisor's discretion is required to evidence the payment of any tax, including, but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and canceled checks.

If this is the initial PayPoint agreement between Franchisee and Franchisor, on the first day of the thirteenth month following the Commencement Date, Franchisee shall have the option, upon giving Franchisor at least 30 days prior written notice, to terminate this Addendum; to downgrade the number of PayPoint Electronic Cashiers (Island CardReaders), if applicable; to downgrade to the Paypoint Cashier only (ARCOmatic terminal), if applicable; or the downgrade to the PayPoint Authorization Terminal (low end terminal device). Any downgrading of equipment is at Franchisee's sole cost and expense.

5.    Security

Franchisee shall require each Cardholder to enter his or her PIN on the POS Equipment at the Facility in order to initiate a Transaction, except to complete Preauthorized Transactions. All Cardholder PINs transmitted to Franchisor must be encrypted at the POS Terminal or ICR Device where the PIN is entered and must remain encrypted from such point of entry throughout the PayPoint Network. After completion of the Transaction, no PINs shall be retained by Franchisee. Franchisee agrees to take all precautions Franchisor may reasonably require to ensure security of data transmitted between the Franchisee location and participating Financial Institutions and in no event shall Franchisee permit PINs to be transmitted "in the clear."

6.    Transaction Approval or Denial

It is understood that participating Financial Institutions have sole discretion to give approval or denial to Transactions requested by Franchisee and a Cardholder. Franchisee agrees to draw no positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial.

7.    <u>Access to Franchisee Location; Promotion and Evaluation of PayPoint Network</u>
Franchisee agrees to provide reasonable access to the Franchisee location to Franchisor's employees, agents and contractors and, if accompanied by Franchisor's employees, agents or contractors, to participating Financial Institutions. Franchisee acknowledges that Franchisor and participating Financial Institutions, shall require access to install and test the PayPoint Network Service and equipment, to demonstrate PayPoint Network Services to Cardholders, to study Cardholder use of the PayPoint Network and to ensure Franchisee's compliance with this Addendum.

To the extent permitted by law, Franchisee agrees to place, at the Franchisee location, promotional and other materials provided by Franchisor. Franchisee agrees further to cooperate with Franchisor in it efforts to promote and evaluate the PayPoint Network.

8.    <u>Interruption of Service</u>
Franchisor and Franchisee shall cooperate to resolve any system malfunction or problem that interrupts normal operation of the PayPoint Network. Franchisor shall provide instructions and procedures for the handling of Transactions that are initiated when communications between Franchisor, the participating Financial Institutions and the Franchisee location are interrupted. Franchisee shall immediately notify Franchisor's Maintenance Department if there is an interruption of the PayPoint Network.

9.    <u>Cardholder Refund or Reversal/Void Transactions</u>
Cardholder refund transactions shall not be processed electronically, but shall be processed by refunding cash or otherwise reimbursing the Cardholders. Receipts shall be made available to Cardholders in accordance with Paragraph 10 of this Addendum for all such Transactions.

10.    <u>Receipts</u>
For each Transaction approved through the PayPoint Network, Franchisee shall make a receipt available to the Cardholder. The receipt shall contain all information required by Federal Reserve Board Regulation E or other applicable laws and regulations. Receipts shall include the following information: Cardholder's access card number, name and location of the Facility, date, time, amount of Transaction, type of Transaction (payment), type of account to or from which funds are transferred (unless only one type of account may be accessed), Franchisor assigned transaction or trace number and/or Financial Institution assigned reference number if the Transaction has been transmitted to Financial Institution, and, if applicable, any Transaction Fee.

Franchisee understands and agrees that portions of this Addendum are for the benefit of participating Financial Institutions and therefore, if Franchisee breaches some of the terms and conditions of this Addendum, including but not limited to:

(a) breaches of the Receipt provisions of this Paragraph 10;

(b) breaches of the Cardholder Dispute provisions of Paragraph 11 of this Addendum;

(c) initiation or attempt to initiate by Franchisee or its agents or employees unauthorized transactions;

(d) uses of any participating Financial Institution's name or marks or references to any participating Financial Institution in any advertising, point of purchase material, news release or trade publication without Franchisor's prior written consent or the sublicense or attempt to sublicense Franchisee's right to use such name or marks after receiving such consent;

(e) failure to display, to the extent permitted by law, promotional and other materials as required by Paragraph 7 of this Addendum or failure to cease using and return any such materials should any participating Financial Institution withdraw from PayPoint Network participation;

(f) drawing a positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial in breach of the provisions of Paragraph 6 of this Addendum;

(h) failure to follow the PayPoint Network procedures set forth in Paragraph 3 of this Addendum;

(i) breaches of the Confidentiality/Non-Disclosure provisions of Paragraph 16 of this Addendum;

(j) breaches of the Security provisions of Paragraph 5 of this Addendum; or

(k) breaches of the Indemnification provisions of Paragraph 15 of this Addendum.

Franchisor or participating Financial Institution(s) shall have the right to name Franchisee a "Special Retailer" and to recover from Franchisee for the amount of all claims, liability, losses and expenses, notwithstanding any limits contained in Paragraph 15 of this Addendum, and (including, without limitation, attorneys fees) asserted against or incurred by Franchisor or such Financial Institution(s) as a result of such breach. Such right to recover on the part of Franchisor or participating Financial Institutions shall include the right to debit the Franchisee's Trade Statement or electronically debit Retailer's Account, if Franchisee has not forwarded such amount to Franchisor within a period of time specified in a notice to the Franchisee. Such third party beneficiary rights shall be enforceable against Franchisee despite any defenses Franchisee may have against Franchisor.

Furthermore, Franchisee understands and agrees that a breach of this Addendum may be grounds for termination/non-renewal of the Contract Dealer Gasoline Agreement.

11.   Resolution of Disputes

(a) Cardholder Disputes
Franchisee acknowledges that participating Financial Institutions are required by Federal law to resolve errors asserted by Cardholders, and to provide documentation requested by Cardholders, within certain time limits. Franchisee agrees to cooperate with Franchisor and participating Financial Institutions to resolve Cardholder disputes or inquiries about PayPoint Network Transactions. To facilitate resolution of Cardholder disputes, Franchisee shall retain, for a period of at least one hundred eighty (180) days, copies of receipts issued to Cardholders pursuant to Paragraph 10 of this Addendum, or reports from which Transaction information can be retrieved. In response to an oral request by Franchisor or a participating Financial Institution, to be confirmed in writing, Franchisee shall, within three (3) Working Days of the oral request, send documentation to Franchisor or to such Financial Institution, as instructed by Franchisor, showing requested receipt information for any Transaction that occurred within the previous one hundred eighty (180) days. If Franchisee fails to provide the requested information within three (3) Working Days, Franchisor shall, at the request of the participating Financial Institution, debit Franchisee's Trade Statement or electronically debit Retailer's Account for the amount disputed by the Cardholder and credit, through the participating Financial Institution, the Cardholder's deposit account for the amount disputed. The obligations of this Paragraph 11 shall survive termination of this Addendum. Detailed procedures for customer dispute resolutions are incorporated herein, made a part hereof and attached hereto as Exhibit B.

(b) Franchisee Disputes
Franchisee agrees to review all Franchisee Account Statements and Management Reports (including journal tapes, daily sales reports and Management Report Printer tapes) and, within 60 days of a Transaction, to notify the PayPoint Network computer facility(ies) by telephone, to be confirmed immediately in writing, of any errors, discrepancies or disputes that Franchisee has concerning such Transaction. Neither Franchisor nor participating Financial Institutions shall be liable for errors, discrepancies or disputes of which Franchisee fails to notify Franchisor within such 60 day period. If the resolution of the error, discrepancy or dispute by Franchisor or a participating Financial Institution involves a credit to Franchisee, Franchisor shall pay Franchisee such credit by check.

(c) Disputes Over Merchandise or Service
Franchisee shall handle all disputes over quality of merchandise or services purchased from Franchisee by Cardholders directly with Cardholders and shall indemnify and hold Franchisor and participating Financial Institutions harmless from any claim, action, damage or expense, including strict liability in tort, arising out of such disputes or the sale of goods or services by Franchisee; provided, however, to the extent Franchisee's petroleum or non-petroleum franchise agreements, if any, are contrary to this provision as to Franchisor, such petroleum or non-petroleum franchise agreement shall be controlling as to Franchisor.

12.    **Transaction Error Resolution**

In certain unusual circumstances, Retailer's Account may be erroneously credited with an amount for a Transaction that did not occur at the Franchisee location or with a duplicate of an amount of a Transaction or fees for which Retailer's Account was previously credited. In such circumstances, Franchisee shall, within three (3) Working Days of receipt of an oral request, provide Franchisor with the amount of such erroneously credited or duplicate amount. If Franchisee fails to provide Franchisor with such amount, Franchisee agrees that Franchisor shall have the right to debit Franchisee's Trade Statement or electronically debit Retailer's Account for the amount of such erroneously credited or duplicate amount so that Franchisor may properly credit the Cardholder or other retailer's account.

13.    **Settlement; Settlement Reporting**

Franchisor shall process all approved Transactions captured each Settlement Day and any preceding non-Settlement Day and make arrangements for the funds to which Franchisee is entitled to be deposited into his or her Retailer's Account.

Deposit and Transaction totals shall be made available to Franchisee by way of the POS Terminal, if possible; otherwise, by way of written reports. Franchisor shall also mail to Franchisee, on request, summary reports of PayPoint Network Transactions at the Facility.

14.    **Term; Termination**

Except as otherwise provided in this Addendum, PayPoint Network Service shall be provided from the Effective Date or, where applicable, the Commencement Date until the termination or expiration of Franchisee's Contract Dealer Gasoline Agreement with Franchisor. The Commencement Date shall be set forth in a notice from Franchisor to Franchisee.

Franchisor may terminate this Addendum for any reason upon at least ninety (90) days advance written notice to Franchisee. For cause, Franchisor may terminate this Addendum immediately upon giving written notice to Franchisee. In addition, Franchisor may, at its sole option, terminate Franchisee's ability to accept access cards from certain participating Financial Institutions or terminate this Addendum or the Contract Dealer Gasoline Agreement immediately if a Financial Institution notifies Franchisor that it has designated Franchisee as a "Special Retailer," *i.e.*, a Franchisee that Financial Institution has reason to believe has originated unauthorized Transactions to a Cardholder's deposit accounts or a Franchisee from whom an excessive number of Transactions are ultimately subject to chargeback, that is, debit of Franchisee's Trade Statement as more fully described in Paragraph 10 of this Addendum or a Franchisee who violated or failed to comply with the Security provisions referred to in Paragraph 5 of this Addendum. On the first day of the thirteenth month following the Commencement Date, Franchisee may terminate this Addendum for any reason upon at least thirty (30) days advance written notice to Franchisor. In the event of termination, Franchisee shall return to Franchisor all instructional and promotional material Franchisor has provided for use with the PayPoint Network and shall cease to use and display the "Marks" as defined in Paragraph 17a and participating Financial Institutions' trademarks, trade names and trade indicia and shall remove all decals and signs indicating Franchisee's participation in the PayPoint Network and, if Franchisee is terminated for cause or because he/she has been designated a Special Franchisee, Franchisee shall pay the applicable amount set forth on Exhibit D.

In the event Franchisee refuses to, or is unable to return the material and/or to cease use and display, then Franchisor shall have the right to enter Franchisee's Facility and remove all such material, decals, and signs, and Franchisee agrees to pay the costs therefor.

15.    **Indemnification**

Each party shall indemnify the other and hold it harmless and Franchisee shall indemnify participating Financial Institutions from any claim, action, damage or expense of any kind arising solely from fault or neglect of the indemnifying party, including but not limited to claims of infringement of any patent, copyright, trade secret or other proprietary right in the operation of the PayPoint Network. Neither party shall be liable to the other for any special, indirect or consequential damages, including but not limited to lost profits, even if the parties have knowledge of the possibility of such damages.

Franchisee shall indemnify, hold harmless and defend Franchisor and participating Financial institutions from and against all claims, losses, costs, damages, liabilities, and expenses (including reasonable attorneys' fees) which are suffered as a result of any Transaction or attempted Transaction and arise out of:

74

(a)  Personal injury or tangible property damage suffered or incurred by any person on Franchisee's premises;

(b)  Negligence or fraudulent conduct of Franchisee, Franchisee's agents and employees and independent contractors;

(c)  Unauthorized entry of data into the PayPoint Network or any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution's debit card system/network, and POS equipment;

(d)  Unauthorized receipt of data from any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution and POS Equipment;

(e)  Disputes over Franchisee's sale or lease of goods or services; or

(f)  Failure of Franchisee, its employees, agents and its independent contractors to comply with this Addendum, or with applicable federal, state, or local laws, rules or regulations.

However, Franchisee shall not be liable for the failure by any Financial Institution to discover a Technical Error, originated by Franchisee.

16.    Confidentiality; Nondisclosure
Franchisee acknowledges that all information that is disclosed to, or comes to the attention of Franchisee for purposes of the development or operation of any aspect of the PayPoint Network (herein "Information") is strictly confidential. Franchisee agrees that Franchisee shall not use for any purpose other than Franchisee's use of the PayPoint Network or disclose said Information or knowingly permit Franchisee's employees or contractors to disclose said Information to any person outside Franchisor and Franchisee, or to any employee or contractor of Franchisor or Franchisee who does not have a specific need to know in performance of work hereunder.

Franchisee acknowledges that participating Financial Institutions have a responsibility to their Cardholders to keep all records pertaining to Cardholders' banking transactions (herein "Cardholder Information") strictly confidential.    Franchisee shall maintain the confidentiality of Cardholder Information.

This paragraph shall not prevent the participating Financial Institutions from disclosing to their Cardholders information about such Cardholders' individual transactions.

Franchisor agrees to use reasonable care to avoid disclosure of information relating to sales by Franchisee (herein "Sales Information") other than to Financial Institutions and other third parties who require access to Sales Information for purposes relating to Franchisee's use of or Franchisor's operation of the PayPoint Network. Franchisor's obligation of non-disclosure shall not apply to any Sales Information which is or becomes available to the public other than through breach of this Addendum by Franchisor. It is presently Franchisor's policy (which may be changed at any time by Franchisor at its sole option without notice) to destroy all records of Sales Information after two (2) years.    Franchisor's obligation of non-disclosure with respect to Sales Information shall terminate upon destruction of such Sales Information.

The obligations of this Paragraph 16 shall survive termination of this Addendum.

17. <u>Service Mark License</u>

(a)  PayPoint, PayPoint Electronic Cashier, PayPoint Cashier, PayPoint Network, PayPoint and "Triangle" design, Electronic PayPoint, and the "Triangle" Design (hereinafter called "Marks") are service marks of Franchisor.

(b)  During the term of this Addendum, Franchisor grants to Franchisee for use at Franchisee's Facility a non-exclusive license and right to use the marks in connection with the PayPoint Network as defined in Paragraph 3, but only so long as such services are performed using equipment approved by Franchisor and such equipment is maintained in good operating order and is operated in accordance with Franchisor's training program and guidelines as promulgated from time to time by Franchisor.

(c)  Franchisor shall have the right at all time to enter Franchisee's Facility for the purpose of inspecting the equipment used with the PayPoint Network, and to satisfy itself that services are being provided to the public according to Franchisor's standards.

(d)  During the term of this Addendum, Franchisee shall be permitted to use and display the marks and other names and trade indicia used or authorized for use by Franchisor in connection with the PayPoint Network, but only in accordance with standards as set forth from time to time by Franchisor for the type of facility Franchisee is operating.  Franchisee shall only be permitted to use or display names, marks, symbols, or trade indicia belonging to participating Financial Institutions in conjunction with PayPoint equipment or on advertising upon Franchisor's prior approval, and such use and display is subject to whatever restrictions Franchisor or such institutions may prescribe.

(e)  Franchisor expressly reserves the right to change, alter, modify, or withdraw the Marks, or any of them including the PayPoint name, at any time by giving Franchisee not less than thirty (30) days prior written notice thereof.  In the event of such change, alteration or modification, Franchisee agrees that it shall henceforth not use the mark or name which has been changed, altered, modified, or withdrawn.  In the event the PayPoint name is changed, altered, modified, or withdrawn by Franchisor, it is agreed that the new name or Mark shall be substituted for "PayPoint Network" as it appears in this Addendum.

(f)  Franchisee recognizes Franchisor's ownership and title to the Marks and shall not claim adversely to Franchisor any right, title, or interest thereto.  Particularly, Franchisee agrees, during and after the term of this Addendum, not to use, register or attempt to register as a trademark or as a trade or corporate name, or aid any third party in registering or attempting to register, any of the Marks or any marks, names, or symbols confusingly similar thereto, or incorporating one or more of the words in such marks or names as trademarks or service marks, or as trade or corporate names.

(g)  All use of the Marks by Franchisee shall inure exclusively to the benefit of Franchisor and Franchisor may utilize such use in registering or defending such Marks.  Franchisee agrees to cooperate with Franchisor in providing evidence or testimony relative to or supporting Franchisee's use of said Marks.  Any registrations obtained by Franchisee contrary to Section (f) shall be held in trust for Franchisor and assigned by Franchisee to Franchisor upon Franchisor's request.

(h)  Upon termination of this Addendum or the Contract Dealer Gasoline Agreement, the undertakings and duties of Franchisee in Sections (f) and (g) shall survive and Franchisee shall cease using and remove the Marks and any names, marks, symbols, or trade indicia of participating Financial Institutions as set forth in Paragraph 14 of this Addendum.

18.  <u>Force Majeure</u>

No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Addendum to the extent that it arises from causes beyond the control and without fault or neglect of the party otherwise chargeable with failure, delay or default, including but not limited to:  action or inaction of governmental, civil or military authority; strike, lockout or other labor dispute; war, riot or civil commotion; theft, fire, flood, earthquake, natural disaster; or default of a common carrier.

The party wishing to rely on this paragraph to excuse failure, delay or default shall, when the cause arises, give the other party prompt written notice of the facts constituting same, and when the cause ceases to exist, give prompt notice to the other party.

19.   Assignment
Franchisee shall not assign any of its rights or delegate any of its obligations pertaining to the PayPoint Network without the prior written consent of Franchisor. Any assignment or delegation made without such prior written consent shall be void and any assignment or delegation to which Franchisor consents must be in conjunction with an assignment of the Contract Dealer Gasoline Agreement.

20.   Prices, Goods and Services
No provision of this Addendum shall be construed as an agreement by Franchisor or participating Financial Institutions to the retail prices charged or the quantity or quality of goods sold or services rendered by Franchisee to Cardholders or to customers of Franchisee.

21.   Independent Contractor
Franchisor and Franchisee are independent contractors with respect to the subject matter of this Addendum and neither party nor its employees shall be deemed for any purpose to be the agent, employee, servant or representative of the other with respect to the subject matter of this Addendum.

IN WITNESS WHEREOF, the parties have executed this Addendum, or caused it to be executed on their behalf on the dates indicated below.

BP West Coast Products LLC

Franchisee
STTN Enterprises, Inc.

_Cherry Heath_ 7-11-06
                        Date

_Nazim Faquiryan_ 6/20/06
                        Date

_Witness_ 7-11-06
                        Date

**BPWCP Contract Dealer/Distributor**

PayPoint Network Fees

| Transactions per Month | Fee per Transaction |
|---|---|
| 0 to 1,000 | $.10 |
| 1,001 to 2,000 | .08 |
| 2,001 to 3,000 | .06 |
| 3,001 to 4,000 | .04 |
| Over 4,000 | .02 |

Minimum Monthly Charge = $60.00

There will be no transaction fee during the first 12 months following the Commencement Date if Retailer installs a PayPoint Electronic Cashier®, purchased through BPWCP, at the pump island.

Phone Line Fee Options:

Leased Line -- $200 per month plus any phone company pass-through costs including installation for each *dedicated* line.

or

Dial Line -- installation costs plus monthly phone charge including per item phone calls.

Billing and Payment Terms:

Unless Retailer is entitled to 12-month waiver of the fee as set forth above, a fee will be charged for each Transaction. By the twentieth day of the following month, Retailer will be issued an invoice for: the total transaction times the fee per transaction for the tier achieved; the monthly phone line fee; and any portion of the monthly minimum not achieved. Invoices are payable upon receipt.

If Retailer's Contract Dealer or Distributor Agreement expires and is not renewed or is canceled prior to the expiration of the PayPoint Retailer Agreement, the PayPoint Agreement will be canceled or, at BPWCP's option, can be converted to a Non-BPWCP PayPoint Retailer Agreement.

Transaction Definition:

A "Transaction" means each use of an access card by a Cardholder for the purpose of paying for a purchase of a product or service or receiving cash, scrip, a refund or a reversal/void from Retailer's Facility through use of the PayPoint Network to which a participating Financial Institution responds with an Approval or Denial code.

EXHIBIT B

<u>Retailer Resolution of Cardholder Disputes</u>

PayPoint Network

A cardholder dispute is initiated when a financial institution is notified of its cardholder's complaint. If a cardholder informs a Franchisee that a problem exists with a transaction made at the retail facility prior to the date of the complaint, the Franchisee should inform the cardholder that the complaint should be taken to the cardholder's financial institution. <u>All</u> resolutions must originate at the cardholder's financial institution.

Examples of complaints:

a)    Cardholder was charged twice for a purchase.

b)    Cardholder never made the purchase, he/she was billed for by his/her financial institution.

Procedure for resolution of cardholder complaints by the PayPoint Network:

1)    Cardholder disputes a transaction and notifies financial institution.

2)    Financial institution then notifies the Franchisor switch of the problem.

3)    The switch researches its records and makes every effort to find the disputed transaction in order to resolve the problem.

4)    However, if the switch is unable to find the disputed transaction in the records maintained at the switch, the Franchisee will be notified via telephone. The switch contact person will provide the Franchisee with the data furnished by the financial institution and request a copy of the cardholder receipt and/or a copy of the Management Report Printer (MRP) report showing the disputed transaction information.

5)    This telephone request will be immediately followed by a written request - a copy of the PayPoint Network Retailer Transaction Information Request form containing all the required transaction information. This form will be mailed to the Franchisee within one (1) working day of the telephone call. A copy of this form is attached.

6)    The Franchisee will have only three (3) working days after receipt of the request to research the transaction and send the requested information to the financial institution listed on the form.

7)    The Franchisee is subject to chargeback of the transaction amount in question if the requested information is not sent within three (3) working days.

8)    The Franchisee must send a copy of the completed PayPoint Network RetailerTransaction Information Request form along with a copy of the customer receipt and/or MRP report (the same information furnished to the financial institution) to the Franchisor switch within one (1) working day of sending the information to the financial institution.

79

EXHIBIT C

PayPoint Network Retailer Account Designation*

RETAILER: _____

ADDRESS: _____

CITY: _____

STATE/ZIP CODE: _____

I HEREBY AUTHORIZE BP WEST COAST PRODUCTS LLC, , TO CREDIT THE ACCOUNT** DESCRIBED BELOW FOR SETTLEMENT PURPOSES FOR SERVICES PROVIDED THROUGH THE BPWCP PAYPOINT NETWORK.

THE ACCOUNT TO WHICH SUCH CREDITS SHOULD BE APPLIED IS

ACCOUNT NO. _____

AT _____

BRANCH NO. _____

PAYPOINT NETWORK RETAILER

BY: _____

TITLE: _____

DATE: _____

* If Retailer has different Retailer's Accounts for its Retailer's Facilities, an Exhibit C must be completed for each different Facility.

**FINANCIAL INSTITUTION MUST BE A MEMBER OF NACHA.

**PAYPOINT NETWORK**

**Retailer Transaction Information Request**

CLAIM NO.: _____

DATE CLAIM RECEIVED: _____

TODAY'S DATE: _____

A dispute has been filed by a cardholder regarding the following transaction:

FI CARD NO.: _____

TRANSACTION AMOUNT: _____  TRANSACTION DATE: _____

TRANSACTION TIME: _____  REFERENCE NO. _____

Please return a copy of cardholder receipt or management report printer (MRP) report showing requested financial data within three (3) working days to:

FINANCIAL INSTITUTION: _____

ADDRESS: _____

_____

CONTACT PERSON: _____

YOU ARE SUBJECT TO CHARGEBACK OF TRANSACTION AMOUNT IN QUESTION IF "REQUESTED INFORMATION" IS NOT SENT <u>WITHIN THREE (3) WORKING DAYS</u>

Franchisee:
Return a copy of this form along with copy of cardholder receipt and/or MRP report to:

NAME: _____

ADDRESS: _____

_____

DATE INFORMATION SENT TO FINANCIAL INSTITUTION: _____

81

EXHIBIT D

POS and Remote Equipment
Disconnection and Removal
<u>Fee Schedule</u>

| | |
|---|---|
| Telephone Line Disconnection | $200.00 |
| Each Inside Terminal Disconnection and Removal | $200.00 |
| Each Outside Terminal Disconnection and Removal | $400.00 |

82

EXHIBIT B
TO FIRST AMENDED COMPLAINT

Facility Number: <u>82461</u>
Customer Account Number: <u>0996439</u>
Category: <u>NTI</u>

am/pm MINI MARKET AGREEMENT

THIS AGREEMENT is made <u>July 11, 2006</u>, between BP West Coast Products LLC, a Delaware limited liability company, with an office at 4 CENTERPOINTE DRIVE, LA PALMA, CALIFORNIA 90623 ("BPWCP")

<u>and STTN Enterprises, Inc., a California Corporation</u>

(state whether a sole proprietorship, partnership, limited partnership, corporation or limited liability company ["LLC"];<br>
if partnership, the names of all partners and State of Organization; if limited partnership, the names of all general partners<br>
and State of Organization; if corporation, the State of Incorporation; if LLC, the State of Organization)

with an address at <u>631 San Felipe Road, Hollister, CA  95035</u> ("Operator").

Operator desires to be the franchisee of, and BPWCP is willing to grant to Operator a franchise for, an am/pm mini market located at the Premises set forth in PART I (which together with the buildings and improvements now or hereafter constructed thereon is referred to herein as the "Premises") on the terms and conditions set forth in PARTS I and II of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained in PARTS I and II hereof, each of the parties intending to be legally bound hereby, agrees as follows:

PART I

PART I contains specific terms which relate to the terms and conditions set forth in the corresponding sections - PART II, Form No. am/pm- 240WR-1 (4/2006), attached hereto and incorporated herein.

| Section | |
|---|---|
| 4.03 | Store Manager (if Operator operates more than one am/pm mini market): |
| 5.01 | This Agreement shall be binding on the parties as of the date first written above (Effective Date.) The franchise term of this Agreement shall begin on the , ("Commencement Date"), and shall end at 10 a.m. on the first day after the last day of the [] 120th or [XX ] 240th full calendar month following the Commencement Date. If no box is checked at the time this Agreement is executed, the box for 120th shall be deemed checked. If no date is set forth in this PART I, the Commencement Date shall be established by the "Notice of Final Inspection and Readiness" provided for in Section 5.01 of PART II. |
| 6.01 | Premises: |

<u>631 San Felipe Road</u>
(complete address by street number, including, where applicable, designation of corner)

City <u>Hollister</u>            State <u>CA</u>        Zip <u>95035</u>
If no address is set forth, the Premises shall be established by the "Site Acceptance" provided for in Section 6.01 of Part II.

| 6.01(a) | Target Area: _____ |
|---|---|
| 7.01(a) | Initial Franchise Fee: <u>Seventy Thousand and 00/100</u><br>Dollars [$ <u>70,000.00</u>]. |
| 7.01(c) | Renewal Franchise Fee: _____<br>Dollars [$ _____ .00] |
| 7.02(a) | Minimum royalty fee: <u>One Thousand and 00/100</u><br>Dollars [$ <u>1,000.00</u>]. |
| 7.03 | Security Deposit: <u>One Thousand and 00/100</u><br>Dollars [$ <u>1,000.00</u>]. |
| 16.01 | Operational Designee, if applicable: _____ |
| 17.02 | Entity Designee (Corporate Operators, LLC's, Limited Partnerships): _____ |

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)
Uniform

1 of 4

83

Facility Number:
Store Size <u>3,600</u> sq. ft.
(exterior dimensions)

## STORE EQUIPMENT
### (Real and Personal Property)

The equipment listed below is required to be installed in the Store unless otherwise indicated by a check mark at the left of the required items.   Operator must install and maintain the equipment so indicated prior to the Commencement Date. All equipment must be obtained from approved vendors, or, if applicable, meet BPWCP's specifications including, but not limited to, specifications with respect to brand, model, size, color and quality.

(Check only Required Equipment to be Furnished and
if excluded) <u>Installed by Operator</u>

### BUILDING
_____ am/pm Sun & Moon Sign
_____ Building Fascia (Illuminated)
_____ Corner Signage
_____ Interior Signage

### STORE
#### COFFEE
_____ Airpots (4) w/Rack (vendor supplied)
_____ Cappuccino Machine (5 head) (vendor supplied)
_____ Coffee Airpot Brewer (vendor supplied)
_____ Coffee Brewer (1 Burner) (vendor supplied)
_____ Coffee Brewer (3 Burner) (vendor supplied)
_____ Coffee Brewer Riser  (vendor supplied)
_____ Coffee Condiment Rack (vendor supplied)
_____ Coffee Menu Board
_____ Coffee Mug rack (vendor supplied)
_____ Coffee Warmer (2 position) (vendor supplied)
_____ Tea Rack (vendor supplied)
_____ Timer  (vendor supplied)
#### FLOOR
_____ Beverage Merchandiser, Breeze 20 oz
_____ Cigarette Merchandiser/Backbar
_____ Cooler Cabinet (Upright)
_____ Cooler boxes (walk-in)
_____ Napkin Dispenser (3)
_____ Shelving (Modular; Walk-in Cooler)
_____ Shelving (Storage Room), NSF Approved
_____ Shelving (hand sink in food area)
#### FOOD
_____ Bun Toaster
_____ Chili/Cheese Dispenser
_____ Condiment Dispenser (6 position)
_____ Convection Oven w/Racks
_____ Food Merchandising Warmer (1)
_____ Food Preparation Table
_____ Hood and Exhaust Ventilation System (for convection oven) (California only)
_____ Microwave Oven (Commercial)
_____ Nacho Rack (3 position)
_____ Sink (3 compartment-food)
_____ Sink (hand sink in food area)
_____ Thermometer (digital)

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)                    2 of 4
Uniform

Facility Number: <u>82461</u>

(Check only Required Equipment to be Furnished and if excluded)
<u>Installed by Operator (continued)</u>

<u>FOUNTAIN</u>
_____ Bulk CO2 (vendor supplied)
_____ Mantiovoc Ice and Beverage Equipment
_____ Scotman Ice Maker
<u>FROZEN BEVERAGE</u>
_____ Frozen Carbonated Beverage (FCB) Machine
<u>OFFICE/SALES COUNTER</u>
_____ Computer Software and Hardware
_____ Counter Merchandising System
_____ Fax Machine
_____ POS System with PayPoint® (BPWCP Approved)
_____ Safe
_____ Video Surveillance Equipment
_____ VSAT Equipment: (1) Hughes Satellite Dish and
                Hughes Indoor Unit - Satellite Receiver
                (2) Deicer (if required for colder climate)
<u>OTHER</u>
_____ Ice Maker
_____ PayQuick Island Cashier (PIC)
_____ Sales, take-out and beverage counters (including cup dispensers)
_____ Sink (service/mop)
_____ Water Heater
_____ Other: _____
_____ Other: _____
_____ Other: _____
_____ Other: _____

Items indicated as vendor supplied may be supplied by vendors in connection with vendors' products. Operator shall be furnished with a list of approved vendors and/or a copy of BPWCP's specifications for all required equipment upon execution by Operator of this Agreement.

This space is intentionally left blank.

ranchisee operator (DOFO)
arvym-241WR-1 (4/2006)                    3 of 4
Delfoye

85

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

OPERATOR ACKNOWLEDGES HAVING READ THIS AGREEMENT, INCLUDING PART II, GENERAL TERMS AND CONDITIONS, FORM No. am/pm- 240WR-1 (4/2006), AND UNDERSTANDS FULLY ALL THE TERMS, PROVISIONS AND CONDITIONS HEREOF. **No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.**

BPWCP MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO OPERATOR'S PROFIT OR INCOME TO BE DERIVED FROM THE OPERATION OF THE am/pm STORE CONTEMPLATED HEREUNDER.

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

BP West Coast Products LLC

By _____      _____7-11-06_____
    Manager                                                              Date

**If Operator is an entity, complete and sign below:**

_____STTN Enterprises, Inc._____
(print or type name of entity)
Check one:
☐ a _____ general partnership;      ☐ a _____ limited partnership;
☐ a _____ limited liability company;   ☑ a _____CA_____ corporation

By: _____

Name: __Nazim Faquiryan_____

Its: __CEO and President_____

Date Signed: __6/20/06_____

By _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: ___n/a_____

By _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: ____n/a_____

By _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: ____n/a_____

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)
Uniform                                                    4 of 4

86

am/pm MINI MARKET AGREEMENT

PART II
General Terms and Conditions

ARTICLE 1

Service Mark and Service Name Conditions, Copyrights, Trade Secrets
and Confidentiality

A.    Service Marks, Trademarks and Service Names

1.01   Subject to the terms and conditions specified herein, and to the extent of BPWCP's rights therein, BPWCP hereby grants to Operator, beginning on the Commencement Date as defined in Section 5.01 and continuing during the term of this Agreement, the non-exclusive right and license to use the trade secrets and know-how regarding operation of am/pm mini markets, the service mark and service name "am/pm", or any variation thereof as may be approved in writing by BPWCP, and any other service marks, trademarks and service names used in connection with am/pm mini markets, solely in conjunction with Operator's operation of the Store provided for herein. Operator has no exclusive territory.  BPWCP reserves the right, in its sole discretion, to establish additional am/pm mini market stores and other BPWCP and non BPWCP franchises and franchises operated by BPWCP's wholly owned subsidiary or other company operated franchises and businesses, in any location and proximity to Operator's business.

1.02   BPWCP represents that it has applied for federal registration for various service marks for "am/pm" for retail grocery store and convenience store services and trademarks for various products. BPWCP has been granted federal registration for certain "am/pm" service marks and trademarks for retail grocery store and convenience store services.  BPWCP expressly reserves the right to change, alter or modify the am/pm service mark or service name or substitute any other service mark or service name at any time by giving Operator not less than thirty (30) days' prior notice thereof.  In the event of any change, alteration or modification of the service mark or service name, Operator agrees that only the service mark or service name, as changed, altered or modified, shall be used by Operator to identify the Store.  If the service mark and service name "am/pm" is changed by BPWCP, it is agreed that the new service mark and service name adopted by BPWCP shall be substituted for "am/pm" wherever "am/pm" appears in this Agreement. BPWCP also expressly reserves the right to change, alter or modify colors and designs and other service marks, trademarks and service names used in connection with am/pm mini markets from time to time and place to place as BPWCP deems appropriate or as required by law and, upon 90 days prior written notice from BPWCP (unless a lesser time is required by law), Operator will install such modified marks, colors or designs at Operator's expense.

1.03   Operator agrees that it shall notify BPWCP promptly of any unauthorized use of the am/pm service mark and service name by any person, firm, corporation or other entity (collectively referred to as "person").  At its expense, BPWCP shall challenge all unauthorized uses or infringements of the am/pm service mark, trademark and service name, and BPWCP shall have the sole right to decide whether to prosecute any person who unlawfully uses or attempts to use BPWCP's am/pm service mark, trademark or service name for retail grocery store, convenience store, or fast food services.  Operator agrees to provide such evidence and expert assistance as Operator may have within its control in connection with any such challenge or prosecution.

1.04   Operator recognizes and acknowledges that, as between BPWCP and Operator, BPWCP is the sole and exclusive owner of the am/pm service mark, trademark and service name and other service marks, trademarks and service names used in connection with am/pm mini markets and appearing on am/pm stores. Operator hereby agrees:  not to claim any right, title or interest in or to said service marks, trademarks or service names; not to directly or indirectly deny, assail, or assist in denying or assailing the sole and

franchisee operator (DOFO)
2nd    241WR-1 (4/2006)
    1 of 34

87

exclusive ownership of BPWCP in said service marks, trademarks and service names; not to adopt or use as Operator's own property any service marks, trademarks or service names of BPWCP nor employ any service marks, trademarks or service names confusingly similar to those of BPWCP; not to register or attempt to register BPWCP's service names or service marks, trademarks in Operator's name or that of any other person and not to use such service marks, trademarks or service names, or any parts thereof, as any part of any corporate or partnership name or any other business name. It is understood that this covenant shall survive the termination of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

1.05    Operator agrees, upon termination or non-renewal of this Agreement or upon termination or non-renewal of any subsequent Store Agreement, to assign BPWCP, without additional consideration, any service name or service mark, trademark rights that may have vested in Operator notwithstanding the provisions of Section 1.04 as a result of any activities of Operator pursuant to this Agreement. Operator agrees to use said service marks, trademarks and service names in connection with, and exclusively for, the promotion and operation of an am/pm store as provided hereunder, and in accordance with the standards, terms and conditions set forth in the Agreement and in accordance with instructions, rules and procedures prescribed in writing by BPWCP. Operator shall not use the am/pm service mark or service name, or other service marks, trademarks or service names of BPWCP, except as authorized by BPWCP and in no event in any manner that may or could adversely impact or jeopardize the am/pm image.

1.06    Operator agrees to display the am/pm service mark, trademark and service names as prescribed by BPWCP and to conduct the business of the Store in such a manner as to not reflect unfavorably on BPWCP's good will, service marks, trademarks and service names.

1.07    Operator agrees, immediately upon the termination of this Agreement or termination of any subsequent Store Agreement to cease and forever abstain from using the am/pm service mark and service name and other service marks, trademarks and service names used in connection with am/pm mini markets.

### B.        Copyrights

1.08    BPWCP grants to Operator a nonexclusive right and license during the term of this agreement to use BPWCP's franchise accounting system software at the am/pm mini market and display at Operator's am/pm Store copyrighted am/pm signage, posters, and other advertising and point of purchase materials. No rights of reproduction or distribution are included in the grant, and upon termination for any reason Operator shall immediately cease and desist from using or displaying any such copyrighted materials.

### C.        Trade Secrets and Confidentiality

1.09    BPWCP shall furnish or make available to Operator for use solely in connection with Operator's conduct of Operator's am/pm Store, BPWCP's franchise accounting system software, an am/pm Store System/Operations Manual, guides, and other forms and materials. Operator agrees during the term of this Agreement and after termination to keep confidential and not to furnish information as to the methods of operation, advertising programs or ideas, business information, or any other confidential information of BPWCP relating to the operation of any am/pm Store, to any person, except BPWCP, Operator's employees, or Operator's attorneys or accountants engaged by Operator in connection with Operator's operation of Operator's am/pm Store who have undertaken the same obligation of confidentiality as set forth herein for Operator. Notwithstanding the foregoing, nothing in this Agreement or any other agreement between the parties shall limit the ability of the Operator to consult with any tax advisor regarding tax issues pertaining to the am/pm franchise business.

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)                    2 of 34
Uniform

88

## ARTICLE 2

### Relationship of Parties

2.01    Neither Operator nor any of its employees shall hold itself or himself out at any time as an agent, representative, partner, joint venturer or employee of BPWCP. Operator shall have no authority, right or power to, and shall not bind nor obligate BPWCP in any way, manner or thing whatsoever, nor shall Operator represent that it has any right or power to do so. Operator shall undertake all obligations herein described as an independent contractor and shall exercise and be responsible for the exclusive control of the Store and Premises and all activities conducted therein and therefrom. In order to communicate with BPWCP, government agencies and others regarding matters such as financial reporting, safety, health and security, an ability to comprehend and communicate in English is necessary. Passing an English proficiency test is required.

2.02    Operator shall be solely responsible for hiring, supervising and directing all employees, the payment and withholding of all payroll and other taxes imposed upon or determined by wages and salaries of such employees, and for complying with all applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws. BPWCP shall have no control over employees of Operator, including, without limitation, the terms and conditions of their employment.

2.03    Unless otherwise expressly set forth in this Agreement, "Operator" shall include and refer to the sole proprietor, shareholders if franchisee is a corporation, partners if franchisee is a partnership and members if franchisee is an LLC.

2.04    Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

## ARTICLE 3

### am/pm Store Systems/Operations Manual; Extranet

3.01  Operator agrees that it shall operate the Store and maintain the Premises in accordance with the standards, methods, procedures, requirements, instructions, food specifications and equipment specifications set forth in the am/pm Store Systems/Operations Manual ("Manual" or "Systems Manual"), and any and all subsequent amendments and supplements thereto. BPWCP shall loan to Operator a copy of the Manual which shall be furnished to Operator upon execution by Operator of this Agreement; subsequent amendments and supplements shall also be loaned and furnished to Operator and Operator shall be required to acknowledge receipt of any of the foregoing loaned materials. The manual may be provided in writing, on CD-ROM, via the internet, extranet or equivalent means. Operator further agrees to instruct and keep its employees fully informed of all such methods and procedures as shall be promulgated by BPWCP from time to time. The Manual, as presently constituted and as it may hereafter be amended or supplemented by BPWCP from time to time, is incorporated in and made a part of this Agreement. Operator acknowledges and agrees that compliance with the standards, methods, procedures, requirements, instructions and food specifications contained in the Manual (as from time to time amended or supplemented) is important to Operator and to BPWCP. Failure to adhere to the provisions of the Manual shall constitute a breach of this Agreement.

3.02(a) Operator must maintain a computer connection to connect to BPWCP's extranet, through which BPWCP and Operator may communicate with each other and through which BPWCP may disseminate the Manual, updates thereto, planograms, inventory books, required standards and specifications and other confidential information from time to time. BPWCP shall have sole discretion and control over all aspects of

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)
Bodi-am                                  3 of 34

89

the extranet, including the content and functionality thereof. BPWCP will have no obligation to maintain the extranet indefinitely, and may dismantle it at any time without liability to Operator.

(b) Operator shall have the privilege to use the extranet, subject to Operator's strict compliance with the Standards, protocols and restrictions that BPWCP may establish from time to time. Such Standards, protocols and restrictions may relate to, among other things, (a) the use of abusive, slanderous or otherwise offensive language in electronic communications, (b) communications between or among operators that endorse or encourage breach of any operator's franchise agreement, (c) confidential treatment of materials that BPWCP transmits via the extranet, (d) password protocols and other security precautions, (e) grounds and procedures for BPWCP's suspending or revoking an operator's access to the extranet, and (f) a privacy policy governing BPWCP's access to and use of electronic communications that operators post to the extranet. Operator acknowledges that, as administrator of the extranet, BPWCP can technically access and view any communication that any person posts on the extranet. Operator further acknowledges that the extranet facility and all communications that are posted to it will become BPWCP's property, free of any claims of privacy or privilege that Operator or any other person may assert.

(c) Operator shall establish and have continually available (during all times that the extranet shall be established and until the termination of this Agreement) an electronic connection (the specifications of which shall be specified in the Manual) with the extranet that allows BPWCP to send messages to and receive messages from Operator, subject to the standards and specifications. Operator shall participate and use the extranet in accordance with BPWCP's requirements as set forth in the Manual.

(d) If Operator shall breach this Agreement or any other agreement with BPWCP or it's Affiliates, BPWCP may, in addition to, and without limiting any other rights and remedies available to BPWCP, disable or terminate Operator's access to the extranet without BPWCP having any liability to Operator, and in which case BPWCP shall only be required to provide Operator a paper copy of the Manual and any updates thereto, if none have been previously provided to Operator, unless not otherwise entitled to the Manual.

ARTICLE 4

*Hours of Operation and Personal Participation*

4.01  Operator shall promote the business of the Store and shall cause the Store to be operated continuously throughout the term of this Agreement. Operator shall cause the Store to be open for business not less than sixteen (16) hours every day of the year, excluding Christmas, or the maximum hours permitted by applicable law if less than sixteen (16) hours.

4.02  Failure of Operator to cause the store to be open for business in the manner and during the hours and days prescribed herein shall constitute a material breach of this Agreement. In addition to any other remedy available to BPWCP, in the event Operator fails to operate the Store during the hours and days prescribed in Section 4.01 during any calendar month during the term of this Agreement, Operator shall pay BPWCP, as liquidated damages and not as a penalty, in addition to the royalty fee payable for such month, one thirtieth of the minimum monthly royalty fee for each day Operator fails to cause the Store to be open for the prescribed hours.

4.03  Operator shall participate in the operation of the am/pm business for a period of at least 40 hours per week and if Operator has more than one am/pm mini market, Operator must have one employee for each store, who has attended and successfully completed the am/pm Store Manager training program offered by BPWCP and who is employed on a full time basis at each store ("Store Manager"). If Operator operates more than one am/pm mini market, Operator hereby designates the person whose name is set forth in PART I, Section 4.03, hereof as the Store Manager for the Premises which are the subject of this Agreement (within two months of the date such designated person is no longer employed at the store, Operator must replace such Store Manager with another trained Store Manager or the franchise may be

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                        4 of 34

90

terminated). For purposes of personal participation, Operator shall be the sole proprietor if Operator is a sole proprietor, the Operational Designee if Operator is a corporation, partnership or LLC. The Operational Designee must be an officer or shareholder if Operator is a corporation, a member or manager of the LLC if Operator is an LLC, a general partner if Operator is a limited partnership, a partner if Operator is a partnership other than a limited partnership. In the case of Concurrent Operations at the Premises, as more fully described in Article 4.05 hereof, Operator is obligated to participate in the operation of all franchise businesses for at least 40 hours per week.

4.04   Failure of Operator to participate in the operation of the am/pm business as described in Section 4.03 and/or, if applicable, to have the Store Manager designated in PART I employed at the store on a full time basis and/or, if applicable, to replace such person with another trained Store Manager within two months from the date the Store Manager designated in PART I or any successor to such person is no longer employed at the store shall constitute a material breach of this Agreement.

4.05   In the event the am/pm mini market, with BPWCP's approval, is operated at the Premises by Operator in conjunction with another or more than one other BPWCP franchise, ("Concurrent Operations"), such Concurrent Operations shall be conducted and governed by the terms and conditions of the franchise agreements of each of the applicable franchises and any additional special terms, conditions and provisions relating to Concurrent Operations as may be included in such franchise agreements or other writing with regard to such operations.

4.06   Each individual who owns an interest in the franchise entity must sign a personal guarantee agreeing to discharge all obligations of the Operator under the franchise agreement. This will also be required of the individual's spouse where the individual lives in or the franchise is located in a community property state. BPWCP will only accept as a franchisee sole proprietorship, partnership, corporation or limited liability company. A franchisee may not be a trust, custodian or trustee of a trust, nor can a trust, trustee or custodian be a partner, shareholder or member of an LLC.

ARTICLE 5

Term

5.01   This Agreement shall be binding on the parties as of the Effective Date. Except as otherwise provided in this Article, the "Commencement Date" shall be on the date set forth in PART I. If no date is set forth in PART I, the Commencement Date shall be the date established by BPWCP by notice to Operator ("Notice of Final Inspection and Readiness") as the date the Premises are available for occupancy and ready for conduct of the business of the am/pm mini market. The term hereof shall end as of 10:00 a.m. on the first day after the last day of the one hundred twentieth (120th) or two hundred fortieth (240th) full calendar month following the Commencement Date as set forth in Part I, unless this Agreement is terminated earlier pursuant to the terms hereof. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Operator before the end of the term.

5.02   **New Construction or Raze and Rebuild.**

(a)   If this Agreement is for an am/pm mini market that will be newly constructed after this Agreement is executed or an am/pm mini market at Premises where an existing BPWCP franchised premises is to be razed and a new am/pm mini market constructed after this Agreement is executed ("New Construction" or "Raze and Rebuild"), BPWCP shall provide standard generic architectural, plumbing and electrical site plans to Operator. It will be necessary for Operator to have the generic plans modified in order to take into consideration the topographic features of the Premises, meet the zoning, setback, easement, sign codes, local building codes and other requirements. Operator shall promptly do all of the following:

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)
Uniform                                      5 of 34

91

A.  Have prepared and submit to BPWPC, for approval, in a format provided by BPWCP or acceptable to BPWCP, a Site Investigation Report which includes, but is not limited to, detailed Development Guidelines, Requirements and Restrictions, Roadway Considerations, Approval Process, Assessments and Fees, Project Timeline, Cost Estimate and Site Photographs.

B.  Have prepared and submit to BPWCP for approval, architectural and construction plans and drawings for the am/pm mini market specific to the Premises.

C.  Submit to BPWCP a copy of the deed, lease or other documents evidencing Operator's right to occupy and modify the Premises

D.  Maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to construct and operate the am/pm mini market.

Within 60 days after BPWCP's approval of the architectural plans and drawings, Operator shall apply for all licenses, permits, variances and other required governmental approvals (collectively "Permits") necessary for the New Construction or the Raze and Rebuild. BPWCP, at its sole discretion, may provide assistance in obtaining Permits. All expenses in connection with obtaining Permits shall be Operator's responsibility.

All changes to the BPWCP approved plans to meet local building codes and other governmental requirements and changes not resulting from governmental requirements must be submitted to BPWCP in writing with drawings and specifications and approved by BPWCP in advance of construction. If changes are mandated by governmental authority, a copy of the specific instructions to change the plans shall be submitted along with the request for approval of the changes. Any changes not mandated by governmental authority shall be submitted simultaneously as one consolidated request for modification of the approved plans.

All construction of the am/pm mini market and Premises shall be in accordance with plans and drawings approved by BPWCP and, once constructed, Operator shall not make alterations or changes to the Store or Premises during the term of this Agreement, except with the prior written consent of BPWCP. Prior to the start of construction, Operator shall transmit a complete construction drawing set in electronic format to BPWCP. Software format shall be AutoCAD release 14 or 13. Drawings created on software other than those AutoCAD versions shall be converted prior to transmittal. Multiple drawing files shall be contained on either a 100 mega byte zip disk or 650 megabyte compact disk. Single sheet or small files, 1MB or less, shall be emailed to a designated addressee. All cross references must be bound prior to transmittal.

If Operator uses a BPWCP approved architectural firm to prepare the Site Investigation Report and all architectural plans and drawings, and after Operator has paid the total Initial Franchise Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000 for the fees and expenses incurred for such Report and plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to such architectural firm, but no sooner than the start of construction.

(b)  Operator shall obtain a license to sell beer and wine if lawful in the jurisdiction in which the Store is located.

(c)  If this Agreement is for New Construction, Operator shall begin construction within 18 months of the Effective Date and complete construction and open for business within 24 months of the Effective Date.

(d)  If this Agreement is for a Raze and Rebuild, Operator shall complete construction and open for business within 12 months of the Effective Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                    6 of 34

92

(e)     Only in the event that Operator is not able, for reasons beyond Operator's control, to obtain permits required for New Construction or Raze and Rebuild or obtain a beer and wine license, if lawful in the jurisdiction where the Premises is located, Operator may terminate this Agreement within 18 months of the Effective Date if this Agreement is for New Construction or 12 months of the Effective Date if this Agreement is for a Raze and Rebuild.  In the event of such termination by Operator, any initial franchise fee paid to BPWCP shall be refunded after deducting the greater of either BPWCP's out of pocket expenses incurred or $1500.  No interest shall be payable on any refunded amounts.

(f)     In the event that Operator fails to timely comply with any of the requirements set forth herein, does not complete the New Construction or Raze and Rebuild, obtain a beer and wine license, if available, and satisfactorily complete the initial training described in Article 16 of this Agreement within the time limits specified, in addition to any other remedies BPWCP shall have under this or any other agreement, BPWCP may terminate this Agreement.

(g)     After Operator has completed construction and successfully completed required initial training, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date.  If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, at its option, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business.  In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.  In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.03  Retrofit or Rebrand.

(a) If this Agreement is for an existing am/pm mini market that does not meet BPWCP's current visual and design standards, Operator shall made modifications to the am/pm mini market and the Premises in accordance with the Retrofit Program Design Intent, Visual Standards and approved am/pm Store layouts provided to Operator ("Retrofit Program").  Such Retrofit Program includes building enhancements, installation of new fixtures, including shelving gondolas and sales counters, new equipment and new graphics as specified in the Retrofit Program Design Intent.  Operator shall obtain, at its expense all necessary permits and licenses to complete such modifications and installations. In the event that permits necessary for the retrofit are obtained by BPWCP and assigned to Operator, Operator shall reimburse BPWCP for its out of pocket costs to obtain such permits. Operator shall complete the Retrofit Program no later than nine months after the Effective Date of this Agreement.

(b)     If this Agreement is for an existing convenience store that is not branded am/pm, Operator shall make modifications to the store and Premises to comply with, at a minimum, the Retrofit Program.  In addition, BPWCP and Operator may agree to additional modifications.  Operator shall apply for all necessary permits and licenses to complete such modifications and installations.  Operator shall complete the Retrofit Program and any additional modifications no later than nine months after the Effective Date of this Agreement.

(c)     Operator shall maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to retrofit or rebrand and operate the am/pm mini market. If Operator fails to complete the Retrofit Program within nine months of the Effective Date of this Agreement, in addition to any other remedies BPWCP may have under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.

(d)     All costs and expenses in connection with the Retrofit Program modifications shall be at the sole expense of Operator.  If Operator uses BPWCP approved architectural firm to prepare all architectural

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                        7 of 34

93

plans and drawings to Rebrand a convenience store, but not to Retrofit an existing am/pm mini market, and after Operator has paid the total Initial Franchisee Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000.00 for the fees and expenses incurred for such plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to the approved architectural firm, but no sooner than the start of the retrofit construction.

(c)    After Operator has completed the retrofit or rebrand work and training, if applicable, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date. If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, at its option, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business. In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement. In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.04    Upon expiration of the term of this Agreement if this Agreement is the initial Store Agreement for the Premises, Operator shall have the right to be offered a subsequent franchise Agreement for the Premises which right can be exercised by payment of the then-current Renewal Franchise Fee or other fees which may then be payable and by execution of a new franchise agreement and collateral agreements on the terms and conditions then existing, which may differ materially from those presently existing, provided that:

(a)    Operator gives BPWCP written notice of its election to be offered a subsequent franchise agreement not less than six months prior to the expiration of the term of the initial Store Agreement ("notice of election"); and

(b)    Operator, at the time of the notice of election and at the end of the term of the initial Store Agreement is not in default of any of the terms or conditions of such Store Agreement or any other agreement between Operator and BPWCP and has substantially complied with the terms and conditions of all such agreements during the term of such Store Agreement; and

(c)    All of the Operator's accrued monetary obligations to BPWCP have been satisfied and timely met throughout the term of the initial Store Agreement; and

(d)    Operator is in compliance with the standards set forth in the then-current Systems Manual and has made or has provided for, to BPWCP's reasonable satisfaction, such renovation and modernization of Operator's Premises as BPWCP may reasonably require, including, without limitation, signs, equipment, furnishings, and decor so as to reflect the then-current image required for new am/pm mini markets; and

(e)    BPWCP has not exercised its right to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic area in which the Premises are located.

5.05    If this Agreement has a term of 240 months, after 120 months, Operator will make such modifications and improvements as may be required to comply with the then current visual and design standards for am/pm mini markets and which may include such items as painting, installation of new fixtures and equipment and compliance with new visual standards but shall not include major structural modifications.

**This space is intentionally left blank**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

8 of 34

94

ARTICLE 6

Premises and Store Equipment

6.01   The am/pm mini market franchise granted hereunder is for the operation of an am/pm mini market on the Premises set forth in PART I hereof which must have prior approval from BPWCP ("Premises") during the term hereof and may not be relocated to another site.

(a)   If no address has been inserted in the space provided in Part I at the time of execution of this Agreement, Operator shall promptly following the execution hereof (but in no event more than 6 months following the Effective Date) locate one or more proposed sites which meet BPWCP's then-current Standards and specifications, which must be located within the Target Area designated by BPWCP in Part I. Operator shall submit to BPWCP such demographic and other information regarding the proposed site(s) and neighboring areas as BPWCP shall require, in the form prescribed by BPWCP ("Site Review Request"). BPWCP may seek such additional information as it deems necessary Operator shall respond promptly to such request for additional information. If BPWCP shall not deliver written notice to Operator that BPWCP accepts the proposed site, within 30 days of receipt of Operator's Site Review Request, or within 10 days after receipt of such additional requested information, whichever is later, the site shall be deemed rejected. If BPWCP accepts the proposed site it shall notify Operator of its acceptance of the site ("Acceptance"), which Acceptance shall be subject to Operator entering into a final lease or purchase agreement, and such other conditions as BPWCP may impose. Promptly following mutual execution of this Agreement, or Operator's receipt of Acceptance, if no address has been inserted in the blank space provided above, Operator shall proceed to negotiate a lease or purchase agreement for the site. Operator's entering into any lease or purchase agreement for the Premises unless Operator has received Acceptance relating to the proposed site is at Operator's sole discretion and at Operator's sole risk. Upon Acceptance of the proposed site by BPWCP, such site shall be deemed to be the "Premises" as defined above.

(b)   BPWCP may voluntarily (without obligation) assist Operator in obtaining an acceptable location. Neither BPWCP's said assistance, if any, its acceptance of Operator's proposed site, nor its acceptance of the proposed lease or purchase agreement shall be construed to insure or guarantee the profitable or successful operation of the Premises by Operator, and BPWCP hereby expressly disclaims any responsibility therefore. Operator acknowledges its sole responsibility for finding the Premises. Operator acknowledges its sole responsibility for finding each site for the Store it develops pursuant to this Agreement.

6.02   Operator is required to have installed on the Premises the equipment shown on the list entitled "Store Equipment" attached to PART I ("Store Equipment"). Operator agrees to install the Store Equipment on or before the Commencement Date. Certain Store Equipment must be purchased or obtained from approved suppliers, as set forth in the Store Systems Manual. All Store Equipment must meet BPWCP's specifications, including but not limited to specifications with respect to brand, model, size, color and quality. Operator may not install additional equipment, fixtures or machines without the prior written consent of BPWCP. Operator shall maintain all equipment, including required and optional equipment, ready for use and in operable condition and shall use or permit the equipment to be used only for its intended use and only in a manner consistent with the manufacturer's instructions, and Operator shall utilize the equipment and exert Operator's best efforts to promote the retail sale of items or services for which the equipment is designed. Operator agrees not to remove any of the Store Equipment from Store without the prior written consent of BPWCP except in the event replacement of the equipment is necessitated by malfunction, in which case Operator shall replace the equipment with the then current equipment or equipment meeting the same specifications with respect to size, color and quality as the equipment replaced, if the malfunctioning equipment is less than 3 years old. Operator shall notify BPWCP of any such replacement. BPWCP reserves the right to add or delete Store Equipment during the term of the Agreement and Operator will install or remove such Equipment within 90 days after written notice from BPWCP. If specifications for Store Equipment or approved suppliers for Store Equipment are changed by BPWCP, any replacement of Store Equipment by Operator, due to wear and tear, malfunction,

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)
Uniform

depreciation or otherwise, shall be with the then current Store Equipment. Otherwise, Operator will be required to obtain the then current Store Equipment upon renewal.

6.03  Operator shall not operate other business within the am/pm mini market, the building housing the am/pm mini market or on the Premises without the prior consent of BPWCP.

ARTICLE 7

Fees

7.01  (a)  Operator shall pay BPWCP an Initial Franchise Fee or Renewal Franchise Fee in the amount set forth in PART I.  The Initial Franchise Fee is payable as follows: one half upon the signing of this Agreement by Operator; The remainder of the Initial Franchise Fee is payable on the Commencement Date. The Initial Franchise Fee shall not be considered paid until paid in full.

(b) The Initial Franchise Fee is not refundable in whole or in part except for the following circumstances:

(1)  If this Agreement is for New Construction or Raze and Rebuild at the Premises, after Operator executes the Agreement, BPWCP shall have up to 90 days to execute the Agreement. BPWCP shall not be obligated under the Agreement until it is executed by BPWCP.  If BPWCP elects not to execute the Agreement, BPWCP shall notify Operator and shall return, in full, any Initial Fee paid by Operator.

(2)  If this Agreement is for New Construction or Raze and Rebuild, and the Operator fails to complete the New Construction or Raze and Rebuild, obtain a beer and wine license, if lawful in the jurisdiction in which the Premises is located, satisfactorily complete the initial training program or meet the requirements of Article 5 or 6.01(a) within the time limits specified, BPWCP may terminate this Agreement and refund one half of the total Initial Franchise Fee provided that in the event Operator has paid only one half of the Initial Franchise Fee, BPWCP shall retain the one-half payment and there shall be no refund.

(3)  If this Agreement is for New Construction or a Raze and Rebuild and the Operator terminates this Agreement within 18 months for New Construction or 12 months for Raze and Rebuild after the Effective Date of this Agreement pursuant to 5.02 (e) for inability to obtain permits or a beer and wine license for reasons beyond Operator's control, BPWCP will refund the Initial Franchise Fee paid after deducting the greater of either BPWCP's expenses incurred in contemplation of Operator operating an am/pm mini market or $1,500.00.

(4)  The Initial Franchise Fee or Renewal Franchise Fee shall be prorated on a monthly basis over the term of the Agreement from the Commencement Date to the termination date and shall be refundable or payable on such prorated basis if BPWCP terminates the Agreement for the following reasons:

(i) Operator's death;

(ii) Operator's physical or mental incapacitation, for more than 90 consecutive days, which renders Operator unable to provide for the continued proper operation of the am/pm mini market;

(iii) Condemnation or the taking, in whole or in part, of the Premises pursuant to the power of eminent domain;

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

10 of 34

96

(iv) Destruction of all or a substantial part of the Premises through no fault of the Operator; or,

(v) A determination made by BPWCP in good faith and in the normal course of business to withdraw from and to no longer maintain the marketing of Motor Fuels through retail outlets and/or the am/pm mini market franchise in the relevant geographic market area in which Operator's am/pm mini market is located.

In the event Operator's Initial Franchise Fee or Renewal Franchise Fee is returned in whole or in part for any reasons, no interest shall be paid on the amount returned.

BPWCP's policy with respect to the payment of the Initial Franchise Fee or Renewal Franchise Fee for any term of the franchise offered in the future may differ from that set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(c)   If this Agreement is for Operator's subsequent term of the Franchise at the Premises, the Renewal Franchise Fee ("Renewal Fee") is payable as follows:

| Amount Payable | Due Date of Payment for Operator's Subsequent Term |
|---|---|
| One third of the total amount payable - | On the Commencement Date of this Agreement |
| One third of the total amount payable - | On the 1st day of the 2nd year of the term of this Agreement |
| One third of the total amount payable - | On the 1st day of the 3rd year of the term of this Agreement |

Notwithstanding the foregoing, payment of any remaining balance due and owing BPWCP on account of the renewal fee shall be accelerated to become due and payable on or before the termination of this Agreement and, at BPWCP's sole discretion, on or before the effective date of the sale, transfer or assignment with BPWCP's consent of Operator's interest in this Agreement and on or before the effective date a designated successor-in-interest assumes all of a deceased or incapacitated Operator's duties and obligations under this Agreement and other agreements with BPWCP.

If the Renewal Franchise Fee is not accelerated, the transferee or successor-in-interest must assume the obligation to make payments.

The Renewal Franchise Fee is not refundable, in whole or in part, except in the circumstances described in Article 7.01(b)(4) of this Agreement.

In the event Operator's Renewal Franchise Fee is returned, in whole or in part, for any of the reason, no interest shall be paid on the amount returned.

BPWCP's policy with respect to schedules of payments and due dates of payments on account of the Renewal Franchise Fee for any term of the franchise offered in the future may differ from those set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(d)   Operator shall pay an Initial Development Fee, if applicable, in the amount set forth in PART I as follows: one-half is payable at the time the Operator executes this Agreement and the other half is payable on the Commencement Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                          11 of 34

97

The Initial Development Fee is not refundable in whole or part except in the circumstances described in Article 7.01(b)(4) of this Agreement and no interest shall be paid on the amount returned.

7.02  (a) Unless otherwise agreed to in writing by the parties, Operator shall pay BPWCP, as a monthly royalty fee, six percent (6%) of the monthly gross sales, as that term is hereinafter defined, but not less than the minimum royalty fee set forth in PART I. Notwithstanding the foregoing, unless otherwise agreed to in writing by the parties, in the event Operator operates the Store twenty-four (24) hours of every day in any given calendar month, the monthly royalty fee for such a month shall be five percent (5%) of the monthly gross sales, but not less than the minimum monthly royalty fee set forth in PART I.

The minimum monthly royalty fee is payable on the Commencement Date and thereafter in advance on or before the first day of each calendar month during the term of this Agreement. For any month this Agreement is in effect which is less than a full calendar month, the minimum monthly royalty fee shall be prorated on a daily basis.

BPWCP shall have the right to increase the amount of the royalty fee at any time by up to one percent (1%) during the term of this Agreement in accordance with BPWCP's then prevailing royalty fee policy. BPWCP shall notify Operator not less than 90 days in advance of any such change in royalty fee.

(b)     As used herein the term "gross sales" shall mean the total amount of the sales of Operator and any inventory variation calculated as described below.

(1)   Gross sales shall be valued in United States currency, whether received in that form or otherwise, without deduction on account of any of the following:

(i)  the cost of the goods sold, including taxes paid by Operator in procuring goods for resale;

(ii)  the cost of material used, labor or service cost, interest paid, or any other expense; or

(iii)  cost of transportation of the goods.

(2)  Gross sales includes all cash, credits, property or other consideration received for:

(i)  all sales of merchandise made from or in the Store or in the immediate vicinity of the store, including, but not limited to, a cart, kiosk, drive thru or sidewalk sale;

(ii)  all compensation received for services performed from or in the Store including but not limited to, commissions and referral, commissions on lottery and lotto tickets (including all payments by state agencies for the sale of tickets and for the redeeming of winning tickets), handling and placement fees and fees for placement of coin operated and other machines; and

(iii)  all rentals of equipment or merchandise.

(3)  The inventory variation shall be determined each time a physical inventory is taken of merchandise currently held for sale in the Store, as required in Section 15.03 (b). The inventory variation is defined as either the inventory gain (physical inventory value is greater than book inventory) or the inventory loss (book inventory value is greater than physical inventory). The inventory variation subject to gross sales calculation for royalty reporting is the inventory variation in excess of the allowable variation. Detailed calculations for variations and allowable variations are further described in the Store Systems Manual.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

12 of 34

98

(4)  The following are not included in gross sales:

(i)  gasoline and other motor fuel sales, if any, including all applicable motor fuel and sales taxes;

(ii)  any deposits refunded to customers;

(iii)  sale price of property returned by customer when the full sale price is refunded either in cash or credit.  Where the customer is required to exchange returned merchandise for other new merchandise, the cashier is required to ring the sale of the new merchandise on the register and the sale of the new merchandise is included in gross sales subject to royalty.  For the purpose of this paragraph, refund or credit of the entire amount shall be deemed to be given when the purchase price, less rehandling and restocking costs, is refunded or credited to the customer;

(iv)  the amount of any tax imposed by the United States or any city, county, state, or other governmental entity or agency or instrumentality thereof upon or with respect to retail sales of tangible personal property measured by a stated percentage of a sales price or gross receipts, whether imposed upon the Operator, as a seller, or upon the customer, as a purchaser.

(v)  for newly constructed or razed and rebuilt am/pm mini markets only, store sales made during the first 7 days of the term of the franchise, i.e., during the period comprised of the Commencement Date as established by the "Notice of Final Inspection and Readiness" and the next succeeding 6 days of initial operation.

(vi)  store sales made during an eligible Grand Opening Event for a new store, or for an existing store, following completion of BPWCP-approved retrofit, remodeling or rebuilding.  An eligible Grand Opening Event, which event is not to exceed seven consecutive days, is more fully described in Article 14.02 hereof.

(c)      Any monthly royalty fee due in excess of the minimum monthly royalty fee shall be payable on or before the tenth (10th) day of the calendar month succeeding the month in which the sales were made for which said fee is due.  Payment of the royalty fee shall be made in accordance herewith and with forms and procedures set forth in the Systems Manual.

7.03  Operator shall pay to BPWCP a security deposit in the amount set forth in PART I on or before the Commencement Date of this Agreement.  If Operator shall be in default at any time in the performance of any of the terms and conditions of this Agreement, BPWCP, at its option, shall have the right, in addition to any other remedy it may possess either at law or at equity or under the terms of this Agreement, to correct said default and deduct any cost or expense in connection therewith from said security deposit.  Immediately upon application of all or part of said security deposit toward any such cost or expense, Operator shall pay to BPWCP an amount equal to that portion of the security deposit so applied so as to restore the security deposit to the amount stated above.  Except as provided herein, the security deposit, less any depletion because of default by Operator shall be refunded to Operator without interest upon termination of this Agreement.

7.04  Unless otherwise agreed to in writing by the parties, commencing on the Commencement Date, Operator shall pay an advertising and promotion fee for each month equal to 5.5% of Operator's gross sales. ("Gross Sales" is defined in Section 7.02 above.)  At any time during the term hereof, on thirty (30) days' prior written notice to Operator, BPWCP may increase or decrease the advertising and promotion fee, but the total advertising and promotion fee may not be increased to more than six and one-half percent (6.5%) at any time during the term of this Agreement and BPWCP may not increase the fee by more than one percent (1%) in any calendar year.  The advertising and promotion fee is payable on or before the tenth (10th) day of the calendar

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

13 of 34

99