**EXHIBIT "B"**
**Part 3 of 3**

month succeeding the month in which sales were made upon which the fee is calculated. In addition, Operator may be required to pay shipping costs, plus the cost of replacement signs, if Operator requests duplicate signage.

7.05  Any fees and other amounts due and owing BPWCP pursuant to this Article and any other provisions of this Agreement shall be paid when due by Operator to BPWCP, at BPWCP's option, to BPWCP's address set forth in the Systems Manual or BPWCP's representative, by money order approved by BPWCP, business check, cashier's check, wire transfer or electronic funds transfer initiated by BPWCP, whichever BPWCP directs and which may change from time to time at BPWCP's sole discretion.  Operator's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association).  If any Agreement between Operator and BPWCP requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm, or entity.  If such Agreement requires or permits payment by wire transfer, all such payments shall be made to "BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by automated clearing house ("ACH"), all such payments shall be made to "BPWCP, c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by the BPWCP credit department.  Operator agrees to indemnify BPWCP for any loss or expense caused by Operator's failure to comply with this Paragraph.  Payment shall be deemed made when, and only when, its receipt has been verified by BPWCP.  Receipt by BPWCP of any monies due BPWCP after notice of termination or non-renewal does not constitute a waiver by BPWCP of such notice of termination or non-renewal.

## ARTICLE 8

### Licenses, Permits, Taxes and Compliance with Laws

8.01  Operator agrees to obtain, post as required, and maintain, at its expense, all permits and licenses necessary for the operation of the Store and Store Equipment including, without limiting the foregoing, all permits and licenses required for selling beer and wine, if available pursuant to applicable laws and regulations, and for signs used or installed by Operator.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all ad valorem taxes assessed upon the Premises and all fees, and sales, use, rental, gross receipts, inventory, excise, income, business and occupation and any other taxes (including interest, penalties and additions to tax) imposed by any federal, state or local governmental authority upon Operator or BPWCP (except those taxes based upon or measured by the net income of BPWCP) in connection with the operation of the Store or in connection with any payments made pursuant to this Agreement.  Operator agrees to pay promptly when due and to hold BPWCP harmless from any taxes (including interest, penalties and additions to tax) imposed upon any property of Operator located at or used in connection with the operation of the Store.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges for the use of any loaned property.  Operator further agrees not to do any act which may result in the suspension or revocation of any permit or license required for the operation of the Store.  Operator shall furnish to BPWCP, promptly upon request, any documentation, which in BPWCP's sole discretion is required to evidence the payment of any tax, including but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and cancelled checks.

8.02  Operator shall at all times operate the Store and Premises in strict accordance with all applicable federal, state and local laws, ordinances, rules, regulations and lawful directives or orders of public officials administering such laws.  Operator agrees to immediately notify BPWCP, in writing, of any citations, notices of violation or other communications alleging violations of federal, state or local laws, ordinances, rules, regulations, directives or orders, affecting the operation of the Store and Premises.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    14 of 34

100

8.03  Operator represents and warrants that as of the date hereof, Operator is in compliance with all leases, contracts and agreements affecting the Premises and Operator's use and possession of the Premises.

ARTICLE 9

Utilities

9.01  Operator shall be solely responsible for all costs of and taxes and assessments on utilities used at or provided to the Store.

ARTICLE 10

Appearance, Housekeeping, Maintenance, Right of Entry and Crisis Management

10.01  Operator shall comply with the housekeeping and maintenance provisions set forth in the Systems Manual and shall maintain the Premises, Store and Store Equipment in a clean, orderly, safe, graffiti free, sanitary and operable condition.  BPWCP shall perform periodic inspections, for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

10.02    In addition to the requirements of Section 10.01, Operator shall perform all maintenance, repairs, and replacement, as necessary, of the Premises, Store and Store Equipment. Replacement equipment must meet BPWCP's then-current specifications.

Notwithstanding the foregoing, in the event of destruction of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice.  The effective date of such termination shall relate back to the date of destruction.

Accidents occurring at the Premises resulting in personal injury are to be reported in writing immediately to BPWCP; such reports shall include names and addresses of people involved, names of insurance companies involved, or potentially involved, and details of the accident.

10.03  Operator shall allow BPWCP the right of entry at all times and the right to remain on the Premises for examination and inspection of the Premises, Store, Store Equipment, Operator's books, records and reports and for any and all other purposes contemplated by any other provisions of this Agreement.  BPWCP shall have the right to enter upon the Premises in order to change, alter or modify its service marks, trademarks and service names and other similar indicia.

10.04  BPWCP shall not be liable to Operator for injury to or sickness or death of Operator or any other person or persons or for the damage to Operator's property or property of others caused by any fire, breakage, failure of, or other casualty occurring to refrigeration equipment, or leakage in any portion of the Store, or from water, rain or snow that may leak into, issue or flow from any part of the Store, or from drains, pipes or plumbing work in the Store, whether such injury or damage is caused by the failure of BPWCP to make repairs or otherwise.

10.05  Except for the time routinely necessary for patrons of the authorized business(es) conducted by Operator on the Premises to conclude purchase transactions in a prompt and efficient manner, Operator agrees not to permit any person(s), including children, teenagers and off-duty employees of Operator, to loiter, i.e. spend time idly or otherwise linger in an aimless way, on or about the Premises.

non-lessee operator (DOFO)
ompony DOWR-1 (4/2006)
Philadelphia

15 of 34

10.06 Operator shall continuously operate the required Video Surveillance equipment for its intended purpose consistent with the manufacturer's instructions and BPWCP's specifications and maintain at all times the equipment, including all of its components, in good working order.

10.07 (a) Operator shall notify BPWCP in writing within 10 days after Operator receives actual notice of the commencement of any investigation, action, suit, or other proceeding, or the issuance of any order, writ, injunction, award, or other decree of any court, agency, or other Governmental Authority that pertains to the Store or that may adversely affect Operator's operation of the Store or ability to meet its obligations hereunder.

(b) Upon the occurrence of a Crisis Management Event, Operator shall immediately inform BPWCP (or as otherwise instructed in the Manual) by telephone and thereafter promptly notify BPWCP in writing of all relevant details regarding such Crisis Management Event. Operator shall cooperate fully with BPWCP with respect to BPWCP's response to the Crisis Management Event. A "Crisis Management Event" means any event that occurs at or about the Store that has or may cause harm or injury to customers or employees, such as food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, criminal activity or any other circumstances which may damage the System, Marks, or image or reputation of the am/pm store, BPWCP or its Affiliates.

(c) In the event of the occurrence of a Crisis Management Event, BPWCP may also establish emergency procedures pursuant to which BPWCP may require Operator to, among other things, temporarily close the Store to the public, in which event BPWCP shall not be liable to Operator for any losses or costs, including consequential damages or lost profits occasioned thereby.

## ARTICLE 11

### Indemnity and Insurance

11.01  Operator agrees to indemnify, hold harmless and defend BPWCP from and against all claims, losses and damages for personal injury or death (whether to third persons, employees of Operator, contractors or agents of Operator), or damage to property, occurring on the Premises, or arising out of Operator's use or occupancy of the Premises, or arising out of Operator's use, custody or operation of the Store, Store Equipment, or any other equipment on the Premises excepting any damage or loss caused solely by the negligence of BPWCP or solely by BPWCP's failure to perform its obligations hereunder.

11.02  During the period this Agreement is in effect, Operator further covenants and agrees that Operator shall procure and maintain, at its expense, in full force and effect with a financially responsible insurance company, (1) Workers' Compensation Insurance, including Occupational Disease in accordance with the laws of the State in which the franchise is located, and Employers' Liability Insurance with limits of not less than $100,000 disease each employee and $100,000 each accident; and (2) General Liability Insurance with contractual liability, insuring the indemnity provision set forth in this Agreement, with products--completed operations coverage (with liquor law liability if Operator sells or dispenses alcoholic beverages)with limits of not less than $1,000,000 applicable to personal injury, including bodily injury, sickness, disease or death in any one occurrence and $200,000 for loss of or damage to property in any one occurrence or a combined single limit of not less than $1,000,000 in any one occurrence; Operator shall name BPWCP as an additional named insured under Operator's General Liability Insurance Policy.  The General Liability Policy shall contain a contractual liability endorsement insuring Operator's obligation to indemnify BPWCP pursuant to Section 11.01.  Operator shall furnish BPWCP, at its address shown herein, or such address as BPWCP may direct in writing, certificates of insurance evidencing the above-required insurances, and providing that Operator's contractual liability to BPWCP as set forth in Section 11.01 above is covered by such policy or policies and that no such policy or policies may be cancelled or changed materially without at least thirty (30) days' prior written notice to BPWCP. BPWCP reserves the right, from time to time, to revise the above stated amounts of insurance required to be maintained by Operator.  Franchisee hereby understands and agrees that any coverage provided BPWCP by

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

16 of 34

102

Franchisee's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

ARTICLE 12

Promotions, Signs and Uniforms

12.01  Operator agrees to display signs and other promotional material solely in a manner as prescribed or authorized by BPWCP. The color, size, design and location of said signs shall be as specified by BPWCP. Operator shall not place additional signs or posters in, on or about the Store and Premises without prior written consent of BPWCP.

12.02  In executing this Agreement, Operator assigns to BPWCP Operator's rights to directly receive marketing, advertising, promotional, volume and retail display and placement allowances offered by any manufacturers or suppliers of products to Operator, excluding volume discounts given off invoice by any manufacturer or supplier and payment for magazine rack placement. Using funds collected from Operator pursuant to Section 7.04 and from other am/pm Operators and using funds collected as promotional and other allowances, BPWCP shall arrange or provide advertising and promotion which may, in BPWCP's sole discretion, include local or regional advertising placed by BPWCP, advertising copy and designs for use of Operator, display or other allowances to Operators, handbills, flyers, brochures, signs, point of purchase, billboards, high rise signs, internet advertising, other materials, the expenses of developing and producing promotions and advertising, both by outside agencies and BPWCP personnel, and marketing research. BPWCP's obligation to provide the foregoing shall be limited in cost to the amount of the advertising and promotion fee paid by Operator and funds collected as promotional and other allowances. The entire amount of the advertising and promotion fee paid by Operator and of promotional and other allowances shall be used by BPWCP for expenses relating to advertising and promotion at such times and in such manner as BPWCP solely determines. All promotion and advertising of the am/pm trademarks and service marks, wherever located and in whatever form, shall be deemed to benefit Operator. BPWCP shall make no accounting to Operator of the expenditure of advertising and promotion fees or promotional and other allowances. BPWCP may condition Operator's eligibility for and receipt of promotional, display and other allowances on Operator's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Franchisee's retail selling price commensurate with the amount of the allowance. Operator will not be eligible to receive all allowances and incentives if Operator does not pay the then current standard advertising and promotion fee.

12.03  Operator and Operator's employees shall be attired in clean, neat uniforms, meeting BPWCP's minimum required specifications at all times while working in the Store, as set forth in the Systems Manual. Operator, Operator's transferee and Operator's successor-in-interest must order the initial supply of 20 uniforms while attending BPWCP's training program at BPWCP's training center. In the case of Concurrent Operations, Operator's employees assigned to perform duties associated with the operation of a particular franchise are required to be attired in the uniform of that franchise.

12.04  Operator shall acquire items specified by BPWCP as part of the Merchandising Accessories Items Required. BPWCP shall give to Operator a list of the specified items prior to Operator's execution of this Agreement.  Operator shall purchase the items from an approved vendor Operator shall maintain all merchandising accessories items required in a clean, workable and presentable condition throughout the term of the franchise. Operator shall sell products bearing am/pm marks, including fountain drinks, frozen desserts, hot chocolate, coffee, hot prepared foods, milkshakes, etc., in standardized containers bearing am/pm marks and Operator shall use only carry-out food trays bearing am/pm marks at the Store. Such containers and carry-out food trays shall be purchased from a vendor licensed by BPWCP and shall meet BPWCP's specifications as to type, quality, and style and shall bear the am/pm marks. BPWCP shall, upon written request by Operator or a vendor, license any responsible vendor upon a showing that the specifications shall be met in a lawful manner and products manufactured in accordance with BPWCP's business and HSSE policies and that the terms of

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

17 of 34

103

license are satisfactory, provided that BPWCP reserves the right to limit the number of vendors licensed and to charge a reasonable fee to evaluate a proposed vendor.

## ARTICLE 13

### Inventory, Working Capital and Required Foods and Beverages

13.01  Operator shall at all times maintain merchandise inventory of a type, quality, quantity and variety as provided in the Systems Manual. BPWCP reserves the right to disapprove certain products and/or services in the event that, in BPWCP's sole discretion, such products and/or services are offensive to community standards or reflect unfavorably on the am/pm trademark or goodwill. Operator shall maintain 85% compliance with the approved shelf planograms or shelf schematics as set forth in the Systems Manual and as will be modified on written notice to Operator.

13.02  Operator shall at all times maintain working capital in an amount sufficient for the payment of current operating expenses as provided for in the Systems Manual.

13.03  Operator shall be required to continuously offer for sale a reasonable inventory of certain prepared foods, frozen desserts and beverages in quantities sufficient to meet customer demand. The items specified by BPWCP are set forth in the Section entitled "Required Foods and Beverages" of the Chapter entitled "Food Specifications" of the am/pm Store Systems Manual. Proprietary products and certain food and beverage items are required to be purchased from approved suppliers as set forth in the Systems Manual. Operator shall fully participate in required programs including, but not limited to, fountain program, coffee program, hot food program and such other programs specified in the Store Systems Manual. Such participation shall include using all equipment required for the program, offering all food items required for the program, using all merchandising accessories required for the program and displaying all signs and trade dress required for the program. The required programs are detailed in the Store Systems Manual.

## ARTICLE 14

### Merchandising Services

14.01  From time to time, BPWCP shall provide Operator with a list of merchandise and equipment vendors approved or suggested by BPWCP. BPWCP will, upon written request by Operator or a vendor, approve any responsible vendor for products or equipment upon showing that the specifications will be met in a lawful manner and the terms of the contract are satisfactory, provided that BPWCP reserves the right to limit the number of approved suppliers to a reasonable number and to charge a reasonable fee to evaluate a proposed vendor. BPWCP will provide a list of merchandise items required or recommended by BPWCP for purchase by Operator, and merchandising requirements and recommendations. A suggested electronic file or the product file will also be available for the operation of the Point of Sale scannable register(s).

14.02  BPWCP shall reimburse Operator for one-half of Operator's expenditures, if any, but not more than two thousand dollars ($2,000) reimbursement, for eligible grand opening advertising which may include any of the following types of media selected by Operator; handbills and flyers, including the cost of preparation, printing and distribution thereof; direct mail advertisements, including mailing lists and postage; local newspaper advertisements; special promotional equipment; give away items; special services such as clowns; and radio advertising. All handbills, flyers, direct mail advertisements, newspaper advertisements and radio advertising must use BPWCP's approved formats, which shall be supplied to Operator. To be eligible for reimbursement, such grand opening advertising, which event is not to exceed seven consecutive days, must be conducted following completion of original construction of the Store between the seventh (7th) and the ninetieth (90th) days after the Commencement Date or within ninety days following completion of BPWCP approved remodeling or rebuilding of an existing store. Requests for reimbursement must be submitted by Operator to BPWCP within 90 days following the conclusion of the grand opening event.

non-lessee operator (DOFO)
am/pm- 241WR-I (4/2006)
Uniform                                                18 of 34

ARTICLE 15

Books, Records, Reports, Fee Verifications Reviews and Audits

15.01   For the purposes of ascertaining the amount of the fees due and payable by Operator pursuant to this Agreement, Operator shall maintain true and accurate business records, reports, accounts, books and data (collectively referred to herein as "business records") pertaining to the operation of the Store, as more fully described in the Systems Manual. Except for records which Operator may be required to retain and maintain on the Premises at all times pursuant to governmental requirements or other provisions of this agreement or other agreements between BPWCP and Operator, upon 24-hour notice from BPWCP. Operator shall make Operator's complete business records available at the Store and shall permit BPWCP and its representatives to enter the Premises and the Store to examine Operator's business records. In addition, in executing this Agreement, Operator grants BPWCP the right to electronically collect certain sales data via Operator's point-of-sale ("P.O.S.") system, including scanning devices, for purposes of verifying fees and analyzing sales, as more fully described in the am/pm Store Systems Manual.

15.02   The acceptance by BPWCP of the monthly royalty fee and advertising and promotion fee paid by Operator shall be without prejudice to BPWCP's right to examine Operator's business records of its gross receipts and inventories of food and other merchandise at the Store in order to verify the amount of the monthly royalty, advertising and promotion fees payable by Operator to BPWCP. In addition, at any reasonable time upon twenty-four (24) hours' prior notice to Operator, BPWCP and its representatives may enter the Store and remain in the Store for the time necessary to perform fee verification reviews or audits of Operator's business records relating to the Store for the period covered by any statement required to be issued by Operator. If a reviewer dispatched by BPWCP to Operator's am/pm mini market is unable to perform a review or audit due to missing or incomplete business records, or the review/audit is cancelled or postponed by Operator such that BPWCP incurs a fee, Operator shall be required to pay BPWCP such fee or its reasonable costs incurred in attempting to perform a review or audit. Without in any way limiting BPWCP's right to review or audit or the grounds for or frequency of reviews or audits of Operator's business records, if Operator fails to submit to BPWCP the bookkeeping information required to be submitted in accordance with the am/pm Store Systems Manual, BPWCP shall have the right to review or audit Operator's business records every six months or more frequently to verify royalty fee and advertising and promotion fees due to BPWCP and, in such event, regardless of whether or not such review(s) or audit(s) disclose(s) a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing such review(s) or audit(s). BPWCP may conduct mystery shops at Operator's location to determine compliance with the terms and conditions of the franchise; in the event such mystery shops result in a fee verification review/audit, regardless of whether such review discloses a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing the review, including the then-current cost of the mystery shops. If a review or audit discloses a liability for royalty, advertising and promotion fees due to BPWCP, Operator shall pay promptly the amount of the deficiency. If the sales amount from which the deficiency is derived is two percent (2%) or more in excess of the sales actually reported for royalty purposes by Operator for such a period, Operator shall promptly pay to BPWCP, as liquidated damages and not as a penalty, the cost of the review or audit in addition to the amount of the deficiency, plus interest at the highest legal rate and, in addition, BPWCP, at its option, may terminate this Agreement upon not less than five (5) days' prior written notice to Operator of BPWCP's election to do so. Prior to giving its written consent to the transfer or assignment of the Store Agreement, BPWCP has the right to review or audit Operator's business records.

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all vendors of Operator to submit to BPWCP copy of any and all invoices evidencing sales of merchandise to Operator and Operator agrees to execute any authorization for release of such invoices to BPWCP as may be required in order for BPWCP to obtain such invoices. BPWCP may also exercise its right to examine invoices direct from vendors via Operator's release at any time.

non-lessee operator (DOFO)
am/pm- 241 WR-1 (4/2006)
Uniform                                         19 of 34


105

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator agrees to provide BPWCP copies of State and Federal tax returns and schedules pertaining to Operator's am/pm Franchise and to execute any authorization to the tax agencies as may be necessary for BPWCP to obtain such tax returns and schedules directly from the tax agencies.

In addition, in executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all banks and other financial institutions of Operator to submit to BPWCP copies of all bank or other financial institution statements and cancelled checks reflecting cash accounts of Operator that pertain to Operator's am/pm franchise and Operator agrees to execute any authorization for release of statements and cancelled checks to BPWCP as may be required in order for BPWCP to obtain such statements and cancelled checks.

15.03  Operator shall have physical inventories performed and shall provide reports, statements and data to BPWCP as described below and as described more fully in the Systems Manual.

(a)  Operator shall provide periodic reports relating to royalty fee calculations.

(b)  Once every two months (at approximately 60-day intervals), Operator shall have performed a physical inventory at retail value of merchandise held for sale in the Store by an independent inventory service. BPWCP reserves the right, upon 15 days' prior written notice to Operator, to increase or decrease the interval at which physical inventories must be performed. Unless prior written approval has been obtained, merchandise off-premises shall not be included in the physical inventory count. Operator shall submit to BPWCP a statement by the service performing the inventory of the total amount of inventory in the Store. At its sole discretion, BPWCP may have the inventory performed at its expense except that if Operator postpones an inventory such that BPWCP incurs a fee, Operator shall reimburse BPWCP for such fee.

(c)  In order for BPWCP to verify fees due and develop merchandising recommendations for Operator and information for the benefit of all am/pm franchises, Operator shall provide to BPWCP, or to an accounting service designated by BPWCP, such reports and data as are reasonably requested by BPWCP for such purposes and as are more fully described in the Systems Manual. Such reports and data shall be in a format as designated by BPWCP and transmitted to BPWCP, at BPWCP's option, either by diskette or electronically. Such reports shall include, but not be limited to, monthly profit and loss statements in a format acceptable to BPWCP and audited annual financial statements.

15.04  (a)  Before the Commencement Date of this Agreement Operator shall purchase from BPWCP, and thereafter use and maintain, the computerized point of sale cash collection system (including all related hardware and software) (the "POS and Back Office Management System") and personal computer system (the "Computer System"), specified by BPWCP at a cost of $20,000 - $25,000 for a two POS System and installation cost of $3,500 to $5,500.

(b)  The POS and Back Office Management System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network for the purpose of implementing software, transmitting and receiving data, accessing the internet for ordering and maintaining the POS and Back Office Management System. The POS and Back Office Management System shall be electronically linked to BPWCP or its designee, and Operator shall allow BPWCP and/or its designee, to poll the POS and Back Office Management System on a daily or other basis at such times and in such manner as established by BPWCP or its designee, with or without notice, and to retrieve such transaction information including sales, sales mix, usage, and other operations data as BPWCP and/or its designee deems appropriate for any purpose, including verifying fees and analyzing sales, as provided in the Manual. Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the POS and Back Office Management System, including hardware and/or software, that, from time to time, BPWCP requires. Operator shall pay a $500 per

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

20 of 34

106

year software maintenance fee, which may be increased up to 10% per year and an upgrade fee of up to $1,500 per year.

(c) The Computer System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network. BPWCP shall designate certain computer software used in the operation of Store. BPWCP may require Operator to maintain an e-mail account. Operator shall obtain all software and hardware, as BPWCP may specify to enable Operator to send and receive e-mail. Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the Computer System, including hardware and/or software, that, from time to time, BPWCP requires. Upon request, Operator shall permit BPWCP to access the Computer System and the files stored therein via any means specified, including electronic polling communications.

(d) BPWCP may provide limited maintenance services for the POS and Back Office Management System and Computer System software, as more specifically set forth in the Manual. Operator shall pay BPWCP's then-current fee for such services, or Operator may obtain maintenance and help desk services from authorized third party providers.

(e) In the event that the POS and Back Office Management System and Computer System are not available before the Commencement Date, BPWCP will lease an interim system to Operator at a cost of $400 per month and Operator will purchase and install the POS and Back Office Management System and Computer System within 30 days after notification from BPWCP that it is available.

15.05   (a) If BPWCP shall designate certain computer software used in the operation of the POS and Back Office Management System and/or Computer System which is owned or licensed by BPWCP ("Proprietary Software"), Operator shall at BPWCP's request license or sublicense such software from BPWCP or its designee and enter into a software (sub)license agreement on BPWCP's or such designee's then-current form. From time to time, Operator shall purchase any upgrades, enhancements or replacements to the Proprietary Software. BPWCP shall provide to Operator, for a reasonable fee, such support services relating to the Proprietary Software as BPWCP deems advisable. Operator must incorporate any required modifications or additions within 30 days after receiving written notice from BPWCP, unless a longer time period is stated in the notice.

(b) Except for Proprietary Software, which Operator is required to use, Operator may elect not to use the other bookkeeping, accounting and inventory services offered by BPWCP and may obtain, at its expense, any other bookkeeping, accounting and inventory services for Operator's business as Operator desires. Operator shall nevertheless be required to provide to BPWCP, or to an accounting service designated by BPWCP, the information referred to in Section 15.03.

15.06   The provisions of Article 15 shall survive termination or expiration of this Agreement.

ARTICLE 16

Training

16.01     All training courses, programs and tests offered by BPWCP shall be given only in the English language and therefore, in order to successfully complete any such courses, programs and tests, an ability to read, communicate in and comprehend English is necessary. Passing an English proficiency test is required.

Unless otherwise indicated, all training programs described herein shall be conducted at BPWCP's facilities in La Palma, California, or, at BPWCP's option, at such other locations as BPWCP may establish and may include nighttime hours in connection with on the job training at an am/pm mini market.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    21 of 34

107

All expenses, including, but not limited to transportation, meals and lodging, incurred by Operator or employee(s) of Operator in connection with attendance of Operator or employee(s) of Operator at any of BPWCP's training programs must be borne by Operator.

The person(s) required to attend and satisfactorily complete the training programs described below are identified herein as follows:

1.  Operator

    For purposes of this Article, "Operator" shall mean:

    o   The sole proprietor, if Operator is a sole proprietor;
    o   All partners or the Operational Designee as designated by the partnership in PART I, Section 16.01(a) of the Store Agreement, who must also be a partner, if Operator is a partnership; in the case of limited partnerships, the Operational Designee must be the general partner, or if more than one, one of the general partners;
    o   All shareholders or the Operational Designee as designated by the corporation in PART I, Section 16.01(a) of the Store Agreement, who must be an officer or a shareholder, if Operator is a corporation;
    o   All members or the Operational Designee as designated by the limited liability company [("LLC"), in States where allowed] in PART I, Section 16.01(a) of the Store Agreement, who must be a manager or member of the LLC, if Operator is an LLC.
        The Operational Designee, if one is designated, may, but need not be the same person designated as the Entity Designee in PART I, Section 17.02 of the Store Agreement (an Entity Designee of a Corporation must be an officer or director and own the largest percentage of shares in the corporation; an Entity Designee of an LLC must be the member owning the majority ownership interest in the LLC). If no Operational Designee is designated, all partners in a partnership (in the case of a limited partnership, the general partner, or if more than one, the general partners), all shareholders in a corporation or all members in an LLC must successfully complete the training programs.

2.  Assignee(s) of Operator

3.  Successor(s)-In-Interest to Operator

4.  Employee(s) of Operator, under the circumstances described below:

    If Operator has more than one am/pm mini market, Operator must have one employee who has attended and successfully completed a four week am/pm Store Manager training program and who is employed on a full time basis at each store in excess of one.

16.02    Following is a description of BPWCP training programs in connection with the operation of am/pm mini markets:

*Initial Franchisee Training Program*

Unless Operator, Operator's successor-in-interest, Operator's assignee, or any employee of Operator required to be trained as Operator, has successfully completed BPWCP's initial franchisee training program, such person(s) must attend and satisfactorily complete BPWCP's current initial franchisee training program before beginning operation of the store.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                                22 of 34

108

Payment of the initial franchise fee (but not the renewal fee) includes training for two people in the operation of an am/pm mini market.

The initial franchisee training program is currently seven weeks, but may be increased or decreased at BPWCP's election, and may include nighttime hours in connection with on the job training at an am/pm location.

The initial franchisee training program shall include instruction in general store management including personnel matters, customer service, merchandise control, bookkeeping and accounting and other subjects relating to the general operation of a retail store featuring convenience store service.

Except for Operator's successor(s)-in-interest and Operator's assignee(s), who are required to pay tuition for the initial franchisee training program at the then–current rate (currently the tuition for the 7-week program is $15,000), no tuition shall be charged for the initial training program for Operator, or for one or two employees eligible for training if they attend before or within thirty-six (36) months after the Commencement Date of the initial Store Agreement between Operator and BPWCP for the Premises. Attendance by additional persons shall be subject to tuition payable by Operator at the current rate. The current tuition is $7,500 per additional person, but that is subject to increase. Tuition must be paid, at BPWCP's then–current rate for initial training, for more than two persons, regardless of whether such persons in excess of two are partners, shareholders or eligible employees of Operator. If the franchise is transferred within thirty-six (36) months, a separate training fee must be paid by the transferee even if only one person has been trained up to that time.

If Operator has previously successfully completed initial franchise training program and, accordingly, Operator is not required to attend and does not attend the initial franchisee training program, Operator may elect to have one or two employees attend.

BPWCP may terminate this Agreement at any time prior to or on the completion of Operator's initial training if, in BPWCP's sole opinion, Operator does not participate in or does not complete the training program in a manner satisfactory to BPWCP. In the event of such termination, BPWCP shall return the initial fee or any other funds paid to BPWCP by Operator in connection with this Agreement, less BPWCP's expenses incurred in studying the site, preparing engineering and architectural plans for the premises, training and any other costs incurred in contemplation of Operator operating an am/pm Store.

*am/pm Store Manager Training Program*

If Operator has more than one am/pm mini market, Operator must have one employee for each store who has attended and successfully completed a six-week am/pm Store Manager training program employed on a full time basis at each store in excess of one. Such am/pm Store Manager training program must be successfully completed prior to the opening of such stores.

BPWCP offers to train one employee for each such store in the am/pm Store Manager training program. The tuition fee for the first employee so trained for each such store shall be $6,000 subject to increase in the future.

If the Store Manager trained by BPWCP is no longer employed at the Store, Operator must replace such trained Store Manager with another trained Store Manager within two months of the date such Store Manager is no longer employed at the Store or the franchise may be terminated. Operator shall be responsible for payment of tuition for training of any such replacement Store Managers (currently, tuition for training of any such replacements is $6,000, but that amount may be increased in the future).

**This space is intentionally left blank**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

23 of 34

*Additional Training Requested by Operator*

BPWCP may, but is not required to, also provide Operator or Operator's employees such additional initial training or special instruction requested by Operator at such time and place and for such duration as may be mutually convenient, provided, however, that the cost of such additional instruction, including transportation, food, lodging and reasonable charges for time and services of BPWCP shall be borne by Operator.

*Additional Training Required by BPWCP*

Additional training required by BPWCP in connection with changes to programs or new programs or equipment added during the term of this Agreement, BPWCP may require Operator to attend additional training not to exceed eight (8) hours per training session. Such required training shall be tuition free except that if Operator does not attend the training session at the time offered and reasonably notified by BPWCP, Operator may be required to pay a fee not to exceed $1,000 to attend such training.

ARTICLE 17

Assignment and Transfer

## A. ASSIGNMENT AND TRANSFER BY OPERATOR

17.01 Operator may not sell (or allow Operator's foreclosing lender to complete a sale) transfer or assign this Agreement or any of Operator rights, duties or obligations hereunder and Operator's interest in the real property and improvements, in whole or in part, without BPWCP's consent, which shall not be unreasonably withheld or delayed, and without first offering the same to BPWCP. If Operator is a party to a Contract Dealer Gasoline Agreement with BPWCP, Operator shall comply with all provisions of paragraph 18 of that agreement as well. The offer must be in writing and must specify the total purchase price, including a breakdown of the amount for real property, equipment and goodwill, with copies of purchase and sale agreements and leases associated with the real property, improvements and equipment and must also include the name and address of the proposed buyer. The Operator shall include the first installment of the transfer fee set forth in 17.01(j). The offer will not have been made until a complete legible copy of the foregoing information is received by BPWCP. BPWCP shall have 30 days from receipt of the complete written offer to accept the offer by agreeing in writing to pay the total purchase price minus the amount of the transfer fee payable to BPWCP in the event of an assignment to a third party. During the 30 day period, BPWCP may conduct environmental testing at the Premises. In case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding and Buyer shall give BPWCP a complete legible copy of the recorded Notice of Default and later recorded Notice of Sale. If BPWCP does not accept the offer within 30 days, Operator may complete the transfer or assignment to a third party subject to BPWCP's prior written consent. If Operator offers a lower price or more favorable terms which have the effect of a lower price to the third party, BPWCP's right of first refusal shall be triggered again and Operator must make the offer to BPWCP. If the assignment has not been completed within 180 days after making the original offer to BPWCP, the request for assignment will be considered abandoned by the operator. Any further request for assignment will again trigger the right of first refusal. All communications between BPWCP and Operator with regard to the assignment, right of first refusal, offers, withdrawals, changes in terms and acceptances must be in writing. In any event, Operator may not assign this Agreement and Operator's interest in the real property and improvements without the prior written consent of BPWCP, which consent shall not be unreasonably delayed or withheld. In order to allow BPWCP adequate time to process an assignment request, Operator will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request, and any such request for BPWCP's consent to an assignment received 45 days or less before the expiration of the Store Agreement shall be considered for a subsequent Store Agreement between Operator and BPWCP, if such subsequent Agreement has been offered and accepted by the parties, and shall be in compliance with the provisions of such subsequent Agreement. Prior to giving its written consent, BPWCP has the right to review or audit Operator's business records,

including but not limited to those relating to the value of inventories at cost, and BPWCP shall consider, among other things, the qualifications, character, apparent ability and creditworthiness of the proposed transferee and such other factors as BPWCP deems appropriate, including but not limited to the following:

(a) There shall be no existing default in the performance or observance of any of Operator's obligations hereunder.

(b) Operator shall have settled all outstanding accounts with BPWCP.

(c) The proposed transferee must satisfactorily demonstrate to BPWCP that it meets reasonable financial standards which shall not be more stringent than the standards applicable to new am/pm Operators at the time of the proposed assignment.

(d) Prior to the assignment, unless previously trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the proposed transferee and any employees who must be trained as described in Article 16, shall attend and satisfactorily complete BPWCP's then-current training program for new am/pm operators. Tuition shall be payable by the proposed transferee. The training tuition fee is due and payable by means of a cashier's check before the proposed transferee begins training school. For prospective transferees, the training tuition fee, which is payable by the prospective transferee to BPWCP regardless of whether or not the transferor is subject to payment of a transfer fee, shall be refunded in full in the event BPWCP refuses its consent to the transfer prior to the proposed transferee attending BPWCP's training program. In the event that BPWCP refuses its consent after the prospective transferee has started attending BPWCP's training program or the prospective transferee withdraws from the training program, BPWCP shall prorate the refund based on any remainder of training to be completed. The training tuition fee is not refundable in whole or in part upon completion of the training program. If the proposed transferee is a sole proprietor or single shareholder corporation, BPWCP shall offer to train and not charge tuition for one employee of the proposed transferee who attends the initial training within twelve months after the effective date of the assignment. BPWCP shall not reimburse the proposed transferee for any expenses incurred in connection with attendance at the training program of the transferee or the transferee's employee. An initial supply of 20 uniforms must be ordered by the transferee while attending BPWCP's training program at BPWCP's training center. In addition, prior to the effective date of the transfer and as a condition of BPWCP granting its consent to the transfer, BPWCP shall require that the transferor has all then current "Merchandising Accessories Items Required" on hand in the Store and in good condition and that any such items that are no longer clean, workable and presentable or outdated be replaced by items meeting BPWCP's then-current specifications for such items.

(e) The proposed transferee must satisfactorily demonstrate management, business and educational experience reasonably consistent, in the opinion of BPWCP, with the nature and extent of obligations of the am/pm franchise. If the proposed transferee operates one or more BPWCP locations, proposed transferee must meet the then-current requirements applicable to multiple unit operators.

(f) The proposed transferee shall agree to assume, as of the effective date of the assignment, all of the agreements and Operator's duties and obligations thereunder relating to the am/pm franchise.

(g) Operator shall agree to unconditionally release Operator's rights under this Agreement and shall release and discharge BPWCP from all duties and obligations to Operator in connection with this Agreement as of the effective date of the assignment; whereupon Operator shall have no further rights, duties or obligations under this Agreement, except for those obligations that survive the termination of the Store Agreement.

(h) Operator shall obtain and submit evidence satisfactory to BPWCP of all required approvals of federal, state and local governmental entities, agencies or instrumentalities thereof or of any third person, including but not limited to, approval for the transfer of, or issuance of a new beer and wine license, if available in the jurisdiction in which Operator's store is located.

new-lessee operator (DOFO)
ampm: 241WR-1 (4/2006)
Uniform                              25 of 34

111

(i) The proposed transferee must satisfactorily meet the then-current criteria established by BPWCP for new am/pm Operators including, but not limited to, passing an English proficiency test, being at least 21 years of age and proof of U.S. citizenship or permanent resident alien status (green card).

(j) Operator shall pay a transfer fee of $20,000 as follows: The first $1,000 of the fee is payable by Operator at the time Operator requests BPWCP's consent to an assignment of the franchise and the remainder must be paid before BPWCP's final consent is given. In the case of Concurrent Operations, the transfer fee shall be the combined amount of the transfer fee applicable to each franchise at the Premises. Such transfer fee is payable as follows: $1,000 at the time Operator requests BPWCP's consent to an assignment of the franchise and (a) where the proposed transferee's transfer price for the businesses shall be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, direct payment from such escrow of the remaining portion of the applicable transfer fee to BPWCP which must be paid before BPWCP's final consent to the assignment is given or (b) where the proposed transferee's transfer price for the businesses shall not be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, pay the remaining portion of the applicable transfer fee by means of a cashier's check payable to BPWCP and given to BPWCP before BPWCP's final consent to the assignment is given. In the event that BPWCP refuses its consent to the proposed assignment prior to the proposed transferee attending BPWCP's training program, BPWCP shall refund all but $1,000 of any transfer fee paid. In the event that BPWCP refuses its consent to the proposed assignment because the proposed transferee does not pass the English proficiency test and before the proposed transferee attends training school, BPWCP shall refund all but $300 of any transfer fee paid. Otherwise, the transfer fee is not refundable in whole or in part and shall bear no interest. Except if there were a transfer immediately preceding the proposed assignment for which transfer (1) no transfer fee was paid, or (2) the $1,000 transfer fee referred to below in this paragraph was paid, the transfer fee shall not be payable by Operator in the event that Operator requests BPWCP to consent to an assignment of Operator's franchise to: (1) Operator's spouse, adult natural or adopted child, or parent; (2) a sole proprietorship in which the current shareholder of Operator, which is a single shareholder corporation, shall be the sole proprietor; (3) a partnership in which there are only two partners, current Operator as an individual and one other person, and in which the current Operator has at least a fifty percent interest; (4) a corporation in which there are only two shareholders, current Operator as an individual and one other person, and in which the sole shareholder of the current Operator has at least fifty percent of the issued and outstanding voting shares of stock; (5) a corporation in which current Operator, as an individual shareholder, owns one hundred percent of the issued and outstanding voting shares of stock; (6) if Operator is a corporation, the transfer of less than fifty percent of the issued and outstanding voting shares of stock; or (7) the dissolution of a two-partner partnership or a two-shareholder corporation resulting in one of the former partners remaining as the sole proprietor or one of the former shareholders remaining as the sole shareholder of the corporation or as a sole proprietor and the remaining partner or shareholder or sole proprietor had at least a fifty percent interest in the partnership or corporation prior to the dissolution; (8) a limited liability company in which current Operator has at least 50% ownership. If and only if (1) there was a transfer immediately preceding the now proposed transfer for which no transfer fee was paid (in other words, the previous transfer qualified as a transfer without transfer fee under the terms of this Agreement), or (2) the full $20,000 transfer fee was paid, and the Operator now proposes to change its form of business through merger, consolidation or reorganization and the existing owner(s) will retain at least 66% of the ownership of the new franchise entity, then the transfer fee will be $1,000, payable at the time of the initial request for BPWCP's consent to the transfer/assignment.

(k) If the proposed transferee operates one or more am/pm locations, he/she/it must meet the then current requirements for multiple unit operators.

(l) Without limiting any other provision of this Agreement, the proposed transferee must agree to meet the then current standards in the operations and equipment then required of new operators, but shall not be required to spend more than $5,000 in new equipment or operational standards at the time of the assignment.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

26 of 34

112

BPWCP reserves the right to refuse to consent to any proposed assignment which would result in BPWCP having any material increased risk, burden or chance of not obtaining performance.

17.02  This Agreement is personal as between Operator and BPWCP and this Agreement is entered into in reliance upon and in consideration of the personal qualifications, and representations made with respect thereto, of Operator. Operator shall not incorporate or form a partnership, a limited liability company ("LLC") or limited partnership without the prior written approval of BPWCP, which approval shall not be unreasonably withheld. In the event Operator incorporates, BPWCP may require Operator to execute a personal guarantee and other instruments as BPWCP deems appropriate. If Operator is a partnership or corporation, all partners or all shareholders must execute this Agreement and guarantees and other instruments, if any; however, if Operator is a limited partnership, a partnership having as members one or more general partners and one or more limited partners, Operator may designate an Entity Designee whose name is set forth in PART I, who must be the general partner, or if more than one, one of the general partners, to execute this Agreement. If an Entity designee is designated, the Entity designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a limited liability company ("LLC"), all members must execute this Agreement and guarantees and other instruments, if any; however, if the LLC has unequal ownership by 2 members or more than 2 members, such Operator may designate an Entity Designee, whose name is set forth in PART I, who must be the member owning the majority ownership interest in the LLC, to execute this Agreement. If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become due and payable to BPWCP pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a corporation with one, two unequal or with more than two shareholders, Operator may designate an Entity Designee whose name is set forth in PART I, who must be an officer or director and shareholder who owns the largest percentage of shares in the corporation, to execute this Agreement. If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any of the provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require. In the case of a corporation with two equal shareholders, both shareholders hereby agree to personally guarantee the performance of this Agreement by Operator as described earlier in this Section 17.02.

17.03  If Operator is a corporation, any transfer of its capital stock, issuance of additional stock, change in rights of any class or series of stock or contractual agreement affecting stock rights which results in present stockholder[s] as an individual or a group, as the case may be, owning legally or beneficially or having voting control of less than one hundred percent (100%) of its capital stock shall be deemed an assignment of Operator's rights under this Agreement.

17.04  Operator agrees not to change its form of business through merger, consolidation, organization or reorganization without the prior written consent of BPWCP, which shall not be unreasonably withheld, and except upon such terms and conditions as BPWCP shall then require.

17.05  In the event Operator requests BPWCP to approve an assignment, Operator agrees to produce a signed copy of the offer to purchase and accept an assignment. BPWCP shall have no obligation to consider any request for consent to any assignment if it does not receive a copy of such offer.

17.06  Any assignment or attempt by Operator to assign any of its rights or interests under this Agreement and Operator's interest in the real property and improvements without having received the prior written consent of BPWCP shall constitute a material breach of this Agreement and BPWCP shall have the right to terminate this Agreement upon written notice to Operator.

non-lessee operator (DOFO)
asr/pm- 241WR-1 (4/2006)
Uniform

17.07  Operator's formation or dissolution of a partnership or adding or deleting any partner, formation or dissolution of a corporation or adding or deleting any shareholder, formation or dissolution of a LLC or adding or deleting any member shall be considered a transfer of this Agreement.

17.08  In the case of Concurrent Operations, if BPWCP consents to the transfer of this Agreement to the proposed transferee, all other franchise agreements relating to any other business conducted at the Premises shall be transferred to the same transferee.

## B.  ASSIGNMENT AND TRANSFER BY BPWCP

17.09  BPWCP shall have the unrestricted right to transfer or assign all or any part of its rights or obligations under the Franchise Agreement including the right of first refusal in Article 17.01, to any person or legal entity.

## ARTICLE 18

## Termination

18.01  (a) Operator may terminate this Agreement due to a material default by BPWCP of its obligations hereunder, which default is not cured by BPWCP within 60 days after BPWCP's receipt of prompt written notice by Operator to BPWCP detailing the alleged default with specificity; provided, that if the default is such that it cannot be reasonably cured within such 60 day period, BPWCP shall not be deemed in default for so long as it commences to cure such default within 60 days and diligently continues to prosecute such cure to completion.  If Operator terminates this Agreement pursuant to this Section, Operator shall comply with all of the terms and conditions of Article 19 of this Agreement and all of the other provisions of this Agreement which expressly or by their nature survive the termination or expiration of this Agreement.

(b) In the event that Operator leases the Premises from a third party and such lease expires on its own terms and not as the result of default by Operator or amendment of the term of the lease entered into by Operator and landlord after the Effective date of this Agreement, and Operator has no contractual right to extend or renew such lease, such that the Operator loses the right to occupy the Premises, then this Agreement may be terminated by Operator upon 60 days prior written notice to BPWCP.

18.02  This Agreement may be terminated at any time by mutual agreement in writing between Operator and BPWCP.

18.03  In addition to any other remedy of BPWCP, BPWCP may terminate this Agreement on the following conditions:

(1)  BPWCP may terminate this Agreement for failure of Operator to comply with the provisions of this Agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure.

(2)  Notwithstanding the foregoing, BPWCP may terminate this Agreement by giving immediate notice of termination without an opportunity to cure upon the occurrence of any of the following events:

a.  Failure of Operator to pay any sums due to BPWCP within 5 days after receipt of written notice of default.

b.  Operator repeatedly fails to comply with one or more requirements of this Agreement, whether or not cured after notice.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    28 of 34

114

c. Operator, after curing any failure pursuant to Section 1 above, engages in the same noncompliance, whether or not such noncompliance is corrected after notice.

d. Failure of Operator to obtain the release of any attachment, garnishment, execution, lien or levy (collectively, "liens") against the Premises, Store Equipment or business of the am/pm mini market within 72 hours after any such liens attach, or such longer time as required by applicable law.

e. Declaration of bankruptcy or judicial determination of insolvency of Operator; Operator's entry into any arrangement with creditors or assignment for the benefit of creditors or the commencement of any proceeding to appoint a receiver or trustee for Operator, its business or its property.

f. Abandonment of the am/pm mini market by Operator.

g. Fraud or criminal misconduct of Operator relating to the operation of the am/pm mini market or conviction of Operator of any felony involving moral turpitude.

h. If Operator is sole proprietor, Operator's death or incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; provided, however, if Operator has, in accordance with the terms set forth in this Agreement designated a successor–in–interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

i. If Operator is a partnership, the withdrawal of any partner or the dissolution of the partnership or the death of any partner; provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

j. If Operator is a corporation, the death of any shareholder, or, if applicable, the death of the Entity Designee; or, the sale, transfer or other disposition (by operation of law or otherwise) of any portion of any interest in the corporation without BPWCP's prior written consent; or the termination of the Entity Designee, if applicable, as director or officer and shareholder of the corporation; or all or substantially all of the assets of the corporation are sold, conveyed or otherwise transferred, voluntarily or by operation of law. Provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of the death of the Entity Designee or any shareholder. For purposes of this Section, "corporation" shall include a limited liability company ("LLC") and "shareholders" shall include a member of the LLC..

k. Operator's failure to commence operation of the am/pm mini market within 30 days after the Commencement Date.

l. If a fee verification review or audit of Operator's books and records discloses liability for royalty fees due of 2% or more in excess of fees reported and paid by Operator.

m. Misrepresentations or misstatements by Operator to BPWCP relating to the acquisition of the franchise or Operator engages in conduct which reflects materially and unfavorably upon the operation and reputation of the franchise business or system.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                   29 of 34


115

n.    BPWCP makes a reasonable determination that continued operation of the franchise by the Operator will result in an imminent danger to public health or safety.

o.    In accordance with the Provisions of Article 5 of this Agreement.

(3)    Operator's assignment or transfer or attempt to assign or transfer this Agreement in whole or in part or attempt to assign or transfer the business of the am/pm mini market or attempt to assign, transfer or sublet in whole or in part the portion of the Premises upon which the store building is located, in a manner inconsistent with the provisions of Article 17 of this Agreement.

(4)    Operator's failure to successfully complete the initial training program described in Article 16 hereof; and, in the case of Operators who operate more than 1 am/pm mini market, failure of Operator to have a Store Manager trained and employed at each store; and, failure of Operator to replace such full-time Store Manager with another trained full-time Store Manager within two months from the date such designated full-time Store Manager or any of their successor(s) is/are no longer employed at the store; and, failure of Operator to comply with any other provision of Article 16 of this Agreement.

(5)    The failure of the conditions relating to obtaining permits and completion of construction or raze and rebuild or retrofit of the Premises which are described in Article 5.

(6)    A determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic market area in which the Premises are located.

18.04  In the event of destruction of all or a significant portion of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice.  The effective date of such termination shall relate back to the date of destruction.

18.05  In the case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement.

18.06  If Operator is a party to a Loan Agreement and related Promissory Note, as described in Item 10 and Exhibit E of the am/pm Offering Circular for Prospective Franchisees, and Operator has not cured any default under that Loan Agreement or Promissory Note as required, BPWCP may terminate this Agreement."

ARTICLE 19

Procedure on Expiration or Termination

19.01  Upon expiration or termination of this Agreement, Operator shall:

(a)        Cease using the am/pm service name and service mark or other indicia of BPWCP pertaining to the am/pm system.

(b)        Return to BPWCP all copies of BPWCP's franchise accounting system software and all copies of the am/pm Manuals and all other documents, instructions, manuals, display items, materials, and writings furnished by BPWCP pertaining to the am/pm mini market franchise or bearing the am/pm service mark or service name or other service marks, trademarks or service names used in connection with the am/pm mini market; and Operator shall sell to BPWCP the Store Equipment consisting of the am/pm building sign, corner sign, building fascia and interior signage ("am/pm Sign Re-Purchase Items") and to de-identify any Operator

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                        30 of 34

116

owned equipment that bears the service mark or service name or other indicia of BPWCP pertaining to the am/pm Store; and

(c)     If the Agreement has been terminated, BPWCP may pay Operator a sum equal to the amount of expenses incurred by Operator in purchasing the am/pm Sign Re-Purchase Items on a 10 year straight line depreciation value but in no event less than $2500.  Operator shall permit BPWCP to enter the premises to remove the am/pm Sign Re-Purchase Items.

d)     In addition, Operator shall pay to BPWCP at the time of termination, as liquidated damages and not as a penalty, the greater of (a) the total minimum royalty fee which would have been payable under the Agreement from the date of termination of the Agreement through the end of the term provided for in the Agreement; or (b) for each month from the date of termination of the Agreement through the end of the term provided in the Agreement, the actual average royalty fee paid but not less than the minimum royalty fee for any months that the Store was operational prior to termination of the Agreement.  Provided, however, that the provisions of the previous sentence shall not be applicable if the Agreement is terminated by BPWCP due to the following: (i) Operator's death; (ii) Operator's incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; (iii) condemnation or other taking, in whole or in part, of the Premises due to eminent domain; (iv) destruction of all or a substantial part of the Premises through no fault of Operator; or (v) a determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing Motor Fuels at retail or the am/pm mini market franchise in the relevant geographic market area in which Operator's Premises are located.

(e)  Pay BPWCP, upon receipt of final statements, any and all sums then due and owing by Operator to BPWCP.

19.02     (a)  Upon termination of Operator's license rights under Article 1 hereof, Operator shall pay BPWCP liquidated damages of $100.00 per day for each Major Violation (as defined hereafter) and $25.00 per day for each other violation of BPWCP's am/pm service marks, trademarks and service names at the terminated am/pm mini market.  (By "Major Violation" is meant the display after termination of the am/pm colored striping design on the facing of the building of the former am/pm mini market or the display of the am/pm pole sign.)

(b)     The aforesaid damages are agreed in advance by the parties because of the difficulty in ascertaining actual damages; however, such damages are not deemed to replace, or be in lieu of, damages or profits that BPWCP may be entitled to recover resulting from, or arising out of, Operator's unlicensed use of BPWCP's am/pm or other trademarks and trade names.

19.03  The provisions of this Article 19 shall survive termination or expiration of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

ARTICLE 20

Successor-in-Interest

20.01  Notwithstanding the terms of Sections 18.03.2(h), (i) or (j) above, this Agreement shall not terminate upon the death or incapacitation, for more than 90 consecutive days, of Operator, if Operator, prior to his or her death or incapacitation, designates a successor-in-interest to his or her interest in this Agreement in a form prescribed by BPWCP and the designated successor-in-interest assumes all of Operator's duties and obligations under the am/pm franchise (the "franchise") on the terms and conditions set forth herein.

20.02  For purposes of this Article, "Operator" shall mean:  if Operator is a sole proprietor, the sole proprietor; if Operator is a partnership, a partner of Operator or, if Operator is a corporation, a shareholder. "Successor-in-interest" shall mean either a surviving spouse or natural or adopted child or parent of Operator,

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    31 of 34

117

provided that such spouse or child, at the time of Operator's death or incapacitation, shall be an adult and shall meet the qualifications then being required of am/pm franchisees by BPWCP for the operation of an am/pm mini market. In the case of partnerships or corporations or LLCs, "successor-in-interest" shall also mean a surviving partner or a surviving shareholder or member and, in such cases, any partner and any shareholder and any member may designate any of the others as successor-in-interest to his or her interest in this Agreement, provided that no other successor-in-interest has been designated by such partner or member or shareholder and that at the time of Operator's death or incapacitation, such surviving partner or shareholder shall meet the qualifications then being required of am/pm franchisees by BPWCP. In case of sole proprietorships, "Successor-in-interest" shall also mean a designated lawful heir, provided that such heir, at the time of Operator's death or incapacitation, is an adult and meet the qualifications then required by BPWCP for am/pm franchisees. If someone other than Operator's spouse is designated as the successor-in-interest, Operator's spouse must execute a document waiving any claim of interest in this Agreement and acknowledging that such spouse understands and agrees to the successor-in-interest designation.

20.03  The designated successor-in-interest shall be allowed 21 days after the death or incapacitation, for more than 90 consecutive days, of Operator to give written notice of his or her intention (the "Notice of Intention") to assume and operate the franchise or, in the case of a successor-in-interest to the corporate designee, written notice of his or her intention to personally guarantee performance hereof by the corporate franchisee. The notification shall contain such information regarding business experience and creditworthiness as is reasonably required by BPWCP. Except as described more fully below, unless the successor-in-interest has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the successor-in-interest must attend and successfully complete such training as is then required by BPWCP for new franchisees and within 21 days after giving the Notice of Intention commence such training. In addition, BPWCP must approve or disapprove the successor-in-interest within 10 days after the successor-in-interest completes such training. If the successor-in-interest successfully completes training and is approved by BPWCP, BPWCP shall give notice of approval to the successor-in-interest and the successor-in-interest must commence operation of the franchise (or execute a guarantee of performance by a corporate franchisee) within 10 days after receipt of such notice by BPWCP. The successor-in-interest shall be required to pay tuition at the then-current rate for assignees and successors-in-interest. Provided, however, that if there is an Operational Designee who is different from the Corporate Designee successor-in-interest, it is the Operational Designee, who must attend and successfully complete the initial training, unless such Operational Designee has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market. An initial supply of 20 uniforms must be ordered by the successor-in-interest while attending BPWCP's training program at BPWCP's training center.

20.04  The franchise available to the successor-in-interest pursuant hereto is intended to be no greater than the franchise as it exists in the name of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, with the deceased or incapacitated Operator as Guarantor) at the time of such Operator's death or incapacitation. The term of the franchise shall not be extended by reason of the successor-in-interest assuming (or guaranteeing) the franchise and BPWCP may change the terms of the franchise upon its renewal, if it is renewed. BPWCP may require Operator to arrange for the discharge or performance of other franchise obligations such as, but not limited to, insurance, but excluding any obligation to be open to the public, for a period of up to 21 days after Operator's death or incapacitation.

20.05  Operator may designate a primary and one alternate successor-in-interest. The alternate, if one is designated, shall have no right to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event of any exercise of rights by the primary successor-in-interest. If the alternate desires to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event the primary successor-in-interest, fails to do so, the alternate must give notice of intention to do so and otherwise comply with Section 20.03. (In the case of Concurrent Operations, the primary successor-in-interest, if one is designated, must be one and the same person designated as the primary successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises; the alternate successor, if one is designated, must be one and the same person designated as the alternate

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

32 of 34

118

successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises.)

20.06  Unless BPWCP otherwise agrees in writing, there shall be no operation of the franchise following the death or incapacitation of Operator by anyone until all parts of the franchise have been expressly assumed as herein provided, including, but not limited to, such items as licensing and tax permits.

20.07  If the successor-in-interest assumes the franchise (or, in the case of a corporate franchisee, guarantees the franchise), the successor-in-interest shall account to the heirs or estate of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, to the corporation) for the value or other disposition of personal property of the Operator located at or related to the franchise.


## ARTICLE 21

### General


21.01  **Right of Entry.** In addition to specific rights of entry granted herein, BPWCP shall have the right at all times to enter the Premises for the purpose of determining Operator's compliance with the provisions of this Agreement and the Manuals.

21.02  **Entire Agreement.** This Agreement, PARTS I and II, the Manual, as from time to time amended or supplemented, and written agreements executed by the parties contemporaneously with this Agreement pertaining to the Premises, including, if applicable, agreements relating to financing that may be offered by BPWCP and, if applicable, agreements relating to the purchase and sale of the real property where franchise is located, contain all agreements and understandings between Operator and BPWCP and cover the entire relationship between the parties concerning the Store and the am/pm franchise. There are no oral representations, stipulations, warranties or understandings, express or implied, with respect to the subject matter of this Agreement which are not fully set forth herein or in any contemporaneously executed written agreements and in the Manuals, and all prior or contemporaneous promises, representations, agreements or understandings, express or implied, in connection with the Store and the am/pm franchise are expressly merged herein and in the Manual incorporated herein by reference.

21.03  **Compliance with Applicable Laws.** In the event any provisions of this Agreement provide for periods of notice less than those required by applicable law, provide for termination other than in accordance with applicable law or are otherwise inconsistent with applicable law, to the extent such provisions are inconsistent with applicable law, they shall not be effective and BPWCP and Operator shall comply with applicable law regarding such matters.

21.04  **Excused Performance.** In the event that either party hereto shall be delayed or hindered or prevented from the performance of any act required hereunder by reason of strikes, lockouts, inability to procure materials, fire, flood, act of God, failure of power, governmental law or regulation, riot, insurrection, war, or other reason of a like or similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay. For the duration of such excused performance, only the minimum royalty fee shall be waived, however the royalty based on a percentage of gross sales and the advertising and promotion fee shall continue to be payable. If the excused performance is for a period less than a full month, the minimum royalty fee shall be prorated for such partial month and Operator shall pay, as a royalty fee for such month, the greater of the royalty fee based on a percentage of gross sales or the prorated minimum.


non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)
Uniform

33 of 34

119

21.05  **Severability.**  If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

21.06  **Notices.**  Except as otherwise provided herein, all notices required or permitted by or pertaining to this Agreement shall be in writing and addressed to the party to be notified at the address for such party specified in PART I of this Agreement (as to notices to BPWCP, from time to time and upon prior written notice to Operator, BPWCP may change the address of BPWCP specified in PART I).  All notices shall be sent by prepaid certified, prepaid registered, or prepaid overnight mail, return receipt requested, and shall be deemed served as of the date of mailing or shall be personally delivered to Operator and shall be deemed served as of the date delivered.

21.07  **Waiver.**  Failure of either Operator or BPWCP to require performance of any provision of this Agreement shall not affect either party's right to require full performance thereof at any time thereafter and the waiver by either Operator or BPWCP of any provision hereof shall not constitute or be deemed a waiver of a similar breach in the future.

21.08  **Amendments.**  No amendment, addition to or alteration, modification or waiver of any provision of this Agreement shall be of any effect unless in writing and signed by Operator and an authorized representative of BPWCP.

21.09  **Prior Course of Dealing.**  BPWCP and Operator acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Operator and BPWCP by their authorized representatives.

21.10  **Approval.**  This Agreement and any modifications thereto shall not become effective and binding upon BPWCP until executed by Operator and accepted by BPWCP as evidenced by the signature of one of BPWCP's representatives authorized to execute this Agreement.  Operator's occupancy of the Store prior to such execution hereof by BPWCP shall not be construed as a waiver by BPWCP of this requirement.

21.11  **Pronouns.**  The use herein of any personal pronoun shall include the masculine, feminine and neuter pronouns.

**This space is intentionally left blank.**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

34 of 34

Facility Number <u>82461</u>
Customer Account <u>0996439</u>

## AMENDMENT TO am/pm MINI MARKET AGREEMENT
## PHASE-IN ROYALTY FEE

This AMENDMENT, dated the _11_ day of ___July___, 20_06_, is attached to, incorporated in and made a part of the am/pm Mini Market Agreement ("Agreement"), dated the ___11___ day of ___July___, 20_06_, between BP West Coast Products LLC ("Company"), and <u>STTN Enterprises, Inc.</u> ("Operator").

For valuable consideration is is agreed as follows:

1,   Notwithstanding the provisions of Article 7.02(a) of the Agreement, it is agreed that for the first twelve (12) full months of operation of the store following the Commencement Date, and for the first partial month of operation, if any, the monthly minimum royalty fee shall be as follows:

| | |
|---|---|
| 1st partial mo. if any | $ _____ |
| 1st full mo. per mo. | $ _250.00_ |
| 2nd full mo. per mo. | $ _250.00_ |
| 3rd full mo. per mo. | $ _250.00_ |
| 4th full mo. per mo. | $ _500.00_ |
| 5th full mo. per mo. | $ _500.00_ |
| 6th full mo. per mo. | $ _500.00_ |
| 7th full mo. per mo. | $ _500.00_ |
| 8th full mo. per mo. | $ _500.00_ |
| 9th full mo. per mo. | $ _500.00_ |
| 10th full mo. per mo. | $ _750.00_ |
| 11th full mo. per mo. | $ _750.00_ |
| 12th full mo. per mo. | $ _750.00_ |

For the thirteenth (13th) full month of operation and thereafter, the monthly minimum royalty fee shall be $ <u>1,000.00</u>.

2.   Except as herein specifically amended, the Agreement, as heretofore amended or supplemented, shall be and therein remain in full force and effect.

**BP West Coast Products LLC**

**Franchisee**
STTN Enterprises, Inc.

_Cherry Heath_ 7-11-06
                    Date

_Nazim Faquiryan_  6/20/06
                    Date

4/05

121

Facility # <u>82461</u>
Customer Account # <u>0996439</u>

### <u>ADDENDUM TO am/pm AGREEMENT</u>
### <u>FOR INSTALLATION OF ATM EQUIPMENT</u>
### <u>(Non-Lessee Dealers)</u>

This is an Addendum to the am/pm Mini Market Agreement between <u>STTN Enterprises, Inc.</u> (Franchisee) and BP West Coast Products LLC (BPWCP).

Pursuant to Article 6.02 of the am/pm Mini Market agreement between the undersigned Franchisee and BP West Coast Products LLC, BPWCP is willing to consent to the installation of an ATM Terminal at the above referenced Premises, subject to agreement and compliance with, the following terms and conditions:

1. The only authorized ATM Terminal or ATM equipment of any nature is that provided by KeyBank of Cleveland, Ohio and installed pursuant to a Master Service Agreement for Electronic Terminal Facilities dated October 23, 1997 between BPWCP and KeyBank ("ATM Terminal").

2. The ATM Terminal will be installed, and if necessary moved or removed, by BPWCP or KeyBank. Franchisee will not move, tamper with, modify or remove the ATM Terminal. Franchisee hereby consents to the entry, by KeyBank and its agents, upon the Premises, to install and move or remove the ATM Terminal.

3. The ATM Terminal will be placed at the Premises as specified by BPWCP. The ATM Terminal may be removed from the Premises at any time and for any reason at the sole discretion of BPWCP. In the event the ATM Terminal is removed, Franchisee will not receive any compensation, and authorization to have such equipment will be revoked.

4. Franchisee will permit and not impede access to the ATM Terminal by BPWCP, KeyBank, their agents and service vendors, and customers and Cardholders.

5. Franchisee will be paid $.50 per completed cash withdrawal transaction at the ATM Terminal. Payment will be made monthly via credit to Franchisee's trade statement by BPWCP the second month after the calendar month in which the transactions have taken place. In the event that Franchisee transfers, assigns or sells its interest in the am/pm Mini Market Agreement, payment will be credited to the franchisee of record on the last day of the month in which the transactions have taken place.

6. The ATM Terminal and signage are the sole property of KeyBank and Franchisee shall make no claim of ownership nor shall franchisee allow any lien or encumbrance to be placed on the ATM Terminal.

7. In the event of vandalism or damage to the ATM Terminal (excluding normal wear and tear in the ordinary course of business), Franchisee will be responsible for up to the first $1000 of damage; BPWCP will be responsible for damage from $1001 to $2000 and KeyBank will be responsible for damage over $2000. Franchisee will not be responsible for any theft or loss of cash currency from the ATM Terminal.

122

8. BPWCP may cancel this addendum before installation without any liability if it is determined by BPWCP or KeyBank in their sole discretion that the Premises are not suitable for an ATM Terminal due to factors including, but not limited to, security concerns, costs, and location.

9. This is the entire agreement between the parties with regard to its subject matter and all prior agreements, promises, or representations are superseded hereby. The terms of this addendum can only be added to, modified, or waived in writing signed by both parties.

10. All other terms of the am/pm Mini Market Agreement, as previously amended or supplemented, shall remain in full force and effect.

FRANCHISEE:

Signature _____    Date _6/20/06_

Name of Franchisee **STTN Enterprises, Inc.**
                    Nazim Faquiryan

Title (Corp. franchisees only)_____

BP West Coast Products LLC

By: _____    Date _7-11-06_

Title _____

123