**EXHIBIT 'C'**

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

# LOAN AGREEMENT
## (Gasoline)

This LOAN AGREEMENT (this "Agreement") is made and entered into as of ___Feb. 12___, 2007 ("Execution Date"), between BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), and STTN ENTERPRISE, INC., a California corporation (the "Borrower").

### Recitals

A. Borrower and Lender have entered into that certain Contract Dealer Gasoline Agreement dated July 11, 2006 (hereinafter referred to as the "CD Agreement") which provides the terms and conditions under which Borrower operates or will operate an ARCO gasoline station located at 631 San Felipe Road, Hollister, CA 95035 (the "Facility"). The Facility comprises a part of certain real property owned by Borrower located at 631 San Felipe Road, Hollister, CA 95035 and more particularly described in Exhibit "A" to the Deed of Trust (the "Property"). Borrower and Lender have also entered into that certain am/pm Mini Market Agreement dated July 11, 2006 which provides the terms and conditions under which Borrower operates or will operate an am/pm Mini Market on the Property (the "Mini Market Agreement").

B. Lender and Borrower desire to provide for the terms and conditions upon which Lender will make available to Borrower a loan to fund the costs associated with certain pre-approved modifications and/or equipment and improvements to the Facility.

### Agreement

In consideration of the mutual promises contained herein, Lender and Borrower agree as follows:

### DEFINITIONS:

**Additional Loan Amounts:** The term Additional Loan Amounts means any Additional Funds which may be disbursed to Borrower or for Borrower's benefit as defined and provided in Section 1.2.

**Alterations:** The term "Alterations" means alterations or improvements to the Facility which are permitted under this Agreement.

**Amortization Amount:** The term "Amortization Amount" is defined in Section 1.5.

**Annual Guaranteed Volume:** The term "Annual Guaranteed Volume means 2,800,000 gallons.

**Architect:** The term "Architect" is defined in Section 2.1(h).

**Base Loan Amount:** The term "Base Loan Amount" is defined in Section 1.1.

**Business Open Date:** The term "Business Open Date" means the first day on which the Facility is open for business of all material components of the gas and store offering as set forth more particularly in the CD Agreement and the Mini Market Agreement, as determined by Lender.

**CD Agreement:** The term "CD Agreement" is defined in Recital A above.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**Closing Date:**   The term "Closing Date" means the date of recordation of the Deed of Trust in the Official Records of the county in which the Property is located.

**Conditional Commitment Letter:**  The letter dated May 25, 2006 from Lender to Borrower outlining the terms and conditions upon which Lender expressed its willingness to make the Loan to Borrower.

**Contract Year:**  The 12 month period beginning on the first day of the first complete month following the Business Open Date and each 12 month period thereafter.  If the Business Open Date occurs on the first day of a calendar month, the Contract Year shall commence on such date.

**Contractor:**   The term "Contractor" is defined in Section 2.1(h).

**Deed of Trust:**  The term "Deed of Trust" means that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of even date herewith, executed by Borrower in favor of Lender.

**Default Rate:**   The term "Default Rate" shall have the meaning set forth in the Note.

**Disbursement:**  The term "Disbursement" means a disbursement of Loan proceeds made by Lender to or for the benefit of Borrower.

**Disbursement Agreement:**   The term "Disbursement Agreement" means that certain Disbursement Agreement Owner and Contractor in the form of Exhibit D attached hereto and made a part hereof, to be executed by Borrower and Lender substantially concurrently with the recordation of the Deed of Trust.

**Engineer:**   The term "Engineer" is defined in Section 2.1(h).

**Environmental Indemnity:**   The term "Environmental Indemnity" means that certain Environmental Indemnity dated as of even herewith, executed by Borrower in favor of Lender.

**Event of Default:**   The term "Event of Default" is defined in Section 4.

**Facility:**   The term "Facility" is defined in Recital A above.

**Fictitious Deed of Trust:**   The term "Fictitious Deed of Trust" is defined in the Deed of Trust.

**First Anniversary Date:**   The term "First Anniversary Date" is defined in Section 1.5 .

**Improvements:** The term "Improvements" shall have the meaning set forth in the Fictitious Deed of Trust.

**Indemnified Costs:**   The term "Indemnified Costs" means all actual or threatened liabilities, claims, actions, causes of action, judgments, orders, damages (including foreseeable and unforeseeable consequential damages), costs, expenses, fines, penalties and losses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of Lender's counsel), but excluding such costs as may be attributable to the gross negligence or willful misconduct of the party seeking to be indemnified.

**Indemnified Parties:**   The term "Indemnified Parties" means, collectively, Lender, its parent, subsidiary and affiliated companies, assignees of any of Lender's interest in the Loan or the Loan Documents, owners of participation, syndication or other interests in the Loan or the Loan Documents, any purchasers of

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

the Facility at any foreclosure sale or from Lender or any of its affiliates, and the officers, directors, employees and agents of each of them.

**Loan:**   The term "Loan" is defined in <u>Section 1.1</u>.

**Loan Documents:**        The term "Loan Documents" means the documents described in <u>Exhibit "C"</u> attached hereto, as the same may be amended, renewed or extended from time to time.

**Maturity Date:** The term "Maturity Date" is defined in <u>Section 1.4</u>.

**Note:**   The term "Note" means that certain Secured Promissory Note (Gas) of even date herewith, executed by Borrower to the order of Lender, which evidences the Loan.

**Obligations:**       The term "Obligations" is defined in <u>Section 1.4</u>.

**Pay Voucher:**   The term "Pay Voucher" shall have the meaning set forth in the Disbursement Agreement.

**Plans:**   The term "Plans" means detailed plans and specifications for the Alterations.

**Products:**        The term "Products" means all grades of gasoline and gasoline containing motor fuels (excluding diesel fuel) bearing the ARCO trademark and other identifying symbols and which are purchased directly from ARCO or Lender.

**Senior Lender:**  Omni Financial

**Senior Loan:** That certain loan from Omni Financial to Borrower in the amount of $1,925,000.00

**Senior Loan Documents:** Those certain documents and agreements executed by Borrower in favor of Senior Lender evidencing and securing the Senior Loan, including a promissory note in the original principal amount of $1,625,000.00 (the "Senior Note") and that certain deed of trust dated August 12, 2003 and recorded on November 11, 2003 as instrument number 2003-0022960 in the Office of the San Benito Recorder (the "Senior Deed of Trust"). The Senior Note and the Senior Deed of Trust are modified to include the principal amount of $300,000.00 evidenced by _____ dated _____ as instrument number _____ and recorded in the Office of the San Benito Recorder.

**Title Company:** The term "Title Company" means Commonwealth Land Title Company.

**Title Policy:**   The term "Title Policy" is defined in <u>Section 2.1(d)</u>.

**Transfer:**   The term "Transfer" is defined in <u>Section 8</u>.

**Trustor:**    AVA Global Enterprise, Inc., a California corporation

1.     <u>**Amount and Terms of the Loan.**</u>

1.1     <u>Amount of Loan</u>.  Lender agrees to make available to the Borrower, upon the terms and conditions set forth in this Agreement, a loan (the "Loan") in the principal amount of $250,000.00 (the "Base Loan Amount") or so much thereof as is disbursed by Lender to or for the benefit of Borrower.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

1.2     Purpose of the Loan.  The proceeds of the Loan, including without limitation any Additional Funds disbursed as provided above in Section 1.2, shall be used exclusively to fund (i) costs and expenditures associated with improvements to and/or purchases of equipment for use at the Facility as described in Exhibit A attached hereto, and (ii) at the election of Lender, payment of the processing fee set forth in Section 3.11 below (collectively, the "Permitted Uses"), and for no other use or purpose whatsoever.

1.3     Term of Loan.  If not sooner repaid, the outstanding principal amount of the Loan (less amounts deemed repaid pursuant to Section 1.6 below) and all other amounts owing under the Loan Documents (collectively, the "Obligations") shall be due and payable on the date which is twenty (20) years following the Business Open Date ("Maturity Date").  Lender shall determine and confirm to Borrower in writing the Business Open Date. Borrower may prepay the Obligations in whole or in part without penalty, at any time. Lender may accept partial payments, whether or not marked "paid in full", without losing its rights under this Agreement.

1.4     Amortization and Interest Payments.  Beginning on the last day of the first Contract Year ("First Anniversary Date") and continuing on each anniversary of the First Anniversary Date, Borrower shall make annual principal payments in the amount equal to five percent (5%) of the outstanding principal balance of the Loan as of the First Anniversary Date (such annual amount shall be referred to herein as the "Amortization Amount").  Notwithstanding the immediately preceding sentence, in the event Lender disburses all or any portion of the Loan after the First Anniversary Date, Lender shall adjust the amount of annual principal reduction payments due on each ensuing anniversary of the First Anniversary Date so as to fully amortize the principal balance of the Loan by the Maturity Date.  In addition to making annual payments of the Amortization Amount, Borrower shall pay to Lender on the First Anniversary Date and on each anniversary of the First Anniversary Date all accrued and unpaid interest on the Loan (at the rate set forth in Section 2 of the Note) for the prior twelve (12) month period, as determined by Lender.  The amounts due pursuant to this Section 1.5 shall be paid by Borrower to Lender no later than sixty (60) days after the end of each Contract Year.

1.5     Repayment Through Products Purchases. Notwithstanding anything to the contrary contained in Section 1.5 above, if during each Contract Year Borrower purchases at least the Annual Guaranteed Volume of the Products directly from Lender, then the Loan shall be deemed repaid by Borrower as of the last day of such Contract Year (i) five percent (5%) of the then outstanding principal balance of the Loan (subject to adjustment as provided in Section 1.5), and (ii) all interest which accrued under the Note during such Contract Year.  For the first Contract Year only, Borrower shall be deemed to have met the requirement for deemed repayment of indebtedness during the first Contract Year set forth herein so long as Borrower purchases an amount of gasoline from Lender equal to ten-twelfths (10/12) of the Annual Guaranteed Volume.  Borrower acknowledges and agrees that it has itself participated in the determination of Annual Guaranteed Volume, that such goal is reasonable and that Borrower's failure to purchase the Annual Guaranteed Volume from Lender each Contract Year will result in repayment obligations. Borrower further acknowledges and agrees that such deemed repayment of debt will result in taxable income to Borrower and that Lender will deliver to Borrower an IRS Form 1099 reflecting such income.  Borrower further acknowledges and agrees that any deemed repayment shall be calculated based only on the purchases made by Borrower for the applicable Contract Year, and that if during any Contract Year, Borrower's purchases exceed the Annual Guaranteed Volume of the Products for such Contract Year, such excess purchases cannot be applied to any previous or future Contract Year.

1.6     No Waiver.  Lender's deemed repayment of any portion of the Loan as set forth in Section 1.6 shall not operate as a waiver of its right to collect or demand repayment of the Obligations upon the occurrence of an Event of Default.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

    1.7    <u>Promissory Note</u>. The obligation of the Borrower to repay the Loan shall be evidenced by the Note. Lender shall record and endorse on the schedule forming a part of the Note appropriate notations to evidence (i) the date and amount of any Disbursement made by Lender, (ii) the date and amount of each payment of principal by the Borrower, and (iii) the date and amount of any deemed repayment of any portion of the Loan by Lender pursuant to <u>Section 1.6</u>; provided, however, that Lender's failure to record or endorse any such amount shall not affect the obligations of the Borrower under this Agreement or the other Loan Documents.

    2.    <u>Conditions to Disbursement</u>. Before Lender becomes obligated to make any Disbursement under this Agreement, all conditions to such Disbursement set forth below shall have been satisfied at Borrower's sole cost and expense in a manner acceptable to Lender in the exercise of its reasonable judgment. Borrower acknowledges that delays in Disbursements may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement. Borrower consents to all such delays. No waiver of any condition to Disbursement shall be effective unless it is expressly made by Lender in writing. If Lender makes a Disbursement before fulfillment of one or more required conditions, that Disbursement alone shall not be a waiver of such conditions, and Lender reserves the right to require their fulfillment before making any subsequent Disbursements.

    2.1 <u>Loan Closing and First Disbursement</u>. Lender shall not be required to make the first Disbursement unless all of the following conditions are satisfied on or before January 7, 2007.

    (a) Borrower shall have complied with all conditions or requirements of Lender as set forth in the Conditional Commitment Letter, including without limitation (i) satisfaction of the conditions set forth in paragraphs (a) through (e) on Page 1 of the Conditional Commitment Letter, (ii) Lender's receipt of reimbursement from Borrower for all costs incurred by Lender in connection with the Loan, and (iii) Lender's receipt of all of the items set forth in Exhibit "B" to the Conditional Commitment Letter.

    (b) All Loan Documents shall have been duly executed by Borrower and any guarantor and received by Lender, including appropriate resolutions or certificates of authority.

    (c) Lender shall have received written confirmation from the Title Company that (i) the Deed of Trust and the other Loan Documents which are in recordable form shall have been duly recorded in the official records of the county where the Facility is located, and (ii) Lender shall be in a position to deliver for filing with the California Secretary of State a UCC-1 Financing Statement which perfects Lender's security interest in all personal property and fixtures covered by the Deed of Trust.

    (d) The Title Company shall have issued or committed to issue an LP-10 ALTA Lender's extended coverage loan policy of title insurance in a liability amount satisfactory to Lender ("Title Policy"). The Title Policy shall insure the Deed of Trust as a second-priority lien on Borrower's fee estate in the Facility, subject only to exceptions consented to by Lender in writing, and shall contain such endorsements as Lender may require. No title matter may be insured over by any title company without the express written consent of Lender.

    (e) Borrower shall have provided to Lender evidence of commercial general liability insurance naming Lender as an additional insured, on an "occurrence" basis against claims for "personal injury" liability, including bodily injury, death or property damage liability, with a limit of not less than One Million Dollars ($1,000,000). Such insurance shall be primary and noncontributory with any other insurance carried by Lender.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

(f)   If required by Lender, Borrower shall have obtained performance and labor and material payment bonds in dual obligee form covering the performance of the Contractor and such principal subcontractors for the Alterations as Lender may designate. The terms of the bonds and the bonding company shall be acceptable to Lender, and all required bonds and the contracts which they cover shall have been duly recorded or filed in accordance with applicable California law.

(g)   Lender shall have approved the information set forth in Borrower's completed Environmental Questionnaire. If Lender so requires, Lender shall also have received a report prepared by a licensed or registered environmental engineer or other qualified party satisfactory to Lender stating that there are no Hazardous Substances, as defined in <u>Section 1.5</u> of the Environmental Indemnity, present in, on, under or around the Facility, and that there is no condition or circumstance which warrants further investigation or analysis in the opinion of the preparer of the report.

(h)   Lender shall have approved the architect ("<u>Architect</u>"), engineer ("<u>Engineer</u>"), general contractor ("<u>Contractor</u>") and principal subcontractors to be used in connection with the Alterations.

(i)   Lender shall have received and approved the Plans, together with (i) a detailed budget for the Alterations and the other Permitted Uses of Loan proceeds, and (ii) copies of building permits.

(j)   Lender shall have received and approved (i) all contracts entered in by Borrower with the Architect, Engineer and Contractor, respectively, (ii) an assignment of each such contract referred to clause (i) in favor of Lender, in form and substance satisfactory to Lender, together with an assignment of the Plans, and (iii) consents to each such assignment executed by the Architect, Engineer and Contractor, respectively, in form and substance satisfactory to Lender.

(k)   Lender shall have received such financial statements and other financial information as it may require regarding the financial condition of Borrower, any guarantor or the Facility.

(l)   Lender shall have received evidence of the due formation and good standing of Borrower and any guarantor, including such organizational documents (including partnership agreements, operating agreements, articles of organization and articles of incorporation) and certificates of status as Lender may require.

2.2   <u>Any Disbursement</u>. In no event shall Lender be required to make any Disbursement if:

(a)   Borrower fails to observe any condition or term set forth in the Disbursement Agreement; or

(b)   For any reason the Title Company fails or refuses at Lender's request to issue a CLTA Form 122 endorsement or its equivalent; or

(c)   The Improvements are materially damaged and not repaired, unless Lender receives funds from Borrower or insurance proceeds sufficient to pay for all repairs in a timely manner; or

(d)   The Facility or any interest in it is affected by eminent domain or condemnation proceedings; or

(e)   Lender receives a bonded or unbonded stop notice, unless Borrower files a release bond satisfactory to Lender in its reasonable judgment; or

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

(f)  Under any of the Loan Documents, a default or Event of Default (as defined in that document) has occurred and is continuing, or an event has occurred that with notice or the passage of time could become a default or Event of Default.

2.3 Disbursement Procedures.  Disbursements for Alterations shall be made in accordance with the procedures set forth in the Disbursement Agreement, the terms of which are incorporated herein by this reference.  Lender may delegate the disbursal and verification duties to a third party, in which case Lender will notify Borrower and Borrower will make disbursement requests to and submit documentation for disbursements to the third party.  Disbursements of the Loan shall be made in the form of vouchers from Borrower to contractors and/or suppliers.  The contractors and/or suppliers through the third party funding company will redeem the vouchers for payment.  Except as otherwise provided in the Disbursement Agreement, loan proceeds shall be available for disbursement as follows: one-fourth of the loan amount at the time Borrower obtains permits for construction; one-fourth of the loan amount when Lender verifies that the improvements are 25% complete; one-fourth of the loan amount when Lender verifies that the improvements are 50% complete and one-fourth of the loan amount after Lender verifies that the improvements are 75% complete.  The Additional Funds, if any, shall be available for disbursement in accordance with the terms of Section 1.2 above.  Lender reserves the right, prior to making any disbursement, to require original paid invoices supporting the expenditure of loan proceeds, releases of mechanics liens, and/or additional security for the Loan as Lender may determine in its sole discretion. The third party fund control company fee, if any, will be paid by Lender.

3.    **Covenants of the Borrower.**  Borrower promises to keep each of the covenants set forth below, unless Lender has waived compliance in writing.

3.1 Commencement and Completion of Improvements.  Borrower shall obtain building permits and commence construction of the Alterations no later than January 11, 2007.  Borrower shall complete the construction of the Alterations, obtain a certificate of completion or a certificate of occupancy from the appropriate governmental authority, and open for business (as determined by Lender) by not later than July 11, 2007.  Borrower's failure to observe any of the deadlines set forth in this Section 3.1 shall be an Event of Default and shall not be subject to the cure period set forth in Section 4.9 below.

3.2 Permits, Licenses and Approvals.  Borrower shall construct the Alterations in a good and workmanlike manner in accordance with sound building practices as well as the Plans and all applicable laws pertaining to such construction.  Borrower shall properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to construct and occupy the Alterations and operate the Facility.

3.3 Site Visits.

(a)  Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Facility for the purposes of performing an appraisal, observing the work of construction, examining all materials and determining whether such work conforms with the Plans approved by Lender. Lender shall also have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors which relate to the Facility or construction of the Alterations. In each instance, Lender shall give Borrower reasonable notice before entering the Facility.  Lender shall make reasonable efforts to avoid interfering with Borrower's Facility operations.

(b)  Lender is under no duty to visit the Facility or to supervise or observe construction or to examine any books or records.  Any site visit, observation or examination by Lender shall be solely for the purpose of protecting Lender's rights and interests.  No site visit, observation or examination by

Lender shall impose any liability on Lender or result in a waiver of any default of Borrower. In no event shall any site visit, observation or examination by Lender be a representation that there has been or shall be compliance with the Plans, that the construction is free from defective materials or workmanship, or that the construction complies with any other applicable law.

3.4 <u>Protection Against Lien Claims</u>. Borrower shall promptly pay or otherwise discharge all claims and liens for labor done and materials and services furnished in connection with the construction of the Alterations. Borrower shall have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to Lender or delay in completing the Alterations.

3.5 <u>Payment of Expenses</u>. Borrower shall pay Lender's costs and expenses incurred in connection with the making, disbursement and administration of the Loan, as well as any revisions, extensions, renewals or "workouts" of the Loan, and in the exercise of any of Lender's rights or remedies under this Agreement. Such costs and expenses include charges for title insurance (including endorsements), filing, recording and escrow charges, fees for appraisal, architectural and engineering review, construction services and environmental services, mortgage taxes, legal fees and expenses of Lender's counsel and any other reasonable fees and costs for services, regardless of whether such services are furnished by Lender's employees or agents or independent contractors. Borrower acknowledges that amounts payable under this Section are not included in any loan or commitment fees for the Loan.

3.6 <u>Financial Information</u>. Borrower shall keep true and correct financial books and records on a cash basis pertaining to the construction of any Alterations. Upon request of Lender from time to time, Borrower shall deliver balance sheets and income statements to Lender for itself and the Facility, together with a statement showing all changes in the financial condition of Borrower and the Facility which occurred during the preceding Contract Year. These financial statements may be Borrower prepared. Borrower shall also furnish to Lender upon request signed copies of any tax returns and such other information as Lender may reasonably request concerning its affairs and properties.

3.7 <u>Notices</u>. Borrower shall promptly notify Lender in writing of:

(a) Any litigation affecting Borrower or any guarantor, where the amount claimed is Fifty Thousand Dollars ($50,000) or more;

(b) Any communication, whether written or oral, that Borrower may receive from any governmental, judicial or legal authority, giving notice of any claim or assertion that the Facility or any Alterations fail in any respect to comply with any applicable governmental law;

(c) Any default by the Contractor or any subcontractor, material supplier or surety; and

(d) Any material adverse change in the physical condition of the Facility (including any damage suffered as a result of earthquakes or floods), or in Borrower's or any guarantor's business condition (financial or otherwise), operations, properties or prospects.

3.8 <u>Indebtedness</u>. Except for the Senior Loan and except as otherwise provided under the Loan Documents, Borrower will not create, incur or assume any indebtedness, commitment or other obligation for borrowed money without the express prior written consent of Lender.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

3.9 <u>Performance of Acts</u>.  Upon request by Lender, Borrower shall perform all acts which may be necessary or advisable to perfect any lien or security interest provided for in the Loan Documents or to carry out the intent of the Loan Documents.

3.10 <u>Insurance</u>.

(a) Borrower shall provide, maintain and keep in force at all times prior to repayment of the Loan, the insurance required by Section 2.1 above and by the Disbursement Agreement. Also at all such times, Borrower shall provide, maintain and keep in force any and all additional insurance that Lender in its reasonable judgment may from time to time require, against insurable hazards which at the time are commonly insured against in the case of property similarly situated.  Such additional insurance may include flood insurance as required by federal law and earthquake insurance as required by Lender.  At Lender's request, Borrower shall supply Lender with an original of any policy or a certificate of coverage.

(b) All policies of insurance required under this Agreement and the Disbursement Agreement shall be issued by companies approved by Lender having a minimum A.M. Best's rating of A:IX. The limits, coverage, forms, deductibles, inception and expiration dates and cancellation provisions of all such policies shall be acceptable to Lender.  In addition, each required property insurance policy shall contain a Lender's Loss Payable Form (Form 438 BFU or equivalent) in favor of Lender, and shall provide that all proceeds be payable to Lender to the extent of its interest.  An approval by Lender is not, and shall not be deemed to be, a representation of the solvency of any insurer or the sufficiency of any amount of insurance.

(c) Each policy of insurance required hereunder and under the Disbursement Agreement shall provide that it may not be modified or cancelled without at least thirty (30) days' prior written notice to Lender.  When any required insurance policy expires, Borrower shall furnish Lender with proof acceptable to Lender that the policy has been reinstated or a new policy issued, continuing in force the insurance covered by the policy which expired.  Borrower shall also furnish Lender with evidence satisfactory to Lender that all premiums for such policy have been paid within thirty (30) days of renewal or issuance.  If Lender fails to receive such proof and evidence, Lender shall have the right, but not the obligation, to obtain current coverage and advance funds to pay the premiums for it.  Borrower shall repay Lender immediately on demand for any advance for such premiums, which shall be considered to be an additional loan to Borrower bearing interest at the Default Rate and secured by the Deed of Trust and which shall not be subject to deemed repayment in accordance with <u>Section 1.6</u> above.

3.11 <u>Processing Fee</u>. Borrower shall pay to Lender upon execution of this Agreement by Borrower a processing fee in the amount of $10,000.

4.    <u>Events of Default</u>.

The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

4.1 The Borrower assigns this Agreement or any of the other Loan Documents to a third party without the prior written consent of Lender: or

4.2 The Borrower assigns the CD Agreement to a third party without the prior written consent of Lender; or

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

4.3 The Borrower fails to observe any of the deadlines set forth in <u>Section 3.1</u> above or, after commencing operations, there occurs a cessation of operations at the Facility for thirty (30) consecutive days; or

4.4 There shall occur a "Transfer" (defined below) without Lender's prior written consent; or

4.5 The CD Agreement is terminated by either Lender or Borrower prior to the end of its stated term; or

4.6 There shall occur a default or "Event of Default" under any contract entered into by Borrower with the Architect, Engineer or Contractor; or

4.7 Borrower fails to make any payment due under the Loan Documents within five (5) business days after the date when due; or

4.8 Borrower fails to comply with any provision contained in this Agreement other than those provisions elsewhere referred to in this <u>Section 4</u>, and does not cure that failure within thirty (30) days after written notice from Lender; or

4.9 Any representation or warranty made by Borrower in the Loan Documents or in any Pay Voucher, financial statement or document delivered pursuant to this Agreement, or in connection with the making of any Disbursement, shall prove to have been incorrect, untrue or misleading in any material respect when made; or

4.10 A default or "Event of Default" shall have occurred under any of the other Loan Documents; or

4.11 There shall occur a default or event of default under any of the Senior Loan Documents; or

4.12 The Borrower shall fail to pay when due the principal of or interest on any other indebtedness secured by the Facility, or there shall occur any other event that would permit the holder of such indebtedness to accelerate the maturity thereof; or

4.13 The Borrower shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or a substantial part of its property or business, or such a receiver or trustee otherwise shall be appointed and shall not be discharged within 30 days after such appointment, or there shall be instituted by or against Borrower a bankruptcy, insolvency, reorganization or liquidation proceeding and such proceeding shall not be dismissed within 30 days ("Insolvency Proceeding"), or any order, judgment or decree shall be entered against the Borrower decreeing its dissolution, or the Borrower's existence shall otherwise be terminated.

5.    <u>Remedies.</u>

5.1 Upon the occurrence of any Event of Default, Lender may, at its option, exercise all remedies and rights available to it under this Agreement, the other Loan Documents and under applicable law or in equity or by statute, including without limitation, the right to (i) declare all or any part of the Obligations to be forthwith due and payable, without presentation, demand, protest or notice of any kind, all of which are

hereby expressly waived by the Borrower; or (ii) terminate any obligation of Lender hereunder to make further Disbursements. All of Lender's rights and remedies shall be cumulative. No delay or failure of Lender in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of that right by Lender, and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or of any other right or remedy that Lender may have.

5.2 Also upon any Event of Default, Lender shall have the right in its sole discretion to enter and take possession of the Facility, whether in person, by agent or by court-appointed receiver, and to take any and all actions which Lender in its sole discretion may consider necessary to complete construction of the Alterations, including making changes in the Plans, work or materials and entering into, modifying or terminating any contractual arrangements, all subject to Lender's right at any time to discontinue any work without liability. If Lender chooses to complete the Alterations, it shall not assume any liability to Borrower or any other person for completing the Alterations or for the manner or quality of construction of the Alterations, and Borrower expressly waives any such liability. If Lender exercises any of the rights or remedies provided in this subparagraph, that exercise shall not make Lender, or cause Lender to be deemed to be, a partner or joint venturer of Borrower. Lender in its sole discretion may choose to complete construction in its own name. All sums which are expended by Lender in completing construction shall be considered to be an additional loan to Borrower bearing interest at the Default Rate, secured by the Deed of Trust and not be subject to deemed repayment in accordance with <u>Section 1.6</u>.

5.3 For purposes of determining the outstanding balance of the Loan at the time an Event of Default occurs hereunder, deemed repayment of principal and interest by Lender pursuant to <u>Section 1.6</u> shall be calculated based upon the percentage of the Annual Guaranteed Volume achieved by Borrower through the last day of the calendar month immediately preceding the occurrence of the Event of Default. For example if the CD Agreement is terminated by Borrower on May 15, 2005 and the current Contract Year expires December 31, 2005, Lender will calculate total Product purchases from Lender during the period January 1, 2005 through April 30, 2005 and compare such total to the Annual Guaranteed Volume. If total Product purchases during such period equal 33% of the Annual Guaranteed Volume, the outstanding principal balance of the Loan will be reduced by an amount equal to 33% of the annual principal reduction payment due for that Contract Year (determined in accordance with <u>Section 1.6</u> above).

6. <u>Interest and Late Charges</u>. Borrower hereby acknowledges that late payment by Borrower to Lender of the payments due under this Agreement will cause Lender to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any payment due from Borrower under this Agreement is not received within five (5) business days after the date on which such payment is due and payable, then without any requirement for notice to Borrower, Borrower shall pay Lender a late charge equal to five percent (5%) of such overdue amount. Borrower and Lender hereby agree that such late charge represents a fair and reasonable estimate of the costs Lender will incur by reason of late payment by Borrower. Acceptance of such late charge by Lender shall in no event constitute a waiver of Borrower's default with respect to such overdue amount, or prevent Lender from exercising any of the rights and remedies granted hereunder. In addition to the foregoing, Borrower agrees to pay interest at the Default Rate on any and all sums due under this Agreement from the payment due date until the date fully paid by Borrower.

7. <u>Transfers</u>. Borrower agrees that, in the event of any "Transfer" (as defined below) without the prior written consent of Lender, Lender shall have the absolute right, at its option, without prior demand or notice, to declare the Obligations immediately due and payable. Consent to one such Transfer shall not be deemed to be a waiver of the right to require consent to future or successive Transfers. Lender may grant or deny such consent in its sole discretion and, if consent should be given, any such Transfer shall be subject to all obligations of Borrower under the Loan Documents, such transferee shall assume all obligations under the

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

Loan Documents and agree to be bound by all provisions contained herein and therein, and Lender may require that Borrower pay to Lender an assumption fee equal to five percent (5%) of the remaining balance of the unamortized Loan. Such assumption shall not, however, release Borrower or any guarantor from any liability to Lender without the prior written consent of Lender. As used herein, "Transfer" shall mean:

(a) any sale, transfer, conveyance, hypothecation, encumbrance or lease of the Facility or any part thereof or interest therein to any person or entity, whether voluntary, involuntary, by operation of law, or otherwise (except for any deed of trust executed in favor of EGI in connection with the Citicorp Loan);

(b) any change of control in Borrower if, within thirty (30) days after such change of control, Borrower has not paid in full all Obligations ("control" as used herein shall mean the ability to direct the day to day management of the affairs of Borrower);

(c) any sale or transfer of greater than ten percent (10%) of the direct or indirect ownership interests in Borrower or any consolidation or merger of Borrower (whether voluntarily, involuntarily, by operation of law or otherwise); or

(d) any sale, lease or other disposal of all or substantially all of Borrower's assets.

8.    **Indemnity Regarding Construction and Other Risks**.  Borrower indemnifies, defends and holds the Indemnified Parties harmless from and against any and all Indemnified Costs directly or indirectly arising out of or resulting from construction of any improvements within the Facility, including any defective workmanship or materials; or any failure to satisfy any requirements of any laws, regulations, recorded covenants, maps, permits or other entitlements that apply or pertain to the Facility; or breach of any representation or warranty made or given by Borrower to any of the Indemnified Parties or to any prospective or actual buyer, tenant or other occupant of all or any portion of the Facility; or any claim or cause of action of any kind by any party that any Indemnified Party is liable for any act or omission of Borrower or any other person or entity in connection with the ownership, sale, operation or development of the Facility.  This indemnity shall survive repayment in full of the Obligations.

9.    **Miscellaneous**.

9.1 _Amendments_.  This Agreement may only be amended by a written instrument duly executed by Lender and Borrower.

9.2 _Notices_.  Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

(a)  If to the Borrower:

STTN Enterprises, Inc.
631 San Felipe Rd.
Hollister, CA 05035
Attention: Nazim Faquiryan
Zayed Faquiryan
Facsimile No.:

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

(b)    If to Lender:

BP West Coast Products LLC
P. O. Box 5077
Buena Park, California 90622-5077
Attention: Contract Dealer Loan Administration
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

9.3 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one agreement.

9.4 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

9.5 Severability. If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

9.6 Assignment, Binding Effect. The Loan is not assumable. Borrower may not assign this Agreement, nor delegate any of its duties hereunder, without the prior written consent of Lender, which consent may be granted or denied in Lender's sole discretion. Lender may assign all or any part of its rights and interests hereunder. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

9.7 Tax Consequences. Lender makes no representation regarding and assumes no responsibility for the tax consequences to Borrower of any term of this Agreement or the other Loan Documents. Borrower represents and warrants to Lender that it has had an opportunity to consult with tax counsel prior to executing the Loan Documents.

9.8 Entire Agreement. This Agreement and the other Loan Documents contain all of the agreements and understandings between the parties with respect to the subject matter of this Agreement. All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Agreement are expressly merged herein and superseded hereby.

9.9 Attorney's Fees. If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Agreement, the Note, the other Loan Documents or the Loan, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law. In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first above written.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**STTN ENTERPRISE, INC.**
a California corporation

By _____

Name: Nazim S.M. Faquiryan

Title:   CEO/President


By _____

Name:  Sayed M.N. Faquiryan

Title:   Secretary and Treasurer

**BP WEST COAST PRODUCTS LLC,**
a Delaware limited liability company

By _____

Name: Jeff M. Cary

Title:   Vice President

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT A

Loans may only be used for gasoline-related image and equipment-based site improvements; the types of qualifying expenditures and the maximum amount permitted to be spent are noted below:

| Description | Maximum Amount |
|---|---|
| Trade dress | $20,000 |
| Dispensers, installation charges, and associated vapor recovery equipment | $96,000 |
| Doublewall underground tanks, installation charges and associated vapor recovery equipment- Four 10 Mgal. tanks | $171,000 |
| Doublewall product piping, singlewall vapor piping and electrical lines | $75,000 |
| Self Serve equipment and installation charges (PIC) | $50,000 |
| PayPoint equipment and installation charges (POS) | $11,000 |
| Canopies and canopy work | $80,000/canopy |
| Yard paving | $30.52/sq yd. |
| Station lighting (exterior) | $10,000 |
| Site preparation | $72,000 |
| Engineering and drawings | $20,000 |
| Landscaping | $40,000 |
| Interior and Exterior Painting | $11,000 |
| Building improvements and additions | $90,000 |

Prices vary up to 20%, dependent on geographic location.

82461 Gas Loan Agreement  v1.doc

Exhibit A – Page 1

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**EXHIBIT B**

**SECURED PROMISSORY NOTE**

[Attached]

## SECURED PROMISSORY NOTE
### (Gas)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Fifty and No/100 Dollars ($250,000.00) (the "Maximum Loan Amount"), or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below. This Note evidences a loan ("Loan") from Lender to Borrower.

1.      This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property"). It may also be secured by other collateral. This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower. Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note. Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

2.      The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to four and five percent (4.75 %) per annum.[1] Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan. Borrower shall also make annual principal reduction payments as provided in the Loan Agreement. Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

3.      All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

4.      All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

5.      Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

6.      Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

7.      If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment. In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

8.      From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate. Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]     The interest rate currently approved for CD Loans is 4.75 % per annum but is subject to change. The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.

1

9.    If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

(a)    Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

(b)    Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

(c)    Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.    If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.  In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests.  From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.    This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.    Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.    If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note.  No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.  All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.    This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance.  Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.    If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:  CEO and President

By _____
Name:  Sayed M.N. Faquiryan
Title:  Secretary and Treasurer

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**EXHIBIT C**

**SCHEDULE OF LOAN DOCUMENTS**

1.  Loan Agreements (am/pm Mini Market and Gasoline)

2.  Secured Promissory Note

3.  Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing

4.  UCC-1 Financing Statement

5.  Environmental Indemnity

6.  Environmental Questionnaire

7.  Senior Lender's Consent to Encumbrance and Request for Notice of Default

8.  Guaranty executed by Sayed M.N. Faquiryan, Mahgul Faquiryan and Nazim S.M. Faquiryan

9.  Contract Dealer Gasoline Agreement

Exhibit C – Page 1

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**EXHIBIT D**

**FORM OF DISBURSEMENT AGREEMENT**

**[Attached]**

# DISBURSEMENT AGREEMENT
### (Owner and Contractor)

This Disbursement Agreement ("Agreement") is made by and between BP WEST COAST PRODUCTS LLC, A Delaware limited liability company and those persons designated below as "Owner" and "Contractor".

## RECITALS

A. Owner has entered into an agreement with Contractor for the construction on the property described below (the "Job Site") of those certain improvements described below (the "Improvements") for the total sum set forth below (the "Contract Price").

B. Owner and BP WEST COAST PRODUCTS LLC entered into a Contract Dealer Gasoline Agreement [am/pm Mini Market Agreement] [Smog Pros Contract Agreement] (the "Franchise Agreement").

C. Owner and BP WEST COAST PRODUCTS LLC entered into a Loan Agreement dated _____ and related agreements (collectively, the "Loan Agreement") whereby BP WEST COAST PRODUCTS LLC agreed to loan funds pursuant to the Loan Agreement ("Construction Loan Proceeds") under the terms and conditions as set forth therein (the "Construction Loan Procedure").

D. The parties hereto hereby intend to provide for the disbursement of the Construction Loan Proceeds upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties agree as follows:

## OPERATIVE PROVISIONS

1. **COST ESTIMATES.** Contractor shall prepare and submit for review by BP WEST COAST PRODUCTS LLC a cost breakdown estimate (the "Cost Estimate") in a form prescribed by BP WEST COAST PRODUCTS LLC.

2. **AUTHORIZATION OF DISBURSEMENT.** Owner and Contractor hereby authorize BP WEST COAST PRODUCTS LLC or its designee to disburse the Construction Loan Proceeds in accordance with the schedule of progress payments determined from time to time by BP WEST COAST PRODUCTS LLC. The Construction Loan Proceeds shall be under the exclusive control of BP WEST COAST PRODUCTS LLC or its designee. Neither Owner nor Contractor shall have any right, title or interest, in or to the Construction Loan Proceeds independent of this Agreement; nor shall Owner have any right to direct the time, manner or mode of disbursement of all or any portion of the Construction Loan Proceeds or to demand repayment thereof.

3. **PROJECT DISBURSEMENT INSTRUCTIONS.** Construction Loan Proceeds will be disbursed from time to time upon receipt by BP WEST COAST PRODUCTS LLC or its designee of Pay Vouchers, executed by Owner or Owner and Contractor, accompanied by original detailed invoices, and UNCONDITIONAL or CONDITIONAL WAIVER AND RELEASE UPON PROGRESS or FINAL PAYMENT, as appropriate, for general contractor, each subcontractor who furnished labor, equipment, materials or services to the Job Site, and each materialman, supplier and vendor who furnished materials to the Job Site during the period covered by said payment. BP WEST COAST PRODUCTS LLC or its designee shall, at their sole discretion based on their expertise, pay such Pay Vouchers. All parties understand and agree that BP WEST COAST PRODUCTS LLC or its designee have the right to withhold payment on any and all Pay Vouchers if supporting documentation requested is not provided. This may include original invoices, job inspection card copy, IRS form W-9, appropriate lien releases for labor and/or materials, receipts, photos, revised cost breakdown and Affidavit and Certification of Completion of Builder/Contractor.

4. **TOTAL PROJECT FUNDING.** The funds provided herein are the maximum funds available under BP WEST COAST PRODUCTS LLC's loan program and Loan Agreement and are the only funds which will be disbursed under this Agreement. These funds may or may not be sufficient to complete the project in its entirety.

5. **COST BREAKDOWN AND APPROVED PLANS.** Prior to issuance of Pay Vouchers and disbursement of any funds, Owner and Contractor will provide to BP WEST COAST PRODUCTS LLC:

    a.   Completed Cost Breakdown for all construction, Improvements and equipment at the Job Site;
    b.   Specifications for all construction, Improvements and equipment at the Job Site; and
    c.   Contracts, as required by BP WEST COAST PRODUCTS LLC.

6.   **OWNER'S TRADE DRESS EXPENSES AND PACKAGING FEES**.  Owner and Contractor hereby acknowledge and understand that during the course of construction BP WEST COAST PRODUCTS LLC may from time to time withhold certain funds from disbursement which are identified as Owner's calculated costs for trade dress and packaging fees pursuant to the Franchise Agreement and Loan Agreement.  In an instance where trade dress or packaging fees are not indicated in the original budget or where funds, as disbursed, are insufficient for the withhold requirement, then BP WEST COAST PRODUCTS LLC will, at its discretion, withhold the needed funds from budget line items which it deems appropriate.

7.   **APPLICATION OF FUNDS**.
7.1  BP WEST COAST PRODUCTS LLC does not guarantee that (a) the construction of the Improvements will proceed, be completed or be in accordance with the plans and/or specifications if and when completed; or (b) the quality of workmanship or materials.  Nor does BP WEST COAST PRODUCTS LLC guarantee the payment of all obligations incurred by Contractor or Owner in connection with the construction of the Improvements.

7.2  BP WEST COAST PRODUCTS LLC or its designee will not be required to disburse any funds for any labor and/or material which, in the opinion of BP WEST COAST PRODUCTS LLC, exceed the value of such labor and/or material, or which will reduce the undisbursed funds below the amount necessary to complete the Improvements.

7.3  In the event a mechanic's lien is filed against the Job Site as a result of the construction of the Improvements, or in the event  BP WEST COAST PRODUCTS LLC is served with a Notice to Withhold, BP WEST COAST PRODUCTS LLC may, at its option, pay or compromise said lien or Notice to Withhold, or any action or judgment based thereon, deducting all costs and expenses so incurred, including reasonable attorney's fees, from the funds remaining  on deposit with BP WEST COAST PRODUCTS LLC.  BP WEST COAST PRODUCTS LLC may elect not to pay or compromise any such lien or Notice to Withhold, or action, which is disputed in good faith by Owner or Contractor, and which Owner or Contractor is at their own expense then diligently contesting, provided, that upon demand by BP WEST COAST PRODUCTS LLC, there shall be recorded in the official records of the County where the Job Site is located, a surety bond acceptable to BP WEST COAST PRODUCTS LLC sufficient to satisfy such claim as shall be determined by ARCO.  Any amount so deposited shall be disbursed in accordance with the resolution of the contest.

8.   **INSPECTIONS AND PERFORMANCE**.
8.1  BP WEST COAST PRODUCTS LLC will inspect or cause to be inspected the Job Site from time to time and at such times as it deems necessary.  These inspections are solely for the purpose of ascertaining the stage of construction and whether certain work has progressed and not for the purpose of determining whether the construction of the Improvements is in accordance with the plans and/or specifications, nor whether such construction has been accomplished in a good, substantial and workmanlike manner. Consequently, such inspection by BP WEST COAST PRODUCTS LLC should not be deemed the equivalent of or a substitute for architectural supervision.

8.2  When BP WEST COAST PRODUCTS LLC has disbursed the Construction Loan Proceeds, its obligations under this Agreement shall cease.  BP WEST COAST PRODUCTS LLC is not responsible either for the quality of the labor or material used in connection with the Improvements or for the correction of any defects, errors or omissions in construction which may from time to time appear.

9.   **AUTHORIZED SIGNATURES**.  The signature of those parties set forth below as "Authorized Parties" ("Authorized Parties") on disbursement orders submitted to BP WEST COAST PRODUCTS LLC for payment on account of the construction of the Improvements on the Job Site shall conclusively, irrevocably and finally establish the right of BP WEST COAST PRODUCTS LLC to make payment in the amount, manner and to the person designated on such Pay Voucher, and shall constitute a representation that the labor, materials and/or services therein referred to were actually furnished, or are to be furnished, to the Job Site and incorporated in the Improvements being constructed thereon and BP WEST COAST PRODUCTS LLC shall be entitled to rely thereon and shall be held free and harmless in connection therewith. BP WEST COAST PRODUCTS LLC may, in its discretion, decline to pay any disbursement order for good cause, and may, in its discretion, pay any disbursement order without the signature of the Authorized Parties, but any such payment must be proper in amount and purpose.  The payment of any disbursement order by BP WEST COAST

PRODUCTS LLC shall not be construed as a guaranty or warranty of the quality or sufficiency of the labor, materials or service represented thereby.  Notwithstanding BP WEST COAST PRODUCTS LLC's right to control disbursement of funds, exercise of such right shall not constitute an obligation by BP WEST COAST PRODUCTS LLC to insure that work or materials are in compliance with the plans and specifications, or any governmental or regulatory agency, or to insure that undisbursed funds are at any time sufficient to complete the Improvements.

10.  **MISCELLANEOUS**.  This Agreement modifies all prior agreementsand Contractor's contracts, written or oral, in so far as they would otherwise be in conflict with the provisions hereof.  If any provision of this Agreement is found invalid or ineffectual for any reason whatsoever, such invalidity shall not in any way affect any other provision hereof.

11.  **UNSUITABLE SOIL CONDITIONS**.  If the Job Site, or any portion thereof upon which the Improvements are to be constructed, is filled ground, or ground otherwise unsuitable to support such Improvements as the same are designed and engineered, Owner and Contractor shall immediately upon discovering such fact disclose the same to BP WEST COAST PRODUCTS LLC and cease all future work on the Improvements until Owner or Contractor and BP WEST COAST PRODUCTS LLC have agreed, in writing, to recommence construction operations.

12.  **ATTORNEYS FEES**.  In the event of any dispute arising out of this Agreement or the performance thereof, whether or not such dispute results in litigation, all attorneys fees incurred by BP WEST COAST PRODUCTS LLC for consultation or representation with respect to such dispute, whether or not BP WEST COAST PRODUCTS LLC is made a party to such dispute, shall be deemed an additional expense of the performance by BP WEST COAST PRODUCTS LLC of this Agreement, for which additional expenses from the Construction Loan Proceeds shall be reimbursed.  To the extent that funds remaining in the Construction Loan Proceeds are insufficient so to reimburse BP WEST COAST PRODUCTS LLC, all parties signatory hereto other than BP WEST COAST PRODUCTS LLC shall be liable, jointly and severally, to BP WEST COAST PRODUCTS LLC for reimbursement of such expenses and shall pay same upon demand.  The amount of such expenses shall be deemed liquidated upon the making of such demand for BP WEST COAST PRODUCTS LLC.

13.  **DATA**.  The name of the "Owner" and "Contractor" and other data referred to above are as follows:

(a)  OWNER:                          _____

                                     _____

                                     _____

(b)  CONTRACTOR:                     _____

                                     _____

                                     _____

(c)  JOB SITE/FACILITY #             _____

                                     _____

(d)  IMPROVEMENTS:                   _____

                                     _____

(e)  LOAN PROCEEDS:                  _____
     (See #4)

(f)  CONTRACT PRICE:                 _____

(g) PARTIES AUTHORIZED
    TO SIGN VOUCHERS:

Signature_____
Name        _____

Signature_____
Name        _____

Signature_____
Name        _____

Signature_____
Name        _____

**CONSTRUCTION LOAN PROCEEDS MAY NOT BE
SUFFICIENT TO COVER ALL EXPENSES FOR THE
IMPROVEMENTS, OR ON THE JOB SITE.**

Dated: _____         BP WEST COAST PRODUCTS LLC
                                                Facility #_____

_____                _____
By: _____            _____
_____                _____
By: _____            _____
_____                _____
By: _____            _____
             "OWNER"                                    "CONTRACTOR"

BP WEST COAST PRODUCTS, a Delaware limited liability company

            By _____

**EXHIBIT 'D'**

```
          CIRCLE A FOOD STORE #200
              631 San Felipe RD
             Hollister, Ca 95028
              Store:  200
10-19-2007  11:43:58      Register: 3
CLERK:0190
11:40:29                 Sale no:386171
-------------------------------------
Item              Sz Qt        Total $
-------------------------------------
PEPSI 200Z  SIN      1 T         1.49
Crv 5cents  EAC      1           0.05
15.2 NR MM  EAC      1           1.49
Crv 5cents  EAC      1           0.05
-------------------------------------

          Sub Total......$      3.08
          Tax........$          0.12
          Total......$          3.20
          Cash.......$         10.00
          Change.....$          6.80
-------------------------------------
          THANK  YOU!
```