KURT OSENBAUGH (State Bar No. 106132)
DEBORAH YOON JONES (State Bar No. 178127)
SAYAKA KARITANI (State Bar No. 240122)
**WESTON, BENSHOOF, ROCHEFORT,**
    **RUBALCAVA & MacCUISH LLP**
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
kosenbaugh@wbcounsel.com
djones@wbcounsel.com
skaritani@wbcounsel.com

Attorneys for Plaintiffs and Counter-Defendants
BP WEST COAST PRODUCTS LLC and
ATLANTIC RICHFIELD COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BP WEST COAST PRODUCTS LLC, a Delaware Limited Liability Company; and ATLANTIC RICHFIELD COMPANY, a Delaware Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> STTN ENTERPRISES, INC., a California Corporation; NAZIM FAQUIRYAN, an individual; SAYED FAQUIRYAN, an individual; and MAGHUL FAQUIRYAN, an individual; and AVA GLOBAL ENTERPRISE, LLC, a California limited liability company, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIM. | Case No.: C07 04808 JF <br><br> **STIPULATION; AND [PROPOSED] ORDER FOR LEAVE TO AMEND FIRST AMENDED COMPLAINT AND COUNTERCLAIM** <br><br> Crtm: 4 <br><br> Honorable Jeremy Fogel <br><br> Filing Date:        September 17, 2007 |

1182249.1

## STIPULATION

WHEREAS, the present action was filed by Plaintiff and Counter-defendant BP West Coast Products LLC ("BPWCP") against Defendants and Counter-claimants STTN Enterprises, Inc., Sayed Faquiryan, Nazim Faquiryan, Maghul Faquiryan, and AVA Global Enterprises, LLC (collectively referred to as "STTN") on September 17, 2007;

WHEREAS, on October 18, 2007, prior to STTN answering the complaint, BPWCP amended the complaint to add its Tenth through Twelfth Causes of Action for claims against STTN based on STTN's trademark violations, and joined Atlantic Richfield Company ("ARCO") as a plaintiff;

WHEREAS, on December 16, 2007, STTN filed its Answer and Counterclaim against BPWCP and ARCO;

WHEREAS, BPWCP and ARCO seek to amend the First Amended Complaint so that it may dismiss its Tenth through Thirteenth Causes of Action, which are claims that are based on STTN's alleged trademark violations, and for ARCO to withdraw as Plaintiff from this action;

WHEREAS, in exchange for BPWCP and ARCO dismissing its Tenth through Thirteenth Causes of Action in its First Amended Complaint and withdrawing ARCO as Plaintiff from this action, STTN agrees to dismiss ARCO as a Counter-Defendant;

NOW THEREFORE, BPWCP and STTN, by and through their respective attorneys of record herein, hereby agree and stipulate to the following:

1.     BPWCP and ARCO may file the Second Amended Complaint, a copy of which is attached hereto as Exhibit A and the original of which is being lodged with the Court, such that BPWCP and ARCO may dismiss its Tenth through Thirteenth Causes of Action in its First Amended Complaint and for ARCO to

1  withdraw as Plaintiff in this action;

2          2.      STTN may file the Amended Counterclaim such that STTN may

3  dismiss ARCO as Counter-defendant from this action; and

4          3.      Each party is to bear its own costs and attorneys' fees related to

5  those claims that are being dismissed.

6

7  DATED: May 14, 2008          KURT OSENBAUGH
                                DEBORAH YOON JONES
8                               SAYAKA KARITANI
                                **WESTON, BENSHOOF, ROCHEFORT,**
9                                  **RUBALCAVA & MacCUISH LLP**

10  _____
                                      Sayaka Karitani
11  Attorneys for Plaintiffs and Counter-Defendants
    BP WEST COAST PRODUCTS LLC and
12  ATLANTIC RICHFIELD COMPANY

13

14  DATED: May ___, 2008          JOHN G. MICHAEL
                                  **BAKER MANOCK & JENSEN PC**

15

16  _____
                                      John G. Michael
17  Attorneys for Defendants
    STTN ENTERPRISES, INC., SAYED FAQUIRYAN,
18  NAZIM FAQUIRYAN, MAGHUL FAQUIRYAN,
    AND AVA GLOBAL ENTERPRISES, LLC

19

20

21

22                              **[PROPOSED] ORDER**

23              PURSUANT TO STIPULATION, IT IS SO ORDERED.

24

25  DATED:  ___5/19/08_____

26                              Hon. Jeremy Fogel
                                United States District Court
27

28
                                      2

1182249.1

1      WHEREAS, the parties still request that the Court go forward with the

2  Case Management Conference presently set for June 13, 2008 in order to set pretrial

3  and trial dates.

4      NOW THEREFORE, BPWCP and STTN, by and through their

5  respective attorneys of record herein, hereby agree and stipulate to the following:

6      1.    That the mediation cut-off date is continued from June 13, 2008 to

7  August 22, 2008;

8      2.    That the post mediation conference is continued from June 13,

9  2008 to August 22, 2008 at 10:00 a.m.; and

10     3.    That the Case Management Conference presently set for June 13,

11  2008 at 10:30 a.m. will go forward so pretrial and trial dates may be set.

12

13  DATED: May __, 2008        KURT OSENBAUGH
                              DEBORAH YOON JONES
14                            SAYAKA KARITANI
                              **WESTON, BENSHOOF, ROCHEFORT,**
15                                **RUBALCAVA & MacCUISH LLP**

16

17                            _____
                                        Sayaka Karitani
18                            Attorneys for Plaintiffs and Counter-Defendants
                              BP WEST COAST PRODUCTS LLC and
19                            ATLANTIC RICHFIELD COMPANY

20  DATED: May 15, 2008        JOHN G. MICHAEL
                              **BAKER MANOCK & JENSEN PC**
21

22                            _____
                                        John G. Michael
23                            Attorneys for Defendants
                              STTN ENTERPRISES, INC., SAYED FAQUIRYAN,
24                            NAZIM FAQUIRYAN, MAGHUL FAQUIRYAN,
                              AND AVA GLOBAL ENTERPRISES, LLC

25

26

27

28                                    2

1182219.1

**EXHIBIT A**

KURT OSENBAUGH (State Bar No. 106132)
DEBORAH YOON JONES (State Bar No. 178127)
SAYAKA KARITANI (State Bar No. 240122)
**WESTON, BENSHOOF, ROCHEFORT,**
  **RUBALCAVA & MacCUISH LLP**
333 South Hope Street
Sixteenth Floor
Los Angeles, California 90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100
Email:    kosenbaugh@wbcounsel.com
          djones@wbcounsel.com
          skaritani@wbcounsel.com

Attorneys for Plaintiff
BP WEST COAST PRODUCTS LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BP WEST COAST PRODUCTS LLC, a Delaware Limited Liability Company,<br><br>            Plaintiff,<br><br>    v.<br><br>STTN ENTERPRISES, INC., a California Corporation; NAZIM FAQUIRYAN, an individual; SAYED FAQUIRYAN, an individual; and MAGHUL FAQUIRYAN, an individual; and AVA GLOBAL ENTERPRISE, LLC, a California limited liability company,<br><br>            Defendants. | Case No.: C07 04808 RS<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF UNDER THE PETROLEUM MARKETING PRACTICES ACT [15 U.S.C. §§ 2801, *et seq.*];**<br>**(2) BREACH OF CONTRACT – GASOLINE AGREEMENT;**<br>**(3) BREACH OF CONTRACT – MINI MARKET AGREEMENT;**<br>**(4) BREACH OF FRANCHISE GUARANTIES;**<br>**(5) COMMON COUNT – GOODS SOLD AND DELIVERED;**<br>**(6) UNJUST ENRICHMENT;**<br>**(7) BREACH OF CONTRACT – MINI MARKET LOAN AGREEMENT;**<br>**(8) BREACH OF MINI MARKET LOAN GUARANTIES; and**<br>**(9) JUDICIAL FORECLOSURE**<br><br>Filing Date:  September 17, 2007 |

1

1184571.1

Plaintiff BP West Coast Products LLC ("BPWCP") alleges as follows:

## SUMMARY OF CLAIMS

1.    This suit involves BPWCP's former gasoline station and mini market franchise located in Hollister, California.    BPWCP seeks damages and declaratory relief based upon Defendants' breaches of the applicable franchise agreements, breaches of a related loan agreement, and breaches of individual guaranties.

2.    The Defendants breached the franchise agreements by failing to pay for over $126,000 worth of ARCO-branded gasoline and failing to operate the station and sell gasoline product for approximately 15 consecutive days.  BPWCP bent over backwards to give Defendants multiple opportunities to correct the defaults. Defendants acknowledged their obligation to pay for the gasoline and BPWCP even agreed to a payment plan.  Nonetheless, Defendants failed to pay for the gasoline and failed to operate the station and sell gasoline product for at least 15 consecutive days in violation of the franchise agreements.  As such, BPWCP terminated the franchise agreements.

3.    By virtue of the franchise breaches, the Defendants have also defaulted on a $150,000 loan that was given by BPWCP to the franchisee for purposes of refurbishing the mini market store.  The loan was secured by the real property on which the gasoline station and mini market were located as well as the fixtures located thereon.  Given the franchise termination and Defendants' loan defaults, the entire loan indebtedness has accelerated and is now due.  Defendants are required to pay the $150,000 loan balance to BPWCP and, to date, they have refused to do so. Accordingly, BPWCP moves for judicial foreclosure on the $150,000 loan and seeks damages for breach of the loan agreement and guaranties.

1184571.1                                                          **SECOND AMENDED COMPLAINT**

1

## THE PARTIES

2     4.     Plaintiff BPWCP is qualified to do business in California and is a

3  limited liability company organized and existing under the laws of the State of

4  Delaware.   BPWCP was, at all relevant times hereto, the franchisor for ARCO-

5  branded service stations and am/pm mini market convenience stores including the

6  facility at issue in this litigation.

7     5.     BPWCP is informed and believes that defendant STTN

8  Enterprises, Inc. ("STTN") is, and at all relevant times hereto was, a California

9  corporation, which has offices and does business in San Benito County, California.

10  STTN is the former franchisee for the facility located at 631 San Felipe Road,

11  Hollister, California 95035 (the "Station").

12     6.     BPWCP is informed and believes that defendant Nazim Faquiryan

13  and Sayed Faquiryan are individuals residing in the City of Hollister, County of San

14  Benito, State of California.   BPWCP is informed and believes that, at all relevant

15  times hereto, Nazim Faquiryan and Sayed Faquiryan were and are the sole

16  shareholders of STTN and individual guarantors for the Station franchise.  BPWCP is

17  also informed and believes that Sayed Faquiryan is the father of Nazim Faquiryan.

18     7.     BPWCP is informed and believes that defendant Maghul

19  Faquiryan is an individual residing in the City of Hollister, County of San Benito,

20  State of California.  BPWCP is informed and believes that, at all relevant times hereto,

21  Maghul Faquiryan was and is the spouse of Sayed Faquiryan and an individual

22  guarantor for the loans related to the Station franchise.

23     8.     BPWCP is informed and believes that defendant AVA Global

24  Enterprises, LLC ("AVA Global") is, and at all relevant times hereto, was and is a

25  California limited liability company, which has offices and does business in San

26  Benito County, California.   AVA Global's address, according to the California

27  Secretary of State business search website, is 631 San Felipe Road, Hollister,

28  California (which is the same address as the Station).  At all relevant times, STTN

1184571 1                                          **SECOND AMENDED COMPLAINT**

1  leased the real property upon which the Station is located ("Real Property") from

2  AVA Global Enterprise, LLC ("AVA Global"). AVA Global is the fee simple owner

3  of the Real Property. BPWCP is informed and believes that individual Defendant

4  Nazim Faquiryan is one of the two equal shareholders of AVA Global. The other

5  50% shareholder of AVA Global is not named individually in this action.

6          9.      BPWCP is informed and believes that STTN, Nazim Faquiryan,

7  Sayed Faquiryan, Maghul Faquiryan, and AVA Global, (collectively, "Defendants"),

8  and each of them, in committing the acts and omissions alleged in this Second

9  Amended Complaint acted as agents and servants of the other Defendants, acted

10  within the scope of their authority as agents and servants of the other Defendants,

11  acted in concert with the other Defendants with a design and for the purposes of

12  injuring BPWCP and of unlawfully benefiting some or all of Defendants, or, in the

13  alternative, approved and ratified the acts and omissions of the other Defendants or

14  third parties, such that each of the Defendants is jointly and severally liable for the

15  acts and omissions of each other Defendants.

16

17                      **JURISDICTION AND VENUE**

18          10.     This action concerns, *inter alia*, the termination of a service station

19  franchise relationship, which is governed by the Petroleum Marketing Practices Act,

20  15 U.S.C. §§ 2801, *et seq.* (the "PMPA"). Accordingly, this Court has jurisdiction

21  over BPWCP's claims, by virtue of 28 U.S.C. § 1331 and 15 U.S.C. § 2805(a), and

22  this Court's pendent jurisdiction. Furthermore, this Court has jurisdiction pursuant to

23  28 U.S.C. § 1331, 28 U.S.C. §§ 1338(a) and (b), and 28 U.S.C. § 2201, because this is

24  a civil action seeking declaratory relief under the PMPA. The amount in controversy

25  exceeds the sum or value of $75,000.00.

26          11.     Venue is proper in the Northern District of California pursuant to

27  28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise

28  to BPWCP's claims occurred in this District; because the subject franchise is located

**SECOND AMENDED COMPLAINT**

1   in this District; and because BPWCP is informed and believes that the individual

2   Defendants reside in this District.

3

4                         **GENERAL ALLEGATIONS**

5                        **The Franchise Agreements**

6        12.    BPWCP is engaged in the marketing and distribution of motor fuel

7   in the State of California and elsewhere in the United States.  BPWCP currently has

8   ARCO-branded gasoline stations with am/pm mini market convenience stores located

9   throughout the Western States.  Among its activities, BPWCP sells ARCO-branded

10   motor fuels to franchisees and, at certain of its properties, BPWCP offers am/pm mini

11   market convenience store franchises to be operated concurrently with the gasoline

12   stations.  Pursuant to franchise agreements, BPWCP licenses to its franchisee dealers

13   the right to use ARCO's trade names, trademarks, and service marks in connection

14   with the resale of ARCO-branded motor fuels and the operation of the am/pm mini

15   market convenience stores; Franchisee dealers pay a royalty for use of this right.

16   ARCO is the registered owner of these trademarks, service marks, and trade names

17   and has the right to enforce any violations thereof.  BPWCP has the right to utilize

18   these marks in connection with its ARCO and am/pm franchises.

19        13.    The franchise relationship between STTN and BPWCP is governed

20   by written agreements, principal among them are: (1) a Contract Dealer Gasoline

21   Agreement, which includes any and all amendments and addendums ("Gasoline

22   Agreement"), and (2) an am/pm Mini Market Agreement, which includes any and all

23   amendments and addendums ("Mini Market Agreement").  The Gasoline Agreement

24   and Mini Market Agreement are each effective as of July 11, 2006.  True and correct

25   copies of the Gasoline Agreement and Mini Market Agreement are attached hereto as

26   Exhibit A and Exhibit B, respectively, and are incorporated herein as though fully set

27   forth at length.  The Gasoline Agreement and Mini Market Agreement contain an

28   expiration date of July 12, 2026.

**SECOND AMENDED COMPLAINT**

14.    On June 20, 2006, Defendants Sayed Faquiryan and Nazim Faquiryan each signed a Guaranty Agreement and individually guaranteed the obligations owed by STTN to BPWCP under the Mini Market Agreement and Gasoline Agreement ("Franchise Guaranties").    True and correct copies of the Franchise Guaranties are collectively attached hereto as <u>Exhibit C</u>, and are incorporated herein as though fully set forth at length.  The Mini Market Agreement, the Gasoline Agreement, and the Franchise Guaranties shall be referred to collectively as the "Franchise Agreements."

15.    The purposes of the Franchise Agreements are to provide locations at which ARCO-branded petroleum products can be sold to the public by franchisees such as STTN, and to provide locations where customers of the service stations may purchase store goods.

16.    The Franchise Agreements set forth the obligations and undertakings required of STTN, which are material to the operation of a BPWCP franchise.  The pertinent provisions of the Franchise Agreements provide, *inter alia*, that:

(a)    The franchisee must "exert good faith efforts to carry out the provisions of this Agreement following written notice to Buyer from BPWCP of such failure and fifteen calendar days to cure such failure."  [See Gasoline Agreement, ¶ 17.1(a), <u>Exhibit A</u>.];

(b)    The franchisee is also required to "order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product . . . ."  [See Gasoline Agreement, Article 2, <u>Exhibit A</u>.];

(c)    The franchisee is also required to "pay the price specified by BPWCP in effect at the time and place of delivery for purchasers of Buyer's class of trade" and by "electronic funds transfer initiated by BPWCP, wire transfer, cashier's

**SECOND AMENDED COMPLAINT**

1  check or business check, whichever BPWCP directs, delivered by Buyer at the time
2  and place as designated by BPWCP." [See Gasoline Agreement, Articles 5 and 6,
3  Exhibit A.]; and

4          (d) The franchisee is also required to conduct all of its
5  operations of the Station, including the Mini Market, under the terms and conditions
6  of each of the Franchise Agreements. [See Mini Market Agreement, Section 4.05,
7  Exhibit B.]

8
9  **The Loan Agreements**

10      17. In addition to the requirements concerning operation of the Station,
11  the Franchise Agreements also required STTN to complete a remodel or retrofit of the
12  Station within nine (9) months of the commencement of the franchise relationship.
13  [See Gasoline Agreement, Section 1.2, Section 5.03(a), Exhibit A; Mini Market
14  Agreement, Exhibit B.] BPWCP assists its franchisees in complying with these
15  "remodel and retrofit" requirements by offering a special loan program to provide
16  funds specifically for completing construction and remodeling at its franchise
17  locations. Specific details of the loan program are described below, however,
18  generally, under BPWCP's loan program if a franchisee meets certain yearly
19  gallonage and store sale requirements a portion of the loan is deemed repaid at the end
20  of each year term. Thus, as long as a franchisee sells a specified amount of gasoline
21  product and/or store products each year for the duration of the loan term, the loan
22  payments for that year are deemed repaid. Furthermore, the franchisee enjoys the use
23  of a remodeled and retrofitted station which, in turn, attracts more customers and
24  therefore generates more income and profit for the franchisee.

25      18. On February 12, 2007, BPWCP and STTN entered into two Loan
26  Agreements, whereby BPWCP agreed to loan STTN the total sum of $475,000 to be
27  used toward BPWCP-approved capital improvements for the Station.

28

SECOND AMENDED COMPLAINT

**The am/pm Mini Market Loan Agreement**

19.    The first loan agreement - - the "am/pm Mini Market Loan Agreement" - - provided a base loan in the amount of $150,000 to fund the costs associated with pre-approved modifications and/or equipment and improvements to the am/pm Mini Market (hereinafter, "Store Loan Agreement" ).  The Store Loan Agreement also included an additional $75,000 that BPWCP could elect to disburse for refreshing and refurbishing the am/pm Mini Market on the eleventh anniversary of the base loan disbursement.  A true and correct copy of the Store Loan Agreement is attached hereto as Exhibit D, and is incorporated herein as though fully set forth at length.

20.    Pursuant to the Store Loan Agreement, the loan was interest-free but was conditioned upon Defendants' agreement to pay five percent (5%) of the loaned amount each year over the course of 20 years, or alternatively, sell merchandise in the am/pm Mini Market in the Annual Guaranteed Amount of at least $960,000 each year.  If Defendants sold $960,000 in gross sales of merchandise in the am/pm Mini Market in a year, BPWCP would deem the loan payment for that year as repaid.

21.    In addition, pursuant to the terms of the Store Loan Agreement, the loan funds were to be disbursed directly to the third parties who were retained to complete the construction, remodeling and retrofitting.  To ensure that all conditions for disbursement were met, STTN and BPWCP entered into a Disbursement Agreement that sets forth the terms and conditions governing disbursements of funding.  The Disbursement Agreement is specifically referenced in the Store Loan Agreement, and a true and correct copy is attached hereto as Exhibit E, and is incorporated herein as though fully set forth at length.  The Disbursement Agreement provides, in pertinent part, that:

> "Construction Loan Proceeds will be disbursed from time to
> time upon receipt by BP West Coast Products LLC or its

8

1     designee of Pay Vouchers, executed by [STTN] and
2     Contractor, accompanied by original detailed invoices, . . .
3     and BP West Coast Products LLC or its designee have the
4     right to withhold payment on any and all Pay Vouchers if
5     supporting documentation reasonably requested is not
6     provided. This may include original invoices, job inspection
7     card copy, IRS form W-9, appropriate lien releases for labor
8     and/or materials, receipts, photos, revised cost breakdown
9     and Affidavit and Certification of Completion of
10    Builder/Contractor."

11 [See Disbursement Agreement, Paragraph 3, Exhibit E.]  As such, the Store Loan

12 Agreement did not call for a lump sum payment to the Defendants but rather release

13 of funds were contingent upon (a) specified work being completed at the Station, and

14 (b) documentation to support payment of that work by STTN.

15          22.    STTN agreed to the terms of the Store Loan Agreement, and

16 Nazim Faquiryan and Sayed Faquiryan signed all necessary loan paperwork on behalf

17 of STTN.  The Store Loan Agreement was secured by a recorded Deed of Trust with

18 Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") on the

19 real property upon which the Station was located ("Real Property").  AVA Global, as

20 the owner of the Real Property, executed the Deed of Trust dated March 2, 2007 and

21 recorded on March 9, 2007, which irrevocably granted BPWCP the power of sale of

22 all of AVA Global's right, title and interest in the Real Property.  A true and correct

23 copy of the Deed of Trust is attached hereto as Exhibit F, and is incorporated herein as

24 though fully set forth at length.  AVA Global, BPWCP and STTN also entered into a

25 "Consent to Encumbrance of Tenant's Interest" dated March 2, 2007 and recorded on

26 March 9, 2007 ("Consent to Encumbrance").  The Consent to Encumbrance created a

27 leasehold mortgage encumbering STTN's leasehold estate in the Lease and Real

28 Property ("Leasehold Mortgage").  A true and correct copy of the Consent to

9

1184571.1

1  Encumbrance is attached hereto as <u>Exhibit G</u>, and is incorporated herein as though

2  fully set forth at length.  In addition, STTN executed a Promissory Note evidencing

3  the Store Loan.  A true and correct copy of the executed Promissory Note is attached

4  hereto as <u>Exhibit H</u> and is incorporated herein as though fully set forth at length.

5      23.    BPWCP's secured interest in the Real Property is second only to

6  senior lienholder Excel National Bank who maintains a first deed of trust on the Real

7  Property in the amount of approximately $1,987,000.

8      24.    In addition, the Store Loan Agreement was secured by a UCC-1

9  Financing Statement ("UCC-1") on the personal property located on or affixed to the

10 Real Property or the Improvements and other property more fully described in the

11 attachments to the UCC-1. A true and correct copy of the UCC-1 is attached hereto as

12 <u>Exhibit I</u>, and is incorporated herein as though fully set forth at length.

13     25.    As of May 29, 2007, the full amount of $150,000 was funded and

14 disbursed for Defendants' benefit pursuant to the Store Loan Agreement.

15

16 **<u>The Gasoline Loan Agreement</u>**

17     26.    The second loan agreement - - the "Gasoline Loan Agreement" - -

18 in the amount of $250,000 was to fund costs associated with the pre-approved

19 modifications and/or equipments and improvements which pertain to the gasoline

20 sales-related aspects of the Station (i.e., dispensers, canopy, etc.).  Disbursement of

21 the funds under the Gasoline Loan Agreement was contingent upon STTN abiding by

22 requirements similar to those applicable to the Store Loan Agreement.  However,

23 STTN failed to provide sufficient financial documents, including proof of any

24 payment by STTN of any construction-related expenditures, required back-up invoices

25 and/or lien releases, all of which are requirements of the Gasoline Loan Agreement

26 and related Disbursement Agreement.  As a result of STTN's failures to abide by the

27 terms of the Gasoline Loan Agreement and related Disbursement Agreement, BPWCP

28 has not disbursed (and will not be disbursing) any monies under the Gasoline Loan to

1  STTN.

2

3  **The Loan Guaranties**

4          27.    Defendants    Sayed    Faquiryan,    Maghul    Faquiryan    (Sayed

5  Faquiryan's spouse), and Nazim Faquiryan each signed a Guaranty Agreement and

6  individually guaranteed the loan obligations owed by STTN to BPWCP under the

7  Store Loan Agreement ("Loan Guaranties").  True and correct copies of the Loan

8  Guaranties are collectively attached hereto as Exhibit J, and are incorporated herein as

9  though fully set forth at length.

10

11          **STTN Breached the Franchise Agreements**

12          28.    Among other things, STTN was required, pursuant to the Franchise

13  Agreement, to maintain adequate supplies of gasoline for sale and make payments for

14  gasoline deliveries.  [See Gasoline Agreement, Article 2, Exhibit A.]  Payment for

15  gasoline product was accomplished by way of an electronic funds transfer ("EFT")

16  from STTN's bank account.

17          29.    However, as of January 29, 2007, BPWCP began requiring STTN

18  to present a cashier's check in order to receive gasoline product because numerous

19  EFT requests pertaining to gasoline deliveries were returned for insufficient funds by

20  STTN's bank.  In other words, STTN failed to pay BPWCP for the gasoline product

21  that had been delivered.

22          30.    When a franchisee is found to be in violation of the Franchise

23  Agreements, BPWCP issues a written "Default Notice" describing the violation

24  ("Default").  The Default is then sent to the franchisee via certified mail, giving the

25  franchisee an opportunity to cure the violation.  BPWCP issued a number of Defaults

26  based upon STTN's repeat operational violations for failure to accept gasoline

27  delivery and to make payment for gasoline that was delivered and payable upon

28  receipt.  True and correct copies of all Defaults pertaining to STTN's failure to pay for

11

gasoline product deliveries are attached hereto as <u>Exhibit K</u> and are incorporated herein as though fully set forth at length.

31.    STTN readily admits that they owe the money to BPWCP for various gasoline deliveries.    Indeed, Nazim Faquiryan and Sayed Faquiryan acknowledged and agreed to in writing in a letter dated May 4, 2007, that they will pay $30,000 per month until the total outstanding balance of the gasoline debt is paid in full.  A true and correct copy of the letter agreement to pay the gasoline debt signed by Nazim Faquiryan and Sayed Faquiryan is attached hereto as <u>Exhibit L</u> and is incorporated herein as though fully set forth at length.

32.    To date, STTN has failed to pay for the gasoline.  The current outstanding balance for the gasoline product that Defendants failed to reimburse BPWCP for gasoline product delivered is One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77).

33.    In addition to Defendants' failure to sell gasoline, commencing on August 23, 2007 through at least September 6, 2007, STTN failed to operate the Station and sell gasoline product for at least 15 consecutive days in violation of the Franchise Agreements.

## BPWCP Terminates the STTN Franchise

34.    Given STTN's continuing breach of the Franchise Agreements, BPWCP sent a Notice of Termination letter dated September 6, 2007, to STTN, advising that the Franchise Agreements would be immediately terminated ("Termination Notice").    A true and correct copy of the Termination Notice is attached hereto as <u>Exhibit M</u> and is incorporated herein as though fully set forth at length.

35.    The Franchise Agreements provide that BPWCP may terminate the Franchise Agreements for various reasons which include, but are not limited to, the following:

**SECOND AMENDED COMPLAINT**

1      (a)    Failure to exert good faith efforts to carry out the provisions

2  of the Franchise Agreements following written notice and opportunity to cure [See

3  Section 17.1(a) of the Gasoline Agreement, <u>Exhibit A</u>.];

4      (b)    Failure to timely pay all sums due to which BPWCP is

5  legally entitled [See Section 17.1(h) of the Gasoline Agreement, <u>Exhibit A</u>.];

6      (c)    Failure to operate the Premises for seven (7) consecutive

7  calendar days, or lesser period, which constitutes an unreasonable period of time [See

8  Section 17.1(i) of the Gasoline Agreement, <u>Exhibit A</u>.];

9      (d)    Breach of any material provision of the Gas Agreement,

10  including without limitation, "Buyer's failure to order and make available for sale

11  quantities of each grade of Product which are sufficient to satisfy foreseeable

12  customer demand." [See Section 17.1(o) of the Gasoline Agreement, <u>Exhibit A</u>.]; and

13      (e)    Termination of any one other franchise agreement (e.g., Gas

14  Agreement) when there is "Concurrent Operations at the Premises," in which

15  "Concurrent Operations" is defined as the operation of the am/pm Mini Market in

16  conjunction with another or more than one other BPWCP franchise. [See Sections

17  4.05 and 18.05 of the Mini Market Agreement, <u>Exhibit B</u>.]

18      36.    The pertinent provisions of the Petroleum Marketing Practices Act,

19  28 U.S.C. §2801, *et seq.* ("PMPA") allow, *inter alia*, for termination upon the

20  occurrence of the any of the following:

21      (a)    Failure by the franchisee to comply with a reasonable and

22  material provision of the franchise [28 U.S.C. § 2802(b)(2)(A)];

23      (b)    Failure by the franchisee to exert good faith efforts to carry

24  out the provisions of the franchise [28 U.S.C. § 2802(b)(2)(B)];

25      (c)    Occurrence of an event which is relevant to the franchise

26  relationship as a result of which termination of the franchise relationship is reasonable

27  [28 U.S.C. § 2802(b)(2)(C)]; and

28

**SECOND AMENDED COMPLAINT**

1    (d)    Failure by the franchisee to operate the marketing premises
2 for 7 consecutive days, or such lesser period which under the facts and circumstances
3 constitutes an unreasonable period of time [28 U.S.C. § 2802(c)(9)].

4    37.    Furthermore, given Defendants' long-standing debt owed to
5 BPWCP for unpaid gasoline, their failure to operate the Station and sell gasoline for at
6 least 15 consecutive days, and the numerous opportunities given by BPWCP to
7 Defendants to cure the defaults, the termination was effective immediately as it was
8 not reasonable for BPWCP to provide any additional notice to STTN. [28 U.S.C. §
9 2804(b).]

10    38.    The Franchise Agreements provide that STTN will owe BPWCP
11 certain sums upon termination. Specifically, Article 19.01(d) of the Mini Market
12 Agreement states that, upon termination, STTN shall owe BPWCP liquidated
13 damages. [See Exhibit B.]

14    39.    Accordingly, BPWCP terminated the Franchise Agreements on the
15 grounds that STTN:

16    (a)    failed to have any gasoline products available for sale to the
17 motoring public for at least 15 consecutive days, despite the fact that BPWCP sent
18 STTN a total of twelve Defaults for failure to offer all grades of gasoline for sale (true
19 and correct copies of which are included in Exhibit K and are dated August 24
20 through 31, 2007 and September 1 through 4, 2007); and

21    (b)    failed to timely pay BPWCP for gasoline products in a
22 timely manner, incurring an outstanding balance of $126,194.77, as of September 6,
23 2007, for gasoline product deliveries that are due and payable at the time of delivery.

24

25 **STTN Defaulted on the Store Loan Agreement**

26    40.    In addition to the Franchise Agreement breaches, STTN also
27 defaulted on the Store Loan Agreement. Pursuant to the Store Loan Agreement,
28 STTN must repay the outstanding balance of the loan in full to BPWCP within 30

14

1   days of the occurrence of an "Event of Default." Paragraph 4 of the Loan Agreement

2   provides the pertinent "Events of Default," which include, but are not limited to, the

3   following:

4             (a)    "The [Mini Market Agreement] is terminated by either

5   Lender or Borrower prior to the end of its stated term" [See Store Loan Agreement,

6   Section 4.5, Exhibit D.];

7             (b)    A default or "Event of Default" shall have occurred under

8   any of the other Loan Documents" [See Store Loan Agreement, Section 4.10, Exhibit

9   D.];

10           (c)    "The Borrower fails to sell Products continuously at the

11   Facility . . . . " [See Store Loan Agreement, Section 4.4, Exhibit D.]; or

12           (d)    "The failure by the Borrower to make any payments of

13   principal of or interest and any other indebtedness secured by the Property, or there

14   shall occur any other event that would permit the holder of such indebtedness to

15   accelerate the maturity thereof." [See Store Loan Agreement, Section 4.12, Exhibit

16   D.].

17       41.   In the Termination Notice, BPWCP demanded that STTN repay

18   the outstanding balance of the Store Loan within 30 days of the termination

19   (October 5, 2007), pursuant to the Store Loan Agreement and Promissory Note. As of

20   September 5, 2007, the outstanding balance on the Store Loan Agreement was

21   $150,000.00. [See Termination Notice, Exhibit M.]

22       42.   To date, STTN has failed and refused to pay the outstanding

23   balance due pursuant to the Store Loan Agreement.

24

25

26

27

28

**SECOND AMENDED COMPLAINT**

# FIRST CLAIM FOR RELIEF

## (Declaratory Relief Under The Petroleum Marketing Practices Act)

### (By Plaintiff BPWCP Against STTN Enterprises, Inc.)

43.    The allegations of paragraphs 1 through 42 above are incorporated herein by reference as though fully set forth herein.

44.    There presently exists an actual controversy within this Court's jurisdiction between BPWCP, on the one hand, and STTN, on the other hand, in that BPWCP asserts that:

(a)    STTN's franchise and the franchise relationship with BPWCP were terminated pursuant to Termination Notice dated September 6, 2007 [Exhibit M];

(b)    Pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. Section 2802, and the terms of the Franchise Agreements between the parties, BPWCP was entitled to terminate STTN's franchise at the Station;

(c)    BPWCP's grounds for terminating STTN's franchise were legitimate and non-discriminatory; and

(d)    The Termination Notice was delivered on the earliest date reasonably practicable, and were otherwise reasonable under 15 U.S.C. § 2804(b).

45.    BPWCP is informed and believes and on that basis alleges, that STTN disputes each of BPWCP's aforementioned assertions.

46.    Defendants disagree with the above, and moreover, threatened to pursue legal remedies against BPWCP.  See Exhibit N.

47.    By reason of STTN's conduct as described above, BPWCP is entitled to a declaratory judgment under 28 U.S.C. Section 2201, stating that:

(a)    The relationship between STTN and BPWCP was that of a franchise relationship as defined and provided by Section 2801 of the PMPA;

(b)    STTN's failure to discharge and comply with the terms, conditions and obligations of the Franchise Agreements is detailed in the Termination

16

1  Notice [Exhibit M], constituted a failure to comply with provisions of the franchise

2  which were reasonable and materially significant, a failure to carry out the provisions

3  of the franchise, and constituted events which were relevant to the franchise

4  relationship, the result of which the franchise termination by BPWCP was reasonable

5  under the PMPA;

6          (c)    Under the PMPA, BPWCP lawfully terminated STTN's

7  franchise and franchise relationship concerning the Franchise;

8          (d)    Under the terms of the Franchise Agreements, BPWCP

9  lawfully terminated STTN's franchise and franchise relationship concerning the

10  Franchise;

11          (e)    Under the terms of the Mini Market Agreement, BPWCP

12  lawfully terminated STTN's franchise and franchise relationship concerning the

13  Station;

14          (f)    The Termination Notice was reasonable and appropriate

15  under 15 U.S.C. § 2802(b)(2)(A) (failure by the franchisee to comply with any

16  provision of the franchise which is both reasonable and materially significant to the

17  franchise relationship); Section 2802(b)(2)(B) (failure by the franchisee to exert good

18  faith efforts to carry out the provisions of the franchise); Section 2802(b)(2)(C) (the

19  occurrence of an event which is relevant to the franchise relationship and as a result of

20  which termination of the franchise is reasonable); and Section 2802(c)(9) (failure by

21  the franchisee to operate the marketing premises for 7 consecutive days);

22          (g)    Pursuant to 15 USC § 2804(b), BPWCP's Notice of

23  Termination calling for the termination effective immediately was proper because it

24  would not have been reasonable for BPWCP to furnish 90 days notification;

25          (h)    BPWCP is entitled to liquidated damages under Article

26  19.01(d) of the Mini Market Agreement; and

27          (i)    BPWCP is entitled to collect any and all other sums due

28  pursuant to the Franchise Agreements between the parties.

17

**SECOND AMENDED COMPLAINT**

19

## SECOND CLAIM FOR RELIEF

### (Breach of Gasoline Agreement)

### (By Plaintiff BPWCP Against STTN Enterprises, Inc.)

48.    The allegations of paragraphs 1 through 47 above are incorporated herein by reference as though fully set forth herein.

49.    BPWCP has fully performed all of its requirements pursuant to the parties' Gasoline Agreement.

50.    STTN has breached multiple provisions of the Gasoline Agreement by, *inter alia*:

(a)    Failing to have any gasoline products available for sale to the motoring public for at least 15 consecutive days.  In fact, STTN had taped off the Station dispensers from any use by customers, and did not sell any gasoline from August 23, 2007 through at least September 6, 2007; and

(b)    Failing to timely pay BPWCP for gasoline products in a timely manner.  As of September 6, 2007, STTN had an outstanding balance of One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77) for gasoline product deliveries that were due and payable at the time of delivery.  In fact, STTN issued several checks that were returned by STTN's bank because STTN had insufficient funds.

51.    As a proximate result of STTN's breach, BPWCP has been damaged in an amount to be determined at trial, but no less than One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77), which is the total outstanding amount due for gasoline product delivered to the Station, and after applying Defendants' security deposit and other advance payments.

SECOND AMENDED COMPLAINT

1

### THIRD CLAIM FOR RELIEF

**(Breach of Mini Market Agreement)**

**(By Plaintiff BPWCP Against STTN Enterprises, Inc.)**

52.    The allegations of paragraphs 1 through 51 above are incorporated herein by reference as though fully set forth herein.

53.    BPWCP has fully performed all of its requirements pursuant to the Mini Market Agreement.

54.    STTN has breached Section 4.05 of the Mini Market Agreement by, *inter alia*, breaching the Gasoline Agreement, as described in full in the second claim for relief.    Section 4.05 requires that all "Concurrent Operations at the Premises" be conducted and governed by the terms and conditions and provisions of the applicable Franchise Agreement, i.e., the Gasoline Agreement.  [See Mini Market Agreement, Section 4.05 Exhibit B.].

55.    As a proximate result of STTN's breach, BPWCP has been damaged in an amount to be determined at trial.

56.    In addition, the Mini Market Agreement contains a liquidated damages provision.  Article 19.01(d) of the Mini Market Agreement provides that "Operator shall pay to [BWPCP] at the time of termination, as liquidated damages and not as penalty, the greater of:  (a) the total minimum royalty fee which would have been payable under the [Mini Market Agreement] from the date of termination of the [Mini Market Agreement] through the end of the term provided for in the [Mini Market Agreement]; or (b) for each month from the date of termination of the [Mini Market Agreement] through the end of the term provided in the [Mini Market Agreement], the actual average royalty fee for any months that the Store was operational prior to termination of the [Mini Market Agreement]."  Given BPWCP's termination of the Mini Market Agreement effective September 6, 2007, the total amount due to BPWCP for liquidated damages is Two Hundred Thirty-Five Thousand and Zero Cents ($235,000.00).

1

## FOURTH CLAIM FOR RELIEF

2

### (Breach of Franchise Guaranties)

3

### (By Plaintiff BPWCP Against

4

### Nazim Faquiryan and Sayed Faquiryan.)

5         57.    The allegations of paragraphs 1 through 56 above are incorporated

6    herein by reference as though fully set forth herein.

7         58.    Sayed Faquiryan and Nazim Faquiryan each executed and

8    delivered to BPWCP the Franchise Guaranties, guaranteeing any and all indebtedness

9    of STTN with respect to both the Store Loan Agreement and the Gasoline Loan

10   Agreement.  [See Franchise Guaranties, Exhibit C.]

11        59.    STTN is currently indebted to BPWCP in an amount of not less

12   than $126,194.77.  BPWCP has made demands for payment of this sum on Sayed

13   Faquiryan and Nazim Faquiryan, who have, to date, failed to make these payments.

14   As such, Sayed Faquiryan and Nazim Faquiryan are in breach of the obligations under

15   the Franchise Guaranties.  Sayed Faquiryan and Nazim Faquiryan are also liable for

16   liquidated damages in the amount of $235,000.00 owed to BPWCP pursuant to the

17   Mini Market Agreement and according to proof.

18

19

## FIFTH CLAIM FOR RELIEF

20

### (Common Count: Goods Sold and Delivered)

21

### (By Plaintiff BPWCP Against

22

### STTN Enterprises, Inc., Nazim Faquiryan, and Sayed Faquiryan.)

23        60.    The allegations of paragraphs 1 through 59 above are incorporated

24   herein by reference as though fully set forth herein.

25        61.    On or about September 5, 2007, at 631 San Felipe Road, Hollister,

26   California 95035, Defendants became indebted to BPWCP in the sum of One Hundred

27   Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents

28   ($126,194.77) for gasoline sold by BPWCP and delivered to STTN.

**SECOND AMENDED COMPLAINT**

62.    BPWCP has repeatedly demanded payment from Defendants. The last demand was made on September 6, 2007. [See Exhibit M.]

63.    No payment has been made by Defendants to BPWCP, and there is now due BPWCP and owed from Defendants at least the principal sum of One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77).

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (By Plaintiff BPWCP Against

### STTN Enterprises, Inc., Nazim Faquiryan, and Sayed Faquiryan.)

64.    The allegations of paragraphs 1 through 63 above are incorporated herein by reference as though fully set forth herein.

65.    STTN, as well as Nazim Faquiryan and Sayed Faquiryan as guarantors, obtained the benefit of receiving deliveries of gasoline in that they have not paid for the gasoline but have been able to sell and profit from the gasoline that was delivered by BPWCP.

66.    On May 4, 2007, Nazim Faquiryan and Sayed Faquiryan sent a letter agreement to BPWCP, promising that STTN would make monthly payments of Thirty Thousand Dollars ($30,000) by certified check payable to BPWCP on or before the 15 day of each month beginning June 20, 2007 until the total outstanding balance owed for the gasoline delivered has been paid off.  [See Exhibit L.]

67.    Despite reaping such benefits and agreeing to make monthly installments, Defendants still have not made any payments to BPWCP for the gasoline product.

68.    As set forth in the above-paragraphs, Defendants' failure to compensate BPWCP constitutes unjust enrichment and has damaged BPWCP in the

1  amount of at least One Hundred Twenty-Six Thousand, One Hundred Ninety-Four

2  Dollars and Seventy-Seven Cents ($126,194.77), plus interest.

### SEVENTH CLAIM FOR RELIEF

### (Breach of Store Loan Agreement)

### (By Plaintiff BPWCP Against

### STTN Enterprises, Inc., Nazim Faquiryan, and Sayed Faquiryan.)

8        69.    The allegations of paragraphs 1 through 68 above are incorporated

9  herein by reference as though fully set forth herein.

10        70.    BPWCP has fully performed all of its requirements pursuant to the

11  Store Loan Agreement.

12        71.    STTN breached Article 4 of the Store Loan Agreement by failing

13  to repay the outstanding balance of the Store Loan in full to BPWCP within 30 days

14  of the occurrence of an Event of Default.  The Store Loan Agreement requires STTN

15  to repay the outstanding balance of the Store Loan within 30 days of the occurrence of

16  an Event of Default.  The termination of the Franchise Agreements is an Event of

17  Default. [See Store Loan Agreement, Section 4.5, Exhibit D.]

18        72.    As of September 5, 2007, the day before the date of termination,

19  STTN's outstanding balance due on the Loan was $150,000.00.  Pursuant to the Store

20  Loan Agreement, the loan balance was due to BPWCP no later than October 5, 2007.

21  To date, the loan balance on the Store Loan has not been repaid by Defendants.

22        73.    As a result of STTN's breach of the Store Loan Agreement,

23  BPWCP has been damaged in the amount of $150,000, plus interest.  In addition, the

24  Store Loan Agreement provide that Nazim Faquiryan, Sayed Faquiryan, and Maghul

25  Faquiryan will reimburse BPWCP on demand for all expenses, including reasonable

26  attorneys' fees incurred by BPWCP in collecting or enforcing the Store Loan

27  Agreement, together with interest thereon.  [See Article 9.9 of the Store Loan

28  Agreement, Exhibit D.]  It has become necessary for BPWCP to engage the law firm

SECOND AMENDED COMPLAINT

1   of Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP to bring this action,
2   and BPWCP is entitled to further and additional sums for reasonable attorneys' fees
3   herein.

5                       **EIGHTH CLAIM FOR RELIEF**
6                         **(Breach of Loan Guaranties)**
7                          **(By Plaintiff BPWCP Against**
8        **Nazim Faquiryan, Sayed Faquiryan, and Maghul Faquiryan.)**

9           74.    The allegations of paragraphs 1 through 73 above are incorporated
10  herein by reference as though fully set forth herein.

11          75.    Nazim Faquiryan, and Sayed Faquiryan, and Maghul Faquiryan (as
12  Sayed Faquiryan's spouse), each executed and delivered to BPWCP the Loan
13  Guaranties, guaranteeing any and all indebtedness of STTN with respect to the Loan
14  Agreements.  [See Loan Guaranties, Exhibit J.]  As such, Nazim Faquiryan, Sayed
15  Faquiryan, and Maghul Faquiryan, as individual guarantors, are liable for damages as
16  provided by the Store Loan Agreement in the amount of $150,000.00 plus interest.

17          76.    STTN is currently indebted to BPWCP in an amount of not less
18  than One Hundred Fifty Thousand Dollars ($150,000).  BPWCP has made demands
19  for payment of this sum on Sayed Faquiryan, Nazim Faquiryan, and Maghul
20  Faquiryan, who have, to date, failed to make these payments.  As such, Sayed
21  Faquiryan and Nazim Faquiryan are in breach of the obligations under the  Loan
22  Guaranties.   Moreover, Sayed Faquiryan and Nazim Faquiryan are liable for
23  liquidated damages owed to BPWCP pursuant to the Mini Market Loan Agreement at
24  the time of the occurrence of an Event of Default and according to proof.  Nazim
25  Faquiryan, Sayed Faquiryan, and Maghul Faquiryan have breached the Loan
26  Guaranties.

27          77.    As a result of the breaches of the Loan Guaranties, BPWCP has
28  been damaged in an amount of not less than $150,000 plus interest.

**SECOND AMENDED COMPLAINT**

1    78.    In addition, the Loan Guaranties provide that Nazim Faquiryan,

2    Sayed Faquiryan, and Maghul Faquiryan will reimburse BPWCP on demand for all

3    expenses, including reasonable attorneys' fees incurred by BPWCP in collecting or

4    enforcing the Loan Guaranties, together with interest thereon.  [See Article 7 of the

5    Loan Guaranties, Exhibit J.]  It has become necessary for BPWCP to engage the law

6    firm of Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP to bring this

7    action, and BPWCP is entitled to further and additional sums for reasonable attorneys'

8    fees herein.

9

10                        **NINTH CLAIM FOR RELIEF**

11                        **(Unified Judicial Foreclosure)**

12              **(By Plaintiff BPWCP Against STTN Enterprises, Inc., and**

13                        **AVA Global Enterprise, LLC.)**

14    79.    The allegations of paragraphs 1 through 78 above are incorporated

15    herein by reference as though fully set forth herein.

16    80.    To secure, in part, Defendants' obligations under the Store Loan

17    Agreement (Exhibit D), Promissory Note (Exhibit H), and Loan Guaranties (Exhibit

18    I), and as part of the same transaction, AVA Global, as the owner of the Real

19    Property, executed the Deed of Trust dated March 2, 2007 and recorded on March 9,

20    2007, which irrevocably granted BPWCP the power of sale of all of ABA Global's

21    right, title and interest in the Real Property.  A true and correct copy of the Deed of

22    Trust is attached hereto as Exhibit F, and is incorporated herein as though fully set

23    forth at length.  AVA Global, BPWCP and STTN also entered into a "Consent to

24    Encumbrance of Tenant's Interest" dated March 2,2 007 and recorded on March 9,

25    2007 ("Consent to Encumbrance").  The Consent to Encumbrance created a leasehold

26    mortgage encumbering STTN's leasehold estate in the Lease and Real Property

27    ("Leasehold Mortgage").  A true and correct copy of the Consent to Encumbrance is

28    attached hereto as Exhibit G, and is incorporated herein as though fully set forth at

                                    24

1  length.  In addition, STTN executed a Promissory Note evidencing the Store Loan.  A

2  true and correct copy of the executed Promissory Note is attached hereto as <u>Exhibit H</u>

3  and is incorporated herein as though fully set forth at length.

4          81.    In addition, Defendants made, executed and delivered to BPWCP,

5  as beneficiary, a UCC-1 (<u>Exhibit I</u>), by the terms of which Defendants conveyed a

6  security interest in the personal property located on or affixed to the Real Property or

7  the Improvements thereon for the benefit of BPWCP, as beneficiary.  The UCC-1 was

8  filed on May 7, 2007 with the California Secretary of State.

9          82.    BPWCP is now, and at all times material to this action was, the

10  lawful beneficiary of the Promissory Note, the holder of the beneficial interest under

11  the Deed of Trust, and the holder of the beneficial interest under the UCC-1.

12          83.    Excel National Bank, has, or claims to have, some interest in the

13  Real Property or some part of it by reason of a senior lien.

14          84.    The Store Loan Agreement provides that Defendants must repay

15  the outstanding balance of the loan in full to BPWCP within 30 days of the occurrence

16  of an "Event of Default."   [See Store Loan Agreement, ¶ 4, <u>Exhibit D</u>.]   The

17  termination of the franchise relationship between STTN and BPWCP on September 6,

18  2007 constituted such a defined "Event of Default."   [See Store Loan Agreement,

19  § 4.5.]

20          85.    The Promissory Note provides that, if a default or "Event of

21  Default" (as defined in the Store Loan Agreement, <u>Exhibit D</u>) occurs, then the Note

22  "shall become immediately due and payable without notice of default, presentment or

23  demand for payment, protest or notice of nonpayment or dishonor, or other notices or

24  demands of any kind or character." [See Promissory Note, ¶ 9, <u>Exhibit H</u>.]

25          86.    The Loan Guaranties provide that, if the Defendants default in the

26  full and timely payment of any installment due under the Loan Agreement, the entire

27  amounts owed to BPWCP will become immediately payable and due upon demand by

28  BPWCP.  [See Loan Guaranties, ¶ 6, <u>Exhibit J</u>.).

25

**SECOND AMENDED COMPLAINT**

87.    BPWCP has fully performed under the Loan Obligation Agreements. On or about September 6, 2007 and September 12, 2007, BPWCP made a demand upon Defendants for the payment of these amounts due on October 6, 2007, but Defendants have wholly failed, neglected, and refused to make those payments. [See Exhibits M and N.]

88.    As a result of such failure and default under Store Loan Agreement, Promissory Note, and the Loan Guaranties by Defendants, BPWCP has exercised its right to declare the entire sum due from Defendants immediately due and payable. The total amount now due under the Store Loan Agreement, Promissory Notes, and Loan Guaranties consists of the principal sum of at least One Hundred and Fifty Thousand Dollars ($150,000), excluding interest and attorneys' fees with respect thereto.

89.    Furthermore, by the provisions of the Loan Guaranties (Exhibit J; Paragraph 1), the Store Loan Agreement (Exhibit D), and the Secured Promissory Note (Exhibit H), Defendants agreed that, if any action were initiated to enforce the Loan Guaranties or Loan Agreement, Defendants would pay the sum fixed by the Court as BPWCP's attorneys' fees and court costs, and that these charges would also be secured by the Deed of Trust recorded against the Real Property and by the UCC-1 filed against the personal property located on the Real Property. Because of the defaults by the Defendants, it has become necessary for BPWCP to employ Weston Benshoof Rochefort Rubalcava & MacCuish, LLP to commence and prosecute this foreclosure action. The reasonable value of services of counsel in this action should be determined by the Court at the time of trial. As a result of Defendants' default, BPWCP is entitled to enforce the Store Loan Agreement, Promissory Note and Loan Guaranties by, among other things, an unified judicial foreclosure of the Deed of Trust as to all of the Defendants' rights in the Real Property, and of the UCC-1 as to all of the Defendants' rights in the personal property located on the Real Property, through

SECOND AMENDED COMPLAINT

1  public sale thereof by the proper judicial officer for proceeds up to $150,000 plus
2  interest and attorneys' fees.

3       90.    BPWCP may hereafter be required to expend additional sums to
4  protect its security in the Real Property described in the Deed of Trust and its security
5  in the personal property located on the Real Property described in the UCC-1. In the
6  Deed of Trust and the UCC-1, Defendants agreed to pay all such sums expended by
7  BPWCP. BPWCP will amend this First Amended Complaint to allege the nature and
8  amounts of such sums if BPWCP is required to make such additional expenditures.

9

10                          **PRAYERS FOR RELIEF:**

11       WHEREFORE, BPWCP prays that judgment be entered in its favor as
12  follows:

13  AS TO THE FIRST CLAIM FOR DECLARATORY RELIEF:

14       1.    For a declaration that under the PMPA, BPWCP lawfully
15  terminated STTN's franchise and franchise relationship pertaining to the Station and
16  the other requested findings set forth in that claim; and

17  AS TO THE SECOND CLAIM FOR BREACH OF GASOLINE AGREEMENT:

18       2.    That BPWCP have judgment against STTN Enterprises, Inc. for
19  damages arising out of breach of the Gasoline Agreement, in an amount according to
20  proof, but not less than One Hundred Twenty-Six Thousand, One Hundred Ninety-
21  Four Dollars and Seventy-Seven Cents ($126,194.77); and

22  AS TO THE THIRD CLAIM FOR BREACH OF MINI MARKET AGREEMENT:

23       3.    That BPWCP have judgment against STTN Enterprise, Inc. for
24  damages arising out of breach of the Mini Market Agreement, in an amount according
25  to proof including, but not limited to, liquidated damages as provided in the
26  Agreements in the amount of $235,000.00; and

27

28

**SECOND AMENDED COMPLAINT**

AS TO THE FOURTH CLAIM FOR BREACH OF FRANCHISE GUARANTIES:

4.    For a declaration that Nazim Faquiryan and Sayed Faquiryan, as guarantors, are each liable for the same amounts due to BPWCP by STTN Enterprise, Inc. with respect to the Franchise Agreements and that a deficiency judgment may be ordered against each of them for those sums;

5.    For general damages and interest thereon calculated at the applicable statutory rates; and

AS TO THE FIFTH CLAIM FOR GOODS SOLD AND DELIVERED:

6.    For the sum of One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77);

7.    For interest on the sum of One Hundred Twenty-Six Thousand, One Hundred Ninety-Four Dollars and Seventy-Seven Cents ($126,194.77) as allowed by law;

8.    For costs of suit incurred; and

AS TO THE SIXTH CLAIM FOR UNJUST ENRICHMENT:

9.    For general damages and interest thereon calculated at the applicable statutory rate; and

AS TO THE SEVENTH CLAIM FOR BREACH OF CONTRACT – MINI MARKET LOAN AGREEMENT:

10.    For a judgment in favor of BPWCP and against STTN Enterprises, Inc. for damages arising out of breach of the Store Loan Agreement, in an amount according to proof, but in no event less than $150,000.00, plus interest;

11.    For reasonable attorneys' fees and costs incurred herein; and

AS TO THE EIGHTH CLAIM FOR BREACH OF MINI MARKET LOAN GUARANTIES:

12.    For a declaration that Nazim Faquiryan, Sayed Faquiryan, and Maghul Faquiryan, as guarantors, are liable for the same amounts due to BPWCP by

SECOND AMENDED COMPLAINT

1  STTN Enterprise, Inc. with respect to the Loan Agreement and that a deficiency

2  judgment may be ordered against her for those sums;

3        13.    For general damages and interest thereon calculated at the

4  applicable statutory rates;

5        14.    For reasonable attorneys' fees and costs incurred herein; and

6  AS TO THE NINTH CLAIM FOR UNIFIED JUDICIAL FORECLOSURE:

7        15.    For a judgment in favor of BPWCP and against STTN, AVA

8  Global, Sayed Faquiryan, Nazim Faquiryan, and Maghul Faquiryan for the sum of

9  $150,000;

10        16.    Costs of this action and attorneys' fees that the Court considers

11  reasonable;

12        17.    For additional sums, if any, that BPWCP hereafter expends to

13  protect its security interest in the Real Property described in the Deed of Trust, and its

14  security interest in the personal property located on the Real Property described in the

15  UCC-1, together with interest at the legal annual rate, according to proof;

16        18.    For a judgment determining that the rights, claims, ownership,

17  liens, titles, and demands of the Defendants are subject, subsequent, and subordinate

18  to BPWCP's Deed of Trust and to BPWCP's UCC-1;

19        19.    For an Order that the Deed of Trust (Exhibit F) and the UCC-1

20  (Exhibit I) be foreclosed upon and that judgment be entered for sale of the Real

21  Property and the personal property located on the Real Property, according to law, by

22  the Sheriff of Orange County or a receiver to be appointed by the Court; that the

23  proceeds of the sale be applied initially to the senior lienholder in the amounts owed

24  thereto; that the next $150,000 of the proceeds of the sale be applied in payment of the

25  amounts due to BPWCP under the Loan Guaranties; and that Defendants, and all

26  persons claiming under them subsequent to the execution of BPWCP's Deed of Trust,

27  as lien claimants, judgment creditors, claimants under a junior deed of trust,

28  purchasers, encumbrancers, or otherwise, be barred and foreclosed from all rights,

29

1   claims, interests, or equity of redemption in the Real Property when time for
2   redemption has elapsed;

3          20.   For judgment and execution against STTN, AVA Global, Nazim
4   Faquiryan, Sayed Faquiryan, and Maghul Faquiryan for any deficiency that may
5   remain after applying the proceeds of the sale of the Real Property to the senior
6   lienholder, and after applying the proceeds of the sale of the personal property on the
7   Real Property, properly applicable to the satisfaction of the amounts found due by the
8   Court under the prayers applicable to the seventh and eighth causes of action;

9          21.   For an order permitting BPWCP or any other party to this action to
10  become a purchaser at the foreclosure sale, that the Sheriff or receiver execute a deed
11  to the purchaser of the Real Property at the sale, and that the purchaser be let into
12  possession of the Real Property on production of the Sheriff's or receiver's deed;

13

14                  AS TO ALL CAUSES OF ACTION:

15         31.   That BPWCP recover its costs of suit and reasonable attorneys'
16  fees pursuant to 15 U.S.C. § 2805(d)(3); and

17         32.   That BPWCP recover such other and further relief as the Court
18  deems appropriate.

19

20  DATED:  May 7, 2008          KURT OSENBAUGH
21                               DEBORAH YOON JONES
                                 SAYAKA KARITANI
22                               **WESTON, BENSHOOF, ROCHEFORT,**
                                    **RUBALCAVA & MacCUISH LLP**
23

24  _____
                                         Sayaka Karitani
25                               Attorneys for Plaintiff
26                               BP WEST COAST PRODUCTS LLC

27

28

                          30
                                        **SECOND AMENDED COMPLAINT**

# EXHIBIT A
# TO SECOND AMENDED COMPLAINT

Customer Acct #0996439
Facility #82461
Category: NTI

## CONTRACT DEALER GASOLINE AGREEMENT

This Contract Dealer Gasoline Agreement (this "Agreement") is made and entered into as of the _____11_____ day
of _____July_____, _____2006_____, ("Effective Date")by and between BP West Coast
Products LLC, a Delaware limited liability company, ("BPWCP"), and
STTN Enterprises, Inc. , a California Corporation ("Buyer").
(state whether a sole proprietorship, partnership, corporation or limited liability company [LLC]; if partnership, the names
of all partners and State of organization; if corporation, the State of incorporation; if an LLC, the State of organization)

BPWCP maintains a place of business at 4 Centerpointe Drive, in the City of La Palma, in the State of California.
Buyer's principal place of business is located at 631 San Felipe Road in the City of Hollister, in the State of CA with
the ZIP code 95035. This Agreement constitutes a "franchise" as defined in the Petroleum Marketing Practices Act, 15
U.S.C. §§ 2801-2806 ("PMPA").

Recitals

A.      BPWCP markets motor fuels comprising gasolines and gasoline containing materials bearing the
ARCO® trademark and other identifying symbols (herein collectively, "Gasoline").

B.      Buyer owns or leases from a third party real property and improvements which Buyer would like to
operate as a retail facility selling Gasoline to end users. The property and improvements are located at 631 San Felipe
Road, in the City or Town of Hollister in the State of CA with the ZIP code 95035 (The "Premises").

NOW, THEREFORE, the parties hereto agree as follows:

1.      **Term.**  This Agreement shall be binding upon the parties and effective on the date first set forth
above. Subject to earlier termination under Paragraph 17.1 below, the "Commencement Date" of this Agreement shall
begin at 10:00 a.m. on the  and the term shall end at 10:00 a.m. on the  If no Commencement Date is set forth at the time
this Agreement is executed, the Commencement Date shall be established by BPWCP by notice to Buyer as the date the
Premises are ready to receive Gasoline delivery, which notice shall also set forth the expiration date which shall be at
10:00 a.m. on the first day after the [] 120th or [XX] 240th full calendar month following the Commencement Date. If
no time is checked, the box for 120th shall be deemed checked. In addition, BPWCP may, at its discretion, extend the
term of this Agreement for a period of up to 180 days by giving written notice to Buyer before the end of the term.

1.2      **Construction or Raze and Rebuild.** If this Agreement is for Premises that require new construction
of an ARCO branded gasoline facility or the razing and rebuilding of an ARCO branded retail facility, Buyer will
promptly undertake such new construction or rebuilding and complete such construction or rebuilding and be ready to
receive Gasoline delivery within 24 months, in the case of New Construction, or 12 months, in the case of a Razing and
Rebuilding, of the Effective Date of this Agreement. If this Agreement is for Premises that require remodeling or
retrofit, Buyer will promptly undertake such work and complete such remodeling or retrofit and be ready to receive
Gasoline delivery within nine months of the Effective Date.

2.      **Orders.**  Buyer will order and make available for retail sale all grades of Gasoline which BPWCP
offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer
demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject

ARCO 40-WR1(4/2006)
CDGA

1 of 18

34

only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. BPWCP will use its best efforts to fill Buyer's orders; however, BPWCP may discontinue sale of any grade of Product at any time upon fifteen (15) calendar days' prior written notice to Buyer. At BPWCP's sole discretion, BPWCP reserves the right to provide ARCO branded motor fuels solely through an automatic Gasoline ordering and delivery system and to not accept individual orders placed by Buyer. Buyer agrees to accept and pay for such Product as BPWCP delivers to the Premises. Buyer shall provide accurate and timely information as reasonably requested by BPWCP in connection with the automatic gasoline inventory and delivery system.

3.    No Wholesaling.  Buyer will sell Product only to end users for their personal use in volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine, and an approved, properly labeled emergency container capable of holding ten gallons or less. The Premises shall be open for business seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day.

4.    Delivery.  BPWCP will deliver Product into Buyer's storage facilities described below. Title to and risk of loss of Product will pass to Buyer upon delivery into Buyer's storage facilities. BPWCP alone will select the method and mode of shipment and delivery. BPWCP expressly reserves the right to supply Product to other retail outlets whether owned and operated directly by BPWCP or by independent owners and operators, regardless of how near or far such other retail outlets may be located relative to the Premises.

5.    Prices.  For Product delivered hereunder, Buyer will pay the price specified by BPWCP in effect at the time and place of delivery for purchasers in Buyer's class of trade. Price shall be subject to change at any time, at the election of BPWCP, without notice. Should BPWCP elect to provide notice of price changes, it may do so by telephone, or at BPWCP's sole election, facsimile or electronic transmission. Buyer must have the capability to receive notices of price changes and invoices at the Premises by facsimile or electronic transmission. At BPWCP's sole discretion, to enable Buyer to compete more effectively with Buyer's competitors, BPWCP may from time to time grant Buyer a "temporary voluntary allowance"(TVA) applicable to Product to be sold by Buyer under this Agreement from metered dispensers on the Premises. If BPWCP determines that Buyer has accepted TVAs on Product which is not sold to motorists at retail through the metered dispensers on the Premises, BPWCP may terminate this Agreement, and the amount of any such TVA shall be due by Buyer to BPWCP on demand and BPWCP may offset such amount against any sums payable by BPWCP to Buyer. BPWCP may condition the payment of allowances on Buyer's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Buyer's retail selling price commensurate with the amount of the allowance.

6.    Payment.  Unless BPWCP extends credit to Buyer as provided below, Buyer will pay for Product prior to its delivery in U.S. dollars.  BPWCP shall require a product advance payment approximately equal to the current cost of an average delivery of Product. BPWCP may increase or decrease the amount of the advance payment at any time to reflect current prices and Buyer will pay any additional amount necessary if the advance payment is increased. Payment will be made by electronic funds transfer initiated by BPWCP, wire transfer, cashier's check or business check, whichever BPWCP directs, delivered by Buyer at the time and place as designated by BPWCP. Buyer's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association). Payment will be deemed made when, and only when, its receipt has been verified by BPWCP. If this Agreement requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm or entity. If this Agreement requires or permits payment by wire transfer, all such payments shall be made to " BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by automated clearing-house ("EFT"), all such payments shall be made to "BPWCP", c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number

ARCO 40-WR1 (4/2006)                    2 of 18
CDGA

35

unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by BPWCP. Buyer agrees to indemnify BPWCP for any loss or expense caused by Buyer's failure to comply with this Paragraph. Upon demand, Buyer will reimburse BPWCP the amount of any temporary voluntary allowance erroneously applied to Product other than Product sold under this Agreement from metered dispensers on the Premises. In addition to any other remedies available to it, BPWCP may offset against any future temporary voluntary allowance or against other amounts owed to Buyer the amount of any reimbursement to which BPWCP is entitled if Buyer fails to make any payment or reimbursement when due. Buyer acknowledges and agrees that BPWCP's receipt of payment due hereunder after the issuance of a notice of termination or nonrenewal does not constitute a waiver of BPWCP's termination or nonrenewal rights.

7.    **Credit.** BPWCP may in its sole discretion from time to time extend credit to Buyer in whatever amounts and on whatever terms BPWCP alone selects. If BPWCP extends Buyer credit, BPWCP may withdraw it at any time without notice and for any reason. In BPWCP's sole judgment, BPWCP may do any or all of the following: (i) require that Buyer pay for Product by cashier's check, or bank wire transfer prior to delivery, (ii) require that Buyer post an irrevocable letter of credit issued by a bank satisfactory to BPWCP, (iii) require Buyer present evidence of financial solvency, and (iv) declare Buyer in default of this Agreement if Buyer fails to pay any indebtedness when due, provide evidence of financial solvency upon request or comply with any other term of this Agreement. Buyer agrees that regardless of whether and for how long BPWCP has extended it credit, BPWCP may cease extending credit at any time and instead require that payment be made in the manner set forth in this Paragraph or in Paragraph 6 above.

8.    **Non-conformities.** Buyer will notify BPWCP in writing of the exact nature of any nonconformity in the type, quantity or price of any Product delivered to Buyer within thirty (30) calendar days after delivery. Buyer hereby waives any claim against BPWCP based on any nonconformity of which Buyer does not so notify BPWCP.

9.    **Record Keeping.** For each delivery of Product, Buyer shall at all times keep a detailed record of the date and time of delivery, and the grade and amount of Product delivered expressed in terms of gallons. To assist BPWCP in determining the necessity of any temporary voluntary allowance described in Paragraph 5 above, Buyer will (i) sell all Product through metered dispensers which shall indicate the grade and amount of gasoline purchased, (ii) allow BPWCP to inspect Buyer's Product dispensers, recorders and meters, and books and records relating to delivery and Product inventory, and (iii) allow BPWCP to ascertain the volume of Product in Buyer's storage facilities.

10.    **Equipment.**

   10.1    **Storage and Dispensers.** Buyer will maintain storage tanks or other appropriate facilities on the Premises into which Product can be delivered. Buyer will ensure that the storage facilities are compatible with BPWCP's delivery equipment and Product formulations; that its storage facilities will accommodate such minimum quantities per single delivery as BPWCP may select; and that the Premises are configured in such a way that Product can be delivered to the Premises consistent with all applicable fire laws and regulations and other governmental requirements. Further, Buyer will ensure that all dispensing devices and storage facilities at all times be properly permitted and completely comply with all applicable governmental requirements and any specifications which BPWCP may issue from time to time. Buyer further agrees that Buyer's motor fuel dispensing devices shall be equipped at all times with Product filters with ten (10) micron filtering capacity. Without restricting any right or remedy of BPWCP, or imposing any duty or liability upon BPWCP, upon BPWCP's request, Buyer will promptly furnish BPWCP with written evidence that Buyer's dispensing devices and storage facilities comply with all governmental requirements and provide copies of underground storage tank permits and specifications, and allow BPWCP representatives to inspect the dispensing devices and storage facilities to confirm such compliance. BPWCP may suspend deliveries in the event that Buyer does not provide written evidence that the dispensing devices and storage facilities comply with all governmental regulations.

36

10.2     PIC Equipment.     Unless the Premises are located in the state of Oregon, Buyer is required by BPWCP to purchase or lease the PayQuick Island Cashier ("PIC Equipment") and install it at the Premises. The PIC Equipment shall be of the type, number and configuration specified by BPWCP.

(a)     Buyer agrees to use the PIC Equipment only in connection with the operation of BPWCP authorized businesses. Buyer agrees not to tamper with, alter, change, dislodge, displace, remove or otherwise interfere with the operational integrity of the PIC Equipment. Buyer agrees to maintain PIC Equipment in a clean and fully operational condition at all times for the convenience of Buyer's customers.

(b)     Buyer will be responsible for all maintenance and repair of the PIC Equipment. Buyer will contract for maintenance services through BPWCP approved service providers and understands that BPWCP will not provide any maintenance and repair services.

(c)     BPWCP will provide training to Buyer and up to 5 employees designated by Buyer to attend training. Training is mandatory for Buyer or Buyer's designated manager. There is no tuition for such training, but all expenses in connection with such training must be borne by Buyer. If Buyer fails to attend training when originally scheduled, there may be a fee of $1000 to attend training.

(d)     Buyer's PIC Equipment will have one or more cash acceptors, except if, in the sole opinion of BPWCP, Buyer's Premises are appropriate exclusively for debit only PIC Equipment. Unless the Premises have no cash acceptors, Buyer agrees to contract with an BPWCP approved licensed and bonded armored security service to do the following: make cash pick ups on a regular basis, but not less frequently than once per week, maintain possession of all keys to the outer door and the vault of the PIC Equipment, handle all removal of cash cassettes from the PIC Equipment and reinstall all empty cassettes into the PIC Equipment. Receipt paper will be changed only by armored security personnel or in their presence.

(e)     Buyer is required to install and operate the BPWCP approved Video Surveillance Equipment, the details of which will be provided to Buyer and which may be changed from time to time by BPWCP. In addition, Buyer must install, keep operational and use one or more video surveillance cameras dedicated to recording the customer activity at each PIC.

(f)     Buyer is responsible for maintaining a supply of receipt paper at the premises to be used in the PIC Equipment.

(g)     BPWCP grants to Buyer a non exclusive right and license to use the PayQuick Island Cashier service marks, trademarks and trade dress in conjunction with the operation of PIC Equipment at the Premises in a form prescribed by BPWCP.

(h)     All information regarding the PIC Equipment, including written manuals, specifications, data and instructions provided to Buyer are confidential and proprietary information of BPWCP and shall remain the exclusive property of BPWCP and shall not be duplicated, in whole or in part by Buyer and shall not be used other than as set forth herein and shall be maintained in confidence and not disclosed to anyone without the prior written consent of BPWCP.

(i)     Upon 180 days prior written notice, Buyer may be required to upgrade the PIC Equipment or purchase and install more technologically advanced cash, debit or other payment equipment in accordance with BPWCP's system wide equipment requirements at that time.

(j)     Buyer will install BPWCP approved Point of Sale equipment which is necessary to operate the PIC or other required payment equipment. Buyer will ensure that its Point of Sale equipment and motor fuel dispensers are compatible with the PIC Equipment. In addition, VSAT satellite equipment is required for telecommunications purposes for which there is a fee for connection, repositioning and maintenance.

ARCO 40 WR-1 (4/2006)
CDGA

37

11.    **Leak Prevention and Detection.** Buyer acknowledges and agrees that with respect to any Product storage facilities located on the Premises, including without limitation underground storage tanks and related equipment, Buyer is solely responsible for taking, and will take the following leak and water contamination prevention and detection measures:

11.1    **Stick Readings.** Using a properly calibrated wooden tank measuring device and water finding paste, Buyer will gauge Product storage tanks for inventory loss or water gain on a daily basis.

11.2    **Reconciliations.** Utilizing daily stick readings to the nearest one eighth (1/8) inch and dispenser meter readings, Buyer will take and reconcile opening and closing inventory levels by grade, including deliveries.

11.3    **Record Retention.** Buyer will keep daily reconciliation records available on the Premises for at least five (5) years.

11.4    **Monitoring.** Buyer will ascertain and perform any and all other monitoring procedures required by applicable laws, regulations or governmental authorities.

11.5    **Secondary Containment.** Buyer will ascertain and perform any and all construction or retrofitting necessary to satisfy or comply with the secondary containment standards for underground storage tanks required by applicable laws, regulations or governmental authorities. Buyer will ensure that all deliveries of ARCO Product are made into double walled tanks.

11.6    **Notification.** Buyer will immediately investigate and report to BPWCP and all appropriate governmental authorities (i) any detectable loss or suspected loss that exceeds Regulatory variation limits of any Product, (ii) the activation or alarm of any leak detector or other continuous monitoring system, (iii) the discovery of any broken weights and measures seals or other seals in any Product dispenser, (iv) the discovery of any visible leak in any Product dispenser, Product piping or submerged pumps, (v) any change in the condition of the land or surface adjacent to fill boxes or dispensers, (vi) water in excess of one inch (1") in any storage container, or (vii) any spills or overfills that are not immediately and properly contained and cleaned up. In the event of the occurrence of any of (i) through (vii) above, Buyer shall immediately investigate in accordance with regulatory leak detection requirements. If a leak is confirmed all Product must be removed from the storage tanks immediately and the tanks secured. In addition, Buyer will keep fill caps tight, keep fill boxes free of dirt, ice and snow, and immediately remove any water in excess of one inch (1") in any Product storage tank. Buyer will not permit any Product to enter any public or private water system, storm drain or sewage disposal system.

11.7    **Training.** BP may offer training on environmental compliance. Such training will not exceed four (4) hours and will be offered on an annual basis or a lesser frequency if specified by BP. The training will be tuition free, but any expenses in connection with such training shall be borne by the Franchisee.

12.    **Gasoline Regulations.**

12.1    **Compliance.** BPWCP will ensure that upon delivery to Buyer by BPWCP, all gasoline, will meet the specifications for lead and phosphorus set forth in the regulations promulgated by the United States Environmental Protection Agency ("EPA"). Buyer will ensure that no gasoline purchased from BPWCP is tampered with or contaminated in a way that could cause the gasoline not to meet the EPA's specifications or any other specifications required by law. Buyer will immediately cease dispensing any gasoline that is determined not to meet such specifications

12.2    <u>Disclosures and Warnings.</u>  Buyer acknowledges that it has been fully informed of and is aware of the nature and existence of risks posed by transporting, storing, using, handling and being exposed to Product. Buyer will inform its employees, agents, contractors and customers of such risks. Buyer will display, publish and distribute any safety warnings or disclosures as may be requested or required by BPWCP or any governmental authority from time to time.

13.    <u>Taxes.</u>

13.1    <u>Payment by Buyer.</u>  Buyer will pay promptly when due and hold BPWCP harmless from all taxes, excise fees and other similar charges (including interest, penalties and additions to tax) which BPWCP is now or in the future required to pay or collect under any federal, state or local governmental requirement based on the manufacture, production, sale, transfer, transportation, delivery, storage, handling, consumption or use of Product under this Agreement, or on any payments made under this Agreement (excepting any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon). BPWCP may, at its sole option, add any such tax, excise fee or similar charge to the amount to be charged for Product. Buyer will also pay promptly when due and hold BPWCP harmless from all fees and sales, use, rental, gross receipts, inventory, excise, income and other taxes (including interest, penalties and additions to tax but not including any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon) imposed by any federal, state or local governmental authority upon Buyer or BPWCP in connection with the operation of Buyer's business.

13.2    <u>Inapplicability of Reseller Exemption.</u>  With respect to Product purchased hereunder, Buyer hereby waives any exemption and agrees not to assert any right of exemption from payment to BPWCP of taxes regularly collected by BPWCP upon delivery of Product to purchasers within Buyer's class of trade by virtue of any reseller or wholesale-distributor exemption to which Buyer may presently or hereafter be entitled under any provision of federal, state or local law regulation or order.

13.3    <u>Tax Information.</u>  Buyer will provide BPWCP with Buyer's motor fuel seller number and use tax registration number. Further, Buyer will provide BPWCP with any information requested by BPWCP relating to tax credits claimed by Buyer for motor fuel, sales, use and other taxes paid by Buyer in connection with the Product for the purpose of resolving any threatened or pending tax dispute with any governmental authority or for the purpose of confirming Buyer's compliance with the terms of this Agreement.

14.    <u>Trademarks and Trade Dress.</u>

14.1    <u>Compliance.</u>  Within one hundred fifty (150) calendar days after the Commencement Date if this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises and upon the Commencement Date if this is not the first agreement between Buyer and BPWCP for the supply of Product at the Premises, unless BPWCP consents otherwise in writing, Buyer will have fully complied with all trademarks and trade dress requirements set forth in Exhibit A. Thereafter, throughout the term of this Agreement, Buyer shall fully comply with all trademarks and trade dress requirements as they may be changed from time to time. Notwithstanding the foregoing, Buyer must have the ARCO I.D. sign, I.D. pole, price pods, and decal specifications for pumps and dispensers as described in Exhibit A (as it may be changed from time to time) in place as soon as Buyer is selling ARCO branded Product but not later than the fifth delivery of Product hereunder and not before Buyer is selling ARCO branded Product under the ARCO trademarks described below. Buyer hereby agrees that BPWCP may and acknowledges that in all likelihood BPWCP will change such requirements from time to time. Buyer will conform its trademarks and trade dress to all such changed requirements within ninety (90) calendar days after receiving written notice from BPWCP of any change. In its sole discretion, BPWCP may loan to Buyer various items of trade dress such as signs, illuminated sign poles, sign faces with a numerals kit and pump identification signs. Buyer hereby agrees that any trade dress which BPWCP provides to Buyer hereunder shall remain the property of BPWCP regardless of whether it is affixed to the Premises. Buyer shall ensure that no such loaned trade dress is removed from the Premises by persons other than BPWCP or

ARCO 40 WR-1 (4/2006)
CDGA

39

its representatives either during or after the term of this Agreement without BPWCP's prior written consent. Buyer shall bear the cost of maintaining, repairing and replacing such loaned trade dress.

14.2    Licenses.  During the term of this Agreement, in connection with the resale of Product, Buyer may display the trademarks, trade names, advertising, signs, devices, symbols, slogans, designs and other trade indicia adopted, used or authorized for use by BPWCP in connection with Product (collectively, "Marks"), provided that (i) Buyer operates the Premises seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day, (ii) the Marks are only displayed or used in the manner specified by BPWCP, and (iii) all trademark rights resulting from such display or usage shall inure to BPWCP's benefit. BPWCP reserves the right to substitute another trademark for ARCO or withdraw or modify any of the Marks or their manner of display without prior notice to Buyer. Upon receiving notice of any withdrawal or modification of the Marks or substitution of another trademark, Buyer will fully implement any modification or termination or substitution within the time specified in the notice and such other trademark shall be deemed substituted for the "ARCO" trademark in all references to Gasoline and Product in this Agreement. If Buyer fails to comply fully with any notice of withdrawal or modification, in addition to any other remedies available to BPWCP for breach of this Agreement, BPWCP may demand that Buyer immediately remove all Marks from the Premises at Buyer's sole expense. If Buyer fails to do so, BPWCP or BPWCP's contractor may enter the Premises and remove all Marks, and Buyer will reimburse BPWCP for such removal.

14.3    Shared Expenses.  BPWCP will reimburse Buyer a portion of the cost of acquiring, transporting and installing certain signs and other trade dress required hereunder and set forth in Exhibit B, as specified below.  The amount of such reimbursement shall be the lesser of (i) one half of Buyer's actual verifiable cost, or (ii) the maximum amount indicated on Exhibit B.  The reimbursement shall apply on a one-time only basis to the Premises during its entire franchise relationship with BPWCP regardless of whether this is the first or a subsequent agreement between Buyer and BPWCP for the supply of Product at the Premises.  Buyer shall be solely responsible for the cost of maintaining, repairing and replacing all trade dress.  Request for the foregoing reimbursement shall be in writing and accompanied by all original invoices (of which Buyer shall keep copies).  Upon receiving such a request, BPWCP shall inspect Buyer's facility to confirm that the trade dress is of the proper type and properly installed and verify Buyer's actual cost.  If BPWCP confirms that the trade dress meets BPWCP's requirements and verifies Buyer's submitted cost as accurate, then BPWCP shall either reimburse Buyer the amount described above or pay the entire cost of such trade dress directly to the third party vendor, whichever BPWCP alone chooses.  If BPWCP elects to pay the third party vendor directly, then within five (5) calendar days after receiving notice from BPWCP that such payment will be or has been made, Buyer will remit to BPWCP the difference between the amount of the invoice and the amount of BPWCP's reimbursement as calculated above.  Further, BPWCP may arrange directly with a third party vendor to satisfy the requirements of this Paragraph 14.3 and collect from Buyer in advance upon five days' notice, an amount equal to the total maximum reimbursements to which Buyer is entitled under this Paragraph and Exhibit B, to cover Buyer's share of the cost of trade dress expenses. Should the amount of this advance payment exceed one half of the actual cost of satisfying the trade dress requirements herein, BPWCP will refund the excess amount to Buyer. If the amount of the advance payment is less than the actual cost of satisfying the trade dress requirements herein, then Buyer shall pay BPWCP the amount of the deficiency upon demand. In addition to all other remedies available to it, BPWCP may offset against any amounts owed to Buyer, the amount of any remittance owing to BPWCP hereunder. Notwithstanding this Paragraph 14.3, Buyer may be obliged to pay BPWCP for any reimbursements received and direct vendor payments made by BPWCP hereunder upon the termination or nonrenewal of this Agreement as specified in Paragraph 17.3.

14.4    Restrictions.  Buyer will not adulterate, mislabel, misbrand or contaminate Product; add any ingredients to Product without BPWCP's prior written consent; use any Mark except in connection with genuine ARCO Product; claim any right, title or interest in or to the Marks; directly or indirectly deny or assail or assist others in denying or assailing the sole and exclusive ownership of BPWCP in and to the Marks; register, adopt as its own property, or use or assist others in registering, adopting, or using any trademarks, trade names, advertising, signs, devices, symbols, slogans, designs, or other trade indicia confusingly similar to the Marks; or commit other trademark violations or acts that could disparage

ARCO 40 WR-1 (4/2006)
CDGA

40

the Marks or adversely affect the value of the marks or BPWCP's goodwill and ownership rights hereto. Any rights to any Marks obtained by Buyer contrary to the foregoing shall be held in trust for BPWCP and, upon request, Buyer will assign such rights free of charge to BPWCP.

    14.5    <u>Standards.</u> The Premises must be clean, well maintained, and graffiti free, with structures, driveways and pavement in good repair. BPWCP will perform periodic inspections for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

15.    <u>Compliance and Indemnification.</u>

    .15.1    <u>Compliance With Laws and Regulations.</u> Buyer shall comply with any and all applicable federal, state and local laws and regulations, including those pertaining to human health, safety or the environment, and shall further comply with any and all permits or license pertaining to the Premises. Any references in this Paragraph 15.1 to laws or regulations shall include all such laws and regulations pertaining to Product, or the air, or surface or subsurface water, surface or subsurface soil, and the handling, storage and disposal of hazardous substances, materials or wastes, or solid wastes (whether or not defined as hazardous by such laws or regulations), and vapor recovery and vapor recovery equipment Buyer shall comply with any and all operating, reporting and record keeping laws and regulations, as well as all operating, reporting and record keeping procedures designed to ensure that no unauthorized release of any Product occurs, and that in the event any Product is released, all applicable reporting, record keeping and cleanup requirements are fully complied with.

    15.2    <u>Indemnification.</u> Buyer will indemnify and hold harmless BPWCP, its affiliates, subsidiaries, shareholders, directors, officers, employees and other representatives (and shareholders, directors, officers, employees and other representatives of such affiliates and subsidiaries) (collectively, "Indemnified Parties") from and against all claims, causes of action, liabilities, suits, demands, legal proceedings, governmental actions, losses and expenses, including without limitation reasonable expert and attorneys fees and costs (collectively, "Indemnified Expenses"), arising out of (i) any breach by Buyer (or any of its officers, employees or representatives) of any provision of this Agreement, (ii) the storage, leakage or other release of Product on, or from the Premises, (iii) any cleanup, remediation or response activity conducted or ordered under applicable law, (iv) Buyer's use or occupancy of the Premises, (v) Buyer's operation of the business or use, custody or operation of BPWCP-owned equipment or any other equipment on the Premises, excepting any loss or damage arising solely from BPWCP's negligence or failure to perform its obligations hereunder, or (vi) any intentional or unintentional violation by Buyer of any government requirement applicable to the Premises or Buyer's storage or sale of Product, or the disclosure or warning of risks associated with Product at the Premises. This indemnification obligation shall survive the termination or nonrenewal of this Agreement.

    15.3    <u>Liability for Charges or Fines.</u> In the event that BPWCP becomes liable for payment of any charges or fines arising out of Buyer's noncompliance with any governmental laws or regulations or Buyer's failure to secure any necessary licenses or permits or renewals thereof, now or hereafter necessary, in connection with the possession and use of the equipment and other property or the conduct of business on the Premises or Buyer's failure to pay any taxes, imposts or charges imposed by any governmental authority, BPWCP shall have the right to charge Buyer the amount of any such charge or fine paid by BPWCP.

    15.4 <u>Reporting</u>. Buyer shall report to BPWCP within 24 hours each incidence of major personal injury or criminal activity. All other incidences of personal injury or criminal activity shall be reported as soon as practicable, but in no event later than 72 hours. Buyer will display display signage regarding BPWCP's crime deterrence and reward offer in the manner specified by BPCWP. BPWCP reserves the right to change or withdraw any reward offer in its sole discretion in which case, Buyer will remove or replace the signage immediately upon notice.

    16.    <u>Insurance.</u> Buyer shall obtain and maintain throughout the term of this Agreement each of the following forms of insurance from a financially sound and reputable insurance carrier: (i) workers'

ARCO 40 WR-1 (4/2006)
CDGA

compensation insurance including occupational disease insurance in accordance with the laws of the State in which the Premises are located, and employers' liability insurance in an amount of at least $100,000 for each employee and $100,000 each accident; and ( ii ) garage liability insurance or general liability insurance, including contractual liability, insuring Buyer's indemnity obligation set forth above, and products--completed operations coverage, in amounts of at least $1,000,000 combined single limit each occurrence applicable to personal injury, including bodily injury, sickness, disease or death and loss of or damage to property (with liquor law liability coverage if Buyer will sell or dispense alcoholic beverages), on which BPWCP is named as an additional insured. Buyer will furnish BPWCP with certificates of insurance evidencing the foregoing coverage and providing that no policy of insurance may be cancelled or materially modified without at least thirty (30) calendar days' prior written notice to BPWCP. Buyer hereby understands and agrees that coverage provided BPWCP by Buyer's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

17.    Termination and Nonrenewal.

17.1    Triggering Events for Termination or Nonrenewal. In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may terminate or nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement following written notice to Buyer from BPWCP of such failure and fifteen calendar days to cure such failure.

(b)    Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Buyer relevant to the operation of the Premises.

(c)    Declaration of bankruptcy by Buyer or judicial determination of insolvency of Buyer.

(d)    Subject to Paragraph 18.3 hereof, the death or the prolonged severe physical or mental disability or disablement of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation) or any of Buyer's general partners (if Buyer is a partnership) for at least three (3) months which renders Buyer unable to provide for the continued proper operation of the Premises.

(e)    The loss of Buyer's right to possess the Premises.

(f)    The condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain.

(g)    The destruction of all or a substantial part of the Premises.

(h)    Buyer's failure to timely pay BPWCP all sums to which BPWCP is legally entitled.

(i)    Buyer's failure to operate the Premises for seven (7) consecutive calendar days, or any lesser period which constitutes an unreasonable period of time.

(j)    The willful adulteration, commingling, mislabeling or misbranding of Product or other violations by Buyer of the Marks.

(k)    Buyer's knowing failure to comply with federal, state or local laws or regulations relevant to the use or operation of the Premises.

42

(l)    The conviction of any felony involving moral turpitude or indictment for any criminal misconduct relevant to the operation of the Premises of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation), Buyer's majority owning member (if Buyer is an LLC) or any of Buyer's general partners (if Buyer is a partnership).

(m)    The determination by BPWCP, made in good faith and in the normal course of business, to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises are located.

(n)    The occurrence of any other event relevant to the relationship between the parties which makes termination or nonrenewal reasonable, including without limitation those set forth in Paragraph 17.2 below.

(o)    The breach by Buyer of any material provision of this Agreement, which Buyer hereby agrees includes (without limitation) ( i ) Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand, (ii) Buyer's failure to keep a detailed record of each delivery of Product to Buyer or make those records available to BPWCP as provided in Paragraph 9, ( iii ) Buyer's failure to take any of the leak prevention and detection measures outlined in Paragraph 11, (iv) any attempt by Buyer to assign any interest in this Agreement without BPWCP's prior written consent, and (v) failure to complete construction or rebuilding within the time as set forth in Paragraph 1.2.

(p)    If Buyer is a party with BPWCP to a Loan Agreement or a Loan Agreement and Security Agreement and Related Promissory Note, and Buyer fails to cure any default under the foregoing Loan Agreement, Loan Agreement and Security Agreement and Promissory Note as requested, BPWCP may terminate this Agreement.

17.2    <u>Triggering Events for Nonrenewal.</u>  In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to agree to changes or additions to its franchise relationship with BPWCP, which BPWCP requests based on BPWCP's determinations made in good faith and the normal course of business and without the purpose of preventing the renewal of the franchise relationship.

(b)    BPWCP's receipt of numerous bona fide customer complaints concerning Buyer's operation of the Premises, of which Buyer was apprised and, to the extent they related to the condition of the Premises or conduct of Buyer or Buyer's employees, which Buyer failed to cure promptly.

(c)    Failure of Buyer to operate the Premises in a clean, safe and healthful manner on at least two previous occasions.

(d)    A good faith determination by BPWCP made in its normal course of business that renewal of the franchise relationship is likely to be uneconomical to BPWCP despite any reasonable changes or additions to the agreements between the parties, which may be acceptable to Buyer.

17.3    <u>Effect of Termination or Nonrenewal.</u>  After receiving notice of termination or nonrenewal and until the effective date of the termination or nonrenewal, Buyer will continue to operate the Premises in accordance with this Agreement.

(a)    From and after the effective date of termination or nonrenewal, Buyer will immediately discontinue all use of trade dress and Marks associated with BPWCP, including without limitation use of such trade dress and Marks on dispensers, pumps, containers, storage equipment,

43

buildings, canopies, pump islands, pole signs, advertising, stationery and invoices. From and after the effective date of termination or nonrenewal, Buyer will not adopt or use any trademarks trade dress or symbols in the operation of the Premises that are confusingly similar to BPWCP's, including without limitation, any four letter name or mark starting with ( i ) the letter "A" or ( ii ) any vowel and having the letter "R" as a second letter, and Buyer will not use or employ as a symbol, mark or design any geometric design that is red or any colored horizontal striping that is predominately red and blue. Further, Buyer will remove from all trade directories and telephone book listings all reference to the Marks. Upon the effective date of the termination or nonrenewal, Buyer will promptly return to BPWCP or destroy, whichever BPWCP directs, all signs, advertising, graphics and other materials in Buyer's possession bearing any Marks or used in any trade dress. In addition, Buyer hereby agrees that BPWCP may enter the Premises to remove or cover up any trade dress or advertisements bearing any Marks. If Buyer terminates or does not renew this Agreement or if BPWCP terminates or does not renew this Agreement for a reason set forth in Paragraph 17.1 or 17.2 above, then Buyer shall pay for the removal or covering up of all trade dress and trademarks as required hereunder. For a reasonable period following the effective date of Buyer's termination or nonrenewal and at no charge, BPWCP may keep any BPWCP property still located on the Premises in place while negotiating for its sale or removal.

(b)     If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises, Buyer will repay BPWCP all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon (i) the mutual termination of this Agreement prior to or at the end of the first twelve months, (ii) the termination of this Agreement by BPWCP or Buyer during the first twelve months or (iii) the nonrenewal of this Agreement by BPWCP or Buyer at the end of the first twelve months (if this is a trial franchise as defined under Section 2803 of the PMPA).

(c)     If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises with a term of more than one year and Buyer has been a party to an agreement regarding the Premises with BPWCP for the supply of Product for less than thirty-six months, then after the first twelve months Buyer will pay BPWCP, on a pro rata basis as described below, the amount of all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon the mutual termination of this Agreement or termination or nonrenewal by Buyer or by BPWCP for a reason set forth in Paragraph 17.1 or 17.2 above. The pro rata amount which Buyer is obligated to pay shall be calculated by multiplying the total of the reimbursements and direct payments made by BPWCP under Paragraph 14.3 times (a) two-thirds during the thirteenth through twenty-fourth month of this Agreement or (b) one-third during the twenty-fifth through thirty-sixth month of this Agreement.

18.     **Assignment, Right of First Refusal and Successors In Interest.**

18.1     **Assignment.**  Buyer will not sell, (or allow Buyer's foreclosing lender to complete a sale), assign, give or otherwise transfer, any interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements on that constitute the Premises, to any individual or entity other than BPWCP, without first complying with Paragraph 18.2 below and obtaining BPWCP's prior written consent to such transfer, which consent shall not be unreasonably delayed or withheld. Further, if Buyer is a corporation or partnership or LLC, neither Buyer nor any shareholder, member or partner of Buyer will sell, assign, give or otherwise transfer, or mortgage, pledge as security or otherwise encumber any shares of stock, partnership interest or other ownership interest in Buyer to any individual or entity without BPWCP's prior written consent. To ensure that BPWCP has adequate time to evaluate any assignment or transfer request, Buyer will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request. A request for consent made less than 45 days before the expiration date of this Agreement will be considered a request for consent to the renewal agreement, provided that one has been offered to Buyer. Buyer acknowledges and agrees that any transfer, encumbrance, attempted transfer or attempted encumbrance which does not satisfy these prerequisites shall be void and without effect. Buyer further acknowledges and agrees that BPWCP may impose a transfer fee upon any transfer or encumbrance of Buyer's interest in its franchise relationship with BPWCP. The fee is currently $1,000, but BPWCP reserves the right to raise the fee to a maximum of $4,000.

44

18.2    <u>Right of First Refusal.</u>  In return for valuable consideration, Buyer's receipt of which is hereby acknowledged, (i) upon receiving or extending any final offer to acquire any or all of Buyer's interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements that constitute the Premises, whether conveyed through a business broker or directly, to any entity or person other than Buyer's current spouse or adult child (natural or adopted)or (ii) upon the recordation of a Notice of Default that commences Buyer's lender's foreclosure of a mortgage or deed of trust encumbering the Premises, Buyer shall offer such interest to BPWCP, in writing, at the same price and on the same other terms as those contained in the final offer or Notice of Default. Buyer shall give BPWCP a complete, legible copy of the final offer including a breakdown of the amount for real property, equipment and goodwill, all agreements in connection with the proposed sale and the name and address of the proposed buyer/transferee.. In the case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding. Buyer shall give BPWCP a complete, legible copy of the recorded Notice of Default and any later recorded Notice of Sale. BPWCP shall have thirty (30) calendar days after its receipt of all data and documentation required by it to evaluate the offer and exercise its right of first refusal by notifying Buyer in writing that it intends to exercise its right of first refusal and agreeing to pay Buyer the purchase price, less the amount of any applicable transfer fee, on the terms stated in the final offer, or the amount required to pay the foreclosing lender to terminate the foreclosure proceeding, as applicable. During the 30 day period, BPWCP shall have the right of entry upon the premises to conduct reasonable environmental testing.    If BPWCP exercises its right of first refusal, each time period in the final offer will be automatically extended so that it starts on the date that BPWCP exercised its right of first refusal. BPWCP may assign its right of first refusal to any third party. If BPWCP does not exercise its right of first refusal, Buyer may consummate the proposed transfer, but not at lower price or on more favorable terms than those offered to BPWCP.  If Buyer does not do so within one hundred eighty (180) calendar days after the date BPWCP received Buyer's written offer, then Buyer must recommence the foregoing right of first refusal procedure and satisfy the requirements of this Paragraph 18.2.  BPWCP's exercise of its right of first refusal shall not be dependent on its prior refusal to approve the proposed transferee.  Buyer agrees to execute a memorandum of this Agreement to be recorded in the Official Records of the county where the Premises are located and take all other action necessary to give effect to this right of first refusal.

18.3    <u>Successors In Interest.</u>  Notwithstanding Paragraphs 18.1 and 18.2, if upon the death or incapacitation for more than ninety (90) consecutive calendar days of Buyer (if Buyer is a natural person), a general partner of Buyer (if Buyer is a partnership) or a majority shareholder of Buyer (if Buyer is a corporation), or majority-owning member of an LLC (if Buyer is an LLC), the interest in this Agreement of such deceased or incapacitated person passes directly to an eligible person or persons whom the deceased or incapacitated has designated as his successor in interest, in writing in a form prescribed by and filed with BPWCP, and who notifies BPWCP within twenty-one (21) calendar days after the death or incapacitation of his intention to succeed to such interest, then this Agreement shall continue for the remaining term hereof, provided that such successor in interest agrees in writing to assume all of the obligations under this Agreement of the deceased or incapacitated and satisfies BPWCP's then current criteria for similar franchisees.  A person who is eligible to be designated a successor in interest is one who is (i) the adult spouse or adult child (natural or adopted) or parent of the deceased or incapacitated, (ii) a general partner of the deceased or incapacitated, (iii) a fellow shareholder of the deceased or incapacitated, (iv) a fellow member of the deceased or incapacitated or, (v) if Buyer is a sole proprietor, a designated legal heir.  Only the most recently properly designated successor in interest will be recognized as such. If Buyer has a spouse and designates someone other than Buyers spouse, Buyers spouse must agree to the designation.

18.4    <u>BPWCP's Right to Assign.</u>  BPWCP shall have the unrestricted right to transfer or assign all or any parts of its rights or obligations under this Agreement, including its right of first refusal described in Paragraph 18.2, to any person or legal entity.

45

19.    **Miscellaneous**

19.1    **Right of Entry.**  Buyer hereby gives BPWCP the right to enter the Premises at all reasonable times and without prior notice, to determine Buyer's compliance with the provisions of this Agreement.  BPWCP may determine Buyer's compliance by any means BPWCP selects, including without limitation, the sampling and laboratory testing of Product.

19.2    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Buyer shall have no right to assign this Agreement, either voluntarily or by operation of law, except as provided in Paragraph 18 above.

19.3    **Force Majeure.**  In the event that either party hereto shall be delayed or unable to perform any act required hereunder by reason of Act of Nature, strikes, lockouts, riots, insurrection, war, governmental act or order, or other reason of a like nature not the fault of or in the control of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  The provisions of this Section shall not operate to excuse Operator from prompt payment of all fees or any other payments required by the terms of this Agreement.

19.4    **Notices.**  Except as limited by applicable law or as otherwise stated in this Agreement, any and all notices and other communications hereunder shall be deemed to have been duly given when delivered personally or forty-eight (48) hours after being mailed, certified or registered mail or overnight mail, return receipt requested, postage prepaid, in the English language, to the Premises if to Buyer and to the address set forth on the first page of this Agreement if to BPWCP, unless otherwise directed in writing by BPWCP.

19.5    **Relationship of the Parties.**  Buyer agrees that nothing in this Agreement creates a joint venture, agency, employment partnership or similar relationship between it and BPWCP, and Buyer shall have no authority to bind BPWCP in any way.  Buyer will not assert otherwise.  Buyer shall undertake all obligations as an independent contractor and shall exercise and be responsible for the exclusive control of the Premises, the employees and all activities conducted there.  Operator shall be responsible for complying with all the applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws. BPWCP shall have no control over employees of the Operator, including without limitation the terms and conditions of their employment.  Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

19.6    **Waiver.**  No purported waiver by either party hereto of any provision of this Agreement or of any breach thereof shall be deemed to be a waiver of such provision or breach unless such waiver is in writing signed by the party making such waiver.  No such waiver shall be deemed to be a subsequent waiver of such provision or a waiver of any subsequent breach of the same or any other provision hereof.

19.7    **Compliance.**  Buyer shall at all times comply with all laws and applicable government requirements and obtain and maintain all necessary licenses and permits for the performance of its obligations hereunder.

19.8    **Authority.**  Buyer hereby represents that as of the date hereof, Buyer has the authority to enter into this Agreement and that no consents of third parties other than those which have been obtained and are attached hereto are necessary to enable Buyer to perform its obligations hereunder. Buyer represents that as of the date of this Agreement, Buyer is in compliance with all leases, contracts and agreements affecting the Premises and Buyer's use and possession of the Premises.

19.9    <u>Prior Course of Dealing.</u>  BPWCP and Buyer acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Buyer and BPWCP by their authorized representatives.

19.10    <u>Further Assurances.</u>  Buyer agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

19.11    <u>Non-exclusivity.</u>  Buyer has no exclusive territory.  BPWCP may establish additional ARCO or other brand or no brand Gasoline or other fueling facilities in any location and proximity to the Premises.

19.12    <u>Other Businesses.</u>  In order to ensure that there is no interference with access for delivery trucks, storage or delivery, Buyer will obtain BPWCP's prior written consent to the placement of any other businesses or equipment on the Premises which consent will not be unreasonably delayed or withheld.

19.13    <u>Ethics.</u>  Buyer acknowledges that giving payments or other inducements to any employee or agent of BPWCP in connection with this Agreement or Buyer's franchise relationship with BPWCP violates BPWCP's ethical policies and entitles BPWCP to terminate this Agreement. Franchisee shall notify BPWCP's Security Department if any employees or agents solicit payments or other inducements.

19.14    <u>Applicable Law.</u>  Except where this Agreement would otherwise be governed by federal law, this Agreement shall in all respects be interpreted, enforced and governed under the laws of the state where the Premises are located.  If any provision of this Agreement should be determined to be invalid or unenforceable, such provision shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions of this Agreement enforceable, and the Agreement as thus amended shall be enforced to give effect to the intention of the parties insofar as that is possible.

19.15    <u>Headings and Gender.</u>  The paragraph headings in this Agreement are intended solely for convenience of reference and shall not in any way or manner amplify, limit, modify or otherwise affect the interpretation of any provision of this Agreement, and the neuter gender and the singular or plural number shall be deemed to include the other genders or numbers whenever the context so indicates or requires.

19.16    <u>Entire Agreement.</u>  This Agreement and the exhibits attached hereto and any written agreements executed contemporaneously with this Agreement relating to the Premises, set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings between the parties, pertaining to the subject matter hereof, and, except as otherwise expressly provided herein, no change in, deletion from or addition to this Agreement shall be valid unless set forth in writing and signed and dated by the parties hereto.

This space is intentionally left blank.

47

Buyer hereby acknowledges having read this Agreement in its entirety and fully understands and agrees to its contents. No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BP West Coast Products LLC

BPWCP

Name _____

Title: _____

Witness: _____

Buyer: _____

Name _____

Title: _____

Witness: _____

Each of the undersigned, as owner, part owner, mortgagee or lien holder, for himself and his legal representatives, successors and assignees, hereby consents to the foregoing agreement, including without limitation, to the installations, maintenance, repair, replacement and removal of all required trade dress and trademarks. Each of the undersigned further waives any interest in, right to levy upon, mortgage or otherwise make any claim against any such trade dress or trademarks and confirms BPWCP's title to and right of removal of any property provided or loaned by BPWCP.

Name _____

Title: _____

Witness: _____

Name _____

Title: _____

Witness: _____

Exhibit A

<u>Trade Dress Requirements</u>

See Attached booklet entitled "Minimum Trademark Standards, Trade Dress Requirements and Trade Dress Options for Selling ARCO Branded Motor Fuels at Retail Outlets".

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

49

Exhibit B

## Shared Trade Dress Costs for ARCO Branded Gasoline Only

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| All Exterior Decals | 100% BPWCP | |
| Interior Decal Kit | 100% BPWCP | |
| Illuminated Building Bullnose | 100% BPWCP | Max. 100 Feet, 50/50 thereafter |
| Canopy  Bullnose LED | 50/50 | |
| Non-illuminated Canopy Bullnose (back of Canopy) | 100% Dealer | |
| ID Sign - Freeway – Sign/Face Only | 100% BPWCP | |
| ID Sign Fwy - Pole and Foundation | 100% Dealer | |
| ID Sign  Face | 100% BPWCP | |
| ID Sign Foundation and Architectural Veneer/Pole | 100% Dealer | |
| ID Sign - Building - 3 x 10 ARCO Logo Sign | 100% BPWCP | |
| Non-ID Sign - 24 Hour Signs | 100% Dealer | |
| Non-ID Sign - Metal Info Signs – Bumper Post, , Tax | 50/50 | |
| Paint | 100% Dealer | |
| Permits for Signage | 100% Dealer | |
| Coming Soon Banners Pump Toppers (all hardware) | 100% BPWCP 50/50 | |
| Quick Crete Cement Trash Container | 100% Dealer | |
| Tank Tags | 100% BPWCP | |
| Channel Letter | 100% BPWCP | |

50

Exhibit B (Continued)

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| Canopy Sparks | 100% BPWCP | (Max. 4 Sparks) |
| VSAT Equipment: (1) Hughes Satellite Dish100% Dealer and (2) Hughes Indoor Unit - Satellite Receiver (3) Deicer (if required for colder climate) | 100% Dealer | |

\* Any costs not set forth as being paid or shared by BPWCP shall be at the sole expense of the Operator/Buyer

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

18 of 18

# AMENDMENT TO CONTRACT
## DEALER GASOLINE AGREEMENT

**(Branded Diesel Fuel)**
Facility: <u>82461</u>
Customer Account: <u>0996439</u>

THIS AMENDMENT, dated as of <u>July 11, 2006</u>, amends the Contract Dealer Gasoline Agreement ("Agreement") dated <u>July 11, 2006</u>, between BP West Coast Products LLC, organized in Delaware ("BPWCP") and <u>STTN Enterprises, Inc.</u> ("Buyer") with delivery premises at <u>631 San Felipe Road, Hollister, CA 95035</u> ("Premises").

It is hereby agreed by and between the parties that effective on the date written above or the Commencement Date of the Agreement, whichever is later, the Agreement is hereby amended to provide that except as set forthbelow, any references to "motor fuels comprising gasolines and gasoline-containing materials bearing the ARCO trademark and other identifying symbols," "gasoline" and "product" shall be construed to include such motor fuels comprising diesel fuel and diesel fuel-containing materials bearing the ARCO trademark and other identifying symbols ("ARCO branded diesel fuels and diesel fuel-containing materials") as Buyer may purchase and receive from BPWCP and BPWCP may sell and deliver to Buyer at the Premises during the term hereof.

It is understood and agreed by and between the parties that Temporary Voluntary Allowances ("TVA's") are not applicable to diesel fuel or diesel fuel-containing materials and, therefore, the terms and conditions relating to TVA's set forth in the Prices provisions, Paragraph 5 of the Agreement, are not amended and supplemented by this Amendment. It is further understood and agreed by and between the parties that, except as herein specifically amended and supplemented, all other terms and conditions of the Agreement, as previously amended and supplemented, shall be and remain in full force and effect.

This Amendment automatically supersedes and terminates, as of the Effective Date hereof, any and all other contracts, agreements or understandings between the parties covering the sale and delivery of ARCO branded diesel fuels and diesel fuel-containing materials to Buyer at the Premises for resale therefrom.

BUYER ACKNOWLEDGES THAT BUYER HAS READ THIS AMENDMENT AND FULLY UNDERSTANDS ALL OF THE TERMS, PROVISIONS AND CONDITIONS HEREOF.

This Amendment is not binding until executed by Buyer and by an authorized officer or manager of BPWCP.

IN WITNESS WHEREOF, the parties have executed this Amendment.

**BP West Coast Products LLC**

_____ 7-11-06
Date

**Franchisee**
**STTN Enterprises, Inc.**

_____ 5/30/0.
Nazim Faquiryan                Date

_____ 7-11-06
Witness                         Date

64

52

Facility #<u>82461</u>
AR#<u>0996439</u>

<u>Contract Dealer</u>
<u>Access and Maintenance Services Agreement</u>
<u>For VSAT Equipment</u>

Agreement between <u>STTN Enterprises, Inc.</u> ("Owner") and BP West Coast Products LLC ("BPWCP") dated _July 11, 2006_.

## WHEREAS

Owner operates an ARCO gasoline franchise located at <u>631 San Felipe Road, Hollister, CA 95035</u> ("Premises").

Whereas the Owner is required to utilize VSAT equipment for communication in connection with the operation of the franchise business

BPWCP has an agreement for access and maintenance services with Hughes Network Systems ("HNS") for maintaining the very small aperture terminal ("VSAT") Equipment at ARCO locations.

## THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. BPWCP will notify HNS that Owner is to receive the same maintenance services for the Equipment listed in Exhibit "A" as BPWCP receives for the same or similar equipment.

2. PES Maintenance Service
   a. HNS shall provide the hub access and Maintenance Services to keep the Personal Earth Station ("PES") Equipment listed in Schedule A in, or restore the Equipment to, good working order, subject to the terms and conditions hereinafter provided.
   b. Owner agrees to provide HNS with full, free and safe access to Equipment.
   c. HNS will restore Owner's PES Equipment to good working condition by performing the following corrective maintenance as required:
      i. Diagnostic testing to determine the existence and cause of the malfunction
      ii. Removal and replacement of any malfunctioning Equipment
      iii. Reorientation (repointing) of the antenna subsystem
      iv. Repair and replacement of PES interconnecting cables
      v. Reloading initializing instructions and recommissioning
      vi. Verification of proper operations and completion of service report
      vii. Notification to the Owner host that Equipment has been restored to operational status
      viii. Repairs for outages caused by birds' nests or high winds whose velocity is less than the greater of 125 miles per hour or the velocity specified by the manufacturer of the equipment

3. Period of Maintenance – the period of Maintenance Services is seven (7) days a week, twenty-four hours a day (7x24) including holidays.

53

4. Response Times
   a. HNS will attempt to provide all BPWCP accounts four (4) hour average resolution Ninety percent (90%) of the time, but actual resolution times will vary depending on the severity of the problem
   b. Field Service Dispatch – HNS will authorize field Service dispatch, according to the maintenance response timetable given below:

Maintenance Response Time Table

| Distance from Service Office | Response Time |
|---|---|
| 0-50 miles | 4 hours |
| 51-100 miles | 5 hours |
| 101-150 miles | 6 hours |
| 151-200 miles | 10 hours |
| Over 200 miles | 24 hours |

5. Charges and Payments
   Owner will pay BPWCP $90, payable by Electronic Funds Transfer between the first and fifteenth day of each month, at BPWCP's discretion. The charges may change if the Equipment on Exhibit A is changed or upgraded or if the equipment warranty coverage changes during the term of this Agreement.

6. Services for Additional Time and Materials Charges
   PES Maintenance Services beyond the service coverage selected or beyond the scope of this Agreement are available on a best reasonable effort basis at the Demand Service Rate se forth in Exhibit B.
   a. PES Maintenance Services Not Included
      i. Parts or equipment damaged or lost through catastrophe, accident, lightening, theft from Owner's premises, misuse or negligence by Owner or Owner's agents, or failure of, or faulty, electrical power, operator error, or malfunction of data communication Equipment not provided to Owners by Hughes.
      ii. Implementation of changes, modifications, or alterations in or to the Equipment other than upgrades and configuration changes approved by HNS.
      iii. Removal of the Equipment or any accessories, attachments, or other devises.
   b. Additional HNS charges will be billed to owner's trade statement by BPWCP and are due and payable within 10 days of such statement and all such charges may be collected by BPWCP via EFT. Owner acknowledges that if HNS deems the services are not part of the PES Maintenance Services, Owner will reimburse via EFT for all charges for such services.

7. Price Increase
   On the anniversary of Commencement Date during the Initial Term or any Renewal Terms hereafter, pricing may be increased by the percentage by which the Consumer Price Index (CPI) for all Urban Owners; U.S. City Average as published by the U.S. Department of Labor, Bureau of Labor Statistic, has increased during the pervious May-to-May period.

8. Term

   The term of this agreement shall be one (1) year, and shall automatically be renewed for additional one (1) year terms provided that either party may terminate on 30 days prior written notice if the VSAT equipment at the Premises is removed or if the agreement between BPWCP and HNS is terminated and no new agreement is entered into.

If the Contract Dealer Gasoline Agreement between Owner and BPWCP is terminated or expires, this Agreement will terminate or expire at the same time.

**IN WITNESS WHEREOF,** the parties have duly executed this agreement on the date first written above.

OWNER: **STTN Enterprises, Inc.**
Nazim Faquiryan

By_____

Title:_____

BPWCP

By_____

Title:_____

67

55

## PES EQUIPMENT LIST
### EXHIBIT A

| Item | Qty |
|---|---|
| 1.0 or 1.2 Meter Antenna | 1 |
| Indoor Unit | 1 |
| Ethernet port | 1 |
| Serial ports | 2 |
| **TOTAL MONTHLY CHARGE** | **$90** |

Note: Monthly Maintenance Charge to Commence upon successful completion of installation and activation of VSAT equipment.

## DEMAND SERVICE RATE
### EXHIBIT B

1. T&M Rates
   a. $125 per onsite hour
   b. Material at a mutually acceptable cost
   c. Round-trip travel charges between service center and Owner site as follows:

   | | |
   |---|---|
   | 1-25 miles | $70 |
   | 26-50 miles | $130 |
   | 51-100 miles | $260 |
   | 101+ miles | $430 |

2. False Call-Out Charge

   In the event that Owner calls out an HNS Service Representative to a PES site, and such Representative determines that the problem was not caused by HNS, HNS may assess a False Call-Out charge of $200 per instance, or HNS will charge $125.00 per hour with a one (1) hour minimum.

68

5€

Facility Number: 82461

### ADDENDUM TO CONTRACT DEALER GASOLINE AGREEMENT
### (PAYPOINT NETWORK NON-LESSEE RETAILER) *

This ADDENDUM, effective _____, ("Effective Date") is attached to, incorporated in and made a part of the Contract Dealer Gasoline Agreement, dated _July 11, 2006_, by and between BP West Coast Products LLC ("Franchisor") and STTN Enterprises, Inc. ("Franchisee"), the operator of an ARCO location located at 631 San Felipe Road, Hollister, CA 95035 ("Facility").

1.  **Agreement**

    Franchisor shall provide PayPoint® Network Service ("PayPoint Network") to Franchisee. Franchisee shall perform as provided herein.

2.  **Definitions**

    (a)  The term "PayPoint Network" shall mean those services more fully described in Paragraph 3 below.

    (b)  The term "Approval" shall mean that, for a Transaction entered into the PayPoint Network, Financial Institution or the PayPoint Network has caused a response to be transmitted to Franchisee through the PayPoint Network which indicates that the Transaction is approved or, for preauthorized transactions, e.g. gasoline purchases, that certain products or services may be purchased or performed, e.g. that gasoline may be pumped.

    (c)  The term "Denial" shall mean that Financial Institution has caused a response to a Transaction to be transmitted through the PayPoint Network which indicates that the Transaction is not approved.

    (d)  The term "Working Day" shall mean any day except Saturdays, Sundays and any other days on which financial institutions are regularly closed.

    (e)  The term "access card" shall mean an access card issued, directly or indirectly, by a participating Financial Institution to a Cardholder of such Financial Institution. An access card shall have the name of the Cardholder encoded and/or embossed thereon and/or a name, number or code which identifies such access card as being issued by a Financial Institution.

    (f)  The term "Cardholder" shall mean a natural person or entity doing banking business with a participating Financial Institution and to whom such Financial Institution has issued or proposes to issue an access card. The term "Cardholder" includes a natural person or entity purporting to be such Cardholder.

    (g)  The term "Transaction" shall mean each use of an access card by a Cardholder for the purpose of paying for a purchase of a product or service or receiving cash or a refund from Franchisee through use of the PayPoint Network to which a participating Financial Institution responds with an approval or denial code.

    (h)  The term "deposit account" shall mean the checking, savings and/or other account of Cardholder at a participating Financial Institution that is accessible via an access card.

    (i)  The term "PayPoint Account(s)" shall mean the accounts at participating Financial Institutions or participating networks to which funds from Cardholders' deposit accounts shall be transferred. These funds so transferred shall be used to credit Retailer's Accounts.

1/2/90
New or Existing BPWCP Non-Lessee Paypoint Retailer: All States

57

(j)  The term "Retailer's Account" shall mean the account maintained by Franchisee at a financial Institution that is a member of the Cal-Western Automated Clearing House Association or the National Automated Clearing House Association and named by Franchisee on Exhibit C, attached hereto, incorporated herein and made a part hereof, as the account into which deposits resulting from Cardholder Transactions at Franchisee's location are made.

(k)  The term "POS Terminal," "POS System," or "POS Equipment" shall mean the point-of-sale device(s) or system used by Franchisee, which must meet the communications protocol and criteria of the PayPoint Network.

(l)  The term "Settlement Day" shall mean any day excluding weekends and the following holidays: New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day as well as any other days on which the Settlement Bank(s) are closed.

(m)  The term "participating Financial Institution," "Financial Institution," or "Network" shall mean the financial institutions, networks or Members or Affiliates of participating networks which execute agreements with Franchisor to participate in or provide services through the PayPoint Network.

3.  PayPoint Network Description

The PayPoint Network shall enable Cardholders to receive cash or to pay for purchases of products and services by means other than cash, money order or check.  Each Cardholder shall use an access card to initiate a Transaction.  Franchisee shall promptly honor all valid access cards when presented by Cardholders and shall treat Cardholders from all participating Financial Institutions equally.  Franchisee shall use a POS Terminal and may also use one or more Island Card Reader devices ("ICR Device") that are in communication with the PayPoint Network computer facility(ies).

When the Cardholder's access card is inserted in the POS Terminal or ICR Device, information encoded on the magnetic stripe on the reverse of the access card shall be read by a magnetic stripe reader.  The Cardholder shall enter his or her Personal Identification Number ("PIN") on a key pad.  The encoded information, the encrypted PIN, the purchase amount or preauthorization request, and such other data regarding the Transaction as Franchisor may reasonably require, shall be transmitted from the POS Equipment to the Pay Point Network computer facility(ies) and from the PayPoint Network computer facility(ies) to a participating Financial Institution.  Financial Institution shall respond with either an approval or denial for the requested Transaction.

With certain types of POS equipment, certain purchases, e.g. gasoline, may be preauthorized by the participating Financial Institution before any product or service is purchased or performed;  the actual purchase amount shall be transmitted to the

Financial Institution after the Cardholder has obtained such product or service.  It is understood and agreed that the actual purchase amount shall be no more than the amount preauthorized.

The final purchase amount shall subsequently be debited form the Cardholder's deposit account and credited to the Retailer's Account via the PayPoint Account(s).  Franchisee shall not permit anyone to complete a Transaction unless Franchisee has received approval through the PayPoint Network.

4.  Rent

Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor, or the Commencement Date, as defined below, if this is the initial PayPoint Agreement between Franchisee and Franchisor or, where applicable, the first day of the thirteenth month following the Commencement Date, Franchisee shall pay to Franchisor, for participation in the PayPoint Network, transaction fees in the amount set forth on Exhibit A, which is incorporated herein, made a part hereof and attached hereto.  Such fees shall be due and payable to Franchisor on or before the tenth day of the month following the month in which such fees were incurred during the term of this Addendum.  Provided, however, that if Franchisee installs and ICR device at the Facility prior to the Commencement Date and operates it thereafter, Franchisee shall pay no fees for participation in the PayPoint Network for the first twelve months following the Commencement Date and 50% of the applicable fees for the balance of the term of this Agreement.  The term "Commencement Date" shall mean the date on which the first "live" Transaction, that is, a Transaction involving a Cardholder at the Facility, is provided to Franchisee through the PayPoint Network.

58

Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor or, if this is the initial PayPoint Agreement between Franchisee and Franchisor, on the Commencement Date, and thereafter on or before the first day of each month during the term of this Addendum, Franchisee shall also pay Franchisor telephone line charges set forth on Exhibit A. It is understood that if Franchisee's product agreement(s) with Franchisor expires within the first twelve months following the Commencement Date and Franchisee and Franchisor execute a new Addendum to Contract Dealer Gasoline Agreement (PayPoint Network Non-Lessee BPWCP Retailer) and Franchisee has installed and is operating an ICR Device and is therefore eligible for the waiver of transaction fees as set forth above, Franchisee shall pay no transaction fees for participation in the PayPoint Network for the number of months remaining of the original twelve month waiver period following the original Commencement Date referred to in this Addendum.

If Franchisor terminates this Addendum at any time during the term of this Addendum for cause or because Franchisee has been designated a Special Retailer as described in Paragraph 14, or if Franchisee elects to terminate this Addendum at the end of the thirteenth month following the Commencement Date, as provided below for Franchisees on their initial PayPoint agreement, Franchisee shall pay Franchisor as set forth on Exhibit D, attached hereto, incorporated herein and made a part hereof, for disconnection and removal of telephone lines. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all fees, and sales, use, rental, gross receipts, inventory, excise, income and any other taxes (including interest, penalties, and additions to tax) imposed by any federal, state or local governmental authority upon Franchisee or Franchisor (except those taxes based upon or measured by the net income of Franchisor) in connection with any payments made pursuant to this Addendum. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges or the use of any loaned property. Franchisee shall furnish to Franchisor, promptly upon request, any documentation, which in Franchisor's discretion is required to evidence the payment of any tax, including, but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and canceled checks.

If this is the initial PayPoint agreement between Franchisee and Franchisor, on the first day of the thirteenth month following the Commencement Date, Franchisee shall have the option, upon giving Franchisor at least 30 days prior written notice, to terminate this Addendum; to downgrade to the number of PayPoint Electronic Cashiers (Island CardReaders), if applicable; to downgrade to the Paypoint Cashier only (ARCOmatic terminal), if applicable; or the downgrade to the PayPoint Authorization Terminal (low end terminal device). Any downgrading of equipment is at Franchisee's sole cost and expense.

5.    Security
Franchisee shall require each Cardholder to enter his or her PIN on the POS Equipment at the Facility in order to initiate a Transaction, except to complete Preauthorized Transactions. All Cardholder PINs transmitted to Franchisor must be encrypted at the POS Terminal or ICR Device where the PIN is entered and must remain encrypted from such point of entry throughout the PayPoint Network. After completion of the Transaction, no PINs shall be retained by Franchisee. Franchisee agrees to take all precautions Franchisor may reasonably require to ensure security of data transmitted between the Franchisee location and participating Financial Institutions and in no event shall Franchisee permit PINs to be transmitted "in the clear."

6.    Transaction Approval or Denial
It is understood that participating Financial Institutions have sole discretion to give approval or denial to Transactions requested by Franchisee and a Cardholder. Franchisee agrees to draw no positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial.

59

7.  Access to Franchisee Location; Promotion and Evaluation of PayPoint Network
Franchisee agrees to provide reasonable access to the Franchisee location to Franchisor's employees, agents and contractors and, if accompanied by Franchisor's employees, agents or contractors, to participating Financial Institutions. Franchisee acknowledges that Franchisor and participating Financial Institutions, shall require access to install and test the PayPoint Network Service and equipment, to demonstrate PayPoint Network Services to Cardholders, to study Cardholder use of the PayPoint Network and to ensure Franchisee's compliance with this Addendum.

To the extent permitted by law, Franchisee agrees to place, at the Franchisee location, promotional and other materials provided by Franchisor. Franchisee agrees further to cooperate with Franchisor in it efforts to promote and evaluate the PayPoint Network.

8.  Interruption of Service
Franchisor and Franchisee shall cooperate to resolve any system malfunction or problem that interrupts normal operation of the PayPoint Network. Franchisor shall provide instructions and procedures for the handling of Transactions that are initiated when communications between Franchisor, the participating Financial Institutions and the Franchisee location are interrupted. Franchisee shall immediately notify Franchisor's Maintenance Department if there is an interruption of the PayPoint Network.

9.  Cardholder Refund or Reversal/Void Transactions
Cardholder refund transactions shall not be processed electronically, but shall be processed by refunding cash or otherwise reimbursing the Cardholders. Receipts shall be made available to Cardholders in accordance with Paragraph 10 of this Addendum for all such Transactions.

10.  Receipts
For each Transaction approved through the PayPoint Network, Franchisee shall make a receipt available to the Cardholder. The receipt shall contain all information required by Federal Reserve Board Regulation E or other applicable laws and regulations. Receipts shall include the following information: Cardholder's access card number, name and location of the Facility, date, time, amount of Transaction, type of Transaction (payment), type of account to or from which funds are transferred (unless only one type of account may be accessed), Franchisor assigned transaction or trace number and/or Financial Institution assigned reference number if the Transaction has been transmitted to Financial Institution, and, if applicable, any Transaction Fee.

Franchisee understands and agrees that portions of this Addendum are for the benefit of participating Financial Institutions and therefore, if Franchisee breaches some of the terms and conditions of this Addendum, including but not limited to:

(a) breaches of the Receipt provisions of this Paragraph 10;

(b) breaches of the Cardholder Dispute provisions of Paragraph 11 of this Addendum;

(c)  initiation or attempt to initiate by Franchisee or its agents or employees unauthorized transactions;

(d) uses of any participating Financial Institution's name or marks or references to any participating Financial Institution in any advertising, point of purchase material, news release or trade publication without Franchisor's prior written consent or the sublicense or attempt to sublicense Franchisee's right to use such name or marks after receiving such consent;

(e) failure to display, to the extent permitted by law, promotional and other materials as required by Paragraph 7 of this Addendum or failure to cease using and return any such materials should any participating Financial Institution withdraw from PayPoint Network participation;

(f)  drawing a positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial in breach of the provisions of Paragraph 6 of this Addendum;

72

60

(h) failure to follow the PayPoint Network procedures set forth in Paragraph 3 of this Addendum;

(i) breaches of the Confidentiality/Non-Disclosure provisions of Paragraph 16 of this Addendum;

(j) breaches of the Security provisions of Paragraph 5 of this Addendum; or

(k) breaches of the Indemnification provisions of Paragraph 15 of this Addendum.

Franchisor or participating Financial Institution(s) shall have the right to name Franchisee a "Special Retailer" and to recover from Franchisee for the amount of all claims, liability, losses and expenses, notwithstanding any limits contained in Paragraph 15 of this Addendum, and (including, without limitation, attorneys fees) asserted against or incurred by Franchisor or such Financial Institution(s) as a result of such breach. Such right to recover on the part of Franchisor or participating Financial Institutions shall include the right to debit the Franchisee's Trade Statement or electronically debit Retailer's Account, if Franchisee has not forwarded such amount to Franchisor within a period of time specified in a notice to the Franchisee. Such third party beneficiary rights shall be enforceable against Franchisee despite any defenses Franchisee may have against Franchisor.

Furthermore, Franchisee understands and agrees that a breach of this Addendum may be grounds for termination/non-renewal of the Contract Dealer Gasoline Agreement.

11.    Resolution of Disputes

(a) Cardholder Disputes
Franchisee acknowledges that participating Financial Institutions are required by Federal law to resolve errors asserted by Cardholders, and to provide documentation requested by Cardholders, within certain time limits. Franchisee agrees to cooperate with Franchisor and participating Financial Institutions to resolve Cardholder disputes or inquiries about PayPoint Network Transactions. To facilitate resolution of Cardholder disputes, Franchisee shall retain, for a period of at least one hundred eighty (180) days, copies of receipts issued to Cardholders pursuant to Paragraph 10 of this Addendum, or reports from which Transaction information can be retrieved. In response to an oral request by Franchisor or a participating Financial Institution, to be confirmed in writing, Franchisee shall, within three (3) Working Days of the oral request, send documentation to Franchisor or to such Financial Institution, as instructed by Franchisor, showing requested receipt information for any Transaction that occurred within the previous one hundred eighty (180) days. If Franchisee fails to provide the requested information within three (3) Working Days, Franchisor shall, at the request of the participating Financial Institution, debit Franchisee's Trade Statement or electronically debit the Retailer's Account for the amount disputed by the Cardholder and credit, through the participating Financial Institution, the Cardholder's deposit account for the amount disputed. The obligations of this Paragraph 11 shall survive termination of this Addendum. Detailed procedures for customer dispute resolutions are incorporated herein, made a part hereof and attached hereto as Exhibit B.

(b) Franchisee Disputes
Franchisee agrees to review all Franchisee Account Statements and Management Reports (including journal tapes, daily sales reports and Management Report Printer tapes) and, within 60 days of a Transaction, to notify the PayPoint Network computer facility(ies) by telephone, to be confirmed immediately in writing, of any errors, discrepancies or disputes that Franchisee has concerning such Transaction. Neither Franchisor nor participating Financial Institutions shall be liable for errors, discrepancies or disputes of which Franchisee fails to notify Franchisor within such 60 day period. If the resolution of the error, discrepancy or dispute by Franchisor or a participating Financial Institution involves a credit to Franchisee, Franchisor shall pay Franchisee such credit by check.

(c) Disputes Over Merchandise or Service
Franchisee shall handle all disputes over quality of merchandise or services purchased from Franchisee by Cardholders directly with Cardholders and shall indemnify and hold Franchisor and participating Financial Institutions harmless from any claim, action, damage or expense, including strict liability in tort, arising out of such disputes or the sale of goods or services by Franchisee; provided, however, to the extent Franchisee's petroleum or non-petroleum franchise agreements, if any, are contrary to this provision as to Franchisor, such petroleum or non-petroleum franchise agreement shall be controlling as to Franchisor.

12.    **Transaction Error Resolution**

In certain unusual circumstances, Retailer's Account may be erroneously credited with an amount for a Transaction that did not occur at the Franchisee location or with a duplicate of an amount of a Transaction or fees for which Retailer's Account was previously credited. In such circumstances, Franchisee shall, within three (3) Working Days of receipt of an oral request, provide Franchisor with the amount of such erroneously credited or duplicate amount. If Franchisee fails to provide Franchisor with such amount, Franchisee agrees that Franchisor shall have the right to debit Franchisee's Trade Statement or electronically debit Retailer's Account for the amount of such erroneously credited or duplicate amount so that Franchisor may properly credit the Cardholder or other retailer's account.

13.    **Settlement; Settlement Reporting**

Franchisor shall process all approved Transactions captured each Settlement Day and any preceding non-Settlement Day and make arrangements for the funds to which Franchisee is entitled to be deposited into his or her Retailer's Account.

Deposit and Transaction totals shall be made available to Franchisee by way of the POS Terminal, if possible; otherwise, by way of written reports. Franchisor shall also mail to Franchisee, on request, summary reports of PayPoint Network Transactions at the Facility.

14.    **Term; Termination**

Except as otherwise provided in this Addendum, PayPoint Network Service shall be provided from the Effective Date or, where applicable, the Commencement Date until the termination or expiration of Franchisee's Contract Dealer Gasoline Agreement with Franchisor. The Commencement Date shall be set forth in a notice from Franchisor to Franchisee.

Franchisor may terminate this Addendum for any reason upon at least ninety (90) days advance written notice to Franchisee. For cause, Franchisor may terminate this Addendum immediately upon giving written notice to Franchisee. In addition, Franchisor may, at its sole option, terminate Franchisee's ability to accept access cards from certain participating Financial Institutions or terminate this Addendum or the Contract Dealer Gasoline Agreement immediately if a Financial Institution notifies Franchisor that it has designated Franchisee as a "Special Retailer," _i.e._, a Franchisee that Financial Institution has reason to believe has originated unauthorized Transactions to a Cardholder's deposit accounts or a Franchisee from whom an excessive number of Transactions are ultimately subject to chargeback, that is, debit of Franchisee's Trade Statement as more fully described in Paragraph 10 of this Addendum or a Franchisee who violated or failed to comply with the Security provisions referred to in Paragraph 5 of this Addendum. On the first day of the thirteenth month following the Commencement Date, Franchisee may terminate this Addendum for any reason upon at least thirty (30) days advance written notice to Franchisor. In the event of termination, Franchisee shall return to Franchisor all instructional and promotional material Franchisor has provided for use with the PayPoint Network and shall cease to use and display the "Marks" as defined in Paragraph 17a and participating Financial Institutions' trademarks, trade names and trade indicia and shall remove all decals and signs indicating Franchisee's participation in the PayPoint Network and, if Franchisee is terminated for cause or because he/she has been designated a Special Franchisee, Franchisee shall pay the applicable amount set forth on Exhibit D.

In the event Franchisee refuses to, or is unable to return the material and/or to cease use and display, then Franchisor shall have the right to enter Franchisee's Facility and remove all such material, decals, and signs, and Franchisee agrees to pay the costs therefor.

15.    **Indemnification**

Each party shall indemnify the other and hold it harmless and Franchisee shall indemnify participating Financial Institutions from any claim, action, damage or expense of any kind arising solely from fault or neglect of the indemnifying party, including but not limited to claims of infringement of any patent, copyright, trade secret or other proprietary right in the operation of the PayPoint Network. Neither party shall be liable to the other for any special, indirect or consequential damages, including but not limited to lost profits, even if the parties have knowledge of the possibility of such damages.

Franchisee shall indemnify, hold harmless and defend Franchisor and participating Financial Institutions from and against all claims, losses, costs, damages, liabilities, and expenses (including reasonable attorneys' fees) which are suffered as a result of any Transaction or attempted Transaction and arise out of:

62

(a)   Personal injury or tangible property damage suffered or incurred by any person on Franchisee's premises;

(b)   Negligence or fraudulent conduct of Franchisee, Franchisee's agents and employees and independent contractors;

(c)   Unauthorized entry of data into the PayPoint Network or any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution's debit card system/network, and POS equipment;

(d)   Unauthorized receipt of data from any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution and POS Equipment;

(e)   Disputes over Franchisee's sale or lease of goods or services; or

(f)   Failure of Franchisee, its employees, agents and its independent contractors to comply with this Addendum, or with applicable federal, state, or local laws, rules or regulations.

However, Franchisee shall not be liable for the failure by any Financial Institution to discover a Technical Error, originated by Franchisee.

16.     Confidentiality; Nondisclosure

Franchisee acknowledges that all information that is disclosed to, or comes to the attention of Franchisee for purposes of the development or operation of any aspect of the PayPoint Network (herein "Information") is strictly confidential. Franchisee agrees that Franchisee shall not use for any purpose other than Franchisee's use of the PayPoint Network or disclose said Information or knowingly permit Franchisee's employees or contractors to disclose said Information to any person outside Franchisor and Franchisee, or to any employee or contractor of Franchisor or Franchisee who does not have a specific need to know in performance of work hereunder.

Franchisee acknowledges that participating Financial Institutions have a responsibility to their Cardholders to keep all records pertaining to Cardholders' banking transactions (herein "Cardholder Information") strictly confidential. Franchisee shall maintain the confidentiality of Cardholder Information.

This paragraph shall not prevent the participating Financial Institutions from disclosing to their Cardholders information about such Cardholders' individual transactions.

Franchisor agrees to use reasonable care to avoid disclosure of information relating to sales by Franchisee (herein "Sales Information") other than to Financial Institutions and other third parties who require access to Sales Information for purposes relating to Franchisee's use of or Franchisor's operation of the PayPoint Network. Franchisor's obligation of non-disclosure shall not apply to any Sales Information which is or becomes available to the public other than through breach of this Addendum by Franchisor. It is presently Franchisor's policy (which may be changed at any time by Franchisor at its sole option without notice) to destroy all records of Sales Information after two (2) years. Franchisor's obligation of non-disclosure with respect to Sales Information shall terminate upon destruction of such Sales Information.

The obligations of this Paragraph 16 shall survive termination of this Addendum.

63

17.    Service Mark License

(a)    PayPoint, PayPoint Electronic Cashier, PayPoint Cashier, PayPoint Network, PayPoint and "Triangle" design, Electronic PayPoint, and the "Triangle" Design (hereinafter called "Marks") are service marks of Franchisor.

(b)    During the term of this Addendum, Franchisor grants to Franchisee for use at Franchisee's Facility a non-exclusive license and right to use the marks in connection with the PayPoint Network as defined in Paragraph 3, but only so long as such services are performed using equipment approved by Franchisor and such equipment is maintained in good operating order and is operated in accordance with Franchisor's training program and guidelines as promulgated from time to time by Franchisor.

(c)    Franchisor shall have the right at all time to enter Franchisee's Facility for the purpose of inspecting the equipment used with the PayPoint Network, and to satisfy itself that services are being provided to the public according to Franchisor's standards.

(d)    During the term of this Addendum, Franchisee shall be permitted to use and display the marks and other names and trade indicia used or authorized for use by Franchisor in connection with the PayPoint Network, but only in accordance with standards as set forth from time to time by Franchisor for the type of facility Franchisee is operating.  Franchisee shall only be permitted to use or display names, marks, symbols, or trade indicia belonging to participating Financial Institutions in conjunction with PayPoint equipment or on advertising upon Franchisor's prior approval, and such use and display is subject to whatever restrictions Franchisor or such institutions may prescribe.

(e)    Franchisor expressly reserves the right to change, alter, modify, or withdraw the Marks, or any of them including the PayPoint name, at any time by giving Franchisee not less than thirty (30) days prior written notice thereof.  In the event of such change, alteration or modification, Franchisee agrees that it shall henceforth not use the mark or name which has been changed, altered, modified, or withdrawn.  In the event the PayPoint name is changed, altered, modified, or withdrawn by Franchisor, it is agreed that the new name or Mark shall be substituted for "PayPoint Network" as it appears in this Addendum.

(f)    Franchisee recognizes Franchisor's ownership and title to the Marks and shall not claim adversely to Franchisor any right, title, or interest thereto.  Particularly, Franchisee agrees, during and after the term of this Addendum, not to use, register or attempt to register as a trademark or as a trade or corporate name, or aid any third party in registering or attempting to register, any of the Marks or any marks, names, or symbols confusingly similar thereto, or incorporating one or more of the words in such marks or names as trademarks or service marks, or as trade or corporate names.

(g)    All use of the Marks by Franchisee shall inure exclusively to the benefit of Franchisor and Franchisor may utilize such use in registering or defending such Marks.  Franchisee agrees to cooperate with Franchisor in providing evidence or testimony relative to or supporting Franchisee's use of said Marks.  Any registrations obtained by Franchisee contrary to Section (f) shall be held in trust for Franchisor and assigned by Franchisee to Franchisor upon Franchisor's request.

(h)    Upon termination of this Addendum or the Contract Dealer Gasoline Agreement, the undertakings and duties of Franchisee in Sections (f) and (g) shall survive and Franchisee shall cease using and remove the Marks and any names, marks, symbols, or trade indicia of participating Financial Institutions as set forth in Paragraph 14 of this Addendum.

18.    Force Majeure

No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Addendum to the extent that it arises from causes beyond the control and without fault or neglect of the party otherwise chargeable with failure, delay or default, including but not limited to:  action or inaction of governmental, civil or military authority; strike, lockout or other labor dispute; war, riot or civil commotion; theft, fire, flood, earthquake, natural disaster; or default of a common carrier.

The party wishing to rely on this paragraph to excuse failure, delay or default shall, when the cause arises, give the other party prompt written notice of the facts constituting same, and when the cause ceases to exist, give prompt notice to the other party.

19. <u>Assignment</u>
Franchisee shall not assign any of its rights or delegate any of its obligations pertaining to the PayPoint Network without the prior written consent of Franchisor. Any assignment or delegation made without such prior written consent shall be void and any assignment or delegation to which Franchisor consents must be in conjunction with an assignment of the Contract Dealer Gasoline Agreement.

20. <u>Prices, Goods and Services</u>
No provision of this Addendum shall be construed as an agreement by Franchisor or participating Financial Institutions to the retail prices charged or the quantity or quality of goods sold or services rendered by Franchisee to Cardholders or to customers of Franchisee.

21. <u>Independent Contractor</u>
Franchisor and Franchisee are independent contractors with respect to the subject matter of this Addendum and neither party nor its employees shall be deemed for any purpose to be the agent, employee, servant or representative of the other with respect to the subject matter of this Addendum.

IN WITNESS WHEREOF, the parties have executed this Addendum, or caused it to be executed on their behalf on the dates indicated below.

**BP West Coast Products LLC**

Franchisee
**STTN Enterprises, Inc.**

_____ 7-11-06
                    Date

_____ 6/20/06
Nazim Faquiryan        Date

_____ 7-11-06
Witness                Date

65

**BPWCP Contract Dealer/Distributor**

PayPoint Network Fees

| Transactions per Month | Fee per Transaction |
|---|---|
| 0 to 1,000 | $.10 |
| 1,001 to 2,000 | .08 |
| 2,001 to 3,000 | .06 |
| 3,001 to 4,000 | .04 |
| Over 4,000 | .02 |

Minimum Monthly Charge = $60.00

There will be no transaction fee during the first 12 months following the Commencement Date if Retailer installs a PayPoint Electronic Cashier®, purchased through BPWCP, at the pump island.

Phone Line Fee Options:

Leased Line -- $200 per month plus any phone company pass-through costs including installation for each dedicated line.

or

Dial Line -- installation costs plus monthly phone charge including per item phone calls.

Billing and Payment Terms:

Unless Retailer is entitled to 12-month waiver of the fee as set forth above, a fee will be charged for each Transaction. By the twentieth day of the following month, Retailer will be issued an invoice for: the total transaction times the fee per transaction for the tier achieved; the monthly phone line fee; and any portion of the monthly minimum not achieved. Invoices are payable upon receipt.

If Retailer's Contract Dealer or Distributor Agreement expires and is not renewed or is canceled prior to the expiration of the PayPoint Retailer Agreement, the PayPoint Agreement will be canceled or, at BPWCP's option, can be converted to a Non-BPWCP PayPoint Retailer Agreement.

Transaction Definition:

A "Transaction" means each use of an access card by a Cardholder for the purpose of paying for a purchase of a product or service or receiving cash, scrip, a refund or a reversal/void from Retailer's Facility through use of the PayPoint Network to which a participating Financial Institution responds with an Approval or Denial code.

**EXHIBIT B**

Retailer Resolution of Cardholder Disputes

PayPoint Network

A cardholder dispute is initiated when a financial institution is notified of its cardholder's complaint. If a cardholder informs a Franchisee that a problem exists with a transaction made at the retail facility prior to the date of the complaint, the Franchisee should inform the cardholder that the complaint should be taken to the cardholder's financial institution. All resolutions must originate at the cardholder's financial institution.

Examples of complaints:

a)   Cardholder was charged twice for a purchase.

b)   Cardholder never made the purchase, he/she was billed for by his/her financial institution.

Procedure for resolution of cardholder complaints by the PayPoint Network:

1)   Cardholder disputes a transaction and notifies financial institution.

2)   Financial institution then notifies the Franchisor switch of the problem.

3)   The switch researches its records and makes every effort to find the disputed transaction in order to resolve the problem.

4)   However, if the switch is unable to find the disputed transaction in the records maintained at the switch, the Franchisee will be notified via telephone. The switch contact person will provide the Franchisee with the data furnished by the financial institution and request a copy of the cardholder receipt and/or a copy of the Management Report Printer (MRP) report showing the disputed transaction information.

5)   This telephone request will be immediately followed by a written request - a copy of the PayPoint Network Retailer Transaction Information Request form containing all the required transaction information. This form will be mailed to the Franchisee within one (1) working day of the telephone call. A copy of this form is attached.

6)   The Franchisee will have only three (3) working days after receipt of the request to research the transaction and send the requested information to the financial institution listed on the form.

7)   The Franchisee is subject to chargeback of the transaction amount in question if the requested information is not sent within three (3) working days.

8)   The Franchisee must send a copy of the completed PayPoint Network RetailerTransaction Information Request form along with a copy of the customer receipt and/or MRP report (the same information furnished to the financial institution) to the Franchisor switch within one (1) working day of sending the information to the financial institution.

67

EXHIBIT C

<u>PayPoint Network Retailer Account Designation*</u>

RETAILER: _____

ADDRESS: _____

CITY: _____

STATE/ZIP CODE: _____

I HEREBY AUTHORIZE BP WEST COAST PRODUCTS LLC, , TO CREDIT THE ACCOUNT** DESCRIBED BELOW FOR SETTLEMENT PURPOSES FOR SERVICES PROVIDED THROUGH THE BPWCP PAYPOINT NETWORK.

THE ACCOUNT TO WHICH SUCH CREDITS SHOULD BE APPLIED IS

ACCOUNT NO. _____

AT _____

BRANCH NO. _____


PAYPOINT NETWORK RETAILER

BY: _____

TITLE: _____

DATE: _____


* If Retailer has different Retailer's Accounts for its Retailer's Facilities, an Exhibit C must be completed for each different Facility.

**FINANCIAL INSTITUTION MUST BE A MEMBER OF NACHA.

68

**PAYPOINT NETWORK**

**Retailer Transaction Information Request**

CLAIM NO.: _____

DATE CLAIM RECEIVED: _____

TODAY'S DATE: _____

A dispute has been filed by a cardholder regarding the following transaction:

FI CARD NO.: _____

TRANSACTION AMOUNT: _____    TRANSACTION DATE: _____

TRANSACTION TIME: _____    REFERENCE NO. _____

Please return a copy of cardholder receipt or management report printer (MRP) report showing requested financial data within three (3) working days to:

FINANCIAL INSTITUTION: _____

ADDRESS: _____

_____

CONTACT PERSON: _____

YOU ARE SUBJECT TO CHARGEBACK OF TRANSACTION AMOUNT IN QUESTION IF "REQUESTED INFORMATION" IS NOT SENT <u>WITHIN THREE (3) WORKING DAYS</u>

Franchisee:
Return a copy of this form along with copy of cardholder receipt and/or MRP report to:

NAME: _____

ADDRESS: _____

_____

DATE INFORMATION SENT TO FINANCIAL INSTITUTION: _____

81

69

EXHIBIT D

POS and Remote Equipment
Disconnection and Removal
<u>Fee Schedule</u>

| | |
|---|---|
| Telephone Line Disconnection | $200.00 |
| Each Inside Terminal Disconnection and Removal | $200.00 |
| Each Outside Terminal Disconnection and Removal | $400.00 |

82

# EXHIBIT B
# TO SECOND AMENDED COMPLAINT