# EXHIBIT B
# TO SECOND AMENDED COMPLAINT

**Facility Number:** <u>82461</u>
**Customer Account Number:** <u>0996439</u>
**Category:** <u>NTI</u>

### am/pm MINI MARKET AGREEMENT

THIS AGREEMENT is made <u>July 11, 2006</u>, between BP West Coast Products LLC, a Delaware limited liability company, with an office at 4 CENTERPOINTE DRIVE, LA PALMA, CALIFORNIA 90623 ("BPWCP")
<u>and STTN Enterprises, Inc., a California Corporation</u>

(state whether a sole proprietorship, partnership, limited partnership, corporation or limited liability company ["LLC"];
if partnership, the names of all partners and State of Organization; if limited partnership, the names of all general partners
and State of Organization; if corporation, the State of Incorporation; if LLC, the State of Organization)

with an address at <u>631 San Felipe Road, Hollister, CA 95035</u> ("Operator").

Operator desires to be the franchisee of, and BPWCP is willing to grant to Operator a franchise for, an am/pm mini market located at the Premises set forth in PART I (which together with the buildings and improvements now or hereafter constructed thereon is referred to herein as the "Premises") on the terms and conditions set forth in PARTS I and II of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained in PARTS I and II hereof, each of the parties intending to be legally bound hereby, agrees as follows:

### PART I

PART I contains specific terms which relate to the terms and conditions set forth in the corresponding sections - PART II, Form No. am/pm- 240WR-1 (4/2006), attached hereto and incorporated herein.

**Section**

4.03    Store Manager (if Operator operates more than one am/pm mini market): _____

_____

5.01    This Agreement shall be binding on the parties as of the date first written above (Effective Date.) The franchise term of this Agreement shall begin on the , ("Commencement Date"), and shall end at 10 a.m. on the first day after the last day of the [] 120th or [XX ] 240th full calendar month following the Commencement Date. If no box is checked at the time this Agreement is executed, the box for 120th shall be deemed checked. If no date is set forth in this PART I, the Commencement Date shall be established by the "Notice of Final Inspection and Readiness" provided for in Section 5.01 of PART II.

6.01    Premises:
_____
631 San Felipe Road
(complete address by street number, including, where applicable, designation of corner)

City____Hollister_____    State____CA_____    Zip_____95035_____
If no address is set forth, the Premises shall be established by the "Site Acceptance" provided for in Section 6.01 of Part II.

6.01(a)    Target Area: _____

7.01(a)    Initial Franchise Fee: <u>Seventy Thousand and 00/100</u> _____
Dollars [$ <u>70,000.00</u>].

7.01(c)    Renewal Franchise Fee: _____
Dollars [$ _____.00]

7.02(a)    Minimum royalty fee: <u>One Thousand and 00/100</u> _____
Dollars [$ <u>1,000.00</u>].

7.03    Security Deposit: <u>One Thousand and 00/100</u> _____
Dollars [$ <u>1,000.00</u>].

16.01    Operational Designee, if applicable: _____

17.02    Entity Designee (Corporate Operators, LLC's, Limited Partnerships): _____

non-lessee operator (DOFO)
am/pm 241WR-1 (4/2006)
Uniform                                    1 of 4

Facility Number:
Store Size 3,600 sq. ft.
(exterior dimensions)

**STORE EQUIPMENT**
**(Real and Personal Property)**

The equipment listed below is required to be installed in the Store unless otherwise indicated by a check mark at the left of the required items. Operator must install and maintain the equipment so indicated prior to the Commencement Date. All equipment must be obtained from approved vendors, or, if applicable, meet BPWCP's specifications including, but not limited to, specifications with respect to brand, model, size, color and quality.

**(Check only Required Equipment to be Furnished and if excluded) Installed by Operator**

**BUILDING**
_____ am/pm Sun & Moon Sign
_____ Building Fascia (Illuminated)
_____ Corner Signage
_____ Interior Signage

**STORE**
**COFFEE**
_____ Airpots (4) w/Rack (vendor supplied)
_____ Cappuccino Machine (5 head) (vendor supplied)
_____ Coffee Airpot Brewer (vendor supplied)
_____ Coffee Brewer (1 Burner) (vendor supplied)
_____ Coffee Brewer (3 Burner) (vendor supplied)
_____ Coffee Brewer Riser  (vendor supplied)
_____ Coffee Condiment Rack (vendor supplied)
_____ Coffee Menu Board
_____ Coffee Mug rack (vendor supplied)
_____ Coffee Warmer (2 position) (vendor supplied)
_____ Tea Rack (vendor supplied)
_____ Timer  (vendor supplied)
**FLOOR**
_____ Beverage Merchandiser, Breeze 20 oz
_____ Cigarette Merchandiser/Backbar
_____ Cooler Cabinet (Upright)
_____ Cooler boxes (walk-in)
_____ Napkin Dispenser (3)
_____ Shelving (Modular; Walk-in Cooler)
_____ Shelving (Storage Room), NSF Approved
_____ Shelving (hand sink in food area)
**FOOD**
_____ Bun Toaster
_____ Chili/Cheese Dispenser
_____ Condiment Dispenser (6 position)
_____ Convection Oven w/Racks
_____ Food Merchandising Warmer (1)
_____ Food Preparation Table
_____ Hood and Exhaust Ventilation System (for convection oven) (California only)
_____ Microwave Oven (Commercial)
_____ Nacho Rack (3 position)
_____ Sink (3 compartment-food)
_____ Sink (hand sink in food area)
_____ Thermometer (digital)

non-lessee operator (DOFO)                    2 of 4
am/pm-241WR-1 (4/2006)
Uniform

Facility Number: <u>82461</u>

**(Check only Required Equipment to be Furnished and if excluded)**
**Installed by Operator (continued)**

**FOUNTAIN**
_____ Bulk CO2 (vendor supplied)
_____ Mantiovoc Ice and Beverage Equipment
_____ Scotman Ice Maker
**FROZEN BEVERAGE**
_____ Frozen Carbonated Beverage (FCB) Machine
**OFFICE/SALES COUNTER**
_____ Computer Software and Hardware
_____ Counter Merchandising System
_____ Fax Machine
_____ POS System with PayPoint® (BPWCP Approved)
_____ Safe
_____ Video Surveillance Equipment
_____ VSAT Equipment: (1) Hughes Satellite Dish and
                 Hughes Indoor Unit - Satellite Receiver
                 (2) Deicer (if required for colder climate)
**OTHER**
_____ Ice Maker
_____ PayQuick Island Cashier (PIC)
_____ Sales, take-out and beverage counters (including cup dispensers)
_____ Sink (service/mop)
_____ Water Heater
_____ Other: _____
_____ Other: _____
_____ Other: _____
_____ Other: _____

Items indicated as vendor supplied may be supplied by vendors in connection with vendors' products. Operator shall be furnished with a list of approved vendors and/or a copy of BPWCP's specifications for all required equipment upon execution by Operator of this Agreement.

**This space is intentionally left blank.**

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

OPERATOR ACKNOWLEDGES HAVING READ THIS AGREEMENT, INCLUDING PART II, GENERAL TERMS AND CONDITIONS, FORM No. am/pm- 240WR-1 (4/2006), AND UNDERSTANDS FULLY ALL THE TERMS, PROVISIONS AND CONDITIONS HEREOF. **No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.**

BPWCP MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO OPERATOR'S PROFIT OR INCOME TO BE DERIVED FROM THE OPERATION OF THE am/pm STORE CONTEMPLATED HEREUNDER.

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

**BP West Coast Products LLC**

By _~Cherry Heith~_ _7-11-06_
     Manager                          Date

**If Operator is an entity, complete and sign below:**

_____ STTN Enterprises, Inc. _____
(print or type name of entity)
Check one:
☐ a _____ general partnership;    ☐ a _____ limited partnership;
☐ a _____ limited liability company;    ☒ a _____CA_____ corporation

By: _____

Name: __Nazim Faquiryan_____

Its: CEO and President_____

Date Signed: _6/20/06_____

By: _____ n/a _____

Name: _____ n/a _____

Its: _____ n/a _____

Date Signed: _____ n/a _____

By _____ n/a _____

Name: _____ n/a _____

Its: _____ n/a _____

Date Signed: _____ n/a _____

By _____ n/a _____

Name: _____ n/a _____

Its: _____ n/a _____

Date Signed: _____ n/a _____

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)                          4 of 4
Uniform

am/pm MINI MARKET AGREEMENT

PART II
General Terms and Conditions

ARTICLE 1

Service Mark and Service Name Conditions, Copyrights, Trade Secrets
and Confidentiality

A.     Service Marks, Trademarks and Service Names

1.01   Subject to the terms and conditions specified herein, and to the extent of BPWCP's rights therein, BPWCP hereby grants to Operator, beginning on the Commencement Date as defined in Section 5.01 and continuing during the term of this Agreement, the non-exclusive right and license to use the trade secrets and know-how regarding operation of am/pm mini markets, the service mark and service name "am/pm", or any variation thereof as may be approved in writing by BPWCP, and any other service marks, trademarks and service names used in connection with am/pm mini markets, solely in conjunction with Operator's operation of the Store provided for herein. Operator has no exclusive territory.  BPWCP reserves the right, in its sole discretion, to establish additional am/pm mini market stores and other BPWCP and non BPWCP franchises and franchises operated by BPWCP's wholly owned subsidiary or other company operated franchises and businesses, in any location and proximity to Operator's business.

1.02   BPWCP represents that it has applied for federal registration for various service marks for "am/pm" for retail grocery store and convenience store services and trademarks for various products. BPWCP has been granted federal registration for certain "am/pm" service marks and trademarks for retail grocery store and convenience store services.  BPWCP expressly reserves the right to change, alter or modify the am/pm service mark or service name or substitute any other service mark or service name at any time by giving Operator not less than thirty (30) days' prior notice thereof.  In the event of any change, alteration or modification of the service mark or service name, Operator agrees that only the service mark or service name, as changed, altered or modified, shall be used by Operator to identify the Store.  If the service mark and service name "am/pm" is changed by BPWCP, it is agreed that the new service mark and service name adopted by BPWCP shall be substituted for "am/pm" wherever "am/pm" appears in this Agreement. BPWCP also expressly reserves the right to change, alter or modify colors and designs and other service marks, trademarks and service names used in connection with am/pm mini markets from time to time and place to place as BPWCP deems appropriate or as required by law and, upon 90 days prior written notice from BPWCP (unless a lesser time is required by law), Operator will install such modified marks, colors or designs at Operator's expense.

1.03   Operator agrees that it shall notify BPWCP promptly of any unauthorized use of the am/pm service mark and service name by any person, firm, corporation or other entity (collectively referred to as "person").  At its expense, BPWCP shall challenge all unauthorized uses or infringements of the am/pm service mark, trademark and service name, and BPWCP shall have the sole right to decide whether to prosecute any person who unlawfully uses or attempts to use BPWCP's am/pm service mark, trademark or service name for retail grocery store, convenience store, or fast food services.  Operator agrees to provide such evidence and expert assistance as Operator may have within its control in connection with any such challenge or prosecution.

1.04   Operator recognizes and acknowledges that, as between BPWCP and Operator, BPWCP is the sole and exclusive owner of the am/pm service mark, trademark and service name and other service marks, trademarks and service names used in connection with am/pm mini markets and appearing on am/pm stores. Operator hereby agrees:  not to claim any right, title or interest in or to said service marks, trademarks or service names; not to directly or indirectly deny, assail, or assist in denying or assailing the sole and

exclusive ownership of BPWCP in said service marks, trademarks and service names; not to adopt or use as Operator's own property any service marks, trademarks or service names of BPWCP nor employ any service marks, trademarks or service names confusingly similar to those of BPWCP; not to register or attempt to register BPWCP's service names or service marks, trademarks in Operator's name or that of any other person and not to use such service marks, trademarks or service names, or any parts thereof, as any part of any corporate or partnership name or any other business name. It is understood that this covenant shall survive the termination of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

1.05  Operator agrees, upon termination or non-renewal of this Agreement or upon termination or non-renewal of any subsequent Store Agreement, to assign BPWCP, without additional consideration, any service name or service mark, trademark rights that may have vested in Operator notwithstanding the provisions of Section 1.04 as a result of any activities of Operator pursuant to this Agreement. Operator agrees to use said service marks, trademarks and service names in connection with, and exclusively for, the promotion and operation of an am/pm store as provided hereunder, and in accordance with the standards, terms and conditions set forth in the Agreement and in accordance with instructions, rules and procedures prescribed in writing by BPWCP. Operator shall not use the am/pm service mark or service name, or other service marks, trademarks or service names of BPWCP, except as authorized by BPWCP and in no event in any manner that may or could adversely impact or jeopardize the am/pm image.

1.06  Operator agrees to display the am/pm service mark, trademark and service names as prescribed by BPWCP and to conduct the business of the Store in such a manner as to not reflect unfavorably on BPWCP's good will, service marks, trademarks and service names.

1.07  Operator agrees, immediately upon the termination of this Agreement or termination of any subsequent Store Agreement to cease and forever abstain from using the am/pm service mark and service name and other service marks, trademarks and service names used in connection with am/pm mini markets.

B.    Copyrights

1.08  BPWCP grants to Operator a nonexclusive right and license during the term of this agreement to use BPWCP's franchise accounting system software at the am/pm mini market and display at Operator's am/pm Store copyrighted am/pm signage, posters, and other advertising and point of purchase materials. No rights of reproduction or distribution are included in the grant, and upon termination for any reason Operator shall immediately cease and desist from using or displaying any such copyrighted materials.

C.    Trade Secrets and Confidentiality

1.09  BPWCP shall furnish or make available to Operator for use solely in connection with Operator's conduct of Operator's am/pm Store, BPWCP's franchise accounting system software, an am/pm Store System/Operations Manual, guides, and other forms and materials. Operator agrees during the term of this Agreement and after termination to keep confidential and not to furnish information as to the methods of operation, advertising programs or ideas, business information, or any other confidential information of BPWCP relating to the operation of any am/pm Store, to any person, except BPWCP, Operator's employees, or Operator's attorneys or accountants engaged by Operator in connection with Operator's operation of Operator's am/pm Store who have undertaken the same obligation of confidentiality as set forth herein for Operator. Notwithstanding the foregoing, nothing in this Agreement or any other agreement between the parties shall limit the ability of the Operator to consult with any tax advisor regarding tax issues pertaining to the am/pm franchise business.

non-lessee operator (DOFO)
am-pm- 241WR-1 (4/2006)          2 of 34
Uniform

80

## ARTICLE 2

### Relationship of Parties

2.01     Neither Operator nor any of its employees shall hold itself or himself out at any time as an agent, representative, partner, joint venturer or employee of BPWCP.  Operator shall have no authority, right or power to, and shall not bind nor obligate BPWCP in any way, manner or thing whatsoever, nor shall Operator represent that it has any right or power to do so.  Operator shall undertake all obligations herein described as an independent contractor and shall exercise and be responsible for the exclusive control of the Store and Premises and all activities conducted therein and therefrom.  In order to communicate with BPWCP, government agencies and others regarding matters such as financial reporting, safety, health and security, an ability to comprehend and communicate in English is necessary.  Passing an English proficiency test is required.

2.02     Operator shall be solely responsible for hiring, supervising and directing all employees, the payment and withholding of all payroll and other taxes imposed upon or determined by wages and salaries of such employees, and for complying with all applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws.  BPWCP shall have no control over employees of Operator, including, without limitation, the terms and conditions of their employment.

2.03     Unless otherwise expressly set forth in this Agreement, "Operator" shall include and refer to the sole proprietor, shareholders if franchisee is a corporation, partners if franchisee is a partnership and members if franchisee is an LLC.

2.04     Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

## ARTICLE 3

### am/pm Store Systems/Operations Manual; Extranet

3.01  Operator agrees that it shall operate the Store and maintain the Premises in accordance with the standards, methods, procedures, requirements, instructions, food specifications and equipment specifications set forth in the am/pm Store Systems/Operations Manual ("Manual" or "Systems Manual"), and any and all subsequent amendments and supplements thereto.  BPWCP shall loan to Operator a copy of the Manual which shall be furnished to Operator upon execution by Operator of this Agreement; subsequent amendments and supplements shall also be loaned and furnished to Operator and Operator shall be required to acknowledge receipt of any of the foregoing loaned materials.  The manual may be provided in writing, on CD-ROM, via the internet, extranet or equivalent means.  Operator further agrees to instruct and keep its employees fully informed of all such methods and procedures as shall be promulgated by BPWCP from time to time.  The Manual, as presently constituted and as it may hereafter be amended or supplemented by BPWCP from time to time, is incorporated in and made a part of this Agreement.  Operator acknowledges and agrees that compliance with the standards, methods, procedures, requirements, instructions and food specifications contained in the Manual (as from time to time amended or supplemented) is important to Operator and to BPWCP.  Failure to adhere to the provisions of the Manual shall constitute a breach of this Agreement.

3.02(a) Operator must maintain a computer connection to connect to BPWCP's extranet, through which BPWCP and Operator may communicate with each other and through which BPWCP may disseminate the Manual, updates thereto, planograms, inventory books, required standards and specifications and other confidential information from time to time.  BPWCP shall have sole discretion and control over all aspects of

the extranet, including the content and functionality thereof. BPWCP will have no obligation to maintain the extranet indefinitely, and may dismantle it at any time without liability to Operator.

(b) Operator shall have the privilege to use the extranet, subject to Operator's strict compliance with the Standards, protocols and restrictions that BPWCP may establish from time to time. Such Standards, protocols and restrictions may relate to, among other things, (a) the use of abusive, slanderous or otherwise offensive language in electronic communications, (b) communications between or among operators that endorse or encourage breach of any operator's franchise agreement, (c) confidential treatment of materials that BPWCP transmits via the extranet, (d) password protocols and other security precautions, (e) grounds and procedures for BPWCP's suspending or revoking an operator's access to the extranet, and (f) a privacy policy governing BPWCP's access to and use of electronic communications that operators post to the extranet. Operator acknowledges that, as administrator of the extranet, BPWCP can technically access and view any communication that any person posts on the extranet. Operator further acknowledges that the extranet facility and all communications that are posted to it will become BPWCP's property, free of any claims of privacy or privilege that Operator or any other person may assert.

(c) Operator shall establish and have continually available (during all times that the extranet shall be established and until the termination of this Agreement) an electronic connection (the specifications of which shall be specified in the Manual) with the extranet that allows BPWCP to send messages to and receive messages from Operator, subject to the standards and specifications. Operator shall participate and use the extranet in accordance with BPWCP's requirements as set forth in the Manual.

(d) If Operator shall breach this Agreement or any other agreement with BPWCP or it's Affiliates, BPWCP may, in addition to, and without limiting any other rights and remedies available to BPWCP, disable or terminate Operator's access to the extranet without BPWCP having any liability to Operator, and in which case BPWCP shall only be required to provide Operator a paper copy of the Manual and any updates thereto, if none have been previously provided to Operator, unless not otherwise entitled to the Manual.

ARTICLE 4

Hours of Operation and Personal Participation

4.01  Operator shall promote the business of the Store and shall cause the Store to be operated continuously throughout the term of this Agreement. Operator shall cause the Store to be open for business not less than sixteen (16) hours every day of the year, excluding Christmas, or the maximum hours permitted by applicable law if less than sixteen (16) hours.

4.02  Failure of Operator to cause the store to be open for business in the manner and during the hours and days prescribed herein shall constitute a material breach of this Agreement. In addition to any other remedy available to BPWCP, in the event Operator fails to operate the Store during the hours and days prescribed in Section 4.01 during any calendar month during the term of this Agreement, Operator shall pay BPWCP, as liquidated damages and not as a penalty, in addition to the royalty fee payable for such month, one thirtieth of the minimum monthly royalty fee for each day Operator fails to cause the Store to be open for the prescribed hours.

4.03  Operator shall participate in the operation of the am/pm business for a period of at least 40 hours per week and if Operator has more than one am/pm mini market, Operator must have one employee for each store, who has attended and successfully completed the am/pm Store Manager training program offered by BPWCP and who is employed on a full time basis at each store ("Store Manager"). If Operator operates more than one am/pm mini market, Operator hereby designates the person whose name is set forth in PART I, Section 4.03, hereof as the Store Manager for the Premises which are the subject of this Agreement (within two months of the date such designated person is no longer employed at the store, Operator must replace such Store Manager with another trained Store Manager or the franchise may be

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    4 of 34

82

terminated). For purposes of personal participation, Operator shall be the sole proprietor if Operator is a sole proprietor, the Operational Designee if Operator is a corporation, partnership or LLC. The Operational Designee must be an officer or shareholder if Operator is a corporation, a member or manager of the LLC if Operator is an LLC, a general partner if Operator is a limited partnership, a partner if Operator is a partnership other than a limited partnership. In the case of Concurrent Operations at the Premises, as more fully described in Article 4.05 hereof, Operator is obligated to participate in the operation of all franchise businesses for at least 40 hours per week.

4.04 Failure of Operator to participate in the operation of the am/pm business as described in Section 4.03 and/or, if applicable, to have the Store Manager designated in PART I employed at the store on a full time basis and/or, if applicable, to replace such person with another trained Store Manager within two months from the date the Store Manager designated in PART I or any successor to such person is no longer employed at the store shall constitute a material breach of this Agreement.

4.05 In the event the am/pm mini market, with BPWCP's approval, is operated at the Premises by Operator in conjunction with another or more than one other BPWCP franchise, ("Concurrent Operations"), such Concurrent Operations shall be conducted and governed by the terms and conditions of the franchise agreements of each of the applicable franchises and any additional special terms, conditions and provisions relating to Concurrent Operations as may be included in such franchise agreements or other writing with regard to such operations.

4.06 Each individual who owns an interest in the franchise entity must sign a personal guarantee agreeing to discharge all obligations of the Operator under the franchise agreement. This will also be required of the individual's spouse where the individual lives in or the franchise is located in a community property state. BPWCP will only accept as a franchisee sole proprietorship, partnership, corporation or limited liability company. A franchisee may not be a trust, custodian or trustee of a trust, nor can a trust, trustee or custodian be a partner, shareholder or member of an LLC.

## ARTICLE 5

### Term

5.01 This Agreement shall be binding on the parties as of the Effective Date. Except as otherwise provided in this Article, the "Commencement Date" shall be on the date set forth in PART I. If no date is set forth in PART I, the Commencement Date shall be the date established by BPWCP by notice to Operator ("Notice of Final Inspection and Readiness") as the date the Premises are available for occupancy and ready for conduct of the business of the am/pm mini market. The term hereof shall end as of 10:00 a.m. on the first day after the last day of the one hundred twentieth (120th) or two hundred fortieth (240th) full calendar month following the Commencement Date as set forth in Part I, unless this Agreement is terminated earlier pursuant to the terms hereof. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Operator before the end of the term.

5.02 **New Construction or Raze and Rebuild.**

(a) If this Agreement is for an am/pm mini market that will be newly constructed after this Agreement is executed or an am/pm mini market at Premises where an existing BPWCP franchised premises is to be razed and a new am/pm mini market constructed after this Agreement is executed ("New Construction" or "Raze and Rebuild"), BPWCP shall provide standard generic architectural, plumbing and electrical site plans to Operator. It will be necessary for Operator to have the generic plans modified in order to take into consideration the topographic features of the Premises, meet the zoning, setback, easement, sign codes, local building codes and other requirements. Operator shall promptly do all of the following:

A. Have prepared and submit to BPWPC, for approval, in a format provided by BPWCP or acceptable to BPWCP, a Site Investigation Report which includes, but is not limited to, detailed Development Guidelines, Requirements and Restrictions, Roadway Considerations, Approval Process, Assessments and Fees, Project Timeline, Cost Estimate and Site Photographs.

B. Have prepared and submit to BPWCP for approval, architectural and construction plans and drawings for the am/pm mini market specific to the Premises.

C. Submit to BPWCP a copy of the deed, lease or other documents evidencing Operator's right to occupy and modify the Premises

D. Maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to construct and operate the am/pm mini market.

Within 60 days after BPWCP's approval of the architectural plans and drawings, Operator shall apply for all licenses, permits, variances and other required governmental approvals (collectively "Permits") necessary for the New Construction or the Raze and Rebuild. BPWCP, at its sole discretion, may provide assistance in obtaining Permits. All expenses in connection with obtaining Permits shall be Operator's responsibility.

All changes to the BPWCP approved plans to meet local building codes and other governmental requirements and changes not resulting from governmental requirements must be submitted to BPWCP in writing with drawings and specifications and approved by BPWCP in advance of construction. If changes are mandated by governmental authority, a copy of the specific instructions to change the plans shall be submitted along with the request for approval of the changes. Any changes not mandated by governmental authority shall be submitted simultaneously as one consolidated request for modification of the approved plans.

All construction of the am/pm mini market and Premises shall be in accordance with plans and drawings approved by BPWCP and, once constructed, Operator shall not make alterations or changes to the Store or Premises during the term of this Agreement, except with the prior written consent of BPWCP. Prior to the start of construction, Operator shall transmit a complete construction drawing set in electronic format to BPWCP. Software format shall be AutoCAD release 14 or 13. Drawings created on software other than those AutoCAD versions shall be converted prior to transmittal. Multiple drawing files shall be contained on either a 100 mega byte zip disk or 650 megabyte compact disk. Single sheet or small files, 1MB or less, shall be emailed to a designated addressee. All cross references must be bound prior to transmittal.

If Operator uses a BPWCP approved architectural firm to prepare the Site Investigation Report and all architectural plans and drawings, and after Operator has paid the total Initial Franchise Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000 for the fees and expenses incurred for such Report and plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to such architectural firm, but no sooner than the start of construction.

(b)     Operator shall obtain a license to sell beer and wine if lawful in the jurisdiction in which the Store is located.

(c)     If this Agreement is for New Construction, Operator shall begin construction within 18 months of the Effective Date and complete construction and open for business within 24 months of the Effective Date.

(d)     If this Agreement is for a Raze and Rebuild, Operator shall complete construction and open for business within 12 months of the Effective Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                      6 of 34

84

(e)    Only in the event that Operator is not able, for reasons beyond Operator's control, to obtain permits required for New Construction or Raze and Rebuild or obtain a beer and wine license, if lawful in the jurisdiction where the Premises is located, Operator may terminate this Agreement within 18 months of the Effective Date if this Agreement is for New Construction or 12 months of the Effective Date if this Agreement is for a Raze and Rebuild. In the event of such termination by Operator, any initial franchise fee paid to BPWCP shall be refunded after deducting the greater of either BPWCP's out of pocket expenses incurred or $1500. No interest shall be payable on any refunded amounts.

(f)    In the event that Operator fails to timely comply with any of the requirements set forth herein, does not complete the New Construction or Raze and Rebuild or obtain a beer and wine license, if available, and satisfactorily complete the initial training described in Article 16 of this Agreement within the time limits specified, in addition to any other remedies BPWCP shall have under this or any other agreement, BPWCP may terminate this Agreement.

(g)    After Operator has completed construction and successfully completed required initial training, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date. If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business. In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement. In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.03    Retrofit or Rebrand.

(a) If this Agreement is for an existing am/pm mini market that does not meet BPWCP's current visual and design standards, Operator shall made modifications to the am/pm mini market and the Premises in accordance with the Retrofit Program Design Intent, Visual Standards and approved am/pm Store layouts provided to Operator ("Retrofit Program"). Such Retrofit Program includes building enhancements, installation of new fixtures, including shelving gondolas and sales counters, new equipment and new graphics as specified in the Retrofit Program Design Intent. Operator shall obtain, at its expense all necessary permits and licenses to complete such modifications and installations. In the event that permits necessary for the retrofit are obtained by BPWCP and assigned to Operator, Operator shall reimburse BPWCP for its out of pocket costs to obtain such permits. Operator shall complete the Retrofit Program no later than nine months after the Effective Date of this Agreement.

(b)    If this Agreement is for an existing convenience store that is not branded am/pm, Operator shall make modifications to the store and Premises to comply with, at a minimum, the Retrofit Program. In addition, BPWCP and Operator may agree to additional modifications. Operator shall apply for all necessary permits and licenses to complete such modifications and installations. Operator shall complete the Retrofit Program and any additional modifications no later than nine months after the Effective Date of this Agreement.

(c)    Operator shall maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to retrofit or rebrand and operate the am/pm mini market. If Operator fails to complete the Retrofit Program within nine months of the Effective Date of this Agreement, in addition to any other remedies BPWCP may have under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.

(d)    All costs and expenses in connection with the Retrofit Program modifications shall be at the sole expense of Operator. If Operator uses BPWCP approved architectural firm to prepare all architectural

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                                7 of 34

85

plans and drawings to Rebrand a convenience store, but not to Retrofit an existing am/pm mini market, and after Operator has paid the total Initial Franchisee Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000.00 for the fees and expenses incurred for such plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to the approved architectural firm, but no sooner than the start of the retrofit construction.

(e)     After Operator has completed the retrofit or rebrand work and training, if applicable, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date. If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, at its option, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business. In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.  In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.04  Upon expiration of the term of this Agreement if this Agreement is the initial Store Agreement for the Premises, Operator shall have the right to be offered a subsequent franchise Agreement for the Premises which right can be exercised by payment of the then-current Renewal Franchise Fee or other fees which may then be payable and by execution of a new franchise agreement and collateral agreements on the terms and conditions then existing, which may differ materially from those presently existing, provided that:

(a)     Operator gives BPWCP written notice of its election to be offered a subsequent franchise agreement not less than six months prior to the expiration of the term of the initial Store Agreement ("notice of election"); and

(b)     Operator, at the time of the notice of election and at the end of the term of the initial Store Agreement is not in default of any of the terms or conditions of such Store Agreement or any other agreement between Operator and BPWCP and has substantially complied with the terms and conditions of all such agreements during the term of such Store Agreement; and

(c)     All of the Operator's accrued monetary obligations to BPWCP have been satisfied and timely met throughout the term of the initial Store Agreement; and

(d)     Operator is in compliance with the standards set forth in the then-current Systems Manual and has made or has provided for, to BPWCP's reasonable satisfaction, such renovation and modernization of Operator's Premises as BPWCP may reasonably require, including, without limitation, signs, equipment, furnishings, and decor so as to reflect the then-current image required for new am/pm mini markets; and

(e)     BPWCP has not exercised its right to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic area in which the Premises are located.

5.05  If this Agreement has a term of 240 months, after 120 months, Operator will make such modifications and improvements as may be required to comply with the then current visual and design standards for am/pm mini markets and which may include such items as painting, installation of new fixtures and equipment and compliance with new visual standards but shall not include major structural modifications.

**This space is intentionally left blank**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)            8 of 34
Uniform

86

# ARTICLE 6

## Premises and Store Equipment

6.01   The am/pm mini market franchise granted hereunder is for the operation of an am/pm mini market on the Premises set forth in PART I hereof which must have prior approval from BPWCP ("Premises") during the term hereof and may not be relocated to another site.

(a)  If no address has been inserted in the space provided in Part I at the time of execution of this Agreement, Operator shall promptly following the execution hereof (but in no event more than 6 months following the Effective Date) locate one or more proposed sites which meet BPWCP's then-current Standards and specifications, which must be located within the Target Area designated by BPWCP in Part I.  Operator shall submit to BPWCP such demographic and other information regarding the proposed site(s) and neighboring areas as BPWCP shall require, in the form prescribed by BPWCP ("Site Review Request").  BPWCP may seek such additional information as it deems necessary Operator shall respond promptly to such request for additional information.  If BPWCP shall not deliver written notice to Operator that BPWCP accepts the proposed site, within 30 days of receipt of Operator's Site Review Request, or within 10 days after receipt of such additional requested information, whichever is later, the site shall be deemed rejected.  If BPWCP accepts the proposed site it shall notify Operator of its acceptance of the site ("Acceptance"), which Acceptance shall be subject to Operator entering into a final lease or purchase agreement, and such other conditions as BPWCP may impose.  Promptly following mutual execution of this Agreement, or Operator's receipt of Acceptance, if no address has been inserted in the blank space provided above, Operator shall proceed to negotiate a lease or purchase agreement for the site.  Operator's entering into any lease or purchase agreement for the Premises unless Operator has received Acceptance relating to the proposed site is at Operator's sole discretion and at Operator's sole risk.  Upon Acceptance of the proposed site by BPWCP, such site shall be deemed to be the "Premises" as defined above.

(b)  BPWCP may voluntarily (without obligation) assist Operator in obtaining an acceptable location.  Neither BPWCP's said assistance, if any, its acceptance of Operator's proposed site, nor its acceptance of the proposed lease or purchase agreement shall be construed to insure or guarantee the profitable or successful operation of the Premises by Operator, and BPWCP hereby expressly disclaims any responsibility therefore.  Operator acknowledges its sole responsibility for finding the Premises.  Operator acknowledges its sole responsibility for finding each site for the Store it develops pursuant to this Agreement.

6.02   Operator is required to have installed on the Premises the equipment shown on the list entitled "Store Equipment" attached to PART I ("Store Equipment").  Operator agrees to install the Store Equipment on or before the Commencement Date.  Certain Store Equipment must be purchased or obtained from approved suppliers, as set forth in the Store Systems Manual.  All Store Equipment must meet BPWCP's specifications, including but not limited to specifications with respect to brand, model, size, color and quality.  Operator may not install additional equipment, fixtures or machines without the prior written consent of BPWCP.  Operator shall maintain all equipment, including required and optional equipment, ready for use and in operable condition and shall use or permit the equipment to be used only for its intended use and only in a manner consistent with the manufacturer's instructions, and Operator shall utilize the equipment and exert Operator's best efforts to promote the retail sale of items or services for which the equipment is designed.  Operator agrees not to remove any of the Store Equipment from Store without the prior written consent of BPWCP except in the event replacement of the equipment is necessitated by malfunction, in which case Operator shall replace the equipment with the then current equipment or equipment meeting the same specifications with respect to size, color and quality as the equipment replaced, if the malfunctioning equipment is less than 3 years old..  Operator shall notify BPWCP of any such replacement.   BPWCP reserves the right to add or delete Store Equipment during the term of the Agreement and Operator will install or remove such Equipment within 90 days after written notice from BPWCP.  If specifications for Store Equipment or approved suppliers for Store Equipment are changed by BPWCP, any replacement of Store Equipment by Operator, due to wear and tear, malfunction,

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)             9 of 34
Uniform

depreciation or otherwise, shall be with the then current Store Equipment. Otherwise, Operator will be required to obtain the then current Store Equipment upon renewal.

6.03  Operator shall not operate other business within the am/pm mini market, the building housing the am/pm mini market or on the Premises without the prior consent of BPWCP.

## ARTICLE 7

### Fees

7.01  (a)  Operator shall pay BPWCP an Initial Franchise Fee or Renewal Franchise Fee in the amount set forth in PART I.  The Initial Franchisee Fee is payable as follows: one half upon the signing of this Agreement by Operator; The remainder of the Initial Franchise Fee is payable on the Commencement Date. The Initial Franchise Fee shall not be considered paid until paid in full.

(b) The Initial Franchise Fee is not refundable in whole or in part except for the following circumstances:

(1)     If this Agreement is for New Construction or Raze and Rebuild at the Premises, after Operator executes the Agreement, BPWCP shall have up to 90 days to execute the Agreement. BPWCP shall not be obligated under the Agreement until it is executed by BPWCP.  If BPWCP elects not to execute the Agreement, BPWCP shall notify Operator and shall return, in full, any Initial Fee paid by Operator.

(2)     If this Agreement is for New Construction or Raze and Rebuild, and the Operator fails to complete the New Construction or Raze and Rebuild, obtain a beer and wine license, if lawful in the jurisdiction in which the Premises is located, satisfactorily complete the initial training program or meet the requirements of Article 5 or 6.01(a) within the time limits specified, BPWCP may terminate this Agreement and refund one half of the total Initial Franchise Fee provided that in the event Operator has paid only one half of the Initial Franchise Fee, BPWCP shall retain the one-half payment and there shall be no refund.

(3)     If this Agreement is for New Construction or a Raze and Rebuild and the Operator terminates this Agreement within 18 months for New Construction or 12 months for Raze and Rebuild after the Effective Date of this Agreement pursuant to 5.02 (e) for inability to obtain permits or a beer and wine license for reasons beyond Operator's control, BPWCP will refund the Initial Franchise Fee paid after deducting the greater of either BPWCP's expenses incurred in contemplation of Operator operating an am/pm mini market or $1,500.00.

(4)     The Initial Franchise Fee or Renewal Franchise Fee shall be prorated on a monthly basis over the term of the Agreement from the Commencement Date to the termination date and shall be refundable or payable on such prorated basis if BPWCP terminates the Agreement for the following reasons:

(i)  Operator's death;

(ii) Operator's physical or mental incapacitation, for more than 90 consecutive days, which renders Operator unable to provide for the continued proper operation of the am/pm mini market;

(iii) Condemnation or the taking, in whole or in part, of the Premises pursuant to the power of eminent domain;

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

10 of 34

88

(iv) Destruction of all or a substantial part of the Premises through no fault of the Operator; or,

(v) A determination made by BPWCP in good faith and in the normal course of business to withdraw from and to no longer maintain the marketing of Motor Fuels through retail outlets and/or the am/pm mini market franchise in the relevant geographic market area in which Operator's am/pm mini market is located.

In the event Operator's Initial Franchise Fee or Renewal Franchise Fee is returned in whole or in part for any reasons, no interest shall be paid on the amount returned.

BPWCP's policy with respect to the payment of the Initial Franchise Fee or Renewal Franchise Fee for any term of the franchise offered in the future may differ from that set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(c)    If this Agreement is for Operator's subsequent term of the Franchise at the Premises, the Renewal Franchise Fee ("Renewal Fee") is payable as follows:

| Amount Payable | | Due Date of Payment for Operator's Subsequent Term |
|---|---|---|
| One third of the total amount payable | - | On the Commencement Date of this Agreement |
| One third of the total amount payable | - | On the 1st day of the 2nd year of the term of this Agreement |
| One third of the total amount payable | - | On the 1st day of the 3rd year of the term of this Agreement |

Notwithstanding the foregoing, payment of any remaining balance due and owing BPWCP on account of the renewal fee shall be accelerated to become due and payable on or before the effective date of termination of this Agreement and, at BPWCP's sole discretion, on or before the effective date of the sale, transfer or assignment with BPWCP's consent of Operator's interest in this Agreement and on or before the effective date a designated successor-in-interest assumes all of a deceased or incapacitated Operator's duties and obligations under this Agreement and other agreements with BPWCP.

If the Renewal Franchise Fee is not accelerated, the transferee or successor-in-interest must assume the obligation to make payments.

The Renewal Franchise Fee is not refundable, in whole or in part, except in the circumstances described in Article 7.01(b)(4) of this Agreement.

In the event Operator's Renewal Franchise Fee is returned, in whole or in part, for any reason, no interest shall be paid on the amount returned.

BPWCP's policy with respect to schedules of payments and due dates of payments on account of the Renewal Franchise Fee for any term of the franchise offered in the future may differ from those set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(d) Operator shall pay an Initial Development Fee, if applicable, in the amount set forth in PART I as follows: one-half is payable at the time the Operator executes this Agreement and the other half is payable on the Commencement Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

11 of 34

89

The Initial Development Fee is not refundable in whole or part except in the circumstances described in Article 7.01(b)(4) of this Agreement and no interest shall be paid on the amount returned.

7.02   (a) Unless otherwise agreed to in writing by the parties, Operator shall pay BPWCP, as a monthly royalty fee, six percent (6%) of the monthly gross sales, as that term is hereinafter defined, but not less than the minimum royalty fee set forth in PART I. Notwithstanding the foregoing, unless otherwise agreed to in writing by the parties, in the event Operator operates the Store twenty-four (24) hours of every day in any given calendar month, the monthly royalty fee for such a month shall be five percent (5%) of the monthly gross sales, but not less than the minimum monthly royalty fee set forth in PART I.

The minimum monthly royalty fee is payable on the Commencement Date and thereafter in advance on or before the first day of each calendar month during the term of this Agreement. For any month this Agreement is in effect which is less than a full calendar month, the minimum monthly royalty fee shall be prorated on a daily basis.

BPWCP shall have the right to increase the amount of the royalty fee at any time by up to one percent (1%) during the term of this Agreement in accordance with BPWCP's then prevailing royalty fee policy. BPWCP shall notify Operator not less than 90 days in advance of any such change in royalty fee.

(b)   As used herein the term "gross sales" shall mean the total amount of the sales of Operator and any inventory variation calculated as described below.

(1)   Gross sales shall be valued in United States currency, whether received in that form or otherwise, without deduction on account of any of the following:

(i)  the cost of the goods sold, including taxes paid by Operator in procuring goods for resale;

(ii)  the cost of material used, labor or service cost, interest paid, or any other expense; or

(iii)  cost of transportation of the goods.

(2)  Gross sales includes all cash, credits, property or other consideration received for:

(i)  all sales of merchandise made from or in the Store or in the immediate vicinity of the store, including, but not limited to, a cart, kiosk, drive thru or sidewalk sale;

(ii)  all compensation received for services performed from or in the Store including but not limited to, commissions and referral, commissions on lottery and lotto tickets (including all payments by state agencies for the sale of tickets and for the redeeming of winning tickets), handling and placement fees and fees for placement of coin operated and other machines; and

(iii)  all rentals of equipment or merchandise.

(3)  The inventory variation shall be determined each time a physical inventory is taken of merchandise currently held for sale in the Store, as required in Section 15.03 (b). The inventory variation is defined as either the inventory gain (physical inventory value is greater than book inventory) or the inventory loss (book inventory value is greater than physical inventory). The inventory variation subject to gross sales calculation for royalty reporting is the inventory variation in excess of the allowable variation. Detailed calculations for variations and allowable variations are further described in the Store Systems Manual.

non-lessee operator. (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

12 of 34

90

(4)  The following are not included in gross sales:

(i)  gasoline and other motor fuel sales, if any, including all applicable motor fuel and sales taxes;

(ii)  any deposits refunded to customers;

(iii)  sale price of property returned by customer when the full sale price is refunded either in cash or credit.  Where the customer is required to exchange returned merchandise for other new merchandise, the cashier is required to ring the sale of the new merchandise on the register and the sale of the new merchandise is included in gross sales subject to royalty.  For the purpose of this paragraph, refund or credit of the entire amount shall be deemed to be given when the purchase price, less rehandling and restocking costs, is refunded or credited to the customer;

(iv)  the amount of any tax imposed by the United States or any city, county, state, or other governmental entity or agency or instrumentality thereof upon or with respect to retail sales of tangible personal property measured by a stated percentage of sales price or gross receipts, whether imposed upon the Operator, as a seller, or upon the customer, as a purchaser.

(v)  for newly constructed or razed and rebuilt am/pm mini markets only, store sales made during the first 7 days of the term of the franchise, i.e., during the period comprised of the Commencement Date as established by the "Notice of Final Inspection and Readiness" and the next succeeding 6 days of initial operation.

(vi)  store sales made during an eligible Grand Opening Event for a new store, or for an existing store, following completion of BPWCP-approved retrofit, remodeling or rebuilding. An eligible Grand Opening Event, which event is not to exceed seven consecutive days, is more fully described in Article 14.02 hereof.

(c)      Any monthly royalty fee due in excess of the minimum monthly royalty fee shall be payable on or before the tenth (10th) day of the calendar month succeeding the month in which the sales were made for which said fee is due.  Payment of the royalty fee shall be made in accordance herewith and with forms and procedures set forth in the Systems Manual.

7.03  Operator shall pay to BPWCP a security deposit in the amount set forth in PART I on or before the Commencement Date of this Agreement.  If Operator shall be in default at any time in the performance of any of the terms and conditions of this Agreement, BPWCP, at its option, shall have the right, in addition to any other remedy it may possess either at law or at equity or under the terms of this Agreement, to correct said default and deduct any cost or expense in connection therewith from said security deposit.  Immediately upon application of all or part of said security deposit toward any such cost or expense, Operator shall pay to BPWCP an amount equal to that portion of the security deposit so applied so as to restore the security deposit to the amount stated above.  Except as provided herein, the security deposit, less any depletion because of default by Operator shall be refunded to Operator without interest upon termination of this Agreement.

7.04  Unless otherwise agreed to in writing by the parties, commencing on the Commencement Date, Operator shall pay an advertising and promotion fee for each month equal to 5.5% of Operator's gross sales. ("Gross Sales" is defined in Section 7.02 above.)  At any time during the term hereof, on thirty (30) days' prior written notice to Operator, BPWCP may increase or decrease the advertising and promotion fee, but the total advertising and promotion fee may not be increased to more than six and one-half percent (6.5%) at any time during the term of this Agreement and BPWCP may not increase the fee by more than one percent (1%) in any calendar year.  The advertising and promotion fee is payable on or before the tenth (10th) day of the calendar

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    13 of 34

91

month succeeding the month in which sales were made upon which the fee is calculated. In addition, Operator may be required to pay shipping costs, plus the cost of replacement signs, if Operator requests duplicate signage.

7.05  Any fees and other amounts due and owing BPWCP pursuant to this Article and any other provisions of this Agreement shall be paid when due by Operator to BPWCP, at BPWCP's option, to BPWCP's address set forth in the Systems Manual or BPWCP's representative, by money order approved by BPWCP, business check, cashier's check, wire transfer or electronic funds transfer initiated by BPWCP, whichever BPWCP directs and which may change from time to time at BPWCP's sole discretion.  Operator's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association).  If any Agreement between Operator and BPWCP requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm, or entity.  If such Agreement requires or permits payment by wire transfer, all such payments shall be made to "BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by automated clearing house ("ACH"), all such payments shall be made to "BPWCP", c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by the BPWCP credit department.  Operator agrees to indemnify BPWCP for any loss or expense caused by Operator's failure to comply with this Paragraph.  Payment shall be deemed made when, and only when, its receipt has been verified by BPWCP.  Receipt by BPWCP of any monies due BPWCP after notice of termination or non-renewal does not constitute a waiver by BPWCP of such notice of termination or non-renewal.

ARTICLE 8

Licenses, Permits, Taxes and Compliance with Laws

8.01  Operator agrees to obtain, post as required, and maintain, at its expense, all permits and licenses necessary for the operation of the Store and Store Equipment including, without limiting the foregoing, all permits and licenses required for selling beer and wine, if available pursuant to applicable laws and regulations, and for signs used or installed by Operator.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all ad valorem taxes assessed upon the Premises and all fees, and sales, use, rental, gross receipts, inventory, excise, income, business and occupation and any other taxes (including interest, penalties and additions to tax) imposed by any federal, state or local governmental authority upon Operator or BPWCP (except those taxes based upon or measured by the net income of BPWCP) in connection with the operation of the Store or in connection with any payments made pursuant to this Agreement.  Operator agrees to pay promptly when due and to hold BPWCP harmless from any taxes (including interest, penalties and additions to tax) imposed upon any property of Operator located at or used in connection with the operation of the Store.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges for the use of any loaned property.  Operator further agrees not to do any act which may result in the suspension or revocation of any permit or license required for the operation of the Store.  Operator shall furnish to BPWCP, promptly upon request, any documentation, which in BPWCP's sole discretion is required to evidence the payment of any tax, including but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and cancelled checks.

8.02  Operator shall at all times operate the Store and Premises in strict accordance with all applicable federal, state and local laws, ordinances, rules, regulations and lawful directives or orders of public officials administering such laws.  Operator agrees to immediately notify BPWCP, in writing, of any citations, notices of violation or other communications alleging violations of federal, state or local laws, ordinances, rules, regulations, directives or orders, affecting the operation of the Store and Premises.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)                    14 of 34
Uniform

8.03  Operator represents and warrants that as of the date hereof, Operator is in compliance with all leases, contracts and agreements affecting the Premises and Operator's use and possession of the Premises.

## ARTICLE 9

### Utilities

9.01  Operator shall be solely responsible for all costs of and taxes and assessments on utilities used at or provided to the Store.

## ARTICLE 10

### Appearance, Housekeeping, Maintenance, Right of Entry and Crisis Management

10.01  Operator shall comply with the housekeeping and maintenance provisions set forth in the Systems Manual and shall maintain the Premises, Store and Store Equipment in a clean, orderly, safe, graffiti free, sanitary and operable condition.  BPWCP shall perform periodic inspections, for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

10.02     In addition to the requirements of Section 10.01, Operator shall perform all maintenance, repairs, and replacement, as necessary, of the Premises, Store and Store Equipment. Replacement equipment must meet BPWCP's then-current specifications.

Notwithstanding the foregoing, in the event of destruction of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice.  The effective date of such termination shall relate back to the date of destruction.

Accidents occurring at the Premises resulting in personal injury are to be reported in writing immediately to BPWCP; such reports shall include names and addresses of people involved, names of insurance companies involved, or potentially involved, and details of the accident.

10.03  Operator shall allow BPWCP the right of entry at all times and the right to remain on the Premises for examination and inspection of the Premises, Store, Store Equipment, Operator's books, records and reports and for any and all other purposes contemplated by any other provisions of this Agreement.  BPWCP shall have the right to enter upon the Premises in order to change, alter or modify its service marks, trademarks and service names and other similar indicia.

10.04  BPWCP shall not be liable to Operator for injury to or sickness or death of Operator or any other person or persons or for the damage to Operator's property or property of others caused by any fire, breakage, failure of, or other casualty occurring to refrigeration equipment, or leakage in any portion of the Store, or from water, rain or snow that may leak into, issue or flow from any part of the Store, or from drains, pipes or plumbing work in the Store, whether such injury or damage is caused by the failure of BPWCP to make repairs or otherwise.

10.05  Except for the time routinely necessary for patrons of the authorized business(es) conducted by Operator on the Premises to conclude purchase transactions in a prompt and efficient manner, Operator agrees not to permit any person(s), including children, teenagers and off-duty employees of Operator, to loiter, i.e. spend time idly or otherwise linger in an aimless way, on or about the Premises.

10.06 Operator shall continuously operate the required Video Surveillance equipment for its intended purpose consistent with the manufacturer's instructions and BPWCP's specifications and maintain at all times the equipment, including all of its components, in good working order.

10.07 (a) Operator shall notify BPWCP in writing within 10 days after Operator receives actual notice of the commencement of any investigation, action, suit, or other proceeding, or the issuance of any order, writ, injunction, award, or other decree of any court, agency, or other Governmental Authority that pertains to the Store or that may adversely affect Operator's operation of the Store or ability to meet its obligations hereunder.

(b) Upon the occurrence of a Crisis Management Event, Operator shall immediately inform BPWCP (or as otherwise instructed in the Manual) by telephone and thereafter promptly notify BPWCP in writing of all relevant details regarding such Crisis Management Event. Operator shall cooperate fully with BPWCP with respect to BPWCP's response to the Crisis Management Event. A "Crisis Management Event" means any event that occurs at or about the Store that has or may cause harm or injury to customers or employees, such as food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, criminal activity or any other circumstances which may damage the System, Marks, or image or reputation of the am/pm store, BPWCP or its Affiliates.

(c) In the event of the occurrence of a Crisis Management Event, BPWCP may also establish emergency procedures pursuant to which BPWCP may require Operator to, among other things, temporarily close the Store to the public, in which event BPWCP shall not be liable to Operator for any losses or costs, including consequential damages or lost profits occasioned thereby.

ARTICLE 11

### Indemnity and Insurance

11.01  Operator agrees to indemnify, hold harmless and defend BPWCP from and against all claims, losses and damages for personal injury or death (whether to third persons, employees of Operator, contractors or agents of Operator), or damage to property, occurring on the Premises, or arising out of Operator's use or occupancy of the Premises, or arising out of Operator's use, custody or operation of the Store, Store Equipment, or any other equipment on the Premises excepting any damage or loss caused solely by the negligence of BPWCP or solely by BPWCP's failure to perform its obligations hereunder.

11.02  During the period this Agreement is in effect, Operator further covenants and agrees that Operator shall procure and maintain, at its expense, in full force and effect with a financially responsible insurance company, (1) Workers' Compensation Insurance, including Occupational Disease in accordance with the laws of the State in which the franchise is located, and Employers' Liability Insurance with limits of not less than $100,000 disease each employee and $100,000 each accident; and (2) General Liability Insurance with contractual liability, insuring the indemnity provision set forth in this Agreement, with products—completed operations coverage (with liquor law liability if Operator sells or dispenses alcoholic beverages)with limits of not less than $1,000,000 applicable to personal injury, including bodily injury, sickness, disease or death in any one occurrence and $200,000 for loss of or damage to property in any one occurrence or a combined single limit of not less than $1,000,000 in any one occurrence; Operator shall name BPWCP as an additional named insured under Operator's General Liability Insurance Policy.  The General Liability Policy shall contain a contractual liability endorsement insuring Operator's obligation to indemnify BPWCP pursuant to Section 11.01.  Operator shall furnish BPWCP, at its address shown herein, or such address as BPWCP may direct in writing, certificates of insurance evidencing the above-required insurances, and providing that Operator's contractual liability to BPWCP as set forth in Section 11.01 above is covered by such policy or policies and that no such policy or policies may be cancelled or changed materially without at least thirty (30) days' prior written notice to BPWCP. BPWCP reserves the right, from time to time, to revise the above stated amounts of insurance required to be maintained by Operator.  Franchisee hereby understands and agrees that any coverage provided BPWCP by

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                                16 of 34

94

Franchisee's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

## ARTICLE 12

### Promotions, Signs and Uniforms

12.01  Operator agrees to display signs and other promotional material solely in a manner as prescribed or authorized by BPWCP.  The color, size, design and location of said signs shall be as specified by BPWCP. Operator shall not place additional signs or posters in, on or about the Store and Premises without prior written consent of BPWCP.

12.02  In executing this Agreement, Operator assigns to BPWCP Operator's rights to directly receive marketing, advertising, promotional, volume and retail display and placement allowances offered by any manufacturers or suppliers of products to Operator, excluding volume discounts given off invoice by any manufacturer or supplier and payment for magazine rack placement.  Using funds collected from Operator pursuant to Section 7.04 and from other am/pm Operators and using funds collected as promotional and other allowances, BPWCP shall arrange or provide advertising and promotion which may, in BPWCP's sole discretion, include local or regional advertising placed by BPWCP, advertising copy and designs for use of Operator, display or other allowances to Operators, handbills, flyers, brochures, signs, point of purchase, billboards, high rise signs, internet advertising, other materials, the expenses of developing and producing promotions and advertising, both by outside agencies and BPWCP personnel, and marketing research. BPWCP's obligation to provide the foregoing shall be limited in cost to the amount of the advertising and promotion fee paid by Operator and funds collected as promotional and other allowances.  The entire amount of the advertising and promotion fee paid by Operator and of promotional and other allowances shall be used by BPWCP for expenses relating to advertising and promotion at such times and in such manner as BPWCP solely determines.  All promotion and advertising of the am/pm trademarks and service marks, wherever located and in whatever form, shall be deemed to benefit Operator.  BPWCP shall make no accounting to Operator of the expenditure of advertising and promotion fees or promotional and other allowances.  BPWCP may condition Operator's eligibility for and receipt of promotional, display and other allowances on Operator's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Franchisee's retail selling price commensurate with the amount of the allowance.  Operator will not be eligible to receive all allowances and incentives if Operator does not pay the then current standard advertising and promotion fee.

12.03  Operator and Operator's employees shall be attired in clean, neat uniforms, meeting BPWCP's minimum required specifications at all times while working in the Store, as set forth in the Systems Manual. Operator, Operator's transferee and Operator's successor-in-interest must order the initial supply of 20 uniforms while attending BPWCP's training program at BPWCP's training center. In the case of Concurrent Operations, Operator's employees assigned to perform duties associated with the operation of a particular franchise are required to be attired in the uniform of that franchise.

12.04  Operator shall acquire items specified by BPWCP as part of the Merchandising Accessories Items Required.  BPWCP shall give to Operator a list of the specified items prior to Operator's execution of this Agreement.  Operator shall purchase the items from an approved vendor  Operator shall maintain all merchandising accessories items required in a clean, workable and presentable condition throughout the term of the franchise.  Operator shall sell products bearing am/pm marks, including fountain drinks, frozen desserts, hot chocolate, coffee, hot prepared foods, milkshakes, etc., in standardized containers bearing am/pm marks and Operator shall use only carry-out food trays bearing am/pm marks at the Store.  Such containers and carry-out food trays shall be purchased from a vendor licensed by BPWCP and shall meet BPWCP's specifications as to type, quality, and style and shall bear the am/pm marks.  BPWCP shall, upon written request by Operator or a vendor, license any responsible vendor upon a showing that the specifications shall be met in a lawful manner and products manufactured in accordance with BPWCP's business and HSSE policies and that the terms of

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

17 of 34

license are satisfactory, provided that BPWCP reserves the right to limit the number of vendors licensed and to charge a reasonable fee to evaluate a proposed vendor.

ARTICLE 13

**Inventory, Working Capital and Required Foods and Beverages**

13.01  Operator shall at all times maintain merchandise inventory of a type, quality, quantity and variety as provided in the Systems Manual.  BPWCP reserves the right to disapprove certain products and/or services in the event that, in BPWCP's sole discretion, such products and/or services are offensive to community standards or reflect unfavorably on the am/pm trademark or goodwill. Operator shall maintain 85% compliance with the approved shelf planograms or shelf schematics as set forth in the Systems Manual and as will be modified on written notice to Operator.

13.02  Operator shall at all times maintain working capital in an amount sufficient for the payment of current operating expenses as provided for in the Systems Manual.

13.03  Operator shall be required to continuously offer for sale a reasonable inventory of certain prepared foods, frozen desserts and beverages in quantities sufficient to meet customer demand.  The items specified by BPWCP are set forth in the Section entitled "Required Foods and Beverages" of the Chapter entitled "Food Specifications" of the am/pm Store Systems Manual.  Proprietary products and certain food and beverage items are required to be purchased from approved suppliers as set forth in the Systems Manual.  Operator shall fully participate in required programs including, but not limited to, fountain program, coffee program, hot food program and such other programs specified in the Store Systems Manual. Such participation shall include using all equipment required for the program, offering all food items required for the program, using all merchandising accessories required for the program and displaying all signs and trade dress required for the program. The required programs are detailed in the Store Systems Manual.

ARTICLE 14

**Merchandising Services**

14.01  From time to time, BPWCP shall provide Operator with a list of merchandise and equipment vendors approved or suggested by BPWCP. BPWCP will, upon written request by Operator or a vendor, approve any responsible vendor for products or equipment upon showing that the specifications will be met in a lawful manner and the terms of the contract are satisfactory, provided that BPWCP reserves the right to limit the number of approved suppliers to a reasonable number and to charge a reasonable fee to evaluate a proposed vendor. BPWCP will provide a list of merchandise items required or recommended by BPWCP for purchase by Operator, and merchandising requirements and recommendations.  A suggested electronic file or the product file will also be available for the operation of the Point of Sale scannable register(s).

14.02  BPWCP shall reimburse Operator for one-half of Operator's expenditures, if any, but not more than two thousand dollars ($2,000) reimbursement, for eligible grand opening advertising which may include any of the following types of media selected by Operator; handbills and flyers, including the cost of preparation, printing and distribution thereof; direct mail advertisements, including mailing lists and postage; local newspaper advertisements; special promotional equipment; give away items; special services such as clowns; and radio advertising. All handbills, flyers, direct mail advertisements, newspaper advertisements and radio advertising must use BPWCP's approved formats, which shall be supplied to Operator.  To be eligible for reimbursement, such grand opening advertising, which event is not to exceed seven consecutive days, must be conducted following completion of original construction of the Store between the seventh (7th) and the ninetieth (90th) days after the Commencement Date or within ninety days following completion of BPWCP approved remodeling or rebuilding of an existing store.  Requests for reimbursement must be submitted by Operator to BPWCP within 90 days following the conclusion of the grand opening event.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                         18 of 34

96

## ARTICLE 15

### Books, Records, Reports, Fee Verifications Reviews and Audits

15.01  For the purposes of ascertaining the amount of the fees due and payable by Operator pursuant to this Agreement, Operator shall maintain true and accurate business records, reports, accounts, books and data (collectively referred to herein as "business records") pertaining to the operation of the Store, as more fully described in the Systems Manual. Except for records which Operator may be required to retain and maintain on the Premises at all times pursuant to governmental requirements or other provisions of this agreement or other agreements between BPWCP and Operator, upon 24-hour notice from BPWCP. Operator shall make Operator's complete business records available at the Store and shall permit BPWCP and its representatives to enter the Premises and the Store to examine Operator's business records. In addition, in executing this Agreement, Operator grants BPWCP the right to electronically collect certain sales data via Operator's point-of-sale ("P.O.S.") system, including scanning devices, for purposes of verifying fees and analyzing sales, as more fully described in the am/pm Store Systems Manual.

15.02  The acceptance by BPWCP of the monthly royalty fee and advertising and promotion fee paid by Operator shall be without prejudice to BPWCP's right to examine Operator's business records of its gross receipts and inventories of food and other merchandise at the Store in order to verify the amount of the monthly royalty, advertising and promotion fees payable by Operator to BPWCP. In addition, at any reasonable time upon twenty-four (24) hours' prior notice to Operator, BPWCP and its representatives may enter the Store and remain in the Store for the time necessary to perform fee verification reviews or audits of Operator's business records relating to the Store for the period covered by any statement required to be issued by Operator. If a reviewer dispatched by BPWCP to Operator's am/pm mini market is unable to perform a review or audit due to missing or incomplete business records, or the review/audit is cancelled or postponed by Operator such that BPWCP incurs a fee, Operator shall be required to pay BPWCP such fee or its reasonable costs incurred in attempting to perform a review or audit. Without in any way limiting BPWCP's right to review or audit or the grounds for or frequency of reviews or audits of Operator's business records, if Operator fails to submit to BPWCP the bookkeeping information required to be submitted in accordance with the am/pm Store Systems Manual, BPWCP shall have the right to review or audit Operator's business records every six months or more frequently to verify royalty fee and advertising and promotion fees due to BPWCP and, in such event, regardless of whether or not such review(s) or audit(s) disclose(s) a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing such review(s) or audit(s). BPWCP may conduct mystery shops at Operator's location to determine compliance with the terms and conditions of the franchise; in the event such mystery shops result in a fee verification review/audit, regardless of whether such review discloses a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing the review, including the then-current cost of the mystery shops. If a review or audit discloses a liability for royalty, advertising and promotion fees due to BPWCP, Operator shall pay promptly the amount of the deficiency. If the sales amount from which the deficiency is derived is two percent (2%) or more in excess of the sales actually reported for royalty purposes by Operator for such a period, Operator shall promptly pay to BPWCP, as liquidated damages and not as a penalty, the cost of the review or audit in addition to the amount of the deficiency, plus interest at the highest legal rate and, in addition, BPWCP, at its option, may terminate this Agreement upon not less than five (5) days' prior written notice to Operator of BPWCP's election to do so. Prior to giving its written consent to the transfer or assignment of the Store Agreement, BPWCP has the right to review or audit Operator's business records.

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all vendors of Operator to submit to BPWCP copy of any and all invoices evidencing sales of merchandise to Operator and Operator agrees to execute any authorization for release of such invoices to BPWCP as may be required in order for BPWCP to obtain such invoices. BPWCP may also exercise its right to examine invoices direct from vendors via Operator's release at any time.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                        19 of 34


97

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator agrees to provide BPWCP copies of State and Federal tax returns and schedules pertaining to Operator's am/pm Franchise and to execute any authorization to the tax agencies as may be necessary for BPWCP to obtain such tax returns and schedules directly from the tax agencies.

In addition, in executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all banks and other financial institutions of Operator to submit to BPWCP copies of all bank or other financial institution statements and cancelled checks reflecting cash accounts of Operator that pertain to Operator's am/pm franchise and Operator agrees to execute any authorization for release of statements and cancelled checks to BPWCP as may be required in order for BPWCP to obtain such statements and cancelled checks.

15.03   Operator shall have physical inventories performed and shall provide reports, statements and data to BPWCP as described below and as described more fully in the Systems Manual.

(a) Operator shall provide periodic reports relating to royalty fee calculations.

(b) Once every two months (at approximately 60-day intervals), Operator shall have performed a physical inventory at retail value of merchandise held for sale in the Store by an independent inventory service. BPWCP reserves the right, upon 15 days' prior written notice to Operator, to increase or decrease the interval at which physical inventories must be performed. Unless prior written approval has been obtained, merchandise off-premises shall not be included in the physical inventory count. Operator shall submit to BPWCP a statement by the service performing the inventory of the total amount of inventory in the Store. At its sole discretion, BPWCP may have the inventory performed at its expense except that if Operator postpones an inventory such that BPWCP incurs a fee, Operator shall reimburse BPWCP for such fee.

(c) In order for BPWCP to verify fees due and develop merchandising recommendations for Operator and information for the benefit of all am/pm franchises, Operator shall provide to BPWCP, or to an accounting service designated by BPWCP, such reports and data as are reasonably requested by BPWCP for such purposes and as are more fully described in the Systems Manual. Such reports and data shall be in a format as designated by BPWCP and transmitted to BPWCP, at BPWCP's option, either by diskette or electronically. Such reports shall include, but not be limited to, monthly profit and loss statements in a format acceptable to BPWCP and audited annual financial statements.

15.04   (a) Before the Commencement Date of this Agreement Operator shall purchase from BPWCP, and thereafter use and maintain, the computerized point of sale cash collection system (including all related hardware and software) (the "POS and Back Office Management System") and personal computer system (the "Computer System"), specified by BPWCP at a cost of $20,000 - $25,000 for a two POS System and installation cost of $3,500 to $5,500.

(b) The POS and Back Office Management System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network for the purpose of implementing software, transmitting and receiving data, accessing the internet for ordering and maintaining the POS and Back Office Management System. The POS and Back Office Management System shall be electronically linked to BPWCP or its designee, and Operator shall allow BPWCP and/or its designee, to poll the POS and Back Office Management System on a daily or other basis at such times and in such manner as established by BPWCP or its designee, with or without notice, and to retrieve such transaction information including sales, sales mix, usage, and other operations data as BPWCP and/or its designee deems appropriate for any purpose, including verifying fees and analyzing sales, as provided in the Manual. Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the POS and Back Office Management System, including hardware and/or software, that, from time to time, BPWCP requires. Operator shall pay a $500 per

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

20 of 34

98

year software maintenance fee, which may be increased up to 10% per year and an upgrade fee of up to $1,500 per year.

(c) The Computer System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network. BPWCP shall designate certain computer software used in the operation of Store. BPWCP may require Operator to maintain an e-mail account. Operator shall obtain all software and hardware, as BPWCP may specify to enable Operator to send and receive e-mail. Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the Computer System, including hardware and/or software, that, from time to time, BPWCP requires. Upon request, Operator shall permit BPWCP to access the Computer System and the files stored therein via any means specified, including electronic polling communications.

(d) BPWCP may provide limited maintenance services for the POS and Back Office Management System and Computer System software, as more specifically set forth in the Manual. Operator shall pay BPWCP's then-current fee for such services, or Operator may obtain maintenance and help desk services from authorized third party providers.

(e) In the event that the POS and Back Office Management System and Computer System are not available before the Commencement Date, BPWCP will lease an interim system to Operator at a cost of $400 per month and Operator will purchase and install the POS and Back Office Management System and Computer System within 30 days after notification from BPWCP that it is available.

15.05   (a) If BPWCP shall designate certain computer software used in the operation of the POS and Back Office Management System and/or Computer System which is owned or licensed by BPWCP ("Proprietary Software"), Operator shall at BPWCP's request license or sublicense such software from BPWCP or its designee and enter into a software (sub)license agreement on BPWCP's or such designee's then-current form. From time to time, Operator shall purchase any upgrades, enhancements or replacements to the Proprietary Software. BPWCP shall provide to Operator, for a reasonable fee, such support services relating to the Proprietary Software as BPWCP deems advisable. Operator must incorporate any required modifications or additions within 30 days after receiving written notice from BPWCP, unless a longer time period is stated in the notice.

(b) Except for Proprietary Software, which Operator is required to use, Operator may elect not to use the other bookkeeping, accounting and inventory services offered by BPWCP and may obtain, at its expense, any other bookkeeping, accounting and inventory services for Operator's business as Operator desires. Operator shall nevertheless be required to provide to BPWCP, or to an accounting service designated by BPWCP, the information referred to in Section 15.03.

15.06  The provisions of Article 15 shall survive termination or expiration of this Agreement.

ARTICLE 16

Training

16.01     All training courses, programs and tests offered by BPWCP shall be given only in the English language and therefore, in order to successfully complete any such courses, programs and tests, an ability to read, communicate in and comprehend English is necessary. Passing an English proficiency test is required.

Unless otherwise indicated, all training programs described herein shall be conducted at BPWCP's facilities in La Palma, California, or, at BPWCP's option, at such other locations as BPWCP may establish and may include nighttime hours in connection with on the job training at an am/pm mini market.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    21 of 34

99

All expenses, including, but not limited to transportation, meals and lodging, incurred by Operator or employee(s) of Operator in connection with attendance of Operator or employee(s) of Operator at any of BPWCP's training programs must be borne by Operator.

The person(s) required to attend and satisfactorily complete the training programs described below are identified herein as follows:

1.  Operator

    For purposes of this Article, "Operator" shall mean:

    o   The sole proprietor, if Operator is a sole proprietor;

    o   All partners or the Operational Designee as designated by the partnership in PART I, Section 16.01(a) of the Store Agreement, who must also be a partner, if Operator is a partnership; in the case of limited partnerships, the Operational Designee must be the general partner, or if more than one, one of the general partners;

    o   All shareholders or the Operational Designee as designated by the corporation in PART I, Section 16.01(a) of the Store Agreement, who must be an officer or a shareholder, if Operator is a corporation;

    o   All members or the Operational Designee as designated by the limited liability company [("LLC"), in States where allowed] in PART I, Section 16.01(a) of the Store Agreement, who must be a manager or member of the LLC, if Operator is an LLC.
        The Operational Designee, if one is designated, may, but need not be the same person designated as the Entity Designee in PART I, Section 17.02 of the Store Agreement (an Entity Designee of a Corporation must be an officer or director and own the largest percentage of shares in the corporation; an Entity Designee of an LLC must be the member owning the majority ownership interest in the LLC). If no Operational Designee is designated, all partners in a partnership (in the case of a limited partnership, the general partner, or if more than one, the general partners), all shareholders in a corporation or all members in an LLC must successfully complete the training programs.

2.  Assignee(s) of Operator

3.  Successor(s)-In-Interest to Operator

4.  Employee(s) of Operator, under the circumstances described below:

    If Operator has more than one am/pm mini market, Operator must have one employee who has attended and successfully completed a four week am/pm Store Manager training program and who is employed on a full time basis at each store in excess of one.

16.02   Following is a description of BPWCP training programs in connection with the operation of am/pm mini markets:

*Initial Franchisee Training Program*

Unless Operator, Operator's successor-in-interest, Operator's assignee, or any employee of Operator required to be trained as Operator, has successfully completed BPWCP's initial franchisee training program, such person(s) must attend and satisfactorily complete BPWCP's current initial franchisee training program before beginning operation of the store.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                              22 of 34

100

Payment of the initial franchise fee (but not the renewal fee) includes training for two people in the operation of an am/pm mini market.

The initial franchisee training program is currently seven weeks, but may be increased or decreased at BPWCP's election, and may include nighttime hours in connection with on the job training at an am/pm location.

The initial franchisee training program shall include instruction in general store management including personnel matters, customer service, merchandise control, bookkeeping and accounting and other subjects relating to the general operation of a retail store featuring convenience store service.

Except for Operator's successor(s)-in-interest and Operator's assignee(s), who are required to pay tuition for the initial franchisee training program at the then–current rate (currently the tuition for the 7-week program is $15,000), no tuition shall be charged for the initial training program for Operator, or for one or two employees eligible for training if they attend before or within thirty-six (36) months after the Commencement Date of the initial Store Agreement between Operator and BPWCP for the Premises. Attendance by additional persons shall be subject to tuition payable by Operator at the current rate. The current tuition is $7,500 per additional person, but that is subject to increase. Tuition must be paid, at BPWCP's then–current rate for initial training, for more than two persons, regardless of whether such persons in excess of two are partners, shareholders or eligible employees of Operator. If the franchise is transferred within thirty-six (36) months, a separate training fee must be paid by the transferee even if only one person has been trained up to that time.

If Operator has previously successfully completed initial franchise training program and, accordingly, Operator is not required to attend and does not attend the initial franchisee training program, Operator may elect to have one or two employees attend.

BPWCP may terminate this Agreement at any time prior to or on the completion of Operator's initial training if, in BPWCP's sole opinion, Operator does not participate in or does not complete the training program in a manner satisfactory to BPWCP. In the event of such termination, BPWCP shall return the initial fee or any other funds paid to BPWCP by Operator in connection with this Agreement, less BPWCP's expenses incurred in studying the site, preparing engineering and architectural plans for the premises, training and any other costs incurred in contemplation of Operator operating an am/pm Store.

*am/pm Store Manager Training Program*

If Operator has more than one am/pm mini market, Operator must have one employee for each store who has attended and successfully completed a six-week am/pm Store Manager training program employed on a full time basis at each store in excess of one. Such am/pm Store Manager training program must be successfully completed prior to the opening of such stores.

BPWCP offers to train one employee for each such store in the am/pm Store Manager training program. The tuition fee for the first employee so trained for each such store shall be $6,000 subject to increase in the future.

If the Store Manager trained by BPWCP is no longer employed at the Store, Operator must replace such trained Store Manager with another trained Store Manager within two months of the date such Store Manager is no longer employed at the Store or the franchise may be terminated. Operator shall be responsible for payment of tuition for training of any such replacement Store Managers (currently, tuition for training of any such replacements is $6,000, but that amount may be increased in the future).

**This space is intentionally left blank**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                              23 of 34

101

*Additional Training Requested by Operator*

BPWCP may, but is not required to, also provide Operator or Operator's employees such additional initial training or special instruction requested by Operator at such time and place and for such duration as may be mutually convenient, provided, however, that the cost of such additional instruction, including transportation, food, lodging and reasonable charges for time and services of BPWCP shall be borne by Operator.

### Additional Training Required by BPWCP

Additional training required by BPWCP in connection with changes to programs or new programs or equipment added during the term of this Agreement, BPWCP may require Operator to attend additional training not to exceed eight (8) hours per training session. Such required training shall be tuition free except that if Operator does not attend the training session at the time offered and reasonably notified by BPWCP, Operator may be required to pay a fee not to exceed $1,000 to attend such training.

## ARTICLE 17

### Assignment and Transfer

### A. ASSIGNMENT AND TRANSFER BY OPERATOR

17.01  Operator may not sell (or allow Operator's foreclosing lender to complete a sale) transfer or assign this Agreement or any of Operator rights, duties or obligations hereunder and Operator's interest in the real property and improvements, in whole or in part, without BPWCP's consent, which shall not be unreasonably withheld or delayed, and without first offering the same to BPWCP. If Operator is a party to a Contract Dealer Gasoline Agreement with BPWCP, Operator shall comply with all provisions of paragraph 18 of that agreement as well. The offer must be in writing and must specify the total purchase price, including a breakdown of the amount for real property, equipment and goodwill, with copies of purchase and sale agreements and leases associated with the real property, improvements and equipment and must also include the name and address of the proposed buyer. The Operator shall include the first installment of the transfer fee set forth in 17.01(j). The offer will not have been made until a complete legible copy of the foregoing information is received by BPWCP. BPWCP shall have 30 days from receipt of the complete written offer to accept the offer by agreeing in writing to pay the total purchase price minus the amount of the transfer fee payable to BPWCP in the event of an assignment to a third party. During the 30 day period, BPWCP may conduct environmental testing at the Premises. In case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding and Buyer shall give BPWCP a complete legible copy of the recorded Notice of Default and later recorded Notice of Sale. If BPWCP does not accept the offer within 30 days, Operator may complete the transfer or assignment to a third party subject to BPWCP's prior written consent. If Operator offers a lower price or more favorable terms which have the effect of a lower price to the third party, BPWCP's right of first refusal shall be triggered again and Operator must make the offer to BPWCP. If the assignment has not been completed within 180 days after making the original offer to BPWCP, the request for assignment will be considered abandoned by the operator.  Any further request for assignment will again trigger the right of first refusal. All communications between BPWCP and Operator with regard to the assignment, right of first refusal, offers, withdrawals, changes in terms and acceptances must be in writing. In any event, Operator may not assign this Agreement and Operator's interest in the real property and improvements without the prior written consent of BPWCP, which consent shall not be unreasonably delayed or withheld.  In order to allow BPWCP adequate time to process an assignment request, Operator will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request, and  any such request for BPWCP's consent to an assignment received 45 days or less before the expiration of the Store Agreement shall be considered for a subsequent Store Agreement between Operator and BPWCP, if such subsequent Agreement has been offered and accepted by the parties, and shall be in compliance with the provisions of such subsequent Agreement. Prior to giving its written consent, BPWCP has the right to review or audit Operator's business records,

non-lessee operator (DOFO)
anv/pm- 241WR-1 (4/2006)
Uniform                                 24 of 34

102

including but not limited to those relating to the value of inventories at cost, and BPWCP shall consider, among other things, the qualifications, character, apparent ability and creditworthiness of the proposed transferee and such other factors as BPWCP deems appropriate, including but not limited to the following:

(a) There shall be no existing default in the performance or observance of any of Operator's obligations hereunder.

(b) Operator shall have settled all outstanding accounts with BPWCP.

(c) The proposed transferee must satisfactorily demonstrate to BPWCP that it meets reasonable financial standards which shall not be more stringent than the standards applicable to new am/pm Operators at the time of the proposed assignment.

(d) Prior to the assignment, unless previously trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the proposed transferee and any employees who must be trained as described in Article 16, shall attend and satisfactorily complete BPWCP's then-current training program for new am/pm operators. Tuition shall be payable by the proposed transferee. The training tuition fee is due and payable by means of a cashier's check before the proposed transferee begins training school. For prospective transferees, the training tuition fee, which is payable by the prospective transferee to BPWCP regardless of whether or not the transferor is subject to payment of a transfer fee, shall be refunded in full in the event BPWCP refuses its consent to the transfer prior to the proposed transferee attending BPWCP's training program. In the event that BPWCP refuses its consent after the prospective transferee has started attending BPWCP's training program or the prospective transferee withdraws from the training program, BPWCP shall prorate the refund based on any remainder of training to be completed. The training tuition fee is not refundable in whole or in part upon completion of the training program. If the proposed transferee is a sole proprietor or single shareholder corporation, BPWCP shall offer to train and not charge tuition for one employee of the proposed transferee who attends the initial training within twelve months after the effective date of the assignment. BPWCP shall not reimburse the proposed transferee for any expenses incurred in connection with attendance at the training program of the transferee or the transferee's employee. An initial supply of 20 uniforms must be ordered by the transferee while attending BPWCP's training program at BPWCP's training center. In addition, prior to the effective date of the transfer and as a condition of BPWCP granting its consent to the transfer, BPWCP shall require that the transferor has all then current "Merchandising Accessories Items Required" on hand in the Store and in good condition and that any such items that are no longer clean, workable and presentable or outdated be replaced by items meeting BPWCP's then-current specifications for such items.

(e) The proposed transferee must satisfactorily demonstrate management, business and educational experience reasonably consistent, in the opinion of BPWCP, with the nature and extent of obligations of the am/pm franchise. If the proposed transferee operates one or more BPWCP locations, proposed transferee must meet the then-current requirements applicable to multiple unit operators.

(f) The proposed transferee shall agree to assume, as of the effective date of the assignment, all of the agreements and Operator's duties and obligations thereunder relating to the am/pm franchise.

(g) Operator shall agree to unconditionally release Operator's rights under this Agreement and shall release and discharge BPWCP from all duties and obligations to Operator in connection with this Agreement as of the effective date of the assignment; whereupon Operator shall have no further rights, duties or obligations under this Agreement, except for those obligations that survive the termination of the Store Agreement.

(h) Operator shall obtain and submit evidence satisfactory to BPWCP of all required approvals of federal, state and local governmental entities, agencies or instrumentalities thereof or of any third person, including but not limited to, approval for the transfer of, or issuance of a new beer and wine license, if available in the jurisdiction in which Operator's store is located.

(i)   The proposed transferee must satisfactorily meet the then-current criteria established by BPWCP for new am/pm Operators including, but not limited to, passing an English proficiency test, being at least 21 years of age and proof of U.S. citizenship or permanent resident alien status (green card).

(j)   Operator shall pay a transfer fee of $20,000 as follows: The first $1,000 of the fee is payable by Operator at the time Operator requests BPWCP's consent to an assignment of the franchise and the remainder must be paid before BPWCP's final consent is given.   In the case of Concurrent Operations, the transfer fee shall be the combined amount of the transfer fee applicable to each franchise at the Premises.   Such transfer fee is payable as follows: $1,000 at the time Operator requests BPWCP's consent to an assignment of the franchise and (a) where the proposed transferee's transfer price for the businesses shall be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, direct payment from such escrow of the remaining portion of the applicable transfer fee to BPWCP which must be paid before BPWCP's final consent to the assignment is given or (b) where the proposed transferee's transfer price for the businesses shall not be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, pay the remaining portion of the applicable transfer fee by means of a cashier's check payable to BPWCP and given to BPWCP before BPWCP's final consent to the assignment is given.   In the event that BPWCP refuses its consent to the proposed assignment prior to the proposed transferee attending BPWCP's training program, BPWCP shall refund all but $1,000 of any transfer fee paid.   In the event that BPWCP refuses its consent to the proposed assignment because the proposed transferee does not pass the English proficiency test and before the proposed transferee attends training school, BPWCP shall refund all but $300 of any transfer fee paid. Otherwise, the transfer fee is not refundable in whole or in part and shall bear no interest.   Except if there were a transfer immediately preceding the proposed assignment for which transfer (1) no transfer fee was paid, or (2) the $1,000 transfer fee referred to below in this paragraph was paid, the transfer fee shall not be payable by Operator in the event that Operator requests BPWCP to consent to an assignment of Operator's franchise to: (1) Operator's spouse, adult natural or adopted child, or parent; (2) a sole proprietorship in which the current shareholder of Operator, which is a single shareholder corporation, shall be the sole proprietor; (3) a partnership in which there are only two partners, current Operator as an individual and one other person, and in which the current Operator has at least a fifty percent interest; (4) a corporation in which there are only two shareholders, current Operator as an individual and one other person, and in which the sole shareholder of the current Operator has at least fifty percent of the issued and outstanding voting shares of stock; (5) a corporation in which current Operator, as an individual shareholder, owns one hundred percent of the issued and outstanding voting shares of stock; (6) if Operator is a corporation, the transfer of less than fifty percent of the issued and outstanding voting shares of stock; or (7) the dissolution of a two-partner partnership or a two-shareholder corporation resulting in one of the former partners remaining as the sole proprietor or one of the former shareholders remaining as the sole shareholder of the corporation or as a sole proprietor and the remaining partner or shareholder or sole proprietor had at least a fifty percent interest in the partnership or corporation prior to the dissolution; (8) a limited liability company in which current Operator has at least 50% ownership.   If and only if (1) there was a transfer immediately preceding the now proposed transfer for which no transfer fee was paid (in other words, the previous transfer qualified as a transfer without transfer fee under the terms of this Agreement), or (2) the full $20,000 transfer fee was paid, and the Operator now proposes to change its form of business through merger, consolidation or reorganization and the existing owner(s) will retain at least 66% of the ownership of the new franchise entity, then the transfer fee will be $1,000, payable at the time of the initial request for BPWCP's consent to the transfer/assignment.

(k)   If the proposed transferee operates one or more am/pm locations, he/she/it must meet the then current requirements for multiple unit operators.

(l)   Without limiting any other provision of this Agreement, the proposed transferee must agree to meet the then current standards in the operations and equipment then required of new operators, but shall not be required to spend more than $5,000 in new equipment or operational standards at the time of the assignment.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                                   26 of 34

104

BPWCP reserves the right to refuse to consent to any proposed assignment which would result in BPWCP having any material increased risk, burden or chance of not obtaining performance.

17.02  This Agreement is personal as between Operator and BPWCP and this Agreement is entered into in reliance upon and in consideration of the personal qualifications, and representations made with respect thereto, of Operator.  Operator shall not incorporate or form a partnership, a limited liability company ("LLC") or limited partnership without the prior written approval of BPWCP, which approval shall not be unreasonably withheld.  In the event Operator incorporates, BPWCP may require Operator to execute a personal guarantee and other instruments as BPWCP deems appropriate.  If Operator is a partnership or corporation, all partners or all shareholders must execute this Agreement and guarantees and other instruments, if any; however, if Operator is a limited partnership, a partnership having as members one or more general partners and one or more limited partners, Operator may designate an Entity Designee whose name is set forth in PART I, who must be the general partner, or if more than one, one of the general partners, to execute this Agreement.  If an Entity designee is designated, the Entity designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a limited liability company ("LLC"), all members must execute this Agreement and guarantees and other instruments, if any; however, if the LLC has unequal ownership by 2 members or more than 2 members, such Operator may designate an Entity Designee, whose name is set forth in PART I, who must be the member owning the majority ownership interest in the LLC, to execute this Agreement.  If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become due and payable to BPWCP pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a corporation with one, two unequal or with more than two shareholders, Operator may designate an Entity Designee whose name is set forth in PART I, who must be an officer or director and shareholder who owns the largest percentage of shares in the corporation, to execute this Agreement.  If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any of the provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require.  In the case of a corporation with two equal shareholders, both shareholders hereby agree to personally guarantee the performance of this Agreement by Operator as described earlier in this Section 17.02.

17.03  If Operator is a corporation, any transfer of its capital stock, issuance of additional stock, change in rights of any class or series of stock or contractual agreement affecting stock rights which results in present stockholder[s] as an individual or a group, as the case may be, owning legally or beneficially or having voting control of less than one hundred percent (100%) of its capital stock shall be deemed an assignment of Operator's rights under this Agreement.

17.04  Operator agrees not to change its form of business through merger, consolidation, organization or reorganization without the prior written consent of BPWCP, which shall not be unreasonably withheld, and except upon such terms and conditions as BPWCP shall then require.

17.05  In the event Operator requests BPWCP to approve an assignment, Operator agrees to produce a signed copy of the offer to purchase and accept an assignment.  BPWCP shall have no obligation to consider any request for consent to any assignment if it does not receive a copy of such offer.

17.06  Any assignment or attempt by Operator to assign any of its rights or interests under this Agreement and Operator's interest in the real property and improvements without having received the prior written consent of BPWCP shall constitute a material breach of this Agreement and BPWCP shall have the right to terminate this Agreement upon written notice to Operator.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

27 of 34

105

17.07  Operator's formation or dissolution of a partnership or adding or deleting any partner, formation or dissolution of a corporation or adding or deleting any shareholder, formation or dissolution of a LLC or adding or deleting any member shall be considered a transfer of this Agreement.

17.08  In the case of Concurrent Operations, if BPWCP consents to the transfer of this Agreement to the proposed transferee, all other franchise agreements relating to any other business conducted at the Premises shall be transferred to the same transferee.

## B. ASSIGNMENT AND TRANSFER BY BPWCP

17.09  BPWCP shall have the unrestricted right to transfer or assign all or any part of its rights or obligations under the Franchise Agreement including the right of first refusal in Article 17.01, to any person or legal entity.

## ARTICLE 18

## Termination

18.01  (a) Operator may terminate this Agreement due to a material default by BPWCP of its obligations hereunder, which default is not cured by BPWCP within 60 days after BPWCP's receipt of prompt written notice by Operator to BPWCP detailing the alleged default with specificity; provided, that if the default is such that it cannot be reasonably cured within such 60 day period, BPWCP shall not be deemed in default for so long as it commences to cure such default within 60 days and diligently continues to prosecute such cure to completion.  If Operator terminates this Agreement pursuant to this Section, Operator shall comply with all of the terms and conditions of Article 19 of this Agreement and all of the other provisions of this Agreement which expressly or by their nature survive the termination or expiration of this Agreement.

(b) In the event that Operator leases the Premises from a third party and such lease expires on its own terms and not as the result of default by Operator or amendment of the term of the lease entered into by Operator and landlord after the Effective date of this Agreement, and Operator has no contractual right to extend or renew such lease, such that the Operator loses the right to occupy the Premises, then this Agreement may be terminated by Operator upon 60 days prior written notice to BPWCP.

18.02  This Agreement may be terminated at any time by mutual agreement in writing between Operator and BPWCP.

18.03  In addition to any other remedy of BPWCP, BPWCP may terminate this Agreement on the following conditions:

(1)     BPWCP may terminate this Agreement for failure of Operator to comply with the provisions of this Agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure.

(2)     Notwithstanding the foregoing, BPWCP may terminate this Agreement by giving immediate notice of termination without an opportunity to cure upon the occurrence of any of the following events:

a.     Failure of Operator to pay any sums due to BPWCP within 5 days after receipt of written notice of default.

b.     Operator repeatedly fails to comply with one or more requirements of this Agreement, whether or not cured after notice.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

28 of 34

c.  Operator, after curing any failure pursuant to Section 1 above, engages in the same noncompliance, whether or not such noncompliance is corrected after notice.

d.  Failure of Operator to obtain the release of any attachment, garnishment, execution, lien or levy (collectively, "liens") against the Premises, Store Equipment or business of the am/pm mini market within 72 hours after any such liens attach, or such longer time as required by applicable law.

e.  Declaration of bankruptcy or judicial determination of insolvency of Operator; Operator's entry into any arrangement with creditors or assignment for the benefit of creditors or the commencement of any proceeding to appoint a receiver or trustee for Operator, its business or its property.

f.  Abandonment of the am/pm mini market by Operator.

g.  Fraud or criminal misconduct of Operator relating to the operation of the am/pm mini market or conviction of Operator of any felony involving moral turpitude.

h.  If Operator is sole proprietor, Operator's death or incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; provided, however, if Operator has, in accordance with the terms set forth in this Agreement designated a successor–in–interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

i.  If Operator is a partnership, the withdrawal of any partner or the dissolution of the partnership or the death of any partner; provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

j.  If Operator is a corporation, the death of any shareholder, or, if applicable, the death of the Entity Designee; or, the sale, transfer or other disposition (by operation of law or otherwise) of any portion of any interest in the corporation without BPWCP's prior written consent; or the termination of the Entity Designee, if applicable, as director or officer and shareholder of the corporation; or all or substantially all of the assets of the corporation are sold, conveyed or otherwise transferred, voluntarily or by operation of law. Provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of the death of the Entity Designee or any shareholder. For purposes of this Section, "corporation" shall include a limited liability company ("LLC") and "shareholders" shall include a member of the LLC..

k.  Operator's failure to commence operation of the am/pm mini market within 30 days after the Commencement Date.

l.  If a fee verification review or audit of Operator's books and records discloses liability for royalty fees due of 2% or more in excess of fees reported and paid by Operator.

m.  Misrepresentations or misstatements by Operator to BPWCP relating to the acquisition of the franchise or Operator engages in conduct which reflects materially and unfavorably upon the operation and reputation of the franchise business or system.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

29 of 34

107

n.    BPWCP makes a reasonable determination that continued operation of the franchise by the Operator will result in an imminent danger to public health or safety.

o.    In accordance with the Provisions of Article 5 of this Agreement.

(3)    Operator's assignment or transfer or attempt to assign or transfer this Agreement in whole or in part or attempt to assign or transfer the business of the am/pm mini market or attempt to assign, transfer or sublet in whole or in part the portion of the Premises upon which the store building is located, in a manner inconsistent with the provisions of Article 17 of this Agreement.

(4)    Operator's failure to successfully complete the initial training program described in Article 16 hereof; and, in the case of Operators who operate more than 1 am/pm mini market, failure of Operator to have a Store Manager trained and employed at each store; and, failure of Operator to replace such full-time Store Manager with another trained full-time Store Manager within two months from the date such designated full-time Store Manager or any of their successor(s) is/are no longer employed at the store; and, failure of Operator to comply with any other provision of Article 16 of this Agreement.

(5)    The failure of the conditions relating to obtaining permits and completion of construction or raze and rebuild or retrofit of the Premises which are described in Article 5.

(6)    A determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic market area in which the Premises are located.

18.04  In the event of destruction of all or a significant portion of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice. The effective date of such termination shall relate back to the date of destruction.

18.05  In the case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement.

18.06  If Operator is a party to a Loan Agreement and related Promissory Note, as described in Item 10 and Exhibit E of the am/pm Offering Circular for Prospective Franchisees, and Operator has not cured any default under that Loan Agreement or Promissory Note as required, BPWCP may terminate this Agreement."

## ARTICLE 19

### Procedure on Expiration or Termination

19.01  Upon expiration or termination of this Agreement, Operator shall:

(a)    Cease using the am/pm service name and service mark or other indicia of BPWCP pertaining to the am/pm system.

(b)    Return to BPWCP all copies of BPWCP's franchise accounting system software and all copies of the am/pm Manuals and all other documents, instructions, manuals, display items, materials, and writings furnished by BPWCP pertaining to the am/pm mini market franchise or bearing the am/pm service mark or service name or other service marks, trademarks or service names used in connection with the am/pm mini market; and Operator shall sell to BPWCP the Store Equipment consisting of the am/pm building sign, corner sign, building fascia and interior signage ("am/pm Sign Re-Purchase Items") and to de-identify any Operator

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

30 of 34

108

owned equipment that bears the service mark or service name or other indicia of BPWCP pertaining to the am/pm Store; and

(c)     If the Agreement has been terminated, BPWCP may pay Operator a sum equal to the amount of expenses incurred by Operator in purchasing the am/pm Sign Re-Purchase Items on a 10 year straight line depreciation value but in no event less than $2500. Operator shall permit BPWCP to enter the premises to remove the am/pm Sign Re-Purchase Items.

d)     In addition, Operator shall pay to BPWCP at the time of termination, as liquidated damages and not as a penalty, the greater of (a) the total minimum royalty fee which would have been payable under the Agreement from the date of termination of the Agreement through the end of the term provided for in the Agreement; or (b) for each month from the date of termination of the Agreement through the end of the term provided in the Agreement, the actual average royalty fee paid but not less than the minimum royalty fee for any months that the Store was operational prior to termination of the Agreement. Provided, however, that the provisions of the previous sentence shall not be applicable if the Agreement is terminated by BPWCP due to the following: (i) Operator's death; (ii) Operator's incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; (iii) condemnation or other taking, in whole or in part, of the Premises due to eminent domain; (iv) destruction of all or a substantial part of the Premises through no fault of Operator; or (v) a determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing Motor Fuels at retail or the am/pm mini market franchise in the relevant geographic market area in which Operator's Premises are located.

(e) Pay BPWCP, upon receipt of final statements, any and all sums then due and owing by Operator to BPWCP.

19.02     (a)  Upon termination of Operator's license rights under Article 1 hereof, Operator shall pay BPWCP liquidated damages of $100.00 per day for each Major Violation (as defined hereafter) and $25.00 per day for each other violation of BPWCP's am/pm service marks, trademarks and service names at the terminated am/pm mini market. (By "Major Violation" is meant the display after termination of the am/pm colored striping design on the facing of the building of the former am/pm mini market or the display of the am/pm pole sign.)

(b)     The aforesaid damages are agreed in advance by the parties because of the difficulty in ascertaining actual damages; however, such damages are not deemed to replace, or be in lieu of, damages or profits that BPWCP may be entitled to recover resulting from, or arising out of, Operator's unlicensed use of BPWCP's am/pm or other trademarks and trade names.

19.03  The provisions of this Article 19 shall survive termination or expiration of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

## ARTICLE 20

### Successor-in-Interest

20.01  Notwithstanding the terms of Sections 18.03.2(h), (i) or (j) above, this Agreement shall not terminate upon the death or incapacitation, for more than 90 consecutive days, of Operator, if Operator, prior to his or her death or incapacitation, designates a successor-in-interest to his or her interest in this Agreement in a form prescribed by BPWCP and the designated successor-in-interest assumes all of Operator's duties and obligations under the am/pm franchise (the "franchise") on the terms and conditions set forth herein.

20.02  For purposes of this Article, "Operator" shall mean:  if Operator is a sole proprietor, the sole proprietor; if Operator is a partnership, a partner of Operator or, if Operator is a corporation, a shareholder. "Successor-in-interest" shall mean either a surviving spouse or natural or adopted child or parent of Operator,

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                     31 of 34


109

provided that such spouse or child, at the time of Operator's death or incapacitation, shall be an adult and shall meet the qualifications then being required of am/pm franchisees by BPWCP for the operation of an am/pm mini market. In the case of partnerships or corporations or LLCs, "successor-in-interest" shall also mean a surviving partner or a surviving shareholder or member and, in such cases, any partner and any shareholder and any member may designate any of the others as successor-in-interest to his or her interest in this Agreement, provided that no other successor-in-interest has been designated by such partner or member or shareholder and that at the time of Operator's death or incapacitation, such surviving partner or shareholder shall meet the qualifications then being required of am/pm franchisees by BPWCP. In case of sole proprietorships, "Successor-in-interest" shall also mean a designated lawful heir, provided that such heir, at the time of Operator's death or incapacitation, is an adult and meet the qualifications then required by BPWCP for am/pm franchisees. If someone other than Operator's spouse is designated as the successor-in-interest, Operator's spouse must execute a document waiving any claim of interest in this Agreement and acknowledging that such spouse understands and agrees to the successor-in-interest designation.

20.03  The designated successor-in-interest shall be allowed 21 days after the death or incapacitation, for more than 90 consecutive days, of Operator to give written notice of his or her intention (the "Notice of Intention") to assume and operate the franchise or, in the case of a successor-in-interest to the corporate designee, written notice of his or her intention to personally guarantee performance hereof by the corporate franchisee. The notification shall contain such information regarding business experience and creditworthiness as is reasonably required by BPWCP. Except as described more fully below, unless the successor-in-interest has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the successor-in-interest must attend and successfully complete such training as is then required by BPWCP for new franchisees and within 21 days after giving the Notice of Intention commence such training.  In addition, BPWCP must approve or disapprove the successor-in-interest within 10 days after the successor-in-interest completes such training.  If the successor-in-interest successfully completes training and is approved by BPWCP, BPWCP shall give notice of approval to the successor-in-interest and the successor-in-interest must commence operation of the franchise (or execute a guarantee of performance by a corporate franchisee) within 10 days after receipt of such notice by BPWCP. The successor-in-interest shall be required to pay tuition at the then-current rate for assignees and successors-in-interest.  Provided, however, that if there is an Operational Designee who is different from the Corporate Designee successor-in-interest, it is the Operational Designee, who must attend and successfully complete the initial training, unless such Operational Designee has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market.  An initial supply of 20 uniforms must be ordered by the successor-in-interest while attending BPWCP's training program at BPWCP's training center.

20.04  The franchise available to the successor-in-interest pursuant hereto is intended to be no greater than the franchise as it exists in the name of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, with the deceased or incapacitated Operator as Guarantor) at the time of such Operator's death or incapacitation. The term of the franchise shall not be extended by reason of the successor-in-interest assuming (or guaranteeing) the franchise and BPWCP may change the terms of the franchise upon its renewal, if it is renewed. BPWCP may require Operator to arrange for the discharge or performance of other franchise obligations such as, but not limited to, insurance, but excluding any obligation to be open to the public, for a period of up to 21 days after Operator's death or incapacitation.

20.05  Operator may designate a primary and one alternate successor-in-interest.  The alternate, if one is designated, shall have no right to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event of any exercise of rights by the primary successor-in-interest.  If the alternate desires to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event the primary successor-in-interest, fails to do so, the alternate must give notice of intention to do so and otherwise comply with Section 20.03. (In the case of Concurrent Operations, the primary successor-in-interest, if one is designated, must be one and the same person designated as the primary successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises; the alternate successor, if one is designated, must be one and the same person designated as the alternate

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

32  of  34

110

successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises.)

20.06  Unless BPWCP otherwise agrees in writing, there shall be no operation of the franchise following the death or incapacitation of Operator by anyone until all parts of the franchise have been expressly assumed as herein provided, including, but not limited to, such items as licensing and tax permits.

20.07  If the successor-in-interest assumes the franchise (or, in the case of a corporate franchisee, guarantees the franchise), the successor-in-interest shall account to the heirs or estate of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, to the corporation) for the value or other disposition of personal property of the Operator located at or related to the franchise.


ARTICLE 21

General


21.01  **Right of Entry.**  In addition to specific rights of entry granted herein, BPWCP shall have the right at all times to enter the Premises for the purpose of determining Operator's compliance with the provisions of this Agreement and the Manuals.

21.02  **Entire Agreement.**  This Agreement, PARTS I and II, the Manual, as from time to time amended or supplemented, and written agreements executed by the parties contemporaneously with this Agreement pertaining to the Premises, including, if applicable, agreements relating to financing that may be offered by BPWCP and, if applicable, agreements relating to the purchase and sale of the real property where franchise is located, contain all agreements and understandings between Operator and BPWCP and cover the entire relationship between the parties concerning the Store and the am/pm franchise.   There are no oral representations, stipulations, warranties or understandings, express or implied, with respect to the subject matter of this Agreement which are not fully set forth herein or in any contemporaneously executed written agreements and in the Manuals, and all prior or contemporaneous promises, representations, agreements or understandings, express or implied, in connection with the Store and the am/pm franchise are expressly merged herein and in the Manual incorporated herein by reference.

21.03  **Compliance with Applicable Laws.**  In the event any provisions of this Agreement provide for periods of notice less than those required by applicable law, provide for termination other than in accordance with applicable law or are otherwise inconsistent with applicable law, to the extent such provisions are inconsistent with applicable law, they shall not be effective and BPWCP and Operator shall comply with applicable law regarding such matters.

21.04  **Excused Performance.**  In the event that either party hereto shall be delayed or hindered or prevented from the performance of any act required hereunder by reason of strikes, lockouts, inability to procure materials, fire, flood, act of God, failure of power, governmental law or regulation, riot, insurrection, war, or other reason of a like or similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  For the duration of such excused performance, only the minimum royalty fee shall be waived, however the royalty based on a percentage of gross sales and the advertising and promotion fee shall continue to be payable.  If the excused performance is for a period less than a full month, the minimum royalty fee shall be prorated for such partial month and Operator shall pay, as a royalty fee for such month, the greater of the royalty fee based on a percentage of gross sales or the prorated minimum.


non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

33 of 34

21.05  **Severability.**  If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

21.06  **Notices.**  Except as otherwise provided herein, all notices required or permitted by or pertaining to this Agreement shall be in writing and addressed to the party to be notified at the address for such party specified in PART I of this Agreement (as to notices to BPWCP, from time to time and upon prior written notice to Operator, BPWCP may change the address of BPWCP specified in PART I).  All notices shall be sent by prepaid certified, prepaid registered, or prepaid overnight mail, return receipt requested, and shall be deemed served as of the date of mailing or shall be personally delivered to Operator and shall be deemed served as of the date delivered.

21.07  **Waiver.**  Failure of either Operator or BPWCP to require performance of any provision of this Agreement shall not affect either party's right to require full performance thereof at any time thereafter and the waiver by either Operator or BPWCP of any provision hereof shall not constitute or be deemed a waiver of a similar breach in the future.

21.08  **Amendments.**  No amendment, addition to or alteration, modification or waiver of any provision of this Agreement shall be of any effect unless in writing and signed by Operator and an authorized representative of BPWCP.

21.09  **Prior Course of Dealing.**  BPWCP and Operator acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Operator and BPWCP by their authorized representatives.

21.10  **Approval.**  This Agreement and any modifications thereto shall not become effective and binding upon BPWCP until executed by Operator and accepted by BPWCP as evidenced by the signature of one of BPWCP's representatives authorized to execute this Agreement.  Operator's occupancy of the Store prior to such execution hereof by BPWCP shall not be construed as a waiver by BPWCP of this requirement.

21.11  **Pronouns.**  The use herein of any personal pronoun shall include the masculine, feminine and neuter pronouns.

**This space is intentionally left blank.**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

34 of 34

Facility Number <u>82461</u>
Customer Account <u>0996439</u>

## AMENDMENT TO am/pm MINI MARKET AGREEMENT
### PHASE-IN ROYALTY FEE

This AMENDMENT, dated the <u>11</u> day of <u>July</u>, 20<u>06</u>, is attached to, incorporated in and made a part of the am/pm Mini Market Agreement ("Agreement"), dated the <u>11</u> day of <u>July</u>, 20<u>06</u>, between BP West Coast Products LLC ("Company"), and <u>STTN Enterprises, Inc.</u> ("Operator").

For valuable consideration is is agreed as follows:

1,    Notwithstanding the provisions of Article 7.02(a) of the Agreement, it is agreed that for the first twelve (12) full months of operation of the store following the Commencement Date, and for the first partial month of operation, if any, the monthly minimum royalty fee shall be as follows:

| | | |
|---|---|---|
| 1st partial mo. if any | $ | _____ |
| 1st full mo. per mo. | $ | 250.00 |
| 2nd full mo. per mo. | $ | 250.00 |
| 3rd full mo. per mo. | $ | 250.00 |
| 4th full mo. per mo. | $ | 500.00 |
| 5th full mo. per mo. | $ | 500.00 |
| 6th full mo. per mo. | $ | 500.00 |
| 7th full mo. per mo. | $ | 500.00 |
| 8th full mo. per mo. | $ | 500.00 |
| 9th full mo. per mo. | $ | 500.00 |
| 10th full mo. per mo. | $ | 750.00 |
| 11th full mo. per mo. | $ | 750.00 |
| 12th full mo. per mo. | $ | 750.00 |

For the thirteenth (13th) full month of operation and thereafter, the monthly minimum royalty fee shall be $ <u>1,000.00</u>.

2.    Except as herein specifically amended, the Agreement, as heretofore amended or supplemented, shall be and therein remain in full force and effect.

**BP West Coast Products LLC**

**Franchisee**
**STTN Enterprises, Inc.**

_Cherry Heath_  7-11-06
                 Date

_(signature)_  6/20/06
Nazim Paquiryan          Date

4/05

113

Facility # <u>82461</u>
Customer Account # <u>0996439</u>

## ADDENDUM TO am/pm AGREEMENT
## FOR INSTALLATION OF ATM EQUIPMENT
### (Non-Lessee Dealers)

     This is an Addendum to the am/pm Mini Market Agreement between <u>STTN Enterprises, Inc.</u> (Franchisee) and BP West Coast Products LLC (BPWCP).

Pursuant to Article 6.02 of the am/pm Mini Market agreement between the undersigned Franchisee and BP West Coast Products LLC, BPWCP is willing to consent to the installation of an ATM Terminal at the above referenced Premises, subject to agreement and compliance with, the following terms and conditions:

1.  The only authorized ATM Terminal or ATM equipment of any nature is that provided by KeyBank of Cleveland, Ohio and installed pursuant to a Master Service Agreement for Electronic Terminal Facilities dated October 23, 1997 between BPWCP and KeyBank ("ATM Terminal").

2.  The ATM Terminal will be installed, and if necessary moved or removed, by BPWCP or KeyBank. Franchisee will not move, tamper with, modify or remove the ATM Terminal. Franchisee hereby consents to the entry, by KeyBank and its agents, upon the Premises, to install and move or remove the ATM Terminal.

3.  The ATM Terminal will be placed at the Premises as specified by BPWCP. The ATM Terminal may be removed from the Premises at any time and for any reason at the sole discretion of BPWCP. In the event the ATM Terminal is removed, Franchisee will not receive any compensation, and authorization to have such equipment will be revoked.

4.  Franchisee will permit and not impede access to the ATM Terminal by BPWCP, KeyBank, their agents and service vendors, and customers and Cardholders.

5.  Franchisee will be paid $.50 per completed cash withdrawal transaction at the ATM Terminal. Payment will be made monthly via credit to Franchisee's trade statement by BPWCP the second month after the calendar month in which the transactions have taken place. In the event that Franchisee transfers, assigns or sells its interest in the am/pm Mini Market Agreement, payment will be credited to the franchisee of record on the last day of the month in which the transactions have taken place.

6.  The ATM Terminal and signage are the sole property of KeyBank and Franchisee shall make no claim of ownership nor shall franchisee allow any lien or encumbrance to be placed on the ATM Terminal.

7.  In the event of vandalism or damage to the ATM Terminal (excluding normal wear and tear in the ordinary course of business), Franchisee will be responsible for up to the first $1000 of damage; BPWCP will be responsible for damage from $1001 to $2000 and KeyBank will be responsible for damage over $2000. Franchisee will not be responsible for any theft or loss of cash currency from the ATM Terminal.

8.  BPWCP may cancel this addendum before installation without any liability if it is determined by BPWCP or KeyBank in their sole discretion that the Premises are not suitable for an ATM Terminal due to factors including, but not limited to, security concerns, costs, and location.

9.  This is the entire agreement between the parties with regard to its subject matter and all prior agreements, promises, or representations are superseded hereby.  The terms of this addendum can only be added to, modified, or waived in writing signed by both parties.

10.  All other terms of the am/pm Mini Market Agreement, as previously amended or supplemented, shall remain in full force and effect.

FRANCHISEE:

Signature_____    Date _6/20/06___
Name of Franchisee **STTN Enterprises, Inc.**
                    Nazim Faquiryan

Title (Corp. franchisees only)_____


BP West Coast Products LLC

By:_____    Date _7-11-06_
Title _____


115