# EXHIBIT I
# TO SECOND AMENDED COMPLAINT

RECORDING REQUESTED BY
FIRST AMERICAN TITLE
4408- 2702639

Recording Requested and
When Recorded Return To:

BP West Coast Products LLC
4 Centerpointe Dr., LPR 4-243
La Palma, CA 90623-1066
Attn. Daniel J. Rolf
Facility: 82461/SCDB65975
          631 San Felipe Road
          Hollister, CA 95035

*First Cap 4408 270 2639 RB*
*Signed in Counterpart*

2007-0003267

| Recorded | REC FEE | 70.00 |
| Official Records | | |
| County of | | |
| San Benito | | |
| JOE PAUL GONZALEZ | | |
| Clerk-Recorder | | |
| | | DS |
| 02:00PM 09-Mar-2007 | Page 1 of 22 | |

Space Above For Recorder's Use Only

## CONSENT TO ENCUMBRANCE OF TENANT'S INTEREST

THIS CONSENT TO ENCUMBRANCE OF TENANT'S INTEREST ("Consent"), dated as of *march 2*, 2007, is made by AVA Global Enterprise, LLC, a California limited liability company ("Landlord") in favor of BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("Lender").

### Recitals

A.    Landlord is the owner of that certain real property located in the City of Hollister, County of San Benito, State of California, more particularly described in Exhibit "A" attached hereto (the "Real Property").

B.    Landlord and STTN Enterprise, Inc., a California corporation ("Tenant") previously entered into a ground lease dated January 2005 with respect to the Real Property ("Lease"). A "Memorandum of Lease" shall be recorded in the San Benito County Official Records.

C.    Tenant intends to construct a gasoline station and convenience store on the Real Property or make certain alterations to an existing gasoline station and convenience store. In connection therewith, Tenant will be entering into certain agreements with Lender to sell ARCO-branded gasoline at the gasoline station and operate the convenience store as an am/pm mini market franchise. The Real Property as improved with any existing or future improvements thereon shall be referred to herein as the "Property."

D.    Tenant has requested that Lender make a loan (the "Loan") to Tenant in the amount of up to Four Hundred and No/100 Dollars ($400,000.00) in connection with such construction or renovation. The Loan shall be secured by that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of even date herewith ("Leasehold Mortgage"), which Leasehold Mortgage shall encumber Tenant's leasehold estate in the Property. The Leasehold Mortgage also encumbers Tenant's personal property, including, but not limited to, all merchandise, equipment, fixtures, furnishings, furniture, machinery, inventory, tools and other property of Tenant located at or used in connection with Tenant's operations upon the Property, together with all additions, substitutions, replacements and improvements to the same, whether now owned or hereafter acquired and the proceeds and products thereof (collectively, the "Personal Property").

E.    Tenant has requested that Landlord execute and deliver this Consent to Lender as a condition to the Loan. Landlord acknowledges that Lender would not make the Loan to Tenant in the absence of this Agreement.

### Agreement

NOW, THEREFORE, Landlord agrees as follows:

1    Consent to Leasehold Mortgage. Landlord hereby consents to the recording of the Memorandum of Lease and to the encumbrance of Tenant's interest in the Lease and the Property by means of the recording of the Fee Mortgage

THIS document signed in Counterpart

1

82461 Consent to Encumbrance of Tenant's Interest v1.doc

2.    Representations and Warranties of Landlord.  Landlord hereby represents and warrants to Lender that: (a) Landlord is the owner of the Real Property, (b) there are no mortgages and deeds of trust encumbering Landlord's interest in the Real Property except as otherwise disclosed on Exhibit B, (c) the Lease is unmodified (except as shown on Exhibit C) and in full force and effect, and (d) to the best knowledge of Landlord, neither Tenant nor Landlord is in default under any of the terms, covenants or conditions contained in the Lease nor has any event occurred which would, with the passage of time, or the giving of notice, or both, constitute a default under any of the terms, covenants or conditions contained in the Lease.

3.    Amendments.  Unless Lender otherwise consents in writing, such consent not to be unreasonably withheld or delayed, (a) the Lease shall not be amended or otherwise modified, and (b) except as otherwise provided in Section 5 below, the Lease shall not be cancelled, terminated or surrendered prior to the expiration of the term thereof.

4.    Lender's Right to Receive Notices.  Landlord shall use its best efforts to mail or deliver to Lender (at the address set forth in Section 13 below) a duplicate copy of any and all notices (individually, a "Default Notice")which Landlord may from time to time give to or serve upon Tenant pursuant to the provisions of the Lease, and such copy should be mailed or delivered to Lender simultaneously with the mailing or delivery of the same to Tenant.

5.    Conditions on Termination after Tenant's Default.  If Tenant shall default under the Lease or reject the Lease in a proceeding under 11 U.S.C. or if any other event shall occur that would permit Landlord to terminate the Lease (or accept a surrender or termination of the Lease by Tenant) or exercise any other rights or remedies under the Lease (any such default, rejection, or other event being referred to herein as a "Tenant Default") and Tenant shall fail to cure such Tenant Default within any applicable grace period provided in the Lease, Landlord agrees that Landlord shall not terminate or accept a surrender of the Lease or otherwise enforce any of its rights or remedies under the Lease as a result of such Tenant Default unless (a) Lender shall have received written notice of such Tenant Default, and (b) Lender shall have failed to remedy such default or acquire Tenant's leasehold estate or commence foreclosure or other appropriate proceedings in the nature thereof, all as set forth in, and within the time specified by, Section 7 below.

6.    Lender's Right to Perform on Behalf of Tenant.  Lender shall have the right, but not the obligation, at any time prior to termination of the Lease and without payment of any penalty, to pay all of the rents due under the Lease, to effect any insurance, to pay any taxes and assessments, to make any repairs and improvements, and to do any act or thing which may be necessary and proper to be done in the performance and observance of Tenant's obligations under the Lease to prevent termination of the Lease. All payments so made and all things so done and performed by Lender shall be as effective to prevent a termination of the Lease as the same would have been if made, done, and performed by Tenant instead of by Lender.

7.    Lender's Right to Cure Tenant's Defaults.  If any Tenant Default occurs, and if the Tenant Default is such that possession of the Property may be reasonably necessary to remedy the Tenant Default,, Lender shall have until the tenth (10th) day after expiration of the applicable cure period specified in the Lease or in any Default Notice (whichever is longer) within which to remedy such Tenant Default, provided that (a) Lender shall have fully cured any default in the payment of any monetary obligations of Tenant under the Lease within such ten-(10) day period and shall continue to pay currently such monetary obligations as and when the same are due and (b) Lender shall have acquired tenant's leasehold estate created by the Lease or commenced foreclosure or other appropriate proceedings in the nature thereof within such period, or prior thereto, and is diligently prosecuting any such proceedings. All right of Landlord to terminate the Lease as the result of the occurrence of any such Tenant Default shall be subject to, and conditioned upon, Landlord first giving Lender a written notice of any such Tenant Default and Lender failing to remedy such default or acquire Tenant's leasehold estate created by the Lease or commence foreclosure or other appropriate proceedings in the nature thereof as set forth in and the within times specified by this Section 7.

8.    Tenant Defaults Which Cannot Be Remedied.  Any Tenant Default under the Lease which in the nature thereof cannot be remedied by Lender shall be deemed to be remedied if (a) within ten (10) days after expiration of the applicable cure period specified in the Lease or in any notice of Tenant Default (whichever is longer), or prior thereto, Lender shall have acquired Tenant's leasehold estate created hereby or shall have

2

3

commenced and is diligently prosecuting foreclosure or other appropriate proceedings in the nature thereof; (b) Lender shall have fully cured any default in the payment of any monetary obligations of Tenant under the Lease which do not require possession of the Property; and shall continue to pay currently such monetary obligations as and when the same are due and (c) after gaining possession of the Property, Lender performs all other obligations of Tenant under the Lease as and when the same are due.

9.    Tolling of Foreclosure Time Periods.    If Lender is prohibited by any process or injunction issued by any court or by reason of any action by any court having jurisdiction of any bankruptcy or insolvency proceeding involving Tenant from commencing or prosecuting foreclosure or other appropriate proceedings in the nature thereof, the time periods specified in Sections 7 and 8 above for commencing or prosecuting such foreclosure or other appropriate proceedings shall be extended for the period of such prohibition. However, Lender must have fully cured any default in the payment of any monetary obligations of Tenant under the Lease and shall continue to pay currently such monetary obligations as and when the same fall due.

10.    Nondisturbance of Lender's Possession; Lender's Liability and Rights.    Foreclosure of a Leasehold Mortgage, or any sale thereunder, whether by judicial proceedings or by virtue of any power contained in the Leasehold Mortgage, or any conveyance of the leasehold estate created by the Lease from Tenant to Lender through, or in lieu of, foreclosure or other appropriate proceedings in the nature thereof, shall not require the consent of Landlord or constitute a breach of any provision of or a default under the Lease. Upon such foreclosure, sale, or conveyance, Landlord shall recognize Lender, or any other foreclosure sale purchaser, as tenant under the Lease. If Lender becomes the tenant under the Lease, (a) Lender shall have the same rights as Tenant with respect to any unexercised extension options, rights of first refusal, rights of first offer or purchase options contained in the Lease.; (b) Lender shall be personally liable for the obligations of Tenant under the Lease only for the period of time that Lender remains tenant thereunder; and (c) Lender shall have the right to assign the Lease to a nominee or assignee of Lender, subject to Landlord's approval, which shall not be unreasonably withheld or delayed, without Lender assuming the obligations of Tenant under the Lease. If Lender subsequently assigns or transfers its interest under the Lease after acquiring the same by foreclosure or deed in lieu of foreclosure, and in connection with any such assignment or transfer Lender takes back a mortgage or deed of trust encumbering such leasehold interest to secure a portion of the purchase price given to Lender for such assignment or transfer, then such mortgage or deed of trust shall be considered a Leasehold Mortgage as contemplated under this Section 10 and any other provisions of this Consent intended for the benefit of Lender.

(a)    Lender

11.    Rights in Personal Property.    Landlord acknowledges and agrees that all Personal Property of Tenant whether or not affixed to the Property, and notwithstanding any Lease provisions to the contrary, shall remain personal property and shall not be subject to any lien, claim or other interest of Landlord. Landlord consents to the installation of the Personal Property on the Property, agrees that Lender may do to and with the Personal Property any or all of the acts below enumerated, and grants Lender a right, as set forth below, to enter into possession of the Property to do any or all of the following (the "Permitted Actions") with respect to the Personal Property: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale). Lender shall have the right to enter into and to occupy the Property, for the purposes described above, for an actual occupancy period of up to one hundred twenty days (at Lender's discretion), provided Lender has cured any monetary defaults under the Lease as provided above in Sections 7(a) and 8(b), following the later of: (a) Landlord placing Lender in possession of the Property; and (b) abandonment or surrender of the Property by Tenant, whether voluntary or involuntary. Landlord shall be reimbursed for, or Lender shall cause to be repaired, at its expense, all physical damage to the Property caused by the removal of the Personal Property. Landlord acknowledges that at any time prior to Landlord placing Lender in possession of the Property, or abandonment of or surrender of the Property by Tenant, Lender may take any or all of the Permitted Actions subject only to Lender's agreements with Tenant.

12.    Notices.    Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

3

4

(a)    If to Landlord:

AVA Global Enterprise, LLC,
631 San Felipe Rd.
Hollister, California 95023
Attention: Nazim M.N. Faquiryan
           Toan To
           Tao To
           Sayed M.N. Faquiryan
Facsimile No.:


(b)    If to Lender:

BP West Coast Products LLC
4 Centerpointe Drive
La Palma, California 90623-1066
Attention: Site Acquisition Manager
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

13.    Counterparts. This Consent may be executed in any number of counterparts, each of which shall constitute one original, but all such counterparts taken together shall constitute one and the same instrument.

14.    Termination of this Consent. This Consent shall automatically terminate upon full repayment of Loan.

15.    Successors and Assigns. This Consent shall inure to the benefit of and be binding on the parties hereto and their respective successors and assigns.

16.    Governing Law. This Consent shall be governed by and construed in accordance with the laws of the State of California.

17.    Entire Agreement. This Consent contains all of the agreements and understandings between the parties with respect to the subject matter of this Consent. All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Consent are expressly merged herein and superseded hereby. In the event of any conflict between the terms and conditions contained in this Consent and the terms and conditions contained in the Lease, the terms and conditions contained in this Consent shall prevail.

18.    Attorney's Fees. If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Consent, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.

IN WITNESS WHEREOF, the parties have executed this Consent as of the date first written above.

*SIGNATURES ON FOLLOWING PAGE*

4

Description: San Benito,CA Document-Year.DocID 2007.3267 Page: 4 of 22      184
Order: eee Comment:

5

"LANDLORD"

AVA GLOBAL ENTERPRISE, LLC.,
a California corporation

By: _____
    Sayed M.N. Faquiryan

By: _____
    Toan To

By: _____
    Tao To

By: _____
    Sayed M.N. Faquiryan


AGREED AND ACCEPTED BY:

"TENANT"

STTN ENTERPRISE, INC.,
a California corporation

By: _____
    Nazim S.M. Faquiryan
    President/CEO

By: _____
    Sayed M.N. Faquiryan
    Secretary and Treasurer

"LENDER"

BP WEST COAST PRODUCTS LLC,
a Delaware limited liability company


By: _____
    Jeff M. Cary
    Vice President

5

S3461 Consent to Encumbrance of Tenant's Interest v1.doc

Landlord's Lender's Agreement

_____ a _____ ("Landlord's Lender"), together with all its successors and assigns and together with any party which obtains title to the Real Property by means of a foreclosure, a deed in lieu of foreclosure, or otherwise, hereby agree that upon obtaining title to the Real Property that (i) any and all of such parties obtaining title to the Real Property shall be bound by all of the terms, covenants, conditions and agreements contained in this Consent as if such party were the Landlord hereunder and (ii) upon Lender or a successor or assign of Lender obtaining Tenant's interest in the Lease, by means of foreclosure, an assignment by Tenant in lieu of foreclosure, a new lease being entered into, or otherwise, that Lender and Lenders' participants and their successors and assigns shall succeed to the Tenant's interest in that certain Subordination, Non-Disturbance and Attornment Agreement executed between Landlord's Lender and Tenant contemporaneously herewith as if Lender were the original tenant under such Agreement. The terms of such Subordination, Non-Disturbance and Attornment Agreement shall not be amended or modified without Lender's prior written consent.

"LANDLORD'S LENDER"

By: _____

Its: _____
       [Printed Name and Title]

6

7

ACKNOWLEDGMENT

State of California                              )
County of _San Benito_                           )
                                                 )

On _March 5 2007_, before me, _Mina Faquiryan, Notary Public_, personally appeared
_Seyed M.D Faqurian_, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

ACKNOWLEDGMENT

State of California                              )
County of _San Benito_                           )
                                                 )

On _March 5 2007_, before me, _Mina Faquiryan, Notary Public_, personally appeared
_Nazim Faquiryan_, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

7

Description: San Benito,CA Document-Year.DocID 2007.3267 Page: 7 of 22
Order: eee Comment:                                                              187

# ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of *San Benito* } ss.

On *March 5 2007* before me, *Mina Faquiryan*, Notary Public

personally appeared *Tao Tu*

☑ personally known to me    - OR -    ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

WITNESS my hand and official seal.

_____
NOTARY'S SIGNATURE

## ═══ OPTIONAL INFORMATION ═══

The information below is not required by law. However, it could prevent fraudulent attachment of this acknowledgment to an unauthorized document.

### CAPACITY CLAIMED BY SIGNER (PRINCIPAL)

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER:
_____
_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____
_____

### DESCRIPTION OF ATTACHED DOCUMENT

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
OTHER

RIGHT THUMBPRINT
OF
SIGNER

Top of thumbprint here

APA 5/99          VALLEY-SIERRA, 800-362-3369

9

# ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of *San Benito*                    } ss.

On *March 5 2007* before me, *Mina Faquiryan*, Notary Public
(DATE)                                                        (NOTARY)

personally appeared *Toan To*
                                              SIGNER(S)

☑ personally known to me        - OR -        ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

WITNESS my hand and official seal.

_____
NOTARY'S SIGNATURE

## ━━━ OPTIONAL INFORMATION ━━━

The information below is not required by law. However, it could prevent fraudulent attachment of this acknowledgment to an unauthorized document.

### CAPACITY CLAIMED BY SIGNER (PRINCIPAL)

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____

_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____

### DESCRIPTION OF ATTACHED DOCUMENT

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
OTHER

RIGHT THUMBPRINT
OF
SIGNER

[Top of thumbprint here]

APA 5/99                    VALLEY-SIERRA, 800-362-3369

*10*

## EXHIBIT "A"

### Legal Description of Real Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1 AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES 30 SECONDS E 146.84 FEET.

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81 FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE POINT OF BEGINNING.

APN 051-100-040

8

82461 Consent to Encumbrance of Tenant's Interest v1.doc

## EXHIBIT "B"

### Existing Mortgages and Deeds of Trust Encumbering the Real Property

One Only:

| | |
|---|---|
| Type: | Blanket Encumbrance |
| Amount: | $1,925,000.00 |
| Firm: | Omni Financial |
| Recorded: | |
| Doc No. | 3AVA104 |

9

s2461 Consent to Encumbrance of Tenant's Interest v1.doc

12

**EXHIBIT "C"**

**Modifications to Lease**

**None**

10

s2461 Consent to Encumbrance of Tenant's Interest v1.doc

13

Recording Requested and
When Recorded Return To:

BP West Coast Products LLC
4 Centerpointe Dr., LPR 4-243
La Palma, CA  90623-1066
Attn. Daniel J. Rolf
Facility: 82461/SCDB65975
          631 San Felipe Road
          Hollister, CA 95035

*7at ceup  yyos 2702639 8B*

_____
Space Above For Recorder's Use Only

## CONSENT TO ENCUMBRANCE OF TENANT'S INTEREST

THIS CONSENT TO ENCUMBRANCE OF TENANT'S INTEREST ("Consent"), dated as of *march 1*,
2007. is made by AVA Global Enterprise, LLC., a California limited liability company ("Landlord") in favor of BP
WEST COAST PRODUCTS LLC, a Delaware limited liability company ("Lender").

### Recitals

A.      Landlord is the owner of that certain real property located in the City of Hollister, County of San
Benito, State of California, more particularly described in Exhibit "A" attached hereto (the "Real Property").

B.      Landlord and STTN Enterprise, Inc., a California corporation ("Tenant") previously entered into a
ground lease dated January 2005 with respect to the Real Property ("Lease").  A "Memorandum of Lease" shall be
recorded in the San Benito County Official Records.

C.      Tenant intends to construct a gasoline station and convenience store on the Real Property or make
certain alterations to an existing gasoline station and convenience store.  In connection therewith, Tenant will be
entering into certain agreements with Lender to sell ARCO-branded gasoline at the gasoline station and operate the
convenience store as an am/pm mini market franchise.  The Real Property as improved with any existing or future
improvements thereon shall be referred to herein as the "Property."

D.      Tenant has requested that Lender make a loan (the "Loan") to Tenant in the amount of up to Four
Hundred and No/100 Dollars ($400,000.00) in connection with such construction or renovation.  The Loan shall be
secured by that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of
even date herewith ("Leasehold Mortgage"), which Leasehold Mortgage shall encumber Tenant's leasehold estate in
the Property.  The Leasehold Mortgage also encumbers Tenant's personal property, including, but not limited to, all
merchandise, equipment, fixtures, furnishings, furniture, machinery, inventory, tools and other property of Tenant
located at or used in connection with Tenant's operations upon the Property, together with all additions,
substitutions, replacements and improvements to the same, whether now owned or hereafter acquired and the
proceeds and products thereof (collectively, the "Personal Property").

E.      Tenant has requested that Landlord execute and deliver this Consent to Lender as a condition to
the Loan.  Landlord acknowledges that Lender would not make the Loan to Tenant in the absence of this
Agreement.

### Agreement

NOW, THEREFORE, Landlord agrees as follows:

1.      Consent to Leasehold Mortgage.  Landlord hereby consents to the recording of the Memorandum
of Lease and to the encumbrance of Tenant's interest in the Lease and the Property by means of the recording of the
Fee Mortgage.

This document signed in Counterpart

82461 Consent to Encumbrance of Tenant's Interest v1.doc

1

2.    _Representations and Warranties of Landlord_.  Landlord hereby represents and warrants to Lender that:  (a) Landlord is the owner of the Real Property, (b) there are no mortgages and deeds of trust encumbering Landlord's interest in the Real Property except as otherwise disclosed on Exhibit B, (c) the Lease is unmodified (except as shown on Exhibit C) and in full force and effect, and (d) to the best knowledge of Landlord, neither Tenant nor Landlord is in default under any of the terms, covenants or conditions contained in the Lease nor has any event occurred which would, with the passage of time, or the giving of notice, or both, constitute a default under any of the terms, covenants or conditions contained in the Lease.

3.    _Amendments_.  Unless Lender otherwise consents in writing, such consent not to be unreasonably withheld or delayed, (a) the Lease shall not be amended or otherwise modified, and (b) except as otherwise provided in Section 5 below, the Lease shall not be cancelled, terminated or surrendered prior to the expiration of the term thereof.

4.    _Lender's Right to Receive Notices_.  Landlord shall use its best efforts to mail or deliver to Lender (at the address set forth in Section 13 below) a duplicate copy of any and all notices (individually, a "Default Notice")which Landlord may from time to time give to or serve upon Tenant pursuant to the provisions of the Lease, and such copy should be mailed or delivered to Lender simultaneously with the mailing or delivery of the same to Tenant.

5.    _Conditions on Termination after Tenant's Default_.  If Tenant shall default under the Lease or reject the Lease in a proceeding under 11 U.S.C. or if any other event shall occur that would permit Landlord to terminate the Lease (or accept a surrender or termination of the Lease by Tenant) or exercise any other rights or remedies under the Lease (any such default, rejection, or other event being referred to herein as a "Tenant Default") and Tenant shall fail to cure such Tenant Default within any applicable grace period provided in the Lease, Landlord agrees that Landlord shall not terminate or accept a surrender of the Lease or otherwise enforce any of its rights or remedies under the Lease as a result of such Tenant Default unless (a) Lender shall have received written notice of such Tenant Default, and (b) Lender shall have failed to remedy such default or acquire Tenant's leasehold estate or commence foreclosure or other appropriate proceedings in the nature thereof, all as set forth in, and within the time specified by, Section 7 below.

6.    _Lender's Right to Perform on Behalf of Tenant_.  Lender shall have the right, but not the obligation, at any time prior to termination of the Lease and without payment of any penalty, to pay all of the rents due under the Lease, to effect any insurance, to pay any taxes and assessments, to make any repairs and improvements, and to do any act or thing which may be necessary and proper to be done in the performance and observance of Tenant's obligations under the Lease to prevent termination of the Lease. All payments so made and all things so done and performed by Lender shall be as effective to prevent a termination of the Lease as the same would have been if made, done, and performed by Tenant instead of by Lender.

7.    _Lender's Right to Cure Tenant's Defaults_.  If any Tenant Default occurs, and if the Tenant Default is such that possession of the Property may be reasonably necessary to remedy the Tenant Default,, Lender shall have until the tenth (10th) day after expiration of the applicable cure period specified in the Lease or in any Default Notice (whichever is longer) within which to remedy such Tenant Default, provided that (a) Lender shall have fully cured any default in the payment of any monetary obligations of Tenant under the Lease within such ten (10) day period and shall continue to pay currently such monetary obligations as and when the same are due and (b) Lender shall have acquired tenant's leasehold estate created by the Lease or commenced foreclosure or other appropriate proceedings in the nature thereof within such period, or prior thereto, and is diligently prosecuting any such proceedings. All right of Landlord to terminate the Lease as the result of the occurrence of any such Tenant Default shall be subject to, and conditioned upon, Landlord first giving Lender a written notice of any such Tenant Default and Lender failing to remedy such default or acquire Tenant's leasehold estate created by the Lease or commence foreclosure or other appropriate proceedings in the nature thereof as set forth in and the within times specified by this Section 7.

8.    _Tenant Defaults Which Cannot Be Remedied_.  Any Tenant Default under the Lease which in the nature thereof cannot be remedied by Lender shall be deemed to be remedied if (a) within ten (10) days after expiration of the applicable cure period specified in the Lease or in any notice of Tenant Default (whichever is longer), or prior thereto, Lender shall have acquired Tenant's leasehold estate created hereby or shall have

2

escription: San Benito,CA Document-Year.DocID 2007.3267 Page: 14 of 22
rder: eee Comment:



commenced and is diligently prosecuting foreclosure or other appropriate proceedings in the nature thereof; (b) Lender shall have fully cured any default in the payment of any monetary obligations of Tenant under the Lease which do not require possession of the Property; and shall continue to pay currently such monetary obligations as and when the same are due and (c) after gaining possession of the Property, Lender performs all other obligations of Tenant under the Lease as and when the same are due.

9.    **Tolling of Foreclosure Time Periods.**    If Lender is prohibited by any process or injunction issued by any court or by reason of any action by any court having jurisdiction of any bankruptcy or insolvency proceeding involving Tenant from commencing or prosecuting foreclosure or other appropriate proceedings in the nature thereof, the time periods specified in Sections 7 and 8 above for commencing or prosecuting such foreclosure or other appropriate proceedings shall be extended for the period of such prohibition.  However, Lender must have fully cured any default in the payment of any monetary obligations of Tenant under the Lease and shall continue to pay currently such monetary obligations as and when the same fall due.

10.    **Nondisturbance of Lender's Possession; Lender's Liability and Rights.**    Foreclosure of a Leasehold Mortgage, or any sale thereunder, whether by judicial proceedings or by virtue of any power contained in the Leasehold Mortgage, or any conveyance of the leasehold estate created by the Lease from Tenant to Lender through, or in lieu of, foreclosure or other appropriate proceedings in the nature thereof, shall not require the consent of Landlord or constitute a breach of any provision of or a default under the Lease.  Upon such foreclosure, sale, or conveyance, Landlord shall recognize Lender, or any other foreclosure sale purchaser, as tenant under the Lease.  If Lender becomes the tenant under the Lease, (a) Lender shall have the same rights as Tenant with respect to any unexercised extension options, rights of first refusal, rights of first offer or purchase options contained in the Lease.; (b) Lender shall be personally liable for the obligations of Tenant under the Lease only for the period of time that Lender remains tenant thereunder; and (c) Lender shall have the right to assign the Lease to a nominee or assignee of Lender, subject to Landlord's approval, which shall not be unreasonably withheld or delayed, without Lender assuming the obligations of Tenant under the Lease.  If Lender subsequently assigns or transfers its interest under the Lease after acquiring the same by foreclosure or deed in lieu of foreclosure, and in connection with any such assignment or transfer Lender takes back a mortgage or deed of trust encumbering such leasehold interest to secure a portion of the purchase price given to Lender for such assignment or transfer, then such mortgage or deed of trust shall be considered a Leasehold Mortgage as contemplated under this Section 10 and any other provisions of this Consent intended for the benefit of Lender.

(a)    Lender

11.    **Rights in Personal Property.**    Landlord acknowledges and agrees that all Personal Property of Tenant, whether or not affixed to the Property, and notwithstanding any Lease provisions to the contrary, shall remain personal property and shall not be subject to any lien, claim or other interest of Landlord.  Landlord consents to the installation of the Personal Property on the Property, agrees that Lender may do to and with the Personal Property any or all of the acts below enumerated, and grants Lender a right, as set forth below, to enter into possession of the Property to do any or all of the following (the "Permitted Actions") with respect to the Personal Property:  assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale).  Lender shall have the right to enter into and to occupy the Property, for the purposes described above, for an actual occupancy period of up to one hundred twenty days (at Lender's discretion), provided Lender has cured any monetary defaults under the Lease as provided above in Sections 7(a) and 8(b), following the later of:  (a) Landlord placing Lender in possession of the Property; and (b) abandonment or surrender of the Property by Tenant, whether voluntary or involuntary.  Landlord shall be reimbursed for, or Lender shall cause to be repaired, at its expense, all physical damage to the Property caused by the removal of the Personal Property.  Landlord acknowledges that at any time prior to Landlord placing Lender in possession of the Property, or abandonment of or surrender of the Property by Tenant, Lender may take any or all of the Permitted Actions subject only to Lender's agreements with Tenant.

12.    **Notices.**  Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

3

82461 Consent to Encumbrance of Tenant's Interest v1.doc

16

(a)    If to Landlord:

AVA Global Enterprise, LLC,
631 San Felipe Rd.
Hollister, California 95023
Attention:  Nazim M.N. Faquiryan
            Toan To
            Tao To
            Sayed M.N. Faquiryan
Facsimile No.:


(b)    If to Lender:

BP West Coast Products LLC
4 Centerpointe Drive
La Palma, California 90623-1066
Attention:- Site Acquisition Manager
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

13.    Counterparts.  This Consent may be executed in any number of counterparts, each of which shall constitute one original, but all such counterparts taken together shall constitute one and the same instrument.

14.    Termination of this Consent.  This Consent shall automatically terminate upon full repayment of Loan.

15.    Successors and Assigns.  This Consent shall inure to the benefit of and be binding on the parties hereto and their respective successors and assigns.

16.    Governing Law.  This Consent shall be governed by and construed in accordance with the laws of the State of California.

17.    Entire Agreement.  This Consent contains all of the agreements and understandings between the parties with respect to the subject matter of this Consent.  All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Consent are expressly merged herein and superseded hereby.  In the event of any conflict between the terms and conditions contained in this Consent and the terms and conditions contained in the Lease, the terms and conditions contained in this Consent shall prevail.

18.    Attorney's Fees.  If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Consent, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.

IN WITNESS WHEREOF, the parties have executed this Consent as of the date first written above.

*SIGNATURES ON FOLLOWING PAGE*

4

"LANDLORD"

AVA GLOBAL ENTERPRISE, LLC.,
a California corporation

By: _____
    Sayed M.N. Faquiryan

By: _____
    Toan To

By: _____
    Tao To

By: _____
    Sayed M.N. Faquiryan

AGREED AND ACCEPTED BY:

"TENANT":

STTN ENTERPRISE, INC.,
a California corporation

By: _____
    Nazim S.M. Faquiryan
    President/CEO

By: _____
    Sayed M.N. Faquiryan
    Secretary and Treasurer

"LENDER"

BP WEST COAST PRODUCTS LLC,
a Delaware limited liability company

By: _____
    Jeff M. Carr
    Vice President

5

82461 Consent to Encumbrance of Tenant's Interest v1.doc

18

Landlord's Lender's Agreement

_____ n\a _____ a _____ n\a _____ ("Landlord's Lender"), together with all its successors and assigns and together with any party which obtains title to the Real Property by means of a foreclosure, a deed in lieu of foreclosure, or otherwise, hereby agree that upon obtaining title to the Real Property that (i) any and all of such parties obtaining title to the Real Property shall be bound by all of the terms, covenants, conditions and agreements contained in this Consent as if such party were the Landlord hereunder and (ii) upon Lender or a successor or assign of Lender obtaining Tenant's interest in the Lease, by means of foreclosure, an assignment by Tenant in lieu of foreclosure, a new lease being entered into, or otherwise, that Lender and Lenders' participants and their successors and assigns shall succeed to the Tenant's interest in that certain Subordination, Non-Disturbance and Attornment Agreement executed between Landlord's Lender and Tenant contemporaneously herewith as if Lender were the original tenant under such Agreement. The terms of such Subordination, Non-Disturbance and Attornment Agreement shall not be amended or modified without Lender's prior written consent.

"LANDLORD'S LENDER"

_____ n\a _____

By: _____

Its: _____

[Printed Name and Title]

82461 Consent to Encumbrance of Tenant's Interest v1.doc

escription: San Benito,CA Document-Year.DocID 2007.3267 Page: 18 of 22                198
rder: eee Comment:

19

ACKNOWLEDGMENT

State of California                    )
                                       )
County of                              )

On _3|2|07__, before me, PRISCILLA SMITH, NOTARY PUBLIC, personally appeared
JEFF CLARY _____, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

> PRISCILLA SMITH
> Commission # 1537634
> Notary Public - California
> Orange County
> My Comm. Expires Jan 14, 2009

ACKNOWLEDGMENT

State of California                    )
                                       )
County of                              )

On ___ _____, before me, _____, personally appeared
_____, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

7

82461 Consent to Encumbrance of Tenant's Interest v1.doc

escription: San Benito,CA Document-Year.DocID 2007.3267 Page: 19 of 22
rder: eee Comment:

# EXHIBIT "A"

### Legal Description of Real Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1 AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES 30 SECONDS E 146.84 FEET;

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81 FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE POINT OF BEGINNING.

APN: 051-100-040

82461 Consent to Encumbrance of Tenant's Interest v1.doc

escription: San Benito,CA Document-Year.DocID 2007.3267 Page: 20 of 22
rder: eee Comment:                                                           200

**EXHIBIT "B"**

**Existing Mortgages and Deeds of Trust Encumbering the Real Property**

One Only:

Type:          Blanket Encumbrance

Amount:        $1,925,000.00

Firm:          Omni Financial

Recorded:

Doc No.:       3AVA104

9

escription: San Benito,CA Document-Year.DocID 2007.3267 Page: 21 of 22
rder: eee Comment:

201

**EXHIBIT "C"**

**Modifications to Lease**

**None**

82461 Consent to Encumbrance of Tenant's Interest v1.doc

Description: San Benito,CA Document-Year.DocID 2007.3267 Page: 22 of 22
Order: eee Comment:

# EXHIBIT J
# TO SECOND AMENDED COMPLAINT

## SECURED PROMISSORY NOTE
### (am/pm Mini Market)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation, (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) (the "Maximum Loan Amount"), or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below. This Note evidences a loan ("Loan") from Lender to Borrower.

1.      This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property"). It may also be secured by other collateral. This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower. Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note. Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

2.      The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to Four and Seventy Five percent (4.75%) per annum.[1] Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan. Borrower shall also make annual principal reduction payments as provided in the Loan Agreement. Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

3.      All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

4.      All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

5.      Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

6.      Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

7.      If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment. In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

8.      From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate. Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]    The interest rate currently approved for CD Loans is 4.75% per annum but is subject to change. The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.

1

9.      If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

     (a)      Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

     (b)      Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

     (c)      Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.      If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law. In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.      This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.      Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.      If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note. No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender. All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.      This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance. Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.      If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:   CEO and President

By _____
Name:  Sayed M.N. Faquiryan
Title:   Secretary and Treasurer

3

# EXHIBIT K
# TO SECOND AMENDED COMPLAINT

**07-7113015712**
**05/07/2007 11:16**



**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS



12580180002    UCC 1 FILING

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

10024734
**AmeriSearch**
1232 Q Street
Sacramento, CA 95814

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | STTN Enterprise, Inc., a California corporation | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 631 San Felipe Road | Hollister | CA | 95035 | US |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | corporation | California | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | BP West Coast Products LLC, a Delaware limited liability company | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4 Centerpointe Drive | La Palma | CA | 90623-1066 | US |

4. This FINANCING STATEMENT covers the following collateral:

The property located at 631 San Felipe Road, Hollister, California 95035

See attached Schedule and Schedule 2.

| 5. ALTERNATIVE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum (if applicable) | | ☐ Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

MH # 1081099

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Debtor:            STTN Enterprise, Inc., a California corporation
Secured Party:     BP West Coast Products LLC, a Delaware limited liability
                   company

## SCHEDULE 1

### Legal Description of Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF
HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED
AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER,
COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1
AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF
PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON
SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT
OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF
BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID
RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT
CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A
CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH
OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL
ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES
30 SECONDS E 146.84 FEET;

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81
FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE
POINT OF BEGINNING.

APN: 051-100-040

Debtor:              STTN Enterprise, Inc., a California corporation
Secured Party:       BP West Coast Products LLC, a Delaware limited liability
                     company

## SCHEDULE 2

## DESCRIPTION OF PERSONAL PROPERTY

(a)     All personal property (including, without limitation, all goods, supplies, equipment, pipes, gasoline dispensers, underground storage tanks, furniture, furnishings, fixtures, machinery, inventory, and construction materials) in which Trustor now or hereafter acquires an interest or right, which is now or hereafter located on or affixed to the Real Property or the Improvements or used in the operation, use or occupancy thereof or the construction of any Improvements thereon, together with any interest of Trustor in and to personal property which is leased or subject to any superior security interest, and all books, records, leases and other agreements, documents, and instruments of whatever kind or character, relating to the Real Property, Improvements, or such personal property;

(b)     All fees, income, rents, issues, profits, earnings, receipts, royalties, and revenues which, after the date hereof and while any portion of the Obligations remains unpaid or unperformed, may accrue from such personal property or any part thereof or from the Real Property, the Improvements or any other part of the Trust Estate, or which may be received or receivable by Trustor from any hiring, using, letting, leasing, subhiring, subletting, subleasing, occupancy, operation, or use thereof;

(c)     All of Trustor's present and future rights to receive payments of money, services, or property from or through the Real Property or Improvements, including without limitation, rights to all deposits from tenants of the Real Property or Improvements, accounts and other accounts receivable, deposit accounts, chattel paper, notes, drafts, contract rights, instruments, general intangibles, and principal, interest and payments due on account of goods sold or leased, services rendered, loans made or credit extended, together with title to or interest in all agreements, documents, and instruments evidencing, securing or guarantying the same, affecting or arising from or through the Real Property or the Improvements;

(d)     All other intangible property and rights relating to the Real Property, the Improvements, the personal property described in Paragraph (a) above or the operation, occupancy, or use thereof, including, without limitation, to the extent assignable, all governmental and non-governmental permits, licenses, and approvals relating to construction on or operation, occupancy, or use of the Real Property or Improvements, all names under or by which the Real Property or Improvements may at any time be operated or known, all rights to carry on business under any such names, or any variant thereof, all trade names and trademarks, relating in any way to the Real Property or the Improvements, and all good will in any way relating to the Real Property or the Improvements;

210

(e)    Trustor's rights under all insurance policies covering the Real Property, the Improvements, the Personal Property, and the other parts of the Trust Estate and any and all proceeds, loss payments, and premium refunds payable regarding the same;

(f)    All reserves, deferred payments, deposits, refunds, cost savings, and payments of any kind relating to the construction of any Improvements on the Real Property;

(g)    All water stock relating to the Real Property;

(h)    All causes of action, claims, compensation, and recoveries for any damage to, destruction of, or condemnation or taking of the Real Property, the Improvements, the Personal Property, or any other part of the Trust Estate, or for any conveyance in lieu thereof, whether direct or consequential, or for any damage or injury to the Real Property, the Improvements, the Personal Property, or any other part of the Trust Estate, or for any loss or diminution in value of the Real Property, the Improvements, the Personal Property, or any other part of the Trust Estate;

(i)    All architectural, structural, mechanical, and engineering plans and specifications prepared for construction of Improvements or extraction of oil, minerals or gravel from the Real Property and all studies, data, and drawings related thereto; and also all contracts and agreements of Trustor relating to the aforesaid plans and specifications or to the aforesaid studies, data, and drawings or to the construction of Improvements on or extraction of oil, minerals or gravel from the Real Property;

(j)    All sales contracts entered into with any party for the sale of all or any part of the Real Property, including, without limitation, all amendments, modifications, extensions and supplements thereto, together with all security, reservation and other deposits received or to be received by Trustor in connection therewith; and

(k)    Except for the excess, all proceeds from sale or disposition of any of the aforesaid collateral.

As used in this Schedule 2, the terms "Real Property", "Improvements", "Personal Property" shall have the meanings set forth in the Deed of Trust to which this Schedule 2 is attached.

# EXHIBIT L
# TO SECOND AMENDED COMPLAINT

## UNCONDITIONAL CONTINUING GUARANTY

In order to induce BP WEST COAST PRODUCTS LLC, a Delaware limited liability company, its successors and assigns ("Lender") having an office at 4 Centerpointe Dr., LPR 6-180, La Palma, CA 90623-1066, to enter into or continue a loan agreement (collectively, the "Loan Agreement"), as amended from time to time, with STTN ENTERPRISE, INC., a California corporation limited partnership ("Debtor"), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees as follows:

1.      The undersigned, Sayed M.N. Faquiryan and Mahgul Faquiryan (collectively, "Guarantor") hereby irrevocably, fully and unconditionally guaranties to Lender the prompt performance and payment when due, whether by acceleration or otherwise, of all of the following (collectively, the "Obligations"): All loans, advances, indebtedness, liabilities, debit balances, letter of credit or purchase guaranty reimbursement obligations, covenants, duties and all other obligations of whatever kind or nature at any time or from time to time owing by Debtor to Lender, or to any of Lender's affiliates, whether fixed or contingent, known or unknown, liquidated or unliquidated, present or future, no matter how or when arising and whether under said Loan Agreement or any other present or future agreement or otherwise, and including without limitation all obligations owed by Debtor to third parties which are or may be assigned to Lender. In addition, the undersigned agree (s) to fully indemnify Lender against any claim, harm, loss, damage, liability, cost or expense (including all costs, attorneys' fees, accounting fees and investigation fees) incurred in connection with any action, nonperformance or breach by Debtor of said Loan Agreement, or any breach of or failure to perform any representation, promise, agreement or warranty of Debtor or any wrongful acts, conduct or omission or fraud of Debtor. **Notwithstanding anything herein to the contrary, the maximum liability of the undersigned under this Guaranty is limited to the principal amount of FOUR HUNDRED AND SEVENTY FIVE THOUSAND Dollars ($475,000.00), plus accrued and unpaid interest, and any costs, expenses and fees of enforcement of this Guaranty or the Loan Agreement; provided, however, that if any of the Obligations arise from false information which was provided by Debtor to Lender where Debtor knew that such information was false or Debtor was grossly negligent in providing such information to Lender, then, the liability of the undersigned for such Obligations shall be unlimited. In connection with the foregoing, the undersigned shall not be liable for any punitive damages unless the undersigned individually or with others caused such false information to be provided to Lender.**

2.      The undersigned waives notice of acceptance of this Guaranty and notice of any liability to which it may apply, and waives diligence, presentment, demand for payment, protest, notice of protest, non-performance, dishonor or nonpayment of any such liabilities and/or the Obligations, notices of the existence, creation, incurring of new or additional indebtedness, suit or taking other action by Lender against, and any other notice to, any party liable thereon (including the undersigned), and waives any defense, offset or counterclaim to any liability hereunder and the performance of each and every condition precedent to which the undersigned might otherwise be entitled by law. The undersigned further waives: i) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Debtor or any other person, or to proceed against any property of any kind securing any of the Obligations, or to exercise any right of offset or other right with respect to reserves held by Lender; ii) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in any property of Debtor or any other person; iii) any defense based upon any failure of Lender to give the undersigned notice of any sale or other disposition of any collateral securing any of the Obligations, or any failure of Lender to comply with any provision of applicable law in enforcing any security interest in any collateral securing any of the Obligations, including without limitation any failure by Lender to dispose of any collateral in a commercially reasonable manner; iv) the benefit of all statutes of limitations with respect to any action based upon, arising out of or relating to this Guaranty; v) any rights under the doctrine of marshalling of assets or any other similar doctrines. Without limiting the generality of any of the foregoing or any other provision of this Guaranty, the undersigned expressly waive any and all benefit which otherwise may be available to the undersigned under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433 or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise and/or any similar law of California or of any other jurisdiction. There are no conditions precedent or other conditions of any kind to the effectiveness of this Guaranty, and this Guaranty is immediately effective.

3.      Lender may at any time from time to time (whether or not after revocation or termination of this Guaranty) without the consent of, or notice to, the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions

and in whole or in part: (i) change the manner, place or terms or payment, or change or extend the time of payment of, renew, alter or release Debtor or any other guarantor from any of the Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, renewed or altered; (ii) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Obligations hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or offset there against; (iii) exercise or refrain from exercising or release any rights against Debtor or others (including the undersigned) or otherwise act or refrain from acting; (iv) settle or compromise any of the Obligations hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect of said Obligations and/or security therefor or this Guaranty, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) to creditors of Debtor other than Lender and the undersigned; and (v) apply any sums by whomsoever paid or howsoever realized to any of the Obligations regardless of what Obligations or other liabilities of Debtor remain unpaid.

4.      No invalidity, irregularity or unenforceability of all or any part of the Obligations hereby guaranteed or of any security therefor or of said factoring agreement or any amendment or supplement thereto or any other document existing between Lender and Debtor shall affect, impair or be a defense to this Guaranty and its enforceability. The liability of the undersigned hereunder is primary and unconditional and not merely that of a surety and shall not be subject to any offset, defense or counterclaim of Debtor. This Guaranty is a continuing one and all Obligations to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. The books and records of Lender showing the account and dealings and transactions between Lender and Debtor shall be admissible in evidence in any action or proceeding, including photocopies thereof, shall be binding upon the undersigned for the purpose of establishing the items and amounts set forth therein, and shall constitute prima facie evidence thereof, except that monthly statements rendered by Lender to Debtor shall constitute, to the extent to which no objection is made within thirty (30) days after date thereof, an account stated between Lender and Debtor that shall be binding upon the undersigned. As to each of the undersigned, this Guaranty shall continue until ninety (90) days after written notice of revocation signed by such undersigned has been actually received by Lender, notwithstanding a revocation by, or the death of, or complete or partial release for any cause, of any one or more of the remainder of the undersigned, other guarantors or of Debtor, or of anyone liable in any manner for the Obligations hereby guaranteed, or for the liabilities (including those herein) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase, decrease or change in personnel of any one or more of the undersigned or other guarantors which may be partnerships or corporations.

5.      No revocation or termination hereof shall affect in any manner any of the rights arising under this Guaranty with respect to (i) Obligations which shall have been created, contracted, assumed or incurred prior to or within ninety (90) days after actual receipt by Lender of written notice of such revocation or termination and all extensions, renewals and modifications of said Obligations, or (ii) Obligations which shall have been created, contracted, assumed or incurred more than ninety (90) days after receipt of such written notice pursuant to any contract entered into by Lender prior to expiration of said ninety (90) day period.

6.      Upon the happening of any of the following events: the failure to pay, fulfill or perform any of the Obligations when due, or any breach or failure to perform by Debtor or any of the undersigned of any representation, promise, agreement or warranty to Lender, or any revocation, breach or termination by any of the undersigned of this Guaranty, or the death or insolvency of Debtor or any of the undersigned or suspension of business of Debtor or any of the undersigned or the issuance of any writ of attachment against any of the property of Debtor or any of the undersigned, or the making by Debtor or any of the undersigned or any assignment for the benefit of creditors, or a trustee or receiver being appointed for Debtor or any of the undersigned or for any property of either of them, or any proceeding being commenced by or against Debtor or any of the undersigned under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute - then and in any such event and at any time thereafter, Lender may, without notice to Debtor or any of the undersigned, declare any or all of the Obligations, whether or not then due, immediately due and payable hereunder by any of the undersigned, and Lender shall be entitled to enforce the obligations of any or all of the undersigned hereunder. All sums of money at any time to the credit of the undersigned with Lender or any of its affiliates and any of the property of any or all of the undersigned at any time in the possession of Lender or

any of its affiliates may be held by or on behalf of Lender as security for any and all obligations of the undersigned hereunder notwithstanding that any of said money or property may have been deposited, pledged or delivered by the undersigned for any other, different or specific purpose. Any and all present and future indebtedness and obligations of Debtor to the undersigned, and any and all claims of any nature which the undersigned may now or hereafter have against Debtor are hereby subordinated to the full payment to Lender of the Obligations, and are hereby assigned to Lender as additional collateral security therefor. If Lender so requests, any such indebtedness of Debtor to the undersigned shall be collected, enforced and received by the undersigned as trustees for Lender and be paid over to Lender on account of the Obligations but without reducing or affecting in any manner the liability of the undersigned under the other provisions of this Guaranty.

7.    Whether or not any suit, claim or proceeding is filed, the undersigned agrees to reimburse and compensate Lender on request or demand for all attorneys' fees, accounting fees, investigation fees and all other costs and expenses incurred by Lender in enforcing this Guaranty or any supplement or amendment thereto or arising out of, or relating in any way to this Guaranty or any supplement or amendment thereto, or in enforcing any of the Obligations against Debtor, the undersigned or any other person. In the event Lender or the undersigned file any lawsuit, action, claim or proceeding against the other predicated on a breach or nonperformance of this Guaranty or any supplement or amendment thereto or to enforce any rights under, or to obtain any declaratory or equitable or other relief as to the terms or provisions of, this Guaranty or any supplement or amendment thereto, the prevailing party in such lawsuit, action, claim or proceeding shall be entitled to recover its attorneys' fees, accounting fees, investigation fees and costs of suit from the non-prevailing party.

8.    If claim is ever made upon Lender for repayment of any amount or amounts received by Lender in payment of or on account or pursuant to of of any of the Obligations and Lender repays all or part of said amount by reason of (i) any judgment, decree or order of any Court or adjudicatory or administrative body having jurisdiction over Lender or any of its property, or (ii) any settlement or compromise of any claim effected by Lender with any such claimant (including Debtor), then and in any such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation or release hereof or the cancellation of any note or other instrument evidencing any of the Obligations, or any release or any such Obligations, and the undersigned shall be and remain liable to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The provisions of this paragraph shall survive, and continue in effect, notwithstanding any revocation or release hereof.

9.    No delay on the part of Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of, and as actually authorized by, Lender, and each such waiver, if any, shall apply only with respect to the specific instance, matter or transaction involved, and shall in no way impair the rights of Lender or the obligations of the undersigned to Lender in any other respect, instance, matter or transaction at any other time. The undersigned hereby expressly and unconditionally waives all rights of subrogation, reimbursement and indemnity of every kind against Debtor, and all rights of recourse to any assets or property of Debtor, and all rights to any collateral or security held for the payment and performance of any Obligations, including (but not limited to) any of the foregoing rights which the undersigned may have under any present or future document or agreement with any Debtor or other person, and including (but not limited to) any of the foregoing rights which the undersigned may have under any equitable doctrine of subrogation, implied contract, or unjust enrichment, or any other equitable or legal doctrine.

10.    The undersigned consent and agree that, without notice to or by the undersigned and without affecting or impairing in any way the obligations or liability of the undersigned hereunder, Lender may, from time to time, before or after revocation of this Guaranty, exercise any right or remedy it may have with respect to any or all of the Obligations or any property securing any or all of the Obligations or any guaranty thereof, including without limitation judicial foreclosure, nonjudicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and the undersigned expressly waive any defense based upon the exercise of any such right or remedy, notwithstanding the effect thereof upon any of the undersigned's rights, including without limitation, any destruction of the undersigned's right of subrogation against Debtor and any destruction of the undersigned's right of contribution or other right against any other guarantor of any or all of the Obligations or against any other person, whether by operation of Sections 580a, 580d or 726 of the California Code

of Civil Procedure, or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise. Without limiting the generality of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the Obligation is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by Debtor; and (ii) If Lender forecloses on any real property collateral pledged by Debtor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to collect from Debtor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure. In addition, without limiting the generality of any of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the guarantee of another guarantor is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by the other guarantor, and (ii) If Lender forecloses on any real property collateral pledged by the other guarantor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to obtain contribution from the other guarantor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the obligations of the other guarantor are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

11.    The undersigned is presently informed of the status and financial condition of Debtor and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. The undersigned hereby covenants that they will continue to keep themselves informed of Debtor's status and financial condition and of all other circumstances which bear upon the risk of nonpayment. The undersigned hereby waives the right, if any, to require Lender to disclose to it any information which Lender may now or hereafter acquire concerning such status, condition or circumstances.

12.    Neither Lender, nor any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender shall be liable for any claims, demands, losses or damages, of any kind whatsoever, made, claimed, incurred or suffered by the undersigned or any other party through the ordinary negligence of Lender, or any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender.

13.    The undersigned agrees that any claim or cause of action by the undersigned against Lender, or any of Lender's directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Guaranty, or any other present or future agreement between Lender and the undersigned or between Lender and Debtor, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, whether or not relating hereto or thereto, occurred, done, omitted or suffered to be done by Lender, or by Lender's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by the undersigned by the commencement of an action or proceeding in a court of competent jurisdiction within Los Angeles County, California by the filing of a complaint within one (1) year after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter. The undersigned agrees that such one (1) year period is a reasonable and sufficient time for the undersigned to investigate and act upon any such claim or cause of action. The one (1) year period provided herein shall not be waived, tolled, or extended except by a specific written agreement of Lender. This provision shall survive any termination of this Guaranty or any other agreement.

14.    This Guaranty was made and entered into in the State of California and the rights and obligations of Lender and of the undersigned hereunder shall be governed and construed in accordance with the laws of the State of California; and this Guaranty is binding upon the undersigned, his, her, their or its executors, administrators, trustees, receivers, parents, holding companies, affiliates, successors and assigns, and shall inure to the benefit of

Lender, its successors and assigns. As a material part of the consideration to the Lender for accepting this Guaranty, the undersigned (i) agree that, at the option of Lender, all actions and proceedings based upon, arising out of or relating in any way directly or indirectly to this Guaranty shall be litigated exclusively in courts located within Los Angeles County, California, (ii) consent to the jurisdiction of any such court and consent to the service of process in any such action or proceeding by personal delivery, first class mail, or any other method permitted by law, and (iii) waive any and all rights to transfer or change the venue of any such action or proceeding to any court located outside Los Angeles County, California.

15.    The undersigned acknowledge that the acceptance of this Guaranty by Lender does not constitute a commitment by Lender to extend credit to Debtor or to permit Debtor to incur Obligations. All sums due from the undersigned to Lender hereunder shall bear interest from the date due to the date paid at a rate equal to the highest rate charged with respect to the Obligations.

16.    The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" wherever used herein shall mean the undersigned or any one or more of them. The term "Debtor", if more than one is named as such, shall mean all or any one thereof. Anyone signing this Guaranty shall be bound hereby, whether or not anyone else signs this Guaranty at any time. The term "Lender" includes any agent or representative of Lender acting for it. If any provision or portion of this Guaranty or any supplement or amendment thereto is held to be illegal, invalid or unenforceable by a court or adjudicatory body of competent jurisdiction, said provision or portion shall be deemed to be severed and deleted and the remainder shall continue to be valid and enforceable. This Guaranty is the entire and only agreement and understanding between the undersigned and Lender with respect to the guarantee of the Obligations and the subject matter of this Guaranty, and all representations, arrangements, agreements, and undertakings, oral or written, previously or contemporaneously made, which are not set forth herein, are superseded hereby. No course of dealing between the parties, no usage of the trade and no parole or extrinsic evidence of any nature shall be used or be relevant to supplement, explain or modify any term or provision of this Guaranty or any supplement or amendment thereto. The undersigned acknowledge receipt of a copy of this Guaranty, and certifies that the undersigned have read all of said document, and fully understand and agree to the same, before having signed it.

17.    MUTUAL WAIVER OF JURY TRIAL. LENDER AND THE UNDERSIGNED HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, LAWSUIT OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO: I) THIS GUARANTY OR ANY SUPPLEMENT OR AMENDMENT THERETO; OR II) ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND THE UNDERSIGNED; OR III) ANY BREACH, CONDUCT, ACTS OR OMISSIONS OF LENDER OR THE UNDERSIGNED OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSON AFFILIATED WITH OR REPRESENTING LENDER OR THE UNDERSIGNED; IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

IN WITNESS WHEREOF, the undersigned has/have executed this Guaranty.

"GUARANTOR"

By: _____          Date: _1-19-07_
Sayed M.N. Faquiryan
SS#: ███████

By: _Mahgul A. Faquiryan_          Date: _1-19-07_
Mahgul Faquiryan
Spouse
SS#: ███████

Address of Guarantors: 708 Antiquity Dr., Fairfield, California 94535

82461guaranty Sayed Faquiryan1          5

ACKNOWLEDGMENT

State of California          )
County of *San Benito*       )

On *1/19/07*        before me, *Mina Faquiryan*, personally appeared
*Sayed Ad. N Faquiryan*, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)


ACKNOWLEDGMENT

State of California          )
County of *San Benito*       )

On *1/19/07*        before me, *Mina Faquiryan*, personally appeared
*Mahgul Faquiryan*, personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)



MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

82461guaranty Sayed Faquiryan1          6

218

## UNCONDITIONAL CONTINUING GUARANTY

In order to induce BP WEST COAST PRODUCTS LLC, a Delaware limited liability company, its successors and assigns ("Lender") having an office at 4 Centerpointe Dr., LPR 6-180, La Palma, CA 90623-1066, to enter into or continue a loan agreement (collectively, the "Loan Agreement"), as amended from time to time, with STTN ENTERPRISE, INC., a California corporation limited partnership ("Debtor"), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees as follows:

1.       The undersigned, Nazim S.M. Faquiryan (collectively, "Guarantor") hereby irrevocably, fully and unconditionally guaranties to Lender the prompt performance and payment when due, whether by acceleration or otherwise, of all of the following (collectively, the "Obligations"): All loans, advances, indebtedness, liabilities, debit balances, letter of credit or purchase guaranty reimbursement obligations, covenants, duties and all other obligations of whatever kind or nature at any time or from time to time owing by Debtor to Lender, or to any of Lender's affiliates, whether fixed or contingent, known or unknown, liquidated or unliquidated, present or future, no matter how or when arising and whether under said Loan Agreement or any other present or future agreement or otherwise, and including without limitation all obligations owed by Debtor to third parties which are or may be assigned to Lender. In addition, the undersigned agree (s) to fully indemnify Lender against any claim, harm, loss, damage, liability, cost or expense (including all costs, attorneys' fees, accounting fees and investigation fees) incurred in connection with any action, nonperformance or breach by Debtor of said Loan Agreement, or any breach of or failure to perform any representation, promise, agreement or warranty of Debtor or any wrongful acts, conduct or omission or fraud of Debtor. Notwithstanding anything herein to the contrary, the maximum liability of the undersigned under this Guaranty is limited to the principal amount of FOUR HUNDRED AND SEVENTY FIVE THOUSAND Dollars ($475,000.00), plus accrued and unpaid interest, and any costs, expenses and fees of enforcement of this Guaranty or the Loan Agreement; provided, however, that if any of the Obligations arise from false information which was provided by Debtor to Lender where Debtor knew that such information was false or Debtor was grossly negligent in providing such information to Lender, then, the liability of the undersigned for such Obligations shall be unlimited. In connection with the foregoing, the undersigned shall not be liable for any punitive damages unless the undersigned individually or with others caused such false information to be provided to Lender.

2.       The undersigned waives notice of acceptance of this Guaranty and notice of any liability to which it may apply, and waives diligence, presentment, demand for payment, protest, notice of protest, non-performance, dishonor or nonpayment of any such liabilities and/or the Obligations, notices of the existence, creation, incurring of new or additional indebtedness, suit or taking other action by Lender against, and any other notice to, any party liable thereon (including the undersigned), and waives any defense, offset or counterclaim to any liability hereunder and the performance of each and every condition precedent to which the undersigned might otherwise be entitled by law. The undersigned further waives: i) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Debtor or any other person, or to proceed against any property of any kind securing any of the Obligations, or to exercise any right of offset or other right with respect to reserves held by Lender; ii) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in any property of Debtor or any other person; iii) any defense based upon any failure of Lender to give the undersigned notice of any sale or other disposition of any collateral securing any of the Obligations, or any failure of Lender to comply with any provision of applicable law in enforcing any security interest in any collateral securing any of the Obligations, including without limitation any failure by Lender to dispose of any collateral in a commercially reasonable manner; iv) the benefit of all statutes of limitations with respect to any action based upon, arising out of or relating to this Guaranty; v) any rights under the doctrine of marshalling of assets or any other similar doctrines. Without limiting the generality of any of the foregoing or any other provision of this Guaranty, the undersigned expressly waive any and all benefit which otherwise may be available to the undersigned under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433 or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise and/or any similar law of California or of any other jurisdiction. There are no conditions precedent or other conditions of any kind to the effectiveness of this Guaranty, and this Guaranty is immediately effective.

3.       Lender may at any time from time to time (whether or not after revocation or termination of this Guaranty) without the consent of, or notice to, the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions

and in whole or in part: (i) change the manner, place or terms or payment, or change or extend the time of payment of, renew, alter or release Debtor or any other guarantor from any of the Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, renewed or altered; (ii) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Obligations hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or offset there against; (iii) exercise or refrain from exercising or release any rights against Debtor or others (including the undersigned) or otherwise act or refrain from acting; (iv) settle or compromise any of the Obligations hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect of said Obligations and/or security therefor or this Guaranty, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) to creditors of Debtor other than Lender and the undersigned; and (v) apply any sums by whomsoever paid or howsoever realized to any of the Obligations regardless of what Obligations or other liabilities of Debtor remain unpaid.

4.    No invalidity, irregularity or unenforceability of all or any part of the Obligations hereby guaranteed or of any security therefor or of said factoring agreement or any amendment or supplement thereto or any other document existing between Lender and Debtor shall affect, impair or be a defense to this Guaranty and its enforceability. The liability of the undersigned hereunder is primary and unconditional and not merely that of a surety and shall not be subject to any offset, defense or counterclaim of Debtor. This Guaranty is a continuing one and all Obligations to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. The books and records of Lender showing the account and dealings and transactions between Lender and Debtor shall be admissible in evidence in any action or proceeding, including photocopies thereof, shall be binding upon the undersigned for the purpose of establishing the items and amounts set forth therein, and shall constitute prima facie evidence thereof, except that monthly statements rendered by Lender to Debtor shall constitute, to the extent to which no objection is made within thirty (30) days after date thereof, an account stated between Lender and Debtor that shall be binding upon the undersigned. As to each of the undersigned, this Guaranty shall continue until ninety (90) days after written notice of revocation signed by such undersigned has been actually received by Lender, notwithstanding a revocation by, or the death of, or complete or partial release for any cause, of any one or more of the remainder of the undersigned, other guarantors or of Debtor, or of anyone liable in any manner for the Obligations hereby guaranteed, or for the liabilities (including those herein) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase, decrease or change in personnel of any one or more of the undersigned or other guarantors which may be partnerships or corporations.

5.    No revocation or termination hereof shall affect in any manner any of the rights arising under this Guaranty with respect to (i) Obligations which shall have been created, contracted, assumed or incurred prior to or within ninety (90) days after actual receipt by Lender of written notice of such revocation or termination and all extensions, renewals and modifications of said Obligations, or (ii) Obligations which shall have been created, contracted, assumed or incurred more than ninety (90) days after receipt of such written notice pursuant to any contract entered into by Lender prior to expiration of said ninety (90) day period.

6.    Upon the happening of any of the following events: the failure to pay, fulfill or perform any of the Obligations when due, or any breach or failure to perform by Debtor or any of the undersigned of any representation, promise, agreement or warranty to Lender, or any revocation, breach or termination by any of the undersigned of this Guaranty, or the death or insolvency of Debtor or any of the undersigned or suspension of business of Debtor or any of the undersigned or the issuance of any writ of attachment against any of the property of Debtor or any of the undersigned, or the making by Debtor or any of the undersigned or any assignment for the benefit of creditors, or a trustee or receiver being appointed for Debtor or any of the undersigned or for any property of either of them, or any proceeding being commenced by or against Debtor or any of the undersigned under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute - then and in any such event and at any time thereafter, Lender may, without notice to Debtor or any of the undersigned, declare any or all of the Obligations, whether or not then due, immediately due and payable hereunder by any of the undersigned, and Lender shall be entitled to enforce the obligations of any or all of the undersigned hereunder. All sums of money at any time to the credit of the undersigned with Lender or any of its affiliates and any of the property of any or all of the undersigned at any time in the possession of Lender or

any of its affiliates may be held by or on behalf of Lender as security for any and all obligations of the undersigned hereunder notwithstanding that any of said money or property may have been deposited, pledged or delivered by the undersigned for any other, different or specific purpose. Any and all present and future indebtedness and obligations of Debtor to the undersigned, and any and all claims of any nature which the undersigned may now or hereafter have against Debtor are hereby subordinated to the full payment to Lender of the Obligations, and are hereby assigned to Lender as additional collateral security therefor. If Lender so requests, any such indebtedness of Debtor to the undersigned shall be collected, enforced and received by the undersigned as trustees for Lender and be paid over to Lender on account of the Obligations but without reducing or affecting in any manner the liability of the undersigned under the other provisions of this Guaranty.

7.    Whether or not any suit, claim or proceeding is filed, the undersigned agrees to reimburse and compensate Lender on request or demand for all attorneys' fees, accounting fees, investigation fees and all other costs and expenses incurred by Lender in enforcing this Guaranty or any supplement or amendment thereto or arising out of, or relating in any way to this Guaranty or any supplement or amendment thereto, or in enforcing any of the Obligations against Debtor, the undersigned or any other person. In the event Lender or the undersigned file any lawsuit, action, claim or proceeding against the other predicated on a breach or nonperformance of this Guaranty or any supplement or amendment thereto or to enforce any rights under, or to obtain any declaratory or equitable or other relief as to the terms or provisions of, this Guaranty or any supplement or amendment thereto, the prevailing party in such lawsuit, action, claim or proceeding shall be entitled to recover its attorneys' fees, accounting fees, investigation fees and costs of suit from the non-prevailing party.

8.    If claim is ever made upon Lender for repayment of any amount or amounts received by Lender in payment of or on account or pursuant to of any of the Obligations and Lender repays all or part of said amount by reason of (i) any judgment, decree or order of any Court or adjudicatory or administrative body having jurisdiction over Lender or any of its property, or (ii) any settlement or compromise of any claim effected by Lender with any such claimant (including Debtor), then and in any such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation or release hereof or the cancellation of any note or other instrument evidencing any of the Obligations, or any release or any such Obligations, and the undersigned shall be and remain liable to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The provisions of this paragraph shall survive, and continue in effect, notwithstanding any revocation or release hereof.

9.    No delay on the part of Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of, and as actually authorized by, Lender, and each such waiver, if any, shall apply only with respect to the specific instance, matter or transaction involved, and shall in no way impair the rights of Lender or the obligations of the undersigned to Lender in any other respect, instance, matter or transaction at any other time. The undersigned hereby expressly and unconditionally waives all rights of subrogation, reimbursement and indemnity of every kind against Debtor, and all rights of recourse to any assets or property of Debtor, and all rights to any collateral or security held for the payment and performance of any Obligations, including (but not limited to) any of the foregoing rights which the undersigned may have under any present or future document or agreement with any Debtor or other person, and including (but not limited to) any of the foregoing rights which the undersigned may have under any equitable doctrine of subrogation, implied contract, or unjust enrichment, or any other equitable or legal doctrine.

10.    The undersigned consent and agree that, without notice to or by the undersigned and without affecting or impairing in any way the obligations or liability of the undersigned hereunder, Lender may, from time to time, before or after revocation of this Guaranty, exercise any right or remedy it may have with respect to any or all of the Obligations or any property securing any or all of the Obligations or any guaranty thereof, including without limitation judicial foreclosure, nonjudicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and the undersigned expressly waive any defense based upon the exercise of any such right or remedy, notwithstanding the effect thereof upon any of the undersigned's rights, including without limitation, any destruction of the undersigned's right of subrogation against Debtor and any destruction of the undersigned's right of contribution or other right against any other guarantor of any or all of the Obligations or against any other person, whether by operation of Sections 580a, 580d or 726 of the California Code

of Civil Procedure, or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise. Without limiting the generality of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the Obligation is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by Debtor; and (ii) If Lender forecloses on any real property collateral pledged by Debtor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to collect from Debtor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure. In addition, without limiting the generality of any of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the guarantee of another guarantor is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by the other guarantor, and (ii) If Lender forecloses on any real property collateral pledged by the other guarantor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to obtain contribution from the other guarantor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the obligations of the other guarantor are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

11.    The undersigned is presently informed of the status and financial condition of Debtor and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. The undersigned hereby covenants that they will continue to keep themselves informed of Debtor's status and financial condition and of all other circumstances which bear upon the risk of nonpayment. The undersigned hereby waives the right, if any, to require Lender to disclose to it any information which Lender may now or hereafter acquire concerning such status, condition or circumstances.

12.    Neither Lender, nor any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender shall be liable for any claims, demands, losses or damages, of any kind whatsoever, made, claimed, incurred or suffered by the undersigned or any other party through the ordinary negligence of Lender, or any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender.

13.    The undersigned agrees that any claim or cause of action by the undersigned against Lender, or any of Lender's directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Guaranty, or any other present or future agreement between Lender and the undersigned or between Lender and Debtor, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, whether or not relating hereto or thereto, occurred, done, omitted or suffered to be done by Lender, or by Lender's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by the undersigned by the commencement of an action or proceeding in a court of competent jurisdiction within Los Angeles County, California by the filing of a complaint within one (1) year after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter. The undersigned agrees that such one (1) year period is a reasonable and sufficient time for the undersigned to investigate and act upon any such claim or cause of action. The one (1) year period provided herein shall not be waived, tolled, or extended except by a specific written agreement of Lender. This provision shall survive any termination of this Guaranty or any other agreement.

14.    This Guaranty was made and entered into in the State of California and the rights and obligations of Lender and of the undersigned hereunder shall be governed and construed in accordance with the laws of the State of California; and this Guaranty is binding upon the undersigned, his, her, their or its executors, administrators, trustees, receivers, parents, holding companies, affiliates, successors and assigns, and shall inure to the benefit of

Lender, its successors and assigns. As a material part of the consideration to the Lender for accepting this Guaranty, the undersigned (i) agree that, at the option of Lender, all actions and proceedings based upon, arising out of or relating in any way directly or indirectly to this Guaranty shall be litigated exclusively in courts located within Los Angeles County, California, (ii) consent to the jurisdiction of any such court and consent to the service of process in any such action or proceeding by personal delivery, first class mail, or any other method permitted by law, and (iii) waive any and all rights to transfer or change the venue of any such action or proceeding to any court located outside Los Angeles County, California.

15.    The undersigned acknowledge that the acceptance of this Guaranty by Lender does not constitute a commitment by Lender to extend credit to Debtor or to permit Debtor to incur Obligations. All sums due from the undersigned to Lender hereunder shall bear interest from the date due to the date paid at a rate equal to the highest rate charged with respect to the Obligations.

16.    The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" wherever used herein shall mean the undersigned or any one or more of them. The term "Debtor", if more than one is named as such, shall mean all or any one thereof. Anyone signing this Guaranty shall be bound hereby, whether or not anyone else signs this Guaranty at any time. The term "Lender" includes any agent or representative of Lender acting for it. If any provision or portion of this Guaranty or any supplement or amendment thereto is held to be illegal, invalid or unenforceable by a court or adjudicatory body of competent jurisdiction, said provision or portion shall be deemed to be severed and deleted and the remainder shall continue to be valid and enforceable. This Guaranty is the entire and only agreement and understanding between the undersigned and Lender with respect to the guarantee of the Obligations and the subject matter of this Guaranty, and all representations, arrangements, agreements, and undertakings, oral or written, previously or contemporaneously made, which are not set forth herein, are superseded hereby. No course of dealing between the parties, no usage of the trade and no parole or extrinsic evidence of any nature shall be used or be relevant to supplement, explain or modify any term or provision of this Guaranty or any supplement or amendment thereto. The undersigned acknowledge receipt of a copy of this Guaranty, and certifies that the undersigned have read all of said document, and fully understand and agree to the same, before having signed it.

17.    MUTUAL WAIVER OF JURY TRIAL. LENDER AND THE UNDERSIGNED HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, LAWSUIT OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO: I) THIS GUARANTY OR ANY SUPPLEMENT OR AMENDMENT THERETO; OR II) ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND THE UNDERSIGNED; OR III) ANY BREACH, CONDUCT, ACTS OR OMISSIONS OF LENDER OR THE UNDERSIGNED OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSON AFFILIATED WITH OR REPRESENTING LENDER OR THE UNDERSIGNED; IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

IN WITNESS WHEREOF, the undersigned has/have executed this Guaranty.

"GUARANTOR"

By: _____          Date: _1-/9-07_____
      Nazim S.M. Faquiryan
SS# ████████

Address of Guarantors: 783 Antiquity Dr., Fairfield, California 94535

ACKNOWLEDGMENT

State of California            )
                              )
County of *San Benito*        )

On _1/19/07_, before me, _Mina Faquiryan_ personally appeared _Nazim SM Faquiryan_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



_(Signature)_

> MINA FAQUIRYAN
> Commission # 1494761
> Notary Public - California
> Santa Clara County
> My Comm. Expires Jun 13, 2008

82461guaranty Nazim Faquiryan1                6

# EXHIBIT N
# TO SECOND AMENDED COMPLAINT

5/4/2007

BP West Coast Products
4 Centerpointe Dr.
La Palma, Ca. 90623


Mr. Tom Reeder:

We, Nazim Faquiryan & Sayed Faquiryan, agree to pay an additional
$30,000.00 by certified check payable to BPWCP on or before the 15th day
of each month beginning June 20, 2007 until total sums of balance due are
paid in full per BP credit dept.

These separate monthly payments will continue until all outstanding
balances due BPWCP, currently, $184,075.50 have been paid.

We further agree that our BPWCP account will not increase in delinquent
amounts due.

Sincerely,

Nazim Faquiry                    5-4-2007

Sayed Faquiryan                  5-4-2007

WITNESS

BRAD CHRISTENSEN                 5-4-2007

226

# EXHIBIT M
# TO SECOND AMENDED COMPLAINT



**bp**

BP West Coast Products LLC

4 Centerpointe Drive
La Palma, CA 90623-1066

Mailing Address: Box 5077
Buena Park, CA 90622-5077

## NOTICE OF DEFAULT

Facility Number <u>82461</u>

☐    Certified Mail - Return Receipt Requested (7005 1160 0000 4099 2107)
☐    Personal Delivery

STTN Enterprises Inc.
631 San Felipe Road
Hollister, CA 95035

**You are hereby notified** that you are in default of your obligations under the terms and conditions of the foregoing Agreement in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said default was observed on the date and at the approximate time shown below.

| |
|---|
| Title of Agreement:<br>Contract Dealer Gasoline Agreement |
| Violation of Articles/Sections:<br>Article/Section:  2 - Orders<br>Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. |
| Details of Violation: (If applicable)<br><br>Franchisee refused to accept first ARCO gas load. |
| |
| |
| |
| Date default was observed: October 11, 2006<br><br>Approximate Time Default was observed: 11:30 a.m.<br>By: Brad Christensen<br><br>Date Default to be cured: |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this <u>12th</u> day of <u>October, 2006</u>.
BP West Coast Products LLC

By: _____
       Tom Reeder – Regional Sales Manager

cc:  B. Christensen
       Dealer File



**bp** BP West Coast Products LLC

4 Centerpointe Drive
La Palma, CA 90623-1066

Mailing Address: Box 5077
Buena Park, CA 90622-5077

## NOTICE OF DEFAULT

Facility Number <u>82461</u>

☐   Certified Mail - Return Receipt Requested (7005 1160 0000 4099 2145)
☐   Personal Delivery

STTN Enterprises Inc.
631 San Felipe Road
Hollister, CA 95035

**You are hereby notified** that you are in default of your obligations under the terms and conditions of the foregoing Agreement in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said default was observed on the date and at the approximate time shown below.

| |
|---|
| Title of Agreement: <br> Contract Dealer Gasoline Agreement |
| Violation of Articles/Sections: <br> Article/Section: 2 - Orders <br> Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. |
| Details of Violation: (If applicable) <br><br> Franchisee refused to accept this morning's fuel delivery. <br><br><br><br><br> |
| Date default was observed: October 16, 2006 <br><br> Approximate Time Default was observed: 6:00 a.m. <br> By: Brad Christensen <br><br> Date Default to be cured: October 19, 2006 |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this <u>18th</u> day of October, 2006.
BP West Coast Products LLC

By: _____
    Tom Reeder – Regional Sales Manager

cc: D. Strenk
    B. Christensen
    Dealer File



 **BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2541

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the
default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| | | |
|---|---|---|
| Title of Agreement: **Contract Dealer Gasoline Agreement** | | |
| Violation of Articles/Sections: am/pm: | Gas: 5, 6 | System Manual: |
| Description: Pay for products prior to their delivery in U.S. dollars. | | |

Details of Violation: (if applicable)

Franchise did not have sufficient funds (NSF) available to pay for gas loads.  Check was  returned on 1/8/07.

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
|---|---|---|---|
| **January 08, 2007** | **15:17:00** | by: **CHRISTENSN** | **January 30, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 23 day of January, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02497848
APPC-440-8-PC Version (9-94)

 **BP West Coast Products LLC**

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2565

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
am/pm:                    Gas: 5, 6                    System Manual: .

Description:
Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)
Failure to pay for fuel loads.

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **January 26, 2007** | **20:42:00**  by:  **CHRISTENSN** | **February 01, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 29 day of January, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number:  02497857
APPC-440-B-PC Version (9-94)

231

 **BP West Coast Products LLC**

**Default Notice**

Facility Number: **82461**

**Certified Mail**
**Return Receipt Requested #:**

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 5, 6 | System Manual: |

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Franchisee is being defaulted for non payment of gasoline.

Note:  One 2/2/07, fuel load was brought to the site and there was no Cashier's check available for load payment. Load was dropped anyway.  On 2/6/07, Franchise Consultant (Brad Christensen made an agreement with Franchisee that Franchisee would put extra for $22K in with next delivery (paying a total of $44K).  On the next delivery only one check was included in payment for $22,500 on 2/7/07.  Refer to inv. #3022358998 and 3022375842.

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
|---|---|---|---|
| February 15, 2007 | 10:27:00 | by: CHRISTENSN | February 20, 2007 |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 20 day of February, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

Document Number: 02498466
APPC-440-B-PC Version (9-94)

**U.S. Postal Service**
**CERTIFIED MAIL   RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*
For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| Postage | $ | |
|---|---|---|
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

7005 1160 0000 4099 2718

**BP West Coast Products LLC**

Default Notice

Facility Number: 82461

Certified Mail
Return Receipt Requested #: 7005 1160 0000 4099 2817

STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA  95035

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: | | |
|---|---|---|
| **Contract Dealer Gasoline Agreement** | | |
| Violation of Articles/Sections: | | |
| am/pm: | Gas: 5, 6 | System Manual: |
| Description: | | |
| Pay for products prior to their delivery in U.S. dollars. | | |

Details of Violation: (if applicable)

Failure to pay for gasoline.  Franchisee's payment was returned due to non sufficient funds.
Check #1220 returned due to Franchisee putting a stop payment,

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
|---|---|---|---|
| **March 05, 2007** | **14:28:00** | by:  CHRISTENSN | **March 22, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 15 day of March, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

Document Number: 02489113
APPC-440-B-PC Version (9-94)

U.S. Postal Service
CERTIFIED MAIL  RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To

Street, Apt. No.;

7005 1160 0000 4099 2817

233

 **BP West Coast Products LLC**

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2817

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
am/pm:                    **Gas: 5, 6**                    System Manual:

Description:
Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)
Failure to pay sums due on account as of 3/5/07.  Amount due - $164,950.81.

Doc. date   Doc. no.      Amount     BOL Date   BOL #    Text
1/1/2007    3022056233   $21,078.93  12/31/06   0556080  returned on 1/08/07 due to stop payment
1/8/2007    3022120003   $20,859.48  1/7/07     0559505  returned NSF on 1/16/07
1/14/2007   3022159335   $20,866.68  1/11/07    0561573  returned on 1/19&1/25 due to stop payment  1/15/2007
3022178299  $21,472.44   1/13/07     0562666    inv. held per fc site has issues due to power outage
1/21/2007   3022213698   $20,938.66  1/19/2007  0565619  returned on 1/26/07 due to stop payment
SEE ATTACHMENT FOR MORE INFORMATION

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
|---|---|---|---|
| **January 30, 2007** | **14:28:00** | by: **CHRISTENSN** | **March 22, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 15 day of March, 2007.
BP West Coast Products LLC

By:   _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number: 02499116
APPC-440-B-PC Version (9-94)

234

**BP West Coast Products LLC**

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 410 6971

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 15.1,17.1(k), Exh.A | System Manual: |

Description:

Operate premises accordance with all applicable federal, state and local laws (health,safety,etc.)

Details of Violation: (If applicable)

Failure to operate in accordance with laws.
Facility operator left fuel dispensing equipment turned on so customers could pump gasoline without an employee attendant present for safety measures, as prescribed by law.  On Friday, March 30, 2007, at 6:16 a.m., a BP employee witnessed and confirmed a fueling purchase when no employee was present on site.  Facility was closed and customer could access PIC for fueling transaction.  A PIC printed receipt was generated as evidence of fuel purchase.  This facility's dispensing permit does not allow for fueling without a station employee present.

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| **March 30, 2007** | **06:16:00**  by:  **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 5 day of April, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02499914
APPG-440-B-PC Version (9-94)

235

| Doc. date | Doc. no. | Amount | BOL Date | BOL.# | Text |
|---|---|---|---|---|---|
| 1/24/2007 | 3022253575 | $20,836.93 | 1/23/2007 | 0567848 | returned on 1/31/07 due to stop payment |
| 1/31/2007 | 3022309234 | $20,851.09 | 1/30/2007 | 0571519 | first COD invoice |
| | | | | | **check #1220 returned due to dlr putting stop payment** |
| 2/5/2007 | 3022358998 | $21,338.16 | 2/2/2007 | 0573078 | |
| 2/7/2007 | 3022375842 | $21,897.50 | 2/7/2007 | 0575276 | |
| 2/12/2007 | 3022414847 | $21,252.22 | 2/10/2007 | 0576943 | |
| | | | | | dlr gave driver $1,800 in cash - Scott Murdock converted to CCHK |
| 2/14/2007 | 3022432918 | $21,084.27 | 2/14/2007 | 0578900 | check not yet posted |
| 2/19/2007 | 3022468658 | $22,136.36 | 2/17/2007 | 0580700 | check not yet posted |
| 2/21/2007 | 3022487185 | $21,563.53 | 2/20/2007 | 0582187 | check not yet posted |
| 2/25/2007 | 3022513117 | $22,138.70 | 2/24/2007 | 0584166 | check not yet posted |
| 2/26/2007 | 3022525674 | $22,167.59 | 2/26/2007 | 0585118 | check not yet posted |
| 3/4/2007 | 3022579291 | $22,968.27 | 3/2/2007 | 0587337 | check not yet posted |

Total due bp:    <u>**$343,450.81**</u>

Net due bp:    <u>**$164,950.81**</u>

236

 **BP West Coast Products LLC**

**Default Notice**

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7006 3450 0000 3879 4174

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: am/pm: | Gas: 2 | System Manual: |
|---|---|---|

Description:
Have all grades of motor fuels available for sale to the public

Details of Violation: (if applicable)

All motor fuels available.   Failure to have all grades of Motor Fuels available for sale to the public.   . On 5/10 & 5/14/2007, Franchise Consultant, CMS, and Regional Sales Manager  observed that no diesel fuel was available for customers.

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **May 14, 2007** | **11:00:00   by:   CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 17 day of May, 2007.
BP West Coast Products LLC

By:

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number: 02501379
APPC-440-B-PC Version (9-94)

237

 **BP West Coast Products LLC**

**Default Notice**

Facility Number: 82461

**Certified Mail**
**Return Receipt Requested #: 7007 0710 0004 4236 3239**

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1 day. Immediately

| Date Default Observed | | Date Default to be cured: |
|---|---|---|
| **August 24, 2007** | **17:00:00** by: **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504284
APPC-440-B-PC Version (9-84)

238



**BP West Coast Products LLC**

**Default Notice**

Facility Number: 82461

**Certified Mail**
**Return Receipt Requested #: 7007 0710 0004 4236 3246**

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

Violation of Articles/Sections:
am/pm:          Gas: 2          System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (If applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1 day. Immediately

| August 25, 2007 | 17:00:00 | by: CHRISTENSN | Date Default to be cured: |
|---|---|---|---|

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504295
APPC-440-B-PC Version (9-94)



**BP West Coast Products LLC**

**Default Notice**

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3253

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).  Cure date:  1. day. Immediately

| Date Default was observed: | Approx. Time: | By: | Date Default to be cured: |
| --- | --- | --- | --- |
| **August 26, 2007** | **13:15:00** | by: **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504296
APPC-440-B-PC Version (9-94)

240



**BP West Coast Products LLC**

**Default Notice**

Facility Number: 82461

**Certified Mail**
**Return Receipt Requested #: 7007 0710 0004 4236 3260**

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the
default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days: Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1 day. Immediately

| | | | Date Default to be cured: |
| --- | --- | --- | --- |
| August 27, 2007 | 17:00:00 | by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02804297
APPC-440-B-PC Version (9-94)



**BP West Coast Products LLC**

**Default Notice**

Facility Number: **82461**

**Certified Mail**
**Return Receipt Requested #: 7007 0710 0004 4236 3277**

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

**Details of Violation: (if applicable)**

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues, 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1 day. Immediately

| | | Date Default to be cured: |
| --- | --- | --- |
| **August 28, 2007** | **17:00:00   by:  CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number:  02504298
APPC-440-B-PC Version (9-94)

 **BP West Coast Products LLC**

**Default Notice**

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3284

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (If applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).  Cure date:  1, day;  Immediately

| | | Date Default to be cured: |
|---|---|---|
| August 29, 2007 | 16:30:00    by:   CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
STRENK
DEALER FILE

Document Number:  02504299
APPC-440-B-PC Version (9-94)

**BP West Coast Products LLC**

Default Notice

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3291

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

Violation of Articles/Sections:

am/pm:              Gas: 2                          System Manual: Sec. 1

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money.  He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).  Cure date:  1. day. Immediately

| **August 30, 2007** | 17:00:00    by: **CHRISTENSN** | Date Default to be cured: |
|---|---|---|

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_ (signature)
        _____

            **Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
       STRENK
       DEALER FILE

Document Number:  02504300
APPC-440-B-PC Version (9-94)

244



 **BP West Coast Products LLC**

**Default Notice**

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3345

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

Violation of Articles/Sections:
am/pm:                          Gas: 2                                    System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (If applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.
2. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold required gallons of gasoline any of the following days: Friday, 8/31/07.  No. 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel.  Each conversation led to FC recommending he orders fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| **August 31, 2007** | 18:30:00    by:  CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number:  02504405
APPC-440-B-PC Version (9-94)

**BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3352

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| | |
|---|---|
| Title of Agreement: **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** | |
| Violation of Articles/Sections: am/pm: | Gas: 2 | System Manual: Sec. 1 |
| Description: Have all grades of Motor Fuels available for sale to the public | |

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period.  Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days:
No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to FC recommending he order fuel.  FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| September 01, 2007 | 12:00:00 | by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02504406
APPC-440-B-PC Version (9-94)

 **BP West Coast Products LLC**

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3369

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
am/pm:                     Gas: 2                          System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)
1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel.  FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date:  Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| September 02, 2007 | 12:00:00    by:  CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By:  _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
      STRENK
      DEALER FILE

Document Number:  02504409
APPC-440-B-PC Version (9-94)

247

 **BP West Coast Products LLC**

**Default Notice**

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3383

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
am/pm:                    Gas: 2                          System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date:  Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **September 03, 2007** | **12:00:00    by:  CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By: _____

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504410
APPC-440-B-PC Version (9-94)

248



BP West Coast Products LLC

**Default Notice**

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #:

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

Violation of Articles/Sections:
am/pm:                    Gas: 2                    System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date:  Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **September 04, 2007** | **12:00:00**   by:  **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 5 day of September, 2007.
BP West Coast Products LLC

By: .
**Tom Reeder - Regional Sales Manager**

Document Number: 02504445
APPC-440-B-PC Version 9 (9-94)

**U.S. Postal Service**
**CERTIFIED MAIL  RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| Postage | $ | |
|---|---|---|
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

# EXHIBIT O
# TO SECOND AMENDED COMPLAINT

1187601.2



bp West Coast Products LLC
4 Centerpointe Drive
LaPalma, CA 90623


September 6, 2007

HAND DELIVERY AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED
#7007 0710 0004 4233 2815


STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA 95035


Re:    <u>Facility No. 82461</u>

<u>NOTICE OF TERMINATION</u>

You are currently a party to an am/pm Mini Market Agreement and Contract Dealer Gasoline Agreement both dated July 11, 2006 and various related agreements (the "Agreement"), with BP West Coast Products LLC ("BPWCP"), concerning the above facility located at 631 San Felipe Road, Hollister, CA. (the "Facility").

**Please take notice** that the Agreements and the am/pm mini market and the petroleum franchise created thereunder shall terminate **immediately** for the reasons set forth below:

You have failed to have any gasoline products available for sale to the motoring public for at least 7 consecutive days. In fact, the Facility has not sold gasoline since the evening of August 23rd and your dispensers have been cautioned taped off from any use by customers. You have been sent a total of twelve (12) defaults for failure to offer all grades of gasoline for sale. Although the period to cure the defaults has passed, as of today, none of the defaults have been cured.

Under these circumstances it would not be reasonable for BPWCP to furnish notification of 90 days prior to the date of termination because of the risk of confusion to the public as well as possible safety risks.

In addition, you have failed to timely pay BP for gasoline products in a timely manner. You currently have an outstanding balance of $126,394.77 for gasoline product deliveries that are due and payable at the time of delivery. Your payment history reflects numerous returned items that were "bounced" by your bank for non-sufficient funds. You are also responsible for any outstanding royalty charges due and payable to BPWCP.

Section 17.1 of the Agreement provides for termination of that Agreement upon the occurrence of the following triggering events:

(a) Buyer fails to exert good faith efforts to carry out the provisions of the Agreement following written notice and opportunity to cure;

251

(h) Buyer fails to timely pay all sums due to which BPWCP is legally entitled;

(i) Buyer fails to operate the Premises for seven (7) consecutive calendar days, or lesser period, which constitutes an unreasonable period of time.

(o) Buyer breaches any material provision of this Agreement, including without limitation, "Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand."

Furthermore, the above stated conduct constitutes grounds for termination of the am/pm Mini Market Agreement and franchise. The relevant provision providing for termination is Article 18.05, "In case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement."

Article 19.01(d) of the am/pm Mini Market Agreement provides: "Operator shall pay to BPWCP at the time of termination, as liquidated damages and not as a penalty, the greater of (a) the total minimum royalty fee which would have been payable under the Agreement from the date of termination of the Agreement through the end of the term provided for in the Agreement; or (b) for each month from the date of termination of the Agreement through the end of the term provided in the Agreement, the actual average royalty fee paid but not less than the minimum royalty fee for any months that the Store was operational prior to the termination of the Agreement." The amount owed to BPWCP is $235,000.00. This sum shall be immediately due and payable. You shall also be held answerable for all other damages due BPWCP under the Agreements and applicable law.

In addition, you are a party to certain loan agreements (the "Loan Agreements"). As of September 5, 2007, there remains an outstanding balance on the Loan Agreements of $150,000.00. The termination of the Agreements is an Event of Default under the Loan Agreements. The Loan Agreements require that you repay the outstanding balance of the Loans within 30 days of the occurrence of an Event of Default. The termination of the Agreements is an Event of Default.

**YOU ARE HEREBY NOTIFIED THAT YOU ARE OBLIGATED TO PAY THE FULL AMOUNT OF THE UNPAID LOANS WITHIN 30 DAYS OF THE TERMINATION OF THE AGREEMENTS.**

These are all provisions that are both reasonable and of material significance to the franchise relationship. In addition, failing to offer any gasoline for sale and failure to pay sums due under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §2801 *et seq.*, specifically, §2802(b)(2)(C) and (c)(9).n. A Summary Statement of the PMPA is attached to this Notice.

Additional provisions of the PMPA relevant to this termination are: 1) failure by the franchisee to comply with a provision of the franchise, which is both reasonable and material significance to the franchise relationship [§2802(b)(2)(A)]; and 2) occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise relationship is reasonable [§2802(b)(2)(C)], specifically, failure by the franchisee to pay to the franchisor in a timely manner when due all sums

to which the franchisor is legally entitled.   As well as your failure to operate the marketing premises for 7 consecutive days, or a shorter period of time which, taking in to account facts and circumstances, amounts to an unreasonable time not to operate, are enumerated events forming the basis for termination under §2802(b)(2)(C).

Accordingly, upon the above-stated effective date of this Notice of Termination, you are to cease selling ARCO-branded gasoline and cease using the ARCO names, trademarks, or trade names and cease holding yourself out as an authorized dealer of ARCO-branded motor fuel at the facility. You will be required to comply with the procedures on expiration or termination described the Agreements.  Furthermore, you are required to permit BPWCP to enter upon the premises to remove or de-identify all of ARCO's trademarks and property at the premises.  You must also return to BPWCP all materials bearing ARCO service marks or trademarks.  You must pay BPWCP any sums due and owing to BPWCP as a result of your operation of the Facility.

By giving this Notice of Termination, BPWCP neither waives nor surrenders any of its rights under the Agreements or at law, including but not limited to:   (1) its right to advance the effective date of the termination for similar or dissimilar acts or conduct constituting a breach of the Agreements or other legal grounds for such action; (2) its rights to provide by supplementary notice that the termination set for the above date also be based on other grounds; and (3) its rights to receive any sums due and owing to BPWCP.  Such sums should be forwarded to BPWCP upon their due date.

BP West Coast Products LLC

By: _____
        Thomas Reeder
        Regional Sales Manager

cc:     Facility File
        Brad Christensen

FEDERAL REGISTER
Vol. 61, No. 123

Notices

DEPARTMENT OF ENERGY (DOE)

Revised Summary of Title I of the Petroleum Marketing Practices Act

61 FR 32786

DATE: Tuesday, June 25, 1996

ACTION: Notice.

------------------------------------------------------- To view the next page, type .np* TRANSMIT.
To view a specific page, transmit p* and the page number, e.g. p*1
-------------------------------------------------------[*32786]

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585; Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, *15 U.S.C. §§ 2801-2806*, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective  [*32787]  responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. *43 F.R. 38743 (1978)*.

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a

franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), *15 U.S.C. §§ 2801*-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

. You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 *(15 U.S.C. §§ 2801-2806)*. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 [*32788] days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See *15 U.S.C. § 2802*(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.  [*32789]

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

### IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. *15 U.S.C. §§ 2801-2806.*

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a [*32790] trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

## F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

## G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

## A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

## B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

## C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

## D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Marc W. Chupka,

Acting Assistant Secretary for Policy.

[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

BILLING CODE 6450-01-P

4673 words

# EXHIBIT P
# TO SECOND AMENDED COMPLAINT



**bp**

**Kristina Koltun**
**Real Estate Attorney**
**BP America, Inc.**
6 Centerpointe Drive, LPR 6-543
La Palma, CA 90623-1066
Direct: 714-670-5311
Email: kristina.koltun@bp.com

September 12, 2007

<u>VIA FACSIMILE (559) 432-5620/CERTIFIED MAIL</u>

John G. Michael
BAKER MANOCK & JENSEN, PC
5260 North Palm, Suite 421
Fresno, CA  93704

Dear Mr. Michael:

As we have stated in our prior conversation, BP West Coast Products LLC ("BPWCP")
properly terminated the am/pm Mini Market Agreement and Contract Dealer Gasoline
Agreement dated July 11, 2006 (the "Agreements") for the reasons set forth in the September
6, 2007 Notice of Termination.  Furthermore, we disagree with your assertion that "STTN has
provided all necessary documentation" to allow for the funding of the gas portion of the loan.
As I indicated in my September 7th email to you, STTN has failed to provide any proof of
payment by STTN of any construction-related expenditures, nor the required back-up invoices
and lien releases, all of which are requirements of the Loan Documents.

To reiterate previous statements, even though BPWCP worked extensively to try to get your
client's marketing facility up and operating, the current situation has been caused by your
client's repeated violations of the Agreements, failure to provide necessary documentation and
failure to cooperate with BPWCP's attempts to resolve the issues.  Please be advised that
STTN still owes BPWCP $126,394.77 for outstanding gasoline product deliveries and must
pay that back as well as the $150,000.00 outstanding store loan balance; both amounts are
due immediately but no later than within 30 days of the Notice of Termination.

In addition, it has come to our attention that your client is currently selling fuel (non ARCO -
branded product) and operating the facility while still displaying various BPWCP owned trade
dress and Marks.  Please be advised that per the Agreements, STTN must immediately
discontinue the use of all trade dress and Marks associated with BPWCP.  Continued use of
these marks by your client has and will cause confusion and increase damages to BPWCP.
Please convey to your client that BPWCP intends to debrand the facility on September 14,
2007 at 8 am. If your client insists on prohibiting this debranding, BPWCP will have no
alternative than to seek court assistance in getting this done and will simultaneously seek its
damages.

Please discuss the foregoing with your client and call the undersigned should you have any questions. Thank you.

Sincerely,

*Kristina Koltun—CAP*

Kristina Koltun
Real Estate Attorney
BP America, Inc.

cc:     Elizabeth Atlee (via email)
        Stephen Lee (via email)

## PROOF OF SERVICE

I, Nora Fernandez, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071. I am over the age of eighteen years and not a party to the action in which this service is made.

On June 6, 2008, I served the document(s) described **PLAINTIFF AND COUNTER-DEFENDANTS BP WEST COAST PRODUCTS LLC AND ATLANTIC RICHFIELD COMPANY'S NOTICE OF LODGING SECOND AMENDED COMPLAINT** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: SEE ATTACHED SERVICE LIST

☐　BY MAIL: I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, California 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071.

☒　BY FEDERAL EXPRESS　☐ UPS NEXT DAY AIR　☐ OVERNIGHT DELIVERY: I deposited such envelope in a facility regularly maintained by ☒ FEDERAL EXPRESS ☐ UPS ☐ Overnight Delivery [specify name of service: ] with delivery fees fully provided for or delivered the envelope to a courier or driver of ☒ FEDERAL EXPRESS ☐ UPS ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP, 333 South Hope Street, Los Angeles, California 90071 with delivery fees fully provided for.

☐　BY FACSIMILE: I telecopied a copy of said document(s) to the following addressee(s) at the following number(s) in accordance with the written confirmation of counsel in this action.

☐　[State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒　[Federal]　I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2008, at Los Angeles, California.

Nora Fernandez

1187601.2

1

2

**BP WEST COAST PRODUCTS LLC v. STTN ENTERPRISES, et al.**
**United States District Court, Northern District**
**Case No. C07 04808 JF**

3

**SERVICE LIST**

4

5

6

John G. Michael, Esq.
Baker Manock & Jensen
5260 North Palm Avenue
Fourth Floor
Fresno, CA  93704

Attorney for Defendants, STTN
ENTERPRISES, INC.; NAZIM
FAQUIRYAN; and SAYED
FAQUIRYAN

7

Tel:  (559) 432-5400
Fax:  (559) 432-5620

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1187601.2