# EXHIBIT C

BP West Coast Products LLC ✦

**Guarantee Agreement**
**Individual**

Facility: 82461

The undersigned Nazim Faquiryan and _____ (spouse, if married), intending to be legally bound hereby and in consideration of BP West Coast Products LLC, organized in Delaware (hereinafter called "BPWCP") advancing credit to STTN Enterprises, Inc. (hereinafter called "Debtor"), and also in consideration of BPWCP, at its sole discretion, (a) agreeing to any additional credit at any time hereafter to Debtor for petroleum products and other merchandise, or (b) to extend credit, advance money, or defer time for payment of any money due or to become due under contract or obligation arising from any lease or loan, or (c) to extend credit in any other manner to, or at the request or for the account of Debtor, either with or without security (all such liability and obligation of Debtor to BPWCP now or hereafter existing being hereinafter referred to as "Obligations"), do hereby jointly and severally guarantee and agree to pay to BPWCP, upon demand, all of the Obligations together with interest thereon, and any and all expenses, including but not limited to, reasonable attorneys' fees which may be incurred by BPWCP in collecting all or any of the Obligations and/or enforcing any rights hereunder; it being further understood and agreed that the liability hereunder of the undersigned shall be unlimited as to the amount of Obligations covered by this Guaranty.

The undersigned waive any right to require BPWCP to (a) proceed against Debtor or any other party; (b) proceed against or exhaust any security held from Debtor; or (c) pursue any other remedy in BPWCP's power whatsoever. The undersigned waive any defense based on or arising out of any defense of Debtor other than payment in full of the indebtedness, including without limitation any defense based on or arising out of the disability of Debtor, or the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of Debtor other than payment in full of the indebtedness. BPWCP may, at its election, foreclose on any security held by BPWCP by one or more judicial or nonjudicial sales whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy BPWCP may have against Debtor, or any security, without affecting or impairing in any way the liability of the undersigned except to the extent the indebtedness has been paid. The undersigned waive any defense arising out of any such election by BPWCP, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the undersigned against Debtor or any security. Until all indebtedness of Debtor to BPWCP shall have been paid in full, even though such indebtedness is in excess of the undersigned's liability hereunder, the undersigned shall have no right of subrogation and waive any right to enforce any remedy which BPWCP now has or may hereafter have against Debtor, and waive any benefit of, or any right to participate in any security now or hereafter held by BPWCP.

If this Guaranty is executed by two or more parties, they shall be severally liable hereunder, and the word "undersigned" wherever used herein shall be construed to refer to each of such parties separated, all in the same manner and with the same effect as if each of them had signed separate instruments; and in any such case this Guaranty shall not be revoked or impaired as to any one or more of such parties by the death of any of the others or by the revocation or release of any liabilities hereunder of any one or more of such other parties.

Executed at _____, this __20__ day of __June__, 20 06 .

_____          _____
Witness                           Guarantor – Nazim Faquiryan.

_____
Residence of Guarantor (street, city, state, zip code)

_____          _____
Witness                           Guarantor - Spouse

_____
Residence of Guarantor (street, city, state, zip code)

* Subscribed and sworn to before me this __20 th__ day of __June__, 20 06 .

_____
Notary Public

*Required in all states

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

111

BP West Coast Products LLC ✦

Guarantee Agreement
Individual

Facility: <u>82461</u>

The undersigned <u>Sayed Faquiryan</u> and _____ (spouse, if married), intending to be legally bound hereby and in consideration of BP West Coast Products LLC, organized in Delaware (hereinafter called "BPWCP") advancing credit to <u>STTN Enterprises, Inc.</u> (hereinafter called "Debtor"), and also in consideration of BPWCP, at its sole discretion, (a) agreeing to any additional credit at any time hereafter to Debtor for petroleum products and other merchandise, or (b) to extend credit, advance money, or defer time for payment of any money due or to become due under contract or obligation arising from any lease or loan, or (c) to extend credit in any other manner to, or at the request or for the account of Debtor, either with or without security (all such liability and obligation of Debtor to BPWCP now or hereafter existing being hereinafter referred to as "Obligations"), do hereby jointly and severally guarantee and agree to pay to BPWCP, upon demand, all of the Obligations together with interest thereon, and any and all expenses, including but not limited to, reasonable attorneys' fees which may be incurred by BPWCP in collecting all or any of the Obligations and/or enforcing any rights hereunder; it being further understood and agreed that the liability hereunder of the undersigned shall be unlimited as to the amount of Obligations covered by this Guaranty.

The undersigned waive any right to require BPWCP to (a) proceed against Debtor or any other party; (b) proceed against or exhaust any security held from Debtor; or (c) pursue any other remedy in BPWCP's power whatsoever. The undersigned waive any defense based on or arising out of any defense of Debtor other than payment in full of the indebtedness, including without limitation any defense based on or arising out of the disability of Debtor, or the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of Debtor other than payment in full of the indebtedness. BPWCP may, at its election, foreclose on any security held by BPWCP by one or more judicial or nonjudicial sales whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy BPWCP may have against Debtor, or any security, without affecting or impairing in any way the liability of the undersigned except to the extent the indebtedness has been paid. The undersigned waive any defense arising out of any such election by BPWCP, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the undersigned against Debtor or any security. Until all indebtedness of Debtor to BPWCP shall have been paid in full, even though such indebtedness is in excess of the undersigned's liability hereunder, the undersigned shall have no right of subrogation and waive any right to enforce any remedy which BPWCP now has or may hereafter have against Debtor, and waive any benefit of, or any right to participate in any security now or hereafter held by BPWCP.

If this Guaranty is executed by two or more parties, they shall be severally liable hereunder, and the word "undersigned" wherever used herein shall be construed to refer to each of such parties separated, all in the same manner and with the same effect as if each of them had signed separate instruments; and in any such case this Guaranty shall not be revoked or impaired as to any one or more of such parties by the death of any of the others or by the revocation or release of any liabilities hereunder of any one or more of such other parties.

Executed at _____, this _20_ day of _June_____, 20 _06_.

_____          _____
Witness                                       Guarantor — Sayed Faquiryan

_____
Residence of Guarantor (street, city, state, zip code)

_____          _____
Witness                                       Guarantor - Spouse

_____
Residence of Guarantor (street, city, state, zip code)

* Subscribed and sworn to before me this _20th_ day of _June_____, 20 _06_.

_____
Notary Public

*Required in all states*

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

112

# EXHIBIT D

AMENDMENT TO CONTRACT
DEALER GASOLINE AGREEMENT

(Branded Diesel Fuel)
Facility: 82592
Customer Account: 0998690

THIS AMENDMENT, dated as of _____, amends the Contract Dealer Gasoline Agreement ("Agreement") dated _____, between BP West Coast Products LLC, organized in Delaware ("BPWCP") and STTN Enterprises, Inc. ("Buyer") with delivery premises at 631 San Felipe Road, Hollister, CA 95035 ("Premises").

It is hereby agreed by and between the parties that effective on the date written above or the Commencement Date of the Agreement, whichever is later, the Agreement is hereby amended to provide that except as set forthbelow, any references to "motor fuels comprising gasolines and gasoline-containing materials bearing the ARCO trademark and other identifying symbols," "gasoline" and "product" shall be construed to include such motor fuels comprising diesel fuel and diesel fuel-containing materials bearing the ARCO trademark and other identifying symbols ("ARCO branded diesel fuels and diesel fuel-containing materials") as Buyer may purchase and receive from BPWCP and BPWCP may sell and deliver to Buyer at the Premises during the term hereof.

It is understood and agreed by and between the parties that Temporary Voluntary Allowances ("TVA's") are not applicable to diesel fuel or diesel fuel-containing materials and, therefore, the terms and conditions relating to TVA's set forth in the Prices provisions, Paragraph 5 of the Agreement, are not amended and supplemented by this Amendment. It is further understood and agreed by and between the parties that, except as herein specifically amended and supplemented, all other terms and conditions of the Agreement, as previously amended and supplemented, shall be and remain in full force and effect.

This Amendment automatically supersedes and terminates, as of the Effective Date hereof, any and all other contracts, agreements or understandings between the parties covering the sale and delivery of ARCO branded diesel fuels and diesel fuel-containing materials to Buyer at the Premises for resale therefrom.

BUYER ACKNOWLEDGES THAT BUYER HAS READ THIS AMENDMENT AND FULLY UNDERSTANDS ALL OF THE TERMS, PROVISIONS AND CONDITIONS HEREOF.

This Amendment is not binding until executed by Buyer and by an authorized officer or manager of BPWCP.

IN WITNESS WHEREOF, the parties have executed this Amendment.

BP West Coast Products LLC

_____ 10-12-06
                          Date

Franchisee
STTN Enterprises, Inc.

_____ 10/04/06
Nazim Faquiryan            Date

_____     _____
Witness            Date        Witness            Date

BP 03057

113

# EXHIBIT E

Customer Acct #0998696
Facility #82592
Category: Rebrand



## CONTRACT DEALER GASOLINE AGREEMENT

This Contract Dealer Gasoline Agreement (this "Agreement") is made and entered into as of the _____ day of _____ _Oct 12_ , _2006_ , ("Effective Date")by and between BP West Coast Products LLC, a Delaware limited liability company, ("BPWCP"), and

STTN Enterprises, Inc. a California Corporation ("Buyer").
(state whether a sole proprietorship, partnership, corporation or limited liability company [LLC]; if partnership, the names of all partners and State of organization; if corporation, the State of incorporation; if an LLC, the State of organization)

BPWCP maintains a place of business at 4 Centerpointe Drive, in the City of La Palma, in the State of California. Buyer's principal place of business is located at 631 San Felipe Road in the City of Hollister, in the State of CA with the ZIP code 95035. This Agreement constitutes a "franchise" as defined in the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806 ("PMPA").

### Recitals

A.    BPWCP markets motor fuels comprising gasolines and gasoline containing materials bearing the ARCO® trademark and other identifying symbols (herein collectively, "Gasoline").

B.    Buyer owns or leases from a third party real property and improvements which Buyer would like to operate as a retail facility selling Gasoline to end users. The property and improvements are located at 631 San Felipe Road, in the City or Town of Hollister in the State of CA with the ZIP code 95035 (The "Premises").

NOW, THEREFORE, the parties hereto agree as follows:

1.    Term.  This Agreement shall be binding upon the parties and effective on the date first set forth above. Subject to earlier termination under Paragraph 17.1 below, the "Commencement Date" of this Agreement shall begin at 10:00 a.m. on the  and the term shall end at 10:00 a.m. on the .  If no Commencement Date is set forth at the time this Agreement is executed, the Commencement Date shall be established by BPWCP by notice to Buyer as the date the Premises are ready to receive Gasoline delivery, which notice shall also set forth the expiration date which shall be at 10:00 a.m. on the first day after the [XX] 12th or [] 120th  or [] 240th  full calendar month following the Commencement Date. If no time is checked, the box for 120th shall be deemed checked. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Buyer before the end of the term.

1.2    Construction or Raze and Rebuild. If this Agreement is for Premises that require new construction of an ARCO branded gasoline facility or the razing and rebuilding of an ARCO branded retail facility, Buyer will promptly undertake such new construction or rebuilding and complete such construction or rebuilding and be ready to receive Gasoline delivery within 24 months, in the case of New Construction, or 12 months, in the case of a Razing and Rebuilding, of the Effective Date of this Agreement. If this Agreement is for Premises that require remodeling or retrofit, Buyer will promptly undertake such work and complete such remodeling or retrofit and be ready to receive Gasoline delivery within nine months of the Effective Date.

Orders.  Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale

Page 1 of 18

ARCO 40-WR-1(4/2006)
CDGA

BP 03039

only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. BPWCP will use its best efforts to fill Buyer's orders; however, BPWCP may discontinue sale of any grade of Product at any time upon fifteen (15) calendar days' prior written notice to Buyer. At BPWCP's sole discretion, BPWCP reserves the right to provide ARCO branded motor fuels solely through an automatic Gasoline ordering and delivery system and to not accept individual orders placed by Buyer. Buyer agrees to accept and pay for such Product as BPWCP delivers to the Premises. Buyer shall provide accurate and timely information as reasonably requested by BPWCP in connection with the automatic gasoline inventory and delivery system.

3.     **No Wholesaling.** Buyer will sell Product only to end users for their personal use in volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine, and an approved, properly labeled emergency container capable of holding ten gallons or less. The Premises shall be open for business seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day.

4.     **Delivery.** BPWCP will deliver Product into Buyer's storage facilities described below. Title to and risk of loss of Product will pass to Buyer upon delivery into Buyer's storage facilities. BPWCP alone will select the method and mode of shipment and delivery. BPWCP expressly reserves the right to supply Product to other retail outlets whether owned and operated directly by BPWCP or by independent owners and operators, regardless of how near or far such other retail outlets may be located relative to the Premises.

5.     **Prices.** For Product delivered hereunder, Buyer will pay the price specified by BPWCP in effect at the time and place of delivery for purchasers in Buyer's class of trade. Price shall be subject to change at any time, at the election of BPWCP, without notice. Should BPWCP elect to provide notice of price changes, it may do so by telephone, or at BPWCP's sole election, facsimile or electronic transmission. Buyer must have the capability to receive notices of price changes and invoices at the Premises by facsimile or electronic transmission. At BPWCP's sole discretion, to enable Buyer to compete more effectively with Buyer's competitors, BPWCP may from time to time grant Buyer a "temporary voluntary allowance"(TVA) applicable to Product to be sold by Buyer under this Agreement from metered dispensers on the Premises. If BPWCP determines that Buyer has accepted TVAs on Product which is not sold to motorists at retail through the metered dispensers on the Premises, BPWCP may terminate this Agreement, and the amount of any such TVA shall be due by Buyer to BPWCP on demand and BPWCP may offset such amount against any sums payable by BPWCP to Buyer. BPWCP may condition the payment of allowances on Buyer's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Buyer's retail selling price commensurate with the amount of the allowance.

6.     **Payment.** Unless BPWCP extends credit to Buyer as provided below, Buyer will pay for Product prior to its delivery in U.S. dollars. BPWCP shall require a product advance payment approximately equal to the current cost of an average delivery of Product. BPWCP may increase or decrease the amount of the advance payment at any time to reflect current prices and Buyer will pay any additional amount necessary if the advance payment is increased. Payment will be made by electronic funds transfer initiated by BPWCP, wire transfer, or at BPWCP's sole election, all such payments shall be made by Buyer at the time and place as designated by BPWCP. Buyer's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association). Payment will be deemed made when, and only when, its receipt has been verified by BPWCP. If this Agreement requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm or entity. If this Agreement requires or permits payment by wire transfer, all such payments shall be made to " BPWCP, c/o Citibank NA. For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by automated clearing house ("EFT"), all such payments shall be made to "BPWCP", c/o Citibank Delaware. For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number

unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by BPWCP. Buyer agrees to indemnify BPWCP for any loss or expense caused by Buyer's failure to comply with this Paragraph. Upon demand, Buyer will reimburse BPWCP the amount of any temporary voluntary allowance erroneously applied to Product other than Product sold under this Agreement from metered dispensers on the Premises. In addition to any other remedies available to it, BPWCP may offset against any future temporary voluntary allowance or against other amounts owed to Buyer the amount of any reimbursement to which BPWCP is entitled if Buyer fails to make any payment or reimbursement when due. Buyer acknowledges and agrees that BPWCP's receipt of payment due hereunder after the issuance of a notice of termination or nonrenewal does not constitute a waiver of BPWCP's termination or nonrenewal rights.

7.     Credit.  BPWCP may in its sole discretion from time to time extend credit to Buyer in whatever amounts and on whatever terms BPWCP alone selects. If BPWCP extends Buyer credit, BPWCP may withdraw it at any time without notice and for any reason. In BPWCP's sole judgment, BPWCP may do any or all of the following: (i) require that Buyer pay for Product by cashier's check, or bank wire transfer prior to delivery, (ii) require that Buyer post an irrevocable letter of credit issued by a bank satisfactory to BPWCP, (iii) require Buyer present evidence of financial solvency, and (iv) declare Buyer in default of this Agreement if Buyer fails to pay any indebtedness when due, provide evidence of financial solvency upon request or comply with any other term of this Agreement. Buyer agrees that regardless of whether and for how long BPWCP has extended it credit, BPWCP may cease extending credit at any time and instead require that payment be made in the manner set forth in this Paragraph or in Paragraph 6 above.

8.     Non-conformities.  Buyer will notify BPWCP in writing of the exact nature of any nonconformity in the type, quantity or price of any Product delivered to Buyer within thirty (30) calendar days after delivery. Buyer hereby waives any claim against BPWCP based on any nonconformity of which Buyer does not so notify BPWCP.

9.     Record Keeping.  For each delivery of Product, Buyer shall at all times keep a detailed record of the date and time of delivery, and the grade and amount of Product delivered expressed in terms of gallons. To assist BPWCP in determining the necessity of any temporary voluntary allowance described in Paragraph 5 above, Buyer will (i) sell all Product through metered dispensers which shall indicate the grade and amount of gasoline purchased, (ii) allow BPWCP to inspect Buyer's Product dispensers, recorders and meters, and books and records relating to delivery and Product inventory, and (iii) allow BPWCP to ascertain the volume of Product in Buyer's storage facilities.

10.     Equipment.

10.1     Storage and Dispensers.  Buyer will maintain storage tanks or other appropriate facilities on the Premises into which Product can be delivered. Buyer will ensure that the storage facilities are compatible with BPWCP's delivery equipment and Product formulations; that its storage facilities will accommodate such minimum quantities per single delivery as BPWCP may select; and that the Premises are configured in such a way that Product can be delivered to the Premises consistent with all applicable fire laws and regulations and other governmental requirements. Further, Buyer will ensure that all dispensing devices and storage facilities at all times be properly permitted and completely comply with all applicable governmental requirements and any specifications which BPWCP may issue from time to time. Buyer further agrees that Buyer's motor fuel dispensing devices shall be equipped at all times with Product filters with ten (10) micron filtering capacity. Without restricting any right or remedy of BPWCP, or imposing any duty or liability upon BPWCP, upon BPWCP's request, Buyer will promptly furnish BPWCP with written evidence that Buyer's dispensing devices and storage facilities comply with all governmental requirements and provide copies of underground storage tank permits and specifications, and allow BPWCP representatives to inspect the dispensing devices and storage facilities to confirm such compliance. BPWCP may suspend deliveries in the event that Buyer does not provide written evidence that the dispensing devices and storage facilities comply with all governmental regulations.

BP 03041

ARCO 40 WR-1 (4/2006)
CDGA

10.2  PIC Equipment. Unless the Premises are located in the state of Oregon, Buyer is required by BPWCP to purchase or lease the PayQuick Island Cashier ("PIC Equipment") and install it at the Premises. The PIC Equipment shall be of the type, number and configuration specified by BPWCP.

(a)  Buyer agrees to use the PIC Equipment only in connection with the operation of BPWCP authorized businesses. Buyer agrees not to tamper with, alter, change, dislodge, displace, remove or otherwise interfere with the operational integrity of the PIC Equipment. Buyer agrees to maintain PIC Equipment in a clean and fully operational condition at all times for the convenience of Buyer's customers.

(b)  Buyer will be responsible for all maintenance and repair of the PIC Equipment. Buyer will contract for maintenance services through BPWCP approved service providers and understands that BPWCP will not provide any maintenance and repair services.

(c)  BPWCP will provide training to Buyer and up to 5 employees designated by Buyer to attend training. Training is mandatory for Buyer or Buyer's designated manager. There is no tuition for such training, but all expenses in connection with such training must be borne by Buyer. If Buyer fails to attend training when originally scheduled, there may be a fee of $1000 to attend training.

(d)  Buyer's PIC Equipment will have one or more cash acceptors, except if, in the sole opinion of BPWCP, Buyer's Premises are appropriate exclusively for debit only PIC Equipment. Unless the Premises have no cash acceptors, Buyer agrees to contract with an BPWCP approved licensed and bonded armored security service to do the following: make cash pick ups on a regular basis, but not less frequently than once per week, maintain possession of all keys to the outer door and the vault of the PIC Equipment, handle all removal of cash cassettes from the PIC Equipment and reinstall all empty cassettes into the PIC Equipment. Receipt paper will be changed only by armored security personnel or in their presence.

(e)  Buyer is required to install and operate the BPWCP approved Video Surveillance Equipment, the details of which will be provided to Buyer and which may be changed from time to time by BPWCP. In addition, Buyer must install, keep operational and use one or more video surveillance cameras dedicated to recording the customer activity at each PIC.

(f)  Buyer is responsible for maintaining a supply of receipt paper at the premises to be used in the PIC Equipment.

(g)  BPWCP grants to Buyer a non exclusive right and license to use the PayQuick Island Cashier service marks, trademarks and trade dress in conjunction with the operation of PIC Equipment at the Premises in a form prescribed by BPWCP.

(h)  All information regarding the PIC Equipment, including written manuals, specifications, data and instructions provided to Buyer are confidential and proprietary information of BPWCP and shall remain the exclusive property of BPWCP and shall not be duplicated, in whole or in part by Buyer and shall not be used other than as set forth herein and shall be maintained in confidence and not disclosed to anyone without the prior written consent of BPWCP.

(i)  Upon 180 days prior written notice, Buyer may be required to upgrade the PIC Equipment or purchase and install more technologically advanced cash, debit or other payment equipment in accordance with BPWCP's system wide equipment requirements at that time.

(j)  Buyer will install BPWCP approved Point of Sale equipment which is necessary to operate the PIC or other required payment equipment. Buyer will ensure that its Point of Sale equipment and motor fuel dispensers are compatible with the PIC Equipment. In addition, VSAT satellite equipment is required for telecommunications purposes for which there is a fee for connection, repositioning and maintenance.

4 of 18                                            BP 03042

ARCO 40 WR-1 (4/2006)
CDGA

11.    Leak Prevention and Detection.  Buyer acknowledges and agrees that with respect to any Product storage facilities located on the Premises, including without limitation underground storage tanks and related equipment, Buyer is solely responsible for taking, and will take the following leak and water contamination prevention and detection measures:

11.1    Stick Readings.  Using a properly calibrated wooden tank measuring device and water finding paste, Buyer will gauge Product storage tanks for inventory loss or water gain on a daily basis.

11.2    Reconciliations.  Utilizing daily stick readings to the nearest one eighth (1/8) inch and dispenser meter readings, Buyer will take and reconcile opening and closing inventory levels by grade, including deliveries.

11.3    Record Retention.  Buyer will keep daily reconciliation records available on the Premises for at least five (5) years.

11.4    Monitoring.  Buyer will ascertain and perform any and all other monitoring procedures required by applicable laws, regulations or governmental authorities.

11.5    Secondary Containment.  Buyer will ascertain and perform any and all construction or retrofitting necessary to satisfy or comply with the secondary containment standards for underground storage tanks required by applicable laws, regulations or governmental authorities. Buyer will ensure that all deliveries of ARCO Product are made into double walled tanks.

11.6    Notification.  Buyer will immediately investigate and report to BPWCP and all appropriate governmental authorities (i) any detectable loss or suspected loss that exceeds Regulatory variation limits of any Product, (ii) the activation or alarm of any leak detector or other continuous monitoring system, (iii) the discovery of any broken weights and measures seals or other seals in any Product dispenser, (iv) the discovery of any visible leak in any Product dispenser, Product piping or submerged pumps, (v) any change in the condition of the land or surface adjacent to fill boxes or dispensers, (vi) water in excess of one inch (1") in any storage container, or (vii) any spills or overfills that are not immediately and properly contained and cleaned up.  In the event of the occurrence of any of (i) through (vii) above, Buyer shall immediately investigate in accordance with regulatory leak detection requirements.  If a leak is confirmed all Product must be removed from the storage tanks immediately and the tanks secured.  In addition, Buyer will keep fill caps tight, keep fill boxes free of dirt, ice and snow, and immediately remove any water in excess of one inch (1") in any Product storage tank. Buyer will not permit any Product to enter any public or private water system, storm drain or sewage disposal system.

11.7    Training.  BP may offer training on environmental compliance.  Such training will not exceed four (4) hours and will be offered on an annual basis or a lesser frequency if specified by BP. The training will be tuition free, but any expenses in connection with such training shall be borne by the Franchisee.

12.    Gasoline Regulations.

12.1    Compliance.  BPWCP will ensure that upon delivery to Buyer by BPWCP, all gasoline, will meet the specifications for lead and phosphorus set forth in the regulations promulgated by the United States Environmental Protection Agency ("EPA").  Buyer will ensure that no gasoline purchased from BPWCP is tampered with or contaminated in a way that could cause the gasoline not to meet the EPA's specifications or any other specifications required by law.  Buyer will immediately cease dispensing any gasoline that is determined not to meet such specifications

BP 03043

ARCO 40 WR-1 (4/2006)
CDGA

12.2   Disclosures and Warnings.  Buyer acknowledges that it has been fully informed of and is aware of the nature and existence of risks posed by transporting, storing, using, handling and being exposed to Product. Buyer will inform its employees, agents, contractors and customers of such risks. Buyer will display, publish and distribute any safety warnings or disclosures as may be requested or required by BPWCP or any governmental authority from time to time.

13.   Taxes.

13.1   Payment by Buyer.  Buyer will pay promptly when due and hold BPWCP harmless from all taxes, excise fees and other similar charges (including interest, penalties and additions to tax) which BPWCP is now or in the future required to pay or collect under any federal, state or local governmental requirement based on the manufacture, production, sale, transfer, transportation, delivery, storage, handling, consumption or use of Product under this Agreement, or on any payments made under this Agreement (excepting any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon). BPWCP may, at its sole option, add any such tax, excise fee or similar charge to the amount to be charged for Product. Buyer will also pay promptly when due and hold BPWCP harmless from all fees and sales, use, rental, gross receipts, inventory, excise, income and other taxes (including interest, penalties and additions to tax but not including any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon) imposed by any federal, state or local governmental authority upon Buyer or BPWCP in connection with the operation of Buyer's business.

13.2   Inapplicability of Reseller Exemption.  With respect to Product purchased hereunder, Buyer hereby waives any exemption and agrees not to assert any right of exemption from payment to BPWCP of taxes regularly collected by BPWCP upon delivery of Product to purchasers within Buyer's class of trade by virtue of any reseller or wholesale-distributor exemption to which Buyer may presently or hereafter be entitled under any provision of federal, state or local law regulation or order.

13.3   Tax Information.  Buyer will provide BPWCP with Buyer's motor fuel seller number and use tax registration number. Further, Buyer will provide BPWCP with any information requested by BPWCP relating to tax credits claimed by Buyer for motor fuel, sales, use and other taxes paid by Buyer in connection with the Product for the purpose of resolving any threatened or pending tax dispute with any governmental authority or for the purpose of confirming Buyer's compliance with the terms of this Agreement.

14.   Trademarks and Trade Dress.

14.1   Compliance.  Within one hundred fifty (150) calendar days after the Commencement Date if this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises and upon the Commencement Date if this is not the first agreement between Buyer and BPWCP for the supply of Product at the Premises, unless BPWCP consents otherwise in writing, Buyer will have fully complied with all trademarks and trade dress requirements set forth in Exhibit A. Thereafter, throughout the term of this Agreement, Buyer shall fully comply with all trademarks and trade dress requirements as they may be changed from time to time. Notwithstanding the foregoing, Buyer must have the ARCO I.D. sign, I.D. pole, price pods, and decal specifications for pumps and dispensers as described in Exhibit A (as it may be changed from time to time) in place as soon as Buyer is selling ARCO branded Product but not later than the fifth delivery of Product hereunder and not before Buyer is selling ARCO branded Product under the ARCO trademarks described below. Buyer hereby agrees that BPWCP may and acknowledges that in all likelihood BPWCP will change such requirements from time to time. Buyer will conform its trademarks and trade dress to all such changed requirements within ninety (90) calendar days after receiving written notice from BPWCP of any change.  In its sole discretion, BPWCP may loan to Buyer various items of trade dress such as signs, illuminated sign poles, sign faces with a numerals kit and pump identification signs. Buyer hereby agrees that any trade dress which BPWCP provides to Buyer hereunder shall remain the property of BPWCP regardless of whether it is affixed to the Premises. Buyer shall ensure that no such loaned trade dress is removed from the Premises by persons other than BPWCP or

ARCO 40 WR-1 (4/2006)
CGGA

BP 03044

119

its representatives either during or after the term of this Agreement without BPWCP's prior written consent. Buyer shall bear the cost of maintaining, repairing and replacing such loaned trade dress.

14.2    Licenses.  During the term of this Agreement, in connection with the resale of Product, Buyer may display the trademarks, trade names, advertising, signs, devices, symbols, slogans, designs and other trade indicia adopted, used or authorized for use by BPWCP in connection with Product (collectively, "Marks"), provided that (i) Buyer operates the Premises seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day, (ii) the Marks are only displayed or used in the manner specified by BPWCP, and (iii) all trademark rights resulting from such display or usage shall inure to BPWCP's benefit.  BPWCP reserves the right to substitute another trademark for ARCO or withdraw or modify any of the Marks or their manner of display without prior notice to Buyer.  Upon receiving notice of any withdrawal or modification of the Marks or substitution of another trademark, Buyer will fully implement any modification or termination or substitution within the time specified in the notice and such other trademark shall be deemed substituted for the "ARCO" trademark in all references to Gasoline and Product in this Agreement.  If Buyer fails to comply fully with any notice of withdrawal or modification, in addition to any other remedies available to BPWCP for breach of this Agreement, BPWCP may demand that Buyer immediately remove all Marks from the Premises at Buyer's sole expense.  If Buyer fails to do so, BPWCP or BPWCP's contractor may enter the Premises and remove all Marks, and Buyer will reimburse BPWCP for such removal.

14.3    Shared Expenses.  BPWCP will reimburse Buyer a portion of the cost of acquiring, transporting and installing certain signs and other trade dress required hereunder and set forth in Exhibit B, as specified below.  The amount of such reimbursement shall be the lesser of (i) one half of Buyer's actual verifiable cost, or (ii) the maximum amount indicated on Exhibit B.  The reimbursement shall apply on a one-time only basis to the Premises during its entire franchise relationship with BPWCP regardless of whether this is the first or a subsequent agreement between Buyer and BPWCP for the supply of Product at the Premises.   Buyer shall be solely responsible for the cost of maintaining, repairing and replacing all trade dress.  Request for the foregoing reimbursement shall be in writing and accompanied by all original invoices (of which Buyer shall keep copies).   Upon receiving such a request, BPWCP shall inspect Buyer's facility to confirm that the trade dress is of the proper type and properly installed and verify Buyer's actual cost.  If BPWCP confirms that the trade dress meets BPWCP's requirements and verifies Buyer's submitted cost as accurate, then BPWCP shall either reimburse Buyer the amount described above or pay the entire cost of such trade dress directly to the third party vendor, whichever BPWCP alone chooses.  If BPWCP elects to pay the third party vendor directly, then within five (5) calendar days after receiving notice from BPWCP that such payment will be or has been made, Buyer will remit to BPWCP the difference between the amount of the invoice and the amount of BPWCP's reimbursement as calculated above.  Further, BPWCP may arrange directly with a third party vendor to satisfy the requirements of this Paragraph 14.3 and collect from Buyer in advance upon five days' notice, an amount equal to the total maximum reimbursements to which Buyer is entitled under this Paragraph and Exhibit B, to cover Buyer's share of the cost of trade dress expenses.  Should the amount of this advance payment exceed one half of the actual cost of satisfying the trade dress requirements herein, BPWCP will refund the excess amount to Buyer.  If the amount of the advance payment is less than the actual cost of satisfying the trade dress requirements herein, then Buyer shall pay BPWCP the amount of the deficiency upon demand.  In addition to all other remedies available to it, BPWCP may offset against any amounts owed to Buyer, the amount of any remittance owing to BPWCP hereunder.  Notwithstanding this Paragraph 14.3, Buyer may be obliged to pay BPWCP for any reimbursements received and direct vendor payments made by BPWCP hereunder upon the termination or nonrenewal of this Agreement as specified in Paragraph 17.3.

14.4    Restrictions.  Buyer will not adulterate, mislabel, misbrand or contaminate Product; add any ingredients to Product without BPWCP's prior written consent; use any Mark except in connection with genuine ARCO Product; claim any right, title or interest in or to the Marks; directly or indirectly deny or assail or assist others in denying or assailing the sole and exclusive ownership of BPWCP in and to the Marks; register, adopt as its own property, or use or assist others in registering, adopting, or using, any trademarks, trade names, advertising, signs, devices, symbols, slogans, designs, or other trade indicia confusingly similar to the Marks; or commit other trademark violations or acts that could disparage

ARCO 40 WR-1 (4/2006)                                                          BP 03045
CDGA

120

the Marks or adversely affect the value of the marks or BPWCP's goodwill and ownership rights hereto. Any rights to any Marks obtained by Buyer contrary to the foregoing shall be held in trust for BPWCP and, upon request, Buyer will assign such rights free of charge to BPWCP.

    14.5    <u>Standards.</u>  The Premises must be clean, well maintained, and graffiti free, with structures, driveways and pavement in good repair. BPWCP will perform periodic inspections for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

15.    <u>Compliance and Indemnification.</u>

    15.1    <u>Compliance With Laws and Regulations.</u>  Buyer shall comply with any and all applicable federal, state and local laws and regulations, including those pertaining to human health, safety or the environment, and shall further comply with any and all permits or license pertaining to the Premises. Any references in this Paragraph 15.1 to laws or regulations shall include all such laws and regulations pertaining to Product, or the air, or surface or subsurface water, surface or subsurface soil, and the handling, storage and disposal of hazardous substances, materials or wastes, or solid wastes (whether or not defined as hazardous by such laws or regulations), and vapor recovery and vapor recovery equipment Buyer shall comply with any and all operating, reporting and record keeping laws and regulations, as well as all operating, reporting and record keeping procedures designed to ensure that no unauthorized release of any Product occurs, and that in the event any Product is released, all applicable reporting, record keeping and cleanup requirements are fully complied with.

    15.2    <u>Indemnification.</u>  Buyer will indemnify and hold harmless BPWCP, its affiliates, subsidiaries, shareholders, directors, officers, employees and other representatives (and shareholders, directors, officers, employees and other representatives of such affiliates and subsidiaries) (collectively, "Indemnified Parties") from and against all claims, causes of action, liabilities, suits, demands, legal proceedings, governmental actions, losses and expenses, including without limitation reasonable expert and attorneys fees and costs (collectively, "Indemnified Expenses"), arising out of (i) any breach by Buyer (or any of its officers, employees or representatives) of any provision of this Agreement, (ii) the storage, leakage or other release of Product on, or from the Premises, (iii) any cleanup, remediation or response activity conducted or ordered under applicable law, (iv) Buyer's use or occupancy of the Premises, (v) Buyer's operation of the business or use, custody or operation of BPWCP-owned equipment or any other equipment on the Premises, excepting any loss or damage arising solely from BPWCP's negligence or failure to perform its obligations hereunder, or (vi) any intentional or unintentional violation by Buyer of any government requirement applicable to the Premises or Buyer's storage or sale of Product or the disclosure or warning of risks associated with Product at the Premises. This indemnification obligation shall survive the termination or nonrenewal of this Agreement.

    15.3    <u>Liability for Charges or Fines.</u>  In the event that BPWCP becomes liable for payment of any charges or fines arising out of Buyer's noncompliance with any governmental laws or regulations or Buyer's failure to secure any necessary licenses or permits or renewals thereof, now or hereafter necessary, in connection with the possession and use of the equipment and other property or the conduct of business on the Premises or Buyer's failure to pay any taxes, imposts or charges imposed by any governmental authority, BPWCP shall have the right to charge Buyer the amount of any such charge or fine paid by BPWCP.

    15.4    <u>Reporting.</u>  Buyer shall report to BPWCP within 24 hours each incidence of major personal injury or criminal activity. All other incidences of personal injury or criminal activity shall be reported as soon as practicable, but in no event later than 72 hours. Buyer will display display signage regarding BPWCP's crime deterrence and reward offer in the manner specified by BPCWP. BPWCP reserves the right to change or withdraw any reward offer in its sole discretion in which case, Buyer will remove or replace the signage immediately upon notice.

16.    <u>Insurance.</u>  Buyer shall obtain and maintain throughout the term of this Agreement each of the following forms of insurance from a financially sound and reputable insurance carrier: (i) workers'

ARCO 40 WR-1 (4/2006)
CDGA

BP 03046

compensation insurance including occupational disease insurance in accordance with the laws of the State in which the Premises are located, and employers' liability insurance in an amount of at least $100,000 disease each employee and $100,000 each accident; and ( ii ) garage liability insurance or general liability insurance, including contractual liability, insuring Buyer's indemnity obligation set forth above, and products—completed operations coverage, in amounts of at least $1,000,000 combined single limit each occurrence applicable to personal injury, including bodily injury, sickness, disease or death and loss of or damage to property (with liquor law liability coverage if Buyer will sell or dispense alcoholic beverages), on which BPWCP is named as an additional insured. Buyer will furnish BPWCP with certificates of insurance evidencing the foregoing coverage and providing that no policy of insurance may be cancelled or materially modified without at least thirty (30) calendar days' prior written notice to BPWCP. Buyer hereby understands and agrees that coverage provided BPWCP by Buyer's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

17.    Termination and Nonrenewal.

17.1    Triggering Events for Termination or Nonrenewal. In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may terminate or nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement following written notice to Buyer from BPWCP of such failure and fifteen calendar days to cure such failure.

(b)    Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Buyer relevant to the operation of the Premises.

(c)    Declaration of bankruptcy by Buyer or judicial determination of insolvency of Buyer.

(d)    Subject to Paragraph 18.3 hereof, the death or the prolonged severe physical or mental disability or disablement of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation) or any of Buyer's general partners (if Buyer is a partnership) for at least three (3) months which renders Buyer unable to provide for the continued proper operation of the Premises.

(e)    The loss of Buyer's right to possess the Premises.

(f)    The condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain.

(g)    The destruction of all or a substantial part of the Premises.

(h)    Buyer's failure to timely pay BPWCP all sums to which BPWCP is legally entitled.

(i)    Buyer's failure to operate the Premises for seven (7) consecutive calendar days, or any lesser period which constitutes an unreasonable period of time.

(j)    The willful adulteration, commingling, mislabeling or misbranding of Product or other violations by Buyer of the Marks.

(k)    Buyer's knowing failure to comply with federal, state or local laws or regulations relevant to the use or operation of the Premises.

ARCO 40 WR-1 (4/2006)
CDGA

BP 03047

(l)    The conviction of any felony involving moral turpitude or indictment for any criminal misconduct relevant to the operation of the Premises of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation), Buyer's majority owning member (if Buyer is an LLC) or any of Buyer's general partners (if Buyer is a partnership).

(m)    The determination by BPWCP, made in good faith and in the normal course of business, to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises are located.

(n)    The occurrence of any other event relevant to the relationship between the parties which makes termination or nonrenewal reasonable, including without limitation those set forth in Paragraph 17.2 below.

(o)    The breach by Buyer of any material provision of this Agreement, which Buyer hereby agrees includes (without limitation) ( i ) Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand, (ii) Buyer's failure to keep a detailed record of each delivery of Product to Buyer or make those records available to BPWCP as provided in Paragraph 9, ( iii ) Buyer's failure to take any of the leak prevention and detection measures outlined in Paragraph 11, (iv) any attempt by Buyer to assign any interest in this Agreement without BPWCP's prior written consent, and (v) failure to complete construction or rebuilding within the time as set forth in Paragraph 1.2.

(p)    If Buyer is a party with BPWCP to a Loan Agreement or a Loan Agreement and Security Agreement and Related Promissory Note, and Buyer fails to cure any default under the foregoing Loan Agreement, Loan Agreement and Security Agreement and Promissory Note as requested, BPWCP may terminate this Agreement.

17.2    Triggering Events for Nonrenewal. In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to agree to changes or additions to its franchise relationship with BPWCP, which BPWCP requests based on BPWCP's determinations made in good faith and the normal course of business and without the purpose of preventing the renewal of the franchise relationship.

(b)    BPWCP's receipt of numerous bona fide customer complaints concerning Buyer's operation of the Premises, of which Buyer was apprised and, to the extent they related to the condition of the Premises or conduct of Buyer or Buyer's employees, which Buyer failed to cure promptly.

(c)    Failure of Buyer to operate the Premises in a clean, safe and healthful manner on at least two previous occasions.

(d)    A good faith determination by BPWCP made in its normal course of business that renewal of the franchise relationship is likely to be uneconomical to BPWCP despite any reasonable changes or additions to the agreements between the parties, which may be acceptable to Buyer.

17.3    Effect of Termination or Nonrenewal. After receiving notice of termination or nonrenewal and until the effective date of the termination or nonrenewal, Buyer will continue to operate the Premises in accordance with this Agreement.

(a)    From and after the effective date of termination or nonrenewal, Buyer will immediately discontinue all use of trade dress and Marks associated with BPWCP, including without limitation use of such trade dress and Marks on dispensers, pumps, containers, storage equipment,

ARCO 40 WR-1 (4/2006)
CDGA

BP 03048

123

buildings, canopies, pump islands, pole signs, advertising, stationery and invoices. From and after the effective date of termination or nonrenewal, Buyer will not adopt or use any trademarks, trade dress or symbols in the operation of the Premises that are confusingly similar to BPWCP's, including without limitation, any four letter name or mark starting with ( i ) the letter "A" or ( ii ) any vowel and having the letter "R" as a second letter, and Buyer will not use or employ as a symbol, mark or design any geometric design that is red or any colored horizontal striping that is predominately red and blue. Further, Buyer will remove from all trade directories and telephone book listings all reference to the Marks. Upon the effective date of the termination or nonrenewal, Buyer will promptly return to BPWCP or destroy, whichever BPWCP directs, all signs, advertising, graphics and other materials in Buyer's possession bearing any Marks or used in any trade dress. In addition, Buyer hereby agrees that BPWCP may enter the Premises to remove or cover up any trade dress or advertisements bearing any Marks. If Buyer terminates or does not renew this Agreement or if BPWCP terminates or does not renew this Agreement for a reason set forth in Paragraph 17.1 or 17.2 above, then Buyer shall pay for the removal or covering up of all trade dress and trademarks as required hereunder. For a reasonable period following the effective date of Buyer's termination or nonrenewal and at no charge, BPWCP may keep any BPWCP property still located on the Premises in place while negotiating for its sale or removal.

(b)    If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises, Buyer will repay BPWCP all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon (i) the mutual termination of this Agreement prior to or at the end of the first twelve months, (ii) the termination of this Agreement by BPWCP or Buyer during the first twelve months or (iii) the nonrenewal of this Agreement by BPWCP or Buyer at the end of the first twelve months (if this is a trial franchise as defined under Section 2803 of the PMPA).

(c)    If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises with a term of more than one year and Buyer has been a party to an agreement regarding the Premises with BPWCP for the supply of Product for less than thirty-six months, then after the first twelve months Buyer will pay BPWCP, on a pro rata basis as described below, the amount of all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon the mutual termination of this Agreement or termination of this Agreement or nonrenewal by Buyer or by BPWCP for a reason set forth in Paragraph 17.1 or 17.2 above. The pro rata amount which Buyer is obligated to pay shall be calculated by multiplying the total of the reimbursements and direct payments made by BPWCP under Paragraph 14.3 times (a) two-thirds during the thirteenth through twenty-fourth month of this Agreement or (b) one-third during the twenty-fifth through thirty-sixth month of this Agreement.

18.    Assignment, Right of First Refusal and Successors In Interest.

18.1    Assignment. Buyer will not sell, (or allow Buyer's foreclosing lender to complete a sale), assign, give or otherwise transfer, any interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements on that constitute the Premises, to any individual or entity other than BPWCP, without first complying with Paragraph 18.2 below and obtaining BPWCP's prior written consent to such transfer, which consent shall not be unreasonably delayed or withheld. Further, if Buyer is a corporation or partnership or LLC, neither Buyer nor any shareholder, member or partner of Buyer will sell, assign, give or otherwise transfer, or mortgage, pledge as security or otherwise encumber any shares of stock, partnership interest or other ownership interest in Buyer to any individual or entity without BPWCP's prior written consent. To ensure that BPWCP has adequate time to evaluate any assignment or transfer request, Buyer will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request. A request for consent made less than 45 days before the expiration date of this Agreement will be considered a request for consent to the renewal agreement, provided that one has been offered to Buyer. Buyer acknowledges and agrees that any transfer, encumbrance, attempted transfer or attempted encumbrance which does not satisfy these prerequisites shall be void and without effect. Buyer further acknowledges and agrees that BPWCP may impose a transfer fee upon any transfer or encumbrance of Buyer's interest in its franchise relationship with BPWCP. The fee is currently $1,000, but BPWCP reserves the right to raise the fee to a maximum of $4,000.

ARCO 40 WR-1 (4/2006)
CDGA

BP 03049

13.2    Right of First Refusal. In return for valuable consideration, Buyer's receipt of which is hereby acknowledged, (i) upon receiving or extending any final offer to acquire any or all of Buyer's interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements that constitute the Premises, whether conveyed through a business broker or directly, to any entity or person other than Buyer's current spouse or adult child (natural or adopted)or (ii) upon the recordation of a Notice of Default that commences Buyer's lender's foreclosure of a mortgage or deed of trust encumbering the Premises, Buyer shall offer such interest to BPWCP, in writing, at the same price and on the same other terms as those contained in the final offer or Notice of Default. Buyer shall give BPWCP a complete, legible copy of the final offer including a breakdown of the amount for real property, equipment and goodwill, all agreements in connection with the proposed sale and the name and address of the proposed buyer/transferee.. In the case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding. Buyer shall give BPWCP a complete, legible copy of the recorded Notice of Default and any later recorded Notice of Sale. BPWCP shall have thirty (30) calendar days after its receipt of all data and documentation required by it to evaluate the offer and exercise its right of first refusal by notifying Buyer in writing that it intends to exercise its right of first refusal and agreeing to pay Buyer the purchase price, less the amount of any applicable transfer fee, on the terms stated in the final offer, or the amount required to pay the foreclosing lender to terminate the foreclosure proceeding, as applicable. During the 30 day period, BPWCP shall have the right of entry upon the premises to conduct reasonable environmental testing.    If BPWCP exercises its right of first refusal, each time period in the final offer will be automatically extended so that it starts on the date that BPWCP exercised its right of first refusal. BPWCP may assign its right of first refusal to any third party. If BPWCP does not exercise its right of first refusal, Buyer may consummate the proposed transfer, but not at lower price or on more favorable terms than those offered to BPWCP. If Buyer does not do so within one hundred eighty (180) calendar days after the date BPWCP received Buyer's written offer, then Buyer must recommence the foregoing right of first refusal procedure and satisfy the requirements of this Paragraph 13.2. BPWCP's exercise of its right of first refusal shall not be dependent on its prior refusal to approve the proposed transferee. Buyer agrees to execute a memorandum of this Agreement to be recorded in the Official Records of the county where the Premises are located and take all other action necessary to give effect to this right of first refusal.

13.3    Successors In Interest. Notwithstanding Paragraphs 13.1 and 13.2, if upon the death or incapacitation for more than ninety (90) consecutive calendar days of Buyer (if Buyer is a natural person), a general partner of Buyer (if Buyer is a partnership) or a majority shareholder of Buyer (if Buyer is a corporation), or majority-owning member of an LLC (if Buyer is an LLC), the interest in this Agreement of such deceased or incapacitated person passes directly to an eligible person or persons whom the deceased or incapacitated has designated as his successor in interest, in writing in a form prescribed by and filed with BPWCP, and who notifies BPWCP within twenty-one (21) calendar days after the death or incapacitation of his intention to succeed to such interest, then this Agreement shall continue for the remaining term hereof, provided that such successor in interest agrees in writing to assume all of the obligations under this Agreement of the deceased or incapacitated and satisfies BPWCP's then current criteria for similar franchisees. A person who is eligible to be designated a successor in interest is one who is (i) the adult spouse or adult child (natural or adopted) or parent of the deceased or incapacitated, (ii) a general partner of the deceased or incapacitated, (iii) a fellow shareholder of the deceased or incapacitated, (iv) a fellow member of the deceased or incapacitated or, (v) if Buyer is a sole proprietor, a designated legal heir. Only the most recently properly designated successor in interest will be recognized as such. If Buyer has a spouse and designates someone other than Buyers spouse, Buyers spouse must agree to the designation.

13.4    BPWCP's Right to Assign. BPWCP shall have the unrestricted right to transfer or assign all or any parts of its rights or obligations under this Agreement, including its right of first refusal described in Paragraph 13.2, to any person or legal entity.

19.   Miscellaneous

19.1   Right of Entry.  Buyer hereby gives BPWCP the right to enter the Premises at all reasonable times and without prior notice, to determine Buyer's compliance with the provisions of this Agreement.  BPWCP may determine Buyer's compliance by any means BPWCP selects, including without limitation, the sampling and laboratory testing of Product.

19.2   Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Buyer shall have no right to assign this Agreement, either voluntarily or by operation of law, except as provided in Paragraph 18 above.

19.3   Force Majeure.  In the event that either party hereto shall be delayed or unable to perform any act required hereunder by reason of Act of Nature, strikes, lockouts, riots, insurrection, war, governmental act or order, or other reason of a like nature not the fault of or in the control of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  The provisions of this Section shall not operate to excuse Operator from prompt payment of all fees or any other payments required by the terms of this Agreement.

19.4   Notices.  Except as limited by applicable law or as otherwise stated in this Agreement, any and all notices and other communications hereunder shall be deemed to have been duly given when delivered personally or forty-eight (48) hours after being mailed, certified or registered mail or overnight mail, return receipt requested, postage prepaid, in the English language, to the Premises if to Buyer and to the address set forth on the first page of this Agreement if to BPWCP, unless otherwise directed in writing by BPWCP.

19.5   Relationship of the Parties.  Buyer agrees that nothing in this Agreement creates a joint venture, agency, employment partnership or similar relationship between it and BPWCP, and Buyer shall have no authority to bind BPWCP in any way.  Buyer will not assert otherwise.  Buyer shall undertake all obligations as an independent contractor and shall exercise and be responsible for the exclusive control of the Premises, the employees and all activities conducted there.  Operator shall be responsible for complying with all the applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws.  BPWCP shall have no control over employees of the Operator, including without limitation the terms and conditions of their employment.  Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

19.6   Waiver.  No purported waiver by either party hereto of any provision of this Agreement or of any breach thereof shall be deemed to be a waiver of such provision or breach unless such waiver is in writing signed by the party making such waiver.  No such waiver shall be deemed to be a subsequent waiver of such provision or a waiver of any subsequent breach of the same or any other provision hereof.

19.7   Compliance.  Buyer shall at all times comply with all laws and applicable government requirements and obtain and maintain all necessary licenses and permits for the performance of its obligations hereunder.

19.8   Authority.  Buyer hereby represents that as of the date hereof, Buyer has the authority to enter into this Agreement and that no consents of third parties other than those which have been obtained and are attached hereto are necessary to enable Buyer to perform its obligations hereunder.  Buyer represents that as of the date of this Agreement, Buyer is in compliance with all leases, contracts and agreements affecting the Premises and Buyer's use and possession of the Premises.

18 of 18

19.9    <u>Prior Course of Dealing.</u>  BPWCP and Buyer acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Buyer and BPWCP by their authorized representatives.

19.10    <u>Further Assurances.</u>  Buyer agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

19.11    <u>Non-exclusivity.</u>  Buyer has no exclusive territory.  BPWCP may establish additional ARCO or other brand or no brand Gasoline or other fueling facilities in any location and proximity to the Premises.

19.12    <u>Other Businesses.</u>   In order to ensure that there is no interference with access for delivery trucks, storage or delivery, Buyer will obtain BPWCP's prior written consent to the placement of any other businesses or equipment on the Premises which consent will not be unreasonably delayed or withheld.

19.13    <u>Ethics.</u>  Buyer acknowledges that giving payments or other inducements to any employee or agent of BPWCP in connection with this Agreement or Buyer's franchise relationship with BPWCP violates BPWCP's ethical policies and entitles BPWCP to terminate this Agreement. Franchisee shall notify BPWCP's Security Department if any employees or agents solicit payments or other inducements.

19.14    <u>Applicable Law.</u>  Except where this Agreement would otherwise be governed by federal law, this Agreement shall in all respects be interpreted, enforced and governed under the laws of the state where the Premises are located.  If any provision of this Agreement should be determined to be invalid or unenforceable, such provision shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions of this Agreement enforceable, and the Agreement as thus amended shall be enforced to give effect to the intention of the parties insofar as that is possible.

19.15    <u>Headings and Gender.</u>  The paragraph headings in this Agreement are intended solely for convenience of reference and shall not in any way or manner amplify, limit, modify or otherwise affect the interpretation of any provision of this Agreement, and the neuter gender and the singular or plural number shall be deemed to include the other genders or numbers whenever the context so indicates or requires.

19.16    <u>Entire Agreement.</u>  This Agreement and the exhibits attached hereto and any written agreements executed contemporaneously with this Agreement relating to the Premises, set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings between the parties, pertaining to the subject matter hereof, and, except as otherwise expressly provided herein, no change in, deletion from or addition to this Agreement shall be valid unless set forth in writing and signed and dated by the parties hereto.

This space is intentionally left blank.

BP 03052

ARCO 40 WR-1 (4/2006)
CDGA

Buyer hereby acknowledges having read this Agreement in its entirety and fully understands and agrees to its contents. No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BP West Coast Products LLC

BPWCP _____        Buyer: _____
                                             Nazim Faquiryan - STTN Enterprises, Inc.
Name _____          Name _____
Title: _____        Title: _____

Each of the undersigned, as owner, part owner, mortgagee or lien holder, for himself and his legal representatives, successors and assignees, hereby consents to the foregoing agreement, including without limitation, to the installations, maintenance, repair, replacement and removal of all required trade dress and trademarks. Each of the undersigned further waives any interest in, right to levy upon, mortgage or otherwise make any claim against any such trade dress or trademarks and confirms BPWCP's title to and right of removal of any property provided or loaned by BPWCP.

Name _____          Name _____

Title: _____        Title: _____

ARCO 40 WR-1 (4/2006)                                          BP 03053
COGA

Exhibit A

<u>Trade Dress Requirements</u>

See Attached booklet entitled "Minimum Trademark Standards, Trade Dress Requirements and Trade Dress Options for Selling ARCO Branded Motor Fuels at Retail Outlets".


This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

BP 03054

129

Exhibit B

Shared Trade Dress Costs for ARCO Branded Gasoline Only

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| All Exterior Decals | 100% BPWCP | |
| Interior Decal Kit | 100% BPWCP | |
| Illuminated Building Bullnose | 100% BPWCP | Max. 100 Feet. 50/50 thereafter |
| Canopy  Bullnose LED | 50/50 | |
| Non-illuminated Canopy Bullnose (back of Canopy) | 100% Dealer | |
| ID Sign - Freeway – Sign/Face Only | 100% BPWCP | |
| ID Sign Fwy - Pole and Foundation | 100% Dealer | |
| ID Sign  Face | 100% BPWCP | |
| ID Sign Foundation and Architectural Veneer/Pole | 100% Dealer | |
| ID Sign - Building - 3 x 10 ARCO Logo Sign | 100% BPWCP | |
| Non-ID Sign - 24 Hour Signs | 100% Dealer | |
| Non-ID Sign - Metal Info Signs – Bumper Post, , Tax | 50/50 | |
| Paint | 100% Dealer | |
| Permits for Signage | 100% Dealer | |
| Coming Soon Banners Pump Toppers (all hardware) | 100% BPWCP 50/50 | |
| Quick Crete Cement Trash Container | 100% Dealer | |
| Tank Tags | 100% BPWCP | |
| Channel Letter | 100% BPWCP | |

ARCO 40 WR-1 (4/2006)
CDGA

BP 03055

130

Exhibit B (Continued)

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| Canopy Sparks | 100% BPWCP | (Max. 4 Sparks) |
| VSAT Equipment: (1) Hughes Satellite Dish100% Dealer and (2) Hughes Indoor Unit - Satellite Receiver (3) Deicer (if required for colder climate) | 100% Dealer | |

* Any costs not set forth as being paid or shared by BPWCP shall be at the sole expense of the Operator/Buyer

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

BP 03056

131

# EXHIBIT F

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## LOAN AGREEMENT
### (am/pm Mini Market)

This LOAN AGREEMENT (this "Agreement") is made and entered into as of ___FEB 12___, 2007 by and between BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), and STTN ENTERPRISE, INC., a California corporation (the "Borrower").

### Recitals

A.     Borrower and Lender have entered into that certain am/pm Mini Market Agreement dated July 11, 2006 (hereinafter referred to as the "CD Store Agreement") which provides the terms and conditions under which Borrower operates or will operate an am/pm Mini Market located at 631 San Felipe Road, Hollister, CA 95035 (the "Store"). The Store comprises a part of certain real property owned by Borrower as more particularly described in Exhibit "A" to the Deed of Trust ("Property"). Borrower and Lender have also entered into that certain Contract Dealer Gasoline Agreement dated July 11, 2006 which provides the terms and conditions under which Borrower operates or will operate an ARCO gasoline station on the Property (the "CD Agreement").

B.     Lender and Borrower desire to provide for the terms and conditions upon which Lender will make available to Borrower a loan to fund the costs associated with pre-approved modifications and/or equipment and improvements to the Store.

### Agreement

In consideration of the mutual promises contained herein, Lender and Borrower agree as follows:

### DEFINITIONS:

**Additional Loan Amounts:** The term Additional Loan Amounts means any Additional Funds which may be disbursed to Borrower or for Borrower's benefit as defined and provided in Section 1.2.

**Alterations:** The term "Alterations" means alterations or improvements to the Store which are permitted under this Agreement.

**Amortization Amount:** The term "Amortization Amount" is defined in Section 1.5.

**Annual Guaranteed Amount:** The term "Annual Guaranteed Amount" means $960,000.00.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Architect:** The term "Architect" is defined in Section 2.1(h).

**Base Loan Amount:** The term "Base Loan Amount" is defined in Section 1.1.

**Business Open Date:** The term "Business Open Date" means the first day on which the Store is open for business of all material components of the gas and store offering as set forth more particularly in the CD Agreement and the CD Store Agreement, as determined by Lender.

**CD Store Agreement:** The term "CD Store Agreement" is defined in Recital A above.

**Closing Date:** The term "Closing Date" means the date of recordation of the Deed of Trust in the Official Records of the county in which the Property is located.

**Conditional Commitment Letter:** The letter dated May 25, 2006 from Lender to Borrower outlining the terms and conditions upon which Lender expressed its willingness to make the Loan to Borrower.

**Contract Year:** The 12 month period beginning on the first day of the first complete month following the Business Open Date and each 12 month period thereafter. If the Business Open Date occurs on the first day of a calendar month, the Contract Year shall commence on such date.

**Contractor:** The term "Contractor" is defined in Section 2.1(h).

**Deed of Trust:** The term "Deed of Trust" means that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of even date herewith, executed by Borrower in favor of Lender.

**Default Rate:** The term "Default Rate" shall have the meaning set forth in the Note.

**Disbursement:** The term "Disbursement" means a disbursement of Loan proceeds made by Lender to or for the benefit of Borrower.

**Disbursement Agreement:** The term "Disbursement Agreement" means that certain Disbursement Agreement Owner and Contractor in the form of Exhibit D attached hereto and made a part hereof, to be executed by Borrower and Lender substantially concurrently with the recordation of the Deed of Trust.

**Engineer:** The term "Engineer" is defined in Section 2.1(h).

**Environmental Indemnity:** The term "Environmental Indemnity" means that certain Environmental Indemnity dated as of even herewith, executed by Borrower in favor of Lender.

**Event of Default:** The term "Event of Default" is defined in Section 4.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Fictitious Deed of Trust:** The term "Fictitious Deed of Trust" is defined in the Deed of Trust.

**First Anniversary Date:** The term "First Anniversary Date" is defined in Section 1.5.

**Gross Sales:** All Store sales as included in the definition of "Gross Sales" in Article 7.02(b) of the CD Store Agreement.

**Improvements:** The term "Improvements" shall have the meaning set forth in the Fictitious Deed of Trust.

**Indemnified Costs:** The term "Indemnified Costs" means all actual or threatened liabilities, claims, actions, causes of action, judgments, orders, damages (including foreseeable and unforeseeable consequential damages), costs, expenses, fines, penalties and losses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of Lender's counsel), but excluding such costs as may be attributable to the gross negligence or willful misconduct of the party seeking to be indemnified.

**Indemnified Parties:** The term "Indemnified Parties" means, collectively, Lender, its parent, subsidiary and affiliated companies, assignees of any of Lender's interest in the Loan or the Loan Documents, owners of participation, syndication or other interests in the Loan or the Loan Documents, any purchasers of the Property at any foreclosure sale or from Lender or any of its affiliates, and the officers, directors, employees and agents of each of them.

**Loan:** The term "Loan" is defined in Section 1.1.

**Loan Documents:** The term "Loan Documents" means the documents described in Exhibit "C" attached hereto, as the same may be amended, renewed or extended from time to time.

**Maturity Date:** The term "Maturity Date" is defined in Section 1.4.

**Note:** The term "Note" means that certain Secured Promissory Note (am/pm Mini Market) of even date herewith, executed by Borrower to the order of Lender, which evidences the Loan.

**Obligations:** The term "Obligations" is defined in Section 1.4.

**Pay Voucher:** The term "Pay Voucher" shall have the meaning set forth in the Disbursement Agreement.

**Plans:** The term "Plans" means detailed plans and specifications for the Alterations.

**Property:** The term "Property" is defined in Recital A above.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Senior Lender:** Omni Financial

**Senior Loan:** That certain loan from Omni Financial to Borrower in the amount of $1,925,000.00

**Senior Loan Documents:** Those certain documents and agreements executed by Borrower in favor of Senior Lender evidencing and securing the Senior Loan, including that promissory note in the original principal amount of $1,625,000.00 (the "Senior Note") and that certain deed of trust dated August 12, 2003 and recorded on November 7, 2003 as instrument number 2003-0022960 in the Office of the San Benito Recorder (the "Senior Deed of Trust"). The Senior Note and the Senior Deed of Trust are modified to include the principal amount of $300,000.00 evidenced by _____ dated _____ as instrument number _____ and recorded in the Office of the San Benito Recorder.

**Store:** The term "Store" is defined in Recital A above.

**Title Company:** The term "Title Company" means Commonwealth Land Title Company.

**Title Policy:** The term "Title Policy" is defined in Section 2.1(d).

**Transfer:** The term "Transfer" is defined in Section 8.

**Trustor:** AVA Global Enterprise, Inc., a California corporation

1.    **Amount and Terms of the Loan.**

    1.1    Amount of Loan. Lender agrees to make available to the Borrower, upon the terms and conditions set forth in this Agreement, a loan (the "Loan") in the principal amount of $150,000.00 (the "Base Loan Amount.

    1.2    Refresh & Refurbish Funds:

        If as of the 11th anniversary of the first disbursement under the Loan, provided Borrower is not then in default under any of the terms and conditions of the Loan Agreements, Loan Documents, or Franchise Agreements, BPWCP may elect, in its sole and absolute discretion, but shall not be obligated to, disburse up to Seventy-Five Thousand and 00/100 Dollars ($75,000) (the "Refresh & Refurbish Funds") to or on behalf of Borrower to enable Borrower to comply with Section 5.05 of the CD Store Agreement, and to be used for non-structural changes to the Improvements, such as, updating and retrofitting the interior of the Improvements to comply with Lender's then-current visual and design standards and layout for its am/pm mini markets (the "Refresh Requirements"), including, but not limited to, new paint, flooring, signage, installation of new fixtures, equipment, and the like (collectively, the "Refresh & Refurbish"). The Refresh & Refurbish Funds shall be used solely to finance the cost of the

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Refresh & Refurbish and to otherwise comply with the Refurbish Requirements, and for no other use or purpose whatsoever. If Lender elects to advance the Refresh & Refurbish Funds, Lender's disbursement of the Refresh & Refurbish Funds to or on behalf of Borrower shall be conditioned upon the satisfaction, as determined by Lender in its sole discretion, that as of the date of the first disbursement of the Refresh & Refurbish Funds, the following conditions have been satisfied:

(a)    Borrower shall be in full compliance with the terms and conditions of the Loan Documents;

(b)    Borrower shall be in full compliance with the terms and conditions of the CD Store Agreement and the CD Agreement;

(c)    Lender has reviewed and approved the financial condition and management capabilities of Borrower, determined that the net cash flow from the Store is sufficient to cover debt service, and approved the economic feasibility of the Store;

(d)    The disbursement of the Refresh & Refurbish Funds has been approved by Lender's appropriately authorized credit officers or committees;

(e)    Borrower has provided to Lender (i) copies of all governmental approvals, licenses and permits required in connection with the Refresh Requirements, and (ii) all equipment rental agreements; and

(f)    Lender shall have approved the competency, reliability and solvency of the general contractor proposed to be retained by Borrower, and the proposed agreement between Borrower and the proposed general contractor pertaining to the permitting and construction of the Refresh Requirements.

1.3    Purpose of the Loan.    The proceeds of the Loan, including without limitation the Additional Funds disbursed as provided above in Section 1.2, shall be used exclusively to fund (i) costs and expenditures associated with improvements to and/or purchases of equipment for use at the Store as described in Exhibit A attached hereto, and (ii) at the election of Lender, payment of the processing fee set forth in Section 3.11 below (collectively, the "Permitted Uses"), and for no other use or purpose whatsoever.

1.4    Term of Loan.    If not sooner repaid, the outstanding principal amount of the Loan (less amounts deemed repaid pursuant to Section 1.6 below) and all other amounts owing under the Loan Documents (collectively, the "Obligations") shall be due and payable on the date which is twenty (20) years following the Business Open Date ("Maturity Date"). Lender shall determine and confirm to Borrower in writing the Business Open Date. Borrower may prepay the Obligations in whole or in part without penalty, at any time. Lender may accept partial payments, whether or not marked "paid in full", without waiving its rights or remedies under this Agreement.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

     1.5    Amortization and Interest Payments. Beginning on the last day of the first Contract Year ("First Anniversary Date") and continuing on each anniversary of the First Anniversary Date, Borrower shall make annual principal payments in the amount equal to five percent (5%) of the then outstanding principal balance of the Loan as of the First Anniversary Date (such annual amount shall be referred to herein as the "Amortization Amount"). Notwithstanding the immediately preceding sentence, in the event Lender disburses all or any portion of the Loan after the First Anniversary Date, Lender shall adjust the amount of annual principal reduction payments due on each ensuing anniversary of the First Anniversary Date so as to fully amortize the principal balance of the Loan by the Maturity Date. In addition to making annual payments of the Amortization Amount, Borrower shall pay to Lender on the First Anniversary Date and on each anniversary of the First Anniversary Date all accrued and unpaid interest on the Loan (at the rate set forth in Section 2 of the Note) for the prior twelve (12) month period, as determined by Lender. The amounts due pursuant to this Section 1.5 shall be paid by Borrower to Lender no later than sixty (60) days after the end of each Contract Year.

     1.6    Repayment Through Store Sales. Notwithstanding anything to the contrary contained in Section 1.5 above, if during a given Contract Year Borrower has Gross Sales with respect to its Store of at least the Annual Guaranteed Amount, then the Loan shall be deemed to be repaid by Borrower as of the last day of such Contract Year (i) five percent (5%) of the then outstanding principal balance of the Loan (subject to adjustment as provided in Section 1.5), and (ii) all interest which accrued under the Note during such Contract Year. During the first Contract Year only, solely for purposes of determining whether Borrower has met the Annual Guaranteed Amount for such Contract Year, the actual Gross Sales with respect to Borrower's Store during such Contract Year shall be grossed up by an amount equal to one-twelfth of the Annual Guaranteed Amount. Borrower acknowledges and agrees that it has itself participated in the determination of the Annual Guaranteed Amount, that such sales goal is reasonable and that Borrower's failure to achieve Gross Sales of at least the Annual Guaranteed Amount each Contract Year will result in repayment obligations. Borrower further acknowledges and agrees that such deemed repayment of debt will result in taxable income to Borrower and that Lender will be delivering to Borrower an IRS Form 1099 reflecting such income. Borrower further acknowledges and agrees that any deemed repayment shall be calculated based only on the register sales made by Borrower for the applicable Contract Year, and that if during any Contract Year, Borrower's register sales exceed the Annual Guaranteed Volume of the Products for such Contract Year, such excess register sales cannot be applied to any previous or future Contract Year.

     1.7.    No Waiver. Lender's deemed repayment of any portion of the Loan as set forth in Section 1.6 shall not operate as a waiver of its right to collect or demand repayment of the Obligations upon the occurrence of an Event of Default.

     1.8    Promissory Note. The obligation of the Borrower to repay the Loan shall be evidenced by the Note. Lender shall record and endorse on the schedule forming a part of the Note appropriate notations to evidence (i) the date and amount of any Disbursement made by

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Lender, (ii) the date and amount of each payment of principal by the Borrower, and (iii) the date and amount of any deemed repayment of any portion of the Loan by Lender pursuant to Section 1.6; provided, however, that Lender's failure to record or endorse any such amount shall not affect the obligations of the Borrower under this Agreement or the other Loan Documents.

     1.9    Audit Rights. So long as there are outstanding Obligations, Lender may, upon reasonable notice to Borrower, audit Borrower's books and records pertaining to Gross Sales. Borrower agrees to cooperate fully with such audit and, if such audit reveals an over-reporting of Gross Sales, Borrower shall immediately pay to Lender any amounts then owing to Lender on account of such over-reporting plus interest at the Default Rate. In addition, if Gross Sales have been overstated by more than five percent (5%), Borrower shall reimburse Lender upon demand for Lender's actual out of pocket audit costs.

     2.    Conditions to Disbursement. Before Lender becomes obligated to make any Disbursement under this Agreement, all conditions to such Disbursement set forth below shall have been satisfied at Borrower's sole cost and expense in a manner acceptable to Lender in the exercise of its reasonable judgment. Borrower acknowledges that delays in Disbursements may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement. Borrower consents to all such delays. No waiver of any condition to Disbursement shall be effective unless it is expressly made by Lender in writing. If Lender makes a Disbursement before fulfillment of one or more required conditions, that Disbursement alone shall not be a waiver of such conditions, and Lender reserves the right to require their fulfillment before making any subsequent Disbursements.

     2.1    Loan Closing and First Disbursement. Lender shall not be required to make the first Disbursement unless all of the following conditions are satisfied on or before January 7, 2007.

     (a)    Borrower shall have complied with all conditions or requirements of Lender as set forth in the Conditional Commitment Letter, including without limitation (i) satisfaction of the conditions set forth in paragraphs (a) through (e) on Page 1 of the Conditional Commitment Letter, (ii) Lender's receipt of reimbursement from Borrower for all costs incurred by Lender in connection with the Loan, and (iii) Lender's receipt of all of the items set forth in Exhibit "B" to the Commitment Letter.

     (b)    All Loan Documents shall have been duly executed by Borrower and any guarantor and received by Lender, including appropriate resolutions or certificates of authority.

     (c)    Lender shall have received written confirmation from the Title Company that (i) the Deed of Trust and the other Loan Documents which are in recordable form shall have been duly recorded in the official records of the county where the Property is located, and (ii) Title Company shall be in a position to deliver for filing with the California Secretary of

82461 am/pm Loan Agreement v1.doc     7

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

State a UCC-1 Financing Statement which perfects Lender's security interest in all personal property and fixtures covered by the Deed of Trust.

(d) The Title Company shall have issued or committed to issue an LP-10 ALTA Lender's extended coverage loan policy of title insurance in a liability amount satisfactory to Lender ("Title Policy"). The Title Policy shall insure the Deed of Trust as a second-priority lien on Borrower's fee estate in the Property, subject only to exceptions consented to by Lender in writing, and shall contain such endorsements as Lender may require. No title matter may be insured over by the Title Company without the express written consent of Lender.

(e) Borrower shall have provided to Lender evidence of commercial general liability insurance naming Lender as an additional insured, on an "occurrence" basis against claims for "personal injury" liability, including bodily injury, death or property damage liability, with a limit of not less than One Million Dollars ($1,000,000.00). Such insurance shall name Lender as an additional insured and shall be primary and non-contributory with any other insurance carried by Lender.

(f) If required by Lender, Borrower shall have obtained performance and labor and material payment bonds in dual obligee form covering the performance of the Contractor and such principal subcontractors for the Alterations as Lender may designate. The terms of the bonds and the bonding company shall be acceptable to Lender, and all required bonds and the contracts which they cover shall have been duly recorded or filed in accordance with applicable California law.

(g) Lender shall have approved the information set forth in Borrower's completed Environmental Questionnaire. If Lender so requires, Lender shall also have received a report prepared by a licensed or registered environmental engineer or other qualified party satisfactory to Lender stating that there are no Hazardous Substances, as defined in Section 1.5 of the Environmental Indemnity, present in, on, under or around the Property, and that there is no condition or circumstance which warrants further investigation or analysis in the opinion of the preparer of the report.

(h) Lender shall have approved the architect ("Architect"), engineer ("Engineer"), general contractor ("Contractor") and principal subcontractors to be used in connection with the Alterations.

(i) Lender shall have received and approved the Plans, together with (i) a detailed budget for the Alterations and the other Permitted Uses of Loan proceeds, and (ii) copies of building permits.

(j) Lender shall have received and approved (i) all contracts entered in by Borrower with the Architect, Engineer and Contractor, respectively, (ii) an assignment of

82461 am/pm Loan Agreement v1.doc                    8

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

each such contract referred to clause (i) in favor of Lender, in form and substance satisfactory to Lender, together with an assignment of the Plans, and (iii) consents to each such assignment executed by the Architect, Engineer and Contractor, respectively, in form and substance satisfactory to Lender.

(k)    Lender shall have received such financial statements and other financial information as it may require regarding the financial condition of Borrower, any guarantor, the Store or the Property.

(l)    Lender shall have received evidence of the due formation and good standing of Borrower and any guarantor, including such organizational documents (including partnership agreements, operating agreements, articles of organization or articles of incorporation) and certificates of status as Lender may require.

2.2    <u>Any Disbursement</u>.  In no event shall Lender be required to make any Disbursement if:

(a)    Borrower fails to observe any condition or term set forth in the Disbursement Agreement; or

(b)    For any reason the Title Company fails or refuses at Lender's request to issue a CLTA Form 122 endorsement or its equivalent; or

(c)    The Improvements are materially damaged and not repaired, unless Lender receives funds from Borrower or insurance proceeds sufficient to pay for all repairs in a timely manner; or

(d)    The Property or any interest in it is affected by eminent domain or condemnation proceedings; or

(e)    Lender receives a bonded or unbonded stop notice, unless Borrower files a release bond satisfactory to Lender in its reasonable judgment; or

(f)    Under any of the Loan Documents, a default or Event of Default (as defined in that document) has occurred and is continuing, or an event has occurred that with notice or the passage of time could become a default or Event of Default.

2.3    <u>Disbursement Procedures</u>.  Disbursements for Alterations shall be made in accordance with the procedures set forth in the Disbursement Agreement, the terms of which are incorporated herein by this reference.  Lender may delegate the disbursal and verification duties to a third party, in which case Lender will notify Borrower and Borrower will make disbursement requests to and submit documentation for disbursements to the third party.  Disbursements of the Loan shall be made in the form of vouchers from Borrower to contractors and/or suppliers.  The contractors and/or suppliers through the third party funding company will

82461 am/pm Loan Agreement v1.doc        9

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

redeem the vouchers for payment.  Except as otherwise provided in the Disbursement Agreement, loan proceeds shall be available for disbursement as follows: one-fourth of the loan amount at the time Borrower obtains permits for construction; one-fourth of the loan amount when Lender verifies that the improvements are 25% complete; one-fourth of the loan amount when Lender verifies that the improvements are 50% complete and one-fourth of the loan amount after Lender verifies that the improvements are 75% complete.  The Additional Funds, if any, shall be available for disbursement in accordance with the terms of Section 1.2 above. Lender reserves the right, prior to making any disbursement, to require original paid invoices supporting the expenditure of loan proceeds, releases of mechanics liens, and/or additional security for the Loan as Lender may determine in its sole discretion. The third party fund control company fee, if any, will be paid by Lender.

     3.    <u>Covenants of the Borrower</u>.  Borrower promises to keep each of the covenants set forth below, unless Lender has waived compliance in writing.

     3.1    <u>Commencement and Completion of Improvements</u>.  Borrower shall obtain building permits and commence construction of the Alterations no later than January 11, 2007. Borrower shall complete the construction of the Alterations, obtain a certificate of completion or a certificate of occupancy from the appropriate governmental authority, and open for business (as determined by Lender) by not later than July 11, 2007.  Borrower's failure to observe any of the deadlines set forth in this <u>Section 3.1</u> shall be an Event of Default and shall not be subject to the cure period set forth in <u>Section 4.9</u> below.

     3.2    <u>Permits, Licenses and Approvals</u>.  Borrower shall construct the Alterations in a good and workmanlike manner in accordance with sound building practices as well as the Plans and all applicable laws pertaining to such construction.  Borrower shall properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to construct and occupy the Alterations and operate the Store.

     3.3    <u>Site Visits</u>.

     (a)    Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Property for the purposes of performing an appraisal, observing the work of construction, examining all materials and determining whether such work conforms with the Plans approved by Lender.  Lender shall also have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors which relate to the Property or construction of the Alterations.  In each instance, Lender shall give Borrower reasonable notice before entering the Property.  Lender shall make reasonable efforts to avoid interfering with Borrower's Store operations.

     (b)    Lender is under no duty to visit the Property or to supervise or observe construction or to examine any books or records.  Any site visit, observation or

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

examination by Lender shall be solely for the purpose of protecting Lender's rights and interests. No site visit, observation or examination by Lender shall impose any liability on Lender or result in a waiver of any default of Borrower. In no event shall any site visit, observation or examination by Lender be a representation that there has been or shall be compliance with the Plans, that the construction is free from defective materials or workmanship, or that the construction complies with any other applicable law.

3.4    Protection Against Lien Claims. Borrower shall promptly pay or otherwise discharge all claims and liens for labor done and materials and services furnished in connection with the construction of the Alterations. Borrower shall have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to Lender or delay in completing the Alterations.

3.5    Payment of Expenses. Borrower shall pay Lender's costs and expenses incurred in connection with the making, disbursement and administration of the Loan, as well as any revisions, extensions, renewals or "workouts" of the Loan, and in the exercise of any of Lender's rights or remedies under this Agreement. Such costs and expenses include charges for title insurance (including endorsements), filing, recording and escrow charges, fees for appraisal, architectural and engineering review, construction services and environmental services, mortgage taxes, legal fees and expenses of Lender's counsel and any other reasonable fees and costs for services, regardless of whether such services are furnished by Lender's employees or agents or independent contractors. Borrower acknowledges that amounts payable under this Section are not included in any loan or commitment fees for the Loan.

3.6    Financial Information. Borrower shall keep true and correct financial books and records on a cash basis pertaining to Gross Sales and to the construction of any Alterations. Upon request of Lender from time to time, Borrower shall deliver balance sheets and income statements to Lender for itself and the Store, together with a statement showing all changes in the financial condition of Borrower and the Store which occurred during the preceding Contract Year. These financial statements may be Borrower prepared. Borrower shall also furnish to Lender upon request signed copies of any tax returns and such other information as Lender may reasonably request concerning its affairs and properties.

3.7    Notices. Borrower shall promptly notify Lender in writing of:

(a)    Any litigation affecting Borrower or any guarantor, where the amount claimed is Fifty Thousand Dollars ($50,000) or more;

(b)    Any communication, whether written or oral, that Borrower may receive from any governmental, judicial or legal authority, giving notice of any claim or assertion that the Store, the Property or any Alterations fail in any respect to comply with any applicable governmental law;

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

(c)    Any default by the Project Manager, Contractor or any subcontractor, material supplier or surety; and

(d)    Any material adverse change in the physical condition of the Property (including any damage suffered as a result of earthquakes or floods), or in Borrower's or any guarantor's business condition (financial or otherwise), operations, properties or prospects.

3.8    Indebtedness.  Except for the Senior Loan and except as otherwise provided under the Loan Documents, Borrower will not create, incur or assume any indebtedness, commitment or other obligation for borrowed money without the express prior written consent of Lender.

3.9    Performance of Acts.  Upon request by Lender, Borrower shall perform all acts which may be necessary or advisable to perfect any lien or security interest provided for in the Loan Documents or to carry out the intent of the Loan Documents.

3.10    Insurance.

(a)    Borrower shall provide, maintain and keep in force at all times prior to repayment of the Loan, the insurance required by Section 2.1 above and by the Disbursement Agreement.  Also at all such times, Borrower shall provide, maintain and keep in force any and all additional insurance that Lender in its reasonable judgment may from time to time require, against insurable hazards which at the time are commonly insured against in the case of property similarly situated.  Such additional insurance may include flood insurance as required by federal law and earthquake insurance as required by Lender.  At Lender's request, Borrower shall supply Lender with an original of any policy or a certificate of coverage.

(b)    All policies of insurance required under this Agreement and the Disbursement Agreement shall be issued by companies approved by Lender having a minimum A.M. Best's rating of A:IX.  The limits, coverage, forms, deductibles, inception and expiration dates and cancellation provisions of all such policies shall be acceptable to Lender.  In addition, each required property insurance policy shall contain a Lender's Loss Payable Form (Form 438 BFU or equivalent) in favor of Lender, and shall provide that all proceeds be payable to Lender to the extent of its interest.  An approval by Lender is not, and shall not be deemed to be, a representation of the solvency of any insurer or the sufficiency of any amount of insurance.

(c)    Each policy of insurance required hereunder and under the Disbursement Agreement shall provide that it may not be modified or cancelled without at least thirty (30) days' prior written notice to Lender.  When any required insurance policy expires, Borrower shall furnish Lender with proof acceptable to Lender that the policy has been reinstated or a new policy issued, continuing in force the insurance covered by the policy which expired.  Borrower shall also furnish Lender with evidence satisfactory to Lender that all premiums for

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

such policy have been paid within thirty (30) days of renewal or issuance. If Lender fails to receive such proof and evidence, Lender shall have the right, but not the obligation, to obtain current coverage and advance funds to pay the premiums for it. Borrower shall repay Lender immediately on demand for any advance for such premiums, which shall be considered to be an additional loan to Borrower bearing interest at the Default Rate and secured by the Deed of Trust and which shall not be subject to deemed repayment in accordance with Section 1.6 above.

      3.11   Processing Fee. Borrower shall pay to Lender upon execution of this Agreement by Borrower a processing fee in the amount of $10,000.

    4.   Events of Default.

      The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

      4.1   The Borrower assigns this Agreement or any of the other Loan Documents to a third party without the prior written consent of Lender: or

      4.2   The Borrower assigns the CD Store Agreement to a third party without the prior written consent of Lender; or

      4.3   The Borrower fails to observe any of the deadlines set forth in Section 3.1 above or, after commencing operations, there occurs a cessation of operations at the Store for thirty (30) consecutive days; or

      4.4   There shall occur a "Transfer" (defined below) without Lender's prior written consent; or

      4.5   The CD Store Agreement is terminated by either Lender or Borrower prior to the end of its stated term; or

      4.6   There shall occur a default or "Event of Default" under any contract entered into by Borrower with the Architect, Engineer or Contractor; or

      4.7   Borrower fails to make any payment due under the Loan Documents within five (5) business days after the date when due; or

      4.8   Borrower fails to comply with any provision contained in this Agreement other than those provisions elsewhere referred to in this Section 4, and does not cure that failure within thirty (30) days after written notice from Lender; or

      4.9   Any representation or warranty made by Borrower in the Loan Documents or in any Pay Voucher, financial statement or document delivered pursuant to this Agreement, or

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

in connection with the making of any Disbursement, shall prove to have been incorrect, untrue or misleading in any material respect when made;

4.10    A default or "Event of Default" shall have occurred under any of the other Loan Documents; or

4.11    There shall occur a default or event of default under any of the Senior Loan Documents; or

4.12    The Borrower shall fail to pay when due the principal of or interest on any other indebtedness secured by the Property, or there shall occur any other event that would permit the holder of such indebtedness to accelerate the maturity thereof; or

4.13    The Borrower shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or a substantial part of its property or business, or such a receiver or trustee otherwise shall be appointed and shall not be discharged within 30 days after such appointment, or there shall be instituted by or against Borrower a bankruptcy, insolvency, reorganization or liquidation proceeding and such proceeding shall not be dismissed within 30 days ("Insolvency Proceeding"), or any order, judgment or decree shall be entered against the Borrower decreeing its dissolution, or the Borrower's existence shall otherwise be terminated.

5.    Remedies.

5.1    Upon the occurrence of any Event of Default, Lender may, at its option, exercise all remedies and rights available to it under this Agreement, the other Loan Documents and under applicable law or in equity or by statute, including without limitation, the right to (i) declare all or any part of the Obligations to be forthwith due and payable, without presentation, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower; or (ii) terminate any obligation of Lender hereunder to make further Disbursements. All of Lender's rights and remedies shall be cumulative. No delay or failure of Lender in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of that right by Lender, and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or of any other right or remedy that Lender may have.

5.2    Also upon any Event of Default, Lender shall have the right in its sole discretion to enter and take possession of the Property, whether in person, by agent or by court-appointed receiver, and to take any and all actions which Lender in its sole discretion may consider necessary to complete construction of the Alterations, including making changes in the Plans, work or materials and entering into, modifying or terminating any contractual arrangements, all subject to Lender's right at any time to discontinue any work without liability.

82461 am/pm Loan Agreement v1.doc          14

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

If Lender chooses to complete the Alterations, it shall not assume any liability to Borrower or any other person for completing the Alterations or for the manner or quality of construction of the Alterations, and Borrower expressly waives any such liability. If Lender exercises any of the rights or remedies provided in this subparagraph, that exercise shall not make Lender, or cause Lender to be deemed to be, a partner or joint venturer of Borrower. Lender in its sole discretion may choose to complete construction in its own name. All sums which are expended by Lender in completing construction shall be considered to be an additional loan to Borrower bearing interest at the Default Rate, secured by the Deed of Trust and not be subject to deemed repayment in accordance with Section 1.6.

     5.3     For purposes of determining the outstanding balance of the Loan at the time an Event of Default occurs hereunder, deemed repayment of principal and interest by Lender pursuant to Section 1.6 shall be calculated based upon the percentage of the Annual Guaranteed Amount achieved by Borrower through the last day of the calendar month immediately preceding the occurrence of the Event of Default. For example if the CD Store Agreement is terminated by Borrower on May 15, 2005 and the current Contract Year expires December 31, 2005, Lender will calculate total Gross Sales during the period January 1, 2005 through April 30, 2005 and compare such total to the Annual Guaranteed Amount. If total Gross Sales during such period equal 33% of the Annual Guaranteed Amount, the outstanding principal balance of the Loan will be reduced by an amount equal to 33% of the annual principal reduction payment due for that Contract Year (determined in accordance with Section 1.6 above).

     6.     **Interest and Late Charges**. Borrower hereby acknowledges that late payment by Borrower to Lender of the payments due under this Agreement will cause Lender to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any payment due from Borrower under this Agreement is not received within five (5) business days after the date on which such payment is due and payable, then without any requirement for notice to Borrower, Borrower shall pay Lender a late charge equal to five percent (5%) of such overdue amount. Borrower and Lender hereby agree that such late charge represents a fair and reasonable estimate of the costs Lender will incur by reason of late payment by Borrower. Acceptance of such late charge by Lender shall in no event constitute a waiver of Borrower's default with respect to such overdue amount, or prevent Lender from exercising any of the rights and remedies granted hereunder. In addition to the foregoing, Borrower agrees to pay interest at the Default Rate on any and all sums due under this Agreement from the payment due date until the date fully paid by Borrower.

     7.     **Transfers**. Borrower agrees that, in the event of any "Transfer" (as defined below) without the prior written consent of Lender, Lender shall have the absolute right, at its option, without prior demand or notice, to declare the Obligations immediately due and payable. Consent to one such Transfer shall not be deemed to be a waiver of the right to require consent to future or successive Transfers. Lender may grant or deny such consent in its sole discretion and, if consent should be given, any such Transfer shall be subject to all obligations of Borrower under the Loan Documents, such transferee shall assume all obligations under the Loan

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Documents and agree to be bound by all provisions contained herein and therein, and Lender may require that Borrower pay to Lender an assumption fee in the amount of five percent (5%) of the remaining balance of the unamortized Loan. Such assumption shall not, however, release Borrower or any guarantor from any liability to Lender without the prior written consent of Lender. As used herein, "Transfer" shall mean:

(a)    any sale, transfer, conveyance, hypothecation, encumbrance or lease of the Property or any part thereof or interest therein to any person or entity, whether voluntary, involuntary, by operation of law, or otherwise (except for any deed of trust executed in favor of EGI in connection with the Citicorp Loan);

(b)    any change of control in Borrower if, within thirty (30) days after such change of control, Borrower has not paid in full all Obligations ("control" as used herein shall mean the ability to direct the day to day management of the affairs of Borrower);

(c)    any sale or transfer of greater than ten percent (10%) of the direct or indirect ownership interests in Borrower or any consolidation or merger of Borrower (whether voluntarily, involuntarily, by operation of law or otherwise); or

(d)    any sale, lease or other disposal of all or substantially all of Borrower's assets.

8.    **Indemnity Regarding Construction and Other Risks**.  Borrower indemnifies, defends and holds the Indemnified Parties harmless from and against any and all Indemnified Costs directly or indirectly arising out of or resulting from construction of any improvements on the Property, including any defective workmanship or materials; or any failure to satisfy any requirements of any laws, regulations, recorded covenants, maps, permits or other entitlements that apply or pertain to the Property; or breach of any representation or warranty made or given by Borrower to any of the Indemnified Parties or to any prospective or actual buyer, tenant or other occupant of all or any portion of the Property; or any claim or cause of action of any kind by any party that any Indemnified Party is liable for any act or omission of Borrower or any other person or entity in connection with the ownership, sale, operation or development of the Property. This indemnity shall survive repayment in full of the Obligations.

9.    **Miscellaneous**.

9.1    **Amendments**.    This Agreement may only be amended by a written instrument duly executed by Lender and Borrower.

9.2    **Notices**.    Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

    (a)    If to the Borrower:

STTN Enterprises, Inc.
631 San Felipe Rd.
Hollister, CA 05035
Attention:    Nazim Faquiryan
                Sayed Faquiryan
Facsimile No.:

    (b)    If to Lender:

BP West Coast Products LLC
P. O. Box 5077
Buena Park, California 90622-5077
Attention: Contract Dealer Loan Administration
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

    9.3    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one agreement.

    9.4    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

    9.5    <u>Severability</u>. If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

    9.6    <u>Assignment, Binding Effect</u>. The Loan is <u>not</u> assumable. Borrower may not assign this Agreement, nor delegate any of its duties hereunder, without the prior written consent of Lender, which consent may be granted or denied in Lender's sole and absolute discretion. Lender may assign all or any part of its rights and interests hereunder. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

    9.7    <u>Tax Consequences</u>. Lender makes no representation regarding and assumes no responsibility for the tax consequences to Borrower of any term of this Agreement or

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

the other Loan Documents.   Borrower represents and warrants to Lender that it has had an opportunity to consult with tax counsel prior to executing the Loan Documents.

        9.8   <u>Entire Agreement</u>.   This Agreement and the other Loan Documents contain all of the agreements and understandings between the parties with respect to the subject matter of this Agreement.  All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Agreement are expressly merged herein and superseded hereby.

        9.9   <u>Attorney's Fees</u>.  If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Agreement, the Note, the other Loan Documents or the Loan, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.  In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

        **IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first above written.

STTN ENTERPRISES, INC.,
a California corporation

By _____

Name: Nazim S.M. Faquiryan

Title:   CEO/President


By _____

Name: Sayed M.N. Faquiryan

Title:  Secretary/Treasurer

BP WEST COAST PRODUCTS LLC,
a Delaware limited liability company

By _____

Name: Jeff M. Cary

Title:  Vice President

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

<u>EXHIBIT A</u>

Loans may only be used for am/pm store-related image and equipment-based improvements; the types of qualifying expenditures and the maximum amount permitted to be loaned are noted below:

| <u>Description</u> | <u>Maximum Amount</u> |
|---|---|
| Coolers/Freezers | $32,500 |
| Gondolas/Sales Modules (fast track) | $15,000 |
| Counters and Cabinets | $50,000 |
| Interior Lighting | $ 12,000 |
| Store Front System | $ 20,000 |
| HVAC | $35,000 |
| Floor and tiling | $20,000 |
| Plumbing | $35,000 |
| Electrical | $50,000 |
| Video Surveillance Equipment | $25,000 |

Prices vary up to 20%, dependent on geographic location

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

### EXHIBIT B

### SECURED PROMISSORY NOTE

[Attached]

## SECURED PROMISSORY NOTE
### (am/pm Mini Market)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation, (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Twenty Five and No/100 Dollars ($225,000.00) (the "Maximum Loan Amount"), or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below.  This Note evidences a loan ("Loan") from Lender to Borrower.

        1.     This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property").  It may also be secured by other collateral.  This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower.  Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note.  Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

        2.     The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to Five percent (4.75 %) per annum.[1]  Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan.  Borrower shall also make annual principal reduction payments as provided in the Loan Agreement.  Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

        3.     All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

        4.     All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

        5.     Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

        6.     Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

        7.     If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment.  In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

        8.     From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate.  Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]  The interest rate currently approved for CD Loans is 4.75 % per annum but is subject to change.  The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.

1

9.  If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

(a)  Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

(b)  Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

(c)  Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.  If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.  In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests.  From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.  This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.  Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.  If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note.  No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.  All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.  This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance.  Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.  If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:    CEO and President

By _____
Name:  Sayed M.N. Faquiryan
Title:    Secretary and Treasurer

3

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT C

## SCHEDULE OF LOAN DOCUMENTS

1.   Loan Agreements (Gasoline and am/pm Mini Market)

2.   Secured Promissory Note

3.   Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing

4.   UCC-1 Financing Statement

5.   Environmental Indemnity

6.   Environmental Questionnaire

7.   Senior Lender's Consent to Encumbrance and Request for Notice of Default

8.   Guaranty executed by Nazim S.M. Faquiryan

9.   Guaranty executed by Sayed M.N. Faquiryan and Mahgul Faquiryan

10.  CD Store Agreement

11.  Memorandum of Gasoline Agreement for Dealer Owned and Franchise Operated Facility

12.

13.

14.

82461 am/pm Loan Agreement v1.doc                Exhibit C
                                                     1

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

<u>EXHIBIT D</u>

<u>FORM OF DISBURSEMENT AGREEMENT</u>

[Attached]

# EXHIBIT G

# DISBURSEMENT AGREEMENT
### (Owner and Contractor)

This Disbursement Agreement ("Agreement") is made by and between BP WEST COAST PRODUCTS LLC, A Delaware limited liability company and those persons designated below as "Owner" and "Contractor".

## RECITALS

A.  Owner has entered into an agreement with Contractor for the construction on the property described below (the "Job Site") of those certain improvements described below (the "Improvements") for the total sum set forth below (the "Contract Price").

B.  Owner and BP WEST COAST PRODUCTS LLC entered into a Contract Dealer Gasoline Agreement (am/pm Mini Market Agreement) (the "Franchise Agreement").

C.  Owner and BP WEST COAST PRODUCTS LLC entered into a Loan Agreements dated February 12, 2007 and related agreements (collectively, the "Loan Agreement") whereby BP WEST COAST PRODUCTS LLC agreed to loan funds pursuant to the Loan Agreement ("Construction Loan Proceeds") under the terms and conditions as set forth therein (the "Construction Loan Procedure").

D.  The parties hereto hereby intend to provide for the disbursement of the Construction Loan Proceeds upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties agree as follows:

## OPERATIVE PROVISIONS

1.  COST ESTIMATES. Contractor shall prepare and submit for review by BP WEST COAST PRODUCTS LLC a cost breakdown estimate (the "Cost Estimate") in a form prescribed by BP WEST COAST PRODUCTS LLC.

2.  AUTHORIZATION OF DISBURSEMENT. Owner and Contractor hereby authorize BP WEST COAST PRODUCTS LLC or its designee to disburse the Construction Loan Proceeds in accordance with the schedule of progress payments determined from time to time by BP WEST COAST PRODUCTS LLC. The Construction Loan Proceeds shall be under the exclusive control of BP WEST COAST PRODUCTS LLC or its designee. Neither Owner nor Contractor shall have any right, title or interest, in or to the Construction Loan Proceeds independent of this Agreement, nor shall Owner have any right to direct the time, manner or mode of disbursement of all or any portion of the Construction Loan Proceeds or to demand repayment thereof. Nothing in this paragraph shall be construed as a waiver of Contractor's Mechanic's Lien or Stop Notice rights under California Law.

3.  PROJECT DISBURSEMENT INSTRUCTIONS. Construction Loan Proceeds will be disbursed from time to time upon receipt by BP WEST COAST PRODUCTS LLC or its designee of Pay Vouchers, executed by Owner or Owner and Contractor, accompanied by original detailed invoices, and UNCONDITIONAL or CONDITIONAL WAIVER AND RELEASE UPON PROGRESS or FINAL PAYMENT, as appropriate, for general contractor, each subcontractor who furnished labor, equipment, materials or services to the Job Site, and each materialman, supplier and vendor who furnished materials to the Job Site during the period covered by said payment. BP WEST COAST PRODUCTS LLC or its designee shall, at their sole discretion based on their expertise, pay such Pay Vouchers. All parties understand and agree that BP WEST COAST PRODUCTS LLC or its designee have the right to withhold payment on any and all Pay Vouchers if supporting documentation reasonably requested is not provided. This may include original invoices, job inspection card copy, IRS form W-9, appropriate lien releases for labor and/or materials, receipts, photos, revised cost breakdown and Affidavit and Certification of Completion of Builder/Contractor.

4.  TOTAL PROJECT FUNDING. The funds provided herein are the maximum funds available under BP WEST COAST PRODUCTS LLC's loan program and Loan Agreement and are the only funds which will be disbursed under this Agreement. These funds may or may not be sufficient to complete the project in its entirety.

5.  COST BREAKDOWN AND APPROVED PLANS. Prior to issuance of Pay Vouchers and disbursement of any funds, Owner and Contractor will provide to BP WEST COAST PRODUCTS LLC:

    a.  Completed Cost Breakdown for all construction, improvements and equipment at the Job Site;
    b.  Specifications for all construction, improvements and equipment at the Job Site; and
    c.  The Prime Contract between Owner and Contractor, as required by BP WEST COAST PRODUCTS LLC.

6.  OWNER'S TRADE DRESS, EXPENSES AND PACKAGING FEES. Owner and Contractor hereby acknowledge and understand that during the course of construction BP WEST COAST PRODUCTS LLC may from time to time withhold certain funds from disbursement which are identified as Owner's calculated costs for trade dress and packaging fees pursuant to the Franchise Agreement and Loan Agreement. In an instance where trade dress or packaging fees are not indicated in the original budget or where funds, as disbursed, are insufficient for the withhold requirement, then BP WEST COAST PRODUCTS LLC will, at its discretion, withhold the needed funds from budget line items which it deems appropriate.

7.  APPLICATION OF FUNDS.
    7.1 BP WEST COAST PRODUCTS LLC does not guarantee that (a) the construction of the Improvements will proceed, be completed or be in accordance with the plans and/or specifications if and when completed; or (b) the quality of workmanship or materials. Nor does BP WEST COAST PRODUCTS LLC guarantee the

payment of all obligations incurred by Contractor or Owner in connection with the construction of the Improvements.

7.2  BP WEST COAST PRODUCTS LLC or its designee will not be required to disburse any funds for any labor and/or material which, in the opinion of BP WEST COAST PRODUCTS LLC, exceed the value of such labor and/or material or which will reduce the undisbursed funds below the amount necessary to complete the Improvements.

7.3  In the event a mechanic's lien is filed against the Job Site as a result of the construction of the Improvements, or in the event BP WEST COAST PRODUCTS LLC is served with a Notice to Withhold, BP WEST COAST PRODUCTS LLC may, at its option, pay or compromise said lien or Notice to Withhold, or any action or judgment based thereon, deducting all costs and expenses so incurred, including reasonable attorney's fees, from the funds remaining on deposit with BP WEST COAST PRODUCTS LLC. BP WEST COAST PRODUCTS LLC may elect not to pay or compromise any such lien or Notice to Withhold, or action, which is disputed in good faith by Owner or Contractor, and which Owner or Contractor is at their own expense then diligently contesting, provided, that upon demand to Owner by BP WEST COAST PRODUCTS LLC, there shall be recorded in the official records of the County where the Job Site is located, a surety bond purchased by Owner and acceptable to BP WEST COAST PRODUCTS LLC sufficient to satisfy such claim as shall be determined by BP WEST COAST PRODUCTS LLC. Any amount so deposited shall be disbursed in accordance with the resolution of the contest. Nothing herein shall alter Owner's obligation to pay Contractor in full for work performed, pursuant to the terms of the Owner/Contractor agreement.

8.   INSPECTIONS AND PERFORMANCE.
8.1  BP WEST COAST PRODUCTS LLC will inspect or cause to be inspected the Job Site from time to time and at such times as it deems necessary. These inspections are solely for the purpose of ascertaining the stage of construction and whether certain work has progressed and not for the purpose of determining whether the construction of the Improvements is in accordance with the plans and/or specifications, nor whether such construction has been accomplished in a good, substantial and workmanlike manner. Consequently, such inspection by BP WEST COAST PRODUCTS LLC should not be deemed the equivalent of or a substitute for architectural supervision.

8.2  When BP WEST COAST PRODUCTS LLC has disbursed the Construction Loan Proceeds, its obligations under this Agreement shall cease. BP WEST COAST PRODUCTS LLC is not responsible either for the quality of the labor or material used in connection with the Improvements or for the correction of any defects, errors or omissions in construction which may from time to time appear.

9.   AUTHORIZED SIGNATURES.  The signature of those parties set forth below as "Authorized Parties" ("Authorized Parties") on disbursement orders submitted to BP WEST COAST PRODUCTS LLC for payment on account of the construction of the Improvements on the Job Site shall conclusively, irrevocably and finally establish the right of BP WEST COAST PRODUCTS LLC to make payment in the amount, manner and to the person designated on such Pay Voucher, and shall constitute a representation that the labor, materials and/or services therein referred to were actually furnished, or are to be furnished, to the Job Site and incorporated in the Improvements being constructed thereon and BP WEST COAST PRODUCTS LLC shall be entitled to rely thereon and shall be held free and harmless in connection therewith, to the extent of the payment made. BP WEST COAST PRODUCTS LLC may, in its discretion, decline to pay any disbursement order for good cause, and may, in its discretion, pay any disbursement order without the signature of the Authorized Parties, but any such payment must be proper in amount and purpose. The payment of any disbursement order by BP WEST COAST PRODUCTS LLC shall not be construed as a guaranty or warranty of the quality or sufficiency of the labor, materials or service represented thereby. Notwithstanding BP WEST COAST PRODUCTS LLC's right to control disbursement of funds, exercise of such right shall not constitute an obligation by BP WEST COAST PRODUCTS LLC to insure that work or materials are in compliance with the plans and specifications, or any governmental or regulatory agency, or to insure that undisbursed funds are at any time sufficient to complete the Improvements.

10.  MISCELLANEOUS.  This Agreement modifies all prior agreements, written or oral, and Contractor's contracts in so far as they would otherwise be in conflict with the provisions hereof. This notwithstanding, as between themselves, Owner and Contractor affirm the existence and enforceability of the underlying construction contract between them, dated November 21, 2006 (the "Prime Contract"), including but not limited to the payment obligations of Owner to Contractor. If any provision of this Agreement is found invalid or ineffectual for any reason whatsoever, such invalidity shall not in any way affect any other provision hereof.

11.  UNSUITABLE SOIL CONDITIONS.  If the Job Site, or any portion thereof upon which the Improvements are to be constructed, is filled ground, or ground otherwise unsuitable to support such improvements as the same are designed and engineered, Owner and Contractor shall immediately upon discovering such fact disclose the same to BP WEST COAST PRODUCTS LLC and cease all future work on the Improvements until Owner or Contractor and BP WEST COAST PRODUCTS LLC have agreed, in writing, to recommence construction operations.

12.  ATTORNEYS FEES.  Except as specifically set forth herein, this paragraph applies between Owner and BP West Coast Products, LLC, only.  In the event of any dispute arising out of this Agreement or the performance thereof, whether or not such dispute results in litigation, all attorneys fees incurred by BP WEST COAST PRODUCTS LLC for consultation or representation with respect to such dispute, whether or not BP WEST COAST PRODUCTS LLC is made a party to such dispute, shall be deemed an additional expense of the performance by BP WEST COAST PRODUCTS LLC of this Agreement, for which additional expenses shall be reimbursed from the Construction Loan Proceeds. To the extent that funds remaining in the Construction Loan Proceeds are insufficient so to reimburse BP WEST COAST PRODUCTS LLC, all parties signatory hereto (excluding Contractor) other than BP WEST COAST PRODUCTS LLC shall be liable, jointly and severally, to BP WEST COAST PRODUCTS LLC for reimbursement of such expenses and shall pay same upon demand. The amount of such expenses shall be deemed liquidated upon the making of such demand for reimbursement to BP WEST COAST PRODUCTS LLC. Contractor does not dispute the rights afforded to BP West Coast Products, LLC in this paragraph to the extent they are not sought from Contractor (aside from the

G:\COMMON\CAVFUND\DISBOC.doc
08/14/07  r11315-08 1-231 restored disbursement agr disd-04-18-07-1:                                                        2

May 14 07 12:08p    Fortune-ratliff/jones-for                    559-432-2876                    p.4

Construction Loan Funds). Owner affirms that any assessment against it or the Construction Loan Funds by BP West Coast Products as set forth in this paragraph will not alter Owner's payment obligations to Contractor as set forth in the Prime Contract

13.  DATA.  The name of the "Owner" and "Contractor" and other data referred to above are as follows:

(a)  OWNER.                         STTN ENTERPRISE, INC.

                                    831 San Felipe Road
                                    Hollister, CA  95023

(b)  CONTRACTOR:                    FORTUNE-RATLIFF GENERAL
                                    CONTRACTORS, INC.

                                    P. O. Box 26944

                                    Fresno  CA  93729

(c)  JOB SITE/FACILITY #            #82461 – 831 San Felipe Road

                                    Hollister  CA  95023

(d)  IMPROVEMENTS:                  Rebrand (C-Store & Gas Remodel)

                                    (DO NOT INCLUDE EXPENSES FOR
                                    CAR WASH)

(e)  LOAN PROCEEDS:                 anvom Loan - $150M/Gas - $250M
     (See #4)

(f)  CONTRACT PRICE:                $498,253.00

(g)  PARTIES AUTHORIZED
     TO SIGN VOUCHERS:      Signature  _____

                           Name  _____
                                 STTN ENTERPRISE, INC. - REP

                           Signature  _____

                           Name  SAYED FAQUIRYAN
                                 STTN ENTERPRISE, INC. - REP

                           Signature
                           Name  ALLEN FORTUNE
                                 FORTUNE-RATLIFF GENERAL CONTRACTORS, INC

                           Signature  _____
                           Name
                                 FORTUNE-RATLIFF GENERAL CONTRACTORS, INC

**CONSTRUCTION LOAN PROCEEDS MAY NOT BE
SUFFICIENT TO COVER ALL EXPENSES FOR THE
IMPROVEMENTS, OR ON THE JOB SITE.**

Dated: _5/15/57_                        BP WEST COAST PRODUCTS LLC
                                        Facility #  82461
_____
By: Nazim Faquiryan                     _____
                                        Allen Fortune
_____
By: Sayed Faquiryan                     _____
                                        Allen Jones
  STTN ENTERPRISES, INC. – "OWNER"      FORTUNE-RATLIFF GENERAL
                                        CONTRACTORS, INC. - "CONTRACTOR"

       BP WEST COAST PRODUCTS, a Delaware limited liability company

                        By _____

# EXHIBIT H

RECORDING REQUESTED BY:

*First American Title*
*#4408-2702639*

WHEN RECORDED MAIL TO:
*BP West Coast Products LLC*
*4 Centerpointe Dr., LPR 4-243*
*La Palma, CA 90623-1066*
*Attn: Daniel J. Rolf*

2007-0003264

| Recorded | REC FEE | 58.00 |
| Official Records | | |
| County of | | |
| San Benito | | |
| JOE PAUL GONZALEZ | | |
| Clerk-Recorder | | |
| 02:00PM 09-Mar-2007 | DS Page 1 of 9 | |

SPACE ABOVE LINE RESERVED FOR RECORDER'S USE

## TITLE(S) OF DOCUMENT

*Deed of Trust with Assignment of Rents,*
*Security Agreement and Fixture Filing*

THIS PAGE IS ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION.
($3.00 ADDITIONAL RECORDING FEE APPLIES)

160

RECORDING REQUESTED BY
Recorded at request of FIRST AMERICAN TITLE
When Recorded Return To:
1408-2702639
BP WEST COAST PRODUCTS LLC
4 Centerpointe Dr., LPR 4-243
La Palma, CA 90623-1066
Attn. Daniel J. Rolf
Facility: 82461/SCDB65975
631 San Felipe Rd.
Hollister, CA 95035
4408 2702639  BD. Fat Cap

2

_Space Above For Recorder's Use Only_

DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
(CALIFORNIA)

This Document Serves as a Fixture Filing Under Section 9-502 of the California Uniform Commercial Code.

Borrower's Organizational Identification Number: 41-2101997

THIS DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING ("Deed of Trust") is made this 2 day of _March_, 2007 and is executed by AVA GLOBAL ENTERPRISE, LLC, a California limited liability company ("Trustor"), whose address is 1313 N. Milpitas Blvd., #1606, Milpitas, California 95035 to Commonwealth Land Title Company ("Trustee"), for the benefit of BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("Beneficiary"). Trustee is an affiliate of Beneficiary.

Trustor irrevocably grants, transfers and assigns to Trustee in trust, with POWER OF SALE, all of Trustor's right, title and interest in and to that certain real property located in the County of , State of California, more particularly described in Exhibit "A" attached hereto and made a part hereof ("Real Property"), together with the rents, issues and profits thereof and the other real and personal property comprising the Trust Estate; subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

FOR THE PURPOSE OF SECURING the following (the "Obligations"):

(a)    payment of the sum of $475,000.00, with interest thereon, evidenced by those certain Secured Promissory Notes dated as of even date herewith, executed by STTN Enterprise, Inc., a California corporation ("Obligor") to the order of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

(b)    performance of Obligor's obligations to Beneficiary under (i) that certain Loan Agreement dated as of even date herewith, by and between Obligor and Beneficiary, and (ii) that certain Environmental Indemnity dated as of even date herewith, executed by Obligor in favor of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

(c)    performance of each agreement of Trustor and Obligor under that certain Fictitious Deed of Trust (With Assignment of Rents, Security Agreement and Fixture Filing) recorded in the office of the county recorder of the county where said Real Property is located as noted below ("Fictitious Deed of Trust"), as amended hereby; and

(d)    payment and performance of the Obligations recited in the Fictitious Deed of Trust (as amended hereby).

To protect the security of this Deed of Trust, and with respect to the Trust Estate, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in the Fictitious Deed of Trust. Said agreements, terms and provisions contained in the Fictitious Deed of Trust are hereby incorporated into and made a part of this Deed of Trust by this reference for all purposes as if set forth at length herein. Trustor acknowledges receipt of a copy of the Fictitious Deed of Trust.

Set forth below is a list of the counties in the State of California where the Fictitious Deed of Trust has been recorded, together with the Book and Page or Instrument Number of each recorded document.

82461deedoftrustv1

1

3

| COUNTY | INSTRUMENT NUMBERS |
|---|---|
| ALAMEDA | 00119576 |
| ALPINE | BOOK #89, PAGES 2784-2808 |
| AMADOR | 91-0003464-00 |
| BUTTE | 2000-0041914 |
| CALAVERAS | 1001-5126 |
| COLUSA | 2000-004663 |
| CONTRA COSTA | 2000-0254378-00 |
| DEL NORTE | 20000-4897 |
| EL DORADO | 2000-0053633-00 |
| FRESNO | 2000-0131783 |
| GLENN | 2000-5476 |
| HUMBOLDT | 2000-13040-25 |
| IMPERIAL | 00-13355 |
| INYO | 2000-0083729 |
| KERN | 020013459T |
| KINGS | 0018961 |
| LAKE | 00-018016 |
| LASSEN | 2000-07002 |
| LOS ANGELES | 00-1671377 |
| MADERA | 2000026090 |
| MARIN | 2000-052653 |
| MARIPOSA | 2004583 |
| MENDOCINO | 2000-17559 |
| MERCED | VOL 4072, PAGE 529 |
| MODOC | 2000-00047827-00 |
| MONO | 2000006195 |
| MONTEREY | 2000070359 |
| NAPA | 2000-0027785 |
| NEVADA | 2000-0031785-00 |

| COUNTY | INSTRUMENT NUMBERS |
|---|---|
| ORANGE | 00-569322 |
| PLACER | 2000-0079930 |
| PLUMAS | 2001-00231 |
| RIVERSIDE | 2000-422005 |
| SACRAMENTO | 20003023 |
| SAN BENITO | 2000-0014070 |
| SAN BERNARDINO | 2000030062 |
| SAN DIEGO | 2000-0577783 |
| SAN FRANCISCO | 2000G852062 |
| SAN JOAQUIN | 00125344 |
| SAN LUIS OBISPO | 2000-062677 |
| SAN MATEO | 2000-133811 |
| SANTA BARBARA | 2000-0064740 |
| SANTA CLARA | 15434492 |
| SANTA CRUZ | 2000-0051824 |
| SHASTA | 2000-0037629 |
| SIERRA | 2000131293 |
| SISKIYOU | 2000101913249 |
| SOLANO | 2000-00097851 |
| SONOMA | 2000112121 |
| STANISLAUS | 2000-0090035-00 |
| SUTTER | 2000-0015017 |
| TEHAMA | FILE # 013179, BOOK 1782, PAGE 083 |
| TRINITY | 2000035S8 |
| TULARE | 2000-0065847 |
| TUOLUMNE | DOC#017535, BOOK 1712, PAGES 0173-0197 |
| VENTURA | NONE |
| YOLO | 2000-0027007-00 |
| YUBA | 200010539 |

Trustor hereby requests that all notices to Trustor be delivered to the address listed above. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Fictitious Deed of Trust. The Fictitious Deed of Trust is hereby modified as set forth on Rider 1 attached hereto and made a part hereof. Rider 2 attached hereto is hereby incorporated herein by this reference.

"Trustor":

AVA GLOBAL ENTERPRISE, LLC.
a California limited liability company

By: _____
Sayed Ma Faquiryan

By: _____
Toan To

2

82461deedoftrustv1

By: _____
Tao To

By: _____
Nazim Faquiryan

"Borrower"

STTN ENTERPRISE, INC.
a California corporation

By: _____
Nazim S.M. Faquiryan
CEO/President

By: _____
Sayed M.N. Faquiryan
Secretary/Treasurer

ACKNOWLEDGMENT

State of California          )
                             )
County of San Benito         )

On March 22007, before me, Mina Faquiryan            Notary Public
_____ Nazim Faquiryan_____, personally appeared
_____, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

[Notary Seal: MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008]

ACKNOWLEDGMENT

State of California          )
                             )
County of San Benito         )

On March 22007, before me, Mina Faquiryan            Notary Public
_____ Seifed M.N. Faquiryan_____, personally appeared
_____, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

[Notary Seal: MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008]

3

82461deedoftrustv1

163

5

ACKNOWLEDGMENT

State of California                )
County of San Benito              )

On March 2 2007, before me, Mina Faquryan, Notary Public, personally appeared
_Joan Lo_ , personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)



MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

ACKNOWLEDGMENT

State of California                )
County of San Benito              )

On March 2 2007, before me, Mina Faquryan, Notary Public, personally appeared
_Joan Lo_ , personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

4

EXHIBIT A
Legal Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1 AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES 30 SECONDS E 146.84 FEET;

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81 FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE POINT OF BEGINNING.

APN: 051-100-040

RIDER 1
Amendment to Fictitious Deed of Trust

The Fictitious Deed of Trust is hereby amended as follows:

1. Paragraph (b) in the section reciting all of the Obligations ("Obligations Section") is hereby deleted in its entirety.

2. The following language is hereby added after the phrase "per annum" in Paragraph (c) of the Obligations Section: "but in no event greater than the maximum amount permitted by law."

3. The two paragraphs below Paragraph (g) of the Obligations Section are hereby deleted in their entirety and replaced with the following new paragraph:

"Trustor has executed an Environmental Indemnity in favor of Beneficiary with respect to the Real Property (the "Environmental Indemnity"). This Deed of Trust, the Note[s], the Loan Agreement[s], the Environmental Indemnity and any other deeds of trust, mortgages, agreements, guaranties or other instruments given to evidence or further secure the payment and performance of any or all of the Obligations, as the foregoing may be amended, modified, extended, or renewed from time to time, may hereinafter be collectively referred to as the 'Loan Documents.' Capitalized terms used herein without definition shall have the meaning given thereto in the Loan Agreement."

4. The following paragraph is hereby substituted for the first sentence of Section 1.5.2:

"In the event of any damage to or destruction of the Improvements, Beneficiary shall have the option, in its sole discretion, to: (i) apply, in the event Beneficiary determines that the security for the repayment of the indebtedness secured hereby has been impaired on account of such damage or destruction, all or any part of such proceeds to any indebtedness secured hereby in such order as Beneficiary may determine, whether or not such indebtedness is then due, (ii) release all or any part of such proceeds to Trustor, or (iii) hold the balance of such proceeds to be used to reimburse Trustor for the cost of reconstruction of the Improvements. In the event Beneficiary elects to so hold such insurance proceeds, the Improvements shall be promptly and diligently restored by Trustor to the equivalent of their condition immediately prior to such damage, destruction or casualty or to such other condition as Beneficiary may approve in writing, and the disbursement of such insurance proceeds shall be in accordance with disbursement procedures acceptable to Beneficiary. If Beneficiary elects to apply the insurance proceeds to the payment of the sums secured hereby, and after doing so Beneficiary reasonably determines that the remaining security is inadequate to secure the remaining indebtedness, Trustor shall, upon written demand from Beneficiary, prepay on principal such amount as will reduce the remaining indebtedness to a balance for which adequate security is present."

5. The last sentence of Section 1.22 is hereby deleted in its entirety. The following new Sections are hereby added to the Fictitious Deed of Trust:

"1.23    Negative Covenants Regarding Leases. Trustor shall not, without the prior written consent of Beneficiary, (i) cancel, terminate or consent to the surrender of any Lease, (ii) modify or in any way alter the terms of any Lease, (iii) release any lessee or guarantor from any obligations or conditions to be performed by any lessee or guarantor under any Lease, (iv) collect any rent from any lessee for a period of more than one (1) month in advance, or (v) execute any further assignment of any of its right, title and interest in the Leases and the Rents.

1.24    Affirmative Covenants Regarding Leases. Trustor shall (i) observe, perform and discharge each and every obligation, term, covenant, condition and agreement of Trustor under the Leases, (ii) enforce the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any lessee or guarantor thereof, (iii) execute and deliver to Beneficiary upon demand, at any time and from time to time, any and all assignments and other instruments which Beneficiary may deem advisable to carry out the true purposes and intent of the assignment of the Leases set forth in this Deed of Trust, and (iv) at the request of Beneficiary, cause any lessee under a Lease to execute a subordination, nondisturbance and attornment agreement and estoppel certificate in form and substance satisfactory to Beneficiary.

1.25    Authorization to File Financing Statements; Power of Attorney. Trustor hereby authorizes Beneficiary at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without signature of Trustor as authorized by applicable law, as applicable to the Personal Property. For purposes of such filings, Trustor agrees to furnish any information requested by Beneficiary promptly upon request by Beneficiary. Trustor hereby irrevocably constitutes and appoints Beneficiary and any officer or agent of Beneficiary, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Trustor or in Trustor's own name to execute in Trustor's name any such documents and to otherwise carry out the purposes of this

6

82461deedoftrustv1

166

Section 1.25, to the extent that Trustor's authorization above is not sufficient. This power of attorney is a power coupled with an interest and shall be irrevocable."

6. The following sentence is hereby added to Section 3.4.2:

"Written notice mailed to Trustor as provided above at least five (5) days prior to the date of public sale of the Personal Property or prior to the date on which private sale of the Personal Property will be made shall constitute reasonable notice; provided that, if Beneficiary fails to comply with this Section 3.4 in any respect, its liability for such failure shall be limited to the liability (if any) imposed on it as a matter of law under the California Uniform Commercial Code, as in effect from time to time (or under the Uniform Commercial Code, in force from time to time, in any other state to the extent the same is applicable law)."

7. The following phrase is hereby added after the end of clause (b) of Section 5.2: "including without limitation Sections 2899 and 3433 of the California Civil Code." In addition, the references to Sections 2899 and 3433 of the California Civil Code set forth in clause (c) of Section 5.2 are hereby deleted in their entirety.

8. Section 5.17 is hereby deleted in its entirety.

9. The following new Section 4.9 is hereby added to the Fictitious Deed of Trust:

"4.9    Upon the occurrence of any Event of Default, Beneficiary may, at its option, terminate Trustor's right and license to collect the Rents, and either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate or any part thereof, in its own name or in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Trust Estate, or any part thereof or interest therein, make, modify, enforce, cancel or accept the surrender of any Lease, increase the income therefrom or protect the security hereof and, with or without taking possession of the Trust Estate, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including, without limitation, attorneys' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of all or any portion of the Trust Estate, the collection of such Rents and the application thereof as aforesaid, or any of such acts, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of all or any portion of the Trust Estate or the collection, receipt and application of Rents, Trustee or Beneficiary shall be entitled to exercise every right provided herein or by law upon occurrence of any Event of Default, including the right to exercise the power of sale. Failure of Beneficiary at any time, or from time to time, to collect the Rents shall not in any manner affect the subsequent enforcement of Beneficiary of the right to collect the same."

10. Subparagraph (k) of Schedule 2 is hereby renumbered as subparagraph (l). The following new subparagraph (k) is hereby added:

"(k)    all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Trustor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Schedule 2."

7

82461deedoftrustv1

9 E

RIDER 2
Agreements of Non-Borrower Trustor

1.    Authority of Beneficiary.  If any Trustor is not an obligor under the Loan Documents (hereinafter, "Nonborrower Trustor"), Nonborrower Trustor hereby authorizes Beneficiary to perform any of the following acts at any time and from time to time, all without notice to Nonborrower Trustor and without affecting Beneficiary's rights or Nonborrower Trustor's obligations under this Deed of Trust: (i) alter any terms of the Loan Documents, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest under, the Secured Promissory Note, (ii) take and hold security for the Loan Documents, accept additional or substituted security for the Loan Documents, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security, (iii) apply any security now or later held for the Loan Documents in any order that Beneficiary in its sole discretion may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale, (iv) release the obligor under the Note and the other Loan Documents ("Obligor") of its liability under any Loan Document, and/or (v) substitute, add or release any one or more guarantors or endorsers of the Loan Documents.  For purposes of this Section 1, all references to the Loan Documents shall also include any instrument or agreement executed by Obligor currently with or subsequent to the date of this Deed of Trust which is secured by this Deed of Trust in accordance with the terms hereof.

2.    Waivers of Nonborrower Trustor.  Nonborrower Trustor hereby waives: (i) any right it may have to require Beneficiary to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Beneficiary's power to pursue, (ii) any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Beneficiary, whether consensual or arising by operation of law or any bankruptcy reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Trustor's obligations exceed or are more burdensome than those of Obligor, (iii) all presentments, demands for performance, notices of nonperformance, protests, notice of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind, (iv) any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Obligations or any part thereof, and (v) all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under 11 U.S.C. or any successor statute, all rights to enforce any remedy that the Beneficiary may have against Obligor, and all rights to participate in any security now or later held by Beneficiary for the Loan Documents.  Nonborrower Trustor understands that if Beneficiary forecloses by trustee's sale on any other deed of trust (other than this deed of trust) securing the Obligations, Nonborrower Trustor would then have a defense preventing Beneficiary from thereafter enforcing Beneficiary's rights and remedies against the Trust Estate.  This defense arises because the trustee's sale under such other deed of trust would eliminate Nonborrower Trustor's right of subrogation, and therefore Nonborrower Trustor would be unable to obtain reimbursement from Obligor.  Nonborrower Trustor specifically waives this defense and all rights and defenses that Nonborrower Trustor may have because the Secured Obligations are secured by real property.  This means, among other things: (1) Beneficiary may exercise any rights or remedies which Beneficiary has or may have against the Trust Estate without first foreclosing on any real or personal property collateral pledged by Obligor; and (2) if Beneficiary forecloses on any real property collateral pledged by Obligor:  (A) the amount of the Obligations may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Beneficiary may exercise its rights and remedies against the Trust Estate even if Beneficiary, by foreclosing on any real property collateral pledged by Obligor, has destroyed any right Nonborrower Trustor may have to collect from Obligor.  This is an unconditional and irrevocable waiver of any rights and defenses Nonborrower Trustor may have because the Obligations are secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or similar laws in other states.

3.    Obligor's Financial Condition.  Nonborrower Trustor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Beneficiary, and agrees that Beneficiary shall have no duty to disclose to Nonborrower Trustor any information which Beneficiary may receive about Obligor's financial condition, business operations or any other circumstances bearing on Obligor's ability to perform.

8

82461deedoftrustv1

168