1  KURT OSENBAUGH (State Bar No. 106132)
   DEBORAH YOON JONES (State Bar No. 178127)
2  SAYAKA KARITANI (State Bar No. 240122)
   **WESTON, BENSHOOF, ROCHEFORT,**
3     **RUBALCAVA & MacCUISH LLP**
   333 South Hope Street, Sixteenth Floor
4  Los Angeles, California 90071
   Telephone:  (213) 576-1000
5  Facsimile:  (213) 576-1100
   kosenbaugh@wbcounsel.com
6  djones@wbcounsel.com
   skaritani@wbcounsel.com
7
   Attorneys for Plaintiff and Counter-Defendant
8  BP WEST COAST PRODUCTS LLC

9
                    **UNITED STATES DISTRICT COURT**
10
                   **NORTHERN DISTRICT OF CALIFORNIA**
11

12  BP WEST COAST PRODUCTS LLC, a Delaware      |  Case No.: C07 04808 JF
    Limited Liability Company,
13                                               |  **BP WEST COAST PRODUCTS LLC'S**
                   Plaintiffs,                   |  **NOTICE OF MOTION AND MOTION FOR**
14                                               |  **SUMMARY JUDGMENT, OR IN THE**
           v.                                    |  **ALTERNATIVE, PARTIAL SUMMARY**
15                                               |  **JUDGMENT AS TO THE**
    STTN ENTERPRISES, INC., a California         |  **COUNTERCLAIM; MEMORANDUM OF**
16  Corporation; NAZIM FAQUIRYAN, an individual; |  **POINTS AND AUTHORITIES IN**
    SAYED FAQUIRYAN, an individual; and          |  **SUPPORT THEREOF**
17  MAGHUL FAQUIRYAN, an individual; and AVA
    GLOBAL ENTERPRISE, LLC, a California limited |  [Filed concurrently with Declarations of
18  liability company,                           |  Deborah Yoon Jones, Thomas Reeder, Brad
                                                 |  Christensen, and Cecile McDonnell; Appendix
19                 Defendants.                   |  of Non-Federal Authorities; and [Proposed]
                                                 |  Order.]
20
                                                 |  Date:          August 8, 2008 (reserved)
21                                               |  Time:          9:00 a.m.
                                                 |  Crtrm:         3
22
                                                 |              Honorable Jeremy Fogel
23
                                                 |  Filing Date:          September 17, 2007
24  _____

25  AND RELATED CROSS-ACTION.

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 3

II.   STATEMENT OF ISSUES TO BE DECIDED ........................................................ 3

III.  STATEMENT OF UNCONTROVERTED FACTS ................................................... 4

    A.    STTN's Franchise Relationship with BPWCP ............................................. 4

    B.    STTN Fails to Pay for and Sell Gasoline and Breaches the Franchise
        Agreements ...................................................................................................... 5

    C.    BPWCP Properly Terminates STTN's Franchise Agreements ..................... 7

    D.    BPWCP'S Loans to STTN Become Due Upon the Franchise Termination .................. 8

        1.    BPWCP Funded the Store Loan ...................................................... 8

        2.    BPWCP Did Not Fund the Gasoline Loan ..................................... 10

IV.   BPWCP'S TERMINATION OF STTN'S FRANCHISE WAS PROPER UNDER
    THE PMPA AND FRANCHISE AGREEMENTS AS A MATTER OF LAW .................... 10

    A.    STTN's Failure To Pay For Gasoline Delivered Justifies The Franchise
        Termination Under the PMPA .................................................................... 11

    B.    STTN's Failure to Operate The Station For At Least 12 Days Justifies The
        Franchise Termination Under The PMPA .................................................. 12

    C.    STTN's Failure to Make All Grades of Gasoline Available Justifies the
        Franchise Termination Under the PMPA .................................................. 14

    D.    Less Than 90 Days Notice of the Termination Was Reasonable, As A Matter
        of Law, Because STTN Failed To Pay for Gasoline Deliveries ................... 14

V.    STTN'S SECOND THROUGH FIFTH COUNTERCLAIMS FOR BREACH OF
    CONTRACT FAIL AS A MATTER OF LAW ................................................... 15

    A.    The Conditional Commitment Letter Is Not A Valid Enforceable Contract .............. 15

        1.    BPWCP's CCL Does Not Contain All Material Terms of the Loan .............. 16

        2.    The Store and Gasoline Loan Agreements Supersede the CCL ..................... 17

    B.    BPWCP Did Not Breach the Store Loan Agreement .................................... 18

    C.    BPWCP Did Not Breach the Gasoline Loan or the Disbursement Agreements ........ 19

i

1208773.2

1

## <u>TABLE OF CONTENTS</u>

**Page**

2

VI.   THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR

3     DEALING CLAIM FAILS AS A MATTER OF LAW.........................................................20

4         A.    The Implied Covenant Claim is Duplicative of the Breach of Contract Claims.........21

5         B.    BPWCP and Counterclaimants Are Not in a Special or Fiduciary Relationship........21

6     VII.  THE FRAUD CLAIM FAILS AS A MATTER OF LAW .....................................................22

7         A.    The Fraud Allegations are Impermissibly Duplicative of the Contract Claims..........22

8         B.    Counterclaimants Fail to Present Any Evidence of Fraud by BPWCP......................23

9     VIII. COUNTERCLAIMANTS' NEGLIGENT MISREPRESENTATION CLAIM FAILS

10        AS A MATTER OF LAW.................................................................................................24

11    IX.   CONCLUSION .................................................................................................................25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1208773.2

1

# <u>TABLE OF AUTHORITIES</u>

2
**Page**

3

### CASES

4

*250 L.L.C. v. Photopoint Corp.*
(2005) 131 Cal.App.4th 703 ................................................................................... 17

*Adickes v. S.H. Kress & Co.*
(1970) 398 U.S. 144 ............................................................................................. 15

*Admiral Oil Co. v. Lynch*
(1961) 188 Cal.App.2d 269 .................................................................................. 18

*Banco Do Brasil, S.A. v. Latian, Inc.*
(1991) 234 Cal.App.3d 973 .................................................................................. 17

*Bank of America v. Pendergrass*
(1935) 4 Cal.2d 258 ............................................................................................. 22

*Bennett v. Carlen*
(1963) 213 Cal.App.2d 307 .................................................................................. 18

*Benton v. Hofmann Plastering Co.*
(1962) 207 Cal.App.2d 61 .................................................................................... 21

*Bionghi v. Metro. Water Dist.*
(1999) 70 Cal.App.4th 1358 ................................................................................. 21

*Careau & Co. v. Security Pacific Business Credit, Inc.*
(1990) 222 Cal.App.3d 1371 ............................................................................ 21-22

*Casa Herrera, Inc. v. Beydoun*
(2004) 32 Cal.4th 336 .......................................................................................... 17

*Celador Int'l Ltd. v. Walt Disney Co.*
(C.D. Cal. 2004) 347 F. Supp. 2d 846 ................................................................. 21

*Celotex Corp. v. Catrett*
(1986) 477 U.S. 317 ...................................................................................... 15, 23

*Charter Marketing Co. v. Burgin*
(D. Conn. 1989) 1989 U.S. District Lexis 18393 ................................................ 13

*Clinkscales v. Chevron, U.S.A., Inc.*
(11th Cir. 1987) 831 F.2d 1565 ........................................................................... 11

1208773.2

1

## <u>TABLE OF AUTHORITIES</u>

**Page**

2

*Consolidate World Investments, Inc. v. Lido Preferred Ltd.*

3       (1992) 9 Cal.App.4th 373 ...................................................................18

4  *Desofosses v. Wallace Energy, Inc.*
        (1st Cir. 1987) 836 F.2d 22.....................................................11, 15

5
   *Eichman v. Fotomat Corp.*
6       (9th Cir. 1989) 871 F.2d 784 ...........................................21-22

7  *Erlich v. Mendezes*
        (1999) 21 Cal.4th 543 ..................................................22, 24
8
   *First Commercial Mortgage Co. v. Reece*
9       (2001) 89 Cal.App.4th 731 ...........................................16

10 *Foley v. Interactive Data Corp.*
        (1988) 42 Cal.3d 654 ..................................................22
11
   *Freeman & Mills v. Belcher Oil Co.*
12       (1995) 11 Cal.4th 85 ..................................................22

13
   *Gruber v. Mobil Oil Corp.*
14       (D. Mich. 1983) 570 F. Supp. 1088 ........................11

15 *Guz v. Bechtel Nat'l, Inc.*
        (2000) 24 Cal.4th 317 ..................................................21
16
   *Harris v. Atlantic Richfield Co.*
17       (1993) 14 Cal.App.4th 70 ...........................................22

18
   *Hickman v. London Assur. Corp.*
19       (1920) 184 Cal. 524 ..................................................18

20 *Hinkleman v. Shell Co.*
        (4th Cir. 1992) 962 F.2d 372 ...........................................11-12
21
   *Horcasitas v. Crown Cent. Petroleum Corp.*
22       (D. Maryland 1986) 649 F. Supp. 1163........................10

23
   *In re Napster, Inc. (Copyright Litigation)*
24       (9th Cir. 2007) 479 F.3d 1078 ........................23

25 *Khoury v. Getty Petroleum Corp.*
        (D.R.I. 1993) 1993 U.S. District LEXIS 19641 .................12
26
   *Kramis v. Security Gas & Oil*
27       (9th Cir. 1982) 672 F.2d 766 ........................23
28

1208773.2

1

## TABLE OF AUTHORITIES

Page

2

3
*Laks v. Coast Fed. Sav. and Loan Ass'n*
(1976) 60 Cal.App.3d 885 ...................................................................... 16

4
*Little Oil Co., Inc. v. Atlantic Richfield Co.*
(9th Cir. 1988) 852 F.2d 441 ................................................................ 22

5

6
*Loomis v. Gulf Oil Corp.*
(M.D. Fla. 1983)  567 F. Supp. 591 ............................................... 11, 15

7
*Magerian v. Exxon Corp.*
(9th Cir. 1997) 124 F.3d 212, 1997 WL 525273 .................................. 10

8

9
*Marathon Petroleum Co. v. Pendleton*
(6th Cir. 1989) 889 F.2d 1509 .............................................................. 12

10

11
*Martin v. U-Haul Co. of Fresno*
(1988) 204 Cal.App.3d 396 .................................................................. 22

12

13
*Masterson v. Sine*
(1968) 68 Cal.2d 222 ............................................................................ 17

14
*Mitri v. Arnel Management Co.*
(2007) 157 Cal.App.4th 1164 ............................................................... 17

15

16
*Peterson Development Co., Inc. v. Torrey Pines Bank*
(1991) 233 Cal.App.3d 103 .................................................................. 16

17

18
*Price v. Wells Fargo Bank*
(1989) 213 Cal.App.3d 465 .................................................................. 22

19
*Rodgers v. Sun Refining and Marketing Co.*
(3d Cir. 1985) 772 F.2d 1154 ............................................................... 10

20

21
*Russo v. Texaco*
(2d Cir 1986) 808 F.2d 221 .................................................................. 11

22

23
*Sheldon Builders, Inc. v. Trojan Towers*
(1967) 255 Cal.App.2d 781 .................................................................. 18

24
*Shell Oil Company v. Kozub*
(N.D. Ohio 1983) 574 F. Supp. 114 ..................................................... 11

25

26
*Simmons v. Mobil Oil Corp.*
(9th Cir. 1994) 29 F.3d 505 .................................................................. 22

27
*Smoot v. Mobil Oil Corporation*
(D. Mass. 1989) 722 F. Supp. 849 ................................................. 13, 15

28

v

1

## TABLE OF AUTHORITIES

**Page**

2

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*
3      (2002) 100 Cal.App.4th 44 .................................................................21

4    *Townsend v. Mobil Oil Corporation*
       (D. Mass 1992) 1992 WL 17252 ........................................................13
5
     *Unocal Corp. v. Kaabipour*
6      (9th Cir. 1999) 177 F.3d 755 .............................................................10

7    *Wagner v. Glendale Adventist Med. Ctr.*
       (1989) 216 Cal.App.3d 1379 .............................................................17
8
     *Youngblood v. Silvagni*
9      (1959) 173 Cal.App.2d 731 ...............................................................18

10   *Zumbrun v. United Services Auto. Assoc.*
11     (E.D.Cal 1989) 719 F. Supp. 890 ......................................................15

12

13                                    STATUTES

14   15 U.S.C. § 2802(b)(2)(A) .....................................................................10

15   15 U.S.C. §§ 2802(c)(1) .........................................................................11

16   15 U.S.C. § 2802(c)(8) ........................................................................3, 11

17   15 U.S.C. § 2802(c)(9) .......................................................................12-13

18   15 U.S.C. § 2804(b)(b)(1)(A) .................................................................14

19   Civ. Proc. Code Section 1856 .................................................................17

20

21

22                               OTHER AUTHORITIES

23   Fed.R.Civ.P. 56(c) .................................................................................15

24

25

26

27

28

1208773.2

1    <u>**NOTICE AND MOTION**</u>

2    **TO THE CLERK OF THE U.S. DISTRICT COURT, NORTHERN DISTRICT OF**

3    **CALIFORNIA, TO ALL PARTIES, AND TO THEIR ATTORNEYS OF RECORD HEREIN**:

4        **PLEASE TAKE NOTICE** that on August 8, 2008, at 9:00 a.m., or as soon thereafter

5    as the matter may be heard, in the Courtroom of the Honorable Jeremy Fogel, Judge for the United

6    States District Court, Northern District of California, located at 280 S. First Street, San Jose,

7    California, Plaintiff and Counter-Defendant BP West Coast Products LLC ("BPWCP") will and

8    hereby does move the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an

9    order granting summary judgment, or in the alternative, partial summary judgment against

10   Defendants and Counterclaimants STTN Enterprises, Inc. ("STTN"), Nazim Faquiryan, Sayed

11   Faquiryan, Maghul Faquiryan and AVA Global Enterprise, LLC (collectively hereinafter referred to

12   as "Counterclaimants"), on the claims alleged in the Counterclaim on the grounds set forth below:

13        1.    <u>BPWCP Is Entitled to Summary Judgment On STTN's First Counterclaim for</u>

14   <u>Wrongful Termination/Violation of the PMPA</u>: BPWCP's decision to terminate was properly based

15   upon enumerated grounds in the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.*

16   ("PMPA") [see Sections 2802(c)(8) and 2802(c)(9)], the franchise agreements, and the applicable

17   legal authority.

18        2.    <u>BPWCP Is Entitled to Summary Judgment On STTN's Second Counterclaim</u>

19   <u>for Breach of the Conditional Commitment Letter</u>:  STTN cannot maintain a cause of action for

20   breach of the Conditional Commitment Letter ("CCL") because the CCL is not an enforceable

21   contract.

22        3.    <u>BPWCP Is Entitled to Summary Judgment On STTN's Third Counterclaim</u>

23   <u>for Breach of the Store Loan Agreement</u>:  BPWCP did not breach the Store Loan Agreement

24   because BPWCP fully funded the $150,000 contemplated in that loan (which has yet to be repaid

25   even though repayment is owed) and did so pursuant to the terms and conditions of the loan.

26        4.    <u>BPWCP Is Entitled to Summary Judgment On STTN's Fourth and Fifth</u>

27   <u>Counterclaims for Breach of the Gasoline Loan Agreement and Disbursement Agreement</u>:  BPWCP

28   did not breach the Gasoline Loan Agreement or Disbursement Agreement because STTN (1) was in

1

1    default of the loan agreement and disbursement agreement terms, and never met all the requisite

2    conditions to funding; and (2) was and continues to owe BPWCP over $126,000 for unpaid gasoline

3    deliveries.

4            5.    BPWCP Is Entitled to Summary Judgment On Counterclaimants' Sixth Cause

5    of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing: BPWCP is entitled

6    to summary judgment against STTN on defendants' claim for Breach of the Implied Covenant of

7    Good Faith and Fair Dealing because (1) the parties' relationship is governed by detailed written

8    agreements and a tort claim cannot be assert in this commercial setting where no independent

9    fiduciary relationship exists; (2) the franchise and lender relationships here are not special

10   relationships under which tort liability attaches when there is a contract; and (3) the covenant does

11   not apply to rights expressly provided for in the contract.

12           6.    BPWCP Is Entitled to Summary Judgment On Counterclaimants' Seventh

13   Cause of Action for Fraud and Eighth Cause of Action for Negligent Misrepresentation: BPWCP is

14   entitled to summary judgment against STTN on defendants' counterclaims for Fraud and Negligent

15   Misrepresentation because (1) the parties' relationship is governed by detailed written agreements

16   and a tort claim cannot be assert in this commercial setting where no independent fiduciary

17   relationship exists; and (2) STTN has no evidence supporting fraud or negligent misrepresentation

18   by BPWCP.

19           This Motion is based upon this Notice of Motion, the accompanying Memorandum of

20   Points and Authorities, the Declarations of Deborah Yoon Jones, Thomas Reeder, Brad Christensen,

21   Cecile McDonnell, and the exhibits attached thereto, all filed concurrently herewith, and all the other

22   records and files in this case, such further papers and records as may be submitted to the Court at or

23   before the hearing on this motion, the oral argument of counsel and any other or further information

24   that may be presented or which the Court deems proper and necessary.

### RELIEF REQUESTED

26           BPWCP requests that the Court enter judgment in BPWCP's favor and against

27   Conterclaimants on each of the Counterclaims asserted.

28

1208773.2                                                    MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         A gasoline station franchisee who fails to pay its franchisor for gasoline delivered and

4    then fails to keep the station open for business can, and obviously should, have its franchise

5    terminated under the governing Petroleum Marketing Practices Act (28 U.S.C. § 2801 *et seq.*,

6    hereinafter "PMPA").  Indeed, among the specifically "*per se*" reasonable enumerated grounds for a

7    proper termination of a gasoline station franchisee under the PMPA are: (1) the failure to pay for all

8    sums due to the franchisor [§2802(c)(8)]; and (2) the failure to operate the Station for seven

9    consecutive days [§2802(c)(8)].    This action involves a franchisee who undisputedly failed to

10   operate the gasoline station for at least twelve consecutive days and currently owes the franchisor

11   hundreds of thousands of dollars.    Incredibly, the franchisee and its representatives here have

12   counterclaimed against the franchisor for $1.7 million dollars.

13        Here, franchisee STTN Enterprises, Inc. ("STTN") and the other counterclaimants

14   ("Counterclaimants") contend that even though they admit to owing BP West Coast Products LLC

15   ("BPWCP") over $126,000 for unpaid gasoline deliveries and $150,000 for repayment on a loan

16   provided by BPWCP to remodel the former ARCO-branded gasoline station and am/pm mini

17   market, BPWCP has acted wrongfully and in breach of the parties' applicable agreements.

18   However, as discussed more fully below, the undisputed facts and applicable legal authority support

19   otherwise, and BPWCP is entitled to summary judgment, in its favor, on each of the counterclaims

20   asserted.[1]

21   **II.    STATEMENT OF ISSUES TO BE DECIDED**

22        Based upon the uncontroverted facts and applicable authorities, BPWCP is entitled to

23   summary judgment in its favor:

24

25   [1] Many of the same arguments set forth herein are duplicated in the concurrently filed BPWCP's
     Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment as to the Second

26   Amended Complaint brought by BPWCP filed herewith.  In both instances, the undisputed facts and
     unequivocally applicable statutory and legal authority warrant a judgment in BPWCP's favor.

27   Indeed, the granting of one of BPWCP's Motions for Summary Judgment should result in the
     granting of BPWCP's other Motion.

28

1208773.2

1          1.     On the First Counterclaim for Wrongful Termination/Violation of the PMPA

2    on grounds that BPWCP's decision to terminate STTN's franchise was proper under the franchise;

3          2.     On the Second Counterclaim for breach of the Conditional Commitment

4    Letter dated May 25, 2006 on the ground that it is not an enforceable contract;

5          3.     On the Third Counterclaim for breach of the Store Loan on grounds that

6    BPWCP performed pursuant to the terms and conditions of the Store Loan;

7          4.     On the Fourth and Fifth Counterclaim for breach of the Gasoline Loan and

8    Disbursement Agreement because Counterclaimants never met all requisite conditions to justify the

9    release of funds pursuant to the Gasoline Loan and Disbursement Agreement.

10          5.     On the Sixth Cause of Action for Breach of Implied Covenant of Good Faith

11    and Fair Dealing as an improper and unavailable claim; and

12          6.     On the Seventh Cause of Action for Fraud and Eighth Cause of Action for

13    Negligent Misrepresentation on grounds that the causes of action are inapplicable in this action and

14    are unsupported by any facts or evidence.

15    **III.    STATEMENT OF UNCONTROVERTED FACTS**

16        **A.    STTN's Franchise Relationship with BPWCP**

17          BPWCP and STTN Enterprises, Inc. ("STTN") entered into a franchise relationship

18    involving an ARCO-branded gasoline station and am/pm mini market located at 631 San Felipe

19    Road, Hollister, California ("Station").[2]   The written franchise agreements that governed the

20    franchise relationship are: (1) a Contract Dealer Gasoline Agreement dated July 11, 2006, which

21    includes any and all amendments and addendums ("Gasoline Agreement")[3]; and (2) an am/pm Mini

---

23    [2] Nazim Faquiryan is the 51% shareholder of STTN. [Nazim Deposition ("Nazim Depo."), at 36:4-
8.]   Sayed is the 49% owner and was the primary representative of STTN during its franchise

24    relationship with BPWCP. [Sayed Deposition ("Sayed Depo."), at 108:14-110:22; Nazim Depo., at
28:12-29:21.]  True and correct copies of the relevant excerpts and exhibits from the depositions of

25    Sayed Faquiryan and Nazim Faquiryan are attached as Exhibits 1 and 2 to the Declaration of
Deborah Yoon Jones ("Jones Decl.").

26    [3] On October 12, 2006, STTN signed an Amendment to the Contract Dealer Gasoline Agreement
and a 1-year Contract Dealer Gasoline Agreement.  At the time, BPWCP believed this was necessary

27    since it was allowing STTN to operate the gasoline station only during the remodeling of the mini
market store located at the Station.  [Sayed Depo. at 39:24-40:12 and Exh. B; Nazim Depo., at

28

1208773.2              MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

Market Agreement dated July 11, 2006, which includes any and all amendments and addendums ("Mini Market Agreement"). [Sayed Depo. at 35:13-36:2 and 40:13-42:5, and Exhs. A and C; Nazim Depo. at 10:18-21, 87:6-8, 12:4-7, 87:9-11, and 87:23-88:1; and Declaration of Thomas Reeder ("Reeder Decl."), ¶ 3 and Exh. A and Exh. B.] The Mini Market Agreement, the Gasoline Agreement, and the Franchise Guaranties shall be referred to collectively as the "Franchise Agreements."

**B.**    **STTN Fails to Pay for and Sell Gasoline and Breaches the Franchise Agreements**

As of January 2007, payments for delivered gasoline product by BPWCP to STTN were accomplished by way of an Electronic Funds Transfer ("EFT"), which automatically drew from STTN's account at the time the gasoline was delivered. [Declaration of Brad Christensen ("Christensen Decl."), ¶ 4.] However, throughout January 2007, STTN ordered gasoline but then refused to pay BPWCP for the gasoline by either placing a stop payment order on the EFTs or failing to have sufficient funds in its account for the EFTs on January 8, 16, 19, 26, and 31. [Christensen Decl., ¶ 5.] By the end of January 2007, STTN was delinquent on gasoline balances due to BPWCP to the sum of $104,580.68. [*Id.*]

Given STTN's interference with the EFT process, BPWCP required STTN to present a cashier's check to the driver of the gasoline delivery truck in order to receive gasoline product. [Reeder Decl., ¶ 6; Christensen Decl., ¶ 6.] Despite this change in procedure, STTN continued to be delinquent on the payment for gasoline deliveries. For example, on February 2, 2007, BPWCP delivered another load of gasoline, but STTN did not pay for the gasoline. [Christensen Decl., ¶ 6.] On February 6, 2007, BPWCP discussed STTN's failure to pay for the February 2 gasoline load, and reached an agreement with Sayed Faquiryan a cashier's check for $44,000 would be presented at the next delivery to account for the $22,000 owed for the February 2 gasoline delivery as well as $22,000 for that next delivery. [*Id.*] On February 7, 2007, BPWCP delivered another load of

---

11:11-14; and Reeder Decl., ¶ 4 and Exhs. C and D.] However, the terms and conditions in the Gasoline Agreement (a 20-year agreement) continued in full force. [Reeder Decl., ¶ 4.] Moreover, STTN's obligations concerning the payment for and sale of gasoline remained the same in the Gasoline Agreement and the 1-year agreement. [*Id.*]

1  gasoline but STTN only presented a check for $22,500. [*Id.*] On March 5, 2007, STTN's bank

2  returned a cashier's check in the amount of $20,851.09 for payment of gasoline due to a stop

3  payment order by STTN. [*Id.*] As of March 2007, the net due to BPWCP given the gasoline balance

4  delinquencies has risen to $164,950.81. [*Id.*]

5  　　　　In a letter dated May 4, 2007, Nazim Faquiryan and Sayed Faquiryan acknowledged

6  the gas balance delinquencies, confirmed the total balance due to BPWCP as of that date had risen to

7  $184,075.50, and, in writing, agreed to pay $30,000 per month until the total outstanding balance of

8  the gasoline debt was paid in full ("Payment Plan Agreement"). [Sayed Depo., at 164:15-165:12 and

9  Exh. O; Nazim Depo., at 79:2-4; Reeder Decl., ¶ 7 and Exh. E; Christensen Decl., ¶ 7 and Exh. A.]

10  Yet, as of September 5, 2007, an outstanding balance of over $126,000, for gasoline product

11  deliveries remained. [Reeder Decl., ¶ 8; Christensen Decl., ¶ 8.] Sayed Faquiryan admits that he

12  never made any payments pursuant to the Payment Plan Agreement. [Sayed Depo., at 166:3-13;

13  Christensen Decl., ¶ 9.] Under the Franchise Agreements, BPWCP required STTN to maintain

14  adequate supplies of gasoline for sale and, of course, to pay BPWCP for gasoline delivered. [Reeder

15  Decl., Exh. A at Art. 2; Sayed Depo., Exh. A at Art. 2.]

16  　　　　In addition to paying for gasoline loads, the Franchise Agreement also required STTN

17  to operate the Station and if it failed to do so for seven (7) or less consecutive days, BPWCP had a

18  right to terminate the franchise. [Sayed Depo., Exh. A at Art. 2 and Art. 17.1(i); Reeder Decl., Exh.

19  A at Art. 2 and Art. 17.1(i).] From the evening of August 23, 2007 through at least September 4,

20  2007, STTN failed to operate the Station and sell gasoline product for at least 12 consecutive days in

21  violation of the Franchise Agreements. [Reeder Decl., ¶ 10 and Exh. F; Christensen Decl., ¶ 10 and

22  Exh. B.] In fact, STTN taped off the Station dispensers from any use by customers from the evening

23  of August 23, 2007 through at least September 4, 2007. [Sayed Depo., at 167:23-168:5, and 170:19-

24  21 and Exh. P; Christensen Decl., ¶ 10 and Exh. B; Reeder Decl., ¶ 10 and Exh. F.] BPWCP's

25  franchise consultant also attempted to pump gasoline from the dispensers and was unable to do so.

26  [Christensen Decl., ¶ 10.] Furthermore, BPWCP's last delivery of gasoline to the Station prior to the

27  Termination was on or about August 18, 2007. [Reeder Decl., ¶ 11 and Exh. G.] At best, STTN

28  would have run out of the amounts delivered within 3-5 days. [*Id.*; and Christensen Decl., ¶ 11.]

6

1   Thus, unless STTN was purchasing gasoline from sources other than BPWCP (which it was not

2   permitted to do under the Gasoline Agreement), STTN would not have had any product to sell by

3   August 24, 2007.[4] [*Id.*]

4          The Franchise Agreements also required STTN to "order and make available for sale

5   all grades of Gasoline which BPWCP offers to [STTN]" and "will at all times have available for sale

6   some of each grade of Product." [Reeder Decl., Exh. A at Art. 2.] During the August 24 through

7   September 4 time frame, however, STTN failed to have all grades of gasoline available for sale to

8   the public. [Sayed Depo., at 170:19-21 and Exh. P; Reeder Decl., ¶ 10 and Exh. F; Christensen

9   Decl., ¶ 10 and Exh. B.] In fact, STTN admits that from August 24, 2007 through at least September

10  4, 2007, it was not selling unleaded grade gasoline. [Sayed Depo., at 170:19-25, and Exh. P.]

11         BPWCP issued numerous defaults concerning these breaches. [Sayed Depo., Exh. P;

12  Reeder Decl., Exh. F; Christensen Decl., ¶ 12 and Exh. B.] STTN admits that it received the

13  numerous default notices regarding the failures to pay for gasoline deliveries and sell gasoline.

14  [Sayed Depo., at 166:19-167:4; and Nazim Depo., at 82:24-83:8.]

15         **C.    BPWCP Properly Terminates STTN's Franchise Agreements**

16         BPWCP sent a Notice of Termination letter dated September 6, 2007, to STTN,

17  advising that the Franchise Agreements would be immediately terminated ("Termination Notice").

18  [*See* Reeder Decl., ¶ 13, Exh. H; Sayed Depo., at 173:5-16 and Exh. R.] The Termination Notice

19  cited STTN's Gasoline Agreement provisions and set forth the following grounds for termination:

20  (1) STTN's failure to pay for gasoline product sold and delivered; (2) STTN's failure to have

21  gasoline products available for sale for at least 12 consecutive days, and (3) STTN's failure to offer

22  all grades of gasoline. [Reeder Decl., ¶ 13, Exh. H, Exh. A at ¶ 17.1; Sayed Depo., Exh. R and Exh.

23  A at ¶ 17.1.]

24

25

26

[4] In an attempt to create a factual dispute concerning this ground for termination, STTN may contend
that even though the gasoline dispensers were cautioned taped off that exterior dispensers were still
"open" for customer use. However, given the delivery schedule, it is undisputable that STTN was
not operating the Station for more than 7 consecutive days. Moreover, by taping off the dispensers,
the Station was not in operation as required by the Franchise Agreement.

28

1208773.2                                    MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

1    **D.    BPWCP'S Loans to STTN Become Due Upon the Franchise Termination**

2    In addition to the requirement that STTN purchase gasoline and operate its business,

3    the Franchise Agreements also required STTN to complete a remodel or retrofit of the station.

4    [Reeder Decl., ¶ 14 and Exh. A at ¶ 1.2 and Exh. B at ¶ 5.03(a); Sayed Depo., Exh. A at ¶ 1.2 and

5    Exh. C at ¶ 5.03(a).]  To assist STTN in complying with this "remodel and retrofit" requirement,

6    BPWCP offered STTN a special loan program to provide funds specifically for completing

7    construction and remodeling of its gasoline station and am/pm mini market store.  [Reeder Decl., ¶

8    14.]  This loan program allowed STTN to make repayments either based on reaching a certain level

9    of performance at the Station, or, alternatively, through a five percent (5%) per year payment for

10   twenty years.  [*Id.*, ¶ 14; *see, e.g.,* Exh. J at ¶¶ 1.4 - 1.6; Sayed Depo., Exh. F at ¶¶ 1.4 - 1.6.]

11   BPWCP and STTN entered into two loan agreements, whereby BPWCP agreed to loan STTN the

12   total sum of $475,000 to be used toward BPWCP-approved capital improvements for the ARCO-

13   branded gasoline station and the am/pm mini market.  [Reeder Decl., ¶¶ 15-16 and Exh. J at ¶ 1.1

14   and Exh. K at ¶ 1.1.]

15   **1.    BPWCP Funded the Store Loan**

16   Pursuant to the Store Loan Agreement dated February 12, 2007, BPWCP agreed to

17   loan STTN the total sum of $150,000 (of the $475,000) to be used toward BPWCP-approved capital

18   improvements for the am/pm mini market convenience store (hereinafter "Store Loan Agreement").

19   [Reeder Decl., ¶ 16 and Exh. J at ¶ 1.1.]  STTN, Sayed Faquiryan and Nazim Faquiryan agreed to

20   the terms and conditions of the Store Loan Agreement by virtue of their signatures thereto.  [Sayed

21   Depo., at 78:11-21 and Exh. F at ¶ 1.1; Nazim Depo., at 14:4-8.]

22   Although STTN and BPWCP entered the Store Loan Agreement effective February

23   12, 2007, funds on the loan did not become available for disbursement until approximately May 29,

24   2007 and the first check was issued to the general contractor on or about June 5, 2007.  [Declaration

25   of Cecile McDonnell ("McDonnell Decl."), ¶ 7.]  The Store Loan Agreement provides that:

26   "[b]efore Lender [BPWCP] becomes obligated to make any Disbursement under this Agreement, all

27   conditions to such Disbursement set forth below shall have been satisfied at Borrower's sole cost

28   and expense in a manner acceptable to Lender in the exercise of its reasonable judgment."  [Reeder

8

MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

1    Decl., Exh. J at ¶ 2; Sayed Depo., at 78:11-21 and Exh. F; Nazim Depo., at 14:4-8.]  Moreover,

2    delays are contemplated and addressed in the Store Loan Agreement, at paragraph 2, as follows:

3    "Borrower acknowledges that delays in the Disbursement may result from the time necessary for

4    Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement.

5    Borrower consents to all such delays." [Reeder Decl., Exh. J at ¶ 2; Sayed Depo., at 78:11-21 and

6    Exh. F; Nazim Depo., at 14:4-8.]

7              Any purported "delay" was a result of delays that were undisputedly caused by

8    someone or some entity (for the most part Counterclaimants) other than BPWCP.  For example,

9    many documents submitted by STTN contained erroneous information and had to be corrected.

10   [McDonnell Decl.,¶ 5.]  As of March 22, 2007, the required budget worksheet to be submitted by

11   STTN to BPWCP was still incorrect (after numerous correction attempts).  [Id.]  As of April 9, 2007,

12   there was still a lien for $92,974 and Franchise Tax Board lien for $9,429 on the Real Property.  [Id.]

13   As of April 11, 2007 new liens were filed on the property for $46,400 for the Board of Equalization

14   and a $14,011 mechanics lien.  [Id.]  As of April 16, 2007, there were still liens on the Real Property

15   totaling $158,941.51. [Id.]  As of April 2007 issues arose concerning the proper corporate designee

16   of STTN - - Sayed Faquiryan had been acting as the representative but since he was only the 49%

17   shareholder certain documentation need to be provided to BPWCP.  [Id.]  Throughout April 2007,

18   BPWCP was negotiating various changes to the Disbursement Agreement with STTN's general

19   contractor, who was insisting that changes be made to BPWCP's form Disbursement Agreement.

20   [Id.]  As of May 2, 2007, STTN still needed to provide a signed promissory note, the amendment re

21   corporate documents naming Sayed as the corporate designee, and the revised disbursement

22   agreement from STTN's general contractor.  [Id.]  In mid-May 2007, BPWCP had to process an

23   "exception to the policy" in order to fund the Store Loan prior to the Gasoline Loan as it was not a

24   usual practice to fund only one of the two loans offered; BPWCP was not disbursing any of the

25   Gasoline Loan unless and until STTN brought its gasoline delinquencies current.  [Id., ¶ 6.]  BPWCP

26   issued additional checks to STTN's contractors in June, July and August 2007, once proper

27   documents including, but not limited to, detailed invoices, releases, and lien releases, were provided

28   by STTN.  [Id., ¶ 7.]

9

Case 5:07-cv-04808-JF    Document 45    Filed 07/03/2008    Page 17 of 32

By early August 2007, BPWCP had disbursed all $150,000 from the Store Loan. [McDonnell Decl., ¶ 7.]  Counterclaimants readily admit that the entire Store Loan proceeds were disbursed.  [Sayed Depo., at 106:1-5 and 141:24-142:12; *see also* CC, ¶ 211.]

### 2. BPWCP Did Not Fund the Gasoline Loan

Under the Gasoline Loan Agreement dated February 12, 2007, BPWCP agreed to loan STTN the total sum of $250,000 (of the $475,000)[5] to be used toward BPWCP-approved capital improvements for the ARCO-branded gasoline station (hereinafter "Gasoline Loan Agreement"). [Reeder Decl., ¶ 16 and Exh. K.]  Similar to the Store Loan Agreement, STTN had to comply with certain terms and conditions before receiving the funds.  Unlike the Store Loan Agreement, which was funded, STTN did not comply with the terms and conditions - - because it owed $126,000 in outstanding balances on gasoline deliveries - - and thus BPWCP did not disburse any funds under the Gasoline Loan Agreement.  [McDonnell Decl., ¶¶ 6-8.]

Despite the above-described undisputed facts, the Counterclaimants seek over $1.7 million for purported damages suffered as a result of BPWCP's actions.  However, as discussed further below, the undisputed facts and applicable authority justify an order granting summary judgment in favor of BPWCP and against the Counterclaimants.

## IV. BPWCP'S TERMINATION OF STTN'S FRANCHISE WAS PROPER UNDER THE PMPA AND FRANCHISE AGREEMENTS AS A MATTER OF LAW

The PMPA allows termination for breaches of the franchise agreement that are of "reasonable and material significance to the franchise relationship."  15 U.S.C. § 2802(b)(2)(A). The PMPA was designed to prevent "sham, pretextual, or discriminatory" franchise termination, but does not invite the courts to second-guess the reasonable business judgments of the franchisors.  *See, e.g., Magerian v. Exxon Corp.* (9th Cir. 1997) 124 F.3d 212, 1997 WL 525273 at *2; *Rodgers v. Sun Refining and Marketing Co.* (3d Cir. 1985) 772 F.2d 1154, 1158; *Horcasitas v. Crown Cent. Petroleum Corp.* (D. Maryland 1986) 649 F. Supp. 1163, 1166; *Unocal Corp. v. Kaabipour* (9th Cir.

[5]  The remaining $75,000 of the loan offer was for BPWCP's option of disbursing for refreshing and refurbishing the store on the 11th anniversary after the loan disbursement.  [Reeder Decl., Exh. J.]

10

MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM
1208773.2

1999) 177 F.3d 755, 767; and *Gruber v. Mobil Oil Corp.* (D. Mich. 1983) 570 F. Supp. 1088, 1091 n.5, 1093-1094. To that end, <u>the PMPA contains a list of safe harbor instances which are *per se* defined as constituting reasonable and materially significant grounds for franchise termination.</u> 15 U.S.C. §§ 2802(c)(1)–(12). Failure to pay for gasoline (§2802(c)(8)) and failure to operate the Station for seven consecutive days (§2802(c)(8)) are some of the *"per se"* reasonable grounds for termination. *Id.*

   <u>Where an event falls within the Section 2802(c) list, the franchise termination is conclusively presumed to be reasonable.</u> *Desofosses v. Wallace Energy, Inc.* (1st Cir. 1987) 836 F.2d 22, 26 ("[i]f an event falls within [Section 2802(c)] list, termination is conclusively presumed to be reasonable as a matter of law"); *Russo v. Texaco* (2d Cir 1986) 808 F.2d 221, 223 ("[o]nce having ascertained that an event is encompassed by one of the twelve enumerated events [in Section 2802(c)], a court need make no further inquiry as to the reasonableness of the termination"); *Clinkscales v. Chevron, U.S.A., Inc.* (11th Cir. 1987) 831 F.2d 1565, 1573; and *Hinkleman v. Shell Co.* (4th Cir. 1992) 962 F.2d 372, 378 (the enumerated list under Section 2802(c) sets forth termination grounds which are *"per se* reasonable").

   BPWCP's grounds for terminating STTN's franchise relationship are among such *"per se"* reasonable and materially significant grounds, as follows:

   **A.** **<u>STTN's Failure To Pay For Gasoline Delivered Justifies The Franchise Termination Under the PMPA</u>**

   STTN's failure to pay all sums to which BPWCP is legally entitled affords a separate and *per se* basis for franchise termination. 15 U.S.C. § 2802(c)(8). Consistent with the PMPA, BPWCP's Gasoline Agreement with STTN provides that BPWCP may terminate the Franchise Agreements if STTN fails to timely pay all sums due to and which BPWCP is legally entitled. [Reeder Decl., Exh. A at ¶ 17.1(h); Sayed Depo., Exh. A at ¶ 17.1(h).]

   Summary judgment in favor of franchisors is appropriate when the franchisee's failure to pay is undisputed. *See, e.g., Loomis v. Gulf Oil Corp.* (M.D. Fla. 1983) 567 F. Supp. 591, 598 (failure to pay $56,233.52 for gasoline is a default in the franchise agreements entitling franchisor to summary judgment); *Shell Oil Company v. Kozub* (N.D. Ohio 1983) 574 F. Supp. 114,

11

1   118 (in accordance with Section 2802(c)(8), of the franchisee's failure to pay for gasoline entitles the

2   franchisor to summary judgment.); *Marathon Petroleum Co. v. Pendleton* (6th Cir. 1989) 889 F.2d

3   1509, 1510 (affirming summary judgment for the franchisor based on an overdue balance of

4   $3,347.93, and missed payments on a note for other funds owned); *Khoury v. Getty Petroleum Corp.*

5   (D.R.I. 1993) 1993 U.S. District LEXIS 19641 (termination of a franchise due to failure to pay rent

6   and for gasoline is conclusively presumed to be reasonable.); *Hinkleman v. Shell Oil Co.* (4th Cir.

7   1992) 962 F.2d 372, 378 (failure to make payments is a "per se reasonable" ground for termination

8   of the PMPA.).

9        Here, it is undisputed that STTN has failed to pay BPWCP for gasoline products in a

10  timely manner, incurring an outstanding balance of over $126,000, for gasoline product deliveries

11  that are due and payable at the time of delivery.  [Reeder Decl., ¶¶ 7-9; Christensen Decl., ¶¶ 8-9;

12  Sayed Depo., at 159:8-11 and 166:3-13; Nazim Depo., at 74:25-75:2 and 76:4-5.]  Moreover,

13  BPWCP gave STTN ample opportunity to pay these outstanding amounts back, even agreeing to a

14  payment plan. [*See* Nazim Depo., at 79:2-4; Sayed Depo., at 162:5-22 and 164:15-165:12 and Exh.

15  O; Reeder Decl., ¶¶ 7-9 and Exh. E.]  STTN, Sayed Faquiryan and Nazim Faquiryan, however,

16  never made any payments to BPWCP pursuant to the Payment Plan Agreement.  [Reeder Decl., ¶¶

17  8-9; Sayed Depo., at 166:3-13.]

18       PMPA authorities hold that BPWCP should not be forced to continue doing business

19  with a franchisee who continuously fails to pay for products provided; BPWCP's termination on this

20  ground was proper and summary adjudication on BPWCP's First Cause of Action to affirm that the

21  franchise termination was proper under the PMPA is warranted.

22  **B.    STTN's Failure to Operate The Station For At Least 12 Days Justifies The**

23  **Franchise Termination Under The PMPA**

24       Failure by a franchisee to operate the marketing premises for seven consecutive days

25  is specifically defined in the PMPA as an event relevant to the franchise relationship warranting

26  termination.  *See*, 15 U.S.C. § 2802(c)(9).  Failing "to operate the premises for seven consecutive

27  days," are material provisions of the agreement.  [Reeder Decl., Exh. A at ¶¶ 17.1(h) and (i); Sayed

28  Depo., Exh. A at ¶¶ 17.1(h) and (i).]  The Gasoline Agreement requires STTN to "order and make

1208773.2                                                        MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

available for retail sale all grades of Gasoline which ARCO offers . . . (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises." [Reeder Decl., Exh. A at ¶ 2; Sayed Depo., Exh. A at ¶ 2.] Failure to offer any fuel is not only a breach of paragraph 2 of the Gasoline Agreement, which is patently material and significant to the franchise relationship, but also a failure to operate the premises, also warranting termination under Paragraph 17.1(o) of the agreement and PMPA § 2802(c)(9).

The case law also supports such a proper ground for termination. Indeed, it has been held that a service station franchisee's failure to sell gasoline frustrates the very purpose of the franchise. *See, e.g., Townsend v. Mobil Oil Corporation* (D. Mass 1992) 1992 WL 17252 ("[t]he primary purpose of a Mobil franchise is to sell Mobil products"). For that reason, the failure to sell gasoline for seven days is a sufficient basis for termination of the franchise. *Smoot v. Mobil Oil Corporation* (D. Mass. 1989) 722 F. Supp. 849, 855 ("[b]ecause the fundamental purpose of any Mobil franchise is to sell Mobil products," the court granted franchisor's motion for summary judgment based on franchisee's failure to sell gas for seven days); *Charter Marketing Co. v. Burgin* (D. Conn. 1989) 1989 U.S. District Lexis 18393, CCH Franchise Business Guide Paragraph 9504 (franchisor' s motion for summary judgment was granted based on the franchisee's failure to operate the Station for seven days or pay rent).

Here, commencing on the evening of August 23, 2007 through at least September 4, 2007, STTN placed a caution tape around the dispensers such that customers were unable to purchase (or, at the very least, dissuaded from purchasing) gasoline at the Station; in other words, STTN was failing to operate the Station as required to do so under the Gasoline Agreement. [Christensen Decl., ¶ 10.] BPWCP's representative confirmed the non-sale of gasoline by attempting to pump gasoline from a dispenser that was located on the exterior of the pump station islands (and therefore not technically taped off), and was unable to pump or purchase any gasoline. [*Id.*] Furthermore, as discussed above, BPWCP's last delivery of gasoline was on August 18, 2007. [Reeder Decl., ¶ 11 and Exh. G.] BPWCP issued numerous defaults concerning this breach and issued many warnings to STTN that the franchise would be terminated if STTN did not remedy the breach. [Reeder Decl., Exh. F.] However, STTN failed to sell ARCO-branded gasoline to the public

13

1  for at least 12 consecutive days, and as such, BPWCP had reasonable grounds to terminate STTN.

2  Summary judgment should be granted in favor of BPWCP on its First Cause of Action for a

3  declaration that the franchise termination was proper.

4      **C.    STTN's Failure to Make All Grades of Gasoline Available Justifies the Franchise**

5          **Termination Under the PMPA**

6          Yet another basis for franchise termination is STTN's failure to make all grades of

7  gasoline available for sale to the public.  Paragraph 2 of the Gasoline Agreement requires STTN to

8  "order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer

9  (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer

10 demand for Product at the Premises" and "at all times have available for sale some of each grade of

11 Product."  [Reeder Decl., Exh. A at ¶ 2; Sayed Depo., Exh. A at ¶ 2.]  Furthermore, the Gasoline

12 Agreement also expressly provides that termination will occur where the franchisee "fails to exert

13 good faith efforts to carry out the provisions of the Agreement following written notice and

14 opportunity to cure . . . ."  [Reeder Decl., Exh. A at ¶ 17.1(a); Sayed Depo., Exh. A at ¶ 2.]

15         As stated in the Termination Notice, BPWCP sent STTN a total of 12 Default Notices

16 for, *inter alia*, STTN's failure to offer all grades of gasoline for sale.  [Reeder Decl., Exhs. F and H;

17 Christensen Decl., ¶¶ 10-12 and Exhs. B and C; Sayed Depo., at 166:19-167:4 and Exhs. P and R.]

18 STTN, however, continued its breaches and as such, BPWCP's termination of STTN's franchise was

19 proper and warranted under the PMPA.  Accordingly, this Court should grant summary judgment in

20 favor of BPWCP on its First Cause of Action for Declaratory Relief to affirm the franchise

21 termination was proper under the PMPA.

22     **D.    Less Than 90 Days Notice of the Termination Was Reasonable, As A Matter of**

23          **Law, Because STTN Failed To Pay for Gasoline Deliveries**

24         Finally, part of STTN's wrongful termination counterclaim includes an allegation that

25 the immediate notice provided by BPWCP was improper.  However, under 15 U.S.C. §

26 2804(b)(b)(1)(A), the PMPA provides that BPWCP may notify the franchisee "on the earliest date

27 on which furnishing of such notification is reasonably practicable" if it would not be reasonable to

28 furnish notification 90 days prior to the termination.  "The purpose of the PMPA's notice of

1    termination requirements is to give the dealer sufficient advance notice of the impending termination

2    so that he can make appropriate arrangements." *Desfosses v. Wallace Energy, Inc.* (1st Cir.1987)

3    836 F.2d 22, 29 (quoting *Avaramidis v. Arco Petroleum Products Co.* (1st Cir.1986) 798 F.2d 12,

4    17). Where there is an "enduring problem with a fundamental aspect of its relationship" with a

5    franchisee, courts have held that it would be "unreasonable to require that problem be tolerated for

6    another ninety days." *Smoot v. Mobil Oil Corp.* (D.Mass. 1989) 722 F. Supp. 849, 855 (accelerated

7    notice permissible for failure to sell gasoline); *Loomis v. Gulf Oil Corp.* (M.D. Fla. 1983) 567 F.

8    Supp. 591, 597 (accelerated notice permissible for deficiency in payment of over $56,000).

9            By September 5, 2007, STTN had failed to timely pay BPWCP for gasoline products

10   in a timely manner, incurring an outstanding balance of over $126,000, for gasoline product

11   deliveries that are due and payable at the time of delivery. [Reeder Decl., ¶¶ 8-9 and Exh. F;

12   Christensen Decl., ¶ 8; Sayed Depo., at 166:3-13 and Exh. P.] Moreover, as discussed above, the

13   gasoline delinquencies had been tolerated by BPWCP since at least January 2007. In addition,

14   STTN had persistently failed to comply with its obligation to have ARCO-branded gasoline

15   available for sale, despite many warnings that STTN's franchise would be terminated if he did not

16   do so. [Reeder Decl., ¶¶ 10-11 and Exh. F; Christensen Decl., ¶¶ 10-12 and Exh. B; Sayed Depo.,

17   Exh. P.] Accordingly, it was not reasonable for BPWCP to provide any additional notice to STTN;

18   immediate termination was proper.

19   **V.    STTN'S SECOND THROUGH FIFTH COUNTERCLAIMS FOR BREACH OF**

20          **CONTRACT FAIL AS A MATTER OF LAW**

21           Summary judgment of the Second through Fifth Counterclaims is appropriate because

22   no genuine issues of fact exist concerning any of these contract claims. *See Celotex Corp. v. Catrett*

23   (1986) 477 U.S. 317, 323; *Adickes v. S.H. Kress & Co.* (1970) 398 U.S. 144, 157; *Zumbrun v.*

24   *United Services Auto. Assoc.* (E.D.Cal 1989) 719 F. Supp. 890, 892; Fed.R.Civ.P. 56(c).

25           **A.    The Conditional Commitment Letter Is Not A Valid Enforceable Contract**

26           STTN's Second Counterclaim is for breach of the Conditional Commitment Letter

27   ("CCL") dated May 25, 2006. [See Counterclaim ("CC"), ¶¶ 164, 196-202; Sayed Depo., 63:20-

28   64:1, Exh. E.] STTN contends that the CCL is a valid contract between it and BPWCP. [CC, ¶¶

                                                    15

1  164, 197-198.]  This counterclaim is based, however, upon the faulty premise that the CCL is a valid

2  enforceable contract, which it is not.

3        **1.    BPWCP's CCL Does Not Contain All Material Terms of the Loan**

4             The elements of a claim for breach of contract are: (1) the existence of the contract;

5  (2) performance by the plaintiff or excuse for nonperformance; (3) breach; and (4) damages.  *First*

6  *Commercial Mortgage Co. v. Reece* (2001) 89 Cal.App.4th 731, 745.  STTN cannot establish the

7  first element to support the breach of contract claim concerning the CCL here.  Under usual

8  principles of lender liability, conditional commitment letters are generally "not binding on the lender

9  unless it contains all of the material terms of the loan, and either the lender's obligation is

10  unconditional or the stated conditions have been satisfied."  *Peterson Development Co., Inc. v.*

11  *Torrey Pines Bank* (1991) 233 Cal.App.3d 103 (quoting 9 Miller & Starr, Cal. Real Estate (2d ed.

12  1989) § 28.4, at p. 8 (footnote omitted)).  In *Peterson,* the Court held that letters of commitment,

13  for which a fee is paid, constitute an option to the applicant to obtain the loan at the specified terms.

14  *Id.,* citing *Lowe v. Massachusetts v. Mut. Life Ins. Co.* (1976) 54 Cal.App.3d 718, 725-28).  The

15  *Peterson* Court further explained that "[w]hen the commitment letter does not contain all of the

16  essential terms . . . the prospective borrower cannot rely reasonably on the commitment, and the

17  lender is not liable for either a breach of the contract or promissory estoppel."  In another case

18  directly on point, *Laks v. Coast Fed. Sav. and Loan Ass'n* (1976) 60 Cal.App.3d 885, the Court, on

19  an action for breach of contract, held that a conditional commitment letter of which indicated the

20  parties were still in negotiating stage as to important conditions, failed to make a clear and

21  unambiguous promise on construction loan to plaintiffs who could not have had legitimate

22  expectations that the letter was a binding offer and could not reasonably have relied on such letter.

23  *Id.* at 891-93.

24             The CCL at issue here states that BPWCP is "pleased to consider the request of

25  [STTN] for a loan."  [Reeder Decl., ¶ 15 and Exh. I.]  The CCL goes on to indicate that "[c]omplete

26  terms of the Loan will be set forth in BPWCP's form of documents and agreements to be signed by

27  [STTN], which will evidence and secure the Loan."  [*Id.*]  Clearly, BPWCP intended the CCL to set

28

1208773.2

1   forth some of the essential terms of the proposed loans in order to determine whether to proceed

2   forward with the loan processing but the CCL was not a binding agreement. [*Id.* at ¶ 6.]

3           Furthermore, the STTN signatures state that they are for the "Acknowledgement of

4   Receipt of Letter." [Reeder Decl., Exh. I.]  Where a document signed by a plaintiff is merely an

5   acknowledgment receipt, it is not an enforceable contract.  *See Mitri v. Arnel Management Co.*

6   (2007) 157 Cal.App.4th 1164 (acknowledgment receipt form signed by plaintiffs did not constitute

7   an agreement to arbitrate when the arbitration clause was in the handbook given out to the

8   employees).  As such, the CCL is not an enforceable agreement and BPWCP cannot be liable for

9   breach of an unenforceable agreement.

10          ## 2.    The Store and  Gasoline Loan Agreements Supersede the CCL

11          Even if the Court were to consider the CCL as an enforceable agreement, the CCL

12  was expressly superseded by the Store Loan Agreement and the Gasoline Loan Agreement signed by

13  STTN, Sayed Faquiryan and Nazim Faquiryan. [*See* Reeder Decl., Exh. J at ¶ 9.8, and Exh. K at ¶

14  9.8; Sayed Depo., at 78:11-21 and 81:20-82:3 and Exh. F and Exh. H; Nazim Depo., at 14:4-8 and

15  15:15-18.]

16          Where a contract contains an express integration clause that states that the contract

17  "embodies the entire agreement and understanding among the parties hereto and supersedes all prior

18  agreements and understandings relating to the subject matter thereof," courts have held that "[i]t is

19  difficult to imagine how the parties could have more clearly expressed their intent to make the

20  written instrument a full and complete expression of their agreement." *Banco Do Brasil, S.A. v.*

21  *Latian, Inc.* (1991) 234 Cal.App.3d 973.  In addition, the law presumes a written contract supersedes

22  all prior or contemporaneous oral agreements and, where the writing is integrated, the presumption

23  cannot be overcome. *Wagner v. Glendale Adventist Med. Ctr.* (1989) 216 Cal.App.3d 1379, 1385;

24  *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344; *see also* Civ. Proc. Code Section 1856

25  (terms in writing intended by parties to be final expression cannot be contradicted by evidence of

26  any prior agreement); *Masterson v. Sine* (1968) 68 Cal.2d 222, 225; *250 L.L.C. v. Photopoint Corp.*

27  (2005) 131 Cal.App.4th 703, 725.  When there is a single and final memorial of the understanding of

28  the parties, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is

17

1  sometimes said, the written memorial supersedes these prior or contemporaneous negotiations.

2  *Admiral Oil Co. v. Lynch* (1961) 188 Cal.App.2d 269, 282; *see also Youngblood v. Silvagni* (1959)

3  173 Cal.App.2d 731, 743.

4         Here, the Store Loan Agreement and Gasoline Loan Agreement contain integration

5  clauses that expressly merge and supersede all other prior oral and written agreements and limit the

6  entire agreement of the parties with respect to the BPWCP-approved loans for the capital

7  improvements to the Loan Agreement and other "Loan Documents," which is expressly defined in

8  the Loan Agreements.[6]  [Reeder Decl., Exh. J at ¶ 9.8, and Exh. K at ¶ 9.8; Sayed Depo., at 78:11-21

9  and 81:20-82:3 and Exh. F and Exh. H; Nazim Depo., at 14:4-8 and 15:15-18.]

10        As such, STTN cannot maintain a breach of contract counterclaim as to the CCL and

11  summary judgment in favor of BPWCP should be granted.

12        **B.    BPWCP Did Not Breach the Store Loan Agreement**

13        STTN's Third Counterclaim for Breach of the Store Loan Agreement is based upon

14  the contention that BPWCP delayed in funding the $150,000 in store loan proceeds.

15        It is undisputed that before the funding could take place, various conditions precedent

16  set forth in the Store Loan Agreement had to be met.  [Reeder Decl., Exh. J at ¶ 2; Sayed Depo., at

17  78:11-21 and Exh. F; Nazim Depo., at 14:4-8.]   The law is clear that, unless a condition precedent to

18  a party's obligation to perform its side of the contract is fulfilled, that party is not obligated to

19  perform. *Bennett v. Carlen* (1963) 213 Cal.App.2d 307, 311.  And, where a plaintiff fails to perform

20  a condition to the contract, that plaintiff is without a cause of action for breach of contract against

21  the defendants. *Hickman v. London Assur. Corp.* (1920) 184 Cal. 524; *see also Consolidate World*

22  *Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373; *Sheldon Builders, Inc. v. Trojan*

23  *Towers* (1967) 255 Cal.App.2d 781.

24        Here, the Store Loan Agreement provides that: "[b]efore Lender [BPWCP] becomes

25  obligated to make any Disbursement under this Agreement, all conditions to such Disbursement set

26

---

27  [6] Moreover, the CCL is consistent with the Store Loan Agreement and Gasoline Loan Agreement, which as discussed before, BPWCP did not breach.

28

forth below shall have been satisfied at Borrower's sole cost and expense in a manner acceptable to Lender in the exercise of its reasonable judgment." [Reeder Decl., Exh. J at ¶ 2; Sayed Depo., at 78:11-21 and Exh. F; Nazim Depo., at 14:4-8.] BPWCP could not disburse the $150,000 store loan amounts until (1) STTN provided all the necessary paper work, (2) STTN cleared its liens, (3) corrected corporate documentation, and (4) submitted proper invoices, lien releases, and other documentation from the contractors, etc. [McDonnell Decl., ¶¶ 5-7; Reeder Decl., Exh. J at ¶¶2.1(a), 2.1(b), 2.1(c), 2.1(k) and 2.1(l).] Once STTN met all conditions, BPWCP funded the $150,000 store loan. [McDonnell Decl., ¶ 7; Sayed Depo., at 106:1-5.]

Moreover, in terms of any delays that occurred, it is entirely appropriate that BPWCP waited until STTN completed all of the conditions of the Store Loan Agreement before funding. Indeed, such delays are contemplated and addressed in the Store Loan Agreement, at paragraph 2, as follows: **"Borrower acknowledges that delays in Disbursement may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement. Borrower consents to all such delays."** [Emphasis added.] [Reeder Decl., Exh. J, ¶ 2; Sayed Depo., at 78:11-21 and Exh. F; Nazim Depo., at 14:4-8.]

Given these undisputed facts, STTN's Counterclaim for Breach of the Store Loan Agreement fails and BPWCP is entitled to summary judgment in its favor.

### C.    BPWCP Did Not Breach the Gasoline Loan or the Disbursement Agreements

As discussed above, BPWCP cannot be liable for a breach of contract if STTN failed to perform a condition precedent. Here, BPWCP's contractual obligations to fund and disburse the Gasoline Loan were not due until each of the conditions in the Gasoline Loan Agreement and the Disbursement Agreement had been completed. [Reeder Decl., Exh. K, ¶ 2, and Exh. L, ¶¶ 2-3; Sayed Depo., at 81:20-82:3 and 86:9-22 and 87:5-8 and Exhs. H, and I; Nazim Depo., at 15:15-18.]

Paragraph 2.2(f) of the Gasoline Loan Agreement, states that "[i]n no event shall Lender be required to make any Disbursement if . . . [u]nder *any of the Loan Documents*, a default or Event of Default (as defined in that document) has occurred and is continuing, or an event has occurred that with notice or the passage of time could become a default or Event of Default." [Emphasis added.][Reeder Decl., Exh. K, ¶ 2.2(f); Sayed Depo., at 81:20-82:3 and Exh. H; Nazim

1  Depo., at 15:15-18.]   The Gasoline Loan Agreement lists the Gasoline Agreement, as one of the
2  "Loan Documents." [Reeder Decl., Exh. K; Sayed Depo., at 81:20-82:3 and Exh. H at "Exhibit C;"
3  Nazim Depo., at 15:15-18.]  In other words, BPWCP had no obligation to disburse funds from the
4  Gasoline Loan if there was default of the Gasoline Agreement.

5          As discussed above, STTN breached the Gasoline Agreement by failing to pay
6  BPWCP for gasoline deliveries from January 2007 through September 2007. [Reeder Decl., ¶¶ 7-9,
7  Exh. A at ¶ 17.1(h), and Exh. B, ¶ 4.05 (integrates the terms of the Gasoline Agreement into the
8  Mini Market Agreement); Sayed Depo., at 78:11-21 and 164:15-165:12 and Exhs. F and O; Nazim
9  Depo., at 14:4-8 and 79:2-4.]  Consequently, STTN's failure to pay BPWCP for gasoline deliveries
10 extinguished BPWCP's obligations to fund and disburse the Gasoline and Store Loan proceeds.
11 Moreover, BPWCP should not have had to loan STTN any more money than BPWCP already had in
12 light of the gasoline payment delinquencies and STTN's failures to adhere to the Payment Plan.

13         Moreover, there was no breach of the Disbursement Agreement because of BPWCP's
14 refusal to fund the Gasoline Loan; BPWCP was not required to fund or disburse loan proceeds as
15 Counterclaimants failed to meet the conditions for funding and disbursement and were $126,000
16 behind in payments for gasoline deliveries. [Reeder Decl., Exh. L at ¶ 3; Sayed Depo., at 86:9-22
17 and 87:5-8  and Exh. I.]  In addition, Counterclaimants' contention that BPWCP unreasonably
18 delayed funding the Gasoline Loan proceeds is meritless as a matter of law.  [See Counterclaim, ¶¶
19 211, 212, 223, 224.]  Per the Gasoline Loan Agreement, Counterclaimants expressly consented to
20 any delays in BPWCP's determination and verification process to ensure that all the necessary
21 documentation for the loans to fund.  [Reeder Decl., Exh. L at ¶ 2; Sayed Depo., at 81:20-82:3 and
22 Exh. H; Nazim Depo., at 15:15-18.]

23 VI.   **THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**
24        **DEALING CLAIM FAILS AS A MATTER OF LAW**

25         Counterclaimants contend in its Sixth Counterclaim that BPWCP breached the
26 implied covenant of good faith and fair dealing pertaining to the CCL, the Mini Market Agreement,
27 the Gasoline Agreement, the Store Loan Agreement, the Gasoline Loan Agreement, and the
28 Disbursement Agreement. [CC, ¶¶ 239-241.]

20

1

A.      **The Implied Covenant Claim is Duplicative of the Breach of Contract Claims**

2

Although every contract imposes on each party a duty of good faith and fair dealing

3 in each performance and in its enforcement, where a claim for breach of the implied covenant does

4 not go beyond the statement of a breach of express contractual terms and seeks only the same relief

5 sought in a breach of contract claim, it is simply superfluous to the contract claim. *Careau & Co. v.*

6 *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393; *Celador Int'l Ltd. v. Walt*

7 *Disney Co.* (C.D. Cal. 2004) 347 F. Supp. 2d 846, 852; *Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal.4th

8 317, 353 n.18; *see also Bionghi v. Metro. Water Dist.* (1999) 70 Cal.App.4th 1358, 1370 (granting

9 summary adjudication for defendants on plaintiff's implied covenant claim as it was simply re-

10 asserting the breach of contract claim); *Benton v. Hofmann Plastering Co.* (1962) 207 Cal.App.2d

11 61, 73 (the law cannot imply a contract in the face of a express agreement covering same subject).

12

Particularly applicable here is *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*

13 (2002) 100 Cal.App.4th 44, where investors in a failed real estate development project sued the

14 lender who refused to continue financing the project, on a theory of breach of the implied covenant

15 of good faith and fair dealing. *Id.* at 48-52. According to the contract, the lender's obligations to

16 disburse the loan funds were conditional on its determination that the project budget was "in

17 balance." The lender determined that the project balance was "out of balance," and refused to

18 disburse additional funds. The appellate court rejected plaintiff's claim that this breached the

19 implied covenant and noted that since the loan agreement was "a freely negotiated contract entered

20 into by sophisticated business entities" the only available challenge was a claim for nonperformance

21 of the contract, not a claim of breach of the implied covenant. *Id.* at 61-62.

22

Here, the franchise agreements were freely negotiated contracts between two

23 sophisticated entities. Furthermore, the facts supporting the breach of the implied covenant claim

24 are covered by express terms of the franchise agreements and loan agreements. The same damages

25 in the implied covenant claim are sought in the breach of contract claims.

26

B.      **BPWCP and Counterclaimants Are Not in a Special or Fiduciary Relationship**

27

Furthermore, claims for tortious breach of the implied covenant do not lie outside of

28 the insurance context or other special relationships. *Eichman v. Fotomat Corp.* (9th Cir. 1989) 871

1208773.2                                    MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM

1    F.2d 784, 802-03; *Foley v. Interactive Data Corp.* (1988) 42 Cal.3d 654, 684-85.  The PMPA-

2    governed franchise relationship does not warrant a departure from the law restricting such tortious

3    breach claims.  *See Simmons v. Mobil Oil Corp.* (9th Cir. 1994) 29 F.3d 505, 512 (holding that a

4    petroleum franchise was not a "special" or "fiduciary" relationship); *Eichman*, 871 F.2d at 802-03;

5    *Little Oil Co., Inc. v. Atlantic Richfield Co.* (9th Cir. 1988) 852 F.2d 441, 445; *Harris v. Atlantic*

6    *Richfield Co.* (1993) 14 Cal.App.4th 70, 72; *Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d

7    396, 413-15.  California courts have also determined that the relationship of a bank and commercial

8    borrower does not constitute a special relationship for the purposes of the covenant of good faith and

9    fair dealing.  See *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d

10   1371, 1399, n.25 (examining the cases that have concluded that certain relationships, such as bank-

11   commercial borrower, are not sufficiently special to warrant imposition of tort remedy for breach of

12   the implied covenant); and *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476.  Finally, tort

13   liability is only allowed in those rare and exceptional cases where the defendants' conduct goes well

14   beyond the bounds of ordinary breach of contract liability.  *Freeman & Mills v. Belcher Oil Co.*

15   (1995) 11 Cal.4th 85, 102; *Foley, supra*, 47 Cal.3d at 685.

16           Here, there is no "special" or "fiduciary" relationship between Counterclaimants and

17   BPWCP.  In addition, beyond the breach of contract allegations, there is no other conduct by

18   BPWCP that goes "well beyond the ordinary breach of contract liability."  BPWCP is entitled to

19   summary judgment in its favor on the Sixth Counterclaim.

20   **VII.**     **THE FRAUD CLAIM FAILS AS A MATTER OF LAW**

21       **A.**     **The Fraud Allegations are Impermissibly Duplicative of the Contract Claims**

22           It is axiomatic that where there is a breach of contract alleged, the law will not find

23   tort liability in addition to the contractual liability unless there is a breach of some independent duty

24   imposed by law.  *Erlich v. Mendezes* (1999) 21 Cal.4th 543, 553-54; *see also Bank of America v.*

25   *Pendergrass* (1935) 4 Cal.2d 258, 263 (explaining that, as a general proposition, a fraud claim

26   cannot be based upon promises that concern contractually negotiated obligations).  As discussed

27   above, a petroleum franchisee and franchisor or borrower-lender are not "special" or "fiduciary"

28   relationships warranting such an exception.

22

                 

1    In this case, Counterclaimants' fraud claim is based upon the promises that concern

2    the contractually negotiated obligations.    [CC, ¶¶ 224-225.]    Consequently, the only thing that

3    Counterclaimants argue is that BPWCP has committed fraud by purportedly breaching the contracts.

4    Such duplicative claims are not permitted and BPWCP is entitled to summary judgment in its favor

5    on the fraud counterclaim.

6    **B.    Counterclaimants Fail to Present Any Evidence of Fraud by BPWCP**

7    Counterclaimants also fail to produce any evidence of BPWCP's purported fraud.

8    The elements of a claim for fraud are as follows: (1) a misrepresentation or concealment of a

9    material fact; (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4)

10    justifiable reliance; and (5) resulting damage. *In re Napster, Inc. (Copyright Litigation)* (9th Cir.

11    2007) 479 F.3d 1078, 1096 (quoting *Small v. Fritz Cos., Inc.* (2003) 30 Cal.4th 167, 173).    The party

12    asserting fraud must establish it with clear and convincing evidence, a burden that Counterclaimants

13    must satisfy at the summary judgment stage.    *Kramis v. Security Gas & Oil* (9th Cir. 1982) 672 F.2d

14    766, 770.    Moreover, affirmative evidence is necessary to avoid summary judgment because mere

15    nonperformance is not enough to show intent to defraud. *Tenzer v. Superscope,* Inc. (1985) 39

16    Cal.3d 18, 30 (quoting *People v. Ashley* (1954) 42 Cal.2d 246, 263 (internal citations omitted)).

17    Counterclaimants thus have the burden in opposition to this Motion to set forth specific facts, not

18    mere allegations, proving each element of its claim for fraud. *Celotex,* 477 U.S. at 325.

19    Each of the four allegations which are the basis of fraud counterclaim are easily

20    refuted given the undisputed facts already discussed above:

21    •    First, STTN obviously had to commence construction before BPWCP could

22    disburse loan proceeds.    (CC, ¶ 245)    Pursuant to the loan agreements, disbursement of loan

23    proceeds are sent directly to contractors and sub-contractors who provide proof of completed work.

24    [Reeder Decl., ¶ 17; McDonnell Decl., ¶ 5.]    Thus any BPWCP representation concerning the

25    commencement of construction was simply stating the obvious.

26    •    Second, pursuant to the loan agreements BPWCP agreed to provide STTN

27    with a loan to help with construction.    (CC, ¶ 246)    In fact, BPWCP funded the Store Loan.

28    [McDonnell Decl., ¶ 7.]    Concerning the Gasoline Loan, as discussed above.    Even though BPWCP

23

1  agreed to provide STTN a loan, STTN failed to meet conditions precedent. [Reeder Decl., ¶¶ 7-9;

2  McDonnell Decl., ¶¶ 6, 8.]

3          •     Third, the undisputed facts discussed above reveal that BPWCP did not have

4  all documents to disburse the loan funds. (CC, ¶ 247) Once it was provided with the requisite

5  documents to support the Store Loan, the amounts were disbursed. [McDonnell Decl., ¶¶ 5-7.]

6  Concerning the Gasoline Loan, though documents may have been sufficient, STTN still had the

7  $126,000 gasoline delinquency.

8          •     Finally, in terms of representations that BPWCP would disburse all the loans

9  in the immediate future (CC, ¶ 248), STTN completely ignores the fact that even if such a

10  representation were true and BPWCP made that representation, STTN's default of the loan

11  provisions by its over $126,000 delinquency for gasoline payments as well as its failures to operate

12  the Station caused BPWCP to terminate the franchise and not fund the loan. [Reeder Decl., ¶¶ 7-13

13  and Exh. H; Christensen Decl., ¶ 13.]

14          Furthermore, in their responses to written discovery the Counterclaimants merely re-

15  state the factually insufficient allegations of their Counterclaim. [Jones Decl., Exh. 5, Discovery

16  Response of Sayed Faquiryan, at p. 13, Exh. 6, Discovery Response of Nazim Faquiryan, at p. 13,

17  Exh. 7, Discovery Response of STTN Enterprises, Inc., at 4-8 and 13-14.] The deposition

18  testimonies also fail to provide any further evidence supporting their insufficient allegations. [Sayed

19  Depo., at 103:20-108:19, 184:2-185:1, and 185:22-189:24; Nazim Depo., at 58:1-21, 62:19-63:21,

20  64:1-15, and 89:25-94:10 and 94:24-95:15.]

21          Without more, Counterclaimants cannot maintain a fraud counterclaim against

22  BPWCP and summary judgment in favor of BPWCP is warranted.

23  **VIII.**   **COUNTERCLAIMANTS' NEGLIGENT MISREPRESENTATION CLAIM FAILS**

24        **AS A MATTER OF LAW**

25          Just as for fraud, when there is a breach of contract alleged, the law will not find tort

26  liability (including liability for purported negligent misrepresentation) in addition to contractual

27  liability, unless there is a breach of some independent duty imposed by law. *Erlich*, 21 Cal.4th at

28  553-54. Similar to its other tort claims, Counterclaimants' Eighth Cause of Action for Negligent

24

Misrepresentation is duplicative of its contract counterclaims and are based upon the same alleged promises underlying contractual obligations. As a result, the Eighth Cause of Action for Negligent Misrepresentation fails as a matter of law.

## IX.    CONCLUSION

Counterclaimants should not be able to recover any monies from BPWCP given the undisputed facts which show that the counterclaimants still owe BPWCP hundreds of thousands of dollars and breached the terms of the franchise-related and loan-related agreements as presented above. Moreover, neither the statutory nor legal authority support any of the counterclaims. Accordingly, Counterclaimants have no viable claim against BPWCP, and as such, BPWCP respectfully requests this Court grant this motion in its entirety and find for BPWCP as a matter of law.

DATED:  July 3, 2008                        Respectfully submitted,

                                            **WESTON, BENSHOOF, ROCHEFORT,
                                            RUBALCAVA & MacCUISH LLP**

                                            Deborah Yoon Jones
                                            Attorneys for Plaintiff and Counter-Defendant
                                            BP WEST COAST PRODUCTS LLC

1208773.2                          MOTION FOR SJ OR PARTIAL SJ ON COUNTERCLAIM