EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      SAN JOSE DIVISION
 4                          -oOo-
 5    BP WEST COAST PRODUCTS, LLC, )
      a Delaware Limited Liability )
 6    Company; and ATLANTIC        )
      RICHFIELD COMPANY, a Delaware)
 7    Corporation,                 )
                                   )
 8              Plaintiffs,        )
                                   )
 9         vs.                     ) No.5:07-CV
                                   )    04808JF
10    STTN ENTERPRISES, INC., a    )
      California Corporation;      )
11    NAZIM FAQUIRYAN, an          )
      individual; SAYED FAQUIRYAN, )
12    an individual; and MAGHUL    )
      FAQUIRYAN, an individual;    )
13    and AVA GLOBAL ENTERPRISE,   )
      LLC, a California limited    )
14    liability company,          )
                                   )
15              Defendants.        )
      AND RELATED CROSS-ACTIONS    )
16
17              Fresno, California; April 23, 2008
18              The deposition of SAYED M.N. FAQUIRYAN was taken
      in the above-entitled matter pursuant to the provisions of
19    law pertaining to the taking and use of depositions,
      commencing at the hour of 10:30 a.m., at the law offices of
20    Baker, Manock & Jensen, 5260 North Palm Avenue, Fresno,
      California, before Cynthia L. Lucas, C.S.R. No. 9973, a
21    Certified Shorthand Reporter of the State of California,
      having offices located at Clovis, California.
22
23
24
25
```

3

2

1  State of California,     )
                           )  ss.
2  County of Fresno        )

3

4      I, CYNTHIA L. LUCAS, a Certified Shorthand Reporter

5  of the State of California, do hereby certify that the

6  witness in the foregoing deposition, was by me duly sworn

7  to testify to the truth, the whole truth and nothing but

8  the truth in the within-entitled cause; that said

9  deposition was taken at the time and place therein named;

10  that the testimony of said witness was reported by me, a

11  disinterested person, and thereafter transcribed into the

12  foregoing pages.

13      And I further certify that I am not of counsel or

14  attorney for either or any of the parties to said

15  deposition, nor in any way interested in the outcome of the

16  cause named in said caption.

17      In Witness Whereof, I have hereunto set my hand

18  at my office in Clovis, California.

19

20      _____
        CYNTHIA L. LUCAS, C.S.R. No. 9973
21

22

23

24

25

                    4

1           Q.   The San Felipe location?

2           A.   The San Felipe and 301 Gateway Drive both.

3           Q.   Did 301 Gateway become an Arco station?

4           A.   No.

5           Q.   That's the one that's currently a 76 station?

6           A.   Yes.

7           Q.   Now, Mr. Faquiryan, you're able to read

8    English, right?

9           A.   Yes, I am.

10          Q.   And you're able to write English; is that

11   correct?

12          A.   Yes.

13          Q.   I'm going to mark as Exhibit A, a document

14   that's entitled Contract Dealer Gasoline Agreement.

15          A.   Yes.

16             (Plaintiffs' Exhibit A was marked for

17              identification.)

18          BY MS. JONES:

19          Q.   If you could please take a look at that

20   document.

21          A.   Yes, I exactly recall this document.

22          Q.   And on page 15 of that document, it's also

23   Bates labeled BP 02844, is your signature on that page?

24          A.   Yes.

25          Q.   Up at the top where it says Buyer, is that

35

1    your signature?

2              A.  Yes.

3              Q.  And at the time you signed this document, did

4    you read the document?

5              A.  No.  The document they gave it to me.  And by

6    such a hurry, they want it back to give them signature.

7    And they pick them up.  Because they came in the store.  I

8    sign it in a restaurant, and I got a copy of it.

9              And they said, okay, we'll give you a copy, okay,

10   after they signed by BP.  And they -- I was so anxious to

11   get this situation solved, and I got my son signature down

12   there so he sign it too.

13             I didn't get a chance to review all of it.

14             Q.  So they brought it in, and they asked you to

15   sign it right then and there?

16             A.  Exactly.  Because if they want to change it

17   to get it right away.

18             Q.  And do you recall who brought that in to you

19   to sign?

20             A.  I believe that was -- I believe it was

21   Ken Wickerham, if I don't make a mistake.  I don't remember

22   exactly.

23             Q.  Did you ask -- if it was Ken or whoever the

24   BP representative was, did you ask that person if you could

25   have the time to read the document before you signed it?

                                                          36

1          Yes, I got a gasoline contract and inside store

2    contract.

3          Q.  So you did end up getting the documents?

4          A.  Yes, that was in April 20th of 2007.

5          Q.  Do you recall what the date was that you

6    started selling gasoline as an Arco gas station?

7          A.  I don't remember exact date, but between

8    October 12 to October 14th.

9          Q.  Of '06?

10         A.  Of '06.

11         Q.  And when you signed the Contract Dealer

12   Gasoline Agreement, you understood that you had to perform

13   a retrofit of the gas station within a certain time frame;

14   is that correct?

15         A.  What do you mean "retrofit," if you can

16   explain it.

17         MR. MICHAEL:  Remodel.

18         BY MS. JONES:

19         Q.  Yeah.  Did you understand that as part of

20   this gas agreement, you were required to remodel the

21   station so it would be an Arco station?

22         A.  That's right, Arco AM PM.  Otherwise, they

23   don't want to sign this agreement with me.

24         MS. JONES:  I'll mark this next exhibit as

25   Exhibit B, an amendment to the agreement.

39

1          (Plaintiffs' Exhibit B was marked for

2           identification.)

3      BY MS. JONES:

4      Q.  Have you seen this document before,

5  Mr. Faquiryan?

6      A.  Yes, signed by my son.  But I have never got

7  a copy of that signed by BP.

8      Q.  And do you understand what this document

9  says?

10     A.  Getting in a contract with Arco for one

11  year -- supply contract gasoline until I finish the

12  remodeling.

13     Q.  I'm going to mark another document as Exhibit

14  C.

15         (Plaintiffs' Exhibit C was marked for

16          identification.)

17     BY MS. JONES:

18     Q.  At the top it says am/pm mini market

19  agreement.  I'll show this document to you, and if you

20  could review it and confirm --

21     A.  Yes, I do remember that.

22     Q.  -- whether or not you've seen this document.

23     A.  No, I saw that.

24     Q.  And it looks on page 4, or Bates No. 02792,

25  that there is a signature of Nazim Faquiryan.

40

1          A.  Yes.

2          Q.  Do you recall seeing this document at the

3    time Nazim signed it?

4          A.  Yes.  And I was the one that got the

5    signature from my son, and I told him to sign it.  And I'm

6    sure --

7          MR. MICHAEL:  She'll ask you questions.

8          THE WITNESS:  Okay.

9          BY MS. JONES:

10         Q.  Did you witness Nazim signing the document?

11         A.  Yes.

12         Q.  When did you get this document to sign?

13         A.  There's a date on there.

14         Q.  Do you believe that the date there, which is

15    June 20th, 2006, that's the date that BP presented it to

16    you for signature?

17         A.  My son came in the store and signed it.

18         Q.  Was that the same day that BP gave you the

19    document to sign?

20         A.  They want my son's signature, yes.

21         Q.  So that was the day of -- June 20th was when

22    they walked in and handed the document to you for

23    signature?

24         A.  That was Ken Wickerham, yes.

25         Q.  Okay.  Did you have an opportunity to review

                                                    41

1    this document before you signed it?

2          A.   No.  We sign them; give to him and we got a

3    copy.

4          Q.   Did you ask Ken Wickerham for some time to

5    review the document before you signed it?

6          A.   I don't recall it.

7          Q.   Did you understand when you had your son sign

8    this document, that this document was going to govern the

9    relationship between BP and yourself concerning the mini

10    market?

11          A.   Yes, supposed to pay me $475,000.

12          Q.   And I'm saying "you" with regard to these

13    questions, but I notice that both on Exhibit A, which is

14    the Contract Dealer Agreement, and this Exhibit C, which is

15    the mini market agreement, that it refers to an entity

16    called STTN Enterprises, Inc.

17          A.   Yes.

18          Q.   And you're part owner of that company, right?

19          A.   Yes.

20          Q.   And what percentage do you own?

21          A.   49 percent.

22          Q.   And who owns the other 51 percent?

23          A.   My son Nazim.

24          Q.   And other than -- does STTN Enterprise

25    currently own the business that's at 631 San Felipe?

                                                            42

1    wanted you to stay with them?

2            A.   Well, I ask them because Ken Wickerham asked

3    me to terminate the contract.

4            Q.   Right.   Do you have any documents to show --

5            A.   No.   They -- I had made the phone call.   They

6    didn't send me officially.

7            Q.   You need to wait until I finish asking the

8    questions.

9            Do you have any documents which show that Chevron

10   wanted you to stay on as a Chevron dealer?

11           A.   No.

12           Q.   Have you ever been terminated by any of the

13   other oil companies that you've dealt with in the past?

14           A.   No.

15           Q.   Have you ever received notices of default

16   from any of the other oil companies that you've dealt with

17   in the past?

18           A.   No.

19           Q.   You have to wait until I'm done.

20           A.   Okay.

21           Q.   I know you can tell where I'm going with it,

22   but you have to wait.

23           A.   Okay.

24           Q.   This next document I'm going to mark is

25   Exhibit D.

                                                            47

1          (Plaintiffs' Exhibit D was marked for

2          identification.)

3      BY MS. JONES:

4          Q.  Please take a look at that and confirm that

5  that's your signature.

6          Is that your signature, Mr. Faquiryan?

7          A.  Yes.

8          Q.  Do you recall when this document was

9  presented to you?

10         A.  I believe the day I got it and I signed it.

11         Q.  You believe it was on June 20th of 2006 that

12  you received this document?

13         A.  I don't recall the exact date.

14         Q.  Do you recall who presented you with this

15  document?

16         A.  Most likely Ken Wickerham.

17         Q.  But you don't know for sure?

18         A.  No, I don't.

19         Q.  Now, at some point, or as part of you

20  becoming a BP franchisee, you spoke to BP about loans for

21  the store and for the gas station; correct?

22         A.  Can you make --

23         Q.  Let me make it clearer.

24         At some point when you were either considering

25  becoming a BP franchisee, or in the process of becoming a

48

1    correct?

2            A.  No, said going to come later on from my

3    pocket when they finished.

4            Q.  Did you ever get a bill for that?

5            A.  No.

6            Q.  So the total of the cost to convert the

7    Chevron gas station to the Arco gas station was between 48

8    and 58,000 out of your pocket if we're including the PIC

9    and the POS.

10           A.  I'm sorry, I paid to convert from Chevron to

11   Arco.  I paid the total bill, which is cost about between

12   800 to $900,000, except $150,000 been funded by Arco in

13   July.  That fund supposed to be done by March, on or

14   before.

15           Q.  Okay.  What portion of the 800 to 900,000 was

16   spent converting the gas station portion of your business

17   from a Chevron to an Arco, and not including the

18   convenience store portion?

19           A.  Probably the most came about -- no, not even

20   90,000.  Probably 70 to $80,000 to get -- include the

21   painting, the building, painting the canopy, imaging sign,

22   probably to 80 to 90,000 to convert from Chevron to Arco.

23           Q.  So you did pay for the imaging and signage?

24           A.  The people that came in -- Arco people, they

25   brought Brad Christensen.  And those people came.  And

55

1    so much money should be spent for mini mart.  My

2    understanding that $400,000 go all toward the remodeling of

3    the store because all one project.

4              Q.  So until you spoke to Cile about the

5    allocations, you had never seen anything in writing

6    about --

7              A.  No.

8              Q.  -- the loans, and you never signed anything

9    about the loans?

10             A.  Well, I did sign it, because most of the

11   time, I didn't read it because they were always in rush.

12   Like, say, get it done so we have to expedite it.

13             Didn't get the project done on Watsonville on

14   time.  But we have to show something good faith to BP, you

15   are doing something good.

16             Q.  Okay.  So do you recall signing anything with

17   regard to the loans?

18             A.  You have to show me the documents.  It's

19   possible.

20             Q.  I'm going to mark as Exhibit E, a letter

21   dated May 25, 2006.  If you could take a look at that,

22   please.

23             (Plaintiffs' Exhibit E was marked for

24             identification.)

25             THE WITNESS:  Yes, I signed this.  But didn't

63

1    have this attachment.  That came later.

2              BY MS. JONES:

3              Q.  Okay.  Now, when you spoke to Cile -- you

4    were just telling me about a conversation with Cile

5    McDonnell about the different allocations, and that was the

6    first time you had heard about that.

7              Do you recall when that conversation took place?

8              A.  It was after March -- after April, because,

9    you know -- actually, wait.  Take that back.  When my

10   general contractors walked out from me because for

11   nonpayment, and I call her, say, when are you going to pay

12   them.  So then the allocation stuff came in later.

13             Q.  Do you recall what time frame that was in?

14   In 2006?  In 2007?

15             A.  2007 most likely, but I don't recall the

16   exact date.

17             Q.  How many conversations with Cile did you have

18   about the allocation portion?

19             A.  Too many.

20             Q.  More than ten?

21             A.  Yes.

22             Q.  More than 20?

23             A.  I don't recall it, but I can say it's too

24   many.

25             Q.  So look at Exhibit E on the second page.

                                                           64

1    into a loan agreement pertaining to a gas station?

2              A.  No.  No, I don't.

3              Q.  Now, in this letter, this Exhibit E, does it

4    discuss the 25 percent payments that you would get --

5              A.  No.

6              Q.  -- periodically?

7              Did that 25 percent payment provision exist in

8    any of the written documents that BP provided to you, or

9    was it just something that Ken Wickerham told you?

10             A.  No.  It was in the loan agreement.

11             Q.  I'll mark this as the next exhibit.  And at

12   the top, it says Loan Agreement (am/pm Mini Market).

13             If you could please, sir, look at that.

14               (Plaintiffs' Exhibit F was marked for

15                identification.)

16             BY MS. JONES:

17             Q.  Sir, once you've had a chance to look at

18   this, if you could turn to page 18 of that document, also

19   Bates stamped BP 01552, and confirm that that's your

20   signature on that page.

21             A.  Yes.

22             Q.  Do you recall when you signed this document?

23             A.  No, I don't.

24             Q.  On the first page, it has a date of February

25   12, 2007.

                                                              78

1    understood that you were going to get some loan proceeds

2    from BP to remodel your store; correct?

3            A.  Yes.

4            Q.  Did you understand that the amount that you

5    were going to receive from BP was not going to cover all of

6    the costs to remodel the store?

7            A.  Yes.

8            Q.  You knew there would be some expenses that

9    you would have to pay out of pocket?

10           A.  Yes.

11           Q.  Did you have an idea of, you know, what

12   amount you would have to pay out of pocket?

13           A.  Estimate between 250 -- between 200 to

14   250,000.

15           Q.  And how were you planning to fund that 200 to

16   250,000?

17           A.  I had the money, and I paid it.

18           Q.  I'm going to mark as Exhibit G, a document

19   which is called Secured Promissory Note.

20           If you could just review that and confirm on page

21   3 that it's your signature.

22               (Plaintiffs' Exhibit G was marked for

23                identification.)

24           THE WITNESS:  Yes.

25           BY MS. JONES:

                                                                    80

1          Q.  Did you read this document before you signed
2     it?
3          A.  No.  I signed this one at the title company,
4     First American Title Company.
5          Q.  With regard to Exhibit F, which is the loan
6     agreement, AM PM Mini Market, have you ever read this
7     document?
8          A.  No, I signed it because I was trying to rush
9     to get this expedited work to fund and pay the bill.
10         Q.  So even to this date, you've never read this
11    document?
12         A.  Well, I read it after -- you know, after the
13    problem.  Not before.
14         Q.  When did you read it for the first time?
15         A.  After all this problem arise.
16         Q.  Do you remember the date, approximately?
17         A.  I don't recall it.
18         Q.  Was it 2006?  2007?
19         A.  2007.
20         Q.  I'm going to mark as Exhibit H, a document
21    entitled Loan Agreement (Gasoline.)
22              (Plaintiffs' Exhibit H was marked for
23              identification.)
24         BY MS. JONES:
25         Q.  If you would please take a look at that

                                                        81

1    document, and confirm for me that it is your signature on

2    page 14.

3              A.  Yes, it is.

4              Q.  Did you read this document before you signed

5    it?

6              A.  No.

7              Q.  Have you ever read this document?

8              A.  After, yes.

9              Q.  In the 2007 time frame?

10             A.  Yes.

11             Q.  After the issues arose concerning funding?

12             A.  Yes.

13             Q.  Prior to signing this document which is

14   Exhibit H, did you ever ask any questions from BP

15   concerning the document?

16             A.  No one was there when I signed this document.

17   We sign it in First American Title Company, and no one was

18   there to answer question.

19             Q.  Did you have Ken Wickerham's cell phone

20   number?

21             A.  Yes, I did.

22             Q.  So if you had any questions, you could have

23   called Ken.

24             A.  Yes.

25             Q.  But you didn't.

                                                           82

```
 1    and everything for gasoline.  And at that time, was my

 2    understanding that was it.  Nothing else.

 3           Q.  So as of the time you signed the gas loan

 4    agreement which is Exhibit H, you had spent the 48 to

 5    58,000 on the PIC machine and the POS; correct?

 6           A.  Yes.

 7           Q.  Nothing else?

 8           A.  Nothing else.

 9           Q.  I'm going to ask you to look at this next

10    document which we'll mark as Exhibit I.  And it's entitled

11    Disbursement Agreement.

12                (Plaintiffs' Exhibit I was marked for

13                 identification.)

14           BY MS. JONES:

15           Q.  Please review that and confirm for me that

16    it's your signature on the third page of this document.

17           A.  Yes, it is.

18           Q.  Have you -- do you recall what this document

19    is?

20           A.  That's a disbursement which is how they pay

21    the bill for the general contractor, or with the money they

22    promise me to pay.

23           Q.  Okay.  So did you understand that you had to

24    fill one of these documents out and provide it to BP before

25    any loan moneys would be paid out?
```

                                                            86

1           MR. MICHAEL:  The question is vague and

2    ambiguous.  There's nothing for him to fill out.

3           BY MS. JONES:

4           Q.  Sign.

5           Did you understand that you had to sign and

6    submit this document to BP before you or the contractor

7    received any funds?

8           A.  Yes.

9           Q.  And how did you have that understanding?

10          A.  Cile McDonnell ask me going to pay directly

11   to my general contractor, and they can submit the invoice

12   and sign the document.

13          I said, no, you have to have my signature submit.

14   I don't want them to overcharge myself.  And that's what

15   she's explaining to me was, I believe, around May 2007.

16          Q.  When was the first time you saw a document

17   that was entitled Disbursement Agreement, whether it was

18   filled in with the information on Exhibit I or a blank one?

19          A.  I'm not sure about the time, between October

20   and November, 2006.  And I submit with a package to

21   Jean Smith for some of the invoices.

22          Q.  Who explained this disbursement agreement to

23   you for the first time?

24          MR. MICHAEL:  If anyone.

25          BY MS. JONES:

87

1          A.   That's what she told me.

2          Q.   It was in October or November of 2006 when

3    you first saw this disbursement agreement.

4               Is that the first time you became aware that you

5    had to fill this type of document out in order to receive

6    the --

7          A.   No, she didn't say I have to fill up this

8    form.  She send me kind of another form -- what you call

9    it -- voucher, I'm sorry.  Send me some voucher to fill up.

10   And she didn't ask me to fill up this one and send it to

11   her.

12         Q.   When did you first find out that you had to

13   fill out this Disbursement Agreement form?

14         A.   After I spoke with Cile McDonnell, I believe,

15   in May or June 2007.

16         Q.   I'll show you a document entitled Exhibit J.

17              (Plaintiffs' Exhibit J was marked for

18                identification.)

19         BY MS. JONES:

20         Q.   It's called a Deed of Trust with Assignment

21   of Rents, Security Agreement and Fixture Filing.

22         A.   Yes.

23         Q.   If you could confirm for me on the third page

24   of the document, or BP 01445, that that is your signature,

25   as well as that next page on BP 01446.

                                                        89

1              A.  Yes.

2              Q.  Did you read that document before you signed

3      it?

4              A.  No.

5              Q.  Do you recall when you signed that document,

6      or never mind.  Strike that.

7              I'll have you look at this next document, which

8      we'll mark as Exhibit K.  It's entitled Consent to

9      Encumbrance of Tenant's Interest.

10                  (Plaintiffs' Exhibit K was marked for

11                   identification.)

12              BY MS. JONES:

13              Q.  Do you recall ever seeing this document?

14              A.  I'm sorry, what was the question?

15              Q.  It was do you recall seeing this document?

16              A.  Yes, I saw it.

17              Q.  Did you sign the document that's on page 5?

18      Is that your signature?

19              A.  Yes.

20              Q.  Did you read the document before you signed

21      it?

22              A.  No.

23              Q.  I'll mark as Exhibit L, a document entitled

24      Unconditional Continuing Guaranty.

25              If you could review it and confirm that your

                                                            90

1    signature is on the fifth page.

2              (Plaintiffs' Exhibit L was marked for

3              identification.)

4         BY MS. JONES:

5         Q.   Is that your signature, sir?

6         A.   Yes.

7         Q.   Did you read this document before you signed

8    it?

9         A.   No.

10        Q.   You mentioned that Jean Smith talked to you

11   about vouchers.

12             When was the concept of vouchers first explained

13   to you by BP?

14        A.   Was October I paid some money advance for,

15   like, equipment inside the store for shop for equipment.

16   And I spoke with Jean Smith.  Say how I can get

17   reimbursement from them.

18             She sent me the sample of voucher and say submit

19   it with voucher, and we'll pay it.  We'll reimburse you.

20        Q.   And that was October of 2006?

21        A.   Sometime October or November of 2006, yes.

22        Q.   I'm going to mark as Exhibit M, a document

23   which is called Voucher Processing and Disbursement

24   Procedure.

25   ///

                                                        91

1          BY MS. JONES:

2          Q.  So when you were running a Chevron store and

3     your independent convenience store -- let me break it down.

4          When you were running the Chevron gas station,

5     you made higher sales in gas sales than when you were

6     running the Arco gas station on average.

7          MR. MICHAEL:  Gross sales.

8          THE WITNESS:  Gross sales, when we open this

9     Arco, because new and probably even.  They were even.

10         BY MS. JONES:

11         Q.  Okay.  Now, with regard to the convenience

12    store, when you were running it as an independent

13    convenience store with your restaurant in it compared to

14    when you were running it as an AM PM mini market, how did

15    the gross sales compare?

16         A.  Is more sale, but less profit.

17         Q.  More sale and less profit as an AM PM mini

18    market?

19         A.  Yes.

20         Q.  Now, you've mentioned a couple of times

21    during this deposition that at some point, you ran into

22    issues with BP concerning the loan funding.

23         Can you describe for me what those issues were.

24         A.  Issue was why I'm not getting the funds.

25         Q.  Any other issues concerning the loan funding

                                                        103

1    that you had with BP?

2            A.   That's as I said, yes, why we not getting the

3    fund to pay general contractor.

4            Q.   Okay.   I understand that that was one of your

5    issues.

6            Did you have any other issues with BP concerning

7    the loan funding?

8            A.   Can you clear your question because I

9    answered it.

10           Q.   It seems to me your issue with BP concerning

11   the loan funding was that you weren't getting the money,

12   right?

13           A.   That's right.

14           Q.   There was nothing else related to the loan

15   funding that you had issues with.   Maybe how people were

16   treating you or...

17           A.   The issue is the higher gas price and less

18   margin profit.

19           Q.   Do you believe that it was BP that was

20   causing the delays in getting you the loan funding?

21           A.   Yes.

22           Q.   Is there anyone specific at BP that you

23   believe was causing those delays?

24           A.   I don't know.

25           Q.   It wasn't any one person that you felt

                                                         104

Veritext National Deposition & Litigation Services
866 299-5127

1   wasn't -- was causing the delays?

2            A.   I don't --

3            Q.   Was it Jean that was causing -- Jean Smith

4   that was causing the delays?

5            A.   As I said, I don't know.

6            Q.   Do you know if it was Ken Wickerham that was

7   causing any delays?

8            A.   I don't know.

9            Q.   Do you know if Rima was causing any delays?

10           A.   I don't know.

11           Q.   Did BP ever tell you at any point in time

12   that they had all the documents that they needed in order

13   to fund the store loan?

14           A.   Yes.

15           Q.   And when was this?

16           A.   I believe was in July, I spoke with

17   Mike Hager.  Mike Hager told me, yes, he had all the

18   documents what he need.  And also he reconfirm it in

19   August.  I really don't recall the exact date.  Between

20   August 18 to 21st, he called me.  He was on a trip.  He

21   said, I have all the documents I need -- we need.

22           Q.   Is that in 2007?

23           A.   Seven, sorry.

24           Q.   And then how long after that -- how much

25   longer after that, did you receive -- let me back it up.

                                                          105

1          Did you receive the store loan funds?

2          A.  I received -- well, they pay the $150,000 to

3    Fortune-Ratliff, the general contractor.

4          Q.  And when was that?

5          A.  It was July 2007.

6          Q.  I'm a little confused, because you said that

7    in July of 2007, you spoke to Mike Hager.  And he said he

8    had all the documents.  But then you reconfirmed it in

9    August of 2007.

10          A.  Reconfirm again.  He said, I have all the

11    documents, his portion to fund for the store for $150,000.

12          Q.  And then you said Fortune-Ratliff was paid in

13    July of 2007.

14          A.  Yes.

15          Q.  So you reconfirmed with Mike that BP had

16    received all the documents after Fortune-Ratliff had

17    received the moneys?

18          A.  No.  The issue was after paid Fortune-Ratliff

19    $150,000, and I asked Mike Hager what other documents you

20    need to fund for the $250,000.

21          He said, "I have all the document I need, Sayed."

22          Q.  Was that a conversation you had over the

23    phone, or was that via e-mail?

24          A.  Over the phone.  And he also he came in my

25    office, and he confirmed by witnessing my children out

106

Veritext National Deposition & Litigation Services
866 299-5127

1    there.

2              Q.   After you had the conversation with Mr. Hager

3    in August of 2007 where he confirmed he had all the

4    documents needed, did you get any correspondence or

5    telephone conversations from anyone else at BP saying that

6    you still needed to provide documents?

7              A.   I don't recall that because it was my only

8    contact.

9              Q.   At that time, Mike Hager was your only

10   contact?

11             A.   I was supposed to go through him.

12             Q.   Were you not speaking with Jean Smith at that

13   point?

14             A.   I was talking with Jean Smith.  But he's a

15   step into take the responsibility and move forward and get

16   it solved.

17             Q.   At that time, in the August of 2007 time

18   frame, did Jean Smith tell you that you still needed to

19   provide other documents?

20             A.   I haven't heard from Jean Smith any -- I do

21   not remember.  And I don't know that she told me.  I'm

22   sorry, I don't remember if she mention.  No, she didn't say

23   anything that she needed any documents.

24             Q.   How about Cile McDonnell, in this August of

25   2007 time frame, did she -- let me ask the question so it's

                                                          107

1    clear.

2              In the August of 2007 time frame or thereafter,

3    did Cile McDonnell ever contact you to inform you that you

4    still needed to provide documents?

5         A.   No.

6         Q.   Did anyone else from BP advise you after

7    August of 2007 that you still needed to provide documents

8    in order to fund the gas loan?

9         A.   No.

10        Q.   Did anyone other than Mike Hager tell you

11   that BP had all the documents to support the funding of the

12   store loan?

13        A.   I don't recall.

14        Q.   During your communications with BP starting

15   from the time that you became interested in opening an

16   Arco, through the time that you started having issues about

17   the funding with the loan, were you the main contact person

18   from STTN to communicate with BP?

19        A.   Yes.

20        Q.   Did any of your business partners or

21   relatives communicate with BP concerning this Arco station

22   at the Hollister San Felipe location?

23        A.   Can you clear up your question so I can

24   understand it better.

25        Q.   I'm sorry?

108

1          A.   Anybody else?  What you mean anybody else?

2    Regarding what?

3          Q.   Let's start at the beginning.  Concerning the

4    interest for STTN to open up an Arco station at the San

5    Felipe location, did anyone other than yourself speak to BP

6    on behalf of STTN or Ava Global, for that matter?

7          A.   No.

8          Q.   Did any of your business partners or

9    relatives speak with BP about any of the other gas station

10   sites that they were interested in perhaps opening an Arco

11   station?

12         A.   Yes.

13         Q.   Who?

14         A.   There was a few places I referred to

15   Ken Wickerham, and I don't remember all those names, who

16   they are.  I give it to Ken Wickerham to contact.

17         Q.   Were any of them direct family members, like

18   your children or your wife?

19         A.   No.

20         Q.   Toan To, did you refer Toan To to

21   Ken Wickerham?

22         A.   We had a few meeting with Toan To with

23   Ken Wickerham, yes.

24         Q.   Concerning what locations?

25         A.   Concerning about Hollister location, and also

                                                         109

1    Watsonville.

2         Q.   In terms of communications about the

3    franchise agreements, which are the Contract Gasoline

4    Agreement and the AM PM mini market agreement, did anyone

5    other than yourself have communications with BP about those

6    agreements?

7         A.   That's kind of open question.  Can you

8    specifically be specific on your question so regarding

9    franchisee agreement, what you mean by that?

10        Q.   Regarding did anyone other than yourself

11   speak to BP about the franchise agreements, about, you

12   know, the document themselves is my question?

13        A.   No.

14        Q.   Did Nazim ever speak to BP about, if you

15   know, about the franchise agreements, and any questions he

16   might have about the franchise agreement?

17        A.   If he meeting, he was with me, because I ask

18   him to come over.  Because they in such a rush to sign the

19   documents.  To get the detail, no.

20        Q.   Nazim never contacted BP by himself to talk

21   about the franchise agreement?

22        A.   No.

23        Q.   Concerning the loan agreements, the gas loan

24   agreement and the store loan agreement, did anyone other

25   than yourself talk to BP about those agreements, about any

                                                      110

1    provide me his cell phone.  I tried to get it from other

2    source.  Nobody provide me his cell phone number.

3         And I ask him why he not going to give it to me.

4    He said, well, you have too many questions.  You keep

5    calling me and bothering me.  I don't want to talk.

6         Q.  Tom Reeder said that to you?

7         A.  Yes.

8         Q.  Did you have Tom Reeder's office number?

9         A.  Yes, I got his number.  And sometime in

10   August, he called me from his office number on my cell

11   phone, August 2007.

12        Q.  Did you have Brad's office number?

13        A.  I had cell phone.

14        Q.  Oh, you had his cell phone.  But Brad

15   wouldn't give you Tom's cell phone number.

16        A.  He never provided me upper management.

17   Whatever he had to go through me.

18        Q.  Did you have Mike Hager's cell phone number?

19        A.  Yes.

20        Q.  I want you to review this e-mail.  It's dated

21   May 18th, 2007.

22        Do you recall receiving that e-mail?

23        A.  Yes, I did.

24        Q.  Without taking the time to go back through my

25   notes, when was Fortune-Ratliff, when did they receive the

                                                          141

1    money from BP?

2              A.   I believe it was in July 2007.

3              Q.   So from as of this May 18th, 2007 e-mail, it

4    seems like the store portion of the loan had funded;

5    correct?

6              MR. MICHAEL:  What does that mean funded?  What

7    do you mean?

8              BY MS. JONES:

9              Q.   That the store portion of the loan was ready

10   to be paid out; is that correct?

11             A.   My understanding Fortune-Ratliff, they

12   received the money in July 2007.

13             To me be ready to have the money entirely

14   different.

15             Q.   But you understood that Fortune-Ratliff in

16   order to get the money, they had to submit certain

17   documents in order to get paid; is that right?

18             A.   Yes.

19             Q.   They had to fill out voucher information and

20   provide invoices; correct?

21             A.   Yes.

22             Q.   And do you have any understanding of how

23   quickly Fortune-Ratliff provided that information?

24             A.   My understanding we were in contact, that

25   they asked probably not delay too long not to provide it.

                                                          142

1          A.   I don't recall it.

2          Q.   Did you ever have this agreement put down in

3     writing where either you e-mailed it to any of the

4     gentlemen you spoke with, or they e-mailed you or wrote

5     something to you?

6          A.   I don't remember.

7          Q.   How many conversations did you have about

8     that agreement?

9          A.   I don't remember.  Too many.

10         Q.   At one point, did someone from BP tell you

11    that that wasn't what the agreement was.  That you were

12    supposed to put your money in first, and then BP was

13    supposed to put the money in?

14         A.   I don't recall it.

15         Q.   What happened with that agreement?

16         A.   Nobody called me the money is there.  I never

17    got a confirmation from the title company the money is

18    there, I could put my money there.

19         Q.   Now, you mentioned that you had some invoices

20    outstanding.

21              What were those invoices for?

22         A.   Can you clear your question.

23         Q.   You just were talking about the fact that

24    there were some invoices outstanding.  You said they were

25    disputed, and that -- so you were going to put some money

153

1    into the escrow account to clear those invoices and --

2              A.  Gasoline invoice deliver Arco or BP.

3              Q.  They were all for gasoline deliveries?

4              A.  Yes.

5              Q.  And they were for deliveries that were made

6    to the store at Hollister that were not paid for?

7              A.  That's correct.

8              Q.  And you said they were disputed, right?

9              A.  There's a couple of invoices by, as I

10   mentioned, Brad Christensen, I called the phone number they

11   had, and I disputed I never get a confirmation where there

12   was action.  And the beginning was $189,000 total

13   outstanding bill.

14              But according to the agreement I made, that was

15   paying every time for the load, plus extra money to bring

16   my balance down.

17              Q.  So at what point did this balance reach

18   $189,000?

19              A.  Yes.

20              Q.  No.  At what point in time did the balance

21   reach $189,000?

22              A.  February 12 -- February sometime.  February

23   2007.

24              Q.  Okay.  And were all of the invoices disputed?

25              A.  No, three of them.

                                                          154

1    104,000?

2          A.   That's what the last time I got from

3    Mike Hager in August 2007 was my balance went down to

4    104,000.

5          Q.   Did you make payments on the amounts that you

6    owed?

7          A.   Every delivery.  Because they put me on COD.

8    Every delivery I was buying by cashier's check, and plus

9    2,000 to $3,000 to the balance.

10         Q.   How often were these deliveries made where

11   you were making these extra payments?

12         A.   Every other day or every day.  Maybe every

13   two days.

14         Q.   Did you keep copies of those checks where you

15   were making the two to $3,000 extra?

16         A.   All total, because I got number from

17   Brad Christensen for -- like, for example, the balance

18   total cost of one load was 22,000.

19              He said every time I got a load, say you have to

20   pay us 26,000.  That's every time I was making get a

21   cashier check for $22,000 to $27,000 cashier's check to

22   give it to him to deliver gas for me.

23         Q.   Now, were there ever any instances where gas

24   was delivered to the San Felipe station and put in the

25   ground in the tanks, and a cashier's check was not given to

                                                              156

1    the driver that you were aware of?

2            A.   Yes.

3            Q.   How many times?

4            A.   I don't recall because Brad Christensen and

5    Tom Reeder a couple of times made a deal with my son.

6            Q.   Which son?

7            A.   Tim.  And they deliver the gas, and they want

8    the cashier's check before the next delivery.

9            Q.   Did your son Tim get your approval to enter

10   into that agreement?

11           A.   I believe he was authorized.

12           Q.   He was what?  Authorized?

13           A.   Yes.

14           Q.   Okay.  Were you involved in the day-to-day

15   operations of the station --

16           A.   Yes.

17           Q.   -- at the San Felipe location?

18           A.   Yes.

19           Q.   You were there -- how many times a week were

20   you at that location?

21           A.   Seven days a week.

22           Q.   How many hours each day on average?

23           A.   Between seven hours to 12 or 16 hours.

24           Q.   And were your children working at that site

25   as well?

                                                              157

1          Every time I was buying a cashier's check, called

2   him first before I get a cashier's check to deliver it to

3   the BP.

4          And I don't know what day I found out my

5   outstanding balance was that much.  And I mention about

6   those three invoices.  Brad said, "I will take care of it,"

7   but he never did.

8          Q.   Before that time in February of 2007 where

9   Brad talked to you about this $189,000 that was due, were

10  you aware that you weren't paying for some of the gas?

11         A.   Yes.

12         Q.   Why weren't you paying for it?

13         A.   Because the three invoices, I didn't receive.

14  They made a stop payment EFT from BP in which BP didn't

15  like it.

16         Q.   But then why didn't you pay for the other

17  loads of gasoline other than the three disputed invoices?

18         A.   That's when they called me in February and

19  said, you have to pay by cashier's check.

20         Q.   Okay.  But you said that the three disputed

21  invoices totaled about $65,000.

22         A.   Uh-huh.

23         Q.   But that in February, they told you the

24  amount was $189,000.

25         A.   Yeah, because, you know, every time they

159

1    deliver, like, two or three days, they were giving us to

2    take the money or seven days.  I didn't know.  They didn't

3    explain their terms of agreement, how much they take the

4    money.

5              Q.  So there were deliveries being made to your

6    station where you weren't paying for them, and I don't

7    understand.

8              A.  Arco was delivering the gas every day or

9    every other day, which it would have my knowledge.

10             Q.  But was that necessary for them to deliver

11   gas every day?  Were you running out?

12             A.  No, not necessary.

13             Q.  But you said they were delivering it every

14   day.  Was this before you were put on cashier's check?

15             A.  Yes.

16             Q.  Did you ask that they stop delivering

17   gasoline so often?

18             A.  Yes, I did.

19             Q.  And what did they say?

20             A.  They said, this is our agreement.  And it was

21   Brad Christensen's.

22             Q.  Now, the gas you received from BP, even the

23   ones that you didn't order, you sold that gasoline, right?

24             A.  Yes.

25             Q.  And you made a profit off of that gasoline,

                                                        160

1          A.  Yes.

2          Q.  So you didn't lose money.  You made a minimal

3     profit.

4          A.  Well, yes.

5          Q.  Now, after February of 2007, where you had a

6     conversation with Brad Christensen about this amount that

7     you owed for the gasoline, did you talk to BP about some

8     type of payment plan that you were going to agree to?

9          MR. MICHAEL:  Other than what he's already

10    testified to?

11          BY MS. JONES:

12          Q.  Other than what you've already testified to.

13          A.  Yes, we did.  Because Brad Christensen told

14    me there we sign some letter, and we wrote a letter draft

15    by Brad Christensen, and send it to me.  We sign it.  And

16    he said, "Sayed, if you don't sign this agreement, and this

17    letter, we not going to fund your gasoline loan."

18          Q.  And did you sign that agreement?

19          A.  Yes, I did.

20          Q.  Do you recall, you know, what the payment

21    amounts were?

22          A.  Like, anywhere between 25 to $30,000 a month.

23          Q.  Prior to this February of 2007 time frame,

24    had you ever had any problems paying for gasoline that was

25    being delivered to you while you were an Arco dealer?

                                                          162

1    didn't receive the load?

2              A.   I call them.

3              Q.   Did they reverse it?

4              A.   You know, I never got any documentation that

5    they reverse it.

6              Q.   Did you ever follow-up on that?

7              A.   I was telling Brad Christensen, and give him

8    the information.   And say, Brad, this is the one I had

9    dispute, so find out.

10             They said, okay, they'll send you information.   I

11   never got the information.

12             Q.   But you don't know either way whether or not

13   they credited it back to you?

14             A.   Exactly.

15             Q.   I'll show you a document.   We'll mark it as

16   Exhibit O.   It's Bates stamped BP 01114.

17                  (Plaintiffs' Exhibit O was marked for

18                   identification.)

19             BY MS. JONES:

20             Q.   You were talking about a document that Brad

21   helped you draft up for a payment plan for money that you

22   owed.

23             Is this document Exhibit O that document?

24             A.   Yes.

25             Q.   And so according to this document, you agreed

                                                           164

Veritext National Deposition & Litigation Services
866 299-5127

1    to pay $30,000 each month until the balance due was paid

2    off.

3              A.  Here I said, We, Nazim Faquiryan and

4    Sayed Faquiryan, agreed to pay an additional $30,000 by

5    certified check payable to BP on or before the 15th of each

6    month beginning June 20th until the total sum of balance

7    due are paid in full to the credit department.

8              These separate monthly payments will continue

9    until all outstanding balances due BP currently $184,075.50

10   have been paid, yes.

11             Q.  You agreed to that?

12             A.  I agreed to that.

13             Q.  Did you ever make any payments per this

14   letter agreement?

15             A.  Because every time I was buying the gas, I

16   was paying additional between 2,000 to $3,000; otherwise,

17   they didn't deliver the gas.  How my balance is going down

18   from 184,000 to 104,000 or $110,000.

19             Q.  Did Brad understand that those extra two to

20   three thousand was part of this $30,000?

21             A.  Exactly right.

22             Q.  He understood that?

23             A.  Yes.

24             Q.  You talked to him about that?

25             A.  Yes.

                                                          165

1          Q.   Did Brad tell you that was acceptable?

2          A.   He didn't say acceptable or not acceptable.

3          Q.   So you never made a $30,000 check?

4          A.   No, because they don't want my high balance

5     standing down there without money pay to bring the balance

6     lower.

7          Q.   Am I correct that as soon as your franchise

8     with BP was terminated, you stopped making any payments for

9     this gas invoice -- the gas amounts that were due?

10         A.   Yes.

11         Q.   So you haven't -- since the franchise was

12    terminated, you haven't paid BP any money; correct?

13         A.   No, because they have my franchise money for

14    Watsonville and Hollister.  And they have my money.  I

15    don't have their money.

16         Q.   And as of today's date, have you made any

17    repayments on the store loan of $150,000?

18         A.   No.

19         Q.   I'm going to mark as Exhibit P, a document

20    entitled Default Notice dated September 5, 2007.

21              (Plaintiffs' Exhibit P was marked for

22               identification.)

23         BY MS. JONES:

24         Q.   Do you recall receiving this document,

25    Mr. Faquiryan?

                                                        166

1          A.  Default on what?

2          Q.  If you could please read that document.

3          A.  Yes, they brought bunch of them that day,

4    they deliver by Brad Christensen.

5          Q.  Now, is it true that from the evening of

6    August 23, 2007 through September 4th, 2007, the San Felipe

7    station was not selling any gasoline to customers?

8          A.  Yes.

9          MR. MICHAEL:  Not selling any?

10         THE WITNESS:  I'm sorry.

11         MR. MICHAEL:  Not selling any gasoline?

12         THE WITNESS:  Selling gasoline -- we had to sell

13   gasoline.  We had a premium.  We had some diesel we were

14   selling, but not unleaded.

15         BY MS. JONES:

16         Q.  During that time frame, the August 23, 2007

17   through September 4th of 2007, were there any days where

18   you didn't sell any gasoline?

19         A.  Not any.  We were selling some, but not the

20   expectation -- you know, I don't know what BP was thinking.

21         Q.  You said you had diesel available, and --

22         A.  Premium.

23         Q.  Were there any days during that August 23,

24   2007 to September 4, 2007 time frame, where all of the

25   dispensers were taped off?

                                                        167

1          A.  What do you mean "taped off"?

2          Q.  Taped off to prevent customers from accessing

3     the pumps.

4          A.  Well, on a metal pump with the PIC machine,

5     yes, but not on both sides.

6          MR. MICHAEL:  She asked if there were any times

7     when all the pumps were taped off so the customers could

8     not get to them.

9          THE WITNESS:  Well, we put the taped off, but

10    they had access on the pump on the side on both sides of

11    the station, not on the metal.

12          BY MS. JONES:

13          Q.  I guess you're going to have to describe your

14    station since I don't have -- are there two islands of

15    pumps?

16          A.  I tape the pump because people didn't want to

17    come here.  I tape the pump here, and the pump this way to

18    here.  But these two pumps here and two pumps here were

19    open.

20          Q.  Did you actually sell gasoline from the

21    exterior pumps during the time frame of August 23, 2007

22    through September 4th of 2007?

23          A.  Yes, were selling premium and diesel.

24          Q.  Where are the -- is the diesel located on

25    those same pumps?

                                                        168

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      September 4th of 2007, were where you were only selling

 2      diesel or premium?

 3              A.  I don't recall, because I had some gas, you

 4      know, get to the bottom of the tank.  I don't want to reach

 5      down there, otherwise, cost a lot of money to reactivate

 6      the pump.  I stop the pump on 1800 gallon to sell unless by

 7      regular customer was selling 10 gallon, 20 gallon of gas.

 8              Q.  When did you stop the pumps for those

 9      particular tanks?

10              A.  Actually when we reached to the 700 gallon, I

11      stop my unleaded, which is I don't remember exactly which

12      day was it.

13              Q.  But was it within the August 23 through the

14      September 4th time frame?

15              A.  I believe was between August 27 to August

16      4th.

17              Q.  September 4th?

18              A.  September 4th.

19              Q.  So between August 27th and September 4th, you

20      believe you shut off the unleaded tanks?

21              A.  Yes.

22              Q.  What about the regular tanks?

23              A.  That's regular unleaded.  But the premium and

24      diesel I still had.  And even Mike Hager come in and saw we

25      were selling less.
```

                                                                170

Veritext National Deposition & Litigation Services
866 299-5127

```
 1   Was there anything in writing which talked about the

 2   requirement that BP had to fund all $400,000 in order for

 3   the franchise agreements to be in effect?

 4          A.  No.

 5          Q.  The last document I believe I'm going to mark

 6   is Exhibit R.

 7              (Plaintiffs' Exhibit R was marked for

 8               identification.)

 9          BY MS. JONES:

10          Q.  And it's a document dated December 6, 2007,

11   entitled Notice of Termination.

12              Mr. Faquiryan, would you please review that, and

13   confirm that you received this document.

14          A.  Yes, I received that one by Brad Christensen.

15          Q.  Brad Christensen delivered it to you?

16          A.  Yes.

17          Q.  Have you had any problems with Valero, your

18   current franchisor?

19          A.  No.

20          Q.  Do you have a contract gasoline agreement

21   with them?

22          A.  Yes.

23          Q.  Is it month-to-month or is it --

24          A.  It's a year.

25          Q.  Is your convenience store branded through
```

173

1    and move forward with the construction.

2             Q.   During this telephone conversation, though,

3    did Jean actually say that BP was guaranteeing that you

4    would receive those moneys?

5             A.   I never heard that one, but it satisfy

6    because I wasn't -- you know, it wasn't three-way

7    conversation.  And I called Jean Smith and hand the phone

8    to Al Fortune, and they confirm it to see how Arco BP is

9    going to pay that $400,000.  The balance is coming from

10   Sayed.

11            Q.   But you couldn't hear what Jean was telling

12   Mr. Fortune over the phone?

13            A.   Well, I heard, says, yes, BP paying $400,000.

14   The balance is coming from Sayed.  And that was the prior

15   to the New Year's.  And January 2nd, sure enough

16   Fortune-Ratliff showed up for the construction.

17            Q.   Other than Ken Wickerham saying that you have

18   to have -- show some good faith and start construction, did

19   anyone else at BP tell you that you were required to start

20   construction before the loan was funded?

21            A.   No.

22            Q.   Has BP ever lied to you or anyone from BP

23   lied to you?

24            A.   Regarding what?

25            Q.   Regarding anything concerning this San Felipe

                                                          184

1    <u>station.</u>

2            MR. MICHAEL:  Well, other than what we've gone

3    over today, I mean.

4            MS. JONES:  He's made a fraud claim.  So I think

5    I'm entitled to know what facts he knows in terms of, or

6    what he's claiming at least or stating.

7            Q.  So do you believe that --

8            MR. MICHAEL:  He's been testifying all day about

9    things that BP said they were going to do that they didn't

10   do.

11           Do you want him to go back over all that?

12           MS. JONES:  I want him to summarize what lies you

13   think BP made to you.

14           MR. MICHAEL:  Well, I'll object.  The questions

15   have been asked.  It calls for a narrative and summary.

16           If you can think of anything else, go ahead and

17   testify to it.

18           THE WITNESS:  That's all I testified to.

19           BY MS. JONES:

20           Q.  Okay.  So I'm going to summarize for you,

21   then, and ask you if there's anything else.

22           <u>Am I correct in understanding that you believe BP</u>

23   <u>lied to you about the funds that were going to be paid to</u>

24   <u>you from the loan?</u>

25           A.  <u>Yes.</u>

                                                         185

1          Q.   Is it your understanding that BP lied to you
2     about how quickly those funds would be paid to you?
3          A.   Yes.
4          Q.   Was there ever a situation or ever a
5     conversation or anything in writing from BP guaranteeing
6     you that the loans would be paid out within a certain time
7     frame?
8          A.   No.
9          Q.   Other than what we've discussed today, is
10    there anything else that BP did which you considered them
11    lying to you?
12         A.   That's all we -- that's all even I know.
13         Q.   Do you think that BP hid from you the fact
14    that there were different allocations for the $400,000?
15         A.   What do you mean by that?
16         Q.   Do you think that they hid from you the fact
17    that the loans -- let me back up.
18              You had an understanding that the loan was for
19    $400,000.  And you testified that in May of 2007, you
20    learned for the first time from Cile McDonnell, that there
21    was some allocation that some portion of the loan would be
22    allocated to the gas, and some would be allocated to the
23    store.
24              Do you believe that anyone at BP lied to you
25    about how the loan was going to be allocated?

                                                          186

1          A.  Yes.

2          Q.  Okay.  Based upon what?

3          A.  My understanding when we signed the

4  agreement, that letter on May 2006, didn't say anything

5  about allocation.

6               In my understanding that money is coming toward

7  the remodeling to make the satisfaction of the requirement

8  of Arco and AM PM, and never had any allocation.

9          Q.  Now, does it say in the commitment letter

10  that the $400,000 is for the store?

11          A.  I didn't have the exhibit, but the way it's

12  my understanding from the letter, that go for store -- it's

13  my understanding from until those allocation came up, was

14  going toward whatever the way of funding, it going toward

15  funding me to paying the $400,000 for remodel.

16          Q.  Do you think that BP lied to you about the

17  process of how you were supposed to get the money funded in

18  terms of the fact that you had to do a voucher process and

19  do a disbursement agreement?

20          A.  No.

21          Q.  Can you think of any other things that you

22  feel were lies by BP other than what we've discussed?

23               (DISCUSSION HELD OFF RECORD.)

24          BY MS. JONES:

25          Q.  Mr. Faquiryan, after you've had an

                                                          187

Veritext National Deposition & Litigation Services
866 299-5127

1    opportunity to speak with your counsel, do you have

2    anything to add in terms of any purported lies by BP?

3         A.   Yes.

4         Q.   And what are those?

5         A.   My understanding according to Ken Wickerham

6    and other staff, by signing agreement and provide all the

7    document after recording the deed of trust by Arco, I will

8    get 25 percent of that money they promised.  And by

9    completion of 25 percent of project, then I get another 25

10   percent.  By completion of 50 percent, I get another 25

11   percent; by completion of another 75 percent, I get 100

12   percent paid.  And that never comply.

13        Q.   But you understood that in order to get those

14   payments, you had to provide all the required documents,

15   right?

16        A.   Yes.

17        Q.   And you understood that any tax liens on the

18   property had to be cleared before you got any payments;

19   correct?

20        A.   I understand, yes.

21        Q.   And you understood that before you got any

22   payments, you would also have to clear up any title issues

23   that you had with regard to the former owner; correct?

24        A.   Yes.

25        Q.   And you also understood that before that loan

                                                      188

1  would fund or any payments would be made, that Omni

2  Financial would have to correct its documents; correct?

3       A.  Yes.  But my understanding too, I provide all

4  the documentation on or before March 12 when Arco record

5  their deed of trust and give them a clear title and satisfy

6  all those questions you asked, and they record deed of

7  trust.

8       So it means I satisfy them, and give them the

9  documentation you ask -- they ask.

10       Q.  Okay.  But you also understood that before

11  paying you any moneys, you had to be clear of any

12  mechanic's liens filed against you; correct?

13       A.  Mechanic's liens happen after the fact.  We

14  went -- it's when they record deed of trust, was clear the

15  property from everything.  You mention all those questions

16  you asked on March 12, 2007.

17       Q.  Okay.  But let me ask you the question:

18  Before they could actually give you any money, though, your

19  property had to be clear of any mechanic's liens.

20       A.  Was clear by March 12 when they record it.

21  And give them the ALTA title report, title insurance by

22  title company.  Everything was free and clear.  And there's

23  a copy of the deed of trust should be in your file, which

24  is Arco recorded on March 12, 2007.

25       Q.  Do you know in your complaint, it says that

                                                    189

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT
# A

Customer Acct #0996439
Facility #82461
Category: NTI

## CONTRACT DEALER GASOLINE AGREEMENT

This Contract Dealer Gasoline Agreement (this "Agreement") is made and entered into as of the ___11___ day of ___July___, ___2006___, ("Effective Date")by and between BP West Coast Products LLC, a Delaware limited liability company, ("BPWCP"), and STTN Enterprises, Inc. , a California Corporation ("Buyer").
(state whether a sole proprietorship, partnership, corporation or limited liability company [LLC]; if partnership, the names of all partners and State of organization; if corporation, the State of incorporation; if an LLC, the State of organization)

BPWCP maintains a place of business at 4 Centerpointe Drive, in the City of La Palma, in the State of California. Buyer's principal place of business is located at 631 San Felipe Road in the City of Hollister, in the State of CA with the ZIP code 95035. This Agreement constitutes a "franchise" as defined in the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806 ("PMPA").

Recitals

      A.      BPWCP markets motor fuels comprising gasolines and gasoline containing materials bearing the ARCO® trademark and other identifying symbols (herein collectively, "Gasoline").

      B.      Buyer owns or leases from a third party real property and improvements which Buyer would like to operate as a retail facility selling Gasoline to end users. The property and improvements are located at 631 San Felipe Road, in the City or Town of Hollister in the State of CA with the ZIP code 95035 (The "Premises").

NOW, THEREFORE, the parties hereto agree as follows:

      1.      **Term.** This Agreement shall be binding upon the parties and effective on the date first set forth above. Subject to earlier termination under Paragraph 17.1 below, the "Commencement Date" of this Agreement shall begin at 10:00 a.m. on the  and the term shall end at 10:00 a.m. on the  If no Commencement Date is set forth at the time this Agreement is executed, the Commencement Date shall be established by BPWCP by notice to Buyer as the date the Premises are ready to receive Gasoline delivery, which notice shall also set forth the expiration date which shall be at 10:00 a.m. on the first day after the [] 120th or [XX] 240th full calendar month following the Commencement Date. If no time is checked, the box for 120th shall be deemed checked. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Buyer before the end of the term.

      1.2      **Construction or Raze and Rebuild**. If this Agreement is for Premises that require new construction of an ARCO branded gasoline facility or the razing and rebuilding of an ARCO branded retail facility, Buyer will promptly undertake such new construction or rebuilding and complete such construction or rebuilding and be ready to receive Gasoline delivery within 24 months, in the case of New Construction, or 12 months, in the case of a Razing and Rebuilding, of the Effective Date of this Agreement. If this Agreement is for Premises that require remodeling or retrofit, Buyer will promptly undertake such work and complete such remodeling or retrofit and be ready to receive Gasoline delivery within nine months of the Effective Date.

      2.      **Orders**. Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject

ARCO 40-WR1(4/2006)
CDGA



BP 02830

only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. BPWCP will use its best efforts to fill Buyer's orders; however, BPWCP may discontinue sale of any grade of Product at any time upon fifteen (15) calendar days' prior written notice to Buyer. At BPWCP's sole discretion, BPWCP reserves the right to provide ARCO branded motor fuels solely through an automatic Gasoline ordering and delivery system and to not accept individual orders placed by Buyer. Buyer agrees to accept and pay for such Product as BPWCP delivers to the Premises. Buyer shall provide accurate and timely information as reasonably requested by BPWCP in connection with the automatic gasoline inventory and delivery system.

      3.    <u>No Wholesaling.</u> Buyer will sell Product only to end users for their personal use in volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine, and an approved, properly labeled emergency container capable of holding ten gallons or less. The Premises shall be open for business seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day.

      4.    <u>Delivery.</u> BPWCP will deliver Product into Buyer's storage facilities described below. Title to and risk of loss of Product will pass to Buyer upon delivery into Buyer's storage facilities. BPWCP alone will select the method and mode of shipment and delivery. BPWCP expressly reserves the right to supply Product to other retail outlets whether owned and operated directly by BPWCP or by independent owners and operators, regardless of how near or far such other retail outlets may be located relative to the Premises.

      5.    <u>Prices.</u> For Product delivered hereunder, Buyer will pay the price specified by BPWCP in effect at the time and place of delivery for purchasers in Buyer's class of trade. Price shall be subject to change at any time, at the election of BPWCP, without notice. Should BPWCP elect to provide notice of price changes, it may do so by telephone, or at BPWCP's sole election, facsimile or electronic transmission. Buyer must have the capability to receive notices of price changes and invoices at the Premises by facsimile or electronic transmission. At BPWCP's sole discretion, to enable Buyer to compete more effectively with Buyer's competitors, BPWCP may from time to time grant Buyer a "temporary voluntary allowance"(TVA) applicable to Product to be sold by Buyer under this Agreement from metered dispensers on the Premises. If BPWCP determines that Buyer has accepted TVAs on Product which is not sold to motorists at retail through the metered dispensers on the Premises, BPWCP may terminate this Agreement, and the amount of any such TVA shall be due by Buyer to BPWCP on demand and BPWCP may offset such amount against any sums payable by BPWCP to Buyer. BPWCP may condition the payment of allowances on Buyer's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Buyer's retail selling price commensurate with the amount of the allowance.

      6.    <u>Payment.</u> Unless BPWCP extends credit to Buyer as provided below, Buyer will pay for Product prior to its delivery in U.S. dollars. BPWCP shall require a product advance payment approximately equal to the current cost of an average delivery of Product. BPWCP may increase or decrease the amount of the advance payment at any time to reflect current prices and Buyer will pay any additional amount necessary if the advance payment is increased. Payment will be made by electronic funds transfer initiated by BPWCP, wire transfer, cashier's check or business check, whichever BPWCP directs, delivered by Buyer at the time and place as designated by BPWCP. Buyer's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association). Payment will be deemed made when, and only when, its receipt has been verified by BPWCP. If this Agreement requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm or entity. If this Agreement requires or permits payment by wire transfer, all such payments shall be made to " BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by automated clearing house ("EFT"), all such payments shall be made to "BPWCP", c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number

ARCO 40-WR1 (4/2006)                2 of 18                          BP 02831
CDGA

unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by BPWCP. Buyer agrees to indemnify BPWCP for any loss or expense caused by Buyer's failure to comply with this Paragraph. Upon demand, Buyer will reimburse BPWCP the amount of any temporary voluntary allowance erroneously applied to Product other than Product sold under this Agreement from metered dispensers on the Premises. In addition to any other remedies available to it, BPWCP may offset against any future temporary voluntary allowance or against other amounts owed to Buyer the amount of any reimbursement to which BPWCP is entitled if Buyer fails to make any payment or reimbursement when due. Buyer acknowledges and agrees that BPWCP's receipt of payment due hereunder after the issuance of a notice of termination or nonrenewal does not constitute a waiver of BPWCP's termination or nonrenewal rights.

7.     Credit.  BPWCP may in its sole discretion from time to time extend credit to Buyer in whatever amounts and on whatever terms BPWCP alone selects. If BPWCP extends Buyer credit, BPWCP may withdraw it at any time without notice and for any reason. In BPWCP's sole judgment, BPWCP may do any or all of the following: (i) require that Buyer pay for Product by cashier's check, or bank wire transfer prior to delivery, (ii) require that Buyer post an irrevocable letter of credit issued by a bank satisfactory to BPWCP, (iii) require Buyer present evidence of financial solvency, and (iv) declare Buyer in default of this Agreement if Buyer fails to pay any indebtedness when due, provide evidence of financial solvency upon request or comply with any other term of this Agreement. Buyer agrees that regardless of whether and for how long BPWCP has extended it credit, BPWCP may cease extending credit at any time and instead require that payment be made in the manner set forth in this Paragraph or in Paragraph 6 above.

8..     Non-conformities.  Buyer will notify BPWCP in writing of the exact nature of any nonconformity in the type, quantity or price of any Product delivered to Buyer within thirty (30) calendar days after delivery. Buyer hereby waives any claim against BPWCP based on any nonconformity of which Buyer does not so notify BPWCP.

9.     Record Keeping.  For each delivery of Product, Buyer shall at all times keep a detailed record of the date and time of delivery, and the grade and amount of Product delivered expressed in terms of gallons. To assist BPWCP in determining the necessity of any temporary voluntary allowance described in Paragraph 5 above, Buyer will (i) sell all Product through metered dispensers which shall indicate the grade and amount of gasoline purchased, (ii) allow BPWCP to inspect Buyer's Product dispensers, recorders and meters, and books and records relating to delivery and Product inventory, and (iii) allow BPWCP to ascertain the volume of Product in Buyer's storage facilities.

10.     Equipment.

10.1     Storage and Dispensers.  Buyer will maintain storage tanks or other appropriate facilities on the Premises into which Product can be delivered. Buyer will ensure that the storage facilities are compatible with BPWCP's delivery equipment and Product formulations; that its storage facilities will accommodate such minimum quantities per single delivery as BPWCP may select; and that the Premises are configured in such a way that Product can be delivered to the Premises consistent with all applicable fire laws and regulations and other governmental requirements. Further, Buyer will ensure that all dispensing devices and storage facilities at all times be properly permitted and completely comply with all applicable governmental requirements and any specifications which BPWCP may issue from time to time. Buyer further agrees that Buyer's motor fuel dispensing devices shall be equipped at all times with Product filters with ten (10) micron filtering capacity. Without restricting any right or remedy of BPWCP, or imposing any duty or liability upon BPWCP, upon BPWCP's request, Buyer will promptly furnish BPWCP with written evidence that Buyer's dispensing devices and storage facilities comply with all governmental requirements and provide copies of underground storage tank permits and specifications, and allow BPWCP representatives to inspect the dispensing devices and storage facilities to confirm such compliance. BPWCP may suspend deliveries in the event that Buyer does not provide written evidence that the dispensing devices and storage facilities comply with all governmental regulations.

10.2   PIC Equipment.  Unless the Premises are located in the state of Oregon, Buyer is required by BPWCP to purchase or lease the PayQuick Island Cashier ("PIC Equipment") and install it at the Premises.  The PIC Equipment shall be of the type, number and configuration specified by BPWCP.

(a)  Buyer agrees to use the PIC Equipment only in connection with the operation of BPWCP authorized businesses.  Buyer agrees not to tamper with, alter, change, dislodge, displace, remove or otherwise interfere with the operational integrity of the PIC Equipment.  Buyer agrees to maintain PIC Equipment in a clean and fully operational condition at all times for the convenience of Buyer's customers.

(b)  Buyer will be responsible for all maintenance and repair of the PIC Equipment. Buyer will contract for maintenance services through BPWCP approved service providers and understands that BPWCP will not provide any maintenance and repair services.

(c) BPWCP will provide training to Buyer and up to 5 employees designated by Buyer to attend training.  Training is mandatory for Buyer or Buyer's designated manager.  There is no tuition for such training, but all expenses in connection with such training must be borne by Buyer.  If Buyer fails to attend training when originally scheduled, there may be a fee of $1000 to attend training.

(d)  Buyer's PIC Equipment will have one or more cash acceptors, except if, in the sole opinion of BPWCP, Buyer's Premises are appropriate exclusively for debit only PIC Equipment.  Unless the Premises have no cash acceptors, Buyer agrees to contract with an BPWCP approved licensed and bonded armored security service to do the following: make cash pick ups on a regular basis, but not less frequently than once per week, maintain possession of all keys to the outer door and the vault of the PIC Equipment, handle all removal of cash cassettes from the PIC Equipment and reinstall all empty cassettes into the PIC Equipment. Receipt paper will be changed only by armored security personnel or in their presence.

(e)  Buyer is required to install and operate the BPWCP approved Video Surveillance Equipment, the details of which will be provided to Buyer and which may be changed from time to time by BPWCP. In addition, Buyer must install, keep operational and use one or more video surveillance cameras dedicated to recording the customer activity at each PIC.

(f)  Buyer is responsible for maintaining a supply of receipt paper at the premises to be used in the PIC Equipment.

(g)  BPWCP grants to Buyer a non exclusive right and license to use the PayQuick Island Cashier service marks, trademarks and trade dress in conjunction with the operation of PIC Equipment at the Premises in a form prescribed by BPWCP.

(h)  All information regarding the PIC Equipment, including written manuals, specifications, data and instructions provided to Buyer are confidential and proprietary information of BPWCP and shall remain the exclusive property of BPWCP and shall not be duplicated, in whole or in part by Buyer and shall not be used other than as set forth herein and shall be maintained in confidence and not disclosed to anyone without the prior written consent of BPWCP.

(i)  Upon 180 days prior written notice, Buyer may be required to upgrade the PIC Equipment or purchase and install more technologically advanced cash, debit or other payment equipment in accordance with BPWCP's system wide equipment requirements at that time.

(j)  Buyer will install BPWCP approved Point of Sale equipment which is necessary to operate the PIC or other required payment equipment. Buyer will ensure that its Point of Sale equipment and motor fuel dispensers are compatible with the PIC Equipment.  In addition, VSAT satellite equipment is required for telecommunications purposes for which there is a fee for connection, repositioning and maintenance.

ARCO 40 WR-1 (4/2006)
CDGA

BP 02833

11.  Leak Prevention and Detection.  Buyer acknowledges and agrees that with respect to any Product storage facilities located on the Premises, including without limitation underground storage tanks and related equipment, Buyer is solely responsible for taking, and will take the following leak and water contamination prevention and detection measures:

11.1  Stick Readings.  Using a properly calibrated wooden tank measuring device and water finding paste, Buyer will gauge Product storage tanks for inventory loss or water gain on a daily basis.

11.2  Reconciliations.  Utilizing daily stick readings to the nearest one eighth (1/8) inch and dispenser meter readings, Buyer will take and reconcile opening and closing inventory levels by grade, including deliveries.

11.3  Record Retention.  Buyer will keep daily reconciliation records available on the Premises for at least five (5) years.

11.4  Monitoring.  Buyer will ascertain and perform any and all other monitoring procedures required by applicable laws, regulations or governmental authorities.

11.5  Secondary Containment.  Buyer will ascertain and perform any and all construction or retrofitting necessary to satisfy or comply with the secondary containment standards for underground storage tanks required by applicable laws, regulations or governmental authorities.  Buyer will ensure that all deliveries of ARCO Product are made into double walled tanks.

11.6  Notification.  Buyer will immediately investigate and report to BPWCP and all appropriate governmental authorities (i) any detectable loss or suspected loss that exceeds Regulatory variation limits of any Product, (ii) the activation or alarm of any leak detector or other continuous monitoring system, (iii) the discovery of any broken weights and measures seals or other seals in any Product dispenser, (iv) the discovery of any visible leak in any Product dispenser, Product piping or submerged pumps, (v) any change in the condition of the land or surface adjacent to fill boxes or dispensers, (vi) water in excess of one inch (1") in any storage container, or (vii) any spills or overfills that are not immediately and properly contained and cleaned up.  In the event of the occurrence of any of (i) through (vii) above, Buyer shall immediately investigate in accordance with regulatory leak detection requirements.  If a leak is confirmed all Product must be removed from the storage tanks immediately and the tanks secured.  In addition, Buyer will keep fill caps tight, keep fill boxes free of dirt, ice and snow, and immediately remove any water in excess of one inch (1") in any Product storage tank. Buyer will not permit any Product to enter any public or private water system, storm drain or sewage disposal system.

11.7  Training.  BP may offer training on environmental compliance. Such training will not exceed four (4) hours and will be offered on an annual basis or a lesser frequency if specified by BP. The training will be tuition free, but any expenses in connection with such training shall be borne by the Franchisee.

12.  Gasoline Regulations.

12.1  Compliance.  BPWCP will ensure that upon delivery to Buyer by BPWCP, all gasoline, will meet the specifications for lead and phosphorus set forth in the regulations promulgated by the United States Environmental Protection Agency ("EPA").  Buyer will ensure that no gasoline purchased from BPWCP is tampered with or contaminated in a way that could cause the gasoline not to meet the EPA's specifications or any other specifications required by law.  Buyer will immediately cease dispensing any gasoline that is determined not to meet such specifications

12.2    <u>Disclosures and Warnings.</u>    Buyer acknowledges that it has been fully informed of and is aware of the nature and existence of risks posed by transporting, storing, handling and being exposed to Product. Buyer will inform its employees, agents, contractors and customers of such risks. Buyer will display, publish and distribute any safety warnings or disclosures as may be requested or required by BPWCP or any governmental authority from time to time.

13.    <u>Taxes.</u>

13.1    <u>Payment by Buyer.</u>    Buyer will pay promptly when due and hold BPWCP harmless from all taxes, excise fees and other similar charges (including interest, penalties and additions to tax) which BPWCP is now or in the future required to pay or collect under any federal, state or local governmental requirement based on the manufacture, production, sale, transfer, transportation, delivery, storage, handling, consumption or use of Product under this Agreement, or on any payments made under this Agreement (excepting any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon). BPWCP may, at its sole option, add any such tax, excise fee or similar charge to the amount to be charged for Product. Buyer will also pay promptly when due and hold BPWCP harmless from all fees and sales, use, rental, gross receipts, inventory, excise, income and other taxes (including interest, penalties and additions to tax but not including any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon) imposed by any federal, state or local governmental authority upon Buyer or BPWCP in connection with the operation of Buyer's business.

13.2    <u>Inapplicability of Reseller Exemption.</u>    With respect to Product purchased hereunder, Buyer hereby waives any exemption and agrees not to assert any right of exemption from payment to BPWCP of taxes regularly collected by BPWCP upon delivery of Product to purchasers within Buyer's class of trade by virtue of any reseller or wholesale-distributor exemption to which Buyer may presently or hereafter be entitled under any provision of federal, state or local law regulation or order.

13.3    <u>Tax Information.</u>    Buyer will provide BPWCP with Buyer's motor fuel seller number and use tax registration number. Further, Buyer will provide BPWCP with any information requested by BPWCP relating to tax credits claimed by Buyer for motor fuel, sales, use and other taxes paid by Buyer in connection with the Product for the purpose of resolving any threatened or pending tax dispute with any governmental authority or for the purpose of confirming Buyer's compliance with the terms of this Agreement.

14.    <u>Trademarks and Trade Dress.</u>

14.1    <u>Compliance.</u>    Within one hundred fifty (150) calendar days after the Commencement Date if this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises and upon the Commencement Date if this is not the first agreement between Buyer and BPWCP for the supply of Product at the Premises, unless BPWCP consents otherwise in writing, Buyer will have fully complied with all trademarks and trade dress requirements set forth in Exhibit A. Thereafter, throughout the term of this Agreement, Buyer shall fully comply with all trademarks and trade dress requirements as they may be changed from time to time. Notwithstanding the foregoing, Buyer must have the ARCO I.D. sign, I.D. pole, price pods, and decal specifications for pumps and dispensers as described in Exhibit A (as it may be changed from time to time) in place as soon as Buyer is selling ARCO branded Product but not later than the fifth delivery of Product hereunder and not before Buyer is selling ARCO branded Product under the ARCO trademarks described below. Buyer hereby agrees that BPWCP may and acknowledges that in all likelihood BPWCP will change such requirements from time to time. Buyer will conform its trademarks and trade dress to all such changed requirements within ninety (90) calendar days after receiving written notice from BPWCP of any change. In its sole discretion, BPWCP may loan to Buyer various items of trade dress such as signs, illuminated sign poles, sign faces with a numerals kit and pump identification signs. Buyer hereby agrees that any trade dress which BPWCP provides to Buyer hereunder shall remain the property of BPWCP regardless of whether it is affixed to the Premises. Buyer shall ensure that no such loaned trade dress is removed from the Premises by persons other than BPWCP or

6 of 18

BP 02835

its representatives either during or after the term of this Agreement without BPWCP's prior written consent. Buyer shall bear the cost of maintaining, repairing and replacing such loaned trade dress.

14.2    Licenses.    During the term of this Agreement, in connection with the resale of Product, Buyer may display the trademarks, trade names, advertising, signs, devices, symbols, slogans, designs and other trade indicia adopted, used or authorized for use by BPWCP in connection with Product (collectively, "Marks"), provided that (i) Buyer operates the Premises seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day, (ii) the Marks are only displayed or used in the manner specified by BPWCP, and (iii) all trademark rights resulting from such display or usage shall inure to BPWCP's benefit. BPWCP reserves the right to substitute another trademark for ARCO or withdraw or modify any of the Marks or their manner of display without prior notice to Buyer. Upon receiving notice of any withdrawal or modification of the Marks or substitution of another trademark, Buyer will fully implement any modification or termination or substitution within the time specified in the notice and such other trademark shall be deemed substituted for the "ARCO" trademark in all references to Gasoline and Product in this Agreement. If Buyer fails to comply fully with any notice of withdrawal or modification, in addition to any other remedies available to BPWCP for breach of this Agreement, BPWCP may demand that Buyer immediately remove all Marks from the Premises at Buyer's sole expense. If Buyer fails to do so, BPWCP or BPWCP's contractor may enter the Premises and remove all Marks, and Buyer will reimburse BPWCP for such removal.

14.3    Shared Expenses.    BPWCP will reimburse Buyer a portion of the cost of acquiring, transporting and installing certain signs and other trade dress required hereunder and set forth in Exhibit B, as specified below. The amount of such reimbursement shall be the lesser of (i) one half of Buyer's actual verifiable cost, or (ii) the maximum amount indicated on Exhibit B. The reimbursement shall apply on a one-time only basis to the Premises during its entire franchise relationship with BPWCP regardless of whether this is the first or a subsequent agreement between Buyer and BPWCP for the supply of Product at the Premises. Buyer shall be solely responsible for the cost of maintaining, repairing and replacing all trade dress. Request for the foregoing reimbursement shall be in writing and accompanied by all original invoices (of which Buyer shall keep copies). Upon receiving such a request, BPWCP shall inspect Buyer's facility to confirm that the trade dress is of the proper type and properly installed and verify Buyer's actual cost. If BPWCP confirms that the trade dress meets BPWCP's requirements and verifies Buyer's submitted cost as accurate, then BPWCP shall either reimburse Buyer the amount described above or pay the entire cost of such trade dress directly to the third party vendor, whichever BPWCP alone chooses. If BPWCP elects to pay the third party vendor directly, then within five (5) calendar days after receiving notice from BPWCP that such payment will be or has been made, Buyer will remit to BPWCP the difference between the amount of the invoice and the amount of BPWCP's reimbursement as calculated above. Further, BPWCP may arrange directly with a third party vendor to satisfy the requirements of this Paragraph 14.3 and collect from Buyer in advance upon five days' notice, an amount equal to the total maximum reimbursements to which Buyer is entitled under this Paragraph and Exhibit B, to cover Buyer's share of the cost of trade dress expenses. Should the amount of this advance payment exceed one half of the actual cost of satisfying the trade dress requirements herein, BPWCP will refund the excess amount to Buyer. If the amount of the advance payment is less than the actual cost of satisfying the trade dress requirements herein, then Buyer shall pay BPWCP the amount of the deficiency upon demand. In addition to all other remedies available to it, BPWCP may offset against any amounts owed to Buyer, the amount of any remittance owing to BPWCP hereunder. Notwithstanding this Paragraph 14.3, Buyer may be obliged to pay BPWCP for any reimbursements received and direct vendor payments made by BPWCP hereunder upon the termination or nonrenewal of this Agreement as specified in Paragraph 17.3.

14.4    Restrictions.    Buyer will not adulterate, mislabel, misbrand or contaminate Product; add any ingredients to Product without BPWCP's prior written consent; use any Mark except in connection with genuine ARCO Product; claim any right, title or interest in or to the Marks; directly or indirectly deny or assail or assist others in denying or assailing the sole and exclusive ownership of BPWCP in and to the Marks; register, adopt as its own property, or use or assist others in registering, adopting, or using any trademarks, trade names, advertising, signs, devices, symbols, slogans, designs, or other trade indicia confusingly similar to the Marks; or commit other trademark violations or acts that could disparage

7 of 18

the Marks or adversely affect the value of the marks or BPWCP's goodwill and ownership rights hereto. Any rights to any Marks obtained by Buyer contrary to the foregoing shall be held in trust for BPWCP and, upon request, Buyer will assign such rights free of charge to BPWCP.

    14.5.   Standards. The Premises must be clean, well maintained, and graffiti free, with structures, driveways and pavement in good repair. BPWCP will perform periodic inspections for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

15.    Compliance and Indemnification.

    15.1   Compliance With Laws and Regulations. Buyer shall comply with any and all applicable federal, state and local laws and regulations, including those pertaining to human health, safety or the environment, and shall further comply with any and all permits or license pertaining to the Premises. Any references in this Paragraph 15.1 to laws or regulations shall include all such laws and regulations pertaining to Product, or the air, or surface or subsurface water, surface or subsurface soil, and the handling, storage and disposal of hazardous substances, materials or wastes, or solid wastes (whether or not defined as hazardous by such laws or regulations), and vapor recovery and vapor recovery equipment Buyer shall comply with any and all operating, reporting and record keeping laws and regulations, as well as all operating, reporting and record keeping procedures designed to ensure that no unauthorized release of any Product occurs, and that in the event any Product is released, all applicable reporting, record keeping and cleanup requirements are fully complied with.

    15.2   Indemnification. Buyer will indemnify and hold harmless BPWCP, its affiliates, subsidiaries, shareholders, directors, officers, employees and other representatives (and shareholders, directors, officers, employees and other representatives of such affiliates and subsidiaries) (collectively, "Indemnified Parties") from and against all claims, causes of action, liabilities, suits, demands; legal proceedings, governmental actions, losses and expenses, including without limitation reasonable expert and attorneys fees and costs (collectively, "Indemnified Expenses"), arising out of (i) any breach by Buyer (or any of its officers, employees or representatives) of any provision of this Agreement, (ii) the storage, leakage or other release of Product on, or from the Premises, (iii) any cleanup, remediation or response activity conducted or ordered under applicable law, (iv) Buyer's use or occupancy of the Premises, (v) Buyer's operation of the business or use, custody or operation of BPWCP-owned equipment or any other equipment on the Premises, excepting any loss or damage arising solely from BPWCP's negligence or failure to perform its obligations hereunder, or (vi) any intentional or unintentional violation by Buyer of any government requirement applicable to the Premises or Buyer's storage or sale of Product, or the disclosure or warning of risks associated with Product at the Premises. This indemnification obligation shall survive the termination or nonrenewal of this Agreement.

    15.3   Liability for Charges or Fines. In the event that BPWCP becomes liable for payment of any charges or fines arising out of Buyer's noncompliance with any governmental laws or regulations or Buyer's failure to secure any necessary licenses or permits or renewals thereof, now or hereafter necessary, in connection with the possession and use of the equipment and other property or the conduct of business on the Premises or Buyer's failure to pay any taxes, imposts or charges imposed by any governmental authority, BPWCP shall have the right to charge Buyer the amount of any such charge or fine paid by BPWCP.

    15.4 Reporting. Buyer shall report to BPWCP within 24 hours each incidence of major personal injury or criminal activity. All other incidences of personal injury or criminal activity shall be reported as soon as practicable, but in no event later than 72 hours. Buyer will display display signage regarding BPWCP's crime deterrence and reward offer in the manner specified by BPCWP. BPWCP reserves the right to change or withdraw any reward offer in its sole discretion in which case, Buyer will remove or replace the signage immediately upon notice.

    16.   Insurance. Buyer shall obtain and maintain throughout the term of this Agreement each of the following forms of insurance from a financially sound and reputable insurance carrier: (i) workers'

8 of 18

compensation insurance including occupational disease insurance in accordance with the laws of the State in which the Premises are located, and employers' liability insurance in an amount of at least $100,000 disease each employee and $100,000 each accident; and ( ii ) garage liability insurance or general liability insurance, including contractual liability, insuring Buyer's indemnity obligation set forth above, and products—completed operations coverage, in amounts of at least $1,000,000 combined single limit each occurrence applicable to personal injury, including bodily injury, sickness, disease or death and loss of or damage to property (with liquor law liability coverage if Buyer will sell or dispense alcoholic beverages), on which BPWCP is named as an additional insured. Buyer will furnish BPWCP with certificates of insurance evidencing the foregoing coverage and providing that no policy of insurance may be cancelled or materially modified without at least thirty (30) calendar days' prior written notice to BPWCP. Buyer hereby understands and agrees that coverage provided BPWCP by Buyer's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

17.    <u>Termination and Nonrenewal.</u>

17.1    <u>Triggering Events for Termination or Nonrenewal.</u>  In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may terminate or nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement following written notice to Buyer from BPWCP of such failure and fifteen calendar days to cure such failure.

(b)    Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Buyer relevant to the operation of the Premises.

(c)    Declaration of bankruptcy by Buyer or judicial determination of insolvency of Buyer.

(d)    Subject to Paragraph 18.3 hereof, the death or the prolonged severe physical or mental disability or disablement of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation) or any of Buyer's general partners (if Buyer is a partnership) for at least three (3) months which renders Buyer unable to provide for the continued proper operation of the Premises.

(e)    The loss of Buyer's right to possess the Premises.

(f)    The condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain.

(g)    The destruction of all or a substantial part of the Premises.

(h)    Buyer's failure to timely pay BPWCP all sums to which BPWCP is legally entitled.

(i)    Buyer's failure to operate the Premises for seven (7) consecutive calendar days, or any lesser period which constitutes an unreasonable period of time.

(j)    The willful adulteration, commingling, mislabeling or misbranding of Product or other violations by Buyer of the Marks.

(k)    Buyer's knowing failure to comply with federal, state or local laws or regulations relevant to the use or operation of the Premises.

ARCO 40 WR-1 (4/2006)
CDGA

BP 02838

(l)    The conviction of any felony involving moral turpitude or indictment for any criminal misconduct relevant to the operation of the Premises of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation), Buyer's majority owning member (if Buyer is an LLC) or any of Buyer's general partners (if Buyer is a partnership).

(m)    The determination by BPWCP, made in good faith and in the normal course of business, to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises are located.

(n)    The occurrence of any other event relevant to the relationship between the parties which makes termination or nonrenewal reasonable, including without limitation those set forth in Paragraph 17.2 below.

(o)    The breach by Buyer of any material provision of this Agreement, which Buyer hereby agrees includes (without limitation) ( i ) Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand, (ii) Buyer's failure to keep a detailed record of each delivery of Product to Buyer or make those records available to BPWCP as provided in Paragraph 9, ( iii ) Buyer's failure to take any of the leak prevention and detection measures outlined in Paragraph 11, (iv) any attempt by Buyer to assign any interest in this Agreement without BPWCP's prior written consent, and (v) failure to complete construction or rebuilding within the time as set forth in Paragraph 1.2.

(p)    If Buyer is a party with BPWCP to a Loan Agreement or a Loan Agreement and Security Agreement and Related Promissory Note, and Buyer fails to cure any default under the foregoing Loan Agreement, Loan Agreement and Security Agreement and Promissory Note as requested, BPWCP may terminate this Agreement.

17.2    **Triggering Events for Nonrenewal.** In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to agree to changes or additions to its franchise relationship with BPWCP, which BPWCP requests based on BPWCP's determinations made in good faith and the normal course of business and without the purpose of preventing the renewal of the franchise relationship.

(b)    BPWCP's receipt of numerous bona fide customer complaints concerning Buyer's operation of the Premises, of which Buyer was apprised and, to the extent they related to the condition of the Premises or conduct of Buyer or Buyer's employees, which Buyer failed to cure promptly.

(c)    Failure of Buyer to operate the Premises in a clean, safe and healthful manner on at least two previous occasions.

(d)    A good faith determination by BPWCP made in its normal course of business that renewal of the franchise relationship is likely to be uneconomical to BPWCP despite any reasonable changes or additions to the agreements between the parties, which may be acceptable to Buyer.

17.3    **Effect of Termination or Nonrenewal.** After receiving notice of termination or nonrenewal and until the effective date of the termination or nonrenewal, Buyer will continue to operate the Premises in accordance with this Agreement.

(a)    From and after the effective date of termination or nonrenewal, Buyer will immediately discontinue all use of trade dress and Marks associated with BPWCP, including without limitation use of such trade dress and Marks on dispensers, pumps, containers, storage equipment,

10 of 18

buildings, canopies, pump islands, pole signs, advertising, stationery and invoices. From and after the effective date of termination or nonrenewal, Buyer will not adopt or use any trademarks trade dress or symbols in the operation of the Premises that are confusingly similar to BPWCP's, including without limitation, any four letter name or mark starting with ( i ) the letter "A" or ( ii ) any vowel and having the letter "R" as a second letter, and Buyer will not use or employ as a symbol, mark or design any geometric design that is red or any colored horizontal striping that is predominately red and blue. Further, Buyer will remove from all trade directories and telephone book listings all reference to the Marks. Upon the effective date of the termination or nonrenewal, Buyer will promptly return to BPWCP or destroy, whichever BPWCP directs, all signs, advertising, graphics and other materials in Buyer's possession bearing any Marks or used in any trade dress. In addition, Buyer hereby agrees that BPWCP may enter the Premises to remove or cover up any trade dress or advertisements bearing any Marks. If Buyer terminates or does not renew this Agreement or if BPWCP terminates or does not renew this Agreement for a reason set forth in Paragraph 17.1 or 17.2 above, then Buyer shall pay for the removal or covering up of all trade dress and trademarks as required hereunder. For a reasonable period following the effective date of Buyer's termination or nonrenewal and at no charge, BPWCP may keep any BPWCP property still located on the Premises in place while negotiating for its sale or removal.

(b)     If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises, Buyer will repay BPWCP all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon (i) the mutual termination of this Agreement prior to or at the end of the first twelve months, (ii) the termination of this Agreement by BPWCP or Buyer during the first twelve months or (iii) the nonrenewal of this Agreement by BPWCP or Buyer at the end of the first twelve months (if this is a trial franchise as defined under Section 2803 of the PMPA).

(c)     If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises with a term of more than one year and Buyer has been a party to an agreement regarding the Premises with BPWCP for the supply of Product for less than thirty-six months, then after the first twelve months Buyer will pay BPWCP, on a pro rata basis as described below, the amount of all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon the mutual termination of this Agreement or termination or nonrenewal by Buyer or by BPWCP for a reason set forth in Paragraph 17.1 or 17.2 above. The pro rata amount which Buyer is obligated to pay shall be calculated by multiplying the total of the reimbursements and direct payments made by BPWCP under Paragraph 14.3 times (a) two-thirds during the thirteenth through twenty-fourth month of this Agreement or (b) one-third during the twenty-fifth through thirty-sixth month of this Agreement.

18.     Assignment, Right of First Refusal and Successors In Interest.

18.1     Assignment.  Buyer will not sell, (or allow Buyer's foreclosing lender to complete a sale), assign, give or otherwise transfer, any interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements on that constitute the Premises, to any individual or entity other than BPWCP, without first complying with Paragraph 18.2 below and obtaining BPWCP's prior written consent to such transfer, which consent shall not be unreasonably delayed or withheld. Further, if Buyer is a corporation or partnership or LLC, neither Buyer nor any shareholder, member or partner of Buyer will sell, assign, give or otherwise transfer, or mortgage, pledge as security or otherwise encumber any shares of stock, partnership interest or other ownership interest in Buyer to any individual or entity without BPWCP's prior written consent. To ensure that BPWCP has adequate time to evaluate any assignment or transfer request, Buyer will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request. A request for consent made less than 45 days before the expiration date of this Agreement will be considered a request for consent to the renewal agreement, provided that one has been offered to Buyer. Buyer acknowledges and agrees that any transfer, encumbrance, attempted transfer or attempted encumbrance which does not satisfy these prerequisites shall be void and without effect. Buyer further acknowledges and agrees that BPWCP may impose a transfer fee upon any transfer or encumbrance of Buyer's interest in its franchise relationship with BPWCP. The fee is currently $1,000, but BPWCP reserves the right to raise the fee to a maximum of $4,000.

ARCO 40 WR-1 (4/2006)
CDGA

BP 02840