18.2    <u>Right of First Refusal.</u> In return for valuable consideration, Buyer's receipt of which is hereby acknowledged, (i) upon receiving or extending any final offer to acquire any or all of Buyer's interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements that constitute the Premises, whether conveyed through a business broker or directly, to any entity or person other than Buyer's current spouse or adult child (natural or adopted)or (ii) upon the recordation of a Notice of Default that commences Buyer's lender's foreclosure of a mortgage or deed of trust encumbering the Premises, Buyer shall offer such interest to BPWCP, in writing, at the same price and on the same other terms as those contained in the final offer or Notice of Default. Buyer shall give BPWCP a complete, legible copy of the final offer including a breakdown of the amount for real property, equipment and goodwill, all agreements in connection with the proposed sale and the name and address of the proposed buyer/transferee.. In the case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding. Buyer shall give BPWCP a complete, legible copy of the recorded Notice of Default and any later recorded Notice of Sale. BPWCP shall have thirty (30) calendar days after its receipt of all data and documentation required by it to evaluate the offer and exercise its right of first refusal by notifying Buyer in writing that it intends to exercise its right of first refusal and agreeing to pay Buyer the purchase price, less the amount of any applicable transfer fee, on the terms stated in the final offer, or the amount required to pay the foreclosing lender to terminate the foreclosure proceeding, as applicable. During the 30 day period, BPWCP shall have the right of entry upon the premises to conduct reasonable environmental testing. If BPWCP exercises its right of first refusal, each time period in the final offer will be automatically extended so that it starts on the date that BPWCP exercised its right of first refusal. BPWCP may assign its right of first refusal to any third party. If BPWCP does not exercise its right of first refusal, Buyer may consummate the proposed transfer, but not at lower price or on more favorable terms than those offered to BPWCP. If Buyer does not do so within one hundred eighty (180) calendar days after the date BPWCP received Buyer's written offer, then Buyer must recommence the foregoing right of first refusal procedure and satisfy the requirements of this Paragraph 18.2. BPWCP's exercise of its right of first refusal shall not be dependent on its prior refusal to approve the proposed transferee. Buyer agrees to execute a memorandum of this Agreement to be recorded in the Official Records of the county where the Premises are located and take all other action necessary to give effect to this right of first refusal.

18.3    <u>Successors In Interest.</u> Notwithstanding Paragraphs 18.1 and 18.2, if upon the death or incapacitation for more than ninety (90) consecutive calendar days of Buyer (if Buyer is a natural person), a general partner of Buyer (if Buyer is a partnership) or a majority shareholder of Buyer (if Buyer is a corporation), or majority-owning member of an LLC (if Buyer is an LLC), the interest in this Agreement of such deceased or incapacitated person passes directly to an eligible person or persons whom the deceased or incapacitated has designated as his successor in interest, in writing in a form prescribed by and filed with BPWCP, and who notifies BPWCP within twenty-one (21) calendar days after the death or incapacitation of his intention to succeed to such interest, then this Agreement shall continue for the remaining term hereof, provided that such successor in interest agrees in writing to assume all of the obligations under this Agreement of the deceased or incapacitated and satisfies BPWCP's then current criteria for similar franchises. A person who is eligible to be designated a successor in interest is one who is (i) the adult spouse or adult child (natural or adopted) or parent of the deceased or incapacitated, (ii) a general partner of the deceased or incapacitated, (iii) a fellow shareholder of the deceased or incapacitated, (iv) a fellow member of the deceased or incapacitated or, (v) if Buyer is a sole proprietor, a designated legal heir. Only the most recently properly designated successor in interest will be recognized as such. If Buyer has a spouse and designates someone other than Buyers spouse, Buyers spouse must agree to the designation.

18.4    <u>BPWCP's Right to Assign.</u> BPWCP shall have the unrestricted right to transfer or assign all or any parts of its rights or obligations under this Agreement, including its right of first refusal described in Paragraph 18.2, to any person or legal entity.

19.    <u>Miscellaneous</u>

19.1    <u>Right of Entry.</u>  Buyer hereby gives BPWCP the right to enter the Premises at all reasonable times and without prior notice, to determine Buyer's compliance with the provisions of this Agreement.  BPWCP may determine Buyer's compliance by any means BPWCP selects, including without limitation, the sampling and laboratory testing of Product.

19.2    <u>Successors and Assigns.</u>  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Buyer shall have no right to assign this Agreement, either voluntarily or by operation of law, except as provided in Paragraph 18 above.

19.3    <u>Force Majeure.</u>  In the event that either party hereto shall be delayed or unable to perform any act required hereunder by reason of Act of Nature, strikes, lockouts, riots, insurrection, war, governmental act or order, or other reason of a like nature not the fault of or in the control of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  The provisions of this Section shall not operate to excuse Operator from prompt payment of all fees or any other payments required by the terms of this Agreement.

19.4    <u>Notices.</u>  Except as limited by applicable law or as otherwise stated in this Agreement, any and all notices and other communications hereunder shall be deemed to have been duly given when delivered personally or forty-eight (48) hours after being mailed, certified or registered mail or overnight mail, return receipt requested, postage prepaid, in the English language, to the Premises if to Buyer and to the address set forth on the first page of this Agreement if to BPWCP, unless otherwise directed in writing by BPWCP.

19.5    <u>Relationship of the Parties.</u>  Buyer agrees that nothing in this Agreement creates a joint venture, agency, employment partnership or similar relationship between it and BPWCP, and Buyer shall have no authority to bind BPWCP in any way.  Buyer will not assert otherwise.  Buyer shall undertake all obligations as an independent contractor and shall exercise and be responsible for the exclusive control of the Premises, the employees and all activities conducted there. Operator shall be responsible for complying with all the applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws. BPWCP shall have no control over employees of the Operator, including without limitation the terms and conditions of their employment. Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

19.6    <u>Waiver.</u>  No purported waiver by either party hereto of any provision of this Agreement or of any breach thereof shall be deemed to be a waiver of such provision or breach unless such waiver is in writing signed by the party making such waiver.  No such waiver shall be deemed to be a subsequent waiver of such provision or a waiver of any subsequent breach of the same or any other provision hereof.

19.7    <u>Compliance.</u>  Buyer shall at all times comply with all laws and applicable government requirements and obtain and maintain all necessary licenses and permits for the performance of its obligations hereunder.

19.8    <u>Authority.</u>  Buyer hereby represents that as of the date hereof, Buyer has the authority to enter into this Agreement and that no consents of third parties other than those which have been obtained and are attached hereto are necessary to enable Buyer to perform its obligations hereunder. Buyer represents that as of the date of this Agreement, Buyer is in compliance with all leases, contracts and agreements affecting the Premises and Buyer's use and possession of the Premises.

13 of 18

ARCO 40 WR-1 (4/2006)
CDGA

BP 02842

19.9    <u>Prior Course of Dealing.</u>  BPWCP and Buyer acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Buyer and BPWCP by their authorized representatives.

19.10    <u>Further Assurances.</u>  Buyer agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

19.11    <u>Non-exclusivity.</u>  Buyer has no exclusive territory.  BPWCP may establish additional ARCO or other brand or no brand Gasoline or other fueling facilities in any location and proximity to the Premises.

19.12    <u>Other Businesses.</u>  In order to ensure that there is no interference with access for delivery trucks, storage or delivery, Buyer will obtain BPWCP's prior written consent to the placement of any other businesses or equipment on the Premises which consent will not be unreasonably delayed or withheld.

19.13    <u>Ethics.</u>  Buyer acknowledges that giving payments or other inducements to any employee or agent of BPWCP in connection with this Agreement or Buyer's franchise relationship with BPWCP violates BPWCP's ethical policies and entitles BPWCP to terminate this Agreement. Franchisee shall notify BPWCP's Security Department if any employees or agents solicit payments or other inducements.

19.14    <u>Applicable Law.</u>  Except where this Agreement would otherwise be governed by federal law, this Agreement shall in all respects be interpreted, enforced and governed under the laws of the state where the Premises are located.  If any provision of this Agreement should be determined to be invalid or unenforceable, such provision shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions of this Agreement enforceable, and the Agreement as thus amended shall be enforced to give effect to the intention of the parties insofar as that is possible.

19.15    <u>Headings and Gender.</u>  The paragraph headings in this Agreement are intended solely for convenience of reference and shall not in any way or manner amplify, limit, modify or otherwise affect the interpretation of any provision of this Agreement, and the neuter gender and the singular or plural number shall be deemed to include the other genders or numbers whenever the context so indicates or requires.

19.16    <u>Entire Agreement.</u>  This Agreement and the exhibits attached hereto and any written agreements executed contemporaneously with this Agreement relating to the Premises, set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings between the parties, pertaining to the subject matter hereof, and, except as otherwise expressly provided herein, no change in, deletion from or addition to this Agreement shall be valid unless set forth in writing and signed and dated by the parties hereto.

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

BP 02843

Buyer hereby acknowledges having read this Agreement in its entirety and fully understands and agrees to its contents. No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BP West Coast Products LLC

Nazim Faquiryan
5-8-2007

BPWCP

_Cherry Heath_                          Buyer: _____

Name _____                    Name _Sa[j]d Faquiryan_

Title: _Supervisor_                      Title: _President_

Witness: _cccnveg_                       Witness: _Brad Christian_ Brad
                                                  Christian

Each of the undersigned, as owner, part owner, mortgagee or lien holder, for himself and his legal representatives, successors and assignees, hereby consents to the foregoing agreement, including without limitation, to the installations, maintenance, repair, replacement and removal of all required trade dress and trademarks. Each of the undersigned further waives any interest in, right to levy upon, mortgage or otherwise make any claim against any such trade dress or trademarks and confirms BPWCP's title to and right of removal of any property provided or loaned by BPWCP.    5-8-2007

Name _____                    Name _____

Title: _____                   Title: _____

Witness: _____                 Witness: _____

ARCO 40 WR-1 (4/2006)
CDGA

15 of 18

70

BP 02844

Exhibit A

<u>Trade Dress Requirements</u>

See Attached booklet entitled "Minimum Trademark Standards, Trade Dress Requirements and Trade Dress Options for Selling ARCO Branded Motor Fuels at Retail Outlets".

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

BP 02845

Exhibit B

Shared Trade Dress Costs for ARCO Branded Gasoline Only

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| All Exterior Decals | 100% BPWCP | |
| Interior Decal Kit | 100% BPWCP | |
| Illuminated Building Bullnose | 100% BPWCP | Max. 100 Feet, 50/50 thereafter |
| Canopy  Bullnose LED | 50/50 | |
| Non-illuminated Canopy Bullnose (back of Canopy) | 100% Dealer | |
| ID Sign - Freeway -- Sign/Face Only | 100% BPWCP | |
| ID Sign Fwy - Pole and Foundation | 100% Dealer | |
| ID Sign  Face | 100% BPWCP | |
| ID Sign Foundation and Architectural Veneer/Pole | 100% Dealer | |
| ID Sign - Building - 3 x 10 ARCO Logo Sign | 100% BPWCP | |
| Non-ID Sign - 24 Hour Signs | 100% Dealer | |
| Non-ID Sign - Metal Info Signs – Bumper Post, , Tax | 50/50 | |
| Paint | 100% Dealer | |
| Permits for Signage | 100% Dealer | |
| Coming Soon Banners Pump Toppers (all hardware) | 100% BPWCP 50/50 | |
| Quick Crete Cement Trash Container | 100% Dealer | |
| Tank Tags | 100% BPWCP | |
| Channel Letter | 100% BPWCP | |

BP 02846

ARCO 40 WR-1 (4/2006)
CDGA

Exhibit B (Continued)

| Trade Dress Item | Cost – % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| Canopy Sparks | 100% BPWCP | (Max. 4 Sparks) |
| VSAT Equipment: (1) Hughes Satellite Dish100% Dealer and (2) Hughes Indoor Unit – Satellite Receiver (3) Deicer (if required for colder climate) | 100% Dealer | |

* Any costs not set forth as being paid or shared by BPWCP shall be at the sole expense of the Operator/Buyer

This space is intentionally left blank.  –

ARCO 40 WR-1 (4/2006)
CENA

18 of 18

73

BP 02847

AMENDMENT TO CONTRACT
DEALER GASOLINE AGREEMENT

**(Branded Diesel Fuel)**
Facility: <u>82461</u>
Customer Account: <u>0996439</u>

THIS AMENDMENT, dated as of _July 11, 2006_, amends the Contract Dealer Gasoline Agreement ("Agreement") dated _July 11, 2006_, between BP West Coast Products LLC, organized in Delaware ("BPWCP") and <u>STTN Enterprises, Inc.</u> ("Buyer") with delivery premises at <u>631 San Felipe Road, Hollister, CA 95035</u> ("Premises").

It is hereby agreed by and between the parties that effective on the date written above or the Commencement Date of the Agreement, whichever is later, the Agreement is hereby amended to provide that except as set forthbelow, any references to "motor fuels comprising gasolines and gasoline-containing materials bearing the ARCO trademark and other identifying symbols," "gasoline" and "product" shall be construed to include such motor fuels comprising diesel fuel and diesel fuel-containing materials bearing the ARCO trademark and other identifying symbols ("ARCO branded diesel fuels and diesel fuel-containing materials") as Buyer may purchase and receive from BPWCP and BPWCP may sell and deliver to Buyer at the Premises during the term hereof.

It is understood and agreed by and between the parties that Temporary Voluntary Allowances ("TVA's") are not applicable to diesel fuel or diesel fuel-containing materials and, therefore, the terms and conditions relating to TVA's set forth in the Prices provisions, Paragraph 5 of the Agreement, are not amended and supplemented by this Amendment. It is further understood and agreed by and between the parties that, except as herein specifically amended and supplemented, all other terms and conditions of the Agreement, as previously amended and supplemented, shall be and remain in full force and effect.

This Amendment automatically supersedes and terminates, as of the Effective Date hereof, any and all other contracts, agreements or understandings between the parties covering the sale and delivery of ARCO branded diesel fuels and diesel fuel-containing materials to Buyer at the Premises for resale therefrom.

BUYER ACKNOWLEDGES THAT BUYER HAS READ THIS AMENDMENT AND FULLY UNDERSTANDS ALL OF THE TERMS, PROVISIONS AND CONDITIONS HEREOF.

This Amendment is not binding until executed by Buyer and by an authorized officer or manager of BPWCP.

IN WITNESS WHEREOF, the parties have executed this Amendment.

**BP West Coast Products LLC**

**Franchisee**
**STTN Enterprises, Inc.**

_____ 7-11-06            _____ 5/30/0
                          Date              Nazim Faquiryan            Date

_____ 7-11-06
Witness                   Date

74

BP 02848

Facility #82461
AR#0996439

Contract Dealer
Access and Maintenance Services Agreement
For VSAT Equipment

Agreement between STTN Enterprises, Inc. ("Owner") and BP West Coast Products LLC ("BPWCP") dated _July 11, 2006_ .

WHEREAS

Owner operates an ARCO gasoline franchise located at 631 San Felipe Road, Hollister, CA 95035 ("Premises").

Whereas the Owner is required to utilize VSAT equipment for communication in connection with the operation of the franchise business

BPWCP has an agreement for access and maintenance services with Hughes Network Systems ("HNS") for maintaining the very small aperture terminal ("VSAT") Equipment at ARCO locations.

THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. BPWCP will notify HNS that Owner is to receive the same maintenance services for the Equipment listed in Exhibit "A" as BPWCP receives for the same or similar equipment.

2. PES Maintenance Service
   a. HNS shall provide the hub access and Maintenance Services to keep the Personal Earth Station ("PES") Equipment listed in Schedule A in, or restore the Equipment to, good working order, subject to the terms and conditions hereinafter provided.
   b. Owner agrees to provide HNS with full, free and safe access to Equipment.
   c. HNS will restore Owner's PES Equipment to good working condition by performing the following corrective maintenance as required:
      i. Diagnostic testing to determine the existence and cause of the malfunction
      ii. Removal and replacement of any malfunctioning Equipment
      iii. Reorientation (repointing) of the antenna subsystem
      iv. Repair and replacement of PES interconnecting cables
      v. Reloading initializing instructions and recommissioning
      vi. Verification of proper operations and completion of service report
      vii. Notification to the Owner host that Equipment has been restored to operational status
      viii. Repairs for outages caused by birds' nests or high winds whose velocity is less than the greater of 125 miles per hour or the velocity specified by the manufacturer of the equipment

3. Period of Maintenance – the period of Maintenance Services is seven (7) days a week, twenty-four hours a day (7x24) including holidays.

75

BP 02849

4. Response Times
   a. HNS will attempt to provide all BPWCP accounts four (4) hour average resolution Ninety percent (90%) of the time, but actual resolution times will vary depending on the severity of the problem
   b. Field Service Dispatch – HNS will authorize field Service dispatch, according to the maintenance response timetable given below:

Maintenance Response Time Table

| Distance from Service Office | Response Time |
|---|---|
| 0-50 miles | 4 hours |
| 51-100 miles | 5 hours |
| 101-150 miles | 6 hours |
| 151-200 miles | 10 hours |
| Over 200 miles | 24 hours |

5. Charges and Payments
   Owner will pay BPWCP $90, payable by Electronic Funds Transfer between the first and fifteenth day of each month, at BPWCP's discretion. The charges may change if the Equipment on Exhibit A is changed or upgraded or if the equipment warranty coverage changes during the term of this Agreement.

6. Services for Additional Time and Materials Charges
   PES Maintenance Services beyond the service coverage selected or beyond the scope of this Agreement are available on a best reasonable effort basis at the Demand Service Rate se forth in Exhibit B.
   a. PES Maintenance Services Not Included
      i. Parts or equipment damaged or lost through catastrophe, accident, lightening, theft from Owner's premises, misuse or negligence by Owner or Owner's agents, or failure of, or faulty, electrical power, operator error, or malfunction of data communication Equipment not provided to Owners by Hughes.
      ii. Implementation of changes, modifications, or alterations in or to the Equipment other than upgrades and configuration changes approved by HNS.
      iii. Removal of the Equipment or any accessories, attachments, or other devises.
   b. Additional HNS charges will be billed to owner's trade statement by BPWCP and are due and payable within 10 days of such statement and all such charges may be collected by BPWCP via EFT. Owner acknowledges that if HNS deems the services are not part of the PES Maintenance Services, Owner will reimburse via EFT for all charges for such services.

7. Price Increase
   On the anniversary of Commencement Date during the Initial Term or any Renewal Terms hereafter, pricing may be increased by the percentage by which the Consumer Price Index (CPI) for all Urban Owners; U.S. City Average as published by the U.S. Department of Labor, Bureau of Labor Statistic, has increased during the pervious May-to-May period.

76                                              BP 02850

8. Term
   The term of this agreement shall be one (1) year, and shall automatically be renewed for additional one (1) year terms provided that either party may terminate on 30 days prior written notice if the VSAT equipment at the Premises is removed or if the agreement between BPWCP and HNS is terminated and no new agreement is entered into.

If the Contract Dealer Gasoline Agreement between Owner and BPWCP is terminated or expires, this Agreement will terminate or expire at the same time.

**IN WITNESS WHEREOF,** the parties have duly executed this agreement on the date first written above.

OWNER: STTN Enterprises, Inc.                    BPWCP
Nazim Faquiryan

By _____                     By _____

Title: _____                    Title: _____

77

BP 02851

## PES EQUIPMENT LIST
### EXHIBIT A

| Item | Qty |
|------|-----|
| 1.0 or 1.2 Meter Antenna | 1 |
| Indoor Unit | 1 |
| Ethernet port | 1 |
| Serial ports | 2 |
| **TOTAL MONTHLY CHARGE** | **$90** |

Note: Monthly Maintenance Charge to Commence upon successful completion of installation and activation of VSAT equipment.

## DEMAND SERVICE RATE
### EXHIBIT B

1. T&M Rates
   a. $125 per onsite hour
   b. Material at a mutually acceptable cost
   c. Round-trip travel charges between service center and Owner site as follows:

   | | |
   |---|---|
   | 1-25 miles | $70 |
   | 26-50 miles | $130 |
   | 51-100 miles | $260 |
   | 101+ miles | $430 |

2. False Call-Out Charge
   In the event that Owner calls out an HNS Service Representative to a PES site, and such Representative determines that the problem was not caused by HNS, HNS may assess a False Call-Out charge of $200 per instance, or HNS will charge $125.00 per hour with a one (1) hour minimum.

BP 02852

Facility Number: 82461

### ADDENDUM TO CONTRACT DEALER GASOLINE AGREEMENT
### (PAYPOINT NETWORK NON-LESSEE RETAILER) *

This ADDENDUM, effective _____, ("Effective Date") is attached to, incorporated in and made a part of the Contract Dealer Gasoline Agreement, dated _July 11, 2006_, by and between BP West Coast Products LLC ("Franchisor") and STTN Enterprises, Inc. ("Franchisee"), the operator of an ARCO location located at 631 San Felipe Road, Hollister, CA 95035 ("Facility").

1.  Agreement
    Franchisor shall provide PayPoint® Network Service ("PayPoint Network") to Franchisee. Franchisee shall perform as provided herein.

2.  Definitions
    (a) The term "PayPoint Network" shall mean those services more fully described in Paragraph 3 below.

    (b) The term "Approval" shall mean that, for a Transaction entered into the PayPoint Network, Financial Institution or the PayPoint Network has caused a response to be transmitted to Franchisee through the PayPoint Network which indicates that the Transaction is approved or, for preauthorized transactions, e.g. gasoline purchases, that certain products or services may be purchased or performed, e.g. that gasoline may be pumped.

    (c) The term "Denial" shall mean that Financial Institution has caused a response to a Transaction to be transmitted through the PayPoint Network which indicates that the Transaction is not approved.

    (d) The term "Working Day" shall mean any day except Saturdays, Sundays and any other days on which financial institutions are regularly closed.

    (e) The term "access card" shall mean an access card issued, directly or indirectly, by a participating Financial Institution to a Cardholder of such Financial Institution. An access card shall have the name of the Cardholder encoded and/or embossed thereon and/or a name, number or code which identifies such access card as being issued by a Financial Institution.

    (f) The term "Cardholder" shall mean a natural person or entity doing banking business with a participating Financial Institution and to whom such Financial Institution has issued or proposes to issue an access card. The term "Cardholder" includes a natural person or entity purporting to be such Cardholder.

    (g) The term "Transaction" shall mean each use of an access card by a Cardholder for the purpose of paying for a purchase of a product or service or receiving cash or a refund from Franchisee through use of the PayPoint Network to which a participating Financial Institution responds with an approval or denial code.

    (h) The term "deposit account" shall mean the checking, savings and/or other account of Cardholder at a participating Financial Institution that is accessible via an access card.

    (i) The term "PayPoint Account(s)" shall mean the accounts at participating Financial Institutions or participating networks to which funds from Cardholders' deposit accounts shall be transferred. These funds so transferred shall be used to credit Retailer's Accounts.

(j)  The term "Retailer's Account" shall mean the account maintained by Franchisee at a financial institution that is a member of the Cal-Western Automated Clearing House Association or the National Automated Clearing House Association and named by Franchisee on Exhibit C, attached hereto, incorporated herein and made a part hereof, as the account into which deposits resulting from Cardholder Transactions at Franchisee's location are made.

(k)  The term "POS Terminal," "POS System," or "POS Equipment" shall mean the point-of-sale device(s) or system used by Franchisee, which must meet the communications protocol and criteria of the PayPoint Network.

(l)  The term "Settlement Day" shall mean any day excluding weekends and the following holidays: New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day as well as any other days on which the Settlement Bank(s) are closed.

(m)  The term "participating Financial Institution," "Financial Institution," or "Network" shall mean the financial institutions, networks or Members or Affiliates of participating networks which execute agreements with Franchisor to participate in or provide services through the PayPoint Network.

3.  PayPoint Network Description
The PayPoint Network shall enable Cardholders to receive cash or to pay for purchases of products and services by means other than cash, money order or check.  Each Cardholder shall use an access card to initiate a Transaction.  Franchisee shall promptly honor all valid access cards when presented by Cardholders and shall treat Cardholders from all participating Financial Institutions equally.  Franchisee shall use a POS Terminal and may also use one or more Island Card Reader devices ("ICR Device") that are in communication with the PayPoint Network computer facility(ies).

When the Cardholder's access card is inserted in the POS Terminal or ICR Device, information encoded on the magnetic stripe on the reverse of the access card shall be read by a magnetic stripe reader.  The Cardholder shall enter his or her Personal Identification Number ("PIN") on a key pad.  The encoded information, the encrypted PIN, the purchase amount or preauthorization request, and such other data regarding the Transaction as Franchisor may reasonably require, shall be transmitted from the POS Equipment to the Pay Point Network computer facility(ies) and from the PayPoint Network computer facility(ies) to a participating Financial Institution.  Financial Institution shall respond with either an approval or denial for the requested Transaction.

With certain types of POS equipment, certain purchases, e.g. gasoline, may be preauthorized by the participating Financial Institution before any product or service is purchased or performed;  the actual purchase amount shall be transmitted to the

Financial Institution after the Cardholder has obtained such product or service.  It is understood and agreed that the actual purchase amount shall be no more than the amount preauthorized.

The final purchase amount shall subsequently be debited form the Cardholder's deposit account and credited to the Retailer's Account via the PayPoint Account(s).  Franchisee shall not permit anyone to complete a Transaction unless Franchisee has received approval through the PayPoint Network.

4.  Rent
Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor, or the Commencement Date, as defined below, if this is the initial PayPoint Agreement between Franchisee and Franchisor or, where applicable, the first day of the thirteenth month following the Commencement Date, Franchisee shall pay to Franchisor, for participation in the PayPoint Network, transaction fees in the amount set forth on Exhibit A, which is incorporated herein, made a part hereof and attached hereto.  Such fees shall be due and payable to Franchisor on or before the tenth day of the month following the month in which such fees were incurred during the term of this Addendum.  Provided, however, that if Franchisee installs and ICR device at the Facility prior to the Commencement Date and operates it thereafter, Franchisee shall pay no fees for participation in the PayPoint Network for the first twelve months following the Commencement Date and 50% of the applicable fees for the balance of the term of this Agreement.  The term "Commencement Date" shall mean the date on which the first "live" Transaction, that is, a Transaction involving a Cardholder at the Facility, is provided to Franchisee through the PayPoint Network.

80

BP 02854

Commencing on the Effective Date, if this is a subsequent PayPoint Agreement between Franchisee and Franchisor or, if this is the initial PayPoint Agreement between Franchisee and Franchisor, on the Commencement Date, and thereafter on or before the first day of each month during the term of this Addendum, Franchisee shall also pay Franchisor telephone line charges set forth on Exhibit A. It is understood that if Franchisee's product agreement(s) with Franchisor expires within the first twelve months following the Commencement Date and Franchisee and Franchisor execute a new Addendum to Contract Dealer Gasoline Agreement (PayPoint Network Non-Lessee BPWCP Retailer) and Franchisee has installed and is operating an ICR Device and is therefore eligible for the waiver of transaction fees as set forth above, Franchisee shall pay no transaction fees for participation in the PayPoint Network for the number of months remaining of the original twelve month waiver period following the original Commencement Date referred to in this Addendum.

If Franchisor terminates this Addendum at any time during the term of this Addendum for cause or because Franchisee has been designated a Special Retailer as described in Paragraph 14, or if Franchisee elects to terminate this Addendum at the end of the thirteenth month following the Commencement Date, as provided below for Franchisees on their initial PayPoint agreement, Franchisee shall pay Franchisor as set forth on Exhibit D, attached hereto, incorporated herein and made a part hereof, for disconnection and removal of telephone lines. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all fees, and sales, use, rental, gross receipts, inventory, excise, income and any other taxes (including interest, penalties, and additions to tax) imposed by any federal, state or local governmental authority upon Franchisee or Franchisor (except those taxes based upon or measured by the net income of Franchisor) in connection with any payments made pursuant to this Addendum. Franchisee agrees to pay promptly when due and to hold Franchisor harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges or the use of any loaned property. Franchisee shall furnish to Franchisor, promptly upon request, any documentation, which in Franchisor's discretion is required to evidence the payment of any tax, including, but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and canceled checks.

If this is the initial PayPoint agreement between Franchisee and Franchisor, on the first day of the thirteenth month following the Commencement Date, Franchisee shall have the option, upon giving Franchisor at least 30 days prior written notice, to terminate this Addendum; to downgrade the number of PayPoint Electronic Cashiers (Island CardReaders), if applicable; to downgrade to the Paypoint Cashier only (ARCOmatic terminal), if applicable; or the downgrade to the PayPoint Authorization Terminal (low end terminal device). Any downgrading of equipment is at Franchisee's sole cost and expense.

5.  Security
    Franchisee shall require each Cardholder to enter his or her PIN on the POS Equipment at the Facility in order to initiate a Transaction, except to complete Preauthorized Transactions. All Cardholder PINs transmitted to Franchisor must be encrypted at the POS Terminal or ICR Device where the PIN is entered and must remain encrypted from such point of entry throughout the PayPoint Network. After completion of the Transaction, no PINs shall be retained by Franchisee. Franchisee agrees to take all precautions Franchisor may reasonably require to ensure security of data transmitted between the Franchisee location and participating Financial Institutions and in no event shall Franchisee permit PINs to be transmitted "in the clear."

6.  Transaction Approval or Denial
    It is understood that participating Financial Institutions have sole discretion to give approval or denial to Transactions requested by Franchisee and a Cardholder. Franchisee agrees to draw no positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial.

BP 02855

7.  **Access to Franchisee Location; Promotion and Evaluation of PayPoint Network**
    Franchisee agrees to provide reasonable access to the Franchisee location to Franchisor's employees, agents and contractors and, if accompanied by Franchisor's employees, agents or contractors, to participating Financial Institutions. Franchisee acknowledges that Franchisor and participating Financial Institutions, shall require access to install and test the PayPoint Network Service and equipment, to demonstrate PayPoint Network Services to Cardholders, to study Cardholder use of the PayPoint Network and to ensure Franchisee's compliance with this Addendum.

    To the extent permitted by law, Franchisee agrees to place, at the Franchisee location, promotional and other materials provided by Franchisor. Franchisee agrees further to cooperate with Franchisor in it efforts to promote and evaluate the PayPoint Network.

8.  **Interruption of Service**
    Franchisor and Franchisee shall cooperate to resolve any system malfunction or problem that interrupts normal operation of the PayPoint Network. Franchisor shall provide instructions and procedures for the handling of Transactions that are initiated when communications between Franchisor, the participating Financial Institutions and the Franchisee location are interrupted. Franchisee shall immediately notify Franchisor's Maintenance Department if there is an interruption of the PayPoint Network.

9.  **Cardholder Refund or Reversal/Void Transactions**
    Cardholder refund transactions shall not be processed electronically, but shall be processed by refunding cash or otherwise reimbursing the Cardholders. Receipts shall be made available to Cardholders in accordance with Paragraph 10 of this Addendum for all such Transactions.

10. **Receipts**
    For each Transaction approved through the PayPoint Network, Franchisee shall make a receipt available to the Cardholder. The receipt shall contain all information required by Federal Reserve Board Regulation E or other applicable laws and regulations. Receipts shall include the following information: Cardholder's access card number, name and location of the Facility, date, time, amount of Transaction, type of Transaction (payment), type of account to or from which funds are transferred (unless only one type of account may be accessed), Franchisor assigned transaction or trace number and/or Financial Institution assigned reference number if the Transaction has been transmitted to Financial Institution, and, if applicable, any Transaction Fee.

    Franchisee understands and agrees that portions of this Addendum are for the benefit of participating Financial Institutions and therefore, if Franchisee breaches some of the terms and conditions of this Addendum, including but not limited to:

    (a) breaches of the Receipt provisions of this Paragraph 10;

    (b) breaches of the Cardholder Dispute provisions of Paragraph 11 of this Addendum;

    (c) initiation or attempt to initiate by Franchisee or its agents or employees unauthorized transactions;

    (d) uses of any participating Financial Institution's name or marks or references to any participating Financial Institution in any advertising, point of purchase material, news release or trade publication without Franchisor's prior written consent or the sublicense or attempt to sublicense Franchisee's right to use such name or marks after receiving such consent;

    (e) failure to display, to the extent permitted by law, promotional and other materials as required by Paragraph 7 of this Addendum or failure to cease using and return any such materials should any participating Financial Institution withdraw from PayPoint Network participation:

    (f) drawing a positive or negative inference about a Cardholder from a participating Financial Institution's approval or denial in breach of the provisions of Paragraph 6 of this Addendum;

82

BP 02856

(h) failure to follow the PayPoint Network procedures set forth in Paragraph 3 of this Addendum;

(i) breaches of the Confidentiality/Non-Disclosure provisions of Paragraph 16 of this Addendum;

(j) breaches of the Security provisions of Paragraph 5 of this Addendum; or

(k) breaches of the Indemnification provisions of Paragraph 15 of this Addendum.

Franchisor or participating Financial Institution(s) shall have the right to name Franchisee a "Special Retailer" and to recover from Franchisee for the amount of all claims, liability, losses and expenses, notwithstanding any limits contained in Paragraph 15 of this Addendum, and (including, without limitation, attorneys fees) asserted against or incurred by Franchisor or such Financial Institution(s) as a result of such breach. Such right to recover on the part of Franchisor or participating Financial Institutions shall include the right to debit the Franchisee's Trade Statement or electronically debit Retailer's Account, if Franchisee has not forwarded such amount to Franchisor within a period of time specified in a notice to the Franchisee. Such third party beneficiary rights shall be enforceable against Franchisee despite any defenses Franchisee may have against Franchisor.

Furthermore, Franchisee understands and agrees that a breach of this Addendum may be grounds for termination/non-renewal of the Contract Dealer Gasoline Agreement.

11.    Resolution of Disputes

(a) Cardholder Disputes
Franchisee acknowledges that participating Financial Institutions are required by Federal law to resolve errors asserted by Cardholders, and to provide documentation requested by Cardholders, within certain time limits. Franchisee agrees to cooperate with Franchisor and participating Financial Institutions to resolve Cardholder disputes or inquiries about PayPoint Network Transactions. To facilitate resolution of Cardholder disputes, Franchisee shall retain, for a period of at least one hundred eighty (180) days, copies of receipts issued to Cardholders pursuant to Paragraph 10 of this Addendum, or reports from which Transaction information can be retrieved. In response to an oral request by Franchisor or a participating Financial Institution, to be confirmed in writing, Franchisee shall, within three (3) Working Days of the oral request, send documentation to Franchisor or to such Financial Institution, as instructed by Franchisor, showing requested receipt information for any Transaction that occurred within the previous one hundred eighty (180) days. If Franchisee fails to provide the requested information within three (3) Working Days, Franchisor shall, at the request of the participating Financial Institution, debit Franchisee's Trade Statement or electronically debit the Retailer's Account for the amount disputed by the Cardholder and credit, through the participating Financial Institution, the Cardholder's deposit account for the amount disputed. The obligations of this Paragraph 11 shall survive termination of this Addendum. Detailed procedures for customer dispute resolutions are incorporated herein, made a part hereof and attached hereto as Exhibit B.

(b) Franchisee Disputes
Franchisee agrees to review all Franchisee Account Statements and Management Reports (including journal tapes, daily sales reports and Management Report Printer tapes) and, within 60 days of a Transaction, to notify the PayPoint Network computer facility(ies) by telephone, to be confirmed immediately in writing, of any errors, discrepancies or disputes that Franchisee has concerning such Transaction. Neither Franchisor nor participating Financial Institutions shall be liable for errors, discrepancies or disputes of which Franchisee fails to notify Franchisor within such 60 day period. If the resolution of the error, discrepancy or dispute by Franchisor or a participating Financial Institution involves a credit to Franchisee, Franchisor shall pay Franchisee such credit by check.

(c) Disputes Over Merchandise or Service
Franchisee shall handle all disputes over quality of merchandise or services purchased from Franchisee by Cardholders directly with Cardholders and shall indemnify and hold Franchisor and participating Financial Institutions harmless from any claim, action, damage or expense, including strict liability in tort, arising out of such disputes or the sale of goods or services by Franchisee; provided, however, to the extent Franchisee's petroleum or non-petroleum franchise agreements, if any, are contrary to this provision as to Franchisor, such petroleum or non-petroleum franchise agreement shall be controlling as to Franchisor.

BP 02857

12.    Transaction Error Resolution
In certain unusual circumstances, Retailer's Account may be erroneously credited with an amount for a Transaction that did not occur at the Franchisee location or with a duplicate of an amount of a Transaction or fees for which Retailer's Account was previously credited. In such circumstances, Franchisee shall, within three (3) Working Days of receipt of an oral request, provide Franchisor with the amount of such erroneously credited or duplicate amount. If Franchisee fails to provide Franchisor with such amount, Franchisee agrees that Franchisor shall have the right to debit Franchisee's Trade Statement or electronically debit Retailer's Account for the amount of such erroneously credited or duplicate amount so that Franchisor may properly credit the Cardholder or other retailer's account.

13.    Settlement; Settlement Reporting
Franchisor shall process all approved Transactions captured each Settlement Day and any preceding non-Settlement Day and make arrangements for the funds to which Franchisee is entitled to be deposited into his or her Retailer's Account.

Deposit and Transaction totals shall be made available to Franchisee by way of the POS Terminal, if possible; otherwise, by way of written reports. Franchisor shall also mail to Franchisee, on request, summary reports of PayPoint Network Transactions at the Facility.

14.    Term; Termination
Except as otherwise provided in this Addendum, PayPoint Network Service shall be provided from the Effective Date or, where applicable, the Commencement Date until the termination or expiration of Franchisee's Contract Dealer Gasoline Agreement with Franchisor. The Commencement Date shall be set forth in a notice from Franchisor to Franchisee.

Franchisor may terminate this Addendum for any reason upon at least ninety (90) days advance written notice to Franchisee. For cause, Franchisor may terminate this Addendum immediately upon giving written notice to Franchisee. In addition, Franchisor may, at its sole option, terminate Franchisee's ability to accept access cards from certain participating Financial Institutions or terminate this Addendum or the Contract Dealer Gasoline Agreement immediately if a Financial Institution notifies Franchisor that it has designated Franchisee as a "Special Retailer," i.e., a Franchisee that Financial Institution has reason to believe has originated unauthorized Transactions to a Cardholder's deposit accounts or a Franchisee from whom an excessive number of Transactions are ultimately subject to chargeback, that is, debit of Franchisee's Trade Statement as more fully described in Paragraph 10 of this Addendum or a Franchisee who violated or failed to comply with the Security provisions referred to in Paragraph 5 of this Addendum. On the first day of the thirteenth month following the Commencement Date, Franchisee may terminate this Addendum for any reason upon at least thirty (30) days advance written notice to Franchisor. In the event of termination, Franchisee shall return to Franchisor all instructional and promotional material Franchisor has provided for use with the PayPoint Network and shall cease to use and display the "Marks" as defined in Paragraph 17a and participating Financial Institutions' trademarks, trade names and trade indicia and shall remove all decals and signs indicating Franchisee's participation in the PayPoint Network and, if Franchisee is terminated for cause or because he/she has been designated a Special Franchisee, Franchisee shall pay the applicable amount set forth on Exhibit D.

In the event Franchisee refuses to, or is unable to return the material and/or to cease use and display, then Franchisor shall have the right to enter Franchisee's Facility and remove all such material, decals, and signs, and Franchisee agrees to pay the costs therefor.

15.    Indemnification
Each party shall indemnify the other and hold it harmless and Franchisee shall indemnify participating Financial Institutions from any claim, action, damage or expense of any kind arising solely from fault or neglect of the indemnifying party, including but not limited to claims of infringement of any patent, copyright, trade secret or other proprietary right in the operation of the PayPoint Network. Neither party shall be liable to the other for any special, indirect or consequential damages, including but not limited to lost profits, even if the parties have knowledge of the possibility of such damages.

Franchisee shall indemnify, hold harmless and defend Franchisor and participating Financial Institutions from and against all claims, losses, costs, damages, liabilities, and expenses (including reasonable attorneys' fees) which are suffered as a result of any Transaction or attempted Transaction and arise out of:

84                                BP 02858

(a)  Personal injury or tangible property damage suffered or incurred by any person on Franchisee's premises;

(b)  Negligence or fraudulent conduct of Franchisee, Franchisee's agents and employees and independent contractors;

(c)  Unauthorized entry of data into the PayPoint Network or any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution's debit card system/network, and POS equipment;

(d)  Unauthorized receipt of data from any Financial Institution's debit card system/network by Franchisee from any point in the PayPoint Network including the data communication link connecting the PayPoint data processing facility(ies) and any Financial Institution and POS Equipment;

(e)  Disputes over Franchisee's sale or lease of goods or services; or

(f)  Failure of Franchisee, its employees, agents and its independent contractors to comply with this Addendum, or with applicable federal, state, or local laws, rules or regulations.

However, Franchisee shall not be liable for the failure by any Financial Institution to discover a Technical Error, originated by Franchisee.

16.  Confidentiality; Nondisclosure

Franchisee acknowledges that all information that is disclosed to, or comes to the attention of Franchisee for purposes of the development or operation of any aspect of the PayPoint Network (herein "Information") is strictly confidential. Franchisee agrees that Franchisee shall not use for any purpose other than Franchisee's use of the PayPoint Network or disclose said Information or knowingly permit Franchisee's employees or contractors to disclose said Information to any person outside Franchisor and Franchisee, or to any employee or contractor of Franchisor or Franchisee who does not have a specific need to know in performance of work hereunder.

Franchisee acknowledges that participating Financial Institutions have a responsibility to their Cardholders to keep all records pertaining to Cardholders' banking transactions (herein "Cardholder Information") strictly confidential.  Franchisee shall maintain the confidentiality of Cardholder Information.

This paragraph shall not prevent the participating Financial Institutions from disclosing to their Cardholders information about such Cardholders' individual transactions.

Franchisor agrees to use reasonable care to avoid disclosure of information relating to sales by Franchisee (herein "Sales Information") other than to Financial Institutions and other third parties who require access to Sales Information for purposes relating to Franchisee's use of or Franchisor's operation of the PayPoint Network. Franchisor's obligation of non-disclosure shall not apply to any Sales Information which is or becomes available to the public other than through breach of this Addendum by Franchisor. It is presently Franchisor's policy (which may be changed at any time by Franchisor at its sole option without notice) to destroy all records of Sales Information after two (2) years. Franchisor's obligation of non-disclosure with respect to Sales Information shall terminate upon destruction of such Sales Information.

The obligations of this Paragraph 16 shall survive termination of this Addendum.

BP 02859

17.   Service Mark License
(a)   PayPoint, PayPoint Electronic Cashier, PayPoint Cashier, PayPoint Network, PayPoint and "Triangle" design, Electronic PayPoint, and the "Triangle" Design (hereinafter called "Marks") are service marks of Franchisor.

(b)   During the term of this Addendum, Franchisor grants to Franchisee for use at Franchisee's Facility a non-exclusive license and right to use the marks in connection with the PayPoint Network as defined in Paragraph 3, but only so long as such services are performed using equipment approved by Franchisor and such equipment is maintained in good operating order and is operated in accordance with Franchisor's training program and guidelines as promulgated from time to time by Franchisor.

(c)   Franchisor shall have the right at all time to enter Franchisee's Facility for the purpose of inspecting the equipment used with the PayPoint Network, and to satisfy itself that services are being provided to the public according to Franchisor's standards.

(d)   During the term of this Addendum, Franchisee shall be permitted to use and display the marks and other names and trade indicia used or authorized for use by Franchisor in connection with the PayPoint Network, but only in accordance with standards as set forth from time to time by Franchisor for the type of facility Franchisee is operating. Franchisee shall only be permitted to use or display names, marks, symbols, or trade indicia belonging to participating Financial Institutions in conjunction with PayPoint equipment or on advertising upon Franchisor's prior approval, and such use and display is subject to whatever restrictions Franchisor or such institutions may prescribe.

(e)   Franchisor expressly reserves the right to change, alter, modify, or withdraw the Marks, or any of them including the PayPoint name, at any time by giving Franchisee not less than thirty (30) days prior written notice thereof. In the event of such change, alteration or modification, Franchisee agrees that it shall henceforth not use the mark or name which has been changed, altered, modified, or withdrawn. In the event the PayPoint name is changed, altered, modified, or withdrawn by Franchisor, it is agreed that the new name or Mark shall be substituted for "PayPoint Network" as it appears in this Addendum.

(f)   Franchisee recognizes Franchisor's ownership and title to the Marks and shall not claim adversely to Franchisor any right, title, or interest thereto. Particularly, Franchisee agrees, during and after the term of this Addendum, not to use, register or attempt to register as a trademark or as a trade or corporate name, or aid any third party in registering or attempting to register, any of the Marks or any marks, names, or symbols confusingly similar thereto, or incorporating one or more of the words in such marks or names as trademarks or service marks, or as trade or corporate names.

(g)   All use of the Marks by Franchisee shall inure exclusively to the benefit of Franchisor and Franchisor may utilize such use in registering or defending such Marks. Franchisee agrees to cooperate with Franchisor in providing evidence or testimony relative to or supporting Franchisee's use of said Marks. Any registrations obtained by Franchisee contrary to Section (f) shall be held in trust for Franchisor and assigned by Franchisee to Franchisor upon Franchisor's request.

(h)   Upon termination of this Addendum or the Contract Dealer Gasoline Agreement, the undertakings and duties of Franchisee in Sections (f) and (g) shall survive and Franchisee shall cease using and remove the Marks and any names, marks, symbols, or trade indicia of participating Financial Institutions as set forth in Paragraph 14 of this Addendum.

18.   Force Majeure
No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Addendum to the extent that it arises from causes beyond the control and without fault or neglect of the party otherwise chargeable with failure, delay or default, including but not limited to: action or inaction of governmental, civil or military authority; strike, lockout or other labor dispute; war, riot or civil commotion; theft, fire, flood, earthquake, natural disaster; or default of a common carrier.

The party wishing to rely on this paragraph to excuse failure, delay or default shall, when the cause arises, give the other party prompt written notice of the facts constituting same, and when the cause ceases to exist, give prompt notice to the other party.

19. <u>Assignment</u>
Franchisee shall not assign any of its rights or delegate any of its obligations pertaining to the PayPoint Network without the prior written consent of Franchisor. Any assignment or delegation made without such prior written consent shall be void and any assignment or delegation to which Franchisor consents must be in conjunction with an assignment of the Contract Dealer Gasoline Agreement.

20. <u>Prices, Goods and Services</u>
No provision of this Addendum shall be construed as an agreement by Franchisor or participating Financial Institutions to the retail prices charged or the quantity or quality of goods sold or services rendered by Franchisee to Cardholders or to customers of Franchisee.

21. <u>Independent Contractor</u>
Franchisor and Franchisee are independent contractors with respect to the subject matter of this Addendum and neither party nor its employees shall be deemed for any purpose to be the agent, employee, servant or representative of the other with respect to the subject matter of this Addendum.

IN WITNESS WHEREOF, the parties have executed this Addendum, or caused it to be executed on their behalf on the dates indicated below.

**BP West Coast Products LLC**

**Franchisee**
**STTN Enterprises, Inc.**

_____ 7-11-06
                        Date

_____ 6/20/06
Nazim Faquiryan        Date

_____ 7-11-06
Witness                 Date

87

BP 02861

---

### BPWCP Contract Dealer/Distributor

---

PayPoint Network Fees

| Transactions per Month | Fee per Transaction |
|---|---|
| 0 to 1,000 | $.10 |
| 1,001 to 2,000 | .08 |
| 2,001 to 3,000 | .06 |
| 3,001 to 4,000 | .04 |
| Over 4,000 | .02 |

Minimum Monthly Charge = $60.00

There will be no transaction fee during the first 12 months following the Commencement Date if Retailer installs a PayPoint Electronic Cashier®, purchased through BPWCP, at the pump island.

Phone Line Fee Options:

Leased Line -- $200 per month plus any phone company pass-through costs including installation for each dedicated line.

or

Dial Line -- installation costs plus monthly phone charge including per item phone calls.

Billing and Payment Terms:

Unless Retailer is entitled to 12-month waiver of the fee as set forth above, a fee will be charged for each Transaction. By the twentieth day of the following month, Retailer will be issued an invoice for: the total transaction times the fee per transaction for the tier achieved; the monthly phone line fee; and any portion of the monthly minimum not achieved. Invoices are payable upon receipt.

If Retailer's Contract Dealer or Distributor Agreement expires and is not renewed or is canceled prior to the expiration of the PayPoint Retailer Agreement, the PayPoint Agreement will be canceled or, at BPWCP's option, can be converted to a Non-BPWCP PayPoint Retailer Agreement.

Transaction Definition:

A "Transaction" means each use of an access card by a Cardholder for the purpose of paying for a purchase of a product or service or receiving cash, scrip, a refund or a reversal/void from Retailer's Facility through use of the PayPoint Network to which a participating Financial Institution responds with an Approval or Denial code.

88

BP 02862

EXHIBIT B

Retailer Resolution of Cardholder Disputes

PayPoint Network

A cardholder dispute is initiated when a financial institution is notified of its cardholder's complaint. If a cardholder informs a Franchisee that a problem exists with a transaction made at the retail facility prior to the date of the complaint, the Franchisee should inform the cardholder that the complaint should be taken to the cardholder's financial institution. All resolutions must originate at the cardholder's financial institution.

Examples of complaints:

a)     Cardholder was charged twice for a purchase.

b)     Cardholder never made the purchase, he/she was billed for by his/her financial institution.

Procedure for resolution of cardholder complaints by the PayPoint Network:

1)     Cardholder disputes a transaction and notifies financial institution.

2)     Financial institution then notifies the Franchisor switch of the problem.

3)     The switch researches its records and makes every effort to find the disputed transaction in order to resolve the problem.

4)     However, if the switch is unable to find the disputed transaction in the records maintained at the switch, the Franchisee will be notified via telephone. The switch contact person will provide the Franchisee with the data furnished by the financial institution and request a copy of the cardholder receipt and/or a copy of the Management Report Printer (MRP) report showing the disputed transaction information.

5)     This telephone request will be immediately followed by a written request - a copy of the PayPoint Network Retailer Transaction Information Request form containing all the required transaction information. This form will be mailed to the Franchisee within one (1) working day of the telephone call. A copy of this form is attached.

6)     The Franchisee will have only three (3) working days after receipt of the request to research the transaction and send the requested information to the financial institution listed on the form.

7)     The Franchisee is subject to chargeback of the transaction amount in question if the requested information is not sent within three (3) working days.

8)     The Franchisee must send a copy of the completed PayPoint Network Retailer Transaction Information Request form along with a copy of the customer receipt and/or MRP report (the same information furnished to the financial institution) to the Franchisor switch within one (1) working day of sending the information to the financial institution.

89                                                    BP 02863

EXHIBIT C

<u>PayPoint Network Retailer Account Designation*</u>

RETAILER: _____

ADDRESS: _____

CITY: _____

STATE/ZIP CODE: _____

I HEREBY AUTHORIZE BP WEST COAST PRODUCTS LLC, , TO CREDIT THE ACCOUNT** DESCRIBED BELOW FOR SETTLEMENT PURPOSES FOR SERVICES PROVIDED THROUGH THE BPWCP PAYPOINT NETWORK.

THE ACCOUNT TO WHICH SUCH CREDITS SHOULD BE APPLIED IS

ACCOUNT NO._____

AT _____

BRANCH NO. _____


PAYPOINT NETWORK RETAILER

BY: _____

TITLE: _____

DATE: _____


\* If Retailer has different Retailer's Accounts for its Retailer's Facilities, an Exhibit C must be completed for each different Facility.

\**FINANCIAL INSTITUTION MUST BE A MEMBER OF NACHA.

BP 02864

PAYPOINT NETWORK

<u>Retailer Transaction Information Request</u>

CLAIM NO.: _____

DATE CLAIM RECEIVED: _____

TODAY'S DATE: _____

A dispute has been filed by a cardholder regarding the following transaction:

FI CARD NO.: _____

TRANSACTION AMOUNT: _____ TRANSACTION DATE: _____

TRANSACTION TIME: _____ REFERENCE NO. _____

Please return a copy of cardholder receipt or management report printer (MRP) report showing requested financial data within three (3) working days to:

FINANCIAL INSTITUTION: _____

ADDRESS: _____

_____

CONTACT PERSON: _____

YOU ARE SUBJECT TO CHARGEBACK OF TRANSACTION AMOUNT IN QUESTION IF "REQUESTED INFORMATION" IS NOT SENT <u>WITHIN THREE (3) WORKING DAYS</u>

Franchisee:
Return a copy of this form along with copy of cardholder receipt and/or MRP report to:

NAME: _____

ADDRESS: _____

_____

DATE INFORMATION SENT TO FINANCIAL INSTITUTION: _____

91

BP 02865

EXHIBIT D

POS and Remote Equipment
Disconnection and Removal
<u>Fee Schedule</u>

| | |
|---|---|
| Telephone Line Disconnection | $200.00 |
| Each Inside Terminal Disconnection and Removal | $200.00 |
| Each Outside Terminal Disconnection and Removal | $400.00 |

92

BP 02866

# EXHIBIT
# B

AMENDMENT TO
CONTRACT DEALER GASOLINE AGREEMENT
FACILITY NUMBER <u>82592</u>

This Amendment, dated _Oct 12, 2006_ is attached to and incorporated in the Contract Dealer Gasoline Agreement and various related agreements (hereinafter the "Agreement") effective _____, by and between BP West Coast Products LLC ("Supplier"), and <u>STTN Enterprises, Inc.</u> ("Buyer") covering premises located at: <u>631 San Felipe Road, Hollister, CA 95035.</u> Parties agree as follows:

1.  That the franchise created by the Agreement shall be a trial franchise defined in the Petroleum Marketing Practices Act, 15 U.S.C. § 2803 ("PMPA");

2.  The duration of the initial trial franchise term is for 1 (one) year.

3.  The Supplier may fail to renew the trial franchise relationship at the conclusion of the initial term by notifying the franchisee, in accordance with the provisions of section 2804 of the PMPA, of the Suppliers intention not to renew the franchise relationship;

4.  The provisions of section 2802 of the PMPA, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise;

5.  All other terms and provisions of the Agreement, as previously amended or supplemented, shall remain in full force and effect.

BP West Coast Products LLC                 Franchisee: STTN Enterprises, Inc.


_____ '10/12/06            _____ 10/04/06
                      Date                 Nazim Faquiryan        Date



PLAINTIFF'S
EXHIBIT
B                    4/23/07
Faquiryan

                                           BP 03032

Trial Franchise

# EXHIBIT
# C

Facility Number: <u>82461</u>
Customer Account Number: <u>0996439</u>
Category: <u>NTI</u>

am/pm MINI MARKET AGREEMENT

THIS AGREEMENT is made <u>July 11 2006</u>, between BP West Coast Products LLC, a Delaware limited liability company, with an office at 4 CENTERPOINTE DRIVE, LA PALMA, CALIFORNIA 90623 ("BPWCP")

<u>and STTN Enterprises, Inc., a California Corporation</u>

(state whether a sole proprietorship, partnership, limited partnership, corporation or limited liability company ["LLC"]; if partnership, the names of all partners and State of Organization; if limited partnership, the names of all general partners and State of Organization; if corporation, the State of Incorporation; if LLC, the State of Organization)

with an address at <u>631 San Felipe Road, Hollister, CA  95035</u> ("Operator").

Operator desires to be the franchisee of, and BPWCP is willing to grant to Operator a franchise for, an am/pm mini market located at the Premises set forth in PART I (which together with the buildings and improvements now or hereafter constructed thereon is referred to herein as the "Premises") on the terms and conditions set forth in PARTS I and II of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained in PARTS I and II hereof, each of the parties intending to be legally bound hereby, agrees as follows:

## PART I

PART I contains specific terms which relate to the terms and conditions set forth in the corresponding sections - PART II, Form No. am/pm- 240WR-1 (4/2006), attached hereto and incorporated herein.

**Section**

4.03    Store Manager (if Operator operates more than one am/pm mini market):

_____

5.01    This Agreement shall be binding on the parties as of the date first written above (Effective Date.) The franchise term of this Agreement shall begin on the , ("Commencement Date"), and shall end at 10 a.m. on the first day after the last day of the [] 120th or [XX ] 240th full calendar month following the Commencement Date. If no box is checked at the time this Agreement is executed, the box for 120th shall be deemed checked. If no date is set forth in this PART I, the Commencement Date shall be established by the "Notice of Final Inspection and Readiness" provided for in Section 5.01 of PART II.

6.01    Premises:
_____ <u>631 San Felipe Road</u> _____
(complete address by street number, including, where applicable, designation of corner)

City____<u>Hollister</u>_____    State___<u>CA</u>____    Zip_____<u>95035</u>_____
If no address is set forth, the Premises shall be established by the "Site Acceptance" provided for in Section 6.01 of Part II.

6.01(a)    Target Area: _____

7.01(a)    Initial Franchise Fee: <u>Seventy Thousand and 00/100</u> _____
Dollars [$ <u>70,000.00</u>].

7.01(c)    Renewal Franchise Fee:_____
Dollars [$ _____.00]

7.02(a)    Minimum royalty fee: <u>One Thousand and 00/100</u> _____
Dollars [$ <u>1,000.</u>.00].

7.03    Security Deposit: <u>One Thousand and 00/100</u> _____
Dollars [$ <u>1,000.</u>.00].

16.01    Operational Designee, if applicable: _____

17.02    Entity Designee (Corporate Operators, LLC's, Limited Partnerships): _____

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)
Uniform                                    1 of 4


PLAINTIFF'S EXHIBIT

BP 02789

Facility Number:
Store Size 3.600 sq. ft.
(exterior dimensions)

## STORE EQUIPMENT
### (Real and Personal Property)

The equipment listed below is required to be installed in the Store unless otherwise indicated by a check mark at the left of the required items. Operator must install and maintain the equipment so indicated prior to the Commencement Date. All equipment must be obtained from approved vendors, or, if applicable, meet BPWCP's specifications including, but not limited to, specifications with respect to brand, model, size, color and quality.

(Check only Required Equipment to be Furnished and
if excluded)  Installed by Operator

**BUILDING**
_____ am/pm Sun & Moon Sign
_____ Building Fascia (Illuminated)
_____ Corner Signage
_____ Interior Signage

**STORE**
**COFFEE**
_____ Airpots (4) w/Rack (vendor supplied)
_____ Cappuccino Machine (5 head) (vendor supplied)
_____ Coffee Airpot Brewer (vendor supplied)
_____ Coffee Brewer (1 Burner) (vendor supplied)
_____ Coffee Brewer (3 Burner) (vendor supplied)
_____ Coffee Brewer Riser (vendor supplied)
_____ Coffee Condiment Rack (vendor supplied)
_____ Coffee Menu Board
_____ Coffee Mug rack (vendor supplied)
_____ Coffee Warmer (2 position) (vendor supplied)
_____ Tea Rack (vendor supplied)
_____ Timer (vendor supplied)
**FLOOR**
_____ Beverage Merchandiser, Breeze 20 oz
_____ Cigarette Merchandiser/Backbar
_____ Cooler Cabinet (Upright)
_____ Cooler boxes (walk-in)
_____ Napkin Dispenser (3)
_____ Shelving (Modular; Walk-in Cooler)
_____ Shelving (Storage Room), NSF Approved
_____ Shelving (hand sink in food area)
**FOOD**
_____ Bun Toaster
_____ Chili/Cheese Dispenser
_____ Condiment Dispenser (6 position)
_____ Convection Oven w/Racks
_____ Food Merchandising Warmer (1)
_____ Food Preparation Table
_____ Hood and Exhaust Ventilation System (for convection oven) (California only)
_____ Microwave Oven (Commercial)
_____ Nacho Rack (3 position)
_____ Sink (3 compartment-food)
_____ Sink (hand sink in food area)
_____ Thermometer (digital)

non-lessee operator (DOFO)                    2 of 4
am/pm-241WR-1 (4/2006)
Uniform

BP 02790

Facility Number: <u>82461</u>

(Check only Required Equipment to be Furnished and if excluded)
<u>Installed by Operator (continued)</u>

        <u>FOUNTAIN</u>
_____ Bulk CO2 (vendor supplied)
_____ Mantiovoc Ice and Beverage Equipment
_____ Scotman Ice Maker
        <u>FROZEN BEVERAGE</u>
_____ Frozen Carbonated Beverage (FCB) Machine
        <u>OFFICE/SALES COUNTER</u>
_____ Computer Software and Hardware
_____ Counter Merchandising System
_____ Fax Machine
_____ POS System with PayPoint® (BPWCP Approved)
_____ Safe
_____ Video Surveillance Equipment
_____ VSAT Equipment: (1) Hughes Satellite Dish and
                  Hughes Indoor Unit - Satellite Receiver
                  (2) Deicer (if required for colder climate)
        <u>OTHER</u>
_____ Ice Maker
_____ PayQuick Island Cashier (PIC)
_____ Sales, take-out and beverage counters (including cup dispensers)
_____ Sink (service/mop)
_____ Water Heater
_____ Other:
_____ Other:
_____ Other:
_____ Other:

Items indicated as vendor supplied may be supplied by vendors in connection with vendors' products. Operator shall be furnished with a list of approved vendors and/or a copy of BPWCP's specifications for all required equipment upon execution by Operator of this Agreement.

**This space is intentionally left blank.**

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

OPERATOR ACKNOWLEDGES HAVING READ THIS AGREEMENT, INCLUDING PART II, GENERAL TERMS AND CONDITIONS, FORM No. am/pm- 240WR-1 (4/2006), AND UNDERSTANDS FULLY ALL THE TERMS, PROVISIONS AND CONDITIONS HEREOF. **No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.**

BPWCP MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO OPERATOR'S PROFIT OR INCOME TO BE DERIVED FROM THE OPERATION OF THE am/pm STORE CONTEMPLATED HEREUNDER.

IN WITNESS WHEREOF, BPWCP and Operator have executed this Agreement as of the date first above written.

BP West Coast Products LLC

By _____         7-11-06_____
   Manager                                   Date

If Operator is an entity, complete and sign below:

____STTN Enterprises, Inc._____
(print or type name of entity)
Check one:
☐ a _____ general partnership;    ☐ a _____ limited partnership;
☐ a _____ limited liability company;  ☑ a _____CA_____ corporation

By: _____

Name: __Nazim Faquiryan_____

Its: _CEO and President_____

Date Signed: _6/20/06_____

By: _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: _____n/a_____

By _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: _____n/a_____

By _____n/a_____

Name: _____n/a_____

Its: _____n/a_____

Date Signed: _____n/a_____

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)                    4 of 4
Uniform

BP 02792

am/pm MINI MARKET AGREEMENT

PART II
General Terms and Conditions

ARTICLE 1

Service Mark and Service Name Conditions, Copyrights, Trade Secrets
and Confidentiality

A.    Service Marks, Trademarks and Service Names

1.01  Subject to the terms and conditions specified herein, and to the extent of BPWCP's rights
therein, BPWCP hereby grants to Operator, beginning on the Commencement Date as defined in Section
5.01 and continuing during the term of this Agreement, the non-exclusive right and license to use the trade
secrets and know-how regarding operation of am/pm mini markets, the service mark and service name
"am/pm", or any variation thereof as may be approved in writing by BPWCP, and any other service marks,
trademarks and service names used in connection with am/pm mini markets, solely in conjunction with
Operator's operation of the Store provided for herein. Operator has no exclusive territory.  BPWCP
reserves the right, in its sole discretion, to establish additional am/pm mini market stores and other BPWCP
and non BPWCP franchises and franchises operated by BPWCP's wholly owned subsidiary or other
company operated franchises and businesses, in any location and proximity to Operator's business.

1.02  BPWCP represents that it has applied for federal registration for various service marks for
"am/pm" for retail grocery store and convenience store services and trademarks for various products.
BPWCP has been granted federal registration for certain "am/pm" service marks and trademarks for retail
grocery store and convenience store services.  BPWCP expressly reserves the right to change, alter or
modify the am/pm service mark or service name or substitute any other service mark or service name at any
time by giving Operator not less than thirty (30) days' prior notice thereof.  In the event of any change,
alteration or modification of the service mark or service name, Operator agrees that only the service mark or
service name, as changed, altered or modified, shall be used by Operator to identify the Store.  If the service
mark and service name "am/pm" is changed by BPWCP, it is agreed that the new service mark and service
name adopted by BPWCP shall be substituted for "am/pm" wherever "am/pm" appears in this Agreement.
BPWCP also expressly reserves the right to change, alter or modify colors and designs and other service
marks, trademarks and service names used in connection with am/pm mini markets from time to time and
place to place as BPWCP deems appropriate or as required by law and, upon 90 days prior written notice
from BPWCP (unless a lesser time is required by law), Operator will install such modified marks, colors or
designs at Operator's expense.

1.03  Operator agrees that it shall notify BPWCP promptly of any unauthorized use of the am/pm
service mark and service name by any person, firm, corporation or other entity (collectively referred to as
"person").  At its expense, BPWCP shall challenge all unauthorized uses or infringements of the am/pm
service mark, trademark and service name, and BPWCP shall have the sole right to decide whether to
prosecute any person who unlawfully uses or attempts to use BPWCP's am/pm service mark, trademark or
service name for retail grocery store, convenience store, or fast food services.  Operator agrees to provide
such evidence and expert assistance as Operator may have within its control in connection with any such
challenge or prosecution.

1.04  Operator recognizes and acknowledges that, as between BPWCP and Operator, BPWCP is the
sole and exclusive owner of the am/pm service mark, trademark and service name and other service marks,
trademarks and service names used in connection with am/pm mini markets and appearing on am/pm stores.
Operator hereby agrees:  not to claim any right, title or interest in or to said service marks, trademarks or
service names; not to directly or indirectly deny, assail, or assist in denying or assailing the sole and

non-lessee operator (DOFO)
am/pm: 241WR-1 (4/2006)
(national)

1 of 34

100

BP 02793

exclusive ownership of BPWCP in said service marks, trademarks and service names; not to adopt or use as Operator's own property any service marks, trademarks or service names of BPWCP nor employ any service marks, trademarks or service names confusingly similar to those of BPWCP; not to register or attempt to register BPWCP's service names or service marks, trademarks in Operator's name or that of any other person and not to use such service marks, trademarks or service names, or any parts thereof, as any part of any corporate or partnership name or any other business name. It is understood that this covenant shall survive the termination of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

1.05  Operator agrees, upon termination or non-renewal of this Agreement or upon termination or non-renewal of any subsequent Store Agreement, to assign BPWCP, without additional consideration, any service name or service mark, trademark rights that may have vested in Operator notwithstanding the provisions of Section 1.04 as a result of any activities of Operator pursuant to this Agreement. Operator agrees to use said service marks, trademarks and service names in connection with, and exclusively for, the promotion and operation of an am/pm store as provided hereunder, and in accordance with the standards, terms and conditions set forth in the Agreement and in accordance with instructions, rules and procedures prescribed in writing by BPWCP. Operator shall not use the am/pm service mark or service name, or other service marks, trademarks or service names of BPWCP, except as authorized by BPWCP and in no event in any manner that may or could adversely impact or jeopardize the am/pm image.

1.06  Operator agrees to display the am/pm service mark, trademark and service names as prescribed by BPWCP and to conduct the business of the Store in such a manner as to not reflect unfavorably on BPWCP's good will, service marks, trademarks and service names.

1.07  Operator agrees, immediately upon the termination of this Agreement or termination of any subsequent Store Agreement to cease and forever abstain from using the am/pm service mark and service name and other service marks, trademarks and service names used in connection with am/pm mini markets.

### B.    Copyrights

1.08  BPWCP grants to Operator a nonexclusive right and license during the term of this agreement to use BPWCP's franchise accounting system software at the am/pm mini market and display at Operator's am/pm Store copyrighted am/pm signage, posters, and other advertising and point of purchase materials. No rights of reproduction or distribution are included in the grant, and upon termination for any reason Operator shall immediately cease and desist from using or displaying any such copyrighted materials.

### C.    Trade Secrets and Confidentiality

1.09  BPWCP shall furnish or make available to Operator for use solely in connection with Operator's conduct of Operator's am/pm Store, BPWCP's franchise accounting system software, an am/pm Store System/Operations Manual, guides, and other forms and materials. Operator agrees during the term of this Agreement and after termination to keep confidential and not to furnish information as to the methods of operation, advertising programs or ideas, business information, or any other confidential information of BPWCP relating to the operation of any am/pm Store, to any person, except BPWCP, Operator's employees, or Operator's attorneys or accountants engaged by Operator in connection with Operator's operation of Operator's am/pm Store who have undertaken the same obligation of confidentiality as set forth herein for Operator. Notwithstanding the foregoing, nothing in this Agreement or any other agreement between the parties shall limit the ability of the Operator to consult with any tax advisor regarding tax issues pertaining to the am/pm franchise business.

new-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

2 of 34

BP 02794

## ARTICLE 2

### Relationship of Parties

2.01    Neither Operator nor any of its employees shall hold itself or himself out at any time as an agent, representative, partner, joint venturer or employee of BPWCP. Operator shall have no authority, right or power to, and shall not bind nor obligate BPWCP in any way, manner or thing whatsoever, nor shall Operator represent that it has any right or power to do so. Operator shall undertake all obligations herein described as an independent contractor and shall exercise and be responsible for the exclusive control of the Store and Premises and all activities conducted therein and therefrom. In order to communicate with BPWCP, government agencies and others regarding matters such as financial reporting, safety, health and security, an ability to comprehend and communicate in English is necessary. Passing an English proficiency test is required.

2.02    Operator shall be solely responsible for hiring, supervising and directing all employees, the payment and withholding of all payroll and other taxes imposed upon or determined by wages and salaries of such employees, and for complying with all applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws. BPWCP shall have no control over employees of Operator, including, without limitation, the terms and conditions of their employment.

2.03    Unless otherwise expressly set forth in this Agreement, "Operator" shall include and refer to the sole proprietor, shareholders if franchisee is a corporation, partners if franchisee is a partnership and members if franchisee is an LLC.

2.04    Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

## ARTICLE 3

### am/pm Store Systems/Operations Manual; Extranet

3.01    Operator agrees that it shall operate the Store and maintain the Premises in accordance with the standards, methods, procedures, requirements, instructions, food specifications and equipment specifications set forth in the am/pm Store Systems/Operations Manual ("Manual" or "Systems Manual"), and any and all subsequent amendments and supplements thereto. BPWCP shall loan to Operator a copy of the Manual which shall be furnished to Operator upon execution by Operator of this Agreement; subsequent amendments and supplements shall also be loaned and furnished to Operator and Operator shall be required to acknowledge receipt of any of the foregoing loaned materials. The manual may be provided in writing, on CD-ROM, via the internet, extranet or equivalent means. Operator further agrees to instruct and keep its employees fully informed of all such methods and procedures as shall be promulgated by BPWCP from time to time. The Manual, as presently constituted and as it may hereafter be amended or supplemented by BPWCP from time to time, is incorporated in and made a part of this Agreement. Operator acknowledges and agrees that compliance with the standards, methods, procedures, requirements, instructions and food specifications contained in the Manual (as from time to time amended or supplemented) is important to Operator and to BPWCP. Failure to adhere to the provisions of the Manual shall constitute a breach of this Agreement.

3.02(a) Operator must maintain a computer connection to connect to BPWCP's extranet, through which BPWCP and Operator may communicate with each other and through which BPWCP may disseminate the Manual, updates thereto, planograms, inventory books, required standards and specifications and other confidential information from time to time. BPWCP shall have sole discretion and control over all aspects of

the extranet, including the content and functionality thereof. BPWCP will have no obligation to maintain the extranet indefinitely, and may dismantle it at any time without liability to Operator.

(b) Operator shall have the privilege to use the extranet, subject to Operator's strict compliance with the Standards, protocols and restrictions that BPWCP may establish from time to time. Such Standards, protocols and restrictions may relate to, among other things, (a) the use of abusive, slanderous or otherwise offensive language in electronic communications, (b) communications between or among operators that endorse or encourage breach of any operator's franchise agreement, (c) confidential treatment of materials that BPWCP transmits via the extranet, (d) password protocols and other security precautions, (e) grounds and procedures for BPWCP's suspending or revoking an operator's access to the extranet, and (f) a privacy policy governing BPWCP's access to and use of electronic communications that operators post to the extranet. Operator acknowledges that, as administrator of the extranet, BPWCP can technically access and view any communication that any person posts on the extranet. Operator further acknowledges that the extranet facility and all communications that are posted to it will become BPWCP's property, free of any claims of privacy or privilege that Operator or any other person may assert.

(c) Operator shall establish and have continually available (during all times that the extranet shall be established and until the termination of this Agreement) an electronic connection (the specifications of which shall be specified in the Manual) with the extranet that allows BPWCP to send messages to and receive messages from Operator, subject to the standards and specifications. Operator shall participate and use the extranet in accordance with BPWCP's requirements as set forth in the Manual.

(d) If Operator shall breach this Agreement or any other agreement with BPWCP or it's Affiliates, BPWCP may, in addition to, and without limiting any other rights and remedies available to BPWCP, disable or terminate Operator's access to the extranet without BPWCP having any liability to Operator, and in which case BPWCP shall only be required to provide Operator a paper copy of the Manual and any updates thereto, if none have been previously provided to Operator, unless not otherwise entitled to the Manual.

ARTICLE 4

Hours of Operation and Personal Participation

4.01  Operator shall promote the business of the Store and shall cause the Store to be operated continuously throughout the term of this Agreement. Operator shall cause the Store to be open for business not less than sixteen (16) hours every day of the year, excluding Christmas, or the maximum hours permitted by applicable law if less than sixteen (16) hours.

4.02  Failure of Operator to cause the store to be open for business in the manner and during the hours and days prescribed herein shall constitute a material breach of this Agreement. In addition to any other remedy available to BPWCP, in the event Operator fails to operate the Store during the hours and days prescribed in Section 4.01 during any calendar month during the term of this Agreement, Operator shall pay BPWCP, as liquidated damages and not as a penalty, in addition to the royalty fee payable for such month, one thirtieth of the minimum monthly royalty fee for each day Operator fails to cause the Store to be open for the prescribed hours.

4.03  Operator shall participate in the operation of the am/pm business for a period of at least 40 hours per week and if Operator has more than one am/pm mini market, Operator must have one employee for each store, who has attended and successfully completed the am/pm Store Manager training program offered by BPWCP and who is employed on a full time basis at each store ("Store Manager"). If Operator operates more than one am/pm mini market, Operator hereby designates the person whose name is set forth in PART I, Section 4.03, hereof as the Store Manager for the Premises which are the subject of this Agreement (within two months of the date such designated person is no longer employed at the store, Operator must replace such Store Manager with another trained Store Manager or the franchise may be

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

4 of 34

103

BP 02796

terminated). For purposes of personal participation, Operator shall be the sole proprietor if Operator is a sole proprietor, the Operational Designee if Operator is a corporation, partnership or LLC. The Operational Designee must be an officer or shareholder if Operator is a corporation, a member or manager of the LLC if Operator is an LLC, a general partner if Operator is a limited partnership, a partner if Operator is a partnership other than a limited partnership. In the case of Concurrent Operations at the Premises, as more fully described in Article 4.05 hereof, Operator is obligated to participate in the operation of all franchise businesses for at least 40 hours per week.

4.04  Failure of Operator to participate in the operation of the am/pm business as described in Section 4.03 and/or, if applicable, to have the Store Manager designated in PART I employed at the store on a full time basis and/or, if applicable, to replace such person with another trained Store Manager within two months from the date the Store Manager designated in PART I or any successor to such person is no longer employed at the store shall constitute a material breach of this Agreement.

4.05  In the event the am/pm mini market, with BPWCP's approval, is operated at the Premises by Operator in conjunction with another or more than one other BPWCP franchise, ("Concurrent Operations"), such Concurrent Operations shall be conducted and governed by the terms and conditions of the franchise agreements of each of the applicable franchises and any additional special terms, conditions and provisions relating to Concurrent Operations as may be included in such franchise agreements or other writing with regard to such operations.

4.06  Each individual who owns an interest in the franchise entity must sign a personal guarantee agreeing to discharge all obligations of the Operator under the franchise agreement. This will also be required of the individual's spouse where the individual lives in or the franchise is located in a community property state. BPWCP will only accept as a franchisee sole proprietorship, partnership, corporation or limited liability company. A franchisee may not be a trust, custodian or trustee of a trust, nor can a trust, trustee or custodian be a partner, shareholder or member of an LLC.

ARTICLE 5

Term

5.01  This Agreement shall be binding on the parties as of the Effective Date. Except as otherwise provided in this Article, the "Commencement Date" shall be on the date set forth in PART I. If no date is set forth in PART I, the Commencement Date shall be the date established by BPWCP by notice to Operator ("Notice of Final Inspection and Readiness") as the date the Premises are available for occupancy and ready for conduct of the business of the am/pm mini market. The term hereof shall end as of 10:00 a.m. on the first day after the last day of the one hundred twentieth (120th) or two hundred fortieth (240th) full calendar month following the Commencement Date as set forth in Part I, unless this Agreement is terminated earlier pursuant to the terms hereof. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Operator before the end of the term.

5.02  New Construction or Raze and Rebuild.

(a) If this Agreement is for an am/pm mini market that will be newly constructed after this Agreement is executed or an am/pm mini market at Premises where an existing BPWCP franchised premises is to be razed and a new am/pm mini market constructed after this Agreement is executed ("New Construction" or "Raze and Rebuild"), BPWCP shall provide standard generic architectural, plumbing and electrical site plans to Operator. It will be necessary for Operator to have the generic plans modified in order to take into consideration the topographic features of the Premises, meet the zoning, setback, easement, sign codes, local building codes and other requirements. Operator shall promptly do all of the following:

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform                                    5 of 34

104                                    BP 02797

A. Have prepared and submit to BPWPC, for approval, in a format provided by BPWCP or acceptable to BPWCP, a Site Investigation Report which includes, but is not limited to, detailed Development Guidelines, Requirements and Restrictions, Roadway Considerations, Approval Process, Assessments and Fees, Project Timeline, Cost Estimate and Site Photographs.

B. Have prepared and submit to BPWCP for approval, architectural and construction plans and drawings for the am/pm mini market specific to the Premises.

C. Submit to BPWCP a copy of the deed, lease or other documents evidencing Operator's right to occupy and modify the Premises

D. Maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to construct and operate the am/pm mini market.

Within 60 days after BPWCP's approval of the architectural plans and drawings, Operator shall apply for all licenses, permits, variances and other required governmental approvals (collectively "Permits") necessary for the New Construction or the Raze and Rebuild. BPWCP, at its sole discretion, may provide assistance in obtaining Permits. All expenses in connection with obtaining Permits shall be Operator's responsibility.

All changes to the BPWCP approved plans to meet local building codes and other governmental requirements and changes not resulting from governmental requirements must be submitted to BPWCP in writing with drawings and specifications and approved by BPWCP in advance of construction. If changes are mandated by governmental authority, a copy of the specific instructions to change the plans shall be submitted along with the request for approval of the changes. Any changes not mandated by governmental authority shall be submitted simultaneously as one consolidated request for modification of the approved plans.

All construction of the am/pm mini market and Premises shall be in accordance with plans and drawings approved by BPWCP and, once constructed, Operator shall not make alterations or changes to the Store or Premises during the term of this Agreement, except with the prior written consent of BPWCP. Prior to the start of construction, Operator shall transmit a complete construction drawing set in electronic format to BPWCP. Software format shall be AutoCAD release 14 or 13. Drawings created on software other than those AutoCAD versions shall be converted prior to transmittal. Multiple drawing files shall be contained on either a 100 mega byte zip disk or 650 megabyte compact disk. Single sheet or small files, 1MB or less, shall be emailed to a designated addressee. All cross references must be bound prior to transmittal.

If Operator uses a BPWCP approved architectural firm to prepare the Site Investigation Report and all architectural plans and drawings, and after Operator has paid the total Initial Franchise Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000 for the fees and expenses incurred for such Report and plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to such architectural firm, but no sooner than the start of construction.

(b)    Operator shall obtain a license to sell beer and wine if lawful in the jurisdiction in which the Store is located.

(c)    If this Agreement is for New Construction, Operator shall begin construction within 18 months of the Effective Date and complete construction and open for business within 24 months of the Effective Date.

(d)    If this Agreement is for a Raze and Rebuild, Operator shall complete construction and open for business within 12 months of the Effective Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

6 of 34

BP 02798

(e)     Only in the event that Operator is not able, for reasons beyond Operator's control, to obtain permits required for New Construction or Raze and Rebuild or obtain a beer and wine license, if lawful in the jurisdiction where the Premises is located, Operator may terminate this Agreement within 18 months of the Effective Date if this Agreement is for New Construction or 12 months of the Effective Date if this Agreement is for a Raze and Rebuild. In the event of such termination by Operator, any initial franchise fee paid to BPWCP shall be refunded after deducting the greater of either BPWCP's out of pocket expenses incurred or $1500. No interest shall be payable on any refunded amounts.

(f)     In the event that Operator fails to timely comply with any of the requirements set forth herein, does not complete the New Construction or Raze and Rebuild, obtain a beer and wine license, if available, and satisfactorily complete the initial training described in Article 16 of this Agreement within the time limits specified, in addition to any other remedies BPWCP shall have under this or any other agreement, BPWCP may terminate this Agreement.

(g)     After Operator has completed construction and successfully completed required initial training, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date. If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, at its option, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business. In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement. In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.03 Retrofit or Rebrand.

(a) If this Agreement is for an existing am/pm mini market that does not meet BPWCP's current visual and design standards, Operator shall made modifications to the am/pm mini market and the Premises in accordance with the Retrofit Program Design Intent, Visual Standards and approved am/pm Store layouts provided to Operator ("Retrofit Program"). Such Retrofit Program includes building enhancements, installation of new fixtures, including shelving gondolas and sales counters, new equipment and new graphics as specified in the Retrofit Program Design Intent. Operator shall obtain, at its expense all necessary permits and licenses to complete such modifications and installations. In the event that permits necessary for the retrofit are obtained by BPWCP and assigned to Operator, Operator shall reimburse BPWCP for its out of pocket costs to obtain such permits. Operator shall complete the Retrofit Program no later than nine months after the Effective Date of this Agreement.

(b)     If this Agreement is for an existing convenience store that is not branded am/pm, Operator shall make modifications to the store and Premises to comply with, at a minimum, the Retrofit Program. In addition, BPWCP and Operator may agree to additional modifications. Operator shall apply for all necessary permits and licenses to complete such modifications and installations. Operator shall complete the Retrofit Program and any additional modifications no later than nine months after the Effective Date of this Agreement.

(c)     Operator shall maintain satisfactory creditworthiness and submit to BPWCP all documents reasonably requested by BPWCP to verify Operator's financial ability to retrofit or rebrand and operate the am/pm mini market. If Operator fails to complete the Retrofit Program within nine months of the Effective Date of this Agreement, in addition to any other remedies BPWCP may have under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.

(d)     . All costs and expenses in connection with the Retrofit Program modifications shall be at the sole expense of Operator. If Operator uses BPWCP approved architectural firm to prepare all architectural

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

7 of 34

106                                        BP 02799

plans and drawings to Rebrand a convenience store, but not to Retrofit an existing am/pm mini market, and after Operator has paid the total Initial Franchisee Fee set forth in Article 7, BPWCP shall reimburse Operator up to a maximum of $20,000.00 for the fees and expenses incurred for such plans and drawings upon submission to BPWCP of satisfactory documentation of the payment of such fees and expenses to the approved architectural firm, but no sooner than the start of the retrofit construction.

(e)    After Operator has completed the retrofit or rebrand work and training, if applicable, BPWCP shall issue the Notice of Final Inspection and Readiness setting forth the Commencement Date. If Operator fails to open the Store for business on the Commencement Date as established by the Notice of Final Inspection and Readiness, in addition to any other remedies provided in this Agreement, at its option, BPWCP shall have the right to collect, as liquidated damages and not as a penalty, in addition to the minimum royalty fee, one thirtieth of the minimum royalty fee per day for each calendar day operator fails to open the Store for business.  In addition, if Operator fails to open the Store for business within 30 days after the Commencement Date, in addition to any other remedies BPWCP has under this Agreement or any other agreement between the parties, BPWCP may terminate this Agreement.    In addition, in the event of such termination pursuant to this subparagraph, the Initial Franchise Fee shall not be refundable in whole or in part.

5.04  Upon expiration of the term of this Agreement if this Agreement is the initial Store Agreement for the Premises, Operator shall have the right to be offered a subsequent franchise Agreement for the Premises which right can be exercised by payment of the then-current Renewal Franchise Fee or other fees which may then be payable and by execution of a new franchise agreement and collateral agreements on the terms and conditions then existing, which may differ materially from those presently existing, provided that:

(a)    Operator gives BPWCP written notice of its election to be offered a subsequent franchise agreement not less than six months prior to the expiration of the term of the initial Store Agreement ("notice of election"); and

(b)    Operator, at the time of the notice of election and at the end of the term of the initial Store Agreement is not in default of any of the terms or conditions of such Store Agreement or any other agreement between Operator and BPWCP and has substantially complied with the terms and conditions of all such agreements during the term of such Store Agreement; and

(c)    All of the Operator's accrued monetary obligations to BPWCP have been satisfied and timely met throughout the term of the initial Store Agreement; and

(d)    Operator is in compliance with the standards set forth in the then-current Systems Manual and has made or has provided for, to BPWCP's reasonable satisfaction, such renovation and modernization of Operator's Premises as BPWCP may reasonably require, including, without limitation, signs, equipment, furnishings, and decor so as to reflect the then-current image required for new am/pm mini markets; and

(e)    BPWCP has not exercised its right to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic area in which the Premises are located.

5.05  If this Agreement has a term of 240 months, after 120 months, Operator will make such modifications and improvements as may be required to comply with the then current visual and design standards for am/pm mini markets and which may include such items as painting, installation of new fixtures and equipment and compliance with new visual standards but shall not include major structural modifications.

This space is intentionally left blank

non-lessee operator (DOFO)
am/pm- 241 WR-1 (4/2006)
Uniform

8 of 34

107

BP 02800

ARTICLE 6

Premises and Store Equipment

6.01   The am/pm mini market franchise granted hereunder is for the operation of an am/pm mini market on the Premises set forth in PART I hereof which must have prior approval from BPWCP ("Premises") during the term hereof and may not be relocated to another site.

(a)   If no address has been inserted in the space provided in Part I at the time of execution of this Agreement, Operator shall promptly following the execution hereof (but in no event more than 6 months following the Effective Date) locate one or more proposed sites which meet BPWCP's then-current Standards and specifications, which must be located within the Target Area designated by BPWCP in Part I. Operator shall submit to BPWCP such demographic and other information regarding the proposed site(s) and neighboring areas as BPWCP shall require, in the form prescribed by BPWCP ("Site Review Request"). BPWCP may seek such additional information as it deems necessary Operator shall respond promptly to such request for additional information. If BPWCP shall not deliver written notice to Operator that BPWCP accepts the proposed site, within 30 days of receipt of Operator's Site Review Request, or within 10 days after receipt of such additional requested information, whichever is later, the site shall be deemed rejected. If BPWCP accepts the proposed site it shall notify Operator of its acceptance of the site ("Acceptance"), which Acceptance shall be subject to Operator entering into a final lease or purchase agreement, and such other conditions as BPWCP may impose. Promptly following mutual execution of this Agreement, or Operator's receipt of Acceptance, if no address has been inserted in the blank space provided above, Operator shall proceed to negotiate a lease or purchase agreement for the site. Operator's entering into any lease or purchase agreement for the Premises unless Operator has received Acceptance relating to the proposed site is at Operator's sole discretion and at Operator's sole risk. Upon Acceptance of the proposed site by BPWCP, such site shall be deemed to be the "Premises" as defined above.

(b)   BPWCP may voluntarily (without obligation) assist Operator in obtaining an acceptable location. Neither BPWCP's said assistance, if any, its acceptance of Operator's proposed site, nor its acceptance of the proposed lease or purchase agreement shall be construed to insure or guarantee the profitable or successful operation of the Premises by Operator, and BPWCP hereby expressly disclaims any responsibility therefore. Operator acknowledges its sole responsibility for finding the Premises. Operator acknowledges its sole responsibility for finding each site for the Store it develops pursuant to this Agreement.

6.02   Operator is required to have installed on the Premises the equipment shown on the list entitled "Store Equipment" attached to PART I ("Store Equipment"). Operator agrees to install the Store Equipment on or before the Commencement Date. Certain Store Equipment must be purchased or obtained from approved suppliers, as set forth in the Store Systems Manual. All Store Equipment must meet BPWCP's specifications, including but not limited to specifications with respect to brand, model, size, color and quality. Operator may not install additional equipment, fixtures or machines without the prior written consent of BPWCP. Operator shall maintain all equipment, including required and optional equipment, ready for use and in operable condition and shall use or permit the equipment to be used only in any in a manner consistent with the manufacturer's instructions, and Operator shall utilize the equipment and exert Operator's best efforts to promote the retail sale of items or services for which the equipment is designed. Operator agrees not to remove any of the Store Equipment from Store without the prior written consent of BPWCP except in the event replacement of the equipment is necessitated by malfunction, in which case Operator shall replace the equipment with the then current equipment or equipment meeting the same specifications with respect to size, color and quality as the equipment replaced, if the malfunctioning equipment is less than 3 years old. Operator shall notify BPWCP of any such replacement. BPWCP reserves the right to add or delete Store Equipment during the term of the Agreement and Operator will install or remove such Equipment within 90 days after written notice from BPWCP. If specifications for Store Equipment or approved suppliers for Store Equipment are changed by BPWCP, any replacement of Store Equipment by Operator, due to wear and tear, malfunction,

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)
Uniform

9 of 34

108

BP 02801

depreciation or otherwise, shall be with the then current Store Equipment. Otherwise, Operator will be required to obtain the then current Store Equipment upon renewal.

6.03  Operator shall not operate other business within the am/pm mini market, the building housing the am/pm mini market or on the Premises without the prior consent of BPWCP.

## ARTICLE 7

### Fees

7.01  (a)  Operator shall pay BPWCP an Initial Franchise Fee or Renewal Franchise Fee in the amount set forth in PART I. The Initial Franchisee Fee is payable as follows: one half upon the signing of this Agreement by Operator; The remainder of the Initial Franchise Fee is payable on the Commencement Date. The Initial Franchise Fee shall not be considered paid until paid in full.

(b)  The Initial Franchise Fee is not refundable in whole or in part except for the following circumstances:

(1)    If this Agreement is for New Construction or Raze and Rebuild at the Premises, after Operator executes the Agreement, BPWCP shall have up to 90 days to execute the Agreement. BPWCP shall not be obligated under the Agreement until it is executed by BPWCP. If BPWCP elects not to execute the Agreement, BPWCP shall notify Operator and shall return, in full, any Initial Fee paid by Operator.

(2)    If this Agreement is for New Construction or Raze and Rebuild, and the Operator fails to complete the New Construction or Raze and Rebuild, obtain a beer and wine license, if lawful in the jurisdiction in which the Premises is located, satisfactorily complete the initial training program or meet the requirements of Article 5 or 6.01(a) within the time limits specified, BPWCP may terminate this Agreement and refund one half of the total Initial Franchise Fee provided that in the event Operator has paid only one half of the Initial Franchise Fee, BPWCP shall retain the one-half payment and there shall be no refund.

(3)    If this Agreement is for New Construction or a Raze and Rebuild and the Operator terminates this Agreement within 18 months for New Construction or 12 months for Raze and Rebuild after the Effective Date of this Agreement pursuant to 5.02 (e) for inability to obtain permits or a beer and wine license for reasons beyond Operator's control, BPWCP will refund the Initial Franchise Fee paid after deducting the greater of either BPWCP's expenses incurred in contemplation of Operator operating an am/pm mini market or $1,500.00.

(4)    The Initial Franchise Fee or Renewal Franchise Fee shall be prorated on a monthly basis over the term of the Agreement from the Commencement Date to the termination date and shall be refundable or payable on such prorated basis if BPWCP terminates the Agreement for the following reasons:

(i)  Operator's death;

(ii)  Operator's physical or mental incapacitation, for more than 90 consecutive days, which renders Operator unable to provide for the continued proper operation of the am/pm mini market;

(iii) Condemnation or the taking, in whole or in part, of the Premises pursuant to the power of eminent domain;

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

10 of 34

109                                                                 BP 02802

(iv) Destruction of all or a substantial part of the Premises through no fault of the Operator; or,

(v) A determination made by BPWCP in good faith and in the normal course of business to withdraw from and to no longer maintain the marketing of Motor Fuels through retail outlets and/or the am/pm mini market franchise in the relevant geographic market area in which Operator's am/pm mini market is located.

In the event Operator's Initial Franchise Fee or Renewal Franchise Fee is returned in whole or in part for any reasons, no interest shall be paid on the amount returned.

BPWCP's policy with respect to the payment of the Initial Franchise Fee or Renewal Franchise Fee for any term of the franchise offered in the future may differ from that set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(c) If this Agreement is for Operator's subsequent term of the Franchise at the Premises, the Renewal Franchise Fee ("Renewal Fee") is payable as follows:

| Amount Payable | | Due Date of Payment for Operator's Subsequent Term |
|---|---|---|
| One third of the total amount payable | - | On the Commencement Date of this Agreement |
| One third of the total amount payable | - | On the 1st day of the 2nd year of the term of this Agreement |
| One third of the total amount payable | - | On the 1st day of the 3rd year of the term of this Agreement |

Notwithstanding the foregoing, payment of any remaining balance due and owing BPWCP on account of the renewal fee shall be accelerated to become due and payable on or before the effective date of termination of this Agreement and, at BPWCP's sole discretion, on or before the effective date of the sale, transfer or assignment with BPWCP's consent of Operator's interest in this Agreement and on or before the effective date a designated successor-in-interest assumes all of a deceased or incapacitated Operator's duties and obligations under this Agreement and other agreements with BPWCP.

If the Renewal Franchise Fee is not accelerated, the transferee or successor-in-interest must assume the obligation to make payments.

The Renewal Franchise Fee is not refundable, in whole or in part, except in the circumstances described in Article 7.01(b)(4) of this Agreement.

In the event Operator's Renewal Franchise Fee is returned, in whole or in part, for any of the reason, no interest shall be paid on the amount returned.

BPWCP's policy with respect to schedules of payments and due dates of payments on account of the Renewal Franchise Fee for any term of the franchise offered in the future may differ from those set forth above and, accordingly, schedules of payments and due dates of payments shall be in accordance with BPWCP's then current policy.

(d) Operator shall pay an Initial Development Fee, if applicable, in the amount set forth in PART I as follows: one-half is payable at the time the Operator executes this Agreement and the other half is payable on the Commencement Date.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

11 of 34

BP 02803

The Initial Development Fee is not refundable in whole or part except in the circumstances described in Article 7.01(b)(4) of this Agreement and no interest shall be paid on the amount returned.

7.02  (a) Unless otherwise agreed to in writing by the parties, Operator shall pay BPWCP, as a monthly royalty fee, six percent (6%) of the monthly gross sales, as that term is hereinafter defined, but not less than the minimum royalty fee set forth in PART I. Notwithstanding the foregoing, unless otherwise agreed to in writing by the parties, in the event Operator operates the Store twenty-four (24) hours of every day in any given calendar month, the monthly royalty fee for such a month shall be five percent (5%) of the monthly gross sales, but not less than the minimum monthly royalty fee set forth in PART I.

The minimum monthly royalty fee is payable on the Commencement Date and thereafter in advance on or before the first day of each calendar month during the term of this Agreement.  For any month this Agreement is in effect which is less than a full calendar month, the minimum monthly royalty fee shall be prorated on a daily basis.

BPWCP shall have the right to increase the amount of the royalty fee at any time by up to one percent (1%) during the term of this Agreement in accordance with BPWCP's then prevailing royalty fee policy. BPWCP shall notify Operator not less than 90 days in advance of any such change in royalty fee.

(b)     As used herein the term "gross sales" shall mean the total amount of the sales of Operator and any inventory variation calculated as described below.

(1)   Gross sales shall be valued in United States currency, whether received in that form or otherwise, without deduction on account of any of the following:

(i)  the cost of the goods sold, including taxes paid by Operator in procuring goods for resale;

(ii)  the cost of material used, labor or service cost, interest paid, or any other expense; or

(iii)  cost of transportation of the goods.

(2)  Gross sales includes all cash, credits, property or other consideration received for:

(i)  all sales of merchandise made from or in the Store or in the immediate vicinity of the store, including, but not limited to, a cart, kiosk, drive thru or sidewalk sale;

(ii)  all compensation received for services performed from or in the Store including but not limited to, commissions and referral, commissions on lottery and lotto tickets (including all payments by state agencies for the sale of tickets and for the redeeming of winning tickets), handling and placement fees and fees for placement of coin operated and other machines; and

(iii)  all rentals of equipment or merchandise.

(3)  The inventory variation shall be determined each time a physical inventory is taken of merchandise currently held for sale in the Store, as required in Section 15.03 (b).  The inventory variation is defined as either the inventory gain (physical inventory value is greater than book inventory) or the inventory loss (book inventory value is greater than physical inventory).  The inventory variation subject to gross sales calculation for royalty reporting is the inventory variation in excess of the allowable variation.  Detailed calculations for variations and allowable variations are further described in the Store Systems Manual.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

12 of 34

111

BP 02804

(4)  The following are not included in gross sales:

(i)  gasoline and other motor fuel sales, if any, including all applicable motor fuel and sales taxes;

(ii)  any deposits refunded to customers;

(iii)  sale price of property returned by customer when the full sale price is refunded either in cash or credit. Where the customer is required to exchange returned merchandise for other new merchandise, the cashier is required to ring the sale of the new merchandise on the register and the sale of the new merchandise is included in gross sales subject to royalty. For the purpose of this paragraph, refund or credit of the entire amount shall be deemed to be given when the purchase price, less rehandling and restocking costs, is refunded or credited to the customer;

(iv)  the amount of any tax imposed by the United States or any city, county, state, or other governmental entity or agency or instrumentality thereof upon or with respect to retail sales of tangible personal property measured by a stated percentage of sales price or gross receipts, whether imposed upon the Operator, as a seller, or upon the customer, as a purchaser.

(v)  for newly constructed or razed and rebuilt am/pm mini markets only, store sales made during the first 7 days of the term of the franchise, i.e., during the period comprised of the Commencement Date as established by the "Notice of Final Inspection and Readiness" and the next succeeding 6 days of initial operation.

(vi)  store sales made during an eligible Grand Opening Event for a new store, or for an existing store, following completion of BPWCP-approved retrofit, remodeling or rebuilding. An eligible Grand Opening Event, which event is not to exceed seven consecutive days, is more fully described in Article 14.02 hereof.

(c)      Any monthly royalty fee due in excess of the minimum monthly royalty fee shall be payable on or before the tenth (10th) day of the calendar month succeeding the month in which the sales were made for which said fee is due. Payment of the royalty fee shall be made in accordance herewith and with forms and procedures set forth in the Systems Manual.

7.03  Operator shall pay to BPWCP a security deposit in the amount set forth in PART I on or before the Commencement Date of this Agreement. If Operator shall be in default at any time in the performance of any of the terms and conditions of this Agreement, BPWCP, at its option, shall have the right, in addition to any other remedy it may possess either at law or at equity or under the terms of this Agreement, to correct said default and deduct any cost or expense in connection therewith from said security deposit. Immediately upon application of all or part of said security deposit toward any such cost or expense, Operator shall pay to BPWCP an amount equal to that portion of the security deposit so applied so as to restore the security deposit to the amount stated above. Except as provided herein, the security deposit, less any depletion because of default by Operator shall be refunded to Operator without interest upon termination of this Agreement.

7.04  Unless otherwise agreed to in writing by the parties, commencing on the Commencement Date, Operator shall pay an advertising and promotion fee for each month equal to 5.5% of Operator's gross sales. ("Gross Sales" is defined in Section 7.02 above.) At any time during the term hereof, on thirty (30) days' prior written notice to Operator, BPWCP may increase or decrease the advertising and promotion fee, but the total advertising and promotion fee may not be increased to more than six and one-half percent (6.5%) at any time during the term of this Agreement and BPWCP may not increase the fee by more than one percent (1%) in any calendar year. The advertising and promotion fee is payable on or before the tenth (10th) day of the calendar

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

13 of 34

112

BP 02805

month succeeding the month in which sales were made upon which the fee is calculated. In addition, Operator may be required to pay shipping costs, plus the cost of replacement signs, if Operator requests duplicate signage.

7.05   Any fees and other amounts due and owing BPWCP pursuant to this Article and any other provisions of this Agreement shall be paid when due by Operator to BPWCP, at BPWCP's option, to BPWCP's address set forth in the Systems Manual or BPWCP's representative, by money order approved by BPWCP, business check, cashier's check, wire transfer or electronic funds transfer initiated by BPWCP, whichever BPWCP directs and which may change from time to time at BPWCP's sole discretion.  Operator's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association).  If any Agreement between Operator and BPWCP requires or permits payment by check, all checks shall be made payable to "BPWCP" or "BP West Coast Products LLC," and to no other person, firm, or entity.  If such Agreement requires or permits payment by wire transfer, all such payments shall be made to "BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by automated clearing house ("ACH"), all such payments shall be made to "BPWCP", c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP.  If such Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by the BPWCP credit department.  Operator agrees to indemnify BPWCP for any loss or expense caused by Operator's failure to comply with this Paragraph.  Payment shall be deemed made when, and only when, its receipt has been verified by BPWCP.  Receipt by BPWCP of any monies due BPWCP after notice of termination or non-renewal does not constitute a waiver by BPWCP of such notice of termination or non-renewal.

ARTICLE 8

Licenses, Permits, Taxes and Compliance with Laws

8.01   Operator agrees to obtain, post as required, and ,maintain, at its expense, all permits and licenses necessary for the operation of the Store and Store Equipment including, without limiting the foregoing, all permits and licenses required for selling beer and wine, if available pursuant to applicable laws and regulations, and for signs used or installed by Operator.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all ad valorem taxes assessed upon the Premises and all fees, and sales, use, rental, gross receipts, inventory, excise, income, business and occupation and any other taxes (including interest, penalties and additions to tax) imposed by any federal, state or local governmental authority upon Operator or BPWCP (except those taxes based upon or measured by the net income of BPWCP) in connection with the operation of the Store or in connection with any payments made pursuant to this Agreement.  Operator agrees to pay promptly when due and to hold BPWCP harmless from any taxes (including interest, penalties and additions to tax) imposed upon any property of Operator located at or used in connection with the operation of the Store.  Operator agrees to pay promptly when due and to hold BPWCP harmless from all sales or use taxes and other similar taxes (including interest, penalties and additions to tax) imposed upon or with respect to charges for the use of any loaned property.  Operator further agrees not to do any act which may result in the suspension or revocation of any permit or license required for the operation of the Store.  Operator shall furnish to BPWCP, promptly upon request, any documentation, which in BPWCP's sole discretion is required to evidence the payment of any tax, including but not limited to, official receipts of the appropriate taxing authorities, copies of tax returns and cancelled checks.

8.02   Operator shall at all times operate the Store and Premises in strict accordance with all applicable federal, state and local laws, ordinances, rules, regulations and lawful directives or orders of public officials administering such laws.  Operator agrees to immediately notify BPWCP, in writing, of any citations, notices of violation or other communications alleging violations of federal, state or local laws, ordinances, rules, regulations, directives or orders, affecting the operation of the Store and Premises.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

14 of 34

113

BP 02806

8.03  Operator represents and warrants that as of the date hereof, Operator is in compliance with all leases, contracts and agreements affecting the Premises and Operator's use and possession of the Premises.

ARTICLE 9

Utilities

9.01  Operator shall be solely responsible for all costs of and taxes and assessments on utilities used at or provided to the Store.

ARTICLE 10

Appearance, Housekeeping, Maintenance,  Right of Entry and Crisis Management

10.01  Operator shall comply with the housekeeping and maintenance provisions set forth in the Systems Manual and shall maintain the Premises, Store and Store Equipment in a clean, orderly, safe, graffiti free, sanitary and operable condition.  BPWCP shall perform periodic inspections, for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

10.02    In addition to the requirements of Section 10.01, Operator shall perform all maintenance, repairs, and replacement, as necessary, of the Premises, Store and Store Equipment. Replacement equipment must meet BPWCP's then-current specifications.

Notwithstanding the foregoing, in the event of destruction of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice.  The effective date of such termination shall relate back to the date of destruction.

Accidents occurring at the Premises resulting in personal injury are to be reported in writing immediately to BPWCP; such reports shall include names and addresses of people involved, names of insurance companies involved, or potentially involved, and details of the accident.

10.03  Operator shall allow BPWCP the right of entry at all times and the right to remain on the Premises for examination and inspection of the Premises, Store, Store Equipment, Operator's books, records and reports and for any and all other purposes contemplated by any other provisions of this Agreement.  BPWCP shall have the right to enter upon the Premises in order to change, alter or modify its service marks, trademarks and service names and other similar indicia.

10.04  BPWCP shall not be liable to Operator for injury to or sickness or death of Operator or any other person or persons or for the damage to Operator's property or property of others caused by any fire, breakage, failure of, or other casualty occurring to refrigeration equipment, or leakage in any portion of the Store, or from water, rain or snow that may leak into, issue or flow from any part of the Store, or from drains, pipes or plumbing work in the Store, whether such injury or damage is caused by the failure of BPWCP to make repairs or otherwise.

10.05  Except for the time routinely necessary for patrons of the authorized business(es) conducted by Operator on the Premises to conclude purchase transactions in a prompt and efficient manner, Operator agrees not to permit any person(s), including children, teenagers and off-duty employees of Operator, to loiter, i.e. spend time idly or otherwise linger in an aimless way, on or about the Premises.

10.06 Operator shall continuously operate the required Video Surveillance equipment for its intended purpose consistent with the manufacturer's instructions and BPWCP's specifications and maintain at all times the equipment, including all of its components, in good working order.

10.07 (a) Operator shall notify BPWCP in writing within 10 days after Operator receives actual notice of the commencement of any investigation, action, suit, or other proceeding, or the issuance of any order, writ, injunction, award, or other decree of any court, agency, or other Governmental Authority that pertains to the Store or that may adversely affect Operator's operation of the Store or ability to meet its obligations hereunder.

(b) Upon the occurrence of a Crisis Management Event, Operator shall immediately inform BPWCP (or as otherwise instructed in the Manual) by telephone and thereafter promptly notify BPWCP in writing of all relevant details regarding such Crisis Management Event. Operator shall cooperate fully with BPWCP with respect to BPWCP's response to the Crisis Management Event. A "Crisis Management Event" means any event that occurs at or about the Store that has or may cause harm or injury to customers or employees, such as food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, criminal activity or any other circumstances which may damage the System, Marks, or image or reputation of the am/pm store, BPWCP or its Affiliates.

(c) In the event of the occurrence of a Crisis Management Event, BPWCP may also establish emergency procedures pursuant to which BPWCP may require Operator to, among other things, temporarily close the Store to the public, in which event BPWCP shall not be liable to Operator for any losses or costs, including consequential damages or lost profits occasioned thereby.

ARTICLE 11

Indemnity and Insurance

11.01 Operator agrees to indemnify, hold harmless and defend BPWCP from and against all claims, losses and damages for personal injury or death (whether to third persons, employees of Operator, contractors or agents of Operator), or damage to property, occurring on the Premises, or arising out of Operator's use or occupancy of the Premises, or arising out of Operator's use, custody or operation of the Store, Store Equipment, or any other equipment on the Premises excepting any damage or loss caused solely by the negligence of BPWCP or solely by BPWCP's failure to perform its obligations hereunder.

11.02 During the period this Agreement is in effect, Operator further covenants and agrees that Operator shall procure and maintain, at its expense, in full force and effect with a financially responsible insurance company, (1) Workers' Compensation Insurance, including Occupational Disease in accordance with the laws of the State in which the franchise is located, and Employers' Liability Insurance with limits of not less than $100,000 disease each employee and $100,000 each accident; and (2) General Liability Insurance with contractual liability, insuring the indemnity provision set forth in this Agreement, with products—completed operations coverage (with liquor law liability if Operator sells or dispenses alcoholic beverages)with limits of not less than $1,000,000 applicable to personal injury, including bodily injury, sickness, disease or death in any one occurrence and $200,000 for loss of or damage to property in any one occurrence or a combined single limit of not less than $1,000,000 in any one occurrence; Operator shall name BPWCP as an additional named insured under Operator's General Liability Insurance Policy. The General Liability Policy shall contain a contractual liability endorsement insuring Operator's obligation to indemnify BPWCP pursuant to Section 11.01. Operator shall furnish BPWCP, at its address shown herein, or such address as BPWCP may direct in writing, certificates of insurance evidencing the above-required insurances, and providing that Operator's contractual liability to BPWCP as set forth in Section 11.01 above is covered by such policy or policies and that no such policy or policies may be cancelled or changed materially without at least thirty (30) days' prior written notice to BPWCP. BPWCP reserves the right, from time to time, to revise the above stated amounts of insurance required to be maintained by Operator. Franchisee hereby understands and agrees that any coverage provided BPWCP by

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

16 of 34

115                                    BP 02808

Franchisee's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

ARTICLE 12

Promotions, Signs and Uniforms

12.01 Operator agrees to display signs and other promotional material solely in a manner as prescribed or authorized by BPWCP. The color, size, design and location of said signs shall be as specified by BPWCP. Operator shall not place additional signs or posters in, on or about the Store and Premises without prior written consent of BPWCP.

12.02  In executing this Agreement, Operator assigns to BPWCP Operator's rights to directly receive marketing, advertising, promotional, volume and retail display and placement allowances offered by any manufacturers or suppliers of products to Operator, excluding volume discounts given off invoice by any manufacturer or supplier and payment for magazine rack placement. Using funds collected from Operator pursuant to Section 7.04 and from other am/pm Operators and using funds collected as promotional and other allowances, BPWCP shall arrange or provide advertising and promotion which may, in BPWCP's sole discretion, include local or regional advertising placed by BPWCP, advertising copy and designs for use of Operator, display or other allowances to Operators, handbills, flyers, brochures, signs, point of purchase, billboards, high rise signs, internet advertising, other materials, the expenses of developing and producing promotions and advertising, both by outside agencies and BPWCP personnel, and marketing research. BPWCP's obligation to provide the foregoing shall be limited in cost to the amount of the advertising and promotion fee paid by Operator and funds collected as promotional and other allowances. The entire amount of the advertising and promotion fee paid by Operator and of promotional and other allowances shall be used by BPWCP for expenses relating to advertising and promotion at such times and in such manner as BPWCP solely determines. All promotion and advertising of the am/pm trademarks and service marks, wherever located and in whatever form, shall be deemed to benefit Operator. BPWCP shall make no accounting to Operator of the expenditure of advertising and promotion fees or promotional and other allowances. BPWCP may condition Operator's eligibility for and receipt of promotional, display and other allowances on Operator's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Franchisee's retail selling price commensurate with the amount of the allowance. Operator will not be eligible to receive all allowances and incentives if Operator does not pay the then current standard advertising and promotion fee.

12.03 Operator and Operator's employees shall be attired in clean, neat uniforms, meeting BPWCP's minimum required specifications at all times while working in the Store, as set forth in the Systems Manual. Operator, Operator's transferee and Operator's successor-in-interest must order the initial supply of 20 uniforms while attending BPWCP's training program at BPWCP's training center. In the case of Concurrent Operations, Operator's employees assigned to perform duties associated with the operation of a particular franchise are required to be attired in the uniform of that franchise.

12.04  Operator shall acquire items specified by BPWCP as part of the Merchandising Accessories Items Required.  BPWCP shall give to Operator a list of the specified items prior to Operator's execution of this Agreement.  Operator shall purchase the items from an approved vendor Operator shall maintain all merchandising accessories items required in a clean, workable and presentable condition throughout the term of the franchise. Operator shall sell products bearing am/pm marks, including fountain drinks, frozen desserts, hot chocolate, coffee, hot prepared foods, milkshakes, etc., in standardized containers bearing am/pm marks and Operator shall use only carry-out food trays bearing am/pm marks at the Store. Such containers and carry-out food trays shall be purchased from a vendor licensed by BPWCP and shall meet BPWCP's specifications as to type, quality, and style and shall bear the am/pm marks. BPWCP shall, upon written request by Operator or a vendor, license any responsible vendor upon a showing that the specifications shall be met in a lawful manner and products manufactured in accordance with BPWCP's business and HSSE policies and that the terms of

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

17 of 34

116

BP 02809

license are satisfactory, provided that BPWCP reserves the right to limit the number of vendors licensed and to charge a reasonable fee to evaluate a proposed vendor.

## ARTICLE 13

### Inventory, Working Capital and Required Foods and Beverages

13.01  Operator shall at all times maintain merchandise inventory of a type, quality, quantity and variety as provided in the Systems Manual.  BPWCP reserves the right to disapprove certain products and/or services in the event that, in BPWCP's sole discretion, such products and/or services are offensive to community standards or reflect unfavorably on the am/pm trademark or goodwill. Operator shall maintain 85% compliance with the approved shelf planograms or shelf schematics as set forth in the Systems Manual and as will be modified on written notice to Operator.

13.02  Operator shall at all times maintain working capital in an amount sufficient for the payment of current operating expenses as provided for in the Systems Manual.

13.03  Operator shall be required to continuously offer for sale a reasonable inventory of certain prepared foods, frozen desserts and beverages in quantities sufficient to meet customer demand.  The items specified by BPWCP are set forth in the Section entitled "Required Foods and Beverages" of the Chapter entitled "Food Specifications" of the am/pm Store Systems Manual.  Proprietary products and certain food and beverage items are required to be purchased from approved suppliers as set forth in the Systems Manual.  Operator shall fully participate in required programs including, but not limited to, fountain program, coffee program, hot food program and such other programs specified in the Store Systems Manual. Such participation shall include using all equipment required for the program, offering all food items required for the program, using all merchandising accessories required for the program and displaying all signs and trade dress required for the program. The required programs are detailed in the Store Systems Manual.

## ARTICLE 14

### Merchandising Services

14.01  From time to time, BPWCP shall provide Operator with a list of merchandise and equipment vendors approved or suggested by BPWCP. BPWCP will, upon written request by Operator or a vendor, approve any responsible vendor for products or equipment upon showing that the specifications will be met in a lawful manner and the terms of the contract are satisfactory, provided that BPWCP reserves the right to limit the number of approved suppliers to a reasonable number and to charge a reasonable fee to evaluate a proposed vendor. BPWCP will provide a list of merchandise items required or recommended by BPWCP for purchase by Operator, and merchandising requirements and recommendations.  A suggested electronic file or the product file will also be available for the operation of the Point of Sale scannable register(s).

14.02  BPWCP shall reimburse Operator for one-half of Operator's expenditures, if any, but not more than two thousand dollars ($2,000) reimbursement, for eligible grand opening advertising which may include any of the following types of media selected by Operator; handbills and flyers, including the cost of preparation, printing and distribution thereof; direct mail advertisements, including mailing lists and postage; local newspaper advertisements; special promotional equipment; give away items; special services such as clowns; and radio advertising.  All handbills, flyers, direct mail advertisements, newspaper advertisements and radio advertising must use BPWCP's approved formats, which shall be supplied to Operator.  To be eligible for reimbursement, such grand opening advertising, which event is not to exceed seven consecutive days, must be conducted following completion of original construction of the Store between the seventh (7th) and the ninetieth (90th) days after the Commencement Date or within ninety days following completion of BPWCP approved remodeling or rebuilding of an existing store.  Requests for reimbursement must be submitted by Operator to BPWCP within 90 days following the conclusion of the grand opening event.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

18 of 34

117                                              BP 02810

ARTICLE 15

Books, Records, Reports, Fee Verifications Reviews and Audits

15.01  For the purposes of ascertaining the amount of the fees due and payable by Operator pursuant to this Agreement, Operator shall maintain true and accurate business records, reports, accounts, books and data (collectively referred to herein as "business records") pertaining to the operation of the Store, as more fully described in the Systems Manual. Except for records which Operator may be required to retain and maintain on the Premises at all times pursuant to governmental requirements or other provisions of this agreement or other agreements between BPWCP and Operator, upon 24-hour notice from BPWCP.  Operator shall make Operator's complete business records available at the Store and shall permit BPWCP and its representatives to enter the Premises and the Store to examine Operator's business records.  In addition, in executing this Agreement, Operator grants BPWCP the right to electronically collect certain sales data via Operator's point-of-sale ("P.O.S.") system, including scanning devices, for purposes of verifying fees and analyzing sales, as more fully described in the am/pm Store Systems Manual.

15.02  The acceptance by BPWCP of the monthly royalty fee and advertising and promotion fee paid by Operator shall be without prejudice to BPWCP's right to examine Operator's business records of its gross receipts and inventories of food and other merchandise at the Store in order to verify the amount of the monthly royalty, advertising and promotion fees payable by Operator to BPWCP.  In addition, at any reasonable time upon twenty-four (24) hours' prior notice to Operator, BPWCP and its representatives may enter the Store and remain in the Store for the time necessary to perform fee verification reviews or audits of Operator's business records relating to the Store for the period covered by any statement required to be issued by Operator.  If a reviewer dispatched by BPWCP to Operator's am/pm mini market is unable to perform a review or audit due to missing or incomplete business records, or the review/audit is cancelled or postponed by Operator such that BPWCP incurs a fee, Operator shall be required to pay BPWCP such fee or its reasonable costs incurred in attempting to perform a review or audit.  Without in any way limiting BPWCP's right to review or audit or the grounds for or frequency of reviews or audits of Operator's business records, if Operator fails to submit to BPWCP the bookkeeping information required to be submitted in accordance with the am/pm Store Systems Manual, BPWCP shall have the right to review or audit Operator's business records every six months or more frequently to verify royalty fee and advertising and promotion fees due to BPWCP and, in such event, regardless of whether or not such review(s) or audit(s) disclose(s) a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing such review(s) or audit(s).  BPWCP may conduct mystery shops at Operator's location to determine compliance with the terms and conditions of the franchise; in the event such mystery shops result in a fee verification review/audit, regardless of whether such review discloses a deficiency, Operator shall be required to pay BPWCP its reasonable costs in performing the review, including the then-current cost of the mystery shops.  If a review or audit discloses a liability for royalty, advertising and promotion fees due to BPWCP, Operator shall pay promptly the amount of the deficiency.  If the sales amount from which the deficiency is derived is two percent (2%) or more in excess of the sales actually reported for royalty purposes by Operator for such a period, Operator shall promptly pay to BPWCP, as liquidated damages and not as a penalty, the cost of the review or audit in addition to the amount of the deficiency, plus interest at the highest legal rate and, in addition, BPWCP, at its option, may terminate this Agreement upon not less than five (5) days' prior written notice to Operator of BPWCP's election to do so.  Prior to giving its written consent to the transfer or assignment of the Store Agreement, BPWCP has the right to review or audit Operator's business records.

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all vendors of Operator to submit to BPWCP copy of any and all invoices evidencing sales of merchandise to Operator and Operator agrees to execute any authorization for release of such invoices to BPWCP as may be required in order for BPWCP to obtain such invoices.  BPWCP may also exercise its right to examine invoices direct from vendors via Operator's release at any time.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

19 of 34

118

BP 02811

In executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator agrees to provide BPWCP copies of State and Federal tax returns and schedules pertaining to Operator's am/pm Franchise and to execute any authorization to the tax agencies as may be necessary for BPWCP to obtain such tax returns and schedules directly from the tax agencies.

In addition, in executing this Agreement, in connection with any fee verification review or audit of Operator's books and records, Operator authorizes all banks and other financial institutions of Operator to submit to BPWCP copies of all bank or other financial institution statements and cancelled checks reflecting cash accounts of Operator that pertain to Operator's am/pm franchise and Operator agrees to execute any authorization for release of statements and cancelled checks to BPWCP as may be required in order for BPWCP to obtain such statements and cancelled checks.

15.03  Operator shall have physical inventories performed and shall provide reports, statements and data to BPWCP as described below and as described more fully in the Systems Manual.

(a)  Operator shall provide periodic reports relating to royalty fee calculations.

(b)  Once every two months (at approximately 60-day intervals), Operator shall have performed a physical inventory at retail value of merchandise held for sale in the Store by an independent inventory service.  BPWCP reserves the right, upon 15 days' prior written notice to Operator, to increase or decrease the interval at which physical inventories must be performed.  Unless prior written approval has been obtained, merchandise off-premises shall not be included in the physical inventory count.  Operator shall submit to BPWCP a statement by the service performing the inventory of the total amount of inventory in the Store.  At its sole discretion, BPWCP may have the inventory performed at its expense except that if Operator postpones an inventory such that BPWCP incurs a fee, Operator shall reimburse BPWCP for such fee.

(c)  In order for BPWCP to verify fees due and develop merchandising recommendations for Operator and information for the benefit of all am/pm franchises, Operator shall provide to BPWCP, or to an accounting service designated by BPWCP, such reports and data as are reasonably requested by BPWCP for such purposes and as are more fully described in the Systems Manual.  Such reports and data shall be in a format as designated by BPWCP and transmitted to BPWCP, at BPWCP's option, either by diskette or electronically.  Such reports shall include, but not be limited to, monthly profit and loss statements in a format acceptable to BPWCP and audited annual financial statements.

15.04  (a)  Before the Commencement Date of this Agreement Operator shall purchase from BPWCP, and thereafter use and maintain, the computerized point of sale cash collection system (including all related hardware and software) (the "POS and Back Office Management System") and personal computer system (the "Computer System"), specified by BPWCP at a cost of $20,000 - $25,000 for a two POS System and installation cost of $3,500 to $5,500.

(b)  The POS and Back Office Management System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network for the purpose of implementing software, transmitting and receiving data, accessing the internet for ordering and maintaining the POS and Back Office Management System.  The POS and Back Office Management System shall be electronically linked to BPWCP or its designee, and Operator shall allow BPWCP and/or its designee, to poll the POS and Back Office Management System on a daily or other basis at such times and in such manner as established by BPWCP or its designee, with or without notice, and to retrieve such transaction information including sales, sales mix, usage, and other operations data as BPWCP and/or its designee deems appropriate for any purpose, including verifying fees and analyzing sales, as provided in the Manual.  Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the POS and Back Office Management System, including hardware and/or software, that, from time to time, BPWCP requires. Operator shall pay a $500 per

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

20  of 34

119

BP 02812

year software maintenance fee, which may be increased up to 10% per year and an upgrade fee of up to $1,500 per year.

(c) The Computer System must be connected to a telephone line (or other communications medium specified from time to time by BPWCP) at all times and be capable of accessing the Internet via a designated third party network. BPWCP shall designate certain computer software used in the operation of Store. BPWCP may require Operator to maintain an e-mail account. Operator shall obtain all software and hardware, as BPWCP may specify to enable Operator to send and receive e-mail. Operator shall purchase from BPWCP, or a designated supplier, all updates, upgrades, enhancements and/or replacements to the Computer System, including hardware and/or software, that, from time to time, BPWCP requires. Upon request, Operator shall permit BPWCP to access the Computer System and the files stored therein via any means specified, including electronic polling communications.

(d) BPWCP may provide limited maintenance services for the POS and Back Office Management System and Computer System software, as more specifically set forth in the Manual. Operator shall pay BPWCP's then-current fee for such services, or Operator may obtain maintenance and help desk services from authorized third party providers.

(e) In the event that the POS and Back Office Management System and Computer System are not available before the Commencement Date, BPWCP will lease an interim system to Operator at a cost of $400 per month and Operator will purchase and install the POS and Back Office Management System and Computer System within 30 days after notification from BPWCP that it is available.

15.05   (a) If BPWCP shall designate certain computer software used in the operation of the POS and Back Office Management System and/or Computer System which is owned or licensed by BPWCP ("Proprietary Software"), Operator shall at BPWCP's request license or sublicense such software from BPWCP or its designee and enter into a software (sub)license agreement on BPWCP's or such designee's then-current form. From time to time, Operator shall purchase any upgrades, enhancements or replacements to the Proprietary Software. BPWCP shall provide to Operator, for a reasonable fee, such support services relating to the Proprietary Software as BPWCP deems advisable. Operator must incorporate any required modifications or additions within 30 days after receiving written notice from BPWCP, unless a longer time period is stated in the notice.

(b) Except for Proprietary Software, which Operator is required to use, Operator may elect not to use the other bookkeeping, accounting and inventory services offered by BPWCP and may obtain, at its expense, any other bookkeeping, accounting and inventory services for Operator's business as Operator desires. Operator shall nevertheless be required to provide to BPWCP, or to an accounting service designated by BPWCP, the information referred to in Section 15.03.

15.06  The provisions of Article 15 shall survive termination or expiration of this Agreement.

ARTICLE 16

Training

16.01      All training courses, programs and tests offered by BPWCP shall be given only in the English language and therefore, in order to successfully complete any such courses, programs and tests, an ability to read, communicate in and comprehend English is necessary. Passing an English proficiency test is required.

Unless otherwise indicated, all training programs described herein shall be conducted at BPWCP's facilities in La Palma, California, or, at BPWCP's option, at such other locations as BPWCP may establish and may include nighttime hours in connection with on the job training at an am/pm mini market.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

21 of 34

120                                        BP 02813

All expenses, including, but not limited to transportation, meals and lodging, incurred by Operator or employee(s) of Operator in connection with attendance of Operator or employee(s) of Operator at any of BPWCP's training programs must be borne by Operator.

The person(s) required to attend and satisfactorily complete the training programs described below are identified herein as follows:

1.  Operator

    For purposes of this Article, "Operator" shall mean:

    o   The sole proprietor, if Operator is a sole proprietor;
    o   All partners or the Operational Designee as designated by the partnership in PART I, Section 16.01(a) of the Store Agreement, who must also be a partner, if Operator is a partnership; in the case of limited partnerships, the Operational Designee must be the general partner, or if more than one, one of the general partners;
    o   All shareholders or the Operational Designee as designated by the corporation in PART I, Section 16.01(a) of the Store Agreement, who must be an officer or a shareholder, if Operator is a corporation;
    o   All members or the Operational Designee as designated by the limited liability company [("LLC"), in States where allowed] in PART I, Section 16.01(a) of the Store Agreement, who must be a manager or member of the LLC, if Operator is an LLC.
        The Operational Designee, if one is designated, may, but need not be the same person designated as the Entity Designee in PART I, Section 17.02 of the Store Agreement (an Entity Designee of a Corporation must be an officer or director and own the largest percentage of shares in the corporation; an Entity Designee of an LLC must be the member owning the majority ownership interest in the LLC). If no Operational Designee is designated, all partners in a partnership (in the case of a limited partnership, the general partner, or if more than one, the general partners), all shareholders in a corporation or all members in an LLC must successfully complete the training programs.

2.  Assignee(s) of Operator

3.  Successor(s)-In-Interest to Operator

4.  Employee(s) of Operator, under the circumstances described below:

    If Operator has more than one am/pm mini market, Operator must have one employee who has attended and successfully completed a four week am/pm Store Manager training program and who is employed on a full time basis at each store in excess of one.

16.02    Following is a description of BPWCP training programs in connection with the operation of am/pm mini markets:

*Initial Franchisee Training Program*

Unless Operator, Operator's successor-in-interest, Operator's assignee, or any employee of Operator required to be trained as Operator, has successfully completed BPWCP's initial franchisee training program, such person(s) must attend and satisfactorily complete BPWCP's current initial franchisee training program before beginning operation of the store.

non-lessee operator (DOFO)
am/pm- 241 WR-1 (4/2006)                    22 of 34
Uniform

121                                        BP 02814

Payment of the initial franchise fee (but not the renewal fee) includes training for two people in the operation of an am/pm mini market.

The initial franchisee training program is currently seven weeks, but may be increased or decreased at BPWCP's election, and may include nighttime hours in connection with on the job training at an am/pm location.

The initial franchisee training program shall include instruction in general store management including personnel matters, customer service, merchandise control, bookkeeping and accounting and other subjects relating to the general operation of a retail store featuring convenience store service.

Except for Operator's successor(s)-in-interest and Operator's assignee(s), who are required to pay tuition for the initial franchisee training program at the then–current rate (currently the tuition for the 7-week program is $15,000), no tuition shall be charged for the initial training program for Operator, or for one or two employees eligible for training if they attend before or within thirty-six (36) months after the Commencement Date of the initial Store Agreement between Operator and BPWCP for the Premises. Attendance by additional persons shall be subject to tuition payable by Operator at the current rate. The current tuition is $7,500 per additional person, but that is subject to increase. Tuition must be paid, at BPWCP's then–current rate for initial training, for more than two persons, regardless of whether such persons in excess of two are partners, shareholders or eligible employees of Operator. If the franchise is transferred within thirty-six (36) months, a separate training fee must be paid by the transferee even if only one person has been trained up to that time.

If Operator has previously successfully completed initial franchise training program and, accordingly, Operator is not required to attend and does not attend the initial franchisee training program, Operator may elect to have one or two employees attend.

BPWCP may terminate this Agreement at any time prior to or on the completion of Operator's initial training if, in BPWCP's sole opinion, Operator does not participate in or does not complete the training program in a manner satisfactory to BPWCP. In the event of such termination, BPWCP shall return the initial fee or any other funds paid to BPWCP by Operator in connection with this Agreement, less BPWCP's expenses incurred in studying the site, preparing engineering and architectural plans for the premises, training and any other costs incurred in contemplation of Operator operating an am/pm Store.

*am/pm Store Manager Training Program*

If Operator has more than one am/pm mini market, Operator must have one employee for each store who has attended and successfully completed a six-week am/pm Store Manager training program employed on a full time basis at each store in excess of one. Such am/pm Store Manager training program must be successfully completed prior to the opening of such stores.

BPWCP offers to train one employee for each such store in the am/pm Store Manager training program. The tuition fee for the first employee so trained for each such store shall be $6,000 subject to increase in the future.

If the Store Manager trained by BPWCP is no longer employed at the Store, Operator must replace such trained Store Manager with another trained Store Manager within two months of the date such Store Manager is no longer employed at the Store or the franchise may be terminated. Operator shall be responsible for payment of tuition for training of any such replacement Store Managers (currently, tuition for training of any such replacements is $6,000, but that amount may be increased in the future).

**This space is intentionally left blank**

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

23 of 34

122

BP 02815

*Additional Training Requested by Operator*

BPWCP may, but is not required to, also provide Operator or Operator's employees such additional initial training or special instruction requested by Operator at such time and place and for such duration as may be mutually convenient, provided, however, that the cost of such additional instruction, including transportation, food, lodging and reasonable charges for time and services of BPWCP shall be borne by Operator.

*Additional Training Required by BPWCP*

Additional training required by BPWCP in connection with changes to programs or new programs or equipment added during the term of this Agreement, BPWCP may require Operator to attend additional training not to exceed eight (8) hours per training session. Such required training shall be tuition free except that if Operator does not attend the training session at the time offered and reasonably notified by BPWCP, Operator may be required to pay a fee not to exceed $1,000 to attend such training.

ARTICLE 17

Assignment and Transfer

A. ASSIGNMENT AND TRANSFER BY OPERATOR

17.01  Operator may not sell (or allow Operator's foreclosing lender to complete a sale) transfer or assign this Agreement or any of Operator rights, duties or obligations hereunder and Operator's interest in the real property and improvements, in whole or in part, without BPWCP's consent, which shall not be unreasonably withheld or delayed, and without first offering the same to BPWCP. If Operator is a party to a Contract Dealer Gasoline Agreement with BPWCP, Operator shall comply with all provisions of paragraph 18 of that agreement as well. The offer must be in writing and must specify the total purchase price, including a breakdown of the amount for real property, equipment and goodwill, with copies of purchase and sale agreements and leases associated with the real property, improvements and equipment and must also include the name and address of the proposed buyer. The Operator shall include the first installment of the transfer fee set forth in 17.01(j). The offer will not have been made until a complete legible copy of the foregoing information is received by BPWCP. BPWCP shall have 30 days from receipt of the complete written offer to accept the offer by agreeing in writing to pay the total purchase price minus the amount of the transfer fee payable to BPWCP in the event of an assignment to a third party. During the 30 day period, BPWCP may conduct environmental testing at the Premises. In case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding and Buyer shall give BPWCP a complete legible copy of the recorded Notice of Default and later recorded Notice of Sale. If BPWCP does not accept the offer within 30 days, Operator may complete the transfer or assignment to a third party subject to BPWCP's prior written consent. If Operator offers a lower price or more favorable terms which have the effect of a lower price to the third party, BPWCP's right of first refusal shall be triggered again and Operator must make the offer to BPWCP. If the assignment has not been completed within 180 days after making the original offer to BPWCP, the request for assignment will be considered abandoned by the operator. Any further request for assignment will again trigger the right of first refusal. All communications between BPWCP and Operator with regard to the assignment, right of first refusal, offers, withdrawals, changes in terms and acceptances must be in writing. In any event, Operator may not assign this Agreement and Operator's interest in the real property and improvements without the prior written consent of BPWCP, which consent shall not be unreasonably delayed or withheld. In order to allow BPWCP adequate time to process an assignment request, Operator will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request, and any such request for BPWCP's consent to an assignment received 45 days or less before the expiration of the Store Agreement shall be considered for a subsequent Store Agreement between Operator and BPWCP, if such subsequent Agreement has been offered and accepted by the parties, and shall be in compliance with the provisions of such subsequent Agreement. Prior to giving its written consent, BPWCP has the right to review or audit Operator's business records,

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

24 of 34

123

BP 02816

including but not limited to those relating to the value of inventories at cost, and BPWCP shall consider, among other things, the qualifications, character, apparent ability and creditworthiness of the proposed transferee and such other factors as BPWCP deems appropriate, including but not limited to the following:

(a) There shall be no existing default in the performance or observance of any of Operator's obligations hereunder.

(b) Operator shall have settled all outstanding accounts with BPWCP.

(c) The proposed transferee must satisfactorily demonstrate to BPWCP that it meets reasonable financial standards which shall not be more stringent than the standards applicable to new am/pm Operators at the time of the proposed assignment.

(d) Prior to the assignment, unless previously trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the proposed transferee and any employees who must be trained as described in Article 16, shall attend and satisfactorily complete BPWCP's then-current training program for new am/pm operators. Tuition shall be payable by the proposed transferee. The training tuition fee is due and payable by means of a cashier's check before the proposed transferee begins training school. For prospective transferees, the training tuition fee, which is payable by the prospective transferee to BPWCP regardless of whether or not the transferor is subject to payment of a transfer fee, shall be refunded in full in the event BPWCP refuses its consent to the transfer prior to the proposed transferee attending BPWCP's training program. In the event that BPWCP refuses its consent after the prospective transferee has started attending BPWCP's training program or the prospective transferee withdraws from the training program, BPWCP shall prorate the refund based on any remainder of training to be completed. The training tuition fee is not refundable in whole or in part upon completion of the training program. If the proposed transferee is a sole proprietor or single shareholder corporation, BPWCP shall offer to train and not charge tuition for one employee of the proposed transferee who attends the initial training within twelve months after the effective date of the assignment. BPWCP shall not reimburse the proposed transferee for any expenses incurred in connection with attendance at the training program of the transferee or the transferee's employee. An initial supply of 20 uniforms must be ordered by the transferee while attending BPWCP's training program at BPWCP's training center. In addition, prior to the effective date of the transfer and as a condition of BPWCP granting its consent to the transfer, BPWCP shall require that the transferor has all then current "Merchandising Accessories Items Required" on hand in the Store and in good condition and that any such items that are no longer clean, workable and presentable or outdated be replaced by items meeting BPWCP's then-current specifications for such items.

(e) The proposed transferee must satisfactorily demonstrate management, business and educational experience reasonably consistent, in the opinion of BPWCP, with the nature and extent of obligations of the am/pm franchise. If the proposed transferee operates one or more BPWCP locations, proposed transferee must meet the then-current requirements applicable to multiple unit operators.

(f) The proposed transferee shall agree to assume, as of the effective date of the assignment, all of the agreements and Operator's duties and obligations thereunder relating to the am/pm franchise.

(g) Operator shall agree to unconditionally release Operator's rights under this Agreement and shall release and discharge BPWCP from all duties and obligations to Operator in connection with this Agreement as of the effective date of the assignment; whereupon Operator shall have no further rights, duties or obligations under this Agreement, except for those obligations that survive the termination of the Store Agreement.

(h) Operator shall obtain and submit evidence satisfactory to BPWCP of all required approvals of federal, state and local governmental entities, agencies or instrumentalities thereof or of any third person, including but not limited to, approval for the transfer of, or issuance of a new beer and wine license, if available in the jurisdiction in which Operator's store is located.

non-lessee operator (DOFO)
am/pm-241WR-1 (4/2006)
Uniform                                    25 of 34

124

BP 02817

(i)  The proposed transferee must satisfactorily meet the then-current criteria established by BPWCP for new am/pm Operators including, but not limited to, passing an English proficiency test, being at least 21 years of age and proof of U.S. citizenship or permanent resident alien status (green card).

(j)  Operator shall pay a transfer fee of $20,000 as follows: The first $1,000 of the fee is payable by Operator at the time Operator requests BPWCP's consent to an assignment of the franchise and the remainder must be paid before BPWCP's final consent is given.  In the case of Concurrent Operations, the transfer fee shall be the combined amount of the transfer fee applicable to each franchise at the Premises.  Such transfer fee is payable as follows: $1,000 at the time Operator requests BPWCP's consent to an assignment of the franchise and (a) where the proposed transferee's transfer price for the businesses shall be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, direct payment from such escrow of the remaining portion of the applicable transfer fee to BPWCP which must be paid before BPWCP's final consent to the assignment is given or (b) where the proposed transferee's transfer price for the businesses shall not be deposited in escrow, Operator may, in accordance with BPWCP's policies in this regard, pay the remaining portion of the applicable transfer fee by means of a cashier's check payable to BPWCP and given to BPWCP before BPWCP's final consent to the assignment is given.  In the event that BPWCP refuses its consent to the proposed assignment prior to the proposed transferee attending BPWCP's training program, BPWCP shall refund all but $1,000 of any transfer fee paid.  In the event that BPWCP refuses its consent to the proposed assignment because the proposed transferee does not pass the English proficiency test and before the proposed transferee attends training school, BPWCP shall refund all but $300 of any transfer fee paid. Otherwise, the transfer fee is not refundable in whole or in part and shall bear no interest.  Except if there were a transfer immediately preceding the proposed assignment for which transfer (1) no transfer fee was paid, or (2) the $1,000 transfer fee referred to below in this paragraph was paid, the transfer fee shall not be payable by Operator in the event that Operator requests BPWCP to consent to an assignment of Operator's franchise to: (1) Operator's spouse, adult natural or adopted child, or parent; (2) a sole proprietorship in which the current shareholder of Operator, which is a single shareholder corporation, shall be the sole proprietor; (3) a partnership in which there are only two partners, current Operator as an individual and one other person, and in which the current Operator has at least a fifty percent interest; (4) a corporation in which there are only two shareholders, current Operator as an individual and one other person, and in which the sole shareholder of the current Operator has at least fifty percent of the issued and outstanding voting shares of stock; (5) a corporation in which current Operator, as an individual shareholder, owns one hundred percent of the issued and outstanding voting shares of stock; (6) if Operator is a corporation, the transfer of less than fifty percent of the issued and outstanding voting shares of stock; or (7) the dissolution of a two-partner partnership or a two-shareholder corporation resulting in one of the former partners remaining as the sole proprietor or one of the former shareholders remaining as the sole shareholder of the corporation or as a sole proprietor and the remaining partner or shareholder or sole proprietor had at least a fifty percent interest in the partnership or corporation prior to the dissolution; (8) a limited liability company in which current Operator has at least 50% ownership.  If and only if (1) there was a transfer immediately preceding the now proposed transfer for which no transfer fee was paid (in other words, the previous transfer qualified as a transfer without transfer fee under the terms of this Agreement), or (2) the full $20,000 transfer fee was paid, and the Operator now proposes to change its form of business through merger, consolidation or reorganization and the existing owner(s) will retain at least 66% of the ownership of the new franchise entity, then the transfer fee will be $1,000, payable at the time of the initial request for BPWCP's consent to the transfer/assignment.

(k)  If the proposed transferee operates one or more am/pm locations, he/she/it must meet the then current requirements for multiple unit operators.

(l)  Without limiting any other provision of this Agreement, the proposed transferee must agree to meet the then current standards in the operations and equipment then required of new operators, but shall not be required to spend more than $5,000 in new equipment or operational standards at the time of the assignment.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

26 of 34

125

BP 02818

BPWCP reserves the right to refuse to consent to any proposed assignment which would result in BPWCP having any material increased risk, burden or chance of not obtaining performance.

17.02  This Agreement is personal as between Operator and BPWCP and this Agreement is entered into in reliance upon and in consideration of the personal qualifications, and representations made with respect thereto, of Operator. Operator shall not incorporate or form a partnership, a limited liability company ("LLC") or limited partnership without the prior written approval of BPWCP, which approval shall not be unreasonably withheld. In the event Operator incorporates, BPWCP may require Operator to execute a personal guarantee and other instruments as BPWCP deems appropriate. If Operator is a partnership or corporation, all partners or all shareholders must execute this Agreement and guarantees and other instruments, if any; however, if Operator is a limited partnership, a partnership having as members one or more general partners and one or more limited partners, Operator may designate an Entity Designee whose name is set forth in PART I, who must be the general partner, or if more than one, one of the general partners, to execute this Agreement. If an Entity designee is designated, the Entity designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a limited liability company ("LLC"), all members must execute this Agreement and guarantees and other instruments, if any; however, if the LLC has unequal ownership by 2 members or more than 2 members, such Operator may designate an Entity Designee, whose name is set forth in PART I, who must be the member owning the majority ownership interest in the LLC, to execute this Agreement. If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become due and payable to BPWCP pursuant to any provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require; if Operator is a corporation with one, two unequal or with more than two shareholders, Operator may designate an Entity Designee whose name is set forth in PART I, who must be an officer or director and shareholder who owns the largest percentage of shares in the corporation, to execute this Agreement. If an Entity Designee is designated, the Entity Designee hereby agrees to personally guarantee the performance of this Agreement by Operator, including, without limitation, the payment of all sums which may from time to time become payable to BPWCP by Operator pursuant to any of the provisions of this Agreement and to execute such forms of guarantee as BPWCP may reasonably require. In the case of a corporation with two equal shareholders, both shareholders hereby agree to personally guarantee the performance of this Agreement by Operator as described earlier in this Section 17.02.

17.03  If Operator is a corporation, any transfer of its capital stock, issuance of additional stock, change in rights of any class or series of stock or contractual agreement affecting stock rights which results in present stockholder[s] as an individual or a group, as the case may be, owning legally or beneficially or having voting control of less than one hundred percent (100%) of its capital stock shall be deemed an assignment of Operator's rights under this Agreement.

17.04  Operator agrees not to change its form of business through merger, consolidation, organization or reorganization without the prior written consent of BPWCP, which shall not be unreasonably withheld, and except upon such terms and conditions as BPWCP shall then require.

17.05  In the event Operator requests BPWCP to approve an assignment, Operator agrees to produce a signed copy of the offer to purchase and accept an assignment. BPWCP shall have no obligation to consider any request for consent to any assignment if it does not receive a copy of such offer.

17.06  Any assignment or attempt by Operator to assign any of its rights or interests under this Agreement and Operator's interest in the real property and improvements without having received the prior written consent of BPWCP shall constitute a material breach of this Agreement and BPWCP shall have the right to terminate this Agreement upon written notice to Operator.

non-lessee operator (DOFO)
sm/pm- 241WR-1 (4/2006)
Uniform

27 of 34

126

BP 02819

17.07  Operator's formation or dissolution of a partnership or adding or deleting any partner, formation or dissolution of a corporation or adding or deleting any shareholder, formation or dissolution of a LLC or adding or deleting any member shall be considered a transfer of this Agreement.

17.08  In the case of Concurrent Operations, if BPWCP consents to the transfer of this Agreement to the proposed transferee, all other franchise agreements relating to any other business conducted at the Premises shall be transferred to the same transferee.

## B. ASSIGNMENT AND TRANSFER BY BPWCP

17.09  BPWCP shall have the unrestricted right to transfer or assign all or any part of its rights or obligations under the Franchise Agreement including the right of first refusal in Article 17.01, to any person or legal entity.

## ARTICLE 18

## Termination

18.01  (a) Operator may terminate this Agreement due to a material default by BPWCP of its obligations hereunder, which default is not cured by BPWCP within 60 days after BPWCP's receipt of prompt written notice by Operator to BPWCP detailing the alleged default with specificity; provided, that if the default is such that it cannot be reasonably cured within such 60 day period, BPWCP shall not be deemed in default for so long as it commences to cure such default within 60 days and diligently continues to prosecute such cure to completion.  If Operator terminates this Agreement pursuant to this Section, Operator shall comply with all of the terms and conditions of Article 19 of this Agreement and all of the other provisions of this Agreement which expressly or by their nature survive the termination or expiration of this Agreement.

(b) In the event that Operator leases the Premises from a third party and such lease expires on its own terms and not as the result of default by Operator or amendment of the term of the lease entered into by Operator and landlord after the Effective date of this Agreement, and Operator has no contractual right to extend or renew such lease, such that the Operator loses the right to occupy the Premises, then this Agreement may be terminated by Operator upon 60 days prior written notice to BPWCP.

18.02  This Agreement may be terminated at any time by mutual agreement in writing between Operator and BPWCP.

18.03  In addition to any other remedy of BPWCP, BPWCP may terminate this Agreement on the following conditions:

(1)    BPWCP may terminate this Agreement for failure of Operator to comply with the provisions of this Agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure.

(2)    Notwithstanding the foregoing, BPWCP may terminate this Agreement by giving immediate notice of termination without an opportunity to cure upon the occurrence of any of the following events:

a.    Failure of Operator to pay any sums due to BPWCP within 5 days after receipt of written notice of default.

b.    Operator repeatedly fails to comply with one or more requirements of this Agreement, whether or not cured after notice.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

28 of 34

BP 02820

c. Operator, after curing any failure pursuant to Section 1 above, engages in the same noncompliance, whether or not such noncompliance is corrected after notice.

d. Failure of Operator to obtain the release of any attachment, garnishment, execution, lien or levy (collectively, "liens") against the Premises, Store Equipment or business of the am/pm mini market within 72 hours after any such liens attach, or such longer time as required by applicable law.

e. Declaration of bankruptcy or judicial determination of insolvency of Operator; Operator's entry into any arrangement with creditors or assignment for the benefit of creditors or the commencement of any proceeding to appoint a receiver or trustee for Operator, its business or its property.

f. Abandonment of the am/pm mini market by Operator.

g. Fraud or criminal misconduct of Operator relating to the operation of the am/pm mini market or conviction of Operator of any felony involving moral turpitude.

h. If Operator is sole proprietor, Operator's death or incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; provided, however, if Operator has, in accordance with the terms set forth in this Agreement designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

i. If Operator is a partnership, the withdrawal of any partner or the dissolution of the partnership or the death of any partner; provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of Operator's death.

j. If Operator is a corporation, the death of any shareholder, or, if applicable, the death of the Entity Designee; or, the sale, transfer or other disposition (by operation of law or otherwise) of any portion of any interest in the corporation without BPWCP's prior written consent; or the termination of the Entity Designee, if applicable, as director or officer and shareholder of the corporation; or all or substantially all of the assets of the corporation are sold, conveyed or otherwise transferred, voluntarily or by operation of law. Provided, however, if Operator has, in accordance with the terms set forth in this Agreement, designated a successor-in-interest who qualifies as a franchisee, this Agreement shall not be deemed to have terminated in the event of the death of the Entity Designee or any shareholder. For purposes of this Section, "corporation" shall include a limited liability company ("LLC") and "shareholders" shall include a member of the LLC..

k. Operator's failure to commence operation of the am/pm mini market within 30 days after the Commencement Date.

l. If a fee verification review or audit of Operator's books and records discloses liability for royalty fees due of 2% or more in excess of fees reported and paid by Operator.

m. Misrepresentations or misstatements by Operator to BPWCP relating to the acquisition of the franchise or Operator engages in conduct which reflects materially and unfavorably upon the operation and reputation of the franchise business or system.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)                29 of 34
Uniform

128                                   BP 02821

n.   BPWCP makes a reasonable determination that continued operation of the franchise by the Operator will result in an imminent danger to public health or safety.

o.   In accordance with the Provisions of Article 5 of this Agreement.

(3)   Operator's assignment or transfer or attempt to assign or transfer this Agreement in whole or in part or attempt to assign or transfer the business of the am/pm mini market or attempt to assign, transfer or sublet in whole or in part the portion of the Premises upon which the store building is located, in a manner inconsistent with the provisions of Article 17 of this Agreement.

(4)   Operator's failure to successfully complete the initial training program described in Article 16 hereof; and, in the case of Operators who operate more than 1 am/pm mini market, failure of Operator to have a Store Manager trained and employed at each store; and, failure of Operator to replace such full-time Store Manager with another trained full-time Store Manager within two months from the date such designated full-time Store Manager or any of their successor(s) is/are no longer employed at the store; and, failure of Operator to comply with any other provision of Article 16 of this Agreement.

(5)   The failure of the conditions relating to obtaining permits and completion of construction or raze and rebuild or retrofit of the Premises which are described in Article 5.

(6)   A determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing and to no longer maintain the am/pm mini market franchise in the relevant geographic market area in which the Premises are located.

18.04   In the event of destruction of all or a significant portion of the Premises to the extent that the normal authorized uses are no longer practicable, either party may terminate this Agreement within 120 days of such destruction by giving the other party written notice. The effective date of such termination shall relate back to the date of destruction.

18.05   In the case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement.

18.06   If Operator is a party to a Loan Agreement and related Promissory Note, as described in Item 10 and Exhibit E of the am/pm Offering Circular for Prospective Franchisees, and Operator has not cured any default under that Loan Agreement or Promissory Note as required, BPWCP may terminate this Agreement."

ARTICLE 19

Procedure on Expiration or Termination

19.01   Upon expiration or termination of this Agreement, Operator shall:

(a)   Cease using the am/pm service name and service mark or other indicia of BPWCP pertaining to the am/pm system.

(b)   Return to BPWCP all copies of BPWCP's franchise accounting system software and all copies of the am/pm Manuals and all other documents, instructions, manuals, display items, materials, and writings furnished by BPWCP pertaining to the am/pm mini market franchise or bearing the am/pm service mark or service name or other service marks, trademarks or service names used in connection with the am/pm mini market; and Operator shall sell to BPWCP the Store Equipment consisting of the am/pm building sign, corner sign, building fascia and interior signage ("am/pm Sign Re-Purchase Items") and to de-identify any Operator

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

30 of 34

129

BP 02822

owned equipment that bears the service mark or service name or other indicia of BPWCP pertaining to the am/pm Store; and

(c)     If the Agreement has been terminated, BPWCP may pay Operator a sum equal to the amount of expenses incurred by Operator in purchasing the am/pm Sign Re-Purchase Items on a 10 year straight line depreciation value but in no event less than $2500.  Operator shall permit BPWCP to enter the premises to remove the am/pm Sign Re-Purchase Items.

d)     In addition, Operator shall pay to BPWCP at the time of termination, as liquidated damages and not as a penalty, the greater of (a) the total minimum royalty fee which would have been payable under the Agreement from the date of termination of the Agreement through the end of the term provided for in the Agreement; or (b) for each month from the date of termination of the Agreement through the end of the term provided in the Agreement, the actual average royalty fee paid but not less than the minimum royalty fee for any months that the Store was operational prior to termination of the Agreement.  Provided, however, that the provisions of the previous sentence shall not be applicable if the Agreement is terminated by BPWCP due to the following: (i) Operator's death; (ii) Operator's incapacity, for at least 90 consecutive days, which results in Operator's inability to personally operate the am/pm mini market; (iii) condemnation or other taking, in whole or in part, of the Premises due to eminent domain; (iv) destruction of all or a substantial part of the Premises through no fault of Operator; or (v) a determination made by BPWCP in good faith and in the normal course of business to withdraw from marketing Motor Fuels at retail or the am/pm mini market franchise in the relevant geographic market area in which Operator's Premises are located.

(e) Pay BPWCP, upon receipt of final statements, any and all sums then due and owing by Operator to BPWCP.

19.02     (a)  Upon termination of Operator's license rights under Article 1 hereof, Operator shall pay BPWCP liquidated damages of $100.00 per day for each Major Violation (as defined hereafter) and $25.00 per day for each other violation of BPWCP's am/pm service marks, trademarks and service names at the terminated am/pm mini market. (By "Major Violation" is meant the display after termination of the am/pm colored striping design on the facing of the building of the former am/pm mini market or the display of the am/pm pole sign.)

(b)  The aforesaid damages are agreed in advance by the parties because of the difficulty in ascertaining actual damages; however, such damages are not deemed to replace, or be in lieu of, damages or profits that BPWCP may be entitled to recover resulting from, or arising out of, Operator's unlicensed use of BPWCP's am/pm or other trademarks and trade names.

19.03  The provisions of this Article 19 shall survive termination or expiration of this Agreement and shall be binding upon the heirs, successors and assigns of Operator.

ARTICLE 20

Successor-in-Interest

20.01  Notwithstanding the terms of Sections 18.03.2(h), (i) or (j) above, this Agreement shall not terminate upon the death or incapacitation, for more than 90 consecutive days, of Operator, if Operator, prior to his or her death or incapacitation, designates a successor-in-interest to his or her interest in this Agreement in a form prescribed by BPWCP and the designated successor-in-interest assumes all of Operator's duties and obligations under the am/pm franchise (the "franchise") on the terms and conditions set forth herein.

20.02  For purposes of this Article, "Operator" shall mean:  if Operator is a sole proprietor, the sole proprietor; if Operator is a partnership, a partner of Operator or, if Operator is a corporation, a shareholder. "Successor-in-interest" shall mean either a surviving spouse or natural or adopted child or parent of Operator,

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

31 of 34

130                                        BP 02823

provided that such spouse or child, at the time of Operator's death or incapacitation, shall be an adult and shall meet the qualifications then being required of am/pm franchisees by BPWCP for the operation of an am/pm mini market. In the case of partnerships or corporations or LLCs, "successor-in-interest" shall also mean a surviving partner or a surviving shareholder or member and, in such cases, any partner and any shareholder and any member may designate any of the others as successor-in-interest to his or her interest in this Agreement, provided that no other successor-in-interest has been designated by such partner or member or shareholder and that at the time of Operator's death or incapacitation, such surviving partner or shareholder shall meet the qualifications then being required of am/pm franchisees by BPWCP. In case of sole proprietorships, "Successor-in-interest" shall also mean a designated lawful heir, provided that such heir, at the time of Operator's death or incapacitation, is an adult and meet the qualifications then required by BPWCP for am/pm franchisees. If someone other than Operator's spouse is designated as the successor-in-interest, Operator's spouse must execute a document waiving any claim of interest in this Agreement and acknowledging that such spouse understands and agrees to the successor-in-interest designation.

20.03  The designated successor-in-interest shall be allowed 21 days after the death or incapacitation, for more than 90 consecutive days, of Operator to give written notice of his or her intention (the "Notice of Intention") to assume and operate the franchise or, in the case of a successor-in-interest to the corporate designee, written notice of his or her intention to personally guarantee performance hereof by the corporate franchisee. The notification shall contain such information regarding business experience and creditworthiness as is reasonably required by BPWCP. Except as described more fully below, unless the successor-in-interest has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market, the successor-in-interest must attend and successfully complete such training as is then required by BPWCP for new franchisees and within 21 days after giving the Notice of Intention commence such training. In addition, BPWCP must approve or disapprove the successor-in-interest within 10 days after the successor-in-interest completes such training. If the successor-in-interest successfully completes training and is approved by BPWCP, BPWCP shall give notice of approval to the successor-in-interest and the successor-in-interest must commence operation of the franchise (or execute a guarantee of performance by a corporate franchisee) within 10 days after receipt of such notice by BPWCP. The successor-in-interest shall be required to pay tuition at the then-current rate for assignees and successors-in-interest. Provided, however, that if there is an Operational Designee who is different from the Corporate Designee successor-in-interest, it is the Operational Designee, who must attend and successfully complete the initial training, unless such Operational Designee has previously been trained by BPWCP pursuant to BPWCP's current 7-week training program for the operation of an am/pm mini market.. An initial supply of 20 uniforms must be ordered by the successor-in-interest while attending BPWCP's training program at BPWCP's training center.

20.04  The franchise available to the successor-in-interest pursuant hereto is intended to be no greater than the franchise as it exists in the name of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, with the deceased or incapacitated Operator as Guarantor) at the time of such Operator's death or incapacitation. The term of the franchise shall not be extended by reason of the successor-in-interest assuming (or guaranteeing) the franchise and BPWCP may change the terms of the franchise upon its renewal, if it is renewed. BPWCP may require Operator to arrange for the discharge or performance of other franchise obligations such as, but not limited to, insurance, but excluding any obligation to be open to the public, for a period of up to 21 days after Operator's death or incapacitation.

20.05  Operator may designate a primary and one alternate successor-in-interest. The alternate, if one is designated, shall have no right to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event of any exercise of rights by the primary successor-in-interest. If the alternate desires to assume and operate (or guarantee) the franchise or Operator's interest in the franchise, as applicable, in the event the primary successor-in-interest, fails to do so, the alternate must give notice of intention to do so and otherwise comply with Section 20.03. (In the case of Concurrent Operations, the primary successor-in-interest, if one is designated, must be one and the same person designated as the primary successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises; the alternate successor, if one is designated, must be one and the same person designated as the alternate

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

32 of 34

131

BP 02824

successor-in-interest to succeed to Operator's interest in all agreements relating to all businesses conducted at the Premises.)

20.06  Unless BPWCP otherwise agrees in writing, there shall be no operation of the franchise following the death or incapacitation of Operator by anyone until all parts of the franchise have been expressly assumed as herein provided, including, but not limited to, such items as licensing and tax permits.

20.07  If the successor-in-interest assumes the franchise (or, in the case of a corporate franchisee, guarantees the franchise), the successor-in-interest shall account to the heirs or estate of the deceased or incapacitated Operator (or, in the case of a corporate franchisee, to the corporation) for the value or other disposition of personal property of the Operator located at or related to the franchise.

ARTICLE 21

General

21.01  Right of Entry.  In addition to specific rights of entry granted herein, BPWCP shall have the right at all times to enter the Premises for the purpose of determining Operator's compliance with the provisions of this Agreement and the Manuals.

21.02  Entire Agreement.  This Agreement, PARTS I and II, the Manual, as from time to time amended or supplemented, and written agreements executed by the parties contemporaneously with this Agreement pertaining to the Premises, including, if applicable, agreements relating to financing that may be offered by BPWCP and, if applicable, agreements relating to the purchase and sale of the real property where franchise is located, contain all agreements and understandings between Operator and BPWCP and cover the entire relationship between the parties concerning the Store and the am/pm franchise.  There are no oral representations, stipulations, warranties or understandings, express or implied, with respect to the subject matter of this Agreement which are not fully set forth herein or in any contemporaneously executed written agreements and in the Manuals, and all prior or contemporaneous promises, representations, agreements or understandings, express or implied, in connection with the Store and the am/pm franchise are expressly merged herein and in the Manual incorporated herein by reference.

21.03  Compliance with Applicable Laws.  In the event any provisions of this Agreement provide for periods of notice less than those required by applicable law, provide for termination other than in accordance with applicable law or are otherwise inconsistent with applicable law, to the extent such provisions are inconsistent with applicable law, they shall not be effective and BPWCP and Operator shall comply with applicable law regarding such matters.

21.04  Excused Performance.  In the event that either party hereto shall be delayed or hindered or prevented from the performance of any act required hereunder by reason of strikes, lockouts, inability to procure materials, fire, flood, act of God, failure of power, governmental law or regulation, riot, insurrection, war, or other reason of a like or similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  For the duration of such excused performance, only the minimum royalty fee shall be waived, however the royalty based on a percentage of gross sales and the advertising and promotion fee shall continue to be payable.  If the excused performance is for a period less than a full month, the minimum royalty fee shall be prorated for such partial month and Operator shall pay, as a royalty fee for such month, the greater of the royalty fee based on a percentage of gross sales or the prorated minimum.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

33 of 34

132

BP 02825

21.05  Severability.  If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

21.06  Notices.  Except as otherwise provided herein, all notices required or permitted by or pertaining to this Agreement shall be in writing and addressed to the party to be notified at the address for such party specified in PART I of this Agreement (as to notices to BPWCP, from time to time and upon prior written notice to Operator, BPWCP may change the address of BPWCP specified in PART I).  All notices shall be sent by prepaid certified, prepaid registered, or prepaid overnight mail, return receipt requested, and shall be deemed served as of the date of mailing or shall be personally delivered to Operator and shall be deemed served as of the date delivered.

21.07  Waiver.  Failure of either Operator or BPWCP to require performance of any provision of this Agreement shall not affect either party's right to require full performance thereof at any time thereafter and the waiver by either Operator or BPWCP of any provision hereof shall not constitute or be deemed a waiver of a similar breach in the future.

21.08  Amendments.  No amendment, addition to or alteration, modification or waiver of any provision of this Agreement shall be of any effect unless in writing and signed by Operator and an authorized representative of BPWCP.

21.09  Prior Course of Dealing.  BPWCP and Operator acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Operator and BPWCP by their authorized representatives.

21.10  Approval.  This Agreement and any modifications thereto shall not become effective and binding upon BPWCP until executed by Operator and accepted by BPWCP as evidenced by the signature of one of BPWCP's representatives authorized to execute this Agreement.  Operator's occupancy of the Store prior to such execution hereof by BPWCP shall not be construed as a waiver by BPWCP of this requirement.

21.11  Pronouns.  The use herein of any personal pronoun shall include the masculine, feminine and neuter pronouns.

This space is intentionally left blank.

non-lessee operator (DOFO)
am/pm- 241WR-1 (4/2006)
Uniform

34 of 34

133

BP 02826

Facility Number <u>82461</u>
Customer Account <u>0996439</u>

## AMENDMENT TO am/pm MINI MARKET AGREEMENT
### PHASE-IN ROYALTY FEE

This AMENDMENT, dated the __11__ day of _____July_____, 20 _06_, is attached to, incorporated in and made a part of the am/pm Mini Market Agreement ("Agreement"), dated the ___11___ day of ___July___, 20 _06_, between BP West Coast Products LLC ("Company"), and <u>STTN Enterprises, Inc.</u> ("Operator").

For valuable consideration is is agreed as follows:

1,     Notwithstanding the provisions of Article 7.02(a) of the Agreement, it is agreed that for the first twelve (12) full months of operation of the store following the Commencement Date, and for the first partial month of operation, if any, the monthly minimum royalty fee shall be as follows:

| | |
|---|---|
| 1st partial mo. if any | $ _____ |
| 1st full mo. per mo. | $ _250.00_ |
| 2nd full mo. per mo. | $ _250.00_ |
| 3rd full mo. per mo. | $ _250.00_ |
| 4th full mo. per mo. | $ _500.00_ |
| 5th full mo. per mo. | $ _500.00_ |
| 6th full mo. per mo. | $ _500.00_ |
| 7th full mo. per mo. | $ _500.00_ |
| 8th full mo. per mo. | $ _500.00_ |
| 9th full mo. per mo. | $ _500.00_ |
| 10th full mo. per mo. | $ _750.00_ |
| 11th full mo. per mo. | $ _750.00_ |
| 12th full mo. per mo. | $ _750.00_ |

For the thirteenth (13th) full month of operation and thereafter, the monthly minimum royalty fee shall be $ _1,000.00_.

2.     Except as herein specifically amended, the Agreement, as heretofore amended or supplemented, shall be and therein remain in full force and effect.

**BP West Coast Products LLC**

**Franchisee**
STTN Enterprises, Inc.

_Cherry Heath_  7-11-06
                    Date

_[signature]_  6/20/06
Nazim Faquiryan        Date

4/05

134                                    BP 02827

Facility # <u>82461</u>
Customer Account # <u>0996439</u>

<u>ADDENDUM TO am/pm AGREEMENT</u>
<u>FOR INSTALLATION OF ATM EQUIPMENT</u>
<u>(Non-Lessee Dealers)</u>

This is an Addendum to the am/pm Mini Market Agreement between <u>STTN Enterprises, Inc.</u> (Franchisee) and BP West Coast Products LLC (BPWCP).

Pursuant to Article 6.02 of the am/pm Mini Market agreement between the undersigned Franchisee and BP West Coast Products LLC, BPWCP is willing to consent to the installation of an ATM Terminal at the above referenced Premises, subject to agreement and compliance with, the following terms and conditions:

1. The only authorized ATM Terminal or ATM equipment of any nature is that provided by KeyBank of Cleveland, Ohio and installed pursuant to a Master Service Agreement for Electronic Terminal Facilities dated October 23, 1997 between BPWCP and KeyBank ("ATM Terminal").

2. The ATM Terminal will be installed, and if necessary moved or removed, by BPWCP or KeyBank. Franchisee will not move, tamper with, modify or remove the ATM Terminal. Franchisee hereby consents to the entry, by KeyBank and its agents, upon the Premises, to install and move or remove the ATM Terminal.

3. The ATM Terminal will be placed at the Premises as specified by BPWCP. The ATM Terminal may be removed from the Premises at any time and for any reason at the sole discretion of BPWCP. In the event the ATM Terminal is removed, Franchisee will not receive any compensation, and authorization to have such equipment will be revoked.

4. Franchisee will permit and not impede access to the ATM Terminal by BPWCP, KeyBank, their agents and service vendors, and customers and Cardholders.

5. Franchisee will be paid $.50 per completed cash withdrawal transaction at the ATM Terminal. Payment will be made monthly via credit to Franchisee's trade statement by BPWCP the second month after the calendar month in which the transactions have taken place. In the event that Franchisee transfers, assigns or sells its interest in the am/pm Mini Market Agreement, payment will be credited to the franchisee of record on the last day of the month in which the transactions have taken place.

6. The ATM Terminal and signage are the sole property of KeyBank and Franchisee shall make no claim of ownership nor shall franchisee allow any lien or encumbrance to be placed on the ATM Terminal.

7. In the event of vandalism or damage to the ATM Terminal (excluding normal wear and tear in the ordinary course of business), Franchisee will be responsible for up to the first $1000 of damage; BPWCP will be responsible for damage from $1001 to $2000 and KeyBank will be responsible for damage over $2000. Franchisee will not be responsible for any theft or loss of cash currency from the ATM Terminal.

135

BP 02828

8.   BPWCP may cancel this addendum before installation without any liability if it is determined by BPWCP or KeyBank in their sole discretion that the Premises are not suitable for an ATM Terminal due to factors including, but not limited to, security concerns, costs, and location.

9.   This is the entire agreement between the parties with regard to its subject matter and all prior agreements, promises, or representations are superseded hereby.  The terms of this addendum can only be added to, modified, or waived in writing signed by both parties.

10.   All other terms of the am/pm Mini Market Agreement, as previously amended or supplemented, shall remain in full force and effect.

FRANCHISEE:

Signature_____    Date _6/20/06_____

Name of Franchisee STTN Enterprises, Inc.
                               Nazim Faquiryan

Title (Corp. franchisees only)_____

BP West Coast Products LLC

By:_____    Date _7-11-06_____

Title _____

BP 02829