# EXHIBIT D

BP West Coast Products LLC 

Guarantee Agreement
Individual

Facility: <u>82461</u>

The undersigned <u>Sayed Faquiryan</u> and _____ (spouse, if married), intending to be legally bound hereby and in consideration of BP West Coast Products LLC, organized in Delaware (hereinafter called "BPWCP") advancing credit to <u>STTN Enterprises, Inc.</u> (hereinafter called "Debtor"), and also in consideration of BPWCP, at its sole discretion, (a) agreeing to any additional credit at any time hereafter to Debtor for petroleum products and other merchandise, or (b) to extend credit, advance money, or defer time for payment of any money due or to become due under contract or obligation arising from any lease or loan, or (c) to extend credit in any other manner to, or at the request or for the account of Debtor, either with or without security (all such liability and obligation of Debtor to BPWCP now or hereafter existing being hereinafter referred to as "Obligations"), do hereby jointly and severally guarantee and agree to pay to BPWCP, upon demand, all of the Obligations together with interest thereon, and any and all expenses, including but not limited to, reasonable attorneys' fees which may be incurred by BPWCP in collecting all or any of the Obligations and/or enforcing any rights hereunder; it being further understood and agreed that the liability hereunder of the undersigned shall be unlimited as to the amount of Obligations covered by this Guaranty.

The undersigned waive any right to require BPWCP to (a) proceed against Debtor or any other party; (b) proceed against or exhaust any security held from Debtor; or (c) pursue any other remedy in BPWCP's power whatsoever. The undersigned waive any defense based on or arising out of any defense of Debtor other than payment in full of the indebtedness, including without limitation any defense based on or arising out of the disability of Debtor, or the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of Debtor other than payment in full of the indebtedness. BPWCP may, at its election, foreclose on any security held by BPWCP by one or more judicial or nonjudicial sales whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy BPWCP may have against Debtor, or any security, without affecting or impairing in any way the liability of the undersigned except to the extent the indebtedness has been paid. The undersigned waive any defense arising out of any such election by BPWCP, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the undersigned against Debtor or any security. Until all indebtedness of Debtor to BPWCP shall have been paid in full, even though such indebtedness is in excess of the undersigned's liability hereunder, the undersigned shall have no right of subrogation and waive any right to enforce any remedy which BPWCP now has or may hereafter have against Debtor, and waive any benefit of, or any right to participate in any security now or hereafter held by BPWCP.

If this Guaranty is executed by two or more parties, they shall be severally liable hereunder, and the word "undersigned" wherever used herein shall be construed to refer to each of such parties separated, all in the same manner and with the same effect as if each of them had signed separate instruments; and in any such case this Guaranty shall not be revoked or impaired as to any one or more of such parties by the death of any of the others or by the revocation or release of any liabilities hereunder of any one or more of such other parties.

Executed at _____, this __20__ day of ____June_____, 20 _06_.

_____          _____
Witness                                          Guarantor – Sayed Faquiryan

_____
Residence of Guarantor (street, city, state, zip code)

_____          _____
Witness                                          Guarantor - Spouse

_____
Residence of Guarantor (street, city, state, zip code)                    BP 02879

* Subscribed and sworn to before me this __20th__ day of ____June____, 20 _06_.

_____
Notary Public                         *Required in all states

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

138

# EXHIBIT
# E

08/10/2006   13:40   UNION BANK MILPITAS → 15625980377                      NO.785   D01

   

**BP WEST COAST PRODUCTS, LLC**
a Delaware limited liability company

May 25, 2006

STTN ENTERPRISES, INC.
1515 N. Milpitas Blvd. #1606
Milpitas, CA 95035

Attn:   Nazim Faquiryan and Sayed Faquiryan

Re:   *Facility #82461*
      *651 San Felipe Rd., Hollister, CA 95035 (the "Real Property")*

Dear Nazim and Sayed:

BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("BPWCP"), is pleased to consider the request of STTN ENTERPRISES, INC., a California corporation ("Borrower"), for a loan (the "Loan") in the amount of $475,000.00 (the "Maximum Loan Amount") to finance the remodeling and refurbishing of the ARCO-branded retail motor fuel station and am/pm Mini Market selling beer and wine (collectively, the "Business") located at the Real Property, and related improvements and personal property (the "Improvements") owned by Borrower and situated on, or used in connection with, the Real Property (collectively, the "Property").

A summary of the terms of the Loan is contained in Exhibit "A" enclosed with and incorporated into this letter. Complete terms of the Loan will be set forth in BPWCP's form of documents and agreements to be signed by Borrower, which will evidence and secure the Loan.

BPWCP's obligation to make and fund the Loan is contingent upon (i) BPWCP's receipt, review, and approval of the items listed on Exhibit "B" enclosed with and made a part of this letter, (ii) the satisfaction of the conditions listed on Exhibit "B," and (iii) BPWCP's:

   a.   Receipt of Borrower's loan application and verification of the information contained in Borrower's application;

   b.   Approval of an appraisal of the Property prepared by an appraiser approved by BPWCP;

   c.   Review and approval of the financial condition of Borrower, condition of title, sufficiency of net cash flow from the Business to cover debt service, and economic feasibility of the Business;

   d.   Receipt, review, and approval of additional documents and information required by BPWCP; and

   e.   Final approval of the Loan by BPWCP's appropriate credit officers or committees.

Borrower shall pay all of BPWCP's costs in connection with the Loan, including, but not limited to, credit reports, title insurance premiums, escrow fees, legal fees, recording fees, the loan processing fee of $10,000 and other expenses. BPWCP will notify Borrower of its final approval of the Loan by issuing loan documents containing the terms and conditions of the Loan as finally approved.

Time is of the essence in connection with any matter discussed in this letter. If you agree to the terms and conditions contained in this letter, please indicate your acknowledgment and agreement by signing and dating the enclosed copy of this letter, initialing Exhibits "A" and "B", and returning them to me. You may retain the original of this letter for your files. If you do not sign and return this letter and the initialed Exhibits to me on or before July 10, 2006, or you do not provide the items or satisfy the conditions listed on Exhibit "B" on or before the time

PAGE 01                   DETRICK MORTGAGE GRP              56259880377      04/09/2007  12:34   S 00016

STTN ENTERPRISES, INC.
May 25, 2006
Page 2

deadlines set forth in Exhibit "B", this letter will become void, and BPWCP will have no further obligations under this letter.

Finally, please note that BPWCP is required by law to report the distribution of funds to the Internal Revenue Service. You should seek the advice of an accountant or tax attorney regarding the possible tax consequences of this transaction before you sign the Loan documents.

If you have any questions regarding this letter, please contact Ken Wickerham at 831-642-9130.

Very truly yours,

Jeff M. Cary
Regional Portfolio Manager

JMC/pjs

cc:    Ken Wickerham

Enclosures

Acknowledgement of Receipt of Letter: _May 30_, 2006.

STTN ENTERPRISES, INC.,
A California corporation

By: _____
    Printed Name: Nazim Faquiryan

    Printed Title: CEO and President

By: _____
    Printed Name: Saeed Faquiryan

    Printed Title: Secretary and Treasurer

S  00017

08/10/2006    13:48    UNION BANK MILPITAS 4 15625988377    NO.785    D05

STTN ENTERPRISES, INC.
May 25, 2006
Page 3

Agreed to this _30_ day of _May_, 2006.

STTN ENTERPRISES, INC.,
A California corporation

By: _____

Printed Name: Nazim Faquiryan

Printed Title: CEO and President

By: _____

Printed Name: Saved Faquiryan

Printed Title: Secretary and Treasurer

PAGE 03    DETRICK MORTGAGE GRP    15625988377    04/09/2007    12:34    S 00018

142

08/18/2006   13:48   UNION BANK MILPITAS → 15625590377                    NO.785   D04

STTN ENTERPRISES, INC.
May 25, 2006
Page 4

EXHIBIT "A"

## SUMMARY OF LOAN TERMS

(Subject to Loan Documents and Final Loan Approval)

Maximum Loan Amount: $475,000.00

Base Loan Amount: $320,000.00
      ($200,000.00 for loan attributable to gasoline service station)
      ($120,000.00 for loan attributable to am/pm Mini Market)

Additional Loan Amounts:

### Additional Funds:

If the date (the "Business Commencement Date") upon which Borrower completes construction of the Improvements and opens the Business [which shall be defined as the completion and opening for business of all material components of the gas and store offering as set forth more particularly in the documents and agreements (collectively, the "Franchise Agreements") to be executed by Borrower in connection with acquisition of a franchise under the Franchise Agreements] occurs within the time periods provided below, and provided Borrower is not then in default under any of the terms and conditions of the Loan Agreement, Loan Documents, or Franchise Agreements, BPWCP may elect, but shall not be obligated to disburse additional funds ("Additional Funds") to or on behalf of Borrower as follows:

- If Business Commencement Date occurs by the last day of the fourteenth (14th) month following Borrower's execution of this Conditional Commitment Letter: 125% of Base Loan Amount.
- If Business Commencement Date occurs between the first day of the fifteenth (15th) month following Borrower's execution of this Conditional Commitment Letter, and the last day of the seventeenth (17th) month following Borrower's execution of this Conditional Commitment Letter: 115% of Base Loan Amount.

Additional Funds shall be used by Borrower solely for reimbursement of costs and expenditures associated with improvements to and/or purchases of equipment for use at the Business, and for no other use or purpose whatsoever. Borrower shall provide to BPWCP reasonable documentation evidencing such costs and expenditures as a condition to BPWCP's disbursement of the Additional Funds to Borrower.

### Refresh & Refurbish Funds:

If as of the 11th anniversary of the first disbursement under the Loan, provided Borrower is not then in default under any of the terms and conditions of the Loan Agreements, Loan Documents, or Franchise Agreements, BPWCP may elect, but shall not be obligated to disburse up to Seventy-Five Thousand and 00/100 Dollars ($75,000) (the "Refresh & Refurbish Funds") to or on behalf of Borrower to be used for non-structural changes to the Improvements, such as, updating and retrofitting the interior of the Improvements to comply with BPWCP's then-current design and layout for its am/pm mini markets, including, but not limited to, new paint, flooring, signage,        fixtures,        equipment,        and        the        like        (collectively,        the        "Refresh & Refurbish"). The Refresh & Refurbish Funds shall be used solely to finance the cost of the Refresh & Refurbish, and for no other use or purpose whatsoever.

Interest Rate: 5.00% per year [subject to change prior to the closing of the Loan].

Prepayment Fee: None.

Assumption: Not permitted.

08/10/2006   13:40    UNION BANK MILPITAS → 15625960377        NO.785    005

STTN ENTERPRISES, INC.
May 25, 2006
Page 5

Term:  Twenty (20) years

Amortization Schedule: 1/20th of the Loan amount comprised of the Base Loan Amount and Additional Funds will be payable on each anniversary of the first day of the first complete month in which the Business is open for business.

Nonrefundable Loan Processing Fee: $10,000

A Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing recorded in the Official Records of the county where the Real Property is situated, and encumbering the Real Property in a lien position approved by BPWCP as BPWCP, in its sole discretion, determines.

The Loan Agreement will include provisions requiring:  1) that construction of the Improvements must commence no later than the last day of the eighteenth (18th) month following Borrower's execution of the Franchise Agreements; 2) that the Business Commencement Date must occur on or before the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements; and (3) that if the Business Commencement Date does not occur by the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements, BPWCP may, at its option, declare the Loan to be in default and immediately due and payable, and terminate the Loan Agreements.

A UCC-1 Financing Statement in a lien position approved by BPWCP as BPWCP, in its sole discretion, determines, filed with the Secretary of State of the state of Borrower's incorporation or organization (or, if Borrower is an individual, in the state where Borrower's principal residence is located), with respect to the personal property of Borrower, including but not limited to, machinery, equipment, furniture, fixtures, and inventory now or in the future situated on, or used in connection with the Business at, the Real Property.

Personal Guaranties acceptable to BPWCP, including but not limited to personal guaranties from all principals in Borrower and spouses of principals in Borrower.

Annual guaranteed gasoline volume: 2,800,000 gallons.
Annual guaranteed am/pm Mini Market sales: $960,000.00.

Loan must be fully funded on or before the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements.

Other terms:   NONE

_____                    _____
BPWCP's Initials                           Borrower's initials

PAGE 05        DETRICK MORTGAGE GRP        5625980377        12:34  04/03/2007    S  00020

06/10/2006   13:40   UNION BANK MILPITAS → 15625980377                     NO.765   D06

STTN ENTERPRISES, INC.
May 25, 2006
Page 6

EXHIBIT "B"

ITEMS REQUIRED TO COMPLETE LOAN APPLICATION
AND CONDITIONS TO BE SATISFIED BEFORE LOAN FUNDING

ITEMS REQUIRED AT THE TIME THE LETTER IS SIGNED BY BORROWER AND RETURNED TO
BPWCP:

1. Borrower must sign BPWCP's Contract Dealer Gasoline Agreement for a term of twenty (20) years.

2. Borrower must sign am/pm Mini Market Agreement for a term of twenty (20) years and pay the Initial Franchise Fee.

ITEMS REQUIRED ON OR BEFORE THE 180TH DAY FOLLOWING BORROWER'S SIGNATURE OF
THE FRANCHISE AGREEMENTS DESCRIBED IN ITEMS 1 AND 2 ABOVE:

3. Credit report(s) of Borrower, all principals in Borrower, all spouses of principals in Borrower, and all guarantors.

4. BPWCP's loan application.

5. Borrower's organizational documents.

6. Borrower's taxpayer identification number.

7. Income tax returns of Borrower, all principals in Borrower, all spouses of principals in Borrower, and all guarantors.

8. Bank and investment statements of Borrower, all principals in Borrower, all spouses of principals in Borrower, and all guarantors.

9. Profit and loss statements for the proposed Business.

10. Structure and Use Proceeds Form.

11. Senior Lien Holder's loan commitment letter.

12. Written authorization for BPWCP to contact and obtain information from Senior Lien Holder.

13. Either:

   a. a certified copy of a recorded grant deed showing Borrower's fee interest in the Real Property; or

   b. a certified copy of signed escrow instructions for Borrower's purchase of the fee interest in the Real Property; or

   c. a signed ground lease between the owner of the Real Property and Borrower, containing mortgagee protection provisions acceptable to BPWCP and its counsel, or alternatively, a signed amendment to the ground lease acceptable to BPWCP and its counsel establishing certain mortgagee protections in favor of BPWCP.

14. A preliminary title report from a BPWCP-approved title company for the Real Property and a complete, legible copy of each document shown as an exception on the preliminary title report.

15. An ALTA survey of the Real Property certified to the BPWCP-approved title company.

PAGE 06                DETRICK MORTGAGE GRP        5625980377   12:34   04/09/2007   S 00021

08/10/2006    13:40    UNION BANK MILPITAS → 15625988377    NO.785    D07

STTN ENTERPRISES, INC.
May 25, 2006
Page 7

16.  Environmental reports and studies enabling BPWCP to determine that the Property is free from contamination by toxic or hazardous substances, except those occurring in the normal course of the Business.

17.  Borrower shall obtain BPWCP's prior approval for each architect and consultant to be retained by Borrower in connection with the permitting and construction of the Real Property and Improvements, both with respect to the competency, reliability and solvency of the architect or consultant and also with respect to the terms of the retention agreement.

18.  An appraisal report by an BPWCP-approved appraiser confirming that, after considering the Loan and any third party financing secured by the Property, Borrower will have at least 20% equity in the Property, based on the "as will be" appraised value of the Property.

19.  BPWCP's approval of site and sign plans for the Real Property and the Improvements.

ITEMS REQUIRED ON OR BEFORE LOAN FUNDING:

20.  Copies of all governmental approvals, licenses, and permits required in connection with the construction and operation of the Improvements and the Business (including but not limited to an alcohol sales permit acceptable to BPWCP).

21.  A commitment from a BPWCP-approved title company to issue an ALTA lender's policy of title insurance insuring that the Deed of Trust encumbers the Real Property in the position approved by BPWCP, subject to exceptions approved in writing by BPWCP.

22.  Insurance naming BPWCP as an additional insured with a 438 BFU endorsement, as follows:

    a.    "All risk" casualty insurance insuring the Improvements against loss or damage by fire or other casualty in an amount equal to 100 percent of the replacement value of the Improvements, with a deductible not exceeding $10,000 per occurrence; and
    b.    Liability insurance.

23.  Borrower shall obtain BPWCP's prior approval for the general contractor to be retained by Borrower in connection with the permitting and construction of the Real Property and Improvements, both with respect to the competency, reliability and solvency of the general contractor and also with respect to the terms of the retention agreement.

24.  Senior lien holder's written approval of the Deed of Trust and UCC-1 Financing Statement securing the Loan, in a form acceptable to BPWCP.

25.  The project architect must submit a complete set of project drawings on computer ZIP disk in a form acceptable to BPWCP, (currently AutoCAD, version 14) upon completion of the Improvements and issuance of all necessary governmental approvals.

26.  Other:  NONE

_____                        _____
BPWCP's initials                               Borrower's initials

# EXHIBIT
# F

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## LOAN AGREEMENT
### (am/pm Mini Market)

This LOAN AGREEMENT (this "Agreement") is made and entered into as of ___FEB 12___, 2007 by and between BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), and STTN ENTERPRISE, INC., a California corporation (the "Borrower").

### Recitals

A.      Borrower and Lender have entered into that certain am/pm Mini Market Agreement dated July 11, 2006 (hereinafter referred to as the "CD Store Agreement") which provides the terms and conditions under which Borrower operates or will operate an am/pm Mini Market located at 631 San Felipe Road, Hollister, CA 95035 (the "Store"). The Store comprises a part of certain real property owned by Borrower as more particularly described in Exhibit "A" to the Deed of Trust ("Property"). Borrower and Lender have also entered into that certain Contract Dealer Gasoline Agreement dated July 11, 2006 which provides the terms and conditions under which Borrower operates or will operate an ARCO gasoline station on the Property (the "CD Agreement").

B.      Lender and Borrower desire to provide for the terms and conditions upon which Lender will make available to Borrower a loan to fund the costs associated with pre-approved modifications and/or equipment and improvements to the Store.

### Agreement

In consideration of the mutual promises contained herein, Lender and Borrower agree as follows:

### DEFINITIONS:

**Additional Loan Amounts:**   The term Additional Loan Amounts means any Additional Funds which may be disbursed to Borrower or for Borrower's benefit as defined and provided in Section 1.2.

**Alterations:**   The term "Alterations" means alterations or improvements to the Store which are permitted under this Agreement.

**Amortization Amount:**  The term "Amortization Amount" is defined in Section 1.5.

**Annual Guaranteed Amount:**   The term "Annual Guaranteed Amount" means $960,000.00.



82461 am/pm Loan Agreement v1.doc                     1

BP 01535

148

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Architect:** The term "Architect" is defined in <u>Section 2.1(h)</u>.

**Base Loan Amount:** The term "Base Loan Amount" is defined in <u>Section 1.1</u>.

**Business Open Date:** The term "Business Open Date" means the first day on which the Store is open for business of all material components of the gas and store offering as set forth more particularly in the CD Agreement and the CD Store Agreement, as determined by Lender.

**CD Store Agreement:** The term "CD Store Agreement" is defined in Recital A above.

**Closing Date:** The term "Closing Date" means the date of recordation of the Deed of Trust in the Official Records of the county in which the Property is located.

**Conditional Commitment Letter:** The letter dated May 25, 2006 from Lender to Borrower outlining the terms and conditions upon which Lender expressed its willingness to make the Loan to Borrower.

**Contract Year:** The 12 month period beginning on the first day of the first complete month following the Business Open Date and each 12 month period thereafter. If the Business Open Date occurs on the first day of a calendar month, the Contract Year shall commence on such date.

**Contractor:** The term "Contractor" is defined in <u>Section 2.1(h)</u>.

**Deed of Trust:** The term "Deed of Trust" means that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of even date herewith, executed by Borrower in favor of Lender.

**Default Rate:** The term "Default Rate" shall have the meaning set forth in the Note.

**Disbursement:** The term "Disbursement" means a disbursement of Loan proceeds made by Lender to or for the benefit of Borrower.

**Disbursement Agreement:** The term "Disbursement Agreement" means that certain Disbursement Agreement Owner and Contractor in the form of <u>Exhibit D</u> attached hereto and made a part hereof, to be executed by Borrower and Lender substantially concurrently with the recordation of the Deed of Trust.

**Engineer:** The term "Engineer" is defined in <u>Section 2.1(h)</u>.

**Environmental Indemnity:** The term "Environmental Indemnity" means that certain Environmental Indemnity dated as of even herewith, executed by Borrower in favor of Lender.

**Event of Default:** The term "Event of Default" is defined in <u>Section 4</u>.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Fictitious Deed of Trust:** The term "Fictitious Deed of Trust" is defined in the Deed of Trust.

**First Anniversary Date:** The term "First Anniversary Date" is defined in Section 1.5.

**Gross Sales:** All Store sales as included in the definition of "Gross Sales" in Article 7.02(b) of the CD Store Agreement.

**Improvements:** The term "Improvements" shall have the meaning set forth in the Fictitious Deed of Trust.

**Indemnified Costs:** The term "Indemnified Costs" means all actual or threatened liabilities, claims, actions, causes of action, judgments, orders, damages (including foreseeable and unforeseeable consequential damages), costs, expenses, fines, penalties and losses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of Lender's counsel), but excluding such costs as may be attributable to the gross negligence or willful misconduct of the party seeking to be indemnified.

**Indemnified Parties:** The term "Indemnified Parties" means, collectively, Lender, its parent, subsidiary and affiliated companies, assignees of any of Lender's interest in the Loan or the Loan Documents, owners of participation, syndication or other interests in the Loan or the Loan Documents, any purchasers of the Property at any foreclosure sale or from Lender or any of its affiliates, and the officers, directors, employees and agents of each of them.

**Loan:** The term "Loan" is defined in Section 1.1.

**Loan Documents:** The term "Loan Documents" means the documents described in Exhibit "C" attached hereto, as the same may be amended, renewed or extended from time to time.

**Maturity Date:** The term "Maturity Date" is defined in Section 1.4.

**Note:** The term "Note" means that certain Secured Promissory Note (am/pm Mini Market) of even date herewith, executed by Borrower to the order of Lender, which evidences the Loan.

**Obligations:** The term "Obligations" is defined in Section 1.4.

**Pay Voucher:** The term "Pay Voucher" shall have the meaning set forth in the Disbursement Agreement.

**Plans:** The term "Plans" means detailed plans and specifications for the Alterations.

**Property:** The term "Property" is defined in Recital A above.

82461 am/pm Loan Agreement v1.doc                3

BP 01537

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

**Senior Lender:** Omni Financial

**Senior Loan:** That certain loan from Omni Financial to Borrower in the amount of $1,925,000.00

**Senior Loan Documents:** Those certain documents and agreements executed by Borrower in favor of Senior Lender evidencing and securing the Senior Loan, including that promissory note in the original principal amount of $1,625,000.00 (the "Senior Note") and that certain deed of trust dated August 12, 2003 and recorded on November 7, 2003 as instrument number 2003-0022960 in the Office of the San Benito Recorder (the "Senior Deed of Trust"). The Senior Note and the Senior Deed of Trust are modified to include the principal amount of $300,000.00 evidenced by _____ dated _____ as instrument number _____ and recorded in the Office of the San Benito Recorder.

**Store:** The term "Store" is defined in Recital A above.

**Title Company:** The term "Title Company" means Commonwealth Land Title Company.

**Title Policy:** The term "Title Policy" is defined in Section 2.1(d).

**Transfer:** The term "Transfer" is defined in Section 8.

**Trustor:** AVA Global Enterprise, Inc., a California corporation

1. **Amount and Terms of the Loan.**

    1.1    <u>Amount of Loan</u>. Lender agrees to make available to the Borrower, upon the terms and conditions set forth in this Agreement, a loan (the "Loan") in the principal amount of $150,000.00 (the "Base Loan Amount").

    1.2    <u>Refresh & Refurbish Funds</u>:

        If as of the 11th anniversary of the first disbursement under the Loan, provided Borrower is not then in default under any of the terms and conditions of the Loan Agreements, Loan Documents, or Franchise Agreements, BPWCP may elect, in its sole and absolute discretion, but shall not be obligated to, disburse up to Seventy-Five Thousand and 00/100 Dollars ($75,000) (the "Refresh & Refurbish Funds") to or on behalf of Borrower to enable Borrower to comply with Section 5.05 of the CD Store Agreement, and to be used for non-structural changes to the Improvements, such as, updating and retrofitting the interior of the Improvements to comply with Lender's then-current visual and design standards and layout for its am/pm mini markets (the "Refresh Requirements"), including, but not limited to, new paint, flooring, signage, installation of new fixtures, equipment, and the like (collectively, the "Refresh & Refurbish"). The Refresh & Refurbish Funds shall be used solely to finance the cost of the

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Refresh & Refurbish and to otherwise comply with the Refurbish Requirements, and for no other use or purpose whatsoever. If Lender elects to advance the Refresh & Refurbish Funds, Lender's disbursement of the Refresh & Refurbish Funds to or on behalf of Borrower shall be conditioned upon the satisfaction, as determined by Lender in its sole discretion, that as of the date of the first disbursement of the Refresh & Refurbish Funds, the following conditions have been satisfied:

(a)    Borrower shall be in full compliance with the terms and conditions of the Loan Documents;

(b)    Borrower shall be in full compliance with the terms and conditions of the CD Store Agreement and the CD Agreement;

(c)    Lender has reviewed and approved the financial condition and management capabilities of Borrower, determined that the net cash flow from the Store is sufficient to cover debt service, and approved the economic feasibility of the Store;

(d)    The disbursement of the Refresh & Refurbish Funds has been approved by Lender's appropriately authorized credit officers or committees;

(e)    Borrower has provided to Lender (i) copies of all governmental approvals, licenses and permits required in connection with the Refresh Requirements, and (ii) all equipment rental agreements; and

(f)    Lender shall have approved the competency, reliability and solvency of the general contractor proposed to be retained by Borrower, and the proposed agreement between Borrower and the proposed general contractor pertaining to the permitting and construction of the Refresh Requirements.

1.3    Purpose of the Loan.    The proceeds of the Loan, including without limitation the Additional Funds disbursed as provided above in Section 1.2, shall be used exclusively to fund (i) costs and expenditures associated with improvements to and/or purchases of equipment for use at the Store as described in Exhibit A attached hereto, and (ii) at the election of Lender, payment of the processing fee set forth in Section 3.11 below (collectively, the "Permitted Uses"), and for no other use or purpose whatsoever.

1.4    Term of Loan.    If not sooner repaid, the outstanding principal amount of the Loan (less amounts deemed repaid pursuant to Section 1.6 below) and all other amounts owing under the Loan Documents (collectively, the "Obligations") shall be due and payable on the date which is twenty (20) years following the Business Open Date ("Maturity Date"). Lender shall determine and confirm to Borrower in writing the Business Open Date. Borrower may prepay the Obligations in whole or in part without penalty, at any time. Lender may accept partial payments, whether or not marked "paid in full", without waiving its rights or remedies under this Agreement.

BP 01539

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

    1.5    Amortization and Interest Payments. Beginning on the last day of the first Contract Year ("First Anniversary Date") and continuing on each anniversary of the First Anniversary Date, Borrower shall make annual principal payments in the amount equal to **five percent (5%)** of the then outstanding principal balance of the Loan as of the First Anniversary Date (such annual amount shall be referred to herein as the "Amortization Amount"). Notwithstanding the immediately preceding sentence, in the event Lender disburses all or any portion of the Loan after the First Anniversary Date, Lender shall adjust the amount of annual principal reduction payments due on each ensuing anniversary of the First Anniversary Date so as to fully amortize the principal balance of the Loan by the Maturity Date. In addition to making annual payments of the Amortization Amount, Borrower shall pay to Lender on the First Anniversary Date and on each anniversary of the First Anniversary Date all accrued and unpaid interest on the Loan (at the rate set forth in Section 2 of the Note) for the prior twelve (12) month period, as determined by Lender. The amounts due pursuant to this Section 1.5 shall be paid by Borrower to Lender no later than sixty (60) days after the end of each Contract Year.

    1.6    Repayment Through Store Sales. Notwithstanding anything to the contrary contained in Section 1.5 above, if during a given Contract Year Borrower has Gross Sales with respect to its Store of at least the Annual Guaranteed Amount, then the Loan shall be deemed to be repaid by Borrower as of the last day of such Contract Year (i) five percent (5%) of the then outstanding principal balance of the Loan (subject to adjustment as provided in Section 1.5), and (ii) all interest which accrued under the Note during such Contract Year. During the first Contract Year only, solely for purposes of determining whether Borrower has met the Annual Guaranteed Amount for such Contract Year, the actual Gross Sales with respect to Borrower's Store during such Contract Year shall be grossed up by an amount equal to one-twelfth of the Annual Guaranteed Amount. Borrower acknowledges and agrees that it has itself participated in the determination of the Annual Guaranteed Amount, that such sales goal is reasonable and that Borrower's failure to achieve Gross Sales of at least the Annual Guaranteed Amount each Contract Year will result in repayment obligations. Borrower further acknowledges and agrees that such deemed repayment of debt will result in taxable income to Borrower and that Lender will be delivering to Borrower an IRS Form 1099 reflecting such income. Borrower further acknowledges and agrees that any deemed repayment shall be calculated based only on the register sales made by Borrower for the applicable Contract Year, and that if during any Contract Year, Borrower's register sales exceed the Annual Guaranteed Volume of the Products for such Contract Year, such excess register sales cannot be applied to any previous or future Contract Year.

    1.7.    No Waiver. Lender's deemed repayment of any portion of the Loan as set forth in Section 1.6 shall not operate as a waiver of its right to collect or demand repayment of the Obligations upon the occurrence of an Event of Default.

    1.8    Promissory Note. The obligation of the Borrower to repay the Loan shall be evidenced by the Note. Lender shall record and endorse on the schedule forming a part of the Note appropriate notations to evidence (i) the date and amount of any Disbursement made by

BP 01540

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Lender, (ii) the date and amount of each payment of principal by the Borrower, and (iii) the date and amount of any deemed repayment of any portion of the Loan by Lender pursuant to Section 1.6; provided, however, that Lender's failure to record or endorse any such amount shall not affect the obligations of the Borrower under this Agreement or the other Loan Documents.

    1.9    <u>Audit Rights</u>. So long as there are outstanding Obligations, Lender may, upon reasonable notice to Borrower, audit Borrower's books and records pertaining to Gross Sales. Borrower agrees to cooperate fully with such audit and, if such audit reveals an over-reporting of Gross Sales, Borrower shall immediately pay to Lender any amounts then owing to Lender on account of such over-reporting plus interest at the Default Rate. In addition, if Gross Sales have been overstated by more than five percent (5%), Borrower shall reimburse Lender upon demand for Lender's actual out of pocket audit costs.

    2.    **Conditions to Disbursement**. Before Lender becomes obligated to make any Disbursement under this Agreement, all conditions to such Disbursement set forth below shall have been satisfied at Borrower's sole cost and expense in a manner acceptable to Lender in the exercise of its reasonable judgment. Borrower acknowledges that delays in Disbursements may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement. Borrower consents to all such delays. No waiver of any condition to Disbursement shall be effective unless it is expressly made by Lender in writing. If Lender makes a Disbursement before fulfillment of one or more required conditions, that Disbursement alone shall not be a waiver of such conditions, and Lender reserves the right to require their fulfillment before making any subsequent Disbursements.

    2.1    <u>Loan Closing and First Disbursement</u>. Lender shall not be required to make the first Disbursement unless all of the following conditions are satisfied on or before January 7, 2007.

    (a)    Borrower shall have complied with all conditions or requirements of Lender as set forth in the Conditional Commitment Letter, including without limitation (i) satisfaction of the conditions set forth in paragraphs (a) through (e) on Page 1 of the Conditional Commitment Letter, (ii) Lender's receipt of reimbursement from Borrower for all costs incurred by Lender in connection with the Loan, and (iii) Lender's receipt of all of the items set forth in Exhibit "B" to the Commitment Letter.

    (b)    All Loan Documents shall have been duly executed by Borrower and any guarantor and received by Lender, including appropriate resolutions or certificates of authority.

    (c)    Lender shall have received written confirmation from the Title Company that (i) the Deed of Trust and the other Loan Documents which are in recordable form shall have been duly recorded in the official records of the county where the Property is located, and (ii) Title Company shall be in a position to deliver for filing with the California Secretary of

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

State a UCC-1 Financing Statement which perfects Lender's security interest in all personal property and fixtures covered by the Deed of Trust.

(d)     The Title Company shall have issued or committed to issue an LP-10 ALTA Lender's extended coverage loan policy of title insurance in a liability amount satisfactory to Lender ("Title Policy"). The Title Policy shall insure the Deed of Trust as a second-priority lien on Borrower's fee estate in the Property, subject only to exceptions consented to by Lender in writing, and shall contain such endorsements as Lender may require. No title matter may be insured over by the Title Company without the express written consent of Lender.

(e)     Borrower shall have provided to Lender evidence of commercial general liability insurance naming Lender as an additional insured, on an "occurrence" basis against claims for "personal injury" liability, including bodily injury, death or property damage liability, with a limit of not less than One Million Dollars ($1,000,000.00). Such insurance shall name Lender as an additional insured and shall be primary and non-contributory with any other insurance carried by Lender.

(f)     If required by Lender, Borrower shall have obtained performance and labor and material payment bonds in dual obligee form covering the performance of the Contractor and such principal subcontractors for the Alterations as Lender may designate. The terms of the bonds and the bonding company shall be acceptable to Lender, and all required bonds and the contracts which they cover shall have been duly recorded or filed in accordance with applicable California law.

(g)     Lender shall have approved the information set forth in Borrower's completed Environmental Questionnaire. If Lender so requires, Lender shall also have received a report prepared by a licensed or registered environmental engineer or other qualified party satisfactory to Lender stating that there are no Hazardous Substances, as defined in Section 1.5 of the Environmental Indemnity, present in, on, under or around the Property, and that there is no condition or circumstance which warrants further investigation or analysis in the opinion of the preparer of the report.

(h)     Lender shall have approved the architect ("Architect"), engineer ("Engineer"), general contractor ("Contractor") and principal subcontractors to be used in connection with the Alterations.

(i)     Lender shall have received and approved the Plans, together with (i) a detailed budget for the Alterations and the other Permitted Uses of Loan proceeds, and (ii) copies of building permits.

(j)     Lender shall have received and approved (i) all contracts entered in by Borrower with the Architect, Engineer and Contractor, respectively, (ii) an assignment of

82461 am/pm Loan Agreement v1.doc                8                              BP 01542

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

each such contract referred to clause (i) in favor of Lender, in form and substance satisfactory to Lender, together with an assignment of the Plans, and (iii) consents to each such assignment executed by the Architect, Engineer and Contractor, respectively, in form and substance satisfactory to Lender.

(k)     Lender shall have received such financial statements and other financial information as it may require regarding the financial condition of Borrower, any guarantor, the Store or the Property.

(l)     Lender shall have received evidence of the due formation and good standing of Borrower and any guarantor, including such organizational documents (including partnership agreements, operating agreements, articles of organization or articles of incorporation) and certificates of status as Lender may require.

2.2     <u>Any Disbursement</u>.  In no event shall Lender be required to make any Disbursement if:

(a)     Borrower fails to observe any condition or term set forth in the Disbursement Agreement; or

(b)     For any reason the Title Company fails or refuses at Lender's request to issue a CLTA Form 122 endorsement or its equivalent; or

(c)     The Improvements are materially damaged and not repaired, unless Lender receives funds from Borrower or insurance proceeds sufficient to pay for all repairs in a timely manner; or

(d)     The Property or any interest in it is affected by eminent domain or condemnation proceedings; or

(e)     Lender receives a bonded or unbonded stop notice, unless Borrower files a release bond satisfactory to Lender in its reasonable judgment; or

(f)     Under any of the Loan Documents, a default or Event of Default (as defined in that document) has occurred and is continuing, or an event has occurred that with notice or the passage of time could become a default or Event of Default.

2.3     <u>Disbursement Procedures</u>.  Disbursements for Alterations shall be made in accordance with the procedures set forth in the Disbursement Agreement, the terms of which are incorporated herein by this reference.  Lender may delegate the disbursal and verification duties to a third party, in which case Lender will notify Borrower and Borrower will make disbursement requests to and submit documentation for disbursements to the third party. Disbursements of the Loan shall be made in the form of vouchers from Borrower to contractors and/or suppliers.  The contractors and/or suppliers through the third party funding company will

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

redeem the vouchers for payment. Except as otherwise provided in the Disbursement Agreement, loan proceeds shall be available for disbursement as follows: one-fourth of the loan amount at the time Borrower obtains permits for construction; one-fourth of the loan amount when Lender verifies that the improvements are 25% complete; one-fourth of the loan amount when Lender verifies that the improvements are 50% complete and one-fourth of the loan amount after Lender verifies that the improvements are 75% complete. The Additional Funds, if any, shall be available for disbursement in accordance with the terms of Section 1.2 above. Lender reserves the right, prior to making any disbursement, to require original paid invoices supporting the expenditure of loan proceeds, releases of mechanics liens, and/or additional security for the Loan as Lender may determine in its sole discretion. The third party fund control company fee, if any, will be paid by Lender.

3.      **Covenants of the Borrower.**  Borrower promises to keep each of the covenants set forth below, unless Lender has waived compliance in writing.

3.1      <u>Commencement and Completion of Improvements</u>.  Borrower shall obtain building permits and commence construction of the Alterations no later than January 11, 2007. Borrower shall complete the construction of the Alterations, obtain a certificate of completion or a certificate of occupancy from the appropriate governmental authority, and open for business (as determined by Lender) by not later than July 11, 2007. Borrower's failure to observe any of the deadlines set forth in this <u>Section 3.1</u> shall be an Event of Default and shall not be subject to the cure period set forth in <u>Section 4.9</u> below.

3.2      <u>Permits, Licenses and Approvals</u>.  Borrower shall construct the Alterations in a good and workmanlike manner in accordance with sound building practices as well as the Plans and all applicable laws pertaining to such construction. Borrower shall properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to construct and occupy the Alterations and operate the Store.

3.3      <u>Site Visits</u>.

(a)      Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Property for the purposes of performing an appraisal, observing the work of construction, examining all materials and determining whether such work conforms with the Plans approved by Lender. Lender shall also have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors which relate to the Property or construction of the Alterations. In each instance, Lender shall give Borrower reasonable notice before entering the Property. Lender shall make reasonable efforts to avoid interfering with Borrower's Store operations.

(b)      Lender is under no duty to visit the Property or to supervise or observe construction or to examine any books or records. Any site visit, observation or

BP 01544

82461 am/pm Loan Agreement v1.doc          10

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

examination by Lender shall be solely for the purpose of protecting Lender's rights and interests. No site visit, observation or examination by Lender shall impose any liability on Lender or result in a waiver of any default of Borrower. In no event shall any site visit, observation or examination by Lender be a representation that there has been or shall be compliance with the Plans, that the construction is free from defective materials or workmanship, or that the construction complies with any other applicable law.

3.4   Protection Against Lien Claims.   Borrower shall promptly pay or otherwise discharge all claims and liens for labor done and materials and services furnished in connection with the construction of the Alterations. Borrower shall have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to Lender or delay in completing the Alterations.

3.5   Payment of Expenses.   Borrower shall pay Lender's costs and expenses incurred in connection with the making, disbursement and administration of the Loan, as well as any revisions, extensions, renewals or "workouts" of the Loan, and in the exercise of any of Lender's rights or remedies under this Agreement. Such costs and expenses include charges for title insurance (including endorsements), filing, recording and escrow charges, fees for appraisal, architectural and engineering review, construction services and environmental services, mortgage taxes, legal fees and expenses of Lender's counsel and any other reasonable fees and costs for services, regardless of whether such services are furnished by Lender's employees or agents or independent contractors. Borrower acknowledges that amounts payable under this Section are not included in any loan or commitment fees for the Loan.

3.6   Financial Information.   Borrower shall keep true and correct financial books and records on a cash basis pertaining to Gross Sales and to the construction of any Alterations. Upon request of Lender from time to time, Borrower shall deliver balance sheets and income statements to Lender for itself and the Store, together with a statement showing all changes in the financial condition of Borrower and the Store which occurred during the preceding Contract Year. These financial statements may be Borrower prepared. Borrower shall also furnish to Lender upon request signed copies of any tax returns and such other information as Lender may reasonably request concerning its affairs and properties.

3.7   Notices. Borrower shall promptly notify Lender in writing of:

(a)   Any litigation affecting Borrower or any guarantor, where the amount claimed is Fifty Thousand Dollars ($50,000) or more;

(b)   Any communication, whether written or oral, that Borrower may receive from any governmental, judicial or legal authority, giving notice of any claim or assertion that the Store, the Property or any Alterations fail in any respect to comply with any applicable governmental law;

BP 01545

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

(c)    Any default by the Project Manager, Contractor or any subcontractor, material supplier or surety; and

(d)    Any material adverse change in the physical condition of the Property (including any damage suffered as a result of earthquakes or floods), or in Borrower's or any guarantor's business condition (financial or otherwise), operations, properties or prospects.

3.8    Indebtedness.    Except for the Senior Loan and except as otherwise provided under the Loan Documents, Borrower will not create, incur or assume any indebtedness, commitment or other obligation for borrowed money without the express prior written consent of Lender.

3.9    Performance of Acts.    Upon request by Lender, Borrower shall perform all acts which may be necessary or advisable to perfect any lien or security interest provided for in the Loan Documents or to carry out the intent of the Loan Documents.

3.10    Insurance.

(a)    Borrower shall provide, maintain and keep in force at all times prior to repayment of the Loan, the insurance required by Section 2.1 above and by the Disbursement Agreement. Also at all such times, Borrower shall provide, maintain and keep in force any and all additional insurance that Lender in its reasonable judgment may from time to time require, against insurable hazards which at the time are commonly insured against in the case of property similarly situated. Such additional insurance may include flood insurance as required by federal law and earthquake insurance as required by Lender. At Lender's request, Borrower shall supply Lender with an original of any policy or a certificate of coverage.

(b)    All policies of insurance required under this Agreement and the Disbursement Agreement shall be issued by companies approved by Lender having a minimum A.M. Best's rating of A:IX. The limits, coverage, forms, deductibles, inception and expiration dates and cancellation provisions of all such policies shall be acceptable to Lender. In addition, each required property insurance policy shall contain a Lender's Loss Payable Form (Form 438 BFU or equivalent) in favor of Lender, and shall provide that all proceeds be payable to Lender to the extent of its interest. An approval by Lender is not, and shall not be deemed to be, a representation of the solvency of any insurer or the sufficiency of any amount of insurance.

(c)    Each policy of insurance required hereunder and under the Disbursement Agreement shall provide that it may not be modified or cancelled without at least thirty (30) days' prior written notice to Lender. When any required insurance policy expires, Borrower shall furnish Lender with proof acceptable to Lender that the policy has been reinstated or a new policy issued, continuing in force the insurance covered by the policy which expired. Borrower shall also furnish Lender with evidence satisfactory to Lender that all premiums for

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

such policy have been paid within thirty (30) days of renewal or issuance. If Lender fails to receive such proof and evidence, Lender shall have the right, but not the obligation, to obtain current coverage and advance funds to pay the premiums for it. Borrower shall repay Lender immediately on demand for any advance for such premiums, which shall be considered to be an additional loan to Borrower bearing interest at the Default Rate and secured by the Deed of Trust and which shall not be subject to deemed repayment in accordance with Section 1.6 above.

      3.11   Processing Fee.  Borrower shall pay to Lender upon execution of this Agreement by Borrower a processing fee in the amount of $10,000.

      4.    Events of Default.

      The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

      4.1    The Borrower assigns this Agreement or any of the other Loan Documents to a third party without the prior written consent of Lender: or

      4.2    The Borrower assigns the CD Store Agreement to a third party without the prior written consent of Lender; or

      4.3    The Borrower fails to observe any of the deadlines set forth in Section 3.1 above or, after commencing operations, there occurs a cessation of operations at the Store for thirty (30) consecutive days; or

      4.4    There shall occur a "Transfer" (defined below) without Lender's prior written consent; or

      4.5    The CD Store Agreement is terminated by either Lender or Borrower prior to the end of its stated term; or

      4.6    There shall occur a default or "Event of Default" under any contract entered into by Borrower with the Architect, Engineer or Contractor; or

      4.7    Borrower fails to make any payment due under the Loan Documents within five (5) business days after the date when due; or

      4.8    Borrower fails to comply with any provision contained in this Agreement other than those provisions elsewhere referred to in this Section 4, and does not cure that failure within thirty (30) days after written notice from Lender; or

      4.9    Any representation or warranty made by Borrower in the Loan Documents or in any Pay Voucher, financial statement or document delivered pursuant to this Agreement, or

BP 01547

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

in connection with the making of any Disbursement, shall prove to have been incorrect, untrue or misleading in any material respect when made;

4.10    A default or "Event of Default" shall have occurred under any of the other Loan Documents; or

4.11    There shall occur a default or event of default under any of the Senior Loan Documents; or

4.12    The Borrower shall fail to pay when due the principal of or interest on any other indebtedness secured by the Property, or there shall occur any other event that would permit the holder of such indebtedness to accelerate the maturity thereof; or

4.13    The Borrower shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or a substantial part of its property or business, or such a receiver or trustee otherwise shall be appointed and shall not be discharged within 30 days after such appointment, or there shall be instituted by or against Borrower a bankruptcy, insolvency, reorganization or liquidation proceeding and such proceeding shall not be dismissed within 30 days ("Insolvency Proceeding"), or any order, judgment or decree shall be entered against the Borrower decreeing its dissolution, or the Borrower's existence shall otherwise be terminated.

5.    **Remedies.**

5.1    Upon the occurrence of any Event of Default, Lender may, at its option, exercise all remedies and rights available to it under this Agreement, the other Loan Documents and under applicable law or in equity or by statute, including without limitation, the right to (i) declare all or any part of the Obligations to be forthwith due and payable, without presentation, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower; or (ii) terminate any obligation of Lender hereunder to make further Disbursements. All of Lender's rights and remedies shall be cumulative. No delay or failure of Lender in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of that right by Lender, and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or of any other right or remedy that Lender may have.

5.2    Also upon any Event of Default, Lender shall have the right in its sole discretion to enter and take possession of the Property, whether in person, by agent or by court-appointed receiver, and to take any and all actions which Lender in its sole discretion may consider necessary to complete construction of the Alterations, including making changes in the Plans, work or materials and entering into, modifying or terminating any contractual arrangements, all subject to Lender's right at any time to discontinue any work without liability.

82461 am/pm Loan Agreement v1.doc                14                                    BP 01548

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

If Lender chooses to complete the Alterations, it shall not assume any liability to Borrower or any other person for completing the Alterations or for the manner or quality of construction of the Alterations, and Borrower expressly waives any such liability. If Lender exercises any of the rights or remedies provided in this subparagraph, that exercise shall not make Lender, or cause Lender to be deemed to be, a partner or joint venturer of Borrower. Lender in its sole discretion may choose to complete construction in its own name. All sums which are expended by Lender in completing construction shall be considered to be an additional loan to Borrower bearing interest at the Default Rate, secured by the Deed of Trust and not be subject to deemed repayment in accordance with Section 1.6.

5.3    For purposes of determining the outstanding balance of the Loan at the time an Event of Default occurs hereunder, deemed repayment of principal and interest by Lender pursuant to Section 1.6 shall be calculated based upon the percentage of the Annual Guaranteed Amount achieved by Borrower through the last day of the calendar month immediately preceding the occurrence of the Event of Default. For example if the CD Store Agreement is terminated by Borrower on May 15, 2005 and the current Contract Year expires December 31, 2005, Lender will calculate total Gross Sales during the period January 1, 2005 through April 30, 2005 and compare such total to the Annual Guaranteed Amount. If total Gross Sales during such period equal 33% of the Annual Guaranteed Amount, the outstanding principal balance of the Loan will be reduced by an amount equal to 33% of the annual principal reduction payment due for that Contract Year (determined in accordance with Section 1.6 above).

6.    <u>Interest and Late Charges</u>.  Borrower hereby acknowledges that late payment by Borrower to Lender of the payments due under this Agreement will cause Lender to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any payment due from Borrower under this Agreement is not received within five (5) business days after the date on which such payment is due and payable, then without any requirement for notice to Borrower, Borrower shall pay Lender a late charge equal to five percent (5%) of such overdue amount. Borrower and Lender hereby agree that such late charge represents a fair and reasonable estimate of the costs Lender will incur by reason of late payment by Borrower. Acceptance of such late charge by Lender shall in no event constitute a waiver of Borrower's default with respect to such overdue amount, or prevent Lender from exercising any of the rights and remedies granted hereunder. In addition to the foregoing, Borrower agrees to pay interest at the Default Rate on any and all sums due under this Agreement from the payment due date until the date fully paid by Borrower.

7.    <u>Transfers</u>.  Borrower agrees that, in the event of any "Transfer" (as defined below) without the prior written consent of Lender, Lender shall have the absolute right, at its option, without prior demand or notice, to declare the Obligations immediately due and payable. Consent to one such Transfer shall not be deemed to be a waiver of the right to require consent to future or successive Transfers. Lender may grant or deny such consent in its sole discretion and, if consent should be given, any such Transfer shall be subject to all obligations of Borrower under the Loan Documents, such transferee shall assume all obligations under the Loan

82461 am/pm Loan Agreement v1.doc        15

162

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

Documents and agree to be bound by all provisions contained herein and therein, and Lender may require that Borrower pay to Lender an assumption fee in the amount of five percent (5%) of the remaining balance of the unamortized Loan. Such assumption shall not, however, release Borrower or any guarantor from any liability to Lender without the prior written consent of Lender. As used herein, "Transfer" shall mean:

(a) any sale, transfer, conveyance, hypothecation, encumbrance or lease of the Property or any part thereof or interest therein to any person or entity, whether voluntary, involuntary, by operation of law, or otherwise (except for any deed of trust executed in favor of EGI in connection with the Citicorp Loan);

(b) any change of control in Borrower if, within thirty (30) days after such change of control, Borrower has not paid in full all Obligations ("control" as used herein shall mean the ability to direct the day to day management of the affairs of Borrower);

(c) any sale or transfer of greater than ten percent (10%) of the direct or indirect ownership interests in Borrower or any consolidation or merger of Borrower (whether voluntarily, involuntarily, by operation of law or otherwise); or

(d) any sale, lease or other disposal of all or substantially all of Borrower's assets.

8. **Indemnity Regarding Construction and Other Risks**. Borrower indemnifies, defends and holds the Indemnified Parties harmless from and against any and all Indemnified Costs directly or indirectly arising out of or resulting from construction of any improvements on the Property, including any defective workmanship or materials; or any failure to satisfy any requirements of any laws, regulations, recorded covenants, maps, permits or other entitlements that apply or pertain to the Property; or breach of any representation or warranty made or given by Borrower to any of the Indemnified Parties or to any prospective or actual buyer, tenant or other occupant of all or any portion of the Property; or any claim or cause of action of any kind by any party that any Indemnified Party is liable for any act or omission of Borrower or any other person or entity in connection with the ownership, sale, operation or development of the Property. This indemnity shall survive repayment in full of the Obligations.

9. **Miscellaneous**.

9.1 **Amendments**. This Agreement may only be amended by a written instrument duly executed by Lender and Borrower.

9.2 **Notices**. Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

(a)    If to the Borrower:

STTN Enterprises, Inc.
631 San Felipe Rd.
Hollister, CA 05035
Attention:    Nazim Faquiryan
              Sayed Faquiryan
Facsimile No.:

(b)    If to Lender:

BP West Coast Products LLC
P. O. Box 5077
Buena Park, California 90622-5077
Attention: Contract Dealer Loan Administration
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

        9.3    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one agreement.

        9.4    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

        9.5    Severability. If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

        9.6    Assignment, Binding Effect. The Loan is not assumable. Borrower may not assign this Agreement, nor delegate any of its duties hereunder, without the prior written consent of Lender, which consent may be granted or denied in Lender's sole and absolute discretion. Lender may assign all or any part of its rights and interests hereunder. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

        9.7    Tax Consequences. Lender makes no representation regarding and assumes no responsibility for the tax consequences to Borrower of any term of this Agreement or

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

the other Loan Documents.    Borrower represents and warrants to Lender that it has had an opportunity to consult with tax counsel prior to executing the Loan Documents.

        9.8    _Entire Agreement_.    This Agreement and the other Loan Documents contain all of the agreements and understandings between the parties with respect to the subject matter of this Agreement.   All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Agreement are expressly merged herein and superseded hereby.

        9.9    _Attorney's Fees_.   If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Agreement, the Note, the other Loan Documents or the Loan, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.  In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

        **IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first above written.

STTN ENTERPRISES, INC.,        BP WEST COAST PRODUCTS LLC,
a California corporation        a Delaware limited liability company


By _____      By _____

Name: Nazim S.M. Faquiryan      Name: Jeff M. Cary

Title:  CEO/President        Title:  Vice President


By _____

Name: Sayed M.N. Faquiryan

Title:  Secretary/Treasurer

BP 01552

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT A

Loans may only be used for am/pm store-related image and equipment-based improvements; the types of qualifying expenditures and the maximum amount permitted to be loaned are noted below:

| Description | Maximum Amount |
| --- | --- |
| Coolers/Freezers | $32,500 |
| Gondolas/Sales Modules (fast track) | $15,000 |
| Counters and Cabinets | $50,000 |
| Interior Lighting | $ 12,000 |
| Store Front System | $ 20,000 |
| HVAC | $35,000 |
| Floor and tiling | $20,000 |
| Plumbing | $35,000 |
| Electrical | $50,000 |
| Video Surveillance Equipment | $25,000 |

Prices vary up to 20%, dependent on geographic location

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT B

### SECURED PROMISSORY NOTE

[Attached]

BP 01554

## SECURED PROMISSORY NOTE
### (am/pm Mini Market)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation, (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Twenty Five and No/100 Dollars ($225,000.00) (the "Maximum Loan Amount", or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below. This Note evidences a loan ("Loan") from Lender to Borrower.

1.      This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property"). It may also be secured by other collateral. This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower. Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note. Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

2.      The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to Five percent (4.75 %) per annum.[1] Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan. Borrower shall also make annual principal reduction payments as provided in the Loan Agreement. Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

3.      All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

4.      All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

5.      Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

6.      Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

7.      If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment. In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

8.      From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate. Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]  The interest rate currently approved for CD Loans is 4.75 % per annum but is subject to change. The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.

1

BP 01555

9.    If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

(a)    Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

(b)    Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

(c)    Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.    If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law.  In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests.  From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.    This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.    Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.    If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note.  No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.  All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.    This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance.  Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.    If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

BP 01556

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:   CEO and President


By _____
Name:  Sayed M.N. Faquiryan
Title:  Secretary and Treasurer

3

170

BP 01557

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT C

### SCHEDULE OF LOAN DOCUMENTS

1.   Loan Agreements (Gasoline and am/pm Mini Market)

2.   Secured Promissory Note

3.   Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing

4.   UCC-1 Financing Statement

5.   Environmental Indemnity

6.   Environmental Questionnaire

7.   Senior Lender's Consent to Encumbrance and Request for Notice of Default

8.   Guaranty executed by Nazim S.M. Faquiryan

9.   Guaranty executed by Sayed M.N. Faquiryan and Mahgul Faquiryan

10.  CD Store Agreement

11.  Memorandum of Gasoline Agreement for Dealer Owned and Franchise Operated
     Facility

12.

13.

14.

Facility Number: 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT D

## FORM OF DISBURSEMENT AGREEMENT

[Attached]

BP 01559

# EXHIBIT
# G

## SECURED PROMISSORY NOTE
### (am/pm Mini Market)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation, (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) (the "Maximum Loan Amount"), or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below. This Note evidences a loan ("Loan") from Lender to Borrower.

1.      This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property"). It may also be secured by other collateral. This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower. Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note. Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

2.      The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to Four and Seventy Five percent (4.75%) per annum.[1] Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan. Borrower shall also make annual principal reduction payments as provided in the Loan Agreement. Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

3.      All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

4.      All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

5.      Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

6.      Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

7.      If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment. In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

8.      From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate. Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]      The interest rate currently approved for CD Loans is 4.75% per annum but is subject to change. The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.


PLAINTIFF'S
EXHIBIT
6

1

BP 01592

9.      If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

(a)      Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

(b)      Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

(c)      Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.      If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law. In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.      This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.      Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.      If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note. No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender. All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.      This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance. Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.      If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

BP 01593

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:   CEO and President

By _____
Name:  Sayed M.N. Faquiryan
Title:   Secretary and Treasurer

3

BP 01594

# EXHIBIT
# H

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

# LOAN AGREEMENT
## (Gasoline)

This LOAN AGREEMENT (this "Agreement") is made and entered into as of ~~Feb. 12~~ , 2007 ("Execution Date"), between BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), and STTN ENTERPRISE, INC., a California corporation (the "Borrower").

### Recitals

A.   Borrower and Lender have entered into that certain Contract Dealer Gasoline Agreement dated July 11, 2006 (hereinafter referred to as the "CD Agreement") which provides the terms and conditions under which Borrower operates or will operate an ARCO gasoline station located at 631 San Felipe Road, Hollister, CA 95035 (the "Facility"). The Facility comprises a part of certain real property owned by Borrower located at 631 San Felipe Road, Hollister, CA 95035 and more particularly described in Exhibit "A" to the Deed of Trust (the "Property"). Borrower and Lender have also entered into that certain am/pm Mini Market Agreement dated July 11, 2006 which provides the terms and conditions under which Borrower operates or will operate an am/pm Mini Market on the Property (the "Mini Market Agreement").

B.   Lender and Borrower desire to provide for the terms and conditions upon which Lender will make available to Borrower a loan to fund the costs associated with certain pre-approved modifications and/or equipment and improvements to the Facility.

### Agreement

In consideration of the mutual promises contained herein, Lender and Borrower agree as follows:

### DEFINITIONS:

**Additional Loan Amounts:**   The term Additional Loan Amounts means any Additional Funds which may be disbursed to Borrower or for Borrower's benefit as defined and provided in Section 1.2.

**Alterations:**   The term "Alterations" means alterations or improvements to the Facility which are permitted under this Agreement.

**Amortization Amount:**  The term "Amortization Amount" is defined in Section 1.5.

**Annual Guaranteed Volume:**   The term "Annual Guaranteed Volume means 2,800,000 gallons.

**Architect:**   The term "Architect" is defined in Section 2.1(h).

**Base Loan Amount:**   The term "Base Loan Amount" is defined in Section 1.1.

**Business Open Date:**   The term "Business Open Date" means the first day on which the Facility is open for business of all material components of the gas and store offering as set forth more particularly in the CD Agreement and the Mini Market Agreement, as determined by Lender.

**CD Agreement:** The term "CD Agreement" is defined in Recital A above.


PLAINTIFF'S
EXHIBIT

BP 01510

82461 Gas Loan Agreement v1.doc                    1

**Closing Date:**   The term "Closing Date" means the date of recordation, of the Deed of Trust in the Official Records of the county in which the Property is located.

**Conditional Commitment Letter:**  The letter dated May 25, 2006 from Lender to Borrower outlining the terms and conditions upon which Lender expressed its willingness to make the Loan to Borrower.

**Contract Year:** The 12 month period beginning on the first day of the first complete month following the Business Open Date and each 12 month period thereafter.  If the Business Open Date occurs on the first day of a calendar month, the Contract Year shall commence on such date.

**Contractor:**   The term "Contractor" is defined in Section 2.1(h).

**Deed of Trust:**  The term "Deed of Trust" means that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of even date herewith, executed by Borrower in favor of Lender.

**Default Rate:**   The term "Default Rate" shall have the meaning set forth in the Note.

**Disbursement:**  The term "Disbursement" means a disbursement of Loan proceeds made by Lender to or for the benefit of Borrower.

**Disbursement Agreement:**   The term "Disbursement Agreement" means that certain Disbursement Agreement Owner and Contractor in the form of Exhibit D attached hereto and made a part hereof, to be executed by Borrower and Lender substantially concurrently with the recordation of the Deed of Trust.

**Engineer:**   The term "Engineer" is defined in Section 2.1(h).

**Environmental Indemnity:**    The term "Environmental Indemnity" means that certain Environmental Indemnity dated as of even herewith, executed by Borrower in favor of Lender.

**Event of Default:**   The term "Event of Default" is defined in Section 4.

**Facility:**    The term "Facility" is defined in Recital A above.

**Fictitious Deed of Trust:**    The term "Fictitious Deed of Trust" is defined in the Deed of Trust.

**First Anniversary Date:**    The term "First Anniversary Date" is defined in Section 1.5 .

**Improvements:** The term "Improvements" shall have the meaning set forth in the Fictitious Deed of Trust.

**Indemnified Costs:**    The term "Indemnified Costs" means all actual or threatened liabilities, claims, actions, causes of action, judgments, orders, damages (including foreseeable and unforeseeable consequential damages), costs, expenses, fines, penalties and losses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of Lender's counsel), but excluding such costs as may be attributable to the gross negligence or willful misconduct of the party seeking to be indemnified.

**Indemnified Parties:**    The term "Indemnified Parties" means, collectively, Lender, its parent, subsidiary and affiliated companies, assignees of any of Lender's interest in the Loan or the Loan Documents, owners of participation, syndication or other interests in the Loan or the Loan Documents, any purchasers of

BP 01511

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

the Facility at any foreclosure sale or from Lender or any of its affiliates, and the officers, directors, employees and agents of each of them.

**Loan:**   The term "Loan" is defined in <u>Section 1.1</u>.

**Loan Documents:**      The term "Loan Documents" means the documents described in <u>Exhibit "C"</u> attached hereto, as the same may be amended, renewed or extended from time to time.

**Maturity Date:** The term "Maturity Date" is defined in <u>Section 1.4</u>.

**Note:**   The term "Note" means that certain Secured Promissory Note (Gas) of even date herewith, executed by Borrower to the order of Lender, which evidences the Loan.

**Obligations:**   The term "Obligations" is defined in <u>Section 1.4</u>.

**Pay Voucher:**   The term "Pay Voucher" shall have the meaning set forth in the Disbursement Agreement.

**Plans:**   The term "Plans" means detailed plans and specifications for the Alterations.

**Products:**   The term "Products" means all grades of gasoline and gasoline containing motor fuels (excluding diesel fuel) bearing the ARCO trademark and other identifying symbols and which are purchased directly from ARCO or Lender.

**Senior Lender:** Omni Financial

**Senior Loan:** That certain loan from Omni Financial to Borrower in the amount of $1,925,000.00

**Senior Loan Documents:** Those certain documents and agreements executed by Borrower in favor of Senior Lender evidencing and securing the Senior Loan, including a promissory note in the original principal amount of $1,625,000.00 (the "Senior Note") and that certain deed of trust dated August 12, 2003 and recorded on November 11, 2003 as instrument number 2003-0022960 in the Office of the San Benito Recorder (the "Senior Deed of Trust"). The Senior Note and the Senior Deed of Trust are modified to include the principal amount of $300,000.00 evidenced by _____ dated _____ as instrument number _____ and recorded in the Office of the San Benito Recorder.

**Title Company:** The term "Title Company" means Commonwealth Land Title Company.

**Title Policy:**   The term "Title Policy" is defined in <u>Section 2.1(d)</u>.

**Transfer:**   The term "Transfer" is defined in <u>Section 8</u>.

**Trustor:**   AVA Global Enterprise, Inc., a California corporation

1.   <u>Amount and Terms of the Loan</u>.

    1.1   <u>Amount of Loan</u>. Lender agrees to make available to the Borrower, upon the terms and conditions set forth in this Agreement, a loan (the "Loan") in the principal amount of $250,000.00 (the "Base Loan Amount") or so much thereof as is disbursed by Lender to or for the benefit of Borrower.

82461 Gas Loan Agreement v1.doc                    3                         BP 01512

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

1.2    Purpose of the Loan.  The proceeds of the Loan, including without limitation any Additional Funds disbursed as provided above in Section 1.2, shall be used exclusively to fund (i) costs and expenditures associated with improvements to and/or purchases of equipment for use at the Facility as described in Exhibit A attached hereto, and (ii) at the election of Lender, payment of the processing fee set forth in Section 3.11 below (collectively, the "Permitted Uses"), and for no other use or purpose whatsoever.

1.3    Term of Loan.  If not sooner repaid, the outstanding principal amount of the Loan (less amounts deemed repaid pursuant to Section 1.6 below) and all other amounts owing under the Loan Documents (collectively, the "Obligations") shall be due and payable on the date which is twenty (20) years following the Business Open Date ("Maturity Date").  Lender shall determine and confirm to Borrower in writing the Business Open Date. Borrower may prepay the Obligations in whole or in part without penalty, at any time.  Lender may accept partial payments, whether or not marked "paid in full", without losing its rights under this Agreement.

1.4    Amortization and Interest Payments.  Beginning on the last day of the first Contract Year ("First Anniversary Date") and continuing on each anniversary of the First Anniversary Date, Borrower shall make annual principal payments in the amount equal to five percent (5%) of the outstanding principal balance of the Loan as of the First Anniversary Date (such annual amount shall be referred to herein as the "Amortization Amount").  Notwithstanding the immediately preceding sentence, in the event Lender disburses all or any portion of the Loan after the First Anniversary Date, Lender shall adjust the amount of annual principal reduction payments due on each ensuing anniversary of the First Anniversary Date so as to fully amortize the principal balance of the Loan by the Maturity Date.  In addition to making annual payments of the Amortization Amount, Borrower shall pay to Lender on the First Anniversary Date and on each anniversary of the First Anniversary Date all accrued and unpaid interest on the Loan (at the rate set forth in Section 2 of the Note) for the prior twelve (12) month period, as determined by Lender.  The amounts due pursuant to this Section 1.5 shall be paid by Borrower to Lender no later than sixty (60) days after the end of each Contract Year.

1.5    Repayment Through Products Purchases. Notwithstanding anything to the contrary contained in Section 1.5 above, if during each Contract Year Borrower purchases at least the Annual Guaranteed Volume of the Products directly from Lender, then the Loan shall be deemed repaid by Borrower as of the last day of such Contract Year (i) five percent (5%) of the then outstanding principal balance of the Loan (subject to adjustment as provided in Section 1.5), and (ii) all interest which accrued under the Note during such Contract Year.  For the first Contract Year only, Borrower shall be deemed to have met the requirement for deemed repayment of indebtedness during the first Contract Year set forth herein so long as Borrower purchases an amount of gasoline from Lender equal to ten-twelfths (10/12) of the Annual Guaranteed Volume.  Borrower acknowledges and agrees that it has itself participated in the determination of Annual Guaranteed Volume, that such goal is reasonable and that Borrower's failure to purchase the Annual Guaranteed Volume from Lender each Contract Year will result in repayment obligations. Borrower further acknowledges and agrees that such deemed repayment of debt will result in taxable income to Borrower and that Lender will deliver to Borrower an IRS Form 1099 reflecting such income.   Borrower further acknowledges and agrees that any deemed repayment shall be calculated based only on the purchases made by Borrower for the applicable Contract Year, and that if during any Contract Year, Borrower's purchases exceed the Annual Guaranteed Volume of the Products for such Contract Year, such excess purchases cannot be applied to any previous or future Contract Year.

1.6    No Waiver.  Lender's deemed repayment of any portion of the Loan as set forth in Section 1.6 shall not operate as a waiver of its right to collect or demand repayment of the Obligations upon the occurrence of an Event of Default.

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

1.7    Promissory Note.  The obligation of the Borrower to repay the Loan shall be evidenced by the Note.  Lender shall record and endorse on the schedule forming a part of the Note appropriate notations to evidence (i) the date and amount of any Disbursement made by Lender, (ii) the date and amount of each payment of principal by the Borrower, and (iii) the date and amount of any deemed repayment of any portion of the Loan by Lender pursuant to Section 1.6; provided, however, that Lender's failure to record or endorse any such amount shall not affect the obligations of the Borrower under this Agreement or the other Loan Documents.

2.    Conditions to Disbursement.  Before Lender becomes obligated to make any Disbursement under this Agreement, all conditions to such Disbursement set forth below shall have been satisfied at Borrower's sole cost and expense in a manner acceptable to Lender in the exercise of its reasonable judgment.  Borrower acknowledges that delays in Disbursements may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given Disbursement.  Borrower consents to all such delays.  No waiver of any condition to Disbursement shall be effective unless it is expressly made by Lender in writing.  If Lender makes a Disbursement before fulfillment of one or more required conditions, that Disbursement alone shall not be a waiver of such conditions, and Lender reserves the right to require their fulfillment before making any subsequent Disbursements.

2.1 Loan Closing and First Disbursement.  Lender shall not be required to make the first Disbursement unless all of the following conditions are satisfied on or before January 7, 2007.

(a)  Borrower shall have complied with all conditions or requirements of Lender as set forth in the Conditional Commitment Letter, including without limitation (i) satisfaction of the conditions set forth in paragraphs (a) through (e) on Page 1 of the Conditional Commitment Letter, (ii) Lender's receipt of reimbursement from Borrower for all costs incurred by Lender in connection with the Loan, and (iii) Lender's receipt of all of the items set forth in Exhibit "B" to the Conditional Commitment Letter.

(b)  All Loan Documents shall have been duly executed by Borrower and any guarantor and received by Lender, including appropriate resolutions or certificates of authority.

(c)  Lender shall have received written confirmation from the Title Company that (i) the Deed of Trust and the other Loan Documents which are in recordable form shall have been duly recorded in the official records of the county where the Facility is located, and (ii) Lender shall be in a position to deliver for filing with the California Secretary of State a UCC-1 Financing Statement which perfects Lender's security interest in all personal property and fixtures covered by the Deed of Trust.

(d)  The Title Company shall have issued or committed to issue an LP-10 ALTA Lender's extended coverage loan policy of title insurance in a liability amount satisfactory to Lender ("Title Policy").  The Title Policy shall insure the Deed of Trust as a second-priority lien on Borrower's fee estate in the Facility, subject only to exceptions consented to by Lender in writing, and shall contain such endorsements as Lender may require.  No title matter may be insured over by any title company without the express written consent of Lender.

(e)  Borrower shall have provided to Lender evidence of commercial general liability insurance naming Lender as an additional insured, on an "occurrence" basis against claims for "personal injury" liability, including bodily injury, death or property damage liability, with a limit of not less than One Million Dollars ($1,000,000).  Such insurance shall be primary and noncontributory with any other insurance carried by Lender.

BP 01514

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

(f)  If required by Lender, Borrower shall have obtained performance and labor and material payment bonds in dual obligee form covering the performance of the Contractor and such principal subcontractors for the Alterations as Lender may designate.  The terms of the bonds and the bonding company shall be acceptable to Lender, and all required bonds and the contracts which they cover shall have been duly recorded or filed in accordance with applicable California law.

(g)  Lender shall have approved the information set forth in Borrower's completed Environmental Questionnaire.  If Lender so requires, Lender shall also have received a report prepared by a licensed or registered environmental engineer or other qualified party satisfactory to Lender stating that there are no Hazardous Substances, as defined in Section 1.5 of the Environmental Indemnity, present in, on, under or around the Facility, and that there is no condition or circumstance which warrants further investigation or analysis in the opinion of the preparer of the report.

(h)  Lender shall have approved the architect ("Architect"), engineer ("Engineer"), general contractor ("Contractor") and principal subcontractors to be used in connection with the Alterations.

(i)  Lender shall have received and approved the Plans, together with (i) a detailed budget for the Alterations and the other Permitted Uses of Loan proceeds, and (ii) copies of building permits.

(j)  Lender shall have received and approved (i) all contracts entered in by Borrower with the Architect, Engineer and Contractor, respectively, (ii) an assignment of each such contract referred to clause (i) in favor of Lender, in form and substance satisfactory to Lender, together with an assignment of the Plans, and (iii) consents to each such assignment executed by the Architect, Engineer and Contractor, respectively, in form and substance satisfactory to Lender.

(k)  Lender shall have received such financial statements and other financial information as it may require regarding the financial condition of Borrower, any guarantor or the Facility.

(l)  Lender shall have received evidence of the due formation and good standing of Borrower and any guarantor, including such organizational documents (including partnership agreements, operating agreements, articles of organization and articles of incorporation) and certificates of status as Lender may require.

2.2  Any Disbursement.  In no event shall Lender be required to make any Disbursement if:

(a)  Borrower fails to observe any condition or term set forth in the Disbursement Agreement; or

(b)  For any reason the Title Company fails or refuses at Lender's request to issue a CLTA Form 122 endorsement or its equivalent; or

(c)  The Improvements are materially damaged and not repaired, unless Lender receives funds from Borrower or insurance proceeds sufficient to pay for all repairs in a timely manner; or

(d)  The Facility or any interest in it is affected by eminent domain or condemnation proceedings; or

(e)  Lender receives a bonded or unbonded stop notice, unless Borrower files a release bond satisfactory to Lender in its reasonable judgment; or

(f)  Under any of the Loan Documents, a default or Event of Default (as defined in that document) has occurred and is continuing, or an event has occurred that with notice or the passage of time could become a default or Event of Default.

2.3  Disbursement Procedures.  Disbursements for Alterations shall be made in accordance with the procedures set forth in the Disbursement Agreement, the terms of which are incorporated herein by this reference.  Lender may delegate the disbursal and verification duties to a third party, in which case Lender will notify Borrower and Borrower will make disbursement requests to and submit documentation for disbursements to the third party.  Disbursements of the Loan shall be made in the form of vouchers from Borrower to contractors and/or suppliers.  The contractors and/or suppliers through the third party funding company will redeem the vouchers for payment.  Except as otherwise provided in the Disbursement Agreement, loan proceeds shall be available for disbursement as follows: one-fourth of the loan amount at the time Borrower obtains permits for construction; one-fourth of the loan amount when Lender verifies that the improvements are 25% complete; one-fourth of the loan amount when Lender verifies that the improvements are 50% complete and one-fourth of the loan amount after Lender verifies that the improvements are 75% complete.  The Additional Funds, if any, shall be available for disbursement in accordance with the terms of Section 1.2 above.  Lender reserves the right, prior to making any disbursement, to require original paid invoices supporting the expenditure of loan proceeds, releases of mechanics liens, and/or additional security for the Loan as Lender may determine in its sole discretion.  The third party fund control company fee, if any, will be paid by Lender.

3.     Covenants of the Borrower.  Borrower promises to keep each of the covenants set forth below, unless Lender has waived compliance in writing.

3.1  Commencement and Completion of Improvements.  Borrower shall obtain building permits and commence construction of the Alterations no later than January 11, 2007.  Borrower shall complete the construction of the Alterations, obtain a certificate of completion or a certificate of occupancy from the appropriate governmental authority, and open for business (as determined by Lender) by not later than July 11, 2007.  Borrower's failure to observe any of the deadlines set forth in this Section 3.1 shall be an Event of Default and shall not be subject to the cure period set forth in Section 4.9 below.

3.2  Permits, Licenses and Approvals.  Borrower shall construct the Alterations in a good and workmanlike manner in accordance with sound building practices as well as the Plans and all applicable laws pertaining to such construction.  Borrower shall properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to construct and occupy the Alterations and operate the Facility.

3.3  Site Visits:

(a)  Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Facility for the purposes of performing an appraisal, observing the work of construction, examining all materials and determining whether such work conforms with the Plans approved by Lender.  Lender shall also have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors which relate to the Facility or construction of the Alterations.  In each instance, Lender shall give Borrower reasonable notice before entering the Facility.  Lender shall make reasonable efforts to avoid interfering with Borrower's Facility operations.

(b)  Lender is under no duty to visit the Facility or to supervise or observe construction or to examine any books or records.  Any site visit, observation or examination by Lender shall be solely for the purpose of protecting Lender's rights and interests.  No site visit, observation or examination by

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

Lender shall impose any liability on Lender or result in a waiver of any default of Borrower.  In no event shall any site visit, observation or examination by Lender be a representation that there has been or shall be compliance with the Plans, that the construction is free from defective materials or workmanship, or that the construction complies with any other applicable law.

3.4  Protection Against Lien Claims.  Borrower shall promptly pay or otherwise discharge all claims and liens for labor done and materials and services furnished in connection with the construction of the Alterations.  Borrower shall have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to Lender or delay in completing the Alterations.

3.5  Payment of Expenses.  Borrower shall pay Lender's costs and expenses incurred in connection with the making, disbursement and administration of the Loan, as well as any revisions, extensions, renewals or "workouts" of the Loan, and in the exercise of any of Lender's rights or remedies under this Agreement.  Such costs and expenses include charges for title insurance (including endorsements), filing, recording and escrow charges, fees for appraisal, architectural and engineering review, construction services and environmental services, mortgage taxes, legal fees and expenses of Lender's counsel and any other reasonable fees and costs for services, regardless of whether such services are furnished by Lender's employees or agents or independent contractors.  Borrower acknowledges that amounts payable under this Section are not included in any loan or commitment fees for the Loan.

3.6  Financial Information.  Borrower shall keep true and correct financial books and records on a cash basis pertaining to the construction of any Alterations.  Upon request of Lender from time to time, Borrower shall deliver balance sheets and income statements to Lender for itself and the Facility, together with a statement showing all changes in the financial condition of Borrower and the Facility which occurred during the preceding Contract Year.  These financial statements may be Borrower prepared.  Borrower shall also furnish to Lender upon request signed copies of any tax returns and such other information as Lender may reasonably request concerning its affairs and properties.

3.7  Notices.  Borrower shall promptly notify Lender in writing of:

(a)  Any litigation affecting Borrower or any guarantor, where the amount claimed is Fifty Thousand Dollars ($50,000) or more;

(b)  Any communication, whether written or oral, that Borrower may receive from any governmental, judicial or legal authority, giving notice of any claim or assertion that the Facility or any Alterations fail in any respect to comply with any applicable governmental law;

(c)  Any default by the Contractor or any subcontractor, material supplier or surety; and

(d)  Any material adverse change in the physical condition of the Facility (including any damage suffered as a result of earthquakes or floods), or in Borrower's or any guarantor's business condition (financial or otherwise), operations, properties or prospects.

3.8  Indebtedness.  Except for the Senior Loan and except as otherwise provided under the Loan Documents, Borrower will not create, incur or assume any indebtedness, commitment or other obligation for borrowed money without the express prior written consent of Lender.

BP 01517

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

3.9 <u>Performance of Acts</u>.  Upon request by Lender, Borrower shall perform all acts which may be necessary or advisable to perfect any lien or security interest provided for in the Loan Documents or to carry out the intent of the Loan Documents.

3.10 <u>Insurance</u>.

(a) Borrower shall provide, maintain and keep in force at all times prior to repayment of the Loan, the insurance required by Section 2.1 above and by the Disbursement Agreement. Also at all such times, Borrower shall provide, maintain and keep in force any and all additional insurance that Lender in its reasonable judgment may from time to time require, against insurable hazards which at the time are commonly insured against in the case of property similarly situated.  Such additional insurance may include flood insurance as required by federal law and earthquake insurance as required by Lender.  At Lender's request, Borrower shall supply Lender with an original of any policy or a certificate of coverage.

(b) All policies of insurance required under this Agreement and the Disbursement Agreement shall be issued by companies approved by Lender having a minimum A.M. Best's rating of A:IX. The limits, coverage, forms, deductibles, inception and expiration dates and cancellation provisions of all such policies shall be acceptable to Lender.  In addition, each required property insurance policy shall contain a Lender's Loss Payable Form (Form 438 BFU or equivalent) in favor of Lender, and shall provide that all proceeds be payable to Lender to the extent of its interest.  An approval by Lender is not, and shall not be deemed to be, a representation of the solvency of any insurer or the sufficiency of any amount of insurance.

(c) Each policy of insurance required hereunder and under the Disbursement Agreement shall provide that it may not be modified or cancelled without at least thirty (30) days' prior written notice to Lender.  When any required insurance policy expires, Borrower shall furnish Lender with proof acceptable to Lender that the policy has been reinstated or a new policy issued, continuing in force the insurance covered by the policy which expired. Borrower shall also furnish Lender with evidence satisfactory to Lender that all premiums for such policy have been paid within thirty (30) days of renewal or issuance.  If Lender fails to receive such proof and evidence, Lender shall have the right, but not the obligation, to obtain current coverage and advance funds to pay the premiums for it.  Borrower shall repay Lender immediately on demand for any advance for such premiums, which shall be considered to be an additional loan to Borrower bearing interest at the Default Rate and secured by the Deed of Trust and which shall not be subject to deemed repayment in accordance with <u>Section 1.6</u> above.

3.11  <u>Processing Fee</u>.  Borrower shall pay to Lender upon execution of this Agreement by Borrower a processing fee in the amount of $10,000.

4.      <u>Events of Default</u>.

The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

4.1 The Borrower assigns this Agreement or any of the other Loan Documents to a third party without the prior written consent of Lender: or

4.2 The Borrower assigns the CD Agreement to a third party without the prior written consent of Lender; or

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

4.3 The Borrower fails to observe any of the deadlines set forth in Section 3.1 above or, after commencing operations, there occurs a cessation of operations at the Facility for thirty (30) consecutive days; or

4.4 There shall occur a "Transfer" (defined below) without Lender's prior written consent; or

4.5 The CD Agreement is terminated by either Lender or Borrower prior to the end of its stated term; or

4.6 There shall occur a default or "Event of Default" under any contract entered into by Borrower with the Architect, Engineer or Contractor; or

4.7 Borrower fails to make any payment due under the Loan Documents within five (5) business days after the date when due; or

4.8 Borrower fails to comply with any provision contained in this Agreement other than those provisions elsewhere referred to in this Section 4, and does not cure that failure within thirty (30) days after written notice from Lender; or

4.9 Any representation or warranty made by Borrower in the Loan Documents or in any Pay Voucher, financial statement or document delivered pursuant to this Agreement, or in connection with the making of any Disbursement, shall prove to have been incorrect, untrue or misleading in any material respect when made; or

4.10 A default or "Event of Default" shall have occurred under any of the other Loan Documents; or

4.11 There shall occur a default or event of default under any of the Senior Loan Documents; or

4.12 The Borrower shall fail to pay when due the principal of or interest on any other indebtedness secured by the Facility, or there shall occur any other event that would permit the holder of such indebtedness to accelerate the maturity thereof; or

4.13 The Borrower shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or a substantial part of its property or business, or such a receiver or trustee otherwise shall be appointed and shall not be discharged within 30 days after such appointment, or there shall be instituted by or against Borrower a bankruptcy, insolvency, reorganization or liquidation proceeding and such proceeding shall not be dismissed within 30 days ("Insolvency Proceeding"), or any order, judgment or decree shall be entered against the Borrower decreeing its dissolution, or the Borrower's existence shall otherwise be terminated.

5.    Remedies.

5.1 Upon the occurrence of any Event of Default, Lender may, at its option, exercise all remedies and rights available to it under this Agreement, the other Loan Documents and under applicable law or in equity or by statute, including without limitation, the right to (i) declare all or any part of the Obligations to be forthwith due and payable, without presentation, demand, protest or notice of any kind, all of which are

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

hereby expressly waived by the Borrower; or (ii) terminate any obligation of Lender hereunder to make further Disbursements. All of Lender's rights and remedies shall be cumulative. No delay or failure of Lender in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of that right by Lender, and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or of any other right or remedy that Lender may have.

5.2 Also upon any Event of Default, Lender shall have the right in its sole discretion to enter and take possession of the Facility, whether in person, by agent or by court-appointed receiver, and to take any and all actions which Lender in its sole discretion may consider necessary to complete construction of the Alterations, including making changes in the Plans, work or materials and entering into, modifying or terminating any contractual arrangements, all subject to Lender's right at any time to discontinue any work without liability. If Lender chooses to complete the Alterations, it shall not assume any liability to Borrower or any other person for completing the Alterations or for the manner or quality of construction of the Alterations, and Borrower expressly waives any such liability. If Lender exercises any of the rights or remedies provided in this subparagraph, that exercise shall not make Lender, or cause Lender to be deemed to be, a partner or joint venturer of Borrower. Lender in its sole discretion may choose to complete construction in its own name. All sums which are expended by Lender in completing construction shall be considered to be an additional loan to Borrower bearing interest at the Default Rate, secured by the Deed of Trust and not be subject to deemed repayment in accordance with Section 1.6.

5.3 For purposes of determining the outstanding balance of the Loan at the time an Event of Default occurs hereunder, deemed repayment of principal and interest by Lender pursuant to Section 1.6 shall be calculated based upon the percentage of the Annual Guaranteed Volume achieved by Borrower through the last day of the calendar month immediately preceding the occurrence of the Event of Default. For example if the CD Agreement is terminated by Borrower on May 15, 2005 and the current Contract Year expires December 31, 2005, Lender will calculate total Product purchases from Lender during the period January 1, 2005 through April 30, 2005 and compare such total to the Annual Guaranteed Volume. If total Product purchases during such period equal 33% of the Annual Guaranteed Volume, the outstanding principal balance of the Loan will be reduced by an amount equal to 33% of the annual principal reduction payment due for that Contract Year (determined in accordance with Section 1.6 above).

6.    **Interest and Late Charges.** Borrower hereby acknowledges that late payment by Borrower to Lender of the payments due under this Agreement will cause Lender to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any payment due from Borrower under this Agreement is not received within five (5) business days after the date on which such payment is due and payable, then without any requirement for notice to Borrower, Borrower shall pay Lender a late charge equal to five percent (5%) of such overdue amount. Borrower and Lender hereby agree that such late charge represents a fair and reasonable estimate of the costs Lender will incur by reason of late payment by Borrower. Acceptance of such late charge by Lender shall in no event constitute a waiver of Borrower's default with respect to such overdue amount, or prevent Lender from exercising any of the rights and remedies granted hereunder. In addition to the foregoing, Borrower agrees to pay interest at the Default Rate on any and all sums due under this Agreement from the payment due date until the date fully paid by Borrower.

7.    **Transfers.** Borrower agrees that, in the event of any "Transfer" (as defined below) without the prior written consent of Lender, Lender shall have the absolute right, at its option, without prior demand or notice, to declare the Obligations immediately due and payable. Consent to one such Transfer shall not be deemed to be a waiver of the right to require consent to future or successive Transfers. Lender may grant or deny such consent in its sole discretion and, if consent should be given, any such Transfer shall be subject to all obligations of Borrower under the Loan Documents, such transferee shall assume all obligations under the

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

Loan Documents and agree to be bound by all provisions contained herein and therein, and Lender may require that Borrower pay to Lender an assumption fee equal to five percent (5%) of the remaining balance of the unamortized Loan. Such assumption shall not, however, release Borrower or any guarantor from any liability to Lender without the prior written consent of Lender. As used herein, "Transfer" shall mean:

(a) any sale, transfer, conveyance, hypothecation, encumbrance or lease of the Facility or any part thereof or interest therein to any person or entity, whether voluntary, involuntary, by operation of law, or otherwise (except for any deed of trust executed in favor of EGI in connection with the Citicorp Loan);

(b) any change of control in Borrower if, within thirty (30) days after such change of control, Borrower has not paid in full all Obligations ("control" as used herein shall mean the ability to direct the day to day management of the affairs of Borrower);

(c) any sale or transfer of greater than ten percent (10%) of the direct or indirect ownership interests in Borrower or any consolidation or merger of Borrower (whether voluntarily, involuntarily, by operation of law or otherwise); or

(d) any sale, lease or other disposal of all or substantially all of Borrower's assets.

8.     Indemnity Regarding Construction and Other Risks.  Borrower indemnifies, defends and holds the Indemnified Parties harmless from and against any and all Indemnified Costs directly or indirectly arising out of or resulting from construction of any improvements within the Facility, including any defective workmanship or materials; or any failure to satisfy any requirements of any laws, regulations, recorded covenants, maps, permits or other entitlements that apply or pertain to the Facility; or breach of any representation or warranty made or given by Borrower to any of the Indemnified Parties or to any prospective or actual buyer, tenant or other occupant of all or any portion of the Facility; or any claim or cause of action of any kind by any party that any Indemnified Party is liable for any act or omission of Borrower or any other person or entity in connection with the ownership, sale, operation or development of the Facility.  This indemnity shall survive repayment in full of the Obligations.

9.     Miscellaneous.

9.1 Amendments.  This Agreement may only be amended by a written instrument duly executed by Lender and Borrower.

9.2 Notices.  Any notice required or permitted to be given to any party under this Agreement shall be in writing and shall be given by (i) facsimile transmission, (ii) certified mail return receipt requested, or (iii) hand delivery, addressed as follows:

(a) If to the Borrower:

STTN Enterprises, Inc.
631 San Felipe Rd.
Hollister, CA 05035
Attention: Nazim Faquiryan
Zayed Faquiryan
Facsimile No.:

BP 01521

82461 Gas Loan Agreement v1.doc                    12

189

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

(b)     If to Lender:

BP West Coast Products LLC
P. O. Box 5077
Buena Park, California 90622-5077
Attention: Contract Dealer Loan Administration
Facsimile No.: 714-670-5178

Such notices shall be deemed received (i) upon delivery, if delivered by hand or by facsimile transmission (with confirmation of receipt), or (ii) three days after having been deposited in the U.S. mail, postage prepaid, if mailed. Any party may change its address for notice hereunder by notice given as provided above.

9.3 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one agreement.

9.4 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

9.5 Severability. If any provision of this Agreement is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

9.6 Assignment, Binding Effect. The Loan is not assumable. Borrower may not assign this Agreement, nor delegate any of its duties hereunder, without the prior written consent of Lender, which consent may be granted or denied in Lender's sole discretion. Lender may assign all or any part of its rights and interests hereunder. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

9.7 Tax Consequences. Lender makes no representation regarding and assumes no responsibility for the tax consequences to Borrower of any term of this Agreement or the other Loan Documents. Borrower represents and warrants to Lender that it has had an opportunity to consult with tax counsel prior to executing the Loan Documents.

9.8 Entire Agreement. This Agreement and the other Loan Documents contain all of the agreements and understandings between the parties with respect to the subject matter of this Agreement. All prior oral or written promises, representations, agreements or understandings, express or implied, in connection with the subject matter of this Agreement are expressly merged herein and superseded hereby.

9.9 Attorney's Fees. If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Agreement, the Note, the other Loan Documents or the Loan, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law. In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

BP 01522

82461 Gas Loan Agreement v1.doc          13

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

STTN ENTERPRISE, INC.
a California corporation

By _____

Name: Nazim S.M. Faquiryan

Title:  CEO/President


By _____

Name:  Sayed M.N. Faquiryan

Title:   Secretary and Treasurer

BP WEST COAST PRODUCTS LLC,
a Delaware limited liability company

By _____

Name: Jeff M. Cary

Title:   Vice President

82461 Gas Loan Agreement v1.doc               14

BP 01523

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

## EXHIBIT A

Loans may only be used for gasoline-related image and equipment-based site improvements; the types of qualifying expenditures and the maximum amount permitted to be spent are noted below:

| Description | Maximum Amount |
|---|---|
| Trade dress | $20,000 |
| Dispensers, installation charges, and associated vapor recovery equipment | $96,000 |
| Doublewall underground tanks, installation charges and associated vapor recovery equipment- Four 10 Mgal. tanks | $171,000 |
| Doublewall product piping, singlewall vapor piping and electrical lines | $75,000 |
| Self Serve equipment and installation charges (PIC) | $50,000 |
| PayPoint equipment and installation charges (POS) | $11,000 |
| Canopies and canopy work | $80,000/canopy |
| Yard paving | $30.52/sq yd. |
| Station lighting (exterior) | $10,000 |
| Site preparation | $72,000 |
| Engineering and drawings | $20,000 |
| Landscaping | $40,000 |
| Interior and Exterior Painting | $11,000 |
| Building improvements and additions | $90,000 |

Prices vary up to 20%, dependent on geographic location.

Exhibit A – Page 1

82461 Gas Loan Agreement v1.doc

192

BP 01524

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**EXHIBIT B**

**SECURED PROMISSORY NOTE**

[Attached]

Exhibit B – Page 1

BP 01525

## SECURED PROMISSORY NOTE
(Gas)

FOR VALUE RECEIVED, STTN ENTERPRISE, INC., a California corporation (hereinafter referred to as "Borrower") hereby promises to pay to BP WEST COAST PRODUCTS LLC, a Delaware limited liability company (hereinafter referred to as "Lender"), or order, on or before _____, the principal sum of Two Hundred Fifty and No/100 Dollars ($250,000.00) (the "Maximum Loan Amount"), or so much of that sum as may be advanced under this promissory note ("Note"), plus interest as specified below. This Note evidences a loan ("Loan") from Lender to Borrower.

1.     This Note is secured by a Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") covering certain real and personal property, as therein described (the "Property"). It may also be secured by other collateral. This Note and the Deed of Trust are two of several Loan Documents, as defined and designated in that certain Loan Agreement ("Loan Agreement") between Lender and Borrower. Some or all of the Loan Documents, including the Loan Agreement, contain provisions for the acceleration of the maturity of this Note. Capitalized terms used herein have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein

2.     The unpaid principal balance of this Note from day to day outstanding, which is not past due, shall bear interest at a fixed rate of interest equal to four and five percent (4.75 %) per annum.[1] Interest will be payable in arrears on an annual basis beginning on the First Anniversary Date and on each successive anniversary of such date during the term of the Loan. Borrower shall also make annual principal reduction payments as provided in the Loan Agreement. Principal and interest are subject to annual forgiveness in accordance with the terms and conditions set forth in the Loan Agreement.

3.     All payments of this Note shall be made in lawful money of the United States of America in immediately available funds at Lender's offices at 4 Centerpointe Drive, Suite 300, La Palma, California 90623-1066, Attention: Contract Dealer Loan Administration, or at such other place or to such account as the holder hereof shall have designated to Borrower in writing.

4.     All principal and all accrued and unpaid interest shall be due and payable no later than the date which is twenty (20) years following the Business Open Date ("Maturity Date").

5.     Lender shall not be required to make any advance if that would cause the outstanding principal of this Note to exceed the Maximum Loan Amount.

6.     Borrower may prepay the principal balance of this Note, in whole or in part, at any time without penalty.

7.     If Lender has not received the full amount of any payment, other than the final principal payment, by the end of five (5) business days after the date when due, Borrower shall pay a late charge to Lender in the amount of five percent (5%) of the overdue payment. In addition to the foregoing, Borrower agrees to pay interest on any and all sums due under this Note from the payment due date until the date fully paid by Borrower, such interest to accrue at a rate of interest equal to the "prime rate" (as reported by the Wall Street Journal) plus two percent (2%) per annum but in no event greater than the maximum amount permitted by law (the "Default Rate").

8.     From and after maturity of this Note (whether upon the Maturity Date, by acceleration or otherwise), all sums then due and payable under this Note, including all unpaid principal, accrued interest and any other sums outstanding hereunder, shall bear interest until paid in full at the Default Rate. Compounding of interest may result if outstanding interest hereunder accrues interest at the Default Rate.

---

[1]   The interest rate currently approved for CD Loans is 4.75 % per annum but is subject to change. The BP tax department should be consulted prior to each loan closing to verify the current interest rate approved for BPWCP CD loans.

1

194

BP 01526

9.    If any of the following "Events of Default" occur, any obligation of the holder to make advances under this Note shall terminate, and at the holder's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character:

(a)    Borrower fails to perform any obligation under this Note to pay principal, interest or other amounts due, and does not cure that failure within five (5) business days after the date when due; or

(b)    Under any of the Loan Documents, a default or "Event of Default" (as defined in that document) occurs.

(c)    Borrower becomes the subject of any proceeding arising under 11 U.S.C. ("Insolvency Proceeding").

10.    If any lawsuit, reference or arbitration is commenced which arises out of or relates to this Note, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in such action, in addition to costs and expenses otherwise allowed by law. In all other situations, including any Insolvency Proceeding, Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Lender's rights or interests. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate.

11.    This Note is governed by the laws of the State of California, without regard to the choice of law rules of that State.

12.    Borrower agrees that the holder of this Note may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to Borrower and without affecting the liability of Borrower.

13.    If Lender delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Lender's rights, or of any breach, default or failure of condition of or under this Note. No waiver by Lender of any of its rights, or of any such breach, default or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender. All of Lender's remedies in connection with this Note or under applicable law shall be cumulative, and Lender's exercise of any one or more of those remedies shall not constitute an election of remedies.

14.    This Note inures to and binds the heirs, legal representatives, successors and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any Loan funds, or assign or delegate any of its rights or obligations under the Loan Documents, without the prior written consent of Lender in each instance. Lender in its sole and absolute discretion may, at any time, sell, transfer, or assign this Note, the Deed of Trust and the other Loan Documents.

15.    If more than one person or entity are signing this Note as Borrower, their obligations under this Note shall be joint and several.

IN WITNESS WHEREOF, this Note has been duly executed and delivered by Borrower as of the date set forth above.

See signatures on the next page

2

BP 01527

STTN ENTERPRISE, INC.,
a California corporation

By _____
Name:  Nazim S.M. Faquiryan
Title:  CEO and President


By _____
Name:  Sayed M.N. Faquiryan
Title:  Secretary and Treasurer

3

196

BP 01528

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

EXHIBIT C

SCHEDULE OF LOAN DOCUMENTS

1.  Loan Agreements (am/pm Mini Market and Gasoline)

2.  Secured Promissory Note

3.  Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing

4.  UCC-1 Financing Statement

5.  Environmental Indemnity

6.  Environmental Questionnaire

7.  Senior Lender's Consent to Encumbrance and Request for Notice of Default

8.  Guaranty executed by Sayed M.N. Faquiryan, Mahgul Faquiryan and Nazim S.M. Faquiryan

9.  Contract Dealer Gasoline Agreement

Exhibit C – Page 1

Facility Number: «Facility 82461/SCDB65975
Customer Account Number: 0996439

**EXHIBIT D**

**FORM OF DISBURSEMENT AGREEMENT**

[Attached]

BP 01530

# DISBURSEMENT AGREEMENT
**(Owner and Contractor)**

This Disbursement Agreement ("Agreement") is made by and between BP WEST COAST PRODUCTS LLC, A Delaware limited liability company and those persons designated below as "Owner" and "Contractor".

## RECITALS

A.  Owner has entered into an agreement with Contractor for the construction on the property described below (the "Job Site") of those certain improvements described below (the "Improvements") for the total sum set forth below (the "Contract Price").

B.  Owner and BP WEST COAST PRODUCTS LLC entered into a Contract Dealer Gasoline Agreement [am/pm Mini Market Agreement] [Smog Pros Contract Agreement] (the "Franchise Agreement").

C.  Owner and BP WEST COAST PRODUCTS LLC entered into a Loan Agreement dated _____ and related agreements (collectively, the "Loan Agreement") whereby BP WEST COAST PRODUCTS LLC agreed to loan funds pursuant to the Loan Agreement ("Construction Loan Proceeds") under the terms and conditions as set forth therein (the "Construction Loan Procedure").

D.  The parties hereto hereby intend to provide for the disbursement of the Construction Loan Proceeds upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties agree as follows:

## OPERATIVE PROVISIONS

1.  **COST ESTIMATES.** Contractor shall prepare and submit for review by BP WEST COAST PRODUCTS LLC a cost breakdown estimate (the "Cost Estimate") in a form prescribed by BP WEST COAST PRODUCTS LLC.

2.  **AUTHORIZATION OF DISBURSEMENT.** Owner and Contractor hereby authorize BP WEST COAST PRODUCTS LLC or its designee to disburse the Construction Loan Proceeds in accordance with the schedule of progress payments determined from time to time by BP WEST COAST PRODUCTS LLC. The Construction Loan Proceeds shall be under the exclusive control of BP WEST COAST PRODUCTS LLC or its designee. Neither Owner nor Contractor shall have any right, title or interest, in or to the Construction Loan Proceeds independent of this Agreement; nor shall Owner have any right to direct the time, manner or mode of disbursement of all or any portion of the Construction Loan Proceeds or to demand repayment thereof.

3.  **PROJECT DISBURSEMENT INSTRUCTIONS.** Construction Loan Proceeds will be disbursed from time to time upon receipt by BP WEST COAST PRODUCTS LLC or its designee of Pay Vouchers, executed by Owner or Owner and Contractor, accompanied by original detailed invoices, and UNCONDITIONAL or CONDITIONAL WAIVER AND RELEASE UPON PROGRESS or FINAL PAYMENT, as appropriate, for general contractor, each subcontractor who furnished labor, equipment, materials or services to the Job Site, and each materialman, supplier and vendor who furnished materials to the Job Site during the period covered by said payment. BP WEST COAST PRODUCTS LLC or its designee shall, at their sole discretion based on their expertise, pay such Pay Vouchers. All parties understand and agree that BP WEST COAST PRODUCTS LLC or its designee have the right to withhold payment on any and all Pay Vouchers if supporting documentation requested is not provided. This may include original invoices, job inspection card copy, IRS form W-9, appropriate lien releases for labor and/or materials, receipts, photos, revised cost breakdown and Affidavit and Certification of Completion of Builder/Contractor.

4.  **TOTAL PROJECT FUNDING.** The funds provided herein are the maximum funds available under BP WEST COAST PRODUCTS LLC's loan program and Loan Agreement and are the only funds which will be disbursed under this Agreement. These funds may or may not be sufficient to complete the project in its entirety.

5.  **COST BREAKDOWN AND APPROVED PLANS.** Prior to issuance of Pay Vouchers and disbursement of any funds, Owner and Contractor will provide to BP WEST COAST PRODUCTS LLC:

a.  Completed Cost Breakdown for all construction, Improvements and equipment at the Job Site;
b.  Specifications for all construction, Improvements and equipment at the Job Site; and
c.  Contracts, as required by BP WEST COAST PRODUCTS LLC.

6.  **OWNER'S TRADE DRESS EXPENSES AND PACKAGING FEES.** Owner and Contractor hereby acknowledge and understand that during the course of construction BP WEST COAST PRODUCTS LLC may from time to time withhold certain funds from disbursement which are identified as Owner's calculated costs for trade dress and packaging fees pursuant to the Franchise Agreement and Loan Agreement. In an instance where trade dress or packaging fees are not indicated in the original budget or where funds, as disbursed, are insufficient for the withhold requirement, then BP WEST COAST PRODUCTS LLC will, at its discretion, withhold the needed funds from budget line items which it deems appropriate.

7.  **APPLICATION OF FUNDS.**
    7.1  BP WEST COAST PRODUCTS LLC does not guarantee that (a) the construction of the Improvements will proceed, be completed or be in accordance with the plans and/or specifications if and when completed; or (b) the quality of workmanship or materials.  Nor does BP WEST COAST PRODUCTS LLC guarantee the payment of all obligations incurred by Contractor or Owner in connection with the construction of the Improvements.

    7.2  BP WEST COAST PRODUCTS LLC or its designee will not be required to disburse any funds for any labor and/or material which, in the opinion of BP WEST COAST PRODUCTS LLC, exceed the value of such labor and/or material, or which will reduce the undisbursed funds below the amount necessary to complete the Improvements.

    7.3  In the event a mechanic's lien is filed against the Job Site as a result of the construction of the Improvements, or in the event  BP WEST COAST PRODUCTS LLC is served with a Notice to Withhold, BP WEST COAST PRODUCTS LLC may, at its option, pay or compromise said lien or Notice to Withhold, or any action or judgment based thereon, deducting all costs and expenses so incurred, including reasonable attorney's fees, from the funds remaining  on deposit with BP WEST COAST PRODUCTS LLC.  BP WEST COAST PRODUCTS LLC may elect not to pay or compromise any such lien or Notice to Withhold, or action, which is disputed in good faith by Owner or Contractor, and which Owner or Contractor is at their own expense then diligently contesting, provided, that upon demand by BP WEST COAST PRODUCTS LLC, there shall be recorded in the official records of the County where the Job Site is located, a surety bond acceptable to BP WEST COAST PRODUCTS LLC sufficient to satisfy such claim as shall be determined by ARCO.  Any amount so deposited shall be disbursed in accordance with the resolution of the contest.

8.  **INSPECTIONS AND PERFORMANCE.**
    8.1  BP WEST COAST PRODUCTS LLC will inspect or cause to be inspected the Job Site from time to time and at such times as it deems necessary.  These inspections are solely for the purpose of ascertaining the stage of construction and whether certain work has progressed and not for the purpose of determining whether the construction of the Improvements is in accordance with the plans and/or specifications, nor whether such construction has been accomplished  in a good, substantial and workmanlike manner. Consequently, such inspection by BP WEST COAST PRODUCTS LLC should not be deemed the equivalent of or a substitute for architectural supervision.

    8.2  When BP  WEST  COAST  PRODUCTS  LLC  has  disbursed  the  Construction  Loan  Proceeds,  its obligations under this Agreement shall cease.  BP WEST COAST PRODUCTS LLC is not responsible either for the quality of the labor or material used in connection with the Improvements or for the correction of any defects, errors or omissions in construction which may from time to time appear.

9.  **AUTHORIZED SIGNATURES.**  The signature of those parties set forth below as "Authorized Parties" ("Authorized Parties") on disbursement orders submitted to BP WEST COAST PRODUCTS LLC for payment on account of the construction of the improvements on the Job Site shall conclusively, irrevocably and finally establish the right of BP WEST COAST PRODUCTS LLC to make payment in the amount, manner and to the person designated on such Pay Voucher, and shall constitute a representation that the labor, materials and/or services therein referred to were actually furnished, or are to be furnished, to the Job Site and incorporated in the Improvements being constructed thereon and BP WEST COAST PRODUCTS LLC shall be entitled to rely thereon and shall be held free and harmless in connection therewith. BP WEST COAST PRODUCTS LLC may, in its discretion, decline to pay any disbursement order for good cause, and may, in its discretion, pay any disbursement order without the signature of the Authorized Parties, but any such payment must be proper in amount and purpose.  The payment of any disbursement order by BP WEST COAST

PRODUCTS LLC shall not be construed as a guaranty or warranty of the quality or sufficiency of the labor, materials or service represented thereby. Notwithstanding BP WEST COAST PRODUCTS LLC's right to control disbursement of funds, exercise of such right shall not constitute an obligation by BP WEST COAST PRODUCTS LLC to insure that work or materials are in compliance with the plans and specifications, or any governmental or regulatory agency, or to insure that undisbursed funds are at any time sufficient to complete the Improvements.

10. **MISCELLANEOUS.** This Agreement modifies all prior agreementsand Contractor's contracts, written or oral, in so far as they would otherwise be in conflict with the provisions hereof. If any provision of this Agreement is found invalid or ineffectual for any reason whatsoever, such invalidity shall not in any way affect any other provision hereof.

11. **UNSUITABLE SOIL CONDITIONS.** If the Job Site, or any portion thereof upon which the Improvements are to be constructed, is filled ground, or ground otherwise unsuitable to support such Improvements as the same are designed and engineered, Owner and Contractor shall immediately upon discovering such fact disclose the same to BP WEST COAST PRODUCTS LLC and cease all future work on the Improvements until Owner or Contractor and BP WEST COAST PRODUCTS LLC have agreed, in writing, to recommence construction operations.

12. **ATTORNEYS FEES.** In the event of any dispute arising out of this Agreement or the performance thereof, whether or not such dispute results in litigation, all attorneys fees incurred by BP WEST COAST PRODUCTS LLC for consultation or representation with respect to such dispute, whether or not BP WEST COAST PRODUCTS LLC is made a party to such dispute, shall be deemed an additional expense of the performance by BP WEST COAST PRODUCTS LLC of this Agreement, for which additional expenses from the Construction Loan Proceeds shall be reimbursed. To the extent that funds remaining in the Construction Loan Proceeds are insufficient so to reimburse BP WEST COAST PRODUCTS LLC, all parties signatory hereto other than BP WEST COAST PRODUCTS LLC shall be liable, jointly and severally, to BP WEST COAST PRODUCTS LLC for reimbursement of such expenses and shall pay same upon demand. The amount of such expenses shall be deemed liquidated upon the making of such demand for BP WEST COAST PRODUCTS LLC.

13. **DATA.** The name of the "Owner" and "Contractor" and other data referred to above are as follows:

(a) OWNER:                        _____

                                  _____

                                  _____

(b) CONTRACTOR:                   _____

                                  _____

                                  _____

(c) JOB SITE/FACILITY #           _____

(d) IMPROVEMENTS:                 _____

                                  _____

(e)  LOAN PROCEEDS:               _____
     (See #4)

(f) CONTRACT PRICE:               _____

(g)  PARTIES AUTHORIZED
     TO SIGN VOUCHERS:

Signature _____
Name        _____

Signature _____
Name        _____

Signature _____
Name        _____

Signature _____
Name        _____

**CONSTRUCTION LOAN PROCEEDS MAY NOT BE
SUFFICIENT TO COVER ALL EXPENSES FOR THE
IMPROVEMENTS, OR ON THE JOB SITE.**

Dated: _____

BP WEST COAST PRODUCTS LLC
Facility #_____

By: _____          _____

By: _____          _____

By: _____          _____

          "OWNER"                                         "CONTRACTOR"


                    BP WEST COAST PRODUCTS, a Delaware limited liability company

                              By _____

# EXHIBIT
# I

May 14 07 12:07p   Fortune   .jones-lor              556-432-1.                    p.2

## DISBURSEMENT AGREEMENT
(Owner and Contractor)

This Disbursement Agreement ("Agreement") is made by and between BP WEST COAST PRODUCTS LLC, A Delaware limited liability company and those persons designated below as "Owner" and "Contractor".

### RECITALS

A. Owner has entered into an agreement with Contractor for the construction on the property described below (the "Job Site") of those certain improvements described below (the "Improvements") for the total sum set forth below (the "Contract Price").

B. Owner and BP WEST COAST PRODUCTS LLC entered into a Contract Dealer Gasoline Agreement [am/pm Mini Market Agreement] (the "Franchise Agreement").

C. Owner and BP WEST COAST PRODUCTS LLC entered into a Loan Agreements dated February 12, 2007 and related agreements (collectively, the "Loan Agreements") whereby BP WEST COAST PRODUCTS LLC agreed to loan funds pursuant to the Loan Agreement ("Construction Loan Proceeds") under the terms and conditions as set forth therein (the "Construction Loan Procedure").

D. The parties hereto hereby intend to provide for the disbursement of the Construction Loan Proceeds upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties agree as follows:

### OPERATIVE PROVISIONS

1. COST ESTIMATES. Contractor shall prepare and submit for review by BP WEST COAST PRODUCTS LLC a cost breakdown estimate (the "Cost Estimate") in a form prescribed by BP WEST COAST PRODUCTS LLC.

2. AUTHORIZATION OF DISBURSEMENT. Owner and Contractor hereby authorize BP WEST COAST PRODUCTS LLC or its designee to disburse the Construction Loan Proceeds in accordance with the schedule of progress payments determined from time to time by BP WEST COAST PRODUCTS LLC. The Construction Loan Proceeds shall be under the exclusive control of BP WEST COAST PRODUCTS LLC or its designee. Neither Owner nor Contractor shall have any right, title or interest, in or to the Construction Loan Proceeds independent of this Agreement, nor shall Owner have any right to direct the time, manner or mode of disbursement of all or any portion of the Construction Loan Proceeds or to demand repayment thereof. Nothing in this paragraph shall be construed as a waiver of Contractor's Mechanic's Lien or Stop Notice rights under California Law.

3. PROJECT DISBURSEMENT INSTRUCTIONS. Construction Loan Proceeds will be disbursed from time to time upon receipt by BP WEST COAST PRODUCTS LLC or its designee of Pay Vouchers, executed by Owner or Owner and Contractor, accompanied by original detailed invoices, and UNCONDITIONAL or CONDITIONAL WAIVER AND RELEASE UPON PROGRESS or FINAL PAYMENT, as appropriate, for general contractor, each subcontractor who furnished labor, equipment, materials or services to the Job Site, and each materialman, supplier and vendor who furnished materials to the Job Site during the period covered by said payment. BP WEST COAST PRODUCTS LLC or its designee shall, at their sole discretion based on their expertise, pay such Pay Vouchers. All parties understand and agree that BP WEST COAST PRODUCTS LLC or its designee have the right to withhold payment on any and all Pay Vouchers if supporting documentation reasonably requested is not provided. This may include original invoices, job inspection card copy, IRS form W-9, appropriate lien releases for labor and/or materials, receipts, photos, revised cost breakdown and Affidavit and Certification of Completion of Builder/Contractor.

4. TOTAL PROJECT FUNDING. The funds provided herein are the maximum funds available under BP WEST COAST PRODUCTS LLC's loan program and Loan Agreement and are the only funds which will be disbursed under this Agreement. These funds may or may not be sufficient to complete the project in its entirety.

5. COST BREAKDOWN AND APPROVED PLANS. Prior to issuance of Pay Vouchers and disbursement of any funds, Owner and Contractor will provide to BP WEST COAST PRODUCTS LLC:

  a. Completed Cost Breakdown for all construction, improvements and equipment at the Job Site;
  b. Specifications for all construction, improvements and equipment at the Job Site; and
  c. The Prime Contract between Owner and Contractor as required by BP WEST COAST PRODUCTS LLC.

6. OWNER'S TRADE DRESS EXPENSES AND PACKAGING FEES. Owner and Contractor hereby acknowledge and understand that during the course of construction BP WEST COAST PRODUCTS LLC may from time to time withhold certain funds from disbursement which are identified as Owner's calculated costs for trade dress and packaging fees pursuant to the Franchise Agreement and Loan Agreement. In an instance where trade dress or packaging fees are not indicated in the original budget or where funds, as disbursed, are insufficient for the withhold requirement, then BP WEST COAST PRODUCTS LLC will, at its discretion withhold the needed funds from budget line items which it deems appropriate.

7. APPLICATION OF FUNDS.
   7.1 BP WEST COAST PRODUCTS LLC does not guarantee that (a) the construction of the Improvements will proceed, be completed or be in accordance with the plans and/or specifications if and when completed; or (b) the quality of workmanship or materials. Nor does BP WEST COAST PRODUCTS LLC guarantee the

O:\COMMON\COA\FUNDG\SBOC.doc
05/14/07 -011216.001.001, revised disbursement agt (final 05-18-07.1

204



BP 03553

payment of all obligations incurred by Contractor or Owner in connection with the construction of the Improvements.

7.2   BP WEST COAST PRODUCTS LLC or its designee will not be required to disburse any funds for any labor and/or material which, in the opinion of BP WEST COAST PRODUCTS LLC, exceed the value of such labor and/or material or which will reduce the undisbursed funds below the amount necessary to complete the Improvements.

7.3   In the event a mechanic's lien is filed against the Job Site as a result of the construction of the Improvements, or in the event BP WEST COAST PRODUCTS LLC is served with a Notice to Withhold, BP WEST COAST PRODUCTS LLC may, at its option, pay or compromise said lien or Notice to Withhold, or any action or judgment based thereon, deducting all costs and expenses so incurred, including reasonable attorney's fees, from the funds remaining on deposit with BP WEST COAST PRODUCTS LLC. BP WEST COAST PRODUCTS LLC may elect not to pay or compromise any such lien or Notice to Withhold, or action which is disputed in good faith by Owner or Contractor and which Owner or Contractor is, at their own expense, then diligently contesting; provided, that upon demand to Owner by BP WEST COAST PRODUCTS LLC, there shall be recorded in the official records of the County where the Job Site is located, a surety bond purchased by Owner and acceptable to BP WEST COAST PRODUCTS LLC sufficient to satisfy such claim as shall be determined by BP WEST COAST PRODUCTS LLC. Any amount so deposited shall be disbursed in accordance with the resolution of the contest. Nothing herein shall alter Owner's obligation to pay Contractor in full for work performed, pursuant to the terms of the Owner/Contractor agreement.

8.   INSPECTIONS AND PERFORMANCE.
8.1   BP WEST COAST PRODUCTS LLC will inspect or cause to be inspected the Job Site from time to time, and at such times as it deems necessary. These inspections are solely for the purpose of ascertaining the stage of construction and whether certain work has progressed and not for the purpose of determining whether the construction of the Improvements is in accordance with the plans and/or specifications, nor whether such construction has been accomplished in a good, substantial and workmanlike manner. Consequently, such inspection by BP WEST COAST PRODUCTS LLC should not be deemed the equivalent of or a substitute for architectural supervision.

8.2   When BP WEST COAST PRODUCTS LLC has disbursed the Construction Loan Proceeds, its obligations under this Agreement shall cease. BP WEST COAST PRODUCTS LLC is not responsible either for the quality of the labor or material used in connection with the Improvements or for the correction of any defects, errors or omissions in construction which may from time to time appear.

9.   AUTHORIZED SIGNATURES. The signature of those parties set forth below as "Authorized Parties" ("Authorized Parties") on disbursement orders submitted to BP WEST COAST PRODUCTS LLC for payment on account of the construction of the Improvements on the Job Site shall conclusively, irrevocably and finally establish the right of BP WEST COAST PRODUCTS LLC to make payment in the amount, manner and to the person designated on such Pay Voucher, and shall constitute a representation that the labor, materials and/or services therein referred to were actually furnished, or are to be furnished, to the Job Site and incorporated in the Improvements being constructed thereon and BP WEST COAST PRODUCTS LLC shall be entitled to rely thereon and shall be held free and harmless in connection therewith, to the extent of the payment made. BP WEST COAST PRODUCTS LLC may, in its discretion, decline to pay any disbursement order for good cause, and may, in its discretion, pay any disbursement order without the signature of the Authorized Parties, but any such payment must be proper in amount and purpose. The payment of any disbursement order by BP WEST COAST PRODUCTS LLC shall not be construed as a guaranty or warranty of the quality or sufficiency of the labor, materials or service represented thereby. Notwithstanding BP WEST COAST PRODUCTS LLC's right to control disbursement of funds, exercise of such right shall not constitute an obligation by BP WEST COAST PRODUCTS LLC to insure that work or materials are in compliance with the plans and specifications, or any governmental or regulatory agency, or to insure that undisbursed funds are at any time sufficient to complete the Improvements.

10.   MISCELLANEOUS. This Agreement modifies all prior agreements, written or oral, and Contractor's contracts in so far as they would otherwise be in conflict with the provisions hereof. This notwithstanding, as between themselves, Owner and Contractor affirm the existence and enforceability of the underlying construction contract between them, dated November 21, 2006 (the "Prime Contract"), including but not limited to the payment obligations of Owner to Contractor. If any provision of this Agreement is found invalid or ineffectual for any reason whatsoever, such invalidity shall not in any way affect any other provision hereof.

11.   UNSUITABLE SOIL CONDITIONS. If the Job Site or any portion thereof upon which the Improvements are to be constructed, is filled ground, or ground otherwise unsuitable to support such Improvements as the same are designed and engineered, Owner and Contractor shall immediately upon discovering such fact disclose the same to BP WEST COAST PRODUCTS LLC and cease all future work on the Improvements until Owner or Contractor and BP WEST COAST PRODUCTS LLC have agreed, in writing, to recommence construction operations.

12.   ATTORNEYS' FEES. Except as specifically set forth herein, this paragraph applies between Owner and BP West Coast Products, LLC, only. In the event of any dispute arising out of this Agreement or the performance thereof, whether or not such dispute results in litigation, all attorneys' fees incurred by BP WEST COAST PRODUCTS LLC for consultation or representation with respect to such dispute, whether or not BP WEST COAST PRODUCTS LLC is made a party to such dispute, shall be deemed an additional expense of the performance by BP WEST COAST PRODUCTS LLC of this Agreement, for which additional expenses shall be reimbursed from the Construction Loan Proceeds. To the extent that funds remaining in the Construction Loan Proceeds are insufficient so to reimburse BP WEST COAST PRODUCTS LLC, all parties signatory hereto (excluding Contractor) other than BP WEST COAST PRODUCTS LLC shall be liable, jointly and severally, to BP WEST COAST PRODUCTS LLC for reimbursement of such expenses and shall pay same upon demand. The amount of such expenses shall be deemed liquidated upon the making of such demand for BP WEST COAST PRODUCTS LLC. Contractor does not dispute the rights afforded to BP West Coast Products, LLC in this paragraph to the extent they are not sought from Contractor (aside from the

G:\COMMON\CONFUND\DISBCC.doc
05/14/07 ...:1316.04 (...) construct disbursement mgt. fund 04 (18-07-1-

2

BP 03554

May 14 07 12:08p     Fortun     #jones-lor                    558-432-                    p.4

Construction Loan Funds). Owner affirms that any assessment against it or the Construction Loan Funds by BP West Coast Products as set forth in this paragraph will not alter Owner's payment obligations to Contractor as set forth in the Prime Contract

13.  DATA.  The name of the "Owner" and "Contractor" and other data referred to above are as follows:

| | | |
|---|---|---|
| (a) | OWNER: | STTN ENTERPRISE, INC. |
| | | 631 San Felipe Road |
| | | Hollister, CA  95023 |
| (b) | CONTRACTOR: | FORTUNE-RATLIFF GENERAL CONTRACTORS, INC. |
| | | P. O. Box 26944 |
| | | Fresno, CA  93729 |
| (c) | JOB SITE/FACILITY #: | #82481  631 San Felipe Road |
| | | Hollister, CA  95023 |
| (d) | IMPROVEMENTS: | Rebrand (C-Store & Gas Remodel) |
| | | (DO NOT INCLUDE EXPENSES FOR CAR WASH) |
| (e) | LOAN PROCEEDS: (See #4) | am/pm Loan - $150M/Gas - $250M |
| (f) | CONTRACT PRICE: | $498,253.00 |
| (g) | PARTIES AUTHORIZED TO SIGN VOUCHERS: | |

Signature

Name   Nozum Fazil jiAyAn
STTN ENTERPRISE, INC. - REP

Signature

Name   SAYAN FARNIQYAAN
STTN ENTERPRISE, INC. - REP

Signature
Name    ALLEN FORTUNE
FORTUNE-RATLIFF GENERAL CONTRACTORS, INC

Signature

Name    FORTUNE-RATLIFF GENERAL CONTRACTORS, INC

**CONSTRUCTION LOAN PROCEEDS MAY NOT BE SUFFICIENT TO COVER ALL EXPENSES FOR THE IMPROVEMENTS, OR ON THE JOB SITE.**

Dated:  5-15-07

By: Nazim Esquiryan

By: Sayed Faquiryan

STTN ENTERPRISES, INC. - "OWNER"

BP WEST COAST PRODUCTS LLC
Facility #   82481

Allen Fortune

Allen Jones

FORTUNE-RATLIFF GENERAL
CONTRACTORS, INC. - "CONTRACTOR"

BP WEST COAST PRODUCTS, a Delaware limited liability company

By:

Q:\COMMON\CDA\FUND\DISBQC.doc
06/14/02; A53284.06.1\061.myloaddisbursement.agc.final/04/15/07.1

3

# EXHIBIT
# J

RECORDING REQUESTED BY:

*First American Title*
*#4408-2702639*

2007-0003264

| | REC FEE | 58.00
Recorded | |
Official Records | |
County of | |
San Benito | |
JOE PAUL GONZALEZ | |
Clerk-Recorder | |
| | DS |
02:00PM 09-Mar-2007 | Page 1 of 9

WHEN RECORDED MAIL TO:

*BP West Coast Products LLC*
*4 Centerpointe Dr., LPR 4-243*
*La Palma, CA 90623-1066*
*Attn: Daniel J. Rolf*

SPACE ABOVE LINE RESERVED FOR RECORDER'S USE

## TITLE(S) OF DOCUMENT

*Deed of Trust with Assignment of Rents,*
*Security Agreement and Fixture Filing*



PLAINTIFF'S
EXHIBIT
J

THIS PAGE IS ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION.
($3.00 ADDITIONAL RECORDING FEE APPLIES)

208

BP 01443

RECORDING REQUESTED BY
FIRST AMERICAN TITLE
Recording Requested by:

When Recorded Return To:
4408-2702639
BP WEST COAST PRODUCTS LLC
4 Centerpointe Dr., LPR 4-243
La Palma, CA 90623-1066
Attn. Daniel J. Rolf
Facility: 82461/SCDB65975
631 San Felipe Rd.
Hollister, CA 95035

4408 2702639  BB Fat Cap

                                                    Space Above For Recorder's Use Only

DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
(CALIFORNIA)

This Document Serves as a Fixture Filing Under Section 9-502 of the California Uniform Commercial Code.

Borrower's Organizational Identification Number: 41-2101997

THIS DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING ("Deed of Trust") is made this 2 day of March, 2007 and is executed by AVA GLOBAL ENTERPRISE, LLC, a California limited liability company ("Trustor"), whose address is 1313 N. Milpitas Blvd., #1606, Milpitas, California 95035 to Commonwealth Land Title Company ("Trustee"), for the benefit of BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("Beneficiary"). Trustee is an affiliate of Beneficiary.

Trustor irrevocably grants, transfers and assigns to Trustee in trust, with POWER OF SALE, all of Trustor's right, title and interest in and to that certain real property located in the County of , State of California, more particularly described in Exhibit "A" attached hereto and made a part hereof ("Real Property"), together with the rents, issues and profits thereof and the other real and personal property comprising the Trust Estate; subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

FOR THE PURPOSE OF SECURING the following (the "Obligations"):

      (a)      payment of the sum of $475,000.00, with interest thereon, evidenced by those certain Secured Promissory Notes dated as of even date herewith, executed by STTN Enterprise, Inc., a California corporation ("Obligor") to the order of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

      (b)      performance of Obligor's obligations to Beneficiary under (i) that certain Loan Agreement dated as of even date herewith, by and between Obligor and Beneficiary, and (ii) that certain Environmental Indemnity dated as of even date herewith, executed by Obligor in favor of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

      (c)      performance of each agreement of Trustor and Obligor under that certain Fictitious Deed of Trust (With Assignment of Rents, Security Agreement and Fixture Filing) recorded in the office of the county recorder of the county where said Real Property is located as noted below ("Fictitious Deed of Trust"), as amended hereby; and

      (d)      payment and performance of the Obligations recited in the Fictitious Deed of Trust (as amended hereby).

To protect the security of this Deed of Trust, and with respect to the Trust Estate, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in the Fictitious Deed of Trust. Said agreements, terms and provisions contained in the Fictitious Deed of Trust are hereby incorporated into and made a part of this Deed of Trust by this reference for all purposes as if set forth at length herein. Trustor acknowledges receipt of a copy of the Fictitious Deed of Trust.

Set forth below is a list of the counties in the State of California where the Fictitious Deed of Trust has been recorded, together with the Book and Page or Instrument Number of each recorded document.

BP 01444

82461deedoftrustv1

3

| COUNTY | INSTRUMENT NUMBERS | COUNTY | INSTRUMENT NUMBERS |
|---|---|---|---|
| ALAMEDA | 00319576 | ORANGE | 00-569322 |
| ALPINE | BOOK #89, PAGES 2784-2808 | PLACER | 2000-0079930 |
| AMADOR | 01-0003464-00 | PLUMAS | 2001-00331 |
| BUTTE | 2000-0042914 | RIVERSIDE | 2000-422065 |
| CALAVERAS | 2001-5226 | SACRAMENTO | 20001023 |
| COLUSA | 2000-004463 | SAN BENITO | 2000-0014070 |
| CONTRA COSTA | 2000-0234538-00 | SAN BERNARDINO | 20000380682 |
| DEL NORTE | 200004897 | SAN DIEGO | 2000-0577783 |
| EL DORADO | 2000-0052633-00 | SAN FRANCISCO | 2000G852003 |
| FRESNO | 2000-0121783 | SAN JOAQUIN | 00125344 |
| GLENN | 2000-5476 | SAN LUIS OBISPO | 2000-062677 |
| HUMBOLDT | 2000-13040-25 | SAN MATEO | 2000-133811 |
| IMPERIAL | 00-22355 | SANTA BARBARA | 2000-0064740 |
| INYO | 2000-0003729 | SANTA CLARA | 15434692 |
| KERN | 0200134597 | SANTA CRUZ | 2000-0051824 |
| KINGS | 0018081 | SHASTA | 2000-0037629 |
| LAKE | 00-018816 | SIERRA | 2000131293 |
| LASSEN | 2000-07002 | SISKIYOU | 2000101913349 |
| LOS ANGELES | 00-1671372 | SOLANO | 2000-00097851 |
| MADERA | 2000026090 | SONOMA | 2000112131 |
| MARIN | 2000-052655 | STANISLAUS | 2000-0090839-00 |
| MARIPOSA | 2004583 | SUTTER | 2000-0015017 |
| MENDOCINO | 2000-17559 | TEHAMA | FILE #013179, BOOK 1982, PAGE 083 |
| MERCED | VOL 4072, PAGE 529 | TRINITY | 200003558 |
| MODOC | 2000-0004727-00 | TULARE | 2000-0065847 |
| MONO | 2000006195 | TUOLUMNE | DOC#017535, BOOK 1712, PAGES 0173-0197 |
| MONTEREY | 2000070259 | VENTURA | NONE |
| NAPA | 2000-0027785 | YOLO | 2000-0027007-00 |
| NEVADA | 2000-0031705-00 | YUBA | 200010539 |

Trustor hereby requests that all notices to Trustor be delivered to the address listed above. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Fictitious Deed of Trust. The Fictitious Deed of Trust is hereby modified as set forth on Rider 1 attached hereto and made a part hereof. Rider 2 attached hereto is hereby incorporated herein by this reference.

"Trustor":

AVA GLOBAL ENTERPRISE, LLC.
a California limited liability company

By: _____
    Sayed Mn Faquiryan

By: _____
    Toan To

82461deedoftrustv1

2

BP 01445

By: _____
    Tao To

By: _____
    Nazim Faquiryan

"Borrower"

STTN ENTERPRISE, INC.
a California corporation

By: _____
    Nazim S.M. Faquiryan
    CEO/President

By: _____
    Sayed M.N. Faquiryan
    Secretary/Treasurer

ACKNOWLEDGMENT

State of California       )
County of _San Benito_  )

On _March 2 2007_, before me, _Mina Faquiryan_, personally appeared _Nazim Faquiryan_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

```
┌─────────────────────────────┐
│      MINA FAQUIRYAN         │
│    Commission # 1494761     │
│  Notary Public - California │
│      Santa Clara County     │
│  My Comm. Expires Jun 13, 2008 │
└─────────────────────────────┘
```

ACKNOWLEDGMENT

State of California       )
County of _San Benito_  )

On _March 2 2007_, before me, _Mina Faquiryan_, personally appeared _Sayed M.N. Faquiryan_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

```
┌─────────────────────────────┐
│      MINA FAQUIRYAN         │
│    Commission # 1494761     │
│  Notary Public - California │
│      Santa Clara County     │
│  My Comm. Expires Jun 13, 2008 │
└─────────────────────────────┘
```

82461deedoftrustv1

3

211

BP 01446

5

ACKNOWLEDGMENT

State of California                          )
County of San Benito                         )
                                             )
On March 2 2007, before me, Mina Faquiryan, Notary Public, personally appeared
Joan Ho, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Signature)

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

ACKNOWLEDGMENT

State of California                          )
County of San Benito                         )
                                             )
On March 2 2007, before me, Mina Faquiryan, personally appeared
Joan Ho, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Signature)

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

4

BP 01447

82461deedoftrustv1

EXHIBIT A
Legal Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1 AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES 30 SECONDS E 146.84 FEET;

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81 FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE POINT OF BEGINNING.

APN: 051-100-040

BP 01448

RIDER 1
Amendment to Fictitious Deed of Trust

The Fictitious Deed of Trust is hereby amended as follows:

1.   Paragraph (b) in the section reciting all of the Obligations ("Obligations Section") is hereby deleted in its entirety.

2.   The following language is hereby added after the phrase "per annum" in Paragraph (c) of the Obligations Section: "but in no event greater than the maximum amount permitted by law."

3.   The two paragraphs below Paragraph (g) of the Obligations Section are hereby deleted in their entirety and replaced with the following new paragraph:

"Trustor has executed an Environmental Indemnity in favor of Beneficiary with respect to the Real Property (the "Environmental Indemnity"). This Deed of Trust, the Note[s], the Loan Agreement[s], the Environmental Indemnity and any other deeds of trust, mortgages, agreements, guaranties or other instruments given to evidence or further secure the payment and performance of any or all of the Obligations, as the foregoing may be amended, modified, extended, or renewed from time to time, may hereinafter be collectively referred to as the 'Loan Documents.' Capitalized terms used herein without definition shall have the meaning given thereto in the Loan Agreement."

4.   The following paragraph is hereby substituted for the first sentence of Section 1.5.2:

"In the event of any damage to or destruction of the Improvements, Beneficiary shall have the option, in its sole discretion, to: (i) apply, in the event Beneficiary determines that the security for the repayment of the indebtedness secured hereby has been impaired on account of such damage or destruction, all or any part of such proceeds to any indebtedness secured hereby in such order as Beneficiary may determine, whether or not such indebtedness is then due, (ii) release all or any part of such proceeds to Trustor, or (iii) hold the balance of such proceeds to be used to reimburse Trustor for the cost of reconstruction of the Improvements. In the event Beneficiary elects to so hold such insurance proceeds, the Improvements shall be promptly and diligently restored by Trustor to the equivalent of their condition immediately prior to such damage, destruction or casualty or to such other condition as Beneficiary may approve in writing, and the disbursement of such insurance proceeds shall be in accordance with disbursement procedures acceptable to Beneficiary. If Beneficiary elects to apply the insurance proceeds to the payment of the sums secured hereby, and after doing so Beneficiary reasonably determines that the remaining security is inadequate to secure the remaining indebtedness, Trustor shall, upon written demand from Beneficiary, prepay on principal such amount as will reduce the remaining indebtedness to a balance for which adequate security is present."

5.   The last sentence of Section 1.22 is hereby deleted in its entirety. The following new Sections are hereby added to the Fictitious Deed of Trust:

"1.23    Negative Covenants Regarding Leases.  Trustor shall not, without the prior written consent of Beneficiary, (i) cancel, terminate or consent to the surrender of any Lease, (ii) modify or in any way alter the terms of any Lease, (iii) release any lessee or guarantor from any obligations or conditions to be performed by any lessee or guarantor under any Lease, (iv) collect any rent from any lessee for a period of more than one (1) month in advance, or (v) execute any further assignment of any of its right, title and interest in the Leases and the Rents.

1.24    Affirmative Covenants Regarding Leases.  Trustor shall (i) observe, perform and discharge each and every obligation, term, covenant, condition and agreement of Trustor under the Leases, (ii) enforce the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any lessee or guarantor thereof, (iii) execute and deliver to Beneficiary upon demand, at any time and from time to time, any and all assignments and other instruments which Beneficiary may deem advisable to carry out the true purposes and intent of the assignment of the Leases set forth in this Deed of Trust, and (iv) at the request of Beneficiary, cause any lessee under a Lease to execute a subordination, nondisturbance and attornment agreement and estoppel certificate in form and substance satisfactory to Beneficiary.

1.25    Authorization to File Financing Statements; Power of Attorney.  Trustor hereby authorizes Beneficiary at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without signature of Trustor as authorized by applicable law, as applicable to the Personal Property. For purposes of such filings, Trustor agrees to furnish any information requested by Beneficiary promptly upon request by Beneficiary. Trustor hereby irrevocably constitutes and appoints Beneficiary and any officer or agent of Beneficiary, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Trustor or in Trustor's own name to execute in Trustor's name any such documents and to otherwise carry out the purposes of this

6

82461deedoftrustv1

BP 01449

Section 1.25, to the extent that Trustor's authorization above is not sufficient. This power of attorney is a power coupled with an interest and shall be irrevocable."

6.  The following sentence is hereby added to Section 3.4.2:

"Written notice mailed to Trustor as provided above at least five (5) days prior to the date of public sale of the Personal Property or prior to the date on which private sale of the Personal Property will be made shall constitute reasonable notice; provided that, if Beneficiary fails to comply with this Section 3.4 in any respect, its liability for such failure shall be limited to the liability (if any) imposed on it as a matter of law under the California Uniform Commercial Code, as in effect from time to time (or under the Uniform Commercial Code, in force from time to time, in any other state to the extent the same is applicable law)."

7.  The following phrase is hereby added after the end of clause (b) of Section 5.2: "including without limitation Sections 2899 and 3433 of the California Civil Code." In addition, the references to Sections 2899 and 3433 of the California Civil Code set forth in clause (c) of Section 5.2 are hereby deleted in their entirety.

8.  Section 5.17 is hereby deleted in its entirety.

9.  The following new Section 4.9 is hereby added to the Fictitious Deed of Trust:

"4.9    Upon the occurrence of any Event of Default, Beneficiary may, at its option, terminate Trustor's right and license to collect the Rents, and either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate or any part thereof, in its own name or in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Trust Estate, or any part thereof or interest therein, make, modify, enforce, cancel or accept the surrender of any Lease, increase the income therefrom or protect the security hereof and, with or without taking possession of the Trust Estate, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including, without limitation, attorneys' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of all or any portion of the Trust Estate, the collection of such Rents and the application thereof as aforesaid, or any of such acts, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of all or any portion of the Trust Estate or the collection, receipt and application of Rents, Trustee or Beneficiary shall be entitled to exercise every right provided herein or by law upon occurrence of any Event of Default, including the right to exercise the power of sale. Failure of Beneficiary at any time, or from time to time, to collect the Rents shall not in any manner affect the subsequent enforcement of Beneficiary of the right to collect the same."

10. Subparagraph (k) of Schedule 2 is hereby renumbered as subparagraph (l). The following new subparagraph (k) is hereby added:

"(k)    all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Trustor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Schedule 2."

82461deedoftrustv1

BP 01450

RIDER 2
Agreements of Non-Borrower Trustor



1.    Authority of Beneficiary. If any Trustor is not an obligor under the Loan Documents (hereinafter, "Nonborrower Trustor"), Nonborrower Trustor hereby authorizes Beneficiary to perform any of the following acts at any time and from time to time, all without notice to Nonborrower Trustor and without affecting Beneficiary's rights or Nonborrower Trustor's obligations under this Deed of Trust: (i) alter any terms of the Loan Documents, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest under, the Secured Promissory Note, (ii) take and hold security for the Loan Documents, accept additional or substituted security for the Loan Documents, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security, (iii) apply any security now or later held for the Loan Documents in any order that Beneficiary in its sole discretion may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale, (iv) release the obligor under the Note and the other Loan Documents ("Obligor") of its liability under any Loan Document, and/or (v) substitute, add or release any one or more guarantors or endorsers of the Loan Documents. For purposes of this Section 1, all references to the Loan Documents shall also include any instrument or agreement executed by Obligor currently with or subsequent to the date of this Deed of Trust which is secured by this Deed of Trust in accordance with the terms hereof.

2.    Waivers of Nonborrower Trustor. Nonborrower Trustor hereby waives: (i) any right it may have to require Beneficiary to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Beneficiary's power to pursue, (ii) any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Beneficiary, whether consensual or arising by operation of law or any bankruptcy reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Trustor's obligations exceed or are more burdensome than those of Obligor, (iii) all presentments, demands for performance, notices of nonperformance, protests, notice of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind, (iv) any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Obligations or any part thereof, and (v) all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under 11 U.S.C. or any successor statute, all rights to enforce any remedy that the Beneficiary may have against Obligor, and all rights to participate in any security now or later held by Beneficiary for the Loan Documents. Nonborrower Trustor understands that if Beneficiary forecloses by trustee's sale on any other deed of trust (other than this deed of trust) securing the Obligations, Nonborrower Trustor would then have a defense preventing Beneficiary from thereafter enforcing Beneficiary's rights and remedies against the Trust Estate. This defense arises because the trustee's sale under such other deed of trust would eliminate Nonborrower Trustor's right of subrogation, and therefore Nonborrower Trustor would be unable to obtain reimbursement from Obligor. Nonborrower Trustor specifically waives this defense and all rights and defenses that Nonborrower Trustor may have because the Secured Obligations are secured by real property. This means, among other things: (1) Beneficiary may exercise any rights or remedies which Beneficiary has or may have against the Trust Estate without first foreclosing on any real or personal property collateral pledged by Obligor; and (2) if Beneficiary forecloses on any real property collateral pledged by Obligor: (A) the amount of the Obligations may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Beneficiary may exercise its rights and remedies against the Trust Estate even if Beneficiary, by foreclosing on any real property collateral pledged by Obligor, has destroyed any right Nonborrower Trustor may have to collect from Obligor. This is an unconditional and irrevocable waiver of any rights and defenses Nonborrower Trustor may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or similar laws in other states.

3.    Obligor's Financial Condition. Nonborrower Trustor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Beneficiary, and agrees that Beneficiary shall have no duty to disclose to Nonborrower Trustor any information which Beneficiary may receive about Obligor's financial condition, business operations or any other circumstances bearing on Obligor's ability to perform.

82461deedoftrustv1

BP 01451