EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4                        -oOo-
 5   BP WEST COAST PRODUCTS, LLC,  )
     a Delaware Limited Liability  )
 6   Company; and ATLANTIC         )
     RICHFIELD COMPANY, a Delaware )
 7   Corporation,                  )
                                   )
 8              Plaintiffs,        )
                                   )
 9         vs.                     ) No.5:07-CV
                                   )    04808JF
10   STTN ENTERPRISES, INC., a     )
     California Corporation;       )
11   NAZIM FAQUIRYAN, an           )
     individual; SAYED FAQUIRYAN,  )
12   an individual; and MAGHUL     )
     FAQUIRYAN, an individual;     )
13   and AVA GLOBAL ENTERPRISE,    )
     LLC, a California limited     )
14   liability company,           )
                                   )
15             Defendants.         )
     AND RELATED CROSS-ACTIONS     )
16
17              Fresno, California; April 24, 2008
18         The deposition of NAZIM S. FAQUIRYAN was taken in
     the above-entitled matter pursuant to the provisions of law
19   pertaining to the taking and use of depositions, commencing
     at the hour of 10:00 a.m., at the law offices of Baker,
20   Manock & Jensen, 5260 North Palm Avenue, Fresno,
     California, before Cynthia L. Lucas, C.S.R. No. 9973, a
21   Certified Shorthand Reporter of the State of California,
     having offices located at Clovis, California.
22
23
24
25                        264
```

```
 1   State of California,    )
                             )   ss.
 2   County of Fresno        )

 3

 4        I, CYNTHIA L. LUCAS, a Certified Shorthand Reporter

 5   of the State of California, do hereby certify that the

 6   witness in the foregoing deposition, was by me duly sworn

 7   to testify to the truth, the whole truth and nothing but

 8   the truth in the within-entitled cause; that said

 9   deposition was taken at the time and place therein named;

10   that the testimony of said witness was reported by me, a

11   disinterested person, and thereafter transcribed into the

12   foregoing pages.

13        And I further certify that I am not of counsel or

14   attorney for either or any of the parties to said

15   deposition, nor in any way interested in the outcome of the

16   cause named in said caption.

17        In Witness Whereof, I have hereunto set my hand

18   at my office in Clovis, California.

19

20                  _Cynthia L. Lucas_____

21                  CYNTHIA L. LUCAS, C.S.R. No. 9973

22

23

24

25                            265
```

1          Q.  Do you have a real estate business?

2          A.  No.

3          Q.  Do you specialize in either commercial or

4    residential?

5          A.  Residential.

6          MR. MICHAEL:  Assumes facts not in evidence that

7    he specializes, because he said he does not have a

8    business.

9          He's already answered, so...

10         BY MS. JONES:

11         Q.  Other than the DRE, do you belong to any

12   other professional organizations or groups?

13         A.  No.

14         Q.  Have you ever filed for bankruptcy?

15         A.  No.

16         Q.  I'm just going to run through the documents

17   that we went through yesterday with your father.

18         If you could please look at Exhibit A.  Review

19   that document and let me know if that is your signature on

20   page 15.

21         A.  Yes, it is.

22         Q.  Do you recall when you signed this document?

23         A.  No.

24         Q.  Does the date 5-8, 2007 that's written next

25   to your signature refresh your recollection as to when you

                                                          10

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    signed this document?

2              A.   No.

3              Q.   Did you read this document before you signed

4    it?

5              A.   No.

6              Q.   Have you ever read this document?

7              A.   Nope.

8              Q.   Did anyone ever instruct you to date this

9    document May 8th, 2007?

10             A.   No.

11             Q.   Let's turn to Exhibit B.   Can you please

12   review that document and indicate whether that's your

13   signature.

14             A.   It is.

15             Q.   Do you recall when you signed this document?

16             A.   No.

17             Q.   Does the date next to your signature of

18   October 4, 2006 refresh your recollection as to when you

19   signed the document?

20             A.   No.

21             Q.   Did anyone ever tell you to date the document

22   10-4-06?

23             A.   No.

24             Q.   Did you ever -- did you read this document

25   before you signed it?

                                                          11

1          A.  No.

2          Q.  Have you ever read this document?

3          A.  No.

4          Q.  Let's go to Exhibit C.  If you could review

5   that document and confirm for me on the fourth page whether

6   that's your signature.

7          A.  Yes.

8          Q.  And do you recall when you signed this

9   document?

10         A.  No.

11         Q.  Does the date June 20, 2006, which is the

12  date near your signature, does that refresh your

13  recollection as to when you signed this document?

14         A.  No.

15         Q.  Did anyone ever tell you to date the document

16  that date?

17         A.  No.

18         Q.  Did you read this document before you signed

19  it?

20         A.  No.

21         Q.  Have you ever read this document?

22         A.  No.

23         Q.  Was this one of the documents that you

24  reviewed to prepare for your deposition today?

25         A.  No.

                                                              12

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1          Q.  Did you review this document in preparation

2      for today's deposition?

3          A.  No.

4          Q.  Let's move on to Exhibit F, which is a loan

5      agreement for AM PM Mini Market.  And if you could review

6      this document and confirm for me on page 18, which is Bates

7      labeled BP 01552, whether that is your signature.

8          A.  Yes.

9          Q.  Do you recall when this document was signed

10     by you?

11         A.  No.

12         Q.  Did you read this document before you signed

13     it?

14         A.  No.

15         Q.  And then if you could flip to the page that's

16     Bates labeled BP 01557, is that your signature?

17         A.  Yes.

18         Q.  Do you recall when you signed this document?

19         A.  No.

20         Q.  Did you read this document before you signed

21     it?

22         A.  No.

23         Q.  Have you ever read this document?

24         A.  No.

25         Q.  Did you read this document in preparation for

14

Veritext National Deposition & Litigation Services
866 299-5127

1    today's deposition?

2              A.  No.

3              Q.  Okay.  Let's go to Exhibit G.  On the third

4    page if you could review that and confirm that that's your

5    signature.

6              A.  Yes.

7              Q.  And did you read this document before you

8    signed it?

9              A.  No.

10             Q.  Do you recall when you signed it?

11             A.  No.

12             Q.  Did you review this document in preparation

13   for today's deposition?

14             A.  No.

15             Q.  Go to Exhibit H.  If you could review that

16   document and then confirm for me on page 14 that that's

17   your signature.

18             A.  Yes.

19             Q.  And do you recall when you signed this

20   document?

21             A.  No.

22             Q.  Did you review this document before you

23   signed it?

24             A.  No.

25             Q.  Have you ever reviewed this document?

15

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    that agreement?

2              A.  No.

3              Q.  How about with your father, did you speak

4    with your father either before or after signing this

5    agreement, Exhibit H, concerning this agreement?

6              A.  Yes.

7              Q.  What did you speak about?

8              A.  He asked me to sign it.

9              Q.  And that was it?

10             A.  That was it.

11             Q.  I'm going to mark as Exhibit -- we're up to

12   T, a document.

13             If you could please take a look at that document,

14   and indicate whether or not that's your signature.

15             (Plaintiffs' Exhibit T was marked for

16             identification.)

17   THE WITNESS:  Yes.

18   BY MS. JONES:

19             Q.  Prior to signing this document, did you

20   review this document?

21             A.  No.

22             Q.  Have you ever reviewed this document?

23             A.  No.

24             Q.  Did you ever speak with anyone at BP either

25   before or after signing this document about this document?

                                                          20

1       A.   No.

2       Q.   Did you ever speak to your father either

3    before or after signing this document concerning this

4    document?

5       A.   Yes.

6       Q.   And what was that conversation about?

7       A.   Told me I needed to get it notarized.

8       Q.   And anything else?

9       A.   No.

10       Q.   And you got it notarized?

11       A.   Yes.

12       Q.   And why didn't you review this document

13    either before or after signing it?

14       A.   I just signed it.

15       Q.   Okay.  This next document is going to be

16    marked Exhibit U.  It's called the Unconditional Continuing

17    Guaranty.

18            (Plaintiffs' Exhibit U was marked for

19             identification.)

20       BY MS. JONES:

21       Q.   If you could please review that document.

22    Did you sign this document on page 5 of that

23    document?

24       A.   Yes.

25       Q.   Prior to signing the document, did you review

                                                         21

1    it?

2              A.   No.

3              Q.   Either before or after signing this document,

4    did you speak to anyone at BP concerning this document?

5              A.   No.

6              Q.   Either before or after signing this document,

7    did you speak to your father about this document?

8              A.   Yes.

9              Q.   What did you speak about?

10             A.   This had to be notarized.

11             Q.   Anything else about this document?

12             A.   No.

13             Q.   And why did you not review the document

14   either before or after signing it?

15             A.   I didn't review them.

16             Q.   Okay.  Concerning Exhibits A, B, C, D --

17   sorry, A, B, C, E, F, G, T and U, did you ever have

18   questions about these documents prior to signing them?

19             A.   No.

20             Q.   After signing these same documents, did you

21   ever have questions?

22             A.   No.

23             Q.   I'm going to show you a document that we've

24   already marked as Exhibit H.

25             And I'd like an agreement that we can just refer

                                                          22

1          A.   He said that this was the sum that Arco was

2     supposed to pay for the remodeling costs, or...

3          Q.   Anything else?

4          A.   No.

5          Q.   Before you signed -- before you signed this

6     Contract Dealer Gasoline -- never mind, strike that.

7               Exhibit J, will you please take a look at Exhibit

8     J.   Specifically on the page which has a Bates label of BP

9     01446.

10              Is that your signature --

11         A.   Yes.

12         Q.   -- on those two locations?

13         A.   Yes.

14         Q.   Did you review this document before you

15    signed it?

16         A.   No.

17         Q.   Did you review this document after you signed

18    it?

19         A.   No.

20         Q.   Did you speak to BP about this document

21    either before or after you signed it?

22         A.   No.

23         Q.   Did you speak with your father about this

24    document before or after you signed it?

25         A.   Yes.

                                                              24

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1          A.   No.

2          Q.   Prior to signing the store loan agreement,

3     did you ever speak to anyone at BP about what the terms of

4     the store loan would be?

5          A.   No.

6          Q.   Prior to signing the gas loan agreement, did

7     you ever speak to anyone at BP concerning what the terms of

8     the gas loan would be?

9          A.   No.

10          Q.   After you signed either of the franchise

11     agreements, the gas agreement or the AM PM agreement, did

12     you speak to BP about the terms and conditions of the

13     franchise?

14          A.   No.

15          Q.   After you signed the store loan agreement,

16     did you ever speak to anyone at BP concerning the terms and

17     conditions of that loan?

18          A.   No.

19          Q.   After you signed -- after you signed the gas

20     loan agreement, did you speak to anyone at BP concerning

21     the terms of the gas loan?

22          A.   No.

23          Q.   Let's look at Exhibit K, is that your

24     signature on page 5 of that agreement?

25          A.   Yes.

                                                        27

1            Q.  Did you review this document before you

2   signed it?

3            A.  No.

4            Q.  Have you ever reviewed this document?

5            A.  No.

6            Q.  Did you ever speak to BP about this document

7   either before or after you signed this document?

8            A.  No.

9            Q.  Have you ever spoken to your father about

10  this document either before or after this document?

11           A.  No.

12           Q.  Were you involved in speaking with

13  representatives of BP about either converting a gas station

14  to an Arco AM PM, or doing a ground up and constructing an

15  Arco or AM PM prior to the San Felipe property becoming an

16  Arco AM PM?

17           A.  Did I initiate, is that --

18           Q.  Did you have any communications?

19           A.  Directly?

20           Q.  With BP; correct.

21           A.  No.

22           Q.  Prior to signing the franchise agreements

23  with BP, did you ever speak to Ken Wickerham?

24           A.  No.

25           Q.  How many conversations have you had with

                                                        28

Veritext National Deposition & Litigation Services
866 299-5127

1    Ken Wickerham?

2              A.  None.

3              Q.  You've never spoken to Ken Wickerham?

4              A.  No.

5              Q.  Have you ever spoken to Rima Chadha?

6              A.  No.

7              Q.  Have you ever spoken to Don Firenze?

8              A.  No.

9              Q.  Do you have any knowledge of how it came

10   about that you and your father and STTN either approached

11   or were approached by BP to open up an Arco station?

12             A.  Yes.

13             Q.  And what is that knowledge?

14             MR. MICHAEL:  He was here yesterday and heard all

15   the testimony.

16             BY MS. JONES:

17             Q.  Other than what you've heard from the

18   testimony from your father, do you have independent

19   knowledge?

20             A.  I was present at a couple of meetings when

21   Ken and Rima were talking to my father.

22             Q.  How many meetings were you at with either Ken

23   or Rima present?

24             A.  Two or three.

25             Q.  Do you recall when those meetings took place?

                                                            29

1          A.  No.

2          Q.  Other than the Gateway location -- let me

3     back that up.

4              Now, your father indicated that you were 51

5     percent owner of STTN; is that correct?

6          A.  Currently?

7          Q.  Currently.

8          A.  Yes.

9          Q.  And STTN owns the businesses located at the

10    Gateway and the San Felipe locations; correct?

11         A.  I don't know.

12         Q.  You don't know what businesses are run out of

13    STTN?

14         A.  No.

15         Q.  Do you know what properties are owned by

16    STTN?

17         A.  No.

18         Q.  Are you involved with Ava Global Enterprise,

19    LLC?

20         A.  I think I'm a member, but I don't know.

21         Q.  Do you have any idea if you have any

22    ownership interest in Ava?

23         A.  I have no clue.

24         Q.  Do you recall ever signing any documents

25    concerning Ava Global?

                                                    36

1          Do you believe that BP lied to you or STTN or

2    your father concerning the station at the San Felipe

3    location?

4          A.   Yes.

5          Q.   And what were those lies or lie?

6          A.   To start out, there was a document at the

7    very beginning to where, if I'm not mistaken, the lady's

8    name was Rose, had us backdate the addendum for STTN to

9    make me 51 percent owner.

10         And then there was the contract that we needed to

11   have in our possession for ten days, so they dated that --

12   they postdated that contract.

13         And then throughout the whole process, they'd

14   give my father the run-around.

15         Q.   Anything else?

16         A.   Yeah, Brad Christensen told me that, "Hey, I

17   want to help you.  I want to deal with you."

18         And I called and left him two messages, and never

19   heard a call back from him, so...

20         Q.   Anything else?

21         A.   No.

22         Q.   Now, you said that at the beginning that

23   somebody named Rose had backdated an addendum for STTN to

24   make you 51 percent owner.

25         Did you have an objection to becoming a 51

                                                        58

```
1           A.   Yes.

2           Q.   What did he say?

3           A.   He said the contract needs to remain in our

4    possession for ten days for some reason of canceling or

5    something like that.  I do not remember the specifics.  So

6    they need to postdate it to make sure we don't cancel the

7    contract.

8           Q.   Did you have a problem at that time that it

9    was postdated?

10          A.   Yes.

11          Q.   Did you raise that problem to anyone at BP?

12          A.   No.

13          Q.   Did you raise that problem to your father?

14          A.   No.

15          Q.   Did your father have a problem with the

16   document being postdated that you know of?

17          A.   No.  He said it needed to be done, so he had

18   to do it.

19          Q.   You said another reason why you believe that

20   BP lied to you and your company is that throughout the

21   process, he got the run-around.

22               And can you describe to me what you mean by that.

23          A.   As far as my memory goes, it was either

24   February or March, right when they were trying to record,

25   to where they called my dad and told him there's a tax
```

                                                                    62

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    lien.

2            So my dad went to go clear the tax lien.  And

3    then my dad called them back and said the tax lien is

4    clear.

5            They said they don't have proof of it.  So one

6    person told him to call another person.  Then he'd call the

7    other person.

8            And then I remember, I faxed -- not faxed, I'm

9    sorry, FedEx'd some documents over to the office in --

10   where is it?  It's in the Los Angeles area, the AM PM

11   offices.  I believe it's close to Brea somewhere.

12   La Palma, I think.  And if I'm not mistaken, I faxed it

13   over to --

14           MR. MICHAEL:  FedEx'd or faxed?

15           THE WITNESS:  FedEx'd, I'm sorry, FedEx'd it to

16   Cecile.

17           And it was -- she claimed that she didn't receive

18   them, but it was actually sitting on Paul Christensen's, I

19   believe, desk.

20           I don't know how it got there, because it was

21   addressed to her.

22           So there was -- I feel like there was a lack of

23   communication amongst Arco personnel that led to us getting

24   a run-around.

25           BY MS. JONES:

                                                        63

```
 1              Q.  Any other situations where you felt you got
 2    the run-around?
 3              A.  Yes.
 4              Q.  What was that?
 5              A.  I'd call Brad.  Brad would tell me to call, I
 6    forget the guy's name, the guy that does -- that's in
 7    charge of, like, the marketing and the ordering.  He helped
 8    me with the -- I forget his name right now.  But I'd call
 9    him, and he'd say, no, you need to call Brad.  And I'd call
10    Brad, and Brad would say, oh, I have to get an approval
11    from Tom.  And we'd never hear back from Brad.  So it's
12    just...
13              Q.  Any other situations where you felt like you
14    got the run-around?
15              A.  No, not that I can remember right now.
16              Q.  In terms of the FedExing documents to Cile,
17    and Paul Christensen getting them, how much longer after
18    you sent those documents via FedEx did Cecile finally
19    receive those documents?
20              A.  I believe it was, like, four or five days
21    afterward.
22              No, it wasn't after I FedEx'd it.  It was after
23    it was supposed to be there; so seven days, because I
24    FedEx'd it, and then --
25              Q.  Did you FedEx it overnight?
                                                          64
```

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    gasoline that were due?

2              A.  No.

3              Q.  Did you speak with anyone at BP concerning

4    payments for gasoline at the San Felipe station?

5              A.  No.

6              Q.  At the time the San Felipe was an Arco AM PM,

7    was there a designated manager?

8              A.  Yes.

9              Q.  Who was that?

10             A.  Mina.

11             Q.  Was she there every day?

12             A.  Yes.

13             Q.  How many hours every day?

14             A.  She wasn't there seven days a week.

15             Q.  How many days a week was she there?

16             A.  Five.

17             Q.  And how many hours for each of those five

18   days on average?

19             A.  About seven to nine hours.

20             Q.  Is she still the manager of the station now

21   that it's a Valero?

22             A.  No.

23             Q.  Who is now?

24             A.  My dad.

25             Q.  Now, at some point, the station fell behind

                                                              74

Veritext National Deposition & Litigation Services
866 299-5127

1    in paying for gasoline; correct?

2                A.   Yeah.

3                Q.   What is your knowledge concerning what

4    happened in terms of falling behind in gasoline payments?

5                MR. MICHAEL:  Objection, vague and ambiguous.

6    Calls for a narrative.

7                BY MS. JONES:

8                Q.   He's not instructing you not to answer.  If

9    he instructs you not to answer, then you don't answer.  But

10   you can answer to the extent you understand the question.

11               A.   Yeah, I'm just thinking right now.

12               Can you repeat your question.

13               Q.   Sure.  Explain to me what your knowledge is

14   concerning the fact that at some point in time when the

15   San Felipe station was running as an Arco and AM PM, you

16   fell behind in paying for gasoline.

17               MR. MICHAEL:  Same objections.

18               THE WITNESS:  So are you asking me from the

19   beginning what happened?

20               BY MS. JONES:

21               Q.   Anything you know about it.

22               A.   Okay.  As far as I remember is the general

23   contractor walked out, and we were forced to pay the

24   general contractor.

25               So the general contractor walked out when it was

                                                          75

1    just operating as a gas station only, and we weren't making

2    enough money to pay the bills.

3         And my dad had some money, so he paid the general

4    contractor off.  And then we fell behind with the gas

5    bills.

6         And from that point, what I remember, and this is

7    from what I heard from my father talking to Tom and Brad,

8    about them wanting to have my dad put some money in escrow.

9    And they put the 160,000 -- or we put the 160,000 that we

10   owe -- at that time it was $160,000 for the gas in escrow,

11   and they'll put the 400 remaining balance in escrow, so

12   it's a same time switch type of thing.

13        Q.  Do you recall what time frame it was that the

14   GC walked out?

15        A.  I don't remember, but it was right when the

16   mechanic's lien started coming on the property.

17        Q.  Do you recall when it was that your father

18   had a conversation with Brad and Tom about the escrow

19   payment agreement?

20        A.  Yes, it was right when the store was -- the

21   store opened as an AM PM.  They had numerous conversations

22   with my father regarding putting the money for the gas in

23   escrow.  And the balance dropped from 160 to 104 at that

24   time.  And putting the 104 in escrow, and they'll wire the

25   rest of the money that they owe us into escrow.

76

1          A.   No.

2          Q.   Let's look at Exhibit O.   Is that your

3     signature on Exhibit O?

4          A.   Yes.

5          Q.   Did you read this document before you signed

6     this document?

7          A.   No.

8          Q.   Have you since read this document?

9          A.   Yes.

10         Q.   When did you read this document?

11         A.   In reviewing for the disposition.

12         Q.   Deposition?

13         A.   Deposition.

14         Q.   And do you have an understanding of how this

15    document came about?

16         A.   No.

17         Q.   Did you know that you were agreeing to pay

18    $30,000 to BP monthly?

19         MR. MICHAEL:   Mischaracterizes the document.

20         BY MS. JONES:

21         Q.   Did you know that you were agreeing to what's

22    in this document?

23         A.   No.

24         Q.   So you didn't -- did you know that you were

25    agreeing to what's in this document before you signed it?

                                                           79

1          Q.   Do you recall when that time frame was?

2          A.   No.

3          Q.   Was it more than five days that that took

4    place?

5          A.   I don't remember.

6          Q.   Did you ever speak to Brad Christensen or

7    anyone else at BP about not having all grades of gasoline

8    available for sale?

9          A.   No.

10         Q.   Did you ever speak with anyone at BP about

11   having all of the pumps shut down and having no gasoline

12   available for sale?

13         A.   No.

14         Q.   Do you know if your father did speak to

15   someone at BP concerning having all available grades of

16   gasoline available for sale?

17         A.   No.

18         Q.   Let's look at Exhibit P.  Have you ever seen

19   this document before?

20         A.   No.

21         Q.   Did you ever review any documents from BP

22   that were titled default notices?

23         A.   No.

24         Q.   Did your dad ever talk to you about default

25   notices that were received from BP?

                                                      82

1          MR. MICHAEL:  Again, don't reveal any

2    conversations with your dad where Deborah Coe or myself

3    were present.

4          THE WITNESS:  Yes.

5          BY MS. JONES:

6          Q.  And what were those conversations?

7          A.  He said we received a note from BP saying

8    that we didn't have all grades of gas.

9          Q.  Anything else?

10         A.  No.

11         Q.  Did you respond?

12         A.  No.

13         Q.  Was that the only time he talked to you about

14   receiving a default?

15         A.  Yes.

16         Q.  That was just one time?

17         A.  Just one time.

18         Q.  Do you know whether or not since the

19   termination of the BP franchise, whether you or STTN has

20   made any payments to BP for gasoline that was unpaid for?

21         A.  No.

22         Q.  You don't know, or...

23         A.  I don't know.

24         Q.  Do you know whether any amounts have been

25   paid to repay the loan from BP since the termination of the

                                                      83

1    your signatures?

2              A.   Yes.

3              Q.   Is that your print as well?

4              A.   Yes.

5              Q.   You have neat handwriting.

6              Let's look at Exhibit A real quick.   And turn to

7    Bates BP 02861, is that your signature?

8              A.   Yes.

9              Q.   Let's turn to Exhibit C, and let's go to

10   Bates No. BP 02827, is that your signature?

11             A.   Yes.

12             Q.   Did you read this document before you signed

13   it?

14             A.   No.

15             Q.   Have you ever read this document?

16             A.   No.

17             Q.   Have you ever spoken to BP about this

18   document?

19             A.   No.

20             Q.   Have you ever spoken to your father about

21   this document?

22             A.   No.

23             Q.   Let's go to Bates No. BP 02829 in Exhibit C.

24   It's the last page of that exhibit.   Is that your

25   signature?

                                                        87

1          A.   Yes.

2          Q.   Did you review that document before you

3    signed it?  It's the page before.

4          A.   No.

5          Q.   Have you ever read that document?

6          A.   No.

7          Q.   Did you speak to BP about this document at

8    any time?

9          A.   No.

10         Q.   Did you speak to your father about this

11   document at any time?

12         A.   No.

13         Q.   Let's go to Exhibit E.  And let's go to Bates

14   labeled S 00020.  Are those your initials?

15         A.   Yes.

16         Q.   And then let's move on to Bates label 00022,

17   are those your initials?

18         A.   Yes.

19         Q.   Did you read those documents before you

20   signed them --

21         A.   No.

22         Q.   -- or initialed them?

23         Did you talk to BP about these documents before

24   you initialed them?

25         A.   No.

                                                        88

1          Q.  Did you ever talk to BP about these

2    documents?

3          A.  No.

4          Q.  Did you speak to your father about these

5    documents other than in conversation where your attorneys

6    were present?

7          A.  No.

8          Q.  I may have already asked you this, but just

9    to be safe, let's go to Exhibit F, and 01557, is that your

10   signature?

11         A.  Yes.

12         Q.  And then let's go to Exhibit H to Bates label

13   BP 01528, is that your signature?

14         A.  Yes.

15         MR. MICHAEL:  You have gone through these

16   already.

17         MS. JONES:  I just wanted to make sure.

18         Q.  Let's turn to Exhibit M real quick.

19         Have you ever seen this document before?

20         A.  No.

21         MS. JONES:  Let me just review my notes, and I

22   think we can wrap it up.

23              (RECESS TAKEN.)

24         BY MS. JONES:

25         Q.  Prior to signing any of the agreements with

                                                      89

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    BP, this includes the Contract Dealer Agreement, the AM PM

2    mini market agreement, the gasoline loan agreement and the

3    store loan agreement, did BP make any promises to you that

4    did not end up being true?

5              A.   I'm sorry, you're asking the question

6    differently now.  Before I was a representative of STTN,

7    now I'm not?  Is that --

8              Q.   Let's start with you personally.

9              A.   No.

10             Q.   As a representative or part owner of STTN,

11    prior to signing any of the agreements, the franchise

12    agreement or the loan agreement, did BP make any promises

13    to STTN that did not end up being true?

14             A.   Prior to signing, I'm not aware of it.

15             Q.   After signing the agreement, did BP make any

16    promises to you personally that ended up not being true?

17             A.   To me personally, no.

18             Q.   Prior to signing the agreements, did BP make

19    any promises to STTN that ended up not being true?

20             MR. MICHAEL:   You said prior.

21             MS. JONES:   I'm sorry, let me rephrase.

22             Q.   After signing the agreement, the franchise

23    and the loan agreement, did BP make any promises to STTN

24    that ended up not being true?

25             A.   Yes.

90

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1          Q.  And what were those?

2          A.  This whole packet here.  This contract here.

3  I mean, everything that was said is not true from BP.  I

4  mean, whether you want to look at it as a whole, or hold

5  each person accountable for it, everything that was said

6  came out as a lie.

7          Q.  Every statement that every BP representative

8  made turned out to be a lie?

9          A.  Not every statement, but the whole process of

10  getting funded and documents that needed to be completed

11  and how much they wanted to help during this process and

12  the dates that were supposed to be funded.  Obviously, I

13  mean, all of that is a lie.

14          Q.  Anything else?

15          A.  Not that I can remember right now.

16          Q.  You said that the process that needed to be

17  followed, that their representations concerning that

18  process were a lie; is that what you're saying?

19          A.  The whole process is what I was referring to

20  when I said the process, the whole process.  They told us

21  that we needed to get the tax lien cleared so we can get

22  some money.  Well, we got the tax lien cleared and

23  recorded.  We didn't get any money.

24          They told us then we need to clear mechanic's

25  liens, which was caused by Arco.  And we didn't get any

91

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1  money.  So that's -- I mean --

2          Q.  Anything else that they told you that you

3  needed to do, and then you did them and whatever they

4  promised to do didn't come true other than the tax liens

5  getting cleared and the mechanic's liens being cleared?

6          MR. MICHAEL:  Vague and ambiguous.

7          THE WITNESS:  The process of the assurance that

8  my dad got from them as far as, you know, go ahead and

9  start the process and we'll -- we're behind you.  We're

10 going to back you up.

11         BY MS. JONES:

12         Q.  In terms of another thing you identified in

13 terms of promises that didn't end up being true, you said

14 something about documents to be completed.

15         What did you mean by that?

16         A.  I referred to it in a prior statement as far

17 as the tax liens, getting those removed to get money.  And

18 getting the mechanic's liens removed to get money.  And

19 sign so and so document, and we'll get you your money.

20         Q.  Now, each time that a BP representative would

21 tell you that there was certain information that needed to

22 be provided or cleared, did you believe that all you needed

23 to do was provide that one item of information and then you

24 would get the money?

25         So, for example, let's make this a little

                                                      92

Veritext National Deposition & Litigation Services
866 299-5127

1  simpler.  So did you believe that when you provided the

2  proof that the tax lien was cleared, that you would

3  automatically get the money?

4        A.  Once they recorded it, they said they were

5  going to give some money, so, yes, I did believe.

6        Q.  Do you have an understanding of why they did

7  not give the money after the tax lien cleared?

8        A.  No.

9        Q.  Did you know if there were any other

10  outstanding information that was due or documents that

11  needed to be provided after?

12        A.  No.

13        Q.  Okay.  Did you have an understanding that

14  once the mechanic's liens would be cleared, that the money

15  would be provided?

16        A.  Yes.

17        Q.  Did you know if there was anything else

18  outstanding in terms of other information that still needed

19  to be provided?

20        A.  No.

21        Q.  Okay.  In terms of the dates to be funded,

22  you indicated that that was a promise that ended up not

23  being true.

24            Did they provide specific dates that there would

25  be money that would be funded?

93

1          A.  They told us -- they said after -- like, for

2   example, the tax lien was removed and they recorded it,

3   they said they would fund us some money within a week.

4   They would give us week ranges rather than specific dates.

5          Q.  And the money didn't come within that week?

6          A.  No.

7          Q.  Was there any explanation provided as to why

8   that money did not come within the week of providing the

9   proof that the tax lien cleared?

10         A.  Not that I'm personally aware of.

11         Q.  Your mother is Maghul Faquiryan; correct?

12         A.  Correct.

13         Q.  Did she ever work at the station at

14  San Felipe?

15         A.  No.

16         Q.  Did she ever have to your knowledge any

17  conversations with anyone at BP concerning the San Felipe

18  station?

19         A.  No.

20         Q.  Were you present at any conversations between

21  your father and your mother concerning the San Felipe

22  station and the BP franchise?

23         A.  No.

24         Q.  Did you ever contact anyone at BP to inquire

25  about when loan moneys would be paid out?

                                                            94

1      A.  No.

2      Q.  Did you ever contact BP to complain about the

3  fact that the payout of the loan moneys is taking too long?

4      A.  No.

5      Q.  Did you ever contact BP ever just to complain

6  about anything concerning the franchise at the San Felipe

7  station?

8          MR. MICHAEL:  Other than the computer?

9          BY MS. JONES:

10     Q.  Other than the computer issue with Brad.

11     A.  No.

12     Q.  Do you know if your siblings ever made calls

13  to BP concerning when, and whether the loan fund would be

14  paid out?

15     A.  Not that I'm aware of.

16         MS. JONES:  I think that's it.

17         MR. MICHAEL:  We're done.

18         MS. JONES:  I would propose the same stipulation.

19         MR. MICHAEL:  You can just duplicate it over from

20  the previous transcript.

21         MS. JONES:  We've stipulated to get an expedited

22  transcript, but that Mr. Faquiryan will have 30 days upon

23  his counselor's receipt of the transcript to review, make

24  any necessary changes and sign the transcript under penalty

25  of perjury without the necessity of appearing before a

95

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT T

**BP West Coast Products LLC** ✛

Guarantee Agreement
Individual

Facility: <u>82461</u>

The undersigned <u>Nazim Faquiryan</u> and _____ (spouse, if married), intending to be legally bound hereby and in consideration of BP West Coast Products LLC, organized in Delaware (hereinafter called "BPWCP") advancing credit to <u>STTN Enterprises, Inc.</u> (hereinafter called "Debtor"), and also in consideration of BPWCP, at its sole discretion, (a) agreeing to any additional credit at any time hereafter to Debtor for petroleum products and other merchandise, or (b) to extend credit, advance money, or defer time for payment of any money due or to become due under contract or obligation arising from any lease or loan, or (c) to extend credit in any other manner to, or at the request or for the account of Debtor, either with or without security (all such liability and obligation of Debtor to BPWCP now or hereafter existing being hereinafter referred to as "Obligations"), do hereby jointly and severally guarantee and agree to pay to BPWCP, upon demand, all of the Obligations together with interest thereon, and any and all expenses, including but not limited to, reasonable attorneys' fees which may be incurred by BPWCP in collecting all or any of the Obligations and/or enforcing any rights hereunder; it being further understood and agreed that the liability hereunder of the undersigned shall be unlimited as to the amount of Obligations covered by this Guaranty.

The undersigned waive any right to require BPWCP to (a) proceed against Debtor or any other party; (b) proceed against or exhaust any security held from Debtor; or (c) pursue any other remedy in BPWCP's power whatsoever. The undersigned waive any defense based on or arising out of any defense of Debtor other than payment in full of the indebtedness, including without limitation any defense based on or arising out of the disability of Debtor, or the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of Debtor other than payment in full of the indebtedness. BPWCP may, at its election, foreclose on any security held by BPWCP by one or more judicial or nonjudicial sales whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy BPWCP may have against Debtor, or any security, without affecting or impairing in any way the liability of the undersigned except to the extent the indebtedness has been paid. The undersigned waive any defense arising out of any such election by BPWCP, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the undersigned against Debtor or any security. Until all indebtedness of Debtor to BPWCP shall have been paid in full, even though such indebtedness is in excess of the undersigned's liability hereunder, the undersigned shall have no right of subrogation and waive any right to enforce any remedy which BPWCP now has or may hereafter have against Debtor, and waive any benefit of, or any right to participate in any security now or hereafter held by BPWCP.

If this Guaranty is executed by two or more parties, they shall be severally liable hereunder, and the word "undersigned" wherever used herein shall be construed to refer to each of such parties separated, all in the same manner and with the same effect as if each of them had signed separate instruments; and in any such case this Guaranty shall not be revoked or impaired as to any one or more of such parties by the death of any of the others or by the revocation or release of any liabilities hereunder of any one or more of such other parties.

Executed at _____, this _20_ day of _June_, 20_06_.

_____

Witness

_____
Guarantor – Nazim Faquiryan

_____

Residence of Guarantor (street, city, state, zip code)

EXHIBIT
T
N. Faquiryan 4-24-08
PENGAD 800-631-6989

_____

Witness

_____
Guarantor - Spouse

_____

Residence of Guarantor (street, city, state, zip code)

BP 02878

* Subscribed and sworn to before me this _20th_ day of _June_, 20_06_.

_____
Notary Public

MINA FAQUIRYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

*Required in all states

299

# EXHIBIT
# U

## UNCONDITIONAL CONTINUING GUARANTY

In order to induce BP WEST COAST PRODUCTS LLC, a Delaware limited liability company, its successors and assigns ("Lender") having an office at 4 Centerpointe Dr., LPR 6-180, La Palma, CA 90623-1066, to enter into or continue a loan agreement (collectively, the "Loan Agreement"), as amended from time to time, with STTN ENTERPRISE, INC., a California corporation limited partnership ("Debtor"), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees as follows:

1.      The undersigned, Nazim S.M. Faquiryan (collectively, "Guarantor") hereby irrevocably, fully and unconditionally guaranties to Lender the prompt performance and payment when due, whether by acceleration or otherwise, of all of the following (collectively, the "Obligations"): All loans, advances, indebtedness, liabilities, debit balances, letter of credit or purchase guaranty reimbursement obligations, covenants, duties and all other obligations of whatever kind or nature at any time or from time to time owing by Debtor to Lender, or to any of Lender's affiliates, whether fixed or contingent, known or unknown, liquidated or unliquidated, present or future, no matter how or when arising and whether under said Loan Agreement or any other present or future agreement or otherwise, and including without limitation all obligations owed by Debtor to third parties which are or may be assigned to Lender. In addition, the undersigned agree (s) to fully indemnify Lender against any claim, harm, loss, damage, liability, cost or expense (including all costs, attorneys' fees, accounting fees and investigation fees) incurred in connection with any action, nonperformance or breach by Debtor of said Loan Agreement, or any breach of or failure to perform any representation, promise, agreement or warranty of Debtor or any wrongful acts, conduct or omission or fraud of Debtor. Notwithstanding anything herein to the contrary, the maximum liability of the undersigned under this Guaranty is limited to the principal amount of FOUR HUNDRED AND SEVENTY FIVE THOUSAND Dollars ($475,000.00), plus accrued and unpaid interest, and any costs, expenses and fees of enforcement of this Guaranty or the Loan Agreement; provided, however, that if any of the Obligations arise from false information which was provided by Debtor to Lender where Debtor knew that such information was false or Debtor was grossly negligent in providing such information to Lender, then, the liability of the undersigned for such Obligations shall be unlimited. In connection with the foregoing, the undersigned shall not be liable for any punitive damages unless the undersigned individually or with others caused such false information to be provided to Lender.

2.      The undersigned waives notice of acceptance of this Guaranty and notice of any liability to which it may apply, and waives diligence, presentment, demand for payment, protest, notice of protest, non-performance, dishonor or nonpayment of any such liabilities and/or the Obligations, notices of the existence, creation, incurring of new or additional indebtedness, suit or taking other action by Lender against, and any other notice to, any party liable thereon (including the undersigned), and waives any defense, offset or counterclaim to any liability hereunder and the performance of each and every condition precedent to which the undersigned might otherwise be entitled by law. The undersigned further waives: i) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Debtor or any other person, or to proceed against any property of any kind securing any of the Obligations, or to exercise any right of offset or other right with respect to reserves held by Lender; ii) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in any property of Debtor or any other person; iii) any defense based upon any failure of Lender to give the undersigned notice of any sale or other disposition of any collateral securing any of the Obligations, or any failure of Lender to comply with any provision of applicable law in enforcing any security interest in any collateral securing any of the Obligations, including without limitation any failure by Lender to dispose of any collateral in a commercially reasonable manner; iv) the benefit of all statutes of limitations with respect to any action based upon, arising out of or relating to this Guaranty; v) any rights under the doctrine of marshalling of assets or any other similar doctrines. Without limiting the generality of any of the foregoing or any other provision of this Guaranty, the undersigned expressly waive any and all benefit which otherwise may be available to the undersigned under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433 or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise and/or any similar law of California or of any other jurisdiction. There are no conditions precedent or other conditions of any kind to the effectiveness of this Guaranty, and this Guaranty is immediately effective.

3.      Lender may at any time from time to time (whether or not after revocation or termination of this Guaranty) without the consent of, or notice to, the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions



and in whole or in part: (i) change the manner, place or terms or payment, or change or extend the time of payment of, renew, alter or release Debtor or any other guarantor from any of the Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, renewed or altered; (ii) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Obligations hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or offset there against; (iii) exercise or refrain from exercising or release any rights against Debtor or others (including the undersigned) or otherwise act or refrain from acting; (iv) settle or compromise any of the Obligations hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect of said Obligations and/or security therefor or this Guaranty, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) to creditors of Debtor other than Lender and the undersigned; and (v) apply any sums by whomsoever paid or howsoever realized to any of the Obligations regardless of what Obligations or other liabilities of Debtor remain unpaid.

4.    No invalidity, irregularity or unenforceability of all or any part of the Obligations hereby guaranteed or of any security therefor or of said factoring agreement or any amendment or supplement thereto or any other document existing between Lender and Debtor shall affect, impair or be a defense to this Guaranty and its enforceability. The liability of the undersigned hereunder is primary and unconditional and not merely that of a surety and shall not be subject to any offset, defense or counterclaim of Debtor. This Guaranty is a continuing one and all Obligations to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. The books and records of Lender showing the account and dealings and transactions between Lender and Debtor shall be admissible in evidence in any action or proceeding, including photocopies thereof, shall be binding upon the undersigned for the purpose of establishing the items and amounts set forth therein, and shall constitute prima facie evidence thereof, except that monthly statements rendered by Lender to Debtor shall constitute, to the extent to which no objection is made within thirty (30) days after date thereof, an account stated between Lender and Debtor that shall be binding upon the undersigned. As to each of the undersigned, this Guaranty shall continue until ninety (90) days after written notice of revocation signed by such undersigned has been actually received by Lender, notwithstanding a revocation by, or the death of, or complete or partial release for any cause, of any one or more of the remainder of the undersigned, other guarantors or of Debtor, or of anyone liable in any manner for the Obligations hereby guaranteed, or for the liabilities (including those herein) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase, decrease or change in personnel of any one or more of the undersigned or other guarantors which may be partnerships or corporations.

5.    No revocation or termination hereof shall affect in any manner any of the rights arising under this Guaranty with respect to (i) Obligations which shall have been created, contracted, assumed or incurred prior to or within ninety (90) days after actual receipt by Lender of written notice of such revocation or termination and all extensions, renewals and modifications of said Obligations, or (ii) Obligations which shall have been created, contracted, assumed or incurred more than ninety (90) days after receipt of such written notice pursuant to any contract entered into by Lender prior to expiration of said ninety (90) day period.

6.    Upon the happening of any of the following events: the failure to pay, fulfill or perform any of the Obligations when due, or any breach or failure to perform by Debtor or any of the undersigned of any representation, promise, agreement or warranty to Lender, or any revocation, breach or termination by any of the undersigned of this Guaranty, or the death or insolvency of Debtor or any of the undersigned or suspension of business of Debtor or any of the undersigned or the issuance of any writ of attachment against any of the property of Debtor or any of the undersigned, or the making by Debtor or any of the undersigned or any assignment for the benefit of creditors, or a trustee or receiver being appointed for Debtor or any of the undersigned or for any property of either of them, or any proceeding being commenced by or against Debtor or any of the undersigned under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute - then and in any such event and at any time thereafter, Lender may, without notice to Debtor or any of the undersigned, declare any or all of the Obligations, whether or not then due, immediately due and payable hereunder by any of the undersigned, and Lender shall be entitled to enforce the obligations of any or all of the undersigned hereunder. All sums of money at any time to the credit of the undersigned with Lender or any of its affiliates and any of the property of any or all of the undersigned at any time in the possession of Lender or

any of its affiliates may be held by or on behalf of Lender as security for any and all obligations of the undersigned hereunder notwithstanding that any of said money or property may have been deposited, pledged or delivered by the undersigned for any other, different or specific purpose. Any and all present and future indebtedness and obligations of Debtor to the undersigned, and any and all claims of any nature which the undersigned may now or hereafter have against Debtor are hereby subordinated to the full payment to Lender of the Obligations, and are hereby assigned to Lender as additional collateral security therefor. If Lender so requests, any such indebtedness of Debtor to the undersigned shall be collected, enforced and received by the undersigned as trustees for Lender and be paid over to Lender on account of the Obligations but without reducing or affecting in any manner the liability of the undersigned under the other provisions of this Guaranty.

7.      Whether or not any suit, claim or proceeding is filed, the undersigned agrees to reimburse and compensate Lender on request or demand for all attorneys' fees, accounting fees, investigation fees and all other costs and expenses incurred by Lender in enforcing this Guaranty or any supplement or amendment thereto or arising out of, or relating in any way to this Guaranty or any supplement or amendment thereto, or in enforcing any of the Obligations against Debtor, the undersigned or any other person. In the event Lender or the undersigned file any lawsuit, action, claim or proceeding against the other predicated on a breach or nonperformance of this Guaranty or any supplement or amendment thereto or to enforce any rights under, or to obtain any declaratory or equitable or other relief as to the terms or provisions of, this Guaranty or any supplement or amendment thereto, the prevailing party in such lawsuit, action, claim or proceeding shall be entitled to recover its attorneys' fees, accounting fees, investigation fees and costs of suit from the non-prevailing party.

8.      If claim is ever made upon Lender for repayment of any amount or amounts received by Lender in payment of or on account or pursuant to of any of the Obligations and Lender repays all or part of said amount by reason of (i) any judgment, decree or order of any Court or adjudicatory or administrative body having jurisdiction over Lender or any of its property, or (ii) any settlement or compromise of any claim effected by Lender with any such claimant (including Debtor), then and in any such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation or release hereof or the cancellation of any note or other instrument evidencing any of the Obligations, or any release or any such Obligations, and the undersigned shall be and remain liable to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The provisions of this paragraph shall survive, and continue in effect, notwithstanding any revocation or release hereof.

9.      No delay on the part of Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of, and as actually authorized by, Lender, and each such waiver, if any, shall apply only with respect to the specific instance, matter or transaction involved, and shall in no way impair the rights of Lender or the obligations of the undersigned to Lender in any other respect, instance, matter or transaction at any other time. The undersigned hereby expressly and unconditionally waives all rights of subrogation, reimbursement and indemnity of every kind against Debtor, and all rights of recourse to any assets or property of Debtor, and all rights to any collateral or security held for the payment and performance of any Obligations, including (but not limited to) any of the foregoing rights which the undersigned may have under any present or future document or agreement with any Debtor or other person, and including (but not limited to) any of the foregoing rights which the undersigned may have under any equitable doctrine of subrogation, implied contract, or unjust enrichment, or any other equitable or legal doctrine.

10.     The undersigned consent and agree that, without notice to or by the undersigned and without affecting or impairing in any way the obligations or liability of the undersigned hereunder, Lender may, from time to time, before or after revocation of this Guaranty, exercise any right or remedy it may have with respect to any or all of the Obligations or any property securing any or all of the Obligations or any guaranty thereof, including without limitation judicial foreclosure, nonjudicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and the undersigned expressly waive any defense based upon the exercise of any such right or remedy, notwithstanding the effect thereof upon any of the undersigned's rights, including without limitation, any destruction of the undersigned's right of subrogation against Debtor and any destruction of the undersigned's right of contribution or other right against any other guarantor of any or all of the Obligations or against any other person, whether by operation of Sections 580a, 580d or 726 of the California Code

of Civil Procedure, or any comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise. Without limiting the generality of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the Obligation is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by Debtor; and (ii) If Lender forecloses on any real property collateral pledged by Debtor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to collect from Debtor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure. In addition, without limiting the generality of any of the foregoing, the undersigned waive all rights and defenses that the undersigned may have because the guarantee of another guarantor is secured by real property. This means, among other things: (i) Lender may collect from the undersigned without first foreclosing on any real or personal property collateral pledged by the other guarantor, and (ii) If Lender forecloses on any real property collateral pledged by the other guarantor, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (B) Lender may collect from the undersigned even if Lender, by foreclosing on the real property collateral, has destroyed any right the undersigned may have to obtain contribution from the other guarantor. This is an unconditional and irrevocable waiver of any rights and defenses the undersigned may have because the obligations of the other guarantor are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

11.    The undersigned is presently informed of the status and financial condition of Debtor and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. The undersigned hereby covenants that they will continue to keep themselves informed of Debtor's status and financial condition and of all other circumstances which bear upon the risk of nonpayment. The undersigned hereby waives the right, if any, to require Lender to disclose to it any information which Lender may now or hereafter acquire concerning such status, condition or circumstances.

12.    Neither Lender, nor any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender shall be liable for any claims, demands, losses or damages, of any kind whatsoever, made, claimed, incurred or suffered by the undersigned or any other party through the ordinary negligence of Lender, or any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Lender.

13.    The undersigned agrees that any claim or cause of action by the undersigned against Lender, or any of Lender's directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Guaranty, or any other present or future agreement between Lender and the undersigned or between Lender and Debtor, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, whether or not relating hereto or thereto, occurred, done, omitted or suffered to be done by Lender, or by Lender's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by the undersigned by the commencement of an action or proceeding in a court of competent jurisdiction within Los Angeles County, California by the filing of a complaint within one (1) year after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter. The undersigned agrees that such one (1) year period is a reasonable and sufficient time for the undersigned to investigate and act upon any such claim or cause of action. The one (1) year period provided herein shall not be waived, tolled, or extended except by a specific written agreement of Lender. This provision shall survive any termination of this Guaranty or any other agreement.

14.    This Guaranty was made and entered into in the State of California and the rights and obligations of Lender and of the undersigned hereunder shall be governed and construed in accordance with the laws of the State of California; and this Guaranty is binding upon the undersigned, his, her, their or its executors, administrators, trustees, receivers, parents, holding companies, affiliates, successors and assigns, and shall inure to the benefit of

BP 01563

Lender, its successors and assigns. As a material part of the consideration to the Lender for accepting this Guaranty, the undersigned (i) agree that, at the option of Lender, all actions and proceedings based upon, arising out of or relating in any way directly or indirectly to this Guaranty shall be litigated exclusively in courts located within Los Angeles County, California, (ii) consent to the jurisdiction of any such court and consent to the service of process in any such action or proceeding by personal delivery, first class mail, or any other method permitted by law, and (iii) waive any and all rights to transfer or change the venue of any such action or proceeding to any court located outside Los Angeles County, California.

15.     The undersigned acknowledge that the acceptance of this Guaranty by Lender does not constitute a commitment by Lender to extend credit to Debtor or to permit Debtor to incur Obligations. All sums due from the undersigned to Lender hereunder shall bear interest from the date due to the date paid at a rate equal to the highest rate charged with respect to the Obligations.

16.     The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" wherever used herein shall mean the undersigned or any one or more of them. The term "Debtor", if more than one is named as such, shall mean all or any one thereof. Anyone signing this Guaranty shall be bound hereby, whether or not anyone else signs this Guaranty at any time. The term "Lender" includes any agent or representative of Lender acting for it. If any provision or portion of this Guaranty or any supplement or amendment thereto is held to be illegal, invalid or unenforceable by a court or adjudicatory body of competent jurisdiction, said provision or portion shall be deemed to be severed and deleted and the remainder shall continue to be valid and enforceable. This Guaranty is the entire and only agreement and understanding between the undersigned and Lender with respect to the guarantee of the Obligations and the subject matter of this Guaranty, and all representations, arrangements, agreements, and undertakings, oral or written, previously or contemporaneously made, which are not set forth herein, are superseded hereby. No course of dealing between the parties, no usage of the trade and no parole or extrinsic evidence of any nature shall be used or be relevant to supplement, explain or modify any term or provision of this Guaranty or any supplement or amendment thereto. The undersigned acknowledge receipt of a copy of this Guaranty, and certifies that the undersigned have read all of said document, and fully understand and agree to the same, before having signed it.

17.     MUTUAL WAIVER OF JURY TRIAL. LENDER AND THE UNDERSIGNED HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, LAWSUIT OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO: I) THIS GUARANTY OR ANY SUPPLEMENT OR AMENDMENT THERETO; OR II) ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND THE UNDERSIGNED; OR III) ANY BREACH, CONDUCT, ACTS OR OMISSIONS OF LENDER OR THE UNDERSIGNED OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSON AFFILIATED WITH OR REPRESENTING LENDER OR THE UNDERSIGNED; IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

IN WITNESS WHEREOF, the undersigned has/have executed this Guaranty.

"GUARANTOR"

By: _____        Date: _1-19-07_
        Nazim S.M. Faquiryan

SS#: ██████████

Address of Guarantors: 783 Antiquity Dr., Fairfield, California 94535

BP 01564

ACKNOWLEDGMENT

State of California            )
County of *San Benito* )

On  *1/19/07*  before  me,  *Mina Faquiryan*  personally  appeared
*Nazim SM Faquiryan* ¿ personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

> MINA FAQUIRYAN
> Commission # 1494761
> Notary Public - California
> Santa Clara County
> My Comm. Expires Jun 13, 2008

BP 01565

82461guaranty Nazim Faquiryan1                6