EXHIBIT 6

1    **BAKER, MANOCK & JENSEN**
    A PROFESSIONAL CORPORATION
2    FIG GARDEN FINANCIAL CENTER
    5260 NORTH PALM AVENUE, FOURTH FLOOR
    FRESNO, CALIFORNIA 93704-2209
3    TELEPHONE (559) 432-5400
    TELECOPIER (559) 432-5620

4

5    Attorneys for    Defendants

6

7

8            UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10

11  BP WEST COAST PRODUCTS LLC, a        )    Case No. 5:07-cv-04808 JF
    Delaware Limited Liability Company; and  )
12  ATLANTIC RICHFIELD COMPANY, a        )
    Delaware Corporation.,               )    **DEFENDANT NAZIM FAQUIRYAN'S**
13                                        )    **RESPONSE TO PLAINTIFF'S**
                        Plaintiffs,       )    **INTERROGATORIES (SET NO. ONE)**
14                                        )
         v.                              )
15                                        )
    STTN ENTERPRISES, INC., a California  )
16  Corporation; NAZIM FAQUIRYAN, an     )
    individual; SAYED FAQUIRYAN, an      )
17  individual; MAGHUL FAQUIRYAN, an     )
    individual; and AVA GLOBAL ENTERPRISE, )
18  LLC, a California limited liability company, )
                                          )
19                      Defendants.       )
                                          )
20  _____ )

21  PROPOUNDING PARTY:    Plaintiff, BP WEST COAST PRODUCTS

22  RESPONDING PARTY:    Defendant NAZIM FAQUIRYAN.

23          Defendant NAZIM FAQUIRYAN responds to Plaintiff's Interrogatories to

24  Defendant Nazim Faquiryan, Set No. One, as follows:

25          It should be noted that this responding party has not fully completed investigation of

26  the facts of this case, has not fully completed discovery in this action, and has not completed

27  preparation for trial. All of the answers contained herein are based only upon such information and

28  documents as are presently available to and specifically known to this responding party, and

                            352

disclose only those contentions which presently occur to such responding party. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to the known facts, and perhaps establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the contentions herein set forth. The following interrogatory responses are given without prejudice to responding party's right to produce evidence of any subsequently discovered fact or facts which this responding party may later recall or uncover.

INTERROGATORY NO. 1:

IDENTIFY the. percentage ownership interest YOU have or had in the STATION.

ANSWER:

51%

INTERROGATORY NO. 2:

IDENTIFY any and all other gasoline service station businesses in which YOU have or had an ownership interest.

ANSWER:

Responding Party objects that this interrogatory seeks information that is not relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the discovery of admissible evidence. In addition, Responding Party objects that this interrogatory seeks information protected by state and federal constitutional rights to privacy, is overly broad and is vague and ambiguous as to time.

INTERROGATORY NO. 3:

IDENTIFY and all businesses, corporations, and/or· fictitious business names (i.e., "dba") that are completely or partially owned by YOU and that deal with the business at the STATION.

ANSWER:

AVA Global Enterprise, Inc.

INTERROGATORY NO. 4:

IDENTIFY any and all lawsuits concerning any gasoline service stations in which

353

2

1  YOU have or had an ownership interest.

2      <u>ANSWER</u>:

3      Responding Party objects that this interrogatory seeks information that is not

4  relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

5  discovery of admissible evidence.

6      <u>INTERROGATORY NO. 5</u>:

7      IDENTIFY any and all COMMUNICATIONS between YOU and any other

8  gasoline company other than BPWCP concerning any gasoline service stations in which YOU

9  have or had an ownership interest.

10      <u>ANSWER</u>:

11      Responding Party objects that this interrogatory seeks information that is not

12  relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

13  discovery of admissible evidence.  In addition, Responding Party objects that this interrogatory

14  seeks information protected by state and federal constitutional rights to privacy, is overly broad

15  and is vague and ambiguous as to time.

16      <u>INTERROGATORY NO. 6</u>:

17      What is YOUR correct full legal name, residence address, and residence telephone

18  number?

19      <u>ANSWER</u>:

20      Nazim S.M. Faquiryan, 2585 Muirfield Way, Gilroy, CA 95020

21      <u>INTERROGATORY NO. 7</u>:

22      What is YOUR Driver' s License Number?

23      <u>ANSWER</u>:

24      Responding Party objects that this interrogatory seeks information that is not

25  relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

26  discovery of admissible evidence.  In addition, Responding Party objects that this interrogatory

27  seeks information protected by state and federal constitutional rights to privacy

28  .

354

3

1   INTERROGATORY NO. 8:

2   What is YOUR Social Security Number?

3   ANSWER:

4   Responding Party objects that this interrogatory seeks information that is not

5   relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

6   discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

7   seeks information protected by state and federal constitutional rights to privacy.

8   INTERROGATORY NO. 9:

9   What is the date and place of YOUR birth?

10   ANSWER:

11   Responding Party objects that this interrogatory seeks information that is not

12   relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

13   discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

14   seeks information protected by state and federal constitutional rights to privacy.

15   INTERROGATORY NO. 10:

16   If YOU own or have any interest in any real property, state:

17   ( a)    the address of the property;

18   (b)    the legal description;

19   (c)    when it was purchased;

20   (d)    for how much money;

21   (e)    the source of the money;

22   (f)    the outstanding debts secured by the property, i.e., mortgages, including

23   monthly payments, liens and encumbrances;

24   (g)    the current market value;

25   (h)    YOUR equity

26   (i)    whether YOU claim this property as YOUR Homestead; and

27   (j)    the correct name of the title owner as shown on the deed or other title

28   documents.

355

4

1    ANSWER:

2    Responding Party objects that this interrogatory seeks information that is not

3    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

4    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

5    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

6    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

7    of harassment.

8    INTERROGATORY NO. 11:

9    If YOU own or have any interest in any vehicles, boats or airplanes, stated:

10    (a)    the year, make and model;

11    (b)    where it is located, garaged or kept;

12    ( c)     when it was bought and for how much;

13    (d)    the amount of outstanding debts or liens that are secured by the vehicle, boat

14    or airplane;

15    (e)    the current fair market value;

16    (f)    YOUR equity;

17    (g)     the correct name shown on the registration documents; and

18    (h)    the use YOU make of this item.

19    ANSWER:

20    Responding Party objects that this interrogatory seeks information that is not

21    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

22    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

23    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

24    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

25    of harassment.

26

27    INTERROGATORY NO. 12:

28    If anyone owes YOU money for debts, notes or on accounts receivable, state:

356

DEFENDANT NAZIM FAQUIRYAN'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1     (a)    the name and address of the person who owes YOU money;

2     (b)    the amount due;

3     (c)    the date due;

4     (d)    the date of billing;

5     (e)    any special payment terms;

6     (f)    if YOU hold any security for such debt and, if so what; and

7     (g)    if there is any dispute about payment, describe it.

8     ANSWER:

9     Responding Party objects that this interrogatory seeks information that is not

10    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

11    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

12    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

13    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

14    of harassment.

15

16    INTERROGATORY NO. 13:

17    If YOU have unbilled services completed forc l ients or customers, state the name,

18    address and amount of each.

19    ANSWER:

20    Responding Party objects that this interrogatory seeks information that is not

21    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

22    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

23    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

24    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

25    of harassment.

26

27    INTERROGATORY NO. 14:

28    If YOU are presently employed or in any business (including, but not limited to, a

357

DEFENDANT NAZIM FAQUIRYAN'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

partnership, corporation, limited liability partnership, and/or limited liability corporation), for each employer or business, state:

        (a)    the name and address of any such employer or business;

        (b)    YOUR salary and date of payment;

        ( c )    ownership (partnership or corporate) interest;

        (d)    bonus;

        (e)    commissions;

        (f)    any accrued but unpaid amount due; and

        (g)    the amount of any arrears.

ANSWER:

Responding Party objects that this interrogatory seeks information that is not relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory seeks information protected by state and federal constitutional rights to privacy.  This interrogatory appears to be in the nature of a debtors examination and is apparently propounded for the purpose of harassment.

INTERROGATORY NO. 15:

If YOU have any furniture, fixtures, equipment, books or inventories, describe each in detail.

ANSWER:

Responding Party objects that this interrogatory seeks information that is not relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory seeks information protected by state and federal constitutional rights to privacy.  This interrogatory appears to be in the nature of a debtors examination and is apparently propounded for the purpose of harassment.

INTERROGATORY NO. 16:

If YOU have any part-time employment, please explain, including any income

1    derived therefrom.

2    ANSWER:

3    Responding Party objects that this interrogatory seeks information that is not

4    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

5    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

6    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

7    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

8    of harassment.

9    INTERROGATORY NO. 17:

10    If YOUR spouse is employed, state:

11    (a)    the name and address of YOUR spouse's employer;

12    (b)    salary or compensation YOUR spouse receives;

13    (c)    date or time of payments and amount YOUR spouse receives;

14    (d)    where YOUR spouse's compensation is deposited; and

15    (e)    whether YOU. have any prenuptial or post-nuptial agreements which alter

16    community property rights.

17    ANSWER:

18    Responding Party objects that this interrogatory seeks information that is not

19    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

20    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

21    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

22    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

23    of harassment.

24    INTERROGATORY NO. 18:

25    If YOU have any checking accounts, savings accounts, money market accounts,

26    stock accounts, credit union accounts or other deposit accounts in YOUR own name or jointly with

27    any other PERSONS, state where the account is maintained, the address, the account number and

28    amount of present balance, and the name and address of any co-depositor.

359

8

1    ANSWER:

2        Responding Party objects that this interrogatory seeks information that is not

3    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

4    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

5    seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

6    appears to be in the nature of a debtors examination and is apparently propounded for the purpose

7    of harassment.

8    INTERROGATORY NO. 19:

9        If YOU maintain a safe deposit box, state the location, the number and the contents.

10

11    ANSWER:

12        Responding Party objects that this interrogatory seeks information that is not

13    relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

14    discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

15    seeks information protected by state and federal constitutional rights to privacy time.  This

16    interrogatory appears to be in the nature of a debtors examination and is apparently propounded for

17    the purpose of harassment.

18    INTERROGATORY NO. 20:

19        State a full description, a statement as to the value of such asset, and the location of

20    the asset, of each of the following items YOU own:

21        (a)    a stamp collection;

22        (b)    gun collection;

23        (c)     tool collection;

24        (d)    coin collection;

25        ( e)    precious metals;

26        (f)    art;

27        (g)    antiques;

28        (h)     trusts;

360

DEFENDANT NAZIM FAQUIRYAN'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1        (i)    commodity accounts or commodities;

2        (j)    notes secured by trust deeds;

3        (k)    certificates of deposit;

4        (l)    commercial paper;

5        (m)    options on real estate of personal property;

6        (n)    pension plan;

7        (o)    IRA or Keogh accounts;

8        (p)    401k or other retirement accounts; and

9        (q)    any other property of value not otherwise mentioned?

10        ANSWER:

11        Responding Party objects that this interrogatory seeks information that is not

12 relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

13 discovery of admissible evidence.   In addition, Responding Party objects that this interrogatory

14 seeks information protected by state and federal constitutional rights to privacy.  This interrogatory

15 appears to be in the nature of a debtors examination and is apparently propounded for the purpose

16 of harassment.

17        INTERROGATORY NO. 21:

18        State any and all facts to support all denials in YOUR ANSWER.

19        ANSWER:

20        Under the PMPA, a refiner/distributor such as BP can terminate a franchise

21 relationship only for the grounds specified in the PMPA.  Moreover, even where sufficient

22 grounds exist to justify termination, the refiner/distributor must also provide notice in the form

23 specifically prescribed by the PMPA.   If a termination is deficient as to either of these

24 requirements, the termination is deemed unlawful and the franchisee is entitled to a variety of

25 remedies, including injunctive relief, damages, attorneys' fees, and punitive damages.  Under the

26 PMPA, the burden is on the franchisor to establish that the termination of the franchise

27 relationship complied with the provisions of the PMPA.

28        For franchise agreements executed after June 19, 1978, there are four grounds

361

10

DEFENDANT NAZIM FAQUIRYAN'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1   permitting the franchisor to terminate the relationship, and two such grounds are implicated here.

2   First, if the franchisee fails to comply with any provision of the franchise agreement, the franchisor

3   may terminate the agreement so long as the violated provision is both "reasonable" and "of

4   material significance to the franchise relationship." Significantly, under the PMPA, the term

5   "failure" does not include any failure that is only technical or unimportant to the franchise

6   relationship, any failure for a cause that is beyond the control of the franchisee, or any failure

7   based on a provision that is illegal or unenforceable. Second, the franchisor may terminate the

8   relationship upon the occurrence of some event which is relevant to the franchise relationship, and

9   as a result of the occurrence, termination is reasonable.

10          Here, Plaintiffs cite two grounds for termination. First, Plaintiffs claim that

11  Defendants failed to have any fuel available for purchase to the motoring public for a period of

12  seven consecutive days. However, there was fuel available during the period in question.

13  Moreover, to the extent that Defendants failed to have a certain grade of gasoline available, this

14  failure was due solely to Plaintiffs' own failure to comply with the various agreements, including

15  the loan and gasoline agreements. As such, Defendants did not fail to have any gasoline for sale

16  for seven consecutive days as envisioned by the PMPA.

17          The second ground for termination cited by Plaintiffs was the Defendants alleged

18  failure to timely pay all sums due. However, with the exception of a disputed invoice, Defendants

19  were current on all payment arrangements (C.O.D. with extra payments to amortize the balance

20  owed) at the time of termination. Moreover, Defendants had a cashiers' check ready to tender to

21  Plaintiffs upon their delivery of fuel, but Plaintiffs simply refused to deliver anything. Finally,

22  STTN had offered to pay the balance through an escrow which would provide for simultaneous

23  loan funding, but BP failed to perform. Additionally, and to the extent that Defendants failed to

24  make any payments as scheduled, that failure was due solely to Plaintiffs' own breach of the

25  various loan agreements. As such, Defendants did not fail to timely pay all sums due as defined by

26  the PMPA.

27          Since the failures cited by Plaintiffs are not failures as defined by the PMPA, they are not

28  proper grounds for termination. And since the grounds for termination do no satisfy the PMPA,

362

11

1    the termination is clearly unlawful.

2              A valid termination under the PMPA must also comply with the notice

3    requirements.  Typically, a franchisor must provide notice of at least 90 days and the notice must

4    be: (1) in writing; (2) sent via certified mail or personally delivered to the franchisee; and (3)

5    contain a statement of intent to terminate the relationship and the reasons for the termination, the

6    effective date of the termination, and a summary statement of the rights and responsibilities of any

7    party under the PMPA.  Franchisors may give less than 90 days notice in circumstances in which it

8    would not be reasonable.  Significantly, if the notice of termination does not satisfy the

9    requirements of the PMPA, the termination is unlawful.  Under the PMPA, BP was required to

10   give at least 90 days notice of its intent to terminate unless it would not be reasonable for BP to

11   furnish 90 days notice.  The 90 day notice provision is not lightly excused.  The 90 day notice

12   requirement is not an all or nothing requirement that permits no notice at all when 90 days would

13   be unreasonable.  Indeed, the legislative history and Congressional hearings conducted in drafting

14   the PMPA indicate that  2804(b)(1)(A) was added to dispense with the lengthy notice requirement

15   where, for example, a franchisee committed <u>serious</u> defaults of the franchise agreement, such as

16   misbranding.

17             As noted above, BP terminated the franchise with no notice whatsoever.  In its

18   notice of termination, BP states that it would not be reasonable for BPWCP to furnish notification

19   of 90 days prior to the date of termination because of the risk of confusion to the public as well as

20   possible safety risks.  While confusion to the public and safety risks may or may not justify an

21   accelerated notice schedule in limited circumstances, there is no evidence in this case that there

22   was any risk of confusion to the public, nor is there any evidence to suggest that the station was a

23   safety hazard.  Indeed, BP terminated the agreement, in part, because there was allegedly no gas

24   being sold at the station.  If Defendants were not selling gas, there would be little risk of confusion

25   to the public.  Nor do any cases addressing this issue recognize an immediate termination notice as

26   reasonable where the franchisee merely owed money.   As such, BP's  immediate termination of

27   the franchise relationship clearly violates the PMPA.

28             Plaintiffs breach of the loan agreements prevented defendants' performance.  In

363                                      12

1   their First Amended Complaint, Plaintiffs present claims based on Defendants alleged breach of

2   various contracts.  However, to the extent that the Defendants failed to comply with any material

3   provision of the contract in question, that failure was the direct and proximate result of Plaintiffs

4   own breach of the agreements.  There is in every contract an implied covenant that neither party

5   will do anything to destroy or injure the right of the other party to receive the benefits of the

6   contract.  This is known as the implied covenant of good faith and fair dealing.  Under this

7   covenant, each party has a duty to do everything that the contract presupposes he or she will do to

8   accomplish the purpose of the contract and the duty not to prevent or hinder the performance by

9   the other party.  It follows that performance is excused when prevented or rendered impossible by

10  the acts of the opposite party and similarly operates as a defense to an action for breach of contract.

11  In this case, the Gasoline and Mini-Market Agreements are silent as to the Loan Agreement.

12  However, it is well settled that all agreements should be considered together where the nature and

13  character of the agreements show that they were part of the same transaction, as is the case here

14  Additionally, pursuant to the implied covenant of good faith and fair dealing, BP was under a duty

15  to not prevent STTN from performing under the Agreements.  In spite of this covenant, Plaintiffs

16  breached their agreement to help finance the re-construction of the Station.  Plaintiffs did so

17  knowing that Defendants had to undertake immediate construction and knowing that the

18  contractors would demand payment.  Indeed, Plaintiffs encouraged Defendants to continue

19  construction despite Plaintiffs refusal to fund the loan.  Moreover, Plaintiffs were to fund the gas

20  loan according to the schedule attached to the loan.   To date, Plaintiffs have failed to make all

21  required  payments, despite the Stations completion and despite the agreed upon disbursement

22  schedule.  Thus, to the extent that Defendants failed to comply with any of the contracts at issue

23  specifically the failure to pay money and to purchase gasoline  that failure was solely the result of

24  Plaintiffs own breach of the loan agreements.

25         Defendants have not infringed on plaintiffs' protected marks.Plaintiffs' also assert

26  infringement against the defendants.  A plaintiff asserting trademark infringement must establish

27  both (1) that it has a protectable ownership interest in the mark; and (2) that the defendants use of

28  the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to

1    the mark. When a plaintiff has an unregistered trademark, the presumption of validity is

2    inapplicable, and the plaintiff must establish its protectable interest. Trademarks fall into five

3    categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. The latter

4    three are automatically entitled to protection, as they require a mental leap between the mark and

5    the object referenced. By contrast, generic and descriptive terms refer[ ] to the type or species of

6    the product at issue. Trademark protection does not extend to generic marks, and only extends to

7    descriptive marks that have acquired secondary meaning in the minds of consumers. Despite

8    Plaintiffs claims to the contrary, the simple fact is that, once the Station was wrongfully de-

9    branded, Defendants did not use any protected marks, aside from the display on the 6 inch

10    computer screen on the PIC machines for a short period of time until those were changed.

11    Plaintiffs claim proprietary rights to the following items, although the marks are unregistered. As

12    noted above, because the marks are unregistered, Plaintiffs must demonstrate that they have a

13    protectable interest in the marks in order to succeed in their claims. Plaintiffs cannot show that the

14    marks are protectable. The marks are simply generic marks that have not attained secondary

15    meaning.

16         The Fill Smart" words on the PIC machine pay screen actually is a protected mark,

17    but it is not registered to Plaintiffs. Instead, it is registered to Hallum, Inc., a corporation in

18    Flagstaff, Arizona. Moreover, Plaintiffs cannot demonstrate that the phrase has acquired

19    secondary meaning that relates to Plaintiffs goods or services. Thus, Plaintiffs have no protectable

20    interest in the words Fill Smart" In fact, Plaintiffs use of this mark may be infringement. The

21    Crunch Cube graphics are also generic and Plaintiff cannot show that the graphics have acquired

22    the secondary meaning entitling it to protection. Moreover, when BP de-branded the Station, it

23    painted over portions of the Crunch Cube graphics, but chose to leave the rest of the graphics in

24    place. Clearly, BPs decision not to remove the rest of the graphics is an admission that they

25    graphics are not a protectable interest. The AM/PM Coffee Graphics is simply a coffee cup with

26    beans. Indeed, employees from BP painted over portions of the coffee graphics when they

27    conducted the de-brand, but elected to leave the rest of the coffee graphics intact. Clearly, if the

28    coffee graphics constituted a protectable interest of BP, the individuals trained specifically to

365                 14

destroy BPs marks would have also painted over the rest of the cup. Their decision not to destroy

the graphics is an admission that the graphics are not a protectable interest. The "hamburger

graphic is nothing more than a hamburger painting. To qualify for protected status, Plaintiff must

show that the hamburger is more than a generic hamburger. In any event, the BP de-branding

squad elected to leave the hamburger in place. Presumably, if it was a protectable interest, they

would have painted it over it, as they did with other marks. Plaintiffs also claim a protectable

interest in the blue light stripe on the fuel canopy. This is nothing more than a generic blue neon

light. It is similar to those used by other gasoline companies, such as Chevron, Marathon, and

countless other independent stations. Like the coffee and hamburger marks, this was left behind

after the BP employees de-branded the Station. And, as with the other marks, Plaintiffs cannot

make even a rudimentary showing that the mark is entitled to protection. Plaintiffs also claim

protection over the orange neon light stripe on the convenience store. This light stripe is nothing

more than a generic orange neon light, similar to that used by other gasoline stations, including 76

and untold other independent stations. This light was also left behind by the BP employees, and

like the blue light, Plaintiffs cannot make even a rudimentary showing that the mark is entitled to

protection.

INTERROGATORY NO. 22:

State any and all facts to support all affirmative defenses in YOUR ANSWER.

ANSWER:

See response to Interrogatory No. 21.

INTERROGATORY NO. 23:

State any and all facts to support all denials in YOUR responses to any of the

Requests for Admissions, Set One, served concurrently herewith.

ANSWER:

See response to Interrogatory No. 21.

INTERROGATORY NO. 24:

IDENTIFY any and all PERSONS with knowledge of any of the facts stated in

YOUR responses to the preceding interrogatories.

366

15

1       ANSWER:

2       Sayed Faquiryan, Nazim Faquiryan, Mina Faquiryan, Al Fortune, Chris A. Johnson

3  of Omni Financial, Barbara Jones, Thomas Reeder, Brad Christensen, Don Strenk, Cheryl Heath,

4  Priscilla "Jean" Smith, Maria Wilson, Kenneth Wickerham, Cecile McDonald, Michael Hagar,

5  McClane Supply, FMI, DeRosa Sales, the debranding squad from BP, various contractors and

6  construction workers identified in the documents produced herewith.

7       INTERROGATORY NO. 25:

8       IDENTIFY any and all DOCUMENTS to support the facts stated in YOUR

9  responses to the preceding interrogatories.

10       ANSWER:

11       Pursuant to FRCP, Rule 33(d), Plaintiffs are directed to the purchase orders,

12  invoices, cancelled checks and emails produced by responding party with it Response to request

13  for Production of Documents.

14  DATED: April  2 , 2008.

15                          BAKER, MANOCK & JENSEN

16

17                          By _____

18                          John G. Michael

19                          Attorney for Defendants and Counter Claimants
                        STTN ENTERPRISES, INC., NAZIM

20                          FAQUIRYAN, SAYED FAQUIRYAN,
                        MAGHUL FAQUIRYAN, and AVA

21                          GLOBAL ENTERPRISE, LLC

22

23  @PFDesktop\::ODMA/MHODMA/DMS;DMS;606041;1
   14366.0001

24

25

26

27

28

     367

# VERIFICATION

STATE OF CALIFORNIA

COUNTY OF SAN BENITO

I have read the foregoing **DEFENDANT NAZIM FAQUIRYAN'S RESPONSE TO PLAINTIFF'S INTERROGATORIES (SET NO ONE)** and know its contents.

☐  CHECK APPLICABLE PARAGRAPHS

☒ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am ☐ an Officer ☐ a partner _____ ☐ a _____, of _____ , a party to this action, and am authorized to make this verification for and on their behalf, and I make this verification for that reason. ☐  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am one of the attorneys for _____, a party to this action. Such parties are absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of these parties for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on April ___, 2008, at Fresno, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Nazim Faquiryan                              _____
                                                              Signature

368

PROOF OF SERVICE
CCP §§ 1011, 1013, 1013a, 2015.5
FRCP 5(b)

STATE OF CALIFORNIA, COUNTY OF FRESNO

I am employed in the County of Fresno, State of California. I am over the age of 18 and not a party to the within action; my business address is 5260 North Palm Avenue, Suite 421, Fresno, California 93704-2209.

On **April 2, 2008**, I served the document described as **DEFENDANT NAZIM FAQUIRYAN'S RESPONSE TO PLAINTIFF'S INTERROGATORIES (SET NO. ONE)** on the interested parties in this action ☒ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list: ☐ by placing ☐ the original ☐ a true copy thereof enclosed in sealed envelopes addressed as follows:

Ms. Deborah Y. Jones
Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
(213) 576-1000
Facsimile No. (213) 576-1100

☒ **BY MAIL**     ☐ I deposited such envelope in the mail at Fresno, California. The envelope was mailed with postage thereon fully prepaid.

☒ As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Fresno, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the addressee.

☒ (BY FAX) I caused the above-referenced document to be transmitted by fax to the addressee(s) at the fax number(s) shown.

☐ (BY OVERNIGHT COURIER) I caused the above-referenced envelope(s) to be delivered to an overnight courier service for delivery to the addressee(s).

Executed on **April 2, 2008**, at Fresno, California.

☒ (State)     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal)     I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

_____
Lynda Phillips
Signature

@PFDesktop\::ODMA/MHODMA/DMS;DMS;582296;1
15678.0003

369

EXHIBIT 7

John G. Michael            #106107

1

BAKER, MANOCK & JENSEN
A PROFESSIONAL CORPORATION
FIG GARDEN FINANCIAL CENTER
5260 NORTH PALM AVENUE, FOURTH FLOOR
FRESNO, CALIFORNIA 93704-2209
Telephone (559) 432-5400
Telecopier (559) 432-5620

2

3

4

5    Attorneys for    Defendants

6

7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10

11   BP WEST COAST PRODUCTS LLC, a          )    Case No. 5:07-cv-04808 JF
     Delaware Limited Liability Company; and )
12   ATLANTIC RICHFIELD COMPANY, a          )
     Delaware Corporation.,                  )    **DEFENDANT STTN ENTERPRISES,**
13                                           )    **INC.'S RESPONSE TO PLAINTIFF'S**
                            Plaintiffs,      )    **INTERROGATORIES (SET NO. ONE)**
14                                           )
                     v.                      )
15                                           )
     STTN ENTERPRISES, INC., a California    )
16   Corporation; NAZIM FAQUIRYAN, an        )
     individual; SAYED FAQUIRYAN, an         )
17   individual; MAGHUL FAQUIRYAN, an        )
     individual; and AVA GLOBAL ENTERPRISE, )
18   LLC, a California limited liability company, )
                                             )
19                           Defendants.     )
                                             )
20   _____ )

21   PROPOUNDING PARTY:    Plaintiff, BP WEST COAST PRODUCTS

22   RESPONDING PARTY:     Defendant STTN ENTERPRISES, INC.

23           Defendant STTN ENTERPRISES, INC.  responds to Plaintiff's Interrogatories to

24   Defendant STTN Enterprises, Set No. One,  as follows:

25           It should be noted that this responding party has not fully completed investigation of

26   the facts of this case, has not fully completed discovery in this action, and has not completed

27   preparation for trial.  All of the answers contained herein are based only upon such information and

28   documents as are presently available to and specifically known to this responding party, and

                                        370

_____

**DEFENDANT STTN ENTERPRISES INC.'S  RESPONSE TO**
**PLAINTIFF'S INTERROGATORIES (SET NO. ONE)**

1    disclose only those contentions which presently occur to such responding party. It is anticipated

2    that further discovery, independent investigation, legal research and analysis will supply additional

3    facts, add meaning to the known facts, and perhaps establish entirely new factual conclusions and

4    legal contentions, all of which may lead to substantial additions to, changes in and variations from

5    the contentions herein set forth. The following interrogatory responses are given without prejudice

6    to responding party's right to produce evidence of any subsequently discovered fact or facts which

7    this responding party may later recall or uncover.

8        INTERROGATORY NO. 1:

9        IDENTIFY all PERSONS who work or have worked at the STATION.

10       ANSWER:

11       Objection, this interrogatory is vague and ambiguous as to time. In addition, to the

12   extent that it seeks the identity of present employees who did not work at the station during the

13   relevant time period, this interrogatory seeks information that is not relevant to any claim or

14   defense in this lawsuit nor is it reasonable calculated to lead to the discovery of admissible

15   evidence. Without waiving the foregoing objections, the identities of the people who worked at

16   the station during the time period of April 1, 2006 through October 31, 2007 are as follows:

17       Francisco S. Ruiz

18       Alison C. Saber

19       Jose L. Gurrola

20       Yadira Zandejas

21       Laura Drnelas

22       Mina Faquiryan

23       Tamim S. Faquiryan

24       Mohammad Ali Sardar

25       Diana (last name to be provided)

26       Susana G. Leviro

27       Estella Gurrola

28

371

2

1    INTERROGATORY NO. 2:

2        IDENTIFY any and all PERSONS, including but not limited to YOUR accountants,

3    bookkeepers, or financial advisors, who reviewed, kept, maintained, prepared, and/or revised any

4    financial records of the STATION.

5        ANSWER:

6        Steven W. Schnur

7        3130 Impala Drive, Suite 101

8        San Jose, CA 95117

9        (408) 374-9410

10    INTERROGATORY NO. 3:

11        IDENTIFY any and all PERSONS, including but not limited to YOUR general

12    contractors, sub-contractors, or architects, who performed any work on YOUR behalf at the

13    STATION in order to convert the STATION into an ARCO-branded gasoline station and an

14    am/pm Mini market convenience store.

15        ANSWER:

16        Pursuant to FRCP, Rule 33(d), Plaintiffs are directed to the purchase orders,

17    invoices, cancelled checks and emails produced by responding party with it Response to request

18    for Production of Documents.

19    INTERROGATORY NO. 4:

20        State any and all facts to support YOUR contention that BPWCP committed

21    "numerous delays and breaches . . . of the agreements between the parties," as alleged at Paragraph

22    27 of YOUR ANSWER.

23        ANSWER:

24        Prior to July 2006, STTN, operated a Chevron-branded motor fuel station at 631

25    San Felipe Road, in Hollister, California (the "Station"). STTN profitably operated the Station

26    and enjoyed a good business relationship with Chevron. However, that relationship was coming to

27    an end and STTN was looking to re-brand the station. At some point before May 2006, STTN was

28    approached by employees of BP, and/or ARCO (collectively "Plaintiffs"). During those

372

3

1    conversations, Plaintiffs asked to purchase the Station from STTN or for STTN to brand the

2    Station as an ARCO.  Terms could not be agreed upon and STTN rejected the purchase offer and

3    agreed to re-brand the Station into an ARCO-branded station.  To effectuate the transition to an

4    ARCO-branded motor fuel station, BP offered STTN a self-amortized loan package in the amount

5    of $475,000.  In essence, so long as STTN sold a specified amount of product annually, a portion

6    of the debt would deemed repaid each year by BP.  On May 25, 2006, BP provided a Commitment

7    Letter to STTN in the sum of $475,000.

8           On July 11, 2006, BP and STTN entered into two franchise agreements.  The

9    purpose of these agreements was for STTN to sell ARCO-branded motor fuel as well as to operate

10    an AM/PM convenience store at the Station.  The agreements required STTN to be operating as an

11    ARCO-branded motor fuel station by April 11, 2007.  The parties agreed that the Station would be

12    operated as a "gas only" station starting October 10, 2006, until the Mini Market was completed.

13           In order to comply with the construction schedule promulgated by BP, STTN was

14    forced to begin reconstruction on the Station immediately.  BP worked closely with STTN

15    throughout the construction phase by approving site plans, contractors, architects, and informing

16    STTN of deficiencies.  BP also knew that the Station was a re-brand, not a new, ground-up facility.

17    STTN worked diligently to satisfy all of BP's requirements.  Indeed, STTN spent of $790,000 of

18    its own funds to remodel the Station.  BP did not finalize its loan agreements until February 12,

19    2007.  The loan was to be disbursed according to the various schedules accompanying the loan

20    documents, including the proposed budget and the disbursement schedule.  Despite its close

21    involvement with the process, and despite having made a commitment to assist STTN in the

22    construction of the Station, BP consistently refused to provide any loan funds to STTN.

23           As a result of BP's breach of its obligations under the loan agreements, while at the

24    same time requiring STTN to continue construction and purchase motor fuel, STTN was unable to

25    pay some of its contractors on time.  Mechanics liens were then filed by certain contractors.

26    However, as of July 7, 2007, STTN completely paid off all liens on the Station.  Still, BP refused

27    to comply with the loan agreements.  During this same time period, because of STTN's working

28    capital was tied up in construction costs awaiting reimbursement from BP, STTN fell behind in its

373

4

1  payments for gasoline delivery and was put on a cash-on-delivery basis.

2      BP eventually paid $150,000.00 of the loan in July 2007. However, the remaining

3  $250,000.00 of the loan funds then due were not disbursed by BP. STTN demanded disbursement

4  of said funds to pay off the creditors of the project and replenish its working capital, but BP

5  refused, claiming that it lacked all of the required documents. STTN asked for clarification as to

6  which documents were missing, and BP simply refused to inform STTN of the missing documents.

7  At the same time, BP demanded that STTN continue to purchase gasoline. Being forced to use its

8  operating capital to satisfy the construction debts due to BP's refusal to disburse the loan, STTN

9  asked that BP enter into an escrow agreement whereby STTN would place the remaining money

10  due for fuel into escrow and BP would similarly place the loan funds in escrow. BP initially

11  agreed to this request, but later failed to place the loan funds in escrow without explanation.

12  Indeed, even as of August 31, 2007, BP offered STTN reassurances that all the information needed

13  to fund the loans was in BP's possession and the funds would be disbursed soon.

14      On August 31, 2007, BP sent seven notices of default to STTN, each alleging that

15  STTN failed to offer any grade of motor fuel for sale to the public on a specified date. However,

16  STTN sold 91 octane and diesel gasoline during the relevant dates cited by BP. Moreover, STTN

17  could not sell 87 and 89 octane gasoline for part of the relevant period because BP refused to

18  deliver any motor fuel to the Station, despite STTN obtaining and offering a cashier's check to

19  tender upon delivery.

20      On September 6, 2007, BP terminated the franchise agreement. In so doing, it cited

21  (1) STTN's failure to offer any grade of motor fuel to the motoring public for a period of seven

22  consecutive days and (2) STTN's failure to pay all sums when due. Rather than give the 90 days

23  notice that is typically required under the PMPA, and without any factual basis thereof, BP cited

24  risk of confusion to the public and safety risks as justifying an immediate termination of the

25  franchise agreement. As such, the franchise relationship was allegedly terminated on September 6,

26  2007.

27      On September 17 and 18, 2007, BP sent multiple agents to "de-brand" the Station.

28  As part of the de-branding process, BP removed, destroyed, re-painted, or otherwise obliterated

374

5

1   any registered trademark or proprietary information belonging to BP. STTN, while maintaining

2   that the franchise agreement was terminated illegally, cooperated with BP during the de-branding

3   process.

4   INTERROGATORY NO. 5:

5   State any and all facts to support YOUR contention that "STTN was approached by

6   employees of [BPWCP] ... and/or [ARCO]" and that BP\VCP "asked to purchase the Station from

7   STTN or for STTN to brand the Station as an ARCO," as alleged at Paragraph 162 of the

8   COUNTERCLAIM.

9   ANSWER:

10   Prior to May of 2006, Ken Wickerham and Rima Thadha discussed the various

11   ways in which the station could be re-branded to Arco. During those conversations, Ken

12   Wickerham inquired whether STTN would be interested in selling the station to BP. Price was

13   discussed, but an agreement was not reached and STTN rejected the idea of a sale. Discussion

14   continued regarding a re-branding, resulting in the various agreements between the parties.

15   INTERROGATORY NO. 6:

16   State any and all facts to support YOUR contention that YOU and BPWCP "orally

17   agreed that the Station would be operated as a 'gas only' station starting October 10, 2006, until the

18   Mini Market was completed," as alleged at Paragraph 165 of the COUNTERCLAIM.

19   ANSWER:

20   This agreement was both oral and written. This was discussed between Sayed

21   Faquiryan and the woman who took Ken Wickerham's place when he retired and Brad Cristensen.

22   INTERROGATORY NO. 7:

23   State any and all facts to support YOUR contention that YOU were "forced to begin

24   construction on the Station immediately," as alleged at Paragraph 166 of the COUNTERCLAIM.

25   ANSWER:

26   In order to comply with the construction schedule promulgated by BP, STTN was

27   forced to begin reconstruction on the Station immediately. Ken Wickerham told Mr. Faquiryan

28   that the station must open on time and that construction must be started in January, 2007. He told

375

6

1  Mr. Faquiryan to start construction and not to worry about the money, that BP would supply the

2  loans.  Construction was started on January 2, 2007.  Mr. Christensen and Mr. Wickerham were

3  present at the start of construction.

4       INTERROGATORY NO. 8:

5       State any and all facts to support YOUR contention that YOU "worked diligently to

6  satisfy all of BPWCP's requirements and spent over $790,000 of [YOUR] own funds to remodel

7  the Station," as alleged at Paragraph 167 of the COUNTERCLAIM.

8       ANSWER:

9       From approximately May, 2006, when BP's commitment letter issued, STTN

10  started working with engineers on the conversion of the station to an Arco station.  From that point

11  forward, STTN worked with its general contractor, subcontractors, equipment dealers, and others

12  to diligently complete the construction required for the conversion, eventually spending over

13  $790,000 of its own funds.

14       INTERROGATORY NO. 9:

15       State any and all facts to support YOUR contention that BPWCP "consistently

16  refused to provide any loan funds to STTN," as alleged at Paragraph 169 of the

17  COUNTERCLAIM.

18       ANSWER:

19       BP refused to fund the loans until July, 2007, when it partially funded the amount

20  of $150,000.

21       INTERROGATORY NO. 10:

22       State any and all facts to support YOUR contention that YOU asked for

23  clarification as to which documents were missing, and BPWCP "simply refused to inform STTN

24  of the missing documents," as alleged at Paragraph 174 of the COUNTERCLAIM.

25       ANSWER:

26       STTN worked with Cile McDonald and Prescilla Smith to provide all

27  documentation required.  When Mr. Faquiryan would inquire about whether anything was missing,

28  he was told "we'll let you know."  He was never given a list of any documentation that was still

DEFENDANT STTN ENTERPRISES INC.'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1  needed to close the gas loan. In fact, he was told by Mike Hagar that all documentation had been

2  provided and the loan would fund in the near future.

3      INTERROGATORY NO. 11:

4      State any and all facts to support YOUR contention that BPWCP "initially agreed

5  to the escrow request, but later failed to place the loan funds in escrow without explanation," as

6  alleged at Paragraph 177 of the COUNTERCLAIM.

7      ANSWER:

8      There was an agreement between Sayed Faquiryan and Tom Reeder and Mike

9  Hagar that BP would place the gas loan funds in escrow and that STTN would place the gas money

10  in the same escrow, which was to close upon both parties' deposits being received by the escrow

11  company. Mr. Faquiryan informed BP that STTN would be borrowing the necessary funds to pay

12  for the gas and that, due to previous delays by BP, STTN did not want to borrow the money before

13  BP placed its funds in escrow, because then, those funds would be tied up and interest expense

14  would accrue. BP, however, never placed its funds into the escrow for the purported reason that

15  STTN did not deposit its funds..

16      INTERROGATORY NO. 12:

17      State any and all facts to support YOUR contention that BPWCP "offered STTN

18  reassurances that all the information needed to fund the loans was in [BPWCP's] possession and

19  the funds would be disbursed soon," as alleged at Paragraph 178 of the COUNTERCLAIM.

20      ANSWER:

21      Both Mike Hager and Jean Smith indicated this shortly before BP terminated the

22  agreements..

23      INTERROGATORY NO. 13:

24      State any and all facts to support YOUR contention that BPWCP "refused to deliver

25  any motor fuel to the Station, despite STTN obtaining and offering a cashier's check to tender upon

26  delivery," as alleged at Paragraph 190 of the COUNTERCLAIM.

27      ANSWER:

28      On August 21, 2007, Mr, Faquiryan was told he needed to buy gas. Because nearly

1  all of his capital was tied up in construction costs due to the failure of BPWCP to fund the gas

2  loan, Mr. Faquiryan told Tom Reeder that he would have to find the money.  Mr. Reeder told Mr.

3  Faquiryan that gas would be delivered if he had a cashier's check.  He told Mr. Faquiryan to fax a

4  copy of the check to the terminal in L.A.  Mr. Faquiryan did so, but no gas was delivered.  When

5  Mr. Faquiryan inquired as to why there was no delivery, Mr. Christensen told him it was because

6  he was in breach because he did not have any gas.  Mr. Christensen would not allow STTN to cure

7  any purported breach.

8          INTERROGATORY NO. 14:

9          If YOU contend that YOU were not in default, pursuant to the Contract Gasoline

10  Dealer Agreement for failure to make available all grades of gasoline to the public for at least

11  seven consecutive days in August 2007, state any and all facts that support YOUR contention.

12          ANSWER:

13          See response to interrogatory no. 4, above

14          INTERROGATORY NO. 15:

15          IDENTIFY any and all other gasoline service station businesses in which YOU

16  have or had an ownership interest.

17          ANSWER:

18          Responding party objects that this interrogatory seeks information that is not

19  relevant to any claim or defense in this lawsuit nor is it reasonable calculated to lead to the

20  discovery of admissible evidence.

21          INTERROGATORY NO. 16:

22          IDENTIFY any and all businesses, corporations, and/or fictitious business names

23  (i.e., "dba") that are completely or partially owned by YOU and that deal with the business at the

24  STATION.

25          ANSWER:

26          None.

27          INTERROGATORY NO. 17:

28          State any and all facts to support YOUR contention that BPWCP's termination of

378

9

1    the STATION was not proper under the Petroleum Marketing Practices Act, 15 U.S.C. § 280, *et*

2    *seq.*

3                    ANSWER:

4                    On September 6, 2007, BP terminated the franchise agreement.  In so doing, it cited

5    (1) STTN's failure to offer <u>any</u> grade of motor fuel to the motoring public for a period of seven

6    consecutive days and (2) STTN's failure to pay all sums when due.  Rather than give the 90 days

7    notice that is typically required under the PMPA, and without any factual basis thereof, BP cited

8    risk of confusion to the public and safety risks as justifying an immediate termination of the

9    franchise agreement.  There <u>was</u> fuel available during the period in question.  Moreover, to the

10   extent that Defendants failed to have a certain grade of gasoline available, this failure was due

11   solely to Plaintiffs' own failure to comply with the various agreements, including the loan and

12   gasoline agreements and Plaintiff's refusal to sell gas to STTn even though it tendered a cashier's

13   check for the load it had ordered.  As such, Defendants did not fail to have any gasoline for sale for

14   seven consecutive days as envisioned by the PMPA.  The second ground for termination cited by

15   Plaintiffs was the Defendants' alleged failure to timely pay all sums due.  However, with the

16   exception of a disputed invoice, Defendants were current on all payment arrangements (C.O.D.

17   with extra payments to amortize the balance owed) at the time of termination.  Moreover,

18   Defendants had a cashiers' check ready to tender to Plaintiffs upon their delivery of fuel, but

19   Plaintiffs simply refused to deliver anything.  Finally, STTN had offered to pay the balance

20   through an escrow which would provide for simultaneous loan funding, but BP failed to perform.

21   Additionally, and to the extent that Defendants failed to make any payments as scheduled, that

22   failure was due solely to Plaintiffs' own breach of the various loan agreements.  As such,

23   Defendants did not fail to timely pay all sums due as defined by the PMPA. In addition, the notice

24   provided failed to comply with PMPA notice requirements.

25                   INTERROGATORY NO. 18:

26                   State any and all facts to support all denials in YOUR ANSWER.

27                   ANSWER:

28                   Under the PMPA, a refiner/distributor such as BP can terminate a franchise

379                                  10

1    relationship only for the grounds specified in the PMPA.  Moreover, even where sufficient

2    grounds exist to justify termination, the refiner/distributor must also provide notice in the form

3    specifically prescribed by the PMPA.   If a termination is deficient as to either of these

4    requirements, the termination is deemed unlawful and the franchisee is entitled to a variety of

5    remedies, including injunctive relief, damages, attorneys' fees, and punitive damages.  Under the

6    PMPA, the burden is on the franchisor to establish that the termination of the franchise

7    relationship complied with the provisions of the PMPA.

8              For franchise agreements executed after June 19, 1978, there are four grounds

9    permitting the franchisor to terminate the relationship, and two such grounds are implicated here.

10   First, if the franchisee fails to comply with any provision of the franchise agreement, the franchisor

11   may terminate the agreement so long as the violated provision is both "reasonable" and "of

12   material significance to the franchise relationship."  Significantly, under the PMPA, the term

13   "failure" does not include any failure that is only technical or unimportant to the franchise

14   relationship, any failure for a cause that is beyond the control of the franchisee, or any failure

15   based on a provision that is illegal or unenforceable.  Second, the franchisor may terminate the

16   relationship upon the occurrence of some event which is relevant to the franchise relationship, and

17   as a result of the occurrence, termination is reasonable.

18             Here, Plaintiffs cite two grounds for termination.  First, Plaintiffs claim that

19   Defendants failed to have any fuel available for purchase to the motoring public for a period of

20   seven consecutive days.  However, there was fuel available during the period in question.

21   Moreover, to the extent that Defendants failed to have a certain grade of gasoline available, this

22   failure was due solely to Plaintiffs' own failure to comply with the various agreements, including

23   the loan and gasoline agreements.  As such, Defendants did not fail to have any gasoline for sale

24   for seven consecutive days as envisioned by the PMPA.

25             The second ground for termination cited by Plaintiffs was the Defendants alleged

26   failure to timely pay all sums due.  However, with the exception of a disputed invoice, Defendants

27   were current on all payment arrangements (C.O.D. with extra payments to amortize the balance

28   owed) at the time of termination.  Moreover, Defendants had a cashiers' check ready to tender to

380                                    11

1   Plaintiffs upon their delivery of fuel, but Plaintiffs simply refused to deliver anything. Finally,

2   STTN had offered to pay the balance through an escrow which would provide for simultaneous

3   loan funding, but BP failed to perform. Additionally, and to the extent that Defendants failed to

4   make any payments as scheduled, that failure was due solely to Plaintiffs' own breach of the

5   various loan agreements. As such, Defendants did not fail to timely pay all sums due as defined by

6   the PMPA.

7        Since the failures cited by Plaintiffs are not failures as defined by the PMPA, they are not

8   proper grounds for termination. And since the grounds for termination do no satisfy the PMPA,

9   the termination is clearly unlawful.

10       A valid termination under the PMPA must also comply with the notice

11  requirements. Typically, a franchisor must provide notice of at least 90 days and the notice must

12  be: (1) in writing; (2) sent via certified mail or personally delivered to the franchisee; and (3)

13  contain a statement of intent to terminate the relationship and the reasons for the termination, the

14  effective date of the termination, and a summary statement of the rights and responsibilities of any

15  party under the PMPA. Franchisors may give less than 90 days notice in circumstances in which it

16  would not be reasonable. Significantly, if the notice of termination does not satisfy the

17  requirements of the PMPA, the termination is unlawful. Under the PMPA, BP was required to

18  give at least 90 days notice of its intent to terminate unless it would not be reasonable for BP to

19  furnish 90 days notice. The 90 day notice provision is not lightly excused. The 90 day notice

20  requirement is not an all or nothing requirement that permits no notice at all when 90 days would

21  be unreasonable. Indeed, the legislative history and Congressional hearings conducted in drafting

22  the PMPA indicate that 2804(b)(1)(A) was added to dispense with the lengthy notice requirement

23  where, for example, a franchisee committed <u>serious</u> defaults of the franchise agreement, such as

24  misbranding.

25       As noted above, BP terminated the franchise with no notice whatsoever. In its

26  notice of termination, BP states that it would not be reasonable for BPWCP to furnish notification

27  of 90 days prior to the date of termination because of the risk of confusion to the public as well as

28  possible safety risks. While confusion to the public and safety risks may or may not justify an

381                                12

1  accelerated notice schedule in limited circumstances, there is no evidence in this case that there

2  was any risk of confusion to the public, nor is there any evidence to suggest that the station was a

3  safety hazard. Indeed, BP terminated the agreement, in part, because there was allegedly no gas

4  being sold at the station. If Defendants were not selling gas, there would be little risk of confusion

5  to the public. Nor do any cases addressing this issue recognize an immediate termination notice as

6  reasonable where the franchisee merely owed money.  As such, BP's  immediate termination of

7  the franchise relationship clearly violates the PMPA.

8          Plaintiffs breach of the loan agreements prevented defendants' performance.  In

9  their First Amended Complaint, Plaintiffs present claims based on Defendants alleged breach of

10 various contracts.  However, to the extent that the Defendants failed to comply with any material

11 provision of the contract in question, that failure was the direct and proximate result of Plaintiffs

12 own breach of the agreements.  There is in every contract an implied covenant that neither party

13 will do anything to destroy or injure the right of the other party to receive the benefits of the

14 contract.  This is known as the implied covenant of good faith and fair dealing.  Under this

15 covenant, each party has a duty to do everything that the contract presupposes he or she will do to

16 accomplish the purpose of the contract and the duty not to prevent or hinder the performance by

17 the other party.  It follows that performance is excused when prevented or rendered impossible by

18 the acts of the opposite party and similarly operates as a defense to an action for breach of contract.

19 In this case, the Gasoline and Mini-Market Agreements are silent as to the Loan Agreement.

20 However, it is well settled that all agreements should be considered together where the nature and

21 character of the agreements show that they were part of the same transaction, as is the case here

22 Additionally, pursuant to the implied covenant of good faith and fair dealing, BP was under a duty

23 to not prevent STTN from performing under the Agreements.  In spite of this covenant, Plaintiffs

24 breached their agreement to help finance the re-construction of the Station.  Plaintiffs did so

25 knowing that Defendants had to undertake immediate construction and knowing that the

26 contractors would demand payment.  Indeed, Plaintiffs encouraged Defendants to continue

27 construction despite Plaintiffs refusal to fund the loan.  Moreover, Plaintiffs were to fund the gas

28 loan according to the schedule attached to the loan.  To date, Plaintiffs have failed to make all

382

13

1    required payments, despite the Stations completion and despite the agreed upon disbursement

2    schedule. Thus, to the extent that Defendants failed to comply with any of the contracts at issue

3    specifically the failure to pay money and to purchase gasoline  that failure was solely the result of

4    Plaintiffs own breach of the loan agreements.

5                Defendants have not infringed on plaintiffs' protected marks claim of trademark assert

6    infringement against the defendants.  A plaintiff asserting trademark infringement must establish

7    both (1) that it has a protectable ownership interest in the mark; and (2) that the defendants use of

8    the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to

9    the mark.  When a plaintiff has an unregistered trademark, the presumption of validity is

10   inapplicable, and the plaintiff must establish its protectable interest. Trademarks fall into five

11   categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful.  The latter

12   three are automatically entitled to protection, as they require a mental leap between the mark and

13   the object referenced.  By contrast, generic and descriptive terms refer[ ] to the type or species of

14   the product at issue. Trademark protection does not extend to generic marks, and only extends to

15   descriptive marks that have acquired secondary meaning in the minds of consumers.  Despite

16   Plaintiffs claims to the contrary, the simple fact is that, once the Station was wrongfully de-

17   branded,  Defendants did not use any protected marks, aside from the display on the 6 inch

18   computer screen on the PIC machines for a short period of time until those were changed.

19   Plaintiffs claim proprietary rights to the following items, although the marks are unregistered.  As

20   noted above, because the marks are unregistered, Plaintiffs must demonstrate that they have a

21   protectable interest in the marks in order to succeed in their claims.  Plaintiffs cannot show that the

22   marks are protectable.  The marks are simply generic marks that have not attained secondary

23   meaning.

24                The Fill Smart" words on the PIC machine pay screen actually is a protected mark,

25   but it is not registered to Plaintiffs.  Instead, it is registered to Hallum, Inc., a corporation in

26   Flagstaff, Arizona.  Moreover, Plaintiffs cannot demonstrate that the phrase has acquired

27   secondary meaning that relates to Plaintiffs goods or services.  Thus, Plaintiffs have no protectable

28   interest in the words Fill Smart"  In fact, Plaintiffs use of this mark may be infringement.  The

383

14

1   Crunch Cube graphics are also generic and Plaintiff cannot show that the graphics have acquired

2   the secondary meaning entitling it to protection. Moreover, when BP de-branded the Station, it

3   painted over portions of the Crunch Cube graphics, but chose to leave the rest of the graphics in

4   place. Clearly, BPs decision not to remove the rest of the graphics is an admission that they

5   graphics are not a protectable interest. The AM/PM Coffee Graphics is simply a coffee cup with

6   beans. Indeed, employees from BP painted over portions of the coffee graphics when they

7   conducted the de-brand, but elected to leave the rest of the coffee graphics intact. Clearly, if the

8   coffee graphics constituted a protectable interest of BP, the individuals trained specifically to

9   destroy BPs marks would have also painted over the rest of the cup. Their decision not to destroy

10  the graphics is an admission that the graphics are not a protectable interest. The "hamburger

11  graphic is nothing more than a hamburger painting. To qualify for protected status, Plaintiff must

12  show that the hamburger is more than a generic hamburger. In any event, the BP de-branding

13  squad elected to leave the hamburger in place. Presumably, if it was a protectable interest, they

14  would have painted it over it, as they did with other marks. Plaintiffs also claim a protectable

15  interest in the blue light stripe on the fuel canopy. This is nothing more than a generic blue neon

16  light. It is similar to those used by other gasoline companies, such as Chevron, Marathon, and

17  countless other independent stations. Like the coffee and hamburger marks, this was left behind

18  after the BP employees de-branded the Station. And, as with the other marks, Plaintiffs cannot

19  make even a rudimentary showing that the mark is entitled to protection. Plaintiffs also claim

20  protection over the orange neon light stripe on the convenience store. This light stripe is nothing

21  more than a generic orange neon light, similar to that used by other gasoline stations, including 76

22  and untold other independent stations. This light was also left behind by the BP employees, and

23  like the blue light, Plaintiffs cannot make even a rudimentary showing that the mark is entitled to

24  protection.

25          INTERROGATORY NO. 19:

26          State any and all facts to support all affirmative defenses in YOUR ANSWER.

27          ANSWER:

28          See response to Interrogatory No. 18.

384

15

INTERROGATORY NO. 20:

IDENTIFY any and all PERSONS with knowledge of any of the facts stated in YOUR responses to the preceding interrogatories.

ANSWER:

Sayed Faquiryan, Nazim Faquiryan, Mina Faquiryan, Al Fortune, Chris A. Johnson of Omni Financial, Barbara Jones, Thomas Reeder, Brad Christensen, Don Strenk, Cheryl Heath, Priscilla "Jean" Smith, Maria Wilson, Kenneth Wickerham, Cecile McDonald, Michael Hagar, Rima Thadha, Patrick Lemon, Debbie Honea at  McClane Supply, FMI, DeRosa Sales, the debranding squad from BP, various contractors and construction workers identified in the documents produced herewith.

INTERROGATORY NO. 21:

IDENTIFY any and all DOCUMENTS to support the facts stated in YOUR responses to the preceding interrogatories.

ANSWER:

Pursuant to FRCP, Rule 33(d), Plaintiffs are directed to the purchase orders, invoices, cancelled checks and emails produced by responding party with it Response to request for Production of Documents.

INTERROGATORY NO. 22:

State any and all facts to support YOUR denials in YOUR responses to any of the Requests for Admissions, Set One, served concurrently herewith.

ANSWER:

See response to Interrogatory No. 18.

INTERROGATORY NO. 23:

IDENTIFY all PERSONS with knowledge of any of the facts to support all of YOUR denials to any of the Requests for Admissions, Set One, served concurrently herewith.

ANSWER:

See response to Interrogatory No. 20, above

INTERROGATORY NO. 24:

DEFENDANT STTN ENTERPRISES INC.'S  RESPONSE TO
PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1    IDENTIFY any and all DOCUMENTS to support all of YOUR denials to any of

2   the Requests for Admissions, Set One, served concurrently herewith.

3   ///

4   ///

5   ///

6   ///

7   ///

8   ///

9   ///

10  ///

11  ///

12  ///

13

14    ANSWER:

15    Pursuant to FRCP, Rule 33(d), Plaintiffs are directed to the purchase orders,

16  invoices, cancelled checks and emails produced by responding party with it Response to request

17  for Production of Documents.

18

19  DATED: April $\geq$, 2008.

20                    BAKER, MANOCK & JENSEN

21

22

23          By _____

24          John Ø. Michael
            Attorney for Defendants and Counter Claimants
25          STTN ENTERPRISES, INC., NAZIM
            FAQUIRYAN, SAYED FAQUIRYAN,
            MAGHUL FAQUIRYAN, and AVA
26          GLOBAL ENTERPRISE, LLC

27

28

        386

                            17

_____
           DEFENDANT STTN ENTERPRISES INC.'S  RESPONSE TO
              PLAINTIFF'S INTERROGATORIES (SET NO. ONE)

1  @PFDesktop\::ODMA/MHODMA/DMS;DMS;606046;1
   14366.0001

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

387

18

# VERIFICATION

STATE OF CALIFORNIA

COUNTY OF SAN BENITO

        I have read the foregoing **DEFENDANT STTN ENTERPRISES, INC.'S RESPONSE TO PLAINTIFF'S INTERROGATORIES (SET NO ONE)** and know its contents.

        ☐ CHECK APPLICABLE PARAGRAPHS

    ☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

    ☒    I am ☒ an Officer ☐ a partner _____ ☐ a _____, of **STTN ENTERPRISES, INC**. , a party to this action, and am authorized to make this verification for and on their behalf, and I make this verification for that reason. ☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

    ☐    I am one of the attorneys for _____, a party to this action. Such parties are absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of these parties for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

        Executed on April ___, 2008, at Fresno, California.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Sayed Faquiryan _____

                                                   Signature

388

PROOF OF SERVICE
CCP §§ 1011, 1013, 1013a, 2015.5
FRCP 5(b)

STATE OF CALIFORNIA, COUNTY OF FRESNO

I am employed in the County of Fresno, State of California.  I am over the age of 18 and not a party to the within action; my business address is 5260 North Palm Avenue, Suite 421, Fresno, California 93704-2209.

On **April 2, 2008**, I served the document described as **DEFENDANT STTN ENTERPRISES, INC.'S  RESPONSE  TO  PLAINTIFF'S  INTERROGATORIES  (SET NO. ONE)** on the interested parties in this action ☒ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list: ☐ by placing ☐ the original ☐ a true copy thereof enclosed in sealed envelopes addressed as follows:

Ms. Deborah Y. Jones
Weston, Benshoof, Rochefort, Rubalcava & MacCuish LLP
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
(213) 576-1000
Facsimile No. (213) 576-1100

☒ BY MAIL     ☐ I deposited such envelope in the mail at Fresno, California.  The envelope was mailed with postage thereon fully prepaid.

☒ As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Fresno, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the addressee.

☒ (BY FAX) I caused the above-referenced document to be transmitted by fax to the addressee(s) at the fax number(s) shown.

☐ (BY OVERNIGHT COURIER) I caused the above-referenced envelope(s) to be delivered to an overnight courier service for delivery to the addressee(s).

Executed on **April 2, 2008**, at Fresno, California.

☒ (State)       I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal)     I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

_____
    Lynda Phillips
    Signature

@PFDesktop\::ODMA/MHODMA/DMS;DMS;582296;1
15678.0003

389