# EXHIBIT C

AMENDMENT TO CONTRACT
DEALER GASOLINE AGREEMENT

(Branded Diesel Fuel)
Facility: 82592
Customer Account: 0998690

THIS AMENDMENT, dated as of _____, amends the Contract Dealer Gasoline Agreement ("Agreement") dated _____, between BP West Coast Products LLC, organized in Delaware ("BPWCP") and STTN Enterprises, Inc. ("Buyer") with delivery premises at 631 San Felipe Road, Hollister, CA 95035 ("Premises").

It is hereby agreed by and between the parties that effective on the date written above or the Commencement Date of the Agreement, whichever is later, the Agreement is hereby amended to provide that except as set forthbelow, any references to "motor fuels comprising gasolines and gasoline-containing materials bearing the ARCO trademark and other identifying symbols," "gasoline" and "product" shall be construed to include such motor fuels comprising diesel fuel and diesel fuel-containing materials bearing the ARCO trademark and other identifying symbols ("ARCO branded diesel fuels and diesel fuel-containing materials") as Buyer may purchase and receive from BPWCP and BPWCP may sell and deliver to Buyer at the Premises during the term hereof.

It is understood and agreed by and between the parties that Temporary Voluntary Allowances ("TVA's") are not applicable to diesel fuel or diesel fuel-containing materials and, therefore, the terms and conditions relating to TVA's set forth in the Prices provisions, Paragraph 5 of the Agreement, are not amended and supplemented by this Amendment. It is further understood and agreed by and between the parties that, except as herein specifically amended and supplemented, all other terms and conditions of the Agreement, as previously amended and supplemented, shall be and remain in full force and effect.

This Amendment automatically supersedes and terminates, as of the Effective Date hereof, any and all other contracts, agreements or understandings between the parties covering the sale and delivery of ARCO branded diesel fuels and diesel fuel-containing materials to Buyer at the Premises for resale therefrom.

BUYER ACKNOWLEDGES THAT BUYER HAS READ THIS AMENDMENT AND FULLY UNDERSTANDS ALL OF THE TERMS, PROVISIONS AND CONDITIONS HEREOF.

This Amendment is not binding until executed by Buyer and by an authorized officer or manager of BPWCP.

IN WITNESS WHEREOF, the parties have executed this Amendment.

**BP West Coast Products LLC**

Franchisee
STTN Enterprises, Inc.

_Cherry Hiatt_ 10-12-06                      _[signature]_ 10/01/06
                        Date      Nazim Faquiryan            Date

_____  _____        _____  _____
Witness                 Date          Witness                 Date

BP 03057

113

86

# EXHIBIT D

Customer Acct #0998090
Facility #82592
Category: Rebrand

 bp

## CONTRACT DEALER GASOLINE AGREEMENT

This Contract Dealer Gasoline Agreement (this "Agreement") is made and entered into as of the _____ day of _____ Oct 12 , 2006 , ("Effective Date") by and between BP West Coast Products LLC, a Delaware limited liability company, ("BPWCP"), and

STTN Enterprises, Inc. a California Corporation ("Buyer").
(state whether a sole proprietorship, partnership, corporation or limited liability company [LLC]; if partnership, the names
of all partners and State of organization; if corporation, the State of incorporation; if an LLC, the State of organization)

BPWCP maintains a place of business at 4 Centerpointe Drive, in the City of La Palma, in the State of California. Buyer's principal place of business is located at 631 San Felipe Road in the City of Hollister, in the State of CA with the ZIP code 95035. This Agreement constitutes a "franchise" as defined in the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806 ("PMPA").

Recitals

A.    BPWCP markets motor fuels comprising gasolines and gasoline containing materials bearing the ARCO® trademark and other identifying symbols (herein collectively, "Gasoline").

B.    Buyer owns or leases from a third party real property and improvements which Buyer would like to operate as a retail facility selling Gasoline to end users. The property and improvements are located at 631 San Felipe Road, in the City or Town of Hollister in the State of CA with the ZIP code 95035 (The "Premises").

NOW, THEREFORE, the parties hereto agree as follows:

1.    Term. This Agreement shall be binding upon the parties and effective on the date first set forth above. Subject to earlier termination under Paragraph 17.1 below, the "Commencement Date" of this Agreement shall begin at 10:00 a.m. on the and the term shall end at 10:00 a.m. on the . If no Commencement Date is set forth at the time this Agreement is executed, the Commencement Date shall be established by BPWCP by notice to Buyer as the date the Premises are ready to receive Gasoline delivery, which notice shall also set forth the expiration date which shall be at 10:00 a.m. on the first day after the [XX] 12th or [] 120th or [] 240th full calendar month following the Commencement Date. If no time is checked, the box for 120th shall be deemed checked. In addition, BPWCP may, at its discretion, extend the term of this Agreement for a period of up to 180 days by giving written notice to Buyer before the end of the term.

1.2    Construction or Raze and Rebuild. If this Agreement is for Premises that require new construction of an ARCO branded gasoline facility or the razing and rebuilding of an ARCO branded retail facility, Buyer will promptly undertake such new construction or rebuilding and complete such construction or rebuilding and be ready to receive Gasoline delivery within 24 months, in the case of New Construction, or 12 months, in the case of a Razing and Rebuilding, of the Effective Date of this Agreement. If this Agreement is for Premises that require remodeling or retrofit, Buyer will promptly undertake such work and complete such remodeling or retrofit and be ready to receive Gasoline delivery within nine months of the Effective Date.

Orders. Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale

ARCO 40-WR-1(4/2006)
CDGA

BP 03039

only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. BPWCP will use its best efforts to fill Buyer's orders; however, BPWCP may discontinue sale of any grade of Product at any time upon fifteen (15) calendar days' prior written notice to Buyer. At BPWCP's sole discretion, BPWCP reserves the right to provide ARCO branded motor fuels solely through an automatic Gasoline ordering and delivery system and to not accept individual orders placed by Buyer. Buyer agrees to accept and pay for such Product as BPWCP delivers to the Premises. Buyer shall provide accurate and timely information as reasonably requested by BPWCP in connection with the automatic gasoline inventory and delivery system.

 3.   **No Wholesaling.** Buyer will sell Product only to end users for their personal use in volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine, and an approved, properly labeled emergency container capable of holding ten gallons or less. The Premises shall be open for business seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day.

 4.   **Delivery.** BPWCP will deliver Product into Buyer's storage facilities described below. Title to and risk of loss of Product will pass to Buyer upon delivery into Buyer's storage facilities. BPWCP alone will select the method and mode of shipment and delivery. BPWCP expressly reserves the right to supply Product to other retail outlets whether owned and operated directly by BPWCP or by independent owners and operators, regardless of how near or far such other retail outlets may be located relative to the Premises.

 5.   **Prices.** For Product delivered hereunder, Buyer will pay the price specified by BPWCP in effect at the time and place of delivery for purchasers in Buyer's class of trade. Price shall be subject to change at any time, at the election of BPWCP, without notice. Should BPWCP elect to provide notice of price changes, it may do so by telephone, or at BPWCP's sole election, facsimile or electronic transmission. Buyer must have the capability to receive notices of price changes and invoices at the Premises by facsimile or electronic transmission. At BPWCP's sole discretion, to enable Buyer to compete more effectively with Buyer's competitors, BPWCP may from time to time grant Buyer a "temporary voluntary allowance" (TVA) applicable to Product to be sold by Buyer under this Agreement from metered dispensers on the Premises. If BPWCP determines that Buyer has accepted TVAs on Product which is not sold to motorists at retail through the metered dispensers on the Premises, BPWCP may terminate this Agreement, and the amount of any such TVA shall be due by Buyer to BPWCP on demand and BPWCP may offset such amount against any sums payable by BPWCP to Buyer. BPWCP may condition the payment of allowances on Buyer's observance of maximum retail selling prices determined by BPWCP or maximum gross profit margins determined by BPWCP or a reduction in Buyer's retail selling price commensurate with the amount of the allowance.

 6.   **Payment.** Unless BPWCP extends credit to Buyer as provided below, Buyer will pay for Product prior to its delivery in U.S. dollars. BPWCP shall require a product advance payment approximately equal to the current cost of an average delivery of Product. BPWCP may increase or decrease the amount of the advance payment at any time to reflect current prices and Buyer will pay any additional amount necessary if the advance payment is increased. Payment will be made by electronic funds transfer initiated by BPWCP, wire transfer, cashier's check or business check, whichever BPWCP directs, delivered by Buyer at the time and place as designated by BPWCP. Buyer's financial institution through which payment by electronic funds transfer initiated by BPWCP is made must be a member of NACHA (The National Automated Clearing House Association). Payment will be deemed made when, and only when, its receipt has been verified by BPWCP. If this Agreement requires or permits payment by check, all checks shall be made payable to "BPWCP," or "BP West Coast Products LLC," and to no other person, firm or entity. If this Agreement requires or permits payment by wire transfer, all such payments shall be made to " BPWCP, c/o Citibank NA, For Credit to BP West Coast Products #4051-4874 ABA 021000089, New York, New York 10043," and to no other bank or account number unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by automated clearing house ("EFT"), all such payments shall be made to "BPWCP," c/o Citibank Delaware, For Credit to BP West Coast Products - ACH #3815-2114, New Castle, Delaware 19720," and to no other bank or account number

unless so advised in writing by the Credit Manager, BPWCP. If this Agreement requires or permits payment by electronic funds transfer ("EFT"), all such payments shall be made in strict accord with procedures established and promulgated by BPWCP. Buyer agrees to indemnify BPWCP for any loss or expense caused by Buyer's failure to comply with this Paragraph. Upon demand, Buyer will reimburse BPWCP the amount of any temporary voluntary allowance erroneously applied to Product other than Product sold under this Agreement from metered dispensers on the Premises. In addition to any other remedies available to it, BPWCP may offset against any future temporary voluntary allowance or against other amounts owed to Buyer the amount of any reimbursement to which BPWCP is entitled if Buyer fails to make any payment or reimbursement when due. Buyer acknowledges and agrees that BPWCP's receipt of payment due hereunder after the issuance of a notice of termination or nonrenewal does not constitute a waiver of BPWCP's termination or nonrenewal rights.

7.    **Credit.**  BPWCP may in its sole discretion from time to time extend credit to Buyer in whatever amounts and on whatever terms BPWCP alone selects. If BPWCP extends Buyer credit, BPWCP may withdraw it at any time without notice and for any reason. In BPWCP's sole judgment, BPWCP may do any or all of the following: (i) require that Buyer pay for Product by cashier's check, or bank wire transfer prior to delivery, (ii) require that Buyer post an irrevocable letter of credit issued by a bank satisfactory to BPWCP, (iii) require Buyer present evidence of financial solvency, and (iv) declare Buyer in default of this Agreement if Buyer fails to pay any indebtedness when due, provide evidence of financial solvency upon request or comply with any other term of this Agreement. Buyer agrees that regardless of whether and for how long BPWCP has extended it credit, BPWCP may cease extending credit at any time and instead require that payment be made in the manner set forth in this Paragraph or in Paragraph 6 above.

8.    **Non-conformities.**  Buyer will notify BPWCP in writing of the exact nature of any nonconformity in the type, quantity or price of any Product delivered to Buyer within thirty (30) calendar days after delivery. Buyer hereby waives any claim against BPWCP based on any nonconformity of which Buyer does not so notify BPWCP.

9.    **Record Keeping.**  For each delivery of Product, Buyer shall at all times keep a detailed record of the date and time of delivery, and the grade and amount of Product delivered expressed in terms of gallons. To assist BPWCP in determining the necessity of any temporary voluntary allowance described in Paragraph 5 above, Buyer will (i) sell all Product through metered dispensers which shall indicate the grade and amount of gasoline purchased, (ii) allow BPWCP to inspect Buyer's Product dispensers, recorders and meters, and books and records relating to delivery and Product inventory, and (iii) allow BPWCP to ascertain the volume of Product in Buyer's storage facilities.

10.    **Equipment.**

10.1    **Storage and Dispensers.**  Buyer will maintain storage tanks or other appropriate facilities on the Premises into which Product can be delivered. Buyer will ensure that the storage facilities are compatible with BPWCP's delivery equipment and Product formulations; that its storage facilities will accommodate such minimum quantities per single delivery as BPWCP may select; and that the Premises are configured in such a way that Product can be delivered to the Premises consistent with all applicable fire laws and regulations and other governmental requirements. Further, Buyer will ensure that all dispensing devices and storage facilities at all times be properly permitted and completely comply with all applicable governmental requirements and any specifications which BPWCP may issue from time to time. Buyer further agrees that Buyer's motor fuel dispensing devices shall be equipped at all times with Product filters with ten (10) micron filtering capacity. Without restricting any right or remedy of BPWCP, or imposing any duty or liability upon BPWCP, upon BPWCP's request, Buyer will promptly furnish BPWCP with written evidence that Buyer's dispensing devices and storage facilities comply with all governmental requirements and provide copies of underground storage tank permits and specifications, and allow BPWCP representatives to inspect the dispensing devices and storage facilities to confirm such compliance. BPWCP may suspend deliveries in the event that Buyer does not provide written evidence that the dispensing devices and storage facilities comply with all governmental regulations.

BP 03041

10.2   PIC Equipment.   Unless the Premises are located in the state of Oregon, Buyer is required by BPWCP to purchase or lease the PayQuick Island Cashier ("PIC Equipment") and install it at the Premises. The PIC Equipment shall be of the type, number and configuration specified by BPWCP.

(a)   Buyer agrees to use the PIC Equipment only in connection with the operation of BPWCP authorized businesses. Buyer agrees not to tamper with, alter, change, dislodge, displace, remove or otherwise interfere with the operational integrity of the PIC Equipment. Buyer agrees to maintain PIC Equipment in a clean and fully operational condition at all times for the convenience of Buyer's customers.

(b)   Buyer will be responsible for all maintenance and repair of the PIC Equipment. Buyer will contract for maintenance services through BPWCP approved service providers and understands that BPWCP will not provide any maintenance and repair services.

(c)   BPWCP will provide training to Buyer and up to 3 employees designated by Buyer to attend training. Training is mandatory for Buyer or Buyer's designated manager. There is no tuition for such training, but all expenses in connection with such training must be borne by Buyer. If Buyer fails to attend training when originally scheduled, there may be a fee of $1000 to attend training.

(d)   Buyer's PIC Equipment will have one or more cash acceptors, except if, in the sole opinion of BPWCP, Buyer's Premises are appropriate exclusively for debit only PIC Equipment. Unless the Premises have no cash acceptors, Buyer agrees to contract with an BPWCP approved licensed and bonded armored security service to do the following: make cash pick ups on a regular basis, but not less frequently than once per week, maintain possession of all keys to the outer door and the vault of the PIC Equipment, handle all removal of cash cassettes from the PIC Equipment and reinstall all empty cassettes into the PIC Equipment. Receipt paper will be changed only by armored security personnel or in their presence.

(e)   Buyer is required to install and operate the BPWCP approved Video Surveillance Equipment, the details of which will be provided to Buyer and which may be changed from time to time by BPWCP. In addition, Buyer must install, keep operational and use one or more video surveillance cameras dedicated to recording the customer activity at each PIC.

(f)   Buyer is responsible for maintaining a supply of receipt paper at the premises to be used in the PIC Equipment.

(g)   BPWCP grants to Buyer a non-exclusive right and license to use the PayQuick Island Cashier service marks, trademarks and trade dress in conjunction with the operation of PIC Equipment at the Premises in a form prescribed by BPWCP.

(h)   All information regarding the PIC Equipment, including written manuals, specifications, data and instructions provided to Buyer are confidential and proprietary information of BPWCP and shall remain the exclusive property of BPWCP and shall not be duplicated, in whole or in part by Buyer and shall not be used other than as set forth herein and shall be maintained in confidence and not disclosed to anyone without the prior written consent of BPWCP.

(i)   Upon 180 days prior written notice, Buyer may be required to upgrade the PIC Equipment or purchase and install more technologically advanced cash, debit or other payment equipment in accordance with BPWCP's system wide equipment requirements at that time.

(j)   Buyer will install BPWCP approved Point of Sale equipment which is necessary to operate the PIC or other required payment equipment. Buyer will ensure that its Point of Sale equipment and motor fuel dispensers are compatible with the PIC Equipment. In addition, VSAT satellite equipment is required for telecommunications purposes for which there is a fee for connection, repositioning and maintenance.

ARCO 40 WR-1 (4/2006)                    4 of 18                    BP 01042
CDGA

11.    **Leak Prevention and Detection.** Buyer acknowledges and agrees that with respect to any Product storage facilities located on the Premises, including without limitation underground storage tanks and related equipment, Buyer is solely responsible for taking, and will take the following leak and water contamination prevention and detection measures:

11.1    **Stick Readings.** Using a properly calibrated wooden tank measuring device and water finding paste, Buyer will gauge Product storage tanks for inventory loss or water gain on a daily basis.

11.2    **Reconciliations.** Utilizing daily stick readings to the nearest one eighth (1/8) inch and dispenser meter readings, Buyer will take and reconcile opening and closing inventory levels by grade, including deliveries.

11.3    **Record Retention.** Buyer will keep daily reconciliation records available on the Premises for at least five (5) years.

11.4    **Monitoring.** Buyer will ascertain and perform any and all other monitoring procedures required by applicable laws, regulations or governmental authorities.

11.5    **Secondary Containment.** Buyer will ascertain and perform any and all construction or retrofitting necessary to satisfy or comply with the secondary containment standards for underground storage tanks required by applicable laws, regulations or governmental authorities. Buyer will ensure that all deliveries of ARCO Product are made into double walled tanks.

11.6    **Notification.** Buyer will immediately investigate and report to BPWCP and all appropriate governmental authorities (i) any detectable loss or suspected loss that exceeds Regulatory variation limits of any Product, (ii) the activation or alarm of any leak detector or other continuous monitoring system, (iii) the discovery of any broken weights and measures seals or other seals in any Product dispenser, (iv) the discovery of any visible leak in any Product dispenser, Product piping or submerged pumps, (v) any change in the condition of the land or surface adjacent to fill boxes or dispensers, (vi) water in excess of one inch (1") in any storage container, or (vii) any spills or overfills that are not immediately and properly contained and cleaned up. In the event of the occurrence of any of (i) through (vii) above, Buyer shall immediately investigate in accordance with regulatory leak detection requirements. If a leak is confirmed all Product must be removed from the storage tanks immediately and the tanks secured. In addition, Buyer will keep fill caps tight, keep fill boxes free of dirt, ice and snow, and immediately remove any water in excess of one inch (1") in any Product storage tank. Buyer will not permit any Product to enter any public or private water system, storm drain or sewage disposal system.

11.7    **Training.** BP may offer training on environmental compliance. Such training will not exceed four (4) hours and will be offered on an annual basis or a lesser frequency if specified by BP. The training will be tuition free, but any expenses in connection with such training shall be borne by the Franchisee.

12.    **Gasoline Regulations.**

12.1    **Compliance.** BPWCP will ensure that upon delivery to Buyer by BPWCP, all gasoline, will meet the specifications for lead and phosphorus set forth in the regulations promulgated by the United States Environmental Protection Agency ("EPA"). Buyer will ensure that no gasoline purchased from BPWCP is tampered with or contaminated in a way that could cause the gasoline not to meet the EPA's specifications or any other specifications required by law. Buyer will immediately cease dispensing any gasoline that is determined not to meet such specifications

BP 03042

ARCO 40 WR-1 (4/2006)
CDGA

118

91

12.2  Disclosures and Warnings.  Buyer acknowledges that it has been fully informed of and is aware of the nature and existence of risks posed by transporting, storing, using, handling and being exposed to Product. Buyer will inform its employees, agents, contractors and customers of such risks. Buyer will display, publish and distribute any safety warnings or disclosures as may be requested or required by BPWCP or any governmental authority from time to time.

13.  Taxes.

13.1  Payment by Buyer.  Buyer will pay promptly when due and hold BPWCP harmless from all taxes, excise fees and other similar charges (including interest, penalties and additions to tax) which BPWCP is now or in the future required to pay or collect under any federal, state or local governmental requirement based on the manufacture, production, sale, transfer, transportation, delivery, storage, handling, consumption or use of Product under this Agreement or on any payments made under this Agreement (excepting any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon). BPWCP may, at its sole option, add any such tax, excise fee or similar charge to the amount to be charged for Product. Buyer will also pay promptly when due and hold BPWCP harmless from all fees and sales, use, rental, gross receipts, inventory, excise, income and other taxes (including interest, penalties and additions to tax but not including any income tax imposed on BPWCP based on income received from Buyer and any interest or penalties thereon) imposed by any federal, state or local governmental authority upon Buyer or BPWCP in connection with the operation of Buyer's business.

13.2  Inapplicability of Reseller Exemption.  With respect to Product purchased hereunder, Buyer hereby waives any exemption and agrees not to assert any right of exemption from payment to BPWCP of taxes regularly collected by BPWCP upon delivery of Product to purchasers within Buyer's class of trade by virtue of any reseller or wholesale-distributor exemption to which Buyer may presently or hereafter be entitled under any provision of federal, state or local law regulation or order.

13.3  Tax Information.  Buyer will provide BPWCP with Buyer's motor fuel seller number and use tax registration number. Further, Buyer will provide BPWCP with any information requested by BPWCP relating to tax credits claimed by Buyer for motor fuel, sales, use and other taxes paid by Buyer in connection with the Product for the purpose of resolving any threatened or pending tax dispute with any governmental authority or for the purpose of confirming Buyer's compliance with the terms of this Agreement.

14.  Trademarks and Trade Dress.

14.1  Compliance.  Within one hundred fifty (150) calendar days after the Commencement Date if this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises and upon the Commencement Date if this is not the first agreement between Buyer and BPWCP for the supply of Product at the Premises, unless BPWCP consents otherwise in writing, Buyer will have fully complied with all trademarks and trade dress requirements set forth in Exhibit A. Thereafter, throughout the term of this Agreement, Buyer shall fully comply with all trademarks and trade dress requirements as they may be changed from time to time. Notwithstanding the foregoing, Buyer must have the ARCO I.D. sign, I.D. pole, price pods, and decal specifications for pumps and dispensers as described in Exhibit A (as it may be changed from time to time) in place as soon as Buyer is selling ARCO branded Product but not later than the fifth delivery of Product hereunder and not before Buyer is selling ARCO branded Product under the ARCO trademarks described below. Buyer hereby agrees that BPWCP may and acknowledges that in all likelihood BPWCP will change such requirements from time to time. Buyer will conform its trademarks and trade dress to all such changed requirements within ninety (90) calendar days after receiving written notice from BPWCP of any change. In its sole discretion, BPWCP may loan to Buyer various items of trade dress such as signs, illuminated sign poles, sign faces with a numerals kit and pump identification signs. Buyer hereby agrees that any trade dress which BPWCP provides to Buyer hereunder shall remain the property of BPWCP regardless of whether it is affixed to the Premises. Buyer shall ensure that no such loaned trade dress is removed from the Premises by persons other than BPWCP or

6 of 18

BP 03044

119

its representatives either during or after the term of this Agreement without BPWCP's prior written consent. Buyer shall bear the cost of maintaining, repairing and replacing such loaned trade dress.

14.2    <u>Licenses.</u>  During the term of this Agreement, in connection with the resale of Product, Buyer may display the trademarks, trade names, advertising, signs, devices, symbols, slogans, designs and other trade indicia adopted, used or authorized for use by BPWCP in connection with Product (collectively, "Marks"), provided that (i) Buyer operates the Premises seven (7) calendar days a week for a minimum of twelve (12) consecutive hours each day, (ii) the Marks are only displayed or used in the manner specified by BPWCP, and (iii) all trademark rights resulting from such display or usage shall inure to BPWCP's benefit. BPWCP reserves the right to substitute another trademark for ARCO or withdraw or modify any of the Marks or their manner of display without prior notice to Buyer. Upon receiving notice of any withdrawal or modification of the Marks or substitution of another trademark, Buyer will fully implement any modification or termination or substitution within the time specified in the notice and such other trademark shall be deemed substituted for the "ARCO" trademark in all references to Gasoline and Product in this Agreement. If Buyer fails to comply fully with any notice of withdrawal or modification, in addition to any other remedies available to BPWCP for breach of this Agreement, BPWCP may demand that Buyer immediately remove all Marks from the Premises at Buyer's sole expense. If Buyer fails to do so, BPWCP or BPWCP's contractor may enter the Premises and remove all Marks, and Buyer will reimburse BPWCP for such removal.

14.3    <u>Shared Expenses.</u>  BPWCP will reimburse Buyer a portion of the cost of acquiring, transporting and installing certain signs and other trade dress required hereunder and set forth in Exhibit B, as specified below. The amount of such reimbursement shall be the lesser of (i) one half of Buyer's actual verifiable cost, or (ii) the maximum amount indicated on Exhibit B. The reimbursement shall apply on a one-time only basis to the Premises during its entire franchise relationship with BPWCP regardless of whether this is the first or a subsequent agreement between Buyer and BPWCP for the supply of Product at the Premises. Buyer shall be solely responsible for the cost of maintaining, repairing and replacing all trade dress. Request for the foregoing reimbursement shall be in writing and accompanied by all original invoices (of which Buyer shall keep copies). Upon receiving such a request, BPWCP shall inspect Buyer's facility to confirm that the trade dress is of the proper type and properly installed and verify Buyer's actual cost. If BPWCP confirms that the trade dress meets BPWCP's requirements and verifies Buyer's submitted cost as accurate, then BPWCP shall either reimburse Buyer the amount described above or pay the entire cost of such trade dress directly to the third party vendor, whichever BPWCP alone chooses. If BPWCP elects to pay the third party vendor directly, then within five (5) calendar days after receiving notice from BPWCP that such payment will be or has been made, Buyer will remit to BPWCP the difference between the amount of the invoice and the amount of BPWCP's reimbursement as calculated above. Further, BPWCP may arrange directly with a third party vendor to satisfy the requirements of this Paragraph 14.3 and collect from Buyer in advance upon five days' notice, an amount equal to the total maximum reimbursements to which Buyer is entitled under this Paragraph and Exhibit B, to cover Buyer's share of the cost of trade dress expenses. Should the amount of this advance payment exceed one half of the actual cost of satisfying the trade dress requirements herein, BPWCP will refund the excess amount to Buyer. If the amount of the advance payment is less than the actual cost of satisfying the trade dress requirements herein, then Buyer shall pay BPWCP the amount of the deficiency upon demand. In addition to all other remedies available to it, BPWCP may offset against any amounts owed to Buyer, the amount of any remittance owing to BPWCP hereunder. Notwithstanding this Paragraph 14.3, Buyer may be obliged to pay BPWCP for any reimbursements received and direct vendor payments made by BPWCP hereunder upon the termination or nonrenewal of this Agreement as specified in Paragraph 17.3.

14.4    <u>Restrictions.</u>  Buyer will not adulterate, mislabel, misbrand or contaminate Product; add any ingredients to Product without BPWCP's prior written consent; use any Mark except in connection with genuine ARCO Product; claim any right, title or interest in or to the Marks; directly or indirectly deny or assail or assist others in denying or assailing the sole and exclusive ownership of BPWCP in and to the Marks; register, adopt as its own property, or use or assist others in registering, adopting, or using any trademarks, trade names, advertising, signs, devices, symbols, slogans, designs, or other trade indicia confusingly similar to the Marks; or commit other trademark violations or acts that could disparage

ARCO 40 WR-1 (4/2006)
CDGA

BP 03045

compensation insurance including occupational disease insurance in accordance with the laws of the State in which the Premises are located, and employers' liability insurance in an amount of at least $100,000 disease each employee and $100,000 each accident; and ( ii ) garage liability insurance or general liability insurance, including contractual liability, insuring Buyer's indemnity obligation set forth above, and products-completed operations coverage, in amounts of at least $1,000,000 combined single limit each occurrence applicable to personal injury, including bodily injury, sickness, disease or death and loss of or damage to property (with liquor law liability coverage if Buyer will sell or dispense alcoholic beverages), on which BPWCP is named as an additional insured. Buyer will furnish BPWCP with certificates of insurance evidencing the foregoing coverage and providing that no policy of insurance may be cancelled or materially modified without at least thirty (30) calendar days' prior written notice to BPWCP. Buyer hereby understands and agrees that coverage provided BPWCP by Buyer's insurance under this Agreement is primary insurance and shall not be considered contributory insurance with any insurance policies of BPWCP.

17.    Termination and Nonrenewal.

17.1    Triggering Events for Termination or Nonrenewal. In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may terminate or nonrenew this Agreement upon any of the following triggering events:

(a)    Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement following written notice to Buyer from BPWCP of such failure and fifteen calendar days to cure such failure.

(b)    Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Buyer relevant to the operation of the Premises.

(c)    Declaration of bankruptcy by Buyer or judicial determination of insolvency of Buyer.

(d)    Subject to Paragraph 18.3 hereof, the death or the prolonged severe physical or mental disability or disablement of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation) or any of Buyer's general partners (if Buyer is a partnership) for at least three (3) months which renders Buyer unable to provide for the continued proper operation of the Premises.

(e)    The loss of Buyer's right to possess the Premises.

(f)    The condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain.

(g)    The destruction of all or a substantial part of the Premises.

(h)    Buyer's failure to timely pay BPWCP all sums to which BPWCP is legally entitled.

(i)    Buyer's failure to operate the Premises for seven (7) consecutive calendar days, or any lesser period which constitutes an unreasonable period of time.

(j)    The willful adulteration, commingling, mislabeling or misbranding of Product or other violations by Buyer of the Marks.

(k)    Buyer's knowing failure to comply with federal, state or local laws or regulations relevant to the use or operation of the Premises.

the Marks or adversely affect the value of the marks or BPWCP's goodwill and ownership rights hereto. Any rights to any Marks obtained by Buyer contrary to the foregoing shall be held in trust for BPWCP and, upon request, Buyer will assign such rights free of charge to BPWCP.

        14.5    Standards. The Premises must be clean, well maintained, and graffiti free, with structures, driveways and pavement in good repair. BPWCP will perform periodic inspections for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

15.    Compliance and Indemnification.

        15.1    Compliance With Laws and Regulations. Buyer shall comply with any and all applicable federal, state and local laws and regulations, including those pertaining to human health, safety or the environment, and shall further comply with any and all permits or license pertaining to the Premises. Any references in this Paragraph 15.1 to laws or regulations shall include all such laws and regulations pertaining to Product, or the air, or surface or subsurface water, surface or subsurface soil, and the handling, storage and disposal of hazardous substances, materials or wastes, or solid wastes (whether or not defined as hazardous by such laws or regulations), and vapor recovery and vapor recovery equipment Buyer shall comply with any and all operating, reporting and record keeping laws and regulations, as well as all operating, reporting and record keeping procedures designed to ensure that no unauthorized release of any Product occurs, and that in the event any Product is released, all applicable reporting, record keeping and cleanup requirements are fully complied with.

        15.2    Indemnification. Buyer will indemnify and hold harmless BPWCP, its affiliates, subsidiaries, shareholders, directors, officers, employees and other representatives (and shareholders, directors, officers, employees and other representatives of such affiliates and subsidiaries) (collectively, "Indemnified Parties") from and against all claims, causes of action, liabilities, suits, demands, legal proceedings, governmental actions, losses and expenses, including without limitation reasonable expert and attorneys fees and costs (collectively, "Indemnified Expenses"), arising out of (i) any breach by Buyer (or any of its officers, employees or representatives) of any provision of this Agreement, (ii) the storage, leakage or other release of Product on, or from the Premises, (iii) any cleanup, remediation or response activity conducted or ordered under applicable law, (iv) Buyer's use or occupancy of the Premises, (v) Buyer's operation of the business or use, custody or operation of BPWCP-owned equipment or any other equipment on the Premises, excepting any loss or damage arising solely from BPWCP's negligence or failure to perform its obligations hereunder, or (vi) any intentional or unintentional violation by Buyer of any government requirement applicable to the Premises or Buyer's storage or sale of Product, or the disclosure or warning of risks associated with Product at the Premises. This indemnification obligation shall survive the termination or nonrenewal of this Agreement.

        15.3    Liability for Charges or Fines. In the event that BPWCP becomes liable for payment of any charges or fines arising out of Buyer's noncompliance with any governmental laws or regulations or Buyer's failure to secure any necessary licenses or permits or renewals thereof, now or hereafter necessary, in connection with the possession and use of the equipment and other property or the conduct of business on the Premises or Buyer's failure to pay any taxes, imposts or charges imposed by any governmental authority, BPWCP shall have the right to charge Buyer the amount of any such charge or fine paid by BPWCP.

        15.4 Reporting. Buyer shall report to BPWCP within 24 hours each incidence of major personal injury or criminal activity. All other incidences of personal injury or criminal activity shall be reported as soon as practicable, but in no event later than 72 hours. Buyer will display display signage regarding BPWCP's crime deterrence and reward offer in the manner specified by BPCWP. BPWCP reserves the right to change or withdraw any reward offer in its sole discretion in which case, Buyer will remove or replace the signage immediately upon notice.

16.    Insurance. Buyer shall obtain and maintain throughout the term of this Agreement each of the following forms of insurance from a financially sound and reputable insurance carrier: (i) workers'

ARCO 40 WR-1 (4/2006)
CDGA

BP 03046

(l)  The conviction of any felony involving moral turpitude or indictment for any criminal misconduct relevant to the operation of the Premises of Buyer (if Buyer is an individual), Buyer's majority shareholder (if Buyer is a corporation), Buyer's majority owning member (if Buyer is an LLC) or any of Buyer's general partners (if Buyer is a partnership).

(m)  The determination by BPWCP, made in good faith and in the normal course of business, to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises are located.

(n)  The occurrence of any other event relevant to the relationship between the parties which makes termination or nonrenewal reasonable, including without limitation those set forth in Paragraph 17.2 below.

(o)  The breach by Buyer of any material provision of this Agreement, which Buyer hereby agrees includes (without limitation) ( i ) Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand, (ii) Buyer's failure to keep a detailed record of each delivery of Product to Buyer or make those records available to BPWCP as provided in Paragraph 9, ( iii ) Buyer's failure to take any of the leak prevention and detection measures outlined in Paragraph 11, (iv) any attempt by Buyer to assign any interest in this Agreement without BPWCP's prior written consent, and (v) failure to complete construction or rebuilding within the time as set forth in Paragraph 1.2.

(p)  If Buyer is a party with BPWCP to a Loan Agreement or a Loan Agreement and Security Agreement and Related Promissory Note, and Buyer fails to cure any default under the foregoing Loan Agreement, Loan Agreement and Security Agreement and Promissory Note as requested, BPWCP may terminate this Agreement.

17.2  <u>Triggering Events for Nonrenewal.</u>  In addition to any other ground BPWCP may have under the PMPA, and subject only to any necessary restrictions under applicable law, BPWCP may nonrenew this Agreement upon any of the following triggering events:

(a)  Buyer's failure to agree to changes or additions to its franchise relationship with BPWCP, which BPWCP requests based on BPWCP's determinations made in good faith and the normal course of business and without the purpose of preventing the renewal of the franchise relationship.

(b)  BPWCP's receipt of numerous bona fide customer complaints concerning Buyer's operation of the Premises, of which Buyer was apprised and, to the extent they related to the condition of the Premises or conduct of Buyer or Buyer's employees, which Buyer failed to cure promptly.

(c)  Failure of Buyer to operate the Premises in a clean, safe and healthful manner on at least two previous occasions.

(d)  A good faith determination by BPWCP made in its normal course of business that renewal of the franchise relationship is likely to be uneconomical to BPWCP despite any reasonable changes or additions to the agreements between the parties, which may be acceptable to Buyer.

17.3  <u>Effect of Termination or Nonrenewal.</u>  After receiving notice of termination or nonrenewal and until the effective date of the termination or nonrenewal, Buyer will continue to operate the Premises in accordance with this Agreement.

(a)  From and after the effective date of termination or nonrenewal, Buyer will immediately discontinue all use of trade dress and Marks associated with BPWCP, including without limitation use of such trade dress and Marks on dispensers, pumps, containers, storage equipment,

ARCO 40 WR-1 (4/2008)
CDGA

BP 03048

buildings, canopies, pump islands, pole signs, advertising, stationery and invoices. From and after the effective date of termination or nonrenewal, Buyer will not adopt or use any trademarks trade dress or symbols in the operation of the Premises that are confusingly similar to BPWCP's, including without limitation, any four letter name or mark starting with ( i ) the letter "A" or ( ii ) any vowel and having the letter "R" as a second letter, and Buyer will not use or employ as a symbol, mark or design any geometric design that is red or any colored horizontal striping that is predominately red and blue. Further, Buyer will remove from all trade directories and telephone book listings all reference to the Marks. Upon the effective date of the termination or nonrenewal, Buyer will promptly return to BPWCP or destroy, whichever BPWCP directs, all signs, advertising, graphics and other materials in Buyer's possession bearing any Marks or used in any trade dress. In addition, Buyer hereby agrees that BPWCP may enter the Premises to remove or cover up any trade dress or advertisements bearing any Marks. If Buyer terminates or does not renew this Agreement or if BPWCP terminates or does not renew this Agreement for a reason set forth in Paragraph 17.1 or 17.2 above, then Buyer shall pay for the removal or covering up of all trade dress and trademarks as required hereunder. For a reasonable period following the effective date of Buyer's termination or nonrenewal and at no charge, BPWCP may keep any BPWCP property still located on the Premises in place while negotiating for its sale or removal.

(b)    If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises, Buyer will repay BPWCP all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon (i) the mutual termination of this Agreement prior to or at the end of the first twelve months, (ii) the termination of this Agreement by BPWCP or Buyer during the first twelve months or (iii) the nonrenewal of this Agreement by BPWCP or Buyer at the end of the first twelve months (if this is a trial franchise as defined under Section 2803 of the PMPA).

(c)    If this is the first agreement between Buyer and BPWCP for the supply of Product at the Premises with a term of more than one year and Buyer has been a party to an agreement regarding the Premises with BPWCP for the supply of Product for less than thirty-six months, then after the first twelve months Buyer will pay BPWCP, on a pro rata basis as described below, the amount of all reimbursements and direct payments made by BPWCP under Paragraph 14.3 upon the mutual termination of this Agreement or termination or nonrenewal by Buyer or by BPWCP for a reason set forth in Paragraph 17.1 or 17.2 above. The pro rata amount which Buyer is obligated to pay shall be calculated by multiplying the total of the reimbursements and direct payments made by BPWCP under Paragraph 14.3 times (a) two-thirds during the thirteenth through twenty-fourth month of this Agreement or (b) one-third during the twenty-fifth through thirty-sixth month of this Agreement.

18.    Assignment, Right of First Refusal and Successors In Interest.

18.1    Assignment.  Buyer will not sell, (or allow Buyer's foreclosing lender to complete a sale), assign, give or otherwise transfer, any interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements on that constitute the Premises, to any individual or entity other than BPWCP, without first complying with Paragraph 18.2 below and obtaining BPWCP's prior written consent to such transfer, which consent shall not be unreasonably delayed or withheld. Further, if Buyer is a corporation or partnership or LLC, neither Buyer nor any shareholder, member or partner of Buyer will sell, assign, give or otherwise transfer, or mortgage, pledge as security or otherwise encumber any shares of stock, partnership interest or other ownership interest in Buyer to any individual or entity without BPWCP's prior written consent. To ensure that BPWCP has adequate time to evaluate any assignment or transfer request, Buyer will allow BPWCP at least sixty (60) calendar days to evaluate any assignment or transfer request. A request for consent made less than 45 days before the expiration date of this Agreement will be considered a request for consent to the renewal agreement, provided that one has been offered to Buyer. Buyer acknowledges and agrees that any transfer, encumbrance, attempted transfer or attempted encumbrance which does not satisfy these prerequisites shall be void and without effect. Buyer further acknowledges and agrees that BPWCP may impose a transfer fee upon any transfer or encumbrance of Buyer's interest in its franchise relationship with BPWCP. The fee is currently $1,000, but BPWCP reserves the right to raise the fee to a maximum of $4,000.

11 of 18

ARCO 40 WR-1 (4/2006)
CDGA

BP 03049

124

97

13.2    **Right of First Refusal.** In return for valuable consideration, Buyer's receipt of which is hereby acknowledged, (i) upon receiving or extending any final offer to acquire any or all of Buyer's interest in this Agreement, its franchise relationship with BPWCP, or its ownership, leasehold or subleasehold interest in the real property or improvements that constitute the Premises, whether conveyed through a business broker or directly, to any entity or person other than Buyer's current spouse or adult child (natural or adopted)or (ii) upon the recordation of a Notice of Default that commences Buyer's lender's foreclosure of a mortgage or deed of trust encumbering the Premises. Buyer shall offer such interest to BPWCP, in writing, at the same price and on the same other terms as those contained in the final offer or Notice of Default. Buyer shall give BPWCP a complete, legible copy of the final offer including a breakdown of the amount for real property, equipment and goodwill, all agreements in connection with the proposed sale and the name and address of the proposed buyer/transferee.. In the case of foreclosure, the price will equal the amount required to pay the foreclosing lender to terminate the foreclosure proceeding. Buyer shall give BPWCP a complete, legible copy of the recorded Notice of Default and any later recorded Notice of Sale. BPWCP shall have thirty (30) calendar days after its receipt of all data and documentation required by it to evaluate the offer and exercise its right of first refusal by notifying Buyer in writing that it intends to exercise its right of first refusal and agreeing to pay Buyer the purchase price, less the amount of any applicable transfer fee, on the terms stated in the final offer, or the amount required to pay the foreclosing lender to terminate the foreclosure proceeding, as applicable. During the 30 day period, BPWCP shall have the right of entry upon the premises to conduct reasonable environmental testing. If BPWCP exercises its right of first refusal, each time period in the final offer will be automatically extended so that it starts on the date that BPWCP exercised its right of first refusal. BPWCP may assign its right of first refusal to any third party. If BPWCP does not exercise its right of first refusal, Buyer may consummate the proposed transfer, but not at lower price or on more favorable terms than those offered to BPWCP. If Buyer does not do so within one hundred eighty (180) calendar days after the date BPWCP received Buyer's written offer, then Buyer must recommence the foregoing right of first refusal procedure and satisfy the requirements of this Paragraph 18.2. BPWCP's exercise of its right of first refusal shall not be dependent on its prior refusal to approve the proposed transferee. Buyer agrees to execute a memorandum of this Agreement to be recorded in the Official Records of the county where the Premises are located and take all other action necessary to give effect to this right of first refusal.

18.3    **Successors in Interest.** Notwithstanding Paragraphs 18.1 and 18.2, if upon the death or incapacitation for more than ninety (90) consecutive calendar days of Buyer (if Buyer is a natural person), a general partner of Buyer (if Buyer is a partnership) or a majority shareholder of Buyer (if Buyer is a corporation), or majority-owning member of an LLC (if Buyer is an LLC), the interest in this Agreement of such deceased or incapacitated person passes directly to an eligible person or persons whom the deceased or incapacitated has designated as his successor in interest, in writing in a form prescribed by and filed with BPWCP, and who notifies BPWCP within twenty-one (21) calendar days after the death or incapacitation of his intention to succeed to such interest, then this Agreement shall continue for the remaining term hereof, provided that such successor in interest agrees in writing to assume all of the obligations under this Agreement of the deceased or incapacitated and satisfies BPWCP's then current criteria for similar franchisees. A person who is eligible to be designated a successor in interest is one who is (i) the adult spouse or adult child (natural or adopted) or parent of the deceased or incapacitated, (ii) a general partner of the deceased or incapacitated, (iii) a fellow shareholder of the deceased or incapacitated, (iv) a fellow member of the deceased or incapacitated or, (v) if Buyer is a sole proprietor, a designated legal heir. Only the most recently properly designated successor in interest will be recognized as such; If Buyer has a spouse and designates someone other than Buyers spouse, Buyers spouse must agree to the designation.

18.4    **BPWCP's Right to Assign.** BPWCP shall have the unrestricted right to transfer or assign all or any parts of its rights or obligations under this Agreement, including its right of first refusal described in Paragraph 18.2, to any person or legal entity.

19.    <u>Miscellaneous</u>

19.1    <u>Right of Entry.</u>  Buyer hereby gives BPWCP the right to enter the Premises at all reasonable times and without prior notice, to determine Buyer's compliance with the provisions of this Agreement.  BPWCP may determine Buyer's compliance by any means BPWCP selects, including without limitation, the sampling and laboratory testing of Product.

19.2    <u>Successors and Assigns.</u>  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Buyer shall have no right to assign this Agreement, either voluntarily or by operation of law, except as provided in Paragraph 18 above.

19.3    <u>Force Majeure.</u>  In the event that either party hereto shall be delayed or unable to perform any act required hereunder by reason of Act of Nature, strikes, lockouts, riots, insurrection, war, governmental act or order, or other reason of a like nature not the fault of or in the control of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay.  The provisions of this Section shall not operate to excuse Operator from prompt payment of all fees or any other payments required by the terms of this Agreement.

19.4    <u>Notices.</u>  Except as limited by applicable law or as otherwise stated in this Agreement, any and all notices and other communications hereunder shall be deemed to have been duly given when delivered personally or forty-eight (48) hours after being mailed, certified or registered mail or overnight mail, return receipt requested, postage prepaid, in the English language, to the Premises if to Buyer and to the address set forth on the first page of this Agreement if to BPWCP, unless otherwise directed in writing by BPWCP.

19.5    <u>Relationship of the Parties.</u>  Buyer agrees that nothing in this Agreement creates a joint venture, agency, employment partnership or similar relationship between it and BPWCP, and Buyer shall have no authority to bind BPWCP in any way.  Buyer will not assert otherwise.  Buyer shall undertake all obligations as an independent contractor and shall exercise and be responsible for the exclusive control of the Premises, the employees and all activities conducted there.  Operator shall be responsible for complying with all the applicable workers' and unemployment compensation, occupational disease, wage and hour, disability and similar laws.  BPWCP shall have no control over employees of the Operator, including without limitation the terms and conditions of their employment.  Operator shall continuously display on the exterior of the building in a conspicuous manner at a point visible and accessible to the public a legible sign meeting BPWCP's specifications, showing that Operator is the owner of the business being conducted thereon.

19.6    <u>Waiver.</u>  No purported waiver by either party hereto of any provision of this Agreement or of any breach thereof shall be deemed to be a waiver of such provision or breach unless such waiver is in writing signed by the party making such waiver.  No such waiver shall be deemed to be a subsequent waiver of such provision or a waiver of any subsequent breach of the same or any other provision hereof.

19.7    <u>Compliance.</u>  Buyer shall at all times comply with all laws and applicable government requirements and obtain and maintain all necessary licenses and permits for the performance of its obligations hereunder.

19.8    <u>Authority.</u>  Buyer hereby represents that as of the date hereof, Buyer has the authority to enter into this Agreement and that no consents of third parties other than those which have been obtained and are attached hereto are necessary to enable Buyer to perform its obligations hereunder.  Buyer represents that as of the date of this Agreement, Buyer is in compliance with all leases, contracts and agreements affecting the Premises and Buyer's use and possession of the Premises.

13 of 18

ARCO 40 WR-1 (4/2006)
CDGA

BP 03051

126

99

19.9    Prior Course of Dealing.  BPWCP and Buyer acknowledge and agree that this Agreement is not to be reformed, altered, or modified in any way by any practice or course of dealing during or prior to the term of the Agreement or by any representations, stipulations, warranties, agreement or understandings, express or implied, except as fully and expressly set forth herein or except as may subsequently be expressly amended by the written agreement of Buyer and BPWCP by their authorized representatives.

19.10    Further Assurances.  Buyer agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Agreement.

19.11    Non-exclusivity.  Buyer has no exclusive territory.  BPWCP may establish additional ARCO or other brand or no brand Gasoline or other fueling facilities in any location and proximity to the Premises.

19.12    Other Businesses.  In order to ensure that there is no interference with access for delivery trucks, storage or delivery, Buyer will obtain BPWCP's prior written consent to the placement of any other businesses or equipment on the Premises which consent will not be unreasonably delayed or withheld.

19.13    Ethics.  Buyer acknowledges that giving payments or other inducements to any employee or agent of BPWCP in connection with this Agreement or Buyer's franchise relationship with BPWCP violates BPWCP's ethical policies and entitles BPWCP to terminate this Agreement. Franchisee shall notify BPWCP's Security Department if any employees or agents solicit payments or other inducements.

19.14    Applicable Law.  Except where this Agreement would otherwise be governed by federal law, this Agreement shall in all respects be interpreted, enforced and governed under the laws of the state where the Premises are located.  If any provision of this Agreement should be determined to be invalid or unenforceable, such provision shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions of this Agreement enforceable, and the Agreement as thus amended shall be enforced to give effect to the intention of the parties insofar as that is possible.

19.15    Headings and Gender.  The paragraph headings in this Agreement are intended solely for convenience of reference and shall not in any way or manner amplify, limit, modify or otherwise affect the interpretation of any provision of this Agreement, and the neuter gender and the singular or plural number shall be deemed to include the other genders or numbers whenever the context so indicates or requires.

19.16    Entire Agreement.  This Agreement and the exhibits attached hereto and any written agreements executed contemporaneously with this Agreement relating to the Premises, set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings between the parties, pertaining to the subject matter hereof, and, except as otherwise expressly provided herein, no change in, deletion from or addition to this Agreement shall be valid unless set forth in writing and signed and dated by the parties hereto.

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

BP 03052

Buyer hereby acknowledges having read this Agreement in its entirety and fully understands and agrees to its contents. No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BP West Coast Products LLC

BPWCP:                                    Buyer:

Name                                      Nazim Faquiryan - STTN Enterprises, Inc.

Title:                                    Name

                                          Title:

Each of the undersigned, as owner, part owner, mortgagee or lien holder, for himself and his legal representatives, successors and assignees, hereby consents to the foregoing agreement, including without limitation, to the installations, maintenance, repair, replacement and removal of all required trade dress and trademarks. Each of the undersigned further waives any interest in, right to levy upon, mortgage or otherwise make any claim against any such trade dress or trademarks and confirms BPWCP's title to and right of removal of any property provided or loaned by BPWCP.

Name                                      Name

Title:                                    Title:

ARCO 40 WR-1 (4/2006)                     15 of 18                    BP 03053
COGA

128

101

Exhibit A

<u>Trade Dress Requirements</u>

See Attached booklet entitled "Minimum Trademark Standards, Trade Dress Requirements and Trade Dress Options for Selling ARCO Branded Motor Fuels at Retail Outlets".

This space is intentionally left blank.

16 of 18

ARCO 40 WR-1 (4/2006)
CDGA

BP 03054

129

102

Exhibit B

Shared Trade Dress Costs for ARCO Branded Gasoline Only

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| All Exterior Decals | 100% BPWCP | |
| Interior Decal Kit | 100% BPWCP | |
| Illuminated Building Bullnose | 100% BPWCP | Max. 100 Feet. 50/50 thereafter |
| Canopy  Bullnose LED | 50/50 | |
| Non-illuminated Canopy Bullnose (back of Canopy) | 100% Dealer | |
| ID Sign - Freeway – Sign/Face Only | 100% BPWCP | |
| ID Sign Fwy - Pole and Foundation | 100% Dealer | |
| ID Sign  Face | 100% BPWCP | |
| ID Sign Foundation and Architectural Veneer/Pole | 100% Dealer | |
| ID Sign - Building - 3 x 10 ARCO Logo Sign | 100% BPWCP | |
| Non-ID Sign - 24 Hour Signs | 100% Dealer | |
| Non-ID Sign - Metal Info Signs – Bumper Post, . Tax | 50/50 | |
| Paint | 100% Dealer | |
| Permits for Signage | 100% Dealer | |
| Coming Soon Banners Pump Toppers (all hardware) | 100% BPWCP 50/50 | |
| Quick Crete Cement Trash Container | 100% Dealer | |
| Tank Tags | 100% BPWCP | |
| Channel Letter | 100% BPWCP | |

17 of 18

ARCO 40 WR-1 (4/2006)
CDGA

BP 03055

130

Exhibit B (Continued)

| Trade Dress Item | Cost - % Share BPWCP/Dealer | Restrictions |
|---|---|---|
| Canopy Sparks | 100% BPWCP | (Max. 4 Sparks) |
| VSAT Equipment: (1) Hughes Satellite Dish 100% Dealer and (2) Hughes Indoor Unit - Satellite Receiver (3) Deicer (if required for colder climate) | 100% Dealer | |

* Any costs not set forth as being paid or shared by BPWCP shall be at the sole expense of the Operator/Buyer

This space is intentionally left blank.

ARCO 40 WR-1 (4/2006)
CDGA

18 of 18

BP 03056

131

104

# EXHIBIT E

5/4/2007

BP West Coast Products
4 Centerpointe Dr.
La Palma, Ca. 90623

Mr. Tom Reeder:

We, Nazim Faquiryan & Sayed Faquiryan, agree to pay an additional
$30,000.00 by certified check payable to BPWCP on or before the 15th day
of each month beginning June 20, 2007 until total sums of balance due are
paid in full per BP credit dept.

These separate monthly payments will continue until all outstanding
balances due BPWCP, currently, $184,075.50 have been paid.

We further agree that our BPWCP account will not increase in delinquent
amounts due.

Sincerely,

Nazim Faquiryan            5-4-2007

Sayed Faquiryan            5-4-2007

WITNESS                    5-4-2007

BRAD CHRISTENSEN

BP 00593

105

# EXHIBIT F



**BP West Coast ... oducts LLC**

4 Centerpointe Drive
La Palma, CA 90623-1066

Mailing Address: Box 5077
Buena Park, CA 90622-5077

NOTICE OF DEFAULT

Facility Number <u>82461</u>

☐   Certified Mail - Return Receipt Requested (7005 1160 0000 4099 2107)
☐   Personal Delivery

STTN Enterprises Inc.
631 San Felipe Road
Hollister, CA 95035

**You are hereby notified** that you are in default of your obligations under the terms and conditions of the foregoing Agreement in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said default was observed on the date and at the approximate time shown below.

| |
|---|
| Title of Agreement: <br> Contract Dealer Gasoline Agreement |
| Violation of Articles/Sections: <br> Article/Section: 2 - Orders <br> Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. |
| Details of Violation: (If applicable) <br><br> Franchisee refused to accept first ARCO gas load. <br><br><br><br> |
| Date default was observed: October 11, 2006 <br><br> Approximate Time Default was observed: 11:30 a.m. <br> By: Brad Christensen <br><br> Date Default to be cured: <br><br><br> |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this <u>12th</u> day of October, 2006.
BP West Coast Products LLC

By: _____              cc:  B. Christensen
         Tom Reeder – Regional Sales Manager                              Dealer File

BP 01631



**BP West Coast Products LLC**

4 Centerpointe Drive
La Palma, CA 90623-1066

Mailing Address: Box 5077
Buena Park, CA 90622-5077

NOTICE OF DEFAULT

Facility Number <u>82461</u>

☐    Certified Mail - Return Receipt Requested (7005 1160 0000 4099 2145)
☐    Personal Delivery

STTN Enterprises Inc.
631 San Felipe Road
Hollister, CA 95035

**You are hereby notified** that you are in default of your obligations under the terms and conditions of the foregoing Agreement in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said default was observed on the date and at the approximate time shown below.

| |
|---|
| Title of Agreement:<br>Contract Dealer Gasoline Agreement |
| Violation of Articles/Sections:<br>Article/Section:  2 - Orders<br>Buyer will order and make available for retail sale all grades of Gasoline which BPWCP offers to Buyer (hereinafter collectively, "Product"), in amounts sufficient to satisfy all foreseeable retail customer demand for Product at the Premises and will at all times have available for sale some of each grade of Product, subject only to allocation of Product by BPWCP in a manner determined in BPWCP's sole discretion in Buyer's geographic area. |
| Details of Violation: (If applicable)<br><br>Franchisee refused to accept this morning's fuel delivery. |
| |
| |
| Date default was observed: October 16, 2006<br><br>Approximate Time Default was observed: 6:00 a.m.<br>By: Brad Christensen<br><br>Date Default to be cured: October 19, 2006 |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this <u>18th</u> day of October, 2006.
BP West Coast Products LLC

By: _____
        Tom Reeder – Regional Sales Manager

cc:  D. Strenk
     B. Christensen
     Dealer File

BP 01630

 **BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2541

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 5, 6 | System Manual: |

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Franchise did not have sufficient funds (NSF) available to pay for gas loads.  Check was  returned on 1/8/07.

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **January 08, 2007** | **15:17:00**   by:  **CHRISTENSN** | **January 30, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 23 day of January, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

     **Tom Reeder - Regional Sales Manager**                    cc: CHRISTENSN
                                                                    STRENK
                                                                    DEALER FILE

Document Number: 02497848
APPC-440-B-PC Version (9-94)

BP 01632

 **BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2565

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 5, 6 | System Manual: . |

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Failure to pay for fuel loads.

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| **January 26, 2007** | **20:42:00**   by: **CHRISTENSN** | **February 01, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 29 day of January, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02497857
APPC-440-B-PC Version (9-94)

BP 01633

109

 **BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #:

**STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
**am/pm:**                    **Gas: 5, 6**                        System Manual:

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Franchisee is being defaulted for non payment of gasoline.

Note:  One 2/2/07, fuel load was brought to the site and there was no Cashier's check available for load payment. Load was dropped anyway.  On 2/6/07, Franchise Consultant (Brad Christensen made an agreement with Franchisee that Franchisee would put extra for $22K in with next delivery (paying a total of $44K).  On the next delivery only one check was included in payment for $22,500 on 2/7/07. Refer to inv. #3022358998 and 3022375842.

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
|---|---|---|---|
| **February 15, 2007** | **10:27:00**  by:  **CHRISTENSN** | | **February 20, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 20 day of February, 2007.
BP West Coast Products LLC

By: _____

**Tom Reeder - Regional Sales Manager**

Document Number: 02498466
APPC-440-B-PC Version (9-94)

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com ®

**OFFICIAL USE**

| Postage | $ | |
|---|---|---|
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

7005 1160 0000 4099 2718

BP 01636



**BP West Coast Products LLC**

Default Notice

Facility Number:  **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2817

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 5, 6 | System Manual: |

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Failure to pay for gasoline.  Franchisee's payment was returned due to non sufficient funds.
Check #1220 returned due to Franchisee putting a stop payment,

| Date Default was observed: | Approximate Time Default was observed: | | Date Default to be cured: |
| --- | --- | --- | --- |
| **March 05, 2007** | **14:28:00** | by:  **CHRISTENSN** | **March 22, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 15 day of March, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_ _____

**Tom Reeder - Regional Sales Manager**

Document Number: 02489113
APPC-440-B-PC Version (9-94)



BP 01637

 **BP West Coast Products LLC**

**Default Notice**

Facility Number:  **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 4099 2817

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 5, 6 | System Manual: |

Description:

Pay for products prior to their delivery in U.S. dollars.

Details of Violation: (if applicable)

Failure to pay sums due on account as of 3/5/07.  Amount due - $164,950.81.

Doc. date Doc. no.      Amount     BOL Date   BOL #   Text
1/1/2007   3022056233  $21,078.93  12/31/06  0556080  returned on 1/08/07 due to stop payment
1/8/2007   3022120003  $20,859.48  1/7/07    0559505  returned NSF on 1/16/07
1/14/2007  3022159335  $20,866.68  1/11/07   0561573  returned on 1/19&1/25 due to stop payment  1/15/2007
3022178299  $21,472.44  1/13/07    0562666  inv. held per fc site has issues due to power outage
1/21/2007  3022213698  $20,938.66  1/19/2007  0565619  returned on 1/26/07 due to stop payment
SEE ATTACHMENT FOR MORE INFORMATION

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| **January 30, 2007** | **14:28:00    by:  CHRISTENSN** | **March 22, 2007** |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 15 day of March, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02499116
APPC-440-B-PC Version (9-94)

BP 01634



| Doc. date | Doc. no. | Amount | BOL Date | BOL # | Text |
|---|---|---|---|---|---|
| 1/24/2007 | 3022253575 | $20,836.93 | 1/23/2007 | 0567848 | returned on 1/31/07 due to stop payment |
| 1/31/2007 | 3022309234 | $20,851.09 | 1/30/2007 | 0571519 | first COD invoice |
|  |  |  |  |  | **check #1220 returned due to dlr putting stop payment** |
| 2/5/2007 | 3022358998 | $21,338.16 | 2/2/2007 | 0573078 |  |
| 2/7/2007 | 3022375842 | $21,897.50 | 2/7/2007 | 0575276 |  |
| 2/12/2007 | 3022414847 | $21,252.22 | 2/10/2007 | 0576943 |  |
|  |  |  |  |  | dlr gave driver $1,800 in cash - Scott Murdock converted to CCHK |
| 2/14/2007 | 3022432918 | $21,084.27 | 2/14/2007 | 0578900 | check not yet posted |
| 2/19/2007 | 3022468658 | $22,136.36 | 2/17/2007 | 0580700 | check not yet posted |
| 2/21/2007 | 3022487185 | $21,563.53 | 2/20/2007 | 0582187 | check not yet posted |
| 2/25/2007 | 3022513117 | $22,138.70 | 2/24/2007 | 0584166 | check not yet posted |
| 2/26/2007 | 3022525674 | $22,167.59 | 2/26/2007 | 0585118 | check not yet posted |
| 3/4/2007 | 3022579291 | $22,968.27 | 3/2/2007 | 0587337 | check not yet posted |

Total due bp:  **$343,450.81**

Net due bp:  **$164,950.81**

BP 01635

113



**BP West Coast Products LLC**

Default Notice

Facility Number: **82461**

**Certified Mail**
Return Receipt Requested #: 7005 1160 0000 410 6971

**STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: **Contract Dealer Gasoline Agreement** |
|---|
| Violation of Articles/Sections:<br>am/pm:                Gas: 15.1,17.1(k), Exh.A                System Manual: |
| Description:<br>Operate premises accordance with all applicable federal, state and local laws (health,safety,etc.) |

| Details of Violation: (if applicable) |
|---|
| Failure to operate in accordance with laws.<br>Facility operator left fuel dispensing equipment turned on so customers could pump gasoline without an employee attendant present for safety measures, as prescribed by law.  On Friday, March 30, 2007, at 6:16 a.m., a BP employee witnessed and confirmed a fueling purchase when no employee was present on site.  Facility was closed and customer could access PIC for fueling transaction.  A PIC printed receipt was generated as evidence of fuel purchase.  This facility's dispensing permit does not allow for fueling without a station employee present.<br><br>Cure date: Immediately |

| Date Default was observed:<br>**March 30, 2007** | Approximate Time Default was observed:<br>**06:16:00**   by: **CHRISTENSN** | Date Default to be cured: |
|---|---|---|

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 5 day of April, 2007.
BP West Coast Products LLC

By:  _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02499914
APPC-440-B-PC Version (8-94)

BP 01638

114

 **BP West Coast Products LLC**

Default Notice

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7006 3450 0000 3879 4174

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: **Contract Dealer Gasoline Agreement** |
| --- |

| Violation of Articles/Sections: am/pm: | Gas: 2 | System Manual: |
| --- | --- | --- |

Description:

Have all grades of motor fuels available for sale to the public

Details of Violation: (if applicable)

All motor fuels available.   Failure to have all grades of Motor Fuels available for sale to the public.   On 5/10 & 5/14/2007, Franchise Consultant, CMS, and Regional Sales Manager  observed that no diesel fuel was available for customers.

Cure date: Immediately

| Date Default was observed: **May 14, 2007** | Approximate Time Default was observed: **11:00:00**   by:  **CHRISTENSN** | Date Default to be cured: |
| --- | --- | --- |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 17 day of May, 2007.
BP West Coast Products LLC

By:  _Thomas Reed_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
     STRENK
     DEALER FILE

Document Number: 02501379
APPC-440-B-PC Version (9-94)

BP 01639

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

Certified Mail
Return Receipt Requested #: 7007 0710 0004 4236 3239

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29) Cure date: 1. day. Immediately.

| | | | Date Default to be cured: |
| --- | --- | --- | --- |
| August 24, 2007 | 17:00:00 | by:  CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

Tom Reeder - Regional Sales Manager

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number: 02504284
APPC-440-B-PC Version (9-94)

BP 03560

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3246

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26. Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed: 8/29). Cure date: 1. day. Immediately

| | | Date Default to be cured: |
|---|---|---|
| August 25, 2007 | 17:00:00    by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504295
APPC-440-B-PC Version (9-94)

BP 03561

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3253

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement |
|---|
| Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement |

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1. day. Immediately ·

| August 26, 2007 | 13:15:00   by: CHRISTENSN | Date Default to be cured: |
|---|---|---|

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
STRENK
DEALER FILE

Document Number: 02504296
APPC-440-8-PC Version (9-94)

BP 03562

 BP West Coast Products LLC

Default Notice

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3260

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (If applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchisee Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date:  1. day. Immediately

| | | Date Default to be cured: |
|---|---|---|
| August 27, 2007 | 17:00:00   by:  CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number:  02504297
APPC-440-B-PC Version (9-94)

BP 03563

 **BP West.Coast Products LLC**

Default Notice

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3277

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

| Description: |
| --- |
| Have all grades of Motor Fuels available for sale to the public |

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN; Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).  Cure date:  1. day. Immediately

| August 28, 2007 | 17:00:00 | by:  CHRISTENSN | Date Default to be cured: |
| --- | --- | --- | --- |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By:  *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number:  02504298
APPC-440-B-PC Version (9-94)

BP 03564

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3284

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks. 2. Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory. He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels Available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29). Cure date: 1 day. Immediately

| Date Default was observed: | | | Date Default to be cured: |
|---|---|---|---|
| August 29, 2007 | 16:30:00 | by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: *Thomas Reeder*

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504299
APPC-440-B-PC Version (9-94)

BP 03565

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3291

STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA  95035

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement |
| --- |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads.  STTN. Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.  2.  Insufficient Working Capital. Franchises Sayed F. told FC he does not have enough money. He cannot gather enough fund to pay for gas inventory.  He has not purchased ARCO Branded Motor Fuel on any day since August 17, 2007. 3. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold gasoline any of the following days:
Fri. 8/24, Sat. 8/25, Sun. 8/26, Mon. 8/27, Tues. 8/28
No 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers.  FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).  Cure date: 1. day. Immediately

| Date Default observed: | Approximate Time Default was observed: | | Date Default to be cured: |
| --- | --- | --- | --- |
| August 30, 2007 | 17:00:00 | by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 31 day of August, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

     Tom Reeder - Regional Sales Manager

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number:  02504300
APPC-440-B-PC Version (9-94)

BP 03566

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3345

STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA 95035

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

Title of Agreement:
**Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement**

Violation of Articles/Sections:
am/pm:                    Gas: 2                    System Manual: Sec. 1

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. Pay for gasoline. PMPA 6. Gasoline must be paid for at time of delivery in U.S. Dollars. STTN, Inc. owes BP $114,000.88. for delivered fuel loads. STTN Inc. put bank Stop Payments on 4 multiple fuel invoices and 2 Williams Fuel Delivery Driver's were not given cashiers checks, but had already dropped the fuel into STTN Inc. tanks.
2. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility has not sold required gallons of gasoline any of the following days: Friday, 8/31/07. No. 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had several phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to FC recommending he orders fuel. Talked Thursday 8/23, Fri. 8/24, Mon. 8/27. (message left Wed. 8/29).

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| August 31, 2007 | 18:30:00    by:  CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

Tom Reeder - Regional Sales Manager

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504405
APPC-440-B-PC Version (9-94)

123

BP 03567

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3352

STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA 95035

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:
Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to FC recommending he order fuel. FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| September 01, 2007 | 12:00:00    by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

Tom Reeder - Regional Sales Manager

cc: CHRISTENSN
    STRENK
    DEALER FILE

Document Number: 02504406
APPC-440-B-PC Version (9-94)

BP 03568

 **BP West Coast Products LLC**

Default Notice

Facility Number:  82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3369

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the
default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

| Description: |
| --- |
| Have all grades of Motor Fuels available for sale to the public |

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the
public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the
facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day
period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel
grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use
by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each
conversation led to my recommending he order fuel.  FC explained this default directly to Sayed on Thurs 8/23, Fri.
8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call
with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date:  Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| **September 02, 2007** | **12:00:00**  by:  **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007.
BP West Coast Products LLC

By:  *Thomas Reeder*

    **Tom Reeder - Regional Sales Manager**

cc:  CHRISTENSN
     STRENK
     DEALER FILE

Document Number:  02504409
APPC-440-B-PC Version (9-94)

BP 03569

 BP West Coast Products LLC

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #: 7007 0710 0004 4236 3383

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA 95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
|---|
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
|---|---|---|
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel. FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date: Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
|---|---|---|
| September 03, 2007 | 12:00:00  by: CHRISTENSN | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 4 day of September, 2007,
BP West Coast Products LLC

By: _____

**Tom Reeder - Regional Sales Manager**

cc: CHRISTENSN
　　STRENK
　　DEALER FILE

Document Number: 02504410
APPC-440-8-PC Version (9-94)

BP 03570

 **BP West Coast Products LLC**

Default Notice

Facility Number: 82461

**Certified Mail**
Return Receipt Requested #:

**STTN ENTERPRISES INC.**
**631 SAN FELIPE ROAD**
**HOLLISTER, CA  95035**

You are hereby notified that you are in default of your obligations under the terms and conditions of the foregoing Agreements in effect on the date of the default between BP West Coast Products LLC, which Agreements relates to the business activity conducted by you at the address shown above.

Said Default was observed on the date and at the approximate time shown below.

| Title of Agreement: |
| --- |
| **Non-Lessee - am/pm Mini Market Agreement, Contract Dealer Gasoline Agreement** |

| Violation of Articles/Sections: | | |
| --- | --- | --- |
| am/pm: | Gas: 2 | System Manual: Sec. 1 |

Description:

Have all grades of Motor Fuels available for sale to the public

Details of Violation: (if applicable)

1. All Motor Fuels Available. PMPA 2. SYSMAN Sec. 1. Have all grades of Motor Fuels available for sale to the public. Facility continues to operate without Diesel Fuel Sales since 8/2/2007. STTN Inc. continues to operate the facility without fuel sales to Arco customers for 13 days. Termination is possible without fuel sales for any 7 day period. Effective today 9/4/07 facility has not sold required gallons of gasoline any of the following days: No fuel grades 87, 89, 91, or Diesel fuel sales since night of 8/23/07. All dispensers are cautioned taped off from any use by customers. FC has had multiple phone discussions informing Sayed he is required to sell Arco Fuel. Each conversation led to my recommending he order fuel.  FC explained this default directly to Sayed on Thurs 8/23, Fri. 8/24, Mon. 8/27, Tues 8/28, Thur 8/29, Fri 8/30, Sat 9/1, Tues 9/4. On Fri 8/30 RSM convened a conference call with Sayed and FC to confirm and clarify Sayed was, again, aware of his continued violation of BP Agreements.

Cure date:  Immediately

| Date Default was observed: | Approximate Time Default was observed: | Date Default to be cured: |
| --- | --- | --- |
| **September 04, 2007** | **12:00:00** by: **CHRISTENSN** | |

You are hereby further notified to correct said default within the period specified by and in accordance with the provisions of the Agreement.

Dated this 5 day of September, 2007.
BP West Coast Products LLC

By: _Thomas Reeder_

Tom Reeder - Regional Sales Manager

Document Number: 02504445
APPC-440-B-PC Version (9-94)

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*
For delivery information visit our website at www.usps.com™

**OFFICIAL USE**

| | |
| --- | --- |
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To

Street, Apt. No.
or PO Box No.

City, State, ZIP+4

7007 0710 0004 4236 3376

BP 03571

# EXHIBIT G

| Sum of Gal | | | Product | | |
|---|---|---|---|---|---|
| End Date | BOL# | Diversion | Regular | Premium | Grand Total |
| 2-May-07 | 620383 | 0 | 8,699 | | 8,699 |
| 5-May-07 | 210956 | 0 | 8,702 | | 8,702 |
| 10-May-07 | 624626 | 0 | 8,698 | | 8,698 |
| 14-May-07 | 626303 | 0 | 7,499 | 1,301 | 8,800 |
| 17-May-07 | 628062 | 0 | 8,698 | | 8,698 |
| 20-May-07 | 629517 | 0 | 7,101 | 1,601 | 8,702 |
| 23-May-07 | 212765 | 0 | 8,702 | | 8,702 |
| 28-May-07 | 633683 | 0 | 7,708 | 1,009 | 8,717 |
| 31-May-07 | 635288 | 0 | 7,102 | 1,601 | 8,703 |
| 2-Jun-07 | 636291 | 0 | 7,601 | 1,000 | 8,601 |
| 5-Jun-07 | 637658 | 0 | 7,702 | 1,000 | 8,702 |
| 8-Jun-07 | 639429 | 0 | 7,150 | 1,551 | 8,701 |
| 11-Jun-07 | 640629 | 0 | 5,800 | 1,000 | 6,800 |
| 13-Jun-07 | 641901 | 0 | 8,703 | | 8,703 |
| 16-Jun-07 | 643462 | 0 | 7,701 | 1,001 | 8,702 |
| 18-Jun-07 | 644376 | 0 | 7,801 | 1,001 | 8,802 |
| 21-Jun-07 | 645926 | 0 | 7,601 | 1,000 | 8,601 |
| 23-Jun-07 | 646883 | 0 | 7,203 | 1,502 | 8,705 |
| 29-Jun-07 | 649997 | 0 | 8,706 | | 8,706 |
| 30-Jun-07 | 650634 | 0 | 7,103 | 1,601 | 8,704 |
| 2-Jul-07 | 651473 | 0 | 7,204 | 1,501 | 8,705 |
| 5-Jul-07 | 653016 | 0 | 8,705 | | 8,705 |
| 7-Jul-07 | 653849 | 0 | 7,203 | 1,501 | 8,704 |
| 12-Jul-07 | 656306 | 0 | 7,728 | 1,110 | 8,838 |
| 14-Jul-07 | 657261 | 0 | 7,799 | 1,000 | 8,799 |
| 16-Jul-07 | 658187 | 0 | 8,701 | | 8,701 |
| 21-Jul-07 | 660634 | 0 | 7,802 | 1,001 | 8,803 |
| 24-Jul-07 | 219627 | 0 | 8,702 | | 8,702 |
| 27-Jul-07 | 663925 | 0 | 7,103 | 1,600 | 8,703 |
| 30-Jul-07 | 665116 | 0 | 7,100 | 1,601 | 8,701 |
| 3-Aug-07 | 220839 | **-8702** | 8,702 | | 8,702 | these gallons were not delivered |
| | 667058 | **-8704** | 8,704 | | 8,704 | these gallons were not delivered |
| 4-Aug-07 | 667678 | 0 | 8,706 | | 8,706 |
| 8-Aug-07 | 221350 | 0 | 7,202 | 1,501 | 8,703 |
| | 669632 | **-7804** | 7,804 | | 7,804 | these gallons were not delivered |
| | | **-1000** | | 1,000 | 1,000 | these gallons were not delivered |
| 11-Aug-07 | 671087 | 0 | 8,701 | | 8,701 |
| 13-Aug-07 | 672191 | 0 | 7,259 | 1,501 | 8,760 |
| 18-Aug-07 | 674543 | 0 | 7,704 | 1,000 | 8,704 |
| Grand Total | | | 298,809 | 30,484 | 329,293 |

# EXHIBIT H



**bp West Coast Products LLC**
4 Centerpointe Drive
LaPalma, CA 90623

September 6, 2007

**HAND DELIVERY AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**#7007 0710 0004 4233 2815**

STTN ENTERPRISES INC.
631 SAN FELIPE ROAD
HOLLISTER, CA 95035

Re:    <u>Facility No. 82461</u>

<u>**NOTICE OF TERMINATION**</u>

You are currently a party to an am/pm Mini Market Agreement and Contract Dealer Gasoline Agreement both dated July 11, 2006 and various related agreements (the "Agreement"), with BP West Coast Products LLC ("BPWCP"), concerning the above facility located at 631 San Felipe Road, Hollister, CA. (the "Facility").

**Please take notice** that the Agreements and the am/pm mini market and the petroleum franchise created thereunder shall terminate **immediately** for the reasons set forth below:

You have failed to have any gasoline products available for sale to the motoring public for at least 7 consecutive days. In fact, the Facility has not sold gasoline since the evening of August 23rd and your dispensers have been cautioned taped off from any use by customers. You have been sent a total of twelve (12) defaults for failure to offer all grades of gasoline for sale. Although the period to cure the defaults has passed, as of today, none of the defaults have been cured.

Under these circumstances it would not be reasonable for BPWCP to furnish notification of 90 days prior to the date of termination because of the risk of confusion to the public as well as possible safety risks.

In addition, you have failed to timely pay BP for gasoline products in a timely manner. You currently have an outstanding balance of $126,394.77 for gasoline product deliveries that are due and payable at the time of delivery. Your payment history reflects numerous returned items that were "bounced" by your bank for non-sufficient funds. You are also responsible for any outstanding royalty charges due and payable to BPWCP.

Section 17.1 of the Agreement provides for termination of that Agreement upon the occurrence of the following triggering events:

(a) Buyer fails to exert good faith efforts to carry out the provisions of the Agreement following written notice and opportunity to cure;

BP 03180

131

(h) Buyer fails to timely pay all sums due to which BPWCP is legally entitled;

(i) Buyer fails to operate the Premises for seven (7) consecutive calendar days, or lesser period, which constitutes an unreasonable period of time.

(o) Buyer breaches any material provision of this Agreement, including without limitation, "Buyer's failure to order and make available for sale quantities of each grade of Product which are sufficient to satisfy foreseeable customer demand."

Furthermore, the above stated conduct constitutes grounds for termination of the am/pm Mini Market Agreement and franchise. The relevant provision providing for termination is Article 18.05, "In case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement."

Article 19.01(d) of the am/pm Mini Market Agreement provides: "Operator shall pay to BPWCP at the time of termination, as liquidated damages and not as a penalty, the greater of (a) the total minimum royalty fee which would have been payable under the Agreement from the date of termination of the Agreement through the end of the term provided for in the Agreement; or (b) for each month from the date of termination of the Agreement through the end of the term provided in the Agreement, the actual average royalty fee paid but not less than the minimum royalty fee for any months that the Store was operational prior to the termination of the Agreement." The amount owed to BPWCP is $235,000.00. This sum shall be immediately due and payable. You shall also be held answerable for all other damages due BPWCP under the Agreements and applicable law.

In addition, you are a party to certain loan agreements (the "Loan Agreements"). As of September 5, 2007, there remains an outstanding balance on the Loan Agreements of $150,000.00. The termination of the Agreements is an Event of Default under the Loan Agreements. The Loan Agreements require that you repay the outstanding balance of the Loans within 30 days of the occurrence of an Event of Default. The termination of the Agreements is an Event of Default.

**YOU ARE HEREBY NOTIFIED THAT YOU ARE OBLIGATED TO PAY THE FULL AMOUNT OF THE UNPAID LOANS WITHIN 30 DAYS OF THE TERMINATION OF THE AGREEMENTS.**

These are all provisions that are both reasonable and of material significance to the franchise relationship. In addition, failing to offer any gasoline for sale and failure to pay sums due under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §2801 et seq., specifically, §2802(b)(2)(C) and (c)(9).n. A Summary Statement of the PMPA is attached to this Notice.

Additional provisions of the PMPA relevant to this termination are: 1) failure by the franchisee to comply with a provision of the franchise, which is both reasonable and material significance to the franchise relationship [§2802(b)(2)(A)]; and 2) occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise relationship is reasonable [§2802(b)(2)(C)], specifically, failure by the franchisee to pay to the franchisor in a timely manner when due all sums

BP 03181

to which the franchisor is legally entitled. As well as your failure to operate the marketing premises for 7 consecutive days, or a shorter period of time which, taking in to account facts and circumstances, amounts to an unreasonable time not to operate, are enumerated events forming the basis for termination under §2802(b)(2)(C).

Accordingly, upon the above-stated effective date of this Notice of Termination, you are to cease selling ARCO-branded gasoline and cease using the ARCO names, trademarks, or trade names and cease holding yourself out as an authorized dealer of ARCO-branded motor fuel at the facility. You will be required to comply with the procedures on expiration or termination described the Agreements. Furthermore, you are required to permit BPWCP to enter upon the premises to remove or de-identify all of ARCO's trademarks and property at the premises. You must also return to BPWCP all materials bearing ARCO service marks or trademarks. You must pay BPWCP any sums due and owing to BPWCP as a result of your operation of the Facility.

By giving this Notice of Termination, BPWCP neither waives nor surrenders any of its rights under the Agreements or at law, including but not limited to: (1) its right to advance the effective date of the termination for similar or dissimilar acts or conduct constituting a breach of the Agreements or other legal grounds for such action; (2) its rights to provide by supplementary notice that the termination set for the above date also be based on other grounds; and (3) its rights to receive any sums due and owing to BPWCP. Such sums should be forwarded to BPWCP upon their due date.

BP West Coast Products LLC

By: _____
    Thomas Reeder
    Regional Sales Manager

cc:   Facility File
      Brad Christensen

BP 03182

FEDERAL REGISTER
Vol. 61, No. 123

Notices

DEPARTMENT OF ENERGY (DOE)

Revised Summary of Title I of the Petroleum Marketing Practices Act

61 FR 32786

DATE: Tuesday, June 25, 1996

ACTION: Notice.

------------------------------------------------------------------------ To view the next page, type .np* TRANSMIT.
To view a specific page, transmit p* and the page number, e.g. p*1
------------------------------------------------------------------------[*32786]

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, *15 U.S.C. §§ 2801*-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective  [*32787]  responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. *43 F.R. 38743 (1978)*.

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a

BP 03183

franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), *15 U.S.C. §§ 2801*-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

BP 03184

135

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 *(15 U.S.C. §§ 2801-2806)*. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 [*32788] days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See *15 U.S.C. § 2802*(b)(E).

BP 03185

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

BP 03186

II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.. [*32789]

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

BP 03187

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. *15 U.S.C. §§ 2801-2806.*

BP 03188

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I--Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a    [*32790] trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

BP 03189

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

## F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

## G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

## A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

## B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

## C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

## D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

BP 03190

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Marc W. Chupka,

Acting Assistant Secretary for Policy.

[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

BILLING CODE 6450-01-P

4673 words

BP 03191