EXHIBIT 1

LEXSEE 131 CAL APP 4TH 703

**250 L.L.C., Plaintiff and Appellant, v. PHOTOPOINT CORP. (USA), Defendant; SHERWOOD PARTNERS, INC., Intervener and Appellant. SHERWOOD PART-NERS, INC., Plaintiff and Appellant, v. 250 L.L.C., Defendant and Appellant.**

**A105231**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVI-SION FOUR**

**131 Cal. App. 4th 703; 32 Cal. Rptr. 3d 296; 2005 Cal. App. LEXIS 1186; 2005 Cal. Daily Op. Service 6688; 2005 Daily Journal DAR 9136**

**July 28, 2005, Filed**

**SUBSEQUENT HISTORY:** Modified and rehearing denied by 250 v. PhotoPoint Corp., 2005 Cal. App. LEXIS 1366 (Cal. App. 1st Dist., Aug. 29, 2005) Review denied by 250 L L C v. Photopoint Corp., 2005 Cal. LEXIS 11901 (Cal., Oct. 26, 2005)

**PRIOR HISTORY:**   [***1] Superior Court of City and County of San Francisco, No. 324137, No. 401396, Perker L. Meeks, Jr., Judge.

**DISPOSITION:**   The judgment is reversed.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

In consolidated actions that arose from a dispute concerning a substantial security deposit under a commercial lease between a lessor and a lessee, the trial court ruled that the lessor failed to return the lessee's security deposit as required by Civ. Code, § 1950.7. The trial court also ruled that the lessor was entitled to offset the amount of the security deposit that it withheld against the even greater amount of damages that it sustained on account of the lessee's breach of the lease and that, therefore, the lessee sustained no actual damages and was not entitled to return of the deposit. (Superior Court of the City and County of San Francisco, Nos. 324137 and 401396, Perker L. Meeks, Jr., Judge.)

The Court of Appeal reversed, holding that the lessor violated Civ. Code, § 1950.7, by retaining the security deposit to cover its damages for future rent owed under the lease because § 1950.7 allowed a security deposit to be applied only against unpaid rent that had accrued as of the date called for in the statute for the return

of the deposit. The words "defaults in the payment of rent" in § 1950.7 did not refer to future rent damages that the landlord could thereafter recover under Civ. Code, § 1951.2. While the parties to a commercial lease could waive Civ. Code, § 1950.7, to provide that a security deposit might be held and applied against future rent damages, no such waiver was made in the lease at issue. The amount of the security deposit that the lessor wrongly retained could not be offset against its future rent damages because that result would enable the lessor to profit from its violation of § 1950.7. (Opinion by Kay, P. J., with Reardon and Rivera, JJ., concurring.) [*704]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Landlord and Tenant § 99--Rent and Security--Security Deposits--Retention, Application or Return--Commercial Leases.**--Security deposits in commercial leases are governed by Civ. Code, § 1950.7. If a deposit was used to cover only defaults in the payment of rent, then the balance is to be returned to the tenant within two weeks after the landlord receives possession of the premises.

**(2) Landlord and Tenant § 138--Termination--Abandonment--Rights and Remedies of Landlord.**--A California lessor with abandoned premises has two mutually exclusive remedies: deem the lease terminated and seek damages pursuant to Civ. Code, § 1951.2, or, under Civ. Code, § 1951.4, continue to perform under the lease and seek rent as it becomes due. Through the termination of the lease upon abandonment, Civ. Code, § 1951.2, converts a landlord's continuing right to rent under the

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

lease into a damage claim for rent lost through the tenant's abandonment.

**(3) Landlord and Tenant § 99--Rent and Security-- Security Deposits--Retention, Application or Return-- Landlord's Liability for Bad Faith Wrongful Retention.**--Under Civ. Code, § 1950.7, subd. (f), a landlord who retains a security deposit in violation of the statute and does so in bad faith is liable for up to $ 200 in damages in addition to any actual damages the tenant sustains. Whereas § 1950.7 affords a summary deduct-and-retain procedure that is to be completed shortly after the landlord's recovery of possession, Civ. Code, § 1951.2, contemplates a court action in which damages are adjudicated. Any estimate of § 1951.2 damages within the limited timeframe of Civ. Code, § 1950.7, would necessarily be speculative. If the rent to be offset against the security deposit must be calculated and the excess returned within two weeks after the premises are surrendered to the landlord, the offset clearly is limited to rent due through the time of surrender.

**(4) Landlord and Tenant § 99--Rent and Security-- Security Deposits--Retention, Application or Return-- Time Limitations.**--The language of Civ. Code, § 1950.7, subd. (c), unambiguously provides that a lessor must credit a security deposit against any rent owing within two weeks following the termination of the lease, at which time the lessee becomes entitled to the balance, if any. Section 1950.7, subd. (c), makes no reference to the application of the deposit towards the amount of any judgment against the lessee. [*705]

**(5) Landlord and Tenant § 124--Termination--Notice to Tenant of Reletting of Premises.**--Civ. Code, § 1951.7, provides that, after a lease is terminated pursuant to Civ. Code, § 1951.2, and if certain conditions are met, including an advance payment by the tenant of over one month's rent under the original lease, the tenant is to receive written notice from the landlord of the reletting of the premises and the term and rent under the new lease. An "advance payment" for purposes of Civ. Code, § 1951.7, is defined, like a security deposit under Civ. Code, § 1950.7, to include money paid to the landlord to secure performance under the lease, pursuant to Civ. Code, §§ 1950.7, subd. (a), 1951.7, subd. (a). A former tenant exposed to future rent damages will have an interest in the landlord's efforts to mitigate them by reletting the premises, whether or not the landlord retains the security deposit. Section 1951.7 does not in any way affect the right of the lessor to recover damages nor the right of a lessee to recover prepaid rent, a security deposit, or other payment. Section 1951.7 is included merely to provide a means whereby the lessee whose lease has been terminated under Civ. Code, § 1951.2, may obtain in-

formation concerning the length of the term of the new lease and the rent provided in the new lease.

**(6) Landlord and Tenant § 99--Rent and Security-- Security Deposits--Retention, Application or Return-- Future Rent Damages.**--The existence of a landlord's right to recover its damages under Civ. Code, § 1951.2, does not depend on a rule that would allow retention of a security deposit for application against possible future rent damages. It is appropriate to retain the deposit so as to utilize the remedy provided under Civ. Code, § 1951.4, and Civ. Code, § 1950.7, does not prevent that recourse. Under Civ. Code, § 1951.4, when the tenant breaches the lease and abandons the premises, the landlord may, if certain conditions are met, elect not to terminate the tenant's right to possession and instead continue to enforce its rights under the lease, including the right to collect the rent as it becomes due. Because the tenant in that event retains the right to sublet the premises or assign its interest in the lease, § 1951.4, subd. (b), the landlord does not receive possession of the premises within the meaning of Civ. Code, § 1950.7, the duty to return the security deposit does not arise, and the landlord can continue to apply the deposit against the rent as it accrues.

**(7) Landlord and Tenant § 99--Rent and Security-- Security Deposits--Retention, Application or Return.**--Cases decided before advent of the right to recover future rent damages under Civ. Code, § 1951.2, can provide no definitive rule governing security for the use of that remedy and, in any event, those decisions have been abrogated insofar as they [*706] conflict with Civ. Code, § 1950.7. Section 1950.7 specifies the obligations against which a security deposit can be applied and directs that the balance of the deposit remaining after those deductions be refunded promptly to the tenant. Civ. Code, § 1950.5, restricts the use of a security deposit to specifically defined purposes and requires that the deposit be returned to the extent it is not necessary for those limited purposes. Those observations apply equally to Civ. Code, § 1950.7.

**(8) Landlord and Tenant § 99--Rent and Security-- Security Deposits--Retention, Application or Return-- Landlord's Wrongful Retention.**--The words "defaults in the payment of rent" in Civ. Code, § 1950.7, refer only to unpaid rent that has accrued as of the time a security deposit is required to be returned, and do not refer to future rent damages a landlord may thereafter recover under Civ. Code, § 1951.2. Accordingly, in a dispute concerning a substantial security deposit under a commercial lease between a lessor and a lessee, the lessor violated Civ. Code, § 1950.7, by retaining the lessee's security deposit to cover its damages for future rent owed

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

under the lease because § 1950.7 allowed a security deposit to be applied only against unpaid rent that had accrued as of the date called for in the statute for the return of the deposit. If the lessor had followed Civ. Code, § 1951.4, it could have applied the security deposit against the monthly rent as it became due until the deposit was exhausted, but, instead, it elected under Civ. Code, § 1951.2, to terminate the lease and the lessee's right of possession thereunder, and thereby triggered the duty to return the security deposit as provided in Civ. Code, § 1950.7..]

[1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 523, 525; Westley & Saltz, Matthew Bender Practice Guide: Cal. Landlord-Tenant Litigation (2005) § 4.57[1]

**(9) Letters of Credit § 2--Definitions and Distinctions--Doctrine of Independence.**--The doctrine of independence protects only the distribution of the proceeds of a letter of credit. It prohibits an attack on the issuing bank's distribution to the beneficiary and does not address claims respecting the underlying contract. It is one thing to attempt to prevent the distribution of the proceeds of a letter of credit, an attempt the doctrine of independence is designed to prevent; but it is another to bring an action on the underlying contract that created the letter of credit. There is no principled reason for allowing a challenge to the underlying contract when the fee is paid in cash and not allowing such a challenge after the fee is paid via a standby letter of credit. Challenging the distribution of the proceeds of a letter of credit is different than challenging the underlying contract. The ultimate result may be the same [*707] (refund of the fee), but in one case the method of recovery is permissible and in the other it is barred.

**(10) Landlord and Tenant § 11--Leases--Agreements for Leases--Waiver of Statutory Protections.**--A tenant under a commercial lease may effectively agree to waive the protections of Civ. Code, § 1950.7.

**(11) Landlord and Tenant § 103--Rent and Security--Remedies of Landlord--Lessee's Obligations Under Lease.**--A lessor's election to forfeit the lessee's rights under a lease because of the lessee's default, or even a judgment in unlawful detainer declaring a forfeiture of the lessee's rights, does not relieve the lessee of the obligations imposed by the lease. That is the precise effect of Civ. Code, § 1951.2, which abrogates the common law rule that the lessee's obligation to pay rent depends on the continued existence of the term.

**(12) Contracts § 27--Construction and Interpretation--Evidence to Aid--Integration and Unavailability of Parol Evidence.**--Where the parties to a written contract have agreed to it as an integration--a complete and final embodiment of the terms of an agreement--parol evidence cannot be used to add to or vary its terms.

**(13) Contracts § 27--Construction and Interpretation--Evidence to Aid--Admissibility of Extrinsic Evidence.**--The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

**(14) Contracts § 25--Construction and Interpretation--Function of Courts--Questions of Law.**--Whether the language of an agreement is reasonably susceptible to a proposed interpretation is a question of law.

**(15) Cross-complaints and Setoffs § 11--Defense--Claim for Monetary Relief.**--Code Civ. Proc., § 431.70, does not create a substantive right to raise setoff as a defense to a claim for monetary relief, but merely describes the procedures to be followed in raising this defense.

**(16) Landlord and Tenant § 103--Rent and Security--Remedies of Landlord--Damages for Unpaid Rent, Repairs, and Cleaning.**--A landlord who has in good faith failed to return a security deposit as required by Civ. Code, § 1950.5, can nonetheless recover damages for unpaid rent, repairs, and cleaning in a subsequent judicial proceeding. The mere fact that the landlord has lost the right to take advantage of the [*708] summary deduct-and-retain procedure of § 1950.5, subd. (f), does not lead to the conclusion that it has lost all right to claim damages for unpaid rent, repair, and cleaning, whether through setoff or otherwise. A landlord that seeks setoff after good faith noncompliance with the procedures described in § 1950.5, subd. (f), does not profit from its own wrong because it cannot set off any damages it could not have recovered if it had complied with § 1950.5, subd. (f). A landlord that in good faith violates the security deposit statute may offset against its damages only those amounts which it properly could have claimed of the security deposit in the first place.

**(17) Landlord and Tenant § 49--Possession and Use of Premises--Tenant's Right--Unlawful Detainer.**--A tenant can remain in possession until an unlawful detainer judgment is rendered.

**COUNSEL:** Law Offices of Janet Brayer and Janet Brayer for Plaintiff and Appellant and for Defendant and Appellant.

Sulmeyer Kupetz, Dean G. Rallis, Jr., and Diane C. Stanfield for Intervener and Appellant and for Plaintiff and Appellant.

**JUDGES:** Kay, P. J., with Reardon, and Rivera, JJ., concurring.

**OPINION BY:** Kay

**OPINION**

[**298]   **KAY, P. J.**--Sherwood Partners, Inc., as assignee for the benefit of creditors of PhotoPoint Corp. (USA), and 250 L.L.C. (250) appeal from the judgment in these consolidated actions arising from a dispute concerning a substantial security deposit under a commercial lease between 250 as lessor and PhotoPoint as lessee. The central issues in the appeals are whether the court below correctly ruled that 250 failed to return the security deposit as required by Civil Code section 1950.7, [1] but that 250 was entitled to offset the amount of the security deposit it withheld against the even greater amount of damages it sustained on account of PhotoPoint's breach of the lease, and therefore PhotoPoint sustained no actual damages and was not entitled to [***2] return of the deposit.

> 1   Unless otherwise indicated, all further statutory references are to the Civil Code.

We conclude that 250 violated section 1950.7 by retaining the security deposit to cover its damages for future rent owed under the lease, because section 1950.7 allows a security deposit to be applied only against unpaid [*709] rent that has accrued as of the date called for in the statute for the return of the deposit. We hold that parties to a commercial lease can waive section 1950.7 [**299] to provide that a security deposit may be held and applied against future rent damages, but that no such waiver was made in the lease in this case. We hold further that the amount of the security deposit 250 wrongly retained cannot be offset against its future rent damages because that result would enable 250 to profit from its violation of section 1950.7. The judgment must therefore be reversed.

**I. BACKGROUND**

The lease in question was for a five-year term beginning on April 10, 2000. The lease defined "Security [***3] Deposit" to mean cash in the amount of $ 49,544.17, a sum equal to one month's base rent, as provided in section 6.A of the lease, and the letter of credit required under section 6.B. Section 6.B stipulated that, in addition to the cash security deposit, PhotoPoint would arrange for issuance by a bank of an irrevocable letter of credit in favor of 250 as beneficiary in the amount of $

890,175.00, a sum equal to 18 months' base rent. PhotoPoint was obligated to cause the issuing bank to immediately restore any amount drawn on the letter of credit. Provided PhotoPoint was not in default under the lease, the letter of credit was to be reduced by $ 178,035--one-fifth the original amount--at the end of each year in the lease term. Pursuant to this provision, the letter of credit was reduced on March 30, 2001, to the sum of $ 712,140.

PhotoPoint failed to pay rent due under the lease for the months of April, May, June, and July 2001. As a result, 250 caused the bank to draw down the letter of credit by $ 98,908.34 on May 23, 2001, and $ 49,454.17 on June 12, 2001. PhotoPoint did not cause the bank to restore these amounts to the letter of credit. On June 26, 2001, PhotoPoint executed a general [***4] assignment for the benefit of creditors to Sherwood as assignee, an event of default under the lease. On July 16, 2001, 250 caused the bank to pay 250 the $ 563,777.49 remaining on the letter of credit. On or about August 14, 2001, 250 served on PhotoPoint a "Notice of Belief of Abandonment," and a "Notice to Quit" containing an election to forfeit the lease.

On August 29, 2001, 250 filed an unlawful detainer action against PhotoPoint (Super. Ct. S.F. City and County, No. 324137). In November 2001, Sherwood as PhotoPoint's assignee sued 250 (Super. Ct. S.F. City and County, No. 401396) seeking return of the security deposit, including the letter of credit funds, retained by 250. 250 amended the complaint in case No. 324137 to replace the unlawful detainer count with a cause of action for damages for breach of the lease, and Sherwood intervened in that case.

The cases were consolidated for trial and tried to the court on stipulated facts. It was stipulated that 250 had not returned any funds referred to in [*710] section 6 of the lease. It was further stipulated that 250 was damaged as a result of PhotoPoint's breach of the lease in the amount of $ 1,557,898.78, which included the base rent of $ 49,454.17 per month from July 2001 [***5] through June 2002, and $ 49,454.17 less $ 20,854.17 per month from July 2002 through April 9, 2005.

The court excluded parol evidence at trial, and ruled that 250 was "entitled to pursue its rights of setoff." The court found that PhotoPoint was entitled to a credit for the security deposit and letter of credit funds 250 retained ($ 49,454.17 + $ 563,777.49) against the damages 250 sustained. The court found that 250 was required to return the security deposit and letter of credit funds to PhotoPoint "within the time frame provided by Civil Code section 1950.7," but that PhotoPoint sustained no actual damages as a result of the statutory violation because those funds [**300] could be applied against

250's damages. The court awarded PhotoPoint a statutory penalty of $ 100 for 250's violation of section 1950.7. The court entered a net judgment of $ 944,567.12 in favor of 250, representing 250's damages of $ 1,557,898.78, less the security deposit and letter of credit funds of $ 613,231.66 and the $ 100 statutory penalty.

## II. DISCUSSION

### A. *Section 1950.7*

**(1)** Security deposits in commercial leases are governed by section 1950.7. As of the date of the judgment herein, section 1950.7, [***6] subdivision (c) provided that a security deposit could be applied "to remedy tenant *defaults in the payment of rent*, to repair damages to the premises caused by the tenant, or to clean the premises upon termination of the tenancy." (Italics added.) If the deposit was used to cover only defaults in the payment of rent, then the balance was to be returned to the tenant within two weeks after the landlord receives possession of the premises. (*Ibid.*) [2] No issue is presented in [*711] this case regarding amounts to clean, or repair damages to, the premises. The dispute is about the meaning of "rent" in the statute.

2    Section 1950.7 formerly provided in part: "(a) Any payment or deposit of money the primary function of which is to secure the performance of a rental agreement for other than residential property or any part of the agreement, other than a payment or deposit, including an advance payment of rent, made to secure the execution of a rental agreement, shall be governed by the provisions of this section. With respect to residential property, the provisions of Section 1950.5 shall prevail. [¶] (b) Any such payment or deposit of money shall be held by the landlord for the tenant who is party to the agreement. The claim of a tenant to the payment or deposit shall be prior to the claim of any creditor of the landlord, except a trustee in bankruptcy. [¶] (c) The landlord may claim of the payment or deposit only those amounts as are reasonably necessary to remedy tenant defaults in the payment of rent, to repair damages to the premises caused by the tenant, or to clean the premises upon termination of the tenancy, if the payment or deposit is made for any or all of those specific purposes. Where the claim of the landlord upon the payment or deposit is only for defaults in the payment of rent, then any remaining portion of the payment or deposit shall be returned to the tenant no later than two weeks after the date the landlord receives possession of the premises. Where the claim of the landlord upon the payment or deposit includes amounts

reasonably necessary to repair damages to the premises caused by the tenant or to clean the premises, then any remaining portion of the payment or deposit shall be returned to the tenant at a time as may be mutually agreed upon by landlord and tenant, but in no event later than 30 days from the date the landlord receives possession of the premises. [¶] ... [¶] (f) The bad faith retention by a landlord or transferee of a payment or deposit or any portion thereof, in violation of this section, may subject the landlord or the transferee to damages not to exceed two hundred dollars ($ 200), in addition to any actual damages. [¶] (g) This section is declarative of existing law and therefore operative as to all tenancies, leases, or rental agreements for other than residential property created or renewed on or after January 1, 1971." (Stats. 1981, ch. 259, p. 1336.)

[***7] **(2)** Sherwood argues that "defaults in the payment of rent" means the unpaid rent that has accrued when the security deposit is required to be returned. 250 takes the position that "rent" includes not only past-due rent, but also future rent damages the landlord could recover under section 1951.2, i.e., the rent owed for the remainder of the lease term, less the rental loss the tenant proves could have been reasonably avoided. [3] "[A] California lessor [**301] with abandoned premises has two mutually exclusive remedies: deem the lease terminated and seek damages pursuant to § 1951.2, or, under § 1951.4, continue to perform under the lease and seek rent as it becomes due." (*In re Lomax* (Bankr. 9th Cir. 1996) 194 B.R. 862, 866.) [4] "Through the termination of the lease upon abandonment, § 1951.2 converts a landlord's continuing right to rent under the lease into a damage claim for rent lost through the tenant's abandonment." (*Id.* at p. 865.)

3    Section 1951.2 provides in part: "(a) Except as otherwise provided in Section 1951.4, if a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. Upon such termination, the lessor may recover from the lessee: [¶] (1) The worth at the time of award of the unpaid rent which had been earned at time of termination; [¶] (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided; [¶] (3) ... the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

such rental loss that the lessee proves could be reasonably avoided; and [¶] (4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom."

[***8]

4  Section 1951.4 provides in part: "(a) The remedy described in this section is available only if the lease provides for this remedy. ... [¶] ... [¶] (b) Even though a lessee of real property has breached the lease and abandoned the property, the lease continues in effect for so long as the lessor does not terminate the lessee's right to possession, and the lessor may enforce all the lessor's rights and remedies under the lease, including the right to recover the rent as it becomes due under the lease, if any of [the specified conditions concerning assignment and subletting by the tenant] is satisfied."

**(3)** In 250's view, the deadline for return of a security deposit under section 1950.7 only limits the time within which a landlord exercising its [*712] rights under section 1951.2 must estimate its damages for future lost rent. Under this scenario, if the deposit would be insufficient to cover the anticipated section 1951.2 damages, the landlord could retain it; on the other hand, if it appeared that the deposit would exceed the damages, the excess would have to be refunded. Here, for example, 250 indicates [***9] the rental market was falling when it received possession of the premises, and 250 asserts it was clear at that point that the damages for future lost rent would exceed the amount of the security deposit. Under section 1950.7, subdivision (f), a landlord who retains a security deposit in violation of the statute and does so in bad faith is liable for up to $ 200 in damages in addition to any actual damages the tenant sustains. Thus, under 250's argument, if the landlord guessed wrong, and retained more of the security deposit than was required to cover future rent damages, the excess would eventually be refunded as actual damages to the tenant; if the landlord acted in bad faith, the tenant could be awarded additional damages of $ 200.

No authority supports 250's reading of section 1950.7, and its interpretation is contrary to the statute's language and purpose. Whereas section 1950.7 affords a "summary deduct-and-retain procedure" ( *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 745 [38 Cal. Rptr. 2d 650, 889 P.2d 970] [describing section 1950.5, the security deposit statute for residential leases]) that is to be completed shortly after the landlord's recovery of possession, section 1951.2 contemplates [***10] a court action in which damages are adjudicated (see *California*

*Safety Center, Inc. v. Jax Car Sales* (1985) 164 Cal. App. 3d 992, 998-999 [211 Cal. Rptr. 39]). Any estimate of section 1951.2 damages within the limited timeframe of section 1950.7 would necessarily be speculative. "If the rent to be offset [**302] against the security deposit *must* be calculated and the excess returned within two weeks after the premises are surrendered to the landlord, the offset clearly is limited to rent due through the time of surrender." (St. James, Landlord Beware: Will a Security Deposit Survive a Bankruptcy? (2001) 26 Cal. Bankr. J. 44, 47, italics added.) Moreover, if 250's construction of section 1950.7 were adopted, landlords could retain security deposits well beyond the statutory deadline in every case, on the ground that the deposit "might" not cover prospective damages, and could do so with relative impunity given the modest penalty for acting in bad faith. Such a result would thwart the statutory purpose of compelling the prompt refund of security deposits. (See *Granberry v. Islay Investments, supra,* at p. 746.)

Sherwood's construction of section 1950.7 [***11] is supported by the decision in *Public Employees' Retirement System v. Winston* (1989) 209 Cal. App. 3d 205 [258 Cal. Rptr. 612]. The tenant in *Winston* vacated the premises on May 5, 1984, and was found to have been constructively evicted on that date. The landlord retained the $ 5,115 security deposit and sued the tenant for over $ 100,000 in unpaid future rent and other damages under the lease. The trial [*713] court found that the landlord was entitled to damages of $ 5,281.57, plus interest. The issue in the appeal was whether the security deposit could be offset against the judgment, in which case the landlord would have obtained a net recovery and been the prevailing party, or whether the security deposit had to be offset against the rent owed as of May 19, 1984, two weeks following the constructive eviction, pursuant to section 1950.7, subdivision (c), in which case the landlord would have owed the tenant money as of that date and the tenant would have been the prevailing party.

**(4)** The *Winston* court held that the "statutory language unambiguously provides that the lessor must credit the deposit against any rent owing within two weeks following the termination of [***12] the lease, at which time the lessee becomes entitled to the balance, if any. Section 1950.7, subdivision (c), makes no reference to the application of the deposit towards the amount of any judgment against the lessee." ( *Public Employees' Retirement System v. Winston, supra,* 209 Cal. App. 3d at p. 209.) This conclusion is directly at odds with 250's reading of the statute. Under 250's interpretation, the landlord in *Winston* would have been able to keep the security deposit because it was far less ($ 5,115) than the unpaid future rent and other damages (over $ 100,000) the landlord thought was due under the lease, and the result

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

would have been a credit of $ 5,115 (less a penalty of up to $ 200 if the landlord retained that amount in bad faith) against the judgment, rather than a credit against the rent that was owed two weeks after the landlord recovered possession of the premises.

Sherwood's interpretation of section 1950.7 is also supported by the timing of the statute's enactment and the evolution of the statute's language. Since section 1950.7 went into effect before section 1951.2, the term "rent" as used in section 1950.7 cannot plausibly be taken to refer [***13] to future rent damages under section 1951.2. Section 1950.7 was enacted as section 1951, which became effective January 1, 1971. (See Stats. 1970, ch. 1317, § 1, p. 2453.) Section 1951.2, however, did not go into effect until July 1, 1971. (Stats. 1970, ch. 89, §§ 2, 14, pp. 104-105, 107.) Before section 1951.2 became effective, a landlord had no right to terminate a lease for a tenant's breach, and then sue [**303] for lost rent; if the lease were terminated due to the tenant's breach, the landlord's right to the remaining rent terminated as well. (Recommendation Relating to Real Property Leases (Nov. 1969) 9 Cal. Law Revision Com. Rep. 153, 157-159 (hereafter Recommendation).) It thus appears that the word "rent" as used in section 1950.7 means unpaid rent that has accrued under the lease, and does not include section 1951.2 damages for the loss of rent payable after the lease is terminated. (See *In re Lomax, supra,* 194 B.R. at p. 865 [distinguishing between the "real property right" to rent and the "contract right" to damages for lost rent arising from termination [***14] of the lease].)

[*714] The purpose of recent amendments to section 1950.7, subdivision (c) provides further support for Sherwood's position. Section 1950.7, subdivision (c) now allows the landlord to retain a security deposit of up to one month's rent for up to 30 days to remedy defaults in the payment of rent. [5] According to a committee report on this change, the retention time was increased from two weeks to 30 days because landlords needed more time to calculate common area maintenance (CAM) charges assessed as additional rent in commercial leases. (Sen. Com. on Judiciary, rep. on Assem. Bill No. 1361 (2003-2004 Reg. Sess.) June 24, 2003, pp. 1-3.) The report explained that "[u]nder the current 14-day requirement ... commercial landlords often cannot determine the CAM charges in that time and must therefore *return all of the tenant's security deposit even though the CAM charges are still owing*. This in turn forces the landlord to try to collect the CAM charges from a departed tenant. If the former tenant does not voluntarily pay, the landlord's only recourse is to sue in court to enforce the debt." (*Id.* at p. 3, italics added.) The italicized language indicates that it [***15] is not permissible for a landlord to keep a security deposit beyond the statutory time limit,

even if an additional amount is certain to be determined to be due to the landlord thereafter, much less that it would be permissible, as 250 claims, to apply the deposit to an unliquidated amount that may subsequently become due.

5    The statute now reads: "(c) The landlord may claim of the payment or deposit only those amounts as are reasonably necessary to remedy tenant defaults in the payment of rent, to repair damages to the premises caused by the tenant, or to clean the premises upon termination of the tenancy, if the payment or deposit is made for any or all of those specific purposes. [¶] (1) If the claim of the landlord upon the payment or deposit is only for defaults in the payment of rent and the security deposit equals no more than one month's rent plus a deposit amount clearly described as the payment of the last month's rent, then any remaining portion of the payment or deposit shall be returned to the tenant at a time as may be mutually agreed upon by landlord and tenant, but in no event later than 30 days from the date the landlord receives possession of the premises. [¶] (2) If the claim of the landlord upon the payment or deposit is only for defaults in the payment of rent and the security deposit exceeds the amount of one month's rent plus a deposit amount clearly described as the payment of the last month's rent, then any remaining portion of the payment or deposit in excess of an amount equal to one month's rent shall be returned to the tenant no later than two weeks after the date the landlord receives possession of the premises, with the remainder to be returned or accounted for within 30 days from the date the landlord receives possession of the premises. [¶] (3) If the claim of the landlord upon the payment or deposit includes amounts reasonably necessary to repair damages to the premises caused by the tenant or to clean the premises, then any remaining portion of the payment or deposit shall be returned to the tenant at a time as may be mutually agreed upon by landlord and tenant, but in no event later than 30 days from the date the landlord receives possession of the premises." (§ 1950.7, subd. (c).)

[***16] (5) 250 argues that to exclude section 1951.2 damages from "rent" under section 1950.7 [**304] would effectively negate section 1951.7, which provides that, after a lease is terminated pursuant to section 1951.2 and if certain conditions are met, including an "advance payment" by the tenant of over one month's [*715] rent under the original lease, the tenant is to receive written notice from the landlord of the reletting of the premises and the term and rent under the new lease.

An "advance payment" for purposes of section 1951.7 is defined, like a security deposit under section 1950.7, to include money paid to the landlord to secure performance under the lease. (§§ 1950.7, subd. (a), 1951.7, subd. (a).) 250 argues that there would be "no point" to section 1951.7 unless the landlord is allowed to retain the former tenant's security deposit as security for future rent damages under section 1951.2. However, a former tenant exposed to such damages will have an interest in the landlord's efforts to mitigate them by reletting the premises, whether or not the landlord retains the security deposit. "Section 1951.7 does not in any way affect the right of the lessor to recover damages nor the right of a lessee [***17] to recover prepaid rent, a security deposit, or other payment. The section is included merely to provide a means whereby the lessee whose lease has been terminated under Section 1951.2 may obtain information concerning the length of the term of the new lease and the rent provided in the new lease." (Recommendation, *supra*, 9 Cal. Law Revision Com. Rep., at p. 171.)

**(6)** 250 submits that section 1950.7 should not be interpreted so as to "strip [the landlord] of its rights" under sections 1951.2 and 1951.4. 250 notes that, upon termination of a lease under section 1951.2, the landlord is "immediately vested" with the "right to recover" its damages under that section, including past and future unpaid rent. However, the existence of that right does not depend on a rule that would allow retention of a security deposit for application against possible future rent damages. As for section 1951.4, we agree with 250 that "it is appropriate to retain the deposit so as to utilize the remedy provided under [that statute]," and our reading of section 1950.7 does not prevent that recourse. Under section 1951.4, when the tenant breaches the lease and abandons the premises, the landlord may, if certain [***18] conditions are met, elect not to terminate the tenant's right to possession and instead continue to enforce its rights under the lease, including the right to collect the rent as it becomes due. Because the tenant in that event retains the right to sublet the premises or assign its interest in the lease (§ 1951.4, subd. (b)), the landlord does not "receive[] possession of the premises" within the meaning of section 1950.7, the duty to return the security deposit does not arise, and the landlord can continue to apply the deposit against the rent as it accrues.

**(7)** 250 cites cases predating the enactment of sections 1950.7 and 1951.2 for the proposition that a landlord may retain a security deposit until the damages from the tenant's breach of the lease are ascertained. (See, e.g., *Thompson v. Swiryn* (1950) 95 Cal. App. 2d 619, 626 [213 P.2d 740] [tenant is not entitled, upon breach of a lease, to the return of a deposit made to secure performance of the lease; "the lessor may look to the fund for

damages proved and the lessee may recover the balance"]; *Gallagher v. McMann* [*716] (1932) 119 Cal.App. 688, 690 [7 P.2d 204] [the landlord is "entitled to retain the deposit until the complete [***19] discharge of the obligation which the same is intended to secure"].) Cases decided before the advent of the right to recover future rent damages under section 1951.2 can provide no definitive rule governing security for the use of that remedy and, in any event, those decisions have [**305] been abrogated insofar as they conflict with section 1950.7. Section 1950.7 specifies the obligations against which a security deposit can be applied, and directs that the balance of the deposit remaining after those deductions be refunded promptly to the tenant. As the court observed in *People ex rel. Smith v. Parkmerced Co.* (1988) 198 Cal. App. 3d 683 [244 Cal. Rptr. 22], disapproved on another point in *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 136-137 [96 Cal. Rptr. 2d 485, 999 P.2d 718], with respect to the statute governing security deposits for residential leases, section 1950.5 "restricts the use [of a security deposit] to specifically defined purposes," ( *Smith, supra,* at p. 690), and requires that the deposit be returned to the extent it is not necessary for those limited purposes. Since those observations apply equally to section 1950.7, 250's reliance on pre-section [***20] 1950.7 cases for a contrary rule is misplaced.

The more recent cases cited by 250-- *Kraus v. Trinity Management Services, Inc., supra,* 23 Cal.4th 116, and *California Safety Center, Inc. v. Jax Car Sales, supra,* 164 Cal. App. 3d 992--are also inapposite. *Kraus* clarified the meaning of the term "security" as used in section 1950.5, subdivision (b) ( *Kraus v. Trinity Management Services, Inc., supra,* at pp. 139-141); *California Safety Center* clarified the damages recoverable for unpaid rent during the time periods specified in section 1951.2, subdivisions (a)(1), (a)(2), and (a)(3) ( *California Safety Center, Inc. v. Jax Car Sales, supra,* at p. 999.) Neither case concerns section 1950.7 or contains any reasoning that supports 250's position.

**(8)** Accordingly we conclude that the words "defaults in the payment of rent" in section 1950.7 refer only to unpaid rent that has accrued as of the time the security deposit is required to be returned, and do not refer to future rent damages the landlord may thereafter recover under section 1951.2.

**B.** *The Lease*

250 bases a series of arguments against the finding that it violated [***21] section 1950.7 on the terms of its lease with PhotoPoint. These contentions, like those advanced by 250 as to the meaning of the statute, are unpersuasive.

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

(1) *The Letter of Credit*

250 contends that the portion of the security deposit represented by the letter of credit was not a "payment or deposit of money" within the meaning of section 1950.7, subdivision (a), and was thus excepted from the statute. 250 notes that section 1950.7, subdivision (a), has no language like that of [*717] section 1951.7, subdivision (a), which defines an "advance payment" under a lease as "moneys" deposited with the landlord to secure performance of the lease, or other payment that is the "substantial equivalent" of such a deposit. 250 thus submits that the letter of credit could not be deemed a security deposit on the theory that it was substantially equivalent to money. 250 also relies on the "independence principle" applicable to letters of credit--the rule that the issuer's obligation to honor a draw on the letter of credit is entirely separate from any underlying contract between the issuer's customer and the letter of credit beneficiary ( *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 237 [62 Cal. Rptr. 2d 243, 933 P.2d 507]) [***22] -- and on cases holding that a letter of credit and its proceeds are not property of the bankruptcy estate of the issuer's customer (*In Matter of Marine Distributors, Inc.* (9th Cir. 1975) 522 F.2d 791, 795; *In re Farm* [**306] *Fresh Supermarkets of Maryland, Inc.* (Bankr. D.Md. 2001) 257 B.R. 770, 772).

We are not called upon to decide whether a letter of credit constitutes a "payment or deposit of money" for purposes of section 1950.7 because 250 had drawn the entire amount of the letter of credit before the security deposit was due to be returned, and 250 was thus holding only "money" at the relevant point. Nor does the "independence" of letters of credit have any bearing on Photo-Point's right to the return of that money under the lease and the law governing the lease. This conclusion is supported by the decision in *In re Graham Square, Inc.* (6th Cir. 1997) 126 F.3d 823.

The debtor in *Graham Square* sought financing from a bank, and arranged for a letter of credit in the bank's favor to cover the loan commitment fee. The bank approved the loan, but the debtor was unable to consummate the loan agreement. The bank drew on the letter of credit [***23] to pay the commitment fee, and the debtor filed for bankruptcy. The bankruptcy trustee sued the bank to recover the proceeds of the letter of credit on the theory that the commitment fee was an impermissible penalty under applicable state contract law. The bankruptcy and district courts held that the trustee had no right to recover the fee because the fee had been paid through a letter of credit and recovery was barred by the independence principle. The circuit court disagreed:

(9) "Critically, and of great importance here, the doctrine of independence protects only the *distribution* of

the proceeds of the letter of credit. It prohibits an attack on the issuing bank's distribution to the beneficiary and does not address claims respecting the underlying contract. In these cases the trustee has not challenged the distribution of the proceeds by [the issuer], but instead, has challenged [the bank's] right to retain the commitment fee and has brought an action on the underlying contract between the debtor and [the bank].

[*718] "While the fee was paid through the vehicle of a standby letter of credit, and may thus be considered 'proceeds' of the letter of credit, it is significant that [***24] [the bank] has already received those funds. It is one thing to attempt to prevent the distribution of the proceeds of a letter of credit, an attempt the doctrine of independence is designed to prevent; but it is quite another to bring an action on the underlying contract that created the letter of credit.

"If the debtor had paid [the bank] the commitment fee in cash, the debtor could seek a refund by challenging the fee provision in the underlying contract as an illegal penalty. All of [the bank's] arguments aside, there is no principled reason for allowing a challenge *to the underlying contract* when the fee is paid in cash, and not allowing such a challenge after the fee is paid via a standby letter of credit. In other words, challenging the distribution of the proceeds of a letter of credit is different than challenging the underlying contract. The ultimate result may be the same (refund of the fee), but in one case the method of recovery is permissible and in the other it is barred." ( *In re Graham Square, Inc., supra,* 126 F.3d at pp. 827-828.)

This reasoning is persuasive and applies equally here. In this case, as in *Graham Square,* it is significant [***25] that the proceeds of the letter of credit have been distributed. Sherwood is seeking to enforce Photo-Point's state law rights under the latter's contract with 250; Sherwood is not challenging 250's right to draw on the letter of credit. Thus, the independence principle is inapplicable, and it is irrelevant that the [**307] security deposit originated as a letter of credit.

(2) *Waiver*

(10) 250 contends that the requirements of section 1950.7 were waived under various provisions of the lease. Sherwood maintained in its briefs that a tenant could not waive the benefits of section 1950.7, but abandoned that claim at oral argument in the appeal. Sherwood is right to concede that a tenant under a commercial lease may effectively agree to waive the protections of section 1950.7. That conclusion is consistent with cases holding that commercial tenants may waive their rights under the Civil Code (e.g., *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512-513 [33 Cal. Rptr. 2d

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

572] [right to quiet enjoyment]; *Folberg v. Clara G. R. Kinney Co.* (1980) 104 Cal. App. 3d 136, 140 [163 Cal. Rptr. 426] [right to notice of rent default]), and with California's public policy of "enabl[ing] and [***26] facilitat[ing] freedom of contract by the parties to commercial real property leases." (§ 1995.270, subd. (a)(1).) Since the Legislature has expressly prohibited waivers of section 1950.5's protections for residential security deposits (§ 1953, subd. (a)(1)), its failure to do so with respect to commercial security deposits indicates that waivers are permissible as to those deposits. (See *Hersh v. State Bar* (1972) 7 Cal.3d 241, 246 [101 Cal. Rptr. 833, 496 P.2d 1201] [disparities [*719] in statutes dealing with the same subject matter are presumed to be intentional]; *Williams v. County of San Joaquin* (1990) 225 Cal. App. 3d 1326, 1332-1333 [275 Cal. Rptr. 302]; see also § 3268).

In view of our holding that tenants can agree to waive section 1950.7, there is no substance to the suggestion in 250's petition for rehearing that our decision will "hurt start up companies."[6] 250 reasons that landlords will be less likely to rent to new businesses without the protection large security deposits can provide against defaults in the payment of rent, and apparently presumes that our decision will preclude that protection. However, parties can "plan around" section 1950.7 should they desire to do so. The question is whether that planning occurred here.

6    Other arguments in the petition for rehearing are either improperly advanced for the first time in the petition ( *Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1308 [71 Cal.Rptr.2d 122]) or adequately addressed in our discussion. The principal new argument is that section 1950.7 is preempted by the current Bankruptcy Code. While we need not and do not reach this belated contention, we note that the petition does not identify precisely how much of the field of tenant security deposit law Congress has allegedly intended to occupy, and that the argument rests on the unsupported assumption that section 1950.7 would not be applied in a bankruptcy—a proposition no reported case has considered, and at least one commentary has rejected (St. James, *supra,* 26 Cal. Bankr. J. at pp. 50-51).

The lease in this case did not provide generally that its terms were to govern to the extent that they conflicted with applicable statutes. The lease stipulated that Photo-Point was waiving its rights under certain specified statutes, but section 1950.7 was not among the statutes mentioned. 250 admits that the lease contains no "explicit" waiver of section 1950.7, but argues that such a waiver can be implied from its terms.

250 contends that, given the sheer size of the security deposit, [***27] it must have been intended to serve as security for the payment of rent that would be owed after PhotoPoint defaulted. While we would agree with that assertion, the problem for 250 is that a waiver of section 1950.7 was not the only means by which the whole of the security deposit could have been applied against future rent under the lease. The lease gave 250 the option to proceed under section 1951.4, keep the lease in effect, and continue to collect the rent as it became due. As previously explained, the security deposit could have been retained [**308] in that situation because 250 would not have received possession of the premises. Thus, if 250 had followed section 1951.4, it could have applied the security deposit against the monthly rent as it became due until the deposit was exhausted. Instead, it elected under section 1951.2 to terminate the lease and PhotoPoint's right of possession thereunder, and thereby triggered the duty to return the security deposit as provided in section 1950.7. Since the lease provided a way to apply the security deposit against future rent without a waiver of section 1950.7, no such waiver need be implied to effectuate the large security deposit.

[*720] 250 searches [***28] the security deposit and remedies sections of the lease for an implicit waiver of section 1950.7. As previously indicated, the lease defines "Security Deposit" to mean the cash deposit and the letter of credit. The security deposit section reads in full as follows:

"6. Security Deposit

"A. The Security Deposit shall be in the amount of $ 49,544.17. The Security Deposit shall be delivered to Landlord upon the execution of this Lease by Tenant and shall be held by Landlord without liability for interest (unless required by Law) as security for the performance of Tenant's obligations. The Security Deposit is not an advance payment of Rent or a measure of Tenant's liability for damages. *Landlord may, from time to time, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent or to cure any uncured default by Tenant, subject to the expiration of any applicable notice and cure period provided in the Lease.* If Landlord uses the Security Deposit, Tenant shall on demand restore the Security Deposit to its original amount. *Landlord shall return any unapplied portion of the Security Deposit to Tenant within 45 days after the later to* [***29] *occur of: (1) the date Tenant surrenders possession of the Premises to Landlord in accordance with this Lease; or (2) the Termination Date.*[7] If Landlord transfers its interest in the Premises, Landlord may assign the Security Deposit to the transferee and, following the assignment, Landlord shall have no further liability for the return of the Security Deposit. Landlord

shall not be required to keep the Security Deposit separate from its other accounts.

7  The lease defines the "Termination Date" as April 9, 2005, "unless terminated early in accordance with this Lease."

"B. In addition to, and not in lieu of, the cash Security Deposit provided for in Section 6.A, Tenant shall deliver to Landlord a sight draft letter of credit in the original principal amount of $ 890,175, permitting partial draws issued by a bank permitting draws in San Francisco, California and which shall be substantially in the form of Exhibit E attached hereto. *The letter of credit shall provide that it shall be renewed annually [***30] with a final expiration date 60 days beyond the scheduled Termination Date unless the issuing bank provides written notice to Landlord that it is not being renewed, in which case Landlord shall have the right to draw down the letter of credit and hold, apply and return such proceeds in accordance with Section 6.A.* In the event any amounts are drawn on the letter of credit, Tenant shall immediately cause the issuing bank to restore such amount. The letter of credit shall provide that on each anniversary date of the Commencement Date it shall be reduced by $ 178,035, provided if Landlord [**309] gives the issuing bank notice that Tenant is then in default under this Lease beyond any applicable notice and cure [*721] period, then such reduction shall be delayed until such time as Landlord gives the issuing bank notice that such default is cured." (Italics added.)

We discern nothing in the relevant language of these sections, which we have italicized, that could reasonably be interpreted to constitute an implicit waiver of section 1950.7 so as to authorize retention of any portion of the security deposit for application against future rent damages under section 1951.2. To the contrary, the only provision [***31] that specifies how the security deposit may be applied, which states that it may be used to satisfy "past due" rent, and uncured defaults after notice and the opportunity to cure, is consistent with our interpretation of section 1950.7. Both the lease and the statute refer to liquidated amounts owed under the lease, not damages subject to proof for future rent. Since there is no evidence that PhotoPoint was given notice and an opportunity to cure any defaults, the lease by its terms allowed the security deposit to be applied only against *past due* rent. Thus, under the lease and section 1950.7, 250 was required to return the security deposit within the time specified after receipt of possession of the premises, less only the rent past due at that point.

250 contends that section 6.A's limitation on the use of the security deposit to cover past due rent does not apply to the portion of the security deposit represented by the letter of credit, because section 6.B provides that

the proceeds of the letter of credit are to be applied in accordance with section 6.A only in the situation where the letter of credit is drawn after the issuing bank advises that the letter of credit will [***32] not be renewed. However, nothing in the lease suggests that the letter of credit proceeds can be applied in any manner other than the one specified in section 6.A. Section 6.A states that the "Security Deposit" can be used to satisfy past due rent, and section 1.H defines "Security Deposit" to include the letter of credit furnished under section 6.B. The lease thus clearly and unambiguously limits the application of the letter of credit funds to past due rent. As we read the sentence in section 6.B on which 250 relies, it simply confirms that the letter of credit proceeds are to be held, applied and returned as provided in section 6.A when the letter of credit is drawn because it will not be renewed, as well as when it is drawn because of a PhotoPoint default. The sentence thus reinforces our interpretation of the permissible use of the security deposit under the lease.

250 contends that the lease implicitly waives section 1950.7 because section 6.A states that the deposit is to be returned within 45 days after the later of the surrender of the premises or the date the lease is terminated in accordance with the lease, and section 6.B states that the letter of credit is to have a final [***33] termination date 60 days beyond the scheduled termination date of April 9, 2005. The termination date specified in a letter of credit that is to be renewed annually during the term of the lease would need to be a date on or after the end of the scheduled lease term. Thus, that the letter of credit would not by its terms expire before the end of the scheduled term of the [*722] lease says nothing about when proceeds of the letter of credit were due to be returned to PhotoPoint. The 45-day return period specified in section 6.A did not effectively waive the whole of section 1950.7 as 250 urges, it merely specified a longer period for retention of the security deposit (45 days after surrender or termination in accordance with the lease), than the period specified in the statute (two weeks after 250's receipt of possession of the premises). However, this provision of section 6.A only waived section 1950.7 to that limited extent; it did not allow 250 to retain the security deposit beyond 45 days for application against future rent damages under section 1951.2.

[**310] 250's attempt to find an implicit waiver of section 1950.7 in the remedies section of the lease is also unavailing. The full text of this [***34] section is set out in the margin. 8  [**311]  The provisions of section 20.A.1 merely restate 250's rights under section 1951.2; they do not expand 250's rights under that statute or [*723] section 1950.7. Under lease section 20.A.1 and section 1951.2, 250 was, as it says, "immediately vested" with the right to recover all damages under the lease,

including damages for future rent determined in accordance with the statute. But as we have indicated, the security deposit statute cannot be read to permit retention of the deposit pending the trial of those damages. We note that in the middle of lease section 20.C., which provides for waivers of rights under section 3275 (relief from forfeiture by full compensation), and Code of Civil Procedure sections 1174, subdivision (c) (five days to reinstate after unlawful detainer judgment) and 1179 (relief from forfeiture because of hardship), there is language stating that PhotoPoint waives any and all rights conferred by "any and all other laws and rules of law from time to time in effect." However, this language cannot in context be taken to refer to a waiver of all applicable law, including section 1950.7, and 250 advances no argument based on section 20.C.

8    "20. Remedies.

"A. Upon the occurrence of any event or events of default under this Lease, whether enumerated in Section 14 [the reference should be to § 19, listing events of default] or not, Landlord shall have the option to pursue any one or more of the following remedies without any notice (except as expressly prescribed herein) or demand whatsoever (and without limiting the generality of the foregoing, Tenant hereby specifically waives notice and demand for payment of Rent or other obligations and waives any and all other notices or demand requirements imposed by applicable law):

"1. Terminate this Lease and Tenant's right to possession of the Premises and recover from Tenant an award of damages equal to the sum of the following: [¶] (a) The Worth at the Time of Award of the unpaid Rent which had been earned at the time of termination; [¶] (b) The Worth at the Time of Award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss that Tenant affirmatively proves could have been reasonably avoided; [¶] (c) The Worth at the Time of Award of the amount by which the unpaid Rent for the balance of the Lease Term after the time of award exceeds the amount of such Rent loss that Tenant affirmatively proves could be reasonably avoided; [¶] (d) Any other amount necessary to compensate Landlord for all the detriment either proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and [¶] (e) All such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time under applicable law. [¶] The 'Worth at the Time of Award' of the amount referred to in parts (a) and (b) above, shall be computed by allowing interest at the lesser of a per annum rate equal to: (i) the greatest per annum rate of interest permitted from time to time under applicable law, or (ii) the Prime rate plus five percent (5%). For purposes hereof, the 'Prime Rate' shall be the per annum interest rate publicly announced as its prime rate or base rate by a federally insured bank selected by Landlord in the State of California. The 'Worth at the Time of Award' of the amount referred to in part (c), above, shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus 1%.

"2. Employ the remedy described in California Civil Codes § 1952.4 (Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations); or

"3. Notwithstanding Landlord's exercise of the remedy described in California Civil Code § 1951.4 in respect of an event or events of default, at such time thereafter as Landlord may elect in writing, to terminate this Lease and Tenant's right to possession of the Premises and recover an award of damages as provided above in Section 20A.1.

"B. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No waiver by Landlord of any breach hereof shall be effective unless such waiver is in writing and signed by Landlord.

"C. TENANT HEREBY WAIVES ANY AND ALL RIGHTS CONFERRED BY SECTION 3275 OF THE CIVIL CODE OF CALIFORNIA AND BY SECTIONS 1174 (C) AND 1179 OF THE CODE OF CIVIL PROCEDURE OF CALIFORNIA AND ANY AND ALL OTHER LAWS AND RULES OF LAW FROM TIME TO TIME IN EFFECT DURING THE LEASE TERM PROVIDING THAT TENANT SHALL HAVE ANY RIGHT TO REDEEM, REINSTATE OR RESTORE THIS LEASE FOLLOWING ITS TERMINATION BY REASON

131 Cal. App. 4th 703, *; 32 Cal. Rptr. 3d 296, **;
2005 Cal. App. LEXIS 1186, ***; 2005 Cal. Daily Op. Service 6688

OF TENANT'S BREACH. TENANT ALSO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE.

"D. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement, applicable law or in equity. In addition to other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief, or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this Lease, or to any other remedy allowed to Landlord at law or in equity. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.

"E. This Section 20 shall be enforceable to the maximum extent such enforcement is not prohibited by applicable law, and the unenforceability of any portion thereof shall not thereby render unenforceable any other portion."

[***35] The remedies provisions further support our view of the permissible uses of the security deposit under the lease. Section 20.A provides for the exercise of 250's rights under section 1951.4 to continue the lease in effect after [*724] PhotoPoint's breach and abandonment, and to recover the rent as it thereafter became due--that procedure, as we have said, would have enabled 250, over time, to apply all of the security deposit to unpaid rent, and obviated the need for a waiver of section 1950.7 for that purpose. Section 20.C, which the parties set out in capital letters, undermines 250's claim that PhotoPoint implicitly waived its section 1950.7 rights. That provision shows that when the parties intended to provide for waivers of statutory rights they knew how to do so very explicitly. [9]

9  See also section 17.A of the lease covering "Casualty Damage": "Landlord and Tenant hereby waive the provisions of any Law relating to the matters addressed in this Article, and agree that their respective rights for damage to or destruction of the Premises shall be those specifically provided in this Lease."

[***36] 250 notes finally that, under section 31.I of the lease, PhotoPoint's obligation to pay rent survived the early termination of the lease. This section provides: "The expiration of the Term, whether by lapse of time or otherwise, shall not relieve either party of any obligations which accrued prior to or which may continue to accrue after the expiration or early termination of this Lease. Without limiting the scope of the prior sentence, it is agreed that Tenant's obligations under Sections 4 [rent], 8 [leasehold improvements], 14 [indemnity and waiver of claims], 20 [remedies], 25 [holding over], and 30 [surrender of premises] shall survive the expiration or early termination of this Lease."

(11) The fact that, pursuant to this section, monthly rent would continue to accrue [10] [**312] after early termination of the lease is of no assistance to 250. This section does not give 250 any greater rights than those bestowed by section 1951.2. "It is true of course that a lessor's election to forfeit the lessee's rights under a lease because of the lessee's default, or even a judgment in unlawful detainer declaring a forfeiture of the lessee's rights, does not relieve the lessee of the obligations [***37] imposed by the lease. That is the precise effect of section 1951.2 ... [Section 1951.2] abrogates the common law rule that the lessee's obligation to pay rent depends on the continued existence of the term." ( *Desert Plaza Partnership v. Waddell* (1986) 180 Cal. App. 3d 805, 812-813 [225 Cal. Rptr. 775], italics omitted.) Moreover, as we have said, 250 could have applied the security deposit against the rent as it accrued if 250 had used the remedy provided in section 1951.4.

10  The section on rent provided in pertinent part: "As consideration for this Lease, Tenant shall pay Landlord, without any setoff or deduction, the total amount of Base Rent and Additional Rent due for the Term. 'Additional Rent' means all sums (exclusive of Base Rent) that Tenant is required to pay Landlord. Additional Rent and Base rent are sometimes collectively referred to as 'Rent.' ... Base Rent and recurring monthly charges of Additional Rent shall be due and payable in advance on the first day of each calendar month without notice or demand, provided that the installment of Base Rent for the first full calendar month of the Term shall be payable upon the execution of this Lease by Tenant. All other items of Rent shall be due and payable by Tenant on or before 30 days after billing by Landlord. ... Tenant's covenant to pay Rent is independent of every other covenant in this Lease."

[***38]  [*725] Accordingly, there was no waiver of section 1950.7 in the lease. Indeed, the parties agreed

to an extension of the time specified in the statute within which the security deposit had to be returned.

### (3) Parol Evidence

250 contends that the court erred in granting Sherwood's motion to preclude 250 from introducing parol evidence to show an understanding between 250 and PhotoPoint that, if the latter breached the lease, the security deposit could be applied against future as well as past due rent. 250 sought to submit testimony from the real estate agent who acted for 250 and PhotoPoint in the lease negotiations that "it was the general intent and it was the general climate in the market that existed, that letters of credit were being issued to protect landlords from tenants going out of business and making sure that you were going to get 18 months of rent, or a year's rent, or whatever a certain landlord was comfortable with." 250 wanted to introduce testimony from PhotoPoint's chief financial officer, who understood that the letter of credit "was there to protect the landlord," and that 250 would look to the security deposit to address damages flowing from a default. 250 also wanted to present testimony [***39] from one of its managers that Sherwood contacted him in 2001 and indicated that it was seeking a replacement tenant in order to negotiate a return of part of the letter of credit funds.

**(12)** Section 31.K of the lease, under the heading "Miscellaneous," stated that: "All understandings and agreements previously made between the parties are superseded by this Lease, and neither party is relying upon any warranty, statement or representation not contained in this Lease. This Lease may be modified only by a written agreement signed by Landlord and Tenant." Section 32 of the lease, under the heading "Entire Agreement," provided that: "This Lease and the following exhibits and attachments constitute the entire agreement between the parties and supersede all prior agreements and understandings related to the Premises ... ." Where, as here, "the parties to a written contract have agreed to it as an 'integration'--a complete and final embodiment of the terms of an agreement--parol evidence cannot be used to add to or vary its terms." ( *Masterson v. Sine* (1968) 68 Cal.2d 222, 225 [65 Cal. Rptr. 545, 436 P.2d 561]; see Code Civ. Proc., § 1856, subds. (a) and (b).)

**(13)** 250 argues that it was offering [***40] parol evidence merely to interpret the agreement, not to vary or add to its terms. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is ... whether the offered evidence is relevant to prove a meaning to which the language of the instrument is [**313] reasonably susceptible." ( *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal. Rptr. 561, 442 P.2d 641].) The evidence in question was being offered to show that [*726] 250 and

PhotoPoint intended for the security deposit to be available for application against future rent under the lease if PhotoPoint defaulted. However, the evidence was unnecessary for that purpose because, as we have acknowledged, that intention was reasonably apparent from the size of the security deposit alone. The question is not whether the parties intended to permit the security deposit to be used for future rent, it is whether they intended to *waive section 1950.7* in order to facilitate that use. This is so, again, because the parties had, by making available in the lease the use of the section 1951.4 remedy (lessor may continue lease in effect), given 250 a means of applying the deposit [***41] against the future rent as it accrued, without any waiver of section 1950.7.

**(14)** Whether the language of an agreement is reasonably susceptible to a proposed interpretation is a question of law. ( *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal. Rptr. 2d 554].) As a matter of law, the language of the lease in this case cannot reasonably be interpreted as waiving section 1950.7. The lease states in relevant part that the security deposit may be used, in accordance with section 1950.7, to satisfy "past due" rent. Those words are clear and cannot be taken to refer to future rent. Accordingly, the court correctly granted the motion to exclude the parol evidence.

### C. Setoff

**(15)** The trial court determined that although 250 had not returned the security deposit as required under section 1950.7, 250 could nonetheless offset the deposit against the damages it sustained as a result of PhotoPoint's breach of the lease. In its statement of decision and judgment, the court concluded that 250 was "entitled to pursue its rights of setoff" pursuant to Code of Civil Procedure section 431.70 and *Granberry v. Islay Investments, supra,* 9 Cal.4th 738. Code of Civil Procedure section 431.70 [***42] "does not create a substantive right to raise setoff as a defense to a claim for monetary relief, but merely describes the procedures to be followed in raising this defense." ( *Granberry, supra,* at p. 744.) The arguments on the setoff issue are centered on the *Granberry* case.

The controversy in *Granberry* arose under section 1950.5, the security deposit statute for residential leases. The issue was "whether a landlord who in good faith fails to comply with the requirements of this statute may nevertheless recover damages for unpaid rent, repairs, and cleaning in a subsequent judicial proceeding." ( *Granberry v. Islay Investments, supra,* 9 Cal.4th at p. 741.) The landlords in *Granberry* owned or operated over 1,000 residential units, charged tenants an extra $ 100 for the first 31 days of occupancy, and never returned any part of that amount to the tenants. Approximately 10,000 tenants paid about $ 1 million in $ 100

first-month [*727] premiums, and a class of former tenants sued for return of those premiums on the ground that they were security deposits within the meaning of section 1950.5. Under section 1950.5 the landlord was required, within three [***43] weeks of the date the tenant vacated the premises, to provide the tenant with a written accounting for any portion of the security deposit the landlord retained; if the landlord failed to provide the accounting within this period the entire deposit had to be returned. The landlords in *Granberry* did not furnish the accountings, and it was determined that they had, in good faith, failed to return the first-month premiums as required by section 1950.5. The question presented in the case was whether the landlords [**314] could nevertheless offset the premiums against damages for unpaid rent, repairs, and cleaning--liabilities against which security deposits could be applied under section 1950.5, subdivision (b). (See *Granberry v. Islay Investments, supra,* 9 Cal.4th at p. 742, fn. 3.)

(16) The court held that a landlord who has in good faith failed to return a security deposit as required by section 1950.5 can nonetheless recover damages for unpaid rent, repairs, and cleaning in a subsequent judicial proceeding. ( *Granberry v. Islay Investments, supra,* 9 Cal.4th at pp. 749-750.) The court reasoned that "the mere fact that the landlord has lost the right to take advantage [***44] of the summary deduct-and-retain procedure of section 1950.5, subdivision (f), does not lead to the conclusion that he has lost *all* right to claim damages for unpaid rent, repair, and cleaning, whether through setoff or otherwise." ( *Granberry, supra,* at p. 745.) The tenants argued that "to allow landlords to raise setoff as a defense would be inconsistent with the equitable principle that an individual should not profit from his own wrong, because landlords may use this defense to keep all or part of the security deposits they retained in violation of section 1950.5, subdivision (f)." ( *Id.* at p. 747.) While the court "recognize[d] the importance of this equitable principle (see § 3517), and while [it did] not doubt that this principle may bar setoff on the particular facts of many *individual* cases, it does not justify an absolute bar to the right to a setoff in *all* cases." (*Ibid.*) The court observed in this regard that "a landlord that seeks setoff after good faith noncompliance with the procedures described in section 1950.5, subdivision (f), does not 'profit from his own wrong,' because he cannot set off any damages he could [***45] not have recovered if he had complied with section 1950.5, subdivision (f)." ( *Id.* at p. 748.)

We read this last statement, as does Sherwood, to mean that a landlord that in good faith violates the security deposit statute may offset against its damages only those amounts which it properly could have claimed of the security deposit in the first place. Here, 250 wrongly

retained the security deposit to cover future rent damages--damages against which the deposit could not have been applied under section 1950.7--and thereby profited from its own wrong unlike the landlords in *Granberry.* To allow the offset against [*728] future rent damages accomplished by the net judgment in this case would enable 250 to profit from its violation of section 1950.7 at the expense of the other creditors of PhotoPoint. If Sherwood were allowed a separate judgment, it would be in a position to marshal an asset of PhotoPoint for the benefit of all of PhotoPoint's creditors, not just 250. A setoff "simply eliminates a superfluous exchange of money between the parties." ( *Jess v. Herrmann* (1979) 26 Cal.3d 131, 137 [161 Cal. Rptr. 87, 604 P.2d 208].) There would be no such "exchange" in this [***46] instance because 250, like other PhotoPoint creditors, is entitled only to a pro rata distribution of PhotoPoint's assets, not a dollar for dollar recovery of its damages. Entry of the net judgment thus resulted in an "inequitable windfall" to 250 ( *id.* at p. 143), and separate judgments are required.

### D. *Time for Return of the Deposit*

In view of the court's ruling on the setoff issue, it was not required to determine precisely when 250 was required to return the security deposit. No evidence on the issue was presented other than the Notice to Quit and the Notice of Belief of [**315] Abandonment 250 served on PhotoPoint on or about August 14, 2001. The Notice to Quit stated that if PhotoPoint did not vacate and deliver possession of the premises, 250 would initiate legal proceedings to declare a forfeiture of the lease, and to recover possession of the premises, rent, and damages. The Notice to Quit further stated: "[250] elects to declare the forfeiture of the Lease under which you hold possession of the premises." The Notice of Belief of Abandonment, given pursuant to section 1951.3, [11] advised that the premises would be deemed abandoned under section 1951.2 and the [***47] lease would terminate on September 3, 2001, unless, before that date, [*729] 250 received written notice from PhotoPoint stating that PhotoPoint did not intend to abandon the property.

11    Section 1951.3 provides in part: "(a) Real property shall be deemed abandoned by the lessee, within the meaning of Section 1951.2, and the lease shall terminate if the lessor gives written notice of his belief of abandonment as provided in this section and the lessee fails to give the lessor written notice, prior to the date of termination specified in the lessor's notice, stating that he does not intend to abandon the real property and stating an address at which the lessee may be served by certified mail in any action for unlaw-

ful detainer of the real property. [¶] (b) The lessor may give a notice of belief of abandonment to the lessee pursuant to this section only where the rent on the property has been due and unpaid for at least 14 consecutive days and the lessor reasonably believes that the lessee has abandoned the property. The date of termination of the lease shall be specified in the lessor's notice and shall be not less than 15 days after the notice is served personally or, if mailed, not less than 18 days after the notice is deposited in the mail. [¶] ... [¶] (f) Nothing in this section precludes the lessor or the lessee from otherwise proving that the real property has been abandoned by the lessee within the meaning of Section 1951.2. [¶] (g) Nothing in this section precludes the lessor from serving a notice requiring the lessee to pay rent or quit as provided in Sections 1161 and 1162 of the Code of Civil Procedure at any time permitted by those sections, or affects the time and manner of giving any other notice required or permitted by law. The giving of the notice provided by this section does not satisfy the requirements of Sections 1161 and 1162 of the Code of Civil Procedure."

[***48]  250 reports in its briefs that, after Photo-Point vacated the premises sometime in July 2001, Sherwood moved in to review documents and marshal PhotoPoint's assets. 250 indicates that Sherwood eventually vacated the property but never turned over the keys or advised 250 of its intentions with respect to the lease. 250 says that this caused it to serve the Notice to Quit and Notice of Belief of Abandonment. The record shows that 250 filed its unlawful detainer action against Photo-Point on August 29, 2001.

As we have said, section 6.A of the lease effectively amended the statutory time for return of the deposit. Section 1950.7, subdivision (c) required that the balance of the security deposit remaining after application toward default in the payment of rent be returned to the tenant within two weeks after the landlord received possession of the premises--"receipt of possession" meaning, in our view, termination of the lease pursuant to section 1951.2, either by the tenant's breach and abandonment, [12] or by termination of the tenant's right of possession. Section 6.A of the lease provided a longer, 45-day deadline, measured from a different date: the later of (1) Photo-Point's surrender [***49] of possession of the premises "in accordance with this Lease," [13] and (2) the "Termination Date," [**316] which is defined in section 1.E to mean April 9, 2005, or the date of early termination "in accordance with this Lease." The situation is further complicated by section 1954.1, which gives a tenant's assignee for the benefit of creditors the right to occupy

the premises for up to 90 days after the assignment, if the assignee pays the monthly rent when due. [14]

> 12   As we have noted, the landlord can effectively decline receipt of possession in that situation if it exercises its rights under section 1951.4.
>
> 13   Section 30 of the lease, under the heading "Surrender of Premises," states that: "At the expiration or earlier termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Property (defined in Section 15) from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear excepted." The section goes on to specify 250's rights with respect to property that is not removed.
>
> 14   Section 1954.1 provides: "In any general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, the assignee shall have the right to occupy, for a period of up to 90 days after the date of the assignment, any business premises held under a lease by the assignor upon payment when due of the monthly rental reserved in the lease for the period of such occupancy, notwithstanding any provision in the lease (whether heretofore or hereafter entered into) for the termination thereof upon the making of the assignment or the insolvency of the lessee or other condition relating to the financial condition of the lessee. This section shall be construed as establishing the reasonable rental value of the premises recoverable by a landlord upon a holding-over by the tenant upon the termination of a lease under the circumstances specified herein."

[***50]  The parties have not briefed the issue of when the security deposit was due to be returned under the lease, and that date is not a pure question of law on [*730] which we can appropriately rule in the first instance. The date needs to be determined by the trial court, after the parties are afforded an opportunity to submit further argument and evidence. However, the briefs do raise arguments on the lease's termination that can be dealt with here.

250 had the right, under the lease and section 1951.2, to terminate the lease by terminating Photo-Point's right of possession. In the absence of proof that PhotoPoint responded to the Notice of Belief of Abandonment, the lease terminated on September 3, 2001, as stated in that notice. (§ 1951.3, subd. (a); *In re Lomax, supra,* 194 B.R. at p. 866.) That termination was unquestionably a termination "in accordance with this lease" within the meaning of section 6.A, which would have

started the running of the 45 days. [15] In the absence of evidence that Sherwood timely paid the rent required to exercise its right of continued occupancy as PhotoPoint's assignee, there is no merit to 250's suggestion that the existence of that right [***51] prevented the lease from being terminated in accordance with its terms on September 3, 2001.

> 15    The lease, in specifying that the 45 days would begin to run on the later of surrender or termination, could be read literally to provide that the duty to return the security deposit would never arise if PhotoPoint never surrendered possession "in accordance with this lease." However, it would be unreasonable to expect a tenant who has abandoned the premises, and then had its lease terminated pursuant to a notice of belief of abandonment, to take any further action to "surrender" the premises.

(17) Sherwood contends that the premises must have been abandoned, and the lease therefore terminated, by August 14, 2001, the date of the Notice of Belief of Abandonment. (See § 1951.3, subd. (b) [such notice may be given only when the lessor reasonably believes that the tenant has abandoned].) However, the lease specifies that the 45 days begin to run from surrender or termina-

tion of the lease in accordance with its terms, not from [***52] the time of breach and abandonment. Sherwood argues that the lease was terminated on August 24, 2001, 10 days after service of the notice to quit. However, termination "in accordance with this lease" apparently refers to termination of PhotoPoint's right of possession, a right that was not extinguished [**317] through the notice to quit. (See *California Safety Center, Inc. v. Jax Car Sales, supra,* 164 Cal. App. 3d at p. 999, fn. 7 [tenant can remain in possession until unlawful detainer judgment is rendered].) These points do not preclude Sherwood from attempting to establish, when the case is returned to the trial court, that the 45-day period for return of the security deposit under the lease began to run before September 3, 2001.

[*731] **III. DISPOSITION**

The judgment is reversed.

Reardon, J., and Rivera, J., concurred.

A petition for a rehearing was denied August 29, 2005, and the opinion was modified to read as printed above. The petition of appellant 250 L.L.C. for review by the Supreme Court was denied October 26, 2005.

EXHIBIT 2

LEXSEE 188 CAL. APP. 2D 269

**ADMIRAL OIL COMPANY (a Corporation), as Trustee, etc., Appellant, v. Mac-DONALD LYNCH et al., Respondents**

**Civ. No. 24745**

**Court of Appeal of California, Second Appellate District, Division One**

**188 Cal. App. 2d 269; 10 Cal. Rptr. 280; 1961 Cal. App. LEXIS 2421**

**January 17, 1961**

**PRIOR HISTORY:**   [***1]  APPEAL from a judgment of the Superior Court of Los Angeles County.  H. Eugene Breitenbach, Judge.

Action to set aside an assignment of oil leases and oil well equipment, and for other relief.

**DISPOSITION:**   Affirmed.  Judgment of dismissal with prejudice, entered after sustaining demurrer to third amended complaint without leave to amend, affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEAD-NOTES**

**(1) Trusts--Actions to Establish--Pleading--Constructive Trust.** --In an action by an oil company to establish that it was trustee of certain oil leases and oil well equipment, an allegation in the complaint that about six months after a written agreement between defendants as beneficiaries and two other oil companies as trustees of the property was entered into plaintiff oil company became the substituted trustee by virtue of an oral agreement made prior to the written agreement because the parties knew the named trustees could not act was not a sufficient allegation that plaintiff oil company became the substituted trustee, and a demurrer to the complaint was properly sustained, since the prior oral agreement was not controlling as against the subsequent written agreement.

**(2) Evidence -- Extrinsic Evidence -- Nature of Rule.** -- The parol evidence rule is not a rule of evidence, but one of substantive law.

**(3) Id.--Extrinsic Evidence--Nature of Rule.** --As applied to contracts, the parol evidence rule is simply that, as a matter of substantive law, the act of embodying the complete terms of an agreement in a writing becomes the contract of the parties.

**(4) Id.--Extrinsic Evidence.** --Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.

**(5) Id.--Extrinsic Evidence.** --The parol evidence rule comes into operation when there is a single and final memorial of the parties' understanding, and when that takes place, prior and contemporaneous negotiations, oral or written, are excluded.

**(6) Estoppel--Pleading--Sufficiency of Allegations.** --In an action by an oil company to establish that it was trustee of certain oil leases and oil well equipment by reason of its substitution for the trustees named in a written agreement, allegations that ratification of the substitution and estoppel to deny it occurred "in that" defendants "accepted the assignment as aforesaid" were insufficient where the only allegation regarding an assignment which preceded the allegations respecting ratification and estoppel related to an assignment of oil in reserve to a bank by plaintiff to which neither defendant was a party.

**(7) Id. -- Pleading -- Sufficiency of Allegations.** --In an action by an oil company to establish that it was trustee of certain oil leases and oil well equipment by reason of its substitution for the trustees named in a written agreement, allegations following an allegation that defendants ratified the substitution and were estopped to deny it "in that" they "accepted the assignment as aforesaid" were not sufficient allegations of ratification or estoppel where they referred to an assignment in which defendants were involved but which did not state that it was made by plaintiff oil company as trustee.

188 Cal. App. 2d 269, *; 10 Cal. Rptr. 280, **;
1961 Cal. App. LEXIS 2421, ***

**COUNSEL:** Theodore G. Lee and Leslie B. Joseph for Appellant.

Forster & Gemmill, Stanley & Kirby and John G. Gemmill for Respondents.

**JUDGES:** Wood, P. J. Fourt, J., and Lillie, J., concurred.

**OPINION BY:** WOOD

**OPINION**

[*270] [**281] Admiral Oil Company, "as Trustee," commenced this action (1) to set aside an assignment of oil leases and oil well equipment, (2) to establish that defendants are constructive trustees of said property for the benefit of plaintiff; (3) for an accounting, (4) for an injunction, and (5) for appointment of a receiver. The assignment was made by Admiral Oil Company to defendant Damar Production Company, a corporation. There were five alleged causes of action. It was alleged that defendants MacDonald Lynch and A. J. Bandy were copartners, and that Damar Production Company was the *alter ego* of MacDonald Lynch. Defendants [***2] MacDonald Lynch, Frances Lynch, and Damar Production Company demurrer to the third amended complaint. The demurrer was sustained without leave to amend, and a judgment of dismissal with prejudice was entered. Plaintiff appeals from the decision and the judgment.

(1) The principal question is whether the third amended complaint sufficiently alleges that plaintiff is the trustee of the trust referred to therein.

The allegations of the third amended complaint regarding a trust, and regarding the manner in which plaintiff became [*271] trustee thereof, are substantially as follows: About February 3, 1958, a certain written Memorandum Trust Agreement was entered into between Pozo Grande Oil Company, a corporation, and Transline Oil Corporation, "as Trustee," and certain persons as beneficiaries. A copy of the agreement is attached to the complaint, marked Exhibit "B," and made a part of the third amended complaint. About August 29, 1958, plaintiff became substituted trustee on behalf of the beneficiaries concerning the properties referred to in the third amended complaint "in that all beneficiaries and defendants MacDonald Lynch and A. J. Bandy were aware that Pozo Grande Oil Company [***3] and Transline Oil Corp. were unable to act as Trustees concerning said properties; that all parties, before signing the aforesaid Memorandum Trust Agreement [Exhibit "B"] orally agreed that Admiral Oil Company [plaintiff] should act as Trustee; that subsequently thereto, Admiral Oil Company, by proper resolution, entered upon its duties as such Trustee in reliance upon the said oral agree-

ment and representations by the beneficiaries and defendants MacDonald Lynch and A. J. Bandy; that furthermore, defendants MacDonald Lynch and A. J. Bandy ratified the substitution of Admiral Oil Company as Trustee in that they accepted the assignment as aforesaid; that by reason of said agreement and ratification defendants MacDonald Lynch and A. J. Bandy are estopped from denying plaintiff is not the substituted Trustee, as aforesaid."

The trustees named in the memorandum trust agreement are Pozo Grande Oil Company and Transline Oil Corporation. The provision of the agreement [**282] with respect to substitution of trustees is as follows: ". . . a new trustee may be substituted in place of the existing named Trustee with the written consent of 100% of the designated beneficiaries or their [***4] assigns first had and obtained." Plaintiff did not allege that it was substituted as trustee with such written consent or with the written consent of any designated beneficiaries or assigns. The allegations with respect to the substitution of plaintiff as trustee were, in effect, that although Pozo Grande Oil Company and Transline Oil Corporation were named as trustees in the written trust agreement (and plaintiff Admiral Oil Company was not named therein), the plaintiff became the substituted trustee, about six months after making the written agreement, because the parties knew that the named trustees could not act and the parties had orally agreed *before signing* the trust [*272] agreement that plaintiff should act as trustee; and further that defendants MacDonald Lynch and A. J. Bandy, by reason of their acceptance of "the assignment as aforesaid," ratified the substitution and are estopped to deny that plaintiff is the substituted trustee. In other words, the allegations were in part to the effect that about six months after the written agreement was made plaintiff became the substituted trustee by virtue of an oral agreement which was made prior to the written agreement. [***5] The allegation that the parties orally agreed before signing the agreement that plaintiff should act as trustee is not a sufficient allegation that plaintiff became the trustee under the agreement which was signed later and in which Pozo Grande Oil Company and Transline Oil Corporation are named as trustees. The prior oral agreement was not controlling as against the subsequent written agreement which was signed by the trustees and beneficiaries named therein. (2) In *Estate of Gaines*, 15 Cal.2d 255 [100 P.2d 1055], it was said at pages 264-265: "The parol evidence rule . . . is not a rule of evidence but is one of substantive law. . . . (3) The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), *becomes the contract of the parties.* . . . (4) Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being deter-

21

mined as a matter of law to be the writing itself. (5) The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous [***6] negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations." (See also *Youngblood* v. *Silvagni*, 173 Cal.App.2d 731 [343 P.2d 951].)

(6) With reference to ratification of the substitution of trustee and to estoppel to deny the substitution, plaintiff alleged that such ratification and estoppel occurred "in that" defendants MacDonald Lynch and A. J. Bandy "accepted the assignment as aforesaid." The only allegation regarding an assignment, which precedes the allegations regarding ratification and estoppel, is an allegation that Bank of America holds an "Assignment of Oil in Reserve" under the oil and gas leases as set forth in Exhibit "A" attached to the original complaint. That exhibit is an assignment, by Admiral Oil Company to Bank of America, of oil royalties as security for the payment of a note executed by Admiral Oil Company in [*273] favor of the bank. Neither Lynch nor Bandy is a party to that assignment. The allegations which precede the reference to "assignment as aforesaid" are not sufficient allegations of ratification or estoppel.

(7) It appears, however, that there were [***7] allegations "thereafter" in the third amended complaint regarding an assignment. Those allegations were to the effect that on August 29, 1958, the plaintiff as trustee for the beneficiaries acquired certain described oil well equipment and oil leases; that on [**283] November 5, 1958, the plaintiff made a written assignment of said property to defendants Damar Production Company and MacDonald Lynch, and a copy of said assignment is attached to the original complaint and made a part of the third amended complaint; that as the consideration for the assignment, in addition to the $ 25,000 stated in the assignment, the assignees orally promised to assume

plaintiff's financial obligation to one Grable, and to pay certain escrow charges, and to deliver certain oil stock to plaintiff; that a confidential relationship existed between plaintiff and the defendants; that in order to induce plaintiff to transfer said property the defendants, in violation of the confidential relationship, failed to disclose that defendants had secretly received firm offers to purchase the property; that in reliance upon such confidence in defendants the plaintiff transferred said property to defendants; that [***8] on December 22, 1958, plaintiff rescinded all agreements concerning the assignment. It is to be noted that the assignment (a copy of which was attached to the complaint) did not state that the assignment was made by plaintiff (Admiral Oil Company) as trustee. The allegations which succeed the reference to "assignment as aforesaid" are not sufficient allegations of ratification of substitution of trustee or sufficient allegations of estoppel to deny such substitution. The allegations which precede the reference to "assignment as aforesaid" are not sufficient allegations of ratification or estoppel.

The allegations of the third amended complaint are not sufficient to allege that plaintiff Admiral Oil Company is the trustee under the memorandum trust agreement or trustee for the beneficiaries named therein. At the hearing on demurrer, plaintiff's counsel said that additional facts could not be alleged. The court did not err in sustaining the demurrer without leave to amend.

In view of the above conclusion, it is not necessary to discuss other contentions on appeal.

[*274] As above stated, plaintiff appeals from the decision and the judgment. An affirmance of the judgment [***9] carries with it an affirmance of the decision.

The judgment is affirmed.

EXHIBIT 3

LEXSEE 234 CAL. APP 3D 973

**BANCO DO BRASIL, S.A., et al., Plaintiffs, Cross-defendants and Appellants, v. LATIAN, INC., et al., Defendants, Cross-complainants and Respondents**

**No. B045477**

**Court of Appeal of California, Second Appellate District, Division Three**

**234 Cal. App. 3d 973; 285 Cal. Rptr. 870; 1991 Cal. App. LEXIS 1135; 91 Cal. Daily Op. Service 7901; 91 Daily Journal DAR 12040**

**September 27, 1991**

**SUBSEQUENT HISTORY:** [***1] A petition for a rehearing was denied October 25, 1991, and respondents' petition for review by the Supreme Court was denied January 23, 1992.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C532005, Billy G. Mills and Richard A. Lavine Judges. *

    * Billy G. Mills was the trial judge; Richard A. Lavine was the posttrial judge.

**DISPOSITION:** The judgment in favor of respondents on Banco's complaint and on respondents' cross-complaint is reversed. The matter is remanded to the trial court with directions to enter judgment in favor of Banco (1) on the first three causes of action of its complaint and (2) on respondents' cross-complaint and to conduct such further proceedings in connection therewith as may be appropriate. Banco and Stefano shall recover their costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

    A bank commenced an action against the guarantors of a company's debts that were secured by inventory the guarantors had purchased. The guarantors filed a cross-complaint against the bank and its general manager, asserting that they breached an oral contract to extend a $ 2 million line of credit to the guarantors when they purchased the inventory, and that the bank committed fraud in making this false promise and in misrepresenting the financial condition of the company. Following a jury trial, the trial court entered judgment against the bank on its complaint, and for the guarantors on their cross-complaint. (Superior Court of Los Angeles County, No.

C532005, Billy G. Mills and Richard A. Lavine Judges. *)

    * Billy G. Mills was the trial judge; Richard A. Lavine was the posttrial judge.

    The Court of Appeal reversed and remanded with instructions that the trial court enter judgment in favor of the bank on its complaint. The court held that the parol evidence rule barred admission of evidence of the alleged oral agreement to vary the terms of the written guaranty, since the written guaranty was intended to reflect the entire agreement of the parties, and the oral agreement was not needed to explain an ambiguity or supply a necessary missing term. The court further held that even if evidence of the oral agreement were admissible, that evidence, which consisted primarily of the guarantors' self-serving statements, was insufficient to establish the existence of an oral agreement or fraud. (Opinion by Croskey, J., with Klein, P. J., and Danielson, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 109--Briefs--Adequacy of Argument.** --Although appellants' one-page discussion of a critical and potentially dispositive issue on appeal did not reflect the substantial effort the issue clearly required, it was sufficient to avoid respondents' claim that appellant had waived the issue, since the reviewing court has the power to decide a case on any proper points or theories, whether urged by counsel or not. The rule requiring adequate legal argument is largely for the court's convenience, and there is no reason why the court cannot exam-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

ine the record, do its own research on the law, or accept a belated presentation.

**(2) Evidence § 61--Parol Evidence Rule--Nature of Rule.** --The parol evidence rule provides that when the parties to a contract have set forth the terms of their agreement in a writing that they intend as the final and complete expression of their understanding, it is deemed integrated and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement ( Code Civ. Proc., § 1856). It is not merely a rule of evidence excluding precontractual discussions for lack of credibility or reliability. It is a rule of substantive law making the parties' integrated written agreement their exclusive and binding contract, no matter how persuasive the evidence of additional oral understandings may be. Such parol evidence is legally irrelevant and cannot support a judgment.

**(3) Appellate Review § 144--Scope of Review--Applicability of Parol Evidence Rule.** --The resolution of whether the parol evidence rule applies so as to exclude evidence of a collateral oral agreement is one of law to be determined by the court. Thus, an appellate court is not bound by the trial court's determination, and resolves the issue de novo.

**(4) Evidence § 61--Parol Evidence Rule--Two-part Test.** --The parol evidence rule is limited to those cases in which the parties intended the writing to be complete unto itself. Application of the rule involves a two-part inquiry: (1) whether the writing was intended to be an integration, that is, a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements, and (2) whether the agreement is susceptible to the meaning advocated by the party offering the evidence. Put another way, if a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

**(5) Evidence § 62--Parol Evidence Rule--Integration--Ascertaining Parties' Intent--Integration Clause as Conclusive.** --The crucial issue in determining whether a document is integrated for purposes of applying the parol evidence rule is whether the parties intended that the written instrument serve as the exclusive embodiment of their agreement. The instrument itself may help to resolve that issue. It may state that there are no previous understandings or agreements not contained in the writing, thus expressing the parties' intention to nullify antecedent understandings or agreements. If the parties adopt such a clause, it may well by conclusive on the issue of integration.

**(6) Evidence § 62--Parol Evidence Rule--Integration--Ascertaining Parties' Intent--Collateral Agreement as Evidence of Intent.** --In order to resolve the threshold issue of whether the parties intended that their written agreement be integrated, so as to preclude admission of a collateral oral agreement, the court may consider all the surrounding circumstances, including the parties' prior negotiations. The court must consider not only whether the written instrument contains an integration clause, but also must examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. The collateral agreement, however, will be examined only insofar as it does not directly contradict an express term of the written agreement, since it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms. In the case of prior or contemporaneous representations, the collateral agreement must be one that might naturally be the subject of a separate contract.

**(7) Evidence § 62--Parol Evidence Rule--Integration--Policy Considerations.** --The resolution of the question of whether the parties intended that their written agreement be integrated, so as to preclude admission of a collateral oral agreement to vary the terms of the writing, requires the accommodation of at least two policy considerations. The first policy is based on the assumption that written evidence is more accurate than human memory, and can be adequately served by excluding parol evidence of agreements that directly contradict the writing. The second policy is based on the fear that fraud or unintentional invention by interested witnesses will mislead the fact finder. This fear can be alleviated by two indicia of credibility, the first of which states that an oral agreement is credible if it might naturally have been made as a separate agreement by parties similarly situated, and the second of which states that an oral agreement is credible unless it can be said with certainty that the parties would have included the oral agreement in the written instrument.

**(8) Evidence § 62--Parol Evidence Rule--Integration--Four-part Analysis.** --The determination of whether the parties intended that their written agreement be integrated, so as to preclude admission of a collateral oral agreement to vary the terms of the writing, involves an analysis based on four questions: (1) whether the written instrument appears on its face to be a complete agreement; (2) whether the alleged oral agreement directly contradicts the written instrument; (3) whether it can be said that the oral agreement might naturally have been made as a separate agreement or, put another way, whether the oral agreement would certainly have been included in the written instrument; and (4) whether evi-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

dence of the oral agreement would be likely to mislead the trier of fact.

**(9) Evidence § 62--Parol Evidence Rule--Integration--Ascertaining Parties' Intent--Complete Agreement Containing Integration Clause.** --In an action involving an agreement by which two guarantors unconditionally guaranteed a company's debt secured by inventory the guarantors had purchased, the parol evidence rule precluded admission of evidence of a bank's alleged oral agreement to extend to the guarantors a $ 2 million line of credit in exchange for their assumption of the debt. The written guaranty was intended to be a complete expression of the parties' understanding, since it purported fully to describe the entire debt relationship among the parties. Most importantly it contained an integration clause, which stated that the guaranty agreement embodied the entire agreement and understanding among the parties and superseded all prior agreements and understandings relating to the subject matter of the agreement, and the guarantors conceded they had read, understood, and discussed the clause with their attorneys.

[See 2 **Witkin**, Cal. Evidence (3d ed. 1986) §§ 967, 972.]

**(10a) (10b) Evidence § 62--Parol Evidence Rule--Integration--Inconsistency Between Oral and Written Agreements as Evidence of Integration.** --A claimed oral agreement by a bank to extend a $ 2 million line of credit, as an indispensable condition to two guarantors' obligations under a written guaranty of a loan secured by a company's inventory they had purchased, unquestionably contradicted the written guaranty agreement, thus precluding evidence of the alleged oral agreement under the parol evidence rule. The testimony offered by the debtors and the arguments of their counsel, which repeatedly emphasized that the line of credit was a condition of their entire obligation, was entirely and directly inconsistent with an express term of the integrated written agreement, which stated that the guarantors acknowledged their joint and several obligations under the guaranty agreement, and agreed that those obligations were absolute and unconditional. It simply was not possible to reconcile the guarantors' claim of an oral condition with their express written agreement that there were no conditions to their liability.

**(11) Evidence § 63--Parol Evidence Rule--Exceptions--Conditions Precedent.** --It is generally true that evidence of a condition precedent to a contract is not barred by the parol evidence rule, unless the written contract includes an express provision inconsistent with the condition precedent.

**(12a) (12b) Evidence § 62--Parol Evidence Rule--Integration--Collateral Agreement as Natural Subject of Separate Agreement.** --The trial court erred in finding that the parol evidence rule did not bar evidence of a bank's alleged oral agreement to extend a $ 2 million line of credit to two guarantors as a condition of their guaranty of an outstanding loan secured by a company's inventory they had purchased. Among other things, the collateral agreement was not one that naturally would be the subject of a separate agreement. The guarantors were sophisticated businessmen who were represented by counsel, and while they contended the line of credit was a significant part of the transaction, it was not mentioned in the documents or any contemporaneous writings or correspondence. It was inconceivable that the bank, having made such an effort to document the transaction, would have made a cavalier oral promise to extend further credit. Although language in one document stated that the debtor agreed to certain terms to induce the bank from time to time make a line of credit available to the borrowers, that language anticipated extension of a line of credit not to the guarantors, but to the seller of the inventory they purchased, which was the "borrower" defined by the document.

**(13) Evidence § 69--Parol Evidence Rule--Exceptions--Evidence of Consistent Collateral Agreement--Prior Superseded Written Agreements as Evidence.** --Under the parol evidence rule, a written guaranty agreement could not be varied by an earlier security agreement which, according to the guarantors, evidenced a bank's agreement to extend them a $ 2 million line of credit in exchange for their guaranty of an outstanding loan secured by a company's inventory they had purchased. The statement in the security agreement that the guarantors agreed to certain terms as an inducement to the bank to extend them credit from time to time spoke only of the parties' understanding at the time the guarantors purchased the inventory. Also, the document was controlled by a later addendum indicating that the inducement was actually for the bank to extend credit to the company, not to the guarantors, and the security agreement concerned the very debt that was restructured by the guaranty agreement. Although the security agreement was included as an historical exhibit to the guaranty agreement, it could not reasonably be read to contradict or detract from the specifically negotiated and contrary language of the later guaranty agreement.

**(14) Evidence § 62--Parol Evidence Rule--Integration--Misleading Nature of Oral Agreement as Evidence of Intent to Integrate.** --Under the parol evidence rule, a written guaranty agreement could not be varied by an earlier security agreement which, according to the guarantors, evidenced a bank's agreement to extend them a $

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

2 million line of credit in exchange for their guaranty of an outstanding loan secured by a company's inventory they had purchased. Among other things, given the circumstances and the carefully drafted language of the written agreement, a trier of fact would be misled by the contradictory terms of the alleged oral agreement. Certainly, the jury was misled, because it rejected the bank's claims and accepted the guarantors' lender liability claims, awarding them substantial damages, on the basis of the guarantors' testimony, in the absence of which the result necessarily would have been just the opposite.

**(15a) (15b) Evidence § 65--Parol Evidence Rule--Exceptions--Evidence in Aid of Interpretation--Reasonably Susceptible--Oral Agreement That Contradicts Writing.** --A bank's alleged oral agreement to extend a $ 2 million line of credit to two guarantors as a condition of their guaranty of an outstanding loan secured by a company's inventory they had purchased was not admissible to vary the terms of the unconditional guaranty agreement under the rule that permits admission of parol evidence that is relevant to prove a meaning to which the language of a written instrument is reasonably susceptible. That exception had no application, since the claimed oral agreement directly contradicted the written instrument, and the guarantors were actually offering the alleged oral agreement as a new, additional, and completely different agreement, rather than as a clarification of an ambiguity or a missing term of the written instrument.

**(16) Evidence § 65--Parol Evidence Rule--Exceptions--Evidence in Aid of Interpretation--Reasonably Susceptible--Test of Admissibility.** --The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether the written instrument appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. Testimony of intention that is contrary to a contract's express terms does not give meaning to the contract, but seeks to substitute a different meaning. It follows that such evidence must be excluded.

**(17) Evidence § 72--Parol Evidence Rule--Exceptions--Evidence Writing is Invalid or Ineffective--Promissory Fraud.** --Although there is a recognized exception to the parol evidence rule permitting evidence of fraud to nullify a written agreement, that exception does not apply to allegations of promissory fraud, unless the false promise is independent of or consistent with the written instrument. It does not apply where parol evidence is offered to prove a fraudulent promise directly at variance with the terms of the written agreement, since a

broad application of the concept of promissory fraud would undermine the policies of the parol evidence rule and would encourage attempts to convert contractual disputes into fraud litigation.

**(18) Appellate Review § 149--Scope of Review--Sufficiency of Evidence--Power of Court.** --The appellate court's review of the sufficiency of the evidence to support the judgment begins and ends with the determination of whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, to support the jury's conclusions. The court must examine all factual matters in the light most favorable to the prevailing party and resolve all conflicts in support of the judgment. "Substantial" evidence, however, is not synonymous with "any" evidence. Rather, it means evidence that is reasonable, credible, and of solid value. It must actually be "substantial" proof of the essentials that the law requires in a particular case. It must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Improbable conclusions drawn in favor of a party through the sanction of a jury's verdict will not be sustained where the testimony is at variance with physical facts and repugnance is material and self evident.

**(19) Contracts § 52--Actions--Evidence--Sufficiency--Consistency Between Testimony and Standard Business Practices.** --The evidence was insufficient to support the jury's verdict that a bank made an oral promise to extend a $ 2 million line of credit to two guarantors in exchange for their written guaranty of an outstanding loan secured by a company's inventory they had purchased. Among other things, the testimony of a guarantor and his son that the bank's representatives had orally made such a promise was not reasonable or credible, given the specific and consistent testimony of bank representatives that no oral commitment was ever made, although the possibility of some credit extension was discussed, subject to approval by the bank's head office. This testimony was consistent with common banking practices, especially when contrasted with the guarantors' version, which required one to believe that a bank officer, without information as to a borrower's financial condition or history, would or could commit a bank to an open-ended, multimillion dollar obligation without discussion as to the terms, such as interest rate, maturity dates, repayment schedule, and security.

**(20) Contracts § 52--Actions--Evidence--Sufficiency--Consistency Between Party's Contemporaneous Conduct and Trial Testimony.** --The evidence was insufficient to support the jury's finding that a bank made an oral promise to extend a $ 2 million line of credit to two guarantors in exchange for their written guaranty of an

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

outstanding loan secured by a company's inventory they had purchased. Among other things, the guarantors' argument and testimony that they viewed the $ 2 million line of credit as the most attractive aspect of the business was inconsistent with the fact that the line of credit was never mentioned in any of the contemporaneous documents or correspondence, and no written financial statements were submitted to the bank in a timely manner in spite of the bank's repeated requests for them. Moreover, the guarantors admitted that the line of credit belonged to the company and that all but $ 150,000 had been extended and was due and payable within less than six months after the purchase contract was originally agreed upon. Finally, even after the bank had supposedly failed for six months to provide the promised credit, the guarantors signed a guaranty agreement by which they expressly acknowledged that their obligations to the bank were unconditional.

**(21a) (21b) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Sufficiency of Evidence of Bank's Fraudulent Promise to Extend Line of Credit.** --There was no evidence to support the conclusion that a bank fraudulently promised that it would provide two guarantors with a $ 2 million line of credit when they guaranteed a debt secured by a company's inventory they had purchased, or that the bank misrepresented the financial condition of the company to induce the guarantors to buy its inventory. There was nothing false about the statements the bank officer made about the history of the company, and the guarantors fully investigated the company before entering into the original purchase contract. Moreover, the transaction was structured so that the company's financial condition was irrelevant to the guarantors, since they merely took possession of the inventory they wanted, and owed the bank only those obligations that were secured by that inventory. In any event, given the guarantors' independent investigation of the company, they could not have justifiably relied on the alleged misrepresentations.

**(22) Fraud and Deceit § 2--Actual Fraud--Elements.** --In order to recover for fraud, one must prove (1) a misrepresentation, such as a promise made without the intent to perform; (2) knowledge of the falsity of the representation; (3) an intent to defraud, that is, to induce reliance; (4) justifiable reliance; and (5) damage.

**COUNSEL:** Wang & Wang, Francis S. L. Wang, Michael T. Welch and Karen L. Hoeg for Plaintiffs, Cross-defendants and Appellants.

Gray, Plant, Mooty, Mooty & Bennett, Daniel R. Shulman, Penny M. Tibke, Alioto & Alioto and Joseph M.

Alioto for Defendants, Cross-complainants and Respondents.

**JUDGES:** Opinion by Croskey, J., with Klein, P.J., and Danielson, J., concurring.

**OPINION BY:** CROSKEY

**OPINION**

   [*981] [**872] Plaintiff, cross-defendant and appellant Banco Do Brasil, S.A., [***2] Los Angeles Agency, a banking association organized and existing under the laws of Brazil (Banco), and cross-defendant and appellant Joao Stefano (Stefano) appeal from a judgment entered against them following a jury verdict in favor of the defendants, cross-complainants and respondents Latian, Inc., a California corporation (Latian), and Amanollah Sarbaz (Amanollah).

   This appeal arises from a lender liability claim asserted by Latian and Amanollah by way of a cross-complaint to Banco's original action which it brought to enforce and recover on certain promissory notes and a written loan restructure agreement. Banco's claims were rejected by the jury in a verdict which awarded to Latian and Amanollah over $ 27 million on their cross-complaint.

   [*982] Latian and Amanollah received a judgment for substantial compensatory and punitive damages for breach of contract and fraud arising from their claim that Banco had orally promised to extend to them a "$ 2 million line of credit" as an integral part of a transaction in which they purchased the assets of a business by assuming certain secured debts of their seller to Banco. While all other aspects of the transaction were fully documented, [***3] the alleged promise to extend additional credit, while assertedly critical, was never the subject of any writing and was vigorously disputed by Banco.

   Banco asserts that the evidence was simply insufficient to establish either that (1) any enforceable contract to provide such a line of credit ever existed or (2) any fraudulent conduct ever took place. In addition, it argues that the documentation of this transaction was such that evidence of an oral collateral agreement should have been barred by the parol evidence rule. From our examination of the extensive record of the month-long jury trial which is before us, we have concluded that Banco's arguments are well taken. The trial court erroneously overruled Banco's parol evidence [**873] objections. In addition, when the record is examined in its totality, there is simply no substantial credible evidence to support the claim that Banco had agreed to or promised a $ 2 million line of credit to Latian or Amanollah. We will therefore reverse the judgment.

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

Procedural History

Banco commenced this action against Latian, Amanollah and, with respect to the fraud claim, a number of Doe defendants [1] on January 28, 1985. On that date, it filed [***4] a complaint seeking to recover sums due and unpaid under a January 1983 guaranty payment agreement ($ 1,072,874.51) (hereinafter the Guaranty Agreement) and three promissory notes dated June 28, 1983 ($ 40,000), December 6, 1983 ($ 5,685.17) and December 31, 1983 ($ 11,927.11). Banco alleged that only two principal payments were made under the Guaranty Agreement, in February and March of 1983, and none was ever made with respect to the three promissory notes. A principal unpaid balance of $ 1,053,433.90, plus substantial accrued interest, was claimed on several theories: a common count for money lent, breach of promissory notes and the Guaranty Agreement and promissory fraud. There is no dispute that these amounts remain unpaid.

1  Apparently the only Doe defendant who was served in the case was Amanollah's son, Manoucher Sarbaz (Manoucher). Amanollah had three other sons; all of whom played some part in this matter; however, they were not made parties to these proceedings. Latian, Amanollah and Manoucher, who is also a cross-complainant, are sometimes collectively referred to as the "respondents."

[***5] On February 12, 1985, the respondents filed a "Joint and Several Answer and Cross-Complaint." By this pleading, the respondents denied all liability [*983] to Banco and affirmatively alleged that they had been substantially damaged by Banco's failure to honor an *oral* commitment to provide a "$ 2 million line of credit" to be used in the operation of Latian's business. The defendants sought damages on several theories which were asserted against both Banco and Stefanon: [2] breach of an oral agreement, fraud, negligent misrepresentation and interference with prospective advantageous economic relationships.

2  Stefanon was at all relevant times the general manager of the Los Angeles Agency of the Banco do Brasil.

Prior to trial, Banco, by a motion for summary judgment sought to bar, under the parol evidence rule, any evidence of a collateral oral agreement or promise by Banco to extend a "line of credit" to Latian. After extensive argument, the trial court ruled that the collateral oral evidence would be admitted. [***6] In support of such ruling, the court took the position that the claimed promise to provide such a line of credit was a matter which was "naturally separate" from the extensively docu-

mented loan and guaranty agreements which were entered into between Banco and Latian and Amanollah; based on that conclusion, the trial court held that the Guaranty Agreement was not integrated. [3] Banco's efforts to reassert this objection first by a motion to reconsider and, just prior to trial, a motion *in limine* were similarly rejected.

3  Ultimately, this conclusion was incorporated, at respondents' request, in the instructions to the jury: "In deciding the Bank's [i.e., Banco's] claim for breach of the January 1, 1983 agreements and Latian's claims for fraud and breach of an agreement to provide a line of credit, you are instructed that I have determined that the January 1, 1983 agreements are not integrated; an agreement for a line of credit is a naturally separate agreement from the January 1, 1983 documents; and you may consider any evidence regarding alleged oral agreements between the parties."

[***7] The case went to trial before a jury on June 12, 1989, and concluded one month later on July 12. The jury found against Banco on its contract and fraud claims and for the defendants on their cross-complaint. The jury awarded compensatory damages of $ 3.6 million for breach of contract against Banco. On the fraud count, the jury awarded $ 1.9 million compensatory damages against Banco and Stefanon and punitive damages of $ 22 million against Banco and $ 500,000 against Stefanon.

Motions for judgment notwithstanding the verdict and a new trial were filed by [**874] Banco and Stefanon. The trial court [4] denied the former and [*984] conditionally granted the latter. The court ruled that if the defendants would accept a remittitur of punitive damages against Banco down to $ 5 million and against Stefanon down to five dollars then the motion for new trial would be denied. The defendants filed a timely acceptance of these conditions. In addition, the trial court made a postjudgment award of attorneys fees to Latian in the sum of $ 637,516.50.

4  The original trial judge, the Honorable Billy G. Mills, unfortunately suffered a disabling stroke following the conclusion of the trial but before any posttrial motions could be heard. As a result, the Honorable Richard A. Lavine was assigned to hear and decide such motions. It appears that Judge Lavine, who obviously did not hear any of the original testimony, did not have a complete record of that testimony upon which to make his rulings, but only those portions thereof which the parties had periodically ordered during the trial and were able to make available to him.

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

[***8] Banco and Stefanon filed a timely notice of appeal. The respondents filed a cross-appeal seeking reinstatement of the original punitive damage awards.

The principal claim of Banco in this action is based upon the Guaranty Agreement and related documents executed in January of 1983. The balance of their claim rests upon three subsequently executed and admittedly unpaid promissory notes. However, to fully understand the competing claims of the parties a detailed chronological (and even tedious) review of the preceding events, which began in April of 1982, is necessary.

Factual Background [5]

5  There is practical agreement among the parties as to a substantial portion of the factual background. There is, however, serious disagreement as to certain critical matters. Unless otherwise indicated, the facts set forth are reflected in the evidence presented or acknowledged by both sides (e.g., there were a substantial number of documents introduced in evidence which speak for themselves). Where a dispute does exist we will identify the conflicting testimony as a predicate to our discussion as to whether substantial evidence supports the express and implied findings of the jury and the judgment entered thereon.

[***9] The Sarbaz family, headed by Amanollah, came to the United States from Iran following the 1979 revolution in that country. While in Iran they apparently had owned and operated a successful auto parts business. Thus, in 1982 when they sought an opportunity in that same business, a broker introduced them to the possibility of acquiring a group of auto parts sale companies collectively referred to as the "Kudsy companies" or, simply, "Kudsy." [6] The two shareholders of these companies were John Koudsi (Koudsi) and Mariano Antoci (Antoci).

6  There were four California corporations in the Kudsy group: J. Kudsy & Co., Inc., The Dot Radio of California, Inc., Wholesale Autoparts Supply, Inc., and Herbert Albrecht Autoparts, Inc.

The Sarbaz family retained counsel to represent them and, in April 1982, commenced negotiations with Koudsi and Antoci for the purpose of acquiring Kudsy or its business. All such negotiations were handled through their attorneys. [7] On May 21, 1982, the Sarbaz family caused Latian to be [*985] [***10] incorporated under the laws of California for the express purpose of acquiring the Kudsy business.

7  It is important to emphasize that the respondents, in *all* of their dealings with Banco, as well

as Kudsy, were advised and assisted by their own counsel.

Having apparently decided not to purchase the capital stock of the Kudsy companies, but rather only their assets, Latian submitted four separate written offers to Kudsy from May 21, through July 7, 1982. [8] These offers all contained variations and differences which are not particularly relevant here. What is clear is that the Sarbaz family and Latian had decided, as a result of their own investigation of Kudsy's business, that the financial condition of the [**875] Kudsy companies was such that only the assets should be purchased. It was ultimately agreed that the principal asset, a large inventory of auto parts, would be valued independently and paid for by the assumption by Latian of the then outstanding obligation due from Kudsy to Banco. [9] The final agreement contained [***11] extensive written provisions for the independent inspection and valuation of the auto parts inventory.

8  In fact, an initial offer had been submitted, on May 18, 1982, on behalf of Sarbaz and Sons, Inc., a California corporation. Although it is not entirely clear, we assume that such corporation is an entity separate from Latian. In any event, there were four specific written offers made in Latian's name which were dated May 21, June 9, June 25, and July 7, 1982. It was this last one which was accepted by Kudsy.

9  The specific language as finally agreed to by the parties provided:

"Payment of the purchase price allocable to the inventory shall take the form of assumption of a certain debt of Seller [i.e., Kudsy]. Latian shall assume Seller's specifically identified long term liability to Banco [de] Brazil, which is currently approximately 2.0 million dollars. Seller and its shareholders agree to remain liable on said notes due Banco [de] Brazil, including renewals, for one year subsequent to Closing."

The agreement provided that in the event the value of the inventory exceeded the debt due to Banco, Latian would provide Kudsy with a four-year UCC secured note for the difference. In the event that the assumed debt exceeded the inventory value, then the Kudsy companies were required to forthwith reduce the liability to the value of the inventory.

It is important to note and remember that these offers, including the three submitted to Kudsy before the respondents met anyone from Banco, all involved the purchase of the Kudsy inventory by the assumption of Kudsy's obligation