to Banco up to the amount of the value of the inventory. In other words, from the outset the respondents were willing to become indebted to Banco in an amount equal to the value of assets which would be delivered to them and which they would be free to resell.

[***12] The first meeting involving Banco, or any of its agents, took place on June 14, 1982. By this time, the respondents had been negotiating with Koudsi and Antoci, the owners of Kudsy, for over a month and had submitted three firm written offers (one of which was in response to a Kudsy counter-offer) to purchase all of the assets of those companies. During those negotiations the respondents had been informed about the Kudsy relationship with Banco. That relationship, which was apparently well established, included not only Banco's security interest in all of the auto parts inventory but also a line of credit arrangement which at that time was in the approximate sum of $ 2 [*986] million, [10] of which approximately $ 1,860,000 had been drawn down and was then outstanding.

> 10    The testimony indicated that Stefanon had approved earlier in 1982 a credit line for Kudsy in the sum of $ 2,010,000.

Present at this initial meeting were (1) Amanollah, Manoucher and Dariush Sarbaz (one of Amanollah's other sons) acting for [***13] themselves and Latian, (2) Koudsi and Antoci on behalf of Kudsy and (3) Stefanon and Messrs. Jose Boiteux and Angel Ferral on behalf of Banco. [11] Amanollah spoke only Farsi and so Manoucher had to translate for him. Manoucher testified that at this meeting with his father asked Stefanon, "If and when we buy it [i.e., Kudsy], would you cooperate with us? Would you let us assume the line of credit?" According to Manoucher, Stefanon replied, "If and when you buy the business, we will cooperate with you. And there should be no problem to let you assume the line of credit. . . . There are some paper works and formality you have to do with the head office, but there would be no problem and we would cooperate with you." According to Stefanon, and this does not appear to be disputed, there was no discussion at that time of a line of credit for Latian, separate and apart from that of Kudsy nor did the respondents make any application for such a separate credit extension or submit any financial information to Banco. In other words, Stefanon had no problem with Kudsy and Latian working together with Kudsy's existing line of credit which, as we have noted, was entirely drawn down except for $ [***14] 150,000 and would be of no practical importance without substantial paydowns to Banco.

> 11    A few days earlier, on June 9, 1982, Koudsi and Antoci had advised Stefanon that because of Antoci's health problems, they were looking for a buyer for the business. They informed Stefanon that they believed they had located such a buyer, the Sarbaz family, whom they described as having been connected with the Mazda Company in Iran. They inquired of Stefanon about Banco's position "regarding financial assistance to a new buyer."

The second meeting involving Banco and the respondents occurred on July 21, 1982, [**876] two weeks after Latian had entered into the written agreement of July 7 to purchase all of the assets of Kudsy. This meeting involved Stefanon and Ferral on behalf of Banco and Amanollah and Manoucher on behalf of Latian. Also present were Latian's counsel, Robert Nagata, and Henry Fields, representing Banco.

The central purpose of this meeting was to discuss Banco's participation in and consent to the sale transaction [***15] that the respondents had already concluded with Koudsi and Antoci to purchase the assets of the four Kudsy companies. In order for Latian to acquire the Kudsy assets by assuming Kudsy's obligation to Banco, Banco's approval was required. Mr. Fields, counsel for Banco, testified that he explained all of this to the respondents and that Amanollah would have to personally guarantee Latian's obligation [*987] and that Banco would retain its security position with respect to the inventory. Manoucher requested that Latian be allowed to assume the credit line and Stefanon responded that Banco's head office would have to approve any additional credit and that the respondents would have to provide adequate financial information. [12] [**877] Finally, Stefanon indicated that the then [*988] outstanding Kudsy debt would have to be reduced by $ 500,000 before the deal could be approved. Following this meeting, Stefanon, on July 26, 1982, submitted a lengthy written report to Banco's home office (see the last paragraph of fn. 12, ante, and the reference to exhibit 49) recommending approval of the transaction allowing Latian to assume Kudsy's bank debt and to provide credit availability up [***16] to $ 1.6 million, for a period of six months, upon certain conditions. However, this report was based upon the assumption that the transaction would close upon the terms and conditions spelled out in the written contractual agreement signed by the parties on July 7, 1982. Unfortunately, it did not.

> 12    There is considerable discrepancy in the testimony with respect to just what was said regarding this issue. Contrast the testimony of Manoucher with that of Stefanon. *Manoucher testified* under examination by his own attorney:

30

"Q. What did Mr. Stefanon say, if at all -- if anything at all, at that meeting with regard to the line of credit?

"A. He did say that of course he has to prepare some paper works and reports and send it to his head office and get their approval. But that is basically a formality. [para.] And my father also spoke with Mr. Stefanon --

"Q. First Mr. Stefanon said he had to get approval at the head office but he said it was a formality?

"A. Yes Sir.

"Q. All right. Now go ahead. [para.] And you said that your father then spoke privately with Mr. Stefanon?

"A. Yes, sir.

"Q. And were you translating?

"A. Yes, sir.

"Q. All right. Tell us now, as best you can, what your father said to you, which you translated to Mr. Stefanon, and what Mr. Stefanon said to you, which you translated to your father?

"A. My father basically repeated the same thing, and he -- that he has lost most of his assets in Iran because of the revolution, and he has six sons and one daughter. He likes to set up a business for them. [para.] And he seeks cooperation of Mr. Stefanon, and he wants to make sure that Banco do Brasil will grant $ 2 million line of credit to us.

"Q. And what did Mr. Stefanon say to your father through you?

"A. Mr. Stefanon assured my father of his cooperation, and he again mentioned that he has to fill out some paper works and get the approval of the head office, but he also mentioned that these are merely a formality. Once we command [sic] the line, it would be okayed by the head office."

*Stefanon, on the other hand, testified* under examination by Banco's counsel:

"Q. And was there any discussion at this meeting concerning a line of credit to be granted to the Latian Company?

"A. The discussion that -- Yes, there was.

"Q. What was that discussion?

"A. The discussion was that I explained to them that any line of credit for Latian should be submitted to the head office. It will depend on the approval from the head office.

"Q. Did you explain to them what the head office was?

"A. Not necessarily. They didn't ask anything, and so I said that I need the authorization from the head office for the approval.

"Q. Did you say where the head office was?

"A. In Rio de Janeiro."

Of these two conflicting versions, *Latian's own counsel*, who was present at the meeting, seems to agree with Stefanon and, by strong implication, rejects any "private conversation" between Amanollah and Stefanon. Mr. Nagata testified:

"Q. And is it your recollection that at this meeting, Mr. Stefanon advised everyone present that the request that was before him would require the head office approval of Banco do Brasil?

"A. Yes.

"Q. Okay. And do you recall that during this meeting, he also asked for financial information from Latian, which he intended to pass on to the head office?

"A. Yes.

"Q. Do you recall what that financial information was that he asked for?

"A. Not exactly.

"Q. When Mr. Stefanon described the bank's position on the transaction, did you understand what he was saying?

"A. Yes.

"Q. Okay. Was it your impression that the Sarbaz family, who was present during that meeting, also understood what he had said?

"A. Yes.

"Q. Do you recall that the transaction between Latian and Kudsy in fact did go forward, and those two parties closed on their transaction around August 25, 1982?

"A. That's my understanding.

" . . .

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

"Q. . . . Now, between July 21, 1982, after the meeting with the bank, and August 25, 1982, did you ever make a written request to Banco do Brasil to allow Latian to assume a $ 2 million line of credit?

"A. No, I didn't.

"Q. Did Mr. Manoucher Sarbaz ever ask you to author such a document during that time frame?

"A. I don't believe he did.

". . .

"Q. Given everything that you knew about the Latian-Kudsy transaction, and given what you had heard at the meeting on July 21, was it not your understanding that if Banco do Brasil was to provide to Latian any $ 2 million line of credit, that the terms and conditions of such line of credit would have been set forth in writing?

"A. Yes.

"Q. And as you sit here today, sir, am I correct that you have never seen any written $ 2 million line of credit that was executed by Banco do Brasil and Latian?

"A. No.  I never have."

Finally, exhibit 49 in evidence is a written report sent, on or about July 26, 1982, by Stefanon to Banco's home office.  This report, *written contemporaneously before any dispute arose*, is entirely consistent with the testimony of Stefanon and Mr. Nagata.

[***17]  By the time of the meeting of July 21, the respondents had inspected the Kudsy auto parts inventory and had concluded that a substantial portion was not marketable.  After the meeting on July 21, the respondents entered into further negotiations with Koudsi and Antoci which resulted in the execution, [*989] in early August 1982, of an "addendum" to the July 7 contract.  Under the terms of the addendum, Latian was given the right to "aggregate and transfer back" to Kudsy $ 442,000 in inventory which was to be designated "at the Buyer's [i.e., Latian's] discretion." In addition, from the total value of the inventory, as reduced by $ 442,000, there was to be deducted a further $ 100,000 as a "discount" from the original agreed purchase price.

This amendment to the transaction had the effect of reducing the total "value of the inventory" for the purpose of the sale transaction by $ 542,000 and in the bargain, gave Latian the right to select from the inventory the most marketable items and to return to the Kudsy companies the less desirable items.  Finally, the adden-

dum provided that if Latian were not successful, within one year of the closing date (which ultimately turned out to be [***18]  August 25, 1982), in obtaining the Blaupunkt distributorship then held by Kudsy, the purchase price would be reduced by still another $ 100,000.

Thus, when the transaction closed on August 25, 1982, neither the total value of the inventory had been determined by the parties (i.e., the "independent valuation" provided for in the sale agreement had not taken place) nor had Latian determined which inventory items it would return to Kudsy.

Although Banco's representatives who attended the closing [13] stated, on Stefanon's instructions, that Banco would not oppose the transaction (i.e., the transfer of the inventory to Latian and its assumption of the secured inventory liability), there had been no action by Banco's head office on Stefanon's letter of July 26, 1982, requesting a six-month credit line for Latian.  Although Stefanon had specifically requested it at the meeting of July 26, as of the closing date Banco had not been supplied with any credit information on Latian or any of the respondents.  However, during Stefanon's absence on vacation, members [**878] of his staff received communications from Banco's home office regarding the need for additional financial information. [14] This process [***19] was not completed by the time of the closing of the transaction on August 25, 1982. [15]

13   This did not include Stefanon who was then away on vacation.

14   On August 6, 1982, Banco's head office had sent a letter to Stefanon requesting more information about the transaction including the Kudsy loan history and inquiring as to whether anything other than receipt of the new guarantees on the debt was required, that is, whether any further extension of credit was either necessary or desirable.  Again on August 18, 1982, after being informed by one of Stefanon's assistant managers that Banco's approval of the sale transaction was required, the Banco head office requested further information including specifically the "new owner's schedule of investments in the business."

15   Manoucher, although conceding that the requested financial information had not been supplied, and indeed was not supplied to Banco until after February 1983, nonetheless testified that at the closing his father, Amanollah, had stated to the Banco representatives (with Manoucher's translation) that "by signing this, we're going to get the line of credit. And if we are not going to get the line of credit, please tell us now because we are not going to close the deal." Manoucher also testified that Mr. Boiteux (Stefanon's assis-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

tant manager, who was one of the two representatives of Banco's Los Angeles Agency present at the meeting) responded that "you can -- we will work with you and we'll cooperate with you. You are -- you can use the line under the name of Kudsy's three companies until officially its transferred to your name . . . we will work with you, and we're not going to choke you." Mr. Boiteux denied making any such statements and claims that he stated only that Banco would not oppose the inventory transfer from Kudsy to Latian.

[***20] [*990] Nonetheless, the sale transaction, as modified by the addendum, closed on August 25, 1982. At that time, Latian and Amanollah signed the continuing guarantee agreement by which they undertook to guarantee Kudsy's inventory debt in a sum not to exceed $ 1,534,296.33. This sum was less than the higher figure originally discussed because of the reduction in the inventory which Latian had agreed to purchase. In addition, Stefanon, on behalf of Banco, had requested that there be a reduction of the total Kudsy indebtedness by $ 500,000 as a part of the transaction. This request was acknowledged and agreed to by Kudsy's letter of August 11, 1982. [16] On August 26, 1982, Latian took possession of the inventory and commenced selling it.

> 16    In the letter of August 11, 1982, Koudsi and Antoci stated, "Persuant [sic] to your request, we are pleased to inform you that, in light of the pending deal with the Sarbaz's, we have agreed to reduce our indebtedness with your Bank by $ 500,000.00 immediately after the approval by your Head Office of the Sarbaz's credit line."

[***21] On September 8, 1982, following his return from vacation, Stefanon met with Amanollah and Manoucher. They explained why they had decided not to buy all of the inventory. By this time Stefanon was aware that Latian did not intend to take all of the inventory and he had been informed that as a result of this change in the transaction, Latian and Kudsy had agreed to split the $ 500,000 debt reduction payment requested by Banco, [17] $ 310,000 from Latian and $ 190,000 from Kudsy. At this meeting Amanollah delivered a check payable to Banco in the sum of $ 310,000. There is considerable conflict in the evidence as to the purpose and appropriate disposition of this check. Both Amanollah and Manoucher testified that when they gave this check to Stefanon on September 8, they told him it was to be placed in an escrow account and held until approval of the line of credit was received from Banco's head office. Stefanon, on the other hand, denied that either of the Sarbazes said any such thing. He testified that such payment was accepted as a paydown on the $ 500,000

debt reduction on the secured obligations then due to Banco. [18] The contemporaneous records of Banco are consistent with [***22] Stefanon's [**879] testimony and reflect that these funds were in fact [*991] promptly applied to the debt. [19] Indeed, the record confirms that Manoucher was informed as to Banco's application of said $ 310,000 and he neither raised any objection thereto nor requested that his counsel do so.

> 17    On September 7, 1982, the attorneys for Kudsy had sent a mailgram to Robert Nagata, the attorney for Latian, a copy of which was received by Stefanon on the same date. The mailgram stated, ". . . pursuant to an agreement with your client, Latian, Inc., Latian was required to pay Banco Do Brasil the sum of $ 310,000 on or before September 1, 1982, it is our understanding that said payment has not been made, demand is hereby made upon your client to make said payment to Banco do Brasil forthwith."
> 18    It should be emphasized that the obligations due Banco were secured by the Kudsy inventory which was now in the possession of Latian and, since August 26, 1982, was being sold off.
> 19    Such records reflected that the $ 310,000 check was placed in an "escrow deposit" account before the check cleared and the proceeds were applied to reduce the Kudsy debt. Stefanon testified that this was not a true escrow account but rather was a routine means utilized by Banco to account for deposited checks pending clearance, payment and determination of the proper account to be credited. Subsequently, on October 5, 1982, the respondents paid another $ 150,000 on account of the assumed Kudsy obligations. However, there was no escrow deposit account utilized with respect to that check. Stefanon explained the difference:
>
> "Q. If those payments, the 150,000 and the 310,000, were for the notes of the Kudsy companies, why was one put into escrow and the other credited directly to the loans?
>
> "A. When we received the first payment of the $ 310,000, we didn't know yet which notes to have apply. Because of the splitting between the Kudsies and the Sarbaz, notes have to be a split -- split also between Kudsies and Sarbaz. [para.] And also the calculation of the interest. Because they decide that interest should be paid up to August 24 by Kudsy; after August 24 by the Sarbaz. [para.] So at the very beginning, when I came back from vacation September 10, we started doing those -- the job as to split the loans. And take some time. That's why the money was applied to

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

this escrow deposited, unrelated. [para.] Later on, when we received the payment of $ 150,000, we had already the notes immediately to be applied, because we had already decided which one to be applied."

[***23] Following the meeting of September 8, Stefanon wrote a report to Banco's home office regarding the changed nature of the transaction. He advised Banco that his Los Angeles Agency had been in the process of collecting the materials requested by Banco, "when we were informed by the interested parties that there would no longer be a total inventory transfer. . . . [para.] We request, therefore, that the proposal referred to in our letter . . . dated July 26, 1982, be suspended until it is substituted by another with the elements of the new position." Much was later made of this letter, with counsel for the respondents arguing that Stefanon, without telling the respondents, had requested that Banco give no further consideration to their request for a credit line. [20]

> 20    This request for suspension of the proposal was the subject of considerable attention and advocacy at trial by counsel for the respondents. However, this language comes from the English translation of Stefano's letter which was actually written in Portuguese. In the original, the statement actually made by Stefanon was that the "*reviewing* of the proposal . . . be stopped until it is submitted by another with the elements of the new position." (Italics added.) By this, Stefanon testified that all he intended to communicate was the fact that the deal described in the July 26 letter had been changed by the parties and Banco should not waste further time on it but rather should await a new report which in fact was subsequently submitted on November 5, 1982.

[***24] Thereafter, on or about September 27, 1982, Stefanon met again with Amanollah and Manoucher to discuss their failure to have signed, on August 25, all of the documentation necessary to their assumption of the Kudsy obligations. The missing document was a Security Agreement in which Latian was described as the "Debtor" and the Kudsy companies were [*992] denominated the "Borrowers." A printed form was modified for this purpose and it described the security as "All inventory of Debtor now owned or hereafter acquired . . . and All proceeds" of such collateral. This agreement also incorporated a special "Addendum to Security Agreement" which stated that, "To induce Secured Party [i.e., Banco] from time to time to make line of credit facilities available *to Borrowers*, Debtor agrees [to maintain a certain minimum inventory value, to give a proper notice to Secured Party in the event of a sale of assets other than inventory in the ordinary course

of business and to provide monthly inventory reports and] . . . (4) At the time of a request for utilization of any line of credit *by any Borrower*, to provide to Secured Party a Compliance Certificate [in a particular described form]." [***25] [21] (Italics [**880] added.) This document was signed by Latian, as debtor, on Sept. 27 and Banco signed on October 21, 1982.

> 21    The record reflects that neither Latian nor Kudsy at any time prepared or submitted a Compliance Certificate which, under the terms of this Addendum to Security Agreement, was required before any credit line advance or utilization could occur. The significance of this Addendum is discussed below in connection with our review and application of the parol evidence rule.

Subsequently, on or about October 6, 1982, Stefanon met with Amanollah and Manoucher. At this time, Stefanon was informed that the respondents were unhappy with the Kudsy people, particularly Koudsi and Antoci. Apparently differences had arisen as to how to operate the business. [22] Stefanon testified that Manoucher requested that Latian be given its own line of credit separate from Kudsy. Stefanon replied that he would do his best to provide it and would submit a proposal for such a credit line.

> 22    Indeed, those differences had become so serious that Koudsi was discharged from his position with Latian. Under the terms of the original agreement, he was to be employed for a 12-month period to assist the respondents in learning and developing the business.

[***26] On November 5, 1982, Stefanon wrote to Banco and explained that the original transaction had changed. Latian would not be taking all of the inventory and had agreed to assume no more than $ 1,534,000 of Kudsy's total indebtedness to Banco. The $ 310,000 payment (made on Sept. 8) was described as a "partial payment of the commitment [which Latian] had assumed." This report also described the deteriorating relationship between the Kudsy owners and the respondents and the fact that Koudsi and Antoci were contemplating bankruptcy. This was of concern because they were liable for the entire debt due Banco. Stefanon stated that since "Latian Inc. [had] committed itself to such an extent that it would not accept a cancellation [and had] practically assumed the control of the business, with the only debt being that [due] to [Banco]," Stefanon (in the absence of a different authorization from Banco) had agreed to the partial sale of inventory to Latian based upon "the guaranties, Latian's UCC-1, personal guaranties of its owners, and insurance policy endorsed in favor of the Bank." In this way, [*993] Stefanon concluded,

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

at least "part of the debt would be protected against the bankruptcy [***27] of [Kudsy]." [23] After describing the unpaid obligations [24] and applying the two payments made by Latian of $ 310,000 and $ 150,000, the total remaining debt for which Latian was liable was $ 1,072,876.33. Stefanon stated that Latian had agreed "to liquidate this balance in 12 monthly installments of approximately equal amounts with interest at 15% per annum." [25]

23    Respondents argued at trial, and reassert here, that this communication was "proof" of the perfidy and fraudulent scheme of Stefanon and Banco. By inducing Latian to become obligated for Kudsy's debts, Banco acquired another debtor who could pay in the event of Kudsy's default. This argument is difficult to accept. Apart from the fact that it was good banking practice to insist upon such guarantee by Latian before agreeing to the transfer of the secured inventory from Kudsy to Latian, this assumption of indebtedness was the idea of the respondents, not Banco. Such debt assumption proposal was an integral and consistent part of every one of the offers made to Kudsy to purchase its assets, including the three which were submitted before Banco ever became involved in the transaction.

[***28]

24    The Kudsy obligations which Latian had assumed were:

| Kudsy Company | Original Debt Assumed | Balance after Latian's Payment of $ 460,000 |
|---|---|---|
| Wholesale Autoparts Supply Inc. | $89,890.00 | $89,890.00 |
| Herbert Albrecht Autoparts Inc. | 875,943.00 | 611,613.00 |
| J. Kudsy & Co., Inc. | 568,463.33 | 371,373.33 |
| TOTALS | $ 1,534,296.33 | $ 1,072,876.33 |

25    Stefanon testified that the respondents had agreed to this repayment structure at the meeting held on or about October 6, 1982. The original Kudsy obligation to Banco, which Latian had assumed on August 25, 1982, required a payoff by December 31, 1982.

After recommending vigorous collection activities for the portion of Banco's unpaid [**881] debt which was the sole responsibility of the Kudsy companies, Stefanon concluded his report with the statement that, "it is in our interest that Latian Inc. continue operating, which depends on the support of the Bank." To express such support, Stefanon proposed that Banco, as an exception [26]

grant Latian a fixed credit ceiling of $ 1,100,000 (to cover the debt already assumed) plus a revolving credit [***29] line of $ 800,000. [27] Stefanon asked that this revolving credit line be valid for a period of six months, at which time a reevaluation of Latian's credit position could be made.

26    As Stefanon explained it, an "exception" was required because an extension of such credit was beyond Stefanon's authority and Banco's parameters as Latian had no financial track record.

27    Of this proposed credit line, Stefanon recommended that it be distributed as follows:

| | |
|---|---|
| Internal Credit | $ 100,000 |
| LISP (credit for Brazilian business) | 500,000 |
| Other foreign business | 200,000 |
| | $ 800,000 |

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

[*994]  Banco responded to Stefanon by a telex dated November 18, 1982, and, among other things, requested a copy of Latian's opening balance sheet. Stefanon called Manoucher and requested that he provide such balance sheet. Manoucher replied that it was being prepared and would be provided later. He orally advised Stefanon that the paid-in capital was $ 800,000 which Stefanon accepted, as he was in a rush to respond to Banco's request [***30] for financial information. He communicated such information to Banco on November 19. As of this date, no financial documents had been supplied to Banco. The requested financial statement, allegedly in preparation in November 1982, was not in fact delivered to Stefanon until April 15, 1983. [28]

28  Manoucher testified that this financial statement was prepared in February 1983 (but apparently not submitted to Banco until April 15, 1983) and reflected a value for the common stock of $ 750,000. However, he admitted that this was incorrect and that the amount of paid-in stock was only $ 100,000 when Latian was formed in May 1982. While no further capital was provided to Latian, Manoucher testified that substantial sums (in excess of $ 1 million) were provided to the company (this included the $ 460,000 paid to Banco on the Kudsy debts), presumably in the form of loans or advances and it was the respondents' intent to convert $ 650,000 of this amount to paid-in capital stock.

In December 1982, Stefanon met with Manoucher [***31] at the bank's Los Angeles Agency offices. Manoucher inquired about the status of the line of credit and stated that Latian was having financial difficulties and was going to have trouble meeting its obligation to Banco. Stefanon approved an additional loan (for 90 days) of $ 50,000 to be used to apply on a $ 57,000 interest payment which was then due. As a result of this disclosure of Latian's financial problems the parties entered into discussions regarding the restructure of the debt obligations which Latian had undertaken. Although Manoucher, in his testimony, stated that he did not know that the Kudsy debt which had been assumed was all due and payable by December 31, 1982, the record makes clear that he indeed must have known such fact. [29]

29  On July 26, 1982, counsel for Banco had supplied to Mr. Nagata, the attorney representing the respondents, a complete schedule of all of the notes and obligations of Kudsy as they then existed. Those documents, which Manoucher concedes were sent to his counsel, but which he says he never reviewed, consisted of a computer printout listing all of the outstanding notes given to

Banco by the four Kudsy companies, and reflecting the total amounts due, interest paid and owing *and the due dates*. In addition, Latian had received from Banco sometime prior to October 18, 1982, a document setting forth the loan schedule on which Latian was expected to make payments. This schedule reflected that the total then owing on the debt assumed by Latian was $ 1,223,501.86 and that it would all be due by December 31, 1982. When Banco received Latian's payment of $ 310,000 it notified Latian how it had applied that payment. The copy of the loan schedule obtained from Latian's files reflected notations regarding such application written by Manoucher.

[***32]  Obviously, a restructure of the payment schedule of the monies due Banco was very important to the respondents. Although there is conflicting testimony on the point, it is also clear that Manoucher, on behalf of Latian, [*995] requested that the interest rate be reduced and the payments extended over 18 rather than 12 months. This was favorably considered by Stefanon [**882] and in early January 1983, Banco's attorneys began preparing drafts of the necessary documents. [30]

30  In his testimony Manoucher denies that any request for an 18-month repayment schedule was ever made. However, that testimony is directly contradicted by the subsequent written restructure documents which he read, approved and signed without oral or written objection. Respondents are *conclusively* bound by such written recitals. ( Evid. Code, § 622.)

On January 19, 1983, Stefanon was advised by Banco that his November 5, 1982 request for approval of Latian's purchase of the Kudsy inventory and assumption of related debt, payable over a 12-month [***33] period, was approved; however, his request for the extension of a revolving $ 800,000 line of credit was refused. According to Stefanon, this information was immediately communicated to Manoucher by telephone as well as to Banco's attorneys who then were in the process of completing work on the restructure documents. [31]

31  However, Manoucher denies that he was ever advised by Stefanon prior to June 1983 that the credit line had been refused.  (See discussion, *post*.)

On the next day, January 20, 1983, Banco's attorneys sent the restructure documents to counsel for respondents. They were reviewed by said counsel and Manoucher carefully read them to make certain that they reflected the agreement which had been reached with Banco regarding the payment of the outstanding obliga-

tions which Latian had assumed. He also carefully explained the documents to his father before they were signed. That explanation included the fact that this agreement was the *entire agreement* between the parties and that it contained [***34] no provision for a "$ 2 million line of credit." There can be little doubt that both Manoucher and Amanollah clearly understood.

The restructure of the debt relationship is set forth in the Guaranty Agreement and it recites and acknowledges certain facts which are conclusively presumed to be true. ( Evid. Code, § 622.) [32] Specifically, the Guaranty Agreement states:

[*996] "A. Latian and Sarbaz [i.e., Amanollah] are joint and several guarantors of any and all indebtedness (the 'Indebtedness') of J. Kudsy & Co., Inc., Herbert Albrecht Autoparts, Inc. and Wholesale Autoparts Supply, Inc. (the 'Borrowers'), existing on August 25, 1982 (and any renewals and extensions thereof), up to a principal amount of $ 1,534,296.33, pursuant to a Continuing Guaranty of Latian and Sarbaz in favor of the Bank dated August 25, 1982 (the 'Guaranty').

"B. The Borrowers are in default in payment of the Indebtedness and the Bank has made demand upon the Borrowers for payment of the Indebtedness. The Borrowers have failed to make such payment.

"C. The Bank has also made demand upon Latian and Sarbaz to make payment on the Indebtedness pursuant to the terms of the Guaranty. *Latian and Sarbaz have* [***35] *made partial payments on the Indebtedness and have requested that the indebtedness* remaining unpaid on January 1, 1983 (which Indebtedness remaining unpaid is $ 1,072,874.51) *be repaid in 18 consecutive monthly installments,* together with interest, as hereinafter provided and the Bank has agreed, all on the terms and subject to the conditions hereinafter set forth.

". . .

"1. *Acknowledgement of Guaranty.* Latian and Sarbaz each acknowledge their joint and several obligations under the Guaranty to pay the Indebtedness and [**883] agree that such obligations are absolute *and unconditional.*" (Italics added.) [33]

32    Evidence Code section 622 provides:

"The facts recited in a written instrument are conclusively presumed to be true between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration."

For reasons that are not at all clear in the record, the trial court, in response to a motion *in limine* filed by Banco, ruled that the conclusive

presumption provision of section 622 would have no application with respect to the Guaranty Agreement. We perceive of no valid legal basis for this conclusion. Respondents' argument that they were induced to execute this agreement by Banco's promissory fraud, and therefore are not bound by any provision of that agreement, has no more validity on this issue than it does with respect to the parol evidence rule discussed below.

[***36]
33    Although this paragraph is not included in the "Recital" portion of the Guaranty Agreement, it nonetheless constitutes a recital of one of the background and existing facts which serve as a predicate for the agreement entered into by the parties.

After setting forth the terms, conditions and security for the repayment of this indebtedness, the following integration clause is set forth: "4. *Entire Agreement; Amendment.* This Agreement together with exhibits attached hereto, [34] *embodies the entire agreement and understanding among the parties* [*997] *hereto and and supersedes all prior agreements and understandings relating to the subject matter hereof.* This Agreement may not be amended or altered except by a writing duly executed by each of the parties hereto." (Italics added.)

34    The attached exhibits were:

1. A promissory note for $ 1,072,874.51, executed by Latian; the interest rate provided for in the note was at the reduced rate of 13 percent per annum;

2. A Continuing Guaranty executed by Amanollah Sarbaz, replacing the one signed by him on August 25, 1982 in which he and Latian had agreed to guarantee the Kudsy indebtedness up to a maximum of $ 1,534,296.33. By this instrument he agreed to guarantee the debt of Latian only up to the amount of $ 1,072,874.51. The prior guaranty was subsequently returned to him by Banco;

3. The Security Agreement, dated September 27, 1982, with Addendum thereto, which we have previously described and discussed. This is the document which describes Latian as "Debtor," the Kudsy companies as "Borrowers" and Banco as "Secured Party." In addition to its relevance to the parol evidence issue, the incorporation of this earlier security agreement into the restructured debt arrangement would seem to confirm Stefanon's testimony that no *separate* credit line was ever recognized or agreed to for Latian.

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

[***37] Manoucher testified that he understood this integration clause and he conceded that no written amendment was thereafter made. He also admitted that during the time that his attorneys were negotiating this agreement he never asked them to make any provision for a $ 2 million line of credit.

It is on this restructured obligation which Banco has based this action. [35] Latian made the payments called for under this agreement for February and March 1983, but did not make any further principal payments, although interest payments were made through December 1983. In May of 1983, Latian obtained a line of credit from another bank (Capistrano Bank) which ultimately rose to approximately $ 500,000. In support of its application for credit, Latian and Amanollah provided Capistrano Bank with financial information which reflected that as of May 1983 Latian had a net equity of $ 535,648 and Amanollah had a personal net worth of $ 11,268,000. Manoucher testified that this financial information which was supplied to Capistrano Bank was true and correct.

> 35 Also, it was on the basis of the extensive documentation of the restructured indebtedness agreement that Banco argued at trial the bar of the parol evidence rule.

[***38] Manoucher testified, contrary to the testimony of Stefanon, that the respondents were never informed at any time during January through May 1983, that Banco had refused to extend to them a line of credit. Thus, on July 25, 1983, the respondents' attorney, Robert Nagata, wrote to Stefanon and complained about the failure to make a "line of credit available for Latian, notwithstanding your prior promises and representations." [36] Mr. Nagata stated that failure to provide this credit extension had resulted in financial difficulties for Latian and if Banco continued to refuse to provide a credit line, Latian would file suit. However, the parties apparently were having ongoing discussions regarding credit extensions and $ 40,000 was loaned to Latian on a 30-day note on June 23, 1983. In addition, in December 1983, Banco agreed to provide a $ 200,000, 90-day revolving line of credit to Latian. Two draws were taken by Latian: on December 6, 1983, it borrowed $ 5,685.17 on a 62-day note and on December 31, 1983, it borrowed $ 11,927.11 [**884] on a 60-day note. None of these sums was ever repaid.

> 36 As we point out below, this was the first time that any *written document* from the respondents or their counsel made any reference to a line of credit for Latian.

[***39] [*998] In December 1983, Latian had stopped making even interest payments. Thereafter, on behalf of himself and Latian, Amanollah met with Ste-

fanon and offered Banco three options: (1) provide the $ 2 million line of credit, (2) retain the guarantees from Latian and Amanollah, but release Banco's security interest so that Latian could obtain a line of credit from another lender or (3) foreclose on the security and take Latian's inventory in satisfaction of the debt. Banco declined to accept any of these alternatives. [37]

> 37 Nor was it obligated to do so. This obviously was not an offer of rescission. It was simply an attempt by Latian to renegotiate its debt position with Banco. However, respondents urge that Banco's failure to accept one of these alternatives precludes its objections to a damage award which returned to Latian and Amanollah *all* of the money they had paid Banco and Kudsy *and* allowed them to retain the auto parts inventory as well.

Latian retained, and presumably sold, the auto parts [***40] inventory purchased from Kudsy which had been security for the repayment of the sums due Banco. No accounting for such sales has apparently even been made and Banco received no credit therefore in the judgment entered against it.

Contentions

Banco in its appeal makes six principal arguments.

1. There was insufficient evidence to establish the formation of a contract whereby Banco would provide to Latian and Amanollah a "$ 2 million line of credit." [38]

2. There was insufficient evidence to establish fraud against either Banco or Stefanon;

3. There was insufficient evidence to establish the damages awarded by the trial court or, indeed, any damages, whether based on contract or fraud and, further, that the compensatory damages were improper and duplicative;

4. There was no evidentiary or legal basis for an award of punitive damages against either Stefanon or Banco;

5. As there is no dispute that Latian failed to pay the obligations to Banco which it had agreed and undertaken to do, Banco is entitled to judgment notwithstanding the verdict; and

6. Banco was denied due process of law when its motion for a new trial was not heard or decided by the trial judge.

> 38 Included within this contention is Banco's argument that the trial court's ruling with respect to the parol evidence rule was in error.

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

[***41] [*999] For their part, respondents contend that the trial court abused its discretion in conditionally granting a new trial and that the punitive damage awards, reduced by respondents' acceptance of the remittitur, should be restored.

As we conclude that the parol evidence rule barred the essential evidence relied upon by respondents and that, in any event, such evidence, when examined in light of the whole record, was not sufficient to demonstrate a binding commitment or promise, we need only reach one of the other issues raised by Banco. [39] In light of our conclusions, the issues raised by respondents in their cross-appeal are moot.

> 39   That other issue is Banco's claim that it is entitled to judgment on its complaint. In view of the conclusions we reach with respect to the assertions of respondent, we concur with Banco on this point. (See discussion, post.)

Discussion

The entire case asserted by respondents, both in defense of Banco's complaint and in support of their successful claims for affirmative relief, [***42] is based upon the allegation that Banco orally promised to provide a $ 2 million line of credit to Latian and failed to honor that commitment. Respondents sought and obtained relief on the theory of breach of contract and, claiming that Banco's promise was falsely made, on fraud as well. [40]

> 40   We do not overlook that respondents also claim that Banco falsely represented the financial standing and strength of Kudsy. We discuss that contention elsewhere and conclude that, in any event, it is totally without merit as a matter of law.

**(1) (See fn. 41.)** [**885] Banco argued at trial and urges here that evidence of the collateral oral agreement upon which respondents base their case should have been excluded under the parol evidence rule. [41] Banco also argues that, in any event, the evidence was not sufficient to establish that Banco had in fact made a commitment or promise to provide such line of credit. We consider each of these arguments in turn.

> 41   We note with some dismay that Banco's original briefs do not devote the substantial effort which this issue clearly requires. Indeed, their two briefs, totaling 191 pages spend less than one page discussing this critical and potentially dispositive question. This meager effort is somewhat surprising in light of the time devoted to the issue in the trial court. However, it is enough to

avoid the claim asserted by respondents that the point has been waived. We also note that "The rule requiring an adequate legal argument . . . is largely for the convenience of the reviewing court. And, since the court may decide a case on any proper points or theories, whether urged by counsel or not, there is no reason why it cannot examine the record, do its own research on the law, or accept a belated presentation." ( 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 480, p. 471.) Following oral argument, we gave the parties an opportunity to file supplemental briefs on this issue; these were ultimately received and have been considered.

[***43] [*1000] 1. *The Parol Evidence Rule*

**(2)** In California, the parol evidence rule is statutorily defined in Code of Civil Procedure section 1856. [42] It provides that where the parties to a contract have set forth the terms of their agreement in a writing which they intend as the final and complete expression of their understanding, it is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. (2 Witkin, Cal. Evidence (3d ed. 1986) § 967, pp. 915-916.)

> 42   Code of Civil Procedure section 1856, as amended in 1978, provides: "(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.
>
> "(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.
>
> "(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.
>
> "(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.
>
> "(e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue.

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

"(f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

"(g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud.

"(h) As used in this section, the term agreement includes deeds and wills, as well as contracts between parties."

The rule also has a foundation in Civil Code section 1625, which provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

[***44] a. *Nature of Rule and De Novo Review*

This "is not merely a rule of evidence excluding pre-contractual discussions for lack of credibility or reliability. It is a rule of substantive law making the integrated written agreement of the parties their exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment. [Citation.]" ( *Marani* v. *Jackson* (1986) 183 Cal. App. 3d 695, 701 [228 Cal. Rptr. 518], italics in the original; see also, *BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal. App. 3d 980, 990 [209 Cal. Rptr. 50].)

[*1001] (3) The resolution of the issue of whether the rule applies so as to exclude any collateral oral agreement is one of law to be determined by the court. ( Code Civ. [**886] Proc., § 1856, subd. (d); *Kaufman & Broad Bldg. Co.* v. *City & Suburban Mortg. Co.* (1970) 10 Cal. App. 3d 206, 215-216 [88 Cal. Rptr. 858]; *Salyer Grain & Milling Co.* v. *Henson* (1970) 13 Cal. App. 3d 493, 499 [91 Cal. Rptr. 847]; *Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal. App. 3d 131, 137 [104 Cal. Rptr. 486]; [***45] *Wagner* v. *Glendale Adventist Medical Center* (1989) 216 Cal. App. 3d 1379, 1385-1386 [265 Cal. Rptr. 412].) We are therefore not bound by the trial court's determination that the Guaranty Agreement was not integrated and that evidence of a collateral oral agreement was therefore admissible. We will consider and resolve the issue de novo. ( *Wagner* v. *Glendale Adventist Medical Center, supra,* 216 Cal. App. 3d at p. 1386.)

b. *Application of the Rule*

" (4) In its actual application the rule is, however, limited to those cases where the parties intended the writing to be complete unto itself." ( *Salyer Grain & Milling Co.* v. *Henson, supra,* 13 Cal. App. 3d at p. 498.) "It is based upon the premise that the written instrument *is* the agreement of the parties. [Citation.] Its application involves a two-part analysis: 1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements [citation]; and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence? [***46] [Citation.]" ( *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal. App. 3d 263, 270 [235 Cal. Rptr. 279].) Put another way, "If a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" ( *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal. App. 3d 1020, 1037, fn. 4 [219 Cal. Rptr. 203].) We will discuss these two issues separately.

(1) *The January 1983 Guaranty Agreement Was Integrated*

(5) The crucial issue is whether the parties *intended* the written instrument to serve as the exclusive embodiment of their agreement. ( *Salyer Grain & Milling Co.* v. *Henson, supra,* 13 Cal. App. 3d at p. 498.) "The instrument itself may help to resolve that issue. It may state, for example, that 'there are no previous understandings or agreements not contained in the writing,' and thus express the parties' 'intention to nullify antecedent understandings or agreements'. (See 3 Corbin, Contracts (1960) § 578, p. 411.)" ( *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225-226 [65 Cal. Rptr. 545, 436 P.2d 561].) [***47] Indeed, if such a clause is adopted and used by the parties, it may well be conclusive on the issue of integration. ( *Salyer Grain & Milling Co.* v. [*1002] *Henson, supra,* 13 Cal. App. 3d at p. 501; Rest.2d Contracts, § 216, ccm. e, p. 140.)

(6) In order to resolve this threshold issue, the court may consider all the surrounding circumstances, including the prior negotiations of the parties. ( *Masterson* v. *Sine, supra,* 68 Cal.2d at p. 226.) "In determining the issue, the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. [Citations.] However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; 'it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement.' ([*Gerlund* v. *Electronic Dispensers International* (1987)] 190 Cal. App. 3d

at p. 271.) [***48] In the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not certainly have appeared in writing. [Citation.]" ( *Wagner* v. *Glendale Adventist Medical Center, supra,* 216 Cal. App. 3d at p. 1386.)

(7) The resolution of the question of integration also requires, as the court in *Masterson* [**887] explained, the accommodation of at least two policy considerations. The first "is based on the assumption that written evidence is more accurate than human memory. [Citation.] This policy, however, can be adequately served by excluding parol evidence of agreements that directly contradict the writing. [The second] policy is based on the fear that fraud or unintentional invention by witnesses interested in the outcome of the litigation will mislead the finder of facts. [Citations.]" ( *Masterson* v. *Sine, supra,* 68 Cal.2d at p. 227.) This fear, which is at the heart of the concern of this second policy consideration, can be alleviated by indicia of credibility. The court in *Masterson* suggested [***49] two such indicia. The first of these, taken from the Restatement of Contracts 240 (§ 216 in Rest.2d Contracts), states that "An oral agreement is credible if it might naturally have been made as a separate agreement by parties similarly situated." ( *FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal. App. 3d 367, 388 [282 Cal. Rptr. 508], fn. omitted.) A second and related indicia, based on Uniform Commercial Code section 2-202, rests upon the proposition that an oral agreement is also "creditable unless it can be said with certainty that the parties would have included the oral agreement in the writing." (231 Cal. App. 3d at p. 388.)

(8) From the foregoing, we perceive that an analysis based on the examination of four questions is appropriate: (1) does the written agreement appear on its face to be a complete agreement; obviously, the presence of an [*1003] "integration" clause will be very persuasive, if not controlling, on this issue; (2) does the alleged oral agreement directly contradict the written instrument; (3) can it be said that the oral agreement might naturally have been made as a separate agreement or, [***50] to put it another way, if the oral agreement had been actually agreed to, would it certainly have been included in the written instrument; and (4) would evidence of the oral agreement be likely to mislead the trier of fact. ( *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal. App. 3d 299, 314 [231 Cal. Rptr. 820]; *Brawthen* v. *H & R Block, Inc.* (1975) 52 Cal. App. 3d 139, 146 [124 Cal. Rptr. 845].)

(a) *The Written Agreement Is Complete.*

(9) An examination of the Guaranty Agreement leaves no doubt that it is complete and was intended by the parties to be a complete expression of their understanding. On its face, it purports to fully describe the entire restructured debt relationship among the parties. Most importantly, however, it contains an express "integration" clause. This provision, which the respondents concede they read, understood and discussed with their attorneys, specifically provided that the Guaranty Agreement "embodies the *entire agreement* and understanding among the parties hereto and *supersedes all prior agreements and understandings* relating to the subject matter hereof." (Italics [***51] added.) It is difficult to imagine how the parties could have more clearly expressed their intent to make the written instrument a full and complete expression of their agreement.

(b) *The Oral Agreement Directly Contradicts the Written Instrument.*

(10a) Respondents' argument to the contrary notwithstanding, there can be no question that the claimed oral agreement directly contradicts the written Guaranty Agreement. (11) (See fn. 43.) (10b) According to the record, the oral agreement relates to the extension of a $ 2 million line of credit which is claimed by respondents to have been an *indispensable condition* to their obligations under the written Guaranty Agreement. [43] The testimony offered by respondents repeatedly emphasized that the "promised" line of credit was *critical* to Latian's purchase of the Kudsy inventory and indeed was a *condition,* absent the [**888] performance of which, they would not have assumed the obligations of such purchase. That the extension of such a [*1004] line of credit was a critical condition of the deal was stated several times in the testimony offered by respondents [44] and was asserted by their counsel as [*1005] the foundation of his damage arguments [***52] and is repeated in the briefs before this court. Thus, it is obviously the position of respondents that the granting of the line of credit was a condition of their entire obligation. This is, however, entirely and directly inconsistent with an express term of the integrated written agreement: "Latian and Sarbaz each acknowledge their joint and several obligations under the Guaranty [the original Guaranty agreement executed in favor of Banco on August 25, 1982] to pay the Indebtedness and agree that such obligations are absolute and *unconditional.*" (Italics added.) It is simply not possible to reconcile the respondents' claim of an oral condition on which their liability to Banco depends with their expressed written commitment that there are no conditions to such liability.

43 Respondents argue that evidence of a condition precedent to a contract is not barred by the parol evidence rule. That is generally true,

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

"unless the written contract includes express provisions inconsistent with the condition." ( *Haines v. Bechdolt* (1965) 231 Cal. App. 2d 659, 661 [42 Cal. Rptr. 53].) As we point out, the very claim that their obligation to Banco was conditional is one of the major contradictions between the claimed oral agreement and the express provisions of the written Guaranty Agreement.

[***53]
44   Indeed, Manoucher testified on examination by counsel for Banco that he had instructed his attorney with regard to the matter:

1. With respect to the next to last offer to Kudsy, dated June 25, 1982, Manoucher testified as follows:

"Q. Did you instruct your attorney to put into this document a condition of the deal which said in essence if we don't get the $ 2 million line of credit from Banco do Brasil, we don't have a deal?

"A. As I remember, yes.

"Q. Your answer is yes?

"A. Yes.

"Q. And do you know where in the document this condition exists?

" . . .

"Q. Do you see there, Mr. Sarbaz, a condition designed to protect what you've testified was very important to you?  And that is that the deal would turn on whether Banco do Brasil would give Latian a $ 2 million line of credit.

"A. I couldn't find it, no."

2. With respect to the final offer of July 7, 1982, which was accepted by Kudsy, Manoucher testified:

"Q. Okay.  The agreement is again with Latian as the purchaser, and the concept is that Latian will purchase all of the assets of the companies as stated in paragraph 1-A; is that correct?

"A. That is true.

"Q. Okay.  This document was prepared by Mr. Nagata?

"A. Yes, sir.

"Q. With your involvement?

"A. Yes, sir.

"Q. With your input?

"A. Yes, sir.

"Q. And you reviewed it before it was signed by your father?

"A. Yes, sir.

"Q. And you recommended to him that he sign it, didn't you?

"A. Yes, sir.

"Q. And you satisfied yourself before he signed it that it accurately reflected the deal between yourself and the Kudsy companies, didn't you?

"A. Yes, sir.

"Q. And at the time this document was signed, Mr. Sarbaz, isn't it true that you considered the $ 2 million line of credit that you've talked about previously to be very significant to this transaction?

"A. Yes, sir.

"Q. And the $ 2 million line of credit that you had hoped to get from Banco do Brasil; right?

"A. Right.

"Q. At the time you had Mr. Nagata put this contract in writing, did you instruct him to include a specific, precise condition which stated in essence that the deal would only go through if Latian got a $ 2 million line of credit from Banco do Brasil?

"A. Yes, sir.

"Q. You instructed him to do that?

"A. Yes, sir."

An examination of these documents, of course, reflects no mention whatever of any condition regarding the availability of a line of credit in any amount.

[***54]   (c) *The Claimed Oral Agreement Would Not Naturally Have Been Made the Subject of a Separate Agreement.*

**(12a)** This issue can best be addressed by examining not only the written Guaranty Agreement, but also the entire transaction.  Such surrounding circumstances provide the context in which the Guaranty Agreement was negotiated and executed.  First, it must be emphasized that respondents were sophisticated and experienced businessmen who were at all times, from the very outset of their involvement with the Kudsy companies,

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

advised, counseled and assisted by attorneys of their own choosing. The record clearly reflects that respondents were both cautious and deliberate with respect to their negotiations and agreements in this matter. Their renegotiation and restructuring, prior to the August 25, 1982, [**889] closing, of the fundamental terms of their original purchase agreement with the Kudsy companies is particularly telling. It is with that background that the events leading to the negotiation and execution of the Guaranty Agreement must be examined.

In December 1982, the respondents, unable to meet the obligation they had undertaken to Banco in the original August 1982 purchase transaction, [***55] sought an extension of the time in which such repayment could be made as well as a reduction of their interest rate burden. This was a major debt restructuring which was sought by the respondents and negotiated by them with the continuous aid and assistance of their counsel. A significant part of this context is the fact that, according to respondents, Banco had failed to deliver on the promised $ 2 million line of credit for over six months at the time the restructure documents were negotiated and drafted; yet not one word about such line of credit appears in the documents or in any other contemporaneous writing or correspondence.

Nonetheless, the trial judge, with such documents and all of this background before him, concluded that the oral collateral agreement relied upon [*1006] by respondents was "a naturally separate agreement" from the Guaranty Agreement. [45] According to his comments from the bench when he made such determination, he was persuaded to this conclusion by the language contained in the Addendum to the Security Agreement executed on September 27, 1982, which was included in and made a part of the January 1983 documents. The language in the Addendum to which [***56] the judge referred stated: "To induce Secured Party from time to time to make line of credit facilities *available to Borrowers*, Debtor agrees . . ." (Italics added.)

45 Curiously, just a few minutes before reaching and announcing this conclusion, the court expressed a contrary view in remarks which he addressed to respondents' counsel:

"The Court: There is no question but what you lawyers were there advising these people. And I have a very -- I just have a very difficult time understanding, with the advice of counsel, if something was that important they would not have it included in the contract. [para.] And it seems to me that since it was important, and since the 1983 agreement actually makes mention of not only payment schedules, which I think must have been intended to be influenced somewhat by

the line of credit, I can't imagine somebody extending somebody a line of credit on a transaction when a schedule of payments with that line of credit not being expected to have any kind of influence on the scheduled payments. [para.] That being the case, it seems to me that that would make it really a natural part of this agreement, and particularly when the agreement actually makes reference to lines of credit."

[***57] The trial court concluded that such "language suggests that there was some arrangement between these parties involving a line of credit, and they do not say what that arrangement is. They don't say it. That language does not indicate it. . . . [para.] So I'm convinced that the document is not integrated."

The trouble with the court's conclusion is that its premise was faulty and, in any event, it misses the point. First, the language to which the court referred anticipates line of credit extensions *to Kudsy* not Latian. The Addendum identified Kudsy as the "Borrowers" and Latian as the "Debtor." The January 1983 documents represented a restructure of the prior debt arrangement (a three-way transaction which involved Kudsy as the principal obligor) in which Banco agreed to make an entirely separate and extended payment agreement with Latian with respect to its assumed portion of the original Kudsy debt. The Addendum makes no reference whatever to any line of credit availability to Latian. [13] (See fn. 46.) The trial court simply misread the documents. [46]

46 We do not overlook respondents' emphasis on a statement contained in the printed form portion of the Security Agreement which is attached as an exhibit to the Guaranty Agreement (the Addendum referred to by the trial judge was a *typed* exhibit to the Security Agreement). Respondents rely upon the printed statement that "as an inducement to Secured Party [i.e., Banco] to extend credit to Debtor [i.e., Latian] from time to time . . ." They contend that such statement is sufficient to suggest that another agreement (i.e., the oral agreement which they advance) existed with respect to future credit extensions. We reject this argument. This printed language was included in the security instrument executed by the parties in September of 1982 in connection with the obligations assumed by Latian in the August 25, 1982, closing. It spoke only of an intent or understanding as of *that* time. Moreover, it is not only controlled by the typed material in the Addendum ( Civ. Code, § 1651), but this is the very debt that was restructured by the Guaranty Agreement. Although included as an historical exhibit in the Guaranty Agreement, it can not reasonably be

read to contradict or detract from the specifically negotiated and contrary language of that *later* document.

[***58]   [*1007]   [**890]   **(12b)** Second, that there may have been some prior, or even pending, discussions regarding a possible extension of a line of credit in the future is of no help in avoiding a conclusion of integration. If a prior binding commitment had been made, as opposed to incomplete negotiations, it would seem obvious, if not compelling, that the terms of such a credit arrangement would have been included in the very written agreement which purported to fully describe the entire relationship of the parties. Indeed, respondents themselves repeatedly have asserted that the claimed oral agreement was integral and indispensable part of the entire transaction. [47] Even their own attorney testified that he understood that any credit line agreement would have been spelled out in writing (see fn. 12, *ante*).

> [47] Respondents assert that Banco's prior relationship with the Kudsy companies demonstrated that "line of credit" agreements were routinely handled separately. This argument is at once irrelevant and factually inaccurate. First, how Banco may have dealt with some other customer with whom it had a long-established relationship is of little assistance in evaluating this transaction and the specific documents involved. Second, the record reflects that the credit line arrangements with Kudsy were all handled as a part of the written documentation created to describe the agreement and understanding of the parties as to the extent of the credit to be advanced and the terms of repayment.

[***59] The Guaranty Agreement before us purports to set forth and describe the entire debt relationship between Banco and Latian. It refers to a total remaining unpaid obligation, specifies the security therefore and describes just how that debt will be repaid. It is inconceivable that an additional agreement to extend further credit would not be provided for therein. That a bank, which has gone to such lengths to document an entire debt relationship, would make a cavalier oral commitment, such as is described in respondents' testimony, to provide further open-ended credit is an incredible proposition. This is especially true here, where even the respondents do not claim that their "oral discussions" with Banco involved (1) the terms of such credit extension, (2) the periods for which it would be extended, (3) the interest rates to be used, (4) any schedule of repayment or maturity dates and (5) the collateral which would secure the debt.

Contrary to the trial court, we have no trouble whatever concluding that a binding agreement for further

credit would *not* have been "naturally separate" from the Guaranty Agreement, but indeed would have necessarily been an integral part thereof; [***60] if in fact agreed upon, such a significant commitment would most certainly have been included in the written Guaranty Agreement. This is particularly true here, where the contradiction of the oral [*1008] agreement arises primarily from the fact that it was not included in the writing but stands apart, asserting the existence of a condition which is expressly denied by the writing.

*(d) The Trier of Fact Would Be Misled.*

**(14)** It seems obvious to us, given the circumstances and the carefully drafted language of the written agreement, that a trier of fact would be misled by the contradictory terms of the alleged oral agreement. Certainly, the jury in this case was misled by such evidence. Based upon respondents' testimony, which the jury apparently chose to believe, Banco's affirmative claims were rejected and respondents were awarded substantial damages. Absent testimony as to such collateral oral agreement, the result would necessarily have been just the opposite.

*(2) The Written Agreement Is Not Reasonably Susceptible to the Meaning Supplied by the Preferred Oral Agreement*

**(15a)** Having concluded that the Guaranty Agreement was integrated, we turn next to [**891] the issue of whether the [***61] evidence of the alleged oral agreement is nonetheless admissible to explain the meaning of the written contractual language. **(16)** "This aspect of the parol evidence rule was stated by the Supreme Court in *Pacific Gas & E.* v. *G. W. Thomas Drayage etc. Co.* [1968] 69 Cal.2d 33, 37 [69 Cal. Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]: 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" ( *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal. App. 3d at p. 272.)

In the interest of a complete and systematic analysis, it is necessary to address this issue; however, when, as here, the claimed oral agreement is a direct contradiction of the written instrument, it is clear that the issue has already been resolved. [48] In the presence of such a conflict, it is not possible to say that the written instrument is reasonably susceptible to the proposed [***62] new meaning of the parties' debt relationship which would be supplied by the parol evidence offered by respondents. "Testimony of intention which is contrary to a contract's express terms . . . does not give meaning to the contract; rather it seeks to substitute a different meaning. It fol-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

lows under the [*1009] *P. G. & E.* case that such evidence must be excluded." ( *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal. App. 3d at p. 273; see also, *Malmstrom* v. *Kaiser Aluminum & Chemical Corp., supra,* 187 Cal. App. 3d at p. 316; *Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal. App. 3d 38, 46 [154 Cal. Rptr. 652]; *American Nat. Ins. Co.* v. *Continental Parking Corp.* (1974) 42 Cal. App. 3d 260, 264-265 [116 Cal. Rptr. 801].)

48    As Code of Civil Procedure section 1856, subdivision (b), makes clear (see fn. 42, *ante.*), if the terms of the alleged collateral oral agreement were *consistent* with the writing, then the result might well be different.

[***63]    **(15b)** Indeed, the respondents do not seriously make such a contention. They do not offer the oral agreement to explain or provide meaning to the written instrument. They offer it as a new, additional and completely different agreement. [49]

49    Thus, this case should be distinguished from those cases where it is claimed that some ambiguity exists which needs to be explained or clarified by extrinsic evidence (e.g., *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal. Rptr. 785, 446 P.2d 785]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512 [67 Cal. Rptr. 761, 439 P.2d 889]) or where the court has determined that there is a *necessary* missing term (e.g., *Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713 [73 Cal. Rptr. 213, 447 P.2d 325]). This case involves a purported oral agreement which is *separate from* or *in addition to* the written agreement. There is no contention made here that the Guaranty Agreement is ambiguous or is some how susceptible of a different meaning than that which would ordinarily be attributed to the words used; nor is the collateral oral agreement advanced by respondents offered to prove any different meaning. Indeed, what respondents seek to prove is an entirely different agreement. Thus, the test of admissibility of extrinsic evidence articulated in *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal. Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] ("whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible") has no application here.

[***64]    **(3)** *Admission of the Oral Agreement Cannot Be Justified by Allegations of Promissory Fraud*

**(17)** Our conclusion that evidence of the oral agreement relied upon by respondents is inadmissible is

not altered by respondents' attempt to characterize that agreement as a false promise. While it is true that a recognized exception to the parol evidence rule permits evidence of fraud in order to nullify the main agreement [50] (2 Witkin, Cal. Evidence (3d ed. 1986) §§ 999, 1000, pp. 945-947), that rule has no application where "'promissory fraud' is alleged, unless the false promise is independent of or consistent with the written instrument. [Citations.] It does not apply where, as [**892] here, parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement. [Citations.]" ( *Continental Airlines, Inc.* v. *McDonnell Douglas Corp.* (1989) 216 Cal. App. 3d 388, 419 [264 Cal. Rptr. 779]; see also *Price* v. *Wells Fargo Bank* (1989) 213 Cal. App. 3d 465, 483-486 [261 Cal. Rptr. 735].)

50    Of course, respondents did not seek to "nullify" the loan agreement with Banco. To the contrary, they successfully pursued their contract remedies under the loan agreement and obtained a substantial damage and attorney's fee award.

[***65]    [*1010]    Over 50 years ago, our Supreme Court made a very defensible policy choice which favored the considerations underlying the parol evidence rule over those supporting a fraud cause of action. In *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258 [48 P.2d 659], the court rejected a debtor's attempt to avoid the clear terms of an unconditional promise to pay contained in a promissory note by the assertion of an oral agreement allegedly made by the bank that the obligation was in fact conditional. The court stated, "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." ( *Id.*, at p. 263.)

Similarly, in *Bank of America* v. *Lamb Finance Co.* (1960) 179 Cal. App. 2d 498 [3 Cal. Rptr. 877], the court rejected a plaintiff's effort to avoid liability pursuant to the express written [***66] terms of a guaranty based upon alleged oral assertions by the bank that she would not have such liability. The court stated, "A distinction has been made by our courts in cases in which the fraud sought to be proved consists of a false promise. They have held that if, to induce one to enter into an agreement, a party makes an independent promise without intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inad-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

missible." ( *Id.*, at p. 502; see also, *Shyvers* v. *Mitchell* (1955) 133 Cal. App. 2d 569, 573 [284 P.2d 826]; *Cobbs* v. *Cobbs* (1942) 53 Cal. App. 2d 780, 783-785 [128 P.2d 373].)

While this rule has been subjected to some scholarly criticism, [51] we believe that the policy decision made by the court in *Pendergrass* is the better one. In explaining how a broad application of the concept of promissory fraud [***67] would undermine the policies of the parol evidence rule and encourage attempts to convert contractual disputes into fraud litigation, one court commented, "A broad doctrine of promissory fraud may allow parties to litigate disputes over the meaning of contract terms armed with an arsenal of tort remedies inappropriate to the resolution of commercial disputes." ( *Price* v. *Wells Fargo Bank, supra*, 213 Cal. App. 3d at p. 485.) We concur with that view.

> [51]   See the discussion in *Price* v. *Wells Fargo Bank, supra*, 213 Cal. App. 3d at pages 483-486.

As we have concluded that the claimed oral "promise" of a $ 2 million line of credit is inconsistent with the written Guaranty Agreement, and is [*1011] certainly not independent of it, respondents' claim of fraud with respect to this promise must also fail. [52]

> [52]   For the same reason, respondents' argument that Evidence Code section 622 has no application is also without merit (see fn. 32, *ante*).

[***68]  c. *Conclusion*

We therefore conclude that the trial court erred in determining that the Guaranty Agreement was not integrated and in admitting the evidence regarding the inconsistent collateral oral agreement for a "$ 2 million line of credit." Such error was obviously prejudicial to Banco. Absent testimony about the collateral oral agreement, there was no evidentiary basis whatever for respondents to recover on their cross-complaint; in addition, such inadmissible evidence provided the only defense asserted by respondents to Banco's complaint.

[**893]  We cannot leave this discussion without a general comment. We do not share the concern expressed in some circles [53] that parties to a contract in California are not capable of drafting a written instrument which will fully and completely define a particular legal relationship. As we view it, it is the essence of the judicial function to contribute to legal certainty and reasonable predictability in the affairs of our citizens rather than to suggest that such goals are not attainable. Parties to a business or commercial transaction, such as those in this case, should be able to clearly express their intent as to the nature and scope [***69] of their legal relationship and then be able to rely on that expression. If, as in

this case, they agree that their entire understanding is completely set forth in a particular writing then they are both entitled and required to live with the agreed terms. The courts simply cannot permit clear and unambiguous integrated agreements, such as the one before us, to be rendered meaningless by the oral revisionist claims of a party who, at the end of the game, does not care for the result.

> [53]   See, for example, the unfortunate and, in our view, inaccurate characterization of California law on this issue set out in *Trident Center* v. *Connecticut General Life Ins.* (9th Cir. 1988) 847 F.2d 564, 568-570. Compare, *FPI Development, Inc.* v. *Nakashima, supra*, 231 Cal. App. 3d 367, 389-390, footnote 10.

2. *Sufficiency of the Evidence*

As we address this second major issue, we are mindful of the special rules which are applicable. **(18)** "[T]he scope of our review begins and ends [***70] with the determination whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the conclusions reached by the jury. [Citations.] In reviewing the voluminous record, we must examine all factual matters in the light most favorable to the prevailing [*1012] parties and resolve all conflicts in support of the judgment. [Citations.] [para.] 'Substantial' evidence, however, is not synonymous with 'any' evidence. To constitute sufficient substantiality to support the verdict, the evidence must be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' ( *Estate of Teed* (1952) 112 Cal. App. 2d 638, 644 [247 P.2d 54]; [citations].)" ( *Kruse* v. *Bank of America* (1988) 202 Cal. App. 3d 38, 51-52.) "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ( *Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 229 [83 L. Ed. 126, 140, 59 S. Ct. 206].) Improbable conclusions drawn in favor of a party [***71] litigant through the sanction of a jury's verdict will not be sustained where testimony is at variance with physical facts and repugnance is material and self evident. ( *Estate of Teed* (1952) 112 Cal. App. 2d 638, 644 [247 P.2d 54].)

**(19)** As we have already noted, our examination of this record fails to disclose sufficient evidence to support either the contract or fraud claims of the respondents. Each claim necessarily depends upon evidence which must be legally sufficient to support a conclusion that Banco made a binding commitment or promise to provide a $ 2 million line of credit.

The evidence produced in this case which respondents claim is sufficient consists almost entirely of (1)

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

the disputed testimony of Amanollah and Manoucher that Stefanon and other Banco representatives had orally "promised" that a "$ 2 million line of credit" would be provided and (2) some superficial conflicts between the testimony of Stefanon at trial and some testimony given by him at his pretrial deposition. [54] However, when the [*1013] evidence presented is examined in its entirety, and in context, the conclusion is inescapable that [**894] the evidence relied upon by respondents [***72] does not constitute the "substantial" proof required. It is only some evidence, but when examined in the context of the total case it is not "reasonable in nature, credible, [or] of solid value." ( *Estate of Teed, supra*, 112 Cal. App. 2d at p. 644.)

[54]    For example, on cross-examination *at trial*, Stefanon testified:

"Q. As a matter of fact, it was your understanding, wasn't it, that Mr. Sarbaz was supposed to give his guarantee if the bank approved the line of credit?

"A. No.

"Q. And isn't it correct that if the bank did not approve the line of credit, you understood that he didn't have to give his guarantee?

"A. No."

Counsel for respondents then read the following testimony from Stefanon's pretrial deposition:

"Q. But the idea was that if the bank approved the loan, then the Sarbazes would give their guarantees; is that it?

"Mr. Kreps: By 'approved the loan,' you mean approve the line of credit?

"Mr. Alioto: Yes, approve the line of credit.

"The Witness: Yes, this was my understanding."

Counsel then engaged in an extended effort to get Stefanon to say whether such deposition testimony was true or false. An exchange followed which involved a series of argumentative questions put to Stefanon (during which, at one point, the trial judge admonished counsel to lower his voice) who stated that he could not answer "yes or no" to the question and that an explanation was required. A review of this testimony in context reflects that Stefanon's *deposition testimony* was directed at Banco's approval of a loan (i.e., Latian's assumption of Kudsy's outstanding indebtedness) and, in that context, he

agreed that the Amanollah's guaranty of the obligation depended on Banco's approval. At trial, on the other hand, Stefanon denied that Amanollah's guaranty depended on Banco's extension of a line of credit separate and apart from the credit extension involved in the assumption of *existing* debt. This was made clear by subsequent testimony where counsel read from the deposition and then asked some further questions:

"Q. By Mr. Alioto: (Reading [from Stefanon's deposition])

"'Q. If the bank didn't approve the loan, the Sarbazes weren't going to give a guarantee?

"'A. This is speculation. I can not assure that they would not.

"'Q. But that was your understanding, wasn't it?

"'A. Yes.'"

"Q. Did you give those answers to those questions?

"A. Yes.

"Q. Were they true or false?

"A. They were true.

"Q. The bank didn't approve the loan to the Sarbazes, did it?

"A. It approved.

"Q. It did?

"A. Yes. [para.] When the bank gave the permission to Sarbaz to take $ 1,533,000 for inventory, it is a loan. It is -- it is finances to them. [para.] This doesn't mean that they have line of credit. Line of credit is completely different. It's not the one that you are mentioning there.

"Q. When you were giving the answers that you gave on this page, do you see what your counsel says? (Reading)

"'Mr. Kreps:' Quote. 'By approve the loan, you mean approve the line of credit? [para.] Mr. Alioto: Yes, approve the line of credit.' [para.] When you gave those answers -- right after you said 'yes,' when you gave those answers, did you understand 'loan' to mean line of credit?

"A. Not the line of credit that we are talking about.

"Q. Some other line of credit?

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

"A. The line of credit was established on the joint venture of the proposal of the letter of July 21st."

"...

"Q. By Mr. Alioto: Again, the question is whether you gave these answers to these questions on page 110 of your deposition? Did you give them in terms of reference to the line of credit? [para.] And if you'd answer that, and then if you want to give an explanation, give one.

"A. Yes, the line of credit that I understood at that day was referring to the $ 1,534,000 that they were guaranteeing for the inventory they bought from the Kudsy Companies. [para.] Because all the line of credit will depend from the head office. [para.] It was explained clearly here, proved in writing, what we have done. [para.] I had no authority to give them any line of credit. And I assured them at the very beginning of the meeting that we had in the bank that any line of credit should have -- be approved by the head office. That was clear. I had no authority to provide them, and I did not assure that they will have a line of credit provided by me. It was all head office that had to be decide. [sic.]"

[***73] A review of the total record compels two major conclusions:

[*1014] a. *Respondents' Version Was Neither Reasonable Nor Credible*

The express denials by Stefanon and all other Banco representatives who participated in the meetings of June 14, July 21 and August 25, 1982, were specific and consistent with each other as well as all of the documentation. They all testified that no oral commitment was ever made to provide the claimed line of credit. What was discussed at one or more of these meetings was the possibility that some credit extension, beyond approval of the Kudsy debt assumption, might be made available. However, that decision, as well as approval of the inventory transfer and debt assumption, would have to be made by Banco's head office. It could not be made by Stefanon alone, particularly in light of the fact [**895] that Latian was a new company and had no financial track record. These circumstances are consistent with common banking practices, especially when contrasted with respondents' version which requires one to believe that a bank officer, without receiving any information as to the borrower's financial condition or history, would (or could) commit his bank to [***74] an open-ended multimillion dollar obligation without discussion, much less agreement, as to terms such as interest rate, maturity dates, repayment schedule and security.

b. *The Contemporaneous Conduct of Respondents Is Inconsistent With Their Version*

(20) (1) Respondents argue in their opening brief that the respondents, in investigating the Kudsy business, determined that the "most attractive aspect of the business was its $ 2 million revolving line of credit with Banco. The continued availability of the line of credit was a prerequisite, absolutely essential to the Sarbaz family, for purchase of the business. Based on prior experience, they knew that without a line of credit, they could not operate an auto parts business successfully. Before acquiring the Kudsy companies they therefore needed to know that the $ 2 million line of credit would continue and be available to them." Yet, in spite of such claimed critical importance and in spite of their being at all times represented by counsel, there is no reference to the "$ 2 million line of credit" in any of the five offers submitted to Kudsy, or in any of their correspondence to Banco, or in the integrated Guaranty Agreement signed [***75] in January 1983, which restructured the entire debt relationship. Indeed, three of those initial offers to the Kudsy companies, which were firm and in writing, were submitted by the respondents *before* ever once meeting with any Banco representative.

(2) A major extension of new credit would reasonably, if not obviously, require the submission of written financial statements justifying it. In spite of this, the record demonstrates without dispute that neither the respondents nor Latian submitted any timely financial statements to Banco. The [*1015] unaudited financial statements which were submitted were not even prepared until February 1983 and, according to Stefanon, not in fact delivered until April 15, 1983, nearly eight months after the purchase transaction closed and three months after the debt restructure documents were drafted, approved and signed. The only financial information which had been provided was oral, in spite of repeated requests from Stefanon and Banco; and even that information contained materially false statements regarding the state of Latian's contributed paid-in capital. If, as the respondents now claim, the extension of substantial credit to a [***76] brand new corporation was so "critical" to their decision to go forward with this transaction, such conduct is inexplicable.

(3) The respondents admit that the "line of credit" which they sought was the credit line enjoyed by the Kudsy companies. When the negotiations started that was slightly in excess of $ 2 million. However, as of July 7, 1982, when the purchase contract was originally agreed to, all but $ 150,000 had already been extended and was due and payable by December 31, 1982. Thus, even under the respondents' own view of the matter, as of the date they entered into the contract to acquire the Kudsy inventory by assuming the debt obligations due

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

thereon they could not have received more than $ 150,000 in additional "credit line" without making debt reduction payments to Banco. [55]

    55  These circumstances also illustrate another defect in the argument that an enforceable oral contract exists. When pressed as to what terms their promised "$ 2 million line of credit" would have, the respondents said that it was to be same as that enjoyed by Kudsy. Given that Kudsy's line was subject to withdrawal or termination at any time and, in any event, required a pay off of the existing balances by December 31, 1982, it appears that the respondents' claimed commitment from Banco was too vague and indefinite to be enforced. At most, what respondents rely upon here was an unenforceable agreement to agree (or more likely negotiate) in the future. This is clearly insufficient. ( *Kruse* v. *Bank of America, supra,* 202 Cal. App. 3d at pp. 59-60; *Laks* v. *Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal. App. 3d 885, 892 [131 Cal. Rptr. 836].) Before such a promise could be enforceable there would have to be agreement on interest rate (Latian's credit rating might or might not warrant the same rate enjoyed by Kudsy), method and schedule of repayment and maturity dates. Even the respondents do not claim that there was any discussion, much less agreement, on any of these points.

    [***77]  (4) In January of 1983, after Banco had failed, in the eyes of the respondents, for [**896] nearly six months to provide the "promised" line of credit, they signed the Guaranty Agreement in which they knowingly and expressly acknowledged that their obligations to Banco, as described in that agreement, were *unconditional.* That agreement contained no reference to any line of credit for Latian and contained a clear integration clause.

    This court, in viewing the whole record through the prism of a search for evidence which is "reasonable in nature" must look at the transaction as a [*1016] whole. Does the self-serving claim of the respondents make any sense? Would a bank which has so meticulously documented every aspect of a transaction commit itself orally and so casually to such an important obligation? We think not. Banks simply do not do business that way. Not only is the evidence offered by the respondents insubstantial and unreasonable, it defies belief. It is not solid, credible or reasonable and cannot support the conclusion that Stefano ever made a commitment to, or that Banco ever intended to promise, a "$ 2 million line of credit" to Latian.

### 3. *There Was Not Sufficient* [***78] *Evidence to Establish Fraudulent Conduct*

    **(21a)** The remaining claim of fraud is, if anything, even more specious than the contract claim. Our search of this record reflects no evidence whatever of any fraudulent misconduct on the part of either Banco or Stefano. Respondents rely entirely on tortured construction of documents improperly translated from Portuguese to English, unreasonable inferences from otherwise undisputed events and creative (and apparently charismatic) argument. [56]

    56  A case in point is respondents' argument concerning the "strategy" which they claim was formulated by Stefanon and Banco to induce the respondents to "rescue" Banco from the consequences of a bad loan to Kudsy. Other than Stefanon's use of the word "strategy" in a communication to Banco, there is absolutely no evidence whatever of any plan to entice the respondents into assuming the Kudsy debt or taking over their business. As we have repeatedly noted, that was entirely respondents' idea. The communications upon which respondents rely reflect nothing more than efforts by Stefano to process Latian's credit application under circumstances where the deal kept changing and the respondents failed to provide timely or adequate financial information.

    [***79]  **(22)** In order to recover for fraud it was necessary for respondents to prove that (1) Banco and/or Stefano had made a misrepresentation (including a "promise" made without the intent to perform), (2) knowledge of the representation's falsity, (3) an intent to defraud, i.e., to induce reliance, (4) justifiable reliance on their part and (5) resulting damage. ( 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) Although Banco emphasizes in its brief the absence of evidence of justifiable reliance (since the respondents contractually committed themselves to purchase the Kudsy inventory based on their own investigation of Kudsy and the business), we believe that there was no evidence whatever of any false representation by Banco or Stefano and certainly there was no solid or credible evidence of an intent to defraud.

    **(21b)** The respondents claim that there were two basic misrepresentations: (1) Stefano's false promise that a $ 2 million line of credit would be provided; and (2) Stefano's false statements regarding the good financial [*1017] condition of Kudsy. [57] We have already disposed of the first of these. We will now discuss the second.

    57  Amanollah apparently was the only one to describe the claimed misrepresentations purport-

234 Cal. App. 3d 973, *; 285 Cal. Rptr. 870, **;
1991 Cal. App. LEXIS 1135, ***; 91 Cal. Daily Op. Service 7901

edly made by Stefanon on behalf of Banco. He described a meeting at Banco's offices which was *before* the purchase was made which necessarily means it was the first meeting he had with Stefanon, on June 14, 1982. Respondents in their brief contend that this was the date when the claimed representations were made:

"Q. By Mr. Shulman: What question did you ask Mr. Stefanon about the Kudsy Company?

"A. I said, 'Mr. Stefanon, if this company -- if this company is a good company, that I would purchase that company, and that we would pay you gradually.'

"Q. By Mr. Shulman: What did Mr. Stefanon say after you said this to him?

"A. He said it was a very good business and that these people are honorable people. [para.] And he said with respect to the $ 2 million line of credit, that we would have access to that line of credit."

At oral argument, respondents conceded that this was the only evidence of the claimed misrepresentation by Stefanon or Banco.

[***80] [**897] It is clear from this record that there was nothing false about the statements Stefanon may have made about Kudsy's history with Banco. Kudsy had a long history with Banco and, indeed, a credit line for $ 2.1 million had been approved in early 1982, of which Kudsy had actually utilized over $ 1.8 million by the time of its negotiations and contracting with the respondents. No evidence was offered to show that the history of the relationship between Kudsy and Banco, up until July 7, 1982, was not entirely as allegedly represented, or in any way different from what the respondents had discovered through their own independent investigation which had been completed by that time.

The record is undisputed that the respondents fully investigated Kudsy before entering into the original July 7, 1982 contract. That is why the respondents decided to buy assets rather than capital stock. In addition, the respondents even renegotiated the deal prior to the August 25, 1982, closing in order to insure that they purchased only the most marketable of the Kudsy inventory. Finally, the way the respondents structured their purchase agreement, the financial condition of Kudsy was of no significance [***81] to them. They took possession of the inventory they wanted and only owed Banco those obligations which were related to and secured by that inventory. If Kudsy failed to pay its portion of the Banco debt, that would harm Banco but not the respondents. This is a makeweight claim with no substance. More-

over, Banco's argument that, in any event, given the independent investigation conducted by the respondents, there was no justifiable reliance, is certainly well taken. ( *Kruse* v. *Bank of America, supra,* 202 Cal. App. 3d at p. 54; *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 415 [115 P.2d 977, 136 A.L.R. 1291].)

[*1018] Conclusion

The evidence presented to the jury regarding Banco's alleged promise or commitment to provide Latian with a line of credit should not have been admitted. Even if properly received, it was not sufficient, when considered in the context of the whole record, to meet the standard of substantial evidence with respect to both the contract and fraud claims. Therefore, the judgment against Banco must be reversed. In addition, as the assertion of this claim was the only defense offered by Latian [***82] and Amanollah, [58] with respect to the first three causes of action in Banco's complaint, [59] Banco is entitled to judgment thereon. ( Code Civ. Proc., § 629.)
[60]

58    When asked at trial why he had not paid Banco the money it claimed, Amanollah answered, "Because of the fact that Bank of Brazil, or Banco do Brasil, did not honor its promise to grant a $ 2 million line of credit." A little later he was asked why he had stopped making payments to Banco in December 1983 and he said, "Because they had not honored their line of credit. They had not honored their promise. And we decided not to pay them anymore."

There was no other contention made in the evidence or the pleadings; nor was there any dispute that the sums claimed were in fact unpaid and otherwise due and owing.

59    Banco had also included a cause of action for fraud. However, the record reflects that it has abandoned that claim.

60    Banco also appealed from the trial court's denial of its motion for a judgment notwithstanding the verdict. For the reasons set out herein, that motion should have been granted.

[***83] The judgment in favor of respondents on Banco's complaint and on respondents' cross-complaint is reversed. The matter is remanded to the trial court with directions to enter judgment in favor of Banco (1) on the first three causes of action of its complaint and (2) on respondents' cross-complaint and to conduct such further proceedings in connection therewith as may be appropriate. Banco and Stefanon shall recover their costs on appeal.

EXHIBIT 4

LEXSEE 4 CAL 2D 258

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Respondent, v. T. S. PENDERGRASS et al., Appellants**

**Sac. No. 4826**

**Supreme Court of California**

**4 Cal. 2d 258; 48 P.2d 659; 1935 Cal. LEXIS 538**

**September 3, 1935**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Stanislaus County. J. C. Needham, Judge.

**DISPOSITION:** Reversed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Appeal--Record--Briefs--Motion to Dismiss.** --On an appeal from a judgment, where the opening brief of appellants, while it set forth the substance of the record, did not make specific reference to the reporter's transcript, but did refer to the page of the clerk's transcript where the facts included in the opening statement were set forth in the answer filed by appellants, and the concluding brief of the appellants specifically indicated the portion of the transcript where a complete report of the opening statement could be found, objection to consideration of the appeal, on the ground that the briefs of appellants did not sufficiently comply with rule VIII, subdivision 3, of rules governing appeals to the Supreme Court, should be disregarded, the court having experienced no difficulty in ascertaining the grounds upon which the appeal was based, and no trial being had upon the merits of the case, but judgment having been entered against the defendants upon their opening statement.

**(2) Promissory Notes--Mortgages--Evidence--Abatement.** --In an action on a promissory note, in which the defendant pleads in his answer that the note was secured by a chattel mortgage, if its allegation is sustained by the evidence the action should be abated, as section 726 of the Code of Civil Procedure provides for only one form of action, specifying the procedure, to wit: foreclosure of the mortgage.

**(3) Id.--Pleading--Answer--Reference to Recordation of Mortgage.** --In such action, an allegation in the answer that the note in suit is secured by a mortgage of a certain date and recorded at a certain place in the official records of a certain county, does not make the mortgage a part of the answer, and, therefore, the reference to the mortgage by counsel constitutes no part of the record of which the court can take notice; but it does establish the error of the trial court, in directing judgment for the plaintiff, in disregarding the portion of the defendants' opening statement with reference to the note being secured by a mortgage, because whether it was or not in fact could only be determined by the introduction of the mortgage in evidence, which was not done.

**(4) Id.--Opening Statement--Consideration of on Appeal.** --Where both the appellants and respondent lay down the premise that upon the consideration of the appeal, in such case, everything set forth in the opening statement must be considered as true, it must be held that the note sued upon was and is secured by a chattel mortgage.

**(5) Id.--Evidence--Time of Payment--Oral Statements.** --Where the promissory note in suit contains the unconditional promise to pay on demand, oral evidence is inadmissible to establish an alleged promise of the payee of the note that if the maker of the note and mortgage would execute them, and do other things mentioned, he would not be required to make any payments on the indebtedness, either interest or principal, until the money came in from a certain crop, and that he would be permitted to go ahead and operate and produce this crop.

**(6) Id.--Fraud--Validity of Instrument--Parol Evidence.** --Parol evidence of fraud to establish the invalidity of an instrument must tend to establish some independent fact or representation, some fraud in the pro-

4 Cal. 2d 258, *; 48 P.2d 659, **;
1935 Cal. LEXIS 538, ***

curement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** Bush & Cleary for Appellants.

T. B. Scott, Louis Ferrari, T. J. Bricca and C. H. White for Respondent.

**JUDGES:** In Bank. Thompson, J. Shenk, J., Waste, C. J., Preston, J., and Seawell, J., concurred.

**OPINION BY:** THOMPSON

**OPINION**

[*259] [**659] This cause was transferred to this court after decision by the District Court of Appeal. We are satisfied with and adopt a portion of the opinion rendered therein, which is as follows:

"This action was instituted by the plaintiff to recover judgment on a promissory note in the sum of $ 4,750. Trial was had before a jury. The note was payable upon demand, and the complaint was a simple action based upon the promissory note. The defendants in their answer interposed two defenses, to-wit: That the note was obtained by fraud, and also was secured by a chattel mortgage. The plaintiff introduced the note in evidence, and also the testimony of a witness [**660] to the effect that the note had not been paid. Following this, counsel for the defendants made an opening statement, [***2] at the conclusion of which the court directed judgment in favor of the plaintiff. From this judgment the defendants appeal.

[*260] (1) "The respondent objects to the consideration of the defendants' appeal on the ground that the appellants have not sufficiently complied with subdivision 3 of rule VIII of the rules governing appeals taken to this court, the point being urged that the briefs of appellants do not sufficiently comply with the rules just referred to in indicating the portions of the record upon which appellants rely for reversal.

"The opening brief of appellants, while it sets forth the substance of the record, does not make specific reference to the reporter's transcript, but does refer to the pages of the clerk's transcript where the facts included in the opening statement are set forth in the answer filed by the appellants. The concluding brief of the appellants does specifically indicate the portion of the transcript where a complete report of the opening statement may be found. No difficulty having been experienced by the

court in ascertaining the grounds upon which this appeal is based, and also in view of the fact that no trial was had upon the merits of this [***3] cause, and judgment having been entered against the defendants upon their opening statement, we conclude that the respondent's objection to a consideration of this appeal upon its merits should be disregarded.

"The opening statement, while not referring to the pleadings, constituted an oral presentation to the court and jury of the defenses set up in the answer. While too lengthy to be set forth herein, we glean from the opening statement the following:

"In 1928, the defendants took over a ranch near Oakdale in Stanislaus county for the purpose of growing lettuce seed thereon. The ranch was then subject to a trust deed securing a note in favor of the Bank of Italy subsequently becoming the Bank of America, in the sum of $ 20,000. From the time of taking over the ranch in 1928, appellants continued the operation thereof in the growing of lettuce seed and marketing the same in the southern portion of the state, particularly in the Imperial valley. Financial transactions appear to have been had between the plaintiff and the defendants until January, 1932, at which time the $ 20,000 note, secured by a trust deed, remained unpaid, and another note in the sum of $ 14,997.40, unsecured, [***4] was held by the plaintiff, signed by the defendants. At this time negotiations were entered into between the defendants and the plaintiff, by and through its representatives, relative to the defendants continuing their [*261] operation of the ranch during the year 1932. At the time of the beginning of these negotiations it appears that the appellants had on hand personal property consisting of ranch equipment of the value of approximately $ 25,000, and also unsold lettuce seed in storage of the approximate value of $ 6,000.

"The opening statement then sets forth that the plaintiff, by its representatives, promised the defendants that if they would execute a new note for $ 4,750, to be credited upon the $ 14,997.40 note to which we have referred, and would give a chattel and crop mortgage, which mortgages should secure the notes referred to, the plaintiff would not interfere with the operation of the ranch by the defendants during the year 1932, but would allow them to operate the ranch and make sales of lettuce seeds to prospective purchasers, contracting for the sale and delivery of the seeds in advance, turning the same over to the appellants. In consideration of this promise [***5] the defendants were to execute, and did execute the note and mortgages which would cover all the property owned by the defendants, and which, up to that time, appears to have been unincumbered.

"The opening statement then goes on to recite that the defendants made preparations to operate the ranch, to

secure contracts for the seed to be raised, and further, that the promises made by the plaintiff, through its representatives, were made without any intention on their part to keep and perform the same, and were fraudulently made for the purpose of securing the notes and chattel and crop mortgages mentioned in the opening statement. The opening statement of the appellants, in relation to the indebtedness of the mortgages, is in the following words and figures (after providing that the $ 6,000 worth of lettuce seed should be turned over to the appellants [respondents] as security for the indebtedness), to-wit: 'That a new note was to be executed for the balance [**661] of the indebtedness above the $ 20,000.00 originally secured by the trust deed, and that the chattel mortgage was to secure not only this indebtedness above the $ 20,000.00, but was to cover the whole thing, $ 20,000.00 [***6] plus the balance of the indebtedness which at that time was about $ 14,750.00.' And further: 'That this chattel and crop mortgage be executed by Mr. Pendergrass; that a new note in the sum of $ 4,753.00 be executed by Mr. Pendergrass, to be credited on a note that they already had of $ 14,753.00, that is, the balance due on it was [*262] $ 14,753.00; that those notes were to be secured by the chattel mortgage, by the pledge of the warehouse receipt of 6500 pounds of lettuce seed on hand, and by the assurance that the sales of the 1932 crop of seed would pass through the bank and the moneys from the sales of the 1932 crop should all go to the bank in payment,' etc.

"The opening statement further shows that the mortgages referred to were executed by the defendants, and that the plaintiff failed to keep its promises, and within a short time after the execution of the mortgages proceeded to seize all the property covered thereby.

(2)  "The answer as well as the opening statement alleges that the note sued upon in this action was and is secured by a chattel mortgage. Under the provisions of section 726 of the Code of Civil Procedure, if the allegations referred to set forth the true [***7] status, then and in that case the plaintiff's cause of action should have been abated. That section provides for only one form of action, specifying the procedure, to-wit, the foreclosure of the mortgage, which was not followed in this case. (3) The respondent seeks to avoid the force of this contention on the part of the appellants by referring to the mortgage itself, and contending that the note sued upon is not secured, basing its argument upon the fact that the answer of the defendants alleges that the note is secured by mortgage of a certain date, and recorded at a certain place in the official records of Stanislaus county. However, such a reference does not make the mortgage a part of the answer, and it was not made a part of the answer in this case; consequently, the contention of the respondent and the reply of the appellants in relation thereto

constitute no part of the record of which this court can take notice. It does establish, however, the error of the court in disregarding this portion of the defendants' opening statement, because whether the note sued upon was or was not in fact secured by a chattel mortgage or a crop mortgage could only be determined by the introduction [***8] of the mortgage in evidence, which was not done. (4) Both the appellants and the respondent lay down the premise that upon the consideration of this appeal, everything set forth in the opening statement must be considered as true. Therefore, it must be held upon this appeal that the note sued upon in this action was and is secured by a chattel mortgage."

[*263] (5) Inasmuch as the cause must go back to the trial court for further proceedings therein it becomes necessary for us to determine whether oral testimony may be introduced to establish the alleged promise of respondent that if appellants executed the note and mortgage and did the other things mentioned, they would not be required "to make any payments on their indebtedness, either interest or principal, until this money came in from the 1932 crop of lettuce seed, and that the bank would permit them to go ahead and operate and produce this 1932 crop". While we have quoted the exact language used in the opening statement of appellants, it is manifest that the promise which it is claimed they relied upon was, as pleaded by them, that the respondent would "extend" or "postpone" all payments for the period of one year. This promise [***9] is in direct contravention of the unconditional promise contained in the note to pay the money on demand. (6) The question then is: Is such a promise the subject of parol proof for the purpose of establishing fraud as a defense to the action or by way of cancelling the note, assuming, of course, that it can be properly coupled with proof that it was made without any intention of performing it? Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing. We find apt language in *Towner* v. *Lucas' Exr.*, 54 Va. (13 Gratt.) 705, 716, in which to express our conviction: "It is reasoning in a circle, to argue that fraud is made out, when it is shown by [**662] oral testimony that the obligee contemporaneously with the execution of a bond, promised not to enforce it. Such a principle would nullify the rule: for conceding that such an agreement is proved, or any other contradicting the written [***10] instrument, the party seeking to enforce the written agreement according to its terms, would always be guilty of fraud. The true question is, Was there any such agreement? And this can only be established by legitimate testimony. For reasons founded in wisdom and to prevent frauds and

4 Cal. 2d 258, *; 48 P.2d 659, **;
1935 Cal. LEXIS 538, ***

perjuries, the rule of the common law excludes such oral testimony of the alleged agreement; and as it cannot be proved by legal evidence, the agreement itself in legal contemplation, cannot be [*264] regarded as existing in fact. Neither a court of law nor of equity can act upon the hypothesis of fraud where there is no legal proof of it." The rule referred to in the quotation has found expression in sections 1625 and 1698 of the Civil Code and section 1856 of the Code of Civil Procedure and, according to our authorities, is one not only of evidence but also of substantive law. ( *Harding* v. *Robinson*, 175 Cal. 534 [166 Pac. 808]; *Lindemann* v. *Coryell*, 59 Cal. App. 788 [212 Pac. 47, 48].) The last-cited case confirms the opinion we entertain, for while it is said no question of fraud was raised, yet the effort was made to prove that the note was executed upon the understanding [***11] that the payee would not enforce payment until the payor had sold sufficient real property to enable him to pay. It

was there said, after citing a pertinent section of Wigmore on Evidence, that fraud may not be established by parol evidence to contradict the terms of the writing "when the statements relate to rights depending upon contracts yet to be made, to which the person complaining is a party, as under such circumstances he has it in his power to guard in advance against any and all consequences of a subsequent change of conduct by the person with whom he is dealing, and to admit evidence of extrinsic agreements would be to open the door to all evils that the parol evidence rule was designed to prevent." For further authorities involving a like principle see *McArthur* v. *Johnson*, 216 Cal. 580 [15 Pac. (2d) 151]; *Pierce* v. *Avakian*, 167 Cal. 330, 331 [139 Pac. 799], *Booth* v. *Hoskins*, 75 Cal. 271 [17 Pac. 225], and *Estate of Watterson*, 130 Cal. App. 741 [20 Pac. (2d) 772].

For the reasons stated the judgment is reversed.

EXHIBIT 5

LEXSEE 213 CAL. APP 2D 307

**DOROTHY M. BENNETT, Plaintiff and Respondent, v. CHARLES E. CARLEN, Defendant and Appellant**

**Civ. No. 20614**

**Court of Appeal of California, First Appellate District, Division Two**

**213 Cal. App. 2d 307; 28 Cal. Rptr. 647; 1963 Cal. App. LEXIS 2729**

**February 21, 1963**

**SUBSEQUENT HISTORY:** [***1] Respondent's Petition for a Hearing by the Supreme Court was Denied April 17, 1963.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James J. Welsh, Judge pro tem. *

    * Assigned by Chairman of Judicial Council.

    Action for damages for breach of a contract to convey a leasehold interest in certain real property.

**DISPOSITION:** Reversed. Judgment for plaintiff reversed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

(1) Contracts--Interpretation--Conditions Precedent. --Where an offer to purchase a leasehold interest, furniture and fixtures of a hotel specified, under the heading "condition of sale," that five days were allowed for the seller's acceptance and an additional five days to gain the landlord's acceptance of the buyer as a lessee, on the seller's accepting the offer, the provision as to the gaining the landlord's acceptance did not constitute an unconditional promise of the seller to secure the landlord's consent, but constituted a condition precedent to all liability under the contract. When this consent was not obtained by the date specified, the contract came to an end.

(2) Id.--Interpretation--Conditions Precedent. --An express condition precedent to performance by a party cannot be construed as imposing a duty on that party to fulfill the condition where the language of the contract does not constitute an undertaking to fulfill the condition.

**COUNSEL:** Ryan & Ryan and Thomas Michael Ryan for Defendant and Appellant.

Morgan & Moscone and George R. Moscone for Plaintiff and Respondent.

**JUDGES:** Shoemaker, J. Kaufman, P. J., and Agee, J., concurred.

**OPINION BY:** SHOEMAKER

**OPINION**

    [*307] [**647] Defendant Charles Carlen appeals from a judgment for plaintiff Dorothy Bennett, in an action [*308] to recover damages for breach of a contract to convey a leasehold interest in certain real property.

    The record discloses that in June of 1959, defendant, as owner, listed the leasehold interest, furniture and fixtures of the Lincoln Hotel for sale with the real estate firm of D'Orazi Investment Company. Under the lease, defendant was required to obtain the landlord's consent to any assignment. On August 3, 1959, D'Orazi Investment [***2] Company presented defendant with an offer in the form of a deposit receipt and agreement of sale signed by the plaintiff. The document, dated August 3, 1959, provided that the purchase price for the leasehold interest, furniture and fixtures, was to be $ 25,500, of which sum the plaintiff had already deposited $ 1,000. A further provision, under the heading "Condition of Sale," stated that "5 days from the above date are allowed for the Seller's approval of this agreement and an additional 5 days to gain the Landlord's acceptance of the Buyer as a lessee." Upon receipt of the seller's and landlord's approvals, plaintiff was to increase her downpayment to $ 8,000. This additional cash consideration was to be paid

to D'Orazi Investment Company for deposit to the account of the seller. Plaintiff was to take possession of the property on August 15, 1959. Time was expressly made of the essence. Defendant signed the agreement on August 3, 1959.

On August 4, 1959, defendant went to the office of Hogan & Vest, the real estate brokers who represented the landlord. He informed Mr. Vest that he had received an offer from the plaintiff and requested that Mr. Vest contact the landlord and [***3] obtain his consent to a transfer of the lease. The remainder of the negotiations for the landlord's consent appear to have [**648] been conducted by D'Orazi Investment Company, acting on behalf of the defendant. Mr. D'Orazi testified that on August 5 or 6, his firm furnished Hogan & Vest with a financial statement on the plaintiff, and that he was thereafter informed that Hogan & Vest considered the plaintiff an acceptable tenant but were desirous of obtaining a commission of $ 1,000 for their services in obtaining the landlord's consent to the assignment. Mr. Hogan testified that he had never actually contacted the landlord in regard to the assignment, but that he did inform D'Orazi Investment Company that he "could possibly" obtain the consent if he were paid part of their commission on the sale.

In any event, by August 15, 1959, Mr. D'Orazi had informed both plaintiff and defendant that an additional $ 1,000 [*309] was necessary to obtain the landlord's consent, but neither party was willing to pay that amount. On August 19, 1959, defendant sold the leasehold interest, fixtures and furnishings, to another party for $ 27,000. This action was brought shortly thereafter.

[***4] The trial court held that the defendant was obligated, under the written agreement of August 3, 1959, to obtain the landlord's consent to the assignment, and that the words "5 days to gain the Landlord's acceptance of the Buyer as a lessee" did not constitute a condition precedent to the validity of the agreement of sale. The court also found that the defendant had refused to perform his duties under the written agreement and that said refusal was motivated solely by his desire to sell the leasehold interest to a third party at a higher purchase price than the plaintiff had agreed to pay. Judgment was accordingly entered that the plaintiff recover $ 1,500 damages for breach of contract.

(1) Appellant first contends that the provision of the contract allowing five days for gaining the consent of the landlord is a condition precedent and not an unconditional promise on appellant's part to secure the landlord's consent to the assignment. Appellant argues that any other construction overlooks the facts that the provision fails to specify that *either* party shall have any affirmative duty to obtain this consent and that the consent provision served no other purpose than to impose a [***5] condition precedent to all liability under the contract. The argument continues that under the contract, neither party was desirous of completing the sale in the event that the landlord's consent was withheld, hence they expressly agreed that the obligations of both parties would be contingent upon the giving of consent. When this consent was not obtained by the date specified under the contract, or indeed, by the date on which possession under the lease was to be transferred, the contract came to an end. Neither party can be deemed to have breached his obligations under the contract, since the event upon which these obligations were contingent never occurred.

This contention is sustained by the record. The written agreement expressly states that the landlord's acceptance of the buyer as a lessee shall be a "Condition of Sale." This provision is neither uncertain nor ambiguous and was obviously intended to make all obligations under the contract contingent upon the giving of the landlord's consent. The agreement provides, for example, that respondent shall not [*310] be required to deposit her full $ 8,000 downpayment until such consent has been given. It also provides [***6] that appellant shall be under no duty to complete the sale and transfer of his leasehold interest until the downpayment shall have been made. It is thus evident that all duties specified under the contract were to arise only in the event that the landlord's consent was in fact obtained.

This conclusion is supported by the reasoning of our Supreme Court in the case of *Britschgi* v. *McCall* (1953) 41 Cal.2d 138 [257 P.2d 977], wherein a contract to convey real property was expressly made "'contingent upon the seller being able to eliminate the interest of George E. Santana, if any, in the above-described property, [**649] for a sum not to exceed $ 5,000.00.'" (P. 141). Following the execution of the contract, defendant sellers attempted to eliminate Santana's interest but were unable to do so. The buyers subsequently brought suit for specific performance of the contract, and the trial court found in favor of the defendants. In affirming the judgment, the Supreme Court concluded that the elimination of the Santana interest was a condition precedent to the defendants' duty to convey. The court pointed out that the provision had obviously been inserted in the contract [***7] in vital part for the benefit of the sellers and was designed to protect them from liability to Santana. The court went on to hold that no fault could be ascribed to the defendants by reason of their inability to perform the condition precedent. (2) The court stated: "The defendants were to convey only if they could eliminate the specified encumbrance, and there was no promise to eliminate or convey in any event. An express condition precedent to performance by a party cannot be construed as imposing a duty on that party to fulfill the condition,

213 Cal. App. 2d 307, *; 28 Cal. Rptr. 647, **;
1963 Cal. App. LEXIS 2729, ***

where, as here, the language employed does not constitute an undertaking to do so. ( *Edwards* v. *Billow*, 31 Cal.2d 350, 361 [188 P.2d 748].)" (P. 144.)

The present case would appear to fall squarely within the holding of the *Britschgi* case. We consider it clear that the contract cannot be construed in such a manner as to impose any absolute duty on appellant to fulfill the condition. Under the wording of the provision, it is open to speculation as to which of the parties was intended to contact the landlord and ask for his approval of the assignment. In the *Britschgi* case, the contract was contingent upon the "Seller's" [***8] ability to eliminate the Santana interest. Yet the court refused, nevertheless, to construe the contract as imposing an affirmative [*311] duty on the seller. In the instant case, respondent points to no parol evidence that the parties ever

agreed upon or even discussed the question of which of them was to negotiate for the landlord's consent.

In view of the express wording of the agreement of sale, we are satisfied that the landlord's consent constituted a condition precedent to all obligations under the contract. Although either party was at liberty to obtain that consent, neither was in fact able to do so. Under such circumstances, the condition precedent to appellant's obligation to perform his side of the contract was never fulfilled, and respondent was accordingly not entitled to recover damages. ( Civ. Code, § 1436; *Peterson* v. *Montgomery Holding Co.* (1949) 89 Cal.App.2d 890, 894 [202 P.2d 365]; *Pry Corp. of America* v. *Leach* (1960) 177 Cal.App.2d 632, 639 [2 Cal.Rptr. 425].)

Judgment reversed.