EXHIBIT 6

LEXSEE 207 CAL. APP 2D 61

**CHARLES J. BENTON, Plaintiff and Appellant, v. HOFMANN PLASTERING COMPANY et al., Defendants and Respondents**

**Civ. No. 19713**

**Court of Appeal of California, First Appellate District, Division One**

**207 Cal. App. 2d 61; 24 Cal. Rptr. 268; 1962 Cal. App. LEXIS 1882**

**August 21, 1962**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Alameda County. Joseph A. Murphy, Judge.

Action for declaratory relief, to recover certain moneys advanced under contracts assigned to plaintiff and to foreclose a trust deed.

**DISPOSITION:** Affirmed. Judgment denying plaintiff most of the relief sought by him, affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

(1) **Assignments--Construction.** --An agreement whereby a lathing contractor assigned to one advancing money to him on lathing contracts the proceeds of all contracts entered into or to be entered into by the contractor for the performance of which the lender advanced or would advance money to the contractor, and which provided for repayment of each advance from the proceeds of the particular contract on which the advance had been made, with any deficiency to be paid out of the proceeds of other lathing contracts, and any surplus to be divided between the parties, constituted a loan agreement under which the loans were to be repaid solely from the proceeds of the assigned contracts, not a loan agreement to be repaid generally at all events.

(2) **Id.--Rights Assignable--Stipulations Against Assignment.** --Where the parties have used language which clearly expresses their intention, a provision in a contract against the assignment of the debts represented thereby is effective.

(3) **Id.--Rights Assignable--Stipulations Against Assignment.** --A contract provision against assignment does not preclude the assignment of money due or to become due under such contract.

(4) **Id.--Rights Assignable--Stipulations Against Assignment.** --By appropriate words used in a contract, the parties may effectively provide that the contract or money due thereunder shall not be assignable.

(5) **Id.--Rights Assignable--Stipulations Against Assignment.** --Clauses in a contract relating to nonassignability are for the benefit of the obligor, and do not prevent the assignee from acquiring rights against the assignor, where the transfer works no substantial detriment to the rights of the other party to the contract.

(6) **Id.--Rights Assignable--Stipulations Against Assignment.** --Although limitations on assignments will be strictly construed by the courts, explicit language used by the parties will be followed.

(7) **Id.--Rights Assignable -- Stipulations Against Assignment--Waiver.** --A prohibition against assignment of a contract is ineffective if it has been waived or if all that remains to be done under the contract is the payment of money.

(8) **Id.--Rights Assignable--Stipulations Against Assignment.** --Where a prohibition against assignment relates not only to the contract but also to the money due or to become due there-under, and there is no waiver of the prohibition by the obligor, it will be enforced in his favor, since his rights to the moneys due under the contract are superior to those of the assignee.

(9) **Id.--Rights and Liabilities of Parties--Defenses Against Assignees.** --Where by virtue of a compromise agreement between a subcontractor-assignor, the obligor, and the county for which work was defectively performed under a contract, the parties waived any right to

Page 2

207 Cal. App. 2d 61, *; 24 Cal. Rptr. 268, **;
1962 Cal. App. LEXIS 1882, ***

receive payment in consideration of the acceptance by the county of the work defectively performed, and the assignee, when asked if he had any objection to the compromise, made no reply, the assignee's rights under the assignment were inferior to the rights of the obligor, because of the former's acquiescence by silence in the compromise agreement.

**(10) Pleading--Answer--Sufficiency.** --An answer amended to conform to the proof, alleging that there was either no consideration for a deed of trust or, if consideration was given, there was a failure of consideration, supported a finding that plaintiff made a false promise to the defendant which induced the execution of the instrument.

**(11) Id.--Amendment -- At Trial -- Filing.** --Where a motion to amend is granted at the trial, the lack of a formal filing of the amended pleading may not be made the ground for complaint after the case is tried as if the amendment had been made.

**(12) Appeal--Questions of Law and Fact--Findings on Conflicting Evidence.** --The trial court's determination, supported by substantial evidence, is binding on an appellate court, although the evidence is conflicting.

**(13) Mortgages -- Foreclosure -- Defenses: Trust Deeds -- Foreclosure.** --Even a partial failure of consideration is a defense to foreclosure of a mortgage or deed of trust.

**COUNSEL:** Francis T. Cornish for Plaintiff and Appellant.

Lindsay & Pettis, Warren G. Reid, Merrill, Commons, Hooper & Miller, Alan A. Lindsay and Wayne M. Hooper for Defendants and Respondents.

**JUDGES:** Bray, P. J. Sullivan, J., and Agee, J., * concurred.

* Assigned by Chairman of Judicial Council.

**OPINION BY:** BRAY

**OPINION**

[*63]    [**270]    Plaintiff Benton sued defendants Hofmann Plastering Company and Coelho in declaratory relief and for judgment against Hofmann for moneys advanced to defendant Coelho to enable Coelho to perform certain lathing contracts with Hofmann, to recover from Hofmann proceeds paid to Coelho under contracts assigned to plaintiff, to recover certain sums from

Coelho, and to foreclose a deed of trust executed by Coelho and wife to Benton to secure advances.

Hofmann cross-complained claiming Coelho and Benton were partners, and sought damages for a [***2] breach of two lathing contracts by Coelho and for defective performance of a third.

Coelho then cross-complained [1] against Benton claiming partnership between him and Benton, seeking dissolution of partnership, appointment of receiver, and cancellation of deed of trust for lack of delivery and execution, and coercion.

1    This cross-complaint was dismissed by Coelho.

Plaintiff appeals from the denial of most of the relief sought by him.

Questions Presented

Although there were many issues presented by the pleadings, the parties at trial limited the issues to be determined. They were:

1. The character of the Benton-Coelho agreement as to whether it was an agreement for advances to be repaid only from proceeds of contracts or for advances under a continuing obligation on Coelho's part to repay all moneys advanced.

2. Whether the assignments of proceeds from the Coelho-Hofmann contracts to Benton prevailed over their assignments to Hofmann.

3. Is plaintiff bound by the settlement of the Eden Office Building [***3] contract?

4. The validity of the deed of trust from Coelho to Benton.

5. Findings.

[*64]    1. *The Benton-Coelho Agreement.*

**(1)**   Defendant Coelho was engaged in the business of installing lathing in connection with various building contracts. Benton had advanced him money to aid in the financing of many of these projects. There is a dispute as to whether the money so advanced constituted a loan or an investment. We are not concerned with that question other than as an aid in interpreting the agreement which Benton and Coelho entered into December 21, 1953. It provided that in consideration of past and future advances by Benton, Coelho assigned to Benton the proceeds of all contracts which Coelho had entered into and which he might enter into for the performance of which contracts Benton had advanced or would advance moneys to Coelho. Coelho agreed that upon all jobs financed by Benton, Coelho would impress upon the invoices on

such jobs a rubber stamp provided by Benton which read "Moneys due under the within job are assigned to Charles J. Benton pursuant to agreement evidenced by formal writing dated December     , 1953." Apparently this condition was met.

The agreement [***4] provided: "The signed imprint of said stamp upon any invoice shall conclusively establish as between the parties . . . that Benton has advanced money to Coelho to finance him in the performance of the job represented by the invoice so imprinted, and that said advances have been made pursuant to the formula set forth in this memorandum of agreement.

"Upon making any advance such as Benton . . . shall hereafter make to Coelho to enable Coelho to finance any lathing job, all moneys due to Coelho or thereafter to become due to Coelho by virtue of [**271] the contract to which said advance relates are by virtue of any such advance assigned by Coelho to Benton. Upon request from Benton, Coelho shall execute any formal document appropriate to evidence the assignment."

The parties agreed that the advances should be repaid as follows: "After all expenses for labor and materials used in the performance of each lathing job have been paid, as much of said proceeds advanced by Benton or paid for said lathing job as remain shall be paid to Benton until Benton shall have received the full amount of all advances on that contract. Should said proceeds be insufficient for that purpose, *any* [***5] *deficiency shall be paid to Benton out of the proceeds of other lathing jobs until Benton shall have received the entire principal advanced on each lathing job completed.* [Emphasis added.]

[*65] "If after all labor and materials have been paid and Benton has been reimbursed all moneys he has advanced to finance all lathing jobs completed, and any of the proceeds from any completed lathing job shall remain, Coelho shall be paid from said proceeds remaining up to an amount equal to 7% of the gross contract price charged by Coelho for that job. The balance thereafter remaining shall be divided equally between Benton and Coelho.

"The parties hereby expressly confirm that on all jobs heretofore performed by Coelho, whether settlement has been heretofore effected or whether settlement remains to be made, the advances by Benton have been on the basis outlined in this memorandum of agreement *and on no other basis*." (Emphasis added.)

Plaintiff advanced Coelho moneys on jobs started before the above-mentioned contract was entered into as well as after. All of the jobs were under contracts between Hofmann and Coelho. Hofmann was a plastering contractor who sublet the lathing [***6] to Coelho.

Over the period involved Benton advanced some $ 73,000 which was not paid back to him. On occasion funds advanced by Benton for a particular job were used by Coelho, unknown to Benton, to pay indebtedness on other jobs for which Benton was providing the financing.

Benton contends that the contract constituted a loan agreement requiring repayment of all moneys advanced. Coelho contends [2] and the court found, that the contract was a loan agreement, repayment to be made solely from the proceeds of the lathing contracts. We adopt the statement of the trial judge, Honorable Joseph A. Murphy, in holding that the intent of the agreement was that repayment of advances should come solely from the lathing contracts. "The agreement provides that Benton shall advance certain funds to Coelho on contracts which are then assigned to Benton, and, in the event that there is a loss on the contracts, such loss may be recouped from any subsequent contracts. This phase of the agreement, in the opinion of the court, indicates that each advance was, in fact, a debt due from Coelho to Benton because of the fact that either party could cancel the agreement at any time, and, conforming to [***7] the intent of the agreement if it were cancelled, Coelho's obligation to Benton for any losses up to the time of cancellation would automatically terminate. [*66] This is also borne out by the fact that Benton set up a reserve account against individual contracts, indicating that it was his intent that such reserve would liquidate not only the contract from which the reserve was drawn, but also any future contracts. This is also supported to some extent by the admission of Benton that be [he] made considerable profits on prior contracts and that at the outset he told Coelho he would like to get into the business to 'make a fast buck.' All of the circumstances and dealings would indicate that it was purely speculative . . . .

2    Coelho originally contended that the agreement was one of partnership between Benton and himself. This contention was abandoned at the trial.

"There was testimony that Coelho made certain misrepresentations to Benton prior [**272] to November 22, 1957, and on the basis thereof [***8] procured advances from Benton. The evidence, however, is susceptible to a further inference; namely, that, while the funds advanced were not used on the particular job noted in the assignment, they were used on other jobs which had previously been financed by Benton; hence, the question of fraud is speculative and not proved by a preponderance of evidence. It is also to be noted that after discovery of the fraud, Benton continued to make advances to Coelho."

The agreement provides for repayment of the loans out of the proceeds of present contracts, and if these are

insufficient, out of future contracts. There is no provision expressly relating to repayment of the loans in the event that both of these sources should prove insufficient. On the face of the contract, it appears that the parties provided with particularity for the sources of repayment of the loans, thereby indicating that the parties intended those sources to be the sole method of repayment. As the contract is ambiguous, the court looked behind it to the evidence, and concluded from both the contract and the evidence what the intent of the parties was. Benton contends that the fact that the deed of trust executed [***9] by Coelho and wife was to secure to Benton "payment of indebtedness in the sum of any deficiency arising through beneficiary having financed Alvin George Coelho in purchasing and installing lathing . . ." conclusively shows that the loans were to be fully repaid. The court apparently believed the testimony of both Coelho and his wife that they were persuaded by Benton to execute the deed of trust to protect their home from Coelho's creditors. Therefore the court's finding that Benton is not entitled to recover from Coelho the unpaid balance of the moneys advanced by Benton should be affirmed.

2. *Assignments.*

As stated hereinbefore, the Benton-Coelho agreement provided that all proceeds of lathing contracts for which Benton [*67] made advances were assigned to Benton. While the record is not clear as to whether all the Hofmann-Coelho contracts under which Coelho did the lathing jobs contained the same provisions as to nonassignability of the moneys to become due thereon, or whether they all contained nonassignability clauses, the parties have assumed they all had the following clause or one similar to it: "That no assignment of this Subcontract, nor of any money due or [***10] which may become due hereunder shall be made without the written consent of the Contractor [Hofmann]."

(2) The court found that "provisions of the Hofmann-Coelho agreements against assignment of money due or to become due by virtue of said agreements did not, under the law of this State, prevent the assignment by defendant Coelho of such moneys to plaintiff, and therefore plaintiff, as Coelho's assignee, is entitled to judgment for the following sums. . . ."

The court was in error in its statement, which, in effect, declared that the law of California considered nonassignability clauses of this kind ineffective. In *Parkinson* v. *Caldwell* (1954) 126 Cal.App.2d 548, 552 [272 P.2d 934], the court stated: "Where the language is clear an agreement not to assign a debt is effective." The court, after referring to a New York decision, relies upon language in 4 Corbin on Contracts, section 872, page 486, where the author stated: "In any case, it is quite possible for the parties to show by apt words that rights created by the contract shall not be assignable."

The court also relies upon the holding in *Fairbanks* v. *Crump Irr. etc. Co., Inc.* (1930) 108 Cal.App. 197, 205 [291 [***11] P. 629, 292 P. 529]. In *Fairbanks* the court held that a provision that money due under a contract might be assigned with the permission of the obligor, is the same as a provision that it may not be assigned without such permission and that such a provision should be given effect. *Parkinson* concurs in this conclusion. (See also 37 A.L.R.2d 1251, 1253.)

(3) There is a distinction between an assignment of a contract and an assignment [**273] of the proceeds of the contract. See *Trubowitch* v. *Riverbank Canning Co.* (1947) 30 Cal.2d 335, 339 [182 P.2d 182], holding that a provision in a contract against assignment does not preclude the assignment of money due or to become due under the contract. (4) However, here the prohibition was against assigning either the contract or the moneys to become due thereunder. Such a prohibition is proper. (See 4 Corbin on Contracts, pp. 482, 486, 494.) [*68] *Trubowitch* also implies that the parties may effectively so provide by the use of appropriate language.

(5) Section 176 of the Restatement of Contracts provides: "A prohibition in a contract of the assignment of rights thereunder is for the benefit of the obligor, and does [***12] not prevent the assignee from acquiring rights against the assignor by the assignment or the obligor from discharging his duty under the contract in any way permissible if there were no such prohibition." That provision is in accord with the statement in 5 California Jurisprudence 2d 292, which states: "It appears that the courts will generally refuse to enforce nonassignability clauses, at least as between the assignor and assignee and those claiming under them, where the transfer works no substantial detriment to the rights of the other party to the contract. [Citing 35 Cal.L.Rev. 577.] Thus, it is ruled that clauses restricting assignability are for the benefit of the obligor, and do not prevent the assignee from acquiring rights against the assignor by an assignment apparently prohibited by the terms of the contract."

In the instant case it is the obligor who will apparently suffer if the assignment is held valid as against him. The validity of the assignment does not aid plaintiff in seeking recovery against Coelho, as his rights against Coelho exist independently of the assignment. The only question is one of set-off and priority as between Hofmann and plaintiff.

(6) The area [***13] of limitations on assignments is, of course, one in which the courts strictly construe such restrictions just as they jealously guard the right to transfer property in general. However, explicit language will be followed in cases of this kind. (7) The court in

*Thomas* v. *Thomas* (1961) 192 Cal.App.2d 771, 779 [13 Cal.Rptr. 872], after quoting from *Fairbanks* v. *Crump, supra,* 108 Cal.App. 197, and *Parkinson* v. *Caldwell, supra,* 126 Cal.App.2d 548, notes, "The courts, of course, have placed certain limits on nonassignment clauses -- there is strong policy in favor of the free transferability of all types of property ( *Farmland Irrigation Co.* v. *Dopplmaier,* 48 Cal.2d 208, 222 [308 P.2d 732]); accordingly, where the restriction against assignability is waived, rights may be transferred despite the prohibition ( *Trubowitch* v. *Riverbank Canning Co.,* 30 Cal.2d 335, 342 [182 P.2d 182]), and the prohibition does not apply where all that remains to do under the contract is the payment of money. ( *Butler* v. *San Francisco Gas & Elec. Co.,* 168 Cal. 32, 41 [141 P. 818].) Here, it is conceded, there has been no waiver by Edison as [*69] obligor; [***14] also, the *Fairbanks* case, quoted from *Parkinson* v. *Caldwell, supra,* would seem to support the view that *where the prohibition against assignment relates to money due under a contract, it will be enforced where the prohibition in question is explicit.*" (Emphasis added.)

(8) Here there is no question of waiver by Hofmann. The prohibition in the lathing contracts extends not merely to the contracts themselves but to the money due or to become due thereunder as well. The nonassignment provisions are valid and should be enforced. Hofmann's right to the moneys under the Coelho-Hofmann lathing contracts is superior to that of Benton, as assignee. However, as Hofmann did not appeal from that portion of the judgment awarding Benton $ 4,415.80 against Hofmann, such award must stand.

Although the court's finding that Hofmann was entitled against Benton to the proceeds of the "Capwell Store" Hofmann-Coelho lathing contract was based upon a different theory than the nonassignability of the moneys under that contract, and such [**274] theory may have been incorrect, the result was correct, as, because of the nonassignability clause, Hofmann had the superior right to those moneys.

[***15] For the same reason the question of the appropriateness of the court's allowing certain set-offs against Benton in favor of Hofmann of moneys it found due from Coelho to Hofmann, has become moot.

3. *The Eden Office Building.*

(9) On what is known as the Eden Office Building, upon which Coelho did the lathing under a subcontract with Hofmann, there was a balance unpaid to Coelho of $ 6,617.89. This balance Hofmann refused to pay because the County of Alameda for whom the work was being done claimed that the plastering did not comply with the specifications, and refused to pay the general contractor, who in turn refused to pay Hofmann. There

is a conflict in the evidence as to whether the fault was that of Coelho or of Hofmann, although there is strong evidence that the fault was Coelho's. It is not necessary to discuss this evidence for the reason that in a meeting at which Benton was present, with Coelho, Hofmann, and representatives of the county and of the general contractor, Hofmann and Coelho waived any right to receive additional payments in consideration of acceptance of the defective building by the county. At this meeting, when asked if he had any objections to the compromise, [***16] Benton made no reply. [*70] The court concluded that this compromise agreement "was in effect a new contract between the parties, and that the so-called 'fruits' of the contract never became due to Hofmann or to Coelho, hence plaintiff, as assignee of Coelho, is entitled to recover nothing" from the Eden Office Building job.

The court's conclusion must be affirmed for two reasons: (1) As we have heretofore shown, the assignment of the proceeds of the contract by Coelho to Hofmann is superior to the assignment to Benton. Hence Hofmann had the right to make the compromise. An obligor who has accepted an assignment of the money due under a construction contract may settle a claim under the contract by accepting a lesser sum in settlement. The "anticipatory debtor may . . . do whatever reasonably appears to be necessary to enable the assignor to perform the contract." ( *Peden Iron & Steel Co.* v. *McKnight* (1910) 60 Tex.Civ.App. 45 [128 S.W. 156].) (2) Even if the assignment by Coelho to Benton granted the latter any interest in the proceeds of the Eden contract, Benton's acquiescence, by silence, in the compromise bars him from now contending that he is not barred by [***17] it. Benton had a great interest in Coelho's continued solvency. Without a compromise of this type, Coelho was faced with a lawsuit to prove that the defective work was not his fault, or with considerable expense to repair the work, neither of which Coelho could afford. Although Benton contends that he had no duty to reply when asked if he had any objections to the compromise, his conduct led Coelho and Hofmann into a trap, and they reasonably had the right to assume and did assume that Benton's silence constituted consent. Both Coelho and Hofmann acted to their detriment in reliance upon Benton's failure to object. Thereby, by his failure to object, Benton waived any objection that he might have had.

4. *The Deed of Trust.*

(10) On November 14, 1957, Coelho and his wife signed a deed of trust conveying to a title company, as trustee, certain real property in Alameda County as security for the advances made by Benton under the December 21, 1953, Benton-Coelho agreement. The court found "that plaintiff represented and promised defen-

207 Cal. App. 2d 61, *; 24 Cal. Rptr. 268, **;
1962 Cal. App. LEXIS 1882, ***

dants Alvin G. Coelho and Anita K. Coelho that if the said deed of trust were executed and delivered to plaintiff, plaintiff would continue to finance [***18] Coelho on his lathing jobs; that it is also true that at the time of making said representation and promise, plaintiff did not intend to keep his promise and did not intend to continue [*71] financing Coelho and [**275] that shortly thereafter plaintiff refused to continue financing Coelho." In its conclusions, the court stated "that the execution and delivery of the deed of trust were vitiated by plaintiff's false promise and plaintiff is not entitled to foreclose said deed of trust."

Benton contends that neither the pleadings nor the evidence supports these findings. Both contentions are unfounded. In the Coelho cross-complaint Coelho alleged "that there was no proper execution acknowledgement or delivery of said instrument and *further that said defendants were coerced into signing said instrument by said plaintiff.*" (Emphasis added.) The court, both in its pretrial order and in its findings of fact, found that there was due execution and delivery of the instrument. It is the consideration for its execution and delivery with which we are concerned. In addition to the allegation in the cross-complaint that the instrument was obtained by coercion, the pretrial order [***19] states, "There is the further issue of the validity of the deed of trust." During the trial, the court granted Coelho's motion to amend to conform to the proof "in that there was either no consideration given by plaintiff Benton for the Deed of Trust, or if consideration was given there was a failure of consideration by Plaintiff Benton." Thus it is clear that the pleadings support the findings.

**(11)** Benton points out that while the court granted leave to amend, no formal amended pleadings were filed, and contends that therefore the amendment allowed may not be considered. His contention is hypertechnical and is not supported by the decisions. The Supreme Court stated in *Campagna v. Market St. Ry. Co.* (1944) 24 Cal.2d 304, 308 [149 P.2d 281]: "As a general rule, an order granting leave to amend is not an amendment, and in the absence of a written statement of facts concerning the issue, it is not properly pleaded. ( *Central Cal. Creditors' Assn. v. Seeley*, 91 Cal.App. 327 [267 P. 138].) But when such a motion is granted during the trial, and the case is tried as if the amendment had been made, a party may not later complain that no formal amendment was filed. [Citations.]"

[***20] The court in *Campagna* commented on the wide discretion which a trial court has to allow amendments to conform to proof, and in view of the presence of the issue of the validity of the deed of trust in the pretrial order, this discretion was wisely exercised in the instant case, and the issue of failure of consideration (continued financing) was properly before the trial court.

[*72] **(12)** Turning to the evidence, while the testimony of Benton to the effect that the deed of trust was given him to secure the advances he had made, conflicts with that of the Coelhos, the court apparently believed the latter and resolved the conflict in their favor. We are bound by that determination, as there is substantial evidence to support it. According to Mrs. Coelho, Benton threatened to terminate his financial backing of the lathing contracts if she did not sign the deed of trust. Benton told her he only wanted it to prevent creditors from reaching the Coelho home. He stated to her, "if I didn't sign it, he wouldn't go on, *but, if I signed, then he would go on and continue to finance until the jobs were pulled out.*" (Emphasis added.) The other testimony in general relates to Benton's [***21] statements that he would *not* finance the lathing contracts if Mrs. Coelho refused to sign. The quoted statement alone is sufficient to support the findings. Mrs. Coelho testified that she would not have signed the deed of trust without such representations and promises. It is admitted that Benton ceased financing Coelho shortly thereafter.

While there is no direct evidence that Benton, at the time of his representations to the Coelhos, did not intend to carry out his promises, the court was entitled reasonably to infer from all the facts and circumstances that he had no intention of doing so. A promisor who does not mean what he says seldom reveals his true state of mind. That must be determined by the [**276] trier of fact from what the promisor does under all the circumstances of the case. (See *Cox v. Klatte* (1938) 29 Cal.App.2d 150 [84 P.2d 290].) Benton received profits from the Coelho lathing contracts until January 1958. At that time Benton ceased advancing money to Coelho, although several jobs were still in progress and required financing in order to be completed. There is evidence that both Benton's and Coelho's losses on the entire transaction were [***22] due to Benton's ceasing to advance further moneys, and Coelho's inability to otherwise finance himself. Coelho, in several instances, was forced to abandon his lathing contracts for this reason.

**(13)** Even partial failure of consideration is a defense to foreclosure of a mortgage or deed of trust. ( *Briggs v. Crawford* (1912) 162 Cal. 124, 129 [121 P. 381].)

Benton interprets the findings and conclusion above mentioned as findings of fraud and claims that no fraud was alleged and hence these findings are improper. Technically, Benton may be correct in that the findings might be susceptible to such interpretation. However, the facts upon which [*73] they are based show, and the findings and conclusion may reasonably be interpreted as determining, that there was a failure of consideration for the execution of the deed of trust. As Judge Murphy said in his memorandum opinion, "Benton represented to the

207 Cal. App. 2d 61, *; 24 Cal. Rptr. 268, **;
1962 Cal. App. LEXIS 1882, ***

Coelhos, and particularly Mrs. Coelho, that if the deed of trust were executed and delivered, he would continue to finance Coelho on his jobs. Within a short time thereafter he refused to continue financing Coelho and Coelho was compelled to abandon his business as a lathing [***23] contractor."

5. *Findings*.

Benton objects to finding II dealing with the ninth cause of action, the count in which Benton sought recovery from Coelho of $ 72,194.83 and foreclosure of the deed of trust. This finding is to the effect that under the terms of the agreement between Benton and Coelho, Benton agreed to finance Coelho in the performance of the lathing contracts. Actually, as Benton points out, there is no promise made by Benton to make advances, in the agreement, the agreement being unilateral in that respect. However, such finding is immaterial. The court nowhere bases its judgment upon any assumption that Benton was required *under the contract* to continue making advances. It did find that the deed of trust was obtained under representations by Benton that he would continue to finance Coelho. There is no conflict between the two findings and the fact that the first finding is unsupported is immaterial.

Finding XIII is to the effect that the Benton-Coelho agreement did not provide for a continuing obligation on the part of Coelho to repay all moneys advanced, and that "it is not true that defendant Coelho acted with intent to defraud plaintiff with respect [***24] to the amounts

of payroll furnished to various lathing jobs from moneys advanced by plaintiff."

Benton's objection to the first part of this finding is that the court failed to find either that there was or was not an agreement, implied by law, that Coelho would repay all advances. Such a finding was unnecessary. Where, as here, the court found that there was an express agreement as to the method of payment, the law cannot imply a contract in the face of such express agreement.

As to the second part of the finding, it is true that at times Coelho used moneys advanced by Benton for a particular lathing contract to pay debts incurred on another contract, or other contracts. The trial judge's opinion gives the reason for [*74] finding that in so acting Coelho did not intend to defraud Benton. Under the agreement any losses Benton suffered were to be recouped from other jobs. The instances in which Coelho used moneys from one job to offset losses on another, caused no net loss to Benton on the total for all the jobs. Moreover, that Benton acquiesced in this type of action is shown, as stated by the court, by the fact that he continued for approximately two to three months [***25] after [**277] knowledge, to finance the jobs. The court made no finding as to the amounts of the payments in this category. In view of the court's determination of the subject, there is no necessity for such a finding, as the amount of such advances is immaterial.

The other findings or their subject matter objected to by Benton have been discussed elsewhere herein.

The judgment is affirmed.

EXHIBIT 7

LEXSEE 70 CAL. APP 4TH 1358

**CHRISTINA BIONGHI, Plaintiff, Cross-defendant and Appellant, v. METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., Defendants, Cross-complainants and Respondents.**

**No. B119890.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FIVE**

**70 Cal. App. 4th 1358; 83 Cal. Rptr. 2d 388; 1999 Cal. App. LEXIS 260; 99 Cal. Daily Op. Service 2293; 99 Daily Journal DAR 3030**

**March 30, 1999, Decided**

**NOTICE:**    [***1] Opinion certified for partial publication. *

    * Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**SUBSEQUENT HISTORY:**    Rehearing Denied April 19, 1999. Review Denied June 30, 1999, Reported at: 1999 Cal. LEXIS 4533.

**PRIOR HISTORY:**    APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC146354. John W. Ouderkirk, Judge.

**DISPOSITION:**    The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

    After a water district terminated its contract with a company that provided the district with temporary employees, the company brought an action against the district for breach of contract and breach of the implied covenant of good faith and fair dealing found in the contract. The contract included an integration clause, and provided that the agreement could be terminated by the district 30 days after notice in writing. The district gave the company 30 days' notice and terminated the contract. The trial court found the contract could not reasonably be interpreted to mean that good cause was required for termination, and thus extrinsic evidence proffered by plaintiff to establish that requirement was inadmissible, and granted summary adjudication and judgment to defendant. (Superior Court of Los Angeles County, No. BC146354, John W. Ouderkirk, Judge.)

    The Court of Appeal affirmed. The court held that the trial court did not err in granting summary adjudication to defendant on plaintiff's breach of contract action, based on the contract's notice provision, which was clear and unambiguous and allowed termination with or without cause. The court further held that the trial court did not err in ruling inadmissible extrinsic evidence proffered by plaintiff to show that the contract required good cause for termination, since the agreement included an integration clause. The court also held that the extrinsic evidence offered by plaintiff did not show that the language of the contract was reasonably susceptible to an interpretation that added a requirement of good cause. The court also held that the trial court did not err in granting summary adjudication to defendant on plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing, since plaintiff's claim for breach of the implied covenant relied on the same acts, and sought the same damages, as its claim for breach of contract, and defendant did not breach the contract by terminating it. (Opinion by Armstrong, J., with Turner, P. J., and Godoy Perez, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) Contracts § 51--Actions--Integrated Contract Providing for Termination on Specified Notice--Admissibility of Extrinsic Evidence of Requirement of Good Cause.** --In a breach of contract action brought against a water district by a company that had

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

contracted to provide the district with temporary employees after the district gave the company 30 days' notice and terminated the contract, the trial court did not err in granting summary adjudication to defendant, based on the contract's provision that the agreement could be terminated by the district 30 days after notice in writing. The termination clause was clear and unambiguous, and allowed termination with or without cause. Furthermore, the trial court did not err in ruling inadmissible extrinsic evidence proffered by plaintiff to show that the contract required good cause for termination, since the agreement included an integration clause. In addition, the extrinsic evidence offered by plaintiff did not show that the language of the contract was reasonably susceptible to an interpretation that added a requirement of good cause. A contract that provides that it may be terminated on specified notice allows termination with or without good cause.

[See 2 Witkin, Cal. Evidence (3d ed. 1986) § 960 et seq.]

**(2) Evidence § 61--Documentary Evidence--Parol Evidence Rule.** --The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument (Code Civ. Proc., § 1856). It is based upon the premise that the written instrument is the agreement of the parties. Its application involves a two-part analysis: was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements; and is the agreement susceptible of the meaning contended for by the party offering the evidence?

**(3) Evidence § 64--Documentary Evidence--Parol Evidence Rule--Exceptions--Evidence in Aid of Interpretation.** --Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding. Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. Such evidence includes testimony as to the circumstances surrounding the making of the agreement including the object, nature, and subject matter of the writing so that the court can place itself in the same situation in which the parties found

themselves at the time of contracting. If the court determines that the contract is reasonably susceptible of the meanings urged, extrinsic evidence relevant to prove the meaning agreed to by the parties is admissible.

**(4) Contracts § 23.1--Construction and Interpretation--Good Faith and Fair Dealing--Application in Breach of Contract Action.** --In an action for breach of the implied covenant of good faith and fair dealing brought against a water district by a company that had contracted to provide the district with temporary employees after the district gave the company 30 days' notice and terminated the contract, the trial court did not err in granting summary adjudication to defendant, since defendant did not breach the contract by terminating it. Plaintiff's claim for breach of the implied covenant relied on the same acts, and sought the same damages, as its claim for breach of contract. Further, tort recovery for breach of the covenant is available only in limited circumstances, generally involving a special relationship between the contracting parties, and there was no special relationship between these parties.

**COUNSEL:** Pillsbury, Madison & Sutro, Kenneth R. Chiate, Kent B. Goss and Leanna B. Einbinder for Plaintiff, Cross-defendant and Appellant.

N. Gregory Taylor; Marcia Scully; Carlsmith Ball and Albert H. Ebright for Defendants, Cross-complainants and Respondents.

**JUDGES:** Opinion by Armstrong, J., with Turner, P. J., and Godoy Perez, J., concurring.

**OPINION BY:** ARMSTRONG

**OPINION**

[*1361] [**390] **ARMSTRONG, J.**

Christina Bionghi, doing business as Abacus Technical (Abacus), entered into an integrated contract with respondent Metropolitan Water District of Southern California (MWD). The MWD later terminated the contract. Abacus sued for breach of contract and breach of the implied [***2] covenant of good faith and fair dealing found in the contract. In additional causes of action, Abacus contended that the MWD had wrongfully interfered with its contractual relations and prospective economic advantage when it informed the Ralph M. Parsons Company that Abacus could no longer work on MWD projects. The MWD moved for summary adjudication of each cause of action.

In the published portion of this opinion, we consider whether the contract, which provides that the MWD may terminate on 30 days' notice to Abacus, is reasonably

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

susceptible to an interpretation requiring the MWD to have good cause for termination. After a preliminary consideration of the plain language of the termination clause, we conclude that the language used by the parties is not reasonably susceptible to that interpretation. However, we recognize, as we are required to under *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal. 2d 33 [69 Cal. Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], that the parties may have ascribed such a meaning to the words they used. We therefore consider whether the evidence offered by Abacus establishes that the parties intended a good cause limit [***3] on the MWD's right to terminate the contract. We conclude that it does not. We also conclude that under *Masterson v. Sine* (1968) 68 Cal. 2d 222 [65 Cal. Rptr. 545, 436 P.2d 561], extrinsic evidence was not admissible to prove the existence of a collateral agreement that good cause was required, since this was an integrated contract. We thus conclude that summary adjudication was correctly granted on the breach of contract causes of action.

In an unpublished portion of this opinion, we also find that summary adjudication was correctly granted on the remaining causes of action. We thus affirm the trial court's grant of judgment to the MWD.

*FACTUAL AND PROCEDURAL SUMMARY*

Abacus was a temporary employment agency owned by Christina Bionghi. In November of 1993, Abacus entered into a consultant contract with the MWD. Under the contract, Abacus would be paid up to $ 200,000 a year for providing temporary employees for the MWD's engineering division. The contract included the provision that "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing to Consultant of such [*1362] termination. [MWD's] only obligation in the event [***4] of termination shall be payment for services provided by Consultant up to and including the effective date of termination." The contract was amended effective January 1, 1995, to increase the maximum allowable annual fee to $ 1,250,000. The amendment did not change the termination clause in the original contract.

Both the original and amended contracts included integration clauses. In the original agreement, the clause read "It is understood that no alteration or variation of the terms of this Agreement shall be valid unless made in writing and signed by the parties hereto and that no oral understanding or agreements not incorporated herein shall be binding on any of the parties hereto." The amended agreement included a similar clause, and further provided that "Both parties have participated in the drafting of this Agreement."

On May 4, 1995, the MWD gave Abacus 30 days' notice of termination of the contract. According to the MWD, the reason for terminating the contract was the appearance of a conflict of interest. This conflict existed because Ralph M. Parsons provided management services to the MWD on the MWD's Eastside Reservoir Project, and Christina Bionghi's husband, Hossein [***5] Bionghi, a Parsons employee, was the lead cost engineer on that project. Parsons employees on the project were fully integrated with MWD personnel and acted as an extension of MWD staff. Hossein Bionghi worked at MWD headquarters as part of a management team. Further, Parsons had subcontracted with Abacus [**391] on one MWD contract relating to the project and had proposed Abacus as a subcontractor on two other MWD projects, one of which was related to the Eastside Reservoir Project. The MWD believed that the situation created the appearance of a conflict of interest, since Abacus appeared to have "an inside track" on information about the Eastside Reservoir Project, and work could be directed to Abacus by Mr. Bionghi.

Abacus contended that the MWD's real reason for terminating the contract was not the relationship between the Bionghis, which the MWD had long been aware of, but office politics, a desire to favor other consultants, and prejudice against individuals of Persian descent, such as Mr. Bionghi, which extended to their spouses.

On May 2, 1995, the MWD informed Parsons that it intended to terminate its contract with Abacus because of the appearance of a conflict of [***6] interest. In a letter and in a meeting, the MWD detailed its concerns about conflict of interest, asked Parsons to "correct the situation" as to its subcontract with Abacus on the Eastside Reservoir Project, informed Parsons that it would not authorize Abacus as a subcontractor in the proposals submitted, and gave [*1363] Parsons a copy of an August 1994 letter from the City of Los Angeles denying Abacus's application for certification as women-owned business enterprise (WBE). [1]

> 1  At summary judgment, Abacus presented evidence that it had been certified as a WBE by an organization which was acceptable to the MWD.

On May 5, 1995, Parsons terminated its subcontract with Abacus and informed Abacus that it would not be used on the two other MWD projects. Parsons's letter to Abacus stated "These actions are being taken out of a concern that Abacus participation in these projects presents the appearance of impropriety and conflict of interest because of your relationship to a Parsons employee. In addition, [***7] we are aware that Abacus Technical's standing as a qualified WBE has been challenged."

Abacus sued the MWD, bringing causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, interference with contractual relations, and interference with prospective business ad-

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

vantage. Other causes of action were disposed of by demurrer. The MWD moved for summary adjudication on each cause of action. The motion was granted and judgment was entered for the MWD.

*DISCUSSION*

I. *The cause of action for breach of contract*

(1a) The contract between Abacus and the MWD provided that [**392] "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing to Consultant of such termination. [MWD's] only obligation in the event of termination shall be payment for services provided by Consultant up to and including the effective date of termination." Based on this language, the MWD alleged that it was undisputed the contract could be terminated on 30 days' notice, and that such notice was given.

Abacus did not dispute notice, but proffered extrinsic evidence which it contended established that the contract also required good [***8] cause for termination. Citing *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co., supra,* 69 Cal. 2d 33 (*Pacific Gas & Electric*); *Wallis v. Farmers Group, Inc.* (1990) 220 Cal. App. 3d 718 [269 Cal. Rptr. 299]; and *Sherman v. Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, Abacus argued that the termination clause was reasonably susceptible of meaning that good cause was required for termination, and thus that its proffered extrinsic evidence was admissible. In response, the MWD argued that since the contract was integrated, extrinsic evidence was not admissible to vary the terms by adding a requirement of good cause for termination.

[*1364] The court found that the contract was not reasonably susceptible to the meaning Abacus urged, and that parol evidence was thus not admissible, and granted summary adjudication to the MWD. We agree with the trial court. The termination clause is clear and unambiguous. With the words "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing," it provides that the only condition for termination is 30 days' notice, and allows termination with [***9] or without cause. ²

2   Further, as to contracts such as this one, "contemplating continuing performance for an indefinite time, the general rule is that such contracts are terminable at will by either party. [Citations.]" (*Zimco Restaurants v. Bartenders Union* (1958) 165 Cal. App. 2d 235, 240 [331 P.2d 789].)

Further, the extrinsic evidence proffered by Abacus was not admissible here. (2) "The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. ( Code Civ. Proc., § 1856.) It is based upon the premise that the written instrument is the agreement of the parties. [Citation.] Its application involves a two-part analysis: 1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements ( *Masterson v. Sine* (1968) 68 Cal. 2d 222 [65 Cal. Rptr. 545, 436 P.2d 561]); [***10]  and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence? ( *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal. 2d 33 [69 Cal. Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)" ( *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal. App. 3d 263, 270 [235 Cal. Rptr. 279], italics omitted.)

(1b) Here, the agreement was integrated. Since there is no dispute about that fact, we turn to the second part of the analysis: is the agreement reasonably susceptible of the meaning contended for by the party offering the evidence? This analysis is explained in *Pacific Gas & Electric, supra,* 69 Cal. 2d 33, which Abacus relies on here.

(3) In that case, the Supreme Court held that "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express [***11] different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding. [P] Accordingly, rational interpretation requires at [*1365] least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (69 Cal. 2d at pp. 39-40, fns. omitted.)

The facts of *Pacific Gas & Electric* further explicate the rule. The contract before the Supreme [***12] Court included a clause in which the defendant agreed to in-

demnify the plaintiff for injury to property arising out of or connected with the performance of the contract. The trial court agreed with the defendant that the clause could be read to cover only injury to the property of third parties, but interpreted the clause otherwise, and refused to admit extrinsic evidence which contradicted its interpretation. The Supreme Court found error in the exclusion of evidence, holding that "Although that evidence was not necessary to show that the indemnity clause was reasonably susceptible of the meaning contended for by defendant, it was nevertheless relevant and admissible on that issue. Moreover, since that clause was reasonably susceptible of that meaning, the offered evidence was also admissible to prove that the clause had that meaning and did not cover injuries to plaintiff's [**393] property." (69 Cal. 2d at pp. 40-41, 69 Cal. Rptr. 561, 442 P.2d 641.)

*Pacific Gas & Electric* is thus not a cloak under which a party can smuggle extrinsic evidence to add a term to an integrated contract, in defeat of the parol evidence rule. Instead, it calls for a two-step process. First, the court must determine [***13] whether the language of the contract is reasonably susceptible to the meanings urged by the parties. In so doing, the court must give consideration to any evidence offered to show that the parties' understanding of words used differed from the common understanding. If the court determines that the contract is reasonably susceptible of the meanings urged, extrinsic evidence relevant to prove the meaning agreed to by the parties is admissible.

As *Brawthen v. H & R Block, Inc.* (1972) 28 Cal. App. 3d 131 [104 Cal. Rptr. 486], explains, the rule of *Pacific Gas & Electric* "must be restricted to its stated bounds; it does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the *words used in their written agreement.* While it allows parol evidence for this purpose, it is unconcerned with extrinsic collateral agreements." ( *Brawthen, supra,* 28 Cal. App. 3d at p. 136, italics in original.) [*1366]

**(1c)** When we examine the case before us in light of those rules, we find that summary adjudication was properly granted. As the trial court found, the termination clause is not on its face reasonably susceptible [***14] to meaning that there can be no termination except on good cause. This is not a case where, for example, a party contended that the words "30 days" were reasonably susceptible of meaning either "30 *business* days" or "30 *calendar* days," or that, in the examples given in *Pacific Gas & Electric,* the term "United Kingdom" in a motion picture distribution contract included Ireland, or that the word "ton" in a lease meant a long ton or 2,240 pounds and not the statutory ton of 2,000 pounds. (*Pacific Gas & Electric, supra,* 69 Cal. 2d at p. 39, fn. 6; *Aronowicz v. Nalley's, Inc.* (1972) 30 Cal. App.

3d 27, 49-50 [106 Cal. Rptr. 424] [where parties contended that " '. . . we are free to terminate our agreement within 30 days,' " meant either 30 days from the agreement or 30 days after decision to terminate, evidence of what those words meant to the parties was admissible].)

Instead, Abacus offered no reason why "the Agreement may be terminated by [the MWD] . . . 30 days after notice in writing," would or could, on its face, be interpreted to mean that the MWD could terminate the contract only if it had good cause to do so.

Under *Pacific Gas & [***15] Electric,* ". . . the ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning." (*Pacific Gas & Electric, supra,* 69 Cal. 2d at p. 40, fn. 8.) When Abacus's extrinsic evidence is considered as part of this preliminary step, the conclusion we draw from the face of the contract does not change. With that evidence, Abacus did not expose any ambiguity, or establish that the words of the contract were reasonably susceptible to the meaning it urged.

Abacus's evidence consisted of statements made by Ahmad Hassani, who was principal engineer of a branch of the MWD for which Abacus supplied employees, MWD manuals, and other MWD contracts. We summarize: before Bionghi signed the 1993 contract, she asked Hassani what would cause the MWD to terminate the contract. He said that no one had ever been terminated, and that as long as she did her job well there was nothing to worry about. Before Bionghi signed the 1995 contract, Hassani told her "not to worry," and that "as long as you provide your resumes, as long as your employees are happy, and as long as you don't have tax problems, I don't see any reason for us to cancel your contract."

The policy manuals [***16] set forth the procedures for termination of consultant agreements, and either provide that the termination notice must indicate the reason for termination or set forth procedures to be followed when a WBE [*1367] consultant is in noncompliance with the MWD's Business Outreach Program Policies and Procedures [**394] Manual. [3] The other MWD contracts cited expressly permit termination "with or without cause."

> 3 Abacus contends that the manual provides that a WBE consultant which is not in compliance with a contract must be given an opportunity to cure the noncompliance. In fact, the manual provides that such a consultant will be considered in material breach, but that the MWD may allow the consultant time to comply.

Abacus did not proffer any facts which would establish that Bionghi read or relied on the manuals or the other contracts when Abacus entered into either contract,

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

[4] and no evidence that Hassani, who did not negotiate or sign either contract, had a position at the MWD which meant that [***17] he could express the MWD's intent, or the meaning it ascribed to words.

4    Abacus contends that the business outreach manual, which references the termination procedures manual, was incorporated into the 1995 contract. We do not so read the contract. Instead, the only relevant incorporation is of a requirement that the consultant support MWD policy encouraging the participation of minority-and women-owned businesses.

The evidence offered by Abacus did not concern the " 'circumstances surrounding the making of the agreement' " or allow a court to " 'place itself in the same situation in which the parties found themselves at the time of contracting.' " ( *Pacific Gas & Electric, supra,* 69 Cal. 2d at p. 40.) Abacus did not offer evidence concerning either the negotiations which took place before the contract was executed or the drafting process. There was thus no evidence of the positions of the parties during the negotiations, their differences and agreements, or the way in which they selected [***18] words and phrases to express the terms agreed on. There was no evidence of the parties' discussion of the meaning of the termination clause as it is found in the contract, either of the notice requirement or the provision that the MWD's only obligation in the event of termination was payment of amounts due, or evidence that the parties discussed a good cause requirement, or indeed of what the parties believed could constitute good cause for termination. There was, in sum, no evidence of the situation the parties were in at the time of contracting.

None of the evidence which was offered by Abacus indicates that the words or phrases of the termination clause are ambiguous. In fact, Abacus did not proffer this evidence for the trial court's consideration as part of *Pacific Gas & Electric's* preliminary step, to show that "the parties' understanding of the words used . . . differed from the judge's understanding." ( *Pacific Gas & Electric, supra,* 69 Cal. 2d at p. 39.) Rather, the evidence was offered to establish a collateral agreement or additional contract term providing that good cause was required before the MWD could terminate the [*1368] contract. Since [***19] the contract was integrated, extrinsic evidence is not admissible for this purpose. [5] ( *Masterson v. Sine, supra,* 68 Cal. 2d 222.)

5    As we have noted, Abacus failed to offer evidence that at the time the contract was executed, the parties intended that good cause was required for termination.

Abacus contends, however, that *Wallis v. Farmers Group, Inc., supra,* 220 Cal. App. 3d 718 establishes that a contract termination clause which does not specify whether good cause is required is, as a matter of law, reasonably susceptible of either meaning, so that extrinsic evidence is always admissible to prove the true terms of the contract. We do not find the case persuasive, and it does not change our conclusion here.

*Wallis* considered an insurance agency contract which allowed termination on three months' notice. The plaintiff alleged in her complaint and contended on appeal that extrinsic evidence established that there was an express oral agreement and an implied-in-fact [***20] agreement, under *Pugh v. See's Candies, Inc.* (1988) 203 Cal. App. 3d 743 [250 Cal. Rptr. 195], that she would not be fired without good cause. The Court of Appeal found that the contract was integrated on the subject of termination. Without explanation, the court then found that since the termination clause was "silent" on the subject of good cause, the agreement was reasonably susceptible of meaning that there was an express oral [**395] agreement, or an implied-in-fact agreement, that the contract could be terminated only for cause. The court determined that extrinsic evidence was admissible to determine whether such an agreement existed. [6] ( *Wallis v. Farmers Group, supra,* 220 Cal. App. 3d 718 at pp. 730-731.) By so doing, *Wallis* permitted evidence of a collateral agreement to be introduced to add a term to an integrated contract, under the guise of *Pacific Gas & Electric,* contrary to the holding of *Masterson v. Sine, supra,* 68 Cal. 2d 222. [7]

6    We note, too, that numerous cases have held where there is a written employment contract which provides for termination on timely notice, the *Pugh* factors have no relevance, since " ' "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." [Citation.]' " ( *Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal. App. 4th 1383, 1388 [77 Cal. Rptr. 2d 383].)

[***21]
7    *Brawthen v. H & R Block Inc., supra,* 28 Cal. App. 3d 131; and *Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal. App. 3d 1020 [219 Cal. Rptr. 203], cited by *Wallis* (220 Cal. App. 3d at p. 731, fn. 8), both concerned nonintegrated contracts. In those cases, parol evidence was properly admitted to establish a collateral agreement.

We note, too, that to the extent that *Wallis* holds that, based solely on the words used in the contract, a termination clause which requires only notice is as a mat-

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

ter of law reasonably susceptible of meaning that good cause is also required, in the same way that "30 days" is reasonably susceptible of meaning either "30 business days" or "30 calendar days," *Wallis* is contrary to the holding of *Pacific Gas & Electric*. A good cause limit on the right to [*1369] terminate is a significant contract term. In our view, a contract which provides that it may be terminated on specified notice cannot reasonably be interpreted to require good cause as well as notice for termination, unless [***22] extrinsic evidence establishes that the parties used the words in some special sense. Instead, such a contract allows termination with or without good cause.

*Sherman v. Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, cited by *Wallis* and by Abacus, is of no assistance to Abacus. In *Sherman*, the district court held a preliminary evidentiary hearing and determined that a contract clause which provided that the contract could be terminated "at any time by either party" meant that the contract could be terminated with or without cause, and dismissed the complaint for failure to state a cause of action. The Ninth Circuit disagreed. The court cited *Pacific Gas & Electric*, and concluded that the evidence presented at the district court hearing was sufficient to establish as a matter of law that the termination clause was reasonably susceptible to an interpretation requiring good cause. We do not reach the same conclusion about the clause before us here, since Abacus did not present evidence to establish that the clause is reasonably susceptible to such a reading.

This result is consistent with California law. "Testimony of intention which is contrary [***23] to a contract's express terms . . . does not give meaning to the contract: rather it seeks to substitute a different meaning." ( *Gerdlund v. Electronic Dispensers International, supra,* 190 Cal. App. 3d 263, 273 [contract providing that "notice of termination may be given at any time and for any reason" not reasonably susceptible of meaning that notice of termination could be given at any time for any *good* reason]; see also *Mobil Oil Corp. v. Handley* (1978) 76 Cal. App. 3d 956, 962 [143 Cal. Rptr. 321] [where lease provided for cancellation on 90 days' notice, evidence that Mobil agents informed the franchisee that Mobil would not cancel without good cause "flatly contradicted" the unambiguous language of the lease and could not vary its terms]; *Anderson v. Savin Corp.* (1988) 206 Cal. App. 3d 356, 364 [254 Cal. Rptr. 627] [employment agreement which provided that either party could terminate "in its discretion" was explicit; parol evidence of agreement for termination only for good cause therefore inadmissible].)

In sum, the contract here was integrated and in unambiguous terms required only notice for termination. [***24] The language of the contract is not on its face

reasonably susceptible of a reading requiring good cause, and [**396] Abacus offered no extrinsic evidence under *Pacific Gas & Electric* which would indicate it was susceptible of such a meaning. Thus, as the trial court correctly found, parol evidence was not admissible to prove the terms of the contract.

[*1370]  II.  *The cause of action for breach of the implied covenant of good faith and fair dealing*

(4) In its complaint, Abacus alleged that the MWD breached an implied covenant of good faith and fair dealing by terminating the contract without good cause and without an explanation, and by falsely assuring Abacus that the contract would not be terminated as long as Abacus did a good job. Abacus now argues that the MWD breached the covenant by failing to follow its own termination procedures, as expressed in its manuals, and by inventing a pretext for terminating Abacus, in order to cover up its true motives. The MWD's motion for summary adjudication on this cause of action was made and granted on the ground that it was without merit, since the MWD had not breached the contract by terminating Abacus.

Abacus contends that [***25] the court erred in this ruling, since a cause of action for breach of the covenant of good faith and fair dealing survives in the absence of a cause of action for breach of contract. Abacus cites in support *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal. App. 3d 1371 [272 Cal. Rptr. 387]. Abacus misreads *Careau*. That case held that if the plaintiff's allegations of breach of the covenant of good faith "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." ( *Id.* at p. 1395.)

Here, Abacus's claim of breach of the implied covenant relies on the same acts, and seeks the same damages, as its claim for breach of contract. Further, as *Careau* explains, tort recovery for breach of the covenant is available only in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer. (222 Cal. App. 3d at pp. 1398-1399.) [***26] Abacus has alleged no special relationship here.

Thus, the cause of action for breach of the implied covenant is duplicative of the cause of action for breach of contract, and may be disregarded. There was no error in the grant of summary adjudication on this cause of action. [8]

8   In a footnote, Abacus argues that the MWD breached the implied covenant by engaging in ra-

70 Cal. App. 4th 1358, *; 83 Cal. Rptr. 2d 388, **;
1999 Cal. App. LEXIS 260, ***; 99 Cal. Daily Op. Service 2293

cial bias against Bionghi, who was married to a person of Persian descent. Abacus supports this contention with deposition testimony which indicates that a MWD employee exhibited prejudice by making negative comments about Hassani, specifically, the comment that he was in the "Persian Mafia," and with the testimony of Persian MWD employees that they believed there was discrimination at the MWD. Abacus argues that the employee's bias created a chain of events which ultimately led to Abacus's termination, but provides no support for this proposition. In contrast, the MWD's proffered facts about the decision to terminate Abacus indicate that the decision did not involve the allegedly biased employee. Abacus's allegations do not create a triable issue of fact on the breach of the covenant of good faith.

[***27]  [*1371] III., IV. *

    *  See footnote, *ante*, page 1358.

*DISPOSITION*

The judgment is affirmed.

Turner, P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied April 19, 1999, and appellant's petition for review by the Supreme Court was denied June 30, 1999.

EXHIBIT 8

LEXSEE 222 CAL. APP 3D 1371

**CAREAU & CO., etc., et al., Plaintiffs and Appellants, v. SECURITY PACIFIC BUSINESS CREDIT, INC., et al., Defendants and Respondents**

**No. B037626**

**Court of Appeal of California, Second Appellate District, Division Three**

**222 Cal. App. 3d 1371; 272 Cal. Rptr. 387; 1990 Cal. App. LEXIS 879**

**August 17, 1990**

**NOTICE:**    [***1] Opinion certified for partial publication - Pursuant to California Rules of Court, rules 976(b) and 976.1(a), this opinion is certified for partial publication. The portion to be published follows.

**PRIOR HISTORY:**    Superior Court of Los Angeles County, Nos. NEC 37743 and NEC 44044, Melvin B. Grover, Judge.

**DISPOSITION:**    The orders of dismissal are reversed as follows: 1. In the *Carrott action*, counts 1, 2, 3, 8 (except as to Torres), 9, 10 and 14 as to Careau only and count 12 as to both Carrott and Careau.  Upon remand, the trial court shall permit Careau to amend the allegations in counts 1, 2, 3, 8 (except as to Torres), 10 and 14 of the second amended complaint; and 2. In the *Careau Group action*, counts 1, 2, 3, 8 (except as to Torres), 9, 10 and 12.  Upon remand, the trial court shall permit the Careau Group to amend counts 1, 2, 3, 8 (except as to Torres), 10 and 12 of the second amended complaint.  In all other respects, the orders of the trial court are affirmed.  Each party shall bear their own costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An individual and a corporation brought actions, consolidated for trial, against a lending institution and one of its officers, alleging several parallel and nearly identical tort and contract causes of action predicated on defendants' alleged breach of a commitment to make a loan to plaintiffs. The complaints incorporated by reference two letters from defendants: the first stated several conditions precedent that had to be satisfied before the loan would be made and specifically stated it was not a commitment to make a loan; the second added further contingencies, but deleted the tentative language. Plaintiffs alleged that the second letter constituted a written

commitment to make the loan and that the conditions precedent had been satisfied or excused. The trial court sustained without leave to amend defendants' demurrers to several causes of action and denied plaintiffs' motion for reconsideration. Defendants subsequently moved for judgment on the pleadings as to all but one remaining cause of action, which motion was granted. The trial court entered a judgment based on that motion, the voluntary dismissal of the remaining count, and the orders sustaining the demurrers. (Superior Court of Los Angeles County, Nos. NEC 37743 and NEC 44044, Melvin B. Grover, Judge.)

The Court of Appeal affirmed in part and reversed in part. It held that the plaintiffs failed to adequately allege satisfaction of the conditions precedent to state a cause of action for breach of contract, but that they were entitled to an opportunity to amend their complaints to do so. It held that there was not a sufficient relationship between the parties to state an action for a tortious breach of the implied covenant of good faith and fair dealing. It also held that plaintiffs did not state a cause of action for bad faith denial of the contract, since the allegations of the complaint itself showed that there was probable cause to dispute the existence of the contract, but that plaintiffs were entitled to an opportunity to amend their complaint. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 128--Rulings on Demurrers. --**
On an appeal from a judgment of dismissal entered after demurrers have been sustained, the appellate court assumes the truth of all properly pleaded material allega-

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

tions of the complaint and gives it a reasonable interpretation by reading it as a whole and by reading its parts in their context. When a demurrer is sustained, the appellate court's function is to determine whether the complaint states sufficient facts to state a cause of action; if the demurrer was sustained without leave to amend, the appellate court decides whether there is a reasonable possibility that the defect can be cured by amendment. If the defect can be cured, the trial court has abused its discretion and the appellate court reverses; if not, there has been no abuse of discretion and the appellate court affirms. The burden of proving such reasonable possibility of amendment is squarely on the plaintiff.

**(2) Pleading § 30--Demurrer to Complaint-- Amendment After General Demurrer Sustained-- Plaintiff's Burden of Showing Possibility of Amendment.** --It is an abuse of discretion for the trial court to sustain demurrers without leave to amend if there is a reasonable possibility that the plaintiff can amend the complaint to cure its defects. To meet the plaintiff's burden of showing abuse of discretion, the plaintiff must show how the complaint can be amended to state a cause of action. However, such a showing need not be made to the trial court so long as it is made to the reviewing court.

**(3) Pleading § 30--Demurrer to Complaint-- Amendment After General Demurrer Sustained-- Submission of Proposed Amended Complaint.** -- Where a demurrer is sustained without leave to amend, a plaintiff is entitled to submit a proposed amended complaint by way of a motion for reconsideration. If the amended complaint states any causes of action, the trial court is obligated to vacate its order that sustained the demurrer without leave to amend and make a different order granting the plaintiff leave to file an amended complaint, which would include the causes of action that the trial court, in deciding the merits of the motion for reconsideration, determined were valid.

**(4) Pleading § 30--Demurrer to Complaint-- Amendment After General Demurrer Sustained-- Plaintiff's Motion for Reconsideration.** --In a civil action, after sustaining without leave to amend defendants' demurrer, the trial court erred in denying plaintiffs' motion to reconsider without specifically considering the changes plaintiffs made in their proposed amended complaint. Code Civ. Proc., § 1008, subd. (a) (subsequent application of motion), does not require that the support for a motion to reconsider be based upon "new facts." It is only necessary that the motion be based upon an alleged different state of facts than the original motion. Thus the trial court should have specifically examined the proposed pleadings attached to the reconsideration

motion to determine whether the added allegations were sufficient to state one or more valid causes of action.

**(5) Pleading § 13--Complaint--Liberal Construction.** --Allegations of a complaint are to be liberally construed with a view to substantive justice between the parties.

**(6) Pleading § 30--Demurrer to Complaint-- Amendment After General Demurrer Sustained-- Liberal Construction of Rule Allowing Amendment.** --An order sustaining a demurrer without leave to amend will constitute an abuse of discretion if there is any reasonable possibility that the defect can be cured by amendment. This rule is liberally applied to permit further amendment not only where the defect is one of form but also where it is one of substance, provided the pleader did not have a fair prior opportunity to correct the substantive defect. On the other hand, there is nothing in the general rule of liberal allowance of pleading amendment which requires an appellate court to find an abuse of discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment. The burden is on the plaintiffs to demonstrate that the trial court abused its discretion and to show in what manner the pleadings can be amended and how such amendments will change the legal effect of their pleadings.

**(7) Contracts § 45--Action for Breach--Elements.** --A cause of action for damages for breach of contract is comprised of the following elements: the contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and resulting damages to plaintiff.

**(8a) (8b) (8c) Contracts § 48--Actions--Pleadings--By Plaintiff--Satisfaction of Conditions Precedent.** --In borrowers' action against a lending institution and one of its officers alleging breach of contract to make a loan, the borrowers failed to adequately allege the due satisfaction of several conditions precedent specified in defendants' commitment letter to plaintiffs so as to allege the formation of a binding contract. All the borrowers had alleged were conclusory allegations such as that the conditions "had been met and satisfied," but at least six of the eight specified conditions were events that had to exist or occur, and such general allegations were not adequate. The pleading of excuse or waiver of performance of conditions precedent requires specific allegations. Further, the plaintiffs could not rely on allegations of the officer's oral statement that a loan commitment had been approved by the institution, since this would not be the equivalent of finding that any of the conditions had been satisfied, excused, or waived. Thus, the trial court properly sustained defendants' demurrer to the complaint, but erred in sustaining it without leave to amend, since it was

not determined that there was no reasonable possibility that plaintiffs could amend their complaint to sufficiently state a cause of action.

[See 1 **Witkin**, Summary of Cal. Law (9th ed. 1987) Contracts, § 725 et seq.]

**(9) Contracts § 4--Consent--Sufficiency--Preliminary Negotiations.** --Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

**(10) Contracts § 48--Actions--Pleadings--By Plaintiff--Satisfaction of Conditions Precedent.** --Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action. This requirement can be satisfied by allegations in general terms. It is sufficient for a plaintiff to simply allege that he has duly performed all the conditions on his part. However, this rule is subject to two important caveats. First, if the condition is an event as distinguished from an act to be performed by the plaintiff, a specific allegation of the happening of the condition is a necessary part of pleading the defendant's breach. Second, general pleadings are controlled by specific allegations. Thus, a general allegation of due performance will not suffice if the plaintiff also sets forth what has actually occurred if such specific facts do not constitute due performance. For example, when a plaintiff alleges a permissible conclusion of law such as the due performance of a condition precedent but also avers specific additional facts that either do not support such conclusion, or are inconsistent therewith, such specific allegations will control and a complaint that might have been sufficient with general allegations alone may be rendered defective.

[See 4 **Witkin**, Cal. Procedure (3d ed. 1985) Pleading, §§ 404, 479.]

**(11) Pleading § 16--Complaint--Allegations of Ultimate Facts Necessary to State Action.** --A complaint must allege the ultimate facts necessary to the statement of an actionable claim. It is both improper and insufficient for a plaintiff to plead the evidence by which he hopes to prove such ultimate facts.

**(12) Appellate Review § 128--Rulings on Demurrers--Possibility of Amending Complaint to State Cause of Action.** --On an appeal from a judgment following the

sustainment of a demurrer without leave to amend, it is not the appellate court's task to be concerned with the possible difficulty or inability of proving allegations to establish plaintiff's cause of action.

**(13a) (13b) (13c) Banks and Banking § 21--Action for Breach of Good Faith and Fair Dealing--Lack of Special Relationship With Prospective Borrower.** --In an action by borrowers against a lending institution and one of its officers alleging tortious breach of the implied covenant of good faith and fair dealing in denying a loan for which plaintiffs alleged there was a contract, the trial court was correct in sustaining without leave to amend defendants' demurrer to the complaint. Even if there was a valid contract, there was no special relationship between the parties sufficient to support a tort recovery for any breach of contract, since the parties were involved in a common commercial banking transaction. Plaintiffs were seeking to make a profit and went into arms length negotiations with the lending institution. There were no indicia of unequal bargaining, no adhesive agreements, and no indications that one party had any particular advantage over the other. Moreover, it did not appear that plaintiffs were either in a particularly vulnerable position or in need of any special protection. Further, ordinary contract damages were adequate to make plaintiffs whole for any compensable misconduct on defendants' part.

**(14) Pleading § 26--General Demurrer; Failure to State Cause of Action--Alternate Theory--Breach of Implied Covenant of Good Faith and Fair Dealing: Contracts § 48--Actions--Pleadings--By Plaintiff--Breach of Implied Covenant of Good Faith and Fair Dealing.** --Even though a plaintiff characterizes a count as the tortious breach of the implied covenant of good faith and fair dealing, it is possible to state a cause of action for breach of that covenant even though no basis for a tort recovery exist. Thus, in resolving a demurrer, the court must consider if a cause of action has been stated on any theory, irrespective of the label attached by the pleader.

**(15) Contracts § 23--Construction and Interpretation--Implied Covenant of Good Faith and Fair Dealing.** --Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement. Simply stated, the burden imposed is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement; the implied covenant imposes upon each party the obligation to do everything that the contract presupposes the party will do to accomplish the contract's purpose. This rule is aimed at making effective the agreement's promises. The precise nature and extent of the duty imposed depends on the contractual purposes. Good faith performance or en-

forcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectation of the other party; it excludes from consideration a variety of types of conduct characterized in other contexts as involving "bad faith" because they violate community standards of decency, fairness, or reasonableness.

**(16) Contracts § 44--Breach of Implied Covenant of Good Faith and Fair Dealing.** --A covenant of good faith and fair dealing is an implied-in-law term of any contract. The covenant of good faith is read into contracts in order to protect the express covenant or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes. Therefore, its breach will always result in a breach of the contract, although a breach of a consensual (i.e., an express or implied-in-fact) contract term will not necessarily constitute a breach of the covenant. A breach of the implied covenant of good faith and fair dealing involves something beyond the breach of the contractual duty itself, and bad faith implies unfair dealing rather than mistaken judgment. Thus, allegations that assert such a claim must show that the defendant's conduct whether or not it constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence, but rather by a conscious and deliberate act that unfairly frustrates the agreed common purposes and disappoints the other party's reasonable expectations thereby depriving that party of the benefits of the agreement.

**(17) Contracts § 48--Actions--Pleadings--By Plaintiff--Tortious Breach of Implied Covenant of Good Faith and Fair Dealing.** --If the allegations of a complaint for breach of implied covenant of good faith and fair dealing do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated. Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery.

**(18) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Tortious Breach of Duty.** --In insurance cases, there is a well-developed history recognizing a tort remedy for a breach of the implied covenant of good faith and fair dealing. The existence of this remedy is justified by the special relationship existing between insurer and insured, which is characterized by elements of public interest, adhesion, and fiduciary responsibility. In addition, it is essential to a recovery in tort that the insurer, in breaching the implied covenant, have acted unreasonably or without proper cause.

**(19) Contracts § 45--Actions--Bad Faith Denial of Contract.** --The elements of the tort of bad faith denial of the existence of a contract are: an underlying contract, that is breached by the defendant, who then denies liability by asserting that the contract did not exist, in bad faith, and without probable cause for such denial. Of these five elements, the last two are the most critical and difficult to demonstrate. The requirement that the defense be asserted in bad faith is a subjective issue relating to the defendant's state of mind. Stated in its simplest form, it means that the defendant does not have a good faith belief in the facts relied upon to constitute or support a legally tenable defense. The fifth element means that on the basis of the facts known to the defendant, the assertion of the defense was not legally tenable; that is, it was neither reasonable nor justified under applicable law. This is an objective requirement and requires a consideration of all of the circumstances.

**(20a) (20b) (20c) Contracts § 48--Actions--Pleadings--By Plaintiff--Defendant's Bad Faith Denial of Existence of Contracts--Probable Cause to Dispute Existence of Contract.** --In an action by borrowers against a lending institution and one of its officers alleging defendants' bad faith denial of the existence of a contract to lend money to plaintiffs, the trial court erred in sustaining without leave to amend defendants' demurrer to the complaint. Although plaintiffs failed to state a cause of action, they were entitled to an opportunity to attempt to amend their complaint. They failed to state a cause of action since they failed to allege the absence of probable cause for defendants' denial. The resolution of the issue of probable cause calls for an objective test whether the defendant's action was reasonable; depending on the allegations of the complaint, and where the facts are undisputed, the issue may be resolved on demurrer, since then this issue is a legal rather than a factual one. Plaintiffs merely alleged that defendants' letter containing conditions precedent to the making of the loan established the contract, but plaintiffs did not specifically plead satisfaction of the conditions. Thus, there was a reasonable basis to dispute the existence of the contract in plaintiffs' own pleadings.

**(21) Pleading § 13--Construction--Written Instrument Incorporated Into Pleading.** --Where a plaintiff attaches and incorporates a written instrument into a pleading, without alleging that it was ambiguous or subject to some special interpretation, the court is free on

demurrer to construe the language and draw its own conclusion as to the legal effect of the instrument.

**(22) Limitation of Actions § 71--Pleading--Negation in Complaint of Defense of Statute of Limitations.** -- Where the allegations in a complaint indicate the existence of the defense of the statute of limitations, specific facts negating that defense must be alleged in the complaint. General or conclusionary allegations will not suffice.

**COUNSEL:** Kinsella, Boesch, Fujikawa & Towle, Philip W. Boesch, David Z. Vance and Jack G. Cairl, Jr., for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, John A. Sturgeon and [***2] Edward D. Vogel for Defendants and Respondents.

**JUDGES:** Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.

**OPINION BY:** CROSKEY

**OPINION**

[*1379]   [**389]   This appeal involves two consolidated actions: Careau & Co. and Richard Carrott v. Security Pacific Business Credit, Inc., Security Pacific National Bank, Security Pacific Corporation and Raymond C. Torres (the Carrott action); and the Careau Group v. Raymond Torres, Security Pacific Business Credit, Inc., Security Pacific National Bank, and Security Pacific Corporation (the Careau Group action). They arise out of a dispute as to (1) whether the bank defendants had made a binding commitment to provide debt financing to the plaintiffs for the leveraged (i.e., debtfinanced) buyout of a business and (2) whether the plaintiffs justifiably relied thereon. These two actions allege numerous parallel and nearly identical claims based upon both contract and tort. (See fn. 8, *post.*)

Plaintiffs appeal from a judgment which was based upon an order sustaining demurrers without leave to amend and an order granting defendants' motion for judgment on the pleadings. In this appeal we are asked to decide the propriety of such orders as well as the trial court's [***3] denial of a motion for reconsideration of the order sustaining the demurrers. For the reasons discussed below, we have determined that the trial court should have overruled the demurrers as to two causes of action pled in the second amended complaints and granted to plaintiffs the right to amend as to certain other causes of action. We therefore will affirm in part and reverse in part.

Procedural Background

The Carrott action was filed in November of 1983. The Careau Group action was filed in October of 1985. First amended complaints were filed in both actions in August 1987. The parties engaged in discovery both before and after the first amended complaints were filed. Ultimately, the two cases were consolidated pursuant to a stipulation and order, dated September 4, 1987.

On October 6, 1987, the defendants filed demurrers to the first amended complaints. Specifically, defendants demurred to the first through fifth and the eighth, tenth and eleventh causes of action in the Carrott action and to the first through fifth and eighth, ninth, and tenth causes of action in the Careau Group action.  On October 30, 1987, all the demurrers were sustained *without leave to amend.*  [***4]  On November 9, 1987, plaintiffs moved for reconsideration of the "without leave to amend" portion of the order sustaining the demurrers, submitting, with their motion for reconsideration, [*1380] proposed second amended complaints for both of the actions. [1] Their motion was [**390] denied on December 4, 1987. A statement of the grounds for ruling upon the demurrers was signed and filed January 8, 1988.

> 1   In the second amended complaints, plaintiffs included two additional causes of action that had not been included in the prior pleadings: (1) breach of option contract (count 13 in the Carrott action and count 11 in the Careau Group action) and (2) bad faith denial of existence of contract (count 14 in the Carrott action and count 12 in the Careau Group action).

In November 1987, defendants had filed an answer to the remaining causes of action in the two cases. This was shortly followed by a motion for judgment on the pleadings as to all but one of those counts. The motion sought dismissal of the sixth (fraud) and seventh [***5] (negligent misrepresentation) causes of action in both of the first amended complaints, as well as the ninth (interference with prospective business advantage) cause of action in the Carrott action. The motion was granted on March 11, 1988.

A judgment, based on that motion and the orders sustaining the demurrers was entered on July 13, 1988. Pursuant to a stipulation, the 12th cause of action in the Carrott first amended complaint (breach of oral contract not to disclose confidential information, which had not otherwise been specifically addressed by the trial court) was dismissed without prejudice in August 1988.  The judgment was then amended nunc pro tunc on August 30, 1988, to reflect such voluntary dismissal.  Plaintiffs filed a timely appeal from that judgment.

Factual Background

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

At the heart of these consolidated actions is the effort to finance the purchase of an egg production facility in Moorpark, California, known as Julius Goldman's Egg City (Egg City). Plaintiffs, or at least one of the plaintiffs, sought to purchase Egg City and sought funding of $ 13 million from defendants. This financing never materialized and plaintiffs were allegedly unable to make the purchase [***6] until a new lender was found. They eventually obtained the necessary funding elsewhere, but on less desirable terms. Plaintiffs filed these actions, contending, inter alia, that defendants (1) breached oral and written contracts, (2) breached the implied covenant of good faith and fair dealing, (3) denied in bad faith the contract's existence, (4) engaged in fraud and negligent misrepresentations, and (5) interfered with plaintiffs' contractual and business relationships and prospective economic advantages.

[*1381] (1) This is an appeal from a judgment of dismissal entered after demurrers were sustained to plaintiffs' first amended complaints. [2] "Therefore, under settled law, we assume the truth of all properly pleaded material allegations of the complaint [citations] and give it a reasonable interpretation by reading it as a whole and its parts in their context. [Citation.]" ( *Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699, 702 [263 Cal.Rptr. 119, 780 P.2d 349].) If the demurrer was sustained, as it was in this case, our function is to determine whether the complaint states sufficient facts to state a cause of action; and [***7] if it was sustained, as it was here, without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" ( *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see also, *Maheu* v. *CBS, Inc.* (1988) 201 Cal.App.3d 662, 669-670 [247 Cal.Rptr. 304]; *Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111, 1117 [222 Cal.Rptr. 239].) In accordance with these rules, we set forth the following facts as disclosed by plaintiffs' second amended pleadings. [3]

2    To be precise, as we have already noted, the demurrer was sustained as to 16 of the 22 counts alleged in these consolidated amended complaints. A motion for judgment on the pleadings was granted as to five additional counts and the last remaining count was dismissed pursuant to stipulation in order to permit a final judgment to be entered.

[***8]
3    As we explain in greater detail below, we will treat the second amended complaints as the op-

erative pleadings and examine them to determine if a cause of action has been stated under any cognizable legal theory.

[**391] During the summer of 1983 the plaintiffs Richard Carrott (Carrott) [4] and Careau & Co. (Careau), a California corporation, negotiated a leveraged purchase of Egg City. It was then owned by the Kroger Company (Kroger), one of the largest grocery chain store owners in the United States. These negotiations led to the execution of a letter of intent between Careau and the defendant Security Pacific Business Credit, Inc. (SPBC) [5] on July 19, 1983. By this letter, SPBC expressed an interest in lending to Careau the sum of $ 12 million (to provide financing for the purchase of Egg City) upon certain terms and conditions and subject to certain specified contingencies. [*1382] The letter was signed on behalf of SPBC by the defendant Raymond C. Torres (Torres) who was a vice-president of SPBC and, at all times, "was acting in and within the scope of that capacity, and under the control and [***9] agency of" SPBC.

4    Carrott was the founder, president and sole shareholder of the corporate plaintiff, Careau & Co.
5    An examination of the proposed second amended complaints demonstrates SPBC is the corporate defendant with whom plaintiffs apparently exclusively dealt during this entire matter. Two other corporate defendants are also named, (1) Security Pacific National Bank (SPNB), a national banking association, doing business in California and (2) Security Pacific Corporation (SPC), a Delaware corporation, also doing business in California. However, there are no allegations describing the corporate or contractual relationships, if any, between SPBC on the one hand and these additional corporate defendants. In any event, these two defendants are charged only in counts eight, nine and ten.

The terms of the letter of intent required Careau to make a good faith deposit of $ 10,000 which would be used by SPBC to cover the costs and expenses incurred by SPBC in reviewing and evaluating Careau's loan application. [***10] This sum was paid to SPBC on July 27, 1983, by a check apparently written on a personal account of Carrott.

The conditional and tentative nature of the letter was emphasized by several phrases which made clear that no loan commitment had been made. Specifically, (1) the terms of the proposed loan were introduced with the disclaimer that the letter should "*in no way should be considered a commitment to provide financing*"; (2) a list of "conditions precedent" was preceded by the sentence, "*The following are some, but obviously not all of the*

*conditions precedent to any loan approval . . . .*"; and finally, (3) the letter concluded with a further caution, "*Since this letter is not a commitment to make a loan, it should not be relied upon by any third party.*"

Thereafter, SPBC had discussions with Kroger, the party from which Egg City would be purchased, and an audit of that property and business was completed by SPBC and distributed internally by August 10, 1983. Two weeks later, on August 25, Torres, on behalf of SPBC, and Carrott, on behalf of Careau, executed a revised letter relative to the proposed loan which the second amended complaints allege was "a written commitment [***11] contract for the acquisition of Egg City." [6]

> [6]  Plaintiffs do not allege the specific reason or purpose for the issuance of this new letter, beyond the conclusionary assertion that it was SPBC's purpose to move from a "letter of intent" to a "commitment letter." However, in the original complaint filed in the Carrott action, and which was verified by Carrott on November 22, 1983, it is alleged that the August 25 letter "was an amended financing plan which modified the July 19, 1983 letter of intention in such a way so that a commitment and agreement would be made by SPBC in accordance with terms and conditions as expressed in [the August 25 letter] in the manner as alleged herein." (Italics added.) In addition, this verified pleading also specifically alleged that, by the August 25 letter, SPBC had agreed to provide financing according to "the terms and conditions of [the August 25 letter]." (Italics added.)

It was identical to the letter of July 19 except for four specific changes:

1.  The total amount of the proposed [***12] loan was increased to $ 13 million (including an increase, from $ 4 million to $ 5 million, of the advances to be secured by accounts receivable);

[*1383]  2.  The conditional and tentative language quoted and italicized above in the next preceding paragraph was deleted;

[**392]  3.  Three contingencies that had *not* been included in the July 19 letter (numbered as 8.4, 8.5 and 8.6) were added.  The proposed loan, as described in the letter of August 25, was thus made subject to the eight specific conditions precedent; [7] and finally,

4.  The letter concluded with the statement, "Since this letter is subject to all of the above conditions and specifically the receipt of the acceptable appraisal with a guarantee from an acceptable insurance company and the confirmed commitment from seller, it should not be re-

lied upon by any third party as a final commitment to make a loan."

> [7]  Section 8 of the August 25 letter spelled out the conditions:
>
> "8. Conditions Precedent:
>
> "8.1 Borrower shall be a California corporation in good standing in the state, and qualified to do business in other states where they have collateral.
>
> "8.2 Borrower shall have a title to all of the above collateral free and clear of encumbrances.
>
> "8.3 Completion of a field survey by Lender's examiners, which results are to be acceptable to Lender.
>
> "8.4 Lender's proposal is contingent upon an initial cash equity of two hundred fifty thousand dollars from Buyer and eight million dollars in debt from The Kroger Company (Seller).  This is based upon a purchase price of eighteen million dollars.  Terms and conditions on debt repayment subject to Lender's approval.
>
> "8.5 Lender's proposal is subject to an appraisal up to three million five hundred thousand dollars on the machinery and equipment.  Appraisal value to be fully guaranteed to Lender over the contract period by an insurance company.  Both the appraisal and the insurance company are subject to Lender's approval.
>
> "8.6 Lender's proposal is contingent upon Borrower's securing Seller's commitment to the terms and conditions they have offered Borrower and which this proposal addresses.
>
> "8.7 Lender's senior credit committee's approval.
>
> "8.8 Borrower and the principals of Borrower shall have executed and delivered such documents, instruments, security agreements, insurance financing statements, guarantees, verifications, non-offset letters, tax lien and litigation searches, good standing certificate, copies of building leases, landlord's waivers, trust deeds or mortgages, opinion of counsel, and done such other acts as Lender may request in order to obtain Lender's Legal approval to effect the completion of the financing arrangements herein contemplated.  All of the foregoing must be in a form satisfactory to Lender and Lender's counsel.  All loan and advances shall be made pursuant to, and subject to, the terms of the financing documents executed at the closing.  If the transaction con-

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

templated by this letter of intent is not completed on or before midnight, October 19, 1983, then the terms and conditions set forth herein shall thereafter expire, without further notice or act of any kind by Lender or any other party."

[***13] In order to demonstrate that the conditions were satisfied, excused or waived, plaintiffs alleged that:

1. On September 7, 1983, Torres orally informed Carrott that "the loan commitment had been approved by SPBC" (apparently referring to [*1384] contingency 8.7). This statement was repeated to Carrott by Torres the next day, September 8, when the two met to conduct a telephone conference with the seller, Kroger. Kroger was advised by Torres in that telephone call that, "This is a verbal commitment. It has been cleared to the level of Vice Chairman, and he has cleared me to make this call to you";

2. Torres "had previously stated to Carrott that the vice chairman was the last and remaining person from the Senior Credit Committee who had to approve the commitment, as the other persons on the loan committee who need to approve the commitment had previously done so . . . . [T]he Senior Credit Committee approval was serial, i.e., each member approved independently, without a formal vote at a meeting";

3. Torres stated to both Carrott and Kroger on September 8, "that conditions precedent 8.1, 8.3, 8.4, 8.5 and 8.7 of the written commitment contract had been met and satisfied and [***14] defendants were fully satisfied that the conditions had been met";

4. On September 23, Kroger advised Carrott that the sale was approved based upon the terms of the August 25 letter (plaintiffs claim that this satisfied condition 8.6);

5. Based upon the conversations of September 7 and 8, "defendants waived . . . the need to satisfy any of the conditions, numbered [**393] 8.1 through 8.8 inclusive . . . . Thus all Conditions Precedent of the written commitment contract had either been met and satisfied or waived or excused . . . .";

6. Condition 8.5 "had thereby been met and satisfied and Kroger and SPBC were fully satisfied that the conditions had been met";

7. On or about September 26, 1983, the written loan commitment was orally modified to provide that (a) the closing of the Egg City purchase would occur in December 1983 as an accommodation to Kroger and (b) the party which would buy Egg City and receive the purchase financing from defendants was to be a new corporation with the name, "The Careau Group." This latter change was required by SPBC because Careau was "involved in many other activities." This new corporation

(hereafter the "Careau Group") was formed and incorporated by Carrott [***15] on or about September 26;

8. "All Conditions Precedent of the written commitment contract were satisfied not later than September 23, 1983 except 8.2 and 8.8 which would have been satisfied at closing"; and

[*1385] 9. Since the defendants gave notice between October 4 and 6, 1983, that they would not perform the commitment to make the loan, conditions 8.2 and 8.8 were excused.

Plaintiffs further allege that they relied upon the representations and commitments made by SPBC in that they (1) desisted from loan negotiations in which they had been engaged with other institutions, (2) incurred the expense of forming the new corporation, Careau Group and (3) expended $ 4,000 for the initial preparation of a business plan.

Following SPBC's decision not to provide the financing to purchase Egg City, plaintiffs allege that they were finally able, in June of 1985, to obtain the necessary funds from another source, but on less advantageous terms and at additional cost. Plaintiffs claim that the damages which they suffered include, (1) past and future lost profits from the Egg City business, (2) the time, expense and cost of obtaining replacement financing and (3) the reduction in the value [***16] of Egg City between December 1983 and June 1985, including physical deterioration of the premises, diminution of the flock of laying chickens, destruction of the hatchery and chicken replacement program and loss of goodwill associated with the trade name, "Julius Goldman's Egg City."

The two consolidated complaints which have been filed assert the same 12 counts, plus 2 additional theories which are alleged only in the Carrott action (i.e., intentional infliction of emotional distress (count 11) and breach of an oral agreement to keep certain information confidential (count 12)). [8]

> [8] The 12 common causes of action asserted are, (1) breach of written commitment contract, (2) breach of oral commitment contract, (3) promissory estoppel, (4) tortious breach of implied covenant of good faith and fair dealing, (5) specific performance, (6) fraud, (7) negligent misrepresentation, (8) conspiracy to induce breach of contract, (9) interference with prospective business advantage, (10) interference with business relationship, (11) breach of option contract (count 13 in Carrott action) and (12) bad faith denial of existence of contract (count 14 in Carrott action).

[***17] Discussion

### 1. *The Basis of Review in This Case*

On appeal, plaintiffs challenge only the fact that the trial court sustained demurrers to the first amended complaints *without leave to amend* and then, in spite of the allegations in the proposed second amended complaints, [*1386] refused to reconsider that order. We therefore presume that the demurrers to their first amended complaints were properly sustained.

**(2)** As we have already noted, it is an abuse of discretion to sustain demurrers without leave to amend if there is a reasonable possibility that the plaintiff can amend the complaint to cure its defects. ( *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]; *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 349 [75 Cal.Rptr. 766, 451 P.2d 406].) To meet the plaintiff's burden of showing abuse of discretion, [**394] the plaintiff must show how the complaint can be amended to state a cause of action. ( *Goodman* v. *Kennedy, supra,* 18 Cal.3d at p. 349.) However, such a showing need not be made in the trial court so long [***18] as it is made to the reviewing court. ( Code Civ. Proc., § 472c; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 939 [101 Cal.Rptr. 568, 496 P.2d 480]; *Schultz* v. *Steinberg* (1960) 182 Cal.App.2d 134, 140-141 [5 Cal.Rptr. 890].)

Here, the record does not show that plaintiffs specified to the trial court, at the original hearing on the demurrers, how they would amend their first amended complaints so as to cure the defects which the trial court found in them. However, they did make such a showing by way of their later motion for reconsideration.

**(3)** Under *Rains* v. *Superior Court* (1984) 150 Cal.App.3d 933, 943-944 [198 Cal.Rptr. 249], plaintiffs were entitled to submit proposed second amended complaints by way of a motion for reconsideration. If those second amended complaints stated any causes of action, then the trial court was obligated to (1) vacate its order which sustained the demurrers without leave to amend and (2) make a different order granting plaintiffs leave to file an amended complaint, which would include the causes of action which the trial court, [***19] in deciding the merits of the motion for reconsideration, determined were valid. ( *Id.*, at p. 945.)

**(4)** Although it does not appear from the record before us that the trial court specifically considered the changes made by the plaintiffs in their proposed second amended complaints before denying the motion to reconsider, [9] we do not believe it to be in the interest of judicial economy to return [*1387] the case to the trial court for such a review. We have the second amended pleadings before us, and we can make a determination as to whether any viable causes of action are stated and, if not, whether further amendment should be permitted.

Thus, although one of plaintiffs' principal claims of error is that they were not given the opportunity to file amended pleadings, we will decide the case as though the court had received them and had sustained demurrers without leave to amend. [10]

9  Indeed, it appears that the trial court denied the plaintiffs' motion for reconsideration because of its perception that Code of Civil Procedure section 1008 required plaintiffs to present new facts and chided them for having "no new factual situation." The court further stated: "You're basing [the proposed second amended complaints] on the same set of facts. The facts aren't going to change. You had all of these facts. All of these facts were there when you filed the complaint." In addition, at the January 8, 1988, hearing on plaintiffs' objections to defendants' proposed statement of decision for the demurrers, the court stated that the plaintiffs had, in their motion for reconsideration, "alleged no new facts." The court went on to state:

". . . since there were no new facts, under 1008 of the CCP, I denied your motion to reconsider."

This was not correct. Code of Civil Procedure section 1008, subdivision (a), does not require that the support for a motion to reconsider be based upon "new facts." It is only necessary that the motion be based upon an "alleged different state of facts" than the original motion. ( *Rains* v. *Superior Court, supra,* 150 Cal.App.3d at pp. 943-944; *Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005, 1012-1014 [183 Cal.Rptr. 594]; *Graham* v. *Hansen* (1982) 128 Cal.App.3d 965, 970-971 [180 Cal.Rptr. 604].) Thus, the trial court should have specifically examined the proposed pleadings attached to the reconsideration motion to determine whether the added allegations were sufficient to state one or more valid causes of action.

[***20]

10  As already noted, defendants' demurrers disposed of only some of the causes of action in the first amended complaints. The rest (except for the 12th cause of action in the Carrott complaint which was ultimately dismissed without prejudice pursuant to stipulation) were decided by a subsequent motion for judgment on the pleadings. However, given the nature and procedural function of a motion for judgment on the pleadings, our determination to decide the issues based upon the adequacy of the allegations of the second

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

amended complaints will necessarily resolve any questions as to those counts as well.

Plaintiffs argue that the second amended complaints do allege viable causes of action but, even if we also find them deficient, they have a right to the opportunity of further amendment. **(5)** The general rule is that allegations of a complaint are [**395] to be liberally construed with a view to substantive justice between the parties. ( *King* v. *Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) **(6)** An order sustaining a demurrer without leave [***21] to amend will constitute an abuse of discretion if there is any *reasonable possibility* that the defect can be cured by an amendment. This rule is liberally applied to permit further amendment not only where the defect is one of form but also where it is one of substance, provided the pleader did not have "'*a fair prior opportunity to correct the substantive defect.*'" ( *Leach* v. *Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362, 368 [192 Cal.Rptr. 650], quoting *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 635 [162 Cal.Rptr. 52].)

On the other hand, there is nothing in the general rule of liberal allowance of pleading amendment which "requires an appellate court to hold [*1388] that the trial judge has abused his discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment." ( *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 513, fn. 3 [125 Cal.Rptr. 365, 542 P.2d 237].) The burden is on the plaintiffs to demonstrate that the trial court abused its [***22] discretion and to show in what manner the pleadings can be amended and how such amendments will change the legal effect of their pleadings. ( *Goodman* v. *Kennedy, supra,* 18 Cal.3d 335, 349; *Sullivan* v. *City of Sacramento* (1987) 190 Cal.App.3d 1070, 1081 [235 Cal.Rptr. 844]; *Von Batsch* v. *American Dist. Telegraph Co., supra,* 175 Cal.App.3d 1111, 1117-1118.)

With such general principles in mind we will examine each of the causes of action alleged by the plaintiffs.

. . . *

* See footnote, *ante,* page 1371.

3. *Whether the Complaints Plead Sufficient Facts to State a Cause of Action on Any Theory*

a. *Claims Based on Contract*

(1) *Written or Oral Contract*

In their first two counts plaintiffs have attempted to plead the breach of both the written and an oral contract. However, they rely upon the same allegations for each and we see no need to distinguish between them.

**(7)** A cause of action for [***23] damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. ( *Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822, 830 [69 Cal.Rptr. 321, 442 P.2d 377].) **(8a)** What plaintiffs have failed to do here is adequately allege the due satisfaction of several conditions precedent to the formation of a binding contract.

Plaintiffs assert that the letter of August 25 sets forth the terms of a contractual commitment to provide financing. While they acknowledge that the letter contains some conditions, they argue that they have alleged sufficient facts to demonstrate, at least for pleading purposes, that each of [*1389] such conditions has been satisfied, waived or excused. Defendants, on the other hand, argue that the letter is tentative and nothing more than an expression of intent subject to many conditions, the satisfaction of which plaintiffs have not alleged.

On its face, the August 25 letter is a conditional agreement to provide financing if certain "conditions precedent" are met. The conditions [***24] listed are both specific and substantial. In addition, the letter refers to financial, legal and collateral investigations which remain to be completed and expressly anticipates the possibility that a loan will not be made; [12] and, as already discussed, the letter expressly cautions [**396] that since it is subject to so many conditions which obviously had not been satisfied as of August 25, "it should not be relied upon by any third party as a final commitment to make a loan." **(9)** As the court noted in *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38 [248 Cal.Rptr. 217], "Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. 'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.' [Citation.]" ( *Id.,* at p. 59.)

12   The letter states that, "If we conclude, for any reason, that we will not make the loan to you, we will return the balance of the [$ 10,000] deposit after deducting all costs and expenses actually incurred by us in connection with our review of your application." To emphasize that a commitment to make the loan had not been reached as of the date of this letter, it further stated that in the event "we conclude that we will make the loan" and plaintiffs do not complete the borrowing, then the said deposit may be retained by the defendants.

[***25]  **(10)** Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action. ( 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 479, pp. 515-516.) This requirement can be satisfied by allegations in general terms. It is sufficient for a plaintiff to simply allege that he has "duly performed all the conditions on his part." ( Code Civ. Proc., § 457.) However, this rule is subject to two important caveats, both of which are applicable here.

First, where the condition is an event, as distinguished from an act to be performed by the plaintiff, a specific allegation of the happening of the condition is a necessary part of pleading the defendant's breach. ( *Clack* v. *State of California* ex rel. *Dept. Pub. Wks.* (1969) 275 Cal.App.2d 743, 748 [80 Cal.Rptr. 274]; *Byrne* v. *Harvey* (1962) 211 Cal.App.2d 92, 113 [27 Cal.Rptr. 110].) Second, general pleadings are controlled by specific allegations. Thus, a general allegation of due performance will not suffice if the [*1390] plaintiff also [***26] sets forth what has actually occurred and such specific facts do not constitute due performance. ( *Willis* v. *Page* (1937) 19 Cal.App.2d 508, 512 [65 P.2d 944].)

For example, where plaintiff alleges a permissible conclusion of law such as the due performance of a condition precedent but also avers specific additional facts which either do not support such conclusion, or are inconsistent therewith, such specific allegations will control "and a complaint which might have been sufficient with general allegations alone may be rendered defective . . . ." (4 Witkin, Cal. Procedure, *supra*, Pleading, § 404, at p. 453; see also, *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 422 [282 P.2d 890]; *Clack* v. *State of California* ex rel. *Dept. of Pub. Wks., supra*, 275 Cal.App.2d at p. 748.)

**(8b)** When we apply these rules to plaintiffs' pleadings we are forced to conclude that they have failed to state a cause of action for breach of contract. There are no specific allegations of the performance of any of the conditions. Although this is their third pleading effort, all plaintiffs have [***27] alleged is that conditions "had been met and satisfied" and "defendants were fully satisfied that the conditions had been met" and "all conditions precedent . . . had either been met and satisfied or waived or excused . . . ." These are simply general conclusions. However, since at least six of the eight conditions were events which had to exist or occur, and not simply acts to be performed by plaintiffs, such general allegations are not adequate. ( *Clack* v. *State of California* ex rel. *Dept. of Pub. Wks., supra*, 275 Cal.App.2d at p. 748; *Byrne* v. *Harvey, supra*, 211 Cal.App.3d at p. 113.)

Nor are plaintiffs' contract claims saved by the allegations of the oral statements attributed to Torres, the officer of SPBC with whom they were dealing. Plaintiffs rely on Torres's statements as a sufficient specific allegation of due performance but unfortunately all that plaintiffs have done is beg the question.

While those statements may be some evidence that one or more conditions were satisfied, they do not constitute the direct, specific allegation of performance which is required. **(11)** A complaint must allege the ultimate facts [***28] necessary to the statement of an actionable claim. It is both improper and insufficient for a plaintiff [**397] to simply plead the *evidence* by which he hopes to prove such ultimate facts. ( *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 212 [197 Cal.Rptr. 783, 673 P.2d 660].) **(8c)** Here, plaintiffs rely heavily on their allegations that Torres had stated to Carrott and others that "the loan commitment had been approved by SPBC" (and other conclusionary statements [*1391] as to the satisfaction of one or more conditions). These allegations do not demonstrate due performance. If at trial a jury were to find that Torres had indeed made such statements, that would not be the equivalent of a finding that any of the conditions in the August 25 letter had been satisfied, excused or waived. It would only mean that it was true that Torres had said certain things about them.

This is obviously more than a quibble. If plaintiffs, after four years of substantial discovery and three separate pleadings, can allege nothing more than they have, then we have serious doubts that they can truthfully allege that any [***29] of the conditions were satisfied. All they have done is allege that Torres made certain statements which they contend constitute an excuse or waiver of performance. However, such conclusory allegations are not sufficient. The pleading of excuse or waiver of performance of conditions precedent requires specific not general allegations. (4 Witkin, Cal. Procedure, *supra*, Pleading, §§ 481-482, at pp. 517-519.) Thus, plaintiffs have failed to adequately allege a cause of action for the breach of either a written or an oral agreement. Their failure to sufficiently allege the satisfaction of several significant, if not critical, conditions precedent to any obligation on the part of SPBC to provide financing is fatal to their contract claims.

These pleading defects are at once matters of both form and substance. However, we cannot conclude, without effectively resolving a factual issue, that there is no reasonable possibility of plaintiffs making the direct allegations necessary to demonstrate the existence of a binding contract. **(12)** On appeal, it is not our task to be concerned with the possible difficulty or inability of proving such allegations. ( *Postley* v. *Harvey* (1984) 153 Cal.App.3d 280, 287 [200 Cal.Rptr. 354].) [***30]

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

Therefore, it is appropriate that plaintiffs be given the opportunity to correct the specific pleading errors we have described. It was therefore error to sustain a demurrer to these contract counts without leave to amend.

. . .*

    * See footnote, *ante,* page 1371.

    c. *Tort Claims Based on Alleged Bad Faith*

    **(13a)** Plaintiffs attempt to assert two separate causes of action based upon a claim of bad faith. Each necessarily depends upon the existence of a valid and existing contractual relationship. As we have already concluded [*1392] that plaintiffs have failed to plead the existence of a contract we could dispose of these counts summarily. However, there are significant additional reasons upon which we rely to support our view that plaintiffs have not alleged a basis for relief on either theory. In addition, plaintiffs will be given a further opportunity to plead the existence of a contract. We therefore deal with these two claims in some detail.

    (1) *Tortious Breach of Implied Covenant of Good Faith and Fair* [***31] *Dealing*

    Arguing that it is "settled" that there is a "special relationship" between a bank and its customers, plaintiffs contend that defendants have tortiously breached the covenant of good faith implied in their contractual relationship. Pleading in conclusory language that defendants "exercised great bargaining power" over them and that the circumstances of the transaction created "a special confidential and fiduciary duty" to them, plaintiffs allege that such breach resulted from (1) the refusal to provide the financing described in the August 25 letter, (2) a "deceitful and pretextual" explanation for such refusal and (3) the disclosure of confidential financial information to third parties. [13]

        13 Plaintiffs also alleged, as part of this cause of action, that defendants had denied, "in bad faith and without a reasonable basis therefore," the existence of the contractual obligation to provide the financing described in the August 25 letter. This claim is really central to another cause of action which plaintiffs have also sought to plead. (See fn. 21, *post.*)

    [***32] [**398] **(14)** Although plaintiffs have characterized this count as the *tortious* breach of the implied covenant, it is obviously possible to state a cause of action for a breach of such covenant even though no basis for a tort recovery exists. Thus, we must consider if a cause of action has been stated *on any theory,* irrespective of the label attached by the pleader. ( *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d

1, 8-9 [101 Cal.Rptr. 499, 51 A.L.R.3d 991].) **(13b)** After a review of the applicable law, [14] we will conclude that plaintiffs' allegations are not sufficient to state any cause of action for a breach of the implied covenant of good faith, irrespective of the remedy sought. First, plaintiffs have not pled sufficient facts to justify a recovery in tort. Secondly, they have not even attempted to plead a basis for a recovery of anything other than ordinary contract damages and their claim is simply duplicative of their two contract causes of action and thus may be disregarded.

        14 As evidenced by the arguments advanced by plaintiffs there appears to be some confusion with respect to both the use and scope of a cause of action for a breach of the implied covenant of good faith, particularly in the noninsurance contractual context. Therefore, in the hope that it will contribute to both clarity and consistency, we review the history and recent developments of this theory.

    [***33] **(15)** [*1393] "Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement." ( Rest. 2d, Contracts, § 205; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158] (*Seaman's*).) Simply stated, the burden imposed is "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" ( *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032], quoting *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) Or, to put it another way, the "implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." ( *Schoolcraft* v. *Ross* (1978) 81 Cal.App.3d 75, 80 [146 Cal.Rptr. 57].) [***34] This rule was developed "in the contract arena and is aimed at making effective the agreement's promises." ( *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) The "precise nature and extent of the duty imposed . . . will depend on the contractual purposes." ( *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818.) [15]

        15 The terms "good faith" and "bad faith" have, from time to time, been variously defined. In *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921-922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980], the Supreme Court, in discussing the concepts of "good faith" and "bad faith," commented: "As stated by the draftsmen of the Restatement of