222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

Contracts, '[t]he phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.' (Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231, com. a.)"

[***35] *Foley* emphasized that an alleged breach of the implied covenant is a claim founded upon contract and that a careful distinction must be maintained between "ex-delicto" and "ex-contractu" obligations. "When a court enforces the implied covenant it is in essence acting to protect 'the interest in having promises performed [citation]' . . . ." ( *Foley, supra,* 47 Cal.3d at pp. 689-690.) This is the traditional function of a contract action. A tort action, on the other hand, redresses the breach of the general duty to society which the law imposes without regard to the substance of the contractual obligation. **(16)** "The covenant of good [***399] faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." ( *Id.,* at p. 690.) In short, it is an implied-in-law term of the contract. Therefore, its breach will always result in a breach of the contract, [*1394] although a breach of a consensual (i.e., an express or implied-in-fact) contract term will not necessarily constitute [***36] a breach of the covenant. [16]

16  The same conduct does not necessarily result in a breach of both a consensual contract term and the implied covenant of good faith. (See, e.g., *Schoolcraft* v. *Ross, supra,* 81 Cal.App.3d at pp. 80-81; *Wilkerson* v. *Wells Fargo Bank* (1989) 212 Cal.App.3d 1217, 1230-1231 [261 Cal Rptr. 185]; *Sheppard* v. *Morgan Keegan & Co.* (1990) 218 Cal.App.3d 61, 66-67 [266 Cal.Rptr. 784].)

In *Schoolcraft,* the court awarded contract damages to the trustor under a deed of trust upon the theory that the beneficiary's conduct, in applying fire insurance proceeds to the secured debt rather than to the reconstruction of the insured residence, was a breach of the covenant of good faith implied in the trust deed. While such choice was permitted by the express terms of the trust deed, and thus there was no breach of those terms, the court found that the choice had been made in bad faith and had deprived the trustor of the benefit of the agreement without necessarily

enhancing the beneficiary's security. This result was simply an application of the rule that "'[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' [Citations.]" ( *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500 [220 Cal.Rptr. 818, 709 P.2d 837], quoting *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496].) In such circumstance, a breach of the implied covenant can result from conduct permitted by the express (or implied-in-fact) terms of the contract. (See also, *Milstein* v. *Security Pac. Nat. Bank* (1972) 27 Cal.App.3d 482, 487 [103 Cal.Rptr. 16].)

In *Wilkerson,* plaintiff sued on an alleged contract of employment that he would not be terminated except for cause. The court held that even though the employer may have had a good faith belief that such "good cause" existed, such belief would be a defense only to an action for breach of the covenant, but would not provide a defense to breach of contract.

In *Sheppard,* the plaintiff had left his stock analyst position in California to accept a similar job in Tennessee but was terminated before he could begin work. The court held that while there was no agreement not to terminate except for cause, and thus no breach of a consensual contract term, the implied covenant of good faith required that the employer at least give the new employee an opportunity to demonstrate his ability to satisfy the requirements of the job. (See also, *Murray* v. *State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58, 65 [268 Cal.Rptr. 33].)

[***37]

A "'breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself' and it has been held that '[b]ad faith implies unfair dealing rather than mistaken judgment . . . . [Citation.]' [Citation.]" ( *Congleton* v. *National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 59 [234 Cal.Rptr. 218].) [17] For example, in the context of the insurance contract, it has been held that the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim "'is not the requirement mandated by the terms of the policy itself -- to defend, settle, or pay. It is the obligation . . . under which [*1395] the insurer must act fairly and in good faith in discharging its contractual responsibilities.' [Citation.]" (Italics in original.) ( *California Shoppers, Inc.* v. *Royal*

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

*Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54 [221 Cal.Rptr. 171], quoting *Gruenberg v. Aetna Ins. Co., supra*, 9 Cal.3d at pp. 573-574.)

17   Several California cases have defined the offensive conduct as "bad faith action, extraneous to the contract, with the motive intentionally to frustrate the [other party]'s enjoyment of contract rights." ( *Sawyer v. Bank of America* (1978) 83 Cal.App.3d 135, 139[145 Cal.Rptr. 623]; *Khanna v. Microdata Corp.* (1985) 170 Cal.App.3d 250, 262 [215 Cal.Rptr. 860].) Such definition has been recently criticized by the Supreme Court, but only in the context that it was uncritically applied to justify a tort remedy rather than contract damages. ( *Foley, supra*, 47 Cal.3d at p. 689.)

[***38] Thus, allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad [**400] judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.  Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties.

(17)  If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.  Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the [***39] implied covenant is to obtain a tort recovery.

(18)  In insurance cases there is a well-developed history recognizing a tort remedy for a breach of the implied covenant. ( *Foley, supra*, 47 Cal.3d at p. 684.) A review of those cases demonstrates that the existence of this remedy has been justified by the "special relationship" existing between insurer and insured, which is characterized by elements of public interest, adhesion and fiduciary responsibility. ( *Seaman's, supra*, 36 Cal.3d at pp. 768-769; *Egan v. Mutual of Omaha, supra*, 24 Cal.3d at p. 820.) In addition, it is essential to a recovery in tort that the insurer, in breaching the implied covenant, have acted *unreasonably* ( *Egan v. Mutual of Omaha, supra*, at p. 818; *Gruenberg v. Aetna Ins. Co., supra*, 9 Cal.3d at p. 575) or *without proper cause* ( *Neal*

*v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 920; *Gruenberg v. Aetna Ins. Co., supra*, 9 Cal. 3d at p. 574; [***40] *Suarez v. Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1407 [254 Cal.Rptr. 377]; *California Shoppers, Inc. v. Royal Globe Ins. Co., supra*, 175 Cal.App.3d at pp. 54-55.)

However, whether such a concept has any application in noninsurance cases appears to be increasingly problematic.  Indeed, the proposition that [*1396] tort damages might be allowed for a breach of the implied covenant in noninsurance cases is barely 10 years old and is based entirely on *dicta* from 2 earlier opinions which the Supreme Court has recently questioned.  To appreciate just how difficult it is to assert such a claim, a short historical review is appropriate.

In 1980, the Supreme Court took the occasion, in a wrongful discharge case where a tort recovery was permitted ( *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] *(Tameny)*), to hint that such a recovery might also be justified under the theory of a breach of the implied covenant.  The authority for this possible transition, however, was insurance [***41] cases. [18] Indeed, any [**401] serious suggestion of such an extension of tort liability would have been a significant change in the law.  Up until that time the courts had repeatedly rejected claims for tort relief for breach of the implied covenant in noninsurance cases. (See, e.g., *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 33 [161 Cal.Rptr. 516]; *Sawyer v. Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; *Glendale Federal Savings & Loan Assn. v. Marina View Heights* (1977) 66 Cal.App.3d 101, 135, fn. 8 [135 Cal.Rptr. 802].) However, following *Tameny*, at least two cases (involving employment termination) simply assumed the existence of a tort remedy, but again relied entirely on insurance cases. ( *Cleary v. American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 456 [168 Cal.Rptr. 722]; *Cancellier v. Federated Dept. Stores* (9th Cir. 1982) 672 F.2d 1312, 1318.)

18   In *Tameny*, the court sanctioned a tort remedy for the termination of a long-term employee who refused the employer's direction to engage in activities which were criminal violations of the antitrust law.  The court concluded its opinion with a footnote reference to the breach of the covenant implied in the employment agreement: "In light of our conclusion that plaintiff's complaint states a cause of action in tort under California's common law wrongful discharge doctrine, *we believe it is unnecessary to determine whether a tort recovery would additionally be available under these circumstances on the theory that Arco's discharge constituted a breach of*

222 Cal. App. 3d 1371, *; 272 Cal. Rptr. 387, **;
1990 Cal. App. LEXIS 879, ***

*the implied-in-law covenant of good faith and fair dealing inherent in every contract.* We do note in this regard, however, that authorities in other jurisdictions have on occasion found an employer's discharge of an at-will employee violative of the employer's 'good faith and fair dealing' obligations, [citations], and past California cases have held that a breach of this implied-at-law covenant sounds in tort as well as in contract. (See, e.g., *Comunale* v. *Traders General Ins. Co.* (1958) 50 Cal.2d 654, 663 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 432-433 [58 Cal.Rptr. 13, 426 P.2d 173]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 . . . ." (Italics added.) ( *Tameny, supra,* 27 Cal.3d at p. 179, fn. 12.)

[***42] The Supreme Court next had occasion to address the issue in its 1984 *Seaman's* decision. [19] In that case, the plaintiff sought to enforce a [*1397] "contract" for a long-term marine fuel supply dealership on which it had relied to its severe detriment. When the oil market dynamics changed following execution of the "contract," the defendant, Standard Oil, did everything in its power to cause the concerned government agencies to deny to Seaman's the permits required by the contract and, when that failed, took the position that the "contract" was an unenforceable letter of intent and denied that any contract was ever formed. The evidence produced at trial essentially demonstrated that this position was taken without any factual basis to support it and without a good faith belief that such assertion had any legal merit.

[19] The precise issue before the court was defined at the outset of the opinion by the question, "May a plaintiff recover in tort for breach of an implied covenant of good faith and fair dealing in a noninsurance, commercial contract?" ( *Seaman's, supra,* 36 Cal.3d at p. 758.)

[***43] Although the issue was directly raised and asserted, the court avoided giving a direct answer as to whether such conduct might constitute a tortious breach of the implied covenant [20] and stated that it was not necessary to predicate liability on such a breach but was simply sufficient "to recognize that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." ( *Seaman's, supra,* 36 Cal.3d at p. 769.) [21] However, in refusing to recognize a tortious breach of the covenant, the court, in dictum, seemed to suggest that when the contracting parties shared a "special relationship," then a breach of the implied covenant might justify a tort remedy. (36 Cal.3d at pp. 768-769.) [22]

[20] The *Seaman's* court explained its reluctance by stating that, "When we move from such special relationships [as are recognized as the basis for tort liability in insurance cases] to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (36 Cal.3d at p. 769, fn. omitted.)

[***44]
[21] As we noted in footnote 13, *ante,* plaintiffs also seek to sustain a cause of action on this theory and we discuss those efforts below. However, the Supreme Court has twice emphasized that such theory is not, as a matter of law, based upon a breach of the implied covenant of good faith. ( *Seaman's, supra,* 36 Cal.3d at p. 769; *Foley, supra,* 47 Cal.3d at pp. 688-689.)
[22] It is arguable that the *Seaman's* dicta also suggested that a tortious breach of the implied covenant could result from a defendant's assertion of a stonewall ("see you in court") defensive posture (see fn. 26, *post*). However, apart from a brief reference to this possibility in one opinion (see *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925, 939 [235 Cal.Rptr. 12]), no court has recognized such a construction of the *Seaman's* opinion. While it certainly has contributed to some of the confusion and uncertainty which has trailed in *Seaman's* wake (see, e.g., fn. 27, *post*), it seems more likely that the discussion of a "stonewall defense" ( *Seaman's, supra,* 36 Cal.3d at pp. 769-770) was merely a part of the court's rationale supporting its recognition of the new tort of bad faith denial of contract existence.

[***45]  [*1398]  [**402] The *Seaman's* court suggested, with both a reference to and reliance upon insurance cases (and the "special relationship" between insurer and insured), that "[n]o doubt there are other rela-

tionships with similar characteristics and deserving of similar legal treatment." ( *Id.*, at p. 769, fn. omitted.) Although not a part of its holding, and certainly unnecessary to it, the court expressed a tentative willingness to entertain an expansion of the tort remedy to contractually based disputes between certain parties who had a relationship other than that of insurer and insured. A judicial test for defining that relationship was not long in coming.

In *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] (*Wallis*), the court announced a five-part description of the characteristics of the "special relationship" which must be present in a noninsurance contractual dispute in order to justify tort recovery for a breach of the implied covenant. [23] However, in its most recent discussion of this issue, the Supreme Court refused to apply this approach to employment cases.

> [23] The *Wallis* court set forth the following five characteristics which must be satisfied: "(1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." (160 Cal.App.3d at p. 1118.)

[***46] In *Foley*, the court held that it was "not convinced that a 'special relationship' analogous to that between insurer and insured" existed in the usual employment relationship so as to justify recognition of a tort remedy for a breach of the implied covenant. (47 Cal.3d at p. 692.) Indeed, the court even suggested that *any* extension of tort remedies to noninsurance cases is not justified given (1) the limited purpose and scope of contract damages, (2) the strong need in our commercial system for predictability of the cost of contractual relationships and (3) the difficulty of formulating a workable test for distinguishing between a simple breach of contract and a "tortious" breach of the implied covenant. ( *Id.*, at pp. 683, 699-700.) [24] Nonetheless, the Foley court did limit its holding to the employer-employee relationship and did not expressly reject the Wallis definitional efforts; however, it did [*1399] suggest that it is still an open question as to whether "the special relationship model is an appropriate one to follow in determining whether to expand tort recovery." ( *Id.*, at p. 692.) [***47] [25]

> [24] "If the covenant is implied in every contract, but its breach does not in every contract give rise to tort damages, attempts to define when tort damages are appropriate simply by interjecting a requirement of 'bad faith' do nothing to limit the potential reach of tort remedies or to differentiate between those cases properly and traditionally compensable by contract damages and those in which tort damages should flow. Virtually . . . any breach of a contract term . . . could provide the basis for a pleading alleging the discharge was in bad faith under the cited standards." ( *Foley, supra*, 47 Cal.3d at p. 699.)

> [25] A number of cases, including *Foley*, have concluded that certain relationships are not sufficiently "special" to warrant imposition of a tort remedy for breach of the implied covenant: (1) employer-employee ( *Foley, supra*, 47 Cal.3d at p. 693 and at p. 700, fn. 42, disapproved of *Cleary* v. *American Airlines, Inc., supra*, 111 Cal.App.3d 443 "and its progeny"), (2) commercial grower-grain hauler ( *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 893 [208 Cal.Rptr. 394]), (3) insurance company-general agent ( *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co., supra*, 189 Cal.App.3d at p. 938), (4) distributor-vendor ( *Premier Wine* v. *E. & J. Gallo Winery* (9th Cir. 1988) 846 F.2d 537, 540), (5) franchisor-franchisee ( *Martin* v. *U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 412 [251 Cal.Rptr. 17]; *Eichman* v. *Fotomat Corp.* (9th Cir. 1989) 871 F.2d 784, 802-803; *Little Oil Co. Inc.* v. *Atlantic Richfield Co.* (9th Cir. 1988) 852 F.2d 441, 447), (6) limousine rental company-customer ( *Rogoff* v. *Grabowski* (1988) 200 Cal.App.3d 624, 632) [246 Cal.Rptr. 185] (7) bank-commercial borrowers and guarantors ( *Price* v. *Wells Fargo* (1989) 213 Cal.App.3d 465, 476-478 [261 Cal.Rptr. 735]; *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726, 730-731 [260 Cal.Rptr. 793]; but see *Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362, 1369 [229 Cal.Rptr. 16], and *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017]) and (8) stockbroker-investor ( *Trustees of the Capital Wholesale Electric etc. Fund* v. *Shearson, Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 624-625 [270 Cal.Rptr. 566]). One court ( *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 826 [250 Cal.Rptr. 220]) has taken a more general view and suggested that no contractual relationship other than insurer-insured would warrant "special relationship" treatment. Only the relationship of

bank and depositor has received any endorsement as meeting the criteria for a "special relationship" ( *Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d at p. 516) and even that has been strongly criticized. (See *Price* v. *Wells Fargo, supra,* 213 Cal.App.3d at p. 476.)

[***48] [**403] From this history, it seems clear to us that the recognition of a tort remedy for a breach of the implied covenant in a noninsurance contract has little authoritative support. In fact, with but one arguable exception (see fn. 25) and apart from decisions disapproved by *Foley,* every case which has considered the issue has rejected the recognition of a special relationship between specific contracting parties. However, as the *Foley* court did not see fit to specifically reject the *Seaman's* consideration of the noninsurance special relationship, or the *Wallis* criteria for determining its existence, we decline to do so. Indeed, the *Foley* court's discussion of why the employment relationship was dissimilar to that of insurer and insured essentially relied upon a *Wallis* analysis. ( *Foley, supra,* 47 Cal.3d at p. 692.)

More recently, in *Mitsui Manufacturers Bank* v. *Superior Court, supra,* 212 Cal.App.3d 726, 733, the court discussed similar criteria in concluding that a lender and commercial borrower did not share a special relationship sufficient to justify a tort claim. The court restated [***49] the standard to be applied in terms very similar to those used by *Wallis.* "It is the nature of the contract that is critical, whether it reflects unequal bargaining strength [*1400] between the parties, an inadequacy of ordinary contract damages or other remedies, adhesiveness of contract provisions adversely impacting the damaged party which are either neutral toward or benefit the other, public concerns that parties to certain types of contracts conduct themselves in a particular manner, the reasonable expectations of the parties or a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other. There are undoubtedly other significant factors and it may be that not all must be present in every case which might give rise to tort damages." ( *Id.* at p. 731.) Whatever the present efficacy of this analytical restatement, we find that plaintiffs here have failed to allege sufficient facts to demonstrate that they satisfy the requirements set forth in either *Wallis* or *Mitsui.*

(13c) This case presents a rather common commercial banking transaction. The plaintiffs, seeking to [***50] make a profit motivated investment in the form of a leveraged buyout of a going business entered into arms length negotiations with a unit of a major lending institution. There were no indicia of unequal bargaining here, no adhesive agreements, no indication that one party had any particular advantage over the other. Indeed, it appears that the terms of the central document,

the August 25 letter, was the product of meaningful negotiations between the parties. Moreover, it does not appear that plaintiffs were either in a particularly vulnerable position nor in need of any special protection. Finally, ordinary contract damages are obviously adequate to make plaintiffs whole for any compensable misconduct on the part of the defendants.

[**404] Under no reasonable perspective of the facts in this case would the *Wallis/Mitsui* standards be satisfied. Given the allegations set out in plaintiffs' second amended pleadings, the "transaction involved here is the quintessentially ordinary arms-length commercial transaction between two parties of equal bargaining strength, breaches of which are adequately remedied by ordinary contract damages." ( *Mitsui Manufacturers Bank* v. *Superior Court, supra,* 212 Cal.App.3d at p. 731.) [***51] Whatever may be the viability of the proposition that a bank can have a special relationship with a depositor so as to justify a tort recovery for breach of the implied covenant (see, e.g., *Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d at p. 516; cf. *Price* v. *Wells Fargo Bank, supra,* 213 Cal.App.3d at p. 476; see also, *Lee* v. *Bank of America* (1990) 218 Cal.App.3d 914 [267 Cal.Rptr. 387], including conc. and dis. opn. of Johnson, J., at pp. 922-929), there is neither authority nor reason for according such characterization to the relationship between a bank and a commercial borrower.

Therefore, since it is patently clear that no "special relationship" exists sufficient to support a tort recovery for an alleged breach of the implied [*1401] covenant of good faith, plaintiffs can state no basis for recovery in tort. Moreover, as they have alleged nothing more than a duplicative claim for contract damages, the trial court was correct in sustaining a demurrer to this count without leave to amend.

(2) *Bad Faith Denial of Contract*

As we [***52] have already discussed, the *Seaman's* court chose to avoid the difficult question of the nature and extent of a tort remedy for a breach of the implied covenant in noninsurance cases by recognizing a new tort which would not be predicated on a breach of the covenant. (19) It provided such a remedy in those limited cases in which a party "seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." ( *Seaman's, supra,* 36 Cal.3d at p. 769). [26] The elements of such a tort are (1) an underlying contract, (2) which is breached by the defendant, (3) who then denies liability by asserting that the contract does not exist, (4) in bad faith and (5) without probable cause for such denial. [27]

26   The *Seaman's* court explained its rationale for the recognition of tort liability in these circumstances with this comment. "It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made "'without probable cause and with no belief in the existence of the cause of action.'" ( *Adams* v. *Crater Well Drilling, Inc.* (1976) 276 Ore. 789 [556 P.2d 679, 681].) There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. (See *Jones* v. *Abriani* (1976) 169 Ind. 556 [350 N.E.2d 635].) Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (36 Cal.3d at pp. 769-770.)

While the Supreme Court in *Foley* did not directly address this comment in *Seaman's*, it is fair to say that it did express considerable skepticism about the viability of a tort recovery which was based upon a defendant's bad faith conduct in asserting a stonewall ("see you in court") defense to an ordinary commercial contract. The court acknowledged that while a test of bad faith could be formulated by requiring both *objective* (no factual basis for an asserted defense) and *subjective* (no good faith belief that asserted defense was reasonable or justified) elements, it would "not serve to limit initiation and prosecution of litigation based on almost any [breach of contract]" ( *Foley, supra,* 47 Cal.3d at p. 697, fn. 35.) The court made it clear that, at least in the employment context, it did not favor actions which would be based upon the subjective intentions and state of mind of the breaching party. Such actions, it said, "could rarely be disposed of at the demurrer or summary judgment stage." ( *Id.,* at p. 697.)

[***53]

27   It is unfortunate that the *Seaman's* court neither explained or justified why tort liability could be imposed for a bad faith denial of contract existence but not for the bad faith assertion of any other defense. As Judge Kozinski put it, "It is impossible to draw a principled distinction between a tortious denial of a contract's existence and a permissible denial of liability under the

terms of the contract. The test -- if one can call it such -- seems to be whether the conduct 'offends accepted notions of business ethics.'" ( *Oki America, Inc.* v. *Microtech Intern., Inc.* (9th Cir. 1989) 872 F.2d 312, 315 (conc. opn. of Kozinski, J., quoting *Seaman's, supra,* 36 Cal.3d at p. 770).) Such test would seem to be equally applicable to the assertion of *any* defense in bad faith, as the *Seaman's* court may have recognized in its dictum concerning the assertion of the "stonewall defense." ( *Seaman's, supra,* 36 Cal.3d at pp. 769-770; see also, fn. 26, *ante*.)

[*1402]   [**405]  Of these five [***54] elements, the last two are the most critical and difficult to demonstrate. The requirement that the defense be asserted in bad faith is a *subjective* issue relating to the defendant's state of mind. Stated in its simplest form, it means that the defendant does not have a good faith belief that the facts relied upon constitute or support a legally tenable defense. The fifth element, the absence of probable cause, means that, on the basis of the facts known to the defendant, the assertion of the defense was not legally tenable; that is, it was neither reasonable nor justified under applicable law. This is an *objective* requirement and requires a consideration of all of the circumstances. **(20a)** As we conclude that plaintiffs have failed to plead the absence of probable cause and that such failure is fatal to their claim, we limit our discussion to that element.

In our view, the question of probable cause presented here is conceptually no different than it is in the tort of malicious prosecution where the court is called upon "to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis on the facts known to the defendant, [***55]  the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.] Because the malicious prosecution tort is intended to protect an individual's interest 'in freedom from unjustifiable and unreasonable litigation' [citation], if the trial court determines that the prior action was objectively reasonable, the plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant is entitled to prevail." ( *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 878 [254 Cal.Rptr. 336, 765 P.2d 498]; see also, *Leonardini* v. *Shell Oil Co.* (1989) 216 Cal.App.3d 547, 569-570 [264 Cal.Rptr. 883]; *Klein* v. *Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 74-75 [259 Cal.Rptr. 149].)

As the Supreme Court put it, the existence or absence of probable cause in a malicious prosecution case is a "'question . . . of law to be determined by the court

from the facts established in the case.'" ( [***56] *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 875, quoting *Ball* v. *Rawles* (1892) 93 Cal. 222, 227 [28 P. 937].) "'[I]f there is no dispute concerning *the existence of the facts* relied upon to show probable cause, the trial court must then determine as a matter of law whether such undisputed facts do or do not warrant an inference of probable cause.' [Citation.]" (Italics in the original.) [*1403] ( *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 880.) Only if there is a dispute concerning (1) the existence of the facts relied upon to show probable cause or (2) the state of the defendant's belief in, or knowledge of, such facts, would there be any issue as to probable cause which would have to be tried to a jury. ( *Id.,* at pp. 879-880.)

We have no trouble in extending the principles applicable to the element of probable cause in malicious prosecution actions to the tort now before us. [28] The [**406] essential interest which a malicious prosecution action addresses is also present in [***57] the context of the tort of bad faith denial of contract. In each case the law seeks to protect a party from the assertion by another of an unreasonable and unjustifiable litigation position. It is immaterial that the offending activity relates in one case to the initiation and prosecution of a legal action and in the other to the assertion of a particular defense. We therefore conclude that the element of probable cause which the plaintiffs here must establish in order to recover is likewise a legal issue, not a factual one.

> 28   The standard in *Sheldon Appel Co.* for probable cause has also been applied in determining the existence of "reasonable cause" to bring an action under the Tort Claims Act for the purpose of making an award of attorney's fees under Code of Civil Procedure section 1038. ( *Ramsey* v. *City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1540 [270 Cal.Rptr. 198]; *Carroll* v. *State of California* (1990) 217 Cal.App.3d 134, 141-142 [265 Cal.Rptr. 753]; see also, BAJI No. 7.87 (1990 new) and related Use Note.)

[***58] Depending on the allegations of a complaint containing a claim for bad faith denial of contract existence, there is no reason why this legal issue cannot be determined by the court on demurrer. This would be most likely to occur in those cases where there are detailed allegations concerning the negotiations for, or formation of, the contract in dispute or where documents are attached and incorporated into the pleadings. **(21)** For example, where a plaintiff attaches and incorporates a written instrument into a pleading, without alleging that it was ambiguous or subject to some special interpretation, the court is free on demurrer to construe the language and draw its own conclusion as to the legal effect of the instrument. ( *Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1561 [260 Cal.Rptr. 237].)

**(20b)** Here, plaintiffs incorporated the August 25 letter, which can only be construed as a conditional agreement. It is clearly subject to several specific conditions precedent which were required to be satisfied before the defendants would be contractually committed to provide the proposed financing. While plaintiffs allege the making [***59] of a number of oral statements by one or more representatives of the defendants to the effect that the [*1404] conditions were satisfied, nowhere is there any direct allegation that any of such conditions, much less all, were ever satisfied. It is also apparent from the pleadings that the defendants dispute the plaintiffs' allegations. In the context of this case, where detailed written documentation and a complicated and sophisticated transaction were clearly contemplated by the parties, defendants should not be compelled to assert their side of such dispute only at their peril.

From plaintiffs' own pleadings, including our construction of the critical August 25 letter, it is clear that there is not only a dispute with the defendants with respect to the satisfaction of significant conditions precedent to liability, but there is a reasonable factual basis for that dispute. Whatever the merits of the competing positions of the parties with respect to just what oral statements were made, there can be no question as to the existence of the factual fabric upon which the dispute is based. In other words, the complaint itself provides a basis for the court to conclude that probable [***60] cause exists for the defendants' denial of contractual obligation. Given that plaintiffs' own allegations provided this foundation, they were then required to affirmatively allege additional facts sufficient to demonstrate that (1) defendants' reliance on the failure of such conditions as a basis for their defensive posture was neither reasonable nor justified and thus was not legally tenable or (2) defendants did not have any belief in, or knowledge of, facts which would make their defensive assertion legally tenable. **(22)** (See fn. 29.) Plaintiffs' failure to provide such additional facts is fatal to their cause of action as the absence of probable cause has not been alleged. [29]

> 29   In our view, this situation is analogous to the complaint which includes allegations indicating the existence of a defense to the claim (e.g., that the statute of limitations has run). In such circumstance, specific facts negating that defense must be alleged. General or conclusory allegations will not suffice. ( *Saliter* v. *Pierce Brothers Mortuary* (1978) 81 Cal.App.3d 292, 297 [146 Cal.Rptr. 271].)

[***61]  **(20c)** Our insistence upon such specific pleading seems amply justified. Without such a requirement, the courts will be faced with general allegations charging this tort in every contract dispute in which liability is denied, and defendants in such cases will be faced with the dilemma of raising a [**407] defense to contract liability only at the risk and expense of litigating a tort action. The recognition we give to the rule that the issue of probable cause is a legal one to be determined by the court and that it can be resolved on demurrer where, as here, a complaint demonstrates the factual basis for the defensive position asserted, will serve to limit these cases to only those where a plaintiff can truthfully allege specific facts demonstrating the absence of probable cause.

[*1405]  Plaintiffs first asserted this claim in their second amended complaints. Thus, they have not been given any opportunity to provide the additional allegations which we here hold, for the first time, are required. As a result, there has been no fair opportunity for plaintiffs to make the necessary allegations. ( *Larwin-Southern California, Inc.* v. *JGB Investment Co., supra,* 101 Cal.App.3d at p. 635; [***62] *Greenberg* v. *Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470].) Moreover, as we are unable to conclude from the face of the pleading that it is legally inca-pable of amendment, it would be an abuse of discretion to deny plaintiffs an opportunity to amend the allegations of this cause of action. ( *Postley* v. *Harvey, supra,* 153 Cal.App.3d 280, 287.) Therefore, we conclude that it was error to sustain defendants' demurrer without leave to amend.

. . .

\*  See footnote, *ante,* page 1371.

The orders of dismissal are reversed as follows:

1. In the *Carrott action,* counts 1, 2, 3, 8 (except as to Torres), 9, 10 and 14 as to Careau only and count 12 as to both Carrott and Careau. Upon remand, the trial court shall permit Careau to amend the allegations in counts 1, 2, 3, 8 (except as to Torres), 10 and 14 of the second amended complaint; and

2. In the *Careau Group action,* counts 1, 2, 3, 8 (except as to Torres), [***63] 9, 10 and 12. Upon remand, the trial court shall permit the Careau Group to amend counts 1, 2, 3, 8 (except as to Torres), 10 and 12 of the second amended complaint.

In all other respects, the orders of the trial court are affirmed. Each party shall bear their own costs on appeal.

EXHIBIT 9

LEXSEE 32 CAL 4TH 336

**CASA HERRERA, INC., Plaintiff and Appellant, v. NASSER BEYDOUN et al., Defendants and Respondents.**

S111998

**SUPREME COURT OF CALIFORNIA**

**32 Cal. 4th 336; 83 P.3d 497; 9 Cal. Rptr. 3d 97; 2004 Cal. LEXIS 735; 2004 Daily Journal DAR 1207**

**February 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Reported at  Casa Herrera v. Beydoun, 2004 Cal. LEXIS 1224 (Cal., Feb. 2, 2004)

**PRIOR HISTORY:**      Superior Court of San Diego County, No. GIC760127, Ronald S. Prager, Judge. Court of Appeal, Fourth Dist., Div. One, No. D038326.
 Casa Herrera, Inc. v. Beydoun, 103 Cal. App. 4th 83, 126 Cal. Rptr. 2d 431, 2002 Cal. App. LEXIS 4866 (Cal. App. 4th Dist., 2002)

**DISPOSITION:**      Judgment of the Court of Appeal affirmed.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

A manufacturer that built and sold tortilla production equipment filed a malicious prosecution action against a tortilla baking company and its owner, who had purchased a tortilla oven from the manufacturer, and against the banks and banker who had enforced a security interest in that oven (collectively tortilla bakers), following termination in the Court of Appeal of an underlying suit that had been brought by the tortilla bakers against the manufacturer. The underlying suit had alleged causes of action for breach of contract and malicious prosecution based on alleged promises by the manufacturer as to the production capacity of the oven. The trial court in the underlying suit had directed a verdict for the manufacturer, finding that the tortilla bakers lacked standing. The Court of Appeal had affirmed, but instead of relying on lack of standing, had found that the parol evidence rule barred the tortilla bakers from attempting to show that the manufacturer had breached a promise to provide an oven with a higher production capacity than that enumerated in the written sales contract. As part of its malicious prosecution claims, the

manufacturer alleged that the Court of Appeal opinion in the underlying suit constituted a termination on the merits in its favor. The trial court granted the tortilla bakers' motion for judgment on the pleadings, and dismissed the malicious prosecution claims with prejudice, finding that resolution of the underlying suit based on the parol evidence rule could not be a favorable termination so as to support a subsequent action for malicious prosecution. (Superior Court of San Diego County, No. GIC760127, Ronald S. Prager, Judge.) The Court of Appeal, Fourth Dist., Div. One, No. D038326, reversed, concluding that termination of the underlying suit based on the parol evidence rule mandated that the manufacturer's liability be determined by the written contract rather than by any prior inconsistent oral promises and that the action had thus been terminated in favor of the manufacturer.

The Supreme Court affirmed the judgment of the Court of Appeal. The court held that termination of a breach of contract and fraud action based on the parol evidence rule satisfies the favorable termination element of a malicious prosecution claim. Although the parol evidence rule results in the  [*337] exclusion of evidence, as it is applied to contracts, it establishes that as a matter of substantive law the execution of a written contract supersedes agreements which precede or accompany the execution of the contract, and that the written contract becomes the sole agreement. By applying the parol evidence rule, the Court of Appeal in the underlying action held that the written contract was the only agreement between the parties. As a consequence of this substantive holding, the court refused to consider evidence offered by the tortilla bakers which suggested that the parties' agreement had included a promise by the manufacturer of a production capacity higher than that stated in the written contract. Having defined the terms of the parties' agreement to be the terms of the written agreement, the Court of Appeal necessarily resolved the breach of contract and fraud claims on the merits in favor

32 Cal. 4th 336, *; 83 P.3d 497, **;
9 Cal. Rptr. 3d 97, ***; 2004 Cal. LEXIS 735

of the manufacturer. The Supreme Court noted a distinction, for purposes of finding a favorable termination to support a subsequent action for malicious prosecution, between an underlying action which has relied on a technical or procedural defense, and one which has relied on a substantive rule of contract law, like the parol evidence rule, and resolved the action on its merits. (Opinion by Brown, J., expressing the unanimous view of the court.)

## HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Malicious Prosecution § 7--Essentials to Maintenance of Action--Favorable Termination--Termination Based on Parole Evidence Rule.**--A termination based on the parol evidence rule is a substantive termination in the malicious prosecution context.

**(2) Evidence § 61--Documentary Evidence--Parol Evidence Rule--Generally--Substantive Rule.**--The parol evidence rule establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements. In doing so, the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement. As a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. In other words, the evidentiary consequences of the rule follow from its substantive component--which establishes, as a matter of law, the enforceable and incontrovertible terms of an integrated written agreement. [*338]

**(3) Malicious Prosecution § 7--Essentials to Maintenance of Action--Favorable Termination--Termination Based on Parol Evidence Rule Constitutes Resolution on the Merits.**--The Court of Appeal necessarily resolved an underlying action on the merits when, after defining the terms of the parties' agreement by applying the parol evidence rule, it found that a manufacturer that sold a tortilla oven to a tortilla baking company did not breach the written contract or commit fraud by orally promising a production capacity higher than that enumerated in the written contract. Its decision reflected on the manufacturer's innocence of the alleged misconduct and therefore constituted a favorable termination for malicious prosecution purposes.

**(4) Malicious Prosecution § 7--Essentials to Maintenance of Action--Favorable Termination--Termination Based on Parol Evidence Rule Constitutes Resolution on the Merits.**--The parol evidence rule establishes that an integrated written agreement su-

persedes any prior or contemporaneous promise at variance with the terms of that agreement. Thus, in a breach of contract suit and fraudulent misrepresentation suit brought by a tortilla baker against the manufacturer who had sold the baker a tortilla oven, any alleged prior oral agreement regarding the capacity of a tortilla oven no longer existed because the written sales contract, as a matter of law, had replaced it. For purposes of establishing a favorable termination in a subsequent malicious prosecution action brought by the manufacturer, the court's decision in the underlying breach of contract action based on the parol evidence rule terminated the action in favor of the manufacturer by establishing that the manufacturer could not have breached any enforceable or unenforceable extant agreement as to the oven's capacity. (Disapproving to the extent inconsistent: *Hall v. Harker* (1999) 69 Cal.App.4th 836, 845 [82 Cal. Rptr. 2d 44].)

[5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 439; 2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, § 63.]

**COUNSEL:** Meisenheimer, Herron & Steele, Matthew V. Herron, Robert M. Steele; Post Kirby Noonan & Sweat, Michael J. Kirby and Matthew P. Nugent for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Julian W. Poon, Gregory D. Brown, Nicola T. Hanna and Michele L. Maryott for Defendants and Respondents Community First National Bank and Tom Ferrara.

Ira S. Carlin for Defendants and Respondents Nasser Beydoun and Am Mex Food Industries, Inc.

**JUDGES:** Brown, J., expressing the unanimous view of the court.

**OPINION BY:** BROWN [*339]

## OPINION

    [***98]    [**499]    **BROWN, J.**--A court resolves an action for breach of contract and fraud in favor of a defendant by applying the parol evidence rule. That defendant subsequently files a malicious prosecution action against the plaintiffs in the breach of contract action and others. We now consider whether the termination of the breach of contract and fraud action based on the parol evidence rule satisfies the favorable termination element of a malicious [***99] prosecution claim. We conclude it does.

### I.

### A.

32 Cal. 4th 336, *; 83 P.3d 497, **;
9 Cal. Rptr. 3d 97, ***; 2004 Cal. LEXIS 735

In 1994, respondent Am Mex Food Industries, Inc. (Am Mex)--which was owned by respondent Nasser Beydoun--purchased an oven and related equipment from appellant Casa Herrera, Inc. (Casa Herrera or appellant) for manufacturing tortillas for sale to its distributors. As stated in the written sales contract, Casa Herrera promised that the oven would produce 1,500 dozen 10-ounce tortillas per hour, 1,800 dozen 8-ounce tortillas per hour, and 2,000 dozen 6-ounce tortillas per hour. [1] The contract also gave Am Mex 10 days to operate the oven after its installation and to return it if dissatisfied.

    1   The weights refer to the weight of one dozen tortillas.

Casa Herrera delivered the oven to Am Mex, but Am Mex did not sign the written acceptance within 10 days after its installation because of difficulties in operating the oven. Casa Herrera then made some repairs and provided Am Mex with additional instructions on how to operate the oven. Over a month after the installation of the oven, Am Mex and Beydoun signed the acceptance, "acknowledging they had observed the oven in operation and were satisfied with the quantity and quality of production."

Am Mex began experiencing financial difficulties and was unable to service its debt to respondent Valle De Oro Bank (Valle), the predecessor to respondent Community First National Bank (collectively, the banks). Valle filed an action to enforce its security interest in Am Mex's assets and obtained the appointment of a receiver. The receiver eventually sold Am Mex's assets, including the oven, to Circle Foods.

Shortly after the appointment of the receiver, Am Mex and Beydoun sued Casa Herrera, asserting causes of action for breach of contract and fraudulent misrepresentation. As the basis for both causes of action, they alleged that Casa Herrera had promised the oven would produce 1,500 dozen *16-ounce* tortillas per hour even though Casa Herrera knew the oven did not and could not do so.

[*340]    At trial, the court, after hearing opening statements, granted Casa Herrera's motion for a nonsuit against Beydoun on the ground that Beydoun lacked standing to sue. After Am Mex presented its case, the trial court directed a verdict for Casa Herrera "on the ground[] that Am Mex had no standing to pursue said claims as they had been sold and assigned to Circle Foods pursuant to a written contract."

The Court of Appeal affirmed. But instead of relying on lack of standing, the court held that "there was no substantial evidence to support the claims for breach of contract [**500] or fraud." In support, the court found that the written sales contract between Am Mex and Casa Herrera was "integrated on the rates of guaranteed production, and the language specifying a guaranteed rate of 1500 dozen per hour for 10-ounce tortillas is not reasonably susceptible to the interpretation that the parties agreed to a guaranteed rate of 1500 dozen per hour for 16-ounce tortillas." The court then concluded that the "parol evidence rule barred Am Mex from attempting to show Casa Herrera breached a promise (or fraudulently promised) to provide an oven producing 16-ounce tortillas at the rate of 1500 dozen per hour."

[***100] **B.**

Following the Court of Appeal's decision, Casa Herrera filed the instant action against Beydoun, Am Mex, the banks, and Tom Ferrara, a director and officer of Valle (collectively respondents), asserting, among other things, causes of action for malicious prosecution. [2] As part of its malicious prosecution claims, Casa Herrera alleged that the Court of Appeal opinion in *Beydoun v. Casa Herrera, Inc.* (Jan. 10, 2000, D030061) (nonpub. opn.) constituted a termination on the merits in its favor.

    2   Although the banks and Ferrara were not parties to the underlying action, Casa Herrera alleged that they "encouraged and advocated the continuation of the" action.

The banks and Ferrara, joined by Am Mex and Beydoun, moved for judgment on the pleadings, contending, as a matter of law, Casa Herrera could not establish the favorable termination element of a malicious prosecution claim. Citing *Hall v. Harker* (1999) 69 Cal.App.4th 836, 845 [82 Cal. Rptr. 2d 44] (*Hall*), the banks claimed that "a resolution ... based on the parol evidence rule cannot be a favorable termination ... so as to support a subsequent action for malicious prosecution." The trial court agreed and dismissed the malicious prosecution claims with prejudice.

The Court of Appeal reversed. [3] Declining to follow *Hall*, the court concluded that "when an action is terminated because the parol evidence rule [*341] mandates the defendant's liability be determined by the provision embodied in the written contract rather than by any prior inconsistent oral promises, the action has been terminated for reasons that *do* reflect on the merits of the plaintiff's underlying claim that the underlying defendant was responsible or liable for allegedly breaching his contractual obligations." In reaching this conclusion, the court observed that "the parol evidence rule is not an evidentiary rule but is instead a rule that fixes duties and establishes rights and responsibilities among persons by declaring that the law will hold parties to their written agreements rather than to prior representations or promises inconsistent with the written agreement."

32 Cal. 4th 336, *; 83 P.3d 497, **;
9 Cal. Rptr. 3d 97, ***; 2004 Cal. LEXIS 735

3    Casa Herrera also asserted a cause of action under Code of Civil Procedure section 1908 against the banks. The trial court dismissed this cause of action with prejudice, and the Court of Appeal affirmed. The parties do not challenge this aspect of the Court of Appeal's ruling.

We granted review to determine whether a termination based on the parol evidence rule constitutes a favorable termination for malicious prosecution purposes, and conclude that it does.

II.

"[I]n order to establish a cause of action for malicious prosecution of either a criminal or civil proceeding, a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' " ( *Sheldon Appeal Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal. Rptr. 336, 765 P.2d 498] (*Sheldon Appeal*), quoting *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal. Rptr. 184, 529 P.2d 608].)

"The theory underlying the requirement of favorable termination is that it tends to indicate the innocence of the accused, and coupled with the other elements of lack of probable cause and malice, establishes the tort [of malicious prosecution]." ( *Jaffe v. Stone* (1941) [**501] 18 Cal.2d 146, 150 [***101] [114 P.2d 335].) Thus, "[i]t is hornbook law that the plaintiff in a malicious prosecution action must plead and prove that the prior judicial proceeding of which he complains terminated in his favor." ( *Babb v. Superior Court* (1971) 3 Cal.3d 841, 845 [92 Cal. Rptr. 179, 479 P.2d 379].)

To determine "whether there was a favorable termination," we "look at the judgment as a whole in the prior action ... ." ( *Sagonowsky v. More* (1998) 64 Cal.App.4th 122, 129 [75 Cal. Rptr. 2d 118].) "It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits." ( *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 [159 Cal. Rptr. 693, 602 P.2d 393] (*Lackner*).) Rather, "[i]n order for the termination of a lawsuit to be considered favorable [*342] to the malicious prosecution plaintiff, the termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit." ( *Pender v. Radin* (1994) 23 Cal.App.4th 1807, 1814 [29 Cal. Rptr. 2d 36].) For example, a termination is favorable for malicious prosecution purposes where the court in the underlying action: (1) granted summary judgment and issued sanctions because the claim was meritless ( *Mattel, Inc. v.*

*Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1191 [121 Cal. Rptr. 2d 794]); (2) granted summary judgment because there was insufficient evidence to establish a triable issue of fact ( *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149-1150 [85 Cal. Rptr. 2d 726] (*Sierra Club*)); or (3) held that the defendant, as a matter of law, violated no duty to the plaintiff ( *Ray v. First Federal Bank* (1998) 61 Cal.App.4th 315, 318 [71 Cal. Rptr. 2d 436] (*Ray*)).

However, a " 'favorable' termination does not occur merely because a party complained against has prevailed in an underlying action. ... If the termination does not relate to the merits--reflecting on neither innocence nor responsibility for the alleged misconduct--the termination is not favorable in the sense it would support a subsequent action for malicious prosecution." ( *Lackner, supra,* 25 Cal.3d at p. 751, fn. omitted.) Thus, a "technical or procedural [termination] as distinguished from a substantive termination" is not favorable for purposes of a malicious prosecution claim. (*Ibid.*) Examples include dismissals (1) on statute of limitations grounds ( *id.* at pp. 751-752; *Warren v. Wasserman, Comden & Casselman* (1990) 220 Cal. App. 3d 1297, 1303 [271 Cal. Rptr. 579] (*Warren*) ); (2) pursuant to a settlement ( *Dalany v. American Pacific Holding Corp.* (1996) 42 Cal.App.4th 822, 828-829 [50 Cal. Rptr. 2d 13]); or (3) on the grounds of laches ( *Asia Investment Co. v. Borowski* (1982) 133 Cal. App. 3d 832, 838-839 [184 Cal. Rptr. 317]).

(1) With these standards in mind, we now turn to the Court of Appeal's decision terminating the underlying breach of contract and fraud action. (See *Ray, supra,* 61 Cal.App.4th at pp. 318-319 [holding "that the appellate decision ... both marked and constituted favorable termination of that case"].) In affirming the judgment in favor of appellant, the Court of Appeal found that "there was no substantial evidence to support the [underlying] claims for breach of contract or fraud." Ostensibly, this finding reflects on the merits and appellant's innocence of the wrongful conduct alleged in the underlying action. (See *Sierra Club, supra,* 72 Cal.App.4th at pp. 1149-1150.) Nonetheless, respondents contend the termination was procedural or technical because the Court of Appeal refused to [***102] consider evidence of prior negotiations in light of the parol evidence rule. According to respondents, under *Lackner* the parol evidence rule is a procedural defense like the statute of frauds, and a termination based on that rule does not reflect on appellant's innocence. (See *Lackner, supra,* 25 Cal.3d at p. 751.) As explained below, we [*343] disagree and find that a termination based on the parol evidence rule is a substantive termination in the malicious prosecution context.

The parol evidence rule is codified in Civil Code section 1625 [4] [**502] and Code of Civil Procedure section 1856. [5] (See *Marani v. Jackson* (1986) 183 Cal. App. 3d 695, 701 [228 Cal. Rptr. 518] (*Marani*).) It "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument." (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433 [7 Cal. Rptr. 2d 718] (*Alling*).) The rule does not, however, prohibit the introduction of extrinsic evidence "to explain the meaning of a written contract ... [if] the meaning urged is one to which the written contract terms are reasonably susceptible." (*BMW of North America, Inc. v. New Motor Vehicle Bd.* (1984) 162 Cal. App. 3d 980, 990, fn. 4 [209 Cal. Rptr. 50] (*BMW*).)

4    Civil Code section 1625 provides that: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

5    Code of Civil Procedure section 1856 states that: "(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. [¶] (b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance. [¶] (d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue. [¶] (f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue. [¶] (g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in [Code of Civil Procedure] Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud. [¶] (h) As used in this section, the term agreement includes deeds and wills, as well as contracts between parties."

Although the rule results in the exclusion of evidence, it "is not a rule of evidence *but is one of substantive law.*" (*Estate of Gaines* (1940) 15 Cal.2d 255, 264 [100 P.2d 1055], italics added.) Of course, our prior characterization of the parol evidence rule as a substantive rule of law is not necessarily dispositive in the malicious prosecution context. (See *Grant v. McAuliffe* (1953) 41 Cal.2d 859, 865 [264 P.2d 944] [" ' "Substance" and "procedure" ... are not legal concepts of invariable content' ... and a statute or other rule of law will be characterized as substantive or procedural according to the [*344] nature of the problem for which a characterization must be made"].) But a careful examination of the underlying nature of the rule demonstrates that it should be so.

[***103]   Unlike traditional rules of evidence, the parol evidence rule "does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the ' integration'), *becomes the contract of the parties.* The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement." (*Estate of Gaines, supra,* 15 Cal.2d at pp. 264-265.) Thus, "[u]nder [the] rule[,] the act of executing a written contract ... *supersedes* all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." (*BMW, supra,* 162 Cal. App. 3d at p. 990, italics added.) And "[e]xtrinsic evidence cannot be admitted to prove what the agreement was, not for any of the usual reasons for exclusion of evidence, but because as a matter of law the agreement is the writing itself. [Citation.]" (*Ibid.*) "Such evidence is legally irrelevant and cannot support a judgment." (*Marani, supra,* 183 Cal. App. 3d at p. 701.)

**(2)** The parol evidence rule therefore establishes that the terms contained in an integrated [**503] written agreement may not be contradicted by prior or contemporaneous agreements. In doing so, the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement. "[A]s a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument." (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23 [92 Cal. Rptr. 704, 480 P.2d 320] (*Tahoe National Bank*).) In other words, the evidentiary consequences of the rule follow from its substantive component--which establishes, as a matter of law, the enforceable [**504] and incontrovertible terms of an integrated written agreement.

(3) Thus, by applying the parol evidence rule, the Court of Appeal, in effect, held that the written sales agreement was the only existing agreement of the parties. (See *Estate of Gaines, supra*, 15 Cal.2d at pp. 264-265.) As a consequence of this substantive holding, the court refused to consider extrinsic evidence suggesting that the parties' agreement had included a term promising that the oven would produce 1,500 dozen 16-ounce tortillas per hour. Such evidence was irrelevant as a matter of law. (See *Marani, supra*, 183 Cal. App. 3d at p. 701.) After defining the terms of the parties' agreement by applying the parol evidence rule, the court then found that appellant did not breach the contract or commit fraud. As such, the Court of [*345] Appeal necessarily resolved the underlying action on the merits, and its decision reflects on appellant's innocence of the alleged misconduct. The decision therefore constitutes a favorable termination for malicious prosecution purposes.

Respondents' reliance on language in *Lackner* analogizing a termination on statute of limitations grounds to a termination based on the statute of frauds ( *Lackner, supra*, 25 Cal.3d at p. 751), and their attempts to equate the statute of frauds to the parol evidence rule are unavailing. Although "[t]he evidentiary consequences of the statute of frauds ... are in many respects similar to those of the parol evidence rule" ( *Ellis v. Klaff* (1950) 96 Cal. App. 2d 471, 475-476 [216 P.2d 15]) and "both aim to secure purity of evidence" [***104] ( *Alameda County Title Ins. Co. v. Panella* (1933) 218 Cal. 510, 515 [24 P.2d 163] (*Alameda County Title*)), the differences between the rules confirm that a termination based on the parol evidence rule is substantive--and not technical or procedural--for malicious prosecution purposes.

The statute of frauds "demands that every material term of an agreement within its provisions be reduced to written form, whether the parties desire to do so or not." ( *Ellis v. Klaff, supra*, 96 Cal. App. 2d at p. 476.) Thus, under the statute of frauds, the written agreement "serves only to prevent the contract from being unenforceable" ( *Hale v. Bohannon* (1952) 38 Cal.2d 458, 465 [241 P.2d 4]); it does not necessarily establish the terms of the parties' contract. Indeed, the sole "object of the statute of frauds is to prevent perjured testimony in proof of purported contracts of important types, and the statute applies only to those enumerated types." (2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, § 63, p. 183.)

By contrast, under the parol evidence rule, all prior or contemporaneous "oral negotiations are merged in the written contract, which is conclusive in the absence of a plea of actual fraud or mistake." ( *Alameda County Title, supra*, 218 Cal. at p. 515.) The written agreement supersedes these negotiations and becomes the parties' sole agreement (see *Estate of Gaines, supra*, 15 Cal.2d at pp.

264-265), and extrinsic evidence may not " add to, detract from, or vary the terms of" that agreement ( *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39 [69 Cal. Rptr. 561, 442 P.2d 641]). As such, the rule "applies to any type of contract, and its purpose is to make sure that the parties' final understanding, deliberately expressed in writing, shall not be changed." (2 Witkin, Cal. Evidence, *supra*, Documentary Evidence, § 63, p. 183.)

Thus, the parol evidence rule, unlike the statute of frauds, does not merely serve an evidentiary purpose; it determines the enforceable and incontrovertible terms of an integrated written agreement. (See *Alling, supra*, 5 [*346] Cal.App.4th at p. 1433 ["The parol evidence rule is not merely a rule of evidence concerned with the method of proving an agreement; it is a principle of substantive law"].) By defining the terms of the parties' agreement, the rule is necessarily substantive--and not procedural or technical--in the malicious prosecution context. Indeed, its substantive nature is further demonstrated by the fact that, unlike the statute of frauds ( *Lackner, supra*, 25 Cal.3d at p. 751), "we cannot consistently subjugate [the parol evidence] rule to the principles of objection and waiver codified in the Evidence Code" ( *Tahoe National Bank, supra*, 4 Cal.3d at p. 23). Likewise, the doctrine of estoppel may preclude the application of the statute of frauds but has no force against the parol evidence rule. ( *Alameda County Title, supra*, 218 Cal. at pp. 515-516.)

(4) As such, the reasoning of *Hall, supra*, 69 Cal.App.4th 836, is not persuasive. In *Hall*, the Court of Appeal reasoned that the "resolution of the underlying case based on the parol evidence rule cannot be a favorable termination" because the rule "cannot erase the *existence* of the [collateral] agreements, if they actually took place." ( *Id.* at p. 845.) But this reasoning betrays a misunderstanding of the parol evidence rule. The parol evidence rule establishes that an integrated written agreement *supersedes* any prior or contemporaneous promise at variance with the terms of that agreement. ( *BMW, supra*, 162 Cal. App. 3d at p. 990.) Thus, any alleged oral agreement regarding [***105] the oven's capacity *no longer exists* because the written sales contract, as a matter of law, has replaced it. The Court of Appeal's decision in the underlying action therefore establishes that appellant could not have breached any extant agreement--enforceable or unenforceable. In doing so, the decision necessarily "show[s] the innocence of ... [appellant of the alleged misconduct] in the prior action"--breaching the sales agreement and fraudulently exaggerating the oven's production capacity. ( *Warren, supra*, 220 Cal. App. 3d at p. 1303.)

Respondents' reliance on a comment to section 530 of the Restatement Second of Torts is misplaced. Al-

though the comment states that a promise made without the intention to perform may still support a cause of action for fraud, even though the promise "is unprovable and so unenforceable under the parol evidence rule" (Rest.2d Torts, § 530, com. c, p. 64), we rejected this proposition long ago. (See *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263-264 [48 P.2d 659].) And, despite some criticism, our courts have consistently rejected promissory fraud claims premised on prior or contemporaneous statements at variance with the terms of a written integrated agreement. [6] (See, e.g., *Wang v. Massey Chevrolet* (2002) 97 [*347] Cal.App.4th 856, 867-871, 873 [118 Cal. Rptr. 2d 770] [following *Pendergrass* but holding that the parol evidence rule does not bar claims for violations of Civ. Code, § 1770, subd. (a)(14) and Bus. & Prof. Code, § 17200]; *Alling, supra,* 5 Cal.App.4th at p. 1436; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal. App. 3d 388, 419 [264 Cal. Rptr. 779]; *Price v. Wells Fargo Bank* (1989) 213 Cal. App. 3d 465, 483-486 [261 Cal. Rptr. 735].) Because the parol evidence rule effectively immunizes appellant from liability for prior or contemporaneous statements at variance with the written sales contract, the Court of Appeal's decision tends to show appellant's innocence of fraud. (See *Lackner, supra,* 25 Cal.3d at p. 751, fn. 2 ["A termination 'inconsistent with wrongdoing' implies a lack of wrongful conduct and thus innocence--a favorable termination"].)

> [6]  In *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 392 [1 Cal. Rptr. 3d 739], the Court of Appeal recognized an exception to this rule for "misrepresentations of fact over the content of an agreement at the time of execution ... ." Even assuming that such an exception exists, it does not apply here because there is no allegation that appellant misrepresented the contents of the written sales agreement.

In this respect, *Berman v. RCA Auto Corp.* (1986) 177 Cal. App. 3d 321 [222 Cal. Rptr. 877], is instructive. In *Berman,* a court [**505] terminated the underlying fraud action because the alleged misstatements were protected by the litigation privilege codified in Civil Code section 47. In the subsequent malicious prosecution action, the Court of Appeal concluded that the termination was favorable because the litigation privilege provides "absolute protection from liability" for statements made in the course of a judicial proceeding. ( *Berman,* at p. 324.) As such, the "Legislature has in effect said that suits based on privileged statements are suits which are without merit." ( *Id.* at p. 325.) Similarly, the parol evidence rule, as a practical matter, provides "absolute protection from liability" for prior or contemporaneous statements at variance with the terms of a written integrated agreement. [7] ( *Berman,* [***106] at p. 324.) Be-

cause the Legislature, by codifying the rule, has "in effect" stated that suits based on such statements "are without merit," a termination based on the rule is favorable for malicious prosecution purposes. ( *Id.* at p. 325.)

> [7]  Indeed, neither the doctrine of waiver (see *Tahoe National Bank, supra,* 4 Cal.3d at p. 23) nor the doctrine of estoppel (see *Alameda County Title, supra,* 218 Cal. at pp. 515-516) affects this protection.

By contrast, *Robbins v. Blecher* (1997) 52 Cal.App.4th 886 [60 Cal. Rptr. 2d 815], is distinguishable. In *Robbins,* the defendants in the malicious prosecution action had filed an alter ego action against the plaintiffs in the malicious prosecution action after obtaining an antitrust judgment against a corporation owned by the plaintiffs. ( *Id.* at pp. 890-891.) After the reversal of the antitrust judgment, the defendants voluntarily dismissed the alter ego action as moot. ( *Id.* at p. 891.) The plaintiffs responded by filing a malicious prosecution action, contending that the dismissal constituted a favorable termination because the defendants could no longer establish an element of the alter ego action after the reversal of the antitrust judgment. ( *Id.* at p. 894.) [*348] The Court of Appeal disagreed and affirmed the dismissal of the malicious prosecution action. According to the court, the defendants voluntarily dismissed the action because they "had simply *lost standing* to pursue" the alter ego action. (*Ibid.,* italics added.) Thus, in dismissing the action, the defendants had not conceded that the plaintiffs "had done nothing wrong; they had merely conceded that" they "[were] no longer in a position to complain of [plaintiffs'] wrongdoing." (*Ibid.*) Unlike the dismissal in *Robbins,* the Court of Appeal in the underlying action in this case did not rely on a technical or procedural defense like lack of standing. Instead, the court applied a substantive rule of contract law and resolved the action on its merits. (See *ante,* at pp. 344-347.)

Finally, public policy considerations do not compel a different result. Concerns over the potential chilling effect of our decision on breach of contract actions due to judicial confusion over the parol evidence rule are readily assuaged by stringent enforcement of the probable cause element of the malicious prosecution tort. Indeed, by requiring courts "to make an objective determination of the 'reasonableness' of the defendant's conduct" ( *Sheldon Appel, supra,* 47 Cal.3d at p. 878) or to determine "whether any reasonable attorney would have thought the claim tenable" ( *id.* at p. 886), the probable cause requirement adequately protects the breach of contract plaintiff's "interest 'in freedom from unjustifiable and unreasonable litigation' " ( *id.* at p. 878).

32 Cal. 4th 336, *; 83 P.3d 497, **;
9 Cal. Rptr. 3d 97, ***; 2004 Cal. LEXIS 735

The policy considerations cited in *Lackner* are also not relevant here. In *Lackner*, we held that a termination on statute of limitations grounds did not constitute a favorable termination in the malicious prosecution context. ( *Lackner, supra,* 25 Cal.3d at p. 751.) In reaching this conclusion, we observed that strong policy considerations militated against a contrary holding. For example, we noted that the statute of limitations defense seeks to avoid litigation over stale claims and that allowing the malicious prosecution claim to proceed would put "in question the same stale issues." ( *Id.* at p. 752.) We also noted that the [**506] statute of limitations is a defense and may only be used as a " ' "shield" ' "--and not as a " ' "sword." ' " ( *Ibid.*)

[***107] Neither consideration, however, applies here. Unlike the statute of limitations, the parol evidence rule does not seek to avoid litigation over stale claims. Thus, our concern in *Lackner* is not implicated here. In any event, finding a termination based on the parol evidence rule to be favorable does not put "in question the same stale issues" to be avoided by the rule. ( *Lackner, supra,* 25 Cal.3d at p. 752.) Like the court in the underlying action, the court in the malicious prosecution action will have to consider the extrinsic evidence in order to determine whether the malicious prosecution defendant had an objectively reasonable basis for filing the underlying action [*349] in light of the parol evidence rule. (See *Alling, supra,* 5 Cal.App.4th at p. 1434 [" 'The matters to which the court must address itself in determining whether the evidence of an oral agreement should go to the jury are such questions as (1) whether the written agreement appears to state a complete agreement; (2) whether the alleged oral agreement directly contradicts the writing; (3) whether the oral agreement might naturally be made as a separate agreement; [and] (4) whether

the jury might be misled by the introduction of the parol testimony' "].) Moreover, unlike the statute of limitations, the parol evidence rule is not a procedural defense but a substantive principle of law. (See *ante,* at pp. 344-347.) Thus, there is no policy consideration precluding its use as a sword rather than a shield.

Although malicious prosecution suits are disfavored, we will not bar such suits for that reason alone. As we stated long ago, "we should not be led so astray by the notion of a 'disfavored' action as to defeat the established rights of the plaintiff by indirection; for example, by inventing new limitations on the substantive right, which are without support in principle or authority, or by adopting stricter requirements of pleading that are warranted by the general rules of pleading. In brief, the public policy involved has properly served, over many years, to crystallize the limitations on the tort, and the defenses available to the defendant. Having served that purpose, it should not be pressed further to the extreme of practical nullification of the tort and consequent defeat of the other important policy which underlies it of protecting the individual from the damage caused by unjustifiable criminal [and civil] prosecution[s]." ( *Jaffe v. Stone, supra,* 18 Cal.2d at pp. 159-160.) Accordingly, we hold that terminations based on the parol evidence rule are favorable for malicious prosecution purposes. In doing so, we disapprove of *Hall v. Harker, supra,* 69 Cal.App.4th 836, to the extent it is inconsistent with our opinion here.

**III.**

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter J., Werdegar, J., Chin, J., and Moreno, J., concurred.

EXHIBIT 10

LEXSEE 9 CAL. APP 4TH 373

**CONSOLIDATED WORLD INVESTMENTS, INC., Plaintiff and Appellant, v. LIDO PREFERRED LTD. et al., Defendants and Respondents.**

**No. B056402**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN.**

**9 Cal. App. 4th 373; 11 Cal. Rptr. 2d 524; 1992 Cal. App. LEXIS 1078; 92 Cal. Daily Op. Service 7687; 92 Daily Journal DAR 12443**

**September 4, 1992, Decided**

**NOTICE:**    [***1]  Opinion certified for partial publication. [*]

> \*   Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**PRIOR HISTORY:**    Superior Court of Los Angeles County, No. LASC C628893, James H. Hastings, Judge. [*]

> \*   Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:**    The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An investment company brought an action against a building owner for breach of contract, specific performance, and promissory fraud, arising from the building owner's cancellation of a building sales contract upon the investment company's failure to open escrow within the time limits of the contract. After the presentation of plaintiff's case, the trial court entered a judgment of nonsuit. (Superior Court of Los Angeles County, No. LASC C628893, James H. Hastings, Judge. [*])

> +   Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.

The Court of Appeal affirmed. The court held that the trial court properly refused to permit plaintiff to introduce parol evidence that the parties had not intended for the escrow period to begin to run until plaintiff had obtained a loan commitment on the property, since the contract, which unambiguously stated that the anticipated period of escrow would be 60 days from the date of the agreement, was not reasonably susceptible of the interpretation advanced by plaintiff. The court further held that the trial court properly entered a judgment of nonsuit, since the closing of escrow within 60 days of the contract date was a condition precedent to defendant's duty to sell, and the uncontradicted evidence established that the condition precedent did not occur. Given the 60-day time limit for closing escrow, the court held, defendant's cancellation of the contract 72 days after its inception could not be considered an anticipatory breach excusing plaintiff's nonperformance. The court also held that the trial court properly refused to permit plaintiff to reopen its case to introduce additional evidence and to amend its complaint to allege that defendant had waived the contractual time requirements, since plaintiff failed to make an offer of proof as to the nature and relevance of the evidence, and did not present any evidence during its case suggesting that defendant had knowingly and intelligently waived its right to timely performance of conditions precedent. (Opinion by Johnson, J., with Lillie, P. J., and Woods (Fred), J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Dismissal and Nonsuit § 51--Nonsuit--Appeal and Review--Standard of Review.** --On review of a judgment of nonsuit, the reviewing court looks to the evidence most favorable to the losing party and indulges

9 Cal. App. 4th 373, *; 11 Cal. Rptr. 2d 524, **;
1992 Cal. App. LEXIS 1078, ***; 92 Cal. Daily Op. Service 7687

in every legitimate inference in that party's favor. A nonsuit may be granted after the plaintiff's presentation of evidence only when no evidence of sufficient substantiality exists to support a verdict for the plaintiff. Thus, in order to defeat a motion for nonsuit after presentation of the plaintiff's evidence, it must be shown that there is some substance to the plaintiff's evidence upon which reasonable minds could differ. Defects not specifically pointed out by the moving party cannot be considered by the trial court or the reviewing court in determining the merits of the motion.

**(2) Appellate Review § 144--Scope of Review--Questions of Law and Fact--Construction of Contract.** --The trial court's construction of a contract, including its determination as to the ambiguity of the contract for purposes of the parol evidence rule, are questions of law subject to the appellate court's independent review.

**(3) Evidence § 66--Parol Evidence Rule--Exceptions--Evidence in Aid of Interpretation--To Explain Ambiguity--Test of Admissibility.** --Under the parol evidence rule, a party is not allowed to introduce extrinsic evidence of a prior agreement contradicting a writing that the parties intended to be a final expression of their agreement as to those terms. An exception to the rule, however, is that extrinsic evidence may be introduced to explain the meaning of ambiguous contractual language, although it is not admissible to flatly contradict the express terms of the agreement. The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is reasonably susceptible.

**(4) Real Estate Sales § 39--Construction and Operation of Contract--Stipulations as to Time and Order of Performance--Closing of Escrow: Evidence § 64--Parol Evidence Rule--Exceptions--Evidence in Aid of Interpretation--To Explain Ambiguity--Prohibition Against Contradicting Contract Terms.** --In an action for breach of contract, specific performance, and promissory fraud by an investment company against the owner of a building that the investment company had contracted to purchase, arising from the building owner's cancellation of the contract upon the investment company's failure to open escrow in accordance with the time limits of the contract, the trial court properly refused to permit plaintiff to introduce parol evidence that the parties had not intended for the escrow period to begin to run until the investment company had obtained a loan commitment. The contract was not reasonably susceptible to such an interpretation, since it unambiguously stated that

the anticipated period of escrow would be 60 days from the date of the agreement. To interpret the agreement as plaintiff suggested would be to impermissibly contradict its terms.

**(5) Contracts § 45--Actions--Plaintiff's Burden of Proof--Performance, Excuse, and Conditions Precedent.** --A plaintiff suing for breach of contract must prove that he or she has performed all conditions required of him or her, or must establish an excuse from nonperformance. Similarly, where the defendant's duty to perform under the contract is conditioned on the happening of some event, the plaintiff must prove that the event transpired.

**(6a) (6b) (6c) Real Estate Sales § 67--Rescission and Abandonment--Rescission by Vendor--Purchaser's Failure to Open Escrow Within Contractual Time Limitation.** --In an action for breach of contract, specific performance, and promissory fraud by an investment company against the owner of a building that the investment company had contracted to purchase, arising from the building owner's cancellation of the contract upon the investment company's failure to open escrow in accordance with the time limits of the contract, the trial court properly entered a judgment of nonsuit. The closing of escrow within 60 days of the contract date was a condition precedent to defendant's duty to sell, and the uncontradicted evidence established that the condition precedent did not occur. Defendant's cancellation of the contract 72 days after its inception could not be considered an anticipatory breach excusing plaintiff's nonperformance. This was so because although the contract, being silent as to the time for opening escrow, was properly construed as giving plaintiff a reasonable time within which to do so, plaintiff's failure to open escrow within the 60-day period for closing escrow could not be considered reasonable.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 725.]

**(7a) (7b) Contracts § 41--Performance--Reasonable Time for Performance.** --What constitutes a reasonable time under Civ. Code, § 1657, which gives a contracting party a reasonable time for performing an act if no time limit is specified in the contract, is a question of fact that depends on the circumstances of each case.

**(8a) (8b) (8c) Dismissal and Nonsuit § 47--Nonsuit--Hearing and Determination--Evidence--Motion to Reopen Case for Additional Evidence--Necessity of Specific Request--Specification of Additional Relevant Evidence.** --In an action for breach of contract, specific performance, and promissory fraud by an investment company against the owner of a building that

9 Cal. App. 4th 373, *; 11 Cal. Rptr. 2d 524, **;
1992 Cal. App. LEXIS 1078, ***; 92 Cal. Daily Op. Service 7687

the investment company had contracted to purchase, arising from the building owner's cancellation of the contract upon the investment company's failure to open escrow in accordance with the time limits of the contract, the trial court, in rendering a judgment of nonsuit, properly refused to permit plaintiff to reopen its case to introduce additional evidence and to amend its complaint to allege that defendant had waived the contractual time requirements. Plaintiff made only a vague request to reopen, and failed to make an offer of proof as to the nature and relevance of the evidence. Moreover, plaintiff was not simply requesting permission to amend its pleadings to conform to proof. On the contrary, in the two weeks it took plaintiff to present its case, it produced no evidence that defendant had knowingly and intelligently waived its rights to timely performance of conditions precedent.

**(9) Dismissal and Nonsuit § 47--Nonsuit--Hearing and Determination--Evidence--Motion to Reopen Case for Additional Evidence--Necessity of Offer of Proof. --** Ordinarily, when the defendant moves for nonsuit, it is an abuse of discretion to deny the plaintiff's request to reopen his or her case for the purpose of presenting additional evidence to cure the defects in the case. Such an error is waived, however, if the plaintiff fails to specify what additional evidence would be presented or how the additional evidence would cure the defects in the case.

**(10) Pleading § 72--Amendment--Time to Amend--At Trial. --**There is a strong policy favoring liberal allowance of amendments to pleadings even if they are requested during trial. On the other hand, the decision to allow an amendment to the pleadings in the midst of trial rests in the sound discretion of the trial court and should not be disturbed in the absence of a clear showing of abuse.

**COUNSEL:** Tova Kitron and Bruce G. Guttman for Plaintiff and Appellant.

Paul M. Hittelman for Defendants and Respondents.

**JUDGES:** Opinion by Johnson, J., with Lillie, P.J., and Woods Fred, J., concurring.

**OPINION BY:** JOHNSON, J.

**OPINION**

[*377] [**525] Plaintiff, Consolidated World Investments, Inc., (CWI), appeals from a judgment of nonsuit on all its causes of action against defendants, Lido Preferred Ltd. and others (Lido). We affirm.

Facts and Proceedings Below

On March 12, 1986, CWI entered into an agreement to purchase from Lido an apartment building in Hollywood. The pertinent provisions of the contract provide:

[**526] "3. Seller agrees to extend the closing of escrow upon Buyer's request in the event the lender is unable to fund the proposed First Trust Deed loan [***2] by the anticipated closing date, provided that the Buyer delivers a written commitment to the Seller from the proposed lender.

"4. The anticipated period of escrow shall be 60 days from the date of this Agreement. Escrow is to be established at Commonwealth Title Escrow, and shall be opened upon Buyer's request."

Paragraph 5 provides Lido will furnish CWI a preliminary title report and paragraph 8 of the contract provides, "Time is of the essence with respect to this Agreement."

On May 23, 1986, escrow not having been opened, Lido wrote to CWI stating "Lido ... terminates said agreement on this day[.]" At the time it cancelled the contract, Lido had not furnished CWI with the preliminary title report.

CWI brought this action against Lido for breach of contract, specific performance and promissory fraud. Lido's principal defense was that CWI [*378] had defaulted on the contract by failing to close escrow within 60 days from the date of the contract.

At trial, CWI attempted to introduce parol evidence showing the intent of the parties was that escrow would not open and the 60-day period would not start running until CWI received a loan commitment on the property. The trial [***3] court ruled the contract was not reasonably susceptible to CWI's interpretation. As the court interpreted the contract, escrow was either to open or close within 60 days of the date of the agreement. In either case, it was undisputed escrow had not opened within the 60-day period and there was no evidence of an excuse for the delay. After CWI had presented all its evidence in support of its claims, the trial court granted defendants' motion for nonsuit as to all three of CWI's causes of action. CWI filed a timely appeal.

DISCUSSION

I. Standard of Review.

**(1a)** Unlike other judgments, in a judgment of nonsuit we look to the evidence most favorable to the losing party and indulge every legitimate inference in that party's favor. A nonsuit may be granted after the plaintiff's presentation of evidence only when no evidence of sufficient substantiality exists to support a verdict for the plaintiff. ( *Carson v. Facilities Development Co.* (1984)

9 Cal. App. 4th 373, *; 11 Cal. Rptr. 2d 524, **;
1992 Cal. App. LEXIS 1078, ***; 92 Cal. Daily Op. Service 7687

36 Cal.3d 830, 838- 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Dameshghi v. Texaco Refining & Marketing, Inc.* (1992) 3 Cal.App.4th 1262, 1285-1286 [6 Cal.Rptr.2d 515].) [***4]  Furthermore, defects not specifically pointed out by the moving party cannot be considered by the trial court, or by us, in determining the merits of the motion. ( *Moore v. Moffatt* (1922) 188 Cal. 1, 5 [204 P. 220]; *Timmsen v. Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 868 [86 Cal.Rptr. 359].) Thus we con-fine our review to the ground for nonsuit raised in the trial court: CWI's failure to open or close escrow within the 60-day period specified in the contract bars the relief it seeks in this action.

The principal issue on the motion for nonsuit was whether parol evidence was admissible to explain the parties' intent with respect to the 60-day escrow period. **(2)** The trial court's construction of the contract, includ-ing its determination as to the ambiguity of the contract for purposes of the parol evidence rule, are questions of law subject to our independent review. ( *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].)

[*379]  II. The Trial Court Properly Refused to Admit Plaintiff's Parol Evidence as to the Meaning of the [***5] Contract Because the Contract Was Not Rea-sonably Susceptible to the Interpretation Urged by Plain-tiff.

A. *Parol Evidence Is Only Admissible to Prove a Meaning to Which the Contractual Language Is Rea-sonably Susceptible.*

**(3)** Under the parol evidence rule, a party is not al-lowed to introduce extrinsic [**527] evidence of a prior agreement contradicting a writing which was intended by the parties to be a final expression of their agreement as to those terms. ( Code Civ. Proc., § 1856, subd. (a).) One exception to the parol evidence rule is that extrinsic evidence may be introduced to explain the meaning of ambiguous contractual language. "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court unambigu-ous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' " ( *Winet v. Price, supra,* 4 Cal.App.4th at p. 1165, quoting *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) [***6]

In *Winet v. Price, supra,* the court suggested the fol-lowing analysis in determining whether the ambiguity exception permits introduction of parol evidence as to the meaning of the contract: (1) What is the construction of the contract urged by the proponent of the parol evi-dence? (2) Is the contract reasonably susceptible to this construction? (3) If so, did the parties intend this con-struction?  (4 Cal.App.4th at p. 1165.)

Parol evidence is admissible only to prove a mean-ing to which the contractual language is "reasonably sus-ceptible"; not to flatly contradict the express terms of the agreement.  ( at p. 1167.) Thus if the contract calls for the plaintiff to deliver to defendant 100 pencils by July 21, 1992, parol evidence is not admissible to show that when the parties said "pencils" they really meant "car batteries" or that when they said "July 21, 1992" they really meant May 13, 2001.

B. *The Contract Is Not Reasonably Susceptible to the Interpretation Proposed by CWI.*

**(4)** In the present case, CWI argues the contract is ambiguous as to when the 60-day escrow period begins to run. It [***7] then offers its construction of the con-tract: the 60-day escrow period does not begin to run until CWI obtains a loan commitment on the property. The trial court found the contract was not reasonably susceptible to this construction. We agree.

[*380]  The contract provides "The anticipated pe-riod of escrow shall be 60 days *from the date of this Agreement.*" (Italics added.) The plain meaning of this provision is that escrow shall close within 60 days from the date of the agreement. The word "anticipated" refers back to the contingency provided for in paragraph 3 un-der which Lido agreed "to extend the closing of escrow upon [CWI's] request in the event the lender is unable to fund the ... loan *by the anticipated closing date*[.]" (Ital-ics added.) Even if the contract could be construed to mean escrow would open within 60 days of the date of the agreement this interpretation would not aid CWI be-cause it was undisputed escrow had not opened by May 23, 1986 (more than 60 days from the date of the agree-ment).  To assert the phrase "from the date of this Agreement" really means "from the date CWI obtains a loan commitment on the property" is to flatly contradict the terms of [***8] the agreement.

III. Nonsuit Was Proper as to the Contract Claims Be-cause CWI Failed to Introduce Sufficient Evidence It Performed, or Was Excused From Performing, Its Duty to Open Escrow.

**(5)** It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. ( *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830 [69 Cal.Rptr. 321, 442 P.2d 377].) Similarly, where defen-dant's duty to perform under the contract is conditioned on the happening of some event, the plaintiff must prove the event transpired. ( *Cochran v. Ellsworth* (1954) 126 Cal.App.2d 429, 440-441 [272 P.2d 904].)

**(6a)** Under the contract between CWI and Lido, Lido's duty to complete the transaction was conditioned on escrow closing within 60 days from the date of the

9 Cal. App. 4th 373, *; 11 Cal. Rptr. 2d 524, **;
1992 Cal. App. LEXIS 1078, ***; 92 Cal. Daily Op. Service 7687

agreement, unless extended under the provisions [**528] of paragraph 3 of the agreement. It was CWI's duty to request opening of escrow. Because the parties intended the sale to be through escrow, performance by CWI of its duty to request opening of escrow was a condition precedent [***9] to Lido's performance of its duty to complete the sale. Lido could not perform its promise until after CWI performed its part. (Cf. *Rubin v. Fuchs* (1969) 1 Cal.3d 50, 54 [81 Cal.Rptr. 373, 459 P.2d 925]; and see 3A Corbin on Contracts (1960) § 640, pp. 60-62.)

At the close of CWI's case the following facts were undisputed: CWI never requested opening of escrow; escrow did not close within 60 days from the date of the agreement; the 60-day escrow period was not extended under the provisions of paragraph 3 of the contract which applied if the lender was unable to fund the loan by the anticipated closing date of escrow. [*381] Thus, the uncontradicted evidence established the failure of the conditions precedent to Lido's duty to sell.

CWI argues, however, there was sufficient evidence to go to the jury on the question whether the conditions precedent had been excused by Lido's conduct. We disagree.

CWI points out that despite the provision in the contract declaring "time is of the essence," the contract contains no specific time limit for its request to open escrow. **(7a)** Where no time limit is specified for the performance [***10] of an act, a reasonable time is allowed. ( *Civ. Code* § 1657; *Henry v. Sharma* (1984) 154 Cal.App.3d 665, 669 [201 Cal.Rptr. 478].) **(6b)** CWI argues the jury could have found a reasonable time to request opening of escrow had not yet expired when, 72 days after the date of the agreement, Lido cancelled the contract. Under that assumption, CWI reasons Lido's cancellation of the contract amounted to an anticipatory breach giving CWI a cause of action and excusing its performance under the contract. (See *Jeppi v. Brockman Holding Co.* (1949) 34 Cal.2d 11, 18 [206 P.2d 847, 9 A.L.R.2d 1297].)

**(7b)** What constitutes a "reasonable time" for performance is a question of fact. ( *Henry v. Sharma, supra,* 154 Cal.App.3d at p. 670.) What is reasonable depends, of course, on the circumstances of each case. ( at p. 672.) For example, in *Doryon v. Salant* (1977) 75 Cal.App.3d 706, 714 [142 Cal.Rptr. 378], the court expressed doubt whether a one-day delay in opening an escrow, even when the contract declared time [***11] is of the essence, would justify the seller's total failure to perform. The court concluded "if the one-day delay was a breach, it was caused by the defendants. More reasonably, it was no breach at all." In *Henry v. Sharma* we upheld the trial court's finding the buyer's performance 63 days after the contract was signed was not an "unrea-

sonable time" where the contract called for performance "within 30 days of escrow or sooner at the close of escrow" and the buyer's broker was authorized "at his discretion to extend all time limits, including escrow time limits, 30 days." (154 Cal.App.3d at p. 672, italics in original.)

*Henry v. Sharma* is clearly distinguishable from the present case. The only similarity is the failure of the contracts in both cases to specify the time within which escrow was to open. This was not an issue in *Henry,* however, because the buyer opened escrow three days after executing the contract. Unlike the present case, the contract in *Henry* did not specify the escrow period nor did it contain a "time is of the essence" clause. (154 Cal.App.3d at p. 668.) [***12]

**(1b)** In order to defeat a motion for nonsuit after presentation of plaintiff's evidence, "there must be some substance to plaintiff's evidence upon [*382] which reasonable minds could differ." ( *Ulwelling v. Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 104 [23 Cal.Rptr. 631].) **(6c)**Although no *specific* time is mentioned in the contract before us, the escrow period is defined as "60 days from the date of this Agreement." Thus, a *reasonable* time for requesting opening of escrow has to be a time which in the normal course of events would permit escrow to close within 60 days from the date of the agreement. Logic compels the conclusion that under the terms of the contract [**529] a "reasonable time" to *open* escrow could not be a time which falls beyond the period to *close* escrow. Thus, as a matter of law, CWI did not perform its duty to request opening of escrow within a reasonable time. Lido's cancellation of the contract after a reasonable time expired was not an anticipatory breach of the contract.

**(8a)** CWI next contends it should have been allowed to reopen its case to introduce additional evidence and to amend its complaint to allege [***13] Lido waived the conditions precedent to its performance. We find these contentions unpersuasive.

**(9)** Ordinarily when the defendant moves for nonsuit it is an abuse of discretion to deny the plaintiff's request to reopen and present additional evidence to cure the defects in its case. (See, e.g., *Huang v. Garner* (1984) 157 Cal.App.3d 404, 416-418 [203 Cal.Rptr. 800].) Such an error is waived, however, if the plaintiff fails to specify what additional evidence would be presented or how the additional evidence would cure the defects in the case. ( *Charles C. Chapman Building Co. v. California Mart* (1969) 2 Cal.App.3d 846, 859 [82 Cal.Rptr. 830]; *Greene v. Atchison, T. & S. F. Ry. Co.* (1953) 120 Cal.App.2d 135, 144 [260 P.2d 834, 40 A.L.R.2d 873].) In *Huang v. Garner, supra,* relied on by CWI, the court reversed a judgment of nonsuit where the

9 Cal. App. 4th 373, *; 11 Cal. Rptr. 2d 524, **;
1992 Cal. App. LEXIS 1078, ***; 92 Cal. Daily Op. Service 7687

trial court had refused to allow plaintiff to reopen its case to present additional evidence. But in that case the non-suit was based on plaintiff's [***14] failure to present evidence of the applicable standard of care in the community for persons engaged in defendant's profession and plaintiff was prepared to present evidence of the standard of care through an expert witness.

**(8b)** Here, CWI made only a vague request to re-open "to submit additional evidence that might clarify a lack of evidence submitted that would support the motion for a nonsuit." We cannot determine from this statement whether the court's denial of the request to reopen was prejudicial or not. If the request was for the purpose of adding more parol evidence on the meaning of the contract, it was properly denied for the reasons set forth in part II of this opinion. If the additional evidence was related to the issue of CWI's performance under the contract, it is difficult to see how it could have [*383] been relevant, given our interpretation of the contract stated above. In any event, CWI should have made an offer of proof as to the nature and relevance of the evidence.

**(10)** We recognize there is a strong policy favoring liberal allowance of amendments to pleadings even if they are requested during trial. ( *Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965 [7 Cal.Rptr.2d 922].) [***15] On the other hand, the decision to allow an amendment to the pleadings in the midst of trial rests in the sound discretion of the trial court and should not be disturbed absent a clear showing of abuse. (Ibid.)

**(8c)** CWI cites Professor Corbin for the proposition "[a]s a matter of course, a plaintiff who has alleged full performance of conditions should be readily permitted to amend his complaint by setting out a waiver or other excuse, if the condition is such that an excuse will be as effective as its performance would be in entitling him to the remedy he seeks. Indeed, in a few cases, the seeming

variance has been disregarded and an amendment not required." (3A Corbin on Contracts, *supra*, § 765, p. 537.)

We have no quarrel with the professor's view as a general statement of policy. Indeed, we would be inclined to follow it if it meant merely allowing CWI to conform its pleadings to the evidence it had already introduced. But such is not this case. Contrary to CWI's assertion on appeal, none of the evidence produced at trial comes close to establishing a waiver by Lido of the timeliness requirements of the contract. Furthermore, CWI's presentation of its case had already [***16] consumed two weeks. Despite extensive examination of the principal witnesses for both parties about their understanding and interpretation of the agreement not a hint of evidence was produced that Lido had knowingly [**530] and intelligently waived its rights to timely performance of the conditions precedent. The trial court was not required to continue the trial at this point on the remote possibility CWI might, through further discovery, produce such evidence.

For the reasons set forth above, we conclude CWI failed to present sufficient evidence it performed, or was excused from performing, its duties under the contract. No prima facie case of breach of contact having been established, the trial court properly granted the motion for nonsuit as to CWI's contract claims.

[*384] IV. The Trial Court Properly Granted the Motion for Nonsuit as to the Cause of Action for Promissory Fraud. *

---

\* See footnote *ante*, page 373.

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods Fred, [***17] J., concurred.

EXHIBIT 11

LEXSEE 216 CAL APP 3D 1310

**DINOSAUR DEVELOPMENT, INC., Plaintiff and Appellant, v. LEWIS H. WHITE
et al., Defendants and Respondents**

**No. A045078**

**Court of Appeal of California, First Appellate District, Division Four**

**216 Cal. App. 3d 1310; 265 Cal. Rptr. 525; 1989 Cal. App. LEXIS 1341**

**December 27, 1989**

**PRIOR HISTORY:**    [***1] Superior Court of Contra Costa County, No. C88-02959, Richard S. Flier, Judge.

**DISPOSITION:**    In order to constitute it an appealable judgment, the order entered on December 23, 1988 (see fn. 1, *ante*) is modified by adding the following paragraph: "Plaintiff's First Amended Complaint on file herein is dismissed as against defendants Lewis H. White and Elma Ruth White." As so reconstituted, the judgment of dismissal is affirmed. Defendants shall recover their costs.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A landowner whose land lacked access to public thoroughfare applied for approval of a subdivision plan. As a condition of approval and as the result of the demand of neighboring landowners, whose land also lacked access to a public thoroughfare, the county required the landowner to extend a proposed access road from the nearest public thoroughfare so that it served the neighbors' land as well as the landowner's. The neighbors refused to pay any part of the construction of the road, and the landowner brought an action for restitution. The neighbors demurred on the ground that any benefit that might accrue to them was not unjust enrichment by was rather an indirect and noncompensable incident of the landowner's decision to improve its property. The trial court sustained the demurrer without leave to amend, but failed to enter a judgment of dismissal. (Superior Court of Contra Costa County, No. C88-02959, Richard S. Flier, Judge.)

The Court of Appeal modified the trial court's order sustaining the demurrer to indicate that the complaint was dismissed; the court affirmed the judgment as so reconstituted. The court held that the landowner was not

entitled to restitution, notwithstanding that the county imposed the access requirement as a result of the neighbors' demands. The county's conduct did not constitute coercion, the court held, since there is no vested right to own or develop property in a specific manner. The court held that the fact the county acted as the result of the neighbors' demands was unimportant; what was important was that the county was acting within the scope of its powers, and that its action arose within the context of an official proceeding initiated at the landowner's request to be allowed to develop its property in a specific manner. (Opinion by Poche, Acting P. J., with Channell and Perley, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 26--Decisions Appealable--Dismissal and Nonsuit--Where No Judgment Entered.** --Where no judgment has been entered on an order dismissing the action, the appellate court may amend the nonappealable order to make it an appealable judgment of dismissal and construe the notice of appeal as applying to that judgment.

**(2) Appellate Review § 128--Rulings on Demurrers.** --On appeal of a judgment following the sustaining of a demurrer, all proper factual allegations are accepted as true for the purpose of determining whether the plaintiff has, however imperfectly, pleaded enough to constitute a cause of action with some entitlement to relief.

**(3) Restitution and Constructive Contracts § 1--Unjust Enrichment--Pleading.** --In terms of pleading, unjust enrichment is synonymous with restitution. There

216 Cal. App. 3d 1310, *; 265 Cal. Rptr. 525, **;
1989 Cal. App. LEXIS 1341, ***

is no particular form of pleading necessary to invoke the doctrine of restitution.

**(4) Restitution and Constructive Contracts § 1-- Restitution--Definition.** --"Restitution" includes not only the restoration or giving back of something to its rightful owner, but also compensation, reimbursement, indemnification, or reparation for benefits derived from, or for loss or injury caused to, another.

**(5) Restitution and Constructive Contracts § 1-- Unjuset Enrichment--Definition.** --The phrase "unjust enrichment" is used to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. One person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where if is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.

**(6) Restitution and Constructive Contracts § 2-- Grounds--Benefit to Another.** --The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. One who improves his own land ordinarily benefits his neighbors to some extent, and one who makes a gift or voluntarily pays money that he knows he does not owe confers a benefit; in neither case is he entitled to restitution.

**(7a) (7b) Restitution and Constructive Contracts § 2-- Grounds--Construction of Road Benefiting Neighbor.** --A landowner, whose land lacked access to a public thoroughfare and who applied for approval of a subdivision plan which included a proposed access road, was not entitled to restitution from neighboring landowners, whose land also lacked such access, after the county, as a condition of approval, required the landowner to extend the projected road so that it also provided access to the public thoroughfare to the neighbors' property, notwithstanding that the county imposed this requirement as the result of the neighbors' demands. The county's conduct did not constitute coercion, since there is no vested right to own or develop property in a specific manner. The fact that the county acted as the result of the neighbors' demands was unimportant; what was important was that the county was acting within the scope of its powers, and that its action arose within the context of an official proceeding initiated at the landowner's request to be allowed to develop its property in a specific manner.

**(8) Restitution and Constructive Contracts § 2-- Grounds--Benefit to Another--Officious Conferral of Benefit.** --One who confers benefits on another officiousl, i.e., by unjustified interference in the other's affairs, is not entitled to restitution. It must ordinarily appear that the benefits were conferred by mistake, fraud, coercion or request; otherwise, though there is enrichment, it is not unjust.

**COUNSEL:** James E. Reed, Nichols, Catterton, Downing & Reed for Plaintiff and Appellant.

Pamela J. Platt, Platt, Boatwright, Adams & Bechelli and Boatwright, Adams & Bechelli for Defendants and Respondents.

**JUDGES:** Opinion by Poche, Acting P. J., with Channell and Perley, JJ., concurring.

**OPINION BY:** POCHE

**OPINION**

[*1312]  [**526]  Opinion

The issue presented is this: If an agency of local government conditions its approval of a subdivision plan submitted by [*1313] landowner A on the construction of a road from the nearest public thoroughfare to the adjacent landlocked property of landowner B, can A require B to shoulder a portion of the road's construction costs? Our holding, which is limited to the peculiar [***2] situation presented, is that A does not have a cause of action against B for restitution.

Background

This appeal is from a judgment of dismissal entered after a general demurrer to a first amended complaint was sustained without leave to amend. [1] < (1) See fn. 1.>, (2) The posture of the appeal thus activates the rule that all proper factual allegations are accepted as true for the purpose of determining whether the plaintiff has, however imperfectly, pleaded enough to constitute a cause of action with some entitlement to relief. (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1040 [232 Cal.Rptr. 542, 728 P.2d 1177]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 496, fn. 2 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447].) The picture sketched by the salient allegations is delightfully simple.

1    The notice of appeal identifies the appeal as being "from the Order . . . entered on December 23, 1988, . . . providing as follows: [para.] An Order dismissing the . . . action . . . ." The only order made on that date provides that "defen-

108

dants' . . . demurrer to the First Amended Complaint is sustained without leave to amend." That order is not appealable. (*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 651 [150 Cal.Rptr. 242, 586 P.2d 556].) "However, where no judgment has been entered, the appellate court may, and we do, amend the nonappealable order to make it an appealable judgment of dismissal and construe the notice of appeal as applying to that judgment." (*Adams Point Preservation Society* v. *City of Oakland* (1987) 192 Cal.App.3d 203, 204, fn. 1 [237 Cal.Rptr. 273].)

[***3]  Within the City of Pleasant Hill are two adjoining parcels of unimproved real property.  One of the parcels is owned by plaintiff Dinosaur Development, Inc.  The other is owned by defendants Lewis H. White and Elma Ruth White.  The two parcels are "landlocked," lacking "access for ingress and egress to and from" Taylor Boulevard, which is "[t]he nearest thoroughfare for vehicular traffic."

Plaintiff applied to the Contra Costa County Community Development Department (the Department) for approval of a subdivision map reflecting plaintiff's plan to construct three single-family residences on its property.  Plaintiff also requested approval of its proposal to construct a paved access road (apparently along the route of an existing unpaved "fire road") from Taylor Boulevard; the proposed access road would "terminate in a cul-de-sac in the approximate center" of plaintiff's property.

According to plaintiff, defendants, who plan to develop their property in a similar fashion, "demanded that the . . . Department . . . [**527] require that [*1314] plaintiff ensure access" from Taylor Boulevard to defendants' property "as a condition of approving plaintiff's subdivision map." [***4]  "As a direct result of defendants' demands" the Department approved plaintiff's subdivision map subject to the express condition that plaintiff " ensure legal access to the proposed access road'" to defendants' property. [2]  Defendants refused to waive this condition or pay any part of the costs of constructing the proposed access road.

2    It appears from documents which were judicially noticed in connection with defendants' demurrer that plaintiff's proposed access road would proceed along approximately half of the northern boundary of plaintiff's parcel before turning into the interior of plaintiff's property.  The condition imposed by the Department would appear to require plaintiff to extend the proposed road along the entire northern boundary of its parcel in order that an undeveloped right-of-way forming the western boundary of plaintiff's parcel could be used to provide a contiguous link between Taylor

Boulevard and defendants' property (whose northeast corner abuts the southwest corner of plaintiff's parcel).

[***5]  Plaintiff alleged that compliance with the condition would require plaintiff to "expend a substantial sum of money on construction" of the proposed access road and would also provide an exclusive benefit to defendants' property, which "will increase in value whether developed or not, in an amount not presently ascertained, which amount shall constitute the unjust enrichment of defendants at plaintiff's expense." Plaintiff further alleged that the "least costly" alternative means of complying with the condition "is to deed the corner of its property [abutting defendants' parcel] to the County of Contra Costa, obtain a right-of-way along the north border of its property adjacent to Taylor Boulevard, and otherwise complete the plans submitted in its application for the subdivision with a cul-de-sac located in the center of its property." Plaintiff prayed for damages in amounts equal to (1) "the increased value of defendants' property as a result of plaintiff's compliance" with the condition, and (2) the "costs to plaintiff of improvements benefiting defendants."

Defendants demurred to the complaint on the ground that any benefit that might accrue to them was not unjust enrichment [***6] in the legal sense, but rather an indirect and noncompensable incident of plaintiff's decision to improve its own property.  After conducting a hearing on their general demurrer, the trial court agreed with defendants and made the order now under review on plaintiff's timely appeal. (See fn. 1, *ante*.)

Review

Although the word itself is never mentioned in its complaint, plaintiff is in essence pleading its entitlement to restitution. (3) Unjust enrichment, the term used by plaintiff, is synonymous with restitution. (See Goff & Jones, The Law of Restitution (1966) p. 12; 1 Palmer, The Law of Restitution [*1315] (1978) § 1.1, pp. 2-3; *id.* (1988 supp.) p. 3; Rest., Restitution (1937) § 1.) "[I]n any event, . . . there is no particular form of pleading necessary to invoke the doctrine" of restitution. (See *Frank* v. *Tavares* (1956) 142 Cal.App.2d 683, 689 [298 P.2d 887].)

The concept of restitution needs no translation from the legal to the vernacular. "It is said that The word "restitution" was used in the earlier common law to denote the return or restoration of a specific thing or condition. (4) [***7]  In modern legal usage, its meaning has frequently been extended to include not only the restoration or giving back of something to its rightful owner, but also compensation, reimbursement, indemnification, or reparation for benefits derived from, or for loss or injury caused to, another. (5) The phrase "unjust enrichment" is

used in law to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. [para.] It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, [**528] where it is just and equitable that such restitution be made, where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly. As expressed by some authorities, the obligation to do justice rests upon all persons, natural and artificial; if one obtains the money or property of others [***8] without authority, the law, independently of express contract, will compel restitution or compensation.'" (*Lucky Auto Supply* v. *Turner* (1966) 244 Cal.App.2d 872, 885 [53 Cal.Rptr. 628].)

(6) This expansive general principle is qualified by the rule that "the mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.' ( Rest., Restitution, § 1, com. c.)" (*Marina Tenants Assn.* v. *Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 134 [226 Cal.Rptr. 321].) That portion of the Restatement comment just quoted is immediately followed by an exceedingly pertinent illustration: "Thus, one who improves his own land ordinarily benefits his neighbors to some extent, and one who makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution." The point is reiterated later in slightly different form. "A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby [***9] entitled to contribution." ( Rest., Restitution, § 106.)

(7a) The parties' respective positions are readily foreseeable and easily stated. According to plaintiff, its entitlement to restitution is simple justice; [*1316] the road which plaintiff has in effect been ordered to confer on defendants is something that defendants expressly demanded, something that plaintiff would not otherwise provide, and something that will benefit no one but defendants. As defendants view the matter, it was only after plaintiff had decided to improve its property and thereby deprive them of their only route of access that the Department -- not defendants -- directed plaintiff to make alternate provision for defendants' access, a directive plaintiff can escape by dropping its proposed subdivision project. Defendants see themselves as the incidental beneficiaries of plaintiff's plan to improve its own land, with the Department acting to safeguard defendants' imperiled right of access. [3]

3  Defendants also contend that plaintiff's complaint is based entirely upon defendants' statements made during the course of proceedings before the zoning department, comments defendants assert are clothed with the absolute privilege of Civil Code section 47, subdivision 2. Because this issue was not raised as a ground for defendants' general demurrer, we do not address it. (See *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192].)

[***10] (8) Witkin concisely summarizes: "[O]ne who confers benefits on another *officiously,* i.e., by unjustified interference in the other's affairs, is not entitled to restitution. It must ordinarily appear that the benefits were conferred by *mistake, fraud, coercion or request*; otherwise, though there is enrichment, it is not unjust." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 97, p. 126 [original italics].) [4]

4  With respect to officiousness, the Restatement defines it as "interference in the affairs of others not justified by the circumstances under which the interference takes place. Policy ordinarily requires that a person who has conferred a benefit either by way of giving another services or by adding to the value of his land or by paying his debt or even by transferring property to him should not be permitted to require the other to pay therefor, unless the one conferring the benefit had a valid reason for so doing." ( Rest., Restitution, § 2, com. a.)

[***11] (7b) Mistake or fraud is not involved. Instead, plaintiff attempts to rely on the two other bases of recovery listed by Witkin. Plaintiff in effect submits that there is a request (albeit one routed through the Department) for the road from defendants, and coercion from the Department. But defendants made no direct request to plaintiff, nor are they coercing plaintiff to construct the access road. Plaintiff sees itself as not acting officiously to interfere in defendants' affairs; plaintiff would be perfectly happy to ignore defendants altogether. Any interference which may impend is, in plaintiff's view, "justified by the circumstances [**529] under which the interference takes place" (see fn. 4, *ante*) as an incident of its plan to improve its property. Just so, reply defendants; the fact that the dislocation of their status quo is incidental to plaintiff's plan absolves them of any obligation of restitution. But plaintiff perceives "a valid reason" for a restitution claim because any benefit it will confer on defendants is the direct consequence of governmental intervention.

[*1317] The parties do agree that their situation is without precedent. Although [***12] there is no author-

ity directly on point, the precedential cupboard is not entirely bare.

In *Green Trees Estates, Inc.* v. *Furstenburg* (1963) 21 Wis.2d 193 [124 N.W.2d 90], the plaintiff subdivision developer sought restitution for costs incurred in installing curb, gutter, and street improvements required by municipal ordinance. The Supreme Court of Wisconsin rejected the developer's claim that the homeowners whose property values were enhanced by these additions enjoyed unjust enrichment. The court began by noting "the complete voluntary nature of the plaintiff's decision to have the improvements installed . . . . The plaintiff, by its own choice, without compulsion from the city and without the consent of the defendants, chose to proceed with the improvements. Indeed, it may fairly be said that the record demonstrates that the plaintiff had the work done for its *own* benefit . . . in order to facilitate the plaintiff's loan arrangements with the FHA." (*Id.* at p. 198 [124 N.W.2d at p. 92] [original italics].) After a review of authorities, including the Restatement, the court held: "In conclusion, we believe that the plaintiff in making [***13] these improvements did so without mistake, emergency, or compulsion; it acted for its own benefit and without requesting or receiving the approval of the defendants. It failed to protect itself by appropriate agreements with those whom it now seeks to charge. Under these circumstances, the defendants were enriched, but so far as this plaintiff is concerned not unjustly." (*Id.* at p. 199 [124 N.W.2d at p 93].)

Closer to home is the earlier decision of *Major-Blakeney Corp.* v. *Jenkins* (1953) 121 Cal.App.2d 325 [263 P.2d 655]. It too involved a subdivider installing the same sort of improvements as in *Green Trees Estates,* also pursuant to the requirements of local government authorities. Unlike *Green Trees Estates,* the improvements were made to lots and streets abutting those lots owned by the defendants from whom the subdivider was seeking restitution. Affirming the trial court's judgment against the subdivider, the Court of Appeal stated: "The evidence and its reasonable inferences demonstrate that the improvements were undertaken as a part of plaintiff's own building program, that they were initiated without reference to any agreement [***14] with defendants concerning the properties here in dispute, that defendants at no time remotely suggested they would pay for or contribute to these improvements made adjacent to or abutting other properties they chanced to own. The whole situation negatives the idea that defendants were expected to participate financially, and any benefit that could possibly have flowed to defendants was incidental to plans and obligations to which plaintiff alone had committed itself. The general rule applicable, absent other equities, is that a party is not entitled to reimbursement for improvements voluntarily made to an-

other's land in the absence of an express or [*1318] implied contract to pay. [Citations.] A related principle, particularly applicable to the instant case, is adopted by the Restatement of Restitution, section 106, in the following language: A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.' The courts of many jurisdictions support this proposition. [Citations.] A property owner who conceivably [***15] acquires some incidental benefit from an adjoining landowner's improvements made pursuant to the latter's private development plans is not required to account for the benefits so received. [para.] . . . The expenditures made and obligations paid were done exclusively in furtherance of plaintiff's own interest and to discharge commitments for which it alone was responsible." (*Major-Blakeney Corp.* v. *Jenkins, supra,* 121 Cal.App.2d at pp. 340-341.)

The situations in *Green Trees Estates* and *Major-Blakeney* are highly similar to that in which plaintiff and defendants are embroiled. Plaintiff, however, discerns a crucial difference in that here the governmental entity acted solely in response to defendants and in such a manner as to benefit no one but defendants. Plaintiff is correct that the role of the Department was not confined to promulgating standards of general application. Plaintiff is also justified in pointing to the tighter causal nexus between the benefit it may provide and defendants may receive. These factors are not exactly irrelevant, yet they furnish no sound basis for diverging from the conclusion reached in *Green Trees Estates* and [***16] *Major-Blakeney.*

The Department's involvement, unlike *Green Trees Estates* and *Major-Blakeney,* was not the sideline passivity of the disinterested lawmaker. Nevertheless, the Department's conduct, although unquestionably important to this entire episode, does not constitute coercion. [5] There being no vested right to own or develop property in a specific manner (see *Save Oxnard Shores* v. *California Coastal Com.* (1986) 179 Cal.App.3d 140, 151 [224 Cal.Rptr. 425]; *Whaler's Village Club* v. *California Coastal Com.* (1985) 173 Cal.App.3d 240, 253 [220 Cal.Rptr. 2]; *City of Carmel-By-The-Sea* v. *Board of Supervisors* (1977) 71 Cal.App.3d 84, 93, fn. 4 [139 Cal.Rptr. 214]), "[c]ourts have . . . granted broad discretion to local authorities to regulate residential land use in order to stabilize economic and social aspects of a neighborhood and to promote aesthetic considerations, family environments, and basic residential character." (*Schroederv* v. *Municipal Court* (1977) 73 Cal.App.3d 841, 849 [141 Cal.Rptr. 85]; see Gov. Code, §§ 66411, 66411.1 [***17] .) As part of that discretion, government may impose conditions on the grant of permits or