216 Cal. App. 3d 1310, *; 265 Cal. Rptr. 525, **;
1989 Cal. App. LEXIS 1341, ***

privileges. Such conditions do not amount [*1319] to compulsion because the property owner remains free either to accept or to reject them. (Cf. *South Dakota* v. *Dole* (1987) 483 U.S. 203, 210 [97 L.Ed.2d 171, 180, 107 S.Ct. 2793] and authorities cited; *Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275, 295 [2 L.Ed.2d 1313, 1327-1328, 78 S.Ct. 1174].)

     5  Because the Department is not a party to this litigation between private parties, we express no opinion regarding whatever remedies, if any, plaintiff may have against any agency to the County of Contra Costa.

     Viewed from this perspective, the issue of whether defendants have been benefited at plaintiff's expense must be subordinated to the cold hard fact of governmental power that has been deployed to safeguard defendants' right of access to the nearest public thoroughfare. (See *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349-350 [144 P.2d 818]; [***18] *Lexington Hills Assn.* v. *State of California* (1988) 200 Cal.App.3d 415, 431 [246 Cal.Rptr. 97].) Once that power is conceded, the question of precisely how or by whom it is triggered becomes irrelevant. Accordingly, the fact that the Department acted "as a directed result of defendants' demand," as plaintiff alleges, is not important. What is important is that it was a governmental agency which acted within the scope of its powers, and that its action arose within the context of an official proceeding initiated by plaintiff's request to be allowed to develop its property in a specified manner. If plaintiff complies with the Department's condition for approval of the subdivision, defendants will benefit. [6] But because the benefit will be incidental to plaintiff's proposed development, it will not be unjust enrichment requiring defendants to make restitution. ( Rest., Restitution, § 1, com. c, § 2, com. a, § 106; *Green Trees Estates, Inc.* v. *Furstenburg, supra,* 21

Wis.2d 193 at pp. 198-199 [124 N.E.2d 90 at pp. 92-93]; *Major-Blakeney Corp.* v. *Jenkins, supra,* 121 Cal.App.2d 325 at pp. 340-341.) [***19] Plaintiff must view the expense of ensuring "legal access" required as the unavoidable cost of official approval for its proposed project. "[W]ithin the limits of the police power some uncompensated hardships must be borne by individuals as the price of living in a modern enlightened and progressive community.'" (*Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600, 603 [55 Cal.Rptr. 710] [citing and quoting *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 518 [35 Cal.Rptr. 480]; accord *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 516 [125 Cal.Rptr. 365, 542 P.2d 237].)

     6  Plaintiff's allegation that compliance with the condition imposed by the Department will benefit only defendants loses much of its force when considered in conjunction with the further allegation that defendants intend to construct a development similar to that contemplated by plaintiff. If plaintiff completes its project and the access road, the benefits of the latter will inure to the advantage of purchasers of residences built on defendants' parcel, the public who may use the road to go to and from those residences, and quite possibly to purchasers of residences built on plaintiff's parcel who may see their property values enhanced by the adjacent development.

     [***20] In order to constitute it an appealable judgment, the order entered on December 23, 1988 (see fn. 1, *ante*) is modified by adding the following [*1320] paragraph: "Plaintiff's First Amended Complaint on file herein is dismissed as against defendants Lewis H. White and Elma Ruth White." As so reconstituted, the judgment of dismissal is affirmed. Defendants shall recover their costs.

# EXHIBIT 12

LEXSEE 21 CAL 4TH 543

**BARRY ERLICH et al., Plaintiffs and Respondents, v. JOHN MENEZES, Defendant, Cross-complainant and Appellant; RON REBALDO et al., Cross-defendants and Respondents.**

No. S068325.

**SUPREME COURT OF CALIFORNIA**

21 Cal. 4th 543; 981 P.2d 978; 87 Cal. Rptr. 2d 886; 1999 Cal. LEXIS 5530; 99 Cal. Daily Op. Service 6808; 99 Daily Journal DAR 8687

August 23, 1999, Decided

**PRIOR HISTORY:**    Superior Court of San Luis Obispo County. Super. Ct. No. CV70302. Paul H. Coffee, Judge, and Jay R. Ballantyne, Judge. *

* Retired Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DISPOSITION:**    The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Homeowners filed an action against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction. Plaintiffs testified that they suffered emotional distress as a result of the defective condition of the house and defendant's invasive and unsuccessful repair attempts. The jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation. The jury awarded plaintiffs the cost of repairs and damages for emotional distress. (Superior Court of San Luis Obispo County, No. CV70302, Paul H. Coffee, Judge, and Jay R. Ballantyne, Judge. *) The Court of Appeal, Second Dist., Div. Six, No. B105675, affirmed.

* Retired Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The Supreme Court reversed the judgment of the Court of Appeal and remanded for further proceedings. The court held that since defendant's negligence directly caused only economic injury and property damage and breached no duty independent of the contract, plaintiffs could not recover damages for emotional distress based upon breach of the contract to build the house. Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. Conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. The court held that even assuming defendant's negligence constituted a breach of a sufficient independent duty to plaintiffs, such a finding would not entitle them to emotional distress damages on the facts alleged. The breach--the negligent construction of the house--did not cause physical injury. The only physical injury alleged was one plaintiff's heart disease, which flowed from the emotional distress and not directly from the negligent construction. The court held that the balance of policy considerations--the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs--counseled against expanding contract damages to include mental distress claims in negligent construction cases. (Opinion by Brown, J., with George, C. J., Kennard, Baxter, and Chin, JJ., concurring. Concurring and dissenting opinion by Werdegar, J., with Mosk, J., concurring (see p. 562).)

**HEADNOTES**

21 Cal. 4th 543, *; 981 P.2d 978, **;
87 Cal. Rptr. 2d 886, ***; 1999 Cal. LEXIS 5530

## CALIFORNIA OFFICIAL REPORTS HEAD-NOTES
Classified to California Digest of Official Reports

**(1a) (1b) Damages § 15--Measure of Damages--Breach of Contract--Distinction From Torts.** -- Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise. In contrast, tort damages are awarded to fully compensate the victim for all injury suffered. The distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate social policy.

**(2) Damages § 15--Measure of Damages--Breach of Contract--Breach of Legal Duty.** --The same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts. A contractual obligation may create a legal duty and the breach of that duty may support an action in tort. However, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury, for breach of the covenant of good faith and fair dealing in insurance contracts, for wrongful discharge in violation of fundamental public policy, or where the contract was fraudulently induced. In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct that is both intentional and intended to harm.

[See 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 141.]

**(3) Negligence § 9--Elements--Duty of Care--Rules--Foreseeability.** --Foreseeability alone is not sufficient to create an independent tort duty. Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability. Because the consequences of a negligent act must be limited to avoid an intolerable burden on society, the determination of duty recognizes that policy considerations may dictate that a cause of action should not be sanctioned no matter how foreseeable the risk.

**(4a) (4b) Damages § 15--Measure of Damages--Breach of Contract--Defective Construction of House--Mental Distress.** --In an action by homeowners against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction, in which the jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation, plaintiffs were not entitled to recover damages for mental distress. A claim for negligent breach of a contract is not sufficient to support tort damages for violation of an independent tort duty. Even assuming defendant's negligence constituted a breach of a sufficient independent duty to plaintiffs, such a finding would not entitle them to emotional distress damages on the facts alleged. The breach--the negligent construction of the house--did not cause physical injury. The only physical injury alleged was one plaintiff's heart disease, which flowed from the emotional distress and not directly from the negligent construction. A preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. Also, the general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462.]

**(5) Damages § 15--Measure of Damages--Tortious Breach of Contract.** --Generally, outside the insurance context, a tortious breach of contract may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages. Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated.

**(6a) (6b) Damages § 15--Measure of Damages--Breach of Contract--Defective Construction of House--Mental Distress as Consequential Damages.** --In an action by homeowners against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction, in which the jury found that defendant breached his construction

21 Cal. 4th 543, *; 981 P.2d 978, **;
87 Cal. Rptr. 2d 886, ***; 1999 Cal. LEXIS 5530

contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation, plaintiffs were not entitled to recover damages for mental distress as consequential or special damages. In California, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract. Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. To permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction causes gross interference with the normal use and habitability of the residence would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. A rule focusing not on the risks contracting parties voluntarily assume, but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815.]

**COUNSEL:** Edward J. Horowitz, Claudia Ribet; Knapp, Petersen & Clarke, Daniels, Baratta & Fine, Alan J. Carnegie, James L. Hsu and Stephen M. Harris for Defendant, Cross-complainant and Appellant.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad, Paula M. Yost and Cheryl Dyer Berg for American Insurance Association and Crum & Forster Insurance Company as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Alister McAlister for National Association of Independent Insurers as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Crosby, Heafey, Roach & May, Kathy M. Banke and Kay Long-Marin for Continental Metroplex as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Cox, Castle & Nicholson, Sandra C. Stewart and Debbie L. Freedman for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Morgenstein & Jubelirer, James L. McGinnis and Laura E. Gasser for Centex Homes as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Songstad, Randall & Ulich, Andrew K. Ulich and Thomas D. Deardorff II for Taylor Woodrow Homes, Inc., as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

Chapin Fleming McNitt Shea & Carter, Craig H. Bell and Keith A. Turner for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

John R. DeLoreto; Law Offices of Victor G. Zilinskas, Zilinskas & Jacobs, Victor G. Zilinskas and Michael L. Smith for Plaintiffs and Respondents.

Williams, Wester & Hall and Scott A. Williams as Amici Curiae on behalf of Plaintiffs and Respondents.

Kasdan, Simonds, McIntyre, Epstein & Martin and David G. Epstein for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Keppleman & Associates and Richard D. Keppleman for Cross-defendant and Respondent Ron Rebaldo.

Borton, Petrini & Conron, Craig R. McCollum and Gary A. Bixler for Cross-defendant and Respondent John Cravens Plastering, Inc.

**JUDGES:** Opinion by Brown, J., with George, C. J., Kennard, Baxter, and Chin, JJ., concurring. Concurring and dissenting opinion by Werdegar, J., with Mosk, J., concurring (see p. 562).

**OPINION BY:** BROWN

**OPINION**

[*548] [**980] [***888] **BROWN, J.**

We granted review in this case to determine whether emotional distress damages are recoverable for the negligent breach of a contract to construct a house. A jury awarded the homeowners the full cost necessary to repair their home as well as damages for emotional distress caused by [***889] the contractor's negligent performance. Since the contractor's negligence directly caused only economic injury and property damage, and breached no duty independent of the contract, we conclude the homeowners may not recover damages for emotional distress based upon breach of a contract to build a house.

I. FACTUAL AND PROCEDURAL BACKGROUND

Both parties agree with the facts as ascertained by the Court of Appeal. Barry and Sandra Erlich contracted with John Menezes, [**981] a licensed general contractor, to build a "dream house" on their ocean-view lot. The Erlichs moved into their house in December 1990. In February 1991, the rains came. "[T]he house leaked from every conceivable location. Walls were saturated in [an upstairs bedroom], two bedrooms downstairs, and the pool room. Nearly every window in the house leaked. The living room filled with three inches of standing water. In several locations water 'poured in streams' from the ceilings and walls. The ceiling in the garage became so saturated . . . the plaster liquefied and fell in chunks to the floor."

Menezes's attempts to stop the leaks proved ineffectual. Caulking placed around the windows melted, " 'ran down [the] windows and stained them and ran across the driveway and ran down the house [until it] . . . looked like someone threw balloons with paint in them at the house.' " Despite several repair efforts, which included using sledgehammers and jackhammers to cut holes in the exterior walls and ceilings, application of new waterproofing materials on portions of the roof and exterior walls, and more caulk, the house continued to leak--from the windows, from the roofs, and water seeped between the floors. Fluorescent light fixtures in the garage filled with water and had to be removed.

"The Erlichs eventually had their home inspected by another general contractor and a structural engineer. In addition to confirming defects in the roof, exterior stucco, windows and waterproofing, the inspection revealed [*549] serious errors in the construction of the home's structural components. None of the 20 shear, or load-bearing walls specified in the plans were properly installed. The three turrets on the roof were inadequately connected to the roof beams and, as a result, had begun to collapse. Other connections in the roof framing were also improperly constructed. Three decks were in danger of 'catastrophic collapse' because they had been finished with mortar and ceramic tile, rather than with the lightweight roofing material originally specified. Finally, the foundation of the main beam for the two-story living room was poured by digging a shallow hole, dumping in 'two sacks of dry concrete mix, putting some water in the hole and mixing it up with a shovel.' " This foundation, required to carry a load of 12,000 pounds, could only support about 2,000. The beam is settling and the surrounding concrete is cracking.

According to the Erlichs' expert, problems were major and pervasive, concerning everything "related to a window or waterproofing, everywhere that there was something related to framing," stucco, or the walking deck.

Both of the Erlichs testified that they suffered emotional distress as a result of the defective condition of the house and Menezes's invasive and unsuccessful repair attempts. Barry Erlich testified he felt "absolutely sick" and had to be "carted away in an ambulance" when he learned the full extent of the structural problems. He has a permanent heart condition, known as superventricular tachyarrhythmia, attributable, in part, to excessive stress. Although the condition can be controlled with medication, it has forced him to resign his positions as athletic director, department head and track coach.

Sandra Erlich feared the house would collapse in an earthquake and feared for her daughter's safety. Stickers were placed on her bedroom windows, and [***890] alarms and emergency lights installed so rescue crews would find her room first in an emergency.

Plaintiffs sought recovery on several theories, including breach of contract, fraud, negligent misrepresentation, and negligent construction. Both the breach of contract claim and the negligence claim alleged numerous construction defects.

Menezes prevailed on the fraud and negligent misrepresentation claims. The jury found he breached his contract with the Erlichs by negligently constructing their home and awarded $ 406,700 as the cost of repairs. Each spouse was awarded $ 50,000 for emotional distress, and Barry Erlich received an additional $ 50,000 for physical pain and suffering and $ 15,000 for lost earnings.

[*550] By a two-to-one majority, the Court of Appeal affirmed the judgment, including the emotional distress award. The majority noted the breach of a contractual duty may support an action in tort. The jury found Menezes was negligent. Since his negligence [**982] exposed the Erlichs to "intolerable living conditions and a constant, justifiable fear about the safety of their home," the majority decided the Erlichs were properly compensated for their emotional distress.

The dissent pointed out that no reported California case has upheld an award of emotional distress damages based upon simple breach of a contract to build a house. Since Menezes's negligence directly caused only economic injury and property damage, the Erlichs were not entitled to recover damages for their emotional distress.

We granted review to resolve the question.

II. DISCUSSION

A.

In an action for breach of contract, the measure of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom" (Civ. Code, § 3300), provided the damages are "clearly ascertainable in both their nature and origin" (Civ. Code, § 3301). In an action not arising from contract, the measure of damages is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not" (Civ. Code, § 3333).

**(1a)** "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." ( *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503, 515 [28 Cal. Rptr. 2d 475, 869 P.2d 454] (*Applied Equipment*).) "In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered. [Citation.]" ( *Id.* at p. 516.)

" '[T]he distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties [*551] to the agreement, tort law is primarily designed to vindicate "social policy." [Citation.]' " ( *Hunter v. Up-right, Inc.* (1993) 6 Cal. 4th 1174, 1180 [26 Cal. Rptr. 2d 8, 864 P.2d 88], quoting *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654, 683 [254 Cal. Rptr. 211, 765 P.2d 373] (*Foley*).) While the purposes behind contract and tort law are distinct, the boundary line between them is not ( *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal. 4th 85, 106 [44 Cal. Rptr. 2d 420, 900 P.2d 669] (conc. and [***891] dis. opn. of Mosk, J.) (*Freeman & Mills*)) and the distinction between the remedies for each is not " 'found ready made.' " (*Ibid.,* quoting Holmes, The Common Law (1881) p. 13.) These uncertain boundaries and the apparent breadth of the recovery available for tort actions create pressure to obliterate the distinction between contracts and torts-- an expansion of tort law at the expense of contract principles which Grant Gilmore aptly dubbed "con*torts.*" In this case we consider whether a negligent breach of a contract will support an award of damages for emotional distress--either as tort damages for negligence or as consequential or special contract damages.

B.

In concluding emotional distress damages were properly awarded, the Court of Appeal correctly observed that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts." ( *North American Chemical Co. v. Superior Court* (1997) 59 Cal. App. 4th 764, 774 [69 Cal. Rptr. 2d 466], citing 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 139, pp. 203-204.) Here, the court permitted plaintiffs to recover both full repair costs as normal contract damages and emotional distress damages as a tort remedy. [1]

> 1    At oral argument, plaintiff cited *Sloane v. Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320], a case involving a passenger wrongly ejected from a train, for the proposition that emotional distress damages arising out of breach of contract have been permitted in California for many years. In fact, *Sloane* specifically recognized the distinction between contract and tort remedies and held plaintiff could either "bring an action simply for the breach of . . . contract, or she could sue . . . in tort" for the carrier's violation of the duty, as a common carrier, which it assumed upon entering into the contract. ( *Id.* at p. 677.)

[**983] **(2)** The Court of Appeal also noted that "[a] contractual obligation may create a legal duty and the breach of that duty may support an action in tort." This is true; however, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. (*Applied Equipment, supra,* 7 Cal. 4th at p. 515.) " ' "An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " (*Ibid.,* quoting *Jones v. Kelly* (1929) 208 Cal. 251, 255 [280 P. 942].)

Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury ( *Fuentes v. Perez* (1977) 66 Cal. App. 3d [*552] 163, 168, fn. 2 [136 Cal. Rptr. 275]); for breach of the covenant of good faith and fair dealing in insurance contracts ( *Crisci v. Security Ins. Co.* (1967) 66 Cal. 2d 425, 433-434 [58 Cal. Rptr. 13, 426 P.2d 173]); for wrongful discharge in violation of fundamental public policy ( *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal. 3d 167, 175-176 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]); or where the contract was fraudulently induced. ( *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal. App. 3d 1220, 1238-1239 [1 Cal. Rptr. 2d 301].) In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm. (See, e.g., *Christensen v. Superior*

*Court* (1991) 54 Cal. 3d 868, 885-886 [2 Cal. Rptr. 2d 79, 820 P.2d 181].)

Plaintiff's theory of tort recovery is that mental distress is a foreseeable consequence of negligent breaches of standard commercial contracts. **(3)** However, foreseeability alone is not sufficient to create an independent tort duty. " 'Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability.' [Citation.]" ( *Burgess v. Superior Court* (1992) 2 Cal. 4th 1064, 1072 [***892] [9 Cal. Rptr. 2d 615, 831 P.2d 1197].) Because the consequences of a negligent act must be limited to avoid an intolerable burden on society ( *Elden v. Sheldon* (1988) 46 Cal. 3d 267, 274 [250 Cal. Rptr. 254, 758 P.2d 582]), the determination of duty "recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." ( *Ibid.*, fn. omitted.) "[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury." ( *Thing v. La Chusa* (1989) 48 Cal. 3d 644, 668 [257 Cal. Rptr. 865, 771 P.2d 814].) In short, foreseeability is not synonymous with duty; nor is it a substitute.

**(4a)** The question thus remains: is the mere negligent breach of a contract sufficient? The answer is no. It may admittedly be difficult to categorize the cases, but to state the rule succinctly: "[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." (*Freeman & Mills, supra*, 11 Cal. 4th at p. 107 (conc. and dis. opn. of Mosk, J.).) The familiar paradigm of tortious breach of contract in this state is the insurance contract. There we rely on the covenant of good faith and fair dealing, implied in every contract, to justify tort liability. (*Foley, supra*, 47 Cal. 3d at pp. 689-690.) In holding that a tort action is available for breach of the covenant in an insurance contract, [*553] we have "emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." (*Freeman & Mills, supra*, 11 Cal. 4th at p. 91; see Louderback & Jurika, *Standards* [**984] *for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16 U.S.F. L.Rev. 187, 227.)

The special relationship test, which has been criticized as illusory and not sufficiently precise (Putz & Klippen, *Commercial Bad Faith: Attorneys Fees--Not Tort Liability--Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 478-479), has little relevance to the question before us. Menezes is in the business of

building single-family homes. He is one among thousands of contractors who provide the same service, and the Erlichs could take their choice among any contractors willing to accept work in the area where their home would be constructed. Although they undoubtedly relied on his claimed expertise, they were in a position to view, inspect, and criticize his work, or to hire someone who could. Most significantly, there is no indication Menezes sought to frustrate the Erlichs' enjoyment of contracted-for benefits. He did build a house. His ineptitude led to numerous problems which he attempted to correct. And he remains ultimately responsible for reimbursing the cost of doing the job properly.

Moreover, since, as *Foley* noted, the insurance cases represented "a major departure from traditional principles of contract law," any claim for automatic extension of that exceptional approach whenever "certain hallmarks and similarities can be adduced in another contract setting" should be carefully considered. (*Foley, supra*, 47 Cal. 3d at p. 690.)

Our previous decisions detail the reasons for denying tort recovery in contract cases: the different objectives underlying tort and contract breach; the importance of predictability in assuring commercial stability in contractual dealings; the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and the preference for legislative action in affording appropriate remedies. (*Freeman & Mills, supra* , 11 Cal. 4th at p. 98, citing approvingly [***893] *Harris v. Atlantic Richfield Co.* (1993) 14 Cal. App. 4th 70, 81-82 [17 Cal. Rptr. 2d 649].) The same concerns support a cautious approach here. Restrictions on contract remedies serve to protect the " 'freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise.' " (11 Cal. 4th at p. 98, quoting *Harris, supra*, 14 Cal. App. 4th at p. 77.)

**(5)** Generally, outside the insurance context, "a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach [*554] the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." (*Freeman & Mills, supra*, 11 Cal. 4th at p. 105 (conc. and dis. opn. of Mosk, J.).) Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. (*Applied Equipment, supra*, 7 Cal. 4th at p. 515.) If every negligent breach of a contract gives rise to tort damages the

limitation would be meaningless, as would the statutory distinction between tort and contract remedies.

**(4b)** In this case, the jury concluded Menezes did not act intentionally; nor was he guilty of fraud or misrepresentation. This is a claim for negligent breach of a contract, which is not sufficient to support tortious damages for violation of an independent tort duty.

It may ultimately be more useful, in attempting to develop a common law of tortious breach, to affirmatively identify specific practices utilized by contracting parties that merit the imposition of tort remedies (*Freeman & Mills, supra,* 11 Cal. 4th at p. 107 (conc. and dis. opn. of Mosk, J.)), instead of comparing each new claim to a template for exceptions. In the interim, however, it is sufficient to note that more than mere negligence has been involved in each case where tort damages have been permitted. The benefits of broad compensation must be balanced against the [**985] burdens on commercial stability. "[C]ourts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." (*Freeman & Mills, supra,* 11 Cal. 4th at p. 109 (conc. and dis. opn. of Mosk, J.).)

C.

Even assuming Menezes's negligence constituted a sufficient independent duty to the Erlichs, such a finding would not entitle them to emotional distress damages on these facts. "The fact that emotional distress damages may be awarded in some circumstances (see Rest.2d Torts, § 905, pp. 456-457) does not mean they are available in every case in which there is an independent cause of action founded upon negligence." (*Merenda v. Superior Court* (1992) 3 Cal. App. 4th 1, 7 [4 Cal. Rptr. 2d 87] (*Merenda*).) "No California case has allowed recovery for emotional distress arising solely out of property damage" (*Cooper v. Superior Court* (1984) 153 Cal. App. 3d 1008, 1012 [200 Cal. Rptr. 746]); moreover, a preexisting contractual relationship, without more, will not support a recovery for mental suffering [*555] where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. (*Smith v. Superior Court* (1992) 10 Cal. App. 4th 1033, 1040, fn. 1 [13 Cal. Rptr. 2d 133]; *Mercado v. Leong* (1996) 43 Cal. App. 4th 317, 324 [50 Cal. Rptr. 2d 569] [emotional distress damages are unlikely when [***894] the interests affected are merely economic]; *Camenisch v. Superior Court* (1996) 44 Cal. App. 4th 1689, 1691 [52 Cal. Rptr. 2d 450] (*Camenisch*) [emotional distress damages are not recoverable when attorney malpractice leads only to economic loss].)

Although the Court of Appeal, plaintiffs, and their amici curiae rely substantially on *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal. 4th 965 [25 Cal. Rptr. 2d 550, 863 P.2d 795] (*Potter*), that case does not assist our inquiry. *Potter,* a toxic tort case, is readily distinguishable. First, the analysis there was narrowly circumscribed by the issue presented: "whether . . . emotional distress engendered by the fear of developing cancer in the future as a result of a toxic exposure is a recoverable item of damages in a negligence action." (*Id.* at p. 981.) Thus, the language of *Potter* cannot be read in support of some larger proposition affording emotional distress damages for any other type of fear of future harm in actions involving negligent breach of contract.

Second, the water supply of the plaintiffs in *Potter* had already been contaminated. The prolonged exposure could not be undone. In contrast, the Erlichs could have avoided the threatened injury by moving out of the house until necessary repairs had been completed. If they had, relocation expenses would have been part of their damages. In any event, the general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462, pp. 934-935.)

In short, *Potter* permitted recovery, within stringent limits, for emotional distress resulting from a personal injury directly caused by the defendant's tortious conduct. The Erlichs seek recovery for emotional distress engendered by an injury to their property.

To the extent *Potter* is relevant here, it reiterates that "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by [breach of the independent duty]. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests. [Citations.]" (*Potter, supra,* 6 Cal. 4th at p. 985.) Although the Erlichs feared [*556] physical injury, Menezes's negligent breach of contract resulted in only damage to their property, and they could have avoided any threat of harm.

The question was thoroughly explored in *Merenda, supra,* 3 Cal. App. 4th 1, [**986] a legal malpractice action in which the plaintiff sought damages for the severe emotional distress she suffered when her attorney's negligence caused the loss of expected damages from her claim for sexual assault and battery. "It is true that the 'transaction,' a contract for legal services, was intended to affect the plaintiff. However, the foreseeability of serious emotional harm to the client and the degree of certainty

that the client suffered such injury by loss of an economic claim are tenuous. Litigation is an inherently uncertain vehicle for advancing one's economic interests. The expectation of a recovery is rarely so certain that a litigant would be justified in resting her peace of mind upon the assurance of victory." (*Id.* at p. 10.)

In *Camenisch, supra,* 44 Cal. App. 4th 1689, the plaintiff sought emotional distress damages because the lawyer's negligent estate planning advice thwarted his tax avoidance goals. The complaint alleged the attorney had been hired " 'for the express purpose of providing for [the plaintiffs' family] and obtaining repose regarding their financial [***895] security.' " (*Id.* at p. 1692.) The trial court overruled the attorney's demurrer. The Court of Appeal rejected the claim for emotional distress damages. Acknowledging that *Merenda* dealt with malpractice related to litigation, the court nevertheless found its reasoning dispositive. "Public policy reasons do not support a different result when the alleged malpractice is committed in a tax advice context, even if the tax advice is part of an estate plan. [P] As in a litigation context, the client's primary protected interest is economic in a tax planning situation. The prospect of paying taxes is generally considered distressing, and the prospect of paying a greater levy than necessary is even more disquieting. However, the emotional upset derives from an inherently economic concern." (*Id.* at p. 1697.)

In *Lubner v. City of Los Angeles* (1996) 45 Cal. App. 4th 525 [53 Cal. Rptr. 2d 24], two artists lost a substantial portion of their life's work when a city trash truck, which had been parked on a hilltop, rolled down and crashed into their home, damaging the house, two cars, and much of their artwork. The Lubners filed a negligence action and sought damages for their emotional distress. Recognizing that the artwork may have been extremely important to the Lubners, the court nevertheless found they were not entitled to recover for emotional distress caused by injury to property. (*Id.* at p. 532.) The court based its ruling primarily on the absence of a pre-existing relationship between the parties, but separately considered whether the defendant breached a duty of care to the plaintiffs. Noting that the moral blame on the [*557] defendant was only that which attends ordinary negligence and nothing in the record indicated bad faith or reckless indifference to the Lubners' emotional tranquillity, the court concluded liability for negligent infliction of emotional distress was unwarranted. (*Id.* at p. 534.)

Public policy supports a similar limit where the negligence concerns the construction of a home. In *Blagrove v. JB Mechanical, Inc.* (Wyo. 1997) 934 P.2d 1273 (*Blagrove*), the homeowners sued a plumbing contractor to recover damages for mental anguish caused when flooding from a faulty plumbing connection damaged

their home and destroyed personal possessions. The Wyoming Supreme Court held that, absent physical injury, emotional distress damages can be recovered only in limited circumstances involving intentional torts, constitutional violations, and the breach of the covenant of good faith and fair dealing in insurance contracts, and concluded a contrary rule would be poor public policy.

"In deciding whether the plaintiff's interests are entitled to legal protection against the defendant's conduct, we must balance the interest of the injured parties against the view that a negligent act should have some end to its legal consequences. . . . We are persuaded that the concerns which have acted to prevent recovery for emotional distress when property is damaged remain relevant and weigh against permitting recovery. While we do not doubt that the Blagroves were justifiably and seriously distressed over the damage to [their home], adopting a rule allowing trial on the issue and recovery if [**987] proved would result in unacceptable burdens for both the judicial system and defendants. We therefore hold that emotional distress damages in connection with property damages are not compensable." (*Blagrove, supra,* 934 P.2d at pp. 1276-1277; see also *Caradonna v. Thorious* (1969) 17 Mich.App. 41 [169 N.W.2d 179, 182]; *Jankowski v. Mazzotta* (1967) 7 Mich.App. 483 [152 N.W.2d 49] [no mental anguish remedy available for ineptly constructed home].)

Here, the breach--the negligent construction of the Erlichs' house--did not cause physical injury. No one was hit by a falling beam. Although the Erlichs state they feared the house was structurally unsafe [***896] and might collapse in an earthquake, they lived in it for five years. The only physical injury alleged is Barry Erlich's heart disease, which flowed from the emotional distress and not directly from the negligent construction.

The Erlichs may have hoped to build their dream home and live happily ever after, but there is a reason that tag line belongs only in fairy tales. Building a house may turn out to be a stress-free project; it is much more likely to be the stuff of urban legends--the cause of bankruptcy, marital [*558] dissolution, hypertension and fleeting fantasies ranging from homicide to suicide. As Justice Yegan noted below, "No reasonable homeowner can embark on a building project with certainty that the project will be completed to perfection. Indeed, errors are so likely to occur that few if any homeowners would be justified in resting their peace of mind on [its] timely or correct completion . . . ." The connection between the service sought and the aggravation and distress resulting from incompetence may be somewhat less tenuous than in a malpractice case, but the emotional suffering still derives from an inherently economic concern.

D.

**(6a)** Having concluded tort damages are not available, we finally consider whether damages for emotional distress should be included as consequential or special damages in a contract claim. **(1b)** "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at the time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied Equipment, supra,* 7 Cal. 4th at p. 515.)

" '[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.' " (*Applied Equipment, supra,* 7 Cal. 4th at p. 517.)

**(6b)** Accordingly, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California. ( *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal. App. 4th 174, 188 [28 Cal. Rptr. 2d 371] (*Kwan*); *Sawyer v. Bank of America* (1978) 83 Cal. App. 3d 135, 139 [145 Cal. Rptr. 623].) "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." (Rest.2d [*559] Contracts, § 353.) The Restatement specifically notes the breach of a contract to build a home is not "particularly likely" to result in "serious emotional disturbance." (*Ibid.*)

Cases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were [**988] unavoidable. (See, e.g., *Burgess v. Superior Court, supra,* 2 Cal. 4th 1064 [infant injured during childbirth]; *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal. 3d 916 [167 Cal. Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] [misdiagnosed venereal disease and subsequent [***897] failure of marriage]; *Kately v. Wilkinson* (1983) 148 Cal. App. 3d 576 [195 Cal. Rptr. 902] [fatal waterskiing accident]; *Chelini v. Nieri* (1948) 32 Cal. 2d 480 [196 P.2d 915] [failure to adequately preserve a corpse].) Thus, when the express object of the

contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress. (See *Wynn v. Monterey Club* (1980) 111 Cal. App. 3d 789, 799-801 [168 Cal. Rptr. 878] [agreement of two gambling clubs to exclude husband's gambling-addicted wife from clubs and not to cash her checks]; *Ross v. Forest Lawn Memorial Park* (1984) 153 Cal. App. 3d 988, 992-996 [203 Cal. Rptr. 468, 42 A.L.R.4th 1049] [cemetery's agreement to keep burial service private and to protect grave from vandalism]; *Windeler v. Scheers Jewelers* (1970) 8 Cal. App. 3d 844, 851-852 [88 Cal. Rptr. 39] [bailment for heirloom jewelry where jewelry's great sentimental value was made known to bailee].)

Cases from other jurisdictions have formulated a similar rule, barring recovery of emotional distress damages for breach of contract except in cases involving contracts in which emotional concerns are the essence of the contract. (See, e.g., *Hancock v. Northcutt* (Alaska 1991) 808 P.2d 251, 258 ["contracts pertaining to one's dwelling are not among those contracts which, if breached, are particularly likely to result in serious emotional disturbance"; typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss]; *McMeakin v. Roofing & Sheet Metal Supply* (1990) 1990 Okla.Civ.App. 101 [807 P.2d 288] [affirming order granting summary judgment in favor of defendant roofing company after it negligently stacked too many brick tiles on roof, causing roof to collapse and completely destroy home, leading to plaintiff's heart attack one month later]; *Day v. Montana Power Co.* (1990) 242 Mont. 195 [789 P.2d 1224] [owner of restaurant that was destroyed in gas explosion allegedly caused by negligence of utility company employee not entitled to recover damages for emotional distress]; *Creger v. Robertson* (La.Ct.App. 1989) 542 So.2d 1090 [reversing award for emotional distress damages caused by foul odor emanating from a faulty foundation, preventing plaintiff from entertaining guests in her residence]; *Groh v. Broadland Builders, Inc.* [*560] (1982) 120 Mich.App. 214 [327 N.W.2d 443] [reversing order denying motion to strike allegations of mental anguish in case involving malfunctioning septic tank system, and noting adequacy of monetary damages to compensate for pecuniary loss of "having to do the job over," as distinguished from cases allowing recovery because situation could never be adequately corrected].)

Plaintiffs argue strenuously that a broader notion of damages is appropriate when the contract is for the construction of a home. Amici curiae urge us to permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction

21 Cal. 4th 543, *; 981 P.2d 978, **;
87 Cal. Rptr. 2d 886, ***; 1999 Cal. LEXIS 5530

causes gross interference with the normal use and habitability of the residence.

Such a rule would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. (Civ. Code, § 3301.) A contracting party cannot be required to assume limitless responsibility for all consequences of a breach and must be advised of any special harm that might result in order to determine whether or not to accept the risk of contracting. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815, p. 733.)

Moreover, adding an emotional distress component to recovery for construction defects could increase the already prohibitively high cost of housing in California, affect the availability of insurance for builders, and greatly diminish the supply of affordable housing. The potential for such broad-ranging economic consequences--costs likely to be paid by the public generally--means the task of fashioning [***898] appropriate limits on the availability of emotional distress claims [**989] should be left to the Legislature. (See Tex. Prop. Code Ann. § 27.001 et seq. (1999); Haw. Rev. Stat. § 663-8.9 (1998).)

Permitting damages for emotional distress on the theory that certain contracts carry a lot of emotional freight provides no useful guidance. Courts have carved out a narrow range of exceptions to the general rule of exclusion where emotional tranquillity is the contract's essence. Refusal to broaden the bases for recovery reflects a fundamental policy choice. A rule which focuses not on the risks contracting parties voluntarily assume but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.

The discussion in *Kwan*, a case dealing with the breach of a sales contract for the purchase of a car, is instructive. "[A] contract for [the] sale of an automobile is not essentially tied to the buyer's mental or emotional well-being. Personal as the choice of a car may be, the central reason for buying one is usually transportation. . . . [P] In spite of America's much-discussed [*561] 'love affair with the automobile,' disruption of an owner's relationship with his or her car is not, in the normal case, comparable to the loss or mistreatment of a family member's remains [citation], an invasion of one's privacy [citation], or the loss of one's spouse to a gambling addiction [citation]. In the latter situations, the contract exists primarily to further or protect emotional interests; the direct and foreseeable injuries resulting from a breach are also primarily emotional. In contrast, the undeniable aggravation, irritation and anxiety that may result from [the] breach of an automobile warranty are secondary effects deriving from the decreased usefulness of the car and the frequently frustrating process of having an automobile repaired. While [the] purchase of an automobile may sometimes lead to severe emotional distress, such a result is not ordinarily foreseeable from the nature of the contract." (*Kwan, supra*, 23 Cal. App. 4th at p. 190.)

Most other jurisdictions have reached the same conclusion. (See *Sanders v. Zeagler* (La. 1997) 686 So.2d 819, 822-823 [principal object of a contract for the construction of a house was to obtain a place to live and emotional distress damages were not recoverable]; *Hancock v. Northcutt, supra*, 808 P.2d at pp. 258-259 [no recovery for emotional distress as a result of defective construction; typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss]; *City of Tyler v. Likes* (Tex. 1997) 962 S.W.2d 489, 497 [mental anguish based solely on property damage is not compensable as a matter of law].)

We agree. The available damages for defective construction are limited to the cost of repairing the home, including lost use or relocation expenses, or the diminution in value. (*Orndorff v. Christiana Community Builders* (1990) 217 Cal. App. 3d 683 [266 Cal. Rptr. 193].) The Erlichs received more than $ 400,000 in traditional contract damages to correct the defects in their home. While their distress was undoubtedly real and serious, we conclude the balance of policy considerations--the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs--counsel against expanding contract damages to include mental distress claims in negligent construction cases.

DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred. [*562]

**CONCUR BY:** WERDEGAR

**DISSENT BY:** WERDEGAR

**DISSENT**

[***899] **WERDEGAR, J.,**

Concurring and Dissenting.--I concur in the majority opinion insofar as it holds that a plaintiff may not recover damages for emotional distress based on a defendant's negligent breach of a contract to build a house when the defendant has breached no duty independent of the contract. Although I read the record differently as to

21 Cal. 4th 543, *; 981 P.2d 978, **;
87 Cal. Rptr. 2d 886, ***; 1999 Cal. LEXIS 5530

whether these plaintiffs did, in fact, [**990] present an independent claim for negligence, in view of the majority's conclusion that plaintiffs did not present such a claim (see maj. opn., *ante*, at pp. 548, 554), the discussion in part C of the majority opinion (*id.*, at pp. 554-558) is unnecessary. I therefore express no opinion on the circumstances under which a tort plaintiff may recover damages for emotional distress.

Mosk, J., concurred.

EXHIBIT 13

LEXSEE 89 CAL APP 4TH 731

**FIRST COMMERCIAL MORTGAGE COMPANY, Plaintiff and Appellant, v. DONALD R. REECE et al., Defendants and Respondents.**

**No. B137132.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

**89 Cal. App. 4th 731; 108 Cal. Rptr. 2d 23; 2001 Cal. App. LEXIS 414; 2001 Cal. Daily Op. Service 4472; 2001 Daily Journal DAR 5481**

**May 31, 2001, Decided**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC186570. Ronald E. Cappai, Judge.

**DISPOSITION:** Reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A lender that was compelled to repurchase property after foreclosure and a successful full credit bid by the mortgage company to which it initially sold the loan, brought an action against the appraiser, who purportedly inflated the property's value, and the loan broker. Plaintiff's lawsuit included causes of action for fraud, negligent misrepresentation, and breach of contract. Defendants moved for summary judgment on the basis that plaintiff's claims were barred by the mortgage company's full credit bid. The trial court granted the motion. (Superior Court of Los Angeles, No. BC186570, Ronald E. Cappai, Judge.)

The Court of Appeal reversed. The court held that the trial court erred in granting summary judgment for defendants. Plaintiff's damages resulting from the compelled repurchase were incurred as a direct consequence of the fraud, and neither the repurchase nor the full credit bid by the purchaser precluded plaintiff from pursuing a fraud claim against defendants. The court further held that plaintiff was not precluded from claiming that it suffered damages as a consequence of the alleged negligent misrepresentation and breach of contract by the appraiser. As for the breach of contract claim, plaintiff alleged that prior to funding the loan, it entered into a written agreement with the loan broker wherein the loan broker agreed to indemnify plaintiff for any loans found to be fraudulent or not in compliance with industry underwriting requirements; however, the loan broker had refused to repurchase the subject loan. The full credit bid rule did not preclude a claim by plaintiff that it suffered damages as a consequence of defendant's breach of this agreement. (Opinion by Klein, P. J., with Croskey and Kitching, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Summary Judgment § 1--Purpose--Burden of Proof.** --Summary judgment motions are to expedite litigation and eliminate needless trials. They are granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A defendant meets its burden upon such a motion by negating an essential element of the plaintiff's case, by establishing a complete defense, or by demonstrating the absence of evidence to support the plaintiff's case. Once the moving defendant has met its initial burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists.

**(2) Summary Judgment § 26--Appellate Review--Scope of Review.** --The appellate court reviews the trial court's ruling on a motion for summary judgment under the independent review standard.

**(3) Deeds of Trust § 38--Sale Under Power--Effect of Sale--Full Credit Bid.** --At a nonjudicial foreclosure sale, if the lender chooses to bid, it does so in the capacity of a purchaser. The only distinction between the

lender and any other bidder is that the lender is not re-quired to pay cash, but is entitled to make a credit bid up to the amount of the outstanding indebtedness. The pur-pose of this entitlement is to avoid the inefficiency of requiring the lender to tender cash that would only be immediately returned to it. A full credit bid is a bid in an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees, and other expenses of the foreclosure. If the full credit bid is suc-cessful, the lender pays the full outstanding balance of the debt and costs of foreclosure to itself and takes title to the security property, releasing the borrower from further obligations under the defaulted note. Under the full credit bid rule, when a lender makes such a bid, it is precluded for purposes of collecting its debt from later claiming that the property was actually worth less than the bid. Thus, the lender is not entitled to insurance pro-ceeds payable for prepurchase damage to the property, prepurchase net rent proceeds, or damages for waste, because the lender's only interest in the property, the repayment of its debt, has been satisfied, and any further payment would result in a double recovery.

**(4) Deeds of Trust § 38--Sale Under Power--Effect of Sale--Full Credit Bid--Fraud Exception.** --There is a limited exception to the full credit bid rule where the lender was fraudulently induced to make the full credit bid. In order to establish reliance, which is an essential element of fraud, the lender must demonstrate that its full credit bid was a proximate result of the defendant's fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the bid. To the extent the lender's full credit bids were proximately caused by the defendant's fraudulent misrepresentations, and this reliance without independent or additional inquiry is either appropriate given the context of the relationship or was not otherwise manifestly unreasonable, the lender's bids cannot be deemed an admission of the property's value. Hence, the full credit bid rule would not apply. Thus, in order to avoid the full credit bid rule, the lender must have been induced to enter into the loan by the false representation, and still be under the mistaken belief that the representation was true at the time it makes the full credit bid. Moreover, the full credit bid rule is inapplica-ble where the lender justifiably relied on the defendant's misrepresentations in selling a loan and thereafter suf-fered damages from a compelled repurchase of the loan.

**(5) Deeds of Trust § 38--Sale Under Power--Effect of Sale--Full Credit Bid--Exceptions--Fraud--Asserted by Repurchasing Lender.** --The rule that a full credit bid operates as an admission by the bidding lender of the property's value did not preclude a claim by plaintiff repurchasing lender that it suffered damages from the compelled repurchase as a consequence of the alleged

fraud by the appraiser, who purportedly inflated the property's value, and the loan broker. Thus, the trial court erred in granting summary judgment for defendants. Plaintiff alleged it was fraudulently induced to make the loan, it sold the loan to a mortgage company that fore-closed and made a successful full credit bid at the trus-tee's sale, it was contractually obligated to indemnify the mortgage company for its losses on the loan, and that in doing so it was damaged by defendants' fraud. Plaintiff's damages resulting from the compelled repurchase were incurred as a direct consequence of the fraud, and neither the repurchase nor the full credit bid by the purchaser precluded plaintiff from pursuing a fraud claim against defendants. Irrespective of whether the repurchase is compelled by federal regulations or by contract, the criti-cal factor is whether the damages resulting from the compelled repurchase were incurred as a direct result of the fraud. To the extent a lender justifiably relies on a defendant's misrepresentations in selling the loans, its damages resulting from any compelled repurchase are incurred as a direct result of the fraud. Thus, defendants' reliance on the full credit bid made by the purchaser was misplaced.

[See 3 Witkin, Summary of Cal. law (9th ed. 1987) Security Transactions in Real Property, § 173.]

**(6) Deeds of Trust § 38--Sale Under Power--Effect of Sale--Full Credit Bid--Exceptions--Negligent Misrep-resentation and Breach of Contract.** --A lender that was compelled to repurchase property after foreclosure from the mortgage company it initially sold the loan to was not precluded from claiming that it suffered dam-ages as a consequence of the alleged negligent misrepre-sentation and breach of contract by the appraiser, who purportedly inflated the property's value, and the loan broker, notwithstanding that the mortgage company made a successful full credit bid at the trustee's sale. Since plaintiff did not make the full credit bid, but rather, sustained damages from a compelled repurchase of the loan, the rationale for applying the full credit bid rule was absent. Also, negligent misrepresentation is a form of deceit without scienter, and since plaintiff was permit-ted to make a claim for fraud, by a parity of reasoning, the same showing of justifiable reliance upon defendants' false representations in extending the loan and then sell-ing it was sufficient to establish a negligent misrepresen-tation claim. As for the breach of contract claim, plaintiff alleged that prior to funding the loan, it entered into a written agreement with the loan broker wherein the loan broker agreed to indemnify plaintiff for any loans found to be fraudulent or not in compliance with industry un-derwriting requirements; however, the loan broker had refused to repurchase the subject loan. The full credit bid rule did not preclude a claim by plaintiff that it suffered

89 Cal. App. 4th 731, *; 108 Cal. Rptr. 2d 23, **;
2001 Cal. App. LEXIS 414, ***; 2001 Cal. Daily Op. Service 4472

damages as a consequence of defendant's breach of this agreement.

**COUNSEL:** Severson & Werson, Jan T. Chilton and Suzanne M. Hankins for Plaintiff and Appellant.

Chapin Shea McNitt & Carter and Neil Gunny for Defendant and Respondent Donald R. Reece.

Wiezorek, Rice & Dieffenbach, Steven C. Rice; and Herman Thordsen for Defendants and Respondents Andrade Financial and John Andrade.

**JUDGES:** Opinion by Klein, P. J., with Croskey and Kitching, JJ., concurring.

**OPINION BY:** KLEIN

**OPINION**

[*734] [**25] **KLEIN, P. J.**

Plaintiff and appellant First Commercial Mortgage Company doing business as FCMC Mortgage Company (First Commercial), an Arkansas corporation, appeals a judgment following a grant of summary judgment in favor of defendants and respondents Donald R. Reece (Reece), John Andrade and Andrade Financial, a California corporation (Andrade) (collectively, defendants).

[*735] The defendants allegedly fraudulently induced First Commercial to make a loan based on an inflated appraisal and false information. First Commercial sold the loan to First Nationwide Mortgage Company (Nationwide). The borrowers [***2] defaulted, Nationwide foreclosed, and made a successful full credit bid at the trustee's sale. Pursuant to their contract, Nationwide then required First Commercial to make it whole. In exchange for repaying Nationwide, First Commercial received the foreclosed property, which it sold at a loss. First Commercial sued defendants to recoup its losses.

The essential issue presented is whether the full credit bid by Nationwide bars First Commercial's causes of action against third party nonborrowers for fraud, negligent misrepresentation and breach of contract.

The rule that a full credit bid operates as an admission by the bidding lender of the property's value does not preclude a [**26] claim by the repurchasing lender that it suffered damages from the compelled repurchase as a consequence of the defendant's misrepresentation or breach. Accordingly, the judgment is reversed.

FACTUAL AND PROCEDURAL BACKGROUND

In May 1996, First Commercial made a $ 207,593 purchase money loan to Juan Lima and Roberto Braca-

montes, secured by a deed of trust on real property, namely, a duplex located on North Alma Avenue in Los Angeles. First Commercial alleges it was induced to make the loan, [***3] in part, by an appraisal report prepared by Reece wherein he grossly inflated the property's value to $ 215,000, when in fact the property was worth less than $ 100,000. Andrade was the loan broker.

First Commercial sold the loan to Nationwide. The borrowers defaulted. On April 15, 1997, Nationwide foreclosed and acquired title to the subject property by making a credit bid of $ 224,183, the full amount of the unpaid debt. Pursuant to their contract, Nationwide demanded that First Commercial repurchase the loan so as to reimburse Nationwide for its loan loss. First Commercial complied and Nationwide reconveyed the property to First Commercial. First Commercial subsequently sold the property and recovered $ 79,252. First Commercial claims that as a result of the fraud, it sustained damages in the amount of $ 148,362.

First Commercial's verified complaint pled causes of action against both Reece and Andrade for fraud and negligent misrepresentation, as well as a cause of action against Andrade for breach of contract.

Defendants answered and thereafter moved for summary judgment. Defendants did not offer any evidence to dispute the allegation in First Commercial's complaint that [***4] First Commercial was contractually obligated to [*736] indemnify Nationwide. Defendants simply contended First Commercial's claims were barred as a matter of law by Nationwide's full credit bid. Defendants adopted as an undisputed fact the allegation in First Commercial's complaint that "[First Commercial] made a $ 207,593 loan based in part upon the presentation of a false and misleading appraisal report." The defense theory on summary judgment rested on the undisputed fact that "on April 15, 1997, the property was acquired with a $ 224,182.88 credit bid--the same amount as the unpaid debt."

In opposition, First Commercial argued its claims were not barred by the full credit bid at the trustee's sale. First Commercial emphasized the full credit bid was made by Nationwide; First Commercial was compelled to repurchase the property from Nationwide pursuant to their written agreement. Therefore, the notion that First Commercial "should bear the consequences of the actions of its successor in interest at a foreclosure sale, which First Commercial did not control, is contrary to the stated policy of the full credit bid rule, that policy being to make the *bidder* bear the consequences [***5] of its' bid."

On July 16, 1999, the matter came on for hearing. The trial court granted summary judgment, ruling "the April 1997 Full Credit Bid at foreclosure satisfied the

89 Cal. App. 4th 731, *; 108 Cal. Rptr. 2d 23, **;
2001 Cal. App. LEXIS 414, ***; 2001 Cal. Daily Op. Service 4472

loan debt herein as a matter of law and that, therefore, plaintiff can prove no recoverable damage."

First Commercial filed a timely notice of appeal from the judgment.

CONTENTIONS

First Commercial contends the full credit bid rule does not bar its claims for fraud, negligent misrepresentation and breach of contract, in that First Commercial neither [**27] conducted, nor bid at, the nonjudicial foreclosure sale.

DISCUSSION

1. *Standard of review.*

**(1)** As stated in *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal. App. 4th 579, 590 [52 Cal. Rptr. 2d 877], summary judgment "motions are to expedite litigation and eliminate needless trials. [Citation.] They are granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citations.]"

[***6] A defendant meets its burden upon such a motion by negating an essential element of the plaintiff's case, or by establishing a complete defense, or by [*737] demonstrating the absence of evidence to support the plaintiff's case. Once the moving defendant has met its initial burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists. ( *PMC, Inc. v. Saban Entertainment, Inc., supra,* 45 Cal. App. 4th at p. 590; *Leslie G. v. Perry & Associates* (1996) 43 Cal. App. 4th 472, 482 [50 Cal. Rptr. 2d 785].)

**(2)** We review the trial court's ruling on a motion for summary judgment under the independent review standard. ( *Rosse v. DeSoto Cab Co.* (1995) 34 Cal. App. 4th 1047, 1050 [40 Cal. Rptr. 2d 680].)

2. *The full credit bid rule.*

**(3)** "At a nonjudicial foreclosure sale, if the lender chooses to bid, it does so in the capacity of a purchaser. [Citation.] [***7] The only distinction between the lender and any other bidder is that the lender is not required to pay cash, but is entitled to make a credit bid up to the amount of the outstanding indebtedness. [Citations.] The purpose of this entitlement is to avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it. [Citation.] A 'full credit bid' is a bid 'in an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure.' [Citation.] If the full credit bid is successful, i.e., results in the acquisition of the property, the lender pays the full outstanding balance of the debt and costs of foreclosure

to itself and takes title to the security property, releasing the borrower from further obligations under the defaulted note. [Citation.]" ( *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal. 4th 1226, 1238 [44 Cal. Rptr. 2d 352, 900 P.2d 601].) [1]

1   The lender "is not required to open the bidding with a full credit bid, but may bid whatever amount [it] thinks the property worth. [Citation.]" ( *Commonwealth Mortgage Assurance Co. v. Superior Court* (1989) 211 Cal. App. 3d 508, 520 [259 Cal. Rptr. 425].)

[***8]   Under the " 'full credit bid rule,' when a lender makes such a bid, it is precluded for purposes of collecting its debt from later claiming that the property was actually worth less than the bid. [Citations.] Thus, the lender is not entitled to insurance proceeds payable for prepurchase damage to the property, prepurchase net rent proceeds, or damages for waste, because the lender's only interest in the property, the repayment of its debt, has been satisfied, and any further payment would result in a double recovery. [Citation.]" ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at pp. 1238-1239.)

In *Cornelison v. Kornbluth* (1975) 15 Cal. 3d 590 [125 Cal. Rptr. 557, 542 P.2d 981], the Supreme Court addressed the effect of a full credit bid in a [*738] nonjudicial foreclosure sale. In *Cornelison,* the plaintiff sold a single-family dwelling, taking back a promissory note secured by a first [**28] deed of trust on the property. ( *Id.* at p. 594.) The property was subsequently resold and ultimately condemned as unfit for [***9] human habitation. The original purchasers defaulted on the note, and the plaintiff caused the property to be sold at a trustee's sale. (*Ibid.*) She purchased the property at the sale by making a full credit bid. ( *Id.* at pp. 594, 606.)

The plaintiff then sued one of the subsequent purchasers, inter alia, for waste. ( *Cornelison v. Kornbluth, supra,* 15 Cal. 3d at p. 594.) *Cornelison* first concluded that a lender's claim for bad faith waste was not precluded by the antideficiency statutes. ( *Id.* at p. 605.) However, *Cornelison* "further concluded that even assuming that defendant is liable on such basis, nevertheless plaintiff cannot recover since she purchased the subject property at the trustee's sale by making a full credit bid." ( *Id.* at p. 606, fn. omitted.) *Cornelison* explained, "the measure of damages for waste is the amount of the impairment of the security, that is the amount by which the value of the security is less than the outstanding indebtedness and is thereby rendered inadequate. [Citation.]" ( [***10] *Ibid.*) "The mortgagee's purchase of the property securing the debt by entering a full credit bid establishes the value of the security as being equal to the outstanding indebtedness and ipso facto the nonexistence of any impairment of the security." (*Ibid.*; accord, *Alli-*

*ance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1242.)

3. *The Alliance exception: full credit bid rule is inapplicable where the lender was fraudulently induced to make a full credit bid.*

"Treating the full credit bid rule as a 'bright line rule' ultimately led to an undesirable result. Lenders that relied on supposedly valid appraisals in initiating loans and purchasing properties at foreclosure were left without recourse--even in cases involving massive fraud--and the defrauding parties escaped free and clear, at least as far as civil damages were concerned. *GN Mortgage Corp. v. Fidelity Nat. Title Ins. Co.* (1994) 21 Cal. App. 4th 1802 [27 Cal. Rptr. 2d 47] and *Western Fed. Savings & Loan Assn. v. Sawyer* (1992) 10 Cal. App. 4th 1615 [13 Cal. Rptr. 2d 639] were two similar cases involving claims of conspiracies to induce the lenders to make [***11] loans by allegedly engaging in fraud in connection with loan applications and appraisal reports. In both cases, the plaintiff/lender had obtained the liened property by full credit bid at a nonjudicial foreclosure sale, and in each case, later sold the property at a loss. The appellate courts concluded that, based on the reasoning in *Cornelison,* the defendants could not be liable for damages. ( *GN Mortgage Corp. v. Fidelity Nat. Title Ins. Co., supra,* 21 Cal. App. 4th at p. 1808[;] . . . *Western Fed. Savings & Loan Assn. v. Sawyer,* [*739] *supra,* 10 Cal. App. 4th at p. 1618[).]" ( *Michelson v. Camp* (1999) 72 Cal. App. 4th 955, 965 [85 Cal. Rptr. 2d 539].)

**(4)** In *Alliance,* "the Supreme Court disapproved the holdings in *GN Mortgage Corp.* and *Western Fed. Savings & Loan Assn.,* and carved out a limited exception to the full credit bid rule." ( *Michelson v. Camp, supra,* 72 Cal. App. 4th at pp. 965-966.) *Alliance* undertook review "solely on the issue of whether a lender's acquisition of security property by full credit bid at a nonjudicial foreclosure sale bars the lender from maintaining a fraud [***12] action to recover damages from nonborrower third parties who fraudulently induced the lender [**29] to make the loans." ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1234.) Specifically, the court considered whether as a result of its full credit bids, the lender "could demonstrate neither justifiable reliance nor actual damages" ( *id.,* at p. 1246), both essential elements of fraud. ( *Id.* at p. 1239.)

*Alliance* began by discussing reliance: "As with any purchaser at a foreclosure sale, by making a successful full credit bid or bid in any amount, the lender is making a generally irrevocable offer to purchase the property for that amount. [Citation.] The lender, perhaps more than a third party purchaser with fewer resources with which to gain insight into the property's value, generally bears the burden and risk of making an informed bid. [P] It does not follow, however, that being intentionally and materially misled by its own fiduciaries [2] or agents as to the value of the property prior to even making the loan is [***13] within the realm of that risk. [Citation.] Most lenders, such as [plaintiff] in this case, are corporate entities, and rely on their agents to provide them material information. Here, [the lender] did obtain appraisals, and attempted to make informed loan decisions. It alleges, however, that its appraiser . . . in conspiracy with defendants, fraudulently misrepresented the nature of the properties and the existence and qualifications of the buyers, and that it did not discover the fraud until after it acquired title to the properties. The full credit bid rule was not intended to immunize wrongdoers from the consequences of their fraudulent acts." ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1246, fn. omitted.)

2    *Alliance* did not determine whether the defendants were fiduciaries and left that issue open. ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1246.)

*Alliance* recognized that the lender's difficulty resulted from its overvalued [***14] bid at the foreclosure sale. Had it become aware of the true value of the property and bid only what it was worth, there would have been no barrier to a later suit against the defrauding parties. ( *Michelson v. Camp, supra,* 72 Cal. App. 4th at p. 967.) The *Alliance* court, therefore, held that in order to establish reliance, the lender needed to demonstrate "that its full credit bids [*740] were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the bids. [Citations.]" ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at pp. 1246-1247.) "To the extent [the lender's] full credit bids were proximately caused by defendants' fraudulent misrepresentations, and this reliance without independent or additional inquiry was either appropriate given the context of the relationship or was not otherwise manifestly unreasonable, [the lender's] bids cannot be deemed an admission of the properties' value. (See *Bank of America etc. Assn. v. Reidy* [(1940)] 15 Cal. 2d [243,] 248 [101 P.2d 77] [***15] ['not unusual for a mortgagee to make a bid for the property in the amount owing on the debt' when it cannot recover a deficiency].) Hence, the full credit bid rule would not apply." ( *Alliance, supra,* at p. 1247.)

In other words, "in order to avoid the full credit bid rule, the lender must have been induced to enter into the loan by the false representation, *and* still be under the mistaken belief that the representation was true at the time it makes the full credit bid." ( *Michelson v. Camp, supra,* 72 Cal. App. 4th at p. 969.) In *Michelson,* "appellants alleged the former--that [**30] they were induced

to enter into the loan agreement . . . by respondent's intentional or negligent misrepresentations--but not the latter. Their complaint does not contain an allegation that they were induced to make their $ 652,000 bid on the property in 1994 in reliance on respondent's representations as to the value of the property in 1991 and 1992." (*Ibid.*)

   4. *Alliance's further recognition that full credit bid rule is inapplicable where lender justifiably* [***16] *relied on defendant's misrepresentations in selling a loan and thereafter suffered damages from a compelled repurchase of the loan.*

   In *Alliance*, "prior to learning of the fraud, [the lender] sold several loan obligations to secondary investors. In the case of three of these properties, regulations of the Federal Home Loan Mortgage Corporation (FHLMC) required [the lender] to repurchase the loans it had earlier sold to the Federal National Mortgage Association (FNMA)." ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1233.) Thus, with respect to these three properties, the lender alleged "it was compelled by FHLMC regulations to repurchase loans it had earlier sold to secondary investors before it learned of the fraud." ( *Id.* at p. 1248.) [3]

   3 Technically speaking, one cannot "repurchase" the loan following a foreclosure at which the property is purchased for a full credit bid. Such a bid extinguishes the loan, releasing the borrower from any further obligation under the defaulted note. ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1238.) The repurchasing lender acquires the property, not the loan. Nonetheless, *Alliance* referred to the transaction as a repurchase of the loan ( *id.* at pp. 1233, 1248) and we use that terminology here.

   [***17] [*741] The Supreme Court held "to the extent [the lender] justifiably relied on defendants' misrepresentations in selling the loans, its damages resulting from any compelled repurchase were incurred as a direct consequence of the fraud. (See *Guild Mortgage Co. v. Heller* (1987)] 193 Cal. App. 3d [1505,] 1508-1509 [239 Cal. Rptr. 59]; *id.* at p. 1514 [Allegations that federal regulations compelled repurchase of properties resulting in plaintiff's damage, repurchase necessitated by fraud, and loan would not have been made in the absence of purported misrepresentations 'sufficient to establish a clear causal connection between defendants' alleged fraudulent conduct and the damages sustained.'].) Accordingly, for these claims in particular, we perceive no basis on which such a repurchase, or any full credit bid by the FNMA, would even arguably preclude [the lender] from pursuing a fraud claim against defendants."

( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at pp. 1248-1249.)

   In *Guild Mortgage Co. v. Heller, supra,* 193 Cal. App. 3d 1505, which the Supreme Court cited with approval in *Alliance* [***18] ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1249), a mortgage company allegedly was fraudulently induced by the buyers to extend them a home loan. ( *Guild Mortgage Co., supra,* at pp. 1508-1509, 1514.) The mortgage company sold the note to the FHLMC, which foreclosed, purchased the property at a nonjudicial sale, and which then required the mortgage company to repurchase the property. ( *Id.* at pp. 1508-1509.) The mortgage company lost over $ 50,000 in reselling the property on the open market. ( *Id.* at p. 1509.) *Guild Mortgage Co.* held [**31] the mortgage company had stated a cause of action for fraud in the inducement of the loan. ( *Id.* at p. 1514, 239 Cal. Rptr. 59.)

   With respect to the consequence of a full credit bid by the secondary purchaser, *Guild Mortgage Co.* stated: "Although the respective briefs devote considerable time to the legal and practical effect of a full credit bid on plaintiff's cause of action, [fn. omitted] we need not resolve that issue on this appeal. Regardless of whether the FHLMC purchased the property by making a full credit bid, the complaint [***19] avers that plaintiff Guild Mortgage and not the FHLMC was damaged in an amount exceeding $ 50,000 when it was required to repurchase and sell the property on the open market. The complaint further alleges that the repurchase was necessitated by defendants' fraud and that the loan would not have been made in the absence of the purported misrepresentations. . . . These allegations are sufficient to establish a clear causal connection between defendants' alleged fraudulent [*742] conduct and the damages sustained." ( *Guild Mortgage Co. v. Heller, supra,* 193 Cal. App. 3d at p. 1514.) [4]

   4  As explained, a full credit bid is deemed an admission of the property's value. ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1238.) However, the repurchasing lender does not control the amount the secondary market investor bids at the foreclosure sale. Therefore, the rationale for holding the foreclosing lender to its full credit bid is inapplicable to a lender required to repurchase the property after foreclosure.

   [***20] 5. *First Commercial's fraud theory herein is not barred by full credit bid rule.*

   (5) First Commercial properly does not allege it was fraudulently induced to make a full credit bid--the full credit bid was made by Nationwide. Rather, First Commercial alleged it was fraudulently induced to make the

89 Cal. App. 4th 731, *; 108 Cal. Rptr. 2d 23, **;
2001 Cal. App. LEXIS 414, ***; 2001 Cal. Daily Op. Service 4472

loan by way of a misleading appraisal. Thereafter, First Commercial was damaged when it acquired the property as a consequence of its alleged contractual obligation to indemnify Nationwide.

As explained above, pursuant to *Alliance*, First Commercial's damages resulting from the compelled repurchase were incurred as a direct consequence of the fraud, and neither the repurchase nor the full credit bid by Nationwide precludes First Commercial from pursuing a fraud claim against defendants. ( *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal. 4th at pp. 1248-1249.)

Defendants contend the *Guild Mortgage Co.* and *Alliance* decisions are distinguishable because they involved repurchase obligations imposed by federal regulations. ( *Guild Mortgage Co. v. Heller, supra*, 193 Cal. App. 3d at p. 1509, fn. 3; *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal. 4th at p. 1248.) [***21] The argument is unpersuasive. Irrespective of whether the repurchase is compelled by federal regulations or by contract, the critical factor is whether the damages resulting from the compelled repurchase were incurred as a direct result of the fraud. As stated in *Alliance*, to the extent a lender "justifiably relied on defendants' misrepresentations in selling the loans, its damages *resulting from any compelled repurchase* were incurred as a direct consequence of the fraud." ( *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal. 4th at pp. 1248-1249, italics added.)

Defendants also contend First Commercial's decision to *voluntarily* reimburse Nationwide cannot recreate liability that the full credit bid had erased. The argument is meritless. First Commercial's verified complaint alleged it was contractually [**32] bound to indemnify Nationwide for any losses resulting from fraudulent loans sold to Nationwide. In seeking summary judgment, defendants did not present any evidence to controvert First Commercial's [*743] claim it was legally obligated to make Nationwide whole. Therefore, respondents' contention that First Commercial acted as a volunteer [***22] in reimbursing Nationwide lacks any evidentiary support. [5]

[5]  Reece also contends *Commonwealth Mortgage Assurance Co. v. Superior Court, supra*, 211 Cal. App. 3d 508, is dispositive. However, that decision too is inapposite because it does not involve the compelled repurchase of a loan. There, the foreclosing lender made a full credit bid and then submitted a claim to the mortgage insurance company under policies of mortgage guaranty insurance. ( *Id.* at p. 512.) The insurer then sued the *borrowers*, alleging that false representations were made by the borrowers to induce the insurer to provide mortgage guaranty insur-

ance for the loans. ( *Id.* at p. 513.) *Commonwealth* held a full credit bid precludes both the lender's and insurer's causes of action for fraud. ( *Id.* at p. 520.) "If the creditor-beneficiary makes a full credit bid for the property and is the successful bidder, then the proceeds from the trustee's sale are exactly sufficient to satisfy the debt, there is no deficiency and no surplus. [Citation.] In this event, the creditor has suffered no damages and cannot recover under an insurance policy. [Citations.]" (*Ibid.*)

[***23]  In sum, defendants' reliance on the full credit bid made by Nationwide is misplaced. First Commercial's verified complaint alleged it was fraudulently induced to make the loan, it sold the loan to Nationwide, *it was contractually obligated to indemnify Nationwide for its losses on the loan*, and that in doing so it was damaged by defendants' fraud. A defendant seeking summary judgment has the burden to negate an essential element of the plaintiff's case, or to establish a complete defense, or to demonstrate the absence of evidence to support the plaintiff's case. ( *PMC, Inc. v. Saban Entertainment, Inc., supra*, 45 Cal. App. 4th at p. 590; *Leslie G. v. Perry & Associates, supra*, 43 Cal. App. 4th at p. 482.) The mere showing by defendants that Nationwide had acquired the property pursuant to a full credit bid did not begin to meet their burden. [6]

[6]  We note the trial court sustained defendants' evidentiary objections to First Commercial's extensive *opposing* declaration and supporting exhibits. Nonetheless, the moving papers on summary judgment did not meet their burden in the first instance. Consequently, the burden did not shift to First Commercial to show that a triable issue of material fact exists. ( Code Civ. Proc., § 437c, subd. (*o*)(2).)

[***24]  6. *Full credit bid does not preclude First Commercial's causes of action for negligent misrepresentation and breach of contract.*

(6)  The remaining issue is the effect of Nationwide's full credit bid on First Commercial's causes of action for negligent misrepresentation [7] and breach of contract.

[7]  The tort of negligent misrepresentation consists of making a false statement honestly believing it is true but without reasonable ground for such belief. ( *Yanase v. Automobile Club of So. Cal.* (1989) 212 Cal. App. 3d 468, 472-473 [260 Cal. Rptr. 513, 2 A.L.R.5th 1084]; Civ. Code, §§ 1710, subd. 2, 1572, subd. 2; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 720 et seq., p. 819 et seq.)

[*744] In *Alliance*, the court considered whether as a result of its full credit bids, the lender "could demonstrate neither justifiable reliance nor actual damages" ( *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal. 4th at p. 1246), both essential elements [***25] of fraud. ( *Id.* at p. 1239.) *Alliance* held "to the extent defendants made fraudulent misrepresentations on which [a lender] [**33] justifiably relied in making its full credit bid, they cannot assert the full credit bid rule as a defense to [the lender's] *fraud* claims." ( *Id.* at p. 1246, fn. 8, italics added.)

*Alliance's* holding was analyzed in *Pacific Inland Bank v. Ainsworth* (1995) 41 Cal. App. 4th 277 [48 Cal. Rptr. 2d 489]. In *Pacific Inland Bank,* after the lender made a full credit bid and suffered a loss, it sued, alleging the appraiser's breach of contract and negligence resulted in the loan being undersecured. ( *Id.* at pp. 279-280.) *Pacific Inland Bank* held *Alliance's* holding was limited to *fraud-based* claims and therefore the full credit bid rule still barred the lender's nonfraud claims against third party nonborrowers. ( *Id.* at pp. 282-283.) *Pacific Inland Bank* concluded: "Absent a fraud claim, a full credit bid estops a plaintiff from establishing damages." ( *Id.* at p. 283.)

However, leaving aside whether *Pacific Inland Bank* [***26] was correctly decided, [8] it is inapplicable to our facts. Here, unlike in that case, the plaintiff is not the lender which made the full credit bid, but rather, the lender which sustained damages from a compelled repurchase of the loan. Under these circumstances, the rationale for applying the full credit bid rule is absent. Because Nationwide made the full credit bid and First Commercial's damages were incurred as a result of the compelled repurchase, there is no issue here as to whether First Commercial justifiably relied on defendants' representations in making a full credit bid, or whether the full credit bid operated as an admission of the property's value by First Commercial.

8  See discussion in *Kolodge v. Boyd* (2001) 88 Cal. App. 4th 349, 369-372 [105 Cal. Rptr. 2d 749].

*Pacific Inland Bank* is inapposite for the additional reason that despite the negligence label, the tort of negligent misrepresentation is a form of deceit, without the element of scienter. ( *Gagne v. Bertran* (1954) 43 Cal. 2d 481, 487, fn. 4 [275 P.2d 15].) [***27] Thus, with respect to the tort of negligent misrepresentation, if a re-

purchasing lender such as First Commercial can show justifiable reliance for purposes of intentional fraud by demonstrating it relied upon false representations in extending the loan and then selling it to Nationwide, by a parity of reasoning the same showing is sufficient to establish justifiable reliance for purposes of a negligent misrepresentation claim. Similarly, irrespective of whether the cause of action is intentional or [*745] negligent misrepresentation, First Commercial can show it sustained damages as a consequence of the compelled repurchase, notwithstanding Nationwide's full credit bid. Therefore, Nationwide's full credit bid does not bar First Commercial's cause of action for negligent misrepresentation. [9]

9  *Kolodge v. Boyd, supra,* 88 Cal. App. 4th 349, involving an action by a lender against an appraiser, likewise held "what the *Alliance* court said about a suit for intentional misrepresentation can be said with equal force about a suit for negligent misrepresentation." ( *Id.* at p. 365.) *Kolodge* concluded the negligent misrepresentation claim was not barred by the full credit bid rule. ( *Id.* at p. 372.)

[***28] Turning to the breach of contract claim, the elements of the cause of action are the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant and damages. (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 476, p. 570.) [**34] Here, First Commercial alleges that prior to funding the loan, it and Andrade entered into a written agreement wherein Andrade agreed to indemnify First Commercial for any loans found to be fraudulent or not in compliance with industry underwriting requirements; however, Andrade had refused to repurchase the subject loan. The rule that a full credit bid operates as an admission by the bidding lender of the property's value does not preclude a claim by the repurchasing lender that it suffered damages as a consequence of the defendant's breach of said agreement.

In sum, we conclude Nationwide's full credit bid has no bearing on First Commercial's causes of action for negligent misrepresentation and breach of contract.

DISPOSITION

The judgment is reversed. First Commercial to recover costs on appeal.

[***29] Croskey, J., and Kitching, J., concurred.

EXHIBIT 14

LEXSEE 11 CAL APP 4TH 1657

**FIRST NATIONWIDE SAVINGS, Plaintiff and Appellant, v. DAVID PERRY, as Trustee, etc., Defendant and Respondent.**

**No. H008601**

**COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT**

**11 Cal. App. 4th 1657; 15 Cal. Rptr. 2d 173; 1992 Cal. App. LEXIS 1509; 93 Cal. Daily Op. Service 108; 93 Daily Journal DAR 189**

**December 3, 1992, Decided**

**SUBSEQUENT HISTORY:**    [***1]  Ordered Published January 4, 1993.

**PRIOR HISTORY:**    Superior Court of Santa Clara County, No. 647434, William F. Martin and Peter G. Stone, Judges.

**DISPOSITION:**    The judgment is reversed. Costs on appeal to FNS.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Defendant purchased a single-family residence at a trustee sale held pursuant to a nonjudicial foreclosure of a deed of trust. Defendant took the property subject to a prior deed of trust, naming plaintiff as beneficiary, which secured a purchase money loan. However, after the trustee's sale and before the trustee's deed in favor of defendant was recorded, the trustee of plaintiff's deed of trust mistakenly, and without authority, executed a reconveyance of plaintiff's deed of trust. Defendant subsequently sold the property and, because of the mistaken reconveyance, plaintiff did not receive any proceeds from the sale to satisfy the purchase money loan. Plaintiff filed a suit stating causes of action against defendant for unjust enrichment and money had and received. The trial court sustained defendant's demurrer and entered a judgment of dismissal. (Superior Court of Santa Clara County, No. 647434, William F. Martin and Peter G. Stone, Judges.)

The Court of Appeal reversed. The court held that an individual is required to make restitution if he or she is unjustly enriched at the expense of another, and that restitution may be required when a person benefiting from another's mistake knew about the mistake and the circumstances surrounding the unjust enrichment. The court

also held that plaintiff could state a cause of action for unjust enrichment against defendant. If defendant knew of the mistaken reconveyance, and that defendant was not entitled to all of the sale proceeds, then it was fair to require defendant to make restitution to plaintiff. Accordingly, plaintiff was entitled to an opportunity to amend its complaint to allege defendant's knowledge. The court also held that plaintiff's action was not barred by the statute precluding deficiency judgments (Code Civ. Proc., § 580b), the statute of frauds (Civ. Code, § 1624, subd. (f)), or the statute of limitations. (Opinion by Elia, J., with Cottle, Acting P. J., and Premo, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Pleading § 29--Demurrer to Complaint--Hearing and Determination--Interpretation of Complaint.** --In examining the sufficiency of a complaint, courts treat a demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. Courts also consider matters which may be judicially noticed. Courts give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.

**(2) Appellate Review § 128--Scope of Review--Function of Appellate Court--Rulings on Demurrers.** --When a demurrer is sustained, reviewing courts determine whether the complaint states facts sufficient to constitute a cause of action. When a demurrer is sustained without leave to amend, reviewing courts decide whether there is a reasonable possibility that the defect can be cured by amendment. If it can be, the trial court has

11 Cal. App. 4th 1657, *; 15 Cal. Rptr. 2d 173, **;
1992 Cal. App. LEXIS 1509, ***; 93 Cal. Daily Op. Service 108

abused its discretion and will be reversed. If not, there has been no abuse of discretion and judgment will be affirmed. The burden of proving such reasonable possibility is squarely on the plaintiff.

**(3) Restitution and Constructive Contracts § 2--Grounds--Unjust Enrichment--Beneficiary's Knowledge of Mistake: Words, Phrases, and Maxims--Enriched--Benefit.** --An individual is required to make restitution if he or she is unjustly enriched at the expense of another. A person is enriched if the person receives a benefit at another's expense. Benefit means any type of advantage. However, the fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it. Determining whether it is unjust for a person to retain a benefit may involve policy considerations. Restitution may be required when a person benefiting from another's mistake knew about the mistake and the circumstances surrounding the unjust enrichment.

**(4) Deeds of Trust § 25--Remedies--Action on Debt--Deficiency Judgment--Reliance on Security: Words, Phrases, and Maxims--Deficiency Judgment.** --A creditor's right to enforce a debt secured by a mortgage or deed of trust on real property is restricted by statute, and the creditor must rely upon the security before enforcing the debt (Code Civ. Proc., §§ 580a, 725a, 726). If the security is insufficient, the creditor's right to a judgment against the debtor for the deficiency may be limited or barred. A deficiency judgment is a personal judgment against the debtor for the difference between the debt and the proceeds received by the creditor from the sale of the security at a foreclosure sale.

**(5) Deeds of Trust § 25--Remedies--Action on Debt--Unjust Enrichment--Availability: Common Counts § 4--Particular Counts--Unjust Enrichment--Prohibition Against Deficiency Judgments.** --A beneficiary under a deed of trust that secured a purchase money loan, and that was accidentally reconveyed by the trustee without the loan being paid, could state a cause of action for unjust enrichment against the former owner of the property, even though Code Civ. Proc., § 580b (conditions under which deficiency judgment forbidden), prevented the beneficiary from obtaining a deficiency judgment against the former owner. Allowing recovery would not contradict the policy of requiring a creditor to rely upon the property to secure the debt, since any unjust enrichment could not exceed the property value. Moreover, equitable principles may outweigh the reasons for prohibiting deficiency judgments. However, a beneficiary may not simply release its security and sue for un-

just enrichment, since a creditor is not allowed to circumvent the one-action rule by divesting himself or herself of the security without the consent of the debtor.

[See 3 Witkin, Summary of Cal. Law (9th ed. 1987) Security Transactions in Real Property, § 162.]

**(6) Deeds of Trust § 25--Remedies--Action on Debt--Unjust Enrichment--Pleading.** --A beneficiary under a deed of trust that secured a purchase money loan, and that was accidentally reconveyed by the trustee, was entitled to an opportunity to amend its complaint against the former owner of the property, who had sold the property without paying off the loan. The beneficiary could state a claim for unjust enrichment by amending the complaint to allege the former owner's knowledge of the improper reconveyance and the former owner's knowledge that it was not entitled to all of the proceeds from the sale of the property. The knowledge of the former owner was critical to the validity of the beneficiary's claim. Under the circumstances, the former owner had notice of the reconveyance, and should have realized that it was not entitled to all of the sale proceeds.

**(7) Deeds of Trust § 25--Remedies--Action on Debt--Unjust Enrichment--Statute of Frauds: Common Counts § 4--Particular Counts--Unjust Enrichment--Statute of Frauds.** --An action for unjust enrichment by a beneficiary of a deed of trust that had secured a purchase money loan, and that had been accidentally reconveyed, against the former owner of the property who sold the property without satisfying the loan, was not barred by Civ. Code, § 1624, subd. (f) (agreement to pay indebtedness secured by trust deed must be in writing). The right to restitution or quasi-contractual recovery is based on unjust enrichment, and the statute of frauds applies to true contracts only. The beneficiary's action was not an action upon a contract, nor a subterfuge for one.

**(8) Deeds of Trust § 25--Remedies--Action on Debt--Unjust Enrichment--Statute of Limitations: Common Counts § 4--Particular Counts--Unjust Enrichment--Statute of Limitations.** --An action for money had and received and for unjust enrichment by a beneficiary of a deed of trust that had secured a purchase money loan, and that had been accidentally reconveyed, against the former owner of the property who sold the property without satisfying the loan, was not barred by the statute of limitations. A quasi-contract action, in the form of a common count for money had and received, to recover money obtained by fraud (waiver of tort) or mistake, is governed by the fraud statute. The former owner's "windfall" occurred when it sold the property, and the complaint naming the former owner as defendant was filed

11 Cal. App. 4th 1657, *; 15 Cal. Rptr. 2d 173, **;
1992 Cal. App. LEXIS 1509, ***; 93 Cal. Daily Op. Service 108

less than three years from the date the cause of action accrued.

COUNSEL: Cameron & Dreyfuss, Steven R. Cameron and Lawrence J. Dreyfuss for Plaintiff and Appellant.

Adelson, Hess, Christensen & Kelly, Duane W. Shewaga and Phillip M. Adelson for Defendant and Respondent.

JUDGES: Opinion by Elia, J., with Cottle, Acting P. J., and Premo, J., concurring.

OPINION BY: ELIA, J.

OPINION

[*1660] [**175] First Nationwide Savings (FNS) sued Sunrise Trust for unjust enrichment and money had and received. Sunrise demurred to the second [*1661] amended complaint. The demurrer was sustained without leave to amend. Judgment was entered against FNS.

On appeal, we consider whether a beneficiary (FNS) can recover for unjust enrichment from a nonassuming grantee of a purchase money deed of trust (Sunrise) after the trustee mistakenly reconveys the deed of trust and the grantee sells the property, thereby obtaining all the proceeds from the sale. For reasons we shall explain, we conclude that a cause of action may be stated. Accordingly, the judgment is reversed.

FACTS AND PROCEDURAL BACKGROUND

In May 1983, Gary [***2] Madden borrowed $ 146,000 from FNS. The loan was evidenced by a written promissory note. Madden used the loan to purchase a single-family residence in Campbell, California. The note was secured by a written deed of trust in which Madden conveyed for the benefit of FNS a power of sale of the single-family residence. The deed of trust was recorded on June 2, 1983.

Madden subsequently sold the property. The purchaser took the property subject to FNS's deed of trust. In January 1986, a trustee's sale was held pursuant to the nonjudicial foreclosure of a deed of trust junior to the FNS deed of trust. Sunrise Trust, with David Perry as trustee, purchased the property at the trustee's sale. Sunrise purchased the property subject to FNS's deed of trust.

In May 1986, Master Mortgage Company (MMC), the trustee on the FNS deed of trust, mistakenly executed a reconveyance of the FNS deed of trust. The reconveyance was recorded on June 25, 1986. According to the complaint, MMC was not [**176] authorized to reconvey the deed of trust and did not intend to do so.

The trustee's deed to Sunrise was recorded on August 13, 1986.

On December 17, 1986, Sunrise sold the property to Vernon and Vera [***3] Sundberg. Because of the reconveyance, FNS did not receive any of the proceeds from the sale of the property to the Sundbergs.

In 1988, FNS sued Gary Madden for imposition of a constructive trust, money lent, conversion, cancellation of instrument, declaratory relief and breach of promissory note. In 1989, FNS filed its first amended complaint naming Sunrise as a defendant. The complaint stated causes of action for unjust enrichment and money had and received. Sunrise's demurrer to the first amended complaint was sustained with leave to amend.

[*1662] On November 19, 1990, FNS filed its second amended complaint for unjust enrichment and money had and received. On April 1, 1991, Sunrise's demurrer to the second amended complaint was sustained without leave to amend. A judgment of dismissal was entered.

This appeal ensued.

STANDARD OF REVIEW

(1) In examining the sufficiency of the complaint, "[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." ( Serrano v. Priest (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; [***4] Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) "[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] (2) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." ( Blank v. Kirwan, supra, 39 Cal.3d at p. 318.)

DISCUSSION

I. Unjust Enrichment Cause of Action

FNS argues its complaint states a claim for unjust enrichment. In examining this contention, we must review principles of restitution and secured transactions law, as well as the pertinent case authorities. After doing so, we shall conclude that FNS's complaint can be [***5] amended to state a cause of action for unjust enrichment.

11 Cal. App. 4th 1657, *; 15 Cal. Rptr. 2d 173, **;
1992 Cal. App. LEXIS 1509, ***; 93 Cal. Daily Op. Service 108

## A. Restitution

We begin with the law of restitution. **(3)** An individual is required to make restitution if he or she is unjustly enriched at the expense of another. ( Rest., Restitution, § 1; *California Federal Bank v. Matreyek* (1992) 8 Cal.App.4th 125, 131 [10 Cal.Rptr.2d 58].) A person is enriched if the person receives a benefit at another's expense. ( Rest., Restitution, *supra*, § 1, com. a.) Benefit means any type of advantage. (Rest., *supra*, § 1, com. b; *California Federal Bank v. Matreyek, supra,* 8 Cal.App.4th at p. 131.)

[*1663] The fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. ( Rest., Restitution, *supra*, § 1, com. c.) For example, a person who improves his or her land usually benefits his or her neighbors to some extent. In that case, however, restitution is not required because [***6] it would not be unjust to permit the neighbors to retain the benefit of the landowner's work. (Ibid.)

Determining whether it is unjust for a person to retain a benefit may involve policy considerations. For example, if a person receives a benefit because of another's [**177] mistake, policy may dictate that the person making the mistake assume the risk of the error. The desirability of allowing a party to retain the benefit of his or her bargain may preclude the injured party from receiving restitution. Similarly, "a customary way of regarding a particular type of transaction may justify the inference that the payor has assumed the risk of mistake, as in the case of payment for a quitclaim deed to land not owned by the transferor ...." (Rest., Restitution, *supra*, introductory note, p. 28.)

In addition, the same equitable considerations justifying restitution may constitute a defense to a restitution claim. For these reasons, "restitution is commonly denied against an innocent transferee or beneficiary, if he has changed his position after the transaction and it is impossible or impractical to restore him to his original position." (Rest., Restitution, *supra*, introductory note, [***7] p. 28; *City of Hope Nat. Medical Center v. Superior Court* (1992) 8 Cal.App.4th 633, 637 [10 Cal.Rptr.2d 465].) Likewise, a bona fide purchaser is generally not required to make restitution. ( Rest., Restitution, *supra*, § 13.)

By contrast, a transferee with knowledge of the circumstances giving rise to an unjust enrichment claim may be obligated to make restitution. For example, "A person who has entered into a transaction with another under such circumstances that, because of a mistake, he would be entitled to restitution from the other, ... [P] (b)

is entitled to *restitution from a third person who had notice of the circumstances before giving value or before receiving title or a legal interest in the subject matter.*" ( Rest., Restitution, *supra*, § 13.)

Finally, section 168 of the Restatement of Restitution provides, "Where a person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, unless he is a bona fide purchaser."

[*1664] The foregoing principles demonstrate that [***8] restitution may be required when the person benefitting from another's mistake knew about the mistake and the circumstances surrounding the unjust enrichment. In other words, innocent recipients may be treated differently than those persons who acquire a benefit with knowledge. Accordingly, under restitution law, Sunrise's knowledge, discussed, *post*, is an important consideration in determining the validity of FNS's unjust enrichment claim.

## B. Purchase Money Deed of Trust

We next review secured transactions principles to consider their impact upon FNS's claim for unjust enrichment. According to Sunrise, secured transactions law precludes FNS's cause of action. As we shall explain, we disagree.

**(4)** "In California, as in most states, a creditor's right to enforce a debt secured by a mortgage or deed of trust on real property is restricted by statute. Under California law, 'the creditor must rely upon his security before enforcing the debt. ( Code Civ. Proc., § 580a, 725a, 726.) [Fn.] If the security is insufficient, his right to a judgment against the debtor for the deficiency may be limited or barred by sections 580a, 580b, 580d, or 726 of the Code of Civil Procedure.' [***9] [Citation.]" ( *Guild Mortgage Co. v. Heller* (1987) 193 Cal.App.3d 1505, 1510 [239 Cal.Rptr. 59]; see also *Rettner v. Shepherd* (1991) 231 Cal.App.3d 943, 949 [282 Cal.Rptr. 687].)

A " 'deficiency judgment' is a personal judgment against the debtor for the difference between the debt and the proceeds received by the creditor from the sale of the security at a ... foreclosure sale. [Citation.]" ( *Coppola v. Superior Court* (1989) 211 Cal.App.3d 848, 866 [259 Cal.Rptr. 811].)

**(5)** Because this case concerns a purchase money deed of trust, no deficiency judgment would be allowed. ( Code Civ. Proc., § 580b.) In other words, FNS could not recover the difference between the debt and the sale proceeds if the property had been foreclosed. According to Sunrise, this same rule prevents FNS from stating a [**178] claim for unjust enrichment. Sunrise argues that

11 Cal. App. 4th 1657, *; 15 Cal. Rptr. 2d 173, **;
1992 Cal. App. LEXIS 1509, ***; 93 Cal. Daily Op. Service 108

permitting recovery for unjust enrichment would be the same as permitting a deficiency judgment.

There are two problems with Sunrise's argument. First, permitting recovery for unjust enrichment and recovering [***10] a deficiency judgment are not the same. In this case, the difference between the debt and the foreclosure proceeds is not at stake; there can be no foreclosure because the lien on the property has been extinguished. Moreover, allowing recovery for unjust [*1665] enrichment would not contradict the policy of requiring the creditor to rely upon the property to secure the debt. This is because any unjust enrichment recovery could not exceed the property value. Thus, if the property value had decreased, and was less than the debt, a plaintiff's unjust enrichment recovery would be limited by the value of the property.

Second, an unjust enrichment claim is based upon equitable principles. These equitable principles may outweigh the reasons for prohibiting deficiency judgments. In fact, in other situations equitable considerations cause the prohibition against deficiency judgments to give way. Bad faith waste is an example. A nonassuming grantee of a purchase money deed of trust would be liable for bad faith waste to the property. ( *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 604 [125 Cal.Rptr. 557, 542 P.2d 981].) [***11] This is so even though the grantee would not be liable for any deficiency judgment upon a purchase money deed of trust. By parity of reasoning, we believe that in appropriate circumstances an action for unjust enrichment could be stated against a nonassuming grantee under a purchase money deed of trust.

Sunrise attacks this result by arguing that it would permit parties to obtain deficiency judgments by trickery. In particular, Sunrise claims a beneficiary under a purchase money deed of trust could simply release its security (rather than resort to it) and then sue a solvent successor for unjust enrichment.

We disagree. A beneficiary would not gain anything in Sunrise's scenario. As previously stated, an unjust enrichment recovery is not the same as a deficiency judgment. Whether through foreclosure or an unjust enrichment cause of action, the beneficiary's recovery would be limited to the amount of the debt covered by the value of the property. Assume the debt was $ 50,000, and the property value decreased from $ 60,000 to $ 40,000. If the trustee mistakenly reconveyed the deed of trust, and the grantee sold the property and received $ 40,000, the beneficiary could recover [***12] only $ 40,000, albeit through an unjust enrichment cause of action or foreclosure. No deficiency would be allowed.

In addition, it is settled that the one-action rule would prevent an unjust enrichment recovery in the circumstances envisioned by Sunrise. "Although an exception to the one-action rule has developed in cases where foreclosure would be an idle act because the security has been destroyed or become worthless [citations], the exception does not apply if the beneficiary himself is responsible for the loss of security. Thus a creditor is not allowed to circumvent the statute by divesting himself of his security without the consent of the debtor." ( *Pacific Valley Bank v. Schwenke* (1987) 189 Cal.App.3d 134, 140 [234 Cal.Rptr. 298].)

[*1666]  C. *Case Law*

We have examined principles relating to restitution and secured transactions law. We will now consider case authority to determine whether FNS may state a claim for unjust enrichment. Although we have not found a case precisely on point, the cases included below should assist our analysis.

In *California Federal Bank v. Matreyek, supra*, 8 Cal.App.4th 125, [***13] the bank assigned the borrowers' loan to Fannie Mae. [1] The bank continued servicing the loan. The borrowers asked the bank if they could refinance and pay off the loan without a prepayment penalty. Although the bank advised them that they could, this advice [**179] was incorrect. ( at p. 128.)

1  Federal National Mortgage Association.

After the borrowers paid off the principal and accrued interest, the bank cancelled the note and reconveyed the deed of trust. The bank then discovered the prepayment penalty should have been assessed. Because of the error, the bank had to pay Fannie Mae $ 653,998.74. Although the bank asked the borrowers for reimbursement, the borrowers refused. The bank then sued the borrowers for unjust enrichment, and equitable subrogation. The borrowers' demurrer was sustained without leave to amend and a judgment of dismissal was entered. ( *California Federal Bank v. Matreyek, supra*, 8 Cal.App.4th at p. 129.)

The appellate court affirmed. In rejecting [***14] the bank's unjust enrichment claim, the court relied upon restitution principles. The court noted that a party who does not know about another's mistake, and has no reason to suspect it, is not necessarily required to give up the benefit received. The court decided that the pivotal issue was whether permitting the borrowers to retain the benefit would be unjust. In concluding that it would not, the court first emphasized that the borrowers gave consideration (paying the loan early) in exchange for the bank's agreement to forgo the prepayment penalty. ( *California Federal Bank v. Matreyek, supra*, 8 Cal.App.4th at p. 133.) Second, the court pointed out that waiver of the prepayment penalty was critical in the borrowers' early payment decision. Third, the court reasoned

that there was no impropriety by the borrowers. It emphasized that the bank did not allege that the borrowers knew of the mistake or took unfair advantage. (Ibid.)

Finally, the court pointed out that "in repaying the loan early, the [the borrowers] entered into substitute financing .... If [the bank] were to recover the claimed sum from [the borrowers], that sum would [***15] erase any benefit to [the borrowers] from the refinancing, while [the bank] and/or [*1667] Fannie Mae still would retain the benefit of an early payoff of the ... loan. Under the circumstances, recovery by [the bank] would be inequitable." ( *California Federal Bank v. Matreyek, supra,* 8 Cal.App.4th at p. 134.)

*California Federal* is distinguishable from our case. First, in *California Federal,* the plaintiff made the mistake. By contrast, in this case, the trustee was responsible for the mistake. Second, in *California Federal,* the borrowers did not know about the mistake. In our case, as we shall explain later, Sunrise knew or should have known that it was not entitled to all of the proceeds from the sale of the property. Finally, in *California Federal,* the recipient of the benefit gave consideration in exchange for obtaining the advantage. In the circumstances here, no such consideration was given.

Also assisting our analysis is *Firato v. Tuttle* (1957) 48 Cal.2d 136 [308 P.2d 333]. In that case, a purchase money deed of trust was mistakenly reconveyed by the trustee. [***16] The trustee was authorized to reconvey only if the loan was paid in full. After the property had been sold several times, the beneficiaries filed suit. The beneficiaries never alleged that the subsequent purchasers knew about the error or were not bona fide purchasers. ( at p. 138.) The court found this persuasive.

The *Firato* court also relied upon former section 2243 of the Civil Code which stated " 'Everyone to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith and for a valuable consideration.' " ( *Firato v. Tuttle, supra,* 48 Cal.2d at p. 139, italics omitted.) Reasoning that such rules are consistent with equitable principles and the "convenient transaction of business," the court affirmed the trial court's sustaining of the demurrer to the beneficiaries' complaint. (Ibid.)

Restitution was denied in *City of Hope Nat. Medical Center v. Superior Court, supra,* 8 Cal.App.4th 633. In that case, the insurer paid the hospital for health care given to the insured. The insurer later decided [***17] the insured's treatment was not covered by the insured's policy. [**180] It sued the hospital for reimbursement, seeking restitution of the money paid. In determining that the hospital was not required to reimburse the insurer, the court emphasized that "[r]estitution will be

denied, however, if the mistaken payment is made to a bona fide creditor of a third person--a creditor without fault because it made no misrepresentations to the payor and because it had no notice of the payor's mistake at the time payment was made. ... Stated plainly, *if it's your mistake, you get to pay for it--unless the recipient misled you or accepted the payment knowing you didn't owe it.*" ( at p. 637, italics added.)

[*1668] Other cases also suggest that a person's notice of the circumstances giving rise to unjust enrichment affects that person's obligation to make restitution. In *Phelps v. American Mtg. Co.* (1936) 6 Cal.2d 604 [59 P.2d 95], the court concluded, " '[i]n equity, a release, unauthorized by the terms of the trust or by the *cestui que trust,* will have no effect upon the deed of trust as between the original parties or *as to subsequent* [***18] *purchasers with notice.*' " ( at p. 608, latter italics added.)

In *Duley v. Westinghouse Electric Corp.* (1979) 97 Cal.App.3d 430 [158 Cal.Rptr. 668], seller sold property to buyer in exchange for a promissory note secured by a deed of trust on the property. A judgment lien was subsequently placed on the property. Seller's trust deed was mistakenly reconveyed. Seller sued to cancel the reconveyance and establish the priority of his deed of trust. The court reasoned, "The only legal and equitable solution in the situation ... is cancellation of the reconveyance, returning the parties to their status quo. The court may cancel a written instrument where there is a reasonable likelihood, if left outstanding, it may seriously injure a person against whom it is void or voidable. ... Allowing the reconveyance to stand would leave [seller] without security for his loan and create an inequitable windfall for [judgment lienor], as its abstract of judgment would take priority in any sale of the property." ( at p. 432.)

Sunrise relies upon *Griffith Co. v. Hofues* (1962) 201 Cal.App.2d 502 [19 Cal.Rptr. 900]; [***19] *Truestone, Inc. v. Simi West Industrial Park II* (1984) 163 Cal.App.3d 715 [209 Cal.Rptr. 757]; *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.* (1988) 205 Cal.App.3d 1415 [253 Cal.Rptr. 289]; and *Pacific Valley Bank v. Schwenke, supra,* 189 Cal.App.3d 134.

These cases differ sharply from the circumstances here. In *Griffith Co. v. Hofues, supra,* 201 Cal.App.2d 502, the recipient of the benefit was not in a position to have refused the advantage. In addition, the plaintiff invited the circumstances leading to the unjust enrichment.

*Truestone, Inc. v. Simi West Industrial Park II, supra,* 163 Cal.App.3d 715, concerned a subcontractor's attempt to recover directly from a property owner. No issue of mistake was involved. In *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn., supra,* 205 Cal.App.3d 1415, no unjust enrichment claim was pre-

11 Cal. App. 4th 1657, *; 15 Cal. Rptr. 2d 173, **;
1992 Cal. App. LEXIS 1509, ***; 93 Cal. Daily Op. Service 108

sented. This was because the alleged misrepresentation which led to [***20] the enrichment was merely a nonactionable expression of opinion. ( at p. 1423.) Finally, in *Pacific Valley Bank v. Schwenke, supra*, 189 Cal.App.3d 134, no mistaken reconveyance or unjust enrichment cause of action was at stake.

[*1669] D. SUNRISE'S KNOWLEDGE

(6) Our review of the authorities discloses that Sunrise's knowledge is critical to the validity of FNS's unjust enrichment claim. If Sunrise should not have known about the reconveyance, and should not have realized that it was not entitled to all of the sale proceeds, then it would not necessarily be unjust to permit it to retain those proceeds. On the other hand, if Sunrise did know that it was not entitled to all of the sale proceeds, then it is fair to require that Sunrise make restitution.

Surprisingly enough, FNS's second amended complaint does not allege Sunrise's knowledge. It does not state that Sunrise knew about the improper reconveyance. [**181] Nor does the complaint allege that Sunrise realized that it was not entitled to all of the proceeds from the sale of the property. In any event, we do not believe Sunrise could *not* have known that it was not entitled to [***21] all of the sale proceeds. Furthermore, it is interesting to note that Sunrise clearly had notice of the reconveyance. The deed of reconveyance indicates it was mailed to David Perry, Sunrise's trustee.

Neither are we persuaded by Sunrise's arguments against FNS's recovery. Sunrise stresses that unjust enrichment recovery would be contrary to secured transactions law and restitution law. As we have already explained, this is incorrect. More importantly, nowhere does Sunrise explain why it should be entitled to all of the proceeds from the sale. Sunrise focuses upon the future consequence of allowing recovery. Given the facts of this case, Sunrise does not, and cannot, explain why it should be entitled to this windfall.

Sunrise also argues that FNS should file suit against the trustee responsible for the reconveyance. To counter this allegation, FNS relies upon a hypothetical: "If a bag of money falls out of the back of an armored car because of a defective lock, the armored car company is not first required to sue the locksmith before seeking to recover the money from its finder."

Sunrise also suggests that FNS should have tried to cancel the reconveyance. However, in this [***22] case, the property was sold to bona fide purchasers approximately six months after the trustee's mistake. For this reason, it is too late to cancel the reconveyance. Moreover, since only six months passed between the time of the reconveyance and the sale, we do not believe that

laches can constitute a defense to FNS's unjust enrichment action.

In sum, we believe that FNS should be given an opportunity to amend its complaint to allege Sunrise's knowledge of the improper reconveyance, as [*1670] well as Sunrise's knowledge that it was not entitled to all of the proceeds from the sale of the property. With this amendment, FNS can state a claim for unjust enrichment.

II. STATUTE OF FRAUD

(7) Sunrise argues that FNS's complaint is barred by the statute of frauds. In particular, it alleges that FNS's unjust enrichment cause of action is merely a de facto "assumption" agreement which is barred by Civil Code section 1624, subdivision (f). [2] We disagree. The right to restitution or quasi-contractual recovery is based upon unjust enrichment. "The statute of frauds applies to true contracts only." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 92, p. 123; *Mayborne v. Citizens T. & S. Bank* (1920) 46 Cal.App. 178, 190 [188 P. 1034]; [***23] *Peterson Tractor Co. v. Orlando's Snack-Mobile Corp.* (1969) 270 Cal.App.2d 787, 791 [76 Cal.Rptr. 221].) Because this is not an action upon a contract, nor a subterfuge for one, the statute of frauds is not a bar to FNS's recovery.

> 2   Civil Code section 1624, subdivision (f), requires that the following type of contract be in writing, "(f) An agreement by a purchaser of real property to pay an indebtedness secured by a mortgage or deed of trust upon the property purchased, unless assumption of the indebtedness by the purchaser is specifically provided for in the conveyance of the property."

III. STATUTE OF LIMITATIONS

(8) Sunrise argues that the statute of limitations precludes FNS's claim. "A quasi-contract action, in the form of a common count for money had and received, to recover money obtained by fraud (waiver of tort) or mistake, is governed by the fraud statute." (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 451, p. 482; *Shain v. Sresovich* (1894) 104 Cal. 402 [38 P. 51].) [***24]

The windfall occurred on December 17, 1986. This was the date when Sunrise sold the property to the Sundbergs. The first amended complaint, naming Sunrise as a defendant, was filed December 11, 1989. Thus, the complaint was filed less than three years from the date the cause of action accrued. Accordingly, FNS's unjust enrichment claim is not barred by the statute of limitations.

[**182] CONCLUSION