47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

tract to bar plaintiff's wife from their gaming tables led to the breakup of his marriage; the court found a triable issue of fact whether damages for mental suffering were reasonably foreseeable and within the contemplation of the contracting parties. *Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844 [88 Cal.Rptr. 39] upheld recovery for emotional distress when defendant, in breach of a contract of bailment, lost jewelry of great sentimental value.

These precedents have not yet been applied to wrongful discharge. But a review of the facts of the Court of Appeal cases overruled by the majority in part III of their opinion, and similar cases pending before this court, makes it clear that in many cases the employer is aware at the time of the contract that bad faith discharge will create great mental and emotional distress. In such cases, the application of existing precedent could serve to provide some redress for that injury. [1]

   1  Application of these precedents will not solve all the problems the majority create. There will be cases in which the probability of emotional distress is not present at the time of contracting, but becomes apparent only later, after the employee has put in years on the job and come to rely on it for his economic security. Most of the cases cited seem to limit recovery to damages foreseeable at the time of the contract. (But see Civ. Code, § 3300 [the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom"]; *Overstreet* v. *Merritt* (1921) 186 Cal. 494, 505 [200 P. 11] ["[one] who in bad faith violates his contract is liable for all damages traceable to the breach, including even those which could not be foreseen at the time of making the contract"].) Secondly, these precedents provide no basis for punitive damages, no matter how outrageous the employer's conduct, or how essential such damages may be to deter future wrongful conduct.

II.

   The majority's discussion of the cause of action for wrongful discharge transposes the positions of plaintiffs and defendants, asserting, incorrectly, [*703] that plaintiffs seek to change established law. For example, the majority introduce their analysis with the statement that "where an *extension* of tort remedies is sought for a duty whose breach previously has been compensable by contractual remedies, it is helpful to consider certain principles relevant to contract law." (*Ante*, p. 683, italics

added.) After considering these principles, the majority conclude that "focus on available contract remedies offers the most appropriate method of *expanding* available remedies for wrongful termination." (*Ante*, p. 699, italics added.) But this case is not about extending or expanding remedies for wrongful discharge. All plaintiffs seek, and all the dissenters seek, is to *retain* existing remedies. It is the defendants, and the majority, who seek a radical contraction in existing remedies.

   I maintain that we should retain the well-recognized tort cause of action for bad faith discharge. To demonstrate the point, I propose to show (1) that a tort cause of action for bad faith discharge is an established feature of California common law, (2) that the analogy between the insurance cases, in which a tort cause of action has long been recognized, justifies tort recovery  [***242]  for bad faith discharge; (3) that the existence of a cause of action in contract for discharge in breach of contract does not exclude a tort action for bad faith; and (4) that it is fundamentally illogical to abolish a tort cause of action on the ground that radical change in existing remedies should be left to legislative action.

   *1. A tort remedy for bad faith discharge is well established in California law.*

   Prior to  *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314],  [**404]  California decisions had recognized a tort action for bad faith breach of insurance contracts. (See, e.g., *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 578 [108 Cal.Rptr. 480, 510 P.2d 1032].) In upholding a tort cause of action for wrongful discharge in violation of public policy, *Tameny* noted an alternative theory -- breach of the employer's duty of good faith and fair dealing. "[Past] California cases," we said, citing the insurance cases, "have held that a breach of this implied-at-law covenant sounds in tort as well as in contract." ( *Tameny, supra,* 27 Cal.3d 167, 179, fn. 12.) In *Tameny,* however, we found it unnecessary to decide whether tort recovery would be available under that theory.

   That issue was first decided in  *Cleary* v. *American Airlines* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722]. Plaintiff in *Cleary* pled that the employer, despite a written policy to the contrary, arbitrarily discharged him [*704] after 18 years of satisfactory service. The Court of Appeal unanimously ruled that "[should] plaintiff sustain his burden of proof, he will have established a cause of action for wrongful discharge that sounds in both contract *and in tort.*" (P. 456, italics added.)

   The next case,  *Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132 [198 Cal.Rptr. 361], endorsed *Cleary,* which it described as based on "present

47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

economic realities and the reasonable expectations of the parties" (p. 1137), but concluded that since the company was enforcing a general rule known to the employee, the discharge was not in bad faith. A subsequent case, *Shapiro* v. *Wells Fargo Realty Advisors*, (1984) 152 Cal.App.3d 467 [199 Cal.Rptr. 613], similarly applied the reasoning of *Cleary*, but found plaintiff's allegations insufficient to show bad faith.

In *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], we concluded a tort action was available for breach of a commercial contract only when the breaching party denied in bad faith the existence of the contract. (P. 769.) We noted that tort remedies had a broader scope in insurance cases because of the special relationship between insurer and insured, and added that "no doubt there are other relationships with similar characteristics and deserving of similar legal treatment." (P. 769.) The footnote to that sentence noted that in *Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d 167, 179, footnote 12, "this court intimated that breach of the covenant of good faith and fair dealing in the employment relationship might give rise to tort remedies. That relationship has some of the same characteristics as the relationship between insurer and insured." (36 Cal.3d at p. 769, fn. 6.) Coming after published decisions in *Cleary* v. *American Airlines, Inc., supra*, 111 Cal.App.3d 443, *Shapiro* v. *Wells Fargo Realty Advisors, supra*, 152 Cal.App.3d 467, and *Crosier* v. *United Parcel Service, supra*, 150 Cal.App.3d 1132, this language signaled the court's approval of a tort remedy for bad faith discharge.[2]

2   Chief Justice Bird, in her concurring and dissenting opinion, wrote that tort remedies should have a broader scope in insurance and employment cases. She observed that "breach of an employment contract by the employer can, in some situations, cause severe harm to an employee's reputation and ability to find new employment. The harm caused cannot be undone by an award of backpay. Thus, employees may be entitled to expect that their contracts will not be breached for frivolous or improper reasons." ( *Seaman's, supra*, 36 Cal.3d at p. 780.)

[***243]   Shortly after *Seaman's* was filed, the court in *Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241 [208 Cal.Rptr. 524], considered whether defendant could fire an employee for "conflict of interest" because she was dating a fellow employee. The case was submitted to the jury under instructions based on *Cleary* v. *American Airlines, Inc.,* [*705] *supra*, 111 Cal.App.3d 443. [**405] The jury awarded tort damages, finding the asserted conflict

of interest a mere pretext and the discharge in bad faith. The Court of Appeal affirmed; we denied a hearing.

The next two cases, *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], and *Wayte* v. *Rollins International, Inc.* (1985) 169 Cal.App.3d 1 [215 Cal.Rptr. 59], did not involve discharge. (*Wallis* concerned bad faith refusal of an employer to pay retirement benefits; *Wayte* concerned bad faith refusal of an employer acting as an insurer to pay medical benefits.) Both cases, however, affirmed the analogy of the employment relationship to insurance. As stated in *Wallis* , "the characteristics of the insurance contract which give rise to an action sounding in tort are also present in most employer-employee relationships." (160 Cal.App.3d 1109, 1116, fn. 2.)

*Khanna* v. *Microdata Crop.* (1985) 170 Cal.App.3d 250 [215 Cal.Rptr. 860] is recognized by the majority as one of the two leading cases on bad faith discharge. In that case the employer refused to acknowledge a contract to pay plaintiff a commission, then fired the employee when he sued to enforce the contract. The opinion reviewed *Cleary, supra*, 111 Cal.App.3d 443, and other California decisions and concluded that a tort cause of action is stated whenever the employer engages in "'bad faith action extraneous to the contract, combined with the obligor's intent to frustrate the [employee's] enjoyment of contract rights.'" (*Khanna, supra*, at p. 262, quoting *Shapiro* v. *Wells Fargo Realty Advisors, supra*, 152 Cal.App.3d at pp. 478-479.) *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813 [226 Cal.Rptr. 570], relied on *Khanna* to find that a worker fired on the basis of a false performance report could state a cause of action in tort.

The other leading case, *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155 [226 Cal.Rptr. 820], was a decision by Justice Kaufman, now on this court. It is well summarized in his dissenting opinion here. As noted in *Koehrer*, a tort cause of action for bad faith discharge may arise if the employer asserts the existence of good cause for discharge without probable cause and in bad faith. (P. 1171.)

Finally, the Court of Appeal in the present case adopted the most limited view of that cause of action of any of the California decisions. It claimed that to state a tort cause of action, the plaintiff must allege facts comparable to those in *Cleary* -- 18 years longevity, and the employer's violation of specific employment guidelines. But, for cases within those facts, the Court of Appeal would permit a tort action.

In sum, there are eight unanimous Court of Appeal decisions permitting a tort action for bad faith discharge, plus dictum approving such an action [*706] in cases here and in the Court of Appeal. Thus it is not surprising

47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

that when the Ninth Circuit considered the matter in a case arising under California law, it had no doubt that such a cause of action existed. (See *Huber v. Standard Ins. Co.* (9th Cir. 1988) 841 F.2d 980.) The only unsettled question, from the viewpoint of the federal judges, was whether the tort cause of action was limited to cases comparable to *Cleary*, as the Court of Appeal held in the present case. The Ninth Circuit correctly concluded that it was not so limited, citing *Koehrer v. Superior Court, supra,* 181 Cal.App.3d 1155-1169 and *Khanna* [***244] *v. Microdata Corp., supra,* 170 Cal.App.3d 250, 262 as declarative of California law.

Many commentators have written summaries or analyses of California law in this area. (See Cal. Wrongful Employment Termination Practice (Cont.Ed.Bar 1987) § 2.42; Kornblum et al., Cal.Practice Guide: Bad Faith (1986) § 12.13; McCarthy, Punitive Damages in Wrongful Discharge Cases (1985) § 2.2; Brandon, *From Tameny to Foley. Time for Constitutional Limitations on California's Employment at Will Doctrine* (1988) 15 Hastings Const. L.Q. 359, 371-372 (hereafter *Brandon*); Brody, *Wrongful Termination as* [**406] *Labor Law* (1988) 17 Sw. U.L. Rev. 434, 442.) All recent writings consider the existence of a tort cause of action for bad faith discharge an established part of the California common law.

Such unanimous agreement among justices and commentators generates reliance. [3] Employers have revised personnel policies and purchased insurance policies. Insurers have calculated and collected premiums. Attorneys have been hired and trained, even entire law firms have been established. Litigants have filed suits, accepted settlement offers, rejected other offers, gone to trial, and appealed. Hundreds of cases are proceeding before the trial courts in which both parties have based their strategy on the assumption that a tort action exists. Many others pending in the Court of Appeal await our decision. There are 10 or so such cases pending before this court. [4]

[3] The majority do not decide whether their decision abolishing the tort cause of action for bad faith discharge is retroactive. A pattern of reliance similar to that present here led this court to make its decision in *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58], prospective.

[4] This court has granted review in 14 cases pending the decision of the present case. Most of those cases involve, among other issues, the question of a tort remedy for bad faith discharge, and in all such cases the Court of Appeal unanimously upheld the existence of a tort remedy.

The majority do not deny the existence of prior precedent, or the consequent reliance thereon, but point out that there has been no decision by *this* court declaring a cause of action for bad faith discharge. They assert that "[if] we were to follow the dissent's urging that we should therefore leave this area of law untouched, we would be abdicating our role." (*Ante,* p. 689, [*707] fn. 28.) They mistake my purpose. I do not claim that this court should never repudiate prior precedent and revise California common law, but only that when it considers doing so it should recognize that the doctrine of stare decisis and judicial reluctance to penalize justified reliance on precedent weigh heavily against such a decision. The majority here in fact radically restructure California law by abolishing an established cause of action, yet they write as if theirs is nothing more than a conservative decision declining to extend remedies into uncharted realms. I cannot join them in this retrogressive decision.

*2. Analogy to the cases upholding a tort cause of action for bad faith breach of a contract of insurance justifies a tort action for bad faith discharge of an employee.*

The majority deride the prior cases for their uncritical incorporation of the insurance model into the employment context without considering the significant differences between the insurer-insured and employer-employee relationships. (*Ante,* p. 689.) But when we consider the differences noted by the majority, we find that they are not significant at all.

The majority find one fundamental difference between insurance and employment relationships: "[if] an insurer pays a claim, it diminishes its fiscal resources . . . [while] as a general rule it is to the employer's economic benefit to retain good employees." (*Ante,* at p. 693.) But their comparison is not between insurers and employers, but between short-sighted insurers and far-sighted employers. In the short run, the insurer saves money by not [***245] paying claims, and the employer by not paying wages. (If the work cannot be deferred, he can hire less experienced but cheaper help.) In the long run, an insurer that never paid claims would be out of business, and an employer that always fired experienced help would not be much better off. Thus if we examine insurers and employers with the same lens, the difference the majority find fundamental simply disappears.

But the majority's analysis leaves a lingering trace, for it betrays their misunderstanding of the problem. We need not be concerned about insurers that never pay [**407] claims or employers that fire all experienced help -- the marketplace will take care of them. The concern is with the insurer or employer that acts arbitrarily some of the time -- and can get away with it unless threatened with damages that, unlike traditional contract damages, exceed the short-term profit. [5]

5    Consider, for example, the case of *K Mart Corp.* v. *Ponsock* (1987) 103 Nev. 39 [732 P.2d 1364]. Ponsock was a forklift driver with 10 years longevity, whose pension would vest in another 6 months. He discovered that the battery cover on his forklift needed painting. Finding a damaged (and thus unsaleable) can of spray paint, he used it to paint the forklift. Although other forklifts had been painted in a similar manner without any action against the employee in question, Ponsock was fired for "defacing" company property and "stealing" a can of paint. When he attempted to explain his conduct, he was excluded from the premises. After a long period of unemployment, he finally obtained a job as a laborer at half his previous wage with no benefits. This income was inadequate to meet mortgage payments, and Ponsock was forced to sell his home at a loss.

Traditional contract damages would not compensate Ponsock for the loss incurred on the sale of a home, or for emotional suffering. In addition, such damages would do nothing to deter further arbitrary actions. The employer would be required to compensate Ponsock for the difference between his prior wage and his present wage, but since Ponsock could be replaced by a lower wage worker whose pension would not vest for many years, the employer might profit from his wrong.

[*708] The majority also point to some nonfundamental distinctions between the insurer-insured and the employer-employee relationships. They argue that the discharged employee may be able to mitigate damages while the insured generally cannot. But as we all know, in many cases the discharged worker cannot mitigate damages. As Justice Kaufman asks, "What market is there for the factory worker laid-off after 25 years of labor in the same plant, or for the middle-aged executive fired after 25 years with the same firm?" (Con. and dis. opn., *ante*, at p. 718.) The ability of some persons to mitigate damages is no reason to deny a cause of action to those unable to mitigate them.

It is next suggested that the employer, unlike the insurer, is not performing a "public service." I fail to understand the significance of the statement. Employment is even more important to the community than insurance; most people value their jobs more than their insurance policies. The public interest in deterring arbitrary breach of employment contracts is, I suggest, at least equal to that in deterring arbitrary breach of insurance contracts.

Finally, the majority reject the idea that an employee is like an insured because both contract for financial security. A business, they point out, may also seek financial security. They put the case of a business contracting to secure a reliable source of supply. But what emerges from the majority's analysis is three propositions: a) that insureds *generally* buy insurance policies for financial security; (b) that employees *generally* seek financial security in their employment; (c) that businesses *occasionally* contract for financial security. These propositions should lead the majority to conclude that the employment contract is more analogous to an insurance contract than to a commercial contract.

The majority are focusing upon the exceptions, not upon the general rule. If we must argue analogies, the question is not whether the employment contract differs from an insurance contract in one particular respect, or resembles a commercial contract in another. It is whether, as a whole, the [*709] contract of employment more closely resembles an insurance contract or an ordinary commercial contract. The answer is [***246] clear. The principal reason we permit tort damages for breach of the covenant of good faith and fair dealing in an insurance contract is that persons do not generally purchase insurance to obtain a commercial advantage, but to secure the peace of mind and security it will provide in protecting against accidental loss. (See *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173].) That reason applies equally to the employer-employee relationship. A man or a woman usually does not enter into employment solely for the money; a job is status, reputation, a way of defining one's self-worth and worth in the community. It is also essential to financial security, offering assurance of future [**408] income needed to repay present debts and meet future obligations. Without a secure job a worker frequently cannot obtain a retirement pension, and often lacks access to affordable medical insurance. In short, "in a modern industrialized economy employment is central to one's existence and dignity." (Gould, *The Idea of the Job as Property in Contemporary America: The Legal and Collective Bargaining Framework*, 1986 B.Y.U. L. Rev. 885, 892.) 6

6    A second significant similarity is that both insurance contracts and employment contracts arise from a context of disparity of bargaining power. Numerous cases have noted this disparity in insurance cases; it has led to the adoption of a general rule that insurance contracts are construed against the insurer. There are fewer cases in the employment context, but here the principle is embodied in a statutory finding that "the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom

of labor, and thereby to obtain acceptable terms and conditions of employment." ( Lab. Code, § 923.)

Because workers value their jobs as more than merely a source of money, contract damages, if limited to loss of income, are inadequate. (See *K Mart Corp.* v. *Ponsock, supra,* 732 P.2d 1364, 1371; Comment, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291, 1330; cf. *Traynor, op. cit. supra,* 8 Bus. L. News 1, 13.) Again the analogy to the insurance cases is close. Explaining the basis for tort damages in insurance cases, *Wallis* v. *Superior Court, supra,* 160 Cal.App.3d 1109, 1118, said that "[money] damages paid pursuant to a judgment years after . . . do not remedy the harm suffered . . ., namely the immediate inability to support oneself and its attendant horrors" -- language which applies equally to a suit for wrongful discharge. As summarized in Miller & Estes, *Recent Judicial Limitations On the Right to Discharge: A California Trilogy* (1982) 16 U.C. Davis L.Rev. 65, 90-91, insureds and employees both depend on the contracts "for their security, well-being, and peace of mind. If insurance companies or employers act in bad faith, the consequences can be very severe, indeed much greater than those that result from a breach of contract."

In contrast, commercial contracts, generally speaking, are negotiated between parties of more nearly equal bargaining strength, and are entered [*710] into for purpose of profit. Breach entails only lost profits, and often a market exists in which the damaged party can cover its loss. I conclude that past decisions were justified in analogizing the relationship between employer and employee to that between insurer and insured, and in distinguishing both from commercial contracts for the sale of goods and services.

3. *The existence of a contract action for discharge in breach of contract does not exclude a tort action for bad faith.*

The majority also assert that the prior cases have not carefully considered the fundamental policies underlying the development of tort and contract law. (*Ante,* at p. 689.) Their argument, in essence, is that the covenant of good faith and fair dealing is simply one provision in the contract. When the employer acts in "bad faith," they argue, he breaches the contract, and the appropriate remedy is an action for damages recoverable for breach of contract.

There are several objections to this reasoning. First, as pointed out by Justice Kaufman, the covenant is a duty imposed [***247] by law, not one arising from the terms of the contract. (Conc. & dis. opn. of Kaufman, J., *ante,* at p. 716).) Second, the majority's reasoning was

previously advanced in opposition to tort recovery in the insurance cases, and has there been rejected by this court. Finally, the majority mistake the distinction between a contract action for wrongful discharge and a tort action for bad faith discharge.

A suit in contract for wrongful discharge is not based directly upon the covenant of good faith and fair dealing, but upon some other provision limiting the right of the [**409] employer to discharge at will. [7] A provision may prohibit discharge without "good cause," in which the employer's good faith may be relevant in deciding whether good cause exists. ( *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917].) The provision may, instead, establish some other limitation on the employer's power to discharge the employee. It may, for example, prohibit the discharge of the worker before January 1, or so long as he produces 400 widgets per month, or without an opportunity for a grievance hearing -- in which examples good faith would not be relevant. The point is that all such actions rest not on proof of the employer's bad faith, but of his breach of some contractual provision apart from the covenant.

> [7] All contracts, including contracts for employment at will, include a covenant of good faith and fair dealing, but the arbitrary discharge of an employee at will is not a breach of contract. (See discussion in maj. opn., *ante,* at p. 698, fn. 39.)

A tort action for bad faith discharge also requires that the discharge be wrongful -- that is, in breach of contract. But once that prerequisite is satisfied, [*711] it focuses not upon the employee's right to enforce a particular contractual provision, but upon society's right to deter and demand redress for arbitrary or malicious conduct which inflicts harm upon one of its members. This is the proper and traditional function of tort law.

The majority attack a tort remedy because it is different than a contract remedy, as if tort law itself served no purpose. They argue, for example, that abolition of a tort remedy for bad faith discharge will enhance predictability of damages. [8] The unpredictability of damages in a tort action for bad faith discharge is the consequence of allowing recovery for emotional distress. Damages in other torts permitting recovery for emotional distress, such as negligence, products liability, malpractice, intentional infliction of emotional distress, etc., are equally unpredictable. I see no reason why predictability is more important to employers in connection with wrongful discharge actions than, for example, in actions for injuries caused by defective products. Of course, one can enhance predictability by denying recovery for injuries suffered, but this is not a trade-off courts have generally been willing to make. It is a decision which, by the majority's own logic, is better left to the Legislature.

8   The importance of predictability of damages, as the majority note (see *ante*, p. 683, fn. 25), is that it facilitates economically efficient breach. A party who can calculate damages can determine whether he can profit by breaching his contract, accepting liability in return for the benefits of breach. This attitude may be appropriate in a commercial context. It should not be condoned in the employer-employee relationship, where breach may cause injury beyond that of mere loss of income, injury which cannot easily be mitigated. It is difficult to summon sympathy for the employer who needs predictability of damages so he can calculate whether he will profit by firing his employee in breach of the employment contract.

The majority then argue that it would be difficult if not impossible to formulate a rule to confine tort relief to "deserving" cases, apparently because the concept of "good faith" is subjective. [9] In fact, a suitable test is simple to describe: an employer acts in bad faith in discharging an employee if and only if he does not believe he has a legal right to discharge the employee. [10] [***248] The majority assert that under similar tests employed by the courts "an ordinary contract breach might give rise to a bad faith action" (*ante*, p. 698) and that a requirement of bad faith "[does] nothing . . . to differentiate between those cases properly and traditionally compensable by contract damages and those in which tort damages should flow" [**410] (*ante*, p. 699). But these assertions are obviously mistaken. A breach of contract does [*712] not require bad faith. The distinction between contract and tort is between a discharge done in good faith, where the employer believes he has a legal right to discharge the worker, and deliberate, arbitrary violation of the employee's rights. Indeed, the majority acknowledge in a footnote the effectiveness of a similar test in limiting tort recovery, and complain only that it does not "serve to limit initiation and prosecution of litigation based on almost any discharge." (*Ante*, p. 697, fn. 35.) I see no reason why the defense remedies of demurrer and summary judgment will not prove as effective here as in any other tort action: presumably if plaintiff cannot prove bad faith he will not assert it in his complaint; if he does he will lose on summary judgment. [11]

9   Of course, tort law is rife with subjective elements -- "malice," "willful misconduct," "reckless disregard," and, in insurance cases, "bad faith."
10   Some cases and writers have suggested that the courts should also consider whether the employer acted reasonably. Since the majority abolish the entire cause of action, it is pointless now to decide that question. I would note only that the concept of reasonableness, like that of bad faith, is one familiar to tort law, and not generally considered so unpredictable or subjective as to justify denial of relief for injuries suffered.
11   The majority's fear that plaintiffs will plead bad faith when they have no basis for that pleading seems exaggerated. I see no more reason to fear false pleading in this context than in any other cause of action. In any case, the majority's decision will not limit initiation and prosecution of litigation since plaintiffs will retain a contractual remedy. At best, it prevents plaintiffs from including false and groundless tort claims in their complaint, but does so only by also preventing them from including true and meritorious claims.

The majority particularly attack *Koehrer* v. *Superior Court, supra*, 181 Cal.App.3d 1155, on the ground that "it failed, however, to recognize that in traditional contract law, the *motive* of the breaching party generally has no bearing on the scope of damages that the injured party may recover for breach of the implied covenant." (*Ante*, p. 699, italics in original.) The argument seems misplaced in the majority opinion; it belongs in the dissent. The fact that traditional contract law draws no distinction between good faith and bad faith, between innocent breach and malicious breach, is a good reason for looking to tort law where such distinctions are recognized. Indeed, the majority argument on this point, and, one might say, on the entire issue of tort damages, makes no sense unless the majority believe that there should be no distinction between innocent and malicious breach -- that the employer who maliciously and arbitrarily fires a worker knowing that he has no right to do so should pay no more in damages than the employer who believed in good faith that he had a right to fire the worker -- and in particular that the bad faith employer should not pay for the suffering he knowingly and deliberately caused. That is not a belief which I share.

*4. It is fundamentally illogical for the majority to abolish an established tort remedy for bad faith discharge and then to argue that radical change in existing remedies is best left to the Legislature.*

The majority in their concluding words recognize the need to provide wrongfully discharged workers with an adequate remedy. They also observe that traditional contract remedies may be inadequate. They assert, however, [*713] that an action in tort is not *necessarily* the answer. Commentators, they say, have pointed out that a tort remedy has social and economic implications which could be more easily studied and weighed by a legislature than by the courts. [12] Some have suggested alternative [**411] remedies, such as arbitration, which could be enacted by legislation but not by judicial [***249] decision. Thus, according to the majority, the choice

47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

between tort remedies and alternative remedies is one best made by the Legislature, not by the courts. [13] One reading this argument would expect that the majority opinion would be limited to clarifying existing law relating to the availability of a tort remedy and that any drastic change in existing law, such as the abolition of the tort remedy or its replacement by some other remedy, would be left to the Legislature.

12   Many of the commentators the majority cite to support their assertion that a tort remedy for bad faith discharge could have economic drawbacks are inapposite.  A number of the articles deal solely with commercial contracts, and do not discuss a tort remedy for employees. (See Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16 U.S.F. L.Rev. 187; Putz & Klippen, *Commercial Bad Faith: Attorney Fees -- Not Tort Liability -- is the Remedy for Stonewalling, supra,* 21 U.S.F. L.Rev. 419; *Traynor, op. cit. supra,* 8 Bus. L. News 1; Comment, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort, supra,* 73 Cal.L.Rev. 1291.) Others are primarily concerned with the rights of at-will employees, but the tort remedy for bad faith breach applies almost exclusively to cases involving employees with contractual protection against arbitrary discharge. (E.g., Gould, *The Idea of the Job as Property in Contemporary America: The Legal and Collective Bargaining Framework, supra,* B.Y.U. L. Rev. 885, 905.)

Most important, most of the commentators recognize the problem of inadequacy of contract damages and, if they do not support a tort remedy, support some alternative.  I doubt that any would support the majority's act of abolishing tort damages without providing an alternative.

13   The majority are not entirely consistent on this point, for they appear to leave open the possibility that the courts, without legislative action, could expand the measure of damages recoverable for discharge in breach of contract. I find it difficult to see why a common law court has greater ability to change the measure of damages in contract than to create a cause of action in tort.

But the practical problem with the majority's suggestion is that while they abolish the cause of action in tort, they only suggest the possibility of expanded contract damages.  This is to trade a bird in the hand for the hope there will be one in the bush next year.  Employees lose an adequate remedy, and may or may not get a replacement sometime.

But the majority do not clarify existing law.  They repudiate it.  They reject the guidance of the only cases by this court to discuss tort actions for wrongful discharge.  They reverse the Court of Appeal decision in this case.  They overrule seven other unanimous Court of Appeal decisions -- every Court of Appeal decision to decide that issue. [14] They will cause reversals in [*714] approximately 10 other cases in which review has been granted and held for this decision, since every one of those cases recognized a tort cause of action.  Having thus swept the table clean of California precedent, [15] they adopt a rule limiting workers discharged in bad faith to contract damages -- a rule rejected by most of the [***250] commentators on whom the majority rely, and recognized as inadequate by the majority themselves.

14   The majority disapprove *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, "and its progeny." (*Ante,* p. 700, fn. 42.) The progeny of *Cleary* include  *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d 1155;  *Gray* v. *Superior Court, supra,* 181 Cal.App.3d 813;  *Khanna* v. *Microdata Corp., supra,* 170 Cal.App.3d 250; *Rulon-Miller* v. *International Business Machines Corp., supra,* 162 Cal.App.3d 241;  *Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d 467; and  *Crosier* v. *United Parcel Service, Inc., supra,* 150 Cal.App.3d 1132.

15   The majority refer to decisions of other jurisdictions, but present a misleading count.  Five decisions of other jurisdictions uphold a tort cause of action (  *Huber* v. *Standard Ins. Co., supra,* 841 F.2d 980;  *Carter* v. *Catamore Co., Inc.* (N.D.Ill. 1983) 571 F.Supp. 94, 97 [R.I. law]; *Dare* v. *Montana Petroleum Marketing Co.* (Mont. 1984) 687 P.2d 1015, 1020;  *Gates* v. *Life of Montana Ins. Co.* (1983) 205 Mont. 304 [668 P.2d 213];  *K Mart Corp.* v. *Ponsock, supra,* 732 P.2d 1364, 1369-1370); three reject that cause of action (  *Arco Alaska, Inc.* v. *Akers* (Alaska 1988) 753 P.2d 1150, 1153-1154;  *Martin* v. *Federal Life Ins. Co.* (1982) 109 Ill.App.3d 596 [440 N.E.2d 998, 1006];  *Murphy* v. *American Home Products Corp.* (1983) 58 N.Y.2d 293 [461 N.Y.S.2d 232, 238, 448 N.E.2d 86].) If we discount *Huber* as based on California law, the count stands at four to three.  The majority compile a more extensive list of decisions by including cases involving quite different issues.  A number of those decisions hold (contrary to California law) that there is no implied covenant of good faith in contracts for employment at will -- a holding which says nothing about whether tort damages would be awarded for the breach, in bad

faith, of a contract barring termination without good cause.

If we count all cases, including California decisions and those based on California law, the current count is 13 cases upholding a tort cause of action and 3 rejecting it. This figure does not include the 10 or so additional cases upholding the cause of action depublished by the grant of review by this court and held pending the present decision.

Only after completely rewriting California law on the subject do the majority leave the matter to the Legislature. But two things have changed. First, the Legislature will face a problem -- the inadequacy of damages in actions for bad faith discharge -- which did not exist before. Second, the burden of seeking legislative [**412] change, which was previously on employers and insurers, two well-organized and financed groups, is now on the unorganized worker.

In fact, the Legislature has already considered this matter. In the 1985-1986 legislative session Senator Greene and Assemblyman McAllister both introduced bills which would have abolished a tort remedy for bad faith discharge, and provided for arbitration of contract claims. (See Sen. Bill No. 1348 and Assem. Bill No. 2800, summarized in *Brandon, op. cit. supra*, 15 Hastings Const. L.Q. 359, 373-374.) Neither bill was enacted. One cannot infer too much from the Legislature's failure to enact a bill, but it seems safe to say that the Legislature was not contemplating abolishing a tort remedy without a suitable replacement.

[*715] 5. *Conclusion.*

The majority's action in abolishing the tort remedy for bad faith discharge comes soon after its decision in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d 287, which abolished the tort cause of action for bad faith settlement practices by insurers. In both cases the court has reached out to overturn precedent and to abolish a cause of action recognized by California law. The decisions abolish protections previously accorded consumers and workers; they extend protection to insurers and employers, giving them tort immunity not for innocent error but for bad faith breach of duty. In both cases, moreover, the California Legislature has considered the cause of action in question but refrained from so doing; [16] the decisions of this court grant immunities which the Legislature has declined to give, and shift to the unorganized consumer and worker the burden of seeking legislative change. It is the function of the common law "to protect the weak from the insults of the stronger." (3 Blackstone, Commentaries 3.) The majority's decision subverts that function.

16    For the proposed legislation relating to wrongful discharge, see *ante,* page 714; for proposed legislation concerning insurance bad faith, see *Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d 287, 300 and pages 295-296 (Mosk, J., dis.).

I have considerable respect for the doctrine of judicial restraint, but that doctrine must run both ways. Judicial restraint should not only restrain the court from creating new remedies, it should also restrain the court from dismantling existing ones.

**KAUFMAN, J.**

I concur in parts I and II of the majority opinion. However, I respectfully dissent from part III dealing with breach of the implied duty of good faith and fair dealing. Contrary to the majority, I would hold that such a breach in the context of employment termination *may* give rise to tort remedies. The reasons which impel me to this conclusion are set forth below.

*Breach of the Implied Duty of Good Faith and Fair Dealing*

Thirty years ago, in *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883], this court first recognized that breach of the implied duty of good faith and fair dealing may give rise to a cause of action sounding in tort. I would not have thought, after these many years, that it was still necessary to defend and explain this basic principle. In purporting to trace its origins, however, the majority fundamentally misstates the nature of the tort, and thereby subverts the powerful impetus for its extension to the area of employment termination. A brief summary [***251] of familiar principles, therefore, may be useful.

[*716] In attempting to emphasize its contractual origins, the majority characterize the covenant of good faith and fair dealing [1] as [**413] "a contract term" (maj. opn. at p. 684) "aimed at making effective the agreement's promises." (Maj. opn. at p. 683.) That characterization is simply incorrect under the decisions of this court and the authorities on which they relied. It is true that the law implies in every *contract* a duty of good faith and fair dealing. ( *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158]; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) The duty to deal fairly and in good faith with the other party to a contract, however, "is a *duty imposed by law, not one arising from the terms of the contract itself.* In other words, this duty of dealing fairly and in good faith is nonconsensual in origin rather

than consensual." ( *Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 239 [102 Cal.Rptr. 547], italics added, quoted with approval in *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032]; accord *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 175-176 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) While the nature of the obligations imposed by this duty is dependent upon the nature and purpose of the contract and the expectations of the parties, these obligations are not consensual, not agreed to in the contract; they are *imposed by law* and thus reflect the normative values of society as a whole. ( *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573-575; *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1169 [226 Cal.Rptr. 820].) The interest which the duty of good faith and fair dealing is designed to preserve and protect is essentially not the *parties'* interest in having their promises performed, but *society's* interest in protecting its members from harm on account of nonconsensual conduct. ( *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573-574; *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at pp. 1169-1171.) (23)

    1    As the commentators have noted, the very term "implied covenant" is misleading, since it "evokes the notion of contract, and therefore the term 'duty' might be more appropriate for treating the violation of good faith and fair dealing as a tort." (Note, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291, 1307, fn. 76.) The Restatement Second of Contracts, section 205, has adopted the language of duty: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."

Because tort actions enforce "duties of conduct . . . imposed by law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties . . . ." ( *Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at p. 176, quoting Prosser, Law of Torts (4th ed. 1971) p. 613), it was quite natural that courts would eventually approve the extension of tort remedies, in appropriate circumstances, to violations of the duty of good faith and fair dealing. (See Note, *supra,* 73 Cal.L.Rev. at p. 1307.) Indeed, [*717] this court was among the first to recognize that the nature of the obligations, the purposes of the contract and the expectations of the parties all combine to impose a heightened duty upon insurers. As we explained in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, "The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy -- rather, he seeks protection against calamity . . . . [The] major moti-

vation for obtaining disability insurance is to provide funds during periods when the ordinary source of the insured's income -- his earnings -- has stopped. The purchase of such insurance provides peace of mind and security in the event the insured is unable to work." (24 Cal.3d at p. 819.) We also observed that "the relationship of insurer and insured is inherently [***252] unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." ( *Id.* at p. 820.)

In the classic tradition of the common law, which adapts functional principles from precedent as changing social and economic conditions require, a number of courts and commentators have distilled from our holdings in the insurance context a relatively narrow but serviceable "bad [**414] faith" doctrine for application in other areas: Breach of the duty of good faith and fair dealing may give rise to an action in tort where the contractual relation manifests elements similar to those which characterize the "special relationship" between insurer and insured, i.e., elements of public interest, adhesion, and financial dependency. ( *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1117-1119 [207 Cal.Rptr. 123]; Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1981) 16 U.S.F. L.Rev. 187, 220-226; accord, *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at pp. 768-769.)

Captured by the force of such reasoning, and fueled by dicta in *Tameny* and *Seaman's* suggesting that the *employment relationship* uniquely satisfies these several criteria ( *Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at p. 179, fn. 12; *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 769, fn. 6), recent Court of Appeal decisions have unanimously recognized that willful and malicious discharge from employment may give rise to tort remedies. (See *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at pp. 1167-1171, *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813, 820-821 [226 Cal.Rptr. 570]; *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 260-264 [215 Cal.Rptr. 860]; *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 477-479 [199 Cal.Rptr. 613]; *Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 251-253 [208 Cal.Rptr. 524].)

The majority is not unmindful of these numerous authorities which have concluded that the criteria which make the relationship between insurer [*718] and insured suitable for tort remedies, apply with even greater force in the employment context. Indeed, the majority reviews the pertinent cases and authorities with considerable care. (Maj. opn. at pp. 685-692.) At the end of this lengthy prologue, however, the majority concludes that

*all* of the arguments are deficient in comparative analysis, and proceeds to explain why it is "not convinced" that a relationship analogous to that between insurer and insured exists in the employment context. (Maj. opn. at p. 692.) That explanation, in its entirety, is as follows.

First, the majority asserts that a breach in the employment context "does not place the employee in the same economic dilemma that an insured faces" because the insured "cannot turn to the marketplace," while an employee presumably may "seek alternative employment." (Maj. opn. at p. 692.) Next, the majority argues that an employer, unlike an insurance company, does not sell economic "protection." (Maj. opn. at p. 692.) The majority also rejects the insurance analogy because an employee, unlike an insured, allegedly does not seek a "different kind of financial security than those entering a typical commercial contract." (Maj. opn. at p. 692.) Finally, the majority asserts that insurance and employment contracts differ "[fundamentally]" because the insured's and insurer's interests are "financially at odds," while the employer's and employee's interests allegedly are "most frequently in alignment." (Maj. opn. at p. 693.)

Such conclusions, in my view, expose an unrealistic if not mythical conception of the employment relationship. They also reveal a misplaced reluctance to define the minimal standards of decency required to govern [***253] that relationship. The delineation of such standards is not, as the majority strongly implies, judicial legislation, but rather constitutes this court's fundamental obligation.

It is, at best, naive to believe that the availability of the "marketplace," or that a supposed "alignment of interests," renders the employment relationship less special or less subject to abuse than the relationship between insurer and insured. Indeed, I [**415] can think of no relationship in which one party, the employee, places more reliance upon the other, is more dependent upon the other, or is more vulnerable to abuse by the other, than the relationship between employer and employee. And, ironically, the relative imbalance of economic power between employer and employee tends to increase rather than diminish the longer that relationship continues. Whatever bargaining strength and marketability the employee may have at the moment of hiring, diminishes rapidly thereafter. Marketplace? What market is there for the factory worker laid off after 25 years of labor in the same plant, or for the middle-aged executive fired after 25 years with the same firm?

[*719] Financial security? Can anyone seriously dispute that employment is generally sought, at least in part, for financial security and all that that implies: food on the table, shelter, clothing, medical care, education for one's children. Clearly, no action for breach of the cove-

nant of good faith and fair dealing will lie *unless* it has first been proved that, expressly or by implication, the employer has given the employee a reasonable expectation of continued employment so long as the employee performs satisfactorily. ( *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at p. 1171.) And that expectation constitutes a far greater and graver security interest than any which inheres in the insurance context. Most of us can live without insurance. Few of us could live without a job.

Peace of mind? One's work obviously involves more than just earning a living. It defines for many people their identity, their sense of self-worth, their sense of belonging. The wrongful and malicious destruction of one's employment is far more certain to result in serious emotional distress than any wrongful denial of an insurance claim.

If everything this court has written concerning the relation between insurer and insured has any deeper meaning; if we have created a living principle based upon justice, reason and common sense and not merely a fixed, narrow and idiosyncratic rule of law, then we must acknowledge the irresistible logic and equity of extending that principle to the employment relationship. We can reasonably do no less.

Beyond, and perhaps underlying, its rejection of the special relationship analogy, the majority makes two additional arguments. The extension of tort remedies to the employment relation, the majority asserts, is a matter best left to the Legislature, for the decision involves "policy" choices which may "profoundly" affect social and commercial relations. (Maj. opn. at p. 694.) Additionally, the majority asserts that "bad faith" is a tort impervious to practical "delineation." (Maj. opn. at p. 698.) Thus, the majority raises the familiar "floodgate-of-litigation" specter to warn of "potentially enormous consequences for the stability of the business community." (Maj. opn. at p. 699.) These sorts of arguments have not fared particularly well with this court in the past, and this case presents no occasion for exception.

As to the contention that a recognition of tort remedies for breach of the duty of good faith and fair dealing is best left to the Legislature, the short answer was aptly summarized in *People* v. *Pierce* (1964) 61 Cal.2d 879, 882 [40 Cal.Rptr. 845, 395 P.2d 893], "In effect the contention is a request that courts abdicate their responsibility for the upkeep of the common law. That upkeep it needs continuously, as this case demonstrates."

[*720] [***254] The responsibility to which we referred in *Pierce, supra,* 61 Cal.2d 879, arises from the unique genius of the common law system and the critical role which the courts play in that system. "In California as in other jurisdictions of Anglo-American heritage, the

47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

common law 'is not a codification of exact or inflexible rules for human conduct . . . but is rather the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice, [**416] and adopted by common consent for the regulation and government of the affairs of men. . . .'

"'The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society. . . .'" ( *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 393-394 [115 Cal.Rptr. 765, 525 P.2d 669].)

"This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." ( *Hurtado* v. *California* (1884) 110 U.S. 516, 530 [28 L.Ed. 232, 237, 4 S.Ct. 111].)

"But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it . . . . Although the Legislature may of course speak to the subject, in the common law system the primary instruments of evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them." ( *Rodriguez* v. *Bethlehem Steel Corp.*, *supra*, 12 Cal.3d at p. 394.)

This court has adhered to these principles over the years, consistently rejecting claims that the reconsideration, expansion or abolition of settled common law rules should await action by the Legislature. In *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], for example, we judicially abolished the doctrine of sovereign immunity from tort liability, overruling earlier decisions which had expressly held that "abrogation or restriction of this doctrine is primarily a legislative matter . . . ." ( *Vater* v. *County of Glenn* (1958) 49 Cal.2d 815, 820 [323 P.2d 85]; see also *Talley* v. *Northern San Diego Hosp. Dist.* (1953) 41 Cal.2d 33, 41 [257 P.2d 22].) In so holding, we emphasized that the doctrine was "court made" (55 Cal.2d at p. 218), and finding no continued "rational basis" for it ( *id.* at p. 216), we ended it. [2]

> 2  In rejecting the doctrine of sovereign immunity we relied in part on earlier decisions in which we had abolished the doctrine of tort immunity of charitable institutions ( *Malloy* v. *Fong* (1951) 37 Cal.2d 356 [232 P.2d 241]; *Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762 [97 P.2d 798]), "an immunity that was also claimed to be so firmly imbedded that only the Legislature could change it." ( *Muskopf* v.

*Corning Hospital Dist.*, *supra*, 55 Cal.2d at p. 219.)

[*721] In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], this court judicially abolished the doctrine of contributory negligence as a total bar to recovery and adopted a rule of comparative negligence in direct proportion to fault. We did so despite the contention that "widespread disagreement among both the commentators and the states as to which [system was] best" rendered the matter more suitable for legislative action. ( *Id.* at p. 833 (dis. opn. of Clark, J.).) "[Logic], practical experience, and fundamental justice," we held, made judicial action imperative. ( *Id.* at pp. 812-813.)

Over the express objection that fundamental tort reform should be left to the Legislature, we judicially abandoned the long-standing distinctions among business invitees, social guests and trespassers in determining the standard of liability for dangerous conditions on land ( *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 121 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]); recognized that a married person whose spouse is injured [***255] by the negligence of a third party has a cause of action for loss of consortium ( *Rodriguez* v. *Bethlehem Steel Corp.*, *supra*, 12 Cal.3d at pp. 389-404); and abrogated the rule of interspousal immunity for negligent torts. ( *Klein* v. *Klein* (1962) 58 Cal.2d 692, 697-699 [26 Cal.Rptr. 102, 376 P.2d 70].)

Every one of these landmark decisions required a difficult choice among competing social and economic policies. It is hardly novel or surprising, therefore, to be confronted [**417] with conflicting arguments over the relative economic efficiency or political wisdom of allowing tort remedies for wrongful and malicious employment termination, or to find that competing policies have been advanced and adopted elsewhere. What is both novel and distressing is to find such arguments being cited by the majority as a justification for *judicial abstention*. The imposition of a tort duty is not contingent upon a consensus of so-called experts. The *courts* are the custodians of the common law -- not the economists, or the legislators, or even the law professors. We abdicate that duty when we abjure decision of common law questions under the guise of "deference" to the political branches.

The second contention of the majority, that bad faith liability cannot adequately be delimited and therefore must be denied, has also been generally rejected by this court. As we explained in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912], "The 'contention that a rule permitting the maintenance of the action would be impractical to administer . . . is but an argument that the courts are incapable of performing their

appointed tasks, a premise which has frequently been rejected.'" ( *Id.* at [*722] p. 736.) The unreasoning fear that we cannot successfully adjudicate future cases of bad faith termination, pursuant to the guidelines already formulated and applied by the Courts of Appeal, should not be permitted to bar recovery in an otherwise meritorious case.

Contrary to the implication of the majority, the standard set forth in *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d 1155, is fully adequate to distinguish between simple breach of contract for discharge without cause, and breach of the implied duty of good faith and fair dealing. "If the employer merely disputes his liability under the contract by asserting in good faith and with probable cause that good cause existed for discharge, the implied covenant is not violated and the employer is not liable in tort. ( *Seaman's, supra,* 36 Cal.3d at p. 770.) If, however, the existence of good cause for discharge is asserted by the employer without probable cause and in bad faith, that is, without a good faith belief that good cause for discharge in fact exists, the employer has tortiously attempted to deprive the employee of the benefits of the agreement, and an action for breach of the implied covenant of good faith and fair dealing will lie." (*Id.* at p. 1171; see also *Khanna* v. *Microdata Corp., supra,* 179 Cal.App.3d 250, 262, 263 [breach of good faith and fair dealing established by proof of employer's bad faith action extraneous to the contract coupled with intent to frustrate the employee's contract rights].) Thus, under the *Koehrer* standard no bad faith action would lie unless the wrongful discharge was both willful and malicious.

As the majority candidly states, its concern is not so much with the workability of the foregoing standard as the fact that "any firing . . . could provide the basis for a *pleading* alleging the discharge was in bad faith under the cited standards." (Maj. opn. at p. 699.) (Italics added.) In other words, such claims should be denied because otherwise courts would experience a "flood of litigation." The floodgate argument is no more plausible now, however, than it was in *Klein* v. *Klein, supra,* 58 Cal.2d 692, where this court, in abolishing the rule of spousal immunity for negligent torts, stated: "'[Courts] should not decline to entertain a meritorious action . . . because of the dubious apprehension that in some future case [frivolous claims] may become the [***256] subject of litigation.'" ( *Id.* at p. 694, quoting *Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 241 [317 P.2d 613] (conc. and dis. opn. of Schauer, J.).) Courts must deal with each case on its merits, "whether there be few suits or many; the existence of a multitude of claims merely shows society's pressing need for legal redress." ( *Dillon* v. *Legg, supra,* 68 Cal.2d at p. 735, fn. 3.) That need has [**418] never been greater than in cases of malicious termination of employment.

[*723] Conclusion

The majority's views of the bad faith issue reflect one overriding concern -- that of judicial overreaching. It is a familiar concern.

The power of the courts as both guardian and expositor of the common law is considerable. To be effective, such power must be exercised with restraint. Judge-made law must progress incrementally, "interstitially" as Justice Holmes said, filling the legislative gaps, neither too far ahead of nor too far behind the body politic.

Still, Justice Cardozo believed, as his landmark common law decisions attest, that the "fissures in the common law are wider than the fissures in a statute . . . ." (Cardozo, The Nature of the Judicial Process (1921) p. 71.) His point, it appears, is that within the framework of the traditional common law responsibilities of the judiciary, the courts may respond to changing social needs without deference to legislative action. As Professor Corbin said: "It is the function of our courts to keep the doctrines up to date with the *mores* by continual restatement and by giving them a continually new content. This is judicial legislation, and the judge legislates at his peril. Nevertheless, it is the *necessity and duty* of such legislation that gives to judicial office its highest honor; and no brave and honest judge shirks the duty or fears the peril." (Corbin, *The Offer of an Act for a Promise* (1920) 29 Yale L.J. 767, 771- 772, italics added.)

The majority's implicit fears of judicial activism are unfounded. We overstep no institutional bounds or constitutional constraints in recognizing that a willful and malicious termination of employment is so offensive to community values that it may give rise to tort remedies. On the contrary, such a holding would be entirely consistent with our judicial function, and with the great common law tradition of this court.

**MOSK, J.**

I dissent.

I am in agreement with the opinions of Justices Broussard and Kaufman with one significant exception: I am unwilling to accept their concurrence in part I of the majority opinion.

When an employee learns that one in a supervisorial position is an embezzler, he has the choice of two immediate courses of action. He can remain silent and thus avoid the enmity of the embezzler and embarrassment to the employer. That apparently is the approach preferred by my colleagues in order to assure the employee's retention of his job. Or, as a dutiful employee concerned with the image of his company, he can report [*724] his knowledge to the employer. That is the course of action I would encourage.

47 Cal. 3d 654, *; 765 P.2d 373, **;
254 Cal. Rptr. 211, ***; 1988 Cal. LEXIS 269

My colleagues insist that reporting the presence of an embezzler to an employer is solely to the benefit of the employer. While undoubtedly it is to the employer's benefit, it is not exclusively so. It is my opinion that such action -- i.e., advising a state-created corporation of the employ in a supervisorial position of a person chargeable with a potential felony -- is in the best interests of society as a whole, and therefore covered by the public policy rule.

Under Labor Code section 1102.5, subdivision (b), an employer is prohibited from retaliating against an employee for disclosing information to a law enforcement agency when there is reasonable cause to believe a violation of state or federal laws has been committed. It seems incongruous to permit retaliation and discharge when the employee chooses to go directly to his employer with the information, rather than to [***257] circumvent the employer, go behind his back and directly to a public agency. In either event, it seems clear to me that the law and public policy are implicated.

With that one exception, I agree with the persuasive opinions of Justices Broussard and Kaufman.

EXHIBIT 16

LEXSEE 11 CAL 4TH 85

**FREEMAN & MILLS, INCORPORATED, Plaintiff and Appellant, v. BELCHER OIL COMPANY, Defendant and Appellant.**

**No. S042831.**

**SUPREME COURT OF CALIFORNIA**

**11 Cal. 4th 85; 900 P.2d 669; 44 Cal. Rptr. 2d 420; 1995 Cal. LEXIS 4963; 95 Cal. Daily Op. Service 6935; 95 Daily Journal DAR 11851**

**August 31, 1995, Decided**

**PRIOR HISTORY:**    Superior Court of Los Angeles County, No. C740915, Edward Y. Kakita, Judge.

**DISPOSITION:**   The judgment of the Court of Appeal, reversing the trial court's judgment in plaintiff's favor and remanding the case for a retrial limited to the issue of damages under plaintiff's breach of contract cause of action, and for judgment in favor of defendant on plaintiff's bad faith denial of contract cause of action, is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An oil company retained a law firm with an understanding that the company was to pay for costs the law firm incurred on the company's behalf, including fees for accountants. The law firm hired accountants to work on the company's case. The company eventually terminated the law firm and the accountants billed the law firm for its services and costs. When the law firm did not pay the bill, the accountants sought payment from the company. The company did not pay, and the accountants brought an action against it, alleging breach of contract, bad faith denial of contract, and quantum meruit. The trial court entered judgment for the accountants on the jury's special verdict, including the finding that the company had breached the contract and had acted in bad faith, and awarded punitive damages. (Superior Court of Los Angeles County, No. C740915, Edward Y. Kakita, Judge.) The Court of Appeal, Second Dist., Div. One, No. B069559, reversed and remanded with directions.

The Supreme Court affirmed the judgment of the Court of Appeal reversing the trial court's judgment in plaintiff's favor and remanding the case for a retrial limited to the issue of damages under plaintiff's breach of

contract cause of action, and for judgment in favor of defendant on plaintiff's bad faith denial of contract cause of action. The court held that the Court of Appeal properly reversed the judgment awarding plaintiffs tort damages for bad faith denial of a contract. It held that the former rule that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that a contract exists, is no longer viable and should be overruled. The presently applicable general rule, announced by the court, precludes tort recovery for noninsurance contract breach, at least in the absence of violation of an independent duty arising from principles of tort law other than the bad faith denial of the existence of, or liability under, the breached contract. However, the court made clear that nothing prevents the Legislature from creating additional civil remedies for noninsurance contract breach, including such measures as providing litigation costs and attorney fees in certain aggravated cases, assessing increased compensatory damages covering lost profits and other losses attributable to the breach, or restoring the overruled decision. (Opinion by Lucas, C. J., with Baxter, J., Werdegar, J., and Klein, J.,[*] concurring. Separate concurring opinion by Kennard, J., with Arabian, J., concurring. Separate concurring and dissenting opinion by Mosk, J.)

[*]    Presiding Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

Page 2

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

**(1a) (1b) Contracts § 44--Performance--Breach--Bad Faith Denial of Existence of Contract--Tort Damages.** --In an action by accountants against an oil company for services performed pursuant to an agreement with the company's former law firm, the Court of Appeal properly reversed the judgment awarding plaintiffs tort damages for bad faith denial of a contract. The former rule that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists, is no longer viable. The applicable general rule precludes tort recovery for noninsurance contract breach, at least in the absence of violation of an independent duty arising from principles of tort law other than the bad faith denial of the existence of, or liability under, the breached contract. However, nothing prevents the Legislature from creating additional civil remedies for noninsurance contract breach, including such measures as providing litigation costs and attorney fees in certain aggravated cases, or assessing increased compensatory damages covering lost profits and other losses attributable to the breach. (Overruling *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], which established tort remedies for bad faith denial without probable cause of a contract.)[See 6 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 1358.]

**(2) Courts § 39.5--Decisions and Orders--Doctrine of Stare Decisis--Opinions of California Supreme Court--Overruling.** --It is a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justice system. This policy of stare decisis is based on the assumption that certainty, predictability, and stability in the law are the major objectives of the legal system, i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law. However, that policy is sufficiently flexible to permit the Supreme Court to reconsider, and ultimately to depart from, its own prior precedent in an appropriate case. This is especially so when the error in the prior opinion is related to a matter of continuing concern to the community at large. Reconsideration of precedent may become necessary when subsequent developments indicate an earlier decision was unsound or has become ripe for reconsideration.

**COUNSEL:** McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, John M. Rochefort, Martha S. Doty, Saman Zia-Zarifi and Andrew M. Gilford for Plaintiff and Appellant.

Ian Herzog, Douglas DeVries, Leonard Sacks, Bruce Broillet, Thomas Stolpman, Robert B. Steinberg, Roland Wrinkle, Gary Paul, Steven Kleifeld, Harvey Levine, Wayne McClean, William Turley, Rose, Klein & Marias, David A. Rosen, Miller, Starr & Regalia, Edmund L. Regalia, Bernard & Wood, David P. Bonaccorsi, Crowe & Day, J. Michael Crowe and Douglas L. Day as Amici Curiae on behalf of Plaintiff and Appellant.

Stanley E. Crawford, Jr., David A. Engels, Sands, Narwitz, Forgie, Leonard & Lerner and Arthur M. Leonard for Defendant and Appellant.

Horvitz & Levy, Ellis J. Horvitz, Lisa Perrochet, John A. Taylor, Jr., Tanke & Willemsen, Tony J. Tanke, Michael A. Willemsen, McCutchen, Doyle, Brown & Enersen, John R. Reese, Robert A. Lewis and William Carpenter as Amici Curiae on behalf of Defendant and Appellant.

**JUDGES:** Opinion by Lucas, C. J., with Baxter, J., Werdegar, J., and Klein, J., * concurring. Separate concurring opinion by Kennard, J., with Arabian, J., concurring. Separate concurring and dissenting opinion by Mosk, J.

    *   Presiding Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

**OPINION BY:** LUCAS, C. J.

**OPINION**

   [*87] [***421] [**670] **LUCAS, C. J.**

We granted review in this case to resolve some of the widespread confusion that has arisen regarding the application of our opinion in *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal. 3d 752 [206 Cal. Rptr. 354, 686 P.2d 1158] (*Seaman's*). We held in that case that a tort cause of action might lie "when, in addition to breaching the contract, [defendant] seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." ( *Id.* at p. 769.) [*88]

In the present case, the Court of Appeal reversed judgment for plaintiff and remanded the case for a limited retrial, but also suggested that "it is time for the Supreme Court to reexamine the tort of 'bad faith denial of contract.' " We agree, and proceed to do so here. As our order granting review stated, "the issue to be argued before this court is limited to whether, and under what circumstances, a party to a contract may recover in tort for another party's bad faith denial of the contract's existence."

(1a) In light of certain developments occurring subsequent to *Seaman's* that call into question its continued validity, we find it appropriate to reexamine that decision. (See generally, *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal. 3d 287 [250 Cal. Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*).) As will appear, we have concluded that the *Seaman's* court incorrectly recognized a tort cause of action based on the defendant's bad faith denial of the existence of a contract between the parties. That holding has been widely criticized by legal scholars, has caused considerable confusion among lower courts, and has been rejected by the courts of several other jurisdictions. These critics convincingly argue that the *Seaman's* decision is confusing and ambiguous, analytically flawed, and promotes questionable policy. After careful review of all the foregoing considerations, we conclude that our *Seaman's* holding should be overruled.

## I. *FACTS*

We first review the underlying facts, taken largely from the Court of Appeal opinion herein. In June 1987, defendant Belcher Oil Company (Belcher Oil) retained the law firm of Morgan, Lewis & Bockius (Morgan) to defend it in a Florida lawsuit. Pursuant to a letter of understanding signed by Belcher Oil's general counsel (William Dunker) and a Morgan partner (Donald Smaltz), Belcher Oil was to pay for costs incurred on its behalf, including fees for accountants. In February 1988, after first obtaining Dunker's express authorization, Smaltz hired plaintiff, the accounting firm of Freeman & Mills, Incorporated (Freeman and Mills), to provide a financial analysis and litigation support for Belcher Oil in the Florida lawsuit.

In March, an engagement letter was signed by both Morgan and Freeman & Mills. At about this time, William Dunker left Belcher Oil and was replaced by Neil Bowman. In April 1988, Bowman became dissatisfied with Morgan's efforts and the lawyers were discharged. Bowman asked Morgan for a summary of the work performed by Freeman & Mills and, at the same [***422] time, directed Smaltz to have Freeman & Mills stop their work for Belcher Oil. Smaltz did as he was asked. Freeman & Mills's final statement was for $70,042.50 in fees, plus $7,495.63 for costs, a total of $77,538.13.

[*89] Freeman & Mills billed Morgan, but no payment was forthcoming. Freeman & Mills then billed Belcher Oil directly and, for about a year, sent monthly statements and regularly called Bowman about the bill, but no payment was forthcoming. In August 1989, Smaltz finally told Freeman & Mills that Belcher Oil refused to pay their bill. Freeman & Mills then wrote to Bowman asking that the matter be resolved. In September 1989, Bowman responded, complaining that Belcher

Oil had not been consulted about the extent of Freeman & Mills's services and suggesting Freeman & Mills should look to [**671] Morgan for payment of whatever amounts were claimed due.

Ultimately, Freeman & Mills filed this action against Belcher Oil, alleging (in its second amended complaint) causes of action for breach of contract, "bad faith denial of contract," and quantum meruit. Belcher Oil answered and the case was presented to a jury in a bifurcated trial, with punitive damages reserved for the second phase. According to the evidence presented during the first phase, the amount owed to Freeman & Mills (as indicated on their statements) was $77,538.13.

The jury returned its first phase verdict. On Freeman & Mills's breach of contract claim, the jury found that Belcher Oil had authorized Morgan to retain Freeman & Mills on Belcher Oil's behalf, that Freeman & Mills had performed its obligations under the contract, that Belcher Oil had breached the contract, and that the amount of damages suffered by Freeman & Mills was $25,000. The jury also answered affirmatively the questions about whether Belcher Oil had denied the existence of the contract and had acted with oppression, fraud, or malice. Thereafter, the jury returned its verdict awarding $477,538.13 in punitive damages and judgment was entered consistent with the jury's verdicts.

In three post-trial motions, Freeman & Mills asked for orders (1) "correcting" the jury's verdicts and the court's judgment to reflect compensatory damages of $77,538.13 and punitive damages of $425,000 (on the ground that the jury's questions showed this was its true intent); (2) awarding attorney fees as sanctions for the litigation tactics of Belcher Oil's attorneys; and (3) awarding prejudgment interest on the compensatory damage award. Over Belcher Oil's opposition, all three motions were granted--but with some changes in the course of correcting the judgment--by giving Freeman & Mills $131,614.93 in compensatory damages (the $25,000 actually awarded by the jury, plus the $77,538.13 included in the punitive damage award, plus $29,076.80 for prejudgment interest), and $400,000 (not $425,000 as requested) in punitive damages.

Belcher Oil appealed from the "corrected" judgment. Freeman & Mills cross-appealed from a mid-trial order denying its request to amend its [*90] complaint to add a cause of action for fraud, an issue not presently before us. The Court of Appeal majority, finding no "special relationship" between the parties to justify a tort theory of recovery under *Seaman's,* reversed the judgment and remanded the case to the trial court for a retrial limited to the issue of damages under plaintiff's breach of contract cause of action. (The Court of Appeal dissenting justice would have sustained the tort cause of action and re-

manded for retrial of the damage issue as to both causes of action.) As will appear, we affirm the judgment of the Court of Appeal, concluding that a tort recovery is unavailable in this case.

## II. *THE SEAMAN'S DECISION*

The tort of bad faith "denial of contract" was established in a per curiam opinion in *Seaman's, supra,* 36 Cal. 3d 752. These were the facts before the court in that case: In 1971, Seaman's Direct Buying Service, a small marine fueling station in Eureka, wanted to expand its operation by developing a marine fuel dealership in conjunction with a new marina under development by the City of Eureka. When Seaman's approached the city about a long-term lease of a large parcel of land in the marina, the city required Seaman's to obtain a binding commitment from an oil supplier. To that end, Seaman's negotiated [***423] with several companies and, by 1972, reached a tentative agreement with Standard Oil Company of California.

Both Seaman's and Standard Oil signed a letter of intent setting forth the basic terms of their arrangement, but that letter was subject to government approval of the contract, continued approval of Seaman's credit status, and future agreement on specific arrangements. Seaman's showed the letter to the city and, shortly thereafter, signed a 40-year lease with the city. (*Seaman's, supra,* 36 Cal. 3d at pp. 759-760.)

Shortly thereafter, an oil shortage dramatically reduced the available supplies of oil [**672] and, in November 1973, Standard Oil told Seaman's that new federal regulations requiring allocation of petroleum products to those that had been customers since 1972 precluded its execution of a new dealership agreement. In response, Seaman's obtained an exemption from the appropriate federal agency. Standard Oil appealed and persuaded the agency to reverse the order, but Seaman's eventually had the exemption reinstated contingent on a court determination that a valid contract existed between the parties. (36 Cal. 3d at pp. 760-761.)

Seaman's then asked Standard Oil to stipulate to the existence of a contract, stating that a refusal would force it to discontinue operations. Standard Oil's representative refused the request, telling Seaman's, "See you [*91] in court." Seaman's business collapsed and it sued Standard Oil for damages on four theories--breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, and interference with Seaman's contractual relationship with the city. (36 Cal. 3d at pp. 761-762.)

The case was tried to a jury, which returned its verdicts in favor of Seaman's on all theories except fraud, awarding compensatory and punitive damages. Standard Oil appealed. (36 Cal. 3d at p. 762.) We considered

"whether, and under what circumstances, a breach of the implied covenant of good faith and fair dealing in a commercial contract may give rise to an action in tort." ( *Id.* at p. 767.) For purposes of completeness, we quote from *Seaman's* at some length:

"It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. [Citations.] Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. [Citation.] [P] California courts have recognized the existence of this covenant, and enforced it, in cases involving a wide variety of contracts.... [P] In the seminal cases of *Comunale v. Traders & General Ins. Co.* [(1958)] 50 Cal. 2d 654 [328 P.2d 198, 68 A.L.R.2d 883], and *Crisci v. Security Ins. Co.* [(1967)] 66 Cal. 2d 425 [58 Cal. Rptr. 13, 426 P.2d 173], this court held that a breach of the covenant of good faith and fair dealing by an insurance carrier may give rise to a cause of action in tort as well as in contract. [Citation.]

"While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's--that breach of the covenant always gives rise to an action in tort--is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. [Citation.] No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.

"When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such [*92] contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations [***424] of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application.

"For the purposes of this case it is unnecessary to decide the broad question which Seaman's poses. Indeed, it is not even necessary to predicate liability on a breach of the implied covenant. It is sufficient to recognize that

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

*a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without [\*\*673] probable cause, that the contract exists.* [Italics added.]

"It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made ' "without probable cause and with no belief in the existence of the cause of action." ' [Citation.] There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. [Citation.] Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Seaman's, supra,* 36 Cal. 3d at pp. 768-770, fns. omitted.)

*Seaman's* concluded that, because a *good faith* denial of the existence of a binding contract is not a tort (*Seaman's, supra,* 36 Cal. 3d at p. 770), the trial court's failure to instruct the jury on the requirement of *bad faith* was error (*ibid.*) and that error was prejudicial ( *id.* at p. 774).

III. *STARE DECISIS*

Before examining various recent developments pertinent to our reconsideration of *Seaman's,* we briefly review certain well-established principles governing the respect we confer upon prior opinions of this court. These principles were summarized in *Moradi-Shalal, supra,* 46 Cal. 3d 287, as follows:

(2) "... It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This [\*93] policy, known as the doctrine of stare decisis, 'is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system; i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law.' (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 758, at p. 726, and see cases cited.)

"It is likewise well established, however, that the foregoing policy is sufficiently flexible to permit this court to reconsider, and ultimately to depart from, its own prior precedent in an appropriate case. (*Id.,* § 759,

and cases cited.) As we stated in *Cianci v. Superior Court* (1985) 40 Cal. 3d 903, 924, 221 Cal. Rptr. 575, 710 P.2d 375, ... '[a]lthough the doctrine [stare decisis] does indeed serve important values, it nevertheless should not shield court-created error from correction.' (Accord, *People v. Guerrero* (1988) 44 Cal. 3d 343, 356, 243 Cal. Rptr. 688, 748 P.2d 1150, ...; *People v. Anderson* (1987) 43 Cal. 3d 1104, 1147, 240 Cal. Rptr. 585, 742 P.2d 1306, ...; *County of Los Angeles v. Faus* (1957) 48 Cal. 2d 672, 679, 312 P.2d 680, ....) In *Anderson,* Justice Mosk noted the need for flexibility in applying stare decisis, stating, 'This is especially so when, as here, the error [in the prior opinion] is related to a "matter of continuing concern" to the community at large. [Citations.]' (*Anderson, supra,* 43 Cal. 3d at p. 1147, ...; see also *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 695, 56 L. Ed. 2d 611, 98 S. Ct. 2018, ... [stare decisis not mechanically applied to prohibit overruling prior decisions interpreting statutes].)

"*Anderson* also recognized that reexamination of precedent may become necessary when subsequent developments indicate an [\*\*\*425] earlier decision was unsound, or has become ripe for reconsideration. [Citation.]" (*Moradi-Shalal, supra,* 46 Cal. 3d at pp. 296-297; see also *People v. Latimer* (1993) 5 Cal. 4th 1203, 1212-1216 [23 Cal. Rptr. 2d 144, 858 P.2d 611], and cases cited.)

As we explain below, developments occurring subsequent to the *Seaman's* decision convince us that it was incorrectly decided, that it has generated unnecessary confusion, costly litigation, and inequitable results, and [\*\*674] that it will continue to produce such effects unless and until we overrule it.

IV. *SUBSEQUENT DEVELOPMENTS*

A. *California Supreme Court Decisions*--Subsequent opinions of this court indicate a continuing reluctance, originally reflected in *Seaman's* itself, to authorize tort recovery for noninsurance contract breaches.

In *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654 [254 Cal. Rptr. 211, 765 P.2d 373] (*Foley*), we considered the availability of tort damages [\*94] for the wrongful termination of a discharged employee. Declining to rely on dictum in *Seaman's* (see *id.* at p. 769 & fn. 6) regarding the possible availability of tort remedies for breach of the implied covenant of good faith and fair dealing (hereafter the implied covenant) in the employment context, we refused to afford such remedies for the essentially contractual claim of breach of the implied covenant arising in that context. (See *Foley, supra,* 47 Cal. 3d at pp. 683-693.)

In reaching our conclusion in *Foley,* we relied in part on certain basic principles relevant to contract law,

including the need for "predictability about the cost of contractual relationships," and the purpose of contract damages to compensate the injured party rather than punish the breaching party. (47 Cal. 3d at p. 683.) Focusing on the implied covenant, we observed that, with the exception of insurance contracts, "[b]ecause the covenant is a contract term, ... compensation for its breach has almost always been limited to contract rather than tort remedies." ( *Id.* at p. 684.)

We acknowledged in *Foley* that "[t]he insurance cases ... were a major departure from traditional principles of contract law," and we stressed that the courts should take "great care" before extending "the exceptional approach taken in those cases" to "another contract setting." (47 Cal. 3d at p. 690.) We concluded that "the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies ...." ( *Id.* at p. 693.)

Thereafter, in *Hunter v. Up-Right, Inc.* (1993) 6 Cal. 4th 1174, 1180-1182 [26 Cal. Rptr. 2d 8, 864 P.2d 88] (*Hunter*), we held that *Foley's* analysis would preclude recovery of tort damages for employer misrepresentations made to induce termination of employment. In the course of our analysis, and without mentioning *Seaman's*, we nonetheless confirmed that, with the exception of insurance contracts, remedies for breach of the implied covenant "have almost always been limited to contract damages." (6 Cal. 4th at p. 1180.)

We reasoned in *Hunter* that the defendant's misrepresentations were "merely the means to the end desired by the employer, i.e., termination of employment. They cannot serve as a predicate for tort damages ...." (*Hunter, supra,* 6 Cal. 4th at p. 1185.) Similar analysis would apply to a defendant's denial of the existence of the underlying contract. Although such "stonewalling" conduct may have been intended to terminate the contractual relationship, there is no logical reason why it should serve as a predicate for tort damages.

Most recently, in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503 [28 Cal. Rptr. 2d 475, 869 P.2d 454] (*Applied* [*95] *Equipment*), we held that a contracting party may not be held liable in tort for conspiring with another to interfere with his own contract. We reiterated the important differences between contract and tort theories of recovery, stating that "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law" (7 Cal. 4th at p. 515), and that "the [***426] law generally does not distinguish between good and bad motives for breaching a contract" (7 Cal. 4th at p. 516). We noted that limiting contract breach damages to those within the reasonably foreseeable contemplation of the parties when the contract was formed "serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." [**675] (7 Cal. 4th at p. 515.)

Our decisions in *Foley, Hunter,* and *Applied Equipment* each contains language that strongly suggests courts should limit tort recovery in contract breach situations to the insurance area, at least in the absence of violation of an independent duty arising from principles of tort law other than denial of the existence of, or liability under, the breached contract. (See also *White v. Western Title Ins. Co.* (1985) 40 Cal. 3d 870, 901 [221 Cal. Rptr. 509, 710 P.2d 309] (conc. and dis. opn. of Kaus, J.) [observing that "our experience in *Seaman's* surely tells us that there are real problems in applying the substitute remedy of a tort recovery--with or without punitive damages--outside the insurance area," and urging a legislative solution].)

B. *Court of Appeal Decisions*--Subsequent decisions of the Courts of Appeal have encountered considerable difficulty in applying our *Seaman's* decision. As one recent commentary stated, "The *Seaman's* tort has generated confusion among California courts. Consequently, in recent decisions, almost every court offers a different interpretation of the tort." (Comment, *California's Detortification of Contract Law: Is the Seaman's Tort Dead?* (1992) 26 Loyola L.A. L.Rev. 213, 223 (hereafter Detortification Comment).)

Without analyzing the particular facts of each case, it is sufficient to observe that our *Seaman's* holding has presented the lower courts with a number of unanswered questions, and that these courts have reached varying, and often inconsistent, conclusions in response. (See, e.g., *Harris v. Atlantic Richfield Co.* (1993) 14 Cal. App. 4th 70, 77-80 [17 Cal. Rptr. 2d 649] (hereafter *Harris*) [reviewing cases and noting criticism of *Seaman's* for "singling out" one type of bad faith contract breach for tort damages]; *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal. App. 3d 552, 566-572 [282 Cal. Rptr. 181] (hereafter *DuBarry*) [reviewing conflicting cases and holding *Seaman's* requires actual denial of contract's existence rather than mere denial of contract *liability*]; *Copesky* v. [*96] *Superior Court* (1991) 229 Cal. App. 3d 678, 686-694 [280 Cal. Rptr. 338] [general review of cases]; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal. App. 3d 1371, 1397, fn. 22 [272 Cal. Rptr. 387] (hereafter *Careau*) [acknowledging "confusion and uncertainty" generated by *Seaman's*]; *Lynch & Freytag v. Cooper* (1990) 218 Cal. App. 3d 603, 610-611 [267 Cal. Rptr. 189] (hereafter *Lynch & Freytag*) [ruling *Seaman's* inapplicable to denials of contract existence set forth in pleadings]; *Okun v. Morton* (1988) 203 Cal. App. 3d 805, 824-826 [250 Cal. Rptr. 220] (hereafter *Okun*) [con-

cluding that *Seaman's* tort is based on breach of implied covenant]; *Multiplex Ins. Agency, Inc. v. California Life Ins. Co.* (1987) 189 Cal. App. 3d 925, 937-940 [235 Cal. Rptr. 12] (hereafter *Multiplex*) [extending *Seaman's* to bad faith denial of *liability*]; *Koehrer v. Superior Court* (1986) 181 Cal. App. 3d 1155, 1170-1171 [226 Cal. Rptr. 820] [extending *Seaman's* to bad faith attempt to deprive employee of contractual benefits]; *Quigley v. Pet, Inc.* (1984) 162 Cal. App. 3d 877, 890-892 [208 Cal. Rptr. 394] [noting uncertainties presented by *Seaman's*, including its application to bad faith disputes over contractual "terms and performance"]; *Wallis v. Superior Court* (1984) 160 Cal. App. 3d 1109, 1118-1119 [207 Cal. Rptr. 123] [interpreting *Seaman's* as allowing tort action for breach of implied covenant in noninsurance cases].)

Several of the foregoing cases criticize our *Seaman's* holding, raise doubts as to its continued viability, or urge our reconsideration of that decision. (See *Harris, supra,* 14 Cal. App. 4th at p. 79-82 [noting criticism and declining to extend *Seaman's* tort to contract breaches in violation of public policy]; *Careau, supra,* 222 Cal. App. 3d at p. 1401, fn. 27 ["unfortunate" that *Seaman's* failed to explain or justify why tort liability could be imposed for bad faith denial of contract existence but not for bad faith assertion of other defenses]; *Lynch & Freytag, supra,* 218 Cal. App. 3d at pp. 611 [***427] 267 Cal. Rptr. 189 (maj. opn.) [observing that "[t]he contours of this new tort have perplexed the appellate courts almost from the day *Seaman's* was filed."], 616 (conc. opn. of Woods (Fred), J.) [stating that "[t]he general viability of *Seaman's* in view of *Foley* appears to be tenuous at best"]; *Okun, supra,* 203 Cal. App. 3d at p. 826 [**676] ["we are of the view--as are many others--that the whole concept of tort liability in bad faith commercial litigation needs to be reexamined"].)

As these cases indicate, much confusion and conflict has arisen regarding the scope and application of our *Seaman's* holding. For example, does the *Seaman's* tort derive from breach of the implied covenant or from some other independent tort duty? (Compare *Okun, supra,* 203 Cal. App. 3d at pp. 823-826, with *Quigley v. Pet, Inc., supra,* 162 Cal. App. 3d at p. 890.) Does the *Seaman's* tort extend to a bad faith *denial of liability* under a contract, as well as denial of its existence? (Compare *Du-Barry, supra,* 231 Cal. App. 3d at [*97] pp. 566-572, with *Multiplex, supra,* 189 Cal. App. 3d at pp. 937-940.) Is a "special relationship" between the contracting parties a prerequisite to a *Seaman's* action? (Compare *Multiplex, supra,* 189 Cal. App. 3d at p. 939, and *Quigley v. Pet, Inc., supra,* 162 Cal. App. 3d at p. 890, with *Okun, supra,* 203 Cal. App. 3d at pp. 823-826; see also *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.* (9th Cir. 1989) 880 F.2d 176 [reviewing the conflicting cases].)

The foregoing "special relationship" conflict extends to the present case, for as previously noted, the Court of Appeal herein concluded that the *Seaman's* tort requires a showing of a special relationship between the parties. As the Court of Appeal stated, "Whatever need there may be to provide special remedies to cover special relationships, there is no similar need in routine business cases. For this reason, we believe our colleagues in Division Two were correct when they interpreted *Seaman's* narrowly, limiting the tort of bad faith denial of contract to the situations where, in addition to whatever other elements may be required (which depends on which case is cited), there is (1) a special relationship and (2) conduct extraneous to the contract (as there was in *Seaman's*). ( *Okun v. Morton, supra,* 203 Cal. App. 3d at pp. 823-826 ....) We also think it is time for the Supreme Court to grant review and resolve the conflict created by *Okun* on the one hand and the *Quigley* line of cases on the other."

Confusion and conflict alone might not justify a decision to abrogate *Seaman's,* for we could attempt to resolve all the uncertainties engendered by that decision. But there are additional considerations that convince us to forgo that predictably Herculean effort. Many of the pertinent Court of Appeal decisions recognize compelling *policy* reasons supporting the preclusion of tort remedies for contractual breaches outside the insurance context.

For example, in *DuBarry, supra,* 231 Cal. App. 3d at page 569, the court refused to extend the *Seaman's* tort to bad faith *defenses* to contract claims. The court explained: "If the rule were otherwise, then any party attempting to defend a disputed contract claim would risk, at the very least, exposure to the imposition of tort damages and an expensive and time-consuming expansion of the litigation into an inquiry as to the motives and state of mind of the breaching party. The distinction between tort and contract actions, and their purposefully different measures of damages, would be blurred if not erased. The insult to commercial predictability and certainty would only be exceeded by the increased burden on the already overworked judicial system." (*Ibid.*) Many of these considerations are equally applicable to the *Seaman's* tort itself.

Similarly, in *Harris, supra,* 14 Cal. App. 4th 70, the Court of Appeal denied a tort recovery for bad faith contract breach in violation of public policy. [*98] The court elaborated on the applicable policy considerations as follows: "The traditional goal of contract remedies is compensation of the promisee for the loss resulting from the breach, not compulsion of the promisor to perform his promises. Therefore, 'willful' breaches have not been distinguished from other breaches. [Citation.] The restrictions on contract remedies serve purposes not [***428] found in tort law. They protect the parties'

freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise. This encourages efficient breaches, resulting in increased production of goods and services at [**677] lower cost to society. [Citation.] Because of these overriding policy considerations, the California Supreme Court has proceeded with caution in carving out exceptions to the traditional contract remedy restrictions. [Citations.]" (14 Cal. App. 4th at p. 77.)

The *Harris* court set forth as reasons for denying tort recovery in contract breach cases (1) the different objectives underlying the remedies for tort and contract breach, (2) the importance of predictability in assuring commercial stability in contractual dealings, (3) the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and (4) the preference for legislative action in affording appropriate remedies. (*Harris*, *supra*, 14 Cal. App. 4th at pp. 81-82; see also *Foley*, *supra*, 47 Cal. 3d at pp. 683, 694, fn. 31, 696.)

As we shall see (pt. V., *post*, pp. 102-103), the foregoing policy considerations fully support our decision to overrule *Seaman's* rather than attempt to clarify its uncertain boundaries. (We observe that plaintiff has asked us to take judicial notice of certain records purportedly showing there were only a few jury *verdicts* involving *Seaman's* claims during the period from 1981 to 1994. Because jury verdicts are an inconclusive indicia of excessive *litigation*, and because defendant has raised some doubts regarding the accuracy and completeness of the submitted materials, the application for judicial notice is denied.)

### C. *Criticism by Courts of Other Jurisdictions*

We decided *Seaman's* in 1984. Since then, courts of other jurisdictions have either criticized or declined to follow our *Seaman's* analysis. Of all the states, only Montana has recognized the tort of bad faith in typical arm's length commercial contracts, and recently even that state has qualified the tort by requiring a showing of a special relationship between the contracting parties. (See *Story v. Bozeman* (1990) 242 Mont. 436 [791 P.2d 767, 776]; see also Farnsworth, *Contracts Is Not Dead* (1992) 77 Cornell L.Rev. 1034, 1037; Macintosh, *Gilmore Spoke Too Soon: Contract Rises From the Ashes of* [*99] *the Bad Faith Tort* (1994) 27 Loyola L.A. L.Rev. 483, 496-497, 500; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 235-236.)

Ninth Circuit Judge Kozinski expressed his candid criticism of *Seaman's* in a concurring opinion in *Oki America, Inc. v. Microtech Intern., Inc.* (9th Cir.1989) 872 F.2d 312, 314-317 (*Oki America*). Among other criticism, Judge Kozinski found the *Seaman's* holding unduly imprecise and confusing. As he stated, "It is im-

possible to draw a principled distinction between a tortious denial of a contract's existence and a permissible denial of liability under the terms of the contract. The test ... seems to be whether the conduct 'offends accepted notions of business ethics.' [Citation.] This gives judges license to rely on their gut feelings in distinguishing between a squabble and a tort. As a result, both the commercial world and the courts are needlessly burdened ...." (*Oki America*, *supra*, 872 F.2d at p. 315.)

Judge Kozinski also mentioned the substantial costs associated with *Seaman's* litigation, and the resulting interference with contractual relationships. "Perhaps most troubling, the willingness of courts to subordinate voluntary contractual arrangements to their own sense of public policy and proper business decorum deprives individuals of an important measure of freedom. The right to enter into contracts--to adjust one's legal relationships by mutual agreement [] is too easily smothered by government officers eager to tell us what's best for us." (872 F.2d at p. 316.) Judge Kozinski concluded by observing that "*Seaman's* is a prime candidate for reconsideration." (*Id.* at p. 317.)

Similarly, in *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, *supra*, 880 F.2d at pages 184-185, Judge Hall observed that *Seaman's* "ambiguous" holding had caused widespread confusion among the lower courts. As Judge Hall stated, "Indeed, the *Seaman's* court's failure to explain *why* it was not necessary to predicate its holding on the implied covenant [***429] of good faith and fair dealing, or to *justify* the dramatically greater liability for the bad faith denial of the existence of a contract as compared to the bad faith dispute of a contract's [**678] terms, undoubtedly spawned the confusion in the appellate division cases discussed *infra*." (*Id.* at p. 184, fn. 11.)

Other federal courts have found similar difficulty interpreting and applying *Seaman's*. Thus, in *Elxsi v. Kukje America Corp.* (N.D.Cal. 1987) 672 F. Supp. 1294, 1296, Judge Aguilar observed: "The major difficulty confronting jurists and commentators trying to understand and apply *Seaman's* is the faithful interpretation of the ... passage [condemning "stonewalling" "without probable cause and with no belief in the existence of a defense"]. The initial sentence ... states that the new tort is denial of the existence [*100] *of a contract*, while the subsequent passage describes denial of the *existence of liability*. Ultimately, the dilemma involves determining whether the subsequent passage is definitional or descriptive."

As we stated in *Moradi-Shalal*, *supra*, 46 Cal. 3d 287, 298, in which we were faced with a similar tide of critical or contrary authority from other jurisdictions regarding one of our prior decisions, "[A]lthough hold-

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

ings from other states are not controlling, and we remain free to steer a contrary course, nonetheless the near unanimity of agreement ... indicates we should question the advisability of continued allegiance to our minority approach."

### D. Scholarly Criticism

Scholarly commentary on *Seaman's* also has been generally critical of our *Seaman's* holding and underlying analysis. (See, e.g., Ashley, Bad Faith Actions; Liability and Damages (1994) § 11.08, at p. 28 [stating that the *Seaman's* court, in creating a new tort of "stonewalling" based on "inapposite" authority, "can only be described as out of balance," having "lost touch with the traditions of contract law"]; Putz & Klippen, *Commercial Bad Faith: Attorney Fees--Not Tort Liability--Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 459 (hereafter Putz & Klippen) [finding "no rational way" to distinguish denial of contract existence from other denials of liability]; Sebert, *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 U.C.L.A. L.Rev. 1565, 1640-1641 (hereafter Sebert) stating that *Seaman's* is an "unhappy compromise" that is "both troubling and likely to be mischievous" by creating a "meaningless distinction" between denial of contract existence and other breaches]; Snyderman, *What's So Good About Good Faith? The Good Faith Performance Obligation in Commercial Lending* (1988) 55 U.Chi. L.Rev. 1335, 1363 (hereafter Snyderman) [stating that *Seaman's* "represents a potentially disastrous expansion of the bad faith tort into the commercial realm"]; Wallenstein, *Breach of the Implied Covenant of Good Faith and Fair Dealing in Commercial Contracts: A Wrong in Search of a Remedy* (1988-1989) 20 U. West L.A. L.Rev. 113, 124 ["[w]ith the advent of *Seaman's*, the root causes of the confusion surrounding the implied covenant in commercial contracts began to emerge"]; Comment, *The Role of Good Faith in Lender Liability Suits: Rising Star or Fading Gadfly* (1989) 31 Ariz. L.Rev. 939, 953 (hereafter Arizona Comment) [stating that *Seaman's* created an "undefined new source of liability" that will have the effect of "deter(ring) zealous advocacy"]; Comment, *Extending the Bad Faith Tort Doctrine to General Commercial Contracts* (1985) 65 B.U. L.Rev. 355, 376 [observing that *Seaman's* failed to articulate a "generally applicable tort [*101] standard which would differentiate between mere breaches of contract and breaches of the tort duty of good faith and fair dealing"]; Comment, *Tort Remedies for Breach of Contract: The Expansion of Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Into the Commercial Realm* (1986) 86 Colum. L.Rev. 377, 401 (hereafter Columbia Comment) [finding "no principled distinction" between denial of a contract's existence, and

denial that certain parts or terms exist, and concluding that *Seaman's* ultimate result "will be to expose commercial parties to tort-level damages whenever a party refuses to perform under the contract"]; Comment, *Bad Faith Lenders* (1989) 60 Colo. L.Rev. 417, 427 [*Seaman's* disclaimer of reliance on implied covenant is inconsistent with imposition of liability for bad faith denial of contract's [***430] existence]; Comment, *Lender Liability for Breach of the Obligation of Good Faith Performance* (1987) [**679] 36 Emory L.J. 917, 960 [*Seaman's* award of tort damages for contract breach is "troublesome" and "easy to misinterpret"]; Comment, *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.: Tortious Breach of the Covenant of Good Faith and Fair Dealing in a Noninsurance Commercial Contract Case* (1986) 71 Iowa L.Rev. 893, 898 ["*Seaman's* leaves attorneys to guess whether their commercial client's conduct is merely healthy capitalistic competition or manifest bad faith."]; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at p. 239 ["[a] growing distaste for the *Seaman's* tort among the California appellate districts, in the Ninth Circuit and in other states mandates that the California Supreme Court ... overrule *Seaman's*"]; Comment, *Sailing the Uncharted Seas of Bad Faith: Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1985) 69 Minn. L.Rev. 1161, 1175 (hereafter Minnesota Comment) [observing that *Seaman's* failure to distinguish its new tort from breaches of implied covenant of good faith "exacerbated the confusion" in the area].)

Many of the foregoing articles and commentaries observe that the *Seaman* decision, being unclear and subject to multiple interpretations, has resulted in widespread confusion among the lower courts. (E.g., Snyderman, *supra*, 55 U.Chi. L.Rev. at p. 1363 [*Seaman's* tort could be applied in all contract breach cases, resulting in "complete subversion of the expectation damages standard"]; Sebert, *supra*, 33 U.C.L.A. L.Rev. at pp. 1640-1641 [decision is "troubling" because it "singles out one particular type of breach for sanction--the bad faith denial of the existence of a contract"]; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at p. 223, fn. omitted ["The *Seaman's* tort has generated confusion among California courts. Consequently, in recent decisions, almost every court offers a different interpretation of the tort. The one similarity ... is that every court appears to limit the tort's application."].)

Additionally, several of these commentaries emphasize the extreme difficulty courts experience in distinguishing between tortious denial of a contract's existence and permissible denial of *liability* under the terms of the [*102] contract. (Columbia Comment, *supra*, 86 Colum. L.Rev. at pp. 401-402; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 223-228.) Further confu-

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

sion concerns the quantum of proof required to establish a denial of the existence of the contract (Detortification Comment, *supra*, 26 Loyola L.A. L.Rev.at pp. 227-228; see *DuBarry*, *supra*, 231 Cal. App. 3d at pp. 572-575) and, as previously discussed, whether or not proof is required of a "special relationship" between the contracting parties (Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 229-231, and cases cited).

The foregoing commentaries raise a wide variety of additional criticisms that support reconsideration of the *Seaman's* decision, including widespread confusion among judges and juries in applying its holding, inappropriately excessive damage awards, overcrowded court dockets and speculative litigation, delay and complication of ordinary contract breach claims, deterrence of contract formation, and restraint on zealous advocacy. (See, e.g., Arizona Comment, *supra*, 31 Ariz. L.Rev. at p. 953; Columbia Comment, *supra*, 86 Colum. L.Rev.at p. 402; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. pp. 236-238.) As one article observes, *Seaman's* created "intolerable uncertainty" and constitutes a "dangerous misstep" that this court should "promptly correct." (Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at p. 499.)

As we stated in *Moradi-Shalal*, *supra*, 46 Cal. 3d at page 299, "the breadth of the criticism ... is disturbing and, like the flood of contrary decisions of other state courts, is pertinent to our determination whether or not to reconsider that decision. [Citation.]"

### V. *SEAMAN'S SHOULD BE OVERRULED*

(1b) As previously indicated, the *Seaman's* decision has generated uniform confusion and uncertainty regarding its scope and application, and widespread doubt about the necessity or desirability of its holding. These doubts and criticisms, express or implied, in decisions from this state and from other state and federal courts, echoed by the generally adverse scholarly comment cited above, convince us that *Seaman's* should be overruled in favor of a general rule precluding tort [**680] [***431] recovery for noninsurance contract breach, at least in the absence of violation of "an independent duty arising from principles of tort law" (*Applied Equipment*, *supra*, 7 Cal. 4th at p. 515) other than the bad faith denial of the existence of, or liability under, the breached contract.

As set forth above, the critics stress, among other factors favoring *Seaman's* abrogation, the confusion and uncertainty accompanying the decision, the need for stability and predictability in commercial affairs, the potential for excessive tort damages, and the preference for legislative rather than judicial action in this area.

[*103] Even if we were unimpressed by the nearly unanimous criticism leveled at *Seaman's*, on reconsideration the analytical defects in the opinion have become apparent. It seems anomalous to characterize as "tortious" the bad faith denial of the existence of a contract, while treating as "contractual" the bad faith denial of liability or responsibility under an acknowledged contract. In both cases, the breaching party has acted in bad faith and, accordingly, has presumably committed acts offensive to "accepted notions of business ethics." (*Seaman's*, *supra*, 36 Cal. 3d at p. 770.) Yet to include bad faith denials of liability within *Seaman's* scope could potentially convert every contract breach into a tort. Nor would limiting *Seaman's* tort to incidents involving "stonewalling" adequately narrow its potential scope. Such conduct by the breaching party, essentially telling the promisee, "See you in court," could incidentally accompany *every* breach of contract.

For all the foregoing reasons, we conclude that *Seaman's* should be overruled. We emphasize that nothing in this opinion should be read as affecting the existing precedent governing enforcement of the implied covenant in insurance cases. Further, nothing we say here would prevent the Legislature from creating additional civil remedies for noninsurance contract breach, including such measures as providing litigation costs and attorney fees in certain aggravated cases, or assessing increased compensatory damages covering lost profits and other losses attributable to the breach, as well as restoration of the *Seaman's* holding if the Legislature deems that course appropriate. (See, e.g., Ashley, Bad Faith Actions; Liability and Damages, *supra*, § 11.05, at p. 14 ["[t]he uniform liberalization of contract damages rules is what is needed"]; Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at pp. 481-499; Detortification Comment, *supra*, 26 Loyola L.Rev. at p. 238; Minnesota Comment, *supra*, 69 Minn. L.Rev. at p. 1198.) Thus far, however, the Legislature has not manifested an intent either to expand contract breach recovery or to provide tort damages for ordinary contract breach.

### VII. *CONCLUSION*

The judgment of the Court of Appeal, reversing the trial court's judgment in plaintiff's favor and remanding the case for a retrial limited to the issue of damages under plaintiff's breach of contract cause of action, and for judgment in favor of defendant on plaintiff's bad faith denial of contract cause of action, is affirmed.

Baxter, J., Werdegar, J., and Klein, J., * concurred. [*104]

* Presiding Justice, Court of Appeal Second Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

CONCUR BY: KENNARD, J.; MOSK, J.

## CONCUR

### KENNARD, J.,

Concurring.--I concur in the majority opinion except for its discussion of *Hunter v. Up-Right, Inc.* (1993) 6 Cal. 4th 1174 [26 Cal. Rptr. 2d 8, 864 P.2d 88]. In my view, *Hunter* has no bearing on this case because the conduct complained of by plaintiff here, unlike the conduct at issue in *Hunter*, does not amount to the violation of any independent duty arising from principles of tort law. Accordingly, the majority's discussion of *Hunter* is unnecessary to its holding and adds nothing to the reasoning supporting that holding.

Arabian J., concurred.

## DISSENT BY: MOSK, J.

## DISSENT

### MOSK, J.,

Concurring and Dissenting.--I concur in the judgment. I disagree, however, with the majority's conclusion that [***432] [**681] *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal. 3d 752 [206 Cal. Rptr. 354, 686 P.2d 1158] (*Seaman's*) was wrongly decided. Although in retrospect I believe its holding was too broad, our task, both for the sake of sound public policy and stare decisis, is to clarify rather than repudiate that holding.

The majority would displace *Seaman's* with "a general rule precluding tort recovery for noninsurance contract breach, [1] at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (Maj. opn., *ante*, at p. 102.) I agree that the bad faith denial of the existence of a contract or contractual liability, *alone*, cannot give rise to tort liability. I agree as well with the tautological proposition that a breach of contract is made tortious only when some "independent duty arising from tort law" is violated.

> 1   The majority's holding, precluding tort recovery for "noninsurance contract breach" should not be misinterpreted. We have found that the breach of the covenant of good faith and fair dealing by an insurer against an insured will sound in tort, due to the "special relationship" between the two parties. (See *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal. 3d 809, 820 [169 Cal. Rptr. 691,

620 P.2d 141].) In *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654 [254 Cal. Rptr. 211, 765 P.2d 373] (*Foley*), while this court declined to find a similar "special relationship" in the employment context, it also explicitly did not decide the question whether such a relationship could be found elsewhere. ( *Id.* at pp. 687-688.) As the majority recognize, the present case does not concern parties involved in an allegedly special relationship; Freeman & Mills, Inc., admits that no such special relationship existed. Therefore, the majority's holding should not be taken as deciding a question not before this court, and left open by *Foley*, whether there are relationships between contracting parties outside the insurance field which may give rise to tort remedies for breach of the covenant of good faith and fair dealing.

In my view, however, this "independent duty arising from tort law" can originate from torts other than those traditionally recognized at common law. There are some types of intentionally tortious behavior unique to the contractual setting that do not fit into conventional tort categories. Allowing for the possibility of tort causes of action outside conventional categories is [*105] consistent with the malleable and continuously evolving nature of tort law. " 'The law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.' " ( *Soldano v. O'Daniels* (1983) 141 Cal. App. 3d 443, 454-455 [190 Cal. Rptr. 310, 37 A.L.R.4th 1183], quoting Prosser on Torts (4th ed. 1971) pp. 3-4.)

*Seaman's* should be viewed within the context of this common law tradition of innovation. When *Seaman's* is understood in light of its facts, it stands for the proposition, in my view, that a contract action may also sound in tort when the breach of contract is intentional and in bad faith, *and* is aggravated by certain particularly egregious forms of intentionally injurious activity. Because, as will be explained, there is no such tortious activity in the present case, I concur in the majority's disposition.

I will discuss below the various circumstances under which courts have found or may find a breach of contract to be tortious--circumstances broader than may be suggested by the majority's holding. As I will explain, a tortious breach of contract outside the insurance context may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

that such a breach will cause severe, unmitigatable harm in the form of mental anguish, personal hardship, or substantial consequential damages. I will then explain why in my view *Seaman's* was correctly decided. Finally, I will explain why *Seaman's* is distinguishable from the present case.

I.

The notion that a breach of contract might be tortious causes conceptual difficulty because [**682] [***433] of the fundamental difference between the objectives of contract and tort law. " ' "[Whereas] [c]ontract actions are created to protect the interest in having promises performed," "[t]ort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by law, and are based primarily on social policy, not necessarily based upon the will or intention of the parties ...." ' " ( *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503, 515 [28 Cal. Rptr. 2d 475, 869 P.2d 454] (*Applied Equipment Corp.*), quoting *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal. 3d 167, 176 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].)

This difference in purpose has its greatest practical significance in the differing types of damages available under the two bodies of law. "Contract [*106] damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." (*Applied Equipment Corp.*, *supra*, 7 Cal. 4th at p. 515.) Damages for emotional distress and mental suffering, as well as punitive damages, are also generally not recoverable. ( *Id.* at p. 516.) "This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." ( *Id.* at p. 515.) "In contrast, tort damages are awarded to compensate the victim for injury suffered. [Citation.] 'For the breach of an obligation not arising from contract, the measure of damages ... is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' ( Civ. Code, § 3333.)" (*Applied Equipment Corp.*, *supra*, 7 Cal. 4th at p. 516.) Both emotional distress damages and punitive damages are, under the proper circumstances, available to the tort victim.

Tort and contract law also differ in the moral significance that each places on intentional injury. Whereas an intentional tort is seen as reprehensible--the deliberate or reckless harming of another--the intentional breach of contract has come to be viewed as a morally neutral act, as exemplified in Justice Holmes's remark that "[t]he

duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it--and nothing else." (Holmes, *The Path of the Law* (1897) 10 Harv. L.Rev. 457, 462.) This amoral view is supported by the economic insight that an intentional breach of contract may create a net benefit to society. The efficient breach of contract occurs when the gain to the breaching party exceeds the loss to the party suffering the breach, allowing the movement of resources to their more optimal use. (See Posner, Economic Analysis of Law (1986) pp. 107-108.) Contract law must be careful "not to exceed compensatory damages if it doesn't want to deter efficient breaches." (*Id.* at p. 108.)

But while the purposes behind contract and tort law are distinct, the boundary line between the two areas of the law is neither clear nor fixed. As Justice Holmes also observed, "the distinction between tort and breaches of contract, and especially between the remedies for the two, is not found ready made." (Holmes, The Common Law (1881) p. 13.) Courts have long permitted a party to a contract to seek tort remedies if behavior constituting a contract breach also violates some recognized tort duty. The courts "have extended the tort liability for misfeasance to virtually every type of contract where defective performance may injure the promisee. An attorney or an abstractor examining a title, a physician treating a patient, a surveyor, an agent collecting a note or lending money or settling a claim, or a liability [*107] insurer defending a suit, all have been held liable in tort for their negligence.... The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract--which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff." (Prosser & Keeton on Torts (5th ed. 1984) Tort and Contract, pp. 660-661, [***434] fns. [**683] omitted.) Stated another way, " '[c]onduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability.' " ( *Groseth Intern., Inc. v. Tenneco, Inc.* (S.D. 1981) 440 N.W.2d 276, 279.)

Nor are the rules that determine whether the action will sound in tort or contract, or both, clear-cut. When the breach of contract also involves physical injury to the promisee, or the destruction of tangible property, as opposed to damage to purely economic interests, then the action will generally sound in tort. Thus, a manufacturer that sells defective automobiles may be liable to an automobile dealer in contract for delivery of nonconforming goods, but will be liable in tort if one of the nonconforming automobiles leads to an accident result-

ing in physical injury. But society also imposes tort duties to protect purely economic interests between contracting parties--such as the duty of care imposed on accountants for malpractice (see *Lindner v. Barlow, Davis & Wood* (1962) 210 Cal. App. 2d 660, 665 [27 Cal. Rptr. 101]), or on banks for wrongfully dishonoring checks (see *Weaver v. Bank of America* (1953) 59 Cal. 2d 428, 431 [30 Cal. Rptr. 4, 380 P.2d 644])--as well as the recognition of intentional torts such as promissory fraud. The complete failure to perform a contractual obligation generally sounds in contract, but once a contractual obligation has begun, a failure to perform which injures the promisee may sometimes sound in tort. (Prosser & Keeton on Torts, *supra*, pp. 661-662.) Perhaps the most reliable manner to differentiate between actions that are purely contract breaches and those that are also tort violations is the following abstract rule: courts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.

It is also true that public policy does not always favor a limitation on damages for *intentional* breaches of contract. The notion that society gains from an efficient breach must be qualified by the recognition that many intentional breaches are not efficient. (See Putz & Klippen, *Commercial Bad Faith: Attorney Fees--Not Tort Liability--Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 482 (hereafter Putz & Klippen); Sebert, [*108] *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 U.C.L.A. L.Rev. 1565, 1573 (hereafter Sebert); *Patton v. Mid-Continent Systems, Inc.* (7th Cir. 1988) 841 F.2d 742, 751 (*Patton*).) As Judge Posner explained in *Patton*, *supra*, 841 F.2d at page 751: "Not all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon costs, and exploits the inadequacies of purely compensatory remedies (the major inadequacies being that pre-and post-judgment interest rates are frequently below market levels when the risk of nonpayment is taken into account and that the winning party cannot recover ... attorney's fees." Commentators have also pointed to other "inadequacies of purely compensatory remedies" that encourage inefficient breaches (i.e. breaches that result in greater losses to the promisee than gains for the promisor): the lack of emotional distress damages, even when such damages are the probable result of the breach, and the restriction of consequential damages to those in the contemplation of the parties at the time the contract was formed. (See Diamond, *The Tort of Bad Faith Breach of Contract: When, If at All, Should It Be Extended Beyond Insurance Transactions?*

(1981) 64 Marq. L.Rev. 425; 439-443; see also Sebert, *supra*, 33 U.C.L.A. L.Rev. at p. 1578.)

In addition to fully compensating contract plaintiffs and discouraging inefficient breaches, the imposition of tort remedies for certain intentional breaches of contract serves to punish and deter business practices that constitute distinct social wrongs independent of the breach. For example, we permit the plaintiff to recover exemplary damages in cases in which the breached contract was induced through promissory fraud, even though the plaintiff has incurred the same loss whether the contract was fraudulently induced or not. (See *Walker v. Signal Companies,* [**684] [***435] *Inc.* (1978) 84 Cal. App. 3d 982, 995-998 [149 Cal. Rptr. 119].) Our determination to allow the plaintiff to sue for fraud and to potentially recover exemplary damages is not justified by the plaintiff's greater loss, but by the fact that the breach of a fraudulently induced contract is a significantly greater wrong, from society's standpoint, than an ordinary breach. "We are aware of the danger of grafting tort liability on what ordinarily should be a breach of contract action. ... However, no public policy is served by permitting a party who never intended to fulfill his obligations to fraudulently induce another to enter into an agreement." ( *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal. App. 3d 1220, 1238 [1 Cal. Rptr. 2d 301].)

As the above illustrate, the rationale for limiting actions for intentional breaches of contract to contract remedies--that such limitation promotes commercial stability and predictability and hence advances commerce-- is [*109] not invariably a compelling one. Breaches accompanied by deception or infliction of intentional harm may be so disruptive of commerce and so reprehensible in themselves that the value of deterring such actions through the tort system outweighs the marginal loss in the predictability of damages that may result. But in imposing tort duties to deter intentionally harmful acts among contracting parties, courts must be cautious not to fashion remedies which overdeter the illegitimate and as a result chill legitimate activities. (See Posner, Economic Analysis of Law, *supra*, at p. 108.) Thus, courts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be, as in the case of fraud, to aid rather than discourage commerce.

As observed above, not all tortious breaches of contract arise from conventional torts. Numerous courts have recognized types of intentionally tortious activity that occur exclusively or distinctively within the context of a contractual relationship. The most familiar type of tortious breach of contract in this state is that of the insurer, whose unreasonable failure to settle or resolve a

claim has been held to violate the covenant of good faith and fair dealing. ( *Egan v. Mutual of Omaha Ins. Co.*, *supra*, 24 Cal. 3d 809.) Tort liability is imposed primarily because of the distinctive characteristics of the insurance contract: the fiduciary nature of the relationship, the fact that the insurer offers a type of quasi-public service that provides financial security and peace of mind, and the fact that the insurance contract is generally one of adhesion. ( *Id*. at pp. 820-821.) In these cases, the special relationship between insurer and insured supports the elevation of the covenant of good faith and fair dealing, a covenant implied by law in every contract and generally used as an aid to contract interpretation (*Foley, supra*, 47 Cal. 3d at p. 684), into a tort duty.

Because the good faith covenant is so broad and all-pervasive, this court and others have been reluctant to expand recognition of the action for tortious breach of the covenant beyond the insurance context. (See *Foley, supra*, 47 Cal. 3d at p. 692 [no special relationship in the employment context]; but see *id*. at pp. 701, 715, 723 (separate conc. and dis. opns. of Broussard, J., Kaufman, J., and Mosk, J.).) Unfortunately, the preoccupation of California courts with limiting the potentially enormous scope of this tort has diverted attention away from the useful task of identifying *specific practices* employed by contracting parties that merit the imposition of tort remedies. Other jurisdictions not so preoccupied have made greater progress in developing a common law of tortious breach of contract. While the cases are not easily amenable to classification, they appear to fit into two broad categories.

[*110] The first category focuses on tortious *means* used by one contracting party to coerce or deceive another party into foregoing its contractual rights. For example, in *Advanced Medical v. Arden Medical Systems* (3d Cir. 1992) 955 F.2d 188, Advanced Medical, Inc. (Advanced), a distributor of medical products, entered into an agreement with a manufacturer of a high-technology blood analysis device, whereby the former [**685] [***436] was designated as the latter's exclusive distributor for the mid-Atlantic region. The manufacturing company was eventually acquired by Johnson & Johnson, which disapproved of the exclusive distributorship. Instead of merely breaching the agreement, Johnson & Johnson used a variety of questionable tactics to "drive Advanced out of the contract," including marketing competing products not made available to Advanced, and withholding its support services. ( *Id*. at pp. 190-191.) The court, applying Pennsylvania law, held that in addition to a breach of contract, there was sufficient evidence to submit the question of punitive damages to a jury on a theory of Johnson & Johnson's "tortious interference" with its own contract. ( *Id*. at pp. 201-202.) (See also *Adams v. Crater Well Drilling, Inc.*

(1976) 276 Ore. 789 [556 P.2d 679, 681] [punitive damages justified when contracting party uses threat of prosecution to obtain more than is owed under the contract]; *John A. Henry & Co., Ltd. v. T.G. & Y Stores Co.* (10th Cir. 1991) 941 F.2d 1068, 1072-1073 [punitive damages allowed under Oklahoma law when commercial tenant attempts to compel landlord to release it from its lease by fabricating defects in the landlord's maintenance and sending letters complaining of such defects to the landlord's lender, thereby disparaging the former's reputation]; *Jones v. Abriani* (1976) 169 Ind. App. 556 [350 N.E.2d 635, 649] [punitive damages upheld when defendant mobile home salesman threatened to forfeit plaintiffs' down payment if plaintiffs did not accept delivery of a home with numerous defects and then reneged on promise to repair these defects].) One commentator provides another example of this kind of tortious breach derived from a case that was originally a companion to *Seaman's*: a major motion picture studio threatens to blacklist an actor appearing in one of its productions if he does not forfeit his contractual right to a prominent billing. (Ashley, Bad Faith Actions: Liability and Damages (1994) § 11.04, p. 6.)

The use of tortious means to breach a contract can also entail the use of deception by one of the contracting parties for the purpose of causing the other party to forego its contractual rights. In *Motley, Green & Co. v. Detroit Steel & Spring Co.* (C.C.S.D.N.Y. 1908) 161 F. 389, for example, the plaintiff was an exclusive sales agent in a given territory for the defendant, an automobile parts company. The defendant allegedly made a sham sale to another company for the sole purpose of extricating itself from the contract with the plaintiff. The court concluded that it was tortious for the defendant, in addition to breaching the contract, "to invite a third party to [*111] unite with him and aid him in breaking the contract in such a way as possibly to escape liability in an action for nonperformance." ( *Id*. at p. 397.) The court compared the case to one cited in a tort treatise of a plaintiff who was an " 'actor, ... engaged to perform in the character of Hamlet, ... and that the defendants and others maliciously conspired together to prevent the plaintiff from so performing, and from exercising his profession in the theater, and in pursuance of the conspiracy hired and procured divers persons to go to the theater and hoot the plaintiff, and the persons so hired, did....' " (*Ibid.*; [2] see also *Houston Cable TV v. Inwood W. Civic Ass'n* (Tex.App. 1992) 839 S.W.2d 497, 504 [punitive damages upheld when cable company terminates contract to pay homeowners [**686] [***437] associations a percentage of revenue in exchange for rights of way to the association members' property by falsely informing the associations that a new federal law forbids them from making such payments].)

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

2    I recognize that this court has recently held that a party cannot be liable in tort for interfering with its own contract. (*Applied Equipment Corp.*, *supra*, 7 Cal. 4th 503 [but see p. 521, dis. opn. of Mosk, J.].) Even if it is conceded, however, that *Applied Equipment Corp.* is generally correct that a party who "interferes" with its own contract does no more than breach the contract, and should not be held liable in tort, the rule appears to me not to apply to the exceptional case when the promisor not only acts in concert with a third party, but does so in an attempt to deceive the promisee as to the promisor's liability. In these cases, the material wrongdoing is not the conspiracy per se, but the deceitful conduct and the fraudulent design. Although it may be argued that "the mere entry of a stranger onto the scene does not render the contracting party's breach more socially or morally reprehensible" ( *id.* at p. 517), the use of the third party for a scheme of deception to conceal the promisor's liability does in fact introduce an additional element of moral culpability. Moreover, in economic terms, if the efficiency promoted by contract law turns on the promisee being able to receive contract damages for a breach, then one who engages in such a conspiracy undermines this efficiency by not only denying liability, but actively conspiring to conceal it.

A second type of tortious intentional breach has been found when the *consequences* of the breach are especially injurious to the party suffering the breach, and the breaching party intentionally or knowingly inflicts such injury. Cases of this type have generally occurred outside the commercial context, involving manifestly unequal contracting parties and contracts concerning matters of vital personal significance, in which great mental anguish or personal hardship are the probable result of the breach. In these cases, courts have permitted substantial awards of emotional distress damages and/or punitive damages, both as a means of providing extra sanctions for a defendant engaging in intentionally injurious activities against vulnerable parties, and as a way of fully compensating plaintiffs for types of injury that are neither readily amendable to mitigation nor generally recoverable as contract damages. For example, in *K Mart Corp. v. Ponsock* (1987) 103 Nev. 39 [732 P.2d 1364, 1370], disapproved on other grounds by *Ingersoll-Rand Co. v. McClendon* (1990) 498 U.S. 133, 137 [112 L. Ed. 2d 474, 482-483, 111 [*112] S. Ct. 478], the Nevada Supreme Court allowed a $ 50,000 award of punitive damages to stand when an employer discharged a long-term employee on a fabricated charge for the purpose of defeating the latter's contractual entitlement to retirement benefits. (See also *Ainsworth v. Franklin Cty. Cheese*

*Corp.* (1991) 156 Vt. 325 [592 A.2d 871, 874-875] [punitive damages permitted when a defendant/employer discharged on pretext of good cause the plaintiff/employee in order to extricate itself from the obligation to pay severance benefits].)

In other cases of this type, an intentional breach of a warranty of habitability by a landlord or building contractor has given rise to substantial emotional distress or punitive damages awards. For example, Missouri courts recognize that a wrongful eviction will sound in tort as well as contract. ( *Ladeas v. Carter* (Mo.App.1992) 845 S.W.2d 45, 52; see also *Emden v. Vitz* (1948) 88 Cal. App. 2d 313, 318-319 [198 P.2d 696] [wrongful eviction accompanied by verbal abuse sounds in tort]; *Hilder v. St. Peter* (1984) 144 Vt. 150 [478 A.2d 202, 210] [punitive damages permitted against a landlord who, "after receiving notice of a defect, fails to repair the facility that is essential to the health and safety of his or her tenant"]; *B & M Homes, Inc. v. Hogan* (Ala. 1979) 376 So. 2d 667, 671-672 [7 A.L.R.4th 1162] [substantial emotional distress damages award against contractor who refused to repair construction defects leading to great personal discomfort]; *Ducote v. Arnold* (La.Ct.App. 1982) 416 So. 2d 180, 183-185 [damages for mental anguish permitted for breach of home remodeling contract].) The New Mexico Supreme Court, in *Romero v. Mervyn's* (1989) 109 N.M. 249 [784 P.2d 992, 999-1001], citing *Seaman's* with approval, upheld a punitive damage award against a department store, which had entered into an oral agreement to pay the medical expenses of a customer accidentally injured on its premises, and then reneged on its agreement.

The principle that certain contractual interests of vulnerable parties deserve greater protection than ordinary contract damages would otherwise provide has led our Legislature to authorize special sanctions for various types of intentional breaches. For example, one who is the victim of an intentional breach of warranty of consumer goods may recover twice the amount of actual damages ( Civ. Code, § 1794, subd. (c)) and treble damages may be awarded to a retail seller who is injured by "willful or repeated" warranty violations (*id.*, § 1794.1, subd. (a)).   Labor Code section 206 provides for treble damages for the willful failure to pay wages after the Labor Commissioner determines the wages are owing. But the fact that the Legislature has acted in some instances to afford these special protections does not mean that it has preempted the courts from exercising their traditional role of fashioning appropriate tort remedies for various kinds of intentionally injurious conduct.

[*113] In sum, the above cited cases show that an intentional breach of contract may be found to be tortious when the breaching party exhibits an extreme disregard for the contractual  [**687]  [***438]  rights of the

other party, either knowingly harming the vital interests of a promisee so as to create substantial mental distress or personal hardship, or else employing coercion or dishonesty to cause the promisee to forego its contractual rights. These cases illustrate the recognition by a number of jurisdictions that an intentional breach of contract outside the insurance context, and not accompanied by any conventional tortious behavior such as promissory fraud, may nonetheless be deemed tortious when accompanied by these kinds of aggravating circumstances.

With this in mind, I next reconsider the *Seaman's* case.

## II.

In *Seaman's, supra,* 36 Cal. 3d 752, Seaman's Direct Buying Service, Inc. (Seaman's), a dealer in ship supplies in the City of Eureka, sought to establish a marine fuel dealership in the new marina that the city was planning to build with federal funds. Seaman's negotiated with the Mobil Oil Company and Standard Oil Company of California (Standard) for a supply contract that would enable it to establish the dealership. The city required such a contractual commitment before it would allow Seaman's to lease a significant part of the new marina. Seaman's signed a tentative 10-year Chevron Marine dealer agreement with Standard. As part of the agreement, Standard consented to provide Seaman's with a fuel discount as well as a loan to construct the new fueling facility, amortized over the life of the agreement. Shortly thereafter, Seaman's entered into the lease it had sought from the city. ( *Id.* at pp. 759-760.)

Soon after, the 1973 oil embargo changed conditions, and a federal program mandating allocations among existing petroleum customers went into effect. Standard claimed it could not supply fuel to Seaman's because of the federal program, and claimed it was willing to help Seaman's obtain the necessary variance from federal regulation. Seaman's successfully obtained a supply order from the federal government, but Standard appealed, thereupon revealing that it was in fact antagonistic to Seaman's interests. Standard's federal appeal was successful, but was later reversed, and the court directed Standard to fulfill supply obligations to Seaman's "upon the filing of a copy of a court decree that a valid contract existed between the parties under state law." Seaman's asked Standard to stipulate to the existence of a contract, but Standard's reply was, "See you in court." Seaman's testified that if Standard had cooperated, Seaman's could have borrowed funds to [*114] remain in business until 1976 when the new marina opened. Instead, Seaman's discontinued operations in early 1975. Seaman's sued and received a large compensatory and punitive damages award. (*Seaman's, supra,* 36 Cal. 3d at pp. 760-762.)

In considering the validity of the punitive damages award against Standard for breach of the covenant of good faith and fair dealing, we acknowledged that the case differed from the insurance cases, in which a special relationship between the insurer and the insured existed, and in which the breach of the good faith covenant may give rise to a tort action. We stated: "When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach.... In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties." (*Seaman's, supra,* 36 Cal. 3d at p. 769.)

We then stated that we did not need to decide the claim raised by Seaman's that the breach of the good faith covenant in ordinary commercial contracts gave rise to tort liability. Instead, "[i]t is sufficient to recognize that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable [**688] [***439] cause, that the contract exists." (*Seaman's, supra,* 36 Cal. 3d at p. 769.) We cited the holding of *Adams v. Crater Well Drilling, Inc., supra,* 556 P.2d 679, 681, that one who coerces another party to pay more than is due under the terms of the contract through the threat of a lawsuit made " ' "without probable cause and with no belief in the existence of the cause of action." ' " (36 Cal. 3d at p. 769.) We concluded that "[t]here is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics." (*Seaman's, supra,* 36 Cal. 3d at pp. 769-770.)

*Seaman's* was correct, in my view, in refusing to rely on the general breach of the covenant of good faith and fair dealing as a justification for imposing tort remedies, and instead seeking to identify specific practices used by Standard that violated "accepted notions of business ethics." *Seaman's* wisely recognized that courts do not have to choose between the [*115] wholesale transformation of a breach of the implied good faith covenant into a tort and the complete refusal to recognize a cause of action for tortious breach of contract. In retrospect, however, *Seaman's* holding appears to be both overly