11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

broad and overly narrow. It was overly narrow because, as numerous authorities cited by the majority point out, there is no logical reason to distinguish between the tort of "bad faith denial of the existence of a contract" and "bad faith denial of liability under a contract." The former is but a subspecies of the latter. Both forms of bad faith are equally reprehensible on the defendant's part and equally injurious to plaintiff.

*Seaman's* was overly broad because, for a number of reasons, it appears to have been unwise to impose tort liability for *all* breaches that involve bad faith denial of a contract or liability under the contract. Although the bad faith denial of contractual liability may be ethically inexcusable, we should hesitate to categorically impose tort liability on such activity for fear it may overly deter legitimate activities that we wish to permit or encourage. Specifically, the bad faith denial of the existence of a contract consists of two actions on the defendant's part that do not, taken individually, give rise to tort liability: First, the defendant intentionally breaches its contract. As discussed above, because of our notions of efficient breach and the freedom of the marketplace, we have generally not considered an intentional breach tortious.

Second, the defendant asserts a bad faith defense to liability under the contract--or, more precisely, *threatens* to assert such a defense We have consistently refused to recognize a tort of "malicious defense" that would be equivalent to that of malicious prosecution. The refusal to recognize such a tort "protect[s] the right of a defendant, involuntarily haled into court, to conduct a vigorous defense." ( *Bertero v. National General Corp.* (1974) 13 Cal. 3d 43, 52 [118 Cal. Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) Instead, the Legislature has fashioned a more limited punishment to fit the "crime" OF BAD FAITH DEFENSE TO A CIVIL ACTION: the awarding of attorney fees and other reasonable expenses incurred by a party to litigation as the result of another's bad faith actions "that are frivolous or solely intended to cause unnecessary delay." ( Code Civ. Proc., § 128.5, subd. (a).) So too, the proper remedy to deter intentional breaches that are combined with bad faith denials of liability is to consistently award attorney fees to the plaintiffs as a sanction. (See Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at pp. 493-495). But if a bad faith defense is not a tortious act, then the threat of such defense, as occurred in *Seaman's*, also cannot be considered tortious.

*Seaman's* was nonetheless correctly decided, in my view, on narrower grounds than bad faith denial of the contract's existence. As discussed [*116] above, a number of cases allow tort damages for an intentional breach which the breaching party knows will probably result in significant emotional distress or personal hardship. In the commercial sphere, we do not as a rule permit such [***440] recovery for [**689] personal distress--the

frustrations that attend breached contracts, unreliable suppliers, and the like are part of the realities of commerce. Society expects the business enterprise to go to the marketplace to seek substitutes to mitigate its losses, and to seek contract damages for those losses that cannot be mitigated. But there are some commercial cases in which the harm intentionally inflicted on an enterprise cannot be mitigated, and in which ordinary contract damages are insufficient compensation. *Seaman's* is such a case. In *Seaman's*, because of the unusual combination of market forces and government regulation set in motion by the 1973 oil embargo, Standard's conduct had a significance beyond the ordinary breach: its practical effect was to shut *Seaman's* out of the oil market entirely, forcing it out of business. In other words, Standard intentionally breached its contract with Seaman's with the knowledge that the breach would result in Seaman's demise. Having thus breached its contract with blithe disregard for the severe and, under these rare circumstances, unmitigatable injury it caused Seaman's, Standard was justly subject to tort damages.

In sum, I would permit an action for tortious breach of contract in a commercial setting when a party intentionally breaches a contractual obligation with neither probable cause nor belief that the obligation does *not* exist, *and* when the party intends or knows that the breach will result in severe consequential damages to the other party that are not readily subject to mitigation, and such harm in fact occurs. This rule is a variant of the more general rule of tort law that, as Holmes said, "the intentional infliction of temporal damage [3] is a cause of action, which, as a matter of substantive law, ... requires a justification if the defendant is to escape." ( *Aikens v. Wisconsin* (1904) 195 U.S. 194, 204 [49 L. Ed. 154, 159, 25 S. Ct. 3].) A breach should not be considered tortious if the court determines that it was justified by avoidance of some substantial, unforeseen cost on the part of the breaching party, even if such cost does not excuse that party's nonperformance. (See 3A Corbin on Contracts (1994 Supp.) § 654E, p. 109.) Nor should a tortious breach under these circumstances be recognized if it is clear that the party suffering the harm voluntarily accepted that risk under the contract. But the intentional or knowing infliction of severe consequential damages on a business enterprise through the unjustified, bad faith [*117] breach of a contract is reprehensible and costly both for the party suffering the breach and for society as a whole, and is therefore appropriately sanctioned through the tort system.

3    Standard's breach "intentionally" inflicted harm on Seaman's in the sense in which the term "intentional" is commonly used in tort law, i.e., extending "not only to having in the mind a purpose (or desire) to bring about given conse-

11 Cal. 4th 85, *; 900 P.2d 669, **;
44 Cal. Rptr. 2d 420, ***; 1995 Cal. LEXIS 4963

quences *but also having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act.*" (Prosser & Keeton on Torts, *supra*, Intentional Interference With the Person, p. 34, fn. omitted, italics added.)

III.

The present case, on the other hand, is essentially a billing dispute between two commercial entities. Belcher Oil Company claimed, apparently in bad faith and without probable cause, that it had no contractual agreement with Freeman & Mills. That is, Belcher Oil not only intentionally breached its contract, but then asserted a bad faith defense to its liability. As explained above, the so-

lution which the Legislature has devised for this kind of transgression is the awarding of the other party's attorney fees, and this is precisely what occurred--Freeman & Mills was awarded $ 212,891 in attorney fees pursuant to Code of Civil Procedure sections 128.5 and 2033, subdivision (c). To permit the award of punitive damages in addition to this sum would upset the legislative balance established in the litigation sanctions statutes and make tortious actions--intentional breach of contract and the assertion of a bad faith defense--which we have consistently held not to be tortious.

On this basis, I concur in the majority's disposition in favor of Belcher Oil on the bad faith denial of contract cause of action.

# EXHIBIT 17

LEXSEE 24 CAL. 4TH 317

**JOHN GUZ, Plaintiff and Appellant, v. BECHTEL NATIONAL, INC., et al., Defendants and Respondents.**

**No. S062201.**

**SUPREME COURT OF CALIFORNIA**

**24 Cal. 4th 317; 8 P.3d 1089; 100 Cal. Rptr. 2d 352; 2000 Cal. LEXIS 7498; 16 I.E.R. Cas. (BNA) 1345; 84 Fair Empl. Prac. Cas. (BNA) 64; 142 Lab. Cas. (CCH) P59,072; 2000 Cal. Daily Op. Service 8230; 2000 Daily Journal DAR 10929**

**October 5, 2000, Decided**

**NOTICE:**

[EDITOR'S NOTE: PART 1 OF 2. THIS DOCU-MENT HAS BEEN SPLIT INTO MULTIPLE PARTS ON LEXIS TO ACCOMMODATE ITS LARGE SIZE. EACH PART CONTAINS THE SAME LEXIS CITE.]

**PRIOR HISTORY:**    Superior Court of the City and County of San Francisco. Super. Ct. No. 964836. William J. Cahill, Judge.

Court of Appeal of California, First Appellate District, Division Four. A072984.

**DISPOSITION:**    For the reasons set forth herein, the judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal for further proceedings consistent with this opinion.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A longtime employee who was terminated at age 49 when his work unit was eliminated brought a wrongful termination action against his former employer, alleging age discrimination in violation of the Fair Employment and Housing Act (Gov. Code, § 12941), breach of an implied contract to be terminated only for good cause, and breach of the implied covenant of good faith and fair dealing. The trial court granted defendant's motion for summary judgment and dismissed the action. (Superior Court of the City and County of San Francisco, No. 964836, William J. Cahill, Judge.) The Court of Appeal, First Dist., Div. Four, No. A072984, reversed.

The Supreme Court reversed the judgment of the Court of Appeal and remanded to that court for further

proceedings. The court held that the trial court erred in granting summary judgment to defendant on plaintiff's claim of breach of an implied contract, since there was a triable issue of fact as to whether plaintiff had implied contractual rights under specific portions of defendant's written personnel policies. Although the record negated any inference of an implied contract restricting defendant's right to implement work force reductions at will, written company policies and guidelines guaranteed fair layoff protections, such as objective employee ranking and placement assistance. There were triable issues as to whether those specific provisions became an implicit part of plaintiff's employment contract, and whether defendant breached that implied contract. The court also held, however, that the trial court did not err in granting summary judgment to defendant on plaintiff's claim that, even if he was an at-will employee, defendant's actions breached the implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing cannot impose substantive terms and conditions beyond those to which the parties actually agreed. Because employment at will gives the employer the freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so. The court also held that the trial court did not err in granting summary judgment to defendant on plaintiff's age discrimination claim. In the face of defendant's strong and unrebutted showing that it took its actions for nondiscriminatory reasons, the evidence of age favoritism proffered by plaintiff lacked sufficient probative force to allow a finding of intentional age discrimination. (Opinion by Baxter, J., with George, C. J., Mosk, Werdegar, Chin, and Brown, JJ., concurring. Concurring opinion by Mosk, J. (see p. 370). Concurring opinion by Chin, J., with Brown, J., concurring. (see p. 371).) Concurring and dissenting opinion by Kennard, J. (see p. 378).)

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEAD-NOTES**
Classified to California Digest of Official Reports

**(1) Summary Judgment § 26--Appellate Review--Scope of Review.** --On appeal after a motion for summary judgment has been granted, the appellate court reviews the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. Under California's traditional rules, the reviewing court determines with respect to each cause of action whether the defendant has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law.

**(2) Employer and Employee § 8--Employment Relationship--Duration and Termination--Presumption of At-will Employment--Policy Considerations.** -- Lab. Code, § 2922, provides that employment that has no specified term may be terminated at the will of either party with notice. An at-will employment relationship may be ended by either party at any time without cause, for any or no reason, and subject to no procedure except the statutory requirement of notice. The statutory and common law rule presuming that employment contracts without a stated duration are at will is required by special policy considerations. The courts have not deemed it to be their function, in the absence of contractual, statutory, or public policy considerations, to compel a person to accept or retain another employee, or to compel any person against his or her will to remain in the employ of another. Indeed, courts have consistently held that in such a confidential relationship, the privilege to terminate is absolute, and the presence of ill will or improper motive will not destroy it.

**(3) Employer and Employee § 8--Employment Relationship--Duration and Termination--Agreement Requiring Termination Only for Good Cause--Implied in Fact--Required Showing.** --While the statutory presumption of at-will employment ( Lab. Code, § 2922) is strong, since the employment relationship is fundamentally contractual, the presumption does not prevent an employer and employee from agreeing to any limitation, otherwise lawful, on the employer's termination rights. For example, the parties can agree that the employee will be terminated only for good cause, in the sense of a fair and honest cause or reason, regulated by good faith, as opposed to one that is trivial, capricious, unrelated to

business needs or goals, or pretextual. The contractual understanding need not be express, but may be implied in fact, arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations. Factors that indicate an implied-in-fact agreement might include the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged. The nature of an implied-in-fact contract must be determined from the totality of the circumstances. Every case turns on its own facts. Where there is no express agreement, the issue is whether other evidence of the parties' conduct has a tendency in reason ( Evid. Code, § 210) to demonstrate the existence of an actual mutual understanding of particular terms and conditions of employment. If such evidence logically permits conflicting inferences, a question of fact is presented. But where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper.

**(4a) (4b) (4c) (4d) (4e) Employer and Employee § 9.4--Actions for Wrongful Discharge--Evidence--Written Personnel Policies--Implied-in-fact Contract--Layoff Protections.** --In a wrongful termination action based on an implied contract, the trial court erred in granting summary judgment to defendant employer, since there was a triable issue of fact as to whether the employee had implied contractual rights under specific portions of the employer's written personnel policies. The employer had the absolute right to eliminate plaintiff's work unit and to transfer the unit's responsibilities to another company entity; thus, the record negated any inference of an implied contract restricting defendant's right to implement work force reductions at will. Further, the undoubted length and merit of plaintiff's career with defendant did not bolster his claim that his at-will status had been altered by an implied contract, and defendant's personnel documents contained an express at-will termination provision. Nevertheless, written company policies and guidelines guaranteed fair layoff protections, such as objective employee ranking and placement assistance, and there was a triable issue as to whether those specific provisions became an implicit part of plaintiff's employment contract, and whether defendant breached that implied contract. It is a question of fact whether an employer's written policy of preferential hiring for its laid-off employees is to be considered an implied contractual promise on which its employees could reasonably rely. There was, however, no triable issue of an implied contract on terms broader than the specific provisions of those documents.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 171 et seq.]

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

**(5) Employer and Employee § 9.4--Actions for Wrongful Discharge--Evidence--Significance of At-will Employment Provision in Written Personnel Materials.** --At-will employment termination provisions in personnel handbooks, manuals, or memoranda do not bar, or necessarily overcome, other evidence of the employer's contrary intent, particularly where other provisions in the employer's personnel documents themselves suggest limits on the employer's termination rights. On the other hand, an at-will provision in an express written agreement, signed by the employee, cannot be overcome by proof of an implied contrary understanding. The reasoning, express or implied, is that parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement, and handbook disclaimers should not permit an employer, at its whim, to repudiate promises it otherwise made in its own self-interest, and on which it intended an employee to rely. Even if a handbook disclaimer is not controlling in every case, such a provision cannot be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create binding limits on an employer's statutory right to terminate the relationship at will. Like any direct expression of employer intent, communicated to employees and intended to apply to them, such language must be taken into account, along with all other pertinent evidence, in ascertaining the terms on which a worker was employed. The more clear, prominent, complete, consistent, and all-encompassing the disclaimer language, the greater the likelihood that workers could not form any reasonable contrary understanding. An employer could promulgate a disclaimer clause that establishes beyond contrary inference that the employment is at will.

**(6) Employer and Employee § 9.4--Actions for Wrongful Discharge--Implied-in-fact Evidence of Employment Contract--Significance of Duration of Service.** --Long duration of service, regular promotions, favorable performance reviews, praise from supervisors, and salary increases do not, without more, imply an employer's contractual intent to relinquish its at-will employment termination rights. Such events are but natural consequences of a well-functioning employment relationship, and thus have no special tendency to prove that the employer's at-will implied agreement, reasonably understood as such by the employee, has become one that limits the employer's future termination rights. An employee's mere length of time in the employer's service, even when marked with tangible indicia that the employer approves the employee's work, cannot alone form an implied-in-fact contract that the employment is no longer at will. Absent other evidence of the employer's intent, longevity, raises, and promotions are their own

rewards for the employee's continuing valued service; they do not, in and of themselves, additionally constitute a contractual guaranty of future employment security. A rule granting such contract rights on the basis of successful longevity alone would discourage the retention and promotion of employees. On the other hand, long and successful service is not necessarily irrelevant to the existence of such a contract. In addition, the employment relationship is fundamentally contractual, and the implied covenant of good faith and fair dealing cannot supply limitations on termination rights to which the parties have not actually agreed.

**(7a) (7b) Employer and Employee § 9.4--Actions for Wrongful Discharge--Implied-in-fact Evidence of Employment Contract--Personnel Manual or Policies.** --In a wrongful termination action, the trier of fact can infer an agreement to limit the grounds for termination based on the employee's reasonable reliance on the company's personnel manual or policies. Provisions of this type which offer additional advantages to employees are, in effect, offers of a unilateral contract which is accepted if the employee continues in the employment, and are not mere offers of gifts. When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely. An employer may intend, and employees may understand, such generally promulgated policies as a systematic approach to personnel relations, providing a clear and uniform alternative to haphazard practices, understandings, and arrangements within the company. Therefore, where the employer has chosen to maintain such written policies, the terms they describe must be a central focus of the contractual analysis.

**(8) Employer and Employee § 9--Actions for Wrongful Discharge--Based on Breach of Implied Covenant of Good Faith--At-will Employment--Implied-in-fact Contract.** --In a wrongful termination action brought by an at-will employee, based on breach of the implied covenant of good faith and fair dealing, the trial court did not err in granting summary judgment to defendant employer. The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.  Lab. Code, § 2922, establishes the presumption that an employer may terminate its employees at will. Precisely because employment at will gives the employer the freedom to ter-

minate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so. In addition, even though an employer's personnel policies and practices may become implied-in-fact terms of the employment contract, a claim that merely realleges that breach as a violation of the implied covenant is superfluous. The remedy for breach of an employment agreement is solely contractual, and an implied covenant theory affords no separate measure of recovery. There is no tort of bad faith breach of an employment contract. (Disapproving, to the extent they are contrary: *Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241 [208 Cal.Rptr. 524]; *Gray v. Superior Court* (1986) 181 Cal.App.3d 813 [226 Cal.Rptr. 570]; *Khanna v. Microdata Corp.* (1985) 170 Cal.App.3d 250 [215 Cal.Rptr. 860]; *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]; *Cleary v. American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].)

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 175 et seq.]

**(9a) (9b) (9c) (9d) Civil Rights § 3.3--Employment--Age Discrimination--Burden-shifting Test--Employer's Nondiscriminatory Explanation: Employer and Employee § 9--Actions for Wrongful Discharge.** --The trial court did not err in granting an employer summary adjudication against a former employee's claim that he was terminated because of his age in violation of the Fair Employment and Housing Act ( Gov. Code, § 12941). Summary judgment for the employer may be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred. In the face of defendant's strong and unrebutted showing that it took its actions for non-discriminatory reasons, the evidence of age favoritism proffered by plaintiff manifestly lacked sufficient probative force to allow a finding of intentional age discrimination. Defendant's explanation, that it eliminated plaintiff's work unit because its functions could be better performed by another work unit, was creditable on its face. Indeed, plaintiff largely conceded the truth of that explanation. Further, the comparative-age evidence cited by plaintiff was insufficient for trial in the face of defendant's strong contrary showing that its reasons were unrelated to age bias. The premise that defendant purposely favored two workers on the basis of youth was weakened, for statistical purposes, by the small size of the working unit (only six persons); and retained employees were, like plaintiff, in their mid-career 40's.

**(10) Civil Rights § 3--Employment--Discrimination--Required Showing--Burden-shifting Test: Employer and Employee § 9--Actions for Wrongful Discharge.** --Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent. In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment. Disparate treatment is intentional discrimination against one or more persons on prohibited grounds. Prohibited discrimination may also be found on a theory of disparate impact, i.e., that regardless of motive, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on members of the protected class. Direct evidence of intentional discrimination is rare, and such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the three-stage burden-shifting test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained. At trial, the plaintiff has the initial burden to establish a prima facie case of discrimination. The specific elements of a prima facie case may vary depending on the particular facts. Generally, the plaintiff must provide evidence that (1) he or she was a member of a protected class, (2) he or she was qualified for the position sought or was performing competently in the position held, (3) he or she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. At trial, if the plaintiff establishes a prima facie case, a presumption of discrimination arises, which, though rebuttable, is legally mandatory. The burden then shifts to the employer to rebut the presumption by producing admissible evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer sustains this burden, the presumption disappears. The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.

**(11) Civil Rights § 3.3--Employment--Age Discrimination--Burden-shifting Test--Employer's Explanation--Downsizing: Employer and Employee § 9--Actions for Wrongful Discharge.** --Downsizing alone is not necessarily a sufficient explanation under the Fair Employment and Housing Act ( Gov. Code, § 12941) for the consequent dismissal of an age-protected worker. An employer's freedom to consolidate or reduce its workforce, and to eliminate positions in the process, does not mean it may use the occasion as a convenient opportunity to get rid of its older workers. Invocation of a right to downsize does not resolve whether the employer had a

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them. On the other hand, if nondiscriminatory, the employer's true reasons need not necessarily have been wise or correct. While the objective soundness of an employer's proffered reasons supports their credibility, the ultimate issue is simply whether the employer acted with a motive to discriminate illegally. Thus, legitimate reasons in this context are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination.

**(12) Civil Rights § 3--Employment--Discrimination-- Burden-shifting Test--Employer's Explanation for Alleged Discriminatory Act--Effect of Lying.** --An inference of intentional employment discrimination cannot be drawn solely from evidence that the employer lied about its reasons for an action that affected an employee within a protected class. The pertinent statutes do not prohibit lying--they prohibit discrimination. Proof that the employer's proffered reasons are unworthy of credence may considerably assist a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. Still, there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the applicable federal or state statute, was the true cause of the employer's actions. Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory. Even where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact finder is not necessarily entitled to find in the plaintiff's favor. Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.

**COUNSEL:** Bianco & Murphy, Stephen M. Murphy; Quackenbush & Quackenbush and William C. Quackenbush for Plaintiff and Appellant.

Thomas W. Osborne and Melvin Radowitz for the American Association of Retired Persons as Amicus Curiae on behalf of Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Paul Grossman, Paul W. Cane, Jr., John C. Oakes; Thelen, Marrin, Johnson & Bridges, Thelen Reid & Priest, Curtis A. Cole, Janet F. Bentley, Clarice C. Liu, Michael Hallerud and Thomas M. McInerney for Defendants and Respondents.

Gibson, Dunn & Crutcher, Pamela L. Hemminger and Kathleen M. Vanderziel for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Respondents.

Law Offices of Steven Drapkin and Steven Drapkin for the Employers Group as Amicus Curiae on behalf of Defendants and Respondents.

Lloyd C. Loomis for California Employment Law Council as Amicus Curiae on behalf of Defendants and Respondents.

**JUDGES:** Opinion by Baxter, J., with George, C. J., Mosk, Werdegar, Chin, and Brown, JJ., concurring. Concurring opinion by Mosk, J. (see p. 370). Concurring opinion by Chin, J., with Brown, J., concurring. (see p. 371). Concurring and dissenting opinion by Kennard, J. (see p. 378).

**OPINION BY:** BAXTER

**OPINION**

[*325] [**1094] [***357] **BAXTER, J.**

This case presents questions about the law governing claims of wrongful discharge from employment as it applies to an employer's motion for summary judgment. Plaintiff John Guz, a longtime employee of Bechtel National, Inc. (BNI), was released at age 49 when his work unit was eliminated and its tasks were transferred to another Bechtel office. Guz sued BNI and its parent, Bechtel Corporation (hereinafter collectively Bechtel), [*326] alleging age discrimination, breach of an implied contract to be terminated only for good cause, and breach of the implied covenant of good faith and fair dealing. The trial court granted Bechtel's motion for summary judgment and dismissed the action. In a split decision, the Court of Appeal reversed. The majority found that Bechtel had demonstrated no grounds to foreclose a trial on any of the claims asserted in the complaint.

Having closely reviewed the Court of Appeal's decision, [1] we reach the following conclusions:

1 We heard argument in this case on February 8, 2000, and the matter was thereupon submitted. (Cal. Supreme Ct., Internal Operating Practices and Proc. VII A, Submission.) However, on April 14, 2000, we vacated submission in light of the

United States Supreme Court's pending decision in *Reeves v. Sanderson Plumbing Products, Inc.*, No. 99-536 (argued Mar. 21, 2000) (*Reeves*), a case presenting issues pertinent to Guz's age discrimination claim. The high court's decision in *Reeves* was filed on June 12, 2000. (530 U.S. 133 [120 S. Ct. 2097, 147 L. Ed. 2d 105].) The parties were thereupon given the opportunity to brief the significance of *Reeves*. Having received the parties' briefs, we resubmitted the matter on July 12, 2000.

[***358] First, the Court of Appeal used erroneous grounds to reverse summary judgment on Guz's implied contract cause of action. The Court of Appeal found triable evidence (1) that Guz had an actual agreement, implied in fact, to be discharged only for good cause, and (2) that the elimination of Guz's work unit lacked good cause because Bechtel's stated reason--a "downturn in . . . workload"--was not justified by the facts, and was, in truth, a pretext to discharge the unit's workers for poor performance without following the company's "progressive discipline" policy. We acknowledge a triable issue that Guz, like other Bechtel workers, had implied contractual rights under specific provisions of Bechtel's written personnel policies. But neither the policies, nor other evidence, suggests any contractual restriction on Bechtel's right to eliminate a work unit as it saw fit, even where dissatisfaction with unit performance was a factor in the decision. The Court of Appeal's ruling on Guz's implied contract claim must therefore be reversed. The Court of Appeal did not reach the additional ground on which Guz claims a contractual breach--i.e., that Bechtel failed to follow its fair layoff policies when, during and after the reorganization, it made individual personnel decisions leading to Guz's release. Accordingly, we leave that issue to the Court of Appeal on remand.

Second, the Court of Appeal erred in restoring Guz's separate cause of action for breach of the implied covenant of good faith and fair dealing. Here Guz claims that even if his employment included no express or implied-in-fact agreement limiting Bechtel's right to discharge him, and was thus "at will" ( Lab. Code, § 2922), the covenant of good faith and fair dealing, implied by law in every contract, precluded Bechtel from terminating him [*327] arbitrarily, as by failing to follow its own policies, or in bad faith. But while the implied covenant requires mutual fairness in applying a contract's actual terms, it cannot [**1095] substantively *alter* those terms. If an employment is at will, and thus allows either party to terminate for *any or no reason*, the implied covenant cannot decree otherwise. Moreover, although any breach of the actual terms of an employment contract also violates the implied covenant, the measure of dam-

ages for such a breach remains solely contractual. Hence, where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous. On the other hand, where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid.

Finally, we disagree with the Court of Appeal that Guz's claim of prohibited age discrimination has triable merit. Bechtel presented evidence, largely undisputed, that the reasons for its personnel decisions leading to Guz's release had nothing to do with his age. In the face of this showing, evidence cited by Guz that certain workers preferred over him were substantially younger is insufficient to permit a rational inference that age played any significant role in his termination.

For the reasons set forth above, we will reverse the judgment of the Court of Appeal and will remand to that court for further proceedings consistent with this opinion.

FACTS

In October 1994, Guz sued Bechtel, challenging the June 1993 termination of his Bechtel employment. The complaint alleged causes of action for breach of an implied employment contract (see *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654 [254 Cal. Rptr. 211, 765 P.2d 373] (*Foley*)), breach of the covenant of good faith and fair dealing, and age discrimination in violation of the California Fair Employment [***359] and Housing Act (FEHA; Gov. Code, § 12941).

After extensive discovery, Bechtel filed a motion for summary judgment in August 1995. The motion, and Guz's opposition thereto, attached numerous supporting documents, including declarations and deposition excerpts. On the basis of these submissions, the following facts appear to be essentially undisputed:

In 1971, Bechtel hired Guz as an administrative assistant at a salary of $ 750 per month. Throughout his Bechtel career, Guz worked in "management information," performing, at various times, duties on both the [*328] "awarded" and "overhead" sides of this specialty. He received steady raises and promotions. His performance reviews were generally favorable, though his March 1992 evaluation indicated he needed to follow through on ideas and should become "fully computer literate in order to improve his long-term job success."

BNI, a division of Bechtel Corporation, is an engineering, construction, and environmental remediation company that focuses on federal government programs, principally for the Departments of Energy and Defense. Prior to 1993, BNI had its own in-house management information unit, the BNI Management Information Group (BNI-MI). BNI-MI itself represented a 1986 con-

solidation of two Bechtel management information units, which resulted in the work of these groups being done by fewer people. Between 1986 and 1991, BNI-MI's size was further reduced from 13 to six persons, and its costs were reduced from $ 748,000 in 1986 to $ 400,000 in 1991.

Guz had worked for BNI-MI since 1986. In 1992, at age 49, he was employed as a financial reports supervisor, responsible for supervising BNI-MI's overhead section, which included himself and 44-year-old Dee Minoia. At salary grade 27, Guz earned $ 5,940 per month. BNI-MI's six-member staff also included its manager, Ronald Goldstein (age 50), Goldstein's secretary Pam Fung (age 45), Robert Wraith (age 41), and Christine Siu (age 34). Guz's immediate superior was his longtime friend and colleague Goldstein. Goldstein, in turn, reported to Edward Dewey, BNI's manager of government services.

During this time, Bechtel maintained Personnel Policy 1101, dated June 1991, on the subject of termination of employment (Policy 1101). Policy 1101 stated that "Bechtel employees have no employment agreements guaranteeing continuous service and may resign [**1096] at their option or be terminated at the option of Bechtel."

Policy 1101 also described several "Categories of Termination," including "Layoff" and "Unsatisfactory Performance." With respect to Unsatisfactory Performance, the policy stated that "[e]mployees who fail to perform their jobs in a satisfactory manner may be terminated, provided the employees have been advised of the specific shortcomings and given an opportunity to improve their performance." [2] A layoff was defined as "a Bechtel-initiated termination[] of employees caused by a reduction in workload, reorganizations, changes in job requirements, or other circumstances . . . ." Under the Layoff policy, employees subject to termination for this reason "may be [*329] placed on 'holding status' if there is a possible Bechtel assignment within the following 3-month period." Guz understood that Policy 1101 applied to him.

2   Such provisions are sometimes referred to as "progressive discipline" policies. We sometimes hereafter use that phrase to describe Bechtel's version.

In January 1992, Robert Johnstone became president of BNI. While previously running another Bechtel entity, Johnstone had received management information services from the San Francisco Regional Office Management Information Group (SFRO-MI) headed by James Tevis. BNI-MI and SFRO-MI performed similar functions, and John Shaeffer, [3] a veteran [***360] Bechtel employee who was several months older than Guz, had overhead reporting duties for SFRO-MI that were similar to Guz's job within BNI-MI.

3   Throughout the record and briefs, the last name of this individual sometimes is spelled "Sheaffer" and at other times is spelled "Shaeffer." We use the latter spelling.

Johnstone soon became unhappy with the size, cost, and performance of BNI-MI. In April 1992, he advised Dewey, Goldstein, and Guz that BNI-MI's work could be done by three people. A May 1992 memo from Dewey to Goldstein warned that Dewey and Johnstone had agreed BNI-MI's 1992 overhead budget of $ 365,000 was a "maximum not to be exceeded" and was "subject to further analysis and review, since the real guideline was far below this level."

Between April and October 1992, Guz and Goldstein discussed how to reduce BNI-MI's work force. In September 1992, Dee Minoia was told to look for another job. In October 1992, on Dewey's recommendation, Goldstein advised Guz to seek another Bechtel position, citing BNI-MI's reduced budget as the "biggest factor." By that time, as Guz knew, BNI-MI's overhead costs for 1992 had already run well over its strict budget.

In preparation for his departure, Guz compiled a list of his job tasks, together with his suggestions about who should perform his work once the BNI-MI staff was reduced. Guz recommended that most of his duties go to Shaeffer in SFRO-MI, and that the small remaining portion of his work, involving the government's Defense Contract Audit Agency, be transferred to a unit headed by Ann Dersheimer, BNI's 46-year-old controller, which regularly performed government audit and contract work. In mid-November, Goldstein managed to persuade Dewey, at least temporarily, that Guz was necessary to BNI-MI's work. With Dewey's consent, Goldstein asked Guz to stay, and Guz accepted.

Meanwhile, however, Dewey and Johnstone were discussing the possibility of involving SFRO-MI more actively in BNI's management information needs. In late November 1992, Goldstein received from Dewey, and discussed with Guz, a memo setting BNI-MI's target overhead budget for 1993 [*330] at $ 250,000. The memo again suggested staff reductions as a means of bringing the unit's overhead within the budget limits.

About the same time, Johnstone asked Tevis to submit a proposal to provide BNI's management information services through SFRO-MI. In early December, Tevis submitted a proposed budget of $ 200,000, which Johnstone accepted.

On December 9, 1992, Goldstein informed Guz that BNI-MI was being disbanded, that its work would be done by SFRO-MI, and that Guz was being laid off. Goldstein told Guz the reason he had been selected for layoff was to reduce costs. On December 11, 1992, Guz received a confirmatory letter from Dewey, which referred to "the downturn in our workload" and placed Guz on holding [**1097] status. In a December 17, 1992, memo to BNI managers, Johnstone announced the transfer of BNI-MI to SFRO-MI effective February 1, 1993. During the transition period, as he had earlier recommended, Guz transferred his overhead reporting work to Shaeffer and his government audit work to Dersheimer.

As part of the transition plan, Tevis consulted with Goldstein "about the positions [Tevis] would need that [he] could cover in [his] group and that [he] couldn't cover." According to Tevis's uncontradicted deposition testimony, Goldstein recommended Wraith and Siu as the best additions to SFRO-MI's staff. The reasons, according to Tevis, were that Siu had necessary skills in Bechtel's ORS computer operating system and occupied a salary grade commensurate with the duties Tevis wished her to assume, and that Wraith "knew the project side" of management [***361] information. Guz's name came up in the discussion, but Tevis and Goldstein "both decided" Shaeffer and another current SFRO-MI employee, Chris Gee, were sufficient to assume Guz's overhead work.

Wraith and Siu, the two youngest members of BNI-MI, were transferred to SFRO-MI, while all the remaining BNI-MI employees, including Guz, were laid off. Guz was placed on holding status pending possible reassignment to another Bechtel position.

During early 1993, while Guz was on holding status, three other positions became available in SFRO-MI, partly because of that unit's expanded responsibilities for BNI. An existing SFRO-MI employee, 42-year-old John Wallace, was selected for a new SFRO-MI position as supervisor of SFRO-MI's work for BNI. Wallace's former SFRO-MI subordinate, 52-year-old Jan Vreim, was placed in Wallace's old job. The third position, vacated by the transfer of another SFRO-MI member, was filled by 38-year-old Barbara [*331] Stenho, who also already worked for Bechtel but was a newcomer to SFRO-MI.

Tevis explained that Wallace was selected for his position because it required his computer skills, and because his supervisory and project experience suited him for the responsibility of working directly with BNI president Johnstone, who was project oriented. Vreim was also chosen for her ORS computer ability, her history of working with high-level managers, and her project experience. The SFRO-MI position taken by Stenho re-

quired a close working relationship with another Bechtel entity, Bechtel Civil, where Stenho had previously been employed. Stenho was placed in her new job at the specific request of Bechtel Civil's manager.

Though Guz insists he let it be known he wanted to stay at Bechtel, even at a reduced salary, he appears to concede he did not specifically apply for any of the SFRO-MI positions. Tevis never saw Guz's resume before filling them, and he admitted he never considered Guz for these jobs. Tevis variously indicated he did not realize Guz was available, thought Guz "only did overhead," understood from Goldstein that Guz lacked computer skills, and did not know Guz had supervisory experience. Tevis also noted Guz did not have the Bechtel Civil relationship necessary for the Stenho position. After Tevis was asked, at his deposition, to examine Guz's resume, Tevis acknowledged it indicated Guz might have qualified for the positions taken by Wraith and Wallace.

Guz's original three-month holding status was renewed for an additional three months, but he obtained no other position within Bechtel. He was terminated on June 11, 1993.

Guz sought to furnish evidence that the cost reduction and workload downturn reasons given him for the elimination of BNI-MI, and his own consequent layoff, were arbitrary, false, and pretextual. To rebut the implication that a general business slowdown required BNI to lay off workers, Guz submitted an excerpt from Bechtel Corporation's 1992 Annual Report. There, Bechtel Corporation's president stated that the "Bechtel team had an exceptional year," and that the company as a whole had achieved healthy gains in both revenue from current projects and new work booked. In his own declaration, Goldstein stated that BNI-MI's 1992 and projected 1993 workload was high, that BNI-MI's work volume was not directly related to the overall job hours of BNI, and [**1098] that because much of BNI-MI's overhead cost was recoverable under BNI's government contracts, the net savings from elimination of BNI-MI were only a small fraction of its budget.

[*332]   Guz also submitted additional Bechtel documents discussing specific company personnel policies and practices, including those policies pertaining to laid-off employees. These documents included Bechtel's 1989 Reduction-in-Force Guidelines (RIF [***362] Guidelines) and Bechtel's Personnel Policy 302 (Policy 302).

Policy 302 described a system of employee ranking (sometimes hereafter called force ranking), which was to be "used alone or in conjunction with other management tools in making personnel decisions in such areas as . . . [s]taffing." Rankings were to be based on the fair, objective, and consistent evaluation of employees' compara-

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

tive job-relevant skills and performance. However, Policy 302 also provided that "[u]nique situations may occur in which employee ranking may be inapplicable based on the nature of the personnel decision or the limited size of the ranking group." (Italics omitted.)

The RIF Guidelines specified that when choosing among employees to be retained and released during a reduction in force, the formal ranking system set forth in Policy 302 was to be employed. For this purpose, the RIF Guidelines said, employees should "[i]deally" be ranked, by similarity of function or level of work activity, in groups of from 20 to 100. The parties disputed whether Bechtel actually used this force ranking system when eliminating entire units of fewer than 20 employees. Bechtel's manager of human resources declared that force ranking was inappropriate for small units, such as BNI-MI, whose employees had dissimilar duties, grades, and skills. However, both Guz and Goldstein declared their recollection that force ranking was an established Bechtel policy and was used in 1986 when two management information units, containing 13 employees, were consolidated into a six-member unit, BNI-MI.

The RIF Guidelines also explained the term "holding status" and its benefits. According to the RIF Guidelines, this status could be granted upon layoff, for a renewable three-month period, while the employee awaited possible reassignment. The employee would not receive salary, but Bechtel would maintain his medical, dental, voluntary personal accident, and term life insurance. Bechtel should also provide the employee with "[t]ransfer and [p]lacement [a]ssistance." The "releasing organization" should determine if the employee was qualified for other vacant positions within the same unit, and "open requisitions" (i.e., solicitation of outside applicants for available positions) should generally be cancelled during a reduction in force. "Efforts should [also] be made to contact discipline counterparts in *other* Bechtel entities/services" in hopes of placing the employee, and the employee should be considered for future positions. (Italics added.) In his deposition, BNI [*333] president Johnstone agreed that Bechtel's practice was to place an employee on holding status prior to termination, to attempt to reassign the employee during this period, and to "continue to look for positions even after the employee has been laid off." [4]

[4] In his deposition, Johnstone also indicated his understanding of Bechtel's fundamental policies regarding employment security. Johnstone did not believe that Bechtel's policy was to terminate employees "arbitrarily and without any reason." On the other hand, Johnstone stated, "I have always known that Bechtel employed people--you call it 'at will,' I call it we don't guarantee employment to people," meaning that Bechtel works on a "project-by-project basis" and "if the work is not there, the employee does not have the job." Thus, Johnstone understood, Bechtel's policy was to terminate employees when "there was a good reason to do so" or "there was lack of work."

In their declarations, Goldstein and Guz insisted Guz was qualified for each of the several vacant positions in SFRO-MI, as well as for several other positions that became available within Bechtel. Addressing Tevis's specific qualms about Guz, Guz and Goldstein declared that Guz had supervisorial experience, and had worked on both the awarded and overhead sides of management information. Guz further stated that he had taken training for the ORS computer system, "had more than adequate computer skills for [his] [**1099] position," and was never told his computer skills were deficient.

[***363] The trial court granted summary judgment. The court reasoned that "[Guz] was an at-will employee and has not introduced any evidence that he was ever told at any time that he had permanent employment or that he would be retained as long as he was doing a good job. . . . [P] Plaintiff is unable to establish a prima facie case of age discrimination. . . . Plaintiff is also unable to rebut [Bechtel's] legitimate business reason for his termination and/or his failure to obtain another position within Bechtel. . . ."

Over a vigorous dissent by Presiding Justice Anderson, the Court of Appeal, First Appellate District, Division Four, reversed. The majority, Justices Poche and Reardon, reasoned as follows: Under *Foley, supra,* 47 Cal. 3d 654, Guz's longevity, promotions, raises, and favorable performance reviews, together with Bechtel's written progressive discipline policy and Bechtel officials' statements of company practices, raised a triable issue that Guz had an implied-in-fact contract to be dismissed only for good cause. There was evidence that Bechtel breached this term by eliminating BNI-MI, on the false ground that workload was declining, as a pretext to weed out poor performers without applying the company's progressive discipline procedures. As to Guz's age discrimination claim, Bechtel was required to advance a credible nondiscriminatory reason for Guz's termination, after which the burden shifted to Guz to produce evidence that the proffered reason was discriminatory or pretextual. As already noted, however, whether [*334] a downturn in workload was the real reason for Bechtel's action was in legitimate dispute. Hence, summary judgment on the age discrimination claim was improper.

The dissent argued that the trial court properly dismissed all Guz's causes of action. It reasoned as follows: As to the contract claim, Policy 1101 expressly provided

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

that Bechtel employment was at will. The progressive discipline policy did not apply to general reductions in force, and nothing in Bechtel's personnel policies otherwise limited its right to eliminate positions. Guz's mere successful longevity could not prove a contractual right to be terminated only for good cause. Moreover, there was no evidence the elimination of BNI-MI was pretextual, or that Bechtel violated the implied covenant of fair dealing by engaging in intentional, bad faith conduct to deprive Guz of the benefits of his employment. As to age discrimination, Bechtel gave legitimate nondiscriminatory reasons for eliminating BNI-MI, and Guz presented no evidence these reasons were false, let alone excuses for intentional discrimination against Guz on the basis of his age. [5]

    5    Subsequent references to the Court of Appeal's decision refer to the majority opinion unless the contrary clearly appears.

We granted review.

DISCUSSION [6]

    6    We note that the California Chamber of Commerce, The Employers Group, and the California Employment Law Council have each filed amicus curiae briefs in support of Bechtel. The American Association of Retired Persons has filed an amicus curiae brief in support of Guz.

I. *Summary judgment rules.*

    (1) On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. ( *Artiglio v. Corning Inc.* (1998) 18 Cal. 4th 604, 612 [76 Cal. Rptr. 2d 479, 957 P.2d 1313].) Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of [***364] trial, such that the defendant is entitled to judgment as a matter of law. (E.g., *Calvillo-Silva v. Home Grocery* (1998) 19 Cal. 4th 714, 735-736 [80 Cal. Rptr. 2d 506, 968 P.2d 65] (*Calvillo-Silva*); *Flatt v. Superior Court* (1994) 9 Cal. 4th 275, 279 [36 Cal. Rptr. 2d 537, 885 P.2d 950]; *Ann M. v. Pacific Plaza Shopping Center* [**1100] (1993) 6 Cal. 4th 666, 673-674 [25 Cal. Rptr. 2d 137, 863 P.2d 207]; *Molko v.* [*335] *Holy Spirit Assn.* (1988) 46 Cal. 3d 1092, 1107 [252 Cal. Rptr. 122, 762 P.2d 46].) [7]

    7    Bechtel and one of its amici curiae have questioned whether such traditional standards apply to this case. Bechtel suggests that, to survive summary judgment, *Guz* had the burden to present evidence of an implied employment security agreement sufficient to overcome the statutory presumption of at-will employment (see discussion, *post*), and also to establish, under the generally accepted three-step procedure for testing such claims (see discussion, *post*), a prima facie case of intentional age discrimination. The California Chamber of Commerce argues more broadly that 1992 and 1993 amendments to the California summary judgment statute ( Code Civ. Proc., § 437c) adopted then extant *federal* standards, under which a moving defendant could obtain summary judgment solely by showing, after opportunity for discovery, that the *opposing plaintiff* had *failed to present* triable evidence crucial to his case (see *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 322-326 [106 S. Ct. 2548, 2552-2554, 91 L. Ed. 2d 265]). We need not belabor these matters. As we explain below, Bechtel *did* adduce, in support of its motion for summary judgment, *affirmative evidence* which, unless materially contradicted or rebutted, would establish that each of Guz's causes of action lacked merit. (See Code Civ. Proc., § 437c, subd. (*o*)(2).) By any interpretation of the summary judgment statute, the burden thereupon shifted to Guz to show the existence of one or more triable issues of material fact (*ibid.*; see *Calvillo-Silva, supra,* 19 Cal. 4th 714, 735), and, as to each cause of action, Guz did submit or point to evidence which, in his view, indicated such triable issues. Thus, as to each count of Guz's complaint, the issue on appellate review is simply whether, and to what extent, the evidence submitted for and against the motion for summary judgment discloses issues warranting a trial.

II. *Implied contract claim.*

    (2) Labor Code section 2922 provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." An at-will employment may be ended by either party "at any time without cause," for any or no reason, and subject to no procedure except the statutory requirement of notice. (E.g., *Foley, supra,* 47 Cal. 3d 654, 680; *Gantt v. Sentry Insurance Co.* (1992) 1 Cal. 4th 1083, 1094 [4 Cal. Rptr. 2d 874, 824 P.2d 680]; *Marin v. Jacuzzi* (1964) 224 Cal. App. 2d 549, 553-554 [36 Cal. Rptr. 880]; see *Crosier v. United Parcel Service, Inc.* (1983) 150 Cal. App. 3d 1132, 1137 [198 Cal. Rptr. 361].) [8]

8    As this court has explained, the statutory and common law rule presuming that employment contracts without a stated duration are at will is required by "[s]pecial policy considerations." ( *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal. 2d 713, 727, fn. 12 [73 Cal. Rptr. 213, 447 P.2d 325].) " '[T]he courts have not deemed it to be their function, in the absence of contractual, statutory or public policy considerations, to compel a person to accept or retain another in his employ, nor to compel any person against his will to remain in the employ of another. Indeed, they have consistently held that in such a confidential relationship, the privilege [to terminate] is absolute, and the presence of ill will or improper motive will not destroy it.' (9 Williston on Contracts [(3d ed. 1957)] § 1017, p. 134.)" ( *Ibid.*)

(3) While the statutory presumption of at-will employment is strong, it is subject to several limitations. For instance, as we have observed, "the employment relationship is fundamentally contractual." (*Foley, supra*, 47 [*336] Cal. 3d 654, 696.) Thus, though Labor Code section 2922 prevails where the employer and employee have reached no other understanding, it does not overcome their "fundamental . . . freedom of contract" to depart from at-will employment. (47 Cal. 3d at p. 677.) The statute does not prevent the parties from *agreeing* to any limitation, otherwise lawful, on the [***365] employer's termination rights. ( *Id.*, at pp. 677, 680.)

One example of a contractual departure from at-will status is an agreement that the employee will be terminated only for "good cause" (*Foley, supra*, 47 Cal. 3d 654, 677) in the sense of " ' "a fair and honest cause or reason, regulated by good faith . . ." ' [citation], as opposed to one that is 'trivial, capricious, unrelated to business needs or goals, or pretextual . . . .' [Citations.]" ( *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal. 4th 454, 467 [46 Cal. Rptr. 2d 427, 904 P.2d 834] (*Scott*); see also *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal. 4th 93, 104-105 [69 Cal. Rptr. 2d 900, 948 P.2d 412]; *Pugh v. See's* [**1101] *Candies, Inc.* (1981) 116 Cal. App. 3d 311, 330 [171 Cal. Rptr. 917] (*Pugh*).) But the parties are free to define their relationship, including the terms on which it can be ended, as they wish. The parties may reach *any* contrary understanding, otherwise lawful, "concerning either the term of employment or the *grounds or manner* of termination." (*Foley, supra*, 47 Cal. 3d at p. 680, italics added.)

Thus, the employer and employee may enter " 'an agreement . . . that . . . the employment relationship will continue indefinitely, pending the occurrence of *some event such as* the employer's dissatisfaction with the employee's services or the existence of some "cause" for

termination.' " ( *Foley, supra*, 47 Cal. 3d 654, 680, quoting *Pugh, supra*, 116 Cal. App. 3d 311, 324-325, italics added.) Among the many available options, the parties may agree that the employer's termination rights will vary with the particular circumstances. The parties may define for themselves what cause or causes will permit an employee's termination and may specify the procedures under which termination shall occur. The agreement may restrict the employer's termination rights to a greater degree in some situations, while leaving the employer freer to act as it sees fit in others.

The contractual understanding need not be express, but may be *implied in fact*, arising from the parties' *conduct* evidencing their actual mutual intent to create such enforceable limitations. ( *Foley, supra*, 47 Cal. 3d 654, 680.) In *Foley*, we identified several factors, apart from express terms, that may bear upon "the existence *and content* of an . . . [implied-in-fact] agreement" placing limits on the employer's right to discharge an employee. (*Ibid.*, italics added.) These factors might include " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or [*337] communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " ( *Ibid.*, quoting *Pugh, supra*, 116 Cal. App. 3d 311, 327.)

*Foley* asserted that "the totality of the circumstances" must be examined to determine whether the parties' conduct, considered in the context of surrounding circumstances, gave rise to an implied-in-fact contract limiting the employer's termination rights. (*Foley, supra*, 47 Cal. 3d 654, 681.) We did not suggest, however, that every vague combination of *Foley* factors, shaken together in a bag, necessarily allows a finding that the employee had a right to be discharged only for good cause, as determined in court.

On the contrary, "courts seek to enforce the *actual* understanding" of the parties to an employment agreement. (*Foley, supra*, 47 Cal. 3d 654, 677, italics added.) Whether that understanding arises from express mutual words of agreement, or from the parties' conduct evidencing a similar meeting of minds, the exact terms to which the parties have assented deserve equally precise scrutiny. As *Foley* indicated, [***366] it is the "nature of [an implied-in-fact] contract" that must be determined from the "totality of the circumstances." ( *Id.*, at p. 681.)

Every case thus turns on its own facts. Where there is no express agreement, the issue is whether other evidence of the parties' conduct has a "tendency in reason" ( Evid. Code, § 210) to demonstrate the existence of an actual mutual understanding on *particular* terms and conditions of employment. If such evidence logically permits conflicting inferences, a question of fact is pre-

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

sented. (*Foley, supra,* 47 Cal. 3d at p. 677.) But where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper.

(4a) Guz alleges he had an agreement with Bechtel that he would be employed so long as he was performing satisfactorily and would be discharged only for good cause. Guz claims no express understanding to this effect. However, he asserts that such an agreement can be inferred by combining evidence of several *Foley* factors, including (1) [**1102] his long service; (2) assurances of continued employment in the form of raises, promotions, and good performance reviews; (3) Bechtel's written personnel policies, which suggested that termination for poor performance would be preceded by progressive discipline, that layoffs during a work force reduction would be based on objective criteria, including formal ranking, and that persons laid off would receive placement and reassignment assistance; and (4) testimony by a Bechtel executive that company practice was to terminate employees for a good reason and to reassign, if possible, a laid-off employee who was performing satisfactorily.

[*338] Guz further urges there is evidence his termination was without good cause in two respects. First, he insists, the evidence suggests Bechtel had no good cause *to eliminate BNI-MI,* because the cost reduction and workload downturn reasons Bechtel gave for that decision (1) were not justified by the facts, and (2) were a pretext to terminate him and other individual BNI-MI employees for *poor performance* without following the company's progressive discipline rules. Second, Guz asserts, even if there was good cause to eliminate his work unit, his termination nonetheless lacked good cause because Bechtel failed to accord him fair layoff rights set forth in its written personnel rules, including (1) use of objective force ranking to determine which unit members deserved retention, and (2) fair consideration for other available positions while he was in holding status.

The Court of Appeal agreed with Guz that there was triable evidence of an implied-in-fact contract to terminate him only for good cause. The court further agreed the evidence warranted a trial on Guz's *first* theory of breach, i.e., that Bechtel's stated economic reason for eliminating his work unit lacked support and was a pretext for firing unsatisfactory workers without resort to progressive discipline procedures. On this basis alone, the Court of Appeal reversed the summary judgment against Guz's contract cause of action. The Court of Appeal did not decide whether the evidence justified a trial on Guz's *second* theory of breach, i.e., the denial of rights specified by the company's fair layoff rules.

As we shall explain, we find triable evidence that Bechtel's *written personnel documents* set forth implied contractual limits on the circumstances under which Guz, and other Bechtel workers, would be terminated. On the other hand, we see *no* triable evidence of an implied agreement between Guz and Bechtel on *additional, different, or broader* terms of employment security. As Bechtel suggests, the personnel documents themselves did not restrict Bechtel's freedom to reorganize, reduce, and consolidate its work force for whatever reasons it wished. Thus, contrary to the Court of Appeal's holding, Bechtel had the absolute right to [***367] eliminate Guz's work unit and to transfer the unit's responsibilities to another company entity, even if the decision was influenced by dissatisfaction with the eliminated unit's performance, and even if the personnel documents entitled an individual employee to progressive discipline procedures before being fired for poor performance.

The basis on which the Court of Appeal overturned this portion of the trial court's summary judgment was therefore erroneous, and the Court of Appeal's decision in this regard must be reversed. Having so concluded, we need not address the issue the Court of Appeal never reached, i.e., whether [*339] Guz has a triable claim that, in the course of the reorganization, Bechtel denied him fair layoff protections, such as objective ranking and placement assistance, as guaranteed by the company's written personnel provisions. We leave that question to the Court of Appeal on remand. The following paragraphs describe in detail our reasoning on these matters.

At the outset, Bechtel insists that the existence of implied contractual limitations on its termination rights is negated because Bechtel *expressly disclaimed* all such agreements. Bechtel suggests the at-will presumption of Labor Code 2922 was conclusively reinforced by language Bechtel inserted in Policy 1101, which specified that the company's employees "have no . . . agreements guaranteeing continuous service and may be terminated at [Bechtel's] option." As Bechtel points out, [**1103] Guz concedes he understood Policy 1101 applied to him.
[9]

9   As noted, Bechtel's disclaimer appears in Policy 1101, part of the general body of Bechtel personnel documents submitted by the parties in connection with the motion for summary judgment. The date on which Policy 1101 was promulgated is uncertain. However, we do not understand Guz to claim that he had an employment security agreement that *predated* and *arose independently of* Policy 1101 and therefore could not be *rescinded or cancelled* by virtue of Policy 1101's belated disclaimer. On the contrary, Guz admits Policy 1101 (necessarily including its disclaimer) applied to him, and he premises his contractual claim on an amalgam of factors, *signifi-*

*cantly including certain language in Policy 1101 itself.* (See discussion herein.) Hence, we may, and do, assume that the disclaimer included in Policy 1101 is a material factor in ascertaining the terms and conditions on which Guz individually was employed by Bechtel.

This express disclaimer, reinforced by the statutory presumption of at-will employment, satisfied Bechtel's initial burden, if any, to show that Guz's claim of a contract limiting Bechtel's termination rights had no merit. But neither the disclaimer nor the statutory presumption necessarily foreclosed Guz from proving the existence and breach of such an agreement.

**(5)** Cases in California and elsewhere have held that at-will provisions in personnel handbooks, manuals, or memoranda do not bar, or necessarily overcome, other evidence of the employer's contrary intent (see, e.g., *Thomka v. Financial Corp.* (1993) 15 Cal. App. 4th 877, 884-885 [19 Cal. Rptr. 2d 382]; *Walker v. Blue Cross of California* (1992) 4 Cal. App. 4th 985, 993 [6 Cal. Rptr. 2d 184] (*Walker*); *Wilkerson v. Wells Fargo Bank* (1989) 212 Cal. App. 3d 1217, 1227-1228 [261 Cal. Rptr. 185] (*Wilkerson*)), particularly where other provisions in the employer's personnel documents themselves suggest limits on the employer's termination rights (see, e.g., *Wood v. Loyola Marymount University* (1990) 218 Cal. App. 3d 661, 665-669 [267 Cal. Rptr. 230]; *Zaccardi v. Zale Corp.* (10th Cir. 1988) 856 F.2d 1473, 1476-1477; *O'Loughlin v. The Pritchard Corp.* (D.Kan. 1997) 972 F. Supp. 1352, 1369-1370; *Farnum v. Brattleboro Retreat, Inc.* (1995) 164 Vt. 488 [*340] [671 A.2d 1249, 1254-1255]; *Swanson v. Liquid Air Corp.* (1992) 118 Wash.2d 512 [826 P.2d 664, 668-677]; *Jones v. Central Peninsula General Hosp.* (Alaska 1989) 779 P.2d 783, 788). [10] The reasoning, [***368] express or implied, is that parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement, and that handbook disclaimers should not permit an employer, at its whim, to repudiate promises it has otherwise made in its own self-interest, and on which it intended an employee to rely.

10  On the other hand, most cases applying California law, both preand post-*Foley,* have held that an at-will provision in an *express written agreement,* signed by the employee, *cannot* be overcome by proof of an implied contrary understanding. (See, e.g., *Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal. App. 4th 1383, 1387-1389 [77 Cal. Rptr. 2d 383]; *Cruey v. Gannett Co.* (1998) 64 Cal. App. 4th 356, 362-363 [76 Cal. Rptr. 2d 670]; *Haggard v. Kimberley Quality Care, Inc.* (1995) 39 Cal. App. 4th 508, 516-522 [46 Cal. Rptr. 2d 16]; *Camp v. Jeffer,*

*Mangels, Butler & Marmaro* (1995) 35 Cal. App. 4th 620, 629-630 [41 Cal. Rptr. 2d 329] (*Camp*); *Tollefson v. Roman Catholic Bishop* (1990) 219 Cal. App. 3d 843, 849-852, 855-857 [268 Cal. Rptr. 550] (*Tollefson*); *Anderson v. Savin Corp.* (1988) 206 Cal. App. 3d 356, 360, 363-364 [254 Cal. Rptr. 627]; *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal. App. 3d 263, 267-268, 270-276 [235 Cal. Rptr. 279]; *Malmstrom v. Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal. App. 3d 299, 309, 313-318 [231 Cal. Rptr. 820]; *Shapiro v. Wells Fargo Realty Advisors* (1984) 152 Cal. App. 3d 467, 473, fn. 1, 482 [199 Cal. Rptr. 613]; *Gianaculas v. Trans World Airlines, Inc.* (9th Cir. 1985) 761 F.2d 1391, 1394; *Baker v. Kaiser Aluminum & Chemical Corp.* (N.D.Cal. 1984) 608 F. Supp. 1315, 1320-1321; *Crain v. Burroughs Corp.* (C.D.Cal. 1983) 560 F. Supp. 849, 851-852; *Crossen v. Foremost-McKesson, Inc.* (N.D.Cal. 1982) 537 F. Supp. 1076, 1077; but see, e.g., *Esbensen v. Userware Internat., Inc.* (1992) 11 Cal. App. 4th 631, 640-642 [14 Cal. Rptr. 2d 93]; *Seubert v. McKesson Corp.* (1990) 223 Cal. App. 3d 1514, 1519-1520 [273 Cal. Rptr. 296]; *Wallis v. Farmers Group, Inc.* (1990) 220 Cal. App. 3d 718, 730-731 [269 Cal. Rptr. 299]; *McLain v. Great American Ins. Companies* (1989) 208 Cal. App. 3d 1476, 1485-1486 [256 Cal. Rptr. 863]; *Brawthen v. H & R Block, Inc.* (1972) 28 Cal. App. 3d 131, 138-139 [104 Cal. Rptr. 486].)

We agree that disclaimer language in an employee handbook or policy manual does not necessarily mean an employee is employed at will. But even if a handbook disclaimer is not controlling (*Wilkerson, supra,* 212 Cal. App. 3d 1217, 1227) in every case, neither can such [**1104] a provision be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create binding limits on an employer's statutory right to terminate the relationship at will. Like any direct expression of employer intent, communicated to employees and intended to apply to them, such language must be taken into account, along with all other pertinent evidence, in ascertaining the terms on which a worker was employed. (*Ibid.*) [11] We examine accordingly the evidence cited by Guz in support of his implied contract claim.

11  Of course, the more clear, prominent, complete, consistent, and all-encompassing the disclaimer language set forth in handbooks, policy manuals, and memoranda disseminated to employees, the greater the likelihood that workers could not form any reasonable contrary understanding. Though we do not find such clarity in

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

the disclaimer language of Policy 1101 (see discussion, *post*), we do not foreclose the possibility an employer could promulgate a disclaimer clause which established beyond contrary inference that the employer intended employment to be at will.

[*341]   **(4b)** At the outset, it is undisputed that Guz received no individual promises or representations that Bechtel would retain him except for good cause, or upon other specified circumstances. (See *Foley, supra,* 47 Cal. 3d 654, 680.) Nor does Guz seriously claim that the practice in Bechtel's industry was to provide secure employment. (*Ibid.*) Indeed, the undisputed evidence suggested that because Bechtel, like other members of its industry, operated by competitive bidding from project to project, its work force fluctuated widely and, in terms of raw numbers, was in general decline. [12]

> 12   Bechtel presented evidence that between 1982 and 1995, its overall work force was reduced from 44,000 to 16,000 employees.

However, Guz insists his own undisputed long and successful service at Bechtel constitutes strong evidence of an implied contract for permanent employment except upon good cause. Guz argues that by retaining him for over 20 years, and by providing him with steady raises, promotions, commendations, and [***369] good performance reviews during his tenure, Bechtel engaged in "actions . . . reflecting assurances of continued employment." (*Foley, supra,* 47 Cal. 3d 654, 680.) Bechtel responds that an individual employee's mere long and praiseworthy service has little or no tendency to show an implied agreement between the parties that the employee is no longer terminable at will.

**(6)** A number of post-*Foley* California decisions have suggested that long duration of service, regular promotions, favorable performance reviews, praise from supervisors, and salary increases do not, without more, imply an employer's contractual intent to relinquish its at-will rights. ( *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal. App. 4th 798, 817-819 [85 Cal. Rptr. 2d 459] (*Horn*); *Kovatch v. California Casualty Management Co.* (1998) 65 Cal. 4th 1256, 1276 [77 Cal. Rptr. 2d 217]; *Davis v. Consolidated Freightways* (1994) 29 Cal. App. 4th 354, 368 [34 Cal. Rptr. 2d 438]; *Tollefson, supra,* 219 Cal. App. 3d 843, 856; *Miller v. Pepsi-Cola Bottling Co.* (1989) 210 Cal. App. 3d 1554, 1559 [259 Cal. Rptr. 56]; see also *Hoy v. Sears, Roebuck & Co.* (N.D.Cal. 1994) 861 F. Supp. 881, 886.) These decisions reason that such events are but natural consequences of a well-functioning employment relationship, and thus have no special tendency to prove that the employer's at-will implied agreement, reasonably under-

stood as such by the employee, has become one that limits the employer's future termination rights.

We agree that an employee's *mere* passage of time in the employer's service, even where marked with tangible indicia that the employer approves [*342] the employee's work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will. Absent other evidence of the employer's intent, longevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, *in and of themselves,* additionally constitute a contractual guarantee of future employment security. A rule granting such contract rights on the basis of successful longevity [**1105] alone would discourage the retention and promotion of employees.

On the other hand, long and successful service is not necessarily irrelevant to the existence of such a contract. Over the period of an employee's tenure, the employer can certainly communicate, by its written and unwritten policies and practices, or by informal assurances, that seniority and longevity *do* create rights against termination at will. The issue is whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding.

Read in context, *Foley, supra,* 47 Cal. 3d 654, did not hold otherwise. In the first place, *Foley's* reference to lengthy, successful service as evidence of an implied contract not to terminate at will was simply quoted, with little independent analysis, from *Pugh, supra,* 116 Cal. App. 3d 311, 328. *Pugh,* in turn, had adopted wholesale the reasoning of *Cleary v. American Airlines, Inc.* (1980) 111 Cal. App. 3d 443 [168 Cal. Rptr. 722] (*Cleary*) that " '[t]ermination of employment without legal cause [after long service] offends the *implied-in-law* covenant of *good faith and fair dealing* contained in all contracts, including employment contracts.' " (*Pugh, supra,* 116 Cal. App. 3d at p. 328, quoting *Cleary, supra,* 111 Cal. App. 3d at p. 455, italics added.) In other words, these cases suggested, because the arbitrary termination of a veteran employee is neither fair nor in good faith, such conduct violates the implied covenant contained in every employment contract, regardless of its terms.

But *Foley* itself discredited this line of reasoning. There we "reiterated that the employment relationship is fundamentally contractual" (*Foley, supra,* 47 Cal. 3d 654, 696), and we made clear that the implied covenant of [***370] good faith and fair dealing cannot supply limitations on termination rights to which the parties have not actually agreed. (*Foley, supra,* at p. 698, fn. 39; see also discussion, *post.*)

Insofar as *Foley* applied the long service factor to its own facts, it did so consistently with the principles of implied-in-fact contracts. In *Foley,* the employer claimed

the employee's six years and nine months of service was *too short* a period to evidence an implied agreement not to discharge at will. We answered that "[l]ength of employment [was] a relevant consideration" [*343] and the plaintiff's length of service was "sufficient time for *conduct to occur* on which a trier of fact could find the existence of an implied contract." (*Foley, supra*, 47 Cal. 3d 654, 681, italics added.) [13] Prominent among the conduct alleged by the *Foley* plaintiff was "repeated *oral assurances of job security*." ( *Foley, supra*, 47 Cal. 3d at p. 681, italics added.)

> 13    As support for this statement, *Foley* cited, with a "cf." signal, *Gray v. Superior Court* (1986) 181 Cal. App. 3d 813, 821 [226 Cal. Rptr. 570] (*Gray*) and *Khanna v. Microdata Corp.* (1985) 170 Cal. App. 3d 250, 262 [215 Cal. Rptr. 860] (*Khanna*). Significantly, both *Gray* and *Khanna*, insofar as they found that length of service alone could strengthen a cause of action for wrongful termination, had relied on the *Cleary* theory, elsewhere rejected in *Foley*, that the arbitrary dismissal of a longtime employee is a breach of the covenant of good faith and fair dealing regardless of the terms of the employment agreement. (*Gray, supra*, 181 Cal. App. 3d 813, 820-821; *Khanna, supra*, 170 Cal. App. 3d 250, 262-263.)

We therefore decline to interpret *Foley* as holding that long, successful service, standing alone, can demonstrate an implied-in-fact contract right not to be terminated at will. **(4c)** In the case before us, there is no indication that employee longevity is a significant factor in determining the existence or content of an implied contract limiting the employer's termination rights. Guz claims no particular " 'actions or communications by [Bechtel]' " (*Foley, supra*, 47 Cal. 3d 654, 680), and no industry customs, practices, or policies (*ibid.*), which suggest that by virtue of his successful longevity in Bechtel's employ, he had earned a contractual right against future termination at will.

If anything, Bechtel had communicated otherwise. The company's Policy 1101 stated that Bechtel employees had no contracts guaranteeing their continuous employment [**1106] and could be terminated at Bechtel's option. Nothing in this language suggested any exception for senior workers, or for those who had received regular raises and promotions. While occasional references to seniority appear in other sections of Bechtel's personnel documents, the narrow context of these references undermines an inference that Bechtel additionally intended, or employees had reason to expect, special immunities

from termination based on their extended or successful service. [14]

> 14    Policy 1101 itself distinguished between the rights of senior and junior employees in one regard only. Thus, in the event of a reduction in force, employees with 10 or more years of continuous service, such as Guz, were entitled to at least *four* weeks' advance notice of layoff, while those with less than 10 years of service were entitled to as little as *two* weeks' layoff notice. Salary in lieu of the requisite advance notice was available in certain circumstances. The RIF Guidelines, which described the specific procedures to be employed during a work force reduction, echoed this disparity in notice rights. They further encouraged managers to give "as much informal notice as possible, particularly for long-term employees." Finally, the RIF Guidelines provided that while seniority and experience "often represent a major company strength," "[s]eniority, per se, is *not* a criteri[on] used in selecting candidates for layoff or retention over other employees." (Italics added.) All these provisions strongly reinforce the inference that seniority provided *no* special immunity against layoff.

Accordingly, the undoubted length and merit of Guz's Bechtel career does not [***371] bolster his claim that his at-will status had been altered by an implied [*344] contract. We must look elsewhere for evidence raising a triable issue that Bechtel entered and breached an implied contract limiting its right to terminate Guz's employment.

Guz asserts that Bechtel's personnel documents, read as a whole, strongly support his claim of an implied agreement for employment security. As Guz suggests, an employer's written personnel policies may be an important source of implied-contract evidence. **(7a)** We have made clear that "the trier of fact can infer an agreement to limit the grounds for termination based on the employee's reasonable reliance on the company's personnel manual or policies." (*Foley, supra*, 47 Cal. 3d 654, 681-682.)

"The principle that implied employment contract terms may arise from the employer's official . . . policies and practices is one that long predates *Foley* . . . . 'Of late years the attitude of the courts (as well as of employers in general) is to consider regulations of this type which offer additional advantages to employees as being in effect offers of a unilateral contract which offer is accepted if the employee continues in the employment, and not as being mere offers of gifts.' ([*Chinn v. China Nat. Aviation Corp.* (1955) 98,] 99-100 [291 P.2d 91]; see also *Newberger v. Rifkind* (1972) 28 Cal. App. 3d 1070,

213

1076 [104 Cal. Rptr. 663, 57 A.L.R.3d 1232] [implied unilateral contract for stock option agreement]; *Hunter v. Sparling* (1948) 87 Cal. App. 2d 711, 721-722 [197 P.2d 807] [enforceable promise to pay pension benefits inferred from personnel policies].) In *Hepp v. Lockheed-California Co.* (1978) 86 Cal. App. 3d 714 [150 Cal. Rptr. 408], this reasoning was extended to policies regarding nonmonetary employment benefits. **(4d)** There the court held that it was a question of fact whether an employer's [written] policy of preferential hiring for its laid-off employees was to be considered an implied contractual promise on which its employees could reasonably rely. ( *Id.* at p. 719.)" (*Scott, supra,* 11 Cal. 4th 454, 464.)

**(7b)** When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely. (See, e.g., *Scott, supra,* 11 Cal. 4th 454, 465.) Both parties derive benefits from such an arrangement. From the employees' perspective, formal policies promote fairness and consistency, guarding against the arbitrary, capricious, and incongruous treatment of similar cases. By the same token, such policies may also help the employer by enhancing worker morale, loyalty, and productivity, providing competitive advantage [*345] in the labor market, and [**1107] minimizing employee litigation. (See *id.,* at pp. 469-470; see also *Foley, supra,* 47 Cal. 3d 654, 681.)

For these reasons, logic suggests that the employer may intend, and employees may understand, such generally promulgated policies as a systematic approach to personnel relations, providing a clear and uniform alternative to haphazard practices, understandings, and arrangements within the company. Therefore, where the employer has chosen to maintain such written policies, the terms they describe must be a central focus of the contractual analysis.

**(4e)** Finally, Guz asserts there is evidence that, industry custom and written company personnel policies aside, Bechtel had an *unwritten* "polic[y] or practice[]" (*Foley, supra,* 47 Cal. 3d 654, 680) to release its employees only for cause. As the sole evidence of this policy, Guz points to the deposition testimony of Johnstone, BNI's president, who stated his understanding that Bechtel terminated workers only with "good reason" or for "lack of [available] [***372] work." But there is no evidence that Bechtel employees were aware of such an unwritten policy, and it flies in the face of Bechtel's general disclaimer. This brief and vague statement, by a single Bechtel official, that Bechtel sought to avoid arbitrary firings is insufficient as a matter of law to permit a

finding that the company, by an unwritten practice or policy on which employees reasonably relied, had contracted away its right to discharge Guz at will.

In sum, if there is any significant evidence that Guz had an implied contract against termination at will, that evidence flows exclusively from Bechtel's *written* personnel documents. It follows that there is no triable issue of an implied contract on terms *broader than the specific provisions of those documents.* In reviewing the Court of Appeal's determination that Bechtel may have breached contractual obligations to Guz by eliminating his work unit, we must therefore focus on the pertinent written provisions.

As noted above, Bechtel's written personnel provisions covering termination from employment fell into two categories. The parties do not dispute that certain of these provisions, expressly denominated "Policies" (including Policies 1101 and 302), were disseminated to employees and were intended by Bechtel to inform workers of rules applicable to their employment. There seems little doubt, and we conclude, a triable issue exists that the specific provisions of these Policies did become an implicit part of the employment contracts of the Bechtel employees they covered, including Guz.

Guz also points to another Bechtel document, the RIF Guidelines, that addressed procedures for implementing reductions in the work force. Evidence suggesting the contractual status of this document is somewhat closer. [*346] On the one hand, the "Guidelines" label and evidence indicating this document was distributed primarily to supervisors for their use, weigh against an inference that Bechtel intended a widely disseminated policy on which employees might directly rely. (See, e.g., *Knights v. Hewlett Packard* (1991) 230 Cal. App. 3d 775, 780 [281 Cal. Rptr. 295].) Moreover, there was some evidence that even some Bechtel managers were unaware of the force ranking system set forth in Policy 302 and the RIF Guidelines.

On the other hand, the formality, tone, length, and detail of the RIF Guidelines suggest they were not intended as merely precatory. The RIF Guidelines comprised a minimum of six single-spaced pages, and were distributed under a cover letter suggesting that they represented "corporate policy." In some instances, the RIF Guidelines defined or supplemented terms and provisions directly set forth in Policies 302 and 1101, such as the holding status described in Policy 1101 and the formal personnel ranking system described in Policy 302. There was also some evidence that Bechtel employees, including Guz, were aware of RIF Guideline procedures such as force ranking, had observed that the company followed these procedures in the past, and believed them to be Bechtel's policy. Goldstein, Guz's supervisor at

BNI-MI, declared that as a supervisor, he received and was "instructed to follow" the RIF Guidelines. On balance, we are persuaded a triable issue exists that the RIF Guidelines, like the formally denominated [**1108] Policies, formed part of an implied contract between Bechtel and its employees.

As Bechtel stresses, Policy 1101 itself purported to disclaim any employment security rights. However, Bechtel had inserted other language, not only in Policy 1101 itself, but in other written personnel documents, which described detailed rules and procedures for the termination of employees under particular circumstances. Moreover, the specific language of Bechtel's disclaimer, stating that employees had no contracts "*guaranteeing . . . continuous service*" (italics added) and were terminable at Bechtel's "option," did not foreclose an understanding between Bechtel and all its workers that Bechtel would make its [***373] termination decisions within the limits of its written personnel rules. Given these ambiguities, a fact finder could rationally determine that despite its general disclaimer, Bechtel had bound itself to the specific provisions of these documents.

In holding that Bechtel may have *breached* the terms of an implied contract with Guz by *eliminating his work unit*, the Court of Appeal relied on two premises. Focusing on one reason Guz was given for this decision--a "downturn in . . . workload"--the Court of Appeal concluded that even if this reason were taken at face value, the evidence permitted a determination [*347] that it was arbitrary and unreasonable, and thus without good cause, because it lacked support in the facts. Second, the Court of Appeal found triable evidence that this stated reason was pretextual, in that it masked Bechtel's true purpose to dismiss BNI-MI's workers on the basis of the unit's poor performance, but without affording each member the benefit of the progressive discipline rules set forth in the company's personnel documents.

On the facts before us, we conclude that both these premises were in error. Bechtel's written personnel documents--which, as we have seen, are the sole source of any contractual limits on Bechtel's rights to terminate Guz--imposed no restrictions upon the company's prerogatives to eliminate jobs or work units, for any or no reason, even if this would lead to the release of existing employees such as Guz.

Policy 1101 itself did address a category of termination labeled "Layoff." However, this section simply *defined* that term as a "Bechtel-initiated termination[] of employees caused by a reduction in workload, *reorganizations, changes in job requirements*, or other circumstances such as failure to meet [a] client's site access requirements." (Italics added.) Policy 1101 further provided that persons scheduled for layoff were entitled to

advance notice to facilitate reassignment efforts and job search assistance, and that "[a] surplus employee[] [might] be placed on 'holding status' if there [was] a possible Bechtel reassignment within the following 3-month period." By proceeding in this fashion, Policy 1101 confirmed that Bechtel was free to "reorganiz[e]" itself, or to "change[] . . . job requirements," and to "initiate[]" employee "terminations . . . caused by" this process, so long as Bechtel provided the requisite advance notice.

The RIF Guidelines set forth more detailed procedures for selecting *individual* layoff candidates, and for helping such persons obtain jobs elsewhere within the company. But the RIF Guidelines, like the Policies, neither stated nor implied any limits on Bechtel's freedom to *implement the reorganization itself*.

Guz, like the Court of Appeal, focuses on a separate section of Policy 1101, titled "Unsatisfactory Performance." This section, the so-called progressive discipline provision, stated that "[e]mployees who *fail to perform their jobs in a satisfactory manner* may be terminated, *provided* the employees have been advised of the specific shortcomings and given an opportunity to improve their performance." (Italics added.) Like the Court of Appeal, Guz cites BNI president Johnstone's disclosure that he was unhappy with BNI-MI's work product as evidence that the elimination of BNI-MI was a pretext for firing its individual members without resort to the progressive discipline policy.

[*348] However, as Bechtel suggests, Policy 1101 cannot reasonably be construed to conflate the separate Unsatisfactory Performance and Layoff provisions in this manner. Whatever rights Policy 1101 gave an employee threatened with replacement on account of his or [**1109] her *individual* poor performance, we see nothing in Bechtel's personnel documents which, despite Bechtel's general disclaimer, limited Bechtel's prerogative to *eliminate* an *entire work unit*, and thus its individual jobs, even if the decision was influenced by a belief that the unit's work would be better [***374] performed elsewhere within the company. [15]

> 15   Because the record negates any inference of an implied contract restricting Bechtel's right to implement work force reductions for any reason, we need not, and do not, decide what would satisfy a company's implied-in-fact contractual obligation to demonstrate good cause for such a decision.

Accordingly, we conclude the Court of Appeal erred in finding, on the grounds it stated, that Guz's implied contract claim was triable. Insofar as the Court of Appeal used these incorrect grounds to overturn the trial court's contrary determination, and thus to reinstate Guz's con-

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

tractual cause of action, the Court of Appeal's decision must be reversed.

The Court of Appeal did not address Guz's second theory, i.e., that Bechtel also breached its implied contract by failing, during and after the reorganization, to provide him personally with the fair layoff protections, including force ranking and reassignment help, which are set forth in its Policies and RIF Guidelines. This theory raises difficult questions, including what the proper remedy, if any, should be if Guz ultimately shows that Bechtel breached a contractual obligation to follow certain procedural policies in the termination process. However, we commonly decline to decide issues not addressed by the Court of Appeal. (See, e.g., *Hughes v. Board of Architectural Examiners* (1998) 17 Cal. 4th 763, 795 [72 Cal. Rptr. 2d 624, 952 P.2d 641].) We will follow that practice here. On remand, the Court of Appeal should confront this issue and should determine whether Guz has raised a triable issue on this theory.

III. *Implied covenant claim.*

**(8)** Bechtel next urges that the trial court properly dismissed Guz's separate claim for breach of the implied covenant of good faith and fair dealing because, on the facts and arguments presented, this theory of recovery is either inapplicable or superfluous. We agree. [16]

> 16  As noted above, the trial court granted summary judgment against all causes of action, including Guz's cause of action alleging breach of the implied covenant of good faith. The Court of Appeal *reinstated* the implied covenant claim for trial on the sole ground that Bechtel had waived any objection by making arguments on appeal that were different from those it had raised in the trial court. Guz asserts that we should leave the Court of Appeal's judgment undisturbed, still without addressing Bechtel's objections, because the arguments Bechtel now makes are not the same as those it raised in the Court of Appeal. (See Cal. Rules of Court, rule 29(b)(1).) Under the present unusual circumstances, we deem it appropriate to address Bechtel's implied covenant arguments.
>
> In the trial court, Bechtel urged that (1) the implied covenant imposes no independent limits on an employer's termination rights, and (2) in any event, there is no evidence Bechtel acted in bad faith. In the Court of Appeal, appellant Guz asserted that Bechtel breached the implied covenant by violating its personnel policies even if Guz was an at-will employee. Bechtel responded only that it did not act in bad faith. The Court of Appeal, mistakenly asserting that Bechtel had not

raised the bad faith argument below, concluded that Bechtel's "change of theory" on appeal waived its challenge to the implied covenant claim. The Court of Appeal reinstated all causes of action, including that alleging a breach of the implied covenant. In its rehearing petition, Bechtel did not call the Court of Appeal's waiver error to its attention. (See Cal. Rules of Court, rule 29(b)(2).)

We did not limit the issues on review. Bechtel's brief on the merits in this court contends that the trial court properly dismissed the implied covenant cause of action. Before us, Bechtel makes *both* of the arguments it made in the trial court, including the "no independent limits" argument it *did not* raise in the Court of Appeal.

We might properly avoid the implied covenant issue on this muddled record. However, there appear several reasons not to do so. First, the "independent limits" issue *was* before the Court of Appeal by virtue of appellant Guz's brief, and the Court of Appeal's waiver analysis is highly suspect. Second, even though Bechtel did not fully litigate the implied covenant issue in the Court of Appeal, the matter is now fully briefed, squarely presented, and of substantial significance. Finally, and significantly, there seems little merit in allowing the *reinstatement* of a spurious cause of action--the result imposed by the Court of Appeal--on grounds that the defendant has waived, in the appellate courts, an issue on which it properly succeeded in the trial court. We therefore address the implied covenant issue on its merits.

[***375] The sole asserted basis for Guz's implied covenant claim is that Bechtel violated its [**1110] established personnel policies when it terminated him without a [*349] prior opportunity to improve his "unsatisfactory" performance, used no force ranking or other objective criteria when selecting him for layoff, and omitted to consider him for other positions for which he was qualified. Guz urges that *even if his contract was for employment at will,* the implied covenant of good faith and fair dealing precluded Bechtel from "unfairly" denying him the contract's benefits by failing to follow its own termination policies.

Thus, Guz argues, in effect, that the implied covenant can impose substantive terms and conditions beyond those to which the contract parties actually agreed. However, as indicated above, such a theory directly contradicts our conclusions in *Foley, supra,* 47 Cal. 3d 654. The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one con-

tracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.* (E.g., *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal. 4th 1, 36 [44 Cal. Rptr. 2d 370, 900 P.2d 619].) The covenant thus cannot " 'be endowed with an existence independent of its contractual underpinnings.' " (*Ibid.,* quoting *Love v. Fire Ins. Exchange* (1990) 221 Cal. App. 3d 1136, 1153 [271 Cal. Rptr. 246].) It cannot [*350] impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

Labor Code section 2922 establishes the presumption that an employer may terminate its employees at will, for any or no reason. A fortiori, the employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment. Because the employment relationship is "fundamentally contractual" (*Foley, supra,* 47 Cal. 3d 654, 696), limitations on these employer prerogatives are a matter of the parties' specific agreement, express or implied in fact. The mere existence of an employment relationship affords no expectation, protectible by law, that employment will continue, or will end only on certain conditions, unless the parties have actually adopted such terms. Thus if the employer's termination decisions, however arbitrary, do not breach such a substantive contract provision, they are not precluded by the covenant.

This logic led us to emphasize in *Foley* that "breach of the implied covenant cannot logically be based on a claim that [the] discharge [of an at-will employee] was made without good cause." (*Foley, supra,* 47 Cal. 3d 654, 698, fn. 39.) As we noted, "[b]ecause the implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty. [Citation.]" (*Ibid.*)

The same reasoning applies to any case where an employee argues that even if his employment was at will, his arbitrary dismissal frustrated his contract benefits and thus violated the implied covenant of good faith and fair dealing. Precisely because employment at will *allows* the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so. In such a case, "the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." (*Hejmadi v. AMFAC, Inc.* (1988) 202 Cal. App. 3d 525, 547 [249 Cal. Rptr. 5].)

[***376] Guz cites several decisions suggesting that the implied covenant precludes an employer from terminating even an at-will employee unfairly, such as by refusing to follow its own established policies and practices. ( *Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal. App. 3d 241, 247 [208 Cal. Rptr. 524] (*Rulon-Miller*) [employer's duty of fair dealing requires that "like cases be treated alike"; thus, employer's termination rules and regulations, if any, must be followed]; see *Gray, supra,* 181 Cal. App. 3d 813, [*351] 820-821 [long service plus violation of employer policies may establish [**1111] breach of covenant of "fair treatment"]; *Khanna, supra,* 170 Cal. App. 3d 250, 262 [implied covenant may be violated by termination of at-will employee where employer engaged in bad faith actions, extraneous to the contract, to frustrate benefits of employment]; *Pugh , supra,* 116 Cal. App. 3d 311, 327-329 [termination after long service, in violation of employer policies, may breach implied covenant to refrain from arbitrary treatment]; *Cleary, supra,* 111 Cal. App. 3d 443, 455-456 [same]; see also *Kern v. Levelor Lorentzen, Inc.* (9th Cir. 1990) 899 F.2d 772, 777 [covenant requires "cooperation in carrying out the contract and honesty in creating or settling disputes"; breach of covenant may thus be shown where employee establishes lengthy satisfactory service and violation of employer's termination policies].) But insofar as these authorities suggest that the implied covenant may impose limits on an employer's termination rights beyond those either expressed or implied in fact in the employment contract itself, they contravene the persuasive reasoning of *Foley,* and are therefore disapproved.

Similarly at odds with *Foley* are suggestions that independent recovery for breach of the implied covenant may be available if the employer terminated the employee in "bad faith" or "without probable cause," i.e., without determining "honestly and in good faith that good cause for discharge existed." (*Walker, supra,* 4 Cal. App. 4th 985, 997; see also, e.g., *Wilkerson, supra,* 212 Cal. App. 3d 1217, 1231; *Burton v. Security Pacific Nat. Bank* (1988) 197 Cal. App. 3d 972, 979 [243 Cal. Rptr. 277]; *Rulon-Miller, supra,* 162 Cal. App. 3d 241, 253.) Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant. (But see fn. 18, *post.*)

A number of Court of Appeal decisions since *Foley* have recognized that the implied covenant of good faith and fair dealing imposes no independent limits on an employer's prerogative to dismiss employees. (E.g., *Camp, supra,* 35 Cal. App. 4th 620, 631 [implied covenant did not preclude unfair termination where there was no express or implied-in-fact contract limiting employer's termination rights]; *Flait v. North American Watch Corp.* (1992) 3 Cal. App. 4th 467, 480-481 [4 Cal. Rptr. 2d 522] [employment contract contained express

at-will term; because employee thus could not show her termination broke any "contractual covenant or promise," implied covenant claim must fail]; *Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal. App. 3d 799, 806 [270 Cal. Rptr. 585] [where contract contained express at-will clause, implied covenant claim must fail because employee could not show her termination without good cause frustrated "the [parties'] intentions or [*352] reasonable expectations . . . within the contract"].) We affirm that this is the law. [17]

> [17]  We are not persuaded otherwise by a brief dictum in *Scott, supra,* 11 Cal. 4th 454. There, the jury found the employer had breached an implied-in-fact contract not to demote without good cause; the issue before us in *Scott* was whether such a contract was enforceable. We answered that question in the affirmative, and we found ample evidence to support the jury's breach-of-contract verdict. In a footnote, we observed that the jury had also reached a plaintiff's verdict on the separate cause of action for breach of the implied covenant of good faith and fair dealing, but we declined to address that claim. We remarked: "Since breach of the implied-in-law covenant of good faith claim is basically a contract claim (*Foley, supra,* 47 Cal. 3d [654,] 700), the former claim only becomes an issue *when there is insufficient evidence to find an implied-in-fact contract not to terminate or demote.* In this case, we are not called on to decide what independent significance a good faith covenant claim may have, since the jury found that there was an implied-in-fact contract not to demote." (*Scott, supra,* 11 Cal. 4th at p. 462, fn. 2, italics added.) Thus, *Scott* expressly declined to resolve what "independent significance" an implied covenant claim may have. Moreover, to the extent *Scott* hinted that the implied covenant may have independent significance in cases where there is insufficient evidence of an implied-in-fact contract, the suggestion contravenes the persuasive reasoning of *Foley.*

Of course, as we have indicated above, the employer's personnel policies and practices [***377] may become *implied-in-fact terms* of the contract between employer and employee. If that has occurred, the employer's failure to [**1112] follow such policies when terminating an employee is a breach of the contract itself.

A breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing. But insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a viola-

tion of the covenant is superfluous. This is because, as we explained at length in *Foley,* the remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is *solely contractual.* In the employment context, an implied covenant theory affords no separate *measure of recovery,* such as tort damages. (*Foley, supra,* 47 Cal. 3d 654, 682-700.) Allegations that the breach was wrongful, in bad faith, arbitrary, and unfair are unavailing; there is no tort of "bad faith breach" of an employment contract.

We adhere to these principles here. To the extent Guz's implied covenant cause of action seeks to impose limits on Bechtel's termination rights *beyond* those to which the parties actually agreed, the claim is invalid. To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous. Guz's remedy, if any, for Bechtel's alleged violation of its personnel policies depends on proof that they were contract [*353] terms to which the parties actually agreed. The trial court thus properly dismissed the implied covenant cause of action. [18]

> [18]  We do not suggest the covenant of good faith and fair dealing has no function whatever in the interpretation and enforcement of employment contracts. As indicated above, the covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits. Thus, for example, the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned. We confront no such claim here.

### IV. *Age discrimination claim.*

**(9a)** Bechtel urges that the trial court correctly granted summary adjudication against Guz's claim that he was terminated because of his age, in violation of the FEHA. [19] Bechtel contends that, in order to survive summary judgment, Guz was obliged to demonstrate a prima facie case of discrimination, but could not do so because it is undisputed that the bulk of his duties were assumed by an *older* employee. Alternatively, Bechtel insists it proffered a legitimate, nondiscriminatory reason for Guz's termination, i.e., a reduction in force resulting in the elimination of his job, which Guz failed to rebut with evidence that this justification was a pretext for age-related animus against him.

> [19]  As pertinent here, the FEHA makes it "an unlawful employment practice for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

the age of 40 on the ground of age . . . ." ( Gov. Code, § 12941, subd. (a).)

[***378] We agree with Bechtel that it was entitled to judgment as a matter of law against Guz's age discrimination claim. In support of its motion for summary judgment, Bechtel offered extensive evidence of its reasons, unrelated to age, for eliminating BNI-MI, and for the ensuing individual personnel decisions that led to Guz's final release. In substantial measure, Guz's written response to Bechtel's motion conceded the truth, if not the wisdom, of Bechtel's explanation. To survive summary judgment, Guz was thus obliged to point to evidence raising a triable issue--i.e., permitting an inference--that, notwithstanding Bechtel's showing, its ostensible reasons were a mask for prohibited age bias.

To sustain that burden, Guz first argues there are several triable bases for concluding that Bechtel's stated reasons are false. None of Guz's theories is persuasive. As sole independent support for an inference that Bechtel discriminated, Guz cites comparative-age evidence which suggests, in his view, that Bechtel's decisions favored younger over older workers. But Guz's claim of statistical age bias is weak in numerous respects. In the face of Bechtel's strong and unrebutted showing that it took its actions for nondiscriminatory reasons, the evidence of age favoritism on which Guz [*354] relies manifestly lacks sufficient probative force to allow a finding of intentional age discrimination. [**1113] In the pages that follow, we explain our reasoning in detail.

A. *General principles* (McDonnell *Douglas* test).

**(10)** Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes. (See, e.g., *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal. App. 3d 1306, 1316 [237 Cal. Rptr. 884] (*Mixon*).) In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment. ( *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248 [101 S. Ct. 1089, 67 L. Ed. 2d 207] (*Burdine*); *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S. Ct. 1817, 36 L. Ed. 2d 668] (McDonnell *Douglas*); *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal. App. 4th 1718, 1730 [35 Cal. Rptr. 2d 181] (*Martin*); *Ewing v. Gill Industries, Inc.* (1992) 3 Cal. App. 4th 601, 610-611, 614 [4 Cal. Rptr. 2d 640] (*Ewing*); *County of Alameda v. Fair Employment & Housing Com.* (1984) 153 Cal. App. 3d 499, 504 [200 Cal. Rptr. 381]; see *Gonzales v. Met-Path, Inc.* (1989) 214 Cal. App. 3d 422, 426 [262 Cal. Rptr. 654].) [20]

20  "Disparate treatment" is *intentional* discrimination against one or more persons on prohibited grounds. (E.g., *Teamsters v. United States* (1977) 431 U.S. 324, 335-336, fn. 15 [97 S. Ct. 1843, 1854-1855, 52 L. Ed. 2d 396] (*Teamsters*); *Mixon, supra,* 192 Cal. App. 3d 1306, 1317.) Prohibited discrimination may also be found on a theory of "disparate impact," i.e., that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class. (E.g., *Griggs v. Duke Power Co.* (1971) 401 U.S. 424, 431 [91 S. Ct. 849, 853-854, 28 L. Ed. 2d 158]; *City and County of San Francisco v. Fair Employment & Housing Com.* (1987) 191 Cal. App. 3d 976, 985-986 [236 Cal. Rptr. 716].) Here, the parties frame the issue as one of disparate treatment.

This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.

At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. [***379] This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled. (*Burdine, supra,* 450 U.S. 248, 253-254 [101 S. Ct. 1089, 1093-1094]; *Caldwell v.* [*355] *Paramount Unified School Dist.* (1995) 41 Cal. App. 4th 189, 202 [48 Cal. Rptr. 2d 448] (*Caldwell*).) While the plaintiff's prima facie burden is "not onerous" (*Burdine, supra,* at p. 253 [101 S. Ct. at pp. 1093-1094]), he must at least show " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . . ." [Citation].' [Citation.]" ( *Ibarria v. Regents of University of California* (1987) 191 Cal. App. 3d 1318, 1327-1328 [237 Cal. Rptr. 92], quoting *Furnco Construction Corp. v. Waters* (1978) 438 U.S. 567, 576 [98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957].)

The specific elements of a prima facie case may vary depending on the particular facts. (*Burdine, supra,* 450 U.S. 248, 253, fn. 6 [101 S. Ct. 1089, 1094]; see also *Teamsters, supra,* 431 U.S. 324, 358 [97 S. Ct. 1843, 1866].) Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. (E.g., *Burdine, supra,* at p. 253 [101 S. Ct. at pp. 1093-1094]; *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 917 (*Nidds*) [FEHA claim]; *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1421.) [21]

> 21   For example, in the seminal case of *McDonnell Douglas,* the court found that one rejected for a job opening could establish a prima facie case of race discrimination by showing that (1) he or she was a member of a racial minority, (2) he or she applied and was qualified for an available job, (3) he or she was rejected, and (4) the position thereafter remained open and the employer continued to seek applications from persons with similar qualifications. (McDonnell *Douglas, supra,* 411 U.S. 792, 802 [93 S. Ct. 1817, 1824].)

[**1114] If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. ( *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 506 [113 S. Ct. 2742, 2746-2747, 125 L. Ed. 2d 407] (*Hicks*); *Burdine , supra,* 450 U.S. 248, 254 [101 S. Ct. 1089, 1094].) This presumption, though "rebuttable," is "legally mandatory." (*Burdine, supra,* at p. 254, fn. 7 [101 S. Ct. at p. 1094]; see also *Hicks, supra,* at p. 506 [113 S. Ct. at pp. 2746-2747].) Thus, in a trial, "[i]f the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." (*Burdine, supra,* at p. 254 [101 S. Ct. at p. 1094], fn. omitted; see also *Hicks, supra,* at p. 506 [113 S. Ct. at pp. 2746-2747].)

Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to "raise[] a genuine issue of fact" and to "justify a judgment for the [employer]," that its [*356] action was taken for a legitimate, nondiscriminatory reason. (*Burdine, supra,* 450 U.S. at pp. 254-255 [101 S. Ct. at p. 1094]; *Clark v. Claremont University Center* (1992) 6 Cal. App. 4th 639, 663-664 [8 Cal. Rptr. 2d 151] (*Clark*); see *Hicks, supra,* 509 U.S. at pp. 506-507, 509 [113 S. Ct. at pp. 2746-2747, 2748] ["evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason" (italics omitted)].)

If the employer sustains this burden, the presumption of discrimination disappears. (*Hicks, supra,* 509 U.S. 502, 510-511 [113 S. Ct. 2742, 2748-2749]; *Burdine, supra,* 450 U.S. 248, 255 [101 S. Ct. 1089, 1094-1095]; *Mixon, supra,* 192 Cal. App. 3d 1306, 1319.) The plaintiff must then have the [***380] opportunity to

attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. (*Hicks, supra,* at pp. 515-518 [113 S. Ct. at pp. 2751-2753]; *Burdine, supra,* at p. 256 [101 S. Ct. at p. 1095]; *Clark, supra,* 6 Cal. App. 4th 639, 664-665.) In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. (*Reeves, supra,* 530 U.S. 133, 148-149 [120 S. Ct. 2097, 2109]; *Hicks, supra,* at p. 511, 518 [113 S. Ct. at pp. 2749-2750, 2753].) The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff. ( *Reeves, supra,* 530 U.S. at pp. 142-143 [120 S. Ct. at p. 2106]; *Hicks, supra,* at p. 518 [113 S. Ct. at p. 2753]; *U. S. Postal Service Bd. of Govs. v. Aikens* (1983) 460 U.S. 711, 716 [103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403]; *Burdine, supra,* at p. 256 [101 S. Ct. at p. 1095].)

B. *Application.*

The Courts of Appeal have pondered how the *McDonnell Douglas* formula should apply, under California law, to an employer's motion for summary judgment against a claim of prohibited discrimination. Code of Civil Procedure section 437c provides that on summary judgment, the *moving party* must establish entitlement to "judgment as a matter of law." (*Id.,* subd. (c).) A moving defendant may do so by "show[ing]" that the plaintiff's action "has no merit" (*id.,* subds. (a), (o)(2)), i.e., that "one or more elements . . . cannot be established" or "there is a complete defense" (*ibid.*). Only after the defendant has met that burden must the plaintiff respond with admissible evidence raising a triable issue. (*Ibid.*)

Several California decisions have suggested that because a plaintiff opposing summary judgment need not demonstrate triable issues until the moving defendant has made an initial no-merit "show[ing]," the *McDonnell Douglas* burdens are "reversed" on a defense motion for summary judgment against a claim of discrimination in employment. ( *Sada v. Robert F. Kennedy* [*357] *Medical Center* (1997) 56 Cal. App. 4th 138, 150-151 [65 Cal. Rptr. 2d 112]; *Addy v. Bliss & Glennon* (1996) 44 Cal. App. 4th 205, 216 [51 Cal. Rptr. 2d 642]; *Martin, supra,* 29 Cal. App. 4th 1718, 1730-1731; *University of Southern California v. Superior Court* (1990) [**1115] 222 Cal. App. 3d 1028, 1036 [272 Cal. Rptr. 264] (*University of Southern California*)). Other California cases, however, have indicated that the plaintiff can survive an employer's motion for summary judgment only by presenting, at the outset, triable evidence satisfying the prima facie elements of *McDonnell Douglas* . (See, e.g., *Horn, supra,* 72 Cal. App. 4th 798, 805-807; *Hersant v. Department of Social Services* (1997) 57 Cal. App. 4th 997, 1002-1006 [67 Cal. Rptr. 2d 483] (*Hersant*); *Caldwell, supra,* 41 Cal. App. 4th 189, 203.)

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

**(9b)** Bechtel urges we adopt the latter view and impose an initial prima facie burden on a plaintiff opposing an employer's motion for summary judgment. Here, Bechtel insists, Guz could not demonstrate a prima facie case, because the transfer of Guz's specific BNI-MI duties to an older worker, Shaeffer, negated an inference of anti-age animus as a matter of law.

In response, Guz argues he should have no prima facie burden to avoid summary judgment. However, Guz asserts, if he did have such a burden, he satisfied it by pointing to evidence that, when implementing its work force reduction, Bechtel treated younger employees more favorably than older.

We need not resolve the "prima facie burden" issue, for an alternative analysis disposes of Guz's cause of action. In its summary judgment motion, Bechtel did not stand mute, relying solely on the premise that Guz failed to demonstrate a prima facie case of age discrimination. As an additional basis for its motion, Bechtel proceeded directly to the second step of the *McDonnell Douglas* formula. Bechtel set forth competent, admissible evidence [***381] (*Reeves, supra,* 530 U.S. 133, 142-143 [120 S. Ct. 2097, 2106]; *Hicks, supra,* 509 U.S. 502, 507 [113 S. Ct. 2742, 2747]; *Burdine, supra,* 450 U.S. 248, 254-255 [101 S. Ct. 1089, 1094-1095]) of its reasons, unrelated to age bias, why it eliminated Guz's work unit, BNI-MI, and thereafter chose persons other than Guz for vacant positions in the unit to which BNI-MI's functions were transferred.

Bechtel's explanation of nondiscriminatory reasons was creditable on its face. Indeed, as we explain below, Guz has largely conceded the truth, if not the wisdom, of Bechtel's proffered reasons. Guz thus had the burden to *rebut* this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred. (See discussion, *post.*) For reasons we hereafter set forth, Guz has failed to do so.

As an initial matter, Bechtel argues that the exercise of its prerogative to eliminate Guz's work unit and position constitutes, as a matter of law, a [*358] legitimate, nondiscriminatory reason for his termination. **(11)** However, downsizing alone is not necessarily a sufficient explanation, under the FEHA, for the consequent dismissal of an age-protected worker. An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may "use the occasion as a convenient opportunity to get rid of its [older] workers." (*Matthews v. Commonwealth Edison Co.* (7th Cir. 1997) 128 F.3d 1194, 1195; see also, e.g., *Cronin v. Aetna Life Ins. Co.* (2d Cir. 1995) 46 F.3d 196, 204 (*Cronin*); *Uffelman v. Lone Star Steel Co.* (5th Cir. 1989) 863 F.2d 404, 407-408.) Invocation of a

right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them. (See, e.g., *Throgmorton v. U.S. Forgecraft Corp.* (8th Cir. 1992) 965 F.2d 643, 646-647.)

On the other hand, if nondiscriminatory, Bechtel's true reasons need not necessarily have been wise or correct. (See, e.g., *Horn, supra,* 72 Cal. App. 4th 798, 807; *Hersant, supra,* 57 Cal. App. 4th 997, 1009.) While the objective soundness of an employer's proffered reasons supports their credibility (see discussion, *post*), the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally.* Thus, "legitimate" reasons (*Burdine, supra,* 450 U.S. at p. 254 [101 S. Ct. at p. 1094]) in this context are reasons that are *facially unrelated to prohibited bias,* and which, if true, [**1116] would thus preclude a finding of *discrimination.* (See, e.g., *Kariotis v. Navistar Intern. Transp. Corp.* (7th Cir. 1997) 131 F.3d 672, 676 [suggesting that proffered reasons, if "nondiscriminatory on their face" and "honestly believed" by employer, will suffice even if "foolish or trivial or baseless"]; *McCoy v. WGN Continental Broadcasting Co.* (7th Cir. 1992) 957 F.2d 368, 373 [ultimate issue is whether employer "honestly believed in the reasons it offers"]; see also *Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765 [issue is discriminatory animus, not whether employer's decision was "wrong or mistaken," or whether employer is "wise, shrewd, prudent, or competent"].) [22]

22    At least one federal case has criticized and rejected a test dependent upon the employer's mere "honest belief," holding instead that the employer's reasons must stem from its actual consideration of "particularized facts." (*Smith v. Chrysler Corp.* (6th Cir. 1998) 155 F.3d 799, 806 (*Smith*).) However, *Smith's* holding should be viewed in light of the facts of that case. There, the employer fired an employee, who had a narcoleptic condition, for failing to disclose this condition on his employment application. The employer apparently assumed on stereotypical grounds, without individualized investigation, that the condition might affect the employee's job performance. Thus, in the employee's suit for discrimination in violation of the Americans with Disabilities Act, the employer's reasons were *not* unrelated on their face to the prohibited form of bias. *Smith* is not persuasive when the employer's proffered reasons are manifestly unconnected to the form of discrimination alleged.

[***382]  **(9c)** With these principles in mind, we examine Bechtel's showing of its reasons for the decisions leading to Guz's dismissal. A substantial portion of [*359] this evidence was the deposition testimony of Bechtel officials, given under questioning by Guz's counsel.

As noted above, BNI president Johnstone explained at length why he decided to eliminate BNI-MI. Johnstone testified as follows: After assuming BNI's presidency, he grew frustrated with BNI-MI's size, work product, and budget overruns. On the other hand, he had high regard for a similar Bechtel entity, SFRO-MI, with which he had worked in the past. Because SFRO-MI, unlike BNI-MI, provided management information services to many different Bechtel entities, he believed BNI could achieve economies of scale by relying on SFRO-MI, rather than BNI's own in-house unit, for such services. After receiving a budget proposal from SFRO-MI that fell well below BNI-MI's current budget, he decided SFRO-MI could perform BNI-MI's work better and more cheaply.

James Tevis, SFRO-MI's manager, testified at length why, when reorganizing SFRO-MI to assume BNI-MI's work, he gave most of the duties Guz had performed to a current SFRO-MI staff member, John Shaeffer. Tevis also explained why he hired Robert Wraith and Christine Siu to perform work they had been doing at BNI-MI, why he promoted SFRO-MI members John Wallace and Jan Vreim to vacant positions within that unit, and why Barbara Stenho was chosen for another vacant SFRO-MI position.

Thus, Tevis recounted that during the transition, he consulted with his BNI-MI counterpart, Goldstein, about which, if any, BNI-MI employees might assist SFRO-MI in assuming BNI-MI's functions. However, Tevis, who was keenly aware of the need for cost savings, felt that his own current employees, Shaeffer and Chris Gee, could assume Guz's overhead duties, and Goldstein agreed. Tevis did contemplate two new positions at SFRO-MI (in place of the six eliminated at BNI-MI). One of these positions would involve "knowledge of the project side" of Bechtel's business. The other, which Tevis wished to fill at a relatively junior salary grade, would be computer-intensive, and would require facility in Bechtel's new ORS computer operating system. On these bases, the 50-year-old Goldstein, Guz's longtime supervisor and close friend, *recommended* Wraith and Siu, *and not Guz*, as the best choices for reassignment to SFRO-MI.

Tevis further indicated why Wallace, Vreim, and Stenho were chosen for positions that later became open at SFRO-MI while Guz was on holding status. First, it became clear, Wallace and Vreim were SFRO-MI veterans, so [*360] Tevis had direct experience with their backgrounds, skills, performance levels, and work habits. Moreover, as Tevis explained, the job to which Wallace was promoted [**1117] required substantial supervisory and computer skills *and* a project background that would allow effective communication with BNI president Johnstone. Vreim, Wallace's former subordinate, was promoted to Wallace's old position. She was selected for her ORS computer skills, project experience, and supervisory background.

Stenho had not previously worked for SFRO-MI, but, according to Tevis, hers was a special case in another way. Her principal SFRO-MI duty would be to provide management information services to a particular Bechtel entity, Bechtel Civil. Stenho was selected because she had previously worked for Bechtel Civil. That department, unhappy with the services it had been receiving from SFRO-MI, specifically requested that the incumbent SFRO-MI employee, Robert Luchini, be transferred, and that Stenho be assigned to replace him.

[***383] Finally, Tevis explained why he had not considered Guz for these positions. Tevis thought Guz "only did overhead," did not realize Guz had supervisory experience, and, in one case "did not even know . . . Guz was available." In particular, Tevis mentioned Guz's poor computer skills, as reported to him by Goldstein. [23]

> 23    Thus, Tevis explained, Goldstein "was always saying that Guz needed to get his computer training because he couldn't operate the computer." Tevis understood from Goldstein that Guz's lack of computer skills at BNI-MI had forced Goldstein to "have an extra person in."

Bechtel's showing of reasons was made by competent and admissible evidence ( Code Civ. Proc., § 437c, subd. (d)). Moreover, the reasons advanced were legally sufficient to establish that Guz's FEHA cause of action had no merit ( Code Civ. Proc., § 437c , subd (o)(2)), because they were manifestly unrelated to intentional age bias against Guz. If Bechtel's showing of proffered reasons is true, Guz's allegations of *intentional age discrimination* thus fail, and Bechtel is entitled to judgment as a matter of law. (*Id.*, subd. (c); *Martin, supra,* 29 Cal. App. 4th 1718, 1732.) Thus, even if Guz had no initial burden to demonstrate a prima facie case of discrimination--a question we do not decide--Guz *did* have a burden, in the face of Bechtel's showing of nondiscriminatory reasons, to show there was nonetheless a triable issue that decisions leading to Guz's termination were actually made on the prohibited basis of his age. ( Code Civ. Proc., § 437c, subd. (o)(2); cf. *Calvillo-Silva, supra,* 19 Cal. 4th 714, 735.)

**(12)** Moreover, an inference of intentional discrimination cannot be drawn solely from evidence, if any, that

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

the company lied about its reasons. [*361] The pertinent statutes do not prohibit lying, they prohibit discrimination. (*Hicks, supra,* 509 U.S. 502, 521 [113 S. Ct. 2742, 2754-2755].) Proof that the employer's proffered reasons are unworthy of credence may "considerably assist" a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. ( *Id.,* at p. 517 [113 S. Ct. at pp. 2752-2753].) Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. ( *Id.,* at pp. 510-520 [113 S. Ct. at pp. 2748-2754].) Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory. [24]

24 See, e.g., *Horn, supra,* 72 Cal. App. 4th 798, 806-807; *Martin, supra,* 29 Cal. App. 4th 1718, 1735; *University of Southern California, supra,* 222 Cal. App. 3d 1028, 1039; *Richter v. Hook-SupeRx, Inc.* (7th Cir. 1998) 142 F.3d 1024, 1029 (*Richter*); *Madel v. FCI Marketing, Inc.* (8th Cir. 1997) 116 F.3d 1247, 1251; *Nidds, supra,* 113 F.3d 912, 918; *E.E.O.C. v. Texas Instruments, Inc.* (5th Cir. 1996) 100 F.3d 1173, 1181; *Sheridan v. E.I. DuPont de Nemours and Co.* (3d Cir. 1996) 100 F.3d 1061, 1067; *Stults v. Conoco, Inc.* (5th Cir. 1996) 76 F.3d 651, 657; *Landon v. Northwest Airlines, Inc.* (8th Cir. 1995) 72 F.3d 620, 624; *Medina-Muno v. R.J. Reynolds Tobacco Co.* (1st Cir. 1990) 896 F.2d 5; *Steckl v. Motorola, Inc.* (9th Cir. 1983) 703 F.2d 392, 393; *Hersant, supra,* 57 Cal. App. 4th 997, 1004; *Addy v. Bliss & Glennon, supra,* 44 Cal. App. 4th 205, 215-216; but see *Aka v. Washington Hosp. Center* (D.C. Cir. 1998) 156 F.3d 1284, 1289, footnote 4 [332 App.D.C. 256]; *Hairston v. Gainesville Sun Pub. Co.* (11th Cir. 1993) 9 F.3d 913, 919-921; *Green v. Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal. App. 4th 686, 694-696 [33 Cal. Rptr. 2d 706].

[**1118] The United States Supreme Court's recent decision in *Reeves, supra,* 530 U.S. 133 [120 S. Ct. 2097] confirms this principle. *Reeves* rejected several federal court of appeals decisions holding that *even after* the plaintiff has presented *prima facie evidence* sufficient to establish an inference of prohibited discrimination in the absence of explanation, and has also presented evidence [***384] that the employer's innocent explanation is false, the employer is nonetheless *necessarily* entitled to *judgment as a matter of law* unless the plaintiff thereafter presents *further* evidence that the true reason

was discriminatory. ( *Id.,* at pp. 146-149 [120 S. Ct. at pp. 2108-2109].) Contrary to these decisions, *Reeves* confirmed that, in a particular case, a plaintiff's showing of pretext, *combined* with sufficient prima facie evidence of an act motivated by discrimination, *may* permit a finding of discriminatory intent, and may thus preclude judgment as a matter of law for the employer. ( *Id.,* at pp. 148-149 [120 S. Ct. at p. 2109].)

But *Reeves* made clear that even where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact [*362] finder is not *necessarily* entitled to find in the plaintiff's favor. Thus, the court admonished, its holding should not be interpreted to mean "that such a showing will *always* be adequate to sustain a . . . finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance,* an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [Citations.] . . . . [¶] Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . ." (*Reeves, supra,* 530 U.S. 133, 148-149 [120 S. Ct. 2097, 2109], second italics added.) [25]

25 The concurring and dissenting opinion, in its treatment of this passage (see conc. & dis. opn. of Kennard, J., *post,* at pp. 384-385), minimizes the express qualifying phrase "[f]or instance" and overlooks the immediately following discussion, which specifies that the propriety of judgment as a matter of law depends on "a number of factors," including, among other things, "the strength of the plaintiff's prima facie case." ( *Reeves, supra,* 530 U.S. 133, 148-149 [120 S. Ct. 2097, 2109].) As the concurring and dissenting opinion must concede, *Reeves* makes clear that a rational inference of discrimination does not necessarily arise *even where* "the plaintiff has established a [technically sufficient] prima facie case *and* [has] set forth sufficient evidence to reject the defendant's explanation." (*Ibid.,* italics added.) Here, as will appear, Guz's circumstantial evidence of intentional discrimination, even if fully credited and

technically sufficient to establish a prima facie case, raises, at most, a weak inference of prohibited bias. Moreover, the concurring and dissenting opinion does not dispute that Guz's responses to discovery *largely conceded the truth* of Bechtel's nondiscriminatory explanations for its actions. (See discussion, *post.*) Under such circumstances, *Reeves* supports our conclusion that the evidence, viewed as a whole, does not give rise to a rational inference of discrimination.

**(9d)** Though *Reeves* discusses the federal age discrimination scheme, we find its reasoning sound for purposes of our similar law. We therefore conclude that Guz's age discrimination claim under the FEHA cannot survive Bechtel's motion for summary judgment unless the evidence in the summary judgment record places Bechtel's creditable and sufficient showing of innocent motive in material dispute by raising a triable issue, i.e., a permissible inference, that, in fact, Bechtel acted for discriminatory purposes. (See, e.g., *Martin, supra,* 29 Cal. App. 4th 1718, 1735.) As *Reeves* indicated, summary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of [**1119] discriminatory motive, even if it may [***385] technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred. Such is the case here.

[*363] Guz argues at length that the evidence raises a triable issue of the falsity of Bechtel's proffered reasons. The authorities suggest that, in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions. (See, e.g., *Ewing, supra,* 3 Cal. App. 4th 601, 615; *Tinker v. Sears, Roebuck & Co.* (6th Cir. 1997) 127 F.3d 519, 523; *Testerman v. EDS Technical Products Corp.* (7th Cir. 1996) 98 F.3d 297, 303; *Bechtel Construction Co. v. Secretary of Labor* (11th Cir. 1995) 50 F.3d 926, 935; but see, e.g., *Horn, supra,* 72 Cal. App. 4th 798, 807 [plaintiff cannot simply show employer's decision was mistaken or unwise]; *Hersant, supra,* 57 Cal. App. 4th 997, 1005 [same].)

Here, however, the record contains no direct evidence, and little if any circumstantial support, for such a finding. Indeed, Guz has made substantial *concessions to the truth* of Bechtel's proffered nondiscriminatory reasons for its decision to eliminate BNI-MI and for choosing others to fill positions at SFRO-MI. In its separate statement of undisputed facts (Undisputed Fact Statement) accompanying the motion for summary judgment (see Code Civ. Proc., § 437c, subd. (b)), Bechtel asserted, on the basis of BNI president Johnstone's deposition testimony, that BNI-MI was eliminated because

Johnstone was concerned about BNI-MI's performance, had prior satisfactory experience with SFRO-MI, and believed BNI would save money by eliminating its own management information unit and obtaining such services from SFRO-MI, which already served many Bechtel entities. In his required written response to the Undisputed Fact Statement, Guz admitted Johnstone considered BNI-MI's group performance. Guz otherwise "[d]isputed" Bechtel's explanation only to stress that Johnstone considered such specific cost issues as BNI-MI's overhead budget and the salaries of its employees. [26]

> 26    Aside from his responses to the Undisputed Fact Statement, Guz has separately acknowledged the truth of Bechtel's claim that unit performance was a major factor in Johnstone's decision to eliminate BNI-MI. Guz has cited Johnstone's testimony to that effect in aid of his claim that Bechtel breached its implied contractual obligations by failing to apply its written progressive discipline rules before terminating the BNI-MI group for performance reasons. (See discussion, *ante.*)

Similarly, the Undisputed Fact Statement, relying on Tevis's deposition testimony, explained Bechtel's decisions to fill SFRO-MI positions with Wraith, Siu, Wallace, Vreim, and Stenho. The Undisputed Fact Statement asserted that Wraith was selected to do "project and proposals work based on his familiarity with project work and PFSR experience." Guz's response claimed this was "[d]isputed," but his required citation of supporting evidence ( Code Civ. Proc., § 437c, subd. (b))--a passage from Tevis's deposition--did not materially contradict Bechtel's claim. The Undisputed Fact [*364] Statement said Siu was selected "to perform [ORS] input based on her familiarity with the ORS and her grade level." Guz responded that this was "[u]ndisputed," except that by considering Siu's grade level, Tevis also necessarily considered her salary. Finally, the Undisputed Fact Statement set forth the particular qualifications that led Tevis to choose Wallace, Vreim, and Stenho for the positions they filled. Again, in his response, Guz raised no material dispute to the reasons given by Bechtel. Guz also admitted he had recommended SFRO-MI member Shaeffer as the logical choice to assume Guz's duties if Guz were laid off. Thus, much of Bechtel's explanation for the reasons, unrelated to Guz's age, that [***386] led to Guz's termination stands uncontradicted.

Guz nonetheless stresses several bases for finding that Bechtel's reasons were pretextual. With respect to the decision to eliminate BNI-MI, Guz emphasizes that over time Bechtel has phrased in different ways its reasons for taking this action. Thus, Guz notes, Goldstein

told him the decision to transfer BNI-MI's functions to SFRO-MI was to reduce costs, but in Guz's official lay-off notice, Goldstein's superior, Dewey, [**1120] blamed BNI-MI's demise on a "downturn in our work-load." Such "shifting," and "inconsistent" statements, Guz urges, are evidence of dissembling. Guz further points to evidence that Bechtel's purported reasons for eliminating BNI-MI were unsound, and therefore likely untrue, in that Bechtel's business was strong, and that the elimination of BNI-MI would not save costs.

However, as noted above, Guz has essentially con-ceded that the reasons cited by Bechtel in support of its motion for summary judgment--cost efficiency and con-cerns about BNI-MI's performance as a unit--*were the true reasons* why Bechtel decided to eliminate BNI-MI. Hence, even if a Bechtel official once used the phrase "downturn in . . . workload," and even if the cost effi-ciencies of eliminating BNI-MI are debatable on their merits, such facts are of little or no relevance in deter-mining that Bechtel's cited reasons were a mask for pro-hibited age discrimination. [27]

> [27]    The concurring and dissenting opinion sug-gests Bechtel's "cost savings" excuse is suspect because Bechtel created *five new* SFRO-MI posi-tions to replace only six eliminated BNI-MI posi-tions. (Conc. & dis. opn. of Kennard, J., *post*, at p. 379.) However, as indicated above, SFRO-MI gained only *three* new positions attributable to work formerly done by the six members of BNI-MI. Former BNI-MI members Wraith and Siu were added to SFRO-MI's staff to do BNI-related work, and SFRO-MI member Wallace was ap-pointed to a new position supervising SFRO-MI's new relationship with BNI. But Jan Vreim, Wal-lace's former SFRO-MI subordinate, was simply promoted to Wallace's old position, and Barbara Stenho was appointed to an existing SFRO-MI job, formerly held by Robert Luchini, that had nothing to do with BNI. (See discussion, *ante*.)

Guz also suggests a triable issue that Bechtel has given pretextual reasons why he was selected for layoff. Here Guz cites Bechtel's "unexplained" [*365] failure to follow its RIF Guidelines, in that Bechtel laid him off without conducting a formal force ranking, did not help him find a new Bechtel job while he was on holding status, and did not fairly consider him for the vacant SFRO-MI positions. On the latter points, Guz stresses evidence from Tevis's deposition that Tevis never saw Guz's resume and was unaware of Guz's full qualifica-tions and availability. (See *ante*, at p. 331.) Moreover, Guz points out, Tevis admitted, after seeing Guz's re-sume for the first time, that he might have considered Guz qualified for certain of the SFRO-MI jobs. (*Ibid.*)

Guz suggests that in any event, Tevis's excuses for fail-ing to consider him are inherently implausible.

However, neither any failure by Bechtel to conduct the reorganization with full formality, nor Tevis's lack of complete information about Guz's background and avail-ability, strongly suggests that the reasons Bechtel gave for releasing Guz are false. As we have already seen, in his response to Bechtel's summary judgment motion, Guz made major concessions to both the plausibility and the truthfulness of Bechtel's proffered reasons. Essen-tially uncontradicted are Bechtel's showings (1) that Guz himself proposed Shaeffer as the logical choice to as-sume Guz's overhead duties, (2) that Tevis had non-age-related business reasons for hiring Wraith, Siu, Wallace, Vreim, and Stenho, and (3) that those persons were well qualified for their positions.

Moreover, Guz has raised no serious dispute to Te-vis's testimony that Goldstein recommended Wraith and Siu over Guz and advised Tevis that in the area of com-puter skills, an important qualification for [***387] most of the SFRO-MI jobs, Guz was relatively deficient. Guz has submitted a declaration by Goldstein, who states therein that Guz was qualified for the vacant SFRO-MI positions. However, Goldstein does not contradict Te-vis's claims about their discussions concerning Guz. In-deed, in his most recent written evaluation of Guz, issued in March 1992, Goldstein had stated that for long-term success in the company, Guz needed to become more "computer literate."

Nor is there any evidence or inference of Bechtel's bad faith effort to prevent or impede Guz's fair consid-eration for suitable Bechtel positions. For all that ap-pears, any such lapse arose, as much as anything, from Guz's own inaction. As noted above (*ante*, at p. 331), Guz asserts no personal efforts to find a Bechtel reas-signment. In particular, it appears Guz did not [**1121] proffer his resume to Tevis, though he knew Tevis's unit was assuming BNI-MI's functions, and he could easily have taken that step.

Thus, despite Bechtel's policy to provide placement assistance to laid-off employees, Tevis's testimony that he lacked full information about Guz's [*366] skills or availability and did not fully consider Guz is neither im-plausible nor ominous, but understandable. For Bechtel's part, it is undisputed that the company renewed Guz's initial three-month holding status for a second three months, in order to afford Guz additional time, while receiving company benefits, to find a suitable reassign-ment.

In sum, we see no grounds in this record for an in-ference that Bechtel has materially dissembled in ex-plaining the reasons, unrelated to chronological age, for the personnel decisions leading to Guz's dismissal. Under