24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

such circumstances, any independent circumstantial evidence of discrimination is insufficient to raise a rational inference that Bechtel acted on grounds of prohibited bias.

At the outset, Bechtel insists that an inference of intentional age discrimination is negated solely by the fact that Shaeffer, an *older* employee, assumed most of the duties Guz was performing before he was laid off. Guz responds by citing facts he claims amount to a prima facie showing that age bias infected the various personnel decisions leading to his release. Stripped to its essentials, Guz's case relies on the facts that despite his own qualifications and satisfactory performance, (1) he, then age 49, and three of the other five BNI-MI employees (respectively ages 50, 45, and 44) were terminated by Bechtel after that unit's elimination, while the only two persons retained, Wraith, age 41, and Siu, age 34, were the youngest of the group, and (2) two of the three persons later hired by SFRO-MI while Guz was on holding status--Wallace, age 43, and Stenho, age 38--were significantly younger than he.

Where an age-protected worker is directly replaced by a person not significantly younger, there may be no basis to suspect a motive of prohibited bias. (E. g., *Maxfield v. Sinclair Intern.* (3d Cir. 1985) 766 F.2d 788, 793; cf.  *O'Connor v. Consolidated Coin Caterers Corp.* (1996) 517 U.S. 308 [116 S. Ct. 1307, 134 L. Ed. 2d 433] (*O'Connor*) [logical inference of age discrimination may arise where replacement is significantly younger, even if not below statutorily protected age].) But where jobs are eliminated and duties reallocated during a general work force reduction, the issue of discriminatory motive becomes more complicated. In the context of a work force reduction, it has been said that the plaintiff's failure to prove his direct " 'replacement by a younger employee is "not necessarily fatal" ' " to a claim of discrimination; instead, he need only show, prima facie, that persons significantly younger, but otherwise similarly situated, were " 'treated more favorably.' " (*Nidds, supra,* 113 F.3d 912, 917, quoting *Washington v. Garrett* (9th Cir. 1994) 10 F.3d 1421, 1434; but see, e.g., *Barnes v. GenCorp Inc.* (6th Cir. 1990) 896 F.2d 1457, 1465; *Simpson v. Midland-Ross Corp.* [***388] (6th Cir. 1987) 823 F.2d 937, 942-944 (*Simpson*). )

LEXSEE 24 CAL. 4TH 317

**JOHN GUZ, Plaintiff and Appellant, v. BECHTEL NATIONAL, INC., et al., Defendants and Respondents.**

**No. S062201.**

**SUPREME COURT OF CALIFORNIA**

**24 Cal. 4th 317; 8 P.3d 1089; 100 Cal. Rptr. 2d 352; 2000 Cal. LEXIS 7498; 16 I.E.R. Cas. (BNA) 1345; 84 Fair Empl. Prac. Cas. (BNA) 64; 142 Lab. Cas. (CCH) P59,072; 2000 Cal. Daily Op. Service 8230; 2000 Daily Journal DAR 10929**

**October 5, 2000, Decided**

**NOTICE:**

[EDITOR'S NOTE: PART 2 OF 2. THIS DOCUMENT HAS BEEN SPLIT INTO MULTIPLE PARTS ON LEXIS TO ACCOMMODATE ITS LARGE SIZE. EACH PART CONTAINS THE SAME LEXIS CITE.]

**PRIOR HISTORY:**    Superior Court of the City and County of San Francisco. Super. Ct. No. 964836. William J. Cahill, Judge.

Court of Appeal of California, First Appellate District, Division Four. A072984.

**DISPOSITION:**    For the reasons set forth herein, the judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal for further proceedings consistent with this opinion.

**COUNSEL:** Bianco & Murphy, Stephen M. Murphy; Quackenbush & Quackenbush and William C. Quackenbush for Plaintiff and Appellant.

Thomas W. Osborne and Melvin Radowitz for the American Association of Retired Persons as Amicus Curiae on behalf of Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Paul Grossman, Paul W. Cane, Jr., John C. Oakes; Thelen, Marrin, Johnson & Bridges, Thelen Reid & Priest, Curtis A. Cole, Janet F. Bentley, Clarice C. Liu, Michael Hallerud and Thomas M. McInerney for Defendants and Respondents.

Gibson, Dunn & Crutcher, Pamela L. Hemminger and Kathleen M. Vanderziel for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Respondents.

Law Offices of Steven Drapkin and Steven Drapkin for the Employers Group as Amicus Curiae on behalf of Defendants and Respondents.

Lloyd C. Loomis for California Employment Law Council as Amicus Curiae on behalf of Defendants and Respondents.

**JUDGES:** Opinion by Baxter, J., with George, C. J., Mosk, Werdegar, Chin, and Brown, JJ., concurring. Concurring opinion by Mosk, J. (see p. 370). Concurring opinion by Chin, J., with Brown, J., concurring. (see p. 371). Concurring and dissenting opinion by Kennard, J. (see p. 378).

**OPINION**

[*367] [**1121] [***388] A number of federal decisions have applied the more-favorable-treatment principle to conclude, on facts somewhat analogous to those before us, that a prima facie inference of discrimination can arise from evidence that during a work force reduction, a satisfactory age-protected worker was laid off, while younger employees were retained in similar jobs, or were reassigned to positions for which the plaintiff also qualified. (E.g., *Jameson v. Arrow Co.* (11th Cir. 1996) 75 F.3d 1528, 1533 [older layoff candidate applied for new assignment fitting his qualifications, but was rejected for younger person; *Cronin, supra,* 46 F.3d 196, 204 [during work force reduction, employer located positions for younger, but not older, employees]; *Branson v. Price River Coal Co.* (10th Cir. 1988) 853 F.2d 768, 771 [employer fired older employees but retained younger employees in similar positions]; *Coburn v. Pan American World Airways, Inc.* (D.C. Cir. 1983) 711 F.2d 339, 342 [229 App.D.C. 61] [evidence that during work force reduction, plaintiff was "disadvantaged" in favor of

younger person]; see also *Hebert v. Mohawk Rubber Co.* (1st Cir. 1989) 872 F.2d 1104, 1111 [evidence that while age-protected worker was laid off, younger workers were retained in the same position].)

[**1122] However, in other cases where alleged numerical favoritism of younger workers arose within an extremely small employee pool, courts have rejected any consequent inference of intentional bias on grounds, among others, that the sample was too minuscule to demonstrate a statistically reliable discriminatory pattern. (See, e.g., *Fallis v. Kerr-McGee Corp.* (10th Cir. 1991) 944 F.2d 743, 745-746 [showing that a greater percentage of over-40 than under-40 workers were laid off is nonprobative because the relevant sample, 51 employees, was too small for statistical reliability]; *Sengupta v. Morrison-Knudsen Co., Inc.* (9th Cir. 1986) 804 F.2d 1072, 1076 [showing that, among 28 employees, four of five laid off were Black did not establish prima facie case; statistical sample too small]; see also *Simpson, supra*, 823 F.2d 937, 943 [even if "age-weighted departure" evidence, based on statistics, established prima facie case, it was insufficient to withstand employer's strong showing of performance-based reasons, where sample was based on only 17 persons]; cf. *Mayor v. Educational Equality League* (1974) 415 U.S. 605, 611 [94 S. Ct. 1323, 1329, 39 L. Ed. 2d 630] [where citizen committee appointed by mayor had only 13 positions, statistical showing of race discrimination in appointments was not reliable where a change of only one person "meant an 8 change in racial composition"].)

Here, for several reasons, we conclude the comparative-age evidence cited by Guz, even if barely adequate to demonstrate a prima facie case, is insufficient for trial in the face of Bechtel's strong contrary showing that its reasons were unrelated to age-related bias. In the first place, the statistical inferences to be drawn from Guz's raw age comparisons are not nearly as [*368] strong as he implies. As suggested above, the premise that Bechtel purposely favored two workers on the basis of youth when deciding which BNI-MI employees to retain is weakened, for statistical purposes, by the small size of that unit, which included only six persons. A similar analysis applies to the three other positions for which Guz claims, or implies, he should have been considered at SFRO-MI. [28]

28    Thus, if Bechtel, when eliminating BNI-MI, had made *only one* different personnel decision, i.e., had retained BNI-MI's manager, Goldstein, age 50, and had laid off the 34-year-old Siu, the effect on Guz would be unchanged, but the statistics would indicate that Bechtel had *favored* workers over 40. Similarly, if SFRO-MI's manager, Tevis, had made *only one* different personnel decision when filling the three later open positions, so that two of the three, rather than only one of the three, were filled by persons older than Guz, Guz would have no statistical claim that Bechtel's failure to consider him for those jobs was the result of age discrimination.

[***389] Any arguable discriminatory inference is further diluted by other age-based evidence from which a contrary conclusion might be drawn. Thus, while it is not *dispositive* that, consistent with Guz's earlier recommendation, his own duties went to an *older* worker, Shaeffer, that fact significantly *undermines* any suspicion that chronological age influenced Guz's dismissal. Similar doubt arises from the fact that at age 52, Vreim, one of the three workers later selected for an open position in SFRO-MI, was also older than Guz.

Moreover, an issue arises whether the younger persons with whom Guz seeks comparison were younger *enough* to raise a logical suspicion of intentional age bias. Courts have differed about the exact gap in age that is significant for purposes of a discriminatory inference. (See, e.g., *Koster v. Trans World Airlines, Inc.* (1st Cir. 1999) 181 F.3d 24, 31 [applying Massachusetts law: prima facie case is established where duties of 49and 48-year-olds were partially assumed by 25-year-old]; *Schiltz v. Burlington Northern R.R.* (8th Cir. 1997) 115 F.3d 1407, 1413 [five-year age gap between plaintiff applicant and persons selected is not significant]; *Barber v. CSX Distribution Services* (3d Cir. 1995) 68 F.3d 694, 699 [eight-year difference between plaintiff and successful applicant is significant]; *Healy v. New York Life Ins. Co.* (3d Cir. 1988) 860 F.2d 1209, 1214 [replacement of 56-year-old senior manager by person nine years younger is significant]; *Douglas v. Anderson* (9th Cir. 1981) 656 F.2d 528, 533 [replacement of 54-year-old bookstore manager by person five years younger is significant].) One federal circuit follows the rule that any gap less than 10 years is presumptively *insignificant*, but the plaintiff can overcome the presumption with other evidence that the employer [**1123] considered his age significant. ( *Hartley v. Wisconsin Bell, Inc.* (7th Cir. 1997) 124 F.3d 887, 892-893; see also *Richter, supra*, 142 F.3d 1024, 1029.)

[*369] Here, Wraith, one of the two reassigned BNI-MI employees, and Wallace, who took one of the later open positions at SFRO-MI, were, like Guz, in their mid-career 40's. Wraith, at 41, was eight years younger than the 49-year-old Guz, and Wallace, at 43, was only six years younger. There is no independent indication whatever that Bechtel considered the age differences among these three workers significant. Of the four younger persons Guz alleges were treated more favorably than he, only two were over 10 years younger. Guz does not dispute that one of these two, the 38-year-old

Stenho, was uniquely qualified for her SFRO-MI job; she was hired, at the specific request of Bechtel Civil, to provide service to that office, where she had previously worked. (See discussion, *ante.*) Under these circumstances, Guz's arithmetic does not, in our view, strongly support a logical inference " 'that [Bechtel's] employment decision[s] [were] based on a[n] [illegal] discriminatory criterion.' " (*O'Connor, supra,* 517 U.S. 308, 312 [116 S. Ct. 1307, 1310], quoting *Teamsters, supra,* 431 U.S. 324, 358 [97 S. Ct. 1843, 1866], first three brackets added, italics omitted.)

Any inference that Guz's raw age comparisons indicate age-based discrimination is further blurred by the weak evidence that the workers retained or hired over him were similar or comparable except for their dates of birth. Guz does not appear to dispute that the six individual members of the eliminated unit, BNI-MI, performed distinct duties at disparate ranks and levels of responsibility. The available SFRO-MI positions were also distinct, and it appears essentially undisputed that those jobs were filled by persons who fit their individual requirements as well as, or better than, Guz. As previously noted, most of these positions required considerable computer facility, while Guz's skills in this area were mediocre at best. The qualifications for Stenho's position essentially excluded any other candidate for that job. These [***390] variances undermine any rational conclusion from the raw age data that age was a significant factor in Bechtel's decisions to choose others instead of Guz. [29]

[29]   In his deposition, James Tevis indicated that the SFRO-MI position for which Christine Siu was hired was a junior one, commensurate with her salary grade, three steps lower than Guz's. Tevis conceded he considered Siu's salary level in selecting her for the job. Before 1999, both state and federal decisions had rejected the premise that prohibited age discrimination may be shown solely by evidence that the employer's actions were taken for economic reasons often *related* to worker age, such as comparative salaries. (*Hazen Paper Co. v. Biggins* (1993) 507 U.S. 604 [113 S. Ct. 1701, 123 L. Ed. 2d 338] [firing of long-term employee to prevent imminent vesting of pension rights did not violate federal age discrimination law]; *Marks v. Loral Corp.* (1997) 57 Cal. App. 4th 30, 42-64 [68 Cal. Rptr. 2d 1] [costor compensation-based personnel decisions which tend to disfavor higher paid older workers are no basis for claim of "disparate impact" age discrimination under either state or federal statutes].) In 1999, however, the Legislature amended the FEHA to overrule *Marks.* (Gov. Code, § 12941.1, added by Stats. 1999, ch. 222, § 2.) The new statute de-

clares that *Marks* "does not affect existing law" governing state age discrimination claims, and states the Legislature's "intent that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers *as a group.*" (Gov. Code, § 12941.1, italics added.) Guz has occasionally insinuated that Bechtel's decisions, particularly the elimination of BNI-MI and the retention of Siu, were discriminatory efforts to reduce salaries by releasing higher-paid older workers. However, Guz has never made a developed claim to that effect, and he has never cited section 12941.1. In any event, while Bechtel concedes that Johnstone sought to save costs by eliminating BNI-MI, any evidence that the motive was to eliminate senior salaries is no greater or different than the evidence that the decision disfavored older workers *directly.* Nor did Tevis's decision to select one junior employee, Siu, for a junior position have a disparate impact on older workers *as a group.*

In sum, even without considering Bechtel's explanation, Guz's evidence raised, at best, only a weak suspicion that discrimination was a likely basis [*370] for his release. Against that evidence, Bechtel has presented a plausible, and largely uncontradicted, explanation that it eliminated BNI-MI, and chose others over Guz, for reasons unrelated to age. Indeed, Guz has raised little argument against Bechtel's further claim that, even if he was minimally [**1124] qualified for the positions he lost, those persons who were actually chosen better fit Bechtel's needs.

Under these circumstances we conclude, as a matter of law, that Guz has failed to point to evidence raising a triable issue that Bechtel's proffered reasons for its actions were a pretext for prohibited age discrimination. Bechtel is therefore entitled to summary judgment on this claim.

CONCLUSION

For the reasons set forth herein, the judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**CONCUR BY:** MOSK; CHIN; KENNARD

**CONCUR**

MOSK, J.

I concur in the majority opinion. I write separately to clarify what may appear to be an inconsistency between parts II and IV of that opinion.

In part II, the majority hold that there was insufficient evidence from which a reasonable jury could conclude that Bechtel National, Inc.'s (BNI) business reorganization was merely a pretext to terminate John Guz. There is therefore no triable issue that BNI breached its implied contractual obligation by failing to follow the "progressive discipline" policy promised in its policy manual to its employees before they are discharged for poor performance. The majority do not decide, however, whether there is a triable issue regarding BNI's breach of its own layoff policies, and leave this question to the Court of Appeal on remand. If the Court of Appeal concludes [***391] there is [*371] such a triable issue, and if Guz is able to prove at trial that these policies were breached, and that if he had been fairly considered for a position as dictated in the policies, he would more likely than not have retained his job, then Guz will have proved a contractual wrongful termination and be eligible for the usual damages associated with such a termination.

In part IV, the majority conclude that there is insufficient evidence from which a reasonable jury could conclude that BNI's termination of Guz was based on age discrimination. In so doing, the majority view this case as fitting into the class of cases discussed in *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 148-149 [120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105], in which "although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." The *Reeves* court elaborated, by way of example, that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." (530 U.S. at p. 148 [120 S. Ct. at p. 2109].) Although the question is close, I agree with the majority that, in light of Guz's concessions as to the nondiscriminatory nature of many of BNI's actions, and in light of the weakness of Guz's prima facie case, this case fits into the relatively narrow class of cases referred to in *Reeves.*

Nonetheless, although BNI apparently had a nondiscriminatory reason for terminating Guz, that is not to conclude that it necessarily complied with its own contractual layoff policies. Nor does it negate the possibility that had it so complied, Guz would have retained his employment. These possibilities remain to be determined on remand and, if appropriate, at trial.

**CHIN, J.,** Concurring.

I agree with the majority. I write separately to state another reason the trial court correctly granted summary judgment against plaintiff John Guz on the age discrimination claim: Even after "extensive discovery" (maj. opn., *ante,* at p. 327), Guz has produced no credible evidence that defendants Bechtel National, Inc., and Bechtel Corporation (collectively Bechtel) discharged him because of his age. [**1125] Bechtel, the moving party on summary judgment, has met its burden of showing that Guz cannot state a prima facie age discrimination case. Accordingly, Bechtel had no duty even to rebut Guz's age discrimination claim, although I agree that it also did so.

[*372] I. THE LEGAL STANDARD FOR SUMMARY JUDGMENT

To prevail at trial, indeed, to avoid a nonsuit, the plaintiff bears the burden of establishing a prima facie case of discrimination. (See generally *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S. Ct. 1817, 36 L. Ed. 2d 668]; maj. opn., *ante,* at pp. 354-355; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal. App. 4th 189, 203-204 [48 Cal. Rptr. 2d 448].) I agree with the majority regarding what this prima facie burden is. It is not onerous, but the plaintiff must show that the employer's actions, if unexplained, support an inference that they were more likely than not based on a prohibited discriminatory criterion. (Maj. opn., *ante,* at p. 355.) Specifically, the plaintiff must show some "circumstance [that] suggests discriminatory motive." (*Ibid.*; see also *O'Connor v. Consolidated Coin Caterers* [***392] *Corp.* (1996) 517 U.S. 308, 312 [116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433].) [1]

> 1 Much of the concurring and dissenting opinion is irrelevant to the majority's holding. The majority does not suggest that age discrimination is lawful; it clearly is not. ( Gov. Code, § 12941, subd. (a); see maj. opn., *ante,* at p. 353, fn. 19.) The majority merely holds that the *evidence in this case* does not suggest Bechtel engaged in age discrimination. For example, the discussion of *Marks v. Loral Corp.* (1997) 57 Cal. App. 4th 30 [68 Cal. Rptr. 2d 1] (conc. & dis. opn. of Kennard, *post,* at p. 382) is utterly irrelevant. Bechtel never asserted a right to discharge older workers in favor of lower-salaried younger workers to save salaries.

Some uncertainty currently exists regarding the way this rule applies to an employer's motion for summary

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

judgment in a discrimination action. (Maj. opn., *ante*, at pp. 356-357.) California's traditional rule was that to prevail on summary judgment, a "defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." ( *Molko v. Holy Spirit Assn.* (1988) 46 Cal. 3d 1092, 1107 [252 Cal. Rptr. 122, 762 P.2d 46].) In 1992 and 1993, however, the Legislature amended Code of Civil Procedure section 437c, the statute concerning summary judgment. (See generally *Union Bank v. Superior Court* (1995) 31 Cal. App. 4th 573, 581-584 [37 Cal. Rptr. 2d 653].) Today, as relevant, Code of Civil Procedure section 437c, subdivision (*o*)(2), provides that a defendant has met its burden on summary judgment "of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

[*373] This court has not yet considered the effect of these amendments in a discrimination case. The Courts of Appeal have, however, considered this question in detail, and not always consistently. (See, e.g., the exhaustive discussion in *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal. App. 4th 64, 69-83 [81 Cal. Rptr. 2d 360] (*Scheiding*).) Some courts have held that to prevail on summary judgment, the defendant need merely point to the plaintiff's lack of evidence establishing a prima facie case. ( *Hersant v. Department of Social Services* (1997) 57 Cal. App. 4th 997, 1002 [67 Cal. Rptr. 2d 483] ["The burden-shifting system requires the employee first establish a prima facie case of age discrimination"]; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal. App. 4th 798, 806 [85 Cal. Rptr. 2d 459]; *Caldwell v. Paramount Unified School Dist.*, *supra*, 41 Cal. App. 4th at p. 203 ["Thus, [**1126] the burdens of proof for purposes of a defendant's motion for summary judgment are precisely the same as those mandated by *McDonnell Douglas*"].) Others have required the defendant to prove the "plaintiff's inability to prove its own case . . . ." ( *Certain Underwriters at Lloyd's of London v. Superior Court* (1997) 56 Cal. App. 4th 952, 959 [65 Cal. Rptr. 2d 821], italics omitted.) Others have suggested that because the moving party must negate the plaintiff's right to prevail on a particular issue, the burden is reversed on summary judgment. ( *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal. App. 4th 138,

150 [65 Cal. Rptr. 2d 112]; *Addy v. Bliss & Glennon* (1996) 44 Cal. App. 4th 205, 216 [51 Cal. Rptr. 2d 642].)

I believe the Court of Appeal cases can generally be reconciled. The recent decisions recognize that Code of Civil Procedure section 437c, subdivision (*o*)(2), significantly [***393] changed California summary judgment law. To prevail on summary judgment, the defendant no longer must conclusively negate the plaintiff's case. Given the difficulty of proving a negative, such a test is often impossibly high. However, the statute also places an initial burden on the defendant in order to prevail on summary judgment. As explained in *Scheiding*, the differences in the cases can largely be described as differing degrees of caution rather than outright disagreement. (*Scheiding*, *supra*, 69 Cal. App. 4th at pp. 82-83.) That case quoted with approval (*ibid.*) most of the following discussion in *Hagen v. Hickenbottom* (1995) 41 Cal. App. 4th 168 [48 Cal. Rptr. 2d 197]: "We cannot agree with those who may be understood to suggest that a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case. It is clear to us, from the requirement . . . that a defendant have 'shown that one or more elements of the cause of action . . . cannot be established' ( Code Civ. Proc. , § 437c, former subd. (n)(2) [now subd. (*o*)(2)]; . . .), that a defendant must make an affirmative *showing* in support of his or her motion. Such a showing connotes something significantly more than simply 'pointing out to the . . . court' that 'there is an absence of evidence': before [*374] the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiff's case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case. But where such a showing can be made we consider it both fair to the defendant and consistent with efficient administration of justice that the plaintiff be called upon, on risk of summary judgment, to make a prima facie case." ( *Id.* at p. 186.)

I think this discussion aptly summarizes the law. To prevail on summary judgment in a discrimination case, the defendant must show that the plaintiff both has not established and cannot reasonably expect to establish a prima facie case. A defendant can meet the former burden merely by showing the absence of evidence of discrimination. But that is not enough. The defendant must also show, by direct or circumstantial evidence, that the plaintiff cannot reasonably expect to obtain a prima facie case. This latter showing, however, is not impossibly difficult. If a plaintiff has had the full opportunity to obtain discovery and to present all available evidence in support of a discrimination claim, and still has failed to establish a prima facie case, the trial court may reasona-

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

bly infer that the plaintiff cannot do so. If the plaintiff cannot present a prima facie case, a nonsuit at trial would be inevitable. ( Code Civ. Proc., § 581c; *Caldwell v. Paramount Unified School Dist.*, *supra*, 41 Cal. App. 4th at pp. 203-204.) In that case, the trial court should grant summary judgment and avoid a useless trial.

## II. THE LEGAL STANDARD APPLIED TO THIS CASE

Bechtel has shown that Guz had a full opportunity to discover and present all available evidence, and that he nonetheless has not stated a prima facie case of age discrimination. This showing meets Bechtel's burden of establishing that Guz cannot state a prima facie case, thus entitling it to summary judgment on this cause of action. Despite extensive discovery, Guz can point to no comments by anyone during his entire lengthy [**1127] history with Bechtel suggesting age played a role in employment decisions in general, or in his case in particular, no meaningful statistical evidence, no evidence even of a possible financial or other motive for Bechtel to get rid of its older workers. He cites no evidence suggesting that age was a significant factor in Bechtel's layoff decision. [2]

> 2   Contrary to the implication of the concurring and dissenting opinion (conc. & dis. opn. of Kennard, *post*, at p. 385, fn. 4), I do not suggest evidence of age discrimination must be direct rather than circumstantial. My point is that Guz has presented no meaningful evidence *whatsoever*, direct *or* circumstantial, suggesting age discrimination.

[***394] It is true that Guz was a member of the protected class, but that fact alone proves nothing. In a reduction in force, many qualified, productive workers, [*375] both within and outside a protected class, lose their positions. Older workers may be laid off just like younger ones. The laws against age discrimination do not " 'require[] that younger employees be fired so that employees in the protected age group can be hired.' " ( *Earley v. Champion Intern. Corp.* (11th Cir. 1990) 907 F.2d 1077, 1083; see also *Vaughan v. MetraHealth Companies, Inc.* (4th Cir. 1998) 145 F.3d 197, 204 [age discrimination laws are not "something akin to a strict seniority protection system"]; *Jameson v. Arrow Co.* (11th Cir. 1996) 75 F.3d 1528, 1532-1533.) Accordingly, "the decision to discharge a qualified, older employee is not inherently suspicious. . . . In a [reduction in force], qualified employees are going to be discharged." ( *Brocklehurst v. PPG Industries, Inc.* (6th Cir. 1997) 123 F.3d 890, 896.)

Like the concurring and dissenting opinion, Guz relies largely on two circumstances to support the age discrimination claim. The first is that, of three positions that

employees other than Guz filled while Guz was on holding status, younger employees filled two, and an older employee filled only one. This fact is meaningless. Even aside from the minuscule size of the sampling (see *post*), Guz does not tell us the average age of persons eligible or considered for these positions. If a majority of those persons were younger than Guz, a majority of those given the positions would likely also be younger. Guz "did not even attempt to place his figures in a relevant context so as to make them meaningful. . . . [P] . . . [H]e neglects vital information regarding the pool of applicants and whether, for example, qualified older employees were available or applied for those jobs. . . . [E]mployee statistics unaccompanied by evidence regarding qualified potential applicants from the relevant labor market . . . lack[] probative value." ( *Simpson v. Midland-Ross Corp.* (6th Cir. 1987) 823 F.2d 937, 943.) Guz's related arguments regarding his qualifications relative to those retained does not aid him. "As courts are not free to second-guess an employer's business judgment, this assertion [that plaintiff was equally or more qualified than the people retained] is insufficient to permit a finding of pretext." ( *Branson v. Price River Coal Co.* (10th Cir. 1988) 853 F.2d 768, 772.) "Thus, plaintiff's general dispute concerning his job performance, in the absence of any other evidence of age discrimination, does not provide a sufficient basis for a jury to infer that [the employer] terminated plaintiff on the basis of his age." ( *Fallis v. Kerr-McGee Corp.* (10th Cir. 1991) 944 F.2d 743, 747.)

The second circumstance Guz cites comes closest to presenting evidence that might suggest age discrimination: Of the six persons in his unit, Bechtel retained the youngest two. This fact also fails to arouse suspicion for several reasons.

First, a group of six is simply too small to be statistically significant. "For [the plaintiff] to show a prima facie case of disparate treatment based solely [*376] on statistics he must show a ' "stark" pattern' of discrimination unexplainable on grounds other than age." ( *Palmer v. United States* (9th Cir. 1986) 794 F.2d 534, 539; *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1423.) In *Mayor v. Educational Equality League* (1974) 415 U.S. 605 [94 S. Ct. 1323, 39 L. Ed. 2d 630], the United States Supreme Court found of "no significance" statistics based on a group of 13, "[i]n large part . . . because the number of positions . . . was too small to provide a reliable sample." ( *Id.* at p. 611 [94 S. Ct. at p. 1329]; see also *id.* at p. 612 [94 S. Ct. at p. 1329].) [***395] A change of only one person "meant an 8% [**1128] change in racial composition." ( *Id.* at p. 611 [94 S. Ct. at p. 1329].) Here, the numbers are even smaller. A *single change*--retaining the 50 year old and laying off the 34 year old--would not have affected

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

Bechtel's actions towards Guz in the slightest but would have made the statistics show action *favoring* older persons. Many cases have found no statistical significance with groups larger than six. (E.g., *Vaughan v. Metra-Health Companies, Inc., supra,* 145 F.3d at p. 203 ["a sample of seven employees . . . is too small for reliable analysis"]; *Brocklehurst v. PPG Industries, Inc., supra,* 123 F.3d at p. 897 [group of 14 is too small]; *Fallis v. Kerr-McGee Corp., supra,* 944 F.2d at p. 746 [group of nine "is too small to provide reliable statistical results"]; *Simpson v. Midland-Ross Corp., supra,* 823 F.2d at p. 943 & fn. 7, and cases cited [reliance on a sample of 17 is "suspect"]; *Sengupta v. Morrison-Knudsen Co., Inc.* (9th Cir. 1986) 804 F.2d 1072, 1076 [group of 28 is too small].)

Second, Bechtel did not systematically replace older persons with substantially younger ones. Of the six in Guz's group, all but one were in their 40's (or 50); one was 34. The replacement of a worker with another "substantially younger than the plaintiff" ( *O'Connor v. Consolidated Coin Caterers Corp., supra,* 517 U.S. at p. 313 [116 S. Ct. at p. 1310]) might look suspicious, but not these actions. *Hartley v. Wisconsin Bell, Inc.* (7th Cir. 1997) 124 F.3d 887 considered the "QUESTION: how much older than a replacement does a plaintiff have to be in order to pass *O'Connor's* test?" ( *Id.* at p. 892.) "While we suspect that the answer depends to some extent on the circumstances in a case, we consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively 'substantial' under *O'Connor.* In cases where the disparity is less, the plaintiff may still present a triable claim if she directs the court to evidence that her employer considered her age to be significant. In that instance, the issue of age disparity would be less relevant. . . . [P] . . . Ten years is a reasonable threshold establishing a 'significant' and 'substantial' gap, which is what *O'Connor* demands. Yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age." ( *Id.* at p. 893.)

[*377] This assessment seems reasonable. In a given case, the plaintiff might be able to show that an age difference of less than 10 years was significant to the employer. For example, if some important contractual right vested at the age of 50, then replacing a 49 year old with someone younger, even if less than 10 years younger, might be replacing a person with someone substantially younger. But no such evidence exists here. Absent any evidence that Bechtel considered the age differences of persons in their 40's to be significant, I would find them insignificant. Without more, choosing among various persons in their 40's gives no cause to suspect age discrimination. Specifically, replacing a 49 year old with a 41 year old is not, by itself, replacing a

person with someone *substantially* younger. Only one person in the group in this case--the 34 year old--was substantially younger than Guz.

Third, the members of the group of six had different qualifications and performed different duties. "[A] plaintiff's statistical evidence must focus on eliminating non-discriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." ( *Fallis v. Kerr-McGee Corp., supra,* 944 F.2d at p. 746.) "[T]here must be evidence that [those over 40] had positions and performance ratings that were comparable to [those under 40] who were retained." ( *Id.* at p. 747.) Here, the group was quite disparate. One, for example, was a secretary, who had duties not remotely similar to Guz's.

[***396] Fourth, any slight weight we may give to plaintiff's statistics is negated by the fact that Guz's *own duties* were largely assumed by someone *older* than he. (Maj. opn., *ante,* at p. 366.) This fact, even if not itself dispositive, eliminates any suspicious inference that may be drawn from Bechtel's retaining the two youngest of Guz's group. "[T]he fact that [the employer] replaced [plaintiff] with [an] even older [employee] contradicts [plaintiff's] claims of discriminatory animus." ( *Brocklehurst* [**1129] *v. PPG Industries, Inc., supra,* 123 F.3d at p. 897.)

Guz also argues that Bechtel did not follow its own fair layoff procedures, and that this circumstance supports his discrimination claim. The argument is factually dubious but even if correct would fail to suggest age discrimination. A mere failure to follow formal internal policies does not support a discrimination claim. In *Vaughan,* the employer had an "elaborate Downsizing Policy . . . memorialized in a 144-page Downsizing Manual." ( *Vaughan v. MetraHealth Companies, Inc., supra,* 145 F.3d at p. 200.) ". . . Cooper, who made the decision to discharge [the plaintiff], admitted he was not familiar with the Downsizing Manual, [and] had never read it . . . ." (*Ibid.*) Thus, the "district court noted . . . various differences between the Downsizing Manual and Cooper's actual decision-making process." ( *Id.* at p. 201.) [*378] But this showing was not sufficient to support the discrimination claim. "The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." ( *Id.* at p. 202.) The employer's failure "to follow its own Manual . . . does not even hint that the real motive was age discrimination. The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent.' *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir. 1995). Federal courts cannot ensure that business decisions are always informed or even methodical." (*Id.* at p.

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

203; see also *Rose v. Wells Fargo & Co., supra*, 902 F.2d at p. 1422; *Moore v. Eli Lilly & Co.* (5th Cir. 1993) 990 F.2d 812, 819.)

Guz's inability to present any credible evidence to establish his age discrimination claim supports the superior court's grant of summary judgment in Bechtel's favor.

Brown, J., concurred.

**DISSENT BY:** KENNARD

**DISSENT**

**KENNARD, J.,** Concurring and Dissenting.

California statutory law prohibits employers from discriminating against workers over the age of 40. In this case, an employee sued his employer after it eliminated his job in the wake of a corporate reorganization and then passed him over in favor of younger workers when other positions became available. At the time of his discharge, the employee had worked for his employer 22 years, and he was 49 years old.

The employee's various causes of action included one for age discrimination, on which the trial court granted summary judgment for the employer. The Court of Appeal disagreed. Unlike the majority here, I would affirm the judgment of the Court of Appeal. I agree, however, with the majority's resolution of the employee's other causes of action.

**I**

This matter comes to us after the trial court granted defendant employer's motion for summary judgment. Under California law, a moving party is entitled to summary judgment only when no "triable issue of material fact" remains for trial. ( Code Civ. Proc., § 437c , subd. (*o*)(1) & (2).) In reviewing an order granting or denying summary judgment, "we examine the facts presented to the trial court and determine their effect as a matter of law." ( *Parsons v. Crown Disposal Co.* (1997) 15 Cal. 4th 456, 464 [63 Cal. Rptr. 2d 291, 936 P.2d 70].)

[*379] [***397] In 1993, plaintiff John Guz worked for Bechtel National, Inc. (BNI), a wholly owned subsidiary of Bechtel Corporation (Bechtel). Guz was one of six employees in BNI's management information unit (BNI-MI); he was a financial reports manager, making $ 71,280 a year. That year, during a phase of corporate reorganization, Bechtel eliminated BNI-MI and transferred its functions to Bechtel's San Francisco Regional Office Management Information Group (SFRO-MI). Reassigned to SFRO-MI as part of this transfer were BNI-MI's two youngest members, both of whom held lower grade positions and earned lower salaries than

Guz. Shortly thereafter, SFRO-MI created three new positions, two of which it filled with workers younger than Guz. The younger workers were between seven and 15 years younger than Guz. Even though Guz was willing to take a grade cut and pay cut, Bechtel did not consider him for [**1130] the new SFRO-MI positions, and it discharged him.

Guz's lawsuit against Bechtel alleged various causes of action, including one for age discrimination in violation of California's Fair Employment and Housing Act (FEHA). ( Gov. Code, § 12941, subd. (a).) [1] Bechtel moved for summary judgment, asserting, as relevant here, these reasons for the termination: (1) It eliminated BNI-MI, where Guz was employed, because of a "downturn in workload" and to consolidate costs; (2) Guz's tasks were then assumed by existing workers at SFRO-MI; and (3) the younger employees chosen to fill the SFRO-MI positions were better qualified for those particular positions than Guz.

> 1   Further undesignated statutory references are to the Government Code.

Guz disputed these reasons as "pretextual." He presented evidence that (1) he was qualified for each of the positions filled at SFRO-MI; (2) in eliminating BNI-MI and terminating him, Bechtel failed to comply with its internal Reduction-in-Force Guidelines (which required that all affected employees be ranked by job skills and functions), thereby depriving him of a fair, objective, and consistent evaluation in comparison with others; and (3) Bechtel's asserted reasons for eliminating BNI-MI--cost savings and a reduction in workload--were demonstrably false because SFRO-MI had to add a total of five positions to cover the work transferred from the six-member BNI-MI unit.

Ruling that Guz had failed to show that Bechtel's proffered reasons were a pretext for age discrimination, the trial court granted summary judgment. The Court of Appeal reversed, concluding that material issues of fact on Guz's FEHA claim were in dispute and needed to be resolved by a full trial.

**II**

As relevant here, the FEHA prohibits an employer from discharging "any individual *over age 40* on the ground of age." (§ 12941, subd. (a), italics [*380] added.) "[T]he practice of age discrimination, like other forms of invidious discrimination, 'foments domestic strife and unrest' in the workplace ( Gov. Code, § 12920), making for a more stressful and ultimately less productive work environment." ( *Stevenson v. Superior Court* (1997) 16 Cal. 4th 880, 895 [66 Cal. Rptr. 2d 888, 941 P.2d 1157].) Thus, the FEHA's express policy condemn-

ing discrimination against older workers benefits the public at large. (*Ibid.*)

Here, plaintiff's case is based on a theory of "disparate treatment," meaning that because of his age (49 years at the time of discharge), Bechtel treated him less favorably than it did younger workers. (See *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal. App. 4th 1718, 1730 [35 Cal. Rptr. 2d 181]; *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1421.) "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." (*Reeves v. Sanderson* (2000) 530 U.S. 133, 153 [***398] [120 S. Ct. 2097, 2111, 147 L. Ed. 105] (*Reeves*).)

In disparate treatment cases, California courts apply the test that the United States Supreme Court articulated in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-803 [93 S. Ct. 1817, 1824-1825, 36 L. Ed. 2d 668] (*McDonnell Douglas*) to assess such cases when brought under federal law. ( *Martin v. Lockheed Missiles & Space Co.*, *supra*, 29 Cal. App. 4th at p. 1730.) This test governs the allocation of the burden of production and the order for the presentation of proof at the trial of a discrimination case. (*Reeves*, *supra*, 530 U.S. at pp. 142-143 [120 S. Ct. at p. 2106]; *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 506 [113 S. Ct. 2742, 2746-2747, 125 L. Ed. 2d 407] (*Hicks*).)

Under the *McDonnell Douglas* test, a plaintiff employee claiming discrimination has the initial burden to establish "by a preponderance of the evidence, a 'prima facie' case of . . . discrimination." (*Hicks*, *supra*, 509 U.S. at p. 506 [113 S. Ct. at p. 2747]; *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 252-253 [101 S. Ct. 1089, 1093-1094, 67 L. Ed. 2d 207] (*Burdine*).) When, as here, the alleged age discrimination resulting in the employee's discharge occurs during an employer's restructuring of its work force, [**1131] the employee can make a prima facie case based on evidence that the employee (1) was age 40 or older; (2) satisfied the employer's legitimate expectations of job performance; and (3) the employer treated younger workers more favorably (for instance, by offering them replacement positions denied to the discharged employee). (See *Collier v. Budd Co.* (7th Cir. 1995) 66 F.3d 886, 889-890; *Greene v. Safeway Stores, Inc.* (10th Cir. 1996) 98 F.3d 554, 560; see also *Jameson v. Arrow Co.* (11th [*381] Cir. 1996) 75 F.3d 1528, 1533.) With respect to the third factor (more favorable treatment of younger workers), a number of federal appellate courts have pointed out that a discharged employee's failure to prove replacement by a younger worker does not necessarily defeat a claim of age discrimination if the termination is the result of a general reduction in work force. ( *Rose v. Wells Fargo & Co.*, *supra*, 902 F.2d at p. 1421; *Armbruster v. Unisys*

*Corp.* (3d Cir. 1994) 32 F.3d 768, 777; *Freeman v. Package Machinery Co.* (1st Cir. 1988) 865 F.2d 1331, 1335, fn. 2. [replacement by a younger person not an element of prima facie age discrimination case].)

Once the discharged employee has established a prima facie case of discrimination, there is a *presumption* of unlawful discrimination by the employer. (*Hicks* , *supra*, 509 U.S. 502, 506 [113 S. Ct. 2742, 2746-2747]; *Burdine*, *supra*, 450 U.S. at p. 254 [101 S. Ct. at p. 1094].) As the high court has explained: "A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. [Citation.] And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts with some reason, based his decision on an impermissible consideration such as race [or age]." ( *Furnco Construction Corp. v. Waters* (1978) 438 U.S. 567, 577 [98 S. Ct. 2943, 2949-2950, 57 L. Ed. 2d 957], italics omitted.)

If the trier of fact finds the discharged employee's prima facie case persuasive, and the employer remains silent in the face of the just-described presumption of unlawful discrimination, the trial court "must enter judgment for the plaintiff because no issue of fact remains in the case." (*Burdine*, *supra*, 450 U.S. at p. 254 [101 S. Ct. at p. 1094].) The employer is, of course, free to rebut the presumption by presenting evidence of a legitimate, nondiscriminatory [***399] reason for the termination. (*Hicks*, *supra*, 509 U.S. at p. 507 [113 S. Ct. at p. 2747].)

An employer's desire to reduce expenses by eliminating some employee positions is not itself a legitimate, nondiscriminatory reason for the discharge of older workers. Chief Judge Richard Posner of the federal Court of Appeals for the Seventh Circuit explained this in a case alleging disability discrimination during corporate downsizing. "Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the [*382] occasion as a convenient opportunity to get rid of its disabled workers. [Citations.] This point is most easily seen by thinking of a [reduction in work force] as a kind of hiring: the employer has decided to reduce its work force from, say, 100 to 80 employees; this means it has 80 slots to fill and in filling them must choose among 100 'applicants.' The law forbids the employer to disqualify the disabled applicants

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

on the basis of their disability." ( *Matthews v. Commonwealth Edison Co.* (7th Cir. 1997) 128 F.3d 1194, 1195.) This reasoning applies with equal force to a case alleging age discrimination.

Nor is it sufficient for the employer to show that the discharged older workers earned higher salaries than the younger workers who were retained. Although a Court of Appeal reached a contrary conclusion in *Marks v. Loral Corp.* (1997) 57 Cal. App. 4th 30 [68 Cal. Rptr. 2d 1], and this court denied review (Justice Mosk and I voting to grant), the Legislature has since expressly abrogated that decision by declaring that "that [**1132] the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group, and . . . that the disparate impact theory of proof may be used in claims of age discrimination." (§ 12941.1, enacted by Stats. 1999, ch. 222, § 2.) [2]

> 2   I do not agree with Justice Chin's concurring opinion that *Marks v. Loral Corp.*, *supra*, 57 Cal. App. 4th 30, is "utterly irrelevant" to the issues here. (Conc. opn. of Chin, J., *ante*, at p. 372, fn. 1.) The younger workers that Bechtel chose to retain earned lower salaries than Guz, and the Legislature's recent clarification of the law on this point serves to explain why Bechtel has not and could not lawfully rely on the resulting salary savings to justify its decision, as other employers in the past have done.
>
> Justice Chin's concurring opinion also complains that this opinion's discussion of the illegality of age discrimination "is irrelevant to the majority's holding" because "[t]he majority does not suggest that age discrimination is lawful." (Conc. opn. of Chin, J., *ante*, at p. 372, fn. 1.) Surely the illegality of age discrimination cannot be entirely irrelevant in an age discrimination case. The nature and purpose of the prohibition against age discrimination in employment should be kept in mind when assessing the sufficiency of the evidence and the allocation of the proof burdens on a summary judgment motion in an age discrimination case.

When, under the *McDonnell Douglas* burden-allocation rules, the employer responding to a discharged employee's prima facie case of age discrimination offers legitimate, nondiscriminatory reasons for the discharge, what countervailing evidence must the employee present to sustain a judgment after trial? This was the question before the United States Supreme Court in *Reeves, supra*, 530 U.S. 133 [120 S. Ct. 2097]. There, the 57-year-old plaintiff had worked for a plumbing manufacturer for

40 years when he was fired. The employees who later filled the plaintiff's former position were all in their 30's. At trial, the employer disputed that age was the motivating factor for the discharge, asserting that it terminated the plaintiff [*383] because he had not kept accurate records of employee attendance. The jury awarded damages to the plaintiff, but the federal Court of Appeals reversed for insufficiency of evidence. The United States Supreme Court disagreed. Describing the issue as "the kind and amount of evidence necessary to sustain a jury's [***400] verdict that an employer unlawfully discriminated on the basis of age" (*Reeves, supra*, 530 U.S. at p. 137 [120 S. Ct. at p. 2103]), the high court held that the circuit court had "misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence" ( *id.* at p. 146 [120 S. Ct. at p. 2108]). That burden could be satisfied by evidence of the "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false." ( *Id.* at p. 148 [120 S. Ct. at p. 2109].) From such evidence, a trier of fact could reasonably conclude "that the employer unlawfully discriminated." (*Ibid.*)

III

Consideration of the evidence here in light of the legal framework discussed, *ante*, leads to these conclusions:

Guz's evidence presented in opposition to Bechtel's summary judgment motion was sufficient to establish a prima facie case of age discrimination under the *McDonnell Douglas* test: (1) He was over 40 years of age when terminated; (2) his job performance exceeded Bechtel's legitimate expectations (he was promoted six times, and was given 17 merit raises, and he received a Silver Performance Plus Award for saving the company $ 1.7 million; his 1991-1992 performance review described him as a "strong performer in his group"; and in his 22 years at Bechtel, he was never told his skills were deficient); and (3) Bechtel treated younger workers more favorably than older workers by transferring, from the disbanded BNI-MI unit (where Guz was employed) to SFRO-MI and selecting for two of the three new SFRO-MI positions, workers between seven and 15 years younger than Guz; and by retaining the two youngest of the six workers at BNI-MI, while terminating the two oldest. This evidence, if presented at trial and accepted by the fact finder would have given rise to a presumption of age discrimination that, if unrebutted by [**1133] Bechtel, would require entry of judgment for plaintiff. (*Hicks, supra*, 509 U.S. at p. 507 [113 S. Ct. at p. 2747].) [3]

> 3   Because I conclude that plaintiff's evidence here was sufficient for a prima facie case of age discrimination, I express no view on whether a

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

plaintiff suing under the FEHA can successfully avoid summary judgment without such evidence. (See maj. opn., *ante*, at p. 357 [also declining to decide this issue].)

Bechtel did, however, present rebutting evidence in support of its motion for summary judgment. According to Bechtel, a "downturn in workload" and [*384] a desire to save costs prompted its elimination of the BNI-MI unit, where Guz had worked. And it chose the younger workers for the SFRO-MI positions because they were the most qualified for those positions.

Notwithstanding Bechtel's rebuttal evidence, Guz could still prevail at trial under the high court's decision in *Reeves* by presenting evidence of a prima facie case of age discrimination plus sufficient additional evidence from which a reasonable fact finder could reject "the employer's asserted justification [as] false." (*Reeves, supra*, 530 U.S. at p. 148 [120 S. Ct. at p. 2109].) As Justice Ginsburg's concurrence in *Reeves* explained, "two categories" of evidence are needed to support a jury's verdict in a disparate treatment case based on circumstantial evidence of unlawful discrimination: "[F]irst, evidence establishing a 'prima facie case,' . . .; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false. " ( *Id.* at p. 154 [120 S. Ct. at p. 2112] (conc. opn. of Ginsburg, J.).) Here, in opposing Bechtel's motion for summary judgment, Guz presented evidence in both categories. As discussed earlier, he offered evidence comprising a prima facie case of age discrimination. In addition to the evidence of the prima facie case, he presented this evidence: (1) He was qualified for the SFRO-MI positions filled by other workers; (2) Bechtel never considered him for any of the new positions at SFRO-MI; (3) [***401] Bechtel did not comply with its own downsizing policy of ranking employees based on skills and functions; and (4) Bechtel's stated reasons for eliminating BNI-MI—cost reduction and downturn in workload—were demonstrably false, as noted on page 379, *ante*. From this additional evidence, a trier of fact could reasonably reject as false Bechtel's asserted business justifications for Guz's discharge. As Justice Ginsburg's concurrence in *Reeves* noted, "evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation." (*Ibid.*) Thus, under the high court's standard in *Reeves*, Guz's evidence here would be sufficient for an appellate court to sustain "a jury's verdict that an employer unlawfully discriminated on the basis of age." ( *Id.* at p. 137 [120 S. Ct. at p. 2103].)

Here, however, we are concerned not with the sufficiency of evidence to sustain a jury verdict of age dis-

crimination, but only with whether Guz's evidence raises "a triable issue of material fact" to be resolved at trial. ( Code Civ. Proc., § 437c, subd. (*o*)(2).) Because, as I have explained, Guz's evidence was sufficient under *Reeves* not only for a jury to reject Bechtel's proffered reasons for the discharge but also for an appellate court to uphold an age discrimination verdict, that evidence squarely presented "[t]he ultimate question" in any disparate treatment case, namely, "whether the plaintiff was the victim of intentional discrimination." (*Reeves, supra*, 530 U.S. at [*385] p. 153 [120 S. Ct. at p. 2111].) That issue was in this case a material issue of fact in dispute. Therefore, the trial court erred when, in granting summary judgment for Bechtel, it precluded Guz from having the merits of this material issue of fact resolved at a trial.

The majority does not at all acknowledge that Guz's evidence was sufficient to establish a prima facie case of age discrimination. [4] [**1134] Instead, it looks to a statement by the high court in *Reeves* that an employer is entitled to judgment as a matter of law when " 'no rational fact finder could conclude that the action was discriminatory.' " (Maj. opn., *ante*, at p. 362, italics omitted.) According to the majority, that is the case here. I disagree.

> 4   Justice Chin's concurring opinion asserts that "Guz cannot state a prima facie case." (Conc. opn. of Chin, J., *ante*, at p. 374.) It finds some significance in Guz's failure to point to "comments by anyone" at Bechtel suggesting that his age played a role in Bechtel's employment decisions. (*Ibid.*) But such evidence of discriminatory intent is unnecessary either to allege or to prove age discrimination based on *disparate treatment*, plaintiff's theory in this case. Rather, as the high court in *Reeves* has said, an employee claiming disparate treatment can rely entirely on circumstantial evidence, which may be probative of intentional discrimination and "quite persuasive." (*Reeves, supra*, 530 U.S. at pp. 146-147 [120 S. Ct. at p. 2108].) That, as I have explained, is the case here.

In *Reeves*, the high court explained that notwithstanding evidence comprising a prima facie case of discrimination and sufficient additional evidence for a jury to reject an employer's proffered explanation, the employer would be entitled to a judgment as a matter of law if, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted *independent* evidence that no discrimination had occurred." (*Reeves, supra*, 530 U.S. at p. 148 [120 S. Ct. at p. 2109], italics added.) But

24 Cal. 4th 317, *; 8 P.3d 1089, **;
100 Cal. Rptr. 2d 352, ***; 2000 Cal. LEXIS 7498

here the record does not conclusively reveal Bechtel's true reason for Guz's discharge, and there is insufficient independent evidence that the reason was other than his age. Therefore, contrary to the majority's assertion, this case falls outside the *Reeves* exception. [***402]

Conclusion

In a recent decision, I explained the reason for FEHA's prohibition against age discrimination in employment: "Aging is a highly complex and variable process. Chronological age alone is not a reliable measure of any individual's vitality or ability, and many individuals remain robust and productive well past the normal retirement age. Nevertheless, some employers have discriminated against highly qualified older workers solely because of their age, either by not hiring them or by replacing them with younger persons." ( *Stevenson v. Superior Court, supra,* 16 Cal. 4th at p. 909.) [*386]

Seeking ever greater efficiency to meet the demands of open market competition, many corporations engage in frequent internal reorganization. As some departments or working groups are reduced or eliminated and others are expanded or created, many employees' jobs are placed at risk in a corporate equivalent of the old game of musical chairs. Because the corporate employer controls the seating assignments, corporate officers who wish to eliminate older workers may use the complexities of the restructuring process to conceal their illegal discriminatory intent. Here, Guz has alleged that he was the victim of exactly this sort of age discrimination by his employer, Bechtel, contrary to the public policy and the law of this state.

Guz's lawsuit against Bechtel is now at the summary judgment stage, where the question to be decided is whether the evidence submitted by Guz and Bechtel shows there is an issue of material fact in dispute that needs to be resolved by a full trial in open court. Unlike the majority, I conclude that the evidence does show a triable issue of fact, and that plaintiff deserves a trial on the merits to determine whether he lost his job for legitimate business reasons or because of illegal age discrimination. Because the majority denies plaintiff the opportunity to prove his case at trial, I dissent.

# EXHIBIT 18

LEXSEE 14 CAL APP 4TH 70

**DAVID B. HARRIS, Plaintiff and Appellant, v. ATLANTIC RICHFIELD COMPANY, Defendant and Respondent.**

**No. F015046**

**COURT OF APPEAL OF CALIFORNIA, FIFTH APPELLATE DISTRICT**

**14 Cal. App. 4th 70; 17 Cal. Rptr. 2d 649; 1993 Cal. App. LEXIS 251; 93 Cal. Daily Op. Service 1835; 93 Daily Journal DAR 3265**

**March 11, 1993, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

\* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of the Statement of Facts and parts I and III.

**SUBSEQUENT HISTORY:** Review Denied May 27, 1993, Reported at: 1993 Cal. LEXIS 2964.

**PRIOR HISTORY:** Superior Court of Tulare County, No. 122940, David L. Allen, Judge.

**DISPOSITION:** The judgment is reversed as to the fifth cause of action, and the case remanded for retrial on that cause of action only. The judgment is affirmed in all other respects. The parties to bear their own costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In an action alleging tortious breach, in violation of public policy, of a written gas station minimarket franchise agreement, the trial court granted defendant franchisor's motion for judgment notwithstanding the verdict after the jury found for plaintiff on that count and awarded compensatory and punitive damages. Plaintiff alleged breach in retaliation for his noncompliance with the franchisor's pricing dictates and his report of an underground gasoline leak to authorities. (Superior Court of Tulare County, No. 122940, David L. Allen, Judge.)

For reasons stated in an unpublished portion of the opinion, the Court of Appeal reversed as to a fraud cause of action, and otherwise affirmed the judgment. It held

the trial court properly granted defendant franchisor's motion for judgment notwithstanding the verdict as to the cause of action for tortious breach of a written contract, since plaintiff's claim for breach of commercial contract, in violation of public policy, fit within none of the circumstances in which California law has imposed tort liability for essentially contract-based claims. Moreover, the court held, there are sound public policy reasons for not recognizing a new tort of breach of commercial contract, in violation of public policy. (Opinion by Best, P. J., with Stone (W. A.) and Vartabedian, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Contracts § 44--Performance-- Breach--Tortious Breach--Franchise Agreement.** --In an action alleging tortious breach of a written gas station minimarket franchise agreement, in violation of public policy, the trial court properly granted defendant franchisor's motion for judgment notwithstanding the verdict after the jury found for plaintiff on that count and awarded compensatory and punitive damages. Plaintiff alleged breach in retaliation for his noncompliance with the franchisor's pricing dictates and for his report of an underground gasoline leak to authorities, but plaintiff was not an employee of the franchisor, the conduct alleged was not also a tort, the requisite "special relationship" between the parties was absent, and the alleged breach was not accompanied by bad faith denial of the contract. Moreover, there are sound public policy reasons for not recognizing a new tort of breach of commercial contract, in violation of public policy.

14 Cal. App. 4th 70, *; 17 Cal. Rptr. 2d 649, **;
1993 Cal. App. LEXIS 251, ***; 93 Cal. Daily Op. Service 1835

**(2) Employer and Employee § 9--Contracts of Employment--Actions for Wrongful Discharge--Contravention of Public Policy.** --An action for wrongful discharge will lie when the basis of the discharge contravenes a fundamental public policy grounded in constitutional or statutory provisions.

**(3) Damages § 15--Measure of Damages--For Breach of Contract--Foreseeability.** --California law does not authorize the award of general or punitive damages for breach of a commercial contract. The measure of damages is limited to those losses that might reasonably be foreseen by the parties.

**(4) Damages § 22.2--Exemplary or Punitive Damages--Availability--Breach of Contract.** --Punitive damages are never recoverable for breach of contract, no matter how willful or malicious, except where the wrongful act is also a tort.

**(5) Contracts § 6--Legality--Compliance Implied in Law.** --Compliance with statutorily imposed duties is implied in law in every contract. Further, as an ordinary commercial contract cannot contain terms that violate fundamental public policy, the general promissory bargain cannot encompass conduct contrary to public policy and sound morality.

[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 461 et seq.]

**COUNSEL:** Jennings, Engstrand & Henrikson, George J. Berger, Wilson A. Schooley, Wild, Carter, Tipton & Oliver, Robert G. Carter and Gary Huss for Plaintiff and Appellant.

Arnold & Porter, Ronald C. Redcay, Matthew T. Heartney, James F. Speyer, Richard E. Woo, Crowe, Williams, Jordan, Richey & Brodersen and Daniel W. Crowe for Defendant and Respondent.

**JUDGES:** Opinion by Best, P. J., with Stone W. A. and Vartabedian, JJ., concurring.

**OPINION BY:** BEST, P. J.

**OPINION**

[*72]  [**650] The novel issue presented by this appeal is whether a *Tameny* [1] cause of action for breach of a contract in violation of public policy exists outside the [***2] employment situation. We conclude it does not.

1  *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].

STATEMENT OF THE CASE

Appellant David B. Harris appeals from the judgment entered on his lawsuit against Atlantic Richfield Company (ARCO) and ARCO's cross-complaint against him. Appellant claimed ARCO mistreated him during his operation of an ARCO "am/pm minimarket" under a written franchise agreement by failing to repair and refurbish his unit as promised in retaliation for his failure to comply with ARCO's pricing dictates and his report of an underground gasoline leak to the authorities. He sought compensatory and punitive damages on five causes of action: (1) breach of written contract, (2) tortious breach of written contract in violation of public policy, (3) breach of oral contract, (4) bad faith denial of the existence of the oral contract, and (5) fraud.

ARCO cross-complained [***3] for compensatory and punitive damages for appellant's failure to report food sales which deprived ARCO of royalties to which it was contractually entitled.

After a four-week trial, the jury awarded damages to appellant on the first, second and fourth causes of action as follows: (1) breach of written contract ($ 3,550), (2) tortious breach of written contract ($ 2,534 compensatory, $ 250,000 punitive damages); and (4) bad faith denial of the existence of the oral contract ($ 250,000 punitive damages). The jury awarded ARCO $ 1,988 compensatory damages and $ 30,000 punitive damages on its cross-complaint.

[*73] After the verdict was read, the parties noted that although the jury found there was no consideration for the oral contract, they awarded $ 250,000 in punitive damages for ARCO's bad faith denial of that contract. The trial court struck the punitive damage award for the bad faith denial claim. Thereafter, ARCO moved for judgment notwithstanding the verdict on the cause of action for tortious breach of the written contract. The trial court granted the motion which reduced appellant's recovery against ARCO to the $ 3,550 awarded on his breach of written contract claim.

[***4] Appellant contends the judgment must be reversed because of trial court error. In the unpublished portion of the opinion, [**651] we agree with one of his contentions and will reverse the judgment on the fraud cause of action. In the published portion of the opinion, we conclude the court properly granted judgment notwithstanding the verdict on the tortious breach of contract claim.

STATEMENT OF FACTS [*]

* See footnote, *ante,* page 70.

. . . .

DISCUSSION

*I. THE TRIAL COURT DID NOT ERR BY EXCUS-ING THE JURY AND RESOLVING THE INCONSIS-TENT VERDICT FINDINGS ITSELF.* •

* See footnote, *ante,* page 70.

. . . .

*II. THE COURT CORRECTLY HELD APPELLANT HAD NO CAUSE OF ACTION FOR TORTIOUS BREACH OF THE WRITTEN CONTRACT.*

The trial court granted ARCO's motion for judgment notwithstanding the verdict on the tortious breach of written contract cause [***5] of action. The court concluded, while the weight of authority seems to militate toward extension of the cause of action for tortious breach of contract to circumstances other than employer-employee, the necessary factual predicates were not present in this case. Specifically, the contract did not require appellant to act in a manner contrary to fundamental public policy, and the parties did not have the requisite "special relationship," one "characterized by elements of public interest, adhesion and fiduciary responsibility."

**(1a)** Appellant contends that ruling was wrong because a *Tameny* claim does not require the contract itself to impose the public policy violation nor [*74] does it require a "special relationship" between the parties. ARCO submits the court made the correct ruling but for the wrong reason. ARCO urges this court to hold that a breach of contract in violation of public policy claim does not exist outside of the employment situation.

(a) *Current case law does not recognize a Tameny cause of action outside the employment situation.*

*Tameny v. Atlantic Richfield Co., supra,* 27 Cal.3d at page 178 [***6] held that a tort action for wrongful discharge may lie if the employer conditions employment upon required participation in unlawful conduct by the employee. The *Tameny* plaintiff alleged he was fired for refusing to engage in price fixing in violation of the Cartwright Act and the Sherman Antitrust Act. ( at p. 170.)

In rejecting Atlantic Richfield's argument that an action for wrongful discharge sounds only in contract, the court stated, " ' "if the cause of action arises from a breach of a promise set forth in the contract, the action is ex contractu, *but if it arises from a breach of duty growing out of the contract, it is ex delicto.*" ' " ( *Tameny, supra,* 27 Cal.3d at p. 175, italics in original.) The court

reasoned that an employer's obligation not to fire an employee who refuses to commit a criminal act arises from a public policy interest in deterring criminal behavior and not from a promise, either express or implied, in the employment contract. Because the cause of action for wrongful discharge arises from a duty grounded in public policy and imposed by law, the remedy is in tort. ( at [***7] pp. 175-176, 178.)

While contract actions are created to protect the interest in having promises performed, tort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to tort relief are imposed by law, and are based primarily upon social policy, not necessarily on the will or intention of the parties. ( *Tameny, supra,* 27 Cal.3d at p. 176, citing Prosser, Law of Torts (4th ed. 1971) p. 613.)

Later courts summarizing this authority have agreed, " 'the theoretical reason for labeling the discharge wrongful in such cases is not based on the terms and conditions of the contract, but rather arises out of a duty implied in law on the part of the employer to conduct its affairs in compliance [**652] with public policy . . .. The tort is independent of the term of employment.' " ( *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 667 [254 Cal.Rptr. 211, 765 P.2d 373]; accord, *Abreu v. Svenhard's Swedish Bakery* (1989) 208 Cal.App.3d 1446, 1453 [257 Cal.Rptr. 26].) [***8]

A *Tameny* claim is not limited to situations where the employment contract or the employer coerces an employee to commit an act which violates [*75] public policy. **(2)** An action for wrongful discharge will lie when the basis of the discharge contravenes a fundamental public policy. ( *Rojo v. Kliger* (1990) 52 Cal.3d 65, 91 [276 Cal.Rptr. 130, 801 P.2d 373]; *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc.* (1992) 3 Cal.App.4th 382, 388, 389 [4 Cal.Rptr.2d 139].) However, the public policy must be grounded in constitutional or statutory provisions. ( *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].)

**(1b)** The parties have not cited nor has our research disclosed case law recognizing a *Tameny* cause of action outside the employment relationship. Several cases suggest such cause of action does not exist. In *Abrahamson v. NME Hospitals, Inc.* (1987) 195 Cal.App.3d 1325 [241 Cal.Rptr. 396], a hospital pathologist claimed his contract was terminated [***9] in violation of public policy because he refused to condone allegedly improper practices at the hospital. The contract was terminable by either party without cause on 90 days' notice. ( at pp. 1326-1328.) The appellate court affirmed a grant of summary judgment for the hospital finding *Tameny* inapplicable for two reasons. First, plaintiff was an independent contractor rather than an at-will employee. Sec-

ond, if the agreed termination without cause term could only be accomplished with cause--for reasons violative of public policy--the phrase "without cause" was effectively deleted from the agreement. Such an interpretation would rewrite the contract. ( at pp. 1329-1330.)

In *Premier Wine & Spirits v. E. & J. Gallo Winery* (9th Cir. 1988) 846 F.2d 537, plaintiff alleged defendant wrongfully terminated a distributorship contract because plaintiff refused to do an illegal act. In granting summary judgment on plaintiff's claim for tortious termination of the contract, the court noted the tort of wrongful discharge for refusal to break the law has been recognized only in the employee-employer relation. ( at p. 540.)

"Although the principle of [***10] *Tameny* is logically capable of extension beyond the employment relation, there is a consideration that makes it peculiarly apt in that setting and not in a broader context: it is normal for an employee to take directions from his employer. In the ordinary commercial world, the control of one party's actions by another is not so usual or so close." (846 F.2d at p. 540.)

Appellant contends *Johns-Manville Sales Corp. v. United States* (N.D.Cal. 1985) 622 F.Supp. 443 supports the principle that *Tameny* is logically capable of extension beyond the employment situation. In *Johns-Manville,* an asbestos manufacturer brought an action for indemnity from the United States for amounts paid to settle a claim with a naval shipyard worker allegedly injured by exposure to asbestos. The United States moved to [*76] dismiss. The court held, while no California tort principles neatly fit the facts alleged in the case, Johns-Manville could state a tort claim if it showed the government forced it, under threat of civil and criminal sanctions, to supply asbestos that conformed to government specifications, and the government had [***11] knowledge, superior to that of the manufacturer, that asbestos was harmful to the safety of its workers. In addition, Johns-Manville had to show the government failed to implement safety procedures to protect its workers. ( at p. 447.)

The court reasoned that the tort duty upon which Johns-Manville's right to recover was based, resulted from the relationship of the parties. ( *Johns-Manville Sales Corp. v. United States, supra,* 622 F.Supp. at p. 449.) "A 'wrongful act committed in the course of a contractual relationship may afford both tort and contractual relief, and in such circumstances the existence of the contractual relationship [**653] will not bar the injured party from pursuing redress in tort.' " (*Ibid.*) The court added, with reference to *Tameny,* "The purpose of imposing tort duties upon contracting parties is to implement fundamental public policy." ( at p. 450.) Moreover,

"While California courts have never recognized such a duty in a buyer-seller relationship, [Johns-Manville] did not have a typical buyer-seller relationship with the government. The fundamental public policy in this case is represented in the policy against unconscionability [***12] in contractual relationships." (*Ibid.*)

The court concluded the government's duty was limited to injury Johns- Manville suffered by way of lawsuits caused by asbestos Johns-Manville was forced by law to supply to the government, not from asbestos it voluntarily contracted to supply. ( *Johns-Manville Sales Corp. v. United States, supra,* 622 F.Supp. at p. 450.)

*Johns-Manville* does not exemplify a tort cause of action for breach of contract in violation of public policy as much as it illustrates a breach of the implied covenant of good faith and fair dealing in a "special relationship" situation. There was no allegation the government breached the contract. Rather, Johns-Manville claimed the government was obligated to indemnify it for injuries caused by Johns-Manville's compelled performance of the contract on the government's terms. As such, the case does not illustrate an extension of a *Tameny* cause of action outside the employment relationship.

Appellant also cites a line of cases which recognize the tort of wrongful eviction in retaliation for the exercise of rights under the law. ( *Barela v. Superior Court* (1981) 30 Cal.3d 244, 252 [178 Cal.Rptr. 618, 636 P.2d 582]; [***13] *Glaser v. Meyers* (1982) 137 Cal.App.3d 770, 774 [187 Cal.Rptr. 242].) *Barela* states, "in an analogous area of law, this court has held that an [*77] employer cannot discharge an employee in retaliation for the employee's exercise of a legally protected right." Further, " '. . . [*Tameny*] persuasively instruct[s] us that one may not exercise normally unrestricted power if his reasons for its exercise normally contravene public policy.' [Citation.]" ( *Barela v. Superior Court, supra,* 30 Cal.3d at pp. 253-254, fn. 8.)

While these cases may support, in principle, the imposition of tort liability when the basis of wrongful action against another is a violation of public policy, they cannot be cited for the broad proposition that breach of a commercial contract in violation of public policy entitles the injured party to tort relief. Thus, at present, case law does not recognize a cause of action for breach of commercial contract in violation of public policy. We therefore navigate through uncharted waters illuminated by only a few landmarks.

(b) *Tort remedies in the context* [***14] *of commercial contracts*

(3) As a general rule, California law does not authorize the award of general or punitive damages for breach of a commercial contract. The measure of dam-

ages is limited to those losses which might reasonably be foreseen by the parties. ( *Quigley v. Pet, Inc.* (1984) 162 Cal.App.3d 877, 887 [208 Cal.Rptr. 394].) Further, Civil Code section 3294, subdivision (a), provides that exemplary damages are only available "in an action for the breach of an obligation not arising from contract, . . ." **(4)** Thus, punitive damages " 'are never recoverable for breach of contract, no matter how wilful or malicious, except where the wrongful act is also a tort.' " (162 Cal.App.3d at p. 887.)

The traditional goal of contract remedies is compensation of the promisee for the loss resulting from the breach, not compulsion of the promisor to perform his promises. Therefore, "willful" breaches have not been distinguished from other breaches. (Rest.2d Contracts, Introductory Note, ch. 16 p. 100.) The restrictions on contract remedies serve purposes not found in tort law. They protect the parties' [***15] freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise. This encourages efficient breaches, resulting in increased production of goods and services at [**654] lower cost to society. (See Comment, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291, fn. 3.) Because of these overriding policy considerations, the California Supreme Court has proceeded with caution in carving out exceptions to the traditional contract remedy restrictions. (See, e.g., *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 769 [206 Cal.Rptr. 354, 686 P.2d 1158]; *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at pp. 694, 696.) To date, only three exceptions have been recognized.

[*78] (i) *Independent tort exception*

The most widely recognized exception is when the defendant's conduct constitutes a tort as well as a breach of the contract. For example, when one party commits a fraud during the contract [***16] formation or performance, the injured party may recover in contract and tort. ( *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154 [180 Cal.Rptr. 95]: knowing nondisclosure of termite damage.)

(ii) *Tortious breach of the implied covenant*

A second exception is tortious breach of the implied covenant of good faith and fair dealing which was first recognized in insurance contracts. ( *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 684.) The rationale for finding tortious conduct in insurance contracts was the existence of a "special relationship" between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. ( *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395 [272 Cal.Rptr. 387].) In *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra,* 36 Cal.3d at page 769, the California Supreme Court suggested, "No doubt there are other relationships with similar characteristics and deserving [***17] of similar legal treatment." (Fn. omitted.)

Following that lead, *Wallis v. Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], announced a test for defining such a relationship: (1) the parties are in inherently unequal bargaining positions; (2) there was nonprofit motivation for entering the contract such as peace of mind, security, future protection; (3) ordinary contract damages are inadequate because they do not require the party in the superior position to account for its actions and they do not make the inferior party "whole"; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party; and (5) the other party is aware of this vulnerability. ( at p. 1118.) The *Wallis* case involved a former employee who sued when his ex- employer ceased making agreed-upon severance payments.

The *Foley* court, however, refused to extend this tort to the usual employment case, finding "the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view of the countervailing [***18] concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees." (47 Cal.3d at p. 693.) The court suggested that any extension of tort remedies to noninsurance cases is not justified given (1) the [*79] limited purpose and scope of contract damages, (2) the strong need in our commercial system for predictability of the cost of contractual relationships, and (3) the difficulty of formulating a workable test for distinguishing between a simple breach of contract and a "tortious" breach of the implied covenant. ( at pp. 683, 699-700.) However, the court left open the question whether "the special relationship model is an appropriate one to follow in determining whether to expand tort recovery . . .." ( at p. 692.)

Notwithstanding *Seaman's* suggestion that other contract relationships may be deserving of tort remedies, the noninsurance [**655] cases have concluded that the relationships at issue are not sufficiently "special" to warrant imposition of a tort remedy for breach of the implied covenant. [***19] (See cases cited at *Careau & Co. v. Security Pacific Business Credit, Inc., supra,* 222 Cal.App.3d at p. 1399, fn. 25, including *Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 412 [251 Cal.Rptr. 17], no special relationship between franchiser and franchisee; and *Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 694 [280 Cal.Rptr. 338].)

14 Cal. App. 4th 70, *; 17 Cal. Rptr. 2d 649, **;
1993 Cal. App. LEXIS 251, ***; 93 Cal. Daily Op. Service 1835

Finally, in *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra,* 36 Cal.3d 752, the court recognized a new tort in the contract arena where the breaching party attempts to avoid liability by denying, in bad faith and without probable cause, that the contract exists. ( at p. 769.) The court reasoned that such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. Therefore, imposing tort remedies in that situation was not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties. ( at p. 770.)

Some commentators have criticized the [***20] singling out of this one type of "bad faith" breach for tort remedies. (See Sebert, *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 UCLA L.Rev. 1565, 1640-1641, 1642.) But subsequent cases have construed the *Seaman's* holding narrowly and refused to extend its rationale to the bad faith assertion of *any* defense to a contract action. ( *Quigley v. Pet, Inc., supra,* 162 Cal.App.3d at pp. 890, 892; *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 567-569 [282 Cal. Rptr. 181].)

The courts justified the circumscribed liability from a policy point of view.

[*80] "If the rule were otherwise then any party attempting to defend a disputed contract claim would risk, at the very least, exposure to the imposition of tort damages and an expensive and time-consuming expansion of the litigation into an inquiry as to the motives and state of mind of the breaching party. The distinction between tort and contract actions, and their purposefully different [***21] measures of damages, would be blurred if not erased. The insult to commercial predictability and certainty would only be exceeded by the increased burden on the already overworked judicial system." (231 Cal.App.3d at p. 569.)

These concerns are shared by the Supreme Court in *Foley:*

"Despite the fact that we carefully limited our holding in *Seaman's* to instances in which a party 'seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists' [citation], the *Koehrer* [v. *Superior Court* (1986) 181 Cal.App.3d 1155 (226 Cal.Rptr. 820)] court expansively concluded that 'If . . . the existence of good cause for discharge is asserted by the employer without probable cause and in bad faith, that is, without a good faith belief that good cause for discharge in fact exists, the employer has tortiously attempted to deprive the employee of the benefits of the agreement, and an action for breach of the implied covenant of good faith and fair dealing will lie.' [Citation.] . . . *Koehrer* thus extended the expressly circumscribed cause of [***22] action established in *Seaman's* based on denial of the existence of the contract, to find a tort cause of action when the dispute related to a contract term. . . . By this broad stroke, made without analyzing the appropriateness of imposing tort remedies in the employment context, the *Koehrer* court broached the possibility of obtaining tort damages for the breach of any term of a contract whether for employment or otherwise." ( *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at pp. 688-689.)

(1c) In summary, under current California law, tort liability has been imposed [**656] for essentially contract-based claims only where (1) the breach is also a tort, (2) the parties to the contract have the requisite "special relationship," or (3) the breach is accompanied by bad faith denial of the contract. Appellant's claim for breach of commercial contract in violation of public policy fits within none of these. Accordingly, the trial court properly granted ARCO's motion for judgment notwithstanding the verdict on that claim unless we recognize a new cause of action for tortious breach of contract in violation of public policy.

[***23] (c) *Policy reasons for denying the claim*

The principle of *Tameny* is logically capable of extension. A cause of action for breach of contract in violation of public policy arguably is [*81] analogous to a *Seaman's* cause of action for bad faith denial of the contract. Such conduct goes beyond the mere breach of contract and offends accepted notions of business ethics. (5) In addition, the imposition of tort remedies for such breach will not intrude upon the bargaining relationship or upset reasonable expectations of the parties because compliance with statutorily imposed duties is implied in law in every contract. (See *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra,* 36 Cal.3d at p. 770.) Further, as an ordinary commercial contract cannot contain terms which violate fundamental public policy, the general promissory bargain cannot encompass conduct " 'contrary to public policy and sound morality.' " (Cf. *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1101.)

(1d) Second, imposition of tort remedies and punitive damages on a party who [***24] breaches a contract in violation of public policy would advance the statutory and constitutional policies at issue. (Cf. *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 694.) "Threat of retribution may discourage unethical business practices." ( *Quigley v. Pet, Inc., supra,* 162 Cal.App.3d at p. 891.)

Finally, recognizing tort liability in this context would create another class of wronged parties who would be adequately compensated for a contract breach. The most frequently cited reason for the move to extend

14 Cal. App. 4th 70, *; 17 Cal. Rptr. 2d 649, **;
1993 Cal. App. LEXIS 251, ***; 93 Cal. Daily Op. Service 1835

tort remedies is the perception that traditional contract remedies are inadequate to compensate for certain breaches. (162 Cal.App.3d at p. 891; and see, Putz & Klippen, *Commercial Bad Faith: Attorney Fees--Not Tort Liability--Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 470-471.)

On the other hand, stronger public policy reasons militate against our recognition of a new tort. First, as set out above, the distinction between tort and contract is well grounded in common [***25] law and divergent objectives underlie the remedies created in the two areas. ( *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 683.) Courts have traditionally awarded damages for breach of contract to compensate the aggrieved party rather than to punish the breaching party. This predictability of the consequences of actions related to contracts is important to commercial stability. (*Ibid.*) Proposals to extend tort remedies to commercial contracts create the potential of turning every breach of contract dispute into a punitive damage claim. (Putz & Klippen, *Commercial Bad Faith, supra,* 21 U.S.F. L.Rev. at p. 481.) The plaintiff's bar has shown admirable creativity in crafting a given set of facts into a newly recognized tort. This practice, combined with the vast array of statutes providing fertile ground for public policy violations, produces a potential Pandora's box.

Second, our Supreme Court has advised against judicial activism where an extension of tort remedies is sought for a duty whose breach previously has [*82] been compensable by contract remedies. ( *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra,* 36 Cal.3d at p. 769; [***26] *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at pp. 683, 690, 694, 696.)

Finally, where significant policy judgments affecting commercial relationships are implicated, the determination is better suited for legislative decision making. The imposition of tort remedies for "bad" breaches of commercial contracts is a substantial deviation from the traditional [**657] approach which was blind to the motive for the breach. Moreover, tort remedies for the nonbreaching party are but one among many solutions posited to remedy the problem of adequately compensating the wronged promisee for such breaches. (See, e.g., 5 Corbin on Contracts (1992 pocket pt.) § 1077, pp. 170-

183.) Determining the appropriate remedy for breach of commercial contract in violation of public policy is no less troubling than determining the appropriate remedy for breach of the implied covenant of good faith and fair dealing in the employment context. (See *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 696.) Only the Legislature is qualified to make the significant policy judgments affecting [***27] commercial relationships required to justify expansion of tort remedies into an area governed by contract law.

"Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views . . .." ( *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 694, fn. 31.) Thus, the more prudent approach is to defer to the Legislature to address the appropriate relief to remedy this type of breach.

Accordingly, there are sound public policy reasons for not recognizing a new tort of breach of commercial contract in violation of public policy. Therefore, the trial court properly granted judgment notwithstanding the verdict on appellant's second cause of action.

III. *The judgment must be reversed because the court excluded a memorandum summarizing statements made by an ARCO representative to a third party that ARCO wanted its dealers to sell below cost and did not care if it was breaking the law.* *

* See footnote, *ante,* page 70.

[***28] . . . .

[*83] DISPOSITION

The judgment is reversed as to the fifth cause of action, and the case remanded for retrial on that cause of action only. The judgment is affirmed in all other respects. The parties to bear their own costs on appeal.

Stone W. A., J., and Vartabedian, J., concurred.

A petition for a rehearing was denied April 8, 1993, and respondent's petition for review by the Supreme Court was denied May 27, 1993.

LEXSEE 184 CAL. 524

**FRANK HICKMAN, Respondent, v. THE LONDON ASSURANCE CORPORA-
TION (a Corporation), et al., Appellants**

**Sac. No. 2845**

**Supreme Court of California**

**184 Cal. 524; 195 P. 45; 1920 Cal. LEXIS 352; 18 A.L.R. 742**

**December 21, 1920**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Kings County. M. L. Short, Judge.

**DISPOSITION:** Reversed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEAD-
NOTES**

(1) **Fire Insurance Law--Submission of Insured to
Examination Under Oath--Valid Provision.** --A provision in a fire insurance policy requiring the insured as often as demanded to submit to an examination under oath touching all matters material to the adjustment of the loss, and providing that no action on the policy shall be sustained until full compliance with such requirement, is a reasonable and valid stipulation.

(2) **Id.--Refusal to Submit to Examination--
Constitutional Immunity.** --An insured under a fire insurance policy containing a warranty that he will when required submit to an examination under oath concerning matters material to the adjustment of the loss cannot justify his refusal to submit to such an examination on the ground that his testimony might be used against him in a pending prosecution for arson, since the constitutional immunity has no application to a private examination arising out of a contractual relationship.

(3) **Id.--Action on Policy -- Defense of Breach of War-
ranty -- Second Demand for Examination Unneces-
sary.** --In an action to recover on a fire insurance policy containing a warranty that the insured would submit to an examination under oath whenever demanded concerning all proper subjects of inquiry, it was not necessary for the defendant, in order to avail itself of the defense that

the plaintiff refused to submit to such an examination on the ground of constitutional immunity, to make a new demand upon the plaintiff for examination after the dismissal of a pending charge of arson, since the insured was in default by his refusal to submit to examination in the first instance, and the insurer was under no obligation to reopen the matter.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** Watt, Miller, Thornton & Watt and Miller, Thornton, Miller & Watt, for Appellants.

Earl Rogers and H. P. Brown, for Respondent.

**JUDGES:** In Bank. Lawlor, J. Shaw, J., Wilbur, J., Lennon, J., Olney, J., Sloane, J., and Angellotti, C. J., concurred.

**OPINION BY:** LAWLOR

**OPINION**

[*525] [**46] The plaintiff, Frank Hickman, brought this action against the defendants, London Assurance Corporation, New Zealand Insurance Company, Limited, British & Federal Fire Underwriters of Norwich, England, Law Union & Rock Insurance Company, Limited, Yorkshire Insurance Company, Limited, Providence Washington Insurance Company, Sterling Fire Insurance Company, the Home Insurance Company of New York, and North British & Mercantile Insurance Company of London and Edinburgh, to recover for loss by fire on their respective policies. Judgment went for the plaintiff and the several defendants appeal. The record is presented in typewriting.

Prior to November 21, 1915, the said policies were issued to respondent to cover his stock of general mer-

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

chandise [***2] kept and used by him in his "clothing and gents' furnishing goods store" in a two-story brick building, at 1922-1924 Mariposa Street, in the city of Fresno.

On the night of November 28, 1915, practically the entire stock of goods insured was destroyed by fire, and it is this loss which is the basis of respondent's asserted cause of action. Each of the policies was in the standard form prescribed by the legislature (Stats. 1909, p. 404) and contained a warranty that gasoline or benzine in excess of one quart would not be kept, used, or allowed on the premises. To the allegation of the complaint that the fire originated from causes unknown, the defendants set up in their answer that the fire was started with the knowledge, connivance, and design of the respondent, and that in violation of the above warranty gasoline in excess of one quart was kept, used, and allowed on the premises.

In the employ of respondent at the time of the fire, and for some years previously, was W. H. Jenks, who testified in detail that in July, 1915, a portion of respondent's stock was destroyed, and that the latter was dissatisfied with the settlement made by him with the companies then carrying his insurance; [***3] that thereafter the policies in suit were issued; that respondent had planned with him "to have the stock totally destroyed," and had told him to bring oil and gasoline upon the premises "and make all the arrangements for burning the store"; that between the 5th and the 15th of October he purchased five gallons of gasoline in a tin container, which he placed in the basement of the store, and told [*526] respondent of this; that subsequently respondent gave him "a gallon jug and a black grip or hand-bag," in which he brought five or more gallons of kerosene and a number of gallons of gasoline into the store; that prior to November 28th he distributed gasoline around the basement, in vessels, and used shavings and different articles to absorb it, so that by seepage the gasoline would be ignited by the gas "pilot lights"; that about 4 or 5 o'clock on the afternoon of November 28th he raised a trap-door in the basement, so that the draught thereby created would cause the gasoline to ignite, and went home, where he remained until notified by telephone that evening there was a fire in the store, and that thereupon, pursuant to the instructions of respondent, who had gone to San Francisco [***4] "to throw off all suspicion from him," he sent in his own name the following telegram to respondent: "Frank Hickman, care Washington Hotel, San Francisco. Don't buy more goods. Your store is burning."

The respondent testified that he went to San Francisco "to visit the Fair," and admitted having received the telegram while there, but denied that he induced Jenks to burn the property, or that he had any knowledge that it

was to be done; that he had ever spoken to Jenks about burning the store or bringing gasoline or oil on the premises, or that he knew of any gasoline or oil being on the premises.

On December 2, 1915, a complaint was sworn to by J. G. Goehring, chief of police of Fresno, and filed on the following day, charging respondent and Jenks with the crime of arson alleged to have been committed in the burning of the store. December 22d they were held to answer. The district attorney filed an information on December 31st, upon which the accused were arraigned January 8, 1916, when respondent was released on bail. An amended information was filed January 13th. February 14th respondent pleaded not guilty. The trial opened on April 18th, and on April 24th, while it was [***5] still in progress, the district attorney moved the court for an order dismissing the information on the ground "that the people have not sufficient evidence on which to warrant a conviction." The motion was granted, the information dismissed, and the bail exonerated.

On May 22d Jenks pleaded guilty and applied for probation. The application was referred to the probation officer, who reported on June 9th, recommending that probation be [*527] denied, and it was so ordered. Jenks thereupon withdrew his plea of guilty and pleaded not guilty. He was tried, convicted on October 11, 1916, and released on probation for the term of five years.

This action was commenced on February 27, 1917. The cause was tried by the court sitting without a jury. It was found in effect that Jenks set fire to the store and that at the time he was insane; that the gasoline was carried upon the premises by him, without the knowledge or connivance of respondent, that respondent did not know there was any gasoline in the store, and that the fire occurred without any complicity on his part.

Each of the policies also contained the following warranty: "the insured shall exhibit to any person designated [***6] in writing by this company all that remains of any property herein described and [**47] shall submit to examination under oath, as often as required, by any such person, and subscribe to the testimony so given, and shall produce to such person for examination, all books of account, bills, invoices and other vouchers, and permit extracts and copies thereof to be made . . . No suit or action on this policy for the recovery of any claim shall be sustained until full compliance by the insured with all of the foregoing requirements."

On February 5th appellants made a written demand upon respondent that he appear before Leon Levy, a notary public, on February 11th, and, pursuant to the above warranty, submit to examination and produce "all original invoices, bills, and vouchers of goods . . . claimed by him to have been damaged or destroyed, . . . and all

books of account pertaining to the business." On the last-mentioned date the hearing was continued by consent to the following day, when respondent appeared. The following took place: Respondent's counsel read into the record of the proceedings each of the letters in which the respective appellants had designated H. M. Farrar as [***7] their representative or adjuster "in any matters pertaining to the loss." Respondent was then sworn and this colloquy ensued: "Farrar: Q. Your name in full? A. Frank Hickman. Q. Your age? A. Forty-four. Q. Your residence? A. 430 Neilson Avenue. Q. Business location? A. 1922 Mariposa. Q. How long have you been in your present business location? . . . A. I refuse to answer on the advice of counsel. Q. Now, Mr. Hickman, you refuse to answer [*528] any more questions? A. For the same reason, at this time." Thereupon respondent served and filed "a written statement" to the effect that he had been accused of arson and was about to be tried upon that charge; "that any material testimony which he might give at said examination would relate either to the amount, value, cost of or extent of damage to the goods . . . or to the cause of the fire, . . . both of which questions are at issue in said criminal proceeding"; that the criminal charge had been initiated and was being prosecuted by H. M. Farrar, appellants' adjuster; that he, respondent, had been advised by counsel that any testimony given by him at any examination could and would be used against him on his trial for arson; [***8] that, by virtue of article I, section 13, of the constitution, he refused to submit to examination or to produce any books or papers at that time; that he was ready "to stipulate and agree that he will" submit to examination "immediately after the conclusion of the said criminal prosecution and immediately after the trial of said cause and verdict and judgment therein"; and that if appellants or Farrar would cause the arson charge to be dismissed he would submit to examination at any time. In reply the following statement was made by Farrar: "The insurance companies . . . refuse to accept Mr. Hickman's offer . . . and further demand that he now submit to examination and furnish the books, bills, invoices, etc., heretofore demanded." Whereupon respondent said: "I stand by my reasons given this morning and the course adopted this morning." No other demand by appellants or offer by respondent to submit to examination and produce the required books and papers was made at any time.

The court found "that the examination of said plaintiff at said time [February 12th] . . . would have had for its purpose inquiry into matters necessarily involved in a criminal prosecution; . . . that the [***9] course and conduct of said plaintiff in the matter of said hearing . . . was proper and right, and that he was justified in said course and conduct; that the plaintiff did comply with all . . . the terms and conditions of said policies; . . . and that he was justified in refusing to submit to an examination

under oath at said time when said information and trial were pending."

The court justified respondent's refusal solely on the ground of his claim of privilege.

[*529] Appellants contend that respondent cannot recover because he "refused to submit to examination under oath, or to permit his books, or vouchers, or bills, or other papers concerning the property . . . to be inspected by the defendants herein, which refusal was in violation of the provisions of said policies"; further, "that the excuse given by plaintiff . . . has no merit, for the reason that in . . . section 1324 of the Penal Code it is expressly declared that no information which might be obtained from him on his examination . . . could be used against him in any criminal proceedings"; and that "the provision of the policies . . . is equivalent to a positive unconditional promise on the part of plaintiff that [***10] he will comply therewith, irrespective of how such compliance may affect him, and . . . his refusal would constitute such a violation . . . of the provision as would preclude him from instituting any action thereon."

Respondent's claim of privilege is thus stated in his brief: "A defendant on trial for his liberty has the right to refuse to submit to a private inquisition." It is a fact, as already appears, that two days after respondent's refusal issue was joined on the criminal charge and thereafter until April 24th it was pending against him.

(1) The validity of provisions of the character here under consideration has been frequently upheld. ( *Gross* v. *St. Paul Fire & Marine Ins. Co.*, 22 Fed. 74; *Fleisch* v. *Insurance Co. of North America*, 58 Mo. App. 596; *Firemen's Fund Ins. Co.* v. *Sims*, 115 Ga. 939, [42 S. E. 269]; *Pearlstine* v. *Westchester Fire Ins. Co.*, 70 S. C. 75, [49 S. E. 4]; *Southern Home Ins. Co.* v. [**48] *Putnal*, 57 Fla. 199, [49 South. 922]; *Liverpool L. & G. Ins. Co.* v. *Cargill*, 44 Okl. 735, [145 Pac. 1134]; *National Fire Ins. Co.* v. *Humphreys* (Tex. Civ.), 211 S. W. 811; *Richards* on Insurance Law, [***11] 3d ed., 416; 1 Clement on Fire Insurance, 251; 5 Joyce on Insurance, sec. 3330; 19 Cyc. 853; 4 Cooley's Briefs on Insurance, 3395.)

This rule is thus expressed in 13 Am. & Eng. Ency. of Law, 358: "As the facts with respect to the amount and circumstances of a loss are almost entirely within the sole knowledge of the insured, and the opportunity and temptation to perpetrate a fraud upon the insurer is often great, it is necessary that it have some means of cross-examining, as it were, upon the written statement and proofs of the [*530] insured, for the purpose of getting at the exact facts before paying the sum claimed of it. Such considerations justify the provision universally to be met with in policies, requiring the insured as often as demanded to submit to an examination under oath touch-

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

ing all matters material to the adjustment of the loss, and provisions of that character are held to be reasonable and valid."

And in Ostrander on Fire Insurance, second edition, section 172, it is said: "The right to require the insured to submit to an examination under oath concerning all proper subjects of inquiry is clearly stipulated for in the form of policies now in general use. The [***12] intent of this provision is to prevent fraudulent concealment, and to enable the insurer to obtain material information in regard to the origin and circumstances of the fire, the value of the property, and the claimant's interest therein. The requirement is a reasonable one, and will often, no doubt, be useful in securing important and truthful disclosures that would otherwise be withheld, to the injury of the insurer. When the insured refuses to be examined under oath, he will forfeit all right to recover."

In *Connecticut Fire Ins. Co.* v. *George*, 52 Okl. 432, [153 Pac. 116], the court said that "There may be logic in plaintiff's argument that defendant was not conducting the examination in good faith, but the fact still remains that defendant was acting within the terms of an expressed stipulation found in the policy, which gave it the right to demand such an examination, and it is not for the insured to inquire into the motive actuating the company in exacting the examination, but on his part to comply therewith and to answer all material questions, notwithstanding he may believe that the principal object of the company is to find some loophole whereby it might evade [***13] payment of the policy.

It was in *Bonner* v. *Home Ins. Co.*, 13 Wis. 758, 771, that the court, speaking through Mr. Chief Justice Dixon, said: "This action should have been dismissed because prematurely commenced; for, until examination was had, the losses were not, by the terms of the policies, due and payable."

And it was said in *Wheeler* v. *Connecticut Ins. Co.*, 82 N. Y. 543, [37 Am. Rep. 594], citing *Beebe* v. *Johnson*, 19 Wend. 500, that "to excuse nonperformance it must appear that the act to be done could not by any means have been accomplished."

[*531] It is to be noted that under the policies a loss was not payable until ninety days after the receipt by appellants of respondent's preliminary proofs of loss, and that no action on the policies should be sustained "unless begun within fifteen months next after the commencement of the fire." The latter period would have expired on February 28, 1917, and the action, as we have stated, was commenced the day before.

No case has been cited, and we are aware of none, where the constitutional immunity of an insured was urged as a ground for refusing to submit to examination, or to produce books and papers. [***14] *Counselman* v. *Hitchcock*, 142 U.S. 547, [35 L. Ed. 1110, 12 Sup. Ct. Rep. 195, see, also, Rose's U. S. Notes], and *Ex parte Clarke*, 103 Cal. 352, [37 Pac. 230], however, are cited by respondent in support of his failure to comply with the demand. In the first of these cases Counselman had been subpoenaed to appear before a federal grand jury and give testimony concerning certain alleged violations of the Interstate Commerce Act (24 Stat. 379). He refused to testify on the ground that any testimony he might give could be made the basis for a criminal prosecution against him under said act. Upon his continued refusal to testify he was committed for contempt and he sued out a writ of *habeas corpus*. The supreme court, in discharging the petitioner, said: "It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show [***15] that he himself had committed a crime. . . . It is an ancient principle of the law of evidence that a witness shall not be compelled, *in any proceeding*, to make disclosures or to give testimony which will tend to criminate him or subject him to fines, penalties or forfeitures." (Italics ours.)

The Clarke case was also a proceeding in *habeas corpus*. The petitioner had been adjudicated an insolvent, and he was cited to appear before the superior court to be examined concerning his assignee's charge that he had fraudulently concealed property which should have been turned over to such [*532] assignee for the benefit of his creditors. Clark declined to testify "upon the ground that his answers might be made the foundation of a criminal action against him." He was committed for contempt, and in discharging him from custody this court, speaking through the late Chief Justice Beatty, said: "To bring a person within the immunity of the constitutional provision, it is not necessary that the examination should be attempted [**49] in a criminal prosecution against the witness, or that such a prosecution should have been commenced and actually pending. It is sufficient if [***16] there is a law creating the offense under which the witness may be prosecuted. If there is such a law under which the witness may be indicted, or otherwise prosecuted, for a public offense arising out of the acts to which the examination relates, he cannot be compelled to answer in any collateral proceeding unless the law absolutely secures him against any use in a criminal prosecution of the evidence he may give," and the court followed *Counselman* v. *Hitchcock, supra*.

(2) But those and other authorities of similar import refer only to the attempted compulsion of a witness in a trial, either civil or criminal, a hearing or other lawful inquiry of a public nature. The compulsion secured against by the constitution is a compulsion exercised by the state in its sovereign capacity in some manner known to the law. Constitutional immunity has no application to a private examination arising out of a contractual relationship. The examination to which appellants demanded respondent should submit was an extrajudicial proceeding, not authorized by any constitutional or statutory provision, but purely by virtue of a contract between the parties. To bring a case within the constitutional [***17] immunity, it must appear that compulsion was sought under public process of some kind. This being so, respondent's refusal to undergo examination and produce his books and papers acquires no sanctity because he urged his constitutional right not to be compelled to be a witness against himself. The demand was made upon him by virtue of the stipulation in the contract and by the stipulation alone must his refusal be judged. The stipulation constituted a promissory warranty under which appellants had the right to demand compliance by respondent "as often as required," and the performance of such stipulation was a condition precedent to any right of action. No question was [*533] raised as to the sufficiency of the demand, or, aside from the claim of privilege, as to the reasonableness of the time and place designated in the demand. The obligation to perform the warranty was as binding on respondent as his obligation to pay the premiums on the policies. The respondent did not fulfill his obligation, and stands here as having recovered a judgment upon an express contract one of the conditions of which he has failed to perform. In other words, when he commenced this suit he was [***18] without a cause of action.

Respondent cites certain cases holding that the right to demand the performance of the condition precedent must be exercised in a reasonable manner. Thus, in *Thomas* v. *Burlington Ins. Co.*, 47 Mo. App. 169, and *Gordon* v. *St. Paul Fire & M. Ins. Co.*, 197 Mich. 226, [L. R. A. 1918E, 402, 163 N. W. 956], it was held under a similar stipulation that the insured was justified in insisting that his counsel be present at his examination and in refusing to be examined unless he were permitted to be present. In *Phillips* v. *Protection Ins. Co.*, 14 Mo. 220, the court declared that the prevalence of a cholera epidemic at the place designated excused the nonattendance of the insured. Under a stipulation to submit to examination as often as required and a special promise to reappear after the original examination, which the insured after notice failed to do, it was held in *Porter* v. *Traders' Ins. Co.*, 164 N. Y. 504, [52 L. R. A. 424, 58 N. E. 641], that because he was sufficiently examined at the first hearing the insured was not in default. In all of these

cases, however, the question was merely as to the reasonableness of the time, [***19] place, or mode of examination. No objection to the examination on any such ground was made here.

(3) Respondent's offer of February 12th, as we have seen, is twofold -- an offer to comply with the demand after the charge of arson was dismissed, or at *any* time if appellants would cause such charge to be dismissed. The point is made that in view of this offer, which was a part of the respondent's refusal to submit to examination, the appellants, after the dismissal of the charge of arson, should have made a new demand upon the respondent for his examination, and that such demand not having been made, he was not in default. But the respondent was already in default, as he had no right to refuse on the ground stated to submit to examination in the first instance. It may be that if he himself had [*534] made an offer, after the criminal charge against him had been dismissed, to then and there submit to an examination, and such offer had been refused, his default would have been removed. But he did not so offer, and, since he was in default, the appellants were under no obligation themselves to reopen the matter.

It may be conceded that the position in which respondent found [***20] himself between February 12th and April 24th was one of difficulty, but it was a difficulty created by the contract he made. It has been said that "Mere hardship or difficulty will not excuse a party from carrying out a contract; and, where one contracts to do any act which is possible, he is liable for a breach, even though circumstances arise, without his fault, making it difficult, or even impossible, for him to perform. ( *Walker* v. *Tucker*, 70 Ill. 527; *Ballance* v. *Vanuxem*, 191 Ill. 319, [61 N. E. 85]; *Lake Shore & M. S. R. Co.* v. *Richards*, 152 Ill. 59, [30 L. R. A. 33, 38 N. E. 773].) The breach of this contract by appellants relieved the other parties from performance on their part. (7 Am. & Eng. Ency. of Law, 2d ed., p. 150, and cases there cited.)" ( *Ptacek* v. *Pisa*, 231 Ill. 522, [14 L. R. A. (N. S.) 537, 83 N. E. 221].) And it was declared in *Bastian* v. *British American etc. Co.*, 143 Cal. 287, [66 L. R. A. 255, 77 Pac. 63]: " [**50] If the insured cannot bring himself within the terms and conditions of the policy he cannot recover. The terms of the policy constitute the measure of the insurer's liability. If it appears that [***21] the contract has been violated, and thus terminated by the assured, he cannot recover. He seeks to recover by reason of a contract, and he must show that he has complied with such contract on his part." (See, also, *Smoot's Case*, 15 Wall. (U.S.) 36, [21 L. Ed. 107, see, also, Rose's U. S. Notes].)

It follows that the conclusion of law that respondent's refusal to submit to examination and produce his books and papers on the ground of his constitutional im-

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

munity was "justified . . . proper and right" is erroneous, and that upon the findings of fact as to his refusal judgment should have gone for the appellants. This renders it unnecessary to consider appellants' other contentions -- that the evidence is not sufficient to support either the finding that respondent was not implicated in causing the fire, or the finding that the gasoline was brought on the premises without his knowledge [*535] or consent; or to pass on their assignments of error to numerous rulings on evidence.

The judgment is reversed and the cause remanded, with directions to the court below to enter judgment in favor of the defendants.

EXHIBIT 19

LEXSEE

⚠
Caution
As of: Jul 03, 2008

FRANK HICKMAN, Respondent, v. THE LONDON ASSURANCE CORPORA-
TION (a Corporation), et al., Appellants

Sac. No. 2845

Supreme Court of California

184 Cal. 524; 195 P. 45; 1920 Cal. LEXIS 352; 18 A.L.R. 742

December 21, 1920

**PRIOR HISTORY:** [***1] APPEAL from a judg-
ment of the Superior Court of Kings County. M. L.
Short, Judge.

**DISPOSITION:** Reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Respondent insured filed
an action against appellant insurers to recover losses af-
ter the insured's clothing store was destroyed by fire. The
insurers sought review of the judgment of the Superior
Court of Kings County (California) in favor of the in-
sured.

**OVERVIEW:** Insurers issued policies to cover stock of
general merchandise in the insurer's clothing store. The
entire stock of goods was destroyed by fire. The insured's
employee was convicted of arson. The insured filed an
action against the insurers to recover losses under the
policies. The insurers claimed that the fire was started
with the knowledge of the insured. The court held: 1)
that an insurer's right to require an insured to submit to
an examination under oath was reasonable and useful; 2)
that when an insured refused to be examined under oath,
he forfeited all rights to recover; 3) that constitutional
immunity had no application to a private examination
arising out of a contractual relationship; 4) that the in-
sured failed to perform under the express provisions of
the policies by refusing to submit to an examination or to
produce records; 5) that the insurers were not obligated
to make another demand for examination after arson
charges were dismissed against the insured; and 6) that

the trial court erred in finding that the insured's refusal to
submit to examination and produce his books and papers
was justified on the ground of constitutional immunity.

**OUTCOME:** The court reversed the judgment of the
trial court in favor of the insured and remanded to the
trial court with directions to enter judgment in favor of
the insurers.

**CORE TERMS:** insured, gasoline, warranty, immunity,
arson, criminal prosecution, default, compelled, de-
manded, insurer's, designated, destroyed, fire insurance,
refusal to submit, compulsion, probation, burning, gal-
lon, stock, refused to submit, criminal charge, right to
demand, prosecuted, thereupon, invoices, vouchers,
claim of privilege, basement, pleaded, oil

**LexisNexis(R) Headnotes**

*Insurance Law > Claims & Contracts > Disclosure Ob-
ligations > Fraudulent Intent*
*Insurance Law > Property Insurance > Obligations >
Cooperation*
[HN1]As the facts with respect to the amount and cir-
cumstances of an insurance loss are almost entirely
within the sole knowledge of the insured, and the oppor-
tunity and temptation to perpetrate a fraud upon the in-
surer is often great, the insurer must have some means of
cross-examining upon the written statement and proofs
of the insured, for the purpose of getting at the exact
facts before paying the sum claimed of it. Such consid-
erations justify the policy provision requiring the insured

Page 1

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

as often as demanded to submit to an examination under oath touching all matters material to the adjustment of the loss. Such provisions are reasonable and valid.

*Civil Procedure > Discovery > Methods > Stipulations*
*Insurance Law > Claims & Contracts > Disclosure Obligations > Fraudulent Intent*
*Insurance Law > Claims & Contracts > Disclosure Obligations > Materiality*
[HN2]The right to require the insured to submit to an examination under oath concerning all proper subjects of inquiry is clearly stipulated for in the form of policies in general use. The intent of this provision is to prevent fraudulent concealment and to enable the insurer to obtain material information in regard to the origin and circumstances of the loss, the value of the property, and the claimant's interest therein. The requirement is a reasonable one and is useful in securing important and truthful disclosures that would otherwise be withheld, to the injury of the insurer. When the insured refuses to be examined under oath, he forfeits all right to recover.

*Civil Procedure > Discovery > Methods > Stipulations*
*Insurance Law > Property Insurance > Obligations > Cooperation*
[HN3]If the insurer acts within the terms of an expressed stipulation found in the policy, which gave it the right to demand an examination of the insured, it is not for the insured to inquire into the motive actuating the company in exacting the examination, but on his part to comply therewith and to answer all material questions, notwithstanding he may believe that the principal object of the company is to find some loophole whereby it might evade payment of the policy.

*Insurance Law > Property Insurance > Obligations > Cooperation*
[HN4]Until examination is had, losses are not, by the terms of an insurance policy, due and payable.

*Contracts Law > Breach > Nonperformance*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN5]To excuse nonperformance of an agreement, it must appear that the act to be done could not have been accomplished by any means.

*Evidence > Testimony > Examination > General Overview*

[HN6]The compulsion of a witness secured against by the U.S. Constitution is a compulsion exercised by the state in its sovereign capacity in some manner known to the law. Constitutional immunity has no application to a private examination arising out of a contractual relationship.

*Contracts Law > Breach > General Overview*
*Contracts Law > Performance > Impossibility of Performance > General Overview*
[HN7]Mere hardship or difficulty will not excuse a party from carrying out a contract and, where one contracts to do any act which is possible, he is liable for a breach, even though circumstances arise, without his fault, making it difficult, or even impossible, for him to perform.

*Insurance Law > Property Insurance > Obligations > Cooperation*
[HN8]If an insured cannot bring himself within the terms and conditions of the policy, he cannot recover. The terms of the policy constitute the measure of the insurer's liability. If it appears that the contract has been violated, and thus terminated by the insured, he cannot recover. He seeks to recover by reason of a contract, and he must show that he has complied with such contract on his part.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Fire Insurance Law--Submission of Insured to Examination Under Oath--Valid Provision.** --A provision in a fire insurance policy requiring the insured as often as demanded to submit to an examination under oath touching all matters material to the adjustment of the loss, and providing that no action on the policy shall be sustained until full compliance with such requirement, is a reasonable and valid stipulation.

**(2) Id.--Refusal to Submit to Examination-- Constitutional Immunity.** --An insured under a fire insurance policy containing a warranty that he will when required submit to an examination under oath concerning matters material to the adjustment of the loss cannot justify his refusal to submit to such an examination on the ground that his testimony might be used against him in a pending prosecution for arson, since the constitutional immunity has no application to a private examination arising out of a contractual relationship.

**(3) Id.--Action on Policy -- Defense of Breach of Warranty -- Second Demand for Examination Unneces-**

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

sary. --In an action to recover on a fire insurance policy containing a warranty that the insured would submit to an examination under oath whenever demanded concerning all proper subjects of inquiry, it was not necessary for the defendant, in order to avail itself of the defense that the plaintiff refused to submit to such an examination on the ground of constitutional immunity, to make a new demand upon the plaintiff for examination after the dismissal of a pending charge of arson, since the insured was in default by his refusal to submit to examination in the first instance, and the insurer was under no obligation to reopen the matter.

## SYLLABUS

The facts are stated in the opinion of the court.

**COUNSEL:** Watt, Miller, Thornton & Watt and Miller, Thornton, Miller & Watt, for Appellants.

Earl Rogers and H. P. Brown, for Respondent.

**JUDGES:** In Bank. Lawlor, J. Shaw, J., Wilbur, J., Lennon, J., Olney, J., Sloane, J., and Angellotti, C. J., concurred.

## OPINION BY: LAWLOR

## OPINION

[*525] [**46] The plaintiff, Frank Hickman, brought this action against the defendants, London Assurance Corporation, New Zealand Insurance Company, Limited, British & Federal Fire Underwriters of Norwich, England, Law Union & Rock Insurance Company, Limited, Yorkshire Insurance Company, Limited, Providence Washington Insurance Company, Sterling Fire Insurance Company, the Home Insurance Company of New York, and North British & Mercantile Insurance Company of London and Edinburgh, to recover for loss by fire on their respective policies. Judgment went for the plaintiff and the several defendants appeal. The record is presented in typewriting.

Prior to November 21, 1915, the said policies were issued to respondent to cover his stock of general merchandise [***2] kept and used by him in his "clothing and gents' furnishing goods store" in a two-story brick building, at 1922-1924 Mariposa Street, in the city of Fresno.

On the night of November 28, 1915, practically the entire stock of goods insured was destroyed by fire, and it is this loss which is the basis of respondent's asserted cause of action. Each of the policies was in the standard form prescribed by the legislature (Stats. 1909, p. 404) and contained a warranty that gasoline or benzine in ex-

cess of one quart would not be kept, used, or allowed on the premises. To the allegation of the complaint that the fire originated from causes unknown, the defendants set up in their answer that the fire was started with the knowledge, connivance, and design of the respondent, and that in violation of the above warranty gasoline in excess of one quart was kept, used, and allowed on the premises.

In the employ of respondent at the time of the fire, and for some years previously, was W. H. Jenks, who testified in detail that in July, 1915, a portion of respondent's stock was destroyed, and that the latter was dissatisfied with the settlement made by him with the companies then carrying his insurance; [***3] that thereafter the policies in suit were issued; that respondent had planned with him "to have the stock totally destroyed," and had told him to bring oil and gasoline upon the premises "and make all the arrangements for burning the store"; that between the 5th and the 15th of October he purchased five gallons of gasoline in a tin container, which he placed in the basement of the store, and told [*526] respondent of this; that subsequently respondent gave him "a gallon jug and a black grip or hand-bag," in which he brought five or more gallons of kerosene and a number of gallons of gasoline into the store; that prior to November 28th he distributed gasoline around the basement, in vessels, and used shavings and different articles to absorb it, so that by seepage the gasoline would be ignited by the gas "pilot lights"; that about 4 or 5 o'clock on the afternoon of November 28th he raised a trap-door in the basement, so that the draught thereby created would cause the gasoline to ignite, and went home, where he remained until notified by telephone that evening there was a fire in the store, and that thereupon, pursuant to the instructions of respondent, who had gone to San Francisco [***4] "to throw off all suspicion from him," he sent in his own name the following telegram to respondent: "Frank Hickman, care Washington Hotel, San Francisco. Don't buy more goods. Your store is burning."

The respondent testified that he went to San Francisco "to visit the Fair," and admitted having received the telegram while there, but denied that he induced Jenks to burn the property, or that he had any knowledge that it was to be done; that he had ever spoken to Jenks about burning the store or bringing gasoline or oil on the premises, or that he knew of any gasoline or oil being on the premises.

On December 2, 1915, a complaint was sworn to by J. G. Goehring, chief of police of Fresno, and filed on the following day, charging respondent and Jenks with the crime of arson alleged to have been committed in the burning of the store. December 22d they were held to answer. The district attorney filed an information on

Page 3

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

December 31st, upon which the accused were arraigned January 8, 1916, when respondent was released on bail. An amended information was filed January 13th. February 14th respondent pleaded not guilty. The trial opened on April 18th, and on April 24th, while it was [***5] still in progress, the district attorney moved the court for an order dismissing the information on the ground "that the people have not sufficient evidence on which to warrant a conviction." The motion was granted, the information dismissed, and the bail exonerated.

On May 22d Jenks pleaded guilty and applied for probation. The application was referred to the probation officer, who reported on June 9th, recommending that probation be [*527] denied, and it was so ordered. Jenks thereupon withdrew his plea of guilty and pleaded not guilty. He was tried, convicted on October 11, 1916, and released on probation for the term of five years.

This action was commenced on February 27, 1917. The cause was tried by the court sitting without a jury. It was found in effect that Jenks set fire to the store and that at the time he was insane; that the gasoline was carried upon the premises by him, without the knowledge or connivance of respondent, that respondent did not know there was any gasoline in the store, and that the fire occurred without any complicity on his part.

Each of the policies also contained the following warranty: "the insured shall exhibit to any person designated [***6] in writing by this company all that remains of any property herein described and [**47] shall submit to examination under oath, as often as required, by any such person, and subscribe to the testimony so given, and shall produce to such person for examination, all books of account, bills, invoices and other vouchers, and permit extracts and copies thereof to be made . . . No suit or action on this policy for the recovery of any claim shall be sustained until full compliance by the insured with all of the foregoing requirements."

On February 5th appellants made a written demand upon respondent that he appear before Leon Levy, a notary public, on February 11th, and, pursuant to the above warranty, submit to examination and produce "all original invoices, bills, and vouchers of goods . . . claimed by him to have been damaged or destroyed, . . . and all books of account pertaining to the business." On the last-mentioned date the hearing was continued by consent to the following day, when respondent appeared. The following took place: Respondent's counsel read into the record of the proceedings each of the letters in which the respective appellants had designated H. M. Farrar as [***7] their representative or adjuster "in any matters pertaining to the loss." Respondent was then sworn and this colloquy ensued: "Farrar: Q. Your name in full? A. Frank Hickman. Q. Your age? A. Forty-four. Q. Your

residence? A. 430 Neilson Avenue. Q. Business location? A. 1922 Mariposa. Q. How long have you been in your present business location? . . . A. I refuse to answer on the advice of counsel. Q. Now, Mr. Hickman, you refuse to answer [*528] any more questions? A. For the same reason, at this time." Thereupon respondent served and filed "a written statement" to the effect that he had been accused of arson and was about to be tried upon that charge; "that any material testimony which he might give at said examination would relate either to the amount, value, cost of or extent of damage to the goods . . . or to the cause of the fire, . . . both of which questions are at issue in said criminal proceeding"; that the criminal charge had been initiated and was being prosecuted by H. M. Farrar, appellants' adjuster; that he, respondent, had been advised by counsel that any testimony given by him at any examination could and would be used against him on his trial for arson; [***8] that, by virtue of article I, section 13, of the constitution, he refused to submit to examination or to produce any books or papers at that time; that he was ready "to stipulate and agree that he will" submit to examination "immediately after the conclusion of the said criminal prosecution and immediately after the trial of said cause and verdict and judgment therein"; and that if appellants or Farrar would cause the arson charge to be dismissed he would submit to examination at any time. In reply the following statement was made by Farrar: "The insurance companies . . . refuse to accept Mr. Hickman's offer . . . and further demand that he now submit to examination and furnish the books, bills, invoices, etc., heretofore demanded." Whereupon respondent said: "I stand by my reasons given this morning and the course adopted this morning." No other demand by appellants or offer by respondent to submit to examination and produce the required books and papers was made at any time.

The court found "that the examination of said plaintiff at said time [February 12th] . . . would have had for its purpose inquiry into matters necessarily involved in a criminal prosecution; . . . that the [***9] course and conduct of said plaintiff in the matter of said hearing . . . was proper and right, and that he was justified in said course and conduct; that the plaintiff did comply with all . . . the terms and conditions of said policies; . . . and that he was justified in refusing to submit to an examination under oath at said time when said information and trial were pending."

The court justified respondent's refusal solely on the ground of his claim of privilege.

[*529] Appellants contend that respondent cannot recover because he "refused to submit to examination under oath, or to permit his books, or vouchers, or bills, or other papers concerning the property . . . to be inspected by the defendants herein, which refusal was in

violation of the provisions of said policies"; further, "that the excuse given by plaintiff . . . has no merit, for the reason that in . . . section 1324 of the Penal Code it is expressly declared that no information which might be obtained from him on his examination . . . could be used against him in any criminal proceedings"; and that "the provision of the policies . . . is equivalent to a positive unconditional promise on the part of plaintiff that [***10] he will comply therewith, irrespective of how such compliance may affect him, and . . . his refusal would constitute such a violation . . . of the provision as would preclude him from instituting any action thereon."

Respondent's claim of privilege is thus stated in his brief: "A defendant on trial for his liberty has the right to refuse to submit to a private inquisition." It is a fact, as already appears, that two days after respondent's refusal issue was joined on the criminal charge and thereafter until April 24th it was pending against him.

(1) The validity of provisions of the character here under consideration has been frequently upheld. ( _Gross v. St. Paul Fire & Marine Ins. Co._, 22 Fed. 74; _Fleisch v. Insurance Co. of North America_, 58 Mo. App. 596; _Firemen's Fund Ins. Co. v. Sims_, 115 Ga. 939, [42 S. E. 269]; _Pearlstine v. Westchester Fire Ins. Co._, 70 S. C. 75, [49 S. E. 4]; _Southern Home Ins. Co. v._ [**48] _Putnal_, 57 Fla. 199, [49 South. 922]; _Liverpool L. & G. Ins. Co. v. Cargill_, 44 Okl. 735, [145 Pac. 1134]; _National Fire Ins. Co. v. Humphreys_ (Tex. Civ.), 211 S. W. 811; Richards on Insurance Law, [***11] 3d ed., 416; 1 Clement on Fire Insurance, 251; 5 Joyce on Insurance, sec. 3330; 19 Cyc. 853; 4 Cooley's Briefs on Insurance, 3395.)

This rule is thus expressed in 13 Am. & Eng. Ency. of Law, 358: [HN1]"As the facts with respect to the amount and circumstances of a loss are almost entirely within the sole knowledge of the insured, and the opportunity and temptation to perpetrate a fraud upon the insurer is often great, it is necessary that it have some means of cross-examining, as it were, upon the written statement and proofs of the [*530] insured, for the purpose of getting at the exact facts before paying the sum claimed of it. Such considerations justify the provision universally to be met with in policies, requiring the insured as often as demanded to submit to an examination under oath touching all matters material to the adjustment of the loss, and provisions of that character are held to be reasonable and valid."

And in Ostrander on Fire Insurance, second edition, section 172, it is said: [HN2]"The right to require the insured to submit to an examination under oath concerning all proper subjects of inquiry is clearly stipulated for in the form of policies now in general use. The [***12] intent of this provision is to prevent fraudulent conceal-

ment, and to enable the insurer to obtain material information in regard to the origin and circumstances of the fire, the value of the property, and the claimant's interest therein. The requirement is a reasonable one, and will often, no doubt, be useful in securing important and truthful disclosures that would otherwise be withheld, to the injury of the insurer. When the insured refuses to be examined under oath, he will forfeit all right to recover."

In _Connecticut Fire Ins. Co. v. George_, 52 Okl. 432, [153 Pac. 116], the court said that "There may be logic in plaintiff's argument that defendant was not conducting the examination in good faith, but the fact still remains that [HN3]defendant was acting within the terms of an expressed stipulation found in the policy, which gave it the right to demand such an examination, and it is not for the insured to inquire into the motive actuating the company in exacting the examination, but on his part to comply therewith and to answer all material questions, notwithstanding he may believe that the principal object of the company is to find some loophole whereby it might evade [***13] payment of the policy.

It was in _Bonner v. Home Ins. Co._, 13 Wis. 758, 771, that the court, speaking through Mr. Chief Justice Dixon, said: "This action should have been dismissed because prematurely commenced; for, [HN4]until the examination was had, the losses were not, by the terms of the policies, due and payable."

And it was said in _Wheeler v. Connecticut Ins. Co._, 82 N. Y. 543, [37 Am. Rep. 594], citing _Beebe v. Johnson_, 19 Wend. 500, that [HN5]"to excuse nonperformance it must appear that the act to be done could not by any means have been accomplished."

[*531] It is to be noted that under the policies a loss was not payable until ninety days after the receipt by appellants of respondent's preliminary proofs of loss, and that no action on the policies should be sustained "unless begun within fifteen months next after the commencement of the fire." The latter period would have expired on February 28, 1917, and the action, as we have stated, was commenced the day before.

No case has been cited, and we are aware of none, where the constitutional immunity of an insured was urged as a ground for refusing to submit to examination, or to produce books and papers. [***14] _Counselman v. Hitchcock_, 142 U.S. 547, [35 L. Ed. 1110, 12 Sup. Ct. Rep. 195, see, also, Rose's U. S. Notes], and _Ex parte Clarke_, 103 Cal. 352, [37 Pac. 230], however, are cited by respondent in support of his failure to comply with the demand. In the first of these cases Counselman had been subpoenaed to appear before a federal grand jury and give testimony concerning certain alleged violations of the Interstate Commerce Act (24 Stat. 379). He refused to testify on the ground that any testimony he

184 Cal. 524, *; 195 P. 45, **;
1920 Cal. LEXIS 352, ***; 18 A.L.R. 742

might give could be made the basis for a criminal prose-cution against him under said act. Upon his continued refusal to testify he was committed for contempt and he sued out a writ of *habeas corpus*. The supreme court, in discharging the petitioner, said: "It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investiga-tion, to give testimony which might tend to show [***15] that he himself had committed a crime. . . . It is an ancient principle of the law of evidence that a wit-ness shall not be compelled, *in any proceeding*, to make disclosures or to give testimony which will tend to crim-inate him or subject him to fines, penalties or forfei-tures." (Italics ours.)

The Clarke case was also a proceeding in *habeas corpus*. The petitioner had been adjudicated an insol-vent, and he was cited to appear before the superior court to be examined concerning his assignee's charge that he had fraudulently concealed property which should have been turned over to such [*532] assignee for the benefit of his creditors. Clark declined to testify "upon the ground that his answers might be made the foundation of a criminal action against him." He was committed for contempt, and in discharging him from custody this court, speaking through the late Chief Justice Beatty, said: "To bring a person within the immunity of the con-stitutional provision, it is not necessary that the examina-tion should be attempted [**49] in a criminal prosecu-tion against the witness, or that such a prosecution should have been commenced or actually pending. It is sufficient if [***16] there is a law creating the offense under which the witness may be prosecuted. If there is such a law under which the witness may be indicted, or otherwise prosecuted, for a public offense arising out of the acts to which the examination relates, he cannot be compelled to answer in any collateral proceeding unless the law absolutely secures him against any use in a criminal prosecution of the evidence he may give," and the court followed *Counselman v. Hitchcock, supra.*

(2) But those and other authorities of similar import refer only to [HN6]the attempted compulsion of a wit-ness in a trial, either civil or criminal, a hearing or other lawful inquiry of a public nature. The compulsion se-cured against by the constitution is a compulsion exer-cised by the state in its sovereign capacity in some man-ner known to the law. Constitutional immunity has no application to a private examination arising out of a con-tractual relationship. The examination to which appel-lants demanded respondent should submit was an extra-judicial proceeding, not authorized by any constitutional

or statutory provision, but purely by virtue of a contract between the parties. To bring a case within the constitu-tional [***17] immunity, it must appear that compulsion was sought under public process of some kind. This being so, respondent's refusal to undergo examination and produce his books and papers acquires no sanctity because he urged his constitutional right not to be com-pelled to be a witness against himself. The demand was made upon him by virtue of the stipulation in the con-tract and by the stipulation alone must his refusal be judged. The stipulation constituted a promissory war-ranty under which appellants had the right to demand compliance by respondent "as often as required," and the performance of such stipulation was a condition prece-dent to any right of action. No question was [*533] raised as to the sufficiency of the demand, or, aside from the claim of privilege, as to the reasonableness of the time and place designated in the demand. The obligation to perform the warranty was as binding on respondent as his obligation to pay the premiums on the policies. The respondent did not fulfill his obligation, and stands here as having recovered a judgment upon an express contract one of the conditions of which he has failed to perform. In other words, when he commenced this suit he was [***18] without a cause of action.

Respondent cites certain cases holding that the right to demand the performance of the condition precedent must be exercised in a reasonable manner. Thus, in *Thomas v. Burlington Ins. Co.*, 47 Mo. App. 169, and *Gordon v. St. Paul Fire & M. Ins. Co.*, 197 Mich. 226, [L. R. A. 1918E, 402, 163 N. W. 956], it was held under a similar stipulation that the insured was justified in in-sisting that his counsel be present at his examination and in refusing to be examined unless he were permitted to be present. In *Phillips v. Protection Ins. Co.*, 14 Mo. 220, the court declared that the prevalence of a cholera epidemic at the place designated excused the nonatten-dance of the insured. Under a stipulation to submit to examination as often as required and a special promise to reappear after the original examination, which the in-sured after notice failed to do, it was held in *Porter v. Traders' Ins. Co.*, 164 N. Y. 504, [52 L. R. A. 424, 58 N. E. 641], that because he was sufficiently examined at the first hearing the insured was not in default. In all of these cases, however, the question was merely as to the rea-sonableness of the time, [***19] place, or mode of ex-amination. No objection to the examination on any such ground was made here.

(3) Respondent's offer of February 12th, as we have seen, is twofold -- an offer to comply with the de-mand after the charge of arson was dismissed, or at *any* time if appellants would cause such charge to be dis-missed. The point is made that in view of this offer, which was a part of the respondent's refusal to submit to

examination, the appellants, after the dismissal of the charge of arson, should have made a new demand upon the respondent for his examination, and that such demand not having been made, he was not in default. But the respondent was already in default, as he had no right to refuse on the ground stated to submit to examination in the first instance. It may be that if he himself had [*534] made an offer, after the criminal charge against him had been dismissed, to then and there submit to an examination, and such offer had been refused, his default would have been removed. But he did not so offer, and, since he was in default, the appellants were under no obligation themselves to reopen the matter.

It may be conceded that the position in which respondent found [***20] himself between February 12th and April 24th was one of difficulty, but it was a difficulty created by the contract he made. It has been said that [HN7]"Mere hardship or difficulty will not excuse a party from carrying out a contract; and, where one contracts to do any act which is possible, he is liable for a breach, even though circumstances arise, without his fault, making it difficult, or even impossible, for him to perform. ( _Walker_ v. _Tucker_, 70 Ill. 527; _Ballance_ v. _Vanuxem_, 191 Ill. 319, [61 N. E. 85]; _Lake Shore & M. S. R. Co._ v. _Richards_, 152 Ill. 59, [30 L. R. A. 33, 38 N. E. 773].) The breach of this contract by appellants relieved the other parties from performance on their part. (7 Am. & Eng. Ency. of Law, 2d ed., p. 150, and cases there cited.)" ( _Ptacek_ v. _Pisa_, 231 Ill. 522, [14 L. R. A. (N. S.)

537, 83 N. E. 221].) And it was declared in _Bastian_ v. _British American etc. Co._, 143 Cal. 287, [66 L. R. A. 255, 77 Pac. 63]: " [**50] [HN8]If the insured cannot bring himself within the terms and conditions of the policy he cannot recover. The terms of the policy constitute the measure of the insurer's liability. If it appears that [***21] the contract has been violated, and thus terminated by the assured, he cannot recover. He seeks to recover by reason of a contract, and he must show that he has complied with such contract on his part." (See, also, _Smoot's Case_, 15 Wall. (U.S.) 36, [21 L. Ed. 107, see, also, Rose's U. S. Notes].)

It follows that the conclusion of law that respondent's refusal to submit to examination and produce his books and papers on the ground of his constitutional immunity was "justified . . . proper and right" is erroneous, and that upon the findings of fact as to his refusal judgment should have gone for the appellants. This renders it unnecessary to consider appellants' other contentions -- that the evidence is not sufficient to support either the finding that respondent was not implicated in causing the fire, or the finding that the gasoline was brought on the premises without his knowledge [*535] or consent; or to pass on their assignments of error to numerous rulings on evidence.

The judgment is reversed and the cause remanded, with directions to the court below to enter judgment in favor of the defendants.

# End Of LexisNexis® Get & Print Report

**Session Name:**     **GP010703**

**Date:**     **July 03, 2008**

**Client:**     **1150-107**

EXHIBIT 20

LEXSEE 269 CAL APP 2D 675

**DAVID M. HOLMES, Plaintiff and Respondent, v. JACK STEELE et al., Defendants and Appellants**

**Civ. No. 32578**

**Court of Appeal of California, Second Appellate District, Division Three**

**269 Cal. App. 2d 675; 75 Cal. Rptr. 216; 1969 Cal. App. LEXIS 2454**

**February 14, 1969**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Los Angeles County. Vincent W. Heublein, Court Commissioner, Judge pro tem.

Action to recover money paid in discharge of an obligation of a third person.

**DISPOSITION:** Reversed. Judgment for plaintiff reversed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

(1) **Vendor and Purchaser--Rescission by Purchaser--Grounds--Fraud and Mistake.** --A prospective buyer of a beer tavern business was entitled to rescind the purchase agreement where the seller, in the written escrow instruction, had warranted the premises "to be in suitable condition to comply with all regulations of any agency . . . ," and where, before the purchase was completed and the escrow closed, the prospective buyer was informed by the city Department of Building and Safety that the premises were in violation of certain building and safety code provisions and failed to pass inspection.

(2) **Contracts--Rescission--Effect.** --If facts exist that justify a rescission by one party to a contract and he declares a rescission in some effectual manner, the contract becomes a nullity; and each of its terms and provisions cease to be subsisting or enforceable against the other party.

(3a) (3b) **Id.--Actions--Restitution: Contracts for Benefit of Third Person--Rescission.** --Where the prospective buyer of a beer tavern business was entitled to rescind the purchase agreement for breach of a warranty by the seller, where, further, under the written escrow

instructions, the seller's liability for the brokers' commission was to be discharged by the buyer's initial deposits in escrow, such amount being credited to the buyer as part of the purchase price, and where the brokers were chargeable with knowledge of the warranty, the brokers were not protected against rescission if, on or before receiving the amount of their commission, they had notice of the defect that permitted the rescission. Thus it was reversible error in an action by the buyer to recover his deposits to render judgment for the buyer without specific finding that the brokers did, in fact, have such notice.

(4) **Id.--Actions--Restitution.** --The principle of unjust enrichment forms the basis for the right to restitution upon a quasi-contractual theory of recovery. Accordingly, where one obtains a benefit which he may not justly retain, he is unjustly enriched, and the law creates an obligation, irrespective of the intention of the parties, that such person restore the aggrieved party to his former position by return of the thing or its equivalent in money.

**COUNSEL:** Mack, Nast & Boss and Leo Mack, Jr., for Defendants and Appellants.

No appearance for Plaintiff and Respondent.

**JUDGES:** Ford, P. J. Moss, J., concurred. Cobey, J., concurring and dissenting.

**OPINION BY:** FORD

**OPINION**

[*676] [**217] The defendants Steele have appealed from a judgment in favor of the plaintiff for recovery of $ 2,000, together with interest thereon from December 21, 1965. [1] No brief has been filed on this appeal by the plaintiff.

269 Cal. App. 675, *; 75 Cal. Rptr. 216, **;
1969 Cal. App. LEXIS 2454, ***

1   Jurisdiction was in the superior court because one of the causes of action was for declaratory relief. (See *Cook* v. *Winklepleck*, 16 Cal.App.2d Supp. 759, 764-766 [59 P.2d 463].)

Portions of the settled statement (rule 7, Cal. Rules of Court) are as follows: "On or about September 10, 1965, defendant [***2] Clifford J. Emmich, Jr., as 'Seller', and plaintiff, as 'Buyer', entered into a written escrow instruction for the sale and purchase of a certain beer tavern business. . . . That said escrow instructions provided in part as follows: 'The seller warrants the premises to be in suitable condition to comply with all regulations of any agency having jurisdiction and/or control over these premises or operation of the business to be conducted therein.' That on or about September 10, 1965, the plaintiff deposited with defendant, Jack Steele & Associates, through its authorized agent and co-defendant, Richard Steele, the sum of $ 1,000.00, of the total sum of $ 3,000.00 to be deposited by buyer . . . [and] on or about September 17, 1965, . . . the sum of $ 1,000.00, of the total sum of $ 3,000.00 to be deposited by buyer. . . . The defendants, Richard Steele and Jack Steele & Associates, executed receipts showing that the deposits were to be in the 'trust account'. . . . A clause of said escrow instructions was inserted, at neither the request nor the demand of the buyer, nor of the seller, . . . as follows: 'It is expressly agreed and [*677] understood that the seller is presently [***3] obligated to pay to Jack Steele & Associates a brokerage commission in the sum of $ 2,000.00 for services rendered and completed. Seller and buyer authorize and instruct said broker to retain and apply from the buyer's deposit of $ 3,000.00 the sum of $ 2,000.00 as payment in full of seller's obligation. Seller shall credit buyer on account of the purchase price for said payment on his behalf.' The building and premises of the certain beer tavern business . . . were inspected by representatives of the Los Angeles Department of Building & [**218] Safety and found to be in violation of certain Building & Safety Code provisions and failed to pass inspection. The plaintiff was informed by the representatives of said Department of such findings and on or about December 21, 1965, the plaintiff served notice of rescission on all defendants. On or about December 28, 1965, the plaintiff made written demand on the defendant, Jack Steele & Associates, for the return of the $ 2,000.00, and such demand was refused. The purchase . . . was not completed and the escrow never closed. . . ."

In the brief of the defendants Steele it is stated that pursuant to the written escrow instructions [***4] the sum of $ 2,000 was paid to defendant Jack Steele & Associates outside of escrow.

**(1)** Since the premises were not "in suitable condition to comply with all regulations of any agency having

jurisdiction and/or control over these premises or operation of the business to be conducted therein," and thus not as represented by the seller, the plaintiff, as buyer, was entitled to rescind the agreement. (Cf. *Riff* v. *Mayhew*, 90 Cal.App.2d 712, 717 [203 P.2d 812].) **(2)** The effect of a rescission is as follows: "When a contract is rescinded it is extinguished. Hence, if facts exist that justify a rescission by one party, and he declares a rescission in some effectual manner, he terminates the contract. . . . The contract becomes a nullity; it and each of its terms and provisions cease to be subsisting or enforceable against the other party." (12 Cal.Jur.2d, Contracts, § 206, p. 425.)

**(3a)** It appears that the seller was liable to the defendants Steele for a broker's commission and that the buyer's money was used for the purpose of discharging that obligation. The question to be resolved is whether, since the provision of the escrow agreement pursuant to which $ 2,000 of the plaintiff buyer's [***5] money was paid to the defendants Steele has, along with the rest of the agreement between the seller and buyer,  [*678] become a nullity by reason of the rescission, those defendants can retain the money.

It was a reasonable inference that the defendants Steele were aware of the escrow provision, expressed as a warranty, [2] as to the condition of the property as well as the provision in their favor relating to the payment of $ 2,000 to them. No contention to the contrary is made. Consequently, their relationship to the matter was such that they were chargeable with the knowledge that the transaction could become a nullity in the event that the condition of the property was not as represented. In the light of that fact they are not in a position to assert that, because of any change of position or of circumstances, they are completely insulated from a duty to return to the plaintiff buyer the sum of $ 2,000.

2   In *Gagne* v. *Bertran*, 43 Cal.2d 481, at page 486 [275 P.2d 15], the Supreme Court stated: "For historical reasons warranties have become identified primarily with transactions involving the sale or furnishing of tangible chattels (see Prosser, Torts [1941], pp. 739-740; 1 Williston on Sales [rev. ed., 1948], §§ 195-197), but they are not confined to such transactions. Strict liability has also been imposed for innocent misrepresentations of facts that the maker purported to know, that the recipient relied on in matters affecting his economic interests, and that the maker positively affirmed under circumstances that justify the conclusion that he assumed responsibility for their accuracy."

[***6]    **(4)**   As stated in *Branche* v. *Hetzel*, 241 Cal.App.2d 801, at page 807 [51 Cal.Rptr. 188]: "The

principle of unjust enrichment is related to the subject of restitution and forms the basis for the right to restitution upon a quasi-contractual theory of recovery. Accordingly, 'Where one obtains a *benefit* which he may not *justly retain*, he is unjustly enriched,' and the law creates an obligation, irrespective of the intention of the parties, that such person 'restore the aggrieved party to his former position by return of the *thing* or its *equivalent* in money.' (1 Witkin, Summary of Cal. Law (1960) § 7, p. 19; [**219] see Rest., Restitution, § 1; Rest., Contracts, § 5, com. (a); and see *Philpott* v. *Superior Court*, 1 Cal.2d 512, 521 [36 P.2d 635, 95 A.L.R. 990].)"

(3b) In resolving the question of the application of the principle of unjust enrichment to the present case, some aid is furnished by section 17 of the Restatement of the Law of Restitution. That section is as follows: "A person who has paid money to another in the performance of an agreement with a third person is entitled to restitution from the other if, because of fraud or mistake, the agreement [***7] or transfer was ineffective or was voidable and has been avoided, unless the other gave value therefor or changed his position, without [*679] notice of the cause of avoidance." In the first paragraph of comment b of section 17 it is stated as follows: "*Creditor beneficiary*. A person may agree with a third person to confer a benefit upon another to satisfy an actual or supposed duty owed by the third person to the other; such other is a creditor beneficiary (see Restatement of Contracts, § 133). If this agreement does not result in a contract or if the contract is voidable by the promisor, the creditor beneficiary, like the promisee, cannot enforce it (see Restatement of Contracts, § 140). On the other hand, if the creditor beneficiary has an existing right against the third person and receives the property in discharge of the duty of the third person, the rule stated in § 14 is applicable. As there stated, he is protected against rescission of the transaction unless, at the time of receiving the property, he had notice of a defect in the original contract which would permit rescission as against the promisee (see Illustrations 4, 5 and 6)."

The difficulty in the present [***8] case is that both the settled statement on appeal and the findings of fact fail to show any resolution of the issue of whether the defendants Steele had notice, at the time of or prior to the receipt of any of the money paid to them, that there was a defect with respect to the agreement of sale as embodied in the escrow instructions which would permit rescission as against the seller. Consequently, the judgment must be reversed and the cause remanded to the trial court for the purpose of determining that issue since such determination is basic to a proper disposition of the controversy.

The judgment is reversed.

**CONCUR BY:** COBEY (In Part)

**DISSENT BY:** COBEY (In Part)

**DISSENT**

COBEY, J., Concurring and Dissenting. I concur in the reversal but dissent as to its basis. I do not believe that on this record the law of restitution should be applied to the broker's withdrawal of the commission owed him by the seller from the buyer's deposit in escrow. The escrow instructions expressly state that the seller is *presently* obligated to pay the broker a brokerage commission of $ 2,000 *for services rendered and completed*, and that both the buyer and the seller authorize and instruct the broker to [***9] retain and apply said commission from the buyer's deposit in escrow.

I do not think that failure of performance on the part of the broker's principal, the seller, gives rise to any right of rescission as against the innocent broker as contrasted with [*680] the defaulting seller. In the absence of any showing of wrongful conduct on the agent's part, or of circumstances indicating that he contemplated assuming responsibility for his principal's performance of the contract, an agent for a disclosed principal does not become liable for such nonperformance. (See Civ. Code, § 2343; *Bogart* v. *Crosby & Van Haren*, 80 Cal. 195, 196-198 [22 P. 84]; Rest.2d Agency, § 328, p. 80.)

There is nothing in the record to indicate any culpability whatsoever on the part of the broker in the seller's failure of performance. As the seller's agent, in my opinion, the broker did not impliedly warrant the accuracy of the seller's representations to the buyer and he should not therefore be held liable for any subsequently discovered inaccuracy in them.

EXHIBIT 21

LEXSEE 60 CAL APP 3D 885

**ERNEST LAKS et al., Plaintiffs and Appellants, v. COAST FEDERAL SAVINGS AND LOAN ASSOCIATION, Defendant and Respondent**

**Civ. No. 47006**

**Court of Appeal of California, Second Appellate District, Division Five**

**60 Cal. App. 3d 885; 131 Cal. Rptr. 836; 1976 Cal. App. LEXIS 1782**

**August 10, 1976**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing was Denied September 8, 1976, and Appellants' Petition for a Hearing by the Supreme Court was Denied October 6, 1976.

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C-111247, August J. Goebel, Judge.

**DISPOSITION:** The order of dismissal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Plaintiff hotel developers brought an action against a lending institution for damages alleged to have resulted from defendant's failure to make a loan as set out in a letter of "conditional commitment." The trial court sustained defendant's demurrer without leave to amend, holding that the letter was not an enforceable contract, and dismissed the action. (Superior Court of Los Angeles County, No. C-111247, August J. Goebel, Judge.)

The Court of Appeal affirmed. The court rejected plaintiffs' contention that the complaint was sufficient to state a cause of action for promissory estoppel, holding that the first requisite for promissory estoppel was missing, namely a clear and unambiguous promise by defendant to commit itself to making a loan in any specified amount. The court also held that reasonable and foreseeable reliance by plaintiffs was absent, in that they should have realized the nature of the conditional offer and should have resolved the ambiguities and obtained a finalized agreement. (Opinion by Hastings, J., with Kaus, P. J., and Stephens, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1a) (1b) Estoppel and Waiver § 9--Promissory Estoppel.** --A letter from a lending institution to plaintiffs relating to a loan for the development of a hotel was not binding on the lender under a theory of promissory estoppel, and the trial court properly sustained a demurrer to the complaint and dismissed the cause of action for damages for failure to make the loan, where the letter's provision concerning the principal amount to be committed by defendant only provided that one named bank was to be the lead lender, another bank was to inspect and make progress payments, while defendant was to participate in not more than 75 percent of the loan, with the option of reducing that position, and where the letter was also silent as to payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculation, loan disbursement procedures, and rights and remedies of the parties in case of default. Accordingly, the first requisite for a complaint for promissory estoppel was missing, that is, a promise that is clear and unambiguous in its terms.

**(2) Estoppel and Waiver § 9--Promissory Estoppel-- Elements.** --The required elements for promissory estoppel are a promise clear and unambiguous in its terms; reliance by the party to whom the promise is made, which is both reasonable and foreseeable; and injury to the party asserting the estoppel resulting from his reliance.

**COUNSEL:** Nelson, Liker & Merrifield, Rodney E. Nelson and Shelley Mercer for Plaintiffs and Appellants.

McKenna & Fitting, Les J. Weinstein, Aaron M. Peck and Alan Holmberg for Defendant and Respondent.

**JUDGES:** Opinion by Hastings, J., with Kaus, P. J., and Stephens, J., concurring.

**OPINION BY:** HASTINGS

**OPINION**

[*886]    [**836]    The facts are not in dispute. Plaintiffs and appellants, Ernest Laks and Richard Schubot (hereinafter "appellants") sought to develop a Sheraton Motor Inn located [**837] near the San Francisco International Airport.    Appellants had obtained a broker to assist them in finding [*887] the financing for the project.    On January 9, 1973, Coast Federal Savings and Loan Association (hereinafter "Coast") sent to appellants' broker a letter of conditional commitment which read as follows:

Mr. Roger H. Alexander

Vice President

Kassler & Company

555 California Street Suite 4870

San Francisco, [***2] California 94104

Dear Roger:

Re: Sheraton Motor Inn - San Francisco International Airport.

Coast Federal Savings, hereinafter referred to as Coast, is pleased to move from our letter of intent to commit, dated December 11, 1972, to this conditional commitment, as follows:

Loan Amount: $ 7,000,000; which must be supported by appraised value with resulting loan to value ratio not in excess of 75%.

Secondary Financing: None permitted.

Interest Rate: 9.00%.

Fees: 1% non-refundable collected at time Commitment Letter accepted and an additional 1% collected at time of loan closing.

Maturity: Interim - 24 months.    Permanent - 25 years.

Construction Financing: Chase Manhattan Bank to be lead lender, Wells Fargo Bank to inspect and make progress payments, Coast to participate in not more than 75% of said loan.    Coast to have the option of reducing said position and increasing Wells Fargo Bank's by same amount.    Coast has begun conversation with Mr. Robert Bevins, Vice President, Wells Fargo Bank (213) 683-7259 in Los Angeles.

Funding: Interim Loan to be recorded no later than March 30, 1973.

[*888]    Appraisal: Must be acceptable [***3] to Coast, Chase and Wells; Coast acknowledges receipt of a feasibility study prepared by the National Feasibility Corporation.    Said study is still under evaluation by Coast; please refer to correspondence between National and Coast.

Mr. Roger H. Alexander

Page 2

January 9, 1973

Ownership of proposed project between Ernest Laks and Richard Schubot to be clarified; Dunn & Bradstreet reports required on both.    Final Limited Partnership Agreement subject to Coast review and approval.

Property Management: Management of subject property subject to review and approval by Coast Federal.    Resume of owners management history plus copies of Management Contract, if applicable, to be forwarded for review.

Plans, specifications and detailed cost breakdown requested on proposed project.

Cordially,

/signature/

Brent Gossage

BG: jl

Acknowledged by: /signature/

Ernest Laks

Date: 1-15-73

[**838]    It is this letter that is the basis for the claim for breach of contract.    Coast demurred to the complaint on the ground, inter alia, that it failed to allege facts suf-

60 Cal. App. 3d 885, *; 131 Cal. Rptr. 836, **;
1976 Cal. App. LEXIS 1782, ***

ficient to constitute a cause of action. The court sustained the demurrer without [***4] leave to amend, holding that the letter is not an enforceable contract. The sustaining of the demurrer occurred [*889] after counsel for appellants stated that he could not allege other facts as to the existence of a contract. [1]

> 1 On appellant's motion for rehearing of order sustaining demurrer, a proposed amended complaint was attached to the motion. The court, in its order denying the motion, stated: "The court recognized that counsel should have an opportunity to amend; but where counsel didn't want it and/or wasn't able to plead facts to get over the demurrer, the court relied thereon." However, we reviewed the proposed amended complaint and it is also fatal in that it does not state a cause of action for promissory estoppel. It pleads the January 15, 1973, letter as an executed contract between the parties, and that Coast waived the conditions required of appellants. The conditions allegedly waived, however, do not cure the defects surrounding the construction loan. The essential terms and commitment of the lenders are still missing.

[***5] Subsequently, an order dismissing the action was filed and the appellants appeal from this order.

I

Appellants contend the court erred in sustaining the demurrer because the complaint sufficiently stated a cause of action for promissory estoppel. They claim that the conditional commitment letter is binding on Coast because (1) all of the conditions to defendant's commitment set forth in the letter were either met or waived by Coast, and (2) appellants relied on it to their detriment in that they proceeded with the development of the project including forbearance from seeking other financing. At the time Coast repudiated the conditional commitment, appellants had only 45 days within which to break ground on the project in order to maintain their permit. The alternative financing was substantially more expensive than that conditionally committed by respondent. They did, however, succeed in building the Motor Inn, and it is now in operation.

Appellants' claim of promissory estoppel is based on Restatement of Contracts, section 90, [2] and the cases of *Drennan* v. *Star Paving Co.*, 51 Cal.2d 409 [333 P.2d 757]; *Aronowicz* v. *Nalley's, Inc.*, 30 Cal.App.3d 27 [106 [***6] Cal.Rptr. 424]; *Saliba-Kringlen Corp.* v. *Allen Engineering Co.*, 15 Cal.App.3d 95 [92 Cal.Rptr. 799]; *Norcross* v. *Winters*, 209 Cal.App.2d 207 [25 Cal.Rptr. 821]; *Anchor Cas. Co.* v. *Surety Bond Sav. & Loan Assn.*, 204 Cal.App.2d 175 [22 Cal.Rptr. 278]; *Wade* v.

*Markwell & Co.*, [*890] 118 Cal.App.2d 410 [258 P.2d 497, 37 A.L.R.2d 1363]; and *Morrison* v. *Home Savings & Loan Assn.*, 175 Cal.App.2d 765 [346 P.2d 917]. [3]

> 2 Section 90 of the Restatement of Contracts states: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance and which is binding if injustice can be avoided only by enforcement of the promise."
> 3 These cases are easily distinguishable from the case at bench in that the promises relied upon were certain and unambiguous.

(1a) Coast replies that the gravamen of appellants' claim is its failure to make two loans; [***7] an interim loan to finance construction, and a permanent loan. That in a loan contract the single most crucial term is the principal amount committed by the lending institution and the key paragraph of the letter is silent on this point. The paragraph states: "Construction Financing: Chase Manhattan Bank to be lead lender, Wells Fargo Bank to inspect and make progress payments, Coast to participate in not more than 75% of said loan. Coast to have the option of reducing said position and increasing Wells Fargo Bank's by same amount. Coast has begun conversation with Mr. Robert Bevins, Vice President, Wells Fargo . . ."

[**839] Coast further argues that other essential terms are missing. In essence, they are as follows:

(1) The letter lists no schedule of payment for either the interim or construction loan as required by regulation of the Federal Home Loan Bank Board.

(2) The security for the loan is not identified.

(3) The identity of the borrower is not clear.

(4) Miscellaneous items are missing; namely, prepayment conditions, terms for interest calculations, method for loan disbursements and rights and remedies of the lender in the case of default.

II

(2) The required [***8] elements for promissory estoppel in California are set forth in *Thomson* v. *Internat. Alliance of Stage Employes*, 232 Cal.App.2d 446, 454 [42 Cal.Rptr. 785]. They are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.

[*891] (1b) Coast did not make a clear and unambiguous offer. In the initial paragraph of the letter, it states it is a conditional commitment. This immediately

places the offeree on notice that finalization of the terms will undoubtedly require further negotiations. This also becomes apparent from the offer itself. The paragraph on Construction Financing is clear in only one respect, namely, that Coast has begun conversation with the vice president of Wells Fargo Bank -- a fact that immediately implies that final terms are far from completed. The remainder of the paragraph defies interpretation. Chase Manhattan Bank is to be lead lender, with Wells Fargo acting as the bank that will inspect the construction and based thereon make the progress payments. Fair enough. But [***9] then the very fatal language "Coast to participate in not more than 75% of said loan. Coast to have the option of reducing said position *and increasing Wells Fargo Bank's by same amount.*" (Italics added.) Coast can only increase Wells Fargo's loan if Wells Fargo has committed itself -- and of course it hasn't as negotiations are still pending. Added to this is the fact that Coast has not made a binding commitment to loan *its* money on the interim financing, but has merely an option to take up to 75 percent of it. The letter is completely silent on the lead lender's (Chase Manhattan Bank's) commitment and the terms of its loan. In view of the fact that Coast would not under any circumstances take all (and maybe none) of the construction loan, and could not commit the other lenders, a full commitment was missing.

Other essentials are absent, namely, payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculations, loan disbursement procedures, and rights and remedies of the parties in case of default. None of these, standing alone, would necessarily make the offer conditional if missing. However, the fact that so many [***10] important conditions are absent, further emphasizes the conditional nature of the letter and strengthens the argument that the parties were still in the negotiation stage.

In *Burgess* v. *Rodom*, 121 Cal.App.2d 71 [262 P.2d 335], the court was dealing with a contract for purchase of real property. It said on page 73: "The agreement upon which the seller predicates his right of action acknowledges receipt of $ 200 as a deposit on the purchase price of the property and provides that 'The balance of the purchase price [$ 5,000.] is to be paid within *30 days from date hereof, as follows, to-wit: Terms to be made as soon as new purchaser arranges for new mortgage now held by Santa Ynez Valley Bank to Burgess* (the seller).' The italicized portion of the agreement was inserted by handwriting in the blanks in a 'deposit [*892] receipt' (California Real Estate Association Standard Form), [**840] which was signed by the plaintiff and defendant Jane E. Rodom but not signed by her husband, George. [para. ] Respondent contends that the agreement is lacking in essential elements and is fatally uncertain. Hence no cause of action is stated. Her position is well founded. [***11] [para. ] An action for damages for breach of contract for the purchase or sale of real property will not lie unless the writing contains the essential terms and material elements of such an agreement without recourse to parol evidence of the intention of the contracting parties. [Citations.] The law does not provide a remedy for breach of an agreement to agree in the future, and the court may not speculate upon what the parties will agree. [Citations.] . . . [para. ] Applying these principles, it is clear that the deposit receipt is incomplete in one essential feature, viz., the terms upon which the balance of the purchase price is to be paid. The deposit of $ 200 represents only approximately 4 percent of the purchase price. It appears to have been contemplated that the remaining 96 percent would be partially financed through a new mortgage at the bank and some other arrangements made for paying or securing the balance. Hence, the handwritten insertion of the provision: 'Terms to be made as soon as new purchaser arranges for new mortgage now held' by the bank. *How this balance would be paid, whether in monthly, quarterly, semiannual or annual installments, or at* [***12] *the end of a specified term of years does not appear. Likewise, absent is the rate of interest. The security, if any, to be provided for this balance,* whatever it might be, is not specified. These are all important items, yet agreement with respect to each of them was 'left open for future settlement.' It is therefore established from the language which the parties painstakingly wrote into the blank space in the deposit receipt that their minds had not met upon these essential and material terms of the deal. They had simply agreed to agree upon terms in the future. In such circumstances there was no binding obligation upon the buyer to accept and pay for the land. [Citations.]" (Italics added.)

And in *Kessler* v. *Sapp*, 169 Cal.App.2d 818, 823 [338 P.2d 34], the court stated: "As we have said, the court ruled that the amended complaint did not state a cause of action for damages for the reason that the contract pleaded therein was too uncertain to be binding. This construction was a correct one and it is not disputed by the parties on the appeal. The escrow instructions of January 20th provided for the subordination of the trust deed to a first trust deed to be [***13] obtained by the purchasers; only one term of the contemplated deed of trust was set out in the instructions; namely, that the amount of the encumbrance was not to exceed $ 6.50 per square foot 'exclusive of garages, stairways and [*893] porches' (evidently relating to buildings to be constructed); *the rate of interest, the amount of the monthly payments and the period of the debt were left to the future agreement of the parties.* This radical uncertainty as to a material feature of the sales agreement not only rendered it incapable of specific enforcement [citation], but

60 Cal. App. 3d 885, *; 131 Cal. Rptr. 836, **;
1976 Cal. App. LEXIS 1782, ***

also rendered unmaintainable an action for damages for its breach." (Italics added.)

Although the case at bar deals with a loan on real property rather than sale of real property, most of the essentials for a binding contract are the same. As stated above, many of the essentials are missing here but one in particular is fatal, namely a clear and unambiguous promise on the construction loan. Accordingly, the first requisite for a complaint for promissory estoppel is missing.

We also believe the third element (the offerees' reasonable and foreseeable reliance on the promise) is absent. While we are inclined [***14] to agree with appellants that lending institutions should be held to a high degree of responsibility in such commercial transactions, appellants are not [**841] completely free of blame. They appear, from the record, to be experienced businessmen. They retained the services of a loan broker to assist them. We cannot believe that they did not understand the *conditional offer* to be just that -- and that the many essentials referred to were missing. They should have resolved the ambiguities and obtained a finalized agreement and not relied on the January 9, 1973, offer. In other words, they could not have had legitimate expectations that this was a binding offer; therefore, they could not reasonably have relied on it.

The order of dismissal is affirmed.

EXHIBIT 22

LEXSEE 137 CAL. 284

**J. R. LUDDY, Respondent, v. JOHN L. PAVKOVICH, Appellant**

**L. A. No. 1021**

**Supreme Court of California, Department Two**

**137 Cal. 284; 70 P. 177; 1902 Cal. LEXIS 549**

September 13, 1902

**PRIOR HISTORY:**  [**1] APPEAL from a judgment of the Superior Court of Los Angeles County. Frank J. Murasky, Judge presiding.

**DISPOSITION:**  The judgment appealed from is affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

   Foreclosure of Mortgage--Pleading--Indebtedness at Commencement of Suit.--A complaint for the foreclosure of a mortgage which sets out the note and mortgage, showing on their face that the principal was part due and payable long before the commencement of the action, and which avers that no part of the principal sum has been paid, and that it is unpaid and owing by defendant to the plaintiff, sufficiently shows that the principal sum was "due" at the commencement of the action.

   Id.--Sufficiency of Findings.--A finding of fact that all of the allegations of the complaint are true, except a part of the allegation as to attorneys' fees, and a finding of law that the principal sum with certain interest is "due and unpaid" are supported by the complaint, and are sufficient to show that the principal sum was "due" at the commencement of the action.

   Id.--Attorney's Fees--Personal Judgment.--Where the mortgage provided that upon its foreclosure the mortgagee "may include in such foreclosure a reasonable counsel fee to be fixed by the court," he is not thereby entitled to have the fees included in the amount of the mortgage lien, and must rely alone upon a personal judgment for the attorney's fee allowed.

**SYLLABUS**

   The facts are stated in the opinion of the court.

**COUNSEL:** J. H. Krimminger, for Appellant.

Thomas L. Neal, and H. C. Millsap, for Respondent.

**JUDGES:** McFarland, J. Temple, J., and Henshaw, J., concurred.

**OPINION BY:** McFARLAND

**OPINION**

   [*285] This is an ordinary suit on a note and mortgage made and executed by defendant to plaintiff. The usual judgment of foreclosure was rendered, and defendant appeals from the judgment, bringing up only the judgment-roll.

   The appellant contends that the complaint does not state facts sufficient to constitute a cause of action, because there is no express averment therein that the principal sum of the note and mortgage was "due" at the commencement of the action. The complaint sets out in full the note and mortgage sued on, which show on their face that the principal was due and payable about two years before the commencement of the action; and it is averred that "no part of the principal mentioned in said promissory note and mortgage has been paid," etc., and that "the principal sum of said promissory [**2] note, to wit: fifteen hundred (1500) dollars, is unpaid, and is owing by said defendant John L. Pavkovich to J. R. Luddy plaintiff herein." These averments are entirely sufficient to show what the contract sued on was, and that appellant had violated it by not paying the note after its maturity. And the sufficiency of the complaint in this respect is an answer to appellant's contention that there is no express finding that the principal sum of the note was "due." The court, in addition to specific findings as to the amount of the principal sum secured, and that it is "unpaid," etc., finds that all allegations of the complaint are true except a part of the allegation as to an attorney's fee; and it also

137 Cal. 284, *; 70 P. 177;
1902 Cal. LEXIS 549, **

finds under the head of "Conclusions of Law" that the principal sum with certain interest, is "due and unpaid."

With respect to an attorney's fee for foreclosing, the mortgage provides that in the event of foreclosure the mortgagee "may include in such foreclosure a reasonable counsel fee, to be fixed by the court"; and it is averred that two hundred and fifty dollars was a reasonable fee. The court allowed a fee of one hundred and twenty-five dollars, -- which is not claimed to be [**3] unreasonable, -- but merely gave a personal judgment for that amount, holding that it was not included in the [*286] mortgage lien. Appellant contends that the provision in the mortgage as to attorney's fee does not warrant a personal judgment therefor; but on this point the case is exactly like *Klokke* v. *Escailler*, 124 Cal. 297, where it was held, -- the provision of the mortgage and the averment in the complaint about an attorney's fee being the same there as in the case at bar, -- that "while plaintiff is entitled upon proper showing to recover attorney's fees in his action, he is not entitled to have those fees included in the amount of the mortgage lien. He must rely alone upon a personal judgment."

The judgment appealed from is affirmed.

LEXSEE 204 CAL APP 3D 396

**T. L. MARTIN, Plaintiff and Appellant, v. U-HAUL COMPANY OF FRESNO, Defendant and Appellant**

**No. F007927**

**Court of Appeal of California, Fifth Appellate District**

**204 Cal. App. 3d 396; 251 Cal. Rptr. 17; 1988 Cal. App. LEXIS 858**

**August 11, 1988**

**NOTICE:**    [***1] Certified for partial publication - Pursuant to California Rules of Court, rule 976(b), this opinion is certified for publication with the exception of parts III through IV.

**SUBSEQUENT HISTORY:**   A petition for a rehearing was denied September 2, 1988.

**PRIOR HISTORY:**    Superior Court of Stanislaus County, No. 190040, Hugh Rose III, Judge.

**DISPOSITION:**    The order conditionally granting the motion for new trial is affirmed. The case is remanded to the trial court for the purpose of allowing plaintiff to elect whether to accept the $ 725 or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of defendant on the first and second causes of action of plaintiff's complaint is affirmed.

Costs are awarded to defendant.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court entered a judgment of nonsuit in favor of defendant, a truck and trailer rental company, on two causes of action (fraud and breach of covenant of good faith and fair dealing) brought by a service station operator/independent equipment rental dealer after the company terminated his equipment rental dealership contract without notice. On the third cause of action, for breach of contract, the trial court granted the company's motion for new trial on the issue of damages, conditioned on the dealer's consent to a reduction in the damages awarded by the jury. The dealership contract provided that it could be terminated by either party on 30 days' written notice or without previous notice on viola-

tion by the opposite party of any promise or condition. The company terminated the dealership contract without notice after it suspected the dealer was taking money from the company by renting equipment on the service station's credit card forms and by not using the correct rental company forms. (Superior Court of Stanislaus County, No. 190040, Hugh Rose III, Judge.

The Court of Appeal affirmed the order conditionally granting the motion for new trial; the case was remanded to the trial court to allow the dealer to elect whether to accept the reduced damage award or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of the company on the first and second causes of action was affirmed. It held the trial court did not err in granting the company's motion for new trial based on excessive damages, since the dealer's contract damages were limited to those accruing in the 30-day period after the breach of the dealership contract. It also held the trial court did not err in granting the company's motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing, since the dealer did not have a "special relationship" with the company; rather, the dealer had an ordinary commercial relationship with the company and thus there was no tort liability for the company's termination of the dealership contract. (Opinion by Best, Acting P. J., with Ardaiz, J., and Brown (G. A.), J., * concurring.)

    * Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1a) (1b) (1c) (1d) Damages § 15--Measure of Damages--For Breach of Contract--30-day Notice for Termination of Dealership Contract.** --In an action by a service station operator/independent equipment rental dealer for breach of contract against a truck and trailer rental company, following the company's termination of his equipment rental dealership contract without notice, the trial court did not err in granting the company's motion for new trial on the issue of damages, conditioned on the dealer's consent to a reduction in the damages award by the jury. The contract provision which provided for the termination of the dealership contract upon 30 days' written notice effectively restricted the damages recoverable by either party to the contract to those attributable to that 30-day period, and the dealer agreed to and understood the effect of that notice provision at the time he entered into the dealership contract.

**(2) Appellate Review § 141--Presumptions--Orders on Motion for New Trial--Discretion of Trial Court.** -- When a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order. The trial court's exercise of discretion in ruling on the new trial motion may be disturbed only where a manifest and unmistakable abuse of discretion clearly appears. The admonition is particularly compelling when discretion is exercised in favor of granting the new trial.

**(3) Appellate Review § 51--Presenting and Preserving Questions in Trial Court--Necessity for Ruling--Abuse of Discretion.** --A trial court may not be held to have abused its discretion as to a particular issue which it was never asked to consider.

**(4a) (4b) Damages § 15--Measure of Damages--For Breach of Contract--Termination Clause.** --If a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach. Thus, contract damages are limited to the notice period. The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

**(5) Employer and Employee § 10--Contracts of Employment--Actions for Wrongful Discharge--Damages.** --If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given.

**(6) Damages § 15--Measure of Damages--For Breach of Contract--Foreseeability.** --Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result, in order that he may determine whether or not to accept the risk of contracting.

**(7) Damages § 15--Measure of Damages--For Breach of Contract--Due Performance of Agreement.** --Civ. Code, § 3358, provides that no person can recover a greater amount in damages for the breach of an obligation than he could have gained by full performance on both sides. Thus, courts will not, except where exemplary damages are awarded, permit a party to a contract to recover more on the breach than he would have received by due performance of the agreement.

**(8) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Bad Faith Denial of Contract's Existence.** --A party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists. Under these circumstances, no special contractual relationship is required. However, where there has been no denial of the existence of a contract, any tort liability must be predicated upon alleged bad faith actions in the performance of the contract.

**(9) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Tort Damages.** --To establish a tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a special relationship between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. California courts have not extended the special relationship doctrine to include ordinary commercial contractual relationships.

204 Cal. App. 3d 396, *; 251 Cal. Rptr. 17, **;
1988 Cal. App. LEXIS 858, ***

**(10) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Special Relationship Under Equipment Rental Dealership Contract.** --A service station operator who also operated an independent equipment rental dealership, pursuant to an equipment rental dealership contract with a truck and trailer rental company, did not have a "special relationship" with the company; rather, the dealer had an ordinary commercial relationship. Thus, there was no tort liability for breach of the covenant of good faith and fair dealing after the company terminated the dealership contract without notice. The dealer had entered into the contract with the company for remuneration, rather to secure peace of mind, security and future protection; thus, the relationship was not a "special" one. Also, the parties were not in an inherently unequal bargaining position; the equipment rental was only a sideline business to the service station business; the transaction was made at arms' length; and contract damages were adequate. Also, there was no special vulnerability on the dealer's part; he could have rented out other similar equipment from the company's competitors.

**COUNSEL:** Moorad, Clark & Gleason and Sean F. Gleason for Plaintiff and Appellant.

Severson, Werson, Berke & Melchior, Jan T. Chilton and Kurt W. Melchior for Defendant and Appellant.

**JUDGES:** Opinion by Best, Acting P. J., with Ardaiz, J., and Brown (G. A.), J., * concurring.

    * Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

**OPINION BY:** BEST

**OPINION**

    [*400] [**17] Plaintiff, T. L. Martin (Martin), appeals from a judgment of nonsuit in favor of [***2] the [**18] defendant, U-Haul Company of Fresno (U-Haul), on two causes of action and from a conditional order granting new trial on the third cause of action on which Martin was successful at trial. We reject Martin's contentions on appeal and affirm in all respects.

    Statement of the Case

    Jury trial began on June 9, 1986, in Martin's action arising out of U-Haul's termination of a dealership contract. At the close of Martin's case, the court granted U-Haul's motions for nonsuit as to the first cause of action for fraud and the second cause of action for breach of the covenant of good faith and fair dealing. The jury re-

turned a verdict in favor of the plaintiff for $ 29,000 on the remaining breach of contract cause of action. Martin was also awarded costs in the amount of $ 3,216.54, attorney fees in the amount of $ 16,000 and $ 1,762.52 in interest. Judgment was entered on August 18, 1986.

    On September 2, 1986, U-Haul filed its notice of motion for a new trial on the issue of damages. Martin filed his counter motion for new trial on the fraud and breach of the covenant of good faith and fair dealing causes of action on September 10, 1986. After a hearing, the court issued its decision [***3] on October 14, 1986, denying Martin's motion and granting U-Haul's motion for new trial based on excessive damages unless Martin agreed to a reduction of the damages to $ 725. The court on its own motion also struck the cost bills filed by the plaintiff.

    Martin filed a timely notice of appeal on November 6, 1986.

    Statement of Facts

    Martin had been an independent U-Haul dealer for nine to ten years before August 31, 1981. He had started with U-Haul in the Los Angeles area and had moved to Modesto in 1969 or 1970. He became a "triple-A" U-Haul dealer in approximately 1978. A "triple-A" dealer is allocated more equipment to rent out to the public. In 1980 Martin's gross income from U-Haul rentals was $ 45,166.07, with his net commission on that amount being [*401] $ 9,416.60. He also earned $ 503.87 from U-Haul repairs during 1980. During that same period, he earned about $ 35,000 from his Texaco service station. In 1981 he had earned $ 5,797.67 through August 8 from his U-Haul activities.

    Richard Adamitz was the president of U-Haul in 1981. There were three officers and directors of the corporation. They were himself, Len Pickhartz and Paul Deaton. Pickhartz was vice president, [***4] and Deaton was secretary-treasurer. They had opened the U-Haul Moving Center in Modesto in April of 1979. Pickhartz became the manager of that location six to eight months later. The managers of the various moving centers were paid a salary and did not receive a commission from the rentals. The moving center is separate from the independent dealers. The independent dealers receive a commission of approximately 20 percent of their gross revenue. The dealers send their gross receipts to U-Haul and are sent their commissions in return. Each Monday Martin would send in the gross receipts from the U-Haul rentals and then received his commission check about six weeks later.

    There are several forms which U-Haul requires its independent dealers to use. When renting the equipment, it requires them to always use the authorized U-Haul

contract on which the driver's license of the renter must be recorded. This contract is necessary to keep track of the one-way rentals. There is also an authorized U-Haul deposit receipt to be used when a customer wishes to reserve a trailer. U-Haul also requires that a "Monday Report" be completed weekly which lets the company know exactly what equipment [***5] has been rented out in the preceding seven-day period and what equipment is on each independent dealer's lot.

U-Haul uses field men to maintain contact with its independent dealers. The field man prepares the "Dealer Service Reports" and also attempts to detect dishonesty among the independent dealers. U-Haul audited Martin prior to 1981, but this audit [**19] did not show that he had been renting out equipment without contracts and thereby collecting money himself which should have been sent to U-Haul. U-Haul had never found a discrepancy in his reports.

Adamitz had heard reports that Martin was renting equipment without reporting it to U-Haul. In August of 1981, he made arrangements for Cynthia Deaton, Paul Deaton's daughter, to go to Martin's station in Modesto and rent a trailer as a test of his procedures. He wanted to use her for this task because she had access to a pickup truck and looked believable. Cynthia, accompanied by her friend, Roberta Craig, went from Fresno to [*402] Martin's station on August 25, 1981, to rent the trailer. She had called Martin a few days previously to ascertain the price of the trailer.

Martin testified that in the early afternoon of August [***6] 25, two girls came to the station and one asked to rent a trailer. She said she was going camping for a week and needed to rent a small trailer. He asked her for her driver's license. She replied that she did not have it with her but had left it at home in Turlock. Martin told her that she had to have her driver's license with her before she could take the trailer off the lot. He told her that she could leave a deposit to hold the trailer. She insisted on leaving the full amount of the rental as the deposit. Martin wrote the deposit on a Texaco invoice and told her that he would prepare the contract when she returned. She gave the name "Cindy Brown" and an address in Turlock. He gave the girls the tissue paper copy of the credit card receipt and put the hard copy on a clipboard and hung it on the wall. He had placed a note with the charge slip explaining which trailer was reserved and that the girl was coming back to get it.

Martin went home about 4 or 4:30 p.m. that day and left two of his employees, Bob Meyers and Don Baker, at the station. He had told Meyers and Baker that if the girls came back, they were to put the trailer rental on a contract and record the renter's [***7] driver's license number. Martin received a telephone call from Baker

about 5 p.m. and returned to the station. When he arrived, the trailer was gone, and the contract had not been filled out. Martin had not been present when the trailer left the station. He went to get the hard copy of the receipt off the wall in his office, but it was gone as well. Baker had died prior to trial.

Martin sent his wife to Turlock to the address Ms. Deaton had given him, but she found no one at that address. When she returned, they both drove to Turlock. The resident of the house at that address did not know anyone named Brown.

On the morning of August 31, 1981, Adamitz, Pickhartz and Steven Baird, Martin's field man at the time, came to his Texaco station about 8:30 a.m. Adamitz showed him the hard copy of the Texaco receipt and said, "We have a problem." Martin told him that the girls had left without a contract and he would have them fill one out when they returned. Adamitz told him that the girls were not coming back, and they were there to take the U-Haul equipment from Martin. Two more men in U-Haul uniforms arrived and began taking the equipment. They blocked the aisles in his service [***8] station with their trucks. They refused to move the trucks when asked to move them. The U-Haul men were working on the trucks before [*403] they took them away, leaving debris and oil for Martin to clean up. It took them all day to remove the equipment.

Baird used Martin's office to complete the necessary paperwork on the trailers and trucks in order to close out the books on them. Martin never received the "U-Haul Dealership Closeout Notice" which had been prepared because he refused to sign a copy of it. Neither did he receive a 30-day written notification of termination of his dealership.

Martin maintained that he had been "set-up" by Adamitz to make it look as if he had been stealing money from U-Haul so that they could have a pretext under which to close down his U-Haul dealership. He was planning to move from his Texaco station at 1401 Coffee Road in Modesto to a new location at 5th and "I" Streets where he would no longer sell gas but would perform auto repairs and expand his U-Haul [**20] operations. The lease at the Texaco station expired one month after he was closed down on August 31, 1981. The new location was close to the Modesto U-Haul Moving Center, and Martin believed [***9] that they did not want the competition. He had contacted John Wilson of U-Haul prior to August 25 to discuss moving his business. Wilson had told him to discuss it with his field man. He had also told Baird of his planned move prior to the August 25 visit by Ms. Deaton. Steven Baird, Martin's field man in 1981, stated that the independent dealers were competing with the U-Haul Moving Center for the same equip-

ment and that Martin's new location was within a mile of the moving center. Baird had agreed to the move and had offered to help him move the trailers.

Nadine Coley was Martin's wife in 1981. She testified that when he returned home in the late afternoon of August 25, he had told her that two girls had been to the station to rent a trailer. She confirmed Martin's version of the events of that evening after they had received a telephone call from the station and left their home to go down there. Martin then asked her to go to Turlock. She did not find anyone at the address which she was given and returned to the station. Both she and Martin then went to Turlock to try to find the girls. She also confirmed that they often used Texaco credit card slips as deposit receipts. [***10] She stated that she had been with Martin for nine years while he had been a U-Haul dealer, during which time she prepared most of the Monday reports and that he had not been stealing money from U-Haul to her knowledge.

Robert Meyers had been employed by Martin in August of 1981 as a mechanic. He also rented out trailers. He corroborated Martin's version of the events of August 25, stating that the girls had come in and asked for a trailer but did not have a driver's license. He testified that they wanted to [*404] pay for the trailer in advance so that it would not be rented out and that one of the girls said she would go back to Turlock so that she could get her license. He stated that the girls then returned about 4:30 or 5:30 that evening. They drove in at the rear of the station while he was in the service bay putting away his tools. They walked to the front of the station and then walked back to the trailer area with the other serviceman, Mr. Baker. Baker then came back to the front of the station because he had a gas customer. Meyers then saw the girls drive out of the station with the trailer. Meyers then called Martin who came to the station.

Meyers was also at [***11] the station on August 31, 1981, when the men from U-Haul came to take away the equipment. He also testified that they blocked the service bays so that he could not work on the cars. He asked them to move the trucks but they refused. The U-Haul personnel were there all day and were going through things that pertained only to the Texaco station and not to U-Haul. One tried to force open the door to Martin's private office.

Martin testified that he always used Texaco credit card invoices as deposit receipts. Henry Leer, his previous U-Haul field man, knew that he followed this practice. Someone would want to reserve a trailer in this fashion about four or five times a month. No one from U-Haul ever told him to use the official U-Haul deposit form instead of a Texaco credit card invoice.

Cynthia Deaton denied leaving Martin's Texaco station and returning for the trailer. She testified that Martin rented her the trailer even though she did not produce a driver's license and that he used a Texaco credit card invoice instead of a U-Haul contract. She denied getting the hard copy of the Texaco credit card slip from Martin's office. Roberta Craig, Ms. Deaton's friend, testified consistently [***12] with Ms. Deaton's version of the events of that day. Juanita Black and John Wilson, both employees of U-Haul of Fresno, testified that Ms. Deaton returned to Fresno that afternoon with a trailer between 3:30 and 5 p.m. Modesto was approximately a two-hour drive from the U-Haul office in Fresno.

Paul Deaton testified that he had no prior knowledge of the plan to have his daughter rent a trailer from Martin as a [**21] test of his procedures. He also stated that he had never tried to put an independent dealer out of business because he was competing with a moving center. Neither was Baird aware of any plan to take business away from the independent dealers. Baird had heard rumors that Martin had not been using U-Haul contracts and had reported these rumors to Adamitz. He did not know of the test of Martin's business practices or of the fact that they were going to close down his dealership until the morning of the 31st.

[*405] Leonard Pickhartz was the manager of the U-Haul Moving Center in Modesto in 1981. He had heard statements that Martin was "ripping off" the company and later received a note from Billy Oswald which stated that Martin was taking money from U-Haul and not using [***13] the correct rental forms. He did realize that the note had come from one of Martin's disgruntled employees who might have been fired. Martin testified that Oswald had worked for him for three days in July of 1981 and that he had fired him because Oswald had told him that he could make a lot of money by renting U-Haul equipment without using the proper contracts. Pickhartz never discussed Oswald's accusation with Martin.

Henry Leer had been one of Martin's U-Haul field men. In 1978 or 1979, another U-Haul dealer had shown him a Texaco credit card slip which he had received along with a trailer which had been returned to him. He discussed this with Martin who told him that he had instructed his employees to use the Texaco credit card slips if they were too busy at the time the equipment was rented and then to put it on a proper contract later. Leer told Martin to discontinue this practice and also informed Adamitz of this development. Leer had also altered Martin's trailers to determine if they were being used without that use being reported but was unable to produce any proof that Martin was cheating.

Adamitz testified that he felt Martin's U-Haul business was low in the area [***14] of the renting of local trailers and that the local trailers were the hardest to trace in the U-Haul system. He had heard several reports of trailers being rented on credit card receipts without U-Haul contracts and had decided to send someone in to test the rumors. He was not hoping to terminate Martin's dealership and actually wanted more dealers in Modesto. He instructed Juanita Black to make the arrangements to have Ms. Deaton rent a trailer from Martin as a test. He had not been otherwise involved in the test and, when he later heard that she had been able to rent a trailer without a contract, made the decision to close Martin's U-Haul operation. He did not tell anyone of his decision until the morning of August 31 when they went to Martin's dealership. He confronted Martin with the credit card slip and told him that their relationship would have to be terminated.

With respect to termination of a dealership, the U-Haul dealership contract provides: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned. Upon termination of this contract [***15] for any reason, Dealer warrants, covenants, and agrees, that within the geographical limits of the county of his place of business, he will not represent or render any service either on his own behalf or in any [*406] capacity for any other persons, firm, or corporation engaged in any rental business which offers the rental of equipment similar to that operated by Marketing Co. for the duration of the then existing telephone directory listing, plus a period of one year from the termination of such telephone directory listing."

Martin testified that when he first started with U-Haul, Henry Leer had told him "that if I did something wrong they could give me a 30-day notice." Even though he testified that he understood at the time he signed the contract that U-Haul could close him down without notice if he violated a provision of the contract, he stated at trial that he did not think U-Haul could close down his operation without notice.

[**22] In August of 1984, Martin began to draw Social Security disability payments. Martin has died during the time this appeal has been pending.

Discussion

I

Whether Martin's Contract Damages Are Limited to Those Accruing in the 30-day Period After the [***16] Breach of the Contract

(1a) Martin contends that the trial court erred when it granted U-Haul's motion for new trial subject to the

condition that the motion would be denied if Martin would consent to a reduction in damages from $ 29,000 to $ 725. The basis for the decision was a finding that U-Haul's contract damages could not extend beyond the 30-day period in which U-Haul was permitted to terminate the dealership contract without cause. That contract provision, paragraph 16 in the U-Haul dealership contract, provides in pertinent part as follows: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned."

(2) "[When] a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." ( *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932 [148 Cal.Rptr. 389, 582 P.2d 980].) "The trial court's exercise of [***17] discretion in ruling on the new trial motion may be disturbed only where '. . . a manifest and unmistakable abuse of discretion clearly appears.' [Citation.] The admonition is particularly compelling when discretion is exercised in favor of granting the new [*407] trial." ( *County of San Diego* v. *Bressi* (1986) 184 Cal.App.3d 112, 119 [229 Cal.Rptr. 44].)

Although Martin devotes much of his argument on appeal to the question of whether or not the contract could only be terminated for good cause, he prevailed on this issue at trial when the jury found that U-Haul had breached the contract. The only issue here is that of the proper measure of damages.

Martin also contends that this was a contract of adhesion and, therefore, that the particular provision cannot be used to limit damages. However, he never pursued this theory in his opposition to the motion for new trial and may not do so now.

(3) A trial court may not be held to have abused its discretion as to a particular issue which it was never asked to consider. ( *Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 599 [197 Cal.Rptr. 303].) [***18]

(1b) This leaves the central issue of whether the contract provision which provides for the termination of the dealership contract upon 30 days' written notice ef-

fectively restricts the damages recoverable by either party to the contract to those attributable to that 30-day period.

In *Pecarovich v. Becker* (1952) 113 Cal.App.2d 309 [248 P.2d 123], the plaintiff had been employed as a coach of the defendants' San Francisco Clippers professional football team. The defendants breached the three-year contract of employment under which Pecarovich served when they informed him that they would no longer operate the football team and, therefore, did not intend to perform their part of the contract. The trial court had computed the plaintiff's damages based on the entire unexpired three-year term of the contract. The appellate court looked to the termination clause of the contract which gave the employer the option of terminating the agreement upon a 90-day written notice with specified payments to be made to the employee. It held that the trial court had erred in awarding damages for the entire unexpired term of the contract and remanded the action with direction [***19] to render a judgment reflecting the lower damage award required by the termination clause.

The *Pecarovich* contract provided for both a specified notice period and also a [**23] specified sum to be paid by the defendants. Here we only have the specified notice period. However, this is not a significant difference when considered in light of the authority relied upon by the *Pecarovich* court as well as the general principles of contract law. **(4a)** As that court explained: "We have found no California decisions in point but judicial [*408] decisions in other jurisdictions indicate that if a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach." ( *Pecarovich v. Becker, supra*, 113 Cal.App.2d at p. 317.)

The *Pecarovich* court cites several out-of-state authorities for the proposition that the contract damages are limited to the notice period. ( *Pecarovich v. Becker, supra*, 113 Cal.App.2d at p. 318.)

**(5)** As one of those cases explained within the context of [***20] an employment contract, "If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given." ( *Bitterman v. Gluck* (1939) 256 App.Div. 336 [9 N.Y.S.2d 1007, 1008].)

In *Cline v. Smith* (1929) 96 Cal.App. 697 [274 P. 761], the court reached a similar conclusion. There a contract which had eight years to run was breached. The

trial court had instructed the jury that, in arriving at proper measure of damages, it could consider the fact that the contract had eight years to run. The contract provided that "'either party may terminate this contract at any time by giving to the other party sixty days notice of its intention to do so.'" ( *Id.* at p. 699.) The Court of Appeal reversed. It held that the portion of the instruction permitting consideration of the fact that the contract had eight years to run was prejudicially erroneous "[in] view of the company's right to terminate the contract at any [***21] time on sixty days' notice . . . ." ( *Id.* at p. 702.) Therefore, although not expressly restricting damages to a 60-day period, it implied that that would be the proper measure of damages and did explicitly find that permitting damages based on the total unexpired term of the contract was erroneous in light of the termination provision.

In the venerable case of *Jewell v. Colonial Theater Co.* (1910) 12 Cal.App. 681 [108 P. 527], a contract for the employment of an actress contained a provision stating, "'This contract may be cancelled at any time after the first performance by either party giving two weeks' notice in writing to the other.'" ( *Id.* at p. 683.) Before the expiration of the plaintiff's contract, the theater closed, and she was dismissed without receiving the required two weeks' notice. The appellate court found that she was properly awarded her salary for the two-week period following her discharge as part of her damages. ( *Id.* at p. 684.)

California Civil Code section 3300 provides for the general measure of damages for a breach of contract. It [***22] reads: "For the breach of an obligation [*409] arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

**(6)** California case law has long held the correct measure of damages to be as follows: "Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. [Citations.] Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. [Citations.]" ( *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305]; accord [**24] *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 123 [135 Cal.Rptr. 802]; *Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 215 [214 Cal.Rptr. 65].) [***23]

204 Cal. App. 3d 396, *; 251 Cal. Rptr. 17, **;
1988 Cal. App. LEXIS 858, ***

Witkin explains the "foreseeability" rule when he states: "The requirement of *knowledge or notice* as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting." (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 815, p. 733, original italics.)

**(4b)** The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

**(1c)** In the case at bench, Martin testified both at trial and during his deposition that he agreed to the 30-day notice provision. At trial he was questioned as follows:

"Q. Didn't you agree to that, that [***24] they could cancel you at any time without, for a reason or no reason, on 30 days notice?

"A. I may have agreed to that, but that don't mean it's true.

"Q. And you didn't see anything wrong with that, did you?

[*410] "A. No."

At his deposition, he responded to questions on this issue in a similar fashion.

"Question: Isn't it true, Mr. Martin, that you knew when you first become [*sic*] a U-Haul dealer on Coffee Road that U-Haul had an absolute right to cancel you for any reason, or no reason, on 30 days notice?

"Answer: That's right.

"Question: You knew that all the time?

"Answer: Yes.

"Question: And you agreed to that?

"Answer: That's right.

"Question: And you didn't see anything wrong with that?

"Answer: No."

Having consciously agreed to and understood the effect of the 30-day notice provision at the time he entered into the dealership contract, Martin may not now avoid the impact of the provision to which he freely assented.

**(7)** Civil Code section 3358 provides in pertinent part, "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." "Thus, courts will not, except where [***25] exemplary damages are awarded, permit a party to a contract to recover more on the breach thereof than he would have received by due performance of the agreement." (23 Cal.Jur.3d, Damages, § 47, p. 78.)

**(1d)** If U-Haul had followed the notice requirements in its dealership contract, it could have terminated Martin's dealership after providing a 30-day notice. Full performance by U-Haul would only have resulted in an additional 30 days of U-Haul dealership business for Martin. That 30-day period is all that Martin could reasonably be assured of remaining in business.

Because of the 30-day notice provision neither party to the dealership contract could reasonably anticipate that damages resulting from a breach of that contract would exceed those potentially accruing during a 30-day period after the breach. Furthermore, awarding the wronged party damages [*411] which exceed those attributable to the 30 days immediately following the breach would place that party in a better position than that resulting if the breaching party had performed in accordance with the terms of the agreement. Therefore, the trial court was correct when it granted the new trial motion conditioned upon Martin's [***26] consent to a reduction in the damage award from $ 29,000 to $ 725. [**25]

II

Whether the Court Erred in Granting the Nonsuit Motion as to the Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing

In his supplemental brief, Martin's counsel urges three bases for his contention that the lower court erred when it granted the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing. They are (1) a special relationship existed between Martin and U-Haul; (2) there was no significant distinction between Martin and an at-will employee; and (3) even absent a special relationship, an action stemming from an alleged bad faith breach of the covenant within the context of an ordinary commercial contract may sound in tort. All three contentions are without merit.

In *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], the California Supreme Court reaffirmed that "the law implies in *every* contract a covenant of good faith and fair dealing." ( *Id.* at p. 768, original italics.)

204 Cal. App. 3d 396, *; 251 Cal. Rptr. 17, **;
1988 Cal. App. LEXIS 858, ***

However, [***27] it specifically stopped short of holding that a cause of action sounding in tort arose in every instance where this covenant may have been breached. As the court explained: "While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's -- that breach of the covenant always gives rise to an action in tort -- is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between the insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. [Citation.] No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.

"When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated [*412] damages in the event [***28] of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (36 Cal.3d at pp. 768-769, fns. omitted.)

The Seaman's court then went on to find tort liability on a basis distinct from breach of the implied covenant. ( Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra, 36 Cal.3d at p. 769.)

(8) As Justice Woolpert of this court has explained: "The facts in Seaman's did not require the court to examine conduct in the performance of the contract. Instead, the court described a new intentional tort, finding 'it is not even necessary to predicate [***29] liability on a breach of the implied covenant.' The new tort: '[A] party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.' [Citation.] Under these circumstances, no special contractual relationship is required. The court avoided plotting additional courses through 'uncharted waters.'" ( Quigley v. Pet, Inc. (1984) 162 Cal.App.3d 877, 890 [208 Cal.Rptr. 394].)

In the instant case, there has been no denial of the existence of the contract. Therefore, any tort liability must be predicated [**26] upon U-Haul's alleged bad faith actions in the performance of the contract. Decisions since Seaman's have continued to stress the requirement that there be a special relationship between the parties before a tort cause of action for breach of the implied covenant of good faith and fair dealing will lie.

(9) As succinctly stated in Premier Wine & Spirits v. E. & J. Gallo Winery (E.D.Cal. 1986) 644 F.Supp. 1431, affirmed (9th Cir. 1988) 846 F.2d 537: "To establish Premier's [***30] tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a 'special relationship' between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. [Citation.] California courts have not extended the 'special relationship' doctrine to include ordinary commercial contractual relationships such as the supplier-distributor relationships present here." ( Id. at p. 1436; accord Multiplex Ins. Agency, Inc. v. California Life Ins. Co. (1987) 189 Cal.App.3d 925, 937 [235 Cal.Rptr. 12] and Commercial Cotton Co. v. United California Bank (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017].)

We, therefore, reject Martin's contention that tort damages may be awarded for a breach of the covenant of good faith and fair dealing absent some special relationship between the parties.

[*413]

(10) The inquiry then turns to the issue of whether or not such a special relationship exists. This tort found its genesis within the special relationship of the insurance context. [***31] (See Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883] and Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173].) Courts have also sustained its viability when the relationship between the parties was one of employer/employee ( Cleary v. American Airlines, Inc. (1980) 111 Cal.App.3d 443, 455 [168 Cal.Rptr. 722]) or bank/depositor ( Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 516). However, the courts have consistently declined to expand liability for this tort into other types of contract-based disputes.

In Commercial Cotton, supra, the court stressed the importance of "public interest, adhesion, and fiduciary responsibility" in looking at whether a special relationship existed. ( Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d at p. 516.) Similarly, in Wallis v. Superior Court (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], [***32] the court examined several

facets of insurance contracts which distinguish them from ordinary commercial contracts. That court stated: "As noted earlier, the [*Seaman's*] court intimated that a noninsurance contract could be tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract. (36 Cal.3d at p. 769.) For purposes of serving as predicates of tort liability, we find that the following 'similar characteristics' must be present in a contract: (1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." [***33] (*Id*. at p. 1118.)

Martin's counsel asserts that "the only element not technically met in the *Wallis* criteria is the fact that Martin had entered into the contract with U-Haul for remuneration," and that, therefore, a special relationship could still have existed between U-Haul and Martin. This argument falls short for two reasons. First, this missing element is a crucial factor in deciding whether or not a special relationship exists. It is of paramount importance that the reason for the contract be "to secure peace [**27] of mind, security, future protection." That is what makes the relationship a "special" one.

Second, contrary to Martin's assertion, all the other factors are not present in this case; indeed, none of them are. The parties were not in "an [*414] inherently unequal bargaining position." Although it is true that U-Haul was a larger business organization, this is not the thrust of this factor. In the vast majority of business transactions, one enterprise will be larger than the other. Martin was a service station owner who rented U-Haul equipment as a sideline. This was an arm's-length transaction; Martin could have chosen to do business with any of several [***34] other equipment rental firms. Similarly, contract damages were adequate. Martin could have been compensated for the loss of income attributable to the 30-day period following the termination as the total of his expectancy interest under the contract.

Finally, there was no special vulnerability on Martin's part. True, Martin could not rent U-Haul equipment without U-Haul. However, he could theoretically rent out other similar equipment from U-Haul's competitors. But more importantly, this was a sideline business from which Martin garnered income additional to that of his Texaco station; this was not his sole means of earning a living as is generally the case in wrongful termination actions.

The facts of the two cases most closely analogous to the instant situation uphold this view. In *Premier Wine & Spirits, supra*, Premier was a distributor for Gallo but also distributed products for other wineries. A dispute arose and Premier brought an action which alleged, in part, a breach of the covenant of good faith and fair dealing on the part of Gallo. The federal district court looked at the *Wallis* factors as well as at this court's decision in *Quigley*. [***35] It concluded: "The supplier-distributor relationship here cannot be described as having a nonprofit motivation; profit is the principal basis of such a relationship. Furthermore, Premier has continued as distributor of product lines from a multitude of suppliers, and was appointed as distributor of the Inglenook line of wines following termination. Therefore, Premier cannot be described as being especially vulnerable to a termination by Gallo." ( *Premier Wine & Spirits* v. *E. & J. Gallo Winery, supra*, 644 F.Supp. at pp. 1436-1437.)

The independent dealer status of Martin is analogous to that of Premier. This was an ordinary commercial relationship, not a "special" one.

Similarly, the situation in *Quigley, supra*, 162 Cal.App.3d 877 is also relevant to the instant analysis. Quigley had contracted to haul raw walnuts for Pet, a large agricultural corporation. Pet was alleged to have breached the contract by failing to honor the agreed rate schedule. Quigley brought an action for breach of contract, tortious interference with business relations, intentional infliction of emotional distress and breach of the implied duty of [***36] good faith and fair dealing arising out of their contract. This court addressed the issue of an asserted special relationship as follows: "Quigley [*415] Bros. and Pet are commercial enterprises. Quigley is a corporate shareholder. There was no special relationship which removed the parties from usual commercial contract rules. At the inception of the contract the bargaining position of the parties was equal; Quigley willingly accepted the contract rate.

· "The contractual relationship was entered into for the usual business reason of profit which can be assured by ordinary contract damages if a failure of performance occurred. Although perhaps financially vulnerable because of the importance of the contract, plaintiffs' hauling business was one in which profit or loss was foreseeably dependent upon a multitude of circumstances. As noted in the *Seaman's* dissent, in most cases purposeful breaches of contract are to be anticipated with only contract damages as the remedy." ( *Quigley* v. *Pet, Inc., supra*, 162 Cal.App.3d at p. 893.)

Therefore, even though the contract with Pet constituted a major portion of Quigley's business, this court

204 Cal. App. 3d 396, *; 251 Cal. Rptr. 17, **;
1988 Cal. App. LEXIS 858, ***

[***37] did not equate that type of vulnerability with that which is [**28] required before a court will allow a cause of action for breach of the covenant of good faith and fair dealing to proceed or a judgment based upon that tort to be upheld. Martin was even less vulnerable than Quigley in that his U-Haul business was merely a sideline. No special relationship was present in this situation.

Finally, appellate counsel agrees that Martin was not an employee of U-Haul but urges this court to hold that he was some sort of quasi-employee and that, therefore, this tort action could proceed. However, as has already been discussed, the employer/employee relationship is merely one type of special relationship which will sustain this tort. As Martin was not an employee and there was no other special relationship, this contention is without merit.

Because there was no "special relationship" between Martin and U-Haul and what was at issue was an ordinary commercial transaction and because California law has not extended this tort to normal commercial contracts, the granting of the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing was proper.

III, IV [Text [***38] omitted.] NOT CERTIFIED FOR PUBLICATION.

[*416] The order conditionally granting the motion for new trial is affirmed. The case is remanded to the trial court for the purpose of allowing plaintiff to elect whether to accept the $ 725 or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of defendant on the first and second causes of action of plaintiff's complaint is affirmed.

Costs are awarded to defendant.