EXHIBIT 23

LEXSEE 204 CAL.APP.3D 396

**T. L. MARTIN, Plaintiff and Appellant, v. U-HAUL COMPANY OF FRESNO, Defendant and Appellant**

**No. F007927**

**Court of Appeal of California, Fifth Appellate District**

*204 Cal. App. 3d 396; 251 Cal. Rptr. 17; 1988 Cal. App. LEXIS 858*

August 11, 1988

**NOTICE:** [***1] Certified for partial publication - Pursuant to California Rules of Court, rule 976(b), this opinion is certified for publication with the exception of parts III through IV.

**SUBSEQUENT HISTORY:** A petition for a rehearing was denied September 2, 1988.

**PRIOR HISTORY:** Superior Court of Stanislaus County, No. 190040, Hugh Rose III, Judge.

**DISPOSITION:** The order conditionally granting the motion for new trial is affirmed. The case is remanded to the trial court for the purpose of allowing plaintiff to elect whether to accept the $ 725 or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of defendant on the first and second causes of action of plaintiff's complaint is affirmed.

Costs are awarded to defendant.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court entered a judgment of nonsuit in favor of defendant, a truck and trailer rental company, on two causes of action (fraud and breach of covenant of good faith and fair dealing) brought by a service station operator/independent equipment rental dealer after the company terminated his equipment rental dealership contract without notice. On the third cause of action, for breach of contract, the trial court granted the company's motion for new trial on the issue of damages, conditioned on the dealer's consent to a reduction in the damages awarded by the jury. The dealership contract provided that it could be terminated by either party on 30 days' written notice or without previous notice on violation by the opposite party of any promise or condition. The company terminated the dealership contract without notice after it suspected the dealer was taking money from the company by renting equipment on the service station's credit card forms and by not using the correct rental company forms. (Superior Court of Stanislaus County, No. 190040, Hugh Rose III, Judge.)

The Court of Appeal affirmed the order conditionally granting the motion for new trial; the case was remanded to the trial court to allow the dealer to elect whether to accept the reduced damage award or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of the company on the first and second causes of action was affirmed. It held the trial court did not err in granting the company's motion for new trial based on excessive damages, since the dealer's contract damages were limited to those accruing in the 30-day period after the breach of the dealership contract. It also held the trial court did not err in granting the company's motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing, since the dealer did not have a "special relationship" with the company; rather, the dealer had an ordinary commercial relationship with the company and thus there was no tort liability for the company's termination of the dealership contract. (Opinion by Best, Acting P. J., with Ardaiz, J., and Brown (G. A.), J.,* concurring.)

\* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

## HEADNOTES

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1a) (1b) (1c) (1d) Damages § 15--Measure of Damages--For Breach of Contract--30-day Notice for Termination of Dealership Contract.** --In an action by a service station operator/independent equipment rental dealer for breach of contract against a truck and trailer rental company, following the company's termination of his equipment rental dealership contract without notice, the trial court did not err in granting the company's motion for new trial on the issue of damages, conditioned on the dealer's consent to a reduction in the damages award by the jury. The contract provision which provided for the termination of the dealership contract upon 30 days' written notice effectively restricted the damages recoverable by either party to the contract to those attributable to that 30-day period, and the dealer agreed to and understood the effect of that notice provision at the time he entered into the dealership contract.

**(2) Appellate Review § 141--Presumptions--Orders on Motion for New Trial--Discretion of Trial Court.** --When a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order. The trial court's exercise of discretion in ruling on the new trial motion may be disturbed only where a manifest and unmistakable abuse of discretion clearly appears. The admonition is particularly compelling when discretion is exercised in favor of granting the new trial.

**(3) Appellate Review § 51--Presenting and Preserving Questions in Trial Court--Necessity for Ruling--Abuse of Discretion.** --A trial court may not be held to have abused its discretion as to a particular issue which it was never asked to consider.

**(4a) (4b) Damages § 15--Measure of Damages--For Breach of Contract--Termination Clause.** --If a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach. Thus, contract damages are limited to the notice period. The specific rule that a termination clause limits recoverable

damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

**(5) Employer and Employee § 10--Contracts of Employment--Actions for Wrongful Discharge--Damages.** --If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given.

**(6) Damages § 15--Measure of Damages--For Breach of Contract--Foreseeability.** --Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result, in order that he may determine whether or not to accept the risk of contracting.

**(7) Damages § 15--Measure of Damages--For Breach of Contract--Due Performance of Agreement.** --*Civ. Code, § 3358*, provides that no person can recover a greater amount in damages for the breach of an obligation than he could have gained by full performance on both sides. Thus, courts will not, except where exemplary damages are awarded, permit a party to a contract to recover more on the breach than he would have received by due performance of the agreement.

**(8) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Bad Faith Denial of Contract's Existence.** --A party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.

204 Cal. App. 3d 396, *; 251 Cal. Rptr. 17, **;
1988 Cal. App. LEXIS 858, ***1

Under these circumstances, no special contractual relationship is required. However, where there has been no denial of the existence of a contract, any tort liability must be predicated upon alleged bad faith actions in the performance of the contract.

**(9) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Tort Damages.** --To establish a tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a special relationship between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. California courts have not extended the special relationship doctrine to include ordinary commercial contractual relationships.

**(10) Contracts § 44--Performance--Breach--Covenant of Good Faith and Fair Dealing--Special Relationship Under Equipment Rental Dealership Contract.** --A service station operator who also operated an independent equipment rental dealership, pursuant to an equipment rental dealership contract with a truck and trailer rental company, did not have a "special relationship" with the company; rather, the dealer had an ordinary commercial relationship. Thus, there was no tort liability for breach of the covenant of good faith and fair dealing after the company terminated the dealership contract without notice. The dealer had entered into the contract with the company for remuneration, rather to secure peace of mind, security and future protection; thus, the relationship was not a "special" one. Also, the parties were not in an inherently unequal bargaining position; the equipment rental was only a sideline business to the service station business; the transaction was made at arms' length; and contract damages were adequate. Also, there was no special vulnerability on the dealer's part; he could have rented out other similar equipment from the company's competitors.

**COUNSEL:** Moorad, Clark & Gleason and Sean F. Gleason for Plaintiff and Appellant.

Severson, Werson, Berke & Melchior, Jan T. Chilton and Kurt W. Melchior for Defendant and Appellant.

**JUDGES:** Opinion by Best, Acting P. J., with Ardaiz, J., and Brown (G. A.), J., * concurring.

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

**OPINION BY:** BEST

**OPINION**

[*400] [**17] Plaintiff, T. L. Martin (Martin), appeals from a judgment of nonsuit in favor of [***2] the [**18] defendant, U-Haul Company of Fresno (U-Haul), on two causes of action and from a conditional order granting new trial on the third cause of action on which Martin was successful at trial. We reject Martin's contentions on appeal and affirm in all respects.

Statement of the Case

Jury trial began on June 9, 1986, in Martin's action arising out of U-Haul's termination of a dealership contract. At the close of Martin's case, the court granted U-Haul's motions for nonsuit as to the first cause of action for fraud and the second cause of action for breach of the covenant of good faith and fair dealing. The jury returned a verdict in favor of the plaintiff for $ 29,000 on the remaining breach of contract cause of action. Martin was also awarded costs in the amount of $ 3,216.54, attorney fees in the amount of $ 16,000 and $ 1,762.52 in interest. Judgment was entered on August 18, 1986.

On September 2, 1986, U-Haul filed its notice of motion for a new trial on the issue of damages. Martin filed his counter motion for new trial on the fraud and breach of the covenant of good faith and fair dealing causes of action on September 10, 1986. After a hearing, the court issued its decision [***3] on October 14, 1986, denying Martin's motion and granting U-Haul's motion for new trial based on excessive damages unless Martin agreed to a reduction of the damages to $ 725. The court on its own motion also struck the cost bills filed by the plaintiff.

Martin filed a timely notice of appeal on November 6, 1986.

Statement of Facts

Martin had been an independent U-Haul dealer for nine to ten years before August 31, 1981. He had started with U-Haul in the Los Angeles area and had moved to Modesto in 1969 or 1970. He became a "triple-A" U-Haul dealer in approximately 1978. A "triple-A" dealer is allocated more equipment to rent out to the public. In 1980 Martin's gross income from U-Haul rentals was $ 45,166.07, with his net commission on that

204 Cal. App. 3d 396, *400; 251 Cal. Rptr. 17, **18;
1988 Cal. App. LEXIS 858, ***3

amount being [*401] $ 9,416.60. He also earned $ 503.87 from U-Haul repairs during 1980. During that same period, he earned about $ 35,000 from his Texaco service station. In 1981 he had earned $ 5,797.67 through August 8 from his U-Haul activities.

Richard Adamitz was the president of U-Haul in 1981. There were three officers and directors of the corporation. They were himself, Len Pickhartz and Paul Deaton. Pickhartz was vice president, [***4] and Deaton was secretary-treasurer. They had opened the U-Haul Moving Center in Modesto in April of 1979. Pickhartz became the manager of that location six to eight months later. The managers of the various moving centers were paid a salary and did not receive a commission from the rentals. The moving center is separate from the independent dealers. The independent dealers receive a commission of approximately 20 percent of their gross revenue. The dealers send their gross receipts to U-Haul and are sent their commissions in return. Each Monday Martin would send in the gross receipts from the U-Haul rentals and then received his commission check about six weeks later.

There are several forms which U-Haul requires its independent dealers to use. When renting the equipment, it requires them to always use the authorized U-Haul contract on which the driver's license of the renter must be recorded. This contract is necessary to keep track of the one-way rentals. There is also an authorized U-Haul deposit receipt to be used when a customer wishes to reserve a trailer. U-Haul also requires that a "Monday Report" be completed weekly which lets the company know exactly what equipment [***5] has been rented out in the preceding seven-day period and what equipment is on each independent dealer's lot.

U-Haul uses field men to maintain contact with its independent dealers. The field man prepares the "Dealer Service Reports" and also attempts to detect dishonesty among the independent dealers. U-Haul audited Martin prior to 1981, but this audit [**19] did not show that he had been renting out equipment without contracts and thereby collecting money himself which should have been sent to U-Haul. U-Haul had never found a discrepancy in his reports.

Adamitz had heard reports that Martin was renting equipment without reporting it to U-Haul. In August of 1981, he made arrangements for Cynthia Deaton, Paul Deaton's daughter, to go to Martin's station in Modesto

and rent a trailer as a test of his procedures. He wanted to use her for this task because she had access to a pickup truck and looked believable. Cynthia, accompanied by her friend, Roberta Craig, went from Fresno to [*402] Martin's station on August 25, 1981, to rent the trailer. She had called Martin a few days previously to ascertain the price of the trailer.

Martin testified that in the early afternoon of August [***6] 25, two girls came to the station and one asked to rent a trailer. She said she was going camping for a week and needed to rent a small trailer. He asked her for her driver's license. She replied that she did not have it with her but had left it at home in Turlock. Martin told her that she had to have her driver's license with her before she could take the trailer off the lot. He told her that she could leave a deposit to hold the trailer. She insisted on leaving the full amount of the rental as the deposit. Martin wrote the deposit on a Texaco invoice and told her that he would prepare the contract when she returned. She gave the name "Cindy Brown" and an address in Turlock. He gave the girls the tissue paper copy of the credit card receipt and put the hard copy on a clipboard and hung it on the wall. He had placed a note with the charge slip explaining which trailer was reserved and that the girl was coming back to get it.

Martin went home about 4 or 4:30 p.m. that day and left two of his employees, Bob Meyers and Don Baker, at the station. He had told Meyers and Baker that if the girls came back, they were to put the trailer rental on a contract and record the renter's [***7] driver's license number. Martin received a telephone call from Baker about 5 p.m. and returned to the station. When he arrived, the trailer was gone, and the contract had not been filled out. Martin had not been present when the trailer left the station. He went to get the hard copy of the receipt off the wall in his office, but it was gone as well. Baker had died prior to trial.

Martin sent his wife to Turlock to the address Ms. Deaton had given him, but she found no one at that address. When she returned, they both drove to Turlock. The resident of the house at that address did not know anyone named Brown.

On the morning of August 31, 1981, Adamitz, Pickhartz and Steven Baird, Martin's field man at the time, came to his Texaco station about 8:30 a.m. Adamitz showed him the hard copy of the Texaco receipt and said, "We have a problem." Martin told him that the girls had

204 Cal. App. 3d 396, *402; 251 Cal. Rptr. 17, **19;
1988 Cal. App. LEXIS 858, ***7

left without a contract and he would have them fill one out when they returned. Adamitz told him that the girls were not coming back, and they were there to take the U-Haul equipment from Martin. Two more men in U-Haul uniforms arrived and began taking the equipment. They blocked the aisles in his service [***8] station with their trucks. They refused to move the trucks when asked to move them. The U-Haul men were working on the trucks before [*403] they took them away, leaving debris and oil for Martin to clean up. It took them all day to remove the equipment.

Baird used Martin's office to complete the necessary paperwork on the trailers and trucks in order to close out the books on them. Martin never received the "U-Haul Dealership Closeout Notice" which had been prepared because he refused to sign a copy of it. Neither did he receive a 30-day written notification of termination of his dealership.

Martin maintained that he had been "set-up" by Adamitz to make it look as if he had been stealing money from U-Haul so that they could have a pretext under which to close down his U-Haul dealership. He was planning to move from his Texaco station at 1401 Coffee Road in Modesto to a new location at 5th and "I" Streets where he would no longer sell gas but would perform auto repairs and expand his U-Haul [**20] operations. The lease at the Texaco station expired one month after he was closed down on August 31, 1981. The new location was close to the Modesto U-Haul Moving Center, and Martin believed [***9] that they did not want the competition. He had contacted John Wilson of U-Haul prior to August 25 to discuss moving his business. Wilson had told him to discuss it with his field man. He had also told Baird of his planned move prior to the August 25 visit by Ms. Deaton. Steven Baird, Martin's field man in 1981, stated that the independent dealers were competing with the U-Haul Moving Center for the same equipment and that Martin's new location was within a mile of the moving center. Baird had agreed to the move and had offered to help him move the trailers.

Nadine Coley was Martin's wife in 1981. She testified that when he returned home in the late afternoon of August 25, he had told her that two girls had been to the station to rent a trailer. She confirmed Martin's version of the events of that evening after they had received a telephone call from the station and left their home to go down there. Martin then asked her to go to Turlock. She did not find anyone at the address which she was given and returned to the station. Both she and Martin then went to Turlock to try to find the girls. She also confirmed that they often used Texaco credit card slips as deposit receipts. [***10] She stated that she had been with Martin for nine years while he had been a U-Haul dealer, during which time she prepared most of the Monday reports and that he had not been stealing money from U-Haul to her knowledge.

Robert Meyers had been employed by Martin in August of 1981 as a mechanic. He also rented out trailers. He corroborated Martin's version of the events of August 25, stating that the girls had come in and asked for a trailer but did not have a driver's license. He testified that they wanted to [*404] pay for the trailer in advance so that it would not be rented out and that one of the girls said she would go back to Turlock so that she could get her license. He stated that the girls then returned about 4:30 or 5:30 that evening. They drove in at the rear of the station while he was in the service bay putting away his tools. They walked to the front of the station and then walked back to the trailer area with the other serviceman, Mr. Baker. Baker then came back to the front of the station because he had a gas customer. Meyers then saw the girls drive out of the station with the trailer. Meyers then called Martin who came to the station.

Meyers was also at [***11] the station on August 31, 1981, when the men from U-Haul came to take away the equipment. He also testified that they blocked the service bays so that he could not work on the cars. He asked them to move the trucks but they refused. The U-Haul personnel were there all day and were going through things that pertained only to the Texaco station and not to U-Haul. One tried to force open the door to Martin's private office.

Martin testified that he always used Texaco credit card invoices as deposit receipts. Henry Leer, his previous U-Haul field man, knew that he followed this practice. Someone would want to reserve a trailer in this fashion about four or five times a month. No one from U-Haul ever told him to use the official U-Haul deposit form instead of a Texaco credit card invoice.

Cynthia Deaton denied leaving Martin's Texaco station and returning for the trailer. She testified that Martin rented her the trailer even though she did not

204 Cal. App. 3d 396, *404; 251 Cal. Rptr. 17, **20;
1988 Cal. App. LEXIS 858, ***11

produce a driver's license and that he used a Texaco credit card invoice instead of a U-Haul contract. She denied getting the hard copy of the Texaco credit card slip from Martin's office. Roberta Craig, Ms. Deaton's friend, testified consistently [***12] with Ms. Deaton's version of the events of that day. Juanita Black and John Wilson, both employees of U-Haul of Fresno, testified that Ms. Deaton returned to Fresno that afternoon with a trailer between 3:30 and 5 p.m. Modesto was approximately a two-hour drive from the U-Haul office in Fresno.

Paul Deaton testified that he had no prior knowledge of the plan to have his daughter rent a trailer from Martin as a [**21] test of his procedures. He also stated that he had never tried to put an independent dealer out of business because he was competing with a moving center. Neither was Baird aware of any plan to take business away from the independent dealers. Baird had heard rumors that Martin had not been using U-Haul contracts and had reported these rumors to Adamitz. He did not know of the test of Martin's business practices or of the fact that they were going to close down his dealership until the morning of the 31st.

[*405] Leonard Pickhartz was the manager of the U-Haul Moving Center in Modesto in 1981. He had heard statements that Martin was "ripping off" the company and later received a note from Billy Oswald which stated that Martin was taking money from U-Haul and not using [***13] the correct rental forms. He did realize that the note had come from one of Martin's disgruntled employees who might have been fired. Martin testified that Oswald had worked for him for three days in July of 1981 and that he had fired him because Oswald had told him that he could make a lot of money by renting U-Haul equipment without using the proper contracts. Pickhartz never discussed Oswald's accusation with Martin.

Henry Leer had been one of Martin's U-Haul field men. In 1978 or 1979, another U-Haul dealer had shown him a Texaco credit card slip which he had received along with a trailer which had been returned to him. He discussed this with Martin who told him that he had instructed his employees to use the Texaco credit card slips if they were too busy at the time the equipment was rented and then to put it on a proper contract later. Leer told Martin to discontinue this practice and also informed Adamitz of this development. Leer had also altered

Martin's trailers to determine if they were being used without that use being reported but was unable to produce any proof that Martin was cheating.

Adamitz testified that he felt Martin's U-Haul business was low in the area [***14] of the renting of local trailers and that the local trailers were the hardest to trace in the U-Haul system. He had heard several reports of trailers being rented on credit card receipts without U-Haul contracts and had decided to send someone in to test the rumors. He was not hoping to terminate Martin's dealership and actually wanted more dealers in Modesto. He instructed Juanita Black to make the arrangements to have Ms. Deaton rent a trailer from Martin as a test. He had not been otherwise involved in the test and, when he later heard that she had been able to rent a trailer without a contract, made the decision to close Martin's U-Haul operation. He did not tell anyone of his decision until the morning of August 31 when they went to Martin's dealership. He confronted Martin with the credit card slip and told him that their relationship would have to be terminated.

With respect to termination of a dealership, the U-Haul dealership contract provides: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned. Upon termination of this contract [***15] for any reason, Dealer warrants, covenants, and agrees, that within the geographical limits of the county of his place of business, he will not represent or render any service either on his own behalf or in any [*406] capacity for any other persons, firm, or corporation engaged in any rental business which offers the rental of equipment similar to that operated by Marketing Co. for the duration of the then existing telephone directory listing, plus a period of one year from the termination of such telephone directory listing."

Martin testified that when he first started with U-Haul, Henry Leer had told him "that if I did something wrong they could give me a 30-day notice." Even though he testified that he understood at the time he signed the contract that U-Haul could close him down without notice if he violated a provision of the contract, he stated at trial that he did not think U-Haul could close down his operation without notice.

[**22] In August of 1984, Martin began to draw Social Security disability payments. Martin has died

during the time this appeal has been pending.

Discussion

I

Whether Martin's Contract Damages Are Limited to Those Accruing in the 30-day Period After the [***16] Breach of the Contract

(1a) Martin contends that the trial court erred when it granted U-Haul's motion for new trial subject to the condition that the motion would be denied if Martin would consent to a reduction in damages from $ 29,000 to $ 725. The basis for the decision was a finding that U-Haul's contract damages could not extend beyond the 30-day period in which U-Haul was permitted to terminate the dealership contract without cause. That contract provision, paragraph 16 in the U-Haul dealership contract, provides in pertinent part as follows: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned."

(2) "[When] a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." ( *Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 932 [148 Cal.Rptr. 389, 582 P.2d 980].)* "The trial court's exercise of [***17] discretion in ruling on the new trial motion may be disturbed only where '. . . a manifest and unmistakable abuse of discretion clearly appears.' [Citation.] The admonition is particularly compelling when discretion is exercised in favor of granting the new [*407] trial." ( *County of San Diego v. Bressi (1986) 184 Cal.App.3d 112, 119 [229 Cal.Rptr. 44].)*

Although Martin devotes much of his argument on appeal to the question of whether or not the contract could only be terminated for good cause, he prevailed on this issue at trial when the jury found that U-Haul had breached the contract. The only issue here is that of the proper measure of damages.

Martin also contends that this was a contract of adhesion and, therefore, that the particular provision cannot be used to limit damages. However, he never pursued this theory in his opposition to the motion for new trial and may not do so now.

(3) A trial court may not be held to have abused its discretion as to a particular issue which it was never asked to consider. ( *Ernst v. Searle (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; Guardians of Turlock's Integrity v. Turlock City Council (1983) 149 Cal.App.3d 584, 599 [197 Cal.Rptr. 303].)* [***18]

(1b) This leaves the central issue of whether the contract provision which provides for the termination of the dealership contract upon 30 days' written notice effectively restricts the damages recoverable by either party to the contract to those attributable to that 30-day period.

In *Pecarovich v. Becker (1952) 113 Cal.App.2d 309 [248 P.2d 123]*, the plaintiff had been employed as a coach of the defendants' San Francisco Clippers professional football team. The defendants breached the three-year contract of employment under which Pecarovich served when they informed him that they would no longer operate the football team and, therefore, did not intend to perform their part of the contract. The trial court had computed the plaintiff's damages based on the entire unexpired three-year term of the contract. The appellate court looked to the termination clause of the contract which gave the employer the option of terminating the agreement upon a 90-day written notice with specified payments to be made to the employee. It held that the trial court had erred in awarding damages for the entire unexpired term of the contract and remanded the action with direction [***19] to render a judgment reflecting the lower damage award required by the termination clause.

The *Pecarovich* contract provided for both a specified notice period and also a [**23] specified sum to be paid by the defendants. Here we only have the specified notice period. However, this is not a significant difference when considered in light of the authority relied upon by the *Pecarovich* court as well as the general principles of contract law. (4a) As that court explained: "We have found no California decisions in point but judicial [*408] decisions in other jurisdictions indicate

that if a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach." ( *Pecarovich v. Becker, supra, 113 Cal.App.2d at p. 317.*)

The *Pecarovich* court cites several out-of-state authorities for the proposition that the contract damages are limited to the notice period. ( *Pecarovich v. Becker, supra, 113 Cal.App.2d at p. 318.*)

(5) As one of those cases explained within the context of [***20] an employment contract, "If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given." ( *Bitterman v. Gluck (1939) 256 App.Div. 336 [9 N.Y.S.2d 1007, 1008].*)

In *Cline v. Smith (1929) 96 Cal.App. 697 [274 P. 761],* the court reached a similar conclusion. There a contract which had eight years to run was breached. The trial court had instructed the jury that, in arriving at proper measure of damages, it could consider the fact that the contract had eight years to run. The contract provided that "'either party may terminate this contract at any time by giving to the other party sixty days notice of its intention to do so.'" ( *Id. at p. 699.*) The Court of Appeal reversed. It held that the portion of the instruction permitting consideration of the fact that the contract had eight years to run was prejudicially erroneous "[in] view of the company's right to terminate the contract at any [***21] time on sixty days' notice . . . ." ( *Id. at p. 702.*) Therefore, although not expressly restricting damages to a 60-day period, it implied that that would be the proper measure and did explicitly find that permitting damages based on the total unexpired term of the contract was erroneous in light of the termination provision.

In the venerable case of *Jewell v. Colonial Theater Co. (1910) 12 Cal.App. 681 [108 P. 527],* a contract for the employment of an actress contained a provision stating, "'This contract may be cancelled at any time after the first performance by either party giving two weeks' notice in writing to the other.'" ( *Id. at p. 683.*) Before the expiration of the plaintiff's contract, the theater closed, and she was dismissed without receiving the required two weeks' notice. The appellate court found

that she was properly awarded her salary for the two-week period following her discharge as part of her damages. ( *Id. at p. 684.*)

*California Civil Code section 3300* provides for the general measure of damages for a breach of contract. It [***22] reads: "For the breach of an obligation [*409] arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

(6) California case law has long held the correct measure of damages to be as follows: "Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. [Citations.] Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. [Citations.]" ( *Coughlin v. Blair (1953) 41 Cal.2d 587, 603 [262 P.2d 305];* accord [**24] *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co. (1977) 66 Cal.App.3d 101, 123 [135 Cal.Rptr. 802];* Bravo v. Buelow (1985) 168 Cal.App.3d 208, 215 [214 Cal.Rptr. 65].) [***23]

Witkin explains the "foreseeability" rule when he states: "The requirement of *knowledge or notice* as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting." (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 815, p. 733, original italics.)

(4b) The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

204 Cal. App. 3d 396, *409; 251 Cal. Rptr. 17, **24;
1988 Cal. App. LEXIS 858, ***23

**(1c)** In the case at bench, Martin testified both at trial and during his deposition that he agreed to the 30-day notice provision. At trial he was questioned as follows:

"Q. Didn't you agree to that, that [***24] they could cancel you at any time without, for a reason or no reason, on 30 days notice?

"A. I may have agreed to that, but that don't mean it's true.

"Q. And you didn't see anything wrong with that, did you?

[*410] "A. No."

At his deposition, he responded to questions on this issue in a similar fashion.

"Question: Isn't it true, Mr. Martin, that you knew when you first become [*sic*] a U-Haul dealer on Coffee Road that U-Haul had an absolute right to cancel you for any reason, or no reason, on 30 days notice?

"Answer: That's right.

"Question: You knew that all the time?

"Answer: Yes.

"Question: And you agreed to that?

"Answer: That's right.

"Question: And you didn't see anything wrong with that?

"Answer: No."

Having consciously agreed to and understood the effect of the 30-day notice provision at the time he entered into the dealership contract, Martin may not now avoid the impact of the provision to which he freely assented.

**(7)** *Civil Code section 3358* provides in pertinent part, "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." "Thus, courts will not, except where [***25] exemplary damages are awarded, permit a party to a contract to recover more on the breach thereof than he would have

received by due performance of the agreement." (23 Cal.Jur.3d, Damages, § 47, p. 78.)

**(1d)** If U-Haul had followed the notice requirements in its dealership contract, it could have terminated Martin's dealership after providing a 30-day notice. Full performance by U-Haul would only have resulted in an additional 30 days of U-Haul dealership business for Martin. That 30-day period is all that Martin could reasonably be assured of remaining in business.

Because of the 30-day notice provision neither party to the dealership contract could reasonably anticipate that damages resulting from a breach of that contract would exceed those potentially accruing during a 30-day period after the breach. Furthermore, awarding the wronged party damages [*411] which exceed those attributable to the 30 days immediately following the breach would place that party in a better position than that resulting if the breaching party had performed in accordance with the terms of the agreement. Therefore, the trial court was correct when it granted the new trial motion conditioned upon Martin's [***26] consent to a reduction in the damage award from $ 29,000 to $ 725. [**25]

II

Whether the Court Erred in Granting the Nonsuit Motion as to the Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing

In his supplemental brief, Martin's counsel urges three bases for his contention that the lower court erred when it granted the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing. They are (1) a special relationship existed between Martin and U-Haul; (2) there was no significant distinction between Martin and an at-will employee; and (3) even absent a special relationship, an action stemming from an alleged bad faith breach of the covenant within the context of an ordinary commercial contract may sound in tort. All three contentions are without merit.

In *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158]*, the California Supreme Court reaffirmed that "the law implies in *every* contract a covenant of good faith and fair dealing." ( *Id. at p. 768*, original italics.) However, [***27] it specifically stopped short of holding that a cause of action sounding in tort arose in every instance where this covenant may have been

204 Cal. App. 3d 396, *411; 251 Cal. Rptr. 17, **25;
1988 Cal. App. LEXIS 858, ***27

breached. As the court explained: "While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's -- that breach of the covenant always gives rise to an action in tort -- is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between the insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. [Citation.] No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.

"When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated [*412] damages in the event [***28] of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (*36 Cal.3d at pp. 768-769*, fns. omitted.)

The *Seaman's* court then went on to find tort liability on a basis distinct from breach of the implied covenant. ( *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra, 36 Cal.3d at p. 769.*)

**(8)** As Justice Woolpert of this court has explained: "The facts in *Seaman's* did not require the court to examine conduct in the *performance* of the contract. Instead, the court described a new intentional tort, finding 'it is not even necessary to predicate [***29] liability on a breach of the implied covenant.' The new tort: '[A] party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.' [Citation.] Under these circumstances, no special contractual relationship is required. The court avoided plotting additional courses

through 'uncharted waters.'" ( *Quigley v. Pet, Inc. (1984) 162 Cal.App.3d 877, 890 [208 Cal.Rptr. 394].*)

In the instant case, there has been no denial of the existence of the contract. Therefore, any tort liability must be predicated [**26] upon U-Haul's alleged bad faith actions in the performance of the contract. Decisions since *Seaman's* have continued to stress the requirement that there be a special relationship between the parties before a tort cause of action for breach of the implied covenant of good faith and fair dealing will lie.

**(9)** As succinctly stated in *Premier Wine & Spirits v. E. & J. Gallo Winery (E.D.Cal. 1986) 644 F.Supp. 1431*, affirmed (9th Cir. 1988) *846 F.2d 537*: "To establish Premier's [***30] tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a 'special relationship' between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. [Citation.] California courts have not extended the 'special relationship' doctrine to include ordinary commercial contractual relationships such as the supplier-distributor relationships present here." ( *Id. at p. 1436*; accord *Multiplex Ins. Agency, Inc. v. California Life Ins. Co. (1987) 189 Cal.App.3d 925, 937 [235 Cal.Rptr. 12]* and *Commercial Cotton Co. v. United California Bank (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017].*)

We, therefore, reject Martin's contention that tort damages may be awarded for a breach of the covenant of good faith and fair dealing absent some special relationship between the parties.

[*413]

**(10)** The inquiry then turns to the issue of whether or not such a special relationship exists. This tort found its genesis within the special relationship of the insurance context. [***31] (See *Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]* and *Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173].*) Courts have also sustained its viability when the relationship between the parties was one of employer/employee ( *Cleary v. American Airlines, Inc. (1980) 111 Cal.App.3d 443, 455 [168 Cal.Rptr. 722]*) or bank/depositor ( *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d 511, 516*). However, the courts have

204 Cal. App. 3d 396, *413; 251 Cal. Rptr. 17, **26;
1988 Cal. App. LEXIS 858, ***31

consistently declined to expand liability for this tort into other types of contract-based disputes.

In *Commercial Cotton, supra*, the court stressed the importance of "public interest, adhesion, and fiduciary responsibility" in looking at whether a special relationship existed. ( *Commercial Cotton Co. v. United California Bank, supra, 163 Cal.App.3d at p. 516.*) Similarly, in *Wallis v. Superior Court (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123]*, [***32] the court examined several facets of insurance contracts which distinguish them from ordinary commercial contracts. That court stated: "As noted earlier, the *[Seaman's]* court intimated that a noninsurance contract could be tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract. (*36 Cal.3d at p. 769.*) For purposes of serving as predicates of tort liability, we find that the following 'similar characteristics' must be present in a contract: (1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." [***33] (*Id. at p. 1118.*)

Martin's counsel asserts that "the only element not technically met in the *Wallis* criteria is the fact that Martin had entered into the contract with U-Haul for remuneration," and that, therefore, a special relationship could still have existed between U-Haul and Martin. This argument falls short for two reasons. First, this missing element is a crucial factor in deciding whether or not a special relationship exists. It is of paramount importance that the reason for the contract be "to secure peace [**27] of mind, security, future protection." That is what makes the relationship a "special" one.

Second, contrary to Martin's assertion, all the other factors are not present in this case; indeed, none of them are. The parties were not in "an [*414] inherently unequal bargaining position." Although it is true that U-Haul was a larger business organization, this is not the thrust of this factor. In the vast majority of business transactions, one enterprise will be larger than the other. Martin was a service station owner who rented U-Haul equipment as a sideline. This was an arm's-length transaction; Martin could have chosen to do business with any of several [***34] other equipment rental firms. Similarly, contract damages were adequate. Martin could have been compensated for the loss of income attributable to the 30-day period following the termination as the total of his expectancy interest under the contract.

Finally, there was no special vulnerability on Martin's part. True, Martin could not rent U-Haul equipment without U-Haul. However, he could theoretically rent out other similar equipment from U-Haul's competitors. But more importantly, this was a sideline business from which Martin garnered income additional to that of his Texaco station; this was not his sole means of earning a living as is generally the case in wrongful termination actions.

The facts of the two cases most closely analogous to the instant situation uphold this view. In *Premier Wine & Spirits, supra*, Premier was a distributor for Gallo but also distributed products for other wineries. A dispute arose and Premier brought an action which alleged, in part, a breach of the covenant of good faith and fair dealing on the part of Gallo. The federal district court looked at the *Wallis* factors as well as at this court's decision in *Quigley*. [***35] It concluded: "The supplier-distributor relationship here cannot be described as having a non-profit motivation; profit is the principal basis of such a relationship. Furthermore, Premier has continued as distributor of product lines from a multitude of suppliers, and was appointed as distributor of the Inglenook line of wines following termination. Therefore, Premier cannot be described as being especially vulnerable to a termination by Gallo." ( *Premier Wine & Spirits v. E. & J. Gallo Winery, supra, 644 F.Supp. at pp. 1436-1437.*)

The independent dealer status of Martin is analogous to that of Premier. This was an ordinary commercial relationship, not a "special" one.

Similarly, the situation in *Quigley, supra, 162 Cal.App.3d 877* is also relevant to the instant analysis. Quigley had contracted to haul raw walnuts for Pet, a large agricultural corporation. Pet was alleged to have breached the contract by failing to honor the agreed rate schedule. Quigley brought an action for breach of

contract, tortious interference with business relations, intentional infliction of emotional distress and breach of the implied duty of [***36] good faith and fair dealing arising out of their contract. This court addressed the issue of an asserted special relationship as follows: "Quigley [*415] Bros. and Pet are commercial enterprises. Quigley is a corporate shareholder. There was no special relationship which removed the parties from usual commercial contract rules. At the inception of the contract the bargaining position of the parties was equal; Quigley willingly accepted the contract rate.

"The contractual relationship was entered into for the usual business reason of profit which can be assured by ordinary contract damages if a failure of performance occurred. Although perhaps financially vulnerable because of the importance of the contract, plaintiffs' hauling business was one in which profit or loss was foreseeably dependent upon a multitude of circumstances. As noted in the *Seaman's* dissent, in most cases purposeful breaches of contract are to be anticipated with only contract damages as the remedy." ( *Quigley v. Pet, Inc., supra, 162 Cal.App.3d at p. 893.*)

Therefore, even though the contract with Pet constituted a major portion of Quigley's business, this court [***37] did not equate that type of vulnerability with that which is [**28] required before a court will allow a cause of action for breach of the covenant of good faith and fair dealing to proceed or a judgment based upon that tort to be upheld. Martin was even less vulnerable than Quigley in that his U-Haul business was merely a sideline. No special relationship was present in this situation.

Finally, appellate counsel agrees that Martin was not an employee of U-Haul but urges this court to hold that he was some sort of quasi-employee and that, therefore, this tort action could proceed. However, as has already been discussed, the employer/employee relationship is merely one type of special relationship which will sustain this tort. As Martin was not an employee and there was no other special relationship, this contention is without merit.

Because there was no "special relationship" between Martin and U-Haul and what was at issue was an ordinary commercial transaction and because California law has not extended this tort to normal commercial contracts, the granting of the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing was proper.

III, IV [Text [***38] omitted.] NOT CERTIFIED FOR PUBLICATION.

[*416] The order conditionally granting the motion for new trial is affirmed. The case is remanded to the trial court for the purpose of allowing plaintiff to elect whether to accept the $ 725 or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of defendant on the first and second causes of action of plaintiff's complaint is affirmed.

Costs are awarded to defendant.

# EXHIBIT 24

LEXSEE 68 CAL. 2D 222

**REBECCA D. MASTERSON et al., Plaintiffs and Respondents, v. LU E. SINE et al., Defendants and Appellants**

**Sac. No. 7725**

**Supreme Court of California**

**68 Cal. 2d 222; 436 P.2d 561; 65 Cal. Rptr. 545; 1968 Cal. LEXIS 157**

**February 6, 1968**

**SUBSEQUENT HISTORY:** Respondents' Petition for a Rehearing was Denied March 6, 1968, and the Opinion was Modified to Read as Printed Above. McComb, J., and Burke, J., were of the Opinion that the Petition should be Granted.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Glenn County. Richard E. Patton, Judge. *

    * Assigned by the Chairman of the Judicial Council.

Action for declaratory relief to establish plaintiff's right to enforce an option to repurchase certain real property.

**DISPOSITION:** Reversed. Judgment declaring plaintiff's right to exercise the option reversed.

## HEADNOTES

## CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Vendor and Purchaser--Option to Repurchase--Construction: Extrinsic Evidence.** --In construing the grantors' option to repurchase in a deed conveying their ranch, the court properly admitted extrinsic evidence to render the repurchase price sufficiently certain to permit specific performance by showing that such price, described in the deed as ". . . the same consideration as being paid heretofore plus . . . depreciation value of any improvements . . ." was meant by the grantors and grantees to be $ 50,000 plus expenditures for improvements by the grantees less depreciation allowable under federal income tax regulations at the time of exercising the option.

**(2) Evidence--Extrinsic Evidence--Rule.** --When the parties to a written contract have agreed to it as an "integration," namely, a complete and final embodiment of the terms of the agreement, parol evidence cannot be used to add to or vary its terms.

**(3) Id.--Extrinsic Evidence: Exceptions to Rule--Where Agreement Is Incomplete.** --When only part of a written contract is integrated, parol evidence cannot be used to add to or vary the terms of that part, but parol evidence may be used to prove elements of the agreement not reduced to writing.

**(4) Id.--Extrinsic Evidence--Exceptions to Rule--Test of Completeness.** --The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement.

**(5) Id.--Extrinsic Evidence--Exceptions to Rule--Test of Completeness: Prior or Contemporaneous Agreements.** --The circumstances at the time of writing a contract may aid in determining whether the parties intended it to be integrated, and any collateral agreement must be examined to determine whether the parties intended the subjects of negotiation it dealt with to be included in, excluded from or otherwise affected by the writing, even though the written contract may have expressed the parties' intention to nullify antecedent understandings or agreements.

**(6) Id.--Extrinsic Evidence--Exceptions to Rule--Prior or Contemporaneous Agreements--When Inadmissible.** --Evidence of oral collateral agreements should be excluded only when the fact finder is likely to be misled.

**(7a) (7b) Vendor and Purchaser--Option to Repurchase--Construction: Extrinsic Evidence.** --In a non-jury declaratory relief action by a bankrupt's wife and

68 Cal. 2d 222, *; 436 P.2d 561, **;
65 Cal. Rptr. 545, ***; 1968 Cal. LEXIS 157

trustee in bankruptcy to establish their right to enforce an option to repurchase a ranch that the bankrupt and his wife, as tenants in common, had conveyed to his sister and brother-in-law, it was reversible error to exclude extrinsic evidence offered to show that the parties had agreed that the option was personal to the grantors so as to keep the property in the family, where the option clause in the deed of conveyance, silent on the question of assignability, did not explicitly provide that it contained the complete agreement, and where, in light of the grantors' inexperience in land transactions, the condition of nonassignability might "naturally" have been made the subject of a separate collateral agreement.

**(8)    Assignment--Rights    Assignable--Stipulations Against Assignment.**  --In the absence of a controlling statute the parties may provide that a contract right or duty is nontransferable.

**(9)  Id.--Rights Assignable--Stipulations Against Assignment--Implied.**  --Even when there is no explicit agreement, written or oral, that contractual duties shall be personal, courts will effectuate a presumed intent to that effect if the circumstances indicate that performance by a substituted person would be different from that contracted for.

**COUNSEL:** Rawlins Coffman and Noel Watkins for Defendants and Appellants.

Glicksberg, Kushner & Goldberg, Lawrence Goldberg, Truce & Veal, Harlan Veal and Duard F. Geis for Plaintiffs and Respondents.

**JUDGES:** In Bank. Traynor, C. J. Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred. Burke, J., dissents. McComb, J., concurred.

**OPINION BY:** TRAYNOR

**OPINION**

[*224] [**562] [***546] Dallas Masterson and his wife Rebecca owned a ranch as tenants in common. On February 25, 1958, they conveyed it to Medora and Lu Sine by a grant deed "Reserving unto the Grantors herein an option to purchase the above described property on or before February 25, 1968" for the "same consideration as being paid heretofore plus their depreciation value of any improvements Grantees may add to the property from and after two and a half years from this date." Medora is Dallas' sister and Lu's wife. Since the conveyance Dallas has been adjudged bankrupt. His trustee in bankruptcy and Rebecca brought this declaratory relief action to establish their right to enforce the option.

The case was tried without a jury. Over defendants' objection the trial court admitted extrinsic evidence that by "the same consideration as being paid heretofore" both the grantors and the grantees meant the sum of $ 50,000 and by "depreciation value of any improvements" they meant the depreciation value of improvements to be computed by deducting from the total amount of any capital expenditures made by defendants grantees the amount of depreciation allowable to them under United States income tax regulations as of the time of the exercise of the option.

The court also determined that the parol evidence rule precluded admission of extrinsic evidence offered by defendants to show that the parties wanted the property kept in the Masterson family and that the option was therefore personal to the grantors and could not be exercised by the trustee in bankruptcy.

The court entered judgment for plaintiffs, declaring their right to exercise the option, specifying in some detail how it could be exercised, and reserving jurisdiction to supervise the manner of its exercise and to determine the amount that plaintiffs will be required to pay defendants for their capital expenditures if plaintiffs decide to exercise the option.

(1) Defendants appeal. They contend that the option provision is too uncertain to be enforced and that extrinsic evidence as to its meaning should not have been admitted. The trial court properly refused to frustrate the obviously declared intention of the grantors to reserve an option to repurchase by an overly meticulous insistence on completeness and [*225] clarity of written expression. (See *California Lettuce Growers, Inc.* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; *Rivers* v. *Beadle* (1960) 183 Cal.App.2d 691, 695-697 [***547] [**563] [7 Cal.Rptr. 170].) It properly admitted extrinsic evidence to explain the language of the deed ( *Nofziger* v. *Holman* (1964) 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; *Barham* v. *Barham* (1949) 33 Cal.2d 416, 422-423 [202 P.2d 289]; *Union Oil Co.* v. *Union Sugar Co.* (1948) 31 Cal.2d 300, 306 [188 P.2d 470]; *Schmidt* v. *Macco Constr. Co.* (1953) 119 Cal.App.2d 717, 730 [260 P.2d 230]; see Farnsworth, "Meaning" in the Law of Contracts (1967) 76 Yale L.J. 939, 959-965; Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161) to the end that the consideration for the option would appear with sufficient certainty to permit specific enforcement (see *McKeon* v. *Santa Claus of Cal., Inc.* (1964) 230 Cal.App.2d 359, 364 [41 Cal.Rptr. 43]; *Vurrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 288 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]). The trial court erred, however, in excluding the extrinsic evidence that the option was personal to the grantors and therefore nonassignable.

68 Cal. 2d 222, *; 436 P.2d 561, **;
65 Cal. Rptr. 545, ***; 1968 Cal. LEXIS 157

**(2)** When the parties to a written contract have agreed to it as an "integration" -- a complete and final embodiment of the terms of an agreement -- parol evidence cannot be used to add to or vary its terms. ( *Pollyanna Homes, Inc.* v. *Berney* (1961) 56 Cal.2d 676, 679-680 [16 Cal.Rptr. 345, 365 P.2d 401]; *Hale* v. *Bohannon* (1952) 38 Cal.2d 458, 465 [241 P.2d 4]; see 3 Corbin, Contracts (1960) § 573, p. 357; Rest., Contracts (1932) §§ 228 (and com. a), 237; Code Civ. Proc., § 1856; Civ. Code, § 1625.) **(3)** When only part of the agreement is integrated, the same rule applies to that part, but parol evidence may be used to prove elements of the agreement not reduced to writing. ( *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; *Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 250 [40 Cal.Rptr. 189]; *Mangini* v. *Wolfschmidt, Ltd.* (1958) 165 Cal.App.2d 192, 200-201 [331 P.2d 728]; Rest., Contracts (1932) § 239.)

**(4)** The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. **(5)** The instrument itself may help to resolve that issue. It may state, for example, that "there are no previous understandings or agreements not contained in the writing," and [*226] thus express the parties' "intention to nullify antecedent understandings or agreements." (See 3 Corbin, Contracts (1960) § 578, p. 411.) Any such collateral agreement itself must be examined, however, to determine whether the parties intended the subjects of negotiation it deals with to be included in, excluded from, or otherwise affected by the writing. Circumstances at the time of the writing may also aid in the determination of such integration. (See 3 Corbin, Contracts (1960) §§ 582-584; McCormick, Evidence (1954) § 216, p. 441; 9 Wigmore, Evidence (3d ed. 1940) § 2430, p. 98, § 2431, pp. 102-103; Witkin, Cal. Evidence (2d ed. 1966) § 721; *Schwartz* v. *Shapiro, supra,* 229 Cal.App.2d 238, 251, fn. 8; contra, 4 Williston, Contracts (3d ed. 1961) § 633, pp. 1014-1016.)

California cases have stated that whether there was an integration is to be determined solely from the face of the instrument (e.g., *Thoroman* v. *David* (1926) 199 Cal. 386, 389-390 [249 P. 513]; *Heffner* v. *Gross* (1919) 179 Cal. 738, 742-743 [178 P. 860]; *Gardiner* v. *McDonogh* (1905) 147 Cal. 313, 318-321 [81 P. 964]; *Harrison* v. *McCormick* (1891) 89 Cal. 327, 330 [26 P. 830, 23 Am.St.Rep. 469]), and that the question for the court is whether it "appears to be a complete . . . agreement. . . ." (See *Ferguson* v. *Koch* (1928) 204 Cal. 342, 346 [268 P. 342, 58 A.L.R. 1176]; *Harrison* v. *McCormick, supra,* 89 Cal. 327, 330.) Neither of these strict formulations of the rule, however, has been consistently applied. The requirement that the writing must appear incomplete on its face has been repudiated in many cases where parol evidence was admitted "to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms" -- even though the instrument appeared to state a complete agreement. (E.g., *American Industrial Sales Corp.* v. *Airscope, Inc.* (1955) 44 Cal.2d 393, 397 [282 P.2d 504, 49 A.L.R.2d 1344]; *Stockburger* v. *Dolan* (1939) 14 Cal.2d 313, 317 [94 P.2d 33, 128 A.L.R. 83]; *Crawford* v. *France* (1933) 219 Cal. 439, 443 [27 P.2d 645]; *Buckner* v. *A. Leon & Co.* (1928) 204 Cal. 225, 227 [267 P. 693]; *Sivers* v. *Sivers* (1893) 97 Cal. 518, 521 [32 P. 571]; cf. *Simmons* v. *California Institute of Technology* (1949) 34 Cal.2d 264, 274 [209 P.2d 581].) Even under the rule that the writing alone is to be consulted, it was found necessary to examine the alleged collateral agreement before concluding that proof of it was precluded by the writing alone. (See 3 Corbin, Contracts (1960) § 582, pp. 444-446.) It is therefore evident that "The conception of a writing as wholly and intrinsically self-determinative of the parties' intent to make it a sole memorial [*227] of one or seven or twenty-seven subjects of negotiation is an impossible one." (9 Wigmore, Evidence (3d ed. 1940) § 2431, p. 103.) For example, a promissory note given by a debtor to his creditor may integrate all their present contractual rights and obligations, or it may be only a minor part of an underlying executory contract that would never be discovered by examining the face of the note.

In formulating the rule governing parol evidence, several policies must be accommodated. One policy is based on the assumption that written evidence is more accurate than human memory. ( *Germain Fruit Co.* v. *J. K. Armsby Co.* (1908) 153 Cal. 585, 595 [96 P. 319].) This policy, however, can be adequately served by excluding parol evidence of agreements that directly contradict the writing. Another policy is based on the fear that fraud or unintentional invention by witnesses interested in the outcome of the litigation will mislead the finder of facts. ( *Germain Fruit Co.* v. *J. K. Armsby Co., supra,* 153 Cal. 585, 596; *Mitchill* v. *Lath* (1928) 247 N.Y. 377, 388 [160 N.E. 646, 68 A.L.R. 239] [dissenting opinion by Lehman, J.]; see 9 Wigmore, Evidence (3d ed. 1940) § 2431, p. 102; Murray, *The Parol Evidence Rule: A Clarification* (1966) 4 Duquesne L.Rev. 337, 338-339.) McCormick has suggested that the party urging the spoken as against the written word is most often the economic underdog, threatened by severe hardship if the writing is enforced. In his view the parol evidence rule arose to allow the court to control the tendency of the jury to find through sympathy and without a dispassionate assessment of the probability of fraud or faulty memory that the parties made an oral agreement collateral to the written contract, or that preliminary tentative agreements were not abandoned when omitted from the writing. (See McCormick, Evidence (1954) § 210.) He

recognizes, however, that if this theory were adopted in disregard of all other considerations, it would lead to the exclusion of testimony concerning oral agreements whenever there is a writing and thereby often defeat the true intent of the parties. (See McCormick, *op. cit. supra*, § 216, p. 441.)

(6) Evidence of oral collateral agreements should be excluded only when the fact finder is likely to be misled. The rule must therefore be based on the credibility of the evidence. One such standard, adopted by section 240(1)(b) of the Restatement of Contracts, permits proof of a collateral agreement if it "is such an agreement as might *naturally* be made as a separate agreement by parties situated as were the parties [*228] to the written contract." (Italics added; see McCormick, Evidence (1954) § 216, p. 441; see also 3 Corbin, Contracts (1960) § 583, p. 475, § 594, pp. 568-569; 4 Williston, Contracts (3d ed. 1961) § 638, pp. 1039-1045.) The draftsmen of the Uniform Commercial Code would exclude the evidence in still fewer instances: "If the additional terms are such that, if agreed upon, they would *certainly* have been included in the document in the view of the court, then evidence of their alleged making [**565] [***549] must be kept from the trier of fact." (Com. 3, § 2-202, italics added.) [1]

[1]  Corbin suggests that, even in situations where the court concludes that it would not have been natural for the parties to make the alleged collateral oral agreement, parol evidence of such an agreement should nevertheless be permitted if the court is convinced that the unnatural actually happened in the case being adjudicated. (3 Corbin, Contracts, § 485, pp. 478, 480; cf. Murray, *The Parol Evidence Rule: A Clarification* (1966) 4 Duquesne L. Rev. 337, 341-342.) This suggestion may be based on a belief that judges are not likely to be misled by their sympathies. If the court believes that the parties intended a collateral agreement to be effective, there is no reason to keep the evidence from the jury.

(7a)  The option clause in the deed in the present case does not explicitly provide that it contains the complete agreement, and the deed is silent on the question of assignability. Moreover, the difficulty of accommodating the formalized structure of a deed to the insertion of collateral agreements makes it less likely that all the terms of such an agreement were included. [2] (See 3 Corbin, Contracts (1960) § 587; 4 Williston, Contracts (3d ed. 1961) § 645; 70 A.L.R. 752, 759 (1931); 68 A.L.R. 245 (1930).) The statement of the reservation of the option might well have been placed in the recorded deed solely to preserve the grantors' rights against any possible future purchasers, and this function could well be

served without any mention of the parties' agreement that the option was personal. There is nothing in the record to indicate that the parties to this family transaction, through experience in land transactions or otherwise, had any warning of the disadvantages of failing to put the whole agreement in the deed. This case is one, therefore, in which it can be said that a collateral agreement such as that alleged "might naturally be made as a separate agreement." *A fortiori*, the case is not one [*229] in which the parties "would certainly" have included the collateral agreement in the deed.

[2]  See *Goble* v. *Dotson* (1962) 203 Cal.App.2d 272 [21 Cal.Rptr. 769], where the deed given by a real estate developer to the plaintiffs contained a condition that grantees would not build a pier or boathouse. Despite this reference in the deed to the subject of berthing for boats, the court allowed plaintiffs to prove by parol evidence that the condition was agreed to in return for the developer's oral promise that plaintiffs were to have the use of two boat spaces nearby.

It is contended, however, that an option agreement is ordinarily presumed to be assignable if it contains no provisions forbidding its transfer or indicating that its performance involves elements personal to the parties. ( *Mott* v. *Cline* (1927) 200 Cal. 434, 450 [253 P. 718]; *Altman* v. *Blewett* (1928) 93 Cal.App. 516, 525 [269 P. 751].) The fact that there is a written memorandum, however, does not necessarily preclude parol evidence rebutting a term that the law would otherwise presume. In *American Industrial Sales Corp.* v. *Airscope, Inc., supra*, 44 Cal.2d 393, 397-398, we held it proper to admit parol evidence of a contemporaneous collateral agreement as to the place of payment of a note, even though it contradicted the presumption that a note, silent as to the place of payment, is payable where the creditor resides. (For other examples of this approach, see *Richter* v. *Union Land etc. Co.* (1900) 129 Cal. 367, 375 [62 P. 39] [presumption of time of delivery rebutted by parol evidence]; *Wolters* v. *King* (1897) 119 Cal. 172, 175-176 [51 P. 35] [presumption of time of payment rebutted by parol evidence]; *Mangini* v. *Wolfschmidt, Ltd., supra*, 165 Cal.App.2d 192, 198-201 [presumption of duration of an agency contract rebutted by parol evidence]; *Zinn* v. *Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 73-74 [306 P.2d 1017]; see also Rest., Contracts, § 240, com. c.) [3] [**566] [***550] Of course a statute may preclude parol evidence to rebut a statutory presumption. ( *E. G. Neff* v. *Ernst* (1957) 48 Cal.2d 628, 635 [311 P.2d 489] [commenting on Civ. Code, § 1112]; *Kilfoy* v. *Fritz* (1954) 125 Cal.App.2d 291, 293-294 [270 P.2d [*230] 579] [applying Deering's Gen. Laws, 1937, Act. 652, § 15(a)]; see also Com. Code, § 9- 318, subd. (4).) Here, however, there is no such statute. (8) In the absence of a

controlling statute the parties may provide that a contract right or duty is nontransferable. ( *La Rue v. Groezinger* (1890) 84 Cal. 281, 283 [24 P. 42, 18 Am.St.Rep. 179]; *Benton* v. *Hofmann Plastering Co.* (1962) 207 Cal.App.2d 61, 68 [24 Cal.Rptr. 268]; *Parkinson* v. *Caldwell* (1954) 126 Cal.App.2d 548, 552-553 [272 P.2d 934]; see 4 Corbin, Contracts (1951) §§ 872-873.) **(9)** Moreover, even when there is no explicit agreement -- written *or* oral -- that contractual duties shall be personal, courts will effectuate a presumed intent to that effect if the circumstances indicate that performance by a substituted person would be different from that contracted for. ( *Farmland Irr. Co.* v. *Dopplmaier* (1957) 48 Cal.2d 208, 222 [308 P.2d 732, 66 A.L.R.2d 590]; *Prichard* v. *Kimball* (1923) 190 Cal. 757, 764-765 [214 P. 863]; *Simmons* v. *Zimmerman* (1904) 144 Cal. 256, 260-261 [79 P. 451, 1 Ann.Cas. 850]; *La Rue* v. *Groezinger, supra*, 84 Cal. 281, 285; *Coykendall* v. *Jackson* [*231] (1936) 17 Cal.App.2d 729, 731 [62 P.2d 746]; see 4 Corbin, Contracts (1951) § 865; 3 Williston, Contracts (3d ed. 1960) § 412, pp. 32-33; [**567] [***551] Rest., Contracts (Tent. Draft No. 3, 1967) § 150 (2).)

3    Counsel for plaintiffs direct our attention to numerous cases that they contend establish that parol evidence may never be used to show a collateral agreement contrary to a term that the law presumes in the absence of an agreement.    In each of these cases, however, the decision turned upon the court's belief that the writing was a complete integration and was no more than an application of the rule that parol evidence cannot be used to vary the terms of a completely integrated agreement. (Cf. discussion in *Mangini* v. *Wolfschmidt, Ltd., supra*, 165 Cal.App.2d 192, 203.) In *Gardiner* v. *McDonogh, supra*, 147 Cal. 313, 319, defendants sought to prove a collateral agreement that beans sold them were to conform to a sample earlier given.    The court purportedly looked only to the face of the writing to decide whether parol evidence was admissible, and such evidence would be excluded if the writing was "clear and complete." Defendants argued that the written order was not complete because it did not fix a time and place of delivery, but the court answered that the failure to state those terms did not result in incompleteness because the law would supply them by implication.    This decision was based on the belief that the question of admissibility had to be decided from the face of the instrument alone.    Virtually every writing leaves some terms to be implied and almost none would qualify as integrations without implying some terms.    The decision was therefore a product of an outmoded approach to the parol evidence rule,

not of any compulsion to give conclusive effect to presumptions of implied terms.

In *Standard Box Co.* v. *Mutual Biscuit Co.* (1909) 10 Cal.App. 746, 750 [103 P. 938], the rationale of *Gardiner* v. *McDonogh* was extended to exclude evidence of an agreement for a time of performance other than the "reasonable time" implied by law in a situation where the writing, although stating no time of performance, was "clear and complete when aided by that which is imported into it by legal implication." This decision was simply an application of the then-current theory regarding integration. The court regarded the instrument as a complete integration, and it therefore precluded proof of collateral agreements. Since it is now clear that integration cannot be determined from the writing alone, the decision is not authoritative insofar as it finds a complete integration. There is no reason to believe that the court gave any independent significance to implied terms. Had the court found from the writing alone that there was no integration, there is nothing to indicate that it would have excluded proof contrary to terms it would have otherwise presumed.

In *Buffalo Arms, Inc.* v. *Remler Co.* (1960) 179 Cal.App.2d 700, 710 [4 Cal.Rptr. 103], the court refused to admit parol evidence showing a collateral oral agreement that a buyer would have more than the "reasonable time" presumed by law to refuse goods, but the decision is based on a conclusion that the writing on its face was a complete expression of the agreement. In *La France* v. *Kashishian* (1928) 204 Cal. 643, 645 [269 P. 655], and *Fogler* v. *Purkiser* (1932) 127 Cal.App. 554, 559-560 [16 P.2d 305], there are no similar findings concerning the completeness of the writings; but the argument in each case is borrowed from the *Standard Box Co.* decision and thus implies a finding of a complete integration. *Calpetro Producers Syndicate* v. *C. M. Woods Co.* (1929) 206 Cal. 246, 247-248, 252 [274 P. 65], relies on *Standard Box Co.* and expressly finds a complete integration.

**(7b)** In the present case defendants offered evidence that the parties agreed that the option was not assignable in order to keep the property in the Masterson family. The trial court erred in excluding that evidence.

The judgment is reversed.

**DISSENT BY: BURKE**

**DISSENT**

BURKE, J. I dissent. The majority opinion:

(1) Undermines the parol evidence rule as we have known it in this state since at least 1872 [1] by declaring that parol evidence should have been admitted by the trial court to show that a written option, absolute and unrestricted in form, was intended to be limited and non-assignable;

(2) Renders suspect instruments of conveyance absolute on their face;

(3) Materially lessens the reliance which may be placed upon written instruments affecting the title to real estate; and

(4) Opens the door, albeit unintentionally, to a new technique for the defrauding of creditors.

> 1   In that year the Legislature set forth the rule in section 1625 of the Civil Code and 1856 of the Code of Civil Procedure.

The opinion permits defendants to establish by parol testimony that their grant [2] to their brother (and brother-in-law) of a written option, absolute in terms, was nevertheless agreed to be nonassignable by the grantee (now a bankrupt), and that therefore the right to exercise it did not pass, by operation of the bankruptcy laws, to the trustee for the benefit of the grantee's creditors.

> 2   The option was in the form of a reservation in a deed; however, in legal effect it is the same as if it had been contained in a separate document.

And how was this to be shown? By the proffered testimony of the bankrupt optionee himself! Thereby one of his assets (the option to purchase defendants' California ranch) would be withheld from the trustee in bankruptcy and from the bankrupt's creditors.  Understandably the trial court, as required by the parol evidence rule, did not allow the bankrupt by parol to so contradict the unqualified language of the written option.

[*232]  The court properly admitted parol evidence to explain the intended meaning of the "same consideration" and "depreciation value" phases of the written option to purchase defendants' land, as the intended meaning of those phrases was not clear.  However, there was nothing ambiguous about the *granting* language of the option and not the slightest suggestion in the document that the option was to be nonassignable. Thus, to permit such words of limitation to be added by parol is to *contradict* the absolute nature of the grant, and to directly violate the parol evidence rule.

Just as it is unnecessary to state in a deed to "lot X" that the house located thereon goes with the land, it is likewise unnecessary to add to "I grant an option to Jones" the words *and his assigns*" for the option to be assignable.  As hereinafter emphasized in more detail, California statutes expressly declare that it *is* assignable, and only if I add language in writing showing my intent to withhold or restrict the right of assignment may the grant be so limited.  Thus, to seek to restrict the grant by parol is to *contradict* the written document in violation of the parol evidence rule.

The majority opinion arrives at its holding via a series of false premises which are not supported either in the record of this case or in such California authorities as are offered.

The parol evidence rule is set forth in clear and definite language in the statutes of this state. ( Civ. Code, § 1625; Code Civ. Proc., § 1856.) It "is not a rule of evidence but is one of substantive law. . . .  The rule as applied to contracts is simply [**568] [***552] that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), *becomes the contract of the parties*." ( *Hale* v. *Bohannon* (1952) 38 Cal.2d 458, 465 [1, 2] [241 P.2d 4], quoting from *Estate of Gaines* (1940) 15 Cal.2d 255, 264-265 [100 P.2d 1055].) The rule is based upon the sound principle that the parties to a written instrument, after committing their agreement to or evidencing it by the writing, are not permitted to add to, vary or *contradict* the terms of the writing by parol evidence. As aptly expressed by the author of the present majority opinion, speaking for the court in *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [2] [44 Cal.Rptr. 767, 402 P.2d 839], and in *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265], such evidence is "admissible to interpret the instrument, but *not to give it a meaning* to which it is not reasonably susceptible." (Italics added.) Or, as stated by the same author, concurring [*233] in *Laux* v. *Freed* (1960) 53 Cal.2d 512, 527 [2 Cal.Rptr. 265, 348 P.2d 873], "extrinsic evidence is not admissible to 'add to, *detract from, or vary* its terms.'" (Italics added.)

At the outset the majority in the present case reiterate [3] that the rule against contradicting or varying the terms of a writing remains applicable when only part of the agreement is contained in the writing, and parol evidence is used to prove elements of the agreement not reduced to writing.  But having restated this established rule, the majority opinion inexplicably proceeds to subvert it.

> 3   Citing three California cases (*ante*, p. 225); *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; *Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 250 [40 Cal.Rptr. 189]; *Mangini* v. *Wolfschmidt,*

68 Cal. 2d 222, *; 436 P.2d 561, **;
65 Cal. Rptr. 545, ***; 1968 Cal. LEXIS 157

*Ltd.* (1958) 165 Cal.App.2d 192, 200-201 [331 P.2d 728].

Each of the three cases cited by the majority (fn. 3, *ante*) holds that although parol evidence is admissible to prove the parts of the contract not put in writing, it is *not admissible* to vary or *contradict* the writing *or prove collateral agreements* which are *inconsistent* therewith. The meaning of this rule (and the application of it found in the cases) is that if the asserted unwritten elements of the agreement would contradict, add to, detract from, vary or be inconsistent with the written agreement, then such elements *may not* be shown by *parol* evidence.

The contract of sale and purchase of the ranch property here involved was carried out through a title company upon written escrow instructions executed by the respective parties after various preliminary negotiations. The deed to defendant grantees, in which the grantors expressly reserved an option to repurchase the property within a ten-year period and upon a specified consideration, was issued and delivered in consummation of the contract. In neither the written escrow instructions nor the deed containing the option is there any language even suggesting that the option was agreed or intended by the parties to be personal to the grantors, and so nonassignable. The trial judge, on at least three separate occasions, correctly sustained objections to efforts of defendant optionors to get into evidence the testimony of Dallas Masterson (the bankrupt holder of the option) that a part of the agreement of sale of the parties was that the option to repurchase the property was personal to him, and therefore unassignable for benefit of creditors. But the majority hold that that testimony should have been admitted, thereby permitting defendant optionors [*234] to limit, detract from and contradict the plain and unrestricted terms of the written option in clear violation of the parol evidence rule and to open the door to the perpetration of fraud.

Options are property, and are widely used in the sale and purchase of real and personal property. One of the basic incidents of property ownership is the right of the owner to sell or transfer it. The author of the present majority opinion, speaking for the court in *Farmland Irr. Co.* v. *Dopplmaier* (1957) 48 Cal.2d 208, 222 [308 P.2d [**569] [***553] 732, 66 A.L.R.2d 590], put it this way: "The statutes in this state clearly manifest a policy in favor of the free transferability of all types of property, including rights under contracts." [4] (Citing Civ. Code, §§ 954, 1044, 1458; [5] see also 40 Cal.Jur.2d 289-291, and cases there cited.) These rights of the owner of property to transfer it, confirmed by the cited code sections, are elementary rules of substantive law and not the mere disputable presumptions which the majority opinion in the present case would make of them. Moreover, the right of transferability applies to an option to purchase,

unless there are words of limitation in the option forbidding its assignment or showing that it was given because of a peculiar trust or confidence reposed in the optionee. ( *Mott* v. *Cline* (1927) 200 Cal. 434, 450 [11] [253 P. 718]; *Prichard* v. *Kimball* (1923) 190 Cal. 757, 764-765 [4, 5] [214 P. 863]; *Altman* v. *Blewett* (1928) 93 Cal.App. 516, 525 [3] [269 P. 751]; see also 5 Cal.Jur.2d 393, 395-396, and cases there cited.) Thus, in *Prichard* the language of the *document itself* (a written, *expressly nonassignable* lease, with option to buy) was held to establish the trust or confidence reposed in the optionee and so to negate assignability of the option.

4  The opinion continues: "The terms and purpose of a contract may show, however, that it was intended to be nonassignable." With this qualification of the general rule I am in accord, but here it is inapplicable as language indicating any intention whatever to restrict assignability is completely nonexistent.

5  Section 1044: "Property of any kind may be transferred, except as otherwise provided by this article." The *only* property the article provides cannot be transferred is "A mere possibility, not coupled with an interest." (§ 1045.)

Section 1458: "A right arising out of an obligation is the property of the person to whom it is due, and may be transferred as such."

The right of an optionee to transfer his option to purchase property is accordingly one of the basic rights which accompanies the option unless limited under the language of the option itself. To allow an optionor to resort to parol evidence to support his assertion that the written option is not transferable [*235] is to authorize him to limit the option by attempting to restrict and reclaim rights with which he has already parted. A clearer violation of two substantive and basic rules of law -- the parol evidence rule and the right of free transferability of property -- would be difficult to conceive.

The majority opinion attempts to buttress its approach by asserting (*ante*, p. 226) that "California cases have stated that whether there was an integration is to be determined solely from the face of the instrument [citations], and that the question for the court is whether it 'appears to be a complete . . . agreement. . . . [citations]," but that "Neither of these strict formulations of the rule . . . has been consistently applied."

The majority's claim of inconsistent application of the parol evidence rule by the California courts fails to find support in the examples offered. First, the majority opinion asserts (*ante*, p. 226) that "The requirement that the writing must appear incomplete on its face has been repudiated in many cases where parol evidence was ad-

mitted 'to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms' -- even though the instrument appeared to state a complete agreement. [Citations.]" But an examination of the cases cited in support of the quoted statement discloses that on the contrary in every case which is pertinent here (with a single exception) the writing was obviously incomplete on its face. [6] In the one exception ( *Stockburger v. Dolan* [**570] [***554] (1939) 14 Cal.2d 313, 317 [94 P.2d 33, 128 A.L.R. 83]) it was held that lessors under a lease to drill for oil in an area zoned against such drilling should be permitted to show by parol that the lessee had contemporaneously agreed orally to seek a variance -- an agreement which, as the opinion points out, *did not contradict* the written contract. But what is additionally noteworthy in *Stockburger*, and controlling here, is [*236] the further holding that lessors *could not show by parol* that lessee had orally agreed that a lease provision suspending payment of rental under certain circumstances would not apply during certain periods of time -- as "evidence to that effect would vary the terms of the contract in that particular . . . ." (P. 317 [5] of 14 Cal.2d.)

    6   Thus in *American Industrial Sales Corp.* v. *Airscope, Inc.* (1955) 44 Cal.2d 393, 397 [282 P.2d 504, 49 A.L.R.2d 1344], the contract was *silent* as to the *place of payment* for property purchased; in *Crawford* v. *France* (1933) 219 Cal. 439, 443 [27 P.2d 645], a contract for an architect's fee based upon the cost of a building was *silent* as to such cost; in *Buckner* v. *A. Leon & Co.* (1928) 204 Cal. 225, 227 [267 P. 693], a contract for sale and purchase of grapes was *silent* as to which party was to furnish the lug boxes required for delivery; in *Sivers* v. *Sivers* (1893) 97 Cal. 518, 521 [32 P. 571], a written agreement to repay money loaned was *silent* as to the time for payment; and *Simmons* v. *California Institute of Technology* (1949) 34 Cal.2d 264, 274 [9] [209 P.2d 581], was a case of *fraud* in the *inducement* and *not one of parol evidence to show a promise* or agreement *inconsistent* with the written contract.

    In further pursuit of what would appear to be nonexistent support for its assertions of inconsistency in California cases, the majority opinion next declares (*ante*, p. 226) that "Even under the rule that the writing alone is to be consulted, it was found necessary to examine the alleged collateral agreement before concluding that proof of it was precluded by the writing alone. (See 3 Corbin, Contracts (1960) § 582, pp. 444-446.)" Not only are *no California cases cited* by the majority in supposed support for the quoted declaration (offered by the majority as an example of inconsistent applications

of the parol evidence rule by *California courts*), but 3 Corbin, Contracts, which the majority do cite, likewise refers to *no California cases*, and makes but scanty citation to any cases whatever. In any event, in what manner other than by "examining" an alleged collateral agreement is it possible for a court to rule upon the admissibility of testimony or upon an offer of proof with respect to such agreement?

    The majority opinion has thus demonstrably failed to substantiate its next utterance (*ante*, pp. 226-227) that "'The conception of a writing as wholly and intrinsically self-determinative of the parties' intent to make it a sole memorial of one or seven or twenty-seven subjects of negotiation is an impossible one,'" citing 9 Wigmore, Evidence (3d ed. 1940) section 2431, page 103, whose *views* on the subject were *rejected* by this court as early as 1908 in *Germain Fruit Co.* v. *J. K. Armsby Co.*, 153 Cal. 585, 595 [96 P. 319], which, indeed, is *also cited by* the *majority* in the present case. And the example given, that of a promissory note, is obviously specious. Rarely, if ever, does a promissory note given by a debtor to his creditor integrate *all* their agreements (that is not the purpose it serves); it may or it may not integrate *all* their present contractual rights and obligations; but relevant to the parol evidence rule, at least until the advent of the majority opinion in this case, alleged collateral agreements which would vary or contradict the terms and conditions of a promissory note may *not* be shown by parol. ( *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258, 263-264 [6] [48 P.2d 659].)

    Upon this structure of incorrect premises and unfounded [*237] assertions the majority opinion arrives at its climax: The pronouncement of "several policies [to] be accommodated . . . *[in] formulating the rule governing parol evidence*." (Italics added.) [7] Two of the "policies" as declared [**571] [***555] by the majority are: Written evidence is more accurate than human memory; [8] fraud or unintentional invention by interested witnesses may well occur.

    7   It is the *Legislature* of this state which *did the formulating* of the rule governing parol evidence nearly a century ago when in 1872, as previously noted, sections 1625 of the Civil Code and 1856 of the Code of Civil Procedure were adopted. And as already shown herein, the rule has since been consistently applied by the courts of this state. The parol evidence rule as thus laid down by the Legislature and applied by the courts *is the policy* of this state.
    8   Although the majority declare that this first "policy" may be served by excluding parol evidence of agreements that directly contradict the writing, such contradiction is *precisely the effect*

68 Cal. 2d 222, *; 436 P.2d 561, **;
65 Cal. Rptr. 545, ***; 1968 Cal. LEXIS 157

of the agreement sought to be shown by parol in this case.

I submit that these purported "policies" are in reality two of the basic and obvious reasons for adoption by the Legislature of the parol evidence rule as the policy in this state. Thus the speculation of the majority (*ante*, pp. 227-228) concerning the views of various writers on the subject and the advisability of following them in this state is not only superfluous but flies flatly in the face of established California law and policy. It serves only to introduce uncertainty and confusion in a field of substantive law which was codified and made certain in this state a century ago.

However, despite the law which until the advent of the present majority opinion has been firmly and clearly established in California and relied upon by attorneys and courts alike, that parol evidence may *not* be employed to vary or contradict the terms of a written instrument, the majority now announce (*ante*, p. 227) that such evidence "should be excluded only when the fact finder is *likely to be misled*," and that "The rule must therefore be based on the *credibility of the evidence*." (Italics added.) But was it not, inter alia, to avoid misleading the fact finder, and to further the introduction of only the evidence which is most likely to *be* credible (the written document), that the Legislature adopted the parol evidence rule as a part of the substantive law of this state?

Next, in an effort to implement this newly promulgated "credibility" test, the majority opinion offers a choice of two "standards": one, a "certainty" standard, quoted from the Uniform Commercial Code [9] (*ante*, p. 228), and the other a [*238] "natural" standard found in the Restatement of Contracts [10] (*ante*, p. 227), and concludes (*ante*, p. 228) that at least for purposes of the present case the "natural" viewpoint should prevail.

> [9] "If the additional terms are such that, if agreed upon, they would *certainly* have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." (Comment 3, § 2-202; italics added.)
> [10] Viz., proof of a collateral agreement should be permitted if it "is such an agreement as might *naturally* be made as a separate agreement by parties situated as were the parties to the written contract." (Restatement of Contracts, § 240, subd. (1) (b); italics added.)

This new rule, not hitherto recognized in California, provides that proof of a claimed collateral oral agreement is admissible if it is such an agreement as might *naturally* have been made a separate agreement by the parties

under the particular circumstances. I submit that this approach opens the door to uncertainty and confusion. Who can know what its limits are? Certainly I do not. For example, in its application to this case who could be expected to divine as "natural" a separate oral agreement between the parties that the assignment, absolute and unrestricted on its face, was intended by the parties to be limited to the Masterson family?

Or, assume that one gives to his relative a promissory note and that the payee of the note goes bankrupt. By operation of law the note becomes an asset of the bankruptcy. The trustee attempts to enforce it. Would the relatives be permitted to testify that by a separate oral agreement made at the time of the execution of the note it was understood that should the payee fail in his business the maker would be excused from payment of the note, or that, as here, it was intended that the benefits of the note would be *personal* to the payee? I doubt that trial judges should be burdened with the task of conjuring whether it would have been [**572] [***556] "natural" under those circumstances for such a separate agreement to have been made by the parties. Yet, under the application of the proposed rule, this is the task the trial judge would have, and in essence the situation presented in the instant case is no different.

Under the application of the codes and the present case law, proof of the existence of such an agreement would not be permitted, "natural" or "unnatural." But conceivably, as loose as the new rule is, one judge might deem it natural and another judge unnatural. [11] And in each instance the ultimate decision [*239] would have to be made ("naturally") on a case-by-case basis by the appellate courts.

> [11] Or perhaps application of the new rule will turn upon the opinion of the court (trial or appellate) that it is "natural" for one family group to agree that in case of unfriendly approach by a creditor of any of them, then the debtor's property will be transferable or assignable only to other members of the family, whereas such a scheme might be considered less than "natural" for other families to pursue.

In an effort to provide justification for applying the newly pronounced "natural" rule to the circumstances of the present case, the majority opinion next (*ante*, p. 228) attempts to account for the silence of the writing in this case concerning assignability of the option, by asserting that "the difficulty of accommodating the formalized structure of a deed to the insertion of collateral agreements makes it less likely that all the terms of such an agreement were included." What difficulty would have been involved here, to add the words "this option is nonassignable"? The asserted "formalized structure of a

deed" is no formidable barrier. The Legislature has set forth the requirements in simple language in section 1092 of the Civil Code. It is this: "I, A B, grant to C D all that real property situated in [naming county], State of California, . . . described as follows: [describing it]." To this the grantor desiring to reserve an option to repurchase need only so state, as was done here. It is a matter of common knowledge that collateral agreements (such as the option clause here involved, or such as deed restrictions) are frequently included in deeds, without difficulty of any nature.

To support further speculation (*ante*, p. 228) that "the reservation of the option might well have been placed in the recorded deed solely to preserve the grantors' rights against any possible future purchasers, and this function could well be served without any mention of the parties' agreement that the option was personal," the majority assert that "There is *nothing in the record* to indicate that the parties to this family transaction, through experience in land transactions or otherwise, had any warning of the disadvantages of failing to put the whole agreement in the deed." (Italics added.) The facts of this case, however, do not support such claim of naivete. The grantor husband (the bankrupt businessman) testified that as none of the parties were attorneys "we wanted to contact my attorney . . . which we did. . . . The wording in the option was obtained from [the attorney]. . . . I told him what my discussion was with the Sines [defendant grantees] and he wanted . . . a little time to compose it . . . . And, then this [the wording provided by the attorney] was taken to the title company at the time Mr. and Mrs. Sine and I went in to *complete the transaction*." (Italics added.) The witness was an experienced businessman who thus demonstrated awareness of the wisdom of seeking legal guidance and advice in this business [*240] transaction, and who did so. Wherein lies the naive family transaction postulated by the majority?

The majority opinion (*ante*, p. 229) then proceeds on the fallacious assertion that the right to transfer or to assign an option, if it contains no provisions forbidding transfer or indicating that performance [**573] [***557] involves elements personal to the parties, is a mere disputable presumption, and in purported support cites cases *not one of which involves an option* and *in each of which the presumption which was invoked served to supply a missing but essential element of a complete* agreement. [12] As already emphasized hereinabove, the right of free transferability of property, including options, is one of the most fundamental tenets of substantive law, and the crucial distinction would appear self-evident between such a basic right on the one hand, and on the other hand the disputable evidentiary presumptions which the law has developed to supply terms lack-

ing from a written instrument but essential to making it whole and complete. *There is no such lack in the deed and the option reservation now at issue.*

12    Thus in *American Industrial Sales Corp.* v. *Airscope, Inc.*, *supra* (1955) 44 Cal.2d 393, 397, the missing element was the place of payment of a note; in *Richter* v. *Union Land etc. Co.* (1900) 129 Cal. 367, 375 [62 P. 39], the missing element was the time of delivery; in *Wolters* v. *King* (1897) 119 Cal. 172, 175-176 [51 P. 35], it was the time of payment; and in *Mangini* v. *Wolfschmidt, Ltd.*, *supra* (1958) 165 Cal.App.2d 192, 200, and *Zinn* v. *Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 73-74 [306 P.2d 1017], it was the duration of an agency contract.

The statement of the majority opinion (*ante*, p. 230) that in the absence of a controlling statute the parties may provide that a contract right or duty is nontransferable, is of course true. Equally true is the next assertion (*ante*, p. 230) that "even when there is no explicit agreement -- written *or* oral -- that contractual duties shall be personal, courts will effectuate a presumed intent to that effect if the circumstances indicate that performance by a substituted person would be different from that contracted for." But to apply the law of contracts for the rendering of personal services to the reservation of an option in a deed of real estate calls for a misdirected use of the rule, particularly in an instrument containing not one word from which such "a presumed intent to that effect" could be gleaned. Particularly is the holding objectionable when the result is to upset established statutory and case law in this state that "circumstances" shown by parol may *not* be employed to contradict, add to or detract from, the agreement of the parties as expressed by them in writing. And once again the quoted pronouncement of the majority concerning the showing [*241] of "circumstances" by parol fails to find support in the cases they cite, [13] which [**574] [***558] relate to a patent license agreement, held to be assignable absent terms indicating a contrary intent; a contract to sell grapes also held assignable; a contract which included language showing the intent that it be nonassignable; a contract to buy land held to be assignable because approval of title by the buyer was held not to be a *personal* privilege attaching only to the assignor; and to contracts for personal services.

13    In *Farmland Irr. Co.* v. *Dopplmaier*, *supra* (1957) 48 Cal.2d 208, 222, the court in holding that a patent license agreement *was* assignable pursuant to the policy "clearly manifested" by "the statutes in this state . . . in favor of the free transferability of all types of property, including rights under contracts," stated "The *terms and*

68 Cal. 2d 222, *; 436 P.2d 561, **;
65 Cal. Rptr. 545, ***; 1968 Cal. LEXIS 157

*purpose* of a contract may show however, that it was intended to be nonassignable. Thus the *duties imposed* upon one party may be of such a *personal nature* that their performance by someone else would in effect deprive the other party of that for which he had bargained. The duties in such a situation cannot be delegated." (Citing *La Rue* v. *Groezinger* (1890) 84 Cal. 281, 283-285, which held (p. 286 [24 P. 42, 18 Am.St.Rep. 179]) that a contract to sell grapes from a certain vineyard *was* assignable to the purchaser of the vineyard, as nothing in the contract language excluded the "idea of performance by another," and (p. 287) there was "nothing in the nature or circumstances . . . which shows that the skill or other personal quality of the party was a distinctive characteristic of the thing stipulated for, or a material inducement to the contract.")

In *Prichard* v. *Kimball, supra* (1923) 190 Cal. 757, 764-765, next cited by the majority, the *written contract contained language* showing the intent that it be nonassignable (as already pointed out hereinabove). *Simmons* v. *Zimmerman* (1904) 144 Cal. 256, 260-261 [79 P. 451, 1 Ann. Cas. 850], held that a contract to buy land *was* assignable, as approval of title by the buyer is *not* a personal privilege attaching only to the assignor (the party to whom the seller agreed to sell). *La Rue* v. *Groezinger* has already been shown not to support the majority's proposition here. And the last case which the majority cite, *Coykendall* v. *Jackson* (1936) 17 Cal.App.2d 729, 731 [62 P.2d 746], involved a contract for *personal services*, almost uniformly held to be nonassignable; it did *not* deal with a contract or an option to buy property, which ordinarily imposes no other obligation on the buyer than to *make payment*, as does the option now before this court.

Neither personal skill nor personal qualities can be conjured as a requirement for the exercise of the option reserved in the deed here, regardless of how ardent may be the desire of the parties (the bankrupt husband-optionee and his sister), "to keep the property in the . . . family." Particularly is this true when a contrary holding would permit the property to be acquired by plaintiff referee in bankruptcy for the benefit of the creditors of the bankrupt husband.

Comment hardly seems necessary on the convenience to a bankrupt of such a device to defeat his credi-

tors. He need only produce parol testimony that any options (or other property, for that matter) which he holds are subject to an oral "collateral agreement" with family members (or with friends) that the property is nontransferable "in order to keep the property in the family" or in the friendly group. In the present case the value of the ranch which the bankrupt and his wife held an option to purchase has doubtless increased substantially during the years since they acquired the option. The initiation of this litigation by the trustee in bankruptcy to establish his right to enforce the option indicates his [*242] belief that there is substantial value to be gained for the creditors from this asset of the bankrupt. Yet the majority opinion permits defeat of the trustee and of the creditors through the device of an asserted collateral oral agreement that the option was "personal" to the bankrupt and nonassignable "in order to keep the property in the family"! [14]

14   As noted at the outset of this dissent, it was by means of the bankrupt's own testimony that defendants (the bankrupt's sister and her husband) sought to show that the option was personal to the bankrupt and thus not transferable to the trustee in bankruptcy.

It also seems appropriate to inquire as to the rights of plaintiff wife in the option which she holds with her bankrupt husband. Is her interest therein also subject to being shown to be personal and not salable or assignable? And, what are her rights and those of her husband in the ranch land itself, if they exercise their option to purchase it? Will they be free to then sell the land? Or, if they prefer, may they hold it beyond the reach of creditors? Or can other members of "the family" claim some sort of restriction on it in perpetuity, established by parol evidence?

And if defendants sell the land subject to the option, will the new owners be heard to assert that the option is "personal" to the optionees, "in order to keep the property in the *Masterson* family"? Or is that claim "personal" to defendants only?

These are only a few of the confusions and inconsistencies which will arise to plague property owners and, incidentally, attorneys and title companies, who seek to counsel and protect them.

I would hold that the trial court ruled correctly on the proffered parol evidence, and would affirm the judgment.

EXHIBIT 25

LEXSEE 157 CAL APP 4TH 1164

**AMANDA MITRI et al., Plaintiffs and Respondents, v. ARNEL MANAGEMENT COMPANY et al., Defendants and Appellants.**

**G038003**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

**157 Cal. App. 4th 1164; 69 Cal. Rptr. 3d 223; 2007 Cal. App. LEXIS 2015; 102 Fair Empl. Prac. Cas. (BNA) 488**

**December 12, 2007, Filed**

**PRIOR HISTORY:** [***1]
Superior Court of Orange County, No. 06CC03994, Geoffrey T. Glass, Judge.

**DISPOSITION:** Affirmed.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Two former employees of a management company sued the company and others for sexual discrimination and harassment, failure to prevent sexual discrimination and harassment, retaliation for opposing sexual discrimination and harassment, invasion of privacy, and defamation. The company filed a motion to compel arbitration of plaintiffs' claims on the ground plaintiffs had each signed a binding arbitration agreement. The trial court entered an order denying the motion based on the company's failure to prove the existence of any such agreement to arbitrate. (Superior Court of Orange County, No. 06CC03994, Geoffrey T. Glass, Judge.)

The Court of Appeal affirmed the order. The court concluded that the trial court properly denied the company's motion to compel arbitration of plaintiffs' claims. The company's employee handbook stated that as a condition of employment, all employees were required to sign an arbitration agreement. The employee handbook further stated that employees would be provided a copy of their signed arbitration agreement. However, the company did not submit any evidence of the existence of an arbitration agreement signed by either plaintiff. Although the company argued that plaintiffs accepted a unilateral contract to arbitrate by continuing to work for the company after their receipt of the employee handbook, the employee handbook's arbitration provision only placed plaintiffs on notice that they would be called upon to sign a separate binding arbitration agreement. Regarding the company's argument that an acknowledgment receipt form constituted evidence of each employee's acquiescence to the arbitration agreement provision in the employee handbook, the court noted that absent from the acknowledgment receipt form was any reference to an agreement by the employee to abide by the employee handbook's arbitration agreement provision. (Opinion by Fybel, J., with Moore, Acting P. J., and Ikola, J., concurring.) [*1165]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Arbitration and Award § 8--Procedures--Petition to Compel--Employee Handbook--Condition of Employment--Signing of Arbitration Agreement--Evidence of Existence.**--In a case in which two former employees of a management company sued the company for sexual discrimination and harassment, the trial court properly denied the company's motion to compel arbitration of the former employees' claims. Although the company's employee handbook stated, as a condition of employment, all employees were required to sign an arbitration agreement, the company did not submit any evidence of the existence of an arbitration agreement signed by either former employee.

[Cal. Forms of Pleading and Practice (2007) ch. 32, Contractual Arbitration: Agreements and Compelling Arbitration, § 32.63; 1 Kiesel et al., Matthew Bender Practice Guide: Cal. Pretrial Civil Procedure (2007) § 6.22.]

**(2) Arbitration and Award § 8--Procedures--Petition to Compel--Existence of Written Agreement--Burden**

Page 2

157 Cal. App. 4th 1164, *; 69 Cal. Rptr. 3d 223, **;
2007 Cal. App. LEXIS 2015, ***; 102 Fair Empl. Prac. Cas. (BNA) 488

of Proof.--When a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence.

**(3) Contracts § 28--Interpretation--Intention of Parties--Agreement to Arbitrate--Validity.**--California contract law applies to determine whether the parties formed a valid agreement to arbitrate. The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. The words of a contract are to be understood in their ordinary and popular sense. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other (Civ. Code, § 1641).

**(4) Contracts § 3--Consent--Essential Component.**--Civ. Code, § 1550, subd. 2, establishes that an essential component to a contract is the consent of the parties to the contract.

**(5) Contracts § 24--Interpretation--Function of Courts.**--A court cannot and will not create a term of a contract between the parties that the evidence does not show was ever agreed upon by the parties. [*1166]

**COUNSEL:** Paul, Hastings, Janofsky & Walker, Michael A. Hood, Sherri Fanger McInnes and Karin K. Sherr for Defendants and Appellants.

Law Office of Patricia Grace and Patricia J. Grace for Plaintiffs and Respondents.

**JUDGES:** Opinion by Fybel, J., with Moore, Acting P. J., and Ikola, J., concurring.

**OPINION BY:** Fybel

**OPINION**

[**224] **FYBEL, J.--**

INTRODUCTION

Plaintiffs Amanda Mitri [1] and Eric Eppel (plaintiffs) sued their former employer, Arnel Management Company (Arnel), Arnel's owner, George Argyros, and Arnel supervisors Steve Mensinger, Ole Olson, and Leslie Holis (collectively defendants) for, inter alia, sexual discrimination and [**225] harassment. [2] Defendants filed

a motion to compel arbitration of plaintiffs' claims on the ground plaintiffs had each signed a binding arbitration agreement. The trial court denied the motion based on defendants' failure to prove the existence of any such agreement to arbitrate. Defendants contend the trial court erred by denying their motion.

> 1    Although the complaint and other documents filed in this action spell this plaintiff's last name "Metri" instead of "Mitri," documents in the record show the latter spelling is correct. [***2]
> 2    The complaint also named Merideth Katz as a defendant. The record does not show whether Katz was ever served in this action. Because Katz was not a moving party with regard to defendants' motion to compel the arbitration agreement, we do not further refer to her.

**(1)** We affirm. Arnel's employee handbook states, "[a]s a condition of employment, all employees are required to sign an arbitration agreement" and further states, "[e]mployees will be provided a copy of their signed arbitration agreement." Defendants have not produced evidence of signed arbitration agreements. Defendants nevertheless contend the handbook's reference to arbitration is sufficient to force plaintiffs to arbitrate their claims. As discussed in detail *post*, defendants' argument is wholly without factual or legal merit.

BACKGROUND

Plaintiffs filed a complaint against defendants containing claims for (1) sexual discrimination and harassment, (2) failure to prevent sexual discrimination and harassment, (3) retaliation for opposing sexual discrimination [*1167] and harassment, (4) invasion of privacy, and (5) defamation. Defendants filed a motion to compel arbitration and stay the proceedings on the grounds (1) each plaintiff [***3] had entered into a written arbitration agreement with Arnel, which required binding arbitration of "any controversy or dispute arising from, or in any way relating to an offer of employment or the position, work, payment or relationship, or the termination of such employment"; and (2) the claims in the complaint " 'arise from' " or are " 'related to' " plaintiffs' employment.

In support of the motion, defendants submitted the declaration of Arnel's director of claims administration, Fola Linebarger, in which she stated, "[i]t is Arnel's business practice to require all employees to sign an arbitration agreement prior to or upon commencement of employment with Arnel and to maintain a signed copy of such agreement in each employee's personnel file. I have custody of the personnel files for both Amanda Mitri and Eric Eppel, and Arnel maintains these files in the ordinary course of business. Attached hereto as Exhibits 'A' and 'B' are true and accurate copies of the arbitration

157 Cal. App. 4th 1164, *; 69 Cal. Rptr. 3d 223, **;
2007 Cal. App. LEXIS 2015, ***; 102 Fair Empl. Prac. Cas. (BNA) 488

agreements that are maintained in Ms. Mitri's and Mr. Eppel's personnel file."

Exhibit A consists of two documents. First, it contains what appears (based on the footer at the bottom of each page) to be a copy of pages [***4] 6 and 7 of the Arnel employee handbook, as revised on September 17, 2004. Pages 6 and 7 contain a section entitled "1.18 Arbitration Agreement" which states: "Any dispute arising out of employment with the Company, as allowed by law, will be settled by binding arbitration. As a condition of employment, all employees are required to sign an arbitration agreement. [¶] To ensure the expeditious and economical resolution to any controversy or dispute arising from, or in any way relating to an offer of employment or the position, work, payment or relationship, or the termination of such employment, will be on the written request by any party, be submitted to and resolved by binding arbitration. Said arbitration will be conducted by the American Arbitration Association in Orange County, California. [**226] The Company will share equitably such expenses associated with the arbitration process. The prevailing party in the arbitration shall be awarded its attorney's fees incurred in the arbitration process and the decision of the arbitrator shall be final, binding and non-appealable. [¶] Further, nothing in this policy is intended to prevent either you or the Company from obtaining injunctive relief [***5] in court to prevent irreparable harm pending the conclusion of any such arbitration. You, as the employee and the Company each have the right to resolve any issue or dispute involving company trade secrets, invention rights, non-competition and non-solicitation [*1168] by court action in lieu of arbitration. [¶] Employees will be provided a copy of their signed arbitration agreement." There is no "signed arbitration agreement" in the exhibit.

Exhibit A also contains a document entitled "Acknowledgment Receipt [¶] *Employee Handbook*" which states: "This Employee Handbook is designed to acquaint new employees, and reacquaint existing employees, with Human Resource policies, operational issues, employee services, and benefits that reflect the desire to provide a professional work environment. The Handbook is an excellent resource for employees with questions about the Company. Employees are encouraged to carefully review the Employee Handbook and become familiar with the contents and periodic updates. [¶] The Company reserves the right to change or revise policies, procedures, and benefits described in this Handbook, other than the employment at-will provisions, without notice, at such times that [***6] the Company determines this action is warranted. [¶] My signature acknowledges that I have read and understood the statements above as well as the contents of the Handbook, and will direct any questions to my supervisor or the Director of Human Re-

sources." The acknowledgment receipt form in exhibit A was signed by Mitri and dated October 14, 2004.

Exhibit B to Linebarger's declaration contains identical documents to those in exhibit A, but the acknowledgment receipt form in exhibit B was signed by Eppel and dated October 18, 2004. As with exhibit A, there is no "signed arbitration agreement" in exhibit B. Defendants requested that the trial court take judicial notice of the rules of the American Arbitration Association. Defendants did not submit any other evidence showing the existence of a mandatory arbitration agreement.

In opposition, plaintiffs each filed a declaration, in which they denied entering into an arbitration agreement with Arnel or ever being asked to do so. Both admitted "signing a receipt for the Arnel Management Company's Policy Handbook," but each stated, "I was not asked to read, nor was I given time to read, the Arnel Management Company's Policy Handbook and I did [***7] not know its contents."

The trial court issued the following tentative ruling before argument on defendants' motion: "The court is inclined to DENY this motion. The acknowledgment and receipt does not specifically cite the arbitration provision. Further, the handbook is not part of the contract of employment, because the policies in the handbook, including the arbitration provision, can be changed or revised without notice whenever the company determines it is warranted. The employee does not have reciprocal rights to amend the [*1169] handbook. [¶] Still further, the acknowledgment states that the employee has 'read and understood' the statements in the acknowledgment, which 'encourage the employee to carefully review ... and become familiar with' the employee handbook. This implies that the review will take place [**227] after the receipt is signed. That can hardly be the basis for a binding election to arbitrate. [¶] The court recognizes that the acknowledgment also says that the employee has 'read and understood the statements above *as well as the contents of the Handbook*.' The court finds this to be ambiguous under the circumstances. Even if this is a promise that the employee read the handbook [***8] before signing (which is unclear), the declarations of the plaintiffs indicate that, in fact, they did not read the handbook before signing. Further, even if they *had* read the handbook, the handbook did not constitute an agreed term of the contract of employment."

Following argument on the motion, the trial court's tentative ruling became the final order of the court. Defendants timely appealed.

DISCUSSION

The trial court's order denying defendants' motion to compel arbitration is appealable pursuant to Code of

Civil Procedure section 1294, subdivision (a). [3] (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1711 [1 Cal. Rptr. 3d 328].)

   3 Code of Civil Procedure section 1294, subdivision (a) provides: "An aggrieved party may appeal from: [¶] (a) An order dismissing or denying a petition to compel arbitration."

   **(2)** "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine *whether the agreement exists* and, if any defense to its enforcement is raised, whether it is enforceable. *Because the existence of the agreement is a statutory prerequisite to granting* [***9] *the petition,* the petitioner bears the burden of proving its existence by a preponderance of the evidence." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 [58 Cal. Rptr. 2d 875, 926 P.2d 1061], italics added.)

   Defendants contend the trial court erred by denying their motion to compel arbitration because the written documentation they submitted established the existence of a binding arbitration agreement between each plaintiff and Arnel. The " '[i]nterpretation of a written document where extrinsic evidence is [*1170] unnecessary is a question of law for independent review by the Court of Appeal. [Citations.]' " (*Romo v. Y-3 Holdings, Inc.* (2001) 87 Cal.App.4th 1153, 1158 [105 Cal. Rptr. 2d 208]; see also *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal. Rptr. 767, 402 P.2d 839].) We therefore review this issue de novo.

   **(3)** California contract law applies to determine whether the parties formed a valid agreement to arbitrate. (*Romo v. Y-3 Holdings, Inc., supra,* 87 Cal.App.4th at pp. 1158-1159; *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420 [100 Cal. Rptr. 2d 818] ["General principles of contract law determine whether the parties have entered a binding agreement to arbitrate"].) General contract law principles include that "[t]he basic goal of contract [***10] interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] ... 'The words of a contract are to be understood in their ordinary and popular sense.' [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal. Rptr. 2d 505].) Furthermore, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, [**228] each clause helping to interpret the other." (Civ. Code, § 1641.)

   **(4)** Section 1550, subdivision 2, of the Civil Code establishes the rule that an essential component to a contract is the consent of the parties to the contract. (See *Lopez v. Charles Schwab & Co., Inc.* (2004) 118 Cal.App.4th 1224, 1230 [13 Cal. Rptr. 3d 544].) Civil Code section 1565, subdivision 3 provides, "[t]he consent of the parties to a contract must be ... [¶] ... [¶] ... [c]ommunicated by each to the other." (See *Romo v. Y-3 Holdings, Inc., supra,* 87 Cal.App.4th at p. 1158 [" 'There is no public policy in favor of forcing arbitration of issues the parties have not agreed to arbitrate' "].)

   Here, the documents submitted by defendants do not show either plaintiff ever consented to binding [***11] arbitration of claims arising out of the employment relationship with Arnel. The arbitration agreement provision in the employee handbook generally states an Arnel policy that "[a]ny dispute arising out of employment with the Company, as allowed by law, will be settled by binding arbitration." The provision explains such an arbitration "will be conducted by the American Arbitration Association," and describes some of the parameters of such an arbitration (e.g., written request triggers arbitration, Arnel agrees to "equitably" share arbitration expenses, and prevailing party is awarded attorney fees). The arbitration agreement provision, however, does not stop there. It also states that pursuant to Arnel's policy, "[a]s a condition of employment, all employees are required to sign an arbitration agreement." This provision completely undermines any argument by defendants the provision in the handbook itself was intended to constitute an arbitration [*1171] agreement between Arnel and its employees. The provision further states, "[e]mployees will be provided a copy of their signed arbitration agreement"--thus reinforcing an intent to have employees sign a separate arbitration agreement to effectuate [***12] Arnel's policy of arbitrating employment claims. Defendants have not produced any evidence of the existence of such an arbitration agreement signed by either plaintiff.

   Defendants cite *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 11 [96 Cal. Rptr. 2d 179, 999 P.2d 71] (*Asmus*) and *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637 [69 Cal. Rptr. 2d 300], for the proposition that "[i]n order [to] establish that [plaintiffs] assented to the arbitration agreement, it is only necessary for [defendants] to show that [plaintiffs] received a copy of the agreement and that [plaintiffs] continued to work after they received a copy of the agreement." Significantly, however, neither *Asmus* nor *DiGiacinto v. Ameriko-Omserv Corp.* addressed whether an arbitration agreement *existed* between an employer and employee.

   *Asmus, supra,* 23 Cal.4th 1 arose in the context of an employer's discontinuance of a management employment security policy but did not involve an arbitration agreement. In *Asmus,* the California Supreme Court addressed the issue whether " '[o]nce an employer's unilaterally