Case 5:07-cv-04808-JF    Document 50-12    Filed 07/03/2008    Page 1 of 30

Page 5

157 Cal. App. 4th 1164, *; 69 Cal. Rptr. 3d 223, **;
2007 Cal. App. LEXIS 2015, ***; 102 Fair Empl. Prac. Cas. (BNA) 488

adopted policy--which requires employees to be retained so long as a specified condition does not occur--has become a part of the employment contract, may the employer [***13] thereafter unilaterally [terminate] the policy, even though the specified condition has not occurred?' " (*Id.* at pp. 5-6, fn. omitted.) In holding an employer could do so, the Supreme Court recognized that "California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept [**229] them by continuing their employment." (*Id.* at p. 11.) In *Asmus,* both parties agreed that the employees had accepted a unilateral contract by their performance. (*Ibid.*) Thus, the question in *Asmus* was whether the unilateral contract, once formed, could be unilaterally modified or terminated by the employer. (*Ibid.*)

In contrast, the core issue in this case, as framed by the motion to compel arbitration, is whether the documents prepared by Arnel show an express *bilateral* contract was entered into through which the parties agreed to arbitrate. As discussed *ante,* the documents do not. At oral argument on appeal, defendants argued plaintiffs accepted a unilateral contract to arbitrate by continuing to work for Arnel after their receipt of the employee handbook. But, as discussed *ante,* the employee handbook's arbitration provision only placed plaintiffs on notice [***14] that they would be called upon to sign a separate binding arbitration agreement, thereby contradicting defendants' argument the provision in the handbook and subsequent performance constituted a unilateral contract of binding arbitration. Defendants' argument on appeal does not [*1172] withstand legal or factual analysis and is fundamentally different from their position before the trial court. Indeed, the reply brief in support of the motion to compel arbitration, which defendants filed in the trial court, stated, "[p]laintiffs insist that the arbitration agreements are 'unilateral[,'] and therefore unenforceable. Not true. The arbitration agreements are expressly *mutual*--compelling both [p]laintiffs and [d]efendants to arbitrate 'Any dispute arising out of employment with the Company.' "

The issue presented in *DiGiacinto v. Ameriko-Omserv Corp., supra,* 59 Cal.App.4th 629, 631, was "whether the employer of an at-will employee is liable for breach of contract when the employer notifies the employee of a prospective change in his rate of compensation and thereafter the employee continues in employment." In concluding that an employer is not so liable, the appellate court noted, "the majority [***15] line of cases supports the proposition that as a matter of law, an at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." (*Id.* at p. 637.)

Both *Asmus, supra,* 23 Cal.4th 1 and *DiGiacinto v. Ameriko-Omserv Corp., supra,* 59 Cal.App.4th 629, are inapposite because, as discussed *ante,* the arbitration agreement provision contained in the employee handbook here placed plaintiffs on notice that they would be required to enter into a separate arbitration agreement with Arnel. As this record shows, neither plaintiff entered into an arbitration agreement.

In their reply brief on appeal, defendants also cite *Craig v. Brown & Root, Inc., supra,* 84 Cal.App.4th 416, 420, in which the appellate court rejected an employee's contention the evidence was insufficient to show she entered a binding arbitration agreement with her employer. The court cited evidence the employer sent the employee a memorandum informing her of the employer's new dispute resolution program, emphasized "IT APPLIES TO YOU," and explained "[i]t will govern all future legal disputes between you and [***16] the Company." (*Id.* at p. 419.) Unlike the arbitration agreement provision in the Arnel employee handbook, the memorandum in *Craig v. Brown & Root, Inc.,* established in and of itself the employer's dispute resolution program, and did not [**230] include an express requirement that its employees sign an arbitration agreement. Therefore, *Craig v. Brown & Root, Inc.,* is inapposite.

Defendants also contend the signed arbitration agreement required by the arbitration agreement provision in the Arnel employee handbook was *impliedly* unnecessary to establish an arbitration agreement between Arnel and plaintiffs. However, such an interpretation of the arbitration agreement provi- [*1173] sion contradicts that same provision's *express* term requiring a signed agreement. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal. Rptr. 2d 467, 826 P.2d 710] ["implied terms should never be read to vary express terms"]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 855, fn. 12 [57 Cal. Rptr. 3d 363] [" '[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract' "].)

Defendants next argue the acknowledgment receipt [***17] form signed by each plaintiff constitutes evidence of each plaintiff's acquiescence to the arbitration agreement provision in the employee handbook. But the language of the acknowledgment receipt form relegates the employee handbook's status to "an excellent resource for employees with questions about the Company," and further states the employee handbook is "designed to acquaint new employees, and reacquaint existing employees, with Human Resource policies, operational issues, employee services, and benefits that reflect the desire to provide a professional work environment." The acknowledgment receipt form states, "[e]mployees are

157 Cal. App. 4th 1164, *; 69 Cal. Rptr. 3d 223, **;
2007 Cal. App. LEXIS 2015, ***; 102 Fair Empl. Prac. Cas. (BNA) 488

encouraged to carefully review the Employee Handbook and become familiar with the contents and periodic updates."

Conspicuously absent from the acknowledgment receipt form is any reference to an *agreement* by the employee to abide by the employee handbook's arbitration agreement provision. Indeed, the line preceding each plaintiff's signature on his or her respective acknowledgment receipt form explains, "[m]y signature acknowledges that I have read and understood the statements above as well as the contents of the Handbook, and will direct any questions [***18] to my supervisor or the Director of Human Resources."

**(5)** We cannot and will not create a term of a contract between the parties that the evidence does not show was ever agreed upon by the parties. (Code Civ. Proc., § 1858 ["In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted ..."].) Taken as a whole, the documents submitted by defendants in support of their motion do not constitute an arbitration agreement. We therefore conclude the trial court did not err by denying defendants' motion to compel arbitration. Because we conclude the documents submitted in support of defendants' motion do not constitute an agreement to arbitrate, we do not need to consider other grounds relied upon by the trial court in denying defendants' motion to compel arbitration. [*1174]

DISPOSITION

The order is affirmed. Respondents shall recover costs on appeal.

Moore, Acting P. J., and Ikola, J., concurred.

EXHIBIT 26

LEXSEE 231 CAL APP 3D 1089

**HANS S. NYMARK, Plaintiff, Cross-defendant and Appellant, v. HEART FED-
ERAL SAVINGS & LOAN ASSOCIATION et al., Defendant, Cross-complainant
and Respondent**

**No. C005999**

**Court of Appeal of California, Third Appellate District**

**231 Cal. App. 3d 1089; 283 Cal. Rptr. 53; 1991 Cal. App. LEXIS 727; 91 Cal. Daily
Op. Service 5021; 91 Daily Journal DAR 7922**

**June 27, 1991**

**PRIOR HISTORY:**    [***1]  Superior Court of Siski-
you County, No. 40973, James E. Kleaver, Judge.

**DISPOSITION:**  The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A property owner brought an action against a lend-
ing institution alleging negligence in the institution's
appraisal of the property used as security for a loan. The
institution appraised the property and approved the loan,
finding the property was in good condition. However, the
owner subsequently discovered the property was in need
of costly repairs. The institution cross-complained for
foreclosure of the note and moved for summary judg-
ment. Plaintiff opposed, asserting his claims against the
institution operated as a setoff against any indebtedness
owed under the note, and arguing there remained a tri-
able issue as to defendant's negligence. The trial court
granted defendant summary judgment on the complaint
and the cross-complaint. (Superior Court of Siskiyou
County, No. 40973, James E. Kleaver, Judge.)

The Court of Appeal affirmed. It held that the lend-
ing institution, acting within the scope of its conventional
activities as a lender of money, owed no duty of care to
the borrower in preparing an appraisal of the security for
the loan, since the purpose of the appraisal was to protect
the lender, not the borrower. It thus held that defendant
was entitled to summary judgment on the complaint,
since it had completely negated an element of plaintiff's
action. (Opinion by Scotland, J., with Sims, Acting P. J.,
and Nicholson, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEAD-
NOTES**
Classified to California Digest of Official Reports, 3d
Series

**(1) Banks and Banking § 16--Loans--Relationship
Between Lender and Borrower.**  --The relationship
between a lending institution and its borrower-client is
not fiduciary in nature. A commercial lender is entitled
to pursue its own economic interest in a loan transaction.
This right is inconsistent with the obligations of a fiduci-
ary that require the fiduciary knowingly agree to subor-
dinate its interest to act on behalf of and for the benefit
of another.

**(2) Pleading § 13--Construction--Allegations Inconsis-
tent With Title.**  --The nature of a cause of action is
determined by the allegations set forth therein, not by the
title ascribed to it by the pleader.

[See 4 Witkin, Cal. Procedure (3d ed. 1985) Plead-
ing, § 404.]

**(3) Summary Judgment § 3--Propriety--When Motion
Brought by Defendant.**  --Summary judgment is prop-
erly granted only when the evidence in support of the
moving party establishes that there is no issue of fact to
be tried, and the moving party is entitled to judgment as
a matter of law. Generally, when the defendant is a mov-
ing party, it must conclusively negate a necessary ele-
ment of each cause of action alleged by the plaintiff or
prove an affirmative defense that would bar every cause
of action, demonstrating that under no hypothesis is there
a material issue of fact that requires the process of a trial.

**(4) Summary Judgment § 19--Hearing and Determi-
nation--Motion Brought by Defendant on Its Cross-**

231 Cal. App. 3d 1089, *; 283 Cal. Rptr. 53, **;
1991 Cal. App. LEXIS 727, ***; 91 Cal. Daily Op. Service 5021

**complaint.** --Where a defendant seeks summary judgment on its cross-complaint, defendant is in a position analogous to that of a plaintiff moving for summary judgment. Accordingly, in order to prevail, defendant must establish each element entitling it to judgment and disprove all affirmative defenses asserted by the plaintiff, the cross-defendant, demonstrating the absence of any material issues of fact that would necessitate trial of the matter.

**(5a) (5b) (5c) (5d) (5e) Banks and Banking § 16--Loans--Lender's Duty of Care to Borrower--Appraisal.** --In a borrower's action against a lending institution for negligently conducting an appraisal in which defendant cross-complained for foreclosure, the trial court properly granted summary judgment to defendant on the main action and cross-action, since defendant conclusively negated an element of the borrower's action. Plaintiff alleged that defendant appraised his property at a certain value and approved the loan, finding the property to be in good condition, but soon thereafter plaintiff discovered that the property was in need of costly repairs. Since defendant was acting within the scope of its conventional activities as a lender of money, it owed no duty of care to the borrower in preparing an appraisal of the security for the loan. The purpose of the appraisal was to protect the lender, not to induce the borrower to enter into the transaction or to assure him the collateral was sound. Moreover, the borrower, in purchasing the property, was in as good as, if not better, position than the lender to discover defects. Also, public policy precluded the imposition of a duty on the part of lending institutions, since this duty would increase the cost of housing.

[See 4 **Witkin,** Summary of Cal. Law (9th ed. 1987) Real Property, § 30.]

**(6) Deeds of Trust § 25--Remedies--Action on Debt--Defenses--Setoff.** --Setoff is an appropriate defense to a foreclosure action under a deed of trust. The basis for this defense is Code Civ. Proc., § 431.70, which provides that cross-demands for money between two persons may be set off against each other and considered paid to the extent they balance in amount.

**(7) Negligence § 9--Elements of Actionable Negligence--Duty of Care--Statement of Rules--Existence of Duty as Question of Law.** --The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence. Whether a legal duty exists in a given case is primarily a question of law. To the extent it presents solely an issue of law, the question of whether a duty exists may be resolved on a motion for summary judgment.

**(8) Banks and Banking § 16--Loans--Relationship Between Borrower and Lender--Lender's Lack of Duty of Care.** --As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. Thus, a lender has no duty to disclose its knowledge that the borrower's intended use of the loan proceeds represents an unsafe investment. Liability to a borrower for negligence arises only when the lender actively participates in the financed enterprise beyond the domain of the usual money lender. Similarly, a financial institution engaged in its conventional role as a lender of money is not liable to a third party for any financial failure of that which is financed, or for any loss or damage due to a defect in, or resulting from, the failure of the borrower to use due care in the design, manufacture, construction, repair, modification, or improvement of real or personal property that was financed by a loan from the institution.

**(9) Banks and Banking § 16--Loans--Lender's Duty of Care to Borrower--Test for Determining.** --Ordinarily a lending institution owes no duty of care to a borrower-client. The test for determining whether a financial institution owes a duty of care to a borrower-client involves the balancing of various factors, among which are: the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; and the policy of preventing future harm.

**COUNSEL:** Carr, Kennedy, Peterson & Frost and Robert M. Harding for Plaintiff, Cross-defendant and Appellant.

McKenna, Conner & Cuneo, Mckenna & Cuneo, Martin H. Kresse, Linnie A. Freeman and Aaron M. Peck for Defendant, Cross-complainant and Respondent.

**JUDGES:** Opinion by Scotland, J., with Sims, Acting P. J., and Nicholson, J., concurring.

**OPINION BY:** SCOTLAND

**OPINION**

[*1092] [**54] Plaintiff, Hans S. Nymark, appeals from the judgment entered in favor of defendant, Heart Federal Savings & Loan Association, after the trial court granted defendant's motion for summary judgment in this action to recover damages allegedly resulting from defendant's negligence in appraising plaintiff's property in connection with his application for a loan from defendant to refinance the purchase money mort-

gage on the property. We agree with the trial court that a financial institution acting within the scope of its conventional activities as a lender of money owes no duty of care to a borrower in preparing an appraisal of the security for a loan when the purpose of the appraisal simply is to protect the lender by satisfying it that the collateral [***2] provides adequate security for the loan. Accordingly, we shall affirm the judgment.

Facts and Procedural History

In 1981, plaintiff purchased a single family residence on five acres of land near Mt. Shasta. As part of the purchase agreement, he executed a promissory note in favor of the sellers in the principal sum of $ 129,000 secured by a deed of trust on the property.

[*1093] Approximately two years later, plaintiff wanted to refinance the note and applied for a $ 100,000 loan from defendant. After defendant conducted an appraisal of plaintiff's property, the loan was approved. Plaintiff executed a promissory note in favor of defendant in the principal amount of $ 100,000, which was secured by a deed of trust on the property. The proceeds of the loan were used to pay the sellers the balance owed on the original note.

Plaintiff's cause of action against defendant centers on the appraisal. (1) (See fn. 1.), (2) (See fn. 2.) The complaint alleges that, as part of the loan transaction, defendant conducted the appraisal, which was paid for by plaintiff; the appraisal report represented that plaintiff's residence was of "A + quality" and that the "roof, foundation, plumbing, mechanical, [***3] electrical all appear OK;" plaintiff relied upon these representations in agreeing to enter into the loan transaction; the representations were untrue; approximately four years after the appraisal was completed, an inspection performed by the County of Siskiyou revealed numerous construction defects and building code violations costing in excess of $ 50,000 to repair, resulting in the property being "red-tagged" as unsafe for habitation; defendant conducted its inspection of the premises in such a negligent manner that it failed to observe and disclose these defects; and "as a proximate result of defendant's breach of its fiduciary duty, [¹] plaintiff has been required to vacate his home and obtain another residence for his family and incur legal expenses." ² The [**55] complaint prayed for damages in an unspecified amount and for a preliminary and permanent injunction to enjoin defendant from foreclosing under its deed of trust.

1   To the extent this cryptic allegation may be construed as pleading a breach of fiduciary duty, it fails as a matter of law. The relationship between a lending institution and its borrower-client is not fiduciary in nature. ( Price v. Wells Fargo

Bank (1989) 213 Cal.App.3d 465, 476-478 [261 Cal.Rptr. 735].) A commercial lender is entitled to pursue its own economic interests in a loan transaction. ( Kruse v. Bank of America (1988) 202 Cal.App.3d 38, 67 [248 Cal.Rptr. 217].) This right is inconsistent with the obligations of a fiduciary which require that the fiduciary knowingly agree to subordinate its interests to act on behalf of and for the benefit of another. ( Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 221 [197 Cal.Rptr. 783, 673 P.2d 660].)

[***4]
2   Although plaintiff entitled his cause of action, "Breach of Contract, Injunction," he did not plead the elements essential to state such a claim. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 464-489, pp. 504-524.) The nature of a cause of action is determined by the allegations set forth therein, not by the title ascribed to it by the pleader. (Id., at § 404, p. 454.) Here, the allegations sound in negligence and, despite the title given to this cause of action, plaintiff characterizes it as one for negligence. It has not been argued either in the trial court or on appeal that the complaint is for breach of contract.

Defendant answered and cross-complained for judicial foreclosure of its deed of trust and for indemnity against the person who prepared the appraisal in conjunction with defendant. With respect to the cause of action for judicial foreclosure, the cross-complaint alleges that plaintiff is in default on the promissory note, having failed to make any payments since May 1, 1987, [*1094] and that "[a]s of May 1, 1988, the total of monthly payments thus defaulted [***5] by [plaintiff] is $ 11,599.24." The cross-complaint further alleges that defendant has elected, pursuant to the default provisions of its note, to declare the whole sum of principal and interest immediately due and payable. Defendant sought a deficiency judgment against plaintiff.

Defendant moved for summary judgment on its cross-complaint for judicial foreclosure. Plaintiff opposed the motion, asserting that his claims against defendant operate as a setoff against the indebtedness owed under the note, and arguing that triable issues of fact exist with respect to his entitlement to this setoff -- i.e., whether defendant was negligent, and whether this resulted in damage to plaintiff. The trial court granted defendant's motion, finding that "no cause of action may be stated against defendant . . . [because] [n]o duty existed as between defendant Heart and plaintiff regarding the appraisal for loan purposes."

Judgment was entered in favor of defendant on both the complaint and the cross-complaint for judicial fore-

231 Cal. App. 3d 1089, *; 283 Cal. Rptr. 53, **;
1991 Cal. App. LEXIS 727, ***; 91 Cal. Daily Op. Service 5021

closure. The judgment accorded defendant the right to recover a deficiency judgment against plaintiff in the event the proceeds from the foreclosure sale are insufficient [***6] to satisfy the indebtedness owed to it by plaintiff. The foreclosure proceedings were stayed by the trial court pending this appeal.

Discussion

I

(3) "Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried" and the moving party is entitled to judgment as a matter of law. ( Lipson v. Superior Court (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822]; Code Civ. Proc., § 437c, subd. (c).) Here, defendant does not occupy the typical position of a defendant moving for summary judgment. [3] (4) By seeking summary judgment on its cross-complaint, defendant is in a position analogous to that of a plaintiff moving for summary judgment. Accordingly, in order to prevail, defendant must establish each element entitling it to judicial foreclosure and disprove all affirmative defenses asserted by plaintiff (cross-defendant), demonstrating the absence of any material issues of fact which would necessitate trial of the matter. ( Hayward [*1095] Union etc. School Dist. v. Madrid (1965) 234 Cal.App.2d 100, 120 [44 Cal.Rptr. 268].) [***7]

> 3 Generally, when the defendant is the moving party, it must conclusively negate a necessary element of each cause of action alleged by the plaintiff or prove an affirmative defense that would bar every cause of action, demonstrating that under no hypothesis is there a material issue of fact that requires the process of a trial. ( Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]; DeRosa v. Transamerica Title Ins. Co. (1989) 213 Cal.App.3d 1390, 1395 [262 Cal.Rptr. 370].)

(5a) As previously noted, plaintiff argued setoff as a defense to the judicial foreclosure action. He contended that the claims alleged in his complaint operate as a setoff against the amount he owed to defendant under the promissory note and thus constitute a defense to the foreclosure action because "the damages proximately [**56] caused by [defendant] . . . could possibly exceed the balance of [plaintiff's] indebtedness under the promissory [***8] note." (6) Setoff is an appropriate defense to a foreclosure action under a deed of trust. ( Hauger v. Gates (1954) 42 Cal.2d 752, 754-755 [269 P.2d 609]; Note, Procedure: Cross Demands: Automatic Setoff (1954) 42 Cal.L.Rev. 897, 901-902.) The basis for this defense is Code of Civil Procedure section 431.70, which

provides that cross-demands for money between two persons may be setoff against each other and considered paid to the extent they balance in amount. [4] ( American Nat. Bank v. Stanfill (1988) 205 Cal.App.3d 1089, 1097 [252 Cal.Rptr. 861]; Hauger, supra, at p. 755.)

> 4 Code of Civil Procedure section 431.70 states in pertinent part: "Where cross-demands for money have existed between persons at any point in time . . ., and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other . . . ."

[***9] (5b) It was defendant's burden as the moving party in the summary judgment motion to disprove this defense. ( Hayward Union etc. School District v. Madrid, supra, 234 Cal.App.2d at p. 120.) To do so, defendant had to negate an essential element of plaintiff's negligence claim which served as the basis for the setoff defense. (Ibid.) Defendant argued that plaintiff has no setoff against the indebtedness under the promissory note because his complaint fails to state a cause of action for negligence in that two essential elements are absent: a duty of care owed by defendant to plaintiff, and damages sustained by plaintiff as a result of defendant's alleged negligence.

II

(7) The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence. ( Beauchamp v. Los Gatos Golf Course (1969) 273 Cal.App.2d 20, 32 [77 Cal.Rptr. 914].) "Whether a legal duty exists in a given case is primarily a question of law." ( Wylie v. Gresch (1987) 191 Cal.App.3d 412, 416 [236 Cal.Rptr. 552].) To the extent it presents solely an issue of law, the [***10] question of whether a duty exists may be resolved on a motion for summary judgment. (See Jones-Hamilton Co. v. Franchise Tax Bd. (1968) 268 Cal.App.2d 343, 347 [73 Cal.Rptr. 896].)

(5c) The parties have not identified, nor have we found, any California case specifically addressing whether a lender has a duty of care to a [*1096] borrower in appraising the borrower's collateral to determine if it is adequate security for a loan. [5] (8) However, as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. ( Wagner v. Benson (1980) 101 Cal.App.3d 27, 34-35 [161 Cal.Rptr. 516]; Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn. (1975) 52 Cal.App.3d 484, 488, 489 [125 Cal.Rptr. 549]; [**57] Bradler v. Craig

(1969) 274 Cal.App.2d 466, 473, 476 [79 Cal.Rptr. 401].) Thus, for example, a lender has no duty to disclose its knowledge that the borrower's intended use of the loan proceeds represents [***11] an unsafe investment. ( *Wagner* v. *Benson, supra,* 101 Cal.App.3d at pp. 33-35.) "The success of the [borrower's] investment is not a benefit of the loan agreement which the [lender] is under a duty to protect [citation]." ( *Id.,* at p. 34.) [6] "Liability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.'" ( *Id.,* at p. 35; quoting *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 864 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].)

5   The case closest in similarity is *Gay* v. *Broder* (1980) 109 Cal.App.3d 66 [167 Cal.Rptr. 123]. In *Gay,* an appraiser designated by the Veterans Administration (VA) to appraise property which was the subject of a veteran's application for a VA guaranteed loan negligently *undervalued* the property. As a result, the veteran was unable to obtain a VA loan and had to get conventional financing at a greater cost. He sued the appraiser for negligence. After the appraiser's demurrer was sustained, a judgment of dismissal was entered. The appellate court affirmed, holding that the appraiser did not owe a duty of care to the veteran who applied for the loan. It reasoned: Under federal law, the VA has a statutory duty to appraise property which is the subject of a VA loan application and may designate an appraiser for that purpose. The statute is designed to protect the federal government from having to assume the responsibility of a guarantor because of inadequate security. ( *Id.,* at pp. 69-74.) Since the statute is intended to protect the VA and not the loan applicant, the appraiser's duty of care extended only to the VA. Otherwise, "[c]oncern with the possibility of claims against him for refusing to set a value as high as the loan desired by the applicant veteran would deter the appraiser from reporting to the administration his true opinion as to value and tend to cause him to breach his duty to the federal government. The policy considerations against the imposition of liability in the instant case are manifest." ( *Id.,* at p. 75.) [***12]

6   Similarly, a financial institution engaged in its conventional role as a lender of money is not liable to a third party for any financial failure of that which is financed ( *Fox & Carskadon Financial Corp.* v. *San Francisco Fed. Sav. & Loan Assn., supra,* 52 Cal.App.3d at pp. 486-489), or for any loss or damage due to a defect in, or re-

sulting from the failure of the borrower to use due care in, the design, manufacture, construction, repair, modification or improvement of real or personal property, which design, etcetera was financed by a loan from the institution. ( Civ. Code, § 3434.)

   **(5d)** Here, defendant performed the appraisal of plaintiff's property in the usual course and scope of its loan processing procedures to protect *defendant's* interest by satisfying it that the property provided adequate security for the loan. The complaint does not allege, nor does anything in the summary judgment papers indicate, that the appraisal was intended to induce [*1097] plaintiff to enter into the loan transaction or to assure him that his collateral was sound. Accordingly, [***13] in preparing the appraisal, defendant was acting in its conventional role as a lender of money to ascertain the sufficiency of the collateral as security for the loan. "Normal supervision of the enterprise by the lender for the protection of its security interest in loan collateral is not 'active participation' [in the financed enterprise beyond that of the ordinary role of a lender in a loan transaction]." ( *Wagner* v. *Benson, supra,* 101 Cal.App.3d at p. 35.) Thus, we must conclude that defendant owed no duty of care to plaintiff in the preparation of the property appraisal.

   Our conclusion is consistent with that of the Supreme Court of Vermont. In *Hughes* v. *Holt* (1981) 140 Vt. 38 [435 A.2d 687], the plaintiffs purchased a house which turned out to be termite infested. While a contractor was attempting to correct the problem, the house collapsed. The plaintiffs sued, among others, the bank which financed the purchase and its appraiser who, in setting the value of the property, overlooked the termite damage. The complaint alleged that the bank was negligent in estimating the residence's value for mortgage purposes [***14] and that plaintiffs relied on the appraisal to their detriment in purchasing the house. However, the confidential appraisal report was for the exclusive use of the bank and was not intended to operate as a representation to the buyers regarding the quality of the home to be purchased. The Vermont court held the defendant bank was not liable for damages incurred by its borrower-client as a result of the defendant's negligence in appraising the client's property. ( *Id.,* at pp. 688-689.) The court reasoned that this was *not* a case "where a bank goes beyond its role as mortgagee and gets involved in a capacity beyond that of a mere lending agency so that a duty relationship analogous to that of a seller or broker may come into being . . . ." ( *Id.,* at p. 688.)

   We note the Supreme Court of Iowa has reached a contrary result. In *Larsen* v. *United Fed. Sav. & Loan Ass'n* (Iowa 1981) 300 N.W.2d 281 [21 A.L.R.4th 855],

the plaintiffs signed an offer to buy a home for $ 45,000 contingent upon their securing "conventional financing." As part of the loan process, the house was appraised by an employee of the defendant lending institution. He valued [***15] the house at $ 45,000, and the realtor informed plaintiffs "the appraisal 'was okay and there was nothing wrong.'" Plaintiffs relied on the appraisal in purchasing the property. When they moved in, plaintiffs discovered major structural defects requiring [**58] up to $ 19,000 to correct. They sued the lender, alleging it negligently supplied misinformation about the condition of the home, which induced them to complete the purchase. The Iowa court concluded the lender was liable because it owed a duty to its borrower-clients to use reasonable care in appraising the property. ( *Id.*, at pp. 284-288.) The court explained: "[I]n determining whether a duty exists in this case, the key inquiry is whether [the lender] knew or should [*1098] have foreseen that [the borrowers] would rely on its appraisal." ( *Id.*, at p. 286.) The court rejected the lender's argument that the appraisal was "for its own purpose and protection, 'solely to justify its investment in the subject property.'" (*Ibid.*) The court reasoned: "Even though the appraisal might be made primarily for the benefit of the lending institution, the appraiser should [***16] also reasonably expect the home purchaser, who pays for the appraisal and to whom the results are reported (and who has access to the written report on request), will rely on the appraisal to reaffirm his or her belief the home is worth the price he or she offered for it. The purchaser of the home should be among those entitled to rely on the accuracy of the report and therefore should be entitled to sue for damages resulting from a negligent appraisal. [para.] . . . [The lender] had every reason to know its appraisal would influence this home purchase, which encompassed the loan transaction. It is not unreasonable to hold [the lender] to a duty of care to the [borrowers], an obvious party to that transaction." ( *Id.*, at p. 287; accord *Costa v. Neimon* (1985) 123 Wis.2d 410 [366 N.W.2d 896].)

We reject the Iowa analysis because it focuses upon the foreseeability of reliance by the borrower. [7] **(9)** In California, the test for determining whether a financial institution owes a duty of care to a borrower-client "'involves the balancing of various factors, among which are [1] the extent to which the transaction was intended [***17] to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.'" ( *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 865 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224], quoting *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16]; *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn., supra,* 52 Cal.App.3d at pp. 488-489; cf. *Gay v. Broder, supra,* 109 Cal.App.3d at pp. 73-74.)

7  The Iowa analysis in *Larsen* and the Wisconsin holding in *Costa* are founded on the theory of negligent misrepresentation set forth in Restatement Second of Torts section 522. This section provides in pertinent part: "(1) One who, in the course of his business, profession or employment, . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Subsection 2 provides that liability is limited to loss suffered (a) by the person or one of the limited group of persons "for whose benefit and guidance" the information was supplied, and (b) through reliance thereon by the person or persons the information was intended to "influence."

This theory of negligent misrepresentation is inapplicable here because plaintiff did not allege that the appraisal prepared by defendant's agent was intended for plaintiff's benefit and guidance or to influence him in the loan transaction. Rather, plaintiff effectively conceded that the appraisal was undertaken simply to protect *defendant's* interest in the transaction.

[***18] [*1099] **(5e)** Application of these factors to the circumstances here supports our conclusion that defendant did not owe a duty of care to plaintiff in preparing the appraisal.

(1) As previously noted, the purpose of the appraisal was to protect *defendant's* interest by satisfying it that plaintiff's property provided adequate security for the loan. Plaintiff did not allege that the appraisal was intended to assure him that his collateral was sound or to induce him to enter into the loan transaction. Thus, the appraisal was not intended to affect plaintiff in a manner dictating the existence of a duty of care in its preparation.

[**59] **(2)** While it was foreseeable the appraisal might be considered by plaintiff in completing the loan transaction, the foreseeability of harm was remote. Plaintiff was in as good a position as, if not better position than, defendant to know the value and condition of the property. One who seeks financing to purchase real property has many means available to assess the property's value and condition, including comparable sales, advice from a realtor, independent appraisal, contractors' inspections, personal observation and opinion, and the like. Here, plaintiff [***19] already had purchased the

231 Cal. App. 3d 1089, *; 283 Cal. Rptr. 53, **;
1991 Cal. App. LEXIS 727, ***; 91 Cal. Daily Op. Service 5021

house and had lived in it for two years, apparently without complaint, before applying to defendant for a refinancing loan. We believe it is not reasonably foreseeable that a borrower will be influenced to his or her detriment by an appraisal prepared by the lender for its own benefit because the borrower is in a position in which he or she knows or should know the value and condition of the property independent of the appraisal made for the lender's protection. Stated another way, the borrower should be expected to know that the appraisal is intended for the lender's benefit to assist it in determining whether to make the loan, and not for the purpose of ensuring that the borrower has made a good bargain, i.e., not to insure the success of the investment. (Cf. *Wagner* v. *Benson, supra*, 101 Cal.App.3d at p. 34.)

(3) We will assume for the purpose of this analysis that plaintiff suffered injury.

(4) As discussed above, the connection between defendant's conduct and the injury suffered is tenuous because the appraisal was intended for the lender's benefit, not to assure the borrower that his collateral was sound.

(5) There [***20] is no moral blame because plaintiff was in a position to protect himself from loss. (*Fox & Carskadon Financial Corp.* v. *San Francisco Fed. Sav. & Loan Assn., supra*, 52 Cal.App.3d at p. 489.)

(6) "[A] strong public policy exists, if our financial institutions are to remain solvent, to prevent a conventional money lender from having to insure [the success of every investment]." (*Fox & Carskadon Financial* [*1100] *Corp.* v. *San Francisco Fed. Sav. & Loan Assn., supra*, 52 Cal.App.3d at p. 489; cf. *Kinner* v. *World Sav. & Loan Assn.* (1976) 57 Cal.App.3d 724, 728-734 [129 Cal.Rptr. 400].) Imposition on a lender of a duty of care in the preparation of an appraisal done solely for the lender's benefit "would drastically alter the risk undertaken by the [lender] in the loan agreement." (*Wagner* v.

*Benson, supra*, 101 Cal.App.3d at p. 34.) Moreover, creation of such a duty would adversely affect consumers, particularly those seeking to acquire affordable housing. A lender which currently obtains a cursory appraisal at minimal cost to the borrower in [***21] order to satisfy itself that the collateral provides adequate security for the loan would be compelled by the threat of negligent appraisal liability to undertake a comprehensive examination of the collateral. The added cost of such a detailed appraisal undoubtedly would be passed on to the borrower. For housing loans, this consequence would be contrary to the public interest in reducing the cost of acquiring housing. (See, e.g., Health & Saf. Code, §§ 52535, 52580.)

For the reasons stated above, defendant, acting in its conventional role as a lender of money, owed no duty of care to plaintiff in preparing the appraisal of his collateral. A contrary conclusion would produce the incongruous result that a lender which conducts an appraisal *for its own benefit* could become responsible for guaranteeing to the borrower the adequacy and soundness of the collateral the borrower has pledged as security for the loan. Such a nonsensical result is not compelled by the law. (Cf. *Gay* v. *Broder, supra*, 109 Cal.App.3d at pp. 74-75; *Kinner* v. *World Sav. & Loan Assn., supra*, 57 Cal.App.3d at pp. 729-734.) [8]

8    We requested and received supplemental briefing on an issue relating to whether the damages claimed by plaintiff were the proximate result of defendant's alleged negligence. In light of our holding that plaintiff's claim fails due to the absence of a duty of care by defendant, it is unnecessary to address the damages element of this cause of action.

[***22]  [**60] The judgment is affirmed.

EXHIBIT 27

LEXSEE 233 CAL. APP. 3D 103

**PETERSON DEVELOPMENT COMPANY, INC., et al., Plaintiffs and Appellants, v. TORREY PINES BANK et al., Defendants and Respondents**

**Nos. D012843, D013435**

**Court of Appeal of California, Fourth Appellate District, Division One**

**233 Cal. App. 3d 103; 284 Cal. Rptr. 367; 1991 Cal. App. LEXIS 914; 91 Cal. Daily Op. Service 6394; 91 Daily Journal DAR 9850**

**August 9, 1991**

**NOTICE:**    [**1]  Opinion certified for partial publication - Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

**SUBSEQUENT HISTORY:**    Review Denied November 14, 1991.
    Mosk, J. is of the opinion the petition should be granted.

**PRIOR HISTORY:**    Superior Court of San Diego County, No. 608331, Thomas Oliver LaVoy and Harrison R. Hollywood, Judges.

**DISPOSITION:**    The judgment and order are affirmed, and the writ of supersedeas is discharged as of the date of the issuance of the remittitur.  The requests for sanctions for a frivolous appeal and for an inadequate provision of the appellate record are denied.  TPB and TPEC shall be allowed their attorney's fees on appeal in an amount to be determined by the superior court on filing of a cost bill.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

    A corporation and its president brought an action against a bank and its subsidiary seeking damages arising out of a construction loan transaction. Plaintiffs, claiming that they had entered into the loan transaction because of defendants' representation that permanent financing would be provided for the construction project, based the action on theories of breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud. Defendants moved for summary judgment, emphasizing the defense that the two-year statute of limitations in Code Civ. Proc., § 339, barred any claim based on oral contract or breach of covenant, and the trial court granted the motion. Defendants then successfully moved for an award of attorney fees under Civ. Code, § 1717, based on an attorney fees clause in a letter of commitment to provide permanent financing that had been part of the loan transaction. (Superior Court of San Diego County, No. 608331, Thomas Oliver LaVoy and Harrison R. Hollywood, Judges.)

    In a consolidated appeal of the summary judgment and of the order granting attorney fees, the Court of Appeal affirmed the summary judgment, and, for reasons stated in an unpublished part of the opinion, affirmed the order granting attorney fees. The court held that, even if an action for breach of an oral contract was barred by the statute of limitations, the dispositive issue on appeal was whether the letter of commitment represented an enforceable written contract, and, since it was missing certain required terms, like the identity of the potential buyer, it did not create an enforceable contract. The court held, further, that plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing had to be considered as seeking damages on a contract theory and could not be maintained in the absence of an underlying contract. Finally, the court held that the bank's relationship to the corporation and its president was not that of a fiduciary, and that the bank accordingly could not be held liable on theories of fiduciary duty or constructive fraud. (Opinion by Huffman, Acting P. J., with Froehlich, J., concurring. Separate opinion by Nares, J., concurring in the result.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

233 Cal. App. 3d 103, *; 284 Cal. Rptr. 367;
1991 Cal. App. LEXIS 914, **; 91 Cal. Daily Op. Service 6394

**(1) Appellate Review § 161.4--Imposition of Sanctions for Frivolous Appeal.** --Defendants whose summary judgment motion had been granted by the trial court were not entitled to sanctions for inadequate record ( Cal. Rules of Court, rule 5.1(i)) or for frivolous appeal ( Code Civ. Proc., § 907; Cal. Rules of Court, rule 26(a)), where statements by the trial judge showed that he had not relied on the part of the record defendants alleged was incomplete, and the issues presented on appeal were complex and challenging, making it impossible to say that the appeal was frivolous or taken solely for delay.

**(2) Summary Judgment § 19--Hearing and Determination--Function of Court--Showing Required.** --The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.

**(3) Contracts § 23--Construction of Several Contracts Together.** --In Civ. Code, § 1642, which provides that several contracts relating to the same matters, between the same parties, and made as part of one transaction are to be taken together, the term "contract" is descriptive only of a writing and, in reality, refers to an instrument.

**(4) Contracts § 1--Implied Contracts.** --Under Civ. Code, § 1621, which defines "implied contract," an agreement may be established by the acts and conduct of the parties and all the circumstances of the case.

**(5) Summary Judgment § 11--Affidavits--Sufficiency--Conflict With Deposition Statements.** --In general, admissions against interest in deposition testimony will control over contradictory statements in affidavits presented to oppose summary judgment proceedings.

[See 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 292.]

**(6) Loans § 1--Letter of Commitment.** --Letters of commitment, for which a fee is paid, constitute an option to the applicant to obtain the loan at the specified terms. A loan commitment is not binding on the lender unless it contains all the material terms of a loan and either the lender's obligation is unconditional or the stated conditions have been satisfied. Thus, a letter of commitment to provide permanent financing that was part of a loan transaction between a corporation and its president and a bank and its subsidiary did not create an enforceable contract to provide permanent financing where, even if the identity of the bank's subsidiary as permanent lender was established by reference to a construction loan agreement that was also part of the transaction, other material contractual terms of the letter were missing or were inadequately defined. Specifically, the identity of the potential borrower was not made clear; the amount of the loans was not specified; and terms of repayment were only vaguely stated.

**(7) Contracts § 44--Breach--Covenant of Good Faith and Fair Dealing.** --A cause of action for breach of the implied covenant of good faith and fair dealing must be considered to seek damages on a contract theory. An underlying contract is required to state such cause of action or the related theory of bad faith denial of contract.

**(8) Fraud and Deceit § 19--Constructive Fraud--Confidential Relations.** --It is essential to the operation of the doctrine of constructive fraud that there exist a fiduciary or special relationship.

**(9) Appellate Review § 55--Adherence to Theory of the Case.** --An appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal.

**(10a) (10b) Escrows § 3--Competency, Duties, and Liabilities of Escrow Holder.** --An escrow holder is the limited agent and fiduciary of all parties to an escrow. The agency is limited because the escrow agent only represents his principals insofar as he carries out the escrow instructions. An escrow holder has a fiduciary duty to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction. A breach of this fiduciary duty or the failure to use reasonable skill in carrying out escrow instructions subjects the escrow holder to liability. To protect the interests of the parties, an escrow agent who has an interest in the transaction is obligated to disclose that interest before accepting employment; and, in order to guarantee proper performance of escrow duties, an escrow agent should not be a party to the transaction.

**(11) Escrows § 1--Definition--Purpose.** --An escrow may be defined as a transaction in which one person, for the purpose of effecting a sale, transfer or encumbrance of real or personal property to another person, delivers

233 Cal. App. 3d 103, *; 284 Cal. Rptr. 367;
1991 Cal. App. LEXIS 914, **; 91 Cal. Daily Op. Service 6394

any written instrument, money, evidence of title or other thing of value to a third party, the escrow holder or depository, to be held by him for ultimate transmittal to the other person upon the happening of an event or the performance of certain specified conditions.

**(12) Banks and Banking § 1--Fiduciary Relationship in Transactions.** --A lender does not generally assume any obligations regarding the viability of the project or investment which is financed by the loan funds so long as the conduct of the lender is limited to the activities which customarily are associated with the lending function, and, with respect to ordinary banking transactions, a bank is in no sense a true fiduciary. Thus, in a loan transaction between a bank and its subsidiary and a corporation and its president, the bank's activities as an escrow holder did not create a fiduciary or special relationship where the relationship between the parties fell into the category of a normal, commercial banking transaction, and, despite the existence of an "escrow statement," the bank never held itself out as a neutral conduit for the exchange of documents and money.

**(13) Fraud and Deceit § 22--Actions--Defenses--Constructive Fraud--Statute of Limitations.** --A corporation and its president had no basis to claim any justified "delayed discovery" of an alleged constructive fraud by a bank in the course of a loan transaction, and the statute of limitations for a fraud action ( Code Civ. Proc., § 338, setting a three-year period) thus was not tolled, where the corporation and its president had been placed on notice with respect to their claim more than three years before they filed their complaint against the bank.

**COUNSEL:** Thor O. Emblem and Tracy L. Emblem for Plaintiffs and Appellants.

Brobeck, Phleger & Harrison, William D. Baldwin, William F. Sullivan and Michael J. Barry for Defendants and Respondents.

**JUDGES:** Opinion by Huffman, Acting P. J., with Froehlich, J., concurring. Separate opinion by Nares, J., concurring in the result.

**OPINION BY:** HUFFMAN

**OPINION**

[*107]  The trial court granted a motion for summary judgment made by defendants Torrey Pines Bank (TPB) and Torrey Pines [**2] Equity Corporation (TPEC) in this action by Peterson Development Company, Inc., and its president and sole shareholder, Eric Peterson (collectively Peterson). Subsequently, the court awarded attorney's fees to TPB and TPEC pursuant to a

contractual attorney's fees clause.  Peterson's action for damages against TPB and TPEC arose out of a construction loan transaction and alleged theories of breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud. In this appeal by Peterson of both the summary judgment order and the attorney's fees award, the issues presented include the enforceability as a contract of a letter of commitment to provide permanent financing, and the potential liability of TPB as a fiduciary in connection with its performance of escrow services as part of its loan processing procedures.  We conclude the trial court correctly entered summary judgment for TPB and TPEC and properly awarded attorney's fees under Civil Code section 1717.  We affirm and award attorney's fees on appeal, while denying the parties' requests for sanctions on appeal.

Factual and Procedural Background

In November 1984, Peterson's [**3] chairman Eric Peterson signed the documents required to obtain a $ 492,000 construction loan from TPB to finance a seven-unit subdivision on Geneva Place in Escondido.  Several months earlier, in negotiating for the loan, Peterson's chief financial officer Tracy Emblem (Tracy) and its president Thor Emblem (Thor) (respectively, daughter and son-in-law of Eric Peterson) had discussed the financing at a meeting with TPB's senior vice-president Walter Strangman.  At that meeting, Peterson claimed, Strangman orally represented TPB would make the construction loan and would also provide permanent financing upon the project's completion, as well as extending the construction loan's one-year term if necessary.

[*108]  The facts of the transaction, as shown in the moving, opposing, and replying summary judgment papers, disclose that when Tracy, Thor, and Eric Peterson arrived at TPB to sign the loan papers, Strangman was not available.  The loan processor gave them the papers to sign and said Strangman would sign later and copies would be provided.  Eric Peterson signed a number of loan documents, notably the building loan agreement and a "Letter of Commitment" for permanent financing. [**4]  [2] The TPB loan agreement, attached as exhibit A to Peterson's first amended complaint (the operative pleading in the case), defines the contract term "Permanent Lender" as "TPEC" (a wholly owned subsidiary of TPB), and states the term for "Permanent Commitment Expiration Date" is not applicable.  In paragraph 4.1.15 of the loan agreement, a condition precedent to the recordation of the loan documents is stated: "a letter or other written acknowledgement from the Permanent Lender that the Permanent Commitment is in full force and effect." The letter of commitment was issued by TPEC, and required by its terms a payment of $ 4,920 for a commitment to provide permanent financing on the pro-

ject. It provided: "This commitment is not effective until the fee is paid and this commitment is fully signed by both parties below." [3]

> 2    The other loan documents Eric Peterson signed included the promissory note and deed of trust, a personal guaranty, loan disbursement instructions, and completion and release price agreements. Tracy, in her capacity as Peterson's chief financial officer, signed a corporate borrowing resolution.

[**5]

> 3    Although Peterson signed the letter of commitment, neither TPEC, which drafted the letter, nor TPB did so. No copy of this letter was returned to Peterson along with the other loan documents. Peterson did not get a copy of the letter or learn that no representative of TPEC, such as Strangman, had ever signed it until it was produced in discovery some years later in connection with a related action against Westwind Mortgage Company, as will be explained *post*.

The moving, opposing and reply papers presented evidence about TPB's escrow procedures. According to Strangman, TPB processed the loan documents internally, without using an external escrow or loan escrow. Although TPB's loan processor, Bess Beagle, testified at her deposition that TPB did not have a separate escrow department, Strangman testified at deposition that TPB's escrow department had prepared a loan escrow statement, and that such statements were ordinarily provided to the borrower. Copies of the other loan documents were also supplied to Peterson, with the exception of the letter of commitment. (See fn. 3, *ante*.) The [**6] escrow statement recites that it covers money settlement "through escrow only," and shows all funds disbursed from the loan proceeds, which included $ 12,300 for loan fees. The usual processing services for a real estate transaction were performed, such as notarizing and recording documents and obtaining title insurance. No charge for escrow fees appears on the statement. A commercial loan checklist was also used, listing "TPB escrow" as the disbursement instruction recipient.

[*109]    At the bank, Peterson also signed loan disbursement instructions with a typed entry of $ 12,300 for loan fees; handwritten entries show $ 7,380 was allocated to TPEC and $ 4,920 to TPB. Cashier's checks were issued by TPB, signed by Strangman, paying TPEC $ 7,380 out of the loan proceeds, which represented a permanent loan commitment fee of $ 4,920 and a broker referral commission of $ 2,460. Although Peterson received the escrow statement listing $ 12,300 total loan fees after signing the papers, as of the fall of 1985, Peter-

son had no documentation showing TPEC had been paid for issuing a permanent financing commitment.

By the fall of 1985, construction of the subdivision was almost completed [**7] and the construction loan was coming due (on Nov. 27, 1985). One day when Strangman and Thor were both visiting the site, Thor asked Strangman whether TPB or TPEC would supply the permanent financing for the project. According to Thor's deposition, Strangman replied "they decided not to do that." According to Tracy's declaration in opposition to the motion for summary judgment, Strangman said TPEC was no longer making permanent financing.

According to Thor's deposition and Tracy's declaration in opposition to the summary judgment motion, Peterson did not pursue the matter by demanding permanent financing from TPB or TPEC because it did not want to upset their relationship, and because it had no copy of the letter of commitment or any knowledge of documents showing TPEC had been paid for issuing the permanent financing commitment. Thor testified at his deposition he did not learn of the existence of the letter of commitment until the later Westwind litigation, but earlier, "we knew that we had paid for some kind of take-out commitment." Thor's deposition testimony also stated he believed the promise of permanent financing was based on the language of the letter of commitment and [**8] "the facts of the relationship" between Peterson and TPB/TPEC. Those facts included the condition of the construction loan that a take-out commitment be provided, and TPEC's providing of such a commitment for a fee. However, he admitted that he didn't know of any conversations in which TPB or TPEC promised to provide permanent financing for the project, that he didn't believe there was any existing commitment to provide such financing at the time it was denied, and that the building loan agreement naming TPEC as the permanent lender did not trigger any thought in his mind that a permanent loan commitment existed.

On his part, Eric Peterson testified at deposition that he believed he had obtained from TPB and TPEC "a construction loan and a permanent loan," based on what Thor and Tracy had told him. However, he had no knowledge of any conversations between TPB or TPEC and any Peterson representatives on the issue of a permanent financing commitment. In his opinion, the [*110] loan fees charged (two and one-half points) were about what he was used to paying on similar projects. Peterson also testified he believed from his reading of the loan documents that TPB/TPEC had the discretion [**9] to decide whether to make any further loans on the project.

In Strangman's deposition, he stated he originally planned to use the letter of commitment to generate fees

233 Cal. App. 3d 103, *; 284 Cal. Rptr. 367;
1991 Cal. App. LEXIS 914, **; 91 Cal. Daily Op. Service 6394

for TPEC, but decided not to do so before the loan was funded, for some reason he couldn't remember. The letter of commitment was prepared and presented to Peterson because of a breakdown in communication between Strangman, another bank official (Torres) and the loan processor. It was not TPB's usual practice to require a permanent loan commitment before funding a construction loan.

After learning from Strangman at about the time of completion of the project that no permanent financing would be forthcoming, Peterson contacted other lenders and reached an agreement for permanent financing with Westwind Mortgage Company (not a party to this action). Westwind told Strangman it would still finance the project even if a notice of default were filed. No extensions were granted on the construction loan although Thor may have asked for one. On February 6, 1986, TPB filed a notice of default on the construction loan after Peterson did not pay on time. Westwind then refused to make its loan. After some delays caused by [**10] Peterson's filing for bankruptcy, TPB obtained relief from the bankruptcy stay and took the property by foreclosure.

Peterson sued Westwind in June 1986 on similar theories as are here alleged against TPB and TPEC: breach of contract, bad faith denial of contract, bad faith breach of contract, actual fraud, and negligent misrepresentation. In discovery in that action, Peterson obtained a copy of the unsigned letter of commitment, which had the words "Not utilized" written across it. [4] Peterson also obtained a copy of the escrow check for $ 7,380 to TPEC and a loan committee report showing TPEC was to receive $ 7,380 for loan and referral fees, with this notation: "Perm. loan *commitment* TPEC." [5] Westwind went bankrupt and Peterson did not pursue that action further.

> 4    At deposition, Strangman testified he did not write "Not utilized" on the document and did not know who did.
> 5    At her deposition, TPB's loan processor Beagle stated she couldn't tell if the word "commitment" was stricken out or underlined on the document.

[**11] In October 1988, Peterson brought this action against TPB and TPEC on the theories of breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and constructive fraud. [6] It [*111] claimed it entered into the loan agreement because of the representation that permanent financing would be provided for the project, and the letter of commitment constituted a written contract that was breached when TPEC refused to provide that financing. TPB and TPEC's motion for summary judgment ( Code Civ. Proc., § 437c) [7] soon followed, based on the argu-

ment there was no valid signed, written contract for permanent financing and no failure to disclose any such nonexistent document. In opposition, Peterson asked for more time to conduct discovery and argued the documents were consistent with the bank's alleged oral promise to provide permanent financing and its alleged concealment of the payment of the permanent financing fee and its failure to sign the letter.

> 6    The complaint was first filed in the North County branch of the superior court in October 1988 and was dismissed and promptly refiled by stipulation. The complaint was amended once after a demurrer was sustained.
> [**12]
> 7    All statutory references are to the Code of Civil Procedure unless otherwise specified.

The reply papers in support of the motion for summary judgment (filed by newly substituted counsel for TPB/TPEC) emphasized a defense that the two-year statute of limitations (§ 339) barred any claim based on oral contract or breach of covenant, and argued no fiduciary relationship between Peterson and TPB/TPEC, debtor and creditor, existed as a matter of law. The reply also claimed with reference to the constructive fraud cause of action that there could be no justifiably delayed discovery of Peterson's claims since Peterson knew about Strangman's representations, the letter of commitment, and the loan fees total amount when the documents were signed. Absent any fiduciary relationship, the reply argued, there was no duty to disclose the internal breakdown of the loan fees.

At oral argument before Judge LaVoy on the motion for summary judgment, the court and counsel focused on the issue of the breakdown of the loan fees and what the amount paid to TPEC out of loan proceeds represented. At the end of argument, [**13] counsel for TPB/TPEC reiterated his position the key issue was the statute of limitations for an oral contract. The motion was granted. Thereafter, Peterson moved for reconsideration of the order, supplying documentary evidence from recently taken depositions of Strangman and the loan processor Bess Beagle. Reconsideration was denied and summary judgment was entered. Peterson appeals.

TPB/TPEC moved for an award of attorney's fees under Civil Code section 1717, based on the attorney's fees clause in the letter of commitment. The trial court (Judge Hollywood) made an award of $ 83,150.59 and ordered a bond to be posted for the appeal. Peterson petitioned this court for a writ of supersedeas (D013104), which was granted on October 24, 1990, staying enforcement of the judgment for costs, expediting the appeal and providing no extensions would be granted. **(1)** (See fn. 8.) Peterson has appealed the [*112] attorney's

fees order, and its two appeals were consolidated by stipulation of the parties. [8]

8    In their respondents' brief, TPB and TPEC have sought an award of sanctions and attorney's fees against Peterson on several bases: inadequate record under California Rules of Court, rule 5.1(i) (all further rule citations are to these rules); frivolous appeal (§ 907; rule 26(a)); and a further award of attorney's fees pursuant to Civil Code section 1717 (see pt. III, *post*, for discussion of all attorney's fees issues). In reply, Peterson requests similar sanctions, claiming the deposition excerpts supplied by respondents to supplement the "incomplete" appellant's appendix were themselves incomplete.

Despite this dispute, neither party has supplied to this court the complete deposition transcripts that were lodged with the trial court for the hearing on the summary judgment motion, as would have been permitted by rule 5(e). In any case, the judge who heard the summary judgment and reconsideration motions noted on the record at reconsideration that he relied on the facts as presented in a nondeposition form, analyzing the issues in this way: "I just got back to the position that we have an oral contract, in my opinion, as a matter of law, evidenced by a series of documents, and that's a problem for [Peterson]." In light of the foregoing, we deem the record jointly presented by the parties to be adequate for analysis of the issues presented and decline to award any sanctions for an inadequate record, as requested.

We also decline to award sanctions for a frivolous appeal. The issues presented are complex and challenging and it is not possible to say these appeals are frivolous or taken solely for purposes of delay. (§ 907; rule 26(a); *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal. Rptr. 508, 646 P.2d 179].)

[**14] Discussion

(2) In reviewing this summary judgment, the rules set forth in *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal. Rptr. 122, 762 P.2d 46], must be applied:

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' ( Code Civ. Proc., § 437c, subd. (c).) The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.] Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.] [para.] Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. [Citation.] It should therefore be used with caution, so that it does not become a substitute for trial. [Citation.] The affidavits of the moving party should be strictly construed, and those of the opponent liberally [**15] construed. [Citation.] Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citation.] [para.] A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must conclusively negate a necessary [*113] element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial."

Our analysis of this record requires discussion of three separate issues: the enforceability of this letter of commitment under contract principles, the scope of duty undertaken by TPB in its performance of the loan escrow function, and the propriety of this award of attorney's fees.

I

*Enforceability of the Letter of Commitment*

To support its contention the letter of commitment, even though unsigned by TPEC, represented an enforceable written contract, Peterson makes two related arguments. (3) It first relies on the general rule of Civil Code section 1642 [9] that "several papers relating to the same subject matter and executed as parts of substantially [**16] one transaction, are to be construed together as one contract. [Citation.]" ( *Nevin v. Salk* (1975) 45 Cal. App. 3d 331, 338 [119 Cal. Rptr. 370].) Although the language of this section speaks in terms of "contracts," it is generally recognized: "The term 'contract' as used in the code section is descriptive only of a writing and, in reality, refers to an 'instrument.' [Citations.]" ( *Harm v. Frasher* (1960) 181 Cal. App. 2d 405, 413 [5 Cal. Rptr. 367].) (4) Peterson also cites the rule of Civil Code section 1621, [10] that "[a]n agreement may be established by the acts and conduct of the parties and all of the circumstances of the case." ( *Penn Sec. Life Ins. Co.* v. *Rising* (1976) 62 Cal. App. 3d 302, 308 [133 Cal. Rptr. 59].)

9    Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

233 Cal. App. 3d 103, *; 284 Cal. Rptr. 367;
1991 Cal. App. LEXIS 914, **; 91 Cal. Daily Op. Service 6394

10    Civil Code section 1621 provides: "An im-plied contract is one, the existence and terms of which are manifested by conduct."

[**17]  Applying these rules, Peterson relies on the construction loan agreement, which required by its terms "a letter or other written acknowledgment from the Permanent Lender that the Permanent Commitment is in full force and effect." The agreement also defined the contract term "permanent lender" as "TPEC." When this agreement and the letter of commitment are read together, Peterson claims, the letter should be considered to be a fully executed agreement, in light of the consideration paid for it out of Peterson loan proceeds, and in light of Peterson's alleged reliance on its "promise" of permanent financing.

In response, TPB and TPEC rely heavily on the rule stated in Angell v. Rowlands (1978) 85 Cal. App. 3d 536, 540-542 [149 Cal. Rptr. 574], regarding [*114] signatures to a contract, where the court adopted the approach of a particular line of cases, as set forth by the Supreme Court in Cavanaugh v. Casselman (1891) 88 Cal. 543 [26 P. 515]. That authority holds that a signer of a contract cannot escape liability unless he or she affirmatively establishes the parties contemplated the signatures of all parties [**18] were a condition precedent to the validity of the contract. In Angell, the Court of Appeal explained:

"We therefore decline to follow the Tewksbury [Tewksbury v. O'Connell (1862) 21 Cal. 60] line of cases insofar as they hold that an agreement is invariably incomplete until signed by all parties purportedly bound. Instead, we adopt the Cavanaugh line of cases, i.e., that a contract is invalid if not signed by all parties purportedly bound only when it is shown, either by parole or express condition, that the contract was not intended to be complete until all parties had signed. Conversely, in the absence of a showing that the contract is not intended to be complete until signed by all parties, the parties who did sign will be bound." ( Angell v. Rowlands, supra, 85 Cal. App. 3d 536, 542, original italics.)

Because TPEC never signed the letter of commitment, TPEC and TPB argue the letter is not an enforceable contract, and the record shows nothing more than an oral agreement to agree in the future on possible permanent financing arrangements. (5) Thus, they contend the statute of limitations on such an oral contract [**19] (§ 339, two years) had already run before this action was filed, over three years after Peterson was told TPEC no longer made permanent financing arrangements. They further claim the deposition excerpts from Eric Peterson's and Thor's testimony, admitting they did not know of conversations promising permanent financing, should control over Tracy's declaration to the contrary that was

presented in opposition to the summary judgment motion, pursuant to the rule of D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 21-22 [112 Cal. Rptr. 786, 520 P.2d 10] (in general, admissions against interest in deposition testimony will control over contradictory statements in affidavits presented to oppose summary judgment proceedings).

Even assuming the trial court correctly concluded the statute of limitations (§ 339) barred any action for breach of an oral contract, the record and the issues presented on appeal require our discussion of the agreement in light of the rules applicable to written contracts. Thus, the dispositive issue presented is whether the letter of commitment represents a complete and fully enforceable contract. In making [**20] this determination, the letter of commitment and the construction loan agreement must be read together, consistent with the rule of Civil Code section 1642. We must inquire whether the parties intended to [*115] be bound by this preliminary agreement to issue permanent financing. ( Birdsong v. Welch (1960) 181 Cal. App. 2d 749, 752 [5 Cal. Rptr. 474].)

(6) Letters of commitment, for which a fee is paid, constitute an option to the applicant to obtain the loan at the specified terms. ( Lowe v. Massachusetts Mut. Life Ins. Co. (1976) 54 Cal. App. 3d 718, 725-728 [127 Cal. Rptr. 23]; see 9 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 28.4, p. 9.) Under the usual principles of lender liability, "[a] loan commitment is not binding on the lender unless it contains all of the material terms of the loan, and either the lender's obligation is unconditional or the stated conditions have been satisfied. When the commitment does not contain all of the essential terms . . . the prospective borrower cannot rely reasonably on the commitment, and the lender is not liable for either a breach of the contract or promissory estoppel." [**21] (9 Miller & Starr, op. cit. supra, § 28.4, at p. 8, fn. omitted.) The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment. (Op. cit. supra; see Laks v. Coast Fed. Sav. & Loan Assn. (1976) 60 Cal. App. 3d 885, 891, 893 [131 Cal. Rptr. 836].)

We have examined the letter of commitment in an effort to identify all the required terms of this type of contract. They are not present. First, the identity of the potential borrower is not made clear; the letter contemplates offering financing either to Peterson or to its individual prospective home buyers in the project. Next, the amount of the loans is not specified; a blank appears where the letter requires specification that "the aggregate amount of all loans shall not exceed $ ___." It is also generally stated that the amount of the loan(s) "shall be up to 90% of Lender's appraisal or the purchase price, whichever is less." The terms of repayment of the loan(s) are nowhere specified in the letter, except that the

lender's "standard interest rate quoted from time to time during the term hereof for comparable loans as of the [**22] date the loans are approved by Lender" shall be used. Similarly vague provisions are stated with regard to amortization and adjustable rate mortgages, while standard provisions are included concerning closing costs, insurance, and documentation.

These material contractual terms of the letter of commitment are so broadly defined that they do not appear to be capable of being made certain; on this record, no binding agreement could have been reached to supply permanent financing on mutually agreed-upon terms. Accordingly, even assuming the identity of TPEC as the permanent lender is established by reference to the construction loan agreement, the remainder of the contractual terms are inadequately defined. No enforceable contract to provide permanent financing is created by this document.

[*116]  Turning to an examination of Peterson's second cause of action for tortious breach of the implied covenant of good faith and fair dealing, it alleges TPB and TPEC denied the existence of the agreement to provide permanent financing and engaged in bad faith conduct depriving Peterson of its rights and benefits under its contractual agreements; punitive damages were sought. On appeal, Peterson [**23] argues this claim falls within the permissible parameters of such theory as established by *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 769 [206 Cal. Rptr. 354, 686 P.2d 1158]. (See discussion in *Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal. App. 3d 1371, 1391-1404 [272 Cal. Rptr. 387] and *Price* v. *Wells Fargo Bank* (1989) 213 Cal. App. 3d 465, 478 [261 Cal. Rptr. 735].) **(7)** However, under *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 684 [254 Cal. Rptr. 211, 765 P.2d 373], this cause of action for breach of the implied covenant of good faith and fair dealing must now be considered to seek damages on a contract theory. An underlying contract is required to state such a cause of action or the related theory of bad faith denial of contract. ( *Careau & Co.* v. *Security Pacific Business Credit, Inc., supra*, 222 Cal. App. 3d at pp. 1393, 1401.) The same conclusions we reached above with reference to the claim for breach of contract thus [**24] apply. (See *Copesky* v. *Superior Court* (1991) 229 Cal. App. 3d 678, 688-694 [280 Cal. Rptr. 338].) Accordingly, the trial court correctly granted the motion for summary judgment with respect to both of Peterson's contract theories of liability.

II

*Escrow Theory of Liability*

Peterson's theories of breach of fiduciary duty and constructive fraud are closely related.  **(8)** It is essential to the operation of the doctrine of constructive fraud that there exist a fiduciary or special relationship. ( *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 525 [86 P.2d 102]; *Byrum* v. *Brand* (1990) 219 Cal. App. 3d 926, 937 [268 Cal. Rptr. 609]; Civil Code, § 1573.) Peterson claims TPB's activities as an escrow holder created such a fiduciary or special relationship, and alleges that breaches of duty and constructive fraud occurred when TPB failed to disclose all material facts regarding the loan transaction to Peterson.  These nondisclosed "material facts" include the payment of $ 7,380 to TPEC for the loan commitment, and the failure of any TPEC representative to sign the letter of commitment.

[**25]  As described above, the record shows TPB handled this construction loan transaction in-house by notarizing and recording loan documents, providing an escrow statement to Peterson, and disbursing loan proceeds.  After the [*117] foreclosure on the property took place and this action was brought, Peterson raised the possibility of a fiduciary theory of liability.  However, the amended complaint does not plead any specific facts about the escrow function, instead merely generally alleging TPB's breach of an unspecified fiduciary duty to disclose all material facts regarding the funding of the loan and the letter of commitment.  Peterson's opposition to the motion for summary judgment makes reference to the escrow statement received from TPB in connection with Peterson's claim that TPB made an inadequate disclosure of the loan documents.  **(9) (See fn. 11.)** It was not until the opening brief on appeal was filed that the escrow theory of liability was specifically argued. [11]

11  Even though the escrow theory of liability was not a focus of the summary judgment proceedings, we have deemed it necessary to address this question in full.  An appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal. ( *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal. App. 3d 869, 879 [242 Cal. Rptr. 184].) Here, the fiduciary theory is generally set forth in the amended complaint and the record contains undisputed evidence about the provision of loan processing services such as are commonly provided by escrow holders.

[**26]  Because this record raises substantial questions about the scope of duty undertaken by TPB in this transaction, we have obtained supplemental briefing from the parties on the question of whether the provision of this type of services resulted in TPB's assumption of particular duties that are fiduciary in nature and that re-

moved this transaction from the usual "armslength" borrower/creditor commercial context. (See *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal. App. 3d 726, 731 [260 Cal. Rptr. 793].) We must decide if TPB removed itself in this transaction from established limitations on the obligations incurred in "normal commercial banking transactions." ( *Id.* at p. 729.)

It is not uncommon for a lending institution to handle escrow functions. (See 2 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 5.1, p. 395.) When banks and similar institutions perform such duties, they are entitled to be exempted from the coverage of Financial Code section 17000 et seq., the law regulating escrow matters such as licensing, bonding, crimes and civil penalties. ( Fin. Code, § 17006.)

**(10a)** Generally, the performance of the [**27] escrow function is governed by the following common law principles:

"An escrow holder is the limited agent and fiduciary of all parties to an escrow. [Citations.] The agency is limited because the escrow agent only represents his principals insofar as he carries out the escrow instructions. [Citation.] . . . [para.] An escrow holder has a fiduciary duty 'to communicate [*118] to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction, particularly where . . . he knows that the principal is looking to him for protection as to those very facts of which he has knowledge.' [Citations.] A breach of this fiduciary duty or the failure to exercise reasonable skill and diligence in carrying out the escrow instructions subjects the escrow holder to liability. [Citation.] Likewise, the escrow agent is liable for any loss caused by his failure to strictly comply with his principal's instructions or by his disposal of escrow property in violation of those instructions. [Citation.]" ( *Kirby* v. *Palos Verdes Escrow Co.* (1986) 183 Cal. App. 3d 57, 64-65 [227 Cal. Rptr. 785].) [**28]

To decide whether these rules should be applied to evaluate TPB's conduct in this case, we look to the definition and purpose of the escrow function. **(11)** An escrow may be defined as "a transaction in which one person, for the purpose of effecting a sale, transfer or incumbrance of real or personal property to another person, delivers any written instrument, money, evidence of title or other thing of value to a third party, the escrow holder or depository, to be held by him for ultimate transmittal to the other person upon the happening of an event or the performance of certain specified conditions." ( *Lee* v. *Title Ins. & Trust Co.* (1968) 264 Cal. App. 2d 160, 162 [70 Cal. Rptr. 378].) "The usual purpose that prompts the creation of an escrow is the desire of persons dealing at arm's-length with each other to have their conflicting

interests handled by one person in such a manner as to adequately protect the rights of each of the parties to the transaction." ( *Blackburn* v. *McCoy* (1934) 1 Cal. App. 2d 648, 654 [37 P.2d 153].) **(10b)** To protect the interests of the parties, an escrow agent who has an interest in the transaction is [**29] obligated to disclose that interest before accepting employment as an agent for the parties to the transaction. ( *McFate* v. *Bank of America of California* (1932) 125 Cal. App. 683, 687 [14 P.2d 146]; also see *Becker* v. *Buman* (1986) 239 Kan. 342 [721 P.2d 246, 250].)

In order to guarantee the proper performance of escrow duties, it is the general rule that an escrow agent should not be a party to the escrowed transaction. ( *Roberts* v. *Carter & Potruch* (1956) 140 Cal. App. 2d 370, 373 [295 P.2d 515]; 2 Miller & Starr, *op. cit. supra*, § 5.2, at p. 398.) It has been held, however, that a bank which acted as an escrow holder did not violate any escrow duties by purchasing the escrowed property, subject to the conditions on which the property was held in escrow, as long as there was nothing in the agreements of the parties preventing the sale of the property to anyone in particular (such as the escrow holder). ( *Portuguese American Bk.* v. *Schultz* (1920) 49 Cal. App. 508, 512 [193 P. 806]; also see *Gurley* v. *Bank of Huntsville* (1977 Ala.) 349 So.2d 43, 45-46.) [**30]

[*119] **(12)** According to a leading real estate treatise, the general rule is "a lender does not assume any obligations regarding the viability of the project or investment which is financed by the loan funds as long as the conduct of the lender is limited to the activities which customarily are associated with the lending function." (4 Miller & Starr, *op. cit. supra*, § 9.61, p. 176.) This court has recognized in *Copesky* v. *Superior Court, supra*, 229 Cal. App. 3d 678, 691, footnote 12, that in some cases, a bank may under special circumstances "undertake obligations which bring it into a 'special relationship' with a customer." Such circumstances include a bank's provision of trust and other specifically fiduciary services. (*Ibid.*; see 9 Miller & Starr, *op. cit. supra*, § 28.9, at p. 30.) Such special circumstances must be distinguished from the usual bank-depositor or bank-borrower relationship. ( *Copesky* v. *Superior Court, supra*, 229 Cal. App. 3d at p. 691, fn. 12.) In *Copesky*, with respect to the normal commercial banking context, we cautioned against the "loose characterization" ( *id.* at p. 693, fn. 14) [**31] of financial relationships as "fiduciary, quasi-fiduciary or fiduciary like" (*ibid.*), commenting that with respect to ordinary banking transactions, "the bank is in no sense a true fiduciary." (*Ibid.*)

With these principles in mind, we have examined the record showing the relationship between Peterson and TPB. TPB was involved from the inception of this transaction as the lender from whom Peterson sought the

construction financing; similarly, Peterson was made aware of TPEC's involvement on the face of the documents. Peterson was also aware that TPB handled the processing of the loan and presented the papers to Peterson for signature. These facts are consistent with only one conclusion: at the time of the transaction, the relationship between borrower and lender fell into the usual category of an arm's-length, adverse, "normal commercial banking transaction[]." ( *Mitsui Manufacturers Bank v. Superior Court, supra,* 212 Cal. App. 3d at p. 729.) Despite the receipt of an "escrow statement" from TPB and Peterson's awareness TPB processed all loan papers, there are no triable issues as to whether Peterson reasonably reposed particular trust and [**32] confidence in TPB as a fiduciary, or whether TPB accepted such particular reliance. No third party was ever involved in this transaction, nor did TPB hold itself out to be a neutral, objective, disinterested conduit for the parties' exchange of documents and money. There could have been no reasonable reliance on any such representations that were never made. Consequently, we conclude Peterson's claimed reliance on TPB's loan processing procedures provides it no basis to claim a "relaxed duty" to inquire into TPB's conduct during and after the term of the loan. ( *Lee v. Escrow Consultants, Inc.* (1989) 210 Cal. App. 3d 915, 921 [259 Cal. Rptr. 117].)

Moreover, absent any fiduciary duty undertaken by TPB, we find no duty on its part to disclose the internal breakdown of the loan fees charged. [*120] Peterson received the escrow statement listing loan fees of $ 12,300; Peterson testified that amount of expense was appropriate for this type of project. That TPB allocated some of this amount to TPEC and some to itself does not create a fiduciary theory where none is otherwise shown to exist.

**(13)** Finally, Peterson has shown no basis to claim any justified [**33] "delayed discovery" of the alleged constructive fraud, which would toll the statute of limitations for a fraud action. (§ 338; *Lee v. Escrow Consultants, Inc., supra,* 210 Cal. App. 3d 915, 921.) This com-

plaint was filed in October 1988, more than three years after Thor was told in the summer of 1985 there would be no permanent financing from TPB or TPEC. Since Peterson was placed on notice of the denial, which it now claims was concealed from it, the claim for constructive fraud is on its face time-barred. No amendment, such as Peterson now requests to be allowed (to change its fraud theories), is supported by the record or would be proper at this time. The trial court correctly concluded no triable issues remained on the fiduciary duty theory of recovery.

III *

    * See footnote 1, *ante,* page 103.

*Attorney's Fees*

. . .

The judgment and order are affirmed, and the writ of supersedeas is discharged as of the date of the issuance of the remittitur. The requests for sanctions [**34] for a frivolous appeal and for an inadequate provision of the appellate record are denied. TPB and TPEC shall be allowed their attorney's fees on appeal in an amount to be determined by the superior court on filing of a cost bill.

**CONCUR BY: NARES**

**CONCUR**

**NARES, J.**

I concur in the result, based upon my agreement with the analysis in parts I and III of the discussion. On this record I would decline to reach the issues presented in part II of the discussion (see maj. opn., fn. 11, *ante,* p. 117) and express no views thereon.

Appellants' petition for review by the Supreme Court was denied November 14, 1991. Mosk, J., was of the opinion that the petition should be granted.

EXHIBIT 28

LEXSEE 213 CAL APP 3D 465

**ERNEST L. PRICE et al., Plaintiffs and Appellants, v. WELLS FARGO BANK et al., Defendants and Respondents**

**No. A040678**

**Court of Appeal of California, First Appellate District, Division One**

**213 Cal. App. 3d 465; 261 Cal. Rptr. 735; 1989 Cal. App. LEXIS 869**

**August 24, 1989**

**SUBSEQUENT HISTORY:** [***1] A petition for a rehearing was denied September 21, 1989, and appellants' petition for review by the Supreme Court was denied December 7, 1989.

**PRIOR HISTORY:** Superior Court of the City and County of San Francisco, No. 850422, Lucy Kelly McCabe, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

Ranchers obtained several loans from a bank. When they had difficulty making payments on the loan, the bank agreed to a new payment schedule, which the ranchers were also unable to meet. Eventually the bank initiated foreclosure proceedings. It postponed publishing notice of the trustee's sale when the ranchers agreed to a new restructuring of the debts, but it proceeded with publication when the ranchers were also unable to meet the requirements of the restructuring. The ranchers were finally able to pay off the loans with funds from a private loan. They then brought suit against the bank, alleging as damages that they were forced to sell beehives, trucks, cattle, and a parcel of land at distressed prices in order to make the final payments. The trial court granted the bank's motion for summary judgment. (Superior Court of the City and County of San Francisco, No. 850422, Lucy Kelly McCabe, Judge.)

The Court of Appeal affirmed. It held that the ranchers' allegations that they were customers of the bank and had been beneficiaries of a fiduciary relationship with it, together with a description of the loan transactions, failed to state a cause of action for tortious breach of the covenant of good faith and fair dealing. The court also held

that the trial court properly granted summary judgment for the bank as to the cause of action for breach of the implied covenant of good faith and fair dealing based on the bank's having taken a "hard line" in repayment negotiations, since the covenant does not impose any affirmative duty of moderation in the enforcement of legal rights. Further, the court held, the trial court properly granted summary judgment as to the ranchers' cause of action for fraud, since the ranchers' own admissions revealed that they understood the nature of their obligations to the bank, and their understanding that the notes would be "redone" raised no triable issue as to a legally enforceable understanding inconsistent with the written terms of the notes. The trial court properly granted summary judgment as to the ranchers' cause of action alleging fraud in the procurement of a mobile home loan, the court held; the promissory note for the loan bore the apparent marks of an integrated agreement, and the bank's alleged oral promise that it would beat the terms of another bank constituted a contemporaneous oral agreement contradicting the terms of the written agreement and thus coming within the terms of the parol evidence rule. Finally, the court held, the trial court properly granted summary judgment as to the ranchers' causes of action for intentional and negligent infliction of emotional distress, and did not err in denying the ranchers' motions for reconsideration, new trial, and relief under Code Civ. Proc., § 473. (Opinion by Newsom, Acting P. J., with Holmdahl and Stein, JJ., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

**(1) Summary Judgment § 26--Appellate Review.** --On appeal, an order granting summary judgment must be reviewed de novo.

**(2) Summary Judgment § 19--Hearing and Determination--Presumptions--Consideration of Evidence.** -- The party moving for summary judgment bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory. All reasonable inferences are drawn in favor of the party opposing the summary judgment. The trial court seeks to identify triable issues without engaging in any determinations of fact. However it is required to some extent to weigh evidence in determining whether the factual issues asserted relate to a material fact, and it must determine what inferences are reasonably deducible from the evidence.

**(3) Banks and Banking § 7--Deposits--Relationship of Bank With Depositors.** --The relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor. A debt is not a trust and there is not a fiduciary relationship between debtor and creditor as such.

**(4) Banks and Banking § 21--Actions--Loan Transaction--Implied Covenant of Good Faith and Fair Dealing--Tortious Breach.** --In an action by debtors against a bank that had loaned them money secured by their real property and had commenced foreclosure proceedings when the debtors fell behind in their loan payments according both to the original payment schedule and to various restructurings of the debt, which forced the debtors to sell certain assets at distressed prices to pay the debt, the debtors' allegations, together with a description of the loan transactions, failed to state a cause of action for tortious breach of the covenant of good faith and fair dealing. The allegations were only that the debtors were customers of the bank and had bank accounts, including checking, with the bank, and that the debtors had been the beneficiaries of a fiduciary relationship with the bank.

**(5a) (5b) Banks and Banking § 21--Actions--Loan Transaction--Implied Covenant of Good Faith and Fair Dealing--Repayment Negotiations.** --In an action by debtors against a bank that had loaned them money secured by their real property and commenced foreclosure proceedings when the debtors fell behind in their loan payments according both to the original payment schedule and to various restructurings of the debt, the trial court properly granted summary judgment for the bank as to the cause of action for breach of the implied covenant of good faith and fair dealing based on the bank's having taken a "hard line" in repayment negotia-

tions. The covenant does not impose any affirmative duty of moderation in the enforcement of legal rights.

**(6) Contracts § 41--Covenant of Good Faith and Fair Dealing.** --Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. In a particular context the phrase "good faith" takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out. For example, the covenant precludes an owner from interfering with work of a contractor in performance of a construction contract.

**(7a) (7b) (7c) Banks and Banking § 21--Actions--Loan Transaction--Fraud--Restructuring Agreement.** --In an action by debtors against a bank that had loaned them money and commenced foreclosure proceedings when the debtors fell behind in their payments, the trial court properly granted summary judgment as to the cause of action for fraud based on allegations that the written loan agreements varied from the terms of the agreement they had expected, bank employees orally promised them that the written agreement would be administered in a manner consistent with their original expectations, the bank never intended to perform the agreements pursuant to these oral promises, and the debtors relied to their detriment on the promises. The debtors' own admissions revealed that they understood the nature of their obligations, and their understanding that the notes would be "redone" raised no triable issue as to a legally enforceable understanding inconsistent with the written terms of the notes, since they nowhere specified any understanding as to the terms of renewal. Unless an agreement to restructure a loan embodies definite terms, capable of enforcement, it is not a legally valid contract.

**(8) Evidence § 42--Hearsay--Admissions by Parties--By Conduct--Failure to Question Bill.** --A failure to question a bill or statement is uniformly received as evidence of an admission of its correctness.

**(9) Payment § 1--Effects--Partial Payments.** --If a party makes a partial payment without protest and without otherwise indicating nonrecognition of the validity of the claim, evidence of the payment is universally received as proof of the validity of the claim.

**(10) Evidence § 31--Admissibility--Offer to Settle or Compromise--Necessity of Dispute.** --In an action by debtors against a bank that had loaned them money secured by their real property and commenced foreclosure proceedings when the debtors fell behind in their loan payments according both to the original payment schedule and to various restructurings of the debt, the trial court was not barred under Evid. Code, § 1152, from

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

considering letters by the debtors' counsel to the bank indicating that the debtors were aware of their obligations and asking for forbearance. Section 1152 codifies the rule that an offer to settle or compromise a claim is not admissible to prove liability; its obvious policy is to avoid deterring parties from making settlement offers and to facilitate candid discussion which may lead to settlement of disputes. However, there was nothing in the record to suggest that there was any dispute over the debtors' obligations at the time the letters were written. They were admissible to show the practical construction of the loan agreements by the parties.

**(11) Summary Judgment § 19--Hearing and Determination--Examination of Party Admissions.** -- Admissions are not shields from careful examination in light of the entire record on a motion for summary judgment. A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions that are contradicted by other credible evidence.

**(12) Evidence § 72--Exceptions to Parol Evidence Rule--Fraud and Mistake.** --The parol evidence rule in general does not preclude proof of fraudulent oral misrepresentations.

**(13) Evidence § 72--Exceptions to Parol Evidence Rule--Fraud and Mistake--Relation of Evidence to Promise of Writing.** --A case holding that, to be admissible, parol evidence of fraud must establish some independent fact or representation, some fraud in the procurement of the instrument, or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing, remains governing law since it has never been overruled and is based on an entirely defensible decision favoring the policy considerations underlying the parol evidence rule over those supporting a fraud cause of action.

**(14) Evidence § 72--Exceptions to Parol Evidence Rule--Fraud and Mistake--Relation of Evidence to Promise of Writing--Mobilehome Loan.** --In an action by debtors against a bank that had loaned them money secured by their real property and commenced foreclosure proceedings when the debtors fell behind in their loan payments according to the original payment schedule and to various restructurings of the debt, the trial court did not err in granting summary judgment as to the debtors' cause of action alleging fraud in the procurement of a mobilehome loan. The promissory note for the loan bore the apparent marks of an integrated agreement, and the bank's alleged oral promise that it would beat the terms of another bank constituted a contemporaneous oral agreement contradicting the terms of the written

agreement and thus coming within the terms of the parol evidence rule.

**(15) Torts § 5--Infliction of Emotional Distress--Particular Acts and Circumstances--Loan Transaction.** --In an action by debtors against a bank that had loaned them money secured by their real property and commenced foreclosure proceedings when the debtors fell behind in their loan payments according both to the original payment schedule and to various restructurings of the debt, the trial court properly granted summary judgment as to the debtors' causes of action for intentional and negligent infliction of emotional distress. Since, contrary to the debtors' allegations, the bank did not defraud them or breach the implied covenant of good faith and fair dealing, it could not have engaged in the sort of outrageous conduct necessary to incur liability for intentional infliction of emotional distress. Further, liability for negligent infliction of emotional distress was precluded in the absence of a breach of the implied covenant, since the debtors did not propose any duty owed to them that did not fall within the implied covenant theory.

**(16) Banks and Banking § 21--Actions--Loan Transaction--Summary Judgment--Posttrial Motions.** --In an action by debtors against a bank that had loaned them money secured by their real property and commenced foreclosure proceedings when the debtors fell behind in their loan payments according both to the original payment schedule and to various restructurings of the debt, the trial court did not err, after granting summary judgment for the bank, in denying the debtors' motions for reconsideration, new trial, and relief under Code Civ. Proc., § 473, notwithstanding that the debtors submitted new material that had not been included in their opposition to the summary judgment motion. A deposition containing observations as to the parties' expectations that the loan agreements would be renewed had no relevance to the actual allegations of the complaint related to fraud since it did not serve to prove any actionable misrepresentation. The testimony also had little bearing on the theories of liability based on the implied covenant of good faith; the debtors did not argue that the implied covenant required the bank to renew the loan agreement.

**COUNSEL:** Silveira, Mattos & Lewis and Weldon J. Mattos, Jr., for Plaintiffs and Appellants.

Brobeck, Phleger & Harrison, David J. Brown and Kent M. Roger for Defendants and Respondents.

**JUDGES:** Opinion by Newsom, Acting P. J., with Holmdahl and Stein, JJ., concurring.

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

**OPINION BY:** NEWSOM

**OPINION**

[*470] [**736] Ernest L. Price and Maxine Price (hereafter appellants) appeal from a summary judgment in favor of Wells Fargo Bank and Pamela G. Bogle (hereafter respondents). The action was filed on July 12, 1985 in the Superior Court of Merced County and later transferred to the Superior Court of the City and County of San Francisco. The amended complaint chiefly concerned three related loan transactions and stated five causes of action: fraud, tortious breach of covenant of good faith, contractual breach of covenant of good faith, negligent infliction of emotional distress, and intentional infliction [***2] of emotional distress. An additional cause of action alleged fraud in connection with a separate mobilehome loan.

On July 1, 1987, respondents filed a motion for summary judgment or, alternatively, summary adjudication of issues. The trial court granted summary judgment for both defendants on all causes of action and, somewhat [*471] inconsistently, summarily adjudicated various issues. Appellants attacked the summary judgment through motions for reconsideration, new trial, and relief under Code of Civil Procedure section 473 and, upon denial of these motions, filed a timely notice of appeal.

For 20 years, appellants owned and operated the Creekview Angus Ranch near Merced, California. In 1982, the ranch comprised 1,872 acres of grazing land and 698 head of cattle. In addition, appellants leased another 1,228 acres of adjoining land from in-laws at a modest price. They concentrated their operations on raising purebred angus cattle and hoped to establish a registered herd over a period of years. As sidelines, they maintained a small almond orchard and a substantial apiary business with 3,000 hives. The ranch was subject to deeds of trust securing [***3] loans of Crocker Bank and Travelers Insurance Company which had balances, respectively, of $ 225,000 and $ 137,378.

In 1982, Crocker Bank informed appellants that it would not extend them any further credit. Seeking a means of paying off the Crocker loan, they approached Wayne Hadsel, the Merced branch manager for Wells Fargo, with a request for a five-year loan. Their loan application was processed by Clifford Wictorin, a loan officer at the Merced branch. On February 14, 1983, Wictorin recommended in a report to Edward Farnam, the agribusiness district manager of Wells Fargo, that the bank extend credit to appellants. The report contained projections of the appellants' gross income but was lacking in any precise estimates of their expenses. For example, it projected an income of $ 385,000 from their apiary operation but neglected to mention estimated expenses of $ 343,000. Farnam approved the loans but later attributed his approval to a mistaken understanding of appellants' expenses.

On February 28, 1983, Wells Fargo extended to appellants three loans, secured by substantially all the ranch property, in the amounts of $ 63,000, $ 97,000, and $ 210,000. The promissory notes [***4] for the $ 63,000 and $ 97,000 loans provided that "[p]rincipal shall be payable in full on October 31, 1983." The $ 210,000 promissory note was less clear. The relevant portion stated: "Principal shall be payable as follows: One principal payment of Forty Two Thousand and no/100 Dollars ($ 42,000.00) due on September 30, 1983. Anything herein to the contrary notwithstanding, all principal and interest remaining unpaid on October 31, [**737] 1983 shall be immediately due and payable." The testimony of Wictorin and Farnam on deposition and certain documents secured from the bank in discovery indicated that the parties actually contemplated that the loan would be repaid over five years, with annual principal payments of $ 42,000.

[*472] Both Ernest and Maxine Price testified that they were surprised to read the October 31, 1983, maturity date on the promissory notes and protested to Wictorin that they couldn't possibly pay the loans off by that date. According to Maxine Price, he reassured them that the loans "would be redid on the five-year program that we were going to be on." On August 19, 1983, Wells Fargo extended another $ 15,000 loan to appellants for purchase of [***5] a mobile home.

Nearly the full amount of the loans was to be applied to repayment of the Crocker Bank and Travelers Insurance Company loans; a balance of only about $ 12,000 was available to cover operating expenses of the ranch. Later in the year, appellants invested the proceeds of cattle sales in a major capital improvement -- the construction of a sales pavilion, including a barn and corrals, to conduct public cattle auctions. There is some evidence that bank officials were aware of appellants' plans to construct this facility; Wictorin's credit report refers to Ernest Price's marketing plan "to increase exposure through cattle shows and publications and conduct annual sales at his home ranch"; and Ernest Price asserted that he showed Wictorin the planned locations of the facility. Nevertheless, Wells Fargo officials expressed surprise when they learned that appellants had made this large capital investment and charged that it represented an unauthorized diversion of ranch income.

From May through November 1983, appellants made a number of interest payments on the three loans. As the maturity dates approached, Ernest Price sought some kind of accommodation in several conversations

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

[***6] with Wictorin in late September and October. According to Price's deposition testimony, Wictorin assured him that he would "redo" the notes. Appellants let the October 31, 1983, maturity date pass without making any payments of principal.

On November 21, 1983, appellants received a letter from Wictorin announcing that their loans were past due, followed by a similar letter on December 13, 1983. They concede that they made no further payments on the loans that year and never disputed that the amounts were due. Instead, they attempted to initiate discussions to restructure the loans. The matter was referred to the Wells Fargo loan adjustment department which handled delinquent accounts. On February 3, 1984, appellants received a letter from Pamela Bogle, an assistant vice-president of Wells Fargo, announcing that all sums were due and payable on the loans and threatening foreclosure.

Without contesting that the loan payments were due, appellants arranged a meeting with Bogle at their ranch on March 8, 1984, to discuss a revised payment schedule. The parties reached an apparent agreement. A letter of [*473] Bogle dated March 19, 1984, stated their agreement as follows: "(1) [***7] Delinquent interest will be paid current on or before April 15, 1984 and will be kept current according to the terms of the original promissory notes. (2) You will commence to make principal reductions on April 15, 1984 in the amount of $ 15,000 and future payments will continue in the following manner:

| | |
|---|---:|
| May 1984 | $ 15,000 |
| July 1984 | 20,000 |
| August 1984 | 25,000 |
| September 1984 | 70,000 |
| October 1984 | 12,500 |
| November 1984 | 24,500 |
| December 1984 | 10,000 |
| January 1985 | 10,000 |
| February 1985 | 10,000 |
| March 1985 | 22,500" |

Appellants fell badly behind this repayment schedule, paying only $ 15,000 in principal on April 18, 1984, $ 24,323.71 in delinquent interest on June 5, 1984 and $ 10,000 in principal on June 20, 1984. In December 1984, Wells Fargo attached an Agriculture Commodity Credit Corporation check in the amount of $ 22,738 payable to their apiary [**738] business. Bogle wrote to appellants on May 17, September 4, November 21, and December 6, 1984, informing them of their continued default and advising them to liquidate assets to pay for the loans. In their correspondence with the bank, appellants never questioned their obligations but [***8] rather promised to make additional payments.

In September 1984, Wells Fargo initiated foreclosure proceedings by filing a notice of default. Appellants subsequently retained an attorney, Weldon J. Mattos, Jr., who arranged a meeting on December 12, 1984, with Bogle, Wictorin, and Farnam at the branch office of the bank. Following the meeting, Mattos proposed a revised repayment schedule which Bogle quickly rejected. The next month, however, Bogle agreed to postpone a trustee's sale in consideration of a small payment of $ 6,000. After further negotiations, Bogle issued a modified ulti-matum in a letter dated February 19, 1985. The bank agreed to forebear publishing notice of trustee's sale on condition that appellants (1) make a payment of $ 50,000 on February 20, 1985, (2) assign to the bank the proceeds of a pending escrow for the sale of the almond orchard, (3) assign to the bank the proceeds of any loan from the Farmers Home Loan Administration, if they should succeed in securing such a loan, and (4) pay all amounts outstanding by June 10, 1985.

[*474] On behalf of appellants, Mattos accepted the terms of Bogle's ultimatum but stated that appellants could not make the [***9] first payment until March 1, 1985. On that date, appellants in fact paid Wells Fargo $ 50,000. They borrowed from a friend to make a further payment of $ 90,000 on June 10, 1985. Not satisfied with this partial payment, the bank published a notice of trustee's sale to be held by July 9, 1985. Securing a loan from another individual, appellants presented Wells Fargo on June 24, 1985, with a check in the amount of $ 146,211.09 in full payment of the outstanding loan balances. As the private loan was drawn on an out-of-state bank, the appellants' check unfortunately did not clear. On June 28, 1985, however, appellants finally paid off

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

the loans with a second check for $ 146,211.09, plus a small additional interest payment of $ 676.54.

A few days after paying off the loan, appellants sued Wells Fargo, alleging as damages that they were forced to sell bee hives, trucks, cattle, and a 60-acre parcel of land for distressed prices in order to make the final payments.

**(1)** On appeal, an order granting summary judgment must be reviewed de novo. ( *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) The [***10] governing statute provides: "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." ( Code Civ. Proc., § 437c, subd. (c).) **(2)** As a gloss on this statutory standard, the courts have cautioned that "'[t]he moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.'" ( *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) "All reasonable inferences are drawn in favor of the party opposing the summary judgment . . . ." ( *Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 179 [229 Cal.Rptr. 612].) In ruling on a motion for summary judgment, the trial court seeks to identify triable issues without engaging in any determinations of fact. ( *D.E. Sanford Co.* v. *Cory Glass Etc. Co.* (1948) 85 Cal.App.2d 724, 726 [194 P.2d 127].) "The trial court is, however, to some extent required [***11] to weigh evidence in determining whether the factual issues asserted relate to a 'material fact,' and must determine what 'inferences [are] reasonably deducible from [the] evidence.'" ( *Sawyer* v. *First City Financial Corp.* (1981) 124 Cal.App.3d 390, 406 [177 Cal.Rptr. 398].)

The tort theory in appellants' cause of action for breach of the implied covenant of good faith and fair dealing is based on a recent, and already discredited, precedent: *Commercial Cotton Co.* v. *United California Bank* [*475] (1985) 163 Cal.App.3d 511, [**739] 516 [209 Cal.Rptr. 551]. The case concerned a simple fact situation covered by division 4, chapter 4, of the California Uniform Commercial Code. The bank paid out $ 4,000 from the plaintiff's checking account on a check containing unauthorized signatures. Almost two years later, the plaintiff discovered the loss and made a claim to the bank for reimbursement. On the advice of its general counsel, the bank refused the claim on the ground that it was barred by a one-year statute of limitations. In fact, the decision of *Sun 'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920], [***12] decided 11 days before the bank re-

fused the claim, clearly indicated that a 3-year statute of limitation applied.

Alleging breach of the covenant of good faith and fair dealing, plaintiff sued the bank and recovered $ 4,000 in compensatory damages and $ 100,000 in punitive damages. Since punitive damages may be awarded only in "an action for the breach of an obligation not arising from contract" ( Civ. Code, § 3294, subd. (a)), the validity of the award of punitive damages turned on whether the cause of action for breach of the covenant of good faith stated a cause of action in tort or contract. Holding that the cause of action was in tort, the court advanced two novel legal concepts in a single, somewhat confusing, paragraph.

The court in *Commercial Cotton* relied on language in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] emphasizing that the relationship between insurer and insured is "characterized by elements of public interest, adhesion, and fiduciary responsibility . . . ." ( *Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d at p. 516.) With [***13] reference to these elements, the court stated: "Analogizing to the factors set out in *Egan* we agree with Calvin's contention that banking and insurance have much in common, both being highly regulated industries performing vital public services substantially affecting the public welfare. A depositor in a non-interest-bearing checking account, except for state or federal regulatory oversight, is totally dependent on the banking institution to which it entrusts deposited funds and depends on the bank's honesty and expertise to protect them. While banks do provide services for the depositor by way of monitoring deposits and withdrawals, they do so for the very commercial purpose of making money by using the deposited funds. The depositor allows the bank to use those funds in exchange for the convenience of not having to conduct transactions in cash and the concomitant security in having the bank safeguard them. The relationship of bank to depositor is at least quasi-fiduciary, and depositors reasonably expect a bank not to claim nonexistent legal defenses to avoid reimbursement when the bank negligently disburses the entrusted funds. Here, UCB's claimed defenses are spurious, [***14] and the jury found experienced legal counsel interposing them in an unjustifiable, stonewalling effort to [*476] prevent an innocent depositor from recovering money entrusted to and lost through the bank's own negligence, is a breach of the bank's covenant of good faith and fair dealing with its depositor." ( *Ibid.*)

The court premised tort liability for breach of the covenant of good faith alternatively on (1) the existence of a special relationship between depositor and bank within the meaning of *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809 and (2) on an apparently new

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

tort of bad faith defense, perhaps derived in some manner from *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158]. We are concerned here only with the first of these theories. The analysis of a special relationship rested not only on the familiar concepts of public interest and adhesion but on the innovative assertion that the relationship between a bank and depositor is "quasi-fiduciary" in nature. In a later case, *Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362 [229 Cal.Rptr. 16], [***15] the same court similarly characterized the relationship between a bank and its loan customers. The issue in *Barrett* was the duty of the court to give an instruction on constructive [**740] fraud. The court noted that constructive fraud "usually arises from a breach of duty where a relation of trust and confidence exists." ( *Id.* at p. 1369.) Citing *Commercial Cotton'* as authority for a "quasi-fiduciary" relationship between a bank and a depositor, the court found that "a similar relationship of trust and confidence exists between a bank and its loan customers . . . ." (*Ibid.*)

The holdings of *Commercial Cotton* and *Barrett* are inconsistent with both past authority and current trends in the law. [1] **(3)** It has long been regarded as "axiomatic that the relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor." ( *Morse* v. *Crocker National Bank* (1983) 142 Cal.App.3d 228, 232 [190 Cal.Rptr. 839].) "A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such." ( *Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 332 [227 Cal.Rptr. 484].) [***16] The same principle should apply with even greater clarity to the relationship between a bank and its loan customers.

   1  See the devastating criticism of the *Commercial Cotton* decision in *The Fiduciary Controversy: Injection of Fiduciary Principles Into the Bank-Depositor and Bank-Borrower Relationships* (1987) 20 Loyola L.A. L.Rev. 795, 810-821, and *Commercial Cotton Co. v. United California Bank: California's Newest Extension of Bad Faith Litigation Into Commercial Law* (1986) 16 Sw.U.L.Rev. 645, 678-687.

A case decided only three days before *Commercial Cotton* made short shrift of a claim that a fiduciary relationship existed between a bank and its depositor. In *Lawrence* v. *Bank of America* (1985) 163 Cal.App.3d 431 [209 Cal.Rptr. 541], the plaintiff sued the bank for dishonoring a check. The second cause of action alleged breach of fiduciary duty. Dismissing this [*477] claim, the court stated, "[U]nder ordinary circumstances the relationship [***17] between a bank and its depositor is that of debtor-creditor, and is not a fiduciary one; and

appellant has failed to allege any facts which would support a finding that a fiduciary relationship existed between appellant and any of the respondents in this case." ( *Id.* at p. 437.)

Since *Commercial Cotton* and *Barrett* were decided, the law has moved decisively away from expansion of the tort of breach of the implied covenant of good faith. The tort, of course, has its origins in insurance law; in *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173], the Supreme Court first allowed an insured to recover from an insurer in tort for emotional suffering resulting from breach of the implied covenant. Tort recovery on this theory was later extended to employment contracts by *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722] and its progeny. (E.g., *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813, 820-821 [226 Cal.Rptr. 570]; *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 260-262 [215 Cal.Rptr. 860].) Through dicta [***18] in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.*, supra, 36 Cal.3d 752, 769, the Supreme Court suggested that this form of tort recovery might be appropriate wherever there are "relationships with similar characteristics" to those of insurer and insured. Pursuing this suggestion, *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] proposed a five-part test for determining the existence of a special relationship justifying tort recovery for breach of the implied covenant. The *Wallis* court found that a severance contract between employer and employee fell within such a special relationship. Three subsequent cases applying the same test to other commercial transactions, however, found the special relationship to be absent. ( *Martin* v. *U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 413 [251 Cal.Rptr. 17]; *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925, 931 [235 Cal.Rptr. 12]; *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 889 [208 Cal.Rptr. 394].)

This evolution of the law was dramatically upset last [***19] year by *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 693 [254 Cal.Rptr. 211, 765 P.2d 373]. The decision did not address *Wallis* v. *Superior Court*, supra, 160 Cal.App.3d 1109 [**741] and its progeny but rather reversed the earlier line of cases stemming from *Cleary* v. *American Airlines, Inc.*, supra, 111 Cal.App.3d 443. The court held that *Cleary* lacked justification in policy or precedent for extending to employment contracts the tort recovery allowed for breach of the implied covenant in insurance contracts: "We therefore conclude that the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies . . . ." The court's analysis affirmed the wisdom of

"the traditional separation of tort and contract law" (*id.* at p. 693) and described the dicta in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 768-769, [*478] suggesting possible extension of tort remedies for breach of the implied covenant as being "tentative at best." (*Id.* at p. 688.)

The impact [***20] of the *Foley* decision cannot be assessed with certainty. The strict terms of its holding leave intact *Wallis* v. *Superior Court, supra,* 160 Cal.App.3d 1109; until the Supreme Court says otherwise, it may still be argued that a noninsurance contract was "tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract." (*Id.* at p. 1118, fn. deleted.) But the implications of the court's analysis presage a close scrutiny of tort recovery for breach of the implied covenant of good faith and fair dealing outside of the insurance context. (See *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726 [260 Cal.Rptr. 793].) The decision surely precludes the sort of loose extension of tort recovery, based on "quasi-fiduciary" relationship, sanctioned in *Commercial Cotton* v. *United California Bank, supra,* 163 Cal.App.3d 511.

(4) In the present case, appellants do not contend that their agreement with Wells Fargo satisfies the rigorous five-part test of the *Wallis* decision. Nor do they seek to prove special circumstances [***21] that might conceivably give a fiduciary character to a lender/borrower relationship. Relying on *Commercial Cotton* and *Barrett,* the complaint alleges only that plaintiffs "were customers of Wells Fargo Bank, National Association and had bank accounts, including checking, with defendant, Wells Fargo, maintained at the Merced Branch of Wells Fargo, and have been the beneficiaries of a fiduciary relationship with defendant, Wells Fargo." These allegations, together with a description of the loan transactions, plainly are insufficient to state a tortious breach of the covenant of good faith and fair dealing.

For the first time in this appeal, appellants argue that Wells Fargo is liable in tort under *Seaman's Direct Buying Services, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752. The tort defined in *Seaman's,* however, is distinct from breach of the implied covenant of good faith and fair dealing; it occurs when a party "seeks to shield itself from liability by denying, in bad faith and without probable cause" that the contract exists. In their opening brief, appellants urge that Wells Fargo in fact denied the existence of a "renewal agreement." This theory, [***22] however, finds no expression in the pleadings and cannot be considered for purposes of summary judgment. (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 57-60 [248 Cal.Rptr. 217].)

(5a) Turning to more firmly established legal principles, appellants urge that the record shows a triable issue of fact concerning contractual breach of the implied covenant of good faith and fair dealing in both the original loans and the March 19, 1984, repayment agreement. (6) "Every [*479] contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ( Rest.2d Contracts, § 205.) The term "good faith" has been described as an "'excluder' phrase which is 'without general meaning (or meanings) of its own and serves to exclude a wide range of heterogenous forms of bad faith. In a particular context the phrase takes on [**742] specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.'" ( *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 697, quoting Summers, [***23] *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va.L.Rev. 195, 201.) For example, the covenant precludes an owner from interfering with work of a contractor in performance of a construction agreement. (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 745, p. 676.)

(5b) Appellants here argue that Wells Fargo breached the implied covenant by taking a "hard line" in repayment negotiations. In particular, they rely on the testimony of John Richards, an expert witness of Wells Fargo, who conceded that, in his opinion, Pamela Bogle was not justified in publishing a notice of foreclosure sale after having received a $ 90,000 payment on June 10, 1985. The necessary implication of appellants' argument is that the bank owed them a duty of reasonable forbearance in enforcing its creditor's remedies. They do not, however, cite any authority supporting this proposition, and we are aware of none. Contracts are enforceable at law according to their terms. The covenant of good faith and fair dealing operates as "'a kind of "safety valve" to which judges may turn to fill gaps and qualify or limit rights and duties [***24] otherwise arising under rules of law and specific contract language.'" ( *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 684, quoting Summers, *The General Duty of Good Faith -- Its Recognition and Conceptualization* (1982) 67 Cornell L.Rev. 810, 812.) It does not impose any affirmative duty of moderation in the enforcement of legal rights. The equitable doctrines of estoppel or waiver may, of course, bar unfair tactics in the enforcement of agreements, but appellants have not raised any such equitable defenses.

(7a) Apart from the implied covenant of good faith, appellants do not claim that Wells Fargo breached any contractual obligation. Rather they contrive to state their grievance alternatively in the form of a cause of action for fraud. The complaint alleges both intentional fraud