and fraudulent concealment. [2] The intentional misrepresentations consisted of statements by the bank employees, Wictorin and Hadsel, that "Wells Fargo, would 'work with' the plaintiffs in the matter of repayment of the promissory [*480] notes, [and] would renew the promissory notes for up to five (5) years . . . ." Though the elements of [***25] fraudulent concealment are not clearly alleged, appellants urge that the record reveals that the bank agents and employees concealed (1) that Wictorin did not have authority to approve the renewal of the loans, (2) that renewal of the $ 210,000 loan was conditioned on the payment of the $ 97,000 and $ 63,000 loans, (3) that Wells Fargo would consider the loans in default if not paid by October 31, 1983, and (4) that the bank officials handling their loans would not be knowledgeable about agriculture.

2   We do not consider the theories of negligent misrepresentation and constructive fraud, urged in appellants' opening brief, since these theories were not pled in the complaint and were raised for the first time on appeal.

With two exceptions, the alleged fraud concerns oral promises relating to the principal terms of the loan agreement. The gravamen of appellant's theory of fraud is that the written loan agreements varied from the terms of the agreement they had expected; that bank employees orally promised them [***26] that the written agreement would be administered in a manner consistent with their original expectations; that the bank "never intended" to perform the agreements pursuant to these oral promises; and that they relied to their detriment on the promises. These allegations appear to raise the difficult and disputed question of the relationship between promissory fraud and the parol evidence rule. Wells Fargo has raised the defense of the parol evidence rule, however, only with respect to the third cause of action relating to the mobilehome loan. As the issue has been briefed only in this connection, we will not discuss it here. The summary judgment on [**743] the fraud cause of action must be affirmed on other grounds.

Wells Fargo argued successfully in the trial court that, since appellants' own admissions revealed that they understood the nature of their obligations to Wells Fargo, they cannot assert that they relied to their detriment on the promises of bank employees that they were subject to other, less stringent, obligations. We will first examine the admissions and then consider their significance for purpose of summary judgment.

The admissions were in part circumstantial. [***27] As recounted earlier in this opinion, appellants conceded that they never disputed Wells Fargo's demands for payment. (8) "A failure to question . . . a bill or statement is uniformly received as evidence of an admission of its correctness." (Cleary, McCormick on Evidence (3d ed. 1984) § 270, p. 802.) Similarly, throughout the duration of the agreement appellants made a number of payments of interest and principal without contesting their obligations. (9) If a party makes a partial payment "'without protest and without otherwise indicating non-recognition of the validity of the claim, evidence of the payment is universally received [as proof of the validity of the claim].'" (6 Cal. Law Revision Com. Rep. (1964) subds. (a) and (b) of rule 52, p. 676, quoting The American Law Institute's Comment on Model Code rule 309(3).)

[*481] (7b) Portions of the deposition testimony of Ernest and Maxine Price tended to confirm these tacit admissions; both conceded that they understood that the maturity date of the three loans was October 31, 1983. Even more damaging were the admissions in the letters of appellants' counsel. A letter of Weldon Mattos to [***28] Pamela Bogle, dated December 12, 1984, states, "[a]s I indicated at our meeting, there is no question that the Prices did not make the payments to Wells Fargo when due." In a letter to W.E. Farnam of the same date, Mattos concedes, "[t]he Prices are not denying that they have not been able to make the payments on the schedule that they foolishly agreed to . . . ." (10) (See fn. 3.) A second letter to Pamela Bogle, dated December 17, 1984, states, "[w]e are not asking that the Bank terminate the foreclosure, but simply that they hold off for a brief period of time to allow for a less catastrophic solution to the Prices' obligation to Wells Fargo." [3]

3   Appellants now argue that the trial court was barred under Evidence Code section 1152 from considering this correspondence in the motion for summary judgment. Section 1152 codifies the rule that "[a]n offer to settle or compromise a claim by paying a sum of money or giving other consideration is *not admissible to prove liability* on the part of the offeror." (1 Witkin, Cal. Evidence (3d ed. 1986) § 424, p. 398.) "[T]he obvious policy of the statute is to avoid deterring parties from making offers of settlement and to facilitate candid discussion which may lead to settlement of disputes." ( *Fieldson Associates, Inc.* v. *Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770, 773 [81 Cal.Rptr. 332].) But we find nothing in the record suggesting that there was any dispute over appellants' obligations under the loan agreements at the time the letters were written. Indeed, the letters affirmatively disclose that no dispute existed. Under these circumstances, Evidence Code section 1152 did not apply.

*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466

P.2d 996] is instructive on this point. During the month of February 1965, plaintiff notified the city that it was unwilling to continue work on a construction project without a change order. On March 8, 1965, the city sent plaintiff a letter rejecting the need for such a change order. In later correspondence in March, the parties nevertheless made certain mutual accommodations. The city sought to introduce evidence of the March correspondence "to show the contemporaneous and practical construction of the contract." ( *Id.* at p. 296.) Plaintiff countered that the correspondence was barred by Evidence Code section 1152. The Supreme Court observed that evidence is admissible that tends to prove "[t]he 'construction given the contract by the acts and conduct of the parties with knowledge of its terms, *before any controversy has arisen as to its meaning* . . . ." ( *Id.* at pp. 296-297.) But it noted, "[b]y March 8, 1965, the parties had reached a stage of clear disagreement on the crucial question whether plaintiff was entitled to a change order." ( *Id.* at p. 297.) Accordingly, the court held that Evidence Code section 1152 precluded the admission of the correspondence. Applying these principles to the present case, we find that the letters in question were written before any controversy had arisen as to the meaning of the loan agreements. Hence, they are not barred by section 1152 but are admissible to show the "practical construction" of the loan agreements by the parties.

This analysis also applies to references to the deposition of Weldon J. Mattos in "Event 11" of the exhibit appendix to the motion for summary judgment. We see no materiality in the remaining document mentioned in this assignment of error, Mattos's letter to Bogle dated March 5, 1985.

[***29] [**744] Arguing that these admissions are decisive, Wells Fargo cites *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10], for the proposition that admissions are entitled to high credibility [*482] in motions for summary judgment: "As the law recognizes in other contexts (see Evid. Code, §§ 1220- 1230) admissions against interest have a very high credibility value. . . . Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." The holding of *D'Amico* appears entirely sound on its facts; and this court has recently applied the decision where credible admissions on deposition were contradicted only

by self-serving declarations of a party. ( *Advanced Micro Devices, Inc.* v. *Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791 [245 Cal.Rptr. 44]. But *Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768], [***30] phrased the holding in broad language that should be accepted with caution: "Accordingly, when a defendant can establish his defense with the plaintiff's admissions . . . the credibility of the admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive." (See also *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1503 [234 Cal.Rptr. 779]; *Shapero* v. *Fliegel* (1987) 191 Cal.App.3d 842, 849 [236 Cal.Rptr. 696].)

Apparently accepting the language of *Leasman* at face value, Weil and Brown comment: "Note that if the case went to trial, the judge or jury might choose to believe the contradictory testimony. But for summary judgment purposes, a party is *bound* by his or her admissions made in the course of discovery!" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (1988) para. 10:84.) As the commentators' exclamation point suggests, an uncritical application of the *D'Amico* decision can lead to anomalous results, inconsistent with the general principles of summary judgment law. [***31] **(11)** We do not interpret the decision, however, as saying that admissions should be shielded from careful examination in light of the entire record. A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence. We are persuaded that the trial court properly relied on the admissions in the case at bar only because we find nothing in the record that is materially inconsistent with the admissions.

On deposition, both Ernest and Maxine Price reiterated again and again that they thought they had a "five-year deal." They acknowledged, however, that the three promissory notes had a maturity of one year. When pressed for clarification, they expressed two distinct understandings. First, they construed the $ 210,000 loan as being payable over a five-year period with annual principal payments of $ 42,000. As we have seen, the note was indeed ambiguous on this point, and the Prices' interpretation was entirely plausible. But the issue does not enter into the present lawsuit because the Prices never made the annual principal payments of $ 42,000 that the note [*483] arguably called for. In the [***32] trial court, they never contended that Wells Fargo failed to comply with this interpretation of the note.

**(7c)** Secondly, the Prices insisted that the notes would be "redone." This understanding clearly applied to the $ 63,000 and $ 97,000 loans but appeared also to extend to the $ 210,000. The difficulty is that the Prices nowhere specify any understanding as to the terms of

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

renewal. The terms of a restructuring agreement obviously may vary as widely as the terms of the original agreement. Unless an agreement to restructure a loan embodies definite terms, capable of enforcement, it is not a legally valid contract. "Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement." ( *Kruse* v. *Bank of* [**745] *America, supra,* 202 Cal.App.3d 38, 59.) The Prices' understanding that the notes would be "redone" thus raises no triable issue as to a legally enforceable understanding inconsistent with the written terms of the notes.

The third cause of action alleging fraud in procurement of the $ 15,000 mobilehome loan raises clearly the issue of the relationship between promissory [***33] fraud and the parol evidence rule. Appellants allege that Bank of America offered to make the loan at a 13 percent interest rate, and a Wells Fargo loan officer countered by promising that Wells Fargo would loan the money "at a better interest rate than Bank of America." In reliance on this promise, they applied for a loan at Wells Fargo; but "[w]hen the promissory note was ready for signing," they discovered that the interest rate was 3 percent above prime, a rate higher than the 13 percent offered by the Bank of America. At that time, however, "Bank of America was no longer offering the same rate on mobilehome loans." Consequently, appellants had no alternative but to accept the Wells Fargo loan at the higher rate of interest.

Without considering other difficulties with this cause of action, we will discuss only the parol evidence rule. Under California law, fraud may consist of "[a] promise made without any intention of performing it." ( Civ. Code, § 1572.) To incur such liability for fraud, BAJI 12.40, subdivision (1) states that "[t]he defendant must have made a promise as to a material matter and, at the time he made it, he must have intended not [***34] to perform it . . . ." *Kett* v. *Graeser* (1966) 241 Cal.App.2d 571 [50 Cal.Rptr. 727] provides an apt example. The plaintiffs there bought a home in reliance on the defendant's promise that certain repairs would be performed by a licensed contractor. Reversing a summary judgment in favor of defendant, the court held that there was a triable issue of fact as to whether the defendant did not intend to perform the promise at the time it was made.

**(12)** The parol evidence rule in general does not preclude proof of fraudulent oral misrepresentations (2 Witkin, Cal. Evidence (3d ed. 1986) [*484] §§ 997, 999, pp. 944-945), but the early case of *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258 [48 P.2d 659] perceived a conflict between the rule and promissory fraud relating to the principal terms of an agreement. The case concerned a promissory note that by its terms was payable on demand. The plaintiffs sought to prove that the bank orally promised, without any intention of honoring the promise, that "they would not be required 'to make any payments on their indebtedness, either interest or principal, until this money [***35] came in from the 1932 crop of lettuce seed . . . .'" ( *Id.* at p. 263.) The court held that the parol evidence rule precluded proof of the alleged promissory fraud: "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (*Ibid.*)

The holding of the *Pendergrass* decision received a slightly different verbal formulation in *Bank of America* v. *Lamb Finance Co.* (1960) 179 Cal.App.2d 498 [3 Cal.Rptr. 877]. The plaintiff offered to prove that the bank fraudulently promised her that, contrary to the written terms of the instrument, she would not be personally liable on a guaranty she signed in the capacity of sole shareholder and officer of a corporation. Relying on *Pendergrass,* the court barred proof of the alleged promissory fraud: "A distinction has been made by our courts in cases in which the fraud sought to be proved consists of a false promise. [***36] They have held that if, to induce one to enter into an agreement, a party makes an independent promise without intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible." ( *Id.* at p. 502; see [**746] also *Shyvers* v. *Mitchell* (1955) 133 Cal.App.2d 569, 573 [284 P.2d 826]; *Cobbs* v. *Cobbs* (1942) 53 Cal.App.2d 780 [128 P.2d 373].)

The *Pendergrass* decision has been severely criticized by scholarly commentators. (*Parol Evidence: Admissibility to Show that a Promise was Made Without Intention to Perform It* (1950) 38 Cal.L.Rev. 535-539; Sweet, *Promissory Fraud and the Parol Evidence Rule* (1961) 49 Cal.L.Rev. 877-907.) While applying the decision, the court in *Coast Bank* v. *Holmes* (1971) 19 Cal.App.3d 581, 591 [97 Cal.Rptr. 30], termed the *Pendergrass* distinction between different [***37] forms of promissory fraud as being "tenuous" and "inconsistent" with tort principles. The court opined, "[t]he recent decisions liberalizing the parol evidence rule cast some doubt on the continued vitality of the distinction." ( *Id.* at p. 592; see also *Glendale Fed. Sav. & Loan Assn.* v. [*485] *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 161 [135 Cal.Rptr. 802].)

(13) We must accept *Pendergrass*, however, as the governing law. The first (and sufficient) reason is that, since the decision has never been overruled, it may not be challenged by an appellate court. (9 Witkin, Cal. Procedure (3d ed. 1985) § 768, p. 735.) The landmark decisions of the 1960's liberalizing the parol evidence rule have only oblique relevance to *Pendergrass* and cannot be read as overruling the decision. ( *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561]; *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; and *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785].) [***38] Moreover, despite scholarly criticisms, the decision is based on an entirely defensible decision favoring the policy considerations underlying the parol evidence rule over those supporting a fraud cause of action.

The scholarly commentators correctly point out that there is no conceptual inconsistency between promissory fraud and the parol evidence rule. Promissory fraud requires a showing of serious intent and reliance in addition to proof of an oral promise; the parol evidence rule is concerned only with proof of an oral promise. The two legal concepts can logically coexist. The policy considerations underlying promissory fraud apply fully when the promise relates to the main terms of the agreement. By limiting promissory fraud to promises relating to collateral matters, not at variance with the principal obligations, *Pendergrass* compromises the objectives of tort law in a manner that is not strictly necessary to give effect to the parol evidence rule.

On the other hand, if loosely construed, the concept of promissory fraud may encourage attempts to convert contractual disputes into litigation over alleged fraud. To be sure, fraud requires proof of the additional elements [***39] of intent and reliance. But these can so easily be inferred from any broken promise that promissory fraud may in fact open the door to attempts to enforce oral promises through tort causes of action under the guise of a promise made without intention to perform. A broad doctrine of promissory fraud may allow parties to litigate disputes over the meaning of contract terms armed with an arsenal of tort remedies inappropriate to the resolution of commercial disputes. Thus, the practical impact of alleged promissory fraud may in fact undermine the policies of the parol evidence rule.

In short, *Pendergrass* compromises the policies of tort law, but a contrary rule would compromise those of the parol evidence rule. How one weighs the conflicting considerations will depend largely on the importance one attaches to the respective policies. In *Pendergrass*, the Supreme Court gave [*486] priority to the policies of the parol evidence rule. While the decision was by no means logically inevitable, it represents a rational policy choice that should be reconsidered only by the Supreme Court itself.

[***40] (14) *Pendergrass* may be easily applied to the present case. The promissory note for the mobile-home loan bears the apparent marks of an integrated agreement, and appellants [**747] have advanced no contrary argument. The alleged oral promise that Wells Fargo would beat the terms of Bank of America constitutes a "contemporaneous oral agreement," contradicting the terms of the written agreement which comes within the terms of the parol evidence rule. ( Code Civ. Proc., § 1856; 2 Witkin, Cal. Evidence, *supra*, § 960 et seq., p. 908.)

(15) As further tort theories, appellants charge Wells Fargo with intentional and negligent infliction of emotional distress. The foregoing analysis is, however, fatal to these claims. Our conclusion that Wells Fargo did not defraud appellants or breach the implied covenant of good faith and fair dealing necessarily implies that it did not engage in the sort of "outrageous" conduct necessary to incur liability for intentional infliction of emotional distress. (5 Witkin, Summary of Cal. Law (9th ed. 1988) § 404, p. 484.) Again, our conclusion that there was no breach of the implied covenant of good [***41] faith and fair dealing appears to preclude liability for negligent infliction of emotional distress; appellants have not proposed any duty owed to appellants that does not fall within the implied covenant theory. (6 Witkin, Summary of Cal. Law (9th ed. 1988) § 838, p. 194.)

(16) To support their three posttrial motions -- the motion for reconsideration, the motion for new trial, and motion for relief under Code of Civil Procedure section 473 -- appellants submitted certain materials that were not included in their opposition to the motion for summary judgment, including excerpts from the depositions of Stephen Schendel and John Richards and declarations of appellants. The trial court overruled the objections of Wells Fargo to this new material but still denied the motions. On appeal, appellants urge that the new material should have compelled a different ruling on the motion for summary judgment.

For purpose of analysis, our discussion of the implied covenant of good faith and fair dealing has in fact included relevant material from the Richards's deposition and the appellants' declarations. This material did not affect our conclusion that [***42] the summary judgment was proper. The deposition of Stephen Schendel contains certain observations regarding the parties' expectation that the loan agreements would be renewed. But the testimony has no relevance to the actual allegations of the complaint relating to fraud since it does not serve to prove any actionable misrepresentation. The [*487] testimony also has little bearing on the theories

213 Cal. App. 3d 465, *; 261 Cal. Rptr. 735, **;
1989 Cal. App. LEXIS 869, ***

of liability based on the implied covenant of good faith; appellants do not argue that the implied covenant required Wells Fargo to renew the loan agreement. The other portions of Schendel's testimony cited in the motions -- relating to "mutual trust" residing in the bank/customer relationship and the impropriety of a bank official informing a customer that he will deny making a statement -- have little materiality.

As a final assignment of error, appellants point out that the trial court granted the motion for summary adjudication of the issues as well as the motion for summary judgment. Code of Civil Procedure section 437c, subdivision (f), provides: "[a] party may move for summary adjudication of issues, either by itself or as an *alternative* to [***43] summary judgment." (Italics added.) This anomalous result apparently occurred because the trial court first announced on August 28, 1987, a tentative ruling to summarily adjudicate various issues but to deny summary judgment as to Wells Fargo. Later, on September 18, 1987, the court decided to grant summary judgment as to the bank. However, the orders ultimately signed included the list of summarily adjudicated issues. We agree that the summary adjudication of issues was unnecessary, but appellants were not prejudiced by it. In this appeal, they cannot base any grievance on this superfluous order. [4]

4    Because of our affirmance of the summary judgment, we do not reach appellant's assignments of error relating to the summary adjudication of issues.

The judgment is affirmed.

EXHIBIT 29

LEXSEE 44 CAL APP 564

**C. W. QUACKENBUSH, Respondent, v. JAMES W. DARROUGH et al., Defendants; RAYMOND W. SMITH et al., Appellants**

**Civ. No. 3031**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION TWO**

**44 Cal. App. 564; 186 P. 1044; 1919 Cal. App. LEXIS 587**

**December 3, 1919, Decided**

**PRIOR HISTORY:**    [***1]  APPEAL from a judgment of the Superior Court of San Diego County. W. R. Guy, Judge.

**DISPOSITION:**    Affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Pleading--Filing of Demurrer--Appearance.** --The filing of a demurrer by given defendants constitutes an appearance by them.

**(2) Id. --Action to Foreclose Mortgage--Right of Owners to Service of Sufficient Complaint.** --In an action to foreclose a mortgage on real property, the owners of the land are entitled, if the land is to be sold under foreclosure decree, to have that done in the manner provided by law, and, accordingly, are entitled to the service upon them of a complaint which is at least invulnerable to general demurrer.

**(3) Id. --Nonpayment--Sufficiency of Allegation.** --In an action to foreclose a mortgage given to secure the payment of a certain promissory note, an allegation "That no payments have been made on the principal, and no payments on the interest since the twentieth day of April, 1916, as provided for in said note and mortgage; and the principal mentioned in said mortgage and note, together with the interest thereon at the rate of seven per cent per annum from the sixteenth day of February, 1916, still remains due and unpaid from . . . [the makers of the note] to the plaintiff," is sufficient as against a general demurrer. It is not necessary to negative payment by a stranger, or to some person other than plaintiff.

**(4) Id. --Erroneous Overruling of Special Demurrer-- Not Prejudicial Error.** --The allegation of nonpayment in such an action having been sufficient as against a general demurrer, the judgment should not be reversed merely because the trial court may have erred in overruling a special demurrer.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** Sam Ferry Smith and Eugene Ferry Smith for Appellants.

F. G. Blood for Respondent.

**JUDGES:** THOMAS, J. Finlayson, P. J., and Sloane, J., concurred.

**OPINION BY:** THOMAS

**OPINION**

[*565]  [**1045]  THOMAS, J. This is an action to foreclose a mortgage executed by defendants James W. Darrough and Susan E. Darrough, his wife, to plaintiff to secure the payment of a note for the principal sum of one thousand five hundred dollars, dated May 18, 1915, payable on or before five years after date. The defendants Raymond W. Smith and Mary E. Nelson Smith, his wife, are subsequent purchasers of the property from the defendants Darrough, and are made parties to the action for that reason.

All defendants were duly and legally served with summons and complaint. The defendants Darrough defaulted. The defendants Smith appeared and entered demurrer, which was general and special in its terms, and which, after presentation and consideration by the court,

was overruled. The defendants Smith did not answer, but the judgment-roll does not disclose the filing or entering [***2] of their default for not so doing. Subsequently a decree of foreclosure was entered, [*566] ostensibly against the defendants Darrough, as no mention is made therein of the defendants Smith, except the erroneous recital in the decree that "defendants Raymond W. Smith and Mary E. Nelson Smith not appearing" -- when, as a matter of fact, both had appeared by filing a demurrer as aforesaid -- and the further recital that they had been duly and legally served with summons, and that all the interest and estate of said defendants so served in said lands and premises, and all their right and title to the same, is subject and subordinate, etc.

The appeal is by the defendants Smith only, and from the judgment on the judgment-roll alone. The sufficiency of the complaint and the validity of the judgment are, therefore, before the court for review.

(1) That the filing of a demurrer by the defendants Smith constituted an appearance by them is, we think, not debatable. ( *Hodgkins* v. *Dunham*, 10 Cal. App. 690, [103 P. 351]; *Dollar* v. *International Banking Corp.*, 10 Cal. App. 83, [101 P. 34]; *Maclay Co.* v. *Meads*, 14 Cal. App. 363, [112 P. 195, 113 P. 364]; [***3] *Altpeter* v. *Postal etc. Co.*, 26 Cal. App. 705, [148 P. 241]; *Clark* v. *Forbes*, 34 Cal. App. 524, [168 P. 155].)

Notwithstanding this fact, we think these appealing defendants are without standing in this court. They are mentioned in the decree only as already above set forth.

(2) Appellants contend that, being the owners of the land subject to the mortgage in question, they are entitled, under the law, if the land is to be sold under foreclosure decree, to have that done in the manner provided by law; and that, accordingly, they are entitled to the service upon them of a complaint which is at least invulnerable to general demurrer. And with this we agree.

(3) But we think the complaint served in this action was such a complaint, although not as carefully drawn as might be desired. The allegation of nonpayment is as follows: "That no payments have been made on the principal, and no payments on the interest since the twentieth

day of April, 1916, as provided for in said note and mortgage; *and the principal mentioned in said mortgage and note, together with the interest thereon at the rate of seven per cent per annum from the sixteenth day of February, 1916, still remains* [***4] *due and unpaid from the said James W. Darrough and Susan E. Darrough to the* [*567] *plaintiff.*" The italicized portion of the foregoing allegation is, we think, the saving clause. It is, in our opinion, a direct and sufficient allegation that all of the interest which accrued subsequent to February 16, 1916, remains "*unpaid*"; and this notwithstanding the fact that, according to the complaint, the quarterly payment of interest was not due until February 18, 1916, for a reason which must be obvious. Unless it can be successfully maintained that the allegation is insufficient merely because it alleges that the said principal and interest is unpaid from the defendants Darrough to the plaintiff, the complaint must be held to be sufficient. Notwithstanding the strict rule in this state, we think the objection to the complaint cannot be successfully maintained. It is not necessary to negative payment by a stranger, or to some person other than plaintiff. ( *Sanford* v. *Litchenberger*, 62 Neb. 501, [87 N.W. 305]; *Lincoln County* v. *Fetterman*, 170 Cal. 357, [149 P. 811]; 8 C. J. 882 et seq.)

(4) We think, therefore, the allegation of nonpayment sufficient as against [***5] a general [**1046] demurrer, and, the special demurrer having been overruled and judgment given for plaintiff, that the judgment should not be reversed merely because the court possibly may have erred in so ruling. ( *Alexander* v. *Central Lumber etc. Co.*, 104 Cal. 532, [38 P. 410]; Const., art. VI, sec. 4 1/2.)

For these reasons, coupled with the fact that appellants' attorneys have been frank enough to say that "while such is our view of the result -- and we want to be frank with the court on the point -- we have taken the appeal only out of the abundance of precaution" -- the judgment, we think, should be sustained.

Judgment affirmed.

Finlayson, P. J., and Sloane, J., concurred.

EXHIBIT 30

LEXSEE 255 CAL. APP. 2D 781

**SHELDON BUILDERS, INC., Plaintiff and Appellant v. TROJAN TOWERS et al., Defendants and Respondents.**

**Civ. No. 31198.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE**

**255 Cal. App. 2d 781; 63 Cal. Rptr. 425; 1967 Cal. App. LEXIS 1340**

**November 8, 1967**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Los Angeles County. Jerold E. Weil, Judge. Affirmed.

Action for money due for services rendered as a building contractor, for money and received, and upon an account stated. Judgment for defendant affirmed.

**DISPOSITION:** A petition for a rehearing was denied November 27, 1967, and appellant's petition for a hearing by the Supreme Court was denied January 3, 1968.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Building and Construction Contracts--Parol Evidence: Burden of Proof.** --In an action by the contractor on a building construction contract specifically providing, as a material condition, that the contractor should aid and cooperate with the property owners in successfully obtaining a construction loan satisfactory to the owners, the contractor had the burden of proving performance of all conditions precedent, and where the contract was ambiguous as to the financing condition and the owners pleaded that the financing was a condition precedent to the contract's becoming effective, parol evidence was properly admitted to explain what the parties actually intended and to establish that a condition precedent existed which had to be fulfilled before the agreement could become valid, binding and effective.

**(2) Evidence--Extrinsic Evidence--Prior or Contemporaneous Agreements--When Admissible.** -- Although oral agreements will not be permitted to change the express written provisions of a contract, should the taking effect of the contract, or any of its provisions, be contingent upon the happening of a future event, parol evidence may be admitted to show the cause of its nonperformance either in whole or in part, and this may necessitate the admission in evidence of a preceding or contemporaneous oral agreement.

**(3) Building and Construction Contracts--Performance--Condition Precedent.** --Where a building contract between a contractor and the property owners demonstrated clearly that it was within the contemplation of both parties that the construction of an apartment building would be financed by a construction loan, as distinguished from funds to be furnished directly by the owners, and substantial evidence disclosed that the parties at all times understood and agreed that construction could not proceed without a construction loan to cover 100 percent of costs, a condition precedent to performance was the obtaining of financing by the contractor, and when the condition was not fulfilled, neither party became obligated to perform further.

**(4) Id.--Performance--Condition precedent.** --Where a building contract provided that the contractor should construct a multistory apartment house for a fixed fee, but the contractor failed within a reasonable time to fulfill a condition precedent to rendering the construction agreement binding, either party was at liberty to consider the agreement terminated, and the contractor was not entitled to payment of the fee.

**(5) Id.--Performance--Condition Precedent.** --Where it was financially impossible for the property owners to proceed with a building project without adequate financing, the obtaining of which was a condition precedent to performance of the construction contract, the owners did not abandon the contract; all parties were discharged from all further duty to perform in the absence of financing.

255 Cal. App. 2d 781, *; 63 Cal. Rptr. 425, **;
1967 Cal. App. LEXIS 1340, ***

**(6a) (6b) Payment--Payment by Check.** --In an action by a building contractor upon a construction contract, retention by the contractor of a check sent to him by the property owners upon which was marked "paid in full" without notification by him to the owners that he would not accept it as payment in full supported a finding by the court that the bill was satisfied, the owners discharging their obligation under the contract by tendering the check which was accepted without complaint.

**(7) Id.--Payment by Check.** --Where a check is presented as payment and not refused, it is the duty of the payee to return it without unreasonable delay if he does not wish to cash it, in order to avoid the presumption that it constituted satisfaction of the obligation.

COUNSEL: Pfaelzer, Robertson, Armstrong & Woodard and Thomas J. McDermott, Jr., for Plaintiff and Appellant.

Arkin & Weissman and Alvin H. Weissman for Defendants and Respondents.

OPINION BY: FOURT

OPINION

[*783] [**426] FOURT, J. This is an appeal by Sheldon Builders, Inc., (hereinafter sometimes referred to as Sheldon) from the judgment of the trial court, sitting without a jury, denying its claims for money due for services rendered as a building contractor, for money had and received, and upon an account stated.

Sheldon contends that there was insufficient evidence to support the trial court's findings (a) that obtaining a loan in the amount equivalent to 100 percent of construction cost was a condition precedent to payment under the construction contract, and (b) that [***2] Sheldon was paid the sum of $297.70 by respondents. Sheldon further contends that parol evidence was improperly considered and that Sheldon was entitled to damages. These contentions are without merit.

Appellant Sheldon is a construction company whose president, Sheldon Appel, is a licensed general contractor. Appel handled the entire transaction herein related with a partnership known as Trojan Towers (hereinafter sometimes called Trojan) which proposed to build an apartment building. Robert Joseph was the principal agent for the partnership in these negotiations; the other two partners were Nathan D. Pasacoe and David Goodman. Of the three, Goodman was the partner with the best financial qualifications and only he had experience with apartment construction. On two prior occasions he had engaged in real estate development by furnishing the property in partnership with a builder who constructed the building on 100 percent financing without further investment by Goodman.

Trojan owned a parcel of real property on Hoover Street in Los Angeles. On October 9, 1961, Sheldon entered into a contract with Trojan providing that Sheldon [**427] should construct a multi-story [***3] apartment house for a fixed fee of $20,000 which was, by subsequent written modification, increased to $22,000. These instruments form the only relevant written agreement [*784] between the parties and it is the construction of this contract which constitutes the subject matter of the instant litigation.

The basic agreement was the result of several months of negotiation during which both parties were represented by counsel. The agreement provides, *inter alia,* that "As part of his services hereunder, the contractor will aid and cooperate with the owner in obtaining the best suitable first trust deed construction loan and/or permanent financing at the best possible rate of interest, length of years and gross amount." Appeal acknowledged that he knew Trojan wanted 100 percent financing, meaning thereby sufficient funds to cover the entire cost of construction, that the partners looked to him to secure such financing, and that they could not proceed without it. By his own admission Appeal encouraged Trojan in the belief that 100 percent financing could be obtained by telling the partners that he had obtained such financing upon previous ventures and occasionally had obtained [***4] financing even in excess of actual construction cost, thus returning to the principals some of their cost of land acquisition. In reliance upon Appeal's representations that 100 percent financing was within the realm of reasonable expectation, the partners executed the agreement of October 9, 1961, and the subsequent modification thereof, although on neither occasion had the parties determined the precise building design or specifications.

Pursuant to their agreement, the parties commenced work on the project. Joseph described the basis student dormitory-type apartment he envisioned and Sheldon's president consulted with an architect, Jack Chernoff, to obtain a design for the building. Over the next year Appel devoted substantial time to meetings with the partners, architect, building department and subcontractors; and his firm demolished the existing building on the proposed construction site.

Although throughout this period both Sheldon and respondents sought financing, no commitment sufficiently large to cover the entire cost of construction was obtained. There is no evidence that the failure to obtain financing was respondents' fault, or that the partners arbitrarily [***5] refused to accept suitable financing.

Goodman, however, was forced to withdraw from the project in April 1962 due to personal financial losses which he incurred when his business partner absconded with funds.

The parties initially envisioned a 57-unit building but the building department would accept no more than 54 units on the property and ultimately, when all efforts to produce adequate [*785] financing for the larger building failed, Trojan considered a smaller, 19-unit building. In October 1963 Joseph obtained on behalf of Trojan a loan commitment on the 19-unit building in the amount of $165,500 and Sheldon was notified that Trojan found this financing satisfactory. At this point there is a conflict in the testimony. Appel testified that he then agreed to proceed with construction, but he advised Joseph that Trojan would have to put in money in addition to the construction loan in order to complete the building. Trojan had paid $1,000 as called for upon execution of the contract, and since no further payment was due thereunder until the framework was completed, Trojan declined to make any earlier disbursement. Joseph contends that Appel refused to proceed until he [***6] received payment for some portion of the services previously rendered in connection with the larger building, and that only after his refusal did Trojan sell the property and assign the loan commitment to Chernoff and his partner.

In any event, Trojan did not build the apartment, but the 19-unit building was built by Chernoff, with a partner, for his own account. Joseph did not disclose the transfer to Sheldon or its president, but called in September 1963, to request the [**428] return of the bids. It was not until Appel drove by the site in late December 1963, or early January 1964, that he discovered the building under construction.

Sheldon thereupon claimed its right to the payment of its contract fee of $22,000 less the $1,000 paid when the agreement was executed. The trial court found that a condition precedent to performance under the agreement was the obtaining of financing to build the apartment building, that such financing had to be suitable to respondents, that respondents needed 100 percent financing which could not be obtained, and that the condition precedent had not, therefore, been satisfied. In the absence of a suitable construction loan, all further [***7] performance under the agreement was excused, and Sheldon was entitled to recover nothing by reason of its complaint.

(1) Appellant contends that the evidence was insufficient to support these findings since the plain language of the contract refutes the finding that 100 percent financing was a condition precedent to continuing performance by either party under the agreement, and that

parol evidence was improperly admitted to alter the contract terms. The trial [*786] court correctly admitted parol evidence to determine whether Sheldon had performed all conditions precedent to its right to recover; to explain the extrinsic ambiguity in the agreement; and to show the existence of the collateral agreement, not inconsistent with the written agreement, that rendered the written agreement ineffective until the happening of the condition precedent.

The construction contract specifically provides, as a material condition, that Sheldon should aid and cooperate with respondents in successfully obtaining a construction loan satisfactory to respondents. Sheldon had the burden of proving performance of all conditions precedent and on this issue evidence of all types was properly received. [***8] The contract was clearly ambiguous, as evidenced by the fact that even the attorneys who drafted it were unable to agree on the interpretation of the financing condition. As a result, the introduction of parol evidence to explain what the parties actually intended, by reference to surrounding circumstances, conversations and conduct, was clearly admissible. Moreover, respondents pleaded and proved, and the court found, that the financing was a condition precedent to the contract's becoming effective. Parol evidence was thus properly admitted, not to vary or contradict the terms of the agreement, but to establish that a condition precedent existed which had to be fulfilled before the agreement could become valid, binding and effective.

Although the execution of a written agreement supersedes all oral negotiations previous to or contemporaneous with the execution, since these are deemed merged in the instrument, nonetheless parol evidence may be admissible for limited purposes. (2) "... The general rule is that oral agreements will not be permitted to change the express written provisions of a contract. However, should the taking effect of the contract, or any of its provisions, [***9] be contingent upon the happening of a future event, parol evidence may be admitted to show the cause of its non-performance either in whole or in part. This may necessitate the admission in evidence of a preceding or contemporaneous oral agreement." (*Paratore* v. *Scharetg*, 53 Cal.App.2d 710, 713 [128 P.2d 560]; *Gleeson* v. *Dunn*, 113 Cal.App. 347 [298 P. 119]; *Fontana* v. *Upp*, 128 Cal.App.2d 205 [275 P.2d 164]; *Campbell* v. *Taylor*, 189 Cal.App.2d 236 [11 Cal.Rptr. 271]; *Clyde Bldg. Assn., Inc.* v. *Walsh*, 248 Cal.App.2d 513, 516 [56 Cal.Rptr. 617].)

(3) The subject agreement demonstrated clearly that it [*787] was within the contemplation of both parties that the construction of the apartment building would be financed by a construction loan, as distinguished from funds to be furnished directly by respondents as owners of the [**429] property. Substantial evidence discloses

that the parties at all times understood and agreed that construction could not proceed without a construction loan to cover 100 percent of costs. It is undisputed that Sheldon cooperated, but since no one could obtain the required financing, the condition precedent [***10] was not fulfilled, and neither party became obligated to perform further.

(4) Appellant contends that the fee was a sum certain to which Sheldon was entitled even if the building was not constructed. Sheldon would have been entitled to payment of the fee, without performance, had Trojan terminated the agreement without cause or breached it in any way; neither event occurred. Since the only financing made available within a reasonable time failed to fulfill the condition precedent to rendering the construction agreement binding, either party was at liberty to consider the agreement terminated.

(5) Appellant further contends that Trojan sought to avoid the contractual obligation to pay the contractor's fee by abandoning the project. The evidence fails to support this contention. As earlier pointed out, it was the opinion of the Trojan partners that it would be financially impossible for them to proceed without adequate financing. They did not intentionally abandon the project and disenfranchise Sheldon; they simply had no choice. The work of construction, through no fault of either party, never progressed to the point where any additional payment fell due the contractor. The contractor [***11] received $1,000 from Trojan to cover the preliminary work for obtaining financing. It would have been entitled to another payment when the framework was completed, but the parties were discharged from all further duty to perform in the absence of financing.

The contract further provided that total construction costs should be deposited in a bank account established for that purpose, or that in lieu of cash the owner might provide a construction loan commitment for the full amount. In the event actual construction costs exceeded the estimate, Sheldon agreed to accept a note individually guaranteed by the partners. Appeal advised Joseph that the partnership would have to dedicate funds in excess of the loan commitment on the 19-unit building be-

cause he could not, in effect, finance his full [*788] contractor's fee. No construction account was ever opened, however, and Appel received no assurance that the contractor's fee could be paid. By that time Goodman's financial position had deteriorated causing him to withdraw and Appel felt the financial condition of the remaining Trojan partners was uncertain. Respondents who had invested substantial sums of money in the property [***12] and the project were then forced to sell the property to Chernoff, ostensibly because Sheldon withdrew. Substantial evidence supports the trial court's conclusions, and we are not, therefore, at liberty to tamper with the findings. ( *Stromerson* v. *Averill,* 22 Cal.2d 808, 815 [141 P.2d 732].) Appellant, which construed its obligation to perform as terminated, is entitled neither to damages nor attorney's fees.

(6a) Finally, appellant contends that the trial court incorrectly determined that it received payment of its invoice for $297.70. The evidence, however, supports the trial court's finding that this bill was satisfied when Joseph sent to Sheldon a check for the full amount on which appeared the legend "Trojan Towers - paid in full." Appel chose not to deposit that check, but retained it without notifying respondents that he would not accept it as payment in full even though at the time he received it the invoice for $297.70 was the only billing which Sheldon had sent Trojan. (7) Where a check is presented as payment and not refused, it is the duty of the payee to return it without unreasonable delay if he does not wish to cash it, in order to avoid the presumption that it [***13] constituted satisfaction of the obligation. ( *Western Pac. Land Co.* v. *Wilson,* 19 Cal.App. 338 [125 P. 1076].) (6b) Respondents discharged their obligation by tendering the check which was accepted by appellant without complaint; appellant cannot [**430] now be heard to complain. ( *Hohener* v. *Gauss,* 221 Cal.App.2d 797 [34 Cal.Rptr. 656]; *Duncan* v. *Standard Acc. Ins. Co.,* 1 Cal.2d 385, 390 [35 P.2d 523]; *Conde* v. *Dreisam Gold Min. Co.,* 3 Cal.App. 583, 589 [86 P. 825]; Civ. Code, § 1501; Code Civ. Proc., § 2076.)

The judgment is affirmed.

Wood P.J., and Lillie J., concurred.

EXHIBIT 31

LEXSEE 100 CAL APP 4TH 44

**STOREK & STOREK, INC., et al., Plaintiffs and Appellants, v. CITICORP REAL ESTATE, INC., Defendant and Appellant.**

**No. A093724**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION FIVE**

**100 Cal. App. 4th 44; 122 Cal. Rptr. 2d 267; 2002 Cal. App. LEXIS 4387; 2002 Cal. Daily Op. Service 6284; 2002 Daily Journal DAR 7838**

**July 15, 2002, Decided**
**July 15, 2002, Filed**

**NOTICE:**    [***1] Opinion certified for partial publication. *

    \* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.

**PRIOR HISTORY:**    Superior Court of Alameda County, No. 7320277, Richard A. Hodge, Judge.

**DISPOSITION:**    The judgment is reversed. Costs on appeal are awarded to Citicorp.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

    After a real estate development project failed, the disappointed investors sued a lender that had refused to continue financing the project, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraud by concealment. The first trial resulted in a hung jury. In a second trial, the jury found defendant liable for both fraud and breach of the implied covenant of good faith and fair dealing, awarding damages on both causes of action, and the trial court entered judgment thereon. (Superior Court of Alameda County, No. 7320277, Richard A. Hodge, Judge.)

    The Court of Appeal reversed the judgment in its entirety. In the published portion of the opinion, the court held that the judgment in favor of plaintiffs on the cause of action for breach of the implied covenant of good faith and fair dealing had to be reversed. The trial court instructed the jury that defendant's determination whether

the project budget was in balance should be evaluated for both reasonableness and good faith. However, the appellate court held that the budget determination, which was a condition precedent to defendant's performance under the contract, was a matter involving financial calculations, and thus was properly evaluated by an objective test--whether a reasonable person would be satisfied. The court held that no obligation to act in good faith could be implied to contradict or limit the express condition precedent. The only available challenge to defendant's determination was a challenge to its reasonableness, and such a challenge was a claim of nonperformance of the contract's express terms, not a claim of breach of the implied covenant. (Opinion by Stevens, J., with Jones, P. J., and Simons, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) (1e) Contracts § 45--Actions--Instructions--Breach of Implied Covenant of Good Faith and Fair Dealing--Where Duty to Act in Good Faith Conflicts with Express Contractual Term.** --In an action by investors in a failed real estate development project against a lender that refused to continue financing the project, the trial court erred in instructing the jury, as to plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing, that defendant's determination whether the project budget was in balance should be evaluated for both reasonableness and good faith. The budget determination, which was a condition precedent to defendant's performance under the contract, was a matter involving financial calculations, and thus

was properly evaluated by an objective test--whether a reasonable person would be satisfied. No obligation to act in good faith could be implied to contradict or limit the express condition precedent. The only available challenge to defendant's determination was a challenge to the reasonableness of that determination, and such a challenge was a claim of nonperformance of the contract's express terms, not a claim of breach of the implied covenant. Thus, the jury's verdict in favor of plaintiffs had to be reversed.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 734.]

**(2) Contracts § 25--Construction and Interpretation--Function of Courts--Questions of Law.** --Where there is no extrinsic evidence to indicate conflicting interpretations of the contract at issue, the appellate court must make an independent determination as to the obligations of each party.

**(3) Contracts § 44--Performance--Breach--Implied Covenant of Good Faith and Fair Dealing.** --Every contract imposes on each party a duty of good faith and fair dealing in the performance of the contract such that neither party may do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, the implied covenant of good faith and fair dealing cannot contradict the express terms of the contract. The scope of conduct prohibited by the covenant is circumscribed by the purposes and express terms of the contract.

**(4) Contracts § 41--Performance--Conditions Precedent--Waiver--Retraction.** --In the absence of consideration or estoppel, a waiver of a condition precedent may be retracted and the condition may be restored at any time.

**(5) Contracts § 41--Performance--Conditions Precedent--Party's Satisfaction--Subjective and Objective Tests.** --Where a contract provides that the satisfaction of one of the parties is a condition precedent to that party's performance, two different tests are recognized: (1) the party may make a purely subjective decision but it must be in good faith; or (2) the party must make the decision in accordance with an objective standard of reasonableness. In this context, a decision is unreasonable when it is arbitrary, capricious, or lacking in evidentiary support. A lack of good faith, on the other hand, suggests a moral quality, such as dishonesty, deceit, or unfaithfulness to duty. When the promisor has the power to make a purely subjective decision, that decision must be made in good faith, but the courts will not examine its reasonableness. Conversely, where the validity of the promisor's decision of satisfaction or dissatisfaction rests on

the reasonableness of the decision, the courts will not examine good faith. The choice of the objective or subjective test depends on the intent of the parties. In the absence of a specific expression, the preference of the law is for the less arbitrary reasonable person standard. It is especially preferable when factors of commercial value or financial concern are involved.

**(6) Contracts § 44--Performance--Breach--Implied Covenant of Good Faith and Fair Dealing--Subjective and Objective Components.** --The question whether a duty to act in good faith should be implied must be distinguished from the question whether a covenant of good faith that is implied has been breached. On the latter question, the concepts of objective reasonableness and subjective good faith merge. The implied covenant of good faith and fair dealing has both a subjective and objective component. A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable.

**(7) Contracts § 44--Performance--Breach--Implied Covenant of Good Faith and Fair Dealing--As Supporting Contract Action.** --A breach of the implied covenant of good faith and fair dealing will, by itself, support a contract action. Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract.

**COUNSEL:** Bien & Summers, Elliot L. Bien; Joseph R. Grodin; Tuttle & Taylor, Douglas W. Beck, E. Robert Wallach and Marshall W. Krause for Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Kimberly A. Bliss; Shearman & Sterling, R. Paul Wickes, Amanda J. Gallagher, Adam S. Hakki and Meghan O. Powell for Defendant and Appellant and for Defendant and Respondent.

**JUDGES:** (Opinion by Stevens, J., with Jones, P. J., and Simons, J., concurring.)

**OPINION BY:** STEVENS

**OPINION**

[*47]  [**270]  **STEVENS, J.**

This lawsuit arises out of a failed real estate development project. The disappointed investors sued the lender, who had refused to continue financing the project, alleging breach of the implied covenant of good faith and fair dealing and fraud in the inducement of the loan agreement. The jury awarded plaintiffs [***2]  $

100 Cal. App. 4th 44, *; 122 Cal. Rptr. 2d 267, **;
2002 Cal. App. LEXIS 4387, ***; 2002 Cal. Daily Op. Service 6284

900,001 on the contract claim and $ 40.92 million for fraud. We conclude that the judgment must be reversed.

## I. FACTS

Three limited partnerships formed and controlled by Glenn and Richard Storek (the Storeks) and collectively referred to as "Old Oakland" undertook a redevelopment project in downtown Oakland to restore and convert several 19th-century Victorian buildings into office and retail space. Storek & Storek, Inc., also owned by the Storeks, was the project architect, developer, and building manager.

To fund the project, Old Oakland borrowed $ 30 million in 1984 from the City of Oakland. The city, in turn, raised that money by issuing industrial development bonds backed by letters of credit from [**271] Citibank.[1] As security for Old Oakland's agreement to reimburse Citibank for any draws on the [*48] letters of credit, Citibank obtained a deed of trust on Old Oakland's property and junior deeds of trust on two pieces of San Francisco property owned by other partnerships controlled by the Storeks--a commercial building at 530 Bush Street and another at 50 Grant Avenue.

> 1   The city had initially authorized $ 55 million for a larger project, but ultimately the city issued only $ 30 million in bonds.

[***3] By 1988 it became clear that the bond funds would be insufficient to complete the project, and Old Oakland approached Citicorp Real Estate, Inc. (Citicorp), a subsidiary of Citibank, to request a loan. In August 1989 the parties entered into a construction loan agreement (loan agreement) by which Citicorp agreed to lend Old Oakland up to $ 8.9 million.[2]

> 2   At that time the Storeks had various grievances with Citibank, including claims that the bank had demanded excessive collateral for its letters of credit, that it had refused to loan the full $ 55 million bond authorization, and that it had endangered the tax-exempt status of the bonds by forcing Old Oakland to use proceeds from the sale of limited partnership interests before any more bond proceeds were disbursed. Under the terms of the loan agreement, Old Oakland released Citibank from any and all claims and liability arising out of the bond transactions. (Loan agreement, § 8.26.)

The renovation project at this point was in the leasing stage, [***4] and the loan agreement provided detailed monthly budgets for the use of funds for the anticipated costs to complete the leasehold improvements. The total costs were projected to be $ 15.4 million for construction and financing, with the funding to come from a combination of the Citicorp loan, equity contributions, and Old Oakland's operating income. The equity contributions included $ 3.8 million to be obtained from refinancing the Storeks' property at 530 Bush Street plus an additional $ 1 million to be raised by Old Oakland through a tax credit syndication. In the period prior to signing of the loan agreement, Citicorp made two bridge loans to Old Oakland, totaling $ 5.1 million, to enable construction to continue. When the property at 530 Bush Street was eventually refinanced (by an unrelated lender), the bridge loans were repaid and $ 3.8 million in capital was put into Old Oakland.

Citibank (the parent corporation) already held deeds of trust on the Old Oakland project property and the San Francisco properties as security for the bonds. As security for the loan agreement, Citicorp received a second deed of trust on the Old Oakland property and junior liens on the properties at [***5] 530 Bush Street and 50 Grant Avenue. Moreover, the loan agreement gave Citicorp tight control over disbursements of the loan proceeds to ensure adherence to the project budget. Each month, Old Oakland was required to submit a request for disbursement of loan funds together with progress [*49] schedules and a current (revised) project budget. (Loan agreement, § 3.01.)[3] Old Oakland represented that the loan funds, together with additional funds provided by Old Oakland, would "at all times be sufficient" to complete the project. The loan agreement authorized Citicorp to require Old Oakland to raise additional capital "[i]f at any time the Lender determines (in the Lender's sole judgment) that such funds to be deposited are not or shall not be sufficient to pay all of such costs and to satisfy such interest obligations . . . ." (§ 2.02(b).)

> 3   Unless otherwise indicated, all further section references refer to the construction loan agreement, dated August 18, 1989.

Under section 3.02 of the loan agreement, [***6] Citicorp's obligation to make any [**272] disbursements was subject to a number of conditions precedent, including the following conditions significant to this appeal: First and foremost, the project budget was required to be "in balance" such that "No determination shall have been made by the Lender that the undisbursed amount of the Loan is less than the amount required to pay all expenses in connection with Completion of the Construction Improvements, including, but not limited to, any extra Work, unless the Borrower shall have deposited in the Construction Account an amount at least equal to the amount of such deficiency . . . ." (§ 3.02(a)(ii).)

Second, Citicorp's obligation to disburse loan funds arose only if the contractually defined "leasing criteria" were met. That is, with its monthly request for disburse-

ments, Old Oakland was required to deliver an executed lease of the space to be improved plus the proposed specifications and cost breakdowns for the tenant improvements, and the costs were not to exceed $ 16.56 per square foot of retail space or $ 35 per square foot of office space. (§§ 3.01(c)(ii)(F), 3.02(a)(xii).)

A third condition to Citicorp's obligation to disburse [***7] the loan funds was that "No Event of Default or Potential Default shall have occurred and be continuing." (§ 3.02(a)(i).) A default, in turn, was defined by the loan agreement to include any proceeding for bankruptcy or receivership for the properties secured by Citibank's deeds of trust if an order for relief remained in effect beyond 60 days. (§ 7.01(d).) Such default would automatically terminate Citicorp's obligation to disburse loan funds. (§ 7.01(s)(5).) A default also included the occurrence of any default under the agreements for reimbursement of the bond funds or any default on the San Francisco properties. (§ 7.01(o), (p), (q), (s).) Such a default terminated Citicorp's obligation to make further loan disbursements upon Citicorp's written notice. (§ 7.01(s)(5).)

[*50] For the first three months after the loan agreement was executed, from August to November 1989, Citicorp disbursed funds totaling $ 3.8 million to reimburse Old Oakland for expenditures incurred back to January 1989. In November 1989, however, Citicorp received a report from its construction monitor that the tenant improvement costs were running "very much over the [original] budget" and that the [***8] available funds would be insufficient to complete the project. For one thing, a shortfall existed because Old Oakland had never raised the $ 1 million in equity capital called for by the project budget. Moreover, Old Oakland had been unable to obtain significant contributions from tenants toward the leasehold improvements. And further, the construction monitor reported that the tenant improvements exceeded the contractual limits on the cost per square foot and projected that the costs to build out future spaces would have the same cost overruns. Extrapolating from the current cost overruns, the construction monitor calculated future cost overruns to be several million dollars.

On November 6, 1989, Citicorp notified Old Oakland that its September requisition would not be funded because the expenses were over budget. On November 25, Citicorp outlined the actual and projected cost overruns and further noted Old Oakland's lack of operating income. Citicorp was aware that the costs for the early tenants were frequently higher than for later tenants. Citicorp asked Old Oakland to submit a plan for bringing the budget into balance, either by showing that it had raised additional funds or [***9] had identified sufficient cost savings. Old Oakland's written responses ac-

knowledged that the budget was out of balance. However, the [**273] Old Oakland representatives complained to Citicorp that some of the cited "excess" tenant improvements had been completed before the loan agreement was executed and that Citicorp had full knowledge of those costs beforehand and had paid the requisitions.

Old Oakland never submitted a written plan for bringing the project budget into balance. However, in January 1990, the Storeks submitted a written proposal for funding above the $ 8.9 million budget of the loan agreement in order to complete the project. This proposal had two alternative plans. One would expand the project to include restaurants and entertainment sites in addition to the office and retail space and would entail new financing of $ 9.5 million. [4] The secondary plan would increase the funding for tenant improvements to meet higher-than-expected costs as a means to attract stronger tenants. Even this smaller plan called for $ 5.6 million in additional [*51] funding. The Storeks had various ideas for obtaining the new funding, none of which involved a new loan from Citicorp.

> 4  This expansion of the project had been proposed before, but Citicorp had declined to provide the additional financing until Old Oakland acquired more tenants and established some steady income.

[***10] According to plaintiffs' evidence at trial, during the negotiations leading to the loan agreement, the Storeks on behalf of Old Oakland had represented to Citicorp that $ 8.9 million would be sufficient to complete the project in a "plain vanilla" form. However, the Storeks informed Citicorp that more money would be necessary to expand the project or to upgrade the tenant improvements, and Citicorp assured the Storeks that the bank would "cooperate" to make Old Oakland a success. The Storeks testified that Citicorp showed some interest in the January 1990 expansion proposal but made no commitments. At the same time, the Storeks gave verbal assurances to Citicorp that the project could be completed in its "plain vanilla" form with the funds available.

On January 24, 1990, Citicorp informed Old Oakland that it was not in compliance with the loan agreement and that Citicorp would not fund the project until Old Oakland's "timely infusion of sufficient equity to complete Tenant Improvements in progress." In particular, Citicorp's letter advised Old Oakland that Citicorp would not waive the contractual conditions precedent for funding. Nevertheless, Citicorp did subsequently disburse [***11] some additional funds for past requisitions, totaling $ 3.3 million, despite its determination that the project budget was out of balance. [5]

100 Cal. App. 4th 44, *; 122 Cal. Rptr. 2d 267, **;
2002 Cal. App. LEXIS 4387, ***; 2002 Cal. Daily Op. Service 6284

5    Notwithstanding any failure of a condition precedent, Citicorp was allowed to make disbursements if it determined, in its sole discretion, that making the disbursements would be advisable. However, the making of a disbursement without satisfaction of all conditions precedent would not constitute a waiver of such conditions with respect to subsequent disbursements. (§ 3.02(b).)

In April 1990 Old Oakland informed Citicorp that it had been unable to obtain any new funding. In May 1990, an unrelated lender (California Federal Savings and Loan Association) filed a complaint for appointment of a receiver and for foreclosure against 50 Grant Avenue--property that had been pledged to Citibank as security for the bonds. Under the terms of the loan agreement, a receivership lasting more than 60 days constituted a default. (§ 7.01(d).) Hence by July a default [***12] in the loan agreement had occurred. In August 1990 the partnership owning the 50 Grant Avenue building filed for bankruptcy. This event again placed Old Oakland in default under the loan agreement, as did the subsequent bankruptcy of 530 Bush [**274] Street. (§ 7.01(c).) The two San Francisco properties were eventually foreclosed by their respective senior lenders.

On August 31, 1990, Citicorp notified Old Oakland that it was in default under the loan agreement "for lack of financial reporting, material adverse [*52] change in the condition of the borrower, bankruptcy of related collateral, and the Borrower's failure to maintain the collateral free of liens" and that no further loan funds would be disbursed. At that point, Citicorp had disbursed all but $ 900,001 of the agreed-upon $ 8.9 million.

Earlier, Citicorp had automatically (without a requisition from Old Oakland) disbursed loan funds each quarter to Citibank to pay the interest on the $ 30 million bonds that had been issued by the city. In September 1990, however, Citicorp refused to make the disbursement from the loan proceeds. The bond trustee then made a demand on Citibank pursuant to its letters of credit, and Citibank paid the [***13] interest of $ 385,201. Citibank then demanded reimbursement from Old Oakland, but Old Oakland was unable to meet the demand inasmuch as Citicorp had cut off the funds. This event, too, constituted a default under the loan agreement. (§ 7.01(o), (p), (q).)

To avoid an actual default on the bonds, Citicorp arranged to pay the interest from its own assets and then charged it as a "soft cost allocation" to the construction loan account. An affiliate of Citibank eventually purchased all the bonds.

On September 7, 1990, Citibank sent Old Oakland a notice of default under its reimbursement agreement based on Old Oakland's failure to reimburse the interest on the bonds, and Citicorp sent Old Oakland a notice of default under the loan agreement based on Old Oakland's default under the reimbursement agreement with Citibank. On September 13 Citicorp recorded a notice of default and subsequently filed a complaint for judicial foreclosure of its deed of trust on the Old Oakland property. Citicorp's internal "action plan" reflects that Citicorp waited to proceed to foreclosure until after the leased space had been outfitted for the tenants and occupied. On December 9, the court found Old [***14] Oakland in default and appointed a receiver. On December 15, Old Oakland filed for bankruptcy. The bankruptcy court allowed Citibank to foreclose its deed of trust, and at the foreclosure sale an affiliate of Citibank (Oakland Victorians Realty, Inc.) purchased the property with a full credit bid of $ 6 million. At that point, Citibank did put money into the project to complete the construction.

## II. PROCEDURAL HISTORY

In 1994 the present lawsuit was filed against Citicorp and Citibank by the bankruptcy trustees for Old Oakland, for 530 Bush Street, and for 50 Grant Avenue, and by Storek & Storek, Inc. Subsequently, a group of Old Oakland investors (Glenn Storek and 39 limited partners) purchased the claims from the bankruptcy trustees and were substituted in as plaintiffs. The complaint [*53] alleged causes of action for, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraud by concealment.

The first trial resulted in a hung jury. In the course of that first trial, Citicorp moved for nonsuit, and the trial court expressed doubt whether plaintiffs had established a breach of contract arising from Citicorp's [***15] failure to disburse the loan funds. Thereafter, plaintiffs dismissed their cause of action for breach of the loan agreement. They also dismissed other [**275] causes of action for breach of fiduciary duty, conversion, and intentional interference with prospective economic advantage. The matter went to the jury only on plaintiffs' causes of action for breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraud by concealment. Storek & Storek, Inc., and the partnerships owning 530 Bush Street and 50 Grant Avenue, who were not parties to the loan agreement, proceeded only on fraud.

It was plaintiffs' theory that Citibank and Citicorp deliberately engineered the collapse of Old Oakland. Plaintiffs contended that Citicorp entered into the loan agreement without any intent to finance the project fully but merely to keep the renovation project going until Old Oakland suffered a monetary default on the bonds so that Citibank could foreclose. Plaintiffs asserted that Citicorp

100 Cal. App. 4th 44, *; 122 Cal. Rptr. 2d 267, **;
2002 Cal. App. LEXIS 4387, ***; 2002 Cal. Daily Op. Service 6284

intended to use the budget balance provisions of the loan agreement unjustifiably to benefit Citibank so as to cut off the funding, thereby precipitating foreclosure and enabling an affiliate to [***16] acquire the Old Oakland property for a fraction of its value. In support of that theory, plaintiffs argued that Citicorp deliberately set the cost limitations for tenant improvements at such a low level that Citicorp could make an out-of-balance determination at any time. Plaintiffs also emphasized evidence that Citicorp's out-of-balance determination in November 1989 was based on cost overruns on tenant improvements that had already been completed before the loan agreement was signed. Further, plaintiffs pointed to evidence that after making the out-of-balance determination Citicorp continued to fund items that would benefit its own interests (i.e., "hard" costs for physical improvements plus interest payments to Citibank on the bonds) while cutting off "soft" costs (such as the salaries for the leasing staff) that were needed to keep the project operational.

At the conclusion of the second trial, by special verdict the jury found Citicorp liable and awarded Old Oakland $ 900,001 for breach of the implied covenant of good faith; and awarded Old Oakland, the partnership owning [*54] 530 Bush Street, and Storek & Storek, Inc., $ 40.92 million for fraud. [6] The trial court ruled that [***17] because only Citicorp was a party to the loan agreement, only the assets of Citicorp would be considered for calculating punitive damages, not the assets of Citibank. This ruling was deemed a directed verdict for Citibank. The trial court also granted a directed verdict for Citicorp on punitive damages, ruling that plaintiffs were ineligible for punitive damages because they were assignees of the original plaintiffs. The trial court denied Citicorp's motions for judgment notwithstanding the verdict and for a new trial, and judgment was entered in favor of plaintiffs aggregating $ 41.82 million. Citicorp appeals. Plaintiffs cross-appealed and also filed a separate appeal from the post-judgment order on attorney fees. We consolidated the two appeals.

   [6] The fraud damage award consisted of $ 22.62 million for Old Oakland, $ 13.4 million for 530 Bush Street, and $ 4.9 million for Storek & Storek, Inc. The jury found no fraud in connection with 50 Grant Avenue.

## III. DISCUSSION

### A. Breach of Covenant of Good Faith

[***18] The first issue before us pertains to the jury's verdict on the cause of action for breach of the implied covenant of good faith and fair dealing. At the outset, it bears emphasizing that plaintiffs' only contract claim was that Citicorp breached the *implied* covenant;

plaintiffs dismissed their cause of action for breach of the *express* terms of the loan agreement.

[**276]  (1a) Plaintiffs' claim was that Citicorp's determinations beginning in November 1989 that the project budget was out of balance were made in bad faith and that Citicorp breached the implied covenant of good faith and fair dealing when it withheld the loan funds based on those bad faith determinations. The jury obviously agreed and awarded plaintiffs $ 900,001 for breach of the implied covenant of good faith—exactly the amount of funds left undisbursed from the $ 8.9 million loan. [7] Citicorp now maintains that the judgment must be reversed because as a matter of law there could be no breach of the implied covenant of good faith and fair dealing when its offending conduct—withholding loan disbursements—was authorized by the express terms of the contract. [8]

   [7]   The loan agreement precluded an award of consequential damages, such as lost profits, for a breach of the contract. (§ 8.25.) Hence, the parties stipulated that plaintiffs' damages on the contract claim were limited to $ 900,001, and the jury awarded just that amount.
[***19]
   [8]   We initially concluded that Citicorp had waived the point by failing to present the issue to the trial court for decision. On rehearing, however, we are persuaded that Citicorp's motions in the first trial for summary judgment, nonsuit, and judgment, together with its proposed jury instructions in the second trial, adequately preserved the issue for review.

Plaintiffs respond by mischaracterizing Citicorp's argument as a challenge to the sufficiency of the evidence to support the jury's finding of a breach of [*55] the covenant of good faith. Plaintiffs mistakenly presume that the question whether the covenant of good faith contradicted the express terms of the loan agreement was a question of fact for the jury. (Indeed, the issue was presented to the jury under the instructions set out in fn. 9, *post.*) However, we conclude that the issue posed by Citicorp is a question of law that requires us to examine whether Citicorp owed a duty to act in good faith when deciding whether to disburse the loan funds. The essential historical facts were undisputed. Moreover, there was no dispute [***20] as to the meaning of the decisive terms of the loan agreement. (2) Under these circumstances, when there was no extrinsic evidence to indicate conflicting interpretations of the contract, we make an independent determination as to the obligations of each party under the contract. ( *Parsons v. Bristol Development Co.* (1965) 62 Cal. 2d 861, 865-866 [44 Cal. Rptr. 767, 402 P.2d 839].) As we will explain, we conclude

that Citicorp was required to make only an objectively reasonable determination that the project budget was not in balance; Citicorp had no duty to act in subjective good faith when making that determination.

   (3) It has long been recognized, of course, that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. ( *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal. 4th 1, 36 [44 Cal. Rptr. 2d 370, 900 P.2d 619].) The Supreme Court has clarified, however, that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. [***21] ( *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal. 4th 342, 374 [6 Cal. Rptr. 2d 467, 826 P.2d 710] (*Carma*).) [9]

> 9   The jury here was so instructed: "In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party impliedly agrees not to do anything to destroy or injure . . . . the right of the other to receive the benefits of the contract. Thus, each party has the duty not to prevent or hinder performance by the other party. [P] However, the law does not imply any promise or duty that is contrary to the express terms of the written agreement between the parties."

[**277]   In *Carma*, a commercial lease expressly gave the lessor the right to terminate the lease and recapture the leasehold upon notice of the tenant's intent to sublet. After the tenant relocated its headquarters out of the area, it submitted a notice of intent to sublet approximately 80 percent of the premises. The lessor responded with a notice of termination [***22] and then (unsuccessfully) pursued negotiations of a new lease with the proposed subtenant, seeking to secure for itself the higher rents. The tenant obtained a [*56] judgment for breach of the implied covenant of good faith and fair dealing, but the Supreme Court directed that judgment be entered in favor of the lessor. The court held as a matter of law that because the lessor's termination of the lease was expressly permitted by the lease and clearly within the parties' expectations, such conduct could never violate an implied covenant of good faith and fair dealing. ( *Carma, supra,* 2 Cal. 4th at pp. 351, 371-376.)

   The *Carma* court reasoned as follows: "It is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [P] . . . [P] We are aware of no reported case in which a court has held the covenant of good faith may be read to

prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] 'The general rule [regarding [***23] the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [P] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." [Citation.] . . . [P] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.' [Citation.]" ( *Carma, supra,* 2 Cal. 4th at pp. 373-374; see also *New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal. App. 4th 495, 504-505 [80 Cal. Rptr. 2d 286].) [10]

> 10   Similarly, it has been held that the implied covenant of good faith and fair dealing does not impose an affirmative duty on a party to forbear from enforcing rights expressly given under the contract. ( *Price v. Wells Fargo Bank* (1989) 213 Cal. App. 3d 465, 479 [261 Cal. Rptr. 735].) The plaintiffs in *Price* had obtained a secured loan from a bank that was repayable, according to the promissory note, six months after the loan was made. After the due date, the plaintiffs initiated discussions to restructure the loan, but the bank insisted on repayment and eventually began foreclosure proceedings. The plaintiffs made no claim that the bank breached any express contractual obligations, but they argued that the bank breached the implied covenant of good faith and fair dealing "by taking a 'hard line' in repayment negotiations." The court rejected that theory and upheld the grant of summary judgment in favor of the bank: "The necessary implication of appellants' argument is that the bank owed them a duty of reasonable forbearance in enforcing its creditor's remedies. They do not, however, cite any authority supporting this proposition, and we are aware of none. Contracts are enforceable at law according to their terms. The covenant of good faith and fair dealing . . . . does not impose any affirmative duty of moderation in the enforcement of legal rights. The equitable doctrines of estoppel or waiver may, of course, bar unfair tactics in the enforcement of agreements, but appellants have not raised any such equitable defenses." ( *Price, supra,* at p. 479.)

[***24] [**278] **(1b)** In the present case, Citicorp was expressly authorized by section 3.02(a)(ii) of the loan agreement to withhold loan funds if the project budget [*57] was "out of balance" such that the anticipated expenses exceeded available funds. Clearly it was within the parties' expectations that Citicorp would regularly determine whether the project budget was in balance. Under section 3.01 of the loan agreement, Old Oakland was required to submit along with its monthly requests for disbursements a current project budget and "evidence satisfactory to the Lender" that the leasing criteria had been met. The obvious purpose for this documentation was to enable Citicorp to make its determination whether the conditions precedent had been met for disbursement of the loan funds.

The offending conduct of the defendant was likewise expressly allowed under the contract in *Third Story Music, Inc. v. Waits* (1995) 41 Cal. App. 4th 798 [48 Cal. Rptr. 2d 747] (*Third Story Music*). There the parties had an agreement whereby Warner Communications agreed to manufacture, sell, distribute, and advertise the works of Tom Waits, but the agreement further provided that Warner "may at our election refrain from any or all of [***25] the foregoing." ( *Id.* at p. 801.) The plaintiff sued for breach of the implied covenant of good faith and fair dealing, claiming that Warner had impeded the plaintiff from receiving the benefits of the contract, but the court affirmed the trial court's sustaining of Warner's demurrer. The court concluded as a matter of law that because the agreement gave Warner discretionary power and expressly allowed Warner to refrain from marketing the Waits recordings, Warner had no duty of good faith in exercising its discretion. ( *Id.* at pp. 808-809.)

The court's analysis in *Third Story Music* is instructive and compelling. After a thorough review of the case law, the court explained that when a party is given absolute discretion by express contract language, the courts will imply a covenant of good faith and fair dealing to limit that discretion in order to create a binding contract and avoid a finding that the promise is illusory. However, when the contract is adequately supported by adequate consideration regardless of the discretionary power, there is no need to impose a covenant of good faith in order to create mutuality. "The conclusion to be drawn is [***26] that the courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." ( *Third Story Music, supra,* 41 Cal. App. 4th at p. 808.)

In *Third Story Music,* the court noted that Warner's promise to market the Waits recordings at its election would have been an illusory promise had it [*58] been

the only consideration given, and a promise to use good faith would have necessarily been implied in order to make it enforceable. However, because Warner gave other consideration--a promise to pay a guaranteed minimum amount no matter what efforts were undertaken--a covenant of good faith was not necessary to render the agreement binding. Accordingly, the court held that Warner owed no duty to act in good faith when exercising the discretion expressly granted to it by the contract. (See [**279] also *PMC, Inc. v. Porthole Yachts, Ltd.* (1998) 65 Cal. App. 4th 882, 891-892 [76 Cal. Rptr. 2d 832].)

In the present case, Citicorp contends *Carma* and *Third Story Music* [***27] are controlling because Citicorp, too, had absolute discretion under the loan agreement to refrain from making loan disbursements. **(4)** (See fn. 11.) We disagree with Citicorp in this respect. [11] Under the plain language of the loan agreement, Citicorp's obligation to make the loan disbursements was not discretionary; Citicorp's obligation was *conditional* upon the fulfillment of a condition precedent, namely, Citicorp's satisfaction that the project budget was in balance. [12]

> 11 Oddly, plaintiffs asserted below that Citicorp had discretionary power and was obligated to exercise that power in good faith. On appeal, however, plaintiffs now contend that Citicorp had no discretion under the loan agreement. Yet, at the same time, plaintiffs present the argument that Citicorp, while it did not have discretion, did have "leeway" to determine whether the loan was out of balance and that Citicorp was obligated to use good faith in exercising its "leeway." We reject the contention.
>
> The "leeway" possessed by Citicorp was nothing more than the election available to any contracting party to waive a condition precedent to performance. That is, Citicorp had the option to waive the balance requirement, and the record indicates, of course, that Citicorp several times did so and made loan disbursements even though it had determined the project budget was out of balance. Under the express terms of the loan agreement such disbursements did not constitute a waiver of the conditions precedent to subsequent disbursements. (*Ante,* fn. 5.) Moreover, under general contract principles, in the absence of consideration or estoppel, a waiver of a condition precedent may be retracted and the condition may be restored at any time. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 769, p. 695.) Under the circumstances here, Citicorp was free to insist that the condition precedent be satisfied

and the project budget be in balance before further loan proceeds were disbursed.

[***28]

12   There was no dispute at trial that Citicorp's obligation to disburse the funds was conditional upon Old Oakland's compliance with the conditions precedent.

In its briefs on appeal, Citicorp recognizes the conditional nature of its obligation, asserting that the loan disbursements were conditioned upon Old Oakland's provision of $ 1 million in equity capital plus its adherence to the contractual cost limitations. Unlike the latter, the former was not an express condition precedent. Old Oakland's obligation to contribute $ 1 million was not included in the text of the loan agreement; it appeared only as a budget line item as an equity contribution. Old Oakland's obligation to make that equity contribution must be seen as part of the overarching condition that the budget be in balance.

(5) When, as here, a contract provides that the satisfaction of one of the parties is a condition precedent to that party's performance, two different [*59] tests are recognized: (1) the party may make a purely subjective decision but it must be made in good faith; or (2) the party must make the decision in accordance [***29] with an objective standard of reasonableness. ( *Mattei v. Hopper* (1958) 51 Cal. 2d 119, 123 [330 P.2d 625] (*Mattei*); *Tiffany v. Pacific Sewer Pipe Co.* (1919) 180 Cal. 700, 702 [182 P. 428]; *Guntert v. City of Stockton* (1974) 43 Cal. App. 3d 203, 209 [117 Cal. Rptr. 601] (*Guntert*); *Kadner v. Shields* (1971) 20 Cal. App. 3d 251, 259 [97 Cal. Rptr. 742] (*Kadner*).) In this context, reasonableness and good faith are distinct concepts. A decision is unreasonable when it is arbitrary, capricious, or lacking in evidentiary support. A lack of good faith, on the other hand, suggests a moral quality, such as dishonesty, deceit, or unfaithfulness to duty. ( *Guntert, supra,* at pp. 210-211.) When the promisor has the power to make a purely subjective decision, that decision must be made in good faith, but the courts will not examine its reasonableness. ( *Hall v. Webb* (1924) 66 Cal. App. 416, 422-424 [226 P. 403] [**280] [as long as riparian owners honestly determined their water supply was lessened, it was immaterial whether that determination was illogical or incorrect]; see also *Locke v. Warner Bros., Inc.* (1997) 57 Cal. App. 4th 354, 363 [66 Cal. Rptr. 2d 921] [***30] (*Locke*); *Schuyler v. Pantages* (1921) 54 Cal. App. 83, 86-87 [201 P. 137] (*Schuyler*).) Conversely, when the promisor's satisfaction is evaluated under the objective test, the validity of the promisor's decision of satisfaction or dissatisfaction rests only on the reasonableness of the

decision; the courts will not examine good faith. ( *Guntert, supra,* at p. 211.)

*Guntert* illustrates the latter point. In that case, the city leased certain waterfront property to a tenant, but the lease allowed the city to terminate the lease when the city council was satisfied with a development proposal for the property from a third party. In a lawsuit by the tenant, the trial court found that the city terminated the lease unreasonably and in bad faith when it failed to inquire into the feasibility of the third party's development proposal or its ability to finance it. ( *Guntert, supra,* 43 Cal. App. 3d at p. 207.) The appellate court upheld the trial court's decision on the ground that the city acted unreasonably, but the court declined to examine whether the city acted in good faith, finding reasonableness to be the only standard by which [***31] to evaluate the city council's satisfaction with the development proposal. ( *Id.* at pp. 211, 217.)

The choice of objective or subjective test to evaluate a promisor's satisfaction depends upon the intent of the parties, as expressed in the language of the contract. In the absence of a specific expression in the contract or one implied from the subject matter, the preference of the law is for the less arbitrary reasonable person standard. ( [*60] *Guntert, supra,* 43 Cal. App. 3d at pp. 209-213; *Kadner, supra,* 20 Cal. App. 3d at pp. 262-263.) The reasonableness test is especially preferable when factors of commercial value or financial concern are involved, as distinct from matters of personal taste. ( *Kadner, supra,* at pp. 264-267; see also *Mattei, supra,* 51 Cal. 2d at p. 123.) Here, of course, the contract was a commercial transaction involving the lending of money. The decision to be made by Citicorp as to whether the project budget was in balance was a matter entirely of financial concern and had no implications for aesthetics or other aspects of personal taste.

The present case is distinguishable from [***32] *Locke, supra,* 57 Cal. App. 4th 354, which involved matters of artistic judgment. In that case, a movie studio had an agreement with actress Sondra Locke that gave the studio the right of first refusal over Locke's movie project proposals and the right to use her services as a director. When the studio declined to develop any of her proposals, Locke sued for breach of contract, claiming the agreement was a sham. The appellate court reversed the trial court's grant of summary judgment and held that a question of fact existed on whether the studio violated the implied covenant of good faith and fair dealing. The development agreement allowed the movie studio to make its own subjective creative decisions about Locke's movie proposals, and the court applied the general principle that when a condition of a promisor's duty is subjective satisfaction with the promisee's performance, the promisor is nonetheless required to exercise his subjec-

tive judgment honestly and in good faith pursuant to the implied covenant of good faith and fair dealing. ( *Id.* at pp. 363, 367.) The court found the rule of *Carma* and *Third* [**281] *Story Music* inapplicable because the development [***33] agreement "did not give [the movie studio] the express right to refrain from working with Locke. Rather, the agreement gave [the studio] discretion with respect to developing Locke's projects. The implied covenant of good faith and fair dealing obligated Warner to exercise that discretion honestly and in good faith." ( *Locke, supra,* at p. 367, italics omitted.)

Because the decision of the movie studio involved matters of artistic judgment, *Locke* applied the *subjective* test for determining the satisfaction of the movie studio as a condition precedent to its performance. That test allows the promisor to make a purely subjective decision, as long as the promisor exercises its subjective judgment in good faith. (See also *Schuyler, supra,* 54 Cal. App. at pp. 85-87 [contract to produce vaudeville act].) **(1c)** Here, however, in contrast to *Locke,* the determination of Citicorp involved matters of financial calculations. The proper method for evaluating Citicorp's satisfaction with the budget balance was the *objective* test--whether a reasonable person would be satisfied.

[*61] The rationale behind the two tests for evaluating a promisor's satisfaction [***34] relates to the familiar issue of whether a promise is illusory. When a condition precedent to a performer's performance calls for satisfaction as to commercial value, the contract is not illusory because the promisor's ability to claim dissatisfaction is limited by the standard of reasonableness. On the other hand, when the promisor's satisfaction deals with matters of fancy, taste, or judgment, the promisor's judgment is purely subjective. The covenant of good faith is implied in order to set a limit on the promisor's ability to express dissatisfaction and thereby supply adequate consideration to support the contract. ( *Mattei, supra,* 51 Cal. 2d at pp. 123-124.)

Parallel reasoning applies when the promisor is expressly given absolute discretion to perform and when the promisor's performance is expressly conditional upon the promisor's satisfaction. In both instances, courts will imply a covenant of good faith to limit the promisor's express contractual authority only when necessary to create mutuality. ( *Mattei, supra,* 51 Cal. 2d at pp. 123-124; *Third Story Music, supra,* 41 Cal. App. 4th at p. 809.) When, as in *Third Story Music,* the [***35] promisor has discretion to perform but has given other consideration or, when, as here, the promisor's performance is conditional on his objectively reasonable satisfaction, then the promisor's ability to avoid performance is sufficiently curtailed, the promise is not illusory, and the covenant of good faith and fair dealing need not be implied to create a binding promise.

This analysis leads us to conclude that Citicorp owed no duty of good faith in determining whether the conditions precedent to its performance had been fulfilled. The loan agreement was a freely negotiated contract entered into by sophisticated business entities. Under the terms of that contract, expressly agreed to by Old Oakland, Citicorp's obligation to disburse the loan funds was conditional on its objectively reasonable determination that the project budget was in balance. No obligation to act in good faith can be implied to contradict or limit that express condition precedent. No inquiry into good faith can be made.

**(6)** (See fn. 13.) **(1d)** In our view, the jury was incorrectly instructed to evaluate Citicorp's determination regarding the loan balance for [**282] both reasonableness *and* good faith: [13] "A contract may give one [***36] of the parties discretionary power to take certain actions to protect its interests or to make [*62] sure that it will receive the benefits of the contract. When the contract does this, the implied promise of good faith and fair dealing requires the party to act in good faith and to deal fairly with the other party in deciding whether to use that discretionary power and in deciding what actions to take. This means that the party who is given a discretionary power to do something to protect its own interests may not use that discretionary power to unreasonably or unfairly harm the other party or to deprive the other party of the benefits of the contract. [P] For example, with regard to the [loan agreement] out-of-balance provision, [*Citicorp] was required to act reasonably and in good faith in determining whether the loan was or was not out of balance.*" (Italics added.) [14] We hold to the contrary. Citicorp had no duty to act in good faith in determining whether the condition precedent to its performance had been fulfilled. Citicorp was required only to act reasonably.

13    The question whether a duty to act in good faith should be implied must be distinguished from the question whether a covenant of good faith that is implied has been *breached.* On the latter question, the concepts of objective reasonableness and subjective good faith do merge. The Supreme Court has said that the implied covenant of good faith and fair dealing has both a subjective and an objective component--subjective good faith and objective fair dealing. "A party violates the covenant if it subjectively lacks belief in the validity of its act *or* if its conduct is objectively unreasonable." ( *Carma, supra,* 2 Cal. 4th at p. 372; italics added.) "[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." ( *Id.* at p. 373; see also *Badie v. Bank of America* (1998)

100 Cal. App. 4th 44, *; 122 Cal. Rptr. 2d 267, **;
2002 Cal. App. LEXIS 4387, ***; 2002 Cal. Daily Op. Service 6284

67 Cal. App. 4th 779, 796 [79 Cal. Rptr. 2d 273].)

[***37]

14  On appeal, Citicorp makes no challenge to that instruction. Indeed, the instruction would have been correct had the implied covenant of good faith been applicable here. (See *ante*, fn. 13.) We decline to find that Citicorp has waived the error. Citicorp makes the same point on appeal in a more roundabout way by asserting both that its decision whether the loan was out of balance must be evaluated under the objective test and that the implied covenant of good faith cannot be applied here.

Consequently, the only available challenge to Citicorp's determination that the project budget was not in balance was a challenge to the reasonableness of that determination. Such a challenge, however, is a claim of nonperformance of the express terms of the contract, not a claim of breach of the implied covenant. That is, if Citicorp's out-of-balance determination was arbitrary and unsupported by the facts, plaintiffs' remedy was to seek damages for Citicorp's breach of its express obligation to make the loan disbursements. As mentioned, *ante*, plaintiffs did initially seek such relief. In opposition [***38] to Citicorp's motion for nonsuit, plaintiffs explained their theory that Citicorp [**283] breached the express terms of the loan agreement "by its failure to timely fund the requisitions starting in November 1989." They argued that the condition precedent to funding--the determination that the budget was not out of balance--was excused because Citicorp "exercised that discretionary power unreasonably and in bad faith." (7) (See fn. 14.) Soon thereafter, plaintiffs dismissed their claim for breach of the specific terms of the contract, impliedly conceding there was no such breach, and pursued only [*63] their claim for breach of the implied covenant of good faith. [15] Whether Citicorp breached the express terms of the contract was not an issue before the jury.

15  We do not suggest, of course, that a breach of the implied covenant of good faith and fair dealing may occur only with a breach of a specific provision of the contract. The opposite is true: a breach of the implied covenant, by itself, will support a contract action. "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." ( *Carma, supra,* 2 Cal. 4th at p. 373.) We hold only that plaintiffs' remedy was necessarily limited to a breach of the express terms of the contract inasmuch as no covenant to act in good faith can be applied to Citicorp's funding decisions [***39] .

(1e) Citicorp mistakenly asserts that the ultimate issue in this appeal is whether Citicorp's out-of-balance determination was objectively reasonable. Because that issue was not properly before the jury on the claim of breach of the implied covenant of good faith, we have no need to analyze whether Citicorp's determination was in fact objectively reasonable. We observe, however, that plaintiffs conceded below that the conditions precedent to funding had not been met. Plaintiffs relied instead on the general rule of contract law that if a party prevents or makes impossible the happening of a condition precedent, the condition is excused. ( *Parsons, supra,* 62 Cal. 2d at pp. 868-869; *Jacobs v. Tenneco West, Inc.* (1986) 186 Cal. App. 3d 1413, 1418 [231 Cal. Rptr. 351]; see generally 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 765, p. 692.)

At plaintiffs' request, the jury was instructed as follows: "The [loan agreement] contains several conditions that the Old Oakland partnerships had to meet before [Citicorp] was obligated to advance or lend them money under the terms of the [loan agreement]. These [***40] conditions must have been met before [Citicorp] was obligated to make loans under the [loan agreement], unless [Citicorp] wrongfully prevented or made it impossible for the Old Oakland partnerships to meet these conditions."

In accordance with that rule, plaintiffs asserted that Citicorp's short funding after November 1989 prevented Old Oakland from attracting new tenants and new investors, hindered Old Oakland from raising needed new capital, prevented Old Oakland from paying its contractors and vendors, prevented payment of the interest on the bonds, and required the Storeks to drain funds from their San Francisco properties to make up the funding shortfalls, ultimately leading to the receivership and bankruptcies on the San Francisco properties.

Yet, plaintiffs' assertions pertain to a claim of breach of the express terms of the contract, not a breach of the implied covenant of good faith and fair [*64] dealing. If Citicorp had prevented the loan from being in balance, then the condition precedent would be excused and Citicorp would be liable for breach of its *express* obligation to make the loan disbursements. That legal theory, however, was not pursued in this litigation. [16] [***41] Plaintiffs abandoned their claim for breach of express provisions of the contract and pursued only their claim for breach of the implied covenant. Likewise, the instruction given on this point pertained to the question whether Citicorp [**284] breached the express provisions of the contract by failing to make the loan disbursements--an issue not before the jury; it had no bearing on the implied covenant of good faith and fair dealing and should not have been given.

100 Cal. App. 4th 44, *; 122 Cal. Rptr. 2d 267, **;
2002 Cal. App. LEXIS 4387, ***; 2002 Cal. Daily Op. Service 6284

16   Plaintiffs also made the point at trial that in its November 1989 determination that the project budget was out of balance, Citicorp should not have used cost overruns which existed even before the loan agreement was executed. The leasing criteria set out in the loan agreement required that Old Oakland's "[*p*]*roposed* . . . cost breakdowns for the [tenant] improvements" be within the limits on the costs per square foot. (§ 3.02(a)(xii)(2), italics added.) Plaintiffs maintain that this language precludes consideration of *past* expenditures. This claim, again, is a claim of breach of the express terms of the contract, not breach of the implied covenant of good faith and fair dealing.

[***42]  In conclusion, we hold that a covenant of good faith and fair dealing cannot be implied so as to prohibit Citicorp from doing what it was expressly permitted to do under the loan agreement--withhold the loan funds when the conditions precedent to its performance had not been fulfilled to its satisfaction. Citicorp had no duty to act in good faith when making its determination of satisfaction; it was required only to make an objectively reasonable decision. The judgment on the cause of action for breach of the implied covenant of good faith must necessarily be reversed.

B. *Fraud* *

* See footnote, *ante*, page 44.

IV. DISPOSITION

The judgment is reversed. Costs on appeal are awarded to Citicorp.

Jones, P. J., and Simons, J., concurred.

EXHIBIT 32

1 of 1 DOCUMENT

**JONATHAN R. TALCOTT, Respondent, v. WILLIAM MEAKIN et al., Appellants**

Civ. No. 1416

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT**

26 Cal. App. 293; 146 P. 897; 1915 Cal. App. LEXIS 264

January 12, 1915, Decided

**PRIOR HISTORY:**    [***1] APPEAL from a judgment of the Superior Court of Alameda County. William H. Donahue, Judge.

**DISPOSITION:**    The judgment appealed from is affirmed.

**HEADNOTES**

Foreclosure of Mortgage--Pleading--Sufficiency of Complaint.--In a suit to foreclose a mortgage, where the complaint alleged the execution of the defendants' promissory note to the plaintiff for a specified sum, and the contemporaneous execution of a mortgage by the defendants as security for the payment of the obligation of the note, the note was alleged to have been made, dated, and delivered to the plaintiff on a certain date and it was not disputed that, as against a general demurrer, it appeared with sufficient certainty from the allegations of the complaint as a whole that the obligation of the note had matured and was due and payable at the time of the commencement of the action, there was no error in overruling defendants' demurrer.

Id.--Mortgage--Pleading Substance of Sufficient.--In such a case the complaint was not demurrable on the ground of uncertainty merely because it did not set out *in haec verba* the mortgage in suit, where it purported to plead in substance and legal effect the terms, conditions, and covenants of the mortgage, including the covenant concerning attorney's fees, as a contract may be declared on either *in haec verba*, or in substance and according to its legal effect.

Id.--Nonpayment--Sufficiency of Allegation.--In such a case an allegation of nonpayment of the obligation was sufficient as against a general demurrer which was in the following form: "That there has been paid on said note or obligation on account of interest the sum of $ 250.00, and that nothing further has been paid on account of principal or interest or otherwise."

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** Henry L. Ford, and A. Q. Lomba, for Appellants.

Vance McClymonds, and Dudley Kinsell, for Respondent.

**OPINION**

[*293] [**897] THE COURT. There was no error committed by the trial court in the overruling of the defendant's demurrer. The plaintiff's complaint alleged the execution of the defendants' promissory note to the plaintiff for a specified sum, and the [*294] contemporaneous execution of a mortgage by the defendants as security for the payment of the obligation of the note. The note in suit was alleged to have been made, dated, and delivered to the plaintiff on the twenty-third day of October, 1907; and it is not disputed that, as against a general demurrer, it appears with sufficient certainty from the allegations of the complaint [**898] as a whole that the obligation of the note had matured and was due and payable at the time of the commencement of the action.

The plaintiff's complaint was not demurrable on the ground of uncertainty, etc., merely because [***2] it did not set out *in haec verba* the mortgage in suit. The plaintiff's complaint purported to plead in substance and legal effect the terms, conditions, and covenants of the mortgage, including the covenant concerning attorneys' fees; and a contract may be declared on either *in haec verba*, or in substance and according to its legal effect. ( *Stoddard* v. *Treadwell*, 26 Cal. 294; *Love* v. *Sierra Nevada etc. Mining Co.*, 32 Cal. 639, [91 Am. Dec. 602]; *Murdock* v. *Brooks*, 38 Cal. 596; *White* v. *Soto*, 82 Cal. 654, [23 Pac. 210].)

26 Cal. App. 293, *; 146 P. 897, **;
1915 Cal. App. LEXIS 264, ***

The demurrer upon the ground of insufficiency of facts pleaded to constitute a cause of action was general in its terms; and it is conceded to have been directed solely to the point that the complaint was fatally defective in not containing a sufficient allegation of nonpayment of the obligation evidenced by the note and secured by the mortgage in suit. The allegation of the complaint in this behalf is as follows: "That there has been paid on said note or obligation on account of interest the sum of two hundred and fifty ($ 250) dollars, and that nothing further has been [***3] paid on account of principal or interest or otherwise."

This averment means more than the mere conclusion of the pleader. It was the statement of an ultimate fact, because in effect it declared that of the aggregate of the sum due for principal and interest upon the note at the time of the commencement of the action no part thereof had been paid save and except the sum of two hundred and fifty dollars.

The judgment appealed from is affirmed.

EXHIBIT 33

LEXSEE 39 CAL.3D 18

**MICHAEL L. TENZER, Plaintiff and Appellant, v. SUPERSCOPE, INC., Defendant and Respondent**

**L.A. No. 31842**

**Supreme Court of California**

*39 Cal. 3d 18*; *702 P.2d 212*; *216 Cal. Rptr. 130*; *1985 Cal. LEXIS 293*

**July 25, 1985**

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.

**DISPOSITION:** The judgment is reversed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A corporation director brought an action against the corporation based on its refusal to pay him a finder's fee for finding a buyer of corporation real estate. The director alleged an oral promise by the corporation president and board chairman to pay him a 10 percent finder's fee, that he acted in reliance upon the promise, and that he suffered damage as a result. The trial court granted the corporation's motion for summary judgment based on the provision in the statute of frauds requiring an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission to be in writing and subscribed by the party to be charged or by his agent (*Civ. Code, § 1624, subd. 5*). (Superior Court of Los Angeles County, No. C 376037, Sara Kleban Radin, Judge.)

The Supreme Court reversed. It held that, although there is no finder's fee exception to the statute of frauds set forth in *Civ. Code, § 1624, subd. 5*, and that the action would therefore ordinarily be barred, the director's allegations entitled him to invoke the doctrine of estoppel to plead the statute of frauds. Further, it held that the unenforceability of the promise as a contract due to the statute of frauds did not preclude the cause of action for fraud. However, it held that proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud, but rather that something more than nonperformance would be required to prove the defendant's intent not to perform the promise. The court held that, on remand, the director would be required to prove that the finder's fee agreement was fair and reasonable to the corporation in order to prove that his reliance on the promise of the finder's fee was justifiable. It held that establishing whether the agreement was fair and reasonable would involve determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to the facts. It held that these would be functions mainly for the trier of facts. Finally, it held that, on remand, if the director's reliance on the promise of a finder's fee was unjustified, equity would not require that the director be allowed to enforce the promise. Thus, in order to invoke the doctrine of estoppel to plead the statute of frauds, the director would, on remand, have to establish that his behavior was reasonably consistent with his fiduciary role. (Opinion by Grodin, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Frauds, Statute of § 6--Agreements for Lease or Sale of Real Property--Finder's Fee.** --There is no finder's fee exception to the requirement that an agreement authorizing or employing an agent, broker, or any other person to find a purchaser or seller of real estate for compensation or a commission must be in writing and subscribed by the party to be charged or by

39 Cal. 3d 18, *; 702 P.2d 212, **;
216 Cal. Rptr. 130, ***; 1985 Cal. LEXIS 293

his agent (*Civ. Code, § 1624, subd. 5*).

**(2a) (2b) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute--Finder's Fee.** --In an action by a corporation director alleging breach of an oral contract for payment by the corporation of a finder's fee for finding a buyer of corporation real estate, the trial court erred in granting the corporation's motion for summary judgment, based on the statute of frauds. Although the action would ordinarily be barred by the provision in the statute of frauds applying to finder's fees agreements (*Civ. Code, § 1624, subd. 5*), the director alleged that he was not a licensed real estate broker, that he supplied the corporation with the name of a buyer in reliance on the promise of payment made by the corporation president and board chairman, and that this was valuable information which he could have sold elsewhere. On these allegations, the director was entitled to invoke the doctrine of estoppel to plead the statute of frauds.

**(3) Frauds, Statute of § 11--Operation of Statute--Estoppel to Assert Statute.** --The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment.

**(4a) (4b) Frauds, Statute of § 8--Operation of Statute--Effect on Action for Fraud.** --In an action in which a corporation director alleged that the corporation president and board chairman, acting for the corporation, deliberately misled the director by falsely orally promising to compensate him for his services in finding a buyer of corporation real estate, that the director acted in reliance upon these misrepresentations, and that he suffered damage as a result, the trial court erred in granting the corporation's motion for summary judgment on the cause of action for fraudulent misrepresentation. Although the finder's fee agreement was unenforceable under the statute of frauds (*Civ. Code, § 1624, subd. 5*), the unenforceability of an allegedly fraudulent promise as a contract due to the statute of frauds does not preclude an action for fraud. (Disapproving the rule stated in *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, *Keely v. Price (1972) 27 Cal. App. 3d 209, 215 [103 Cal. Rptr. 531]*, *Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]*, and *Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854]*.)

**(5) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Necessity of Evidence of Intent to Mislead.** --To survive a motion for nonsuit (*Code Civ. Proc., § 581c*) in an action on a fraudulent promise, the plaintiff must produce evidence of the promisor's intent to mislead him. Proof that a promise was made and that it was not fulfilled is not sufficient to prove fraud. Rather, something more than nonperformance is required to prove the defendant's intent not to perform his promise. (Disapproving *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488]* and *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994]* to the extent that they suggest otherwise.)

**(6) Summary Judgment § 21--Hearing and Determination--Issues Precluding Judgment--Illustrations.** --In an action by a corporation director against the corporation based on its refusal to pay the director a finder's fee for finding a buyer of corporation real estate, the trial court erred in granting the corporation's motion for summary judgment based on its contention that the director acted as a real estate broker and could not recover because he was not licensed (*Bus. & Prof. Code, § 10136*). Whether the director acted as a broker was a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations.

**(7) Compromise, Settlement, and Release § 8--Compromise and Release--Requisites and Validity--Extinction of Obligation Without Consideration--Showing of Creditor's Intent.** --A written release under *Civ. Code, § 1541*, extinguishing an obligation without consideration, must expressly show the creditor's intent to extinguish the obligation.

**(8) Corporations § 34--Officers and Agents--Directors--Contracts With Corporation.** --A director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent. Directors' dealings with the corporation are subjected to rigorous scrutiny, and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

**(9)    Corporations    §    34--Officers    and
Agents--Directors--Contracts           With
Corporation--Corporation's Option to Avoid.** --A
corporate director is charged with the knowledge that any
contract he entered into with his own corporation, even if
valid and enforceable in all other respects, could be
avoided at the corporation's option if it were determined
to be unfair or unreasonable to the corporation.

**(10) Estoppel and Waiver § 6--Equitable Estoppel.**
--Estoppel is an equitable remedy and, as such, will only
be applied to avoid injustice.

**COUNSEL:** Merle H. Horwitz, Herbert A. Bernhard and
Greenberg, Bernhard, Weiss & Rosin for Plaintiff and
Appellant.

Nossaman, Guthner, Knox & Elliott and Alvin S. Kaufer
for Defendant and Respondent.

**JUDGES:** Opinion by Grodin, J., expressing the
unanimous view of the court. Bird, C. J., Mosk, J., Kaus,
J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**OPINION BY:** GRODIN

**OPINION**

[*21]  [**213]  [***131]  Plaintiff Michael L.
Tenzer (Tenzer) appeals from a judgment in favor of
defendant Superscope, Inc. (Superscope) after the trial
court granted Superscope's motion for summary
judgment.

[*22]  Facts

The facts, as revealed by Tenzer's complaint [1] and
the papers filed in support of and in opposition to the
motion for summary judgment, are these:

Superscope is a corporation listed on the New York
Stock Exchange and authorized to do business in
California. Joseph Tushinsky is the president of the
corporation, as well as the chairman of its board of
directors.

1    In its motion for summary judgment,
Superscope argued that, even if all the facts
alleged in Tenzer's complaint and supporting
papers were true, he was entitled to no relief as a
matter of law. For this reason, Superscope

submitted no factual declarations to counter the
truth of Tenzer's allegations.

Tenzer has been involved in a management capacity
in the real estate and housing industries in the western
part of the United States for 20 years. Although he has
extensive personal and business contacts among investors
in the real estate field, Tenzer is not a licensed real estate
broker.

Tenzer and Tushinsky served together on the board
of directors of a charitable organization in Los Angeles.
Sometime prior to May of 1979, they began to discuss the
possibility that Tenzer should become a member of the
Superscope board of directors (Board).

On May 10, 1979, at Tushinsky's invitation, Tenzer
attended a Board meeting. At this meeting Tenzer
learned, for the first time, that Superscope was attempting
to sell its corporate headquarters to meet pressing
cashflow problems. The next day, Tenzer was elected to
the Board at the corporation's annual meeting. At a
Board meeting the same day, the need to sell the
corporation's headquarters was again discussed.

The next meeting of the Board occurred on June 22,
1979. At this meeting, the outside directors, [2] including
Tenzer, first learned the details of Superscope's financial
predicament. The Board was informed that the
corporation was technically in default on over $ 45
million in loans and that the corporation's banks were
threatening to accelerate payment on these loans. The
Board was also told that a cash sale of the corporate
headquarters was imperative to avoid reorganization
pursuant to the federal Bankruptcy Act. The
headquarters building, together with other property and
facilities including a warehouse, parking lot, and adjacent
undeveloped acreage, had been on the real estate market
for nearly a year, but Superscope's real estate broker had
not yet been able to effect a sale. The asking price for the
property was approximately $ 16 million. At this
meeting, Tushinsky expressed [*23] his view that the
situation was desperate and that a miracle was needed to
save the corporation.

2    An outside director is a director who has no
interest or other duties in the corporation other
than as a director.

Subsequently, Tushinsky, in a phone conversation,
implored Tenzer personally to [**214] seek a suitable

39 Cal. 3d 18, *23; 702 P.2d 212, **214;
216 Cal. Rptr. 130, ***131; 1985 Cal. LEXIS 293

buyer for the property. Shortly afterwards, Tenzer became aware that Paul Amir, a Beverly Hills-based entrepreneur, was interested in negotiating a quick-closing real estate purchase for tax reasons. The Superscope headquarters appeared to be precisely the sort of property which would suit Amir's needs. Tenzer discussed the Superscope property with Amir without revealing its identity and verified that Amir might be interested in buying it.

With this information in hand, Tenzer telephoned Tushinsky. He explained that he was calling not in his capacity as a Board member, but as a finder, that he had located a potential buyer for the corporate headquarters and that, should the sale be consummated, he would expect a finder's fee of 10 percent. Tushinsky responded enthusiastically, authorizing Tenzer to discuss the matter further with his contact. Tushinsky also indicated that payment of a [***132] finder's fee was entirely proper, that the requested fee was satisfactory, and that if a $ 16 million sale were to close when expected, Tenzer's fee would be earned and payable upon the closing.

Neither Tenzer nor Tushinsky discussed the need to reduce the finder's fee agreement to writing. Tenzer felt that their personal relationship and Tushinsky's integrity were sufficient assurance that he would be paid. In reliance upon Tushinsky's promise, Tenzer then revealed each party's identity to the other.

The Board accepted Amir's offer in July 1979. A contract for the sale of Superscope's headquarters to Amir was consummated in August, and the sale was ultimately closed.

Tenzer was aware of other real estate opportunities for Amir, but he refrained from exploring such opportunities on Amir's behalf in reliance upon Tushinsky's promise that he would receive a finder's fee from the Superscope sale. Prior to the Board's approval of the Amir transaction, Tenzer informed it that he was entitled to a finder's fee in the event of a sale to Amir. He did not, however, reveal the amount of the finder's fee to which Tushinsky had agreed. [3] Tenzer took no part in the deliberations concerning or in the vote approving acceptance of Amir's offer.

[3]    Tenzer felt that it was Tushinsky's duty to disclose to the Board the amount of the finder's fee. He asserts that a fee of 10 percent was reasonable given the precarious financial condition of Superscope and the fact that the sale saved Superscope from bankruptcy.

[*24] At the July 27, 1979, Board meeting at which the sale to Amir was approved, a discussion regarding the payment of finders' fees to directors was held, but a final decision on the issue was deferred to the next Board meeting on August 24, 1979. At the August meeting, a motion was made to authorize the payment of finders' fees to corporate directors. Tenzer maintains that the discussion involved only whether such fees would be approved for future transactions, and did not touch upon approval of the finder's fee arrangement he had already made with Tushinsky. He believed that the Board had ratified that arrangement when it accepted Amir's offer in July. In any case, Tenzer participated in the August discussion and voted on the motion. Part of the discussion centered upon whether such fees were permitted under the corporate bylaws. [4] All outside directors [**215] voted in favor of the resolution authorizing payment of finders' fees. All the "inside" directors (including corporate employees and members of the Tushinsky family) voted against. The resolution was defeated. Tenzer has never received a finder's fee for his services in connection with the Amir transaction.

[4]    Superscope's bylaws provide in pertinent part as follows:

"Article III

"Directors

"Section 1: Powers. . . . [para. ] Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the directors shall have the power and authority to: [para. ] (a) Select and remove all officers, agents, and employees of the corporation, . . . and . . . fix their compensation . . . .

"Section 14: Fees and Compensation of Directors. Directors . . . may receive such compensation, if any, for their services, . . . as may be fixed or determined by resolution of the board of directors. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for such services."

39 Cal. 3d 18, *24; 702 P.2d 212, **215;
216 Cal. Rptr. 130, ***132; 1985 Cal. LEXIS 293

Tenzer filed suit against both Superscope and Tushinsky. He alleged three "causes of action" which he entitled "Breach of Contract and Unjust Enrichment," "Estoppel," and "Fraud." The complaint further alleged that, in making the promise to pay him a 10 percent finder's fee, Tushinsky had acted as the agent of the corporation, and that he made the promise fraudulently, with no intent to perform. Rather, Tenzer alleged, Tushinsky intended to cheat him by inducing him to reveal Amir's name [***133] while secretly harboring an intent to prevent payment of the agreed fee.

After a hearing on the merits, Superscope's motion for summary judgment pursuant to *Code of Civil Procedure section 437c* was granted. [5] Tenzer filed a timely appeal from the judgment in favor of Superscope. For the reasons stated below, we reverse.

> 5    Tushinsky is not a party to the judgment entered below or to this appeal.

[*25] Discussion

Tenzer's contentions on appeal may be summarized as follows:

1. There is a finder's fee exception to the statute of frauds contained in *Civil Code section 1624, subdivision 5.* Therefore, an oral contract to pay a finder's fee in a real estate transaction is enforceable.

2. Even if the statute of frauds would normally preclude enforcement of an oral finder's fee contract, in this case Tenzer performed in reliance upon the agreement and Superscope retained the benefits. This should operate as an estoppel to assert the statute of frauds as a defense.

3. Because of Tushinsky's misrepresentations, Tenzer may maintain an action for fraud even if the underlying oral agreement is unenforceable.

4. Summary judgment was inappropriate because of the presence of triable issues of fact.

As explained further below, we find that, liberally construed, the papers Tenzer submitted in opposition to the motion for summary judgment are sufficient to raise triable issues of fact as to the second and third of these contentions. Thus summary judgment was inappropriate. (See, e.g., *Corwin v. Los Angeles Newspaper Service Bureau, Inc. (1971) 4 Cal.3d 842, 851-852 [94 Cal. Rptr.*

*785, 484 P.2d 953].*) However, we find no merit in Tenzer's first argument.

I.

*Civil Code section 1624,* provides in pertinent part as follows: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 5. An agreement authorizing or employing an agent, broker, or any other person to . . . find a purchaser or seller of real estate . . . for compensation or a commission; . . ."

**(1)** In his first cause of action, Tenzer attempts to claim damages based upon breach of an alleged oral contract employing him to find a purchaser of real estate for a commission. He does not allege that the contract was ever put in writing. Under the plain language of the statute this contract, if it was entered into, was invalid.

Tenzer argues that precedent establishes the statute is irrelevant to his claim. He cites several cases, including *Tyrone v. Kelley (1973) 9 Cal.3d 1 [*26] [106 Cal. Rptr. 761, [**216] 507 P.2d 65]; Rees v. Dept. of Real Estate (1977) 76 Cal. App. 3d 286, 295 [142 Cal. Rptr. 789]; and Spielberg v. Granz (1960) 185 Cal. App. 2d 283 [8 Cal. Rptr. 190],* for the proposition that there is a "finder's exception," both to licensing laws and the statute of frauds. He is in error. Those cases merely stand for the principle that a finder in a real estate transaction need not be licensed as a real estate broker to collect a finder's fee. They state nothing about a finder's exception to the statute of frauds. As noted in *Grant v. Marinell (1980) 112 Cal. App. 3d 617 [169 Cal. Rptr. 414],* the Legislature has gone to considerable lengths to clarify that finders' agreements such as this must be memorialized in writing to be enforceable:

"Before 1963, the so-called oral 'finder's agreement,' that is an agreement merely to introduce a seller of real estate to a prospective purchaser or a purchaser to a prospective [***134] buyer, was held not to be within the statute of frauds, whether such contract was made by a real estate broker or agent or by an unlicensed person. (See *Heyn v. Philips (1869) 37 Cal. 529, 531; Palmer v. Wahler (1955) 133 Cal. App. 2d 705, 710 [285 P.2d 8].*)

"In 1963, however, the Legislature amended subdivision 5 to add, inter alia, the italicized language: 'An agreement authorizing or employing an agent or

39 Cal. 3d 18, *26; 702 P.2d 212, **216;
216 Cal. Rptr. 130, ***134; 1985 Cal. LEXIS 293

broker to purchase or sell real estate, . . . *or to procure, introduce, or find a purchaser or seller of real estate* or a lessee or lessor of real estate where such lease is for a longer period than one year, for compensation or a commission.' (Stats. 1963, ch. 814, § 1 p. 1843.)

"If by this amendment the Legislature intended all finder's fee agreements to come within the ambit of the statute of frauds, it failed, as was predicted in the State Bar Journal's review of 1963 legislation (38 State Bar J. 604, 649). [Fn. omitted.] The section, as amended, was interpreted to bar only oral finder's agreements between licensed brokers or agents and sellers or purchasers of property. Subdivision 5, as revised, was still held to be inapplicable to oral agreements by unlicensed individuals. (See *Hasekian v. Krotz* (1968) 268 Cal. App. 2d 311, 317 [74 Cal. Rptr. 410]; *Porter v. Cirod, Inc.* (1966) 242 Cal. App. 2d 761, 766 [51 Cal. Rptr. 784].) This anomaly resulted in the 1967 amendment (Stats. 1967, ch. 52, § 1 p. 953), which added the following italicized language: 'An agreement authorizing or employing an agent, *or any other person* to purchase or sell real estate . . . or to procure, introduce or find a purchaser or seller . . . .'" (*d.*, at pp. 620-621, original italics.)

Tenzer also refers us to *Zalk v. General Exploration Co.* (1980) 105 Cal. App. 3d 786 [Cal. Rptr. 647], and a passage from *Tyrone v. Kelley, supra,* 9 Cal.3d 1, 12-13, but these decisions merely involve oral agreements [*27] for finder's fees in nonrealty transactions, and therefore are inapposite to this case.

We conclude that Tenzer's action based on contract would ordinarily be barred by the statute of frauds. **(2a)** Tenzer asserts, however, that even if the finder's fee agreement was oral, and in violation of the statute of frauds, he has alleged facts sufficient to invoke the estoppel doctrine and thus to foreclose Superscope from relying upon the statute of frauds as a defense. In brief, Tenzer alleges that Tushinsky -- as Superscope's representative -- promised to pay him for valuable information which could have been sold elsewhere. In reliance on this promise, Tenzer surrendered Amir's name. Superscope, having profited from Tenzer's performance, now refuses to keep its end of the bargain.

**(3)** The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment. ( *Monarco v.* [**217] *Lo Greco* (1950) 35 Cal.2d 621, 623-624 [220

P.2d 737].) On the basis of the factual contentions advanced in Tenzer's papers, Superscope has received the benefit of Tenzer's performance but relies upon the statute of frauds to avoid paying the agreed-upon price. Provided that Tenzer was not otherwise obligated to reveal this information to Superscope -- a point which we consider further, *infra* -- these allegations suggest a case of unjust enrichment as that term was defined in *Monarco v. Lo-Greco, supra, at page 624.* In such cases, the doctrine of estoppel to assert the statute of frauds may be applied in the interests of fairness.

**(2b)** Superscope argues that, as a real estate finder, Tenzer may not invoke the equitable doctrine of estoppel. It relies upon a series of cases which have established that "'an estoppel to plead the statute of frauds cannot be predicated upon the . . . refusal to comply with an oral promise to pay a [real estate] commission.'" ( *Keely v. Price* (1972) 27 Cal. App. 3d 209, 212 [***135] [103 Cal. Rptr. 531], quoting *Herzog v. Blatt* (1947) 80 Cal. App. 2d 340, 343 [180 P.2d 30]; see also *Hicks v. Post* (1908) 154 Cal.22 [96 P. 878]; *King v. Tilden Park Estates* (1958) 156 Cal. App. 2d 824 [320 P.2d 109]; *Augustine v. Trucco* (1954) 124 Cal. App. 2d 229 [268 P.2d 780]; *White v. Hirschman* (1942) 54 Cal. App. 2d 573 574 [129 P.2d 430]; *Sweeley v. Gordon* (1941) 47 Cal. App. 2d 381 [118 P.2d 14].)

Superscope's reliance is misplaced. The cases it cites all involved licensed real estate brokers. The rationale for rigorous application of the statute of frauds to bar claims by licensed real estate brokers is related to the statutory licensing requirements. "Real estate brokers are licensed as such only after they have demonstrated a knowledge of the laws relating to real estate transactions (*Bus. & Prof. Code, §§ 10150, 10153*), and it would seem that they [*28] would thus require less protection against pitfalls encountered in transactions regulated by those laws. In *Pacific Southwest Dev. Corp. v. Western Pac. R. R. Co.* [1956] 47 Cal.2d 62 [301 P.2d 825], the court stated at page 70: 'Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral promises of defendant, and it has no cause for complaint if its efforts go unrewarded.'" ( *Franklin v. Hansen* (1963) 59 Cal.2d 570, 575 [30 Cal. Rptr. 530, 381 P.2d

386]; see also *Jaffe v. Albertson Co. (1966) 243 Cal. App. 2d 592, 603-604 [53 Cal. Rptr. 25]; King v. Tilden Park Estates, supra, 156 Cal. App. 2d 824, 830.*) [6]

> 6   We note that the rules withholding traditional equitable remedies, such as recovery in quantum meruit and the doctrine of estoppel, from real estate brokers have been vigorously criticized. (See, e.g., Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal. L. Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1:54, pp. 69-74, fn. 8.) Miller and Starr suggest that this issue may be due for reexamination in light of changed conditions in the real estate field. (*Ibid.*) In today's market, they assert, brokers often deal with sophisticated principals in superior bargaining positions. In such circumstances, the broker is powerless to compel the principal's cooperation in executing a written commission agreement and denial of the broker's claim for a commission based on failure to comply with the requirements of the statute of frauds is unjust. Whether or not there is merit in these arguments, we reserve for another day the question whether licensed brokers may invoke equitable remedies to avoid the sometimes harsh results of the statute of frauds. As noted above, the question is not presented in this case.

This rationale is inapplicable to "finders," who need not be licensed brokers, or [**218] even involved in the real estate business professionally. We, therefore, decline to extend the scope of the *Keely* v. *Price* rule to unlicensed finders such as Tenzer. Tenzer is entitled to invoke the doctrine of estoppel to plead the statute of frauds. On the facts alleged, Superscope's motion for summary judgment was improperly granted.

II.

**(4a)** Tenzer's complaint also sets forth an alternative basis for relief, seeking damages for fraud. Tenzer alleges that Tushinsky, acting for Superscope, deliberately misled him by falsely promising to compensate him for his services as a finder. Tenzer acted in reliance upon these misrepresentations and has suffered damage. Therefore, Tenzer asserts that, regardless of whether the oral contract is enforceable, he may maintain an action in tort for fraudulent misrepresentation.

[*29] A series of cases have held that an action for fraud cannot be maintained where the allegedly fraudulent promise is unenforceable as a contract due to the statute of frauds. The rule was stated in [***136] *Kroger v. Baur (1941) 46 Cal. App. 2d 801, 803 [117 P.2d 50]*, as follows: "Appellant contends that his action is not upon the invalid agreement, but is an action for damages for fraud, upon the theory that the oral promise to pay him a commission was made without any intention of performing it and for the purpose of inducing him to waive a written memorandum. If the law can be thus nullified by the transparent device of predicating a tort action upon the invalid oral promise on the ground that the promisor did not intend to perform it, then the section might just as well be stricken from the statute. To license such a circuitous procedure to evade the provisions of such legislation would be to nullify and destroy its wholesome effect and the protection it affords against fraud." (See also *Keely v. Price, supra, 27 Cal. App. 3d 209, 215; Owens v. Foundation for Ocean Research (1980) 107 Cal. App. 3d 179 [165 Cal. Rptr. 571]; Beach v. Arblaster (1961) 194 Cal. App. 2d 145, 163 [14 Cal. Rptr. 854].*)

But the *Kroger* rule has been criticized and, in 1978, Justice Kaus -- then sitting on the Second District Court of Appeal -- invited this court to disapprove it. Today we accept his invitation.

As Justice Kaus observed: "Several considerations point to a demise of the *Kroger* rule . . . . In brief: 1. The 'better' rule is contra. *Comment (c) to section 530 of the Restatement Second of the Law of Torts* states that a misrepresentation of one's intention is actionable even 'when the agreement is oral and made unenforceable by the statute of frauds, or when it is unprovable and so unenforceable under the parol evidence rule.' 2. The broad statement of the *Kroger* rule is difficult to reconcile with the principle that a party may be estopped to assert the statute of frauds where such estoppel is necessary 'to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances.' ( *Monarco v. Lo Greco (1950) 35 Cal.2d 621, 623.*) 3. It is simply untrue that a plaintiff who undertakes to plead and prove actionable fraud is attempting to get around the statute of frauds by a 'transparent device.' *Kroger* seems to assume the inability of a jury to distinguish between an unkept

39 Cal. 3d 18, *29; 702 P.2d 212, **218;
216 Cal. Rptr. 130, ***136; 1985 Cal. LEXIS 293

but honest promise and one which the promisor never intended to perform. The law is otherwise. ( *People v. Ashley (1954) 42 Cal.2d 246, 263-264 [267 P.2d 271].*) 4. The provision of the statute of frauds which spawned *Kroger* was *Civil Code section 1624, subdivision 5*, relating to agreements for real estate brokers' commissions. The law has traditionally had little sympathy with the broker who has failed to sign up his client. (E.g., *Augustine v. Trucco (1954) 124 Cal. App. 2d 229, 237-238 [268 P.2d 780].*)" ( *Southern Cal. etc. Assemblies of God v. Shepherd* [*30] *of Hills etc. Church (1978) 77 Cal. App. 3d 951, 958, fn. 3 [144 Cal. Rptr. 46].*)

[**219] In addition, the *Kroger* approach is inconsistent with the general rule "'that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme.'" ( *Seymour v. Oelrichs (1909) 156 Cal. 782, 794 [106 P. 88],* quoting 2 Pomeroy's Equity Jurisprudence, § 921; see also *Moore v. Day (1954) 123 Cal. App. 2d 134, 138 [266 P.2d 51];* 3 Williston on Contracts (3d ed. 1960) § 533A, p. 802.)

(5) Nor do we agree with the view that the *Kroger* rule is necessary to prevent the nullification of the statute of frauds. This view is perhaps based upon the notion that, when the statute of frauds clearly bars an action in contract, a disappointed promisee should not be allowed to present his claim for compensation to a jury simply by recasting his complaint to include an allegation of misrepresentation. If it were, in fact, that easy to reach a jury on a claim of fraud, we might agree. Fortunately, this is not the case. To survive a motion for a nonsuit (*Code Civ. Proc., § 581c*), plaintiff in an action on a fraudulent promise must [***137] produce evidence of the promisor's intent to mislead him.

Some California cases have stated broadly that "[the] subsequent failure to perform as promised warrants the inference that defendant did not intend to perform when she made the promise. [Citations.]" ( *Santoro v. Carbone (1972) 22 Cal. App. 3d 721, 728 [99 Cal. Rptr. 488];* see also *Jarkieh v. Badagliacco (1946) 75 Cal. App. 2d 505, 509 [170 P.2d 994].*) This may suggest that proof that a promise was made and that it was not fulfilled is sufficient to prove fraud. This is not, and has never been, a correct statement of the law, and we disapprove the

cases cited to the extent they suggest otherwise.

Rather, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." ( *People v. Ashley (1954) 42 Cal.2d 246, 263 [267 P.2d 271];* see also *Jacobson v. Mead (1936) 12 Cal. App. 2d 75, 82 [55 P.2d 285]; Justheim Petroleum Company v. Hammond (10th Cir. 1955) 227 F.2d 629, 637; Rest.2d Torts, § 530, com. d.;* Prosser, Torts (5th ed. 1984) § 109, p. 764.) To be sure, fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. (Prosser, *supra,* at pp. 764-765.) However, [*31] if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury. The policies of the statute of frauds will not be subverted by affording plaintiffs who can prove actual fraud the opportunity to do so.

(4b) For these reasons, we disapprove of *Kroger* v. *Baur* and its progeny. We conclude that Tenzer's papers were sufficient to raise triable issues of fact on a cause of action for fraudulent misrepresentation.

III.

(6) In its motion for summary judgment, Superscope contended that, even if Tenzer had had a commission agreement, he acted as a real estate broker and cannot recover because he was not licensed. (*Bus. & Prof. Code, § 10136.*) Whether Tenzer acted as a broker is a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations. ( *Lyons v. Stevenson (1977) 65 Cal. App. 3d 595, 605-606 [135 Cal. Rptr. 457].*) (7) (See fn. 7.)The record does not permit adjudication of this factual question on a motion for summary judgment. [7]

[7]    Superscope also advanced a somewhat confused theory of "waiver"; alleging that, by giving misleading answers on questionnaires Superscope distributed in 1980 and 1981, Tenzer had waived his claim against the corporation.

The use of the term "waiver" in a contractual context is ambiguous and uninformative. (See

39 Cal. 3d 18, *31; 702 P.2d 212, **219;
216 Cal. Rptr. 130, ***137; 1985 Cal. LEXIS 293

generally 5 Williston on Contracts (3d ed. 1961) § 678, p. 238 et seq.) As Professor Williston notes, an agreement to discharge from liability previously incurred is more normally denominated a release. *Civil Code section 1541* permits the extinction of an obligation, unsupported by consideration, provided that the release is in writing. The writing must, however, expressly show the creditor's intent to extinguish the obligation. ( *Golden West Credit etc. Co. v. Wilson (1932) 119 Cal. App. 627, 636 [7 P.2d 345].*) In our view, Tenzer's answers on the 1980 and 1981 questionnaires express no such intent.

[**220] IV.

Finally, we address Superscope's contention that in light of Tenzer's fiduciary obligations as corporate director any reliance by him upon Tushinsky's promise was unreasonable as a matter of law.

At the time of the alleged agreement, Tenzer was a member of Superscope's Board. As such, he bore a fiduciary relationship to Superscope and to all its stockholders. ( *Remillard Brick Co. v. Remillard-Dandini (1952) 109 Cal. App. 2d 405, 419 [241 P.2d 66].*) **(8)** Well-established principles [***138] of corporations law hold that a "director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent." ( *Id., at p. 418.*) "[Directors'] dealings with the corporation are [*32] subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director . . . not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. [Fn. omitted.] If it does not, equity will set it aside." ( *Pepper v. Litton (1939) 308 U.S. 295, 306-307 [84 L. Ed. 281, 289, 60 S. Ct. 238].*) "[Transactions] that are unfair and unreasonable to the corporation may be avoided." ( *Remillard Brick Co., supra, at p. 418,* see also 1 *Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 103.01,* pp. 6-20.1-6-21.)

**(9)** As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's

option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation.

Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these facts. These are functions mainly for the trier of facts. (See *Mueller v. MacBan (1976) 62 Cal. App. 3d 258, 276 [132 Cal. Rptr. 222];* see also *MacEwen v. Star-Kist Foods, Inc. (E.D.N.Y. 1966) 251 F. Supp. 33.*)

For the guidance of the trial court in overseeing this factfinding process, we offer the following observations. In ever-increasing numbers, we derive our livelihoods from transactions in information rather than property or labor. In addition to real estate professionals, lawyers, bankers, and accountants, as well as consultants in any number of fields often sell what they *know* as much as what they *do.* Many of these same professionals serve as directors on the boards of corporations for which they also work. The ethics and wisdom of serving on the board of a corporation to which one regularly renders professional services has been questioned. (See Knepper, *Liability of Lawyer-Directors* (1970) 40 Ohio St. L.J. 341; see also Ruder, *The Case Against the Lawyer-Director* [**221] (1975) 30 Bus. Law. 41.) Yet the practice is widespread and has its defenders, who point out that corporations should not be deprived of the special skills such "interested directors" can provide, and that the potential for conflicts of interest can be avoided by full disclosure and establishment of procedures to assure conscientious adherence to ethical standards of fairness. (See, e.g., Note, *Should Lawyers* [*33] *Serve as Directors of Corporations for Which They Act as Counsel?* 1978 Utah L. Rev. 711.)

Certainly it would be unfair to require such directors to surrender gratuitously to their corporations information or advice for which they would otherwise be paid in the normal course of their business. At the same time, we discern nothing oppressive in the view that corporate directors should be required, as a facet of their role as fiduciaries, to pass on information vital to the survival of their corporations which either is incidental to the directors' usual mode of earning a living or was casually

39 Cal. 3d 18, *33; 702 P.2d 212, **221;
216 Cal. Rptr. 130, ***138; 1985 Cal. LEXIS 293

acquired.

The determination whether Tenzer's agreement with Tushinsky was fair and reasonable to Superscope involves evaluation of the specific facts surrounding the transaction. Was Tenzer dependent upon transactions of this sort for his livelihood? [***139] If so, was this fact known to Tushinsky? Was it known that, by revealing Amir's name to Superscope, Tenzer would be forgoing the opportunity to sell the same information in other quarters?

How did Tenzer become aware of Amir's interest in a deal of this sort? Directors may be more obligated freely to disclose information which "falls into their laps" than information obtained by employing the skills and resources normally used in their professions.

How did the price Tenzer asked for his information compare to the usual commission for such information in this real estate market? Did Superscope's bylaws specifically allow or prohibit compensation of directors for professional services? This list of questions is by no means exhaustive.

The answers to these questions are also pertinent to Tenzer's claim of estoppel to plead the statute of frauds. **(10)** Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice. If reliance upon Tushinsky's promise was unjustified in light of Tenzer's position as a director, equity does not require that Tenzer be allowed to enforce the promise. (See generally *Rest.2d Contracts, § 139.*) At the same time, this factual inquiry may establish that, because of his fiduciary relationship to the corporation, Tenzer was obligated to reveal his information without seeking compensation. If so, the corporation cannot be said to be unjustly enriched by retaining the benefits of Tenzer's information but refusing to pay for it. Thus, Tenzer will have to establish that his behavior was reasonably consistent with his fiduciary role in order to invoke the doctrine of estoppel.

Resolution of this issue requires information which, at this point, does not appear in the record. For this reason, we conclude that summary adjudication was inappropriate.

[*34] The judgment is reversed.

# EXHIBIT 34

LEXSEE 216 CAL. APP 3D 1379

**NANCY WAGNER, Plaintiff and Appellant, v. GLENDALE ADVENTIST MEDI-CAL CENTER, Defendant and Appellant**

**No. B041261**

**Court of Appeal of California, Second Appellate District, Division One**

**216 Cal. App. 3d 1379; 265 Cal. Rptr. 412; 1989 Cal. App. LEXIS 1331; 115 Lab. Cas. (CCH) P56,252**

**December 28, 1989**

**PRIOR HISTORY:**    [***1] Superior Court of Los Angeles County, No. NCC19631G, Joseph R. Kalin, Judge.

**DISPOSITION:**    The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

An employee of a medical center who was dismissed from her position as rehabilitation coordinator brought an action against the medical center. Her employment application form had stated that employment could be terminated by either party at will upon two weeks' notice. However, she alleged the existence of an implied agreement that her employment would be permanent. The trial court granted the medical center's motion for summary judgment. (Superior Court of Los Angeles County, No. NCC19631G, Joseph R. Kalin, Judge.)

The Court of Appeal affirmed. The court held that the "at will" provision in the employment application was a partial integration, i.e., a complete and final expression of this term of the parties' agreement, thus precluding any evidence of a prior or contemporaneous collateral agreement at variance with or in contradiction of this term. The court also held that an acknowledgment form attached to the employee's employee handbook, signed by her, and stating that employment was "at will" and policies could change, was not an integrated agreement. However, the court held, any error in the trial court's application of the parol evidence rule to this form did not warrant reversal of the judgment. The form reflected the employment agreement then in existence, mentioning only possible future change. The employee alleged an implied modification, based on the medical center's prior conduct, but there can be no implied con-tractual term completely at variance with an express term of a contract. (Opinion by Spencer, P. J., with Hanson and Devich, JJ. concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

(1) **Summary Judgment § 8--Affidavits--Construction.** --The party opposing a summary judgment has the burden of demonstrating that triable issues of material fact exist; unless that burden is met, summary judgment properly is granted. Because the summary procedure is drastic, any doubts concerning the propriety of the motion are resolved in favor of the opposing party. The papers filed on behalf of the moving party are strictly construed, while those of the opposing party are liberally construed. Since, the trial court's determination is one of law, based on the papers submitted, the reviewing court makes its own independent determination of the construction an effect of those papers.

(2) **Evidence § 62--Parol Evidence Rule--Integration and Merger.** --The parol evidence doctrine is based on the premise that the written agreement is the agreement of the parties. The law presumes a written contract supersedes all prior or contemporaneous oral agreements, and, where the writing is integrated, the presumption cannot be overcome. An integration may be partial, as well as complete; that is, the parties may intend that a writing finally and completely express certain terms of their agreement rather than the agreement in its entirety. The parol evidence doctrine applies equally to the partial integration. Neither a noncontractual writing, such as a

receipt or a mere memorandum, nor an incomplete writing is an integration.

**(3) Evidence § 62--Parol Evidence Rule-- Determination of Integration Question.** --The central question in determining whether a writing is integrated, and thus whether the parol evidence doctrine applies, is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. The question is one of law for resolution by the court.

**(4) Evidence § 69--Exception to Parol Evidence Rule-- Evidence of Consistent Collateral Agreement.** --The intent of the parties that a written agreement be integrated, i.e., a final and complete expression of one of more terms of an agreement, may be manifested even in the absence of an explicit statement to that effect and without signature. Thus, the court may consider evidence of surrounding circumstances and prior negotiations to determine whether the writing was intended as the final and complete expression of the parties' agreement. In determining the issue, the court must not only consider whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. However, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement. Further, the collateral agreement must be one that might naturally be made as a separate contract.

**(5a) (5b) Evidence § 62--Parol Evidence Rule-- Integration and Merger--"At Will" Provision in Employment Application.** --An "at will" provision in an employment application was a partial integration, i.e., a complete and final expression of this term of the parties' agreement, thus precluding any evidence of a prior or contemporaneous collateral agreement at various with or in contradiction of this term, There were not negotiations preceding completion and execution of the application, no evidence of any prior or contemporaneous collateral agreement, and no evidence of any contemporaneous personnel practices or employee guidelines to shed light on the actual terms of employment. Consistent language in later employee handbooks indicated that the employer and employee did not incorporate the "at will" provision into their employment contract.

**(6) Evidence § 67--Exceptions to Parol Evidence Rule- -Evidence in Aid of Interpretation--Surrounding Circumstances.** --To determine whether a provision is the final and complete expression of one term of an agreement, for purposes of applying the parol evidence rule, the court looks at the surrounding circumstances. The court must attempt to place itself in the same situation as

that in which the parties found themselves at the time of contracting. To do this, the court must receive provisionally all evidence offered to prove the intention of the parties, including evidence concerning any proffered prior or contemporaneous collateral agreement itself.

**(7a) (7b) (7c) (7d) Employer and Employee § 9.4-- Actions for Wrongful Discharge--Modification of "At Will" Provision--Parol Evidence.** --In an action against a medical center by a former employee alleging she was dismissed in violation of explicit and implied assurances, in modification of her employment contract, that she would not be dismissed without cause, any error in the trial court's application of the parol evidence doctrine did not warrant reversal of the summary judgment in favor of the medical center. As contended by the employee, an acknowledgment form attached to her employee handbook, signed by her, and stating that employment was "at will" and policies could change, was not an integrated agreement. However, it reflected the employment agreement then in existence, mentioning only possible future change. The employee's alleged implied modification was based on the medical center's previous conduct, and there can be no implied contractual term completely at variance with an express term of a contract.

**(8) Contracts § 37--Modification--By Conduct or Oral Representations.** --When a party has, through oral representations and conduct or custom. subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract.

**(9) Summary Judgment § 17--Counteraffidavits-- Sufficiency--Conflict With Admission.** --When a defendant can establish his defense with the plaintiff's admission sufficient to pass the strict construction test imposed on the party moving for summary judgment, the credibility of the admission is valued so highly that any contradicting affidavits may be disregarded as irrelevant, inadmissible or evasive. There is no reason to draw a distinction between an attempt to counter an admission by affidavit and an attempt to counter an admission by changing the content of an answer given by a party directly in the deposition, especially where there is no assertion that the original answer was incorrectly transcribed or the question was misleading or ambiguous. In both the changed affidavit and changed deposition cases, the credibility of the parties is held up for examination by the contradicting statements, the first of which constitutes a reliable admission against interest. The trial court

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

may accept the first and reject the second of these contrary positions.

**(10) Summary Judgment § 18--Counteraffidavits--Sufficiency--Conflict With Admissions of Party.** --In an action against a medical center by a former employee in which the medical center was able to establish from the employee's admissions in her deposition an utter lack of any substance to her claim of an implied or express agreement that her employment would be permanent, the trial court was entitled, in ruling on the medical center's motion for summary judgment, to disregard "corrections" the employee later made to this testimony and her summary judgment affidavit, where these corrections and the affidavit directly contradicted her deposition testimony.

**(11) Appellate Review § 161--Imposition of Sanctions for Frivolous Appeal--Abandonment of Cross-appeal Without Explanation.** --On appeal of a summary judgment in favor of a medical center in an action against it by a former employee alleging she was dismissed in violation of explicit and implied assurances, in modification of her employment contract, that she would not be dismissed without cause, there was no basis for an award of frivolous-appeal sanctions against the medical center on the ground of its having sought sanctions pursuant to Code Civ. Procs., §§ 128.5, 437c, against the employee in the trial court and then, after the trial court denied its sanctions motion, having abandoned its cross-appeal from that denial without explanation. The employee suffered no harm from the medical center's action, and there was no time-consuming and disruptive use of the judicial process. The cross-appeal might simply have been brought in haste, and the abandonment could have bee motivated by a reconsideration of the medical center's position and the conclusion that the cross-appeal did indeed lack merit.

**COUNSEL:** David Romley for Plaintiff and Appellant.

Proskauer, Rose, Goetz & Mendelsohn, Jeffrey A. Berman, Steven G. Drapkin and Barry B. Kaufman for Defendant and Appellant.

**JUDGES:** Opinion by Spencer, P. J., with Hanson and Devich, JJ., concurring.

**OPINION BY:** SPENCER

**OPINION**

[*1383]  [**414] Opinion

Introduction

Plaintiff Nancy Wagner appeals from a summary judgment entered in favor of defendant Glendale Adventist Medical Center.

[**415] Statement of Facts

In 1969, defendant hired plaintiff as a physical therapist to work in the rehabilitation institute. Upon seeking employment with defendant, plaintiff completed and signed an application form which stated in pertinent part: "I understand that if I am employed, . . . the employment may be terminated by either party at will upon two weeks' notice to the other." By 1976, plaintiff was a senior physical therapist.

In approximately June 1976, plaintiff was made rehabilitation coordinator of the rehabilitation institute. Thereafter, she received favorable reviews and one commendation for her work. As plaintiff [***2] acknowledges, throughout [*1384] her employment with defendant, the terms and conditions of employment were set forth in a series of employee handbooks. Each of these handbooks contained language stating, "Since employment in this hospital is based on mutual consent, either the employee or the hospital is privileged to terminate employment." By 1983, the language had changed to "terminate the employment relationship at will."

On February 18, 1986, plaintiff received a copy of the most recent employee handbook. It contained the same language referenced above as had the 1983 handbook. Attached to the 1986 handbook was a document entitled "Acknowledgement of Receipt of Employee Handbook." The document read: "I, Nancy Wagner, hereby acknowledge the receipt of the Employee Handbook' and realize that it is my responsibility to read it in detail so that I clearly understand the material within. I understand that it is the intent of the Employee Handbook' to give me some idea as to the policies and practices to which I will be subject. I further understand that this is not a complete manual. I realize that policies, practices, procedures, rules and regulations, compensation, benefits [***3] and insurance information may change from time to time and that this information will be available from my supervisor or the Personnel Department if I have questions. I also understand that employment in this Hospital is based on the mutual consent of the Hospital and the employee and, therefore, either the Hospital or I am privileged to terminate the employment at will." Plaintiff signed this document.

In January 1987, plaintiff was informed the position of rehabilitation coordinator was being eliminated. She was asked to leave immediately. Plaintiff later learned defendant was advertising in the Los Angeles Times for an individual to fill a position which seemed to her to be the same as the one she had held.

Contention

Plaintiff contends the trial court erred in ruling the parol evidence doctrine barred consideration of extrinsic evidence concerning any collateral agreement that she have permanent employment and be terminated only for cause; therefore, there remain triable issues of material fact rendering summary judgment improper. For the reasons set forth below, we disagree.

Discussion

A motion for summary judgment properly is granted where the "affidavits, declarations, [***4] admissions, answers to interrogatories, depositions and matters of which judicial notice . . . may be taken" in support of and in [*1385] opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ( Code Civ. Proc., § 437c, subds. (b), (c).)

**(1)** The party opposing a summary judgment has the burden of demonstrating that triable issues of material fact exist; unless that burden is met, summary judgment properly is granted. ( *Los Angeles County-U.S.C. Medical Center* v. *Superior Court* (1984) 155 Cal.App.3d 454, 459 [202 Cal.Rptr. 222].)

Because the summary procedure is drastic, any doubts concerning the propriety of the motion are resolved in favor of the opposing party. ( *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953]; *Garcia* v. *Wetzel* (1984) 159 Cal.App.3d 1093, 1095 [206 Cal.Rptr. 251].) [**416] Toward that end, the papers filed on behalf of the moving party are strictly construed while those of the opposing [***5] party are liberally construed. ( *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 285 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 442 [165 Cal.Rptr. 741].) Since the trial court's determination is one of law, based on the papers submitted, the reviewing court makes its own independent determination of the construction and effect of those papers. ( *Hoffman* v. *Citadel General Assurance, Ltd.* (1987) 194 Cal.App.3d 1356, 1362 [240 Cal.Rptr. 253].)

The parol evidence doctrine prohibits the introduction of extrinsic evidence to vary or contradict the terms of an integrated written instrument. ( Code Civ. Proc., § 1856; *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561]; *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].)

**(2)** The doctrine is based on the premise that the written agreement *is*, in those circumstances, the agreement of the parties. (*Ibid.*) In other words, the law "presumes [***6] a written contract supersedes all prior or contemporaneous oral agreements" ( *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 314 [231 Cal.Rptr. 820], citations omitted) and, where the writing is integrated, the presumption cannot be overcome. An integration may be partial, as well as complete; that is, the parties may intend that a writing finally and completely express certain terms of their agreement rather than the agreement in its entirety. ( *Masterson, supra,* at p. 225.) The parol evidence doctrine applies equally to the partial integration. (*Ibid.*) Neither a noncontractual writing, such as a receipt or a mere memorandum, nor an incomplete writing is an integration. (2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, §§ 973, 974, pp. 919, 920.)

**(3)** The central question in determining whether there has been an integration, and thus whether the parol evidence doctrine applies, is "whether [*1386] the parties intended their writing to serve as the exclusive embodiment of their agreement." ( *Masterson* v. *Sine, supra1,* 68 Cal.2d at p. 225.) The question is one of law for [***7] resolution by the court (2 Witkin, *op. cit. supra,* § 970, p. 917), and thus will be resolved de novo by this court.

**(4)** The intent of the parties that the written agreement be integrated, i.e., a final and complete expression of one or more terms of an agreement, may be manifested even in the absence of an explicit statement to that effect and without signature. (2 Witkin, *op. cit. supra,* § 967, p. 915; Rest.2d, Contracts, § 209, subd. (1).) Thus, the court may consider evidence of surrounding circumstances and prior negotiations to determine whether the writing was intended as the final and complete expression of the parties' agreement. (2 Witkin, *op. cit. supra,* § 971, pp. 917-918.) In determining the issue, the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. ( *Masterson* v. *Sine, supra,* 68 Cal.2d at p. 226; *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d at pp. 270-271.) However, in determining [***8] the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." ( *Id.* at p. 271.) In the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not certainly have appeared in writing.

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

( *Masterson, supra,* at pp. 227-228.) There are two writings at issue in the instant matter.

On August 4, 1969, plaintiff completed and signed an employment application. It is a preprinted form, two pages in length. While it has spaces for the applicant [**417] to indicate "choice of work" and "expected wage," it is not an application for a specific position at an agreed upon wage or salary. On the second page of the application, following a certification paragraph and a paragraph authorizing the release of information to the employer, there is a paragraph in small print, reading in pertinent part: "I understand that *if* [***9] I am employed, it will be for a trial period of three months; that *if*, in the judgment of the institution, I am unsuitable during this period, the employment may be terminated by the institution without notice; and that, after this period, the employment may be terminated by either party at will upon two weeks' notice to the other." (Italics added.) Given the contingent language used, as well as the lack of such essential terms as position and salary, it is clear the employment application is not intended as a full and complete employment contract. In actuality, it is a non-contractual document -- a [*1387] mere solicitation of an offer of employment. As such, it cannot, in and of itself, be an integration. (2 Witkin, *op. cit. supra,* §§ 973, 974, pp. 919, 920.)

**(5a)** However, the parties may have intended the "at will" provision to be the final and complete expression of one term, incorporated into the contract of employment they ultimately concluded.

**(6)** To determine this issue, we must look at the surrounding circumstances. (2 Witkin, *op. cit. supra,* § 971, pp. 917-918.) In other words, the court must attempt to place itself in the same situation [***10] as that in which the parties found themselves at the time of contracting. ( *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d at p. 270.) To do this, the court must receive provisionally all evidence offered to prove the intention of the parties, including evidence concerning any proffered prior or contemporaneous collateral agreement itself. (*Ibid.*)

**(5b)** In the instant matter, plaintiff proffered no prior or contemporaneous collateral agreement, relying solely on perceived express and implied assurances made several years after she initially accepted employment. In addition, it is clear there were no negotiations preceding the completion and execution of the employment application. Neither is there evidence of any contemporaneous personnel practices or employee guidelines to shed light on the actual terms of employment. Nonetheless, plaintiff acknowledged in deposition testimony that the employee handbooks reflected personnel policies, practices, rules and regulations, i.e., the terms and conditions of her employment.

The oldest handbook in evidence is one applicable in 1977. That handbook states in part, in a section entitled [***11] "Termination": "Since employment in this Hospital is based on *mutual consent,* either the employee or the hospital is privileged to terminate employment." (Italics added.) Although this provision does not use the words "at will," the concept of "mutual consent" embodies that principle. This portion of the handbook then lists various methods by which termination may be achieved, including resignation and dismissal. Dismissal is of special significance, for the handbook states a dismissal will be entered in the employee's personnel record and will become a permanent part thereof. Dismissal appears to be predicated solely on good cause, for the handbook states: "There are two general conditions that subject an employee to dismissal. [para.] A. Lack of adequate job performance[.] [para.] B. Misconduct . . . ."

While mentioning an employee's resignation and the requirement that the employee give two weeks' notice, the handbook makes no mention of a reciprocal procedure for termination without cause by the employer. It does, however, address termination during the three-month probationary [*1388] period, stating it may be "initiated by either the employee or the hospital [***12] at any time without notice." This is consistent with the language of the employment application, and suggests strongly that the parties intended the "at will" provisions of that application to be a final and complete expression of one term of their agreement, incorporated into their employment contract. The language of a 1981 employee handbook is entirely consistent with that of [**418] the 1977 handbook, as is that of a 1983 handbook. However, the latter document has added the words "at will" to the termination language. On balance, it appears the parties did incorporate the "at will" provisions into their employment contract.

It follows that the "at will" provisions of the application are a partial integration, i.e., a complete and final expression of this term of the parties' agreement, thus precluding any evidence of a prior or contemporaneous collateral agreement at variance from or in contradiction of this term. As noted *ante,* however, plaintiff does not rely on such a collateral agreement.

**(7a)** Rather, she relies on her perception that there were *subsequent* express and implied assurances in *modification* of the agreement.

Defendant argues there [***13] can be no implied modification of a prior written agreement, relying on *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613]. *Shapiro* does not stand for that proposition. In *Shapiro,* the court

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

states: "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results. [Citations.]" (*Ibid.*) The principle expressed is based on the reasoning that where the parties freely, fairly and voluntarily enter into a bargain, it would be inequitable to imply a different liability and to withdraw from one party benefits to which he or she is entitled under the contract. ( *Wal-Noon Corp.* v. *Hill* (1975) 45 Cal.App.3d 605, 613 [119 Cal.Rptr. 646].)

In *Shapiro,* as in *Wal-Noon Corp.,* the oral representations alleged to create an implied contract were made contemporaneously with or prior to the execution of the written contract. The inequity in enforcing the implied contract in that situation is apparent. However, that is not to say the parties may not in that manner thereafter modify their agreement.

**(8)** When one party [***14] has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be equally inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract.

**(7b)** It remains to be seen whether plaintiff presented evidence of an implied modification affording her permanent employment subject only to [*1389] termination for cause. In opposition to the motion for summary judgment, plaintiff submitted a declaration to the effect that both Michael Weinper and Laverne Roth stated to her when contemplating expansion of the rehabilitation department "that they wanted my assurance that I would continue to permanently serve as Rehabilitation Coordinator. They specifically stated that they would expand the rehab department but only if I continued to stay on to do the marketing. I told Mr. Weinper that I would serve the Hospital forever as long as he realized that my family came first (meaning that I wanted to be able to accept phone [***15] calls from them at any time no matter what I was doing) and he acknowledged this. Also it was understood among myself, Mr. Weinper and Mr. Roth that I would work at the Hospital until my husband retired or if I wanted until I became 65. I also stated to Mr. Dan Bowers who was Administrative Director of rehabilitation, that I would be there long after he left because he was seeking the vice presidency and I was permanently the Rehabilitation Coordinator. He did not disagree with my statement."

However, deposition testimony plaintiff previously gave is at variance with the portion of her declaration quoted above. Plaintiff was asked what conversations and documents she relied upon as conferring on her permanent employment. In response, after detailing her efforts as rehabilitation coordinator upon assuming that position in 1976, the success of her efforts in filling the rehabilitation department and her consequent desire to expand the department, she noted she and Mr. Weinper "established an ad hoc committee to see where rehab could go in the future. . . . We got together with the vice president at that time, Leonard Yost, . . . and he brought in an outside firm, and we had our [***16] director of [**419] nursing from rehab, Margaret Caruso, . . . and we worked for the future of the rehabilitation institute . . . . That gives me an idea that my job there was permanent. I was in on the ground floor of building rehab to . . . what I brought it up to . . . . We worked on [expanding the rehabilitation department] every week for months and months and months. . . . Finally we established our long range plans . . . and we were at 100 percent occupancy at all times because of my marketing and the way I was doing things."

Plaintiff further testified she continued to add and fill beds "because I was on a roll." She testified defendant became the most successful rehabilitation unit in all of Los Angeles. "I built from nothing. Now, to me that established that this facility who appreciated what I was doing so much wasn't about to terminate me. I was giving 200 percent of my time. . . ." Plaintiff also mentioned that defendant agreed in 1979 to pay for her education and to retain her on full salary while she pursued a master's degree in rehabilitation administration. She then was asked whether there was anything else supporting the contention she had an understanding [***17] or guaranty or promise [*1390] or anything to that effect of permanent employment. She responded: "Sometimes those things are unwritten, but they are certainly implied the way people treated me."

Asked whether "there were any other facts that relate to the contention of permanency," she testified: "Our hospital does not give employees parking spaces. . . . Because I was going in and out of the hospital so often and . . . all over the City of L. A. . . . I asked for . . . and I was given a permanent parking spot . . . and when I left, my permanent parking spot was removed the next day. . . . We had a program evaluation report every year, and because of the good work in our census that was high, they would always say to me, Boy, you will be here forever, Nancy. You have done such a wonderful job.' So they named me the Madam of Rehab . . . because I filled the beds. So there was always an indication they will never get you out of here. You will never leave because you are absolutely . . . the Madam of Rehab.'" She further testified everyone made these statements: "Steve Forer, . . . who was in charge of program evaluations, Mark Johnson, . . . who was also in charge of program [***18] evaluations after Steve Forer, the administration directors that I have had in the past, both Mike Weinper

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

and Dave Igler . . . . They said, you know, 'You are invaluable here. I don't know what we would ever do without you.' So it was verbally implied that you will be here forever . . . . I was invited by Mr. Roth, . . . who was president at the time of the [hospital] . . . to go to a retreat where they were planning the future of the hospital, and we were planning for the next three to five years . . . . [T]hat was in [1982] . . . . I was in the pension program, and I had planned on continuing to stay . . . for five more years, and then that would have given me 22 years with the company . . . ." She then indicated she could think of nothing else relating to permanency of employment.

In other words, in her deposition testimony, plaintiff was able to point to nothing other than the conclusions she drew from her "creation" of the expanded rehabilitation department, courtesies extended to her and her participation in a long range planning retreat, as well as expressions of appreciation for her efforts and implications she had made herself indispensable in the eyes of her superiors. [***19] She presented no evidence of oral representations her employment was in fact permanent, made by those with express or implied authority so to act, or that it was the custom and practice of the hospital to terminate long term employees only for cause. Her testimony thus directly contradicts the express representations of permanent employment and the "mutual understanding" she would remain until retirement which she details in her declaration.

Two months after she gave her deposition testimony, plaintiff attempted to "correct" the deposition transcript in the following manner: On April 28, [*1391] 1988, her attorney wrote to defendant's attorney a "correction" letter which added to the deposition [**420] testimony a statement that she intended to remain five more years "or until I became sixty-five if I so desired." In addition, the letter added: "After approx. 1 1/2 years with increased census, Mr. Weinper & Mr. Roth, who was the president of the hospital, told me that they wanted me to serve on a special committee for the purpose of expanding the rehab Institute's occupancy to 42-44 beds because of my tremendous success in marketing & that I would be a permanent part of [***20] the hospital.

"I told Mr. Weinper that I would serve the hospital forever as long as he realized that my family came first (meaning being able to accept phone calls from them at any time no matter what I was doing) and he acknowledged that. [para.] Also, it was understood that I would work at the hospital until my husband retired or if I wanted, until I became 65. Also, at one time I stated to Dan Bowers I will be here long after you leave because you are seeking a vice presidency and I am permanently the rehab coordinator.' He did not disagree. [para.] Over the years I turned down other employment offers and did not pursue other jobs where I could have made more

money because I agreed to permanently work at the hospital as the rehab coordinator." These "corrections" mirror the pertinent contents of plaintiff's subsequent declaration and, like that declaration, directly contradict her prior testimonial admissions she relied on nothing more than her own impressions, courtesies extended to her and implications she had made herself indispensable.

**(9)** As noted in *Burgon v. Kaiser Foundation Hospitals* (1979) 93 Cal.App.3d 813 [155 Cal.Rptr. 763]: " [W]hen a [***21] defendant can establish his defense with the plaintiff's admission sufficient to pass the strict construction test imposed on the moving party, the credibility of the admissions are valued so highly that the contradicting affidavits may be disregarded as irrelevant, inadmissible or evasive [citations]. . . . There is no reason to draw a distinction between an attempt to counter an admission by affidavit and an attempt to counter an admission by changing the content of an answer given by a party directly in the deposition, especially where there is no assertion the original answer was incorrectly transcribed or the question was misleading or ambiguous. In both the changed affidavit and changed deposition cases the credibility of the parties is held up for examination by the contradicting statements, the first of which constitutes a reliable admission against interest. The trial court may accept the first and reject the latter of these contrary positions.' [Citation.]" (At p. 823.)

**(10)** Here, defendant is able to establish from plaintiff's admissions the utter lack of any substance to a claim of an implied or express agreement her employment would be permanent. Thus, [***22] both the trial court and this [*1392] court are entitled to disregard the "corrections" she made to her deposition testimony and her contradictory affidavit. In sum, there is no reliable evidence of an express or implied modification of the "at will" provisions of her original employment contract.

On February 18, 1986, plaintiff received a copy of the then-current employee handbook attached to which was a document entitled "Acknowledgement of Receipt of Employee Handbook," bearing her employee number, 66150. This document provided: "I, Nancy Wagner, hereby acknowledge receipt of the Employee Handbook' and realize that it is my responsibility to read it in detail so that I clearly understand the material within. I understand that it is the intent of the Employee Handbook' to give me some idea as to the policies and practices to which I will be subject. I further understand that this is not a complete manual. I realize that policies, practices, procedures, rules and regulations, compensation, benefits and insurance information may change from time to time and that this information will be available from my supervisor or the Personnel Department if I have questions.

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

I also [***23] understand that employment in this Hospital is based on the mutual consent of the Hospital and the employee and, therefore, either the Hospital or I am privileged to terminate the employment at will." Plaintiff signed this document.

[**421] The 1986 handbook no longer refers to "dismissal," but to "discipline," which "may consist of verbal warning, written warning, suspension without pay, and/or discharge depending on the seriousness of the infraction." It lists illustrative causes for discipline. Under the section entitled "Termination," the handbook states in pertinent part: "The information contained in this handbook is intended as a guideline and is not meant to create a contractual relationship, either express or implied, between the hospital and any one of its employees. [para.] Since employment in this hospital is based on mutual consent of the employee and the hospital, either the employee or the hospital is privileged to terminate the relationship at will."

(7c)  Plaintiff directs the brunt of her attack on the trial court's ruling concerning the parol evidence doctrine at the acknowledgement she signed on February 18, 1986. She argues it cannot be viewed [***24] as an integrated agreement, relying on *McLain* v. *Great American Ins. Companies* (1989) 208 Cal.App.3d 1476 [256 Cal.Rptr. 863]. The document at issue in *McLain,* an employment application, contained an "at will" clause followed by a statement that " 'I also understand and agree that the terms and conditions of my employment may be changed, with or without cause, and with or without notice, at any time . . . .'" (At p. 1480.) Based in part on the latter language, the court concludes the employment application was not an integrated agreement, in that the language suggested the parties [*1393] intended specifically that the relationship remain subject to a change in the conditions of employment. ( *Id.* at p. 1485.) As the court notes, the provision that the terms of employment could be changed at any time "strips the with or without cause' provision of its force. If the terms of [plaintiff's] employment could be changed, then it is conceivable that there was an implied contract that [plaintiff] could only be discharged for cause." (*Ibid.*) The court also addresses additional language in the employment application to the effect that [***25] the defendant had no authority to enter into an agreement " 'contrary to the foregoing.' However, this language seems to contradict the provision providing that the agreement could be changed and therefore appears to be ambiguous and confusing. Because the application was a standardized form, did not cover several key aspects of the employment relationship and because it expressly stated that the terms and conditions of employment could be changed, we

conclude that it was not an integrated document." (*Ibid.*) Finally, the court concludes extrinsic evidence would in any event be admissible to explain the true meaning of the application, given the ambiguity therein. ( *Id.* at pp. 1485-1486.)

Despite defendant's attempt to impugn and/or distinguish *McLain,* it appears clear the acknowledgement form cannot be considered an integrated agreement for the reasons expressed therein. It, too, is a standardized form missing key elements of the employment agreement; not only is it clearly not intended to embody the entire employment agreement between the parties, but it mentions one aspect of the relationship only incidentally. Most importantly, it also indicates a specific [***26] intent that the terms and conditions of employment remain subject to change.

However, there can be no implied contractual term completely at variance with an express term of a contract. ( *Shapiro* v. *Wells Fargo Realty Advisers, supra,* 152 Cal.App.3d at p. 482;  *Wal-Noon Corp.* v. *Hill, supra,* 45 Cal.App.3d at p. 613.) Tied as it is to the 1986 employee handbook, it is clear the language in the acknowledgement relating to the "at will" nature of the employment relationship is intended to restate a term of the employment contract as it exists at the moment, subject only to *future* change.  In this respect, the instant matter differs from *McLain,* for there the plaintiff relied primarily on *subsequent* events: " 'the personnel policies or practices of the employer, the employee's longevity of service, [and] actions or communications by the employer reflecting assurances of continued employment.'" ( *McLain* v. *Great American Ins.* [**422] *Companies, supra,* 208 Cal.App.3d at p. 1486.) In contrast, here, plaintiff relies on *prior* events.  Thus, integrated or not, unless the then-existing implied term for which [***27] plaintiff contends is not completely at variance with the then-existing express term, it can have no force.  It is obvious that an implied contractual term of permanent employment subject only to discharge for good cause is completely at variance [*1394] with an express contractual term that employment may be terminated at will.

Moreover, as noted *ante,* plaintiff presented no reliable evidence of an implied collateral agreement of permanent employment subject to termination only for cause.  In addition to ruling the parol evidence doctrine precluded consideration of plaintiff's extrinsic evidence, the trial court premised the summary judgment on the conclusion that, even if plaintiff's evidence was considered, it was insufficient to support the contention defendant "agreed, expressly or impliedly, that Plaintiff would be employed permanently' or that she could only be terminated for just cause.'" In this conclusion, the trial court was correct.

216 Cal. App. 3d 1379, *; 265 Cal. Rptr. 412, **;
1989 Cal. App. LEXIS 1331, ***; 115 Lab. Cas. (CCH) P56,252

**(11)** (See fn. 1.),

**(7d)** Accordingly, any error in applying the parol evidence doctrine does not warrant reversal of the judgment. [1]

[1] After the trial court granted defendant's motion for summary judgment, defendant moved for the sanction of attorney's fees pursuant to Code of Civil Procedure sections 128.5 and 437c, subdivision (i), on the ground plaintiff had brought a frivolous action. The trial court denied the motion, and defendant cross-appealed from the order of denial. Defendant has abandoned the cross-appeal without explanation. Plaintiff relies on this abandonment as evidence the cross-appeal was frivolous and seeks sanctions therefor. In her view, it could have been brought for no other reason than an intention to intimidate her; thus, it was pursued for an improper motive. On the contrary, the cross-appeal might simply have been brought in haste, and the abandonment could have been motivated by a reconsideration of defendant's position and the conclusion the cross-appeal did indeed lack merit.

Plaintiff has suffered no harm from defendant's action. In view of the abandonment of the cross-appeal, there has been no "time-consuming and disruptive use of the judicial process"; it has not "tie[d] up judicial resources and divert[ed] attention from the already burdensome volume of work at the appellate courts." ( *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal.Rptr. 508, 646 P.2d 179].) Thus, there is no basis for awarding sanctions.

[***28] The judgment is affirmed.

EXHIBIT 35

LEXSEE 173 CAL APP 2D 731

### N. E. YOUNGBLOOD et al., Respondents, v. VICTOR SILVAGNI, Appellant

### Civ. No. 23467

### Court of Appeal of California, Second Appellate District, Division Three

### 173 Cal. App. 2d 731; 343 P.2d 951; 1959 Cal. App. LEXIS 1647

### September 21, 1959

**SUBSEQUENT HISTORY:** [***1] Respondents' Petition for a Hearing by the Supreme Court was Denied November 18, 1959. Peters, J., was of the Opinion that the Petition Should be Granted.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Lloyd S. Nix, Judge.

Action for declaratory relief regarding an agreement for attorneys' fees for the reasonable value of services rendered, and for other relief.

**DISPOSITION:** Affirmed in part and reversed in part. Judgment for plaintiffs affirmed in part and reversed in part.

## HEADNOTES

### CALIFORNIA OFFICIAL REPORTS HEADNOTES

(1a) (1b) **Attorneys at Law--Actions for Compensation--Appeal--Reversible Error.** --In an action by attorneys to recover fees for services rendered to establish defendant's ownership of stock in a family corporation, it was reversible error to admit parol evidence that the fee was to be "in kind," that is, shares of stock, where the written fee agreement provided that "Our fee in this connection will be a sum equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the value of any interest established. . . .," since the words "in this connection" referred to the attorneys' representation of defendant in establishing his ownership of stock, the words "sum" and "value" were not used as substitutes for, or synonyms of, the word "stock," the contract was drawn by the attorneys and had to be construed most strongly against them, and the corporation was family-owned, it thus being reasonable to assume that defendant

would not want persons other than family members to own stock in it.

(2) **Evidence -- Extrinsic Evidence -- In Aid of Interpretation--Ambiguous Instrument.** --In determining the admissibility of parol evidence to aid in the interpretation of an instrument, the question whether such agreement is ambiguous is one of law, and the trial court's finding on that issue is not binding on a reviewing court.

(3) **Id.--Extrinsic Evidence--Nature of Rule.** --The parol evidence rule is not a rule of evidence, but is one of substantive law.

(4) **Id.--Extrinsic Evidence--Nature of Rule.** --As applied to contracts, the parol evidence rule is simply that as a matter of substantive law the act of embodying the complete terms of an agreement in a writing becomes the contract of the parties.

(5) **Id.--Extrinsic Evidence.** --Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.

(6) **Id.--Extrinsic Evidence.** --The parol evidence rule comes into operation when there is a single and final memorial of the parties' understanding, and when that takes place, prior and contemporaneous negotiations, oral or written, are excluded.

(7) **Id. -- Extrinsic Evidence -- Nature of Rule.** --Parol evidence, though admitted without objection, must be ignored as of no legal import, and its incompetency to vary a written contract is a matter of law.

(8) **Attorneys at Law--Actions for Compensation--Judgment.** --In an action by attorneys to recover fees for services rendered to establish defendant's ownership

of stock in a family corporation, a provision in the fee agreement that "This percentage shall apply either by settlement or otherwise, and it is understood and agreed that we shall have a lien against said cause of action, settlement, judgment, . . . and that you will advance and pay any and all court costs and other expenses as they become necessary from time to time" did not authorize a lien on defendant's stock to secure reimbursement of money lent or advanced to him and it was error for the court to impose such a lien in its judgment.

COUNSEL: Robert H. Powsner for Appellant.

N. E. Youngblood and Anthony T. Carsola, in pro. per., and Marvin Gross for Respondents.

JUDGES: Wood (Parker), J. Shinn, P. J., and Vallee, J., concurred.

OPINION BY: WOOD

OPINION

[*732] [**952] Plaintiffs' first cause of action is for declaratory relief regarding an agreement for attorneys' fees. The second cause of action is for the reasonable value of services rendered, in the alleged amount of $ 25,000. The third cause of action is for money lent in the amount of $ 1,114.68. The fourth is for $ 500 on an account stated. The fifth is for money lent in the amount of $ 320.93.

At the pretrial, defendant stipulated to judgment for plaintiffs [***2] on the third and fifth causes of action (for money lent). The trial proceeded upon the causes of action for declaratory relief, reasonable value of services, and account stated.

Judgment for plaintiffs included the amounts alleged in the third, fourth, and fifth causes of action (for money lent and account stated). Defendant (appellant) makes no contention on appeal regarding the judgment on those causes [*733] of action. The judgment also declares that the written agreement is valid and that defendant's (appellant's) discharge of plaintiffs was without legal cause. The judgment awarded the plaintiffs 3,750 shares of stock of the Silvagni Estate Company, and ordered defendant to execute the necessary documents to effect an assignment of the shares, and awarded plaintiffs a lien upon the interest of defendant in said company. Defendant appeals from the judgment.

Defendant Victor Silvagni and his brother Michael had had a controversy with their father as to their alleged interests in the Silvagni Estate Company, a corporation, which owned property in Las Vegas, Nevada. The sons claimed that the father had improperly deprived them of income from the company. About November, [***3] 1954, defendant (Victor) consulted plaintiff Carsola, attorney at law, whom he had known in college in 1939. Mr. Carsola went to Las Vegas and discussed the controversy with the father; and he conferred with defendant about the matter at various times in January, February, and the first half of March, 1955. In one of those conferences defendant said that Mr. Carsola should have a more experienced attorney associated with him in the matter. Mr. Carsola mentioned the name of Mr. Youngblood.

On March 17, 1955, Mr. Carsola introduced Mr. Youngblood to defendant and Michael, and the four of them had a conference regarding the controversy, the matter of being represented by the attorneys, and the matter of providing money for the brothers.

On March 18 the attorneys and the brothers had another conference wherein the controversy and the financial problems of the brothers were discussed. Mr. Carsola testified that at the conference he said that each brother owed him $ 500 for past legal services, and that Mr. Youngblood would be the chief counsel if defendant retained him. At that conference Mr. Youngblood lent $ 650 to Michael, and on March 22 he lent $ 500 to defendant. Between March [***4] 18 and April 24, Mr. Youngblood and defendant had several conferences in connection with the preliminary investigation as to the facts of the controversy. Mr. Youngblood testified that he said, at one of those conferences, that until a written fee agreement was signed by the defendant he would not represent defendant.

On April 24 the attorneys and the brothers had a conference at defendant's home regarding a proposed written agreement [**953] which the attorneys had prepared. In the proposed [*734] agreement, as submitted to defendant by the attorneys, there was a blank space wherein the amount of the fee, stated in percentage of recovery, was to be inserted. During the conference, which continued about 45 minutes, the blank space (as to percentage) was filled in with the word "fifteen," and then the agreement was signed by the attorneys and defendant. The agreement provided that the attorneys would represent defendant in establishing his interest in the corporation; the fee of the attorneys would be "a sum equivalent to fifteen percent of the 'gross recovery.'" which would include "the value of any interest established to be owned" by defendant; the percentage would [***5] apply "either by settlement or otherwise"; the attorneys would have a lien against a "settlement" or judgment; and the defendant would advance all costs. The agreement is set out in the margin. [1] Also, during that [*735] conference the attorneys and Michael entered into a similar agreement.

173 Cal. App. 2d 731, *; 343 P.2d 951, **;
1959 Cal. App. LEXIS 1647, ***

1    "April 24, 1955

"Mr. Victor Silvagni,

2936 North Marengo Avenue,

Altadena, California.

Re: Silvagni vs. Silvagni

"Dear Mr. Silvagni:

"In accordance with our verbal agreement it is our understanding and it is our agreement that we shall represent you in doing whatever is reasonably necessary to establish your interest through ownership of stock or otherwise in your family corporation, the details of which have been discussed with you and with which you are thoroughly familiar.

"In the event legal action becomes necessary, it will be prosecuted through the proper court in such manner as we agree to be expedient. You shall have sole determination of any offer of settlement, but we will, of course, give to you our recommendations.

"Our fee in this connection will be a sum equivalent to

VAS fifteen percent of the 'gross recovery' in your behalf, which shall
        include the value of any interest established to be owned by you in this proceeding. This percentage shall apply either by settlement or otherwise, and it is understood and agreed that we shall have a lien against said cause of action, settlement, judgment, amount to be paid or to become due, and that you will advance and pay any and all court costs and other expenses as they become necessary from time to time.

"In the event the foregoing corresponds with your understanding of our agreement please sign the original of this letter in the space provided below, return to us

for our files, and we shall proceed accordingly.

Very truly yours,

N. E. Youngblood

For N. E. Youngblood and

Anthony T. Carsola

Accepted and approved:

Victor A. Silvagni

Victor Silvagni"

[***6] Defendant testified that, at the conference on April 24 and on several previous occasions, he said that his income from Las Vegas (his salary of $ 1,000 a month from the corporation) would be cut off if he undertook a stock recovery venture or a lawsuit; that he also said that, as he had stated previously, he would need money in order to live, and that it was understood that the attorneys were going to arrange to lend him $ 10,000 in order for "us to live and get by" during the litigation; that Mr. Youngblood replied that the money would be available and forthcoming in about four weeks; that Mr. Carsola replied, "Don't worry. You will get the money." Mr. Carsola testified that, at the conference on April 24, defendant said that his financial matters were pressing and that before they "go into this sitting down and signing any contract" he wanted to know how the money situation was coming and to know what is going to be done financially in connection with the matter. Mr. Carsola testified that Mr. Youngblood replied, "Well, I can't promise anything. I will do what I can." Mr. Carsola also testified that he (witness) replied that the State Bar takes a dim view of the matter of attorneys [***7] advancing substantial sums of money to clients, but it is all right for emergency purposes; that he (witness) would do all he could to get available money; that he thought he knew [**954] persons who would lend money to defendant, based upon the stock ownership expectancy, but the money would come from other persons and he would guarantee the loans. Mr. Youngblood testified that on April 24, after the agreement had been signed, he said in substance that they (attorneys) would still try to assist them in obtaining a loan with which to alleviate their temporary financial distress, but that was not a part of the attorneys' representation of them in this matter.

On the day after the agreement was signed, Mr. Youngblood lent $ 1,000 to Michael and $ 100 to defendant. Two days thereafter he lent $ 200 to defendant. About two weeks thereafter he lent $ 250 to Michael and $ 150 to defendant.

173 Cal. App. 2d 731, *; 343 P.2d 951, **;
1959 Cal. App. LEXIS 1647, ***

Mr. Youngblood testified that, immediately preceding the signing of the agreement, he said, "You recognize, boys, that if you recover your stock, we will probably have to take our fifteen percent of the recovery in kind or by taking it in stock. . . . Otherwise there would be only one way in [***8] which it could be determined, and that would be if we were to discuss and agree that the stock you recovered had a specific value, [*736] by mutual agreement determine the value, and then we would agree, or should we so determine, we might possibly agree on taking fifteen percent of that agreed evaluation."

On April 29 the attorneys wrote a letter to each of the following persons (who owned interests in the corporation): the father, and the two sisters of defendant. The letter stated that the attorneys had been retained by defendant and Michael to take action against the addressees to establish and recover the interests of defendant and Michael in the family corporation known as Silvagni Estate Company; that the attorneys did not desire to cause the addressees any more inconvenience and expense than the addressees made necessary, but the attorneys insisted that their clients' interests be preserved; that the attorneys would be happy to confer with the addressees or their attorneys to ascertain whether the controversy could be worked out upon an amicable basis.

On May 2 the attorneys conferred with defendant and Michael approximately two and a half hours. On May 11 the attorneys [***9] examined corporation papers in Carson City, Nevada. The attorneys prepared a rough draft of a complaint on behalf of the brothers against the corporation, and its officers and stockholders. Mr. Youngblood testified that he did not maintain a record of the number of hours he performed legal services for the defendant, but he estimated that the number of hours was in excess of 125. He also testified that he, Mr. Carsola, and Mr. Gross (an attorney associated with Mr. Youngblood) did "some research" in connection with the matter.

On May 23 defendant sent a notice to the attorneys wherein he stated that he terminated the relationship of attorney and client and the authority of the attorneys to represent him; he desired to pay the attorneys a reasonable fee for their services to that date; and if the attorneys would send a bill to him he would make arrangements to pay it if it was reasonable.

On May 31 defendant called Mr. Carsola by telephone and said that he was willing to attempt to pursue the litigation "if their verbal part of the contract of promising the $ 10,000 would be lived up to." Pursuant to that conversation, Mr. Youngblood telephoned defendant who was in Las Vegas. Defendant [***10] testified that in that conversation he said he was interested in proceeding with the litigation "if the verbal part of the contract involving the $ 10,000 could be lived up to." Mr. Youngblood testified that in that conversation he said he [*737] would not do anything further in defendant's behalf unless defendant sent him a notice repudiating the termination of the attorneys' authority and authorizing the attorneys to proceed as originally authorized. Defendant did not send such a notice.

Mr. Youngblood testified that, at a conference on June 29, when the attorneys [**955] and the brothers were present, he (witness) said that the attorneys were willing to proceed with the action if the brothers would repudiate the attempted revocation of the attorneys' authority; defendant replied that he would not repudiate the notice unless he (witness) lent them $ 10,000. Mr. Youngblood testified further that he said he had not agreed to make that loan; he had attempted to work out loans for them with other persons; he understood that the brothers had rejected the loans; he did not deem that the attorneys had any obligation under the fee agreement to lend money; and he did not intend [***11] to lend money.

In June 1955, a controversy arose between defendant's father and other directors of the corporation (two daughters and one Wartman) regarding an account which the father had opened in the Bank of Nevada. On June 17 the bank commenced an action in interpleader to determine the rights of the parties to the bank account. On July 5 the defendant, Michael, the two sisters, and the father entered into a compromise agreement in that action, which agreement provided that 25,000 shares of stock (of the 200,000 shares) of the corporation would be issued to each of the brothers and sisters; the stock would be delivered to the First National Bank of Nevada, as bailee, to be held as a bailment until 10 years after the death of defendant's father; dividends on the stock, issued to the brothers and sisters, would be paid to them; salaries would be paid to the brothers and sisters in the same amounts as had been paid to them during the year 1955; during the term of the bailment, none of the parties had the right to transfer or encumber the stock or dividends or salaries; the stock, dividends, and salaries would not be subject to the claims of creditors; at the termination of the [***12] bailment, if any party to the bailment desired to sell his stock, he must sell said stock to the corporation. The agreement provided further that the 100,000 shares of stock to be issued to the brothers and sisters (25,000 shares each) consisted of stock which theretofore had been held: (1) in the names of the sisters as their own stock; and (2) in the name [*738] of one of the sisters as trustee for the other sister, Michael, and the defendant.

Defendant testified that, after he signed the compromise agreement, 25,000 shares of the stock were is-

sued to him; he did not receive possession of the stock; he, Michael, the husband of Lena (one of the sisters), and defendant's other sister (Olga) placed the stock "in care of the First National Bank of Nevada, in bailment."

On August 8, 1955, the attorneys sent a letter to defendant and his wife stating that demand was made for payment of money advanced by the attorneys, and for payment of money expended by the attorneys in connection with their representation of defendant. The letter also stated that demand was made "for payment of our legal fees in the same connection."

The court found, among other things, as follows: On April [***13] 24, 1955, defendant employed plaintiffs under a written fee contract (the letter of April 24 quoted hereinabove). The contract is a valid and existing fee contract between the plaintiffs and defendant, and it is fair and just, and no undue influence or duress was exercised by either plaintiff upon defendant. Defendant entered into the contract voluntarily and understood the meaning of the contract, and no advantage was taken of defendant by either plaintiff. The contract was not entered into by reason of any promise by either plaintiff to obtain loans or money for defendant. There was a sufficient and valid consideration for the contract, and the plaintiffs were prevented from performing the contract by conduct of the defendant. The action taken by plaintiffs in defendant's behalf, after the agreement was executed, was a proximate cause of the compromise settlement. No relationship of attorney and client existed between Mr. Youngblood and defendant until the execution [**956] of the contract on April 24 as to any matters covered by the contract. A relation of attorney and client existed between Mr. Carsola and defendant from November 1, 1954, to March 18, 1955, and that [***14] relation ceased to exist as of said March 18 by mutual agreement. Mr. Carsola rendered no services as an attorney at law on behalf of defendant from said March 18 to said April 24, and no relation of attorney and client existed between them during that period. Immediately following April 24 plaintiffs commenced representation of defendant, and they have performed all of the terms and conditions of the contract on their part to be performed, except as prevented by defendant. On May 26, 1955, plaintiffs received from defendant "Notice [*739] Terminating Authority of Attorney," dated May 23, 1955. The purported discharge of plaintiffs by defendant was without legal or any cause. At the time of said purported discharge plaintiffs were ready, willing and able to perform all the terms and conditions of the agreement on their part to be performed. About May 31, 1955, defendant attempted to make an oral revocation of his prior instructions terminating authority of attorneys, and orally promised to furnish to plaintiffs a written acknowledgment of the oral revocation, and requested that plaintiffs

proceed forthwith to represent defendant as originally authorized by the written agreement [***15] of April 24, but defendant failed to furnish such acknowledgment of the revocation and on June 29, 1955, defendant refused to sign such a written acknowledgment which was submitted by plaintiffs to defendants. After June 29 neither plaintiff did anything on behalf of defendant. About July 5, 1955, defendant entered into a settlement agreement relating to his interest in the Silvagni Estate Company. The settlement agreement was entered into by defendant as a part of a fraudulent plan to defeat any interest of plaintiffs in the stock of that company, by lien or otherwise, through the purported irrevocable bailment set up in the settlement agreement. The bailment is voidable insofar as plaintiffs are concerned to the extent of their interest in the stock, and the extent of the lien imposed upon the stock under the terms of the fee agreement of April 24. The settlement agreement was entered into by the defendant without the consent of either plaintiff and was negotiated for the sole purpose of defrauding plaintiffs. By reason of the fact that the court has determined that the fee agreement is a valid contract under which the plaintiffs are entitled to recover as prayed, there is [***16] no necessity for a determination in connection with the second cause of action (for reasonable value of services). During the period from March 17 to May 10, 1955, Mr. Youngblood lent $ 1,114.68 to defendant and no part thereof has been repaid. About said March 18 there was an account stated between Mr. Carsola and defendant whereby $ 500 was due to Mr. Carsola, and no part thereof had been paid. During the period from November 15, 1954, to May 10, 1955, Mr. Carsola lent $ 320.93 to defendant and no part thereof has been repaid. Prior to and as a part of the execution of the fee agreement plaintiffs and defendant agreed that in the event of a recovery of defendant's claimed interest in the corporation, in capital stock, 15 per cent thereof would be payable to plaintiffs in kind, unless by mutual agreement [*740] the parties agreed upon the value of the stock, in which event plaintiffs could elect whether the fee would be payable in kind or in money equivalent. No mutual agreement was reached as to the value of the stock. Neither of the plaintiffs lent or agreed to lend money to defendant as a part of the written agreement by which plaintiffs were employed to represent defendant. [***17] Under the terms of the fee agreement plaintiffs were granted a lien upon the claimed interest of defendant in the corporation, by stock or otherwise, to the extent of 15 per cent of the gross recovery, and further to secure reimbursement for all money advanced by either plaintiff to defendant.

[**957] The judgment included provisions which were the same as the findings with respect to: (1) the fee contract being valid, fair, and voluntarily made for a valid consideration; (2) the plaintiffs being prevented

from performing the contract by conduct of defendant; (3) there being no relationship of attorney and client at the time the contract was made. The judgment also provided that plaintiffs recover from defendant, and the plaintiffs are awarded, 3,750 shares of the capital stock in the Silvagni Estate Company, constituting 15 per cent of 25,000 shares derived by defendant under the settlement of July 5, 1955, which shares are of record in the name of defendant or deposited in the First National Bank, Las Vegas, Nevada, for his account, and the defendant is ordered to execute forthwith the necessary documents to effect an assignment of the 3,750 shares to plaintiffs, and pending [***18] the execution of the documents the defendant is enjoined from transferring or encumbering the shares. Plaintiffs are awarded a lien upon all claimed interest of defendant in the corporation derived by him under the settlement agreement, by stock or otherwise, including the stock of record in his name or deposited in said bank in Nevada for his account to the extent of 15 per cent of the gross recovery by defendant, and further to secure reimbursement for all money advanced by either plaintiff to defendant including all money to which plaintiffs are entitled under the judgment.

(1a) One of the contentions of appellant is to the effect that the court erred in awarding stock in the family corporation to the plaintiffs, for the reason the agreement did not provide for compensation in that form but did provide for money compensation of 15 per cent of the value of the stock allegedly recovered. Appellant refers particularly to the portion of the agreement which is as follows: "Our fee in this [*741] connection will be a sum equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the value of any interest established to be owned by you in this proceeding." [***19] He argues that the words "sum equivalent to fifteen percent" and "value of any interest" mean money and do not mean shares of stock; that the written agreement was not ambiguous, and the testimony of Mr. Youngblood to the effect that the fee was to be "in kind" should be disregarded. In one place in plaintiffs' (respondents') brief (p. 13), they assert that "there is some ambiguity" in the agreement. At another place in their brief (p. 23), they assert that "the fee agreement is clear and unequivocal." They assert also to the effect that it was proper to consider the testimony of Mr. Youngblood to the effect that the fee was to be "in kind," that is, shares of stock. It is to be noted that the first paragraph of the agreement, prepared by the attorneys, recites that the attorneys understand that their agreement is to represent defendant in establishing his interest in the family corporation "through ownership of stock" or otherwise. After having shown clearly in the agreement that the main purpose of the representation was to establish defendant's ownership of stock in the family corporation,

the attorneys then recite in their agreement that "Our *fee in this connection* will [***20] be a *sum* equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the *value* of any interest established . . . ." (Italics added.) It is apparent that the words "in this connection" refer to the attorneys' representation of defendant in establishing his ownership of stock. It is also apparent that the words "sum" and "value," used in stating what the fee would be "in this connection," were not used as substitutes for, or synonyms of, the word "stock." In their brief, the plaintiffs (attorneys) refer to the agreement as the "fee agreement." It is obvious that the main point of the attorneys in preparing the "fee agreement" and submitting it to defendant for his signature was to have a written agreement which stated what the fee would be. It seems to be the position of plaintiffs that they, as attorneys [**958] at law, in preparing their "fee agreement," overlooked the main point which they intended to cover by the agreement, with the result that they prepared an ambiguous agreement and therefore they were entitled to resort to parol evidence to explain that the words "sum" and "value," used by them, did not refer to money but did refer to [***21] and mean [*742] shares of stock. In *Bennett* v. *Potter*, 180 Cal. 736 [183 P. 156], wherein plaintiffs sought to recover fees for legal services, it was said at page 740: "The contract was drawn by the plaintiff, Bennett. Hence, it is to be interpreted most strongly against the plaintiffs. This rule is accentuated by the fact that the plaintiffs were attorneys at law and presumably familiar with legal terms and proceedings and accustomed to the use of language appropriate to the framing of contracts . . . ." In the present case, as above shown, there was testimony by Mr. Youngblood to the effect that he told defendant and Michael that probably the attorneys would have to take their 15 per cent in kind, otherwise the only way would be to mutually agree as to the value of the stock and then the attorneys might agree on taking 15 per cent of the valuation. Defendant testified that there may have been some conversation with reference to determining the 15 per cent by agreeing as to the value of the stock but he did not remember what the conversation was. Michael testified that he did not think they (he and defendant) agreed to apply the 15 per cent to the stock, because [***22] they (brothers) wanted their own stock. The stock of the Silvagni Estate Company was owned by members of the Silvagni family. It is reasonable to assume that the defendant or other members of the family would not want persons other than members of the family to own stock in the company. If it was the intention of the plaintiffs (attorneys), at the time the written agreement was made, to claim shares of stock instead of money as their fee, it would have been a simple matter to so state in the writing. As it now is, the attorneys rely on

conversations, allegedly occurring at the time of executing the fee agreement, to explain the agreement.

**(2)** Whether an agreement is ambiguous is a question of law, and the trial court's finding on that issue is not binding on a reviewing court. ( *Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13].)

**(1b)** The words "sum" and "value," as used in the written agreement herein, should not be interpreted to mean that the fee would be shares of stock. The written agreement was not ambiguous. The trial court should not have considered the parol evidence in determining whether the agreement meant that the fee would be shares of stock or [***23] money.

**(3)** "The parol evidence rule, as is now universally recognized, is not a rule of evidence but is one of substantive law. . . .

**(4)** The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an [*743] agreement in a writing (the 'integration'), *becomes the contract of the parties*. . . .

**(5)** Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.

**(6)** The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations." ( *Estate of Gaines*, 15 Cal.2d 255, 264-265 [100 P.2d 1055].) In the present case the defendant did not object to the parol evidence.

**(7)** Parol evidence, "though admitted without objection, must be ignored as of no legal import and its incompetency to vary a written contract is a matter of law." ( *Lifton* v. *Harshman*, 80 Cal.App.2d 422, 432 [182 [***24] P.2d 222].)

**(8)** Appellant also contends that the court erred in awarding a lien upon the stock to secure reimbursement of money lent or advanced to him. The provision in the written agreement regarding a lien is as follows: "This

percentage shall apply either by settlement or otherwise, and it is understood and agreed that we shall [**959] have a lien against said cause of action, settlement, judgment, . . . and that you will advance and pay any and all court costs and other expenses as they become necessary from time to time." The contract did not provide for a lien to secure the reimbursement of money lent or advanced to defendant. The court erred in imposing such a lien. (It is not to be understood that this court, by ruling upon the contention as to a lien for money lent, is impliedly or at all deciding that it was proper to impose a lien for any purpose upon the stock which was located in Nevada. This court is not determining that question. See *Hardy* v. *Hardy*, 164 Cal.App.2d 77, 79 [330 P.2d 278].)

Some of the other contentions of appellant are: (1) The court erred in rendering judgment which in effect ordered appellant to specifically perform the agreement by [***25] transferring stock to plaintiffs, when there was no proof of performance by plaintiffs, when the agreement lacked mutuality, and when there was no pleading or proof of inadequacy of remedy at law. (2) The court erred in awarding stock, because the spendthrift trust was not a "recovery" under the agreement. (3) The provisions of the judgment imposing liens on stock in Nevada are void. (4) The court erred in [*744] finding that the relationship of attorney and client did not exist at the time the agreement was made. (5) The appellant did not receive a fair trial.

In view of the above conclusion to the effect that the court erred in considering parol evidence and that such error requires a reversal of a portion of the judgment, it is not necessary to determine other contention on appeal.

As above stated, the appellant does not contend on appeal that the judgment is erroneous as to the portions thereof which are based on the third, fourth, and fifth causes of action (which causes of action pertain to money lent and account stated.) The portions of the judgment (paragraph V and VI) pertaining to those causes of action should be affirmed. The other portions of the judgment should [***26] be reversed.

The portion of the judgment, designated paragraph V, awarding $ 1,114.68 and interest, and the portion of the judgment, designated paragraph VI, awarding $ 820.93 and interest, are affirmed. The other portions of the judgment are reversed.

EXHIBIT 36

Retrieve State Legislative Impact® **($)**          **Practitioner's Toolbox**

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH ***
2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 38 OF THE 2008 REGULAR
SESSION APPROVED 6/25/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CODE OF CIVIL PROCEDURE
Part 2.  Of Civil Actions
Title 10.  Actions in Particular Cases
Chapter 1.  Actions for Foreclosure of Mortgages

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Code Civ Proc § 726 (2008)

### § 726.  Foreclosure of mortgage or deed of trust; Proceedings; Action based on fraud

**(a)** There can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property or an estate for years therein, which action shall be in accordance with the provisions of this chapter. In the action the court may, by its judgment, direct the sale of the encumbered real property or estate for years therein (or so much of the real property or estate for years as may be necessary), and the application of the proceeds of the sale to the payment of the costs of court, the expenses of levy and sale, and the amount due plaintiff, including, where the mortgage provides for the payment of attorney's fees, the sum for attorney's fees as the court shall find reasonable, not exceeding the amount named in the mortgage.

**(b)** The decree for the foreclosure of a mortgage or deed of trust secured by real property or estate for years therein shall declare the amount of the indebtedness or right so secured and, unless judgment for any deficiency there may be between the sale price and the amount due with costs is waived by the judgment creditor or a deficiency judgment is prohibited by Section 580b, shall determine the personal liability of any defendant for the payment of the debt secured by the mortgage or deed of trust and shall name the defendants against whom a deficiency judgment may be ordered following the proceedings prescribed in this section. In the event of waiver, or if the prohibition of Section 580b is applicable, the decree shall so declare and there shall be no judgment for a deficiency. In the event that a deficiency is not waived or prohibited and it is decreed that any defendant is personally liable for the debt, then upon application of the plaintiff filed at any time within three months of the date of the foreclosure sale and after a hearing thereon at which the court shall take evidence and at which hearing either party may present evidence as to the fair value of the real property or estate for years therein sold as of the date of sale, the court shall render a money judgment against the defendant or defendants for the amount by which the amount of the indebtedness with interest and costs of levy and sale and of action exceeds the fair value of the real property or estate for years therein sold as of the date of sale. In no event shall the amount of the judgment, exclusive of interest from the date of sale and of costs exceed the difference between the amount for which the real property or estate for years therein was sold and the entire amount of the indebtedness secured by the mortgage or deed of trust. Notice of the hearing shall be served upon all defendants who have appeared in the action and against whom a deficiency judgment is sought, or upon their attorneys of record, at least 15 days before the date set for the hearing. Upon application of any party made at least 10 days before the date set for the hearing the court shall, and upon its own motion the court at any time may, appoint one of the probate referees provided for by law to appraise the real property or estate for years therein sold as of the time of sale. The probate referee shall file the appraisal with the clerk and the appraisal is admissible in evidence. The probate referee shall take and subscribe an oath to be attached to the appraisal that the referee has truly, honestly and impartially appraised the real property or estate for years therein to the best of the referee's knowledge and ability. Any probate referee so appointed may be called and examined as a witness by any party or by the court itself. The court shall

fix the compensation, in an amount as determined by the court to be reasonable, but the fees shall not exceed similar fees for similar services in the community where the services are rendered, which may be taxed and allowed in like manner as other costs.

**(c)** No person holding a conveyance from or under the mortgagor of real property or estate for years therein, or having a lien thereon, which conveyance or lien does not appear of record in the proper office at the time of the commencement of the action need be made a party to the action, and the judgment therein rendered, and the proceedings therein had, are as conclusive against the person holding the unrecorded conveyance or lien as if the person had been a party to the action. Notwithstanding Section 701.630, the sale of the encumbered real property or estate for years therein does not affect the interest of a person who holds a conveyance from or under the mortgagor of the real property or estate for years therein mortgaged, or has a lien thereon, if the conveyance or lien appears of record in the proper office at the time of the commencement of the action and the person holding the recorded conveyance or lien is not made a party to the action.

**(d)** If the real property or estate for years therein mortgaged consists of a single parcel, or two or more parcels, situated in two or more counties, the court may, in its judgment, direct the whole thereof to be sold in one of the counties, and upon these proceedings, and with like effect, as if the whole of the property were situated in that county.

**(e)** If a deficiency judgment is waived or prohibited, the real property or estate for years therein shall be sold as provided in Section 716.020. If a deficiency judgment is not waived or prohibited, the real property or estate for years therein shall be sold subject to the right of redemption as provided in Sections 729.010 to 729.090, inclusive.

**(f)** Notwithstanding this section or any other provision of law to the contrary, any person authorized by this state to make or arrange loans secured by real property or any successor in interest thereto, that originates, acquires, or purchases, in whole or in part, any loan secured directly or collaterally, in whole or in part, by a mortgage or deed of trust on real property or an estate for years therein, may bring an action for recovery of damages, including exemplary damages not to exceed 50 percent of the actual damages, against a borrower where the action is based on fraud under Section 1572 of the Civil Code and the fraudulent conduct by the borrower induced the original lender to make that loan.

**(g)** Subdivision (f) does not apply to loans secured by single-family, owner-occupied residential real property, when the property is actually occupied by the borrower as represented to the lender in order to obtain the loan and the loan is for an amount of one hundred fifty thousand dollars ($150,000) or less, as adjusted annually, commencing on January 1, 1987, to the Consumer Price Index as published by the United States Department of Labor.

**(h)** Any action maintained pursuant to subdivision (f) for damages shall not constitute a money judgment for deficiency, or a deficiency judgment within the meaning of Section 580a, 580b, or 580d of the Code of Civil Procedure.

## ⚓ History:

Enacted 1872. Amended Stats 1893 ch 101 § 1; Stats 1895 ch 108 § 1; Stats 1901 ch 43 § 1; Stats 1933 ch 793 § 1; Stats 1937 ch 353 § 1; Stats 1963 ch 819 § 26; Stats 1967 ch 1003 § 1; Stats 1968 ch 450 § 3; Stats 1970 ch 1282 § 2, operative July 1, 1971; Stats 1982 ch 497 § 46, ch 517 § 152, ch 1535 § 2; Stats 1983 ch 18 § 18, effective April 21, 1983; Stats 1983 ch 155 § 22, effective June 30, 1983, operative July 1, 1983; Stats 1987 ch 180 § 1; Stats 1989 ch 698 § 14; Stats 1992 ch 1095 § 4 (AB 2734).

## ⚓ Notes:

⚓ 1. Amendments
⚓ 2. Historical Derivation
⚓ 3. Note

⚓ 1. Amendments:

EXHIBIT 37

Retrieve State Legislative Impact® **($)**                    **Practitioner's Toolbox**

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\*\*\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*\*\*
2007-2008 THIRD EXTRA. SESSION CH. 7 AND CH. 38 OF THE 2008 REGULAR
SESSION APPROVED 6/25/08, AND PROPOSITION 99 APPROVED BY VOTERS 6/3/08

CODE OF CIVIL PROCEDURE
Part 4.  Miscellaneous Provisions
Title 1.  Of the General Principles of Evidence

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Code Civ Proc § 1856 (2008)

## § 1856.  Parol evidence rule

**(a)** Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

**(b)** The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

**(c)** The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

**(d)** The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

**(e)** Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue.

**(f)** Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

**(g)** This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud.

**(h)** As used in this section, the term agreement includes deeds and wills, as well as contracts between parties.

⚓ **History:**

Enacted 1872; Amended Stats 1978 ch 150 § 1.

⚓ **Notes:**

Amendments: