John G. Michael       #106107
Ryan L. Eddings       #256519

**BAKER MANOCK & JENSEN, PC**
A PROFESSIONAL CORPORATION
FIG GARDEN FINANCIAL CENTER
5260 NORTH PALM AVENUE, FOURTH FLOOR
FRESNO, CALIFORNIA 93704-2209
TELEPHONE (559) 432-5400
TELECOPIER (559) 432-5620

Attorneys for    Defendants and Counter-Claimants

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| BP WEST COAST PRODUCTS, LLC, a Delaware Limited Liability Company, | Case No. 5:07-CV-04808 JF |
| Plaintiff, | DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | |
| STTN ENTERPRISES, INC., a California Corporation; NAZIM FAQUIRYAN, an individual; SAYED FAQUIRYAN, an individual; and MAGHUL FAQUIRYAN, an individual; and AVA GLOBAL ENTERPRISE, LLC, a California limited liability company, | |
| Defendants. | [Filed concurrently with Declarations of Sayed Faquiryan and John G. Michael] |
| STTN ENTERPRISES, INC., a California Corporation; NAZIM FAQUIRYAN, an individual; SAYED FAQUIRYAN, an individual; and MAGHUL FAQUIRYAN, an individual; and AVA GLOBAL ENTERPRISE, LLC, a California limited liability company, | Date: August 8, 2008 Time: 9:00 a.m. Dept. 3 The Honorable Jeremy Fogel |
| Cross-Complainants, | |
| v. | |
| BP WEST COAST PRODUCTS, LLC, a Delaware Limited Liability Company; | |
| Cross-Defendants. | |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    BP's Termination of the Franchise Agreement Was Unlawful . . . . . . . . . . . . . . 9

        1.    STTN did not fail to pay for all sums due to BP . . . . . . . . . . . . . . . . 10

        2.    STTN did not fail to operate the marketing premises for at
            least 12 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.    STTN did not fail to have all grades of gasoline available . . . . . . . . . . . 14

        4.    BP failed to comply with notice PMPA provisions . . . . . . . . . . . . . . . 15

    C.    Summary Judgment Against STTN'S Second Through Fifth
        Counterclaims For Breach of Contract Is Inappropriate . . . . . . . . . . . . . . . . . 16

        1.    The Conditional Commitment Letter is a Valid Contract . . . . . . . . . . . . 17

            a.    The CCL contains all material terms . . . . . . . . . . . . . . . . . . . . . 17

            b.    The Store and Gas Loans do not supercede the CCL . . . . . . . . . . . 18

        3.    BP Breached the Gasoline Loan and Disbursement Agreements . . . . . . . 20

    D.    Summary Judgment Against STTN's Sixth Counterclaim For
        Breach of the Implied Covenant of Good Faith and Fair Dealing
        Is Inappropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    E.    Summary Judgment Against STTN's Fraud Counterclaim is Inappropriate . . . . . 23

    F.    Summary Judgment Against STTN's Negligent Misrepresentation
        Counterclaim is Inappropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                        Page

3

*Badie v. Bank of America*, 67 Cal.App.4th 779, 798 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4

*Birman v. Loeb* (1998) 64 Cal.App.4th 502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5

*Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d
1371, 1393 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

6

*Celotex Corp. v. Cutrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

*Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d 1159, 1163 (9th Cir. 2002) . . . . . . . . . 10, 11, 13-15

8

*Crosstalk Productions, Inc. v. Jacobson*, 65 Cal.App.4th 631, 644 (1998) . . . . . . . . . . . . . . . . 18

9

*Erlich v. Mendezes*, 21 Cal.4th 543, 553-54 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10

*FDIC v. Craft* 157 F.3d 697 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11

*First Commercial Mortgage Co. v. Reece,* 89 Cal.App.4th 731, 745 (2001) . . . . . . . . . . . . . . . 20

12

*Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 550 (1996) . . . . . . . . . . . . . . . . . 12

13

*Harm v. Frasher*, 181 Cal.App.2d 405, 417 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14

*Harrison v. Adams* (1942) 20 Cal.2d 646 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15

*Hauger v. Gates* (1954) 42 Cal.2d 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16

*Hazel v. Superior Court*, 123 Cal.App.3d 652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17

*In re Estate of Bennett*, 78 Cal.Rptr.3d 435, 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18

*Jess v. Herrman* (1979) 26 Cal.3d 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

19

*Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 14

20

*Krobitzsch v. Middleton*, 72 Cal.App.2d 804, 808 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21

*Marathon Petroleum Co. v. Pendleton*, 689 F.Supp. 739, 744 (N.D.Ohio 1988) . . . . . . . . . . . . 15

22

*Marshall v. Hilton*, 209 Cal. 531, 534 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

23

*McClain v. Octagon Plaza, LLC*, 159 Cal.App.4th 792, 793 (2008) . . . . . . . . . . . . . . . . . . . . . . 24

24

*McDaniel v. City and County of San Francisco* (1968) 259 Cal.App.2d 356 . . . . . . . . . . . . . . . 11

25

*Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp. 1099, 1123-24
(D.C. Mo. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

26

*Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1055 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . 9, 10

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1                              TABLE OF AUTHORITIES (Continuing)

2

3    CASES                                                                                        Page

4    *Murchison v. Murchison* (1963) 219 Cal.App.2d 600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5    *Murphy v. FDIC* 38 F.3d 1490, 1504 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6    *Palmquist v. Palmquist*, 212 Cal.App.2d 322, 331 (1963) . . . . . . . . . . . . . . . . . . . 19, 21

7    *Peterson Development Co. v. Torrey Pines Bank*, 233 Cal.App.3d 103, 115 (1991) . . . . . . . . . . 17

8    *Rich & Whillock v. Ashton Dev.,* 157 Cal.App.3d 1154, 1158 (1984) . . . . . . . . . . . . . . . . 18

9    *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) . . . . . . . . 9

10   *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir. 1981) . . . . . . . . . . . 15

11   *Williams v. Pratt* (1909) 10 Cal.App.625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12   *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir. 1984) . . . . . . . . . . . . . . . . 15, 16

13   *Zipper v. Sun Co., Inc.*, 947 F.Supp. 62, 69 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . 15, 16

14

15   STATUTES

16   15 U.S.C. §2801(13)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

17   15 U.S.C. §2802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18   15 U.S.C. §2802(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19   15 U.S.C. §2802(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20   15 U.S.C. §2802(c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21   15 U.S.C. §2802(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

22   15 U.S.C. §2804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

23   15 U.S.C. §2804(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

24   15 U.S.C. §§ 2801 (2008) (PMPA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11, 13, 15

25   California Civil Code §1486 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26   California Civil Code §1487 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

27   California Civil Code §1488 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28   California Civil Code §1489 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

TABLE OF AUTHORITIES (Continuing)

<u>STATUTES</u>                                                                                          <u>Page</u>

California Civil Code §1490 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Civil Code §1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Civil Code §1565 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Civil Code §1567; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Civil Code §1697 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rules of Civil Procedure §56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1    Defendants and Counter-Claimants STTN ENTERPRISES, INC. ("STTN"), a California

2    Corporation; NAZIM FAQUIRYAN ("Nazim"), an individual; SAYED FAQUIRYAN ("Sayed"),

3    an individual; and MAGHUL FAQUIRYAN ("Maghul"), an individual; and AVA GLOBAL

4    ENTERPRISE, LLC ("AVA"), a California limited liability company (collectively referred to

5    herein as "Defendants") for their Opposition to Plaintiff's Motion for Summary Judgment, or in

6    the Alternative Partial Summary Judgment, as to the Counterclaim, state as follows:

7                                         **I.**

8                                  **INTRODUCTION**

9          This case concerns the remodeling and rebranding of a Chevron gasoline station

10   and mini mart/restaurant in Hollister, California to an Arco gasoline station and am/pm mini mart.

11   STTN and BP entered into various agreements to accomplish this purpose, including two

12   Conditional Commitment Letters, a Store Loan Agreement, a Gasoline Loan Agreement, a

13   Disbursement Agreement, an am/pm Franchise Agreement and two Contract Dealer Gasoline

14   Agreements. STTN fully performed its obligations under these agreements between it and BP.

15   Despite this performance, BP failed and refused to fully fund the loans it agreed to provide to

16   STTN, delayed its performance of the Store Loan Agreement and caused STTN to deplete its

17   working capital to pay construction expenses to the point where it could no longer pay for gasoline

18   on a regular basis. BP then used this as an excuse, despite STTN's tender of further performance

19   by offering to purchase gasoline with a cashier's check, to terminate STTN's franchise agreements

20   after it had spent almost $1 million to remodel and rebrand its Chevron gasoline station to BP's

21   standards in order to operate as an Arco gas station and am/pm mini mart. BP should be held

22   accountable for its actions.

23         The undisputed facts show that STTN had satisfied all conditions to funding by

24   March 9, 2007 when BP recorded its deed of trust and received a commitment from its title

25   company to issue a policy of title insurance in the form it requested. BP, however, delayed

26   funding the loan by repeatedly asking for documents and information that were not conditions to

27   funding or disbursement. As a result of this delay, by early April, 2007, STTN could no longer

28   pay its contractors and its subcontractors. They stopped work and began to record mechanic's

1

1    liens on the real estate on which the station was operating.  BP, although it was entitled under the

2    agreements to use the loan proceeds to pay the mechanic's liens, then used the mechanic's liens as

3    an excuse to refuse to fund the loans.  BP required STTN to pay the mechanic's liens as a

4    condition to funding.  STTN was forced to have a related company, AVA Global Enterprise, LLC,

5    refinance the real property in order to generate funds to pay the contractors.  This re-financing

6    further delayed the funding of the loans because BP insisted that certain documents be re-drafted

7    to reflect that the senior lender on the property had made a new loan.

8         BP finally partially funded the loans at the end of May, 2007.  The Store Loan was

9    fully funded and disbursed by August 7, 2007, with the final disbursement being an approximately

10   $12,000 payment to STTN.  In the meantime, due to the delays in funding and the need for STTN

11   to use its working capital to pay contractors, STTN had fallen behind in its gasoline payments to

12   BP.  STTN was put on a COD basis.  An agreement to pay the arrearages was entered into in May,

13   2007 that called for the first payment to be made in July, 2007.  Despite this payment plan, under

14   which STTN reduced the balance owing by almost $60,000, BP refused to fund the Gasoline Loan

15   until the arrearages were paid in full.  STTN tendered payment through various escrow offers, but

16   BP failed to perform, including failing to acknowledge that the arrearages had been cured by a

17   setoff against loan proceeds, as recognized by California law.

18        Finally, in late August, STTN ceased purchasing gasoline as a way of informing BP

19   that an agreement had to be reached about the funding of the Gasoline Loan.  Instead of dealing

20   with the real issue, BP threatened to terminate the franchise agreements if STTN did not purchase

21   gasoline.  STTN than offered to purchase a load of gasoline and even faxed a copy of its cashier's

22   check to BP.  BP, however, refused to deliver any gasoline to STTN.  Instead, BP wrongfully

23   terminated the franchise agreements and failed to give the proper notice.  Because BP is the one

24   who breached the agreements and wrongfully terminated the franchises, summary judgment in

25   BP's favor should be denied.

26   ///

27   ///

28   ///

2

## II.

### STATEMENT OF UNDISPUTED FACTS

In 2005, Sayed Faquiryan, a principal in STTN, and Ken Wickerham discussed STTN becoming a BP franchisee. Declaration of Sayed Faquiryan filed herewith ("Faquiryan Dec."), ¶ 3). The first location discussed was in Watsonville, California. Faquiryan Dec., ¶ 3. STTN applied for and was approved for an Arco and am/pm franchise for that location. Faquiryan Dec., ¶ 3. STTN paid to BP a franchise fee of $100,000. Some time later, STTN applied for and was approved for an additional franchise in Hollister, California. Faquiryan Dec., ¶ 3. STTN paid a franchise fee of $72,000 to BP for this franchise. Faquiryan Dec., ¶ 3. The Hollister franchise is the subject of this lawsuit and involves the remodeling and rebranding of STTN's existing Chevron station and mini mart/restaurant to an Arco gasoline station and am/pm mini mart. Faquiryan Dec., ¶ 3. STTN and BP entered into various agreements to accomplish this purpose. On May 25, 2006, STTN and BP entered into a Conditional Commitment Letter ("CCL"), pursuant to which STTN paid to BP an additional $10,000 fee. Declaration of Thomas Reeder in Support of BP West Coast Products LLC's Motion for Summary Judgment, etc. ("Reeder Dec."), Ex. I [Defendant cites to the Reeder Dec. and its exhibits solely for the purpose of directing the court's attention to the exhibits thereto, to avoid duplication in the exhibits submitted, and Defendant does not intend to adopt the testimony of Mr. Reeder regarding the interpretation or effect of these agreements, or any other matter, except as identified below.]. On July 11, 2006, STTN and BP entered into a Contract Dealer Gasoline Agreement and an am/pm Mini Market Agreement. Reeder Dec., Exhibits A and B.

At the time that these agreements were entered into, BP was aware that STTN's Chevron station was an operating business and that the gas station portion already had tanks, pumps, dispensers, and a canopy. Deposition of Tom Reeder ("Reeder Dep.") 36:14-37:17. Because of this, the gas station portion of the remodel would be much less expensive than the store portion. Faquiryan Dec., ¶ 5. Despite this knowledge, BP allocated the loans $150,000 to the store portion of the remodel and $250,000 to the gas station portion. Reeder Dec., Ex. I, Deposition of Jean Smith ("Smith Dep") 105:2-7 and Exhibit "A" to Exhibit 80 thereto.

3

1    Due to the expense and disruption involved in the remodel, STTN requested that it

2    be permitted to sell Arco branded gas during the remodel of the store.  Faquiryan Dec., ¶ 6.  This

3    request was granted.  Reeder Dep. 41:25-42:7.  STTN then proceeded with the rebranding of the

4    gas station from Chevron to Arco.  Faquiryan Dec., ¶ 6.  When that process was complete, and

5    when STTN was ready to open the gas portion of the station, BP required that STTN sign another

6    Contract Dealer Gasoline Agreement on October 12, 2006.  Reeder Dec., Ex. D.

7    Because the Watsonville project was delayed, BP requested STTN to show good

8    faith and start construction on the store remodel, even though it had not presented STTN with any

9    loan agreements.  Faquiryan Dec., ¶ 7;  BP assured STTN that loan funds would be forthcoming.

10    Faquiryan Dec., ¶ 7.  STTN started construction on the store remodel on January 2, 2007.

11    Faquiryan Dec., ¶ 7.  Because the loans were not forthcoming, STTN had to use its working

12    capital to pay for the construction.  Faquiryan Dec., ¶ 7.  Because of this drain on its working

13    capital, STTN fell behind in its payments for gasoline.  Faquiryan Dec., ¶ 7.

14    All of the conditions to funding the loan were set forth in the CCL.  Deposition of

15    Cile McDonnell, 56:18-58:8.  Throughout January, February and early March, STTN worked to

16    satisfy the conditions set forth in the CCL.  Faquiryan Dec., ¶ 8.  On February 12, 2007, long after

17    construction had started and STTN was running out of working capital, BP presented STTN with

18    the Gasoline Loan Agreement and the Store Loan Agreement, both of which STTN signed.

19    Faquiryan Dec., ¶ 8, Reeder Dec. Exs. J and K.  **By March 9, 2007, all conditions to funding**

20    **had been met.**  Smith Dep. 11:7-12:14, 14:21-24, 19:20-20:20, 27:11-16, 31:6-21; 32:14-24;

21    34:10-35:11, 40:3-9, 44:14-45:7, 54:13-17, 55:24-56:7; , 58:8-11.  Also on March 9, 2009, BP

22    presented STTN with another CCL for it to sign.  Faquiryan Dec., ¶ 9, Smith Dep. 105:2-7 and

23    Exhibit "A" to Exhibit 80 thereto.  BP recorded its Deed of Trust securing  its loans on March 9,

24    2007.  Declaration of John G. Michael, filed herewith (the "Michael Dec."), ¶ 9, Ex. "G."

25    Certainly by March 20, 2007, there was no doubt that conditions had been met for funding.  Smith

26    Dep. 58:8-11.

27    ///

28    ///

1    BP, however, refused to fund the loan, alleging that it had to wait for the actual

2   policy of title insurance.  Smith Dep. 45:13-20.  The CCL's and Loan Agreements, however,

3   contain no such condition.  The CCL's, at ¶ 21 on Exhibit "B" thereto merely require:

4           A *commitment* from a BPWCP-approved title company to issue an ALTA
            lender's policy of title insurance insuring that the Deed of trust encumbers
5           the Real Property in the position approved by BPWCP, subject to
            exceptions approved in writing by BPWCP. (Emphasis added.)
6

7    BP received that commitment when the title company recorded BP's deed of trust

8   on March 9, 2007.  In BP's transmittal letter and instructions to the title company, it stated:

9           When the following conditions are met, you are to proceed as indicated
            below:
10
                1. Title Policy.  *You are committed to issue to BPWCP your ALTA*
11              *Leasehold Loan Policy of title insurance* (the "Policy") insuring
                BPWCP as the lender of the Real Estate in the amount of
12              $475,000.00....(Emphasis added).

13          Closing.  Upon satisfaction of the above conditions, you are to do the
            following:
14
                1.  Record the enclosed documents....
15
            ...[Y]our recording of any of the enclosed documents *will constitute* your
16          acceptance of the above instructions and *your agreement to issue the policy*
            *described above.*  (Emphasis added).
17

18   See Michael Dec., Ex. "F."  Thus, upon the recording of the deed of trust, the

19  condition that BP obtain a *commitment* from a title company to issue the required policy was

20  satisfied and BP should have then funded the loan.  It did not.  Faquiryan Dec., ¶ 10,11.  BP

21  breached the loan agreements and the CCL's by failing to timely fund the loans.  The ramifications

22  of this breach were terrible.  The general contractor and his subs walked off the job because they

23  were no longer being paid.  Faquiryan Dec., ¶ 11.  Mechanics liens started to appear.  Faquiryan

24  Dec., ¶ 11.  The project was delayed and STTN lost additional store sales, which generated a pre-

25  BP profit each month of approximately $30,000.  Faquiryan Dec., ¶ 11.  AVA Global Enterprise,

26  Inc., a related company to STTN, had to refinance the real property on which the station was

27  located  to generate funds to be used by STTN to clear the liens, pay the subcontractors and

28  general contractor and get work started.  Faquiryan Dec., ¶ 11.  The refinancing process delayed

1    the project even further because BP required a new subordination agreement to be signed and the

2    preparation, review and approval of the new loan took time.  Faquiryan Dec., ¶ 11.

3              Approximately two months after the deed of trust was recorded, BP required STTN

4    to sign a Disbursement Agreement.  Reeder Dec., Ex. L.  BP had the option under ¶ 7.3 of the

5    Disbursement Agreement to pay the mechanics liens from loan proceeds, but although BP caused

6    the problems by failing to timely fund the loans in the first place, it never even considered paying

7    the liens from loan proceeds.  McDonnell 114:16-115:18; 137:8-138:2.

8              Even after the liens had been cleared, BP held up loan funding while gathering

9    documents that were not conditions to funding.  McDonnell 134:7-10.  As set forth in the

10   Declaration of Cecile McDonnell, filed with BP's motion for summary judgment ("McDonnell

11   Dec."), she was requiring budgets (which are not listed as a condition to funding), that Sayed

12   Faquiryan be named as corporate designee (not a condition to funding) and a revised Disbursement

13   Agreement (also not a condition to loan funding).  The promissory notes were signed at the same

14   time as the loan agreements, on February 12, 2007.  Faquiryan Dec., ¶ 14.

15             Finally in late May, 2007, BP funded the store loan only and provided STTN and its

16   contractor with Vouchers to use to get paid or reimbursed.  Faquiryan Dec., ¶ 15.  Despite the fact

17   that any alleged default in gas payments was not a default under the store loan agreement (see

18   Reeder Dec., Ex. J), BP obtained a waiver of its policy in order to fund the store loan because BP

19   determined that its best chance of earning the return on its investment and its profit was to release

20   the store loan funds.  Smith Dep. 99:6-100:19.  The store loan was fully disbursed by early August,

21   with approximately $12,000 being paid to STTN, despite its alleged default on gas payments.

22   McDonnel Dec., ¶ 12;

23             In the meantime, STTN agreed to reduce the balance owing for gasoline by paying

24   an extra $30,000 per month on the 15th of each month, starting on June 20, 2007.  Faquiryan Dec.,

25   ¶ 16.  Although BP and its witnesses have testified that STTN did not adhere to the payment plan,

26   STTN reduced the balance owing from the approximately $185,000 owing in May, 2007 at the

27   time of the payment agreement to what BP alleges is approximately $126,000 by the end of

28   August, 2007, which is approximately a $60,000 reduction in the two month period that the

1   agreement was in effect (July 15th and August 15th).  Declaration of Brad Christensen, filed with

2   BP's Motion for Summary Judgment ("Christensen Dec."), ¶ 7; Reeder Dec. ¶ 9.  However, BP's

3   own documents indicate that the debt was only $114,000.88 on August 24, 2007.  Reeder Dec.,

4   Ex. F.  STTN disputes that this balance is accurate and alleges that is has been charged for loads of

5   gasoline that was never delivered.  Faquiryan Dec., ¶ 16.  This alone creates a question of fact that

6   precludes summary judgment.

7           BP, however, demanded that STTN pay the entire balance of the gasoline payments

8   before it would fund the gasoline loan.  McDonnell 98:23-99:3; 100:7-18.  Even though STTN had

9   paid construction expenses in excess of the amount of the gasoline loan, BP refused to setoff the

10   gasoline payments against the loan proceeds that would go to STTN.  Faquiryan Dec., ¶ 17.  In

11   fact, STTN had performed under the payment agreement by reducing the balance owing by

12   approximately $60,000 and was not in default during the time that BP demanded that it pay the

13   entire balance of the gas payments before it would fund the gasoline loan.  Faquiryan Dec., ¶ 17.

14           Further, as set forth below in more detail, even if STTN was in default of the

15   payment agreement, its debt was paid and discharged as a matter of law by the doctrine of setoff.

16   STTN owed the gas payments at the same time as BP owed the loan proceeds and BP's debt

17   clearly exceeded any owed by STTN.  Under California law, the debt is deemed paid to the extent

18   that there is at least an equal amount owing from BP.

19           Finally, STTN tendered payment through an escrow.  McDonnell 99:23-100:4;

20   100:19-101:19.  STTN offered to have the amount of the gas payments deducted from the gas loan

21   proceeds at the close of escrow when the loan proceeds would be disbursed.  Faquiryan Dec., ¶ 18.

22   BP falsely represented to STTN that this could not be done as it was against BP policy.  Faquiryan

23   Dec., ¶ 18.  Internal emails, however, show that BP could have approved this procedure if

24   management had agreed and the franchisee agreed.  Reeder 90:12-91:17 and Exhibit 137 thereto.

25   Next, STTN offered to put the amount then owing into the same escrow and that the gas payments

26   could be disbursed to BP at the same time that the loan proceeds were disbursed to STTN to

27   reimburse it for construction expenses.  Faquiryan Dec., ¶ 18.  Reeder 92:9-20.  STTN had already

28   provided BP with proof that it paid over $200,000 of reimbursable expenses.  Faquiryan Dec., ¶

7

1    18.  BP refused and stated that they could not "commingle" their funds with STTN's funds in the

2    same escrow, which makes no sense.  Reeder 92:9-20.

3            STTN then offered to open a separate escrow and to place its money for the gas

4    payments into its escrow if BP would place the loan proceeds into its escrow.  Faquiryan Dec., ¶

5    19; Reeder 92:21-93:2.  BP agreed, but insisted that STTN place its money into escrow first.

6    McDonnell 103:22-104:2.  Because of the repeated delays, the repeated requests for additional

7    documentation that is not required by the loan documents as a condition to funding, BP's prior

8    breach of the loan agreements and because STTN would have to borrow the money to pay the gas

9    bills (with a plan of paying it back with the loan proceeds it received), it was suspicious of BP's

10   demand that STTN provide its money first.  Faquiryan Dec., ¶ 19.  Also, it could not afford to

11   borrow the money and have it sit in escrow for weeks while BP further delayed funding the gas

12   loan.  Faquiryan Dec., ¶ 19.  STTN refused to put its money in first, BP also refused and the

13   escrow procedure never was used.

14           Because of BP's breaches of the loan agreements, because STTN was out of

15   working capital, and because BP would not respond with a date certain as to when the gas loan

16   would fund, STTN ceased purchasing gasoline around August 18, 2007.  Faquiryan Dec., ¶ 20.

17   STTN informed BP that as soon as the loan funded, either through the escrow process or

18   otherwise, it would again purchase and sell gasoline.  Faquiryan Dec., ¶ 20.

19           After discussion with Brad Christensen, Tom Reeder and Mike Hagar in late

20   August in which they threatened to terminate the franchise, because of all of the money that it had

21   invested, STTN agreed to purchase gasoline for sale over the Labor Day weekend.  Faquiryan

22   Dec., ¶ 21.  BP required that STTN pay by cashier's check and that it fax a copy to the distribution

23   center.  Faquiryan Dec., ¶ 21.  STTN obtained a cashier's check and faxed a copy to the

24   distribution center, but was later told that BP would not sell gasoline to STTN and that its

25   franchise was being terminated.  Faquiryan Dec., ¶ 21.  STTN therefore tendered a cure of its

26   default under the franchise agreements before they were terminated, but its tender was refused.

27           BP then proceeded to wrongfully terminate the franchise agreements.  BP's notice

28   of termination was wrongful for the following reasons. (1) BP is the one the breached the

8

1  agreements and caused the arrearages in the gasoline payments.  (2) There was no default in

2  gasoline payments due to the doctrine of setoff.  (3) STTN tendered a cure of the failure to sell all

3  grades of gasoline default, but its tender was refused.  (4)   The notice falsely states that all grades

4  of gasoline were not available for sale, when, in fact, premium gas was available and was being

5  sold. Faquiryan Dec., ¶ 23. (5) the notice references the wrong agreement (the 10/12/06 agreement

6  states that it supersedes the prior agreements).  (6) the Notice falsely states that 90 days is not

7  required because of safety concerns (Reeder 130:6-8).  The notice falsely states that no notice is

8  required because of consumer confusion, which makes no sense. (Reeder 129:4-130:5).

### III.

### ARGUMENT

11  There are numerous questions of fact that preclude summary judgment in favor of

12  BP's claims.  Moreover, many of BP's claims are simply unsupported by existing law.  As such,

13  BP's motion for summary judgment on the Second Amended Complaint must be denied.

**A.**    **Standard for Summary Judgment**

15  Summary judgment is proper only where the Court finds that there is "no genuine

16  issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

17  Fed. R. Civ. Pro. 56(c).  Inasmuch as summary judgment is a drastic remedy, it must be

18  contemplated with "due regard . . . for the rights of persons asserting claims and defenses tried to a

19  jury." *Celotex Corp. v. Cutrett*, 477 U.S. 317 (1986).  As moving party, Plaintiff bears the burden

20  of demonstrating every essential element of its claim. *See, e.g., Southern California Gas Co. v.*

21  *City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

**B.**    **BP's Termination of the Franchise Agreement Was Unlawful**

23  The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 (2008), *et*

24  *seq.*, governs franchise agreements between oil companies and franchisees.  The PMPA was

25  enacted to prevent the well-documented and serious abuses committed by oil companies such as

26  BP, including sham, pretextual, and discriminatory terminations of the franchise agreements.

27  Indeed, the overriding purpose of the PMPA is to provide protection for franchisees from arbitrary

28  or discriminatory termination or non-renewal of their franchises. *Mobil Oil Corp. v. Karbowski*,

9

1   879 F.2d 1052, 1055 (2d Cir. 1989).  The protections provided by the PMPA are needed to curtail

2   the widespread abuse by petroleum franchisors and their ability to arbitrarily terminate franchises.

3   *Krabowski*, 879 F.2d at 1055.

4   .              As a result, the termination of a petroleum franchise agreement must be grounded

5   upon a specific reason recognized by the PMPA.  In addition, even if there are sufficient grounds

6   for termination, there are certain notice requirements that oil company *must* provide to the

7   franchisee in the notice termination.  Thus, in order to prevail on this count, BP must show that its

8   termination of the franchise agreement was based on grounds recognized by the PMPA *and* that

9   the notice of termination satisfied the applicable statutory requirements.  § 2802(b).

10          **1.      STTN did not fail to pay for all sums due to BP**

11              BP contends that STTN's alleged failure to pay all sums owed to BP is a *per se*

12  basis for franchise termination.  To this end, BP claims that it is "undisputed" that STTN failed to

13  pay for BP gas products in a timely manner.  Specifically, BP refers to a September 5, 2007,

14  outstanding balance of $126,000.  Curiously, BP also states that on May 4, 2007, this balance was

15  $184,075.50.  This account was also the subject of the Separate Agreement (hereinafter the

16  "Separate Agreement") between BP and Sayed and Nazim, whereby they would pay $30,000 to BP

17  on the 15th of each month, starting June 20, 2007, until the balance was reduced.  Faquiryan Dec., ¶

18  16.  Sayed and Nazim made payments in July and August, thereby reducing the amount to

19  approximately $126,000.  Indeed, BP's own documents state the balance was only $114,000.88 on

20  August 24, 2007.  Reeder Dec., Ex. F.  Despite this glaringly obvious fact, BP asserts that STTN

21  "never made any payments" to BP under the separate agreement.  Clearly this is a factual question,

22  rendering summary judgment inappropriate.

23              Additionally, BP glosses over an important facet of the PMPA.  In enacting the

24  PMPA, Congress went out of its way to define "failure" in a particular way.  Under the PMPA, the

25  term "failure" does not include "any failure for a cause *beyond the reasonable control* of the

26  franchisee."  § 2801(13)(b) (emphasis added).  This definition of "failure" must be used when

27  applying the "failures" listed in section 2802(c).  *Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d

28

10

1   1159, 1163 (9th Cir. 2002). Moreover, whether a franchisee's actions constitute "failure" is

2   generally a question of fact for the jury. *El-Khoury*, 285 F.3d at 1164.

3           Here, although STTN denies that it was behind in any payment, any such "failure"

4   was not a "failure" as envisioned by the PMPA. Indeed, to the extent that STTN missed payments,

5   such missed payments were due to causes beyond STTN's reasonable control – mainly, that BP

6   itself failed to provide the loan funds that it originally agreed to provide to STTN to get the station

7   up and running and breached the loan agreements. There is substantial evidence to establish that

8   STTN had satisfied all conditions by March 9, 2007, and that STTN was legally entitled to a set-

9   off of debts owed, as discussed below. As such, the *only* reason that STTN could not make

10  payments to BP was due to BP's wrongful refusal to provide the funds it had previously promised

11  to STTN as part of the initial plan to re-brand the station. This forced STTN to use its working

12  capital to pay contractors, even though this was the primary purpose of the loan. Accordingly,

13  STTN did not *fail* to pay all sums due to BP under section 2802(c)(8). In any event, this question

14  is a question of fact for the jury, making summary judgment on this issue inappropriate. *See El-*

15  *Khoury*, 285 F.3d at 1164.

16          Moreover, the doctrine of setoff effectively discharged any debt owed to BP by

17  STTN. In *Williams v. Pratt,* 10 Cal.App.625, 632 (1909), the court held that where a debtor on a

18  promissory note secured by a deed of trust was owed more by the payee than was owing on the

19  promissory note, there was no default under the promissory note. The court stated: "It would

20  certainly be a reproach to the law if one debt could not be set off against the other. Indeed the two

21  demands, as far as they equal each other, are deemed compensated."

22          See also *Hauger v. Gates,* 42 Cal.2d 752, 755 (1954), where the court stated: "By

23  reason of their failure to deliver certain personal property to which plaintiffs were entitled under

24  the agreement of sale, defendants Gates were indebted to plaintiffs in a greater sum than the

25  amount owing by plaintiffs on their promissory note...accordingly, plaintiffs were not in default at

26  the time of the sale."

27          In *Murchison v. Murchison,* 219 Cal.App.2d 600, 605 (1963), the court held that

28  the right of setoff is available to extinguish a debt even though no action is pending. *McDaniel v.*

11

1   *City and County of San Francisco,* 259 Cal.App.2d 356, 365 (1968), held that when cross-

2   demands exist between parties, their claims are paid to the extent they are equal.  In *Harrison v.*

3   *Adams,* 20 Cal.2d 646, 648 (1942), the court stated: "...it is well settled that a court of equity will

4   compel a setoff when mutual demands are held under such circumstances that one of them should

5   be applied against the other and only the balance recovered."

6              As was stated in *Birman v. Loeb,* 64 Cal.App.4th 502, 518 (1998):

7                    In order to assert a setoff, cross-demands for money must exist between the
                     parties...The right of setoff arises when two parties are mutually debtor and
8                    creditor to each other...The Supreme Court has held that "[the right to a
                     setoff is] founded on the equitable principal that 'either party to a
9                    transaction involving mutual debts and credits can strike a balance, holding
                     himself owing or entitled only to the net difference...The Supreme Court has
10                   also held: [I]t is well settled that a court of equity will compel a setoff when
                     mutual demands are held under such circumstances that one of them should
11                   be applied against the other and only the balance recovered....As the
                     Supreme Court explained in *Jess v. Herrman* (1979) 26 Cal.3d 131, 137...in
12                   the ordinary setoff circumstances "a setoff procedure simply eliminates a
                     superfluous exchange of money between the parties...
13

14             This doctrine of setoff is also applied in federal cases.  See *Murphy v. FDIC* 38

15  F.3d 1490, 1504 (9th Cir. 1994) and *FDIC v. Craft* 157 F.3d 697, 703 (9th Cir. 1998).

16             Here, although STTN owed BP approximately $126,000 at the time BP wrongfully

17  terminated the franchise agreement, BP owed STTN $250,000 under the Gasoline Loan

18  Agreement signed between BP and STTN.  As noted above, STTN had satisfied all requirements

19  for funding the loan by March 2007.  Yet, as of September 2007, BP had simply not funded or

20  disbursed *anything* under the Gasoline Loan.  In light of BP's debt to STTN, any amounts owed to

21  BP were deemed satisfied as a matter of law.

22             Furthermore, even if STTN had defaulted on the Dealer Gas Agreement, this fact

23  would have no bearing on BP's obligations, because remaining out of default on the Dealer Gas

24  Agreement is not a condition precedent to Gasoline Loan.  Courts do not favor conditions

25  precedent and will not construe a promise as a condition precedent unless compelled to do so by

26  the unambiguous language of the contract.  *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th

27  534, 550 (1996).  Further, an agreement will be strictly construed against the party asserting the

28  existence of a condition precedent.  *Hazel v. Superior Court*, 123 Cal.App.3d 652, 663 (1981).

1    Here, the Gas Loan Agreement itself is patently ambiguous. Although it was not

2  signed by the parties until February 12, 2007, section 2.1 of the Agreement states that BP "shall

3  not be required to make the first Disbursement unless all of the following conditions are satisfied

4  on or before January 7, 2007." Reeder Ex. K. Even if section 2.1 could operate as a condition

5  precedent, none of the subsections listed therein identify default as a condition to funding. Indeed,

6  default is listed at section 2.2, subpart (f). A plain reading of section 2.2 reveals that this section is

7  a list of *concurrent* conditions. Thus, the plain language of the Gas Loan Agreement clearly states

8  that default is a *concurrent* condition, making any outstanding balance subject to set-off with the

9  Gas Loan. Once the language is construed *against* finding a condition precedent, as the Court

10  must do, this fact is even more obvious. Since any outstanding balance was subject to set-off,

11  STTN clearly did not fail to pay all outstanding sums owed to BP. Therefore, BP's motion for

12  summary judgment on this issue must be denied.

13  Finally, the Separate Agreement set forth above was clearly an accord, which effectively

14  suspended any outstanding debt owed to BP. An accord is an agreement to accept, in extinction of

15  an obligation, something different from or less than that to which the person agreeing to accept is

16  entitled. Cal. Civ. Code § 1521. Acceptance, by the creditor, of the consideration of an accord

17  extinguishes the obligation and is called satisfaction. Cal. Civ. Code § 1523. In other words, an

18  accord substitutes a new executory contract for a previously existing contract. *Moving Picture*

19  *Machine Operators Union v. Glasgow Theaters*, 6 Cal.App.3d 395, 402 (1970). It is axiomatic

20  that an accord suspends the original obligation until the accord is fully performed. However, an

21  accord without satisfaction does not discharge the underlying obligation. *Id.* The question as to

22  whether an agreement amounts to an accord and satisfaction is one of the intention of the parties

23  and is therefore a question of fact. *Conderback, Inc. v. Standard Oil of Co., of California, Western*

24  *Operations*, 239 Cal.App.2d 664, 680 (1966).

25    Here, STTN disputes the amount of money allegedly due to BP. Additionally, BP

26  agreed to accept payment over many months when it made the Separate Agreement with STTN,

27  although payment was originally due upon the delivery of fuel. Thus, this Separate Agreement

28  was an accord that suspended the original obligation to pay for the fuel debt. Because it was an

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1  accord, and because STTN was current with its payments under the accord, STTN could not, as a

2  matter of law, be in default of the original agreement.  STTN could *only* default on the outstanding

3  debt if it failed to adhere to the terms of the accord.  However, as is extensively set for above,

4  STTN was not in breach of the accord.  Coupled with the fact that this issue presents a question of

5  fact, the plain nature of the accord clearly precludes an entry of summary judgment on this issue as

6  well.

7  **2.     STTN did not fail to operate the marketing premises for at least 12 days**

8          Next, BP contends that STTN failed to operate the marketing premises for at least

9  12 days, allegedly violating section 2802(c)(9).  According to BP, STTN was not selling *any* fuel

10  for a 12 day period.  However, while STTN did not sell regular and mid-grade gasoline, both

11  premium gasoline and diesel were available for sale during the *entire* twelve day period.  Clearly,

12  this is a question of fact, precluding summary judgement on this issue as well.

13          Additionally, as noted above, under the PMPA, the term "failure" does not include

14  "any failure for a cause *beyond the reasonable control* of the franchisee."  § 2801(13)(b)

15  (emphasis added).  This definition of "failure" must be used when applying the "failures" listed in

16  section 2802(c).  *El-Khoury*, 285 F.3d at 1163.  Moreover, whether a franchisee's actions

17  constitute "failure" is generally a question of fact for the jury.  *Id.* at 1164.

18          Here, although STTN denies that it did not have any grade of gasoline available for

19  purchase, any such "failure" was not a "failure" as envisioned by the PMPA.  Indeed, to the extent

20  that STTN did not have any grades of fuel available, this was due to causes beyond STTN's

21  reasonable control – mainly, that BP itself failed to provide the loan funds that it originally agreed

22  to provide to STTN to get the station up and running both when it was contractually obligated to

23  do so and when it was legally obligated to do so, under the set-off doctrine.  As such, the only

24  reason that STTN did not have any grade of gasoline for sale was due to BP's refusal to provide

25  the funds it had previously promised to STTN as part of the initial plan to re-brand the station.

26  Accordingly, STTN did not *fail* to operate the station for 12 days under section 2802(c)(9).

27

28

14

1       In any event, the issue of whether STTN failed to operate the station for 12 days is a

2   question of fact for the jury, making summary judgment on this issue inappropriate. *See El-*

3   *Khoury*, 285 F.3d at 1164.

4       **3.    STTN did not fail to have all grades of gasoline available**

5       Next, BP argues that STTN failed to have *all* grades of gasoline available for

6   purchase.  It should be noted that in making this argument, BP appears to admit that STTN was

7   selling at least one grade of gasoline.  (Indeed, as noted previously, STTN was selling two grades:

8   premium and diesel.)  Of course, this directly conflicts with the factual assertions made in support

9   of its argument that STTN failed to operate the station for 12 days.  This alone creates a question

10  of fact sufficient to preclude summary judgment.

11      Further, although BP leaves it unsaid, in order to reach its conclusion BP assumes

12  that failure to sell *certain* grades of gasoline is material to the franchise relationship between BP

13  and STTN.  Since termination is an "extreme remedy," it is available *only* where the violation is so

14  serious that is undermines the entire franchise relationship.  *El-Khoury*, 285 F.3d at 1163.  This is

15  interpreted to mean that the breach must be material.  *Id.*  In making its argument, BP neglects to

16  mention that whether a breach was material to the franchise relationship is usually a question of

17  fact for the jury.  *Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985).  Thus, in light of

18  STTN's good faith efforts and BP's refusal to fulfill its obligations, whether STTN's alleged

19  failure to sell certain grades of gasoline was a material breach - such that termination was lawful -

20  is a question of fact, precluding summary judgment on this issue.

21      In any event, to the extent that STTN did not have certain grades of fuel available,

22  this was due to causes beyond STTN's reasonable control – mainly, that BP itself failed to provide

23  the loan funds that it originally agreed to provide to STTN to get the station up and running.  As

24  such, the only reason that STTN did not have a certain grade of gasoline for sale was due to BP's

25  refusal to provide the funds it had previously promised to STTN as part of the initial plan to re-

26  brand the station.  Accordingly, STTN did not *fail* to have a certain grade of gasoline for sale.

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1    Regardless, the issue of whether STTN failed to have all grades of gasoline

2    available is a question of fact for the jury, making summary judgment on this issue inappropriate.

3    *See El-Khoury*, 285 F.3d at 1164.

4    **4.    BP failed to comply with notice PMPA provisions**

5    In yet another glaring omission, BP fails to mention that in addition to having a

6    legal justification for terminating a franchise, the PMPA also requires that any termination comply

7    with specific notice provisions contained in section 2804.  2802(b)(1)(A).  In other words, *only if*

8    termination complied with the notice requirements of section 2804 will the termination be lawful,

9    regardless of the underlying reasons.  Typically, an oil company must provide notice of at least 90

10   days and the notice must be: (1) in writing; (2) sent via certified mail or personally delivered to the

11   franchisee (STTN); and (3) contain a statement of intent to terminate the relationship and the

12   reasons for the termination, the effective date of the termination, and a summary statement of the

13   rights and responsibilities of any party under the PMPA.  § 2804.  An oil company may give less

14   than 90 days notice in circumstances in which it would "not be reasonable."  If the notice of

15   termination does not satisfy the requirements of the PMPA, the termination is unlawful.

16   *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir. 1981).  Moreover, the

17   notice provisions must be strictly followed and compliance is mandatory.  *Thompson*, 660 F.2d at

18   1390.  Additionally, where the notice of termination enumerates specific justifications, a franchisor

19   cannot later raise *other* grounds in defense of its termination.  *Midwest Petroleum Co. v.*

20   *American Petrofina, Inc.*, 603 F.Supp. 1099, 1123-24 (D.C. Mo. 1985).

21   A determination of what is reasonable is one that is done on a case by case basis

22   under the circumstances of each particular case.  *Marathon Petroleum Co. v. Pendleton*, 689

23   F.Supp. 739, 744 (N.D.Ohio 1988).  However, the 90 day notice provision "should not be lightly

24   excused."  *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir. 1984).  The 90 day

25   notice requirement is not an "all or nothing" requirement that permits no notice at all when 90 days

26   would be unreasonable.  *Zipper v. Sun Co., Inc.*, 947 F.Supp. 62, 69 (E.D.N.Y. 1996).  In

27   addressing the reasonableness of an accelerated notice schedule, some courts have noted that the

28   legislative history and hearings of the PMPA "indicate that § 2804(b)(1)(A) was added to dispense

16

1   with the lengthy notice requirement where, for example, a franchisee committed serious defaults of

2   the franchise agreement, such as misbranding." *Wisser*, 730 F.2d at 60.

3        Initially, it must be noted that BP does not even allege that it has complied with the

4   notice requirements in section 2804. BP has simply failed to present *any* evidence to support a

5   finding of compliance. Likewise, BP has failed to present *any* evidence that not only was the

6   standard 90 day notice *unreasonable*, but that *immediate* termination was *necessary*. Indeed, it has

7   cited no authority for the proposition that an immediate termination notice is reasonable where the

8   franchisee merely owed money. *See Zipper*, 947 F.Supp. at 69 (noting that there is no authority for

9   an immediate termination where the franchisee merely owed money). This failure alone precludes

10  the entry of summary judgment on the issue of the lawfulness of the termination.

11       Moreover, in its notice of termination, BP justifies the decision to terminate the

12  franchise immediately due to "safety concerns" and "consumer confusion." Christensen Dec., Ex.

13  C. As noted above, BP cannot now assert different reasons for terminating the franchise

14  agreement *immediately*. *Midwest Petroleum*, 603 F.Supp. at 1123-24. Not surprisingly, BP fails

15  to offer *any* evidence that such concerns were legitimate. According to BP, there was no gas for

16  sale at STTN's station. How this fact presents a safety issue remains a mystery to which BP has

17  no answer. Reeder Dec., 130:6-8. Similarly, in light of BP's allegations that gas was not being

18  sold, there was simply no risk of confusion to consumers. As such, BP's motion for summary

19  judgment on its claims that it lawfully terminated the franchise agreement under the PMPA must

20  be denied.

21       Additionally, whether BP's immediate termination was reasonable under the facts

22  and circumstances is clearly a question of fact. Because BP has not established that its notice of

23  termination complied with section 2804, summary judgment as to the lawfulness of the

24  termination must be denied.

25  **C.   Summary Judgment Against STTN'S Second Through Fifth Counterclaims For
         Breach of Contract Is Inappropriate**

26

27       Before addressing the merits of the remainder of BP's claims, it is important to

28  consider the entire context of this dispute. The issue underlying all claims is whether BP lawfully

17

1   terminated the franchise agreement, which is solely a question of federal law.  With that in mind, it

2   seems incongruous to deny BP summary judgment on its federal PMPA claim, but award it the

3   *same relief* under state contract law.

4           Nevertheless, as is more fully set forth below, summary judgment against STTN on

5   its Second through Fifth Counterclaims is inappropriate.

6           1.      **The Conditional Commitment Letter is a Valid Contract**

7           BP argues that the Conditional Commitment Letter ("CCL") between STTN and

8   BP signed on May 25, 2006, was not a valid contract.  BP alleges that the CCL did not contain all

9   material terms and, in any event, was superceded by the Store and Gas Loans.  BP is wrong on

10  both counts.

11          a.      **The CCL contains all material terms**

12          BP states that the CCL did not contain all "material terms," and, therefore, it was

13  not a binding contract.  Curiously, at no point does BP define "material terms."  Fortunately, the

14  California Court of Appeals has defined the phrase.  *Peterson Development Co. v. Torrey Pines*

15  *Bank*, 233 Cal.App.3d 103, 115 (1991).  According to the *Peterson Development* Court, material

16  terms include the identity of the lender and borrower, the amount of the loan, and the terms of

17  repayment.  *Peterson Development Co.*, 233 Cal.App.3d at 115.

18          Based on the above, it is clear that the CCL contained all material terms to make it

19  an enforceable contract.  First, it plainly sets forth the identities of both the borrower and lender.  It

20  even calls STTN the "borrower."  Reeder Dec., Ex. I.  Second, it clearly sets forth that the loan is

21  for the maximum amount of $475,000, with a base loan of $320,000 (a base loan of $400,000 in

22  the march 9, 2007 CCL).  These additional funds were subject to the contingencies set forth in

23  Exhibit "A" to the CCL, which is appropriately titled "Summary of Loan Terms."  (Reeder Dec.,

24  Exhibit "I".)  Finally, the CCL plainly sets forth the repayment terms.  The loan was payable over a

25  term of 20 years, with one-twentieth of the loan amount "payable on each anniversary of the first

26  day of the first complete month in which the Business is open for business."  (Reeder Dec., Exhibit

27  "I".)  Additionally, the CCL is signed by representative from both STTN and BP, and their

28  respective initials are on each Exhibit to the CCL.

1    Moreover, both Sayed and Nazim sign on page 3 of the CCL under the line "Agreed

2    to this 30th Day of May, 2006." These signatures appear on a separate page from the line where

3    Sayed and Nazim acknowledged receipt of the CCL. And it begs the question, to what were they

4    *agreeing*? They had already acknowledged receipt of the CCL. It has long been the law of this

5    state that ambiguous language in a contract is to be construed against the drafting party. Cal. Civ.

6    Code § 1654; *Badie v. Bank of America*, 67 Cal.App.4th 779, 798 (1998). This rule should be

7    applied with particular force where it is a contract of a adhesion, such as the case here. *Badie*, 67

8    Cal.App.4th at 798. Here, the CCL was undoubtedly drafted by BP. It even bears their letterhead.

9    Clearly, they were *agreeing* to be bound by the terms and conditions of the CCL.

10    Thus, the CCL clearly contains all material provisions of the agreement. As such,

11    summary judgment against STTN on this issue is inappropriate.

12    **b.     The Store and Gas Loans do not supercede the CCL**

13    BP next argues that even if the CCL was an enforceable contract, it was superceded

14    by the Gasoline Loan and the Store Loans, both of which were signed on February 12, 2007. Once

15    again, BP's argument fails.

16    It is axiomatic that a contract must be entered into freely to be given effect. Cal.

17    Civ. Code § 1565; *Rich & Whillock v. Ashton Dev.*, 157 Cal.App.3d 1154, 1158 (1984). It is

18    equally axiomatic that contracts entered into under duress are not to be given effect. ((Cal. Civ.

19    Code § 1567; ) California law recognizes many different types of duress, including economic

20    compulsion. *Rich & Whillock*, 157 Cal.App.3d at 1158. Of course, whether duress exists is a

21    question of fact for the jury. *In re Estate of Bennett*, 78 Cal.Rptr.3d 435, 442 (2008), *citing*

22    *Crosstalk Productions, Inc. v. Jacobson*, 65 Cal.App.4th 631, 644 (1998).

23    In this case, the loan documents signed on February 12, 2007 were signed by STTN

24    and its representatives under duress. By this date, BP had persuaded STTN to begin construction

25    on the station. It had led STTN to believe that all loan documents were signed and the funds

26    would soon be disbursed. Relying on BP's representations, STTN had expended approximately

27    $387,500 in construction costs by February 12, 2007. By February 12, 2007, the project was well

28    underway, and STTN desperately needed the loan funds that were promised under the CCL.

19

1   Instead of disbursing the loan, BP approached STTN with even more agreements and informed

2   STTN that the loan funds promised under the CCL would not be disbursed until STTN signed the

3   *new* loan documents.  At this point, STTN had no choice but to sign the loan documents.  After

4   sinking $387,500 into the project based on BP's representations, STTN could not afford to lose the

5   BP loans.

6           Moreover, there was no new consideration for the Gasoline and Store Loans.

7   Under California law, new consideration is required where a subsequent written contract replaces

8   an earlier written contract and imposes new and onerous burdens upon one of the parties.

9   *Krobitzsch v. Middleton*, 72 Cal.App.2d 804, 808 (1946).  Here, there was no new mutual

10  consideration, although STTN was saddled with numerous additional burdens.  STTN simply

11  received nothing under the new contracts that it was not already entitled to.

12          As such, the February 12, 2007 Gasoline Loan and Store Loan could not have

13  superceded the CCL, as a matter of law.

14      **2.      BP Breached the Store Loan Agreement**

15          BP asserts that regardless of its own actions, STTN consented to any and all delays

16  in BP's performance.  Although the contracts do not contain a specific time for BP's performance

17  (except upon the satisfaction of all conditions, which as noted above, occurred at least by March 9,

18  2007), BP's time to perform was not unlimited.  Indeed, where the contract is silent as to the time

19  for performance, the court will imply a *reasonable* time for performance.  Cal. Civ. Code § 1697;

20  *Palmquist v. Palmquist*, 212 Cal.App.2d 322, 331 (1963).  What is a reasonable time for

21  performance is a question of fact.  *Palmquist*, 212 Cal.App.2d at 331.  Based on the facts and

22  circumstances *known to BP at the time*, it is clear that BP's delay in performance outlasted any

23  reasonable time for performance.

24          Indeed, as set forth above, the evidence is unequivocal that STTN had satisfied all

25  conditions under the Store Loan by March 9, 2007.  Despite this fact, and despite knowing that

26  STTN was using its operating capital to pay for the store's construction costs - expenses that were

27  supposed to be paid with the Store Loan - BP delayed funding the loan for over an additional two

28  months.  During this time, BP requested documents and actions that were not conditions under the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1    CCL or any other written policy.  This delay was completely unreasonable in light of the facts and

2    circumstances surrounding the parties.

3         **3.     BP Breached the Gasoline Loan and Disbursement Agreements**

4              As noted by BP, the elements for a breach of contract action are: (1) the existence

5    of a contract, (2) performance by plaintiff or excuse for nonperformance, (3) breach, and (4)

6    damages.  *First Commercial Mortgage Co. v. Reece,* 89 Cal.App.4th 731, 745 (2001).  Here, BP

7    was obligated to disburse $250,000 to STTN.  As noted above, the facts clearly establish that BP

8    failed to perform this obligation in at least two respects.

9              First, BP simply refused to disburse the Gas Loan Funds in March 2007, despite

10   acknowledging that all conditions to such disbursal were met.  This failure led directly to the

11   recording of mechanic's liens - a fact BP plainly knew.  BP then used the existence of the

12   mechanic's liens to further delay funding.

13             BP's deed of trust recorded on March 9, 2007, indicating that BP was satisfied with

14   the state of the title.  BP had sent a letter to the title company instructing them when to record the

15   deed of trust and stating that recording the deed of trust was a commitment to issue the necessary

16   title policy.  At this time, BP had STTN's first handwritten voucher (the sample provided by BP)

17   and receipts and invoices totaling over $150,000.  The CCL's (both the May 25, 2006 and March

18   9, 2007 ones) provide that, among other things, all that is required is a "commitment from a

19   BPWCP-approved title company to issue an ALTA lender's policy of title insurance insuring that

20   the Deed of Trust encumbers the Real Property in the position approved by BPWCP, subject to

21   exceptions approved in writing by BPWCP."  Jean Smith testified that the reason that the loan did

22   not fund on or after March 9th was that they were waiting for the title insurance policy, which did

23   not arrive until April 13th.  In the meantime, the mechanic's liens had started to appear.

24             There is no reason why the loans did not fund in March.  Once the deed of trust was

25   recorded by the title company, BP had a commitment from them to issue the title policy in the

26   form that was acceptable to BP.  BP's delay, at a time that they knew STTN was having cash flow

27   and working capital problems, caused the lien problems, caused STTN to have to refinance the

28   land to free up some working capital to pay the liens, which caused further delay, which caused

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . . PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1  further problems.  If BP had funded the loan in March, STTN could have used those funds to pay

2  contractors and would not have used it's working capital to do so, which would have avoided

3  STTN's alleged default on the payment for gasoline.

4    Further, even if BP had funded, but not disbursed the loan, in March of 2007, when

5  liens started showing up, BP had the option under ¶ 7.3 of the disbursement agreement to pay

6  those liens from loan proceeds.  The witnesses' testimony cited above indicates that BP did not

7  even consider this option.

8    All of this further delayed the construction and the store opening, increasing

9  STTN's damages from lost sales and further causing a shortage of working capital that caused

10  STTN to default on gas payments and prevented it from curing the arrears.

11    Second, BP breached the loan agreements by refusing to fund the loans despite the

12  gas bills being paid by the statutory right to set-off.  As set forth above, STTN made numerous

13  offers to have the mutually-existing debts set-off against each other, even through escrow to ensure

14  transparency.  BP refused to make any disbursement and subsequently terminated the franchise

15  agreement.  BP breached the loan agreements by its failure to fund and disburse the gas portion of

16  the loan in the summer of 2007 despite the gas bills being paid by setoff.  Both Jean Smith and

17  Cile McDonnell testified that by the time the store loan was funded (in late May, 2007), all

18  conditions to funding both loans had been fulfilled, except that STTN was still allegedly in default

19  on gas payments.  Because the gas bills were paid by setoff, BP clearly breached the agreements

20  and is liable to STTN for all of the damages caused.

21    Since BP clearly did not perform its obligations, summary judgment in favor of BP

22  on its breach of contract claims must be denied.

23    Finally, BP again raises the argument that STTN consented to *any* delays in BP's

24  performance.  However, as set forth above, this position is clearly rejected by both California Civil

25  Code section 1697 and *Palmquist*, 212 Cal.App.2d at 331.  Moreover, whether BP's time for

26  performance was unreasonable is a question of fact.  *Palmquist*, 212 Cal.App.2d at 331.

27  ///

28  ///

22

**D.**     <u>Summary Judgment Against STTN's Sixth Counterclaim For Breach of the Implied Covenant of Good Faith and Fair Dealing Is Inappropriate</u>

BP clearly breached the implied covenant of good faith and fair dealing. In California, in every contract there is an implied covenant whereby each party agrees not to do anything which will deprive the other parties thereto of the benefits of the contract. *Harm v. Frasher*, 181 Cal.App.2d 405, 417 (1960). This implied covenant also imposes on each contracting party the duty to refrain from doing anything which would render performance on the contract impossible. *Harm*, 181 Cal.App.2d at 417. It has been noted that "allegations which assert such a claim must show that the conduct of the defendant... by a conscious and deliberate act... unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1393 (1990).

The allegations described by the *Careau & Co.* court are the same allegations contained in STTN's Counterclaim. As noted above, BP consciously undertook actions that frustrated the purposes of the contracts, thereby disappointing the reasonable expectations of STTN. Such actions include failing to disburse the Store Loan funds in March 2007, which directly caused liens to be placed on the project, BP's subsequent failure to pay the mechanic's liens with the Store Loan proceeds, BP's refusal to acknowledge STTN's statutory right to set-off, as well as BP's unjustified refusal to place the Gas Loan funds in escrow in August 2007.

At the same time, because of STTN's tender of a cashier's check on September 4, 2007, BP further breached its obligations of good faith and fair dealing by refusing to accept tender. A tender is an offer of performance. Tender, when properly made, has the effect of placing the other party in default if he or she refuses to accept it, and the party making the tender may rescind, or sue for breach of contract or for specific performance. *Marshall v. Hilton*, 209 Cal. 531, 534 (1930). To be effective, the tender must be of full performance, at a proper time and place, made by the debtor and to the creditor. Cal. Civil Code §§ 1486, 1487, 1488, 1489, 1490, and 1491.

///

1    Here, BP provided STTN an opportunity to cure the alleged failure of STTN to

2  purchase gasoline from BP. STTN agreed to purchase the gasoline and informed BP that a

3  cashier's check was waiting for the driver to take upon delivery of the fuel. STTN even sent a

4  copy of the cashier's check to BP via facsimile. Under *Marshall*, such tender has the effect of

5  placing BP in default if it refused to accept performance. However, despite this tender of full

6  performance, BP simply refused to deliver anything to STTN. Thus, it was BP who breached the

7  agreement by failing to deliver gasoline to STTN after STTN tendered performance.

8    Taken together, these deliberate acts constitute intentional actions that unfairly

9  frustrated the purposes of the contracts and deprived STTN of the benefits of the agreement.

10  **E.    Summary Judgment Against STTN's Fraud Counterclaim is Inappropriate**

11    BP's position that STTN cannot allege fraud in a breach of contract action is

12  seriously misplaced. BP's own authority recognizes that in cases involving both breach of contract

13  and fraud claims, "the duty that gives rise to tort liability is either completely independent of the

14  contract *or arises from conduct which is both intentional and intended to harm.*" *Erlich v.*

15  *Mendezes*, 21 Cal.4th 543, 553-54 (1999) (emphasis added). Indeed, California Civil Code section

16  1710 explicitly recognizes a cause of action for fraud where a promise is "made without any

17  intention of performing it."

18    There is substantial evidence that BP represented to STTN on numerous occasions

19  that it was without all the documents required to fund the loan. Such representations were made

20  repeatedly from employees at BP to STTN after March 9, 2007. However, as set forth above,

21  these representations were patently false. BP knew it had all the documents it needed as of March

22  9, 2007. Instead of disbursing the loan, BP made representations to induce STTN to continue

23  construction and compile additional information and sign additional contracts. STTN justifiably

24  relied on these representations, which resulted in significant damage.

25    Moreover, BP repeatedly represented to STTN that it was against BP policy to set

26  off the gas debt owed by STTN against loan funds owed by BP. However, as early as March 2007,

27  BP knew these representations were false as well. In an internal email dated March 27, 2007,

28  Cecile McDonnell of BP's fund control admitted that "[m]anagement with notification to

24

1  franchisee can authorize Fund Control *to deduct final past due amount from the loan funds prior to*

2  *releasing from escrow*." Michael Dec., Ex. F (emphasis added).  The representations made in July

3  and August of 2007 that no such set-off was possible were clearly false when made.  They were

4  also made with the intent to induce reliance on STTN's part, mainly to forfeit its statutory right to

5  set-off and default on its loans.  STTN did in fact justifiably rely on these representations when it

6  attempted to obtain additional avenues to pay the debt and receive the loan funds.

7        As such, there is substantive and credible evidence that BP intentionally made

8  various misrepresentations to STTN throughout this process.  These representations were relied

9  upon by STTN, which resulted in significant harm.  As such, summary judgment in favor of BP on

10  this issue is inappropriate.

11  **F.    Summary Judgment Against STTN's Negligent Misrepresentation Counterclaim is
        Inappropriate**

12

13        BP's entire position as to this counterclaim is that a tort cause of action is

14  inappropriate in this case.  However, as set forth above, a fraud cause of action is explicitly

15  recognized by both the California Civil Code and California Courts.  Moreover, a cause of action

16  for negligent misrepresentation is derived from a cause of action for fraud, only the plaintiff need

17  not prove that the offending party acted with the intent to deceive.  *McClain v. Octagon Plaza,*

18  *LLC,* 159 Cal.App.4th 792, 793 (2008).  Therefore, BP's motion for summary judgment as to this

19  counterclaim must be denied as well.

20  **IV.**

21  **CONCLUSION**

22        Based on the foregoing, it is clear that BP is not entitled to summary judgment on

23  any portion of Defendants' Counterclaim.  BP failed to demonstrate that its termination of the

24  Franchise Agreement was lawful.  It further failed to establish that the Defendants breached *any*

25  contract or quasi-contract.  Accordingly, Defendants request that BP's motion be denied in its

26  entirety.

27  ///

28  ///

25

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF

1     DATED: July 18, 2008.

2                                          BAKER MANOCK & JENSEN, PC

3

4                                          By s/John G. Michael/
                                           John G. Michael
5                                          Ryan L. Eddings
                                           Attorney for Defendants
6                                          STTN ENTERPRISES, INC., NAZIM
                                           FAQUIRYAN, SAYED FAQUIRYAN, MAGHUL
7                                          FAQUIRYAN, and AVA GLOBAL ENTERPRISE,
                                           LLC
8
@PFDesktop\::ODMA/MHODMA/DMS;DMS;651841;1
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SUMMARY JUDGMENT, OR . . .PARTIAL
SUMMARY JUDGMENT AS TO THE COUNTERCLAIM; MEMORANDUM OF P&A IN SUPPORT THEREOF