John G. Michael
Ryan L. Eddings                    #106067
                                   #256519

1    **BAKER MANOCK & JENSEN, PC**
     A PROFESSIONAL CORPORATION
2    FIG GARDEN FINANCIAL CENTER
     5260 NORTH PALM AVENUE, FOURTH FLOOR
     FRESNO, CALIFORNIA 93704-2209
3    TELEPHONE (559) 432-5400
     TELECOPIER (559) 432-5620

4

5    Attorneys for    Defendants and Counter-Claimants

6

7

8                    UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11   BP WEST COAST PRODUCTS, LLC, a          )   Case No. 5:07-CV-04808 JF
     Delaware Limited Liability Company,     )
12                                           )
                            Plaintiff,       )   DEFENDANTS' OPPOSITION TO
13                                           )   PLAINTIFF'S MOTION FOR SUMMARY
          v.                                 )   JUDGMENT, OR IN THE
14                                           )   ALTERNATIVE PARTIAL SUMMARY
     STTN ENTERPRISES, INC., a California    )   JUDGMENT AS TO THE SECOND
15   Corporation; NAZIM FAQUIRYAN, an        )   AMENDED COMPLAINT;
     individual; SAYED FAQUIRYAN, an         )   MEMORANDUM OF POINTS AND
16   individual; and MAGHUL FAQUIRYAN, an    )   AUTHORITIES IN SUPPORT THEREOF
     individual; and AVA GLOBAL ENTERPRISE,  )
17   LLC, a California limited liability company, )   [Filed concurrently with Declarations of
                                             )   Sayed Faquiryan and John G. Michael]
18                          Defendants.       )
     _____ )
19                                           )   Date: August 8, 2008
     STTN ENTERPRISES, INC., a California    )   Time: 9:00 a.m.
20   Corporation; NAZIM FAQUIRYAN, an        )   Dept.  3
     individual; SAYED FAQUIRYAN, an         )
21   individual; and MAGHUL FAQUIRYAN, an    )   The Honorable Jeremy Fogel
     individual; and AVA GLOBAL ENTERPRISE,  )
22   LLC, a California limited liability company, )
                                             )
23                   Cross-Complainants,      )
                                             )
24        v.                                 )
                                             )
25   BP WEST COAST PRODUCTS, LLC, a          )
     Delaware Limited Liability Company;     )
26                                           )
                     Cross-Defendants.        )
27   _____ )

28

1

## TABLE OF CONTENTS

2

Page

3   TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

4   TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

5

6   I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 3

7
    III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8
           A.     Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

9
           B.     BP's Termination of the Franchise Agreement Was Unlawful . . . . . . . . . . . . . . 9

10
                  1.    STTN did not fail to pay for all sums due to BP . . . . . . . . . . . . . . . 10

11
                  2.    STTN did not fail to operate the marketing premises for at
12                       least 12 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

13                3.    STTN did not fail to have all grades of gasoline available . . . . . . . . . . 15

14                4.    BP failed to comply with notice PMPA provisions . . . . . . . . . . . . . . 16

15         C.     Summary Judgment is Not Proper on BP's Breach of Contract Claims . . . . . . . . 17

16                1.    BP did not perform under the agreements . . . . . . . . . . . . . . . . . . . 18

17                2.    STTN did not breach the Gasoline Agreement . . . . . . . . . . . . . . . . 21

18                3.    STTN did not breach the Mini-Market Agreement . . . . . . . . . . . . . . 22

19                4.    Sayed and Nazim did not breach the Franchise Guaranties . . . . . . . . . . 22

20         D.     BP's Breach of Contract Claim for the Store Loan Must Fail . . . . . . . . . . . . . 22

21         E.     BP's Common Count Claim Must Fail . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22         F.     BP's Claim for Unjust Enrichment Must Fail . . . . . . . . . . . . . . . . . . . . . . 23

23         G.     BP's Claim For Unified Judicial Foreclosure Must Fail . . . . . . . . . . . . . . . . 24

24  IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25

26

27

28

i

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1

# TABLE OF AUTHORITIES

2

CASES                                                                                     Page

3

*Birman v. Loeb* (1998) 64 Cal.App.4th 502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4

*Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1393 (1990) . . . 20

5

*Celotex Corp. v. Cutrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6

*Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d 1159, 1163 (9th Cir. 2002) . . . . . . . . . 10, 11, 14, 15

7

*Conderback, Inc. v. Standard Oil of Co., of California, Western Operations,*
239 Cal.App.2d 664, 680 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8

9    *FDIC v. Craft* 157 F.3d 697 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10   *Ferro v. Cititzens National Trust & Savings Bank of Los Angeles*, 44 Cal.2d 401 (1955) . . . . . . 23

11   *First Commercial Mortgage Co. v. Reece*, 89 Cal.App.4th 731, 745 (2001) . . . . . . . . . . . . . . . 18

12   *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 550 (1996) . . . . . . . . . . . . . . . . . 12

13   *Harm v. Frasher*, 181 Cal.App.2d 405, 417 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

14   *Harrison v. Adams* (1942) 20 Cal.2d 646 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15   *Hauger v. Gates* (1954) 42 Cal.2d 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16   *Hazel v. Superior Court*, 123 Cal.App.3d 652, 663 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . 12

17   *Jess v. Herrman* (1979) 26 Cal.3d 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18   *Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 15

19   *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.*, 44 Cal.App.4th 194,
203 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

20

21   *Marathon Petroleum Co. v. Pendleton*, 689 F.Supp. 739, 744 (N.D.Ohio 1988) . . . . . . . . . . . . 16

*Marshall v. Hiltion*, 209 Cal. 531, 534 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22

*McDaniel v. City and County of San Francisco* (1968) 259 Cal.App.2d 356 . . . . . . . . . . . . . . 11

23

*Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp. 1099, 1123-24
24   (D.C. Mo. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

25   *Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1055 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . 9, 10

26   *Moving Picture Machine Operators Union v. Glasgow Theaters*, 6 Cal.App.3d 395,
402 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27

*Murchison v. Murchison* (1963) 219 Cal.App.2d 600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28

TABLE OF AUTHORITIES (Continuing)

CASES                                                                                    Page

*Murphy v. FDIC* 38 F.3d 1490, 1504 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) . . . . . . . . 9

*Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir. 1981) . . . . . . . . . . . 16

*Weitzenkorn v. Lesser*, 40 Cal.2d 778 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Williams v. Pratt* (1909) 10 Cal.App.625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir. 1984) . . . . . . . . . . . . . . . . 16

*Zipper v. Sun Co., Inc.*, 947 F.Supp. 62, 69 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . 16, 17

STATUTES

15 U.S.C. § 2804(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. §2801(13)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

15 U.S.C. §2802(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15 U.S.C. §2802(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. §2802(c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

15 U.S.C. §2802(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

15 U.S.C. §2804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

15 U.S.C. §§ 2801 (2008) (PMPA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 16, 17

California Civil Code § 1486 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1487 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1488 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1489 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1490 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §1521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Civil Code §1523. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. Pro. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1    Defendants and Counter-Claimants STTN ENTERPRISES, INC. ("STTN"), a

2   California Corporation; NAZIM FAQUIRYAN ("Nazim"), an individual; SAYED FAQUIRYAN

3   ("Sayed"), an individual; and MAGHUL FAQUIRYAN ("Maghul"), an individual; and AVA

4   GLOBAL ENTERPRISE, LLC ("AVA"), a California limited liability company (collectively

5   referred to herein as "Defendants") for their Opposition to Plaintiff's Motion for Summary

6   Judgment, or in the Alternative Partial Summary Judgment, as to the Second Amended Complaint,

7   state as follows:

## I.

## INTRODUCTION

10    This case concerns the remodeling and rebranding of a Chevron gasoline station

11   and mini mart/restaurant in Hollister, California to an Arco gasoline station and am/pm mini mart.

12   STTN and BP entered into various agreements to accomplish this purpose, including two

13   Conditional Commitment Letters, a Store Loan Agreement, a Gasoline Loan Agreement, a

14   Disbursement Agreement, an am/pm Franchise Agreement and two Contract Dealer Gasoline

15   Agreements. STTN fully performed its obligations under these agreements between it and BP.

16   Despite this performance, BP failed and refused to fully fund the loans it agreed to provide to

17   STTN, delayed its performance of the Store Loan Agreement and caused STTN to deplete its

18   working capital to pay construction expenses to the point where it could no longer pay for gasoline

19   on a regular basis. BP then used this as an excuse, despite STTN's tender of further performance

20   by offering to purchase gasoline with a cashier's check, to terminate STTN's franchise agreements

21   after it had spent almost $1 million to remodel and rebrand its Chevron gasoline station to BP's

22   standards in order to operate as an Arco gas station and am/pm mini mart. BP should be held

23   accountable for its actions.

24    The undisputed facts show that STTN had satisfied all conditions to funding by

25   March 9, 2007 when BP recorded its deed of trust and received a commitment from its title

26   company to issue a policy of title insurance in the form it requested. BP, however, delayed

27   funding the loan by repeatedly asking for documents and information that were not conditions to

28   funding or disbursement. As a result of this delay, by early April, 2007, STTN could no longer

pay its contractors and its subcontractors. They stopped work and began to record mechanic's liens on the real estate on which the station was operating. BP, although it was entitled under the agreements to use the loan proceeds to pay the mechanic's liens, then used the mechanic's liens as an excuse to refuse to fund the loans. BP required STTN to pay the mechanic's liens as a condition to funding. STTN was forced to have a related company, AVA Global Enterprise, LLC, refinance the real property in order to generate funds to pay the contractors. This re-financing further delayed the funding of the loans because BP insisted that certain documents be re-drafted to reflect that the senior lender on the property had made a new loan.

BP finally partially funded the loans at the end of May, 2007. The Store Loan was fully funded and disbursed by August 7, 2007, with the final disbursement being an approximately $12,000 payment to STTN. In the meantime, due to the delays in funding and the need for STTN to use its working capital to pay contractors, STTN had fallen behind in its gasoline payments to BP. STTN was put on a COD basis. An agreement to pay the arrearages was entered into in May, 2007 that called for the first payment to be made in July, 2007. Despite this payment plan, under which STTN reduced the balance owing by almost $60,000, BP refused to fund the Gasoline Loan until the arrearages were paid in full. STTN tendered payment through various escrow offers, but BP failed to perform, including failing to acknowledge that the arrearages had been cured by a setoff against loan proceeds, as recognized by California law.

Finally, in late August, STTN ceased purchasing gasoline as a way of informing BP that an agreement had to be reached about the funding of the Gasoline Loan. Instead of dealing with the real issue, BP threatened to terminate the franchise agreements if STTN did not purchase gasoline. STTN than offered to purchase a load of gasoline and even faxed a copy of its cashier's check to BP. BP, however, refused to deliver any gasoline to STTN. Instead, BP wrongfully terminated the franchise agreements and failed to give the proper notice. Because BP is the one who breached the agreements and wrongfully terminated the franchises, summary judgment in BP's favor should be denied.

///

///

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

# II.

## STATEMENT OF UNDISPUTED FACTS

In 2005, Sayed Faquiryan, a principal in STTN, and Ken Wickerham discussed STTN becoming a BP franchisee. Declaration of Sayed Faquiryan filed herewith ("Faquiryan Dec."), ¶ 3. The first location discussed was in Watsonville, California. Faquiryan Dec., ¶ 3. STTN applied for and was approved for an Arco and am/pm franchise for that location. Faquiryan Dec., ¶ 3. STTN paid to BP a franchise fee of $100,000. Some time later, STTN applied for and was approved for an additional franchise in Hollister, California. Faquiryan Dec., ¶ 3. STTN paid a franchise fee of $72,000 to BP for this franchise. Faquiryan Dec., ¶ 3. The Hollister franchise is the subject of this lawsuit and involves the remodeling and rebranding of STTN's existing Chevron station and mini mart/restaurant to an Arco gasoline station and am/pm mini mart. Faquiryan Dec., ¶ 3. STTN and BP entered into various agreements to accomplish this purpose. On May 25, 2006, STTN and BP entered into a Conditional Commitment Letter ("CCL"), pursuant to which STTN paid to BP an additional $10,000 fee. Declaration of Thomas Reeder in Support of BP West Coast Products LLC's Motion for Summary Judgment, etc. ("Reeder Dec."), Ex. I [Defendant cites to the Reeder Dec. and its exhibits solely for the purpose of directing the court's attention to the exhibits thereto, to avoid duplication in the exhibits submitted, and Defendant does not intend to adopt the testimony of Mr. Reeder regarding the interpretation or effect of these agreements, or any other matter, except as identified below.]. On July 11, 2006, STTN and BP entered into a Contract Dealer Gasoline Agreement and an am/pm Mini Market Agreement. Reeder Dec., Exhibits A and B.

At the time that these agreements were entered into, BP was aware that STTN's Chevron station was an operating business and that the gas station portion already had tanks, pumps, dispensers, and a canopy. Deposition of Tom Reeder ("Reeder Dep.") 36:14-37:17. Because of this, the gas station portion of the remodel would be much less expensive than the store portion. Faquiryan Dec., ¶ 5. Despite this knowledge, BP allocated the loans $150,000 to the store portion of the remodel and $250,000 to the gas station portion. Reeder Dec., Ex. I, Deposition of Jean Smith ("Smith Dep") 105:2-7 and Exhibit "A" to Exhibit 80 thereto.

3

1    Due to the expense and disruption involved in the remodel, STTN requested that it

2    be permitted to sell Arco branded gas during the remodel of the store.  Faquiryan Dec., ¶ 6.  This

3    request was granted.  Reeder Dep. 41:25-42:7.  STTN then proceeded with the rebranding of the

4    gas station from Chevron to Arco.  Faquiryan Dec., ¶ 6.  When that process was complete, and

5    when STTN was ready to open the gas portion of the station, BP required that STTN sign another

6    Contract Dealer Gasoline Agreement on October 12, 2006.  Reeder Dec., Ex. D.

7    Because the Watsonville project was delayed, BP requested STTN to show good

8    faith and start construction on the store remodel, even though it had not presented STTN with any

9    loan agreements.  Faquiryan Dec., ¶ 7;  BP assured STTN that loan funds would be forthcoming.

10    Faquiryan Dec., ¶ 7.  STTN started construction on the store remodel on January 2, 2007.

11    Faquiryan Dec., ¶ 7.  Because the loans were not forthcoming, STTN had to use its working

12    capital to pay for the construction.  Faquiryan Dec., ¶ 7.  Because of this drain on its working

13    capital, STTN fell behind in its payments for gasoline.  Faquiryan Dec., ¶ 7.

14    All of the conditions to funding the loan were set forth in the CCL.  Deposition of

15    Cile McDonnell, 56:18-58:8.  Throughout January, February and early March, STTN worked to

16    satisfy the conditions set forth in the CCL.  Faquiryan Dec., ¶ 8.  On February 12, 2007, long after

17    construction had started and STTN was running out of working capital, BP presented STTN with

18    the Gasoline Loan Agreement and the Store Loan Agreement, both of which STTN signed.

19    Faquiryan Dec., ¶ 8, Reeder Dec. Exs. J and K.  **By March 9, 2007, all conditions to funding**

20    **had been met.**  Smith Dep. 11:7-12:14, 14:21-24, 19:20-20:20, 27:11-16, 31:6-21; 32:14-24;

21    34:10-35:11, 40:3-9, 44:14-45:7, 54:13-17, 55:24-56:7; , 58:8-11.  Also on March 9, 2009, BP

22    presented STTN with another CCL for it to sign.  Faquiryan Dec., ¶ 9, Smith Dep. 105:2-7 and

23    Exhibit "A" to Exhibit 80 thereto.  BP recorded its Deed of Trust its loans on March 9, 2007.

24    Declaration of John G. Michael, filed herewith (the "Michael Dec."), ¶ 9, Ex. "G."  Certainly by

25    March 20, 2007, there was no doubt that conditions had been met for funding.  Smith Dep. 58:8-

26    11.

27    BP, however, refused to fund the loan, alleging that it had to wait for the actual

28    policy of title insurance.  Smith Dep. 45:13-20.  The CCL's and Loan Agreements, however,

4

1   contain no such condition.  The CCL's, at ¶ 21 on Exhibit "B" thereto merely require:

2          A *commitment* from a BPWCP-approved title company to issue an ALTA
           lender's policy of title insurance insuring that the Deed of trust encumbers
3          the Real Property in the position approved by BPWCP, subject to
           exceptions approved in writing by BPWCP. (Emphasis added.)

4

5          BP received that commitment when the title company recorded BP's deed of trust

6   on March 9, 2007.  In BP's transmittal letter and instructions to the title company, it stated:

7          When the following conditions are met, you are to proceed as
           indicated below:

8
           1. <u>Title Policy</u>.  *You are committed to issue to BPWCP your ALTA
9          Leasehold Loan Policy of title insurance* (the "Policy") insuring
           BPWCP as the lender of the Real Estate in the amount of
10         $475,000.00....(Emphasis added).

11         <u>Closing</u>.  Upon satisfaction of the above conditions, you are to do the
           following:
12
           1.  Record the enclosed documents....
13
           ...[Y]our recording of any of the enclosed documents *will constitute* your
14         acceptance of the above instructions and *your agreement to issue the policy
           described above.*  (Emphasis added).
15

16         See Ex. "F" to the Michael Dec..  Thus, upon the recording of the deed of trust, the

17  condition that BP obtain a *commitment* from a title company to issue the required policy was

18  satisfied and BP should have then funded the loan.  It did not.  Faquiryan Dec., ¶ 10, 11.  BP

19  breached the loan agreements and the CCL's by failing to timely fund the loans.  The ramifications

20  of this breach were terrible.  The general contractor and his subs walked off the job because they

21  were no longer being paid.  Faquiryan Dec., ¶ 11.  Mechanics liens started to appear.  Faquiryan

22  Dec., ¶ 11.  The project was delayed and STTN lost additional store sales, which generated a pre-

23  BP profit each month of approximately $30,000.  Faquiryan Dec., ¶ 11.  AVA Global Enterprise,

24  Inc., a related company to STTN, had to refinance the real property on which the station was

25  located  to generate funds to be used by STTN to clear the liens, pay the subcontractors and

26  general contractor and get work started.  Faquiryan Dec., ¶ 11.  The refinancing process delayed

27  the project even further because BP required a new subordination agreement to be signed and the

28  preparation, review and approval of the new loan took time.  Faquiryan Dec., ¶ 11.

1    Approximately two months after the deed of trust was recorded, BP required STTN

2 to sign a Disbursement Agreement. Reeder Dec., Ex. L. BP had the option under ¶ 7.3 of the

3 Disbursement Agreement to pay the mechanics liens from loan proceeds, but although BP caused

4 the problems by failing to timely fund the loans in the first place, it never even considered paying

5 the liens from loan proceeds. McDonnell 114:16-115:18; 137:8-138:2.

6    Even after the liens had been cleared, BP held up loan funding while gathering

7 documents that were not conditions to funding. McDonnell 134:7-10. As set forth in the

8 Declaration of Cecile McDonnell, filed with BP's motion for summary judgment ("McDonnell

9 Dec."), she was requiring budgets (which are not listed as a condition to funding), that Sayed

10 Faquiryan be named as corporate designee (not a condition to funding) and a revised Disbursement

11 Agreement (also not a condition to loan funding). The promissory notes were signed at the same

12 time as the loan agreements, on February 12, 2007. Faquiryan Dec., ¶ 14.

13    Finally in late May, 2007, BP funded the store loan only and provided STTN and its

14 contractor with Vouchers to use to get paid or reimbursed. Faquiryan Dec., ¶ 15. Despite the fact

15 that any alleged default in gas payments was not a default under the store loan agreement (see

16 Reeder Dec., Ex. J), BP obtained a waiver of its policy in order to fund the store loan because BP

17 determined that its best chance of earning the return on its investment and its profit was to release

18 the store loan funds. Smith Dep. 99:6-100:19. The store loan was fully disbursed by early August,

19 with approximately $12,000 being paid to STTN, despite its alleged default on gas payments.

20 McDonnel Dec., ¶ 12;

21    In the meantime, STTN agreed to reduce the balance owing for gasoline by paying

22 an extra $30,000 per month on the 15th of each month, starting on June 20, 2007. Faquiryan Dec.,

23 ¶ 16. Although BP and its witnesses have testified that STTN did not adhere to the payment plan,

24 STTN reduced the balance owing from the approximately $185,000 owing in May, 2007 at the

25 time of the payment agreement to what BP alleges is approximately $126,000 by the end of

26 August, 2007, which is approximately a $60,000 reduction in the two month period that the

27 agreement was in effect (July 15th and August 15th). Declaration of Brad Christensen, filed with

28 BP's Motion for Summary Judgment ("Christensen Dec."), ¶ 7; Reeder Dec. ¶ 9. However, BP's

6

1    own documents indicate that the debt was only $114,000.88 on August 24, 2007. Reeder Dec.,

2    Ex. F. STTN disputes that this balance is accurate and alleges that is has been charged for loads of

3    gasoline that was never delivered. Faquiryan Dec., ¶ 16. This alone creates a question of fact that

4    precludes summary judgment.

5            BP, however, demanded that STTN pay the entire balance of the gasoline payments

6    before it would fund the gasoline loan. McDonnell 98:23-99:3; 100:7-18. Even though STTN had

7    paid construction expenses in excess of the amount of the gasoline loan, BP refused to setoff the

8    gasoline payments against the loan proceeds that would go to STTN. Faquiryan Dec., ¶ 17. In

9    fact, STTN had performed under the payment agreement by reducing the balance owing by

10   approximately $60,000 and was not in default during the time that BP demanded that it pay the

11   entire balance of the gas payments before it would fund the gasoline loan. Faquiryan Dec., ¶ 17.

12           Further, as set forth below in more detail, even if STTN was in default of the

13   payment agreement, its debt was paid and discharged as a matter of law by the doctrine of setoff.

14   STTN owed the gas payments at the same time as BP owed the loan proceeds and BP's debt

15   clearly exceeded any owed by STTN. Under California law, the debt is deemed paid to the extent

16   that there is at least an equal amount owing from BP.

17           Finally, STTN tendered payment through an escrow. McDonnell 99:23-100:4;

18   100:19-101:19. STTN offered to have the amount of the gas payments deducted from the gas loan

19   proceeds at the close of escrow when the loan proceeds would be disbursed. Faquiryan Dec., ¶ 18.

20   BP falsely represented to STTN that this could not be done as it was against BP policy. Faquiryan

21   Dec., ¶ 18. Internal emails, however, show that BP could have approved this procedure if

22   management had agreed and the franchisee agreed. Reeder 90:12-91:17 and Exhibit 137 thereto.

23   Next, STTN offered to put the amount then owing into the same escrow and that the gas payments

24   could be disbursed to BP at the same time that the loan proceeds were disbursed to STTN to

25   reimburse it for construction expenses. Faquiryan Dec., ¶ 18. Reeder 92:9-20. STTN had already

26   provided BP with proof that it paid over $200,000 of reimbursable expenses. Faquiryan Dec., ¶

27   18. BP refused and stated that they could not "commingle" their funds with STTN's funds in the

28   same escrow, which makes no sense. Reeder 92:9-20.

STTN then offered to open a separate escrow and to place its money for the gas payments into its escrow if BP would place the loan proceeds into its escrow. Faquiryan Dec., ¶ 19; Reeder 92:21-93:2. BP agreed, but insisted that STTN place its money into escrow first. McDonnell 103:22-104:2. Because of the repeated delays, the repeated requests for additional documentation that is not required by the loan documents as a condition to funding, BP's prior breach of the loan agreements and because STTN would have to borrow the money to pay the gas bills (with a plan of paying it back with the loan proceeds it received), it was suspicious of BP's demand that STTN provide its money first. Faquiryan Dec., ¶ 19. Also, it could not afford to borrow the money and have it sit in escrow for weeks while BP further delayed funding the gas loan. Faquiryan Dec., ¶ 19. STTN refused to put its money in first, BP also refused and the escrow procedure never was used.

Because of BP's breaches of the loan agreements, because STTN was out of working capital, and because BP would not respond with a date certain as to when the gas loan would fund, STTN ceased purchasing gasoline around August 18, 2007. Faquiryan Dec., ¶ 20. STTN informed BP that as soon as the loan funded, either through the escrow process or otherwise, it would again purchase and sell gasoline. Faquiryan Dec., ¶ 20.

After discussion with Brad Christensen, Tom Reeder and Mike Hagar in late August in which they threatened to terminate the franchise, because of all of the money that it had invested, STTN agreed to purchase gasoline for sale over the Labor Day weekend. Faquiryan Dec., ¶ 21. BP required that STTN pay by cashier's check and that it fax a copy to the distribution center. Faquiryan Dec., ¶ 21. STTN obtained a cashier's check and faxed a copy to the distribution center, but was later told that BP would not sell gasoline to STTN and that its franchise was being terminated. Faquiryan Dec., ¶ 21. STTN therefore tendered a cure of its default under the franchise agreements before they were terminated, but its tender was refused.

BP then proceeded to wrongfully terminate the franchise agreements. BP's notice of termination was wrongful for the following reasons. (1) BP is the one the breached the agreements and caused the arrearages in the gasoline payments. (2) There was no default in gasoline payments due to the doctrine of setoff. (3) STTN tendered a cure of the failure to sell all

8

grades of gasoline default, but its tender was refused.  (4)   The notice falsely states that all grades

of gasoline were not available for sale, when, in fact, premium gas was available and was being

sold. Faquiryan Dec., ¶ 23. (5) the notice references the wrong agreement (the 10/12/06 agreement

states that it supersedes the prior agreements).  (6) the Notice falsely states that 90 days is not

required because of safety concerns (Reeder 130:6-8).  The notice falsely states that no notice is

required because of consumer confusion, which makes no sense. (Reeder 129:4-130:5).

## III.

## ARGUMENT

There are numerous questions of fact that preclude summary judgment in favor of

BP's claims.  Moreover, many of BP's claims are simply unsupported by existing law.  As such,

BP's motion for summary judgment on the Second Amended Complaint must be denied.

### A.     Standard for Summary Judgment

Summary judgment is proper only where the Court finds that there is "no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. Pro. 56(c).  Inasmuch as summary judgment is a drastic remedy, it must be

contemplated with "due regard . . . for the rights of persons asserting claims and defenses tried to a

jury." *Celotex Corp. v. Cutrett*, 477 U.S. 317 (1986).  As moving party, Plaintiff bears the burden

of demonstrating every essential element of its claim.  *See, e.g., Southern California Gas Co. v.*

*City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

### B.     BP's Termination of the Franchise Agreement Was Unlawful

The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 (2008), *et*

*seq.*, governs franchise agreements between oil companies and franchisees.  The PMPA was

enacted to prevent the well-documented and serious abuses committed by oil companies such as

BP, including sham, pretextual, and discriminatory terminations of the franchise agreements.

Indeed, the overriding purpose of the PMPA is to provide protection for franchisees from arbitrary

or discriminatory termination or non-renewal of their franchises.  *Mobil Oil Corp. v. Karbowski*,

879 F.2d 1052, 1055 (2d Cir. 1989).  The protections provided by the PMPA are needed to curtail

///

9

1    the widespread abuse by petroleum franchisors and their ability to arbitrarily terminate franchises.

2    *Krabowski*, 879 F.2d at 1055.

3            As a result, the termination of a petroleum franchise agreement must be grounded

4    upon a specific reason recognized by the PMPA.  In addition, even if there are sufficient grounds

5    for termination, there are certain notice requirements that oil company *must* provide to the

6    franchisee in the notice termination.  Thus, in order to prevail on this count, BP must show that its

7    termination of the franchise agreement was based on grounds recognized by the PMPA *and* that

8    the notice of termination satisfied the applicable statutory requirements.  § 2802(b).

9        **1.    STTN did not fail to pay for all sums due to BP**

10            BP contends that STTN's alleged failure to pay all sums owed to BP is a *per se*

11    basis for franchise termination.  To this end, BP claims that it is "undisputed" that STTN failed to

12    pay for BP gas products in a timely manner.  Specifically, BP refers to a September 5, 2007,

13    outstanding balance of $126,000.  Curiously, BP also states that on May 4, 2007, this balance was

14    $184,075.50.  This account was also the subject of the Separate Agreement (hereinafter the

15    "Separate Agreement") between BP and Sayed and Nazim, whereby they would pay $30,000 to BP

16    on the 15th of each month, starting June 20, 2007, until the balance was reduced.  Sayed and Nazim

17    made payments in July and August, thereby reducing the amount to approximately $126,000.

18    Faquiryan Dec., ¶ 19.  Indeed, BP's own documents state that the balance was only $114,000.88

19    on August 24, 2007.  Reeder Dec., Ex. F.  Despite this glaringly obvious fact, BP asserts that

20    STTN "never made any payments" to BP under the separate agreement.  Clearly this is a factual

21    question, rendering summary judgment inappropriate.

22            Additionally, BP glosses over an important facet of the PMPA.  In enacting the

23    PMPA, Congress went out of its way to define "failure" in a particular way.  Under the PMPA, the

24    term "failure" does not include "any failure for a cause *beyond the reasonable control* of the

25    franchisee."  § 2801(13)(b) (emphasis added).  This definition of "failure" must be used when

26    applying the "failures" listed in section 2802(c).  *Chevron U.S.A., Inc. v.  El-Khoury*, 285 F.3d

27    1159, 1163 (9th Cir. 2002).  Moreover, whether a franchisee's actions constitute "failure" is

28    generally a question of fact for the jury.  *El-Khoury*, 285 F.3d at 1164.

10

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1    Here, although STTN denies that it was behind in any payment, any such "failure"

2  was not a "failure" as envisioned by the PMPA. Indeed, to the extent that STTN missed payments,

3  such missed payments were due to causes beyond STTN's reasonable control – mainly, that BP

4  itself failed to provide the loan funds that it originally agreed to provide to STTN to get the station

5  up and running and breached the loan agreements. There is substantial evidence to establish that

6  STTN had satisfied all conditions by March 9, 2007, and that STTN was legally entitled to a set-

7  off of debts owed, as discussed below. As such, the *only* reason that STTN could not make

8  payments to BP was due to BP's wrongful refusal to provide the funds it had previously promised

9  to STTN as part of the initial plan to re-brand the station. This forced STTN to use its working

10 capital to pay contractors, even though this was the primary purpose of the loan. Accordingly,

11 STTN did not *fail* to pay all sums due to BP under section 2802(c)(8). In any event, this question

12 is a question of fact for the jury, making summary judgment on this issue inappropriate. *See El-*

13 *Khoury*, 285 F.3d at 1164.

14    Moreover, the doctrine of setoff effectively discharged any debt owed to BP by

15 STTN. In *Williams v. Pratt*, 10 Cal.App.625, 632 (1909), the court held that where a debtor on a

16 promissory note secured by a deed of trust was owed more by the payee than was owing on the

17 promissory note, there was no default under the promissory note. The court stated: "It would

18 certainly be a reproach to the law if one debt could not be set off against the other. Indeed the two

19 demands, as far as they equal each other, are deemed compensated."

20    See also *Hauger v. Gates,* 42 Cal.2d 752, 755 (1954), where the court stated: "By

21 reason of their failure to deliver certain personal property to which plaintiffs were entitled under

22 the agreement of sale, defendants Gates were indebted to plaintiffs in a greater sum than the

23 amount owing by plaintiffs on their promissory note...accordingly, plaintiffs were not in default at

24 the time of the sale."

25    In *Murchison v. Murchison,* 219 Cal.App.2d 600, 605 (1963), the court held that

26 the right of setoff is available to extinguish a debt even though no action is pending. *McDaniel v.*

27 *City and County of San Francisco,* 259 Cal.App.2d 356, 365 (1968) held that when cross-demands

28 exist between parties, their claims are paid to the extent they are equal. In *Harrison v. Adams*, 20

1   Cal.2d 646, 648 (1942), the court stated: "...it is well settled that a court of equity will compel a

2   setoff when mutual demands are held under such circumstances that one of them should be applied

3   against the other and only the balance recovered."

4           As was stated in *Birman v. Loeb*, 64 Cal.App.4th 502, 518 (1998):

5           In order to assert a setoff, cross-demands for money must exist between the
            parties...The right of setoff arises when two parties are mutually debtor and
6           creditor to each other...The Supreme Court has held that "[the right to a
            setoff is] founded on the equitable principal that 'either party to a
7           transaction involving mutual debts and credits can strike a balance, holding
            himself owing or entitled only to the net difference...The Supreme Court has
8           also held: [I]t is well settled that a court of equity will compel a setoff when
            mutual demands are held under such circumstances that one of them should
9           be applied against the other and only the balance recovered....As the
            Supreme Court explained in *Jess v. Herrman* (1979) 26 Cal.3d 131, 137...in
10          the ordinary setoff circumstances "a setoff procedure simply eliminates a
            superfluous exchange of money between the parties...

11

12          This doctrine of setoff is also applied in federal cases. See *Murphy v. FDIC* 38

13   F.3d 1490, 1504 (9th Cir. 1994) and *FDIC v. Craft* 157 F.3d 697, 703 (9th Cir. 1998).

14          Here, although STTN allegedly owed BP approximately $126,000 at the time BP

15   wrongfully terminated the franchise agreement (STTN disputes this balance), BP owed STTN

16   $250,000 under the Gasoline Loan Agreement signed between BP and STTN.  As noted above,

17   STTN had satisfied all requirements for funding the loan by March 2007.  Yet, as of September

18   2007, BP had simply not funded or disbursed *anything* under the Gasoline Loan.  In light of BP's

19   debt to STTN, any amounts owed to BP were deemed satisfied as a matter of law.

20          Furthermore, even if STTN had defaulted on the Dealer Gas Agreement, this fact

21   would have no bearing on BP's obligations, because remaining out of default on the Dealer Gas

22   Agreement is not a condition precedent to Gasoline Loan.  Courts do not favor conditions

23   precedent and will not construe a promise as a condition precedent unless compelled to do so by

24   the unambiguous language of the contract.  *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th

25   534, 550 (1996).  Further, an agreement will be strictly construed against the party asserting the

26   existence of a condition precedent.  *Hazel v. Superior Court*, 123 Cal.App.3d 652, 663 (1981).

27          Here, the Gas Loan Agreement itself is patently ambiguous.  Although it was not

28   signed by the parties until February 12, 2007, section 2.1 of the Agreement states that BP "shall

12

1    not be required to make the first Disbursement unless all of the following conditions are satisfied

2    on or before January 7, 2007." Reeder Ex. K. Even if section 2.1 could operate as a condition

3    precedent, none of the subsections listed therein identify default as a condition to funding. Indeed,

4    default is listed at section 2.2, subpart (f). A plain reading of section 2.2 reveals that this section is

5    a list of *concurrent* conditions. Thus, the plain language of the Gas Loan Agreement clearly states

6    that default is a *concurrent* condition, making any outstanding balance subject to set-off with the

7    Gas Loan. Once the language is construed *against* finding a condition precedent, as the Court

8    must do, this fact is even more obvious. Since any outstanding balance was subject to set-off,

9    STTN clearly did not fail to pay all outstanding sums owed to BP. Therefore, BP's motion for

10   summary judgment on this issue must be denied for this reason as well.

11            Finally, the Separate Agreement set forth above was clearly an accord, which

12   effectively suspended any outstanding debt owed to BP. An accord is an agreement to accept, in

13   extinction of an obligation, something different from or less than that to which the person agreeing

14   to accept is entitled. Cal. Civ. Code § 1521. Acceptance, by the creditor, of the consideration of

15   an accord extinguishes the obligation and is called satisfaction. Cal. Civ. Code § 1523. In other

16   words, an accord substitutes a new executory contract for a previously existing contract. *Moving*

17   *Picture Machine Operators Union v. Glasgow Theaters*, 6 Cal.App.3d 395, 402 (1970). It is

18   axiomatic that an accord suspends the original obligation until the accord is fully performed.

19   However, an accord without satisfaction does not discharge the underlying obligation. *Id.* The

20   question as to whether an agreement amounts to an accord and satisfaction is one of the intention

21   of the parties and is therefore a question of fact. *Conderback, Inc. v. Standard Oil of Co., of*

22   *California, Western Operations*, 239 Cal.App.2d 664, 680 (1966).

23            Here, STTN disputes the amount of money allegedly due to BP. Additionally, BP

24   agreed to accept payment over many months when it made the Separate Agreement with STTN,

25   although payment was originally due upon the delivery of fuel. Thus, this Separate Agreement

26   was an accord that suspended the original obligation to pay for the fuel debt. Because it was an

27   accord, and because STTN was current with its payments under the accord, STTN could not, as a

28   matter of law, be in default of the original agreement. STTN could *only* default on the outstanding

1    debt if it failed to adhere to the terms of the accord.  However, as is extensively set for above,

2    STTN was not in breach of the accord.  Coupled with the fact that this issue presents a question of

3    fact, the plain nature of the accord clearly precludes an entry of summary judgment on this issue as

4    well.

5        **2.    STTN did not fail to operate the marketing premises for at least 12 days**

6            Next, BP contends that STTN failed to operate the marketing premises for at least

7    12 days, allegedly violating section 2802(c)(9).  According to BP, STTN was not selling *any* fuel

8    for a 12 day period.  However, while STTN did not sell regular and mid-grade gasoline, both

9    premium gasoline and diesel were available for sale during the *entire* twelve day period.  Clearly,

10   this is a question of fact, precluding summary judgement on this issue as well.

11           Additionally, as noted above, under the PMPA, the term "failure" does not include

12   "any failure for a cause *beyond the reasonable control* of the franchisee."  § 2801(13)(b)

13   (emphasis added).  This definition of "failure" must be used when applying the "failures" listed in

14   section 2802(c).  *El-Khoury*, 285 F.3d at 1163.  Moreover, whether a franchisee's actions

15   constitute "failure" is generally a question of fact for the jury.  *Id.* at 1164.

16           Here, although STTN denies that it did not have any grade of gasoline available for

17   purchase, any such "failure" was not a "failure" as envisioned by the PMPA.  Indeed, to the extent

18   that STTN did not have any grades of fuel available, this was due to causes beyond STTN's

19   reasonable control – mainly, that BP itself failed to provide the loan funds that it originally agreed

20   to provide to STTN to get the station up and running both when it was contractually obligated to

21   do so and when it was legally obligated to do so, under the set-off doctrine.  As such, the only

22   reason that STTN did not have any grade of gasoline for sale was due to BP's refusal to provide

23   the funds it had previously promised to STTN as part of the initial plan to re-brand the station.

24   Accordingly, STTN did not *fail* to operate the station for 12 days under section 2802(c)(9).

25           In any event, the issue of whether STTN failed to operate the station for 12 days is a

26   question of fact for the jury, making summary judgment on this issue inappropriate.  *See El-*

27   *Khoury*, 285 F.3d at 1164.

28   ///

3.    **STTN did not fail to have all grades of gasoline available**

Next, BP argues that STTN failed to have *all* grades of gasoline available for purchase. It should be noted that in making this argument, BP appears to admit that STTN was selling at least one grade of gasoline. (Indeed, as noted previously, STTN was selling two grades: premium and diesel.) Of course, this directly conflicts with the factual assertions made in support of its argument that STTN failed to operate the station for 12 days. This alone creates a question of fact sufficient to preclude summary judgment.

Further, although BP leaves it unsaid, in order to reach its conclusion BP assumes that failure to sell *certain* grades of gasoline is material to the franchise relationship between BP and STTN. Since termination is an "extreme remedy," it is available *only* where the violation is so serious that is undermines the entire franchise relationship. *El-Khoury*, 285 F.3d at 1163. This is interpreted to mean that the breach must be material. *Id.* In making its argument, BP neglects to mention that whether a breach was material to the franchise relationship is usually a question of fact for the jury. *Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985). Thus, in light of STTN's good faith efforts and BP's refusal to fulfill its obligations, whether STTN's alleged failure to sell certain grades of gasoline was a material breach - such that termination was lawful - is a question of fact, precluding summary judgment on this issue.

In any event, to the extent that STTN did not have certain grades of fuel available, this was due to causes beyond STTN's reasonable control – mainly, that BP itself failed to provide the loan funds that it originally agreed to provide to STTN to get the station up and running. As such, the only reason that STTN did not have a certain grade of gasoline for sale was due to BP's refusal to provide the funds it had previously promised to STTN as part of the initial plan to re-brand the station. Accordingly, STTN did not *fail* to have a certain grade of gasoline for sale.

Regardless, the issue of whether STTN failed to have all grades of gasoline available is a question of fact for the jury, making summary judgment on this issue inappropriate. *See El-Khoury*, 285 F.3d at 1164.

///

///

15

### 4.    BP failed to comply with notice PMPA provisions

In yet another glaring omission, BP fails to mention that in addition to having a legal justification for terminating a franchise, the PMPA also requires that any termination comply with specific notice provisions contained in section 2804. 2802(b)(1)(A). In other words, *only* if termination complied with the notice requirements of section 2804 will the termination be lawful, regardless of the underlying reasons. Typically, an oil company must provide notice of at least 90 days and the notice must be: (1) in writing; (2) sent via certified mail or personally delivered to the franchisee (STTN); and (3) contain a statement of intent to terminate the relationship and the reasons for the termination, the effective date of the termination, and a summary statement of the rights and responsibilities of any party under the PMPA. § 2804. An oil company may give less than 90 days notice in circumstances in which it would "not be reasonable." If the notice of termination does not satisfy the requirements of the PMPA, the termination is unlawful. *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir. 1981). Moreover, the notice provisions must be strictly followed and compliance is mandatory. *Thompson*, 660 F.2d at 1390. Additionally, where the notice of termination enumerates specific justifications, a franchisor cannot later raise *other* grounds in defense of its termination. *Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp. 1099, 1123-24 (D.C. Mo. 1985).

A determination of what is reasonable is one that is done on a case by case basis under the circumstances of each particular case. *Marathon Petroleum Co. v. Pendleton*, 689 F.Supp. 739, 744 (N.D.Ohio 1988). However, the 90 day notice provision "should not be lightly excused." *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir. 1984). The 90 day notice requirement is not an "all or nothing" requirement that permits no notice at all when 90 days would be unreasonable. *Zipper v. Sun Co., Inc.*, 947 F.Supp. 62, 69 (E.D.N.Y. 1996). In addressing the reasonableness of an accelerated notice schedule, some courts have noted that the legislative history and hearings of the PMPA "indicate that § 2804(b)(1)(A) was added to dispense with the lengthy notice requirement where, for example, a franchisee committed serious defaults of the franchise agreement, such as misbranding." *Wisser*, 730 F.2d at 60.

///

16

Initially, it must be noted that BP does not even allege that it has complied with the notice requirements in section 2804. BP has simply failed to present *any* evidence to support a finding of compliance. Likewise, BP has failed to present *any* evidence that not only was the standard 90 day notice *unreasonable*, but that *immediate* termination was *necessary*. Indeed, it has cited no authority for the proposition that an immediate termination notice is reasonable where the franchisee merely owed money. *See Zipper*, 947 F.Supp. at 69 (noting that there is no authority for an immediate termination where the franchisee merely owed money). This failure alone precludes the entry of summary judgment on the issue of the lawfulness of the termination.

Moreover, in its notice of termination, BP justifies the decision to terminate the franchise immediately due to "safety concerns" and "consumer confusion." Christensen Dec., Ex. C. As noted above, BP cannot now assert different reasons for terminating the franchise agreement *immediately*. *Midwest Petroleum*, 603 F.Supp. at 1123-24. Not surprisingly, BP fails to offer *any* evidence that such concerns were legitimate. According to BP, there was no gas for sale at STTN's station. How this fact presents a safety issue remains a mystery to which BP has no answer. Reeder Dec., 130:6-8. Similarly, in light of BP's allegations that gas was not being sold, there was simply no risk of confusion to consumers. As such, BP's motion for summary judgment on its claims that it lawfully terminated the franchise agreement under the PMPA must be denied.

Additionally, whether BP's immediate termination was reasonable under the facts and circumstances is clearly a question of fact. Because BP has not established that its notice of termination complied with section 2804, summary judgment as to the lawfulness of the termination must be denied.

**C.    Summary Judgment is Not Proper on BP's Breach of Contract Claims**

Before addressing the merits of the remainder of BP's claims, it is important to consider the entire context of this dispute. The issue underlying all claims is whether BP lawfully terminated the franchise agreement, which is solely a question of federal law. With that in mind, it seems incongruous to deny BP summary judgment on its federal PMPA claim, but award it the *same relief* under state contract law.

1    BP states that it is entitled to summary judgment on its claims of breach of contract

2    regarding the Franchise Agreements and related personal guaranties.  BP alleges that it entered into

3    a Gasoline Agreement and a Mini-Market Agreement with STTN, as well as personal guaranties of

4    the Gasoline and Mini-Market Agreements with Sayed and Nazim.  BP's argument that these

5    agreements were breached are based on the violations alleged above.  However, as is more fully

6    set forth below, BP failed to perform its own obligations under the contracts.  Similarly, there is

7    substantial evidence that none of the Defendants are in breach of their agreements with BP.

8    **1.    BP did not perform under the agreements**

9    As noted by BP, the elements for a breach of contract action are: (1) the existence

10    of a contract, (2) performance by plaintiff or excuse for nonperformance, (3) breach, and (4)

11    damages.  *First Commercial Mortgage Co. v. Reece,* 89 Cal.App.4th 731, 745 (2001).  Here, BP

12    was obligated to disburse $250,000 to STTN.  As noted above, the facts clearly establish that BP

13    failed to perform this obligation in at least two respects.

14    First, BP simply refused to disburse the Gas Loan Funds in March 2007, despite

15    acknowledging that all conditions to such disbursal were met.  This failure led directly to the

16    recording of mechanic's liens - a fact BP plainly knew.  BP then used the existence of the

17    mechanic's liens to further delay funding.

18    BP's deed of trust recorded on March 9, 2007, indicating that BP was satisfied with

19    the state of the title.  BP had sent a letter to the title company instructing them when to record the

20    deed of trust and stating that recording the deed of trust was a commitment to issue the necessary

21    title policy.  At this time, BP had STTN's first handwritten voucher (the sample provided by BP)

22    and receipts and invoices totaling over $150,000.  The CCL's (both the May 25, 2006 and March

23    9, 2007 ones) provide that, among other things, all that is required is a "commitment from a

24    BPWCP-approved title company to issue an ALTA lender's policy of title insurance insuring that

25    the Deed of Trust encumbers the Real Property in the position approved by BPWCP, subject to

26    exceptions approved in writing by BPWCP."  Jean Smith testified that the reason that the loan did

27    not fund on or after March 9th was that they were waiting for the title insurance policy, which did

28    not arrive until April 13th.  In the meantime, the mechanic's liens had started to appear.

1        There is no reason why the loans did not fund in March. Once the deed of trust was

2    recorded by the title company, BP had a commitment from them to issue the title policy in the

3    form that was acceptable to BP. BP's delay, at a time that they knew STTN was having cash flow

4    and working capital problems, caused the lien problems, caused STTN to have to refinance the

5    land to free up some working capital to pay the liens, which caused further delay, which caused

6    further problems. If BP had funded the loan in March, STTN could have used those funds to pay

7    contractors and would not have used it's working capital to do so, which would have avoided

8    STTN's alleged default on the payment for gasoline.

9        Further, even if BP had funded, but not disbursed the loan, in March of 2007, when

10    liens started showing up, BP had the option under ¶ 7.3 of the disbursement agreement to pay

11    those liens from loan proceeds. The witnesses' testimony cited above indicates that BP did not

12    even consider this option.

13        All of this further delayed the construction and the store opening, increasing

14    STTN's damages from lost sales and further causing a shortage of working capital that caused

15    STTN to default on gas payments and prevented it from curing the arrears.

16        Second, BP breached the loan agreements by refusing to fund the loans despite the

17    gas bills being paid by the right to set-off. As set forth above, STTN made numerous offers to

18    have the mutually-existing debts set-off against each other, even through escrow to ensure

19    transparency. BP refused to make any disbursement and subsequently terminated the franchise

20    agreement. BP breached the loan agreements by its failure to fund and disburse the gas portion of

21    the loan in the summer of 2007 despite the gas bills being paid by setoff. Both Jean Smith and

22    Cile McDonnell testified that by the time the store loan was funded (in late May, 2007), all

23    conditions to funding both loans had been fulfilled, except that STTN was still allegedly in default

24    on gas payments. Because the gas bills were paid by setoff, BP clearly breached the agreements

25    and is liable to STTN for all of the damages caused.

26        Third, because of STTN's tender of a cashier's check on September 4, 2007, BP

27    breached its obligations by refusing to accept tender. A tender is an offer of performance. Tender,

28    when properly made, has the effect of placing the other party in default if he or she refuses to

1    accept it, and the party making the tender may rescind, or sue for breach of contract or for specific

2    performance. *Marshall v. Hilton*, 209 Cal. 531, 534 (1930). To be effective, the tender must be

3    of full performance, at a proper time and place, made by the debtor and to the creditor. Cal. Civil

4    Code §§ 1486, 1487, 1488, 1489, 1490, and 1491.

5          Here, BP provided STTN an opportunity to cure the alleged failure of STTN to

6    purchase gasoline from BP. STTN agreed to purchase the gasoline and informed BP that a

7    cashier's check was waiting for the driver to take upon delivery of the fuel. STTN even sent a

8    copy of the cashier's check to BP via facsimile. Under *Marshall*, such tender has the effect of

9    placing BP in default if it refused to accept performance. However, despite this tender of full

10   performance, BP simply refused to deliver anything to STTN. Thus, it was BP who breached the

11   agreement by failing to deliver gasoline to STTN after STTN tendered performance.

12         Finally, BP clearly breached the implied covenant of good faith and fair dealing. In

13   California, in every contract there is an implied covenant whereby each party agrees not to do

14   anything which will deprive the other parties thereto of the benefits of the contract. *Harm v.*

15   *Frasher*, 181 Cal.App.2d 405, 417 (1960). This implied covenant also imposes on each

16   contracting party the duty to refrain from doing anything which would render performance on the

17   contract impossible. *Harm*, 181 Cal.App.2d at 417. It has been noted that "allegations which

18   assert such a claim must show that the conduct of the defendant... by a conscious and deliberate

19   act... unfairly frustrates the agreed common purposes and disappoints the reasonable expectations

20   of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v.*

21   *Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1393 (1990).

22         The allegations described by the *Careau & Co.* court are the same allegations

23   contained in STTN's Counterclaim. As noted above, BP consciously undertook actions that

24   frustrated the purposes of the contracts, thereby disappointing the reasonable expectations of

25   STTN. Such actions include failing to disburse the Store Loan funds in March 2007, which

26   directly caused liens to be placed on the project, BP's subsequent failure to pay the mechanic's

27   liens with the Store Loan proceeds, BP's refusal to acknowledge STTN's statutory right to set-off,

28   as well as BP's unjustified refusal to place the Gas Loan funds in escrow in August 2007, and BP's

20

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1   unlawful rejection of STTN's tender of performance. Taken together, these deliberate acts

2   constitute intentional actions that unfairly frustrated the purposes of the contracts and deprived

3   STTN of the benefits of the agreement.

4          Since BP clearly did not perform its obligations, summary judgment in favor of BP

5   on its breach of contract claims must be denied.

6          **2.    STTN did not breach the Gasoline Agreement**

7          BP alleges that STTN breached the Gasoline Agreement by failing to pay for

8   gasoline products in a timely manner. Specifically, BP refers to the outstanding balance of

9   $126,194.77. As noted above, this is the balance that was the subject of a separate agreement

10  between Sayed, Nazim and BP, whereby they would pay $30,000 to BP on the 15th of each month,

11  starting June 20, until the balance was reduced. Sayed and Nazim made the payments in July and

12  August, thereby reducing the amount to approximately $126,000. Indeed, BP's own documents

13  state the balance was reduced to $114,000.88. Despite this glaringly obvious fact, BP asserts that

14  STTN "never made any payments" to BP under the separate agreement. Thus, even BP's evidence

15  suggests that payments were made and current. Clearly this is a factual question, rendering

16  summary judgment inappropriate.

17         In addition, as est forth above, the gas bills were deemed paid through the doctrine

18  of setoff and there was no amount owing for gasoline at the time that BP terminated the franchise.

19         BP further alleges that STTN breached the Gasoline Agreement by failing to

20  operate the station or have any gasoline available for sale to the public for at least 12 days. First,

21  STTN has presented credible evidence refuting both allegations, including testimony that there

22  was both premium and diesel available for purchase. Indeed, BP seems to admit as much above.

23  Second, although STTN denies both allegations, any such "failure" was not a "failure" as

24  envisioned by the PMPA. Indeed, to the extent that STTN did not have grades of fuel available,

25  this was due to causes beyond STTN's reasonable control – mainly, that BP itself failed to provide

26  the loan funds that it originally agreed to provide to STTN to get the station up and running. As

27  such, the only reason that STTN did not have any grade of gasoline for sale was due to BP's

28

21

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1  refusal to provide the funds it had previously promised to STTN as part of the initial plan to re-

2  brand the station.  Accordingly, STTN did not *fail* to operate the station for 12 days under section

3  2802(c)(8) or (9).  In light of the credible evidence that STTN did not fail to act as alleged,

4  summary judgment must be denied.

      **3.     STTN did not breach the Mini-Market Agreement**

6        BP's allegation that STTN breached the mini-market agreement is based *entirely* on

7  STTN's alleged breach of the Gasoline Agreement.  As noted above, there is substantial and

8  credible evidence to establish that STTN did not breach the Gasoline Agreement.  Thus, at the

9  very least, there is a question of fact as to whether STTN breached the Gasoline Agreement.  As

10  such, there is necessarily a question of fact as to whether STTN breached the Mini-Market

11  Agreement.  Therefore, summary judgment on this issue is inappropriate as well.

      **4.     Sayed and Nazim did not breach the Franchise Guaranties**

13        In support of its position that Sayed and Nazim were in breach of the Franchise

14  Guaranties, BP again raises the factually inaccurate argument that there was a failure to make

15  payments on the separate arrangement, leaving an outstanding balance of $126,000.  However, as

16  set forth above, Sayed and Nazim had made payments under this agreement amounting to over

17  $60,000.  Moreover, in light of the doctrine of set-off, there simply was no outstanding balance

18  owed to BP.  There was, however, an outstanding balance owed to STTN under the loan

19  agreements.  As such, summary judgement on this issue must be denied as well.

**D.     BP's Breach of Contract Claim for the Store Loan Must Fail**

21        BP alleges that its termination of the franchise relationship in September 2007

22  required the Defendants to pay the outstanding balance of the Store Loan within 30 days of

23  termination.  However, as it extensively set forth above, BP's termination of the Franchise

24  Agreement was unlawful.  It is illogical that an *unlawful* termination could become a *lawful* trigger

25  for a closely-related contract.  Since it is inappropriate to enter judgment in favor of BP on the

26  issue of the lawfulness of the termination, summary judgment as to the alleged default of the Store

27  Loan is inappropriate as well.

28  ///

**E.      BP's Common Count Claim Must Fail**

BP alleges that it is entitled to summary judgment on its common count for goods sold and delivered.  In short, BP alleges that it delivered gasoline to STTN and STTN never paid BP for the gasoline.  The common count for goods sold and delivered is a common-law action by which damages can be recovered for the non-payment of goods.  This claim is typically employed where goods are delivered to one party in the absence of an express contract and the seller asks the court to find the existence of a quasi-contract and award to the seller the reasonable value of the goods delivered to the purchaser. *Weitzenkorn v. Lesser*, 40 Cal.2d 778 (1953).  As such, this action will not lie where express binding agreements exist and define the parties' rights.  However, an exception to this general rule exists where the seller has performed its part and nothing remains to be performed but the payment under the contract. *Ferro v. Cititzens National Trust & Savings Bank of Los Angeles*, 44 Cal.2d 401 (1955).

Initially, it must be noted that STTN has paid for the gasoline it received from BP and entered into a Separate Agreement with BP that was current when the franchise was terminated by BP.  Moreover, pursuant to the doctrine of set-off, STTN simply did not owe BP *anything*.

Additionally, an express contract exists between STTN and BP.  Presumably, it is BP's position that the only thing left undone is STTN's performance.  However, as is fully set forth above, due to BP's failure to fund the loans, it has not fully performed under the express contract.  Indeed, it was BP's failure that caused the need to a Separate Agreement in the first place.  As such, the common count for goods sold and delivered is inapplicable.  Moreover, the Gasoline Agreement requires deliveries over a period of *twenty years*.  Obviously, under such terms BP could not have fully performed its obligations, again rendering this exception inapplicable.  Accordingly, BP's motion for summary judgement on this issue must be denied.

**F.      BP's Claim for Unjust Enrichment Must Fail**

BP also seeks summary judgment on its claim of unjust enrichment.  However, "it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Lance*

23

1    *Camper Manufacturing Corp. v. Republic Indemnity Co.*, 44 Cal.App.4th 194, 203 (1996).

2    Indeed, courts have held that it is internally inconsistent for a party to allege the existence and

3    validity of an enforceable written contract between the parties in one cause of action and the

4    reallege the same in its claim of a quasi-contract. *See Lance Camper*, 44 Cal.App.4th at 203.

5    Thus, only by alleging that the written contract was void or rescinded could a cause of action for

6    unjust enrichment proceed.

7            Here, BP has repeatedly alleged the existence of numerous written agreements

8    between the parties.  Accordingly, the doctrine of unjust enrichment is clearly inapplicable to this

9    case.

10            Additionally, as set forth above, the Defendants had a Separate Agreement covering

11    any outstanding balance arising from gasoline purchases.  At the same time, the doctrine of set-off

12    clearly extinguished *any* debt owed to BP.

13            As such, BP's motion for summary judgment on its claim for unjust enrichment

14    must be denied.

15    **G.    BP's Claim For Unified Judicial Foreclosure Must Fail**

16            BP's claim for unified judicial foreclosure is based *entirely* on the Defendants'

17    alleged default of the Store Loan.  However, as noted above, there is substantial and credible

18    evidence that the Defendants did not default on the Store Loan.  As summary judgment is

19    inappropriate for the issue of default on the Store Loan, summary judgment must also be

20    inappropriate for unified judicial foreclosure based on the same alleged default.  Therefore,

21    summary judgment must be denied on this issue as well.

22                                              **IV.**

23                                      **CONCLUSION**

24            Based on the foregoing, it is clear that BP is not entitled to summary judgment on

25    any portion of its Second Amended Complaint.  It failed to demonstrate that its termination of the

26    ///

27    ///

28    ///

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF

1  Franchise Agreement was lawful.  It further failed to establish that the Defendants breached *any*

2  contract or quasi-contract.  Accordingly, Defendants request that BP's motion be denied in its

3  entirety.

4          DATED: July 18, 2008.

5                                          BAKER MANOCK & JENSEN, PC

6

7                                          By s/John G. Michael/_____
                                           John G. Michael
8                                          Ryan L. Eddings
                                           Attorney for Defendants
9                                          STTN ENTERPRISES, INC., NAZIM
                                           FAQUIRYAN, SAYED FAQUIRYAN, MAGHUL
10                                         FAQUIRYAN, and AVA GLOBAL ENTERPRISE,
                                           LLC
11

12  @PFDesktop\::ODMA/MHODMA/DMS;DMS;651840;1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ, PARTIAL SUMMARY JUDGMENT AS TO THE
SECOND AMENDED COMPLAINT; MEMORANDUM OF P&AS IN SUPPORT THEREOF