1  **BAKER MANOCK & JENSEN, PC**
   A PROFESSIONAL CORPORATION
2  FIG GARDEN FINANCIAL CENTER
   5260 NORTH PALM AVENUE, FOURTH FLOOR
   FRESNO, CALIFORNIA 93704-2209
3  TELEPHONE (559) 432-5400
   TELECOPIER (559) 432-5620

4

5  Attorneys for    Defendants and Counter-Claimants

6

7

8                    UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11 | BP WEST COAST PRODUCTS, LLC, a          ) Case No. 5:07-CV-04808 JF
   | Delaware Limited Liability Company,       )
12 |                                           ) DECLARATION OF SAYED
   |                         Plaintiff,         ) FAQUIRYAN:
13 |                                           )
   |        v.                                 ) 1. IN OPPOSITION TO PLAINTIFF'S
14 |                                           ) MOTION FOR SUMMARY JUDGMENT
   | STTN ENTERPRISES, INC., a California      ) AS TO THE SECOND AMENDED
15 | Corporation; NAZIM FAQUIRYAN, an          ) COMPLAINT; AND
   | individual; SAYED FAQUIRYAN, an           )
16 | individual; and MAGHUL FAQUIRYAN, an      ) 2. IN OPPOSITION TO PLAINTIFF'S
   | individual; and AVA GLOBAL ENTERPRISE, ) MOTION FOR SUMMARY JUDGMENT
17 | LLC, a California limited liability company, ) ON DEFENDANTS' COUNTERCLAIMS
   |                                           )
18 |                         Defendants.       ) [Filed concurrently with, Memoranda of
   | _____ ) Points and Authorities and Declaration of
19 |                                           ) John G. Michael]
   | STTN ENTERPRISES, INC., a California      )
20 | Corporation; NAZIM FAQUIRYAN, an          ) Date: August 8, 2008
   | individual; SAYED FAQUIRYAN, an           ) Time: 9:00 a.m.
21 | individual; and MAGHUL FAQUIRYAN, an      ) Dept. 3
   | individual; and AVA GLOBAL ENTERPRISE, ) The Honorable Jeremy Fogel
22 | LLC, a California limited liability company, )
   |                                           )
23 |                    Cross-Complainants,    )
   |                                           )
24 |        v.                                 )
   |                                           )
25 | BP WEST COAST PRODUCTS, LLC, a          )
   | Delaware Limited Liability Company;        )
26 |                                           )
   |                    Cross-Defendants.      )
27 | _____ )

28

NOTICE OF CROSS-MOTION, CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS' FIRST COUNTER CLAIM AND
PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF PLAINTIFF'S LIABILITY ON SECOND THROUGH SIXTH COUNTER CLAIMS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
1

1

2

3          I, Sayed Faquiryan, declare:

4          1.      I am a defendant herein and am, and at all times relevant herein was, the

Vice-President, Secretary and Treasurer of Defendant STTN ENTERPRISES, INC. ("STTN").  I

am also a 49% shareholder in STTN.  The facts contained in this declaration are within my

personal knowledge and, if called as a witness, I could competently testify thereto.

2.      From 2003 through approximately October, 2006, STTN successfully

owned and operated a Chevron gas station, with a mini mart and restaurant, located at 631 San

Felipe Road in Hollister, California (the "Station").  STTN also owned and operated a Union 76

gas station and mini mart, which was also located in Hollister, Califorina.

3.      In 2005, Ken Wickerham and I discussed STTN becoming a franchisee for

Arco gasoline and an am/pm mini mart.   The first location discussed was in Watsonville,

California.  STTN applied for and was approved for an Arco and am/pm franchise for that

location.  STTN paid to BP West Coast Products LLC ("BP") a franchise fee of $100,000 for this

franchise, which BP has retained.  Some time later, STTN applied for and was approved for an

additional franchise in Hollister, California.  STTN paid a franchise fee of $72,000 to BP for this

franchise, which BP has also retained.   The Hollister franchise is the subject of this lawsuit and

involves the remodeling and rebranding in 2006 and 2007 of STTN's existing Chevron station and

mini mart/restaurant to an Arco gasoline station and am/pm mini mart.  STTN and BP entered into

various agreements  to accomplish this purpose.

4.      On May 25, 2006, STTN and BP entered into a Conditional Commitment

Letter ("CCL"), pursuant to which BP committed to lend STTN $400,000 to help with the

construction costs involved in the rebranding process.  STTN paid to BP a $10,000 loan

commitment fee.  A copy of this CCL is attached to the Declaration of Thomas Reeder in Support

of BP West Coast Products LLC's Motion for Summary Judgment, etc. ("Reeder Dec."), as Ex. I.

On July 11, 2006, STTN and BP entered into a Contract Dealer Gasoline Agreement and an

am/pm Mini Market Agreement, copies of which are attached to the Reeder Dec. as Exhibits A

1    and B.

2       5.      At the time that these agreements were signed by STTN, the Station was

3    operating as a Chevron gasoline station and mini mart/restaurant.  The gas station portion already

4    had underground tanks, pumps and dispensers, isles and a canopy.   Because the Station already

5    had this equipment, the gas station portion of the remodel would be much less expensive than the

6    store portion.   BP was aware of this because both Ken Wickerham and Tom Reeder had visited

7    me at the Station and we had discussed the remodel.  Despite this knowledge, BP allocated the

8    loans $150,000 to the store portion of the remodel and $250,000 to the gas station portion.

9       6.      Due to the expense and disruption involved in the remodel, STTN requested

10   of BP that it be permitted to sell Arco branded gas during the remodel of the store.  This request

11   was granted.  STTN then proceeded with the rebranding of the gas station portion of the Station

12   from Chevron to Arco, which was paid by STTN and its principals, using my own funds from

13   various sources, including my account and the account of AVA Global Enterprise, Inc., a related

14   company, at Omni Financial Services, Inc. (an unrelated financial services institution).  These

15   were funds that I owned and were not borrowed. STTN submitted a handwritten voucher, together

16   with cancelled checks and invoices to be reimbursed for these costs, but BP would not reimburse

17   STTN because the loans had not yet funded.  When the rebranding process for the gas station

18   portion was complete and STTN was ready to open the gas portion of the station, BP required that

19   STTN sign another Contract Dealer Gasoline Agreement on October 12, 2006, a copy of which is

20   attached to the Reeder Dec. as Ex. D.

21      7.      Because the Watsonville project had been delayed during the permitting

22   process, BP, through Ken Wickerham,  requested STTN to show good faith and start construction

23   on the store remodel, even though BP had not yet presented STTN with any loan agreements.  BP

24   assured me that loan funds would be forthcoming.   STTN started construction on the store

25   remodel on January 2, 2007.  At this point, the only agreements between BP and STTN were the

26   Loan Commitment Letter, Mini Mart Agreement and Contract Dealer Gasoline Agreement.

27   Because the loans were not forthcoming, STTN had to use its working capital to pay for the

28   construction.   Because of this drain on its working capital, STTN fell behind in its payments for

1  gasoline. From that point forward, STTN was forced to pay for gasoline with a cashier's check for

2  each load delivered.

3          8.      Throughout January, February and early March, STTN worked to satisfy the

4  conditions set forth in the CCL. On February 12, 2007, long after construction had started and

5  STTN was running out of working capital, BP presented me with the Gasoline Loan Agreement

6  and the Store Loan Agreement. Copies of these agreements are attached to the Reeder Dec. as

7  Exs. J and K. Despite the fact that BP was aware that the store remodel would cost far more than

8  the gasoline station remodel, the loan agreements allocated only $150,000 to the store remodel and

9  $250,000 to the gasoline station construction. I was informed by Ken Wirkerham and Rima

10 Chadra that this was the only way that BP could do it and that they would work with me on the

11 allocation of the funds. In addition, many of the categories of construction expenses were vague

12 and I was told by Ken Wirkerham that it was possible to move funds from one category to another.

13 By this time, I had already expended approximately $387,500 of STTN's and my own funds on the

14 construction and re-branding and had no choice but to rely upon the representations of Ken

15 Wirkerham that they would work with me on the allocation of funds. STTN signed the

16 agreements.

17          9.      On March 9, 2007, BP required me to sign a revised commitment letter

18 because the first one, dated in May, 2006, contained some errors. A copy of this revised CCL is

19 Exhibit 80 to Prescilla Jean Smith's deposition transcript, which is attached to the Declaration of

20 John G. Michael, filed herewith. The budget that BP provided to STTN at the same time was for a

21 new "ground up" facility, even though all parties understood that this was a re-brand, not new

22 construction.

23          10.     Although BP had its deed of trust recorded on March 9, 2007, BP still

24 refused to fund the loan, pay my contractor or reimburse STTN for its construction expenses.

25 Construction was approximately 80% complete by this time and STTN was running out of money

26 waiting for the loan funds. Ms. Smith informed me that she could not fund the loans until she had

27 received a policy of title insurance and that the title company had not yet sent it.

28          11.     As a result of the delay by BP in funding the loans, STTN ran out of money.

NOTICE OF CROSS-MOTION, CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS' FIRST COUNTER CLAIM AND PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF PLAINTIFF'S LIABILITY ON SECOND THROUGH SIXTH COUNTER CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

4

1   The general contractor and his subs walked off the job because they were no longer being paid.

2   Mechanics liens started to appear.  The project was delayed and STTN lost additional store sales,

3   which generated a pre-BP profit each month of approximately $30,000.  AVA Global Enterprise,

4   Inc., a related company to STTN (which is owned 50% by my son, Nazim), refinanced the real

5   property on which the station was located  to generate funds to be used by STTN to clear the liens,

6   pay the subcontractors and general contractor and get work started.   The refinancing process

7   delayed the project even further because BP required a new subordination agreement to be signed

8   and the preparation, review and approval of the new loan took time.

9          12.    Long after the loans should have been funded, in May, 2007, BP required

10  STTN to sign a Disbursement Agreement.  A copy of that Disbursement Agreement is attached to

11  the Reeder Dec. as Ex. L.  BP had the option under ¶ 7.3 of the Disbursement Agreement to pay

12  the mechanics liens from loan proceeds, but although BP caused the problems by failing to timely

13  fund the loans, it would not pay the liens from loan proceeds.

14         13.    Even after the liens had been cleared, BP held up loan funding while

15  gathering documents that were not conditions to funding.  BP repeatedly requested budgets from

16  STTN.  BP required changes to STTN's corporate documents and requested other documents that

17  were not listed in the CCL.

18         14.    STTN executed the promissory notes at the same time as the loan

19  agreements, on February 12, 2007.

20         15.    Finally in late May, 2007, BP funded the store loan only and provided

21  STTN and its contractor with preprinted vouchers to use to get paid or reimbursed.   The store loan

22  was fully disbursed by early August, with approximately $12,000 being paid to STTN.

23         16.    In the meantime, STTN agreed to reduce the balance owing for gasoline by

24  paying an extra $30,000 per month on the 15th of each month, starting on June 20, 2007.   STTN

25  paid approximately $1,500 - $3,000 extra per load of gasoline delivered during this time period

26  and reduced the balance owing from the approximately $185,000 owing in May, 2007 at the time

27  of the payment agreement to what BP alleges is approximately $126,000 by the end of August,

28  2007, which is approximately a $60,000 reduction in the two month period that the agreement was

1  in effect. STTN, however, disputes that $126,000 is owing to BP. STTN has been charged for 4-5

2  loads of gasoline that were not delivered. Although included in STTN's broad first request for

3  production of documents propounded to BP in April, 2008, BP has failed to produce any

4  documents related to gasoline deliveries. STTN recently sent a second, more specific request for

5  production regarding this issue and is awaiting BP's response.

6         17.    BP, however, demanded that STTN pay the entire balance of the gasoline

7  payments before it would fund the gasoline loan. By this time, STTN had paid approximately

8  $790,000 of construction expenses without reimbursement by BP. Because STTN had paid

9  construction expenses in excess of the amount of the gasoline loan, I asked Ms. Smith if BP would

10 setoff the gasoline payments against the loan proceeds that would go to STTN. BP refused. In

11 fact, STTN had performed under the payment agreement by reducing the balance owing by

12 approximately $60,000 and was not in default during the time that BP demanded that it pay the

13 entire balance of the gas payments before it would fund the gasoline loan.

14        18.    Finally, STTN tendered payment through an escrow. First, STTN offered to

15 have the amount of the gas payments deducted from the gas loan proceeds at the close of escrow

16 when the loan proceeds would be disbursed. Cecile McDonnell and Ms. Smith stated to me that

17 this could not be done as it was against BP policy. Next, STTN offered to put the amount then

18 owing into the same escrow as the loan proceeds and that the gas payments could be disbursed to

19 BP at the same time that the loan proceeds were disbursed to STTN to reimburse it for

20 construction expenses. STTN had already provided BP with proof that it paid well over $200,000

21 of reimbursable expenses. BP refused and Ms. McDonnell stated to me that they could not

22 "commingle" their funds with STTN's funds in the same escrow, which makes no sense.

23        19.    STTN then offered to open a separate escrow and to place its money for the

24 gas payments into its escrow if BP would place the loan proceeds into its escrow. BP agreed but

25 insisted that STTN place its money into escrow first. Because of the repeated delays, the repeated

26 requests for additional documentation that is not required by the loan documents as a condition to

27 funding, BP's prior breach of the loan agreements and because STTN would have to borrow the

28 money to pay the gas bills (with a plan of paying it back with the loan proceeds it received), I was

1  suspicious of BP's demand that STTN provide its money first.  Also, STTN could not afford to

2  borrow the money and have it sit in escrow for weeks while BP further delayed funding the gas

3  loan.  STTN refused to put its money in first, BP also refused and the escrow procedure never was

4  used.

5          20.    Because of BP's breaches of the loan agreements, because STTN was out of

6  working capital, and because BP would not respond with a date certain as to when the gas loan

7  would fund, STTN ceased purchasing gasoline around August 18, 2007.  I informed BP that as

8  soon as the loan funded, either through the escrow process or otherwise, STTN would again

9  purchase and sell gasoline.

10          21.    After discussion with Brad Christensen, Tom Reeder and Mike Hagar in

11  late August in which they threatened to terminate the franchise, because of all of the money that it

12  had invested, on August 31, 2007 STTN agreed to purchase gasoline for sale.  I told Tom Reeder

13  would try to arrange for a cashier's check but that with the weekend and banking holiday coming

14  up, it may not be until Tuesday.  On Tuesday, September, 4, 2007, I informed BP that I had a

15  cashier's check ready for them.  I was told that a load would be delivered later that day if I faxed a

16  copy of the cashier's check to the distribution center.  I did so.  Later that same day, I received a

17  phone call from Brad Christensen informing me that they were terminating my contracts

18  immediately and that I could no longer buy gasoline from BP.  STTN tendered a cure of its alleged

19  default under the franchise agreements before they were terminated, but its tender was refused.

20          22.    On September 6, 2007, I received the termination notices.  These notices

21  state that STTN did not have <u>any</u> gasoline to sell for seven consecutive days.  This statement is

22  false.  While STTN was out of regular unleaded, it still had and was selling premium gasoline and

23  diesel fuel.  The termination notices are, therefore, false and ineffective.

24          23.    BP wrongfully terminated the franchise agreements.  BP's notice of

25  termination was wrongful for the following reasons. (1) BP is the one the breached the agreements

26  and caused the alleged arrearages in the gasoline payments. (2) There was no default in gasoline

27  payments due to the doctrine of setoff. (3) STTN tendered a cure of the failure to operate and sell

28  gasoline, but its tender was refused. (4)   The notice falsely states that all grades of gasoline were

NOTICE OF CROSS-MOTION, CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS' FIRST COUNTER CLAIM AND
PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF PLAINTIFF'S LIABILITY ON SECOND THROUGH SIXTH COUNTER CLAIMS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

7

1   not available for sale, when, in fact, premium gas and diesel were available and were being sold.

2   (5) the notice references the wrong agreement (the 10/12/06 agreement states that it supersedes the

3   prior agreements).  (6) the notice falsely states that 90 days is not required because of safety

4   concerns and the notice falsely states that no notice is required because of consumer confusion,

5   which makes no sense.

6           24.    STTN's alleged failure to purchase and pay for gasoline was directly caused

7   by BP's breach of the commitment letter and loan agreements, by its delay in funding the $150,000

8   loan and its total failure to fund the $250,000 loan.  If BP had timely performed its obligations,

9   STTN would be successfully operating the Station today.

10

11          I declare under penalty of perjury under the laws of the United States of America

12  that the foregoing is true and correct and that this declaration was executed on July 17, 2008 at

13  Hollister, California.

14

15

16                                  _____

17                                  Sayed Faquiyran

18

19

20

21  @PFDesktop\::ODMA/MHODMA/DMS;DMS;651747;1

22

23

24

25

26

27

28