1   **BAKER MANOCK & JENSEN, PC**
    A PROFESSIONAL CORPORATION
    FIG GARDEN FINANCIAL CENTER
2   5260 NORTH PALM AVENUE, FOURTH FLOOR
    FRESNO, CALIFORNIA 93704-2209
3   TELEPHONE (559) 432-5400
    TELECOPIER (559) 432-5620

4

5   Attorneys for   Defendants and Counter-Claimants

6

7

8                  UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11  BP WEST COAST PRODUCTS, LLC, a          )   Case No. 5:07-CV-04808 JF
    Delaware Limited Liability Company,     )
12                                          )   DECLARATION OF JOHN G.
                            Plaintiff,      )   MICHAEL:
13                                          )
            v.                              )   1. IN OPPOSITION TO PLAINTIFF'S
14                                          )   MOTION FOR SUMMARY JUDGMENT
    STTN ENTERPRISES, INC., a California    )   AS TO THE SECOND AMENDED
15  Corporation; NAZIM FAQUIRYAN, an        )   COMPLAINT; AND
    individual; SAYED FAQUIRYAN, an         )
16  individual; and MAGHUL FAQUIRYAN, an    )   2. IN OPPOSITION TO PLAINTIFF'S
    individual; and AVA GLOBAL ENTERPRISE,  )   MOTION FOR SUMMARY JUDGMENT
17  LLC, a California limited liability company, )   ON DEFENDANTS' COUNTERCLAIMS
                                            )
18                          Defendants.     )   [Filed concurrently with Notices,
    _____)   Memoranda of Points and Authorities and
19                                          )   Declaration of Sayed Faquiryan]
    STTN ENTERPRISES, INC., a California    )
20  Corporation; NAZIM FAQUIRYAN, an        )   Date: August 8, 2008
    individual; SAYED FAQUIRYAN, an         )   Time: 9:00 a.m.
21  individual; and MAGHUL FAQUIRYAN, an    )   Dept. 3
    individual; and AVA GLOBAL ENTERPRISE,  )   The Honorable Jeremy Fogel
22  LLC, a California limited liability company, )
                                            )
23                  Cross-Complainants,     )
                                            )
24          v.                              )
                                            )
25  BP WEST COAST PRODUCTS, LLC, a          )
    Delaware Limited Liability Company;     )
26                                          )
                    Cross-Defendants.       )
27  _____)

28

1

2

3    I, John G. Michael, declare:

4    1.    I am an attorney at law duly licensed to practice before all courts of the

5 State of California.  I am a shareholder with the law firm of Baker, Manock & Jensen, counsel of

6 record for Defendants and Counter Claimants herein.  I am familiar with the pleadings, discovery,

7 and issues in this matter.

8    2.    The facts contained herein are within my personal knowledge, and if called

9 upon to testify, I could and would competently testify thereto.

10    3.    On May 21, 2008, I took the deposition of Cecile McDonnell.  True and

11 correct copies of the following pages of the transcript of that deposition are attached hereto as

12 Exhibit "A:" 56-58, 98-101, 103, 104, 114, 115, 134, 137, and 138.

13    4.    On May 22, 2008,  I took the deposition of Priscilla Jean Smith.  True and

14 correct copies of the following pages of the transcript of that deposition are attached hereto as

15 Exhibit "B:" 11, 12, 14, 19, 20, 27, 31,  32; 34, 35, 40, 44, 45, 54, 55, 56, 58, 99, 100, and 105.

16    5.    Attached hereto as Exhibit "C" is a true and correct copy of Exhibit 80 to

17 the deposition of Priscilla Jean Smith.

18    6.    On June 27, 2008, I took the deposition of Thomas L. Reeder.  True and

19 correct copies of the following pages of the transcript of that deposition are attached hereto as

20 Exhibit "D:" 36, 37, 41, 42, 90-92, 93, 129, and 130.

21    7.    Attached hereto as Exhibit "E" is a true and correct copy of Exhibit 137 to

22 the deposition of Thomas L. Reeder.

23    8.    Attached hereto as Exhibit "F" is a true and correct copy of a letter

24 produced by BP West Coats Products LLC ("BP") during discovery.  This is a letter of instructions

25 from BP to its title company regarding the recording of, among other things, BP's deed of trust.

26    9.    Attached hereto as Exhibit "G" is a true and correct copy of the Deed of

27 ///

28 ///

2

1    Trust recorded by BP on March 9, 2007, a copy of which was produced by BP during discovery.

2

3            I declare under penalty of perjury under the laws of the United States of America

4    that the foregoing is true and correct and that this declaration was executed on July 17, 2008 at

5    Fresno, California.

6

7

8                                        s/John G. Michael/
                                         John G. Michael
9

10   @PFDesktop\::ODMA/MHODMA/DMS;DMS;653229;1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOHN G. MICHAEL IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT A

Certified Copy



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BP WEST COAST PRODUCTS, LLC, a
Delaware Limited Liability
Company, et al.,

      Plaintiffs,

   vs.                       CASE NO. C07 04808 JF

STTN ENTERPRISES, INC., a
California Corporation, et al.,

      Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

CECILE MCDONNELL

May 21, 2008

9:03 A.M.

333 South Hope Street, 17th Floor

Los Angeles, California

Elena C. Chester, CSR No. 10274

**EXHIBIT A**

Cecile McDonnell                                    May 21, 2008

56

1       Q    So was Ms. Smith inquiring about the payment

2   schedule or just letting you know that suppliers were

3   asking about it?

4       A    Yes.

5       Q    Which one?

6       A    She was letting me know that suppliers --

7       Q    Okay.

8       A    -- were inquiring.

9       Q    And then did you discuss payment to suppliers

10  with STTN?  Or did you go directly to the suppliers and

11  start talking to them?

12      A    No.  I communicated with Jean Smith.

13      Q    Okay.  What did you tell her?

14      A    I told her I cannot guarantee payment to the

15  suppliers, and when I would be able to fund.

16      Q    When did you tell her you'd be able to fund?

17      A    I don't remember.

18      Q    During the course of your processing this

19  loan, did you ever provide STTN with a checklist of

20  documents that you needed in order to satisfy the

21  conditions to funding?

22      A    No.

23      Q    Did you, yourself, have a checklist of

24  documents that you needed in order to fulfill the

25  conditions to funding?

Cecile McDonnell                                                    May 21, 2008

57

1        A     No.

2        Q     How did you determine what documents were

3    needed to fulfill the conditions to funding?

4        A     The items are listed as an exhibit in the

5    conditional-commitment letter.

6              MR. MICHAEL:  Let's go ahead and mark what I

7    think is the conditional-commitment letter as the next

8    in order.

9              THE REPORTER:  4.

10             (Exhibit 4 was marked.)

11       Q     BY MR. MICHAEL:  Please take a minute to

12   review Exhibit No. 4 and let me know if you recognize

13   that as the conditional-commitment letter for the STTN

14   loan.

15       A     Yes, it is the conditional-commitment letter.

16       Q     Okay.  And the exhibit that you were talking

17   about, that contains the list of things that are needed

18   to be satisfied before funding -- is that Exhibit B to

19   the conditional-commitment letter?

20       A     Yes.

21       Q     Okay.  And this was the list that you worked

22   off of; is that correct?

23       A     No.  This is a -- the checklist that Asset

24   uses.

25       Q     Okay.  How did you determine whether or not

Cecile McDonnell                                          May 21, 2008

58

1    the conditions to funding had been fulfilled, if you

2    didn't use this list?

3         A    Asset notifies me when those conditions are

4    met.

5         Q    So you don't work directly with the borrower

6    to fulfill the conditions?  It's the Asset Department

7    that does that?

8         A    Yes.

9         Q    Were you ever notified by Asset that the

10   conditions to funding had been fulfilled?

11        A    Yes.

12        Q    When was that?

13        A    May 2007.

14        Q    And how were you notified?

15        A    Via e-mail.

16        Q    And what did you do in response?

17        A    I then proceeded to release the loan funds to

18   the escrow company.

19        Q    So had escrow already been opened?

20        A    Yes.

21        Q    Okay.  Do you recall when escrow was opened?

22        A    No.

23        Q    Do you have an estimate?

24        A    March 2007.

25        Q    Okay.  Then the loan funds were released to

Cecile McDonnell                                    May 21, 2008

98

1    submitted by STTN is -- has been produced.

2              MS. JONES:  Yes.

3              MR. MICHAEL:  Good.

4         Q    Were there any vouchers that were submitted

5    with regard to the gas loan?

6         A    I don't believe so.

7         Q    Did the gas loan ever get to the point where

8    escrow was opened and the vouchers were preprinted?

9         A    Yes.

10        Q    Okay.  When did that happen?

11        A    At the same -- we open escrow once, and

12   normally we handle the loans as a total.

13        Q    Okay.  So there is just one escrow that was to

14   handle both the mini-mart and the gas loan?

15        A    Yes.

16        Q    And the vouchers that were preprinted could be

17   used for either the gas loan or the mini-mart loan; is

18   that right?

19        A    So long as conditions to funding are met, yes.

20        Q    Were you ever informed that conditions for

21   funding were met with regard to the gas loan?

22        A    No.

23        Q    Did you ever develop an understanding of why

24   conditions were not met for the gas loan?

25        A    Yes.



Cecile McDonnell                                    May 21, 2008

99

1      Q    What was your understanding?

2      A    The conditions were not met because of the

3  unpaid gas balance.

4      Q    Did you have any discussions with Sayed

5  Faquiryan about the unpaid gas balance?

6      A    I believe I did.

7      Q    Do you know how many such discussions you had?

8      A    No, I don't.

9      Q    Do you know when those discussions occurred?

10     A    No, not exactly.

11     Q    Did those discussions occur in the summer of

12  2007?

13     A    It would have been before that.

14     Q    Okay.  Did those discussions occur before the

15  mini-market loan was funded?

16     A    Yes.

17     Q    Can you tell me what was discussed between you

18  and Mr. Faquiryan regarding the unpaid gas balance?

19     A    I probably mentioned that I only have approval

20  to release the am/pm loan, but not the gas loan.

21     Q    And what did Sayed say about that?

22     A    I don't remember.

23     Q    Okay.  Do you remember anything else about the

24  conversations that you had with Sayed Faquiryan

25  regarding the unpaid gas balances?

Cecile McDonnell                                    May 21, 2008

100

1      A      Yes.

2      Q      Okay.  What else do you remember?

3      A      He was willing to pay the gas balance and came

4   up with a payment plan.

5      Q      Did he describe the payment plan to you?

6      A      No.

7      Q      Do you remember anything else about your

8   conversations with Sayed Faquiryan about the gas

9   balances?

10     A      I believe we discussed that, once the gas

11  balance was satisfied and I received notification that

12  conditions to funding were met, I would be in a position

13  to release the gas-loan funds.

14     Q      Is it your understanding that, up until the

15  end of August of 2007, the only thing that was

16  preventing BP from releasing the gas-loan funds was the

17  unpaid gas balances?

18     A      Yes.

19     Q      Did you have any discussions with

20  Mr. Faquiryan about his paying the outstanding gas

21  balances through an escrow?

22     A      Yes.

23     Q      And when did you have those discussions with

24  him?

25     A      It might have been July, August.

Cecile McDonnell                                    May 21, 2008

101

1      Q      And what did you discuss with him in that

2    regard?

3      A      We -- well, we had a previous conversation

4    with one of his sons, Tim Faquiryan, who wanted to

5    assist his father, Sayed, in curing this gas default and

6    had stated that "We are willing to pay.  We can transfer

7    the gas balance to our escrow company if BP would do the

8    same and transfer the gas-loan funds to your escrow

9    company, and each of us would receive the notification

10   that funds had been transferred."  When they were

11   satisfied that BP had released the gas-loan funds to our

12   escrow and they received that notification, they would

13   then instruct their escrow company to release the

14   payment for the gas load to BP.  And once BP was

15   satisfied that we had been paid for the balance, we

16   could then work on reimbursing the franchisee for the

17   gas business improvements.

18     Q      And was that an acceptable arrangement?

19     A      Yes.

20     Q      And did BP go ahead then and put the money

21   into escrow and notify Sayed that it had been done so

22   that he could put his money in?

23     A      No.  Sayed later sent me a note that his

24   escrow had not received the gas-loan funds.  And I

25   responded with "No.  The agreement was:  Each of our

Cecile McDonnell                                        May 21, 2008

                                  103

1        A    He might have mentioned that.

2        Q    Okay.  And --

3             MS. JONES:  Did you say "its escrow account"

4    or "his escrow account"?

5             MR. MICHAEL:  Its.

6             MS. JONES:  Oh.

7        Q    BY MR. MICHAEL:  And did BP then go ahead and

8    fund its escrow account?

9        A    Our escrow account?  No.

10       Q    Why not?

11       A    We never received notification that he had

12   done the same with his escrow.

13       Q    Okay.  So, basically, he was waiting for you

14   to fund the escrow account, and you were waiting for him

15   to fund his escrow account before you funded your escrow

16   account?

17       A    We were waiting for the communication that he

18   was ready to release, and we would do the same.

19       Q    Okay.  And his informing you that he had the

20   funds available was not enough; is that right?

21       A    Yes.

22       Q    Okay.  Why is it that BP was going to require

23   that they first be notified that Sayed had placed his

24   money into his escrow account, before BP released its

25   money to its escrow account?

104

1      A      We wanted the assurance that he, in fact,

2    would do what he had agreed to.

3      Q      Okay.  Was there any risk to BP in putting its

4    money into its escrow account prior to receiving

5    notification that Sayed had put his money into his

6    escrow account?

7      A      I suppose there is some risk.

8      Q      What risk?

9      A      If he's in default, then we have to request

10   the funds to be returned, when they could be earning

11   interest.

12     Q      So you may have lost a day or two of interest

13   on $250,000?

14            MS. JONES:  Objection.  Argumentative.

15     Q      BY MR. MICHAEL:  Is that right?

16            MS. JONES:  Also calls for a legal conclusion,

17   calls for speculation.

18     Q      BY MR. MICHAEL:  You can go ahead and answer.

19            MS. JONES:  You can answer.

20            THE DEPONENT:  Oh, I can answer?

21            MS. JONES:  Yes.

22            THE DEPONENT:  Possibly.

23            MR. MICHAEL:  Let's take a short break.

24            (Brief recess.)

25     Q      BY MR. MICHAEL:  Any other risks that you can

Cecile McDonnell                                    May 21, 2008

114

1     A    No.

2     Q    During your conversations with Sayed Faquiryan

3  about setting up the escrows for the payment of the

4  amounts owing on the gas and to receive the disbursement

5  of the loan proceeds, did you have any discussions with

6  him about how he didn't have the working capital

7  available to place his funds in escrow before BP because

8  he was afraid of further delays by BP?

9     A    No.

10    Q    To your understanding, was STTN's franchise

11 terminated in part because of the unpaid gas balances?

12    A    I don't know.

13    Q    Do you have any understanding of why the

14 franchise was terminated?

15    A    No.

16    Q    Going back to Exhibit No. 9 for a minute, the

17 disbursement agreement.  With regard to Paragraph 7.3,

18 on page 2 -- it states, "In the event a mechanic's lien

19 is filed against the job site as a result of the

20 construction of the improvements, or in the event BP

21 West Coast Products, LLC, is served with a notice to

22 withhold, BP West Coast Products, LLC, may, at its

23 option, pay or compromise said lien or notice to

24 withhold, or any action or judgment based thereon,

25 deducting all costs and expenses so incurred, including

Cecile McDonnell                                    May 21, 2008

115

1    reasonable attorney's fees, from the funds remaining on

2    deposit with BP West Coast Products, LLC."

3           Do you see that?

4    A    Yes.

5    Q    And you understand that, in the spring of

6    2007, there were mechanics' liens that were filed

7    against the project; right?

8    A    Yes.

9    Q    Okay.  Did BP consider paying or compromising

10   those liens and then deducting the amounts so paid from

11   the balance of the loan proceeds?

12   A    That was not brought to my attention.

13   Q    Okay.  Do you know if there was any

14   consideration, by the Asset Department, of doing that?

15   A    Not that I'm aware of.

16   Q    Would this be something that you would

17   authorize?  Or would it be the Asset Department?

18   A    This would be working with the Asset Group.

19   Q    Okay.  You are aware, though, that, prior to

20   funding the mini-market loan, BP required that STTN pay

21   off the mechanics' liens that had been placed on the

22   property; right?

23   A    Yes.

24   Q    Do you have an understanding of the effect on

25   the working capital that that had on STTN (sic)?

Cecile McDonnell                                    May 21, 2008

134

1    and fully funded the store loan.

2        Q    Okay.  So it was at least, say, four months or

3    three months after recording the deed of trust that loan

4    funds were finally disbursed to the franchisee; is that

5    correct?

6        A    Yes.

7        Q    So for three months, the deed of trust was of

8    record, even though no funds had been disbursed to the

9    franchisee; correct?

10       A    Correct.

11       Q    Have you been involved in obtaining any other

12   type of commercial loans?

13            MS. JONES:  Objection.  Vague and ambiguous.

14       Q    BY MR. MICHAEL:  You, personally.

15       A    My mortgage.

16       Q    Okay.  Not necessarily a commercial loan, but

17   it is a loan; right?

18       A    Yes.

19       Q    Okay.  And when you obtained a mortgage, was

20   the deed of trust recorded at the same time that you

21   received the mortgage-loan proceeds?

22       A    I believe it recorded first.

23       Q    Do you know how much in advance?

24       A    No, I don't.

25       Q    Was it three months?

Cecile McDonnell                                    May 21, 2008

137

1    our disbursement agreement, and finalizing the new loan.

2        Q    Okay.  What did BP do with regard to

3    finalizing the new loan?

4        A    BP was working with the franchisee and the

5    title company to ensure that we had our deed-of-trust

6    position, with the subordination agreement to the new

7    loan.

8        Q    And did you become aware, during this time,

9    that there were mechanics' liens that were piling up

10    against the job?

11        A    I was only aware of what was recorded.

12        Q    Okay.  And you became aware that there were

13    recorded mechanics' liens against the property?

14        A    Yes.

15        Q    Because contractors weren't being paid at this

16    time?

17        A    Yes.

18        Q    Okay.  And were you aware that the general

19    contractor had walked off the job by this time?

20        A    Yes.

21        Q    And pursuant to the disbursement agreement, BP

22    had the option of paying off those mechanics' liens and

23    getting the general contractor back on the job; right?

24        A    Yes.

25        Q    But it wasn't something that BP considered

Cecile McDonnell                                          May 21, 2008

138

1    doing; correct?

2        A    I don't think that was even addressed.

3        Q    Now, the e-mail that's Exhibit No. 18 is dated

4    May 17th of 2007, and you state that the loan funds will

5    be transferred on May 29th.  Why was there a 12-day

6    delay?

7        A    I believe that was requested by Al Fortune:

8    that that would be the time when he would be able to

9    submit complete packages to BP, for payment.

10       Q    Is that something that he indicated to you?

11       A    Yes.

12       Q    Was that in an e-mail?

13       A    No.  I believe it was verbal communication.

14       Q    Do you have any notes of that conversation?

15       A    I don't believe so.

16       Q    Is it the general practice of yours to take

17   notes of telephone calls that you receive in the normal

18   course of your business?

19       A    I typically take voice-mail notes.

20       Q    What does that mean?

21       A    If somebody leaves me a voice mail, I note it

22   down, to remind myself to return the call or how I need

23   to respond.

24       Q    Okay.  But it's not your general practice to

25   take notes during phone calls?

# EXHIBIT B

Certified Copy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BP WEST COAST PRODUCTS LLC,
a Delaware Limited Liability
Company, et al.,

       Plaintiffs,

    vs.                         CASE NO. C07 04808 JF

STTN ENTERPRISES, INC., a
California Corporation, et
al,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

AND RELATED COUNTERCLAIMS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

PRISCILLA JEAN SMITH

MAY 22, 2008
10:03 a.m.

333 South Hope Street, 16th Floor,
Los Angeles, California

Sara U. Misa, CSR No. 13204

**EXHIBIT B**

Priscilla Jean Smith                                    May 22, 2008

                                    11

1       A    No.

2       Q    I'd like to get an idea of your background.

3            What's your date of birth?

4       A    10/14/42.

5       Q    And did you graduate from college?

6       A    No.

7       Q    Okay.  What's your current position at BP?

8  And when I say "BP" I'm talking about BP West Coast

9  Products, LLC.  Okay?

10      A    Yeah.  I'm a real estate coordinator.

11      Q    What are your duties and responsibilities as

12  a real estate coordinator?

13      A    I collect paperwork to get -- or I collect

14  documents to get things ready for final credit and to

15  order the loan docs to get the site to funding.

16           THE REPORTER:  What was the last word?  I'm

17  sorry.

18           THE WITNESS:  To get the site to funding.

19           THE REPORTER:  "Defending"?

20           THE WITNESS:  To funding.

21           THE REPORTER:  "Funding."  I'm sorry.

22  BY MR. MICHAEL:

23      Q    So you -- you deal with loans to potential or

24  actual franchisees; is that right?

25      A    Yes, I do.

12

1    Q   Okay.  And you do sort of the preliminary

2    document-gathering to determine whether or not the

3    conditions have been met to funding; is that right?

4    A   Yes, I do.

5    Q   And then once you determine that the

6    conditions have been met to funding, do you hand off

7    the file to another department?

8    A   I -- I make copies of certain paperwork that

9    is required by the fund control department, and I take

10   that package up to funding.

11   Q   When you're -- when you're doing your work

12   and collecting the paperwork, is there a checklist

13   that you work off of?

14   A   Yes, there is.

15       MR. MICHAEL:  Let's go ahead and mark as, I

16   think it's 36.

17       (Exhibit 36 marked)

18   BY MR. MICHAEL:

19   Q   This is the one of the documents that was

20   produced yesterday in these boxes, and I haven't had

21   time to make a copy of it.

22       But is that the checklist that you work off

23   of in gathering documentation in order to determine

24   whether or not the conditions are met for a loan?

25   A   Yes, it is.

Priscilla Jean Smith                                    May 22, 2008

14

1      Q    How long have you been a real estate

2   coordinator with BP?

3      A    Recently I've been a real estate coordinator

4   for the past three years.  Prior to that my title was

5   real estate coordinator, but I did other duties, and I

6   did that for two years.  And prior to that I was a

7   loan administrator which is the same position as what

8   I'm doing right now.

9      Q    And how long were you a loan administrator?

10     A    For probably two years.  So all total, I've

11  been working with loans for five years.

12     Q    Okay.  What did you do before you were a loan

13  administrator at BP?

14     A    I was the admin in a special projects, a

15  special project that BP was doing or actually it was

16  ARCO at the time, was doing.

17     Q    What was the special project?

18     A    It was called Retail Excellence, and we were

19  trying to come up with a back-office system for all of

20  our stations.

21     Q    So I get the sequence right, you've been a

22  real estate coordinator doing the job you're doing now

23  since approximately 2005?

24     A    Yes.  July of 2005.

25     Q    And then two years -- for two years before

Priscilla Jean Smith                                    May 22, 2008

19

1      A    Yes.

2           MS. JONES:   Objection.   Irrelevant.

3   BY MR. MICHAEL:

4      Q    To your knowledge, how long has that plan

5   been in place?

6           MS. JONES:   Objection.   Irrelevant.

7   BY MR. MICHAEL:

8      Q    You can answer.   Unless she instructs you not

9   to answer, you can answer.

10          MS. JONES:   You can answer.   I'm not going to

11  let much more.

12          THE WITNESS:   How long has it been in place?

13  BY MR. MICHAEL:

14     Q    Yeah.

15     A    As of November of 2007.   Actually no, I

16  change that.   As of, I believe we've been divesting

17  sites for the past two years.

18     Q    Since about mid 2006?

19     A    Yes.

20     Q    When in the loan process do you become

21  involved?   Are you involved in seeking franchisees, or

22  are you involved once they make an application to

23  become a franchisee?   When do you get involved in the

24  process?

25     A    Our procedures have changed over the years.

Priscilla Jean Smith                                May 22, 2008

20

1    When --

2        Q    How about in 2006?

3        A    When -- when --

4        Q    Yeah, in 2006?

5        A    In 2006 I get involved after final credit has

6    been received for a rebrand.

7        Q    And how were you notified?  Who notifies you,

8    or who provides you with the file or the information?

9        A    The franchise development coordinator.

10       Q    In 2006, who was that?

11       A    Maria Wilson.

12       Q    So is it your understanding that there's a

13   determination as to whether or not the franchisee is

14   eligible for the credit that's requested prior to your

15   involvement in the process?

16       A    Yes.

17       Q    And in order for you to get involved in the

18   process, they have to be approved for the credit;

19   right?

20       A    On rebrands only.

21       Q    Is it different for a ground-up construction?

22       A    Yes.

23       Q    Do you get involved in the process earlier

24   for ground-up?

25       A    Yes.

Priscilla Jean Smith                                    May 22, 2008

27

1    Q    Have you had a chance to review Exhibit

2   Number 40?

3    A    Yes.

4    Q    And do you recognize that's an e-mail -- you

5   recognize Exhibit Number 40 as an e-mail from you to

6   Sayed Faquiryan?

7    A    Yes.

8    Q    And you wrote this e-mail on or about

9   November 22nd of 2006?

10    A    Yes.

11    Q    Does that refresh your memory at all about

12   when you became involved in the STTN loan?

13    A    Yes.

14    Q    Okay.  Do you know when you first became

15   involved --

16    A    11/22/06.

17    Q    Okay.  Now from the e-mail you wrote, it

18   looks like the loan was still going through the final

19   credit process when you got involved; is that right?

20    A    It was handed over to me to finish up final

21   credit.

22    Q    Does that mean that the credit had been

23   approved but there was still some documents --

24    A    No.  No, it looks --

25    Q    You need -- you need to wait until I finish

Priscilla Jean Smith                                    May 22, 2008

31

1  same date as what's on the budget.

2      Q   Okay.  Does that indicate to you that you

3  received an acceptable budget on that date?

4      A   No.  It just reflects that I received one on

5  11/27.

6      Q   Okay.  Did you ever receive an acceptable

7  budget and check that item off your list?

8      A   I would have had to have an acceptable budget

9  prior to going to funding.

10     Q   Okay.  And you did eventually hand off this

11  loan to funding; correct?

12     A   Yes, I did.

13     Q   Okay.  And that means that whatever documents

14  were necessary to fulfill the conditions that you

15  needed to fulfill in your department were, in fact,

16  fulfilled; right?

17         MS. JONES:  At the time that she handed it

18  off?

19         MR. MICHAEL:  Right.

20         THE WITNESS:  To the best of my knowledge,

21  yes.

22  BY MR. MICHAEL:

23     Q   Do you know when you handed the file off to

24  Cecile McDonnell?

25     A   I don't know the exact the date.  I believe

Priscilla Jean Smith                                    May 22, 2008

32

1    it was in March of 2007.

2            MR. MICHAEL:  Let's go ahead and mark another

3    document as Number 42.

4            (Exhibit 42 marked)

5    BY MR. MICHAEL:

6        Q    Take a look at Exhibit Number 42.  Let me

7    know if you've seen that document before.

8        A    This was required for final credit.

9        Q    What's the purpose of this document?

10       A    To show that the -- the applicant has

11   20 percent involved in the project.

12       Q    Twenty percent equity?

13       A    Yes.

14       Q    Do you know when final credit approval was

15   received?

16       A    No, I don't.

17       Q    Okay.  But it was received; correct?

18       A    Yes.

19       Q    Okay.  And it was received for the entire

20   $400,000 loan; right?

21       A    Yes.

22       Q    There weren't separate approvals for 150- and

23   250-?

24       A    No.

25       Q    During the course of your dealing with

Priscilla Jean Smith                                    May 22, 2008

34

1   copies?

2       A    I don't recall.

3       Q    Okay.  Do you ever recall asking him for

4   copies of documents more than once?

5           MS. JONES:  This is the same documents?

6           MR. MICHAEL:  Yes.

7           THE WITNESS:  If I had them in my file, I

8   would not ask him more than once, no.

9   BY MR. MICHAEL:

10      Q    Now, at the beginning of the process, did you

11  provide STTN with a list of all the documents that you

12  had required?

13      A    It's in the conditional commitment letter

14  that he was issued.

15      Q    And just so we -- let me show that to you.

16  Let's show you what's already been marked as Exhibit

17  Number 4 to Ms. McDonnell's deposition.

18          MS. JONES:  Show her that.

19          MR. MICHAEL:  You can show her the actual

20  exhibit.

21  BY MR. MICHAEL:

22      Q    Do you recognize Exhibit Number 4 to

23  Ms. McDonnell's deposition as the conditional

24  commitment letter?

25      A    Yes.

Priscilla Jean Smith                                    May 22, 2008

35

1       Q    And the -- the list of documents that are

2    necessary is contained --

3       A    Exhibit B.

4       Q    -- in Exhibit B.  Okay.

5            And you eventually received all of those

6    documents from STTN before you handed off the file to

7    Cecile McDonnell; correct?

8       A    Correct.

9       Q    And that was for both the store loan and the

10   gas loan; correct?

11      A    Correct.

12      Q    Did you ever provide Mr. Faquiryan or anybody

13   else from STTN with a copy of your checklist?

14           MS. JONES:  Objection.  Vague and ambiguous.

15   Which checklist are you referring to?

16   BY MR. MICHAEL:

17      Q    Either -- either one of the checklists that

18   were in your handwriting to whatever exhibits they

19   were, 36 and 39?

20      A    Those are internal documents, no.

21      Q    It's not your practice to share those with

22   franchisees?

23      A    No.

24      Q    And other than through the conditional

25   commitment letter, how do you communicate with

Priscilla Jean Smith                                    May 22, 2008

40

1    agreements; right?

2        A    Yes.

3        Q    Were there any policies or procedures

4    in effect at the time that the commitment letter,

5    Exhibit Number 4, was signed that required any

6    additional information from STTN as conditions to

7    funding the loan, other than what's set forth in the

8    letter?

9        A    Not to my knowledge.

10       Q    Let's see.  Were there -- in March of 2007

11   was there a need for STTN to submit some kind of a

12   newer revised budget?

13       A    This was in March?  May I see it?

14       Q    Sure.

15           MR. MICHAEL:  Let's go ahead and mark it as

16   whatever's next.

17           THE REPORTER:  43.

18           (Exhibit 43 marked)

19   BY MR. MICHAEL:

20       Q    Do you recognize Exhibit 43 as a fax from

21   STTN to you on March 20th of 2007?

22           MS. JONES:  Objection.  The document speaks

23   for itself and shows that it was faxed to Cecile but

24   copied to Jean.

25           But you can answer the question.

Priscilla Jean Smith                                    May 22, 2008

44

1    Q   Okay.  Were you involved in the process at

2   all of trying to clear the liens?  Let's start with

3   the tax lien.

4    A   Sayed wanted me to clear all of his title,

5   and I attempted as much as I could, but you know, most

6   of them -- because I'm not the person, they wouldn't

7   talk to me.  And I finally had to tell Sayed that he

8   had to clear them himself.

9    Q   Okay.  Do you know when you finally told him

10   that he had to clear them himself?

11    A   I don't recall the exact time, no.

12    Q   Okay.  Would there be an e-mail or --

13    A   I'm sure there would be.

14    Q   Okay.  Now, one of the conditions to -- to

15   funding the loan is that the title company be in a

16   position to issue an ALTA policy that's acceptable to

17   BP; correct?

18    A   Yes.

19    Q   And before BP would record its deed of trust,

20   it has to know that that policy is going to be in an

21   acceptable form to it; right?

22    A   Yes.

23    Q   So the deed of trust in this case was

24   recorded on March 9th of 2007.

25        Do you remember that?



Priscilla Jean Smith                                      May 22, 2008

45

1      A    Yes.

2      Q    So at that time the title was in an

3    acceptable form to BP; correct?

4      A    Correct.

5      Q    Okay.  There were no unacceptable liens at

6    that point; right?

7      A    There shouldn't have been, no.

8      Q    Do you know why the loan wasn't funded at

9    that time?

10         MS. JONES:  Objection.  Vague and ambiguous

11   as to why the loan wasn't funded.

12   BY MR. MICHAEL:

13     Q    Do you know why BP didn't place its funds in

14   escrow at that time?

15     A    Even though it recorded on March 9th, by the

16   time I get notification that it's recorded and get

17   notified that an ALTA title policy has issued, I -- I

18   was -- I'm sure -- well, I don't want to guess.

19         Usually that takes several days and -- do we

20   have a list of when the first lien hit?

21     Q    I don't, but I do have a transmission

22   document for the title policy.

23         Would it surprise you to learn that it took a

24   month for the title company to get the title policy to

25   you?

Priscilla Jean Smith                                    May 22, 2008

54

1    ALTA title policy.  So, no, the title would not have

2    been clear.

3        Q    Okay.  Would BP have sent the trust deed to

4    the company to -- strike that.

5             Would BP have sent the trust deed to the

6    title company to be recorded if title was not in a

7    condition that was acceptable to BP?

8        A    Usually the copy of the PTR that I have is

9    within six months old, and when we send the paperwork

10   to the title company, we expect the title company to

11   notify us there's anything that needs to be put --

12   they usually do not record unless it is clear.

13       Q    Okay.  And when trust deed is sent by BP to

14   the title company, it's sent along with instructions

15   to not record it until title is in an acceptable form

16   to BP; correct?

17       A    Yes, it is.

18            MR. MICHAEL:  Okay.  Let's go ahead and mark

19   this as 50.

20            (Exhibit 50 marked)

21            MR. MICHAEL:  Hand these directly to the

22   witness.

23            THE REPORTER:  Okay.

24   BY MR. MICHAEL:

25       Q    Do you recognize the bottom portion as an



Priscilla Jean Smith                                    May 22, 2008

55

1    e-mail that you received from Sayed Faquiryan?

2        A    Yes.

3        Q    And you received it on or about March 10th?

4        A    Yes.

5        Q    Okay.  And March 10th was a Saturday.  Were

6    you working on Saturday?

7        A    I would think if I was working on Saturday I

8    would have responded on Saturday, so no.

9        Q    Okay.  Does that lead you to believe you

10   received this e-mail on -- Monday the 12th?

11       A    Monday.

12       Q    Monday the 12th?

13       A    Uh-huh.

14       Q    In his e-mail he's informing you that the

15   deadline for payment to the general contractor is the

16   14th which is four days from when he wrote the e-mail,

17   two days from when you got it.

18       A    Uh-huh.

19       Q    And he's informing you that there is risk

20   that the general contractor is going to stop working

21   on the job if payment is not received.

22            Do you see that?

23       A    Right.

24       Q    Now, as of this time of March 12th of 2007,

25   it was three days after the trust deed recorded and

Priscilla Jean Smith                                    May 22, 2008

56

1    title was in the form acceptable to BP; correct?

2        A    I -- I responded to that before.  I would

3    have thought that when the deed of trust was recorded

4    that title was okay.

5        Q    Okay.  As of this time, were there any

6    conditions to funding that had not been done?

7        A    I don't know.

8            MR. MICHAEL:  Let's go ahead and mark this

9    e-mail as 51.

10           (Exhibit 51 marked)

11   BY MR. MICHAEL:

12       Q    Do you recognize Exhibit Number 51 as --

13   sorry -- as an e-mail that you sent to --

14       A    Yes.

15       Q    -- Mr. Faquiryan later that same day on

16   March 12th?

17       A    Yes.

18       Q    And you're informing him that even if you

19   declare conditions met today, it's going to be about

20   seven days before the loan can fund, right?

21       A    At least, yes.

22       Q    Okay.

23       A    And when I say "fund," that doesn't mean

24   he'll actually -- I mean that --

25       Q    BP puts the money in escrow?



58

1    just been saying that the file had gone to Cecile and

2    that I thought that we were finally in position.  With

3    the changes in the budget, when Cecile discusses the

4    budget with the contractors, if the items that he has

5    down don't match the expenses, then budgets have to be

6    changed.  So that could have been why on 3/21 the

7    budget was changed.

8        Q   Okay.  But as far as you were concerned by

9    March 20th conditions had been met and you had handed

10   off the file to Cecile?

11       A   Yes.

12           MR. MICHAEL:  Let's go ahead and mark this

13   one as the next in order.

14           (Exhibit 53 marked)

15   BY MR. MICHAEL:

16       Q   Do you recognize Exhibit Number 53 that you

17   received from Cecile McDonnell on or about March 20th?

18       A   Yes.

19       Q   And she's asking you to forward her copies of

20   the budget work sheet, the signage budget list, and

21   the blank budget work sheet; right?

22       A   Yes.

23       Q   Did you forward those to her?

24       A   I believe those are what I forwarded to

25   Sayed.

Priscilla Jean Smith                                    May 22, 2008

99

1      A    It's for the whole thing.

2      Q    -- it's for the whole thing and they would

3  have been fulfilled by the time the store loan was

4  funded and disbursed; right?

5      A    Yes.

6          MR. MICHAEL:   Let's go ahead and mark the

7  next in order a policy exception request.

8          And Debbie, I'll leave this tag so it can be

9  copied.

10          (Exhibit 78 marked)

11          THE WITNESS:   Okay.

12          MR. MICHAEL:   I was looking for this for 15

13  minutes before.   I finally found the transmittal

14  letter for the title policy.

15  BY MR. MICHAEL:

16      Q    Exhibit 78, were you involved at all in the

17  preparation of that exhibit?

18      A    I might have passed it around for signatures,

19  but I didn't prepare it.

20      Q    Okay.   And if I remember correctly, that's a

21  request for an exception to the policies so that the

22  loan can be funded even though -- or STTN is still

23  owed money for gasoline; correct?

24      A    Yes.   This was for the am/pm.

25      Q    And that was approved?



Priscilla Jean Smith                                          May 22, 2008

100

1    A    Yes.

2    Q    And do you recall having any discussions with

3    anybody about that?

4    A    This would have been something that came up

5    in some of the phone conversations that we were

6    having, that they had to do an exception in order to

7    break up the loan, yes.

8    Q    And is there --

9    A    We've never before funded half, you know,

10   part of a loan and not the whole loan.  And again, we

11   were just trying to keep him going.

12   Q    Is there any written policy that you know of

13   at BP that prohibits funding a loan while there are

14   outstanding gas balances?

15   A    I've not read the FC&A from front to back.

16   You know, there's a policy that Cecile follows.  If

17   she refers to something in it and tells me to look at

18   a certain page I will, but I've not read it from front

19   to back.  So the answer is no.

20   Q    What's the FC&A?

21   A    It's a policy on -- that Cecile uses when

22   she's funding.  It's the financial -- financial

23   controls.

24   Q    The USCR customer financing --

25   A    Okay.  That's what I refer to as FC&A, yes.

105

1    order.

2            (Exhibit 80 marked)

3    BY MR. MICHAEL:

4        Q    Do you recognize Exhibit Number 80 as the

5    revised conditional commitment letter that you

6    provided to STTN for signature on or about March 9th?

7        A    Yes.

8            MR. MICHAEL:  Let's go ahead and mark as the

9    next in order a check, Exhibit 81.

10           (Exhibit 81 marked)

11   BY MR. MICHAEL:

12       Q    Have you seen Exhibit 81 before?

13       A    I don't recognize it, no.

14       Q    Okay.  Do you know if Mr. Faquiryan was

15   charged a franchise fee for the gasoline dealer

16   agreement?

17       A    Everybody is charged a franchise fee.

18       Q    Okay.  That's for the gasoline portion of the

19   franchise as well as the am/pm portion?

20       A    Yes.

21       Q    So it's one single franchise fee for both?

22       A    Right.

23           MR. MICHAEL:  Okay.  Let's go ahead and mark

24   a contract dealer gasoline agreement as the next in

25   order.