# EXHIBIT C



 

**BP WEST COAST PRODUCTS, LLC**
a Delaware limited liability company

March 9, 2007

STTN ENTERPRISES, INC.
1313 N. Milpitas Blvd. #1606
Milpitas, CA 95035

Attn:   Nazim Faquiryan and Sayed Faquiryan

*Re:    Facility #82461*
        *631 San Felipe Rd., Hollister, CA 95035 (the "Real Property")*

Dear Nazim and Sayed:

BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("BPWCP"), is pleased to consider the request of STTN ENTERPRISES, INC., a California corporation ("Borrower"), for a loan (the "Loan") in the amount of $475,000.00 (the "Maximum Loan Amount") to finance the remodeling and refurbishing of the ARCO-branded retail motor fuel station and am/pm Mini Market selling beer and wine (collectively, the "Business") located at the Real Property, and related improvements and personal property (the "Improvements") owned by Borrower and situated on, or used in connection with, the Real Property (collectively, the "Property").

A summary of the terms of the Loan is contained in Exhibit "A" enclosed with and incorporated into this letter. Complete terms of the Loan will be set forth in BPWCP's form of documents and agreements to be signed by Borrower, which will evidence and secure the Loan.

BPWCP's obligation to make and fund the Loan is contingent upon (i) BPWCP's receipt, review, and approval of the items listed on Exhibit "B" enclosed with and made a part of this letter, (ii) the satisfaction of the conditions listed on Exhibit "B," and (iii) BPWCP's:

     a.     Receipt of Borrower's loan application and verification of the information contained in Borrower's application;

     b.     Approval of an appraisal of the Property prepared by an appraiser approved by BPWCP;

     c.     Review and approval of the financial condition of Borrower, condition of title, sufficiency of net cash flow from the Business to cover debt service, and economic feasibility of the Business;

     d.     Receipt, review, and approval of additional documents and information required by BPWCP; and

     e.     Final approval of the Loan by BPWCP's appropriate credit officers or committees.

Borrower shall pay all of BPWCP's costs in connection with the Loan, including, but not limited to, credit reports, title insurance premiums, escrow fees, legal fees, recording fees, the loan processing fee of $10,000 and other expenses. BPWCP will notify Borrower of its final approval of the Loan by issuing loan documents containing the terms and conditions of the Loan as finally approved.

Time is of the essence in connection with any matter discussed in this letter. If you agree to the terms and conditions contained in this letter, please indicate your acknowledgment and agreement by signing and dating the enclosed copy of this letter, initialing Exhibits "A" and "B", and returning them to me. You may retain the original of this letter for your files. If you do not sign and return this letter and the initialed Exhibits to me on or before March 31, 2007, or you do not provide the items or satisfy the conditions listed on Exhibit "B" on or before the time

#82461

BP 01573

**EXHIBIT C**

80.1

STTN ENTERPRISES, INC.
March 9, 2007
Page 2

deadlines set forth in Exhibit "B", this letter will become void, and BPWCP will have no further obligations under this letter.

Finally, please note that BPWCP is required by law to report the distribution of funds to the Internal Revenue Service. You should seek the advice of an accountant or tax attorney regarding the possible tax consequences of this transaction before you sign the Loan documents.

If you have any questions regarding this letter, please contact Ken Wickerham at 831-642-9130.


Very truly yours,


Jeffrey Cary
Regional Portfolio Manager

JMC/pjs

cc:    Ken Wickerham

Enclosures


Acknowledgement of Receipt of Letter: _____, 2007


**STTN ENTERPRISES, INC.,**
A California corporation

By: _____

    Printed Name: Nazim Faquiryan

    Printed Title: CEO and President

By: _____

    Printed Name: Sayed Faquiryan

    Printed Title: Secretary and Treasurer


#82461

BP 01574

80.2

STTN ENTERPRISES, INC.
March 9, 2007
Page 3

Agreed to this _12_ day of _March_, 2007.

**STTN ENTERPRISES, INC.,**
A California corporation

By: _____

    Printed Name: <u>Nazim Faquiryan</u>

    Printed Title: <u>CEO and President</u>

By: _____

    Printed Name: <u>Sayed Faquiryan</u>

    Printed Title: <u>Secretary and Treasurer</u>

#82461

BP 01575

80.3

STTN ENTERPRISES, INC.
March 9, 2007
Page 4

### EXHIBIT "A"

### SUMMARY OF LOAN TERMS

**(Subject to Loan Documents and Final Loan Approval)**

Maximum Loan Amount: $475,000.00

Base Loan Amount: $400,000.00
    ($250,000.00 for loan attributable to gasoline service station)
    ($150,000.00 for loan attributable to am/pm Mini Market)

Additional Loan Amounts:

    Refresh & Refurbish Funds: If as of the 11th anniversary of the first disbursement under the Loan, provided Borrower is not then in default under any of the terms and conditions of the Loan Agreements, Loan Documents, or Franchise Agreements, BPWCP may elect, but shall not be obligated to disburse up to Seventy-Five Thousand and 00/100 Dollars ($75,000) (the "Refresh & Refurbish Funds") to or on behalf of Borrower to be used for non-structural changes to the Improvements, such as, updating and retrofitting the interior of the Improvements to comply with BPWCP's then-current design and layout for its am/pm mini markets, including, but not limited to, new paint, flooring, signage, fixtures, equipment, [such as the Retalix POS/BOS and the am/pm Operations/Franchise Accelerator (or any other updated systems or equipment then required by Lender for new am/pm mini markets (collectively, the New Systems")], and the like (collectively, the "Refresh & Refurbish"). The Refresh & Refurbish Funds shall be used solely to finance the cost of the Refresh & Refurbish, and for no other use or purpose whatsoever.

Interest Rate: 4.75% per year [subject to change prior to the closing of the Loan].

Prepayment Fee: None.

Assumption: Not permitted.

Term: Twenty (20) years

Amortization Schedule: 1/20th of the Loan amount comprised of the Base Loan Amount and Additional Funds will be payable on each anniversary of the first day of the first complete month in which the Business is open for business.

Nonrefundable Loan Processing Fee: $10,000

A Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing recorded in the Official Records of the county where the Real Property is situated, and encumbering the Real Property in a lien position approved by BPWCP as BPWCP, in its sole discretion, determines.

The Loan Agreement will include provisions requiring: 1) that construction of the Improvements must commence no later than the last day of the eighteenth (18th) month following Borrower's execution of the Franchise Agreements; 2) that the Business Commencement Date must occur on or before the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements; and (3) that if the Business Commencement Date does not occur by the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements, BPWCP may, at its option, declare the Loan to be in default and immediately due and payable, and terminate the Loan Agreements.

A UCC-1 Financing Statement in a lien position approved by BPWCP as BPWCP, in its sole discretion, determines, filed with the Secretary of State of the state of Borrower's incorporation or organization (or, if Borrower is an individual, in the state where Borrower's principal residence is located), with respect to the personal

#82461

BP 01576

80.4

STTN ENTERPRISES, INC.
March 9, 2007
Page 5

property of Borrower, including but not limited to, machinery, equipment, furniture, fixtures, and inventory now or in the future situated on, or used in connection with the Business at, the Real Property.

Personal Guaranties acceptable to BPWCP, including but not limited to personal guaranties from all principals in Borrower and spouses of principals in Borrower.

Annual guaranteed gasoline volume: 2,800,000 gallons.
Annual guaranteed am/pm Mini Market sales: $960,000.00.

Loan must be fully funded on or before the last day of the twenty-fourth (24th) month following Borrower's execution of the Franchise Agreements.

Other terms:    NONE

_____                          _____
BPWCP's initials                                 Borrower's initials

BP 01577

80.5

STTN ENTERPRISES, INC.
March 9, 2007
Page 6

EXHIBIT "B"

**ITEMS REQUIRED TO COMPLETE LOAN APPLICATION
AND CONDITIONS TO BE SATISFIED BEFORE LOAN FUNDING**

**ITEMS REQUIRED AT THE TIME THE LETTER IS SIGNED BY BORROWER AND RETURNED TO
BPWCP:**

1.   Borrower must sign BPWCP's Contract Dealer Gasoline Agreement for a term of twenty (20) years.

2.   Borrower must sign am/pm Mini Market Agreement for a term of twenty (20) years and pay the Initial
     Franchise Fee.

**ITEMS REQUIRED ON OR BEFORE THE 180TH DAY FOLLOWING BORROWER'S SIGNATURE OF
THE FRANCHISE AGREEMENTS DESCRIBED IN ITEMS 1 AND 2 ABOVE:**

3.   Credit report(s) of Borrower, all principals in Borrower, all spouses of principals in Borrower, and all
     guarantors.

4.   BPWCP's loan application.

5.   Borrower's organizational documents.

6.   Borrower's taxpayer identification number.

7.   Income tax returns of Borrower, all principals in Borrower, all spouses of principals in Borrower, and all
     guarantors.

8.   Bank and investment statements of Borrower, all principals in Borrower, all spouses of principals in
     Borrower, and all guarantors.

9.   Profit and loss statements for the proposed Business.

10.  Structure and Use Proceeds Form.

11.  Senior Lien Holder's loan commitment letter.

12.  Written authorization for BPWCP to contact and obtain information from Senior Lien Holder.

13.  Either:

     a.   a certified copy of a recorded grant deed showing Borrower's fee interest in the Real Property; or

     b.   a certified copy of signed escrow instructions for Borrower's purchase of the fee interest in the
          Real Property; or

     c.   a signed ground lease between the owner of the Real Property and Borrower, containing
          mortgagee protection provisions acceptable to BPWCP and its counsel, or alternatively, a signed
          amendment to the ground lease acceptable to BPWCP and its counsel establishing certain
          mortgage protections in favor of BPWCP.

14.  A preliminary title report from an BPWCP-approved title company for the Real Property and a complete,
     legible copy of each document shown as an exception on the preliminary title report.

15.  An ALTA survey of the Real Property certified to the BPWCP-approved title company.

#82461

BP 01578

80.6

STTN ENTERPRISES, INC.
March 9, 2007
Page 7

16.     Environmental reports and studies enabling BPWCP to determine that the Property is free from contamination by toxic or hazardous substances, except those occurring in the normal course of the Business.

17.     Borrower shall obtain BPWCP's prior approval for each architect and consultant to be retained by Borrower in connection with the permitting and construction of the Real Property and Improvements, both with respect to the competency, reliability and solvency of the architect or consultant and also with respect to the terms of the retention agreement.

18.     An appraisal report by an BPWCP-approved appraiser confirming that, after considering the Loan and any third party financing secured by the Property, Borrower will have at least 20% equity in the Property, based on the "as will be" appraised value of the Property.

19.     BPWCP's approval of site and sign plans for the Real Property and the Improvements.


**ITEMS REQUIRED ON OR BEFORE LOAN FUNDING:**

20.     Copies of all governmental approvals, licenses, and permits required in connection with the construction and operation of the Improvements and the Business (including but not limited to an alcohol sales permit acceptable to BPWCP).

21.     A commitment from an BPWCP-approved title company to issue an ALTA lender's policy of title insurance insuring that the Deed of Trust encumbers the Real Property in the position approved by BPWCP, subject to exceptions approved in writing by BPWCP.

22.     Insurance naming BPWCP as an additional insured with a 438 BFU endorsement, as follows:

        a.      "All risk" casualty insurance insuring the Improvements against loss or damage by fire or other casualty in an amount equal to 100 percent of the replacement value of the Improvements, with a deductible not exceeding $10,000 per occurrence; and
        b.      Liability insurance.

23.     Equipment rental agreement(s).

24.     Borrower shall obtain BPWCP's prior approval for the general contractor to be retained by Borrower in connection with the permitting and construction of the Real Property and Improvements, both with respect to the competency, reliability and solvency of the general contractor and also with respect to the terms of the retention agreement.

25.     Senior lien holder's written approval of the Deed of Trust and UCC-1 Financing Statement securing the Loan, in a form acceptable to BPWCP.

26.     The project architect must submit a complete set of project drawings on computer ZIP disk in a form acceptable to BPWCP, (currently AutoCAD, version 14) upon completion of the Improvements and issuance of all necessary governmental approvals.

27.     Other: _____ NONE _____


_____                                    _____
BPWCP's initials                                        Borrower's initials


#82461


BP 01579

20.7

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BP WEST COAST PRODUCTS LLC,
et al.,

        Plaintiffs,

   vs.                        Case No. 5:07-cv-04808
                                 JF

STTN ENTERPRISES, INC., a
California corporation, et al.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF
THOMAS L. REEDER

JUNE 27, 2008
10:10 a.m.

44 Montgomery Street, Suite 1100
San Francisco, California

Reported by Cynthia Manning, CSR No. 7645

P A U L S O N

**EXHIBIT D**

36

1      A.   Yes.

2      Q.   What are the names of the people you know

3   in the real estate group that are analysts?

4      A.   Cile McDonnell, Donna Yorac.

5      Q.   What was the first name?

6      A.   Donna.

7      Q.   Donna.   Do you know how to spell the last

8   name?

9      A.   Y-O-R-A-C.

10          That's all I can think of right now.

11          Jean Smith.   That's it.

12     Q.   That's it?

13     A.   Yeah.

14     Q.   Now, when you went out to interview Mr.

15   Faquiryan at the 76 station in Hollister, did you

16   also look at the station that was to become an ARCO

17   station which was a Chevron station?

18     A.   Yes.

19     Q.   And that was an existing station at the

20   time?

21     A.   Yes.

22     Q.   It was operating?

23     A.   Yes.

24     Q.   It had a gas portion, right?

25     A.   Yes.



Thomas L. Reeder                                    June 27, 2008

37

1      Q.  And it had a minimarket?

2      A.  Correct.

3      Q.  Okay.  And was there a restaurant in the

4  minimarket?

5      A.  Yes.

6      Q.  Can you estimate how many square feet the

7  restaurant took up?

8      A.  I'm not too great at estimating square

9  feet, but I would say 800, or 800 to a thousand

10  square feet.  800.

11      Q.  And the gas portion, it had pumps?

12      A.  Six dispensers.

13      Q.  Six dispensers.  So you assume it had

14  tanks, too?

15      A.  Yes.

16      Q.  It had a canopy?

17      A.  Yes.

18      Q.  Show you what's already been marked as

19  Exhibit No. 4 to Cile McDonnell's deposition.  Just

20  to give you kind of a reference date, that's the

21  Conditional Commitment Letter dated May 25th of

22  2006.

23          Between the time you interviewed Mr.

24  Faquiryan and the date of the Conditional Commitment

25  Letter, did you have any contact with Mr. Faquiryan

41

1    BY MR. MICHAEL:

2        Q.   Do you recognize the initials?

3        A.   No.   We're talking -- this is all the same

4    document, the May 25th.

5            MR. OSENBAUGH:   Are those Ken's initials?

6            THE WITNESS:   It doesn't look like it.

7            MR. OSENBAUGH:   Didn't to me either.   Good

8    enough.   I'm just trying to have a clear record and

9    not some confusion.

10            THE WITNESS:   Sorry.

11            MR. OSENBAUGH:   It's all right.

12            THE WITNESS:   It could have been --

13            MR. OSENBAUGH:   It's all right.

14   BY MR. MICHAEL:

15        Q.   After Mr. Faquiryan or whichever one of

16   them did sign the Contract Dealer Gasoline

17   Agreement, did you have conversations with anybody

18   from STTN about the station in Hollister opening up

19   as a gasoline-only station?

20        A.   After this?

21        Q.   Yes.

22        A.   No.

23        Q.   How about before that?

24        A.   No.

25        Q.   Were you involved at all in the decision

Thomas L. Reeder                                    June 27, 2008

42

1  for the gas station to open only as a gas-only

2  station?

3       A.  Yes.

4       Q.  What was your involvement?

5       A.  The people from the real estate department

6  would have called me just to see -- say would I be

7  okay with that, and I said yes.

8       Q.  Did you have to do any investigation or

9  analysis before you said yes?

10       A.  No.

11       Q.  Do you recall who called you from the real

12  estate department?

13       A.  No.

14       Q.  Did you have any involvement in the

15  branding process that was necessary before the

16  station could open as gas only?

17       A.  Some involvement, yes.  It would have been

18  Brad Christensen, the main person coordinating it

19  with Mr. Faquiryan, and I would have been kept

20  informed of what was happening.

21       Q.  Were you told of any problems in the

22  branding process?

23       A.  No.

24       Q.  And at some point were you informed that

25  Mr. Faquiryan had refused the first load of gas that

Thomas L. Reeder                                      June 27, 2008

90

1    Q.  Did you ever find out that it would be

2  possible to offset the gas balance against the loan

3  funds?

4    A.  No.  We found out that it would not be

5  possible.

6         MR. MICHAEL:  Go ahead and mark this next

7  one in order.

8         (Deposition Exhibit No. 137 was marked for

9         identification)

10        THE WITNESS:  (Witness reviewing document.)

11 BY MR. MICHAEL:

12   Q.  Exhibit 137 looks like it has a couple of

13 redactions.  It looks like there is one or more of

14 the recipients' names have been blocked out.  And

15 then there is a portion of the actual e-mail that's

16 been redacted.

17        But what I would like to do is direct your

18 attention about halfway down the page, where it

19 says:

20        "Finally, below is a big issue that needs

21        to be resolved prior to releasing the loan

22        funds.  Management with notification to

23        franchisee can authorize Fund Control to

24        deduct the final past due amount from the

25        loan funds prior to releasing to escrow."

Thomas L. Reeder                                    June 27, 2008

91

1          So did you ever find out that with

2     notification to the franchisee, that it was possible

3     to actually deduct the gas bills from the loan

4     funds?

5          A.   No.

6          Q.   Did you receive a copy of this e-mail?

7          A.   Yeah, I'm copied on here.

8          Q.   Okay.  Did you respond to Cile McDonnell

9     and say:  Hey, we can't do that?

10          A.   No.  I was working pretty much by phone

11    with my boss and somewhat with recommendations from

12    our legal department.

13          Q.   And did the legal department explain why it

14    was that they wouldn't let you do this?

15          A.   Nothing more than I had already told you,

16    that we want to keep the loan -- we want to stay

17    true to the loan agreement.

18          Q.   Okay.

19          A.   Now, I think you'll see there is a later

20    e-mail where in order to -- in order to get this

21    done -- and I think this was after we funded the

22    150.  After we funded the $150,000, we were working

23    on holding up funding of the gas portion and we were

24    trying to work out -- well, a couple of things, but

25    were we -- we agreed to put the 250 remaining in

Thomas L. Reeder                                              June 27, 2008

92

1    escrow if he put the 168 in escrow.  And then

2    although he never qualified, he never provided the

3    documentation to qualify for that portion, that's

4    what we were willing to do.  Set that there, he sets

5    that money there.  He agreed to do it.  He never did

6    do it, but that was just, you know, a way to

7    continue doing everything we could do help make this

8    happen.

9         Q.  With regard to that proposed escrow

10   arrangement in the summer of 2007, was that Mr.

11   Faquiryan's idea to open up actually -- didn't he

12   suggest at first a single escrow that he would put

13   his money in escrow and you guys put your money in

14   escrow and there could be a release of funds that

15   way?

16        A.  It may have been his idea, but I'm not

17   sure.

18        Q.  And BP refused that and said they didn't

19   want to commingle funds in an escrow?

20        A.  Probably.

21        Q.  And Mr. Faquiryan came back and said:

22   We'll do separate escrows.  I'll set up an escrow

23   and you set up an escrow, and we'll put money in

24   escrow and we'll have the funds released when

25   they're ready.  Right?

93

1      A.   Right.   And whoever idea that was, that

2  was acceptable.

3      Q.   And Mr. Faquiryan requested that BP put its

4  money into escrow first because he felt that there

5  had been delays and he had to go borrow the money in

6  escrow and didn't want to pay interest on it, right?

7      A.   I don't know.

8      Q.   Did he tell you that?

9      A.   I don't recall.

10     Q.   Did you have any conversations with anybody

11  at BP where they informed you that Mr. Faquiryan

12  didn't want to put in his money in first because he

13  couldn't afford to pay the interest while it sat

14  there until BP funded its escrow?

15     A.   I don't recall that either.

16     Q.   Okay.

17     A.   I don't think -- him not doing that did not

18  hold up the approval from us.   It was, you know, him

19  not providing the necessary documentation that was

20  holding up the approval.

21     Q.   So I understand your testimony right, Mr.

22  Faquiryan's not putting money into a separate escrow

23  to pay the gas bills did not hold up BP's funding of

24  the gas escrow, the gas loan escrows?

25     A.   The approval for it.   Because it hadn't

Thomas L. Reeder                                    June 27, 2008

129

1     A.   Yes.

2     Q.   And that's your signature on the last page?

3     A.   Yes.

4     Q.   In the fourth paragraph, you state:

5          "Under these circumstances it would not be

6          reasonable for BPWCP to furnish

7          notification of 90 days prior to the date

8          of termination because of the risk of

9          confusion to the public as well as possible

10         safety risks."

11         What risk of confusion to the public are

12    you referencing there?

13    A.   Oh.   Okay.   This is an immediate

14    termination.   And I'm not sure if he actually

15    debranded it himself around this time, but if we're

16    terminating immediately -- well, it -- I have some

17    ideas, but I think it would be speculation on risk

18    of confusion to the public.

19    Q.   Okay.

20    A.   For 90 days.   I mean, it was --

21    Q.   When you signed the letter, what risk of

22    confusion to the public did you have in mind at that

23    time?

24    A.   It must relate to confusion of having an

25    ARCO-branded gasoline facility that is not selling

Thomas L. Reeder                                    June 27, 2008

130

1    any gasoline.  So that would be confusing to the

2    public.

3         Q.  Any other confusion to the public that you

4    had in mind when you signed the letter?

5         A.  No.

6         Q.  What safety risk did you have in mind when

7    you signed the letter?

8         A.  I didn't have any safety risk in mind.

9         Q.  The terminal in San Jose, who's in charge

10   of the terminal out there?

11        A.  Scott Murdock is the terminal supervisor.

12        Q.  M-U-R-D-O-C-H?

13        A.  C-K.

14        Q.  Since the STTN merchandise in Hollister was

15   terminated, what efforts has BP made to replace that

16   station?

17        A.  Replace it?  Find another ARCO station to

18   brand is that what you mean?

19        Q.  Correct.

20        MR. OSENBAUGH:  Before you answer, I don't

21   see the relevance of this at all.

22        MR. MICHAEL:  You're seeking liquidated

23   damages for royalty fees for a quarter of a million

24   dollars and you don't see the relevance?

25        MR. OSENBAUGH:  All right.  I'm asking you

P A U L S O N

# EXHIBIT E

## Debbie Jones

| | |
|---|---|
| **From:** | McDonnell, Cecile F |
| **Sent:** | Thursday, March 29, 2007 2:46 PM |
| **To:** | Cary, Jeff M; Wickerham, Kenneth T; E · Hager, Michael |
| **Cc:** | Knebel, Colly; Christensen, Brad S; Chang, Elizabeth Y; Reeder, Thomas L (USCR); Smith, Priscilla J. |
| **Subject:** | RE: Fac. #82461 - SAP #90152961 (STTN Enterprises) |

Jeff, Ken & Mike, here is an update:
- Both Sayed and Al Fortune (GC) have stated to me that Sayed has said that I have reversed the loan amounts to meet his contractual obligations because the c-store expenses exceed the loan of $150K (Gas - $250K). With Jean today, I informed Al that I <u>cannot</u> and <u>do not</u> revise loan amounts and if franchisee puts in the request, the process starts all over again.

- I had hoped to open escrow today but once again the Budget Worksheet I rec'd is incorrect; it exceeds the total loan and still waiting for Sayed's signature (I requested this because father and son don't seem to communicate their wishes to each other and I'm caught in the middle delivering bad news).

<div align="center">REDACTED</div>



EXHIBIT
Reeder
137
6/27/08

This is what we have:
**MISCELLANEOUS.** This Agreement modifies all prior agreements and Contractor's contracts, <u>written or oral</u>, in so far as they would otherwise be in conflict with the provisions hereof. If any provision of this Agreement is found
invalid or ineffectual for any reason whatsoever, such invalidity shall not in any way affect any other provision hereof.

- Finally, below is a big issue that needs to be resolved prior to releasing the loan funds. **Management with notification to franchisee can authorize Fund Control to deduct final past due amount from the loan funds prior to releasing to escrow. Keep in mind that GC is very anxious to getting access to all the funds (less internal adjustments for Trade Dress and Proc. Fee) so this could cause more problems as their** expectation
is to get $355,453.00 but then BP needs this past due paid. Please advise how you want to handle.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Best Regards,
*Cile*
Cecile McDonnell (Fund Control)
BP / U. S. Convenience Operations
(714)/670-5340) : FAX (714)/670-5492)
<u>E-Mail Address A/0 9/15/06 - Cecile.McDonnell@BP.COM</u>
This email (including any attachments) is confidential. If you are not the intended recipient you must not copy, use, disclose, distribute or rely on the information contained in it. If you have received this email in error, please notify the sender immediately by reply email and delete the email from your system. Confidentiality and legal privilege attached to this communication are not waived or lost by reason of mistaken delivery to you.

| | |
|---|---|
| **From:** | Chang, Elizabeth Y |
| **Sent:** | Thursday, March 29, 2007 2:01 PM |
| **To:** | Reeder, Thomas L (USCR) |
| **Cc:** | Wickerham, Kenneth T; Knebel, Colly; McDonnell, Cecile F; Christensen, Brad S |
| **Subject:** | Fac. #82461 - SAP #90152961 (STTN Enterprises) |

Tom, can you please provide me with an update on how the past due balance will be resolved. Dlr is past due approximately $150,000 plus. This site is in the process of receiving a DOFO loan and I recall you had requested if we could hold back funds from the DOFO loan to pay off the receivables balance. At that time I told you I wasn't sure this could be done & forwarded you over to Cile McDonnell in Fund Control. I am still not sure what would be required if you wanted to proceed down this path.

<div align="center">**EXHIBIT E**</div>

Please let us know because Cile McDonnell is working on funding the loan.

Thanks,

Beth

BP 00295

# EXHIBIT F



**Daniel J. Rolf**

BP WEST COAST PRODUCTS, LLC
a Delaware limited liability company

FEDERAL EXPRESS – OVERNIGHT DELIVERY

February 22, 2007

Bill Bredl
American Title Insurance Company
4450 Capitola Road, Suite 103
Capitola, CA 95010

Facility No.: 82343/SCDB65975:  631 San Felipe Road, Hollister, CA 95035
Order No.:  4408-2702639
Buyer:  AVA Global Enterprise

Dear Mr. Bredl:

The following documents are being forwarded to you for your handling in recording:

- Deed of Trust  (the "Deed of Trust") dated February 12, 2007, naming BP West Coast Products LLC, a Delaware limited liability company ("BPWCP"), as Beneficiary, and encumbering certain property described therein (the "Property");

- Memorandum of Contract Dealer Gasoline Agreement dated February 12, 2007 ;

- Senior Lender's Consent to Encumbrance and Request for Notice of Default;

- Consent to Encumbrance of Tenant's Interest dated February 12, 2007.

Conditions.  When the following conditions are met, you are to proceed as indicated below:

1.    Title Policy.  You are committed to issue to BPWCP your ALTA Leasehold Loan Policy of title insurance (the "The Policy") insuring BPWCP as the lender of the Real Estate in the amount of $475,000.00.  The Title Policy may show as exceptions only the following:

82461 Escrow Closing Letter

BP 01438

**EXHIBIT F**

(a)    a lien for nondelinquent real property taxes and assessments,

(b)    those exceptions 5 through 13 and 16 in Schedule B as shown in your   Preliminary Report No.: 4408-2702639 dated January 30, 2007, and

(c)    Exception 14 and 15 must be removed.  Exception 12, Deed of Trust must be modified by Omni Financial, LLC to include the principal amount of $300,000.00.

(d)    please include a survey exception as no survey will be provided for this policy.

<u>Closing</u>.  Upon satisfaction of the above conditions, you are to do the following:

1.    Record the enclosed documents in the order they are listed above.

2.    Call me at my Daytime Office Telephone No.:  (310) 664-4003 or e-mail me to inform me that the recording has been accomplished and provide me with the Instrument Numbers assigned to each of the enclosed documents by the County Recorder.

3.    Issue the policy of title insurance described above and deliver the original and one copy to me.

4.    Send to me a conformed copy of the recorded documents.

5.    Send and code the invoice as follows:

Pay Key: ZSMITP5001
Facility #82461/SCDB65975
CC: 18026242

Process to:

Accenture
Attn:  Scanning & Indexing
P.O. Box 460329
Houston, TX 77056-8329

Please acknowledge receipt and your acceptance of these instructions by signing a copy of this letter and returning it to me.  In any event, your recording of any of the enclosed documents will constitute your acceptance of the above instructions and your

82461 Escrow Closing Letter

BP 01439

agreement to issue the policy described above.

Sincerely,

*Daniel J. Rolf*

Daniel J. Rolf
Real Estate Paralegal
BP America Inc.
4 Centerpointe Drive  LPR 4-243
La Palma, California 90623-1066
Daytime Office Telephone:  (310) 664-4003
Home Office e-mail:  danjrolf@sbcglobal.net

Enclosures

Acknowledged and accepted this _____ day of _____, 2007.

By:    _____
       Bill Bredl

Cc:  Jean Smith

82461 Escrow Closing Letter

BP 01440

# EXHIBIT G

RECORDING REQUESTED BY:

*First American Title*
*#4408-2702639*

| | |
|---|---|
| | 2007-0003264 |

Recorded | REC FEE    51.00
Official Records |
County of |
San Benito |
JOE PAUL GONZALEZ |
Clerk-Recorder |
| 08
02:00PM 09-Mar-2007 | Page 1 of 9

WHEN RECORDED MAIL TO:

*BP West Coast Products LLC*
*4 Centerpointe Dr., LPR 4-243*
*La Palma, CA 90623-1066*
*Attn: Daniel J. Rolf*

_____

SPACE ABOVE LINE RESERVED FOR RECORDER'S USE

## TITLE(S) OF DOCUMENT

*Deed of Trust with Assignment of Rents,*
*Security Agreement and Fixture Filing*

THIS PAGE IS ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION.
($3.00 ADDITIONAL RECORDING FEE APPLIES)

154

| EXHIBIT |
|---|
| *8  5/21/08* |
| *McDonnell* |

*p. 1 of 9*

**EXHIBIT G**

2

RECORDING REQUESTED BY
Recorded FIRST AMERICAN TITLE
When Recorded Return To:
4408-2702639
BP WEST COAST PRODUCTS LLC
4 Centerpointe Dr., LPR 4-243
La Palma, CA  90623-1066
Attn.  Daniel J. Rolf
Facility: 82461/SCDB65975
          631 San Felipe Rd.
          Hollister, CA 95035
4408 2702639  BP Fat Cap

_____
                                    Space Above For Recorder's Use Only

DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
(CALIFORNIA)

This Document Serves as a Fixture Filing Under Section 9-502 of the California Uniform Commercial Code.

Borrower's Organizational Identification Number: 41-2101997

THIS DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING ("Deed of Trust") is made this 2 day of March , 2007 and is executed by AVA GLOBAL ENTERPRISE, LLC, a California limited liability company ("Trustor"), whose address is 1313 N. Milpitas Blvd., #1606, Milpitas, California 95035 to Commonwealth Land Title Company ("Trustee"), for the benefit of BP WEST COAST PRODUCTS LLC, a Delaware limited liability company ("Beneficiary"). Trustee is an affiliate of Beneficiary.

Trustor irrevocably grants, transfers and assigns to Trustee in trust, with POWER OF SALE, all of Trustor's right, title and interest in and to that certain real property located in the County of , State of California, more particularly described in Exhibit "A" attached hereto and made a part hereof ("Real Property"), together with the rents, issues and profits thereof and the other real and personal property comprising the Trust Estate; subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

FOR THE PURPOSE OF SECURING the following (the "Obligations"):

      (a)    payment of the sum of $475,000.00, with interest thereon, evidenced by those certain Secured Promissory Notes dated as of even date herewith, executed by STTN Enterprise, Inc., a California corporation ("Obligor") to the order of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

      (b)    performance of Obligor's obligations to Beneficiary under (i) that certain Loan Agreement dated as of even date herewith, by and between Obligor and Beneficiary, and (ii) that certain Environmental Indemnity dated as of even date herewith, executed by Obligor in favor of Beneficiary, as the same may be amended, modified, extended and renewed from time to time;

      (c)    performance of each agreement of Trustor and Obligor under that certain Fictitious Deed of Trust (With Assignment of Rents, Security Agreement and Fixture Filing) recorded in the office of the county recorder of the county where said Real Property is located as noted below ("Fictitious Deed of Trust"), as amended hereby; and

      (d)    payment and performance of the Obligations recited in the Fictitious Deed of Trust (as amended hereby).

To protect the security of this Deed of Trust, and with respect to the Trust Estate, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in the Fictitious Deed of Trust. Said agreements, terms and provisions contained in the Fictitious Deed of Trust are hereby incorporated into and made a part of this Deed of Trust by this reference for all purposes as if set forth at length herein.  Trustor acknowledges receipt of a copy of the Fictitious Deed of Trust.

Set forth below is a list of the counties in the State of California where the Fictitious Deed of Trust has been recorded, together with the Book and Page or Instrument Number of each recorded document.

82461deedoftrustv1

1

8-2

3

| COUNTY | INSTRUMENT NUMBERS | COUNTY | INSTRUMENT NUMBERS |
|---|---|---|---|
| ALAMEDA | 00219574 | ORANGE | 00-569322 |
| ALPINE | BOOK 489, PAGES 2784-2844 | PLACER | 2000-0079936 |
| AMADOR | 01-0003464-00 | PLUMAS | 2001-00221 |
| BUTTE | 2000-0042914 | RIVERSIDE | 2000-422046 |
| CALAVERAS | 2001-5226 | SACRAMENTO | 20001023 |
| COLUSA | 2000-004063 | SAN BENITO | 2000-001-0070 |
| CONTRA COSTA | 2000-0224538-00 | SAN BERNARDINO | 20008300442 |
| DEL NORTE | 200004997 | SAN DIEGO | 2006-0677723 |
| EL DORADO | 2000-0052633-00 | SAN FRANCISCO | 2006G852003 |
| FRESNO | 2006-0121723 | SAN JOAQUIN | 00125344 |
| GLENN | 2006-5476 | SAN LUIS OBISPO | 2006-062677 |
| HUMBOLDT | 2000-23040-25 | SAN MATEO | 2000-133821 |
| IMPERIAL | 00-21555 | SANTA BARBARA | 2000-0061740 |
| INYO | 2000-0003729 | SANTA CLARA | 15434402 |
| KERN | 0200134597 | SANTA CRUZ | 2000-0051824 |
| KINGS | 0018861 | SHASTA | 2000-0027629 |
| LAKE | 00-019016 | SIERRA | 2000032292 |
| LASSEN | 2000-07062 | SISKIYOU | 2000201912249 |
| LOS ANGELES | 00-1671372 | SOLANO | 2000-99097854 |
| MADERA | 2000026090 | SONOMA | 2009112122 |
| MARIN | 2000-062655 | STANISLAUS | 3000-0090829-00 |
| MARIPOSA | 2924583 | SUTTER | 2000-0045017 |
| MENDOCINO | 2000-17559 | TEHAMA | FILE #013179, BOOK 1982, PAGE 043 |
| MERCED | VOL 4072, PAGE 329 | TRINITY | 180003058 |
| MODOC | 2000-0006727-00 | TULARE | 2000-0065067 |
| MONO | 2000004455 | TUOLUMNE | DOC#017535, BOOK 1712, PAGES 0173-0197 |
| MONTEREY | 2000070239 | VENTURA | NONE |
| NAPA | 2000-0017785 | YOLO | 2000-0027097-00 |
| NEVADA | 2000-0031785-00 | YUBA | 200018529 |

Trustor hereby requests that all notices to Trustor be delivered to the address listed above.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Fictitious Deed of Trust.  The Fictitious Deed of Trust is hereby modified as set forth on Rider 1 attached hereto and made a part hereof.  Rider 2 attached hereto is hereby incorporated herein by this reference.

"Trustor":

AVA GLOBAL ENTERPRISE, LLC.
a California limited liability company

By: _____
Sayed Mn Faquiryan

By: _____
Toan To

82461deedoftrustv1

2

8-3

By: _____
Tao To

By: _____
Nazim Faquiryan

"Borrower"

STTN ENTERPRISE, INC.
a California corporation

By: _____
Nazim S.M. Faquiryan
CEO/President

By: _____
Sayed M.N. Faquiryan
Secretary/Treasurer

4.

ACKNOWLEDGMENT

State of California                    )
County of San Benito                   )
On March 2207, before me, Adina Faquiryan, Notary Public, personally appeared
Nazim Faquiryan, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

ACKNOWLEDGMENT

State of California                    )
County of San Benito                   )
On March 2209, before me, Mina Faquiryan, Notary Public, personally appeared
Seyed M.N Faquiryan, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

MINA FAQURYAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

3

82461deedoftrustv1

157

8-4

5

ACKNOWLEDGMENT

State of California )
County of San Benito )
On March 2 2007, before me, Mina Faquirian, Notary Public, personally appeared Tad Do, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Signature)

MINA FAQUIRIAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

ACKNOWLEDGMENT

State of California )
County of San Benito )
On March 2 2007, before me, Mina Faquirian, Notary Public, personally appeared Jana Do, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Signature)

MINA FAQUIRIAN
Commission # 1494761
Notary Public - California
Santa Clara County
My Comm. Expires Jun 13, 2008

82461deedoftrustv1

4

158

8-5

EXHIBIT A
Legal Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

ALL THAT REAL AND CERTAIN PROPERTY LOCATED IN THE CITY OF HOLLISTER, COUNTY OF SAN BENITO, STATE OF CALIFORNIA, BEING A PORTION OF PARCEL 1 AS SAID PARCEL IS SHOWN UPON THE PARCEL MAP RECORDED IN BOOK 7 OF PARCEL MAPS AT PAGE 59, OFFICIAL RECORDS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF PARCEL 1 AS SHOWN UPON SAID MAP;

THENCE N 2 DEGREES 06 MINUTES 20 SECONDS E, 183.48 FEET ALONG THE RIGHT OF WAY OF SAN FELIPE ROAD (STATE HWY. 156) TO THE TRUE POINT OF BEGINNING;

THENCE FROM SAID TRUE POINT OF BEGINNING, CONTINUING ALONG SAID RIGHT OF WAY, N 2 DEGREES 06 MINUTES 20 SECONDS E, 176.48;

THENCE NORTHEASTERLY ON THE ARC OF A TANGENT CURVE TO THE RIGHT CONCAVE TO THE SOUTHEAST, HAVING A RADIUS OF 20.00 FEET, THROUGH A CENTRAL ANGLE OF 90 DEGREES 28 MINUTES 10 SECONDS, FOR AN ARC LENGTH OF 31.58 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CHAPPELL ROAD.

THENCE EASTERLY ALONG SAID RIGHT OF WAY LINE, S 87 DEGREES 25 MINUTES 30 SECONDS E 146.84 FEET;

THENCE LEAVING SAID LINE, S 2 DEGREES 06 MINUTES 20 SECONDS W, 222.81 FEET;

THENCE N 87 DEGREES 25 MINUTES 11 SECONDS W, 90.03 FEET;

THENCE N 79 DEGREES 10 MINUTES 29 SECONDS W, 60.93 FEET;

THENCE N 41 DEGREES 33 MINUTES 35 SECONDS W, 24.26 FEET TO THE TRUE POINT OF BEGINNING.

APN: 051-100-040

82461deedoftrustv1

5

8 -6

RIDER 1
Amendment to Fictitious Deed of Trust

The Fictitious Deed of Trust is hereby amended as follows:

1.  Paragraph (b) in the section reciting all of the Obligations ("Obligations Section") is hereby deleted in its entirety.

2.  The following language is hereby added after the phrase "per annum" in Paragraph (c) of the Obligations Section: "but in no event greater than the maximum amount permitted by law."

3.  The two paragraphs below Paragraph (g) of the Obligations Section are hereby deleted in their entirety and replaced with the following new paragraph:

> "Trustor has executed an Environmental Indemnity in favor of Beneficiary with respect to the Real Property (the "Environmental Indemnity"). This Deed of Trust, the Note[s], the Loan Agreement[s], the Environmental Indemnity and any other deeds of trust, mortgages, agreements, guaranties or other instruments given to evidence or further secure the payment and performance of any or all of the Obligations, as the foregoing may be amended, modified, extended, or renewed from time to time, may hereinafter be collectively referred to as the 'Loan Documents.' Capitalized terms used herein without definition shall have the meaning given thereto in the Loan Agreement."

4.  The following paragraph is hereby substituted for the first sentence of Section 1.5.2:

> "In the event of any damage to or destruction of the Improvements, Beneficiary shall have the option, in its sole discretion, to: (i) apply, in the event Beneficiary determines that the security for the repayment of the indebtedness secured hereby has been impaired on account of such damage or destruction, all or any part of such proceeds to any indebtedness secured hereby in such order as Beneficiary may determine, whether or not such indebtedness is then due, (ii) release all or any part of such proceeds to Trustor, or (iii) hold the balance of such proceeds to be used to reimburse Trustor for the cost of reconstruction of the Improvements. In the event Beneficiary elects to so hold such insurance proceeds, the Improvements shall be promptly and diligently restored by Trustor to the equivalent of their condition immediately prior to such damage, destruction or casualty or to such other condition as Beneficiary may approve in writing, and the disbursement of such insurance proceeds shall be in accordance with disbursement procedures acceptable to Beneficiary. If Beneficiary elects to apply the insurance proceeds to the payment of the sums secured hereby, and after doing so Beneficiary reasonably determines that the remaining security is inadequate to secure the remaining indebtedness, Trustor shall, upon written demand from Beneficiary, prepay on principal such amount as will reduce the remaining indebtedness to a balance for which adequate security is present."

5.  The last sentence of Section 1.22 is hereby deleted in its entirety. The following new Sections are hereby added to the Fictitious Deed of Trust:

> "1.23   Negative Covenants Regarding Leases. Trustor shall not, without the prior written consent of Beneficiary, (i) cancel, terminate or consent to the surrender of any Lease, (ii) modify or in any way alter the terms of any Lease, (iii) release any lessee or guarantor from any obligations or conditions to be performed by any lessee or guarantor under any Lease, (iv) collect any rent from any lessee for a period of more than one (1) month in advance, or (v) execute any further assignment of any of its right, title and interest in the Leases and the Rents.
>
> 1.24   Affirmative Covenants Regarding Leases. Trustor shall (i) observe, perform and discharge each and every obligation, term, covenant, condition and agreement of Trustor under the Leases, (ii) enforce the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any lessee or guarantor thereof, (iii) execute and deliver to Beneficiary upon demand, at any time and from time to time, any and all assignments and other instruments which Beneficiary may deem advisable to carry out the true purposes and intent of the assignment of the Leases set forth in this Deed of Trust, and (iv) at the request of Beneficiary, cause any lessee under a Lease to execute a subordination, nondisturbance and attornment agreement and estoppel certificate in form and substance satisfactory to Beneficiary.
>
> 1.25   Authorization to File Financing Statements; Power of Attorney. Trustor hereby authorizes Beneficiary at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without signature of Trustor as authorized by applicable law, as applicable to the Personal Property. For purposes of such filings, Trustor agrees to furnish any information requested by Beneficiary promptly upon request by Beneficiary. Trustor hereby irrevocably constitutes and appoints Beneficiary and any officer or agent of Beneficiary, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Trustor or in Trustor's own name to execute in Trustor's name any such documents and to otherwise carry out the purposes of this

6

8-7

Section 1.25, to the extent that Trustor's authorization above is not sufficient. This power of attorney is a power coupled with an interest and shall be irrevocable."

6. The following sentence is hereby added to Section 3.4.2:

"Written notice mailed to Trustor as provided above at least five (5) days prior to the date of public sale of the Personal Property or prior to the date on which private sale of the Personal Property will be made shall constitute reasonable notice; provided that, if Beneficiary fails to comply with this Section 3.4 in any respect, its liability for such failure shall be limited to the liability (if any) imposed on it as a matter of law under the California Uniform Commercial Code, as in effect from time to time (or under the Uniform Commercial Code, in force from time to time, in any other state to the extent the same is applicable law)."

7. The following phrase is hereby added after the end of clause (b) of Section 5.2: "including without limitation Sections 2899 and 3433 of the California Civil Code." In addition, the references to Sections 2899 and 3433 of the California Civil Code set forth in clause (c) of Section 5.2 are hereby deleted in their entirety.

8. Section 5.17 is hereby deleted in its entirety.

9. The following new Section 4.9 is hereby added to the Fictitious Deed of Trust:

"4.9    Upon the occurrence of any Event of Default, Beneficiary may, at its option, terminate Trustor's right and license to collect the Rents, and either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate or any part thereof, in its own name or in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Trust Estate, or any part thereof or interest therein, make, modify, enforce, cancel or accept the surrender of any Lease, increase the income therefrom or protect the security hereof and, with or without taking possession of the Trust Estate, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same. less costs and expenses of operation and collection, including, without limitation, attorneys' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of all or any portion of the Trust Estate, the collection of such Rents and the application thereof as aforesaid, or any of such acts, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of all or any portion of the Trust Estate or the collection, receipt and application of Rents, Trustee or Beneficiary shall be entitled to exercise every right provided herein or by law upon occurrence of any Event of Default, including the right to exercise the power of sale. Failure of Beneficiary at any time, or from time to time, to collect the Rents shall not in any manner affect the subsequent enforcement of Beneficiary of the right to collect the same."

10. Subparagraph (k) of Schedule 2 is hereby renumbered as subparagraph (l). The following new subparagraph (k) is hereby added:

"(k)    all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Trustor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Schedule 2."

82461deedoftrustv1

7

161

8-8



RIDER 2
Agreements of Non-Borrower Trustor

1.    Authority of Beneficiary.  If any Trustor is not an obligor under the Loan Documents (hereinafter, "Nonborrower Trustor"), Nonborrower Trustor hereby authorizes Beneficiary to perform any of the following acts at any time and from time to time, all without notice to Nonborrower Trustor and without affecting Beneficiary's rights or Nonborrower Trustor's obligations under this Deed of Trust: (i) alter any terms of the Loan Documents, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest under, the Secured Promissory Note, (ii) take and hold security for the Loan Documents, accept additional or substituted security for the Loan Documents, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security, (iii) apply any security now or later held for the Loan Documents in any order that Beneficiary in its sole discretion may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale, (iv) release the obligor under the Note and the other Loan Documents ("Obligor") of its liability under any Loan Document, and/or (v) substitute, add or release any one or more guarantors or endorsers of the Loan Documents.  For purposes of this Section 1, all references to the Loan Documents shall also include any instrument or agreement executed by Obligor currently with or subsequent to the date of this Deed of Trust which is secured by this Deed of Trust in accordance with the terms hereof.

2.    Waivers of Nonborrower Trustor.  Nonborrower Trustor hereby waives: (i) any right it may have to require Beneficiary to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Beneficiary's power to pursue, (ii) any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Beneficiary, whether consensual or arising by operation of law or any bankruptcy reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Trustor's obligations exceed or are more burdensome than those of Obligor, (iii) all presentments, demands for performance, notices of nonperformance, protests, notice of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind, (iv) any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Obligations or any part thereof, and (v) all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under 11 U.S.C. or any successor statute, all rights to enforce any remedy that the Beneficiary may have against Obligor, and all rights to participate in any security now or later held by Beneficiary for the Loan Documents.  Nonborrower Trustor understands that if Beneficiary forecloses by trustee's sale on any other deed of trust (other than this deed of trust) securing the Obligations, Nonborrower Trustor would then have a defense preventing Beneficiary from thereafter enforcing Beneficiary's rights and remedies against the Trust Estate.  This defense arises because the trustee's sale under such other deed of trust would eliminate Nonborrower Trustor's right of subrogation, and therefore Nonborrower Trustor would be unable to obtain reimbursement from Obligor.  Nonborrower Trustor specifically waives this defense and all rights and defenses that Nonborrower Trustor may have because the Secured Obligations are secured by real property.  This means, among other things: (1) Beneficiary may exercise any rights or remedies which Beneficiary has or may have against the Trust Estate without first foreclosing on any real or personal property collateral pledged by Obligor; and (2) if Beneficiary forecloses on any real property collateral pledged by Obligor:  (A) the amount of the Obligations may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Beneficiary may exercise its rights and remedies against the Trust Estate even if Beneficiary, by foreclosing on any real property collateral pledged by Obligor, has destroyed any right Nonborrower Trustor may have to collect from Obligor.  This is an unconditional and irrevocable waiver of any rights and defenses Nonborrower Trustor may have because the Obligations are secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or similar laws in other states.

3.    Obligor's Financial Condition.  Nonborrower Trustor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Beneficiary, and agrees that Beneficiary shall have no duty to disclose to Nonborrower Trustor any information which Beneficiary may receive about Obligor's financial condition, business operations or any other circumstances bearing on Obligor's ability to perform.

8

82461deedoftrustv1

8-9