# EXHIBIT 4

C California State Auto. Ass'n Inter-Insurance Bureau v. Barrett Garages, Inc.
Cal.App.1.Dist.

CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU, Plaintiff and Respondent,
v.
BARRETT GARAGES, INC., Defendant and Appellant.
**Civ. No. 24917.**

Court of Appeal, First District, Division 2, California.
Dec. 18, 1967.

HEADNOTES

(1) Appeal and Error § 1172(6)--Review--Presumptions--Findings.
Every intendment being in favor of a judgment, it will be presumed that the trial court in effect found all of the facts necessary to support such judgment where written findings were waived by the parties.
See **Cal.Jur.2d,** Appeal and Error, § 573; **Am.Jur.2d,** Appeal and Error, § 843.
(2) Pleading § 157(5)--Replication--Denial of Written Instrument.
Plaintiff's failure to file an affidavit under former Code Civ. Proc., § 448 (repealed September 17, 1965) denying the genuineness and due execution of a written contract set forth in the answer admitted only that the copy of the contract alleged in the answer was a correct and genuine copy; it did not admit its legal effect or that it was a contract; and except for genuineness and due execution, plaintiff could attack the contract on any other grounds.
See **Cal.Jur.2d,** Pleading, § 222.
(3) Contracts § 12--Consent.
It is essential to the existence of a contract that there be mutual consent. (Civ. Code, § 1550, subd. 2.)

(4) Contracts § 34--Consent--Reality--Acceptance of Instrument in Ignorance of Contents.
A person is bound by the printed contractual provisions of an instrument which he accepts delivery of if, as an ordinarily prudent man, he could and should have read such provisions.

(5) Bailments § 9--Rights and Liabilities of Parties--Limitation of Bailee's Liability.
The delivery of claim checks by the operator of an airport parking lot to three bailors who had parked their cars therein did not create a contract with each embodying the matter printed thereon as a matter of law; a question of fact was presented as to whether there was the necessary consent by the bailors to be bound by such contractual provisions as required by Civ. Code, § 1550, and the crucial question for determination by the trier of fact was whether the particular circumstances were such that a prudent man, acting reasonably, would or would not have read the exculpatory provisions in question.
See **Cal.Jur.2d,** Bailments, § 15; **Am.Jur.2d,** Bailments, § 43 et seq.
(6) Bailments § 1--Contract of Bailment--Validity.
A contract of bailment is void and of no effect unless each of the conditions specified in Civ. Code, § 1630, prescribing the conditions under which a bailment contract for parking or storage of vehicles is binding on the owner or person leaving the vehicle, is complied with.

(7) Bailments § 9--Rights and Liabilities of Parties--Limitation of Bailee's Liability.
One of the conditions provided by Civ. Code, § 1630, relating to conditions under which a bailment contract for parking of vehicles is binding on the owner or person leaving the vehicle, that a copy of the contract of bailment, printed in large type in an area of at least 17 by 22 inches shall be posted in a conspicuous place at each entrance of the parking lot, was not complied with and purported contracts of bailment limiting the bailee's liability to patrons of an airport parking facility were void and of no effect where the distance from the place where the bailors involved turned over their respective cars to bailee's attendants was approximately one hundred to one hundred fifty feet from an attendant's station on each side of which were signs of a size which complied with the statute, but which were below the eye level of a motorist positioned behind the steering wheel of his car.

(8) Bailments § 7--Rights and Liabilities of Parties--Liability of Bailee.
The Legislature did not contemplate that a car lot

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

operator's liability was to be limited to a compliance with the provisions of Civ. Code, § 1630, prescribing conditions under which a bailment contract for parking or storage of vehicles is binding on the owner or person leaving the vehicle, nor did the Legislature intend that such compliance would ipso facto create a contract between the parties and afford the operator of a public parking lot a complete defense to an action by a motorist-bailor whose car was stolen through the negligence of such operator.

(9) Bailments § 22--Actions--Evidence--Value.
In an action against an airport parking lot operator by a bailor whose car was stolen while parked therein, the testimony of the owner as to the reasonable value of the automobile was competent to prove value.

(10) Bailments § 25--Actions--Damages.
In an action against an airport parking lot operator by the subrogee of automobile owners whose cars were stolen while parked therein, the amount of damages proximately caused by the thefts was sufficiently proven where it appeared that after the thefts there was a thirty-day waiting period within which it was hoped that the car would be found; that on the expiration of such period a settlement was made by the subrogee with the insured owner and the latter executed a bill of sale of the car to the plaintiff subrogee; and that thereafter plaintiff salvaged whatever it could if the stolen car in question, or what was left of it, was found.

SUMMARY

APPEAL from judgments of the Municipal Court for the Northern Judicial District of San Mateo County. Charles Becker, Judge. Affirmed.

Action by an insurer to recover amounts paid to owners of vehicles stolen from defendant's parking lot. Judgments granting recovery affirmed.

COUNSEL
Nicholas G. Schoonbrood for Defendant and Appellant.
H. Kelly Ogle and Keil & Connolly as Amici Curiae on behalf of Defendant and Appellant.
Marquart & Bahre and M. G. Bahre for Plaintiff and Respondent.
AGEE, J.
Plaintiff is the subrogee of three automobile owners who left their cars at the San Francisco International Airport parking lot in the care of "Parking Valet Service," operated by defendant, Barrett Garages, Inc.

Upon return from their respective plane trips it was discovered that the cars had been stolen. After reimbursing each owner for his loss, as provided in its insurance policies issued to such owners, plaintiff filed suit in municipal court against defendant to recover the amounts so paid. The three actions, numbered 11145, 13912, and 13930, were consolidated for trial and plaintiff recovered judgments of $1,335, $650, and $850, respectively.

These judgments were affirmed by the Appellate Department of the Superior Court in San Mateo County. We accepted certification under rules 62 and 63 of the California Rules of Court.

(1) Since written findings of fact by the municipal court were waived by the parties (Code Civ. Proc., § 632) and every intendment is in favor of the judgments, it will be presumed that the trial court in effect found all of the facts necessary to support such judgments. (*Annin v. Belridge Oil etc. Union*, 119 Cal.App.2d Supp. 900, 906 [260 P.2d 295]; *74*Mastrofini v. Swanson*, 114 Cal.App.2d Supp. 848, 849-850 [250 P.2d 764].)

No contention is made on appeal that the evidence is insufficient to support the implied finding of defendant's negligence. Defendant bases its defense against liability on the provisions printed on the claim check given to each motorist at the time of leaving his car, a facsimile of which is as follows:

CLAIM CHECK No. 00813

S.F. International Airport

PARKING VALET SERVICE

$1.25 PLUS STORAGE

THIS CONTRACT LIMITS OUR LIABILITY - READ IT

No Cars Delivered Without This Check

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Customer and Company agree: All claimed damage or loss must be reported and itemized by customer to manager in writing before vehicle is taken from the delivery area, after loss occurs and if not so made is waived. Company has option to make repairs of any claimed damage, at its own expense, such option to be exercised within 48 hours after filing of claim. Court actions by customer for any claims must be filed within 90 days from date of parking, in court of jurisdiction where claimed loss occurred. In all court actions burden of proof to establish claim remains with customer. Company not responsible for damage by fire, theft or defective brakes or parts, or for loss or theft of accessories or articles left in the vehicle. Total liability of Company limited to $250.00 for all damages or loss to customer. Company not responsible for loss of use. Customer must set brake before leaving vehicle. This is the entire contract and no employee can modify it. It is not assignable. Customer waives all laws in conflict with the foregoing.

No Cars Delivered Without This Check

The facts in each case are essentially identical. The owner drove into the parking lot and left his car with an attendant to park and store for the duration of his plane trip. He was given a claim check by the attendant, which he put in his pocket and then headed for the terminal building. There was no mention of the provisions printed on the claim check or of any signs posted on the lot. The motorist did not read or know anything about any provisions restricting the liability of the bailee. His understanding was that the only purpose of the claim check was to identify his car so that he could regain its possession upon his return.

*Effect of Code of Civil Procedure, Section 448*

This section was repealed, effective September 17, 1965 (Stats. 1965, ch. 105, p. 1046), and defendant's contention thereunder is limited to action 11145, wherein the defendant's answer was filed *prior* to the effective date of such repeal. The answers in the other two actions were filed after said date.

Said section provided: "When the defense to an action is founded upon a written instrument, and a copy thereof is ***75** contained in the answer [which it was], or is annexed thereto, the genuineness and due execution of such instrument are deemed admitted, unless the plaintiff file ... an affidavit denying the same. ..." No such affidavit was filed.

(2) Defendant argues that plaintiff thereby became bound by the terms of the claim check. This is not the law.

Except for genuineness and due execution, plaintiff could attack the claim check on any other grounds. (*Miller v. McLaglen,* 82 Cal.App.2d 219, 225 [186 P.2d 48]; *Wilson v. McCormick S.S. Co.,* 38 Cal.App.2d 726, 729-730 [102 P.2d 412]; *Gajanich v. Gregory,* 116 Cal.App. 622, 630 [3 P.2d 389].)

"He could controvert the instruments by evidence of fraud, mistake, undue influence, mental incapacity, want of consideration, failure of consideration, compromise, estoppel, that they were void because not fairly made or fully comprehended; ..." (*Miller v. McLaglen, supra,* p. 225; *Moore v. Copp,* 119 Cal. 429, 432 [51 P. 630].)

In the instant case plaintiff can challenge the *creation* of a contract containing the provisions printed on the claim check, although admitting that a replica of such claim check was delivered to each of the three motorists in question.

Defendant cites *Ward v. System Auto etc. Garages, Inc.,* 149 Cal.App.2d Supp. 879 [309 P.2d 577], decided by the Appellate Department of the Superior Court in and for Los Angeles County.

In that case plaintiff recovered a money judgment against defendant for damage to his automobile while it was parked with defendant. Defendant set forth *in haec verba* in its answer to plaintiff's complaint a written contract of bailment, which contained a provision limiting the period for bringing an action to three months.

The trial court found that this purported contract " 'was never entered into by any of the parties herein.' " The majority opinion states that "We are reversing the judgment because the trial court was not at liberty to make any such finding; ..." (P. 880.)

This ruling is based entirely upon the majority's erroneous interpretation of the legal effect of not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

filing an affidavit under Code of Civil Procedure, section 448. This is made doubly clear by the majority's statement made upon denial of a rehearing. This statement is as follows: "By failing to file *76 affidavit, there was no issue of fact (that there was no contract)." (P. 884.)

The dissenting opinion of Judge Swain sets forth the rule correctly, as follows: "The failure of the plaintiff to file an affidavit under Code of Civil Procedure, section 448, admits only that the copy of the parking ticket alleged in the answer is a correct and genuine copy of the one issued to the plaintiff by the defendant. *It does not admit its legal effect or that it is a contract.*" (P. 882; italics added.)

"We should recognize the fact that a trier of the facts could hold that a prudent man may consider a parking ticket merely as a means of identifying his car when he claims it." (P. 884.)

*Was a Contract Created As a Matter of Law?*

(3) It is essential to the existence of a contract that there be mutual consent. (Civ. Code, § 1550, subd. 2.) Here, there was no discussion with the motorist as to the provisions on the claim check and he had no knowledge of them.

The situation is similar to that of one who deposits his money with a bank and receives a passbook which shows receipt of the money. He is not bound by a form of agreement printed in the passbook respecting nonliability of the bank as to forged or altered checks and endorsements when he did not sign such agreement and its terms were not called to his attention. It was held that such a provision was a "trap for the unwary" and unenforceable. (*Los Angeles Inv. Co. v. Home Sav. Bank*, 180 Cal. 601, 612-613 [182 P. 293, 5 A.L.R. 1193].)

In this cited case, the Supreme Court stated, at page 613: "This statement [in the passbook] is not signed by the plaintiff, nor is there any showing that it was called to the plaintiff's attention or wittingly agreed to by it. It is just the character of thing that the average man would not trouble to read, ..."

(4) However, the general rule is that a person is bound by the printed contractual provisions of an instrument which he accepts delivery of *if*, as an ordinarily prudent man, he could and should have read such provisions. (*Hischemoeller v. National Ice etc. Storage Co.* (1956) 46 Cal.2d 318, 323 [294 P.2d 433].) Obviously, this presents a question of fact.

In *Merrill v. Pacific Transfer Co.*, 131 Cal. 582 [63 P. 915], the holder of a baggage check obtained a $950 judgment against the defendant transfer company for the loss of a *77 trunk and its contents. The baggage check contained a provision limiting the transfer company's liability to $100. Plaintiff did not read this provision or have any actual knowledge of it.

His conduct was described in the opinion as follows: "He was familiar with the usual method of the transaction of the business of the transfer company, had traveled a good deal, and had always been in the habit of giving his checks to and taking a receipt from the agent of the transportation company. It was light enough to read. There was time enough for him to have read the printed portion, but he could not with certainty have done so without using his eyeglasses. He did not, however, think to read it, nor attempt to read it. He put the receipt in his pocket. He does not recollect that he ever read the printed portion of any receipt. He read the printed portion of this one only after the trunk was lost. He did not know that there were conditions on the receipt. He regarded it merely as a receipt, as the only thing he had to connect him with his baggage." (P. 586.)

It was held that if plaintiff had *constructive* notice or knowledge of the $100 limitation provision this was sufficient to bind plaintiff and that the trial court erred in refusing to so instruct the jury. The Supreme Court cited and relied upon Civil Code, section 19, which provides: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

A new trial was ordered on the ground that "it was with the jury [trier of fact] to say whether under all the circumstances, as disclosed by the evidence, Mr. Merrill [plaintiff] had the actual or constructive notice or knowledge contemplated by the law." (P. 589.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Curtis v. United Transfer Co., 167 Cal. 112 [138 P. 726], cites and follows *Merrill.* That was an action against a transfer company to recover damages for the loss of a trunk, in excess of the sum stated in the receipt given therefor limiting the liability of the defendant. The opinion holds that it is a question of *fact* for the jury, *not* one of *law* for the court, to determine whether the plaintiff accepted the receipt with actual knowledge of its terms, or under such circumstances as constituted constructive knowledge in contemplation of law.

The *Curtis* opinion states: "The controlling question is, ***78** Was there an acceptance [of the receipt] with knowledge of the terms of the limitation of liability? This is to be determined not merely from acceptance but from a consideration of all of the circumstances, including acceptance, surrounding the transaction between the parties at the time the receipt was given and taken. From these it is for the jury to determine whether the plaintiff had actual knowledge that the paper was a contract when she received it or if not, whether the circumstances under which she received it were such as put her on notice of the contents of the instrument-constructive notice or, as that term imputes, knowledge implied by law." (167 Cal., at pp. 115-116.)

In the instant case defendant relies upon *Cunningham v. International Committee of Y.M.C.A.*, 51 Cal.App. 487 [197 P. 140]. In that case the plaintiff left a suitcase for storage with defendant, a charitable organization acting in this instance as a gratuitous bailee. Plaintiff was given a claim check bearing a number and, among other things, the printed words: "The article checked on this check is left with the Association at owner's risk. ..." The suitcase could not be found when plaintiff returned for it.

Judgment for plaintiff was reversed by the appellate court on the ground that "There is no testimony that plaintiff did not read this receipt and have actual knowledge of its contents." (P. 490.) It was therefore held that plaintiff "is *presumed* to have assented" to such contents. (P. 490; italics added.)

The court pointed out that "there is no evidence in the record of any negligence on the part of the defendant" and that the public policy question as to contracts by which a bailee seeks to release itself from its own negligence was therefore not involved. (P. 491.)

In the instant cases the trial court's implied finding of defendant's negligence is not challenged and the testimony is undisputed that the respective bailors did not read the provisions on the claim check and had no knowledge of them.

Defendant cites an unpublished superior court appellate department opinion, *Reimer v. Jack Tar Hotel,* San Francisco No. 2797, which holds that "a writing [auto claim check] appearing on its face to be a contract, delivered by one party to another, and accepted without objection, constitutes a contract."

*Reimer* cites and relies upon *Ward, supra,* saying that it ***79** "is practically on all fours with the instant case, upholding the validity of the claim check as a contract, as well as the 90 day limitation."

As we have seen, in *Ward* the majority opinion was based upon an erroneous interpretation of section 448 of the Code of Civil Procedure, which issue was not involved in *Reimer.*

To the extent that these two decisions may be inconsistent with or contrary to our opinion herein, they are disapproved.

(5) We hold that the delivery of a claim check to the respective bailors herein did not create a contract embodying the matter printed thereon as a *matter of law.* Under the particular circumstances, *a question of fact* was presented in each case as to whether there was the necessary consent by said bailors to be bound by such contractual provisions, as required by Civil Code, section 1550. [FN1]

> FN1 In view of this holding, we believe that it is not necessary to discuss the application of the rule applicable to standardized adhesion contracts of exculpation. (See *Tunkl v. Regents of University of California,* 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]; *Steven v. Fidelity & Cas. Co.,* 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284].)

In other words, the crucial question to be determined by the trier of fact in each case is whether the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

particular circumstances are such that a prudent man, acting reasonably, would or would not have read the exculpatory provisions in question. (*Hischemoeller v. National Ice etc. Storage Co., supra,* 46 Cal.2d, at p. 323.)

*Effect of Civil Code, Section 1630*

(6) This section was enacted in 1957. The first paragraph thereof provides as follows: "*No* printed contract of bailment providing for the parking or storage of a motor vehicle *shall be binding,* either in whole or in part, on the vehicle owner or on the person who leaves the vehicle with another, *unless* the contract conforms to the following:" (Italics added.)

We regard this provision as meaning that any such purported contract is void and of no effect unless each of the conditions specified in said section is complied with. (See 32 State Bar J., p. 513.)

(7) One of such conditions is as follows: "A copy of the contract printed in large type, in an area at least 17 by 22 inches, shall be posted in a conspicuous place at each entrance of the parking lot." This condition was not complied with.

Upon entering the parking lot the motorist is required to ***80** drive upon a ramp until he reaches the point where he stops, which is usually behind the car stopped ahead of him. He then awaits the appearance of an attendant who comes to his car, gives him a claim check, and drives the car away. The motorist then proceeds on foot to the nearby terminal building.

Running parallel to this ramp is a cement platform raised approximately 6 to 8 inches above the level of the ramp. Located on this platform is a structure described as a "valet station," about the size of a telephone booth, where claim checks are kept and obtained by the attendants as needed.

The opening to this station faces the ramp. On each side of the booth are signs of a *size* which comply with the statute. They are attached to the lower halves of said sides and are below the eye level of a motorist positioned behind the steering wheel of his car. Similar signs are posted near the cashier's booth on the lower ramp, where the motorist goes to reclaim his car when he returns from his trip. (There is no contention these two signs have any bearing upon the issue under discussion.)

The exact distance from the parking lot entrance to the sign on the side of the "station" booth nearest the entrance was not testified to by any witness.

However, one of the three motorists involved herein testified that he stopped his car behind a line of cars and that he was then 100 to 150 feet from the station. His car remained in this position until the attendant appeared and gave him a claim check. He then got out and walked to the terminal building. The other two motorists departed from their cars at about the same point.

We know from this testimony and the photographs in evidence that the distance from the place where the three motorists involved herein turned over their respective cars to defendant's attendants is approximately 100 to 150 feet from said station.

(8) Moreover, even if it be held that defendant sufficiently complied with the condition as to the posting of a copy of the alleged contract, we do not believe that the Legislature intended that such compliance would ipso facto create a contract between the parties and afford the operator of a public parking lot a complete defense to an action by a motorist-bailor, whose car was stolen through the negligence of such operator. ***81**

This is evident from the concluding paragraph of section 1630, which provides that cities may enact ordinances on the same subject matter so long as such ordinances are not *less restrictive* than section 1630. Obviously, the Legislature did not contemplate that the car lot operator's liability was to be limited to a compliance with the provisions of section 1630.

*Damages*

Defendant contends that the respective amounts of the damages awarded herein are not supported by competent evidence, but are based upon "conjecture and surmise." However, it concedes that such amounts should be sufficient to "compensate for all the detriment proximately caused" by its negligence. (Civ. Code, § 3333.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(9) In the first action, number 11145, the owner testified that the reasonable value of his 1959 Impala sedan, on the date of the theft, March 20, 1963, was $1,400. This testimony is competent to prove value. (Witkin, Cal. Evidence (1958) p. 361.)Plaintiff's expert witness agreed with the owner's valuation and plaintiff paid said amount to the owner.

Seven dismantled pieces of this car were later found and sold by plaintiff for $65. An expert testified that the amount so recovered for such salvage represented its reasonable value. The amount of the judgment was $1,400 less $65, or $1,335.

(10) In the second action, number 13912, the owner testified that the value of his 1961 Dodge Lancer, on the date of the theft, June 22, 1963, was "In the neighborhood of $2,000." Plaintiff's expert testified to a value of $1,675 and the owner accepted this sum from plaintiff on August 2, 1963 in full settlement.

On August 29, 1963, plaintiff was notified that the Lancer had been recovered. Plaintiff sold it to the highest bidder in its then condition for the sum of $995. An expert established that this was the highest amount that could be obtained for it. The amount of the judgment was $650. It cannot be ascertained from the record why this amount should not have been $680, but defendant was benefited by what was probably a mathematical miscalculation by the court.

In the third action, number 13930, the owner testified to a value of $1,200 for her 1959 MG sports coupe and loss of use in the sum of $218.38 during the period between the theft and her purchase of another car. Plaintiff paid her these amounts.

On February 14, 1964, over five months after the theft, the ***82** car was located at San Bruno. It was towed to San Francisco, where it was repaired and cleaned, at a total cost of $88.69.

The MG was then exhibited to potential buyers and sold for $650, which was the highest bid obtainable. Judgment of $850 was rendered in favor of plaintiff, which was less than the total amount of the damages shown.

The procedure followed by plaintiff in dealing with its insureds was the same in each case. There was a 30-day waiting period within which it was hoped that the car would be found. When that period expired a settlement was made with the insured and the latter executed a bill of sale of the car to the plaintiff. Thereafter, plaintiff salvaged whatever it could if the stolen car in question, or what was left of it, was found.

We conclude that the amount of damages proximately caused by the thefts in question was sufficiently proven, as reflected in the three judgments involved herein.

Judgments affirmed.

Shoemaker, P. J., and Taylor, J., concurred.
A petition for a rehearing was denied January 17, 1968.

Cal.App.1.Dist.
California State Auto. Ass'n Inter-Insurance Bureau v. Barrett Garages, Inc.
257 Cal.App.2d 71, 64 Cal.Rptr. 699

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Careau & Co. v. Security Pacific Business Credit, Inc.
Cal.App.2.Dist.

CAREAU & CO., etc., et al., Plaintiffs and Appellants,
v.
SECURITY PACIFIC BUSINESS CREDIT, INC., et al., Defendants and Respondents.
**No. B037626.**

Court of Appeal, Second District, Division 3, California.
Aug. 17, 1990.

[Opinion certified for partial publication. FN*]

FN* Pursuant to California Rules of Court, rules 976(b) and 976.1(a), this opinion is certified for partial publication. The portion to be published follows.

SUMMARY

An individual and a corporation brought actions, consolidated for trial, against a lending institution and one of its officers, alleging several parallel and nearly identical tort and contract causes of action predicated on defendants' alleged breach of a commitment to make a loan to plaintiffs. The complaints incorporated by reference two letters from defendants: the first stated several conditions precedent that had to be satisfied before the loan would be made and specifically stated it was not a commitment to make a loan; the second added further contingencies, but deleted the tentative language. Plaintiffs alleged that the second letter constituted a written commitment to make the loan and that the conditions precedent had been satisfied or excused. The trial court sustained without leave to amend defendants' demurrers to several causes of action and denied plaintiffs' motion for reconsideration. Defendants subsequently moved for judgment on the pleadings as to all but one remaining cause of action, which motion was granted. The trial court entered a judgment based on that motion, the voluntary dismissal of the remaining count, and the orders sustaining the demurrers. (Superior Court of Los Angeles County, Nos. NEC 37743 and NEC 44044, Melvin B. Grover, Judge.)

The Court of Appeal affirmed in part and reversed in part. It held that the plaintiffs failed to adequately allege satisfaction of the conditions precedent to state a cause of action for breach of contract, but that they were entitled to an opportunity to amend their complaints to do so. It held that there was not a sufficient relationship between the parties to state an action for a tortious breach of the implied covenant of good faith and fair dealing. It also held that plaintiffs did not state a cause of action for bad faith denial of the contract, since the allegations of the complaint itself showed that there was probable cause to dispute the existence of the contract, but that plaintiffs were entitled to an opportunity to amend their complaint. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Appellate Review § 128--Rulings on Demurrers.
On an appeal from a judgment of dismissal entered after demurrers have been sustained, the appellate court assumes the truth of all properly pleaded material allegations of the complaint and gives it a reasonable interpretation by reading it as a whole and by reading its parts in their context. When a demurrer is sustained, the appellate court's function is to determine whether the complaint states sufficient facts to state a cause of action; if the demurrer was sustained without leave to amend, the appellate court decides whether there is a reasonable possibility that the defect can be cured by amendment. If the defect can be cured, the trial court has abused its discretion and the appellate court reverses; if not, there has been no abuse of discretion and the appellate court affirms. The burden of proving such reasonable possibility of amendment is squarely on the plaintiff.

(2) Pleading § 30--Demurrer to Complaint--Amendment After General Demurrer Sustained--Plaintiff's Burden of Showing Possibility of Amendment.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

It is an abuse of discretion for the trial court to sustain demurrers without leave to amend if there is a reasonable possibility that the plaintiff can amend the complaint to cure its defects. To meet the plaintiff's burden of showing abuse of discretion, the plaintiff must show how the complaint can be amended to state a cause of action. However, such a showing need not be made to the trial court so long as it is made to the reviewing court.

(3) Pleading § 30--Demurrer to Complaint--Amendment After General Demurrer Sustained--Submission of Proposed Amended Complaint.
Where a demurrer is sustained without leave to amend, a plaintiff is entitled to submit a proposed amended complaint by way of a motion for reconsideration. If the amended complaint states any causes of action, the trial court is obligated to vacate its order that sustained the demurrer without leave to amend and make a different order granting the plaintiff leave to file an amended complaint, which would include the causes of action that the trial court, in deciding the merits of the motion for reconsideration, determined were valid.

(4) Pleading § 30--Demurrer to Complaint--Amendment After General Demurrer Sustained--Plaintiff's Motion for Reconsideration.
In a civil action, after sustaining without leave to amend defendants' demurrer, the trial court erred in denying plaintiffs' motion to reconsider without specifically considering the changes plaintiffs made in their proposed amended complaint. Code Civ. Proc., § 1008, subd. (a) (subsequent application of motion), does not require that the support for a motion to reconsider be based upon "new facts." It is only necessary that the motion be based upon an alleged different state of facts than the original motion. Thus the trial court should have specifically examined the proposed pleadings attached to the reconsideration motion to determine whether the added allegations were sufficient to state one or more valid causes of action.

(5) Pleading § 13--Complaint--Liberal Construction.
Allegations of a complaint are to be liberally construed with a view to substantive justice between the parties.

(6) Pleading § 30--Demurrer to Complaint--Amendment After General Demurrer Sustained--Liberal Construction of Rule Allowing Amendment.
An order sustaining a demurrer without leave to amend will constitute an abuse of discretion if there is any reasonable possibility that the defect can be cured by amendment. This rule is liberally applied to permit further amendment not only where the defect is one of form but also where it is one of substance, provided the pleader did not have a fair prior opportunity to correct the substantive defect. On the other hand, there is nothing in the general rule of liberal allowance of pleading amendment which requires an appellate court to find an abuse of discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment. The burden is on the plaintiffs to demonstrate that the trial court abused its discretion and to show in what manner the pleadings can be amended and how such amendments will change the legal effect of their pleadings.

(7) Contracts § 45--Action for Breach--Elements.
A cause of action for damages for breach of contract is comprised of the following elements: the contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and resulting damages to plaintiff.

(8a, 8b, 8c) Contracts § 48--Actions--Pleadings--By Plaintiff-- Satisfaction of Conditions Precedent.
In borrowers' action against a lending institution and one of its officers alleging breach of contract to make a loan, the borrowers failed to adequately allege the due satisfaction of several conditions precedent specified in defendants' commitment letter to plaintiffs so as to allege the formation of a binding contract. All the borrowers had alleged were conclusory allegations such as that the conditions "had been met and satisfied," but at least six of the eight specified conditions were events that had to exist or occur, and such general allegations were not adequate. The pleading of excuse or waiver of performance of conditions precedent requires specific allegations. Further, the plaintiffs could not rely on allegations of the officer's oral statement that a loan commitment had been approved by the institution, since this would not be the equivalent of finding that any of the conditions had been satisfied, excused, or waived. Thus, the trial court properly sustained defendants' demurrer to the complaint, but erred in sustaining it without leave to amend, since it was not determined that there was no reasonable possibility

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

that plaintiffs could amend their complaint to sufficiently state a cause of action.
[See 1 **Witkin,** Summary of Cal. Law (9th ed. 1987) Contracts, § 725 et seq.]
(9) Contracts § 4--Consent--Sufficiency--Preliminary Negotiations.
Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

(10) Contracts § 48--Actions--Pleadings--By Plaintiff--Satisfaction of Conditions Precedent.
Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action. This requirement can be satisfied by allegations in general terms. It is sufficient for a plaintiff to simply allege that he has duly performed all the conditions on his part. However, this rule is subject to two important caveats. First, if the condition is an event as distinguished from an act to be performed by the plaintiff, a specific allegation of the happening of the condition is a necessary part of pleading the defendant's breach. Second, general pleadings are controlled by specific allegations. Thus, a general allegation of due performance will not suffice if the plaintiff also sets forth what has actually occurred if such specific facts do not constitute due performance. For example, when a plaintiff alleges a permissible conclusion of law such as the due performance of a condition precedent but also avers specific additional facts that either do not support such conclusion, or are inconsistent therewith, such specific allegations will control and a complaint that might have been sufficient with general allegations alone may be rendered defective.
[See 4 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, §§ 404, 479.]
(11) Pleading § 16--Complaint--Allegations of Ultimate Facts Necessary to State Action.
A complaint must allege the ultimate facts necessary to the statement of an actionable claim. It is both improper and insufficient for a plaintiff to plead the evidence by which he hopes to prove such ultimate facts.

(12) Appellate Review § 128--Rulings on Demurrers--Possibility of Amending Complaint to State Cause of Action.
On an appeal from a judgment following the sustainment of a demurrer without leave to amend, it is not the appellate court's task to be concerned with the possible difficulty or inability of proving allegations to establish plaintiff's cause of action.

(13a, 13b, 13c) Banks and Banking § 21--Action for Breach of Good Faith and Fair Dealing--Lack of Special Relationship With Prospective Borrower.
In an action by borrowers against a lending institution and one of its officers alleging tortious breach of the implied covenant of good faith and fair dealing in denying a loan for which plaintiffs alleged there was a contract, the trial court was correct in sustaining without leave to amend defendants' demurrer to the complaint. Even if there was a valid contract, there was no special relationship between the parties sufficient to support a tort recovery for any breach of contract, since the parties were involved in a common commercial banking transaction. Plaintiffs were seeking to make a profit and went into arms length negotiations with the lending institution. There were no indicia of unequal bargaining, no adhesive agreements, and no indications that one party had any particular advantage over the other. Moreover, it did not appear that plaintiffs were either in a particularly vulnerable position or in need of any special protection. Further, ordinary contract damages were adequate to make plaintiffs whole for any compensable misconduct on defendants' part.

(14) Pleading § 26--General Demurrer; Failure to State Cause of Action-- Alternate Theory--Breach of Implied Covenant of Good Faith and Fair Dealing:Contracts § 48--Actions--Pleadings--By Plaintiff--Breach of Implied Covenant of Good Faith and Fair Dealing.
Even though a plaintiff characterizes a count as the tortious breach of the implied covenant of good faith and fair dealing, it is possible to state a cause of action for breach of that covenant even though no basis for a tort recovery exist. Thus, in resolving a demurrer, the court must consider if a cause of action has been stated on any theory, irrespective of the label attached by the pleader.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(15) Contracts § 23--Construction and Interpretation--Implied Covenant of Good Faith and Fair Dealing.
Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement. Simply stated, the burden imposed is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement; the implied covenant imposes upon each party the obligation to do everything that the contract presupposes the party will do to accomplish the contract's purpose. This rule is aimed at making effective the agreement's promises. The precise nature and extent of the duty imposed depends on the contractual purposes. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectation of the other party; it excludes from consideration a variety of types of conduct characterized in other contexts as involving "bad faith" because they violate community standards of decency, fairness, or reasonableness.
[See **Cal.Jur.3d**, Contracts, § 181.]

(16) Contracts § 44--Breach of Implied Covenant of Good Faith and Fair Dealing.
A covenant of good faith and fair dealing is an implied-in-law term of any contract. The covenant of good faith is read into contracts in order to protect the express covenant or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes. Therefore, its breach will always result in a breach of the contract, although a breach of a consensual (i.e., an express or implied-in-fact) contract term will not necessarily constitute a breach of the covenant. A breach of the implied covenant of good faith and fair dealing involves something beyond the breach of the contractual duty itself, and bad faith implies unfair dealing rather than mistaken judgment. Thus, allegations that assert such a claim must show that the defendant's conduct whether or not it constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence, but rather by a conscious and deliberate act that unfairly frustrates the agreed common purposes and disappoints the other party's reasonable expectations thereby depriving that party of the benefits of the agreement.

(17) Contracts § 48--Actions--Pleadings--By Plaintiff--Tortious Breach of Implied Covenant of Good Faith and Fair Dealing.
If the allegations of a complaint for breach of implied covenant of good faith and fair dealing do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated. Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery.

(18) Insurance Contracts and Coverage § 109--Duty of Insurer to Act in Good Faith--Tortious Breach of Duty.
In insurance cases, there is a well-developed history recognizing a tort remedy for a breach of the implied covenant of good faith and fair dealing. The existence of this remedy is justified by the special relationship existing between insurer and insured, which is characterized by elements of public interest, adhesion, and fiduciary responsibility. In addition, it is essential to a recovery in tort that the insurer, in breaching the implied covenant, have acted unreasonably or without proper cause.

(19) Contracts § 45--Actions--Bad Faith Denial of Contract.
The elements of the tort of bad faith denial of the existence of a contract are: an underlying contract, that is breached by the defendant, who then denies liability by asserting that the contract did not exist, in bad faith, and without probable cause for such denial. Of these five elements, the last two are the most critical and difficult to demonstrate. The requirement that the defense be asserted in bad faith is a subjective issue relating to the defendant's state of mind. Stated in its simplest form, it means that the defendant does not have a good faith belief in the facts relied upon to constitute or support a legally tenable defense. The fifth element means that on the basis of the facts known to the defendant, the assertion of the defense was not legally tenable; that is, it was neither reasonable nor justified under applicable law. This is an objective requirement and requires a consideration of all of the circumstances.

(20a, 20b, 20c) Contracts § 48--Actions--Pleadings--By Plaintiff-- Defendant's Bad Faith Denial of Existence of Contracts--Probable Cause to Dispute

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Existence of Contract.
In an action by borrowers against a lending institution and one of its officers alleging defendants' bad faith denial of the existence of a contract to lend money to plaintiffs, the trial court erred in sustaining without leave to amend defendants' demurrer to the complaint. Although plaintiffs failed to state a cause of action, they were entitled to an opportunity to attempt to amend their complaint. They failed to state a cause of action since they failed to allege the absence of probable cause for defendants' denial. The resolution of the issue of probable cause calls for an objective test whether the defendant's action was reasonable; depending on the allegations of the complaint, and where the facts are undisputed, the issue may be resolved on demurrer, since then this issue is a legal rather than a factual one. Plaintiffs merely alleged that defendants' letter containing conditions precedent to the making of the loan established the contract, but plaintiffs did not specifically plead satisfaction of the conditions. Thus, there was a reasonable basis to dispute the existence of the contract in plaintiffs' own pleadings.

(21) Pleading § 13--Construction--Written Instrument Incorporated Into Pleading.
Where a plaintiff attaches and incorporates a written instrument into a pleading, without alleging that it was ambiguous or subject to some special interpretation, the court is free on demurrer to construe the language and draw its own conclusion as to the legal effect of the instrument.

(22) Limitation of Actions § 71--Pleading--Negation in Complaint of Defense of Statute of Limitations.
Where the allegations in a complaint indicate the existence of the defense of the statute of limitations, specific facts negating that defense must be alleged in the complaint. General or conclusionary allegations will not suffice.

COUNSEL
Kinsella, Boesch, Fujikawa & Towle, Philip W. Boesch, David Z. Vance and Jack G. Cairl, Jr., for Plaintiffs and Appellants.
Sheppard, Mullin, Richter & Hampton, John A. Sturgeon and Edward D. Vogel for Defendants and Respondents. ***1379**
**CROSKEY, J.**
This appeal involves two consolidated actions: Careau & Co. and Richard Carrott v. Security Pacific Business Credit, Inc., Security Pacific National Bank, Security Pacific Corporation and Raymond C. Torres (the Carrott action); and the Careau Group v. Raymond Torres, Security Pacific Business Credit, Inc., Security Pacific National Bank, and Security Pacific Corporation (the Careau Group action). They arise out of a dispute as to (1) whether the bank defendants had made a binding commitment to provide debt financing to the plaintiffs for the leveraged (i.e., debt-financed) buyout of a business and (2) whether the plaintiffs justifiably relied thereon. These two actions allege numerous parallel and nearly identical claims based upon both contract and tort. (See fn. 8, *post.*)

Plaintiffs appeal from a judgment which was based upon an order sustaining demurrers without leave to amend and an order granting defendants' motion for judgment on the pleadings. In this appeal we are asked to decide the propriety of such orders as well as the trial court's denial of a motion for reconsideration of the order sustaining the demurrers. For the reasons discussed below, we have determined that the trial court should have overruled the demurrers as to two causes of action pled in the second amended complaints and granted to plaintiffs the right to amend as to certain other causes of action. We therefore will affirm in part and reverse in part.

Procedural Background

The Carrott action was filed in November of 1983. The Careau Group action was filed in October of 1985. First amended complaints were filed in both actions in August 1987. The parties engaged in discovery both before and after the first amended complaints were filed. Ultimately, the two cases were consolidated pursuant to a stipulation and order, dated September 4, 1987.

On October 6, 1987, the defendants filed demurrers to the first amended complaints. Specifically, defendants demurred to the first through fifth and the eighth, tenth and eleventh causes of action in the Carrott action and to the first through fifth and eighth, ninth, and tenth causes of action in the Careau Group action. On October 30, 1987, all the demurrers were sustained *without leave to amend.* On November 9, 1987, plaintiffs moved for reconsideration of the "without leave to amend" portion of the order sustaining the demurrers,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

submitting, with their motion for reconsideration, ***1380** proposed second amended complaints for both of the actions. [FN1] Their motion was denied on December 4, 1987. A statement of the grounds for ruling upon the demurrers was signed and filed January 8, 1988.

FN1 In the second amended complaints, plaintiffs included two additional causes of action that had not been included in the prior pleadings: (1) breach of option contract (count 13 in the Carrott action and count 11 in the Careau Group action) and (2) bad faith denial of existence of contract (count 14 in the Carrott action and count 12 in the Careau Group action).

In November 1987, defendants had filed an answer to the remaining causes of action in the two cases. This was shortly followed by a motion for judgment on the pleadings as to all but one of those counts. The motion sought dismissal of the sixth (fraud) and seventh (negligent misrepresentation) causes of action in both of the first amended complaints, as well as the ninth (interference with prospective business advantage) cause of action in the Carrott action. The motion was granted on March 11, 1988.

A judgment, based on that motion and the orders sustaining the demurrers was entered on July 13, 1988. Pursuant to a stipulation, the 12th cause of action in the Carrott first amended complaint (breach of oral contract not to disclose confidential information, which had not otherwise been specifically addressed by the trial court) was dismissed without prejudice in August 1988. The judgment was then amended nunc pro tunc on August 30, 1988, to reflect such voluntary dismissal. Plaintiffs filed a timely appeal from that judgment.

Factual Background

At the heart of these consolidated actions is the effort to finance the purchase of an egg production facility in Moorpark, California, known as Julius Goldman's Egg City (Egg City). Plaintiffs, or at least one of the plaintiffs, sought to purchase Egg City and sought funding of $13 million from defendants. This financing never materialized and plaintiffs were allegedly unable to make the purchase until a new lender was found. They eventually obtained the necessary funding elsewhere, but on less desirable terms. Plaintiffs filed these actions, contending, inter alia, that defendants (1) breached oral and written contracts, (2) breached the implied covenant of good faith and fair dealing, (3) denied in bad faith the contract's existence, (4) engaged in fraud and negligent misrepresentations, and (5) interfered with plaintiffs' contractual and business relationships and prospective economic advantages. ***1381**

(1) This is an appeal from a judgment of dismissal entered after demurrers were sustained to plaintiffs' first amended complaints. [FN2] "Therefore, under settled law, we assume the truth of all properly pleaded material allegations of the complaint [citations] and give it a reasonable interpretation by reading it as a whole and its parts in their context. [Citation.]" (*Phillips v. Desert Hospital Dist.* (1989) 49 Cal.3d 699, 702 [263 Cal.Rptr. 119, 780 P.2d 349].) If the demurrer was sustained, as it was in this case, our function is to determine whether the complaint states sufficient facts to state a cause of action; and if it was sustained, as it was here, without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see also, *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 669-670 [247 Cal.Rptr. 304]; *Von Batsch v. American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111, 1117 [222 Cal.Rptr. 239].) In accordance with these rules, we set forth the following facts as disclosed by plaintiffs' second amended pleadings. [FN3]

FN2 To be precise, as we have already noted, the demurrer was sustained as to 16 of the 22 counts alleged in these consolidated amended complaints. A motion for judgment on the pleadings was granted as to five additional counts and the last remaining count was dismissed pursuant to stipulation in order to permit a final judgment to be entered.

FN3 As we explain in greater detail below, we will treat the second amended complaints

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

as the operative pleadings and examine them to determine if a cause of action has been stated under any cognizable legal theory.

During the summer of 1983 the plaintiffs Richard Carrott (Carrott) [FN4] and Careau & Co. (Careau), a California corporation, negotiated a leveraged purchase of Egg City. It was then owned by the Kroger Company (Kroger), one of the largest grocery chain store owners in the United States. These negotiations led to the execution of a letter of intent between Careau and the defendant Security Pacific Business Credit, Inc. (SPBC) [FN5] on July 19, 1983. By this letter, SPBC expressed an interest in lending to Careau the sum of $12 million (to provide financing for the purchase of Egg City) upon certain terms and conditions and subject to certain specified contingencies. ***1382** The letter was signed on behalf of SPBC by the defendant Raymond C. Torres (Torres) who was a vice-president of SPBC and, at all times, "was acting in and within the scope of that capacity, and under the control and agency of" SPBC.

FN4 Carrott was the founder, president and sole shareholder of the corporate plaintiff, Careau & Co.

FN5 An examination of the proposed second amended complaints demonstrates SPBC is the corporate defendant with whom plaintiffs apparently exclusively dealt during this entire matter. Two other corporate defendants are also named, (1) Security Pacific National Bank (SPNB), a national banking association, doing business in California and (2) Security Pacific Corporation (SPC), a Delaware corporation, also doing business in California. However, there are no allegations describing the corporate or contractual relationships, if any, between SPBC on the one hand and these additional corporate defendants. In any event, these two defendants are charged only in counts eight, nine and ten.

The terms of the letter of intent required Careau to make a good faith deposit of $10,000 which would be used by SPBC to cover the costs and expenses incurred by SPBC in reviewing and evaluating Careau's loan application. This sum was paid to SPBC on July 27, 1983, by a check apparently written on a personal account of Carrott.

The conditional and tentative nature of the letter was emphasized by several phrases which made clear that no loan commitment had been made. Specifically, (1) the terms of the proposed loan were introduced with the disclaimer that the letter should "*in no way should be considered a commitment to provide financing*"; (2) a list of "conditions precedent" was preceded by the sentence, "*The following are some, but obviously not all of the conditions precedent to any loan approval* ...."; and finally, (3) the letter concluded with a further caution, "*Since this letter is not a commitment to make a loan, it should not be relied upon by any third party.*"

Thereafter, SPBC had discussions with Kroger, the party from which Egg City would be purchased, and an audit of that property and business was completed by SPBC and distributed internally by August 10, 1983. Two weeks later, on August 25, Torres, on behalf of SPBC, and Carrott, on behalf of Careau, executed a revised letter relative to the proposed loan which the second amended complaints allege was "a written commitment contract for the acquisition of Egg City." [FN6]

FN6 Plaintiffs do not allege the specific reason or purpose for the issuance of this new letter, beyond the conclusionary assertion that it was SPBC's purpose to move from a "letter of intent" to a "commitment letter." However, in the original complaint filed in the Carrott action, and which was verified by Carrott on November 22, 1983, it is alleged that the August 25 letter "was an amended financing plan which modified the July 19, 1983 letter of intention in such a way so that a commitment and agreement would be made by SPBC in accordance with terms and conditions as expressed in [the August 25 letter] in the manner as alleged herein." (Italics added.) In addition, this verified pleading also specifically alleged that, by the August 25 letter, SPBC had agreed to provide financing according to "the terms and conditions of [the August 25 letter]." (Italics added.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

It was identical to the letter of July 19 except for four specific changes:

1. The total amount of the proposed loan was increased to $13 million (including an increase, from $4 million to $5 million, of the advances to be secured by accounts receivable); ***1383**

2. The conditional and tentative language quoted and italicized above in the next preceding paragraph was deleted;

3. Three contingencies that had *not* been included in the July 19 letter (numbered as 8.4, 8.5 and 8.6) were added. The proposed loan, as described in the letter of August 25, was thus made subject to the eight specific conditions precedent; [FN7] and finally,

> FN7 Section 8 of the August 25 letter spelled out the conditions:
> "8. Conditions Precedent:
> "8.1 Borrower shall be a California corporation in good standing in the state, and qualified to do business in other states where they have collateral.
> "8.2 Borrower shall have a title to all of the above collateral free and clear of encumbrances.
> "8.3 Completion of a field survey by Lender's examiners, which results are to be acceptable to Lender.
> "8.4 Lender's proposal is contingent upon an initial cash equity of two hundred fifty thousand dollars from Buyer and eight million dollars in debt from The Kroger Company (Seller). This is based upon a purchase price of eighteen million dollars. Terms and conditions on debt repayment subject to Lender's approval.
> "8.5 Lender's proposal is subject to an appraisal up to three million five hundred thousand dollars on the machinery and equipment. Appraisal value to be fully guaranteed to Lender over the contract period by an insurance company. Both the appraisal and the insurance company are subject to Lender's approval.
> "8.6 Lender's proposal is contingent upon Borrower's securing Seller's commitment to the terms and conditions they have offered Borrower and which this proposal addresses.
> "8.7 Lender's senior credit committee's approval.
> "8.8 Borrower and the principals of Borrower shall have executed and delivered such documents, instruments, security agreements, insurance financing statements, guarantees, verifications, non-offset letters, tax lien and litigation searches, good standing certificate, copies of building leases, landlord's waivers, trust deeds or mortgages, opinion of counsel, and done such other acts as Lender may request in order to obtain Lender's Legal approval to effect the completion of the financing arrangements herein contemplated. All of the foregoing must be in a form satisfactory to Lender and Lender's counsel. All loan and advances shall be made pursuant to, and subject to, the terms of the financing documents executed at the closing. If the transaction contemplated by this letter of intent is not completed on or before midnight, October 19, 1983, then the terms and conditions set forth herein shall thereafter expire, without further notice or act of any kind by Lender or any other party."

4. The letter concluded with the statement, "Since this letter is subject to all of the above conditions and specifically the receipt of the acceptable appraisal with a guarantee from an acceptable insurance company and the confirmed commitment from seller, it should not be relied upon by any third party as a final commitment to make a loan."

In order to demonstrate that the conditions were satisfied, excused or waived, plaintiffs alleged that:

1. On September 7, 1983, Torres orally informed Carrott that "the loan commitment had been approved by SPBC" (apparently referring to ***1384** contingency 8.7). This statement was repeated to Carrott by Torres the next day, September 8, when the two met to conduct a telephone conference with the seller, Kroger. Kroger was advised by Torres in that telephone call that, "This is a verbal commitment. It has been cleared to the level of Vice Chairman, and he has cleared me to make this call to you";

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2. Torres "had previously stated to Carrott that the vice chairman was the last and remaining person from the Senior Credit Committee who had to approve the commitment, as the other persons on the loan committee who need to approve the commitment had previously done so .... [T]he Senior Credit Committee approval was serial, i.e., each member approved independently, without a formal vote at a meeting";

3. Torres stated to both Carrott and Kroger on September 8, "that conditions precedent 8.1, 8.3, 8.4, 8.5 and 8.7 of the written commitment contract had been met and satisfied and defendants were fully satisfied that the conditions had been met";

4. On September 23, Kroger advised Carrott that the sale was approved based upon the terms of the August 25 letter (plaintiffs claim that this satisfied condition 8.6);

5. Based upon the conversations of September 7 and 8, "defendants waived ... the need to satisfy any of the conditions, numbered 8.1 through 8.8 inclusive .... Thus all Conditions Precedent of the written commitment contract had either been met and satisfied or waived or excused ....";

6. Condition 8.5 "had thereby been met and satisfied and Kroger and SPBC were fully satisfied that the conditions had been met";

7. On or about September 26, 1983, the written loan commitment was orally modified to provide that (a) the closing of the Egg City purchase would occur in December 1983 as an accommodation to Kroger and (b) the party which would buy Egg City and receive the purchase financing from defendants was to be a new corporation with the name, "The Careau Group." This latter change was required by SPBC because Careau was "involved in many other activities." This new corporation (hereafter the "Careau Group") was formed and incorporated by Carrott on or about September 26;

8. "All Conditions Precedent of the written commitment contract were satisfied not later than September 23, 1983 except 8.2 and 8.8 which would have been satisfied at closing"; and ***1385**

9. Since the defendants gave notice between October 4 and 6, 1983, that they would not perform the commitment to make the loan, conditions 8.2 and 8.8 were excused.

Plaintiffs further allege that they relied upon the representations and commitments made by SPBC in that they (1) desisted from loan negotiations in which they had been engaged with other institutions, (2) incurred the expense of forming the new corporation, Careau Group and (3) expending $4,000 for the initial preparation of a business plan.

Following SPBC's decision not to provide the financing to purchase Egg City, plaintiffs allege that they were finally able, in June of 1985, to obtain the necessary funds from another source, but on less advantageous terms and at additional cost. Plaintiffs claim that the damages which they suffered include, (1) past and future lost profits from the Egg City business, (2) the time, expense and cost of obtaining replacement financing and (3) the reduction in the value of Egg City between December 1983 and June 1985, including physical deterioration of the premises, diminution of the flock of laying chickens, destruction of the hatchery and chicken replacement program and loss of goodwill associated with the trade name, "Julius Goldman's Egg City."

The two consolidated complaints which have been filed assert the same 12 counts, plus 2 additional theories which are alleged only in the Carrott action (i.e., intentional infliction of emotional distress (count 11) and breach of an oral agreement to keep certain information confidential (count 12)). [FN8]

FN8 The 12 common causes of action asserted are, (1) breach of written commitment contract, (2) breach of oral commitment contract, (3) promissory estoppel, (4) tortious breach of implied covenant of good faith and fair dealing, (5) specific performance, (6) fraud, (7) negligent misrepresentation, (8) conspiracy to induce breach of contract, (9) interference with prospective business advantage, (10) interference with business relationship, (11) breach of option contract (count 13 in Carrott action) and (12) bad faith denial of existence of contract (count 14 in Carrott action).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Discussion

1. *The Basis of Review in This Case*

On appeal, plaintiffs challenge only the fact that the trial court sustained demurrers to the first amended complaints *without leave to amend* and then, in spite of the allegations in the proposed second amended complaints, ***1386** refused to reconsider that order. We therefore presume that the demurrers to their first amended complaints were properly sustained.

(2) As we have already noted, it is an abuse of discretion to sustain demurrers without leave to amend if there is a reasonable possibility that the plaintiff can amend the complaint to cure its defects. (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [75 Cal.Rptr. 766, 451 P.2d 406].) To meet the plaintiff's burden of showing abuse of discretion, the plaintiff must show how the complaint can be amended to state a cause of action. (*Goodman v. Kennedy, supra,* 18 Cal.3d at p. 349.) However, such a showing need not be made in the trial court so long as it is made to the reviewing court. (Code Civ. Proc., § 472c; *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 939 [101 Cal.Rptr. 568, 496 P.2d 480]; *Schultz v. Steinberg* (1960) 182 Cal.App.2d 134, 140-141 [5 Cal.Rptr. 890].)

Here, the record does not show that plaintiffs specified to the trial court, at the original hearing on the demurrers, how they would amend their first amended complaints so as to cure the defects which the trial court found in them. However, they did make such a showing by way of their later motion for reconsideration.

(3) Under *Rains v. Superior Court* (1984) 150 Cal.App.3d 933, 943-944 [198 Cal.Rptr. 249], plaintiffs were entitled to submit proposed second amended complaints by way of a motion for reconsideration. If those second amended complaints stated any causes of action, then the trial court was obligated to (1) vacate its order which sustained the demurrers without leave to amend and (2) make a different order granting plaintiffs leave to file an amended complaint, which would include the causes of action which the trial court, in deciding the merits of the motion for reconsideration, determined were valid. (*Id.*, at p. 945.)

(4) Although it does not appear from the record before us that the trial court specifically considered the changes made by the plaintiffs in their proposed second amended complaints before denying the motion to reconsider, FN9 we do not believe it to be in the interest of judicial economy to return ***1387** the case to the trial court for such a review. We have the second amended pleadings before us, and we can make a determination as to whether any viable causes of action are stated and, if not, whether further amendment should be permitted. Thus, although one of plaintiffs' principal claims of error is that they were not given the opportunity to file amended pleadings, we will decide the case as though the court had received them and had sustained demurrers without leave to amend. FN10

FN9 Indeed, it appears that the trial court denied the plaintiffs' motion for reconsideration because of its perception that Code of Civil Procedure section 1008 required plaintiffs to present new facts and chided them for having "no new factual situation." The court further stated: "You're basing [the proposed second amended complaints] on the same set of facts. The facts aren't going to change. You had all of these facts. All of these facts were there when you filed the complaint." In addition, at the January 8, 1988, hearing on plaintiffs' objections to defendants' proposed statement of decision for the demurrers, the court stated that the plaintiffs had, in their motion for reconsideration, "alleged no new facts." The court went on to state:
"... since there were no new facts, under 1008 of the CCP, I denied your motion to reconsider."
This was not correct. Code of Civil Procedure section 1008, subdivision (a), does not require that the support for a motion to reconsider be based upon "new facts." It is only necessary that the motion be based upon an "alleged different state of facts" than the original motion. (*Rains v. Superior Court, supra,* 150 Cal.App.3d at pp. 943-944; *Blue Mountain Development Co. v. Carville* (1982) 132 Cal.App.3d 1005,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

1012-1014 [183 Cal.Rptr. 594]; *Graham v. Hansen* (1982) 128 Cal.App.3d 965, 970-971 [180 Cal.Rptr. 604].) Thus, the trial court should have specifically examined the proposed pleadings attached to the reconsideration motion to determine whether the added allegations were sufficient to state one or more valid causes of action.

FN10 As already noted, defendants' demurrers disposed of only some of the causes of action in the first amended complaints. The rest (except for the 12th cause of action in the Carrott complaint which was ultimately dismissed without prejudice pursuant to stipulation) were decided by a subsequent motion for judgment on the pleadings. However, given the nature and procedural function of a motion for judgment on the pleadings, our determination to decide the issues based upon the adequacy of the allegations of the second amended complaints will necessarily resolve any questions as to those counts as well.

Plaintiffs argue that the second amended complaints do allege viable causes of action but, even if we also find them deficient, they have a right to the opportunity of further amendment. (5) The general rule is that allegations of a complaint are to be liberally construed with a view to substantive justice between the parties. (*King v. Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) (6) An order sustaining a demurrer without leave to amend will constitute an abuse of discretion if there is any *reasonable possibility* that the defect can be cured by an amendment. This rule is liberally applied to permit further amendment not only where the defect is one of form but also where it is one of substance, provided the pleader did not have " '*a fair prior opportunity to correct the substantive defect.*' " (*Leach v. Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362, 368 [192 Cal.Rptr. 650], quoting *Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 635 [162 Cal.Rptr. 52].)

On the other hand, there is nothing in the general rule of liberal allowance of pleading amendment which "requires an appellate court to hold ***1388** that the trial judge has abused his discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment." (*HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 513, fn. 3 [125 Cal.Rptr. 365, 542 P.2d 237].) The burden is on the plaintiffs to demonstrate that the trial court abused its discretion and to show in what manner the pleadings can be amended and how such amendments will change the legal effect of their pleadings. (*Goodman v. Kennedy, supra,* 18 Cal.3d 335, 349; *Sullivan v. City of Sacramento* (1987) 190 Cal.App.3d 1070, 1081 [235 Cal.Rptr. 844]; *Von Batsch v. American Dist. Telegraph Co., supra,* 175 Cal.App.3d 1111, 1117-1118.)

With such general principles in mind we will examine each of the causes of action alleged by the plaintiffs.

. . . . . . . . . . . FN*

FN* See footnote, *ante*, page 1371.

3. *Whether the Complaints Plead Sufficient Facts to State a Cause of Action on Any Theory*

a. *Claims Based on Contract*

(1) *Written or Oral Contract*

In their first two counts plaintiffs have attempted to plead the breach of both the written and an oral contract. However, they rely upon the same allegations for each and we see no need to distinguish between them.

(7) A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830 [69 Cal.Rptr. 321, 442 P.2d 377].) (8a) What plaintiffs have failed to do here is adequately allege the due satisfaction of several conditions precedent to the formation of a binding contract.

Plaintiffs assert that the letter of August 25 sets forth the terms of a contractual commitment to provide financing. While they acknowledge that the letter

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

contains some conditions, they argue that they have alleged sufficient facts to demonstrate, at least for pleading purposes, that each of ***1389** such conditions has been satisfied, waived or excused. Defendants, on the other hand, argue that the letter is tentative and nothing more than an expression of intent subject to many conditions, the satisfaction of which plaintiffs have not alleged.

On its face, the August 25 letter is a conditional agreement to provide financing if certain "conditions precedent" are met. The conditions listed are both specific and substantial. In addition, the letter refers to financial, legal and collateral investigations which remain to be completed and expressly anticipates the possibility that a loan will not be made; [FN12] and, as already discussed, the letter expressly cautions that since it is subject to so many conditions which obviously had not been satisfied as of August 25, "it should not be relied upon by any third party as a final commitment to make a loan." (9) As the court noted in *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38 [248 Cal.Rptr. 217], "Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. 'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.' [Citation.]" (*Id.*, at p. 59.)

FN12 The letter states that, "If we conclude, for any reason, that we will not make the loan to you, we will return the balance of the [$10,000] deposit after deducting all costs and expenses actually incurred by us in connection with our review of your application." To emphasize that a commitment to make the loan had not been reached as of the date of this letter, it further stated that in the event "we conclude that we will make the loan" and plaintiffs do not complete the borrowing, then the said deposit may be retained by the defendants.

(10) Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 479, pp. 515-516.) This requirement can be satisfied by allegations in general terms. It is sufficient for a plaintiff to simply allege that he has "duly performed all the conditions on his part." (Code Civ. Proc., § 457.)However, this rule is subject to two important caveats, both of which are applicable here.

First, where the condition is an event, as distinguished from an act to be performed by the plaintiff, a specific allegation of the happening of the condition is a necessary part of pleading the defendant's breach. (*Clack v. State of California* ex rel. *Dept. Pub. Wks.* (1969) 275 Cal.App.2d 743, 748 [80 Cal.Rptr. 274]; *Byrne v. Harvey* (1962) 211 Cal.App.2d 92, 113 [27 Cal.Rptr. 110].) Second, general pleadings are controlled by specific allegations. Thus, a general allegation of due performance will not suffice if the ***1390** plaintiff also sets forth what has actually occurred and such specific facts do not constitute due performance. (*Willis v. Page* (1937) 19 Cal.App.2d 508, 512 [65 P.2d 944].)

For example, where plaintiff alleges a permissible conclusion of law such as the due performance of a condition precedent but also avers specific additional facts which either do not support such conclusion, or are inconsistent therewith, such specific allegations will control "and a complaint which might have been sufficient with general allegations alone may be rendered defective ...." (4 Witkin, Cal. Procedure, *supra.*, Pleading, § 404, at p. 453; see also, *Stowe v. Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 422 [282 P.2d 890];*Clack v. State of California* ex rel. *Dept. of Pub. Wks., supra,* 275 Cal.App.2d at p. 748.)

(8b) When we apply these rules to plaintiffs' pleadings we are forced to conclude that they have failed to state a cause of action for breach of contract. There are no specific allegations of the performance of any of the conditions. Although this is their third pleading effort, all plaintiffs have alleged is that conditions "had been met and satisfied" and "defendants were fully satisfied that the conditions had been met" and "all conditions precedent ... had either been met and satisfied or waived or excused ...." These are simply general conclusions. However, since at least six of the eight conditions were events which had to exist or occur, and not simply acts to be performed by plaintiffs, such general allegations are

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

not adequate. (*Clack v. State of California* ex rel. *Dept. of Pub. Wks., supra,* 275 Cal.App.2d at p. 748;*Byrne v. Harvey, supra,* 211 Cal.App.3d at p. 113.)

Nor are plaintiffs' contract claims saved by the allegations of the oral statements attributed to Torres, the officer of SPBC with whom they were dealing. Plaintiffs rely on Torres's statements as a sufficient specific allegation of due performance but unfortunately all that plaintiffs have done is beg the question.

While those statements may be some evidence that one or more conditions were satisfied, they do not constitute the direct, specific allegation of performance which is required. (11) A complaint must allege the ultimate facts necessary to the statement of an actionable claim. It is both improper and insufficient for a plaintiff to simply plead the *evidence* by which he hopes to prove such ultimate facts. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 212 [197 Cal.Rptr. 783, 673 P.2d 660].) (8c) Here, plaintiffs rely heavily on their allegations that Torres had stated to Carrott and others that “the loan commitment had been approved by SPBC” (and other conclusionary statements ***1391** as to the satisfaction of one or more conditions). These allegations do not demonstrate due performance. If at trial a jury were to find that Torres had indeed made such statements, that would not be the equivalent of a finding that any of the conditions in the August 25 letter had been satisfied, excused or waived. It would only mean that it was true that Torres had said certain things about them.

This is obviously more than a quibble. If plaintiffs, after four years of substantial discovery and three separate pleadings, can allege nothing more than they have, then we have serious doubts that they can truthfully allege that nay of the conditions were satisfied. All they have done is allege that Torres made certain statements which they contend constitute an excuse or waiver of performance. However, such conclusory allegations are not sufficient. The pleading of excuse or waiver of performance of conditions precedent requires specific not general allegations. (4 Witkin, Cal. Procedure, *supra.*, Pleading, §§ 481-482, at pp. 517-519.)Thus, plaintiffs have failed to adequately allege a cause of action for the breach of either a written or an oral agreement. Their failure to sufficiently allege the satisfaction of several significant, if not critical, conditions precedent to any obligation on the part of SPBC to provide financing is fatal to their contract claims.

These pleading defects are at once matters of both form and substance. However, we cannot conclude, without effectively resolving a factual issue, that there is no reasonable possibility of plaintiffs making the direct allegations necessary to demonstrate the existence of a binding contract. (12) On appeal, it is not our task to be concerned with the possible difficulty or inability of proving such allegations. (*Postley v. Harvey* (1984) 153 Cal.App.3d 280, 287 [200 Cal.Rptr. 354].) Therefore, it is appropriate that plaintiffs be given the opportunity to correct the specific pleading errors we have described. It was therefore error to sustain a demurrer to these contract counts without leave to amend.

. . . . . . . . . . . FN*

FN* See footnote, *ante*, page 1371.

c. *Tort Claims Based on Alleged Bad Faith*

(13a) Plaintiffs attempt to assert two separate causes of action based upon a claim of bad faith. Each necessarily depends upon the existence of a valid and existing contractual relationship. As we have already concluded ***1392** that plaintiffs have failed to plead the existence of a contract we could dispose of these counts summarily. However, there are significant additional reasons upon which we rely to support our view that plaintiffs have not alleged a basis for relief on either theory. In addition, plaintiffs will be given a further opportunity to plead the existence of a contract. We therefore deal with these two claims in some detail.

(1) *Tortious Breach of Implied Covenant of Good Faith and Fair Dealing*

Arguing that it is “settled” that there is a “special relationship” between a bank and its customers, plaintiffs contend that defendants have tortiously breached the covenant of good faith implied in their contractual relationship. Pleading in conclusory language that defendants “exercised great bargaining

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

power" over them and that the circumstances of the transaction created "a special confidential and fiduciary duty" to them, plaintiffs allege that such breach resulted from (1) the refusal to provide the financing described in the August 25 letter, (2) a "deceitful and pretextual" explanation for such refusal and (3) the disclosure of confidential financial information to third parties. [FN13]

FN13 Plaintiffs also alleged, as part of this cause of action, that defendants had denied, "in bad faith and without a reasonable basis therefore," the existence of the contractual obligation to provide the financing described in the August 25 letter. This claim is really central to another cause of action which plaintiffs have also sought to plead. (See fn. 21, *post.*)

(14) Although plaintiffs have characterized this count as the *tortious* breach of the implied covenant, it is obviously possible to state a cause of action for a breach of such covenant even though no basis for a tort recovery exists. Thus, we must consider if a cause of action has been stated *on any theory,* irrespective of the label attached by the pleader. (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 8-9 [101 Cal.Rptr. 499, 51 A.L.R.3d 991].) (13b) After a review of the applicable law, [FN14] we will conclude that plaintiffs' allegations are not sufficient to state any cause of action for a breach of the implied covenant of good faith, irrespective of the remedy sought. First, plaintiffs have not pled sufficient facts to justify a recovery in tort. Secondly, they have not even attempted to plead a basis for a recovery of anything other than ordinary contract damages and their claim is simply duplicative of their two contract causes of action and thus may be disregarded. ***1393**

FN14 As evidenced by the arguments advanced by plaintiffs there appears to be some confusion with respect to both the use and scope of a cause of action for a breach of the implied covenant of good faith, particularly in the noninsurance contractual context. Therefore, in the hope that it will contribute to both clarity and consistency, we review the history and recent developments of this theory.

(15) "Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement." (Rest. 2d, Contracts, § 205; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158] (*Seaman's*).) Simply stated, the burden imposed is " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032], quoting *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) Or, to put it another way, the "implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." (*Schoolcraft v. Ross* (1978) 81 Cal.App.3d 75, 80 [146 Cal.Rptr. 57].) This rule was developed "in the contract arena and is aimed at making effective the agreement's promises." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) The "precise nature and extent of the duty imposed ... will depend on the contractual purposes." (*Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818.) [FN15]

FN15 The terms "good faith" and "bad faith" have, from time to time, been variously defined. In *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921-922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980], the Supreme Court, in discussing the concepts of "good faith" and "bad faith," commented: "As stated by the draftsmen of the Restatement of Contracts, '[t]he phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.' (Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231, com. a.)"

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*Foley* emphasized that an alleged breach of the implied covenant is a claim founded upon contract and that a careful distinction must be maintained between "ex-delicto" and "ex-contractu" obligations. "When a court enforces the implied covenant it is in essence acting to protect 'the interest in having promises performed [citation]' ...." (*Foley, supra,* 47 Cal.3d at pp. 689-690.) This is the traditional function of a contract action. A tort action, on the other hand, redresses the breach of the general duty to society which the law imposes without regard to the substance of the contractual obligation. (16) "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Id.*, at p. 690.)In short, it is an implied-in-law term of the contract. Therefore, its breach will always result in a breach of the contract, ***1394** although a breach of a consensual (i.e., an express or implied-in- fact) contract term will not necessarily constitute a breach of the covenant. [FN16]

FN16 The same conduct does not necessarily result in a breach of both a consensual contract term and the implied covenant of good faith. (See, e.g., *Schoolcraft v. Ross, supra,* 81 Cal.App.3d at pp. 80-81;*Wilkerson v. Wells Fargo Bank* (1989) 212 Cal.App.3d 1217, 1230-1231 [261 Cal Rptr. 185]; *Sheppard v. Morgan Keegan & Co.* (1990) 218 Cal.App.3d 61, 66-67 [266 Cal.Rptr. 784].)

In *Schoolcraft,* the court awarded contract damages to the trustor under a deed of trust upon the theory that the beneficiary's conduct, in applying fire insurance proceeds to the secured debt rather than to the reconstruction of the insured residence, was a breach of the covenant of good faith implied in the trust deed. While such choice was permitted by the express terms of the trust deed, and thus there was no breach of those terms, the court found that the choice had been made in bad faith and had deprived the trustor of the benefit of the agreement without necessarily enhancing the beneficiary's security. This result was simply an application of the rule that " '[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' [Citations.]" (*Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500 [220 Cal.Rptr. 818, 709 P.2d 837], quoting *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496].) In such circumstance, a breach of the implied covenant can result from conduct permitted by the express (or implied-in-fact) terms of the contract. (See also, *Milstein v. Security Pac. Nat. Bank* (1972) 27 Cal.App.3d 482, 487 [103 Cal.Rptr. 16].)

In *Wilkerson,* plaintiff sued on an alleged contract of employment that he would not be terminated except for cause. The court held that even though the employer may have had a good faith belief that such "good cause" existed, such belief would be a defense only to an action for breach of the covenant, but would not provide a defense to breach of contract.

In *Sheppard,* the plaintiff had left his stock analyst position in California to accept a similar job in Tennessee but was terminated before he could begin work. The court held that while there was no agreement not to terminate except for cause, and thus no breach of a consensual contract term, the implied covenant of good faith required that the employer at least give the new employee an opportunity to demonstrate his ability to satisfy the requirements of the job. (See also, *Murray v. State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58, 65 [268 Cal.Rptr. 33].)

A " 'breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself' and it has been held that '[b]ad faith implies unfair dealing rather than mistaken judgment .... [Citation.]' [Citation.]" (*Congleton v. National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 59 [234 Cal.Rptr. 218].) [FN17] For example, in the context of the insurance contract, it has been held that the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim " 'is not the requirement mandated by the terms of the policy itself-to defend, settle, or pay. It is the obligation ... under which ***1395** the insurer must act fairly and in good faith in discharging its contractual responsibilities.' [Citation.]" (Italics in original.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54 [221 Cal.Rptr. 171], quoting *Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573-574.)

FN17 Several California cases have defined the offensive conduct as "bad faith action, extraneous to the contract, with the motive intentionally to frustrate the [other party]'s enjoyment of contract rights." (*Sawyer v. Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; *Khanna v. Microdata Corp.* (1985) 170 Cal.App.3d 250, 262 [215 Cal.Rptr. 860].) Such definition has been recently criticized by the Supreme Court, but only in the context that it was uncritically applied to justify a tort remedy rather than contract damages. (*Foley, supra,* 47 Cal.3d at p. 689.)

Thus, allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties.

(17) If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated. Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery.

(18) In insurance cases there is a well-developed history recognizing a tort remedy for a breach of the implied covenant. (*Foley, supra,* 47 Cal.3d at p. 684.) A review of those cases demonstrates that the existence of this remedy has been justified by the "special relationship" existing between insurer and insured, which is characterized by elements of public interest, adhesion and fiduciary responsibility. (*Seaman's, supra,* 36 Cal.3d at pp. 768- 769;*Egan v. Mutual of Omaha, supra,* 24 Cal.3d at p. 820.) In addition, it is essential to a recovery in tort that the insurer, in breaching the implied covenant, have acted *unreasonably* (*Egan v. Mutual of Omaha, supra,* at p. 818; *Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at p. 575) or *without proper cause* (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 920;*Gruenberg v. Aetna Ins. Co., supra,* 9 Cal. 3d at p. 574;*Suarez v. Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1407 [254 Cal.Rptr. 377]; *California Shoppers, Inc. v. Royal Globe Ins. Co., supra,* 175 Cal.App.3d at pp. 54-55.)

However, whether such a concept has any application in noninsurance cases appears to be increasingly problematic. Indeed, the proposition that ***1396** tort damages might be allowed for a breach of the implied covenant in noninsurance cases is barely 10 years old and is based entirely on *dicta* from 2 earlier opinions which the Supreme Court has recently questioned. To appreciate just how difficult it is to assert such a claim, a short historical review is appropriate.

In 1980, the Supreme Court took the occasion, in a wrongful discharge case where a tort recovery was permitted (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*)), to hint that such a recovery might also be justified under the theory of a breach of the implied covenant. The authority for this possible transition, however, was insurance cases. FN18 Indeed, any serious suggestion of such an extension of tort liability would have been a significant change in the law. Up until that time the courts had repeatedly rejected claims for tort relief for breach of the implied covenant in noninsurance cases. (See, e.g., *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 33 [161 Cal.Rptr. 516]; *Sawyer v. Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; *Glendale Federal Savings & Loan Assn. v. Marina View Heights* (1977) 66 Cal.App.3d 101, 135, fn. 8 [135 Cal.Rptr. 802].) However, following *Tameny,* at least two cases (involving employment termination) simply assumed the existence of a tort remedy, but again relied entirely on insurance cases. (*Cleary v. American Airlines, Inc.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(1980) 111 Cal.App.3d 443, 456 [168 Cal.Rptr. 722]; *Cancellier v. Federated Dept. Stores* (9th Cir. 1982) 672 F.2d 1312, 1318.)

FN18 In *Tameny,* the court sanctioned a tort remedy for the termination of a long-term employee who refused the employer's direction to engage in activities which were criminal violations of the antitrust law. The court concluded its opinion with a footnote reference to the breach of the covenant implied in the employment agreement: "In light of our conclusion that plaintiff's complaint states a cause of action in tort under California's common law wrongful discharge doctrine, *we believe it is unnecessary to determine whether a tort recovery would additionally be available under these circumstances on the theory that Arco's discharge constituted a breach of the implied-in-law covenant of good faith and fair dealing inherent in every contract.* We do note in this regard, however, that authorities in other jurisdictions have on occasion found an employer's discharge of an at-will employee violative of the employer's 'good faith and fair dealing' obligations, [citations], and past California cases have held that a breach of this implied-at-law covenant sounds in tort as well as in contract. (See, e.g., *Comunale v. Traders General Ins. Co.* (1958) 50 Cal.2d 654, 663 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 432-433 [58 Cal.Rptr. 13, 426 P.2d 173]; *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 ...." (Italics added.) (*Tameny, supra,* 27 Cal.3d at p. 179, fn. 12.)

The Supreme Court next had occasion to address the issue in its 1984 *Seaman's* decision. [FN19] In that case, the plaintiff sought to enforce a ***1397** "contract" for a long-term marine fuel supply dealership on which it had relied to its severe detriment. When the oil market dynamics changed following execution of the "contract," the defendant, Standard Oil, did everything in its power to cause the concerned government agencies to deny to Seaman's the permits required by the contract and, when that failed, took the position that the "contract" was an unenforceable letter of intent and denied that any contract was ever formed. The evidence produced at trial essentially demonstrated that this position was taken without any factual basis to support it and without a good faith belief that such assertion had any legal merit.

FN19 The precise issue before the court was defined at the outset of the opinion by the question, "May a plaintiff recover in tort for breach of an implied covenant of good faith and fair dealing in a noninsurance, commercial contract?" (*Seaman's, supra,* 36 Cal.3d at p. 758.)

Although the issue was directly raised and asserted, the court avoided giving a direct answer as to whether such conduct might constitute a tortious breach of the implied covenant [FN20] and stated that it was not necessary to predicate liability on such a breach but was simply sufficient "to recognize that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Seaman's, supra,* 36 Cal.3d at p. 769.) [FN21] However, in refusing to recognize a tortious breach of the covenant, the court, in dictum, seemed to suggest that when the contracting parties shared a "special relationship," then a breach of the implied covenant might justify a tort remedy. (36 Cal.3d at pp. 768-769.) [FN22] ***1398**

FN20 The *Seaman's* court explained its reluctance by stating that, "When we move from such special relationships [as are recognized as the basis for tort liability in insurance cases] to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (36 Cal.3d at p. 769, fn. omitted.)

FN21 As we noted in footnote 13, *ante*, plaintiffs also seek to sustain a cause of action on this theory and we discuss those efforts below. However, the Supreme Court has twice emphasized that such theory is not, as a matter of law, based upon a breach of the implied covenant of good faith. (*Seaman's, supra,* 36 Cal.3d at p. 769;*Foley, supra,* 47 Cal.3d at pp. 688-689.)

FN22 It is arguable that the *Seaman's* dicta also suggested that a tortious breach of the implied covenant could result from a defendant's assertion of a stonewall ("see you in court") defensive posture (see fn. 26, *post*). However, apart from a brief reference to this possibility in one opinion (see Multiplex Ins. Agency, Inc. v. California Life Ins. Co. (1987) 189 Cal.App.3d 925, 939 [235 Cal.Rptr. 12]), no court has recognized such a construction of the *Seaman's* opinion. While it certainly has contributed to some of the confusion and uncertainty which has trailed in *Seaman's* wake (see, e.g., fn. 27, *post*), it seems more likely that the discussion of a "stonewall defense" (*Seaman's, supra,* 36 Cal.3d at pp. 769-770) was merely a part of the court's rationale supporting its recognition of the new tort of bad faith denial of contract existence.

The *Seaman's* court suggested, with both a reference to and reliance upon insurance cases (and the "special relationship" between insurer and insured), that "[n]o doubt there are other relationships with similar characteristics and deserving of similar legal treatment." (*Id.*, at p. 769, fn. omitted.) Although not a part of its holding, and certainly unnecessary to it, the court expressed a tentative willingness to entertain an expansion of the tort remedy to contractually based disputes between certain parties who had a relationship other than that of insurer and insured. A judicial test for defining that relationship was not long in coming.

In *Wallis v. Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] (*Wallis*), the court announced a five-part description of the characteristics of the "special relationship" which must be present in a noninsurance contractual dispute in order to justify tort recovery for a breach of the implied covenant. [FN23]However, in its most recent discussion of this issue, the Supreme Court refused to apply this approach to employment cases.

FN23 The *Wallis* court set forth the following five characteristics which must be satisfied: "(1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." (160 Cal.App.3d at p. 1118.)

In *Foley,* the court held that it was "not convinced that a 'special relationship' analogous to that between insurer and insured" existed in the usual employment relationship so as to justify recognition of a tort remedy for a breach of the implied covenant. (47 Cal.3d at p. 692.) Indeed, the court even suggested that *any* extension of tort remedies to noninsurance cases is not justified given (1) the limited purpose and scope of contract damages, (2) the strong need in our commercial system for predictability of the cost of contractual relationships and (3) the difficulty of formulating a workable test for distinguishing between a simple breach of contract and a "tortious" breach of the implied covenant. (*Id.*, at pp. 683, 699-700.) [FN24]Nonetheless, the Foley court did limit its holding to the employer-employee relationship and did not expressly reject the Wallis definitional efforts; however, it did ***1399** suggest that it is still an open question as to whether "the special relationship model is an appropriate one to follow in determining

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

whether to expand tort recovery." (*Id.*, at p. 692.) FN25

FN24 "If the covenant is implied in every contract, but its breach does not in every contract give rise to tort damages, attempts to define when tort damages are appropriate simply by interjecting a requirement of 'bad faith' do nothing to limit the potential reach of tort remedies or to differentiate between those cases properly and traditionally compensable by contract damages and those in which tort damages should flow. Virtually ... any breach of a contract term ... could provide the basis for a pleading alleging the discharge was in bad faith under the cited standards." (*Foley, supra,* 47 Cal.3d at p. 699.)

FN25 A number of cases, including *Foley,* have concluded that certain relationships are not sufficiently "special" to warrant imposition of a tort remedy for breach of the implied covenant: (1) employer-employee (*Foley, supra,* 47 Cal.3d at p. 693 and at p. 700, fn. 42,disapproved of *Cleary v. American Airlines, Inc., supra,* 111 Cal.App.3d 443 "and its progeny"), (2) commercial grower-grain hauler (*Quigley v. Pet, Inc.* (1984) 162 Cal.App.3d 877, 893 [208 Cal.Rptr. 394]), (3) insurance company-general agent (*Multiplex Ins. Agency, Inc. v. California Life Ins. Co., supra,* 189 Cal.App.3d at p. 938), (4) distributor- vendor (*Premier Wine v. E. & J. Gallo Winery* (9th Cir. 1988) 846 F.2d 537, 540), (5) franchisor-franchisee (*Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 412 [251 Cal.Rptr. 17]; *Eichman v. Fotomat Corp.* (9th Cir. 1989) 871 F.2d 784, 802-803; *Little Oil Co. Inc. v. Atlantic Richfield Co.* (9th Cir. 1988) 852 F.2d 441, 447), (6) limousine rental company-customer (*Rogoff v. Grabowski* (1988) 200 Cal.App.3d 624, 632) [246 Cal.Rptr. 185] (7) bank-commercial borrowers and guarantors (*Price v. Wells Fargo* (1989) 213 Cal.App.3d 465, 476-478 [261 Cal.Rptr. 735]; *Mitsui Manufacturers Bank v. Superior Court* (1989) 212 Cal.App.3d 726, 730-731 [260 Cal.Rptr. 793]; but see *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1369 [229 Cal.Rptr. 16], and *Commercial Cotton Co. v. United California Bank* (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017]) and (8) stockbroker-investor (*Trustees of the Capital Wholesale Electric etc. Fund v. Shearson, Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 624-625 [270 Cal.Rptr. 566]). One court (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 826 [250 Cal.Rptr. 220]) has taken a more general view and suggested that no contractual relationship other than insurer-insured would warrant "special relationship" treatment. Only the relationship of bank and depositor has received any endorsement as meeting the criteria for a "special relationship" (*Commercial Cotton Co. v. United California Bank, supra,* 163 Cal.App.3d at p. 516) and even that has been strongly criticized. (See *Price v. Wells Fargo, supra,* 213 Cal.App.3d at p. 476.)

From this history, it seems clear to us that the recognition of a tort remedy for a breach of the implied covenant in a noninsurance contract has little authoritative support. In fact, with but one arguable exception (see fn. 25) and apart from decisions disapproved by *Foley,* every case which has considered the issue has rejected the recognition of a special relationship between specific contracting parties. However, as the *Foley* court did not see fit to specifically reject the *Seaman's* consideration of the noninsurance special relationship, or the *Wallis* criteria for determining its existence, we decline to do so. Indeed, the *Foley* court's discussion of why the employment relationship was dissimilar to that of insurer and insured essentially relied upon a *Wallis* analysis. (*Foley, supra,* 47 Cal.3d at p. 692.)

More recently, in *Mitsui Manufacturers Bank v. Superior Court, supra,* 212 Cal.App.3d 726, 733, the court discussed similar criteria in concluding that a lender and commercial borrower did not share a special relationship sufficient to justify a tort claim. The court restated the standard to be applied in terms very similar to those used by *Wallis.*"It is the nature of the contract that is critical, whether it reflects unequal bargaining strength ***1400** between the parties, an inadequacy of ordinary contract damages or other remedies, adhesiveness of contract

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

provisions adversely impacting the damaged party which are either neutral toward or benefit the other, public concerns that parties to certain types of contracts conduct themselves in a particular manner, the reasonable expectations of the parties or a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other. There are undoubtedly other significant factors and it may be that not all must be present in every case which might give rise to tort damages." (*Id.* at p. 731.)Whatever the present efficacy of this analytical restatement, we find that plaintiffs here have failed to allege sufficient facts to demonstrate that they satisfy the requirements set forth in either *Wallis* or *Mitsui.*

(13c) This case presents a rather common commercial banking transaction. The plaintiffs, seeking to make a profit motivated investment in the form of a leveraged buyout of a going business entered into arms length negotiations with a unit of a major lending institution. There were no indicia of unequal bargaining here, no adhesive agreements, no indication that one party had any particular advantage over the other. Indeed, it appears that the terms of the central document, the August 25 letter, was the product of meaningful negotiations between the parties. Moreover, it does not appear that plaintiffs were either in a particularly vulnerable position nor in need of any special protection. Finally, ordinary contract damages are obviously adequate to make plaintiffs whole for any compensable misconduct on the part of the defendants.

Under no reasonable perspective of the facts in this case would the *Wallis/Mitsui* standards be satisfied. Given the allegations set out in plaintiffs' second amended pleadings, the "transaction involved here is the quintessentially ordinary arms-length commercial transaction between two parties of equal bargaining strength, breaches of which are adequately remedied by ordinary contract damages." (*Mitsui Manufacturers Bank v. Superior Court, supra,* 212 Cal.App.3d at p. 731.) Whatever may be the viability of the proposition that a bank can have a special relationship with a depositor so as to justify a tort recovery for breach of the implied covenant (see, e.g., *Commercial Cotton Co. v. United California Bank, supra,* 163 Cal.App.3d at p. 516; cf. *Price v. Wells Fargo Bank, supra,* 213 Cal.App.3d at p. 476; see also, *Lee v. Bank of America* (1990) 218 Cal.App.3d 914 [267 Cal.Rptr. 387], including conc. and dis. opn. of Johnson, J., at pp. 922-929), there is neither authority nor reason for according such characterization to the relationship between a bank and a commercial borrower.

Therefore, since it is patently clear that no "special relationship" exists sufficient to support a tort recovery for an alleged breach of the implied ***1401** covenant of good faith, plaintiffs can state no basis for recovery in tort. Moreover, as they have alleged nothing more than a duplicative claim for contract damages, the trial court was correct in sustaining a demurrer to this count without leave to amend.

(2) *Bad Faith Denial of Contract*

As we have already discussed, the *Seaman's* court chose to avoid the difficult question of the nature and extent of a tort remedy for a breach of the implied covenant in noninsurance cases by recognizing a new tort which would not be predicated on a breach of the covenant. (19) It provided such a remedy in those limited cases in which a party "seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Seaman's, supra,* 36 Cal.3d at p. 769). [FN26] The elements of such a tort are (1) an underlying contract, (2) which is breached by the defendant, (3) who then denies liability by asserting that the contract does not exist, (4) in bad faith and (5) without probable cause for such denial. [FN27] ***1402**

FN26 The *Seaman's* court explained its rationale for the recognition of tort liability in these circumstances with this comment. "It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made ' "without probable cause and with no belief in the existence of the cause of action. " ' (*Adams v. Crater Well Drilling, Inc.* (1976) 276 Ore. 789 [556 P.2d 679, 681].) There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court')

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. (See *Jones v. Abriani* (1976) 169 Ind. 556 [350 N.E.2d 635].) Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (36 Cal.3d at pp. 769-770.)

While the Supreme Court in *Foley* did not directly address this comment in *Seaman's,* it is fair to say that it did express considerable skepticism about the viability of a tort recovery which was based upon a defendant's bad faith conduct in asserting a stonewall ("see you in court") defense to an ordinary commercial contract. The court acknowledged that while a test of bad faith could be formulated by requiring both *objective* (no factual basis for an asserted defense) and *subjective* (no good faith belief that asserted defense was reasonable or justified) elements, it would "not serve to limit initiation and prosecution of litigation based on almost any [breach of contract]" (*Foley, supra,* 47 Cal.3d at p. 697, fn. 35.) The court made it clear that, at least in the employment context, it did not favor actions which would be based upon the subjective intentions and state of mind of the breaching party. Such actions, it said, "could rarely be disposed of at the demurrer or summary judgment stage." (*Id.*, at p. 697.)

FN27 It is unfortunate that the *Seaman's* court neither explained or justified why tort liability could be imposed for a bad faith denial of contract existence but not for the bad faith assertion of any other defense. As Judge Kozinski put it, "It is impossible to draw a principled distinction between a tortious denial of a contract's existence and a permissible denial of liability under the terms of the contract. The test-if one can call it such-seems to be whether the conduct 'offends accepted notions of business ethics.' " (*Oki America, Inc. v. Microtech Intern., Inc.* (9th Cir. 1989) 872 F.2d 312, 315 (conc. opn. of Kozinski, J., quoting *Seaman's, supra,* 36 Cal.3d at p. 770).) Such test would seem to be equally applicable to the assertion of *any* defense in bad faith, as the *Seaman's* court may have recognized in its dictum concerning the assertion of the "stonewall defense." (*Seaman's, supra,* 36 Cal.3d at pp. 769-770; see also, fn. 26, *ante*.)

Of these five elements, the last two are the most critical and difficult to demonstrate. The requirement that the defense be asserted in bad faith is a *subjective* issue relating to the defendant's state of mind. Stated in its simplest form, it means that the defendant does not have a good faith belief that the facts relied upon constitute or support a legally tenable defense. The fifth element, the absence of probable cause, means that, on the basis of the facts known to the defendant, the assertion of the defense was not legally tenable; that is, it was neither reasonable nor justified under applicable law. This is an *objective* requirement and requires a consideration of all of the circumstances. (20a) As we conclude that plaintiffs have failed to plead the absence of probable cause and that such failure is fatal to their claim, we limit our discussion to that element.

In our view, the question of probable cause presented here is conceptually no different than it is in the tort of malicious prosecution where the court is called upon "to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis on the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.] Because the malicious prosecution tort is intended to protect an individual's interest 'in freedom from unjustifiable and unreasonable litigation' [citation], if the trial court determines that the prior action was objectively reasonable, the plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant is entitled to prevail." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 878 [254 Cal.Rptr. 336, 765 P.2d 498]; see also, *Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 569-570 [264 Cal.Rptr. 883]; *Klein v. Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 74-75 [259 Cal.Rptr. 149].)

As the Supreme Court put it, the existence or absence of probable cause in a malicious prosecution case is a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

" 'question ... of law to be determined by the court from the facts established in the case.' " (*Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 875, quoting *Ball v. Rawles* (1892) 93 Cal. 222, 227 [28 P. 937].) " '[I]f there is no dispute concerning *the existence of the facts* relied upon to show probable cause, the trial court must then determine as a matter of law whether such undisputed facts do or do not warrant an inference of probable cause.' [Citation.]" (Italics in the original.) ***1403** (*Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 880.) Only if there is a dispute concerning (1) the existence of the facts relied upon to show probable cause or (2) the state of the defendant's belief in, or knowledge of, such facts, would there be any issue as to probable cause which would have to be tried to a jury. (*Id.*, at pp. 879-880.)

We have no trouble in extending the principles applicable to the element of probable cause in malicious prosecution actions to the tort now before us. [FN28]The essential interest which a malicious prosecution action addresses is also present in the context of the tort of bad faith denial of contract. In each case the law seeks to protect a party from the assertion by another of an unreasonable and unjustifiable litigation position. It is immaterial that the offending activity relates in one case to the initiation and prosecution of a legal action and in the other to the assertion of a particular defense. We therefore conclude that the element of probable cause which the plaintiffs here must establish in order to recover is likewise a legal issue, not a factual one.

FN28 The standard in *Sheldon Appel Co.* for probable cause has also been applied in determining the existence of "reasonable cause" to bring an action under the Tort Claims Act for the purpose of making an award of attorney's fees under Code of Civil Procedure section 1038. (*Ramsey v. City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1540 [270 Cal.Rptr. 198]; *Carroll v. State of California* (1990) 217 Cal.App.3d 134, 141-142 [265 Cal.Rptr. 753]; see also, BAJI No. 7.87 (1990 new) and related Use Note.)

Depending on the allegations of a complaint containing a claim for bad faith denial of contract existence, there is no reason why this legal issue cannot be determined by the court on demurrer. This would be most likely to occur in those cases where there are detailed allegations concerning the negotiations for, or formation of, the contract in dispute or where documents are attached and incorporated into the pleadings. (21) For example, where a plaintiff attaches and incorporates a written instrument into a pleading, without alleging that it was ambiguous or subject to some special interpretation, the court is free on demurrer to construe the language and draw its own conclusion as to the legal effect of the instrument. (*Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1561 [260 Cal.Rptr. 237].)

(20b) Here, plaintiffs incorporated the August 25 letter, which can only be construed as a conditional agreement. It is clearly subject to several specific conditions precedent which were required to be satisfied before the defendants would be contractually committed to provide the proposed financing. While plaintiffs allege the making of a number of oral statements by one or more representatives of the defendants to the effect that the ***1404** conditions were satisfied, nowhere is there any direct allegation that any of such conditions, much less all, were ever satisfied. It is also apparent from the pleadings that the defendants dispute the plaintiffs' allegations. In the context of this case, where detailed written documentation and a complicated and sophisticated transaction were clearly contemplated by the parties, defendants should not be compelled to assert their side of such dispute only at their peril.

From plaintiffs' own pleadings, including our construction of the critical August 25 letter, it is clear that there is not only a dispute with the defendants with respect to the satisfaction of significant conditions precedent to liability, but there is a reasonable factual basis for that dispute. Whatever the merits of the competing positions of the parties with respect to just what oral statements were made, there can be no question as to the existence of the factual fabric upon which the dispute is based. In other words, the complaint itself provides a basis for the court to conclude that probable cause exists for the defendants' denial of contractual obligation. Given that plaintiffs' own allegations provided this foundation, they were then required to affirmatively allege additional facts sufficient to demonstrate that (1) defendants' reliance on the failure of such

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

conditions as a basis for their defensive posture was neither reasonable nor justified and thus was not legally tenable or (2) defendants did not have any belief in, or knowledge of, facts which would make their defensive assertion legally tenable. (22)**(See fn. 29.)**Plaintiffs' failure to provide such additional facts is fatal to their cause of action as the absence of probable cause has not been alleged. FN29

> FN29 In our view, this situation is analogous to the complaint which includes allegations indicating the existence of a defense to the claim (e.g., that the statute of limitations has run). In such circumstance, specific facts negating that defense must be alleged. General or conclusionary allegations will not suffice. (*Saliter v. Pierce Brothers Mortuary* (1978) 81 Cal.App.3d 292, 297 [146 Cal.Rptr. 271].)

(20c) Our insistence upon such specific pleading seems amply justified. Without such a requirement, the courts will be faced with general allegations charging this tort in every contract dispute in which liability is denied, and defendants in such cases will be faced with the dilemma of raising a defense to contract liability only at the risk and expense of litigating a tort action. The recognition we give to the rule that the issue of probable cause is a legal one to be determined by the court and that it can be resolved on demurrer where, as here, a complaint demonstrates the factual basis for the defensive position asserted, will serve to limit these cases to only those where a plaintiff can truthfully allege specific facts demonstrating the absence of probable cause. ***1405**

Plaintiffs first asserted this claim in their second amended complaints. Thus, they have not been given any opportunity to provide the additional allegations which we here hold, for the first time, are required. As a result, there has been no fair opportunity for plaintiffs to make the necessary allegations. (*Larwin-Southern California, Inc. v. JGB Investment Co., supra,* 101 Cal.App.3d at p. 635;*Greenberg v. Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470].) Moreover, as we are unable to conclude from the face of the pleading that it is legally incapable of amendment, it would be an abuse of discretion to deny plaintiffs an opportunity to amend the allegations of this cause of action. (*Postley v. Harvey, supra,* 153 Cal.App.3d 280, 287.) Therefore, we conclude that it was error to sustain defendants' demurrer without leave to amend.

. . . . . . . . . . . FN*

FN* See footnote, *ante,* page 1371.

Disposition

The orders of dismissal are reversed as follows:

1. In the *Carrott action,* counts 1, 2, 3, 8 (except as to Torres), 9, 10 and 14 as to Careau only and count 12 as to both Carrott and Careau. Upon remand, the trial court shall permit Careau to amend the allegations in counts 1, 2, 3, 8 (except as to Torres), 10 and 14 of the second amended complaint; and

2. In the *Careau Group action,* counts 1, 2, 3, 8 (except as to Torres), 9, 10 and 12. Upon remand, the trial court shall permit the Careau Group to amend counts 1, 2, 3, 8 (except as to Torres), 10 and 12 of the second amended complaint.

In all other respects, the orders of the trial court are affirmed. Each party shall bear their own costs on appeal.

Klein, P. J., and Hinz, J., concurred. ***1406**
Cal.App.2.Dist.
Careau & Co. v. Security Pacific Business Credit, Inc.
222 Cal.App.3d 1371, 272 Cal.Rptr. 387

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.