# EXHIBIT 6

Westlaw.

239 Cal.App.2d 664                                                                 Page 1
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

▷Conderback, Inc. v. Standard Oil Co. of Cal.,
Western Operations
Cal.App.1.Dist.
CONDERBACK, INCORPORATED, Plaintiff and
Respondent,
v.
STANDARD OIL COMPANY OF CALIFORNIA,
Defendant and Appellant.
**Civ. No. 22563.**

District Court of Appeal, First District, Division 1,
California.
Jan. 27, 1966.

HEADNOTES

(**1**) Building Contracts § 4--Licensing of Contractors-
-Persons Required to Be Licensed.
One who offers, undertakes or contracts in this state
to construct or demolish a building, project or other
improvement located outside California does not
thereby become a contractor within this state subject
to the Contractors' License Law (Bus. & Prof. Code,
§ 7000 et seq). Nor does the fact of the principal
place of his business being in California necessarily
compel a different conclusion.
See **Cal.Jur.2d,** Building and Construction
Contracts, § 26.
(**2**) Accord and Satisfaction § 20--Questions of Fact.
Whether an agreement amounts to an accord and
satisfaction is a question of the parties' intent and
therefore a question of fact.
See **Cal.Jur.2d,** Accord and Satisfaction, § 47;
**Am.Jur.2d, Accord and Satisfaction, § 4.**
(**3**) Accord and Satisfaction § 22--Appeal.
Unless there is a lack of evidence to support a finding
as to whether an agreement amounted to an accord
and satisfaction, the determination of this issue by the
trier of fact will not be disturbed on appeal.

(**4**) Accord and Satisfaction § 19--Evidence.
In an action to recover the balance allegedly due on a
construction contract, the jury could reasonably
conclude that in accordance with the parties' past
practices expenses would be billed until plaintiff
recovered costs and that the parties did not agree a
certain invoice was the final billing where it was
shown that reference in a letter to final billing had

been dictated to plaintiff's office manager by
defendant's representative, that plaintiff signed the
letter assuming it referred to finality of that particular
billing, that defendant's check given in payment did
not indicate its tender as final payment, that
defendant made further payments, and that defendant
had given plaintiff an "open-ended" purchase order
subject to markups in accordance with customary
business practice over a long period.

(**5**) Accord and Satisfaction § 18--Evidence.
Though compromise offers are not admissible in
evidence as such, in an action to recover the balance
allegedly due on a construction contract claimed by
plaintiff to be based on cost plus markup formulas
applied to various items, the court properly held that
discussions between the parties as to the markup
defendant would be willing to pay and plaintiff
would be willing to accept was relevant to whether
the parties had reached an accord and satisfaction as
to the amounts due.

(**6**) Building Contracts § 31--Evidence.
In an action to recover amounts allegedly due on a
construction contract, plaintiff's theory of the case
that its compensation was to be determined according
to a pricing formula in line with customary past
practices did not justify admission of what were
apparently offers by defendant to compromise a
pending dispute and the admission of such evidence
was error, though not prejudicial error.

(**7**) Building Contracts § 31--Evidence.
Evidence of similar contracts between the same
parties establishing a custom, habit or continuing
course of business dealing is admissible to show that
on a particular occasion a thing was done as usual,
and in an action to recover the balance allegedly due
on a construction contract, where it was shown that
defendant conducted its initial discussions and
solicited estimates in line with projected budgeting in
substantially the same manner as it had previously,
the rule did not become inapplicable though the
contract involved a project much larger than previous
jobs.

(**8**) Building Contracts § 31--Evidence.
In an action to recover the amount allegedly due

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

under a construction contract, evidence of the party's course of dealing in the past was admissible to show their true intent as to various billings alleged by defendant to be "final" billings and to give them a meaning to which they were reasonably susceptible.

(**9**) Depositions § 28--Use in Evidence--Admissibility--Part of Deposition.
Though defense counsel, after reading into evidence part of plaintiff's deposition testimony in response to a certain question, objected to admission of the omitted part on the ground that it revealed the deponent's secret intent, and was conclusionary, not responsive and not relevant, plaintiff's counsel, on redirect or at any other appropriate time during plaintiff's case, would have been entitled to read the objectionable portion where it had a bearing on the testimony already read. (Code Civ. Proc., § 1854.)
See Cal.Jur.2d, Depositions, § 62; Am.Jur.2d, Depositions and Discovery, § 108.
(**10**) Depositions § 28--Use in Evidence--Admissibility--Part of Deposition.
Where defense counsel read part of plaintiff's deposition testimony into evidence, it was within the trial judge's sound discretion to require defense counsel to read all of plaintiff's answer to a particular question to obviate immediately any false or distorted impression the jury might receive from a fragmentary introduction.

(**11**) Accord and Satisfaction § 20--Instructions.
Instructions on accord and satisfaction correctly stated the law where the jury was required to determine the existence of accord and satisfaction from all the surrounding circumstances, both oral and written, to decide whether there was a meeting of the minds between the parties, and to find whether both parties knew and intended a final settlement and whether each knew and understood the settlement terms.

(**12**) Appeal and Error § 875(2), 1144(2)--Briefs--Pointing Out Errors—Presumptions--Sufficiency of Evidence.
The appellate court presumes that the evidence sustains each finding of fact, and appellant has the burden to demonstrate no substantial evidence supports challenged findings by setting forth in his brief all material evidence, not merely his own proofs.

(**13**) Appeal and Error § 875(1)--Briefs--Pointing Out Errors.
In urging insufficiency of the evidence, appellant must do more than merely reassert its trial position.

(**14**) Building Contracts § 30--Evidence.
In an action to recover the balance allegedly due on a construction contract, substantial evidence supported a finding that the parties' contract was based on a series of negotiations interpreted by their prior course of dealings, rather than on a firm bid by plaintiff, where it was shown that the letter allegedly setting forth plaintiff's firm bid arose out of an earlier request for estimated costs that defendant required only for budgetary reasons, that the letter was ignored after it was sent with respect to changes in the project and not accepted as a letter agreement by defendant until the project was almost completed, and that defendant would not have stopped the project had the letter not been sent.

(**15**) Building Contracts § 35--Damages.
In an action to recover the balance allegedly due under a contract for construction of a fair exhibit, which plaintiff was to maintain and dismantle, plaintiff could not use an alleged breach by defendant in refusing to permit plaintiff to dismantle the project as a basis for recomputing the charge for maintenance by using a markup formula, where plaintiff had been paid in full for all maintenance services under a separate agreement.

(**16**) Building Contracts § 30--Evidence.
In an action to recover the balance allegedly due on a construction contract for a fair exhibit, though defendant showed that the initial correspondence between the parties did not mention a markup on the design fee, the markup was allowable where the jury accepted plaintiff's general theory that the markup was based on a prior course of dealing between the parties and there was testimony that the markup was to be applied at the end of the job.

(**17**) Damages § 34--Recovery of Interest.
Under Civ. Code, § 3287, interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. The rationale of the rule is that a defendant who does not know the amount he owes and who cannot ascertain it except by accord or judicial process cannot be in default for not paying.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

**(18)** Damages § 42--Recovery of Interest--Computation--Building Contracts.

In an action to recover the balance allegedly due under a construction contract, the allowance of interest prior to judgment was improper where plaintiff, who was presumably familiar with both its own data and pricing formula, arrived at different results in computing the amount owed by defendant and it was not clear that defendant was able to ascertain the exact amount due from data submitted.

## SUMMARY

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Edward Molkenbuhr, Judge. Modified and affirmed.

Action to recover the balance of money allegedly due on a contract to construct and maintain a fair exhibit. Judgment for plaintiff modified and affirmed.

## COUNSEL

Pillsbury, Madison & Sutro, Francis R. Kirkham, Thomas E. Haven and Anthony P. Brown for Defendant and Appellant.

FitzSimmons & Petris, Edward R. FitzSimmons and Roderic Duncan for Plaintiff and Respondent.

SULLIVAN, P. J.

Defendant Standard Oil Company of California (Standard) appeals from a judgment entered upon a jury verdict in favor of plaintiff Conderback, Incorporated (Conderback) in the sum of $154,374.45 with interest and costs.

The action was brought to recover the balance allegedly due on a contract for the construction, designing, maintenance and dismantling of Standard's exhibit at the Seattle World's Fair in 1962. There were two jury trials. On defendant's motion, the cause first proceeded to trial on the issues raised by the separate defenses of account stated, accord and satisfaction and compromise and release set forth *668 in defendant's answer and in the cross-complaint. (Code Civ. Proc., § 597.) By their negative answers to two special interrogatories submitted to them, [FN1] the jury in substance found that the parties had not agreed between themselves at either of the times therein specified as to what was the total amount then due Conderback. The cause then proceeded to a second trial before a different jury on

the main issue dealing with the terms of the agreement entered into by the parties. The jury returned a verdict in favor of Conderback in the amount indicated above. This appeal followed.

> FN1 The special interrogatories were: "1. Did the parties agree between themselves in July or August of 1962 as to the total amount due Conderback, Inc. for the erection of the building and the construction and installation of displays in the building at the Seattle World's Fair; 2. Did the parties agree between themselves in January, 1963, as to all sums due Conderback, Inc. for all work done by Conderback, Inc. for Standard Oil at the Seattle World's Fair."

At all times here material, Conderback was a California corporation engaged in the business of building advertising exhibits. [FN2] It had been organized in 1957 and had its principal place of business in San Francisco. All of its capital stock was owned by Marinus van der Woert and Edward Railsback, its president and vice-president respectively. Prior to the formation of Conderback, Railsback had been continuously employed in the exhibit business since 1935 and had personally done work for Standard since 1939. Van der Woert had worked in the exhibit display business since 1946 and during that time on exhibits for Standard. Both men had been employees together in the same exhibit building firm and were able to acquire some of the accounts, including that of Standard, when the firm ceased doing business.

> FN2 Conderback suspended business activities in July 1963, approximately two months after the commencement of this action on May 13, 1963. It was not a going business at the time of trial.

From the time they organized Conderback, Railsback and van der Woert had continuous business dealings with the advertising department of Standard, approximately 90 percent of the time with either M. A. Mattes, the advertising manager, or Jeff Kersh, an employee in the department. From 1960 until it suspended its operations, Conderback did over 300 jobs for Standard's advertising department. Among these were Standard's exhibits at the California State Fair, which Conderback built each year. Railsback

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

Page 4

considered Standard to be one of Conderback's better accounts. However, prior to the Seattle World's Fair job, the largest job *669 done by Conderback for Standard was at the Portland Centennial involving an expenditure of about $40,000. The Seattle job was 10 times larger than any job Conderback had done for anyone.

In their years of working together on more than 300 jobs, there had never been any litigation between Conderback and Standard over the former's billings. According to their customary way of working together, Conderback would "be notified that there was a job coming up and we had a certain budget to adhere to. We would then come back to the shop and design within this budget and endeavor to hold the budget price that they had given us." An estimate would be given through the use of a basic formula but at the end of the job an adjustment would usually be made based on the same formula to take care of changes and additions. [FN3] This applied to so-called "time and material" business as distinguished from "bid" business which was billed at the bid price. There was testimony that Conderback's methods of estimating and billing were discussed with Standard and that the latter was well aware of them. The increase of the markup on subcontracted work (see fn. 3, *ante*) had also been discussed with Standard who had assured Conderback that this so- called agency markup should and could be used.

> FN3 In general outline, Conderback's standard formula which it had used over the years consisted of the following principal factors: (a) the cost of labor plus a 100 percent markup plus an additional markup for fringe benefits; (b) the cost of materials plus a 50 percent markup; (c) the cost of subcontracted work plus a 10 percent markup "as a rule," subsequently changed to 17.625 percent as an "agency markup" customarily paid agencies by Standard when they supervised subcontractors.

The Seattle World's Fair was scheduled to open on April 21, 1962. In the spring of 1961, Railsback and van der Woert met with Mattes, advertising manager of Standard, to discuss the possibility of having Conderback handle Standard's exhibit at the Fair. Mattes inquired as to whether the project was beyond the "scope" of Conderback and was assured by the latter's representatives that they could handle the job since much of the work would be subcontracted. Mattes was told that because Conderback was a small company and the project was a large one, Conderback would have to bill Standard in advance of any expenditures. Mattes selected Conderback to do the job. There were no other competitive bidders.*670

During these preliminary discussions Mattes advised Conderback that his department had authority for a budget of $230,000 for the project "plus a 10 per cent discretionary factor." [FN4] On July 6, 1961, Conderback wrote to Mattes: "Confirming our discussions ... we believe the exhibit as presented, including tentative individual displays, can be constructed, with minor modifications, for the $230,000.00 budget plus the 10% override." [FN5] This letter was signed by both van der Woert and Railsback and underneath said signatures contained the language "Accepted By Standard Oil Company of California" with space provided for signature and date. Mattes acknowledged acceptance on the same date. Railsback testified that the letter-contract of July 6, 1961, was entered into on the basis of the budgeted amount. The next day, July 7, 1961, Standard, through Mattes, issued its purchase order to Conderback for "Century 21 Exhibit-Seattle," covering exhibit building and displays, but silent as to any specified price. [FN6] At this time there were no plans in existence.

> FN4 This followed a letter of June 15, 1961, from Conderback to Mattes offering an "estimated quotation for budgeting purposes only" of $275,194.

> FN5 The letter further stated that "any major changes from building model or additional mechanical displays, we are sure you will understand, will be confirmed in writing and subject to negotiation" and presented a plan for payment consisting of "a blanket advance progress billing substantiated within 30 days" to be made on the first of each month, payment thereon on the 10th of the month, and "detailed billing for the payment ... by the end of the month." There is testimony that these arrangements were made because Conderback did not have "the cash load to finance this job."

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

FN6 This purchase order is attached to and incorporated by reference in plaintiff's amended complaint which alleges the delivery thereof on July 7, 1961, defendant's promise to pay for labor, material and expenses, plus amounts for overhead and profit, and the delivery on August 10, 1961, of a modification (request for adjustment) of such order. Plaintiff's amended complaint is based solely upon such purchase order and modification.

Conderback started work almost immediately. To design Standard's building at the Fair, it retained one Tepper who was to work directly with Railsback and van der Woert, but who soon "bypassed" them at Mattes' request and worked with the latter who approved the building and all exhibits before Conderback saw them. Conderback also retained an architect and an engineer and entered into a number of subcontracts for the performance of the construction work. The subcontractors billed Conderback for the work done and the latter in turn eventually billed Standard for the same *671 amounts plus a markup for the supervision of the work involved.

The concept of the Century 21 Exhibit as designed within the limits of the initial budget of $230,000 soon started changing and continued to change up to and even after the Fair opened in April 1962. These changes were made principally by Mattes. At first Conderback did not challenge his decisions but finally at the beginning of 1962 the matter "was so far out of hand that ... [Conderback] could never catch up," since it had no control of the budget or the design or the coordination between them. When Railsback raised some question about completing on time the work as modified, Mattes replied "Let's get the job done, we will worry about that later."

At about this time-February 1962-the parties realized that the job had already cost more than the initial budget figure of $230,000. Standard thereupon requested from Conderback a written estimate of the total cost of the job. According to Standard's Whitmore, this was required for budgetary reasons. In compliance with the request, Conderback wrote to Standard on February 12, 1962, giving an itemized breakdown of costs and noting that to date there were

total authorized expenditures of $307,518.12. [FN7]Standard then requested a firm bid on the amount required to finish the job. In reply Conderback on February 26, 1962, sent Standard "our firm bid" for the Century 21 Exhibit in the sum of $351,587.20 based on the detailed breakdown furnished in its letter of February 12, 1962. [FN8]Standard accepted and confirmed this "firm bid" by its letter of March 23, 1962. [FN9]*672

FN7 The letter stated in part: "At the inception of this project, we offered our original estimate to you for $275,000.00. This was subsequently formalized in writing for $253,000.00 and we undertook the project. Since starting the project there has been a series of changes and additions to the project. To date we have written and verbal approval for the following changes and additions" in the amount of $307,518.12 including "Formal estimate" of $253,000 (apparently $230,000 plus the 10 percent override). It concluded: "The changes and additions listed on the above and preceding pages have materially increased our original estimate to you for the entire exhibit. It is hoped that these changes and additions *can be negotiated and approved* as soon as possible so that our delivery date will not be impaired." (Italics added.)

FN8 The letter concluded: "The price is based on designs and details *as planned as of* February 12, 1962. Any *major changes or additions* requested to the project *will be negotiated* and *confirmed to you in writing* before expense is incurred." (Italics added.)

FN9 This is made the basis of Standard's first affirmative defense and of all four counts of its cross-complaint.

The Fair exhibit opened on time. During the next two months, Standard made several requests for a final billing. On June 15, 1962, Conderback's van der Woert wrote Mattes attaching "our breakdown sheets covering expenses incurred by our Company to June 1, 1962." Explaining "over-budget expenditures," [FN10] Conderback requested an opportunity to meet with Mattes and "to negotiate the outcome of these expenditures." "Actual costs as of 6-1-62" were

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

Page 6

scheduled at *$520,134.17* of which $344,465.31 was noted as "paid." Conderback requested payment "at this time" of $137,405.49, which did not include balance of maintenance costs, dismantling costs or State of Washington sales tax.

> FN10 This was attributed to: (1) Conderback's inability to coordinate design with estimated budget; (2) numerous changes to exhibits, art and copy; (3) necessity of quoting in "our February 12, 1962 budget quotation" on many exhibits not then in final design concept.

There ensued a number of meetings between the representatives of the parties. In the meantime Conderback was rceiving invoices after June 1-the cutoff date of their June 15 billing. Standard indicated that it was not willing to discuss these latter invoices at the time. On June 30, 1962, Conderback's van der Woert wrote to Mattes attaching "schedules covering costs ... to June 1, 1962, maintenance costs for the exhibit to October 26, 1962, and costs incurred during the month of June" but holding in abeyance design fees and sales tax. Total actual costs to June 1, 1962, were therein scheduled at $525,134.17, of which the same amount was noted paid as in the June 15 schedule and $109,762.23 was the "additional requested." The parties agreed upon a number of the items for which Conderback thereupon invoiced Standard on July 11, 1962, in the sum of $66,794.01 and was paid. On July 26, 1962, Conderback again invoiced Standard for specified items totalling $39,848.87. [FN11] The invoice was not designated a final billing. Eventually Standard agreed to pay the invoice. Standard's Whitmore testified at the first trial that he wanted a reassurance from Conderback that it was the final payment on the building and exhibits. Railsback on the other hand testified that he attended all the meetings, that he never heard of such a statement and that it was not a condition of the payment of either the July 11 or the July 26 invoice. Defendant's claim is that it specifically conditioned its agreement to pay the July 26 invoice on the receipt of an *673 assurance from Conderback that this was the final billing and that such assurance was received in the form of Conderback's letter of August 2, 1962. [FN12] Standard paid the full amount of the July 26 invoice. There was no indication on the check that it was in final payment.

> FN11 Attached schedules showed $418,759.32 as of July 16, 1962, plus the "Additional Requested" and invoiced of $39,848.87 producing a grand total of $458,608.19, of which $411,259.32 had been paid.

> FN12 This letter to Mattes from van der Woert was embraced within the first special interrogatory at the first trial (see fn. 1, *ante*). It read: "Regarding our invoice 21000-11, dated July 26, 1962, the amount will cover *final billing* for the erection of the building and construction and installation of the displays within the exhibit building. The amount *does not include* maintenance, dismantling, sales tax, additional design fees, nor additional changes to the exhibit since June 1, 1962." (Italics added.)
> Andrew Leong, office manager and accountant for Conderback, gave the following explanation at the first trial as to how the letter came to be written: On August 2, 1962, Standard's Whitmore telephoned him and requested such a letter, even dictating the first sentence. Whitmore gave no indication that this was the agreement of the principals and at the time both Railsback and van der Woert were out of the office. Leong had the letter typed and placed on van der Woert's desk for signature. Van der Woert then signed the letter assuming that it referred to the finality of that particular billing.

Nevertheless, after these events upon which Standard based its claim of final settlement, said defendant paid $1,871.80 to Conderback, most of which represented charges for work done prior to May 28, 1962. Additionally, on September 14, 1962, van der Woert wrote to Mattes "listing the developments to date regarding the following unpaid accounts." [FN13] Eventually in the fall of 1962, Conderback settled its obligations with the designer and its sales tax liability to the State of Washington. Although the parties differ as to the basic contract under which the work was being done, they appear to agree that under either of their respective theories, the total amount to be paid by Standard to Conderback could not be arrived at until the above two liabilities had been

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

determined.

> FN13 This letter referred to three subcontractors and Tepper, the designer. It concluded by stating that Conderback had never included the amounts from the first three to Standard "in our final billing. We feel that if the explanations are satisfactory, we will negotiate with them."

In December 1962, van der Woert telephoned Whitmore, advising that there were some additional bills. [FN14]On January *674 9, 1963, Conderback sent a list totalling $25,878.21, including the sales tax liability of $19,842.11 and thus representing additional items of $6,036.10. [FN15]Whitmore testified that he telephoned van der Woert and told him the items Standard would pay; that Conderback then sent an invoice therefor which Standard returned because it did not contain the words "final billing," and that on January 21, 1963, Conderback sent an acceptable invoice. [FN16]Standard paid the sum of $2,025.13.

> FN14 According to Whitmore, whose testimony is relied upon by both parties on this point, van der Woert said there were a number of items previously understood not to be Standard's responsibility which van der Woert had not been able to negotiate with subcontractors in Seattle. He inquired whether Whitmore "would meet with him and discuss whether or not Standard would be willing to pick up some of these costs because he was going to be stuck with them, and I said yes, I would meet with him, ..." After the meeting, Whitmore requested van der Woert to send a list of the items.

> FN15 The list not in the form of an invoice was captioned: "Standard Oil Company Final Billing Century 21 World's Fair."

> FN16 In the sum of $3,110.19 (later adjusted) and captioned "Re: Standard Oil Company of California final billing, Century 21, World's Fair."

By this time, Conderback's Leong, who had run an audit on the Fair job, had left the company. Railsback had been hospitalized with a serious illness until January 3, 1963, and the two Conderback officers had decided to defer discussion with Standard of the application "of our formula to the costs that we had incurred. ..." [FN17]Railsback and van der Woert, with the help of an outside auditor, then started "to re-audit this job on a complete and thorough basis" in the latter part of January and the first part of February. In early March 1963, they contacted Mattes and asked for an opportunity to present their final bill. A meeting was held at which Conderback submitted and left with Standard for its examination all of the work sheets of the reaudit together with their supporting data. Other discussions followed with Standard's representatives. There was testimony that the manager of Standard's purchase and stores department indicated that after the $230,000 limit of the original purchase order had been passed, the job should have been handled on a cost-plus-*fixed-fee* basis. Conderback indicated it merely wanted its existing formula applied. At one point, Standard's representatives offered a 17.625 percent markup on *675 some of the overall costs of the job which would give Conderback an additional $7,000. Upon its refusal, Mattes telephoned Railsback and "offered a different formula that amounted to $28,000" which was also rejected. Conderback insisted that it wanted its existing formula, which, according to Railsback's testimony, "would have been in the vicinity of $664,000." Conderback then demanded payment of said sum less approximately $494,000 theretofore paid. The demand was rejected and the present action commenced. [FN18]

> FN17 According to plaintiff's contentions made at the pretrial conference and plaintiff's evidence at trial, the sum to be paid plaintiff for the completion of the entire job was to be computed by the following formula: (1) the amount paid by plaintiff to its subcontractors plus a 17.625 percent markup for supervision; (2) plaintiff's own labor costs plus 100 percent markup, plus 19.8 percent of said labor costs to cover fringe benefits, plus an additional 10 percent on the total sum; (3) plaintiff's own cost of materials plus a markup of 50 percent; (4) miscellaneous direct expenditures, e.g., freight and telephone, plus a 10 percent markup; and (5) expenses of plaintiff's officers while in Seattle at $200 a day each (compare customary formula of plaintiff as outlined in fn. 3, *ante*). Railsback testified that by agreement between the parties, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

above formula was to be applied to the contract entered into.

FN18 On May 31, 1963, the amended complaint prayed for judgment in the sum of $171,026.80 ($665,400.85 less $494,374.05 paid).

Standard's first attack is aimed at the very heart of the judgment. It contends that Conderback could not bring or maintain the present action since it was acting in the capacity of a contractor in California without being duly licensed. [FN19]In substance defendant argues that all negotiations and correspondence leading up to the contract between the parties, the contractual arrangements themselves and certain contracts between Conderback and the designer, architect and engineer of the project all took place in San Francisco, where the principals herein and the other persons mentioned all had their respective offices. At the same time Standard admits, as it must, that the building which was the subject of the project was intended to be, and in fact was, constructed outside of the State of California and in the State of Washington and has conceded both in its briefs and at oral argument that its contention is confined to and is predicated solely upon those acts of Conderback which occurred in the State of California.

FN19 This issue was not raised by the pleadings or designated as an issue in dispute in the interlocutory pretrial conference order made before the first trial. At the start of the first trial it was asserted in a trial memorandum filed by defendant. It was thereafter raised in defendant's motion for a judgment notwithstanding the verdict (necessarily made after the second trial) upon denial of which the court stated: "It is my opinion and the Court finds that plaintiff did not have to possess a California Contractor's license for the performance of the work in the State of Washington; ..." Although the issue was timely raised below, "It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue. The court may do so of its own motion when the testimony produces evidence of illegality. [Citation.] It is not too late to raise the issue on motion for new trial

[citation], in a proceeding to enforce an arbitration award [citation], or even on appeal. [Citation.]" (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 148 [308 P.2d 713].)

Section 7028 of the Business and Professions Code [FN20] makes it "*unlawful for any person to engage in the business or act *676 in the capacity of a contractor within this State* without having a license therefor, ..." (Italics added.) Section 7030 at all times material herein provided: [FN21] "Any person who *acts in the capacity of a contractor* without a license is guilty of a misdemeanor." (Italics added.) Section 7026 of said code defines contractor as follows: "The term contractor for the purposes of this chapter is synonymous with the term 'builder' and, within the meaning of this chapter, a contractor is any person, who *undertakes* to or offers to undertake to or purports to have the capacity to undertake to or submit a bid to, or does himself or by or through others, *construct*, ... or *demolish* any *building*, ... or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. The term contractor includes subcontractor and specialty contractor." (Italics added.)

FN20 Hereafter unless otherwise indicated all section references are to the Business and Professions Code.

FN21 Section 7030 was repealed in 1963 and in substance incorporated within section 7028, which was amended at the same time.

Section 7031 provides: "No person engaged in the business or *acting in the capacity of a contractor*, may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract." (Italics added.)

Conderback concedes, and the record shows, that it was not a licensed contractor in California at any time. Its basic position is that the California Contractors' License Law (Bus. & Prof. Code, §§

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

7000-7145) does not extend to construction outside of California although it has not squarely met defendant's argument that Conderback's acts within the state were done in the capacity of a contractor so as to make the law operative against it. Neither of the parties has cited, nor have we found, any case involving a similar question.

It is clear at the outset, as indeed defendant seems to concede, that where a state in the proper exercise of its police power enacts statutes, such as those now before us, regulating a business and requiring a license to be obtained by anyone engaged therein (_Riley v. Chambers_ (1919) 181 Cal. 589, 592-593 [185 P. 855, 8 A.L.R. 418]; _Drummey v. State Board of Funeral Directors_ (1939) 13 Cal.2d 75, 79 [87 P.2d 848]; _In re Fuller_ (1940) 15 Cal.2d 425, 428-431 [102 P.2d 321];*677 _Rosenblatt v. California State Board of Pharmacy_ (1945) 69 Cal.App.2d 69, 72-73 [158 P.2d 199]; _Doyle v. Board of Barber Examiners_ (1963) 219 Cal.App.2d 504, 509-510 [33 Cal.Rptr. 349]), the exercise of this regulatory power is necessarily limited to activities carried on within the territorial limits of such state. (See generally, 53 C.J.S., Licenses, § 6, pp. 464-469; 33 Am.Jur., Licenses, §§ 7-8, pp. 330-332.) Therefore it seems to us that the purpose of any given regulatory statute must be examined in the perspective of such constitutional principle.

In the much cited case of _Howard v. State of California_ (1948) 85 Cal.App.2d 361, 365-366[163 P.2d 11], it was said: "The purpose of the act is to guard the public against the consequences of incompetent workmanship, imposition and deception. In order to procure a license an applicant is required to make a showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business, as the board deems necessary for the safety and protection of the public. (§§ 7068, 7069.) Willful breaches of contract and other willful and fraudulent acts, causing material injury to another, furnish grounds for suspension or revocation of a license. (§§ 7109-7119.) ... The statute in question expresses the judgment of the Legislature that the prospect of having to pay damages for incompetence, fraud and breach of contract, is not an adequate deterrent from wrongful practices in the building trades." Substantially the same views on the

purpose of the Contractors' License Law have been expressed in other cases. (See _Loving & Evans v. Blick_ (1949) 33 Cal.2d 603, 609 [204 P.2d 23]; _Franklin v. Nat C. Goldstone Agency_ (1949) 33 Cal.2d 628, 632 [204 P.2d 37]; _Fraenkel v. Bank of America_ (1953) 40 Cal.2d 845, 848 [256 P.2d 569]; _Bowline v. Gries_ (1950) 97 Cal.App.2d 741, 743 [218 P.2d 806]; _Bierman v. Hagstrom Constr. Co._ (1959) 176 Cal.App.2d 771, 775 [1 Cal.Rptr. 826,82 A.L.R. 1424]; _G & P Electric Co. v. Dumont Constr. Co._ (1961) 194 Cal.App.2d 868, 879-880 [15 Cal.Rptr. 757]; _Steinbrenner v. J. A. Waterbury Constr. Co._ (1963) 212 Cal.App.2d 661, 666 [28 Cal.Rptr. 204].) In _Bowline, supra,_ the court said: "The underlying purpose of the contractor's license law is to protect the general public respecting structural improvements to real property wherein special skill, training and ability are required." (97 Cal.App.2d 741, 743.) In _Fraenkel, supra,_ it *678 was said: "That law was enacted for the safety and protection of the public against imposition by persons inexperienced in contracting work, and for the prevention of fraudulent acts by contractors resulting in loss to subcontractors, materialmen, employees, and owners of structures. [Citations.]" (40 Cal.2d at p. 848.) The same objective of promoting the "safety and protection of the public" by prohibiting inexperienced persons from engaging in contracting work had been emphasized by the Supreme Court in its previous decisions in _Gatti v. Highland Park Builders, Inc._ (1946) 27 Cal.2d 687, 690 [166 P.2d 265] and _Loving & Evans v. Blick, supra._

Examined in the context of these cases, the concern for the public inherent in the statute centers upon building done in California and practices of the building trades in this state (_Howard v. State of California, supra,_ 85 Cal.App.2d 361, 366); it focuses upon all those who may be involved in such building-subcontractors, materialmen, employees and owners (_Fraenkel v. Bank of America, supra,_ 40 Cal.2d 845, 848); and it is thus the motivating influence in the policing of such work and practices for the protection of all concerned. Thus, as the above authorities point out, the law requires that an applicant for a contractor's license "show such degree of knowledge and experience in the classification applied for, and such general knowledge of the _building, safety, health and lien laws of the State_ and of the administrative principles of the contracting business as the board deems necessary for the _safety and protection of the public_" (italics added; § 7068 as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

Page 10

amended in 1963) and makes detailed provision for the investigation of the acts of contractors and for disciplinary proceedings in connection therewith. (§§ 7090-7124.1.) Among the causes and grounds for discipline (§§ 7107-7120) is the "Willful or deliberate disregard and violation of the *building laws of the state,* or of any political subdivision thereof, or of the *safety laws or labor laws or compensation insurance laws or Unemployment Insurance Code of the state,* or violation by any licensee of any provision of the *Health and Safety Code or Water Code,* ..." (Italics added.) (§ 7110 as amended in 1965.)

In our view, it was not the purpose of the Legislature in enacting the Contractors' License Law to bring within its ambit a person who, not otherwise engaged in the contracting business in California, merely enters into negotiations or contracts in this state for a construction work or project in another state or foreign country. The purpose of the law is to**\*679** protect the public in California against incompetent and dishonest persons who do, or offer, undertake or contract to do, building in this state or represent that they have the capacity for such work in California. This objective of the law is insured by inspecting their building practices in this state and holding them accountable for a wilful disregard of California building and other laws. The above purpose and objective are not subserved by making subject to the license law those persons who do not contemplate any construction work in California but merely enter into negotiations and contracts here for construction work to be done outside the jurisdiction of California and beyond the reach of its building laws. By way of illustration, the legislative purpose would not be furthered in the instant case if we were to hold that a contractor duly licensed by the State of Washington would be required to have a California contractor's license before he could meet, negotiate and contract with Standard at the latter's offices in San Francisco for the construction of Standard's exhibit at the World's Fair in Seattle. We venture to say that many corporations of national and international size and scope of operations with executive and administrative offices located in this state negotiate and contract here for the construction of buildings and projects in other states and in foreign countries. It could not have been reasonably intended by the Legislature that all persons thus dealing with such corporations would be required to qualify for and obtain a California contractor's license. Nor could it have been

reasonably intended that since they were subject to the Contractors' License Law, there was thereupon imposed upon the Contractors' State License Board (§§ 7000; 7011-7013; 7090-7098) the insuperable burden of investigating and passing upon the building practices of such persons all over the world. Basically, Conderback is in no different position.

(1) We hold that where, as in the instant case, a person offers, undertakes or contracts in this state to construct or demolish a building, project or other improvement located outside of California, such person does not thereby become one engaged in the business or acting in the capacity of a contractor within this state so as to be subject to the Contractors' License Law. Nor does the mere fact that, as here, such person's principal place of business is in California necessarily compel a different conclusion.

Defendant refers us to **\*680**_Lewis & Queen v. N. M. Ball Sons_ (1957) 48 Cal.2d 141 [308 P.2d 713], as authority for its proposition that the site of the actual construction work is immaterial since plaintiff did much of the administrative work for the Seattle project in San Francisco. But defendant takes the emphasized language of *Lewis & Queen* out of its context. That case involved physical work of construction *within* California and the point of the language relied upon by defendant was that in respect to such work it was intended by the Legislature that the partner-contractor who had charge of the administrative functions of the business should qualify under the law just as much as the partner-contractor who supervised the actual work of construction. There is nothing inconsistent between this holding and the conclusion we have reached herein.

Standard next contends that according to the undisputed evidence the parties after the completion of the job reached an agreement as to the amounts due Conderback which Standard promptly paid and that Conderback is bound by "the account stated by it and by the accord and satisfaction reached." It will be recalled that these and other special defenses were the subject of the first trial at which a jury returned a verdict rejecting them. It is now urged that there is no evidence supportive of such verdict and that this case is controlled by _Potter v. Pacific Coast Lumber Co._ (1951) 37 Cal.2d 592 [234 P.2d 16] and _Creighton v. Gregory_ (1904) 142 Cal. 34 [75 P. 569]. Although

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

Standard broadly states that all three of its special defenses are established on the record, it confines its argument and authorities to the defense of accord and satisfaction.

This defense is defined by <u>Civil Code sections 1521</u> and <u>1523</u>: "An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." "Acceptance, by the creditor, of the consideration of an accord extinguishes the obligation, and is called satisfaction."

(2) The question whether an agreement amounts to an accord and satisfaction is one of the intention of the parties and is therefore a question of fact. (<u>Lapp-Gifford Co. v. Muscoy Water Co.</u> (1913) 166 Cal. 25, 27 [134 P. 989]; <u>Dietl v. Heisler</u> (1961) 188 Cal.App.2d 358, 363 [10 Cal.Rptr. 587]; <u>Dunlap v. Bellah</u> (1960) 184 Cal.App.2d 579, 585 [7 Cal.Rptr. 766]; <u>Moore v. Satir</u> (1949) 92 Cal.App.2d 809, 812 [207 P.2d 835]; <u>D. E. Sanford Co. v. Cory Glass etc. Co.</u> (1948) 85 Cal.App.2d 724, 730 [194 P.2d 127]; *681<u>Owens v. Noble</u> (1946) 77 Cal.App.2d 209, 215 [175 P.2d 241];<u>Carpenter v. Pacific States S. & L. Co.</u> (1937) 19 Cal.App.2d 263, 268 [64 P.2d 1102,66 P.2d 656]; <u>Everhardy v. Union Finance Co.</u> (1931) 115 Cal.App. 460, 466 [1 P.2d 1024].) (3) Unless there is a lack of evidence to support the finding of the trier of fact, its determination of this issue will not be disturbed on appeal. (<u>Everhardy v. Union Finance Co., supra</u>;<u>Kinkle v. Fruit Growers Supply Co.</u> (1944) 63 Cal.App.2d 102, 112 [146 P.2d 8]; <u>Moore v. Satir, supra</u>;<u>Dunlap v. Bellah, supra</u>.)

(4) In the instant case, the evidence pertinent to the events and transactions allegedly constituting the accord and satisfaction was in conflict. In the first place, as we have seen, Standard's witnesses maintained that it agreed to pay the invoice of July 26, 1962, only on condition it receive "reassurance" that it was the final payment on the building and exhibits and that such reassurance was given by Conderback in its letter of August 2, 1962 (see fn. 12, ante). On the other hand, Conderback's witness Railsback testified that he attended all of the meetings out of which the accord is supposed to have arisen and that there was no condition affixed to the payment of the invoice. Conderback also introduced testimony explaining how the letter of August 2 happened to be sent (see fn. 12, ante). According to

Conderback's witnesses, Standard's Whitmore dictated the crucial opening sentence of the letter to Conderback's office manager giving no explanation that this understanding had been reached between the parties and thereafter van der Woert signed the letter on the assumption that it referred to the finality of the particular billing. [FN22]Standard's check did not indicate it was tendered in full and final payment.

> FN22 Conderback's invoice of July 26, 1962, set forth a column of 16 items, with amounts of billing for only six items, the columnar spaces opposite the others being left blank. The six items billed totalled $39,848.87. Attached to the invoice are detailed schedules covering the same 16 items with a series of columns headed "Amount as of 7/16/62," "Additional Requested," "Total," "Amount Paid," "Amount Requested," "Amount to be Billed." The invoiced amount of $39,838.87 appears as a footing in the columns "Additional Requested" and "Amount Requested."

A second and more significant consideration however is the fundamental issue raised by the parties as to the exact nature of their contractual arrangements. As we have set forth above, Standard's evidence was directed to establishing its central thesis that the work was being done on the basis of Conderback's firm bid of February 12, 1962, plus the costs of *682 any changes or additions thereafter occurring to be negotiated between the parties. Conderback's evidence, on the other hand, was directed to supporting its position that in accordance with the customary business methods employed by the parties over a long period of time, Standard had given Conderback for the Fair Exhibit what amounted to an "open-ended" purchase order to which Conderback's customary formula was to be applied in calculating the amount due. (See fns. 3, 17, ante.)Thus the divergent theories of case advanced by the evidence of the respective parties pervade and affect the subsidiary issue of accord and satisfaction. Conderback's evidence on the main issue of the case, to the effect that the firm bid of February 12, 1962, had been superseded by the many additions and changes and that Conderback was to be compensated under an open-ended purchase order by application of a pricing formula, establishes that all expenses were

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

to be computed and billed from time to time and necessarily supports the inference that a billing for an "additional requested" amount was not a final billing for the project as a whole.

Events transpiring after the alleged accord and satisfaction of July and August 1962 fall into the same pattern of plaintiff's evidence. As to these, there was evidence that in September 1962 Standard made a further payment to Conderback; that in the same month the latter sent Standard a list of developments relating to unpaid accounts; that in December 1962 the parties had discussions in connection with additional bills, quite apart from the tax liability; and that Standard made a payment in February 1963.

From all of the foregoing evidence introduced by Conderback, the jury could reasonably conclude that the parties did not agree that the July 26 invoice was to be a final billing and that its payment by Standard was to constitute full payment for the building and exhibits, but could conclude that the various items of expense were to be billed from time to time until Conderback, in accordance with the parties' customary practices in the past, had been paid for all costs of the project.

The *Potter* and *Creighton* cases relied upon by defendant do not declare rules of law different from those set forth by us herein. They are distinguishable on their own facts from the case before us and hold that upon evidence which is neither in conflict nor reasonably susceptible of conflicting inferences the respective creditors therein knew or of necessity**683** must have known that payment was in full satisfaction of all amounts claimed to be due.

We turn to consider defendant's three claims of error in the admission of evidence.

(5) 1. At the first trial on the separate defenses Railsback testified on direct examination concerning discussions had with Mattes in the spring of 1963 about Conderback's most recent billing and the formula applicable to it. Railsback was then asked if Mattes approached him with a new formula of his own to which defendant's counsel interposed that "possibly we are getting into objectionable area" and "whether or not Standard offered to help these people out to a certain extent in April would be a matter which would be excluded from evidence" and "I

don't think that they should get into any offers made by Standard." Plaintiff's counsel stated that "this isn't a settlement negotiation" and "We are not asking for offers." The court observed that in considering whether or not there was a settlement in July or August 1962, the jury could consider what transpired thereafter and overruled the objection. The witness thereupon testified as set forth in the footnote. [FN23] At the second trial the same evidence was admitted over defendant's objection that it was "an offer of settlement." Plaintiff's counsel stated "This isn't an offer of settlement. This is introduction now of a different formula after years of dealing." Standard now claims it was prejudiced before both juries.

> FN23 Railsback testified: "In the meeting the day before they had offered us-this group of nine people, as I recall, had offered us a 17.625 markup on the over-all cost of the job. This amounted to, well, none on the overall costs on some balance of it. It amounted to $7,000, which we refused. Mr. Mattes called the ensuing morning, called me personally and offered a different formula that amounted to $28,000, which I also refused."

The rule is well established that offers in compromise are not admissible in evidence as such. (*People ex rel. Dept. of Public Works v. Forster* (1962) 58 Cal.2d 257, 263 [23 Cal.Rptr. 582, 373 P.2d 630] and cases cited therein; Code Civ. Proc., § 2078; 4 Wigmore on Evidence (3d ed.) § 1061, p. 28; Witkin, Cal. Evidence (1958) p. 182; McCormick on Evidence, pp. 157-158, 539.)

As we think the trial judge properly held at the first trial, evidence of discussions between the parties in 1963 was relevant on the issue then before the jury (see fn. 1, *ante*) of whether there had been an accord and satisfaction between them in July or August 1962. (See *684Owens v. Noble, supra,* 77 Cal.App.2d 209, 215.) Plaintiff's counsel there stated that his purpose in introducing such evidence was not to elicit evidence of offers in compromise. At no time did defendant's counsel request an instruction to the jury limiting the purpose for which the evidence might be considered. (See *Hatfield v. Levy Brothers* (1941) 18 Cal.2d 798, 810 [117 P.2d 841]; *Daggett v. Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 665-666 [313 P.2d 557].) In any event, the first trial

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

was limited to the issues raised by the special defenses. In our view, the admission of the evidence at the first trial was not error.

(6) The problem at the second trial is a more difficult one since, as we have said, plaintiff's theory of case was that it was to be compensated according to a pricing formula and in line with customary practices in the past. In our view, this theory did not justify the admission of what were apparently offers to compromise the then pending dispute and the admission of such evidence was error.

However, even assuming that the admission of the evidence at the first trial was error, neither such error nor the error at the second trial appears to us to be prejudicial in the light of the entire record. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

(7) 2. At the first trial evidence was admitted, over defendant's objection, to the effect that prior to 1960 plaintiff had lost money on several jobs it had done for Standard and that in some cases Standard paid plaintiff more money on being apprised of the loss. This evidence of a course of dealing in the past was offered to show the contractual arrangements in the instant matter and to negate the existence of a firm bid contract. Evidence of other similar contracts between the same parties establishing a custom, habit or continuing course of business dealing is admissible as showing that on a particular occasion the thing was done as usual. (*Roberts Distributing Co. v. Kaye-Halbert Corp.* (1954) 126 Cal.App.2d 664, 676 [272 P.2d 886]; 2 Wigmore, *op. cit.*, § 377, p. 307; McCormick, *op. cit.*, p. 347; 31A C.J.S., Evidence, § 180, pp. 457-458.) We cannot agree with Standard that this rule became inapplicable in the instant case because the Seattle project was much larger than previous jobs. The record indicates that in respect to the Seattle job Standard conducted its initial discussions and solicited estimates in line with projected budgeting in substantially the same manner as it had on previous occasions.*685

(8) Defendant also argues, without citation of any cases, that even though the above evidence is deemed proper as showing a prior course of dealing, it was nevertheless inadmissible since it contradicted the express provisions of the "final" billings. Considering the billings as instruments of a contractual nature, nevertheless the evidence did not contradict but

rather interpreted them by showing the true intent of the parties and giving the instruments a meaning to which they were reasonably susceptible. It was admissible for such purpose. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Hulse v. Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; *Coast Bank v. Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Imbach v. Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; Code Civ. Proc., § 1860; Rest., Contracts, § 235(d).)

(9) 3. At the first trial defendant's counsel read into evidence portions of the testimony of Railsback given at a deposition taken by defendant in which the witness was asked to explain alleged discrepancies in costs in various documents already before the jury. Railsback testified that he could not explain in detail without records but could explain "in generalities." In the course of this explanation he stated in the deposition that because of Conderback's need for funds, "we would take and let go, things we were negotiating at that moment ... to get some money that would keep us going until next time. Having had past experience, long years of past experience with Standard I felt sure this would be adjusted fairly and squarely in the ultimate negotiations that followed jobs of this nature."

The deposition testimony then continued: "Q. [By defendant's counsel] And you say you prepared this thing and let go of certain sums, is that right? A. Yes, that is right."

Upon the request of plaintiff's counsel and the order of the court, defendant's counsel was then required, over his objection, to read the rest of the last answer as set forth in the footnote. [FN24]

> FN24 Mr. Brown, defendant's counsel, then read the following complete answer: "Yes, that is right. Putting them off, may I say, putting off certain sums or certain portions of certain sums, hoping that and trusting that they would do as we had previously been on jobs of this nature. I said that this fell into four general areas."

Defendant contends that the admission of the rest of the *686 answer was error since the witness' "secret

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

intent" was conclusionary, not responsive and irrelevant. However, the objectionable portion of the answer had some bearing upon the testimony already read and plaintiff's counsel, upon redirect examination or at any other appropriate time during plaintiff's case, would have been entitled to read such portion into evidence himself. (Code Civ. Proc., § 1854;[FN25] *Rosenberg v. Wittenborn* (1960) 178 Cal.App.2d 846, 852 [3 Cal.Rptr. 459] and authorities there collected; Witkin, *op. cit.*, pp. 677-678; McCormick, *op. cit.*, p. 132; cf. *Zibbell v. Southern Pac. Co.* (1911) 160 Cal. 237, 250 [116 P. 513]; *Bacon v. Grosse* (1913) 165 Cal. 481, 490 [132 P. 1027].)

> FN25 Code Civ. Proc., § 1854, provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence."

(10) It was also within the sound discretion of the trial judge to require defendant's counsel to read all of the answer in order to obviate immediately any false or distorted impression the jury might receive from a fragmentary introduction. McCormick states the applicable rule in this situation as follows: "[T]he prevailing practice seems to permit the proponent to prove any relevant part that he desires. It seems, however, that to guard against the danger where it exists of an ineradicable false first impression, the adversary should be permitted to invoke the court's discretion to require the proponent to prove so much as relates to the fact sought to be proved, that is, all that is relevant to explain or is needed in interpreting the part proved." (McCormick, *op.cit.*, pp. 131-132.) The trial court did not abuse its discretion in the instant case. Furthermore, we cannot see how defendant could have possibly been prejudiced anyway since its counsel, just prior to the answer in dispute, had read into evidence similar testimony (quoted by us above) as to what Railsback "felt" would be done by Standard.

(11) Standard further complains that the court's instructions to the first jury on accord and satisfaction compounded the claimed error since, while stating that accord and satisfaction depended on the mutual intention of the parties, it failed to state that such intention must be determined by the words and actions of the parties and that subjective motives must be disregarded. The point is without *687 merit. An examination of the instructions referred to[FN26] satisfies us that they are correct statements of the law and that, contrary to defendant's claim, they *do* state that the intention of the parties "must be determined from all the circumstances, both *oral* and *written*" (italics added). We do not see how the jury could have been misled into believing that they were to consider also the secret intentions of Railsback.

> FN26 The instructions in question are: "You are instructed that question of the existence of an accord and satisfaction depends upon the intention of the parties, which must be determined from all the surrounding circumstances, both oral and written. There must be a meeting of the minds between the parties to an accord, whether there was an accord in this case, is a question for you as jurors to decide."
> "For there to be a valid accord and satisfaction you must find that both parties knew and intended that a final settlement was taking place and that each knew and understood the terms of the settlement."

Standard next contends that there is no evidence to support the verdict of $154,374.45 or any part thereof. The gist of the argument in support of this point seems to be this: that the so-called "firm" bid of February 26, 1962, constituted the contract between the parties and the jury by its verdict in effect disregarded the firm bid and re-evaluated the job on a time and materials basis. Standard seems content to confine its argument to these assertions and within this narrow range. Its responsibility in urging a total insufficiency of evidence extends much further. (12) "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

[citations]; ..." (*Davis v. Lucas* (1960) 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479].)

We have already alluded to the central issue raised by the parties as to the contractual arrangements entered into between them. This was spelled out in detail by the second pretrial conference order. It is apparent that at the second trial the jury found in favor of plaintiff's theory of case and rejected defendant's theory of case. (13) It follows therefore that in urging the insufficiency of the evidence defendant must do more than merely reassert its position at the trial.

(14) We have carefully examined the record and the **\*688** exhibits and we are satisfied that with the exceptions hereinafter noted there is substantial evidence as set forth by us above to support a finding that the so-called firm bid did not constitute the contract between the parties but that their agreement must be found in a series of negotiations and arrangements interpreted in the light of their prior course of dealing. Supportive of the conclusion that the letter of February 26, 1962, did not constitute the contract between the parties is the following, among other, evidence in the record: that it arose out of an earlier letter of February 12, 1962, giving an estimate of the total cost of the job which Standard required only for budgetary reasons; that by this time Conderback had already been doing work on the job for seven months on the basis of a previous budget figure in accordance with the parties' prior course of dealing, as we have set forth *supra*.; that the initial budget figure had already been exceeded; that the bid of February 26, 1962, was "based on designs and details as planned as of February 12, 1962"; that nevertheless after it was sent it was quickly ignored in respect to any changes in the project; that it was not "accepted" by Standard until March 23, approximately one month before the Fair opened, by which time most of the project had been completed and more than the $351,000 amount of the bid had either been paid by Standard to Conderback or already committed on the job; and finally that, as Whitmore testified, Standard was not about to stop Conderback's performance of the project if the February 26 letter had not been sent.

In its fifth contention on appeal Standard asserts that the inclusion in the judgment of amounts for maintenance [FN27] and a markup on the design fee is contrary to the undisputed evidence.

FN27 Maintenance was a "24-hour round-the-clock service" at the Fair building by three of Conderback's employees throughout the course of the Fair. They would keep the building up, clean it, "work on things, be called at any time to repair, etcetera."

(15) As to the first item, the record shows without contradiction that, as defendant claims, the maintenance of the project was under a *separate* contract and that Conderback had been paid in full for all such services. Standard points out to us that notwithstanding this clear testimony, an amount for maintenance of $40,412.91 as calculated according to the formula advanced by plaintiff was erroneously submitted to the jury. After deduction of the sum of **\*689** $31,769.60 admittedly paid in full for maintenance under the separate agreement, this would leave, according to Standard, an excessive amount of $8,641.31. Plaintiff has not questioned these figures either in its briefs or at oral argument but attempts to justify the amount on the basis that Standard did not permit Conderback to dismantle the project. The gist of this argument is that originally Conderback billed its maintenance at cost because it was going to do the dismantling work and, when it was not permitted to do so, it then recomputed the maintenance work using its formula. This point has no merit. Conderback's representative testified that Conderback had been paid for all maintenance services under a separate agreement. It cannot use an alleged breach to create additional maintenance charges in this matter. The inclusion of the sum of $8,641.31 was improper.

(16) As to the design fee, Standard contends that the parties did not intend that Conderback should have a markup and that as a consequence an excessive amount of $6,609.37 is included in the judgment. We cannot agree. Although Standard points to initial correspondence in which no mention is made of a markup on the design fee, there was testimony that the markup was to be applied at the end of the job. This was a part of plaintiff's general theory of case, involving the prior course of dealing between the parties which the jury passed upon favorably to plaintiff.

Finally Standard contends that the court erred in awarding interest on the judgment from the date of

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

filing the original complaint. [FN28]

> FN28 The judgment on the verdict provides for "interest thereon at the rate of seven percent (7%) per annum from the date the obligation became due, being the date of the filing of the Complaint in this action, being May 13, 1963, ..."

Civil Code section 3287 provides in relevant part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, ..." ([17]) Under this section interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. (*Lineman v. Schmid* (1948) 32 Cal.2d 204, 212 [195 P.2d 408,4 A.L.R.2d 1480];*Coughlin v. Blair* (1953) 41 Cal.2d 587, 604 [262 P.2d 305].) The rationale of such rule is that where a defendant does not know what *690 amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it. (*Cox v. McLaughlin* (1888) 76 Cal. 60, 70 [18 P. 100, 9 Am.St.Rep. 164]; *Chase v. National Indemnity Co.* (1954) 129 Cal.App.2d 853, 865 [278 P.2d 68].) However, when the exact sum of the indebtedness is known or can be ascertained readily the reason suggested for the denial of the interest does not exist. (*Courteney v. Standard Box Co.* (1911) 16 Cal.App. 600, 615 [117 P. 778].) If the amount owing can be calculated and determined from statements rendered by the plaintiff to the defendant and those statements are found to be true and correct, it is a matter of mere calculation and prejudgment interest can be awarded. (*Anselmo v. Sebastiani* (1933) 219 Cal. 292, 301 [26 P.2d 1].) " 'A dispute as to the price agreed, or as to the amount of work done or its cost, will not prevent the allowance of interest. ... Where the data necessary to determine the amount due are supplied to the debtor by an invoice or statement, he will be charged with interest for failure to pay.' " (*Anselmo v. Sebastiani, supra,* 219 Cal. 292, 301-302;*Ansco Const. Co. v. Ocean View Estates, Inc.* (1959) 169 Cal.App.2d 235, 239 [337 P.2d 146] and cases there collected.)

([18]) In the instant matter, at least according to plaintiff's theory of case which the jury accepted, there is no single contractual document in which the sum due or the means of calculating it are clearly provided for. Indeed, according to plaintiff's theory, compensation is predicated on an "open ended" purchase order involving application of a pricing formula and negotiations between the parties, all in accordance with a prior course of dealing. We detect an inherent complexity in the process. The applicable test then is whether the exact sum found to be due plaintiff was known to defendant in that it was certain or capable of being made certain by calculation. (See *Gray v. Bekins* (1921) 186 Cal. 389, 399 [199 P. 767]; *Perry v. Magneson* (1929) 207 Cal. 617, 623 [279 P. 650].) Standard could not determine what was owing until it had received from plaintiff some statement with supporting date from which it could make the determination. Conderback argues that after it presented its final bill in March 1963 it submitted its invoices, shop records and books to Standard. We are not persuaded that defendant was able to ascertain the exact amount due from this data, since plaintiff, who was presumably familiar with both its own data and its own pricing formula, arrived at several different *691 results. [FN29]Indeed, as previously mentioned, Conderback's principals, apparently concluding that their previous efforts at billing had not achieved certitude, as late as the latter part of January 1963 undertook a complete reauditing of the entire project. In the course of the reaudit, a Conderback accountant made a miscalculation resulting in a figure $16,652.35 in excess of the amount subsequently admitted by Conderback as the true amount. It is noteworthy that in its original complaint Conderback prayed for general damages in the sum of $139,256.92; in its amended complaint in the sum of $171,026.80; in its bill of particulars in the same amount; and that finally at the trial in June 1964, it amended its prayer to the sum of $154,374.45, for which a verdict was returned. We do not believe that under all the circumstances it can be said that the exact sum due Conderback could have been readily ascertained by Standard. We conclude that the allowance of interest prior to judgment was improper.

> FN29 When asked at the trial to explain these divergent results, Railsback testified: "We were at the time, I believe, auditing or in the course of auditing the job as a whole, and *these figures would change, I would dare say if they were audited today, they would change again.*" (Italics added.)

239 Cal.App.2d 664
239 Cal.App.2d 664, 48 Cal.Rptr. 901
**239 Cal.App.2d 664**

The judgment is modified by deducting therefrom the sum of $8,641.31 and by eliminating therefrom interest on the judgment from the date of the commencement of the action to the date of entry of judgment on the verdict and as thus modified the judgment is affirmed. Plaintiff is to recover its costs on appeal.

Molinari, J., and Sims, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied March 22, 1966.

Cal.App.1.Dist.
Conderback, Inc. v. Standard Oil Co. of Cal., Western Operations
239 Cal.App.2d 664, 48 Cal.Rptr. 901

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

65 Cal.App.4th 631                                                                          Page 1
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

▷
CrossTalk Productions, Inc. v. Jacobson
Cal.App.2.Dist.
CrossTalk PRODUCTIONS, INC., et al., Plaintiffs
and Appellants,
v.
STEVEN JACOBSON, Defendant and Respondent.
**No. B116366.**

Court of Appeal, Second District, Division 2, Cali-
fornia.
Jul 16, 1998.

SUMMARY

Two individuals and their corporation filed an ac-
tion against a television executive (their former
boss), arising out of the termination of their con-
tract to supply the television company with promo-
tional video spots after they reported to the com-
pany that defendant, who had approved the con-
tract, had coerced plaintiffs into paying him a
monthly sum (presumably to protect their contract).
The trial court sustained defendant's demurrer
without leave to amend, on the theory that the al-
legations in the complaint established as a matter of
law that the individual plaintiffs had committed
commercial bribery as defined in Pen. Code, §
641.3, and that such an offense would necessarily
establish a defense of unclean hands. (Superior
Court of Los Angeles County, No. BC172852,
Richard P. Kalustian, Judge.)

The Court of Appeal reversed with directions to va-
cate the order sustaining the demurrer without leave
to amend and to allow plaintiffs leave to amend.
The court held that the allegation in the complaint
that plaintiffs believed that they had no reasonable
alternative under these circumstances but to accede
to defendant's demand in order to secure their con-
tract with the company, did not establish as a matter
of law that plaintiffs were guilty of commercial
bribery. The trial court apparently interpreted the
word secure as meaning to obtain, procure, get, ac-
quire or gain. However, it can also mean to
"protect, guard or safeguard." If used in the latter
sense, it did not establish that any bribe was paid to
obtain the contract. The court further held that the
facts alleged did not otherwise establish that
plaintiffs were guilty of commercial bribery, as the
complaint did not necessarily demonstrate any in-
tent on plaintiffs' part that the company not receive
the full benefit of a market value bargain or that
plaintiffs obtained the contract improperly. The
court held that the facts alleged, liberally construed
with a view to doing substantial justice, showed
that plaintiffs' actions (paying defendant) were mo-
tivated by the realistic fear of losing their contract,
that there was no moral turpitude involved in
plaintiffs' ultimate decision to refuse further pay-
ments, and that defendant was guilty of the greater
moral fault as he instigated the illegal payment pro-
gram. Also, any ambiguity in the complaint argu-
ably indicating bribery by plaintiffs could be cured
by amendment. (Opinion by Zebrowski, J., with
Fukuto, Acting P. J., and Nott, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1a, 1b)** Pleading § 24--Demurrer to Complaint-
-Grounds--Affirmative Defense.
When a demurrer is based upon an affirmative de-
fense, the defense must clearly appear on the face
of the complaint. The demurrer cannot properly be
granted where the defense might bar the action, but
does not necessarily do so. Nor is a demurrer the
appropriate procedure for determining the truth of
disputed facts or what inferences should be drawn
where competing inferences are possible. In a case
of unclean hands, a demurrer does not require that
the plaintiff admit the legal conclusion that his or
her conduct was wrongful.

**(2a, 2b)** Equity § 4--Grounds and Subjects of Re-
lief--Unclean Hands-- Construction of Complaint-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                                                    Page 2
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

-Commercial Bribery--Coerced Payment to Protect Contract.

In an action by two individuals and their corporation against a television executive (their former boss), arising out of the termination of their contract to supply the television company with promotional video spots after they reported to the company that defendant, who had approved the contract, had coerced plaintiffs into paying him a monthly sum (presumably to protect their contract), the trial court erred in sustaining defendant's demurrer without leave to amend on the ground of unclean hands. The allegation in the complaint that plaintiffs believed that they had no reasonable alternative under these circumstances but to accede to defendant's demand in order to secure their contract with the company, did not establish as a matter of law that plaintiffs were guilty of commercial bribery (Pen. Code, § 641.3). The trial court apparently interpreted the word "secure" as a meaning to "obtain, procure, get, acquire or gain." However, it can also mean to "protect, guard or safeguard." If used in the latter sense, it did not establish that any bribe was paid to obtain the contract.

**(3a, 3b)**Equity § 4--Grounds and Subjects of Relief--Unclean Hands-- General Principles.

Unclean hands is not one but rather a number of doctrines, each dependent for their substance on the context of application. One is not barred from recovery for an interference with his or her legally protected interests merely because at the time of the interference he or she was committing a tort or a crime. Regardless of whether a plaintiff was committing a tort or even a crime at the time his injury occurred, the question is the same: whether under the circumstances there should be an application of that rule of equity which denies relief to one party against another when both have been engaged in a fraudulent transaction. An exception to the unclean hands doctrine allows a party relief even if that party has been guilty of wrongdoing. The exception can apply if the party seeking relief is the one least at fault. The rule is ordinarily invoked where the party seeking relief is not a free moral agent, and

participation in the wrongdoing is the result of the undue influence, menace, or duress of the other party. Whether there is a bar depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.

**(4)** Bribery § 5--Evidence--Commercial Bribery.

In an action by two individuals and their corporation against a television executive (their former boss), arising out of the termination of their contract to supply the television company with promotional video spots after they reported to the company that defendant, who had approved the contract, had coerced plaintiffs into paying him a monthly sum (presumably to protect their contract), the facts alleged did not establish that plaintiffs were guilty of commercial bribery (Pen. Code, § 642.3). The complaint did not necessarily demonstrate any intent on plaintiffs' part that the company not receive the full benefit of a market value bargain or that plaintiffs obtained the contract improperly.

**(5)** Contracts § 5--Consent--Economic Duress:Words, Phrases, and Maxims-- Economic Duress.

The doctrine of economic duress can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract. The party subjected to the coercive act, having no reasonable alternative, can then plead economic duress to avoid the contract. When a party pleads economic duress, that party must have had no reasonable alternative to the action it seeks to avoid (generally, agreeing to a contract). If a reasonable alternative was available, and hence there was no compelling necessity to submit to the coercive demands, economic duress cannot be established. Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might sub-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

mit.

**(6)** Interference § 6--Interference With Prospective Economic Advantage.

The tort of intentional interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another that fall outside the boundaries of fair competition. The elements of the tort include (1) the existence of a prospective business relationship containing the probability of future economic rewards for the plaintiff; (2) the defendant's knowledge of the existence of the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual causation; and (5) damages to the plaintiff proximately caused by the defendant's conduct. The general wrong inherent in this tort is the unlawful interference with a business opportunity through methods which are not within the privilege of fair competition. To plead this theory, the plaintiff must also plead that the defendant engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.

**(7)** Equity § 4--Grounds and Subjects of Relief--Unclean Hands--Coerced Payment to Protect Contract.

In an action by two individuals and their corporation against a television executive, their former boss, arising out of the termination of their contract to supply the television company with promotional video spots after they reported to the company that defendant, who had approved the contract, had coerced plaintiffs into paying him a monthly sum (presumably to protect their contract), the trial court erred in sustaining defendant's demurrer without leave to amend on the ground of unclean hands. The facts alleged, liberally construed with a view to doing substantial justice, showed that plaintiffs' actions were motivated by the realistic fear of losing their contract, that there was no moral turpitude involved in plaintiffs' ultimate decision to refuse further payments, and that defendant was guilty of the greater moral fault as he instigated the illegal payment program. Any ambiguity in the complaint arguably indicating bribery by plaintiffs could be cured by amendment.

[See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 12.]

COUNSEL

Fox & Spillane, Gerard P. Fox, Cynthia A. Vroom and Anne E. Kearns for Plaintiffs and Appellants.

Heller & Edwards and Lawrence E. Heller for Defendant and Respondent. *635

**ZEBROWSKI, J.**

This case concerns the sustaining of a demurrer without leave to amend on grounds of unclean hands. Plaintiffs are CrossTalk Productions, Inc. (CrossTalk), and Jeffrey Keith and Steven Cross (the individual plaintiffs). [FN1] Defendant is Steven Jacobson (defendant). CBS Incorporated (CBS) was also a defendant, but is not a party to this appeal. The trial court sustained the demurrers of both defendant Jacobson and former defendant CBS without leave to amend, and entered a judgment of dismissal. Plaintiffs appeal only the dismissal as to defendant Jacobson.

> FN1 All three plaintiffs are collectively referred to as "plaintiffs" where appropriate in the context involved.

I. Standard of Review and Summary of Disposition.

A demurrer is treated as admitting all material facts properly pleaded, but not " 'contentions, deductions or conclusions of fact or law.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) "... we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.]" (*Ibid.*) The complaint must be liberally construed

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631

65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813

**65 Cal.App.4th 631**

with a view to substantial justice between the parties. (Code Civ. Proc., § 452.)

(1a) Here, the demurrer was based upon an affirmative defense (unclean hands). In such a case, the affirmative defense must clearly appear on the face of the complaint in order to support a demurrer. A demurrer based on an affirmative defense cannot properly be sustained where the action *might* be barred by the defense, but is not *necessarily* barred. (See, e.g., *Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339] [statute of limitations defense].) Nor is a demurrer the appropriate procedure for determining the truth of disputed facts or what inferences should be drawn where competing inferences are possible. (*Ramsden v. Western Union* (1977) 71 Cal.App.3d 873, 879 [138 Cal.Rptr. 426].)

The complaint here did contain a factual ambiguity. If this ambiguity is construed one way, the ruling and dismissal by the trial court would be correct. Construed the other way, however, the ruling and dismissal by the trial court were clearly incorrect. The complaint otherwise contained no fatal **\*636** defects. Since the complaint could easily have been amended to cure the ambiguity and to state a claim on which relief could be granted, the dismissal as to defendant Jacobson must be reversed.

II. Factual and Procedural Background.

A. *Allegations of the complaint.*

The following facts, alleged in the complaint, must be accepted as true. The individual plaintiffs are the founders of plaintiff CrossTalk. Prior to, and for a period after, the incorporation of CrossTalk, the individual plaintiffs were employed by CBS Television Network. [FN2] Defendant Jacobson was at that time CBS's "Vice President, Advertising and Promotion (West Coast)." While employed at CBS, the individual plaintiffs reported directly to defendant Jacobson, who was their "boss" and had the ability

to terminate their employment.

FN2 The CBS Television Network is a division of former defendant CBS.

In late March of 1996, the individual plaintiffs approached defendant with the idea of forming an "outside" company to contract with CBS to supply video promotional spots. Defendant's responsibilities at CBS included selecting outside vendors, "overseeing" vendor contracts, and approving contract payments to vendors. Defendant would select the vendor, negotiate the terms of the contract, and approve the final contract. Even if a vendor contract exceeded defendant's "final authority" dollar level (and the signature of defendant's superior was hence required), defendant decided which vendors to select and defendant's superior "routinely approved" his decision. The individual plaintiffs asked defendant if they might be able to negotiate such a contract with CBS. Defendant's response was affirmative.

On or about April 25, 1996, the individual plaintiffs met with defendant and his superior to make a formal request "to be considered for an exclusive contract with CBS for the production of video promotional spots." Defendant's superior approved the request and "directed [defendant] to prepare the contract." Defendant and his superior asked the individual plaintiffs to remain at CBS until replacements could be hired. "At or about this point" the individual plaintiffs "let it be known to management" they would be leaving CBS to form CrossTalk.

The next day, defendant told plaintiff Keith that he wanted CrossTalk to "help him out" by paying him $500 a month, because he had done the individual plaintiffs a "favor." By this time, defendant knew that the individual plaintiffs had notified management that they were leaving and "had **\*637** staked their entire future on CrossTalk's deal with CBS." In considering defendant's demand, the individual plaintiffs knew that defendant had the ability to "kill" the contract CrossTalk was negotiating with

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                                    Page 5
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

CBS, and the power to terminate the contract once the individual plaintiffs were "out on their own." Defendant was also still the individual plaintiffs' "boss," and had the power to terminate their employment before they could start up CrossTalk.

Defendant's demand "shocked and dismayed" plaintiff Keith. Although he did not believe he and plaintiff Cross owed defendant (or CBS) anything other than their continued hard work, he told defendant that he would speak with plaintiff Cross. The individual plaintiffs then attempted to "rationalize" defendant's demands as a form of "help" to defendant and his department. The individual plaintiffs believed defendant "stood in a position of power and control" over them, and had their economic future "in his hands." They were intimidated by defendant's status at CBS and his power over the contract and all potential CrossTalk projects. CBS had not yet provided the "promised contract," and the individual plaintiffs feared they would lose both the contract and their jobs if they refused, or told anyone of, defendant's demand.

Plaintiff Keith was "greatly distressed, and felt as though a gun were being put to his head." Plaintiff Cross was also "very distressed." Both individual plaintiffs "believed, to their great distress, that they had no reasonable alternative under these circumstances but to accede to [defendant's] demand in order to *secure* CrossTalk's contract with CBS." (Italics added). Accordingly, plaintiff Keith returned to defendant's office and "reluctantly" agreed to pay. (The use of the term "secure" in the complaint apparently figured prominently in the ruling of the trial court below.)

The individual plaintiffs then incorporated CrossTalk. The CrossTalk/CBS contract, although dated "[a]s of May 15, 1996," was not actually executed (by defendant's superior and the individual plaintiffs) until July, with performance to begin on August 1. Under the agreement, CrossTalk would work exclusively for CBS for two years, in exchange for a guaranteed minimum number of projects.

The individual plaintiffs were unable to leave CBS prior to the August 1 start date. Plaintiff Keith therefore asked defendant if the $500 payments could begin the following month. Defendant agreed, but plaintiff Keith's "perception" was that defendant was expecting a payment soon "or the contract would be in jeopardy." The individual plaintiffs believed this was defendant's means of doing business, and the "price of admission being *638 charged by the person CBS empowered to preside over outside vendors." The individual plaintiffs still feared that the contract "on which they had staked their entire livelihood after leaving their jobs at CBS," would be imperiled if they did not make the payments demanded by defendant. Plaintiff Keith therefore delivered the first $500 to defendant on September 4, 1996, "under duress and believing that they had no other choice." He "tried to summon the strength to confront [defendant] ... but the reality of defendant's position of power and authority, and the oppressive nature of his office, caused [plaintiff Keith] to fold under defendant's control and to accede to his demands."

Although plaintiff Keith delivered additional $500 payments to defendant in October and November 1996, the individual plaintiffs heard through a separate source that defendant wanted to cancel the contract. They consequently became even more fearful of the consequences of failing to pay. In December, when plaintiff Keith called to discuss billing on a project for which CrossTalk sought additional compensation, defendant said he wanted his payments increased to $1,000. Plaintiff Keith explained that CrossTalk could not afford that sum. Defendant appeared to become angry and stated that nonpayment would be "unacceptable."

After being advised that CrossTalk could not pay his increased demands, defendant began to fail to respond to plaintiff Keith's work-related communications, which made CrossTalk's performance under the contract difficult. On December 20, plaintiff Keith delivered to defendant $300 in cash and $200 in gift certificates he hoped would "pass" as the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                Page 6
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

fourth payment. Defendant then claimed there were a number of "problems" with CrossTalk's projects. Although other CBS representatives had voiced satisfaction with CrossTalk's work, plaintiff Cross learned that defendant had been overheard suggesting that CrossTalk "would not be with CBS much longer." On January 16, 1997, the individual plaintiffs met with defendant and were given a letter detailing alleged "problems" with CrossTalk's work which had to be resolved to avoid cancellation of the contract.

The individual plaintiffs believed they were being "set up" and that the identified "problems" were "merely props for defendant's staged threat." On January 17, believing that defendant was about to terminate the contract, but unable to afford the $1,000 payments, the individual plaintiffs told CBS about defendant's demands, "along with his threat to cancel the contract after CrossTalk indicated it could not pay the increased amount."

CBS then terminated defendant (giving him a substantial "settlement" payment) in March of 1997. By letter dated May 15, 1997, CBS stated it was *639 terminating CrossTalk's contract "on the basis of the admitted wrongdoing of Jeffrey Keith and Steve Cross."

### B. Plaintiffs' theories and defendant's demurrer.

Plaintiffs' complaint advanced three theories against defendant. The first, entitled "Economic Duress," alleges that defendant "wrongfully employed economic duress in demanding and receiving payments ...." The individual plaintiffs also asserted claims for intentional and negligent infliction of emotional distress. The complaint alleges that defendant abused his authority and power "with the recognition and desire" that such acts would result in severe emotional distress, or in the alternative, that defendant, as an officer of CBS, "owed a duty of due care" in dealing with plaintiffs, which he breached, resulting in damage to reputation and career development. Defendant demurred to all three

causes of action for failure to state a claim upon which relief could be granted, arguing each claim was barred by the affirmative defense of "unclean hands." [FN3]

> FN3 Defendant separately demurred on the ground that "economic duress" is merely a "defense," which cannot be asserted as a cause of action. The record does not reflect a ruling on this ground.

The trial court sustained the demurrers without leave to amend, on the theory that the allegations in the complaint established as a matter of law that the individual plaintiffs had committed "Commercial Bribery" as defined in Penal Code section 641.3, and that such an offense would necessarily establish a defense of unclean hands. Judgment of dismissal was entered and this appeal followed.

### III. Discussion.

### A. The complaint's use of the word "secure" cannot support the demurrer.

(2a) The facts alleged, liberally construed with a view to doing substantial justice between the parties (Code Civ. Proc., § 452), do not necessarily establish a defense of unclean hands as a matter of law. This case presents no exception to the general rule that application of the doctrine of unclean hands is a question of fact. (*Insurance Co. of North America v. Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306 [180 Cal.Rptr. 244]; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726-727 [39 Cal.Rptr. 64].) An examination of the facts alleged here leaves ample room for a verdict in favor of plaintiffs.

The complaint alleges that plaintiffs believed "that they had no reasonable alternative under these circumstances but to accede to [defendant's] demand *640 in order to secure CrossTalk's contract with

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                  Page 7
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

CBS." (Italics added.) The trial court apparently interpreted the word "secure" in the sense of "obtain, procure, get, acquire or gain." "Secure," however, can also mean "protect, guard or safeguard." Applying the meaning first stated above, the complaint could be read to mean that the individual plaintiffs paid defendant a bribe in order to obtain CrossTalk's contract with CBS. If that is what the individual plaintiffs did-pay a bribe to obtain a contract-then the doctrine of unclean hands would apply to bar their claim for damages caused by losing that very contract.

The individual plaintiffs argue, however, that the word "secure" was used in the complaint in the second sense noted above. Applying the second sense, the complaint alleges that the individual plaintiffs were forced to accede to defendant's extortionate demands in order to safeguard the finalization of a contract which had already been negotiated between CBS and CrossTalk, and which would be finalized without incident in the absence of extortionate interference by defendant. This "safeguarding" was necessary, according to a fair reading of the complaint, only because of defendant's extortionate threats. If what actually happened here is the second scenario-an extortionate scheme perpetrated by defendant to take advantage of plaintiffs' vulnerable position-there appears to be no authority which would bar plaintiffs from recovering against defendant merely for trying to avoid the damage which might follow if defendant's extortionate threats were carried out. So long as no bribe was paid to obtain CrossTalk's contract with CBS, and the contract was hence awarded on the merits, the moral culpability of defendant would be far and away greater than any which would attach to CrossTalk and the individual plaintiffs. The defendant would then not be shielded by the individual plaintiffs' failure to resist his extortionate demands. To construe the doctrine of unclean hands otherwise would be to transform the doctrine into protection for extortionists. Unclean hands is an equitable doctrine. The proposition that it is not equitable to protect extortionists against liability for the injuries caused to their victims should not require an elaborate defense.

Ironically, this case would probably not be on appeal had counsel chosen some word other than "secure" to describe what happened. Or, the entire passage in which the word "secure" appears could have been deleted without detracting materially from the complaint. The complaint alleges that the plaintiffs "had no reasonable alternative under these circumstances but to accede to [defendant's] demand in order to *secure* CrossTalk's contract with CBS." (Italics added.) If this passage had been ended with a period after the word "demand," this appeal might have been unnecessary. While precision is generally a virtue, counsel drafting a complaint can hardly be expected to *641 anticipate that a word such as "secure" will be construed as necessarily constituting an adverse admission, much less that leave to amend will then be denied. Courts should not sustain demurrers without leave to amend based on such ambiguities. Instead, leave to amend should be granted to clarify the ambiguity.

### B. *The Blain test for unclean hands.*

Since the doctrine of unclean hands is heavily fact dependent, it is a uniquely poor candidate to support a demurrer. Nevertheless, there have been unusual situations in which a defense of unclean hands has been established solely by the allegations of the complaint. (See, e.g., *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048 [272 Cal.Rptr. 250].)*Blain* recently examined the unclean hands doctrine in detail. (3a) The court recognized that "unclean hands" is not one but rather a number of doctrines, each "*dependent for their substance on the context of application.*" (*Id.* at p. 1059, italics added.) For example, the court quoted with approval the Restatement Second of Torts section 889: " 'One is not barred from recovery for an interference with his legally protected interests *merely* because at the time of the interference he was committing a tort or a crime ....' " (222 Cal.App.3d at p. 1060, it-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                                                        Page 8
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

alics in original.) Regardless of whether a plaintiff was committing a tort or even a crime at the time his injury occurred, the question is the same: whether " ' "*under the circumstances* there should be an application of that rule of equity which denies relief to one party against another when both have been engaged in a fraudulent transaction .... " ' " (*Id.* at p. 1062, italics in original; *Clark v. Millsap* (1926) 197 Cal. 765 [242 P. 918].) Finding no bright line theory of application, the court stated: "We glean from this sparse product that whether there is a bar depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." (*Blain, supra,*222 Cal.App.3d at p. 1060.)At least one court has referred to this three prong analysis as "the *Blain* test." (See *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 618-619 [12 Cal.Rptr.2d 741].)

Defendant relies heavily on *Blain.*In *Blain*, plaintiff doctor was suing his lawyer for legal malpractice. The doctor alleged that he had suffered damages by lying at a deposition, allegedly on the advice of his lawyer, in a lawsuit in which he was being sued for medical malpractice. The question was whether unclean hands precluded the doctor's action against the lawyer for legal malpractice. Reviewing the doctor's amended complaint in conjunction with more candid allegations in his original complaint, the court found: "On this reading Blain alleges that *he* committed serious misconduct which was the cause of his injuries. This leads to consideration of the law of *642 unclean hands." (*Blain v. Doctor's Co., supra,*222 Cal. App. 3d at p. 1058, italics in original.) The *Blain* court found that under the doctrine of unclean hands, plaintiff had no cause of action for injuries necessarily caused by his own misconduct: "Blain's emotional distress, if any, is attributable to his own knowing misbehavior. Even the most naive must know that lying under oath is illegal.... [T]he relationship of misconduct to harm in this case is direct and not incidental. The misconduct was, so it is alleged, the instrumentality of harm." (*Blain, supra,*222 Cal.App.3d at p.

The court similarly disposed of Blain's claim to have lost the ability to practice medicine, finding his misconduct "inherently involved" that risk. (*Id.* at p. 1064.)

*Blain* does not compel the conclusion that plaintiffs are barred from suing for the allegedly extortionate actions of defendant. The first prong of the "*Blain* test" is analogous case law. Defendant has cited no authority finding unclean hands generally to be a defense to claims for extortion or "economic duress" in other factual circumstances, or generally to be a defense to claims for intentional or negligent infliction of emotional distress. Defendant's authorities merely confirm that application of the unclean hands doctrine depends upon the circumstances of the case, the nature of the claims asserted, and comparison of the parties' conduct-factual inquiries. "[I]t is not every wrongful act nor even every fraud which prevents a [plaintiff] from obtaining relief." (*Fibreboard Paper Products v. East Bay Union of Machinists, supra,*227 Cal.App.2d at p. 728.)

The second prong of the "*Blain* test" requires examination of "the nature of the misconduct." Defendant argues in this vein that plaintiffs' allegations necessarily constitute an admission of bribery. However, whether plaintiffs did or did not admit bribery would be immaterial *if* the facts alleged otherwise necessarily established bribery. (1b) A demurrer on the ground of unclean hands does not require that the plaintiff admit the legal conclusion that his conduct was wrongful. (*Blain v. Doctor's Co., supra,*222 Cal.App.3d at p. 1058.)(2b) And, as discussed above, the use of the word "secure" cannot be interpreted as a binding admission of bribery. Focusing on *Blain*'s second prong, the "nature of the misconduct," here the allegations show that defendant instigated the misconduct and that the moral blame attributable to him far outweighs any attributable to plaintiffs. Hence *Blain*'s second prong does not support an unclean hands defense on these allegations.

The final prong of the *Blain* test requires examina-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                                                    Page 9
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

tion of the relationship between plaintiff's misconduct and the claimed injuries. Here, plaintiffs allege that they reasonably feared loss of a legitimately obtained contract, *643 which constituted their sole source of support, if defendant carried out his alleged extortionate threats. To forestall this possibility, they initially paid defendant what he demanded in order to induce him not to carry out his threats. When defendant's demands escalated, and plaintiffs consequently advised CBS of what had occurred, they suffered the very injury they sought to avoid by acceding to defendant's extortionate demands-loss of CrossTalk's contract with CBS. A fair inference could be drawn that the underlying cause of the damage to plaintiffs was defendant's extortionate demands. The allegations here are unlike the situation in *Blain.* Here, plaintiffs had nothing to gain by paying defendant other than forestalling conduct in which defendant had no right to engage. In *Blain,* the plaintiff attempted to avoid liability by lying. This instant situation as alleged is not analogous.

### C. *Commercial bribery.*

(4) The allegations of the complaint do not compel the conclusion that plaintiffs necessarily committed commercial bribery. (Pen. Code, § 641.3.) [FN4] The commercial bribery statute provides that either (1) an "employee" who solicits or receives money or anything of value (other than in trust for his "employer"), "corruptly" and in return for using his position to benefit another person, or (2) the person who offers or gives the "employee" money or anything of value "under those circumstances," is guilty of commercial bribery. (*Ibid.*) "Corruptly" is defined to mean the person "specifically intends to injure or defraud" either his own employer, the employer of the person on the other side of the transaction, or a competitor of "any such employer." (*Id.,* subd. (d)(3).) The facts alleged here do not necessarily establish that plaintiffs intended to injure or defraud anyone. The alleged facts are that plaintiffs initially obtained CBS's agreement to a contract *644 untainted by any payment or agree-

ment to pay defendant. Although plaintiffs subsequently feared "losing" the "promised contract," and paid defendant to "secure" the contract, the complaint alleges the contract was "approved" before any demand for payment by defendant. The complaint does not necessarily demonstrate any intent on the part of plaintiffs that CBS not receive the full benefit of a market value bargain or that plaintiffs obtained a contract improperly. It is therefore questionable whether the allegations can be construed as an admission of commercial bribery, since intent to injure or defraud CBS is absent if CBS was intended to receive full market value, and could not have obtained any better service elsewhere.

> FN4 Penal Codesection 641.3 provides in pertinent part:
> "(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.
> "............................"
> "(d) For purposes of this section:
> "(1) 'Employee' means an officer, director, agent, trustee, partner, or employee.
> "(2) 'Employer' means a corporation, association, organization, trust, partnership, or sole proprietorship.
> "(3) 'Corruptly' means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631                                                                  Page 10
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

value, or (D) a competitor of any such employer."

### D. *"Economic duress," duress generally, and related theories.*

(5) The doctrine of "economic duress" can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract. (*Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158 [204 Cal.Rptr. 86].) The party subjected to the coercive act, and having no reasonable alternative, can then plead "economic duress" to avoid the contract. The instant case directly concerns not economic duress, but instead an allegation of extortion. Plaintiffs, however, used the term "economic duress" in their complaint, and the parties have consequently briefed the subject extensively. The economic duress cases do appear to be the type of "analogous case law" referenced in the first prong of the *Blain* test, and the treatment of the "reasonable alternative" issue in the economic duress cases is instructive.

When a party pleads economic duress, that party must have had no "reasonable alternative" to the action it now seeks to avoid (generally, agreeing to a contract). If a reasonable alternative was available, and there hence was no compelling necessity to submit to the coercive demands, economic duress cannot be established. Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit. (See, e.g., *Louisville Title Ins. Co. v. Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 802 [132 Cal.Rptr. 63].) Clearly this inquiry is a factual one, rarely if ever susceptible to determination on demurrer. Similarly, in applying the *Blain* test (three prongs: examining analogous case law, the nature of plaintiffs' misconduct, and the relationship of plaintiffs' misconduct to plaintiffs' injuries), it might be asked whether plaintiffs' conduct was

coerced, or whether plaintiffs had a reasonable alternative.

(3b) Plaintiffs also cite the related concept of an exception to the unclean hands doctrine which allows a party relief even if that party has **\*645** been guilty of wrongdoing. The exception can apply if the party seeking relief is the one "least at fault." The rule is ordinarily invoked where the party seeking relief is not a "free moral agent," and his participation in the wrongdoing is the result of the undue influence, menace or duress of the other party. (See, e.g., *Belling v. Croter* (1943) 57 Cal.App.2d 296, 304-305 [134 P.2d 532].) As one court described "duress" in a related context (a suit to set aside a settlement which was allegedly the product of threats to reveal "secret" unfavorable information): "The question of duress ... is a factual question; the existence of duress always depends upon the circumstances." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1078 [267 Cal.Rptr. 457].)

Defendant argues there is no cause of action for "economic duress." It appears, however, that the Supreme Court has noted a general "right ... to be free from acts constituting duress" (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 202 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]) and the propriety of a "cause of action for wrongful acts in the nature of duress ...." (*Id.* at p. 203.) Such duress may consist of threats to business or property interests. (*Ibid.*) The "wrongful act" must be sufficiently coercive to cause a reasonably prudent person to be faced with no reasonable alternative but to "succumb." Examples of such "wrongful acts" include the assertion of a claim known to be false, a bad faith threat to breach a contract or a threat to withhold a payment. (*Rich & Whillock, Inc. v. Ashton Development, Inc., supra,* 157 Cal.App.3d at p. 1159.)

In *Rich & Whillock*, a "start up" corporation sued on a contract and was required to argue the economic duress doctrine to avoid being barred from recovery by a release it had signed in order to ob-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813
**65 Cal.App.4th 631**

Page 11

tain a reduced payment under the contract. Although there was no "affirmative" claim pleaded for "economic duress," the court's discussion of the basis for the doctrine provides support for the proposition that claims such as "economic duress" can be asserted offensively. "The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics.... They include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value.... The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing." (*Rich & Whillock, Inc. v. Ashton Development, Inc.*, *supra*,157 Cal.App.3d at p. 1159.)

Moreover, allied theories are potentially applicable to the facts alleged here. Plaintiffs' allegations do not negate the possibility of amendment to state a cause of action for interference with prospective economic advantage, **\*646** for example. (6) "The tort of intentional ... interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition. [Citation.]" (*Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757].) " 'The elements of the tort include (1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct. [Citation.] The general wrong inherent in this tort is the unlawful interference with a business opportunity through methods which are not within the privilege of fair competition. [Citation.]' " (*PMC, Inc. v . Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 595 [52 Cal.Rptr.2d 877].) To plead this theory, a plaintiff must also plead that the defendant "engaged in con-

duct that was wrongful by some legal measure other than the fact of interference itself" (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740]), but that is certainly within the scope of the allegations here. Although, as a general proposition, this theory is unavailable against a party to the contract or relationship from which the anticipated economic advantage would arise (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *Kasparian v . County of Los Angeles* (1995) 38 Cal.App.4th 242 [45 Cal.Rptr.2d 90]), and generally corporate officers acting on behalf of the corporation cannot be held liable for interfering with the employer's contracts (see *Marin v. Jacuzzi* (1964) 224 Cal.App.2d 549, 553-554 [36 Cal.Rptr. 880]), these protections may not apply to defendant if it can be shown that he was acting not for CBS, but for himself. (See *Aalgaard v.Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 684 [274 Cal.Rptr. 81].)

E. *The Jacobs case.*

The case of *Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692 [62 Cal.Rptr.2d 446] is also instructive as part of the "analogous case law" forming the first prong of the *Blain* test. The plaintiff in *Jacobs* was a marketing director for four residential developments in San Diego. In addition to his salary, he received a commission for every escrow closed. Shortly after his employment began, he learned that his employer was rebating a portion of the purchase price on federally financed sales. These rebates resulted in federal lenders financing a higher percentage of a purchase price than the federal limit of 80 percent. The plaintiff protested, but his employer continued the practice. Fearing that he would be fired if he complained **\*647** further, the plaintiff ceased his complaints and continued working. He subsequently initialed and forwarded to his superiors 12 purchase offers containing illegal rebates, and received commissions on the sales that followed. Later, his employer advised the plaintiff that henceforth the plaintiff would have to act as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

broker of record for the company's sales in San Diego. The plaintiff responded that he would not act as broker of record on sales including an illegal rebate, and was fired. He sued. His employer moved for summary judgment based on the affirmative defense that the plaintiff and his employer were "in pari delicto," and that the plaintiff was consequently barred from using the judicial process for redress. The trial court granted the motion. The plaintiff appealed. The appellate court reversed.

The *Jacobs* court stated that "[i]n pari delicto means, '[i]n equal fault; equally culpable or criminal; in a case of equal fault or guilt.' (Black's Law Dict. (6th ed. 1990) p. 791, col. 1.) According to Witkin, '[h]e who comes into equity must come with clean hands.* A court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both parties are *in pari delicto*.' (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 8, p. 684, original italics.) The doctrine ' "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks redress, however improper may have been the behavior of the defendant." ' (*Id.* at pp. 684-685.) 'In California, the doctrine of unclean hands may apply to legal as well as equitable claims [citation] and to both tort and contract remedies. [Citations.]' (*Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 638 [41 Cal.Rptr.2d 329].)

"In *Norwood v. Judd* (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24 [209 P.2d 24], the court discussed the doctrine's applicability in the following oft-quoted passage: 'The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But courts should not be so enamored with the Latin phrase *"in pari delicto"* that they blindly extend the rule to every case where illegal-

ity appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be *648 applied.' " (*Jacobs v. Universal Development Corp., supra,*53 Cal.App.4th at pp. 699-700.)

The *Jacobs* court went on to find that the employer had failed to meet its burden on a summary judgment motion of proving its entitlement to judgment as a matter of law, because its evidence showed only that the plaintiff "while consistently protesting to his immediate supervisors-acquiesced in [the employer's] illegal rebate program because he presciently feared being fired if he did not. [The plaintiff] is not suing to enforce the terms of an illegal agreement, and he need not rely on any culpability of his own to prove entitlement to tortious discharge damages.... [¶] ... [¶] ... Any illegal conduct of [the plaintiff] is completed, not executory, and this action is not founded on any illegal or immoral act of [the plaintiff]. While [the plaintiff's] conduct cannot be condoned, it was motivated by the realistic fear of losing his job, and thus his initialing of purchase offers including illegal rebates and accepting the standard $125 commissions on such sales, did not involve reprehensible moral conduct. Certainly, there was no moral turpitude involved in [the plaintiff's] ultimate refusal to participate in [the employer's] rebate program, and to the contrary an employee initially acquiescing in his employer's criminality should be encouraged to cease such activity and not left without recourse when he is consequently fired. [The employer] was guilty of the greatest moral fault as it instigated the illegal rebate program, proceeded with it over [the plaintiff's] protests, and then abruptly fired him after he refused further participation. And, finally,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

65 Cal.App.4th 631

65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813

**65 Cal.App.4th 631**

application of the doctrine would unjustly enrich [the employer] and violate fundamental public policy by allowing it to condition continued employment on criminal conduct." (*Jacobs v. Universal Development Corp.*, *supra*,53 Cal.App.4th at pp. 701-703.)

(7) The instant case is analogous. Plaintiffs in the instant case do seek damages for the loss of CrossTalk's contract with CBS, and thus indirectly do seek-in effect-to enforce that contract. However, if the contract was not obtained by bribery, plaintiffs are not seeking-even indirectly-to enforce a contract obtained by illegal means. As in *Jacobs,* there are no illegal executory acts to be performed. Similar to *Jacobs*, plaintiffs' actions (paying defendant) were motivated by the "realistic fear of losing" their contract with CBS. (53 Cal.App.4th at p. 702.)The same as in *Jacobs,* there was no moral turpitude involved in plaintiff's ultimate decision to refuse further payments, and defendant "was guilty of the greatest moral fault as it instigated the illegal [payment] program." (*Ibid.*) Finally, just as in *Jacobs,* allowing defendant to escape liability would unjustly enrich defendant and would allow defendant to condition continued employment on acquiescence to his extortionate demands. Thus although *Jacobs* was a wrongful termination case, while the instant case pleads in essence a claim of interference *649 with contract or prospective economic advantage, the reasoning of *Jacobs* supports the allowance of a remedy in the instant case as well. Considering *Jacobs* as part of the analogous case law making up the first prong of the *Blain* test for unclean hands, neither *Blain* itself nor *Jacobs* supports a defense of unclean hands on the allegations in plaintiffs' complaint.

### IV. Conclusion.

As the discussion above demonstrates, the "secure" problem can easily be cured by amendment, and the face of the complaint does not otherwise necessarily establish a case of commercial bribery. The three prongs of the *Blain* test were not established

by the pleadings, and a defense of unclean hands therefore cannot support a demurrer here. Plaintiffs can easily choose a label other than "economic duress" for their theory that defendant caused them to lose their contract with CBS. Hence there is ample basis for successful amendment and possible eventual recovery against defendant. It was therefore error for the trial court to sustain the demurrer without leave to amend.

### V. Disposition.

The judgment of dismissal is reversed with directions to vacate the order sustaining the demurrer without leave to amend and to allow appellants leave to amend. Plaintiffs (appellants) to recover costs on appeal.

Fukuto, Acting P. J., and Nott, J., concurred. *650 Cal.App.2.Dist.

CrossTalk Productions, Inc. v. Jacobson
65 Cal.App.4th 631, 76 Cal.Rptr.2d 615, 98 Cal. Daily Op. Serv. 5611, 98 Daily Journal D.A.R. 7813

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

981 P.2d 978 — Page 1
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

▷
Erlich v. Menezes
Cal. 1999.

Supreme Court of California
BARRY ERLICH et al., Plaintiffs and Respond- ents,
v.
JOHN MENEZES, Defendant, Cross-complainant
and Appellant; RON REBALDO et al., Cross-
defendants and Respondents.
No. S068325.

Aug. 23, 1999.

SUMMARY

Homeowners filed an action against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction. Plaintiffs testified that they suffered emotional distress as a result of the defective condition of the house and defendant's invasive and unsuccessful repair attempts. The jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation. The jury awarded plaintiffs the cost of repairs and damages for emotional distress. (Superior Court of San Luis Obispo County, No. CV70302, Paul H. Coffee, Judge, and Jay R. Ballantyne, Judge. FN* ) The Court of Appeal, Second Dist., Div. Six, No. B105675, affirmed.

FN* Retired Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The Supreme Court reversed the judgment of the Court of Appeal and remanded for further proceedings. The court held that since defendant's negligence directly caused only economic injury and property damage and breached no duty independent of the contract, plaintiffs could not recover damages for emotional distress based upon breach of the contract to build the house. Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. Conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. The court held that even assuming defendant's negligence constituted a breach of a sufficient independent duty to plaintiffs, such a finding would not entitle them to emotional distress damages on the facts alleged. The breach-the negligent construction of the house-did not cause physical injury. The only physical injury alleged was one plaintiff's heart disease, which flowed from the emotional distress and not directly from the negligent construction. The court held that the balance of policy considerations-the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs-counseled against expanding contract damages to include mental distress claims in negligent construction cases. (Opinion by Brown, J., with George, C. J., Kennard, Baxter, and Chin, JJ., concurring. Concurring and dissenting opinion by Werdegar, J., with Mosk, J., concurring (see p. 562).)

HEADNOTES

Classified to California Digest of Official Reports

**(1a, 1b)** Damages § 15--Measure of Damages-
-Breach of Contract-- Distinction From Torts.
Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                                Page 2
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

not recoverable. This limitation on available dam-
ages serves to encourage contractual relations and
commercial activity by enabling parties to estimate
in advance the financial risks of their enterprise. In
contrast, tort damages are awarded to fully com-
pensate the victim for all injury suffered. The dis-
tinction between tort and contract is well grounded
in common law, and divergent objectives underlie
the remedies created in the two areas. Whereas con-
tract actions are created to enforce the intentions of
the parties to the agreement, tort law is primarily
designed to vindicate social policy.

**(2)** Damages § 15--Measure of Damages--Breach of
Contract--Breach of Legal Duty.
The same wrongful act may constitute both a
breach of contract and an invasion of an interest
protected by the law of torts. A contractual obliga-
tion may create a legal duty and the breach of that
duty may support an action in tort. However, con-
duct amounting to a breach of contract becomes
tortious only when it also violates a duty independ-
ent of the contract arising from principles of tort
law. An omission to perform a contract obligation
is never a tort, unless that omission is also an omis-
sion of a legal duty. Tort damages have been per-
mitted in contract cases where a breach of duty dir-
ectly causes physical injury, for breach of the cov-
enant of good faith and fair dealing in insurance
contracts, for wrongful discharge in violation of
fundamental public policy, or where the contract
was fraudulently induced. In each of these cases,
the duty that gives rise to tort liability is either
completely independent of the contract or arises
from conduct that is both intentional and intended
to harm.
[See 3 Witkin, Cal. Procedure (4th ed. 1996) Ac-
tions, § 141.]
**(3)** Negligence § 9--Elements--Duty of Care-
-Rules--Foreseeability.
Foreseeability alone is not sufficient to create an in-
dependent tort duty. Whether a defendant owes a
duty of care is a question of law. Its existence de-
pends upon the foreseeability of the risk and a
weighing of policy considerations for and against

imposition of liability. Because the consequences of
a negligent act must be limited to avoid an intoler-
able burden on society, the determination of duty
recognizes that policy considerations may dictate a
cause of action should not be sanctioned no matter
how foreseeable the risk.

**(4a, 4b)** Damages § 15--Measure of Damages-
-Breach of Contract--Defective Construction of
House--Mental Distress.
In an action by homeowners against the contractor
who built their new house for breach of contract,
fraud, negligent misrepresentation, and negligent
construction, in which the jury found that defendant
breached his construction contract by negligently
constructing the house but was not guilty of fraud
or negligent misrepresentation, plaintiffs were not
entitled to recover damages for mental distress. A
claim for negligent breach of a contract is not suffi-
cient to support tort damages for violation of an in-
dependent tort duty. Even assuming defendant's
negligence constituted a breach of a sufficient inde-
pendent duty to plaintiffs, such a finding would not
entitle them to emotional distress damages on the
facts alleged. The breach-the negligent construction
of the house --did not cause physical injury. The
only physical injury alleged was one plaintiff's
heart disease, which flowed from the emotional dis-
tress and not directly from the negligent construc-
tion. A preexisting contractual relationship, without
more, will not support a recovery for mental suffer-
ing where the defendant's tortious conduct has res-
ulted only in economic injury to the plaintiff. Also,
the general measure of damages where injury to
property is capable of being repaired is the reason-
able cost of repair together with the value of lost
use during the period of injury.
[See 6 Witkin, Summary of Cal. Law (9th ed. 1988)
Torts, § 1462.]
**(5)** Damages § 1 5--Measure of Damages--Tortious
Breach of Contract.
Generally, outside the insurance context, a tortious
breach of contract may be found when (1) the
breach is accompanied by a traditional common law
tort, such as fraud or conversion; (2) the means

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                      Page 3
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages. Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated.

**(6a, 6b) Damages § 15--Measure of Damages--Breach of Contract--Defective Construction of House--Mental Distress as Consequential Damages.**
In an action by homeowners against the contractor who built their new house for breach of contract, fraud, negligent misrepresentation, and negligent construction, in which the jury found that defendant breached his construction contract by negligently constructing the house but was not guilty of fraud or negligent misrepresentation, plaintiffs were not entitled to recover damages for mental distress as consequential or special damages. In California, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract. Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. To permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction causes gross interference with the normal use and habitability of the residence would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. A rule focusing not on the risks contracting parties voluntarily assume, but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815.]

COUNSEL
Edward J. Horowitz, Claudia Ribet; Knapp,

Petersen & Clarke, Daniels, Baratta & Fine, Alan J. Carnegie, James L. Hsu and Stephen M. Harris for Defendant, Cross-complainant and Appellant. *547
Sonnenschein Nath & Rosenthal, Paul E. B. Glad, Paula M. Yost and Cheryl Dyer Berg for American Insurance Association and Crum & Forster Insurance Company as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.
Alister McAlister for National Association of Independent Insurers as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
Crosby, Heafey, Roach & May, Kathy M. Banke and Kay Long-Marin for Continental Metroplex as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
Cox, Castle & Nicholson, Sandra C. Stewart and Debbie L. Freedman for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.
Morgenstein & Jubelirer, James L. McGinnis and Laura E. Gasser for Centex Homes as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
Songstad, Randall & Ulich, Andrew K. Ulich and Thomas D. Deardorff II for Taylor Woodrow Homes, Inc., as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
Chapin Fleming McNitt Shea & Carter, Craig H. Bell and Keith A. Turner for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.
John R. DeLoreto; Law Offices of Victor G. Zilinskas, Zilinskas & Jacobs, Victor G. Zilinskas and Michael L. Smith for Plaintiffs and Respondents.
Williams, Wester & Hall and Scott A. Williams as Amici Curiae on behalf of Plaintiffs and Respondents.
Kasdan, Simonds, McIntyre, Epstein & Martin and David G. Epstein for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978

Page 4

21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687

**21 Cal.4th 543**

Keppleman & Associates and Richard D. Keppleman for Cross-defendant and Respondent Ron Rebaldo. **\*548**
Borton, Petrini & Conron, Craig R. McCollum and Gary A. Bixler for Cross-defendant and Respondent John Cravens Plastering, Inc.

**BROWN, J.**
We granted review in this case to determine whether emotional distress damages are recoverable for the negligent breach of a contract to construct a house. A jury awarded the homeowners the full cost necessary to repair their home as well as damages for emotional distress caused by the contractor's negligent performance. Since the contractor's negligence directly caused only economic injury and property damage, and breached no duty independent of the contract, we conclude the homeowners may not recover damages for emotional distress based upon breach of a contract to build a house.

### I. Factual and Procedural Background

Both parties agree with the facts as ascertained by the Court of Appeal. Barry and Sandra Erlich contracted with John Menezes, a licensed general contractor, to build a "dreamhouse" on their ocean-view lot. The Erlichs moved into their house in December 1990. In February 1991, the rains came. "[T]he house leaked from every conceivable location. Walls were saturated in [an upstairs bedroom], two bedrooms downstairs, and the pool room. Nearly every window in the house leaked. The living room filled with three inches of standing water. In several locations water 'poured in ... streams' from the ceilings and walls. The ceiling in the garage became so saturated ... the plaster liquefied and fell in chunks to the floor."

Menezes's attempts to stop the leaks proved ineffectual. Caulking placed around the windows melted, " 'ran down [the] windows and stained them and ran across the driveway and ran down the house [until it] ... looked like someone threw balloons with paint in them at the house.' " Despite several repair efforts, which included using sledge-

hammers and jackhammers to cut holes in the exterior walls and ceilings, application of new waterproofing materials on portions of the roof and exterior walls, and more caulk, the house continued to leak-from the windows, from the roofs, and water seeped between the floors. Fluorescent light fixtures in the garage filled with water and had to be removed.

"The Erlichs eventually had their home inspected by another general contractor and a structural engineer. In addition to confirming defects in the roof, exterior stucco, windows and waterproofing, the inspection revealed **\*549** serious errors in the construction of the home's structural components. None of the 20 shear, or load-bearing walls specified in the plans were properly installed. The three turrets on the roof were inadequately connected to the roof beams and, as a result, had begun to collapse. Other connections in the roof framing were also improperly constructed. Three decks were in danger of 'catastrophic collapse' because they had been finished with mortar and ceramic tile, rather than with the light-weight roofing material originally specified. Finally, the foundation of the main beam for the two-story living room was poured by digging a shallow hole, dumping in 'two sacks of dry concrete mix, putting some water in the hole and mixing it up with a shovel.' " This foundation, required to carry a load of 12,000 pounds, could only support about 2,000. The beam is settling and the surrounding concrete is cracking.

According to the Erlichs' expert, problems were major and pervasive, concerning everything "related to a window or waterproofing, everywhere that there was something related to framing," stucco, or the walking deck.

Both of the Erlichs testified that they suffered emotional distress as a result of the defective condition of the house and Menezes's invasive and unsuccessful repair attempts. Barry Erlich testified he felt "absolutely sick" and had to be "carted away in an ambulance" when he learned the full extent of the structural problems. He has a permanent heart con-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                                        Page 5
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

dition, known as superventricular tachyarrhythmia, attributable, in part, to excessive stress. Although the condition can be controlled with medication, it has forced him to resign his positions as athletic director, department head and track coach.

Sandra Erlich feared the house would collapse in an earthquake and feared for her daughter's safety. Stickers were placed on her bedroom windows, and alarms and emergency lights installed so rescue crews would find her room first in an emergency.

Plaintiffs sought recovery on several theories, including breach of contract, fraud, negligent misrepresentation, and negligent construction. Both the breach of contract claim and the negligence claim alleged numerous construction defects.

Menezes prevailed on the fraud and negligent misrepresentation claims. The jury found he breached his contract with the Erlichs by negligently constructing their home and awarded $406,700 as the cost of repairs. Each spouse was awarded $50,000 for emotional distress, and Barry Erlich received an additional $50,000 for physical pain and suffering and $15,000 for lost earnings. **\*550**

By a two-to-one majority, the Court of Appeal affirmed the judgment, including the emotional distress award. The majority noted the breach of a contractual duty may support an action in tort. The jury found Menezes was negligent. Since his negligence exposed the Erlichs to "intolerable living conditions and a constant, justifiable fear about the safety of their home," the majority decided the Erlichs were properly compensated for their emotional distress.

The dissent pointed out that no reported California case has upheld an award of emotional distress damages based upon simple breach of a contract to build a house. Since Menezes's negligence directly caused only economic injury and property damage, the Erlichs were not entitled to recover damages for their emotional distress.

We granted review to resolve the question.

II. Discussion

A.

In an action for breach of contract, the measure of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom" (Civ. Code, § 3 300), provided the damages are "clearly ascertainable in both their nature and origin" (Civ. Code, § 3301). In an action not arising from contract, the measure of damages is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not" (Civ. Code, § 3333).

(1a) "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment*).) "In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered. [Citation.]" (*Id.* at p. 516.)

" '[T]he distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties \*551 to the agreement, tort law is primarily designed to vindicate "social policy." [Citation.]' " (*Hunter v. Up-right, Inc.* (1993) 6 Cal.4th 1174, 1180 [26 Cal.Rptr.2d 8, 864 P.2d 88], quoting *Foley v. Interactive Data*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                    Page 6
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

*Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) While the purposes behind contract and tort law are distinct, the boundary line between them is not (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 106 [44 Cal.Rptr.2d 420, 900 P.2d 669] (conc. and dis. opn. of Mosk, J.) (*Freeman & Mills*)) and the distinction between the remedies for each is not " 'found ready made.' " (*Ibid.*, quoting Holmes, The Common Law (1881) p. 13.) These uncertain boundaries and the apparent breadth of the recovery available for tort actions create pressure to obliterate the distinction between contracts and torts-an expansion of tort law at the expense of contract principles which Grant Gilmore aptly dubbed "con*torts*." In this case we consider whether a negligent breach of a contract will support an award of damages for emotional distress-either as tort damages for negligence or as consequential or special contract damages.

## B.

In concluding emotional distress damages were properly awarded, the Court of Appeal correctly observed that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts." (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774 [69 Cal.Rptr.2d 466], citing 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 139, pp. 203-204.) Here, the court permitted plaintiffs to recover both full repair costs as normal contract damages and emotional distress damages as a tort remedy. [FN1]

> FN1 At oral argument, plaintiff cited *Sloane v. Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320], a case involving a passenger wrongly ejected from a train, for the proposition that emotional distress damages arising out of breach of contract have been permitted in California for many years. In fact, *Sloane* specifically recognized the distinction between contract and tort remedies and held plaintiff could

either "bring an action simply for the breach of ... contract, or she could sue ... in tort" for the carrier's violation of the duty, as a common carrier, which it assumed upon entering into the contract. (*Id.* at p. 677.)

(2) The Court of Appeal also noted that "[a] contractual obligation may create a legal duty and the breach of that duty may support an action in tort." This is true; however, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. (*Applied Equipment, supra,*7 Cal.4th at p. 515.) " ' "An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " (*Ibid.*, quoting *Jones v. Kelly* (1929) 208 Cal. 251, 255 [280 P. 942].)

Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury (*552Fuentes v. Perez* (1977) 66 Cal.App.3d 163, 168, fn. 2 [136 Cal.Rptr. 275]); for breach of the covenant of good faith and fair dealing in insurance contracts (*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 433-434 [58 Cal.Rptr. 13, 426 P.2d 173]); for wrongful discharge in violation of fundamental public policy (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 175-176 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]); or where the contract was fraudulently induced (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1238-1239 [1 Cal.Rptr.2d 301].) In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm. (See, e.g., *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 885-886 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

Plaintiff's theory of tort recovery is that mental distress is a foreseeable consequence of negligent breaches of standard commercial contracts. (3) However, foreseeability alone is not sufficient to create an independent tort duty. " 'Whether a de-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                                    Page 7
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

fendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability.' [Citation.]" (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Because the consequences of a negligent act must be limited to avoid an intolerable burden on society (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582]), the determination of duty "recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." (*Ibid.*, fn. omitted.) "[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury." (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814].) In short, foreseeability is not synonymous with duty; nor is it a substitute.

(4a) The question thus remains: is the mere negligent breach of a contract sufficient? The answer is no. It may admittedly be difficult to categorize the cases, but to state the rule succinctly: "[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." (*Freeman & Mills, supra,* 11 Cal.4th at p. 107 (conc. and dis. opn. of Mosk, J.).) The familiar paradigm of tortious breach of contract in this state is the insurance contract. There we relied on the covenant of good faith and fair dealing, implied in every contract, to justify tort liability. (*Foley, supra,* 47 Cal.3d at pp. 689-690.)In holding that a tort action is available for breach of the covenant in an insurance contract, *553 we have "emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." (*Freeman & Mills, supra,* 11 Cal.4th at p. 91; see Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16 U.S.F. L.Rev. 187, 227.)

The special relationship test, which has been criticized as illusory and not sufficiently precise (Putz & Klippen, *Commercial Bad Faith: Attorneys Fees-Not Tort Liability-Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 478-479), has little relevance to the question before us. Menezes is in the business of building single-family homes. He is one among thousands of contractors who provide the same service, and the Erlichs could take their choice among any contractors willing to accept work in the area where their home would be constructed. Although they undoubtedly relied on his claimed expertise, they were in a position to view, inspect, and criticize his work, or to hire someone who could. Most significantly, there is no indication Menezes sought to frustrate the Erlichs' enjoyment of contracted-for benefits. He did build a house. His ineptitude led to numerous problems which he attempted to correct. And he remains ultimately responsible for reimbursing the cost of doing the job properly.

Moreover, since, as *Foley* noted, the insurance cases represented "a major departure from traditional principles of contract law," any claim for automatic extension of that exceptional approach whenever "certain hallmarks and similarities can be adduced in another contract setting" should be carefully considered. (*Foley, supra,* 47 Cal.3d at p. 690.)

Our previous decisions detail the reasons for denying tort recovery in contract breach cases: the different objectives underlying tort and contract breach; the importance of predictability in assuring commercial stability in contractual dealings; the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and the preference for legislative action in affording appropriate remedies. (*Freeman & Mills, supra,* 11 Cal.4th at p. 98, citing approvingly *Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 81-82 [17 Cal.Rptr.2d 649].) The same concerns support a cautious approach here. Restrictions on contract remedies serve to protect the " 'freedom to bargain over special risks and [to] promote contract

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                              Page 8
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

formation by limiting liability to the value of the promise.' " (11 Cal.4th at p. 98, quoting *Harris*, *supra*, 14 Cal.App.4th at p. 77.)

(5) Generally, outside the insurance context, "a tortious breach of contract ... may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach *554 the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." (*Freeman & Mills*, *supra*, 11 Cal.4th at p. 105 (conc. and dis. opn. of Mosk, J.).) Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. (*Applied Equipment*, *supra*, 7 Cal.4th at p. 515.) If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies.

(4b) In this case, the jury concluded Menezes did not act intentionally; nor was he guilty of fraud or misrepresentation. This is a claim for negligent breach of a contract, which is not sufficient to support tortious damages for violation of an independent tort duty.

It may ultimately be more useful, in attempting to develop a common law of tortious breach, to affirmatively identify specific practices utilized by contracting parties that merit the imposition of tort remedies (*Freeman & Mills*, *supra*, 11 Cal.4th at p. 107 (conc. and dis. opn. of Mosk, J.)) instead of comparing each new claim to a template for exceptions. In the interim, however, it is sufficient to note that more than mere negligence has been involved in each case where tort damages have been permitted. The benefits of broad compensation must be balanced against the burdens on commercial stability. "[C]ourts should be careful to apply tort remedies only when the conduct in question is

so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be ... to aid rather than discourage commerce." (*Freeman & Mills*, *sup ra*, 11 Cal.4th at p. 109 (conc. and dis. opn. of Mosk, J.).)

### C.

Even assuming Menezes's negligence constituted a sufficient independent duty to the Erlichs, such a finding would not entitle them to emotional distress damages on these facts. "The fact that emotional distress damages may be awarded in some circumstances (see Rest.2d Torts, § 905, pp. 456-457) does not mean they are available in every case in which there is an independent cause of action founded upon negligence." (*Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 7 [4 Cal.Rptr.2d 87] (*Merenda*).) "No California case has allowed recovery for emotional distress arising solely out of property damage" (*Cooper v. Superior Court* (1984) 153 Cal.App.3d 1008, 1012 [200 Cal.Rptr. 746]); moreover, a preexisting contractual relationship, without more, will not support a recovery for mental suffering *555 where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. (*Smith v. Superior Court* (1992) 10 Cal.App.4th 1033, 1040, fn. 1 [13 Cal.Rptr.2d 133]; *Mercado v. Leong* (1996) 43 Cal.App.4th 317, 324 [50 Cal.Rptr.2d 569] [emotional distress damages are unlikely when the interests affected are merely economic]; *Camenisch v. Superior Court* (1996) 44 Cal.App.4th 1689, 1691 [52 Cal.Rptr.2d 450] (*Camenisch*) [emotional distress damages are not recoverable when attorney malpractice leads only to economic loss].)

Although the Court of Appeal, plaintiffs, and their amici curiae rely substantially on *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] (*Potter*), that case does not assist our inquiry. *Potter*, a toxic tort case, is readily distinguishable. First, the analysis there was narrowly circumscribed by the issue presented: "whether... emotional distress engendered by the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                        Page 9
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

fear of developing cancer in the future as a result of a toxic exposure is a recoverable item of damages in a negligence action." (*Id.* at p. 981.)Thus, the language of *Potter* cannot be read in support of some larger proposition affording emotional distress damages for any other type of fear of future harm in actions involving negligent breach of contract.

Second, the water supply of the plaintiffs in *Potter* had already been contaminated. The prolonged exposure could not be undone. In contrast, the Erlichs could have avoided the threatened injury by moving out of the house until necessary repairs had been completed. If they had, relocation expenses would have been part of their damages. In any event, the general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462, pp. 934-935.)

In short, *Potter* permitted recovery, within stringent limits, for emotional distress resulting from a personal injury directly caused by the defendant's tortious conduct. The Erlichs seek recovery for emotional distress engendered by an injury to their property.

To the extent *Potter* is relevant here, it reiterates that "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by [breach of the independent duty]. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests. [Citations.]" (*Potter, supra,*6 Cal.4th at p. 985.)Although the Erlichs feared **\*556** physical injury, Menezes's negligent breach of contract resulted in only damage to their property, and they could have avoided any threat of harm.

The question was thoroughly explored in *Merenda, supra,*3 Cal.App.4th 1, a legal malpractice action in which the plaintiff sought damages for the severe emotional distress she suffered when her attorney's negligence caused the loss of expected damages from her claim for sexual assault and battery. "It is true that the 'transaction,' a contract for legal services, was intended to affect the plaintiff. However, the foreseeability of serious emotional harm to the client and the degree of certainty that the client suffered such injury by loss of an economic claim are tenuous. Litigation is an inherently uncertain vehicle for advancing one's economic interests. The expectation of a recovery is rarely so certain that a litigant would be justified in resting her peace of mind upon the assurance of victory." (*Id.* at p. 10.)

In *Camenisch, supra,*44 Cal.App.4th 1689, the plaintiff sought emotional distress damages because the lawyer's negligent estate planning advice thwarted his tax avoidance goals. The complaint alleged the attorney had been hired " 'for the express purpose of providing for [the plaintiffs' family] and obtaining repose regarding their financial security.' " (*Id.* at p. 1692.)The trial court overruled the attorney's demurrer. The Court of Appeal rejected the claim for emotional distress damages. Acknowledging that *Merenda* dealt with malpractice related to litigation, the court nevertheless found its reasoning dispositive. "Public policy reasons do not support a different result when the alleged malpractice is committed in a tax advice context, even if the tax advice is part of an estate plan. [¶] As in a litigation context, the client's primary protected interest is economic in a tax planning situation. The prospect of paying taxes is generally considered distressing, and the prospect of paying a greater levy than necessary is even more disquieting. However, the emotional upset derives from an inherently economic concern." (*Id.* at p. 1697.)

In *Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525 [53 Cal.Rptr.2d 24], two artists lost a substantial portion of their life's work when a city trash truck, which had been parked on a hilltop,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                          Page 10
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

rolled down and crashed into their home, damaging the house, two cars, and much of their artwork. The Lubners filed a negligence action and sought damages for their emotional distress. Recognizing that the artwork may have been extremely important to the Lubners, the court nevertheless found they were not entitled to recover for emotional distress caused by injury to property. (*Id.* at p. 532.)The court based its ruling primarily on the absence of a preexisting relationship between the parties, but separately considered whether the defendant breached a duty of care to the plaintiffs. Noting that the moral blame on the *557 defendant was only that which attends ordinary negligence and nothing in the record indicated bad faith or reckless indifference to the Lubners' emotional tranquillity, the court concluded liability for negligent infliction of emotional distress was unwarranted. (*Id.* at p. 534.)

Public policy supports a similar limit where the negligence concerns the construction of a home. In *Blagrove v. JB Mechanical, Inc.* (Wyo. 1997) 934 P.2d 1273 (*Blagrove*), the homeowners sued a plumbing contractor to recover damages for mental anguish caused when flooding from a faulty plumbing connection damaged their home and destroyed personal possessions. The Wyoming Supreme Court held that, absent physical injury, emotional distress damages can be recovered only in limited circumstances involving intentional torts, constitutional violations, and the breach of the covenant of good faith and fair dealing in insurance contracts, and concluded a contrary rule would be poor public policy.

"In deciding whether the plaintiff's interests are entitled to legal protection against the defendant's conduct, we must balance the interest of the injured parties against the view that a negligent act should have some end to its legal consequences.... We are persuaded that the concerns which have acted to prevent recovery for emotional distress when property is damaged remain relevant and weigh against permitting recovery. While we do not doubt that the Blagroves were justifiably and seriously distressed

over the damage to [their home], adopting a rule allowing trial on the issue and recovery if proved would result in unacceptable burdens for both the judicial system and defendants. We therefore hold that emotional distress damages in connection with property damages are not compensable." (*Blagrove, supra*, 934 P.2d at pp. 1276-1277; see also *Caradonna v. Thorious* (1969) 17 Mich.App. 41 [169 N.W.2d 179, 182]; *Jankowski v. Mazzotta* (1967) 7 Mich.App. 483 [152 N.W.2d 49] [no mental anguish remedy available for ineptly constructed home].)

Here, the breach-the negligent construction of the Erlichs' house-did not cause physical injury. No one was hit by a falling beam. Although the Erlichs state they feared the house was structurally unsafe and might collapse in an earthquake, they lived in it for five years. The only physical injury alleged is Barry Erlich's heart disease, which flowed from the emotional distress and not directly from the negligent construction.

The Erlichs may have hoped to build their dream home and live happily ever after, but there is a reason that tag line belongs only in fairy tales. Building a house may turn out to be a stress-free project; it is much more likely to be the stuff of urban legends-the cause of bankruptcy, marital *558 dissolution, hypertension and fleeting fantasies ranging from homicide to suicide. As Justice Yegan noted below, "No reasonable homeowner can embark on a building project with certainty that the project will be completed to perfection. Indeed, errors are so likely to occur that few if any homeowners would be justified in resting their peace of mind on [its] timely or correct completion ...." The connection between the service sought and the aggravation and distress resulting from incompetence may be somewhat less tenuous than in a malpractice case, but the emotional suffering still derives from an inherently economic concern.

D.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978

Page 11

21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687

**21 Cal.4th 543**

(6a) Having concluded tort damages are not available, we finally consider whether damages for emotional distress should be included as consequential or special damages in a contract claim. (1b) "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at the time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied Equipment, supra,*7 Cal.4th at p. 515.)

" '[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.' " (*Applied Equipment, supra,*7 Cal.4th at p. 517.)

(6b) Accordingly, damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California. (*Kwan v . Mercedes -Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 188 [28 Cal.Rptr.2d 371] (*Kwan*); *Sawyer v. Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623].) "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." (**559**Rest.2d Contracts, § 353.) The Restatement specifically notes the breach

of a contract to build a home is not "particularly likely" to result in "serious emotional disturbance." (*Ibid.*)

Cases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were unavoidable. (See, e.g., *Burgess v. Superior Court, supra,*2 Cal.4th 1064 [ infant injured during childbirth]; *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] [misdiagnosed venereal disease and subsequent failure of marriage]; *Kately v. Wilkinson* (1983) 148 Cal.App.3d 576 [195 Cal.Rptr. 902] [fatal waterskiing accident]; *Chelini v. Nieri* (1948) 32 Cal.2d 480 [196 P.2d 915] [failure to adequately preserve a corpse].) Thus, when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress. (See *Wynn v. Monterey Club* (1980) 111 Cal.App.3d 789, 799-801 [168 Cal.Rptr. 878] [agreement of two gambling clubs to exclude husband's gambling-addicted wife from clubs and not to cash her checks]; *Ross v. Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 992-996 [203 Cal.Rptr. 468, 42 A.L.R.4th 1049] [cemetery's agreement to keep burial service private and to protect grave from vandalism]; *Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844, 851-852 [88 Cal.Rptr. 39] [bailment for heirloom jewelry where jewelry's great sentimental value was made known to bailee].)

Cases from other jurisdictions have formulated a similar rule, barring recovery of emotional distress damages for breach of contract except in cases involving contracts in which emotional concerns are the essence of the contract. (See, e.g., *Hancock v. Northcutt* (Alaska 1991) 808 P.2d 251, 258 ["contracts pertaining to one's dwelling are not among those contracts which, if breached, are particularly likely to result in serious emotional disturbance"; typical damages for breach of house

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                                                    Page 12
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

construction contracts can appropriately be calculated in terms of monetary loss]; *McMeakin v. Roofing & Sheet Metal Supply* (1990) 1990 Okla.Civ.App 101 [807 P.2d 288] [affirming order granting summary judgment in favor of defendant roofing company after it negligently stacked too many brick tiles on roof, causing roof to collapse and completely destroy home, leading to plaintiff's heart attack one month later]; *Day v. Montana Power Co.* (Mont. 1990) 789 P.2d 1224 [owner of restaurant that was destroyed in gas explosion allegedly caused by negligence of utility company employee not entitled to recover damages for emotional distress]; *Creger v. Robertson* (La.Ct.App. 1989) 542 So.2d 1090 [reversing award for emotional distress damages caused by foul odor emanating from a faulty foundation, preventing plaintiff from entertaining guests in her residence]; *560Groh v. Broadland Builders, Inc.* (1982) 120 Mich.App. 214 [327 N.W.2d 443] [reversing order denying motion to strike allegations of mental anguish in case involving malfunctioning septic tank system, and noting adequacy of monetary damages to compensate for pecuniary loss of "having to do the job over," as distinguished from cases allowing recovery because situation could never be adequately corrected].)

Plaintiffs argue strenuously that a broader notion of damages is appropriate when the contract is for the construction of a home. Amici curiae urge us to permit emotional distress damages in cases of negligent construction of a personal residence when the negligent construction causes gross interference with the normal use and habitability of the residence.

Such a rule would make the financial risks of construction agreements difficult to predict. Contract damages must be clearly ascertainable in both nature and origin. (Civ. Code, § 3301.)A contracting party cannot be required to assume limitless responsibility for all consequences of a breach and must be advised of any special harm that might result in order to determine whether or not to accept

the risk of contracting. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 815, p. 733.)

Moreover, adding an emotional distress component to recovery for construction defects could increase the already prohibitively high cost of housing in California, affect the availability of insurance for builders, and greatly diminish the supply of affordable housing. The potential for such broad-ranging economic consequences-costs likely to be paid by the public generally-means the task of fashioning appropriate limits on the availability of emotional distress claims should be left to the Legislature. (See Tex. Prop. Code Ann. § 27.001 et seq. (1999); Haw. Rev. Stat. § 663-8.9 (1998).)

Permitting damages for emotional distress on the theory that certain contracts carry a lot of emotional freight provides no useful guidance. Courts have carved out a narrow range of exceptions to the general rule of exclusion where emotional tranquility is the contract's essence. Refusal to broaden the bases for recovery reflects a fundamental policy choice. A rule which focuses not on the risks contracting parties voluntarily assume but on one party's reaction to inadequate performance, cannot provide any principled limit on liability.

The discussion in *Kwan*, a case dealing with the breach of a sales contract for the purchase of a car, is instructive. "[A] contract for [the] sale of an automobile is not essentially tied to the buyer's mental or emotional well-being. Personal as the choice of a car may be, the central reason for buying one is usually transportation.... [¶] In spite of America's much-discussed *561 'love affair with the automobile,' disruption of an owner's relationship with his or her car is not, in the normal case, comparable to the loss or mistreatment of a family member's remains [citation], an invasion of one's privacy [citation], or the loss of one's spouse to a gambling addiction [citation]. In the latter situations, the contract exists primarily to further or protect emotional interests; the direct and foreseeable injuries resulting from a breach are also primarily emotional. In contrast, the undeniable ag-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

981 P.2d 978                                                      Page 13
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687
**21 Cal.4th 543**

gravation, irritation and anxiety that may result from [the] breach of an automobile warranty are secondary effects deriving from the decreased usefulness of the car and the frequently frustrating process of having an automobile repaired. While [the] purchase of an automobile may sometimes lead to severe emotional distress, such a result is not ordinarily foreseeable from the nature of the contract." (*Kwan, supra,* 23 Cal.App.4th at p. 190.)

Most other jurisdictions have reached the same conclusion. (See *Sanders v. Zeagler* (La. 1997) 686 So.2d 819, 822-823 [principal object of a contract for the construction of a house was to obtain a place to live and emotional distress damages were not recoverable]; *Hancock v. Northcutt, supra,* 808 P.2d at pp. 258-259 [no recovery for emotional distress as a result of defective construction; typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss]; *City of Tyler v. Likes* (Tex. 1997) 962 S.W.2d 489, 497 [mental anguish based solely on property damage is not compensable as a matter of law].)

We agree. The available damages for defective construction are limited to the cost of repairing the home, including lost use or relocation expenses, or the diminution in value. (*Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683 [266 Cal.Rptr. 193].) The Erlichs received more than $400,000 in traditional contract damages to correct the defects in their home. While their distress was undoubtedly real and serious, we conclude the balance of policy considerations-the potential for significant increases in liability in amounts disproportionate to culpability, the court's inability to formulate appropriate limits on the availability of claims, and the magnitude of the impact on stability and predictability in commercial affairs-counsel against expanding contract damages to include mental claims in negligent construction cases.

Disposition

The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred. *562
**WERDEGAR, J.,**
Concurring and Dissenting.-I concur in the majority opinion insofar as it holds that a plaintiff may not recover damages for emotional distress based on a defendant's negligent breach of a contract to build a house when the defendant has breached no duty independent of the contract. Although I read the record differently as to whether these plaintiffs did, in fact, present an independent claim for negligence, in view of the majority's conclusion that plaintiffs did not present such a claim (see maj. opn., *ante,* at pp. 548, 554), the discussion in part C of the majority opinion (*id.,* at pp. 554-558) is unnecessary. I therefore express no opinion on the circumstances under which a tort plaintiff may recover damages for emotional distress.

Mosk, J., concurred. *563
053 cent-Y cent-R found without first cent-Y.
Cal. 1999.
Erlich v. Menezes
21 Cal.4th 543, 981 P.2d 978, 87 Cal.Rptr.2d 886, 99 Cal. Daily Op. Serv. 6808, 1999 Daily Journal D.A.R. 8687

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Westlaw.

3 Cal.App.3d 872                                                          Page 1
3 Cal.App.3d 872, 84 Cal.Rptr. 74, 73 L.R.R.M. (BNA) 2810
**3 Cal.App.3d 872**

►Federico v. Frick
Cal.App.2.Dist.
ARMANDO FEDERICO, Plaintiff and Respondent,
v.
JEROME H. FRICK, Defendant and Appellant
**Civ. No. 34084.**

Court of Appeal, Second District, Division 3,
California.
January 26, 1970.

SUMMARY

Plaintiff was hired under a one-year employment
contract as a pianist at a restaurant and cocktail
lounge. Some weeks later he was discharged for
conduct on the job allegedly offensive to certain
female customers. He then filed a formal claim with
the local musicians' union for the balance of his
year's salary. He received an award after arbitration
hearings were held by a trial board of the union, a
procedure provided for in the employment contract.
Upon the employer's failure to pay the award,
plaintiff commenced confirmation proceedings
resulting in a judgment confirming the award.
(Superior Court of Los Angeles County, Clinton
Rodda, Court Commissioner, Judge pro tem.)

On appeal by the employer, the Court of Appeal
affirmed. the judgment. The employer contended that
he had not read that part of the contract pertaining to
arbitration prior to signing it, and that he never knew
until he received the award that the proceedings
before the trial board were arbitration proceedings.
The court, held that neither contention was a valid
basis for revocation of the contract, or vacation of the
award, pointing out that a written agreement to
submit to arbitration is valid, enforceable and
irrevocable except upon such grounds as exist for the
revocation of any contract. Rejected also were the
employer's contentions that the contract was one of
adhesion, and therefore against public policy, and
that the arbitration procedure provided by the
contract was not an impartial one. The court stated
that, though this might be true, the State Arbitration
Act forbade neither adhesion contracts nor
agreements to the conduct of arbitration proceedings
by a nonneutral arbitrator, and further stated that any

changes in this area should come from the
Legislature and not from the courts. (Opinion by
Cobey, J., with Schweitzer, Acting P. J., and Allport,
J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Arbitration and Award § § 2.1, 43--Contracts--
Award--Vacation by Court.
A written agreement to submit to arbitration a
controversy thereafter arising is valid, enforceable
and irrevocable save upon such grounds as exist for
the revocation of any contract (Code Civ. Proc., §
1281); thus, neither the contention that the one
against whom the award was made failed to read the
entire contract, nor that he was ignorant of the nature
of the proceedings before the trial board which made
an arbitration award, constituted a basis for the
revocation of the contract or vacation of the award.
[See **Cal.Jur.2d, Rev.,** Arbitration and Award, § 58;
**Am.Jur.2d,** Arbitration and Award, § 167 et seq.]
(2) Arbitration and Award § § 2.1, 3--
Contracts:Statutory Provisions.
In this state, arbitration is entirely a creature of
statute and is a favored method for the expeditious
settlement of disputes. This being so, the court will
not amend the California Arbitration Act by declaring
that contracts of adhesion are beyond its coverage,
that being a task for the Legislature if it desires to do
so.

(3) Arbitration and Award § 17--Arbitrators and
Proceedings.
Although an arbitration board may be neither
impartial nor neutral, potential unfairness in
arbitration proceedings resulting from the nonneutral
nature of the controlling arbitrator is not a statutory
ground for either vacation of the arbitration award or
dismissal of the confirmation proceedings; Code Civ.
Proc., § 1282, expressly permits the parties to an
arbitration to agree to the conduct of arbitration
proceedings by a nonneutral arbitrator.

COUNSEL
Michael J. Clemens for Defendant and Appellant.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

3 Cal.App.3d 872
3 Cal.App.3d 872, 84 Cal.Rptr. 74, 73 L.R.R.M. (BNA) 2810
**3 Cal.App.3d 872**

James A. McLaughlin, Jr., for Plaintiff and Respondent.

**COBEY, J.**

Jerome H. Frick appeals from a judgment for $12,627 confirming an arbitration award against him. The appeal lies. (*874Code Civ. Proc., § 1294, subd. (d).) The basis of the appeal, broadly stated, is that there was no agreement to arbitrate and the arbitration was not an impartial one. We find no merit in the appeal.

### The Facts Generally

On August 23, 1967, Armando Federico was hired for a period of one year as a pianist at the Mikado, a restaurant and cocktail lounge owned and operated by Frick. This employment was made under a standard printed contract of Local 47 of the American Federation of Musicians. Federico was a member of the local.

The employment contract contained a Paragraph 11, reading in relevant part as follows: "... All controversies involving matters within the competence of Locals of the Federation arising out of this contract, [sic] shall be submitted to, heard, arbitrated and determined by the person, persons or body specified by the rules, By-laws or practices of the Local in whose jurisdiction the services have been or are to be performed in accordance with the procedures in such rules or By-laws. ..." Furthermore, Paragraph 10 of this contract provided that such rules and bylaws, among other things, were incorporated into the contract and "the employer acknowledges his responsibility to be fully acquainted, now and for the duration of this contract, with the contents thereof." FN1

> FN1 These bylaws contained provisions covering trial boards, contracts, claims, penalties and remedies, rehearings and appeals. (See Art. I, § 8, Arts. VI, VIII, X and XI thereof.)

Some weeks later Frick discharged Federico for conduct on the job allegedly offensive to certain female customers. On November 22, 1967, Federico filed a formal claim with the local for the balance of his year's salary. Arbitration hearings were thereafter held by a five member trial board of the local which made the arbitration award at issue FN2 on January 17, 1968. Upon Frick's failure to pay the award, Federico

commenced in timely fashion the confirmation proceedings which are now before us. (Code Civ. Proc., § 1288.)

> FN2 The award contains no provision for deduction of possible unemployment insurance benefits paid Federico or of any earnings by him during the remainder of the contract term. Frick, however, did not seek correction of the award. (See Code Civ. Proc., §§ 1284, 1285, 1285.2.)

The record on appeal contains nothing with respect to the factual basis for the award. We, therefore, know nothing of its merit.

Frick's position is that we should reverse the judgment confirming the arbitration award against him because: (1) he was unaware of the existence of the arbitration provisions in the contract as he failed to read that *875 portion of the contract prior to signing it; (2) he never knew until he received the award that the proceedings before the trial board were arbitration proceedings; (3) the contract was one of adhesion and, therefore, against public policy; and (4) the arbitration procedure provided by the contract was not an impartial one since the arbitration board was composed of Federico's fellow members of Local 47 which would also receive a portion of the award.

### The Award Must Be Confirmed

Code of Civil Procedure section 1281 of the California Arbitration Act provides in relevant part that, "... A written agreement to submit to arbitration ... a controversy thereafter arising is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract." Frick asserts Paragraph 11 of the employment contract, which we have quoted in relevant part, is not a valid and enforceable arbitration agreement because he signed the contract without reading this provision and therefore was unaware of its existence, and because the contract itself is one of adhesion. In determining the validity of this position, we are first faced with the trier of fact's specific finding that all of the affirmative allegations of Frick's response to the petition to confirm the award were untrue. These included the allegations of his verified declaration since they were incorporated in his response. These findings are, however, without any evidentiary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

support. Therefore we will disregard them.

But doing this does not make Frick's position a tenable one. (1) Failure to read an entire contract is not a basis for its revocation. (See *California State Auto. etc. Bureau v. Barrett Garages, Inc.*, 257 Cal.App.2d 71, 76 [64 Cal.Rptr. 699].) Similarly, ignorance of the arbitral nature of the proceedings is not one of the statutory grounds for vacation of an arbitration award. [FN3](See *Code Civ. Proc.*, § 1287.2; cf. *Sanserino v. Shamberger*, 245 Cal.App.2d 630, 634-636 [54 Cal.Rptr. 206].)

> FN3 We note that Frick failed to exhaust his rights of review under the local's bylaws.

The standard union employment contract before us may well be a contract of adhesion (see *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 269-271 [54 Cal.Rptr. 104, 419 P.2d 168]), but there is nothing in the record providing evidentiary support for this conclusion. (2) Furthermore, in this state arbitration is entirely a creature of statute and is a favored method for the expeditious settlement of disputes. (See *Horn v. Gurewitz*, 261 Cal.App.2d 255, 261 [67 Cal.Rptr. 791]; *Leon Handbag Co. v. Local 213*, 276 Cal.App.2d 240, 243 [81 Cal.Rptr. 63]; *876Lesser Towers, Inc. v. Roscoe-Ajax Constr. Co.*, 271 Cal.App.2d 675, 702 [77 Cal. Rptr. 100]; *Canadian Indem. Co. v. Ohm*, 271 Cal.App.2d 703, 707 [76 Cal.Rptr. 902].) This being so, we are reluctant to amend the California Arbitration Act by declaring that contracts of adhesion are beyond its coverage. That is a task for the Legislature if it desires to do so.

(3) This brings us to Frick's final argument against confirmation of the award. This is that the arbitration board was neither impartial nor neutral and, therefore, presumably unfair to any employer caught in its toils. It may be argued that this is a realistic appraisal, but, again, potential unfairness resulting form the nonneutral nature of the controlling arbitrator is not a statutory ground for either vacation of the award or dismissal of the confirmation proceedings. (See *Code Civ. Proc.*, §§ 1286, 1286.2, 1287.2; cf. *Gear v. Webster*, 258 Cal.App.2d 57 [65 Cal.Rptr. 255].) Elementary fairness may seem to demand that arbitration proceedings be under the control of a neutral and impartial arbitrator, but we note that section 1282 of the Act expressly permits the parties to an arbitration to agree to the conduct of

arbitration proceedings by a nonneutral arbitrator. [FN4]Again, arbitration being a creature of statute, the statute controls.

> FN4 We note that many government contracts customarily provide that all disputes arising under them shall be arbitrated by a specified official of the governmental entity which is one of the contracting parties. (See Domke, Commercial Arbitration, § 11.03, pp. 93-96.)

The judgment is affirmed.

Schweitzer, J., and Allport, J., concurred.
A petition for a rehearing was denied February 19, 1970, and appellant's petition for a hearing by the Supreme Court was denied March 25, 1970. *877

Cal.App.2.Dist.
Federico v. Frick
3 Cal.App.3d 872, 84 Cal.Rptr. 74, 73 L.R.R.M. (BNA) 2810

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

282 P.2d 849                                                    Page 1
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

**H**Ferro v. Citizens National Trust and Savings Bank
of Los Angeles
Cal.

PIETRO FERRO, Respondent,
v.
CITIZENS NATIONAL TRUST AND SAVINGS
BANK OF LOS ANGELES, Appellant.
MONARCH WINE COMPANY, INC. (a
Corporation), Respondent
v.
CITIZENS NATIONAL TRUST AND SAVINGS
BANK OF LOS ANGELES, Appellant.
**L. A. No. 23524., L. A. No. 23525.**

Supreme Court of California
Apr. 26, 1955.

HEADNOTES

(**1**) Pledges § 22--Trust Character of Relation.
A pledgee of collateral security for payment of debt
is trustee of pledgor.
See **Cal.Jur.**, Pledges, § 31; **Am.Jur.**, Pledge and
Collateral Security, § 43 et seq.
(**2**)    Insurance    §    220--Persons    Entitled    to
ProceedsTrusts--Following Trust Property.
Insurance proceeds of insured wine, which was
destroyed by fire while stored with winery, take place
of wine, and when such proceeds come into
possession of loss payee holding policy as collateral
security for its loans to winery, they become subject
to trust established by pledge.

(**3**) Pledges § 78--Application of Proceeds--Surplus.
After pledgee of insurance policy has applied
insurance proceeds to discharge obligation secured
by pledge, it is obliged, on satisfaction thereof, to
return any surplus to pledgor. (Civ. Code, § 3008.)

(**4**) Assumpsit § 7--Effect of Express Contract--
Contract Fully Performed.
General rule that common count will not lie to
enforce express contract does not apply if plaintiff
owes no further performance under contract and
nothing remains to be done thereunder except
payment of money by defendant, in which case
payment can be recovered under complaint stating

common count for money had and received.
See **Cal.Jur.2d**, Assumpsit, § 10; **Am.Jur.**,
Assumpsit, § 7.
(**5**) Money Received § 24(1)--Pleading.
In action by owner of wine destroyed by fire against
loss payee holding policy as collateral security for its
loans to winery on whose premises wine was stored,
complaint based on common count for money had
and received stated cause of action, where defendant
exercised its rights under pledge to satisfy plaintiff's
debts out of insurance proceeds, so that nothing
remained to be done but payment by defendant of
surplus to plaintiff.

(**6**) Insurance § 220--Persons Entitled to Proceeds.
Provision in fire policy that "Loss ... [shall] be
adjusted with and ... payable to the insured
specifically named herein" does not entitle insured
winery to insurance proceeds in excess of insurable
interest of loss payee holding policy as collateral
security for its loans to winery, since such provision
merely defines obligation of insurer and is intended
to protect insurer by permitting it to pay named
insured and be thereafter free of claims by other
persons who might have interest in lost property; it
does not give pledgee right to transfer such proceeds
to insured nor prevent insured, owner of wine and
pledgee from expressly agreeing to different
arrangement.

(**7**) Insurance § 220--Persons Entitled to Proceeds.
In action by owner of wine destroyed by fire against
loss payee holding policy as collateral security for its
loans to winery on whose premises wine was stored,
defendant's contention that it was merely acting as
collection agent for insured winery is rebutted by
testimony that defendant "insisted" that it be last to
endorse claim drafts issued by insurer and that it
control disposition of all insurance proceeds, and by
testimony of winery's president that defendant was
not acting as mere agent of winery but that winery
was obliged to "follow the procedure set down by
[defendant]" for handling and disposition of funds.

(**8**)    Insurance    §    220--Persons    Entitled    to
ProceedsTrusts § 272--Following Trust Property.
Insurance proceeds take place of insured chattel and
named insured holds proceeds in trust for owner of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

chattel, and if such proceeds come into possession of third person who has notice of trust and of interest of beneficial owner, he likewise holds them in trust.

**(9)** Trusts § 276(1)--Following Trust Property--Knowledge or Notice of Transferee.
Loss payee having possession of insurance proceeds of insured wine with actual knowledge of wine owner's interest commits breaches of trust by allowing such proceeds to be used to pay insured winery's unsecured creditors, by commingling such proceeds with those of building and equipment insurance, by paying itself winery president's personal debt and winery's unsecured debt, and by delivering remainder of proceeds to winery without paying wine owner and without notice to such owner that it was thus disposing of proceeds, and fact that winery was also obligated to pay wine owner and that such owner might have recovered its share of proceeds from winery before its bankruptcy cannot excuse loss payee's breach of its trust obligation to wine owner.

**(10)** Trusts § 283--Following Trust Property--Knowledge or Notice of Transferee.
In action by owner of wine to recover proceeds of fire policy from loss payee holding policy as collateral security for its loans to winery on whose premises wine was stored, jury could reasonably conclude that loss payee should have known that possibility of payment of wine owner's claim was both doubtful and hazardous where, for several years before fire, loss payee had continuous course of dealings with winery and kept informed of winery's financial condition, where at time of fire loss payee held approximately $4,000 worth of trade acceptances on which winery had defaulted and which were paid from insurance proceeds, and where, though it led winery to believe it would not call winery's mortgage obligation of $81,000, it did call such obligation and paid it off from such proceeds.

**(11)** Money Received § 28--Instructions.
In action by owner of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, jury were not inadequately instructed as to what could be found to be "wrongful" payment by defendant to winery of insurance proceeds covering owner's wine where, considering instructions as whole, jury could not have been under misapprehension as to judge's meaning in use of

word "wrongful."

**(12)** Trusts § 330--Establishment of Trust--Instructions.
In action by owner of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, an instruction that defendant became involuntary trustee and held property for plaintiff's benefit if defendant wrongfully acquired or wrongfully detained plaintiff's property is not necessarily inconsistent with instructions informing jury of consequences of lawful acquisition but wrongful disposition of plaintiff's property.

**(13)** Trusts § 330--Establishment of Trust--Instructions.
In action by owner of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, instructions that plaintiff could not recover if he "authorized or consented" or "consented and agreed" to payment by defendant to insured winery are not in conflict with earlier instruction using words "assented to or acquiesced in" if word "acquiescence" in such instruction referred to laches.

**(14)** Trusts § 314--Establishment of Trust--Defenses.
Mere acquiescence is not defense to action against trustee for breach of trust.

**(15)** Trial § 228--Special Verdicts.
Direction of special verdicts is within discretion of trial judge. (Code Civ. Proc., § 625.)

**(16)** Damages § 198--Instructions.
In actions by owners of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, it is proper to instruct jury that if verdict is returned for one or more plaintiffs jury must determine amount of money particular plaintiff is entitled to where amount due to one plaintiff could be ascertained by multiplying gallons destroyed by amount such wine was worth and then subtracting amount of plaintiff's debt to defendant, and where amount of other plaintiff's loss was amount which he paid for destroyed wine, which was less than amount of insurance proceeds attributable to that wine.

**(17)** Trusts § 336--Establishment of Trust--Relief

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

Granted.
In actions by owners of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, it is not proper to exclude from computation of amount of recovery a draft that was used to pay insured winery's attaching creditors and draft on which a warehouse company was named as payee where these drafts were within defendant's possession and control, where one draft was paid without notice to either plaintiff and one plaintiff's agreement to use the other draft to pay winery's creditors was made in reliance on defendant's assurance that he would be paid from remaining proceeds, and where defendant had knowledge of each plaintiff's interest in insurance proceeds and assured each that those proceeds would be adequate to pay their claims.

**(18)** Damages § 43--Interest.
In actions by owners of wine destroyed by fire to recover proceeds of fire policy in defendant's possession as loss payee, plaintiffs are entitled to recover interest on portion of insurance proceeds to which they are entitled from date of wrongful disbursement thereof, where such damages are capable of being made certain on such date except for dispute as to amount of shrinkage on one plaintiff's wine, which is not included in amount of recovery.

### SUMMARY

APPEAL from judgments of the Superior Court of Los Angeles County. Arthur Coats, Judge. FN*Affirmed.

FN* Assigned by Chairman of Judicial Council.
Actions to recover proceeds of insurance policy in defendant's possession as loss payee. Judgments for plaintiffs affirmed.

### COUNSEL

Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether and Edward A. Nugent for Appellant.
Jerome Weber and Jack Altman for Respondent in No. 23524.
Bronson, Bronson & McKinnon and George K. Hartwick for Respondent in No. 23525.
TRAYNOR J.
Defendant appeals from judgments in favor of plaintiffs Ferro and Monarch in actions that were

separately filed but were consolidated for purposes of trial and appeal. In these plaintiffs seek to recover insurance proceeds paid for their wine, which was destroyed by fire while stored with Sunnyside Winery. These proceeds came into defendant's possession, and plaintiffs contend that defendant held them in trust for the benefit of plaintiffs and that defendant breached that trust by its disposition of these proceeds and by its failure to pay them to plaintiffs.

The storage facilities of Sunnyside Winery were operated as a field warehouse by the Lawrence Warehouse Company. Of the 297,117 gallons of wine stored therein on February 8, 1950, the Lawrence Warehouse Company's inventory showed that Ferro owned 200,237 gallons, Monarch owned 83,000 gallons, Federal Wine and Liquor Company owned 6,100 gallons, Cella Vineyards owned 200 gallons, and Sunnyside owned 7,580 gallons. All of this wine and a part of Sunnyside's winery were destroyed by fire on February 8, 1950. Pursuant to contracts with the owners of the wine, Sunnyside paid the premiums on several policies of insurance covering all of the wine in storage. It also maintained insurance on its buildings and equipment. Defendant was named loss payee in all of these insurance policies. Sunnyside and its president, Felix Butte, had been clients of defendant since 1947 and defendant had occasionally made loans to Sunnyside on its wine. Defendant held the policies as collateral security for its loans and retained possession of them even when there were no loans outstanding in order to facilitate the making of a new loan to Sunnyside when the occasion for it arose. *406

At the time of the fire Sunnyside owed defendant $81,000 on a note secured by $25,000 in bonds and a deed of trust and a chattel mortgage on its plant and equipment. The insurance policies insured the plant and equipment for a maximum of $800,000. Defendant also held approximately $4,000 worth of trade acceptances on which Sunnyside was in default. On the same date Felix Butte, president of Sunnyside, owed defendant $23,000 on an unsecured personal note; Ferro owed defendant $52,636.67, which was secured by warehouse receipts for the 200,237 gallons of wine stored by Ferro at Sunnyside; and Monarch owed defendant $42,000 on two unsecured trade acceptances representing the purchase price of the wine stored at Sunnyside, which Monarch had

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

Page 4

purchased through an escrow conducted by defendant.

After the fire the insurance loss for all of the wine was adjusted at $136,440.49 and for the buildings and equipment at $202,000. Defendant insisted that Sunnyside, the named insured, endorse the insurance claim drafts, that defendant be the last to endorse the drafts, and that defendant collect them and control all of the proceeds received therefrom. Before any of the drafts were collected, however, unsecured creditors of Sunnyside, with claims totalling approximately $35,000, attached the monies in the hands of the insurers. On April 20, 1950, Butte arrived at defendant's place of business with the first claim draft from one of the seven wine insurers in the amount of $40,932.15. At this time a conference took place between Butte, defendant, and Ferro's attorney; Monarch was not represented. To obtain a release of the attachments, an agreement was reached whereby defendant would endorse the $40,932.15 draft, which would then be forwarded for payment of Sunnyside's unsecured creditors to the sheriff of San Francisco, who was named a payee because of the attachment. Ferro signed a written authorization for that disposition of this draft in reliance on the further agreement that defendant would collect all of the remaining proceeds of the wine insurance and the building and equipment insurance and allocate it among the several owners of the property that was destroyed by the fire and in reliance on the assurance of defendant and an insurance adjuster, who was present at the meeting, that the remaining proceeds were more than ample to cover all of the claims.

Defendant endorsed the $40,932.15 draft, and it was forwarded to the sheriff of San Francisco. Sunnyside's unsecured creditors were paid, the attachments were released, and *407 the balance remaining (approximately $6,000) was paid to Sunnyside. At the time of its endorsement, defendant knew that the claim draft represented proceeds of the wine insurance, and that the proceeds would be used to pay unsecured creditors of Sunnyside. It was also aware that Sunnyside owned only 7,580 gallons of the wine and that the remainder was owned by Ferro, Monarch, Federal Wine and Liquor Company, and Cella Vineyards, in the proportions indicated in the Lawrence Warehouse Company's inventory, a copy of which was given defendant at the April 20th meeting.

After the attachments were released, defendant collected all but one of the remaining claim drafts on both the wine and the building and equipment insurance. Its collections from the insurers of the wine totalled $85,275.30, and collections from the building and equipment insurers totalled $183,000. The monies thus collected from the different types of insurance were not kept separate, but were commingled, and reduced to cashier's checks drawn on defendant and payable to defendant. The only claim draft that defendant did not collect was one on which the Lawrence Warehouse Company was a payee. Lawrence refused to endorse, and defendant held it until July 27, 1950, when it forwarded the draft to Sunnyside.

By June 27, 1950, defendant's collections were substantially complete, and on that date it took $52,636.67 thereof to satisfy Ferro's debt to it. Late in June, Ferro's attorney learned that defendant had received the insurance money, but when he inquired about it, one of defendant's officers told him that defendant could not give out information about the insurance proceeds without the authorization of Butte. On July 5, 1950, defendant used insurance proceeds to satisfy all of the obligations owed to it by Butte and Sunnyside, except the $81,000 due from Sunnyside on its building loan. Monarch's obligation had come due before the insurance proceeds were collected. At defendant's insistence and in reliance on defendant's assurance that it would be reimbursed out of the insurance proceeds, Monarch paid its obligations on the due date. On July 6, 1950, defendant sent cashier's checks aggregating $60,000 to Sunnyside. Defendant retained another $60,000 in cashier's checks payable to itself as well as the $10,223.04 claim draft on which the Lawrence Warehouse Company was named as a payee. Shortly thereafter it received the final payment from the insurers in the amount *408 of $45,000. Neither Ferro nor Monarch had any knowledge of these transactions prior to July 6, 1950.

On July 19, 1950, Monarch wired defendant: "We understand that the insurance moneys were collected on fire loss at Sunnyside Winery, Fresno. Amount due us on fire loss is approximately $35,000. We have been informed money is in your possession. Please be informed that we look to you for check in payment of amount due to us on fire loss." On this

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

date defendant had in its possession commingled insurance proceeds in the amount of $105,000, as well as the $10,223.04 claim draft on which Lawrence Warehouse Company was a payee. On July 21, 1950, defendant used $81,000 of the proceeds in its possession to satisfy Sunnyside's building loan, and the remainder of the proceeds was delivered to Sunnyside. On July 24, 1950, defendant wrote Monarch: "Please be advised that we do not hold any moneys representing insurance proceeds on loss by fire of wine inventory at Sunnyside Winery, Fresno, California. It is respectfully suggested that you communicate with the Sunnyside Winery and Mr. Felix Butte, Jr., to whom or to whose order such proceeds were paid." On July 27, 1950, defendant sent the $10,223.04 draft to Sunnyside. In November 1950 Sunnyside was declared insolvent. Neither Ferro nor Monarch was paid for their wine that was lost in the fire, and in this action they seek to hold defendant responsible for their loss.

*The Ferro Case*

Ferro pledged (Civ. Code, §§ 2986, 2987) the warehouse receipts for his wine as collateral security for the payment of his debt to defendant. (1) A pledgee of collateral security for the payment of a debt is a trustee of the pledgor. (*Hudgens v. Chamberlain, 161 Cal. 710, 715* [120 P. 422]; *Sparks v. Caldwell, 157 Cal. 401, 403* [108 P. 276]; *Haber v. Brown, 101 Cal. 445, 452* [35 P. 1035]; *Wade v. Markwell & Co., 118 Cal.App.2d 410, 426* [258 P.2d 497, 37 A.L.R.2d 1363].) (2) After the wine was destroyed, the insurance proceeds took the place of the wine (*California Ins. Co. v. Union Compress Co., 133 U.S. 387, 410* [10 S.Ct. 365, 33 L.Ed. 730]; *American Eagle Fire Ins. Co. v. Gayle, 108 F.2d 116, 119*; *Century Ins. Co. v. First Nat. Bank, 102 F.2d 726, 728*), and when those proceeds came into defendant's possession they likewise became subject to the trust established by the pledge. (*Haber v. Brown, supra, 101 Cal. 445, 452; Ponce v. McElvy, 47 Cal. 154, 159-160; Tracy v. Stock Assurance Bureau, 132 Cal.App. 573, 580* [23 P.2d 41]; 21 Cal.\*409 Jur., "Pledges," § 72; see also *Cushing v. Building Assn. etc. of Psychology, 165 Cal. 731, 737-738* [134 P. 324]; *Lucas v. Associacao Protectora etc. Da Calif., 61 Cal.App.2d 344, 351-352* [143 P.2d 53].) (3) Defendant could properly apply those proceeds to discharge the obligation secured by the pledge, but upon satisfaction thereof, it was obliged

to return any surplus that remained to the pledgor, Ferro. (Civ. Code, § 3008; *Hudgens v. Chamberlain, supra, 161 Cal. 710, 715; Sparks v. Caldwell, supra, 157 Cal. 401, 403; MacDonald v. Pacific Nat. Bank, 66 Cal.App.2d 357, 365* [152 P.2d 360]; see also *Baird v. Olsheski, 116 Cal.App. 109, 111* [2 P.2d 493].) Its failure to do so was a breach of trust.

Defendant contends, however, that a pledge is an express contract, that it was not pleaded in Ferro's complaint, and that it would therefore be improper to allow recovery on the theory of breach of trust. Ferro did plead a common count for money had and received, but defendant contends that "such a count will not lie to enforce an express contract," citing *Barrere v. Somps, 113 Cal. 97, 101* [45 P. 177, 572]. (4) The general rule thus stated by defendant does not apply if the plaintiff owes no further performance under the contract and nothing remains to be done thereunder except the payment of money by the defendant. Payment can then be recovered under a complaint stating a common count for money had and received. (*Willett & Burr v. Alpert, 181 Cal. 652, 659* [185 P. 976]; *Castagnino v. Balletta, 82 Cal. 250, 257-258* [23 P. 127]; *Haggerty v. Warner, 115 Cal.App.2d 468, 474* [252 P.2d 373]; *Abbott v. Limited Mut. Comp. Ins. Co., 30 Cal.App.2d 157, 165* [85 P.2d 961]; see also *McClure v. Alberti, 190 Cal. 348, 351* [212 P. 204].) The latter rule was recognized in the Barrere case, for the court there expressly pointed out that the plaintiff's contractual obligation was still executory. (5) Ferro's obligation under the pledge contract was to pay his debt to defendant. When the insurance proceeds for Ferro's wine came into defendant's possession they became subject to the pledge, and when defendant exercised its rights under the pledge to satisfy Ferro's debt out of those proceeds nothing remained to be done but the payment by defendant of the surplus to Ferro. Ferro's complaint therefore properly stated a cause of action for the enforcement of this obligation.

(6) Defendant also contends that because Sunnyside was the named insured in the insurance policies and because the policies provided that the "Loss ... [shall] be adjusted \*410 with and ... payable to the insured specifically named herein," Sunnyside, rather than Ferro and Monarch, was legally entitled to the insurance proceeds in excess of defendant's insurable interest, which was protected by the commodity loss payable endorsement that appeared on each policy.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

The simple answer to this contention is that the provision in the insurance policy defines only the obligation of the insurer. (*Alexander v. Security-First Nat. Bank,* 7 Cal.2d 718, 725, 726-727 [62 P.2d 735]; *Mutual Life Ins. Co. v. Henes,* 8 Cal.App.2d 306, 310-311 [47 P.2d 513].) The provision is intended to protect the insurer by permitting it to pay the named insured and to be thereafter free of claims by other persons who might have an interest in the lost property. The insurance policy did not give defendant a right to transfer the proceeds to Sunnyside, and did not prevent Sunnyside, Ferro, and defendant from expressly agreeing to a different arrangement (*ibid.*), as defendant's satisfaction from the insurance proceeds of Butte's and Sunnyside's unsecured debts clearly shows.

(7) Moreover, defendant's repeated contention that it was merely acting as a collection agent for Sunnyside is rebutted by the testimony of several witnesses that defendant "insisted" that it be the last to endorse the claim draft and that it control the disposition of all of the insurance proceeds, and by Butte's testimony that defendant was not acting as a mere agent of Sunnyside but that, instead, Sunnyside was obliged to "follow the procedure set down by [defendant]" for the handling and disposition of these funds.

*The Monarch Case*

The judgment in favor of Monarch must also be affirmed on the ground of breach of trust. Shortly after the fire but before any of the insurance proceeds were received, Leo Star, president of Monarch, had two conferences with one of defendant's officers who assured him that there was ample insurance to cover all of the stored wine, including that of Monarch, and that Monarch therefore "had nothing to worry about." On April 20th (the day the first claim draft for $40,932.15 came into defendant's possession) defendant was given a copy of the Lawrence Warehouse Company's inventory showing that Monarch owned 83,000 gallons of wine that had been destroyed. On the same day, and without notice to Monarch, defendant endorsed the $40,932.15 claim draft, which was a part of the proceeds of the wine insurance, and delivered it to Butte with knowledge that it \*411 would be used to pay Sunnyside's unsecured creditors. Thereafter, defendant collected all of the proceeds of both the wine and the building and equipment insurance, with the exception of the

$10,223.04 claim draft on which the Lawrence Warehouse Company was named as a payee. Defendant commingled these proceeds, and reduced them to cashier's checks drawn on itself and payable to itself. (Cf. Civ. Code, § 2236.) From these commingled proceeds it paid itself Ferro's debt, Butte's personal debt, Sunnyside's unsecured debt, and delivered $60,000 to Sunnyside. After these transactions were completed, Monarch wired defendant that it was advised that defendant was in possession of the insurance proceeds and that Monarch was looking to defendant for payment of its claim. At that time defendant had in its possession $105,000 of the commingled proceeds, in addition to the uncollected claim draft on which the Lawrence Warehouse Company was named payee. The day after receiving Monarch's telegram, defendant used $81,000 of the commingled proceeds to pay off Sunnyside's building loan. The remainder of the proceeds was ultimately forwarded to Sunnyside.

(8) It is established that insurance proceeds take the place of the insured chattel, and that the named insured holds the proceeds in trust for the owner of the chattel. (*California Ins. Co. v. Union Congress Co.,* 133 U.S. 387, 410 [10 S.Ct. 365, 33 L.Ed. 730]; *American Eagle Fire Ins. Co. v. Gayle,* 108 F.2d 116, 119; *Century Ins. Co. v. First Nat. Bank,* 102 F.2d 726, 728; *Polley v. Daniels,* 238 App.Div. 181 [264 N.Y.S. 194, 197].) If these proceeds come into the possession of a third party who has notice of the trust and of the interest of the beneficial owner, he likewise holds them in trust.(*Ibid.;Lucas v. Associacao Protectora etc. Da Calif.,* 61 Cal.App.2d 344, 351-352 [143 P.2d 53]; 3 Scott on Trusts §§ 324.3, 324.4.) (9) It is clear that before defendant disposed of any of the insurance proceeds in its possession, it had actual knowledge that Monarch owned 83,000 gallons of the destroyed wine. Thereafter, defendant committed several breaches of trust by allowing proceeds of the wine insurance to be used to pay Sunnyside's unsecured creditors, by commingling the wine insurance proceeds with those of the building and equipment insurance and paying itself Butte's personal debt and Sunnyside's unsecured debt, and by delivering the remainder of the proceeds to Sunnyside without paying Monarch and without notice to Monarch that it was thus disposing of the proceeds. The fact that Sunnyside \*412 was also obligated to pay Monarch and that Monarch might have recovered its share of the proceeds from Sunnyside (before its bankruptcy in November 1950)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

cannot excuse defendant's breach of its trust obligation to Monarch.

(10) Moreover, there is evidence from which it can be inferred that defendant knew at the time it delivered a part of the insurance proceeds to Sunnyside that Sunnyside's financial condition was such that the possibility of Monarch's and Ferro's claims being paid by Sunnyside was both doubtful and hazardous. For several years before the fire, defendant had a continuous course of dealings with Sunnyside and kept informed of the latter's financial condition. At the time of the fire defendant held approximately $4,000 worth of trade acceptances on which Sunnyside had defaulted. These acceptances were paid from insurance proceeds in July 1950. Defendant knew that Sunnyside urgently needed financing, and it led Sunnyside to believe that it would not call the latter's mortgage obligation of $81,000. Defendant did call that obligation and paid it off from the insurance proceeds in its possession. At that time defendant had in its possession Sunnyside's balance sheet, dated June 15, 1950, which listed the *whole* of the insurance proceeds as an asset of the corporation. In light of these facts the jury could reasonably conclude that defendant should have known that payment of Monarch's claim was rendered both doubtful and hazardous by delivery to Sunnyside of the insurance proceeds remaining after defendant had made the disbursements mentioned above.

*Instructions*

A number of defendant's objections to the instructions have already been answered by the foregoing discussion. (11) In addition, defendant contends that the jury was inadequately instructed as to what could be found to be a "wrongful" payment by defendant to Sunnyside of the share of the insurance proceeds covering Monarch's wine. Considering the instruction as a whole, and instructions 41 [FN*] and *413 42 [FN*] in particular, it does not appear that the jury could have been under any misapprehension as to the trial judge's meaning in the use of the word "wrongful."

FN* "The gist and substance of Monarch's claim that a constructive trust has been established is that before the Bank endorsed the first draft of $40,000 it had promised and

agreed, or by its conduct led and induced Monarch to believe, as a reasonably prudent person, that when it received the insurance proceeds, it would pay to Monarch that portion of the insurance proceeds that represented payment for Monarch's wine, and that when the Bank did receive such proceeds, it distributed them, or allowed them to be distributed to others, knowing at the time that the financial condition of Sunnyside was such that the disposal of these funds other than to them would probably result in Monarch's being deprived of that portion of the proceeds which represented its wine.

"In this regard you must determine what facts and circumstances have been proved, and whether the facts and circumstances found to be proved, are themselves of such a nature as to establish a trust, the breach of which would entitle Monarch to judgment in the action.

"The question of liability must be determined by what happened before the Bank disbursed the money. Whatever conversations took place or events occurred after the money passed from the hands of the Bank is not to be considered by you in determining the question of liability of the Bank."

FN* "In order for Monarch to recover it must be established by a preponderance of the evidence:

"The Bank knew of the ownership of Monarch in the wine destroyed:

"The Bank agreed to pay Monarch, or led or induced Monarch to believe that it would pay Monarch, out of insurance proceeds that came into its possession, the insured value of Monarch's wine.

"That the Bank thereafter paid, or allowed to be paid, to others all of the insurance proceeds, except the amount of Ferro's indebtedness to it, knowing at the time, or having such knowledge that, as a reasonably prudent person it should have known, that by such action Monarch would not be paid for its wine, or that such payment would be doubtful and hazardous.

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

(12) Defendant also contends that instructions 41 and 42 are in conflict with instruction 32. [FN†] These instructions are not necessarily inconsistent, however, for they were intended to describe the different factual situations on which defendant's liability could be predicated. Instruction 32 informed the jury that if defendant wrongfully acquired or wrongfully detained plaintiff's property, it became an involuntary trustee and held the property for plaintiff's benefit. Instructions 41 and 42 informed the jury of the consequences of lawful acquisition but wrongful disposition of plaintiff's property. There was evidence to warrant the giving of each of these instructions.

FN† "You are instructed that a person who wrongfully detains the property of another, or a person who gains property by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act is, unless he has some other and better right thereto, an involuntary trustee of the property gained, for the benefit of the person who would otherwise have had it."

(13) The jury was instructed that if Ferro "authorized or consented" or " consented and agreed" to the payment by defendant to Sunnyside he could not recover. Defendant contends that these instructions are in conflict with an earlier instruction using the words "assented to or acquiesced in" in that any reference to Ferro's "acquiescence" is omitted.*414 The instructions were not inconsistent, if the word "acquiescence" in the earlier instruction referred to laches. (14) If "acquiescence" was intended to mean "passive submission or acceptance" (see Webster's New Internat. Dict. [2d ed. 1942], p. 23), defendant was not prejudiced thereby since a mere acquiescence is not a defense to an action against a trustee for breach of trust. (Rest., Trusts, § 216(1), comment *a*; 2 Scott on Trusts 1151.;

(15) Defendant contends that it was prejudicial error for the court to refuse to give its requested instruction that the jury must "state in [its] verdict upon which, if any, of the respective causes of action you believe any plaintiff is entitled to recover judgment against defendant. ..." Both Ferro and Monarch stated alternative theories of recovery in three separate counts of their complaints. The instruction requested by defendant in effect asked for special verdicts on each of the six counts. The direction of special verdicts is within the discretion of the trial judge. (Code Civ. Proc., § 625; *House Grain Co. v. Finerman & Sons,* 116 Cal.App.2d 485, 498 [253 P.2d 1034]; *Lloyd v. Kleefisch,* 48 Cal.App.2d 408, 417 [120 P.2d 97].) Nothing appears herein to indicate that the refusal to give defendant's requested instruction was an abuse of discretion.

(16) Defendant contends that the following instruction on the measure of damages was erroneous and prejudicial:

"If you should return a verdict for one or more of the plaintiffs against the defendant, you shall determine the amount of money the particular 🔑r plaintiff is entitled to, and return a verdict for that amount, together with interest from the 6th day of July, 1950.

"Plaintiff Ferro seeks to recover on the basis of 14 cents a gallon for the wine destroyed by the fire. [FN*]

FN* This prayer was based on the theory, which was presented at the trial, that Ferro's wine was worth 39 cents a gallon and that his debt to defendant was the equivalent of 25 cents a gallon. Since that debt had been paid he contended that he was entitled to the remaining 14 cents. This method of computation was the result of a practice established before the fire. Ferro had agreed to sell his wine to Sunnyside in accordance with the latter's needs from time to time. As Sunnyside withdrew irregular lots and appropriated them to its own use, it would send a check for the amount withdrawn, computed at 39 cents a gallon, to defendant. Defendant would retain the equivalent of 25 cents a gallon and apply it to Ferro's obligation to defendant. The equivalent of 14 cents a gallon would then be forwarded by defendant to Ferro.

"Plaintiffs [*sic*] Monarch seeks to recover the amount paid per gallon by the insurance companies for its wine stored in the Sunnyside Warehouse." *415

The instruction was correct. Ferro's prayer for $29,174.32 was based on the assumption that he owned 208,388 gallons of wine. Evidence was introduced to show that normal shrinkage had reduced Ferro's wine to 200,237 gallons. The jury

282 P.2d 849
44 Cal.2d 401, 282 P.2d 849
**44 Cal.2d 401**

Page 9

accepted this evidence and multiplied that figure by 39 cents. From that total ($78,092.43) it subtracted the amount of Ferro's debt to defendant ($52,636.67) and returned a verdict for the remainder, $25,455.76. Monarch's loss was found to be the amount that Monarch paid for the destroyed wine, which was less than the amount of insurance proceeds attributable to that wine. Thus, the verdicts for both plaintiffs were less than those that could have been returned under the court's instructions.

(17) Defendant contends, however, that it "received" only $85,275.30 of the total wine insurance proceeds of $136,440.49, and thus that plaintiffs are at most entitled to a share of that sum equivalent to the proportion that their wine bore to the total amount of the destroyed wine and, in Ferro's case, less the amount of his debt to defendant. Such a computation would result in a verdict for Ferro in the amount of $4,830.35, and for Monarch in the amount of $23,821.74. This argument is based on the assumption that it is proper to exclude from the computation the $40,932.15 draft that was used to pay Sunnyside's attaching creditors and the $10,233.04 draft on which the Lawrence Warehouse Company was named a payee. These drafts cannot be excluded. Defendant had these drafts as well as the remainder of the proceeds within its possession and control. It delivered the $10,233.04 draft to Sunnyside without notice to either plaintiff, and Ferro's agreement to the use of the $40,932.15 draft to pay Sunnyside's creditors was made in reliance on defendant's assurance that he would be paid from the remaining proceeds. Defendant had knowledge of each plaintiff's interest in the wine insurance proceeds and it assured each of them that those proceeds would be adequate to pay their claims. Defendant was a trustee of those funds and was obligated to protect plaintiffs' interests therein.

(18) It is contended that the court's instruction that plaintiffs were entitled to interest from July 6, 1950, was error and that plaintiffs are entitled to interest only from the date of judgment. Section 3287 of the Civil Code provides that "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular *416 day, is entitled also to recover interest thereon from that day. ..." (See _Lineman v. Schmid_, 32 Cal.2d 204, 209-213 [195 P.2d 408, 4 A.L.R.2d 1380].) Plaintiffs'

damages were "capable of being made certain" on July 6, 1950, except for the dispute over the amount of shrinkage on Ferro's wine. There was no question but that Ferro was entitled to recover for 200,237 gallons of wine, and the dispute over the amount of shrinkage from the original 208,388 gallons cannot affect the certainty of that figure. Since the jury limited recovery to 200,237 gallons, there was no error in allowing interest.

The judgments are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.

Cal.

Ferro v. Citizens National Trust and Savings Bank of Los Angeles

44 Cal.2d 401, 282 P.2d 849

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.