# EXHIBIT 11

Westlaw.

128 P.2d 9
20 Cal.2d 646, 128 P.2d 9
**20 Cal.2d 646**

Page 1

**H**Harrison v. Adams
Cal.
R. E. HARRISON, Plaintiff; CHARLOTTE R.
HARRISON, as Executrix, etc. (Substituted
Plaintiff), Appellant,
v.
HENRY J. ADAMS et al., Respondents.
**L. A. Nos. 17675, 17706.**

Supreme Court of California
Aug. 3, 1942.

HEADNOTES

(**1**) Appeal and Error § 1150--Presumptions--
Sufficiency of Evidence.
On appeal on the judgment roll alone, a finding that
an assignment was made for a valuable consideration
is presumed to have the support of substantial
evidence.

(**2**) Set-off § 9, 11--Equitable Set-off--Insolvency.
A court of equity will compel a set-off when mutual
demands are held under such circumstances that one
of them should be applied against the other and only
the balance recovered. The insolvency of the party
against whom the relief is sought justifies invoking
this principle.

(**3**) Judgments § 521, 523, 527--Set-off--Effect of
Assignment.
A judgment debtor who has by assignment or
otherwise become the owner of a judgment or a claim
against his judgment creditor may have his judgment
or claim offset against the judgment. Such set-off
may be compelled even against an assignee of the
judgment who took without notice and for value.
Set-off as between judgments, note, 121 A. L. R.
478. See, also, 15 Cal.Jur. 275; 31 Am. Jur. 370.
(**4**) Judgments § 522, 523--Set-off--Requisites--
MutualityEffect of Assignment.
To authorize the offsetting of a judgment or claim
against the judgment, the assignee must be the
beneficial owner of the claim or judgment. Moreover,
there must be mutuality, that is, the judgments must
be between the same parties in the same right. In
determining whether demands are mutual, equity will

look to the real party in interest.

(**5**) Judgments § 523--Set-off--Effect of Assignment--
Assignment for Collection.
While an assignee for collection may maintain an
action in his own name, a judgment debtor to whom a
claim has been assigned for collection cannot have
the claim set off against the judgment, especially
where before such assignment the judgment had been
assigned for value. A contrary rule would violate the
rule forbidding a trustee from using trust property for
a private purpose, and also the rule requiring
mutuality of the parties. The insolvency of the
creditors does not justify violation of the rule of
mutuality.

SUMMARY

APPEALS from a judgment of the Superior Court of
San Diego County. Robert B. Burch, Judge.
Affirmed.

Action by judgment debtor to compel the set-off of
an amount due on a note against the judgment.
Judgment for plaintiff on the note but denying the
right to use the note as a set-off, affirmed.

COUNSEL
Luce, Forward, Lee & Kunzel for Appellant.
Dempster McKee for Respondents.
EDMONDS, J.
The judgment from which the plaintiff has appealed
must be reversed if a chose in action, which has been
assigned for collection, may be used by the assignee
as a set-off against the judgment creditor of the
assignee. The record in L. A. 17675 shows a notice of
appeal from a portion of the judgment. Under a
second notice of appeal from the whole of the same
judgment, a transcript was filed under L. A. 17706.
The two appeals have been consolidated, and
following the death of R. E. Harrison, the appellant,
the executrix of his estate, was substituted for him.

In a previous action, Henry J. Adams obtained a
judgment against the plaintiff for $11,000. Harrison
appealed, making a cash deposit with the county
clerk to stay execution. Adams assigned the judgment

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 P.2d 9
20 Cal.2d 646, 128 P.2d 9
**20 Cal.2d 646**

to F. N. Meyers for the purpose of distributing its proceeds in accordance with a contract for attorneys' fees. Harrison was served with notice of this assignment.

Subsequently, Adams assigned his interest in the judgment to Verda Adams, his wife, giving notice to Meyers of the assignment. However, Harrison had no notice of the second assignment until after the present action was commenced.

Following these assignments, one Russell assigned to Harrison, for the purpose of collection, Adams' promissory note for $3,800 which was then due and payable. Later, the judgment against Harrison was affirmed. Harrison then commenced the present action, naming Adams and Meyers as defendants, to set off the amount due upon the note against the judgment obtained by Adams. At the time of filing it, Harrison secured an order restraining the clerk of the superior court from paying to Adams or Meyers any part of the money deposited by him in lieu of a bond on appeal. Subsequently, *648 by stipulation, all of the deposit was paid to Meyers except $4,600, which is held pending the final determination of this action, and Verda Adams was substituted for Meyers as a party defendant.

These facts are undisputed. In connection with them, the trial court found that the assignment from Adams to his wife was for a valuable consideration and that Adams was insolvent both before and after the assignment. Judgment was rendered for Harrison against Adams for the amount of principal and interest on the note, approximately $4,600, with costs, and for Verda Adams against Harrison for her costs, directing the clerk to pay to her the amount of the deposit held by him.

Unquestionably the judgment against Henry J. Adams is proper but, in view of Adams' insolvency, the question vital to the success of Harrison in realizing upon it is whether he can reach the interest of Verda Adams in the money held by the county clerk, or conversely, whether Verda Adams took her title subject to the rights of Harrison and Russell, his assignor, upon the note.

At the time of the assignments made by Adams, California had not enacted the Uniform Fraudulent Conveyance Act (Stats. 1939, p. 1667; Civ. Code §§

3439.1-3439.12.) But many years before, this court held that a transfer of property without consideration by a person insolvent, or in contemplation of insolvency, is void as to creditors regardless of the intent of the debtor. (*Atkinson v. Western Development Syndicate,* 170 Cal. 503 [150 Pac. 360].) (1) However, Harrison cannot successfully challenge the assignment made to Verda Adams because his appeal is upon the judgment roll alone, and the finding that it was made for a valuable consideration must be presumed to have the support of substantial evidence to that effect.

(2) Concerning the rights of the appellant to the money on deposit as against the assignee of the judgment for a valuable consideration, it is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered. The insolvency of the party against whom the relief is sought affords sufficient ground for invoking this equitable principle. (*Machado v. Borges,* 170 Cal. 501 [150 Pac. 351]; *Coonan v. Loewenthal,* 147 Cal. 218 [81 Pac. 527,109 Am. St. Rep. 128]; *649Hobbs v. Duff,* 23 Cal. 596;*Russell v. Conway,* 11 Cal. 93;*California Cotton Credit Corp. v. Superior Court,* 127 Cal. App. 472 [15 P. (2d) 1108]; *City Investment Co. v. Pringle,* 73 Cal. App. 782 [239 Pac. 302]; *Arp v. Blake,* 63 Cal. App. 362 [218 Pac. 773].) (3) And a judgment debtor who has, by assignment or otherwise, become the owner of a judgment or claim against his judgment creditor, may go into the court in which the judgment against him was rendered and have his judgment offset against the first judgment. (*Machado v. Borges, supra;Coonan v. Loewenthal, supra;Haskins v. Jordan,* 123 Cal. 157 [55 Pac. 786]; *McBride v. Fallon,* 65 Cal. 301 [4 Pac. 17]; *Hobbs v. Duff, supra; Porter v. Liscom,* 22 Cal. 430 [83 Am. Dec. 76]; *Russell v. Conway, supra; Arp v. Blake, supra;* and see annotation in 121 A. L. R. 478-542.)The fact that the demand of the plaintiff has not been reduced to judgment is no obstacle to its allowance as a set-off against a judgment. (*Machado v. Borges, supra.*)Such a set-off may be compelled even against an assignee of the judgment who took without notice and for value. (*Machado v. Borges, supra; Coonan v. Loewenthal, supra; Haskins v. Jordan, supra; McBride v. Fallon, supra; Porter v. Liscom, supra; Cohen v. Bonnell,* 14 Cal. App. (2d) 38 [57 P. (2d) 1326]; *Bank of America v. Pacific Ready-Cut Homes, Inc.,* 122 Cal. App. 554 [10 P.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 P.2d 9
20 Cal.2d 646, 128 P.2d 9
**20 Cal.2d 646**

(2d) 478]; *Arp v. Blake, supra.*)

It has also been held that under section 368 of the Code of Civil Procedure the debtor may set off claims against the creditor which were acquired after the assignment of the judgment to a third person but prior to notice to the debtor of the assignment. (*Arp v. Blake, supra;* and see *McKenney v. Ellsworth,* 165 Cal. 326 [132 Pac. 75]; *St. Louis Nat. Bank v. Gay,* 101 Cal. 286 [35 Pac. 876]; *McCabe v. Grey,* 20 Cal. 509.) "Whatever may be the rule as to notice in other states, however much or little the courts may have permitted themselves to be influenced by equitable considerations in favor of the assignee, the fact remains that in this state there is no room for the exercise of discretion upon this question. The rule is one rigidly fixed by statute. ..." (*Haskins v. Jordan, supra.*)

(4) But the assignee must be the beneficial owner of the claim or judgment in order to use it as a set-off against a judgment against him. (*Jones v. Chalfant,* 55 Cal. 505; see cases collected in note, 121 A. L. R. 478, 523.)And mutuality is essential, that is, the judgments must be between the same *650 parties in the same right. (*Machado v. Borges, supra; Kaye v. Metz,* 186 Cal. 42 [198 Pac. 1047]; *Petersen v. Lyders,* 139 Cal. App. 303 [33 P. (2d) 1030]; *California Cotton Credit Corp. v. Superior Court, supra;Hobbs v. Duff, supra; Flynn v. Seale,* 2 Cal. App. 665 [84 Pac. 263]; and see cases collected in note, 121 A. L. R. 478, 514.)In determining whether demands are mutual, equity will look to the real parties in interest. Thus there may be a set-off of judgments where the real and beneficial owner of one of them is the debtor upon the other, although an assignee for collection is the nominal owner of the first judgment. (*Heine Piano Co. v. Bloomer,* 183 Cal. 398 [191 Pac. 900].)

(5) An assignment for collection vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name, but the assignor retains the equitable interest in the thing assigned. (*National Reserve Co. v. Metropolitan Trust Co.,* 17 Cal. (2d) 827 [112 P. (2d) 598]; *Morrison v. Veach,* 190 Cal. 507 [213 Pac. 945]; *Bechtel v. Baglieto,* 13 Cal. App. (2d) 495 [57 P. (2d) 192]; *Elam v. Arzaga,* 122 Cal. App. 742 [10 P. (2d) 805]; *Koepple v. Morrison,* 84 Cal. App. 137 [257 Pac. 590].) Such an assignee has been referred to as the trustee or agent

of the assignor (*Weiner v. Luscombe,* 19 Cal. App. (2d) 668 [66 P. (2d) 151]; *Elam v. Arzaga, supra; Toby v. Oregon Pac. R. R. Co.,* 98 Cal. 490 [33 Pac. 550].), and a fiduciary relationship exists between them. (*Elam v. Arzaga, supra.*)If the assignee for collection should attempt to set off the assigned chose in action against his individual obligation, he would be violating the elementary rule of the law of trusts which forbids the trustee from using trust property for his private or individual purposes. (Civ. Code, § 2229; *Purdy v. Johnson,* 174 Cal. 521 [163 Pac. 893]; *Bermingham v. Wilcox,* 120 Cal. 467 [52 Pac. 822]; and see *Levy v. Drew,* 4 Cal. (2d) 456 [50 P. (2d) 435, 101 A. L. R. 1144].) Also, a trustee, or one bearing a similar fiduciary relationship, may not set off a claim due the trust estate against his own personal obligation. (*Hobbs v. Duff, supra; Estate of Hildebrandt,* 92 Cal. 433 [28 Pac. 486]; *Flynn v. Seale, supra;* see annotation in 121 A. L. R. 478, 517.)And to allow a judgment debtor to set off a claim assigned to him for collection would be violative of the rule requiring the mutuality of parties; it would, in effect, permit the collection of a debt due to a third party, in this case, Russell, against whom no corresponding right of set-off exists on the part of the judgment creditor. *651

The respondent urges, however, that where an equitable action for a set- off is being maintained because of the insolvency of the creditor, equity will allow a set-off, even though the demands be not mutual. But what equity exists in behalf of the judgment debtor when he seeks to collect, not his own claim, but a claim to which another is beneficially entitled? In the present action, Harrison must account to Russell for two-thirds of any amount he receives upon the note of Adams. Harrison does not own a separable interest in it and his beneficial interest is contingent upon collection. If the money held by the county clerk in connection with the case of *Adams v. Harrison* were owned by Adams, it might be subjected to the judgment rendered against Adams in the present action. But at the time the action was commenced, the money *in custodio legis* belonged to Verda Adams, and was therefore not subject to the judgment obtained by Harrison for the benefit of Adams.

The appellant contends that since the court in *Del Monte Ranch Dairy v. Bernardo,* 174 Cal. 757 [164 Pac. 628], held that an assignor for collection could

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

128 P.2d 9
20 Cal.2d 646, 128 P.2d 9
**20 Cal.2d 646**

not use the claim as a set-off after the assignment, the assignee must have that right or none exists. But that conclusion could only apply where the assignee claims the right to set off his assignor's demand against a debt owed by his assignor. In such a case to allow an assignee to set off, for the benefit of his assignor, the assignor's equitable right against the assignor's creditor would be consistent with the rule that, in determining whether claims are mutual for the purpose of set-off, equity will look to the real parties in interest. (*Hobbs v. Duff, supra; Heine Piano Co. v. Bloomer, supra.*)But the principles stated in the Del Monte Ranch case have no application to the present action, where there is no claim that Russell, the assignor for collection, has any right of set-off against Adams.

The appellant cites *Hammell v. Superior Court,* 217 Cal. 5 [17 P. (2d) 101], as determinative of the right of an assignee for collection to apply the assigned chose as a set-off against his personal obligation. In that case counsel advanced the argument that, inasmuch as the amounts sued for in the complaint were made up of several claims assigned to the plaintiff for collection, the superior court did not have jurisdiction because there were, in fact, separate plaintiffs. In rejecting the contention, the court held that, for the purposes of jurisdiction, since the plaintiff had the capacity to sue in his own \*652 name and the aggregate amount demanded fell within the jurisdiction of the court, no further inquiry would be made into the character of the plaintiff's ownership. That decision is of course inapplicable to the present action where the character of the ownership of the claim upon which set-off is sought determines the rights of the parties.

Finally, says the appellant, it makes no difference to the judgment creditor whether the assignee is one for collection or holds both the legal and the equitable title; his only concern is that he should receive a full release from the debt. Such a holding would ignore the fundamental basis of equitable set-off, which is the right to balance mutual demands between the parties to the action, by allowing a stranger to collect his claim through a nominal party. Moreover, in the present case, this stranger is asserting rights against a bona fide purchaser for value.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Traynor, J., concurred.
Cal.
Harrison v. Adams
20 Cal.2d 646, 128 P.2d 9

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

1219457.1

Westlaw.

269 P.2d 609
42 Cal.2d 752, 269 P.2d 609
**42 Cal.2d 752**

Page 1

▷Hauger v. Gates
Cal.

CARSON J. HAUGER et al., Appellants,
v.
CHARLES E. GATES et al., Respondents.
**Sac. No. 6326.**

Supreme Court of California
Apr. 30, 1954.

HEADNOTES

(1) Trust Deeds § 77--Sale Under Power--Attack on Sale--Grounds.
Where grantors of realty and beneficiaries of subsequent trust deed were, by reason of their failure to deliver certain personal property to which grantees and trustors of trust deed were entitled under agreement of sale, indebted to trustors in a greater sum than amount of unpaid installments owing by them on their promissory note, and where these cross-demands existed at time notice of default was declared and sale under trust deed was held, trustors may have sale of realty under trust deed set aside on ground that they were entitled under Code Civ. Proc., § 440, to a setoff or counterclaim in an amount exceeding amount due on note, and hence were not in default at time of sale.
See **Cal.Jur.,** Trust Deeds, § 73; **Am.Jur.,** Mortgages, § 709 et seq.
(2) Pleading § 84--Demurrer--As Admission.
Allegations of a complaint must be accepted as true for purposes of demurrer.

(3) Setoff and Counterclaim § 8--Compensation of Cross-demands.
Statement in Code Civ. Proc., § 440, that coexisting cross-demands shall be "compensated so far as they equal each other" necessarily means that each of the claimants is paid to extent that their claims may be balanced in amount.
See **Cal.Jur.,** Setoff and Counterclaim, § 29.
(4) Setoff and Counterclaim § 8--Compensation of Cross-demands.
Right of setoff under Code Civ. Proc., § 440, relating to compensation of cross-demands, is available without necessity of bringing an independent action setting forth related dealings between the parties.

(5) Setoff and Counterclaim § 16--Requisites--Liquidation.
Code Civ. Proc., § 440, relating to compensation of cross- demands, does not require that cross-demands be liquidated.

(6) Trust Deeds § 50, 55--ForeclosureSale Under Power.
Provisions of Code Civ. Proc., §§ 438, 440, relating to right of setoff and counterclaim, are equally applicable to a foreclosure action under trust deed and to an extrajudicial sale thereunder.
See **Cal.Jur.,** Trust Deeds, §§ 52, 57; **Am.Jur.,** Mortgages, §§ 529, 647 et seq.
(7)Equity § 46--Laches.
A court of equity will consider all the surrounding circumstances where defense of laches is interposed.

(8) Trust Deeds § 82(1)--Sale Under Power--Attack on Sale--Laches.
Trustors of trust deed are not barred by laches from raising issue of right of setoff or cross-demands in action to set aside extrajudicial sale made under trust deed, although their most prompt procedure would have been by way of an action seeking to enjoin trustee's sale, where delay was not unduly prolonged and did not cause any detriment to the parties involved because the sale was made to a purchaser who allegedly was acting for beneficiaries of trust deed and was not a purchaser in good faith or for value.

SUMMARY

APPEAL from a judgment of the Superior Court of Sonoma County. Hilliard Comstock, Judge. Reversed.

Action to set aside an extrajudicial sale made under a trust deed. Judgment for defendants after sustaining demurrers to second amended complaint without leave to amend, reversed.

COUNSEL
Joseph E. Isaacs, Alan H. Critcher, Donald M. Haet and Louis Garcia for Appellants.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

269 P.2d 609
42 Cal.2d 752, 269 P.2d 609
**42 Cal.2d 752**

Edward T. Koford and Bryce Swartfager for Respondents.

SPENCE, J.

Plaintiffs brought this action to set aside an extrajudicial sale made under a deed of trust. Defendants' demurrers to plaintiffs' second amended complaint were sustained without leave to amend. From the judgment accordingly entered for defendants, plaintiffs appeal. They maintain that the allegations of their second amended complaint were sufficient to state a cause of action for the setting aside of the sale, as such allegations showed that plaintiffs were entitled to a setoff or counterclaim in an amount exceeding the amount due on the note, and that therefore they were not in default on their obligation. (Code Civ. Proc., § 440.) We have concluded that their position is well taken.

As alleged, plaintiff Carson J. Hauger agreed to purchase from defendants Charles E. Gates and his wife for $16,000 certain real property in the county of Sonoma, together with the improvements thereon and certain specified ranch equipment. Pursuant to the agreement, defendants Gates executed and delivered to plaintiffs a deed to the realty; and plaintiffs executed and delivered a promissory note and second deed of trust as security for the unpaid portion of the purchase price. *754 In the deed of trust plaintiffs were the first parties-trustors, defendant Sonoma County Abstract Bureau was second party-trustee, and defendants Gates were third parties-beneficiaries.

Plaintiffs failed to make certain payments under the deed of trust and defendants Gates failed to make the agreed delivery of certain personal property. Thereafter and on December 11, 1950, defendants Gates and the Sonoma County Abstract Bureau recorded a notice of breach and election to sell under the deed of trust. Plaintiffs claim that they were not then indebted to defendants Gates because the latter, in breach of their contract, had failed to deliver to plaintiffs the agreed personal property, valued at $987.50, which sum exceeded the amount of the installments then due under the promissory note and deed of trust; that plaintiffs repeatedly told defendants Gates that they would pay the overdue installments if the Gateses would return the personal property but the latter refused. On April 12, 1951, the property was sold by the Sonoma County Abstract Bureau, the trustee under the deed of trust, to

defendant Chalmers, who allegedly had full knowledge of the above-recited facts and was "not a purchaser in good faith or for value" but holds the property "in trust" for defendants Gates. The property was sold for $5,025 to defendant Chalmers, and the deed therefor was accordingly made and recorded. The Exchange Bank of Santa Rosa holds a first deed of trust on the property, calling for monthly payments of $65. Defendants have made certain of these payments to the bank and in the event the sale is set aside, plaintiffs are willing to pay to defendants Gates and "all other defendants ... who may be entitled thereto such sums as may in right, justice and equity be owing from ... plaintiffs to defendants."

Plaintiffs' theory of relief rests upon the proposition that a trustor under a deed of trust is entitled to offset money owing to him by the beneficiary against the amount secured by the deed of trust; and that where there was not in fact any indebtedness due from the trustor to the beneficiary under the note secured by the deed of trust, the sale thereunder may be set aside. Section 440 of the Code of Civil Procedure provides: "When cross-demands have existed between persons under such circumstances that if one had brought an action against the other, a counterclaim could have been set up, the two demands shall be deemed compensated so far as they equal each other, and neither can be deprived of the benefits thereof by the assignment or death of the other." *755

(1) Under this section plaintiffs had a setoff which they were entitled to assert. The cross-demands between plaintiffs and defendants Gates existed at the time the notice of default was declared and the sale under the deed of trust was held. By reason of their failure to deliver certain personal property to which plaintiffs were entitled under the agreement of sale, defendants Gates were indebted to plaintiffs in a greater sum than the amount of the unpaid installments owing by plaintiffs on their promissory note. (2) These allegations of plaintiffs' complaint must be accepted as true for the purposes of demurrer, and accordingly plaintiffs were not in default at the time of the sale. (3) Section 440 is explicit in stating that the coexisting cross-demands shall be "compensated so far as they equal each other," which necessarily means that each of the claimants is *paid* to the extent that their claims may be balanced in amount.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

269 P.2d 609
42 Cal.2d 752, 269 P.2d 609
**42 Cal.2d 752**

Page 3

Plaintiffs and defendants Gates were aware of the cross-demands prior to the sale proceedings; plaintiffs had informed defendants Gates that they would pay the installments on their note if the Gateses in turn would deliver the personal property as theretofore agreed; and then, without regard for the consequences of their own breach of contract and the damages thereby caused to plaintiffs, defendants Gates proceeded with the sale. (4) Section 440 makes it clear that plaintiffs' right of setoff was available without the necessity of bringing an independent action setting forth the related dealings between the parties. (See *Walters v. Bank of America,* 9 Cal.2d 46, 54-55 [69 P.2d 839]; *Williams v. Pratt,* 10 Cal.App. 625, 632 [103 P. 151].) And the fact that plaintiffs' demand is an unliquidated claim for damages for breach of the contract of sale with the Gateses does not affect their right to the setoff. (5) Section 440 does not require that the cross-demands be liquidated. (*Sunrise Produce Co. v. Malovich,* 101 Cal.App.2d 520, 525 [225 P.2d 973].)

(6) It would not be reasonable, as contended by defendants, to interpret section 440 of the Code of Civil Procedure so as to permit the right of setoff in a foreclosure action under a deed of trust and yet to deny such right where the foreclosure was attempted by extrajudicial sale thereunder. On the contrary, it would appear that the provisions of said section are equally applicable in relation to either type of proceeding. Section 438 of the Code of Civil Procedure provides that "the right to maintain a counterclaim shall not be affected by the fact that either plaintiffs or defendant's claim *756 is secured by mortgage or otherwise, nor by the fact that the action is brought, or the counterclaim maintained, for the foreclosure of such security." It therefore appears that the choice of remedy under a deed of trust is an extraneous factor, not going to the merits of the claimed right to a setoff.

Defendants argue that plaintiffs should be barred by laches from now raising the disputed issue in an effort to set aside the sale. Defendants point out that plaintiffs did not file the present action until 70 days after the sale; that four months prior to the sale plaintiffs, by the recording of the notice of default, were put on notice regarding the forthcoming sale; and that a period of "thirty days is about the utmost length of time which the courts are disposed to

allow" for *rescission* of a sale. (*Schneider v. Henley,* 61 Cal.App. 758, 763 [215 P. 1036].) However, the cited case has no relevancy to the problem here, for plaintiffs do not seek to rescind their purchase agreement but rather they stand on their contract and their rights thereunder. (7) A court of equity will consider all the surrounding circumstances where the defense of laches is interposed. (10 Cal.Jur., § 62, p. 523.) (8) It may be conceded that plaintiffs' most prompt procedure would have been by way of an action seeking to enjoin the trustee's sale. But the fact that they failed to so proceed does not bar them from resort to the present action for an adjudication of their rights. The delay was not unduly prolonged and does not appear to have caused any detriment to the parties involved as the sale was made to defendant Chalmers, who allegedly "was acting for and on behalf of defendants [Gates] ... and ... was not a purchaser in good faith or for value."

For the reasons stated, we conclude that plaintiffs' second amended complaint stated a cause of action, and that the trial court erred in sustaining defendants' demurrers without leave to amend.

The judgment is reversed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred. *757
Cal.
Hauger v. Gates
42 Cal.2d 752, 269 P.2d 609

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

1219457.1

**Westlaw.**

259 Cal.App.2d 356                                          Page 1
259 Cal.App.2d 356, 66 Cal.Rptr. 384
**259 Cal.App.2d 356**

**C** McDaniel v. City and County of San Francisco
Cal.App.1.Dist.

SAMUEL A. McDANIEL, Plaintiff and Appellant,
v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.
**Civ. No. 23813.**

Court of Appeal, First District, Division 3, California.
Feb. 23, 1968.

HEADNOTES

(**1a, 1b**) Mandamus § 98--Trial--Questions Involved--Setoff and Counterclaim § 8--Availability--Compensation of Cross-demands.
An amount by which a city employee's retirement account was deficient was, as a cross-demand, entitled to be set off by the city against the employee's claim for back wages under a civil service commission order reinstating the employee following his suspension, where the amount claimed as a setoff, having been levied upon by the employee's judgment creditor, under Code Civ. Proc., § 710, was, in all fairness to other employees, due and owing the retirement fund by the employee.

(**2**) Mandamus § 5--Conditions Affecting Issuance.
One of the essential conditions for the issuance of the writ of mandate is a showing on the part of the applicant that he has a clear legal right to the performance of the act the writ would compel.
See Cal.Jur.2d, Mandamus, § 13; Am.Jur., Mandamus (1st ed § 37).

(**3**) Mandamus § 10--Conditions Affecting Issuance--Equitable Principles.
The writ of mandate is an equitable remedy, and will not always issue as a matter of right.

(**4**) Mandamus § 9--Conditions Affecting Issuance--Discretion.
The decision whether to grant or deny a writ of mandate lies within the sound discretion of the court, and one of the chief considerations in the exercise of that discretion is the effect of the court's order in promoting the ends of justice.

(**5**) Garnishment § 5(1), 31--Property Subject--Debts Owing and Unpaid--Retirement Fund Contributions--Proceedings Against Public Corporations.
A city employee's retirement fund contributions were "owing and unpaid" to him within the meaning of Code Civ. Proc., § 710, where the city charter made an employee's contributions refundable to him if for any reason he ceased to be a city employee before his pension was due, where the employee was suspended from employment and thereafter made a written demand for the refund of his accumulated contributions, and where, though the employee had an appeal pending regarding his status as an employee a few days before a portion of the funds standing to his credit were transferred to the court to satisfy the claim of the judgment creditor, the employee neglected to revoke his demand for the refund or to notify the retirement system as to his change of intention or his appeal until after the transfer of funds to the court in the collection procedure.
See Cal.Jur.2d, Rev., Attachment and Garnishment, § 15; Am.Jur.2d, Attachment and Garnishment, § 85 et seq.

(**6a, 6b**) Garnishment § 5(1), 31--Property Subject--Debts Owing and Unpaid--Retirement Fund Contributions--Proceedings Against Public Corporations.
Neither a city nor its auditor could be held liable on the ground that a portion of a city employee's retirement fund contributions due and owing the employee were paid to the court by the auditor pursuant to a judgment creditor's levy, under Code Civ. Proc., § 710, without notice to the employee, with the result that the court paid out the funds to the creditor before the employee could assert a claim of exemption, since § 710 imposes no duty on the auditor or controller to notify the debtor that his funds have been levied upon, and to hold the city liable would defeat the purpose of that section.

(**7**) Garnishment § 31--Proceedings Against Public Corporations.
The purpose of providing a special garnishment procedure in the superior court where governmental units are involved (Code Civ. Proc., § 710) is clearly to shift to the court the burden of adjudicating any

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

259 Cal.App.2d 356
259 Cal.App.2d 356, 66 Cal.Rptr. 384
**259 Cal.App.2d 356**

Page 2

claims of exemption which may arise and to insulate the governmental units from liability for wrongful payments to garnishing creditors.

**(8)** Garnishment § 24(1), 31--Duties and Liabilities of GarnisheeProceedings Against Public Corporations.
Though, under some circumstances, a garnishee, who knows that the property levied on is subject to a claim of exemption and that the judgment debtor is ignorant of the levy, has a duty, whenever practicable, to notify the debtor of the garnishment, so that the latter may have the opportunity to claim his exemption if he desires, such rule is not applicable where the garnishee is a governmental unit or a public officer and Code Civ. Proc., § 710, is involved.

**(9)** Mandamus § 89--Pleading--AnswerSetoff and Counterclaim § 42(1)-- Pleading.
In a mandamus proceeding by a city employee to compel a city to pay the employee's back wages without setoff of an amount allegedly owed by the employee to the retirement fund, the pleading by the city of the setoff in its answer rather than in a separate pleading, either by cross-complaint or counterclaim, was proper, where, all the facts surrounding the setoff being fully and clearly set forth, the employee was fully informed, where, though he demurred generally to the answer, he made no reference to the claimed defect in the answer, and where, the matter being fully heard under the pleadings presented, whatever objection might have been urged against the pleading vanished at the close of the evidence.

**(10)** Mandamus § 98--Trial--Questions InvolvedSetoff and Counterclaim § 8-- Availability-- Compensation of Cross-demands.
In a mandamus proceeding to compel a city to pay a reinstated employee's back wages, as ordered by the civil service commission, without setoff of an amount allegedly owed by the employee to the retirement system, the setoff was not a collateral matter, unrelated to the employee's right to have the city comply with the order of the commission, and the claim was properly asserted by the city and considered by the trial court in arriving at its judgment denying the writ, since a defendant's answer to a petition for the writ of mandate should set up any matter of defense relied upon as

justification for the circumstances which gave rise to the petition for the writ.

## SUMMARY

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Joseph Karesh, Judge. Affirmed.

Proceeding in mandamus to compel a city to pay an employee's claim for back wages without setoff of an amount owed by the employee to the retirement system. Judgment denying writ affirmed.

COUNSEL
McMurray & Tepper and Lloyd E. McMurray for Plaintiff and Appellant.
Thomas M. O'Connor, City Attorney, and Donald J. Garibaldi, Deputy City Attorney, for Defendants and Respondents. *359
SALSMAN, J.
This is an appeal from a judgment denying appellant's petition for a writ of mandate, dissolving the alternative writ, and adjudging appellant indebted to the retirement fund of the City and County of San Francisco in the amount of $4,708.92.

The facts are not in dispute. Appellant is a cable car gripman on the San Francisco Municipal Railway, a civil service position. For a long time prior to the events in this case, his former wife Zereldia McDaniel had regularly attached his earnings pursuant to a judgment for child support. These attachments were made under the procedure described in Code of Civil Procedure, section 710.

On April 23, 1964, appellant had been employed by the Municipal Railway for 16 1/2 years and had accumulated $8,238.86 in the city retirement fund. Beginning with that date, the following events occurred:

(1) April 23, appellant was suspended from his employment for a violation of Municipal Railway rules.

(2) May 26, he requested a refund of his retirement contributions. The form filled out and signed by him stated: "My service with the City and County of San Francisco terminated 4-23-64. I hereby request

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

259 Cal.App.2d 356
259 Cal.App.2d 356, 66 Cal.Rptr. 384
**259 Cal.App.2d 356**

refund of the accumulated contributions standing to my credit in the retirement fund."

(4) June 8, appellant's former wife filed an abstract of judgment and affidavit with the controller's office under Code of Civil Procedure, section 710. The affidavit asserted that $4,872.68 was due her under the judgment.

(5) June 19, the city's Retirement System, pursuant to appellant's request, submitted to the controller a refund roll for the sum of $8,238.86, payable to appellant.

(6) June 23, appellant's appeal was filed with the Civil Service Commission.

(7) June 25, the controller, in response to the abstract of judgment and affidavit filed with him, prepared a warrant in the sum of $4,708.92, [FN1] payable to the superior court, and deposited the warrant with the court. The controller did not notify appellant that a part of the refund of his retirement contributions was being paid into court pursuant to the attachment.

> FN1 The amount of the warrant was $163.76 less than the amount demanded in the levy because that amount had already been paid into court from other funds due appellant.

(8) June 29, appellant called at the offices of the Retirement *360 System. There he learned that a portion of his retirement refund had been sent to the superior court. A warrant for the remainder of his contributions was tendered to him, but he refused to accept it. He informed the clerk in the office that he "... didn't want the money, because my case was being appealed, and chances are I would get reinstated by the railway, and I wanted the money to remain in the Retirement System."

(9) June 30, the superior court ordered the funds in its possession paid over to the attaching creditor. This payment was made without appellant's knowledge.

(10) July 8, appellant's attorneys notified the Retirement System of the rescission of his request to withdraw his retirement funds. His attorneys requested prompt action and noted that a levy had been made upon the controller, and that there was

danger some of the funds might be paid over under the levy unless speedy action was taken. At the same time appellant notified the Retirement System of his appeal.

(11) March 22, 1965, the Civil Service Commission ordered appellant reinstated with back pay from the date of his dismissal, less amounts earned while discharged.

(1a) The respondent city did not pay the back wages ordered by the Civil Service Commission. It asserts that appellant is deficient in his retirement fund contributions because of the money withdrawn by appellant and seized by his creditor, and that this amount should be set off against the amount of back wages found due under the Commission's order.

On the facts recited, the trial court found that appellant was indebted to the city's retirement fund in the amount of $4,708.92 and that the city was entitled to set off this amount against any back wages due him. Accordingly, the court denied the writ. We conclude that the trial court's judgment is correct, and therefore affirm.

(2) One of the essential conditions for issuance of the writ of mandate is a showing on the part of the applicant that he has a clear legal right to the performance of the act the writ would compel. (Consumers Salt Co. v. Riggins, 208 Cal. 537, 543 [282 P. 954]; 32 Cal.Jur.2d, Mandamus, § 6, p. 122; 3 Witkin, Cal. Procedure (1954) Extraordinary Writs, § 40, p. 2520.) (3) Moreover, the writ is an equitable remedy, and will not always issue as a matter of right. (Sutro Heights Land Co. v. Merced Irr. Dist., 211 Cal. 670, 704-705 [296 P. 1088]; *361 Wallace v. Board of Education, 63 Cal.App.2d 611, 617 [147 P.2d 8].) (4) The decision whether to grant or deny the writ lies within the sound discretion of the court, and one of the chief considerations in the exercise of that discretion is the effect of the court's order in promoting the ends of justice. (See Bartholomae Oil Corp. v. Superior Court, 18 Cal.2d 726, 730 [117 P.2d 674], and cases cited.) When these fundamental rules are applied to the facts of this case it is clear that appellant does not make the clear and unequivocal showing of a right to the writ contemplated by the law, and that grant of the writ would not accomplish substantial justice.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

259 Cal.App.2d 356
259 Cal.App.2d 356, 66 Cal.Rptr. 384
**259 Cal.App.2d 356**

Code of Civil Procedure, section 710 establishes a procedure for enforcing money judgments against a debtor to whom money is owed by the state or a political subdivision thereof. Insofar as applicable here, the statute allows the judgment creditor to file an abstract of judgment with the city auditor, together with an affidavit stating the amount due, and thereupon makes it the duty of the auditor to forward to the court which issued the abstract of judgment an amount sufficient to pay the claim, or a part thereof equal to no more than one-half of the debtor's salary or wages owing by the city to the debtor for personal services rendered within 30 days of the levy.

(5) One of appellant's prime contentions is that the retirement contributions paid into court by the auditor were not monies "owing and unpaid" to him within the meaning of section 710, because petitioner was not entitled to have his retirement contributions paid to him while the appeal from his discharge was pending. We find no merit in this ground of appeal.

In our opinion, appellant's retirement contributions were "owing and unpaid" from the time of his discharge on May 21, or, at the very latest, from May 26, when he demanded a refund of his contributions in writing. The city had received his contributions over a period of years and was bound to account to him for them if for any reason his pension rights did not mature. (S.F. Charter § 165.2(F.).) This was an existing and unsatisfied legal liability on the part of the city. (See *Department of Water & Power v. Inyo Chemical Co.,* 16 Cal.2d 744, 751 [108 P.2d 410], and cases cited.) It is true that two days before the controller paid the funds into court, appellant appealed his discharge. But he did not revoke his demand for a refund of his retirement money or notify the *362 Retirement System. A few days after the auditor's payment he called at the office of the Retirement System and learned that some of his funds had been paid over to the court for his wife. At that time he orally notified the clerk in the office that he was rescinding his request for repayment of his retirement funds. But by that time the funds were beyond the control of the city and were in the hands of the court. Appellant cannot fault the city because it complied with his written demand for the return of his money, and at the same time complied with the law by paying a portion of it over to the court pursuant to a lawful levy.

Appellant's reliance upon *Credit Bureau of San Diego, Inc. v. Getty,* 61 Cal.App.2d Supp. 823 [142 P.2d 105] is misplaced. In that case a court deposited bail money with the county treasurer. A creditor of the defendant for whom it was deposited attempted to reach it under Code of Civil Procedure, section 710. The court pointed out that the bail money was not money owing by any city or county within the meaning of the statute and that it could not be reached by the statutory procedure. In *Credit Bureau of San Diego, Inc.* the funds, although in possession of the county, were subject to disposition by the court and not by the board of supervisors. Here, however, all money in the Retirement System is under the control of the city, although the fund is administered by the system as an agency of the city government. As we have already pointed out, the charter itself makes an employee's contributions refundable to him if for any reason he ceases to be a city employee before his pension is due. Thus, the monies requested by appellant after his discharge and before his appeal were clearly monies "due and owing" by the city to the employee.

(6a) Nevertheless appellant argues that the city breached a statutory duty to notify him that his wife had levied upon his funds. The sum of his argument is that if he had been notified in time he could have taken steps to revoke his claim for a refund before the auditor sent the money to the court, or claim an exemption under Code of Civil Procedure, section 690. (See, e.g., Code Civ. Proc., § 690.23.) Perhaps appellant could have successfully contested the claims of his wife and the rights of his children if he had been forewarned. But appellant set the machinery in operation to obtain his money. This began on May 26, when he demanded a refund of his contributions. The creditor's levy arrived on June 8th, but it was not until June 19th, when the Retirement System submitted *363 its roll to the auditor, that the latter was aware of the funds due appellant. Two days later, without any word from appellant, the auditor complied with the court's order and forwarded the funds to the court. The auditor called the court's attention to possible exemptions appellant might claim, and in this respect went further than the law expressly requires. Thereafter the matter was in the hands of the court. Neither the city nor the auditor can be held liable because the court paid out the funds to the creditor before appellant could assert a claim of exemption.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Although section 710 provides a summary adversary proceeding in the superior court for one whose funds are attached while in the hands of a governmental unit (see Code Civ. Proc., § 690.26), it imposes no duty on the auditor or controller to notify the debtor of the garnishment. The Legislature could have inserted such a requirement in the detailed provisions for proceeding under section 710 if it had so desired, and it may do so at any time. As drafted, however, it is significant that the statute merely requires that the controller or auditor forward the funds to the court, withholding only a wage exemption (Code Civ. Proc., § 710, subd. 2). (7) The purpose of providing a special garnishment procedure in the superior court where governmental units are involved is clearly to shift to the court the burden of adjudicating any claims of exemption which may arise and to insulate the governmental units from liability for wrongful payments to garnishing creditors. (6b) To hold the city and county liable in this case would thus defeat the purpose of section 710. Whether the garnishing judgment creditor or any other person has a duty to notify the judgment debtor of the proceedings in the superior court is a question not properly before us on this appeal.

(8) We recognize that, under some circumstances, it has been held that a garnishee, who knows that the property levied on is subject to a claim of exemption and that the judgment debtor is ignorant of the levy, has a duty, whenever practicable, to notify the debtor of the garnishment, so that the latter may have the opportunity to claim his exemption if he desires. (Agnew v. Cronin, 148 Cal.App.2d 117, 126 [306 P.2d 527]; Hing v. Lee, 37 Cal.App. 313, 317-318 [174 P. 356]; Harris v. Balk, 198 U.S. 215, 217 [49 L.Ed. 1023, 1024, 25 S.Ct. 625].) But we do not think that rule is applicable where the garnishee is a governmental unit or a public officer and section 710 is involved. *364

(9) Appellant argues that the alleged setoff has not been properly pleaded. The essence of his objection is that it should have been presented in a separate pleading, either by cross-complaint or counterclaim. (See 2 Witkin, Cal. Procedure (1954) Pleading, § 566, p. 1570.) The record shows it was merely included as a part of a paragraph in the answer to the petition for the writ. Perhaps it would have been better to describe respondents' setoff in a separate

pleading, but no harm has been done by that omission. All of the facts surrounding the claim are fully and clearly set forth in the answer. Appellant was fully informed. He knew exactly what to expect at the hearing. He could not have been better informed by a separate pleading. Aside from a brief reference to the subject in his memorandum of points and authorities accompanying his general demurrer to the answer, he made no reference in the trial court to the claimed defect in the answer. The matter was thereafter fully presented on its merits. Whatever objection might have been urged against the pleading of the setoff vanished at the close of the evidence, because the matter was fully heard under the pleadings presented.

(10) Appellant contends further that, in this mandamus proceeding, the city is not entitled to set off the amount of his retirement account deficiency against his claim for back wages, because that matter is purely collateral, unrelated to his right to have the city comply with the order of the Civil Service Commission, and thus may not be considered in this case. We do not agree.

Code of Civil Procedure, section 1109, relating to extraordinary writs, makes the provisions of part 2 of that code applicable to writ proceedings. Part 2 includes provisions relating to pleadings in civil actions, and such provisions are therefore fully applicable to writ proceedings unless other rules are specifically made applicable. A respondent's answer to a petition for the writ of mandate should set up any matter of defense relied upon as justification for the circumstances which gave rise to the petition for mandate. (Rittersbacher v. Board of Supervisors, 220 Cal. 535, 542 [32 P.2d 135]; Bank of Italy v. Johnson, 200 Cal. 1, 28 [251 P. 784]; Felice v. City of Inglewood, 84 Cal.App.2d 263 [190 P.2d 317].) Here the city properly asserted its claim to a setoff, and the trial court properly considered it in arriving at its judgment.

(1b) The doctrine of setoff is described in Code of Civil Procedure, section 440. It reads: "When cross-demands have *365 existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim could have been set up, the two demands shall be deemed compensated, so far as they equal each other, and neither can be deprived of the benefit thereof by the assignment or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

259 Cal.App.2d 356
259 Cal.App.2d 356, 66 Cal.Rptr. 384
**259 Cal.App.2d 356**

Page 6

death of the other." Thus, when cross-demands exist between parties, their claims are paid to the extent they are equal. (*Jones v. Mortimer,* 28 Cal.2d 627, 633 [170 P.2d 893]; *Sunrise Produce Co. v. Malovich,* 101 Cal.App.2d 520 [225 P.2d 973].) Pursuant to this rule it has been held that an employer may set off his employee's debt against the employee's claim for wages due. (*Patterson v. Henderson Tire & Rubber Co.,* 112 Cal.App. 48 [296 P. 304].) A municipal corporation has the same right as any other creditor to claim a setoff (*Corbett v. Widber,* 123 Cal. 154, 156 [55 P. 764]; *United States v. Munsey Trust Co.,* 332 U.S. 234 [91 L.Ed. 2022, 67 S.Ct. 1599]), and it has been held that it would be a breach of duty for a public officer to pay an obligation due an individual when the individual owed a like sum to the public body. (See *State* ex rel. *Pratt v. Seattle,* 73 Wash. 396 [132 P. 45].) Appellant's ultimate pension rights do not depend upon his contributions to the retirement fund. His full pension may be paid even though his contribution account is deficient. But in fairness to all other members of the Retirement System who are required to contribute their full share to the fund, as well as to the city's taxpayers who underwrite and guarantee the fund's deficiencies, the city should be allowed to set off against appellant's claim for back wages the amount by which his retirement account is deficient.

The judgment is affirmed.

Draper, P. J., and Bray, J., [FN*] concurred. *366

      FN* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

Cal.App.1.Dist.
McDaniel v. City and County of San Francisco
259 Cal.App.2d 356, 66 Cal.Rptr. 384

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

# Miller & Starr
# California Real Estate
## 3rd Edition

By Harry D. Miller
and Members of the Firm of
Miller, Starr & Regalia,
a Professional Law Corporation

## Chapter 10

DEEDS OF TRUST AND MORTGAGES

**THOMSON**
★
**WEST** ™

*For Customer Assistance Call 1-800-328-4880*



copy of the notices of default and sale.[9] In order to be sure, therefore, a copy of the document of substitution should be mailed to the original trustee, the trustor, and all other persons who have filed a request for special notice.[10] The statute provides that if the substitution occurs after the notice of sale, the foreclosure sale is void unless a new notice of sale is given in the manner prescribed by the statute.[11] Therefore, a new notice of sale must be given if the substitution occurs after the notice of sale.



**A court's power to substitute a trustee is limited.** As a general rule, because there is a trustee named in the deed of trust, the court does not have the power to substitute for the trustee.[12] However, if the trustee refuses to act[13] or there is a vacancy in the position of trustee, the court probably can exercise its equitable powers and appoint a trustee.[14]

### 3.   DEBT OR OBLIGATION SECURED

### § 10:10   Requirement of some debt or obligation

**Research References**

West's Key Number Digest, Mortgages ⬮114



**No lien without an underlying obligation.** The deed of trust must secure some debt or obligation; the lien does not attach prior to the creation of the underlying debt or obligation. Because the security instrument is merely incident to and measured by the performance of the obligation,[1] there can be no lien of a mortgage or trust deed without an underlying and enforceable debt or obligation.[2]

◆ **Case Example:** A mortgage securing a construction loan was recorded before the claims of mechanics' liens attached to the property, but the promissory note was not delivered to the lender until

---

[9]§ 10:8 (substitution of trustee; statutory procedure).

**Comment:** The statute was amended in 1982 after the contrary decision in *U. S. Hertz, Inc. v. Niobrara Farms,* 41 Cal. App. 3d 68, 83-85, 116 Cal. Rptr. 44 (3d Dist. 1974).

[10]§ 10:8 (substitution of trustee; statutory procedure).

[11]Civ. Code, § 2934a, subd. (c).

[12]*Mutual Building & Loan Ass'n of Pasadena v. Wiborg,* 59 Cal. App. 2d 325, 331, 139 P.2d 73 (2d Dist. 1943).

[13]*Baumann v. Harrison,* 46 Cal. App. 2d 84, 93, 115 P.2d 530 (4th Dist. 1941).

[14]Prob. Code, § 15660.

See also Prob. Code, §§ 17000, 17002, 17005.

**[Section 10:10]**

[1]§ 10:2 (lien versus title theories).

[2]*Alliance Mortgage Co. v. Rothwell,* 10 Cal. 4th 1226, 1235, 44 Cal. Rptr. 2d 352, 900 P.2d 601 (1995); *Goodfellow v. Goodfellow,* 219 Cal. 548, 554, 27 P.2d 898 (1933); *Fleming v. Kagan,* 189 Cal. App. 2d 791, 796, 11 Cal. Rptr. 737 (2d Dist. 1961); *Turner v. Gosden,* 121 Cal. App. 20, 22, 8 P.2d 505 (1st Dist. 1932).

**Forms References:** See Am. Jur. Legal Forms 2d, Mortgages and Trust Deeds §§ 179:221 to 179:229.

© West, a Thomson business, 11/2003

41

142

# EXHIBIT 15

Westlaw.

6 Cal.App.3d 395
6 Cal.App.3d 395, 86 Cal.Rptr. 33
**6 Cal.App.3d 395**

▷Moving Picture Mach. Operators Union Local No. 162 v. Glasgow Theaters, Inc.
Cal.App.1.Dist.
  MOVING PICTURE MACHINE OPERATORS UNION LOCAL NO. 162, Plaintiff and Appellant,
v.
  GLASGOW THEATERS, INC., Defendant and Appellant
**Civ. No. 26201.**

Court of Appeal, First District, Division 1, California.
April 8, 1970.

SUMMARY

Defendant, an operator of a motion picture theater, employed a number of projectionists who were members of plaintiff union. Plaintiff claimed that defendant was obligated to make certain payments to a pension fund for the benefit of plaintiff's members, with payments retroactive to August 15, 1963, pursuant to a collective bargaining agreement. Defendant maintained its obligation to make payments commenced on August 15, 1965. Negotiations to settle the dispute were entered into by the parties, resulting in an agreement fixing a compromise date of August 15, 1964, but the agreement was subsequently repudiated by defendant. Plaintiff filed an action, seeking recovery in the sum of $1,854 based upon an alleged participation agreement whereby defendant had agreed to make pension fund payments commencing August 15, 1963. A second cause of action attempted to state an accord and satisfaction between the parties in the sum of $1,486. A third cause of action sought a declaration of rights as to defendant's obligation to make pension payments. After the filing of the complaint, defendant's attorney wrote a letter to counsel for plaintiff admitting that defendant owed the sum of $1,209 and was prepared to pay this amount in full satisfaction of the matter sued upon in the complaint, but this offer was rejected by plaintiff. The trial court found that defendant was indebted to plaintiff for $1,209 for the period from August 15, 1964, to August 15, 1967, on the basis of admitted liability in that sum. (Superior Court of the City and County of San Francisco, Raymond J. Arata, Judge.)

On appeal by both parties, the trial court's judgment was affirmed. The Court of Appeal rejected a contention by defendant that the evidence pertaining to the settlement negotiations should have been inadmissible and that there was therefore no evidentiary support for the award. The court also found that there was no accord and satisfaction between the parties, since the agreement of the attorneys was subsequently repudiated by defendant, and no satisfaction of the agreement was ever made. In addition, the court held that the trial court was justified in declining to grant the union the full relief requested by them based upon the August 15, 1963, retroactivity date, since the agreement upon which the union based its claim contained a material alteration in that the commencement of the period of coverage had been changed by handwritten notation from 1965 to 1963. (Opinion by Molinari, P. J., with Sims and Elkington, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(**1**)  Evidence  §  190--Admissions--Offers to Compromise.
It is error to admit evidence that a person has offered or promised to furnish money, as well as any conduct or statement made in negotiation thereof (Evid. Code, § 1152), and this rule not only excludes offers to compromise but also excludes all negotiations in relation thereto unless they are otherwise admissible. [See **Cal.Jur.2d, Rev.,** Evidence, § 304; **Am.Jur.2d,** Evidence, § 629.]

(**2**)  Evidence  §  190--Admissions--Offers to Compromise.
The rule which excludes offers of compromise in evidence does not apply to statements which are in nowise connected with any attempt of compromise or of statements of fact independent of an offer of compromise.

(**3**)  Evidence  §  190--Admissions--Offers to Compromise.
Evidence relative to the issue whether there has been an accord and satisfaction is not subject to the objection that it violates the rule which excludes offers of compromise.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

6 Cal.App.3d 395
6 Cal.App.3d 395, 86 Cal.Rptr. 33
**6 Cal.App.3d 395**

**(4)** Evidence § 190--Admissions--Offers to Compromise.
Statements of a party against whom a claim is made, that he is willing to settle the claim, when not connected with an offer of compromise, may be proved as an admission against interest.

**(5)** Evidence § 190--Admissions--Offers to Compromise.
The intention of a party is dispositive when considering whether a person's statement amounts to an ordinary admission or constitutes an offer of compromise. If the proposal is tentative, and any statements made in connection with it hypothetical, or if the offer was made to "buy peace" and in contemplation of mutual concessions, it is as to such point a mere offer of compromise; but if the intention is apparent to admit liability and to seek to buy or secure release against a liability recognized as such, or if the party making the proposal apparently intended to make no concession but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise.

**(6)** Accord and Satisfaction § 1--Definition.
The phrase "accord and satisfaction" means the substitution of a new agreement for and in satisfaction of a preexisting agreement between the same parties.
[See **Cal.Jur.2d,** Accord and Satisfaction, § 7 et seq.; **Am.Jur.2d,** Accord and Satisfaction, § 1.]

**(7)** Accord and Satisfaction § 2--Accord.
In an accord and satisfaction, the "accord" is the agreement whereby one of the two parties having a right of action against the other upon a claim arising out of an existing agreement agrees to accept from the other party something in satisfaction of such right of action different from and usually less than that which might be recovered upon the original obligation.

**(8)** Accord and Satisfaction § 2--Accord.
Since "accord" signifies an agreement between the parties, the primary principles which govern the law of contracts are necessarily applicable to an accord and satisfaction, that is, proper subject matter, competent parties, mutual consent, and consideration.

**(9)** Accord and Satisfaction § 1--Nature.

For the principle of accord and satisfaction to apply there must be a bona fide dispute between the parties; it is also necessary to show satisfaction as well as an accord since an accord without satisfaction does not extinguish the original obligation.

**(10)** Accord and Satisfaction § 4--Payment.
Where a dispute is as to the amount due and an accord has been reached as to the amount to be paid, the original obligation is not extinguished until the agreement to pay is performed.

**(11)** Attorneys at Law § 64--Authority to Bind Client--Compromise.
An attorney does not, without specific authorization, possess the power or authority to bind his client to a compromise settlement.

**(12)** Attorneys at Law § 61--Authority to Bind Client.
The rules governing the attorney-client relation are founded on the rules governing the relation of principal and agent, and notwithstanding the lack of express or apparent authority in the attorney, his act is binding on the client if the latter ratifies it or accepts the benefits of the attorney's acts.

**(13)** Accord and Satisfaction § 12--Satisfaction.
In an action by a union against a theater for payments allegedly owed by the theater to the union's pension fund in accordance with an alleged agreement between them, negotiations between attorneys for the parties did not reach a settlement by way of accord and satisfaction, where, though an accord was entered into by the attorneys and was ratified by their respective clients, the accord was never executed, and where, accordingly, a satisfaction of the accord agreement never occurred.

**(14)** Trial § 337(3)--Implied Findings--Implication Arising From General Finding.
In the absence of a request for special findings, in an action by a union against a theater for payments allegedly owed by the theater to the union's pension fund in accordance with an alleged agreement between them, the appellate court could conclude that the trial court found against the union's claim of accord and satisfaction, where a finding on that issue resulted by necessary implication from the express finding that the theater admitted liability in a sum certain rather than upon the facts pleaded in the cause of action seeking to predicate liability upon an accord

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

and satisfaction.

**(15)** Accord and Satisfaction § 13--Effect.
Where a settlement agreement reached by attorneys, although ratified by their clients, did not constitute an accord and satisfaction, it did not extinguish the original obligation, if any, of one client to the other.

**(16)** Evidence § 188--Admissions--Written Admissions.
In an action by a union against a theater for payments allegedly owed by the theater to the union's pension fund in accordance with an alleged agreement between them, a letter written subsequent to the filing of the action by the theater's attorney to the union's attorney admitting that the theater owed the union a certain sum was admissible in evidence as relevant to the issue whether it was a declaration against interest, where no contention was made that the letter was not authorized by the theater, and where the letter indicated that a copy was mailed to the president of the theater.

**(17)** Evidence § 190--Offers to Compromise.
If the intention of an admission against interest is apparent to admit liability and to secure relief against a liability recognized as such, or if the party making the proposal apparently intended to make no concessions but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise, and is not subject to the rule which excludes offers of compromise.

**(18a, 18b)** Evidence § 188--Admissions--Written Admissions.
In an action by a union against a theater for payments owed by the theater to the union's pension fund in accordance with an alleged agreement between them, the question whether the theater intended to admit liability in the sum of $1,209 and to make no other concessions was correctly determined by the trial court to be an admission against interest admitting liability in that sum and not an attempt to compromise, where the language of the letter included the phrases "[defendant] admits he owes as follows: ..." and "The defendants are prepared to pay this amount in full satisfaction of the matter sued upon in your complaint," and such determination sufficed to support a finding that defendant admitted to a liability of $1,209 for a certain period.

**(19)** Evidence § 327--Extrinsic Evidence.
An appellate court must make an independent determination of the meaning of a letter offered into evidence at trial, where there was no extrinsic evidence offered as to its meaning.

**(20)** Alteration of Instruments § 5--Effect.
If it pertains to a material matter, an alteration of a written instrument made after delivery and without previous consent vitiates the obligation at the option of the other party; thus, in an action by a union against a theater for payments allegedly owed by the theater to the union's pension fund in accordance with an alleged agreement between them, the trial court, in finding for the union, correctly declined to grant the union the full relief requested - that is, that the funds were due from August 15, 1963, where the agreement on which the union based its claim of retroactivity to that date contained a material alteration in that commencement of the period of coverage had been changed by handwritten notation from 1965 to 1963, and where there was substantial evidence to warrant the findings that a written agreement had not been entered into between the parties providing for pension payments commencing August 15, 1963.

COUNSEL
Kenneth C. Zwerin for Plaintiff and Appellant.
Neyhart, Grodin & Beeson, Brundage, Neyhart, Grodin & Beeson and Joseph R. Grodin for Defendant and Appellant.
**MOLINARI, P. J.**
In this appeal by both parties from the judgment below Glasgow Theaters, Inc. (hereinafter referred to as "Glasgow"), appeals from an adverse judgment in the sum of $1,209, and Moving Picture Machine Operators Union Local No. 162 (hereinafter referred to as "Union") appeals from that portion of the judgment denying relief in the sum of $1,845.

Glasgow operates a motion picture theater which employs a number of projectionists who are members of Union. A dispute arose between Glasgow and Union concerning payments Union claimed Glasgow was obligated to make to a pension fund for the benefit of Union's members. Union contended that under a collective bargaining agreement and a supplement thereto entered into between the parties, Glasgow's payment obligation was retroactive to August 15, 1963. Glasgow maintained that its

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

obligation to make payments commenced on August 15, 1965.

Counsel for both parties entered into negotiations for settlement of the dispute. Such negotiations resulted in an oral agreement reached by counsel on or about March 15, 1967 to settle the dispute by a compromise fixing the commencement date for the subject payments as August 15, 1964. This proposal was agreed to by Union Glasgow, but was subsequently repudiated by Glasgow.

On August 9, 1967, Union filed a complaint, subsequently amended, against Glasgow stating three causes of action. The first sought recovery in the sum of $1,854 based on an alleged participation agreement entered into on January 24, 1966, whereby Glasgow had agreed to make pension fund payments in the sum of $9 per week for 206 weeks commencing August 15, 1963. The second cause of action sought recovery of the sum of $1,486 based on the agreement allegedly reached by counsel on March 15, 1967. The third cause of action sought a declaration of rights as to Glasgow's obligation to make pension payments under the subject agreements. **\*401**

Following the filing of this complaint, counsel for Glasgow directed a letter, date August 24, 1967, to counsel for Union in which it was stated that Glasgow admitted it owed the sum of $1,209 for the period commencing August 1964 and that Glasgow was prepared to pay this amount in full satisfaction of the matter sued upon in the complaint. Union's counsel responded, by letter dated August 29, 1967, that the proposal contained in the letter of August 24, 1967 was not acceptable, but that Union was prepared to settle on the basis of the formula originally agreed upon between counsel. This letter contained the following condition: "This proposal will not be open if my client is required to litigate the matter."

At trial Glasgow objected to the admissibility of evidence of the negotiations between counsel on the basis that such evidence was inadmissible because it related to an attempt to compromise. These objections were overruled. In ruling on the objection the trial court stated that it was receiving the evidence relating to the negotiations in evidence but stated that it would "decide the legal effect of it later." The trial

court found that Glasgow was indebted to Union for $1,209 for the period from August 15, 1964 to August 14, 1967 on the basis that Glasgow had admitted its liability in that sum. The court also found that Glasgow was not indebted to Union in the sum of $1,854 on the basis that the parties had entered into a written agreement on January 24, 1966 providing for pension payments in the amount of $9.00 per week, commencing August 15, 1963.

Glasgow contends that the evidence pertaining to the settlement negotiations should have been inadmissible and therefore there is no evidentiary support for the judgment against it in the sum of $1,209. Union contends that the trial court did not err in granting the judgment of $1,209 but that it did err in not granting the full relief requested. As we understand Union's contention, Glasgow is indebted to it in the sum of $1,854 for payments due from August 15, 1963, of which sum $1,209 was admitted to be due by Glasgow. In short, Union's position is that the trial court should also have awarded it the difference between these two sums.

(1) Evidence Code section 1152 provides that "Evidence that a person has, ... offered or promised to furnish money, ... as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability ...." The admission of such evidence is error. (*Conderback, Inc.* v. *Standard Oil Co.,* 239 Cal.App.2d 664, 684 [48 Cal.Rptr. 901];*People* ex rel. *Dept. of Public Works* v. *Forster,* 58 Cal.2d 257,263 [23 Cal.Rptr. 582, 373 P.2d 630].) This rule not only excludes offers to compromise but also excludes all negotiations in relation thereto unless they are otherwise admissible. (*Boyes v. Evans,* 14 Cal.App.2d 472, 479-480 [58 P.2d 922]; *People v. Lagiss,* 160 Cal.App.2d 28, 34 [324 P.2d 926]; *Realty Co. of America v. Burton,* 160 Cal.App.2d 178, 194 [\***402**325 P.2d 171].) (2) It is well settled, however, that the rule which excludes offers of compromise does not apply to statements which are in nowise connected with any attempt of compromise or are statements of fact independent of an offer of compromise. (*Smith v. Whittier,* 95 Cal. 279, 297-298 [30 P. 529]; *Kelly v. Steinberg,* 148 Cal.App.2d 211, 219 [306 P.2d 955];*People* ex rel. *Dept. of Public Works* v. *Glen Arms Estate, Inc.,* 230 Cal.App.2d 841, 863-864 [41 Cal.Rptr. 303];*People* ex rel. *Dept. of Public Works* v. *Forster, supra.*)(3) Accordingly, evidence relative to the issue of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

whether there has been an accord and satisfaction is not subject to the objection that it violates the rule which excludes offers of compromise. ( *Conderback, Inc.* v. *Standard Oil Co., supra,* at pp. 683-684.) (4) Moreover, the statements of a party against whom a claim is made, that he is willing to settle the claim, when not connected with an offer of compromise, may be proved as an admission against interest. (*People* ex rel. *Dept. of Public Works v. Forster, supra,* at p. 263;*Kelly* v. *Steinberg, supra; Smith v. Whittier, supra.*)

(5) In considering whether a person's statement amounts to an ordinary admission or constitutes an offer of compromise, the intention of the party is dispositive. (*People* ex rel. *Dept. of Public Works v. Forster, supra,* 58 Cal.2d 257, 265;*People* ex rel. *Dept. of Public Works v. Glen Arms Estate, Inc., supra,* 230 Cal.App.2d 841, 864.) In ascertaining this intention *Forster* quotes the rule from 31 Corpus Juris Secundum, section 285, pages 1042-1043, as follows: "'If the proposal is tentative, and any statements made in connection with it hypothetical, if the offer was made to "buy peace" and in contemplation of mutual concessions, it is as to such point a mere offer of compromise. On the other hand, if the intention is apparent to admit liability and to seek to buy or secure relief against a liability recognized as such, or if the party making the proposal apparently *intended* to make *no concessions* but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise.' (Italics added.)" (P. 265.)

Adverting to the evidence objected to in the instant case, we first observe that, in the light of the foregoing principles, the negotiations by the attorneys for the parties leading up to and including the March 15, 1967 oral agreement of counsel were relevant on the issue of whether a settlement by the way of an accord and satisfaction had been reached between Glasgow and Union. (6) "The phrase 'accord and satisfaction' as it is known and applied in the law means the substitution of a new agreement for and in satisfaction of a pre-existing agreement between the same parties." (*B. & W. Engineering Co.* v. *Beam,* 23 Cal.App. 164, 170 [137 P. 624]; *Security First Nat. Bank v. Rospaw,* 107 Cal.App.2d 220, 223 [237 P.2d 76]. (7) The "accord" is the agreement whereby one of two parties *403 having a right of action against

the other upon a claim arising out of an existing agreement, agrees to accept from the other party something in satisfaction of such right of action different from and usually less than that which might be recovered upon the original obligation. ( *B. & W. Engineering Co. v. Beam, supra; Whepley Oil Co. v. Associated Oil Co.,* 6 Cal.App.2d 94, 112 [44 P.2d 670]; Civ. Code, § 1521.) (8) Since "accord" signifies an agreement between the parties, the primary principles which govern the law of contracts are necessarily applicable, that is, proper subject matter, competent parties, mutual consent, and consideration. (*Dunlap v. Bellah,* 184 Cal.App.2d 579, 586 [7 Cal.Rptr. 766]; *Kelly v. David D. Bohannon Organization,* 119 Cal.App.2d 787, 792 [260 P.2d 646]; *Reid v. Overland Machined Products,* 55 Cal.2d 203, 208 [10 Cal.Rptr. 819, 359 P.2d 251]; *Whepley Oil Co.* v. *Associated Oil Co., supra; Republic Indem. Co. v. Maier Brewing Co.,* 249 Cal.App.2d 495 499 [57 Cal.Rptr. 670]; *Rabinowitz v. Kandel,* 1 Cal.App.3d 961, 966 [81 Cal.Rptr. 897].)

(9) For the principle of accord and satisfaction to apply there must be a bona fide dispute between the parties. (*Kelly v. David D. Bohannon Organization, supra,* 119 Cal.App.2d 787, 792;*Whepley Oil Co. v. Associated Oil Co., supra,* 6 Cal.App.2d 94, 112.) It is also necessary to show satisfaction as well as an accord since an accord without satisfaction does not extinguish the original obligation. (*Silvers v. Grossman,* 183 Cal. 696, 699 [192 P. 534]; *B. & W. Engineering Co. v. Beam, supra,* 23 Cal.App. 164, 170;Civ. Code, §§ 1522-1523.) (10) Where the dispute was as to the amount due and an accord has been reached as to the amount to be paid, the original obligation is not extinguished until the agreement is performed. (*Holton* v. *Noble,* 83 Cal. 7, 9 [23 P. 58]; *Silvers* v. *Grossman, supra;* see Civ. Code, § 1524.)

In the instant case no contention is made that there was not a bona fide dispute between the parties, a proper subject matter, or sufficient consideration. (11) With respect to the competency of the parties, we observe, initially, that an attorney does not, without specific authorization, possess the power or authority to bind his client to a compromise settlement. (*Bice v. Stevens,* 160 Cal.App.2d 222, 231-232 [325 P.2d 244]; *People v. Davis,* 48 Cal.2d 241, 256 [309 P.2d 1].) (12) We also observe that the rules governing the attorney-client relation are

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

6 Cal.App.3d 395
6 Cal.App.3d 395, 86 Cal.Rptr. 33
**6 Cal.App.3d 395**

founded on the rules governing the relation of principal and agent. (*Fidelity & Cas. Co. v. Abraham, 70 Cal.App.2d 776, 783* [161 P.2d 689; *Redsted v. Weiss, 71 Cal.App.2d 660, 664* [163 P.2d 105].) Therefore, notwithstanding the lack of express or apparent authority in the attorney, his act is binding on the client if the latter ratifies it or accepts the benefits of the attorney's acts. ( *Redsted* v. *Weiss, supra,* at pp. 664-665; *Fidelity & Cas. Co.* v.*404 Abraham, supra;* see *Cathcart* v. *Gregory, 45 Cal.App.2d 179, 185, 187* [113 P.2d 894].)

(13) In the present case it appears that the second cause of action of plaintiff's complaint purports to plead, although inartfully, facts stating an accord and satisfaction. The proof in support of this cause of action consisted of a stipulation entered into at trial by counsel for the parties. According to that stipulation the agreement entered into by counsel on or about March 15, 1967 that Glasgow was to make pension payments retroactive to August 15, 1964 was confirmed and ratified by their respective clients but was subsequently repudiated by Glasgow. It is apparent from the record, therefore, that although the accord entered into by the attorneys was ratified by their respective clients, the accord was never executed. Accordingly, a satisfaction of the accord agreement never occurred. [FN1]

> FN1 It should be noted that Civil Code section 1522 provides that "the parties to an accord are bound to execute it." The proper procedure to enforce the accord is to bring an action for specific performance. (See suggested form of complaint to enforce agreement of accord in Deering's Civil Code, Anno., section 1522.)

(14) We point out here that the trial court's findings do not mention a disposition of the second cause of action. In the absence of a request for specific findings we can conclude that the court found against plaintiff's claimed accord and satisfaction since a finding upon that issue, consistent with the judgment, results by necessary implication from the express findings made by the court. (Code Civ. Proc., § 632; *Auer* v. *Frank, 227 Cal.App.2d 396, 406* [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]; *Calloway* v. *Downie, 195 Cal.App.2d 348, 353* [15 Cal.Rptr. 747].) This conclusion finds support in the express finding made by the court that Glasgow admitted

liability in the sum of $1,209 for the period August 15, 1964 to August 14, 1967 rather than upon the facts pleaded in the second cause of action which sought to predicate liability upon an accord and satisfaction in the sum of $1,486.

(15) Since the settlement agreement reached by the attorneys, although ratified by the clients, did not constitute an accord and satisfaction it did not extinguish the original obligation, if any. Union was, therefore, justified in proceeding on the original obligation as alleged in the first cause of action.

(16) Our next inquiry, therefore, is to the relevancy of the letter dated August 24, 1967 written subsequent to the filing of the instant action by Glasgow's attorney to Union's attorney. This letter admitted that Glasgow owed Union the sum of $1,209. No contention is made that this letter was not authorized by Glasgow. Moreover, the letter indicates that a copy *405 was mailed to Wayne L. Glasgow, President of Glasgow. The letter was, therefore, admissible in evidence because relevant to the issue whether it was a declaration against interest. (17) As indicated in *Forster, supra,* if the intention is apparent to admit liability and to secure relief against a liability recognized as such, or if the party making the proposal apparently intended to make no concessions but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise. Such an admission against interest is not subject to the rule which excludes offers of compromise. (58 Cal.2d at p. 265.)

(18a) The question whether Glasgow intended to admit liability in the sum of $1,209 and to make no other concessions was one of fact. (*Cope v. Davidson, 30 Cal.2d 193, 200* [180 P.2d 873, 171 A.L.R. 667];*People ex rel. Dept. of Public Works v. Forster, supra,* 58 Cal.2d 257, 265-266.) Here the only evidence as to Glasgow's intention was the letter of August 24, 1967. No extrinsic evidence was introduced to show any intent different from that expressed in said letter. The trial court was therefore called upon to make its interpretation based solely upon the terms of the letter. It interpreted the letter as an admission against interest admitting liability in the sum of $1,209 rather than an attempt to compromise.

(19) Since there is no extrinsic evidence in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

6 Cal.App.3d 395
6 Cal.App.3d 395, 86 Cal.Rptr. 33
**6 Cal.App.3d 395**

present case, we must make an independent determination of the meaning of the subject letter. (*Parsons v. Bristol Dev. Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) (18b) A reading of the letter discloses an apparent intent to admit liability in the stated sum and to make no other concessions. This is clear from the language "Mr. Glasgow admits he owes as follows: ..." and "The defendants are prepared to pay this amount in full satisfaction of the matter sued upon in your complaint." We, therefore, conclude that the trial court's interpretation is not erroneous and that it suffices to support the finding that defendant admitted to a liability of $1,209 for the period August 15, 1964 to August 14, 1967.

The admission of the subject letter, as relevant to the issue as to whether Glasgow made a declaration against interest, was evidence of an intent to admit liability to the extent of $1,209. Based on this evidence the trial court made a finding that Glasgow admitted such liability. Our remaining inquiry, therefore, is whether the trial court was justified in declining to grant Union the full relief requested on the basis of the August 15, 1963 retroactivity date.

(20) The record herein indicates that the participation agreement dated January 24, 1966, upon which Union bases its claim of retroactivity to August 15, 1963, contains a material alteration in that the period of coverage had been changed by handwritten notation from 1965 to 1963.*406 The presence of this change was the essence of the dispute between the parties. Wayne Glasgow testified that when he signed the agreement it provided that the pension payments would commence on August 15, 1965, and that the first time he learned that the year had been changed to 1963 was when he received a copy of the agreement signed by Union's officials. He also testified that he immediately called Henry Meyer, Union's business agent, and called attention to the altered contract. He also stated that he repudiated the agreement because of the alteration.

Although there was considerable conflict in the evidence as to the cause of the alteration, there was substantial evidence to warrant the findings that it was not true that a written agreement had been entered into between the parties providing for pension payments commencing August 15, 1963, and that "there is no valid existing current agreement as

alleged in the amended complaint." It is well settled that if it pertains to a material matter an alteration of a written instrument made after delivery and without previous consent vitiates the obligation at the option of the other party. (Civ. Code, § 1700; *Consolidated Loan Co.* v. *Harman,* 150 Cal.App.2d 488, 491 [310 P.2d 450]; *Rosenberg v. C. W. Clarke Co.,* 200 Cal.App.2d 178, 184 [19 Cal.Rptr. 191]; *Commercial & Sav. Bank v. Foster,* 210 Cal. 76, 81 [290 P. 583].)

The judgment is affirmed. Each party is to bear its own costs.

Sims, J., and Elkington, J., concurred.
The petition of the defendant and appellant for a hearing by the Supreme Court was denied June 5, 1970. Tobriner, J., did not participate therein.

Cal.App.1.Dist.
Moving Picture etc. Union v. Glasgow Theaters, Inc.
6 Cal.App.3d 395, 86 Cal.Rptr. 33

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

Westlaw.

219 Cal.App.2d 600                                                                          Page 1
219 Cal.App.2d 600, 33 Cal.Rptr. 285, 12 A.F.T.R.2d 6032, 64-1 USTC P 9158
**219 Cal.App.2d 600**

▷Murchison v. Murchison
Cal.App.2.Dist.

R. BRUCE MURCHISON, Plaintiff and Appellant,
v.
ETHEL A. MURCHISON, Defendant and
Respondent.
**Civ. No. 26490.**

District Court of Appeal, Second District, Division 3,
California.
Aug. 27, 1963.

HEADNOTES

(**1a**, **1b**, **1c**) Husband and Wife § 157(8)--
Transactions Inter Se-- Property Settlement
Agreements--Operation and EffectContribution § 5--
Who May Claim Contribution.
Where the monthly payments to be made by a
husband to a wife over a five- year period pursuant to
a divorce judgment were based on an integrated
property settlement agreement whereby the parties
discharged all other obligations then existing between
them, and where, after the divorce, the Internal
Revenue Service and the state claimed additional
income tax on income for which the husband and
wife had filed joint returns and the husband paid the
tax, a new claim or cause of action arose by operation
of law in favor of the husband against the wife and
the husband's obligation to pay the balance of the
monthly payment was extinguished when the wife
became obligated to pay to the husband a greater sum
as contribution for the tax deficiency than the total
amount of the balance of the payments.
See **Cal.Jur.2d**, Community Property, § 27;
**Am.Jur.**, Husband and Wife (1st ed § 275).
(**2**) Taxation § 458(2)--Income Taxes--Husband and
Wife.
When husband and wife elect to file a joint income
tax return, they become jointly and severally liable
for the entire tax payable on the aggregate return,
including any additional tax assessed after an audit.

(**3**) Contribution § 2--Necessity of Contractual
Relation.
Civ. Code, § 1432, concerning the right of a party
who satisfies more than his share of a joint or joint
and several obligation to require proportionate

contribution from all parties to the obligation, applies
though there is no contract or agreement between the
one paying and the person benefited.

(**4**) Contribution § 1--Nature and Basis of Doctrine.
Though in some cases an agreement to contribute
may be implied, the doctrine of proportionate
contribution between persons jointly or jointly and
severally liable on an obligation is not founded on
consent but on natural justice, the underlying idea
being that it is just and equitable for the one benefited
by another's payment to pay his proportionate share.

(**5**) Contribution § 1--Nature and Basis of Doctrine.
Civ. Code, § 1432, concerning the right of a party
who satisfies more than his share of a joint or joint
and several obligation to require proportionate
contribution from all parties to the obligation, is
consistent with the equitable origin of the doctrine in
that its application is not limited to cases where
consent, express or implied, can be found.

(**6**) Setoff and Counterclaim § 4--Availability of
Remedy.
The principle of setoff in Code Civ. Proc., § 440, that
where cross-demands exist between two parties, the
demands are deemed compensated so far as they
equal one another, applies between the parties to
extinguish the debt though no action is pending
between the parties.
See **Cal.Jur.2d**, Setoff and Counterclaim, § 3;
**Am.Jur.**, Setoff and counterclaim (1st ed §§ 12, 15).
(**7**) Husband and Wife § 157(8)--Transactions Inter
Se--Property Settlement Agreements--Operation and
Effect.
Where a divorce judgment ordered the husband to
pay the wife $300 per month for five years and the
payments were not the result of the court's
determination of what the wife needed for support
but were based on an integrated property settlement
agreement whereby the parties divided their property
and discharged all other obligations then existing
between them, the payments did not have the favored
status of alimony and it cannot be said the divorce
judgment was a determination that the wife receive
the payments free and clear of her then existing tax
liability or free of the obligation in the future to make
contribution to the payment of additional taxes by the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

219 Cal.App.2d 600

219 Cal.App.2d 600, 33 Cal.Rptr. 285, 12 A.F.T.R.2d 6032, 64-1 USTC P 9158

**219 Cal.App.2d 600**

husband on income for which the husband and wife had filed joint returns.

**(8)** Husband and Wife § 157(6)--Property Settlement Agreements-- InterpretationSetoff and Counterclaim § 4--Availability of Remedy.

A provision in an integrated property settlement agreement that neither the husband nor the wife will ask any court for further relief does not prohibit a setoff, against payments to be made under the agreement, of a money obligation from one to the other that arises by reason of a subsequent event not contemplated when the agreement was made.

See **Cal.Jur.2d,** Husband and Wife, §§ 57, 63; **Am.Jur.,** Husband and Wife (1st ed § 264).

### SUMMARY

APPEAL from an order of the Superior Court of Los Angeles County denying a motion to quash execution of a writ and enter satisfaction of judgment in a divorce action. Philbrick McCoy, Judge. Reversed.

COUNSEL
Murchison, Cumming, Baker & Velpmen, Henry F. Walker and John Baker for Plaintiff and Appellant.
*602
William P. Mealey for Defendant and Respondent.
FILES, J.

This appeal is from an order denying a motion to quash execution and enter satisfaction of judgment in a divorce action. The question is whether the plaintiff, who paid an income tax deficiency after the divorce, was entitled to offset a part of it against the balance due defendant under the divorce judgment.

**(1a)** The record on appeal indicates that plaintiff obtained an interlocutory judgment of divorce against defendant on July 30, 1956. The final judgment was entered a year later. The interlocutory ordered plaintiff to pay defendant $300 per month beginning with July 1956 and continuing for 59 months. The judgment contained separate provisions for child custody and support. The judgment also contained these words: "The Court finds the property settlement agreement, dated June 26, 1956, between plaintiff and defendant is a fair and equitable distribution of the property of the parties and it is hereby approved." There was no other mention of property in the judgment. Nothing was said about whether there were debts, or if there were, who was to pay.

In December 1961 defendant filed in the superior court an affidavit stating that plaintiff had paid only $14,100 of the $17,700 which had been ordered paid, leaving a balance of $3,600 due, plus interest. Upon this affidavit a writ of execution was issued. Plaintiff then moved to quash execution and enter satisfaction of judgment. In support of this motion plaintiff filed a declaration showing the following facts which were not controverted and which for the purpose of this appeal are assumed to be true:

After the dissolution of the marriage the joint income tax returns of the parties for the years 1953, 1954, 1955 and 1956 were audited by the Internal Revenue Service with the result that the government claimed more than $20,000 as additional tax due for those years. An additional claim was asserted by the State of California based upon the federal government's audit. Plaintiff employed an attorney who negotiated a settlement with the federal and state governments. In June 1960 plaintiff paid to the Director of Internal Revenue $9,165.69 and to the State Franchise Tax Board $810.25 in full satisfaction of the joint tax liability of plaintiff and defendant. Plaintiff also paid in full the fees of the attorneys whom he had employed to handle the tax matters.

Plaintiff thereupon set off the $3,600 which remained unpaid *603 under the divorce judgment against defendant's share of the tax deficiency which plaintiff had paid.

Plaintiff's declaration also stated that when the parties had received notice of the tax claims, they had agreed that plaintiff would handle the matter for both of them and that defendant would reimburse him for one-half of any amount paid to the state and federal governments and one-half of the attorneys' fees. Defendant filed a counteraffidavit denying that any such agreement had been made. For the purpose of this appeal it is assumed that the trial court believed the affidavit of the prevailing party (defendant). We are bound by the implied finding that there was no agreement to share this burden.

The property settlement agreement, which had been received in evidence at the time of the divorce, was called to the attention of the court hearing the motion. The agreement was an integrated contract which expressed the desire of the parties to settle all rights

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

219 Cal.App.2d 600
219 Cal.App.2d 600, 33 Cal.Rptr. 285, 12 A.F.T.R.2d 6032, 64-1 USTC P 9158
**219 Cal.App.2d 600**

and claims of each against the other "which may now exist or which may hereafter arise by reason of the marriage of the parties and their marital status to the date hereof. ..." The agreement specified a division of property and contained the husband's promise to pay the wife $300 per month for five years. These payments were not designated as "alimony" or "support." The paragraph providing for the cash payments was headed "Concluding Property Distribution." [FN1]

> FN1 In the paragraph of the interlocutory decree providing for the monthly payments, the words "for her support" appear in typewriting with an ink line through them. The judge's initials appear in the margin opposite the change.

There was in the agreement no mention of debts, nor any promise by either to discharge any existing debts except a mortgage on the home, which the husband agreed to pay.

The agreement contained the following language:

"Each of the parties hereto agrees that neither he or she will not, under any circumstances, ask any court in any proceedings for any allowance, support or maintenance or for further counsel fees or costs, or suit money or for any money or for any decree or order affecting the property rights of the parties hereto other than as provided and set forth in this agreement."

Notwithstanding the double negative in the quoted language, the parties are agreed that the purpose and effect of the clause is to prohibit further proceedings of the kind mentioned therein. *604

Preliminary, it should be noted that there is nothing in the record to indicate (a) that at the time the tax deficiency was asserted either party held any property which had been the common property of the parties during the marriage; (b) that either party was guilty of any fraud, or even negligence, in underpaying their income taxes; (c) that the amounts paid by plaintiff to settle the deficiency claims were not paid in good faith to compromise valid claims.

(2) When husband and wife elect to file a joint

income tax return they become jointly and severally liable for the entire tax payable upon the aggregate income. (Cal. Rev. & Tax. Code, § 18555; 26 U.S.C. § 6013 (d) (3); *Furnish v. Commissioner of Internal Revenue* (9th Cir.) 262 F.2d 727, 731.)

Under the circumstances shown here plaintiff was compelled by law to make a payment which benefited defendant in that defendant's tax liability was discharged.

(3) Civil Code, section 1432, provides: "A party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him."

This rule applies even though there be no contract or agreement between the payer and the person benefited. (*Powell v. Powell,* 48 Cal. 234;*Hilton v. Young,* 73 Cal. 196 [14 P. 684].) (4) Although in some cases an agreement to make contribution may be implied, the doctrine, as it began in the courts of equity, is founded not upon consent but upon natural justice. The underlying idea is that it is just and equitable for the person benefited to pay his proportionate share. (See *Chipman v. Morrill,* 20 Cal. 130, 135;*Blankenhorn-Hunter-Dulin Co. v. Thayer,* 199 Cal. 90, 96 [247 P. 1088, 48 A.L.R. 797]; 18 C.J.S., Contribution, § 2; 13 Am.Jur., Contribution, § 4.) (5) Civil Code, section 1432, is consistent with the equitable origin of the doctrine in that its application is not limited to cases where consent, express or implied, can be found.

*Richter v. Henningsan,* 110 Cal. 530 [42 P. 1077], is an illustration of contribution enforced by a party who had paid a joint and several federal tax liability. The case holds that the action for contribution was not barred by the statute of limitations because the cause of action did not arise until one party had paid more than his share of the joint obligation.

(1b) It follows, from the application of these principles, that when plaintiff paid the full amount of the parties' joint and several tax obligations, a new claim or cause of action *605 arose by operation of law in his favor against defendant. [FN2]

> FN2 Also of interest is the reasoning of the court in *Rutledge v. Rutledge,* 119

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Cal.App.2d 114 [259 P.2d 79], where the former husband was held to be entitled to recover from his ex-wife the amount he was required to pay, after the divorce, to discharge the income tax lien on the common property which arose because of deficiencies on her separate returns.

(6) Where cross-demands exist between two parties they are deemed compensated so far as they equal one another. (Code Civ. Proc., § 440.)This principle of setoff is not limited to judicial proceedings. The setoff applies between the parties to extinguish the debt even though no action is pending. (See *Jones v. Mortimer, 28 Cal.2d 627, 632* [170 P.2d 893]; *Pan Pacific Sash & Door Co. v. Greendale Park, Inc., 166 Cal.App.2d 652, 660* [333 P.2d 802].) Thus in *Hauger v. Gates, 42 Cal.2d 752* [269 P.2d 609], the court held that a sale under a trust deed could be set aside where it appeared that the note which the trust deed secured had been discharged by a setoff.

(1c) It follows that in the present case plaintiff's obligation to pay the $3,600 balance to defendant was extinguished when defendant became obligated to pay to plaintiff a greater sum as contribution for the tax deficiency. The effect was to compensate defendant just as though payment had been made to her in cash.

*Keck v. Keck, 219 Cal. 316* [26 P.2d 300], is not inconsistent with this analysis. In that case the wife had acted as the husband's guardian, and upon the settlement of her accounts it had been determined that $1,896.26 was due from her to him, which sum she never paid. Subsequently in a divorce proceeding the court ordered the husband to pay the wife $100 per month alimony. Later the superior court made an order which in effect allowed the husband to offset the preexisting judgment debt against accrued alimony. The Supreme Court reversed that order. The opinion pointed out that a husband may be ordered to pay for the support of his wife notwithstanding that she is indebted to him; and that the alimony order, which did not mention her indebtedness, was in effect an order that the husband support her at the rate of $100 per month notwithstanding the preexisting indebtedness. A setoff under these circumstances would have had the effect of depriving the wife of her support at the rate which the court had found to be necessary and reasonable.

The *Keck* case involved an attempt to set off a preexisting debt against alimony. The present case involves neither a preexisting debt nor alimony. (7) The payments owed to the wife under the divorce judgment in this case were based *606 upon an integrated property settlement and hence did not have the specially favored status of alimony. (*Bradley v. Superior Court, 48 Cal.2d 509* [310 P.2d 634].) The installments payable to the wife were not the result of a court's determination of what she needed for her support, but were based upon a negotiated bargain whereby the parties had divided their property and discharged all other obligations then existing between them. In the present case the obligation of the wife to make contribution did not exist at the time of the divorce, and the antecedent tax liability was not known or suspected to exist. It could not be said here, as in *Keck,* that the divorce judgment was a determination that she should receive $300 per month free and clear of her then existing tax liability or free of any obligations which might arise against her in the future.

(8) Defendant has placed her reliance entirely upon the provision of the settlement agreement whereby each agrees that he or she will not ask any court for further relief. Strictly speaking, a setoff does not come within that language because the setoff operates without the necessity of maintaining a proceeding or asking a court for relief. Even the most liberal construction of the language of the agreement would not make it operate to prevent a money obligation from arising in the future by reason of a subsequent event not contemplated at the time of the agreement.

It cannot reasonably be said that the settlement agreement forbids the parties to invoke the aid of the court either to enforce the judgment or to order the entry of satisfaction under Code of Civil Procedure, section 675, when the judgment is in fact satisfied. In this case the record shows that the judgment has been satisfied, and plaintiff is entitled to have the writ of execution quashed and satisfaction entered.

The order is reversed.

Shinn, P. J., and Ford, J., concurred.
A petition for a rehearing was denied September 18, 1963. *607

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

219 Cal.App.2d 600                                                                     Page 5
219 Cal.App.2d 600, 33 Cal.Rptr. 285, 12 A.F.T.R.2d 6032, 64-1 USTC P 9158
**219 Cal.App.2d 600**


Cal.App.2.Dist.
Murchison v. Murchison
219 Cal.App.2d 600, 33 Cal.Rptr. 285, 12 A.F.T.R.2d
6032, 64-1 USTC P 9158

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 17**

Westlaw.

233 Cal.App.3d 103                                    Page 1
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

▷Peterson Development Co., Inc. v. Torrey Pines Bank
Cal.App.4.Dist.
PETERSON DEVELOPMENT COMPANY, INC.,
et al., Plaintiffs and Appellants,
v.
TORREY PINES BANK et al., Defendants and
Respondents.
**Nos. D012843, D013435.**

Court of Appeal, Fourth District, Division 1,
California.
Aug. 9, 1991.

[Opinion certified for partial publication. [FN1]]

FN1 Pursuant to California Rules of Court,
rule 976.1, this opinion is certified for
publication with the exception of part III.

SUMMARY

A corporation and its president brought an action
against a bank and its subsidiary seeking damages
arising out of a construction loan transaction.
Plaintiffs, claiming that they had entered into the loan
transaction because of defendants' representation that
permanent financing would be provided for the
construction project, based the action on theories of
breach of contract, breach of the covenant of good
faith and fair dealing, breach of fiduciary duty, and
constructive fraud. Defendants moved for summary
judgment, emphasizing the defense that the two-year
statute of limitations in Code Civ. Proc., § 339,
barred any claim based on oral contract or breach of
covenant, and the trial court granted the motion.
Defendants then successfully moved for an award of
attorney fees under Civ. Code, § 1717, based on an
attorney fees clause in a letter of commitment to
provide permanent financing that had been part of the
loan transaction. (Superior Court of San Diego
County, No. 608331, Thomas Oliver LaVoy and
Harrison R. Hollywood, Judges.)

In a consolidated appeal of the summary judgment
and of the order granting attorney fees, the Court of
Appeal affirmed the summary judgment, and, for
reasons stated in an unpublished part of the opinion,
affirmed the order granting attorney fees. The court
held that, even if an action for breach of an oral
contract was barred by the statute of limitations, the
dispositive issue on appeal was whether the letter of
commitment represented an enforceable written
contract, and, since it was missing certain required
terms, like the identity of the potential buyer, it did
not create an enforceable contract. The court held,
further, that plaintiffs' cause of action for breach of
the implied covenant of good faith and fair dealing
had to be considered as seeking damages on a
contract theory and could not be maintained in the
absence of an underlying contract. Finally, the court
held that the bank's relationship to the corporation
and its president was not that of a fiduciary, and that
the bank accordingly could not be held liable on
theories of fiduciary duty or constructive fraud.
(Opinion by Huffman, Acting P. J., with Froehlich,
J., concurring. Separate opinion by Nares, J.,
concurring in the result.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Appellate Review § 161.4--Imposition of
Sanctions for Frivolous Appeal.
Defendants whose summary judgment motion had
been granted by the trial court were not entitled to
sanctions for inadequate record (Cal. Rules of Court,
rule 5.1(i)) or for frivolous appeal (Code Civ. Proc., §
907; Cal. Rules of Court, rule 26(a)), where
statements by the trial judge showed that he had not
relied on the part of the record defendants alleged
was incomplete, and the issues presented on appeal
were complex and challenging, making it impossible
to say that the appeal was frivolous or taken solely
for delay.

(2) Summary Judgment § 19--Hearing and
Determination--Function of Court-- Showing
Required.
The purpose of summary judgment is to penetrate
evasive language and adept pleading and to ascertain,
by means of affidavits, the presence or absence of
triable issues of fact. Accordingly, the function of the
trial court in ruling on a motion for summary

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.

**(3)** Contracts § 23--Construction of Several Contracts Together.
In Civ. Code, § 1642, which provides that several contracts relating to the same matters, between the same parties, and made as part of one transaction are to be taken together, the term "contract" is descriptive only of a writing and, in reality, refers to an instrument.

**(4)** Contracts § 1--Implied Contracts.
Under Civ. Code, § 1621, which defines "implied contract," an agreement may be established by the acts and conduct of the parties and all the circumstances of the case.

**(5)** Summary Judgment § 11--Affidavits--Sufficiency--Conflict With Deposition Statements.
In general, admissions against interest in deposition testimony will control over contradictory statements in affidavits presented to oppose summary judgment proceedings.
[See Cal.Jur.3d, Judgments, § 35; 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 292.]
**(6)** Loans § 1--Letter of Commitment.
Letters of commitment, for which a fee is paid, constitute an option to the applicant to obtain the loan at the specified terms. A loan commitment is not binding on the lender unless it contains all the material terms of a loan and either the lender's obligation is unconditional or the stated conditions have been satisfied. Thus, a letter of commitment to provide permanent financing that was part of a loan transaction between a corporation and its president and a bank and its subsidiary did not create an enforceable contract to provide permanent financing where, even if the identity of the bank's subsidiary as permanent lender was established by reference to a construction loan agreement that was also part of the transaction, other material contractual terms of the

letter were missing or were inadequately defined. Specifically, the identity of the potential borrower was not made clear; the amount of the loans was not specified; and terms of repayment were only vaguely stated.

**(7)** Contracts § 44--Breach--Covenant of Good Faith and Fair Dealing.
A cause of action for breach of the implied covenant of good faith and fair dealing must be considered to seek damages on a contract theory. An underlying contract is required to state such cause of action or the related theory of bad faith denial of contract.

**(8)** Fraud and Deceit § 19--Constructive Fraud--Confidential Relations.
It is essential to the operation of the doctrine of constructive fraud that there exist a fiduciary or special relationship.

**(9)** Appellate Review § 55--Adherence to Theory of the Case.
An appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal.

**(10a, 10b)** Escrows § 3--Competency, Duties, and Liabilities of Escrow Holder.
An escrow holder is the limited agent and fiduciary of all parties to an escrow. The agency is limited because the escrow agent only represents his principals insofar as he carries out the escrow instructions. An escrow holder has a fiduciary duty to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction. A breach of this fiduciary duty or the failure to use reasonable skill in carrying out escrow instructions subjects the escrow holder to liability. To protect the interests of the parties, an escrow agent who has an interest in the transaction is obligated to disclose that interest before accepting employment; and, in order to guarantee proper performance of escrow duties, an escrow agent should not be a party to the transaction.

**(11)** Escrows § 1--Definition--Purpose.
An escrow may be defined as a transaction in which one person, for the purpose of effecting a sale, transfer or encumbrance of real or personal property

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

Page 3

to another person, delivers any written instrument, money, evidence of title or other thing of value to a third party, the escrow holder or depository, to be held by him for ultimate transmittal to the other person upon the happening of an event or the performance of certain specified conditions.

(12) Banks and Banking § 1--Fiduciary Relationship in Transactions.

A lender does not generally assume any obligations regarding the viability of the project or investment which is financed by the loan funds so long as the conduct of the lender is limited to the activities which customarily are associated with the lending function, and, with respect to ordinary banking transactions, a bank is in no sense a true fiduciary. Thus, in a loan transaction between a bank and its subsidiary and a corporation and its president, the bank's activities as an escrow holder did not create a fiduciary or special relationship where the relationship between the parties fell into the category of a normal, commercial banking transaction, and, despite the existence of an "escrow statement," the bank never held itself out as a neutral conduit for the exchange of documents and money.

(13) Fraud and Deceit § 22--Actions--Defenses--Constructive Fraud--Statute of Limitations.

A corporation and its president had no basis to claim any justified "delayed discovery" of an alleged constructive fraud by a bank in the course of a loan transaction, and the statute of limitations for a fraud action (Code Civ. Proc., § 338, setting a three-year period) thus was not tolled, where the corporation and its president had been placed on notice with respect to their claim more than three years before they filed their complaint against the bank.

COUNSEL
Thor O. Emblem and Tracy L. Emblem for Plaintiffs and Appellants.
Brobeck, Phleger & Harrison, William D. Baldwin, William F. Sullivan and Michael J. Barry for Defendants and Respondents.
**HUFFMAN, Acting P. J.**
The trial court granted a motion for summary judgment made by defendants Torrey Pines Bank (TPB) and Torrey Pines Equity Corporation (TPEC) in this action by Peterson Development Company, Inc., and its president and sole shareholder, Eric Peterson (collectively Peterson). Subsequently, the

court awarded attorney's fees to TPB and TPEC pursuant to a contractual attorney's fees clause. Peterson's action for damages against TPB and TPEC arose out of a construction loan transaction and alleged theories of breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud. In this appeal by Peterson of both the summary judgment order and the attorney's fees award, the issues presented include the enforceability as a contract of a letter of commitment to provide permanent financing, and the potential liability of TPB as a fiduciary in connection with its performance of escrow services as part of its loan processing procedures. We conclude the trial court correctly entered summary judgment for TPB and TPEC and properly awarded attorney's fees under Civil Code section 1717. We affirm and award attorney's fees on appeal, while denying the parties' requests for sanctions on appeal.

Factual and Procedural Background

In November 1984, Peterson's chairman Eric Peterson signed the documents required to obtain a $492,000 construction loan from TPB to finance a seven-unit subdivision on Geneva Place in Escondido. Several months earlier, in negotiating for the loan, Peterson's chief financial officer Tracy Emblem (Tracy) and its president Thor Emblem (Thor) (respectively, daughter and son-in-law of Eric Peterson) had discussed the financing at a meeting with TPB's senior vice-president Walter Strangman. At that meeting, Peterson claimed, Strangman orally represented TPB would make the construction loan and would also provide permanent financing upon the project's completion, as well as extending the construction loan's one-year term if necessary. *108

The facts of the transaction, as shown in the moving, opposing, and replying summary judgment papers, disclose that when Tracy, Thor, and Eric Peterson arrived at TPB to sign the loan papers, Strangman was not available. The loan processor gave them the papers to sign and said Strangman would sign later and copies would be provided. Eric Peterson signed a number of loan documents, notably the building loan agreement and a "Letter of Commitment" for permanent financing. [FN2] The TPB loan agreement, attached as exhibit A to Peterson's first amended complaint (the operative pleading in the case), defines the contract term "Permanent Lender" as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 103

233 Cal.App.3d 103, 284 Cal.Rptr. 367

**233 Cal.App.3d 103**

"TPEC" (a wholly owned subsidiary of TPB), and states the term for "Permanent Commitment Expiration Date" is not applicable. In paragraph 4.1.15 of the loan agreement, a condition precedent to the recordation of the loan documents is stated: "a letter or other written acknowledgement from the Permanent Lender that the Permanent Commitment is in full force and effect." The letter of commitment was issued by TPEC, and required by its terms a payment of $4,920 for a commitment to provide permanent financing on the project. It provided: "This commitment is not effective until the fee is paid and this commitment is fully signed by both parties below." [FN3]

> FN2 The other loan documents Eric Peterson signed included the promissory note and deed of trust, a personal guaranty, loan disbursement instructions, and completion and release price agreements. Tracy, in her capacity as Peterson's chief financial officer, signed a corporate borrowing resolution.

> FN3 Although Peterson signed the letter of commitment, neither TPEC, which drafted the letter, nor TPB did so. No copy of this letter was returned to Peterson along with the other loan documents. Peterson did not get a copy of the letter or learn that no representative of TPEC, such as Strangman, had ever signed it until it was produced in discovery some years later in connection with a related action against Westwind Mortgage Company, as will be explained *post.*

The moving, opposing and reply papers presented evidence about TPB's escrow procedures. According to Strangman, TPB processed the loan documents internally, without using an external escrow or loan escrow. Although TPB's loan processor, Bess Beagle, testified at her deposition that TPB did not have a separate escrow department, Strangman testified at deposition that TPB's escrow department had prepared a loan escrow statement, and that such statements were ordinarily provided to the borrower. Copies of the other loan documents were also supplied to Peterson, with the exception of the letter of commitment. (See fn. 3, *ante.*)The escrow statement recites that it covers money settlement

"through escrow only," and shows all funds disbursed from the loan proceeds, which included $12,300 for loan fees. The usual processing services for a real estate transaction were performed, such as notarizing and recording documents and obtaining title insurance. No charge for escrow fees appears on the statement. A commercial loan checklist was also used, listing "TPB escrow" as the disbursement instruction recipient. *109

At the bank, Peterson also signed loan disbursement instructions with a typed entry of $12,300 for loan fees; handwritten entries show $7,380 was allocated to TPEC and $4,920 to TPB. Cashier's checks were issued by TPB, signed by Strangman, paying TPEC $7,380 out of the loan proceeds, which represented a permanent loan commitment fee of $4,920 and a broker referral commission of $2,460. Although Peterson received the escrow statement listing $12,300 total loan fees after signing the papers, as of the fall of 1985, Peterson had no documentation showing TPEC had been paid for issuing a permanent financing commitment.

By the fall of 1985, construction of the subdivision was almost completed and the construction loan was coming due (on Nov. 27, 1985). One day when Strangman and Thor were both visiting the site, Thor asked Strangman whether TPB or TPEC would supply the permanent financing for the project. According to Thor's deposition, Strangman replied "they decided not to do that." According to Tracy's declaration in opposition to the motion for summary judgment, Strangman said TPEC was no longer making permanent financing.

According to Thor's deposition and Tracy's declaration in opposition to the summary judgment motion, Peterson did not pursue the matter by demanding permanent financing from TPB or TPEC because it did not want to upset their relationship, and because it had no copy of the letter of commitment or any knowledge of documents showing TPEC had been paid for issuing the permanent financing commitment. Thor testified at his deposition he did not learn of the existence of the letter of commitment until the later Westwind litigation, but earlier, "we knew that we had paid for some kind of take-out commitment." Thor's deposition testimony also stated he believed the promise of permanent financing was based on the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

language of the letter of commitment and "the facts of the relationship" between Peterson and TPB/TPEC. Those facts included the condition of the construction loan that a take-out commitment be provided, and TPEC's providing of such a commitment for a fee. However, he admitted that he didn't know of any conversations in which TPB or TPEC promised to provide permanent financing for the project, that he didn't believe there was any existing commitment to provide such financing at the time it was denied, and that the building loan agreement naming TPEC as the permanent lender did not trigger any thought in his mind that a permanent loan commitment existed.

On his part, Eric Peterson testified at deposition that he believed he had obtained from TPB and TPEC "a construction loan and a permanent loan," based on what Thor and Tracy had told him. However, he had no knowledge of any conversations between TPB or TPEC and any Peterson representatives on the issue of a permanent financing commitment. In his opinion, the *110 loan fees charged (two and one-half points) were about what he was used to paying on similar projects. Peterson also testified he believed from his reading of the loan documents that TPB/TPEC had the discretion to decide whether to make any further loans on the project.

In Strangman's deposition, he stated he originally planned to use the letter of commitment to generate fees for TPEC, but decided not to do so before the loan was funded, for some reason he couldn't remember. The letter of commitment was prepared and presented to Peterson because of a breakdown in communication between Strangman, another bank official (Torres) and the loan processor. It was not TPB's usual practice to require a permanent loan commitment before funding a construction loan.

After learning from Strangman at about the time of completion of the project that no permanent financing would be forthcoming, Peterson contacted other lenders and reached an agreement for permanent financing with Westwind Mortgage Company (not a party to this action). Westwind told Strangman it would still finance the project even if a notice of default were filed. No extensions were granted on the construction loan although Thor may have asked for one. On February 6, 1986, TPB filed a notice of default on the construction loan after Peterson did not

pay on time. Westwind then refused to make its loan. After some delays caused by Peterson's filing for bankruptcy, TPB obtained relief from the bankruptcy stay and took the property by foreclosure.

Peterson sued Westwind in June 1986 on similar theories as are here alleged against TPB and TPEC: breach of contract, bad faith denial of contract, bad faith breach of contract, actual fraud, and negligent misrepresentation. In discovery in that action, Peterson obtained a copy of the unsigned letter of commitment, which had the words "Not utilized" written across it. [FN4] Peterson also obtained a copy of the escrow check for $7,380 to TPEC and a loan committee report showing TPEC was to receive $7,380 for loan and referral fees, with this notation: "Perm. loan *commitment* TPEC." [FN5] Westwind went bankrupt and Peterson did not pursue that action further.

> FN4 At deposition, Strangman testified he did not write "Not utilized" on the document and did not know who did.

> FN5 At her deposition, TPB's loan processor Beagle stated she couldn't tell if the word "commitment" was stricken out or underlined on the document.

In October 1988, Peterson brought this action against TPB and TPEC on the theories of breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and constructive fraud. [FN6] It *111 claimed it entered into the loan agreement because of the representation that permanent financing would be provided for the project, and the letter of commitment constituted a written contract that was breached when TPEC refused to provide that financing. TPB and TPEC's motion for summary judgment (Code Civ. Proc., § 437c) [FN7] soon followed, based on the argument there was no valid signed, written contract for permanent financing and no failure to disclose any such nonexistent document. In opposition, Peterson asked for more time to conduct discovery and argued the documents were consistent with the bank's alleged oral promise to provide permanent financing and its alleged concealment of the payment of the permanent financing fee and its failure to sign the letter.

233 Cal.App.3d 103                                                                    Page 6
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

FN6 The complaint was first filed in the North County branch of the superior court in October 1988 and was dismissed and promptly refiled by stipulation. The complaint was amended once after a demurrer was sustained.

FN7 All statutory references are to the Code of Civil Procedure unless otherwise specified.

The reply papers in support of the motion for summary judgment (filed by newly substituted counsel for TPB/TPEC) emphasized a defense that the two- year statute of limitations (§ 339) barred any claim based on oral contract or breach of covenant, and argued no fiduciary relationship between Peterson and TPB/TPEC, debtor and creditor, existed as a matter of law. The reply also claimed with reference to the constructive fraud cause of action that there could be no justifiably delayed discovery of Peterson's claims since Peterson knew about Strangman's representations, the letter of commitment, and the loan fees total amount when the documents were signed. Absent any fiduciary relationship, the reply argued, there was no duty to disclose the internal breakdown of the loan fees.

At oral argument before Judge LaVoy on the motion for summary judgment, the court and counsel focused on the issue of the breakdown of the loan fees and what the amount paid to TPEC out of loan proceeds represented. At the end of argument, counsel for TPB/TPEC reiterated his position the key issue was the statute of limitations for an oral contract. The motion was granted. Thereafter, Peterson moved for reconsideration of the order, supplying documentary evidence from recently taken depositions of Strangman and the loan processor Bess Beagle. Reconsideration was denied and summary judgment was entered. Peterson appeals.

TPB/TPEC moved for an award of attorney's fees under Civil Code section 1717, based on the attorney's fees clause in the letter of commitment. The trial court (Judge Hollywood) made an award of $83,150.59 and ordered a bond to be posted for the appeal. Peterson petitioned this court for a writ of supersedeas (D013104), which was granted on October 24, 1990, staying enforcement of the judgment for costs, expediting the appeal and

providing no extensions would be granted. (1)(See fn. 8.) Peterson has appealed the *112 attorney's fees order, and its two appeals were consolidated by stipulation of the parties. [FN8]

FN8 In their respondents' brief, TPB and TPEC have sought an award of sanctions and attorney's fees against Peterson on several bases: inadequate record under California Rules of Court, rule 5.1(i) (all further rule citations are to these rules); frivolous appeal (§ 907; rule 26(a)); and a further award of attorney's fees pursuant to Civil Code section 1717 (see pt. III, *post,* for discussion of all attorney's fees issues). In reply, Peterson requests similar sanctions, claiming the deposition excerpts supplied by respondents to supplement the "incomplete" appellant's appendix were themselves incomplete.

Despite this dispute, neither party has supplied to this court the complete deposition transcripts that were lodged with the trial court for the hearing on the summary judgment motion, as would have been permitted by rule 5(e). In any case, the judge who heard the summary judgment and reconsideration motions noted on the record at reconsideration that he relied on the facts as presented in a nondeposition form, analyzing the issues in this way: "I just got back to the position that we have an oral contract, in my opinion, as a matter of law, evidenced by a series of documents, and that's a problem for [Peterson]." In light of the foregoing, we deem the record jointly presented by the parties to be adequate for analysis of the issues presented and decline to award any sanctions for an inadequate record, as requested.

We also decline to award sanctions for a frivolous appeal. The issues presented are complex and challenging and it is not possible to say these appeals are frivolous or taken solely for purposes of delay. (§ 907; rule 26(a); *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal.Rptr. 508, 646 P.2d 179].)

Discussion

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

Page 7

(2) In reviewing this summary judgment, the rules set forth in _Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]_, must be applied:

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.] Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.] [¶] Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. [Citation.] It should therefore be used with caution, so that it does not become a substitute for trial. [Citation.] The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. [Citation.] Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citation.] [¶] A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must conclusively negate a necessary \*113 element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial."

Our analysis of this record requires discussion of three separate issues: the enforceability of this letter of commitment under contract principles, the scope of duty undertaken by TPB in its performance of the loan escrow function, and the propriety of this award of attorney's fees.

_I Enforceability of the Letter of Commitment_

To support its contention the letter of commitment, even though unsigned by TPEC, represented an enforceable written contract, Peterson makes two related arguments. (3) It first relies on the general rule of Civil Code section 1642 [FN9] that "several papers relating to the same subject matter and executed as parts of substantially one transaction, are

to be construed together as one contract. [Citation.]" (_Nevin v. Salk_ (1975) 45 Cal.App.3d 331, 338 [119 Cal.Rptr. 370].) Although the language of this section speaks in terms of "contracts," it is generally recognized: "The term 'contract' as used in the code section is descriptive only of a writing and, in reality, refers to an 'instrument.' [Citations.]" (_Harm v. Frasher_ (1960) 181 Cal.App.2d 405, 413 [5 Cal.Rptr. 367].) (4) Peterson also cites the rule of Civil Code section 1621, [FN10] that "[a]n agreement may be established by the acts and conduct of the parties and all of the circumstances of the case." (_Penn Sec. Life Ins. Co. v. Rising_ (1976) 62 Cal.App.3d 302, 308 [133 Cal.Rptr. 59].)

> FN9 Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

> FN10 Civil Code section 1621 provides: "An implied contract is one, the existence and terms of which are manifested by conduct."

Applying these rules, Peterson relies on the construction loan agreement, which required by its terms "a letter or other written acknowledgment from the Permanent Lender that the Permanent Commitment is in full force and effect." The agreement also defined the contract term "permanent lender" as "TPEC." When this agreement and the letter of commitment are read together, Peterson claims, the letter should be considered to be a fully executed agreement, in light of the consideration paid for it out of Peterson loan proceeds, and in light of Peterson's alleged reliance on its "promise" of permanent financing.

In response, TPB and TPEC rely heavily on the rule stated in _Angell v. Rowlands_ (1978) 85 Cal.App.3d 536, 540-542 [149 Cal.Rptr. 574], regarding \*114 signatures to a contract, where the court adopted the approach of a particular line of cases, as set forth by the Supreme Court in _Cavanaugh v. Casselman_ (1891) 88 Cal. 543 [26 P. 515]. That authority holds that a signer of a contract cannot escape liability unless he or she affirmatively establishes the parties contemplated the signatures of all parties were a condition precedent to the validity of the contract. In

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*Angell,* the Court of Appeal explained:

"We therefore decline to follow the *Tewksbury*
[*Tewksbury v. O'Connell* (1862) 21 Cal. 60] line of
cases insofar as they hold that an agreement is
invariably incomplete until signed by all parties
purportedly bound. Instead, we adopt the *Cavanaugh*
line of cases, i.e., that a contract is invalid if not
signed by all parties purportedly bound *only when it
is shown,* either by parole or express condition, that
the contract was not intended to be complete until all
parties had signed. Conversely, in the absence of a
showing that the contract is not intended to be
complete until signed by all parties, the parties who
did sign will be bound." (*Angell v. Rowlands, supra,*
85 Cal.App.3d 536, 542, original italics.)

Because TPEC never signed the letter of
commitment, TPEC and TPB argue the letter is not
an enforceable contract, and the record shows
nothing more than an oral agreement to agree in the
future on possible permanent financing arrangements.
Thus, they contend the statute of limitations on such
an oral contract (§ 339, two years) had already run
before this action was filed, over three years after
Peterson was told TPEC no longer made permanent
financing arrangements. (5) They further claim the
deposition excerpts from Eric Peterson's and Thor's
testimony, admitting they did not know of
conversations promising permanent financing, should
control over Tracy's declaration to the contrary that
was presented in opposition to the summary
judgment motion, pursuant to the rule of *D'Amico v.
Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-
22 [112 Cal.Rptr. 786, 520 P.2d 10] (in general,
admissions against interest in deposition testimony
will control over contradictory statements in
affidavits presented to oppose summary judgment
proceedings).

Even assuming the trial court correctly concluded the
statute of limitations (§ 339) barred any action for
breach of an oral contract, the record and the issues
presented on appeal require our discussion of the
agreement in light of the rules applicable to written
contracts. Thus, the dispositive issue presented is
whether the letter of commitment represents a
complete and fully enforceable contract. In making
this determination, the letter of commitment and the
construction loan agreement must be read together,
consistent with the rule of Civil Code section 1642.

We must inquire whether the parties intended to *115
be bound by this preliminary agreement to issue
permanent financing. (*Birdsong v. Welch* (1960) 181
Cal.App.2d 749, 752 [5 Cal.Rptr. 474].)

(6) Letters of commitment, for which a fee is paid,
constitute an option to the applicant to obtain the loan
at the specified terms. (*Lowe v. Massachusetts Mut.
Life Ins. Co.* (1976) 54 Cal.App.3d 718, 725-728
[127 Cal.Rptr. 23]; see 9 Miller & Starr, Cal. Real
Estate (2d ed. 1989) § 28.4, p. 9.) Under the usual
principles of lender liability, "[a] loan commitment is
not binding on the lender unless it contains all of the
material terms of the loan, and either the lender's
obligation is unconditional or the stated conditions
have been satisfied. When the commitment does not
contain all of the essential terms ... the prospective
borrower cannot rely reasonably on the commitment,
and the lender is not liable for either a breach of the
contract or promissory estoppel." (9 Miller & Starr,
*op. cit. supra,* § 28.4, at p. 8, fn. omitted.) The
material terms of a loan include the identity of the
lender and borrower, the amount of the loan, and the
terms for repayment. (*Op. cit. supra;* see *Laks v.
Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d
885, 891, 893 [131 Cal.Rptr. 836].)

We have examined the letter of commitment in an
effort to identify all the required terms of this type of
contract. They are not present. First, the identity of
the potential borrower is not made clear; the letter
contemplates offering financing either to Peterson or
to its individual prospective home buyers in the
project. Next, the amount of the loans is not
specified; a blank appears where the letter requires
specification that "the aggregate amount of all loans
shall not exceed $ _____." It is
also generally stated that the amount of the loan(s)
"shall be up to 90% of Lender's appraisal or the
purchase price, whichever is less." The terms of
repayment of the loan(s) are nowhere specified in the
letter, except that the lender's "standard interest rate
quoted from time to time during the term hereof for
comparable loans as of the date the loans are
approved by Lender" shall be used. Similarly vague
provisions are stated with regard to amortization and
adjustable rate mortgages, while standard provisions
are included concerning closing costs, insurance, and
documentation.

These material contractual terms of the letter of

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

commitment are so broadly defined that they do not appear to be capable of being made certain; on this record, no binding agreement could have been reached to supply permanent financing on mutually agreed-upon terms. Accordingly, even assuming the identity of TPEC as the permanent lender is established by reference to the construction loan agreement, the remainder of the contractual terms are inadequately defined. No enforceable contract to provide permanent financing is created by this document. *116

Turning to an examination of Peterson's second cause of action for tortious breach of the implied covenant of good faith and fair dealing, it alleges TPB and TPEC denied the existence of the agreement to provide permanent financing and engaged in bad faith conduct depriving Peterson of its rights and benefits under its contractual agreements; punitive damages were sought. On appeal, Peterson argues this claim falls within the permissible parameters of such theory as established by *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 769 [206 Cal.Rptr. 354, 686 P.2d 1158]. (See discussion in *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1391-1404 [272 Cal.Rptr. 387] and *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 478 [261 Cal.Rptr. 735].) (7) However, under *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684 [254 Cal.Rptr. 211, 765 P.2d 373], this cause of action for breach of the implied covenant of good faith and fair dealing must now be considered to seek damages on a contract theory. An underlying contract is required to state such a cause of action or the related theory of bad faith denial of contract. (*Careau & Co. v. Security Pacific Business Credit, Inc., supra,* 222 Cal.App.3d at pp. 1393, 1401.) The same conclusions we reached above with reference to the claim for breach of contract thus apply. (See *Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 688-694 [280 Cal.Rptr. 338].) Accordingly, the trial court correctly granted the motion for summary judgment with respect to both of Peterson's contract theories of liability.

II *Escrow Theory of Liability*

Peterson's theories of breach of fiduciary duty and constructive fraud are closely related. (8) It is essential to the operation of the doctrine of

constructive fraud that there exist a fiduciary or special relationship. (*Mary Pickford Co. v. Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 525 [86 P.2d 102]; *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 937 [268 Cal.Rptr. 609]; Civil Code, § 1573.) Peterson claims TPB's activities as an escrow holder created such a fiduciary or special relationship, and alleges that breaches of duty and constructive fraud occurred when TPB failed to disclose all material facts regarding the loan transaction to Peterson. These nondisclosed "material facts" include the payment of $7,380 to TPEC for the loan commitment, and the failure of any TPEC representative to sign the letter of commitment.

As described above, the record shows TPB handled this construction loan transaction in-house by notarizing and recording loan documents, providing an escrow statement to Peterson, and disbursing loan proceeds. After the *117 foreclosure on the property took place and this action was brought, Peterson raised the possibility of a fiduciary theory of liability. However, the amended complaint does not plead any specific facts about the escrow function, instead merely generally alleging TPB's breach of an unspecified fiduciary duty to disclose all material facts regarding the funding of the loan and the letter of commitment. Peterson's opposition to the motion for summary judgment makes reference to the escrow statement received from TPB in connection with Peterson's claim that TPB made an inadequate disclosure of the loan documents. (9)(See fn. 11.)It was not until the opening brief on appeal was filed that the escrow theory of liability was specifically argued.[FN11]

> FN11 Even though the escrow theory of liability was not a focus of the summary judgment proceedings, we have deemed it necessary to address this question in full. An appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].) Here, the fiduciary theory is generally set forth in the amended complaint and the record contains undisputed evidence about the provision of loan processing services such as are commonly provided by escrow

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

holders.

Because this record raises substantial questions about the scope of duty undertaken by TPB in this transaction, we have obtained supplemental briefing from the parties on the question of whether the provision of this type of services resulted in TPB's assumption of particular duties that are fiduciary in nature and that removed this transaction from the usual "arms-length" borrower/creditor commercial context. (See _Mitsui Manufacturers Bank v. Superior Court_ (1989) 212 Cal.App.3d 726, 731 [260 Cal.Rptr. 793].) We must decide if TPB removed itself in this transaction from established limitations on the obligations incurred in "normal commercial banking transactions." (_Id._ at p. 729.)

It is not uncommon for a lending institution to handle escrow functions. (See 2 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 5.1, p. 395.) When banks and similar institutions perform such duties, they are entitled to be exempted from the coverage of Financial Code section 17000 et seq., the law regulating escrow matters such as licensing, bonding, crimes and civil penalties. (Fin. Code, § 17006.)

(10a) Generally, the performance of the escrow function is governed by the following common law principles:

"An escrow holder is the limited agent and fiduciary of all parties to an escrow. [Citations.] The agency is limited because the escrow agent only represents his principals insofar as he carries out the escrow instructions. [Citation.] ... [¶] An escrow holder has a fiduciary duty 'to communicate *118 to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction, particularly where ... he knows that the principal is looking to him for protection as to those very facts of which he has knowledge.' [Citations.] A breach of this fiduciary duty or the failure to exercise reasonable skill and diligence in carrying out the escrow instructions subjects the escrow holder to liability. [Citation.] Likewise, the escrow agent is liable for any loss caused by his failure to strictly comply with his principal's instructions or by his disposal of escrow property in violation of those instructions. [Citation.]" (_Kirby v. Palos Verdes Escrow Co._ (1986) 183 Cal.App.3d 57, 64-65 [227

Cal.Rptr. 785].)

To decide whether these rules should be applied to evaluate TPB's conduct in this case, we look to the definition and purpose of the escrow function. (11) An escrow may be defined as "a transaction in which one person, for the purpose of effecting a sale, transfer or incumbrance of real or personal property to another person, delivers any written instrument, money, evidence of title or other thing of value to a third party, the escrow holder or depository, to be held by him for ultimate transmittal to the other person upon the happening of an event or the performance of certain specified conditions." (_Lee v. Title Ins. & Trust Co._ (1968) 264 Cal.App.2d 160, 162 [70 Cal.Rptr. 378].) "The usual purpose that prompts the creation of an escrow is the desire of persons dealing at arm's-length with each other to have their conflicting interests handled by one person in such a manner as to adequately protect the rights of each of the parties to the transaction." (_Blackburn v. McCoy_ (1934) 1 Cal.App.2d 648, 654 [37 P.2d 153].) (10b) To protect the interests of the parties, an escrow agent who has an interest in the transaction is obligated to disclose that interest before accepting employment as an agent for the parties to the transaction. (_McFate v. Bank of America of California_ (1932) 125 Cal.App. 683, 687 [14 P.2d 146]; also see _Becker v. Buman_ (1986) 239 Kan. 342 [721 P.2d 246, 250].)

In order to guarantee the proper performance of escrow duties, it is the general rule that an escrow agent should not be a party to the escrowed transaction. (_Roberts v. Carter & Potruch_ (1956) 140 Cal.App.2d 370, 373 [295 P.2d 515]; 2 Miller & Starr, _op. cit. supra_, § 5.2, at p. 398.)It has been held, however, that a bank which acted as an escrow holder did not violate any escrow duties by purchasing the escrowed property, subject to the conditions on which the property was held in escrow, as long as there was nothing in the agreements of the parties preventing the sale of the property to anyone in particular (such as the escrow holder). (_Portuguese American Bk. v. Schultz_ (1920) 49 Cal.App. 508, 512 [193 P. 806]; also see _Gurley v. Bank of Huntsville_ (1977 Ala.) 349 So.2d 43, 45-46.)*119

(12) According to a leading real estate treatise, the general rule is "a lender does not assume any obligations regarding the viability of the project or

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

Page 11

investment which is financed by the loan funds as long as the conduct of the lender is limited to the activities which customarily are associated with the lending function." (4 Miller & Starr, *op. cit. supra*, § 9.61, p. 176.) This court has recognized in *Copesky v. Superior Court, supra,* 229 Cal.App.3d 678, 691, footnote 12, that in some cases, a bank may under special circumstances "undertake obligations which bring it into a 'special relationship' with a customer." Such circumstances include a bank's provision of trust and other specifically fiduciary services. (*Ibid.*; see 9 Miller & Starr, *op. cit. supra,* § 28.9, at p. 30.)Such special circumstances must be distinguished from the usual bank-depositor or bank-borrower relationship. (*Copesky v. Superior Court, supra,* 229 Cal.App.3d at p. 691, fn. 12.) In *Copesky,* with respect to the normal commercial banking context, we cautioned against the "loose characterization" (*id.* at p. 693, fn. 14) of financial relationships as "fiduciary, quasi-fiduciary or fiduciary like" (*ibid.*), commenting that with respect to ordinary banking transactions, "the bank is in no sense a true fiduciary." (*Ibid.*)

With these principles in mind, we have examined the record showing the relationship between Peterson and TPB. TPB was involved from the inception of this transaction as the lender from whom Peterson sought the construction financing; similarly, Peterson was made aware of TPEC's involvement on the face of the documents. Peterson was also aware that TPB handled the processing of the loan and presented the papers to Peterson for signature. These facts are consistent with only one conclusion: at the time of the transaction, the relationship between borrower and lender fell into the usual category of an arm's-length, adverse, "normal commercial banking transaction[ ]." (*Mitsui Manufacturers Bank v. Superior Court, supra,* 212 Cal.App.3d at p. 729.) Despite the receipt of an "escrow statement" from TPB and Peterson's awareness TPB processed all loan papers, there are no triable issues as to whether Peterson reasonably reposed particular trust and confidence in TPB as a fiduciary, or whether TPB accepted such particular reliance. No third party was ever involved in this transaction, nor did TPB hold itself out to be a neutral, objective, disinterested conduit for the parties' exchange of documents and money. There could have been no reasonable reliance on any such representations that were never made. Consequently, we conclude Peterson's claimed reliance on TPB's loan processing procedures

provides it no basis to claim a "relaxed duty" to inquire into TPB's conduct during and after the term of the loan. (*Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921 [259 Cal.Rptr. 117].)

Moreover, absent any fiduciary duty undertaken by TPB, we find no duty on its part to disclose the internal breakdown of the loan fees charged. *120 Peterson received the escrow statement listing loan fees of $12,300; Peterson testified that amount of expense was appropriate for this type of project. That TPB allocated some of this amount to TPEC and some to itself does not create a fiduciary theory where none is otherwise shown to exist.

(13) Finally, Peterson has shown no basis to claim any justified "delayed discovery" of the alleged constructive fraud, which would toll the statute of limitations for a fraud action. (§ 338; *Lee v. Escrow Consultants, Inc., supra,* 210 Cal.App.3d 915, 921.) This complaint was filed in October 1988, more than three years after Thor was told in the summer of 1985 there would be no permanent financing from TPB or TPEC. Since Peterson was placed on notice of the denial, which it now claims was concealed from it, the claim for constructive fraud is on its face time-barred. No amendment, such as Peterson now requests to be allowed (to change its fraud theories), is supported by the record or would be proper at this time. The trial court correctly concluded no triable issues remained on the fiduciary duty theory of recovery.

### III <sup>FN*</sup> *Attorney's Fees*

FN* See footnote 1, *ante, page 103.*

. . . . . . . . . . .

### Disposition

The judgment and order are affirmed, and the writ of supersedeas is discharged as of the date of the issuance of the remittitur. The requests for sanctions for a frivolous appeal and for an inadequate provision of the appellate record are denied. TPB and TPEC shall be allowed their attorney's fees on appeal in an amount to be determined by the superior court on filing of a cost bill.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 103
233 Cal.App.3d 103, 284 Cal.Rptr. 367
**233 Cal.App.3d 103**

Froehlich, J., concurred.

**NARES, J.**

I concur in the result, based upon my agreement with the analysis in parts I and III of the discussion. On this record I would decline to reach the issues presented in part II of the discussion (see maj. opn., fn. 11, *ante,* p. 117) and express no views thereon.

Appellants' petition for review by the Supreme Court was denied November 14, 1991. Mosk, J., was of the opinion that the petition should be granted.

Cal.App.4.Dist.
Peterson Development Co. v. Torrey Pines Bank
233 Cal.App.3d 103, 284 Cal.Rptr. 367

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.