# EXHIBIT 18

Westlaw.

2 Cal.App.4th 556                                                                                    Page 1
2 Cal.App.4th 556, 3 Cal.Rptr.2d 340
**2 Cal.App.4th 556, 3 Cal.Rptr.2d 340**

▷Pittman v. Canham
Cal.App. 2 Dist.,1992.

Court of Appeal, Second District, Division 6,
California.
Jeffrey A. PITTMAN, Plaintiff and Appellant,
v.
Lily V. CANHAM, Defendant and Respondent.
**Civ. No. B055532.**

Jan. 8, 1992.
Review Denied March 25, 1992.

Purchaser brought action against vendor for breach of land sale contract. The Superior Court, San Luis Obispo County, No. 65170,Christopher G. Money, J., granted vendor's motion for nonsuit on grounds that time was of essence of contract and neither party tendered timely performance. Purchaser appealed. The Court of Appeal, Gilbert, J., held that failure of both parties to perform concurrent conditions during time for performance resulted in discharge of both parties.

Affirmed.

West Headnotes

**[1] Contracts 95 ☜279(1)**

95 Contracts
   95V Performance or Breach
     95k279 Tender of Performance
      95k279(1) k. Necessity. Most Cited Cases
Where contract creates concurrent conditions and neither party tenders timely performance, both parties are discharged.

**[2] Contracts 95 ☜225**

95 Contracts
   95II Construction and Operation
     95II(E) Conditions
      95k225 k. Concurrent Conditions. Most Cited Cases

**Contracts 95 ☜279(2)**

95 Contracts
   95V Performance or Breach
     95k279 Tender of Performance
      95k279(2) k. Sufficiency of Tender. Most Cited Cases
"Concurrent conditions" are conditions precedent which are mutually dependent, and only important difference between concurrent condition and condition precedent is that condition precedent must be performed before another duty arises, whereas tender of performance is sufficient in case of condition concurrent.

**[3] Vendor and Purchaser 400 ☜76**

400 Vendor and Purchaser
   400II Construction and Operation of Contract
     400k74 Time of Performance and Payment
      400k76 k. Concurrent Acts. Most Cited Cases
In contract for sale of land where time was made the essence of the contract, provision requiring vendor to deliver recordable deed into escrow and provision requiring purchaser to deposit money, note and deed of trust were concurrent conditions, and failure of parties to tender their performances by the date set for performance discharged both parties.

**[4] Deposits and Escrows 122A ☜15**

122A Deposits and Escrows
   122AII Conditional Deposits or Escrows
     122Ak15 k. Construction of Escrow Agreements in General. Most Cited Cases
Escrow instruction stating that time was of the essence and that "[i]f no demand for cancellation is made, you will proceed to close this escrow when the principals have complied with the escrow instructions," could not reasonably be construed as meaning time was not truly of essence and did not purport to give party the unilateral right to demand performance after time for performance had passed; provision merely instructed escrow holder not to cancel escrow on own initiative, but to close escrow should parties voluntarily and notwithstanding

discharge mutually decide to perform.

|5| Costs 102 ☞260(1)

102 Costs
   102X On Appeal or Error
      102k259 Damages and Penalties for Frivolous
Appeal and Delay
         102k260 Right and Grounds
            102k260(1) k. In General. Most Cited
Cases
Sanctions for frivolous appeal should be used most
sparingly to deter only the most egregious conduct.

**341 *557 Lowthorp, Richards, McMillan, Miller,
Conway & Templeman and Patrick T. Loughman,
Oxnard, for plaintiff and appellant.

Ilan Funke-Bilu, San Luis Obispo, for defendant and
respondent.

GILBERT, Associate Justice.

When is a contract no longer a contract? When it
contains concurrent conditions and neither party
tenders timely performance. Unlike love or taxes,
concurrent conditions do not last forever.

[1] We hold that where a contract creates concurrent
conditions and neither party tenders timely
performance, both parties are discharged. We affirm
the judgment.

*558 FACTS

Jeffrey Pittman was a licensed real estate broker. In
1987 he contacted Lily Canham, then 85 years old, to
purchase a parcel of property she owned in San Luis
Obispo County. After many telephone calls to
Canham between May and November 1987, she
agreed to sell a 56-acre parcel to Pittman for
$250,000.

Pittman drafted the contract dated November 24,
1987, and deposited $1,000. The contract called for a
further deposit of $24,000 in cash with the balance of
the purchase price to be paid by a note secured by a
deed of trust on the property. Closing of escrow was
to be within 30 days. The contract provided that
"[t]ime is of the essence. All modification or
extensions shall be in writing signed by the parties."

The parties executed escrow instructions that

provided: "Time is of the essence of these
instructions. If this escrow is not in condition to close
by the TIME LIMIT DATE of December 24, 1987
and written demand for cancellation is received by
you from any principal to this escrow after said date,
you shall act in accordance with [other provisions of
the instructions].... [¶] If no demand for cancellation
is made, you will proceed to close this escrow when
the principals have complied with the escrow
instructions." Paragraph 2 of section 4 of the
instructions provided, however, that the instructions
are not intended to amend, modify or supersede the
contract.

About the second week of December Canham gave a
signed copy of the escrow instructions to Pittman for
delivery to escrow. With the instructions, Canham
included a signed deed to the property. The escrow
company pointed out, however, that the deed had not
been notarized. When Pittman contacted Canham,
she told him she would have it notarized at an escrow
company near her home.

The December 24 closing date came and went.
Canham had not tendered a notarized deed nor had
Pittman tendered $24,000, a promissory note or deed
of trust.

By March 1988, Canham had been contacted by
another broker who wanted to list the property. On
March 21 she told Pittman she wanted $10,000 per
acre. Pittman embarked on an effort to find out what
a fair price for the property was.

In May 1988, Canham told Pittman that she had
entered into a contract with other purchasers to buy
the property for $600,000. Pittman wrote a *559
letter demanding that she perform on his contract, but
she sold the property to the other buyers.

Pittman sued Canham for breach of contract. At trial
he attributed the difference in the $250,000 he
offered Canham and the $600,000 sales price six
months later to an escalating real estate market.

At the end of Pittman's case, Canham moved for a
judgment of nonsuit. (Code Civ.Proc., § 581c.) A
ruling on the motion was reserved, however, until all
the evidence was presented. After the presentation of
the evidence, the court granted the motion on the
ground that time was of the essence of the contract

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2 Cal.App.4th 556

2 Cal.App.4th 556, 3 Cal.Rptr.2d 340

**2 Cal.App.4th 556, 3 Cal.Rptr.2d 340**

and neither party tendered performance. The court also gave a statement of decision in which it found that Pittman and not Canham was responsible for the delay in performance, **342 that Canham had not waived time for performance, and that Pittman defaulted when he failed to tender the purchase money, note and deed of trust by December 24, 1987.

## DISCUSSION

Pittman contends the trial court erred in finding he was in default for failing to tender the purchase money note and deed of trust. He concedes that the result reached by the trial court would be proper if his performance had been a condition precedent, but he points out that here the contract provision requiring Canham to deliver a recordable deed into escrow and the provision requiring him to deposit money, a note and a deed of trust are concurrent conditions. Pittman claims that unlike the failure to perform a condition precedent, the failure of both parties to perform concurrent conditions does not automatically terminate the contract, but that one party must tender performance before the other party is in default. (Citing *Chan v. Title Ins. & Trust Co.* (1952) 39 Cal.2d 253, 246 P.2d 632; *Rubin v. Fuchs* (1969) 1 Cal.3d 50, 81 Cal.Rptr. 373, 459 P.2d 925; *Miller & Starr, Cal. Real Estate* (2d ed. 1989) § 1:135, p. 488.)

[2] Concurrent conditions are conditions precedent which are mutually dependent, and the only important difference between a concurrent condition and a condition precedent is that the condition precedent must be performed before another duty arises, whereas a tender of performance is sufficient in the case of a condition concurrent. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 737, pp. 667-668.)

[3] Contrary to Pittman's assertion, the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure. The failure *560 of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform. Thus, where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged. (3A Corbin on Contracts (1960) § 663, p. 181.) Here, because time was made the essence of the

contract, the failure of both parties to tender performance by December 24, 1987, discharged both from performing. Neither party can hold the other in default and no cause of action to enforce the contract arises. (See *Pitt v. Mallalieu* (1948) 85 Cal.App.2d 77, 81, 192 P.2d 24.)

[4] Pittman relies on the portion of the escrow instructions that states: "Time is of the essence of these instructions.... If this escrow is not in condition to close by the TIME LIMIT DATE of December 24, 1987 and ... [i]f no demand for cancellation is made, you will proceed to close this escrow when the principals have complied with the escrow instructions." He claims this provision shows that time was not truly of the essence in this transaction.

But it is difficult to see how a paragraph that begins with the words "[t]ime is of the essence" could reasonably be construed as meaning time is not truly of the essence. The provision relied on by Pittman merely instructs the escrow holder not to cancel escrow on its own initiative, but to close escrow should the parties voluntarily and notwithstanding discharge mutually decide to perform. As we read the paragraph, it does not purport to give a party the unilateral right to demand performance after the time for performance has passed. Such a construction would render meaningless the parties' agreement that time is of the essence.

We appreciate the reluctance of a buyer to act first by placing money into escrow. But in a contract with concurrent conditions, the buyer and seller cannot keep saying to one another, "No, you first." Ultimately, in such a case, the buyer seeking enforcement comes in second; he loses.

*Chan v. Title Ins. & Trust Co., supra,* 39 Cal.2d 253, 246 P.2d 632, is of no help to Pittman. There the court found no default because time for performance had been waived. (*Id.,* at p. 256, 246 P.2d 632.) Here the trial court held that there has been no waiver, and there is nothing in the record that requires us to disturb that finding.

**343 Nor is Pittman aided by *Rubin v. Fuchs, supra,* 1 Cal.3d 50, 81 Cal.Rptr. 373, 459 P.2d 925. There buyer promised to deposit cash and a purchase money deed of trust before the date set for close of escrow. Seller promised to record a tract map prior to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2 Cal.App.4th 556
2 Cal.App.4th 556, 3 Cal.Rptr.2d 340
**2 Cal.App.4th 556, 3 Cal.Rptr.2d 340**

Page 4

that date. Recordation of the tract map would supply the legal description for the deed of trust. Seller, however, did not record the tract map, and buyer could therefore not deposit a deed of trust.

**\*561** Our Supreme Court held that seller could not rescind for buyer's failure to perform because seller's performance was necessarily precedent to performance by the buyer. (*Rubin v. Fuchs, supra,* 50, 54, 81 Cal.Rptr. 373, 459 P.2d 925.) Here there was no impediment to Pittman's tender of performance.

[5] Canham requests sanctions for a frivolous appeal. But sanctions should be used most sparingly to deter only the most egregious conduct. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651, 183 Cal.Rptr. 508, 646 P.2d 179.) This appeal does not qualify for sanctions.

The judgment is affirmed. Costs are awarded to Canham.

STONE, P.J., and YEGAN, J., concur.
Cal.App. 2 Dist.,1992.
Pittman v. Canham
2 Cal.App.4th 556, 3 Cal.Rptr.2d 340

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 19

Westlaw.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

POTTER v. PACIFIC COAST LUMBER CO. OF
CALIFORNIA
CAL. 1951.

Supreme Court of California, in Bank.
POTTER
v.
PACIFIC COAST LUMBER CO. OF CALIFORNIA
et al.
**L. A. 21779.**

July 27, 1951.

G. E. Potter brought an action against Pacific Coast
Lumber Company of California, and others, to
recover alleged balance due on sale of carloads of
lumber to defendant. The Superior Court, San Luis
Obispo County, Ray B. Lyon, J., 222 P.2d 54,
entered a judgment for plaintiff and defendants
appealed. The Supreme Court, Spence, J., held that
an **accord** and **satisfaction** was established as a
**matter** of **law**.

Judgment reversed with directions.

Carter, J., dissenting.

West Headnotes

**[1] Accord and Satisfaction 8 ☞11(3)**

**8 Accord and Satisfaction**
  8k6 Part Payment
    8k11 Conditioned on Acceptance as Payment
in Full
      8k11(3) k. Effect of Protest. Most Cited
Cases

**Compromise and Settlement 89 ☞5(2)**

89 Compromise and Settlement
  89I In General
    89k1 Nature and Requisites
      89k5 Making and Form of Agreement
        89k5(2) k. Acceptance. Most Cited
Cases

Where a claim is disputed or unliquidated and tender
of a check or draft in settlement thereof is of such
character as to give creditor notice that it must be
accepted "in full discharge of his claim" or not at all,
retention and use of such check or draft constitutes an
"accord and satisfaction", notwithstanding creditor
protests against accepting tender in full payment.

**[2] Accord and Satisfaction 8 ☞10(1)**

8 Accord and Satisfaction
  8k6 Part Payment
    8k10 Disputed or Unliquidated Claims
      8k10(1) k. In General. Most Cited Cases
For principle of accord and satisfaction to apply in
disposition of an unliquidated claim, there must be a
bona fide dispute between the parties but it does not
matter that there was no solid foundation for the
dispute as the test is whether the dispute was honest
or fraudulent.

**[3] Accord and Satisfaction 8 ☞10(1)**

8 Accord and Satisfaction
  8k6 Part Payment
    8k10 Disputed or Unliquidated Claims
      8k10(1) k. In General. Most Cited Cases
For principle of accord and satisfaction to apply in
disposition of an unliquidated claim, debtor must
make it clear that acceptance of what he tenders in
satisfaction of claim is subject to condition that it
shall be in full satisfaction.

**[4] Appeal and Error 30 ☞1011.1(8.1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and
Findings
      30XVI(I)3 Findings of Court
        30k1011 On Conflicting Evidence
          30k1011.1 In General
            30k1011.1(8) Particular Cases or
Questions
              30k1011.1(8.1) k. In General.
Most Cited Cases
      (Formerly 30k1011.1(8), 30k1011(1))

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

Page 2

A finding of trial court, upon conflicting evidence will not be disturbed on appeal if there is evidence of a substantial character which reasonably supports judgment.

**[5] Appeal and Error 30 ⛌996**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)1 In General
                30k996 k. Inferences from Facts Proved. Most Cited Cases
Conclusions of a trier of fact from evidence or testimony that is reasonably susceptible of conflicting or opposing inferences will not be set aside by an appellate tribunal.

**[6] Appeal and Error 30 ⛌1010.1(6)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1010 Sufficiency of Evidence in Support
                    30k1010.1 In General
                        30k1010.1(6) k. Substantial Evidence. Most Cited Cases
    (Formerly 30k1010(1))
The principle that a finding of trial court upon conflicting evidence will not be disturbed on appeal if there is evidence of a substantial character which reasonably supports judgment, and principle that conclusions of trier of fact from evidence or testimony that is reasonably susceptible of conflicting or opposing inferences will not be set aside by an appellate tribunal, do not relieve an appellate court of its duty of analyzing record to determine whether there is any evidence of substantial character which reasonably supports judgment as applied to peculiar facts of case.

**[7] Accord and Satisfaction 8 ⛌11(2)**

8 Accord and Satisfaction
    8k6 Part Payment
        8k11 Conditioned on Acceptance as Payment in Full
            8k11(2) k. Remittances on Condition. Most Cited Cases

**Compromise and Settlement 89 ⛌5(2)**

89 Compromise and Settlement
    89I In General
        89k1 Nature and Requisites
            89k5 Making and Form of Agreement
                89k5(2) k. Acceptance. Most Cited Cases
Where defendant bought carloads of lumber from plaintiff and defendant mailed to plaintiff sight draft, attached to which were vouchers identifying shipment for which payment was intended and setting forth amount of corresponding invoice, with deductions noted, and vouchers contained statements that payment of draft was accepted in full settlement of account, and plaintiff cashed drafts knowing of dispute as to deductions taken by defendant, and defendant did not regard accounts as open for further adjustment and settlement, cashing of checks constituted as **matter** of **law** an **accord** and **satisfaction**.

**[8] Compromise and Settlement 89 ⛌2**

89 Compromise and Settlement
    89I In General
        89k1 Nature and Requisites
            89k2 k. In General. Most Cited Cases
Compromises are favored in law and a man is allowed to negotiate for purchase of his peace without prejudice to his rights.

**[9] Appeal and Error 30 ⛌1011.1(8.1)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1011 On Conflicting Evidence
                  30k1011.1 In General
                      30k1011.1(8) Particular Cases or Questions
                        30k1011.1(8.1) k. In General. Most Cited Cases
    (Formerly 30k1011.1(8), 30k1011(1))

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

In cases of conflicting evidence, or where contrary inferences can be drawn from uncontradicted proof, whether a dispute exists concerning amounts due, and whether tender was on condition that acceptance would be in full satisfaction, are primarily questions of fact for trial court in determination of issue as to whether there has been an accord and satisfaction.

**[10] Appeal and Error 30 ☜1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In General. Most Cited Cases

**Appeal and Error 30 ☜1010.1(10)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)3 Findings of Court
            30k1010 Sufficiency of Evidence in Support
               30k1010.1 In General and Questions
                  30k1010.1(8) Particular Cases
                     30k1010.1(10) k. Contracts in General; Sales; Landlord and Tenant. Most Cited Cases
      (Formerly 30k1010(1))
Unless there is a lack of evidence to support jury finding or decision of trial court as to whether there has been an accord and satisfaction, their determination of that issue will not be disturbed on appeal.

**[11] Compromise and Settlement 89 ☜6(2)**

89 Compromise and Settlement
   89I In General
      89k1 Nature and Requisites
         89k6 Consideration
            89k6(2) k. Unliquidated, Disputed, or Doubtful Claims in General. Most Cited Cases

Where there is a real and genuine contest between the parties as to amount due and a settlement is had without fraud or misrepresentation, for an amount determined upon as a compromise between conflicting claims, settlement should be upheld, although such amount is materially less than amount claimed by person to whom it is paid.

**\*\*17\*594** Buck & O'Reilly and John F. Runner, all of San Luis Obispo, for appellants.
Renetzky & Davis, Paul W. Davis, all of San Luis Obispo, and Laura O. Coffield, Napa, for respondent.
SPENCE, Justice.
Plaintiff sought to recover the alleged balance due under contracts for the sale of three carloads of lumber. Defendants pleaded an accord and satisfaction as an affirmative defense. The trial court made findings rejecting said defense and entered judgment in favor of plaintiff for the sum of $1,011.96. From such judgment, defendants appeal.

Defendants argue the single proposition that the findings against the existence of an accord and satisfaction are contrary to the undisputed facts. An examination of the record sustains defendants' position.

Plaintiff, a lumber broker in Oregon, contracted to sell three carloads of Oregon lumber to defendant company, a California corporation with offices in San Luis Obispo. Defendants C. V. Wilson and S. G. Truitt, as vice-president and purchasing agent, respectively, of defendant company, negotiated the contracts. The terms of sale specified grade, widths, and surfacing of the lumber and a stated price per **\*595** 1,000 board feet 'F.O.B. mill,' with 2 per cent discount for cash. At the trial defendants claimed that under business custom with respect to such sales of Oregon lumber 'F.O.B. mill,' the freight charge would be at the 'Portland rate' that is, the buyer would be obligated to pay the shipping cost as computed from Portland to the point of destination unless a different zone or rate was specified; that such uniform practice prevails so that the buyer may know what his 'laid down cost is' for lumber as supplied from various small mills located in different parts of the state, and any freight cost that the seller 'may have to get the lumber into the (applicable) zone is reflected in the mill price'; and that on such basis, the buyer would regularly charge back to the seller any 'excess freight' paid to the carrier. Plaintiff

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

denied having any knowledge of such applicable 'zone system' and the existence of such business custom. In none of the three contracts in question was there anything said concerning freight or the shipping rate chargeable except the bare term 'F.O.B. mill.'

The first order called for shipment from Oregon to San Luis Obispo. That carload arrived with a freight bill from Spokane, Washington, to San Luis Obispo, as the result of an erroneous routing. Defendant company paid the carrier's freight bill. It then remitted $2,930.14 by check to plaintiff, this sum representing the amount of plaintiff's invoice, less the 2 per cent cash discount and $86.40 as 'freight overcharge' being the difference between the freight actually paid to the carrier and the freight from Portland, Oregon.

The other two orders called for shipment, respectively, to Grover City, California, and Santa Barbara. The lumber in each of these carloads was rough-milled at Seneca, in eastern Oregon; one carload was then shipped to Brewster, Oregon, for 'remanufacture,' and from there transported to Grover City, while the other carload was shipped to Portland for 're-manufacture,' and thence to Santa Barbara. On these two shipments defendant company remitted to plaintiff by check the respective amounts of $2,594.76 and $1,772.89, having deducted in each instance the 2 per cent cash discount and the freight rate chargeable from eastern to western Oregon, respectively**18 $500.35 and $361.49. In addition, with respect to the Santa Barbara car, these further deductions were made: '$35.71 for 'scant loading,' an extra charge exacted by the carrier because the car had not been *596 fully loaded; $111.81 or $5 per thousand board feet, for improper surfacing of the lumber; and $223.61, or $10 per thousand board feet, for 'random widths.' With regard to these latter two items on the Santa Barbara car, it is undisputed that the contract called for twelve-inch stock exclusively, surfaced four sides; and that the lumber actually shipped consisted of 'random widths,' all of it less than twelve-inch, and was surfaced on two sides only. According to defendants, the basis of the deduction for improper surfacing was the cost, at Santa Barbara, of having the lumber surfaced as ordered; and the basis for the deduction for 'random widths' was the difference in retail price between the lumber ordered and that actually received.

In remitting for each of the three shipments, defendant company mailed a check or draft, attached to which was a voucher identifying the shipment for which payment was intended and setting forth the amount of the corresponding invoice, with deductions noted. Printed at the top of each such voucher was the following notation: 'Payee will please detach and keep this statement. Payment of sight draft attached hereto is accepted in full settlement of account stated below, and endorsement thereof will constitute payee's receipt to the Pacific Coast Lumber Company of California.'Plaintiff cashed each of the three remittance checks or drafts, and then later wrote to defendant company seeking additional payments.

The trial court found that defendants were indebted to plaintiff in the sum of $1,011.96 (apparently allowing defendants with respect to the San Luis Obispo car the deduction of $86.40 for the 'freight overcharge'; and with respect to the Santa Barbara car the deductions for 'scant loading,' improper surfacing, and 'random widths'). With respect to defendants' special plea of an accord and satisfaction, the court found that the allegations thereof (except that the checks were actually sent to plaintiff and cashed by him) were untrue, thereby finding that it was not true that by the voucher attached to each check defendant company 'informed plaintiff that it intended the check as full payment of a certain disputed claim,' or that the vouchers 'informed plaintiff that the said checks were intended as full payment,' or that 'plaintiff, by the acceptance, endorsement and/or depositing for collection of said drafts, or in any other manner, agreed to any settlement of the amount(s) due plaintiff.'Defendants properly contest the propriety *597 of these findings relating to the alleged accord and satisfaction as without support in the record.

[1][2][3] The great weight of authority undoubtedly supports the rule that where a claim is disputed or unliquidated and the tender of a check or draft in settlement thereof is of such character as to give the creditor notice that it must be accepted 'in full discharge of his claim' or not at all, the retention and use of such check or draft constitutes an accord and satisfaction (1 C.J.S., Accord and Satisfaction s 34, page 528); and it is immaterial that the 'creditor protests against accepting the tender in full payment' (1 Am.Jur. s 26, p. 228), for in such case 'the law permits but two alternatives, either reject or accept in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

accordance with the condition' (Williston on Contracts, Rev.Ed., Vol. VI, s 1856, p. 5220; see, also, 1 Cal.Jur. s 10, p. 134; annos. 34 A.L.R. 1035, 1044; 75 A.L.R. 905, 916;Lapp-Gifford Co. v. Muscoy Water Co., 166 Cal. 25, 27, 134 P. 989;Berger v. Lane, 190 Cal. 443, 447, 213 P. 45;Sierra and San Francisco Power Co. v. Universal Electric & Gas Co., 197 Cal. 376, 387, 241 P. 76;Johnston v. Burnett, 17 Cal.App. 497, 501, 120 P. 436;Russell v. Riley & Peterson, 82 Cal.App. 728, 737-738, 256 P. 557;Robertson v. Robertson, 34 Cal.App.2d 113, 118, 93 P.2d 175.Of course, for the principle of accord and satisfaction to apply in disposition of an unliquidated claim, there must be a 'bona fide dispute' between the parties (Stub v. Belmont, 20 Cal.2d 208, 218, 124 P.2d 826, but 'it matters not that there was no solid foundation for the dispute' as the test is whether 'the dispute was honest or fraudulent'.**19B. & W. Engineering Co. v. Beam, 23 Cal.App. 164, 171, 137 P. 624; see 1 C.J.S., Accord and Satisfaction s 32(b), pages 515-517; 1 Cal.Jur. s 7, p. 131; Berger v. Lane, supra, 190 Cal. 443, 450-451, 213 P. 45;Shortell v. Evans-Ferguson Corp., 98 Cal.App. 650, 663, 277 P. 519;Everhardy v. Union Finance Co., 115 Cal.App. 460, 465, 1 P.2d 1024.Also, the debtor must make it clear that acceptance of what he tenders is subject to the condition that it shall be in full satisfaction. 1 Am.Jur. s 22, p. 223; Ann.Cas.1915A, 954; Lapp-Gifford Co. v. Muscoy Water Co., supra, 166 Cal. 25, 27-28, 134 P. 989;Biaggi v. Sawyer, 75 Cal.App.2d 105, 113-114, 170 P.2d 678.

[4][5][6][7] In the application of these settled rules to the present case, defendants properly recognize that 'A finding of the trial court upon conflicting evidence will not be disturbed on appeal if there is evidence of a substantial character which reasonably supports the judgment.'Fewel & Dawes, Inc., v. Pratt, 17 Cal.2d 85, 89, 109 P.2d 650.Likewise *598 it must be said that the conclusions of the trier of fact from evidence or testimony that is reasonably susceptible of conflicting or opposing inferences will not be set aside by an appellate tribunal. Estate of Bristol, 23 Cal.2d 221, 223, 143 P.2d 689.But these principles do not relieve an appellate court of its duty of analyzing the record for the purpose of determining whether or not there is any evidence of substantial character which reasonably supports the judgment as applied to the peculiar facts of the case. See 1 C.J.S., Accord and Satisfaction, s 49(b), pages 565-567. Upon such review, the conclusion is inescapable that

the record here does not justify the finding that no **accord** and **satisfaction** was effected by the parties in settlement of plaintiff's claim, and that the trial court erred, as a **matter** of **law**, in adjudicating this issue contrary to defendants' position. 2 Cal.Jur. s 542, p. 918.

Here the check or draft in each instance remitted to plaintiff in payment for the respective carloads of lumber had attached a voucher with a printed statement thereon declaring, in clear and unequivocal terms, that the tender was made 'in full settlement of account stated below' and calling for acceptance upon that precise condition. Plaintiff clearly understood, according to his own admissions at the trial, that defendant company intended such remittances to constitute payment in full of the particular claim as plainly identified on the voucher. Thus, plaintiff, in response to the question of whether he had talked to defendant Wilson before cashing the draft tendered in payment for the first shipment, stated: 'Yes, I think I did; and then I felt, if they were going to be that way about it, the best thing for me to do was to cash the draft so they couldn't stop payment on the draft. This was not a check, it was a draft. I knew that, with a dispute of that type, that there would be a question as to my accepting that as final payment, but I figured that a bird in the hand was better than nothing.'Plaintiff further testified that 'at the time (he) cashed (the) checks, (he) knew there was a dispute as to the amounts'; that he checked 'the deductions' that were taken, knew the 'freight' amounts to be 'so much' and had 'notice' of the other items as shown 'from the attached statement(s).' From this testimony it plainly appears that there was a bona fide dispute between the parties, not only as to the assessable freight charges, but also as to the other matters listed by defendant company as deductible items upon tender of the checks or drafts in full settlement, and that plaintiff so understood the explicit terms of the proffered settlement.*599 In such circumstances, plaintiff's acceptance, endorsement, and cashing of the checks or drafts amounted in legal effect to an agreement that the claims be thereby compromised and settled. Russell v. Riley & Peterson, supra, 82 Cal.App. 728, 737-738, 256 P. 557; he 'could not accpet the benefit of the checks by cashing them, without consenting to the conditions endorsed thereon'Robertson v. Robertson, supra, 34 Cal.App.2d 113, 118, 93 P.2d 175, 178; and such uncommunicated mental reservations as plaintiff may have had that he and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

Page 6

defendants 'would be able to settle it (the dispute) one way or the other later' could not militate against the validity of the accord and satisfaction. Creighton v. Gregory, 142 Cal. 34, 41, 75 P. 569.So pertinent is the statement in **20Johnston v. Burnett, supra, 17 Cal.App. 497, at page 501, 120 P. 436, 438:'He (plaintiff) was bound either to reject the check, or by accepting it, accede to the defendant's terms. * * * He could not accept the benefit, and reject the condition. * * * The use of the check was ipso facto an acceptance of the condition. The minds of the parties then met, so as to constitute an accord.'

[8] Plaintiff argues that 'the conduct of both parties after the receipt and cashing of the drafts' indicates that 'neither of them intended that the prior acceptance by (plaintiff) of the drafts was in full settlement of his claim(s).' To this point he cites these evidentiary considerations: that until he received the respective drafts, he did not know that defendants were disputing the amounts allegedly due on the respective shipments; that after receiving the first of the three drafts but before cashing it, he spoke to defendant Wilson by telephone and protested the deductions taken; that after cashing the three drafts, he went to defendant company's Seattle office and discussed that factors in dispute; that there then followed an exchange of correspondence between him and defendant Wilson as to the propriety of the deductions; and finally, the whole subject was discussed at a meeting in Santa Barbara between himself and defendant Wilson, culminating in the latter's offer of the settlement but that he would not agree to it. However, these matters do not strengthen plaintiff's position. Reasonably viewed, they simply show that plaintiff did not willingly assent to the condition of 'full settlement' accompanying the three remittances; that after cashing the three drafts tendered for acceptance on the prescribed express terms, he nevertheless persisted in his efforts to collect additional amounts which he claimed to be still due under the original contracts of sale; and that defendants remained in *600 the position that they had taken at the time the checks or drafts were tendered, until finally, for reasons which did not appear, defendant Wilson at the Santa Barbara meeting made an offer of compromise, which was in turn rejected by plaintiff. As to the latter factor, it is code law that 'An offer of compromise is not an admission that anything is due' (Code Civ.Proc. s 2078), it constitutes no proof of liability, and its admission into evidence without objection cannot

affect the disposition of this case. As was said in Estate of Johanson, 62 Cal.App.2d 41, at page 56, 144 P.2d 72, at page 80:'Compromises are favored in law and a man is allowed to negotiate for the purchase of his peace without prejudice to his rights.'Accordingly, none of these factors, either singly or in combination, can be said to have deflected from the positive position taken by defendant company in tendering the respective checks or drafts for acceptance in full discharge of the respective accounts, or from the consequences of plaintiff's cashing such checks and drafts upon that basis in establishment of an accord and satisfaction. Johnston v. Burnett, supra, 17 Cal.App. 497, 501, 120 P. 436.

[9][10] Plaintiff unavailingly cites cases where accompanying correspondence failed to state that the remittance was 'intended or offered as in full of all demands'Lapp-Gifford Co. v. Muscoy Water Co., supra, 166 Cal. 25, 32, 134 P. 989, 992, and the parties' continued uncertainty as to the extent of their differences called for further checking on the matter of an adjustment, conduct clearly showing that 'they did not consider the (prior) check a final settlement of the debt' (Work v. Associated Almond Growers, 102 Cal.App. 232, 236, 282 P. 965, 967); where evidence of 'constructive fraud, or at least mistake', operated to impeach the 'conclusiveness of the asserted stated account' dispite the notation of the words 'full receipt' on the check (Kinkle v. Fruit Growers Supply Co., 63 Cal.App.2d 102, 115, 146 P.2d 8, 14); where the debtor 'at the time the check was tendered * * * himself conceded that it did not represent the full amount due' and not only was there a failure to plead an 'accord and satisfaction,' but it was expressly 'pleaded that there never had been an accounting'.Owens v. Noble, 77 Cal.App.2d 209, 215, 175 P.2d 241, 244.Under such distinguishable circumstances, it is not open to dispute that the trial court's finding that no accord and satisfaction had been effected by the parties was supported by substantial evidence. But that is not the record in **21 this case. Here the condition imposed upon plaintiff's acceptance of the checks or *601 drafts was clear and unequivocal that payment was 'intended as full satisfaction of the disputed account'.Biaggi v. Sawyer, supra, 75 Cal.App.2d 105, 114, 170 P.2d 678, 683; there was no question of mistake or fraud to impeach the conclusiveness of the stated account; and there were no admissions by any of defendants that they regarded the accounts as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

still open for further adjustment and payment. While it is true that in cases of conflicting evidence or where contrary inferences can be drawn from uncontradicted proof, where 'a dispute concerning the amount due, and whether the tender was on condition that acceptance would be in full satisfaction, are primarily questions of fact for the trial court'Owens v. Noble, supra, 77 Cal.App.2d 209, 215, 175 P.2d 241, 244, and 'unless there is a lack of evidence to support the finding of the jury or the decision of the trial court in that regard, their determination of that issue (the existence of an accord and satisfaction) will not be disturbed on appeal'Moore v. Satir, 92 Cal.App.2d 809, 812, 207 P.2d 835, 836; also D. E. Sanford Co. v. Cory Glass Coffee Brewer Co., 85 Cal.App.2d 724, 730, 194 P.2d 127, just such lack of evidence prevails here. The record conclusively shows from plaintiff's own testimony that he knowingly accepted the remittances from defendants on the terms definitely stated on the accompanying vouchers in unequivocal expression of their intent as 'full settlement,' for he 'figured that a bird in the hand was better than nothing.'This state of the evidence cannot be reasonably held to give rise to conflicting inferences as to the intention of the parties to consummate an accord and satisfaction upon the tender and acceptance of the checks or drafts in question, but rather they irresistibly point to the conclusion that plaintiff is estopped to deny the effect of hs deliberate act in full settlement of the disputed accounts between the parties. See Creighton v. Gregory, supra, 142 Cal. 34, 41-42, 75 P. 569

Nor is it of legal significance that the freight charges were computed as separable items for deduction and constituted a major point of difference between the parties. While the freight items were listed as definite amounts on each of the vouchers accompanying the remittances, the total freight (only a part of which was disputed) was for all practical purposes integrated into the entire contract to which it related. To this point is defendant Wilson's undisputed testimony that defendant company, as the buyer of goods f. o. b. point of manufacture, must have 'the mill price and the freight rate' the 'delivered price' at hand so as to 'know *602 what (the) laid down cost is.' In such circumstances it would be unrealistic to isolate the freight items and regard such items as severable undertakings in the consummation of the parties' dealings. Moreover, in the case of one disputed shipment the Santa Barbara car there were also included, as deductible items, amounts for 'scant loading,' improper surfacing, and 'random widths,' so that it cannot reasonably be said that the parties considered, at the time of the tender and acceptance of the checks or drafts, that the only matters in controversy were the freight charges. Rather, as defendants maintain, the record clearly shows that in each instance plaintiff's entire demand was in dispute and the respective checks were intended and accepted in full discharge of the entire disputed obligation.

It is further suggested that defendant company, by the respective remittances in the reduced sums, paid only the conceded amount of indebtedness on each shipment. But that circumstances would not prevent an accord and satisfaction arising from acceptance of the conditionally offered remittances applicable to the entire demand. While there is some conflict in the authorities on whether the payment of the conceded part of the claim is a good accord and satisfaction if received in discharge of the whole (anno. 112 A.L.R. 1219), it is the majority view, as well as the 'tendency of the later cases,' to 'sustain the discharge where there is a dispute as to any part of the claim made by the creditor, although the payment is only the smaller amount which was conceded by the debtor to be due.'(1 Am.Jur. s 64, p. 251; also Willston on Contracts, Rev.Ed., Vol. I, s 129, p. 439, and cases there cited.) Consistent with this 'tendency' in the rationale of **22 'The later cases' is the decision in Robertson v. Robertson, supra, 34 Cal.App.2d 113, 93 P.2d 175, 177, where concededly due payments of support money were made by checks marked 'in full payment to (date)' and the only dispute between the parties involved the question of whether a greater amount was due pursuant to the terms of a property settlement agreement. In sustaining the defense of an accord and satisfaction, the court aptly stated, 34 Cal.App.2d at page 118, 93 P.2d at page 178:'The consideration for the tender and acceptance of each check in a less amount was the determination of dispute, and the extinction of obligation in relation to each monthly payment so made.'

[11]'The law wisely favors settlements, and where there is a real and genuine contest between the parties, and a settlement is had without fraud or misrepresentation, for an amount *603 determined upon as a compromise between the conflicting claims, such settlement should be upheld, although such amount is materially less than the amount

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

claimed by the person to whom it is paid.'Post v. Thomas, 212 N.Y. 264, 106 N.E. 69, 72; in accord, B. & W. Engineering Co. v. Beam, supra, 23 Cal.App. 164, 171, 137 P. 624.It is difficult to see here how defendant company could have been more explicit in stating to plaintiff the conditional tender of the checks or drafts in question, and we therefore conclude that the latter's acceptance and cashing of such checks and drafts pursuant to their unequivocal terms of 'full settlement' constituted, as a **matter of law**, an **accord** and **satisfaction**.

The judgment is reversed, with directions to the trial court to make findings of fact and conclusions of law and to enter judgment thereon in favor of defendants in accordance with the views herein expressed.

SHENK, EDMONDS, TRAYNOR, and SCHAUER, JJ., concur.
CARTER, Justice (dissenting).
I dissent.

While the factual situation disclosed by the record may have presented a problem difficult of solution by the trier of fact, I can not say that there was not sufficient evidence to support the finding that defendant corporation was indebted to the plaintiff in the amount found, and for which judgment was rendered. This judgment was affirmed by the District Court of Appeal, Second Appellate District, Division One, and I adopt, as my dissent, the opinion of that court prepared by Mr. Presiding Justice White, which is as follows:

'Defendants appeal from a judgment in favor of plaintiff, a lumber broker, in an action for a balance claimed to be due under contracts for the sale of three carloads of lumber to the defendant corporation, Pacific Coast Lumber Company. Defendants C. V. Wilson and S. G. Truitt, as vice-president and purchasing agent, respectively, of defendant corporation, negotiated the contracts. The complaint was in the form of common counts. The answer, in addition to denials, set forth an affirmative defense of accord and satisfaction, the substance of the allegations in this respect being that three checks in stated amounts had been mailed to plaintiff by defendant corporation; that attached to each of said checks was a voucher in which said defendant informed plaintiff that it intended the check as full payment of a certain disputed claim; that *604 the

vouchers so attached to the three checks informed plaintiff that the checks were intended as full payment; that the plaintiff indorsed and cashed each check, and thereby agreed to the settlement intended by the defendant corporation; that at the time of making said payments the defendants in good faith disputed the amounts due the plaintiff.

'The first transaction involved a carload of pine, of specified grade, widths, surfacing, and price per thousand board feet, 'F.O.B. mill,' with 2 per cent discount for cash. The lumber was to be shipped from Oregon to San Luis Obispo. Upon arrival of the shipment, defendant corporation paid the carrier's freight bill which covered freight from Spokane, Washington, to San Luis Obispo. The corporation then remitted $2,930.14 by check to the plaintiff, this sum representing the amount of the plaintiff's invoice less the cash discount**23 and less $86.40 claimed as 'freight overcharge' being the difference between the freight actually paid the carrier and the freight from Portland, Oregon.

'Subsequently defendant corporation ordered two more carloads of pine, one to be shipped to Grover City, California, and the other to Santa Barbara. Again, it was understood that the lumber was to come from Oregon, although the plaintiff testified that he informed defendants it would come from eastern Oregon. The lumber in these two carloads was roughmilled at Seneca, in eastern Oregon. One carload was then shipped to Brewster, Oregon, for 're-manufacture,' and from there transported to Grover City, while the other carload was shipped to Portland for 're-manufacture' and thence to Santa Barbara. On each of these shipments defendant corporation remitted to the plaintiff by check, deducting the 2 per cent cash discount and also deducting the items representing freight charges from eastern to western Oregon. In the case of the Santa Barbara car defendant also made certain deductions for 'scant loading.' 'improper surfacing,' and 'random widths.'

'Defendant C. V. Wilson testified that by 'F.O.B. mill' he understood to mean F.O.B. the 're-manufacturing' mill where the lumber was finished and from whence it was finally shipped; he and other witnesses also testified to a custom of the lumber trade that where Oregon lumber is sold 'F.O.B. mill' a zone freight rate is often specified, but if nothing is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

said about the zone, then the 'Portland rate,' from Portland, Oregon, to destination, will apply; in such case the custom is for the purchaser to charge back to the seller any excess *605 freight paid to the carrier. In none of the transactions here in question was there anything said concerning freight or the freight rate applicable except the bare phrase 'F.O.B. mill.' Plaintiff denied the existence of any such custom.

'In remitting for each of the three shipments, defendant corporation mailed to the plaintiff a check or draft, attached to which was a voucher identifying the shipment for which payment was intended and setting forth the amount of the corresponding invoice, with deductions noted. Printed at the top of each such voucher was the notation:

"Payee will please detach and keep this statement. Payment of sight draft attached hereto is accepted in full settlement of account stated below, and endorsement thereof will constitute payee's receipt to the Pacific Coast Lumber Company of California.'

The trial court found that defendants were indebted to plaintiff in sum of $1,011.96; and with respect to the special defense found that the allegations thereof (except, of course, that the checks were actually sent) were untrue, thereby finding that it was not true that by the voucher attached to each check defendant corporation 'informed plaintiff that it intended the check as full payment of a certain disputed claim,' or that the vouchers 'informed plaintiff that the said checks were intended as full payment.'The court further found that 'it is not true that plaintiff, by the acceptance, endorsement and/or depositing for collection of said drafts, or in any other manner, agreed to any settlement of the amount due plaintiff.'

'Appellants contend that the trial court's findings relating to the alleged accord and satisfaction were contrary to undisputed facts in evidence. With respect to the finding (implied) that plaintiff was not informed that the checks he received were intended by defendant corporation as payment in full, attention is directed to testimony of the plaintiff, as follows:

"Q. Did you talk to him (Mr. Wilson) before you cashed it? Did you call him up before you cashed it? (Referring to the payment on the first shipment.) A. Yes, I think I did; and then I felt, if they were going to be that way about it, the best thing for me to do

was to cash the draft so they couldn't stop payment on the draft. This was not a check, it was a draft. I knew that, with a dispute of that type, that there would be a question as to my accepting that as final *606 payment, but I figured that a bird in the hand was better than nothing.

**24 'Q. Well, Mr. Potter, at the time your cashed those checks, you knew there was a dispute as to the amounts? A. Yes, because the amount was short on the draft. I figured we would be able to settle it one way or the other later.

"Q. Did you know the basis for the dispute? A. No, only from checking the deductions that I figured that they took. I knew that the freight amounted to so much.

"Q. Then you surmised, at least, that the deduction on one item was for freight? A. That's right.

"Q. And on the other item, you had notice of what the deductions were from the attached statement with the check, did you not? A. Yes, sir.'

'Appellants argue that 'on the basis of the foregoing testimony the ultimate fact irresistibly following is that the defendant corporation informed the plaintiff * * * that the check or draft tendered therewith was offered in full payment of a certain fully identified, disputed claim.'Appellants' remaining two contentions with respect to the findings are that there is no support in the evidence for the finding that by his acceptance of the checks or drafts plaintiff did not agree to a settlement, or for the finding that there was no bona fide dispute concerning the amount due.

'As conceded by appellants, 'A finding of the trial court upon conflicting evidence will not be disturbed on appeal if there is evidence of a substantial character which reasonably supports the judgment.'(Fewel & Dawes, Inc. v. Pratt, 17 Cal.2d 85, 89, 109 P.2d 650.)It is also well settled that the conclusions of a trier of fact from evidence or testimony that is susceptible of conflicting or opposing inferences will not be set aside by an appellate tribunal. (Estate of Bristol, 23 Cal.2d 221, 143 P.2d 689.)

'Conceding the force of appellants' argument that the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

Page 10

evidence clearly shows the existence of a dispute as to the amount due, and further that plaintiff was informed, by the fact that the checks were for less than the amount of his invoice, by the notations appearing on the attached vouchers, and through telephone conversations with defendants, that defendant corporation contested the particular freight items it does not follow that the trial court erred, as a **matter of law**, in concluding that no **accord** and **satisfaction** was consummated.

**\*607** 'It was an essential element of defendants' proof of an **accord** and **satisfaction** that their tender of a check for less than the amount due be expressly conditioned that if the money be accepted, it is to be in full satisfaction. (1 Am.Jur. 222, 223.)As said in the cited authority, at page 223:

"As pointed out in the preceeding section, in order that the acceptance of an offer of payment of a lesser sum in discharge of a greater shall result in the discharge, it is a necessary element that the offer be made upon condition that the creditor accept the offered sum in full satisfaction of the indebtedness. This principle finds frequent application in the case of checks and other remittances. In order that the acceptance of the check or remittance shall operate as a full discharge, the condition that it is to be accepted in full satisfaction of the pending claim or obligation must be expressly made or the circumstances must be such as to indicate clearly to the creditor that it is so sent.

"When the assent of the creditor is sought to be inferred from the acceptance of a less sum than that claimed to be due, the fact that such amount is offered in full discharge of the whole claim must have been communicated to the creditor in some unmistakable manner. Consequently, where a check is tendered, even though it accompanies an account, if there is no expression of the condition that it must be accepted in full payment, the acceptance of the check does not constitute an accord and satisfaction, as no agreement to that effect can be implied from the transaction. * * *'

'Under the particular facts of the case at bar, it would appear that the trier of fact was justified in concluding, despite the printed statement on the voucher, that the tender of each check or draft was not unequivocally stated to be on condition that it be accepted in full settlement. The language**\*\*25** of Owens v. Noble, 77 Cal.App.2d 209, 215, 175 P.2d 241, quoting from Biaggi v. Sawyer, 75 Cal.App.2d 105, 114, 170 P.2d 678, is here pertinent: "Whether there was a dispute concerning the amount due and whether the tender was on condition that acceptance would be in full satisfaction, are primarily questions of fact for the trial court.'In the case of Work v. Associated Almond Growers, 102 Cal.App. 232, 236, 282 P. 965, this court quoted from cited authorities as follows: 'It is an essential element of accord and satisfaction by tender of a check, that the tender is subject to the condition that the acceptance of the check is satisfaction in full. This condition is not shown by the mere fact that the debtor accompanies**\*608** the check with an account showing a balance equal to the amount of the check, and it is disproved where the giving and acceptance of the check is followed by such conduct of both parties as clearly shows that they did not consider the check a final settlement of the debt.'(Italics added.) Also see 1 Cal.Jur. p. 134, par. 10; Lapp-Gifford Co. v. Muscoy Water Co., supra (166 Cal. 25, 134 P. 989);Duncan v. F. A. Hihn Co., 27 Cal.App. 152, 155, 149 P. 971; Wallace v. Crawford, 21 Cal.App.2d 394, 404, 69 P.2d 455.'

'The record does not disclose conclusive evidence that the plaintiff was explicitly advised that his acceptance of the checks or drafts in any of the three transactions would be considered as an agreement to an accord and satisfaction. On the contrary, the actions of the parties indicate simply that the defendant corporation asserted that it was not liable for certain freight charges and refused to pay them. It is significant in this respect that the disputed freight charge was a separable item. The amount tendered by defendant corporation was an amount admittedly due. The trier of fact could well conclude that the amount tendered was not offered in settlement of a disputed claim, but, as above stated, in payment of a conceded indebtedness, leaving at large the question of from which point freight should be charged to the buyer. Upon analysis, the facts herein show that an acknowledged debtor has made a remittance of an amount admittedly due, and now seeks to have declared an accord and satisfaction because the creditor accepted what was concededly justly due him. The trier of fact was warranted in concluding that there was lacking an essential element of an accord and satisfaction, to wit, that the payment was offered and accepted in settlement of a disputed

234 P.2d 16
37 Cal.2d 592, 234 P.2d 16
**37 Cal.2d 592, 234 P.2d 16**

demand. Here no payment whatever was made on the 'disputed' demand.

'The situation here presented is one in which an acknowledged debtor, disputing one small separable item of an invoice received in the regular course of business, deducts from his remittance the amount he disputes and remits in the regular course of business an amount admittedly owed, accompanying his check with a voucher in customary form containing printed words to the effect that the remittance is accepted 'in full settlement of account stated below.'It cannot be held that as a **matter** of **law** in such circumstances there has been an **accord** and **satisfaction** or account stated.

"* * * to hold otherwise would put in the power of a sharp, shrewd business man frequently to take advantage of **\*609** the ignorant, uneducated, or unwary, and open the way, in the business and commercial world, to the perpetration of frauds rather than the honest settlement of disputes.'(Sanders v.Standard Wheel Co., 151 Ky. 257, 151 S.W. 674, Ann.Cas. 1915A, 954.)

'Appellants state that they make no point of the fact that the judgment runs against Mr. Wilson and Mr. Truitt, agents of defendant corporation, 'unless the suggestion is met with that the judgment ought to stand against the defendant individuals even though it be reversed as to their principal.'No such problem arising, the question need not receive further consideration.

'The attempted appeal from the order denying defendants' motion for new trial is dismissed. The judgment is affirmed.'

CAL. 1951.
Potter v. Pacific Coast Lumber Co. of Cal.
37 Cal.2d 592, 234 P.2d 16

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 20

Westlaw.

17 Cal.App.4th 158                                                                  Page 1
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245
**17 Cal.App.4th 158**

▷Randas v. YMCA of Metropolitan Los Angeles
Cal.App.2.Dist.
    LEMONIA T. RANDAS, Plaintiff and Appellant,
v.
YMCA OF METROPOLITAN LOS ANGELES,
Defendant and Respondent.
No. B067811.

Court of Appeal, Second District, California.
Jul 14, 1993.

SUMMARY

The trial court entered summary judgment in favor of
a YMCA in a personal injury action against it by a
swimmer enrolled in a YMCA class, ruling that the
release of liability form signed by plaintiff was valid.
(Superior Court of Los Angeles County, No.
GC006114, Coleman A. Swart, Judge.)

The Court of Appeal affirmed. The court held that the
release signed by plaintiff absolving the YMCA from
liability for its own negligence was not invalid under
Civ. Code, § 1668, as involving "the public interest."
Swimming, like other athletic or recreational
activities, is not essential, and the release form was
neither unclear nor ambiguous. The court further held
that the release was not invalid by reason of plaintiff's
inability to read it. In the absence of fraud,
overreaching, or excusable neglect, one who signs an
instrument may not avoid the impact of its terms on
the ground that he or she failed to read the instrument
before signing it. Although plaintiff was literate in
Greek but not English, she made no claim of fraud or
overreaching, nor did she claim that the YMCA had
reason to suspect she did not or could not read the
release she had signed. (Opinion by Woods (Fred), J.,
with Lillie, P. J., concurring. Johnson, J., concurred
in the judgment only.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Contracts § 8--Legality--Contracts Contravening
Public Policy-- Exculpatory Provisions.
If an exculpatory provision in a contract involves the

public interest it is invalid under Civ. Code, § 1668.
Such a contract involves a transaction that exhibits
some or all of the following characteristics: it
concerns a business generally thought suitable for
public regulation, and the party seeking exculpation
is engaged in performing a service of great
importance to the public, which is often a matter of
practical necessity for some members of the public;
the party holds itself out as willing to perform this
service for any member of the public who seeks it, or
at least for any member coming within certain
established standards; as a result of the essential
nature of the service, and the economic setting of the
transaction, the party invoking exculpation possesses
a decisive advantage of bargaining strength against
any member of the public who seeks the party's
services; in exercising a superior bargaining power,
the party confronts the public with a standardized
adhesion contract of exculpation, and makes no
provision whereby a purchaser may pay additional
reasonable fees and obtain protection against
negligence; and, finally, as a result of the transaction,
the person or property of the purchaser is placed
under the control of the seller, subject to the risk of
carelessness by the seller or its agents.

(2) Contracts § 8--Legality--Contracts Contravening
Public Policy-- Exculpatory Provisions--Release--
Sports and Recreation.
A release signed by a person injured while enrolled in
a swimming class at a local YMCA, which release
absolved the YMCA from liability for its own
negligence, was not invalid under Civ. Code, § 1668,
on the ground it involved "the public interest."
Swimming, like other athletic or recreational
activities, however enjoyable or beneficial, is not
essential.

(3) Contracts § 8--Legality--Contracts Contravening
Public Policy-- Exculpatory Provisions--Release--
Intent--Validity.
An agreement exculpating the drafter from liability
for his or her own future negligence must clearly and
explicitly express that this is the intent of the parties.
Accordingly, release and waiver of liability
provisions stating that the undersigned released "the
YMCA ... from all liability to the undersigned ... for
any loss or damage ... on account of injury to ... the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.App.4th 158
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245
**17 Cal.App.4th 158**

undersigned ... caused by the negligence of the [YMCA]," and further stating that the undersigned assumed full responsibility for and risk of bodily injury due to the negligence of the YMCA, were neither unclear nor ambiguous.

**(4)** Contracts § 43--Performance--Excuses for Nonperformance--Failure to Read Contract--Inability to Read English--Release.

In a personal injury action against the YMCA by a swimmer injured while enrolled in a YMCA class, the trial court, in entering summary judgment for defendant, properly determined the release was not invalid by reason of plaintiff's inability to read it. In the absence of fraud, overreaching or excusable neglect, one who signs an instrument may not avoid the impact of its terms on the ground that he or she failed to read the instrument before signing it. Although plaintiff was literate in Greek but not English, she made no claim of fraud or overreaching, nor did she claim that the YMCA had reason to suspect she did not or could not read the release she had signed. Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he or she cannot read; the party should have it read or explained to him or her.

[See 1 **Witkin**, Summary of Cal. Law (9th ed. 1987) Contracts, § 120.]

COUNSEL

Paul A. Connolly for Plaintiff and Appellant.

Lynberg & Watkins and Stephen M. Harber for Defendant and Respondent.

**WOODS (Fred), J.**

In this personal injury action, plaintiff-appellant appeals from an adverse summary judgment and contends the release she signed was invalid because against public interest (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]) and because she couldn't read it. We affirm the judgment.

Procedural and Factual Background

The facts are simple and undisputed. [FN1]

FN1 Appellant concedes the issue is one of law.

Sometime before August 8, 1991, Lemonia T.

Randas (plaintiff and appellant), literate in Greek but not English, enrolled in a swimming class at a local YMCA (YMCA of Metropolitan Los Angeles; respondent2). [FN2] She was provided a "Release and Waiver of Liability and Indemnity Agreement" which she signed. On August 8, 1991, after her swimming class, she slipped and fell on the wet poolside tile, injuring herself.

FN2 The complaint erroneously identified defendant-respondent as South Pasadena-San Marino YMCA.

On January 9, 1992, she filed the instant personal injury action. Respondent answered and later moved for summary judgment. (Code Civ. Proc. § 437c.)The trial court granted the motion. This appeal followed. *161

Discussion

As appellant implicitly concedes, if the release she signed is valid summary judgment was properly awarded to respondent.

We consider her contentions that the release is not valid.

1. *Appellant contends the release affects the public interest and is invalid under Civil Code section 1668.* [FN3]

(1) If an exculpatory provision, such as the subject release, involves "the public interest" it is invalid under Civil Code section 1668. (*Tunkl v. Regents of University of California, supra,* 60 Cal.2d 92, 96.) As *Tunkl,* the seminal case, stated: "[n]o definition of the concept of public interest can be contained within the four corners of a formula." (*Id.* at p. 98.) *Tunkl* instead listed *characteristics,* [FN4] some or all of which characterize invalid exculpatory provisions. It held that "the hospital-patient contract clearly falls within the category of agreements affecting the public interest." (*Id.* at p. 101.)

FN3 The section reads: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.App.4th 158
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245
**17 Cal.App.4th 158**

Page 3

whether willful or negligent, are against the policy of the law."

FN4 "It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (60 Cal.2d at pp. 98-101, fns. omitted.)

This court has previously considered exculpatory provisions challenged on "public interest" grounds. In _Gardner v. Downtown Porsche Audi (1986) 180 Cal.App.3d 713 [225 Cal.Rptr. 757]_ we found an automobile repair garage disclaimer affected the public interest and thus was invalid. More recently, in _Buchan v. United States Cycling Federation, Inc. (1991) 227 Cal.App.3d 134 [277 Cal.Rptr. 887],_ we found an international bicycle racing competition _not_ to involve a public interest.

(2) We observed in _Buchan:_ "This court has not been apprised of any case ... which ... voided a release on ... 'public interest' [grounds] *162 ... in the sports and recreation field." (227 Cal.App.3d at p. 149.) We had in mind such cases as _Hulsey v. Elsinore Parachute Center (1985) 168 Cal.App.3d 333 [214 Cal.Rptr. 194]_ [parachute jumping]; _McAtee v. Newhall Land & Farming Co. (1985) 169 Cal.App.3d 1031 [216_

Cal.Rptr. 465] ["motocross" race]; _Okura v. United States Cycling Federation (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429]_ [bicycle race]; _Coates v. Newhall Land & Farming, Inc. (1987) 191 Cal.App.3d 1 [236 Cal.Rptr. 181]_ [dirt-bike park]; _Saenz v. Whitewater Voyages, Inc. (1990) 226 Cal.App.3d 758 [276 Cal.Rptr. 672]_ [commercial river rafting]. Our observation in _Buchan_ remains true.

Swimming, like other athletic or recreational activities, however enjoyable or beneficial, is not "essential" as a hospital is to a patient (_Tunkl v. Regents of University of California, supra, 60 Cal.2d 92_) or a repair garage is to a California motorist. (_Gardner v. Downtown Porsche Audi, supra, 180 Cal.App.3d 713._)

We find no reason to invalidate the release on public interest grounds. [FN5] Moreover, as one court recently noted there is good reason to validate such releases because "[t]he public as a whole receives the benefit of such waivers so that groups such as Boy and Girl Scouts, Little League, and parent-teacher associations are able to continue without the risks and sometimes overwhelming costs of litigation. Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing-victims of decreasing financial and tax support for other than the bare essentials of an education. Every learning experience involves risk.... No public policy forbids the shifting of that burden." (_Hohe v. San Diego Unified Sch. Dist., supra, 224 Cal.App.3d 1559, 1564._)

FN5 We reject appellant's attempted distinction of _Buchan,Hulsey,McAtee_ et al. as involving "death defying" activities. Not only does _Tunkl_ fail to include dangerousness as a relevant characteristic but bicycle riding (_Okura_), dirt bike riding (_Coates_), river rafting (_Saenz_) and hypnosis (_Hohe v. San Diego Unified Sch. Dist. (1990) 224 Cal.App.3d 1559 [274 Cal.Rptr. 647]_) are not "death defying" activities.

_2. Appellant contends the release is unclear and ambiguous._

(3) "An agreement exculpating the drafter from liability for his or her own future negligence must

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.App.4th 158
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245
**17 Cal.App.4th 158**

clearly and explicitly express that this is the intent of the parties." (*Saenz v. Whitewater Voyages, Inc., supra, 226 Cal.App.3d 758, 764.*) But "[t]o be effective, a release need not achieve perfection; only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign." (*National & Internat. Brotherhood of Street Racers, Inc. v. SuperiorCourt (1989) 215 Cal.App.3d 934, 938 [264 Cal.Rptr. 44].*)

The subject release (see appendix) is boldly captioned: "Release and Waiver of Liability and Indemnity Agreement." Its one-page text **\*163** states: "1. The Undersigned Hereby Releases ... the YMCA ... from all liability to the undersigned ... for any loss or damage ... on account of injury to ... the undersigned ... caused by the negligence of the [YMCA] ...." It further states: "3. The Undersigned Hereby Assumes Full Responsibility for and Risk of Bodily Injury ... due to the negligence of [YMCA] ...."

We find the subject release neither unclear nor ambiguous. (See *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court, supra, 215 Cal.App.3d 934; McAtee v. Newhall Land & Farming Co., supra, 169 Cal.App.3d 1031; Saenz v. Whitewater Voyages, Inc., supra, 226 Cal.App.3d 758.*)

*3. Appellant contends the release is invalid because she couldn't read it.*

**(4)** "It is well established, in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it." (*Hulsey v. Elsinore Parachute Center, supra, 168 Cal.App.3d 333, 339; see also Madden v. Kaiser Foundation Hospitals (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; Izzi v. Mesquite Country Club (1986) 186 Cal.App.3d 1309, 1318-1319 [231 Cal.Rptr. 315].*)

Appellant made no claim of respondent's fraud or overreaching. Nor did appellant claim that respondent had reason to suspect she did not or could not read the release she had signed and which in full captions above and below her signature stated: "I Have Read This Release."

As Mr. Witkin states: "Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it. If he cannot read, he should have it read or explained to him." (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 120, p. 145.) This is not only the California but the general rule. (3 Corbin, Contracts (1960) § 607, pp. 668-669, fn. omitted ["One who signs an instrument when for some reason, such as illiteracy or blindness, he can not read it, will be bound by its terms in case the other party acts in good faith without trick or misrepresentation. The signer should have had the instrument read to him."].)

Appellant's contention is not well taken. **\*164**

Disposition

The judgment is affirmed. Costs on appeal are awarded to respondent.

Lillie, P. J., concurred. Johnson, J., concurred in the judgment only. **\*165**

YMCA OF METROPOLITAN LOS ANGELES

RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT

IN CONSIDERATION of being permitted to enter the YMCA for any purpose, including, but not limited to observation, use of facilities or equipment, or participation in any way, the undersigned, for himself or herself and any personal representatives, heirs, and next of kin, hereby acknowledges, agrees and represents that he or she has, or immediately upon entering will, inspect such premises and facilities. It is further warranted that such entry into the YMCA for observation, participation or use of any facilities or equipment constitute an acknowledgement that such premises and all facilities and equipment thereon have been inspected and that the undersigned finds and accepts same as being safe and reasonably suited for the purposes of such observation or use.

IF FURTHER CONSIDERATION OF BEING PERMITTED TO ENTER THE YMCA FOR ANY PURPOSE INCLUDING, BUT NOT LIMITED TO

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.App.4th 158
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245
**17 Cal.App.4th 158**

OBSERVATION, USE OF FACILITIES OR EQUIPMENT, OR PARTICIPATION IN ANY WAY, THE UNDERSIGNED HEREBY AGREES TO THE FOLLOWING:

1. THE UNDERSIGNED HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE THE YMCA, its directors, officers, employees, and agents (hereinafter referred to as "releases") from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releases or otherwise while the undersigned is in, upon, or about the premises or any facilities or equipment therein.

2. THE UNDERSIGNED HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of them from any loss, liability, damage or cost they may incur due to the presence of the undersigned in, upon or about the YMCA premises or in any way observing or using any facilities or equipment of the YMCA whether caused by the negligence of the releasees or otherwise.

3. THE UNDERSIGNED HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasee or otherwise while in, about or upon the premises of the YMCA and/or while using the premises or any facilities or equipment hereon.

THE UNDERSIGNED further expressly agrees that the foregoing RELEASE, WAIVER AND INDEMNITY AGREEMENT is intended to be as broad and inclusive as is permitted by the law of the State of California and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducement apart from the foregoing written agreement have been made.

I HAVE READ THIS RELEASE

Date /s/

Signature of Applicant

I HAVE READ THIS RELEASE **\*166**

Cal.App.2.Dist.
Randas v. YMCA of Metropolitan Los Angeles
17 Cal.App.4th 158, 21 Cal.Rptr.2d 245

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21

1219457.1

Westlaw.

157 Cal.App.3d 1154                                                Page 1
157 Cal.App.3d 1154, 204 Cal.Rptr. 86
**157 Cal.App.3d 1154, 204 Cal.Rptr. 86**

▷
Rich & Whillock, Inc. v. Ashton Development, Inc.
Cal.App. 4 Dist.,1984.

Court of Appeal, Fourth District, Division 1, California.
**RICH & WHILLOCK, INC.**, Plaintiff and Respondent,
v.
**ASHTON DEVELOPMENT, INC.**, et al., Defendants and Appellants.
**D000849.**
**Civ. 28919.**

June 29, 1984.

Subcontractor brought action against developer and general contractor for balance due under grading and excavating contract. The Superior Court, San Diego County, F.V. Lopardo, J., entered judgment in favor of subcontractor, and appeal was taken. The Court of Appeal, Wiener, J., held that subcontractor's settlement agreement and release were products of economic duress and thus provided no defense to subcontractor's claim.

Affirmed.

West Headnotes

**[1] Contracts 95 ☞95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k95 Duress
       95k95(1) k. In General. Most Cited Cases
Economic-duress doctrine does not require an unlawful act in nature of tort or crime; instead, doctrine may come into play upon doing of wrongful act which is sufficiently coercive to cause reasonably prudent person faced with no reasonable alternative to succumb to perpetrator's pressure. West's Ann.Cal.Civ.Code § 1569, subd. 2.

**[2] Contracts 95 ☞95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k95 Duress
       95k95(1) k. In General. Most Cited Cases

**Contracts 95 ☞95(3)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k95 Duress
       95k95(3) k. Threats in General. Most Cited Cases
Assertion of claim known to be false or a bad-faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of economic-duress doctrine.

**[3] Release 331 ☞18**

331 Release
   331I Requisites and Validity
     331k18 k. Duress. Most Cited Cases
Subcontractor's settlement agreement and release of claim for full amount due from developer and general contractor under grading and excavating contract were the products of economic duress and thus provided no defense to subcontractor's claim, as developer and general contractor acted in bad faith when they refused to pay subcontractor's final billing and offered instead to pay a compromise amount, where they knew subcontractor was a new company overextended to creditors and faced with imminent bankruptcy if not paid its final billing, subcontractor strenuously protested those coercive tactics and succumbed to them only to avoid economic disaster and adverse ripple effects of bankruptcy on those to whom it was indebted.

**87 *1155** Phillip Stein, Orange, for defendants and appellants.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

157 Cal.App.3d 1154                                                     Page 2
157 Cal.App.3d 1154, 204 Cal.Rptr. 86
**157 Cal.App.3d 1154, 204 Cal.Rptr. 86**

Thomas E. Wenbourne, El Cajon, for plaintiff and respondent.

WIENER, Associate Justice.

Ashton Development, Inc. and Bob Britton, Inc. appeal from the judgment awarding Rich & Whillock, Inc. $22,286.45 for the *1156 balance due under a grading and excavating contract. Following a nonjury trial the court entered judgment after it found a settlement agreement and release signed by Rich & Whillock, Inc. were the products of economic duress and thus provided no defense to its contract claim. We conclude substantial evidence supports the court's finding and affirm the judgment.

*Factual and Procedural Background*

On February 17, 1981, Bob Britton, president of Bob Britton, Inc., signed a contract for grading and excavating services to be provided by Rich & Whillock, Inc. at a price of $112,990. The work was to be done on a project by Ashton Development, Inc. Bob Britton, Inc. was general contractor on the project and the agent for Ashton Development, Inc. in all dealings with Rich & Whillock, Inc. Work began the day the contract was signed.

In late March 1981 Rich & Whillock, Inc. encountered rock on the project site. A meeting was held at the site to discuss the problem. In attendance were Greg Whillock and Jim Rich, president and vice-president of Rich & Whillock, Inc., Bob Britton, Berj Aghadjian, president of Ashton Development, Inc., and a man from a blasting company. Everyone agreed the rock would have to be blasted. The $112,990 contract price expressly excluded blasting. The contract also stated "[a]ny rock encountered will be considered an extra at current rental rates." In response to Britton's inquiry, Whillock and Rich estimated the extra cost to remove the rock would be about $60,000, for a total contract price of approximately $172,000. They also emphasized, however, the estimate was not firm and the actual cost could go much higher due to the unpredictable nature of rock work.

**88 Britton directed Whillock and Rich to go ahead with the rock work and bill him for the extra costs and said they would be paid. Rich & Whillock, Inc. proceeded accordingly, submitting invoices and receiving payments every other week. The invoices separately stated the charges for the regular contract work and the extra rock work and were supported by attached employee time sheets. Toward the end of April Whillock asked Britton if he had any questions about any of the billings. Britton had no questions and told Whillock to continue with the rock work because it had to be done.

By June 17, 1981, after receiving payments totalling $190,363.50, Rich & Whillock, Inc. submitted a final billing for an additional $72,286.45. After consulting with Aghadjian, Britton refused to pay. When Whillock asked why, Britton explained he and Aghadjian were short on funds for the project and had no money left to pay the final billing. Up until he received that billing, Britton had no complaints about the work done or the invoices *1157 submitted by Rich & Whillock, Inc. and had never asked for any accounting of charges in addition to that already provided. Whillock told Britton he and Rich would "go broke" if not paid because they were a new company, the project was a big job for them, they had rented most of their equipment and they had numerous subcontractors waiting to be paid. Britton replied he and Aghadjian would pay them $50,000 or nothing, and they could sue for the full amount if unsatisfied with the compromise.

On July 10, 1981, Britton presented Rich with an agreement for a final compromise payment of $50,000. The agreement provided $25,000 would be paid "upon receipt of this signed agreement," to be followed by a second $25,000 payment on August 10, 1981 "upon receipt of full and unconditional releases for all labor, material, equipment, supplies, etc., purchased, acquired or furnished for this contract up to and including August 10, 1981." Rich repeated Whillock's earlier statements about the probable effects of nonpayment on their busi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

157 Cal.App.3d 1154
157 Cal.App.3d 1154, 204 Cal.Rptr. 86
**157 Cal.App.3d 1154, 204 Cal.Rptr. 86**

ness. Britton replied: "I have a check for you, and just take it or leave it, this is all you get. If you don't want this, you have got to sue me." Rich then signed the agreement and received a $25,000 check after telling Britton the agreement was "blackmail" and he was signing it only because he had to in order to survive. Rich & Whillock, Inc. received the second $25,000 payment on August 20, 1981, at which time Whillock signed a standard release form.

In December 1981 Rich & Whillock, Inc. filed this action for damages for breach of contract. The court found Ashton Development, Inc. and Bob Britton, Inc. were liable for the $22,286.45 balance due under the contract, and that the July 10 agreement and August 20 release were unenforceable due to economic duress. On the latter point the court found Britton and Aghadjian "never really disputed the amount of plaintiff's charge in that they never asked for an accounting nor documentation concerning the extra work." The court also stated it disbelieved Britton when he testified Rich & Whillock, Inc. had agreed to do the extra work for a sum not to exceed $90,000. By disbelieving Britton and finding no dispute about the actual amount owed, the court impliedly found Britton and Aghadjian acted in bad faith when they refused to pay Rich & Whillock, Inc.'s final billing and offered instead to pay a compromise amount of $50,000. Based upon its finding of bad faith, the court concluded the July 10 agreement and August 20 release were signed "under duress in that plaintiff felt they would face financial ruin if they did not accept the lesser sum and that defendants, knowing this, threatened no further payment unless plaintiff accepted the lesser sum."

*1158 Discussion

"At the outset it is helpful to acknowledge the various policy considerations which are involved in cases involving economic duress. Typically, those claiming such coercion are attempting to avoid the consequences of a modification of an original contract or of a settlement and release **89 agreement. On the one hand, courts are reluctant to set aside agreements because of the notion of freedom of contract and because of the desirability of having private dispute resolutions be final. On the other hand, there is an increasing recognition of the law's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances." (*Totem Marine T. & B. v. Alyeska Pipeline, Etc.* (Alaska 1978) 584 P.2d 15, 21, fn. omitted.)

[1][2] California courts have recognized the economic duress doctrine in private sector cases for at least 50 years. (*Young v. Hoagland* (1931) 212 Cal. 426, 430-432, 298 P. 996.) [FN1] The doctrine is equitably based (*Burke v. Gould, supra,* 105 Cal. at p. 281,38 P. 733) and represents "but an expansion by courts of equity of the old common-law doctrine of duress." (*Sistrom v. Anderson* (1942) 51 Cal.App.2d 213, 220, 124 P.2d 372.) As it has evolved to the present day, the economic duress doctrine is not limited by early statutory and judicial expressions requiring an unlawful act in the nature of a tort or a crime. (Civ.Code, § 1569, subd. 2; [FN2] *Burke v. Gould, supra,* 105 Cal. at p. 282, 38 P. 733; see generally 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 337-338, pp. 284-286; 13 Williston on Contracts (3d ed. 1970) §§ 1601, pp. 648-649, 1602, pp. 650-651, 656-657.) Instead, the doctrine now may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 203-205, 1 Cal.Rptr. 12, 347 P.2d 12; *Louisville Title Ins. Co. v. Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 799-802, 132 Cal.Rptr. 63;*1159 *Thompson Crane & Trucking Co. v. Eyman* (1954) 123 Cal.App.2d 904, 908-910, 267 P.2d 1043; accord, *Totem Marine T. & B. v. Alyeska Pipeline, Etc., supra,* 584 P.2d at pp. 22-23; see also 13 Williston on Contracts,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

§§ 1603, pp. 663-665, 1617, pp. 704, 706; Annot., Refusal to Pay Debt as Economic Duress or Business Compulsion Avoiding Compromise or Release (1981) 9 A.L.R. 4th 942, 946-947.) The assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine. (*Leeper v. Beltrami, supra,* 53 Cal.2d at pp. 203-204,1 Cal.Rptr. 12, 347 P.2d 12; *Louisville Title Ins. Co. v. Surety Title & Guar. Co., supra,* 60 Cal.App.3d at pp. 799-800, fn. 6,132 Cal.Rptr. 63; accord, *Totem Marine T. & B. v. Alyeska Pipeline, Etc., supra,* 584 P.2d at p. 22.) Further, a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin. (*Louisville Title Ins. Co. v. Surety Title & Guar. Co., supra,* 60 Cal.App.3d at p. 806, 132 Cal.Rptr. 63; *Thompson Crane & Trucking Co. v. Eyman, supra,* 123 Cal.App.2d at pp. 905-907, 909-910,267 P.2d 1043; accord, *Totem Marine T. & B. v. Alyeska Pipeline, Etc., supra,* 584 P.2d at pp. 22-23.)

FN1. Even earlier applications of the doctrine appear in private sector cases dating back to the turn of the century. (*Burke v. Gould* (1894) 105 Cal. 277, 281-283, 38 P. 733; *Standard Box Co. v. Mutual Biscuit Co.* (1909) 10 Cal.App. 746, 758-762, 103 P. 938; *Rowland v. Watson* (1906) 4 Cal.App. 476, 481, 88 P. 495.)

FN2. Originally enacted in 1872 and never since amended, Civil Code section 1569 provides:

"Duress consists in:

"1. Unlawful confinement of the person of the party, or of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband, or wife;

"2. Unlawful detention of the property of any such person; or,

"3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics. Hard bargaining, "efficient" breaches and reasonable settlements of good faith disputes are all acceptable, even desirable, in our economic system. **90 That system can be viewed as a game in which everybody wins, to one degree or another, so long as everyone plays by the common rules. Those rules are not limited to precepts of rationality and self-interest. They include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value. Such exchanges make a mockery of freedom of contract and undermine the proper functioning of our economic system. The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing. The necessity for the doctrine in cases such as this has been graphically described:

"Nowadays, a wait of even a few weeks in collecting on a contract claim is sometimes serious or fatal for an enterprise at a crisis in its history. The business of a creditor in financial straits is at the mercy of an unscrupulous debtor, who need only suggest that if the creditor does not care to settle on the debtor's own hard terms, he can sue. This situation, in which promptness in payment is vastly more important than even approximate justice in the settlement terms, is too common in modern business relations to be ignored by society and the courts." (Dalzell, *Duress by Economic Pressure II* (1942) 20 N. Carolina L.Rev. 340, 370.)

*1160 *Totem Marine T. & B. v. Alyeska Pipeline, Etc., supra,* 584 P.2d 15, presents an example of economic duress remarkably parallel to the circum-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

stances of this case. Totem, a new corporation, contracted with Alyeska to transport pipeline construction materials from Houston, Texas to a port in southern Alaska, with the possibility of one or two cargo stops along the way. Totem chartered the equipment necessary to perform the contract. Unfortunately, numerous unanticipated problems arose from the outset which impeded Totem's performance. When Totem's chartered tugs and barge arrived in the port of Long Beach, California, Alyeska caused the barge to be unloaded and unilaterally terminated the contract. Totem then submitted termination invoices totalling somewhere between $260,000 and $300,000. At the same time, Totem notified Alyeska it was in urgent need of cash to pay creditors and that without immediate payment it would go bankrupt. After some negotiations, Alyeska offered to settle Totem's account for $97,500. In order to avoid bankruptcy, Totem accepted Alyeska's compromise offer and signed an agreement releasing Alyeska from all claims under the contract. (*Id.,* at pp. 17-19.)

About four months after signing the release agreement Totem sued Alyeska for the balance due under the contract. The trial court entered summary judgment for Alyeska based on the release agreement. (*Totem Marine T. & B. v. Alyeska Pipeline, Etc., supra,* 584 P.2d at p. 19.) The Supreme Court of Alaska reversed, explaining:

"[W]e believe that Totem's allegations, if proved, would support a finding that it executed a release of its contract claims against Alyeska under economic duress. Totem has alleged that Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt; that Totem was faced with impending bankruptcy; that Totem was unable to meet its pressing debts other than by accepting the immediate cash payment offered by Alyeska; and that through necessity, Totem thus involuntarily accepted an inadequate settlement offer from Alyeska and executed a release of all claims under the contract. If the release was in fact executed under these circumstances, we think that under the legal principles discussed above that this would constitute the type of wrongful conduct and lack of alternatives that would render the release voidable by Totem on the ground of economic duress." (*Id.,* at pp. 23-24, fn. omitted.)

[3] Here, Britton and Aghadjian acted in bad faith when they refused to pay Rich & Whillock, Inc.'s final billing and offered instead to pay a compromise amount of **91** $50,000. At the time of their bad faith breach and settlement offer, Britton, and through him, Aghadjian, knew Rich & Whillock, Inc. was a new company overextended to creditors and subcontractors and faced with imminent bankruptcy if not paid its final billing. Whillock and ***1161** Rich strenuously protested Britton's and Aghadjian's coercive tactics, and succumbed to them only to avoid economic disaster to themselves and the adverse ripple effects of their bankruptcy on those to whom they were indebted. Under these circumstances, the trial court found the July 10 agreement and August 20 release were the products of economic duress. That finding is consistent with the legal principles discussed above and is supported by substantial evidence. Accordingly, the court correctly concluded Ashton Development, Inc. and Bob Britton, Inc. were liable for the $22,286.45 balance due under the contract.

*Disposition*

Judgment affirmed.

COLOGNE, Acting P.J., and STANIFORTH, J., concur.
Cal.App. 4 Dist.,1984.
Rich & Whillock, Inc. v. Ashton Development, Inc.
157 Cal.App.3d 1154, 204 Cal.Rptr. 86

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 22

Westlaw.

196 Cal.App.2d 678
196 Cal.App.2d 678, 16 Cal.Rptr. 881
**196 Cal.App.2d 678**

CRoehm Distributing Co. v. Burgermeister Brewing
Corp.
Cal.App.4.Dist.
ROEHM DISTRIBUTING COMPANY,
INCORPORATED (a Corporation), Appellant,
v.
BURGERMEISTER BREWING CORPORATION
(a Corporation), Respondent.
**Civ. No. 6343.**

District Court of Appeal, Fourth District, California.
Nov. 6, 1961.

HEADNOTES

**(1)** Contracts § 188--Modification--Consideration.
Two letters were a valid modification of an oral beer
distributorship contract despite the assertion that
there was no consideration for such letters, since no
new consideration is required for the alteration of an
oral contract by a written modification thereof (Civ.
Code, § 1697) and since, if the letters were regarded
as a true recitation of the original oral contract, it was
supported as to consideration by the mutual promises
of the parties thereto.
See **Cal.Jur.2d**, Contracts, §§ 179, 180; **Am.Jur.**,
Contracts, § 427.
**(2)** Judgments § 8a(9)--Summary Judgments--
Affidavits.
In a summary judgment proceeding in which it was
claimed that certain letters constituted a modification
of an oral beer distributorship contract, the mere
statement in an opposing affidavit that "said letters
are incorrect in several particulars," unsupported by
any evidentiary material or any statement by the
opposing party pointing out just how the letters were
in error, had no legal force.
See **Cal.Jur.2d**, Judgments, § 39.
**(3)** Judgments § 8a(9)--Summary Judgments--
Affidavits.
In a summary judgment proceeding in which it was
claimed that certain letters constituted a modification
of an oral beer distributorship contract, the bald
assertion in plaintiff's opposing affidavit that such
letters were obtained under threat of economic
duress, without any evidentiary facts to support it,
was a legal conclusion having no evidentiary weight.

**(4)** Contracts § 109--Mutuality.
An oral beer distributorship contract was not illusory
because it provided for termination on written notice
from either party where mutuality was present in all
parts of the contract and nothing was unilateral.

SUMMARY

APPEAL from a judgment of the Superior Court of
Orange County. Kenneth E. Morrison, Judge.
Affirmed.

Action for damages for breach of an oral
distributorship contract. Summary judgment for
defendant affirmed.

COUNSEL
Dreizen & Corfman for Appellant.
Hoffman, Davis & Martin and Forgy & Forgy for
Respondent.
SHEPARD, J.
This is an appeal from a summary judgment for
defendant.

Facts

Plaintiff brought this action for damages for alleged
breach of an oral contract of exclusive distributorship
of defendant's product in Orange County and the city
of San Onofre. The parties are successors in interest
of the original contracting parties but both admit
responsibility for all of the acts of their predecessors
in interest. Therefore, for simplification, each of the
acts referred to will be called the act of the respective
party except where explanation is necessary. After
plaintiff filed its second amended complaint,
defendant answered and moved for summary
judgment, filing its affidavit and points and
authorities in support thereof. Plaintiff filed its
opposition affidavit. The motion was heard and
granted.

From the record before us, the pertinent facts appear
in general substance to be as follows: Defendant is a
manufacturer of beer. About August 20, 1950,
plaintiff entered into an oral contract for exclusive
distribution of defendant's products in the area first

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

196 Cal.App.2d 678

196 Cal.App.2d 678, 16 Cal.Rptr. 881

**196 Cal.App.2d 678**

above noted. E. L. Roehm personally remained the active operating manager at all times of plaintiff's business. He was the sole owner up to January 1, 1954, when a family partnership was formed which assumed the contract with the knowledge and consent of defendant. They formed a family corporation July 8, 1957, which in turn, on that date, assumed the contract with knowledge of defendant and without objection from it.

At all times herein referred to there existed a business custom throughout the industry that under a distributorship like that here under consideration, in the absence of any agreement to the contrary, any termination of the distributorship would only be on reasonable notice from the manufacturer to the distributor. Such reasonable notice would allow at least 60 days after termination so as to permit distributor to gather in accounts, adjust stock on hand, and to otherwise rearrange *680 his business so as to avoid serious loss. There was also some evidence of a doubtful character relating to an additional extension of time for nine months more, but we need not here discuss the details thereof.

Defendant's affidavit consisted principally of a copy of the sworn deposition of E. L. Roehm, in which he testified in detail as to the business customs, plaintiff's damage, and the execution of two letters signed by both parties hereto and the notice of termination given by defendant to plaintiff. He testified without reservation that plaintiff and defendant signed each of the letters, one dated August 16, 1955, and one dated June 20, 1956. Each of these letters recited, *inter alia,* that it was a confirmation in writing of the mutual understanding of the parties regarding their contractual relation and that as one of the elements of the contract either party might terminate the relation "at any time, by written notice to that effect." Written notice of termination of the contract was given in writing from defendant to plaintiff on or about August 28, 1958. The motion for summary judgment was granted, the judgment was entered for defendant in accordance therewith, and plaintiff appeals.

## Summary Judgment

The principles regarding application of <u>Code of Civil Procedure, section 437c</u>, that the court in a summary judgment proceeding is engaged in discovering

whether or not there are any legal issues to be tried; the necessity for particularization of evidentiary facts in the affidavits; the acceptance as true of those evidentiary facts stated in the affidavit of the party opposing the motion; the strictness of construction toward the affidavit of the moving party; and other matters involved in this type of proceeding, have been adequately reviewed in many recent cases. It is therefore unnecessary to burden this record with a review of the general principles controlling summary judgment procedure. (See *People v. City of Garden Grove,* 165 Cal.App.2d 794 [332 P.2d 841]; *Estate of Kelly,* 178 Cal.App.2d 24 [2 Cal.Rptr. 634]; *Spencer v. Hibernia Bank,* 186 Cal.App.2d 702 [9 Cal.Rptr. 867], and authorities there cited.)

## The Dispute

The real gravamen of the dispute between plaintiff and defendant relates to the validity of the letters and particularly *681 the portion thereof giving the right to either party to terminate the contract at any time on written notice to the other. The testimony by deposition of plaintiff's manager, E. L. Roehm, which testimony was set forth at length in the affidavit of defendant, established the prior existence of the oral contract, the full details of the contractual relation, the facts surrounding the signing of the two letters, notice of termination and damage, but no evidentiary facts were given to show economic duress or any other factual negation of the voluntary signing of the letters. The dispute, then, centers directly on whether or not the two letters sufficiently establish a modification of the original oral contract.

## Considerations

(1) Plaintiff contends that the letters are invalid as a modification of the oral contract because (it contends) there was no consideration therefor. Plaintiff in its affidavit makes the single flat assertion without supporting detail or evidentiary material, that there was no consideration for the modification, as shown by the letters, of the oral contract. It likewise contends that the letter of termination dated August 28, 1958, was invalid because (it asserts) there was no consideration for the letters of modification. We cannot agree with either of these contentions. <u>Civil Code section 1697</u> provides as follows: "A contract not in writing may be altered in any respect by consent of the parties, in writing, without a new

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

196 Cal.App.2d 678
196 Cal.App.2d 678, 16 Cal.Rptr. 881
**196 Cal.App.2d 678**

consideration, and is extinguished thereby to the extent of the new alteration."

This is a clear, direct and unequivocal statutory mandate that no new consideration is required for the alteration of an oral contract by a written modification thereof. (*Griswold v. Pieratt*, 110 Cal. 259, 263 [42 P. 820]; *G. S. Johnson Co. v. Nevada Packard Mines Co.*, 272 F. 291, 297 [3].) Thus, it is unnecessary to discuss whether or not plaintiff's lone assertion, without supporting facts that there was no consideration for the written agreement, complied with the particularization required by Code of Civil Procedure, section 437c.

Furthermore, if the letters be regarded as a true recitation of the original oral contract, it was supported as a consideration by the mutual promises of the parties thereto. (*Furlong v. White*, 51 Cal.App. 265, 273 [5] [196 P. 903].)*682

### Claimed Errors In Letters

(2) Next, appellant asserts that there were errors in the letters. Its affidavit merely states that "said letters are incorrect in several particulars." This statement in the affidavit is not supported in any way by any evidentiary material nor does plaintiff point out either in his deposition which was given in defendant's affidavit, nor in his own affidavit, just how the letters were in error. No particularization whatever is given. This does not comply with the requirement of the section that evidentiary facts be stated with particularity in support of such a conclusion. The statement, as contained in the affidavit, has no legal force whatever. (*Estate of Kelly, supra,* p. 29 [5]; *Buffalo Arms, Inc. v. Remler Co.*, 179 Cal.App.2d 700, 710 [13-10b] [4 Cal.Rptr. 103]; *Albermont Petroleum, Ltd. v. Cunningham*, 186 Cal.App.2d 84, 92 [10] [9 Cal.Rptr. 405].)

### Economic Duress

(3) Next, plaintiff contends that the letters were invalid (it alleges) because letters were obtained under threat of economic duress. In its affidavit plaintiff simply makes the same bald assertion without any evidentiary facts of any kind whatever to support it. The statement is pure legal conclusion and can be given no evidentiary weight whatever in this proceeding. (*Marshall v. Packard-Bell Co.*, 106

Cal.App.2d 770, 774 [5] [236 P.2d 201].) It does not meet the requirements of the section. (*Hardy v. Hardy*, 23 Cal.2d 244, 248 [4] [143 P.2d 701]; *Terrell v. Local Lodge 758, etc., Machinists*, 150 Cal.App.2d 24, 28 [3] [309 P.2d 130]; *Johnson v. Holt*, 173 Cal.App.2d 107, 110 [1] [342 P.2d 398].)

### Contract Not Illusory

(4) Plaintiff next contends that because the contract provided for termination of written notice from either party it belongs in the category called "illusory" by such authorities as *Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354 [6 Cal.Rptr. 31]; *County of Alameda v. Ross*, 32 Cal.App.2d 135 [89 P.2d 460]; and *Shortell v. Evans-Ferguson Corp.*, 98 Cal.App. 650 [277 P. 519]; and that no binding obligation is imposed therefrom on anyone, citing *Hancock Oil Co. v. McClellan*, 135 Cal.App.2d 667 [288 P.2d 39], and *Charles Brown & Sons v. White Lunch Co.*, 92 Cal.App. 457 [268 P. 490]. This contention is without merit, as an analysis of the authorities cited by plaintiff shows. In the *Automatic *683 Vending Co.* case, the contract was held valid even though the right to change prices on notice was unrestricted. The *County of Alameda* case involved the right of the county to spend public funds on a bridge over the Oakland estuary, where the county held only a conditional license revocable at any time by the unilateral control of the Secretary of War. The decision also rested on the expenditures in part being for the sole benefit of a private railroad. The *Shortell* case involved a unilateral right to reject a land purchase deposit. The *Hancock* case rested on the retention in Hancock of the sole unilateral discretion as to quantity and price of goods sold. The *Brown* case likewise involved unilateral control of quantity, price and continuance of contract in the seller. There was no mutuality. Thus, it is clear that lack of mutuality of obligation is the fundamental basis of the "illusory" terminology.

In the case at bar, none of the factors or deficiencies discussed in the cited cases were present. Here we have a perfectly enforceable contract of distribution with prices fixed, not at the will of the parties, but by the prevailing market. Each party had fixed responsibilities for a delivery, payment, etc. Each had the right to terminate on written notice. Mutuality was present in all parts of the contract; nothing was unilateral. Such a contract is binding on the parties

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

196 Cal.App.2d 678
196 Cal.App.2d 678, 16 Cal.Rptr. 881
**196 Cal.App.2d 678**

until written notice of termination has been given. Both had not only the right but the mutual duty to give written notice to the other if they desired to terminate the relation. (*Mattei v. Hopper,* 51 Cal.2d 119, 152 [2] [330 P.2d 625]; *Sloan v. Stearns,* 137 Cal.App.2d 289, 296, 297 [5-6] [290 P.2d 382]; *Ross v. Frank W. Dunne Co.,* 119 Cal.App.2d 690, 698 [4] [260 P.2d 104]; Witkin, Summary of California Law, Vol. 1, p. 83 [3]; *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369 [144 N.E.2d 371, 379]; *Buggs v. Ford Motor Co.,* 113 F.2d 618, 619-621 [1]; *Bushwick-Decatur Motors v. Ford Motor Co.,* 116 F.2d 675, 677.)No other points are raised by plaintiff.

The judgment is affirmed.

Griffin, P. J., concurred. *684
Cal.App.4.Dist.
Roehm Distributing Co. v. Burgermeister Brewing Corp.
196 Cal.App.2d 678, 16 Cal.Rptr. 881

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 23

Westlaw.

267 P.2d 1043                                                                  Page 1
123 Cal.App.2d 904, 267 P.2d 1043
**123 Cal.App.2d 904**

**C**
Thompson Crane & Trucking Co. v. Eyman
Cal.App.4.Dist.
THOMPSON CRANE AND TRUCKING COM-
PANY et al., Plaintiffs,
v.
HERMAN L. EYMAN, Appellant; CARL W.
WELLER et al., Respondents.
Civ. No. 4653.

District Court of Appeal, Fourth District, Califor- nia.
Mar. 17, 1954.

HEADNOTES

**(1) Contracts § 28--Duress.**
A finding that an accountant's client signed a con-
tingent fee contract for tax services under duress is
sustained by evidence that on a Saturday afternoon,
two days before time for filing a protest with feder-
al treasury department had expired, accountant re-
quired that such contract be signed as a condition to
transmittal of protest and told client that unless
protest was forwarded, client would be liable for a
large assessment.
See **Cal.Jur.2d,** Contracts, § 65; **Am.Jur.,** Con-
tracts, § 147.
**(2) Fraud § 51--Actions--Waiver.**
A party to a contract who is placed in a position in
which rescission would not afford an adequate rem-
edy may complete contract without waiving his
right to assert a claim for fraud.

SUMMARY

APPEAL from a judgment of the Superior Court of
Fresno County. Arthur C. Shepard, Judge. Af-
firmed.

Action in interpleader to determine conflicting
claims to proceeds of an assigned note. Judgment
cancelling note and distributing proceeds between
defendants, affirmed.

COUNSEL
Adams, Duque, Davis & Hazeltine, Docker &
Docker, James S. Cline and Lawrence T. Lydick for
Appellant.
Thompson & Thompson and Harold V. Thompson
for Respondents.
BARNARD, P. J.
This action was commenced as one in interpleader.
The plaintiff alleged that the defendants Eyman and
Weller claimed adverse interests in the proceeds of
a note given by plaintiff to Weller, and assigned by
him to Eyman. By appropriate pleadings Weller and
Eyman each claimed the money, Eyman relying on
an assignment of the note and a claimed breach of
contract and Weller claiming that the contract had
been obtained through compulsion and duress. The
money due on the note was deposited in court, it
was stipulated that the plaintiff should have its
judgment of interpleader, and the action was tried
on the issues as **\*905** to the respective rights of
Weller and Eyman to the funds deposited.

Weller, who was in business in Coalinga, filed in-
come tax returns for 1943, 1944 and 1945 upon a
cash basis. In 1945, nearly all of his records were
destroyed by fire. In 1946, he employed Eyman, a
certified public accountant, to install a system of
bookkeeping and to prepare his income tax return
for 1946. While doing this Eyman examined
Weller's returns for 1943 to 1945, and then filed the
1946 return upon an accrual basis without obtaining
permission to change the basis of reporting. On Ey-
man's recommendation Weller also filed amended
returns for 1943 to 1945, claiming a refund of
$4,800. Eyman was paid for his work up to that time.

As a result of filing this claim of refund a large ad-
ditional assessment against Weller was proposed by
the treasury department. In 1948, Weller conferred
with Eyman about handling this matter since he was
familiar with the basis of the amended returns and
claim of refund. Eyman told Weller the proposed
assessment was asinine, and it was a simple matter

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

267 P.2d 1043
123 Cal.App.2d 904, 267 P.2d 1043
**123 Cal.App.2d 904**

to wind up. On April 14, 1949, they entered into an oral agreement by which Eyman agreed to handle the matter and Weller agreed to pay him a retainer of $1,000, and paid $250 on account thereof. Nothing was said in that conversation about a contingent fee, and Eyman later wrote Weller a series of letters repeatedly mentioning the $1,000 retainer but saying nothing of any contingency.

In July, 1950, the treasury department sent Weller formal notice of additional assessments amounting to about $118,000. These notices were delivered to Eyman who applied for a 60-day extension in which to file a protest, saying he had only eight days which was not sufficient. His request for 60 days was refused but he was given 30 days, extending the time to Monday, September 18. On September 15, Weller received a telegram from the treasury department stating that September 18 was the deadline. Eyman prepared the protest, completing it on Saturday morning, September 16. On the afternoon of September 16, in response to Eyman's request, Weller went to Eyman's office in Los Angeles to sign the protest. Eyman told Weller that he had completed the protest and that it would have to be mailed that night in order to be received in San Francisco by Monday, which was the deadline. He then produced a written contract, which he had prepared the day before, providing that Weller was *906 to pay him 7 1/2 per cent of any and all relief secured, in addition to the $1,000 retainer, and demanded that Weller sign it. When Weller refused to sign it, Eyman told him that if he did not sign it the protest would not be filed, and he would be liable for the assessment. It had taken Eyman more than a month to prepare the protest and after a couple of hours' discussion Weller signed the contingent fee contract, believing that if he did not do so he would be subject to this assessment which would result in his financial ruin.

Eyman mailed the protests on Sunday, September 17, 1950, and later attended five conferences in connection with this assessment matter, one of which was on February 19, 1951. On February 16,

1951, upon Eyman's insistence that he have some security, Weller assigned the note in question to Eyman for the purpose of securing the payment to him of any money due him for his services in this tax matter. On April 13, 1951, Eyman succeeded in having the claimed assessments reduced to about $2,500.

This action was brought in September, 1951. The court found that the plaintiff had deposited $9,212.79 with the clerk, and that it was entitled to have the note satisfied and to a reconveyance under the trust deed given to secure the note. With respect to the issues between the two cross-complainants, the court found most of the facts above stated and found, among other things, that Eyman had, without any request therefor, advised Weller to file amended returns for 1943 to 1945; that Weller did so upon Eyman's representation that he was experienced and learned in tax matters; that Eyman knew that most of Weller's records had been destroyed by fire, that he would have no adequate records to support his position, and that the filing of the amended returns would start an investigation of Weller's entire account; and that after preliminary discussions Weller and Eyman entered into an agreement on April 14, 1949, by which Eyman agreed to handle the tax matter and Weller agreed to pay him a retainer of $1,000.

In connection with the written contract for a contingent fee it was found that when Weller went to Eyman's office to sign the protests on the afternoon of Saturday, September 16, 1950, he was for the first time confronted with Eyman's demand for a contingent fee; that Eyman then refused to file the protest unless this contract was signed, and stated that a large assessment would be made against Weller unless the protest was filed; that the following Monday was the *907 last day in which the protest could be filed in San Francisco; that most attorneys' and accountants' offices were then closed; that Eyman had taken considerably more than a month to prepare the protest, and Weller believed that an extension of time could not be secured to permit him

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

267 P.2d 1043
123 Cal.App.2d 904, 267 P.2d 1043
**123 Cal.App.2d 904**

to find another accountant or prepare new protests; that Weller was mentally "in extremis" and convinced that unless he complied with Eyman's demand a judgment would be taken against him which would destroy him financially; that he signed the contract under this belief and to prevent said assessment; that Weller was taken by surprise and had had no warning of a possible demand for contingent fees prior to that date; that he believed that Eyman would abandon his case if he did not sign the contract; that he would not have signed it if Eyman had not stated that he would not file the protests and that the assessment would be made if he did not sign; that it was impossible at that late hour for Weller to secure the necessary assistance to prepare and file a protest before the deadline; that Eyman told Weller that if he did not sign the contract he would become liable for the total amount of the tax assessments; and that under these circumstances Weller signed the contingent fee agreement under business compulsion and duress.

It was further found that the services performed by Eyman in connection with this matter were performed under the agreement of April 14, 1949, and not under the contingent fee contract signed on September 16, 1950; that the reasonable value of Eyman's services in the matter is $2,700, in addition to the retainer already paid; that the assignment of the note to Eyman on February 16, was not made under duress or business compulsion, but was made to secure the payment of any money to become due Eyman for his services in this matter; that on that date the retainer had been paid, but any further amount to become due to Eyman had not been determined; that on that date Eyman demanded that this note be assigned to him as security for any further sums to become due him for his services; and that Weller assigned said note to him for that purpose.

Judgment was entered providing for the cancellation and return to the plaintiff of the note and security given in connection therewith; for the payment to Eyman of $2,700 (plus some interest and an ad-ditional amount not here in question) out of the fund deposited in court; and for the *908 payment to Weller of the balance remaining in the possession of the clerk. From this judgment Eyman has appealed.

The appellant contends that the findings are not sufficient to support the conclusions and judgment. It is argued that a contract, even if obtained under duress, is merely voidable and subject to the rules governing a rescission; that the respondent was here seeking a rescission and the court failed to find that he rescinded promptly, which finding was essential to a judgment of rescission; that the findings are fatally inconsistent and conflicting since it was found that the contingent fee agreement was obtained under compulsion, but also found that the respondent had voluntarily assigned the note to secure the payment to appellant of any money coming due to him "under the contingent fee agreement"; and that the findings are deficient in that the court did not specifically find that the respondent acted reasonably in submitting to the alleged compulsion.

While a consent not freely given is not necessarily void and "may be rescinded" under the rules prescribed for a rescission (Civ. Code, § 1566) this was not an action for a rescission, the claims of the respective parties being presented in response to the complaint in intervention, and the technical requirements of rescission are not necessarily controlling here. The finding of compulsion in obtaining the contingent fee agreement is not fatally inconsistent with the finding of lack of compulsion in the later assignment of the note, since it was found that the services were performed under the oral agreement of April 14, 1949, and that the note was assigned only for the purpose of securing payment for any further sums due for said services, this amount being then undetermined. There is nothing in the record to indicate that the assignment of the note mentioned the contingent fee agreement, and the court did not find that it was made to secure any payment coming due under that agreement. A finding that the respondent acted reasonably in submit-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

267 P.2d 1043
123 Cal.App.2d 904, 267 P.2d 1043
**123 Cal.App.2d 904**

ting to duress and compulsion is necessarily implied from the other facts found.

It is further contended that the evidence is insufficient to support the finding of economic duress or compulsion since it does not meet the test that to be sufficient for that purpose the evidence must show some wrongful act, that no other adequate means were available to the other party to prevent the threatened loss, and that the other party acted as a reasonable person in submitting to the alleged coercion. It is *909 argued that there is no evidentiary support for the finding that these parties made an oral agreement on April 14, 1949, providing that Eyman was to handle this matter and that Weller was to pay him a retainer of $1,000; that there is no evidence of any wrongful act on the part of the appellant, but only of a mere breach of contract which is not sufficient to support a conclusion of illegal compulsion; that there is no evidence that the respondent did not have other adequate means to prevent a threatened loss since he had two days in which to file a protest, and since other proceedings would have been necessary before any judgment against him would have become final; that there is no evidence that the respondent acted as a reasonably prudent person in submitting to the alleged coercion; that there is no evidence that he rescinded promptly; and that the evidence conclusively shows that he affirmed the contingent fee agreement, and waived the right to rescind, by later paying the remainder of the $1,000 retainer and assigning the note to the appellant.

The facts are the best answer to most of these contentions. Both parties testified that an oral agreement was made on April 14, 1949, providing that Eyman would handle this matter and that Weller would pay him $1,000. Weller testified that nothing was said about a contingent fee, and that he thought this $1,000 was to be the full charge. Eyman testified that the $1,000 was specified as a retainer, that there was also an indefinite agreement that he was to be paid somewhere from 10 to 15 per cent of any savings effected, and that about a week later he

wrote Weller a letter "confirming the $1,000 retainer," but not mentioning any other terms of the agreement. The court accepted a part only of the testimony of each party, and the evidence supports the finding as to the agreement thus made.

There is ample evidence of a wrongful act on the part of the appellant, and something more than a mere passive threat to breach a previous oral contract. Eyman not only refused to complete his service under the original contract, which would have required his attendance at future hearings on the protest, but he refused to allow Weller to file the protest already prepared and used the impossible position thus created to enforce his demand, and thereby secure a new contract on different terms. A very real compulsion appears, which is no less real because an incidental breach of contract was also involved.

The evidence supports the conclusion that other adequate *910 means to prevent the threatened loss were not available to Weller. He had only two days before the protest must be filed in San Francisco, although Eyman had obtained an extension on the ground that eight days was not sufficient and had then taken about 40 days to prepare it. It was Saturday afternoon, and other assistance would naturally not be available. A failure to file the protest on time would have seriously affected the later proceedings, and in addition to other considerations, it cannot reasonably be said that any means which might become available in the course of subsequent proceedings, were adequate or would have appeared so to a reasonable person.

(1) The evidence rather conclusively shows that Weller did not act freely and voluntarily, and appellant's contention that the trial judge erroneously applied the subjective test as to what Weller believed, rather than the objective test as to what a reasonably prudent person would have believed, is without merit. Whether he acted as a reasonably prudent person was a factual question for the court, and the evidence amply supports the implied finding that he did, which is sufficiently disclosed by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

267 P.2d 1043
123 Cal.App.2d 904, 267 P.2d 1043
**123 Cal.App.2d 904**

the facts specifically found including the finding that the contingent fee contract was signed under duress. (*Young v. Hoagland,* 212 Cal. 426 [298 P. 996, 75 A.L.R. 654]; *Steffen v. Refrigeration Discount Corp.,* 91 Cal.App.2d 494 [205 P.2d 727].) This was not a case where Weller acted on his own suggestion. (See *Campbell v. Rainey,* 127 Cal.App. 747 [16 P.2d 810].) Eyman told Weller that he would be liable for the proposed assessment if he did not sign the agreement, and any reasonably prudent layman would naturally rely on such statements by a tax expert in such a situation. The findings as a whole indicate an intention to find that Weller was justified in believing the statements made, and sufficiently disclose an implied finding, which necessarily and logically follows from the other facts established, that Weller acted as a reasonably prudent person in yielding to this coercion.

It does not necessarily follow that the respondent is barred from any relief because he did not rescind promptly, or because a waiver of his rights conclusively appears. This was not an action for a rescission, and the respondent could not restore what he had received, as required by section 1691 of the Civil Code. (2) His position was similar to that involved in the recognized rule that where a party is placed in a position where rescission would not afford an adequate *911 remedy, he may complete the contract without waiving his right to assert his claim for the fraud. (*Rothstein v. Janss Inv. Corp.,* 45 Cal.App.2d 64 [113 P.2d 465]; *Hines v. Brode,* 168 Cal. 507 [143 P. 729]; *Bagdasarian v. Gragnon,* 31 Cal.2d 744 [192 P.2d 935].) No issues of affirmance and waiver were directly raised by the pleadings, although they were incidentally involved in the trial. Both parties came into court as a result of the complaint in intervention, both claiming the funds deposited by the plaintiff. This was only a few months after appellant's services were completed, no prior legal step to enforce the alleged contract had been taken, no prejudice appears from the delay, and no such issue was raised by his answer and cross-complaint. The note was assigned as security for whatever amount the respondent actu-

ally owed, and it was not given, specifically or otherwise, as security for the payments called for by the contract of September 16, and the court did not so find. Under the facts proved and found, it cannot be held, as a matter of law, that Weller waived his right to defend against Eyman's claim to a percentage fee. In view of the manner in which Eyman secured the contract for a contingent fee, we are not impressed by his argument that the equities of the case are in his favor.

Because the evidence was conflicting, and because they could not be controlling, several other points incidentally raised by the appellant need not be considered.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.
A petition for a rehearing was denied April 12, 1954, and appellant's petition for a hearing by the Supreme Court was denied May 6, 1954. *912

Cal.App.4.Dist.
Thompson Crane & Trucking Co. v. Eyman
123 Cal.App.2d 904, 267 P.2d 1043

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 24

1219457.1

Westlaw.

103 P. 151
10 Cal.App. 625, 103 P. 151
**10 Cal.App. 625**

**C**H. G. WILLIAMS et al., Trustees, etc., Respondents, v. A. H. PRATT et al., Respondents, and ANNA MARIA RAYMOND, Appellant.
Cal.App. 3 Dist. 1909.
H. G. WILLIAMS et al., Trustees, etc., Respondents,
v.
A. H. PRATT et al., Respondents, and ANNA MARIA RAYMOND, Appellant.
**Civ. No. 591.**

Court of Appeal, Third District, California.
May 20, 1909.
SALE UNDER TRUST DEED--RIGHT TO SURPLUS--DEED FROM TRUSTOR--NOTICE OF PRIOR EQUITY--DEED FROM OWNER TO TRUSTOR--CONTRACT TO RESELL--PAYMENTS--MATERIAL OMISSION TO FIND.
In an action involving the right to a surplus in the hands of trustees after sale under a trust deed, in which the surplus was adjudged to the trustor's grantee, who took with notice of the prior equity of appellant, who, as original owner of the property, conveyed the same to the trustor, who agreed to resell the same to appellant, upon payment of the amount of the trust deed besides a further sum advanced by the trustor and such grantee, with monthly interest on the whole amount, which was payable within one year, with a forfeiture clause in case of nonpayment, and before the end of the year the sale was made, an issue joined that appellant paid and tendered all the interest due under the agreement to resell to the date of sale was material, and the failure to find thereon is ground for reversal of the judgment.

ID.--EFFECT OF PAYMENTS AS PROVIDED--OWNERSHIP OF SURPLUS IN EQUITY.
If appellant made the payments as provided in the agreement to resell to the time of sale under the trust deed, she is in equity the owner of the surplus, under the findings of the court as to such agreement, though mistaken in her contention that the transaction amounted to a mortgage.

ID.--APPEAL FROM JUDGMENT--REVIEW OF MATERIAL OMISSION IN FINDINGS--JUDGMENT UNSUPPORTED--REVERSAL.
An error in failing to find upon a material issue, upon which evidence was offered, as shown by the record upon appeal, is not necessarily required to be passed upon on appeal from an order denying a new trial, but may be reviewed upon appeal from the judgment, and such material omission in the findings leaves the judgment without support, and requires a reversal thereof.

ID.--CONFLICTING EVIDENCE AS TO PAYMENTS--FINDING REQUIRED.
Where there is testimony to the effect that appellant made the payments as required, notwithstanding conflicting evidence to the contrary, such conflict cannot be determined by the appellate court, and does not deprive a party of the right to have a finding upon the material issue as to such payments.

ID.--FORMER JUDGMENT OF NONSUIT NOT A BAR--FINDING CONCLUDING RESPONDENTS.
A finding in the present action, that a former judgment of nonsuit in a prior action by appellant to collect the surplus was not a bar in favor of respondents against the appellant in this action, concludes the respondents from questioning such finding.

ID.--SUPPOSITION OF DEFAULT IN INTEREST--RELIEF IN EQUITY AGAINST FORFEITURE--COMPENSATION.
Upon the supposition of default of the purchaser in the payment of interest, equity will relieve against a forfeiture, if intended to secure the payment of the purchase money with interest, when compensation can be made, which can be done in the present case, since, prior to the year fixed for payment of the principal sum, the property was sold, through no fault of the appellant, and appellant is only required to reimburse respondents for their outlay with interest.

ID.--COMPENSATION OF CROSS-DEMANDS.
In determining whether the evidence is sufficient to show that the omission to find upon the material issue as to payments of interest by appellant until the sale, and ascertainment of the surplus, the appellant will not be deemed in default when it appears that the vendor owed the purchaser a sufficient sum to pay the interest required, and the one debt could offset the other. In such case the two demands, so far as equaling each other, are deemed compensated, under

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

103 P. 151

10 Cal.App. 625, 103 P. 151

**10 Cal.App. 625**

Page 2

section 1440 of the Code of Civil Procedure.

APPEAL from a judgment of the Superior Court of Alameda County, and from an order denying a new trial. John Ellsworth, Judge.

The facts are stated in the opinion of the court.

*626 J. B. Richardson, W. H. H. Hart, and Aylett R. Cotton, for Appellant.

Abe A. Leach, for Plaintiffs, Respondents.

F. W. Sawyer, for A. H. Pratt, J. T. Robinson, Geo. E. Faw, and Lizzie K. Faw, Defendants, Respondents.

BURNETT, J.

Three different actions were consolidated and tried together. In each of them was involved the question of the ownership of a fund of nearly $4,000 in the hands of plaintiffs as trustees under a trust deed of certain real property held by them as security for the payment of an indebtedness of $8,000 due to one Robert Dalziel, Sr.

On the twenty-ninth day of April, 1904, George E. Faw and his wife made to said Dalziel a promissory note for *627 $8,000, payable one year after date, bearing interest at eight per cent per annum, payable monthly, containing a stipulation that if the interest was not paid within two months after due the principal and interest should forthwith become due at the option of the holder of the note. The note was secured by that trust deed aforesaid and, by the terms of the latter, upon default of payment of principal or interest, the trustees, on demand of said Dalziel, were authorized to sell the property after publishing a certain notice. Default was made in the payment of interest and in accordance with the terms of said deed the property was sold, and after the payment of the expenses and of said indebtedness a surplus of $3,786.60 remained. Faw and his wife disclaimed any interest in this surplus. They conveyed said real property and assigned whatever interest they might have in said surplus to A. H. Pratt, and said Pratt conveyed one-half to J. T. Robinson, and the controversy is between Pratt and Robinson on the one hand and said Anna Maria Raymond on the other. The latter's claim is based upon the contention that on the said twenty-ninth day of April, 1904, she was the owner and in possession of said real property, and that she informed said Faw that she desired to borrow $9,500; thereupon he informed her that he could

secure $8,000 of said fund from said Dalziel, provided he could secure him by a deed of trust, and that he (Faw) and A. H. Pratt would loan to her the further sum of $1,500, taking said property as security for said sums; thereupon, relying upon the statements and representations of Faw, she borrowed from him and Pratt the $1,500, and as security therefor she executed and delivered to said Faw an instrument in the form of an ordinary deed; that the only purpose and consideration for said deed was to secure the payment of said indebtedness, and in pursuance of said purpose said Faw executed and delivered to said Anna Maria Raymond an instrument, intended as a defeasance, in the form of an agreement to sell and convey to said Raymond said property on the payment of $9,500 within one year from date, with interest at eight and one-half per cent per annum, payable monthly, with a provision that "should the said party fail to comply with the terms thereof and fail to make any payment of interest for sixty days after the same shall become due, the said party of the first part shall be released *628 from all obligations in law or equity to convey said property and said party of the second part shall forfeit all right thereto." It was further agreed therein that said Raymond "shall have immediate and continued possession of the premises heretofore described."

It is the contention of Pratt and Robinson that said deed from Raymond to Faw was an absolute conveyance and not as security for the payment of any sum of money, and Pratt avers in his pleading that "the said Faw did make, execute and deliver to the said plaintiff said instrument, and that the same was executed and delivered solely as a contract to sell to said plaintiff, Anna Maria Raymond, the said property under the terms, time given and conditions as set forth therein, and that the same was not made as a defeasance nor as a part of any security for the payment of any sum of money or otherwise." He also claims to have been an innocent purchaser for value without notice of any interest of said Raymond except what is disclosed by the record.

Robinson's claim admittedly depends upon the validity of that of Pratt. Therefore it is necessary to consider only the controversy between the latter and the said Anna Maria Raymond.

Among the points made by appellant is that the court

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

103 P. 151
10 Cal.App. 625, 103 P. 151
**10 Cal.App. 625**

failed to find upon certain material issues. One of these presented by appellant's cross-complaint is that she paid and tendered all the interest that was due under said agreement of purchase.

Respondents contend that the question cannot be considered on appeal from the judgment, but must be reviewed, if at all, on an appeal from the order denying the motion for a new trial under proper specifications, which are not shown by the record herein. But it has been held by the supreme court in various decisions that the error may be reviewed on an appeal from the judgment as well as from said order. (_Knight v. Roche_, 56 Cal. 17;_Russell v. Russell_, 147 Cal. 52, [81 Pac. 297].) In the latter decision it is stated: "It is well settled that where the court fails to find upon a material issue the judgment is unsupported and will be reversed on appeal."

It is also argued that these issues are immaterial because the findings actually made support the judgment, and therefore**\*629** any additional findings could not affect the result. (_Robinson v. Muir_, 151 Cal. 124, [[[[90 Pac. 521].)

But whatever may be true as to action 22888 in which said Raymond was not a party, in the other two actions, in one of which she was plaintiff, and in the other defendant and cross-complainant, the question of her compliance with the terms of the said purported agreement to purchase is obviously the foundation of her claim to the surplus. It is true that she claimed the transaction amounted to a mortgage, and the court found that Pratt was an innocent purchaser without notice that the transaction amounted to anything more than what was shown by the record. The court also found expressly that it was not a mortgage, and that "on the same day (April 29, 1904), an agreement was executed between said Anna Maria Raymond and said George E. Faw, which agreement is correctly set forth in paragraph 3 of the complaint," which was acknowledged and recorded "before the execution by said George E. Faw to said A. H. Pratt of the deed hereinbefore referred to conveying said land to said Pratt."

We have, therefore, the judgment in favor of Pratt resting upon the finding of a deed from the owner who had, within the knowledge of Pratt, and as he avers, agreed to convey the land to appellant upon certain terms. In other words, without any finding of

facts showing whether the claim of appellant has become extinguished or has ripened into the right to a conveyance, and, therefore, to the surplus, it appears that Pratt purchased this land subject to this equitable interest of Raymond. If she made the payments as provided in said agreement, it is clear that she is in equity the owner of the surplus, although she is mistaken in her contention that the transaction amounted to a mortgage. We think there can be no doubt, therefore, that the issue as to the payment by her was material and should have been determined.

If there had been no evidence of said payment, the omission to find thereon would be without prejudice, but there was testimony to the effect that appellant made the payments as required, and although there was evidence to the contrary, we cannot say which the court would have followed. It will not be disputed that a conflict of evidence does not deprive a party of the right to have a finding upon a material issue.

**\*630** Respondents further contend that a former judgment is a bar to appellant's claim. It appears that an action was brought by appellant against Faw and Pratt to recover the surplus in the hands of the trustees, but Faw disclaimed any interest and recovered his costs while a nonsuit was granted as to Pratt. Herein in reference to this judgment the court found that it was upon the merits as to Faw, but not as to Pratt, "but as to him the judgment in said action is not a bar to the action numbered 22684 as aforesaid brought by said Anna Maria Raymond against said Pratt and others." As this finding cannot be questioned by respondents it answers their contention.

Another point made by appellant is that "upon the pleadings in this case, even if the relation of Faw and Mrs. Raymond was that of vendor and vendee, and if she had made default for more than sixty days in payment of interest, she would, in equity, be regarded as the owner of the real property at the time it was sold under the deed of trust, and entitled to the proceeds remaining after paying Dalziel and what continued due Faw and Pratt for the money paid to Dalziel and for interest." In support of the position, among the authorities cited is 1 Pomeroy's Equity Jurisprudence, third edition, section 433, wherein it is said: "Where a penalty or forfeiture is used merely to secure the payment of a debt, or the performance of some act, or the enjoyment of some right or benefit,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

equity, considering the payment or performance, or enjoyment, to be the real thing intended by the agreement, and the penalty or forfeiture to be only an accessory, will relieve against such penalty or forfeiture by awarding compensation instead thereof, proportionate to the damages actually resulting from the non-payment, or non-performance, according to the stipulations of the agreement. The test which determines whether equity will or will not interfere in such cases is the fact whether compensation can or cannot be adequately made for a breach of the obligation which is thus secured. If the penalty is to secure the mere payment of money, compensation can always be made and a court of equity will relieve the debtor party upon his paying the principal and interest."

Here there is no doubt compensation can be made since the real estate has been converted into money, and as the *631 property was sold within the year in consequence of no fault of appellant, and as she does not question the right of respondents to be reimbursed for their outlay, including interest, the contention that granting her failure to pay the interest as agreed she is in equity entitled to the residue is at least entitled to serious consideration. However, respondents content themselves with the declaration that the court will not consider the point because it is the first time it has been raised--no motion having been made for a judgment upon the pleadings, and the question not having been presented by a demurrer in the court below. But assuming the position of appellant to be well taken, it is not a case where the point is deemed to have been waived, as the judgment would be directly opposed to the pleading and admission of the prevailing party, and therefore not supported. (*Traverso v. Tate*, 82 Cal. 170, [22 Pac. 1082].)

We are disinclined, though, to pass upon the point without further argument, but we are of the opinion that appellant should at least be reimbursed for the amount actually paid by her under said agreement with Faw.

As they may not arise again, we consider it unnecessary to consider other points made by appellant, some of which have received no attention from respondents in their brief.

Appellant declares that "it is rarely that so much

treachery and iniquity appear in a case as in this and it is evident that from the very beginning Faw and Pratt were scheming to thwart the appellant and Mrs. Roberts in their efforts to save the home."

We cannot say, however, that the court below was not entirely justified in finding that Pratt acted in perfect good faith, but for the reason stated we think there should be a new trial.

The judgment and order are therefore reversed.

Chipman, P. J., and Hart, J., concurred.
A petition for a rehearing of this cause was denied by the district court of appeal on June 19, 1909, and the following opinion was then rendered thereon:
BURNETT, J.
Respondents in their petition for rehearing invite our attention to several points that were not mentioned*632 in their brief or suggested in the oral argument. These suggestions, however, have received careful attention, but they have not shaken our confidence in the correctness of our former conclusion.

As to the contention that a certain $180 could not be applied to the payment of the interest due, and therefore that appellant was in default according to her own showing, it is sufficient to refer to the testimony of Mrs. Roberts that "Mr. Faw said we would have an interest, interest in the $200, until that comes back to my sister-in-law and until that is paid back, or if it is not paid back it can go in the end to help pay up the difference that may be necessary to come from you, your sister-in-law." She afterward testified that $20 of it were handed back to her by Mr. Faw, leaving a balance due from Faw of $180. Giving full credit to her testimony, then, the situation is that appellant was required to make certain payments of interest to Faw in order to be entitled to a conveyance of the property. Faw owed her $180 which if applied on said contract of sale would prevent a default. It would certainly be a reproach to the law if one debt could not be set off against the other. Indeed, the two demands, as far as they equal each other, are deemed compensated. (Code Civ. Proc., sec. 440; *Freeman v. Seitz*, 126 Cal. 293, [58 Pac. 690].)

The petition is denied.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

103 P. 151
10 Cal.App. 625, 103 P. 151

**10 Cal.App. 625**

Page 5

Chipman, P. J., and Hart, J., concurred.
A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 19, 1909.

Cal.App. 3 Dist. 1909.
Williams v. Pratt
10 Cal.App. 625, 103 P. 151

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 25

Westlaw.

1 WITSUM Ch. I, § 118                                                                    Page 1
1 Witkin, Summary 10th (2005) Contracts, § 118, p. 157

<u>Supplement</u>

Copyright (c) 2005, 2008 B.E. Witkin Article Sixth Testamentary Trust

Witkin
Summary of California Law, Tenth Edition
B.E. Witkin and Members of the Witkin Legal Institute

Chapter I. Contracts
V. FORMATION: MUTUAL CONSENT
A. Objective Theory.

**3. [§ 118] Negligence in Signing or Accepting Instrument.**

    Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to consent to all its terms, and cannot escape liability on the ground that he or she has not read it. If the person cannot read, he or she should have it read or explained. (<u>Greve v. Taft Realty Co.</u> (1929) 101 C.A. 343, 351, 281 P. 641; <u>Security First Nat. Trust & Savings Bank v. Loftus</u> (1933) 129 C.A. 650, 654, 19 P.2d 297; <u>Randas v. YMCA of Metropolitan Los Angeles</u> (1993) 17 C.A.4th 158, 163, 21 C.R.2d 245, quoting the text; see 7 Corbin (Rev. ed.), §28.38; 1 Williston 4th, §4:16; 17A Am.Jur.2d (2004 ed.), Contracts §210.) Fraud, or a confidential relationship giving rise to an affirmative duty of disclosure, are obvious exceptions to this rule. (See <u>infra, §282</u>, <u>infra, §301</u>, <u>infra, §318</u>.) (On right of insured requesting special coverage to rely on company's promise to provide that coverage even though policy as written differs, see <u>2 Summary (10th), Insurance, §28</u>; on principle of <u>disclosure in contract law generally, see 91 Cal. L. Rev. 1645.</u>)<<* **p.158**>>

****SUPPLEMENT****
1 Witkin, Summary 10th (2008 supp.) Contracts, § 118, p. 18

**3. [§ 118] Negligence in Signing or Accepting Instrument.**

    See 1 Williston 4th (2007 ed.), §4:19.

    <u>Contents</u>  <u>Index and Tables</u>

1 WITSUM Ch. I, § 118

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.