# EXHIBIT 26

Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2008 WL 269069 (E.D.Cal.)
**2008 WL 269069 (E.D.Cal.)**

**H**Ball v. Johanns
E.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Dennis W. BALL, an individual, Plaintiff,
v.
Mike JOHANNS, et al, Defendants.
**No. CIV. S-07-1190 LKK/DAD.**

Jan. 29, 2008.

William M. Lukens, Lukens Law Group, San
Francisco, CA, for Plaintiff.
Melville Zachary Smith, Michael Scott Wilcox,
McDonough Holland & Allen PC, Sacramento, CA,
for Defendants.
Ana Maria Martel, United States Attorney,
Sacramento, CA, for Defendants/ThirdParty
Plaintiffs.

*ORDER*

LAWRENCE K. KARLTON, Senior District Judge.
**\*1** The plaintiff for the purposes of this motion is the
United States of America, on behalf of its
Department of Agriculture and Farm Service Agency
("FSA"). It has brought a cross-claim against
Defendant PremierWest Bank ("Premier") alleging
various equitable and legal claims to recover a
Guarantee Loss Claim paid to Defendant. This case
was brought as a cross-claim to *Ball v. Johanns*,
which was consolidated with *Ball v. Premier West
Bank.* Pending before the court is Premier's motion to
dismiss FSA's cross-claim. The court resolves the
motion on the parties' papers and after oral argument.
For the reasons explained below, the motion is
granted in part and denied in part.

**I. Background and Allegations**[FN1]

FN1. These allegations are taken from the
Answer of the United States and Third Party
Complaint filed on November 1, 2007.

Plaintiff, FSA, is a federal agency that acts as a loan
guarantor. It guarantees payment to secured lenders
for a certain amount of the guaranteed loan.

Defendant, Premier, is a banking corporation
organized and existing under the laws of the state of
Oregon and is authorized to conduct business in the
state of California. The case-in-chief involves two
consolidated claims of individual debtor, Ball. The
first claim is for breach of contract and related claims
against Premier for submitting the Loss Claim to
FSA after entering into a Settlement Agreement that
allegedly terminated all of Ball's debts. The second
claim is against FSA under the Administrative
Procedures Act for accepting and paying Premier's
loss claim and subsequently declaring that Ball owed
FSA a federal debt. These cases' allegations were
described more fully in the court's October 23, 2007
order.

In its cross-claim, FSA alleges that Premier is liable
for the amount paid on the loss claim if it was
inappropriate for Premier to submit the claim.
Specifically, FSA alleges that if Premier improperly
submitted the loss claim, FSA had no duty to pay and
is entitled to receive either restitution from Defendant
or an award of damages. FSA's cross-claim alleges
four causes of action: (1) unjust enrichment, (2)
breach of contract, (3) money had and received, and
(4) money paid by mistake of law or fact.

**II. Standard for Dismissal Under Federal Rule of
Civil Procedure 12(b)(6)**

In order to survive a motion to dismiss for failure to
state a claim, plaintiffs must allege "enough facts to
state a claim to relief that is plausible on its face." *Bell
Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct.
1955, 1974, 167 L.Ed.2d 929 (2007). While a
complaint need not plead "detailed factual
allegations," the factual allegations it does include
"must be enough to raise a right to relief above the
speculative level." *Id.* at 1964-65.

As the Supreme Court observed, Federal Rule of
Civil Procedure 8(a)(2) requires a "showing" that the
plaintiff is entitled to relief, "rather than a blanket
assertion" of entitlement to relief. *Id.* at 1965 n. 3.
Though such assertions may provide a defendant with
the requisite "fair notice" of the nature of a plaintiff's
claim, only factual allegations can clarify the
"grounds" on which that claim rests. *Id.* "The

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action ..."*Id.* at 1965, quoting 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1216, pp. 235-36 (3d ed.2004).<u>FN2</u>

> FN2. The holding in *Twombly* explicitly abrogates the well established holding in *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Twombly,* 127 S.Ct. at 1968.

**\*2** On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). In general, the complaint is construed favorably to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). That said, the court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

### III. Analysis

In its third party complaint, FSA alleges four causes of action: (1) unjust enrichment, (2) breach of contract, (3) money had and received, and (4) money paid by mistake of law or fact. For reasons stated in the following analysis, the motion to dismiss is denied as to the claims of unjust enrichment, breach of contract, and money had and received. The motion to dismiss is granted for the claim of money paid by mistake of law or fact.

### A. Unjust Enrichment

In order to prove unjust enrichment, a plaintiff must

establish three elements: (1) a benefit conferred on the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *Van Gemert v. Boeing Co.,* 590 F.2d 433 (2d Cir.1978), *aff'd,*441 U.S. 942, 99 S.Ct. 2158, 60 L.Ed.2d 1043 (1980). The doctrine of unjust enrichment is recognized where there is no enforceable agreement between the parties on the subject matter at issue or where no adequate legal remedy exists. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc .,* 339 F.3d 1087, 1090 (9th Cir.2003); *Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,* 448 F.3d 573 (2d Cir.2006). Here, FAS alleges that if Ball prevails in its case against FSA, then Premier has been unjustly enriched by FSA's payment to Premier on its Loss Claim.

### 1. Inconsistency with FSA's Prior Assertions

Premier makes three arguments. First, Premier asserts that FSA previously determined in its administrative proceeding that it was proper for Premier to be paid for the Loss Claim.<u>FN3</u>Premier argues that a court finding in favor of Ball against FSA would do nothing to change the basis of FSA's prior conclusion that payment of the Loss Claim to Premier was proper. The court is not persuaded by this argument.

> FN3. To support this proposition, Defendant cites to the National Appeals Division's, Director Review Determination, *In the Matter of Ball and Farm Services Agency,* case no. 2006W000130, dated November 21, 2006 (hereafter "NAD Review") at 6. Defendant requests the court take judicial notice of it.
>
> A court may take judicial notice of a fact not subject to reasonable dispute pursuant to Fed.R.Evid. 201(b) and Fed.R.Evid. 201(d). Here, the National Appeals Division Review is capable of accurate and ready determination and its contents derive from a source whose accuracy cannot reasonably be questioned. Furthermore, Defendant has complied with Federal Rule of Evidence 201(d) by

Slip Copy
Slip Copy, 2008 WL 269069 (E.D.Cal.)
**2008 WL 269069 (E.D.Cal.)**

requesting judicial notice and supplying the court with a copy of the Review. Therefore, the court takes judicial notice of the National Appeals Division's, Director Review Determination, *In the Matter of Ball and Farm Services Agency,* case no. 2006W000130, dated November 21, 2006. To note the decision and its contents, is, of course, different from noting its propriety.

If Ball prevails in his claims against Premier, the factfinder necessarily will have determined that Premier acted improperly in submitting the loss claim to FSA. This finding against Premier could affect the basis of FSA's conclusion in its administrative proceedings that its payment to Premier was proper. Since the determinative issues on which the cross-claim depends are inextricably linked to the consolidated case-in-chief and have yet to be resolved, it is premature to dismiss this argument for failure to state a claim.[FN4] Consequently, it appears that there are potential facts supporting FSA's claim that Premier inequitably retained the benefit of payment of the Loss Claim. See *Twombly,* 127 S.Ct. at 1968.

> FN4. According to Federal Rule of Civil Procedure 13(g), cross claims need not be limited to definite or matured claims or causes of action. In other words, cross claims may be brought on the basis of claims of a contingent nature where the ultimate outcomes of the claims depend on the determination of other features or issues in the case. Therefore in this situation, the contingent nature of FSA's cross claims on resolution of the case-in-chief, does not bar the cross claim.

**2. Effect of the Express Contract On FSA's Unjust Enrichment Claim**

*3 Second, Premier maintains that the Lender's Agreement between it and FSA governs the issue of FSA's payment to Premier in response to the filing of the Loss Report, and that FSA has conceded this by pleading a breach of contract claim. Premier argues, therefore, that the existence of the contract precludes FSA's claim for unjust enrichment. See *McKesson HBOC, Inc.,* 339 F.3d at 1090.

Here, FSA has pled that the Lender's Agreement was an express contract between the parties. However, pursuant to Federal Rule of Civil Procedure 8(e)(2), the plaintiff may plead alternative, inconsistent theories. See, e.g., *In re Wal-Mart Wage and Hour Employment Practices Litigation,* 490 F.Supp.2d 1091, 1117 (D.Nev.2007). Furthermore, the liberal policy reflected in Rule 8(e)(2) instructs courts not to construe a pleading "as an admission against another alternative or inconsistent pleading in the same case."*McCalden v. Cal. Library Ass'n,* 955 F.2d 1214, 1219 (9th Cir.1990) (quoting *Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir.1985). Thus, Plaintiff's claim for unjust enrichment should not be barred despite the simultaneous claim for breach of contract. To the extent the Plaintiff is ultimately able to prevail on a legal breach of contract theory, the Plaintiff will be barred from also recovering under an equitable claim for unjust enrichment. See *E.H. Boly & Son, Inc. v. Schneider,* 525 F.2d 20, 23 n. 3 (9th Cir.1975). However, if the factfinder determines that the terms of the Lender's Agreement did not govern the conduct in dispute in the cross-claim, then the unjust enrichment claim is proper. See *McKesson HBOC, Inc.,* 339 F.3d at 1090;*Van Gemert,* 590 F.2d 433

**3. Unclean Hands**

Third, Defendant argues that if the court finds in favor of Ball against FSA, this requires a determination that FSA did not act equitably and thus is not entitled to an equitable remedy against Premier. Defendant specifically maintains that "one seeking equity must do equity."*In re. Beaty,* 306 F.3d 914, 925 (9th Cir.2002). Since unjust enrichment is an equitable doctrine, Defendant asserts that a finding for Ball against FSA precludes an equitable remedy for FSA against Premier.

FSA's duty to pay Premier does not revolve around the concept of equitable behavior by FSA. While the court in *Beaty* did state that debtors who have "unclean hands" may not invoke laches, the court further explained that debtors also fail to comply with their obligations innocently, inadvertently and in good faith. *Beaty,* 306 F.3d at 925-26.The *Beaty* court held that the debtor in that case did not have "unclean hands" because the debtor's actions were inadvertent. *Id.* at 926.The *Beaty* court did not clearly

state the standard for finding "unclean hands" but implied that "unclean hands" might be avoided if there is inadvertent or innocent behavior in good faith.

Based on the pleadings in the cross-claim and the cases in chief, it appears that FSA's conduct as alleged by Ball in *Ball v. Johanns* would not constitute "unclean hands," as there is no suggestion of FSA's willfull impropriety. As the court understands Ball's causes of actions, he alleges that, at most, FSA's acts were negligent in its payment of the Loss Claim. This is not the type of conduct that would prevent FSA from subsequent recovery from Premier on equitable principles. *See Beaty,* 306 F.3d at 925-26.

**\*4** Furthermore, since the court has yet to determine whether Premier properly submitted the Loss Claim to FSA and whether FSA acted properly in accepting and paying the loss claim, it is premature to dismiss FSA's claim for unjust enrichment against Premier. Premier's motion to dismiss FSA's first cause of action is therefore denied.

**B. Breach of Contract**

FSA also alleges that if Premier was precluded by its Settlement Agreement with Ball from filing a Loss Claim with FSA, Premier breached the terms of its Lender's Agreement with FSA. Premier argues that FSA had already determined in its administrative proceedings that if Premier breached its Lender's Agreement with FSA by failing to keep FSA informed of the settlement, the breach was not substantive. Premier contends that FSA's opinion and subsequent performance constitutes a waiver of any alleged breach. *Cutting v. Bryan,* 30 F.2d 754, 756 (9th Cir.1929).

Premier's argument that Plaintiff waived any alleged breach through agency proceedings and subsequent performance is not persuasive. In *Cutting,* 30 F.2d at 756, the court simply held that the "acceptance of acts of performance may operate as a waiver of strict or complete compliance."FSA's administrative decision does not constitute waiver as a matter of law, and Premier has presented no authority to indicate that it does. A factfinder reasonably could conclude that FSA's administrative decision was based on the assumption that Premier's Loss Claim

was lawful, in that it properly stated that there was a balance on the loan to which Premier was entitled, but that it did not constitute a knowing waiver of FSA's rights under the Lender's Agreement. Consequently, there are facts sufficient to state a claim for breach of contract that is plausible on its face. *Twombly,* 127 S.Ct. at 1974.

**C. Money Had and Received**

FSA's third cause of action seeks restitution from Premier if the court finds FSA had no duty to pay the Loss Claim to Premier. In order to succeed on an action for money had and received, the plaintiff must show that what the defendant has received should in good conscience be returned to plaintiff.*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933 (2d Cir.1998); *Dickey v. Royal Banks of Missouri,* 111 F.3d 580 (8th Cir.1997). As Defendant properly states, a claim for "money had and received" is a legal claim, although it is subject to equitable principles. *Myers v. Hurley Motor Co.,* 273 U.S. 18, 24-5, 47 S.Ct. 277, 71 L.Ed. 515 (1927).

**1. Unclean Hands**

Premier reasserts its "unclean hands" argument that a court finding in favor of Ball against FSA will necessarily lead to FSA's "unclean hands" and preclude the equitable remedy FSA seeks. The court rejects this argument for the reasons stated in section A.3, *supra.*

**2. Judicial Deference to Agency Determinations**

Second, Defendant argues that FSA's cause of action asks the court to review the correctness of FSA's own agency determination that payment to Premier was proper where the standard of review is deference to agency determinations. This implies that the court should affirm the FSA's decision that Ball owes a federal debt to the FSA. *See Morgan v. United States,* 304 U.S. 1, 18 (1938) (stating the deferential standard for judicial review of agency decisions); *Love v. Thomas, Administrator, Environmental Protection Agency,* 858 F.2d 1347, 1356 (9th Cir.1988).

**\*5** The court cannot accept Premier's characterization of FSA's cause of action. FSA is not asking for the court to review the correctness of its own Agency

Slip Copy                                                                                                    Page 5
Slip Copy, 2008 WL 269069 (E.D.Cal.)
**2008 WL 269069 (E.D.Cal.)**

determinations. Instead, FSA's claim alleges that Premier acted unlawfully in submitting the Loss Claim to FSA, which caused FSA to erroneously pay the claim. FSA alleges in its opposition to Premier's motion and at oral argument that the administrative proceedings did not inquire into the factual validity of the loss Premier asserted in its Loss Claim, and that the FSA presumed that the claim was made in good faith. As such, while the standard of judicial deference is relevant to the court's determination of issues in Ball's action against FSA, this standard is irrelevant to the determination of Premier's liability for submitting its Loss Claim to FSA. Premier's motion to dismiss must be denied as to this cause of action.

**D. Money Paid by Mistake of Law or Fact**

Finally, FSA has brought a claim seeking restitution if the court finds that FSA was misled by Premier submitting its Loss Claim to FSA and FSA had no factual or legal duty to pay said claim. Mistake of law arises when (1) there is a misapprehension of the law by all parties, and (2) there is a misapprehension of the law by one party of which the other party is aware at the time of contracting but which they do not rectify. Cal. Civ.Code § 1578. Mistake of fact, on the other hand, arises when (1) an unconscious ignorance or forgetfulness of a fact past or present that is material to the contract, and (2) belief in the present existence of a thing material to the contract which does not exist or in the past existence of such a thing which has not existed.Cal. Civ.Code § 1577. Furthermore, mistake in judgment alone is not a basis for avoiding a contract or transaction. *MWS Wire Industries, Inc. v. California Fine Wire Co.,* 797 F.2d 799, 803 (9th Cir.1986); *American Nat'l Ins. Co. v. Continental Parking Corp.,* 42 Cal.App.3d 260, 267, 116 Cal.Rptr. 801 (1974). The doctrine of mistake of fact or law is utilized in the context of consent to a contract. Cal Civ.Code § 1567(5); Cal. Civ.Code § 3391(4). Thus, a mistake of law or fact satisfying the requirements of the law will form the basis for an affirmative action for rescission. Cal. Civ.Code § 1689(b)(1).

First, Premier argues that the doctrine of mistake is an affirmative defense and mistake must be mutual or made where the other party knows of the mistake. Here, FSA does not plead that the Lender's Agreement should be rescinded. Moreover, even if

FSA did plead this, it is doubtful that it could be pled as a cause of action, since it is an affirmative defense if Premier sought to enforce the contract against FSA.

Furthermore, Premier is correct in pointing out that FSA does not point to any specific facts that FSA mistook at the time of contract formation with Premier via the Lender's Agreement. In addition, FSA's cross-claim pleads no facts as to what facts or law FSA misapprehended at the time of contracting. On this basis, the claim must fail. *Twombly,* 127 S.Ct. 1965.

**\*6** To the extent the FSA intended to plead actual or constructive fraud, it has not done so. In order to prove a claim of actual fraud, the plaintiff must demonstrate the following elements: (1) a false material assertion, (2) knowledge of the falsity or a high degree if disregard for whether the assertion was correct, (3) intention to induce the plaintiff to act or refrain from action, (4) justifiable reliance on the assertion, and (5) damage to the plaintiff. *Coffel v. Stryker Corp.,* 284 F.3d 625 (5th Cir.2002); *Southern Union Co. v. Southwest Gas Corp.,* 180 F.Supp.2d 1021 (D.Ariz.2002) (applying California law). The elements for constructive fraud are similar although knowledge of the falsity is not required. *In re Harmon,* 250 F.3d 1240 (9th Cir.2001) (applying California law). Neither these elements nor the facts comprising them have been pled in FSA's cross-claim.[FN5]

> [FN5.] Premier's additional arguments, alleging FSA acted with unclean hands and that the court should defer to agency determinations, were considered and rejected in section III.C, *supra.*

The court therefore grants the motion to dismiss this count, as FSA has not plead a cause of action on which relief may be granted. *See Twombly,* S.Ct. at 1965 n. 3.

**IV. Conclusion**

For the reasons explained above, Defendant's motion to dismiss is GRANTED as to FSA's fourth cause of action and DENIED as to FSA's first, second, and third causes of action. FSA is granted leave to amend.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 269069 (E.D.Cal.)
**2008 WL 269069 (E.D.Cal.)**

Page 6


IT IS SO ORDERED.

E.D.Cal.,2008.
Ball v. Johanns
Slip Copy, 2008 WL 269069 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 27

LEXSEE 1989 U.S. DIST. LEXIS 18393

**CHARTER MARKETING COMPANY v. JAMES BERGEN**

**Civil No. H-89-405(AHN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*1989 U.S. Dist. LEXIS 18393*

**October 20, 1989, Decided**
**October 20, 1989, Filed**

**JUDGES:** [*1] Nevas

**OPINION BY:** ALAN H. NEVAS

**OPINION**

*RULING ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT*

The plaintiff Charter Marketing Co. ("Charter") brought this action under the Petroleum Marketing Practices Act, *15 U.S.C. Section 2801 et seq.* (the "PMPA") and under the doctrine of pendent jurisdiction, seeking declaratory and injunctive relief as well as money damages under *Rules 57* and *65, Fed. R. Civ. P.* The case involves the termination by Charter, effective June 24, 1989, upon fifteen days notice to the defendant, James Bergen, of a lease and franchising agreement for the use and occupancy of a gasoline station and convenience store located on Capitol Avenue in Hartford, Connecticut; and the termination by Charter, effective September 18, 1989, upon 62 days notice, of a lease and franchising agreement for the defendant's use and occupancy of a gasoline station and convenience store located on New Park Avenue in West Hartford, Connecticut. The plaintiff has filed two motions for summary judgment, one pertaining to the Capitol Avenue station and the other to the New Park Avenue station, arguing that the terminations were valid. At issue is whether, as a matter of [*2] law, fifteen days notice and sixty-two days notice of termination for nonpayment of rent and failure to operate the station for seven consecutive days was "reasonable" notice within the meaning of *Section 2804(b)(1)* of the PMPA. The defendant argues that

summary judgment should be denied because an evidentiary hearing is needed for the court to assess whether, under the circumstances of this case, the notice Charter provided was reasonable. For the reasons stated below, both motions for summary judgment are granted.

*Background*

The following facts giving rise to this action are not in dispute. [1] Bergen [2] signed a written three-year lease with Charter for the use and occupancy of the Capital Avenue station for the period from August 8, 1986 through August 7, 1989, which they renewed in February 1989 for another three years to run from August 8, 1989 through August 7, 1992. The lease provided for a monthly base rent of $ 550 due on or before the tenth day of each month and a monthly ancillary rent based on convenience store sales of a minimum of $ 660 on or before the tenth day of the month succeeding the month in which ancillary sales were made. Bergen paid Charter the monthly [*3] base rent for the period through April 30, 1989 and the monthly ancillary rent for the period through March 31, 1989. He has paid Charter no base rent for the month of May 1989 or thereafter and no ancillary rent for the month of April 1989 or thereafter. The Capitol Avenue station was closed on May 26, 1989 and has remained closed. On June 9, 1989, Charter terminated the franchise by sending Bergen a written notice, effective June 24, 1989, invoking Bergen's failure to pay the base rent for May and the ancillary rent for April as well as his failure to operate the station since May 26, thereby providing Bergen with fifteen days notice.

1    *Compare* Plaintiff's Statement of Undisputed Facts, filed August 8, 1989 and the Supplemental

1989 U.S. Dist. LEXIS 18393, *3

Statement of Undisputed Facts, filed September 14, 1989 *with* Defendant's Statement of Disputed Facts in Opposition to Plaintiff's Motion for Summary Judgment, filed September 18, 1989.

2    A police officer by occupation, Bergen operated the service stations as an investment. Bergen's explanation for his failure to pay the rent was that his money was tied up in other investments (i.e. retirement villages throughout the United States, the financing of which required his personal involvement in seeking the chartering of an offshore bank in Montserrat in the British West Indies and in Antigua). *See* Bergen's Affidavit in Opposition to Charter's Motion for Summary Judgment, filed September 18, 1989 at 4.

[*4] Bergen also signed a written three-year lease with Charter for the use and occupancy of the New Park Avenue service station for the period from August 8, 1986 through August 7, 1989, which they renewed in February 1989 for another three years to run from August 8, 1989 through August 7, 1992. The lease provided a monthly base rent of $ 1,500 due on the tenth day of each month for which such rental was paid; and a monthly ancillary rent based on convenience store sales of a minimum of $ 660, due on the tenth day of the month succeeding the month in which the ancillary sales were made. Bergen paid Charter the monthly base rent for the period through April 30, 1989 and the monthly ancillary rent for the period through March 31, 1989. He has paid Charter no base rent for the month of May 1989 or thereafter and no ancillary rent for the month of April 1989 or thereafter, but continues to operate the station. Charter terminated the franchise, effective September 18, 1989, by sending Bergen written notice on July 13, 1989, invoking Bergen's failure to pay the base rent for May or the ancillary rent for April, thereby providing Bergen with 62 days notice.

The plaintiff commenced this action [*5] on June 30, 1989, seeking a declaratory ruling that the Capital Avenue lease was validly terminated under the PMPA and an order that the defendant vacate the station immediately. Bergen filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code, on August 10, 1989. The Bankruptcy Court (Krechevsky, J.) granted Charter relief from automatic stay pursuant to *Section 362 of the Bankruptcy Code* to permit this court to determine whether the leases were validly terminated under the

PMPA or were rather executory prepetition contracts which could be assumed by Bergen under the bankruptcy proceeding. To restrain Charter from reclaiming the New Park Avenue station upon the effective date of termination, Bergen filed a motion for a temporary restraining order ("TRO"). Upon joint stipulation, a TRO was entered pending the outcome of the hearing on Charter's motions for summary judgment.

*Discussion*

A. *The Petroleum Marketing Practices Act*

At issue in this case is the reasonableness of Charter's notices of termination to Bergen under *Section 2804* of the PMPA. 3 *Section 2804(a)(2)* requires a franchisor to provide 90 days notice of termination in writing but *section 2804(b)(1)* [*6] provides for an exception in circumstances in which it would not be reasonable for the franchisor to furnish notification . . .." To comply with the exception in *section 2804(b)(1),* the statute provides in *section 2804(b)(1)(A)* that the less than 90 days notice must be furnished "on the earliest date" which is reasonably practicable."

3    *Section 2804* provides in relevant part:

(a) Prior to termination of any franchise . . ., the franchisor shall furnish notification of such termination . . . to the franchisee who is a party to such franchise . . . --

(1) . . .

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination . . . takes effect. (b)(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination . . . takes effect, as required by subsection (a)(2) of this section --

(A) such franchisor shall furnish notification to the

1989 U.S. Dist. LEXIS 18393, *6

franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable . . . .

[*7] In addition to the notice requirement in *section 2804*, *sections 2802(b)(2)* and *(3)* [4] explicitly enumerate examples of per se reasonable grounds for termination, including the franchisee's failure to make timely payments *(section 2802(c)(8))* and the franchisee's failure to operate the marketing premises for seven consecutive days *(section 2802(c)(9))*. Thus, the statute's requirements for termination of a franchise are in the conjunctive: the franchisor must have *reasonable* grounds for termination under 2802 *and* must comply with the notice provisions set forth in *section 2804*, providing (in the disjunctive) either 90 days notice *or* less than 90 days notice in circumstances in which it would not be *reasonable* for the franchisor to provide 90 days notice.

4    *Section 2082(b)(2)* provides in relevant part:

(2) For purposes of this subsection, the following are grounds for termination of a franchise . . .:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship --

(i) . . .

. . .

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable, if such event occurs during the period the franchise is in effect . . . .

(i) . . .

. . .

*Section 2802(c)* provides in

relevant part:

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable" includes events such as --

. . .

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9) failure by the franchisee to operate the marketing premises for --

(A) 7 consecutive days.

[*8] B. *Summary Judgment*

Summary judgment under *Rule 56, Fed. R. Civ. P.*, is appropriate and indeed may be favored when there are no genuine issues of material fact to be resolved at trial, and where the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74 , 106 S. Ct. 91 (1986).* To grant summary judgment in the instant case, the court must find as a matter of law that it would not be reasonable under the circumstances of this case to require 90 days notice of termination of the franchise.

C. *The Case Law*

Bergen's failure to pay the rent and failure to operate the station for seven consecutive days fall squarely within the statute's enumeration of per se reasonable grounds for termination under *section 2802*. The courts have held that failure to pay the rent in a timely manner when due constitutes sufficient grounds for termination under 2802(c)(8). *Kajdan v. Exxon Co., U.S.A., 1980-1* Trade Reg. Rep. (CCH), para. 63,262 at p. 78,306 (D. Conn.

1989 U.S. Dist. LEXIS 18393, *8

1980); [*9] *Exxon v. Gonzalez,* Bus. Franchise Guide (CCH), R 8440 (S.D. Fla. 1985).

At issue here, however, is whether the less than 90 days notice of termination provided by Charter to Bergen comports with the statute's provision in *section 2804(b)(1)* for less than 90 days notice in cases where it would be unreasonable to supply 90 days notice. The courts interpreting the PMPA's notice provision have held terminations based on less than 90 days notice to be reasonable where the franchisee has breached the contract by failing to make timely payments or to operate the marketing premises. *Smith v. Amerada Hess Corp.,* Bus. Franchise Guide (CCH), para. 58,177 (D.N.J. 1984) (holding two days notice reasonable where franchisee had failed to make timely payments and to operate the station for several consecutive days); *Loomis v. Gulf Oil, 567 F. Supp. 591, 597 (M.D. Fla. 1983)* (holding eight days notice reasonable where franchisee had failed to make timely payments); *Brummet v. Amoco Oil Corp.,* (W.D. Mich. 1988)(Lexis 3561) (stating that ten days notice was reasonable where franchisee had failed to make timely payments). Under the circumstances, these courts [*10] concluded that it would not be reasonable to require the franchisor to suffer additional loss of revenues by waiting for 90 days to terminate the franchises. [5] Where, as here, the statute explicitly provides that a franchise can be terminated if the franchisee fails to make timely payments, and the contract states that payments are due on the tenth of each month, it would frustrate the intent of the drafters to require the franchisor to wait for an extended period following the breach before termination. Similarly, where, as here, the statute explicitly provides that a franchise can be terminated if the franchisee fails to operate the marketing premises for seven consecutive days, it would be unreasonable to require the franchisor to wait more than fifteen days beyond the seven day period to terminate the franchise.

[5] These decisions reflect the legislative intent to protect the small service station retailers from arbitrary termination of their franchises but to allow the franchisor to terminate a franchise "based on certain actions of the franchisee." S. Rep. No. 95-731, 95th Cong., 2d Sess. 15, 17 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 874.

[*11] The defendant argues that summary judgment is inappropriate here and that the court should conduct an evidentiary hearing in order to satisfy the reasonable circumstances test of *section 2804(b),* citing *Wisser v. Mobil Oil Corp., 730 F.2d 54 (2d Cir. 1984).* In *Wisser,* the court held that 90-days notice was unreasonable in light of the franchisee's misbranding of gasoline. [6] The *Wisser* court did not, however, even in dictum, restrict that result to instances of wrongful misconduct and serious default. Furthermore, neither the language of *section 2804(b)(1)* nor the Senate report accompanying it restrict its applicability to serious misconduct like misbranding. *Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 29 (1st Cir. 1987).*

[6] The *Wisser* court rejected as too restrictive the analysis in *Escobar v. Mobil Oil Corp., 522 F. Supp. 593, 600 (D. Conn. 1981), rev'd on other grounds, 678 F.2d 398 (2d Cir. 1982) (per curiam),* holding that *section 2804(b)(1)(A)* of the PMPA was intended to apply only to "circumstances created by an outside agency, such as condemnation of the marketing premises." *Wisser,* 730 F.2d at 60.

[*12] *Conclusion*

This court agrees with the holding and rationale of the cited cases and concludes that Bergen's failure to pay rent since May for either station and to operate the (Capital Avenue) station for seven consecutive days constitute circumstances under which it would not be reasonable as a matter of law to require Charter to give 90 days notice, in compliance with *Section 2804(b)(1)* of the PMPA. Accordingly, both of Charter's motions for summary judgment are granted. The temporary restraining order, entered on September 20, 1989 and extended by stipulation of counsel at oral argument on September 22, is hereby dissolved.

SO ORDERED this 20th day of October, 1989 at Hartford, Connecticut.

Alan H. Nevas

United States District Judge

# EXHIBIT 28

1219457.1

1 of 1 DOCUMENT

Copyright 2008 CCH Incorporated, All Rights Reserved
CCH Business Franchise Guide

Cases, Rulings, New Developments
State Decision

*Business Franchise Guide (CCH) P 8326*

February 25, 1985 Dated

**Fotinos v. Amoco Oil Co.**

New Jersey Superior Court, Chancery Division.  No. C527184E. Dated February 25, 1985

**Strict Compliance with Notice of Nonrenewal Not Required**

**Petroleum Marketing Practices Act**

**Relationship/Termination -- Gasoline Dealers -- Notice of Nonrenewal -- Duration of Underlying Lease -- Notice that Lease Might Not Be Renewed -- Strict Compliance v. Flexible Approach.**

A gasoline franchisor's letter informing a franchisee that an underlying lease of service station premises would expire and might not be renewed did not strictly comply with the notice of nonrenewal requirement of the Petroleum Marketing Practices Act. However, the franchisor provided sufficient notice of the expiration through the lease agreement, various documents contained in the lease package, and information disclosed by the franchisor's territory manager. Moreover, each of the leases from the inception of the franchise relationship put the franchisee on notice of the expiration date of the underlying lease and of the franchisor's right to terminate the relationship upon the loss of the underlying leasehold estate. Accordingly, the franchisee had actual knowledge of the terms of the underlying lease and the franchisor provided sufficient information to meet the notice requirements of the federal dealer law.

**Letter Opinion**

**[In full text]**

Kentz, J.:

Gentlemen:

This matter comes before the court by way of motion filed by plaintiff Nicholas Fotinos (Fotinos) seeking an order of the court granting partial summary judgment for plaintiff on the notice issue in connection with the termination of the franchise agreement between the parties and compelling defendant Amoco Oil Co. (Amoco) to continue to supply plaintiff with gasoline at his retail service station located at the corner of Yale Avenue and Cornell Place in Hillside, New Jersey.

The material facts necessary for the resolution of plaintiff's application are not in dispute. Subsequent to the execution of the initial lease agreement dated December 15, 1978 between Amoco as lessor and Fotinos as lessee, the parties continued in their business relationship with respect to the service station premises in question by executing three subsequent leases and product supply agreements covering the total period from December 29, 1979 through

Copyright 2008 CCH Incorporated,All Rights Reserved

January 31, 1985. During the entire period of time covered by these three subsequent leases and supply agreements, Amoco continued to exercise its oneyear options on an annual basis with the owners of the realty upon which the service station premises are located and extended the underlying lease with the owners for the total period commencing February 1, 1979 through January 31, 1985. Prior to the expiration on January 30, 1982 of the November 9, 1980 lease between Amoco and Fotinos, Amoco entered into its final lease with Fotinos pertaining to the service station premises. That final lease dated November 30, 1981 which covered the period commencing January 31, 1982 and ending January 30, 1985 was prepared on November 30, 1981 along with several other documents, including a dealer supply agreement to be executed by Fotinos, and comprised the "342 Lease Package." The entire lease package was presented to Fotinos on or before December 8, 1981 by Harold J. Smith, the territory manager for Amoco. Smith reviewed the lease with Fotinos and explained the various provisions contained therein. Fotinos was advised by Smith that Amoco's underlying lease with the owners of the service station premises was expiring on January 31, 1982, that Amoco had eight oneyear options to renew the base lease each for a period of one further year, that Amoco was going to exercise its option to extend its base lease for the period commencing February 1, 1982 through January 31, 1983, that thereafter Amoco had the right but was under no obligation to further extend the base lease for additional oneyear periods at the end of each successive year but that if Amoco did not extend the base lease with the owner of the service station premises during any one of those successive years for which it held oneyear options, Amoco had the right to terminate or nonrenew the lease with Fotinos and the business relationship between the parties. In addition to the provisions of the lease dated November 30, 1981 pertaining to the expiration of Amoco's underlying lease with the owner of the property, Amoco notified Fotinos of this fact by forwarding a letter dated November 31, 1981 which letter comprised one of the documents in the lease package. The letter advised Fotinos that in accordance with the provisions of the Petroleum Marketing Practices Act (PMPA), the property being leased to him was leased to him by Amoco from the owners, that the underlying lease term in effect would expire on January 31, 1982, that the underlying lease with the property owner may not be renewed and that in the event it was not renewed, Fotinos would be given notice of this fact in a timely manner.

**[*Notice Requirement*]**

The plaintiff Fotinos alleges that Amoco did not comply with the notice requirements of the PMPA, *15 U.S.C.A. § 2802*(c)(4). Section 2802(c)(4) of the PMPA provides that loss of the right to grant possession of the premises is a valid reason for nonrenewal if the franchisee was notified in writing prior to the commencement of the term of the then existing franchise

(a)

of the duration of the underlying lease, and

(b)

of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of the term (in the case of nonrenewal).

In support of this allegation, Fotinos, relies upon Amoco's letter dated November 30, 1981 which notified Fotinos that its underlying lease with the property owner would expire on January 31, 1982 and may not be renewed. Fotinos alleges that Amoco did not comply with subsection (A) of the PMPA since the lease ran for oneyear terms expiring on January 31 of each year and could be renewed yearly until 1990. Furthermore, Fotinos submits that the current franchise agreement ran from January 31, 1982 until January 30, 1985 and that the lease underlying this franchise is really three leasesthree oneyear leases running from February 1, 1982 until January 31, 1985. Fotinos contends that Amoco's notice, however, notified him of the underlying lease for the previous franchise agreementthe 19811982 lease with the property ownerrather than the lease underlying the current franchisethe 19821983 lease with the property owner. Accordingly, Fotinos asserts that Amoco did not comply with the statute which requires that notice of the duration of the lease which underlies the franchise relationship be given prior to the commencement of the term of the then existing franchise. The

Copyright 2008 CCH Incorporated,All Rights Reserved

plaintiff takes the position that the PMPA requires strict compliance with the notice provisions and that defendant's failure to give proper notice is grounds for compelling Amoco to continue the franchise relationship and to close its new service station.

In opposition to this application, Amoco submits that under the totality of the circumstances and the undisputed facts in this case, it substantially complied with the notice provisions of the PMPA with respect to notifying Fotinos of the duration of the underlying lease. Amoco points out that although Fotinos relies upon the notice letter from Amoco to Fotinos dated November 30, 1981 which accompanied the lease, Fotinos fails to address paragraph 17 of the final lease which notified him that there remained only eight oneyear options to renew the underlying lease each for a period of one further year. It is Amoco's position that paragraph 17 of the final lease, when read in conjunction with paragraph 17 of the prior lease dated November 3, 1980, reveals one less option for Amoco to renew the underlying lease since the prior lease reveals nine oneyear options remaining while the final lease reveals eight oneyear options remaining, thereby notifying Fotinos that Amoco was extending the underlying lease for a further period of one year and thus notifying Fotinos that the duration of the underlying lease, at a minimum, would be January 31, 1983. It is argued that these facts, together with the facts pertaining to the knowledge imparted by Harold Smith to Fotinos as to the duration of the underlying lease, reveal that Fotinos had actual knowledge of the duration of the underlying lease when he entered into his final lease with Amoco dated November 30, 1981. Amoco asserts that plaintiff's contention on the notice issue is a hypertechnical argument which ignores the undisputed facts of the case. Under the totality of the circumstances, Amoco submits that Fotinos was properly notified of the duration of the underlying lease as required by the PMPA and that such notice was legally sufficient under the federal act.

**[Strict Compliance v. Flexible Approach]**

Although certain courts have held that compliance with specific notice provisions of the PMPA is a mandatory prerequisite to nonrenewal and the court has no power either to cure or to waive a notice defect [see *Blankenship v. AtlanticRichfield Co., 478 F. Supp. 1016, 1018 (D.Ore. 1979)]*, other courts have hesitated to take such a rigid approach to the PMPA's notice requirements. See *Brown v. Am. Petrofina Marketing, Inc., 555 F.Supp. 1327 (M.D.Fla. 1983)*, aff'd, *733 F.2d 906 (11th Cir. 1984)* [The court was reluctant to accept a hypertechnical argument requiring strict compliance when the franchisees had actual knowledge of the notice that was required to be given under § 2802(c)(4) and plaintiffs may not have been prejudiced as a result of the lack of such written notice. The court instead proposed that substance rather than form should control the notice issue.]. Other courts have similarly rejected strict compliance with the notice provisions of the PMPA, adopting the more flexible approach first enunciated in *Brown* by looking at the totality of the circumstances and all the facts known by the franchisee in connection with the notice given by the franchisor. See *Hooper Oil Co., Inc. v. Am. Petrofina Marketing, Inc.,* No. 831050, sip op. at 5 (5th Cir. Nov. 14, 1983) ["In determining the sufficiency of notice, courts should consider not only the reason stated in the formal notice, but all the facts about nonrenewal or termination known to the franchisee."]. See also *Perk v. Standard Oil Co., Inc.,* No. 831067 (4th Cir. Jan. 17, 1984) [The Court of Appeals rejected the plaintiff's argument that there must be strict compliance with the notice provisions and looked instead to the totality of the circumstances and the franchisee's actual knowledge.].

After reviewing the documentation submitted by the parties and after considering the oral argument on the motion for partial summary judgment, I conclude that Amoco complied with the notice requirements set forth in the PMPA. Although Amoco's letter dated November 30, 1981 may be construed as facially defective in that the date which Amoco specified as the expiration date of its underlying lease with the property owner was January 31, 1982 rather than January 31, 1983, the court is compelled to consider the past business practices and relationship between the parties which impact upon the propriety of the notice given by Amoco with respect to the duration of the underlying lease.

It is a fundamental maxim of equity that "equity looks to the substance rather than the form." *Applestein v. United Bd. & Carton Corp., 60 N.J. Super. 333* (Ch. Div.), aff'd, *33 N.J. 72 (1960)*. The application of this maxim further supports my conclusion that adequate notice was given as required by the PMPA.

Page 4

Copyright 2008 CCH Incorporated, All Rights Reserved

Furthermore, the record reveals that although Amoco's letter dated November 30, 1981 did not strictly comply with the notice requirements of the PMPA, Amoco did provide sufficient notice of the expiration of the underlying lease through the lease agreement and the various collateral documents contained in the final lease package as well as through the information disclosed to Fotinos by Amoco's territory manager. Moreover, each of the leases from the inception of and through the entire business relationship between the parties put Fotinos on notice of the date of the expiration of Amoco's underlying lease with the available options which remained but that if Amoco's underlying lease terminated or was not renewed during the term of or at the expiration of the lease, Amoco had the right to terminate or nonrenew the lease with Fotinos and any applicable franchise relationship coincidentally with Amoco's loss of its underlying leasehold estate. Accordingly, I find that Fotinos had actual knowledge of the terms of the underlying lease and that Amoco provided sufficient information to Fotinos to meet the notice requirements of the PMPA.

For the foregoing reasons, plaintiff's motion for partial summary judgment compelling defendant to continue to supply plaintiff with gasoline and to close its new service station facility is denied. In accordance with this ruling, all preliminary restraints are dissolved.

Please submit an order in accordance herewith.

**UPDATE-DATE:** April 04, 2008

220

# EXHIBIT 29

LEXSTAT BUS. FRANCHISE GUIDE (CCH) 9264

Copyright 2008 CCH Incorporated, All Rights Reserved
CCH Business Franchise Guide

Cases, Rulings, New Developments
U.S. Bankruptcy Court, East. Dist. La.

*Business Franchise Guide (CCH) P 9264*

September 19, 1988 Dated

**In re Harold D. Smith and Donna M. Smith, d/b/a Sam's Service Center.**

U.S. Bankruptcy Court, District of Massachusetts. Chapter 11; Case No. 88-11045-HL. Dated September 19, 1988

**Gasoline Franchise Validly Terminated Prior to Franchisee's Bankruptcy**

**Petroleum Marketing Practices Act**

**Relationship/Termination -- Notice of Termination -- Refusal to Accept Delivery of Notice -- Posting v. Receipt -- Assignment During Notice Period. --**

A gasoline franchisee's refusal to accept delivery of a notice of termination sent by its franchisor did not render the notice ineffective. Under Massachusetts law, one who avoids notice is deemed to have knowledge of the notice. In addition, Section 104(c)(2) of the Petroleum Marketing Practices Act requires only that a notice of termination be posted by certified mail; it does not require receipt of the notice. A contention that the franchise agreement was assignable to a third party during the notice period was rejected. Once a notice of termination is posted, the franchise agreement is deemed terminated. The 90-day notice period is not intended to be a cure period; it is intended to provide an opportunity for the franchisee to contest the validity of a termination.

**Relationship/Termination -- Cause for Termination -- Closing Franchise for Seven Consecutive Days -- Reason Beyond Franchisee's Control -- Continued Operation as Repair Shop. --**

A gasoline franchisee's closing of its service station for more than seven consecutive days constituted good cause for termination within Section 102(c) (9) of the Petroleum Marketing Practices Act. The franchisee correctly maintained that closing for more than seven days is not a *per se* ground for termination. However, such closing is excused only if it was caused by a reason beyond the franchisee's control, such as a fire. The lack of funds necessary to continue operation did not qualify as a reason beyond the franchisee's control. A contention that the franchise was not closed because it continued to operate as a repair shop was without merit. The primary mission of the franchise was to sell gasoline. The franchise agreement required the franchisee to sell gasoline and nothing else. Thus, failure to sell gasoline was, in effect, closing the franchise.

**Bankruptcy Law -- Assumption, Assignment of Franchise Agreement -- Termination Prior to Bankruptcy -- Filing for Bankruptcy During Notice Period. --**

A gasoline franchisee could not assume and assign a franchise agreement in bankruptcy, since the franchisee received notice of termination prior to filing for bankruptcy. The Petroleum Marketing Practices Act provides that once a notice of termination is posted by certified mail, the franchise agreement is deemed terminated. Neither the Act nor the agreement allowed the franchisee a cure period. A franchisee's subsequent filing for bankruptcy does not revive the

Copyright 2008 CCH Incorporated, All Rights Reserved

franchise agreement even if the gasoline station continues to operate. Since the agreement was terminated prior to bankruptcy, it was not part of the bankruptcy estate and could not be assumed or assigned by the franchisee.

## Memorandum on Termination of Gas Station Lease

**[In full text]**

LAVIEN, BANKR. J.: The matters before the Court are the debtors' motions to assume a franchise and lease and assign the same. On March 16, 1988, the debtors entered into a franchise and lease of an Exxon gasoline station. Within two months, the debtors lacked the funds to purchase fuel for resale. On May 12, 1988, an Exxon sales representative, Mr. Schnakenberg, visited the service station and found the fuel pump islands were blocked by a tow truck, as well as bearing signs stating "out of gas." At that time Mr. Schnakenberg took meter and tank readings. Also, Mr. Schnakenberg informed the debtors and debtors' counsel that the failure to sell fuel constituted sufficient cause to terminate the lease.

Eight days later, on May 20, 1988, the representative of Exxon again visited the gasoline station. He found the islands still had "out of gas" signs and were blocked by a tow truck. At that time, Mr. Smith was again warned that this was grounds for termination of his lease and franchise.

The debtors executed an agreement to assign their lease to Howard A. Rhone, Jr. on May 21, 1988. Exxon then made another visit on May 26 to establish that no gasoline was being sold. The next day, Exxon notified the debtors' counsel in writing that Exxon would not consent to the assignment to Mr. Rhone. In addition, Exxon noted that the Smiths had breached their lease and sales agreement and that Exxon had the right to terminate the lease and sales agreement and intended to do so. On June 1, 1988, Exxon posted by certified mail that it was terminating the lease pursuant to paragraph 14 of the retail service station lease and paragraph 21 of the sales agreement, as of September 1, 1988. The debtor, on June 10, 1988, filed for the protection under Chapter 11 of the Bankruptcy Code. On August 9, 1988, the debtor filed the motions to assume and assign the lease in question.

The Court held a hearing on August 25, 1988. The right of the Exxon Corporation to terminate the lease under its terms and the Petroleum Marketing Practices Act ("PMPA") were dealt with at the hearing. *15 U.S.C. §§ 2801*-2806.

**[*Notice of Termination*]**

The debtors contended at the hearing that they had not been given sufficient notice pursuant to *15 U.S.C. § 2804* because they refused to accept delivery of the certified letter from Exxon. That argument has no merit under Massachusetts law. One who avoids notice is deemed to have knowledge of the notice. *Durkin v. Siegal, 340 Mass. 445 (1960); Liberty Mutual Insurance Company v. Wolfe, 7 Mass. App. 263 (1979).* In addition, PMPA only requires that a notice of termination is posted by certified mail and does not require receipt of it. *Moody v. Amoco Oil Co., 734 F.2d. 1200, 1212 (7th Cir. 1983); 15 U.S.C. § 2804*(c)(2). The Court, therefore, found that the debtors had notice of the termination as of June 1, 1988.

The debtors advanced as an alternative argument that if notice was deemed to be given as of June 1, 1988, the lease did not terminate until September 1, 1988 and, therefore, the lease is assignable. PMPA requires that a franchisee be given 90-day notice of termination. *15 U.S.C. § 2804*(a). Exxon has rebutted this argument by showing that once a notice of termination is posted, the contract is deemed terminated and that the subsequent filing of a bacnkruptcy petition by the franchisee does not revive a terminated service station franchise agreement, even if the gasoline station is still operating. The 90-day notice is not intended as a cure period but rather as providing an opportunity to contest the validity of the termination. *In re Anne Cara Oil Co., Inc., 32 B.R. 643 (Bankr. D. Mass. 1983); In re Joyner, 46 B.R. 130 (Bankr. M.D. Ga. 1985).* The filing of a bankruptcy petition, however, stays the right of the franchisor to mail the notice of termination if, unlike this case, it has not been mailed prepetition. *Joyner, 46 B.R. 130.*

Copyright 2008 CCH Incorporated, All Rights Reserved

**[*Cause for Termination*]**

The debtors contend that Exxon's termination of the franchise violates PMPA; however, there is no merit to that contention. A franchisor can terminate a service station franchise if it is closed for seven consecutive days. *15 U.S.C. § 2802*(c)(9). The debtors correctly argue that closing a service station for more than seven days is not *per se* grounds for terminating the franchise. *Sun Refining & Marketing Company v. Rago, 741 F.2d 670 (3rd Cir. 1984). Rago,* however, only excuses a seven day closing if the closing was for a reason beyond the service station control, such as a fire. *Id.* Lack of funds is not in legal contemplation a reason beyond their control. Consequently, the Court has no choice but to find the franchise could be terminated for failure to operate. Once a franchise is terminated due to a failure to operate, the grounds for termination cannot be cured. *Wisser Co. v. Mobil Oil Corp., 730 F.2d 54 (2d Cir. 1984).*

The debtors' final argument that the service station was not closed because it has been operating as a repair shop has no merit. Both parties knew that the primary mission of this gas station was to sell gas. The intent of both parties that the primary obligation of this service station was to sell fuel is evidenced by the March 16, 1988 sales agreement that required the debtors to sell fuel and nothing else. The debtors' failure to sell gas was, in effect, closing the gas station.

At the August 25, 1988 hearing, the Court allowed Exxon to file a memorandum explaining why a vague paragraph in the sales agreement did not grant the debtors a right to cure a ground for franchise termination. Exxon has filed a well researched brief that attempts to explain away the right to cure. The debtors have filed a response. While the issues raised are interesting, the matter is not before the Court. The debtors are only seeking to assume the retail service station lease in which paragraph 14 clearly provides the lease can be terminated for a failure to operate for seven days and does not provide an opportunity to cure. The debtor is not seeking to assume the sales agreement, but even if it were, without the lease the sales agreement would be meaningless.

The Court, for reasons provided herein, denies the debtors' motions to assume and assign the lease which had been legally terminated pre-filing in accordance with both its terms and the PMPA provisions.

**UPDATE-DATE:** June 26, 2008

# EXHIBIT 30

LEXSEE 1989 U.S. DIST LEXIS 15266

**CHARLIE JACKSON, PLAINTIFF v. KERR-McGEE REFINING CORPORATION, a Delaware Corporation, DEFENDANT; MANNING CURETON, JAMES CURETON, and THEDREL C. CURETON, PLAINTIFFS v. KERR-McGEE REFINING CORPORATION, FIRST NATIONAL BANK OF EASTERN ARKANSAS, and CHARLIE JACKSON, DEFENDANTS**

**Case No. H-C-88-45, H-C-87-78**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS, EASTERN DIVISION**

*1989 U.S. Dist. LEXIS 15266*

**May 8, 1989, Decided; May 9, 1989, Filed; May 10, 1989, Entered**

**COUNSEL:** [*1] FOR: Manning Cureton, et al: W. Frank Morledge, Forrest City, Arkansas.

FOR: Charlie Jackson: R. Alan Cline, Michael Easley, Forrest City, Arkansas.

FOR: Kerr-McGee Refining Corporation: Peter G. Kumpe, Leon Holmes, Steven W. Quattlebaum Williams & Anderson, Little Rock, Arkansas and Carolyn G. Hill, Kerr-McGee Corporation, Oklahoma City, Oklahoma.

**OPINION BY:** YOUNG

**OPINION**

*ORDER*

H. DAVID YOUNG, UNITED STATES MAGISTRATE

Now before the Court are three motions filed by Kerr-McGee

Refining Corporation (Kerr-McGee) in this consolidated case. Kerr-McGee has filed a motion for summary judgment pursuant to *Fed. R. Civ. P. Rule 56* with respect to Charlie Jackson. Kerr-McGee has also filed a motion for summary judgment against Manning Cureton, James Cureton, and Thedrel C. Cureton (the Curetons).

*Federal Rule of Civil Procedure 56* provides for the entry of summary judgment only in those circumstances where there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.

This may occur when a plaintiff cannot demonstrate that a genuine fact issue exists. But the party opposing the summary judgment must be given the benefit of all favorable factual inferences, and [*2] summary judgment cannot be granted when the non-movant shows that an alleged undisputed fact actually presents a triable issue.

*Holloway v. Lockhart, et al., 813 F.2d 874, 878 (8th Cir. 1987)* (citations omitted).

*FACTUAL BACKGROUND*

Jackson and Kerr-McGee were operating under a franchise relationship as defined in the Petroleum Marketing Practices Act, *15 U.S.C. § 2801 et seq.* (PMPA), at all relevant times. Jackson had been a Kerr-McGee franchisee for more than ten years prior to the events leading to these consolidated cases.

On September 30, 1986, Jackson and Kerr-McGee executed a service station lease whereby Jackson leased the service station located at 1506 North Washington, Forrest City, Arkansas, from Kerr-McGee for a term of three years. Paragraph 16 of the lease provided that Jackson was not to assign the lease without the written consent of Kerr-McGee.

1989 U.S. Dist. LEXIS 15266, *2

Kerr-McGee and Jackson also agreed that Kerr-McGee would supply Jackson with petroleum products on a credit basis. As security for this credit arrangement, Jackson obtained a $ 25,000.00 letter of credit in favor of Kerr-McGee.

On November 21, 1986, Jackson subleased the service station to Manning Cureton, with [*3] the sublease to be effective as of September 1, 1986. Kerr-McGee did not consent in writing to this sublease agreement.

On November 21, 1986, James and Thedrel C. Cureton, Manning Cureton's parents, executed a note in the amount of $ 25,000.00 in favor of Jackson, with this note to be drawn upon to reimburse Jackson for amounts debited against the letter of credit Jackson had executed in favor of Kerr-McGee. The note was secured by a deed of trust executed by James and Thedrel C. Cureton covering certain real property located in St. Francis County, Arkansas.

Manning Cureton contends that Kerr-McGee was aware of the sublease agreement he entered with Jackson and that Kerr-McGee had no objections to such an arrangement. Therefore, according to Manning Cureton, he was a franchisee of Kerr-McGee as defined in the PMPA. Kerr-McGee disputes Manning Cureton on this point, asserting that no contractual or other relationship existed between it and Manning Cureton. For the purposes of this Order, we will accord Manning Cureton the benefit of this factual dispute and assume that he was a franchisee of Kerr-McGee within the meaning of the PMPA.

After the sublease between Jackson and Manning Cureton [*4] was executed, invoices for petroleum products continued to be sent to Jackson, who saw to paying the bills. A normal feature of the invoices was a charge for certain taxes. Through Kerr-McGee's error, charges for taxes were omitted from invoices in late 1986 and early 1987. Jackson was aware of the error in billing from its first occurrence. The error in billing was not corrected quickly. When the situation was finally sorted through, Kerr-McGee requested over $ 17,000.00 owed for taxes which had accrued.

Despite his awareness of the billing error, Jackson did not set aside sufficient funds to pay the taxes as they accrued. Neither did Manning Cureton As a result, Jackson was unable to pay the tax bill of over $

17,000.00, and he requested that Kerr-McGee permit a payout of the tax bill over time. The parties do not dispute that the taxes were owed to Kerr-McGee. Kerr-McGee declined to permit a payout plan and, when payment was not forthcoming, Kerr-McGee made demand to collect the overdue amount by drawing on the letter of credit Kerr-McGee also revoked Jackson's credit privileges with Kerr-McGee, at first requiring on June 16, 1987, that Jackson pay 100 percent cash on delivery [*5] for petroleum products and then, on June 18, 1987, requiring 99 percent cash on delivery for petroleum products purchased by Jackson.

The Curetons filed suit in Arkansas state court against Kerr-McGee, Jackson, and the bank which had issued the letter of credit (First National Bank of Eastern Arkansas), claiming that Kerr-McGee's failure to bill Jackson and Kerr-McGee's demand on the letter of credit would result, in turn, in Jackson making demand on the note and foreclosing on the deed of trust executed by James and Thedrel C. Cureton. A temporary restraining order was obtained in state court, but subsequently was dissolved. Thereafter, the letter of credit was honored to the extent of the indebtedness owed by Jackson to Kerr-McGee.

Jackson did not purchase petroleum products from Kerr-McGee on the 99 percent cash basis available after June 18, 1987.

On July 27, 1987, Kerr-McGee sent, by certified mail, a notice of termination of franchise relationship to Jackson. The reason for the termination was that the franchisee failed to operate the service station for seven consecutive days (July 17-24, 1987). The parties agree that the service station was closed on the date in question.

### [*6] CASE BACKGROUND

The action brought by the Curetons in state court and briefly described *supra* was removed to United States District Court by Kerr-McGee on May 11, 1988, and has proceeded as Case No. H-C-88-45.

On September 9, 1987, Jackson filed suit in Arkansas state court, naming Kerr-McGee and Manning Cureton as defendants. That action was removed to United States District Court by Kerr-McGee on October 13, 1987, and has proceeded as Case No. H-C-87-78.

On the motion of Kerr-McGee, Case Nos H-C-88-45

1989 U.S. Dist. LEXIS 15266, *6

and H-C-87-78 were consolidated on March 9, 1989, with H-C-87-78, the older case, designated as the lead case.

The motion for summary judgment of Kerr-McGee versus the Curetons and the motion for summary judgment of Kerr-McGee versus Jackson were filed shortly after the consolidation of the cases.

## LEGAL ISSUES AND DISCUSSION

Given our previous assumption that Manning Cureton was a franchisee within the meaning of the PMPA, it follows that the legal issues in this case are governed by the PMPA provisions. Kerr-McGee contends that it has complied with the PMPA requirements. Jackson and Cureton allege that Kerr-McGee has failed to comply with both the letter and the spirit [*7] of the PMPA.

We first consider the pertinent portions of the PMPA. The PMPA provides that the franchise relationship existing in this case may be terminated upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence." *15 U.S.C. § 2802(b)(2)(C).*

Specifically included within the definition of a relevant event which justifies termination of the franchise relationship is the "failure by the franchisee to operate the marketing premises for 7 consecutive days." *15 U.S.C. § 2802(c)(9)(A).*

The term, "failure," in *15 U.S.C. § 2802(c)(9)*)A) does not include any failure for a "cause beyond the reasonable control of the franchisee. *15 U.S.C. § 2801(1)(B)(13)(b)*

Prior to termination, the franchisor must comply with certain notice requirements found at *15 U.S.C. § 2804.* These requirements include that notification:

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; [*8] and

(3) shall contain--

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d). [*15 U.S.C. § 2804(d)*].

*15 U.S.C. § 2804(c).* Jackson admits that Kerr-McGee complied with the notice requirements of the, PMPA. [1]

> 1    The Curetons, or Manning Cureton individually, have not claimed that Kerr-McGee failed to comply with the notice requirements of the PMPA as these requirements relate to them.

As mentioned previously, Kerr-McGee asserts full compliance with the PMPA. Jackson and the Curetons allege failure of Kerr-McGee to comply with the letter of the PMPA in that the closing was necessitated by a "cause beyond the reasonable control" of Charlie Jackson and therefore unjustified under the statute. Further, Jackson and the Curetons allege that Kerr-McGee departed from the spirit of the PMPA by acting in bad faith.

The argument that the closing was the result of a "cause beyond the reasonable control" of Charlie Jackson is stated succinctly in this excerpt from Jackson's brief in [*9] support of his response to Kerr-McGee's motion for summary judgment:

> Charlie Jackson was forced to close his station because Kerr-McGee arbitrarily changed its longstanding policy with him and required Charlie Jackson to purchase gasoline with cash instead of allowing Charlie Jackson to use credit as had always been the practice [citation to deposition omitted]. Charlie Jackson contends that Kerr-McGee did this in order to force him out of business.

Even giving Jackson the benefit of all favorable factual inferences, we find his argument concerning a cause beyond his reasonable control to be without merit. Jackson's characterization of Kerr-McGee's change from credit to cash billing as "arbitrary" is without support in the record before the Court. At the outset of the parties' credit agreement for the purchase of petroleum products,

Jackson and Kerr-McGee agreed that a $ 25,000.00 letter of credit would stand as security. There are no allegations that this agreement was anything other than an agreement negotiated at arms length. Jackson does not contend he was coerced into this agreement. The record shows that on or around June 16, 1987, Kerr-McGee changed the credit arrangement [*10] with Mr. Jackson. This was only after Kerr-McGee had not been paid the money due it for taxes and as Kerr-McGee was pursuing reimbursement for the more than $ 17,000.00 by drawing upon the letter of credit. When well over half the amount available under the letter of credit had been drawn, Kerr-McGee became more vulnerable to nonpayment from Jackson, and its decision to require either 100 percent or 99 percent cash was not arbitrary. The requirement that cash on delivery be paid violated no contractual provision between the parties and violated no statutory provisions within the PMPA.

Just as there is no evidence in the record that the decision to change the credit relationship between Kerr-McGee and Jackson was arbitrary, there is likewise no factual basis to support the contention that Kerr-McGee changed the credit relationship to force Jackson out of business. The record supports the conclusion that Kerr-McGee responded to the failure of Jackson to pay the taxes which were admittedly owed. To find that Kerr-McGee acted out of some malevolence toward Jackson would require us to engage in speculation. There are no facts to support the conclusions urged by Jackson and the Curetons [*11] with respect to Kerr-McGee's compliance with the PMPA. Without such facts, a reasonable juror could not find against Kerr-McGee.

Jackson and the Curetons point to the billing errors of Kerr-McGee with respect to the taxes and allege that these errors are evidence of Kerr-McGee's bad faith, which constitutes an implied duty under the PMPA. Jackson cites the Court to *Marks v. Shell Oil Company, 643 F. Supp. 1050 (1986)*, and *Roberts v. Amoco Oil Company, 740 F.2d 602 (8th Cir. 1984)*, to support their argument that good-faith dealing is implied under the PMPA. We need not address the question of whether good-faith dealing is a requirement under the statute, since we find no evidence that Kerr-McGee dealt other than in good faith. Kerr-McGee does not dispute that billing errors occurred. However, Jackson was aware of the billing errors from the initial error. Jackson was equally aware that the taxes were accruing and would be due at some point, yet no funds were set aside by Jackson or Manning Cureton to provide for the tax bill which was certain to come. The failure of Jackson and/or Manning Cureton to accrue the funds to pay the taxes which they knew were due to Kerr-McGee cannot [*12] be characterized as an event beyond the control of Jackson and Manning Cureton. Setting aside sufficient funds for payment of these taxes was an event completely within their control, particularly when they were aware of the billing defect and the persisting problems in correcting the tax bill. Further, Kerr-McGee's negligence in billing the account properly is not evidence of its bad faith, when Jackson and Manning Cureton were aware of the problems. A reasonable response from Jackson and Manning Cureton to the billing problems would have been to set aside the funds for the taxes which were accruing until the correct bill was sent by Kerr-McGee. Had they so acted, they would have benefited by earning interest for a few months on the tax money which rightfully was owed to Kerr-McGee. However, Jackson and Manning Cureton chose not to set aside funds to pay the inevitable tax bill and, thus, were unable to make the requested payment of over $ 17,000.00. While Jackson and Manning Cureton maintain that Kerr-McGee acted in bad faith in denying their request to pay out the money over time, Kerr-McGee was under no contractual duty to make such a concession. When Jackson and Manning Cureton [*13] failed to make the payment as requested, Kerr-McGee pursued the security of its letter of credit and, as a result of its lessened security position, changed the terms of its credit relationship with Jackson. We find no evidence of bad-faith dealings on the part of Kerr-McGee, which was within its rights under the terms of the agreement to demand payment of the taxes in full and to require cash on delivery for the petroleum products when the tax payment was not forthcoming.

There are no genuine issues of fact with respect to either of the pending motions for summary judgment. As a matter of law, Kerr-McGee is entitled to judgment in its favor against both Charlie Jackson and the Curetons.

Our ruling in Kerr-McGee's favor on its motions for summary judgment renders moot its motion to strike the claim for punitive damages. The granting of Kerr-McGee's motions for summary judgment does not conclude this case. James and Thedrel C. Cureton seek to recover approximately $ 19,000.00 paid to Jackson on Manning Cureton's behalf pursuant to an escrow agreement, and this issue is yet to be resolved.

1989 U.S. Dist. LEXIS 15266, *13

In summary, the motion for summary judgment of Kerr-McGee against Charlie Jackson is granted; [*14] the motion for summary judgment of Kerr-McGee against the Curetons is granted; and the motion of Kerr-McGee to strike the claims for punitive damages is moot in light of the disposition of the motions for summary judgment.

IT IS SO ORDERED this 8th day of May, 1989.

# EXHIBIT 31

Westlaw.

2004 WL 1305314                                                                    Page 1
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

**H**Mobil Oil Guam, Inc. v. Young Ha Lee
Guam Terr.,2004.

Supreme Court of the Territory of Guam.
MOBIL OIL GUAM, INC., Plaintiff-Appellee,
v.
YOUNG HA LEE, Defendant-Appellant.
**No. CVA02-007.**

Submitted July 23, 2003.
Filed June 10, 2004.

Petition for Rehearing. Superior Court Case No.
CV0460-00.

Thomas C. Moody, Esq., Klemm, Blair, Sterling &
Johnson, P.C., Hagåtña, GU, for plaintiff-appellee.
John F. Tarantino, Esq., Law Office of John
Tarantino, Tamuning, GU, for defendant-appellant.

Before F. PHILIP CARBULLIDO, Chief Justice;
FRANCES M. TYDINGCO-GATEWOOD,
Associate Justice; RICHARD H. BENSON, Justice
Pro Tempore.

**OPINION**

CARBULLIDO, C.J.
*1 [1] The court's Opinion in this matter, 2003 Guam
15, was filed on July 9, 2003. Defendant-Appellant
Young Ha Lee ("Lee") filed a Petition for Rehearing
on July 23, 2003. Plaintiff-Appellee Mobil Oil Guam,
Inc. ("Mobil") filed a Petition for Rehearing on July
23, 2003. Lee's Petition for Rehearing was denied by
this court on November 19, 2003. After considering
Lee's Answer to Mobil's Petition for Rehearing, we
hereby grant Mobil's Petition, vacate our Opinion,
2003 Guam 15, and issue this Opinion.

[2] This case arises out of Lee's alleged breach of a
Petroleum Marketing Practices Act ("PMPA") Motor
Fuels Franchise Agreement ("Franchise
Agreement"). On Mobil's Motion for Summary
Judgment, the trial court held that Lee breached the
Franchise Agreement and that Mobil's termination of
the Franchise Agreement did not violate the
provisions of the PMPA. We affirm the decision of

the trial court.

**I.**

[3] On September 1, 1998, Mobil and Lee executed a
PMPA Franchise Agreement, wherein Lee was
granted the right to use and occupy the Mangilao
Mobil Station in connection with the sale and
distribution of Mobil brand fuels for a period of eight
years. In return for the franchise rights, Lee provided
Mobil with a $260,000 non-refundable conversion
fee, a $30,000 security deposit, and an authorization
to make direct debit draws on Lee's First Hawaiian
Bank ("FHB") business banking account.

[4] For twelve months, Lee operated his service
station and received monthly account statements
from Mobil, which indicated that Mobil was being
paid timely for its fuel sales. However, Lee's credit
posture changed after Lee's wife triggered an
investigation into their account when she inquired
about the possibility that Mobil was double charging
on some invoices. The investigation led to the
discovery that some of Mobil's direct debit draws
from Lee's FHB account were returned for non-
sufficient funds, which meant that Mobil's monthly
account statements did not reconcile with the parties'
respective monthly bank statements.

[5] In a letter dated September 16, 1999, Serge Alves,
a Mobil employee, informed Lee's wife of the
problem. On October 4, 1999, Leo A. Manlapaz
("Manlapaz"), Mobil Fuels Manager, contacted Lee
for a meeting, in which Lee was "provided a listing
of all the returned direct debits amounting to
$270,198.60" ("NSF List") and was informed that his
account would be switched to cash on delivery basis.
When Lee was asked to review and verify each item
on the NSF List, Lee could not readily do so and
"claimed that he had no prior knowledge of the
returned direct debits and it was his wife who was
handling all bank deposits."Appellant's Excerpts of
Record, vol. II, p. 239 (Manlapaz' Decl.). On October
20, 1999, after several failed attempts to follow-up on
the status of Lee's review of the listing, Manlapaz
called Lee, wherein "[Lee] confirmed the accuracy of
the NSF listing that was provided to him" and
"promised to submit a written payment plan by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1305314
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

October 21, 1999."Appellant's Excerpts of Record, vol. II, p. 240 (Manlapaz' Decl.).

*2 [6] Lee did not submit a payment plan by his self-imposed deadline of October 21, 1999. Instead, on November 1, 1999, Lee personally delivered a letter to Manlapaz, which apologized for the overdue payments. The letter also contained a proposed payment plan, wherein Lee would "pay at least $50,000 within the next 2 weeks."Appellant's Excerpts of Record, vol. II, p. 354 (Lee's Ltr.). On November 8, 1999, Mobil informed Lee that his proposed payment plan outlined in his November 1, 1999 letter was "unacceptable as it [did] not meet Mobil's requirements on the timeliness of the full payment of [Lee's] delinquent account."Appellant's Excerpts of Record, vol. II, p. 355 (Manlapaz' Ltr.). Mobil also warned Lee that the overdue payments "constitute[d] a serious violation of Article II(C) of [the] Franchise Agreement."Excerpts of Record, vol. II, p. 355 (Manlapaz' Ltr.).

[7] On November 26, 1999, Mobil again reminded Lee of his continued violation of Article II(C) of the Franchise Agreement. Mobil further notified Lee that in order to cure his default, he would have to make a $155,000.00 payment by the end of November 1999 and pay the remaining balance by December 31, 1999. In response to Mobil's demand, on November 29, 1999, Lee's attorney informed Mobil of the difficulty in making the $155,000 payment within four days. The attorney further expressed that, "Mr. Lee, of course, will make the payments, and he does not dispute the debt at this time, but he does need some additional time in which to make this overdue payment."Appellant's Excerpts of Record, vol. II, p. 358 (Teker's Ltr.).

[8] In light of Lee's request for additional time to make the payments, on December 1, 1999, Mobil informed Lee that the $155,000.00 payment deadline would be extended to December 9, 1999. Lee did not meet the December 9 deadline. On December 15, 1999, Mobil sent Lee a "Final Warning" letter that again reminded Lee of his continued default. Three days later, on December 18, 1999, Lee outlined another proposed payment plan.

[9] On December 22, 1999, Mobil formally declined Lee's latest proposed payment plan and counter-offered with another plan. Under the plan, Lee was to

sign a promissory note and agree to pay $50,000 per month with interest at 15% per annum. The promissory note was to be secured by a mortgage on some of Lee's property. Mobil noted that Lee's acceptance of the plan would be evidenced by either first payment of the $50,000 by December 28, 1999 or the finalization of certain documents (such as appraisal papers) in preparation for the execution of the promissory note. Lee failed to accept Mobil's payment plan, and on December 29, 1999, Mobil sent Lee a "Notice of Termination" letter ("December 29th Notice of Termination"), which notified Lee that the Franchise Agreement would be terminated on January 16, 2000.

[10] On January 13, 2000, Lee's attorney informed Mobil that Lee was able to sell one of his properties and therefore, "[would] be able to deliver a check in the amount of Eighty Thousand Dollars" to Mobil, which was to be applied on the outstanding account. Appellant's Excerpts of Record, vol. I, p. 162 (Teker's Ltr.). The letter also noted other properties that Lee was trying to sell and requested "that Mobil continue its practice of withholding" $9,000.00 to $10,000.00 monthly from Lee's "customers' credit card charges to apply on the outstanding indebtedness."Appellant's Excerpts of Record, vol. I, p. 162 (Teker's Ltr.).

*3 [11] Despite Lee's offer, on January 16, 2000, Mobil effectively terminated the Franchise Agreement and took control of the Mangilao Mobil Station. On January 26, 2000, Mobil informed Lee's attorney that Lee's offer (expressed during counsels' telephone conversation on January 24, 2000) of a $100,000.00 check payment and an execution of a promissory note "for the balance due providing for $10,000.00 monthly payments until this account is paid in full" was rejected. Appellant's Excerpts of Record, vol. I, p. 167 (Johnson's Ltr.). The letter also outlined Lee's balance of $199,463.22 after Mobil subtracted the value of the station's inventory.

[12] On March 20, 2000, Mobil filed a in the Superior Court, alleging breach of contract and praying for Lee's payment of $192,465.72. On April 24, 2000, Lee filed an Answer and a Counterclaim alleging that Mobil's termination and termination notice violated the provisions of the PMPA.

[13] On July 20, 2000, Mobil sent Lee a "Supplemental Notice of Termination." Appellant's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1305314
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

Excerpts of Record, vol. II, p. 380 (Glath's Ltr.). Although "Mobil maintain[ed] that the notice of termination was sufficient as a matter of law and that termination of your franchise, Franchise Agreement and franchise relationship was legal and proper as January 16, 2000," the supplemental notice provided that if "the Superior Court of Guam ... determines that you were entitled to a longer notice period than was provided by Mobil's December 29, 1999 notice of termination, this letter shall serve as a supplemental notice of termination."Appellant's Excerpts of Record, vol. II, p. 380 (Glath's Ltr.).

[14] On November 16, 2000, Mobil filed a motion for partial summary judgment arguing that Lee breached the contract, and, that Mobil's termination of the Franchise Agreement and notice of termination did not violate the provisions of the PMPA.

[15] On December 4, 2001, the trial court issued a decision and order granting partial summary judgment and holding that Lee breached the Franchise Agreement and that Mobil complied with the PMPA. Appellant's Excerpts of Record, vol. I, p. 51 (Decision and Order). However, the trial court found that there was a factual question regarding "the amount due in excess of $164,922.51."Appellant's Excerpts of Record, vol. I, p. 47 (Decision and Order). The trial court also dismissed Lee's counterclaim "for attorney fees and exemplary damages."Appellant's Excerpts of Record, vol. I, p. 51 (Decision and Order). Lee appealed.

## II.

[16] This court has jurisdiction over this appeal from a final judgment pursuant to Title 7 GCA §§ 3107 (as amended by P.L. No. 27-31, Oct. 31, 2003), 3108(a) (1994).

[17] We review the trial court's grant of a summary judgment de novo. See Amsden v. Yamon, 1999 Guam 14, ¶ 7 (citations omitted). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Guam R. Civ. P. 56(c); Amsden, 1999 Guam 14 at ¶ 7. We similarly review contract construction de novo. Brown v. Dillingham Const. Pacific Basin Ltd.,

2003 Guam 2,¶ 6. "In interpreting a contract, the language governs if clear and explicit and not involving absurdity."Ronquillo v. Korea Auto., Fire, & Marine Ins. Co., 2001 Guam 25, ¶ 10 (citing Title 18 GCA § 87104 (1992)."Issues of statutory construction and jurisdiction are [also] reviewed de novo." Taijeron v. Kim, 1999 Guam 16, ¶ 9 (citing People v. Quichocho, 1997 Guam 13, ¶ 3).

## III.

*4 [18] On appeal, Lee asserts that the trial court erred in granting Mobil's summary judgment motion on the issues of whether he breached the Franchise Agreement, and whether Mobil's termination of the Franchise Agreement and notice of the termination complied with the provisions of the PMPA.

### A. Breach of the Franchise Agreement

[19] Lee avers three factual issues to support his contention that the trial court erred in granting summary judgment on the breach of contract issue: (1) non-delivery of fuel, (2) amount of damages, and, (3) equitable estoppel.

### 1. Non-Delivery of Fuel

[20] Lee first argues that "there are issues of material fact in dispute of whether good[s] for which Mobil is seeking payment were actually delivered."Appellant's Opening Brief, p. 11. Although Lee correctly maintains that "evidence rais[ing] a disputed issue of material fact as to whether the goods ... were actually delivered" forecloses summary judgment, Mountain Bound, Inc. v. Alliant FoodService, Inc., 530 S.E.2d 272, 274 (Ga.Ct.App .2000) (citation omitted), Lee has not proffered any material evidence that disputes Mobil's actual delivery of the fuels.

[21] The gravamen of Lee's allegation of non-delivery of fuel is that the documents accompanying Mobil's NSF List are computer-generated and contain no signatures to prove receipt of the deliveries. We find Lee's allegation unpersuasive. The NSF List contains twelve entries, denoting the dates and the amounts of the returned direct debits from Lee's account. Accompanying the NSF List were sets of the following documents: (1) summary statements, which contain various invoice numbers to account for the

2004 WL 1305314
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

Page 4

direct debit entries that were allegedly returned for non-sufficient funds (Appellant's Excerpts of Record, vol. II, pp. 317, 323-324, 333, 336, 338, 340, 341, 344, 346, 348, 350, 352), and, (2) the duplicate sales invoices, which match the invoice numbers noted on the summary statement (Appellant's Excerpts of Record, vol. II, pp. 318-322, 325-332, 334, 337-339, 342-343, 345, 347, 349, 351, 353). While we agree with Lee's observation that the summary statements were most likely computer-generated and printed around November as noted on the bottom of each summary statement, we disagree with Lee's contention that the sales invoices are not valid duplicates of the original invoices. Each of the sales invoices contains various order numbers and is dated from September 29, 1998 through June 3, 1999. Unless Lee "submit[s] evidentiary facts or materials, by affidavit or otherwise" to challenge the validity of the duplicate sales invoices, Lee is unable to support his assertion that Mobil did not make actual delivery of the items it claims it did. *See Tobron Office Furniture Corp. v. King World Prods., Inc.,* 555 N.Y.S.2d 315, 316 (N.Y.App.Div.1990) (citations omitted).

[22] Moreover, we find especially significant the fact that Lee's own "review [ ][of] the documentation relative to the deliveries of fuel Mobil claims it delivered to the Mangilao Mobil gas station during the time at issue" (in preparation for trial) resulted in the discovery of only three challenged invoices that are not dispositive in this appeal. Appellant's Excerpts of Record, vol. I, pp. 62-64 (Lee's Decl.). Consequently, because Lee has not produced evidence challenging the invoices that are part of the appeal, Lee's conclusory assertions that Mobil did not make the actual deliveries of fuel are insufficient to defeat summary judgment. *See Hartz Mountain Corp. v. Allou Distribs., Inc.,* 570 N.Y.S.2d 66, 67 (N.Y.App.Div.1991); *Tobron Office Furniture Corp.,* 555 N.Y.S.2d at 316 (noting that "[t]he failure to sufficiently demonstrate a material issue of fact requiring trial entitles plaintiff to an expedited determination of its claim for payment as to that merchandise actually delivered.").

**2. Total Amount of Damages**

***5** [23] Lee next challenges the trial court's granting of summary judgment in light of his own expert's inability to determine the exact amount of damages.

Lee's challenge is grounded upon the declaration of Roger Slater ("Slater"), a Certified Public Accountant, who was hired by Lee "to review documents and financial records pertaining to this case."Appellant's Excerpts of Record, vol. II, p. 169 (Slater's Decl.). With regard to the determination of the total outstanding amount owed, Slater made the following conclusion:

In reviewing the monthly Statements of Account, and the invoices and other paperwork supplied by Mobil I am unable to determine for the proper balance of Mr. Lee's account, because various documentation supporting numerous charges and credits to Mr. Lee's account was not supplied.

Appellant's Excerpts of Record, vol. II, p. 174 (Slater's Decl.). We find Lee's solicitation of an expert, whose only real conclusion is that he was unable to determine the amount that Lee owes because of missing documents, especially unpersuasive since Lee was responsible for maintaining current, complete and accurate business records under the Franchise Agreement.[FN1] As we discussed above, notwithstanding Lee's challenge to the three invoices, Lee has not averred material evidence disputing the rest of the invoices, and therefore, the total damages that Mobil claims that Lee owes. *See Tobron Office Furniture Corp.,* 555 N.Y.S.2d at 316.

> FN1. Pursuant to Article IV, paragraph C, section 10 of the Franchise Agreement, the Dealer is obligated to maintain current, complete and accurate business records, including all records referred to in Article VII, Paragraph A, and make such records available to Mobil for inspection during normal business hours at Mobil's request. Mobil shall not disclose any such records or the contents thereof to any other party unless required by law to do so.

> Appellant's Excerpts of Record, vol. I, p. 14 (Franchise Agreement).

**a. Equitable Estoppel**

[24] Lee's last challenge with respect to the breach of contract issue is whether equitable estoppel is applicable in this case. "Equitable estoppel is defined

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1305314
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

as [t]he doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he would otherwise have had."*Heskett v. Paulig,* 722 N.E.2d 142, 145-146 (Ohio Ct.App.1999) (citation and internal quotation marks omitted); *see Hodgkins v. New England Tel. Co.,* 82 F.3d 1226, 1232 (1st Cir.1996)."The doctrine ... is designed to prevent a miscarriage of justice" and "is to be *used cautiously* because it bars the normal assertion of rights otherwise present."*Prof'l Credit Servs. of New Orleans v. Skipper,* 543 So.2d 498, 499-500 (La.Ct.App.1989) (emphasis added)."Unlike promissory estoppel, equitable estoppel is available only as a 'shield' or defense."*Estate of Hall v. HAPO Fed. Credit Union,* 869 P.2d 116, 118 (Wash.Ct.App.1994) (citations omitted). Guam has codified the doctrine of equitable estoppel in Title 6 GCA § 5106(3), which provides:

Specification of Conclusive Presumptions. The following presumptions, and no others, are deemed conclusive:

....

(3) Whenever a party has, by his own declaration, act or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act or omission be permitted to falsify it;

*6 Title 6 GCA § 5106(3) (1994). Lee correctly notes that Guam's equitable estoppel doctrine was adopted from the California Civil Procedure law (CCP § 1962). Case law applying the doctrine has set forth four elements that must be proven in an equitable estoppel analysis:
(1) the party to be estopped must be apprised of the facts;

(2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon;

(3) the party asserting the estoppel must be ignorant of the true state of the facts; and

(4) he must rely upon the conduct to his injury.

*Crestline Mobile Homes Mfg. Co. v. Pac. Fin. Corp.,* 356 P.2d 192, 195-196 (Cal.1960); *Mariano v. Guam Civil Service Comm'n Bd.,* D.C. Civ.App. No. 810052A, 1983 WL 30227 * 1 (D. Guam App. Div. June 20, 1983); *Safway Steel Prods. v. Lefever,* 256 P.2d 32, 33 (Cal.Ct.App.1953).[FN2] Moreover, because the doctrine is an affirmative defense, "the party relying upon the doctrine of equitable estoppel," which in this case is Lee, has the burden to "prove the existence of the four required elements essential to its application."*See Crestline Mobile Homes,* 356 P.2d at 195-96.

> FN2. Because Guam's equitable estoppel statute was derived from California law, case law from that state is persuasive. *See O'Mara v. Hechanova,* 2001 Guam 13, ¶ 8 n. 1. District Court of Guam Appellate Division opinions are also persuasive. *People v. Quenga,* 1997 Guam 6, ¶ 13 n. 4.

[25] In the case at bar, Lee argues that Mobil is equitably estopped from demanding payment on Lee's outstanding balance because Mobil sent him monthly account statements, which provided that he was making timely statements, notwithstanding his receipt of FHB's monthly statements that apprised him that his direct debits were being returned. We find that Lee's equitable estoppel argument fails for two reasons. First, with regards to the first and second elements in an equitable estoppel analysis, the record does not establish that Mobil, an international conglomerate, was intentionally misleading one of its franchisees by sending him account statements that did not include information on the returned direct debits. Mobil explained that the error was caused by Mobil's internal accounting system, which "was not 'directly linked' with information generated by its 'direct debit system' and information provided by the statements furnished Mobil by the Bank of Guam relating to Mobil's account with the Bank of Guam."Appellant's Excerpts of Record, vol. II, p. 170 (Slater's Decl.); *see* Appellant's Excerpts of Record, vol. II, p. 239 (Manlapaz' Decl.) (expressing "Mobil acknowledges that it did not catch numerous returned items until the fall of 1999."). However, once Mobil was made aware of the problem, it immediately notified Lee.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

[26] Second, assuming *arguendo* that Lee successfully demonstrates that Mobil was aware of the returned direct debits and nonetheless sent Lee the inaccurate monthly account statements, Lee remains unable to prove all of the requisite elements in an equitable estoppel defense. Lee must still establish that he was "ignorant of the true state of the facts" and was therefore, an innocent party. *See Scottsbluff Nat'l. Bank v. Blue J Feeds, Inc., 54 N.W.2d 392, 401 (Neb.1952)* (quotations and citations omitted) ("An essential element [of equitable estoppel] is the entire good faith and innocence of the party imposed on."); *W.E. Richmond & Co. v. Sec. Nat'l. Bank, 64 S.W.2d 863, 872 (Tenn.Ct.App.1933)*. Here, Lee does not deny receiving FHB's monthly statements, which afforded him knowledge of the true facts. *See Scottsbluff Nat'l. Bank, 54 N.W.2d at 402* (noting "no estoppel can arise where all the parties interested have equal knowledge of the facts, or where the party setting up the estoppel is chargeable with notice of the facts, or is equally negligent or at fault.") (citations omitted and quotation marks omitted); *Yancey Bros. Co. v. Dehco, Inc., 134 S.E.2d 828, 830 (Ga.Ct.App.1964)* ("[A]n estoppel of this nature cannot arise where both parties have equal knowledge or means of obtaining knowledge of the facts alleged to constitute an estoppel.") (citations omitted). More importantly, Lee is also not arguing that proper examination of the monthly statements, conducted by a prudent businessman such as himself, was insufficient to provide him notice of the returned direct debits. Lee's monthly bank statements from FHB informed him that certain direct debits were being returned as marked by "Return Item Non-Encl." At the bare minimum, Lee's disregard of the FHB statements illustrates that he did not "exercise ... reasonable diligence to learn the truth." *See Scottsbluff Nat'l. Bank, 54 N.W.2d at 402* (citations omitted).

*7 [27] Accordingly, we hold that the trial court did not err with respect to the equitable estoppel defense issue.

**B. Compliance with the PMPA**

[28] Lee argues that the trial court erred in holding that Mobil's termination of the Franchise Agreement and the notice of termination complied with the provisions of the PMPA. The PMPA, 15 U .S.C. §§ 2801 *et seq.,* "was enacted by Congress in 1978 to

establish 'minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchiser or supplier of such fuel.' " *Clinkscales v. Chevron U.S.A., Inc., 831 F.2d 1565, 1566 (11th Cir.1987)* (quoting S.REP. NO. 95-731, 95th Cong., 2d Sess. 1, *reprinted in*1978 U.S.C. C.A.N. 873). The Act reflects Congress' concern with "protecting franchisees, who generally have inferior bargaining power when dealing with franchisors, from unfair termination or nonrenewal of their franchises." *Carter v. Exxon Co., U.S.A., 177 F.3d 197, 201 (3rd Cir.1999)* (citing S.REP. NO. 95-731, at 17-19, (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 875-77); *see Pro Sales, Inc. v. Texaco, U.S.A., 792 F.2d 1394, 1399 (9th Cir.1986)* (citing S.REP. NO. 95-731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 874). In order to prevent unlawful terminations or non-renewal of franchise agreements, the PMPA "impos[es] two requirements on franchisors. First, the franchisor may terminate a franchise only for certain statutorily prescribed grounds. Second, the franchisee must be given adequate notice of the franchisor's intent to terminate the franchise." *Sun Refining & Mktg. Co. v. Rago, 741 F.2d 670, 672 (3rd Cir.1984)* (citations omitted); *see Hinkleman v. Shell Oil Co., 962 F.2d 372, 376 (4th Cir.1992)* (citations omitted).

[29] Lee argues that summary judgment was inappropriate because material facts are in dispute on the issue of whether Mobil complied with the PMPA's provisions. We disagree. The PMPA delineates specific grounds for termination and non-renewal of a franchise agreement. In particular, Title 15 U.S.C. § 2802(b)(2) provides:

For purposes of this subsection, the following are grounds for termination or nonrenewal of a franchise relationship:

(A) *A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship,* if the franchisor *first acquired actual or constructive knowledge of such failure-*

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) *A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise,* if

*8 (i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period of the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

15 U.S.C. § 2802(b)(2)(A)-(C) (2002)(emphasis added).

[30] Mobil's December 29th Notice of Termination provided as follows:

Your failure to comply with the above-mentioned provisions provides grounds for termination of our Franchise Agreement, franchise and franchise relationship under the Petroleum Marketing Practices Act (PMPA). Pursuant to 15 U.S.C. 2802(b)(2)(A) and 2802(b)(2)(B), Mobil hereby terminates its Franchise Agreement, franchise and franchise relationship with you along with all related

supplemental agreements, effective January 16, 2000.

Appellant's Excerpts of Record, vol. I, pp. 41-42 (Manlapaz' Ltr .). The termination of the franchise agreement was expressly based on subsections (A) and (B) of section 2802(b)(2). We turn to whether Mobil complied with each of these provisions.

**1. Section 2802(b)(2)(A)**

[31] To justify termination of a franchise agreement, section 2802(b)(2)(A) requires that the franchisee's breach must be a failure to comply with a provision of the franchise that is reasonable and materially significant to the franchise relationship. 15 U.S.C. § 2802(b)(2)(A) (2002). This section then gives two different timing requirements for a notice of termination: (1) a notice of termination must be furnished within 120 days of the franchisor acquiring actual or constructive notice of the franchisee's failure, if the notice is given not less than ninety days prior to the termination date (pursuant to Title 15 U.S.C. § 2804(a)); or (2) a notice of termination must be furnished within sixty days of the franchisor acquiring actual or constructive notice of the franchisee's failure, under circumstances in which it would unreasonable for the franchisor to provide notice not less than 90 days prior to the termination date (pursuant to Title 15 U.S.C. § 2804(b)(1)).15 U.S.C. § 2802(b)(2)(A) (2002).

*9 [32] In this case, Mobil furnished the December 29th Notice of Termination, which stated that the franchise would be terminated on January 16, 2000. Lee argues that the effective date of termination was not properly indicated because the December 29th Notice of Termination and the Supplemental Notice of Termination provided four dates.

[33] A notice terminating a franchise agreement must contain "the date on which such termination or nonrenewal takes effect."15 U.S.C. § 2804(c)(3)(B) (2002). The Supplemental Notice of Termination sent by Mobil to Lee on July 20, 2000 was apparently aimed at correcting any potential deficiencies in complying with the timing requirements for providing notice under the PMPA. However, the supplemental notice offers Mobil no support. The December 29, 1999 notice of termination expressly specified a termination date: "Mobil hereby terminates its Franchise Agreement, franchise and

franchise relationship with you along with all related supplemental agreements, effective January 16, 2000."Appellant's Excerpts of Record, vol. I, p. 42 (Notice of Termination). On January 16th, Lee met Manlapaz at the service station and "voluntarily turned over the site to Mobil."Appellant's Excerpts of Record, vol. II, p. 245 (Manlapaz' Decl.). Thus, there is no genuine issue of material fact that the December 29th Notice of Termination provided the January 16, 2000 date of termination, and on that date Mobil took possession of the service station and terminated the Franchise Agreement.

[34] Without dispute, the December 29th Notice of Termination gave less than ninety days notice before the termination date. Thus, our inquiry is narrowed to whether there is a genuine issue of material fact that: (1) the breach was reasonable and of material significance to the franchise relationship, and (2) Mobil complied with section 2804(b)(1).

**a. Lee's Breach of the Franchise Agreement**

[35] The December 29th Notice of Termination was based on Lee's violation of Articles I(C), II(C), and IV(A) of the franchise agreement. Appellant's Excerpts of Record, vol. I, p. 41 (Notice of Termination). Article I(C) required Lee to comply with personal performance obligations and commitments. Appellant's Excerpts of Record, vol. I, p. 4 (Franchise Agreement). Article II(C) required Lee to make payment by direct debit or other payment method specified by Mobil. Appellant's Excerpts of Record, vol. I, p. 6 (Franchise Agreement). Article IV(A) governed Lee's use of the marketing premises. Appellant's Excerpts of Record, vol. I, p. 9 (Franchise Agreement).

[36] Lee argues that the notice of termination did not mention Lee's failure to make payments for the fuel delivered to him, thus he did not have information to determine whether the termination complied with the PMPA. Appellant's Opening Brief p. 31. His argument is unconvincing. In addition to stating that Lee violated Article II(C), requiring payment of amounts due as specified by Mobil, the December 29th Notice of Termination stated:

*10 In previous warning notices, we outlined your violations and requested that you carry out the above-mentioned provisions of your franchise. Despite

those opportunities to cure, however, you have continued to violate those provisions. Your account remains past due in the sum of $226,101.68.

Appellant's Excerpts of Record, vol. I, p. 41 (Notice of Termination). This notice clearly referred to Lee's failure to pay amounts past due. Lee admitted that he learned of the unpaid debits on October 4, 1999, made payments toward his debt, and engaged in negotiations over payment proposals with Mobil throughout the months of October, November and December of 1999 and up to January 13, 2000. Appellant's Excerpts of Record, vol. I, pp. 56-62 (Lee's Decl.). Lee does not dispute that Mobil made repeated demands for payment in his meetings with Mobil officials on October 4, November 4, and November 8, 1999. Appellant's Excerpt of Record, pp. 58-60 (Lee Decl. ¶¶ 9-11, 13). Additionally, Lee does not dispute that Mobil demanded payment by letters of November 8, November 26, December 1, December 15, and December 22, 1999. Appellant's Excerpts of Record, vol. II, pp. 355, 356, 360, 363, 368 (Manlapaz Decl.).

[37] The December 29th Notice of Termination and the undisputed record show that Lee had ample knowledge of his failure to pay Mobil and his violation of Article II(C) of the Franchise Agreement. The analysis turns to whether the breach was reasonable and of material significance to the franchise relationship.

[38] Under the PMPA:

an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable includes events such as [the] *failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled* .

15 U.S.C. § 2802(c)(8) (emphasis added internal, quotation marks omitted). Thus, Lee's undisputed failure to pay all sums to which Mobil was entitled was a material breach of the Franchise Agreement and Mobil's termination of the Franchise Agreement was justified under the PMPA. The next question is whether Mobil complied with the timing requirements of the PMPA.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1305314
2004 WL 1305314, 2004 Guam 9
**2004 WL 1305314 (Guam Terr.)**

Page 9

### b. Compliance with sections 2802(b)(2)(A)(ii) and 2804(b)(1)

[39] As noted above, because Mobil's December 29th Notice of Termination gave less than ninety days notice prior to the date of termination, section 2802(b)(2)(A)(ii) applies. This section provides that the franchisor must have

first acquired actual or constructive knowledge of [the franchisee's] ... failure ... not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title,

15 U.S.C. § 2802(b)(2)(A)(ii) (2002).Section 2804(b)(1) is also applicable under the present circumstances and it provides:
*11 In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section ... such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable[.]

15 U.S.C. § 2804(b)(1) (2002). The analysis requires a determination of whether: (1) Mobil acquired actual or constructive notice of Lee's failure to pay within sixty days prior to the December 29th Notice of Termination, and (2) it would have been unreasonable for Mobil to provide ninety days notice.

[40] Lee states that Mobil acquired actual or constructive notice of the first unpaid debit as early as October of 1998 as indicated in Mobil's Final Warning letter of December 15, 1999. Appellant's Opening Brief p. 40. Thus, Lee argues that more than a year lapsed from the date Mobil's debits were first returned to the date of the December 29th Notice of Termination, in violation of the sixty day actual or constructive knowledge requirement of section 2802(b)(2)(A)(ii). We disagree. The same Mobil letter that Lee uses to support this argument also shows a series of returned debits extending to June 22, 1999. *See* Appellant's Excerpts of Record, vol. II, pp. 364, 316 (Manlapaz Decl). Each of these returned debits constituted a new breach. *See Geib v. Amoco Oil Co., 29 F.3d 1050, 1056 (6th Cir.1994).*

Moreover, it is undisputed that Mobil began demanding payment and commenced negotiations for payment plans in October of 1999.

[41] The case of *California Petroleum Distrib. v. Chevron U .S.A., Inc., 589 F.Supp. 282 (E.D.N.Y.1984),* provides a situation very similar to the one at bar. In that case, California Petroleum became indebted to Chevron for failing to pay for fuel products and Chevron spent four months attempting to negotiate payment to preserve the franchise agreement. *Id.* at 284-85. Chevron terminated the franchise agreement and gave sixteen days notice. *Id.* at 285. Because Chevron's notice of termination provided less than ninety days notice, the issue was whether Chevron had actual or constructive knowledge of California Petroleum's breach within sixty days prior to the issuance of the notice of termination. *Id.* at 287. The court held that California Petroleum's failure to pay amounts past due was an ongoing default and that each of Chevron's unsuccessful attempts to negotiate payment gave rise to a new event of noncompliance. *Id.* at 288. The court found that the last meeting between Chevron and California Petroleum, wherein the franchisee could neither give nor guarantee payment, was a new default and Chevron's notice of termination, issued within three weeks of that meeting, was within the sixty day actual or constructive knowledge requirement. *Id.*

[42] We agree in principle with *California Petroleum*[FN3] and find that Lee's failure to commence payments on December 28, 1999, pursuant to Mobil's last demand letter of December 22, 1999, constituted a new breach of the franchise agreement. Therefore, we hold that Mobil's December 29th Notice of Termination was in compliance with the sixty day actual or constructive knowledge requirement of Title 15 U.S.C. § 2802(b)(2)(A)(ii).

> **FN3.** Although *California Petroleum* is a decision of a federal district court, both Lee and Mobil argued the applicability of *California Petroleum* in their briefs. Moreover, the parties did not offer, and this court could not find, appellate case law involving the issues and factual circumstances presented in the instant case.

*12 [43] Lee next argues that the eighteen days

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

notice given by Mobil was not reasonable under section 2804(b)(1). We disagree. Mobil began negotiations with Lee in October of 1999. A series of proposals, counter-proposals and demands for payment were made through December of 1999. Thus, from October of 1999 through January 16, 2000, Lee had more than three months to attempt to make payments or arrive at a payment plan to Mobil's satisfaction. Moreover, although the last demand letter gave Lee until December 28, 1999 to begin payments, the December 29th Notice of Termination effectively gave Lee eighteen additional days to attempt to cure his deficiencies. Indeed, the record shows that Lee attempted to save the franchise on January 13 and 14, 2000. Appellant's Excerpts of Record, vol. I, pp. 67-68 (Lee Decl.). Under these circumstances, we find that Mobil's eighteen-day notice of termination was reasonable. *See California Petroleum, 589 F.Supp at 289* (finding that a sixteen-day notice of termination was reasonable after the franchisor spent four months attempting to negotiate payment); *cf. Zipper v. Sun Co., 947 F.Supp. 62, 69 (E.D.N.Y.1996)* (finding that it would have been reasonable for the franchisor to give ninety days notice, "*or at least some notice which was not effective immediately*"(emphasis added, internal quotation marks omitted).

[44] We hold that Mobil's December 29th Notice of Termination was proper under 15 U.S.C. § 2802(b)(2)(A) and the timing requirements of sections 2802(b)(2)(A)(ii) and 2804(b)(1).

## 2. Section 2802(b)(2)(B)

[45] Because we hold that termination of the Franchise Agreement was proper under section 2802(b)(2)(A), we need not reach the issue of whether it was also proper under section 2802(b)(2)(B).*See Clinkscales, 831 F.2d at 1571* (stating that a franchisor need prove "only one of the grounds for termination under the PMPA.").

## 3. Section 2801(13)(B)

[46] Lee's final argument is that his failure to pay Mobil resulted from acts which were beyond his control. Specifically, Lee cites to the PMPA definition of "failure" which provides: "The term failure does not include ... any failure for a cause beyond the reasonable control of the franchisee."15

U.S.C. § 2801(13)(B) (2002). Lee argues that Mobil's negligence in furnishing incorrect information on his monthly account statements was beyond his control and caused his nonpayment. We disagree.

[47] While better accounting practices might have enabled Mobil to discover Lee's unpaid debts sooner, Lee also had an affirmative duty to pay any amounts owed to Mobil under Article II(C) of the Franchise Agreement or risk termination under Title 15 U.S.C. §§ 2802(b)(2) and 2802(c)(8). As we noted above, Lee does not dispute receiving the FHB monthly statements of his account which afforded him knowledge of the facts. Moreover, and as also found above, Lee's disregard of the FHB statements amounted to a failure to exercise reasonable diligence. Thus, Lee's failure to make payments was not beyond his reasonable control and section 2801(13)(B) is not available to Lee as a defense.

### IV.

*13 [48] We find that there are no genuine issues of material fact that Lee breached the Franchise Agreement, that his breach was reasonable and of material significance to the franchise relationship, and that Mobil's December 29th Notice of Termination complied with the provisions of the PMPA. We hold that Mobil is entitled to summary judgment as a matter of law on these issues. The summary judgment of the trial court is hereby **AFFIRMED.**

Guam Terr.,2004.
Mobil Oil Guam, Inc. v. Young Ha Lee
2004 WL 1305314, 2004 Guam 9

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 32

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**


**H**Talbert-Siebert Ent., Inc. v. Shell Oil Co.
M.D.La.,1992.
Only the Westlaw citation is currently available.
United States District Court,M.D. Louisiana.
TALBERT-SIEBERT ENT., INC.
v.
SHELL OIL COMPANY.
**Civ. A. No. 90-552-A.**

May 8, 1992.

Samuel A. Bacot, Thibaut, Thibaut, Garrett & Bacot, Baton Rouge, La., for plaintiff.
Daniel K. Rester, Hoffman, Sutterfield, Ensenate, & Bankston, Baton Rouge, La., for Christi D. Quinn, James L. Michalak, Shell Oil Co., Houston, Tex., for defendants.

RULING ON CONSOLIDATED MOTIONS FOR SUMMARY JUDGMENT

JOHN V. PARKER, Chief Judge.
**\*1** This matter is before the court on motions by plaintiff and defendant for summary judgment. The motions are opposed. There is no need for oral argument. Jurisdiction is based on alleged diversity of citizenship. The motions have been extensively "briefed" by both sides.

Plaintiff, Talbert-Siebert Ent., Inc. (Talbert-Siebert), brings its Motion for Partial Summary Judgment on the issie of liability before the court. Talbert-Siebert alleges that it suffered damages due to defendant, Shell Oil Company's (Shell), breach of an oral contract between Talbert-Siebert and Shell to convert a full service gas station to a convenience store gas station. Alternatively, Talbert-Siebert claims damages for detrimental reliance on promises made and not kept by Shell.

Defendant Shell brings a "Motion for (1) Complete Summary Judgment, or in the Alternative, (2) Partial Summary Judgment Adjudicating Specific Facts" on the following issues:

(1) Talbert-Siebert's claim of breach of promise or oral contract to convert the premises located at 8065

Florida Blvd. ("the Florida Blvd. Station") into a convenience store facility is barred by the parol evidence rule and the operation of the integration clauses contained in the relevant Leases and Dealer Agreement;

(2) Talbert's claim that Shell breached any obligation regarding the terms of payment is barred by the express written agreement of the parties.

(3) The termination of the franchises and franchise leaseholds relating to the premises located at 8989 Greenwell Springs Road ("the Greenwell Springs Station") and the Florida Blvd. Station was effective pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. 2801-2806.

(4) It is undisputed that Talbert-Siebert is indebted to Shell in the amount of $40,260.52 for past due rental payments and goods and services delivered in connection with the Greenwell Springs Station and the Florida Blvd. Station.

(5) It is undisputed that Talbert is individually [FN1] liable to Shell for any and all indebtedness owed by Talbert-Siebert and for costs of collecting same.

(Defendant Shell's Motion pgs. 1-2).

I. PLAINTIFF TALBERT-SIEBERT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

Talbert-Siebert claims that there was an oral contract between itself and Shell to convert the Florida Blvd. station from a full service to a convenience location and that without such contract it would not have entered into the Dealer Agreement and Motor Fuel Station Lease as to the Florida Blvd. station.

It is undisputed that as to the Florida Blvd. location, there are two written contracts governing the relationship between Talbert-Siebert and Shell: the Dealer Agreement and the Motor Fuel Station Lease executed by both parties and both effective on February 6, 1988. (Defendant's Exhibit C & D).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

Page 2

Both the Dealer Agreement and the Motor Fuel Station Lease contain entirety clauses, which read as follows:

Dealer Agreement:

**\*2** 26. This Agreement, along with any related agreement(s) which may be executed contemporaneously herewith, comprises the entire agreement, and merges and supersedes all prior agreements, understandings, representations and warranties (oral or written, expressed or implied), between Shell and Dealer covering the sale and delivery of Shell products. All such prior agreements between Shell and Dealer are hereby terminated as of the effective date hereof; and Shell and Dealer hereby respectively release each other, as of the date of each party's execution hereof and to the extent permitted by law, from all claims which each now has against the other (whether or not now know to either), arising directly or indirectly out of or in connection with any such prior agreement or any sales or deliveries of any products by Shell to Dealer thereunder or otherwise, excepting however, claims of Shell against Dealer for indebtedness, reimbursement or indemnification, or relating to equipment. Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement shall be binding on Shell unless and until it is signed for Shell by a duly authorized representative.

Motor Fuel Station Lease:

17. ENTIRETY-RELEASE-EXECUTION. This Lease terminates, as of its effective date, any prior lease by Shell to Lessee of the Premises, and merges and supersedes all prior representations and agreements, and constitutes the entire contract between Shell and Lessee concerning the subject matter or in consideration hereof. Neither this Lease nor any subsequent agreement amending or supplementing this Lease shall be binding on Shell unless and until it is signed for Shell by a duly authorized representative. Subject to the foregoing provisions hereof, this Lease shall bind and benefit Lessee's heirs, estate and assigns, and Shell's successors and assigns.

Under Louisiana law, parol evidence is not admissible for the purpose of altering or negating the terms of written agreements:

Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.

La. C.C. art. 1848.

Talbert-Siebert has not alleged any vice of consent or simulation which might allow parol evidence. The integration clauses forbid consideration of any oral agreement either before or after execution of the written Dealer Agreement and Motor Fuel Station Lease.

Plaintiff urges that parol evidence is admissible in spite of the parol evidence rule and the entirety clauses because the written lease agreement "was only part of the entire oral contract", citing *Stokes v. Georgia-Pacific Corp.,* 894 F.2d 764 (5th Cir.1990).

In *Stokes,* plaintiff sued for alleged breach of an oral contract between Stokes and Georgia-Pacific wherein Georgia-Pacific allegedly committed to purchase a certain minimum amount of wood chips per week in exchange for Stoke's interesting in a larger woodchipper. The written contracts between the parties contained merger clauses and set forth the volume of chips to be delivered, the price per ton, and the time period involved. The court found that the parol evidence rule was not implicated because the written contracts "did not encompass the entire agreement between the parties ... the 30-day contracts merely regulated the volume and movement of chips." *Stokes* (supra at 768).

**\*3** The Motor Fuel Station Lease and the Dealer Agreement executed between Talbert-Siebert and Shell, unlike the 30-day contracts in Stokes (supra) are comprehensive. "Where the parties have stated the terms of their contract in t.he form of a complete integration, negotiations held prior to the written agreement are inadmissible to vary its terms." *Johnson v. Orkin Exterminating Co., Inc.,* 746 F.Supp. 627 (E.D. La.1990).

The court finds that the written lease agreement is in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

the form of a complete written integration. The contracts are comprehensive and each expressly states that it "comprises the entire agreement" (Dealer agreement) or "constitutes the entire contract between Shell and Lessee concerning the subject matter or in consideration hereof." (Motor Fuel Station Lease).

To allow parol evidence of alleged promises to convert the Florida Boulevard station would be to expand Shell's obligations beyond what the parties bargained for and would render the integration clauses a nullity.

When the party moving for summary judgment bears the burden of persuasion at trial, its showing must satisfy that burden and it must show no material facts are in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiff has failed to carry its burden of proof that an oral contract existed between the parties. Plaintiff is precluded from introducing any parol evidence of such a contract by Louisiana's parol evidence rule and the integration clause in the Motor Fuel Station Lease on the Florida Blvd. station entered into between the parties.

Plaintiff's motion for partial summary judgment for breach of oral contract is DENIED.

Defendant's motion for partial summary judgment against plaintiff on plaintiff's breach of oral contract claim is GRANTED.

## II. DETRIMENTAL RELIANCE

Plaintiff also filed a Motion for Summary Judgment on a claim of detrimental reliance. The law of detrimental reliance is stated as follows:

Cause is the reason why a party obligates himself.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous

promise made without required formalities is not reasonable.

La. C.C. art.1967.

The essential elements of a detrimental reliance claim are (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. *John Bailey Contractor, Inc. v. State Through Dept. of Transp. and Development,* 425 So.2d 326 328 (La.App. 3d Cir.1982), affd., 439 So.2d 1055 (La.1983).

In order to support its claim for detrimental reliance, Talbert-Siebert seeks to use the same alleged representations by Shell which it sought to use on the breach of oral contract claim.

**\*4** Detrimental reliance is a contractual cause of action. *Flynn v. Nesbitt,* 771 F.Supp 766, 768 (E.D. La.1991) citing *Stokes v. Georgia-Pacific Corp.,* 894 F.2d 764, 770 (5th Cir.1990). Any alleged oral representation to convert the Florida Blvd. station made by Shell to plaintiff are related to the written lease agreement between the parties and are barred by the parol evidence rule and the operation of the integration clause. That clause (supra) provides that any representations which may have been made by Shell were superseded by the written Motor Fuel Station Lease executed by plaintiff and defendant. To allow Talbert-Siebert to introduce alleged representations or promises made to it outside the fully integrated written contract in order to support an action in contract not on that written instrument, would be to vary the terms agreed to by the parties. *Johnson* (supra).

The plaintiff's motion for partial summary judgment upon the detrimental reliance claim is DENIED.

The defendant's motion for summary judgment denying plaintiff's claim for detrimental reliance is GRANTED.

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT THAT TALBERT-SIEBERT'S CLAIM THAT SHELL BREACHED ANY OBLIGATION REGARDING THE TERMS OF PAYJMENT IS BARRED BY THE EXPRESS

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

WRITTEN AGREEMENT OF THE PARTIES.

Plaintiff, Talbert-Siebert, in defense of Shell's counterclaim for declaratory relief and damages argues that it was justified in selling non-Shell brand gasoline in alleged violation of the Dealer Agreement at the Greenwell Springs station because Shell had made the terms of payment for Shell gasoline too onerous.

Essentially, plaintiff states that Shell required it to pay for deliveries of gasoline at the Greenwell Springs location with certified checks only. (Affidavit of James G. Talbert In Opposition To Shell Oil Company's Motion For complete Summary Judgment Or In the Alternative Partial Summary Judgment Adjudicating Specific Facts). This required form of payment allegedly caused hardship to Talbert-Siebert so as to justify the purchase and sale of non-Shell brand gasoline in alleged violation of the Dealer Agreement.

The Dealer Agreement between Talbert-Siebert and Shell on the Greenwell Springs station provides in pertinent part the following regarding payment:

Dealer shall pay Shell for products at the time of delivery by cash, certified or cashier's check, postal money order, or a combination of the foregoing, as Shell may specify by reasonable advance notice to Dealer ... (Defendant's Exhibit A, p. 3).

Although the form of payment required by Shell may well have been onerous, it was in accordance with the terms of the contract.

Defendant's motion for summary judgment against plaintiff's claim that Shell breached any obligation regarding the terms of payment is GRANTED.

IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT THAT THE TERMINATION OF THE FRANCHISE AND FRANCHISE LEASEHOLDS ON THE GREENWELL SPRINGS STATION AND FLORIDA BLVD. STATION WAS EFFECTIVE PURSUANT TO THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.S.C. 2801-2806.

*5 PMPA regulates the termination of petroleum franchises by franchisors. The Act "establishes protection for franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises." S.Rep. No. 731, 95th Cong.2d Sess. 17, U.S.Code Cong. & Admin. News 1978, pp. 873,877. Relevant to the Shell-Talbert-Siebert dispute, PMPA allows termination only for certain statutory grounds and requires adequate notice be given to franchisees by franchisors who intend to terminate the franchise (15 USC 2802, 2804). The franchisor who wishes to terminate or not renew a franchise has the burden of proving compliance with all the statutory requirements of PMPA (15 USC 2805(c)).

Shell asserts that under PMPA it had grounds to terminate the Dealer Agreements and the Motor Fuel Station Lease agreements with Talbert-Siebert at both the Florida Boulevard station and the Greenwell Springs station.

Shell terminated the Florida Blvd. station franchise agreements on alleged grounds that Talbert-Siebert failed to operate the marketing premises for seven consecutive days in violation of Article 18.1(c)(9) of the Dealer Agreement and Article 10.1(c)(8) of the Lease and as permitted by 15 U.S.C. 2802(b)(2)(C) & 2802(c)(9)(A).

Termination of the Greenwell Springs franchise agreements was on alleged grounds that Talbert-Siebert sold non-Shell products or mixtures of Shell products with other non-Shell products under Shell's trademarks and identifications in violation of Article 3.1 and 18 of the Dealer Agreement and as permitted by 15 U.S.C. 2802(b)(2)(A) and (C) and 2802(c)(1), (10), and (11).

For clarity, each notice of termination, its grounds and Talbert-Siebert's response will be discussed separately.

A. The Florida Blvd. Station

Shell sent Talbert-Siebert a Notice of Termination of the Motor Fuel Station Lease and Dealer Agreement on the Florida Blvd. station dated March 2, 1990. The grounds for termination were stated as follows:

We have observed that you have had no motor fuels available for sale and have not sold motor fuels from February 13, 1990, up to and including the date of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

this notice. Article 18.1(c)(9) of the Agreement and Article 10.1(c)(8) of the Lease provide that your failure to operate the service station for seven consecutive days constitutes grounds for termination or nonrenewal. Failure to operate the service station for seven consecutive days is a grounds for which termination or nonrenewal is permitted under Sections 2802(b)(2)(c) and 2802(c)-(9) of the Petroleum Marketing Practices Act (P.M.P.A.). (Defendant's Exhibit G).

Talbert-Siebert admits that it did not operate the Florida Boulevard station after about February 13, 1990, but claims that it did not do so because Shell failed to pay credit card invoices "in accordance with the agreement between Talbert-Siebert and Shell." (Plaintiff's Response to Request for Admission ## 13, Defendant's Exhibit L) However, this court has not been directed to any explanation of what that agreement may have been. Therefore, the court will not consider any such agreement to have existed.

*6 Talbert-Siebert further argues that its failure to operate the station was excused because "their (Shell's) failure to convert the station had caused ruinious ecomonic (sic) loss to Talbert-Siebert Ent., Inc. and that Shell's failure to convert the station was a prior breach of contract relieving Talbert-Siebert of any obligation thereunder." (Affidavit of James G. Talbert in Opposition to Shell Oil Company's Motion For Complete Summary Judgment or in the Alternative Partial Summary Judgment Adjudicating Specific Facts)

The Petroleum Marketing Practices Act regulates the circumstances under which a franchise relationship may be terminated and reads in pertinent part as follows:

15 U.S.C. 2802(b)(2)(C): The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-...

15 U.S.C. 2802(c): As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which

termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-...

(9) failure by the franchisee to operate the marketing premises for-

(A) 7 consecutive days, or

(B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time.

The twelve events enumerated in 15 USC 2802(c) have been judicially interpreted to provide per se reasonable grounds for termination of a franchise relationship. *Russo v. Texaco*, 808 F.2d 221 (2nd Cir.1986); *Lugar v. Texaco*, 755 F.2d 53 (3rd Cir.1985); *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670 (1984).

However, Section 2802(c)(9), failure to operate the marketing premises for a particular period of time, must be interpreted in light of PMPA's definition of "failure," in Section 2801(13) which reads as follows:

(13) The term "failure,' does not include-

(A) any failure which is only technical or unimportant to the franchise relationship; or

(B) any failure for a cause beyond the reasonable control of the franchisee.

Thus, a franchisee's failure to operate a station for seven or more days because of a reason beyond his or her reasonable control would not constitute grounds for termination under PMPA. *Sun Refining and Marketing Co. v. Rago* (supra at 673).

In viewing the evidence in the light most favorable to Talbert-Siebert, this court concludes that neither in Talbert-Siebert's pleadings nor in its affidavits has it stated any cause beyond its reasonable control that would justify its closure well beyond seven days.

Plaintiff asserts that he closed the station due to lack of money which was caused by Shell's breach of the oral contract to convert the station to a convenience

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

Page 6

location. This court has ruled that no parol evidence of an oral contract between the parties to convert the Florida Blvd. station may be received, hence no such oral contract exists.

*7 As a matter of law, economically difficult times are not an excuse for failure by the franchisee to timely pay to the franchisor all sums to which the franchisor is legally entitled. _Cantrell v. Exxon Co. U.S.A., A Div. Of Exxon Corp., 574 F.Supp. 313 (M.D. Tenn.1983)_. Likewise, economic stress does not excuse a failure to operate the station for a period greater than seven days.

Shell has met its burden of proof that the termination of the Florida Blvd. franchise was in accordance with PMPA.

Defendant's motion for summary judgment that the termination of the Florida Blvd. franchise relationship with Talbert-Siebert was effective under PMPA is GRANTED.

B. Greenwell Springs Station

Shell sent Talbert-Siebert a Notice of Termination of the Motor Fuel Station Lease and Dealer Agreement on the Greenwell Springs station on May 18, 1990. The notice sets forth the following grounds for termination:

Your attention is called to Article 3.1 of the Agreement which prohibits you from selling under Shell's Identifications any products other than Shell products or any mixture or adulteration of any of the Shell products with each other or with any other product or material. Your further attention is called to Article 18 of the Agreement which permits Shell to terminate the Agreement if you violate any reasonable and materially significant provision of the Agreement; if you commit or permit any violation of law, fraud, or criminal misconduct involving the business conducted on or from the Premises; or cause or permit any adulteration, commingling or contamination of, or misrepresent any product sold at or from the Premises. Your further attention is called to 15 U.S.C. 2802(b)(2)(A) and (C) and 28G2 (c)(1), (10), and (11) of the Petroleum Marketing Practices Act which permit the franchisor to terminate a franchise for the reasons herein stated and to other applicable federal and state laws which prohibit

adulteration and misbranding of products offered for sale to the public. (Defendant's Exhibit E).

Talbert-Siebert has admitted that it did sell gasoline to the public which was not Shell branded gasoline on or about May 3, 1990 and thereafter. (Affidavit of James G. Talbert in Opposition to Shell Oil Company's Motion for Complete Summary Judgment or in the Alternative Partial Summary Judgment Adjudicating Specific Facts)

Talbert-Siebert admitted that the non-Shell branded gasoline was mixed with Shell-branded gasoline in the tanks. (Talbert's Response to Request for Admission No. 7, Defendant's Exhibit L)

Furthermore, Talbert-Siebert admits that Shell brand identifications were displayed at the Greenwell Springs station on May 4, 1990 and thereafter, except for the Shell pectin on the gas pumps. (Talbert-Siebert's Response to Request for Admission No. 5, Defendant's Exhibit L)

Talbert as a defense "denies that under his interpretation that it was sold under Shell brand identifications." (Talbert Response to Request for Admission No. 6, Defendant's Exhibit L)

*8 Section 1. (i) of the Dealer Agreement provides that, "_Shell's Identifications_ shall mean any of Shell's trademarks, brand names, service marks or color schemes." (Defendant's Exhibit A)

In a deposition taken on May 28, 1991, James G. Talbert testified that he covered the Shell pectin on the pumps, but the Shell identification sign remained up, the brand name remained on the pump, and the Shell color scheme was visible on the pump. Talbert offered in explanation that he did not realize that the Shell name was trademarked and that the sign was left up because he was selling other Shell products, such an antifreeze from the station. (Shell's exhibit Q)

Under the Petroleum Marketing Practices Act an "event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" under 15 U.S.C. 2802(b)(2)(C) is willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

15 U.S.C. 2802(c) (10).

The jurisprudence has interpreted the term "willful" alternatively to mean an adulteration, mislabeling, or misbranding which is voluntary and done either with intentional disregard of, or plain-indifference to, the requirements of the franchise agreement. *Retsieg Corp. v. Arco Petroleum Products Co.*, 870 F.2d 1495 (9th Cir.1989) and as "a conscious, intentional, deliberate and voluntary act. Proof of willfulness under this provision does not require proof of bad motive, nor does evidence of good faith negate the willfulness of an act covered by said provision." *Gilderhaus v. Amoco Oil Co.*, 1980-81 Trade Cas. (CCH) 63,648, 77,495, 1980 WL 1956 (D. Minn. July 30, 1980).

These definitions appear to be at odds with each other: the *Retsieg Corp.* (supra) definition seems to require some knowledge of the commission of an act of misbranding, while the *Gilderhaus* opinion merely requires an intentional act of misbranding and any belief of the franchisee as to whether he misbranded is irrelevant. In the *Retsieg* (supra) case, the issue was whether the franchisee knew in fact that the *gasoline* he was selling was in violation of his franchise agreements. In other words, it was disputed whether the franchisee knew that the gasoline being delivered to him and subsequently sold to the public was in fact not branded gasoline. In *Gilderhaus* (supra) the franchisee clearly knew that the *gasoline* he was selling was not branded gasoline, but was allegedly unaware that his selling it was a violation of the law between the parties contained in the franchise agreement.

This court finds that the instant case parallels the *Gilderhaus* (supra) situation. Talbert-Siebert clearly intended and knew that it was selling misbranded gasoline. (See Talbert deposition and admissions, supra). That Talbert-Siebert may have been unaware that its efforts to cover the Shell pectin were insufficient is tantamount to lack of awareness of a violation of the franchise agreement. Thus, plaintiff's alleged good faith belief that it debranded the pumps (assuming debranding would allow plaintiff to sell non-Shell fuel) does not serve to make its misbranding nonwillful.

**\*9** The court finds that plaintiff, Talbert-Siebert, sold misbranded fuel from the Greenwell Springs station

in violation of the Dealer Agreement and that termination of the franchise was proper under 18 U.S.C. 2802(b)(2)(C) and 2802(c)(10). The motion for summary judgment in favor of defendant, Shell, that termination of the franchise relationship between Talbert-Siebert and Shell as to the Greenwell Springs station was effective under the PMPA is GRANTED.

V. DEFENDANT SHELL OIL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF HOLDING JAMES G. TALBERT INDIVIDUALLY LIABLE TO ANY AND ALL INDEBTEDNESS OWED BY TALBERT-SIEBERT AND FOR COSTS OF COLLECTING SAME.

It is undisputed that on January 1, 1988, James G. Talbert executed a guaranty agreement in favor of Shell Oil Company in consideration of Shell's extension of credit to Talbert-Siebert.

Talbert, individually, interposes as defenses the following:

(a) The agreement has no effect as it was never accepted by Shell;

(b) That the guaranty referred to is incomplete;

(c) That no contract of guaranty ever came into existence between James G. Talbert and Shell;

(d) in the event and only in the event that the guaranty is found to be effective as a contract, that the guaranty was only given in connection with and for the benefit of the Florida Boulevard location it was not intended by James G. Talbert and/or Shell to be a guaranty for any other indebtedness or obligation except as might arise out of operation of that location.

Talbert-Siebert's first argument has no merit. No acceptance by Shell is required.

Suretyship is established upon receipt by the creditor of the writing evidencing the surety's obligation. The creditor's acceptance is presumed and no notice of acceptance is required.

La. C.C. art. 3039.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**

Talbert's assertion that the agreement is incomplete is unclear and not supported by argument. Talbert admits that the signature on the guaranty is his. (Defendant's exhibit K, 10). The guaranty is complete and Talbert's assertion that it is not is without merit. i

Like Talbert's assertion that the guaranty is incomplete, the assertion that the guaranty was never in existence between the parties is unsupported by argument and is hereby dismissed as without merit.

Thus, this court finds that the guaranty is effective as the law between the parties. *Louisiana Nat. Leasing v. Family Pools, Inc.,* 345 So.2d 480 (La.1977).

Contracts of guaranty are subject to the same general rules of interpretation as contracts in general. *Ferrell v. South Central Bell Tel. Co.,* 403 So.2d 698 (La.1981). The contract clearly states that "Guarantor, guarantees payment of "all indebtedness heretofore or hereafter incurred by Buyer to Shell." The contract identifies "Guarantor" as James G. Talbert. The guaranty contract further states that "Buyer" is Talbert-Siebert Ent., Inc. of 8065 Florida Blvd., Baton Rouge, La. 70806. (Defendant's Exhibit H). Talbert claims that he thought when he signed the guaranty it was limited to the debts Talbert-Siebert incurred at the Florida Blvd. station. Shell argues that the phrase "of 8065 Florida Blvd., Baton Rouge, LA 70806" is merely an address and no such limitation was intended. (Defendant's Exhibit J, excerpts of Deposition of James Talbert, p. 142). Thus, whether the guaranty was intended by Talbert and Shell to cover debts generated by Talbert at the Greenwell Springs location is ambiguous. The undisputed facts are not sufficient to establish the intent of the agreement.

**\*10** However, the guaranty agreement is a valid contract between the parties and it is undisputed that James G. Talbert intended to guarantee at least the debts Talbert-Siebert incurred in the operation of the Florida Blvd. station. (Defendant's Exhibit J, excerpts of Deposition of James Talbert, p. 142).

Partial summary judgment in favor of Shell holding James G. Talbert personally liable for all debts of Talbert-Siebert arising out of the operation of the Florida Blvd. station is GRANTED.

Partial summary judgment in favor of Shell holding

James G. Talbert personally liable for all debts of Talbert-Siebert arising out of the operation of the Greenwell Springs station is DENIED.

VI. DEFENDANT SHELL'S MOTION FOR SUMMARY JUDGMENT ON SUMS OWED BY TALBERT-SIEBERT FOR GOODS AND SERVICES DELIVERED AND RENTAL ON THE GREENWELL SPRINGS AND FLORIDA BLVD. STATIONS.

A. Goods and Services Delivered

As a preliminary matter, counsel for Talbert-Siebert has conceded that Talbert-Siebert does not dispute the amount owed for goods and services delivered to it at both locations. (Plaintiff's memorandum of law in opposition to and reply to Shell Oil Company's Motion in Support of (1) Complete Summary Judgment, or in the Alternative (2) Summary judgment adjudicating specific facts, unnumbered pages, Section IV)

Therefore, partial summary judgment in favor of Shell for goods and services owed by Talbert-Siebert to Shell for goods and services delivered at Greenwell Springs and Florida Blvd. is GRANTED.

B. Rentals

Material factual disputes surround the circumstances of vacating the premises.

Summary judgment in favor of Shell for rentals due on Greenwell Springs and Florida Blvd. station is DENIED.

FN1. Defendant, Shell, has filed a "counterclaim" purportedly asserting claims against Talbert-Siebert and James G. Talbert individually. Technically, such a pleading is not in accordance with the Federal Rules of Civil Procedure since Talbert individually is not a plaintiff. Since Talbert individually has filed an answer to the "counterclaim, " he has waived service of process and the court will consider the claim against him.

M.D.La.,1992.
Talbert-Siebert Ent., Inc. v. Shell Oil Co.
Not Reported in F.Supp., 1992 WL 119916

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9
Not Reported in F.Supp., 1992 WL 119916 (M.D.La.)
**1992 WL 119916 (M.D.La.)**


(M.D.La.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.